**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA
450 Fifth Street, NW
Washington, DC 20530;


     *Plaintiff,*

      v.

AT&T INC.
208 South Akard Street,
Dallas, TX 75202;

DIRECTV GROUP HOLDINGS, LLC
2260 E. Imperial Hwy,
El Segundo, CA 90245; and

TIME WARNER INC.
One Time Warner Center,
New York, NY 10019;

     *Defendants.*

**COMPLAINT**

AT&T/DirecTV is the nation's largest distributor of traditional subscription television.

Time Warner owns many of the country's top TV networks, including TNT, TBS, CNN, and

HBO.  In this proposed $108 billion transaction—one of the largest in American history—AT&T

seeks to acquire control of Time Warner and its popular TV programming.  As AT&T has

expressly recognized, however, distributors that control popular programming "have the

incentive and ability to use (and indeed have used whenever and wherever they can) that control

as a weapon to hinder competition."  Specifically, as DirecTV has explained, such vertically

integrated programmers "can much more credibly threaten to withhold programming from rival

1

[distributors]" and can "use such threats to demand higher prices and more favorable terms."

Accordingly, were this merger allowed to proceed, the newly combined firm likely would—just

as AT&T/DirecTV has already predicted—use its control of Time Warner's popular

programming as a weapon to harm competition.  AT&T/DirecTV would hinder its rivals by

forcing them to pay hundreds of millions of dollars more per year for Time Warner's networks,

and it would use its increased power to slow the industry's transition to new and exciting video

distribution models that provide greater choice for consumers.  The proposed merger would

result in fewer innovative offerings and higher bills for American families.

 For these reasons and those set forth below, the United States of America brings this civil

action to prevent AT&T from acquiring Time Warner in a transaction whose effect "may be

substantially to lessen competition" in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## I. INTRODUCTION

 1. American consumers have few options for traditional subscription television.  For

the nearly one hundred million American households that pay a monthly bill to traditional video

distributors (cable, satellite, and telephone companies), this means paying higher prices year

after year and waiting on hold to hear why a service technician is running late or why their

monthly bill has skyrocketed.[1]  For traditional video distributors, this lack of competition means

huge profit margins.  Indeed, AT&T/DirecTV describes the traditional pay-TV model as a "cash

cow" and "the golden goose."

---

[1] Indeed, the Federal Trade Commission sued DirecTV for deceptively advertising its rates and misleading
consumers about the cost of its satellite television services and cancellation fees by not clearly disclosing that the
cost of the package will increase by up to $45 more per month in the second year, and that early cancellation fees of
up to $480 apply if consumers cancel the package before the end of the two-year period. *See FTC v. DirecTV LLC*,
N.D. Cal., case number 4:15-cv-01129 (March 11, 2015).

2.      In many industries, online distribution has enhanced consumer welfare by enabling disruptive entry.  In an effort to challenge the traditional subscription television model, online video distributors are emerging and increasingly are a welcome option for consumers. Some consumers subscribe to an online video service like Netflix or Amazon Prime, often in addition to their traditional TV subscription.  And a small but growing minority of consumers are replacing their traditional television subscription altogether with new choices of online services like Sling TV, which generally offer American consumers packages with fewer channels than a typical cable or satellite bundle, but at more affordable prices and without long-term commitments.  As these online services improve and expand, they bring increasing competition to traditional video distributors—competition that benefits consumers, but which AT&T/DirecTV fears will disrupt the industry and deteriorate its high profit margins.

3.      If allowed to proceed, this merger will harm consumers by substantially lessening competition among traditional video distributors and slowing emerging online competition. After the merger, the merged company would have the power to make its video distributor rivals less competitive by raising their costs, resulting in even higher monthly bills for American families.  The merger also would enable the merged firm to hinder the growth of online distributors that it views as a threat to the traditional pay-TV model.  As AT&T/DirecTV's strategic merger documents state, after the merger, disruption need not occur immediately—the merged firm can "operate [its] pay-TV business as a 'cash cow' while slowly pivoting to new models."

4.      *First*, the merger would result in higher prices for consumers of traditional subscription television because it would give the merged company the power to raise the prices that competing video distributors pay to it for Time Warner's popular TV networks for no reason

other than that those networks would now be owned by AT&T/DirecTV.  Time Warner's

networks are some of the most valuable in the country.  As Time Warner has told its

shareholders, its Turner networks include three of the top five basic cable networks; Turner also

has one of the top news networks.  And HBO is the "[w]orld's leading premium pay TV brand."

Time Warner's networks own the rights to hit shows such as *Game of Thrones*, as well as the

current and future rights to "marquee sports programming," including NCAA March Madness,

substantial numbers of regular season and playoff games of Major League Baseball and the

NBA, as well as the PGA Championship.  AT&T has concluded that Time Warner's networks

have "world-class ability to attract and sustain audiences with premium content."  Because these

popular networks drive ratings and attract customers, video distributors consider it extremely

important to carry them.  As Time Warner stated in its Annual Report for 2016, its most popular

Turner networks reach over 91 million households—of the nearly 100 million households with

traditional video distribution subscriptions.  Time Warner's own internal documents note the

"high proportion of 'must carry' networks" in its Turner portfolio, which "are a critical

component of the basic cable bundle."

5.       Nonetheless, there is currently a limit to what video distributors will agree to pay

Time Warner for its Turner networks.  If, in negotiations, Time Warner seeks too high a price for

the Turner TV networks, the video distributor across the table may walk away.  Without a deal,

Time Warner loses monthly payments from the video distributor and advertising revenue—and

gains nothing in return.  This merger, if allowed, would change that.  After the merger, if the

merged company raised prices of the Turner networks to the video distributor and no deal were

reached, resulting in a blackout of such networks, the merged company would still lose monthly

payments and advertising revenue from the video distributor with whom it could not reach a

deal, but, importantly, it would now get an offsetting benefit.  Because the video distributor walking away from a deal with the merged company would lose access to Turner's popular programming, some of the video distributor's valuable customers would be dissatisfied and switch to a competing video distributor.  Some of those departing customers would sign up with AT&T/DirecTV, bringing with them significant new profits for the merged company.  This improvement in Time Warner's best alternative to a deal resulting from the proposed merger— and therefore in its negotiating leverage—would give the merged firm the ability to credibly demand higher prices than it otherwise would.

6.      The merger would thus substantially lessen competition by giving the merged company the additional leverage to charge its rival video distributors higher prices for its networks than Time Warner's current market power would otherwise allow, making those distributors less able to compete effectively with the merged company.  This harm to competition is based on a well-accepted understanding within the industry.  Indeed, tellingly, both AT&T and DirecTV have recognized in public filings and internal documents that video distributors that own popular programming have the power and the incentive to harm competition.  Congress also expressed such a concern by recognizing that "[v]ertically integrated program suppliers also have the incentive and ability to favor their affiliated cable operators over nonaffiliated cable operators and programming distributors using other technologies."[2]

7.      Because video distributors aim to cover programming cost increases by raising the prices they charge their customers, the higher prices video distributors would pay for Turner TV networks as a result of this merger would directly hit the pocketbooks of American consumers.  The merger would also give the merged firm the incentive and ability to use its

---

[2] Cable and Television and Consumer Protection Act of 1992, P.L. 102-385 § 2(a)(5).

control of HBO—which rival video distributors have used to attract customers—to lessen competition among video distributors.  In sum, as DirecTV itself has explained: "[V]ertical integration of programming and distribution can, if left unchecked, give the integrated entity the incentive and ability to gain an unfair advantage over its rivals.  This ultimately results in higher prices and lower quality service for consumers."

8.      *Second*, the merger would enable the merged company to impede disruptive competition from online video distributors—competition that has allowed consumers greater choices at cheaper prices.  Although it has concluded that "[t]raditional Pay-TV will be a cash cow business to AT&T for many years to come," AT&T/DirecTV fears future "disruption" from emerging competitors.  Consumers are beginning to see new video distribution offerings.  For example, online distributors like Sling TV offer less expensive alternatives to traditional subscription television that do not require yearly contracts or cable set top boxes, but this merger would impede that innovation.  AT&T/DirecTV perceives online video distribution as an attack on its business that could, in its own words, "deteriorate[] the value of the bundle."  Accordingly, AT&T/DirecTV intends to "work to make [online video services] less attractive."  AT&T/DirecTV executives have concluded that the "runway" for the decline of traditional pay-TV "may be longer than some think given the economics of the space," and that it is "upon us to utilize our assets to extend that runway."  This merger would give the merged firm key, valuable assets, empowering it to do just that.

9.      Time Warner's Turner networks are extremely important for many emerging video distributors—its own analysis ranks those networks as tied for second behind only Disney in their ability to attract customers to emerging platforms.  Turner benefits from the traditional pay-TV model but has also, previous to the announcement of this merger, secured a position for

its networks as "anchor tenants" for virtual MVPDs, which are growing competitors to AT&T/DirecTV.  After the merger, the merged firm would likely use Turner's important programming to hinder these online video distributors—for example, the merged firm would have the incentive and ability to charge more for Turner's popular networks and take other actions to impede entrants that might otherwise threaten the merged firm's high profit, big-bundle, traditional pay-TV model.  The merger would also make oligopolistic coordination more likely.  For example, the merger would align the structures of the two largest traditional video distributors, who would have the incentive and ability to coordinate to impede competition from innovative online rivals and result in higher prices.  In short, the merger would help the merged firm's bottom line by extending the life of the old pay-TV model, but harm consumers who are eager for new innovative options.

10.     Section 7 of the Clayton Act prohibits mergers if "the effect of such acquisition may be substantially to lessen competition."  This includes vertical mergers, as Congress made plain in the 1950 amendments to the Clayton Act.  A vertical merger may violate the antitrust laws where the merging parties would—by means of their control of an input that their competitors need—have the incentive and ability to substantially lessen competition by withholding or raising the price for that input.  The competitive conditions in this industry and specific facts of this vertical merger make it unusually problematic.  It is well-recognized within the industry that popular programming is something traditional video distributors need to compete effectively.  AT&T itself has previously stated that access to some of the most popular television programming is "critical to preserve and promote competition and diversity in the distribution of video programming."  This merger would give the combined firm control over AT&T/DirecTV's massive video, wireless, and internet distribution network as well as Time

Warner's popular and valuable TV networks and studio.  It would give the merged firm the power to make its current and potential rivals less competitive.  The effect of the merger would likely be substantially to lessen competition.  It would violate the antitrust laws and therefore should be enjoined.

## II. INDUSTRY BACKGROUND

11.     Popular television shows like *The Big Bang Theory* generally travel through three layers of production and distribution: A studio like Warner Bros. creates the show; a programmer like Turner or a broadcaster like CBS purchases the right to include the show on one of its networks; and a video distributor like AT&T/DirecTV or Comcast purchases the right to include the network in one or more packages that it sells to customers.

### A.  *Programmers bargain with video distributors to have their networks carried.*

12.     Programmers make money by licensing their networks to video distributors and by selling air time for advertisements shown on their networks.  Accordingly, programmers generally seek to have their networks carried by many video distributors.  They typically reach multi-year agreements under which video distributors pay programmers monthly, per-subscriber license or "affiliate" fees for a bundle of networks owned by the programmer.

13.     Programmers' arms-length negotiations with video distributors involve a give and take based on the relative bargaining leverage of the parties, which is informed by the options available to each party in the event a deal is not reached.

14.      Video distributors make money by receiving monthly subscriber fees from their customers and need to carry popular programming to attract those customers.  So programmers with popular networks that carry hit shows and live sports have more bargaining leverage with video distributors than do programmers with less popular networks.  Programmers also gain

revenue through advertising, the price of which is typically based on the number of consumers watching their networks. Video distributors with large numbers of subscribers generally have more bargaining leverage and often pay programmers less per subscriber to carry their networks than do video distributors with fewer subscribers.

### B. Video distributors include traditional MVPDs, virtual MVPDs, and SVODs.

15. <u>MVPDs.</u> Multichannel video programming distributors (or "MVPDs") include cable companies such as Comcast, satellite broadcasters such as DirecTV, and offerings from telephone companies such as AT&T's U-Verse. They pay license fees to carry the programmers' networks, which the MVPDs generally bundle into different packages to sell to consumers. For example, AT&T/DirecTV's recent offerings include both a high-priced "premier" bundle including 325 channels for $125 per month for the first twelve months and a lower-priced "select" bundle with 150 channels for $50 per month for the first twelve months.

16. <u>Virtual MVPDs.</u> Virtual MVPDs employ a similar business model to traditional MVPDs but deliver their channels to consumers over the internet. Some virtual MVPDs offer so-called "skinny bundles"—cheaper packages with fewer channels than an MVPD would typically offer. For example, Sling TV currently offers a package of 30 channels for $20 a month. They also generally require less equipment—no need for a cable set-top box or a satellite dish—and do not require a long-term contract.

17. <u>SVODs.</u> Subscription video on demand services (or "SVODs") like Netflix and Amazon Prime similarly offer their programming online, but they generally do not offer live programming. Rather, consumers using an SVOD generally can choose to watch the TV shows or movies in the SVOD's catalogue "on demand," i.e., at any time upon their request. SVODs in some instances create their own TV shows, but they most commonly purchase the rights to

previously aired television shows and films from studios such as Warner Bros.  Unlike MVPDs and virtual MVPDs, however, SVODs typically do not carry live sports programming or live news telecasts.

### C.  *Sports programming is increasingly valuable to MVPDs and virtual MPVDs.*

18.     Due in part to the emergence of SVODs, which offer television shows and movies but generally do not offer live sports (or news) programming, the ability to offer live programming is becoming increasingly important to MVPDs and virtual MVPDs.  The value of live sports programming in particular is enhanced by the fact that viewers are more likely to watch it live and not skip through commercials, and it is a limited resource that—due to existing, exclusive, long-running contracts—generally will not become available again for purchase by programmers for several years. As a Time Warner document explains: "Across the industry, most of the remaining top sports rights are locked up into the next decade."

19.     AT&T's internal documents acknowledge that programmers with live sports events "have leverage to command affiliate fees beyond their viewership shares."  Similarly, discussing its sports programming, which includes long-term contracts to host critical portions of important events from MLB (through 2021), NBA (through 2025), and NCAA March Madness (through 2032), Time Warner concluded in a report to its Board of Directors: "[T]hese sports rights provide us with the base of **must-watch** content that should enable us to achieve our targeted **rate increases**." (Emphasis added.)

### III. DEFENDANTS AND THE PROPOSED MERGER

20.     AT&T is the world's largest telecommunications company.  It is a Delaware corporation headquartered in Dallas, Texas.  AT&T was established in 1885 and in 1899 became the parent of The Bell Telephone Company, which Alexander Graham Bell founded in 1877.

AT&T maintained a monopoly in the provision of local telephone services until 1982, when it agreed to divest the portions of its business relating to local telephone services to settle an antitrust lawsuit filed by the Department of Justice.  Pursuant to that settlement, SBC Communications Inc. was spun-off from AT&T on January 1, 1984.  In 2005, one of SBC Communications' subsidiaries merged with AT&T, and in connection with the merger the name of the company was changed to AT&T, Inc.  In 2009, AT&T agreed to pay more than $2 million to settle a claim that it had violated a consent decree and court order related to its 2007 acquisition of Dobson Communications Corp.  In 2011, AT&T attempted to purchase T-Mobile, but abandoned the transaction after the Department of Justice filed suit alleging that the merger violated the antitrust laws.

21.     Today, AT&T is the country's second largest wireless telephone company, third largest home internet provider, and one of the largest providers of landline telephone services.  It is also the country's largest MVPD, with more than 25 million subscribers.  It has three MVPD offerings: (1) DirecTV, a satellite-based product with almost 21 million subscribers that it acquired through a merger in 2015; (2) U-Verse, a product which uses the local AT&T fiber optic and copper network and has almost 4 million subscribers; and (3) DirecTV Now, its new online video product (virtual MVPD) with almost 800,000 subscribers.

22.     DirecTV is a subsidiary of AT&T.  It is a Delaware corporation, with its headquarters in El Segundo, California.  As noted above, it has almost 21 million subscribers to its satellite-based MVPD product, which is offered nationwide.  Earlier this year, DirecTV agreed to certain conditions to settle an antitrust lawsuit filed by the Department of Justice, which alleged that DirecTV acted as the ringleader of illegal information-sharing agreements

with three of its rival competitors to obtain bargaining leverage in negotiations to carry the Los

Angeles Dodgers' cable sports channel.

23.     Time Warner, Inc. is a Delaware corporation headquartered in New York, New

York.  It is a media company with essentially three business units: (1) Turner Broadcasting

System, Inc., whose most popular networks include TNT, TBS, CNN, and Cartoon Network; (2)

Warner Bros. Entertainment, Inc., which is one of the country's major television and movie

studios; and (3) the Home Box Office, Inc. (HBO) premium network, which also owns Cinemax,

and in total has almost 50 million subscribers (the vast majority of whom access HBO through an

MVPD).

24.     The Turner networks—with their mix of live sports, live news, and entertainment

content—are consistently highly rated and highly compensated, and have market power.  As

Time Warner has stated, its most popular Turner networks reach more than 91 million

households—of the nearly 100 million households that subscribe to traditional subscription

television.  AT&T has described Turner programming as including "'must have' premium sports

rights," and Turner has significantly and consistently increased the prices it charges MVPDs for

its networks each of the last three years.  There are few equally important and popular substitutes

for these networks, and they are sufficiently unique and attractive that video distributors that do

not carry them risk losing a substantial number of current and potential subscribers to rival

MVPDs and virtual MVPDs that do.

25.     HBO is the "World's #1 premium cable network," and also has market power.

HBO is the "[b]est brand name, most recognized" premium network with the "[o]verall best

collection of content."  AT&T's own "[p]remium network affiliate revenue [is] dominated by

HBO," which "earns more than 50% of all premium network affiliate revenue."  HBO is also a

"[p]roven acquisition driver."  HBO markets itself to MVPDs as playing "a key role in attracting and retaining" subscribers, stating that its "effectiveness in driving sales of other products is well established."

26.    On October 22, 2016, AT&T agreed to purchase Time Warner.  Including debt, the transaction is valued at $108 billion.  Tellingly, among the rationales for a vertical merger set forth in AT&T's strategic merger documents are:

- "Improved positioning vis-à-vis cable rivals and [online] players";

- "Support margins via vertical integration"; and

- "Advantage ability to shape future of video ecosystem."

### IV. RELEVANT MARKETS

27.    This merger would substantially lessen competition among all distributors of professionally produced, full-length video programming subscription services to residential customers in the United States.  As a result, consumers in relevant local geographic markets throughout the country in this "All Video Distribution" product market—which includes MVPDs, virtual MVPDs, and SVODs—would see higher monthly TV bills and less innovative TV offerings.  If one company owned all video distributors in a geographic market, it would profitably raise prices significantly on at least one product.  The All Video Distribution market constitutes a relevant antitrust product market and line of commerce under Section 7 of the Clayton Act.

28.    The distribution of video programming by MVPDs and virtual MVPDs also constitutes a relevant antitrust product market and line of commerce under Section 7 of the Clayton Act.  This "Multichannel Video Distribution" market is a submarket within the broader All Video Distribution product market.  The video distribution industry and American consumers

recognize this submarket, whose participants charge different prices and serve different customer needs than do distributors of other video programming.  If one company owned all MVPDs and virtual MVPDs in a geographic market, it would profitably raise prices significantly on at least one product.  AT&T/DirecTV is the largest participant in this product market in the United States.  It has nationwide presence and has a large market share in many regions across the country.  For example, AT&T/DirecTV has more than 40 percent of MVPD subscribers in at least 18 local Designated Market Areas.

29.      The relevant product markets in which to evaluate this merger are the sale of subscription video programming in the All Video Distribution and Multichannel Video Distribution product markets, and the relevant geographic markets are local geographic markets across the country.  Consumers seeking to purchase video distribution services must choose from among those providers that can offer such services directly to their home.  Direct broadcast satellite providers, such as DirecTV, can serve customers almost anywhere in the United States. In addition, online video distributors are available to any consumer with high-speed internet service, such as broadband, sufficient to deliver video of an acceptable quality.  By contrast, traditional wireline distributors, such as cable (e.g., Comcast, Cox, and Charter) and telephone companies (e.g., AT&T and Verizon), serve only those particular geographic areas where they have deployed network facilities.  A customer cannot purchase video distribution services from a wireline distributor that does not operate network facilities that can connect to that customer's home.  For example, a customer within a Cox cable franchise area typically cannot purchase video distribution service from Comcast.

30.      Because consumers within a local area have the same options available to them for video programming, it is appropriate to treat such similarly situated consumers the same and

aggregate them into local geographic markets.  For example, a cable service area that only offers consumers a choice among three options (a cable company and two satellite companies) would be a local market.  If a cable service area overlapped with the area in which a telephone company offers video distribution services (such as AT&T's U-Verse offering), that area of overlap would be a local market in which consumers are offered a choice among four options: a cable company, a telephone company and two satellite companies.  Using available data generally allows measurement of these local markets by zip code.

## V. ANTICOMPETITIVE EFFECTS

31.    The proposed merger would substantially lessen competition and harm consumers in these local geographic markets in both the All Video Distribution and the Multichannel Video Distribution product markets.  Both AT&T/DirecTV's video distribution services and Time Warner's TV networks are available nationwide, so the harm would occur throughout the country.  In both relevant product markets, the merger would give the merged company the market power to weaken competing distributors' ability to compete by raising their costs, would allow the merged company to impede emerging and growing rivals, and, furthermore, would result in increased likelihood of oligopolistic coordination.

*A.  The merger would give the merged company the power to lessen competition and harm consumers in the Multichannel Video Distribution and the All Video Distribution markets by increasing the prices its rival MVPDs and virtual MVPDs pay for Turner's networks and impeding their use of HBO to attract customers.*

32.    Losing even a modest number of customers can have a major financial impact on an MVPD.  The margins these video distributors earn from their customers are significant, and it is expensive and difficult for these distributors to obtain new customers or win back prior customers once they have cancelled their subscription or switched to a competitor.

33.    Accordingly, when an MVPD considers the price it is willing to pay a programmer to carry its networks, it generally takes into account the extent of potential subscriber losses if it did not carry those networks.  In fact, before negotiating with programmers for their networks, and to better understand their best alternative option if negotiations break down, MVPDs have conducted analyses to determine the percentage of likely subscriber loss that would occur if they did not carry the particular networks for which they are bargaining (a "blackout").  These analyses have concluded that, for certain popular networks, the subscriber loss rate would be significant and the subscriber losses would continue over time if the video distributor continued not to carry the networks at issue.  That such subscriber losses can be a significant concern for an MVPD is confirmed by DirecTV's analysis of a potential blackout with a different substantial programmer.  In a December 2014 presentation prepared for the Board of Directors, DirecTV's Economic Impact Study estimated that subscriber losses from a blackout of a particular programmer's channels would cost it $10.5 billion over 6 years.

34.    In the event an MVPD or virtual MVPD does not carry a group of popular networks, most customers who leave that distributor in response to that blackout will look elsewhere for a comparable video distributor that still offers those networks.  Because AT&T/DirecTV has an MVPD that it offers throughout the United States, it stands to gain a significant number of new customers in the event a rival MVPD or virtual MVPD is foreclosed from carrying certain popular networks that the merged company continues to carry—i.e., a blackout.

35.    Accordingly, were this merger to go forward, the merged company could "more credibly threaten to withhold" Turner's popular programming—including the hit shows and live sporting events carried by TNT, TBS, and Cartoon Network—as leverage in its negotiations with

MVPDs and virtual MVPDs.  In a given negotiation, both the merged company and a rival

MVPD—for example, a cable company—know that if the merged company were to walk away

from the bargaining table and the Turner networks were to go dark on that cable company's

offerings, a significant number of the cable company's customers would cancel their

subscriptions, and the cable company would gain fewer new subscribers during the blackout.  In

fact, MVPDs have done studies to determine the subscriber loss that would occur if they did not

have the popular networks Time Warner owns.  Unsurprisingly, given the popularity of Turner's

networks—which carry hit shows and important live sports events—these studies confirm that

the anticipated subscriber loss rate is likely to be significant.  In addition, because the merged

company would know beforehand that the rival MVPD would soon lack Turner programming,

the merged company would be in a particularly strong position, as a result of the merger, to

target the rival MVPD's customers with advertisements and telephone calls urging them to

subscribe to AT&T/DirecTV's television offerings.

    36.    The merged company's bargaining leverage as a seller of programming would

thus increase, and not through the offering of lower prices or a superior product or service

offering, but directly because of this proposed merger.  Competing MVPDs and virtual MVPDs

would thus recognize that it will make financial sense to pay the merged firm a higher price for

Turner networks than it would prior to the merger, rather than risk losing valuable customers.

And the merged company would know that it can extract higher rates for Turner's networks

because, if no deal were reached, the merged firm would capture a significant number of the

customers who would depart the competing MVPD or virtual MVPD's service, and it would

have an improved chance to sign up new customers since one rival would lack Turner's highly

popular programming.  These new customers bring with them significant margins that would

reduce the losses the merged company would sustain when the rival MVPD or virtual MVPD no longer distributes Turner programming.  As DirecTV has explained, control of programming by a distributor creates "the ability to extract higher rates for years going forward based on the threat of such [subscriber] switching."  The merger would thus create a company that has the incentive and ability to weaken its video distributor competitors by charging them higher prices for Turner's networks, resulting in a substantial lessening of competition.

37.     The manner in which this merger would likely result in a substantial lessening of competition is based on a well-accepted understanding within the industry.  Indeed, both AT&T and DirecTV have previously explicitly stated that MVPDs that control popular networks and sports programming have precisely this incentive and ability to harm competition.  With respect to a similar, but smaller, purchase of a programmer by a distributor (the Comcast acquisition of NBCU), DirecTV stated that "a standard bargaining model can be used to determin[e] the likely increase in price that would result from vertical integration."  Here, an estimate of the price increases the merged company can impose on its competitors as a result of the effects of this merger and due to its increased bargaining leverage can be calculated by taking into account: (1) how many customers competing distributors would lose or fail to add without Turner programming (their subscriber loss rate); (2) the percentage of those departing customers that would likely become subscribers of the merged company (the diversion rate); and (3) how much AT&T/DirecTV profits from its customers (its margins).

38.     Following this merger, using a bargaining model similar to the one previously endorsed by DirecTV, the eventual price increases to the merged firm's competitors for Turner networks due to the merged company's increased power would likely be at least hundreds of millions of dollars.  Because video distributors pass through most of their cost increases to their

customers, these increased costs would likely result in higher monthly bills for consumers.  But whether the effect of these increased costs for rival video distributors results in higher prices or a form of reduced service, the effect would be to substantially lessen competition by rendering these competitors less able to compete effectively with the merged company.  As a result of the merger, the merged company would also have the power to raise its own prices relative to what it could have, had the merger not reduced competition from competing MVPDs.

39.     In addition, the merger would likely give the merged firm the incentive and ability to use its control of HBO to substantially lessen competition.  Due to its strong brand and consumer recognition and demand, MVPDs (including AT&T/DirecTV) today use HBO as a tool to entice new customers and to dissuade unhappy customers from leaving and switching to a rival MVPD.  Other premium channels, like Starz or Showtime, are not adequate alternatives to HBO for MVPDs seeking to attract or retain customers with premium content.  When used in this way, HBO can increase competition.  After the merger, however, the merged firm would have the incentive and ability, through contractual restrictions, to impede rival MVPDs from using HBO to compete against AT&T/DirecTV, thereby reducing competition among MVPDs. In addition, after the merger, the combined firm would have additional leverage when it is negotiating with rival MVPDs over HBO.

**B.  The merger would give the merged company the ability to impede and slow innovation by hindering emerging online competitors and would increase the likelihood of oligopolistic coordination.**

40.     The entry and growth of online video services promise to bring substantial benefits to consumers.  But as the nation's largest provider of traditional pay-TV, AT&T/DirecTV views these services as a threat.  As a result of this merger, the merged firm would have the increased market power to counter that threat and slow the emerging competition

AT&T/DirecTV would otherwise face in the All Video Distribution and Multichannel Video Distribution markets.  For example, after the merger, AT&T/DirecTV would have an increased ability to charge virtual MVPDs higher prices for Turner's and HBO's important and popular programming and could very well withhold that programming entirely from some virtual MVPDs, leading to even more severe effects on competition.  Without the Turner networks, even virtual MVPDs such as Sling TV, which to date has been the most successful virtual MVPD competing with traditional MVPDs, may not continue to be the competitive force they are today.  Turner knows this.  Its CEO has stated that it has "leverage" over Dish, whose online Sling TV service "is shit without Turner."

41.     In addition, the merger would increase the likelihood and effect of oligopolistic coordination, particularly among certain vertically integrated MVPDs.  AT&T itself has noted the high levels of concentration within the pay-TV industry and their stabilizing effect.  In a presentation prepared for a meeting with Time Warner executives related to this merger, AT&T noted that, after the merger, the merged company and just three other companies would control a large portion of all three levels of the industry: television studio revenue, network revenue, and distribution revenue.  AT&T went on to explain that—given these high levels of concentration— its "Core Belief #1" is that, notwithstanding the emergence of online video distributors, "[t]he economic incentives of major pay-TV players will encourage **stability** as the ecosystem evolves." (Emphasis added.)  This "stability" comes at the cost of competition that benefits consumers in the All Video Distribution and Multichannel Video Distribution markets.  In addition, the nature of the subscription television industry, including the widespread use of most favored nations (MFN) clauses between video distributors and programmers, facilitates

coordination.  Moreover, after the merger, AT&T/DirecTV and Comcast/NBCU,[3] which

together have almost half of the country's MVPD customers, would have an increased incentive

and ability to harm competition by impeding emerging online competitors that they consider a

threat, and increasing the prices for the networks they own.

## VI.  ABSENCE OF COUNTERVAILING FACTORS

42.      The proposed merger would be unlikely to generate verifiable, merger-specific

efficiencies in the relevant markets sufficient to reverse or outweigh the anticompetitive effects

that are likely to occur.

43.      Entry of new video programming distributors in the relevant markets is unlikely

to prevent or remedy the proposed merger's anticompetitive effects.

## VII.  VIOLATIONS ALLEGED

44.      The United States brings this action under Section 15 of the Clayton Act, 15

U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act,

15 U.S.C. § 18.  The effect of the proposed merger would be likely to lessen competition

substantially in interstate trade and commerce in both the All Video Distribution product market

and the Multichannel Video Distribution product market in numerous relevant local geographic

markets throughout the country, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

45.      AT&T, DirecTV, and Time Warner are engaged in, and their activities

substantially affect, interstate commerce. AT&T and DirecTV buy and distribute video

programming in interstate commerce.  Time Warner sells and distributes video programming that

---

[3] Although Comcast/NBCU is currently subject to conditions that were imposed by the Department and the FCC as a result of their respective reviews of the merger between that video distributor and programmer, the FCC's conditions expire on January 20, 2018 and the DOJ consent decree expires on September 1, 2018.  *See Comcast-NBCU Order*, 26 FCC Rcd 4238 at ¶ XX (2011); Comcast/NBCUniversal Modified Final Judgment at ¶ XI (2013).

is purchased and consumed in interstate commerce.  The Court has subject-matter jurisdiction

over this action pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to

prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18,

and 28 U.S.C. §§ 1331, 1337(a), and 1345.

46.     This Court has personal jurisdiction over each Defendant under Section 12 of the

Clayton Act, 15 U.S.C. § 22. AT&T and Time Warner both transact business in this district.

47.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C.

§ 22, and 28 U.S.C. § 1391(b)(1) and (c).  Defendants AT&T and Time Warner transact business

and are found within the District of Columbia.

## VIII.  REQUESTED RELIEF

48.     Plaintiff requests that:

a.   the proposed acquisition be adjudged to violate Section 7 of the Clayton Act,

15 U.S.C. § 18;

b.   AT&T and Time Warner be permanently enjoined from carrying out the proposed

merger and related transactions; carrying out any other agreement, understanding,

or plan by which AT&T would acquire control over Time Warner or any of its

assets; or merging;

c.   the Plaintiff be awarded costs of this action; and

d.   the Plaintiff receives such other and further relief as the case requires and the

Court deems just and proper.

Dated: November 20, 2017

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA**:

MAKAN DELRAHIM
Assistant Attorney General for Antitrust

ANDREW C. FINCH
Principal Deputy Assistant Attorney General

DONALD G. KEMPF, JR.
Deputy Assistant Attorney General for
Litigation

BERNARD A. NIGRO, JR.
(D.C. Bar #412357)
Deputy Assistant Attorney General

PATRICIA A. BRINK
Director of Civil Enforcement

BRYSON L. BACHMAN (D.C. Bar #988125)
Senior Counsel to the Assistant Attorney
General

SCOTT SCHEELE (D.C. Bar #429061)
Chief, Telecommunications and Broadband
Section

JARED A. HUGHES
Assistant Chief, Telecommunications and
Broadband Section

CRAIG W. CONRATH
ERIC D. WELSH (D.C. Bar #998618)
SHOBITHA BHAT
ALEXIS K. BROWN-REILLY (D.C. Bar #1000424)
DYLAN M. CARSON (D.C. Bar #465151)
ALVIN H. CHU
ROBERT DRABA (D.C. Bar #496815)
ELIZABETH A. GUDIS
JUSTIN T. HEIPP  (D.C. Bar #1017304)
ELIZABETH S. JENSEN
MATTHEW JONES (D.C. Bar #1006602)
MELANIE M. KISER
KATHRYN B. KUSHNER
DAVID B. LAWRENCE
DAPHNE LIN
CERIN M. LINDGRENSAVAGE
MICHELLE LIVINGSTON
BRENT E. MARSHALL
ERICA MINTZER (D.C. Bar #450997)
SARAH OLDFIELD
LAWRENCE REICHER
LAUREN G.S. RIKER
LISA SCANLON
PETER SCHWINGLER
DAVID J. SHAW  (D.C. Bar #996525)
MATTHEW SIEGEL
CURTIS STRONG (D.C. Bar #1005093)
FREDERICK S. YOUNG (D.C. Bar #421285)
RACHEL L. ZWOLINSKI (D.C. Bar #495445)

United States Department of Justice
Antitrust Division
Telecommunications and Broadband Section
450 Fifth Street, N.W., Suite 7000
Washington, DC  20530
Telephone: (202) 514-5621
Facsimile: (202) 514-6381