**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>450 Fifth Street, NW<br>Washington, DC 20530;<br><br>    *Plaintiff,*<br><br>  v.<br><br>AT&T INC.<br>208 South Akard Street,<br>Dallas, TX 75202;<br><br>DIRECTV GROUP HOLDINGS, LLC<br>2260 E. Imperial Hwy,<br>El Segundo, CA 90245; and<br><br>TIME WARNER INC.<br>One Time Warner Center,<br>New York, NY 10019;<br><br>    *Defendants.* | Civil No. 1:17-cv-02511 (RJL) |

**ANSWER**

Defendants AT&T Inc. ("AT&T"), DIRECTV Group Holdings, LLC ("DIRECTV"), and

Time Warner Inc. ("Time Warner") respond to the allegations of the Complaint as set forth

below.  Any allegation not specifically and expressly admitted is denied.

**GENERAL RESPONSE TO PLAINTIFF'S ALLEGATIONS**

1.  In only a few years, the way in which Americans watch television has radically

and irreversibly changed.  While incumbent cable companies continue to lead in the delivery of

television programming to homes across the country, massive digital platforms are harnessing

the power of vertical integration to bring premium video content directly to consumers' internet-

connected televisions, phones, and tablets.  With over 100 million global subscribers, Netflix

plans to spend $17 billion on streaming content over the upcoming years.  Apple, Google, and

Facebook, with billions of users and a combined market capitalization of more than two trillion

dollars, are likewise investing billions of dollars in their own video offerings.  Hulu has 47

million unique viewers, Amazon will spend $4.5 billion on content this year alone, Snapchat has

partnered with NBC for the 2018 Olympics, and even Twitter has streamed live NFL games.

This is indeed a golden age for television—and for consumers.

2.     Against this backdrop, the proposed merger of AT&T and Time Warner is a pro-

competitive, pro-consumer response to an intensely competitive and rapidly changing video

marketplace.  Time Warner *produces* high-quality video content through its three operating

units: Warner Brothers, HBO, and Turner.  AT&T *distributes* video content through its satellite,

broadband, and wireless networks.  Simply put, no competitor will be eliminated by this merger.

This transaction is therefore a classic vertical deal, combining Time Warner's video content with

AT&T's video distribution platforms so that the merged company can compete more effectively

against market-leading cable incumbents and insurgent tech giants.

3.     To challenge a vertical merger, the Government must prove that the merging

parties enjoy sufficient market power in their respective markets to cause antitrust concern.

Otherwise, the vertical combination of two companies occupying different levels of the supply

chain cannot substantially lessen competition in violation of Section 7 of the Clayton Act.  On

this threshold issue, the Government cannot meet its burden of proof.

4.     This is not a vertical combination of two firms with an imposing market share or

anything near it.  To the contrary, the relevant distribution markets in which AT&T operates are

highly competitive—and becoming more so by the day—and by no conceivable measure does

Time Warner have anything but insignificant market shares in a rapidly-expanding content

marketplace with low barriers to entry and new participation by several of the most well-funded companies in the world.  Indeed, notwithstanding the Government's year-long investigation, the Complaint makes no meaningful effort to establish the basic factual predicate of market power, offering no real market analysis or empirical evidence to support its hypothesis that the combination of this particular supplier (among many) and this particular distributor (among many) would harm consumers.

5.      Google's "YouTube TV" service is a powerful and recent example that disproves the Government's central thesis.  When Google launched "YouTube TV" as an alternative to traditional pay-TV services, it did not include *any* Time Warner networks.  Instead, it chose to carry the Big Four broadcast channels (ABC, CBS, NBC, and Fox) and their affiliated cable networks, including ESPN, Showtime, USA, E!, and Disney Channel.  The fact that Google, one of the most sophisticated and well-funded companies in the world, launched its video platform without any Time Warner channels confirms not only that the television ecosystem is awash in content, but that Time Warner's networks are not, in any antitrust sense of the word, essential to attracting and retaining subscribers.

6.      For these reasons, this transaction presents absolutely no risk of harm to competition or consumers.  Rather, the transaction will allow the combined company to drive innovation in video content and distribution; develop an over-the-top path for Time Warner content to reach consumers directly; develop new ad-supported video models that shift more costs to advertisers and off consumers; use AT&T's consumer data to increase the value of Turner's substantial advertising inventory and create a platform for other programmers to do the same; use the same data to improve Time Warner's decisions as to content investment, marketing and promotions, and scheduling of programming; enable numerous cross-promotional

opportunities; and achieve substantial cost savings by integrating various key functions and operations of both companies.  These are natural synergies of vertical integration, but the Government's Complaint credits none of them.

7.     Finally, as the Court knows, the Government elected in 2011 not to litigate the vertical merger between Comcast and NBCUniversal, even though Comcast is typically the clear pay-TV leader in its local service areas and NBCUniversal owns one of the Big Four broadcast networks.  Instead, despite the strength of both parties in their respective markets, the Government concluded that a seven-year regime of binding arbitration would be sufficient to address its competitive concerns, and it agreed to clear the transaction with several conditions. In filings to this Court in support of its conclusion, the Government stated that "arbitration has been successfully employed as a vertical merger remedy pursuant to numerous FCC orders and there is no evidence that it would not be an effective remedy in this case."[1]  Based on that precedent—as well as the Government's own guidelines to consider "tailored conduct remedies designed to prevent conduct that might harm consumers while still allowing the efficiencies that may come from [a vertical] merger to be realized."[2]—AT&T and Time Warner fully expected to resolve the Government's review of this merger by agreement, rather than litigation.

8.     While the merging parties cannot explain the Government's abrupt departure from precedent, Time Warner has now extended to third-party distributors the same sort of arbitration protections that the Government embraced in Comcast/NBCUniversal.  Specifically, contingent only upon the closing of this merger, Turner has formally and irrevocably offered its distributors

---

[1] *United States et al. v. Comcast et al.*, Plaintiff United States' Response to Comments, 1:11-cv-00106, dkt. 23, at 12–13 (June 6, 2011) (footnote omitted).

[2] U.S. Dep't of Justice, *Antitrust Division Policy Guide to Merger Remedies* at 4 (June 2011).

licensing terms that, for seven years after closing, (i) entitle the distributor to invoke "baseball-style" arbitration if it is unable to reach a satisfactory distribution agreement for Turner Networks and (ii) forbid Turner from "going dark" on any Turner distributor during the arbitration process. Under this approach, if a distributor reaches an impasse with AT&T/Time Warner over access to Turner content, the parties will submit their respective "best offers" to the arbitrator, and the arbitrator will choose the one that best represents fair market value, subject to a right of judicial review under the Federal Arbitration Act. This contractual regime is self-executing and will require no monitoring or enforcement by the Government or this Court.

9.      Turner has offered this contractual commitment to its distributors as clear proof that, when it is owned by AT&T, Turner will have no greater incentive to increase the price of Turner Networks. To that end, while the Complaint's allegations of competitive harm are wholly without merit, Turner's commitment eliminates even the theoretical risk that lies at the heart of the Government's case—the risk that, post-close, Turner would be more inclined to threaten to "go dark" on a distributor. Therefore, by agreeing to submit all carriage disputes to commercial arbitration and relinquishing its ability to go dark during the arbitration process, Turner has demonstrated not only how strongly it believes that this transaction will not harm its distributors, but also that the Government's demand to block this merger is unwarranted.

10.      In sum, Time Warner accounts for a valuable, but exceptionally thin, slice of all the video content available to consumers, and AT&T's legacy video distribution platforms are being squeezed by cable incumbents and tech giants alike. Far from lessening competition, the vertical combination of these assets is necessary to allow the combined company to keep pace in an environment where cable is the incumbent market leader and viewer preferences are rapidly tilting towards the direct-to-consumer platforms of Netflix, Google, Amazon Prime, Facebook,

Apple, Hulu, and others.  In seeking to block this merger, then, the Government is not only departing from established antitrust precedent, but is also shielding rivals from new competition that would greatly benefit consumers.

## RESPONSE TO SPECIFIC ALLEGATIONS

1. *American consumers have few options for traditional subscription television.  For the nearly one hundred million American households that pay a monthly bill to traditional video distributors (cable, satellite, and telephone companies), this means paying higher prices year after year and waiting on hold to hear why a service technician is running late or why their monthly bill has skyrocketed.[1]  For traditional video distributors, this lack of competition means huge profit margins.  Indeed, AT&T/DirecTV describes the traditional pay-TV model as a "cash cow" and "the golden goose."*

> [1] *Indeed, the Federal Trade Commission sued DirecTV for deceptively advertising its rates and misleading consumers about the cost of its satellite television services and cancellation fees by not clearly disclosing that the cost of the package will increase by up to $45 more per month in the second year, and that early cancellation fees of up to $480 apply if consumers cancel the package before the end of the two-year period. See FTC v. DirecTV LLC, N.D. Cal., case number 4:15-cv-01129 (March 11, 2015).*

**Response**:     Defendants admit that the Federal Trade Commission sued DIRECTV in *FTC v. DIRECTV LLC*, N.D. Cal., no. 4:15-cv-01129 (March 11, 2015).  Defendants respond that the Commission's complaint speaks for itself and that DIRECTV vigorously disputes the Commission's claims.  Defendants further respond that the fourth sentence contains a quotation from unidentified written material that is taken out of context and is misleading.  Defendants deny the remaining allegations contained in this paragraph.

2. *In many industries, online distribution has enhanced consumer welfare by enabling disruptive entry.  In an effort to challenge the traditional subscription television model, online video distributors are emerging and increasingly are a welcome option for consumers.  Some consumers subscribe to an online video service like Netflix or Amazon Prime, often in addition to their traditional TV subscription.  And a small but growing minority of consumers are replacing their traditional television subscription altogether with new choices of online services like Sling TV, which generally offer American consumers packages with fewer channels than a typical cable or satellite bundle, but at more affordable prices and without long-term commitments.  As these online services improve and expand, they bring increasing competition to traditional video distributors—competition that benefits consumers, but which AT&T/DirecTV fears will disrupt the industry and deteriorate its high profit margins.*

6

**Response**:      Defendants admit that online video services, which now include Defendants' own DIRECTV NOW and HBO NOW services, are an important and established source of competition in the distribution of video programming, that online video service providers and the content they offer continue to experience tremendous growth, and that such services enhance consumer welfare.  Defendants further admit that many consumers subscribe to online video services, including Netflix and Amazon Prime, that many do so in addition to their traditional TV subscription, and that a growing number of consumers do not subscribe to traditional television subscription services at all.  Defendants deny the remaining allegations contained in this paragraph.

3. *If allowed to proceed, this merger will harm consumers by substantially lessening competition among traditional video distributors and slowing emerging online competition.  After the merger, the merged company would have the power to make its video distributor rivals less competitive by raising their costs, resulting in even higher monthly bills for American families.  The merger also would enable the merged firm to hinder the growth of online distributors that it views as a threat to the traditional pay-TV model.  As AT&T/DirecTV's strategic merger documents state, after the merger, disruption need not occur immediately—the merged firm can "operate [its] pay-TV business as a 'cash cow' while slowly pivoting to new models."*

**Response**:      Defendants deny the allegations contained in this paragraph.  Defendants further respond that Plaintiff's quotation from unidentified written material is taken out of context and is misleading.

4. *First, the merger would result in higher prices for consumers of traditional subscription television because it would give the merged company the power to raise the prices that competing video distributors pay to it for Time Warner's popular TV networks for no reason other than that those networks would now be owned by AT&T/DirecTV.  Time Warner's networks are some of the most valuable in the country.  As Time Warner has told its shareholders, its Turner networks include three of the top five basic cable networks; Turner also has one of the top news networks. And HBO is the "[w]orld's leading premium pay TV brand."  Time Warner's networks own the rights to hit shows such as Game of Thrones, as well as the current and future rights to "marquee sports programming," including NCAA March Madness, substantial numbers of regular season and playoff games of Major League Baseball and the NBA, as well as the PGA Championship.  AT&T has concluded that Time Warner's networks have "world-class ability to attract and sustain audiences*

*with premium content." Because these popular networks drive ratings and attract customers, video distributors consider it extremely important to carry them. As Time Warner stated in its Annual Report for 2016, its most popular Turner networks reach over 91 million households—of the nearly 100 million households with traditional video distribution subscriptions. Time Warner's own internal documents note the "high proportion of 'must carry' networks" in its Turner portfolio, which "are a critical component of the basic cable bundle."*

**Response**:     Defendants admit that Turner networks and HBO offer original and other programming that appeals to consumers, including programming distributed on certain cable television networks and a cable news network. Defendants further admit that Turner and HBO programming currently includes *Game of Thrones* and certain sporting events. Defendants further respond that Turner networks and HBO are not universally carried by video distributors and that a large and growing number of significant distributors offer popular video programming, including a wide variety of very popular news, sports, and original entertainment programming. Defendants also respond that the Time Warner Annual Report for 2016 speaks for itself, and Plaintiff's selective quotations in the fourth, fifth, sixth, and ninth sentences of unidentified written material are taken out of context and are misleading. Defendants deny the remaining allegations contained in this paragraph.

5.   *Nonetheless, there is currently a limit to what video distributors will agree to pay Time Warner for its Turner networks. If, in negotiations, Time Warner seeks too high a price for the Turner TV networks, the video distributor across the table may walk away. Without a deal, Time Warner loses monthly payments from the video distributor and advertising revenue—and gains nothing in return. This merger, if allowed, would change that. After the merger, if the merged company raised prices of the Turner networks to the video distributor and no deal were reached, resulting in a blackout of such networks, the merged company would still lose monthly payments and advertising revenue from the video distributor with whom it could not reach a deal, but, importantly, it would now get an offsetting benefit. Because the video distributor walking away from a deal with the merged company would lose access to Turner's popular programming, some of the video distributor's valuable customers would be dissatisfied and switch to a competing video distributor. Some of those departing customers would sign up with AT&T/DirecTV, bringing with them significant new profits for the merged company. This improvement in Time Warner's best alternative to a deal resulting from the proposed merger—and therefore in its negotiating*

*leverage—would give the merged firm the ability to credibly demand higher prices than it otherwise would.*

**Response**:      Defendants admit that video distributors are unwilling to pay an unlimited amount to distribute Turner networks and that, if Turner does not reach agreement with a video distributor regarding carriage of the Turner networks, it loses monthly payments from the video distributor and advertising revenue associated with those networks.  Defendants further respond that, after the merger, the merged company will continue to have the same incentives as before the merger to distribute Turner networks as widely as possible.  Defendants deny the remaining allegations contained in this paragraph.

6.  *The merger would thus substantially lessen competition by giving the merged company the additional leverage to charge its rival video distributors higher prices for its networks than Time Warner's current market power would otherwise allow, making those distributors less able to compete effectively with the merged company.  This harm to competition is based on a well-accepted understanding within the industry. Indeed, tellingly, both AT&T and DirecTV have recognized in public filings and internal documents that video distributors that own popular programming have the power and the incentive to harm competition.  Congress also expressed such a concern by recognizing that "[v]ertically integrated program suppliers also have the incentive and ability to favor their affiliated cable operators over nonaffiliated cable operators and programming distributors using other technologies."[2]*

   [2] *Cable and Television and Consumer Protection Act of 1992, P.L. 102-385 § 2(a)(5).*

**Response**:      Defendants deny the allegations contained in this paragraph.  Defendants further respond that Plaintiff's references to unidentified written material are taken out of context and are misleading.  Defendants also respond that the statutory excerpt speaks for itself.

7.  *Because video distributors aim to cover programming cost increases by raising the prices they charge their customers, the higher prices video distributors would pay for Turner TV networks as a result of this merger would directly hit the pocketbooks of American consumers.  The merger would also give the merged firm the incentive and ability to use its control of HBO—which rival video distributors have used to attract customers—to lessen competition among video distributors.  In sum, as DirecTV itself has explained: "[V]ertical integration of programming and distribution can, if left unchecked, give the integrated entity the incentive and ability to gain an unfair advantage over its rivals.  This ultimately results in higher prices and lower quality service for consumers."*

**Response**:      Defendants deny the allegations contained in this paragraph.  Defendants

further respond that Plaintiff's selective quotation of unidentified written material is taken out of

context and is misleading.

8. *Second, the merger would enable the merged company to impede disruptive*
   *competition from online video distributors-competition that has allowed consumers*
   *greater choices at cheaper prices.  Although it has concluded that "[t]raditional Pay-*
   *TV will be a cash cow business to AT&T for many years to come," AT&T/DirecTV*
   *fears future "disruption" from emerging competitors.  Consumers are beginning to*
   *see new video distribution offerings.  For example, online distributors like Sling TV*
   *offer less expensive alternatives to traditional subscription television that do not*
   *require yearly contracts or cable set top boxes, but this merger would impede that*
   *innovation.  AT&T/DirecTV perceives online video distribution as an attack on its*
   *business that could, in its own words, "deteriorate[] the value of the bundle."*
   *Accordingly, AT&T/DirecTV intends to "work to make [online video services] less*
   *attractive."  AT&T/DirecTV executives have concluded that the "runway" for the*
   *decline of traditional pay-TV "may be longer than some think given the economics of*
   *the space," and that it is "upon us to utilize our assets to extend that runway."  This*
   *merger would give the merged firm key, valuable assets, empowering it to do just that.*

**Response**:      Defendants admit that consumers continue to be offered new video

distribution services and that certain of those services, including AT&T's DIRECTV NOW and

Time Warner's HBO NOW, are less expensive alternatives to traditional subscription services

such as cable television, do not require yearly contracts, and do not require cable set-top boxes.

Defendants further respond that online video service offerings are offered to and purchased by

millions of consumers.  Defendants also respond that Plaintiff's selective quotation of

unidentified written material is taken out of context and is misleading.  Defendants deny the

remaining allegations contained in this paragraph.

9. *Time Warner's Turner networks are extremely important for many emerging video*
   *distributors—its own analysis ranks those networks as tied for second behind only*
   *Disney in their ability to attract customers to emerging platforms.  Turner benefits*
   *from the traditional pay-TV model but has also, previous to the announcement of this*
   *merger, secured a position for its networks as "anchor tenants" for virtual MVPDs,*
   *which are growing competitors to AT&T/DirecTV.  After the merger, the merged firm*
   *would likely use Turner's important programming to hinder these online video*
   *distributors—for example, the merged firm would have the incentive and ability to*
   *charge more for Turner's popular networks and take other actions to impede entrants*

*that might otherwise threaten the merged firm's high profit, big-bundle, traditional pay-TV model. The merger would also make oligopolistic coordination more likely. For example, the merger would align the structures of the two largest traditional video distributors, who would have the incentive and ability to coordinate to impede competition from innovative online rivals and result in higher prices. In short, the merger would help the merged firm's bottom line by extending the life of the old pay-TV model, but harm consumers who are eager for new innovative options.*

**Response**: Defendants deny the allegations contained in this paragraph. Defendants respond that certain emerging video distributors or "virtual MVPDs," including Google's fast-growing video distribution service, have chosen not to distribute Turner networks. Defendants further respond that Plaintiff's selective quotation of unidentified written material is taken out of context and is misleading. Defendants also respond that AT&T and Comcast have competed and will continue to compete vigorously in a broad range of broadband, wireless, and video services, and that this transaction would heighten competition between those companies.

10. *Section 7 of the Clayton Act prohibits mergers if "the effect of such acquisition may be substantially to lessen competition." This includes vertical mergers, as Congress made plain in the 1950 amendments to the Clayton Act. A vertical merger may violate the antitrust laws where the merging parties would—by means of their control of an input that their competitors need—have the incentive and ability to substantially lessen competition by withholding or raising the price for that input. The competitive conditions in this industry and specific facts of this vertical merger make it unusually problematic. It is well-recognized within the industry that popular programming is something traditional video distributors need to compete effectively. AT&T itself has previously stated that access to some of the most popular television programming is "critical to preserve and promote competition and diversity in the distribution of video programming." This merger would give the combined firm control over AT&T/DirecTV's massive video, wireless, and internet distribution network as well as Time Warner's popular and valuable TV networks and studio. It would give the merged firm the power to make its current and potential rivals less competitive. The effect of the merger would likely be substantially to lessen competition. It would violate the antitrust laws and therefore should be enjoined.*

**Response**: Defendants respond that the first three sentences of this paragraph assert conclusions of law to which no response is required. With respect to the fifth sentence of this paragraph, Defendants admit that having programming that appeals to consumers is an important competitive tool, among others, for video distributors. Defendants further respond that

Plaintiff's selective quotation of unidentified written material is taken out of context and is misleading.  Defendants deny the remaining allegations contained in this paragraph.

11. *Popular television shows like* The Big Bang Theory *generally travel through three layers of production and distribution: A studio like Warner Bros. creates the show; a programmer like Turner or a broadcaster like CBS purchases the right to include the show on one of its networks; and a video distributor like AT&T/DirecTV or Comcast purchases the right to include the network in one or more packages that it sells to customers.*

**Response**:     Defendants admit that *The Big Bang Theory* is a popular television show. Defendants also admit that the production and distribution of content can reflect distinct stages within the structure of the video industry.  Defendants respond that Warner Bros. is only one of many sources of television and film content and that video programmers and broadcasters can choose from a large and growing array of programming similar to Warner Bros.' programming from an increasing variety of sources.  Defendants deny the remaining allegations contained in this paragraph.

12. *Programmers make money by licensing their networks to video distributors and by selling air time for advertisements shown on their networks.  Accordingly, programmers generally seek to have their networks carried by many video distributors.  They typically reach multi-year agreements under which video distributors pay programmers monthly, per-subscriber license or "affiliate" fees for a bundle of networks owned by the programmer.*

**Response**:     Defendants deny that all programmers sell "air time for advertisements" but otherwise admit the allegations contained in the first two sentences of this paragraph. Defendants deny the allegations contained in the third sentence of this paragraph.

13. *Programmers' arms-length negotiations with video distributors involve a give and take based on the relative bargaining leverage of the parties, which is informed by the options available to each party in the event a deal is not reached.*

**Response**:     Defendants deny the allegations contained in this paragraph.  Defendants respond that myriad factors are relevant in negotiating the price and other key terms of programming.

14. *Video distributors make money by receiving monthly subscriber fees from their customers and need to carry popular programming to attract those customers. So programmers with popular networks that carry hit shows and live sports have more bargaining leverage with video distributors than do programmers with less popular networks. Programmers also gain revenue through advertising, the price of which is typically based on the number of consumers watching their networks. Video distributors with large numbers of subscribers generally have more bargaining leverage and often pay programmers less per subscriber to carry their networks than do video distributors with fewer subscribers.*

**Response**:      Defendants deny the allegations contained in the first sentence of this

paragraph. Defendants respond that not all video distributors receive monthly subscriber fees

from their customers, have such fees as their only source of revenue, or need all of their

programming to be popular in order to attract customers. Defendants deny the allegations

contained in the second sentence of this paragraph. Defendants respond that negotiations over

the terms of distributing video programming depend upon multiple factors and that the dynamic

growth of alternative sources of original content has had a profound impact on these

negotiations. Defendants deny the allegation contained in the third sentence of this paragraph

that all programmers gain revenue through advertising. Defendants deny the allegation in the

final sentence of this paragraph that video distributors with large numbers of subscribers

generally have more bargaining leverage than video distributors with fewer subscribers but admit

that video distributors with large numbers of subscribers generally pay programmers less per

subscriber to carry their networks than do video distributors with fewer subscribers.

15. <u>MVPDs.</u>  *Multichannel video programming distributors (or "MVPDs") include cable companies such as Comcast, satellite broadcasters such as DirecTV, and offerings from telephone companies such as AT&T's U-Verse. They pay license fees to carry the programmers' networks, which the MVPDs generally bundle into different packages to sell to consumers. For example, AT&T/DirecTV's recent offerings include both a high-priced "premier" bundle including 325 channels for $125 per month for the first twelve months and a lower-priced "select" bundle with 150 channels for $50 per month for the first twelve months.*

13

Case 1:17-cv-02511-RJL   Document 20   Filed 11/28/17   Page 14 of 29

**Response**:    Defendants admit that multichannel video programming distributors (or "MVPDs") include Comcast, DIRECTV, and AT&T's U-verse and that MVPDs often pay fees to programmers to carry their content, but Defendants respond that some programmers pay to have their content distributed and some content is distributed at no charge.  Defendants admit that DIRECTV's recent offerings include a "premier" package comprising 325 channels and a "select" package comprising 150 channels, but Defendants deny the remaining allegations contained in this paragraph.

16. *Virtual MVPDs. Virtual MVPDs employ a similar business model to traditional MVPDs but deliver their channels to consumers over the internet.  Some virtual MVPDs offer so-called "skinny bundles"—cheaper packages with fewer channels than an MVPD would typically offer.  For example, Sling TV currently offers a package of 30 channels for $20 a month.  They also generally require less equipment—no need for a cable set-top box or a satellite dish—and do not require a long-term contract.*

**Response**:    Defendants admit that so-called virtual MVPDs deliver packages of programming content to consumers over the internet and that some of them offer smaller and less expensive packages of programming than MVPDs typically offer.  Defendants lack knowledge sufficient to admit or deny the allegations contained in the third sentence of this paragraph. Defendants admit that virtual MVPDs generally require less equipment than MVPDs typically require, but Defendants deny the remaining allegations contained in this paragraph.

17. *SVODs.  Subscription video on demand services (or "SVODs") like Netflix and Amazon Prime similarly offer their programming online, but they generally do not offer live programming.  Rather, consumers using an SVOD generally can choose to watch the TV shows or movies in the SVOD's catalogue "on demand," i.e., at any time upon their request.  SVODs in some instances create their own TV shows, but they most commonly purchase the rights to previously aired television shows and films from studios such as Warner Bros.  Unlike MVPDs and virtual MVPDs, however, SVODs typically do not carry live sports programming or live news telecasts.*

**Response**:    Defendants admit that so-called subscription video on demand services ("SVODs") deliver programming content to consumers over the internet but deny that SVODs do not offer live programming.  Defendants admit that SVODs have created their own TV

14

shows, some of which are extremely popular and award-winning like Hulu's *The Handmaid's Tale*, and that SVODs also purchase rights to previously aired television shows.  Defendants deny the remaining allegations contained in this paragraph.

> 18. *Due in part to the emergence of SVODs, which offer television shows and movies but generally do not offer live sports (or news) programming, the ability to offer live programming is becoming increasingly important to MVPDs and virtual MVPDs.  The value of live sports programming in particular is enhanced by the fact that viewers are more likely to watch it live and not skip through commercials, and it is a limited resource that—due to existing, exclusive, long-running contracts—generally will not become available again for purchase by programmers for several years.  As a Time Warner document explains: "Across the industry, most of the remaining top sports rights are locked up into the next decade."*

**Response**:        Defendants deny the allegation contained in the first sentence of this paragraph to the extent that it suggests that SVODs do not offer live programming.  Defendants further respond that Plaintiff's selective quotation of unidentified written material is taken out of context and is misleading.  Defendants deny the remaining allegations contained in this paragraph.

> 19. *AT&T's internal documents acknowledge that programmers with live sports events "have leverage to command affiliate fees beyond their viewership shares."  Similarly, discussing its sports programming, which includes long-term contracts to host critical portions of important events from MLB (through 2021), NBA (through 2025), and NCAA March Madness (through 2032), Time Warner concluded in a report to its Board of Directors: "[T]hese sports rights provide us with the base of **must-watch** content that should enable us to achieve our targeted **rate increases**."  (Emphasis added.)*

**Response**:        Defendants respond that Plaintiff's selective quotation of unidentified written material is taken out of context and is misleading.  Defendants deny the remaining allegations contained in this paragraph.

> 20. *AT&T is the world's largest telecommunications company.  It is a Delaware corporation headquartered in Dallas, Texas.  AT&T was established in 1885 and in 1899 became the parent of The Bell Telephone Company, which Alexander Graham Bell founded in 1877.  AT&T maintained a monopoly in the provision of local telephone services until 1982, when it agreed to divest the portions of its business relating to local telephone services to settle an antitrust lawsuit filed by the*

*Department of Justice.  Pursuant to that settlement, SBC Communications Inc. was spun-off from AT&T on January 1, 1984.  In 2005, one of SBC Communications' subsidiaries merged with AT&T, and in connection with the merger the name of the company was changed to AT&T, Inc.  In 2009, AT&T agreed to pay more than $2 million to settle a claim that it had violated a consent decree and court order related to its 2007 acquisition of Dobson Communications Corp.  In 2011, AT&T attempted to purchase T-Mobile, but abandoned the transaction after the Department of Justice filed suit alleging that the merger violated the antitrust laws.*

**Response**:       Defendants admit that AT&T is the world's largest telecommunications company as measured by annual revenue, but Defendants otherwise deny the allegations contained in the first sentence.  Defendants admit the allegations contained in the second and third sentences of this paragraph.  Defendants deny the allegation contained in the fourth sentence that "AT&T maintained a monopoly in the provision of local telephone services until 1982" but admit the allegations contained in the remainder of that sentence.  Defendants deny the allegation contained in the fifth sentence of this paragraph.  Defendants admit the allegations contained in the sixth sentence, except to note that the name of the merged company was "AT&T Inc." without a comma.  Defendants admit that AT&T settled a claim in 2009 without any admission or determination of wrongdoing relating to its 2007 acquisition of Dobson Communications Corp. and that AT&T abandoned its effort to purchase T-Mobile in December 2011.  Defendants deny the remaining allegations contained in this paragraph.

21. *Today, AT&T is the country's second largest wireless telephone company, third largest home internet provider, and one of the largest providers of landline telephone services.  It is also the country's largest MVPD, with more than 25 million subscribers.  It has three MVPD offerings: (1) DirecTV, a satellite-based product with almost 21 million subscribers that it acquired through a merger in 2015; (2) U-Verse, a product which uses the local AT&T fiber optic and copper network and has almost 4 million subscribers; and (3) DirecTV Now, its new online video product (virtual MVPD) with almost 800,000 subscribers.*

**Response**:       Defendants admit that AT&T is a wireless telecommunications company and otherwise admit the allegations contained in this paragraph.

22. *DirecTV is a subsidiary of AT&T.  It is a Delaware corporation, with its headquarters in El Segundo, California.  As noted above, it has almost 21 million subscribers to its satellite-based MVPD product, which is offered nationwide.  Earlier this year, DirecTV agreed to certain conditions to settle an antitrust lawsuit filed by the Department of Justice, which alleged that DirecTV acted as the ringleader of illegal information-sharing agreements with three of its rival competitors to obtain bargaining leverage in negotiations to carry the Los Angeles Dodgers' cable sports channel.*

**Response**:        Defendants admit the allegations contained in the first two sentences of this paragraph.  Defendants also admit that DIRECTV has almost 21 million video subscribers as of the third quarter of 2017.  Defendants admit that DIRECTV agreed in 2017 to settle a lawsuit, without any admission or judgment regarding any issue of fact or law, relating to the carriage of SportsNet LA.  Plaintiff's complaint in that case speaks for itself.  Defendants deny the remaining allegations contained in this paragraph.

23. *Time Warner, Inc. is a Delaware corporation headquartered in New York, New York. It is a media company with essentially three business units: (1) Turner Broadcasting System, Inc., whose most popular networks include TNT, TBS, CNN, and Cartoon Network; (2) Warner Bros. Entertainment, Inc., which is one of the country's major television and movie studios; and (3) the Home Box Office, Inc. (HBO) premium network, which also owns Cinemax, and in total has almost 50 million subscribers (the vast majority of whom access HBO through an MVPD).*

**Response**:        Defendants admit the allegations contained in this paragraph and further respond that HBO also includes HBO NOW online video distribution service, which customers may access and subscribe to without a subscription to an MVPD.

24. *The Turner networks—with their mix of live sports, live news, and entertainment content—are consistently highly rated and highly compensated, and have market power.  As Time Warner has stated, its most popular Turner networks reach more than 91 million households—of the nearly 100 million households that subscribe to traditional subscription television.  AT&T has described Turner programming as including "'must have' premium sports rights," and Turner has significantly and consistently increased the prices it charges MVPDs for its networks each of the last three years.  There are few equally important and popular substitutes for these networks, and they are sufficiently unique and attractive that video distributors that do not carry them risk losing a substantial number of current and potential subscribers to rival MVPDs and virtual MVPDs that do.*

17

**Response**:       Defendants deny the allegations contained in this paragraph other than to admit that the Turner networks offer a mix of live sports, live news, and entertainment content. Defendants further respond that Plaintiff's selective quotation of unidentified written material is taken out of context and is misleading.

25. HBO is the "World's #1 premium cable network," and also has market power.  HBO is the "[b]est brand name, most recognized" premium network with the "[o]verall best collection of content."  AT&T's own "[p]remium network affiliate revenue [is] dominated by HBO," which "earns more than 50% of all premium network affiliate revenue."  HBO is also a "[p]roven acquisition driver."  HBO markets itself to MVPDs as playing "a key role in attracting and retaining" subscribers, stating that its "effectiveness in driving sales of other products is well established."

**Response**:       Defendants deny the allegations contained in this paragraph.  Defendants further respond that Plaintiff's selective quotation of unidentified written material is taken out of context and is misleading.

26. On October 22, 2016, AT&T agreed to purchase Time Warner.  Including debt, the transaction is valued at $108 billion.  Tellingly, among the rationales for a vertical merger set forth in AT&T's strategic merger documents are:

• "Improved positioning vis-à-vis cable rivals and [online] players";

• "Support margins via vertical integration"; and

• "Advantage ability to shape future of video ecosystem."

**Response**:       Defendants admit the allegation contained in the first sentence of this paragraph.  Defendants deny the allegation contained in the second sentence of this paragraph to the extent it purports to estimate the value of the transaction today, as opposed to its estimated value when it was announced.  Defendants further respond that Plaintiff's selective quotation of unidentified written material is taken out of context and is misleading. Defendants deny the remaining allegations contained in this paragraph.

27. This merger would substantially lessen competition among all distributors of professionally produced, full-length video programming subscription services to residential customers in the United States.  As a result, consumers in relevant local

18

*geographic markets throughout the country in this "All Video Distribution" product market—which includes MVPDs, virtual MVPDs, and SVODs—would see higher monthly TV bills and less innovative TV offerings. If one company owned all video distributors in a geographic market, it would profitably raise prices significantly on at least one product. The All Video Distribution market constitutes a relevant antitrust product market and line of commerce under Section 7 of the Clayton Act.*

**Response**:   Defendants deny the allegations contained in this paragraph. Defendants

further respond that this paragraph asserts a conclusion of law regarding market definition to

which no response is required.

28. *The distribution of video programming by MVPDs and virtual MVPDs also constitutes a relevant antitrust product market and line of commerce under Section 7 of the Clayton Act. This "Multichannel Video Distribution" market is a submarket within the broader All Video Distribution product market. The video distribution industry and American consumers recognize this submarket, whose participants charge different prices and serve different customer needs than do distributors of other video programming. If one company owned all MVPDs and virtual MVPDs in a geographic market, it would profitably raise prices significantly on at least one product. AT&T/DirecTV is the largest participant in this product market in the United States. It has nationwide presence and has a large market share in many regions across the country. For example, AT&T/DirecTV has more than 40 percent of MVPD subscribers in at least 18 local Designated Market Areas.*

**Response**:   This paragraph asserts a conclusion of law regarding market definition to

which no response is required. To the extent the paragraph makes factual allegations,

Defendants admit that DIRECTV offers service nationwide but typically lags well behind cable

incumbents in their respective territories. Defendants further admit that AT&T/DIRECTV

serves more MVPD subscribers than any other MVPD, but respond that cable incumbents nearly

always surpass AT&T/DIRECTV in subscribership within their respective footprints, generally

by a substantial margin. Defendants deny the remaining allegations contained in this paragraph.

29. *The relevant product markets in which to evaluate this merger are the sale of subscription video programming in the All Video Distribution and Multichannel Video Distribution product markets, and the relevant geographic markets are local geographic markets across the country. Consumers seeking to purchase video distribution services must choose from among those providers that can offer such services directly to their home. Direct broadcast satellite providers, such as DirecTV, can serve customers almost anywhere in the United States. In addition, online video*

*distributors are available to any consumer with high-speed internet service, such as broadband, sufficient to deliver video of an acceptable quality.  By contrast, traditional wireline distributors, such as cable (e.g., Comcast, Cox, and Charter) and telephone companies (e.g., AT&T and Verizon), serve only those particular geographic areas where they have deployed network facilities.  A customer cannot purchase video distribution services from a wireline distributor that does not operate network facilities that can connect to that customer's home.  For example, a customer within a Cox cable franchise area typically cannot purchase video distribution service from Comcast.*

**Response**:      This paragraph asserts conclusions of law concerning market definition to

which no response is required.  To the extent the paragraph makes factual allegations,

Defendants admit that many cable incumbents have service territories that have evolved in part

from non-overlapping monopoly franchises and that DIRECTV offers service nationwide, but

respond that DIRECTV typically lags well behind cable incumbents in their respective territories

and that online video distributors offer service nationwide as well.  Defendants deny the

remaining allegations contained in this paragraph.

30. *Because consumers within a local area have the same options available to them for video programming, it is appropriate to treat such similarly situated consumers the same and aggregate them into local geographic markets.  For example, a cable service area that only offers consumers a choice among three options (a cable company and two satellite companies) would be a local market.  If a cable service area overlapped with the area in which a telephone company offers video distribution services (such as AT&T's U-Verse offering), that area of overlap would be a local market in which consumers are offered a choice among four options: a cable company, a telephone company and two satellite companies.  Using available data generally allows measurement of these local markets by zip code.*

**Response**:      This paragraph asserts a conclusion of law regarding market definition to

which no response is required.  To the extent the paragraph makes factual allegations,

Defendants admit that AT&T/DIRECTV faces competition in every locality from all providers

serving that locality (including both traditional MVPDs and online video distributors), no matter

how many additional localities those providers also serve.  Defendants lack knowledge of the

"available data" or types of "measurement" to which this paragraph refers, and further respond

that no matter how the relevant geographic market is defined, AT&T/DIRECTV faces intense

and increasing competition as a distributor of video programming.  Defendants deny the

remaining allegations contained in this paragraph.

> 31. *The proposed merger would substantially lessen competition and harm consumers in these local geographic markets in both the All Video Distribution and the Multichannel Video Distribution product markets.  Both AT&T/DirecTV's video distribution services and Time Warner's TV networks are available nationwide, so the harm would occur throughout the country.  In both relevant product markets, the merger would give the merged company the market power to weaken competing distributors' ability to compete by raising their costs, would allow the merged company to impede emerging and growing rivals, and, furthermore, would result in increased likelihood of oligopolistic coordination.*

**Response**:      Defendants admit that DIRECTV and DIRECTV NOW are offered

nationwide to consumers with the ability to receive them and that Time Warner's "TV networks"

are distributed nationally.  Defendants deny the remaining allegations contained in this

paragraph.

> 32. *Losing even a modest number of customers can have a major financial impact on an MVPD.  The margins these video distributors earn from their customers are significant, and it is expensive and difficult for these distributors to obtain new customers or win back prior customers once they have cancelled their subscription or switched to a competitor.*

**Response**:      Defendants admit that acquiring and retaining customers can affect an

MVPD's financial position but deny the remaining allegations contained in this paragraph.

> 33. *Accordingly, when an MVPD considers the price it is willing to pay a programmer to carry its networks, it generally takes into account the extent of potential subscriber losses if it did not carry those networks.  In fact, before negotiating with programmers for their networks, and to better understand their best alternative option if negotiations break down, MVPDs have conducted analyses to determine the percentage of likely subscriber loss that would occur if they did not carry the particular networks for which they are bargaining (a "blackout").  These analyses have concluded that, for certain popular networks, the subscriber loss rate would be significant and the subscriber losses would continue over time if the video distributor continued not to carry the networks at issue.  That such subscriber losses can be a significant concern for an MVPD is confirmed by DirecTV's analysis of a potential blackout with a different substantial programmer.  In a December 2014 presentation prepared for the Board of Directors, DirecTV's Economic Impact Study estimated that*

*subscriber losses from a blackout of a particular programmer's channels would cost it $10.5 billion over 6 years.*

**Response**:      Defendants lack knowledge or information sufficient to admit or deny the

allegations contained in the second and third sentences of the paragraph.  Defendants further

respond that Plaintiff's selective citation in the fifth sentence to unidentified written material is

taken out of context and is misleading.  Defendants deny the remaining allegations contained in

this paragraph.

34. *In the event an MVPD or virtual MVPD does not carry a group of popular networks, most customers who leave that distributor in response to that blackout will look elsewhere for a comparable video distributor that still offers those networks.  Because AT&T/DirecTV has an MVPD that it offers throughout the United States, it stands to gain a significant number of new customers in the event a rival MVPD or virtual MVPD is foreclosed from carrying certain popular networks that the merged company continues to carry—i.e., a blackout.*

**Response**:      Defendants deny the allegations contained in this paragraph.

35. *Accordingly, were this merger to go forward, the merged company could "more credibly threaten to withhold" Turner's popular programming—including the hit shows and live sporting events carried by TNT, TBS, and Cartoon Network—as leverage in its negotiations with MVPDs and virtual MVPDs.  In a given negotiation, both the merged company and a rival MVPD—for example, a cable company—know that if the merged company were to walk away from the bargaining table and the Turner networks were to go dark on that cable company's offerings, a significant number of the cable company's customers would cancel their subscriptions, and the cable company would gain fewer new subscribers during the blackout.  In fact, MVPDs have done studies to determine the subscriber loss that would occur if they did not have the popular networks Time Warner owns.  Unsurprisingly, given the popularity of Turner's networks—which carry hit shows and important live sports events—these studies confirm that the anticipated subscriber loss rate is likely to be significant.  In addition, because the merged company would know beforehand that the rival MVPD would soon lack Turner programming, the merged company would be in a particularly strong position, as a result of the merger, to target the rival MVPD's customers with advertisements and telephone calls urging them to subscribe to AT&T/DirecTV's television offerings.*

**Response**:      Defendants lack knowledge or information sufficient to admit or deny the

allegations contained in the third and fourth sentences of this paragraph.  Defendants deny the

remaining allegations contained in this paragraph.

36. *The merged company's bargaining leverage as a seller of programming would thus increase, and not through the offering of lower prices or a superior product or service offering, but directly because of this proposed merger. Competing MVPDs and virtual MVPDs would thus recognize that it will make financial sense to pay the merged firm a higher price for Turner networks than it would prior to the merger, rather than risk losing valuable customers. And the merged company would know that it can extract higher rates for Turner's networks because, if no deal were reached, the merged firm would capture a significant number of the customers who would depart the competing MVPD or virtual MVPD's service, and it would have an improved chance to sign up new customers since one rival would lack Turner's highly popular programming. These new customers bring with them significant margins that would reduce the losses the merged company would sustain when the rival MVPD or virtual MVPD no longer distributes Turner programming. As DirecTV has explained, control of programming by a distributor creates "the ability to extract higher rates for years going forward based on the threat of such [subscriber] switching." The merger would thus create a company that has the incentive and ability to weaken its video distributor competitors by charging them higher prices for Turner's networks, resulting in a substantial lessening of competition.*

   **Response**:   Defendants deny the allegations contained in this paragraph. Defendants further respond that Plaintiff's selective quotation in the fifth sentence of unidentified material is taken out of context and is misleading.

37. *The manner in which this merger would likely result in a substantial lessening of competition is based on a well-accepted understanding within the industry. Indeed, both AT&T and DirecTV have previously explicitly stated that MVPDs that control popular networks and sports programming have precisely this incentive and ability to harm competition. With respect to a similar, but smaller, purchase of a programmer by a distributor (the Comcast acquisition of NBCU), DirecTV stated that "a standard bargaining model can be used to determin[e] the likely increase in price that would result from vertical integration." Here, an estimate of the price increases the merged company can impose on its competitors as a result of the effects of this merger and due to its increased bargaining leverage can be calculated by taking into account: (1) how many customers competing distributors would lose or fail to add without Turner programming (their subscriber loss rate); (2) the percentage of those departing customers that would likely become subscribers of the merged company (the diversion rate); and (3) how much AT&T/DirecTV profits from its customers (its margins).*

   **Response**:   Defendants deny the allegations contained in this paragraph. Defendants also lack knowledge of the methodology Plaintiff is using to "estimate" alleged price increases. Defendants further respond that Plaintiff's selective quotation in the third sentence of unidentified written material is taken out of context and is misleading.

38. *Following this merger, using a bargaining model similar to the one previously endorsed by DirecTV, the eventual price increases to the merged firm's competitors for Turner networks due to the merged company's increased power would likely be at least hundreds of millions of dollars.  Because video distributors pass through most of their cost increases to their customers, these increased costs would likely result in higher monthly bills for consumers.  But whether the effect of these increased costs for rival video distributors results in higher prices or a form of reduced service, the effect would be to substantially lessen competition by rendering these competitors less able to compete effectively with the merged company.  As a result of the merger, the merged company would also have the power to raise its own prices relative to what it could have, had the merger not reduced competition from competing MVPDs.*

**Response**:       Defendants deny the allegations contained in this paragraph.

39. *In addition, the merger would likely give the merged firm the incentive and ability to use its control of HBO to substantially lessen competition.  Due to its strong brand and consumer recognition and demand, MVPDs (including AT&T/DirecTV) today use HBO as a tool to entice new customers and to dissuade unhappy customers from leaving and switching to a rival MVPD.  Other premium channels, like Starz or Showtime, are not adequate alternatives to HBO for MVPDs seeking to attract or retain customers with premium content.  When used in this way, HBO can increase competition.  After the merger, however, the merged firm would have the incentive and ability, through contractual restrictions, to impede rival MVPDs from using HBO to compete against AT&T/DirecTV, thereby reducing competition among MVPDs.  In addition, after the merger, the combined firm would have additional leverage when it is negotiating with rival MVPDs over HBO.*

**Response**:       Defendants admit that HBO has a valuable brand and consumer recognition.  Defendants also admit that video distributors, including AT&T and DIRECTV, offer HBO for many reasons, including because customers value HBO's programming.  Defendants further respond that video distributors use numerous promotional tools, other than HBO, to gain and retain customers.  Defendants deny the remaining allegations contained in this paragraph.

40. *The entry and growth of online video services promise to bring substantial benefits to consumers.  But as the nation's largest provider of traditional pay-TV, AT&T/DirecTV views these services as a threat.  As a result of this merger, the merged firm would have the increased market power to counter that threat and slow the emerging competition AT&T/DirecTV would otherwise face in the All Video Distribution and Multichannel Video Distribution markets.  For example, after the merger, AT&T/DirecTV would have an increased ability to charge virtual MVPDs higher prices for Turner's and HBO's important and popular programming and could very*

*well withhold that programming entirely from some virtual MVPDs, leading to even more severe effects on competition. Without the Turner networks, even virtual MVPDs such as Sling TV, which to date has been the most successful virtual MVPD competing with traditional MVPDs, may not continue to be the competitive force they are today. Turner knows this. Its CEO has stated that it has "leverage" over Dish, whose online Sling TV service "is shit without Turner."*

**Response**:        Defendants admit that the growth of online video services, many of which are well-established, and the frequent entry of new online video service providers have brought and will continue to bring substantial benefits to consumers. Defendants respond that Plaintiff's selective quotation in the seventh sentence of unidentified written material is taken out of context and is misleading. Defendants deny the remaining allegations contained in this paragraph.

41. *In addition, the merger would increase the likelihood and effect of oligopolistic coordination, particularly among certain vertically integrated MVPDs. AT&T itself has noted the high levels of concentration within the pay-TV industry and their stabilizing effect. In a presentation prepared for a meeting with Time Warner executives related to this merger, AT&T noted that, after the merger, the merged company and just three other companies would control a large portion of all three levels of the industry: television studio revenue, network revenue, and distribution revenue. AT&T went on to explain that—given these high levels of concentration—its "Core Belief #1" is that, notwithstanding the emergence of online video distributors, "[t]he economic incentives of major pay-TV players will encourage **stability** as the ecosystem evolves." (Emphasis added.) This "stability" comes at the cost of competition that benefits consumers in the All Video Distribution and Multichannel Video Distribution markets. In addition, the nature of the subscription television industry, including the widespread use of most favored nations (MFN) clauses between video distributors and programmers, facilitates coordination. Moreover, after the merger, AT&T/DirecTV and Comcast/NBCU,[3] which together have almost half of the country's MVPD customers, would have an increased incentive and ability to harm competition by impeding emerging online competitors that they consider a threat, and increasing the prices for the networks they own.*

[3]*Although Comcast/NBCU is currently subject to conditions that were imposed by the Department and the FCC as a result of their respective reviews of the merger between that video distributor and programmer, the FCC's conditions expire on January 20, 2018 and the DOJ consent decree expires on September 1, 2018. See Comcast-NBCU Order, 26 FCC Rcd 4238 at ¶ XX (2011); Comcast/NBCUniversal Modified Final Judgment at ¶ XI (2013).*

**Response**:        Defendants deny the allegations contained in this paragraph. Defendants respond that Plaintiff's selective quotation of unidentified written material is taken out of context and is misleading. Defendants further respond that the FCC Order and the court-approved

consent decree between Plaintiff and the parties to the Comcast/NBCUniversal merger speak for themselves.

42. *The proposed merger would be unlikely to generate verifiable, merger-specific efficiencies in the relevant markets sufficient to reverse or outweigh the anticompetitive effects that are likely to occur.*

**Response**:   Defendants deny the allegations contained in this paragraph.  Defendants further respond that this merger will generate significant efficiencies that will increase competition and benefit consumers.  Defendants also respond that the proposed transaction will, among other things, foster innovation in video content and distribution; allow AT&T and Time Warner to use content intelligence to produce and market new content more efficiently and effectively; combine Defendants' complementary capabilities to enable the combined company to provide much needed competition with Google and Facebook, which today dominate digital advertising; and lead to significant cost savings measured in the billions of dollars.  Defendants respond as well that this single allegation is insufficient to meet Plaintiff's burden to prove that the overall effect of the transaction is to substantially lessen competition.

43. *Entry of new video programming distributors in the relevant markets is unlikely to prevent or remedy the proposed merger's anticompetitive effects.*

**Response**:   Defendants deny the allegations contained in this paragraph.

44. *The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  The effect of the proposed merger would be likely to lessen competition substantially in interstate trade and commerce in both the All Video Distribution product market and the Multichannel Video Distribution product market in numerous relevant local geographic markets throughout the country, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.*

**Response**:   Defendants admit that Plaintiff has filed its Complaint pursuant to Section 15 of the Clayton Act and that Plaintiff purports to seek to prevent and restrain Defendants from

violating Section 7 of the Clayton Act.  Defendants deny that the proposed transaction would

lessen competition in any market or otherwise violate the Clayton Act.

45. *AT&T, DirecTV, and Time Warner are engaged in, and their activities substantially affect, interstate commerce.  AT&T and DirecTV buy and distribute video programming in interstate commerce.  Time Warner sells and distributes video programming that is purchased and consumed in interstate commerce.  The Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18, and 28 U.S.C. §§ 1331, 1337(a), and 1345.*

**Response**:      Defendants admit that AT&T affiliates and Time Warner affiliates are

engaged in relevant interstate commerce and that this Court has subject matter jurisdiction over

this action.  Defendants deny that the proposed transaction would violate the Clayton Act or

provides any basis for Plaintiff to secure relief against Defendants from this Court.

46. *This Court has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22.  AT&T and Time Warner both transact business in this district.*

**Response**:      Defendants admit that this Court has personal jurisdiction over Defendants

as a result of an agreement entered between Defendants and Plaintiff whereby Defendants

acceded to personal jurisdiction.  Defendants deny that AT&T transacts business in this District.

47. *Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)(1) and (c).  Defendants AT&T and Time Warner transact business and are found within the District of Columbia.*

**Response**:      Defendants admit that venue is proper in this District as a result of an

agreement entered between Defendants and Plaintiff.  Defendants deny that AT&T transacts

business in this District.

48. *Plaintiff requests that:*

   a. *the proposed acquisition be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;*
   b. *AT&T and Time Warner be permanently enjoined from carrying out the proposed merger and related transactions; carrying out any other agreement,*

*understanding, or plan by which AT&T would acquire control over Time
Warner or any of its assets; or merging;*

c.  *the Plaintiff be awarded costs of this action; and*

d.  *the Plaintiff receives such other and further relief as the case requires and the
Court deems just and proper.*

**Response**:      Defendants deny that Plaintiff is entitled to any of the relief requested.

Defendants request that they be awarded the costs incurred in defending this action, as well as

any and all other relief the Court may deem just and proper.

## DEFENSES

Defendants assert the following defenses, without assuming the burden of proof on such

defenses that would otherwise rest with Plaintiff:

1.      The injunctive relief that Plaintiff seeks is inconsistent with the public interest.

2.      Plaintiff has failed to define any appropriate relevant market or markets.

3.      Plaintiff has failed to establish that Defendants exercise market power with
respect to any relevant market.

4.      Without prejudice to Defendants' response to Paragraph 42, the overwhelming
efficiencies that will result from the transaction will benefit consumers, such that the transaction
is in the public interest.

5.      Plaintiff's claim reflects improper selective enforcement of the antitrust laws.

6.      DIRECTV is not a proper defendant, and Plaintiff is entitled to no relief against it.

Dated: November 28, 2017

Respectfully submitted,

By: _____

Daniel M. Petrocelli
dpetrocelli@omm.com
M. Randall Oppenheimer
roppenheimer@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Katrina M. Robson (#989341)
krobson@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Counsel for AT&T Inc., DIRECTV Group Holdings, LLC, and Time Warner Inc.*

Christine A. Varney
cvarney@cravath.com
Peter T. Barbur
pbarbur@cravath.com
Kevin J. Orsini
korsini@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 8th Ave
New York, NY 10019
Telephone: (212) 474-1140
Facsimile: (212) 474-3700

*Counsel for Time Warner Inc.*

Robert C. Walters
rwalters@gibsondunn.com
Michael L. Raiff
mraiff@gibsondunn.com
**GIBSON DUNN & CRUTCHER**
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
Telephone: (214) 698-3114
Facsimile: (214) 571-2932

*Counsel for AT&T Inc. and DIRECTV Group Holdings, LLC*