UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　Plaintiff,<br><br>-v-<br><br>AT&T INC.;<br>DIRECTV GROUP HOLDINGS, LLC; and<br>TIME WARNER INC.;<br>Defendants. | Civil Action No.:　17-cv-02511 (RJL) |

**BRIEF OF AMICUS CURIAE CARTER PAGE
IN SUPPORT OF PLAINTIFF'S COMPLAINT**

September 12, 2017

By:　/s/ Carter Page
Carter Page
c/o Global Energy Capital LLC
590 Madison Ave., 21st floor
New York, NY 10022
Phone (212) 537-9261
Fax　(212) 537-9281
cpage@globalenergycap.com

# TABLE OF CONTENTS

I.     STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE* .................................. 1

II.    SUMMARY OF ARGUMENT ........................................................................................ 3

III.   ARGUMENT ............................................................................................................... 5

    A.   Dangers associated with further enlargement of today's telecommunications-media oligopoly ................................................................................................................ 5

    B.   Case study of telecommunications-media conglomerate market abuses: Impact on the 2016 election ...................................................................................................................... 7

    C.   Creation of the telecommunications-media oligopoly: 2009-present. ..................................... 10

    D.   Pending Dodgy Dossier litigation and the initial exposure of oligopolistic abuses................ 14

    E.   Illegal activity within BBG, DOJ and its affiliates: Conspiracy with telecommunications-media oligopoly .......................................................................................................... 15

    F.   Current limitations on Congressional oversight pending Bean v. Bank and HPSCI ............ 16

    G.   Media exception to global market rulings .......................................................................... 18

    H.   Structural inequality and general market impact of telecommunications-media oligopoly on small business ...................................................................................................................... 18

IV.   CONCLUSION ............................................................................................................ 21

## TABLE OF AUTHORITIES

**Cases**

*Bean LLC d/b/a Fusion GPS v. Defendant Bank and Permanent Select Committee on Intelligence,* 17-cv-2187-RJL (D.D.C., Oct. 20, 2017) .......................................... 14, 15, 16, 18

*Brown Shoe Co., Inc. v. United States*, 370 U.S. 294 (1962) ...................................................... 2

*Carter Page v. Oath Inc. and Broadcasting Board of Governors,* 17-cv-6990-LGS (S.D.N.Y., September 14, 2017) ................................................................................................................ 2, 20

*Federal Trade Commission v. Procter Gamble Company*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) ................................................................................................................... 7

*Fridman et al v. Bean LLC et al*, 17-cv-02041, (D.D.C., Oct. 3, 2017) ........................................ 15

*General Foods Corporation v. FTC*. 386 F.2d 936 (3rd Cir. 1967) .............................................. 10

*Gubarev et al v. Buzzfeed, Inc. et al*, 17-cv-60426 (S.D. Fla., Feb 28, 2017) ............................. 15

*Kennecott Copper Corporation v. FTC*, 467 F.2d 67 (10th Cir. 1972) ......................................... 11

*Marbury v. Madison*, 5 U.S. 137 (1803) ...................................................................................... 19

*Scott Paper Company v. FTC*, 301 F.2d 579 (3rd Cir. 1962) ......................................................... 6

*United Nuclear Corp. v. Combustion Engineering, Inc.*, 302 F. Supp. 539 (1969) ...................... 6

*United States Steel Corp., v. FTC*, 426 F.2d 592 (6th Cir. 1970) ............................................. 20, 21

*United States v. General Dynamics Corp.*, 415 U. S. Reports 486, 94 S.Ct. 1186 , 39 L.Ed.2d 530 (1974) ........................................................................................................................................ 20

*United States v. Marine Bancorp., Inc.,* 418 U.S. 602, 41 L.Ed.2d 978, 94 S.Ct. 2856 (1974)... 20

*United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966). ....... 18

*United States v. Penn-Olin Chemical Co.*, 378 U.S. 158 (1964) ..................................... 10, 13, 19

*United States v. Tracinda Inv. Corp.*, 477 F. Supp. 1093 (C.D. Cal. 1979) ................................. 18

*United States v. Von Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966) ............. 6

## Statutes

18 U.S. Code § 798 ........................................................................................................... 17

22 U.S.C. § 6202 ................................................................................................................. 5

Pub. L. No. 112-239, § 1078, 126 Stat. 1632, 1957-59 ............................................... 13, 16, 17, 18

Section 7 of the Clayton Act, 15 U.S.C. § 18 .............................................................. 3

## Rules

Local Civ. R. 7(o) .............................................................................................................. 3

## Constitutional Provisions

First Amendment of the United States Constitution ....................................................... 5

## I.   STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Carter Page, Ph.D. ("Dr. Page") is the Managing Partner of Global Energy Capital LLC, a New York Corporation with principal offices in New York City.  Throughout much of the past twenty years, he has made contributions as a scholar in the fields of foreign policy and international political economy.  In this capacity, he has served as an adjunct or evening faculty member at institutions of higher education as well as a research fellow at foreign policy think tanks.  In 2016, Dr. Page similarly volunteered as a junior, unpaid, informal advisor to the Donald J. Trump for President campaign (the "Trump Campaign").  His ability to make any supportive contribution as a private citizen during this American democratic process last year was effectively blocked.  The related diverse array of obstruction of justice abuses in violation of many Constitutional rights primarily stemmed from illicit activities undertaken by major participants in the U.S. telecommunications-media oligopoly and their illegal de facto joint venture marketing partners in the U.S. Government ("USG") propaganda network.  Based on preliminary accounts from these institutions[1] and associated unfulfilled appeals by members of Congress, Dr. Page was illicitly hacked in 2016.

Prior to the severe disruption to his life stemming from the U.S. Government's meddling in the 2016 election, Dr. Page spent over 15 years as a finance practitioner in mergers and acquisitions ("M&A") as well as a diverse array of capital markets transactions.  In addition to his firsthand experience with each current and proposed institution in the U.S. telecommunications-media oligopoly, these practical M&A insights offer unique perspectives relevant to the review of AT&T's case for joining this elite club.

---

[1]   "FBI Reportedly Monitored Trump Campaign Adviser For Russia Contacts," Radio Free Europe / Radio Liberty, April 12, 2017. https://www.rferl.org/a/fbi-monitored-trump-campaign-adviser-russia-contacts-washington-post-reported/28424682.html

Other than the exception of then-candidate Donald J. Trump, Dr. Page was thus the main direct victim of U.S. Government interference in the 2016 election. This widely-reported public conspiracy was advanced by U.S. federal agencies in conjunction primarily with subsidiaries of Verizon Communications Inc. ("Verizon") including the media conglomerate that it controls, Oath Inc. ("Oath").[2] As the largest current U.S. example of the vertically integrated business model that AT&T Inc. is presently seeking to transition toward (Exhibit 1, *infra*), the legal and factual evidence surrounding the unlawful actions of Verizon and its subsidiaries last year may prove highly relevant to this pending antitrust litigation. In assessing the potential impact of admitting a third corporate behemoth into this telecommunications-media oligopoly with AT&T's proposed transaction, no theoretical economic model could ever prove equally effective in exposing the travesty of justice displayed by the real-world impact of the recent abuses of this analogous archetype as seen in the firsthand experience of Dr. Page. The Supreme Court has held that "a merger has to be viewed functionally, in the context of its particular industry." *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294 (1962). The facts surrounding the recent abuses of last year provide essential context that illustrates the potential for further damage which the U.S. telecommunications-media oligopoly already represents. Given Dr. Page's unique experiences with these oppressive abuses and his depth of experience in closely related fields, he is uniquely situated to confirm that plaintiff's assessment that AT&T's proposed acquisition of Time Warner could serve as a weapon to harm competition. The related analysis in this *amicus curiae* thus offers further evidence and analysis in support of the United States of America's case.

---

[2]   See *Carter Page v. Oath Inc. and Broadcasting Board of Governors,* 17-cv-6990-LGS (S.D.N.Y., September 14, 2017).

Turner Broadcasting System's television news channel CNN is only mentioned briefly in Plaintiff's Compl. of November 20, 2017.  But further factual background regarding the broader related competitive landscape involving news distribution across a comparative sample of leading U.S. telecommunications and pure-play media corporations is available in Exhibit 1, *infra*.  While the current telecommunications-media oligopoly initially spawned from a series of transactions initiated in 2009 already represents a clear violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, further extending these prevailing detrimental market structures would only further enable the continuation of such abuses.

Pursuant to Local Civ. R. 7(o), *amicus* has submitted a motion for leave to file this brief as *amicus curiae*.[3]

## II. SUMMARY OF ARGUMENT

A fundamental premise of the Chicago school of antitrust policy analysis has been described as follows:

> "antitrust issues should be analyzed on the assumption that business firms are rational profit maximizers, so that the standard theorems of price theory can be used to predict the competitive effects of a challenged transaction."[4]

Taking potential theoretical violations of challenged transactions even one step further, more egregious abuses of power have instead been created by an exclusive oligopoly of telecommunications-media conglomerate consolidators that emerged in recent years.  With the essential regulatory approval and support enabled by Washington lobbyists and government

---

[3]  *Amicus* declares that no party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—including *amicus*, who is handling this matter *pro se*—contributed money that was intended to fund the preparation of this brief.
[4]  Richard A. Posner, "Vertical Restraints and Antitrust Policy," *University of Chicago Law Review*, Vol. 72, Issue 1 (Winter 2005), pp. 229-242.

relations networks beginning in 2009, these corporations have created arrangements that involved prejudice to the public interest.  Contrary to the theoretical Chicago school of antitrust policy analysis framework, the oligopoly's goals verifiably extend far beyond rational profit maximization.  Given recent instances of corruption in Washington that these corporations themselves have played a key role in helping to enable, an oligopolistic concentration of telecommunications-media power was created.  Beginning to reaching a new crescendo, this market power concentrated in the hands of a few large dominant mega corporate telecommunications-media conglomerates:

1)  Encourages extreme levels of journalistic recklessness and impropriety since it allocates considerable resources to the media outlets under their control.  In the case of Verizon, this includes subsidiaries such as Yahoo News and HuffPost.  With such substantial associated government relations and legal resources as well as associated relationships backing them, they have demonstrated the capacity to effectively crush opposition no matter how factually and legally solid those subtler voices in the national conversation who hold alternative perspectives may be.

2)  Enables these overly-empowered media outlets with the support of their parent entities, which stand among the largest corporations in the United States (Exhibit 1, *infra*), to be easily leveraged by powerful owners and managers who may continue to further conspire with favored political actors to exclude contrarian perspectives.  By doing so and as observed last year prior to the 2016 election, they may continue to thereby further undermine federal institutions and American democracy in general as well as fundamental Constitutional principles in particular.  These include First

4

Amendment principles such as the right of peaceful assembly and freedom of speech.[5]

This unprecedented market concentration was enabled with a new wave of regulatory approvals that began in 2009.  As a result, a perfect storm exhibiting each element of the new brand of unprecedented societal and market impact was most vividly observed preceding the 2016 election.  In this instance, such oligopolistic private corporate media arrangements extended even further by allowing effective control over the U.S. Government propaganda networks in violation of U.S. law: "United States international broadcasting shall… not duplicate the activities of private United States broadcasters [and]… be conducted in accordance with the highest professional standards of broadcast journalism…" See 22 U.S.C. § 6202.  This representative deviation from statutory requirements helped these telecommunications-media conglomerate consolidators either initially precipitate or further enable the unjustified Witch Hunt against Dr. Page and other Americans on behalf of their chosen political beneficiaries last year.[6]

## III. ARGUMENT

### A. Dangers associated with further enlargement of today's telecommunications-media oligopoly

---

[5]    See also Lydia Segal, "Can We Fight the New Tammany Hall: Difficulties of Prosecuting Political Patronage and Suggestions for Reform," *Rutgers Law Review*, Vol. 50, Issue 2 (Winter 1998), pp. 507-562.

[6]    See: Carter Page letter to James Comey, September 25, 2016.
http://washingtonpost.com/r/2010-2019/WashingtonPost/2016/09/26/Editorial-Opinion/Graphics/2016.09.25_FBI_letter.pdf

The damages that the telecommunications-media oligopoly displayed in 2016 cut to the core of the intent of what the Sherman Act was initially designed to prevent: "From this country's beginning there has been an abiding and widespread fear of the evils which flow from monopoly—that is the concentration of economic power in the hands of a few. On the basis of this fear, Congress in 1890, when many of the Nation's industries were already concentrated into what it deemed too few hands, passed the Sherman Act in an attempt to prevent further concentration… congressional purpose revealed by the legislative history was to protect small businessmen and to stem the rising tide of concentration in the economy." *United States v. Von Grocery Co.*, 384 U.S. 274-284, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966).

Despite these explicit intentions of Congress, key uncertainties that are directly relevant to the AT&T case still remain.  For example: "The guidelines for the application of Section 7 to vertical mergers are not clearly etched. The case law has not developed rapidly, and the principles evolving from the cases are complex… However, a particular vertical merger may result in a transfer of oligopolistic market conditions from one market to another, or in other anti-competitive effects." *United Nuclear Corp. v. Combustion Engineering, Inc.*, 302 F. Supp. 539 (E.D. Pa. 1969).   Such a transfer of the industry to oligopolistic market conditions is precisely what occurred through a series of telecommunications-media transactions in the period of eight years beginning from 2009.

Common law precedent has demonstrated concern related to "barriers to entry into the industry" in vertical mergers, noting the associated analytic challenges: "It is concluded that while the survey may supply interesting statistical information of a general nature regarding the… industry, it is without any substantial probative value on the vital question of the effects of the challenged acquisitions." *Scott Paper Company v. FTC*, 301 F.2d 579, 581 (3rd Cir. 1962).

The experiences of an elite set of telecommunications-media market consolidators leading up to the events of 2016 thus provides substantial relevant additional insights into the applicable market trends, offering additional requisite probative value related to these vital market questions.

### B.  Case study of telecommunications-media conglomerate market abuses: Impact on the 2016 election

Amongst managers of small U.S. firms, few fears of retaliation may exceed those stemming from the ones inflicted by the telecommunications-media oligopoly in recent years.  These market actors arranged unparalleled access to U.S. government agencies for direct marketing and regulatory support of their oligopoly, further strengthening the impact of their highly rigid and often detrimental collective control over information and news markets in America: "The Court first declares that the market here was oligopolistic and that interjection of Procter would make the oligopoly 'more rigid' because there is every reason to assume that the smaller firms would become more cautious in competing due to their fear of retaliation" (citation and internal quotation marks omitted). *Federal Trade Commission v. Procter Gamble Company*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967).

As vividly demonstrated by the facts in the case of interference in the 2016 U.S. election by Verizon and its subsidiaries, the collaboration with a leading USG propaganda agency by AT&T's rival last year demonstrated an arrangement that involved a clear pattern of prejudice to the public interest.  In this recent historic instance, "all the relevant marketing and economic factors"[7] have included unparalleled personal access by senior leaders of the oligopoly to

---

[7]  "Economic Evidence in Antitrust Cases: Address by Honorable Edward F. Howrey, Chairman, Federal Trade Commission, to the American Marketing Association," Atlantic City, New Jersey, June 14, 1954.

prominent political and government actors in Washington in 2016 which have supported their marketing strategy.  Aside from extensive basic "evidence that the efficiency-through-merger hypothesis is a dubious basis for formulating public policy"[8], far greater potential damage to the public interest may be directly observed in the damages that resulted from Verizon's actions last year.  With the pending litigation in U.S.A. v. AT&T Inc., it is important to protect America from the repeat and continuation of such damaging outcomes in the future.  Such protection may be achieved through the prevention of a further expansion and concentration of power amongst the current short list of oligopolists who now dominate the vertically integrated corporate mammoths in the telecommunications-media sector.

Approximately 45 days prior to the U.S. election on September 23, 2016, in perhaps the most dangerous, reckless, irresponsible and historically-instrumental moments in modern-day sensational crime story journalism, a current subsidiary of Verizon, Yahoo Inc. ("Yahoo") chose to publish a highly misleading article filled with false allegations, entitled: "U.S. intel officials probe ties between Trump adviser and Kremlin" (the "2016 Yahoo Report").[9] The article represented the world premiere of an extensive array of completely false, misrepresented and/or unverified information (the "Dodgy Dossier") compiled by Orbis Business Intelligence Ltd., a private company in London, U.K.  The 2016 Yahoo Report and the subsequent Dodgy Dossier that eventually followed it each made various outrageous allegations concerning, among other things, meetings between Dr. Page and two sanctioned Russian officials.  In both instances, Dr.

---

https://www.ftc.gov/system/files/documents/public_statements/687161/19540614_howrey_economic_evidence_in_antitrust_cases.pdf
[8]   Walter Adams, "The Proposed Emasculation of Section 7 of the Clayton Act," *Nebraska Law Review*, Vol. 65, Issue 4 (1986), pp. 813-822.
[9]   Michael Isikoff, "U.S. intel officials probe ties between Trump adviser and Kremlin," Yahoo News, September 23, 2016. [https://www.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-kremlin-175046002.html]

Page has never met with either of these individuals at any point in his life.  Like many of the other elements of false information in this opposition political research report, these allegations regarding Dr. Page are completely unfounded.

Several hours later, the U.S. federal agency Broadcasting Board of Governors ("BBG") grantee Radio Free Europe ("RFE") republished Yahoo's false allegations that Dr. Page met with these individuals[10] (the "RFE Republication").  Falling under the oversight of the U.S. Government's financial sponsor BBG and as a deliberate act that contributed to the indirect damage inflicted by federal authorities in Washington on the Donald J. Trump for President campaign, RFE directly tied Dr. Page to dominant public controversies regarding alleged cybercrimes that he never played any role in whatsoever: "The Yahoo News report was published a day after leading Democrats on the congressional intelligence committees accused Russia of trying to influence the U.S. election via computer hacking and called on Putin to 'order a halt to this activity.'"[11]

According to one summary analysis of the Clayton Act, the Supreme Court has frequently held that a Plaintiff "must allege threatened loss or damage of the type antitrust laws were designed to prevent".[12]  Dr. Page's personal experience and the offenses committed against America's democracy by Verizon, its managers and their corporate subsidiaries in collusion with federal agencies in Washington as well as other subsidiaries of the telecommunications-media

---

[10]  "Report: U.S. Intelligence Officials Examining Trump Adviser's Russia Ties," Radio Free Europe / Radio Liberty, September 24, 2016. http://www.rferl.org/a/report-us-intelligence-probes-trump-advisers-russia-ties-kremlin/28010062.html

[11]  "Report: U.S. Intelligence Officials Examining Trump Adviser's Russia Ties," Radio Free Europe / Radio Liberty, September 24, 2016. [http://www.rferl.org/a/report-us-intelligence-probes-trump-advisers-russia-ties-kremlin/28010062.html]

[12]  Anthony Tedesco, "Antitrust - Clayton Act - Monopolies [decisions]," *Duquesne Law Review*, Vol. 26, Issue 1 (Fall 1987), pp. 107-120.

oligopoly last year offer a vivid illustration of these specific types of potential extreme losses and damages that must be effectively guarded against.  Effectively addressing these unfortunate anticompetitive outcomes may be resolved through support of the United States of America's position in this current case as well as other related potential litigation in the future.

### C.  Creation of the telecommunications-media oligopoly: 2009-present.

Federal courts and the FTC have defined a "product extension merger" as a "merger that may enable significant integration in the production, distribution or marketing activities of the merging firms." *General Foods Corporation v. FTC.* 386 F.2d 936 (3rd Cir. 1967).  The collaborative production and marketing activities related to the dominant false news reporting by the current two participants in the telecommunications-media oligopoly, Verizon and Comcast, represent precisely these characteristics.

The de facto news joint venture between Verizon and Comcast also created amongst these initial participants in the telecommunications-media oligopoly have frequently been assessed by the Court with similar cases, in an attempt to create a range of anticompetitive dangers in related common law precedent: "It is the chosen competitive instrument of two or more corporations previously acting independently and usually competitively with one another. The result is 'a triumvirate of associated corporations.'". *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158 (1964).  With the added collaborative support of the USG's propaganda network seen in their joint misinformation campaign, the telecommunications-media oligopoly instead achieved an illicit quadrumvirate in the months preceding the November 2016 U.S. Presidential election.

Similar to the more recently proposed AT&T transaction involving Time Warner's Turner Broadcasting System subsidiary including CNN, Verizon and Yahoo announced on July 25, 2016 that they had entered into a definitive agreement under which Verizon would acquire Yahoo's operating business for approximately $4.83 billion in cash, subject to customary closing

adjustments.[13]  While thereby further enlarging their news media footprint and network that had

previously expanded with the acquisition of Huffington Post by Verizon's subsidiary AOL in

2011[14], the Yahoo acquisition was completed on June 13, 2017.[15]

Courts have recognized the prerogative of the federal government and the FTC to make

decisions "based on its predictions derived from the evidence that the market would become a

tight oligopoly if action were not taken at what it considered to be the incipient stage. In the light

of the general objectives of the [Clayton] Act we perceive no error in the Commission's

approaching the case on the basis of assessing probabilities rather than present conditions. The

Act contemplates this." *Kennecott Copper Corporation v. FTC*, 467 F.2d 67 (10th Cir. 1972).  In

the current instance of today's two party telecommunications-media conglomerate oligopoly,

AT&T's acceptance into this exclusive club would likely inflict further damage.  Underscoring

these anti-competitive tendencies as seen in Verizon's concentration of media power, similar

trends may be found in the related case of another member of its exclusive telecommunications-

media oligopoly, with which it has often maintained a de facto joint venture: Comcast and its

press affiliates including NBC News / MSNBC.  In the lead-up to last year's abuses that

---

[13]  http://www.verizon.com/about/news/verizon-acquire-yahoos-operating-business

[14]  "AOL Agrees To Acquire The Huffington Post," Huffington Post, February 7, 2011. https://www.huffingtonpost.com/2011/02/07/aol-huffington-post_n_819375.html

[15]  According to the completion announcement: "Verizon has combined these assets with its existing AOL business to create a new subsidiary, Oath, a diverse house of more than 50 media and technology brands that engages more than a billion people around the world.  The Oath portfolio includes HuffPost, Yahoo Sports, AOL.com, MAKERS, Tumblr, BUILD Studios, Yahoo Finance, Yahoo Mail and more, with a mission to build brands people love… Tim Armstrong, former CEO of AOL, is now CEO of Oath, which is part of Verizon's Media and Telematics organization. He has been leading integration planning teams since the Yahoo transaction was announced in July 2016, and Oath begins operation today as a global leader in digital and mobile. See www.oath.com for further information." http://www.verizon.com/about/news/verizon-completes-yahoo-acquisition-creating-diverse-house-50-brands-under-new-oath-subsidiary

negatively impacted American democracy and many of our country's citizens including Dr.
Page, Jeffrey Shell ("Mr. Shell"), a senior executive at Comcast subsidiary NBCUniversal[16], was
named to the Broadcasting Board of Governors ("BBG") by then-President Barack Obama on
September 12, 2012.[17] "He was confirmed to the board on August 1, 2013 and served as
Chairman of the Broadcasting Board of Governors from August 1, 2013 and until January 25,
2017".[18] According to an October 7, 2012 report by AllGov.com, "A Democrat, Shell has made
political contribution totaling $222,950 since 1995, mostly to Democratic candidates and
committees, including $82,600 to the Democratic National Committee, $16,500 to the
Democratic Senatorial Campaign Committee, and thousands to numerous Democratic
candidates, mostly at the Senatorial level. He has also contributed $42,000 to two broadcasting-
related PACs: $25,000 to ComCast PAC and $17,000 to the National Cable and
Telecommunications Association."[19]

During Mr. Shell's term, blatant exploitations of many of the fundamental legal bases upon
which these federal propaganda agencies were founded and have been operated by the USG
throughout most of their respective histories prior to their troubled reorganization plan of 2013
came to light for the first time.  See National Defense Authorization Act for Fiscal Year 2013,
Pub. L. No. 112-239, § 1078, 126 Stat. 1632, 1957-59 (the "NDAA 2013").

Evidence of the essential links between the dominant managers of the telecommunications-
media oligopoly and the USG may also be observed in the critically important events

---

[16] https://www.universalpictures.com/leadership-team/jeff-shell
[17] https://obamawhitehouse.archives.gov/the-press-office/2012/09/12/president-obama-announces-more-key-administration-posts
[18] https://www.bbg.gov/who-we-are/our-leadership/board/jeff-shell/
[19] http://www.allgov.com/news/appointments-and-resignations/chairman-of-the-broadcasting-board-of-governors-who-is-jeffrey-shell-121007

surrounding Comcast's acquisition of NBCUniversal and its journalistic subsidiaries including NBC News and MSNBC. This transaction was announced in December 2009.[20]  Reflective of the government relations power of the telecommunications-media oligopoly as similarly seen in recent events surrounding Verizon, Meredith Attwell Baker, the FCC commissioner who approved the Comcast-NBCUniversal transaction, was hired as a lobbyist by Comcast within months of when the FCC and the United States Department of Justice's approved the acquisition on January 18, 2011.[21]

The current telecommunications-media oligopoly of Verizon and Comcast includes many other cross-marketing arrangements as seen with a Huffington Post republication of Yahoo and the USG's influential false reports regarding Dr. Page prior to last year's election. This additional republication article also included a web link to the full 2016 Yahoo Report and featured the video of an appearance by the author of this defamatory article, Mr. Michael Isikoff, on Comcast-subsidiary MSNBC's "AM Joy" program on Saturday, September 24, 2016. Reflective of the de facto oligopolistic joint venture between Verizon and Comcast as previously seen in the similar precedent of *U.S. v. Penn-Olin (1964):*[22] Yahoo's representative and former Comcast/NBC employee[23] Mr. Isikoff did "not compete with the progeny in its line of commerce" amidst his interview with MSNBC host Joy Reid.[24]

---

[20]    Tim Arango, "G.E. Makes It Official: NBC Will Go to Comcast," *New York Times,* December 3, 2009. http://www.nytimes.com/2009/12/04/business/media/04nbc.html

[21]    Nate Anderson, "After approving NBC buyout, FCC Commish becomes Comcast lobbyist: Meredith Attwell Baker is leaving the FCC, but she won't be going far," Ars Technica, May 11, 2011. https://arstechnica.com/tech-policy/2011/05/after-approving-comcastnbc-deal-fcc-commish-becomes-comcast-lobbyist/

[22]    378 U.S. at 169.

[23]    Hadas Gold, "Michael Isikoff leaves NBC News," Politico, April 14, 2014. https://www.politico.com/blogs/media/2014/04/michael-isikoff-leaves-nbc-news-186821

[24]    http://www.huffingtonpost.com/entry/trump-campaign-russia-carter-page_us_57c7eb59e4b0c80b1ba299b9

**D.  Pending Dodgy Dossier litigation and the initial exposure of oligopolistic abuses.**

Aside from the specific abuses committed against Dr. Page and our American democracy by

the U.S. Government in conjunction with the telecommunications-media oligopoly during the

months leading up to the 2016 election, our country is fortunate that this Court may be more

aware of some of these exact same closely related patterns of offenses than any Article III bench

in the United States.  Since October 20, 2017, the proceedings of *Bean LLC d/b/a Fusion GPS v.*

*Defendant Bank and Permanent Select Committee on Intelligence,* 17-cv-2187-RJL (D.D.C.,

Oct. 20, 2017) have effectively taken steps to incrementally introduce some increased levels of

transparency regarding the abuses against America's democracy and many fundamental tenets of

the U.S. Constitution last year.[25]  This associated case may offers an initial related glimpse into

some aspects of the associated oligopolistic abuses by the dominant telecommunications-media

conglomerates which occurred in 2016.

Many of the core tenets of the known rules governing the conduct and affairs of BBG and

RFE throughout their histories were fundamentally altered with the NDAA 2013, now allowing

USG propaganda to reach American citizens in the domestic audience.[26]  The 2016 election thus

marked the first time these revised organizational structures and legal tenets were tested amidst a

U.S. Presidential contest.  Under the control and influence of managers and employees of the

telecommunications-media oligopoly, the detrimental impact of excessive control by their de

facto joint venture was readily observed.

---

[25] See also Catherine Herridge, "Firm behind Trump dossier goes to court to block House
subpoena for bank records," Fox News, October 20, 2017.
http://www.foxnews.com/politics/2017/10/20/firm-behind-trump-dossier-goes-to-court-to-block-
house-subpoena-for-bank-records.html

[26]   John Hudson, "U.S. Repeals Propaganda Ban, Spreads Government-Made News to
Americans, *Foreign Policy,* July 14, 2013.  http://foreignpolicy.com/2013/07/14/u-s-repeals-
propaganda-ban-spreads-government-made-news-to-americans/

### E. Illegal activity within BBG, DOJ and its affiliates: Conspiracy with telecommunications-media oligopoly

DOJ currently finds itself at one of the most critical crossroads of its 147-year history.

Directly related to several of the severe abuses that were fostered in part by the widespread illicit misinformation campaign enabled by the telecommunications-media oligopoly consolidation alluded to, *supra*, the House Permanent Select Committee on Intelligence ("HPSCI")[27] and Senate Judiciary Committee[28] have increasingly attempted to take affirmative steps which might help reintroduce some level of integrity and credibility within the DOJ Antitrust Division's parent organization following its alleged exploitations of America's democracy last year. Whereas this court is now presiding over one of the most important cases amongst many pending Dodgy Dossier civil actions[29] in parallel with the antitrust review of AT&T, these pending civil actions related to the 2016 election have already played an important role in providing assistance in the DOJ's ongoing ethical and institutional reformation as well.[30] In the interim, increasing

---

[27]  James Rosen, "House lawyer urged contempt citations against DOJ, FBI over dossier 'stonewalling'," Fox News, November 30, 2017. http://www.foxnews.com/politics/2017/11/30/house-lawyer-urged-contempt-citations-against-doj-fbi-over-dossier-stonewalling.html

[28]  "Grassley, Graham Seek Surveillance Applications in Russia Probe," Website of Senator Chuck Grassley, June 28, 2017. https://www.grassley.senate.gov/news/news-releases/grassley-graham-seek-surveillance-applications-russia-probe  Chuck Ross, "Lindsey Graham Previews Tough Questions For Obama Officials About Trump Surveillance," Daily Caller, April 25, 2017. [http://dailycaller.com/2017/04/25/lindsey-graham-previews-tough-questions-for-obama-officials-about-trump-surveillance/

[29]  Among others including *Bean v. Bank and HPSCI*, see also: *Gubarev et al v. Buzzfeed, Inc. et al*, 17-cv-60426 (S.D. Fla., Feb. 28, 2017); *Fridman et al v. Bean LLC et al*, 17-cv-02041 (D.D.C., Oct. 3, 2017).

[30]  Cogan Schneier, "Three Things to Know About the Latest Fusion GPS Subpoena Fight: The research firm behind the so-called 'Steele' dossier is fighting a congressional subpoena for its clients' bank record in federal court," National Law Journal, November 30, 2017. https://www.law.com/nationallawjournal/sites/nationallawjournal/2017/11/30/three-things-to-know-about-the-latest-fusion-gps-subpoena-fight/

evidence of coordination between the DOJ and those responsible for the Dodgy Dossier continues to come to light.[31]

Many other fundamental tenets of the known rules governing the conduct and affairs of BBG and its beneficiary RFE throughout their histories were fundamentally altered with the NDAA 2013, now allowing USG propaganda to reach American citizens in the domestic audience.[32] The 2016 election marked the first time these revised organizational structures and legal tenets were tested amidst a U.S. Presidential contest.  Under the Chairmanship of Comcast executive Mr. Shell, the federal agency BBG displayed the material adverse impact of influence by the telecommunications-media oligopoly in the months leading up to the 2016 election given clear breeches of their new regulatory framework.

### F.  Current limitations on Congressional oversight pending *Bean v. Bank and HPSCI*
Consistent with the requirements of reasonable Congressional oversight, HPSCI has

heretofore been frequently ignored by the U.S. Department of Justice in their recent requests for transparency regarding the abuses enabled in part by the telecommunications-media oligopoly of last year.[33]  Related to the ongoing reform initiatives that HPSCI has taken efforts to lead as part of these requisite oversight efforts over relevant Article II institutions, this Congressional Committee stands as an essential party in this Court's *Bean v. Bank and HPSCI* case, 17-cv-2187-RJL.

---

[31]   James Rosen and Jake Gibson, "Wife of demoted DOJ official worked for firm behind anti-Trump dossier," Fox News, December 11, 2017. http://www.foxnews.com/politics/2017/12/11/wife-demoted-doj-official-worked-for-firm-behind-anti-trump-dossier.html
[32]   John Hudson, "U.S. Repeals Propaganda Ban, Spreads Government-Made News to Americans, *Foreign Policy,* July 14, 2013. http://foreignpolicy.com/2013/07/14/u-s-repeals-propaganda-ban-spreads-government-made-news-to-americans/
[33]   Billy House, "House Republicans Prepare Contempt Action Against FBI, DOJ," Bloomberg News, December 3, 2017. https://www.bloomberg.com/news/articles/2017-12-03/u-s-house-republicans-prepare-contempt-action-against-fbi-doj-jaqegooo

Partially unchecked by DOJ and creating further complications with the requisite analysis for the AT&T transaction, some reprobate actors within the USG have created an unauthorized review of the policy decisions of Congress. The associated management challenges within some offices in DOJ and issues related to illegal leaks concerning Dr. Page's alleged FISA warrant to the press[34] have represented another abuse. The related illegal support from the USG's propaganda network represents another antitrust market exploitation of the telecommunications-media oligopoly. See 18 U.S. Code § 798; NDAA 2013. "Congress, in passing § 7 and in amending it with the Celler-Kefauver Anti-Merger amendment, was concerned with arresting concentration in the American economy, whatever its cause, in its incipiency. To put a halt to what it considered to be a 'rising tide' of concentration in American business, Congress, with full power to do so, decided 'to clamp down with vigor on mergers.' *United States v. Von's Grocery Co.*, 384 U. S. Reports 276, 86 S.Ct., at 1482. It passed and amended § 7 on the premise that mergers do tend to accelerate concentration in an industry. Many believe that this assumption of Congress is wrong, and that the disappearance of small businesses with a correlative concentration of business in the hands of a few is bound to occur whether mergers are prohibited or not. But it is not for the courts to review the policy decision of Congress that mergers which may substantially lessen competition are forbidden, which in effect the courts would be doing should they now require proof of the congressional premise that mergers are a major cause of concentration." *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966). The concentrated market power of the telecommunications-media oligopoly in its

---

[34]   First reported in Ellen Nakashima, Devlin Barrett and Adam Entous, "FBI obtained FISA warrant to monitor Trump adviser Carter Page" *Washington Post,* April 12, 2017, p. A1. https://www.washingtonpost.com/world/national-security/fbi-obtained-fisa-warrant-to-monitor-former-trump-adviser-carter-page/2017/04/11/620192ea-1e0e-11e7-ad74-3a742a6e93a7_story.html

current form have already fundamentally undermined many congressional premises upon which state-sponsored media broadcasts have been founded both before and after the unfortunate impact of the troubled 2013 NDAA.

### G.   Media exception to global market rulings

While the Supreme Court has not directly addressed the problems related with defining global markets in most instances, it has demonstrated limited precedent in some areas including cases specific to the media sector. "The Court's conclusion with respect to the geographic market rests in a recognition of the extent to which the worldwide nature of this industry effects competition here in the United States." *United States v. Tracinda Inv. Corp.*, 477 F. Supp. 1093 (C.D. Cal. 1979). The increasing evidence of conspiracy between private political forces in America, U.S. federal authorities and the global opposition political research industry[35] further underscores the adverse market impact of the telecommunications-media oligopoly. The oligopoly's employees played leading roles in these adverse market developments as illustrated in the events leading up to the 2016 election. The *Bean v. Bank and HPSCI* case has further illustrated key details regarding these fundamental realities and the problematic governance standards that enabled it, both within the telecommunications-media oligopoly as well as Article II institutions with which the oligopoly held unparalleled close associations.

### H. Structural inequality and general market impact of telecommunications-media oligopoly on small business

Despite the initial progress by this Court in its efforts to return to proper standards of the rule of law in the pending *Bean v. Bank and HPSCI* case, DOJ's continued reluctance to fully

---

[35]   Rebecca Ballhaus, "Clinton Campaign, DNC Helped Fund Trump-Russia Dossier," *Wall Street Journal,* October 25, 2017. https://www.wsj.com/articles/clinton-campaign-dnc-helped-fund-trump-russia-dossier-1508942615

acknowledge the misinformation that flowed from Great Britain last year and the civil rights

abuses that stemmed from it cuts against the very essence of many Constitutional protections

upon which the U.S. was founded.  Such abuses are more reflective of the relationships inherent

in an absolute monarchy form of government, rather than a Constitutional democracy or even the

more advanced commonwealth monarchy found in the United Kingdom.  The collaborative role

that the U.S. telecommunications-media oligopoly played in this debacle inflicted against

American democracy in 2016 further underscores the structural inequality of the current system

which is at risk of only becoming more egregious if the proposed AT&T transaction is approved:

"The very essence of civil liberty certainly consists in the right of every individual to claim the

protection of the laws whenever he receives an injury. One of the first duties of government is to

afford that protection. In Great Britain, the King himself is sued in the respectful form of a

petition, and he never fails to comply with the judgment of his court."  *Marbury v. Madison*, 5

U.S. 137 (1803).

"In weighing these factors the court should remember that the mandate of the Congress is in

terms of the probability of a lessening of substantial competition, not in terms of tangible present

restraint." *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158 (1964).  Operating in tandem

with rogue actors within the USG including some offices within the DOJ and BBG, the existing

two-party telecommunications-media oligopoly of Verizon and Comcast has already been largely

unrestrained in their abuses with significant national and global ramifications amidst recent

history.  These recent warning signs represent an ominous precedent for the proposed AT&T

transaction which bears many close structural similarities as it seeks accession into this business

model.

Given the unreliable indicators of actual market behavior and particularly in light of the continued cover-up by other offices within DOJ apart from the Antitrust Division, the actual experiences of the telecommunications-media oligopoly in 2016 offer other important alternative evidentiary references amidst this unfortunate recent historical data point as well. "We conclude that by introducing evidence of concentration ratios of the magnitude of those present here the Government established a prima facie case that the… market was a candidate for the potential-competition doctrine. On this aspect of the case, the burden was then upon appellees to show that the concentration ratios, which can be unreliable indicators of actual market behavior, see *United States v. General Dynamics Corp.*, 415 U. S. Reports 486, 94 S.Ct. 1186 , 39 L.Ed.2d 530 (1974), did not accurately depict the economic characteristics of the… market. In our view, appellees did not carry this burden, and the District Court erred in holding to the contrary." *United States v. Marine Bancorp., Inc.,* 418 U.S. 602, 41 L.Ed.2d 978, 94 S.Ct. 2856 (1974).

The telecommunications-media oligopoly framework that AT&T seeks to achieve in 2018 would represent a further violation of several other key benchmarks. Current trends in the oligopoly since 2009 breach many additional core criteria that courts have traditionally used to determine Section 7 violations. *United States Steel Corp., v. FTC*, 426 F.2d 592 (6th Cir. 1970). First, these include clear adverse effects for small businesses as seen in the impact on Dr. Page. *Page v. Oath and BBG.* Second, a trend toward concentration amongst the powerful telecommunications-media oligopoly as demonstrated in the events since 2009 with particular reference to the impact amidst last year's election. Third, "present industry trends towards vertical integration". Finally, and as seen in the concentration of power in 2016, "the ease with which potential entrants may readily overcome barriers to full entry and compete effectively with

existing companies" is limited by structural advantages created by favored federal government power sources amongst Article II institutions. (*USS v. FTC,* 1970).

Early in the history of the telecommunications-media oligopoly that began to emerge in 2009, an in-depth FTC report from 2012 noted the failure in self-regulation by these same conglomerates related to the proliferation of privacy invasions that had just begun to occur in the wake of new technology.[36] The relatively narrow scope of this early FTC analysis only encompassed relatively narrow concerns that pale in comparison to the subsequent abuses by the dominant members of the telecommunications-media oligopoly as seen over the following years.

## IV. CONCLUSION

Under any fair reading of the Clayton Act, the continued transition to a telecommunications-media oligopoly that began in 2009 would create further damage to America's legitimate media enterprises, small businesses, and private citizens while risking a future repetition of the abuses seen in 2016. For this reason and those set forth above, *amicus curiae* Dr. Page urges this Court to grant the plaintiff's requested relief as set forth in the Compl.

Dated: New York, New York
      December 12, 2017

Very respectfully,

By:  /s/ Carter Page
Carter Page
c/o Global Energy Capital LLC
590 Madison Ave., 21st floor
New York, NY 10022
Phone (212) 537-9261
Fax    (212) 537-9281
cpage@globalenergycap.com

---

[36]  Federal Trade Commission, "Protecting Consumer Privacy in an Era of Rapid Change: Recommendations For Businesses and Policymakers," March 2012. https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf

**Exhibit 1**
**Sample of the Largest U.S. Telecommunications-News**
**and Pure-play Media Conglomerates**

<u>Mega Telecommunications-Media/News Conglomerate Oligopoly:</u>
<u>Proposed and Current Members</u>

| 2017 Fortune 500 ranking[37] | Company | Primary Relevant News Assets, and related notes |
|---|---|---|
| #14 | Verizon | **Yahoo News & Huffington Post** – Illegally influenced the 2016 election with the September 2016 world premiere of the complete falsehoods in the Dodgy Dossier, in collusion with the U.S. Government's propaganda network. |
| #31 | Comcast | **NBC News / MSNBC** – Senior Comcast executive Jeffrey Shell served as Chairman of U.S. federal agency, Broadcasting Board of Governor from August 2013 until January 2017, during the period they influenced the 2016 election with the September 2016 RFE Republication. This partnership of the USG with the telecommunication-media oligopoly enabled this and other illegal reporting prior to last year's election. |
| #9 | AT&T | *TBD - CNN acquisition* – Contingent upon outcome of this pending case. |

<u>Smaller, Pure-play Media / News Networks</u>

| 2017 Fortune 500 ranking[16] | Company | Relevant News assets, and related notes | |
|---|---|---|---|
| #52 | Disney | ABC News | Albeit far smaller than members of the telecommunications-media oligopoly, these firms stand among the largest pure media-news companies included in the U.S. television news industry. |
| #101 | Twenty-First Century Fox | Fox News | |
| #193 | CBS Corporation | CBS News | |

---

[37]   http://fortune.com/fortune500/list/