**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---------------------------------------------------------------- x

THE UNITED STATES OF AMERICA      :

                 :

              Plaintiff,      :

                 :

          – v. –      :    No. 1:17-cv-2511-RJL

                 :

AT&T INC., ET AL,      :

                 :

            Defendants.      :

                 :

---------------------------------------------------------------- x

**MOTION FOR LEAVE BY FORMER DEPARTMENT OF JUSTICE OFFICIALS
TO FILE BRIEF AMICI CURIAE IN SUPPORT OF NEITHER PARTY**

Benjamin L. Berwick (D.D.C. Bar No. MA0004)
THE PROTECT DEMOCRACY PROJECT
10 Ware St.
Cambridge, MA 02138
Phone: 202-599-0466
Fax: 929-777-8428

Justin Florence (D.C. Bar No. 988953)
Cameron Kistler (D.C. Bar No. 1008922)
Kristy Parker*
THE PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
Phone: 202-856-9191

*D.C. Bar application pending, practicing under the supervision of D.C. bar members.

*Of Counsel to Amici*

Movants, Former Department of Justice Officials, request leave to file as amici curiae a brief in support of neither party in this matter.[1] The proposed brief is submitted with this motion. Movants inquired as to whether the parties consented to the filing of this brief. Counsel for the government indicated that as "a general matter, the Antitrust Division does not oppose amicus briefs in the district court." Movants sought consent from counsel for defendants by an email dated March 6, 2018, and a follow-up email dated March 8, 2018. Counsel for defendants did not respond to movants' request.

## I.   Identity of Amici

Amici are former Department of Justice officials:

**Preet Bharara** served as the United States Attorney for the Southern District of New York (2009-2017), and as an Assistant United States Attorney for the Southern District of New York (2000-2005). He is a paid Senior Legal Analyst for CNN; he files this brief not in that capacity, but in his capacity as a former United States Attorney for the Southern District of New York.

**Joyce R. Branda** served as Acting Assistant Attorney General of the Civil Division (September 2014-February 2015), Deputy Assistant Attorney General for the Commercial Litigation Branch of the Civil Division (2012-2017), Director of the Commercial Litigation Branch (2007-2012), Deputy Director of the Commercial Litigation Branch (1991-2007), Assistant Director of the Commercial Litigation Branch (1987-1991), as a Trial Attorney for the Commercial Litigation Branch (1982-1987), and a Trial Attorney for the Land and Natural Resources Division (1980-1982).

---

[1] A note on formatting: internal quotation marks and citations are omitted and capitalization is modernized and conformed to sentence structure without notice.

**John W. Dean** served as the Associate Deputy Attorney General (1969-1970). He also served as White House Counsel to the President of the United States (1970-1973). Mr. Dean, an independent contractor with CNN, is an on-air "contributor"; he files not in that capacity, rather in his capacity as a former Associate Deputy Attorney General and White House Counsel.

**Damon P. Martinez** served as the United States Attorney for the District of New Mexico (2014-2017), as an Assistant United States Attorney for the District of New Mexico (2001-2014), and as a Special Assistant United States Attorney for the District of New Mexico (2000-2001).

**John McKay** served as the United States Attorney for the Western District of Washington (2001-2007), and as a Special Assistant to the Director of the Federal Bureau of Investigation (1989-1990).

**Molly Moran** served as the Principal Deputy Associate Attorney General (2014-2016), Acting Assistant Attorney General for the Civil Rights Division (2014), and Counselor and Deputy Chief of Staff to the Attorney General (2010-2014).

**Florence T. Nakakuni** served as the United States Attorney for the District of Hawaii (2009-2017), as an Assistant United States Attorney for the District of Hawaii (1985-2009), and as an Attorney-Advisor in the Office of Information and Privacy Appeals (1980-1982).

**Sarah R. Saldaña** served as the United States Attorney for the Northern District of Texas (2011-2014), and as an Assistant United States Attorney for the Northern District of Texas (2004-2011). She also served as the Director of Immigration and Customs Enforcement in the Department of Homeland Security (2014-2017).

**Jocelyn Samuels** served as the Acting Assistant Attorney General for the Civil Rights Division (2013-2014), as the Principal Deputy Assistant Attorney General for the Civil Rights

Division (2011-2013), and as a Counsel to the Assistant Attorney General for the Civil Rights Division (2009-2011).

**Carter M. Stewart** served as the United States Attorney for the Southern District of Ohio (2009-2016), and as an Assistant United States Attorney for the Northern District of California (2003-2005).

**Joyce White Vance** served as the United States Attorney for the Northern District of Alabama (2009-2017), and as an Assistant United States Attorney for the Northern District of Alabama (1991-2009).

## II.     Movants' Interest

Amici are former Department of Justice officials who served in prior administrations. As alumni of the Department, amici understand the importance of avoiding political interference in specific-party law enforcement matters and are intimately familiar with the Department of Justice's procedures for doing so. Amici agree with Thomas Jefferson that "[t]he most sacred of the duties of government [is] to do equal and impartial justice to all its citizens." This fundamental principle of our democracy—that all people are equal under the law—is imperiled when there is White House interference, or even the appearance of such interference, with law enforcement matters involving specific parties. For decades, administrations of both parties have abided by this norm and limited White House intervention in specific-party matters. Amici worry that this norm, which is grounded in our Constitution, is weakening.

As explained herein, amici are concerned that the President and the White House may have interfered in this matter. Amici request that the Court ensure that the parties are able to examine this issue—and if necessary, the Court provide redress—so that the public retains confidence that the Department is fulfilling its mission of ensuring the fair and impartial

administration of justice for all Americans. Amici take no position on the antitrust aspects of this matter.

### III.    The proposed brief provides amici's unique perspective and is relevant to the disposition of the case

This Court has "broad discretion" to permit the filing of amicus briefs. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 519 F. Supp. 2d 89, 93 (D.D.C. 2007). "Amicus participation is normally appropriate when (a) a party is not represented competently or is not represented at all, (b) the amicus has an interest in some other case that may be affected by the decision in the present case, or (c) when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Hard Drive Prods., Inc. v. Does 1-1, 495*, 892 F. Supp. 2d 334, 337 (D.D.C. 2012); *see also Cobell v. Norton*, 246 F. Supp. 2d 59, 62 (D.D.C. 2003). "The filing of an *amicus* brief should be permitted if it will assist the judge by presenting ideas, arguments, theories, insights, facts or data that are not to be found in the parties' briefs." *Commonwealth of the N. Mar. I. v. United States*, No. 08-1572, 2009 WL 596986, *1 (D.D.C. 2009).

Amici's participation is justified under this standard. Amici have both "relevant expertise and a stated concern for" the issue of avoiding White House interference in specific-party matters. *District of Columbia v. Potomac Elec. Power Co.*, 826 F. Supp. 2d 227, 237 (D.D.C. 2011). Moreover, amici bring a unique and informed perspective to this matter. Amici's longstanding service in the Justice Department allows them to provide the court with an in-depth constitutional and equitable framework for considering whether there has been unlawful interference in this matter. Amici's *only* interest in this matter is ensuring that the proceedings comply with the Constitution.

## CONCLUSION

Amici request that the Court grant this motion, allow them to participate in this action as amici curiae, and accept for filing the attached brief.

Date: March 8, 2018

/s/ *Benjamin L. Berwick*
Benjamin L. Berwick (D.D.C. Bar No. MA0004)
THE PROTECT DEMOCRACY PROJECT
10 Ware St.
Cambridge, MA 02138
Phone: 202-599-0466
Fax: 929-777-8428

Justin Florence (D.C. Bar No. 988953)
Cameron Kistler (D.C. Bar No. 1008922)
Kristy Parker*
THE PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
Phone: 202-856-9191

*D.C. Bar application pending, practicing under the supervision of D.C. bar members.

*Of Counsel to Amici*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2018, I filed this motion with the United States District Court for the District of Columbia using the CM/ECF system, which will cause it to be served on all counsel of record.

/s/ *Benjamin L. Berwick*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
------------------------------------------------------------------ x
THE UNITED STATES OF AMERICA                    :
                                                :
                    Plaintiff,                  :
                                                :
            – v. –                              :    No. 1:17-cv-2511-RJL
                                                :
AT&T INC., ET AL,                               :
                                                :
                    Defendants.                 :
                                                :
------------------------------------------------------------------ x
```

**BRIEF OF FORMER DEPARTMENT OF JUSTICE OFFICIALS
AS AMICI CURIAE IN SUPPORT OF NEITHER PARTY**

Benjamin L. Berwick (D.D.C. Bar No. MA0004)
THE PROTECT DEMOCRACY PROJECT
10 Ware St.
Cambridge, MA 02138
Phone: 202-599-0466
Fax: 929-777-8428

Justin Florence (D.C. Bar No. 988953)
Cameron Kistler (D.C. Bar No. 1008922)
Kristy Parker*
THE PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
Phone: 202-856-9191

*D.C. Bar application pending, practicing under the supervision of D.C. bar members.

*Of Counsel to Amici*

## TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ............................................................................................... 1

INTRODUCTION AND SUMMARY ...................................................................................... 2

RELEVANT BACKGROUND ................................................................................................. 4

ARGUMENT ............................................................................................................................. 7

I.   IT VIOLATES THE CONSTITUTION IF THE PRESIDENT INTERVENED IN A
JUSTICE DEPARTMENT ENFORCEMENT MATTER BASED ON PERCEIVED
CRITICISM BY A MEDIA ORGANIZATION. ....................................................................... 7

   A.   The Constitution does not grant the president the "absolute right to do what [he] want[s]
   with the Justice Department." ................................................................................................ 8

   B.   White House intervention risks violating the Bill of Rights. ......................................... 11

      1.   *White House interference in specific-party matters raises serious due process
      concerns.* ........................................................................................................................... 11

      2.   *White House interference may also violate the Equal Protection Clause.* .................. 12

      3.   *White House interference can violate the First Amendment, particularly where it seeks
      to punish perceived unfavorable news coverage.* .............................................................. 13

   C.   The White House is not institutionally structured to properly intervene in most specific-
   party enforcement matters. ..................................................................................................... 14

II.   THIS COURT SHOULD NOT TURN A BLIND EYE TO POTENTIAL
CONSTITUTIONAL ISSUES. ................................................................................................ 17

   A.   Courts should allow discovery to determine the existence and scope of plausibly-alleged
   improper interference. ............................................................................................................ 17

   B.   Several established doctrines are available to redress improper political interference in
   specific-party enforcement matters. ....................................................................................... 20

      1.   *The Court could apply a presumption of vindictiveness.* ............................................. 20

      2.   *The Court could evaluate the involvement of interested officials.* ............................... 22

      3.   *The Court could dismiss the action under the unclean-hands doctrine.* ...................... 22

      4.   *The court could dismiss the case as unlawful selective enforcement.* ......................... 23

      5.   *The Court could shift the burden to the government to show that it is not punishing
      First Amendment-protected conduct.* ................................................................................ 24

CONCLUSION ........................................................................................................................ 25

APPENDIX A ........................................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*Adarand Constructors, Inc. v. Pena*,
   515 U.S. 200 (1995).............................................................................................. 12

*Alabama v. Smith*,
   490 U.S. 794 (1989).............................................................................................. 12

*Analytical Diagnostic Labs v. Kusel*,
   626 F.3d 135 (2d Cir. 2010).................................................................................. 12

*Anderson v. Larpenter*,
   No. 16-13733, 2017 WL 3064805 (E.D. La. 2017).............................................. 14

*Backpage.com, LLC, v. Dart*,
   807 F.3d 229 (7th Cir. 2015) ................................................................................ 24

*Bartko v. SEC*,
   845 F.3d 1217 (D.C. Cir. 2017)...................................................................... 22, 23

*\*Blackledge v. Perry*,
   417 U.S. 21 (1974).......................................................................................... 11, 21

*Bordenkircher v. Hayes*,
   434 U.S. 357 (1978).............................................................................................. 21

*Branch Ministries, Inc. v. Richardson*,
   970 F. Supp. 11 (D.D.C. 1997)............................................................................. 18

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985).............................................................................................. 12

*Connick v. Myers*,
   461 U.S. 138 (1983).............................................................................................. 13

*Edwardsen v. McCaughtry*,
   977 F.2d 585 (7th Cir. 1992) ................................................................................ 21

*Engquist v. Or. Dep't of Agric.*,
   553 U.S. 591 (2008).............................................................................................. 12

*Envt'l Protection Servs. v. EPA*,
   353 F. App'x 448 (D.C. Cir. 2009)....................................................................... 20

*Geinosky v. City of Chi.*,
    675 F.3d 743 (7th Cir. 2012) ............................................................... 13, 19

*\*Hartman v. Moore*,
    547 U.S. 250 (2006) ............................................................................ 14, 24

*Heckler v. Community Health Services*,
    467 U.S. 51 (1984) ..................................................................................... 23

*Mills v. Alabama*,
    384 U.S. 214 (1966) ................................................................................... 14

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977) ................................................................................... 24

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ............................................................................ 14, 23

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ................................................................................... 14

*\*North Carolina v. Pearce*,
    395 U.S. 711 (1969), ....................................................................... 12, 21, 22

*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003) ..................................................................... 24

*Sanchez-Lopez v. Fuentes-Pujols*,
    375 F.3d 121 (1st Cir. 2004) ..................................................................... 25

*SEC v. Gulf & W. Indus.*,
    502 F. Supp. 343 (D.D.C. 1980) .............................................................. 23

*Texas v. McCullough*,
    475 U.S. 134 (1986) ................................................................................... 22

*United States v. Al Jubori*,
    90 F.3d 22 (2d Cir. 1996) .......................................................................... 19

*United States v. Alleyne,*
    454 F. Supp. 1164 (S.D.N.Y. 1978) ......................................................... 12

*\*United States v. Armstrong*,
    517 U.S. 456 (1996) ........................................................................... passim

*United States v. AT&T*,
　__ F. Supp. 3d ___, 2018 WL 953332 (D.D.C. 2018)............................................................... 18

*United States v. Bourque*,
　541 F.2d 290 (1st Cir. 1976)............................................................................................ 11

*United States v. Falk*,
　479 F.2d 616 (7th Cir. 1973) ........................................................................................... 20

*United States v. Goodwin*,
　457 U.S. 368 (1982)............................................................................................. 11, 12, 21

*United States v. Heldt*,
　668 F.2d 1238 (D.C. Cir. 1981) ....................................................................................... 22

*United States v. Meyer*,
　810 F.2d 1242 (D.C. Cir. 1987) ....................................................................................... 21

*United States v. Nixon*,
　418 U.S. 683 (1974)......................................................................................................... 15

*United States v. Ojala*,
　544 F.2d 940 (8th Cir. 1976) ........................................................................................... 20

*United States v. Safavian*,
　649 F.3d 688 (D.C. Cir. 2011) ......................................................................................... 21

*United States v. Siegelman*,
　786 F.3d 1322 (11th Cir. 2015) ....................................................................................... 22

*United States v. Slatten*,
　865 F.3d 767 (D.C. Cir. 2017).......................................................................................... 22

*United States v. Vazquez*,
　145 F.3d 74 (2d Cir. 1998)............................................................................................... 14

*United States v. Windsor*,
　570 U.S. 744 (2013)......................................................................................................... 13

*Vill. of Willowbrook v. Olech*,
　528 U.S. 562 (2000)......................................................................................................... 12

*W. Va. State Bd. of Educ. v. Barnette*,
　319 U.S. 624 (1943)......................................................................................................... 25

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ......................................................................................... 12

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
  481 U.S. 787 (1987) ......................................................................................... 12

*\*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ...................................................................................... 8, 9

## Statutes

28 U.S.C. § 516 ................................................................................................ 15

28 U.S.C. § 547 ................................................................................................ 15

## Rules

Fed. R. Civ. P. 26(b)(1) ................................................................................ 17, 18

Fed. R. Crim. P. 16 ........................................................................................... 18

## Constitutional Provisions

U.S. Constitution, Article II § 1 Clause 8 ....................................................... 10

U.S. Constitution, Article II § 2 Clause 1. ........................................................ 9

U.S. Constitution, Article II § 3 ........................................................................ 8

## Books

Jonathan Elliot, *Debates on the Federal Constitution* (2d ed. 1836) ............. 13

## Memos & Manuals

Department of Justice Antitrust Division Manual ............................................ 15

Memorandum from Donald F. McGahn II to all White House Staff (January 27, 2017) ........ 2, 20

*Presidential or Legislative Pardon of the President*, 1 Op. O.L.C. Supp. 370 (Aug. 5, 1974).... 10

U.S. Attorneys' Manual ................................................................................... 15

**<u>Law Review Articles</u>**

Daniel J. Hemel & Eric A. Posner, *Presidential Obstruction of Justice*, 106 Cal. L. Rev. (forthcoming 2018) .................................................................................................................. 10

Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 Yale L. J. 1836 (2015) ............... 9

**INTEREST OF AMICI CURIAE**

Amici are former Department of Justice (DOJ) officials who served in prior administrations.[1] As alumni of the Department, amici understand the importance of avoiding political interference in specific-party law enforcement matters and are intimately familiar with the Department of Justice's procedures for doing so. Amici agree with Thomas Jefferson that "[t]he most sacred of the duties of government [is] to do equal and impartial justice to all its citizens." This fundamental principle of our democracy—that all people are equal under the law—is imperiled when there is White House interference, or even the appearance of such interference, with law enforcement matters involving specific parties. For decades, administrations of both parties have abided by this norm and limited White House intervention in specific-party matters. Amici worry that this norm, which is grounded in our Constitution, is weakening.

As explained herein, amici are concerned that the president and the White House may have interfered in this matter. Amici request that the Court ensure that the parties are able to examine this issue—and if necessary, the Court provide redress—so that the public retains confidence that the Department is fulfilling its mission of ensuring the fair and impartial administration of justice for all Americans. Amici take no position on the antitrust aspects of this matter.

To be clear, amici have no intention of impugning DOJ or its dedicated public servants. Amici served in the Department for years—in some cases, decades—and have the utmost respect and admiration for the institution and its people. Amici are confident that many of DOJ's attorneys would push back against efforts to improperly interfere in specific-party matters, and

---

[1] See Appendix A for a full list of amici.

1

may well have done so here. Further inquiry is necessary not because of the actions of the

Department or its attorneys, but because of the actions of the president and the White House.

Amici offer this brief because of their love for the Department and their experience with those

who work there.[2]

## INTRODUCTION AND SUMMARY

In a constitutional democracy, officeholders do not wield the powers of the state to

benefit allies and punish critics. In recognition of this important principle, which is reflected in

the text and structure of our Constitution, presidents of both parties have long adhered to strict

limits on permissible contacts between the White House and DOJ to avoid improper White

House interference in law enforcement matters involving specific parties.[3]

Although it had purported to adopt a policy on White House communications with DOJ,

*see* Memorandum from Donald F. McGahn II to all White House Staff, at 1 (January 27, 2017)

("McGahn Memo"),[4] this administration has repeatedly violated its own policy and the long-

established constitutional principle limiting White House interference in specific-party matters.

President Trump has urged a criminal investigation of his political rivals; he has suggested that

---

[2] Pursuant to Local Rule 7(o)(5), amici affirm that no counsel for a party authored this brief in whole or in part and that no person other than amici, their members, or their counsel made any monetary contributions intended to fund the preparation or submission of this brief. Amici note that Preet Bharara is a paid Senior Legal Analyst for CNN; he files this brief not in that capacity, but in his capacity as a former United States Attorney for the Southern District of New York. Amici also note that John W. Dean, an independent contractor with CNN, is an on-air "contributor"; he files not in that capacity, rather in his capacity as a former Associate Deputy Attorney General and White House Counsel.

[3] A note on formatting: internal quotation marks and citations are omitted and capitalization is modernized and conformed to sentence structure without notice.

[4] A copy of the memo is available at https://www.politico.com/f/?id=0000015a-dde8-d23c-a7ff-dfef4d530000.

he can instruct the Department to halt investigations into his associates; and he has claimed an "absolute right to do what I want to do with the Justice Department."[5]

Indeed, this case is being pursued under a cloud, with a perception—at least by some—that DOJ brought this case at the behest of President Trump in order to punish CNN for what he viewed as unfavorable coverage of his administration.[6] As we will explain, there is a reasonable basis for that perception. If it is accurate, it would result in significant constitutional harms that are in need of a remedy.

Amici submit this brief in favor of neither party and take no position on the underlying merits of this matter. Instead, amici wish to make two points.

*First*, President Trump's claim to be able to direct federal law enforcement against specific parties is inconsistent with the Constitution. The president neither has the absolute right to do what he wants with DOJ nor the constitutional authority to punish a news organization for its critical coverage. The president's Article II powers don't grant absolute control over law enforcement; instead, they impose a series of commands and limitations. And the Bill of Rights further protects against unequal and irregular treatment—protections that are at their zenith if the White House retaliated against a media organization for exercising its core First Amendment-protected rights.

*Second*, when cases and controversies involving such issues come before Article III courts, it is the proper role of the courts to examine whether there has been inappropriate

---

[5] *Excerpts from Trump's Interview With The Times*, N.Y. Times (Dec. 28, 2017), https://www.nytimes.com/2017/12/28/us/politics/trump-interview-excerpts.html.

[6] Callum Borchers, Analysis, *Two Reasons Trump Loves One Media Merger but Hates Another: Fox News and CNN*, Wash. Post (Dec. 15, 2017), https://www.washingtonpost.com/news/the-fix/wp/2017/12/15/two-reasons-trump-loves-one-media-merger-but-hates-another-fox-news-and-cnn/?utm_term=.b6ca6c346585.

interference in the exercise of the law enforcement function. After all, when the federal government seeks to use the power of the courts to enforce the law, it shouldn't be permitted to do so in a manner inconsistent with the Constitution. If this case involved unconstitutional activity by the executive branch, this Court has a number of doctrinal tools it can use to redress such actions. We urge it to employ them.

To be clear, DOJ may well have acted independently and outside the cloud of any White House interference in this matter. Indeed, based on their long experience in the Department working alongside its dedicated public servants, amici hope and expect that to be the case. But when the president specifically threatens to use the power of DOJ to punish a perceived opponent, it raises serious constitutional concerns. Public confidence in the rule of law demands a full inquiry, if for no other reason than to ensure the public that the Department continues to adhere to its obligation of ensuring the fair and impartial administration of justice for all Americans.

## RELEVANT BACKGROUND

Without recounting the full background of this matter, we note certain information relevant to this brief, foremost that President Donald Trump has repeatedly denounced CNN (which is owned by Time Warner, one of the parties to this prospective merger) for its coverage of him and his administration. Moreover, he has threatened to use the levers of government power, including the Antitrust Division of DOJ, to punish CNN for its protected speech.

As a candidate, Mr. Trump called CNN "terrible," accusing it of failing to cover his campaign accurately.[7] Throughout his campaign, he continued these attacks, tweeting that "CNN

---

[7] MJ Lee, *Abortion Rights Groups Protest Donald Trump Event*, CNN (August 28, 2015), https://www.cnn.com/2015/08/28/politics/abortion-rights-protest-trump-fundraiser/index.html.

is laughable," that CNN panels "are so one-sided," and urging "Don't Watch CNN!"[8] In August 2016, he told his audience that CNN was part of the media "power structure" that was trying to suppress his vote.[9] As president, he has called CNN "fake news" and "garbage," and has gone so far as to tweet a video showing him physically attacking the network's logo, concluding the tweet with a refashioning of the logo as "FNN: Fraud News Network."[10]

The president has also frequently attacked CNN's president, Jeff Zucker, and suggested that he should be fired. In June 2017, for example, at a gathering at the Trump Hotel in Washington, D.C., the president called CNN's personnel "really dishonest people," suggested he should sue CNN, and then said, "Jeff Zucker, I hear he's going to resign at some point pretty soon. I mean, these are horrible human beings."[11] Then-President-elect Trump met with AT&T CEO Randall Stephenson at Trump Tower in January 2017.[12] Mr. Trump tweeted that same day that "@CNN is in a total meltdown" and "their credibility will soon be gone!"[13]

---

[8] Brian Stelter, *Donald Trump Attacks CNN in Tweetstorm*, CNN (August 1, 2016), http://money.cnn.com/2016/08/01/media/donald-trump-attacking-cnn/index.html.

[9] Erik Wemple, Opinion, *AT&T-Time Warner Merger: Trump Dashes Trust in Media and Government at the Same Time*, Wash. Post (Nov. 8, 2017), https://www.washingtonpost.com/blogs/erik-wemple/wp/2017/11/08/att-time-warner-merger-trump-dashes-trust-in-media-and-government-at-the-same-time/?utm_term=.64ed84cf9261.

[10] Michael M. Grynbaum, *Trump Tweets a Video of Him Wrestling 'CNN' to the Ground*, N.Y. Times (July 2, 2017), https://www.nytimes.com/2017/07/02/business/media/trump-wrestling-video-cnn-twitter.html.

[11] Aric Jenkins, *President Trump Calls CNN Staff 'Horrible Human Beings' in Leaked Audio from RNC Fundraiser*, Time (July 1, 2017), http://time.com/4842997/donald-trump-cnn-horrible-human-beings.

[12] Cecelia Kang, *AT&T Chief Visits Trump with Time Warner Deal Looming Large*, N.Y. Times (Jan. 12, 2017), https://www.nytimes.com/2017/01/12/business/donald-trump-att-time-warner-deal-.html.

[13] Donald J. Trump (@realDonaldTrump), Twitter (Jan 12, 2017, 9:22 AM), https://twitter.com/realdonaldtrump/status/819550083742109696.

As Mr. Trump has attacked CNN for its coverage of him, he has threatened to use the regulatory power of the government against CNN and its parent company. Speaking of the proposed merger before this Court during the campaign, Mr. Trump vowed that it was "a deal we will not approve in my administration."[14] After the president assumed office, the *Daily Caller* reported that the White House would not support the merger "if Jeff Zucker remains president of CNN,"[15] and referring to the Administration's consideration of whether to approve or challenge the merger, the *Financial Times* reported: "It's all about CNN."[16] *The New York Times* reported that White House advisers had discussed using the merger as "a potential point of leverage over [CNN]."[17] According to another article on November 9, 2017, "Justice Department officials called on AT&T to sell Turner Broadcasting—the group of cable channels under the Time Warner banner that includes CNN—as a potential requirement for gaining government approval" of the merger.[18] As the article explains, "A central component of the dispute, according to people from both companies and DOJ, is CNN—the network that Mr. Trump has frequently attacked as a purveyor of 'fake news.'"[19]

---

[14] Wemple, *supra* note 9.

[15] Alex Pfeiffer, *Source: Trump Doesn't Back the Time Warner and AT&T Merger If Zucker Still Heads CNN*, *The Daily Caller* (July 6, 2017), http://dailycaller.com/2017/07/06/source-trump-doesnt-back-the-time-warner-and-att-merger-if-zucker-still-heads-cnn/.

[16] James Fontanella-Khan, Shannon Bond, and Matthew Garrahan, *US Regulators Demand CNN Sale to Approve AT&T-Time Warner Deal*, Financial Times (Nov. 8, 2017).

[17] Michael M. Grynbaum, *The Network Against the Leader of the Free World*, N.Y. Times (July 5, 2017), https://www.nytimes.com/2017/07/05/business/media/jeffrey-zucker-cnn-trump.html.

[18] Michael J. de la Merced, et al., *Justice Department Says Not So Fast to AT&T's Time Warner Bid*, N.Y. Times (Nov. 8, 2017), https://www.nytimes.com/2017/11/08/business/dealbook/att-time-warner.html.

[19] *Id.*

This brief does not address whether there are or are not independent legal reasons for the government's handling of this antitrust matter; rather we draw attention to the fact that the president's conduct has already created, at a minimum, an appearance of bias in this process. Commentators have variously described the lawsuit as a "political vendetta," and as "rais[ing] the specter of political retaliation" against CNN.[20] The media quoted one employee of CNN as saying, "This is political, this is unprecedented, and the only explanation is political pressure from the White House."[21]

## ARGUMENT

I.  **It violates the Constitution if the president intervened in a Justice Department enforcement matter based on perceived criticism by a media organization.**

The Constitution permits the president to set overall enforcement priorities and to ensure that the executive departments faithfully execute the laws in order to preserve, protect, and defend the Constitution. But it generally limits the president from intervening in specific law enforcement matters. And it absolutely prohibits such intervention for corrupt, unlawful, or self-protective purposes—including punishing a media company for exercising its First Amendment rights. White House interference in this matter would raise serious constitutional concerns.

---

[20] James Hohmann, Analysis, *Seven Reasons to Be Suspicious of the DOJ Lawsuit to Stop AT&T from Buying CNN*, Wash. Post (Nov. 21, 2017), https://www.washingtonpost.com/news/powerpost/paloma/daily-202/2017/11/21/daily-202-seven-reasons-to-be-suspicious-of-the-doj-lawsuit-to-stop-at-t-from-buying-cnn/5a139a5330fb0469e883f6fb/?utm_term=. 28a2ceeb379c ; Editorial Board, *Trump's Comments Create a Lose-Lose Position for Justice*, Wash. Post (Nov. 13, 2017), https://www.washingtonpost.com/ opinions/trumps-comments-create-a-lose-lose-position-for-justice/2017/11/13/6fd7b28e-c596-11e7-aae0-cb18a8c29c65_story.html? utm_term=.a120b285befa.

[21] Joe Pompeo, *"This is Political": CNN Sees Trump's Hand in Justice Department's Merger Crackdown*, Vanity Fair (Nov. 8, 2017), https://www.vanityfair.com/news/2017/11/political-cnn-trump-hand-in-justice-department-merger-crackdown.

A.    The Constitution does not grant the president the "absolute right to do what [he] want[s] with the Justice Department."

Although the Constitution places the president at the head of the executive branch, it does not authorize direction of Justice Department enforcement actions on a whim. The absolute right of kings died with the House of Stuart in England. And Article II, Section 3 requires that, among other things, the president "*shall take Care that the Laws be faithfully executed*."

The Take Care Clause subjects the president to the rule of law. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). In *Youngstown*, the Supreme Court held that the president lacked the power to effectively enact his own laws by taking over the nation's steel mills during the Korean War. Justice Black began with the premise that "[t]he president's power . . . must stem either from an act of Congress or from the Constitution itself." 343 U.S. at 585. Rather than taking care that the laws be faithfully executed, the president had become a law unto himself—and, as Justice Black explained, that conduct summoned up all "the fears of power and the hopes for freedom that lay behind" the decision to "entrust the law making power to the Congress alone in both good and bad times." *Id*. at 589.

Justice Jackson's famous *Youngstown* concurrence further bolsters the view that the Take Care Clause imposes constraints on presidential power. Justice Jackson rejected the argument that Article II's Vesting Clause constitutes "a grant of all the executive powers of which the Government is capable.'" 343 U.S. at 640 (Jackson, J., concurring). "If that be true," Jackson reasoned, "it is difficult to see why the forefathers bothered to add several specific items, including some trifling ones," such as the power to require written opinions of cabinet members or to commission officers. *Id*. at 640-41 & n.9. "Matters such as those," Jackson observed, "would seem to be inherent in the Executive if anything is." *Id*. at 641 n.9. As a result, Justice

Jackson "[could not] accept the view that this clause is a grant in bulk of all conceivable executive power." 343 U.S. at 641.

Justice Jackson further explained that any authority conferred by the Take Care Clause "must be matched against words of the Fifth Amendment that 'No person shall be . . . deprived of life, liberty, or property, without due process of law . . . .' One gives a governmental authority that reaches so far as there is law, the other gives a private right that authority shall go no farther." *Id*. at 646 (alterations in original). This approach envisions a president constrained by law and doubly checked by the right of private citizens to enforce the requirements of due process. These two provisions, Justice Jackson added, "signify . . . that ours is a government of laws, not of men," and that "we submit ourselves to rulers only if under rules." *Id*.

The text and structure of the Take Care Clause provide further guidance on the president's proper role in enforcing the laws. The passive phrasing of the Clause is unique and significant. Nowhere else does the document employ a similar construction to describe the duties of a constitutional officeholder. This phrasing suggests that the president oversees the execution of the laws, but does not execute them himself. *See* Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 Yale L. J. 1836, 1875-76 (2015). If the president were charged with executing the Laws himself, the Clause should read: "*he shall faithfully execute the laws*." Instead, the Constitution leaves actual hands-on execution to the officers of the executive departments—a conclusion that is reinforced by the fact that the Constitution authorizes the president to supervise those officers by requiring written opinions from them "upon any Subject relating to the Duties of their respective Offices," U.S. Const., Art. II, § 2, cl. 1. It is the president's job to ensure that *they* "faithfully execute" the laws.

And what does "faithfully" mean? The phrase "faithfully execute" appears only one other time, in the president's oath of office:

> Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:—"I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States."

U.S. Const., Art. II, § 1, cl. 8. The oath leaves no doubt that at least one component of "faithfully executing" is to uphold the Constitution to the *best* of one's ability. Thus, when the president intervenes in an individual law enforcement matter to influence it for corrupt, self-protective, or otherwise unlawful purposes, he violates his oath in two respects: he is not preserving, protecting, and defending the Constitution to the best of his ability—indeed, he is undermining it. The president, as the name of the office itself suggests, is supposed to exercise the executive power by *presiding over* the departments and serving as their constitutional conscience—not by reaching down *into* the departments to place a corrupt or preferential finger on the scales of their deliberations.[22]

The president may direct generally applicable law-enforcement policies and priorities—if he does so "faithfully."[23] For example, if the president concludes that there is an opioid crisis, he can instruct the Attorney General to prioritize law-enforcement efforts against the illegal opioids

---

[22] There's nothing unusual about constitutional limitations on the president's ability to act in a self-interested fashion. For example, the Office of Legal Counsel has concluded that the president may not self-pardon because "no one may be a judge in his own case." *Presidential or Legislative Pardon of the President*, 1 Op. O.L.C. Supp. 370, 370 (Aug. 5 1974). It follows that the Take Care Clause limits the president's ability to issue self-interested orders to DOJ. *See* Daniel J. Hemel & Eric A. Posner, *Presidential Obstruction of Justice*, 106 Cal. L. Rev. (forthcoming 2018), at 50 ("[I]f the president lacks the 'greater' power to self-pardon, then presumably he also lacks the 'lesser' power to obstruct an investigation of which he is a target.").

[23] There are certain categories of cases in which it is constitutionally proper for the White House to be involved in specific-party enforcement matters. These include national-security cases, clemency, and cases (for example before the Supreme Court) that would set generally applicable policy.

trade. But the president violates Article II of the Constitution if he directs DOJ to pursue an enforcement action against a particular party in that industry because it supported his opponent— or if he asks the Department not to take action involving a company because he is an investor. And so too it would violate Article II if the president were to intervene in an antitrust matter involving a media company because it has covered him critically.

**B.     White House intervention risks violating the Bill of Rights.**

The Bill of Rights enshrines guarantees of due process, equal treatment, and free speech and political participation. These impose additional constraints on the White House's authority to interfere in specific Justice Department enforcement matters.

*1.     White House interference in specific-party matters raises serious due process concerns.*

The Due Process Clause requires the government to follow fair and neutral procedures before denying people important interests. Accordingly, the Clause limits the executive's ability to exert political influence over enforcement action. For example, each of the following White House actions in a law enforcement matter would violate the Due Process Clause:

***Vindictive law enforcement.*** Vindictive law enforcement—*i.e.*, "punishing a person because he has done what the law plainly allows . . . is a due process violation of the most basic sort." *United States v. Goodwin*, 457 U.S. 368, 372 (1982). Vindictiveness is unconstitutional whether committed by line attorneys or by the person that ordered the retaliation. *See United States v. Bourque*, 541 F.2d 290, 293 (1st Cir. 1976). So the White House may not intervene in a specific-party matter to urge DOJ to retaliate against a party. Because the very perception of vindictiveness can unconstitutionally deter the exercise of constitutional rights, *see, e.g.*, *Blackledge v. Perry*, 417 U.S. 21, 28 (1974), if the White House does anything that even creates a public impression that "a reasonable likelihood of vindictiveness exists," *Goodwin*, 457 U.S. at

11

373, then the government has the burden to show that it is not acting vindictively, *North Carolina v. Pearce*, 395 U.S. 711, 725-26 (1969), *companion case overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989).

**Law Enforcement by interested attorneys or officials.** It is unlawful—and can violate the Due Process Clause—for an "interested" individual to control the law-enforcement machinery of the United States in a specific-party matter. *See Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810-11 (1987); *id*. at 815 (Blackmun, J., concurring) (explaining that "due process" mandates "a disinterested prosecutor"). So if a White House official were to direct proceedings in a self-interested fashion, the proceedings would be unlawful.

    2.    *White House interference may also violate the Equal Protection Clause.*

The Fifth Amendment precludes the executive branch from denying any person—or corporation—the equal protection of the laws. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 215-18 (1995). Thus, it precludes the White House from intervening in specific-party matters to order (1) the prosecution of disfavored persons or groups or (2) the non-prosecution of favored ones. *See Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886); *see, e.g.*, *United States v. Alleyne,* 454 F. Supp. 1164, 1174 (S.D.N.Y. 1978).

The equal protection requirement is not limited to race, gender, or large classes. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Supreme Court precedents "have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff . . . has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference . . . ." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).[24]

---

[24] Such claims require that there be "clear standard[s]" for judging whether individuals have been intentionally treated differently. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008); *e.g.*, *Analytical Diagnostic Labs v. Kusel*, 626 F.3d 135 (2d Cir. 2010).

Under that doctrine, it would be unconstitutional for DOJ to irrationally single out an individual

for differential treatment, *see Geinosky v. City of Chi.*, 675 F.3d 743, 747 (7th Cir. 2012)—for

example, to investigate a political opponent based on pressure from the White House. Although

the executive branch is "necessarily afforded wide discretion . . . , that discretion does not extend

to discriminating against or harassing people." *Id.*; *cf. United States v. Windsor*, 570 U.S. 744,

770 (2013) ("A bare . . . desire to harm . . . cannot justify disparate treatment . . . .").

3.      *White House interference can violate the First Amendment, particularly
        where it seeks to punish perceived unfavorable news coverage.*

While any improper use of government authority to punish critics or reward supporters

would pose a grave threat to our constitutional system, that threat is particularly acute in a

situation in which the government uses or appears to use its regulatory authority to punish media

entities or others who are critical of the government. Such behavior could chill criticism,

endangering the kind of free and open speech and debate that our Founders adopted the First

Amendment to protect precisely because it is necessary for self-government. As James Madison

observed, freedom of speech is "the only effectual guardian of every other right," because the

"value and efficacy" of free elections "depends on the knowledge of the comparative merits and

demerits of the candidates . . . and on the equal freedom, consequently, of examining and

discussing these merits and demerits of the candidates respectively." 4 Jonathan Elliot, *Debates

on the Federal Constitution* 575-76 (2d ed. 1836).

Speech concerning public officials and public affairs "occupies the highest rung of the

hierarchy of First Amendment values and is entitled to special protection." *Connick v. Myers*,

461 U.S. 138, 145 (1983). Therefore, "the law is settled that as a general matter the First

Amendment prohibits government officials from subjecting an individual to retaliatory actions,

including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

Because the Government cannot retaliate for the exercise of First Amendment rights, "it is possible to base an action for selective prosecution . . . if the government's motivation was an unconstitutional one—e.g., if the reason for selecting the particular person charged was to chill the exercise of that person's First Amendment rights." *United States v. Vazquez*, 145 F.3d 74, 82 n.5 (2d Cir. 1998). And it is equally unconstitutional to investigate someone in retaliation for First Amendment protected speech. *See, e.g.*, *Anderson v. Larpenter*, No. 16-13733, 2017 WL 3064805, at *12 (E.D. La. 2017). Thus, any White House intervention in a specific-party matter for the purpose of silencing or punishing a party's speech violates the First Amendment.

These First Amendment concerns are at their apex in a circumstance where the government acts in retaliation for perceived unfavorable news coverage. State action against a media entity aimed at stifling criticism of the government "strikes at the very center of the constitutionally protected area of free expression." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 292 (1964). "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982).

### C.    The White House is not institutionally structured to properly intervene in most specific-party enforcement matters.

DOJ has certain institutional features—which the White House does not share—that have both the purpose and effect of protecting the constitutional principles described above, including faithful execution of the law, due process, equal treatment, and protection of political speech and participation.

For example, DOJ's authorizing statute allocates the authority to litigate among Justice Department components, and "reserve[s] to officers of the Department of Justice" the authority to conduct "litigation in which the United States, an agency, or officer thereof is a party." 28 U.S.C. § 516. As a result, it is DOJ—not the White House—that represents the United States in litigation. Thus, in *United States v. Armstrong*, the Supreme Court observed that "[t]he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws." 517 U.S. 456, 464 (1996) (citing the Take Care Clause and 28 U.S.C. §§ 516, 547). Note that the Court did *not* say the president has such discretion; rather Justice Department officials do.[25]

DOJ, consistent with its role handling specific litigation and enforcement matters, maintains extensive policies and procedures to safeguard the proper, fair, and neutral enforcement of the law.[26] Because DOJ has the statutory authority to litigate and because, historically, White House involvement in specific matters has been strictly limited, the White House has not developed a set of rules and guidelines to govern law enforcement. As a result, when the White House weighs in on specific-party matters, it lacks any sort of guidelines to ensure that it is complying with the Constitution. It also lacks an internal inspector general or

---

[25] In *United States v. Nixon*, the Court likewise observed that "[u]nder the authority of Art. II, s 2, Congress has vested in the Attorney General the power to conduct the criminal litigation of the United States Government." 418 U.S. 683, 694 (1974) (citing 28 U.S.C. § 516). In that case, the Court explained that acting pursuant to that statute, the Attorney General had delegated authorities to a specific prosecutor (there, the Watergate Special Prosecutor), who was authorized to make certain evidentiary decisions. And the Court decisively rejected President Nixon's assertion that "that a President's decision is final in determining what evidence is to be used in a given criminal case." *Id.* at 693. Instead, the Court concluded that such decisions had validly been assigned by Congress to Justice Department officials.

[26] See, for example, the U.S. Attorneys' Manual (https://www.justice.gov/usam/united-states-attorneys-manual) and the Antitrust Division Manual (https://www.justice.gov/atr/division-manual).

professional responsibility office to ensure that it is complying with those guidelines and treating like cases alike.

That lack of safeguards is compounded by a lack of expertise and by potential political bias. Unlike DOJ, where thousands of non-political civil servants represent the United States and develop subject-matter expertise in specialized departments, the White House has a small staff— hired and fired at the president's whim—that represents the White House. White House officials lack the bandwidth to specialize in specific areas or to ensure consistent application of the law in cases arising across the country. Accordingly, other than in narrow categories (*see supra* n.23), interventions by the White House in matters involving specific parties carry an unacceptable risk of violating the Constitution through irregular processes; political favoritism; and vindictive, arbitrary, and unequal justice.

\*       \*       \*

In sum, Article II does not grant President Trump the absolute right to use DOJ as he pleases. Just the opposite, in fact: Article II's Take Care Clause places a faithfulness requirement on the president, prohibiting actions motivated by personal, pecuniary, corrupt, or unlawful considerations. The First and Fifth Amendments to the Constitution further circumscribe the president's power by barring arbitrary or vindictive singling out, and by prohibiting actions that target parties based on their free expression. Amici do not claim that it always violates the Constitution any time the White House interferes in law enforcement matters involving specific parties.  Rather, because it creates an intolerable risk of such a violation, where there is evidence that interference has occurred (outside of the categories noted above, *see supra* n.23), the onus should fall on the government to show that its actions comport with the law.

**II.    This Court should not turn a blind eye to potential constitutional issues.**

The prior Part establishes that White House interference in specific-party law

enforcement matters raises significant constitutional questions that can eclipse the underlying

merits of a matter. This Part explains what the Court should do in light of colorable claims of

unlawful interference in this matter. In short, where there is evidence that the White House

(including the president) has sought to intervene in a particular matter,[27] this Court should take

two steps. It should permit discovery and testimony so that the parties and the public know the

extent to which the White House has intervened. And if the Court determines that the White

House interfered in this matter, the Court should apply one or more of a variety of judicial

doctrines to determine whether such interference was unlawful and, if so, provide redress.

**A.    Courts should allow discovery to determine the existence and scope of plausibly-alleged improper interference.**

This is a civil case. Discovery is available into "any nonprivileged matter that is relevant

to *any . . . claim or defense* and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1)

(emphasis added). White House interference is relevant to multiple defenses that defendants

could raise. Thus, where there is reason to believe that the White House may have interfered in a

specific matter, evidence and testimony relating to such interference should be permissible in

civil cases unless the government can demonstrate that the evidence is privileged.

Amici appreciate that this Court already has decided that *Armstrong*, 517 U.S. 456, which

sets out the standard for obtaining selective enforcement discovery in support of an equal

---

[27] Amici do not suggest that *any* allegation of White House interference warrants a full inquiry. While the quantity and nature of evidence that should be required to allow for further fact development on the question of White House interference may be a close call in some cases, this is not such a case. An explicit threat by the president to interfere in a matter to punish a perceived media critic surely suffices to at least warrant further exploration.

protection defense in a criminal case, precludes such discovery in this civil antitrust action. *See United States v. AT&T*, __ F. Supp. 3d __, 2018 WL 953332 (D.D.C. 2018). For three reasons, however, amici suggest that the Court should reconsider that ruling and allow defendants to obtain discovery and testimony relating to White House interference.

*First*, *Armstrong*'s standard for obtaining selective-enforcement discovery should not govern in civil cases. *Armstrong* is a criminal case analyzing Criminal Rule 16, and it relies heavily on interpreting the word "defense" in Criminal Rule 16 as encompassing only "shield claims" related to guilt and not "sword" claims challenging the prosecution's conduct. *See* 517 U.S. at 461-63. But that is irrelevant to Civil Rule 26, which permits inquiry into "any nonprivileged matter that is relevant to *any . . . claim or defense*." Fed. R. Civ. P. 26(b)(1) (emphasis added). There is little textual reason for the Court to use *Armstrong* when determining whether discovery is available under Civil Rule 26. *Cf. Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11, 16 n.6 (D.D.C. 1997) (court does not need to reach issue of whether *Armstrong* governs discovery in civil cases).

*Second*, even if *Armstrong* applies in some civil cases, that decision setting forth the standard for obtaining discovery in support of an "ordinary equal protection" defense, 517 U.S at 465, should not govern discovery for every possible claim that a defendant could raise concerning unlawful political interference. White House interference can violate much more than the Constitution's equal-protection guarantee. And not all of the legal issues raised by potential White House interference—such as vindictiveness or equitable defenses like unclean hands— require a showing of a similarly situated, non-prosecuted defendant. If any one of those defenses is at issue—as amici believe is possible here—then even *Armstrong* doesn't require the showing of a similarly situated, non-prosecuted defendant before obtaining discovery.

18

*Third*, even if *Armstrong* applies to all claims in all cases, it didn't decide "whether a defendant must satisfy the similarly situated requirement in a case 'involving direct admissions by [prosecutors] of discriminatory purpose.'" 517 U.S. at 469 n.3; *cf. Geinosky*, 675 F.3d at 748-49 (plaintiff doesn't need to comply with similarly situated requirement in analogous "class of one" equal-protection claim when government's action is obviously discriminatory). That exception makes sense: courts should not persist in assuming that the case has been brought in good faith if the defendant—without the aid of any discovery—already can show some evidence of intentional discrimination by an executive-branch official potentially in control of the enforcement action.

This direct-admissions exception may justify further discovery in this matter. The president repeatedly has declared his enmity for CNN and, as a result, declared that his administration would block the merger. *See supra* Relevant Background. Those voluntary statements regarding the merger and expressing disagreement with CNN because of the *content* of its reporting should open the door to discovery to help determine whether the president's political self-interest and potentially unconstitutional bias have infected the handling of this matter. *See United States v. Al Jubori*, 90 F.3d 22, 25 (2d Cir. 1996) (governmental "admissions should sometimes justify further inquiry").

If that limited discovery reveals White House communications or influence on this matter, then the Court should permit fuller discovery and inquiry into the issue at trial. *See United States v. Steele*, 461 F.2d 1148, 1151-52 (9th Cir. 1972) (deferring less to the government in analyzing selective enforcement defense where government followed "a discretionary procedure not followed with any other offenders"); *see also United States v. Ojala*, 544 F.2d

940, 943 (8th Cir. 1976); *United States v. Falk*, 479 F.2d 616, 622 (7th Cir. 1973) (en banc).[28]

After all, White House intervention in specific-party matters threatens to inject political concerns

where they have no place. And courts should not deny discovery on the basis of judicial

deference to the proper functioning of the executive branch if the executive is not following the

procedures that even executive-branch attorneys acknowledge are necessary "*to ensure that DOJ

exercises its investigatory and prosecutorial functions free from the fact or appearance of

improper political influence*." McGahn Memo (emphasis in original).

> ### B.   Several established doctrines are available to redress improper political interference in specific-party enforcement matters.

As explained in Part I, serious constitutional issues arise when the White House interferes

in specific-party enforcement matters. If that happened here, this Court has a number of doctrinal

tools that it can use to determine whether such interference was unlawful and provide redress.

Amici lay out this menu of options, although which of these would apply depends on the facts.

> #### 1.   The Court could apply a presumption of vindictiveness.

The Court could consider vindictiveness—a doctrine, which, if applied, is not a complete

defense, but instead requires the government to demonstrate, with objective evidence, that it is

not acting vindictively.[29] For example, if the government insisted on harsher terms for obtaining

government approval of the merger, or if it brought this action to punish CNN, that would violate

---

[28] To be sure, there is not a large body of case law dealing with White House meddling in specific-party law enforcement matters. That's because in the wake of the Watergate scandal, a long-standing bipartisan consensus developed that such meddling should not occur. When the executive ceases to comply with post-Watergate norms, it should not be able to claim the shield of post-Watergate precedents like *Armstrong*.

[29] Though the vast majority of vindictiveness cases are criminal matters, the doctrine is rooted in the Due Process Clause, which applies in both civil and criminal cases. Accordingly, the doctrine also has been considered in civil enforcement actions. *See, e.g.*, *Envt'l Protection Servs. v. EPA*, 353 F. App'x 448, 449 (D.C. Cir. 2009).

the Due Process Clause by punishing defendants for what the First Amendment allows. Indeed,

the mere *appearance* of vindictiveness is constitutionally problematic. *See, e.g., Blackledge*, 417

U.S. at 28, *Edwardsen v. McCaughtry*, 977 F.2d 585 (7th Cir. 1992) ("The appearance of

vindictiveness is relevant because the 'fear of such vindictiveness may unconstitutionally deter a

defendant's exercise of the right to collaterally attack his first conviction.'" (quoting *Pearce*, 395

U.S. at 725)).

Defendants have the initial burden to either (1) provide "objective evidence [of] an

improper prosecutorial motive," *Goodwin*, 457 U.S. at 380 n.12, or (2) demonstrate that there

should be a presumption of vindictiveness by showing that "a reasonable likelihood of

vindictiveness exists," *id.* at 373. A reasonable likelihood of vindictiveness exists when the

government's actions appear to be "more likely than not attributable to vindictiveness." *United*

*States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011).

Here, the conduct of the president and the White House have created such an appearance

of vindictiveness that it is likely to satisfy the defendants' initial burden. Given the

circumstances, this Court should consider applying a presumption of vindictiveness.[30] That does

not mean that the defendants automatically win—instead, the government must justify its

position by providing "objective information" establishing the "constitutional legitimacy" of its

---

[30] This conclusion is not altered by the holding in *Bordenkircher v. Hayes* that it cannot be
unconstitutionally vindictive for the government to offer certain benefits during plea bargaining
in exchange for defendants giving up the *procedural rights*—*i.e.*, the right to trial. 434 U.S. 357
(1978). A presumption of vindictiveness remains appropriate if the government appears to be
retaliating against the exercise of *substantive* constitutional rights. *See, e.g.*, *United States v.*
*Meyer*, 810 F.2d 1242, 1247 (D.C. Cir. 1987) (applying presumption in pretrial setting where
government took a highly coercive position after learning, among other things, that defendants
planned to raise First Amendment defense), *vacated*, 816 F.2d 695 (D.C. Cir.), *reinstated*, 824
F.2d 1240 (D.C. Cir. 1987). For example, a presumption of vindictiveness would be appropriate
if it appeared more likely than not that a prosecutor took a more aggressive pre-trial position
after learning that the defendant voted for a candidate that the prosecutor didn't like.

action. *Pearce*, 395 U.S. at 726; *see also United States v. Slatten*, 865 F.3d 767, 800-01 (D.C. Cir. 2017). The gold standard for doing so would be proving that DOJ was already arriving at its position on this merger before any interference by the White House. *See Texas v. McCullough*, 475 U.S. 134, 141 (1986) (explaining government's burden in rebutting presumption of vindictiveness); *Pearce*, 395 U.S at 726 (noting timing's relevance to vindictiveness analysis).

> ### 2.    *The Court could evaluate the involvement of interested officials.*

The Court also could consider whether interference has resulted in the proceedings being controlled by a government official with an unlawful self-interest in the proceedings. That could occur in two ways: first, if the president himself exercised direct control over the proceedings, *see, e.g.*, *United States v. Siegelman*, 786 F.3d 1322, 1329 (11th Cir. 2015); or second, if the White House intervened in a such a way as to have leverage over DOJ officials' "personal and professional" interests, *United States v. Heldt*, 668 F.2d 1238, 1275 (D.C. Cir. 1981).

The remedy for unlawful self-interest depends on the stage of the proceedings. *See id.* at 1276-77. One potential approach would be to require DOJ to reconsider this case with a new team that is more insulated from White House interference.

> ### 3.    *The Court could dismiss the action under the unclean-hands doctrine.*

The Court also could consider whether the equitable doctrine of "unclean hands" applies, and, if so, whether the doctrine requires either dismissal of the case.

The unclean-hands doctrine derives its name from the ancient maxim that "he who comes into equity must come with clean hands." *Bartko v. SEC*, 845 F.3d 1217, 1227 (D.C. Cir. 2017). The doctrine "requires that a party seeking equitable relief show that his or her conduct has been fair, equitable, and honest as to the particular controversy in issue." *Id.* "If a plaintiff does not act 'fairly and without fraud or deceit,' the unclean hands doctrine affords a defendant a complete defense." *Id*.

It was once thought that the unclean-hands doctrine and other equitable defenses could not be raised against a government agency. *See SEC v. Gulf & W. Indus.*, 502 F. Supp. 343, 348 (D.D.C. 1980). But *Heckler v. Community Health Services* opened the door to invoking equitable defenses when the public's interest in law enforcement is "outweighed" by the "countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." 467 U.S. 51, 60-61 (1984). And in *Bartko*, the D.C. Circuit applied *Heckler* to the unclean-hands defense. Under *Bartko*, the equitable "outweigh[ing]" described in *Heckler* occurs where the government's misconduct is "egregious" and "the resulting prejudice to the defendant rise[s] to a constitutional level." 845 F.3d at 1227.

It would be "egregious" and result in a "constitutional level" of prejudice if the White House attempted to use antitrust law to retaliate for speech protected First Amendment. Such an enforcement action would betray our "national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Accordingly, if the Court finds unlawful interference, it should consider exercising its equitable discretion to dismiss this suit.

4.    *The court could dismiss the case as unlawful selective enforcement.*

The Court also could consider whether there has been an unconstitutional selective enforcement of the antitrust laws—which would defeat the government's case. To demonstrate unconstitutional selective enforcement under the Fifth Amendment, defendants need to demonstrate "that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465. As described above, the parties should have a full opportunity to obtain discovery and testimony needed to pursue this claim.

23

> 5.    *The Court could shift the burden to the government to show that it is not punishing First Amendment-protected conduct.*

The Court also could consider whether this antitrust enforcement action violates the First Amendment. Before this action was filed, the president repeatedly denounced CNN for the content of its coverage and threatened to use the machinery of government against CNN. *See supra* Relevant Background. These threats by a government actor would have violated CNN's First Amendment rights even if the current action had never been filed. *See Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003); *Backpage.com, LLC, v. Dart*, 807 F.3d 229, 229-30 (7th Cir. 2015). Those rights are certainly violated if the White House interfered in this action in retaliation for CNN's First Amendment-protected speech. *Hartman*, 547 U.S. at 256. Based on the president's clearly expressed animus toward CNN and his threats directed at the network, defendants likely can make a *prima facie* showing that the present action was brought with improper motive to retaliate against CNN.

Where defendants have made a *prima facie* showing that the basis for a government enforcement action is retaliation against the defendants for exercising their First Amendment rights, the burden shifts to the government to show that it would have brought this action to block the merger even in the absence of the retaliatory animus. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). [31] The government can carry that burden by

---

[31] A retaliation claim would not be defeated merely if the government can show "probable cause" that the challenged merger violates antitrust laws. *Cf. Hartman*, 547 U.S. at 260-66. This is not an action for damages where absolute and qualified immunity is at stake. And there's no grand-jury indictment to complicate the causation analysis. Further, *Hartman* dealt with allegations that the unconstitutional animus was transferred from an investigative agent who lacked authority to initiate a prosecution, to the prosecutor, who did. Here, the alleged animus originates at the top of the executive branch. For these reasons, the *Mount Healthy* burden-shifting standard—and not the *Hartman* standard—applies to the government's alleged retaliation.

showing that it would have brought a similar enforcement action even against companies of whose speech the president approves. *See, e.g., Sanchez-Lopez v. Fuentes-Pujols*, 375 F.3d 121 (1st Cir. 2004).

## CONCLUSION

As the Supreme Court has observed, "if there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). That constellation dims when the public believes that the president, with his obligation to preserve, protect, and defend democracy, is instead using federal law enforcement to betray, beleaguer, and undermine it. To ensure that this is not happening, this Court should allow the parties to conduct an inquiry into whether there has been unconstitutional political interference in this enforcement matter and should order an appropriate remedy if there has been.

Date: March 8, 2018

/s/ *Benjamin L. Berwick*
Benjamin L. Berwick (D.D.C. Bar No. MA0004)
THE PROTECT DEMOCRACY PROJECT
10 Ware St.
Cambridge, MA 02138
Phone: 202-599-0466
Fax: 929-777-8428

Justin Florence (D.C. Bar No. 988953)
Cameron Kistler (D.C. Bar No. 1008922)
Kristy Parker*
THE PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
Phone: 202-856-9191

*D.C. Bar application pending, practicing under the supervision of D.C. bar members.

*Of Counsel to Amici*

25

## APPENDIX A

**Preet Bharara** served as the United States Attorney for the Southern District of New York (2009-2017), and as an Assistant United States Attorney for the Southern District of New York (2000-2005). He is a paid Senior Legal Analyst for CNN; he files this brief not in that capacity, but in his capacity as a former United States Attorney for the Southern District of New York.

**Joyce R. Branda** served as Acting Assistant Attorney General of the Civil Division (September 2014-February 2015), Deputy Assistant Attorney General for the Commercial Litigation Branch of the Civil Division (2012-2017), Director of the Commercial Litigation Branch (2007-2012), Deputy Director of the Commercial Litigation Branch (1991-2007), Assistant Director of the Commercial Litigation Branch (1987-1991), as a Trial Attorney for the Commercial Litigation Branch (1982-1987), and a Trial Attorney for the Land and Natural Resources Division (1980-1982).

**John W. Dean** served as the Associate Deputy Attorney General (1969-1970). He also served as White House Counsel to the President of the United States (1970-1973). Mr. Dean, an independent contractor with CNN, is an on-air "contributor"; he files not in that capacity, rather in his capacity as a former Associate Deputy Attorney General and White House Counsel.

**Damon P. Martinez** served as the United States Attorney for the District of New Mexico (2014-2017), as an Assistant United States Attorney for the District of New Mexico (2001-2014), and as a Special Assistant United States Attorney for the District of New Mexico (2000-2001).

**John McKay** served as the United States Attorney for the Western District of Washington (2001-2007), and as a Special Assistant to the Director of the Federal Bureau of Investigation (1989-1990).

**Molly Moran** served as the Principal Deputy Associate Attorney General (2014-2016), Acting Assistant Attorney General for the Civil Rights Division (2014), and Counselor and Deputy Chief of Staff to the Attorney General (2010-2014).

**Florence T. Nakakuni** served as the United States Attorney for the District of Hawaii (2009-2017), as an Assistant United States Attorney for the District of Hawaii (1985-2009), and as an Attorney-Advisor in the Office of Information and Privacy Appeals (1980-1982).

**Sarah R. Saldaña** served as the United States Attorney for the Northern District of Texas (2011-2014), and as an Assistant United States Attorney for the Northern District of Texas (2004-2011). She also served as the Director of Immigration and Customs Enforcement in the Department of Homeland Security (2014-2017).

**Jocelyn Samuels** served as the Acting Assistant Attorney General for the Civil Rights Division (2013-2014), as the Principal Deputy Assistant Attorney General for the Civil Rights Division (2011-2013), and as a Counsel to the Assistant Attorney General for the Civil Rights Division (2009-2011).

**Carter M. Stewart** served as the United States Attorney for the Southern District of Ohio (2009-2016), and as an Assistant United States Attorney for the Northern District of California (2003-2005).

**Joyce White Vance** served as the United States Attorney for the Northern District of Alabama (2009-2017), and as an Assistant United States Attorney for the Northern District of Alabama (1991-2009).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
------------------------------------------------------------------- x
THE UNITED STATES OF AMERICA          :
                                      :
                    Plaintiff,        :
                                      :
             – v. –                   :    No. 1:17-cv-2511-RJL
                                      :
AT&T INC., ET AL,                     :
                                      :
                    Defendants.       :
                                      :
------------------------------------------------------------------- x
```

**[PROPOSED] ORDER**

Before the Court is the motion for leave by Former Department of Justice Officials to file an amici curiae brief in support of neither party in this matter. Having considered the papers and pleadings on file, the Court GRANTS the motion for leave to file and ORDERS that the brief submitted by these amici is deemed filed.

**IT IS SO ORDERED.**

Dated: _____, 2018


_____

Judge Richard J. Leon
United States District Judge