# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Civil Action No. 1:17-cv-02511 (RJL) |
| *Plaintiff*, | **[REDACTED VERSION]** |
| v. |  |
| AT&T INC., DIRECTV GROUP HOLDINGS, LLC, and TIME WARNER, INC., |  |
| *Defendants*. |  |

## <u>TRIAL BRIEF OF THE UNITED STATES</u>

# TABLE OF CONTENTS

I.      INTRODUCTION................................................................................................. 1

II.     TRIAL BRIEF OVERVIEW ............................................................................... 5

III.    BACKGROUND: DEFENDANTS & THE PROPOSED MERGER ............................. 5

        A. Defendants.................................................................................................. 5

        B. The Proposed Merger ................................................................................. 7

IV.     LEGAL STANDARDS ...................................................................................... 8

V.      BACKGROUND: INDUSTRY .......................................................................... 14

        A. Cast of Characters: Overview ................................................................... 14

        B. The Negotiation of Affiliate Agreements.................................................. 16

        C. Time Warner's Unique and Valuable Content........................................... 17

        D. "The Times They Are A-Changin'" .......................................................... 17

VI.     THE EFFECT OF THE AT&T-TIME WARNER MERGER "MAY BE
        SUBSTANTIALLY TO LESSEN COMPETITION" ........................................... 21

        A. Multichannel Video Distribution in Local Competitive Zones Are Relevant Markets .. 22

            1.  Multichannel Video Distribution Is a Relevant Product Market.............................. 22

            2.  The Relevant Geographic Markets Are Local Footprint Overlap Zones .................. 25

        B. Time Warner Content Is Key for MVPDs and Virtual MVPDs ..................... 26

        C. The Merger Would Harm Competition by Empowering AT&T to Raise the
           Programming Costs of its Rivals....................................................................... 30

            1.  The Parties' Own Words Confirm the Threat of Harm from a Raising of Rivals'
                Costs ................................................................................................................. 31

            2.  With its Increased Bargaining Leverage, the Merged Firm Would Likely Raise the
                Price of Turner Content........................................................................................ 32

            3.  The Higher Costs AT&T Would Impose on its Rival Distributors Would Weaken
                Them as Competitors, Harming Consumers Nationwide.......................................... 34

    4. To the Extent Natural Experiments Exist, They Confirm that AT&T Will Be Able to Raise its Rivals' Costs ................................................................................................ 36

  D. The Merger Would Harm Competition by Constraining AT&T's Rival Distributors from Effectively Using HBO as a Competitive Tool ............................................................. 37

  E. The Merger Would Facilitate Coordination between AT&T and Comcast/NBCU to Disadvantage Emerging Virtual MVPD Rivals ............................................................. 40

    1. The Merger Would Change Time Warner's Posture toward Virtual MVPDs, Creating a Real Danger of Coordination .................................................................. 41

    2. Market Conditions and the Lack of Impediments to a Coordinated Denial of Content Make Coordinated Effects Likely ............................................................................ 43

    3. Coordination Would Reduce Competition from Virtual MVPDs and Mean Higher Prices, Fewer Options, and Less Innovation for Consumers .................................... 48

  F. Defendants' Contentions Regarding Upstream Market Power Have No Basis in Law or Fact ................................................................................................................................. 50

VII.   DEFENDANTS' PRO-MERGER ARGUMENTS DON'T HOLD WATER ................ 52

  A. Claimed Efficiencies Cannot Save This Merger ............................................................ 52

  B. Entry Will Not Forestall Harm from the Merger ........................................................... 55

  C. FCC Regulation Will Not Prevent Harm ...................................................................... 58

  D. Defendants' Do-It-Yourself "Cure" Is No Substitute for Lost Competition and Cannot Remedy Likely Harm .................................................................................................... 61

VIII.  TRIAL PRESENTATION ............................................................................................ 67

IX.    CONCLUSION ............................................................................................................. 68

Appendix A ……………………………………………………………………….............. 70

# TABLE OF AUTHORITIES

**Cases**

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)................ 41, 44

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), ....................................................... passim

*California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) ................................................................. 9

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ...................................... 51

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972).................................................... 14, 62, 66

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) .................................................. 11, 25

*FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) ............................... 43, 44, 46, 52

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) .......................................................... 9, 41

*FTC v. H.J. Heinz Co.*, 246 F.3d708 (D.C. Cir. 2001) ......................................................... passim

*FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069 ......................................................... 40, 45, 63

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) ............................................ 9

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ..................................................................... 9

*FTC v. ProMedica Health Sys., Inc.*, No. 11-cv-47, 2011 WL 1219281 (N. D. Ohio Mar. 29,
    2011) ..................................................................................................................................... 33

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) .......................................................... 62

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ............................................................. 23

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015)........................................................ passim

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)................................. 12

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) .......................................... 13

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) ................................................................ 30

*NCAA v. Bd. of Regents*, 468 U.S. 85 (1984)............................................................................... 51

*Sprint Nextel Corp. v. AT&T, Inc.*, 821 F. Supp. 2d 308 (D.D.C. 2011)................................... 30

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775
    (9th Cir. 2015)................................................................................................................. 33, 52

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ............................................ 22

*Toys 'R Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) .............................................................. 51

U.S. Dep't of Justice, Non-Horizontal Merger Guidelines (1984) ............................................. 10

*United States v. Aetna Inc.*, 240 F. Supp. 3d at 1 (D.D.C.2017) ..................................... 53, 55, 63

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ............................................. passim

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990)............................................. 9

*United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966
    (N.D. Cal. Jan. 8, 2014) ...................................................................................................... 26

*United States v. Borden*, 347 U.S. 514 (1954).............................................................................. 66

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) .............................................. 51

*United States v. Du Pont & Co.*, 366 U.S. 316 (1961) .......................................................... passim

*United States v. General Dynamics*, 415 U.S. 486 (1974) .......................................................... 11

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) .................................. passim

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995)............................................... 13

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1962) ................................................. 9, 12, 53

*Yankee Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657,
    (S.D.N.Y. 2002)............................................................................................................. 30, 37

## Other Authorities

ABA SECTION OF ANTITRUST LAW, MERGERS AND ACQUISITIONS:  UNDERSTANDING THE
ANTITRUST ISSUES (4th ed. 2015) .......................................................................................... 10
C. Scott Hemphill & Tim Wu, *Parallel Exclusion, 11 YALE L.J. 1182 (2013),* 1223 ................ 46
HR. Rep. No. 81-1191 (1949) ................................................................................................. 11
Michael Riordan, *Competitive Effects of Vertical Integration*, *in* HANDBOOK OF ANTITRUST
ECONOMICS 145, (Paolo Buccirossi ed., 2008) ........................................................ 30
Restatement (Second) of Contracts .......................................................................................... 65
RICHARD A. POSNER, ANTITRUST LAW (2d ed. 2001) ................................................................ 46
Steven C. Salop & Daniel P. Culley, *Vertical Merger Enforcement Actions:  1994-2016*
(June 30, 2017) .................................................................................................................. 12
Steven C. Salop, *Invigorating Vertical Merger Enforcement* 127 YALE L.J.
(forthcoming 2018) ............................................................................................................ 11
U.S. Dep't of Justice & Fed. Trade Comm'n, Commentary on the Horizontal Merger
Guidelines (2006) ............................................................................................................... 10
U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES
(2010) ................................................................................................................................ 40
U.S. DEP'T OF JUSTICE, ANTITRUST DIVISION POLICY GUIDE TO MERGER REMEDIES
(June 2011) ......................................................................................................................... 66

## Rules and Regulations

15 U.S.C. § 18 .................................................................................................................... 8, 50
15 U.S.C. § 16(e) ................................................................................................................... 13
47 C.F.R. § 76.1002(b)(3) ...................................................................................................... 59
47 U.S.C. § 548(b) ................................................................................................................. 58

## I.      INTRODUCTION

If TV-program distributor AT&T acquires TV-program producer Time Warner,

American consumers will end up paying hundreds of millions of dollars more than they do now

to watch their favorite programs on TV.  In short, the transaction violates Section 7 of the

Clayton Act, because its effect "may be substantially to lessen competition."  Prices for current

services will go up and development of emerging competition will slow down.  And we know

this because the defendants themselves have told us so:

**AT&T:**  AT&T, now that it proposes to buy Time Warner, finds the United States'

theory of anticompetitive consequences "inexplicable."  Before it cut the deal, however, AT&T

had no trouble at all explaining to the Federal Communications Commission that, when

program distributors acquire content producers, the resulting vertically integrated firms "have

the incentive and ability to use (and indeed have used whenever and wherever they can) that

control as a weapon to hinder competition."[1]

**DirecTV:**  DirecTV too—before *it* was acquired by AT&T—saw things much the same

way, telling the Federal Communications Commission while it was evaluating the

Comcast/NBCU merger, that (1) a "vertically integrated programmer can much more credibly

threaten to withhold programming from rival MVPDs [Multichannel Video Programming

Distributors] than can a non-integrated programmer" and (2) "the proposed transaction would

enable Comcast/NBCU to use such threats to demand higher prices and more favorable terms—

and withhold programming from any MVPD that failed to acquiesce.  DirecTV specifically

concluded that vertical integration of programming and distribution can "give the integrated

---

[1] *Compare* Press Release, David R. McAtee II, Senior Vice President and General Counsel,
AT&T, Inc. (Nov. 20, 2017), *with* PX0002-004

entity the incentive and ability to gain an unfair advantage over its rivals.  This ultimately results in higher prices and lower quality service for consumers."[2]

These express concessions will be backed up and reinforced at trial by confirming evidence—internal documents from the files of defendants and others, informed opinions from expert witnesses who have carefully studied the industry generally and this transaction in particular, and, most importantly, multiple knowledgeable industry participants who work in the marketplace day in and day out.  Thus, expertise and real-world experience alike will demonstrate that this proposed transaction poses an unacceptable threat to competition and consumers.

What is the defendants' response to all this?  It is fourfold.  *First*, there is the *Star Wars* defense:  everything the government is telling the Court is stale and out of context—it is from a long time ago in a galaxy far, far away.  Not so.  To the contrary, as will be shown at trial, the government is challenging this merger to address the real concerns of real people who populate the real marketplace today.  And tomorrow as well, since the acquisition would give AT&T a new tool to slow down the development and growth of disruptive online competitors in the future.  The fact that this is an evolving industry does not provide a reason to let the challenged acquisition proceed.  Just the opposite:  It provides a compelling additional reason why it should be blocked.  AT&T can profess it wants to lead the charge to the future, but its internal documents reveal a less attractive reality.  Specifically, they show starkly that, in fact, AT&T recognizes the ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████

---

[2] PX0001-003, -017.

████████████████████ of the future.[3]  For current consumers of traditional pay-TV content, economic modelling shows that the merger will mean paying for the equivalent of 13 months of Turner content per year, while getting only 12.  That's pure overcharge consumers will have to pay without getting anything in return.  And perhaps even more significant, the decision in this case will chart the course for the future of video-content delivery in the United States—either important video content will be available through a competitive market to all distributors, including up-and-coming innovators, or it will likely only be available through vertically integrated, well-funded silos.

*Second*, defendants argue that this is a vertical merger and therefore undeserving of scrutiny.  But the Clayton Act is directed at all acquisitions, and tests them all by the same standard—whether they will likely lead to a substantial lessening of competition.  The fact that most vertical mergers (like most horizontal mergers) are procompetitive or competitively neutral is immaterial to that inquiry.   Indeed, Congress amended the Clayton Act in 1950 to specifically include vertical mergers under Section 7.  Here, the critical question is this:  Would consumers quit subscribing to AT&T's competitors and switch to AT&T if they did not carry Time Warner content, thus allowing AT&T to increase the price of that content?  If so, the merger will allow AT&T to increase its rivals' costs—and those higher costs will, in turn, be passed on to consumers.  At trial, the United States will prove that the answer to this critical question is yes:  Time Warner's content is competitively significant—in fact, in defendants' own words it is more than significant, Time Warner content is "must have."

*Third*, defendants claim that, with the merger, they will achieve efficiencies they could not achieve otherwise.  But defendants' efficiency claims are a mile wide and an inch deep—

---

[3] PX0031-041, -042.

ranging everywhere from 

█████, but never with the solid documentation and verification that the law demands.  Their most

speculative claimed efficiency benefit is a ████████████████████████████

████████████████████████████████████████████

█████   Other categories of supposed efficiencies, ████████████████████

██████████████████████, could likely be accomplished without the need for a

merger through ordinary arm's-length agreements between the parties—indeed, such

agreements are common in this industry.

*Fourth*, defendants filed a self-contradictory answer that is 29 pages long but boils down

to this:  our merger poses no competitive problem … and, besides, we have a cure for it!

Reality, however, is that the proposed merger would be decidedly anticompetitive.  And

defendants' proposed "cure"—an offer made to competitors post-Complaint promising to

engage in "baseball-style" arbitration to license Time Warner content for the next seven

years—is no cure at all.  It is a fundamentally flawed effort to undermine the free market

solution by merely offering to behave in a way that is contrary to the merged company's natural

business incentives and interests.  With no oversight.  And, if this sort of do-it-yourself price

regulation is sufficient to cure structural harm to the market in this merger, why wouldn't it be

appropriate in every merger?  Why wouldn't it be sufficient, in a merger of the only two

companies in a market, for the merged company to offer customers the option of appealing any

price offering to an arbitrator?  Defendants' theory is simply inconsistent with the purpose of

Section 7—to protect the market structures that ensure welfare-enhancing competition.

Moreover, defendants' arbitration offer would turn into a pumpkin after seven years—

leaving the combined firm with no restraint at all on its ability to act on the incentives to harm

competition that this merger creates.  Indeed, AT&T's internal analysis—performed before it

entered into the Time Warner deal—of what AT&T itself will face when the *Comcast/NBCU*

decree expires six months from now highlights why this is a problem.  In AT&T's own words,

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████[4]

## II.     TRIAL BRIEF OVERVIEW

In the sections that follow in this trial brief, the United States will first provide

background on defendants and their proposed merger.  We will then briefly discuss the legal

standards relevant to this case.  Next, we will turn our attention to industry background.  And

then, in the context of the foregoing, we will provide a detailed discussion of the evidence

proving that the effect of the proposed AT&T-Time Warner merger "may be substantially to

lessen competition" in violation of Section 7.  We will then address the would-be merging

parties' defenses—demonstrating that none should permit their proposed transaction to proceed.

Finally, we will provide a preview of what we anticipate the trial in this case will be like. (In

addition, attached to this brief is an appendix that provides a glossary of terms, abbreviations

and acronyms used in the industry)

## III.    BACKGROUND: DEFENDANTS & THE PROPOSED MERGER

### A.    Defendants

*AT&T.*  AT&T is the world's largest telecommunications company, by revenue, and one

of the country's leading business enterprises.  AT&T is no stranger to the antitrust laws.  Over

the years, AT&T has been a defendant in many antitrust actions.  In 1982, following nearly a

decade of litigation, a decree was entered in *United States v. AT&T*, 552 F. Supp. 131 (D.D.C.

---

[4] PX0011.

1982), that required AT&T to divest itself of seven Regional Bell Operating Companies (the so-called Baby Bells).  In the divestiture, AT&T kept its long-distance business and the Baby Bells took over local phone services.

Consolidation among the Baby Bells followed.  For example, Southwestern Bell acquired Ameritech, BellSouth, and Pac Bell.  In 2005, Southwestern Bell (then known as SBC Communications) acquired AT&T for $16 billion and changed its corporate name to AT&T. Growth through acquisition has continued, with AT&T, most prominently, purchasing DirecTV in 2015 for $67 billion.

Today, AT&T sells video, internet, voice, and data services to customers across the United States.  With its acquisition of DirecTV, it has become the largest video programming distributor in the United States, with over 25 million subscribers.  AT&T has three MVPD offerings:  (1) DirecTV, a nationwide satellite-based service with over 20 million subscribers, (2) U-Verse, a service using AT&T's local fiber optic and copper networks with over 3 million subscribers, and (3) DirecTV Now, a new online video service that has already signed up over a million subscribers.

*DirecTV.*  DirecTV provides television and audio services to subscribers across the country through satellite transmissions. Its subscribers have access to hundreds of channels.  In 2010, DirecTV opposed the purchase of NBCU by Comcast, submitting an economic analysis to demonstrate the likely anticompetitive effects of the transaction using a Nash bargaining model, just like the analysis the government's expert Dr. Carl Shapiro will present at trial here. As noted above, DirecTV was acquired by AT&T in 2015 for $67 billion and today has over 20 million subscribers. DirecTV specifically concluded that vertical integration of programming and distribution can "give the integrated entity the incentive and ability to gain an unfair

advantage over its rivals.  This ultimately results in higher prices and lower quality service for consumers."[5]

***Time Warner.***  Time Warner is a mass media and entertainment conglomerate and one of the country's marquee creators of movie and television programming.  Time Warner has three key business units—Turner Broadcasting System, Warner Bros. Entertainment and Home Box Office (HBO).  Turner operates several popular TV networks, including TNT, TBS, CNN, and the Cartoon Network, providing news, entertainment, and premium sports programing.  Warner Bros. is the largest studio in the world, producing both television series and major films.  HBO is the most widely distributed premium TV network in the country, with over 50 million subscribers in 2017.  (HBO also owns the Cinemax premium network.)

### B.     The Proposed Merger

On October 22, 2016, AT&T agreed to acquire Time Warner.  Including assumption of debt, the value of the transaction is approximately $108 billion, the largest ever vertical merger in this industry.  The parties recently agreed to extend the date by which the transaction must close until June 21, 2018.  Following that date, either side can walk away from the transaction.  If the deal does not close by that date, AT&T must pay Time Warner a "break-up fee" of $500 million.

AT&T had considered purchasing a content company for several years, expecting that acquiring a major content provider like Time Warner would allow it to ███████████████

███████████████████████████████████████████

███████████████.[7]



---

[5] PX0001-017.
[6] PX0032-010, -011.
[7] PX0034-099.

On the day the United States filed this action, AT&T's CEO, sounding a bit like Captain Renault in the classic Warner Bros. film *Casablanca,*[8] proclaimed that he was surprised— "surprised to be here."  Thomson Reuters, Transcript of AT&T Press Conf. at 2 (Nov. 20, 2017).  But a year earlier, when the deal was announced, the *New York Times* predicted it was "likely to face tough scrutiny."  Michael J. de la Merced, *AT&T Pledges $83 Billion to Acquire Time Warner*, N.Y. TIMES, Oct. 23, 2016, at A1.  The *Wall Street Journal* echoed, stating that the transaction "will be in for a lengthy regulatory review and, at the very least, tough conditions."  Shalini Ramachandran & Thomas Gryta, *AT&T's Bid for Time Warner Would Face Obstacles*, WALL ST. J., Oct. 21, 2016.  And in a candid moment, approximately 10 days prior to the filing of the present action by the United States, AT&T's CEO, Randall Stephenson, himself conceded that "[s]ince the day we've announced this, we've been preparing to litigate this deal, and we have been working very diligently on a litigation strategy and a litigation plan."  David Ng, *AT&T CEO Randall Stephenson Says He Is Prepared to Litigate Time Warner Deal*, L.A. TIMES, Nov. 9, 2017.

## IV.   LEGAL STANDARDS[9]

The plain language of Section 7 of the Clayton Act states that "[n]o person … shall acquire [assets] … where in any line of commerce or … in any section of the country, the effect of such acquisition *may* be substantially to lessen competition, or to *tend* to create a monopoly." 15 U.S.C. § 18 (emphasis added).  Section 7 applies equally to mergers of all stripes.  "All mergers are within the reach of [Section] 7, and all must be tested by the same standards,

---

[8] CASABLANCA (Warner Bros. 1942) (Captain Renault: "I'm shocked, shocked to find that gambling is going on in here!").
[9] At the Court's direction, the law setting out each side's burdens will be discussed more fully in a separate filing.

whether they are classified as horizontal, vertical, conglomerate or other." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967) (emphasis added).

Section 7 "creates a relatively expansive definition of antitrust liability," and "subjects mergers to searching scrutiny." *California v. Am. Stores Co.*, 495 U.S. 271, 284, 285 (1990). "To establish a Section 7 violation, plaintiff must show that a pending acquisition is reasonably likely to cause anticompetitive effects." *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011) (quotation omitted).  As the statutory text indicates, merger review is concerned with "probabilities, not certainties," *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962), given that Congress "intended to arrest anticompetitive tendencies in their 'incipiency,'" *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1962) (quoting *Brown Shoe*, 370 U.S. at 317).  "A certainty, even a high probability, need not be shown," and "doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989).

"A burden-shifting analysis applies to consider the merger's effect on competition." *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017). "To establish a prima facie case, the Government must (1) propose the proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337-38 (3d Cir. 2016).  Once the plaintiff makes a prima facie case, the burden shifts to the defendant to produce evidence to rebut the case. *Anthem*, 855 F.3d at 349 (alteration in original).  "Upon rebuttal by the defendant, 'the burden of producing additional evidence of anticompetitive effect shifts to the [plaintiff], and merges with the ultimate burden of persuasion, which remains with the [plaintiff] at all times.'" *Id.* at 350 (quoting *United States v. Baker Hughes Inc.*, 908 F.2d 981, 983 (D.C. Cir. 1990)).  In a vertical-merger case, the

plaintiff makes its prima facie case with case-specific evidence of a danger of future competitive harm. *See Brown Shoe*, 370 U.S. at 329.[10]

Defendants would make much of the fact that most vertical mergers do not threaten competitive harm. *See, e.g.*, U.S. Dep't of Justice, Non-Horizontal Merger Guidelines § 4.0 (1984). But neither do most horizontal mergers. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Commentary on the Horizontal Merger Guidelines 1 (2006). The Division has highlighted this reality in its Guidelines for over 40 years—from 1982 ("the Department seeks to avoid [] unnecessary interference with that larger universe of mergers that are either competitively beneficial or neutral," U.S. Dep't of Justice, Merger Guidelines § 1 (1982)) to its most recent iteration in 2010 (agencies "avoid unnecessary interference with mergers that are either competitively beneficial or neutral," U.S. Dep't of Justice & Fed. Trade Comm'n Horizontal Merger Guidelines § 1 (2010)). The Division reviews thousands of mergers each year—horizontal, vertical, and otherwise—and clears all but the scant few that careful analysis demonstrates will harm competition.[11]

Thus, defendants are wrong when their economic expert says that "unlike horizontal mergers, vertical mergers are generally pro-competitive." This betrays a fundamental misconception about Section 7 and its enforcement. Vertical mergers are not *unlike* horizontal mergers in that they are generally procompetitive; rather, they are *like* horizontal mergers in

---

[10] *See generally* ABA SECTION OF ANTITRUST LAW, MERGERS AND ACQUISITIONS: UNDERSTANDING THE ANTITRUST ISSUES 367 (4th ed. 2015) ("Current antitrust treatment of vertical mergers tends to be fact specific, with emphasis on whether a likelihood of harm can be demonstrated in the particular transaction.")

[11] *See, e.g.*, Bernard (Barry) A. Nigro, Jr., Deputy Assistant Att'y Gen., Antitrust Div., U.S. Dep't of Justice, A Partnership to Promote and Protect Competition for the Benefit of Consumers (Feb. 2, 2018) (explaining that "[m]ost transactions do not raise competitive concerns," and that in 2017 "the Antitrust Division opened an investigation into only 2.7% of proposed transactions, and issued second requests in only 1.6% of proposed transactions").

that *both* are generally procompetitive.  Some specific transactions—both horizontal and vertical—are not, of course.  And that is why, in 1950, after "extensive legislative attention," Congress specifically amended Section 7 of the Clayton Act to make clear that it covered vertical as well as horizontal mergers.  *Brown Shoe*, 370 U.S. at 312, 317.  The associated House Report specifically included vertical mergers within the amendment, stating that "the law would be violated, even though there did not exist any competition between the acquiring … and the acquired … firms."  HR. Rep. No. 81-1191 at 11 (1949).  Thus, in making enforcement decisions, as long recognized—and unless the federal enforcement agencies are to ignore Congress's specific amendment to cover vertical mergers—the test is not whether a particular merger is horizontal or vertical, but whether it will likely harm competition.

The law is clear:  in evaluating *any* merger, a court considers the facts at bar to determine whether the transaction in question may lessen competition substantially.  As the Supreme Court admonished in *United States v. General Dynamics*, 415 U.S. 486, 498 (1974), only such an "examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive competitive effect of the merger."  *Cf. FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116-17 (D.D.C. 2004) ("cases must be resolved on the basis of record evidence relating to the market and its probable future").  It is unquestionable that vertical mergers can harm competition and consumers.  *See, e.g.*, Steven C. Salop, *Invigorating Vertical Merger Enforcement* 127 YALE L.J. (forthcoming 2018) (in the current economy, "vertical and complementary product mergers present heightened concerns") (manuscript at 29).

By one count, the Department of Justice and the Federal Trade Commission initiated 52 vertical-merger enforcement actions between 1994 and 2016.  Steven C. Salop & Daniel P.

Culley, *Vertical Merger Enforcement Actions: 1994-2016* 1 (June 30, 2017). As this Court recently observed, a vertical merger that is challenged under the antitrust laws "is not a unicorn!" Slip Op. at 6, *United States v. AT&T Inc.*, No. 17-cv-02511-RJL (D.D.C. Feb. 20, 2018). Some of these actions have involved the same industries and the same types of theories as involved in the case at bar.[12] This enforcement activity rests on the premise that "competition is our fundamental national economic policy, offering as it does the only alternative to the cartelization or governmental regimentation of large portions of the economy." *Phila. Nat'l Bank*, 374 U.S. at 372.

Applying longstanding law, sound economic principles and common sense, courts and enforcers undertake case-by-case analyses to identify those mergers that pose an anticompetitive threat. *Cf. Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) (antitrust law "adapts to modern understanding and greater experience" and draws on "authorities in the economics literature"). And after enforcers have identified a merger that does pose a competitive threat, as here, they bring suit to enjoin it.

Finally, with respect to relief, defendants act as though they are entitled to a *Comcast/NBCU* type decree to remedy the anticompetitive consequences of the proposed merger. But defendants in antitrust actions do not get to select the relief to which the United States will agree. Rather, it is the United States, with the review and approval of the Court, that

---

[12] *See, e.g.*, Competitive Impact Statement at 2, 8-9, *United States v. Google Inc.*, No. 1:11-cv-00688 (D.D.C. Apr. 8, 2011) (merger would give travel search site control of critical software and pose a significant risk that merged entity would deny or raise the cost of the software to competing sites); Competitive Impact Statement at 23-26, *United States v. Comcast Corp.*, No. 1:11-cv-00106 (Jan. 18, 2011) (merged entity would have strong incentive to raise price of programming to MVPD rivals); *In re Time Warner Inc.*, 123 F.T.C. 171, 180 (1997) (merged entity would charge rival MVPDs discriminatory high prices for programming); *In re Eli Lilly & Co, Inc.*, 120 F.T.C. 243, 246 (1995) (merger would enhance coordinated interaction among vertically integrated pharmaceutical companies).

shapes appropriate relief based on its understanding of market circumstances and the efficacy—or not—of remedial provisions.  And, as the Supreme Court has noted, "[i]t is well settled that once the government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor."  *United States v. Du Pont & Co.*, 366 U.S. 316, 334 (1961).

The decision whether to enter into a consent decree like the one in *Comcast/NBCU*, like the decision whether to enter into a deferred prosecution agreement, is fundamentally an exercise of prosecutorial discretion.  *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1236-37 (D.C. Cir. 2004) (citing *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459-60 (D.C. Cir. 1995)).  Such a consensual resolution is reserved for circumstances where the prosecutor is persuaded that there is a way to eliminate the threat of harm to competition with a set of conditions to the transaction, and is convinced that using its resources to police compliance with those conditions is in the public interest.  Of course, the reviewing court must agree that the consent decree is in the public interest.  *Id.*; 15 U.S.C. §16(e).  But if the prosecutor in the first instance is not so convinced, or does not believe that scarce resources should be allocated to such oversight, then it is wholly within the discretion of the prosecutor to seek injunctive relief instead.  In an appropriate exercise of its prosecutorial discretion, the present Department of Justice is less interested in entering into consent decrees that require ongoing monitoring of promises to behave—often called "behavioral decrees."[13]  Such monitoring may not be the most provident use of prosecutorial or judicial resources.  Moreover, in this case it is clear that a behavioral remedy would be neither wise nor effective.  *See infra* Section VII.D.

---

[13] *See* Makan Delrahim, Assistant Att'y Gen., Antitrust Div., U.S. Dep't of Justice, Antitrust and Deregulation 5-9 (Nov. 16, 2017), *available at* https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-keynote-address-american-bar.

Here, the United States seeks structural relief.  It seeks to block the proposed merger, and earlier, at the pre-Complaint stage, it offered to settle this matter with structural relief involving partial divestitures.  The United States seeks structural relief for the same reason that structural relief "has been called the most important of antitrust remedies"—"[i]t is simple, relatively easy to administer, and sure."  *Du Pont*, 366 U.S. at 331.  In contrast, behavioral remedies are usually short-lived, often difficult to administer and risky.  And, here, market circumstances suggest, ineffectual.  The situation here mirrors that in *Ford Motor Co. v. United States*, 405 U.S. 562 (1972), where the Supreme Court specifically addressed the question of how to remedy an already consummated vertical transaction that the United States sought to unwind.  The Court agreed that "[c]omplete divestiture is particularly appropriate where asset or stock acquisitions violate the antitrust laws," *id.* at 573, and ordered structural relief—as the United States seeks here.

To sum up, where a merger runs afoul of Section 7, the competitive harm that would otherwise result from the merger—be it horizontal or vertical—can sometimes be cured with a consent decree.  And sometimes it cannot.  Here, of course, both the merging parties and the government advanced proposed consent decrees—behavioral in the case of the defendants and structural in the case of the United States.  But the two sides were unable to reach agreement.  Thus, this case.

## V.    BACKGROUND: INDUSTRY

### A.    Cast of Characters: Overview

The video production and distribution industry, sometimes referred to as the "pay TV ecosystem," operates at three levels.  *First*, content is brought to the market by studios like Warner Brothers (*e.g.*, a series like *Game of Thrones*) or sports content providers like Turner Sports (*e.g.*, NCAA March Madness).  They license that content to programmers.  *Second*,

programmers—like Turner and HBO—package such programming content into 24/7 networks (*e.g.*, TNT or HBO) that are, in turn, licensed to video distributors. *Third*, video distributors—like DirecTV and Comcast—assemble packages of networks that are sold to customers.

There are various types of video distributors. MVPDs include cable companies (*e.g.*, Comcast), satellite broadcasters (*e.g.*, DirecTV), and telephone companies (*e.g.*, AT&T's U-verse service). The vast majority of customers get their pay TV from such traditional MVPDs. MVPDs bundle broadcasting and basic cable networks into different packages that are sold to consumers, often along with content available "on demand" (*i.e.*, available at any time, upon request).

In recent years, Virtual MVPDs have begun to offer service. Virtual MVPDs employ a business model similar to traditional MVPDs, but deliver their content to consumers over the internet, either through an internet browser, an app, or a special internet-connected TV or set top box. Additionally, some Virtual MVPDs offer "skinny bundles" (*i.e.*, cheaper packages with fewer channels than an MVPD typically offers). Both MVPDs and Virtual MVPDs present multiple channels of "linear programming," meaning a scheduled selection of programs shown in a time sequence. Live sports and news programming are highly desired components of linear programming.

Subscription Video-On-Demand services (SVODs) like Netflix and Amazon Prime also deliver content to consumers, but do so differently, such that they are not a close substitute for linear programming providers. SVODs often produce their own content and offer it over the internet "on demand" instead of at scheduled times over 24/7 channels. This type of programming is sometimes called "non-linear." Virtual MVPDs and SVODs are each called Over-The-Top (or OTT) services because they operate "over the top" of an internet connection

provided by a third party.  OTT services are sometimes called Online Video Distributors (OVDs).

### B.    The Negotiation of Affiliate Agreements

Programmers license their content to video distributors (MVPDs, Virtual MVPDs, *etc.*) via "affiliate" or "affiliation" agreements.  Affiliate agreements are reached through protracted negotiations, with each side typically making concessions.  The terms of these agreements typically include (1) a monthly "Per Subscriber Per Month" (PSPM) fee paid by the distributor to the programmer, (2) the share of the distributor's customers that will receive access to the programming (the "penetration rate"), (3) "packaging" requirements that specify how the network will be carried (*e.g.*, on what tier), and (4) one or more most-favored-nation clauses (MFNs) that guarantee the distributor parity with other distributors on economic and non-economic terms.

Programmers and distributors reach agreements through negotiations when there are positive gains from the deal for both sides—*i.e.*, it is mutually beneficial that the distributor carry the programming.  The terms of the agreement that the parties reach depend on the options available to each party in the event a deal is not reached.  In determining the price it is willing to pay, a distributor takes into account both (1) the potential loss of subscribers if it does not have the programming—*i.e.*, if there is a "blackout"—and (2) the potential lost revenue from selling air time for advertising if it does not have the programming.  Thus, programmers with desirable networks generally have more bargaining leverage than programmers with less desirable networks.  Likewise, in determining the price it is willing to accept, a programmer takes into account the lost revenue (both PSPM fees and advertising) if the otherwise desirable programming is not carried.  Thus, distributors with large numbers of subscribers generally have more bargaining leverage than distributors with fewer subscribers.

16

### C.       Time Warner's Unique and Valuable Content

The content world is vast and broad—some people like Shakespeare, some like baseball, and some like Sesame Street.  Today, Time Warner, Netflix and others are making new shows, just as many content providers have done in the past and will continue to do in the future.  There's a lot to watch and a lot of variety, and Americans watch a lot of TV.

What has always been true, of course, is that video content is not all the same.  If a D.C. resident invites friends over to watch the Nationals in the playoffs one October night, obviously, the latest Amazon original programming just won't do as an acceptable alternative. Content is differentiated, and some shows and networks are more valuable than others.  For just that reason, consumers have long valued breadth from their MVPD services—they buy cable packages to get a lot of choices, and especially to give them access to the key content they've long expected to get with those services.

Time and Warner Bros. are both names that have long been near the top of the list for valuable content, and that history is consistent with the unique content holdings of the current Time Warner Inc.  The Major League Baseball playoffs, NCAA March Madness, *Game of Thrones*, the NBA playoffs, and CNN, just to name a few pieces of programming, are representative of the content that makes Time Warner's networks among the country's most widely carried.  No matter what a consumer likes to watch – TNT, TBS, HBO, CNN, Cartoon Network, or Turner Classic Movies – most like to watch Time Warner content.  For that reason, Time Warner networks are carried with near ubiquity by MVPDs to their consumers all around the country.

### D.       "The Times They Are A-Changin'"

The pay-TV ecosystem has experienced significant change during recent years—change that is still going on and is likely to continue.  These developments bring with them increased

competition and greater choice for consumers.  Increasingly, for example, customers can choose to switch to less expensive pay-TV subscriptions and fill in the gaps with online content, or even to cut the cord entirely and get all of their content online.

But—and this is of critical importance—the fact that the number of MVPD subscribers is declining as some consumers turn to online options should not distract from the overriding reality that *the vast majority of American households still subscribe to traditional MVPD service and they will continue to do so well into the future.*   AT&T strategy documents explain that ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████.[15] Thus, defendants' suggestion to the Court that firms like Google, Netflix, Amazon, and Facebook "are now dominating the industry," and that AT&T and Time Warner "are merging, frankly, to try to keep up," are just a variation on a common refrain by merging parties who claim that their industry is changing rapidly and thereby seek to justify an anticompetitive merger.  Tr. Pretrial Conf., at 31, 34, *United States v. AT&T, Inc.*, No. 17-cv-02511 (D.D.C. Feb. 16, 2018).  Indeed, a 2017 analyst report ████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████████████████.

U.S. households have few options for MVPD service.  The vast majority choose among a cable company and the two satellite companies, though consumers in some areas have a fourth

_____

[14] PX0174-040.
[15] PX0045-011.

option of a telephone company MVPD or a cable company overbuilder (*e.g.*, RCN).
Nationally, the vast majority of households are served by a handful of major MVPDs—one of
the four largest cable companies (Comcast, Charter, Cox, and Altice), the two satellite
providers (DirecTV and Dish), and one of the two largest telecommunications MVPDs (AT&T
and Verizon).  Despite the growth of nascent online competitors, AT&T expects that

████████████████████████████████████████████████████[16]

But OTT distributors—in particular, Virtual MVPDs and SVODs—are starting to
pressure MVPDs like AT&T.  Virtual MVPDs like Dish Sling and PlayStation Vue pose a
particular threat to MVPD products like AT&T's DirecTV and U-verse.  SVODs like Netflix
were the first OVDs on the market.  But SVODs do not include linear programming, and are
primarily a supplement to MVPD service, not a replacement for it.[17]  Virtual MVPDs, by
contrast, are substitutes for MVPD service, and compete with them for pay-TV subscribers.[18]
Virtual MVPDs further threaten traditional MVPDs because some of them have been willing to
experiment with the MVPD business model, *e.g.*, offering "skinny" bundles of programming
that are smaller and less expensive than MVPDs' base packages.

Today, Virtual MVPDs are nascent competitors, accounting for a minimal share of pay-
TV subscribers.  AT&T's internal documents suggest, however, that ████████████████
████████████████████████████████████████████.[19]  AT&T
recognizes that, if it continues, the current trend toward Virtual MVPDs will severely harm its

---

[16] PX0031-049, -050.

[17] PX0178-097 █████████████████████████████████████
████████████████████████████

[18] PX0301-051 (describing Netflix and Hulu █████████████████████████████
██████████████

[19] PX0258-059.

bottom line.  As AT&T's Strategy Group explained, ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████[20]

AT&T worries that ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████[21]

Motivated by this threat, *AT&T has sought to slow the growth of its online competitors.*

For instance, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████" [22] ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████" [23]  And AT&T has █████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████[24]

AT&T launched its own Virtual MVPD, DirecTV Now, as what executives called ███

████████████████████████.[25]  AT&T executives knew that DirecTV Now, like other

Virtual MVPDs, threatened its MVPD business. The AT&T executive overseeing DirecTV

Now wrote that ████████████████████████████████[26]  But unlike other Virtual

---

[20] PX0175-045, -046.
[21] PX0166-005.
[22] PX0041.
[23] PX0047.
[24] PX0047.
[25] PX0168-031.
[26] PX0164-003.

MVPDs, DirecTV Now is under AT&T's control, and so AT&T can manage the threat.  Thus,

AT&T executives have discussed ███████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████ [27] In addition to launching its own

virtual MVPD, ██████████████████████████████████████████████████████

███████████████████████████████

## VI.    THE EFFECT OF THE AT&T-TIME WARNER MERGER "MAY BE SUBSTANTIALLY TO LESSEN COMPETITION"

As detailed below, the evidence at trial will establish that AT&T's proposed acquisition

of Time Warner threatens significant harm to competition and consumers in markets across the

country.  Section A defines the markets that the merger would impact, specifically,

Multichannel Video Distribution in Local Footprint Overlap Zones.  Section B sets out some of

the reasons that Time Warner content is a critical input for MVPDs and Virtual MVPDs.

The balance of the section explains the ways the merged entity would deploy that "must

have" content to lessen competition substantially in the relevant markets.  Section C explains

that the merger would enable AT&T to raise its rivals' costs.  Specifically, with increased

bargaining leverage, AT&T would raise the programming costs of rival MVPDs and Virtual

MVPDs, leading to weakened competition and increased prices for consumers.  Section D

describes how the merger would allow AT&T to limit the competitive freedom of its rivals.

Specifically, AT&T would prevent rival MVPDs and Virtual MVPDs from using HBO to win

subscribers (*e.g*., through free trials).  Section E explains that the merger would have

"coordinated effects."  That is, the merger would make it profitable, and likely, for AT&T and

---

[27] PX0046.

Comcast/NBCU to coordinate to deny emerging Virtual MVPDs critical inputs, namely, NBC and Time Warner programming.  These three practices—each alone a violation of Section 7—would reinforce one another, inflicting serious harm on competition and consumers.

## A. Multichannel Video Distribution in Local Competitive Zones Are Relevant Markets

"A court may enjoin a merger based on proof of probable harm to any market alleged." *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 193 (D.D.C. 2017).  Relevant markets have two dimensions:  product and geographic area.  *Id.*  "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one."  *Brown Shoe*, 370 U.S. at 336.  "This is because '[t]he 'market,' as most concepts in law or economics, cannot be measured by metes and bounds.'"  *Anthem*, 236 F. Supp. 3d at 193 (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953)).

Here, the government will prove at trial that distribution of live video programming by MVPDs and Virtual MVPDs—the "Multichannel Video Distribution" market—is a relevant product market.[28]  Additionally, the government will prove that the relevant geographic markets are Local Footprint Overlap Zones, where consumers have the same choice of distributors

### 1. Multichannel Video Distribution Is a Relevant Product Market

Market definition is an inquiry into "whether two products can be used for the same

---

[28] Additionally, the United States will prove that distribution of professionally produced, full-length video programming subscription services to residential customers—the "All Video Distribution" market—also is a relevant product market.  The All Video Distribution market is broader than the Multichannel Video Distribution, including not just MVPD and Virtual MVPD distribution, but SVOD distribution as well.  *See Brown Shoe*, 370 U.S. at 325 (within the "outer boundaries" of a "broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes").  Both economic analysis and the *Brown Shoe* factors establish that All Video Distribution also is a relevant product market for assessing the likely effects of the proposed merger.  For the reasons discussed in this brief, the merger may lessen competition substantially in All Video Distribution markets across the country.

purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074 (D.D.C. 1997) (quotation omitted). Courts look to two types of evidence in defining the product market: "the 'practical indicia' set forth by the Supreme Court in *Brown Shoe* and testimony from experts in the field of economics." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 27 (D.D.C. 2015). In the present case, both types of evidence establish that Multichannel Video Distribution is a relevant product market.

**a.      Economic Analysis Establishes that Multichannel Video Distribution Is a Relevant Product Market**

Courts give substantial weight to economic analysis in defining markets. *See, e.g.*, *Anthem*, 236 F. Supp. 3d at 198-99. Expert economists sometimes apply the "hypothetical monopolist test" (the HMT), which asks whether a hypothetical profit-maximizing monopolist of all products within a proposed market likely would impose a "small but significant and non-transitory increase in price" (a SSNIP) on at least one product sold by the merging firms. *See FTC v. Staples*, *Inc.,* 190 F. Supp. 3d 100, 121-22 (D.D.C. 2016). If so, the proposed market is a relevant product market.

At trial, one of the government's experts, Professor Shapiro of the University of California at Berkeley, will explain that he has performed an HMT for the Multichannel Video Distribution market, applying a formula accepted in prior litigated cases, and inputting data from the parties and from third parties. The results show a single firm controlling all distribution of video programming by MVPDs and Virtual MVPDs in a specified geographic region would charge significantly higher prices to households in that region for at least one option, including for DirecTV, than currently charged. Hence, Multichannel Video Distribution is a relevant product market.

### b. The *Brown Shoe* Factors Confirm that Multichannel Video Distribution Is a Relevant Product Market

The *Brown Shoe* factors confirm Professor Shapiro's economic analysis. *Brown Shoe*, 370 U.S. at 325 (listing factors). The evidence will show that MVPDs and Virtual MVPDs compete most closely with each other and are distinct from other forms of video distribution, including non-linear content from SVODs and non-professional content.

*First*, there is broad industry recognition that Multichannel Video Distribution is a distinct product. For example, defendants' ordinary course documents ███████████████████

██████████████████████████████████████████████████████

██████"[29] Likewise, industry witnesses will testify about important differences between Virtual MVPDs and SVODs.

*Second*, Multichannel Video Distribution has peculiar characteristics and uses. For example, because they provide linear programming, MVPDs and Virtual MVPDs are much better suited than other distributors for sports, news, and other live events, which SVODs generally do not offer. The vast majority of SVOD subscribers have MVPD or Virtual MVPD service as well. Additionally, MVPDs and Virtual MVPDs employ a different business model than SVODs, typically selling packages of networks rather than individual programs, and earning revenue not just through subscriptions but also through advertising.

*Third*, Multichannel Video Distribution has distinct prices. Customers are willing to pay higher prices for MVPDs and Virtual MVPDs than for SVODs. And *fourth*, consumers of Multichannel Video Distribution are largely insensitive to price changes. Despite a steady increase in the price of Multichannel Video Distribution services, consumers continue to

---

[29] PX0212.

subscribe to these services.

**2.     The Relevant Geographic Markets Are Local Footprint Overlap Zones**

The relevant geographic market is "the region in which the seller operates, and to which the purchaser can practicably turn for supplies." *Arch Coal, Inc.*, 329 F. Supp. 2d at 123. "The Supreme Court has recognized that an element of fuzziness would seem inherent in any attempt to delineate the relevant geographical market, and therefore such markets need not—indeed cannot—be defined with scientific precision." *Sysco*, 113 F. Supp. 3d at 48.

Given DirecTV's national footprint, consumers across the country would feel the effects of the proposed merger. The specific effects will vary from geographic area to geographic area, based on the particular distributors serving an area and their market shares within that area. Thus, the relevant geographic markets are Local Footprint Overlap Zones—1,174 local geographic areas in which consumers have the same choice of distributors.

As he will explain at trial, Professor Shapiro has identified Local Footprint Overlap Zones by (1) analyzing the options available to consumers in every zip code in the United States and (2) aggregating into a zone all zip codes in a Designated Metropolitan Area (DMA)[30] where residents have access to offerings from the same set of competitors. For example, within the Washington, DC, DMA, there are 679 zip codes and 11 Local Footprint Overlap Zones. Because Multichannel Video Distribution and All Video Distribution consumers can turn only to distributors serving their physical locations, and because distributors, in turn, can set prices based on their customers' location (in economic parlance, they can price discriminate), the geographic markets properly are defined based on the location of customers. *United States v.*

---

[30] A DMA is a geographic area that represents specific television markets as defined and updated annually by the Nielsen Company.

*Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966, at *30 (N.D. Cal. Jan. 8, 2014) ("Where, as here, a hypothetical monopolist could price discriminate*, i.e.*, set different prices for different customers based on customer location, the geographic market is based on the location of the customers, not the suppliers.").

### B.   Time Warner Content Is Key for MVPDs and Virtual MVPDs

Though defendants pretend otherwise, the reality is that the Time Warner networks are ███████████████████████ programming.[31]  Turner's portfolio is ███████████████ ██████████████████████ "[32]  HBO is "the number-one global leader in premium content subscriptions," in the words of AT&T's CEO.[33]  Thus, Turner and HBO channels are material to the competitiveness of MVPD and Virtual MVPD offerings, and the loss of, or limits on the use of, this programming would impair a distributor's ability to attract and retain subscribers.

At trial, a range of testimony and documents from defendants and from other industry participants will demonstrate the importance of Time Warner content.  MVPDs and Virtual MVPDs—including AT&T—consider Time Warner programming to be critical to compete effectively.  Time Warner, in AT&T's description, is "the global leader in media and entertainment, with terrific brands" and has the "best" content library "on the planet."[34]  In the words of AT&T Senior Executive Vice President for Time Warner Merger Integration, John Stankey, Time Warner content ████████████████████████████████████████ "[35]

---

[31] *See, e.g.*, PX0006; PX0003-017.
[32] PX0008-035; PX0081-013.
[33] PX0453-003.
[34] PX0453-002.
[35] Stankey (AT&T) Dep. 279:4-14.



Turner ██████████████████████████████████ █ ████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████[37]

████████████████████████████████████████████████

████████████████████████████████████[39]  For example, Turner CEO

John Martin testified that NCAA March Madness is a "one-of-a-kind tournament" that "will be

very, very popular through distributors, and it will draw large audiences that we'll be able to

monetize."[40]  Robert Thun, Senior Vice President of Content and Programming for AT&T,

believes that sports rights compared to other television programming ████████████████

█████████████████████████████████████████.[41]  AT&T's

Stankey has emphasized the role of sports in maintaining traditional linear television model,

saying ███████████████████████████████████████[42]  Live

sporting events are particularly valuable as less content is watched live.

HBO is far and away the most popular premium cable network, and ████████████

████████████████[43] █████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████[44]  Its programming has

an ██████████████████████████████ and popular shows ranging from the *The Sopranos*

---

[36] PX0008-020.
[37] PX0008-035, -036; PX0023-010.
[38] PX0005-019.
[39] PX0308-038.
[40] Martin (Time Warner) Dep. at 102:1-103:7.
[41] Thun (AT&T) CID Dep. 262:6-263:21.
[42] Stankey (AT&T) Dep. at 281:11-17.
[43] PX0345-002.
[44] PX0288.

to *Game of Thrones* attract millions of viewers per episode.[45]  HBO has exclusive deals for

recently released theatrical programming with Fox, Universal, Summit, and Warner Bros.

movie studios.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████[46]

Distributors pay a premium for Time Warner programming.  ██████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

Consumers will leave or choose not to join a video distributor if it loses Time Warner

content.  Time Warner executives have considered their ability  ███████████████████████

---

[45] PX0005-031, -033; PX0062-002.
[46] PX0062-007; PX0037; PX0090.

████████████████████████████████████████████[47] During negotiations

with DISH in 2015, for example, ████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████[48]

At trial, Professor John Hauser of the Massachusetts Institute of Technology will testify about empirical research confirming this evidence.  Professor Hauser has conducted a survey to estimate how many subscribers would choose to leave their video distributor if the distributor lost access to Turner content.  Consistent with what other MVPDs and Virtual MVPDs have estimated, Prof. Hauser found that a significant number—approximately 12%—would switch.

Finally, defendants' Answer relies in significant part on the experience of Google in launching YouTube TV without Turner content, even though YouTube TV's actual experience demonstrates that content's importance.  Answer ¶ 5 ("launch[]…without any Time Warner channels confirms … that Time Warner's networks are not, in any antitrust sense of the word, essential to attracting and retaining subscribers").  But while the defendants were giving TV interviews describing the lack of Turner content on YouTube TV as "a real bullet in the government's theory,"[49] ██████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[47] PX0004.
[48] PX0121.
[49] Matthew J. Belvedere, *AT&T Counsel Dan Petrocelli, an Ex-Trump Attorney, Calls DOJ's Suit on Time Warner Deal 'Fake Antitrust,"* CNBC.COM (Nov. 21, 2017, 7:25 A.M.), *available at* https://www.cnbc.com/2017/11/21/a-t-and-t-counsel-petrocelli.html.

██  ████  ███████████████████████



"[53]  YouTube TV

subsequently reached a deal early in 2018 to carry Turner content, and the content is now

available on YouTube TV.

### C.    The Merger Would Harm Competition by Empowering AT&T to Raise the Programming Costs of its Rivals

A vertical merger may reduce competition by "foreclosing competitors of the purchasing

firm in the merger from access to a potential source of supply, or *from access on competitive*

*terms*." *Yankee Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657,

673 (S.D.N.Y. 2002) (emphasis added).  The merger may result in rivals "paying more to

procure necessary inputs."  *Sprint Nextel Corp. v. AT&T, Inc.*, 821 F. Supp. 2d 308, 330

(D.D.C. 2011).[54]

This merger likely would engender this very type of harm.  The evidence will show that

the merged entity likely would charge rival MVPDs and Virtual MVPDs higher prices for

competitively significant Turner content, reducing the competitive pressure on DirecTV, and

increasing prices across the country.  At trial, witnesses from the industry will explain the

---

[51] PX0003-013, -017.

[52] PX0052-012.

[53] PX0003-017; *see also* PX0052-004.

[54] *See generally* ABA SECTION OF ANTITRUST LAW, MERGERS AND ACQUISITIONS: UNDERSTANDING THE ANTITRUST ISSUES 383 (4th ed. 2015) (explaining raising-rivals'-cost theories); Michael Riordan, *Competitive Effects of Vertical Integration*, *in* HANDBOOK OF ANTITRUST ECONOMICS 145, 155-59 (Paolo Buccirossi ed., 2008) (reviewing economic literature on raising rivals' costs).  The Sherman Act also addresses anticompetitive harm from raising rivals' costs.  *See, e.g.*, *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015) ("an exclusive dealing arrangement can be harmful when it allows a monopolist to maintain its monopoly power by raising its rivals' costs sufficiently to prevent them from growing into effective competitors").

importance of Turner content and their vulnerability to price increases by the merged firm.

Professor Shapiro will use standard economic tools to illuminate the resulting harm to

competition and consumers.  Specifically, he will explain how the merger would increase

Turner's bargaining leverage, and hence enable Turner to act on its new incentive to raise the

price of its content to rivals.  He then will explain economic models he has used to estimate the

harm to consumers, which, even on conservative assumptions, would total hundreds of millions

of dollars per year.  Perhaps most telling, though, are the statements by defendants themselves.

     **1.**     **The Parties' Own Words Confirm the Threat of Harm from a Raising of Rivals' Costs**

Before deciding to merge, defendants complained to regulators on multiple occasions that

a vertically integrated distributor with control over important programming would limit access

to that programming.  For example, in a filing with the Federal Communications Commission

(the FCC) concerning the Comcast/NBCU transaction, DirecTV explained that a vertical

merger "changes the bargaining positions vis-à-vis unaffiliated MVPDs" as "a programmer's

potential losses from a bargaining impasse are offset to the extent subscribers lost by the

foreclosed MVPD migrate to the affiliated MVPD."  Comments of DirecTV, Inc., *In re*

*Applications of Comcast Corp., General Elec. Co. & NBC Universal, Inc., for Consent to*

*Assign Licenses & Transfer Control of Licensees,* FCC MB Docket No. 10-56, at i, 6 (June, 21,

2010).  Thus, the merged entity can present its competitors "with the no-win choice of either

acceding to higher prices (which are likely to be passed along to consumers) or losing access to

broadcast programming, online video, and national networks (depriving viewers of popular

programming and the full benefits of MVPD competition)."  *Id.* at 12.  More recently, AT&T

told the FCC in a regulatory proceeding that "[c]able-affiliated programmers retain the

incentive and ability to withhold unique and popular programming to inhibit competition

against their downstream cable affiliates" and urged the FCC "to monitor closely developments in the video marketplace to ensure that all MVPDs continue to have reasonable access to programming that is vertically integrated with cable operators."  Comments of AT&T, *In re Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming,* FCC MB Docket No. 14-16, at 3 (Mar. 21, 2014).

Defendants' internal documents also recognize this threat.  For example, in a recent analysis,



### 2.    With its Increased Bargaining Leverage, the Merged Firm Would Likely Raise the Price of Turner Content

The merger would increase Turner's bargaining leverage against AT&T's MVPD and

Virtual MVPD rivals.  Today, in negotiating affiliate agreements, Turner takes into account

---

[55] PX0030-010.
[56] PX0448-002.
[57] PX0231-013.

only its potential loss of revenue if it fails to strike a deal with a distributor.  The merger would alter this calculation.  Post-merger, the firm would be able to recapture some of Turner's lost revenue if negotiations with a distributor break down because some subscribers would switch from the competing MVPD to AT&T in order to continue to receive the desired Turner content. Thus, because both parties at the table know this, Turner's bargaining leverage would increase materially, and AT&T would have the ability and incentive to extract higher prices for its content from AT&T's distributor rivals.

Professor Shapiro has analyzed the effect of the change in bargaining dynamics using bargaining theory, a standard tool in merger analysis.[58]  In particular, he has used the "Nash Bargaining Model," a standard model derived from a seminal article by Nobel Laureate John Nash, and employed by economists in an array of settings.[59]

The gains from trade in any negotiation depend on each party's "best alternative to a negotiated agreement" (BATNA).  The critical insight illustrated by Professor Shapiro's analysis is that the merger increases Turner's BATNA by combining Turner's profits with AT&T's.  For example, post-merger, if Turner and Charter are unable to reach a deal, the merged entity now would realize a benefit in the form of increased profits for DirecTV from new subscribers to AT&T's service gained from Charter as subscribers switch from Charter to AT&T to ensure continuity in their reception of the desired Turner content.  Accordingly, the model predicts that post-merger bargaining between Turner and Charter will result in a higher

---

[58] Bargaining theory has been used to analyze competitive effects in several recent mergers.  *See, e.g.*, *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 786-87 (9th Cir. 2015); *FTC v. ProMedica Health Sys., Inc.*, No. 11-cv-47, 2011 WL 1219281, at *16-17 (N. D. Ohio Mar. 29, 2011).

[59] *See generally* Aviv Nevo, Assistant Attorney Gen., Antitrust Dev., U.S. Dep't of Justice, Mergers that Increase Bargaining Leverage (Jan. 22, 2014), *available at* https://www.justice.gov/atr/speech/mergers-increase-bargaining-leverage.

price for Turner content.

Professor Shapiro has quantified these effects, drawing on documents and data from the parties and others in the industry for the key variables in the model: (1) the Turner Subscriber Loss Rate, or the share of subscribers that an MVPD would lose if it could not offer Turner content, (2) the Diversion Ratio, or the proportion of lost subscribers who would choose DirecTV instead of staying with the now-Turner-less MVPD, and (3) DirecTV's Contribution Margin, essentially the profit that DirecTV would realize from a new subscriber. The model assumes that parties split the gains from trade equally. Professor Shapiro's model predicts that the merger will cause a price increase to rival MVPDs for Turner content of 18.4% on average, translating into a total increase of about $61 million per month or about $731 million per year.

### 3.     The Higher Costs AT&T Would Impose on its Rival Distributors Would Weaken Them as Competitors, Harming Consumers Nationwide

The increased cost of Turner content to its rivals would place an umbrella over DirecTV and other AT&T distribution services. Faced with higher costs, rival MVPDs and Virtual MVPDs would increase their prices or downgrade their services, and would be less likely to engage in price cutting or other aggressive tactics. DirecTV would rest easier and would have room to raise its prices or to cut back on service. As he will explain at trial, Professor Shapiro has estimated the merger's impact on consumers using two different methods.

Importantly, in both calculations, Professor Shapiro has accounted for the elimination of double marginalization (EDM).[60] EDM provides that, under certain conditions, a vertical merger can create downward pressure on the price charged by the merged firm by eliminating a

---

[60] Defendants have the burden on efficiencies. *See infra* Section VII.A. However, Professor Shapiro has accounted affirmatively for EDM in his estimations of consumer harm.

double markup.  Here, the EDM effect would arise if, in setting a price for DirecTV post-merger, AT&T considers the impact of the price on Turner's profits.  A lower price for DirecTV might increase Turner's profits by increasing the number of subscribers with access to Turner content.  Thus, the EDM effect depends on a lower DirecTV price attracting new subscribers who do not have access to Turner content already.  But Turner content is already widely distributed, and thus the EDM effect in this case would be much smaller than the effect seen in vertical mergers in some other industries.  It would be much too small to offset the competitive harm.

*First*, Professor Shapiro took the net effect of the merger on MVPD prices and applied a single rate at which MVPDs would pass through the increased cost to consumers.  The net effect of the merger on the prices MVPDs pay for Turner content is $30.1 million per month (the increased cost to rivals of $60.9 million per month less the savings to DirecTV via EDM of $30.8 million per month.)  Documentary evidence indicates that MVPDs attempt to pass content cost increases through to customers in the form of price increases.  In recent years, AT&T itself ███████████████████████████████████████████████████[61] Thus, consumers would pay between $22.6 and $30.1 million more per month—and between $270.9 and $361.2 million more per year—for MVPD service alone.

*Second*, Professor Shapiro performed a merger simulation.[62]  Specifically, he prepared a model of competition among MVPDs in each Local Footprint Overlap Zone that simultaneously accounts for the effect of increased costs to rivals and EDM on the prices paid by consumers.  One key advantage of this model is that it accounts for variations in the

---

[61] PX0162; PX0115.

[62] A merger simulation is an econometric tool commonly used to quantify the expected harm from a merger.  *See, e.g.*, *Sysco*, 113 F. Supp. 3d at 66-67.

competitive dynamics in different Local Footprint Overlap Zones, which affect the strategic responses of DirecTV and its rivals to changes in their costs.  Professor Shapiro's model predicts that, nationwide, consumers will pay about $36 million more per month, and about $436 million more per year, for MVPD services.

In developing his estimates, Professor Shapiro used conservative estimates of a number of key inputs.  Thus, his calculation likely underestimates the true harm from the merger.  Furthermore, as Professor Shapiro will explain, every model requires some simplifying assumptions, and in this case the result is that the models do not account fully for all of the additional incentives the merged entity would have to negotiate higher fees for Turner content.  For example, Virtual MVPDs are particularly vulnerable to the merged firm's ability to raise their costs, impose contractual requirements that limit their ability to innovate, or even without content entirely.

### 4.     To the Extent Natural Experiments Exist, They Confirm that AT&T Will Be Able to Raise its Rivals' Costs

Relevant natural experiments can be informative regarding the likely anticompetitive effects from a merger that shares the same key attributes.  As described above, one of the key variables in Professor Shapiro's model is the Turner Subscriber Loss rate, or the share of subscribers that an MVPD would lose if it could not offer Turner content.  There has never been a long-term blackout of Turner content, so there are no clear natural experiments that can be used to measure the Subscriber Loss Rate.  The best available evidence is what market participants expect would happen if such a blackout were to occur, along with other estimates of how consumers would react, such as the survey conducted by Professor Hauser.

AT&T points to two blackouts involving the programmer Viacom, owner of cable networks like Nickelodeon and MTV.  Viacom's content is significantly weaker than Turner.

AT&T CEO Randall Stephenson 

[63]

Nevertheless, the Suddenlink-Viacom blackout confirms that the Subscriber Loss Rate in the event of a Turner blackout would be significant. Professor Shapiro's analysis shows ███

██████████████████████████████████████████████ Given Turner's greater importance, this estimate is consistent with what Professor Shapiro, MVPDs, and Virtual MVPDs estimate would occur if they lost Turner.

Defendants also point to several prior vertical integrations or disintegrations in this industry as evidence that no merger of a video distributor and content owner could ever be anticompetitive.  The folly here is plain:  different mergers have different characteristics, and each must be examined on its own merits.

### D.     The Merger Would Harm Competition by Constraining AT&T's Rival Distributors from Effectively Using HBO as a Competitive Tool

The merged firm also would have the incentive and the ability to prevent rival MVPDs and Virtual MVPDs from using HBO to attract and retain subscribers, a common practice that forces AT&T to improve its own offerings.[64]  Currently, distributors use HBO throughout the subscriber lifecycle to acquire subscribers, convince subscribers to upgrade their packages, and to retain subscribers. ███████████████████████████████

███████████████████████████████████████

████████████████████████

---

[63] PX0081-012; Stephenson (AT&T) Dep. 159:22-160:15.
[64] *See Yankee Entm't*, 224 F. Supp. 2d at 673 (vertical merger may "reduce competition by … foreclosing competitors of the purchasing firm in the merger from access to a potential source of supply, or *from access on competitive terms*" (emphasis added)).

HBO is an important tool for distributors to grow their market share and reduce churn. To attract new subscribers, distributors often offer months of free or discounted HBO or embed HBO in select video packages.  They also feature HBO heavily in marketing campaigns to capitalize on the HBO "brand halo" and bring other features to life.[65]  Having access to HBO and its TV Everywhere app, HBO Go, is known to drive subscriber engagement with the video platform and improve its perceived value, which makes the customer "stickier" and less likely to cancel their subscription.[66]  HBO is also used to reduce churn in another way, as a retention offer to subscribers that have called to cancel their service and been routed to the "save desk."



HBO—███████████████████[67]██████████████—is a valuable promotional tool.  ████████, and others in the industry agree that HBO is much more effective than other premium channels (*e.g.*, Showtime and Starz), as well as other promotional tools, in attracting and retaining subscribers.[68] ██████████████████

███████████████████████████████████

████████████████

Critically, promotions are contingent on HBO's approval and cooperation.  ████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████  These decisions can be pivotal to the viability of an HBO campaign for the MVPD

---

[65] Aulestia (Time Warner) Dep. 306:23-307:18; PX0055.
[66] Aulestia (Time Warner) Dep. 54:23-56:24.
[67] PX0010-004; PX0055-005.
[68] *See, e.g.*, PX0010-004; PX0055-005; PX0154

or Virtual MVPD.

Currently, HBO works cooperatively with its affiliates given that it benefits from greater distribution of its content.  It also benefits from competition among MVPDs, which tends to increase HBO's penetration as affiliates seek to match or beat one another's offerings while also enabling HBO to play them off each other in carriage negotiations.  Indeed, HBO sometimes encourages and guides MVPDs on leveraging HBO as a tool to steal rivals' subscribers and market share.  And it is emphatically agnostic regarding which MVPD or Virtual MVPD its subscribers come through.

That will change with the merger.  AT&T would be far less inclined to allow rivals to use HBO to win subscribers from DirecTV, as AT&T would have a strong preference that subscribers access HBO content via DirecTV.  It likely would act on these changed incentives immediately.  HBO could limit approvals for the use of HBO in marketing and promotions by DirecTV's rivals in a number of ways, including forms of subtle or targeted obstruction.  Also, it could raise the costs of HBO offers and campaigns for rivals by refusing to waive fees during trial periods or by reducing its funding for cooperative advertising campaigns or insisting that such funds be used only for upgrade campaigns unlikely to affect DirecTV's market share.  Additionally, with advanced notice of its rivals' marketing plans, DirecTV would be better positioned for countermoves.

Later, when it renegotiates its affiliate agreements, HBO could demand more restrictive contractual terms on the use of its content.  Even if these tactics resulted in fewer HBO subscribers total, it could be well worth it for AT&T.

Thus, the merger would limit drastically an important dimension of competition among MVPDs and Virtual MVPDs.  Consumers would enjoy fewer and less aggressive deals on

HBO.  More broadly, rivals of the merged firm would be less able to compete aggressively, disrupting the competitive process and harming consumers.  This restriction, by itself a substantial lessening of competition, would compound the harm from the raising of rivals' costs, further weakening AT&T's rivals and reducing the intensity of competition in the relevant markets.

      **E.**      **The Merger Would Facilitate Coordination between AT&T and Comcast/NBCU to Disadvantage Emerging Virtual MVPD Rivals**

"A merger may diminish competition by enabling or encouraging post-merger coordinated interaction among firms in the relevant market that harms customers."  *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1086 (N.D. Ill. 2012) (quotation omitted).  Indeed, merger law "rests upon the theory that, where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels."  *FTC v. H.J. Heinz Co.*, 246 F.3d.708, 715 (D.C. Cir. 2001) (quotation omitted).

Coordination can occur "either by overt collusion or implicit understanding," *Heinz*, 246 F.3d at 715 (quotation omitted),[69] and "involves a range of conduct, including unspoken understandings about *how* firms will compete or refrain from competing," *H&R Block*, 833 F. Supp. 2d at 77.  Tacit coordination happens when producers recognize their "shared economic interests and their interdependence with respect to price and output decisions."  *Brooke Group*

---

[69] *See generally* U.S. Dep't of Justice & Fed. Trade Comm'n Horizontal Merger Guidelines § 7 (2010) (explaining that a merger can lead to at least three types of coordinated interaction:  "the explicit negotiation of a common understanding," a "similar common understanding that is not explicitly negotiated," and "parallel accommodating conduct not pursuant to a prior understanding").

*Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).[70]

Here, the merger would facilitate coordination between AT&T and Comcast, post-merger, the only major vertically integrated distributors.  Unlike an independent Time Warner, the merged firm would share with Comcast a strong interest in slowing or blocking disruptive new entry by Virtual MVPDs.  The firms could advance this shared interest by withholding from Virtual MVPDs Turner and NBC content—two of the most important network groups for Virtual MVPDs— or restricting their use of that content (*e.g.*, by prohibiting inclusion of channels in skinny bundles).  Because market conditions are conducive to coordination, and because a coordinated denial of content to Virtual MVPDs would face relatively few obstacles, the merger likely would facilitate coordination and lead to higher prices, fewer options, and reduced innovation.

      **1.**      **The Merger Would Change Time Warner's Posture toward Virtual MVPDs, Creating a Real Danger of Coordination**

Recognizing the company is █████████████   Turner executives have agreed that █████ ██████████████████████████████████████████████████████████████ ████████████████████████"[71]  The merger would take the company decidedly in the wrong direction, driving it to make licensing decisions that protect AT&T's video business to the detriment of consumers.

Thus far, Time Warner has been eager to license its content to Virtual MVPDs.  It has sought to ███████████████████████████████████████████████

---

[70] Section 7 of the Clayton Act casts a wider net than Section 1 of the Sherman Act, which requires an agreement.  *Elders Grain, Inc.*, 868 F.2d at 905.  In fact, tacit coordination "is feared by antitrust policy even more than express collusion, for tacit coordination, even when observed, cannot easily be controlled directly by the antitrust laws."  *Heinz*, 246 F.3d at 725 (quotation omitted).
[71] PX0035.



███████████████████████████████████████████████████

████ [72] Turner describes itself as ███████████ and █████████████████

███████████████████████████████████████████████████

█████████ [73] Time Warner told its Board that its strategy is to ██████████████

████████████████████████—for example, by ████████████████

██████████████████████████████████ [74]

With the merger, Time Warner would turn from friend to foe.  AT&T strategy documents

explain that ████████████████████████████████████████

████████████████████████████████████████

████████ .[75]  AT&T has concluded that ████████████████████████

█████████████████████████████████████ [76] Moreover,

AT&T recognizes that other incumbent MVPDs share this goal.  When AT&T assessed the

possibility of ████████████████████████████████████

█████████████████████ one of the implications it identified was that ██████████████

█████████████████████" [77]

As AT&T's documents suggest, after the merger, AT&T and Comcast would share an

interest in leveraging their control of important content to protect their MVPD businesses.  And

coordination to deny desirable content to Virtual MVPDs, or to restrict their use of that content,

---

[72] PX0195-026.
[73] PX0005-012, -025.
[74] PX0008-004, -005.
[75] PX0032-009.
[76] PX0032-010, -011 ████████████████████████████████

████████████████████████████████████████████

[77] PX0034-099.

would be a particularly effective tactic.  While the merged firm might withhold content from a Virtual MVPD unilaterally, it would be even more profitable for it to act in concert with Comcast.  A vertically integrated firm that refuses a license loses upstream revenue (advertising and licensing fees from the Virtual MVPD), but gains downstream revenue (from an increase in subscribers or MVPD margins).  A coordinated withdrawal would inflict greater harm on Virtual MVPDs and thus increase the downstream gains.  Additionally, an MVPD withholding content from Virtual MVPDs benefits other MVPDs—generates a positive externality, in the language of economics.[78]  Working together, the merged firm and Comcast would capture a larger share of the total benefit without changing the cost that either bears—meaning that the incentive for joint withholding is larger than for unilateral withholding.

### 2. Market Conditions and the Lack of Impediments to a Coordinated Denial of Content Make Coordinated Effects Likely

Courts have identified factors potentially relevant to assessing the likelihood of coordination.  *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 60 (D.D.C. 2009).[79]  As the evidence will show, a number of these factors demonstrate that the relevant markets are conducive to coordination and a coordinated denial of content to Virtual MVPDs would be readily achievable.  In short, conditions are ripe for coordinated effects.[80]

---

[78] ███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████ PX0030-006.

[79] These cases involve horizontal mergers.  However, even though this case involves a vertical merger, the coordination would be horizontal—i.e., would involve competitors, AT&T and Comcast.  Hence, these cases inform the analysis here.

[80] AT&T's own statements confirm the danger of coordination.  AT&T has represented to the FCC that industry conditions suit coordination, citing factors such as "a small number of competitors, concentrated market shares, and high entry barriers" as relevant to the likelihood of "coordinated action to exclude OVDs."  PX0449-009

*First*, AT&T and Comcast recognize their common interest in stymieing Virtual MVPDs. *Brooke Group*, 509 U.S. at 227 (tacit coordination occurs with firms "recognizing their shared economic interests").  For example, an AT&T profile observes that ███████████████

████████████████████████████████████████████████

███████████████████████"[81]   Similarly, in April 2017, AT&T stated

████████████████████████████████████████████████

████████████████████"[82]   AT&T executives have recognized that, once the *Comcast/NBCU* consent decree expires, █████████████████████████████

█████"[83]

*Second*, AT&T and Comcast would not need to enlist other programmers to advance this common interest.  *Cf. CCC Holdings*, 605 F. Supp. 2d at 66 ("It is easier for two firms to collude without being detected than for three to do so" (quotation omitted)).  Time Warner and NBC content are critical to Virtual MVPDs, and a denial of access to (or restrictions on the use of) that content alone would be sufficient to limit their competitiveness.  For example, market research conducted by Turner found that █████████████████████████████

█████████████████████[84] and that ████████████████████████████

████████████████████████████████████████████████

████████████████████████████[85]

Evidence from Virtual MVPDs confirms the importance of Time Warner and NBC



---

[81] PX0033-043.
[82] PX0031-041.
[83] PX0011.
[84] PX0195-030 ████████████████████████████████████
██████████████████
[85] PX0215-024.

content. ███████████████████████████████████████████

██████ 86 ████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ 87

*Third*, there would be ample opportunity for AT&T and Comcast to communicate their intentions to each other.  *See OSF Healthcare Sys.*, 852 F. Supp. 2d at 1087.  The firms would engage in frequent and detailed communications.  The buyer/seller relationships—NBC licensing content to DirecTV, and Time Warner licensing content to Comcast—would necessitate regular communications of a detailed nature between the firms.  Further, MFN clauses could enable AT&T and Comcast to share the terms and conditions (or lack thereof) of their licenses to Virtual MVPDs.[88]  Alternatively, the firms could coordinate through signaling or another form of indirect communication, *e.g.*, through statements at industry conferences or to the press.  AT&T itself has explained how a signaling strategy could work to enable MVPDs to coordinate against Virtual MVPDs, namely, an MVPD "could signal to the other an intent to restrict OVD access to programming through public statements to industry analysts or at other industry events regarding its strategies for online access to content, perhaps under the heading of how it intends to differentiate its pay-TV offerings."[89]

*Fourth*, the terms of coordination—or, rather, term—could be simple.  For example, coordination could involve nothing more than a refusal to license content to new Virtual

---

[86] PX0049.

[87] PX0003-003.

[88] *See e.g.*, PX0487 ███████████████████████████████
████████████████████████████████████████████████

[89] PX0449-007

MVPDs, or a contractual prohibition on Virtual MVPDs including content in skinny bundles. Thus, coordination would be simpler than, for example, coordination on a price increase.[90]

*Fifth*, because "key information" is transparent, AT&T or Comcast would quickly detect cheating by the other. *See CCC Holdings*, 605 F. Supp. 2d at 62 (coordination more difficult if "the ability to detect deviations from the terms of coordination is limited"). AT&T, for example, would know that Comcast had licensed NBC channels to a Virtual MVPD as soon as the Virtual MVPD advertised or went live with that content. Detection, thus, would be much easier than in the case of coordination on price or other dimensions.[91]

*Sixth,* prior instances show that the industry is vulnerable to coordination. *See H&R Block*, 833 F. Supp. 2d at 78 (historical act of cooperation "highly persuasive" in assessing likelihood of coordinated effects). Distributors—including AT&T—already have considered strategies to protect the pay-TV ecosystem from online distribution platforms. For example, as mentioned above, AT&T attempted to ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████[92]  When an AT&T executive mused about ████████████████████████████████ an

NBCU representative responded that ████████████████████████████████

---

[90] *See, e.g.*, RICHARD A. POSNER, ANTITRUST LAW 244 (2d ed. 2001) ("Less coordination is required for such an exclusionary campaign, since there is no need to agree on a succession of price changes."); C. Scott Hemphill & Tim Wu, *Parallel Exclusion*, 122 YALE L.J. 1182, 1222-23 (2013) ("By contrast, the implementation of parallel exclusion is often simpler.  In theory, the action is often binary:  each firm either deals or refuses to deal with a new entrant ….").
[91] *See, e.g.*, Hemphill & Wu, *supra note* 90, 1223 (explaining that "observing compliance with the elevated price level is difficult" but exclusionary conduct is "much easier" to observe because, for example, it "is hard to secretly cut a deal with an innovative entrant").
[92] PX0044 (an AT&T executive had raised idea of ████████████████████████████

████████████████████████

████████████████ [93]

Other schemes have gotten even further.  In 2016, for example, the government prosecuted DirecTV for sharing competitively sensitive information with other distributors to reduce competition regarding carriage of sports programming in Los Angeles.  As the complaint explained, DirecTV was "the ringleader of information sharing agreements with three different rivals that corrupted the Dodgers Channel carriage negotiations and the competitive process," and "was the one company that unlawfully exchanged information with multiple rivals, and without it competition would not have been harmed and none of the violations would have occurred."[94]

Moreover, the industry is rife with specific instances of price leadership.  *Heinz*, 246 F.3d at 724 (prior price leadership indicates market conducive to collusion).  The major distributors typically increase their prices every year, often by similar amounts.[95]  AT&T's marketing team has recognized that ████████████████████████████████████████████████████████

████████████████████████████████ [96]  And the FCC has found that DirecTV has been a leader in introducing new "fees" to consumers' bills, which has prompted other MVPDs to follow suit.[97]

---

[93] PX0053.

[94] Complaint ¶ 2, *United States v. DIRECTV Group Holdings, LLC and AT&T Inc.*, No. 2:16-cv-08150 (C.D.Cal. Nov. 2, 2016).  The matter was settled with a consent decree.

[95] *See, e.g.*, PX0013-008 ████████████████████████████████████████

████ [96] PX0028-012.

[97] *See Eighteenth Report, In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, MB Docket No. 16-247, ¶ 49. ("A relatively new strategy for addressing increased programming costs involves listing 'broadcast fees' and 'regional sports fees' separately on customers' monthly billing statements.  The strategy raises monthly bills while typically leaving the advertised prices for video packages unchanged.  SNL Kagan explains that MVPDs hope to deal with declining margins by adding on additional 'fees' to the monthly bill in the form of sports and broadcast 'surcharges.'  According to SNL Kagan,

*Seventh*, concentrated markets and high barriers to entry are "a recipe" for coordination where, as here, both ingredients are present. *Heinz*, 246 F.3d at 724. Section VII.B below discusses barriers to entry. AT&T and Comcast are the top two MVPDs in the country by number of subscribers—AT&T/DirecTV with about 25.3 million and Comcast with about 22.5 million. Adding Charter (17.2 million subscribers) and Dish (13.7 million subscribers), the top four firms account for 81 percent of linear pay-TV subscribers.[98]

### 3. Coordination Would Reduce Competition from Virtual MVPDs and Mean Higher Prices, Fewer Options, and Less Innovation for Consumers

As nascent competitors, Virtual MVPDs are particularly vulnerable to an AT&T armed with control over Time Warner content. As AT&T recognizes, acquiring programming is



[99] A document presented to AT&T's board explained that

[100]

Turner content is a critical input for Virtual MVPDs as they seek to win customers away from traditional MVPDs. In fact, in the words of Turner's CEO, John Martin,

[101] Time Warner believes that

██████████████████████████████████████████[102]██████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████"[103]  Evidence from the industry will confirm that Turner content is a critical input

to their Virtual MVPDs.  ████████████████████████████████████████████████████

████.[104]

    Thus, a coordinated denial of Turner and NBC content would slow the emergence of

Virtual MVPDs, and the benefits of additional competition would be delayed or even denied

altogether to consumers.  MVPDs would face less pressure to reduce their prices or to offer new

packages or better service to compete with Virtual MVPDs.  Additionally, innovation by

Virtual MVPDs, such as offering skinny bundles, would be slowed or stopped.

    AT&T's own statements erase any doubts as to the plausibility of such a result.  AT&T

has represented to the FCC that industry conditions suit coordination, citing factors such as "a

small number of competitors, concentrated market shares, and high entry barriers" as relevant

to the likelihood of "coordinated action to exclude OVDs."[105]  And coordinating to arrest

emerging threats is top of mind – ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

---

[102] PX0195-026.
[103] PX0195-030.
[104] PX0050-002.
[105] PX0449-009

██████████████████████ [106] ████████████████████████████████████████

████████ [107]

### F. Defendants' Contentions Regarding Upstream Market Power Have No Basis in Law or Fact

Defendants apparently maintain that this merger cannot violate Section 7 unless the merging entities have market power in an upstream market and that Turner and HBO lack that power. They are wrong on both counts.

Section 7 proscribes any merger that may harm competition substantially in "*any* line of commerce" in "*any* section of the country." 15 U.S.C. § 18 (emphasis added). Thus, under the plain language of the statute, a plaintiff need only show competitive harm in one relevant market. *See Anthem, Inc.*, 855 F.3d at 349 349. At trial, the United States will show that Multichannel Video Distribution in Local Footprint Overlap Zones are relevant markets, and that the merger would harm competition in those markets. The law does not require more.

Nor need the Court make a finding of upstream market power in order to conclude, on the facts of this case, that this proposed merger may well lessen competition substantially. As described above, real-world evidence and expert testimony will establish the competitive significance of Time Warner content and that the merged firm likely would use that content to harm its rivals and competition.

Defendants' expert economist uses a grab-bag of viewership statistics to claim that Turner has a limited share of an ill-defined content market. Professor Shapiro will explain that, to the contrary, improperly calculated market shares have limited value in assessing the

---

[106] PX0475-003
[107] PX0475

competitive significance of highly differentiated products like video content.  Instead, the most

informative types of quantitative evidence are subscriber losses (when a distributor loses access

to content) and the affiliate fees—data relied upon by Professor Shapiro in his analysis.  These

are direct measures of the competitive significance of Turner content and clearly superior to

defendants' miscellaneous viewership statistics.  In short, defendants present an unnecessary

distraction from the issue before the Court—whether the merger would harm competition in

relevant (downstream) markets—and ignore that the "Supreme Court on more than one

occasion has emphasized that economic realities rather than a formalistic approach must govern

review of antitrust activity."  *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189 (3d Cir.

2005).

     Regardless, the evidence at trial will show that Turner and HBO do have market power.

Market power "is the power to force a purchaser to do something that he would not do in a

competitive market," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992)

(quotation omitted), or "the ability to raise prices above those that would be charged in a

competitive market," *NCAA v. Bd. of Regents*, 468 U.S. 85, 109 n.38 (1984).  It is well-

established that a plaintiff can demonstrate market power in two ways:  indirectly, through

market definition and shares; or directly, through proof of an anticompetitive effect.  *See, e.g.*,

*Toys 'R Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000).

     As discussed above, the evidence at trial will show that Turner and HBO offer unique

networks that competitors cannot offer, that consumers desire those networks, that those

networks command higher affiliate rates and earn higher margins than other networks, and that

distributors need access to those networks at prices similar to those obtained by rivals to offer

competitive bundles of programming.  The evidence at trial further will show that the merged

firm likely would raise the prices charged to other MVPDs and to Virtual MVPDs for Turner and HBO content.

## VII.    DEFENDANTS' PRO-MERGER ARGUMENTS DON'T HOLD WATER

Defendants argue that their merger should be permitted because, whatever the evidence may be as to its likely anticompetitive effects, (1) the merger would generate significant efficiencies, (2) entry is easy, (3) FCC regulations would preclude anticompetitive conduct, and (4) their do-it-yourself "cure" would purportedly forestall competitive harm.[108]  It is all pie in the sky; none of it alters the conclusion that the merger likely would harm competition.

### A.    Claimed Efficiencies Cannot Save This Merger

"The Supreme Court has never expressly approved an efficiencies defense to a § 7 claim," *St. Luke's*, 778 F.3d at 788-89, and lower courts have "rarely, if ever," held that efficiencies successfully rebutted the government's prima facie case, *CCC Holdings*, 605 F. Supp. 2d at 72.  This case does not present the Court with reasons to deviate from that general result.

To qualify as a possible antitrust defense, efficiencies must be (i) "reasonably verifiable by an independent party," *H&R Block*, 833 F. Supp. 2d at 89, and not "mere speculation and promises about post-merger behavior," *Heinz*, 246 F.3d at 721; and (ii) "merger-specific," meaning "efficiencies that cannot be achieved by either company alone" absent the merger, *id.* at 721-22.  "Efficiencies are inherently difficult to verify and quantify and it is incumbent upon the merging firms to substantiate efficiency claims."  *H&R Block*, 833 F. Supp. 2d at 89

---

[108] The United States does not expect defendants to pursue the "selective enforcement" affirmative defense set forth in their answer, and, accordingly, does not address that subject in this Trial Brief.  Should it come up trial, however, the reasons it must fail are set forth in this Court's February 20, 2018, Order, and the parties' joint letter submission of February 13, 2018.

(quotation omitted).  Otherwise, "the efficiencies defense might well swallow the whole of Section 7 of the Clayton Act because management would be able to present large efficiencies based on its own judgment and the Court would be hard pressed to find otherwise." *Id.* at 91.

Defendants "must also demonstrate that their claimed efficiencies would benefit customers." *Sysco*, 113 F. Supp. 3d at 82.  That is because savings "only improve consumer welfare to the extent that they are actually passed through to consumers, rather than simply bolstering [the defendant's] profit margin." *Anthem*, 855 F.3d at 362.  Further, the efficiencies must benefit "the customers *in the challenged markets*." *United States v. Aetna Inc.*, 240 F. Supp. 3d at 1, 94 (D.D.C.2017) (emphasis added); *see also Philadelphia Nat'l Bank*, 374 U.S. at 370 ("anticompetitive effects in one market" may not be justified by "procompetitive consequences in another").

Defendants will fall short of showing that their asserted "synergies" (a term they use to encompass both cost reductions, a type of efficiency regularly claimed in mergers, and the less familiar category of "revenue synergies") satisfy any of these elements.  To begin, examples of a lack of verifiability abound. ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████.[109]  The largest claimed "revenue synergy" category—███████████

████████████████—also lacks substantiation. ███████████████████████

---

[109] Figures included here for defendants' claimed efficiency and synergy dollar values are those found in the Expert Rebuttal Report of Rajiv Gokhale.  They are all stated in terms of earnings before interest, taxes, depreciation, and amortization (EBITDA).



depends on the establishment of a new and untested business,  and relies on a host of unsubstantiated assumptions.[110]

Another large category of revenue synergies, depends on unsubstantiated assertions.  Defendants claim the merged firm would However, defendants will fail to provide evidence that supports the many highly specific assumptions that these synergies rely on on TBS, TNT, and the Cartoon Network).  As Time Warner executives have noted, these synergies are based on ideas that are [111]

Defendants also describe a host of unquantified innovation-related benefits that they hope to achieve from the transaction.  These and other innovation synergies are unsubstantiated aspirations, and are far from being verifiable by an outside observer.

---



[110] For example, although an underlying assumption for

[111] PX0068.

Defendants' claimed efficiencies also fail to qualify as merger-specific.  For example, 

But defendants will be unable to explain why the same benefits could not be achieved by a contract or joint venture

—also fail on merger-specificity grounds.  For example, one such item imagines AT&T

thus boosting earnings.  But defendants will not give any good reasons to believe that such c            if profitable, could not be achieved by contract

Moreover, in addition to the lack of evidence to show that defendants' claimed efficiencies are verifiable and merger-specific, defendants will also fail to show that their claimed efficiencies are likely to be passed along to consumers in the markets in which consumers would be harmed.  Furthermore, the vast majority of defendants' claimed cost efficiencies appear to involve reductions in fixed rather than variable costs. Thus, there is no reason to believe any of them would benefit consumers, even if they were otherwise cognizable. *See Aetna*, 240 F. Supp. 3d at 95 n.50 ("Reductions in fixed costs are even less likely to be passed on to consumers").

## B.  Entry Will Not Forestall Harm from the Merger

Defendants suggest that potential new entry into pay-TV markets will ensure that their merger is not anticompetitive. But entry must be "timely, likely, and sufficient in its magnitude, character, or scope to deter or counteract the competitive effects of concern," *H&R Block,* 833

F. Supp. 2d at 73 (quotation omitted), and defendants cannot meet these criteria.  Neither entry

upstream in content aggregation nor entry downstream in video distribution will "fill the

competitive void that will result" from the merger.  *Id.* (quotation omitted).

At the outset, it is important to note that, unlike many horizontal mergers, a vertical

merger may not incentivize new entry.  In horizontal mergers, the harm often is a price increase

by the merged entity (and possibly others in the market), which may increase the demand facing

a new entrant and thus encourage entry.  A vertical merger, in contrast, need not make new

entry more profitable, and may even make it less profitable.

Let's start by examining video content.  There is no evidence of likely and timely new

entry that would diminish significantly the importance of the Turner or HBO content.  In the

last four years, only one new basic cable network (the SEC Network) was launched in the

United States, according to defendants.  The proposed merger would increase already

significant entry barriers by removing current incentives for AT&T, with its approximately 25

million video subscribers, to carry new television networks.  There is no indication that the

increased prices for Turner content that will result from the merger will incentivize entry.

Indeed, over the last five years, Turner has been able to impose substantial fee increases for its

primary networks on its MVPD distributors, without significant entry.

Even if entry by new content aggregators were to occur in the near future, such entry

would not affect significantly the importance of the Time Warner content to MVPDs and

Virtual MVPDs.  The Turner networks will continue to own significant amounts of unique,

valuable programming, in particular live sports programming, for the foreseeable future.

Turner has the long-term exclusive licensing rights to numerous marquee live events from

several of the most popular sports leagues, including NCAA Basketball (through 2032), NBA

(through 2025), MLB (through 2021), PGA (through 2019), and UEFA Champions League (through 2021).  The major programming groups (including Turner NBCU, Fox, and CBS, among others) continue to command the overwhelming majority of affiliate fees.

Likewise, entry by MVPDs or Virtual MVPDs will not prevent the anticompetitive effects of the merger.  Most importantly, the merger would increase the costs of AT&T's rival video distributors through an increase in the cost of the Turner content, making entry in this segment *less* profitable.  Likewise, a coordinated denial of Turner and NBC content, which the merger would facilitate, would make it more difficult for Virtual MVPDs to enter.  The anticompetitive effects of the merger themselves therefore deter rather than invite entry.

In addition, a number of factors make entry by MVPDs or Virtual MVPDs unlikely to prevent the anticompetitive effects from the merger.  Barriers to entry for MVPDs are high, including the need to obtain content and to deploy the required infrastructure.  Over the last several years, MVPD entry has largely been limited to footprint expansion by existing MVPDs. Essentially the only new MVPD entrant has been Alphabet, Inc., which has since effectively withdrawn from the video distribution markets.

One major entry barrier is higher content costs for new MVPDs, which typically have to pay more for the right to distribute the most valuable video content than larger incumbent MVPDs.  Indeed, AT&T itself faced this obstacle following the introduction of its U-verse MVPD service in 2006.  By increasing content costs even more, the proposed merger will further strengthen this entry barrier.

While several new Virtual MVPD services were launched in recent years, and additional entry has been announced, entry or expansion by Virtual MVPDs is nevertheless unlikely to prevent the competitive harm resulting from the proposed merger.  First, growth of Virtual

MVPDs is not likely to decrease diversion to AT&T video distribution.  Among Virtual

MVPDs, DirecTV Now has about the same share that DirecTV has among traditional MVPDs.

Second, as described above, the anticompetitive effects of the merger would make new entry

difficult.  Third, to the extent they obtain Time Warner content at all, Virtual MVPDs will pay

even higher prices than their MVPD rivals.  Indeed, its strategy documents ████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

The merger would give AT&T the ability to reinforce these entry barriers.  AT&T

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████[112]  Facing these prospects, some companies have abandoned plans

to launch Virtual MVPD services entirely.

## C.      FCC Regulation Will Not Prevent Harm

Pursuant to the 1992 Cable Act, the Federal Communications Commission (FCC) has

enacted program-access rules intended to prohibit a vertically integrated MVPD from engaging

in certain practices that would restrict other MVPDs' access to its programming.  *See* 47 U.S.C.

§ 548(b).[113]  Contrary to defendants' argument, the rules are not a remedy for an

anticompetitive merger.  The FCC itself has reached this conclusion, deciding in its review of

the Comcast/NBCU merger that, "despite the rules," it was "necessary to impose additional

transaction-related safeguards as conditions for approving vertical transactions between

---

[112] *See* PX0166-004.

[113] The rules serve to prevent (a) a cable owner from engaging in undue or improper influence
over the programmer with which it is integrated; (b) discrimination in prices, terms or conditions
of carriage; and (c) exclusive contracts.  47 U.S.C. § 548(c)(2).

MVPDs and video programming networks."  Memorandum Opinion and Order, *In re*
*Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc., for*
*Consent to Assign Licenses and Transfer Control of Licensees,* 26 FCC Rcd. 4238 ¶ 35 (2011)
[hereinafter *Comcast* Order].

The program-access rules are intended to prevent programmers from discriminating
between MVPDs but cannot prevent Time Warner from increasing prices industrywide.  In an
industry where volume discounts are the rule, AT&T, as the largest distributor, ordinarily is
able to obtain the lowest prices in affiliate agreements.  After the merger, it could raise the price
it charges itself for Time Warner content, which does not reflect the actual economic cost to
AT&T, and so set a price floor allowing it to raise Time Warner prices for all other distributors.
In its *Comcast/NBCU* Order, the FCC itself identified this danger:  "To facilitate the combined
entity's exercise of a uniform-price-increase strategy, Comcast could pay the same fees as its
MVPD rivals or could choose to pay the highest fee that NBCU charges a competing MVPD.
Therefore, our program access rules, which address discriminatory pricing, inadequately
address the potential harms presented by the increased ability and incentive of Comcast-NBCU
to uniformly raise Comcast's rivals' fees."  *Comcast Order* ¶ 49.  In addition, the program
access rules identify a number of justifications for differential pricing and terms, including
volume discounts.  47 C.F.R. § 76.1002(b)(3).

Furthermore, the rules would not prevent the merged entity from using permanent
foreclosure as a threat point in bargaining negotiations with rival MVPDs.  The rules ensure
that a video programmer engages with a MVPD that seeks to negotiate for the right to carry its
programming, but do not ensure that an agreement will be reached.  *See* First Report and Order,
*In re Implementation of Sections 12 and 19 of the Cable Television Consumer Protection and*

*Competition Act of 1992 Development of Competition and Diversity in Video Programming Distribution and Carriage*, 8 FCC Rcd. 3359 (1993) [hereinafter First Report].   The FCC has emphasized the distinction between actionable behavior, like "unreasonable refusals to sell," and "certain legitimate reasons that could prevent a contract between a vendor and a particular distributor." *See* Memorandum Opinion and Order, *In re RCN Telecom vs. Cablevision Systems Corp., et al.; Microwave Satellite Technologies, Inc., vs. Cablevision Systems Corp. et al.,* 14 FCC Rcd. 17093 ¶¶ 3, 4 (1999).   Specifically, the FCC has identified as examples of legitimate reasons for not reaching an agreement as "an impasse on particular terms" or "a vendor's preference not to sell a program package in a particular area for reasons unrelated to … a specific distributor." *See* First Report, 8 FCCRcd 3359.   And as noted, the rules allow volume discounts, *i.e.*, differences in prices, terms, or conditions.   47 C.F.R. § 76.1002(b)(3).   Barring an FCC determination that the terms, prices, or conditions offered by a programmer violate the rules, the FCC will not order a programmer to supply programming.  *Id.*

Moreover, the FCC would grant relief only after a lengthy and expensive regulatory process, and an MVPD subject to anticompetitive tactics may well be dissuaded from filing a complaint or pressured to settle early.   As AT&T and DirecTV both have explained, "the threat of adjudication does not dissuade vertically integrated cable operators and their affiliated programmers from engaging in anticompetitive withholding," and "a case-by-case process takes far too long (in some cases, several years) to redress such conduct, during which consumers are deprived of the programming and competitive alternatives they desire, contrary to congressional objectives."  Reply Comments of AT&T, Inc., *In re Revision of FCC's Program Access Rules*,

FCC MB Docket No. 12-68, at 23 (July 23, 2012).[114]  In particular, "[n]umerous factors deter small and mid-sized cable operators from filing complaints" under the program access rules. "[C]able operators and programmers develop long-term 'buyer/seller' relationships that involve recurring negotiations" and "[f]iling complaints creates real risk of straining those relationships."  Beyond the potential for "damaging relationships with large programmers," the evidentiary burdens to show differences in the rates charged to other MVPDs can be difficult to know "given the confidential nature of programming network affiliation agreements…." Comments of Cox Communications, Inc., In re Revision of the Commission's Program Access Rules, MB Docket No. 12-68, at 6 (June 22, 2012).

And finally, the rules do not protect the newest forms of competition, Virtual MVPDs and other new online distributors, Order, *In re Sky Angel U.S., LLC Emergency Petition for Temporary Standstill*, 25 FCC Rcd. 3879 ¶ 7 (2010), and thus in no way address the harm resulting from lessened competition from Virtual MVPDs.

### D.  Defendants' Do-It-Yourself "Cure" Is No Substitute for Lost Competition and Cannot Remedy Likely Harm

Defendants boldly assert that they themselves have devised a plan to avoid causing the harm that would otherwise flow from the proposed merger.  How?  With a self-created arbitration proposal they claim to have modeled on provisions in the FCC's order and the Department of Justice's consent decree regarding Comcast's acquisition of NBC Universal. Specifically, Turner has offered to distributors licensing terms that, for seven years after the closing of the merger, allow the distributor to invoke "baseball-style" arbitration if the parties

---

[114] *See also* PX0443-006 (rules "demand that MVPDs devote enormous amounts of time and money (more than *two years* for the recent AT&T and Verizon complaints against Cablevision) to prove harm" (emphasis in original)).

fail to reach an agreement on mutually acceptable terms for certain Turner content.  Each party

submits a final offer of a complete carriage agreement to the arbitrator, the parties conduct

discovery, and the arbitrator picks the offer best representing "fair market value," a term

undefined in the offer and not used in the ordinary course of Turner's business.  Turner would

be prohibited from withholding the content once the distributor has noticed its intent to arbitrate

and so long as the distributor continues the arbitration proceeding.

Defendants admit they offered this "contractual commitment" only because of this

lawsuit.  The response of MVPDs and Virtual MVPDs has been underwhelming.  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

This response is not surprising as the offer fails in many ways to address the threatened

harm to competition.  To the extent defendants' arbitration proposal should even be considered

a "remedy" (since it does not restore competition that will be lost through the merger),

defendants will fall short of carrying their burden of showing it would "redress the violations."

*Sysco*, 113 F. Supp. 3d at 72 (quoting *Ford Motor Co.*, 405 U.S. at 573).  "[I]t is well settled

that once the Government has successfully borne the considerable burden of establishing a

violation of law, all doubts as to remedy are to be resolved in its favor."  *Ford Motor Co.*, 405

U.S. at 575 (quoting *du Pont,* 366 U.S. at 334).  Defendants "bear the burden of showing that

any proposed remedy would negate any anticompetitive effects of the merger." *FTC v. Staples,

Inc.*, 190 F. Supp. 3d 100, 137 n.15 (D.D.C. 2016) and would preserve the terms of carriage

agreements between Time Warner and video distributors that would exist "but for" the altered

incentives of the merger.  That burden includes "producing evidence that the [remedy] will

actually occur," *Aetna*, 240 F. Supp. 3d at 60, and "will remedy the anticompetitive effects of the merger," *Sysco*, 113 F. Supp. 3d at 78.

Defendants rest heavily on the argument that their arbitration proposal is "the same sort" as the arbitration conditions in the decrees in the Comcast/NBCU merger.  Answer ¶ 8.  But this is a different transaction, and defendants' remedy has material weaknesses as compared to the combined FCC and Department of Justice conditions, including the following.  First, the combined remedies imposed a wider range of behavioral conditions, including, for example, prohibitions on a range of retaliatory and discriminatory conduct.  Second, the FCC, an expert agency with long experience administering arbitrations, is not available to manage these arbitrations or to hear appeals; in fact, AT&T deliberately structured the deal to avoid FCC jurisdiction.  Third, DirecTV provides MVPD service nationally, which means that there is no control group of regional peers here that could to serve as a baseline in determining what constitutes "fair market value" during an arbitration.  Finally, the FCC Order provided that any arbitration award would be subject to de novo review at the FCC,[115] and of course this Court retained jurisdiction to enforce compliance with the consent decree.[116]

Evaluated on its merits, the offer plainly fails to "eliminate the concern about potential anticompetitive effects" of the proposed merger.  *OSF Healthcare Sys.*, 852 F. Supp. 2d at 1086. *First*, and fundamentally, defendants' proposal does not change the incentives of the merged firm to engage in anticompetitive behavior.  At trial, Professor John E. Kwoka of Northeastern University, one of the government's expert economists, will explain that the offer

---

[115] Memorandum Opinion and Order, *In re Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc., for Consent to Assign Licenses and Transfer Control of Licensees,* 26 FCC Rcd. 4238 ¶ 131 (2011).
[116] Final Judgment at 32, *United States v. Comcast Corp.*, No. 1:11-cv-00106 (D.D.C. Sept. 1, 2011)

has properties of a conduct (or behavioral) remedy rather than a divestiture (or structural) remedy.  Divestiture entails the sale of assets causing competitive concern (*e.g.*, an overlapping business in a horizontal merger, an input that could be used to harm downstream competitors in a vertical merger) in order to preserve incentives to engage in independent competitive behavior.  In contrast, a conduct remedy does not change the anticompetitive incentives of the merged firm, but rather attempts to prevent it from acting on its incentives by prohibiting specific anticompetitive practices.  Thus, to be effective, a remedy in this case would have to anticipate and "be detailed enough to cover in advance all the many fashions in which improper influence might manifest itself." *du Pont*, 366 U.S. at 334.

*Second*, the arbitrator's directive to choose the offer approximating the "fair market value" of Turner networks is not the same as the antitrust objective of preserving competition. The term "fair market value" is not defined in the offer, and is not used in ordinary course of Turner's business.  And as Prof. Kwoka will explain, terms that represent "fair market value" are not necessarily the same as the prices and terms that would be negotiated in the marketplace "but for" the merger.  Additionally, there would be few, if any, truly comparable contracts for an arbitrator to use as benchmarks.  Moreover, a reliance on benchmarks would exacerbate the loss of dynamics of competition—for example, a distributor would be less likely to propose, and Turner would be less likely to accept, new contractual terms that enable innovative business models.  In short, arbitration simply would not "effectively preserve competition in the relevant market." *Sysco*, 113 F. Supp. 3d at 73 (quotation omitted).

*Third*, the offer does not even address all of the harms alleged in the Complaint, much less all of the ways the merged entity might use its control of Time Warner content to harm rivals in the future.  For example, the offer does not apply to HBO or new Turner content, and

is not available to certain new entrants.  Nor does it address coordination between NBC
Universal and the merged entity.

*Fourth*, arbitration is not a practical alternative for all distributors.  Video distributors
view arbitration as costly and risky, with both informational and risk asymmetries that favor
Turner.   Also, a distributor may fear retribution in other areas of its relationship with the
merged entity if it proceeds to arbitration on this single issue.  Accordingly, distributors are
wary that an adverse arbitration decision could put them in a worse position than not carrying
the Turner content.

*Fifth*, the arbitration proposal is time-limited.  Defendants cannot establish that the
market will have changed sufficiently by the time it expires so that the merged entity no longer
has the incentive and the ability to harm competition.  In fact, both the FCC Order and the
Department of Justice consent decree had similar seven-year terms, and evidence will show that
MVPDs are concerned about anticompetitive behavior when all conditions expire this year.

*Sixth*, it is questionable whether the "contractual commitment" is enforceable or whether
the offer is "irrevocable," as defendants' maintain.  A video distributor who accepts the offer is
"giving up nothing" in return, thereby raising the question as to whether adequate consideration
has been provided in exchange.[117]  Moreover, as a matter of contract law, an offer is not
binding on the offeree until acceptance, and an offeree may revoke its offer at any time prior to
acceptance.  Restatement (Second) of Contracts §§ 36, 42.[118]  There would be no recourse
should, post-merger, AT&T-Time Warner revoke the offer to those video distributors who have
not accepted it.

---

[117] PX0499-018.
[118] The offer does not contain a choice-of-law clause.

*Seventh*, the remedy is unsupervised.[119]  The Government, the FCC, and this Court would be powerless to enforce the offer.  Hence, the vital public interest in the enforcement of the antitrust laws would be entrusted to private actors alone through contract.[120]

Finally, defendants' claim that the Government's request for divestiture represents an "abrupt departure from precedent," Answer ¶ 8, must rest on a gerrymandered body of "precedent."  To be sure, "in *appropriate* cases vertical merger matters the Division will consider tailored conduct remedies."  U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies 5 (June 2011) (emphasis added).  But "the Division also will consider structural remedies in vertical merger matters," *id.*, and has sought structural relief for vertical mergers regularly.[121]  As the Supreme Court summarized in a vertical-merger case, "Complete divestiture is particularly appropriate where asset or stock acquisitions violated the antitrust laws."  *Ford Motor*, 405 U.S. at 573.  As suggested above, divestiture is "a simple, relatively easy to administer, and sure" remedy, *du Pont*, 366 U.S. at 331, compared to a conduct remedy that "would probably involve the courts and the Government in regulation of private affairs

---

[119] PX0499-026 (explaining that there are no appeal rights to the DOJ, FCC or this Court under the arbitration offer).

[120] *Cf. United States v. Borden*, 347 U.S. 514, 519 (1954) ("the Government's right and duty to seek an injunction to protect the public interest exist without regard to any private suit or decree").

[121] *See e.g.*, Memo. Op. at 6, *United States v. United Tech. Corp.*, No. 12-cv-1230 (May 29, 2013); Competitive Impact Statement at 11, *United States v. Premdor Inc.*, No 01-cv-D1696 (Aug. 3, 2001); Competitive Impact Statement at 9, *United States v. Enova Corp.*, No 98-cv-583 (June 8, 1998); *see also* American Antitrust Institute, AAI Applauds Move to Block AT&T-Time Warner Merger 3 (Dec. 6, 2017), *available at* http://www.antitrustinstitute.org/content/aai-applauds-move-block-att-time-warner-merger-sets-record-straight-vertical-merger ("From 1994 to 2016, for example, about 27% of the total remedies taken by the DOJ and FTC in vertical merger cases were structural and about 73% were conduct-related."); D. Bruce Hoffman, Acting Dir., Bureau of Competition, Fed. Trade Comm'n, Vertical Merger Enforcement at the FTC 8 (Jan. 10, 2018), *available at* https://www.ftc.gov/public-statements/2018/01/vertical-merger-enforcement-ftc ("no one should be surprised if the FTC requires structural relief" because "we start by looking at structural remedies for most vertical mergers").

more deeply than the administration of a simple order of divestiture," *id.* at 334.

## VIII.  TRIAL PRESENTATION

As with most civil trials, the evidence will consist primarily of documents, deposition designations, and live witnesses.

*Documents.*  This trial will have quite a few documents, but not an overwhelming number.  Because defendants, like most large corporations, extensively use email, presentations, and memoranda in conducting their business, it is essential to see their documents to understand key facts.  Recognizing that these documents help prove critical factual elements of the government's case, defendants have spent much time trying to distance themselves from them in pre-trial discovery—and are fully expected to continue such denial during trial.  For example, faced with corporate strategy documents that support our case, AT&T's CEO diminished the work of AT&T's large and well-paid strategic planning group, dismissively stating that he alone makes all strategic planning decisions for the company.  The reason for defendants' tactic is obvious:  defendants' documents show that AT&T can use Time Warner content to raise rivals' costs and to impede innovative new competitors from becoming viable substitutes for the pay-TV business, just as the government alleges.

*Live witnesses.*  The live witnesses at trial generally will be of three kinds:  defendants' own employees, experts and third party industry witnesses.[122]

Defendant's employees.  The testimony of defendants' employees will be of two very different stripes.  *First*, the government will use concessions made and documents written by

---

[122] We expect few actual readings (or showings) of deposition designations at trial but some submissions will be made to the Court to establish certain largely non-controversial factual assertions, provide evidentiary foundations for the admission of documents, or as party admissions.

many of these employees to support its case. *Second*, defendants will call their employees to try to spin a different narrative that supports allowing the challenged merger to proceed.

Experts. There could be quite a few expert witnesses at trial—each side will undoubtedly call an economic expert. Both of the economic experts—Professor Carl Shapiro from the University of California at Berkeley for the United States, and Professor Dennis Carlton from the University of Chicago for defendants—are distinguished academics supported by professional economic support shops. Unlike Professor Carlton, however, Professor Shapiro has modeled the likely effects of the transaction. This work predicts significant harm to consumers.

Industry witnesses. The United States also will be calling a number of third-party industry witnesses to testify in this case. They have spent their careers in this industry and thus have views are that are particularly well informed. Several of the government's video distributor witnesses will testify about the importance of Turner content, particularly live sports and news, to their customers; how and with whom they compete for customers; how they negotiate for content rights and how they believe AT&T's incentives will change if this deal goes through; and how that would impact the distributor's future content negotiations with AT&T.

To be sure, defendants will try to undermine this testimony, but the heart of the testimony by these especially knowledgeable witnesses who live with the market dynamics this case involves, day-in and day-out, reflects reality, and the Court should give it great weight.

## IX. CONCLUSION

As this trial brief has laid out, the evidence at trial will show, that the effect of the proposed acquisition of Time Warner by AT&T may be substantially to lessen competition. Accordingly, the Court should permanently enjoin AT&T from acquiring Time Warner.

Dated: March 9, 2018

Respectfully submitted,

/s/ Craig Conrath

| | |
|---|---|
| MAKAN DELRAHIM | CRAIG CONRATH |
| Assistant Attorney General for Antitrust | ERIC D. WELSH (D.C. Bar # 998618) |
| ANDREW C. FINCH | LISA SCANLON |
| Principal Deputy Assistant Attorney General | PATRICK KUHLMANN |
| DONALD G. KEMPF, JR. | SANFORD ADLER |
| Deputy Assistant Attorney General for | THOMAS DEMATTEO |
| Litigation | MARISA DIEKEN |
| BERNARD A. NIGRO, JR. | ROBERT DRABA |
| Deputy Assistant Attorney General | RICHARD GOWER |
| PATRICIA A. BRINK | JENNIFER HANE |
| Director of Civil Enforcement | ELIZABETH JENSEN |
| DAVID B. LAWRENCE | MATTHEW JONES |
| Counsel to the Assistant Attorney General | IHAN KIM |
| CAROLINE J. ANDERSON | MELANIE KISER |
| Counsel to the Assistant Attorney General | KATHRYN KUSHNER |
| SCOTT SCHEELE | DAPHNE LIN |
| Chief, Telecommunications and Broadband | MICHELLE LIVINGSTON |
| Section | BRENT MARSHALL |
| JARED A. HUGHES | LORENZO MCRAE |
| Assistant Chief, Telecommunications and | ERICA MINTZER |
| Broadband Section | DANIEL MONAHAN |
| | SAMER MUSALLAM |
| | SOMADINNA NWOKOLO |
| | SARAH OLDFIELD |
| | LAWRENCE REICHER |
| | ANNA SALSTROM |
| | PETE SCHWINGLER |
| | DAVID SHAW |
| | MATTHEW SIEGEL |
| | FREDERICK S. YOUNG |

U.S. Department of Justice, Antitrust Division
Telecommunications and Broadband Section
450 Fifth Street, N.W., Suite 7000
Washington, DC  20530
Telephone: (202) 514-5621
Facsimile: (202) 514-6381

# APPENDIX A

This appendix defines some terms commonly used in the subscription TV industry, which appear in this brief and which the Court is likely to hear at trial.

**"ACPU" - Average Cost Per Unit** – Total cost of production divided by the number of units produced.  For an MVPD or Virtual MVPD provider, it is usually the programming costs for the channels the system carries divided by the number of multichannel subscribers.

**Affiliate Agreement/Distribution Agreement/Carriage Agreement** – Cable and broadcast network owners negotiate with distributors regarding the distribution rights for the networks.  This is usually a multi-year television programming contract that outlines how much the distributor will pay the network in order to carry the programming for each of the distributor's subscribers, among other terms and conditions.

**"ARPU" - Average Revenue Per Unit** – ARPU measures the average revenue generated per telephone, wireless, broadband or TV user per month, and is used to compare various companies, as well as internally to spot lagging product lines.

**Authenticate** – Using the login/password provided by your TV provider to validate that the content you are trying to watch online is in fact part of your pay TV package.

**"AVOD" - Advertising-Supported Video on Demand** – Video content is "free" to watch for viewers in return for them watching advertising.  Content owners or video platforms, like YouTube, use advertising in and around videos to make money.

**Blackout** – There are two types of blackouts: 1) when a home sporting event is not carried by local TV because of contractual agreement or regulations imposed by a league; and 2) when a programmer and distributor are unable to reach an affiliate agreement, the programmer may "go dark" on the distributor, or the distributor may "take down" the disputed

channels resulting in the affected distributor's subscribers being unable to access the disputed channels for the duration of the blackout.

**Broadcast Network/Commercial Broadcast Network** – A production and/or distribution company which commissions or acquires the rights to television programs and series and distributes them to a group of affiliated broadcasting stations, which also supply local content.  Examples include: ABC, CBS, NBC, FOX and The CW.

**"CAGR" - Compound Annual Growth Rate** – CAGR is the average annual growth rate of an investment over a specified period of time, longer than one year.

**Churn** – Churn is a measurement of the percent of customers who leave a distributor each month for various reasons, either for voluntary or involuntary reasons.  Customers who voluntarily churn usually leave to buy a competing distribution service.

**"CID" - Civil Investigative Demand** – A request for documents and information sent to a Third-Party during an investigation.

**Connected TV (CTV)/Smart TV** – A digital television set or set top box which can access the Internet and streaming media, and run apps.

**Cord Cutter** – A person who switches from a pay TV subscription service (MVPD or Virtual MVPD) to an Internet-based streaming service such as Netflix.

**Cord Never** – Someone who has never paid for a pay TV subscription service.

**Cord Shaver** – A pay TV subscriber who has reduced her pay TV fees by eliminating certain channels, or downgrading packages.

**CPM** – Advertisers' cost per thousand viewers exposed to a commercial.  The total cost for one or a series of commercials is divided by the projected audience shown in thousands.

**"DAI" - Dynamic Ad Insertion** – A server-side video ad technology that enables you to

serve video ads into live linear programming and video on demand content.  DAI stitches your video content and ads into a single stream, independent of a web page or app.  DAI can stitch custom targeted video ads into the stream, based on the individual user viewing the content.

**Double Marginalization** – The phenomenon in which different firms in the same industry that have their respective market powers but at different vertical levels in the supply chain (i.e. upstream and downstream) apply their own markups in prices.  Due to these markups individually, a deadweight loss is induced and because of both markups, the deadweight loss occurs twice thus making it worse off for the whole market.

**"DTC" - Direct to Consumer** – Bypassing traditional distributors to sell directly to consumers, such as CBS All Access and HBO NOW.

**"EDM" - Elimination of Double Marginalization** – Integrating two firms within different vertical levels in the supply chain can eliminate double marginalization, by reducing at least one of the dead weight losses.

**"HHI" -  Herfindahl-Hirschman Index** – A commonly accepted measure of market concentration, which is calculated by squaring the market share of each firm competing in a market, and then summing the resulting numbers, and can range from close to zero to 10,000.

**Linear Channel** – Video programming viewable on a specific channel at a specific time of day.

**Major Studio** – Film production and distribution companies that release a substantial number of films every year and earn a major portion of box office revenues.  The Major Studios currently are 20th Century Fox, Warner Bros., Paramount Pictures, Sony Pictures, Universal Pictures, and Walt Disney Pictures.

**"MFN" - Most Favored Nations** – A contractual provision in which a programmer

guarantees a distributor that it will receive prices and/or terms that are at least as favorable as those provided to other distributors of the same programming.

**"MVPD" - Multichannel Video Programming Distributor** – A distributor that delivers, through its own facilities that it controls, multiple channels of video programming available for purchase by subscribers or customers, via cable, direct broadcast satellite (DBS), or fiber optic.  Most of today's MVPDs also offer Internet and phone services as core elements of their business models.  Examples include AT&T (U-verse and DIRECTV), Cable One, Charter, Comcast, Cox, DISH, and RCN.

**"OTA" - Over-the-air** – A mode of transmission where a feed of programming is delivered to an antenna over the air, rather than over the Internet or facilities like cable or satellite.

**"OTT" - Over-the-top** – A mode of transmission through which a product, often an app or website, is delivered over the Internet and bypasses traditional distribution.  Examples include Sony PlayStation Vue and Hulu.

**"OVD" - Online Video Distributor** – An entity that distributes video programming via internet connection.

**Overbuild** – A cable system built in an area where another cable system has established service.  The competing cable operator is known as an overbuilder, such as RCN.

**"PPV" - Pay-per-view** – Payment made for individual programs rather than for monthly service, usually for major sports events or blockbuster films.

**Programmer** – A Programmer purchases content, such as TV shows, movies, sports rights, etc., aggregates the content into channels, and sells those channels to MVPDs and vMVPDs, such as Cox and DISH Sling TV.  Examples include Time Warner Inc. (Turner and

HBO), The Walt Disney Company, and CBS.

**"PSPM" - Per Subscriber Per Month** – The fee that distributors pay programmers to carry their content.

**"RSN" - Regional Sports Network** – Any non-broadcast video programming service that 1) provides live or same-day distribution within a limited geographic region of sporting events of a sport team that is a member of Major League Baseball, the National Basketball Association, the National Football League, the National Hockey League, NASCAR, NCAA Division I Football, NCAA Division I Basketball, and 2) in any year, carries a minimum of either 100 hours of programming that meets the previous criteria, or 10% of the regular season games of at least one sports team that meets the previous criteria.  Examples include the Yankees Entertainment and Sports Network (YES), and SportsNet LA, which carries games and programming related to the Los Angeles Dodgers.

**"SAC" - Subscriber Acquisition Cost** – The amount the distributor pays to sign up a new subscriber. (i.e. for DIRECTV, this typically covers things like the DVR and satellite dish, including installation and marketing).

**Skinny Bundle** – Video packages that include a limited selection of channels at a lower price point than other distribution service, such as DISH Sling TV.

**"SVOD" - Subscription Video on Demand** – Examples include Amazon Prime, Hulu, and Netflix.

**"TVE" - TV Everywhere** – The ability to watch content that is part of your pay TV package on the Internet, through a variety of devices, such as a phone, laptop, or tablet.  TVE must be authenticated using an MVPD or Virtual MVPD subscription log in information, and can be accessed through websites and apps.

**Video Distributor** – MVPD or OVD that sells packages of programming to subscribers. Examples include AT&T, Cable One, Charter, Comcast, Cox, DISH, DISH Sling TV, Google YouTube TV, Hulu, Netflix, RCN, and Sony PlayStation Vue.

**"vMVPD" - Virtual MVPD** – Acts in the same way as a traditional cable or satellite provider, but delivers linear television via an internet connection.  Examples include DISH Sling TV, DIRECTV Now, Google YouTube TV, and Sony PlayStation Vue.

**"VOD" – Video on Demand/On Demand** – An entertainment service that allows viewers instant access to content such as movies, cable series, original programs, educational programs, premium channels, news, sports, etc. Programming from content providers is delivered by consumer's cable company and may be free, subscription-based, or paid for on a pay-per-view basis.  With On Demand service, consumers can control what they watch and when, with features such as play, pause, fast-forward, rewind, and stop, which is in contrast with linear programming.

**Window** – The period during which a network or other distributor has contractual rights to show or sell a program.

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2018, a true and correct copy of the foregoing was served on all counsel of record via email.

/s/ Craig Conrath
CRAIG CONRATH

U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 7000
Washington, DC 20530
Phone: (202) 532-4560
Email: craig.conrath@usdoj.gov

*Attorney for the United States of America*