# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) Case Number 1:17-cv-02511-RJL |
| | ) |
| AT&T INC., DIRECTV GROUP HOLDINGS, | ) |
| LLC, and TIME WARNER INC., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

---

## DEFENDANTS' OPPOSITION TO
## THE UNITED STATES' MOTION *IN LIMINE*

Defendants oppose the government's motion *in limine*.

The government's central claim in this case is that the merger of AT&T and Time Warner will lead to a theoretical 45-cent increase in the average monthly pay-TV bills for U.S television consumers—an increase of 0.4% in an average monthly bill. Apart from the remarkably small size of the alleged increase, there are several independent reasons why the evidence cannot support the government's claim. The motion concerns just one of those reasons: defendants' irrevocable and legally binding commitment to (1) continue to license the Turner networks to distributors after the merger without any drops in service and (2) resolve disputes about licensing terms through "baseball-style" arbitration (the "Arbitration/No-Blackout Commitment" or "Commitment"). Defendants extended this Commitment to Turner's current and future distributors in November 2017 as a concrete assurance that this merger has never been about raising the price of Turner content.

Irrevocable and fully binding on the merged company for seven years after the deal closes, the Commitment is one of several market facts that are fatal to the government's case. As

1

the Court is aware, the government's price-increase theory rests primarily on the hypothesis that the merged company will gain "bargaining leverage" that it can use to compel other distributors to pay higher prices for Turner networks.  The government's "proof," in turn, depends on an abstract "bargaining model" proffered by its expert economist, Professor Carl Shapiro, who purports to quantify this increased bargaining leverage.  His model—and the government's theory more generally—is flawed for many reasons.  One of them is its failure to account for the Arbitration/No-Blackout Commitment's effect on post-merger bargaining leverage—an effect all three of the government's economic experts have now acknowledged.

Most significantly, just before the government filed its motion, Professor Shapiro himself conceded (1) that the Commitment would alter the realities of the market by benefiting distributors in their post-merger negotiations over the Turner networks, and (2) that he did *not account for this real-world impact in his analysis*.  Those concessions expose one of the fatal flaws in the evidence the government plans to use to demonstrate a violation of Section 7 of the Clayton Act.  To obscure that flaw, the government now seeks to preclude the Court from even considering the Commitment at trial.  But its arguments are not only baseless, they are squarely contradicted by the very cases the government cites.

Indeed, by requesting in the alternative that the Court limit its consideration of the Commitment to so-called remedial issues, even the government acknowledges that the Arbitration/No-Blackout Commitment is relevant to this case.  But that request is pointless in a bench trial, where there is no risk of confusion and the Court has ample power to ensure that evidence is presented efficiently and to then assess it for whatever purposes the Court deems proper.

**BACKGROUND**

**1.**  The principal theory of harm in the government's Complaint is that, after the merger, the combined firm could "more credibly threaten to withhold" Time Warner's Turner television networks (*e.g.*, TNT, TBS, and CNN) from pay-TV distributors, or so-called multichannel video programming distributors (MVPDs), like Comcast and DISH.  Compl. ¶ 35.  According to the government, these threats to withhold Turner networks would force MVPDs to pay more for Turner programming and raise their consumer prices.  Compl. ¶ 38.

Defendants adopted the Arbitration/No-Blackout Commitment in November 2017 as a good-faith effort not only to address this alleged theory of harm, but also to confirm that they never had any intention to engage in such behavior in the first place.  Modeled on a provision of the Comcast/NBCU consent decree that the government endorsed and this Court approved (*see* Defs. Pretrial Br. 36-41), the Commitment allows an MVPD to demand all Turner networks or any bundle of them licensed to AT&T or another distributor.  Arb. Procedures ¶¶ A.2, A.6, D.14 (Exhibit 1).  If the parties cannot agree on terms, the distributor can elect "baseball" arbitration, *id.* ¶¶ A.1, A.3, A.4, where each party submits its best offer and an arbitrator decides which one "most closely approximates the fair market value of the Turner Networks at issue," *id.* ¶¶ A.4, A.5, C.7.  If an MVPD chooses arbitration, Turner *cannot withhold programming*—it must provide the networks to the MVPD on existing terms, subject to a true-up based on the arbitrator's award.  *Id.* ¶¶ B.1, B.2.

**2.**  As defendants' experts and other witnesses will establish at trial, the Arbitration/No-Blackout Commitment directly addresses the government's theory of harm and in fact disposes of all the Turner-related claims in this case.  After the merger, Turner will not be able to *threaten* to withhold its television networks from distributors, because it will have relinquished the *ability*

to withhold those networks.  And without a credible threat to withhold Turner programming, the core premise of the government's theory—that the merged firm will be able to scare distributors into paying higher prices—makes no sense.  Instead, a distributor can invoke arbitration in which an arbitrator, not Turner, will determine the fair market value of its networks, subject to judicial review.  *See* Arb. Procedures ¶ C.8.

The government asserts that the Arbitration/No-Blackout Commitment does not create "any binding or continuing commitment enforceable in this Court," and thus is "a purely unilateral promise that defendants assert they will adhere to."  Mot. 2.  But the Commitment explicitly states that it will remain available for seven years, Arb. Agreement ¶ 6, and under governing New York law, the specification of a time period makes the Commitment *irrevocable* for that period, even without consideration from companies yet to accept it.[1]  The Commitment also will legally succeed to and be binding on the merged company if the merger is consummated,[2] as AT&T's 30(b)(6) witness on the Commitment explicitly acknowledged.  *See* Stankey 2/16/18 Dep. 110:23-115:22 (Exhibit 2).  The Commitment, in short, imposes a post-merger legal obligation on the merged company that will be enforceable in any court of competent jurisdiction.

**3.**  To support its "bargaining leverage" theory, the government will offer the testimony of Professor Shapiro, who applied a hypothetical "bargaining" model that purports to quantify

---

[1] *See Silverstein v. United Cerebral Palsy Ass'n of Westchester Cnty., Inc.*, 17 A.D.2d 160, 163 (N.Y. App. Div. 1962); *Hermanowski v. Acton Corp.*, 580 F. Supp. 140, 143 (E.D.N.Y. 1983), *aff'd in part and rev'd and remanded in part*, 729 F.2d 921 (2d Cir. 1984); *Fullerton v. Prudential Life Ins. Co.*, 2000 WL 1810099, at *8 (S.D.N.Y. Nov 30, 2000) ("[l]ack of consideration . . . does not affect revocability" if writing specifies period of time).

[2] *See AT&S Transp., LLC v. Odyssey Logistics & Tech. Corp.*, 22 A.D.3d 750, 752 (N.Y. App. Div. 2005).

the extent to which the combined company could more credibly threaten to withhold the Turner

networks after the merger and thereby force distributors to pay higher prices.  In discovery,

however, Professor Shapiro conceded that, if operative, the Arbitration/No-Blackout

Commitment would protect distributors against any supposed Turner withholding threat:

> Q. So the standstill component of AT&T in Time Warner's arbitration
> commitment means that MVPDs covered by the offer need not fear post-merger
> that AT&T will terminate their access to Turner content even if carriage
> negotiations are unsuccessful.  Correct?
>
> A. That's what I understand this offer is meant to represent, assuming it's
> operating as described. I think that's what it amounts to. That's the description, as
> I understand it, yes.
>
> Q. And that's a very different outcome in the event of not reaching an agreement
> in a negotiation than just being confronted with a permanent blackout. Correct?
>
> A. Well, I wouldn't say permanent blackout.  I mean, the way blackouts work is
> they continue until an agreement is reached or not.  But yes, the—in the event of
> impasse, there may be a different outcome from a blackout, namely the MVPD
> could submit it to arbitration. That's the point, I think, of this, isn't it?

Shapiro Dep. 226:23-227:19 (Exhibit 3); *see id.* at 226:17-21 (agreeing that Commitment would

affect post-bargaining outcomes: "Yes, I would think so.  Yes.  Because . . . if the MVPD

wants, they could invoke this option.").  The government's two other economic experts agreed

that the Commitment would alter Turner's bargaining leverage.[3]  Professor Shapiro further

---

[3] Professor John Kwoka agreed that the Commitment would have "[at] least some impact on Turner's bargaining leverage."  Kwoka Dep. at 134-35 (Exhibit 4).  Professor Simon Wilkie made the same concession, albeit in hypothetical terms:

> Q: I want you to imagine a situation in which two parties are engaged in a
> negotiation over programming costs.  And there is an agreement that governs that
> negotiation which states that in the absence of agreement, an adjudicator will set a
> fair market price, a competitive price as you defined in in your report.  Would you
> expect the parties to take that into account in their negotiations?
>
> A: Yes, I would.

Wilkie Dep. 112:11-21 (Exhibit 5).

conceded that because of these bargaining effects, his model must account for the Commitment in order to accurately model post-merger bargaining behavior. *Id.* at 230:12-25 (agreeing that if he conducted a bargaining model post-merger, he would "account for" the Commitment: "I would think so.  I would think so.  I would need to think about the specifics of the assignment and what's going on.  But if that's in place and applies and effective and all these other conditions to a particular counterparty, I would want to take that into account post-merger."). Despite those critical concessions, he admitted that he did *not* include these essential real-world effects in his bargaining model (*id.* at 225:11-20, 227:20-28:7), because, in his words, "modeling the transaction with this fix" was not "my role . . . in this whole drama" (*id.* at 227:25-228:7).

That omission confirms the unreliability of the model—the central pillar of the government's claim of anticompetitive harm.  Recognizing as much, the government moved to exclude evidence of the Arbitration/No-Blackout Commitment from trial the day after Professor Shapiro was deposed.

## ARGUMENT

The government's motion is baseless.  It is indisputable that legally binding commitments that affect the commercial realities of a post-merger market are relevant to whether a merger will "substantially lessen" competition.  In fact, numerous cases recognize that it is not only proper but necessary to consider such commitments.  The Arbitration/No-Blackout Commitment is also relevant to the government's claims that defendants merged so they could threaten blackouts and make rivals pay more for Turner content:  parties with such intentions do not execute binding agreements that bar them from engaging in that conduct.

Despite the Commitment's obvious relevance, the government seeks to exclude it based on an artificial construct of its own creation—*i.e.*, that legally binding commitments are

irrelevant as a matter of law in reviewing a merger unless they are embodied within the four corners of the merger agreement.  Mot. 6.  That theory is flatly contradicted by the government's own cases.  Nor are there valid grounds for restricting the purposes for which evidence of the Commitment can be introduced in this bench trial.  The government's motion should be denied.

## I.  The Government Has Offered No Valid Basis For Excluding The Arbitration/No-Blackout Commitment, Which Is Directly Relevant To The Issue Of Liability.

The Arbitration/No-Blackout Commitment is relevant—and therefore admissible—because, in cases brought under Section 7 of the Clayton Act, courts must analyze "the particular market—its structure, history and *probable future*." *United States v. General Dynamics Corp.*, 415 U.S. 486, 498 (1974) (emphasis added).  Accordingly, any evidence that bears upon post-merger competition in the relevant market is relevant and "must be considered." *Proctor & Gamble Co. v. FTC*, 358 F.2d 74, 83 (6th Cir. 1966), *rev'd and remanded on other grounds*, 386 U.S. 568 (1967).  Applying that principle, courts analyzing merger challenges routinely—and properly—look beyond the four corners of merger agreements and consider contracts and other commitments that will materially affect competition in the market after the merger.[4]

One especially instructive ruling is cited by the government itself.  Mot. 6.  In *United States v. Franklin Electric Co.*, No. 3:00-cv-00334-bbc (W.D. Wis. July 19, 2000) (Exhibit 6), the government sought to preclude the defendants from offering evidence of their planned post-merger licensing of technology on the ground that the licensing did not address "whether the

---

[4] *See, e.g.*, *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1485 (7th Cir. 1991) (utility's long-term take-or-pay contracts relevant factor in rejecting a Sherman Act claim); *FTC v. Atlantic Richfield Co.*, 549 F.2d 289, 299 (4th Cir. 1977) (FTC claim rendered "moot" by a post-merger agreement to divest certain assets); *United States v. Aetna Inc.*, 240 F. Supp. 1, 60 (D.D.C. 2017) ("[E]vidence about the likelihood of the divestiture goes to the weight of the evidence regarding the divestiture's effects."); *United States v. Atlantic Richfield Co.*, 297 F. Supp. 3d 1061, 1069 (S.D.N.Y. 1969) (finding relevant post-merger agreement to sell certain assets to rival), *aff'd mem. sub nom. Bartlett v. United States*, 401 U.S. 986 (1971).

proposed merger will violate" the Clayton Act.  Slip op. at 2.  The court denied the motion

because the licensing was "relevant to the determination whether, considered as a whole,

defendants' transaction will lessen future competition substantially."  *Id.* at 2-3.[5]

Here, both parties' experts agree that the Arbitration/No-Blackout Commitment will have

real-world impacts on post-merger competition, yet the government seeks to prevent the Court

from considering the Commitment because it does not formally "amend[]" the merger agreement

itself.  Mot. 6.  No case cited by the government supports such a myopic approach to assessing

post-merger competition.

In fact, the decision in *FTC v. Arch Coal, Inc.*, No. 1:04-cv-00534-JDB (D.D.C. July 7,

2004) (Exhibit 7), affirmatively refutes the government's position.  The *Arch Coal* court held

that an agreement to sell certain assets of the merging parties was relevant *even though it was not

part of the merger agreement*, because the court's task is "to review the *entire* transaction in

question" and the court was "unwilling simply to ignore the fact of the divestiture."  Slip op. at 4,

7.  The court further emphasized that the contract was a good faith response to alleged concerns

about the merger's potential effect on competition.  *Id.* at 5.  The same principles apply here:  the

Arbitration/No-Blackout Commitment is not formally a provision in the merger agreement, but it

constitutes an irrevocable contractual commitment that will have a direct impact on post-merger

bargaining, as defendants' witnesses will establish and the government's economic experts

acknowledge.  *Arch Coal* accordingly supports consideration of the Commitment.

---

[5] The government observes that in *Franklin*, the court eventually ruled that the
agreements did not eliminate the risk of competitive harm.  Mot. 6 n.2.  In other words, the
*Franklin* court made a merits determination *after reviewing the relevant evidence*—exactly what
the government seeks to prevent here.

The government's other two cases—*FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34 (D.D.C. 2002), and *United States v. Dairy Farmers of America,, Inc.*, 426 F.3d 850 (6th Cir. 2005)—say nothing to the contrary.  In *Libbey*, the court criticized the FTC for predicating its request for an injunction on the terms of an original merger agreement rather than an amended agreement.  211 F. Supp. 2d at 46.  By contrast, in *Dairy Farmers*, the court considered the government's challenge to both the original merger agreement and a revision to the agreement.  426 F.3d at 861-62.  Neither case even suggests, let alone holds, that binding legal commitments outside a merger agreement are legally irrelevant to an assessment of the merger's competitive impacts.

Lacking any authority for its request, the government contends it would be bad "policy" to permit "defendants to avoid liability by unilaterally 'promising'" to take steps to address the government's concerns about their merger.  Mot. 7.  This is exactly backwards.  Nearly 50 years ago, the court in *Atlantic Richfield* rejected this same contention, noting—in words equally applicable today—that "[n]o cases are cited to support this position" and there is "no reason why merging companies cannot eliminate" the possible anticompetitive effects of a merger through ancillary commitments.  297 F. Supp. at 1069.  Courts sometimes refuse to consider such commitments if they can be altered post-merger or are made too late in the litigation,[6] but neither point is true here.  The Arbitration/No-Blackout Commitment is irrevocable and thus cannot be altered post-merger.  And the government has had ample opportunity to evaluate the Commitment:  it was made before defendants filed their Answer, it is based on proposals discussed with—indeed *made by*—the government during months of pre-lawsuit discussions,

---

[6] *See Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986) (concern about potential for post-merger changes); Pre-Hr'g Conf. Tr. 29, 35, *FTC v. Ardagh Group, S.A.*, No. 13-1021 (D.D.C. Sept. 24, 2013) (declining to consider divestiture proposed three weeks before trial), https://www.ftc.gov/sites/default/files/documents/cases/130924ardaghtranscript.pdf.

and the government and its experts have explored the Commitment extensively in discovery.  *See*

Plaintiff's Pretrial Br. 61-67 (offering lengthy critique).

The government now complains that the Commitment would "obfuscate the real effects

of the[] merger," Mot. 7, but its experts have conceded that the Commitment will alter

negotiations in a meaningful—and, for distributors, beneficial—way.  *See supra* p. 5.  The

government's lawyers may disagree with them, but that internecine dispute only underscores the

need to consider the effects of the Commitment on post-merger competition *at trial*, rather than

ruling any consideration of it categorically out-of-bounds before trial even begins.

## II. There Is No Basis For Restricting The Purpose For Which The Arbitration/No-Blackout Commitment Can Be Introduced.

The government's effort to preclude any consideration of the Arbitration/No-Blackout

Commitment is all the more remarkable in light of its concession that the Commitment *is*

relevant in its view to remedial issues.  The government is thus forced to seek, in the alternative,

an order limiting the purposes for which the Commitment can be introduced and discussed at

trial.  This makes no sense in a bench trial where the Court has not bifurcated the issues of

liability and remedy.

In bench trials, evidence is routinely admitted without concern that the presiding Judge

will fail to understand whether, and to what extent, it is relevant.[7]  There is thus no reason for

this Court to enter an order instructing itself to consider evidence for one purpose but not

another.  Nor would it be efficient to prohibit witnesses already on the stand from discussing the

---

[7] *See, e.g.*, *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994) (risk that verdict will be affected by admission of irrelevant evidence is far less in a bench trial); *United States v. H & R Block, Inc.,* 831 F.Supp.2d 27, 30 (D.D.C. 2011) (court's "gatekeeper role is 'significantly diminished' in bench trials"); *Harris v. Rivera*, 454 U.S. 339, 346 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions.").

Arbitration/No-Blackout Commitment's effects on competition, only to call them back later to testify about the Commitment as a remedy.

The government nevertheless urges an order restricting evidentiary use of the Commitment because it is a "moving target" that could "confuse the issues at trial." Mot. 3-4. The government is wrong. The Arbitration/No-Blackout Commitment is not a moving target at all—it is an irrevocable offer with terms fixed in writing. Defendants have never suggested any deviation from those written terms. To suggest otherwise, the government cites a single deposition question in which one third-party executive was asked whether he would be satisfied if the Commitment were amended in one specific way. *See* Mot. Exhibit C. Nowhere in that deposition, however, did counsel state that the Commitment would be changed to include that amendment, nor have defendants ever proposed that amendment or any other. There is thus no basis for the government's suggestion that the Court might become confused about what the Arbitration/No-Blackout Commitment is. It is—and will remain—exactly what is attached to this pleading: an irrevocable contractual commitment with terms written in black-and-white.

Finally, introduction of those written, irrevocable terms fully comports with the Tunney Act. Mot. 7. The Tunney Act does not regulate the way private parties structure their own business relationships. It provides a process for public comment on, and judicial review of, *consent decrees entered by the Department of Justice* in antitrust cases. *See* 15 U.S.C. § 16. The Arbitration/No-Blackout Commitment is not a consent decree remedy. It is simply a private, commercial obligation—one that will indisputably alter the incentives and outcomes of negotiations between the merged firm and the MVPDs that want to carry the Turner networks.[8]

---

[8] Because the Commitment alters underlying incentives post-merger, it is properly considered a *structural* response to the government's alleged concerns about anticompetitive effects, rather than an effort to constrain specific anticompetitive *behavior*.

The Tunney Act in no way precludes the Court from considering how the Commitment's effects on bargaining will affect competition in the post-merger marketplace.

## CONCLUSION

In a crowning irony, the government complains that the Arbitration/No-Blackout Commitment was "devised and implemented without any review or even notice to this Court." Mot. 7.  Yet it is the government that—after ample notice of the Commitment and full discovery into its details—now seeks to *prevent* the Court from reviewing the Commitment and its effects on post-merger competition.  That effort should be rejected.  The Arbitration/No-Blackout Commitment is indisputably relevant to the liability issues in this case, and the government has cited no authority or sound policy reason for excluding the Commitment from trial or limiting the purposes for which it can be discussed.  For the foregoing reasons, the United States' motion *in limine* should be denied.

Date: March 13, 2018

Respectfully submitted,

By: /s/ Daniel M. Petrocelli

Daniel M. Petrocelli (*pro hac vice*)
dpetrocelli@omm.com
M. Randall Oppenheimer (*pro hac vice*)
roppenheimer@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone:  (310) 553-6700
Facsimile:  (310) 246-6779

Katrina M. Robson (D.C. Bar No. 989341)
krobson@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414

*Counsel for AT&T Inc., DIRECTV Group
Holdings, LLC, and Time Warner Inc.*

Peter T. Barbur (*pro hac vice*)
pbarbur@cravath.com
Kevin J. Orsini (*pro hac vice*)
korsini@cravath.com
Margaret Segall D'Amico (*pro hac vice*)
mdamico@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 8th Avenue
New York, NY 10019
Telephone:  (212) 474-1140
Facsimile:  (212) 474-3700

*Counsel for Time Warner Inc.*

Robert C. Walters (*pro hac vice*)
rwalters@gibsondunn.com
Michael L. Raiff (*pro hac vice*)
mraiff@gibsondunn.com

**GIBSON DUNN & CRUTCHER**
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
Telephone:  (214) 698-3114
Facsimile:  (214) 571-2932

*Counsel for AT&T Inc. and DIRECTV
Group Holdings, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 13, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

By: /s/ *Daniel M. Petrocelli*

Daniel M. Petrocelli (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone:  (310) 553-6700
Facsimile:  (310) 246-6779
dpetrocelli@omm.com