# EXHIBIT 1

# ARBITRATION AGREEMENT

1. At the request of any Video Distributor, Turner shall provide, for distribution to consumers, the Turner Networks that it provided, as of November 20, 2017, to a Video Distributor with more than one million subscribers. Turner shall negotiate in good faith and with reasonable diligence with any requesting Video Distributor. If negotiation fails to produce a mutually acceptable set of terms and conditions for a Carriage Agreement, the Video Distributor may submit the dispute to commercial arbitration in accordance with the Arbitration Procedures set forth herein.

2. Upon receiving timely notice of a Video Distributor's intent to arbitrate, Turner shall continue to provide the Turner Networks pursuant to the terms of any existing agreement until the arbitration is completed. If the arbitrator's decision changes the financial terms on which Turner must provide the Turner Networks to the Video Distributor, Turner or the Video Distributor, as the case may be, shall compensate the other based on application of the new financial terms for the period dating from expiration of the existing agreement (see Arbitration Procedures Section B).

3. Arbitration pursuant to this Agreement shall be conducted in accordance with the AAA's Commercial Arbitration Rules and Expedited Procedures, except where inconsistent with specific procedures prescribed below (see Arbitration Procedures Section C). As described below, the arbitrator shall select the Final Offer of either the Video Distributor or Turner and may not alter, or request or demand alteration of, any terms of those Final Offers. The decision of the arbitrator shall be binding on the parties and Turner shall abide by the arbitrator's decision, subject to any right of appeal pursuant to Federal Arbitration Act, 9 U.S.C. § 1 et seq. (see Arbitration Procedures Section C.8).

4. For purposes of this Agreement:

    4.1 In any agreement with a Video Distributor, Turner may withhold licensing Turner Networks to a Video Distributor until at least eight of the top 35 Non-Affiliated Nielsen-rated Video Networks (as measured in prime time, live + 7 over the prior calendar year) have agreed to provide such Video Networks through a linear feed to the Video Distributor.

4.2   Turner may condition its provision of Turner Networks to a Video Distributor on the Video Distributor's (a) agreement not to distribute the Video Programming to consumers through a website or other means that associate the Video Programming with content that is patently offensive or unlawful or that promotes or communicates the availability or accessibility of pornography, gambling, or unlawful activities; (b) objectively reasonable and customary demonstration of its ability to meet its financial obligations; (c) demonstration of its ability to satisfy objectively reasonable and customary quality and technical requirements for the display and secure protection of Turner's Video Programming; or (d) agreement to limit the distribution of Turner's Video Programming to the territory of the United States.

4.3   Turner is not prohibited from ceasing to license a Video Network so long as the network is no longer licensed, distributed or otherwise provided to any Video Distributor.

5.   Nothing in this Agreement prohibits Turner from refusing to provide to any Video Distributor rights to any Video Programming: (1) for which Turner does not possess copyright and/or any other applicable rights; (2) not subject to Turner's management or control or over which Turner does not possess the power or authority to negotiate content licenses; or (3) the provision of which would require Turner to breach any contract in effect as of November 20, 2017.

6.   This Agreement shall apply from and after the closing of the Merger to renewals of existing affiliate or other agreements providing rights to distribute the Turner Networks or to agreements for the provision of the Turner Networks to a Video Distributor not currently distributing such Turner Networks. This Agreement shall expire seven years after closing of the Merger, unless any or all of the Turner Networks shall no longer be owned by the same company that owns DirecTV, in which case any such network not commonly-owned with DirecTV shall no longer be bound by this Agreement.

7.   Provisions in the existing Turner Networks Carriage Agreements governing notice, waiver, and choice of law are incorporated herein by reference.

# ARBITRATION PROCEDURES

### A. Initiation of Arbitration

1. Up to 30 calendar days before the expiration of a Carriage Agreement, or at least 90 calendar days after a first-time written request for Turner Networks, a Claimant may notify Turner in writing that it intends to request arbitration to determine the terms and conditions of a new Carriage Agreement. The notification must describe with specificity the Turner Networks that Claimant is requesting. Within 10 calendar days of such notification, Turner and the Claimant must notify any Person who is party to a Carriage Agreement subject to discovery under Section C.4 and entitled to notice prior to the intended disclosure of that Carriage Agreement pursuant to compulsory process and furnish them with a copy of the confidentiality agreement pursuant to Section A.6 herein. Nothing in the foregoing shall prevent subsequent notifications, disclosures, or discovery.

2. A Claimant may demand a standalone offer or offers for (i) a bundle of all Turner Networks or (ii) any bundles of Turner Networks that Turner has licensed to AT&T, the Claimant, or another Video Distributor for distribution to consumers on or after October 22, 2014. For the purposes of subpart (i) of this paragraph, bundles of Turner Networks shall include all Turner Networks licensed to a Video Distributor, whether through a single Carriage Agreement or multiple Carriage Agreements. A Claimant may demand in its initial notice of intent to arbitrate, and Turner must provide within 10 calendar days, a list of bundles available under subpart (ii) of this paragraph.

3. Prior to submitting a matter to arbitration, a Claimant may elect to enter mediation with Turner, who must participate in good faith and with reasonable diligence, to resolve the dispute or narrow the issues to be arbitrated pursuant to this Agreement. This mediation is to be administered by the AAA under its Commercial Mediation Procedures except where otherwise specified. At any time after the conclusion of the mediation, the Claimant may submit its dispute with Turner to commercial arbitration.

4. The Claimant's formal demand for arbitration, which shall include the Claimant's Final Offer, shall be filed with the AAA no earlier than the 10th calendar day after the filing of the Claimant's intent to arbitrate and no later than the end of the 15th calendar day following such filing, unless the Claimant elects to enter mediation pursuant to the preceding paragraph, in which case the clock shall toll from the date on which the Claimant notifies Turner of its intent to enter mediation and the conclusion of mediation.

5. Turner shall file a single Final Offer with the AAA within 10 calendar days of being notified by the AAA that a formal demand for arbitration has been filed by the Claimant.

6. The Final Offers shall be in the form of Carriage Agreement(s) for the Turner Networks requested by the Claimant, in accordance with Section A.2 of the Arbitration Procedures and shall be for a term of three years unless the parties agree to a different term. Each party shall submit with their Final Offer a mutually agreed upon confidentiality agreement, which shall include, but not be limited to, the following: (i) a commitment to maintain the confidentiality of any mediation or arbitration, all information and materials exchanged or submitted during the mediation and arbitration processes, and any decision of a mediator or arbitrator; (ii) a limitation on disclosure of highly confidential and/or competitively sensitive information to outside counsel and/or consultants only; and (iii) an agreement to destroy or return all information and materials exchanged or submitted during the mediation and arbitration processes and any material derived therefrom.

7. Promptly upon receiving Turner's Final Offer, the AAA shall notify all parties to the arbitration that both Final Offers have been received. At this time, the Claimant and Turner shall each provide a copy of their Final Offer to the other party.

8. Following the exchange of the Final Offers and prior to the initiation of an arbitration hearing, the parties may agree to enter mediation to resolve the dispute or narrow the issues in contention. If both parties agree, they may submit revised Final Offers following such mediation.

9. At any time after the commencement of arbitration, the Claimant and Turner may agree to suspend the arbitration to attempt to resolve their dispute through negotiation. The Claimant and Turner shall effectuate such suspension through a joint writing filed with the AAA. Either the Claimant or Turner may terminate the suspension at any time by filing with the AAA a writing calling for the arbitration to resume.

10. Arbitrations under this Agreement shall begin within 45 calendar days of the AAA's receipt of Turner's Final Offer. The arbitration hearing shall last no longer than 10 calendar days, after which the arbitrator shall have 10 calendar days to inform the Claimant and Turner in a written decision setting forth the reasons for selecting a Final Offer.

### B. Standstill & True-Up

1. Upon receiving timely notice of the Claimant's intent to arbitrate, Turner will allow carriage of the Turner Networks, and Claimant will continue carriage on the same terms or conditions that were in effect prior to the contract's expiration as long as the Claimant continues to meet the obligations set forth in this Agreement. In addition, Turner shall not terminate or interfere with the Claimant's customers' online access to otherwise available Video Programming in connection with a dispute, regardless of whether the Video Programming is carried pursuant to an agreement.

2. Carriage of the disputed Turner Networks during the period of arbitration is not required in the case of first-time requests, provided that the Claimant shall have the option of carrying the disputed Turner

Networks on the terms of Turner's Final Offer while arbitration is pending, subject to a true-up pursuant to Section B.3.

3. To the extent practicable, the terms of the Final Offer chosen by the arbitrator, including payment terms, if any, shall become retroactive to the expiration date of the previous Carriage Agreement, if any, and Turner or Claimant, as the case may be, shall compensate the other for any difference based on application of the new terms for the period dating from expiration of the prior agreement, plus appropriate interest, as determined by the arbitrator.

**C. Expedited Arbitration Rules**

1. The arbitration shall be decided by a single arbitrator under the AAA Commercial Arbitration Rules and Expedited Procedures, excluding the rules relating to large, complex cases and any rules inconsistent with those set forth in this Agreement.

2. The AAA shall assemble a list of at least five potential arbitrators, to be furnished to the Claimant and Turner as soon as practicable after commencement of the arbitration. Each of the arbitrators on the list shall have demonstrable experience practicing in the video programming and distribution industry. Within 10 calendar days after receipt of this list, the Claimant and Turner each may submit to the AAA the names of up to 30 percent of the persons on the list to be excluded from consideration, and shall rank the remaining arbitrators in their respective orders of preference. The AAA will appoint as arbitrator the candidate with the highest ranking who is not excluded by the Claimant or Turner within 10 calendar days of receiving the list of exclusions from the parties.

3. The parties to the arbitration may agree to modify any of the time limits set forth herein and any of the procedural rules of the arbitration.

4. The parties to the arbitration shall exchange written discovery requests within 10 calendar days of receiving the respective Final Offers, and shall respond within 14 calendar days following receipt of such discovery request. Except for good cause shown, discovery shall be limited to:

    a. Carriage Agreements in effect on or after October 22, 2014, (i) between the Claimant and any Top Video Programmer; (ii) between Turner and any MVPD with more than one million subscribers or any OVD; and (iii) in the case of a Claimant with fewer than one million subscribers, between Turner and up to three additional Video Distributors identified by the Claimant;

    b. Data or documents sufficient to show, for each Carriage Agreement subject to discovery and for each year it was or has been in effect and one year prior to its effective date:

        i. The number of subscribers to the Video Distributor;

        ii. Total payments and revenues relating to the Carriage Agreement, including advertising revenues;

        iii. Offers exchanged between the Claimant and Turner to enter into or renew Carriage Agreements for the Turner Networks at issue in the arbitration;

        iv. The written decision of an arbitrator pursuant to Section A.10 of the Arbitration Procedures and any Carriage Agreement entered into with a prior Claimant as a result of such written decision in a past arbitration for the Turner Networks pursuant to this Agreement; and

        v. Any documents or data in the possession of either party on which that party intends to rely in the arbitration.

Provided, however, there shall be no discovery or use in the arbitration of documents or information not in the possession, custody, or control of the Claimant or Turner, or of the costs or margins associated with the Turner Networks, provided that Turner raises no arguments related to such costs or margins.

5. Notwithstanding the limitations on discovery included herein, Turner and the Claimant are each entitled to submit any additional relevant evidence to the arbitrator, provided that such evidence also be timely provided to the other party. In reaching his or her decision, the arbitrator may consider all documents and data entered into the record, testimony regarding the documents and the parties' Final Offers, briefs submitted and arguments made by counsel, and summary exhibits illustrating the terms of Turner's Carriage Agreements or the Claimant's agreements with other Video Programmers.

6. There shall be a presumption that, for each Carriage Agreement used as evidence of fair market value, the number of subscribers of the Video Distributor that is party to the Carriage Agreement, total payments and revenues relating to the Carriage Agreement, including advertising revenues, promotional and marketing commitments, ratings and viewership (both currently and at the time the contract was negotiated), the date of the Carriage Agreement, and similar information relating to the value of the Carriage Agreement terms and conditions shall be relevant evidence in the determination of fair market value.

7. The arbitrator shall choose the Final Offer of the party which most closely approximates the fair market value of the Turner Networks at issue. The arbitrator may not alter, or request or demand alteration of any terms of either Final Offer.

8. Turner or the Claimant may appeal a decision of the arbitrator to the extent permitted by the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

9. Arbitration under this Agreement is not available if a dispute between a Claimant and Turner concerning the same bundle of Turner Networks is the subject of any Federal Communications Commission dispute resolution process. Nor may Federal Communications Commission dispute resolution processes be utilized during or after arbitration regarding the same bundle of Turner Networks under this Agreement. Turner shall not (a) commence arbitration of any dispute

under the arbitration procedures contained in this Agreement; or (b) upon receipt of the notice from the Claimant that it intends to commence arbitration under this Agreement, commence any Federal Communications Commission dispute resolution process to resolve the same dispute with the Claimant.

**D. Definitions**

1. "AAA" means the American Arbitration Association.

2. "Affiliated" or "Affiliates" means any Person that is directly or indirectly controlling, controlled by, or under common control with Turner.

3. "Carriage Agreement" means any agreement for a Video Distributor to carry or distribute, and for a Video Programmer to license, Video Networks in the United States.

4. "Claimant" means a Video Distributor seeking arbitration under this Agreement.

5. "Cloud DVR rights" means any rights involved in services enabling consumers to record linear Video Networks to a remote storage location, accessible over the Internet, including any terms and conditions regarding fast-forwarding or ad-skipping, or to view linear Video Networks on a time-shifted basis.

6. "Final Offer" means a proposed Carriage Agreement submitted to the Arbitrator pursuant to this Agreement, identifying the Turner Networks Turner is to provide to the Claimant and containing the proposed price, terms, and conditions on which Turner will provide those Turner Networks. A Final Offer may not include an arbitration provision that extends beyond or expires after the seventh anniversary of the closing of the Merger.

7. "MVPD" means a multichannel video programming distributor in the United States as that term is defined as of November 20, 2017 in 47 C.F.R. § 76.1200(b), in its capacity as an MVPD.

8. "Non-Affiliated" means any Person that is not directly or indirectly controlling, controlled by, or under common control with Turner.

9. "OVD" means any Person that distributes Video Programming in the United States by means of the Internet or another IP-based transmission path (unless the service is offered only as a component of an MVPD subscription), in its capacity as an OVD.

10. "Person" means any natural person, corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office, or other business or legal entity, whether private or governmental.

11. "Time Warner" means Time Warner Inc., a Delaware corporation with its principal place of business in New York, New York, its successors and assigns and its managed or controlled subsidiaries in the United States, including Turner, and their directors, officers, managers, agents, and employees.

12. "Top Video Programmer" means Time Warner Inc., Walt Disney Co., NBCUniversal, Inc., CBS Corporation, 21st Century Fox, Scripps Networks Interactive, Discovery Communications, AMC Networks, A&E Networks, Viacom Media Networks, and any other Video Programmer affiliated with any top ten Nielsen-rated Video Networks during the term of this Agreement, their successors and assigns and managed or controlled subsidiaries.

13. "Turner" means Turner Broadcasting System, Inc., its successors and assigns and its managed or controlled subsidiaries in the United States.

14. "Turner Networks" means Video Networks provided by Turner for distribution to consumers to Video Distributors in the United States as of November 20, 2017 (i.e., the Video Networks currently known as TNT, TBS, Turner Classic Movies (TCM), truTV, CNN, CNN International, CNN en Español, Cartoon Network/Adult Swim, Boomerang, and Headline News), including any video-on-demand, TV Everywhere, and Cloud DVR Rights that Turner makes available to a Video Distributor in connection with the license for the linear feed of a Turner Network, as well as any Affiliated Video Network that in the future consists substantially of the same Video Programming as a Turner Network as of November 20, 2017.

15. "Video Distributor" means any OVD or MVPD doing business in the United States.

16. "Video Network" means Video Programming provided as a linear feed by a Video Programmer for distribution through Video Distributors or local broadcast stations in the United States and any rights, privileges, or benefits provided along with its linear feed, including but not limited to video-on-demand, TV Everywhere, and Cloud DVR.

17. "Video Programmer" means any Person that provides a Video Network for distribution through Video Distributors or local broadcast stations in the United States, including but not limited to Time Warner Inc., Walt Disney Co., NBCUniversal, Inc., CBS Corporation, 21st Century Fox, Scripps Networks Interactive, Discovery Communications, AMC Networks, A&E Networks, Viacom Media Networks, and their successors and assigns and managed or controlled subsidiaries.

18. "Video Programming" means programming provided by, or generally considered comparable to programming provided by, a Video Programmer in the United States regardless of the medium or method used for distribution, and includes but is not limited to programming prescheduled by the programming provider (also known as scheduled programming or a linear feed); programming offered to viewers on an on-demand basis (also known as video on demand ); pay-per-view or transactional video on demand; programming that includes multiple video sources (also known as feeds, including camera angles); programming that includes video in different qualities or formats (including high-definition and 3D).