**\*\* PUBLIC VERSION – REDACTED \*\***

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,         ) <br> ) <br> *Plaintiff*,              ) <br> ) <br> v.                    ) <br> ) <br> AT&T INC., DIRECTV GROUP HOLDINGS, ) <br> LLC, and TIME WARNER INC.,     ) <br> ) <br> *Defendants*.        ) | Case No. 1:17-cv-02511-RJL |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

** PUBLIC VERSION – REDACTED **

**Table of Contents**

Introduction..................................................................................................... 1

Proposed Findings of Fact ............................................................................. 1

I.     The Ongoing Transformation of the Video Marketplace and Its Effects on Time
       Warner and AT&T .................................................................................... 2

       A.     Time Warner's Business and Its Competitive Challenges........................ 2

       B.     AT&T's Business and Its Competitive Challenges ................................. 14

       C.     The Transaction Will Allow the Combined Company To Meet these
              Challenges and Benefit Consumers......................................................... 22

II.    The Government Did Not Meet Its Burden To Show That the Merged Company Is
       Likely to Substantially Lessen Competition by Raising the Prices of the Turner
       Networks ................................................................................................... 27

       A.     The Testimony Refuted the Government's Bargaining-Leverage Theory ............. 28

       B.     The Government's Price-Increase Model Provides No Reliable Basis for
              Predicting Likely Consumer Harm ........................................................ 36

              i.     The Government's Price-Increase Model Ignores Real-World Evidence........ 39

              ii.    The Model Ignores Existing Contracts That Undermine The Predictions of
                     Harm.................................................................................................. 47

              iii.   Correcting the Data Inputs Both Eliminates Any Predicted Price Increase
                     and Shows the Unreliability of the Government's Modeling ......................... 48

              iv.    The Arbitration/No-Blackout Commitment and the FCC's "Program
                     Access Rules" Defeat the Government's Price-Increase Theory.................... 88

              v.     The Government's Model Does Not Adequately Account for Effects of the
                     Merger That Will Drive Prices Down......................................... 105

III.   The Government Did Not Meet Its Burden to Prove the Merged Company Is Likely
       to Coordinate with Comcast to Harm Competition from Virtual MVPDs ................. 122

IV.    The Government's Theory That the Combined Company Will Limit HBO's Use As
       a "Promotional Tool" Is Illogical and Contrary to the Evidence ................................ 131

V.     Other Concerns and Complaints Raised by Third-Party Witnesses Called by the
       Government Are Inconsistent with the Evidence and/or Not Merger-Specific............. 141

Proposed Conclusions of Law ................................................................................... 144

I.      The Government Did Not Show That the Merger Is Likely To Result in Substantially
        Lessened Competition Through Increased Prices for Turner Programming .................. 145

        A.      The Government Failed To Show That This Merger Will Likely Result in a
                Turner Price Increase ........................................................................... 147

                i.      Real-World Historical Evidence Contradicts the Government's Price
                        Increase Theory .......................................................................... 147

                ii.     The Government's Bargaining Model Failed To Reflect Economic Reality. 149

        B.      Even Taken at Face Value, the Government's Projected Price Effects Do Not
                State a Claim Under the Clayton Act .................................................... 159

II.     The Government Has Failed To Prove That the Merged Entity Will Likely Coordinate
        With Comcast/NBCU To Harm Virtual MVPDs............................................. 163

        A.      AT&T/Time Warner and Comcast/NBCUniversal Lack the Incentive and
                Ability To Coordinate To Deprive Virtual MVPDs of Their Cable Networks..... 164

        B.      The Government's "Skinny Bundle" Evidence Is Not Merger-Specific and Is
                Not Persuasive...................................................................................... 169

III.    The Government Has Failed To Prove That the Merged Firm Will Use HBO To
        Harm Competition ....................................................................................... 171

## INTRODUCTION

For multiple independent reasons, the government failed to carry its burden of showing that the likely effect of this merger will be "substantially to lessen competition."  15 U.S.C. § 18. The evidence establishes that the transaction is not likely to harm competition at all, much less substantially.  Although that fact itself resolves this case, the evidence further demonstrates that the merger will generate significant benefits for consumers.  The merger should thus be permitted to proceed, and judgment should be entered for defendants.

## PROPOSED FINDINGS OF FACT

1.      On October 22, 2016, AT&T Inc. ("AT&T") announced plans to acquire Time Warner Inc. ("Time Warner").

2.      The Department of Justice ("DOJ") conducted an investigation of the merger that went on for more than a year.

3.      On November 20, 2017, the United States filed a complaint seeking to enjoin the merger under Section 7 of the Clayton Act.  *See* Compl. ¶ 48(b), *United States v. AT&T Inc., et al.*, No. 1:17-cv-02511 (RJL) (D.D.C. filed Nov. 20, 2017).  The case was tried and included over 20 days of testimony, concluding on April 30, 2018.

4.      Plaintiff presented testimony from 23 witnesses.  Witnesses included individuals who work for defendants' competitors, employees and executives of defendants, and expert witnesses.

5.      Defendants presented testimony from eight witnesses, including executives that run AT&T and Time Warner as well as several expert witnesses.

I.     **The Ongoing Transformation of the Video Marketplace and Its Effects on Time Warner and AT&T**

6.     This transaction takes place against the backdrop of the ongoing revolution in video programming and distribution.  Multiple witnesses for both the government and the defendants testified extensively about the highly competitive video marketplace and how the ongoing transformations in the industry are affecting Time Warner, AT&T, and other traditional video programmers and distributors.

A.     **Time Warner's Business and Its Competitive Challenges**

7.     Time Warner is a content creator and aggregator organized into three business units.  **Turner** operates, among other things, 10 linear cable networks that televise scheduled video programming around the clock:  TNT, TBS, CNN, CNN Español, CNN International, Cartoon Network/Adult Swim, TruTV, TCM, Boomerang, and HLN, *see* PX148-014; **HBO** is a premium subscription-based video service that offers movies and television shows, including a significant amount of original content; and **Warner Bros.** operates a studio that creates movies, television programs, and other video content that are licensed both to Time Warner's other businesses and to third parties.  *See generally* PX459-018 (describing Turner), -017 and -022 (describing HBO), and -012, -017, -024 (describing Warner Bros.).

8.     Like other traditional video programmers, Time Warner historically has distributed its content to consumers through unaffiliated third parties.  In particular, both the linear Turner networks and HBO have been distributed through Multi-Channel Video Programming Distributors ("MVPDs"), such as cable companies and satellite companies.  *See* Tr. 485:1-18 (Martin (Turner)).  In the last three years, the linear Turner networks and HBO have also been distributed through "virtual MVPDs," new entrants that distribute packages of television networks over the Internet (also referred to as "over-the-top" services).  *See* Tr. 485:19-486:6

(Martin (Turner)); Tr. 1456:03-05 (Sutton (HBO)).  Virtual MVPDs include AT&T's DIRECTV

NOW (discussed further below), DISH's Sling, Sony's PlayStation Vue, Google's YouTube TV,

Hulu Live, FuboTV, and Philo.  *See* Tr. 411:15-18, 412:3 (Schlichting (DISH)).  All of these

have entered the marketplace since February 2015 and offer service nationwide.  *See* Tr. 235:18-

22 (Schlichting (DISH)).

9.      As Time Warner CEO Jeff Bewkes testified, there are two major, and related,

"tectonic" changes that are having a significant impact on Time Warner's business.  Tr. 3079:18-

3080:2.  These changes affect both of the primary sources of revenue for Time Warner's

television subsidiaries:  fees from distributors that offer Turner and HBO channels, and, in the

case of Turner, advertising revenue.  *See* Tr. 604:21-23 (Martin (Turner)); PX456-065, -067

(94% of Turner's 2017 revenue came from subscriptions and advertising; 87% of HBO's 2017

revenue came from subscriptions).

10.     The first of these transformational changes is the entry of new vertically integrated

competitors that deliver programming directly to consumers over the Internet.  *See* Tr. 3079:18-

23 (Bewkes (Time Warner)).

11.     These new entrants include subscription video on demand ("SVOD") services such

as Netflix, Amazon Prime, and Hulu, which offer large libraries of original and acquired content

on demand, rather than on a linear (*i.e.*, pre-scheduled) basis, at a low price.  *See* Tr. 486:10-17,

487:3-12 (Martin (Turner)); Tr. 1492:20-23 (Sutton (HBO)); Tr. 145:14-19 (Fenwick (Cox)).

These competitors are investing billions of dollars in creating original programming.  Netflix

alone now spends more on content than all of Time Warner.  *See* Tr. 2456:2-17 (Carlton); Tr.

3099:12-15 (Bewkes (Time Warner)) (Netflix has a programming budget more than twice that of

HBO); *see also* Tr. 3388:8-9 (Stephenson (AT&T)) (Netflix is "investing billions of dollars in

original content creation"); Tr. 2456:7-11 (Carlton) ("So we have Netflix, . . . you have Amazon Prime. . . .  So these are firms that are coming into the industry and these firms come in and start creating content."); Tr. 1053:4-6 (Breland (Turner)) ("[I]n 2016, Netflix created 126 originals in films.  This year, they'll spend almost $8 billion and create 700."); Tr. 888:2-7 (Rigdon (Comcast)) (agreeing that "Netflix has been dramatically increasing its investments," an industry development that has "put increased pressure on programmers")); PX153-006 ("The growth in original programming has increased competition for top projects and made it more difficult for networks to surface hits."); *infra* Proposed Findings of Fact ("FOF") ¶¶ 35-36 (SVODs compete with distributors like DIRECTV as well).

12.     Importantly, unlike Time Warner, these firms are vertically integrated—they create or aggregate content and distribute it directly to consumers:  "They have the content, the programming, and they have the technological capability of delivering it straight to you."  Tr. 3081:21-23 (Bewkes (Time Warner)); *see also* Tr. 3388:10-16 (Stephenson (AT&T)) ("[T]hey create video, they aggregate it meaning they have a place where you can go out and see all of the content available from Netflix. . . .  They deliver it directly to the consumer."); Tr. 2453:7-9 (Carlton) ("[T]hese are vertically integrated entities who have gotten into the combination of distribution and content.").  Time Warner, by contrast, remains a "stuck in the middle wholesaler" that largely lacks a relationship with the consumers of its content.  Tr. 641:13-25 (Martin (Turner)); *see* Tr. 612:3-15 (Martin (Turner)).

13.     Vertical integration gives these new competitors key advantages.  Their direct relationship with the consumer gives them access to large amounts of data.  *See* Tr. 3080:19-24 (Bewkes (Time Warner)) ("[T]hey know who the consumer is.  They know what the consumer is watching.  They know—they know the contact information.  They know billing—they have

billing relation—they have all kinds of relationships with consumers, beyond just providing, in many cases, the television."). They can use that data to optimize their decisions about what programming to develop. *See* Tr. 3080:11-3081:12 (Bewkes (Time Warner)); Tr. 624:2-16, 625:17-23 (Martin (Turner)); Tr. 3388:25-3389:3 (Stephenson (AT&T)). That information can also inform decisions about when to schedule content, how to market it, and in what form to offer it. *See* Tr. 624:7-16 (Martin (Turner)). Vertically integrated firms can also provide recommendations of what other content consumers might like, which provides consumers a much better viewing experience. *See* Tr. 3080:25-3081:3, 3082:4-7 (Bewkes (Time Warner)); Tr. 3388:12-13 (Stephenson (AT&T)); Tr. 3245:17-20 (Stankey (AT&T)). Vertical integration also allows these companies to develop new products rapidly—for example, Netflix can allow users to download content and watch it on the go, while DIRECTV has been unable to obtain download rights for all of the content it carries. *See* Tr. 1688:6-18 (York (AT&T)). And they can market better to consumers who might otherwise leave for other options. *See* Tr. 3081:4-7 (Bewkes (Time Warner)). More generally, these companies are "all about engagement," which allows them not only to "sell more advertising" but also to monetize in new and different ways, such as "sell[ing] more shoes or grocery," in the case of Amazon. Tr. 3387:20-24 (Stephenson (AT&T)); *see also* Tr. 888:12-13 (Rigdon (Comcast)) ("I would say all this competition is competition for [a] consumer's time and attention.").

14.     Time Warner currently lacks similar capabilities. *See* PX456-022 (rapid industry evolution threatening "some of the Company's longest-standing business models"); PX8-049 (Time Warner 2016 Briefing Book for Board Strategy Session: "[C]onsumer data is a key strategic asset and competitive advantage for many companies such as Google, Amazon, and Netflix. Historically, however, Time Warner was at a disadvantage in collecting consumer data

because most of our businesses (other than Time Inc.) generally distributed their products and services through distributors who had the direct relationship with consumers."). Even when Time Warner started selling HBO directly to consumers through its HBO NOW product, it had to contract with a third party for the technological capability to deliver the programming. *See* Tr. 3083:7-10 (Bewkes (Time Warner)). Likewise, it does not have consumer billing systems, retail stores, or customer service people necessary for large-scale direct-to-consumer products. *See* Tr. 3083:18-23 (Bewkes (Time Warner)). And it does not have data on its customers similar to that of its vertically integrated competitors. *See* Tr. 3084:4-24 (Bewkes (Time Warner)). Indeed, it does not even "know which people are watching" its content. Tr. 3085:2-3 (Bewkes (Time Warner)); *see also* Tr. 3098:13-16 (Bewkes (Time Warner)) ("[W]e're still not getting from [HBO NOW] the data about our own subscribers . . . that an Amazon or Apple has about those subscribers. We don't know what else they're watching. We don't know who they are by name. They do.").

15. Turner has made small strides recently to improve its own ability to distribute content directly to consumers, including through the launch of several new niche video services (*e.g.*, Boomerang, FilmStruck). Tr. 3098:21-3099:1 (Bewkes (Time Warner)); Tr. 666:2-6 (Martin (Turner)). But these are "nascent businesses" with small subscriber bases. *See* Tr. 667:17-21, 682:1-8 (Martin (Turner)); Tr. 1055:22-24 (Breland (Turner)) ("Q. How many subscribers do you currently have to FilmStruck? A. We're closing in on about 100,000."); Tr. 1056:10-1057:3 (Breland (Turner)) ("Q. How many subscribers does Turner have for [Boomerang]? A. I believe it's around 150,000."). While Turner's direct-to-consumer products have "a few hundred thousand subscribers," Netflix has 125 million subscribers around the world, and Amazon has over 100 million subscribers with access to its video content. Tr.

3098:24-3099:12 (Bewkes (Time Warner)); Tr. 3389:18-25 (Stephenson (AT&T)).  Time

Warner lacks the technical infrastructure to provide direct-to-consumer products at any

meaningful scale.  *See* Tr. 3099:2-3 (Bewkes (Time Warner)) ("So if we were trying to serve

tens of millions of subscribers, our systems couldn't handle it.").

16.     Although Time Warner has attempted to obtain more data, it has had very little

success.  It has tried to negotiate for data from traditional distributors in affiliate carriage

agreements, but it has not been able to reach a deal.  *See* Tr. 3099:20-3100:22 (Bewkes (Time

Warner)).  For example, Turner attempted to negotiate with DISH for consumer-usage data from

Sling, DISH's over-the-top product.  DISH, however, would not allow Turner to combine such

data with any third-party data, as would be necessary for advertising purposes.  *See* Tr. 1119:12-

1120:4 (Breland (Turner)) ("It's like having a bicycle and you can [only] ride it inside.  It means

I can't use the data to monetize.  So I can get it, but if I can't put it with third party data then it

means the ad sales I've given them [are a] hollow shell.  There's nothing they can really use to

monetize."); *see also* Tr. 3100:22-3101:8 (Bewkes (Time Warner)) (explaining that Time

Warner had unsuccessfully attempted to obtain useful data from Comcast); Tr. 955:8-12

(**[REDACTED]**); Tr. 612:17-25 (Martin (Turner)) ("Q. . . . You said you don't know who your

viewers are . . . why don't you just ask the distributors to tell you?  A.  We do.  Q.  And what is

the response?  A.  'No.' ").

17.     Time Warner has also had only limited success getting data from virtual MVPDs.

While it has data from Hulu's and YouTube's virtual MVPDs, it "just get[s] viewing data on

those people watching [its] channels.  [It doesn't] get who they are, all their preferences [or]

what these same subscribers are watching on competing channels."  Tr. 3101:13-22 (Bewkes

(Time Warner)).

18.     As Time Warner's chief executive explained, this difficulty in negotiating for data is an example of bargaining friction. *See* Tr. 3104:18-25 (Bewkes (Time Warner)); Tr. 3185:17-24 (Bewkes (Time Warner)) ("[W]hat [Comcast] offered to us, we didn't think was what they've got really. And we didn't think they're willing to let us have what we thought would be useful. We never got a chance to go in and talk with them about what they had to see if we could make use of it.").

19.     Time Warner also considered buying technology companies that might provide more data, but it determined that their data was insufficient and that technology companies could not ensure long-term access to it in any event. *See* Tr. 3102:9-3103:6 (Bewkes (Time Warner)).

20.     The success of new, vertically integrated entrants such as Netflix and Amazon has put pressure on Time Warner's subscription revenues because the entrants are taking subscribers away from cable companies, satellite providers, and other MVPDs. *See* Tr. 3088:22-3089:1 (Bewkes (Time Warner)); PX153-003 ("Due in large part to the growth of SVOD, and Netflix in particular, subscribers and viewership of traditional TV are shrinking."). Twenty percent of American households no longer have traditional MVPD services—in industry parlance, they have "cut the cord." *See* Tr. 2505:10-20 (Carlton). That number is growing. *See* Tr. 2466:4-10 (Carlton) ("From my point of view, it's quite clear the number of cord cutters is going up over time. Young people are the ones who are cutting the cord. They're going to be growing older, and they're going to become more and more important, cord cutting is going to become more and more important as an economic influence."). Consumers increasingly are switching to these vertically integrated services because of the improved user experience. *See* Tr. 638:25-639:7 (Martin (Turner)) ("[N]ew services like YouTube TV or Netflix . . . have beautiful user [interfaces] that are available on any and all devices . . . all the time. The quality of the video is

quite high and they have recommendations.  They have abilities, they have better mouse traps

than traditional MVPDs who still have inferior user interface guides.  And it's a real impediment

to the user experience.").

21.     Many other consumers have "shaved" the cord—*i.e.*, reduced, but not eliminated,

their consumption of MVPD services by, for example, selecting a "skinny bundle" cable package

that is less expensive and contains fewer channels and then supplementing that bundle with

subscriptions to SVODs  *See* Tr. 606:2-4 (Martin (Turner)); Tr. 2949:15-18 (Holanda (RCN));

PX456-056.

22.     As a result of these trends, Time Warner projects continued declines in the number

of overall pay-TV subscribers across its long-range plan.  *See* PX0063-036 (explaining that even

including virtual MVPD subscribers, the total number of pay-TV subscribers continues to

decline); PX456-056; *see generally* Tr. 1053:4-1054:17 (Breland (Turner)) ("The disruption is

like Mount Vesuvius on top of Pompeii.  These are massive changes to the marketplace.").

23.     The viewership of Time Warner's Turner networks has declined along with these

trends.  *See* PX0153-003 to -004 ("Overall TV *viewing* has declined at a much faster rate [than

the decline in subscribers]. . . .  Large scale GE [general entertainment] networks such as TNT

and TBS have been disproportionately affected by these viewing trends.").  Turner networks

combined now account for only about 8% of pay-TV viewership, down from 10% in 2011.  *See*

Tr. 2458:5-8, 22-24 (Carlton).  When Internet-based distribution is considered, as it should be,

Turner networks accounted for only about 6% of viewership in 2017.  *See* Tr. 2458:13-15

(Carlton).

24.     Likewise, although Turner successfully executed a multiyear plan through 2017 to

increase its affiliate fees in response to rising programming costs to "catch up" to its

competitors' price increases after years of below-market increases, Tr. 643:15-645:5 (Martin

(Turner)); Tr. 1063:3-12 (Breland (Turner)); *see* DX781.0019, Turner projects its domestic

subscription revenue growth will decrease to low single digits in each year from 2018 to 2022,

*see* Tr. 646:17-647:12 (Martin (Turner)); DX781.0021. *Cf.* Tr. 928:1-2 **[REDACTED]**.

25.     The second tectonic shift is that, at the same time that these well-funded new

competitors are "bleeding away [Time Warner's] viewers," Tr. 3088:23 (Bewkes (Time

Warner)), advertising is moving to digital platforms and away from television. *See* PX456-056

(2017 Time Warner 10K: "The advantages of digital advertising . . . have resulted in advertisers

shifting more of their advertising budgets from traditional television advertising to digital

advertising."); DX746A.0002 (graph showing growth of digital advertising); Tr. 623:2-624:1

(Martin (Turner)); Tr. 3088:3-6 (Bewkes (Time Warner)) ("[A]dvertisers are moving [their] ad

budgets, which are finite, to the digital platforms at Google and Facebook.  They're moving it

away from television advertising in general."); Tr. 3746:9-15 (Athey).  Digital advertising has

"taken off like a rocket" in recent years, surpassed television advertising in 2016, and is expected

to be far bigger in the next few years.  Tr. 3092:15-3093:1 (Bewkes (Time Warner)).

26.     These simultaneous shifts have created a "double whammy" that is hurting both

Turner's advertising revenue and subscription revenues because "it means that the financial

support for all this programming . . . gets pushed over toward subscription prices."  Tr. 3088:7-

3089:11 (Bewkes (Time Warner)).

27.     Because of their ownership of and access to data, Google and Facebook have been

the primary beneficiaries of this shift from advertising on TV to advertising on digital properties.

*See* Tr. 3746:10-22 (Athey) (agreeing that more and more ad dollars having been shifting from

television to digital advertising, and that those two companies account for 60% of digital

advertising); Tr. 623:23-624:6 (Martin (Turner)). Google and Facebook are dominant in this area, *see* Tr. 3089:12-14, 20-23 (Bewkes (Time Warner)); Tr. 3747:23-3748:1 (Athey), and are growing at an extremely rapid pace*, see* Tr. 3097:2-11 (Bewkes (Time Warner)) (describing Google "almost tripling" advertising revenue in the five years from 2012 to 2017 and Facebook growing from $4 billion to $40 billion in the same period). The government's own expert agreed that consumers would benefit from additional competition to Google's advertising platform. *See* Tr. 3748:10-14 (Athey). As the Court has noted, these companies are "three, four, five times the size of AT&T. They're massive." Mar. 20, 2018 AM Hr'g Tr. 49:16-17. Notably, these two companies are also vertically integrated. *See* Tr. 3089:15-16 (Bewkes (Time Warner)); Tr. 3390:14-17 (Stephenson (AT&T)).

28.     The success of digital advertising largely reflects the fact that it enables advertisers to better target their intended audience. Television advertising today is done mostly in the same way it has been done for decades. *See* Tr. 3086:9-10 (Bewkes (Time Warner)); Tr. 3243:1-4 (Stankey (AT&T)). That means it relies on highly general demographic data, such as age range and gender, about typical audiences for a program to decide on the placement of commercials that will be seen by the entire audience. *See* Tr. 625:4-6 (Martin (Turner)); Tr. 3086:9-14 (Bewkes (Time Warner)). Turner, like other television programmers, does not have viewer-by-viewer information that allows it to offer more targeted advertising. *See* Tr. 624:24-25 (Martin (Turner)) (Turner lacks data "down to the household or an individual level"); Tr. 3392:10-11 (Stephenson (AT&T)) (programmers such as "Turner, CBS, they have massive inventories of advertising but they don't know who the customer is"). As a result, consumers end up seeing ads for things they are not interested in, and advertisers pay to show ads that the vast majority of the audience is not interested in seeing. *See* Tr. 3087:1-15 (Bewkes (Time Warner)); *see also* Tr.

685:20-23 (Martin (Turner)) ("[T]here's been a long saying in the advertising industry where the advertiser would always say, I know I'm wasting half my money, I just don't know which half.").

29.    By contrast, the capabilities of the Internet and the consumer data held by Google and Facebook allow digital advertising to be sent to consumers who are more likely to be interested in a particular product.  *See* Tr. 3087:16-21 (Bewkes (Time Warner)); Tr. 3390:9-11 (Stephenson (AT&T)).  Google and Facebook know who is viewing particular content, what their interests are, and what they are more likely to be receptive to, which allows Google and Facebook to show consumers more relevant ads—for instance, showing Chevy ads to someone looking to buy a car—which are more valuable to advertisers.  *See* Tr. 623:2-13 (Martin (Turner)); Tr. 3086:9-3087:21 (Bewkes (Time Warner)); Tr. 3243:5-10 (Stankey (AT&T)). Google and Facebook are also able to demonstrate the effectiveness of advertisements, which allows advertisers to better determine their return on investment relative to traditional television advertising.  *See* Tr. 623:14-22 (Martin (Turner)); *see generally* PX456-024 to -025 (Time Warner 10-K: "Google and Facebook, with their large user bases, high consumer engagement and ability to use their data to target consumers, track consumer behavior and measure consumer responsiveness to advertising, have captured a significant and growing portion of digital advertising expenditures.").

30.    Obstacles similar to the ones that prevent Time Warner from effectively competing with the vertically integrated firms that are eroding Time Warner's subscription revenues also prevent Time Warner from competing with Google and Facebook in advertising.  *See* Tr. 3090:1-7 (Bewkes (Time Warner)) ("But the reason we can't do it is we don't have the tech platforms; we don't have engineers; we don't have any of the information to know who is this person.

What ad would they like to see?  We can't do any of that.  It's very difficult.  We've been trying

to do it, but it's hard to do it at the speed and scale that our new competitors are doing it.").

While Turner has purchased some data from third-party data companies, this information is

generally not at a sufficiently granular level to be useful for Turner's advertising purposes.  *See*

Tr. 674:11-15, 622:21-623:1 (Martin (Turner)); Tr. 3768:19-23, 3771:17-3772:3 (Athey).  And,

although Turner has launched some limited advanced advertising products using data it has

collected or purchased, Turner's lack of meaningful data makes it difficult to scale these

products—Turner's advanced advertising represents less than five percent of Turner's

advertising revenues.  *See* Tr. 680:4-7 (Martin (Turner)).  And Turner offers no addressable

advertising, which is far more targeted to specific customers and more valuable than Turner's

advanced data-driven advertising (which sends the same ad to all viewers of a program).  *See* Tr.

3760:25-3761:21 (Athey).

  31. The move to digital advertising has put significant stress on Turner's advertising

revenue.  *See* Tr. 3088:3-15 (Bewkes (Time Warner)) ("So the problem there is that advertisers

are moving [their] ad budgets, which are finite, to the digital platforms at Google and Facebook.

They're moving it away from television advertising in general."); PX456-025 ("Turner is

engaged in a variety of efforts to make advertising on its networks more valuable to advertisers

and improve the consumer experience; however, these efforts may not be successful or may take

several years to become successful.").  Advertisers are interested in spending their limited

budgets to reach consumers in the most efficient way possible, whether through linear television

or on the Internet.  *See* Tr. 3182:23-3183:4 (Bewkes (Time Warner)) ("[T]his competition for

advertising isn't just about television.  If the advertisers have a more efficient way to give you a

commercial message while you're searching, that takes away revenue from television.  And I

think the idea the TV ads only compete with other ads in a TV program from a digital company is wrong."). In 2017, Turner's advertising revenue was down 2% relative to the prior year. *See* PX456-065.

32. That is bad not only for Time Warner, but also for consumers. The less money a programmer like Turner receives from advertisers, the more programming costs have to be borne by consumers through subscription fees. *See* Tr. 3093:6-9 (Bewkes (Time Warner)); Tr. 3089: 6-11 (Bewkes (Time Warner)) ("[I]t's actually bad for consumers, because it means that the financial support for all this programming on all these different channels gets pushed over toward subscription prices. And that's a problem, because we think consumers are up to here with subscription prices."); *cf.* Tr. 3394:15-16 (Stephenson (AT&T)) ("The better you do on advertising, the less you have to charge the consumer for the service.").

**B.     AT&T's Business and Its Competitive Challenges**

33. AT&T is a distribution company—it is in what its Chairman and CEO, Randall Stephenson calls, "the connectivity business." Tr. 3378:23-24. Beyond the "voice telephone" service for which AT&T was originally known, the company also provides wireless service, broadband service, and TV service to consumers. *See* Tr. 3379:12-15 (Stephenson (AT&T)). It is not a creator of any significant television or movie content. *See* Tr. 3213:3-15 (Stankey (AT&T)).

34. As part of its TV service, AT&T offers two distinct MVPD products. **DIRECTV** is a satellite-based MVPD service that operates by transmitting programming from satellites to rooftop dishes installed at the customers' homes. *See* PX455-011. **U-verse** is an MVPD service that operates "over the same line that [] deliver[s] your telephone service." Tr. 3384:1-2 (Stephenson (AT&T)); *see also* Tr. 3206:14-20 (Stankey (AT&T)). DIRECTV and U-verse compete with incumbent cable MVPD operators such as Comcast, Charter, Cox, and Altice, as

well as with other pay-TV providers.  *See* Tr. 3255:12, 3213:4-9, 3214:8-11 (Stankey (AT&T));

Tr. 3387:15-17 (Stephenson (AT&T)); Tr. 1608:14-1609:5 (York (AT&T)).  The incumbent

cable operator in any given local area—having begun with a state- or local-franchise-authorized

monopoly—is typically the dominant MVPD.  *See* Tr. 408:1-3 (Schlichting (DISH)).

35.    In addition to competition among traditional MVPDs, MVPDs must now compete

with over-the-top providers, including virtual MVPDs like Sling, YouTube TV, and Hulu Live,

and SVODs like Netflix and Amazon.  *See* Tr. 3387:15-17, 3450:7-14 (Stephenson (AT&T))

("DirecTV . . . lost 1.2 million subscribers in 2017.  The whole system, pay TV, cable, satellite,

lost 3 million.  Netflix . . . added 2 million U.S. subscribers this last quarter alone.  So we know

[consumers are] getting entertainment and media.  They're just not getting it from the traditional

cable and satellite services."); Tr. 3213:7-9, 3214:8-11 (Stankey (AT&T)).  Thus, consumers

who have no subscription to an MVPD, including "half of all the Millennials in the United

States," are "largely using subscription video on demand, SVOD-type services."  Tr. 3449:12-18

(Stephenson (AT&T)).

36.    DIRECTV's competitors also recognize the growing competition from SVODs.

*See*, *e.g.*, Tr. 1395:16-21 (Montemagno (Charter)); DX921.0034 (DISH 10-K:  "We face

competition from providers of digital media, including, among others, Netflix, Hulu, Apple,

Amazon, Alphabet . . . .").

37.    AT&T initially entered the pay-TV business in order to more effectively sell

wireline broadband, which cable providers often bundle together with video.  *See* Tr. 3383:17-24

(Stephenson (AT&T)).

38.    In 2014, however, AT&T agreed to acquire DIRECTV to achieve the scale needed

to operate more efficiently and position it within the industry to innovate away from the

traditional pay-TV model.  *See* Tr. 3384:13-3385:14 (Stephenson (AT&T)).  Although AT&T

understood at the time that the pay-TV business was in decline, it made the DIRECTV

acquisition as a way to enhance its "largest business," which is wireless.  *See* Tr. 3209:4-7

(Stankey (AT&T)); Tr. 3379:19-20 (Stephenson (AT&T)); Tr. 3385:12-14 (Stephenson

(AT&T)) ("the key driver behind getting DIRECTV" was to enable delivering video "content to

our wireless subscribers"); Tr. 3208:19-23 (Stankey (AT&T)) ("[W]hen I came in, one of the

clear objectives was to start to transform the way we deliver video to customers, make the video

far more portable, start to emphasize the fact that we could use our 100 million wireless

subscribers to be able to do things differently . . . "); Tr. 3209:12-18 (Stankey (AT&T)) ("we

knew that we were in a foot race to basically start to change the product to be able to catch the

next wave . . . this was kind of a renovation project."); Tr. 3209:23-3210:12 (Stankey (AT&T))

(after the transaction, AT&T "immediately began negotiating rights" to be able to deliver content

licensed to DIRECTV "to people over their mobile phones" and did a "fair amount of work" on

DIRECTV's contracts to obtain these rights).

39.     As the wireless industry has evolved, the overwhelming trend in how people use

their cell phones and mobile devices has been toward the consumption of video.  *See* Tr.

3380:17-3382:15 (Stephenson (AT&T)) (tracing development of mobile networks from "flip

phone[s]" that could only text and take pictures to the "iPhone," which "made the internet

mobile," to the now-current fourth-generation technology which "has allowed video to take off,"

so that today fully "[h]alf of the volume on [AT&T's] network is video").  AT&T has thus long

understood that, in order to grow its wireless business, it would need to be "getting video

delivered onto the mobile device."  Tr. 3381:24-25 (Stephenson (AT&T)).

40.     As Mr. Stephenson explained, the DIRECTV acquisition provided AT&T an opening for a future investment:  it would enable AT&T to deliver video content "over [those customers'] mobile devices" and thereby enhance AT&T's wireless product.  Tr. 3384:25-3385:12; *see* Tr. 3254:19-22 (Stankey (AT&T)) ("more usage on the wireless network . . . causes [customers] to buy up on data plans or get more devices," all of which is "good for our business"); *see also* Tr. 3254:10-14 (Stankey (AT&T)) ("At the core, our biggest business is our wireless business.  It's almost two times what we do in the entertainment side of things.  It's huge to us.  We've got to do things that keep[] growing the engagement with our network and our wireless business.").

41.     In furtherance of this strategy, soon after completing the DIRECTV transaction, AT&T introduced DIRECTV NOW, a virtual MVPD that offers fewer channels (*i.e.*, the bundle is "skinnier") than DIRECTV at a less expensive price point and that, like other virtual MVPDs, is delivered over the Internet.  *See* Tr. 3385:5-3386:10 (Stephenson (AT&T)) ("we sized down the content . . . and we priced it at $35 a month"); Tr. 3252:18-23 (Stankey (AT&T)) ("And so when I talked about buying DIRECTV and our need to figure out how to get a very mature product in the right place, part of the way you're going to see content distributed in the future is virtually, over the Internet.  You've got to build content that can be distributed that way and seen that way.").  That service launched in November 2016 and now has more than one million subscribers.  *See* Tr. 1824:23-24, 1830:9-12 (Merrill (AT&T)).  As noted above, there are a number of other virtual MVPD competitors, including Google's YouTube TV, Hulu Live, DISH's Sling, and Sony's Playstation Vue.  *See supra* FOF ¶ 8.  Each of these virtual competitors competes with traditional pay-TV companies for subscribers.  *See supra* FOF ¶¶ 8, 35.

42.     The rise of mobile video provides an enormous opportunity for AT&T.  AT&T has

a nationwide wireless broadband network and is working to develop and deploy a fifth-

generation—or "5G"—wireless network that will position it to deliver video even faster than it

can today, both to homes and to mobile devices.  *See* Tr. 3382:12-3383:9 (Stephenson (AT&T))

("5G is probably going to be the most transforming . . . .  This is going to begin to allow things

that we have talked about for a long time . . . things like driverless automobiles . . . .  Why is that

important to us?  The connectivity is important.  But most importantly is when you put people in

driverless cars you've given them more time . . . .  Our belief is that's going to drive video

consumption up even more.  So video delivery is going to become more and more important.

The other thing that 5G will do and probably I'll stop with this, but as you get that kind of

bandwidth . . . you have something that will broadly compete with the traditional cable model.").

43.     At the same time, the transformation of the video marketplace presents significant

challenges.  The entry of these Internet-based virtual MVPDs and, even more importantly, the

growth of SVODs like Netflix, Amazon, and Hulu make the marketplace more competitive than

ever before.  *See* Tr. 3213:7-9 (Stankey (AT&T)) (because of "[t]he fact that there were new

virtual MVPDs coming into the market, competition was at an all-time high"); Tr. 3387:13-17

(Stephenson (AT&T)) (describing the "rather significant disruption" going on in the pay-TV

industry); Tr. 2950:2-6 (Holanda (RCN)) (agreeing that "the video distribution market today is

more competitive than at any point" in the past 30 years); Tr. 1397:1-4 (Montemagno (Charter))

(confirming "there's been a veritable explosion of OTT [Internet-based] offerings just since

we've had this high speed Internet phenomenon in the last five, seven years"); Tr. 2133:15-17

(Sejen (Cable One)) (agreeing that competition among traditional MVPDs and Internet-based

video providers has increased over the last five to seven years); Tr. 2456:7-9 (Carlton) ("So we

have Netflix, we have Google coming in, you have Amazon Prime.  These are all big firms,

Apple and Facebook we know are coming in.").

44.     The success of these SVOD and virtual MVPD platforms has meant that video

consumption is increasingly taking place outside of traditional MVPD services like those offered

by DIRECTV and U-verse.  *See* Tr. 3449:12-18 (Stephenson (AT&T)); Tr. 1829:3-9 (Merrill

(AT&T)); Tr. 891:18-25 (Rigdon (Comcast)).  AT&T is now competing for customers' attention

with Facebook, Amazon, Apple, Netflix, and Google (sometimes called the "FAANG"

companies) and other vertically integrated technology giants.  *See* Tr. 3214:8-14 (Stankey

(AT&T)) ("The time-and-attention competition now from the likes of Facebook, from the likes

of Google, from the likes of Netflix, they're distracting people from other things they used to do.

And somehow, we have to build products that continue to command customers' time and

attention.  That's the battle here.").  This trend is likely to continue, as the tech giants focus more

and more on premium video to drive engagement.  *See* Tr. 3387:25-3388:3 (Stephenson

(AT&T)) ("The one area that drives engagement like no place else  . . . is premium content.

Premium video . . . .  That drives engagement so the [FAANG], if you will, are all focused on

premium video.").

45.     As a result, AT&T/DIRECTV's position as a traditional video distributor is

declining at an accelerated pace.  *See* PX455-136 to -37.  "DirecTV[] lost 1.2 million [traditional

pay-TV] subscribers in 2017" alone.  Tr. 3450:7-8 (Stephenson (AT&T)); *see* Tr. 3369:13-16

(Stankey (AT&T)) (discussing the "inflection change" where the "decline of the traditional pay-

TV bundle started faster than [AT&T] assumed"); Tr. 3004:6-7 (Christopher (AT&T)) ("In 2016,

our traditional video business lost 133,000 customers.").  For this reason, it is unsurprising that

AT&T has been concerned that it is not receiving rights to innovative features like split-screen

viewing for March Madness.  Compare PX40 *with* PX228 ("Any of this offered to us? . . .  I feel

like we should start writing letters to the top every time they intro a feature that deteriorates the

value of the bundle and don't pass it through to us.  We can't get them to give us a 4K feed, but

they will move content to Apple TV.").[1]

46.     The growth of targeted advertising likewise provides challenges and opportunities

for AT&T.  Because of its technology and its direct relationships with its consumers through

more than 100 million connections, AT&T has the ability (consistent with its privacy policy, *see*

Tr. 3246:12-17 (Stankey (AT&T))), to build an anonymized "data set that [it] could use to sell

advertising" that would enable it to "compete with Google and Facebook."  Tr. 3189:19-22

(Bewkes (Time Warner)); *see* Tr. 3391:23-3392:1 (Stephenson (AT&T)); Tr. 3208:25-3209:3

(Stankey (AT&T)) ("One of the reasons our data is different is we have a lot of mobile

subscribers who do lots of things that generate data, and we started investing very heavily to do

that."); Tr. 3770:1-18 (Athey) (describing the different sources of AT&T's first-party data).  But

as a distributor of programming, AT&T gets only two minutes of advertising every hour and thus

lacks the "inventories of advertising," *see* Tr. 3392:10 (Stephenson (AT&T)), that Turner and

other programmers (which generally get 14 minutes per hour) retain that would justify investing

to create an advertising business at "a sufficient scale."  Tr. 3243:18-25 (Stankey (AT&T)); *see*

*also* Tr. 1405:9-12 (Montemagno (Charter)) (discussing division of advertising time).

47.     Likewise, AT&T lacks ownership of the content necessary to develop in a timely

way innovative, engaging video content, especially content designed for viewing on mobile

---

[1] Although the government suggests that this Apple TV episode indicates that AT&T is
hostile to innovative programming arrangements, AT&T executive Dan York explained that
AT&T's concern was that there was "no offer at all to us."  Tr. 1677:14-1678:14.  In addition,
Mr. York described PX40 as a draft, and the record does not show that it was ever sent. *See* Tr.
1616:19-25.

devices.  *See* Tr. 3219:1-3 (Stankey (AT&T)) ("What we don't have is, we didn't have

programming.  We didn't have the flexibility to change the product, and that's what the guys on

the other side had."); Tr. 3220:19-3221:20 (Stankey (AT&T)).

48.    AT&T senior executives testified that, from their experience, those sorts of

innovations are extremely difficult to achieve without content ownership, because they must rely

on arm's length negotiations with content owners who do not know how to value the rights they

are selling for an unproven use.  *See* Tr. 1685:18-19 (York (AT&T)) ("because we can't assign a

value around that uncertainty, nothing gets done"); *see also* Tr. 1685:7-16 (York (AT&T))

("[W]hat I've seen in 30 years of doing this is this friction just is constant, and nothing truly

innovative really gets done when we have an arm's-length commercial negotiation like this.  I

see innovation with Netflix and Amazon and Apple and others that are more vertical, and they

can do things with their own content.  So it's really both parties not knowing what this

innovation or new grant of rights will deliver in the future.  It's the uncertainty; it's the risk.  We

both have it.  But because we can't assign a value around that uncertainty, nothing gets done.");

Tr. 3211:10-3213:2 (Stankey (AT&T)) (discussing conversations with programmers to try to

"build opportunities to do some more unique things" but ultimately "realiz[ing] the path to . . .

innovation was not going to come through . . . these particular companies."); Tr. 3223:1-2

(Stankey (AT&T)) ("These are the things that traditionally move very, very slowly in the media

and distribution business . . . ."); Tr. 3220:12-3222:15 (Stankey (AT&T)) (providing examples of

"the kinds of things that [AT&T] could envision doing by owning" content that it cannot do

now).

### C.   The Transaction Will Allow the Combined Company To Meet these Challenges and Benefit Consumers

49.    The vertical integration of AT&T and Time Warner will enable the combined company to respond to the challenges posed by the current transformation of the video marketplace and, in so doing, bring better products and better value to consumers.

50.    Both Time Warner and AT&T have attempted, without significant success, to respond to competitive challenges regarding, among other things, access to data and flexible use of content, through contracts with independent parties. *See supra* FOF ¶¶ 16-18, 48.  Experience has shown that vertical integration can remove the "bargaining friction" that impedes innovation through arm's-length bargaining. *See, e.g.*, Tr. 3105:1-3109:14 (Bewkes (Time Warner)) (describing development of multiplex and video on demand ("VOD") while Time Warner was vertically integrated with Time Warner Cable); Tr. 3218:22-3219:13 (Stankey (AT&T)) (explaining the "frustration that I alluded to when I was talking about the difficulty getting programmers to adjust," hence the goal to "get in and innovate faster and quicker" and "not do it by contract"); Tr. 1689:24-1690:1 (York (AT&T)) ("You get a little bit more alignment and willingness to experiment, to trial and see if there's value and prove these concepts out."); *see also* Tr. 3742:8-14 (Athey) (agreeing that potential benefits of vertical mergers are that they "can lead to lower prices, higher quality products, and increased investment and innovations").  As Mr. Bewkes testified, being vertically integrated with a distributor was crucial to experiment to "know what was possible" and whether the new product was "worth anything."  Tr. 3109:15-3010:4.[2]

---

[2] That Time Warner spun off Time Warner Cable in 2009 is not probative of the pro-competitive benefits of vertical integration today. As Mr. Bewkes testified, Time Warner Cable was dis-integrated in a very different time and was spun off primarily for financial reasons.  Tr. 3093:19-3094:6; Tr. 3094:15-3096:17 (Bewkes (Time Warner)) (discussing the financial reasons

51.     In August 2016, "it became clear to both [Mr. Bewkes and Mr. Stephenson] that while [their] companies didn't overlap, that [they] actually had complementary assets to take advantage of [the] opportunities or . . . to meet the challenge coming from [] new competitors." Tr. 3111:18-3112:7 (Bewkes (Time Warner)); *see* Tr. 3400:7-3401:5 (Stephenson (AT&T)). After the CEOs had further discussions with their respective Board of Directors, Time Warner and AT&T "reached an agreement to merge the companies and put these complementary capabilities together."  *See* Tr. 3112:14-23 (Bewkes (Time Warner)); Tr. 3412:5-8 (Stephenson (AT&T)).

52.     According to Mr. Bewkes, there were two main strategic reasons beyond price for doing this transaction with AT&T, both of which relate to the "tectonic" shifts described above. *See* Tr. 3113:3-11; *supra* FOF ¶¶ 9-32.  Notably, the strategic rationale did not involve increasing Time Warner's leverage to raise the prices of its content for distributors.  *See* Tr. 3116:23-3117:4 (Bewkes (Time Warner)).

53.     *First*, combining with AT&T will address Time Warner's issues relating to direct-to-consumer distribution.  *See* Tr. 3113:10-11 (Bewkes (Time Warner)).  It will do so through AT&T's 150 million consumer relationships—and accompanying data—across AT&T's telephone, mobile, broadband, and satellite businesses.  *See* Tr. 3113:12-20 (Bewkes (Time Warner)); Tr. 3114:9-10 (Bewkes (Time Warner)); *see also* Tr. 635:1-8 (Martin (Turner)).

---

for the spin-off, and further noting that "Netflix . . . was still sending you movies . . . in the mail," "video streaming directly to your house hadn't really happened" and "nobody in the cable business or the distribution business at that point was mining data to sell advertising or to sell [subscriptions]."); *see also* Tr. 602:22-25 (Martin (Turner)) ("I don't think at the time we, at Time Warner, fully understood the importance of what data and customer information would mean in the future as it relates to advertising and making decisions.").

AT&T also has the infrastructure and technical delivery capabilities to distribute content on all these platforms. *See* Tr. 3114:3-18 (Bewkes (Time Warner)).

54.    The merger will allow Time Warner access to AT&T's customer information and distribution assets to enable the combined firm to improve the marketing of Time Warner content. *See* Tr. 3114:3-18, 24 (Bewkes (Time Warner)).  It will also enable Time Warner to connect directly with its viewers to better inform its programming decisions. *See* Tr. 3114:19-25 (Bewkes (Time Warner)).  In sum, it will allow Time Warner, like the vertically integrated companies that are now transforming the video marketplace, to "get out of that wholesale position and actually begin to market and advertise directly to people in a much more effective and efficient way."  Tr. 624:2-16 (Martin (Turner)); *see* Tr. 625:17-23 (Martin (Turner)); Tr. 634:5-635:9 (Martin (Turner)).  Ultimately, these direct-to-consumer capabilities and related information can provide "a better consumer experience [by] knowing what to offer people, which package, which bundle, what kinds of programming within those would be interesting," as well as informing programming decisions.  Tr. 3114:5-23 (Bewkes (Time Warner)).

55.    *Second*, the combination with AT&T also will help Time Warner move in the "direction of being able to compete with the Googles and the Facebooks in this new, very fast-growing ad business."  Tr. 3115:22-24 (Bewkes (Time Warner)).[3]  It will do so in two ways: (1) AT&T's data includes information on what people are watching or want to watch, as well as other preferences, Tr. 3115:11-17 (Bewkes (Time Warner)); and (2) AT&T "has the ability,

---

[3] Although the government suggests that an email from AT&T CEO Randall Stephenson suggests AT&T wants to cooperate, not compete, with Facebook, the document itself makes clear that Mr. Stephenson was discussing placing ads for AT&T services on Facebook mobile, not cooperating in selling ads.  *See* PX558 (discussing whether AT&T's "ad inventory yields better results on FB mobile."); *see also* Tr. 3464:25-3465:1 (Stephenson (AT&T)) ("The first part of the email is Mark and me talking as me, his customer.").

increasingly, to deliver a different ad to a different person" across its platforms, and "they know

which ad to deliver to which person."  Tr. 3115:18-21 (Bewkes (Time Warner)); *see* Tr. 3762:1-

7 (Athey).  Time Warner does not have similar advertisement delivery capabilities.  *See* Tr.

3115:20-21 (Bewkes (Time Warner)).

56.     AT&T likewise concluded that the merger will position it to compete better in

today's highly competitive and quickly evolving marketplace and to bring benefits to consumers

that it cannot currently deliver.  *See* Tr. 3403:2-4 (Stephenson (AT&T)) (AT&T's "vision" that

"distribution of this content to wireless will drive the value of the content up"); *see also infra*

FOF ¶¶ 245-277 (discussing benefits in more detail).  Mr. Stephenson's notes for his discussion

with the AT&T Board on the proposed merger outlined how ownership of Time Warner's assets

would drive AT&T's strategic goals forward by empowering it to "[l]everage customer

viewership data to build unique advertising models" and "[u]se our data, TV, [broadband], and

wireless to increase the value of the content."  DX609.0004–0005 (Bewkes and Stephenson were

"energized" about how the merger "would radically accelerate" those objectives); DX640.0036

(describing part of the "Transaction Rationale" as "[a]ccelerates innovation").

57.     The Turner networks' additional 14 minutes of advertising time every hour will

provide AT&T the inventory scale necessary to justify development of a programmatic targeted

advertising platform for premium video that can compete with the digital advertising duopoly of

Facebook and Google.  *See* Tr. 3243:5-3244:8 (Stankey (AT&T)) (Time Warner content will

provide "a sufficient scale to get started and demonstrate that, in fact, these improvements can be

made in the market and effectively work").

58.     Furthermore, owning significant content will solve some of the bargaining-friction

issues that have stymied video and wireless innovations from AT&T.  *See* Tr. 1686:23-1687:25

(York (AT&T)); Tr. 2971:10-14 (Holanda (RCN)) (conceding that vertical integration has removed bargaining frictions for Comcast, which "has allowed [it] to innovate more effectively than [RCN has]").  Owning content will give AT&T rights it previously could not attain and allow it to experiment in ways that ultimately prove the value of those innovations.  *See* Tr. 3219:1-13 (Stankey (AT&T)); *see also* Tr. 3222:16-3224:4 (Stankey (AT&T)).

59.    Moreover, AT&T will be better positioned to integrate Time Warner content into its own advertising campaign and direct points of contact with consumers (*e.g.*, retail stores), which is another way the merged firm will "sell more product and drive more revenue."  Tr. 3245:8-9 (Stankey (AT&T)); *see generally* Tr. 3244:19-3245:6 (Stankey (AT&T)).

60.    Soon after the AT&T Board approved the deal, Mr. Stephenson sent a memo to the employees of AT&T and Time Warner—a document known internally as the "Magna Carta," Tr. 3421:21 (Stephenson (AT&T))—confirming that, among other things, the merged company would "continue to distribute Time Warner content broadly" and would use its combined assets "to create new choices, skinnier bundles," and "video created just for mobile"—in short, "[m]ore choice, lower cost."  DX625.0001; *see generally* Tr. 3421:20-3422:24 (Stephenson (AT&T)). The evidence convincingly shows that it is "more probable than not," that AT&T will succeed in achieving the pro-competitive benefits that formed the basis for this transaction.  Tr. 3247:5-8 (Stankey (AT&T)).

61.    Although Time Warner had attempted to address the competitive challenges with respect to direct-to-consumer distribution and advertising on its own, its management and Board concluded that this transaction provides the best way "to get there in time, at the right scale [and] without inefficient cost."  Tr. 3116:14-18 (Bewkes (Time Warner)).

62.     As the combined company becomes more innovative and more competitive, other players will respond with their own innovations.  That will benefit all consumers.  *See* Tr. 3107:3-13 (Bewkes (Time Warner)); Tr. 3372:7-23 (Stankey (AT&T)) (lower DIRECTV prices put pressure on competitors).  That is precisely what happened with many of the innovations that were enabled by Time Warner's prior vertical integration, including multiplexing and VOD.  *See* Tr. 3107:7-13; 3110:13-23 (Bewkes (Time Warner)).

## II.     The Government Did Not Meet Its Burden To Show That the Merged Company Is Likely to Substantially Lessen Competition by Raising the Prices of the Turner Networks

63.     This is a vertical merger between two companies that have highly complementary assets and that do not compete with each other.  Time Warner is a media company, and AT&T is a distribution company.  *See*, *e.g.*, Tr. 3402:11-15 (Stephenson (AT&T)) ("[T]his [is] a vertical deal.  There are not a lot of overlaps of operation, there is not redundant distribution, redundant sales and so forth.").  The merger thus will not remove a competitor or increase concentration in any market, and the government does not contend otherwise.

64.     The government also does not claim that the combined company is likely to unilaterally withhold Turner programming from rival distributors or that it would have the economic incentive to do so.  On the contrary, the government's primary economic expert, Professor Carl Shapiro, concluded that a withholding strategy would *not* be profitable and thus that the combined company would *not* engage in any unilateral foreclosure of competitors' access to Time Warner content.  *See* Tr. 2218:14-17.

65.     Moreover, the government does *not* claim that the merger will cause the combined firm to raise its own prices to consumers.  In fact, Professor Shapiro again predicted the opposite: that, as a result of the merger, AT&T will charge its 25 million video customers *lower prices* for

MVPD (DIRECTV and U-verse) service than in the absence of the merger.  *See* Tr. 2322:3-5

(agreeing with statement that his analysis shows that "25,000,000 subs or so would have a price

decrease, not a price increase").

66.    The government's primary theory of harm at trial was that the merged company

would have increased "bargaining leverage" that would enable it to force rival distributors to pay

a higher price for Turner networks, and that some of those increases would be passed on to

consumers.  As to that claim, the government has failed to carry its burden of showing that the

merger is likely to substantially lessen competition.  There is no probative evidence to support a

prediction that consumers will be harmed by this merger.

### A.    The Testimony Refuted the Government's Bargaining-Leverage Theory

67.    At the outset, the evidence at trial failed to support the government's suggestion

that the parties had an illicit, anticompetitive *motive* for the merger.  That theory was

contradicted by the detailed testimony of the chief executives who agreed to the merger, AT&T

CEO Randall Stephenson and Time Warner CEO Jeff Bewkes, as well as the company

documents explaining the rationale for the deal.  *See* Tr. 3111:7-3113:11 (Bewkes (Time

Warner)); Tr. 3411:2-3412:1 (Stephenson (AT&T)); DX640.0036.

68.    They explained that the goal of the merger is to address the challenges that both

companies face because of the ongoing transformation of the video marketplace.  *See* Tr.

3111:24-3112:13 (Bewkes (Time Warner)); Tr. 3393:6-3397:5 (Stephenson (AT&T));

DX640.0036.  In particular, they explained how combining Time Warner's content with AT&T's

nationwide distribution assets, particularly its nationwide wireless broadband network, would

allow the company to offer better products to consumers and compete more effectively in the

rapidly changing video and advertising markets. *See*, *e.g.*, Tr. 3400:17-3401:5 (Stephenson

(AT&T)) (discussing how he and Mr. Bewkes realized the merger could create opportunities

"most importantly, [in] the mobile, the wireless environment," particularly by using AT&T's 100 million wireless subscribers to "leverage the advertising business"); Tr. 3218:22 (Stankey (AT&T)) ("AT&T has customers.  We have technology and distribution platforms to get content out to customers . . . .  What we don't have is, we didn't have programming.  We didn't have the flexibility to change the product, and that's what the guys on the other side had."); Tr. 3111:24-3112:10 (Bewkes (Time Warner)) (discussing how he and Mr. Stephenson recognized that their companies "had complementary assets to take advantage of" opportunities in "digital Internet competition" and "meet the challenge coming from these new [OTT] competitors"); Tr. 3113:3-11 (Bewkes (Time Warner)) ("This combination gives us, in the combined company, we hope, a good chance to compete effectively in digital advertising and to get the benefits for our networks of direct-to-consumer distribution.").  Mr. Stephenson's contemporaneous notes on his initial discussions with Mr. Bewkes and his analysis before making the first offer also establish that none of the concerns raised by the government were on his mind.  *See* DX664; DX609.

69.     Notably, the actual decision-makers at both companies did not and do not expect any benefits of the merger to result from increased bargaining leverage or other anticompetitive effects.  *See* Tr. 3119:20 (Bewkes (Time Warner)) (theory is "ridiculous"); Tr. 3251:21-23 (Stankey (AT&T)) ("There is no reality to it."); Tr. 3430:11 (Stephenson (AT&T)) ("On its face, the premise—it's absurd . . . .  The idea that all of a sudden Turner is under the AT&T umbrella and somehow Turner's content is worth more defies logic to me."); Tr. 3251:24-3252:2 (Stankey (AT&T)) ("[A]s you've heard, there's already very intense and aggressive negotiations [that] occur out of that process.  And I expect them to be the same way in the future, and I don't think there's going to be any change.").  Additionally, Richard Warren, Turner's lead content

negotiator, testified that he does not "think it's realistic" that Turner will be able to raise prices simply as a result of the merger.  Tr. 1190:7-17.

70.    The government's attempt to support a contrary conclusion relies on cherry-picked, out-of-context snippets of documents from employees who are not the companies' leaders— documents that often were dated, unrelated to the merger, in draft form, or not even authored by them or anyone else at AT&T or Time Warner.  In instance after instance, the government has introduced documents that were not a final product and do not reflect the judgment of the actual decision-makers in the companies.  *Compare* PX10 (PowerPoint presentation:  "Going Big with Premiums") *with* Tr. 1520:19-23 (Patel (AT&T)) (PX10, a non-merger document, "was the beginning of the evaluation process" of which premium network AT&T should market); *compare* PX30 *with* Tr. 1714:1-2 (Gibson (AT&T)) ("This was our, again, draft understanding of some pretty complicated merger conditions.") *and* Tr. 1714:9-10 (Gibson (AT&T)) ("[T]his was a draft.  We hadn't finished this work."); *compare* PX11 (email from AT&T employee Bill Belden to Tim Gibson) *with* Tr. 1717:17-18 (Gibson (AT&T)) ("These were the statements of an individual who reported to me reading merger conditions for the first time."); *see also* Tr. 1777:16-1778:3 (Manty (AT&T)) (confirming that, other than collecting information, he did not have "anything to do" with the decision-making surrounding or implementation of the merger); Tr. 1770:20-21, 1765 (Manty (AT&T)) (testifying that he was unsure whether a statement in PX184 "was a Bain quote" and not the view of an AT&T employee, but in any event it was a draft document and had nothing to do with the decision to enter into the Time Warner transaction).

71.    In its closing argument, the government claimed support for its theory in a document concerning Mr. Stephenson's reaction to Time Warner's decision to acquire a small

stake in Hulu, a virtual MVPD. *See* Tr. 3977:6-3979:6 (citing PX47). But Mr. Stephenson's

testimony made clear that he simply "want[ed] to make sure [AT&T] got the same access" for its

DIRECTV NOW platform as other virtual MVPDs. Tr. 3477:1.

72. The government also attempted to rely on notes Mr. Stephenson used to prepare for

a presentation to the AT&T Board on the proposed merger, claiming they show that AT&T

sought Time Warner content to "advantage" its "distribution" business. Tr. 3979:7-3980:35

(citing DX609). But as Mr. Stephenson testified, the "intent of this" statement was exactly the

opposite: "to tell the Board, you can't do that. Don't have that in your mind." Tr. 3491:7-9.

This is because "the value of a content company is a function of how many people watch the

content. Period. It's no more complex than that. So content valuations are a function of

distribution. Wide broad distribution. The more distribution, the better you are." Tr. 3407:10-

15 (Stephenson (AT&T)). Mr. Stephenson confirmed this strategic outlook in his Magna Carta

letter, widely circulated just four days after the merger was announced. That document declared

that the merged firm would "continue to distribute Time Warner content broadly" and indeed

would "extend its distribution deeper into mobile." DX625.0001.

73. Although some rival distributors testified that they are concerned Turner's affiliate

fees would rise after the merger, none could point to any data or analysis supporting that

concern. *See* Tr. 147:17-148:10 (Fenwick (Cox)); Tr. 404:22-405:3 (Schlichting (DISH)).

Moreover, these rivals have a natural incentive to oppose this merger: they do not want to

compete against a more competitive DIRECTV. *See* Tr. 2462:14-23 (Carlton) ("A rival doesn't

want to see a transaction that makes it[s] competitor more efficient . . . . Well that's good for the

consumer. Maybe bad for the competitors, I understand that. But that's the whole point of

competition. We want prices to go down for consumers. We don't want to protect rivals from

that [e]ffect.").  As to DISH, the evidence further showed that, as elaborated below, *see infra*

FOF ¶ 178, these alleged fears of Turner's power to raise prices conflict with the prior statements

of DISH's own Chairman that, among other things, Turner networks are among "the easier ones

to take down" if DISH believes Turner's affiliate fees are too high.  Tr. 367:7-368:25

(Schlichting (DISH)).

74.     Moreover, the evidence shows that vertical integration has not in reality led to the

increase in bargaining leverage that the government theorizes.  Madison Bond, Chairman of

Content Distribution at NBCU, testified that the fact that NBCU is affiliated with Comcast Cable

does not factor at all into his negotiations with other distributors, that he never considers that fact

in his negotiations, and that no one from Comcast Cable or Comcast Corporation has ever asked

him to do so.  *See* Tr. 2014:21-2015:15; *see also* Tr. 882:17-21 (Rigdon (Comcast)) ("Q.  . . .

[Y]ou have no reason to believe, do you sir, that the fact that NBC is owned by a company that

also owns a cable company has had any impact on its negotiating strategy with other

distributors?  A.  That's correct."); Tr. 1565:12-14, 1691:1-11 (York (AT&T)) (stating that, in

his experience on the distributor side, "ownership or affiliation of the content company doesn't

really have an impact on the price of the content" and that he does not give "any consideration

whatsoever" to who owns the programming when negotiating for content rights).[4]

---

[4] The government has relied on PX11 and PX30 to suggest that AT&T thought that
Comcast/NBCU would have increased bargaining leverage as a merged entity (after the consent
decree conditions expired).  But the trial testimony showed that this statement was made by a
"junior" person who is "not a lawyer" and not a "regulatory expert" "reading some pretty
complicated merger conditions for the first time."  Tr. 1718:2-4; 1719:8-22 (Gibson (AT&T)).
Moreover, PX30 was a "Preliminary Draft" and "Subject to contradiction [or] alternate
evaluation by other organizations."  Tr. 1720:3-18 (Gibson (AT&T)).  After the slides were sent
to senior individuals for further review, the "slides changed dramatically" and made no
prediction regarding increased bargaining leverage.  Tr. 1720:24-1721:21.

75.     Similarly, testimony from Time Warner and Turner executives established that, when Time Warner and Time Warner Cable were affiliated, vertical integration did not affect Turner's negotiations or bargaining leverage with Time Warner Cable competitors such as DIRECTV, DISH, or Verizon.  *See* Tr. 3121:22-3122:3 (Bewkes (Time Warner)) (stating that, when the two companies were integrated, no one raised the added-leverage theory the government relies on here because "there isn't any added ability or incentive to do that, and all of our executives know that"); Tr. 601:15-602:15, 682:14-21 (Martin (Turner)) ("Q.  Did you ever hear that Turner had an incentive to demand higher prices or other concessions from distributors because it was affiliated with Time Warner Cable?  A.  No, I did not.  Q.  Or that it had the ability to do so?  A.  No, I did not."); Tr. 1129:6-12 (Breland (Turner)) ("I've been in Turner when we were a vertically integrated company and had a sister company called Time Warner Cable.  And I can tell you at no time during my tenure there did anyone ask me to consider in my negotiations and how I dealt with other distributors the outcome and impact at Time Warner Cable, I was never asked to consider that nor would I consider that."); Tr. 1190:14-17 (Warren (Turner)) ("We didn't do that when we were part of Time Warner Cable.  I just don't think it's realistic to take that view that that would be something that we should consider or would do.").  The government did not provide any evidence to contradict this consistent testimony.

76.     The evidence at trial established why actual industry behavior does not align with the government's theory here.  A blackout has disastrous, and immediate, consequences for Turner.  *See* Tr. 1128:1-1129:4 (Breland (Turner)) ("I lose money the minute I go dark.  It can be catastrophic to my business . . . ."); Tr. 659:22 (Martin (Turner)) ("[I]t's very bad for business to go dark."); Tr. 1189:13-16 (Warren (Turner)) (lost subscriber revenue from going dark has "massive implications" for Turner's business).  Turner stops receiving license fees as soon as its

networks are off the air, and loses advertising revenue as a result of under-delivering advertising

on the networks that have gone dark.  *See* Tr. 1095:5-18 (Breland (Turner)).  Depending on the

size of the distributor, these losses could be $75 million per month.  *See* Tr. 1095:21-1096:2

(Breland (Turner)).  They could be even higher during a time period with popular programming

on the air, because advertising slots are more valuable.  *See* Tr. 1096:9-1097:21 (Breland

(Turner)) ("If we go dark in March Madness, it means not only do you lose your license fees

again standard for each month, but you are going to lose higher volume of ad dollars because live

sports bring a premium for ad sales.").

    77.    In this regard, real-world evidence of DISH's drop of most Turner networks show

how expensive it is for Turner to have its networks dropped and to get back onto a distributor's

platform.  During the blackout itself, Turner lost more than $30 million in lost subscriber and

advertising revenue that was never recouped.  Tr. 1114:24-1115:2 (Breland (Turner)).

Additionally, in order to get its networks back up on DISH, Turner had to make financial

concessions to DISH worth more than $120 million, including forgoing its right to payments

DISH owed Turner for prior periods.  *See* Tr. 1118:5-20 (Breland (Turner)); *see also* PX414, ¶ 5.

Turner agreed to these financial concessions in exchange for guaranteed carriage from November

21, 2014, to March 31, 2015—four months—because of the severity of its losses in the blackout.

*See* Tr. 1118:21-24 (Breland (Turner)) ("Q.  Why did Turner give up all of that money to get

back on for four months?  A.  I'm bleeding, I'm losing a tremendous amount of money.  I have

to get back on."); *see also* Tr. 652:14-16 (Martin (Turner)).

    78.    Moreover, though the government has attempted to show that Turner has almost

gone dark with several distributors in recent negotiations, Mr. Breland testified that it is

extremely common for negotiations to come down to the last minute, and to sign a new contract

shortly before the previous deal expires. *See* Tr. 1093:14-16 ("I maybe signed one deal two or three days ahead in all of those years [of negotiating for Turner]. They always come down to the last day and sometimes the last handful of minutes."). He explained that this has become the usual course of negotiations in the industry for the past ten years or so, as subscriber growth has slowed and pressure on day-to-day revenue streams has increased. *See* Tr. 1093:18-1094:8 (Breland (Turner)). But while Turner prepares for the possibility of going dark with a distributor in the ordinary course, Turner sees these preparations as necessary to understand the severe financial impact of a blackout. *See* Tr. 1094:16-1095:1 (Breland (Turner)) ("[Y]ou never want to go dark if you are a programmer. You bleed instantly. But you have to be prepared . . . . It's just prudent math."). Indeed, Turner executives have testified that Turner has only ever considered the possibility of going dark with a distributor when that distributor has sought a particular contract term that would have a cascading effect across Turner's Most Favored Nation ("MFN") clauses, which require Turner to extend to other distributors certain types of terms given to any one distributor, or if the sought-after term would harm Turner's ability to compete. *See* Tr. 1099:21-1100:17 (Breland (Turner)) (providing an example of a distributor that sought an MFN that would give it protection against Turner competing "as a distributor"); Tr. 658:11-659:1 (Martin (Turner)) (same).

79.     Beyond that, as Mr. Bewkes testified, if Turner goes dark, not only does it lose subscriber fees and subscription revenue, but also its supply of programming will "start[] to dry up because the sports leagues don't like it if their games aren't carried wherever," and "[t]he talent doesn't like it if their show isn't everywhere." Tr. 3120:6-12. Moreover, other distributors may try to take advantage of Turner's weakened state to extract a better deal from it. *See* Tr. 3120:19-22 (Bewkes (Time Warner)). In short, Mr. Bewkes explained, the supposed

added leverage is like moving from the "risk that a thousand-pound weight might fall on us" to

the risk of "a 950-pound weight" falling instead: "[A]re you going to think about it differently,

feel differently? Are you going to take more risk that any of that might happen to you?

Absolutely not." Tr. 3120:23-3121:7.

80. For all these reasons, broad distribution is critical to the long-term success of any

video programmer. *See* Tr. 3079:1-3 (Bewkes (Time Warner)); Tr. 3407: 9-12 (Stephenson

(AT&T)). Indeed, Mr. Stephenson represented to the AT&T Board of Directors that limiting

distribution of Time Warner content was antithetical to the goals of the merger: "So I was trying

to tell my board that if there is a thought process that says we're going to use this content to

enhance the distribution business, that means you're going to have to limit the distribution, do

exclusive things with AT&T. That is counter to how you create value in one of these

businesses." Tr. 3407:16-21; *see* DX609.0008 (Stephenson notes for board discussion regarding

the potential merger); DX625.0001 (Magna Carta: "We will continue to distribute Time Warner

content broadly across the industry."); *see also* Tr. 604:17-18 (Martin (Turner)) ("I believe that

distribution is the most important variable for success for any programmer."); Tr. 1129:18-22

(Breland (Turner)) ("When you're in distribution it's all about the scale and reach. You have to

be on all the platforms. Otherwise you don't have a chance of being successful in this business,

you have to be on every platform. And you favor none over the others; that's all."); Tr. 1189:17-

21 (Warren (Turner)) (discussing the importance of broad distribution for relationships with

sports leagues).

### B. The Government's Price-Increase Model Provides No Reliable Basis for Predicting Likely Consumer Harm

81. With no meaningful real-world evidence to support its prediction of substantial

harm, the government's theory relies primarily on a theoretical bargaining model presented by its

economic expert, Professor Carl Shapiro.  Initially, Professor Shapiro used the model to predict

that the merger would have caused the average consumer's monthly cable or satellite bill to go

up by about 0.2% (27 cents).  *See*, *e.g.*, Tr. 2450:16-17 (Carlton).  Several weeks later, however,

Professor Shapiro revised this estimate upward, but still below 0.5% (45 cents), *cf.* Tr. 2513:4-5

(Carlton), by adjusting certain inputs that would cause his estimate of harm to go up, but not

adjusting others that would cause his estimate of harm to go down, *see* Tr. 2346:17-2347:8

(Shapiro); *see also infra* FOF ¶¶ 192-194.  Then, in his testimony during the government's case-

in-chief, Professor Shapiro relied principally on the 0.2% (27-cent) estimate, only to concede on

rebuttal that once the model is updated to include 2017 data for just one of the critical inputs—a

change in margins Professor Shapiro himself deemed "reasonable," Tr. 3843:17—the new

estimate would be only 0.1% (13 cents).  *See* Tr. 3851:6-15 (Shapiro).  These facts demonstrate

that the model is, at best, imprecise and its results are highly sensitive to the inputs and

assumptions used in applying it.  *See* Tr. 2516:13-14 (Carlton) ("Well, his model depends a lot

on the value you have for these key parameters.").

     82.     The government did not show that its necessarily imprecise estimate of harm is

statistically distinguishable from zero.  As Professor Carlton explained, such a "tiny percent

increase" could in fact "be zero just because of normal fluctuations in how we estimate models."

Tr. 2450:24-2451:3.  Indeed, Professor Shapiro did not conduct any statistical tests to analyze

whether that "tiny percent increase" was in fact different from zero, as Professor Carlton also

explained.  *See* Tr. 2450:16-2451:25.

     83.     For this reason alone, the model is not a reliable basis to predict a substantial

lessening of competition.  As Professor Carlton stated when asked "how much confidence should

this Court have in the numbers produced by Professor Shapiro's model?," the answer is "None." Tr. 2450:1-3.

84.     Moreover, as Professor Carlton further explained, because the model's predictions are necessarily imprecise, substantial harm to consumer welfare could result from relying on its conclusion of a small amount of harm to block a merger, particularly a vertical merger that will yield consumer benefits:  "[I]f you adopt the standard where someone can come in and say I think there's going to be a slight percentage wise price increase, [but] I can't tell you it's any different than zero, you stand the risk of stopping a merger that could create benefits to consumers.  That's going to wind up harming the public."  Tr. 2451:4-12, 2451:18-23.[5]  Such a result would be "dangerous" to consumers.  Tr. 2451:24-25 (Carlton).

85.     In all events, the evidence established a series of other significant flaws in the government's application of the model, each of which *independently* establishes that Professor Shapiro's model is not probative here and cannot reliably predict that this merger will likely lessen competition substantially.

---

[5] The government attempted to defend the significance of Professor Shapiro's 27-cent estimate by pointing to an instance in which, purportedly, Turner "almost went dark . . . because of a one-penny price increase," implying that Turner had threatened to withhold programming in order to obtain an increase of one cent in a distributor's affiliate fee.  Tr. 991:15-17 (questioning Breland (Turner)).  That is misleading at best.  As Mr. Warren from Turner explained, the government mischaracterized the circumstances of that negotiation.  In that instance, the distributor sought to stay near its "legacy" rate, which was below what others in the market were paying, and was only willing to *increase that rate* by one cent.  *See* Tr. 1187:5-21.  In addition, the distributor did not want to pay rates that varied by penetration (the percentage of subscribers that would receive the service).  *See* Tr. 1187:14-21 (Warren (Turner)) (noting the distributor wanted to pay "the lowest rate, regardless of how they carried the service").  Moreover, Turner did *not* go dark and ultimately *agreed* to the small "penny year-over-year rate increases" on the legacy rate that the distributor was demanding.  Tr. 1187:23-1188:1 (Warren (Turner)).

### i. The Government's Price-Increase Model Ignores Real-World Evidence

86.     The government relies on Professor Shapiro's model to attempt to show that, after

the merger, prices for the Turner networks will increase because the economic consequences of

Turner's failing to license its content to a distributor will change.  *See* Tr. 25:4-27:2 (opening).

That change, the government asserts, results from the prospect that some consumers might

switch from the distributor to DIRECTV/U-verse to obtain the lost Turner content and the

merged company could therefore recoup some portion of the revenue that Turner would lose.

The real-world evidence belies that price-increase theory.

87.     Professor Shapiro was clear that he does not believe that there will be an economic

incentive for the combined company actually to withhold the Turner networks:  "I'm not saying

that after the merger, Turner will deny its content to the other distributors.  This is not a

foreclosure-withholding story."  Tr. 2218:14-16; *see also* Tr. 2293:2-13 (agreeing that the

merged company will continue to license Turner content to rival MVPDs and virtual MVPDs).

88.     Nonetheless, the government contends that Turner will be able to "more credibly

threaten to withhold" its networks.  Compl. ¶ 35.  Professor Shapiro's model assumes that Turner

will have more bargaining leverage after the merger simply because it will be owned by AT&T.

*See* Tr. 2216:17-2217:5 (Shapiro).  The model further assumes that, given Turner's theoretically

higher "walk away" point, rival distributors will agree to pay a higher price for the Turner

networks because, in this hypothetical negotiation, the parties always "split the difference"

between their respective "walk away" points.  *See* Tr. 2213:13-25 (Shapiro).

89.     This theoretical model does not accord with the substantial evidence presented at

trial as to how negotiations in this industry actually work.  Indeed, Professor Shapiro admitted

that, unlike his academic model, "the real world is messy, and it's imperfect," Tr. 2210:22-23,

and "bargaining is a dark art in many ways," Tr. 2213:12.  Further, he agreed that his model does

not literally predict a price increase in individual negotiations and "cannot capture all of the uncertainties and personalities and unpredictable factors and hairy stuff that might [a]ffect negotiations." Tr. 2294:18-2295:6.

90.    As shown above, *see supra* FOF ¶¶ 67- 80, the evidence at trial overwhelmingly established that vertically integrated media companies do not obtain added leverage from which to extract higher prices.  Indeed, Professor Shapiro conceded that there is a "strong tension" between the real-world behavior reflected in this consistent trial testimony and the assumptions in his model.  Tr. 2311:12-13.  He further conceded that, if the Court credited the testimony of these executives who actually negotiate content agreements for a vertically integrated company, the "concerns" he raised as to the merger "would not arise."  Tr. 2311:16-19 (Shapiro); *see also* Tr. 2202:3-12 (Shapiro) ("If you accept that [NBCU negotiates without considering the interests of the distribution company] then this bargaining leverage will not come into play").

91.    Moreover, the evidence further showed that the structure and organization of the merged firm would not enable the sorts of incentives Professor Shapiro fears.  After the merger, AT&T will be divided into "four unique operating groups."  Tr. 3247:13 (Stankey (AT&T)).  Most critically for these purposes, AT&T's pay-TV services (like DIRECTV) will be in "the communications company," while the companies currently known as Time Warner will be housed in "the media company."  Tr. 3247:14-21 (Stankey (AT&T)); *see* Tr. 3423:20-3427:10 (Stephenson (AT&T)); *see also* Tr. 3471:7-10 (Stephenson (AT&T)) ("[P]reserving the culture, that is the main reason we're talking about organizing the business the way we are, is to preserve the culture of both companies.").  Each distinct company will be led by a separate CEO and management, and they will be charged with implementing a business plan distinct to that

individual business and accountable for the financial success of that particular business. *See* Tr. 3471:19-22 (Stephenson (AT&T)); Tr. 3248:21-25 (Stankey (AT&T)).

92.     The disparate groups will be barred from sharing certain confidential information (for instance, the "media" company will not be permitted to know the terms of DIRECTV's affiliate deals), as a matter of both contract and AT&T policy. *See* Tr. 3428:20-3429:2 (Stephenson (AT&T)); *see also* Tr. 3250:15-19 (Stankey (AT&T)) (referring to "non-disclosure agreements" and "separately structure[d] entities" to "firewall" information sharing); Tr. 3251:2-3 (Stankey (AT&T)) ("There will be no Turner employee that can gain access to DirecTV carriage agreements and vice versa."). The reason is straightforward: because AT&T has multiple lines of businesses, its competitors in one business are often its customers in another. The survival of those relationships depends on appropriate limitations on information sharing. *See* Tr. 3429:13-17 (Stephenson (AT&T)) ("I never want Verizon to question that the information I get by doing business with them is being shared with the retailer. They'll stop doing business with us . . . but it's also just inappropriate."); Tr. 3250:20-3251:1 (Stankey (AT&T)) ("We have sensitive information all over AT&T today . . . . I mentioned I ran the wholesale business, as an example. And I would sell to competitors who compete with our business services group that sells directly to retail customers like Bank of America and GM. There were hard firewalls. My contracts could never be seen by anybody else in the business.").[6]

---

[6] AT&T will be able to achieve synergies despite the independence of the four operating companies because the objectives to become more competitive will be built into the operating plans of the companies and "the fact that it's in their operating plan will drive that level of cooperation." Tr. 3249:1-10 (Stankey (AT&T)). Further, even with arm's-length negotiations among the operating companies, the elimination of the double margin will reduce price pressure because AT&T can reduce the profit requirements on the communications company, which allows it to pass cost reductions on to consumers. *See* Tr. 3503:24-3504:18 (Stephenson (AT&T)).

93.     The evidence also shows that the merger will not affect what rival distributors are willing to pay for Turner content. *See* Tr. 884:4-6 (Rigdon (Comcast)) ("I don't know how [AT&T and Time Warner] [a]re going to operate the company, but I don't have any reason to believe that it will impact my negotiations with Turner or HBO."); *cf.* Tr. 421:5 (Schlichting (DISH)) ("Why would we recommend [to the decision-maker at DISH] that we pay more money?").  **[REDACTED]**.  Mr. Warren from Turner even testified that, in his most recent negotiations with Charter, the cable company's *preference* was to "wait until after the merger and . . . negotiate with [Turner] then."  Tr. 1102:9-14.  Not even Professor Shapiro was willing to predict that the Chairman of DISH, Charlie Ergen, would actually pay the increased fees his model predicted.  *See* Tr. 2307:15-19 ("Q.  . . . [D]o you have any reason to believe that Mr. Ergen is going to pay almost $300,000,000 in additional money just because Turner merged? . . . A.  I am not trying to get into the head of Mr. Ergen.").

94.     Additionally, Professor Shapiro agreed that "fundamentally" the model "rests on the threat of a *permanent* blackout of Turner programming."  Tr.2394:5-7 (emphasis added). However, as he conceded, "in the real world there has *never* been a permanent blackout of the Turner networks" on any major MVPD.  Tr. 2394:8-11 (Shapiro) (emphasis added).  Professor Shapiro further agreed that, even in fiercely contentious negotiations, "virtually every one of these impasses is resolved after requiring either no blackout or a short-term blackout."  Tr. 2396:1-5.  The threat of a permanent blackout is thus not a credible one in the real world, and it is not one that would give Turner any additional leverage.  For the same reason, Professor Shapiro's model is not a reliable predictor of actual market behavior.

95.     Consistent with all the trial testimony that vertical integration does not affect bargaining outcomes, the real-world data does not support the government's model's prediction of higher content prices after a programmer vertically integrates with a distributor.

96.     There are three relevant transactions that allow one to test the effects of vertical integration on the price of content.  They are:  (1) the 2011 merger of Comcast and NBCU; (2) News Corp./Fox's divestiture of control of DIRECTV in 2008; and (3) Time Warner Inc.'s 2009 divestiture of control over Time Warner Cable.  Professor Shapiro did not analyze any of these transactions or look at whether his predictions were consistent with these actual events.  *See* Tr. 2337:9-2338:25 (Shapiro).  He failed to do so even though, as he acknowledged, he has written that "the most direct way" to measure the "reliability of different methods of evaluating proposed mergers" is "to compare the observed changes from completed mergers against premerger predictions."  Tr. 3885:25-3886:20.  And, as Professor Shapiro recalled, he criticized another academic in the context of the Fox/DIRECTV acquisition for failing to provide sufficient *empirical* evidence to support a bargaining leverage theory.  *See* Tr. 3886:21-3887:8; *see also* Tr. 3890:11-14 (Shapiro) ("Since he did not do empirical analysis to support his bargaining model and did not have prior historical evidence, my view was that his analysis was incomplete.").

97.     Professor Carlton, on the other hand, did analyze these real-world events as the best evidence to predict what is likely to happen with this merger.  As he testified, "[u]sually when you are studying a merger you don't have the luxury of seeing what's going on in past transactions that are similar.  That's different here.  We have at least three that are relevant . . . . Those are all great opportunities to study whether there's any truth to the government's claim that vertical integration in this industry leads to higher content prices."  Tr. 2440:1-11; *see also* Tr. 2478:17-18 (Carlton) ("[M]y preference is always to see what's happened.").

98.     The evidence from those transactions shows that, contrary to the government

model, there is *no statistical support* for the conclusion that distributors pay more for content

where the content provider is affiliated with a competing distributor; in fact, there is some

statistical support for the conclusion that these transactions cause prices to *fall*. *See* Tr. 2470:13-

21, 2477:3-12 (Carlton).  As Professor Carlton explained, "some show a decrease that is

statistically significant, but none, let me emphasize this, none show a statistically significant

increase in price, which is what the government is claiming should occur."  Tr. 2477:9-12.

Because the market is now more competitive than it was at the time of these transactions, it is

even less likely that there would be a price increase now.  *See* Tr. 2476:6-9 (Carlton) ("So if you

didn't see a harm, a support for the government's theory back then when times were less

competitive, you're unlikely to see it, certainly unlikely to see it in the future as times become

more competitive.").

99.     In particular, Professor Carlton testified that, as to the most recent of these

transactions, Comcast/NBCU, he reviewed data from multiple sources and did regression

analyses using a wide variety of datasets.  *See* Tr. 2470:2-2473:18.  Those analyses consistently

led to the conclusion that NBCU's prices did not increase more than those of other programmers.

*See* Tr. 2470:13-21 (Carlton).  Professor Shapiro did not offer any econometric analysis that

contradicted these consistent findings.  *See* Tr. 2473:24-25 (Carlton).

100.    Although the government has suggested that the lack of a price increase relative to

other programmers may reflect the fact that Comcast competes regionally, and thus does not

compete with some other distributors, Professor Carlton confirmed that he found no price

increase for NBCU programming associated with the merger even when he looked at actual

prices paid over time by national distributors (DISH and DIRECTV) that do compete with

Comcast everywhere within Comcast's footprint. *See* Tr. 2474:11-17. Professor Carlton likewise explained that the existence of conditions on the Comcast/NBCU merger was not a valid distinction, because the arbitration/no-blackout mechanism here is "very similar" to what was imposed there. Tr. 2475:1-3; *see* Tr. 2557:17-21 (Carlton) ("I simply made the observation that there were conditions in that case that look pretty similar to the arbitration commitments in this case. And I'm observing that in that other case, there was no effect [on prices].").

101. Indeed, in its response to an interrogatory, the government stated that it takes no position on whether the prices for NBC content increased as a result of the Comcast/NBCU merger. *See* DX893.00027-.00029. The government asked Professor Carlton whether an uptick in the rate of NBCU price increases to DIRECTV in the first contract DIRECTV entered with NBCU as a vertically-integrated company showed that prices rose as a result of the Comcast-NBCU transaction. *See* Tr. 2568:4-16 (Carlton). However, as Professor Carlton explained, that there was an uptick after signing the contract is "utterly irrelevant" as a matter of economic logic. Tr. 2570:4-5. What matters for determining whether there was any price increase as a result of the merger is that the NBCU and "All Other Networks" price trend lines begin in 2010 at the same place, and end in 2017 in the same place. Tr. 2570:6-23 (Carlton). More important, Professor Carlton explained that his graph was only suggestive; his "econometric study" showed there was no evidence that prices increased following the Comcast-NBCU merger. *See* Tr. 2471:3-2473:18 (Carlton) (explaining multiple runs of regression analyses showing "no statistical support" of a price increase resulting from the merger).

102. The government's theory that vertical integration leads to higher prices also is fundamentally inconsistent with the fact that programmers have spun off distribution assets, as Time Warner did with Time Warner Cable and News Corp/Fox did with DIRECTV. *See* Tr.

2468:25-2469:24 (Carlton).  As Professor Carlton testified, "[t]he government's theory is that vertical integration is profitable for the firm because they harm their rival and they make more money.  Well, if that's true, if you're vertically integrated, you wouldn't vertically disintegrate because, according to the government, you're now not going to make as much money.  The government's whole theory is that vertical integration is bad, and the company makes, you know, excess—too much money.  Well, then you should never see vertical disintegration."  Tr. 2469:11-19.

103.    Professor Carlton's analysis on that point is buttressed by the testimony of Time Warner executives.  Time Warner CEO Jeff Bewkes stated that Time Warner never considered that the Time Warner Cable spinoff might reduce the prices it could charge distributors.  *See* Tr. 3122:20-24.  Turner Chairman and CEO John Martin likewise confirmed that the spin off, with which he was closely involved as then-CFO of Time Warner, *see* Tr. 599:5-11, did not affect Turner's ability to negotiate affiliate fees with distributors.  *See* Tr. 603:19-604:1 ("Q.  Now, at the time of the spin-off, were there any discussions that Turner's prices to distributors would go down after the disintegration on the theory that they were artificially propped up during the vertical integration?  A.  No.  Q.  And afterwards, did you observe that Turner's pricing, I mean after the spin-off, suddenly went down?  A.  That did not happen.").

104.    Rather than rely on the ample available real-world data, the government, through Professor Shapiro, relied on "a complicated [economic] model to put it mildly." Tr. 2446:25-2447:1 (Carlton).  Relying on models instead of real-world evidence is a dubious approach in any case:  "trying to build models that are predictive [is] more speculative . . . than analyzing data of what has actually occurred."  Tr. 2526:13-15 (Carlton).  In this case, moreover, the evidence repeatedly showed the government's model to be fragile and highly dependent on a

series of incorrect assumptions.  It is extremely sensitive to erroneous inputs and is, in numerous

independent respects, not consistent with reality.  It is thus of little use in making predictions

about the real world.

### ii. The Model Ignores Existing Contracts That Undermine The Predictions of Harm

105.   Professor Shapiro's model fundamentally fails to model the effects of *this* merger

on *these* facts because, in predicting price increases, it ignores the contractual protections *against*

such price increases that are contained in Turner's existing contracts with its distributors.  *See* Tr.

2444:10-14 (Carlton).  **[REDACTED]**.

106.   Despite that contract, the government's model assumes an immediate price increase

for Turner programming for every single distributor.  Even Professor Shapiro concedes that this

result is inconsistent with the real world:  "I fully acknowledge the actual effects will only occur

gradually, because these contracts will prevent the prices from going up right away."  Tr.

2209:17-19; *accord* Tr. 2316:3-4 (Shapiro) ("I'm looking at the market configuration without

those contracts."); Tr. 2317:6-2318:6 (Shapiro) (agreeing that one-third of the predicted price

increase cannot happen for years due to one contract alone).  Simply put, as Professor Shapiro

himself stated, the existence of that contract means that, even assuming his model is correct in all

other respects, the harm it predicts *simply will not occur.  See* Tr. 2317:12-19 (Shapiro)

(confirming that his predicted harm "isn't going to happen" and "can't happen" in "the year after

the merger" and "can't happen in the second year" either).

107.   Indeed, excluding that one distributor from receiving a Turner affiliate fee

increase—even leaving all other data inputs untouched—eliminates one-third of the price

increase to distributors Professor Shapiro predicted.  *See* Tr. 2317:6-2318:6 (Shapiro).  In fact,

acknowledging the existence of this one binding agreement "take[s] away the vast majority of

the net effect" on consumers.  Tr. 2319:15-16 (Shapiro).  Professor Shapiro himself did not

dispute that this one correction reduces the monthly consumer price increase his model projects

from $20 million to $3 million.  *See* Tr. 2319:17-20 (Shapiro) ("That sounds like your math is

right . . . .").

108.   Accounting for *all* of the current contracts that exist in the real world has an even

greater effect.  As Professor Carlton testified, if Professor Shapiro's 2016 model is corrected *only*

to account for all existing contracts, the model would predict a net consumer *benefit* of 20 cents

per subscriber per month, instead of a net consumer harm of 27 cents.  *See* Tr. 2515:25-2516:1.

109.   Professor Shapiro attempted to justify his decision to ignore the existence of these

agreements because his analysis is intended to evaluate "the fundamental incentives and changes

in the market" and these "contracts will . . . expire in time."  Tr. 2209:11-14.  But, because of the

inherent uncertainty of predictions further into the future, Professor Shapiro predicted the effects

of the transaction only through 2021.  *See* Tr. 2256:18, 2258:1-2 ("My binoculars are pretty

good, but that's getting out there a ways.").  **[REDACTED]**.  Thus, the contracts must be

accounted for in the real world, and Professor Shapiro's attempt to predict the future beyond the

current contracts is too divorced from the facts to be probative.

### iii.   *Correcting the Data Inputs Both Eliminates Any Predicted Price Increase and Shows the Unreliability of the Government's Modeling*

110.   The government's bargaining model independently fails to establish any post-

merger harm to competition because it relies on flawed data inputs.  *See* Tr. 2315:9-17 (Shapiro)

(acknowledging that the quality of the model's results is only as good as its inputs).  As

discussed below, in many instances, correcting just one of these erroneous inputs results in no

projected harm to consumers even under Professor Shapiro's model.

### a. Inputs Overestimate Departure Rate

111. As discussed above, the hypothetical model used by the government assumes that Turner will increase its minimum price in bargaining because, after the merger, the losses it would suffer from failing to reach agreement would be partially offset by revenues DIRECTV/U-verse would receive from subscribers who switch to that service. The number of subscribers the rival distributor would lose either through existing customers leaving or fewer new customers signing up is known as the "departure" or "subscriber loss" rate. *See* Tr. 2217:15-17 (Shapiro).[7]

112. Professor Shapiro relied primarily on a model that (at least initially) assumed a departure rate of 9%. *See* Tr. 2356:4-5 (Shapiro). The evidence does not support that conclusion.

113. Correcting the government's inflated departure rate—and *making no other change* to Professor Shapiro's model—eliminates all predicted consumer harm. Professor Carlton explained that, after considering all of the reliable material that was available, his estimate for the departure rate is no more than 5%. *See* Tr. 2503:21-24. He further testified, "If you use a 5 percent departure rate, it turns [Professor Shapiro's] consumer harms into consumer benefits. Prices on average go down." Tr. 2504:8-10; *see also* Tr. 2515:11-15 (Carlton) ("So if you just change the departure rate from Shapiro's 9 percent to Carlton's 5 percent, Shapiro's effect goes from a 27-cent, on average, price increase to a 1-cent price decrease, consumer price decrease."). Indeed, Professor Shapiro agreed that it did "not sound unreasonable" that even a departure rate of 5-6% leads to "no price increase to consumers." Tr. 2357:4-7; *see also* Tr. 3871:2-3 (Shapiro)

---

[7] In this document, unless the context indicates otherwise, these terms refer to both the loss of existing subscribers as well as the loss of potential new customers (sometimes called "gross adds").

("If you just make that change alone, I think we figured that largely eliminates the net MVPD cost increase.").

114.  ***Altman Vilandrie Slides.***  Instead of relying on evidence of actual drops involving Turner or even another programmer, Professor Shapiro testified that "the single best document . . . that [he] found" to inform his assumed departure rate is an April 27, 2017 set of slides created by a third-party consultant, Altman Vilandrie, for Charter, a rival distributor that opposed the merger and testified for the government in this case.  Tr. 2235:11-14.  But, after Professor Shapiro was presented with evidence that Altman Vilandrie's original estimates of losses due to a Turner blackout were much lower, he admitted in his rebuttal testimony that if he were to make that change, it would largely eliminate the cost increase to MVPDs.  *See* Tr. 3871:2-3.

115.  The Altman Vilandrie slides purport to provide the findings of a "Content Valuation Project" that Altman Vilandrie performed for Charter.  *See* Tr. 1271:22-23 (Bewley (Altman Vilandrie)).  The slide deck contains estimates of departure rates for existing customers and losses of gross adds that would result following a hypothetical blackout of Turner and other programmers' contract groups.  Professor Shapiro relied on what he refers to as the "lower end" of the departure rates that Altman Vilandrie estimates Charter would experience if there were a blackout of all Turner channels.  *See* Tr. 2360:25-2361:9.

116.  The Altman Vilandrie slides do not support Professor Shapiro's modeling assumption, as the estimates for Turner were inexplicably manually increased.  The evidence shows that, on April 21, 2017, Altman Vilandrie sent what it called the "final" version of its slide deck to Charter executives.  *See* Tr. 1301:7-21 (Bewley (Altman Vilandrie)).  However, immediately after meeting with Charter on April 26, 2017, the Altman Vilandrie director in

charge of the project, Stefan Bewley, instructed his team to modify the estimated subscriber departure rates attributable to the loss of the Turner networks. *See* Tr. 1310:23-25 (Bewley (Altman Vilandrie)). Specifically, Altman Vilandrie made manual changes that raised the "lower end" of the estimated subscriber loss rate for existing customers—the rate on which Professor Shapiro has relied—from the initial 5% to 9%, without making any changes to its methodology or data or to the results for any programmer other than Turner. *See* Tr. 1318:1-11 (Bewley (Altman Vilandrie)). Mr. Bewley ordered that change while standing in line at the airport to return from his meeting with Charter. *See* Tr. 1314:24-1317:15 (Bewley (Altman Vilandrie)); DX681.0023 (**[REDACTED]**). These manual changes also resulted in an increase for the "lower end" for its prospective subscriber loss rate (that is, the percentage of potential *new* customers that Charter would not get) from 6% to 10%. *See* Tr. 2814:20-2815:10 (Rossi).

117.   Of the numerous networks included in the slides, those changes were made exclusively for Turner and then "hard coded" into modeling that generated financial valuation results. *See* Tr. 1286:6-7 (Bewley (Altman Vilandrie)); DX684.0002 (**[REDACTED]**); DX687.0002 (**[REDACTED]**). Less than a day later, Altman Vilandrie sent its revised "Final Readout" presentation with the higher numbers to Charter. *See* Tr. 1312:22-1313:1 (Bewley (Altman Vilandrie)). It was not until several months later that Altman Vilandrie applied the same manual change to its treatment of other network groups. Mr. Bewley admitted that the decision to make those harmonizing edits was not made, quite notably, until shortly after Altman Vilandrie revealed "to the DOJ [] the fact that [it] had made the change for Turner and only Turner." Tr. 1314:17-19; *see* Tr. 1314:20-23 (Bewley (Altman Vilandrie)) ("Q. It was after you told that to DOJ that you then went back and did the additional work in October for the additional $70,000, correct?  A. Yes . . . .").

118.   Although Professor Shapiro testified that "it is not my practice" to use data without "look[ing] into it more and figur[ing] out how reliable it is," Tr. 3848:10-13, he did not take steps to determine for himself the reliability of the Altman Vilandrie data before he relied on it. Professor Shapiro testified that, when he chose to rely principally on the Altman Vilandrie slide deck, he was unaware that Altman Vilandrie had made these manual changes solely to the Turner inputs on which he relied.  *See* Tr. 2364:21-2365:10 (Professor Shapiro was unaware of the change from 5% to 9% for departures of existing subscribers when he relied on the document and at his deposition).  Although Altman Vilandrie had explained the change to DOJ during a telephone interview in August 2017, *see* Tr. 1293:14-25 (Bewley (Altman Vilandrie)), DOJ evidently did not inform Professor Shapiro about the change.  *See* Tr. 2367:7-12 (Shapiro) (DOJ did not provide Professor Shapiro the original draft of the Altman Vilandrie slide deck).

119.   Professor Shapiro further testified that he did "not review[ ]" Altman Vilandrie's work, Tr. 2235:24, and was "not sure" what work Altman Vilandrie did between April 21, when Altman Vilandrie submitted its original findings, and April 27, when it submitted the altered, hard-coded results.  Tr. 2398:21-25; *see* Tr. 3863:21-23 (Shapiro) ("Q. So we can establish that all you did was read the report, right?  A.  I relied on the report. I didn't dig behind it.").  Indeed, even when he confirmed at trial that the Altman Vilandrie slide deck was the most important evidence for his subscriber loss calculation, Professor Shapiro testified that he never spoke with anyone at Altman Vilandrie or at Charter.  *See* Tr. 2361:10-17, 3860:16-22.

120.   Although Professor Shapiro initially tried to minimize the importance of the last-minute manual change by suggesting that using the 5% number for existing subscribers would only change the overall "subscriber loss rate" he used from 9% to 8.5%, *see* Tr. 2387:25-2388:15, the evidence demonstrated that this statement was incorrect.  As Professor Peter Rossi,

defendants' survey expert, explained, the 5% existing subscriber loss that Altman Vilandrie manually changed was also used to derive a 6% estimate for loss of *prospective* customers. *See* Tr. 2816:13-2818:3. Thus, when Altman Vilandrie raised the 5% figure to 9% for *existing* subscribers, that alteration also necessarily changed the resulting loss rate for *prospective* subscribers from 6% to 10%. *See* Tr. 2811:13-2812:16, 2814:20-2815:10 (Rossi). Accordingly, to reverse the extraordinary "hard coding" of the Turner results, Professor Shapiro should have changed *both* the 9% and 10% figures, for existing and prospective customers respectively, to 5% and 6%. *See* Tr. 2818:7-17 (Rossi).

121. When he was presented with evidence during his rebuttal testimony that the 10% prospective customer figure was also a result of the manual changes undertaken by Altman Vilandrie, which increased that figure from its original 6% estimate, Professor Shapiro admitted that he was incorrect. *See* Tr. 3868:14-20 ("Q. So you were wrong when you testified under oath in your trial examination a couple of weeks ago when you said the 10 was not changed. The 10 was changed from 6, correct? A. Well, to look at this document, that seems to be the case. So it appears that I was not aware of that change, so I made a mistake on that.").

122. If Professor Shapiro had used the original, unaltered 5% and 6% rates, his model would have predicted *no* price increase. *See* Tr. 2504:8-10 (Carlton); Tr. 3870:22-3871:3 (Shapiro) ("Q. And you know that if you use the 5 and the 6 percent, rather than the 9 and the 10 percent or the 5 and the 10 percent, it's going to yield a departure rate between 5 and 6 percent. And as you've previously testified, that's going to wipe out entirely any price increase, correct? A. If you just make that change alone, I think we figured that largely eliminates the net MVPD cost increase.").

123.   Moreover, Professor Shapiro testified that he relied on the Altman Vilandrie slides

because he believed they were ordinary-course materials used for Charter's actual content

negotiations.  *See* Tr. 2225:24-2226:5 ("[I]n particular, I'll emphasize the study done by Charter

regarding what they predicted or expected the impact on their subscribership would be from a

long-term Turner blackout.  So that's 'normal course of business' documents, which were

developed as part of the negotiation process or to inform negotiation.").  The evidence, however,

showed that the document was created by Charter to advocate against the AT&T/Time Warner

merger, not for ordinary business purposes.

124.   As an initial matter, Charter's lead content negotiator, Tom Montemagno,

confirmed that he had "no involvement in commissioning or generating" the Altman Vilandrie

study.  Tr. 1355:4-7.  Indeed, he was "unaware when" the consultancy was first retained, Tr.

1355:3, confirmed that he "never spent much time with the study" in the course of his work, Tr.

1358:15-17, and admitted he did not even know until his deposition in this case that "the primary

purpose of that study was purportedly for content negotiations."  Tr. 1357:15-23.  That

uncontested testimony from Charter's lead content negotiator—the person most likely to rely on

an ordinary-course content-negotiation study—significantly undermines the suggestion that the

Altman Vilandrie study was a normal-course document intended to inform content negotiations.

125.   Beyond that, Mr. Montemagno expressed skepticism as to the value of data of the

sort provided by Altman Vilandrie purporting to estimate the number of customers who would

cancel their service if a programmer's channels were not available.  *See* Tr. 1359:19-1360:10.

The best evidence of what actually happens when a distributor drops programming, he agreed, is

the "real world evidence."  Tr. 1360:11-15.  He did not, however, have any real-world evidence,

empirical data, or facts regarding what would happen if Charter lost Turner content.  *See* Tr. 1371:11-16.

126.   Mr. Bewley of Altman Vilandrie, for his part, confirmed Mr. Montemagno's lack of involvement.  He admitted that during all of his time working on a project purportedly "designed to inform negotiators dealing with programmers, *[he] never met*" Mr. Montemagno, let alone worked with him.  Tr. 1297:19-22 (emphasis added).  On the contrary, he and the Altman Vilandrie project team dealt directly with several employees at Charter, including David Ellen, one of the top executives at the company.  *See* Tr. 1298:6-23 (Bewley (Altman Vilandrie)).  In addition, Mr. Bewley testified that Altman Vilandrie representatives, including himself, also spoke with the government twice to discuss its Turner loss estimates.  *See* Tr. 1291:13-1292:2, 1324:4-6.

127.   Even apart from the circumstances surrounding the manual alteration to the Turner estimates, the Altman Vilandrie presentation is unreliable because it relied on three different methodologies, each of which was "based on what amounts to pure conjecture . . . unsupported assumptions and unverifiable assumptions."  Tr. 2792:4-8 (Rossi).

128.   The first Altman Vilandrie methodology was an Internet survey.  *See* Tr. 1305:6-13, 1337:6-15 (Bewley (Altman Vilandrie)).  The survey was, in effect, "a combination of three different survey methods":  a "conjoint survey," a "channel chooser" survey, and a "Max Diff" survey.  *See* Tr. 2792:13-17 (Rossi).

129.   That survey methodology was "completely invalid."  Tr. 2800:24-25 (Rossi). Altman Vilandrie's survey methods are not, separately or in combination, a reliable basis for estimating departure rates.  For example, the "conjoint" survey included only 12 networks—and the only Turner network included was CNN.  *See* Tr. 2793:11-14, 2794:7-9, 2794:12-15 (Rossi)

("It is impossible as just a matter of mathematical logic to infer [the value of] the group of Turner channels, all nine of them[,] from a survey that only uses one of them.").

130.    The "Max Diff" method, which asked respondents to rank networks in small groups, did include all of the Turner networks, but provided only an ordinal ranking by "importance."  However, these rankings do not provide any information about how much more important one channel is than another; they show "[a]bsolutely nothing" about the likelihood of a subscriber leaving in the event that a particular network is blacked out.  Tr. 2795:13-2796:11 (Rossi); *see also* Tr. 2796:12-14 (Rossi) ("[W]hen you get out a Max Diff, there are a bunch of numbers that allow you to sort channels from the most important to the least important but nothing else.").

131.    Altman Vilandrie then purported to combine these methods to calculate a loss estimate for existing and prospective subscribers to Charter.  That action is not reliable because these are methodologies that "fundamentally cannot be combined." Tr. 2796:18-2797:4 (Rossi); *see also* Tr. 2800:16-17 (Rossi) ("It's literally an impossibility, and there is absolutely no way to combine these two.").  As Professor Rossi testified, "It's completely invalid.  There's no support for what they've done on the survey side." Tr. 2800:24-25.

132.    Altman Vilandrie used standard statistical software, Sawtooth, for parts of its analysis—software that incorporates some of Professor Rossi's own innovations in survey methodology.  *See* Tr. 2854:5-10 (Rossi).  As Professor Rossi explained, however, Altman Vilandrie's procedure for combining the conjoint and Max Diff surveys was "outside of Sawtooth Software." Tr. 2855:20-2856:6.

133.    The second Altman Vilandrie methodology was an analysis of set-top box data, collected from a sample of existing Charter customers, that showed the amount of time these

viewers were tuned to specific channels.  *See* Tr. 1274:16-18 (Bewley (Altman Vilandrie)).

Because this methodology assesses the behavior of subscribers watching a channel that they *do*

have access to, it "cannot possibly answer the question about the effect of removing any channel

or group of channels."  Tr. 2802:7-8 (Rossi).

134.    As Mr. Bewley admitted, this method attempted to determine whether a subscriber

would leave Charter in the event of a Turner blackout based solely on the percentage of time the

subscriber watched the Turner channels.  *See* Tr. 1274:22-1275:2.  To do that, Altman Vilandrie

was required to rely on unsupported assumptions.  Altman Vilandrie simply assumed that 100%

of subscribers would leave Charter if they lost a channel they watched on average a certain

percentage of the time (or more); conversely, 100% of subscribers were assumed not to leave if

they lost a channel that was viewed a certain lower percentage of the time (or less).  *See* Tr.

2802:23-25 (Rossi).  These upper and lower thresholds were not based on any actual data, but

were "purely assumed numbers" not explained or "based on any data of any kind."  Tr. 2804:12-

14 (Rossi).  Mr. Bewley even admitted that, despite relying on these data, "[y]ou don't really

understand how much value [viewers] got out of [a channel]" just because you know "how much

people have viewed."  Tr. 1275:17-23; *see* Tr. 2857:7-9 (Rossi) ("[T]he link between viewing

concentration and switching [due to lack of Turner content] cannot be established using set-top

box data alone."); Tr. 2807:13-2808:5 (Rossi) (Altman Vilandrie assumed these churn

propensities and thresholds "without any supporting argument or data"); Tr. 2804:12-14 (Rossi)

(explaining that "all of the numbers" used to determine likelihood of churn "are purely assumed

numbers" and are "not based on any data of any kind").

135.    Beyond that, the set-top-box method is limited to *current* Charter subscribers.

Altman Vilandrie obviously did not have set-top-box viewing data for prospective customers.  In

Professor Shapiro's model of potential harm, the behavior of prospective customers is weighted far more heavily. *See* Tr. 3857:8-12 (Shapiro). The Altman Vilandrie methodology, however, does not directly measure viewership data for prospective subscribers. *See* Tr. 2801:18-24 (Rossi). Rather, it attempts to convert viewing data obtained from the set-top boxes of existing Charter subscribers into estimates of existing and prospective subscriber losses that would occur if the entire Turner network group were to be lost. *See* Tr. 2802:9-2803:3 (Rossi). Thus, the analysis on which Professor Shapiro relies for his estimate of loss of potential subscribers has no independent basis or support. *See* Tr. 2801:21-23 (Rossi) ("[T]hat might raise a red flag in your mind, how could they estimate departure rates or loss rates for prospective customers if the set-top box data doesn't have that.").

136. Altman Vilandrie's third methodology was a "hybrid" methodology that simply modified the assumptions applied in the set-top box method with "the survey data where people supposedly state where they care about [a channel]." Tr. 1276:6-12 (Bewley (Altman Vilandrie)). This method was primarily just a "minor alteration to the set-top box method" that adjusted the assumed thresholds in the STB method for some channels. Tr. 2808:9-2809:17 (Rossi). Accordingly, just as the set-top-box method "can't say anything about prospective customers, . . . [t]he hybrid method can't either." Tr. 2808:21-24 (Rossi). Like the set-top box method, "essentially everything [in the hybrid method] is made up by assumption. If you change the assumptions, everything changes." Tr. 2812:17:19 (Rossi). As described above, this method does not make up for the lack of data on what would happen if the Turner networks were dropped. And it is as to this "Hybrid STB" methodology that Altman Vilandrie changed the result with respect to Turner—what Professor Rossi described as "fudging numbers," Tr. 2859:24-2860:7.

137.    For all the reasons discussed above, the Altman Vilandrie document is not reliable,

and since Professor Shapiro claims that it is the "single best document" supporting his

conclusions as to departures, Tr. 2235:13, those conclusions also cannot be credited.

138.    ***Real-World Evidence as to Turner.***   Professor Shapiro's estimated departure rate is

also undermined by the fact that his supposed low-end estimate of 9% is far higher than has ever

occurred in the real world due to the loss of Turner networks.   *See* Tr. 2524:22-2525:4 (Carlton)

(explaining that these short-term drops of Turner are relevant).

139.    Distributors have dropped Turner's channels on only two occasions.   In each case,

the departure rate was far lower than Professor Shapiro posited.

140.    The first involved DISH, which dropped most of the Turner networks (including

CNN, but not TBS and TNT) for one month in October and November 2014.   *See* Tr. 1124:22-

1125:3 (Breland (Turner)).   Mr. Breland, former President of Turner Content Distribution and

head negotiator for Turner at the time, testified that in the negotiations preceding the blackout,

his team "thought [they] were in pretty good shape," but that DISH changed the "tenor" of the

negotiations without a clear explanation.   Tr. 1113:7-22.   From Mr. Breland's perspective, the

negotiations between the DISH and Turner teams had been "normal" up until that point, and

even at the time of his testimony, it was unclear to him why the blackout had occurred.   Tr.

1113:22-1114:5.   Mr. Martin recalled that the negotiations came to a stop shortly after Time

Warner announced the launch of the HBO NOW over-the-top product, in response to which

DISH Chairman Charlie Ergen "immediately expressed his disappointment and frustration that

we would be willing to launch a product like that."   Tr. 648:10-649:12; *see also* Tr. 3131:23-

3132:2 (Bewkes (Time Warner)) ("Charlie Ergen, who runs the Dish company, didn't like what

we were doing with HBO and doing competing distribution.  And so he sent the message that he

was going to punish the Turner networks by taking them out of distribution.").

141.   According to Warren Schlichting, the government's own witness from DISH,

during this blackout DISH lost an estimated 30,000 subscribers—"less than 1 percent" of DISH's

subscriber base.  Tr. 388:10-389:5; *see also* Tr. 401:4-12, 404:8-11 (Schlichting (DISH)).

142.   The second instance involved Cable One, which dropped all of the Turner channels

for about three weeks in October 2013.  *See* Tr. 1043:18-20, 1107:13-14 (Breland (Turner)).  Mr.

Breland testified that the Turner negotiating team entered the final day of negotiations believing

it was "$200,000 apart in economics" from the terms Cable One wanted, but that the Cable One

team "fundamenta[lly] change[d]" its position by seeking only three of the Turner networks.  Tr.

1104:18-1105:3, 1106:11-12.  Mr. Breland characterized this as being "sucker punched,"

because the teams had gone through the entire negotiating period, and had negotiated all other

terms within the contract, under the assumption that all Turner networks would be included in

the agreement.  Tr. 1105:2-1106:17.  Though the parties entered into a 24-hour extension, Cable

One dropped six of the Turner channels, and Turner then pulled the remaining three.  *See* Tr.

1045:4-17; 1105:25-1106:01 (Breland (Turner)).

143.   In this instance as well, the departure rate was far lower than Professor Shapiro

posited.  The government's witness from Cable One, Randy Sejen, testified that Cable One's

subscriber losses were "very, very small" and "fairly insignificant," and that a 0.6% subscriber

loss rate caused by the blackout "sounds about right."  Tr. 2124:10-11, 2127:21-2128:2.

144.   Testimony from Time Warner and Turner witnesses further confirmed that the

government's 9% departure rate is highly unrealistic.  As Mr. Breland stated, "I've got two real

market examples, DISH Network, and I believe I said one tenth of one percent when they were

dark, albeit without TNT and TBS.  But when we were dark with Cable One, I believe their word about the outage was something along the lines of insignificant." Tr. 1128:15-19.  In the view of John Martin, Turner's current Chairman and CEO, who has spent approximately 25 years in the industry, including at a programmer (Turner), distributor (Time Warner Cable), and the parent company of both (Time Warner Inc.), the "maximum loss from the Turner networks being off would be low single digits at most." Tr. 659:13-660:1.  Similarly, Mr. Bewkes, who has spent nearly 40 years in the industry, testified that "half of [12%] wouldn't sound reasonable to" him, stating that percentages around "1 percent . . . maybe 2" would be more likely.  Tr. 3123:8-3124:9.

145.   Although Professor Shapiro initially promoted what he described as a "conservative" estimate of harm based on the 9% subscriber loss rate, he also did calculations using a 14% rate—also derived from the flawed Altman Vilandrie slide deck—which he described as "the higher end of the range." Tr. 3851:21-3852:13.  A 14% subscriber loss rate, however, is even more inconsistent with the real-world evidence of what has actually occurred when distributors stopped carrying Turner (and Viacom, as explained below).  *See infra* FOF ¶¶ 149-155.  Moreover, relying on the higher end number would violate what Professor Shapiro testified was his "normal practice" to report the lower end of the range.  Tr. 3852:10-14.  Professor Shapiro's attempt to defend his 9% lower-end figure in the face of evidence that it is far too high by pointing to an even higher number from the same source lacks credibility and demonstrates his lack of objectivity.

146.   ***Estimates of Turner Drop Impact by Rival Distributor.***  Comcast prepared ordinary-course business forecasts to attempt to estimate the potential subscriber losses that would result from dropping Turner.  Those estimates are not based on an actual long-term drop

of Turner, because none exists.  Even on their face, moreover, the Comcast drop estimates do not support Professor Shapiro's 9% departure rate.  **[REDACTED]**.

147.  Mr. Rigdon further testified that Comcast's drop analyses are designed to be conservative, in the sense that they err in the direction of overstating potential lost customers. *See* Tr. 893:10-18.  In Comcast's prior experience with an *actual* network drop, which lasted more than a year, *see* Tr. 895:6-13 (Rigdon (Comcast)), **[REDACTED]**.  In this regard, Professor Shapiro did not recall at trial that, compared to Comcast's one real-world example, the Comcast drop analysis was "overestimated by eighty percent."  Tr. 2371:25-2372:3.  Thus, although Professor Shapiro testified that the Comcast estimate was near the "lower end of his range," Tr. 2237:9-22, that estimate in fact provides no support for his assumptions.

148.  Nor did the government's other distributor witnesses provide support for Professor Shapiro's 9% departure rate.  Although Ms. Fenwick of Cox asserted that Turner blackouts would cause substantial departures, neither she nor Mr. Hinson (also of Cox) made any effort to calculate, and thus did not know, how many customers would leave in the event of a drop.  *See* Tr. 140:23-141:14 (Fenwick (Cox)) (if Turner were to go dark, "Q.  . . . How many customers are going to leave . . . ?  A.  We don't know.  Q.  Have you tried to compute it?  A.  I have not."); Tr. 129:18-20 (Fenwick (Cox)) ("Q.  My question was isn't it true that you, your company has never once done a drop analysis with respect to Turner?  A.  Not to my knowledge."); Tr. 695:17-18 (Hinson (Cox)) ("Q.  Have you ever done a drop analysis for Turner?  A.  Not specifically for Turner, no.").  Mr. Schlichting from DISH also had no evidence to support his assertions.  *See* Tr. 404:22-405:3 (does not have a recent projection of how many subscribers DISH or Sling would lose if Turner went dark); *see also* Tr. 413:14-16 (confirming he has no calculations or quantifications of how many subscribers would leave DISH and go to Internet

distributors if Turner went dark).  Nor did Mr. Holanda, CEO of RCN, offer any real-world

evidence of subscriber losses if RCN did not carry Turner.  *See* Tr. 2947:2-13.

149.  ***Suddenlink Drop of Viacom.***  Because Turner has never "gone dark" for a long-

term period, both Professor Carlton and Professor Shapiro analogized to the three-year drop of

the Viacom networks by the cable company Suddenlink to estimate a potential long-term drop of

Turner.  *See* Tr. 2226:9-12 (Shapiro); Tr. 2225:22 (Shapiro) (Viacom is "comparable content" to

Turner); Tr. 2478:17-2479:14 (Carlton); Tr. 2548:6-9 (Carlton) (AT&T documents considered

Viacom a "pretty close" proxy for Turner).

150.  Professor Carlton relied on four separate studies of this event.  *See* Tr. 2480:4-10

(Carlton).  Those included studies performed by Suddenlink itself, as well as by Comcast,

Charter, and Citi.  *See* Tr. 2480:18-2483:2 (Carlton).  All of these analyses concluded that the

drop led to departure rates in the low single digits.  *See* Tr. 2482:24-2483-2 (Carlton); PX373-

021 (**[REDACTED]**).  Indeed, Suddenlink's own analysis, which it reported to shareholders and

was subject to SEC obligations, found that the departure rate was between 2% and 2.5%, and that

subscriber losses were over within a period of six months.  *See* Tr. 2480:18-25 (Carlton).

151.  Professor Carlton explained why Professor Shapiro's much higher 9% estimate was

not plausible.  *See* Tr. 2483:6-10.  As Professor Carlton explained, that number is an "outlier"

that fails to account for key "industry trends."  Tr. 2483:8-9, 2483:16-19.  Professor Carlton

explained that the industry as a whole was losing customers faster in the period after the

Suddenlink drop of Viacom than before, so that a proper analysis must control for those industry

trends (which may explain why the analyses of actual drops that were calculated by distributors

in the ordinary course of business are a fraction of Professor Shapiro's rate).  *See* Tr. 2483:20-

2484:2; *see also* Tr. 2490:8-10 (Professor Carlton confirmed his results comparing Suddenlink's

customer losses to industry trends with two separate econometric specifications).  When

Professor Shapiro's analysis is corrected to control for those trends, the result is a 4.8% departure

rate.  *See* Tr. 2484:3-8 (Carlton).

152.   Professor Shapiro never offered any specific criticism of Professor Carlton's

regression—which used Professor Shapiro's own industry data—and Professor Shapiro likewise

never presented any statistical analysis to show that his departure rate accounted for industry

trends or to justify his failure to account for industry trends.  *See* Tr. 2489:10-13 (Carlton).  On

the contrary, his regression simply *assumed* that *all* of the increased rate of decline of Suddenlink

subscribership after October 2014 was due to the loss of Viacom *and no other factor*.  *See* Tr.

2227:15-2228:10 (Shapiro); Tr. 2483:16-19 (Carlton).

153.   Instead of presenting any statistical analysis, Professor Shapiro tried to use a

demonstrative to suggest that industry trends did not change after October 2014 and therefore

could be ignored.  *See* Tr. 2229:2-2230:7 (Shapiro).  But Professor Shapiro also acknowledged

that—even based on his own chart—the rate of industry subscriber losses was twice as fast in the

21-month period after the Suddenlink/Viacom blackout as it was during the 21-month period

before.  *See* Tr. 3876:7-3877:9, 3877:16-20.  That acknowledged acceleration means that

Professor Shapiro's model was attributing increased subscriber losses at Suddenlink after

October 2014 to the Viacom blackout when in fact a significant portion of those losses was the

result of industry-wide trends.

154.   Moreover, the demonstrative Professor Shapiro used gave a misleading impression

because Professor Shapiro's team left off a month of data that showed a steep decline in industry

subscribership in December 2016.  *See* Tr. 3879:1-14 (Shapiro).  Professor Shapiro had not been

aware that any month of data was left off his chart, *see* Tr. 3879:1-8.  But when called back to

the stand two days later for redirect, he tried to justify the omission by claiming that some of the

data for December 2016 was "peculiar." *See* Tr. 3915:9. Professor Carlton showed, however,

that even using Professor Shapiro's chart, which omitted December 2016, the industry decline

was more rapid after October 2014 than before and that Professor Shapiro did not properly

account for the change, *see* Tr. 2488:5-2489:9 (Carlton). Professor Shapiro was forced to

concede that point on cross-examination. *See* Tr. 3876:6-3877:9.

155. ***Cable One Drop of Viacom.*** Professor Shapiro testified that his analysis of a long-

term blackout of Viacom on the distributor Cable One led to a "long-term subscriber loss rate of

16 percent." Tr. 2232:10-11 (Shapiro). But that conclusion simply showed that Professor

Shapiro's simplistic before-and-after analysis was unreliable. Indeed, a former Cable One

executive agreed that the impact of the Viacom drop "was felt and absorbed" within four to six

months, Tr. 2130:1-4, and that it caused a loss of just two percent of Cable One's subs.

Tr. 2123:21-2124:12 (Sejen (Cable One)) ("The losses attributable to Viacom are very, very

small . . . and were not significant."). In addition, Professor Carlton testified that the "Cable One

blackout was not as probative or informative because Cable One underwent a lot of business

transition" after it dropped Viacom. Tr. 2479:7-9 (Carlton) ("They decided to de-emphasize

video. They jacked up their prices of video. They reassigned their sales force, there was

subsequent blackouts of other channels. So I didn't think that was a good example."). As with

Suddenlink, Professor Shapiro's analysis ignored relevant factors and simply assumed that all

impact was due to Viacom—even though the evidence showed that was not so.

156. ***Professor Hauser's Internet Survey.*** Professor Shapiro also relied on an Internet

survey by Professor Hauser in support of his postulated departure rate. Like Professor Shapiro,

Professor Hauser declined to examine real-world data from past blackouts to determine whether

his findings were realistic.  *See* Tr. 762:23-763:3, 801:10-802:1 (Hauser).  Moreover, Professor

Hauser's calculations of a 12.2% departure rate for a permanent blackout and an 8.2% departure

rate for a one-month blackout of the Turner channels, *see* Tr. 795:12-16, 803:23-804:3, 805:10-

17, are inconsistent with the evidence of much lower customer losses from actual blackouts.

Indeed, Professor Shapiro conceded that it was "fair" to compare Professor Hauser's survey to

the actual Cable One blackout experience and that, in doing so, "*[t]hat eight percent number [for

a one-month blackout] seems high.*"  Tr. 2359:25-2360:18 (emphasis added).  Similarly,

government witness Greg Rigdon of Comcast testified that each of Professor Hauser's estimates

of 8% and 12% "seem[] like . . . big number[s]."  Tr. 896:10-898:5; *accord* Tr. 2491:4-15

(Carlton) (Professor Hauser's 8% departure rate for one month "strikes me as way too high" and

is "nothing like" the Cable One estimate of 1.1% to 1.2% for the actual temporary Turner drop,

which "cast[s] doubt on what Professor Hauser is doing.").

157.   Professor Hauser's Internet survey also was "confusing" and "designed in a biased

way," which renders its results "unreliable."  Tr. 2768:14-15, 2778:22-23 (Rossi).  Professor

Hauser conducted an online survey with approximately 1,600 participants.  Tr. 765:11 (Hauser).

Participants were drawn from an Internet panel and then broken into four groups of

approximately 400 participants each, three "test" groups and one "control" group.  *See* Tr.

775:10-14 (Hauser); *see also* Tr. 761:21-762:21-25 (Hauser).  The test groups were asked to

consider a permanent blackout, a one-month blackout, and a one-week blackout, respectively.

*See* Tr. 775:22-776:6 (Hauser).  The control group was not presented with any information about

a blackout.  *See* Tr. 776:14-18 (Hauser); Tr. 2768:8-11 (Rossi).

158.   Professor Hauser's survey was unreliable for at least four independent reasons:

*first*, it posed the "blackout" scenario to respondents in a biased way that almost certainly

inflated the prediction of switching behavior; *second*, it used a confusing, unreliable, and inaccurate "intent to switch" scale to estimate an expected departure rate in the event of a Turner blackout; *third*, there was no showing that the survey sample was appropriately representative of the universe of pay-TV subscribers; and *fourth*, Professor Hauser's margin of error is so large that it renders his results unreliable. *See* Tr. 2768:12-2769:8 (Rossi).

159.   The blackout scenario in the survey was "biased" in that it "tend[ed] to visually overemphasize Turner content" relative to other content. Tr. 2783:12, 15-17 (Rossi). Professor Hauser testified that many TV viewers think about television in terms of programs or genres of programming, not channels. *See* Tr. 817:17-818:5. He therefore began his survey by "priming" survey respondents to connect programming to specific channels. *See* Tr. 817:25-818:17.

160.   This priming tended to bias respondents in favor of indicating an intent to switch because the examples of channels repeatedly displayed a disproportionate number of Turner channels. For instance, when Professor Hauser presented a screen of "News/Talk" networks to some respondents, 4 of the 12 network logos displayed were Turner networks. CNN en Español was included, while CNBC, MSNBC, and Fox Business were not. *See* Tr. 824:1-14. The survey included among "Sports" networks TBS, TNT, and TruTV, because they carry the NBA playoffs and March Madness, even though every other network listed carries *only* sports programming. *See* Tr. 824:15-825:6 (Hauser). Thus, other than these three Turner networks, the "Sports" page did not include any general entertainment networks, such as the four broadcast networks, despite the fact that ABC shares the NBA playoffs with TNT and CBS shares March Madness with Turner, and all of the broadcast networks have significant sports rights. *See* Tr. 825:7-826:2 (Hauser); *see also* Tr. 2788:19-2789:8 (Rossi) (excluding the broadcast networks "does provide another opportunity to display Turner logos.").

161.   In addition, in listing examples of "Special Events," such as the Academy Awards, Professor Hauser said he relied primarily on a list of the top 100 prime-time telecasts.  *See* Tr. 819:22-820:4.  But only one Turner telecast was actually on that top 100 list.  *See* Tr. 821:4-12 (Hauser); *see also* Tr. 2788:10-15 (Rossi).  Professor Hauser then *added* to the priming page additional special events *only from Turner networks*, even though their telecasts were not in the top 100.  *See* Tr. 2788:16-18 (Rossi) ("This set of logos here includes more Turner logos than I think is representative of the top 100 events.  Because the other top 100 events don't have any Turner.").

162.   Later in the survey, when he presented information regarding the Turner blackout to the three test groups, Professor Hauser showed respondents a set of 10 large Turner logos at least six times.  *See* Tr. 838:23-839:3 (Hauser).  He did *not* show logos to the control group for any other channels during the same questions.  *See* Tr. 2790:24-2791:3 (Rossi).  This, as well as the priming section, biased respondents into overvaluing the Turner networks relative to other networks for purposes of the survey.  *See* Tr. 2786:21-2787:4, 2789:18-2790:17 (Rossi).  As Professor Hauser acknowledged, he was criticized in a prior case for giving "extra attention" to the subject of the experiment through "graphic effects and presentation methods" that caused the results to "likely overstate" the effect being measured.  Tr. 844:21-845:6; *see Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2014 WL 976898, at *10-*16 (N.D. Cal. Mar. 6, 2014).

163.   The survey was also biased because it "minimiz[ed] or neglect[ed] many aspects of switching costs."  Tr. 2783:13-14 (Rossi).  In particular, Professor Hauser's survey ignored search costs, bundling costs, and psychological costs.  *See* Tr. 2786:10-16 (Rossi); *see generally* Tr. 2783:19-2785:16 (Rossi).  For example, real-world consumers spend considerable time and

effort researching alternative pay-TV providers and their offerings before making a decision to switch ("search" costs). *See* Tr. 2783:21-2784:2 (Rossi). By doing all of the search work for the respondents and giving them a set of pre-packaged options to choose from, Professor Hauser essentially set search costs to zero. *See* Tr. 2784:1-3 (Rossi).

164. The academic literature cited by Professor Hauser himself in his report estimates such switching costs for television subscribers to be between $250 and $400. *See* Tr. 2785:17-2786:7 (Rossi). Because the survey only attempted to "evoke a hypothetical switching cost[] of one type," Tr. 2786:14-16 (Rossi), it did not (and could not) actually account for the real-world costs to subscribers of switching and likely inflated the number of respondents who said they would be likely to switch. As the government's witness from DISH pointed out, "in the satellite business you actually have to call up. You have to have somebody come visit your house. They have to be there, they take the equipment, there's a lot of inefficiency." Tr. 266:15-18 (Schlichting (DISH)).

165. Professor Hauser's survey also did not directly ask respondents whether they would switch providers in the event of a Turner blackout. *See* Tr. 813:4-8 (Hauser). Instead, it used a "Juster" scale to ask whether they would consider switching and, if so, to indicate "How likely are you to switch your TV provider, on a scale from 1 to 99?" DX915.0152. The scale included percentages—10%, 20%, 30%, etc.—and accompanying descriptors such as "very slight possibility," "slight possibility," "some possibility," and "fair possibility." *See* Tr. 813:23-814:19 (Hauser); DX915.0152.

166. The evidence showed this scale to be "confusing and biased" as applied here. Tr. 2778:22-23 (Rossi). That is the case because, as Professor Rossi testified, "the text description [wa]s out of w[h]ack with the numbers." Tr. 2778:17-21. Indeed, Professor Hauser conceded

that, if all respondents said that there was a "very slight possibility" (which coincided with a 10% notation on the scale) that they would switch, he would conclude based on his survey that 10% of subscribers would in fact switch in the event of a Turner blackout.  Tr. 815:20-816:4.  As Professor Rossi testified, "[n]ow if I told you that I thought there was a very slight possibility that I would get into a car accident driving from Washington to Baltimore on the Baltimore Washington Parkway this evening, I don't think you would say that was one out of every ten times I attempted that.  You might say one out of every thousand or more.  So the text description is out of whack with the numbers.  And that's true throughout the scale."  Tr. 2778:12-19.

167.  Additionally, the Juster intention scale used by Professor Hauser is "very inaccurate" when used to quantify the actual likelihood of individuals making certain choices (as opposed to, for example, making relative choices of which product a consumer prefers).  *See* Tr. 2779:1-15, Tr. 2782:2-13 (Rossi) ("[T]here are some situations in which a Juster scale can be useful.  They're useful I think in a directional sense. . . .  That's not the sense of which the results of Professor Hauser's surveys are being used.  They are being used as an exact quantification.").  There is, at best, only a moderate correlation between the scale measurement and actual probabilities.  *See* Tr. 2779:16-2780:5 (Rossi) (literature cited by both Rossi and Hauser establishes the average correlation between 0.3 and 0.6, which is even lower than the correlation between the heights of parents and their children).  And even that moderate correlation "basically disappears" in surveys regarding new products or situations, such as a permanent blackout of Turner content.  Tr. 2780:15-24 (Rossi); *see* Tr. 2893:3-6 (Rossi) ("[T]he survey is not about pay-TV.  It's about the reaction of the respondents to a new experience for most of the respondents being black outed [sic].").  Although Professor Hauser contended that

the Juster scale was more reliable in this context because pay-TV is a "durable good," Tr.

787:17-788:2, a television subscription is neither durable nor a good, and Professor Rossi

testified that he does not "know of any marketer or economist who would characterize this

product as a durable good," Tr. 2893:19-21.

168.  Further, in any consumer survey, the sample should be representative of the

population of interest.  Yet, as Professor Rossi confirmed, Professor Hauser did not "do anything

to ensure that his sample was representative."  Tr. 2771:22-24.  Although Professor Hauser used

"click balancing" to proportion the sample to the general demographics of the population by

gender, age, and region, "that does not mean that the sample is representative" in terms of "the

important things that he's asking them about[,] which are things like their view about what's the

value of Turner content."  Tr. 2772:2-21 (Rossi).  For example, the sample might not have been

representative in terms of whether households have multiple services (phone, Internet, video)

bundled together in a "double play" or "triple play," which might reduce the likelihood of

switching.  Tr. 2773:14-21 (Rossi).  The people who take Internet surveys generally might not be

representative of the broader population in question, as they are—by definition—"people who

have the time to take the surveys."  Tr. 2773:22-23 (Rossi).  Because of representativeness

concerns, Professor Rossi noted that, "[i]n virtually all cases," he uses Internet surveys only as

illustrations rather than the basis for conclusions.  Tr. 2774:4-9.

169.  Professor Hauser also failed to provide "any margin of error in his results," which

means there is no way to assess the "reliability of th[e] number that's provided" in his report.  Tr.

2775:2-6 (Rossi).  Without a margin of error, it would be impossible to determine even how

reliable Professor Hauser believes his own findings to be.  When Professor Hauser later provided

a margin of error in his deposition testimony, the confidence interval was "very wide,

amount[ing] to about forty percent of his [departure rate] estimate," Tr. 2885:6-12 (Rossi), which further undermines the reliability of his estimated subscriber loss rates.

170.  ***Subscriber Loss Mitigation Efforts.***  The government estimate of departure rate also fails because it does not adequately account for the fact that distributors that lose access to programming can use various strategies to stem subscriber losses.  Indeed, the government's own witnesses testified that distributors can reduce subscriber losses by lowering prices to consumers or by offering temporary promotions, skinnier bundles, or combinations of video, Internet, and phone service, among others.  *See* Tr. 140:16-19 (Fenwick (Cox)) (if expenses fell following Turner blackout, "Q. . . . [Y]ou could pass that savings on to your subscribers by lowering their cable bills, right?  A.  Yes[.]"); Tr. 2112:3-4 (Sejen (Cable One)) ("We actually gave rebates to our subscribers for the month that Turner was off"); Tr. 2119:3-8 (Sejen (Cable One)) ("adding replacement networks" is a potential mitigation tactic); Tr. 2948:3-6 (Holanda (RCN)) (agreeing that "the last thing [RCN] would do is sit on [its] hands" as it "would do everything [it] could to hang on to [its] customers").  **[REDACTED]**; Tr. 1429:22-24 (Torres (AT&T)) (drop analyses are conducted "assuming we did nothing" to forestall churn or to attract new subscribers); PX0373-021 (**[REDACTED]**).

171.  That is a significant omission because such countermeasures can be extremely effective.  As Mr. Sejen explained, Cable One had a *stronger* channel lineup after dropping Viacom's networks, because Cable One mitigated that loss by "put[ting] on some very popular networks that our subscribers had been asking for for years" after the drop.  Tr. 2096:21-25.

172.  ***Consistency with Turner's Declining Importance in the Transforming Video-Content Marketplace.***  All this evidence demonstrating that there would be relatively few subscriber losses in the event of a blackout of Turner content is consistent with the fact that, in

today's video marketplace, little if any content is truly necessary for an MVPD to compete, and

Turner's content in particular, though valued by some subscribers, is unlikely to drive many

consumers to change providers.

173.   At the outset, despite the government's suggestion that Turner content is

extraordinarily important to distributors, the evidence showed that Turner's networks together

account for only about 6% of television viewership on traditional platforms and online.  *See* Tr.

2458:13-15 (Carlton).  And Turner's share has been "falling over time."  Tr. 2458:6 (Carlton).

174.   Similarly, despite the government's focus on Turner's rights to various sports

events, Turner's share of sports programming is small.  Overall, Turner has rights to only 1% of

Major League Baseball games, less than 8% of NBA games, well less than 3% of NCAA men's

basketball games, and no rights at all to football (NFL or college), NHL, MLS, or NASCAR

events.  *See* Tr. 341:1-18, 344:4-21 (Schlichting (DISH)); Tr. 488:2-5 (Martin (Turner)) (Turner

has 8% of NBA games); Tr. 491:20-492:1 (Martin (Turner)) (of MLB, Turner carries only

playoff games, and splits those with Fox); Tr. 629:5-10 (Martin (Turner)) ("[W]e are not in

business with the NFL. . . .  We don't do business with NASCAR.  We don't do business with

college football.  Even in golf we only have two rounds of one of the major tournaments."); *see*

*generally* DX609.0013-0014 ("Disney in different league with ESPN" and CBS, NBC, and Fox

all have "NFL" rights).  Turner accounts for only 12% of the top-500 highest-rated sports

telecasts, and its highest-rated sports event ranked 161 out of those 500.  *See* Tr. 2459:21-24

(Carlton).

175.   Even Turner's coverage of March Madness, on which the government repeatedly

relied, is both limited and non-exclusive.  *See* Tr. 489:8-20 (Martin (Turner)) (Turner has a

"fifty/fifty partnership with CBS" for March Madness and only carries the semifinals and

championship game every other year).  As Mr. Schlichting from DISH conceded, any consumer

with an Internet connection can watch March Madness for "[t]hree hours for free" online.  Tr.

345:11-13; *see also* Tr. 2122:6-9 (Sejen (Cable One)) ("[A]t least last year, the viewing of March

Madness did not require—did not require authentication through your cable operator.").

176.  March Madness, though popular programming, is thus not essential for distributors

to compete.  In this regard, although Mr. Schlichting initially testified that "if you don't have

March Madness you're not in the pay-TV business," Tr. 242:14-15, he acknowledged that his

own virtual MVPD, Sling, is "doing well," Tr. 356:15-16, even though it does *not* carry CBS and

thus does *not* offer a significant portion of March Madness, including (every other year) the

national semifinals and championship game.  *See* Tr. 352:15-25.  Because it does not carry CBS,

Sling also lacks the NFL games shown on that network, including the Super Bowl in some years,

which is far more popular than any of Turner's programming.  *See* Tr. 353:12-18 (Schlichting

(DISH)).  **[REDACTED]**; DX708.

177.  Even if certain sports programming has no perfect substitute for some customers,

that does not make it essential for a distributor to compete.[8]  For example, DISH's Warren

Schlichting testified that, although regional sports networks have "their own crazies that either

---

[8] As John Martin testified, his comment in an e-mail to Mr. Bewkes regarding Sling's
appeal to consumers absent the Turner networks was made in the context of a difficult
negotiation during a period in which DISH had recently gone dark on the majority of the Turner
networks and "Charlie Ergen had threatened to be out of business with us forever," which would
have been "economically catastrophic" for Turner.  Tr. 653:5-654:5 (discussing PX4); *see also*
Tr. 577:7-10 (Martin (Turner)) ("I was also trying to rally [m]y boss, who was negotiating with
Charlie [Ergen], who's among the smartest and toughest negotiators in the industry, to not give
in on some important points.").  Mr. Martin further testified that his comments related to his
belief that Sling was carrying so few networks that it would have benefitted from also offering
Turner networks, although Sling ultimately chose to carry fewer Turner networks than Mr.
Martin would have preferred.  *See* Tr. 576:24-577:4 ("I thought the number of offerings of
networks that they had were so skinny that they would have benefited clearly by having our
networks, which I try to get all our networks on, didn't succeed.").

love you while you have them or leave you if you don't," Tr. 455:10-12, DISH does not carry all

the available regional sports networks, *see* Tr. 344:24-345:1 (Schlichting (DISH)).

178.   The rival distributors testifying for the government provided no empirical evidence

to support their claims that Turner programming is critical for them to compete.  Indeed, Mr.

Schlichting admitted that claims about the importance of Turner programming contradicted the

public statements of DISH's Chairman, Charlie Ergen, who explained in September 2017:

> [I]n today's market, [a pay-TV provider] could take ESPN down and survive it.
> Five years ago, that would not have been an option.  That would have been—that
> would have been suicidal.  But today they—they could do it.  It would be painful
> but they could do it.  And there's not any channel—there's not any channel that I
> go to sleep at night that that the price is—that I say if the price is too high for
> my—for our consumers, based on our analysis, that we wouldn't be willing to
> take down.

*See* Tr. 376:23-377:10 (Schlichting (DISH)) ("agree[ing] that" Ergen "made" the statement but

not necessarily agreeing with the statement); *see also* Tr. 367:7-368:25 (Schlichting (DISH))

(agreeing that Ergen said that the Turner networks are "one of the easier ones to take down," and

calling it "true" but stating that he "disagree[s]" with it).

179.   Turner employees' and executives' natural affirmation of the value of their own

networks likewise does not show that they are essential to distributors' competitiveness.  In

particular, descriptions of Turner's sports rights as "must have" or use of similar terms show

only that Turner executives are advocates for their own networks.  These phrases are not literal

descriptions of marketplace dynamics.  As the government's witnesses repeatedly acknowledged,

"must have" is a common term that industry insiders apply to all sorts of content; it does not

actually describe content that any distributor "must" have to remain competitive.  *See* Tr. 127:14-

21 (Fenwick (Cox)) (agreeing "must have" is a "sales pitch term" in "marketing mode"); Tr.

2130:23-2131:6 (Sejen (Cable One)) ("Q.  Did you hear from them kind of coming and pitching

that their content was must-have content?  A.  Oh, absolutely, yes.  Q.  Okay.  You would expect

to hear that from all programmers?  A.  Pretty much, yeah.  Q.  And did you just kind of take that with a grain of salt?  A.  Of course."); Tr. 241:10-20 (Schlichting (DISH)) ("must have content" is "popular content"); Tr. 340:4-10 (Schlichting (DISH)) ("turn of phrase" used "in sales pitches"); Tr. 899:13-24 (Rigdon (Comcast)) ("So nothing is must have if it's over charged for, you know, so yes, in general it's a term of art saying it's popular."); *see also* Tr. 1092:18-24 (Breland (Turner)) ("[M]ust have means it's popular . . . .  I don't in a literal sense mean that I must have this content or I can't be successful.  I don't believe that there's a single network in the world that we live in that you have to have it to be successful in video."); Tr. 1092:4-6 (Breland (Turner)) ("It just made me think about all of the signs in restaurants and diners [that] say well, best cup of coffee."); Tr. 549:19-20 (Martin (Turner)) ("'Must have' is another way of saying, we have popular programming."); Tr. 3357:4-9 (Stankey (AT&T)) (explaining that in PX6, he indicated that Time Warner and "a number of other players in the industry given the popularity of the content" own "must have" content).

180.   YouTube TV launched without Turner and did not carry the networks for almost a year.  That Google/YouTube re-engaged with Turner for carriage on its new virtual MVPD service, YouTube TV, does not indicate that distributors need Turner content to be successful.  As both Time Warner's CEO and Turner's lead content negotiator testified, Google launched YouTube TV without Turner and only later decided to re-engage—a year after launch—as a

result of a change in its business model.[9]  Tr. 3133:1-3134:20 (Bewkes (Time Warner));

1203:19-1204:6 (Warren (Turner)).[10]

181.   Nor does Turner charge "industry-leading" fees, as alleged by the government.

Historically, year-over-year, rates for all networks have always moved "higher."  Tr. 91:3-8

(Fenwick (Cox)); *see also* Tr. 252:14 (Schlichting (DISH)) ("programming rates only go one

direction")); Tr. 3888:5-10 (Shapiro) (noting there is generally a re-set of prices when new

contracts are negotiated given the general increase in programming costs).  And Time Warner

executives explained that higher-than-normal price increases for Turner prior to 2017 reflected a

correction of what were previously below-market rates.  *See* Tr. 1063:3-12 (Breland (Turner))

("We had made investments in original programming of sports, and we also looked at it as a

catch-up period.  For example, Cartoon Network, to our understanding, was—had a big gap

compared to a competitor like Nickelodeon.  And CNN was behind Fox News.  So we looked at

these as this is [a] catch-up period for us to get back to where we should be.  We had done

smaller increases, even CPI increases at certain times.  And we were way behind the market, so

this was a catch-up tour of duty."); Tr. 644:10-15 (Martin (Turner)) ("In the past the price

increases that Turner had sought were less aggressive than that of it[s] competitors such as

Disney and Fox.  So we decided that we had to try to catch up the affiliate rates and also in

understanding that we were making big sports commitments and we needed to try to push our

---

[9] Contrary to the government's suggestion, the testimony indicated that YouTube TV
initially considered Turner a fifth-best programmer that was not necessary for launch, *see* Tr.
1072:4-14 (Breland (Turner)), and added Turner only after it changed the nature of the product to
add a number of other new channels as well, *see* Tr. 1203:23-1204:4 (Warren (Turner)).

[10] The government also cited documents to suggest that Time Warner coordinated
Turner's and HBO's negotiations with YouTube to gain leverage in negotiations.  *See*, *e.g.*,
PX481.  However, as Mr. Bewkes testified, YouTube "very recently" reached an agreement with
Turner, but still does not have an agreement with HBO.  Tr. 3134:19-22.

rates back up to be competitive."). Going forward, fee increases are expected to be much lower. *See* Tr. 645:1-5 (Martin (Turner)) ("Well, our rate increases are going to decline dramatically now for the foreseeable future. So we're going to go from rate increase or subscriber revenue increases in 2017 that were approximately 13 percent. We anticipate in 2018 it's going to be low single digits."); DX781.0021 (SEALED) (projected subscription revenue growth). If anything, this recent Turner activity suggests that Turner has obtained full value for its content, not that the merger will enable it to charge still more.

### b. *Inputs Overestimate Diversion Rate*

182. Independently, the government's model also relies on a faulty diversion rate, which is the proportion of customers departing an MVPD that stops carrying the Turner networks who will sign up for AT&T/DIRECTV. For the most part, the government calculates a diversion rate by relying on current MVPD market shares, essentially assuming that switching subscribers will distribute themselves proportionally in accordance with each distributor's market share today. *See* Tr. 2240:23-2241:3 (Shapiro). But with respect to one important aspect of diversion rates— the number of subscribers likely to "cut the cord" if they leave their current provider—Professor Shapiro ignored market shares and relied instead on the same Altman Vilandrie slide show he used to obtain an inflated Turner subscriber loss rate. Tr. 2372:19-2373:4. By understating the rate of cord-cutting, Professor Shapiro substantially inflated the results of his model.

183. To calculate a diversion rate, what matters is where switching subscribers are likely to go *today and in the future* after the merger—a calculation that requires consideration of what Professor Shapiro acknowledges is the trend away from traditional MVPDs and toward new online alternatives (both virtual MVPDs like Sling and YouTube TV, and SVOD options like Netflix). *See* Tr. 2372:16-18; *see also* Tr. 2948:17-24 (Holanda (RCN)) (agreeing that today "at least half of the customers who leave just RCN's video services are leaving for [online]

providers"); Tr. 3449:12-18 (Stephenson (AT&T)) ("Half, half of all the Millenials in the United

States have no subscription service to a satellite or a cable subscription . . . .  [T]hey're largely

using subscription video on demand, SVOD-type services"); Tr. 3450:7-8 (Stephenson (AT&T))

("DirecTV, lost 1.2 million subscribers in 2017.  The whole system, pay TV, cable, satellite, lost

3 million.").

184.   The government's diversion-rate calculation underestimates this cord-cutting trend.

Indeed, although cord-cutting is plainly on the rise, the government's model—because of a

"peculiar feature"—assumes that the number of cord cutters is declining over time.  *See* Tr.

2448:7-9 (Carlton).  Professor Shapiro used an industry share of cord-cutters of about 9.8%.  *See*

Tr. 2505:7-9 (Carlton).  This share is derived from Altman Vilandrie's survey results, which

estimates a cord-cutting rate of 16.8% as a result of a Turner blackout (which adjusted to reflect

broader market shares results in a number of approximately 10%).  *See* Tr. 2372:19-2373:5

(Shapiro).  However, as Professor Rossi testified, that cord-cutting rate is unreliable because

Altman Vilandrie manually reduced the cord-cutting rate its model generated by 40% before

presenting its results to Charter.  *See* Tr. 2821:3-18 (Rossi) (Altman Vilandrie "[j]ust went

directly in and" multiplied a key figure affecting the cord-cutting finding "by .6 without

justification").  This change significantly lowered the percentage of cord-cutting.  Had Altman

Vilandrie not changed its results, Professor Shapiro's model would have assumed a lower

diversion rate to AT&T.  *See* Tr.2821:19-2822:19 (Rossi).

185.   Moreover, as Professor Carlton explained, publicly available data from SNL

Kagan, a source that Professor Shapiro and the FCC have used for other purposes, shows that the

actual proportion of cord-cutters is approximately 20%, double what Professor Shapiro used.

*See* Tr. 2505:10-20.  That is closer to the 25-30% of consumers leaving AT&T's MVPD services

who self-identify as cord-cutters.  *See* Tr. 2506:19-24 (Carlton).  In his own work, Professor

Carlton used the more conservative—that is, the more "favorable to the government"—estimate

of 20%.  Tr. 2506:7-17 (Carlton).  The government's error is particularly notable given that it is

much easier to switch to an SVOD like Netflix than to switch to a traditional MVPD that

requires specialized hardware to be set up.  *See* Tr. 266:15-18 (Schlichting (DISH)).

186.  Professor Shapiro's underestimation of cord-cutting overstates consumer harm in

two respects.  By overestimating the predicted diversion to AT&T, it overstates the predicted

harm to other MVPDs.  *See* Tr. 2447:25-2448:13 (Carlton).  At the same time, failing to consider

the full effect of cord-cutting underestimates the elimination of double-marginalization benefits

to AT&T customers.  *See* Tr. 2465:12-2466:13 (Carlton); *see also infra* FOF ¶ 246.

187.  Professor Carlton explained that correcting for the government's underestimation

of cord-cutting—*and making no other change to its model*—also eliminates all predicted

consumer harm (in part due to the effect of the change on Professor Shapiro's calculation of

efficiencies from the elimination of double marginalization or "EDM").  *See* Tr. 2447:25-

2448:13.  In fact, it results in a predicted net consumer benefit:  "If you just change the diversion

rate by . . . taking . . . cord cutting and instead of making it 10 percent of the market, you make it

20 percent, then Professor Shapiro's 27-cent price increase on average becomes 6-cent benefit,

decrease."  Tr. 2515:16-20 (Carlton).

### c.  Inputs Overestimate AT&T's Margins

188.  The government's profit-margin figure is based on AT&T's calculation of new

customers' lifetime values (or "LTVs") for a three-month period ending in June 2016.  *See* Tr.

2344:12-16 (Shapiro).[11]  That figure is outdated and thus not a reliable input into Professor

Shapiro's model.  *See* Tr. 2999:22-25 (Christopher (AT&T)) (confirming that "the second-

quarter 2016 LTVs" relied on by Professor Shapiro are not "the most recent LTVs"); *see also* Tr.

2345:1 (Shapiro) ("Having additional data would be helpful.").

189.  Professor Carlton relied on the same source of LTV data that Professor Shapiro

used, only updated for June 2017.  *See* Tr. 2448:17-20; *see also* Tr. 2582:20-2583:7 (Carlton)

(AT&T has been "continually refining" how it calculates LTVs in the "ordinary course," but

"[t]he LTVs that are being produced today are used in the same way as the LTVs in prior years

for financial planning"); Tr. 3027:13-15 (Christopher (AT&T)) ("[T]he overall methodology is

the same.  The inputs of how we capture churn and bundling has been modified and improved.").

Mr. Christopher, the executive in charge of the business unit producing LTVs, confirmed that if

one "wanted to get the best view of the value of a new subscriber to [AT&T]," the June 2017

LTV would be the best source.  Tr. 3017:2-8.  That more recent data showed LTVs that are 40%

lower than the stale data on which Professor Shapiro relied.  *See* Tr. 2448:17-23 (Carlton); Tr.

3003:15-20 (Christopher (AT&T)).[12]

190.  The decline in AT&T's LTV values from June 2016 to June 2017 is consistent with

the reduction of margins across the industry.  *See* Tr. 2449:2-4 (Carlton); Tr. 3853:18-19

(Shapiro) ("I think it is not disputed that the video margins are going down."); Tr. 3016:13-22

(Christopher (AT&T)) (describing the "overall" "downward" margin trend); Tr. 2950:24-2951:2

---

[11] Lifetime value measurements "capture the value of new subscribers.  It is calculated
simply by how long a new group of customers will stay with us, times the margin we get from
those customers, minus the cost to acquire those customers."  Tr. 2997:16-19 (Christopher
(AT&T)).

[12] Professor Carlton further explained his understanding that a "coding error" did not
affect the June 2017 LTV data he used.  *See* Tr. 2582:11-12.

(Holanda (RCN)) (acknowledging that "over the last five, seven years, [] margins at RCN on the video product have decreased by over half"); Tr. 462:5-8 (Schlichting (DISH)) ("DISH is still making some money on video, but our margins have been compressed [and] are declining"); Tr. 708:22-25 (Hinson (Cox)) ("every year . . . our video margin does continue to decline"); Tr. 1399:8-11 (Montemagno (Charter)) (agreeing that video "margins at Charter . . . have considerably eroded over the past few years"); Tr. 2110:21-22 (Sejen (Cable One)) ("the business had changed to the point where nobody was making money on video").

191.   That reduction in margins, in turn, is the natural consequence of the increased competitive pressure affecting distributors across the industry.  *See generally* Tr. 3003:15-3004:5 (Christopher (AT&T)) (updated LTV figure is "approximately 40 percent lower" because AT&T is "acquiring fewer customers," "paying more to get those customers," facing rising "content costs," and "paying more to retain" existing customers); Tr. 3004:6-9 (Christopher (AT&T)) (describing pressure on margins:  "In 2016, our traditional video business lost 133,000 customers.  In 2017, we lost 1.2 million.  So those trends are significant pressure.  They pressure LTVs."); Tr. 3004:2-12 (Christopher (AT&T)) (explaining the challenge of dealing with the "significant transformation" of the traditional video business and the downward pressure on LTVs flowing from this transformation); *see also supra* FOF ¶ 43 (collecting industry witness statements that video distribution market has never been more competitive).

192.   The government knew its LTVs were outdated, yet chose to use a stale input (one that made its model yield a larger estimate of consumer harm).  Indeed, the government learned the exact June 2017 LTV figure during discovery, when David Christopher testified about it at his deposition on February 14, 2018, 12 days before submission of Professor Shapiro's rebuttal report.  *See* Tr. 3002:16-25 (Christopher (AT&T)).  Professor Shapiro's report even cited that

very deposition, even though Professor Shapiro did not read the deposition transcript or even

know who David Christopher was.  *See* Tr. 2345:17-2346-9.

193.   Professor Shapiro's rebuttal report nevertheless continued to use the obsolete figure

for margins; that omission is particularly significant given that Professor Shapiro's rebuttal

report updated *other* figures in ways that generated a larger estimate of consumer harm.  *See*

Tr. 2346:17-2348:2 (Shapiro).

194.   Moreover, the backup material for the updated figures was provided with Professor

Carlton's rebuttal report on February 26, yet Professor Shapiro still did not update his margin

figure to include more recent final data.  *See* Tr. 3845:5-12 (Shapiro) ("Q.  Okay.  As of

February 26, 2018, you had data for not only June 2017 for the 812 LTV, but you also had data

for January and April.  Right?  A.  That is correct.  Q.  Now, when you gave your deposition on

March 8, you did not update your second-quarter 2016 profit margin to reflect this new data,

correct?  A.  That is correct."); Tr. 3847:2-8 (Shapiro) ("Q.  So going back to my question,

Professor, I'm just establishing, which I think is clear already from the record, that you did not

update the 1324 number by using the January, April, and June 2017 numbers, correct?  A.  When

I testified previously, that is correct.").  Indeed, Professor Shapiro acknowledged in his

testimony that, although *he* did not do so, "it would be reasonable to use the 2017 margins."  Tr.

3843:17-18.

195.   The government incorrectly argued that draft LTVs since June 2017 show an

upward trend that undermines the relevance of the June data.  Although the draft analyses for

July and August 2017 show a slight uptick, they are followed by a decrease in the draft LTV for

September.  Additionally, Mr. Christopher confirmed that these draft LTVs are based on an

"analysis [that] has not completely run its course."  Tr. 3017:10-19.  And, in all events, the draft

LTVs for all three months are consistent with the downward trend in LTVs. *See* Tr. 3016:4

(Christopher (AT&T)); *see also* Tr. 3016:17 (Christopher (AT&T)) ("The overall trend is the

same."); Tr. 3016:23-3017:1 (Christopher (AT&T)) (agreeing that an apt comparison is to an

overall stock market decline that includes certain day-to-day variations). This downward trend is

a direct reflection of the competitive conditions facing AT&T and the rest of the pay-TV

industry, as described *supra* FOF ¶¶ 43-45. *Cf.* Tr. 3853:18-19 (Shapiro) ("I think it is not

disputed that the video margins are going down.").

196.   In all events, the projections for months before and after June 2017 show expected

LTV levels that are far below Professor Shapiro's assumptions. *See* Tr. 2600:14-17 (Carlton)

("even the more recent LTV values are significantly below those that Professor Shapiro used

and, therefore, would not alter the fact that he used LTVs that were too high"). Professor

Shapiro himself thus acknowledged that an average LTV for January, April, and June 2017

would reduce his predicted monthly consumer price increase to only about 13 cents. *See* Tr.

3851:13-15. And Professor Carlton explained that if he relied, for instance, on April 2017 LTV

data, that "would change the specific numbers, but it wouldn't change my conclusion that

Professor Shapiro's margins are way too high." Tr. 2586:2-5.

197.   The government's argument that churn-reduction initiatives will improve LTVs is

unavailing. To be sure, AT&T has made efforts to decrease churn, *see* Tr. 3040:11-3042:3

(Christopher (AT&T)), and, *all else equal*, lower churn causes higher LTV. But all else is not

equal. As Mr. Christopher explained, the flipside of these churn-reduction efforts is considerable

additional cost to mitigate churn, which pushes LTVs *down*. *See* Tr. 3047:13-23 ("If you're

spending more to reduce churn, it impacts—so the fact that customers stay longer helps the LTV.

The fact that you're spending more on a consistent basis hurts the LTV. But churn is only one

part of—one part of the LTV.  We're spending heavily on acquisition. . . .  We're spending

heavily to compete.  That is also impacting these LTVs, in addition to the spending on churn.");

Tr. 3040:25-3041:3 (Christopher (AT&T)) ("[I]n the fourth quarter as an example, we spent

roughly 90% more on a year-over-year basis.  We're spending heavily to try to adjust churn.").

In suggesting that efforts to reduce churn might increase LTVs in the future, the government

took no account of the increased costs of those efforts that decrease LTVs.[13]

198.   Professor Shapiro testified that his use of LTVs is conservative because, as a result

of withholding Turner content to rival MVPDs, AT&T would retain some number of customers

who would have otherwise left AT&T and switched to the rival MVPD but for the lack of Turner

content.  Tr. 2243:23-2244:8.  This point barely made it into Professor Shapiro's expert report:  it

appeared in footnote 414 (of 417) in Appendix I.  Tr. 3855:5-3856:5.  And Professor Shapiro

presented no evidence that would establish even the *direction*, much less the *amount* of this

supposed effect.  He admitted that he did not "have the proper data on the value of the retained

customers."  Tr. 2244:9-17.  More fundamentally, Professor Shapiro admitted that those

customers who remain at DIRECTV only because a single competitor does not have Turner

programming are unhappy customers.  *See* Tr. 2354:15-17 ("I don't think it's the happy ones that

march across the street.  Churn is for other reasons, usually not the happy ones.").  And Professor

Carlton explained that Professor Shapiro's analysis completely ignored that point:  those

"unhappy" customers are the ones who "are mostly likely to leave" and thus have "high churn."

---

[13] The government incorrectly argues that AT&T's ongoing efforts to reduce churn from 2% per month to 1.5% per month—the so-called "Drive to 1.5"—demonstrate that profitability will return to higher levels.  In fact, as AT&T Senior Vice President Vince Torres explained, the Drive to 1.5 specifically *excludes* churn due to cord-cutting.  *See* Tr. 1420:2-5.  Thus, even if the 1.5% goal can be met for churn excluding cord-cutting, total churn, which includes cord-cutting, will necessarily be higher.

Tr. 2509:9-12.  "The ones with high churn, even if they remained at DTV are likely to leave in

the future."  Tr. 2509:13-14 (Carlton).  So "just completely from a theoretical point of view" it is

not clear "which way it affects margins," and Professor Shapiro gave "absolutely no

quantification of this effect."  Tr. 2509:17-20 (Carlton).[14]

199.   As Professor Carlton explained, merely using the more recent data, even without

taking into account any further potential reductions in the future, "has a big effect" in

"eliminating [the] harms" Professor Shapiro predicts.  Tr. 2449:4-7; *see also* Tr. 2508:17-21

(Carlton) ("It eliminates a large fraction of all his harms.").  Indeed, if the only change to

Professor Shapiro's initial modeling is to update his margin data to reflect the more recent June

2017 data, the effect is to reduce his estimated 0.2% increase (27 cents per subscriber per month)

to well under one-twentieth of one percent (5 cents per subscriber per month).  *See* Tr. 2515:21-

24 (Carlton).  Professor Carlton's analysis is again conservative—that is, favorable to the

government—in that his calculations use the current margins even though margins are in fact

declining over time.  *See* Tr. 2449:2-5 ("So margins are going down in this industry.  [Professor

Shapiro] underestimates the importance of that.  And into the future I won't even take account

that they may continue to go down.  I'm just going to use the current margins.").

***

_____

[14] The government asked about LTVs for households that purchase wireless service along
with video service.  *See* Tr. 3036:24-3037:11 (Christopher (AT&T)).  But Professor Shapiro did
not rely on that number.  *See* Tr. 2247:19-21 (Shapiro) ("I'm not including the wireless margins.
We did not have sufficient data to add the wireless piece here.").  And, in any event, Mr. Stankey
testified that only a trivial portion of new AT&T video customers also purchase wireless.  *See*
Tr. 3260:24-3261:9 (Stankey (AT&T)) ("[L]ess than 3 percent of our inbound customers were
buying both [video and wireless] together . . . .  It's an unnatural bundle.").  Moreover, Mr.
Christopher testified that recent data show LTVs of bundled customers "going down."
Tr. 3036:12-16.

200.   If the incorrect inputs as to departure rate, diversion rate, and margin are corrected and existing contracts are taken into account, Professor Shapiro's model predicts that the merger will result in net consumer *benefits* of 52 cents per subscriber per month, rather than 27 cents of net consumer harm.  *See* Tr. 2516:2-3 (Carlton).

### d.  Inputs Wrongly Assume Bargaining Split

201.   The government's theoretical model assumes that, in every negotiation between Turner and a distributor, the two parties split the gains from trade *exactly* 50/50—*i.e.*, they meet exactly halfway between their two walk away points.  *See* Tr. 2193:9-12, 2214:4-11 (Shapiro) (discussing this "split the difference" approach); *see also* Tr. 2211:17-23 (Shapiro) (explaining "gains from trade").  That is critical to the model because it underlies the reasoning that, if Turner's walk away point rises, and the distributor's stays the same, the distributor will agree— *always*—to pay the new, slightly higher, average of the two levels for the same content.  *See* Tr. 2213:3-17 (Shapiro); Tr. 2510:10-16 (Carlton) ("It matters a lot, because, obviously, if the split already is in Turner's favor, then Turner is already getting a lot—a very high price, and there won't be much left for them to be able to raise the price.  So it matters a lot in his bargaining model.  It's an important parameter.").

202.   The 50/50 split is merely an assumption, however, and Professor Shapiro did not provide empirical evidence establishing that it is grounded in the facts of this case.  *See* Tr. 2510:21-22 (Carlton) ("He didn't do any empirical analysis.  He just assumed 50/50.").  To the contrary, as Professor Shapiro conceded, one of the articles he cited in his report concluded that an appropriate split in this industry may be 72/28 in favor of the programmer.  *See* Tr. 2375:10-14 (Shapiro); Tr. 2511:4-6 (Carlton) ("[W]hat it finds is that the bargaining split is, if I remember right, 72 percent in favor of the content provider and 28 percent in favor of the distributor.").  Notably in this regard, Professor Shapiro did not dispute that courts have *rejected*

use of the Nash bargaining model altogether on the basis of the 50/50 bargaining-split

assumption where, as here, that assumption could not be shown to fit the facts of the particular

case.  *See* Tr. 2393:22-24 (Shapiro) ("it could be"); *see infra* COL ¶ 19 (collecting cases).

203.   If the 72/28 split used in the article Professor Shapiro relied upon is applied here,

the harm predicted by the model goes away, again without making any other changes.  *See*

Tr. 2375:17 (Shapiro) ("That would be significantly different, yes.").  In fact, it results in net

consumer benefits from the merger.  *See* Tr. 2516:8-10 (Carlton) ("[I]f you just change the

bargaining split from 50/50 to 72/28, you, in his 2016 model, cause the prices on average to go

down to consumers by a penny.").

### iv.   The Arbitration/No-Blackout Commitment and the FCC's "Program Access Rules" Defeat the Government's Price-Increase Theory

204.   Professor Shapiro's theoretical model also does not mirror the actual post-merger

marketplace because it completely and intentionally ignores two real-world mechanisms that will

preclude Turner from exerting its allegedly greater post-merger leverage to induce distributors to

pay higher prices for its content:  (1) the arbitration/no-blackout commitment (the

"Commitment"); and (2) the FCC's Program Access Rules.

### a.   The Commitment

205.   In November 2017, Turner sent all its distributors written, irrevocable offers,

conditioned on the merger closing, to negotiate with distributors in good faith to license the

Turner networks, to submit disputes over the price and other terms of Turner programming to

binding arbitration, and to guarantee continued access to (*i.e.*, no blackout of) that programming

during the course of arbitration.  *See* DX785 (Turner "irrevocably offering" the agreement to the

National Cable Television Cooperative "NCTC")); PX491-003, § B.1.  The Commitment

incorporates by reference provisions in the existing distributor agreements governing choice of

law.  *See* PX491-002, ¶ 4.  **[REDACTED]**.  If a distributor invokes the Commitment, Turner

*cannot go dark*.  PX491-003 to -004, §§ B.1, B.2.  Instead, Turner must continue to provide

carriage on the same terms and conditions in effect at the expiration of its existing contract with

the distributor, subject to a true-up based on the arbitrator's award.  *See* PX491-003 to -004,

§§ B.1, B.2.

206.  AT&T has agreed that it is bound by the Commitment.  *See* DX785.  AT&T made

the Commitment even though it does not believe there is merit to the government's argument.

*See* Tr. 3261:23-3262:3 (Stankey (AT&T)) (the Commitment was intended to "put our money

where our mouth is," "take away the blackout provision and *make sure that everybody*

*understands that we're sincere about that*") (emphasis added).

207.  The Commitment deals a fatal blow to a key assumption of Professor Shapiro's

model:  that the combined firm will use the threat of a blackout to get higher prices for Turner

content.  As Professor Katz testified, "Professor Shapiro's theory really boiled down is that

Turner will have more bargaining leverage from blackouts after the merger than it would if the

merger didn't occur . . . .  Well, if a distributor invokes the arbitration option that Turner's

committed to giving them, if they invoke it, *there's no blackout during the negotiation.  So it*

*takes away the whole mechanism that Professor Shapiro hypothesizes*."  Tr. 2653:17-25

(emphasis added).  The "economic evidence" is thus that "arbitration is going to hold down those

price increases," with the result that, even under Professor Shapiro's model, there will be

"hundreds of millions of dollars of benefits for consumers."  Tr. 2648:3-13 (Katz).

208.  Professor Carlton similarly stressed that "[b]lackouts are what are driving"

Professor Shapiro's model, but, if a distributor triggers arbitration, "you don't have to worry

about a blackout." Tr. 2443:19-23.  With Turner having no ability to engage in a blackout (or

credibly threaten to do so), "the central element of [Professor Shapiro's] theoretical model does not apply." Tr. 2443:25-2444:1 (Carlton); *see* Tr. 2444:3-7 (Carlton); *see also* Tr. 2197:8-10 (Shapiro) ("So we have to think through what happens in the event of a blackout, because that's what the leverage is based on."); Tr. 2325:9-13 (Shapiro) ("This model is very much based on the leverage associated with blackouts . . . . So it would take a completely different model to model arbitration . . . [because] the distributor who invokes arbitration would not be subject to the blackout threat.").

209.   Indeed, the government did not ask Professor Shapiro to consider arbitration. "[T]hat would be a different analysis, a different assignment." Tr. 2323:17-23; 2324:15-16; *see* Tr. 2326:13-17 (Shapiro) ("If they choose to invoke the arbitration then *this would not be the leverage. We'd be in a different world* where they would be participating in the arbitration and *I have not analyzed that outcome*.") (emphases added); Tr. 2324: 25-2326:1 (Shapiro) ("the distributor who invokes arbitration would not be subject to the blackout threat"). Rather, he relied on another government expert, Professor John Kwoka, to address the issue. Professor Shapiro stated that he "did discuss" with DOJ "how [his] analysis might be altered" because of the arbitration offer, but then declined to pursue that discussion any further after he "learned that DOJ hired a separate expert . . ., Professor John Kwoka, who would be addressing the arbitration part more specifically." Tr. 2325:1-5 (Shapiro).

210.   Professor Shapiro therefore ignored the possibility that distributors would have the ability to invoke arbitration. *See* Tr. 2326:13-16. And the government never presented testimony from Professor Kwoka. As a result, there is no evidence supporting Professor Shapiro's decision to ignore the Commitment. As Professor Michael Katz explained, Professor

Shapiro's failure to consider the existence of the Commitment is a "fatal error" that renders his entire bargaining model "incorrect."  Tr. 2647:10-24 (Katz).

211.   Representatives from rival distributors acknowledged that the Commitment would ensure they could not lose Turner programming before reaching a new deal.  *See* Tr. 898:22-899:8 (Rigdon (Comcast)) (acknowledging that the Commitment "means if you invoke it, *they can't go dark*" and that the arbitration provision "would take away that piece of leverage they've used before") (emphasis added); Tr. 1388:6-10 (Montemagno (Charter)) (confirming that "[t]o the extent the government projects a Turner price increase stemming from an increased threat of blackout, *Turner loses that ability* with its standstill and arbitration commitment") (emphasis added); Tr. 2957:11-16 (Holanda (RCN)) (agreeing that the standstill agreement "would eliminate the ability of a content provider like Turner to raise prices by threatening a blackout, because it has no threat of blackout"); *see also* Tr. 2404:13-17 (Shapiro) ("That option for the distributor [to invoke arbitration] has some value . . . .").

212.   Turner's lead content negotiator testified that the Commitment leaves him "in a weakened bargaining position" because it removes Turner's ability to walk away from a deal that could have a "profound" impact across Turner's business due to the impact of MFNs.[15]  Tr. 1201:9-1202:6, 1202:22-1203:7 (Warren (Turner)); *see also* Tr. 2103:10-20 (Sejen (Cable One)) (going dark is "probably the ultimate weapon" because, "other than that, what leverage do they have?"); Tr. 2955:23-2956:9 (Holanda (RCN)) (agreeing that the standstill provision "changes the negotiating dynamic between a content provider and a distributor" by shifting the negotiating "dynamic in the distributor's favor").  The ability to go dark is very important, as being forced to

---

[15] *See* Tr. 1024:10-14 (Breland (Turner)) confirming that "[a]n example of an MFN would be if you give a distributor a lower price, then you have to give a lower price to everyone who has an MFN against that distributor").

accept a provision that triggers an MFN could force Turner to give the provision to others, and the impact "could be very significant for [Turner] financially and otherwise." Tr. 1202:22-1203:7 (Warren (Turner)). The risk of arbitration is therefore asymmetric in favor of the distributor. *See* Tr. 2689:5-8 (Katz). Professor Katz explained why, because of MFN clauses, there is "greater risk on Turner": "if Turner loses in arbitration, there's a chance that it's getting a lower price for its programming, not just from the programmer in the arbitration, but from other programmers when the MFN kicks in." Tr. 2688:15-24. The distributor does not face a similar risk. *See* Tr. 2688:15-16 (Katz). For this reason, Mr. Warren testified that the outcomes under arbitration will be "worse for Turner" than the deals negotiated pre-merger. Tr. 1203:8-15 (Warren).

213. The fact that all offers in the negotiations leading to the arbitration are discoverable, *see* PX491-004, § C.4.b.iii, also limits Turner's ability to use certain negotiating tactics, further weakening its bargaining position. *See* Tr. 1202:7-21 (Warren (Turner)) ("[A]t some point during negotiations, sometimes you open extreme, because that's what parties do in negotiation to close the gap. . . . But I'm thinking, I'm not sure I could even open extreme, because the arbitrator is going to see everything and might say, you were gaming them. So . . . I'm in a weakened position.").

214. The Commitment here is modeled on a provision of the Comcast/NBCU consent decree the government itself endorsed, and it is similar in fundamental ways. *See* Tr. 2680:1-9 (Katz) (providing examples of similarities).

215. The Commitment applies to both traditional and online distributors, including virtual MVPDs. *See* PX491-001 (¶ 1) and -005 (§§ D.7, D.9, D.15); Tr. 1199:1-3 (Warren (Turner)). Turner also sent a letter to the NCTC, a buying cooperative for smaller cable

distributors, making clear that the Commitment will apply to it as well.  *See* DX785; Tr. 1175:14-23 (Warren (Turner)).[16]

216.   The Commitment applies not only to existing distributors, but also to new distributors.  *See* Tr. 1199:17-21 (Warren (Turner)); PX491-003, § B.1-.2.  Indeed, Turner has already begun preparations in the event the merger closes and the Commitment needs to be implemented, including developing a process to notify new entrants.  *See* Tr. 1200:22-1201:6 (Warren (Turner)).  New distributors must meet the threshold requirement that they carry at least 8 of the top 35 Nielsen-rated networks, *see* PX491-001, ¶ 4.1, which is the same requirement found in a number of Turner's other carriage agreements.  *See* Tr. 1198:2-15 (Warren (Turner)).  This requirement ensures Turner's brand is associated with a product that has been vetted by more than one programmer and is commercially viable.  *See* Tr. 1198:2-20 (Warren (Turner)).

217.   The Commitment includes all existing Turner networks and any future networks consisting of substantially the same programming.  *See* PX491-005, § D.14; Tr. 1193:14-21 (Warren (Turner)) (providing the definition of "Turner Networks" in the arbitration agreement).  This definition of "Turner Networks," as well as existing contractual commitments, prevents Turner "from moving programming [as] an end run around [the] arbitration agreement."  Tr. 1193:14-1194:17 (Warren (Turner)).  It also includes the associated video-on-demand, TV Everywhere, and Cloud DVR rights that Turner makes available to any distributor.  *See* PX491-005, § D.14.

218.   A distributor can require Turner to make a final offer on all Turner networks or any bundle of Turner networks that has been licensed to any distributor at any time on or after

---

[16] Mr. Holanda did not know at trial that Turner in fact had extended the Commitment to NCTC as RCN had recommended.  *See* Tr. 2961:11-14.  After reading the offer, Mr. Holanda testified that any issue he had on that point was now "checked off."  Tr. 2963:2-5.

October 22, 2014.  *See* PX491 §§ A.2, A.6, D.14; Tr. 1194:18-1195:13 (Warren (Turner)).  The

final offers shall be in the form of a Carriage Agreement.  *See* PX491-003, § A.6.  The

distributor may require Turner to provide a list of bundles available.  *See* PX491-003, § A.2.

219.  Similar to Comcast/NBCU, the Commitment is in force for a seven-year period.

As Turner's executive in charge of content negotiations, Richard Warren, testified, seven years is

a "pretty long period of time" in the video programming industry, which is "evolving quickly."

Tr. 1191:12-19.  In that time, there will be "multiple" renewals of affiliate agreements, and likely

more major changes in the industry.  Tr. 1191:19-22 (Warren (Turner)).  Similarly, in response

to the Court's question about where the ecosystem will be seven years from now, AT&T's CEO

explained that in seven years "the proliferation of [content] means it gets cheaper over time" and

that "content pricing to the consumer can do nothing but continue to go down in the foreseeable

future."  Tr. 3505:15-3507:3.

220.  Pursuant to the Commitment, AT&T commits to negotiate in good faith with any

requesting Video Distributor for Turner content.  *See* PX491-001, ¶ 1; DX785.  At the

distributor's request, Turner "must participate in good faith and with reasonable diligence" in

mediation to "resolve the dispute or narrow the issues to be arbitrated pursuant to [the]

Agreement."  PX491-003, § A.3.  "Following the exchange of the Final Offers and prior to the

initiation of an arbitration hearing, the parties may agree to enter mediation . . . [and,] [i]f both

parties agree, they may submit revised Final Offers."  PX491-003, § A.8.  If the parties cannot

agree on terms, the distributor can elect "baseball" arbitration, *see* PX491-003, §§ A.1, A.3, A.4,

A.5, where each party submits its best offer to an arbitrator.  The arbitrator, who will be

experienced in the industry, PX491-004 § C.2, decides which offer "most closely approximates

the fair market value of the Turner Networks at issue," PX491-004, § C.7.  The arbitration will

be conducted under AAA procedures except where otherwise provided.  *See* PX491-001, ¶ 3 &

PX491-004, § C.1.  The arbitrator's decision is subject to any right of appeal pursuant to the

Federal Arbitration Act.  *See* PX491-001, ¶ 3 & PX491-004, § C.8.  There will be prompt

resolution of the arbitration; it must be complete within 75 days unless the parties agree to

modify any of the time limits.  *See* PX491-003 to -004, §§ A.5, A.10, C.3.

221.  Turner may not condition the carriage of the Turner Networks on the carriage of

HBO under the agreement.  *See* Tr. 1197:14-19 (Warren (Turner)); PX491-003, § A.2 (providing

that a distributor "may demand a *standalone* offer" for Turner Networks) (emphasis added).  The

Commitment is self-executing and can be invoked solely by the distributor (and not by Turner).

*See* Tr. 1200:7-8, 1200:17-21 (Warren (Turner)).  Professors Katz and Shapiro agreed that there

are benefits to baseball arbitration over other forms of arbitration.  Baseball arbitration creates an

incentive for both sides to be reasonable.  *See* Tr. 2651:17-2652:16 (Katz); Tr. 2327: 4-8

(Shapiro).  It also makes settlement more likely.  Tr. 2652:17-2653:11 (Katz); Tr. 2327:9-19

(Shapiro).  Indeed, the Commitment allows the parties to agree to "suspend the arbitration to

attempt to resolve their dispute through negotiation."  PX491-003, § A.9.

222.  Several of the government's own witnesses testified that their companies supported

baseball-style arbitration in prior transactions and had advocated for the government to impose it

as a condition here.  *See* Tr. 121:14-122:9 (Fenwick (Cox)) (Cox advocated for an arbitration

provision in this merger, modeled after the mechanism used in the Comcast/NBCU merger, as

"something that we felt like would be important if conditions were imposed"); Tr. 464:17-20

(Schlichting (DISH)) ("Q.  And, in fact, your company proposed an arbitration mechanism in

this matter last summer, correct?  A.  I believe we did that at the request of the DOJ assuming

that the merger takes place."); Tr. 2940:21-25 (Holanda (RCN)) ("Q.  And in fact, at one point in

earlier looking at the merger, RCN itself recommended one of the conditions that it proposed related to the merger included arbitration, right?  A.  That's correct."); Tr. 2958:21-2959:5 (Holanda (RCN)) (confirming RCN's March 2017 recommendation that DOJ require AT&T to "submit to binding, baseball-style arbitration").

223.   One of the representatives of a rival distributor who testified for the government, Tom Montemagno of Charter, confirmed that, under the arbitration provision adopted in the Comcast/NBCU merger, Charter had "a highly satisfactory experience with having a standstill and arbitration tool in [its] toolbox available . . . as a negotiating aid" in a transaction with Comcast/NBCU.  Tr. 1388:18-22; *see also* Tr. 1390:21-22 (Montemagno (Charter)) ("[T]he value exchange . . . got improved for Charter.").  Mr. Montemagno also agreed that a "standstill would be helpful" in dealing with AT&T-Time Warner post-merger, Tr. 1388:17—so helpful, Mr. Montemagno confirmed, that "Charter's position is it *would rather* have a satisfactory standstill and arbitration agreement in a post-merger environment" than to negotiate pre-merger without either protection.  Tr. 1388:11-15 (emphasis added); *see also* Tr. 2956:3-9 (Holanda (RCN)) (acknowledging that "the standstill changes the dynamic in the distributor's favor").  The fact that Charter's preference is to "wait until after the merger and . . . negotiate with [Turner] then," Tr. 1102:6-14 (Breland (Turner)); *see* Tr. 1186:16-22 (Warren (Turner)), suggests it believes it will be able to obtain a more favorable deal following the merger.

224.   Although Mr. Schlichting was reluctant to concede that DISH benefits from a standstill/baseball-style arbitration agreement with a programmer, he did not dispute that his testimony on this point conflicted with prior statements by DISH's Chairman and former CEO, Charlie Ergen, including that DISH has "been very vocal about the fact that baseball arbitration is a good way to do it" and that baseball-style arbitration under the Comcast/NBCU decree has

"worked very well in the market place."  Tr. 426:12-427:16; *see also* Tr. 2669:10-22 (Katz)

(discussing DISH comments supporting baseball-style arbitration with Comcast); Tr. 2327:4-19

(Shapiro) (acknowledging that his own prior scholarship has explained the effectiveness of

baseball-style arbitration).[17]

225.   This Court approved a similar arbitration/no-blackout mechanism in the

Comcast/NBCU merger proceeding.  *See* Modified Final Judgment, *United States v. Comcast

Corp.*, No. 1:11-cv-00106-RJL (D.D.C. Aug. 21, 2013), Dkt. 36.  Since that remedy was

approved, the government—in response to annual reporting obligations—has never reported any

complaints or problems with its effectiveness.  *See* Tr. 2402:18-21 (Shapiro) (stating he is "not

aware" of any reports of problems by DOJ to this Court under its obligation to report issues).

Indeed, in its interrogatory responses here, the government took no position as to whether the

arbitration remedy was effective.  See DX893.00031.

226.   Rather, the Comcast/NBCU arbitration/no-blackout mechanism became an

important part of the competitive landscape.  Even when a distributor did not invoke arbitration,

the *possibility* of arbitration helped distributors reach agreement with NBCU, with both sides

aware that NBCU could not go dark because of the no-blackout provisions.  *See* Tr. 1391:5-6

(Montemagno (Charter)) ("[T]he threat of [arbitration] did improve the situation."); Tr. 1409:12-

14 (Montemagno (Charter)) (confirming to the Court "that threatening to go that route [invoking

arbitration] can have a positive effect on a negotiation"); Tr. 2959:17-2960:5 (Holanda (RCN))

---

[17] Any argument the government makes that DISH's support for baseball-style arbitration
was in the context of retransmission consent negotiations with broadcast channels (and thus not
with cable channels) is unavailing.  As Professor Katz explained, those agreements, like the
licensing agreements at issue here, are complex and involve issues beyond rates.  *See*
Tr. 2700:13-16.  In all events, DISH has in fact sought arbitration as to both cable and broadcast
networks.  *See* Tr. 2755:11-24 (Katz).

(agreeing that arbitration is "a reasonable solution" that also "encourages a party to negotiate as hard as they can to reach an agreement" without arbitration); Tr. 2667:3-5 (Katz) ("Charter has used the threat of arbitration to sort of unblock or get their negotiations going").

227. DISH's Warren Schlichting testified that DISH filed for arbitration with NBCU in March 2016 because it "needed more time to close the gap" between negotiating positions, but reached agreement before the two sides filed their final offers. Tr. 274:5-19, 423:15-25. Mr. Schlichting further conceded that, when negotiating in the shadow of the Comcast/NBCU arbitration/no-blackout mechanism, DISH and NBCU never came close to a blackout. *See* Tr. 273:17-19 ("Q. And at any point during negotiation, did you come close to going dark with NBC? A. Not really."); *see also* Tr. 2675:18-2676:2 (Katz) (testifying that DISH filed a notice of arbitration but that, "as economics would suggest," the parties then settled); Tr. 2403:13-18 (Shapiro) (testifying that "if the distributor finds the arbitration to be a better option than not invoking it, then that would affect the outcome of the negotiations or could anyhow."). Madison Bond, the Chairman of Content Distribution at NBCU, confirmed that the "arbitration conditions" come up in "almost every" negotiation NBCU has with MVPDs and that, from NBCU's vantage point, the possibility of arbitration gave distributors additional leverage over NBCU. Tr. 1983:15-17; *see also* 2017:12-15 (Bond (NBCU)) ("Q. And it's your view that by them raising the arbitration provision they have, in fact, gained some leverage over you, correct? A. I think that's fair.").

228. Moreover, post-merger prices for NBCU programming did not rise compared to industry benchmarks. *See* Tr. 2471:2-2473:18 (Carlton).

229. Nor do the concerns raised by rival distributors about the terms of the Commitment provide any basis to disregard it. Some of these distributors raised concerns that the

Commitment does not define what constitutes "fair market value." *See*, *e.g.*, Tr. 111:1-15

(Fenwick (Cox)); Tr. 276:14-15 (Schlichting (DISH)).  Fair-market value is the result that would

be reached "if the merger hadn't occurred."  Tr. 2656:6-7 (Katz).  This is consistent with the

rationale the FCC has set forth for the fair market value standard.  *See* Tr. 2656:21-2657:6 (Katz)

("[The FCC has] said, in multiple orders, . . . the reason we're imposing arbitration and fair

market value is because we want to preserve the pre-transaction or pre-merger[] balance of

bargaining power.").  Further, the Commitment provides that the arbitrator take into account all

relevant evidence presented by the parties to the arbitration and does not limit what the arbitrator

may take into account in assessing fair-market value.  *See* PX491-004, §§ C.4, C.5, C.6; Tr.

1205:13-22 (Warren (Turner)).  The non-party distributor witnesses acknowledged that the

arbitrator would be able to consider all types of evidence.  *See* Tr. 126:15-17 (Fenwick (Cox))

("Q.  Did you have a belief that there was some type of evidence the arbitrator was not permitted

to receive? A.  No.").  In addition to distributor contracts, distributors may use information such

as set-top box data, consumers' viewing habits, and other information.  *See* Tr. 2659:8-21 (Katz).

230.  In addition, there will be appropriate benchmarks for the arbitrator to use in

determining fair-market value.  There will be recent contracts as well as third-party distributors'

contracts with programmers similar to Turner.  *See* Tr. 2658:6-2659:7 (Katz).  With respect to

innovative contract provisions, arbitrators can look at other contracts reflecting those innovations

and distributors can explain why an innovative or unique provision makes sense.  *See*

Tr. 2685:17-2686:11; 2687:21-2688:5 (Katz).

231.  With respect to any concern that carriage agreements are complex, the arbitrator

will have "demonstrable experience practicing in the video programming and distribution

industry."  *See* PX491-004, § C.2.  The parties involved are "sophisticated parties" who will

"focus on what matters, and they'll point the arbitrator to that."  Tr. 2691:25-2692:9 (Katz).

Moreover, the Commitment provides that neither side will see the other side's offer before it

must submit its own offer.  *See* PX491-003, § A.7; Tr. 2680:10-13 (Katz).  It allows for

discovery pursuant to a confidentiality agreement, and also provides that the parties may submit

any relevant evidence to the arbitrator.  *See* PX491-003, § A.6; PX491-004, §§ C.4, C.5.  As a

result, there will be a "balance of information" when the parties make their offers.  Tr. 2683:21-

2684:15 (Katz).

232.   Government witness James Holanda from RCN testified that he believes that,

during arbitration, RCN is at a disadvantage due to a lack of information.  *See* Tr. 2942:24-

2943:17.  To address that perceived disadvantage, RCN proposed that Turner be required to

provide pricing information for distributors of similar size so that RCN can use these data points

to develop its arbitration offer.  But Mr. Holanda conceded that "baseball arbitration . . . tr[ies] to

achieve a result that most closely resembles commercial negotiation," Tr. 2964:6-9, and that, in a

commercial negotiation for programming, "RCN wouldn't know the specific terms . . . [Turner

has] with other distributors," Tr. 2963:20-23.  In any event, NBCU's testimony about its

negotiations under its arbitration commitment minimizes any potential concerns about the

purported informational asymmetry.  *See* Tr. 2017:16-2019:5 (Bond (NBCU)) (testifying that, in

negotiations, distributors "every time" propose terms that are out of line with the market and

NBCU will represent to distributors that NBCU's proposals are consistent with its agreements

across the industry prior to the time that distributors elect to enter arbitration).  **[REDACTED]**.

233.   Mr. Holanda also suggested that the Commitment should require Turner to bid first,

which would allow RCN to see Turner's offer before providing its own.  *See* Tr. 2967:17-

2968:23.  But he also conceded that this design, not unlike being able to place a bet in poker after

seeing the other players' cards, would be "unprecedented in baseball arbitration."  Tr. 2967:9-11.

In any event, once arbitration is invoked and the parties exchange final offers, the distributor can

obtain discovery, PX491-004, § C.4, and then walk away from the arbitration—but Turner

cannot walk away.  *See* Tr. 1199:22-1200:16, 1208:9-13 (Warren (Turner)).  Further, the

distributor can come back again and invoke arbitration down the road.  *See* Tr. 1209:3-8 (Warren

(Turner)).

234.   Speculation that Time Warner could withhold HBO from distributors to deter them

from invoking the Commitment is likewise not based on any probative evidence.  As Professor

Katz explained, there is no logic to that assertion.  Once HBO has used the threat of a blackout to

obtain an agreement for HBO on specific rate terms, it cannot use the threat of a blackout again

to seek higher prices for Turner.  *See* Tr. 2690:17-25, 2691:12-17, 2737:14-16 (Katz).  In essence

that would be attempting to charge for HBO twice.  *See* Tr. 2691:3-8 (Katz).  In all events, Time

Warner CEO Jeff Bewkes explained that such a tactic would make no sense because the

government properly does not contend that the combined company would have any incentive to

withhold HBO in the first place and because HBO's aim is to get higher penetration by *reducing*

its effective rates to distributors.  *See* Tr. 3135:21-3136:5 (explaining that HBO is working to

"get its wholesale net effective rate down").  AT&T likewise is committed to even broader

distribution of HBO after the transaction closes.  *See* Tr. 3262:4-25 (Stankey (AT&T)) (noting

that it is "not an economically sound decision" to withhold HBO and "[a]fter the close of the

transaction, . . . that'll be even a more important focus of this business, to get broader distribution

of HBO"); Tr. 3263:11-13 (Stankey (AT&T)) ("I have absolutely no concerns whatsoever that

we're going to continue to push HBO to anybody who wants to sell it moving forward.").

235.   Similarly, Turner's lead content negotiator testified that there is no basis for concern that Turner could move content to a new or different channel to avoid the Commitment. Turner's existing affiliate agreements and contracts with sports leagues require Turner to maintain consistent programming content on the channels covered by those agreements.  *See* Tr. 1193:22-1194:17 (Warren (Turner)).  Moreover, the Commitment itself precludes Turner from shifting programming to avoid the Commitment, because it includes within its scope any future network if Turner moves its current content to that network.  *See* Tr. 1193:14-21 (Warren (Turner)).

236.   The government also cited the fact that only a small number of distributors have accepted the Commitment to date to imply that other distributors do not believe it will be effective.  *See* Tr. 1181:17-1182:4 (Warren (Turner)).  Distributors may accept the Commitment at any time during the seven years it is in effect.  *See* PX491-002, ¶ 6 (Commitment lasts for seven years); DX785 (Commitment is irrevocable).  In fact, "they could, at the . . . last opportunity, present [Turner] with a signed arbitration agreement and tell [Turner] they want to invoke arbitration."  Tr. 1191:8-11 (Warren (Turner)).  The fact that a distributor has not yet accepted it does not establish dissatisfaction with the offer.  *See* Tr. 1190:18-1191:7 (Warren (Turner)).

237.   Furthermore, the Commitment does not need to be completely effective to eliminate any prospect of the harm that Professor Shapiro predicts.  For example, if it were effective only to prevent price increases as to the two largest and most sophisticated distributors (which presumably would be well equipped to employ the mechanism), it would eliminate any prediction of consumer harm under Professor Shapiro's own model, even leaving aside consideration of all of the model's other errors.  *See* Tr. 2660:10-2661:14, 2665:3-2666:4

(Katz).  One of those distributors—Comcast—has stated it is not concerned that its leverage will

change vis-à-vis Turner after the merger closes.  *See* Tr. 884:10-14 (Rigdon (Comcast)).

238.   Beyond that, as Professor Katz testified, "the evidence in economics shows that

arbitration is going to work very well for all the distributors."  Tr. 2660:1-3.  That includes small

distributors.  First, Professor Katz specifically noted that small distributors can join buyer

cooperatives.  *See* Tr. 2676:12-15.  Further, as Professor Katz explained, there is no basis to

believe that arbitration will be too costly for distributors to invoke.  He noted that there was

evidence from one of the government's experts that the cost of an arbitration is a million dollars,

but, even if it were five times that number, that would still be a "tiny percentage" of the amount

of money at issue in these agreements.  Tr. 2689:13-23.  Thus, as Professor Katz explained, there

would be no deterrent to invoking arbitration as a result of those small costs.  *See* Tr. 2690:5-6.

### b.  *Program Access Rules*

239.   Independently, Professor Shapiro's model wrongly ignored the FCC's Program

Access Rules, which require vertically integrated programmers to provide their affiliated

programming to all MVPDs on nondiscriminatory terms and prohibit those firms from

improperly influencing affiliated programmers in their dealings with unaffiliated MVPDs.  *See*

Tr. 2693:8-2694:2 (Katz).

240.   In general, the program access rules prevent programmers affiliated with certain

MVPDs (including AT&T) from engaging in "unfair methods of competition . . . the purpose or

effect of which is to hinder significantly" competing MVPDs.  47 U.S.C. § 548(b), (j).  Under

the FCC's implementing rules, prohibited conduct "includes, but is not limited to," (1) "[a]ny

effort or action . . . to unduly or improperly influence the decision of [the programmer] to sell, or

unduly or improperly influence [the programmer]'s prices, terms, and conditions for"

programming, and (2) "[d]iscrimination in the prices, terms, or conditions of sale or delivery" of

programming.  47 C.F.R. § 76.1001(b)(1)(i)-(ii); *see* 47 U.S.C. § 548(c)(2).  Once an aggrieved

distributor files a complaint, the FCC may set programming prices and assess damages for past

overcharges.  47 C.F.R. § 76.1003(h).  Although the government has suggested that the rules

protect only traditional and not virtual MVPDs, that issue remains unresolved.  *See* NPRM,

*Promoting Innovation and Competition in the Provision of Multichannel Video Programming*

*Distribution Services*, 29 FCC Rcd 15995, ¶ 13 (2014) ("tentatively conclud[ing] that the

statutory definition of MVPD includes certain Internet-based distributors of video

programming").

241.  Professor Shapiro assumed that those rules, which will apply to Turner after the

merger,[18] will have no effect whatsoever on bargaining outcomes.  *See* Tr. 2329:5-6, 2331:16-17

(Shapiro).

242.  As Professor Katz testified, Professor Shapiro's basis[19] for concluding that the

program access rules are ineffective is incorrect, and therefore his approach to modeling post-

merger price increases was also incorrect.  *See* Tr. 2694:8-2697:3 (Katz).  By incorrectly

concluding that the rules would be ineffective, the government's model again failed to account

for all relevant aspects of bargaining dynamics and for that reason does not provide a reliable

basis to predict a price increase.  *See* Tr. 2694:10-18 (Katz) (testifying that Professor Shapiro

was wrong to treat these rules as "completely ineffective").

---

[18] *See* 47 U.S.C. § 548(c)(2)(A)-(B); 47 C.F.R. § 76.1002(a)-(b); *see also* 47 U.S.C.
§ 548(j) (extending rules to common carriers and their affiliates); 47 C.F.R. § 76.1004 (same).

[19] "[H]is basis . . . that he gave in his report was citing some sentences in an FCC order,
particularly the FCC Comcast-NBCU order, that he concluded said that a uniform price increase
across distributors would get by the rules."  Tr. 2694:12-15 (Katz).  Professor Shapiro also relied
on another government expert, Professor Wilkie, who (as discussed below) did not testify.

243.   In response to Professor Shapiro's contention that the rules do not apply to a uniform price increase, Professor Katz demonstrated that Professor Shapiro's model does not predict uniform price increases.  *See* Tr. 2695:5-6.  In Professor Katz's words, even "if this loophole does exist, [Professor Shapiro's] price increases can't drive through it."  Tr. 2695:7-8; *see also infra* COL ¶¶ 20 & n.31, 24 & n.33.  Accordingly, because the government's model does not consider *any* effect from those rules, it is not a useful or persuasive simulation of real-world conditions.

244.   In this regard, Professor Shapiro admitted that he is not an expert on the program access rules, and that he largely relied on the analysis of another government expert, Professor Simon Wilkie, as to this issue.  *See* Tr. 2328:21-23 ("Q.  Now you're not an expert on FCC program access rules, right?  A.  I am not."); *see also* Tr. 2329:14-15 (Shapiro) ("There's a lot of nuances about the rules that I'm not an expert on."); Tr. 2329:13 (Shapiro) ("I guess I'm relying on him.  I've read his report.").  Professor Wilkie, however, did not testify.  He thus provided no evidence that could justify Professor Shapiro's failure to give any weight at all to the FCC's program access rules.

### v.   The Government's Model Does Not Adequately Account for Effects of the Merger That Will Drive Prices Down

245.   As is true of nearly all vertical mergers, this merger will create efficiencies.  *See, e.g.*, Tr. 2452:5-7 (Carlton).  Indeed, the government concedes that, because AT&T will no longer bear an economic cost for Turner programming, the merged firm will have a stronger incentive than AT&T would pre-merger to reduce prices to attract new subscribers.  *See* Tr. 2251:15-2252:12 (Shapiro) ("I see some efficiencies here . . . called elimination of double marginalization . . . .  [Turner's and DIRECTV's] margins get stacked on top of each other in terms of what consumers have to pay.  And in the interests of the joint company, it's desirable to

shrink that total margin . . . [which] leads to a lower cost for DirecTV of the Turner content,"
which is "significant."); Tr. 2322:3-5 (Shapiro) (result would be lower prices for DIRECTV
subscribers). And as Professor Carlton explained, the downward pricing pressure from EDM can
kick in right away. *See* Tr. 2464:17-2465:6.

246.  As an initial matter, Professor Carlton explained why Professor Shapiro's
accounting of even this efficiency—known as the elimination of double marginalization or
"EDM"—is understated. A firm's incentive to decrease its prices is greater when there are more
potential new customers to be gained and when there are more current customers in danger of
leaving. The prevalence of cord-cutting boosts the incentive EDM creates to cut prices on both
counts—lowering price may avoid creating a cord-cutter and losing a subscriber forever, and
current cord-cutters are an additional pool of potential customers. *See* Tr. 2465:20-25 (Carlton)
("cord cutters are customers you'd love to get . . . [s]o if there are a lot of cord cutters, it creates a
greater incentive for you to lower your price"). Because Professor Shapiro's analysis
significantly understates the prevalence of cord-cutting, *see supra* FOF ¶¶ 184-186, he
understates the effect of cord-cutting and the extent of the downward effect on DIRECTV's retail
prices. *See* Tr. 2466:7-13 (Carlton) ("And that's going to have a big effect on the incentive of
AT&T to use the elimination of double marginalization to become a more aggressive
competitor."). In addition, Professor Carlton's estimate of cord-cutting conservatively excluded
additional consumers who subscribe to a pay-TV service but whose packages do not include
Turner: "That means there are people within each MVPD that also could be attracted to Turner"
– increasing AT&T's price-cutting incentive. Tr. 2506:1-6. Had he included those subscribers,
his estimate of cord-cutting would have been "30 percent," making his estimate of EDM
"favorable to the government." Tr. 2506:6, 16.

247.    The elimination of "double marginalization" is not the only benefit of the merger,

however.  The combination of complementary video content with distribution is highly likely to

yield additional consumer benefits.  As Professor Carlton explained, "the intuitive idea of what's

going on here is pretty clear," and it is consistent with what new vertically integrated competitors

such as Netflix and Amazon are demonstrating:  "[h]ow to use information to better, to improve

the creation of content and the distribution of content as well as their plans obviously to use this

for advertising purposes."  Tr. 2452:11-12, 2452:21-2453:3.

248.    AT&T and Time Warner executives testified in detail as to these benefits.  In

particular, the merger will empower the combined firm to innovate and compete more

aggressively in advertising, both by using AT&T's data to make the advertising in Time

Warner's programming more targeted to its viewers and by using AT&T's advertising

technology with Time Warner's programming to offer a new advertising platform that competes

with Facebook and Google for advertising.  *See* Tr. 3392:6-3393:9 (Stephenson (AT&T)) ("We

are generating revenues that are three, four, and five times per impression what companies like

Turner, CBS and those companies are getting from theirs because we have such targeted

data. . . .  [T]his is something that if we had a large inventory of advertising, we could do at

scale.").  AT&T has already hired a "seasoned executive" from a major advertising firm to head

the organization whose sole focus will be "realizing these advertising synergies that we've been

talking about."  Tr. 3426:3-23 (Stephenson (AT&T)) ("This is where all of our advertising

technology will go.  This is where all of the data aggregation capabilities will go.").

249.    Turner's advertising business currently relies almost exclusively on broad

demographic categories.  *See supra* FOF ¶ 28.  Because it does not have personalized viewer-by-

viewer data, it is unable to offer advertisers valuable targeted advertising.  *See* Tr. 685:20-23

(Martin (Turner)); *see also supra* FOF ¶¶ 28-30.  Although Turner has launched some limited advanced advertising products using data it has collected or purchased, Turner's lack of meaningful data makes it difficult to scale these products—Turner's advanced advertising represents less than 5% of Turner's advertising revenues, and it cannot offer features that advertisers value, such as customer-list matching or addressable advertising.  *See*, *e.g.*, Tr. 680:4-7 (Martin (Turner)); Tr. 3765:6-21 (Athey).  As also noted, those challenges have constrained Turner's business.  Advertisers have shifted dollars from traditional television to digital advertising, and as a result the digital advertising market is now bigger than the traditional television advertising market.  *See*, *e.g.*, Tr. 623:2-624:1 (Martin (Turner)).

250.   This shift from television to advertising on digital platforms has largely benefited two companies, Google and Facebook.  *See* Tr. 623:23-624:6 (Martin (Turner)); Tr. 3747:23-3748:1 (Athey).  They are, Professor Athey acknowledged, "the biggest players in digital advertising," accounting for "roughly sixty percent" of that market.  Tr. 3746:16-22 (Athey); *see also* Tr. 3184:7-10 (Bewkes (Time Warner)) (Facebook's and Google's advertising revenues are growing exponentially).  And even though the format of television and digital advertisements is not always identical, "it's the same ad dollars; they're just being used different ways."  Tr. 3457:17-18 (Stephenson (AT&T)).

251.   AT&T, for its part, has the consumer relationships that Time Warner lacks through its video distribution products, and it has the technological acumen and distribution capabilities to offer targeted advertising.  *See* Tr. 3218:22-25 (Stankey (AT&T)) ("AT&T has customers.  We have technology and distribution platforms to get content out to customers.  We have the knowledge of how to manage a customer cycle, how to find them, how to recruit them, bring them in."); Tr. 3242:6-8 (Stankey (AT&T)) (discussing how AT&T's consumer data "raises the

value of the advertising we sell, and that's what drives higher yield").  But, because it does not

own the large amount of premium video content and associated advertising inventory that a

programmer controls, it does not have the scale necessary to realize the full value of its data.  *See*

Tr. 3395:23-25 (Stephenson (AT&T)).

252.   The merger will give AT&T the scale in advertising inventory necessary to invest

in developing a platform for premium video advertising that shows advertisements tailored to the

consumer, and provides a marketplace for advertisers and third-party programmers to transact

television advertising inventory, much as companies do today on existing digital advertising

platforms.  While AT&T's DIRECTV has only two minutes of advertising time per hour to sell,

Turner owns substantial television ad inventory (typically 14 minutes per hour of programming

on each of its 10 channels).  *See*, *e.g.*, Tr. 1405:9-12 (Montemagno (Charter)).

253.   Even with its limited inventory, AT&T has demonstrated that it can use targeted

advertising to "generate revenues that are three, four, and five times" what companies like

Turner now receive.  Tr. 3392:6-7 (Stephenson (AT&T)); *see* Tr. 3762:11-15 (Athey).

254.   Access to Turner's much greater inventory of advertising time will justify the

investments necessary to build an automated programmatic platform to connect AT&T's

customer-level data with the advertising time sold by *any* programmer and *any* distributor.  *See*

Tr. 3243:21-3244:8 (Stankey (AT&T)) ("It's a sufficient scale to get started and demonstrate

that, in fact, these improvements can be made in the market and effectively work. . . .  At the end

of the day, we need to ultimately get others to come in and want to do the same thing with their

advertisement, but prove it on ourselves, demonstrate it works, and then encourage other

companies" to come in).

255.  Owning this inventory will allow AT&T quickly to set up the platform and seed it with enough advertising inventory to attract advertisers, even if other programmers take longer to participate in the platform.  *See* Tr. 3467:18-3468:9 (Stephenson (AT&T)) ("The ability to build an exchange, to sell our own advertising inventory and have advertisers coming in and exchanging and then actually building campaigns themselves into our advertising inventory, I—that is something that we can stand up, I am confident, fairly quickly."); Tr. 677:9-14 (Martin (Turner)) ("I believe that we—that Turner Time Warner working with AT&T would be able to supercharge the time to creating a viable commercial ad platform in a way that's a product that could benefit, not only Turner, but the entire industry."); Tr. 3752:9-19 (Athey) (noting that to attract a significant amount of advertisers, the platform must have a critical mass of advertising inventory).  This is the same path followed by Google and Facebook, which owned scaled content and associated advertising inventory before building their successful advertising businesses.  *See* Tr. 3754:21-3756:2 (Athey).

256.  Improved advertising produces significant benefits for consumers, including:  (i) more useful advertisements, (ii) fewer advertisements, and (iii) perhaps most importantly, advertisers, not subscribers, bearing more of the cost of video service, thus reducing upward pressure on consumer rates.  *See* Tr. 668:14-17 (Martin (Turner)) ("to the extent that we succeed at growing our advertising revenue on the overall business model, it would put less pressure on the subscription revenue"); Tr. 3180:11-13 (Bewkes (Time Warner)) ("We're trying to reduce the number of those; that's why we want to make the commercials more valuable, so we don't have to have as many commercials."); Tr. 3242:6-8 (Stankey (AT&T)) ("That raises the value of the advertising we sell, and that's what drives higher yield and improves the advertising business."); Tr. 3435:19-22 (Stephenson (AT&T)) ("Ability to generate new advertising revenue

streams to help us offset the rising cost of content and keep subscriptions prices low—this is a really good thing for the consumer."); Tr. 3748:22-3749:6 (Athey) (describing how "if consumers see more relevant ads, yes, they can benefit from that."); Tr. 3749:25-3750:16 (Athey) (advertising subsidizes new services for which customers would otherwise need to pay).

257.    These innovations are merger-specific.  Bargaining friction—based on an inability to value data being used in a novel way—has hindered prior attempts to innovate at arm's length. *See supra* FOF ¶¶ 16-18; *see also* Tr. 3774:25-3775:4 (Athey) (describing the "different beliefs about the value" as a form of bargaining friction).  Time Warner is unable to get data from third parties that are as valuable as AT&T's data, which are collected from 25 million television subscribers, 16 million broadband subscribers, and over 100 million mobile connections.  *See* Tr. 3770:1-18 (Athey); Tr. 3767:25-3768:4 (Athey) (explaining why data Turner receives from third parties such as comScore or Nielsen cannot be used for targeted advertising).  AT&T's data-driven advertising, to which Turner will have access post-merger, enables AT&T to sell its advertising inventory at prices 60% higher than the advertising AT&T sells using traditional Nielsen data.  *See* Tr. 3771:11-16, 3772:19-23 (Athey).  Further, merging with AT&T will enable Turner to offer addressable advertising, a capability that Turner currently lacks.  *See* Tr. 3762:1-19 (Athey) (agreeing that Turner lacks addressable advertising capabilities today).  Time Warner CEO Jeff Bewkes similarly testified about how AT&T's addressable advertising capabilities will aid Turner in addressing the advertising challenges it faces today.  *See* Tr. 3115:4-3116:1.

258.    Likewise, AT&T tried for a full year prior to the merger to reach a contractual arrangement to provide data to programmers.  Those efforts were unsuccessful.  *See* Tr. 3211:4-3213:2 (Stankey (AT&T)) (describing "meeting directly with many of the large programmers to

try to figure out whether we could get rights to do some things differently" and to "see if we could build products on a win-win basis that allowed us to use our data to help them change their advertising," but without success); *see also*. Tr. 3773:20-22, 3775:6-9, 3776:2-3777:2 (Athey).

259.   The merger will also enable Time Warner to use AT&T's customer data to improve Time Warner's ability to deliver content to customers that best meets their needs, and it will let AT&T combine its strong mobile network and expertise with Time Warner's content assets to create new mobile video products and services.   As the shift to mobile continues, and as wireless networks are upgraded to ultra-fast 5G technologies, *see* Tr. 3382:7-3383:14 (Stephenson (AT&T)) (explaining the transforming effects that 5G will have), consumers will increasingly demand customized, lower-cost, mobile-first video services.   *See*, *e.g.*, Tr. 1688:6-9 (York (AT&T)) ("We have a laundry list of things that the technology would permit us to do, a couple sitting here right now.   One would be something called download, download-and-go rights."). Merging with Time Warner will enable AT&T to kick-start the innovation of those services and meet burgeoning consumer demand by combining Time Warner's content assets with AT&T's broadband wireless platform to develop new and more valuable services, especially for mobile video devices.   *See* Tr. 3220:23-3224:4 (Stankey (AT&T)).

260.   Mr. Stankey gave several specific examples of the sorts of innovations AT&T intends to pursue following the merger:

- **Mobile-Optimized Content**.   Consumers do not always have time to "sit around their living room" and watch an entire show or newscast.   If AT&T owned content, however, it would investigate ways "to re-stack that and re-edit it and get it out to mobile phones so that during a 15-minute break, you can get your set of news clips and information that's tailored to you."   Tr. 3220:24-3221:9 (Stankey (AT&T)).

- **Ultra-High Definition.**   Although the industry developed so-called "4K" ultra-high-definition technology, programmers and distributors have "been very slow to adopt it. . . . By []controlling the source of it now in some cases, like the NBA games, like the NCAA games that we've been talking about in this courtroom, and controlling the

distribution, we can move more 4K out to enjoy . . . ."  Tr. 3222:4-14 (Stankey (AT&T)).

- **Interaction with Social Media.**  Owning content would enable AT&T to distribute more content flexibly without strict restrictions on use.  Users of social media applications could then interact with specific "clip[s]" from favored content—perhaps "a funny scene from a comedy sketch the night before"—and "share it with people, put it on there.  Maybe even while they're watching it, they want to have a social conversation, texting back and forth."  Tr. 3223:8-18 (Stankey (AT&T)).  Viewers could also interact with a "second screen experience" for their television content, providing "stats and information on their mobile phone so that they're getting information about the play calling in [an NBA] game."  Tr. 3223:8-24 (Stankey (AT&T)).

261.   These and other video innovations provide a merger-specific benefit because, to date, bargaining friction has restrained the development of these sorts of offerings.  The changes transforming the video marketplace have created uncertainty among programmers about how to realize the value of their content—uncertainty that has impeded AT&T's efforts to develop innovative, mobile-first products, despite consumer demand.  *See* Tr. 1685:18-19 (York (AT&T)) ("because we can't assign a value around that uncertainty, nothing gets done"); *see also* Tr. 1685:7-16 (York (AT&T)) ("[W]hat I've seen in 30 years of doing this is this friction just is constant, and nothing truly innovative really gets done when we have an arm's-length commercial negotiation like this.  I see innovation with Netflix and Amazon and Apple and others that are more vertical, and they can do things with their own content.  So it's really both parties not knowing what this innovation or new grant of rights will deliver in the future.  It's the uncertainty; it's the risk."); Tr. 3219:8-13 (Stankey (AT&T)) (explaining that the merger will circumvent the "difficulty getting programmers to adjust" and allow AT&T to "innovate faster and quicker" than when they attempted to "do it by contract"); Tr. 3223:1-2 (Stankey (AT&T)) ("These are the things that traditionally move very, very slowly in the media and distribution business[.]").

262.   By contrast, vertically integrated providers like "Netflix, with all the content that they own and produce, ha[ve] full downloading rights to all their content" and avoid the same bargaining challenges.  Tr. 1688:16-18 (York (AT&T)); *see also* Tr. 3389:6-8 (Stephenson AT&T)).  Ownership of Time Warner content will provide AT&T with key programming it can use to demonstrate the value of new products and thereby address some of the bargaining friction issues it has encountered with other programmers and push these innovations throughout the industry.  *See* Tr. 1689:24-1690:5 (York (AT&T)) ("[Through vertical integration], [y]ou get a little bit more alignment and willingness to experiment, to trial and see if there's value and prove these concepts out.  This whole thing is a chicken and the egg.  And when you kind of just take that out of it and just see if something will work, you get a chance to try and innovate and better serve your customers.").

263.   The merger will also enable pro-consumer marketing innovations.  After the merger, Time Warner will be able to use insights gleaned from AT&T's set-top box data to schedule programming to maximize its viewership or to provide customized guides featuring programming that customers are most likely to watch.  *See* Tr. 3246:4-9 (Stankey (AT&T)).  Without these capabilities, Time Warner is at a significant disadvantage to its vertically integrated rivals.  *See* Tr. 3084:18-19 (Bewkes (Time Warner)) (comparing HBO to its SVOD competitors:  "we don't know any of that [details about subscribers and viewing habits]; whereas, our new competitors do know that"); Tr. 1119:13-1120:10 (Breland (Turner)) ("Dish had presented to us that one of the great benefits of Sling was that they would provide us with viable consumer usage data which of course our networks were very excited about.  It's great insight.  Remember you've got Netflix using artificial intelligence to track behaviors and we're sort of making fire with sticks so we were very excited about that.  But at the last minute late at[]

night they informed us that [we] . . . can't put it with any other data and use it and have your ad

sales group use that to sell. . . . It was very testy. . . . We acquiesced because we needed to get a

deal done."); *see also* Tr. 3245:17-20 (Stankey (AT&T)) ("We read about how Netflix, for

example, is using information on what customers are watching to figure out what content to

charter and make and build, what stars to put in shows, when to schedule things."); Tr. 3778:12-

3779:2 (Athey) (explaining that AT&T's set-top box data can be useful when a company is

making content decisions, and can inform scheduling decisions).[20]

264.   The merger will also allow AT&T to use its customer relationships and

information, and its distribution assets, to better market Time Warner content.  For example, the

firm could launch innovative marketing campaigns for Time Warner content across AT&T's

extensive set of consumer touchpoints (such as AT&T's thousands of retail outlets or its

DIRECTV user interface).  *See* Tr. 3244:19-3245:9 (Stankey (AT&T)) (describing placing Time

Warner content on "different screens that customers scroll through" on DIRECTV or "us[ing

AT&T's] retail stores" to sell "Time Warner products and services" and "promote the sale of

those").  As a result, the merged company will enhance the consumer experience surrounding

Time Warner's content, more effectively market Time Warner's movies and TV series, and

---

[20] The government suggested at trial that initial concerns within Time Warner about the
magnitude of this "content intelligence" synergy undermine this benefit.  *See* Tr. 3330:1-3338:5
(Stankey (AT&T)).  Mr. Stankey acknowledged that deploying innovative content-intelligence
insights will require people at the two firms used to doing business a certain way "to learn new
tricks."  Tr. 3370:16-17; *accord* Tr. 3370:18-20 (all transactions include "dynamics of culture
and willingness to change").  However, he further testified that the reality is that "[t]here will be
more information coming after the business is combined," and that "part of the leadership
challenge is to incent and motivate people to" embrace new approaches and new technologies.
Tr. 3370:15-16, 22-23.  As in many businesses, that can (and will) be done through management
"incentives" that affect employees' "direct compensation to get them to start testing some of
these new concepts and see if we can innovate around them."  Tr. 3371:2-5 (Stankey (AT&T)).
Blocking the merger would prevent that market-based process of innovation.

thereby increase revenues by driving increased viewership of Time Warner's content.  *See id.*  In addition, AT&T can dynamically incorporate popular "Time Warner characters and figures into our advertising" and "help raise customer awareness of new movies that are coming out to sell more movie tickets and raise attendance at movies."  Tr. 3245:3-6 (Stankey (AT&T)).

265.   The evidence at trial established the combined company will also be able to realize substantial cost savings by eliminating redundant services and positions, insourcing services that Time Warner currently acquires from vendors, and achieving scale economies.  *See* Tr. 3235:22-3240:1 (Stankey (AT&T)) (discussing cost savings).  For instance, Time Warner and AT&T both purchase significant amounts of advertising, but can achieve substantial savings by combining their purchasing power for greater economies of scale.  *See* Tr. 3236:1-21 (Stankey (AT&T)).  AT&T spends some money building new content for products that could instead be replaced with existing, unused content from Time Warner's library.  *See* Tr. 3237:5-16 (Stankey (AT&T)).  And "Time Warner uses another company other than AT&T for some of their network services and will be able to replace that provider with an AT&T network."  Tr. 3239:17-21 (Stankey (AT&T)).  Even the government's synergies expert, Mr. Ronald Quintero, acknowledged that AT&T will likely achieve cost synergies from eliminating duplicative corporate functions.  *See* Tr. 3660:23-3661:14 (Quintero).

266.   AT&T uses a well-established and reliable process to estimate all of these benefits.  Before a transaction is announced, a group of dedicated analysts conducts a "very conservative" analysis of potential synergies to ensure, before the Board of Directors considers the transaction, whether the financials meet "some minimum threshold"—that analysis is called "version one."  Tr. 3227:9-14 (Stankey (AT&T)).  As CEO Randall Stephenson testified, the synergies presented to the Board of Directors are those that AT&T feels "highly confident that [it] can achieve";

these are "highly probable scenarios." Tr. 3404:24-3405:2; 3420:3-5. These synergy projections are used, in part, to determine what price AT&T "feel[s] comfortable offering" for the target company. Tr. 3404:11-15 (Stephenson (AT&T)).

267.   After the transaction is approved by the Board and announced, representatives from the two firms then engage in what is known as a "parlor room process"—the representatives begin a more informed, more comprehensive analysis of how a post-merger firm would operate. *See* Tr. 3227:17-3228:11 (Stankey (AT&T)). Executives from both companies review "more data and more information" and have "exploratory meetings" (in this case "about 2,000 meetings") in order to continue "iterati[ng]" to generate synergy estimates that are increasingly accurate as the process proceeds. Tr. 3228:6-15 (Stankey (AT&T)); *see id.* (in all, "over 15,000 manhours of work went into this"). And the historical evidence shows the process to be quite reliable. "The most recent transaction with DIRECTV, we generated over $2 billion of value and expense savings. By the time we got to the end of 2017—that's a run rate, recurring every year—that was higher than what we had predicted." Tr. 3229:4-8 (Stankey (AT&T)).[21]

268.   Once the transaction closes, the synergy estimates become part of AT&T's operating plans with senior executives accountable for achieving them as part of their performance objectives. Tr. 3230:7-13 (Stankey (AT&T)) ("Part of the process that we use is these estimates are all built into business plans. So they go from being estimates to, once the transaction closes, they're decomposed and installed into people's operating plans. Executives like myself . . . our performance and our bonuses are based on achieving them."); Tr. 3405:21-3406:5 (Stephenson (AT&T)) (testifying that he "always" "put[s] people on these merger

---

[21] Mr. Stankey further testified that his "compensation" and "longevity with the company" were tied to his ability to realize the efficiencies this analysis has predicted. Tr. 3231:5-8.

integration teams that are going to own these businesses when the deal is consummated. . . .

They know ultimately when the deal closes they will have to execute on those synergies and they

will have to produce them, and their compensation will be tied to achieving those synergies.").

269.    The evidence demonstrates that the effect of these synergies will be to save the

combined company billions of dollars in costs, unlock billions of dollars of untapped revenue

opportunities, and, in so doing, exert significant downward pressure on consumer prices.  AT&T

executives have identified $2.5 billion in projected synergies, comprising about $1.5 billion in

cost synergies and $1 billion in revenue synergies.  *See* Tr. 3234:17-3235:14 (Stankey (AT&T));

Tr. 3229:20-25 (Stankey (AT&T)) (a "revenue synergy" is "some business opportunity to do

something, to sell a product or serve that we're not able to sell today with the businesses

separate," and a "cost synergy" or "savings" is "[r]emoving an expense from the business").

270.    Despite all these facts, the government's model unrealistically assumes there will

be *zero* benefits beyond EDM.  *See* Tr. 2276:21-22 (Shapiro) (accounting for EDM); Tr. 2278:3-

7 (Shapiro) (agreeing he credited *no* efficiencies other than EDM); Tr. 2322:22-2323:5 (Shapiro)

(confirming that he did no independent analysis of efficiencies); Tr. 2453:10-12 (Carlton).  In

this regard, Professor Shapiro was clear that he did not evaluate these other efficiencies at all, but

relied on the testimony of Mr. Quintero and Professor Athey.  *See* Tr. 2277:19-22 (Shapiro)

("I'm aware of and I'm relying on the other experts who have been retained by the Justice

Department; namely Mr. Quintero and Professor Athey, who have looked at these efficiencies.").

Mr. Quintero, however, conceded that there is "a high degree of likelihood" that there would be

efficiencies resulting from this transaction.  *See* Tr. 3675:4-23; Tr. 3674:14-21 ("if AT&T had

hired [Mr. Quintero] to evaluate the synergies here, [he] would not tell them that there [are] zero

synergies to be achieved here").  Furthermore, Mr. Quintero conceded that some portion of the

synergies projected by AT&T are merger-specific.  Tr. 3661:7-14 ("I couldn't say none of them

[is merger-specific], because, again, I indicated in my report that a portion of it probably is

merger-specific").

271.   In all events, Mr. Quintero is not a credible witness.  Mr. Quintero has been

discredited in other courts for testifying inconsistently.  *See* Tr. 3607:21-3608:12 (Quintero)

(acknowledging that other courts have declined to rely upon his testimony).  Mr. Quintero

claimed to have been unaware of a recent decision in which the court found his testimony to be

"discredited."  *See* Tr. 3609:8-12.  Beyond that, Mr. Quintero's testimony was filled with

inconsistencies.  Mr. Quintero offered shifting descriptions for the standard he applied in

assessing which costs were variable costs, and he conceded that he described a different standard

in his deposition testimony than in his direct examination.  *See* Tr. 3668:6-12 ("That's one way

that I believe I testified in my deposition testimony, and I also testified on that, slightly different

way, in my court testimony.").  And, once retained, Mr. Quintero applied the framework

provided to him by DOJ rather than an independent analysis.  Tr. 3614:14-17.

272.   Mr. Quintero also did not apply a reliable methodology to support his opinions.

Indeed, throughout his testimony, Mr. Quintero described no methodology at all, other than to

declare which synergies (none) he found to be verifiable or merger-specific.  When pressed on

cross-examination for the standard that he applied, he explained that he required a degree of

"certainty" in order to find that synergies were verifiable.  Tr. 3616:12-18 ("I'm looking for

some reasonable degree of certainty").  Mr. Quintero's standard conflicts with the government's

own Horizontal Merger Guidelines, which, as Mr. Quintero did not dispute, do not require any

degree of "certainty."  *See* Tr. 3617:17-22 (Quintero); *see also* Tr. 2277:4-7 (Shapiro) ("[A]s an

antitrust economist we generally credit efficiencies in mergers if they are merger specific.  If they're likely to actually be achieved which usually involves some sort of verifiability.").

273.  Nor did Mr. Quintero conduct a meaningful investigation of the facts relating to AT&T's synergy projections, and he was woefully ignorant of relevant facts.  This not only undermines the persuasiveness of Mr. Quintero's conclusions, but also demonstrates that he did not attempt to perform the tasks that supposedly define his expertise.  *See* Tr. 3550:14-22 (Mr. Quintero testifying that his work experience and training qualifies him as an expert "[b]ecause my work experience professional, background, professional licenses are heavily geared towards being able to dig deep into information, to solicit information").

274.  In particular, Mr. Quintero agreed that "it certainly is possible to verify" at least some of the synergies he evaluated, but he "would have required more information" to do so.  Tr. 3620:8-12.  He made no effort, however, "to determine what level of synergies might actually, in a real world, be reflected by this transaction," because DOJ did not ask him to do so.  Tr. 3626:11-16; *see also* Tr. 3626:18-21 ("Q.  And the government didn't ask you to determine when you could do any additional work to satisfy the standards that they gave you, did they?  A. They did not.").  Instead, where he found information missing (or where he could not understand the synergy estimates projected by AT&T), he made no effort to look into the millions of documents and the vast trove of financial information that was provided to DOJ in this case to determine whether the supposedly missing information was available.  *See* Tr. 3623:19-3624:12 (Quintero).  He made no effort to speak to any of the AT&T people involved in the synergy process, and instead he spoke only to DOJ lawyers and his staff.  *See* Tr. 3644:24-3645:10 (Quintero).  And he did not ask DOJ to depose the individuals responsible for the synergy estimates.  *See* Tr. 3654:4-3655:2 (Quintero).  This lack of effort stands in sharp contrast to the

methodology and effort Mr. Quintero would apply if he were performing similar work for a

client. *See* Tr. 3622:7-13 (Quintero) (agreeing that "[i]f [he] were looking at a client's business

and if there was a piece of information that [he] needed, [he] would just go ask for it").

275. Professor Athey, the government's other synergy expert, likewise did not dispute

that there could well be value to AT&T being able to use data to increase the value of Time

Warner's advertising inventory. For instance, she acknowledged that, currently, AT&T is able to

sell data-driven advertising for approximately 60% more than regular advertising (and

addressable advertising for more than five times what it gets for regular advertising, a capability

that Turner lacks entirely). *See* Tr. 3762:11-19, 3771:12-16.[22]

276. Although Professor Athey refused to credit platform efficiencies, her testimony

supports AT&T's argument that the greater scale that Turner's inventory offers is necessary for

AT&T to build and invest in the platform. Professor Athey acknowledged that acquiring "seed"

inventory is an obstacle to the success of the platform. Tr. 3756:5-8. It was, she stated, a

"chicken and egg problem." Tr. 3752:9-15. "[I]n order to have a large successful programmatic

platform, you would need to have a large amount of ad inventory," she agreed. Tr. 3751:24-

3752:2; *see also* Tr. 3752:16-19 (Athey) ("Q. And as you noted in your report, it's very difficult

to attract one side of the platform without having the other side, right? A. That's correct.").

And although Professor Athey asserted that AT&T could acquire such inventory through

---

[22] Although Turner's Long Range Plan independently projected increased revenue due to data-driven advertising, such forecasts were "aspirational" and assumed that Turner "would have had enough data to be able to create [new ad] products." Tr. 595:5-17 (Martin (Turner)) (discussing PX67). As discussed above, Turner has been unsuccessful in acquiring sufficient data on its own, *see supra* FOF ¶¶ 16-19, and will benefit from the access to data it gets as a result of merging with AT&T. *See* Tr. 635:1-4 (Martin (Turner)) ("Well again, coming back to the word data. All of the customer relationships that AT&T has, the scale . . . which they have in technology is significantly better than anything we can do on our own.").

contractual relationships, Tr. 3730:23-3731:9, as discussed above, real-world evidence in the

video advertising marketplace refutes that conclusion.  *See supra* FOF ¶¶ 47-48.

277.   In sum, while the government disputes the *amount* of synergies that will be

achieved as a result of this transaction, it is undisputed that the synergies will be greater than

zero.  Those synergies will decrease costs (allowing AT&T to be a more aggressive competitor)

and make broad distribution more valuable to the combined company and thus will put further

downward pressure on the combined company's prices.  Again, however, other than EDM,

Professor Shapiro's model does not account for these consumer benefits at all.  In this way as

well, the model is contrary to the post-merger reality and does not provide a plausible basis for

predicting likely net consumer harm (much less substantial harm).

## III.   The Government Did Not Meet Its Burden to Prove the Merged Company Is Likely to Coordinate with Comcast to Harm Competition from Virtual MVPDs

278.   The government's second theory of harm is that the merged company will

coordinate with Comcast to harm competition from virtual MVPDs.  The evidence does not

support this theory, and the government's lead expert essentially abandoned it at trial.

279.   Indeed, far from opining that such coordination was likely to substantially lessen

competition, Professor Shapiro went no further than to say he was "concerned" that coordination

between AT&T and Comcast "might happen."  Tr. 2260:1-3, 2260:22-23 (Shapiro).  When asked

*how likely* such an outcome was, Professor Shapiro *could not provide any estimate*.  *See* Tr.

2264:1-4 ("Q.  Have you quantified the likelihood of this coordination occurring between

AT&T, Comcast, if the merger were to go forward?  A.  No, I'm not able to do that."); Tr.

2292:12 ("I don't have a way of accessing [sic] the probability.").  He could not testify whether

it was 51% likely to occur or even 1% likely to occur.  *See* Tr. 2292:6-13 (Shapiro); *see also* Tr.

2292:2 (Shapiro) ("I cannot quantify that probability . . . .").  There is thus no evidence that

coordinated activity is probable or more likely than not.  *See* Tr. 2292:6-8 (Shapiro) ("Q.  And you're not in a position to say it's more likely to happen than not, correct?  A.  That is correct.").

280.   Moreover, coordinated *withholding* with Comcast would be expected *only if* both companies would receive profits from new subscribers or retained existing subscribers that exceeded their lost affiliate fees and advertising revenues.  But Professor Shapiro did not demonstrate that such benefits would exceed those certain costs for either company, and thus the government presented no evidence that there would be an economic incentive to engage in the conduct it posited.  *See* Tr. 2454:8-9 (Carlton) (Professor Shapiro has done "absolutely nothing" "to quantify anything" as to coordination).  In other words, the government's economic analysis provides no basis for this Court to conclude that such allegedly anticompetitive coordination is likely because of this merger.

281.   Nor did the government present any other evidence supporting its coordination theory.  The government's own witness, Mr. Rigdon of Comcast, confirmed that there is no basis to believe Comcast will coordinate with AT&T post-merger.  *See* Tr. 884:15-885:7.  Mr. Stankey similarly confirmed that AT&T has no incentive to coordinate with one of its chief rivals.  *See* Tr. 3255:12-22 ("I've been competing with Comcast for years.  And to the notion that we are going to align with them—you know, we do battle with them all the time. . . .  We don't want to cooperate with Comcast to play their game.  We want to figure out how we use our mobile devices and our mobile network to change the game and do things differently, not do it the same way they want to do it."); *see also* Tr. 3432:2-5 (Stephenson (AT&T)) ("We compete every day with Comcast in the marketplace.  The individual that runs the communication company, he wakes up every day trying to think, how do I win in the marketplace against Comcast?").

282.   In addition to claiming that the merger would lead to coordinated *withholding* of

content, the government alternatively argues that the combined company would have an

incentive to coordinate with Comcast/NBCU to demand that virtual MVPDs take *too much*

programming in an effort to prevent virtual MVPDs from offering sufficiently "skinny bundles."

In addition to the points noted above, the evidence at trial refuted this contention for two further

reasons.

283.   First, any concern that programmers will seek to sell more channels to virtual

MVPDs than the virtual MVPDs want is not merger-specific.  As the government's competitor

witnesses conceded, independent of vertical integration, *all* programmers want distributors to

carry as many networks as possible.  *See* Tr. 433:18-21 (Schlichting (DISH)) ("Q.  Pre merger all

the programmers, all the programmers want you or your company to take as many networks as

they can persuade you to take, correct?  A.  That's true."); Tr. 2098:6-19 (Sejen (Cable One))

(Turner "went to great lengths to protect [its] bundle"); Tr. 2063:16-21 (Bond (NBCU))

(**[REDACTED]**).  The reason is apparent.  Whatever the licensing fee for a bundle,

programmers will always prefer to have more networks available, because that increases affiliate

revenue *and* advertising revenues.  *Cf.* Tr. 2466:24-2467:1 (Carlton) (confirming that "the more

eyeballs you have, the more valuable your advertising is").  And in any case, the government did

not establish that virtual MVPDs would be unable to compete effectively even if they were

unable to carry as few networks as they desired.

284.   Second, contrary to the government's theory, the merged company would have no

economic incentive to withhold content from virtual MVPD services.  *See* Tr. 2260:19-21

(Shapiro) (post-merger, "AT&T will still want to license the Turner content to virtual MVPDs").

As AT&T's key executives explained, AT&T *wants* growth in these services because more

online video viewership increases usage of its wireless broadband network, where AT&T has a

decided market advantage over Comcast.  *See* Tr. 3432:16-20 (Stephenson (AT&T)) ("With

AT&T, we're in a unique position.  We like over-the-top [Internet-delivered video].  Over-the-

top generally means, in this day and age, wireless.  People are using their wireless devices to

watch video, whether it's our video or not, we're somewhat ambivalent."); Tr. 3433:17-18

(Stephenson (AT&T)) ("Anything that will drive more utilization of our mobile asset is a good

thing."); Tr. 3254:19-22 (Stankey (AT&T)) (when consumers use virtual MVPD services, "they

put more usage on the wireless network and it causes them to buy up on data plans or get more

devices and connect more things to the network to do that, that's good for our business"); Tr.

3255:15-17 (Stankey (AT&T)) ("[W]e're different.  And we have a mobile network; that's what

different about us.").  AT&T has more than 100 million wireless connections in the United

States.  *See* Tr. 3208:22-24 (Stankey (AT&T)) ("[W]e could use our 100 million wireless

subscribers to be able to do things differently, which is dramatically different than Comcast.");

*see also* Tr. 3432:6-10 (Stephenson (AT&T)) ("Wireless distribution is a huge advantage for

[AT&T] against Comcast, because they have no wireless business, per se.").

285.   Thus, and contrary to the government's unproven theory that AT&T is incentivized

to maintain the traditional pay TV product, AT&T is quickly moving to smaller bundles of video

programming, at lower prices and over mobile devices.  AT&T not only offers DIRECTV NOW,

but also, as AT&T's CEO Randall Stephenson testified, will soon offer an even skinnier bundle,

"AT&T Watch," for $15.  Tr. 3434:12-17; *see* DX625.0001 (AT&T will "create new choices—

skinnier bundles . . .").  This bundle will not only be among the most inexpensive available to all

customers at $15, but also, "if you're an AT&T wireless unlimited customer, we're going to give

that bundle to you for free."  Tr. 3434:18-20 (Stephenson (AT&T)).  As Mr. Stephenson

explained, "these are the kind of things that we're motivated to do as a distributor, get the bundle's [d]ensity down and get a skinnier, skinnier bundle into the marketplace." Tr. 3434:21-24; *see also* 3506:23-25 (Stephenson (AT&T)) ("What we're all working towards is creating [$]35 and $15 bundles.  And that's where the world is moving."); Tr. 3257:4-6 (Stankey (AT&T)) ("I think the future of this industry is going to be a little bit smaller compilations of different types of services.").[23]  **[REDACTED]**.

286.  Indeed, increasing the extent to which consumers watch video on AT&T's mobile network will benefit the merged firm even when those consumers watch video offered by distributors other than AT&T.  Those customers increase their use of AT&T's wireless network, and become less likely to switch ("churn") to other wireless providers.  *See* DX625.0001 (AT&T intends to "distribut[e] [Time Warner] content deeper into mobile so *all wireless companies* become distribution points for Time Warner content") (emphasis added); Tr. 3253:21-23 (Stankey (AT&T)) ("They use their wireless device more.  The more you watch, the more you use.  The more you use, the more indispensable it is.").  They will also become more likely over time to treat their mobile connection as their default video-viewing mechanism, again benefiting the merged firm over Comcast.  *See* Tr. 3208:19-21 (Stankey (AT&T)) ("one of the clear objectives was to start to transform the way we deliver video to customers, make the video far more portable"); Tr. 3432:23-25 (Stephenson (AT&T)) ("We want to propagate that.  We're enthusiastic about that.  We want people engaged with these devices all day, as much as possible, watching media and video.").

---

[23] Contrary to the government's assertion that PX47 shows that AT&T has tried to slow the growth of its online competitors, AT&T has recognized that it is trying to "navigate a very new world."  PX47.  It has embraced this "new world" by launching DIRECTV NOW and AT&T Watch.

287.  The merged company also will have the incentive to include Turner content in this growing sector of the video ecosystem in order to obtain affiliate fees and advertising revenue and to encourage consumers to continue to use services that offer Turner's networks rather than turning to Netflix and similar alternatives that do not.  *See* PX456-003 (Time Warner 10-K states that "the merger with AT&T is consistent with the Company's strategy of ensuring that its content is available to consumers on a wide range of distribution platforms"); PX8-004 (one of Turner's primary strategies is to "[l]everage technology and new business models to distribute our content both inside and outside the traditional ecosystem"); *see also* Tr. 2260:19-21 (Shapiro) (post-merger, "AT&T will still want to license the Turner content to virtual MVPDs"). As Turner's Chairman and CEO, Mr. Martin, testified, with "more and more households in the United States who are, quote, unquote, cutting the cord," Tr. 605:21-22, Turner is "embracing virtual MVPDs and any other distributors that might enter the marketplace, because, again, we need to be distributed to as full distribution as possible," Tr. 607:13-16; *see also* Tr. 3126:8-16 (Bewkes (Time Warner)) (stating that the government's theory "makes no sense" because "[w]e want to be on all the virtual MVPDs"); Tr. 3157:22-3158:7 (Bewkes (Time Warner)) (explaining that virtual MVPDs are a favorable trend because they are "another place where we could put our networks in front of consumers"); Tr. 1065:1-3 (Breland (Turner)) ("Q. . . . [W]hat was your strategy with respect to negotiating with the new entrant virtual MVPDs?  A.  I want to be on every platform that comes."); PX132-009 (Mr. Martin from Turner states at public conference that "the more Slings there are, the more we're going to try to make sure our networks are in those packages").  Indeed, Mr. Bewkes explained that Time Warner is better positioned than Comcast to be on "skinny bundle" virtual MVPD platforms because 85-90% of Turner's revenue

comes from four networks, whereas Comcast relies on 13 to 15 networks.  *See* Tr. 3126:22-

3127:6; *see also* **[REDACTED]**.[24]

288.   Moreover, for different business reasons, NBCU as a programmer also wants to

distribute its content broadly on all platforms, including virtual MVPDs.  As Mr. Bond,

Chairman of Content Distribution at NBCU, testified, NBCU has "licensed all of those [virtual]

distributors."  Tr. 2019:20-2020:1; **[REDACTED]**.[25]  The emerging virtual MVPDs now have

"well over three million subscribers in total" and "represent an important new pathway of

distribution," especially while "the traditional MVPD universe, that is, those customers that are

reflected in cable and satellite and [t]elco, those subscribers are all declining."  Tr. 2020:5-13

(Bond (NBCU)); *see* Tr. 2020:22-24 (Bond (NBCU)) (virtual MVPDs will "continue to grow").

Mr. Bond further testified that he sees the emergence of these new distribution platforms as "a

positive" for NBCU, Tr. 2020:14-16, and that he has never had any pressure to make decisions

---

[24] The sometimes-higher per-subscriber rates that virtual MVPDs pay Turner relative to traditional MVPDs are attributable to the fact that, as recent entrants, virtual MVPDs generally have fewer subscribers.  *See* Tr. 1083:4-10 (Breland (Turner)) (where a distributor reaches fewer viewers, "your rate may be higher and it needs to be higher because it means the other side of the revenue stream ad sales won't be able to monetize those eyeball[s].  That's one.  And then the rate goes down as you give us better carriage.  The more eyeballs you give us, the lower the rate."); Tr. 585:8-16 (Martin (Turner)) ("Subsequently, we've done a new contract with Sony Vue, where their rates are much more comparable with the equivalent small cable system that would have a comparable number of subscribers."); Tr. 1188:10-1189:04 (Warren (Turner)) ("The first deal that Sony signed was . . . higher than our deals we might have with someone having 10 million, 5 million subscribers, in large measure because Sony was telling us that they were going to pay minimum guarantees in terms of dollar value" and the subsequent renegotiation resulted in rates that "are now within a single-digit percentage to distributors having 7, 8 million subscribers").  Mr. Breland testified that this has been the case for any new entrant to the industry when it first comes into the market, and that rates decrease as the provider establishes a subscriber base.  *See* Tr. 1062:2-10 ("When direct broadcast satellite came on, they paid a slight premium.  Same thing when the [telcos] came on.  And same thing with the virtual MVPDs.").

[25] **[REDACTED]**.

about licensing to virtual MVPDs related to the fact that NBCU is affiliated with Comcast Cable, Tr. 2021:19-2022:17; *see also* Tr. 2038:13-18 (Bond (NBCU)) (**[REDACTED]**).

289.   Even assuming, contrary to the evidence, that AT&T and Comcast were inclined to withhold content from virtual MVPDs in a coordinated fashion, the Commitment would categorically preclude the merged entity from coordinating with Comcast on a withholding strategy because, at a distributor's election, it *prevents* withholding.  *See* Tr. 2454:11-15 (Carlton) (Professor Shapiro's analysis of coordination to withhold "completely ignore[s] . . . the arbitration commitment," which bars withholding).  The evidence thus shows that, post-merger, AT&T cannot agree to withhold content because it can be *required* to provide the content at the option of any distributor.

290.   Independently, the structure of the contracts in this industry further precludes the kind of competitive response necessary to enforce coordination.  The programming market relies on staggered multi-year agreements, under which NBCU's and Turner's contracts with providers frequently expire years apart.  *See* Tr. 643:20-644:2 (Martin (Turner)) (testifying that "because of the length of these contracts, because they're typically years in length," a strategy set "in 2013" would "begin to show up in '15, '16 and '17"); PX123-020 (showing Turner's contracts expiring over staggered periods).  In other words, in order to coordinate, one party—Turner or NBC—would have to give up sales of valuable programming and all the associated revenue merely in the hope that the other party *might* elect to forgo its revenue months or years later.

291.   In attempting to prove that the merged company will have the incentive to coordinate with Comcast to withhold content from virtual MVPDs, the government relied on selected vague statements from one Turner employee, John Harran.  *See generally* Tr. 1840:10-1866:11.  Mr. Harran, however, confirmed that he has no "authority within Turner to set strategy

concerning how Turner engages with virtual MVPDs," "to negotiate virtual MVPD linear agreements," or "to decide what rights Turner will license to distributors," including "virtual MVPDs." Tr. 1868:3-8, 1868:21-24. The government also relies on language from an email sent by AT&T executive Daniel York to suggest that AT&T would not want to license content to virtual MVPDs. *See* PX42. But this document not only confirms that programmers have a strong economic incentive to support virtual MVPDs, but also underscores the changing industry dynamics by pointing out "how quickly the product and category definitions have all blurred." *Id.* Mr. York explained that he was "trying to give Mr. White, who was relatively new to the media business, a sense of how the world is changing." Tr. 1679:13-16.

292.   The government also relied on a previous, unrelated episode involving the regional sports network SportsNet LA ("SNLA"). DIRECTV declined to license the network because the price demanded was unreasonably high, and the government showed no more than that two DIRECTV executives expressed an interest in other distributors likewise "holding firm." PX462. But Mr. York (who was then at DIRECTV before its merger with AT&T) testified that SNLA's failure to license its network to distributors was easily explained by the "insane" terms of SNLA's offer and its unwillingness to negotiate. Tr. 2082:5-15. DIRECTV "made a very aggressive set of counterproposals, got no movement whatsoever, and couldn't come to terms to carry it." Tr. 2082:13-15 (York (AT&T)). Nor was DIRECTV alone in this regard. The press had publicly reported that DISH, too, was unlikely to carry the channel. *See* Tr. 2085:1-18 (York (AT&T)) ("Q. Do you recall this article as being one of several that announced what Dish's position was at the time? A. Yes."). Mr. York confirmed that communications between him and counterparts at other companies in the industry are not about specific contract terms or other confidential information. *See, e.g.*, Tr. 1671:10-16, 1673:17-18, 1683:22-25.

293.   The government also failed to prove at trial that, even if AT&T and Comcast were to coordinate in withholding their content from virtual MVPDs, it would substantially lessen competition.

294.   A new virtual MVPD does not need to acquire programming from all the major content providers to enter the marketplace.  As DISH's Warren Schlichting testified, one of Sling's basic packages has *no* broadcast stations, meaning that it lacks ABC, NBC, CBS, and Fox.  *See* Tr. 351:12.  Sling's other basic package lacks ESPN, which has more sports programming than any other network.  *See* Tr. 355:2-7 (Schlichting (DISH)).  Although Schlichting testified at one point that "it's very hard to have a pay-TV service without" "ABC, NBC, CBS, Fox and Time Warner," Tr. 242:19-21, he later conceded Sling was "doing well," Tr. 356:15-16, despite the fact that CBS is not available on Sling at all, *see* Tr. 351:24-25.

295.   Despite DISH's real-world experience, the government attempted to rely on theoretical findings from a so-called "Rubi[x] summary."  But Mr. Breland testified that Rubix was merely an attempt by an internal research department at Turner to "gain some degree of insight into consumer behavior."  Tr. 1076:11-14.  He did not "recall if there were one, two, five, or ten different Rubi[x] studies" and "didn't use the [Rubix] data to help [him] establish any strategies."  Tr. 1076:18-1077:11.

**IV.   The Government's Theory That the Combined Company Will Limit HBO's Use As a "Promotional Tool" Is Illogical and Contrary to the Evidence**

296.   The government's final theory involves HBO.  HBO is a premium network, meaning it offers high-quality programming that is supported by subscriber fees rather than advertising and, unlike the Turner networks, is not part of a basic MVPD subscription but rather is an add-on purchase.  *See* Tr. 3070:3-8 (Bewkes (Time Warner)) ("[T]he key thing about [HBO] was there was no advertising.  There's never been. . . .  [s]o in order to pay for the

programming, we had to get people to subscribe to it, the more, the better.  And that's how we

paid for what we were doing.").  The majority of MVPD subscribers—more than two-thirds—do

*not* subscribe to HBO.  *See* Tr. 1529:16-17 (Patel (AT&T)) (reporting 30% penetration

nationally); Tr. 3073:22-23 (Bewkes (Time Warner)) ("I think the national average is in the 30,

low 30 percent range.").

297.   HBO competes not only with several other premium networks (including Showtime

and The Movie Channel, owned by CBS, and Starz, owned by Lionsgate), but also with other

cable networks (such as FX, A&E, and AMC), as well as online distributors such as Netflix and

Amazon.  *See* Tr. 886:16-22 (Rigdon (Comcast)) (acknowledging that he has characterized

Netflix "as a competitor to HBO and a substitute for HBO" because it "is another offering that

you can give to consumers instead of HBO or Showtime"); Tr. 1493:18-1494:3 (Sutton (HBO))

(HBO competes with SVODs like Netflix for viewers' time, for distribution, and for

programming content); *see also* DX709.0003 (**[REDACTED]**).  And Netflix has a programming

budget over twice that of HBO's.  *See* Tr. 3099:13-15 (Bewkes (Time Warner)).  As HBO

executive Simon Sutton testified, "There was a time when very few people were making the kind

of shows we make.  Now, it seems that almost every week, there's an announcement of

somebody else making it."  Tr. 1494:16-18; *see also* DX709.0003 (**[REDACTED]**).

298.   The government does not argue that the merged firm would have an incentive to

withhold HBO from either MVPDs or virtual MVPDs or that the merger would produce any

incentive to raise prices for the service.  *See* Tr. 2290:15-23 (Shapiro).  Instead, it has alleged

narrowly that the merged company will gain the incentive and ability to prevent rival distributors

from using HBO as a promotional tool to attract and retain subscribers and that such conduct will

substantially lessen competition.  *See* Compl. ¶ 39.

299.   The trial evidence showed the opposite.  Even Professor Shapiro conceded that the minor "harm" he is concerned about "*[o]n its own . . . would not have such a big impact, that it would substantially lessen competition.*"  Tr. 2276:11-13 (emphasis added); *see* Tr. 2454:1-3 (Carlton) (indicating that he is "not quite sure what" he is "suppose[d] to rebut" in light of what Professor Shapiro said).  Professor Shapiro further conceded that he had done nothing to quantify the alleged harm to consumers relating to this issue.  *See* Tr. 2291:4-7.  In light of that concession, there is no substance to the government's assertion that restricting HBO promotions could substantially lessen competition.

300.   In fact, HBO needs MVPD promotions far more than MVPDs need to promote HBO—HBO's business model "absolutely" depends on promotions.  Tr. 1496:16-17 (Sutton (HBO)); *see also* Tr.1508:14-16 (Sutton (HBO)) ("[O]ur whole business is relying on our affiliates to promote us.  If we can't do that, then our entire business model is destroyed."); Tr. 3074:5-6 (Bewkes (Time Warner)) (HBO is "heavily dependent" on distributors).  In fact, wide distribution and effective marketing are the two key drivers of HBO's business.  *See* Tr. 3071:6-9 (Bewkes (Time Warner)); Tr. 3072:2-9 (Bewkes (Time Warner)) ("[W]e needed to get our channel, HBO . . . . carried in the cable ecosystem and then, . . . if they didn't sell anybody an HBO subscription in their cable system, we didn't get— we had no revenue.  So we had both goals:  get it in, get it on every distribution platform, and try to get as many people subscribing to it as we could."); Tr. 1455:16-21 (Sutton (HBO)) ("we actually want to incent [distributors] to grow, so . . . in our deal structure, as they add subscribers, they generally pay less on the increment").  That is why HBO's contracts provide for a volume-discount pricing structure—the per-subscriber rate an MVPD pays is reduced as subscribership increases.  *See* Tr. 1533:21-1534:11 (Patel (AT&T)).

301.   HBO must rely on its distributors to promote it, because it does not have direct relationships with its viewers, and it is an extra purchase not automatically included in MVPDs' basic packages.  *See* Tr. 3070:9-14 (Bewkes (Time Warner)) ("The other important thing . . . is we had to go through a cable system on a wholesale basis, to get them to carry the network and then get them to offer [HBO] vigorously to the homes in their cable system."); Tr. 1496:13-15 (Sutton (HBO)) ("Because we're a discrete purchase, we rely on our affiliates to promote and sell us as much as they can."); Tr. 2136:15-19 (Sejen (Cable One)) ("Q.  . . .  [I]n your experience in the industry, HBO, as a promotional device, was coming more from the HBO end than it certainly was from the distributor end, at least you as a distributor, Cable ONE?  A. Particularly in later years, yes.").

302.   Even with respect to its over-the-top offering (HBO NOW), HBO still largely functions as a wholesaler because a consumer must purchase an HBO NOW subscription through a third party such as Apple or Amazon, and the third party "act[s] as [HBO's] agent." Tr. 1491:6-7 (Sutton (HBO)); *see also* Tr. 3163:1-10 (Bewkes (Time Warner)) ("we had to use third parties to deliver and to market that HBO service").  AT&T's Hanny Patel likewise confirmed that it is the distributor that has the relationship with the customer and thus that Showtime, where she spent 19 years, needed the distributor to market Showtime.  Tr. 1528:14-1529:4.

303.   Furthermore, HBO has to negotiate for guarantees that MVPDs will use HBO in their promotions.  *See* Tr. 3128:20-25 (Bewkes (Time Warner)) ("[O]ur efforts, when we're dealing with affiliates, are not, you know, that, yes, we've got to get them to carry the service on their system, but mostly what it's about is getting them providing incentives, getting them to agree to market it so that a lot of people in their system have HBO.").

304.   HBO also subsidizes those promotions, providing substantial funds, sometimes millions of dollars, to MVPDs for that purpose. *See* Tr. 1499:20-24 (Sutton (HBO)) ("[W]e will agree to provide certain marketing funds . . . , which we will contribute to their advertising and marketing campaigns in order for them to market and promote HBO."); Tr. 1534:22-23 (Patel (AT&T)) ("There was a significant marketing budget that [HBO] offered us to grow their subscribers."); Tr. 2971:16-23 (Holanda (RCN)) (agreeing that without economic incentives from HBO, "RCN would not use HBO as a promotional tool").

305.   As HBO's Mr. Sutton testified, most of HBO's distribution staff, consisting of 150 employees, is engaged in "encourag[ing] our affiliates to promote HBO and Cinemax as much as possible.  They are going out to our affiliates' call centers, encouraging the agents there to push HBO and Cinemax to customers who call in."  Tr. 1491:16-1492:1.  HBO needs to make substantial efforts to be "included in promotions and bundles and marketing campaigns" because "[i]t is a highly effective way of increasing HBO's penetration and, therefore, HBO's subscriber numbers and revenue."  Tr. 1492:9-13 (Sutton (HBO)); *see also* Tr. 2136:10-13 (Sejen (Cable One)) ("Q.  And is it your understanding that HBO has a pretty high churn rate so it really needs to keep pushing its product to replace that churn?  A.  Uh-huh.  I believe that's accurate, yes."); Tr. 2972:20-24 (Holanda (RCN)) ("Q.  And, in fact, it would be antithetical to HBO's entire business model, where it has a high churn rate and it needs to keep pushing its product to gain subscribers.  You understand that's the way HBO works, don't you?  A.  Well, I understand the churn and the push point.").  Along the same lines, HBO frequently waives fees or contractual requirements in order to induce a distributor to launch a special HBO-related promotion.  *See* Tr. 1498:18-1499:3 (Sutton (HBO)).

306.   There is another important reason that the combined firm would have no incentive to restrict distributors from using HBO as a promotional tool.  In order to attract the content and talent it needs to compete with the exploding universe of other high-quality video programming, HBO requires broad distribution.  *See* Tr. 3073:2-7 (Bewkes (Time Warner)) ("[T]he more subscribers we have, therefore, the more revenue.  And the more people in the country are talking about it, the more the press will write about it.  That attracts the talent that wants to have their show on HBO, and that gives us better shows and, therefore, more subscribers."); Tr. 3263:8-13 (Stankey (AT&T)) ("And that's our goal, is to put more of [HBO] out there, and these distributors are incredibly important to us.  I have absolutely no concerns whatsoever that we're going to continue to push HBO to anybody who wants to sell it moving forward.").  Without assurances of wide distribution, content creators would leave HBO and go elsewhere.  *See* Tr. 1493:20-25 (Sutton (HBO)) (discussing how HBO and Netflix compete "in many different ways," including for "talent to make the same shows").

307.   HBO will continue to need to rely on MVPDs post-merger to distribute its programming, and it will have the same incentives to encourage these distributors to package and promote HBO as widely as possible.  *See* Tr. 3262:12-15 (Stankey (AT&T)) ("We want broad distribution on HBO.  After the close of the transaction, . . . that'll be even a more important focus of this business, to get broader distribution of HBO."); Tr. 3431:10-12 (Stephenson (AT&T)) (explaining restricting use of HBO as a promotional tool "defies business logic" as "HBO is dependent upon all these distributors to sell their product"); Tr. 3431:15-19 (Stephenson (AT&T)) ("The value of one's content is a function of how many people are watching the content, and any action that would restrict the distribution of that content is value-destroying action."); Tr. 1508:5-16 (Sutton (HBO)) (testifying that it would be "devastating" to

HBO's business to prevent competing distributors from using HBO as a promotional tool; "[O]ur whole business is relying on our affiliates to promote us.  If we can't do that, then our entire business model is destroyed."); Tr. 3128:16-19 (Bewkes (Time Warner)) ("HBO's entire business, for all the 40 years I've been in it, we need to be in every outlet, and we need as many—we'd like, we want as many people to subscribe to it as we can get.").  According to Ms. Patel, the government's theory that it might be beneficial for the combined company to withhold HBO in some way from programs and promotions "doesn't make any sense" based on 25 years of experience at a premium network and a distributor.  Tr. 1536:15-23.

308.   HBO's existing agreements allow distributors to make many promotional offers without the need for additional approval.  *See* Tr. 719:24-720:5 (Hinson (Cox)).  There are "few circumstances" where a distributor needs HBO's approval in order to use it as a promotional tool.  Tr. 1497:25-1498:2 (Sutton (HBO)).  Mr. Sutton, HBO's President and Chief Revenue Officer, testified that he could not think of an instance in which HBO had denied approval for a promotion.  *See* Tr. 1499:8-11.

309.   Furthermore, due to the extensive competition it faces, HBO is not an essential or unique promotional tool for any MVPD.  Cable One largely eschews using HBO in promotions.  *See* Tr. 2135:24-2136:1 (Sejen (Cable One)) ("Q.  So Cable ONE, if I hear you correctly, didn't really need or want HBO as a promotional tool?  A.  That's essentially the case, yes.").  RCN believes that the use of premium channels as a promotional tool is "in the middle of the pack."  Tr. 2972:7-11 (Holanda (RCN)).  **[REDACTED]**.  The ability of consumers to get HBO apart from traditional MVPDs through HBO NOW further reduces any perceived importance as a promotional tool.  *See* Tr. 2973:2-6 (Holanda (RCN)) (agreeing that "today, HBO really has less

influence with [RCN] than ever before because a consumer, if it really wants HBO, it can just

pop on the app and go get HBO Now").

310.    In 2016 when AT&T was considering choosing one of its existing premium

networks to be its "preferred partner," AT&T "could have partnered with any of the premiums."

Tr. 1526:17-22 (Patel (AT&T)).  At that time, HBO was only the *third* most popular premium

distributed by AT&T, following Starz and Showtime, both of which gave AT&T "more

favorable deal terms and offered better incentives" than HBO.  *See* Tr. 1527:18-1528:5 (Patel

(AT&T)).  Ultimately, Ms. Patel confirmed, AT&T chose to make HBO its "preferred partner"

only after HBO made a "very aggressive" offer (that is, very favorable to AT&T).  Tr. 1532:21-

1533:3, 1535:19-22.  Ms. Patel testified that in her 25 years in the industry, she had "never seen

an offer that strong in terms of incentive for growth."  Tr. 1533:8-9.  The offer lowered AT&T's

rate per subscriber over the course of the deal (amounting to hundreds of millions of dollars),

offered AT&T a free band of subscribers also worth hundreds of millions of dollars, and

provided AT&T a significant marketing budget it could use to grow HBO subscribers, among

other things.  *See* Tr. 1532:24-1535:14 (Patel (AT&T)); *see* Tr. 1535:7-18 (Patel (AT&T))

(explaining that these terms were worth "hundreds of millions of dollars").  HBO's offer also

included a grant of rights for AT&T's wireless services, which at the time had not been offered

by Starz or Showtime.  Tr. 1530:20-24, 1534:24-1535:1 (Patel (AT&T)).

311.    Distributors can—and do—use all other premium services in promotions.  *See*, *e.g.*,

Tr. 717:9-25 (Hinson (Cox)).  Although HBO can be useful for attracting or retaining

subscribers, other premium networks can and do serve the same purpose.  *See* Tr. 2971:20-

2972:15 (Holanda (RCN)) (acknowledging that RCN uses other premium channels—Showtime,

Starz—as promotional tools and that "the use of premium channels as a promotional tool is not

the most or the least important tool"—"it's just one tool [a]nd it doesn't exercise tremendous clout and power" over RCN).

312.  As an additional example, Comcast uses Netflix, which can now be accessed through Comcast's set-top box, in its promotional offerings.  *See* Tr. 886:8-15 (Rigdon (Comcast)) (confirming that Comcast has "incorporated Netflix into [its] set top box" and markets it to new subscribers).  HBO recognizes that Netflix is a competitor for affiliates' promotional efforts.  *See* Tr. 1497:11-13 (Sutton (HBO)) (noting use of Netflix as a promotional tool by HBO's distributors); Tr. 1507:7-1508:4 (Sutton (HBO)) (discussing exclusion of HBO by Comcast from Comcast's "Watchathon" promotion in 2017 and the fact that Netflix was used as the "lead product in the Watchathon").  In that way as well, Netflix competes with traditional programmers for promotional placement with distributors.

313.  Distributors also rely on a wide range of promotions that use no premium channels at all, including free equipment and—most importantly—gift cards and other price reductions. *See*, *e.g.*, Tr. 717:15-25 (Hinson (Cox)) (explaining that Cox promotions include "gift cards," price discounts, and free installations or equipment); Tr. 1497:7-10 (Sutton (HBO)) ("[T]hey bundle their video services with anything from gift cards to devices.  I think Verizon had a promotion where it bundled with iPads.  There's a lot of different promotions out there."); Tr. 2972:2-6 (Holanda (RCN)) (agreeing that RCN employs a "wide array" of promotional tools, including "higher broadband speeds, additional telephone lines free equipment, [and] video-on-demand movies").  Distributors are "using more and more tools than they used to" for promotions.  Tr. 1497:5-6 (Sutton (HBO)).

314.  HBO's experience with Comcast further shows that promotional usage of HBO is not essential to competition.  Prior to renewal negotiations with HBO, Comcast deemphasized

HBO in its promotions and packages, putting pressure on HBO to grant concessions.

**[REDACTED]**.  The point of this exercise was for Comcast negotiators to "show how powerful they are" relative to HBO, to show how "HBO depends on them to be packaged," and to show that, "by removing us from their packages, . . . [HBO] would significantly see subscriber drops." Tr. 1506:15-19 (Sutton (HBO)).  The fact that Comcast could subsequently use HBO to significantly increase signups in one campaign is not inconsistent with the fact that—like other MVPDs—it does not need to use HBO in promotions to compete.  **[REDACTED]**.

315.   Although Mr. Hinson of Cox testified that losing the ability to use HBO as a promotional tool would harm Cox's business, that testimony was contradicted by other evidence. As discussed above, Mr. Hinson admitted that Cox uses many tools as part of its promotions, including price discounts, other premiums, gift cards, and free equipment installations or rentals. *See* Tr. 717:15-25.  Cox has never conducted a study about how its packages would fare with the other premium networks, but without HBO.  *See* Tr. 718:1-20 (Hinson (Cox)).  With contrary testimony from a number of competitors and obvious alternatives for promotions, the conclusion that HBO is so effective in promotions that restrictions on promotional use would harm a distributor's business has no evidentiary support.  As Ms. Patel testified, if a distributor were unable to work with HBO, it would "turn to the other premiums because they're all willing and eager to work with us," and there would be no impediment to acquiring or retaining subscribers. Tr. 1537:7-15.  Ms. Patel further explained that PX10, cited by the government, uses the phrase "proven acquisition driver" to refer only to HBO's ability to acquire *premium* subscribers among existing DIRECTV customers—"upgrades," not new subscriber acquisitions.  *See* Tr. 1538:24-1539:10.

V.      **Other Concerns and Complaints Raised by Third-Party Witnesses Called by the
Government Are Inconsistent with the Evidence and/or Not Merger-Specific**

316.    The government called third-party witnesses who testified about their concerns

about the merger and how it might affect their agreements with Turner or HBO.  A number of

these concerns—those that relate to the government's allegations—have already been addressed

above.  The remainder are irrelevant because they represent concerns that do not arise from this

merger.

317.    For example, Suzanne Fenwick testified that Cox is concerned because it does not

have certain rights from Turner **[REDACTED]**.  *See* Tr. 113:1-114:5; **[REDACTED]**.  There

was contrary evidence from Turner that Cox customers have the same rights "as [those of] any

other distributor" in this regard, and the only outstanding issue is a technical delivery issue

related to Cox's non-standard technological requirements.  *See* Tr. 1186:2-15 (Warren (Turner))

("The Cox subscriber has access to the same content as any other distributor . . . .  It's really right

now a question of delivery and technical delivery, how we get them that content.  Cox, as I

understand it, through my team, is using a different standard relative to what we've used for

everyone else; but we're still making the content accessible, and we're working through the

technical negotiation.").  In any event, Cox's dissatisfaction with the rights it has been able to

negotiate under its current agreement with Turner is not relevant to the merger.

318.    Cox also complained about Turner's practice of offering volume discounts to

distributors with more subscribers than Cox.  *See* Tr. 120:15-121:13 (Fenwick (Cox)).  Indeed,

changing Turner's volume discount practices was one of the three proposed conditions to the

merger that Cox recommended to DOJ.  *See* Tr. 119:18-120:14.  But these discounts had already

been an "ongoing issue" in negotiations between the distributor and Turner—the merger played

no role in creating them, as Ms. Fenwick of Cox acknowledged.  *See* Tr. 121:10-13.  She further

admitted that volume discounts are not even unique to Turner, but, rather, are a "problem in the industry." Tr. 117:24; *see also* Tr. 117:11-18 ("Q.  Now you have complained that you don't like volume discounts, correct?  A.  We certainly don't like volume discounts, we don't think that they're equitable.  Q.  But every programmer has volume discount arrangements with distributors, correct?  A.  I don't know if every one [sic] has it, but I do believe most do.").  They are thus not relevant here.

319.   Tom Montemagno of Charter testified that he was concerned that Turner would create bundled products that forced Charter to take more networks than it desired.  *See* Tr. 1352:6-13.  But Mr. Montemagno conceded that bundling of channels by programmers was an industry issue pre-merger, not a result of the merger.  *See* Tr. 1407:12-18 ("Q.  But all of these issues, bundling, penetration packaging, all those issues exist today, and you deal with those every day, don't you?  A.  Correct.  Q.  Okay.  And none of those issues are a result of this merger, they all exist in the marketplace today, don't they?  A.  Correct.").  Warren Schlichting of DISH explained that DISH has similar concerns about bundling and noted that it was "very rare that [DISH is] able to unplug any network."  Tr. 467:11.  Again, however, this concern is present today rather than as a result of the merger.

320.   Jim Holanda of RCN also testified that he was concerned that Turner post-merger would demand penetration requirements during content negotiations, thereby limiting RCN's ability to provide skinny Broadcast Basic packages to its customers.  *See* Tr. 2920:6-2921:16. But Mr. Holanda conceded that "every major company has penetration rates," and Turner has had such rates for "a long time before there was even any talk of a merger."  Tr. 2953:21-2954:7. Mr. Stankey of AT&T confirmed that non-vertically integrated programmers like Fox and

Disney have similar penetration requirements and that the bundle that concerned Mr. Holanda

did not even include Turner.  *See* Tr. 3259:14-16, 21-24.

# PROPOSED CONCLUSIONS OF LAW

1.  To justify blocking a merger under Section 7 of the Clayton Act, the government

must demonstrate that its "*probab[le]*" effect, *United States v. Baker Hughes Inc.*, 908 F.2d 981,

984 (D.C. Cir. 1990), is "substantially to lessen competition, or to tend to create a monopoly," 15

U.S.C. § 18.

2.  Although Section 7 requires predictive judgments, it "involves *probabilities*, not

. . . possibilities." *Baker Hughes*, 908 F.2d at 984; *see also FTC v. H.J. Heinz Co.*, 246 F.3d 708,

713 (D.C. Cir. 2001) (Section 7 requires the government to show "the reasonable *probability* of

the proscribed effect" rather than its "mere *possibility*") (emphasis added).  In other words, the

government must show that "the challenged acquisition [is] *likely* substantially to lessen

competition." *FTC v. Arch Coal*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004) (emphasis added); *see

also Baker Hughes*, 908 F.2d at 991 (the "ultimate issue" in a Section 7 case is "whether a

transaction is likely to lessen competition substantially"); *ProMedica Health Sys., Inc. v. FTC*,

749 F.3d 559, 570 (6th Cir. 2014) (the "ultimate inquiry in merger analysis is . . . whether the

merger is *likely* to create or enhance market power or facilitate its exercise") (quoting Professor

Carl Shapiro) (emphasis added); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1109

(N.D. Cal. 2004) (rejecting merger challenge because the government failed to prove the "merger

will *likely* lead to a substantial lessening of competition") (emphasis added).

3.  Although the government has cited *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381,

1389 (7th Cir. 1986), for the proposition that a merger can be invalidated where the government

establishes an "appreciable danger of [anticompetitive] consequences in the future," Joint St. on

Burden of Proof, Pltf.'s Position, at 2 ¶ 2 (Dkt. 87) (emphasis omitted); *see also* Mar. 22, 2018

AM Hrg. Tr. 9:23-10:1, that decision makes clear that the government must prove that such

effects are "likely."  The Seventh Circuit there held that Section 7 "requires [a] district court . . . to make a judgment whether the challenged acquisition is *likely* to hurt consumers" by harming competition.  807 F.2d at 1386 (emphasis added).[26]

4.      Ultimately, even the government acknowledged that it bore the burden of proving that competition is "*likely* to be substantially lessened" by this merger.  Tr. 4087:5-6 (emphasis added).  But the government did not show that this merger is likely—or even close to likely—to have that effect.  To the contrary, the merger will *increase* competition by enabling the merged firm to offer more innovative services at lower prices than would be possible in the absence of this merger.

I.      **The Government Did Not Show That the Merger Is Likely To Result in Substantially Lessened Competition Through Increased Prices for Turner Programming**

5.      The government's primary theory of harm shifted considerably after this litigation began.  Originally, the government claimed that the post-merger firm could "credibly threaten to withhold" Turner programming from major distribution rivals, weaken them as competitors, and "raise its own [distribution] prices relative to what it could have" charged but for the merger.  Compl. ¶¶ 35, 38.  As discussed below, these are key elements of a vertical merger challenge: evidence that the merged firm will profitably withhold essential inputs from rivals, hobble them as competitors, and exercise its resulting market power by increasing its own prices.  *See infra* Part I.B.

_____

[26] Indeed, just two sentences before the "appreciable danger" passage, the court reaffirmed that the relevant question was whether "the challenged acquisitions [we]re *likely* to foster collusive practices, harmful to consumers, in the Chattanooga hospital market."  *Id.* at 1389 (emphasis added).

6.      The government abandoned that theory of harm at trial.  First, it gave up on arguing that the combined firm would unilaterally withhold Turner programming from rival distributors. Indeed, the government's own expert conceded that such withholding would make no economic sense because the company would suffer immediate and enormous losses in the licensing and advertising revenues it would receive from Turner content, and those losses would exceed any gains the company might eventually receive from denying rivals access to that programming. FOF ¶ 64; *see also* FOF ¶¶ 76-80, 306 (describing economic implications of going dark and noting that Time Warner needs maximal distribution to continue attracting top talent).  The government's expert therefore concluded that Turner will continue to license its content to all distributors that want it, including virtual as well as traditional MVPDs.  FOF ¶ 87; Tr. 2218:14-16, 2293:2-17 (Shapiro).  Industry participants confirmed this conclusion.  Tr. 883-884 (Rigdon (Comcast)); Tr. 107-108 (Fenwick (Cox)).  Second, the government's expert further confirmed that continuing competition, combined with reduced costs for Turner content, will lead AT&T/DIRECTV to *reduce* its retail prices compared to what it would charge in the absence of this merger.  FOF ¶¶ 65, 245.

7.      Because the government could not and did not rely on any theory of actual foreclosure, it relied on a much more attenuated and abstract theory of harm:  that the merger will increase Turner's "bargaining leverage," enable it to force rival distributors to agree to pay more for Turner channels, and result in those distributors raising retail prices to their own customers by some minute amount.  *See* Tr. 2213:11-25 (Shapiro); FOF ¶¶ 66, 86, 88.  That claim fails for two paramount reasons.  First, the government's "price increase" theory rests on many counterfactual assumptions and collides with the overwhelming weight of real-world evidence introduced at trial, which confirms that vertical integration does *not* change bargaining

dynamics or result in higher retail prices. *See infra* Part I.A. Second, even if the government

had an empirical basis for predicting these minuscule retail price effects, they would not

constitute "substantially lessened competition" within the meaning of Section 7. *See infra* Part

I.B.

### A.     The Government Failed To Show That This Merger Will Likely Result in a Turner Price Increase

#### i.  *Real-World Historical Evidence Contradicts the Government's Price Increase Theory*

8.      According to the government, vertical integration between a programmer and a

distributor will typically prompt rival distributors to pay more for that programmer's content.

The theory is that, even if withholding the programmer's content would be catastrophic for the

vertically integrated company, it would be slightly *less* catastrophic than for the standalone

programmer (here, Turner) because a few customers of other distributors might switch to the

affiliated distributor (here, AT&T/DIRECTV), and the merged firm could thus slightly offset its

programming revenue losses with new distribution revenues. The government argued that this

subtle change in economic considerations would significantly alter bargaining dynamics and

enable the vertically integrated firm to coerce other distributors into paying more than before for

the exact same programming.

9.      That bargaining theory is unpersuasive from the outset because it flies in the face of

real-world industry experience. FOF ¶¶ 74-79, 86-104. The government presented no evidence

substantiating its claim that vertical integration in this industry is in fact correlated with higher

programming prices, even though it possessed in its files all the real-world pricing information

needed to analyze the issue. In contrast, defendants presented actual case studies of vertical

integration (and dis-integration) after this Court ordered the government to make relevant pricing

data available to defendants.  As defendants demonstrated, there is no evidence that

programming prices rise when programmers integrate with distributors or fall when vertically

integrated firms dis-integrate into unaffiliated programmers and distributors.  FOF ¶¶ 95-102.

10.     Numerous industry participants involved in real-world programming negotiations

for both programmers and distributors further undermined the government's position by

testifying that vertical integration with a distributor does not materially increase a programmer's

bargaining leverage.  FOF ¶¶ 74-75.  The witnesses who confirmed that conclusion included

executives—several called by the government itself—who had negotiated on behalf of both

third-party programmers and third-party distributors.  FOF ¶ 93.  For example, two executives

from Comcast/NBCU, both called by the government, confirmed that Comcast's merger with

NBCU had no effect on NBCU's leverage in programming negotiations.  FOF ¶ 74.  And four

different Time Warner executives testified that when Time Warner was vertically integrated with

Time Warner Cable, they obtained no bargaining advantage from the affiliation.  FOF ¶ 75.

Although several government fact witnesses speculated to the contrary that this merger would

increase Turner's bargaining leverage, their testimony lacked any empirical foundation.  FOF

¶¶ 73, 148.

11.     The government nonetheless tried to show competitive harm by relying on a highly

theoretical and factually ungrounded "bargaining model," introduced through the expert

testimony of Professor Shapiro.  That academic model predicts that vertical integration between

*any* programmer and *any* distributor will *always* result in higher programming prices.  *See* Tr.

2356:16-18 (Shapiro) ("In order for there not to be a cost increase for the other MVPDs, the

subscriber loss rate would have to be zero.").  The model thus contradicts the historical evidence

noted above, which does not support the hypothesis that vertical integration leads to higher

programming prices.  The surest "way to test a model is to compare its projection against real

outcomes," *NRDC v. Jackson*, 650 F.3d 662, 665-66 (7th Cir. 2011)—as Professor Shapiro

himself has previously observed.[27]  *See also Brooke Gr. Ltd. v. Brown & Williamson Tobacco*

*Corp.*, 509 U.S. 209, 242 (1993) (plaintiff cannot meet its burden with expert opinion that "is not

supported by sufficient facts" or is "contradict[ed]" by "record facts"); *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 n.19 (1986) (rejecting reliance on expert opinion

"based on a mathematical construction that in turn rests on assumptions" that are "both

implausible and inconsistent with record evidence").

### ii.  The Government's Bargaining Model Failed To Reflect Economic Reality

12.     Even if viewed in isolation from that historical evidence, the government's

modeling analysis here is unreliable because, in at least seven independent respects, it rests on

"assumptions and simplifications that are not supported by real-world" facts, *American*

*Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041-42 (N.D. Cal.

2001), and does not "incorporate all aspects of the economic reality" relevant to consumer

welfare, *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004).

Indeed, Professor Shapiro himself "agree[d]" that his model does not "capture all of the

uncertainties and personalities and unpredictable factors and hairy stuff that might [a]ffect

negotiations."  Tr. 2295:2-6.  That is an extreme understatement.  Correcting any one of the

------

[27] Tr. 3885:25-3886:5 (Shapiro) (acknowledging that, according to a 2010 article he coauthored:  "Ideally, the reliability of different methods of evaluating proposed mergers should be gauged by an intelligent combination of theoretical analysis and empirical evaluation.  The most direct way to do the latter is to compare the observed changes from completed mergers against premerger predictions.");  *see also* Tr. 3886:21-3887:1 (Shapiro) (acknowledging that, in advocating for prior programmer-distributor transaction, he argued that "[i]n light of the significant vertical acquisitions that have occurred in this industry, we believe that [expert economist opposing merger] would need to provide considerably more empirical evidence before the Commission should place any significant weight on his bargaining theory").

following errors in Professor Shapiro's analysis would eliminate or dramatically reduce the government's predicted price increase.  Correcting them all results in a projected consumer price *decrease* greater in magnitude than the price increase he asserts.  FOF ¶ 200.[28]

13.  *First*, the government's model inexplicably assumes away the "economic reality," *Craftsman Limousine*, 363 F.3d at 777, that Turner has binding long-term contracts that prevent it from raising programming prices to major distributors.  FOF ¶¶ 105-109.  In contrast, it is undisputed that certain merger efficiencies will promptly exert downward pressure on AT&T/DIRECTV's retail prices.  FOF ¶ 245.  Correcting for the government's failure to account for these contracts, even standing alone, erases most of the price increase predicted by its model for the foreseeable future.  FOF ¶¶ 107-108.  And much of the remaining projected price increase—*i.e.*, the portion not precluded by existing contracts with distributors—occurs so far in the future that it is inherently speculative, as Professor Shapiro acknowledged.  FOF ¶ 109; Tr. 2258:1-2 (Shapiro) ("My binoculars are pretty good, but [2021 is] getting out there a ways.").

14.  *Second*, the government's modeling analysis assumes a grossly inflated *departure rate* (or "subscriber loss rate").  This input is the percentage of subscribers a rival distributor would lose or fail to gain because of a long-term Turner blackout and is a critical component of the government's "bargaining leverage" claim.  The government's evidence on this issue was inevitably speculative because its model requires estimating the departure rate in the event of a

---

[28] Because (among other considerations) the government has not alleged and proved a relevant upstream market for the sale of programming to distributors, evidence of Turner price increases to rival *distributors* is legally irrelevant without proof of harm to *consumers*.  *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962) ("[D]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened [harm] must be one which will substantially lessen competition within the area of effective competition.  Substantiality can be determined only in terms of the market affected.") (internal quotation marks omitted).

permanent Turner blackout, which has never happened in the real world.  FOF ¶ 94.  But even within the context of that inherently speculative inquiry, the government's analysis of departure rates was completely unmoored from reality.

15.     In particular, the government presented no credible basis for assuming, as its expert did, a departure rate of 9%.  FOF ¶¶ 111-181.  Professor Shapiro admitted that, to justify using that figure in his analysis, he primarily relied on the Altman Vilandrie slide deck commissioned by Charter, which he testified was the "single best" document for that purpose.  FOF ¶ 114.  But Professor Shapiro twice revealed in this litigation that he did not vet that document or even fully understand the inherent unreliability of its estimate of subscriber losses in the event of a Turner blackout.  First, he expressed surprise when he learned at his deposition that Altman Vilandrie had arbitrarily raised this Turner departure rate from 5% to 9% (while leaving the predictions for all other programmers unchanged) before the results were provided to the Department of Justice.  FOF ¶¶ 118-119.  Second, he admitted under cross-examination in his second trial appearance that he had been fundamentally "mistake[n]" during his first trial appearance when he tried to downplay the dramatic effect of that numerical manipulation on his prediction of a price increase.  FOF ¶¶ 120-121.  Professor Shapiro's additional justifications for his use of a 9% departure rate were equally unconvincing.  FOF ¶ 138-181.  In contrast, defendants did present persuasive evidence showing that the departure rate would be no more than than 5%.  FOF ¶¶ 113, 138-144.  Correcting for this error completely eliminates the price increase projected by the government, leaving no basis for a finding that harm is likely or substantial.  FOF ¶¶ 113, 122.

16.     *Third,* and similarly, the government's model assumes a counterfactually high *diversion rate*.  This is the percentage of lost subscribers who would sign up for an AT&T

distribution service instead of some other distribution service, including online alternatives.  As discussed, the government inflated this figure by grossly underestimating the extent of cord-cutting in today's marketplace.  FOF ¶¶ 182-187.  In particular, it relied on numbers derived from Altman Vilandrie, which in turn had made an ad hoc and unsupported adjustment to its results.  FOF ¶ 184.  Altman Vilandrie's error had the effect of overstating the diversion rate and understating the merger's price-reducing EDM effects.  FOF ¶¶ 184, 246.  Using a more realistic—but still conservative—estimate of cord-cutting by itself eliminates the government's projected price increase and, indeed, converts it to a decrease.  FOF ¶ 187.

17.    *Fourth*, the government's model assumes counterfactually high *margins* that AT&T would earn on any additional subscribers obtained from a rival distributor in the event of a blackout.  FOF ¶¶ 188-199.  There was overwhelming and uncontradicted evidence at trial that video margins are rapidly decreasing across the industry, as distribution competition intensifies.  FOF ¶¶ 190-191.  Replacing the government's reliance on AT&T's outdated 2016 margin assumptions with updated and much lower margin figures from June 2017 would by itself nearly eliminate the government's projected price increase.  FOF ¶¶ 189, 199.  Professor Shapiro offered no credible basis for continuing to use AT&T's 2016 margin figures now that these 2017 final figures are available.  FOF ¶¶ 192-198.  Professor Shapiro admitted that even averaging the three available months from the first half of 2017, while holding all other inputs constant, would slash his projected monthly price increase by more than half:  from 27 cents to an even more trivial 13 cents.  FOF ¶ 196; *see* Tr. 3851:6-15.  As discussed below, the government has not established that either figure is statistically distinguishable from zero.

18.    *Fifth*, the government's modeling analysis arbitrarily and counterfactually assumes a *50/50 bargaining split* in any programming carriage negotiation.  Specifically, the analysis

assumes that, before and after the merger, Turner and each third-party distributor always equally split the bargaining "surplus"—the difference between the highest price the distributor would pay for Turner's programming and the lowest price Turner would accept.  The government offered no evidence to support that assumption, and it is unmoored from real-world bargaining dynamics.  FOF ¶¶ 201-203.

19.     As other courts have held in analogous circumstances, this arbitrary 50/50 assumption renders the government's bargaining model unreliable.  *See VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1333 (Fed. Cir. 2014) (rejecting use of bargaining model because "the use of a 50/50" bargaining split as "starting point" was "unjustified by evidence about the particular facts" of case); *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011) (excluding bargaining model where there was "no anchor . . . in the record of actual transactions" for the 50/50 bargaining-split assumption).  Altering this 50/50 assumption in a manner consistent with academic literature that Professor Shapiro himself cited would eliminate much or all of the government's projected price increase.  FOF ¶ 203.

20.     *Sixth*, the government's model improperly ignores two legal mechanisms that would negate any supposed increase in bargaining leverage by the merged company:  (1) the parties' arbitration/no-blackout commitment ("the Commitment"), which is similar to a mechanism the government proffered to address its comparable concerns about the Comcast/NBCUniversal merger,[29] and (2) the FCC's program access rules, which apply to vertically integrated programmers and thus will automatically apply to Turner post-merger.[30]

---

[29] The government presents no evidence that the Comcast condition has been ineffective. FOF ¶¶ 225-227.  It separately notes that Comcast, unlike DIRECTV, does not operate nationally and that an arbitrator could thus use as a "benchmark" the price of NBC content outside of Comcast's footprint.  That distinction is immaterial because an arbitrator can rely on other highly relevant benchmarks, including (1) Turner's pre-merger contracts and (2) third-party

21.    The Commitment will bind the defendants post-merger, despite contrary

suggestions by the government.  In November 2017, Turner extended irrevocable offers

containing this Commitment contingent only on the consummation of this transaction, and

existing and new distributors can accept those offers anytime within the next seven years.  FOF

¶¶ 205-206, 219.  The Commitment explicitly states that it "is binding on Turner and Time

Warner" and that "AT&T has agreed to be bound by th[e] offer upon closing of the Merger."

DX785.

22.    Although the government has implied that defendants might somehow seek to

evade or revoke the Commitment post-merger, Tr. 4090:12-21, principles of judicial estoppel

will preclude the defendants from doing so or otherwise seeking to avoid arbitration on grounds

---

distributors' contracts with programmers similar to Turner.  FOF ¶ 230.  The FCC has
recognized that both types of contracts provide effective benchmarks in arbitration.  *See* Mem.
Op & Order, *GM Corp. and Hughes Elecs. Corp., Transferors, and The News Corp. Ltd.,*
*Transferee*, 19 FCC Rcd 473, ¶¶ 147, 174 (2004); *Comcast/NBCU Merger Order*, 26 FCC Rcd
at 4366-67, App. A, § VII.B.5-6, .8; Mem. Op. & Order, *News Corp. and The DIRECTV Group,*
*Inc., Transferors, and Liberty Media Corp. Ltd., Transferee*, 23 FCC Rcd 3265, 3343, App. B,
§ IV.B.4 (2008).  The government also has no basis for asserting that the offer's seven-year
period is insufficient.  If anything, it is even more reasonable than the corresponding seven-year
period in the Comcast decree on which it is based, given the much more rapid pace of industry
change today.

[30] In general, the program access rules prevent programmers affiliated with certain
MVPDs (including AT&T) from engaging in "unfair methods of competition … the purpose or
effect of which is to hinder significantly" competing MVPDs.  47 U.S.C. § 548(b), (j); *see*
*generally Cablevision Sys. Corp. v. FCC*, 649 F. 3d 695 (D.C. Cir. 2011).  Under the FCC's
implementing rules, prohibited conduct "includes, but is not limited to," (1) "[a]ny effort or
action . . . to unduly or improperly influence the decision of [the programmer] to sell, or unduly
or improperly influence [the programmer]'s prices, terms, and conditions for" programming, and
(2) "[d]iscrimination in the prices, terms, or conditions of sale or delivery" of programming.  47
C.F.R. § 76.1001(b)(1)(i)-(ii); *see* 47 U.S.C. § 548(c)(2).  Once an aggrieved distributor files a
complaint, the FCC may set programming prices and assess damages for past overcharges.  47
C.F.R. § 76.1003(h).  Although the government has suggested that the rules protect only
traditional and not virtual MVPDs, that issue remains unresolved.  *See* NPRM, *Promoting*
*Innovation and Competition in the Provision of Multichannel Video Programming Distribution*
*Services*, 29 FCC Rcd 15995, ¶ 13 (2014) ("tentatively conclud[ing] that the statutory definition
of MVPD includes certain Internet-based distributors of video programming").

inconsistent with representations they have made to this Court. *See New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (summarizing principles of judicial estoppel). For example, consistent with record evidence, the defendants have represented that the Commitment:

- cannot and will not be revoked by the merged entity;

- will be enforceable against the merged entity;

- can be invoked by both existing and future distribution partners;

- can be invoked by NCTC to trigger arbitration on behalf of small cable companies; and

- defines a "fair market value" standard reflecting the terms that would be obtained in an arm's length transaction absent the merger.

*See* FOF ¶¶ 205-206, 215-216, 229. These representations will bind defendants in any future contractual disputes. *See, e.g.*, *Postscript Enters. v. City of Bridgeton*, 905 F.2d 223, 227-28 (8th Cir. 1990) (city will be bound by "judicial admission" about operation of its ordinance "in its brief and at oral argument"); *Cardinal Health Solutions, Inc. v. Valley Baptist Med. Ctr.*, 2008 WL 5047673, at *5 (S.D. Tex. Nov. 21, 2008) (party's representations in brief and argument about operation of contract will "be binding"); *In re T.G. Morgan, Inc.*, 172 F.3d 607 (8th Cir. 1999) (applying judicial estoppel to prevent a party from acting against a promise previously made before the court that he would abide by terms of the final judgment in a different action); *Chance v. Board of Examiners*, 561 F.2d 1079, 1092 (2d Cir. 1977) ("we emphasize that the Examiners have agreed not to revert to the original examination system [and] that they are judicially estopped from doing so"); *Rockwood v. SKF USA Inc.*, 758 F. Supp. 2d 44, 62-63

(D.N.H. 2010) (party judicially estopped from "recharacterizing" previous statements that the party had claimed were a "promise to buy [ ] pursuant to the option agreement").[31]

23.     The Commitment and the program access rules defeat the government's theory that the merger will increase Turner's bargaining leverage and lead to higher prices for its programming. FOF ¶¶ 207-213.  Equally important, the government's decision not to address these mechanisms in its bargaining model undermines the model's reliability.  For example, the Commitment necessarily changes Turner's "threat point" in negotiations by forbidding it to go dark on distributors that wish to continue carrying its programming pending arbitration.  FOF ¶ 212.  And the government's own witnesses acknowledged that the Commitment will reduce Turner's bargaining leverage.  FOF ¶ 211.  Yet the government's model counterfactually assumes that the Commitment and program access rules *do not even exist* and exert *no* influence on bargaining dynamics.  FOF ¶¶ 209-210; 239-244.  That fact by itself undermines the reliability of Professor Shapiro's analysis.

24.     When confronted with that fact, Professor Shapiro protested that these omitted but obviously relevant factors would be addressed by other expert witnesses.  Tr. 2324:19-2325:5 (deferring to Professor Kwoka), 2328:21-2329:13 (deferring to Professor Wilkie).  But the government then *failed even to call* those witnesses.  *See Mike's Train House, Inc. v. Lionel*, 472 F.3d 398, 409 (6th Cir. 2006) ("We have . . . held that a district court erred by admitting expert testimony that was based 'upon the opinion of others who were not even qualified as experts, nor

---

[31] Even apart from judicial estoppel, New York law—**[REDACTED]**—independently confirms that these arbitration offers are irrevocable, *see Silverstein v. United Cerebral Palsy Ass'n of Westchester Cnty., Inc.*, 17 A.D.2d 160, 163 (N.Y. App. Div. 1962); *Hermanowski v. Acton Corp.*, 580 F. Supp. 140, 143 (E.D.N.Y. 1983), *aff'd in part and rev'd and remanded in part*, 729 F.2d 921 (2d Cir. 1984), and will become operative after the merger is consummated for those distributors that accept the offer, *see AT&S Transp., LLC v. Odyssey Logistics &* Tech. *Corp.*, 22 A.D.3d 750, 752 (N.Y. App. Div. 2005).

present at the trial'"); *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (one expert cannot be turned into a "mouthpiece" for others).  In any event, even if those witnesses had been called, they would have been unable to fill this gaping hole in Professor Shapiro's analysis as a matter of law because, as he conceded, "it would take a completely different model" to "tak[e] into account the arbitration and standstill commitment." Tr. 2325:7-16.[32]

25.    In short, quite apart from the other errors discussed above, the government's modeling analysis is nonprobative because, by completely ignoring the Commitment and program access rules, it describes a counterfactual world and fails to "incorporate all aspects of the economic reality" relevant to consumer welfare.  *Craftsmen Limousine*, 363 F.3d at 777. Indeed, the government produced *no* economic expert or other evidence that addresses the world as it actually exists, where these mechanisms will play a central role in the relationship between Turner and its distribution partners.

26.    *Seventh*, the government's analysis arbitrarily assumes away substantial merger-specific benefits, including advertising efficiencies.  FOF ¶¶ 245-269.  It is well recognized that vertical mergers are generally "procompetitive" because they "encourage product innovation,

---

[32] Professor Shapiro also admitted that his competitive concerns might "be mistaken" if he misunderstood the program access rules, Tr. 2331:21-24, and he punted on the meaning of those rules to Professor Wilkie, Tr. 2328:21-2329:13, whom the government did not call. Professor Shapiro did misunderstand the rules, as explained by Professor Katz.  *See* Tr. 2694:6-2697:3.  Although Professor Shapiro asserted that the rules will be ineffective because, he assumed, they do not prevent a programmer from imposing a uniform price increase, his own (independently flawed) theory of harm predicts widely divergent price increases that vary by distributor.  A distributor subjected to a greater increase could allege discrimination on that basis. In addition, any distributor could allege discrimination based on lower rates paid by other distributors subject to *existing* long-term contracts for the same programming.  In any event, the FCC has asserted authority to conclude that even uniform price increases may violate its rules. *See* NPRM, *Revision of the Commission's Program Access Rules*, 27 FCC Rcd 3413, 3469, ¶ 102 (2012).

lower costs for businesses, and create efficiencies—and thus reduce prices and lead to better goods and services for consumers."[33]  Yet the government's modeling evidence ignores these natural and expected benefits of vertical integration, with the limited exception of EDM, which the government acknowledges but understates.  FOF ¶¶ 245-246.

27.     Accounting for those benefits not only undermines the government's modeling results, *see* FOF ¶¶ 245-270, but makes it even clearer that the government fell far short of its acknowledged burden of proving *net* consumer harm.[34]  The defendants presented evidence that this merger would result in approximately $2.5 billion in cognizable efficiencies.  FOF ¶ 269.  With the exception of EDM, the government refused to credit any of these efficiencies and thus effectively assigned them a value of zero.  *See* Tr. 3611:5-21 (Quintero).  That conclusion is implausible, particularly given the well-documented benefits of vertical integration.  FOF ¶¶ 53-62, 245-269.  That said, the Court need not quantify the substantial benefits of this merger or

---

[33] *Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 990 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (emphasis omitted); *National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) ("[V]ertical integration creates efficiencies for consumers."); *Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1244 (3d Cir. 1987) ("respected scholars question the anticompetitive effects of vertical mergers in general" because such "'mergers are [a] means of creating efficiency, not of injuring competition'") (quoting Robert Bork, *Antitrust Paradox* 226, 237 (1978)); Douglas H. Ginsburg, *Vertical Restraints:  De Facto Legality Under the Rule of Reason*, 60 Antitrust L.J. 67, 76 (1991); III-B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 756a, at 9 (3d ed. 2008) (vertical integration "is either competitively neutral or affirmatively desirable because it promotes efficiency").

[34] In a colloquy with this Court, the government's lead counsel conceded that, although defendants must initially "com[e] forward with evidence on efficiencies," the government "agree[s] a hundred percent" that it "ha[s] got to be persuasive" that on "balance" the merger will substantially lessen competition after accounting for any relevant merger "efficien[cy] or synergy."  Mar. 20, 2018 Hrg. Tr. 36:2-14.  That concession accurately reflects applicable legal standards, particularly in the vertical merger context, where no concentration-related presumption of harm can arise.  *See* Joint St. on Burden of Proof, Defts.' Positions, at 11-13, ¶¶ 5-13 (Dkt. 87).  Ultimately, however, it does not matter who bears the burden of persuasion on merger-related benefits because defendants would meet that burden even if they had it.  *See* FOF ¶¶ 245-270.

"balance" them against the government's predictions of minuscule price increases because, as discussed, those predictions are untenable in the first place.

28.    In short, even if the government's bargaining model were not squarely at odds with real-world evidence disproving its premise that vertical integration results in higher distribution prices, the model still would not help the government meet its burden.  To the contrary, correcting the inputs in that model shows that the merger will substantially reduce rather than increase consumer prices.  FOF ¶¶ 108, 113, 187, 200.

29.    In any event, the very fact that the model's predicted retail price increases are so minuscule as a percentage of retail bills and so sensitive to these modest variations in its inputs exposes the fundamental unreliability of the model itself as applied by the government in this case.  Indeed, the government's modeled price increase is so negligible that, given the inherent uncertainty in the model's predictive inputs, the government has not even shown that its asserted increase is statistically distinguishable from zero.  FOF ¶¶ 82, 98.  Given the high risk of error inherent in the model, no weight should be given to the model's prediction of small price increases, particularly in a highly volatile market that may change beyond recognition in a matter of years.  FOF ¶¶ 83-85.

30.    In sum, and for multiple independent reasons, the government has failed to prove that this merger will likely result in higher average retail rates for video distribution.

**B.    Even Taken at Face Value, the Government's Projected Price Effects Do Not State a Claim Under the Clayton Act**

31.    Even if the government *had* substantiated its claim that competing distributors will pay somewhat higher prices for Turner programming post-merger and then impose minuscule price increases on their distribution customers, that showing would be legally insufficient to satisfy its burden under the Clayton Act.  "The antitrust laws . . . were enacted for the protection

of *competition* not *competitors*." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477,

488 (1977) (emphasis added).  That distinction is crucial in vertical merger cases because

vertical integration normally disadvantages rivals by making the merged firm a more efficient

and thus stronger competitor.  Here, for example, even the government acknowledges that this

merger's efficiencies will enable AT&T/DIRECTV to lower its consumer prices relative to what

they would be without this merger.  In response, its competitors will have to compete harder to

attract and retain customers.  This pro-competitive dynamic is the natural and expected benefit of

vertical integration, whether through contract or merger.  *See supra* COL ¶ 26.

     32.    Because of its inherent efficiencies, vertical integration is generally found to raise

antitrust concerns only where it leaves rivals "stunted" as competitors and materially impairs

their ability to discipline the defendant's prices.  *McWane, Inc. v. FTC*, 783 F.3d 814, 838-39

(11th Cir. 2015), *cert. denied*, 136 S. Ct. 1452 (2016); *see United States v. Microsoft Corp.*, 253

F.3d 34, 71 (D.C. Cir. 2001) (en banc) (issue is whether exclusive dealing keeps competitors

"below the critical level necessary . . . to pose a real threat" to defendant's market power); *see*

*also Paddock Pubs., Inc. v. Chicago Tribune*, 103 F.3d 42, 44 (7th Cir. 1996) (rejecting

challenge to exclusivity agreement between incumbent newspaper and content creators because

any rival newspaper "deprived of access" even to the "best known" content can compete on the

basis of alternative content).  To date, courts have applied that principle in the context of vertical

contracts rather than vertical mergers, but only because the government has not taken a vertical

merger to trial in four decades.  The same principle logically applies whether vertical integration

occurs by merger or contract.  *See Fruehauf Corp. v. FTC*, 603 F.2d 345, 352 n.9 (2d Cir. 1979)

(vertical mergers and vertical exclusive-dealing arrangements present "similar issue[s]" under the Clayton Act).[35]

33.     Here, the government does *not* contend that the modest price increases it alleges will "stunt" any MVPD, *McWane*, 783 F.3d at 839, or deprive it of competitive responses.  The government also does not contend that this transaction will allow AT&T/DIRECTV to capitalize on increased market power by raising its own retail prices—the ordinary theory of competitive harm in successful challenges to vertical transactions.  *See id.*  Instead, the government concedes that this merger will cause AT&T/DIRECTV to *reduce* its retail prices below what it would charge if the merger were blocked.  FOF ¶¶ 65, 245.  Thus, even if (contrary to the discussion in Section I.A *supra*) the government had shown that the merger will lead *other* distributors to raise their retail prices slightly, the government still could not show "substantially . . . lessen[ed] competition" under modern antitrust doctrine.

34.     Under older decisions, a vertical merger could be invalidated if it caused the merging parties to buy or sell exclusively to or from each other if such exclusive dealing "foreclosed" their rivals from "a substantial share of [the] market."  *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 595 (1957) (alterations omitted); *see, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962); *Fruehauf*, 603 F.2d at 352 & n.9.  Here, the government's

---

[35] For example, in an "exclusive dealing" contract, a supplier agrees to sell all of its goods through one distributor (or vice versa), thereby aligning the parties' interests in ways similar to a vertical merger.  Because this contractual form of vertical integration creates efficiencies, it is favored under modern antitrust doctrine, except in the rare case where it allows one of the contracting firms to raise its own prices above competitive levels.  *See, e.g.*, McWane, 783 F.3d at 839.  Notably, many exclusive-dealing cases arise under Section 3 of the Clayton Act, 15 U.S.C. § 14, whose text is identical to Section 7 in all relevant respects ("may . . . substantially lessen competition") and is thus read *in pari materia* with that provision.  *See Fruehauf*, 603 F.2d at 352 n.9; *see also United States v. Phila. Nat'l Bank*, 374 U.S. 321, 365-66 (1963).

case would fail even under this traditional "foreclosure" analysis, which is widely viewed as more favorable to plaintiffs than current antitrust doctrine.[36]  The government does not argue that the combined firm will "foreclose" any MVPD's access to Turner programming, let alone "foreclose" any MVPD from "a substantial share of [the relevant programming] market," *Du Pont*, 353 U.S. at 595 (alterations omitted).  The government also does not even define a relevant programming market of which Turner programming could constitute "a substantial share," *id.*, and in which it could thus exercise "the kind of market power" sufficient to trigger antitrust concerns, *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 (1984).  That is independently fatal to the government's challenge because a vertical merger "will not have an anticompetitive effect" where "substantial market power is absent at any one product or distribution level."  *Auburn News Co. v. Providence J. Co.*, 659 F.2d 273, 278 (1st Cir. 1981).[37]

---

[36] A "foreclosure" showing is no longer a sufficient basis for challenging a vertical merger; a plaintiff must show as well that such foreclosure makes rivals ineffective as competitors.  *See, e.g.*, *Microsoft*, 253 F.3d at 71; *McWane*, 783 F.3d at 838-39.  *See generally Baker Hughes*, 908 F.2d at 990 n.12 ("The most important developments that cast doubt on the continued vitality of such [merger] cases as *Brown Shoe* . . . are found in [non-merger] cases, where the Supreme Court . . . has said repeatedly that the economic concept of competition, rather than any desire to preserve rivals as such, is the lodestar that shall guide the contemporary application of the antitrust laws, not excluding the Clayton Act.") (internal quotation marks omitted); *Comcast*, 717 F.3d at 990 (Kavanaugh, J., concurring) ("[b]eginning in the 1970s," the Supreme Court shifted to a favorable view of "vertical integration and vertical contracts"); VII Areeda, *Antitrust Law* ¶ 1511e2, at 517-18 (4th ed. 2017) (explaining that *Ford Motor Co. v. United States*, 405 U.S. 562 (1972), and *Brown Shoe* addressed vertical mergers "under an aggressive standard that struck down many mergers that would never be challenged today" because "our theory and most of our law of vertical integration have changed very considerably since that time").

[37] The government argues that "a structural analysis based on market definition and market share is but one way to establish market power."  Pl's. Objs. and Resps. to Defs.' First Set of Interrogs. at 15.  But in doing so it relies on cases involving a "finding of actual, sustained adverse effects on competition."  *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 461 (1986).  Here, the government merely (and implausibly) *predicts* such effects.  Because it can show no actual effects, the government must allege and prove a properly defined market in which such effects are likely to result from power in that market.  *See also Republic Tobacco Co. v. North Atl.*

\* \* \*

35.     In sum, for each of the reasons set forth above, the government has failed to carry

its burden of proving that this merger will likely cause substantially lessened competition

stemming from the price of Turner programming.

## II.     The Government Has Failed To Prove That the Merged Entity Will Likely Coordinate With Comcast/NBCU To Harm Virtual MVPDs

36.     At trial, the government abandoned any claim that the combined firm would

*unilaterally* "withhold . . . programming entirely from some virtual MVPDs" that provide

multichannel TV packages over the Internet. *Compare* Compl. ¶ 40 *with* Tr. 2218:14-16,

2293:2-17 (Shapiro).  That decision was prudent because the trial evidence foreclosed any such

claim.  Virtual MVPDs are growing quickly in both numbers and popularity, and, even if it

wanted to, the merged firm will be unable to do anything to stop that inexorable trend.  FOF

¶¶ 43-44.  Turner receives substantial affiliate fees and advertising revenue from these virtual

distributors.  FOF ¶¶ 8, 287.  And Turner would have rapidly diminishing relevance and a dim

long-term outlook if millennials and other cord-cutters did not see Turner channels in the

programming arrays offered by online providers.  FOF ¶ 287.

37.     The government nonetheless speculates that, even though the merged firm would

not withhold the Turner networks from virtual MVPDs unilaterally, it might *coordinate* with

Comcast/NBCU to withhold both Turner and NBCU networks from them, thereby achieving an

anticompetitive objective neither company could achieve alone.  The government also appears to

argue in the alternative that Turner and NBCU might coordinate to require each virtual MVPD to

buy most or all of their cable networks rather than a select few.  As to each theory, the

---

*Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) ("direct effects" proof is generally not "used
outside the context of horizontal agreements").

government failed to carry its burden of proving that such coordination is both likely to occur as a result of the merger and likely to result in substantially lessened competition—as the government's economist effectively conceded at trial.

**A.      AT&T/Time Warner and Comcast/NBCUniversal Lack the Incentive and Ability To Coordinate To Deprive Virtual MVPDs of Their Cable Networks**

38.     Coordination, sometimes referred to as "tacit collusion" or "conscious parallelism," "describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power . . . by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Grp.*, 509 U.S. at 227. Coordination between rivals can occur only if the firms can solve what economists call "cartel problems," *i.e.*, the difficulties of establishing a consensus to take actions that would *not* be in each company's individual interest absent coordination. *See* George J. Stigler, *A Theory of Oligopoly*, 72 J. Pol. Econ. 44, 44-46 (1964). Maintaining this consensus, in turn, requires a market conducive to "the detection and punishment of firm's that 'cheat.'" *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 393 (8th Cir. 2007). These problems make the "anticompetitive minuet" of tacit coordination "most difficult to compose and to perform." *Brooke Grp.*, 509 U.S. at 227-28; *see also Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 727 (1988) ("Cartels are neither easy to form nor easy to maintain.").

39.     Here, the government was required to prove that merger-induced coordination that results in substantially lessened competition is not only theoretically possible, but more likely than not to occur. *See Baker Hughes*, 908 F.2d at 991 (the "ultimate issue" in a Section 7 case is "whether a transaction is likely to substantially lessen competition"); *United States v. Oracle*, 331 F. Supp. 2d 1098, 1109 (N.D. Cal. 2004) (rejecting government claim where it had not proved that defendants "would *likely* engage in coordinated interaction") (emphasis added); *see*

*also supra* COL ¶¶ 1-4.  That essential element of proof is especially important in vertical

merger cases, both because vertical mergers involve inherent efficiencies and because, unlike

horizontal mergers, they do not increase market concentration.  The government failed to carry

that burden.

40.     Revealingly, the government's lead economic expert, Professor Shapiro, conceded

that he had no basis for opining that anticompetitive coordination is a likely result of the merger

or even that the odds of such coordination are greater than 1%.  FOF ¶ 279.  AT&T/Time Warner

and Comcast/NBCU would both sacrifice substantial profits if they withheld their respective

programming networks from virtual MVPDs.  FOF ¶ 280.  Such withholding could thus make

sense only if it enabled these companies to offset those losses by earning greater incremental

profits through their distribution services.  FOF ¶ 280.  And Professor Shapiro did not quantify

the costs to AT&T/Time Warner and Comcast/NBCU of the hypothesized coordination scheme

or determine that those costs would be lower than the supposedly countervailing benefits.  FOF

¶ 280.  He acknowledged that he could not reach, much less substantiate, any conclusion that

anticompetitive coordination is likely.  FOF ¶ 279.

41.     The failure of the government's economic expert to make that required showing is

itself fatal to the government's case on coordination, and the government did not introduce any

alternative evidence that could enable it to meet its burden of proof.  To the contrary, the trial

record confirms that AT&T/Time Warner and Comcast/NBCU would lack both the shared

incentive and the new-found ability to engage in the anticompetitive coordination scheme the

government hypothesizes.

42.     ***No shared incentive.***  The evidence affirmatively refutes the government's

contention that the merged firm and Comcast/NBCU will share a common interest in

withholding content from virtual MVPDs.  First, the merged firm will want virtual MVPDs to continue carrying the Turner networks not only to obtain affiliate fees and advertising revenues, but also to keep Turner's network-based business relevant to consumers during the accelerating transition from traditional MVPD services to online alternatives.  FOF ¶¶ 8, 287.

43.    Second, AT&T will continue benefiting from the increasing demand that the growth of virtual MVPDs will create for its mobile services.  FOF ¶ 286.  Increased mobile demand expands the use of AT&T's wireless network, where AT&T has a decided market advantage over Comcast.  Increased mobile usage further makes customers more likely over time to treat their mobile broadband connections as their default video viewing mechanism, benefiting AT&T at the expense of traditional cable companies such as Comcast, which do not have significant mobile operations.  FOF ¶ 286.

44.    Because Comcast has almost no mobile customers, FOF ¶ 284, its incentives are different.  But for its own independent reasons, Comcast/NBCU likewise will have no incentive to withhold content from virtual MVPDs in conjunction with AT&T-Time Warner.  FOF ¶ 288. It too sees virtual MVPDs as an important and growing pathway of distribution.  FOF ¶ 288. Thus, the hypothesized coordination scheme would implausibly require Comcast/NBCU to forgo programming revenues for a wide swath of consumers with no hope of obtaining distribution revenues from them to compensate.

45.    ***No ability to coordinate.***  Even if (counterfactually) Comcast/NBCU and the merged firm shared an incentive to impede the growth of virtual MVPDs, they could not successfully coordinate to implement such a strategy.  The government completely failed to demonstrate that AT&T and Comcast could establish an agreement to withhold valuable

programming, let alone that they could devise an effective mechanism to detect and punish "cheating."

46.    First, the staggered, multi-year nature of the contracts in this industry precludes the kind of competitive response necessary to enforce coordination.  Different programmers' contracts with the same distributors often expire years apart.  FOF ¶ 290.  That fact would make it difficult—or even impossible, depending on the contract timing—to respond quickly enough to rivals' decisions to enforce any implicit coordination agreement.  It means that one party— Turner or NBCU—would have to give up sales of valuable programming in hopes that the other party would do so months or years later.  FOF ¶ 290.  Second, the intense and expanding competition among programmers and distributors, which includes constant entry and new products and services in both marketplaces, FOF ¶¶ 6-62, likewise undermines key preconditions to successful coordination among rivals.  *See* DOJ/FTC Horizontal Merger Guidelines § 7.2.

47.    Just as important, the Commitment would independently preclude Turner from coordinating with NBCU over the terms of virtual MVPD distribution deals.  FOF ¶ 289; *see also supra* COL ¶¶ 21–22.  Most obviously, the Commitment will deny Turner even the ability to withhold content from virtual MVPDs, whether unilaterally or in coordination with NBCU. FOF ¶¶ 205-238, 289.  Likewise, an independent arbitrator, not Turner, would decide the terms on which Turner must sell programming to virtual MVPDs in the event of any impasse.  FOF ¶¶ 215, 220.  This Commitment would thus destroy the "mutual trust and forbearance" that any coordination scheme requires for success.  *Hospital Corp.*, 807 F.2d at 1388-89.

48.    Finally, no evidentiary weight should be given to the government's allegations that AT&T and Time Warner employees sought to share information among industry participants concerning issues unrelated to virtual MVPDs.  One set of allegations involved discussions about

rights to distribute "library seasons" (prior-season reruns) of particular television shows.
Tr. 1854-60.  The other set of allegations concerns discussions by DIRECTV personnel in 2014
(before the AT&T-DIRECTV merger) regarding a regional sports network that broadcast Los
Angeles Dodgers games (SNLA).  Tr. 2082-85.  These incidents have no bearing on concerns
about harm to the virtual MVPD business model.  The alleged "library seasons" discussions
related to whether SVODs like Netflix will retain sole rights to distribute reruns of particular
*shows* (to the exclusion of MVPDs and virtual MVPDs), not whether virtual MVPDs will have
access to *cable networks* such as TBS and TNT.  Tr. 1854-60.  And the alleged SNLA
discussions had nothing to do with online distribution at all.  FOF ¶ 292.[38]

49.     In any event, any evidence that AT&T and Turner have *shared information* with
rivals in the past does not begin to satisfy the government's burden to establish a likelihood of
anticompetitive *coordination* after the merger.  *See FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109,
138 (D.D.C. 2004) (even where there is mutual access to "[k]ey market information," "whether
anticompetitive coordination is likely requires closer examination" of critical market features);
*see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 762 (1984) ("[T]he fact that a
manufacturer and its distributors are in constant communication about prices and marketing

---

[38] *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011), cited by the
government, is thus inapposite.  In that horizontal merger case, "the government point[ed] to a
highly persuasive historical act of cooperation" between the same two parties that the
government alleged would engage in post-merger coordination, which, had the merger closed,
would have been the two largest remaining firms in a relevant market with fewer participants.
*Id.* at 77-78.  In contrast, the "historical acts" that the government alleges here, even if they were
substantiated, would not be "persuasive" because they did not involve the same participants or
even the same markets as the post-merger coordination schemes the government hypothesizes.
For example, in the SNLA matter, the government accused DIRECTV of coordinating with other
MVPDs (not including Comcast) to deny distribution to a programmer (a regional sports
network), whereas here the government is arguing that two programmers (Turner and NBCU)
might coordinate to withhold content from virtual MVPDs.

strategy does not alone show that the distributors are not making independent pricing

decisions.").

    **B.**    **The Government's "Skinny Bundle" Evidence Is Not Merger-Specific and Is Not Persuasive**

    50.    Even while speculating that Turner will coordinate with NBCU to *withhold*

programming from virtual MVPDs, the government also inconsistently suggests the two

companies might coordinate to sell "too much" programming to virtual MVPDs—specifically, to

deny virtual MVPDs access to "skinny bundles" of their respective programming networks.  This

argument, which appears nowhere in the Complaint, is equally unsupported by the evidence.

    51.    First, the government's new concern about the availability of skinny bundles has

little or nothing to do with this merger.  The government must prove that the *merger* will likely

"substantially . . . lessen[] competition," 15 U.S.C. § 18, not that competition will fall short of

some ideal whether the merger proceeds or not.  Yet the government introduced no persuasive

*merger-specific* evidence concerning skinny bundles.  Like all major programmers, Turner seeks

to license all of its networks to distributors.  FOF ¶¶ 283, 287.  So too does NBCU.  FOF ¶ 283.[39]

The government's own witnesses acknowledged that these and other programmers in the

industry always seek to get distributors to carry all of their networks.  FOF ¶ 283.  That desire

follows from basic economics:  distribution of more networks enables a programmer to earn

greater subscription *and advertising* revenues.  FOF ¶ 283.  These economic realities exist today

and will continue to exist after and independent of this merger.

---

[39] Although Turner and NBCU both have preexisting incentives to license all of their channels to a distributor, they are differently situated in an important respect that makes Turner far better positioned to be featured on skinny bundles and further undermines any claim of likely coordination.  Turner earns approximately 85-90% of its revenues from just four of its networks (TBS, TNT, CNN, and Cartoon Network), whereas NBCU's programming revenues are much less concentrated and spread among many different networks.  FOF ¶ 287.

52.     In any event, the government did not prove that any merger-specific coordination scheme to sell only traditional bundles to virtual MVPDs is likely to occur, let alone that it is likely to result in "substantially . . . lessen[ed] competition."  Just as the government failed to prove that a coordinated scheme to withhold programming altogether is likely, the government also failed to prove the basic facts needed to establish that a coordinated scheme to sell only traditional bundles is likely.  For example, it did not quantify the costs to Turner and NBCU of this hypothesized coordination scheme, nor did it demonstrate that those costs would be lower than the supposedly countervailing benefits.  FOF ¶¶ 280, 282, 284-287.  Again, the government's own economist performed no such analysis for any coordination theory and thus could not say that any form of coordination between AT&T/Time Warner and Comcast/NBCU is likely.  FOF ¶ 279.

53.     Beyond that, the Commitment will independently prevent Turner from forcing any virtual MVPD to license more channels than it or another distributor currently licenses.  Under the Commitment, a virtual MVPD (the arbitration "Claimant") can demand a "standalone offer or offers for (i) a bundle of all Turner Networks or (ii) any bundles of Turner Networks that Turner has licensed to AT&T, the Claimant, or another Video Distributor for distribution to consumers on or after October 22, 2014."  PX0491-003.  In a renewal context (provided the prior carriage agreement was made "on or after October 22, 2014"), that means the Claimant could demand a standalone offer for the same bundle of networks the Claimant currently licenses (or that another distributor currently licenses or has licensed at any time on or after October 22, 2014).  FOF ¶¶ 218, 221.  If the parties do not reach agreement, the Claimant may then submit a final offer to arbitration.  FOF ¶ 220.  Turner then is obliged to respond with its own final offer,

which must be limited to "the Turner Networks *requested by the Claimant*."  PX0491-003 (emphasis added).

54.     Finally, the government has not shown that a hypothesized scheme to sell only traditional bundles to virtual MVPDs could result in "substantially . . . lessen[ed] competition." The government introduced trial testimony from only a single virtual MVPD (Sling) that it prefers to offer only "skinny bundles" of Turner programming.  Yet AT&T faces increasing competition from numerous MVPD and virtual MVPDs in addition to Sling.  FOF ¶¶ 34–35, 43–44.  Even if (counterfactually) the government had identified some basis for arguing that the merger will somehow cause Sling to carry a traditional Turner bundle when it otherwise would carry a skinny bundle, the government did not show how forcing that one distributor to carry more Turner channels would "substantially lessen competition" from rival distributors in general. *See Brunswick*, 429 U.S. at 488 ("The antitrust laws . . . were enacted for the protection of *competition* not *competitors*.") (emphasis added).[40]

*     *     *

55.     In sum, for each of the reasons set forth above, the government has failed to carry its burden of proving that coordination between the merged firm and Comcast-NBCU, caused by the merger, is both likely to occur and likely to result in substantially lessened competition.

## III.    The Government Has Failed To Prove That the Merged Firm Will Use HBO To Harm Competition

56.     The Complaint alleged that the post-merger company will disable distribution competitors from using HBO as a promotional tool to attract and retain subscribers and that such

---

[40] In any event, AT&T witnesses testified that the company intends to offer skinny bundles, FOF ¶ 285, and Sling can then arbitrate on that basis for those offerings.

conduct will substantially lessen competition.  Compl. ¶ 39.[41]  The government twice abandoned

that theory of harm at trial.  First, the government's lead economic expert admitted that even if

the merged firm did restrict other distributors' use of HBO as a promotional tool, doing so

"would not have such a big impact[ ] that it would substantially lessen competition, this element

of conduct alone."  Tr. 2276:12-13 (Shapiro); *see also* Tr. 2276:3-4 (characterizing such conduct

as a mere "step in the wrong direction in terms of competition").  Second, the government

endorsed, as an "alternative remed[y]," a "decree prohibiting AT&T from acquiring Turner but

permitting it to acquire the other parts of Time Warner," *including HBO*.  Tr. 4019:4-23.  The

trial record necessitated this move:  the government did not and could not show that any HBO-

related theory of competitive harm is remotely plausible, let alone likely.

57.    To prevail on such a theory, the government first needed to show that there is no

effective substitute for HBO's use as a promotional tool, so that depriving competing distributors

of that tool would substantially impede their ability to compete with AT&T/DIRECTV.  *See*

*Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1220-21 (10th Cir. 1986);

IV.A Areeda, *Antitrust Law* ¶¶ 1004, 1008 (4th ed. 2016); *see also supra* COL Part I.B.  The

government has not come close to meeting that evidentiary burden.  As explained, competing

distributors have used many alternative means of attracting and retaining customers.  These

include promotional campaigns involving (1) other premium channels such as Showtime and

Starz, (2) partnerships with SVODs such as Netflix, (3) bundles including free equipment, and

(4) price concessions such as discounts or gift cards.  FOF ¶¶ 311–313.

---

[41] The government concedes that the merger will not cause HBO to withhold
programming from rival distributors or raise their rates for it.  The government's only theory of
harm is "the promotional topic."  Tr. 2290:23 (Shapiro).

58.    In any event, the combined firm would have no incentive to impose such restrictions because, as the evidence showed, HBO needs MVPDs more than MVPDs need HBO. FOF ¶¶ 300-301.  Although MVPDs use HBO (among many other offered benefits) in promotions to gain or maintain customers, that is not because they need to do so.  FOF ¶¶ 314-315.  Rather, it is HBO that needs the promotions and incentivizes distributors to actively promote its service.  FOF ¶¶ 300-301, 303-305.  HBO's agreements with its distributors are specifically designed to encourage broad distribution by providing a volume-discount pricing structure—the per-subscriber rate an MVPD pays is reduced as subscribership increases.  FOF ¶ 300.  Furthermore, HBO negotiates for guarantees that MVPDs will use HBO in their promotions and provides substantial funds, sometimes millions of dollars, to support and subsidize these promotion efforts.  FOF ¶¶ 303-304.  Along the same lines, HBO will frequently waive fees or contractual requirements in order to induce a distributor to launch a special HBO-related promotion.  FOF ¶ 305.  In short, the government has it exactly backwards:  it is HBO that needs its distributors to promote its programming—not vice versa—and nothing in this merger will affect those fundamental business imperatives.  FOF ¶¶ 300, 307.

59.    Furthermore, in order to attract the content and talent it needs to compete with the exploding universe of other high-quality video programming, HBO requires the broadest distribution possible.  FOF ¶ 306.  The vast majority (more than two-thirds) of MVPD customers do *not* currently subscribe to HBO.  FOF ¶ 296.  Without assurances of wide distribution, content creators would leave HBO and go elsewhere.  FOF ¶ 306.  HBO will continue to need to rely on MVPDs post-merger to distribute its programming, and it will have the same incentives to encourage these distributors to package and promote HBO as widely as possible.  FOF ¶ 307.

60.     The government introduced no evidence showing otherwise.  Professor Shapiro did not quantify a single dollar of potential consumer harm associated with this theory.  FOF ¶ 299. To the contrary, as noted above, Professor Shapiro conceded that restricting HBO as a promotional tool "would not have such a big impact[ ] that it would substantially lessen competition."  Tr. 2276 (Shapiro); *see also id.* (characterizing such conduct as a mere "step in the wrong direction in terms of competition").

61.     In sum, the government has failed to carry its burden of proving that the merged firm is likely to "substantially lessen competition" in distribution markets through the use of HBO.

Date: May 3, 2018

Respectfully submitted,

By: /s/  Daniel M. Petrocelli

Daniel M. Petrocelli (*pro hac vice*)
dpetrocelli@omm.com
M. Randall Oppenheimer (*pro hac vice*)
roppenheimer@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Katrina M. Robson (D.C. Bar No. 989341)
krobson@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC  20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Counsel for AT&T Inc., DIRECTV Group*
    *Holdings, LLC, and Time Warner Inc.*

Peter T. Barbur (*pro hac vice*)
pbarbur@cravath.com
Kevin J. Orsini (*pro hac vice*)
korsini@cravath.com
Margaret Segall D'Amico (*pro hac vice*)
mdamico@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 8th Ave
New York, NY 10019
Telephone: (212) 474-1140
Facsimile: (212) 474-3700

*Counsel for Time Warner Inc.*

Robert C. Walters (*pro hac vice*)
rwalters@gibsondunn.com
Michael L. Raiff (*pro hac vice*)
mraiff@gibsondunn.com
**GIBSON DUNN & CRUTCHER**
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: (214) 698-3114
Facsimile: (214) 571-2932

*Counsel for AT&T Inc. and DIRECTV*
    *Group Holdings, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 3, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

       /s/ Daniel M. Petrocelli
Daniel M. Petrocelli (*pro hac vice*)
dpetrocelli@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414