# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-02511-RJL |
| | ) | |
| AT&T INC., DIRECTV GROUP HOLDINGS, LLC, and TIME WARNER INC., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## POST-TRIAL BRIEF OF DEFENDANTS AT&T INC., DIRECTV GROUP HOLDINGS, LLC, AND TIME WARNER INC.

May 3, 2018

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 6

I.    The Government Did Not Show That the Merger Is Likely To Substantially
      Lessen Competition by Increasing Consumer Pay-TV Prices .............................................7

      A.    The Government Did Not Show That This Merger Will Likely Result in a
            Price Increase for the Turner Networks ...................................................................8

      B.    Even Taken at Face Value, the Government's Projected Price Effects Do
            Not State a Claim Under the Clayton Act...............................................................16

II.   The Government Failed To Prove That the Merged Entity Will Likely Coordinate
      with Comcast/NBCU To Harm Virtual MVPDs ................................................................17

      A.    AT&T/Time Warner and Comcast/NBCUniversal Lack the Incentive and
            Ability To Coordinate To Deprive Virtual MVPDs of Their Networks................18

      B.    The Government's "Skinny Bundle" Coordination Theory Fails..........................20

III.  The Government Failed To Prove That the Merged Firm Will Use HBO To Harm
      Competition............................................................................................................................21

IV.   The Court Should Impose No Remedial Order Because the Government Has Not
      Carried Its Burden of Proving a Violation That Requires a "Remedy"............................22

CONCLUSION......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Booksellers Ass'n v. Barnes & Noble, Inc.*,
    135 F. Supp. 2d 1031 (N.D. Cal. 2001) ..................................................................11

*Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) .................................................................................................10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) .................................................................................................17

*Comcast Cable Commc'ns, LLC v. FCC*,
    717 F.3d 982 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ..................................15

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
    363 F.3d 761 (8th Cir. 2004) ...................................................................................11

*Ford Motor Co. v. U.S*,
    405 U.S. 562 (1972) .................................................................................................23

*Franklin v. District of Columbia*,
    163 F.3d 625 (D.C. Cir. 1998) ...........................................................................23, 24

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ................................................................6, 9, 23

*Hospital Corp. of Am. v. FTC*,
    807 F.2d 1381 (7th Cir. 1986) ...................................................................................7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .................................................................................................10

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006) .................................................................................15

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) .................................................................................................24

*NRDC v. Jackson*,
    650 F.3d 662 (7th Cir. 2011) .....................................................................................9

*Oracle Am., Inc. v. Google Inc.*,
    798 F. Supp. 2d 1111 (N.D. Cal. 2011) ...................................................................13

*Postscript Enters. v. City of Bridgeton*,
    905 F.2d 223 (8th Cir. 1990) ...................................................................................24

*U.S. v. Anthem, Inc.*,
    855 F.3d 345 (D.C. Cir. 2017) ...................................................................................6

*U.S. v. Baker Hughes, Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) ...................................................................................6

*U.S. v. E.I. du Pont de Nemours & Co.*,
    353 U.S. 586 (1957) .................................................................................................23

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*U.S. v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ..........................................................................19

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)...............................................................................13

**Statutes**

15 U.S.C. § 16(e)(1)........................................................................................................22

**Other Authorities**

Douglas H. Ginsburg, *Vertical Restraints:  De Facto Legality Under the Rule of
    Reason*, 60 Antitrust L.J. 67 (1991).........................................................................15

Federal Antitrust Policy, Hearing Before the Committee on Small Business, U.S.
    Senate, 97th Cong. 111 (1981) .................................................................................9

Joseph G. Krauss *et al.*, *The Tunney Act: A House Still Standing*, The Antitrust
    Source (June 2007). .................................................................................................22

**INTRODUCTION**

The government came nowhere close to proving that this merger violates Section 7 of the Clayton Act.  To carry its burden of proof, the government had to prove a prediction about future events:  specifically, that this merger will *likely* (not potentially or possibly) lessen competition *substantially*, in a video marketplace that is experiencing revolutionary, unstoppable transformation and growth in competition at all levels.  To support that prediction, the government had to offer concrete evidence grounded firmly in real-world experience and reliable expert analysis, not conjured crystal-ball prognostications.

The government's trial evidence was nothing of the kind.  In fact, far from proving a likelihood of substantial harm to competition, the government's own evidence proved the opposite.  As to its price-increase theory, the government itself conceded that the merger would cause prices to go *down* for millions of AT&T customers nationwide.  The government's own "bargaining model" likewise showed a price decrease for *all* consumers, once the correct data were employed.  And the government's own economic expert effectively repudiated its other two theories of likely harm.  The government, in short, gave the Court no basis for finding that this merger is likely to reduce competition at all, much less substantially.  Rather, the evidence overwhelmingly showed that this merger is likely to *enhance* competition substantially, because it will enable the merged company to reduce prices, offer innovative video products, and compete more effectively against the increasingly powerful, vertically integrated "FAANG" companies.

The government's central prediction of harm rests on the premise that AT&T would use Time Warner's Turner content as a "weapon" against rival distributors by threatening to withhold it during bargaining, thereby forcing them to pay higher prices.  The trial evidence

demolished that premise—starting from the government's own express concession that post-merger Turner would *not*, in fact, ever withhold content, thereby conceding away any prospect that Turner could ever credibly *threaten* to withhold.

To support its counterintuitive theory of harm even absent withholding, the government relied heavily on predictable complaints from AT&T rivals whose real concern was to avoid the *increased* competition the merger would create—precisely why antitrust authorities discount competitor objections in merger analysis.  The government also relied on a few documents—most authored by lower-level employees—none of which supports the implausible inference that Turner's bargaining leverage is what impelled AT&T's and Time Warner's management and Boards to approve this historic, $100 billion merger.

Beyond non-probative competitor complaints and irrelevant slide shows, the government rested its prediction of harm on a theoretical model proffered by its economic expert, Professor Carl Shapiro.  The Court saw for itself how this model collapsed at trial when confronted with the real-world evidence—in particular, how it relied on data inputs that were outdated, manipulated, and overstated, and how it showed a price *decrease* when more accurate and current data were used.  The government scorns these demonstrable errors as "nitpicking" (Tr. 27), which is actually a telling objection:  it shows that the projected price increase is so minute and fragile that even the *slightest* adjustment to its inputs erases its effects.  This is not a "death by a thousand cuts"—here, it takes only one or two.

The Court also heard Professor Shapiro's refusal to consider the uncontested evidence—not opinion or prediction, but verifiable fact—that real-world vertical transactions in the industry showed *none* of the price effects his model predicts.  As defendants' economic expert Professor Dennis Carlton explained, these prior transactions are the "best evidence" for predicting this

merger's future effects.  Tr. 2467.  Even Professor Shapiro agreed—at least until he started

testifying in this case—that analysis of a proposed merger *should* include "compar[ing] the

observed changes from completed mergers against premerger predictions."  Tr. 3886.  But when

that comparison is conducted here, his model fails:  *none* of the prior transactions shows that

vertical integration in this industry causes the increased consumer prices his model predicts.

  The trial evidence explained why the model cannot capture real-world dynamics.  Its

central assumption is that the day after the merger, Turner will have greater bargaining leverage

than the day before, solely because of Turner's new ownership.  And that leverage, the theory

goes, in turn guarantees that Turner will take greater risks to extract higher prices from

distributors.  But multiple witnesses with actual negotiating experience described that

assumption as "ridiculous" (Tr. 3119), "absurd" (Tr. 3430), and contrary to "reality" (Tr. 3251).

Comcast—a principal supposed target of AT&T's new bargaining weapon—agreed, testifying

that the merger would *not* affect its bargaining.  Tr. 884.  And a DISH executive likewise

acknowledged that he would not recommend that DISH "pay more money" just because of

Turner's new ownership.  Tr. 421.  Indeed, no competitor witness testified he would pay more

for Turner content just because of the change in ownership.

  That record also refuted another essential premise of the government's case—that

distributors will have no choice but to knuckle under to Turner's new bargaining threats, lest

Turner withhold its "must have" programming from them.  The government treats the phrase

"must have" as a showstopper, but its own witnesses repeatedly testified that the phrase is merely

a "sales pitch term" for "popular content."  FOF ¶ 179.[1]  In fact, the evidence showed that while

---

[1] "FOF" and "COL" refer to Defendants' Proposed Findings of Fact and Conclusions of
Law.

licensing Turner programming may be important to (some, not all) distributors, broad

distribution is much *more* important to Turner, whose entire business depends on licensing fees

and advertising revenues.  Again, it is an uncontested fact—not hypothesis or speculation—that

Turner cannot financially tolerate the loss of programming deals and so cannot wield a serious

threat of walking away from the table.  In Time Warner CEO Jeff Bewkes' words, the

government's added-leverage theory at best means only that a "thousand-pound weight" of

failure to make a deal would become "a 950-pound weight" instead—still a "catastrophic" and

unacceptable risk.  Tr. 3119-20.  The real-world evidence thus refutes the essential premise of

the government's price-increase theory.  And because Professor Shapiro himself agreed that his

model depends on the "economist assumption" (Tr. 2201) that Turner will have new leverage

from an increased walkaway threat in the real world (Tr. 2195-96, 2394), the government's

failure to support that assumption with facts breaks his model.

The government's other two theories of harm met even worse fates at trial.  Professor

Shapiro's testimony was damaging enough to the price-increase theory, but it was outright

calamitous for the government's other two theories—that the merged firm would likely

coordinate with Comcast to withhold content from virtual MVPDs, and would likely restrict

distributors from using HBO to promote their services.

As to the coordinated-withholding theory, Professor Shapiro explicitly refused to testify

that such coordination was likely—he would not even say whether the odds were 1%, let alone

that coordination was more likely than not.  Tr. 2292.  If the government's own expert cannot

find that coordinated withholding is likely, the claim categorically fails—even before

considering the overwhelming evidence that Turner has far greater incentives than Comcast to

reach the next generation of online viewers, not to mention the many market barriers to coordinated withholding.

As to the HBO-promotion theory, Professor Shapiro did his best to avoid the issue, but under prodding from the Court, he was forced to concede that even if the merged firm limited promotional use of HBO, that would not itself substantially reduce competition.  Distributors have myriad promotional alternatives to HBO, which would never impose such restrictions in any event because its very survival *depends* on distributors' promotional activities.

It is, by now, no mystery why the government's theories disintegrated upon first contact with real-world events, testimony, and data.  It is difficult to prove that any vertical merger is likely to harm competition, but the trial evidence showed that this merger, in particular, was specifically intended to *solve* indisputable competitive problems and thereby *enhance* competition in the markets in which Time Warner and AT&T compete.  The Court heard credible—indeed uncontested—testimony from Time Warner and Turner executives explaining the extraordinary new challenges they face competing against vertically integrated tech titans Facebook, Amazon, Apple, Netflix, and Google.  Unlike Time Warner, those entities have the direct customer relationships, information, and operations needed to compete effectively in today's increasingly direct-to-consumer world.  Merging with AT&T will solve that problem and allow Turner to compete better in this rapidly changing video landscape.

The Court likewise heard credible—indeed uncontested—testimony from AT&T executives explaining how merging with Time Warner will allow them to develop innovative video products focused especially on mobile viewers, and to establish a national platform for targeted video advertising that will challenge the digital advertising duopoly of Google and Facebook.  The government proffered an academic theorist who professed to know better than

5

these executives how to achieve their objectives by contract, but among the answers to her testimony (FOF ¶¶ 275-276), the most obvious is that these executives have *repeatedly tried to reach contractual agreements*, but they have been stymied by real-world bargaining frictions. FOF ¶¶ 16-18.  The merger solves that problem, too, thereby enabling AT&T and Time Warner to reduce consumer prices, offer innovative video products, and compete more effectively against the vertically integrated FAANG companies that are increasingly defining the future of the video programming industry.  The government's case seeks to control that future by keeping traditional providers restricted to traditional models while FAANG companies drive innovation. But it is not the government's role to use antitrust laws to pick winners and losers—especially when the competitive field itself is the midst of a historic transformation.

The indisputable competitive benefits of this merger, however, are not themselves the reason it does not violate the Clayton Act.  The principal reason is simpler:  the government did not even begin to make a credible case that the merger would likely harm competition, substantially or even just a little.  There is no sound evidence from which the Court could fairly conclude that retail pay-TV prices are likely to increase, that there will be coordinated withholding of content from virtual MVPDs, or that distributors will be unable to use HBO as a promotional tool.  There is no proven harm at all—only proven benefits.  And because there is no proven harm, there is no basis in law for any remedy, equitable or otherwise.  The Court should deny the request for an injunction blocking the merger and enter judgment for defendants.

## ARGUMENT

The government agreed in closing that to justify blocking this merger, it must prove that competition is "*likely* to be *substantially* lessened."  Tr. 4087 (emphasis added); *see U.S. v. Baker Hughes, Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990) (government must prove that

"transaction is likely to substantially lessen competition"); *see also U.S. v. Anthem, Inc.*, 855

F.3d 345, 348 (D.C. Cir. 2017); *id.* at 380 (Kavanaugh, J., dissenting) ("Of course, lots of bad

things could happen after the merger.  But the courts have to assess what is likely."); *FTC v.*

*Arch Coal, Inc.*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004).[2]  The government has not shown that

this merger is likely—or even close to likely—to substantially lessen competition.  To the

contrary, the merger is likely to *increase* competition.

## I.     The Government Did Not Show That the Merger Is Likely To Substantially Lessen Competition by Increasing Consumer Pay-TV Prices

When the rare vertical merger challenge is asserted, the typical theory of harm is that the

merged firm will control key inputs and withhold them from competitors, thereby increasing

their costs and allowing the merged entity to increase its own consumer prices.  COL ¶¶ 33-34.

The trial evidence made perfectly clear that none of that will happen here.  The government

conceded that AT&T will not unilaterally withhold Turner content from any distributor.

Professor Shapiro testified that such withholding would make no economic sense.  FOF ¶ 64.

The company would suffer immediate and enormous losses in Turner licensing and advertising

revenues, as well as potentially irrevocable damage to relationships with content producers (like

sports leagues and leading creative talent)—harms that would vastly exceed any speculative

gains the company might eventually receive from denying rivals access to Turner programming.

FOF ¶¶ 76-79.  Professor Shapiro therefore concluded that following the merger, Turner *will*

license its content to all distributors that want it, including virtual as well as traditional MVPDs.

---

[2] In some briefs, the government invoked an observation originating in *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986), that § 7 requires an "appreciable danger of [anticompetitive] consequences in the future."  *Id.* at 1389.  But *Hospital Corp.* holds that a court must "make a judgment whether the challenged acquisition is likely to hurt consumers."  *Id*. at 1387; *see id.* at 1389 ("the challenged acquisitions are likely to foster collusive practices, harmful to consumers").  In other words, a "danger" of harm is "appreciable" when it is *likely*.

FOF ¶ 87.  Professor Shapiro further conceded that cost savings created by the merger will cause the combined firm to *reduce* AT&T's consumer pay-TV prices compared to what it would charge in the absence of this merger.  FOF ¶ 65.

Rather than the normal input-foreclosure theory of harm asserted in a vertical-merger challenge, the government here hypothesizes a much more attenuated and abstract theory:  that the merger will give Turner new leverage at the bargaining table, which it will use to force rival distributors to agree to pay more for Turner channels, in turn causing those distributors to raise their own consumer prices by some 0.2%—just a few pennies per month on a $100 average monthly bill.  FOF ¶ 81.  That theory imploded at trial.  Witnesses with actual bargaining experience categorically refuted it, comparable vertical transactions showed no such price effect, and the bargaining model on which it rests completely fell apart.[3]

### A.    The Government Did Not Show That This Merger Will Likely Result in a Price Increase for the Turner Networks

The government's price-increase theory rests on a model in which vertical integration between a programmer and a distributor *necessarily* gives the programmer new bargaining leverage that *always* causes the distributor to pay higher prices for programming content.  FOF ¶ 201.  Overwhelming real-world evidence proved that theory to be as implausible as it sounds.

Multiple witnesses with actual experience in programming negotiations testified that programmers affiliated with distributors do *not* have greater bargaining leverage than unaffiliated programmers.  Four different executives testified that when Time Warner was vertically integrated with Time Warner Cable, it obtained no bargaining advantage whatsoever from the affiliation.  FOF ¶ 72.  And after Time Warner Cable was dis-integrated, Turner did not lose

---

[3] Even if the evidence supported the tiny price increase the government claims, the increase would not constitute "substantially lessened competition."  *See infra* Part I.B.

bargaining leverage or suffer lower prices.  FOF ¶ 103.  Two executives from Comcast/NBCU—both called by the government—testified to their same experience:  Comcast's merger with NBCU did exactly nothing to increase NBCU's leverage in programming negotiations.  FOF ¶ 74.  There is no basis for doubting these executives' credibility.  Certainly the testimony of Turner's customers (AT&T's rivals) does not suffice:  their unsupported, self-interested speculation about Turner's possible bargaining strategies exemplifies why many "antitrust authorities do not accord great weight to subjective views of customers in the market."  *Arch Coal*, 329 F. Supp. 2d at 145; *see* Federal Antitrust Policy, Hearing Before the Committee on Small Business, U.S. Senate, 97th Cong. 111 (1981) ("When competitors oppose a merger, [then-Antitrust Division chief Bill Baxter] said, 'My instinctive reaction is to approve the merger.'").[4]

Prior experience with vertical integration in the industry also provided real-world evidence refuting the government's theory.  That experience provides the "best evidence" of the merger's likely effects (Tr. 2467)—the surest "way to test a model is to compare its projection against real outcomes."  *NRDC v. Jackson*, 650 F.3d 662, 665 (7th Cir. 2011).  As Professor Shapiro once wrote, analysis of a proposed merger should include "compar[ing] the observed changes from completed mergers against premerger predictions."  Tr. 3886.  Yet the government not only refused to consider the pricing effects of prior vertical integrations (FOF ¶ 96), it refused even to allow *defendants* to examine the historical pricing data in its possession.  It took

---

[4] The documents cited by the government in closing were all fully explained at trial; none shows that AT&T would have a credible threat of withholding after the merger or supports the government's facially dubious premise that AT&T would spend $100 billion to use Time Warner as a "weapon" to preserve an inexorably declining pay-TV business.  FOF ¶¶ 71-72.

an order from this Court to compel production of the data, and the trial showed why: *none* of the real-world transactions showed any price effect associated with vertical integration.  FOF ¶ 98.

The real-world economics of the programming business further refuted the government's theory that Turner could more credibly threaten to walk away from a licensing deal.  Multiple Time Warner witnesses testified without contradiction that failing to reach a licensing deal is "catastrophic" for Turner.  Tr. 1128, 3119; FOF ¶¶ 76-77.  Turner's entire business depends on licensing and advertising revenues, and those revenues in turn depend on broad and uninterrupted distribution of its programs.  FOF ¶ 80.  Whatever revenues AT&T would earn from the tiny percentage of subscribers AT&T might gain if Turner went dark on a rival distributor would be vastly outstripped by the licensing and advertising revenues Turner would lose.  Turner, accordingly, would no sooner walk away from this "kabuki dance" after the merger than before (Tr. 4085)—and everyone knows it.

Unable to find credible real-world support for its price-increase predictions, the government was forced to rely on Professor Shapiro's bargaining model.  In closing, the government tried to retreat from the model, suggesting that it served mainly to support the third-party testimony that antitrust law accords little weight.  Tr. 3997, 4083-84.  But adding zero to zero is hardly a sound way to prove a price increase.  Professor Shapiro himself "agree[d]" that his model does not "capture all of the uncertainties and personalities and unpredictable factors and hairy stuff that might [a]ffect negotiations."  Tr. 2295.  And the fact that the model cannot be squared with real-world transactions and bargaining dynamics, as just discussed, conclusively establishes its unreliability.  *See Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (plaintiff cannot meet its burden with expert opinion that "is not supported by sufficient facts"); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 n.19

(1986) (rejecting reliance on expert opinion "based on a mathematical construction that in turn rests on assumptions" both "implausible and inconsistent with record evidence").

The model contradicts the real-world evidence in other ways as well. It rests on "assumptions and simplifications that are not supported by real-world" facts, *Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001), and does not "incorporate all aspects of the economic reality" relevant to consumer welfare, *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004) (quotation omitted). Correcting any *one* of these errors eliminates or dramatically reduces the model's predicted price increase. Correcting them all results in a projected price *decrease* even greater in magnitude than the tiny and ever-changing price increases Professor Shapiro proffered. FOF ¶ 200.

*First*, the model rests on a demonstrably incorrect "departure rate," i.e., the percentage of subscribers who would cancel their service with a rival distributor (or decline to sign up) if it did not reach a licensing deal with Turner. The model assumes a departure rate of at least 9%, but in the real world, no drop of Turner or any comparable programmer has *ever* resulted in a departure rate close to 9%. FOF ¶¶ 138-144. The 9% estimate relies mainly on the slide show Altman Vilandrie prepared to help Charter lobby DOJ against the merger—a report Professor Rossi thoroughly discredited. FOF ¶¶ 126-136.[5] Professor Shapiro called the unreliable Altman Vilandrie document the "single best" analysis supporting a 9% departure rate (Tr. 2235), but he misunderstood the document in critical ways. In addition to erroneously believing it was a "normal course of business" document used for Charter's actual negotiations (it was not, FOF ¶¶ 123-126), he did not know that Altman Vilandrie, after conferring with its client, had

---

[5] Professor Shapiro's 9% rate relied to lesser extent on Professor Hauser's survey, which Professor Rossi debunked as well. FOF ¶¶ 157-169.

*manually increased* the estimated loss rate of existing subscribers from 5% to 9%.  FOF ¶¶ 116-119.  Confronted with that manipulation, he denied that it mattered because his 9% estimate was supposedly justified by another figure Altman Vilandrie had not adjusted—but that figure, too, in fact was increased by the *same manual adjustment*.  FOF ¶ 120.  Professor Shapiro finally confessed that his testimony about both figures was "mistake[n]," and that the *unadjusted* figures produced a departure rate of about 5%, erasing his predicted price increase.  Tr. 3868-71.[6]

Professor Shapiro then sought refuge in the long-term blackout of Viacom on Suddenlink.  But the evidence—including Suddenlink's own statements to investors and multiple industry analyses—demonstrated conclusively that Professor Shapiro's 9%+ departure rate was an outlier and that the actual departure rate there was well under 5%.  FOF ¶ 150.  In coming up with a higher rate, Professor Shapiro made yet another mistake:  he compared the pre-drop trend in Suddenlink subscribers to the post-drop trend without accurately accounting for industry trends.  FOF ¶ 151.  Correcting that error produces a departure rate below 5%, which is in line with all credible estimates and real-world experience, and erases any price increase.  FOF ¶ 151.

*Second*, the model similarly assumes an inflated "diversion rate," i.e., the percentage of departing subscribers who would sign up for an AT&T distribution service rather than one of the many other alternatives.  FOF ¶¶ 182-187.  In particular, Professor Shapiro underestimated the rate of "cord-cutting," leading him to underestimate the number of subscribers who would divert to online distributors, rather than a traditional service like DIRECTV.  Correcting his cord-cutting error transforms the projected price effect into a price *decrease*.  FOF ¶ 187.

---

[6] When he finally grasped the effect of Altman Vilandrie's machinations on his 9% departure rate, Professor Shapiro tried to retreat to an even higher 14% rate—a figure much *more* disconnected from real-world experience, and one contrary to Professor Shapiro's "normal practice" of using the "more conservative" figure.  FOF ¶ 145.

*Third*, the model relies on obsolete data to estimate the "margin rate," i.e., the profit margins that AT&T would earn on additional distribution subscribers.  Professor Shapiro inexplicably used *2016* margin data even after final *2017* data became available.  FOF ¶¶ 192-194.  He admitted that using the three available months of 2017 data—which showed lower margins—reduces his projected price increase from 27 cents to 13 cents.  FOF ¶ 196.  Using the most recent finalized data (June 2017) eliminates 80% of the increase.  FOF ¶ 199.

*Fourth*, the model ignores Turner's binding long-term contracts with major distributors, which prevent Turner from raising prices under those contracts until they expire.  FOF ¶¶ 105-109.  In contrast, certain merger efficiencies will begin exerting downward pressure on consumer prices almost immediately.  FOF ¶ 245.  Properly accounting for this timing issue, standing alone, eliminates any price increase for the foreseeable future.  FOF ¶ 108.  What remains is a theoretical price increase occurring too far into the future to permit any reliable predictions at all.

*Fifth*, the model assumes that Turner and each third-party distributor always equally split the bargaining "surplus" (the difference between the highest price the distributor would pay for Turner's programming and the lowest price Turner would accept).  The government offered no evidence proving that parties in the real world always or even usually split the surplus 50/50.  FOF ¶ 202.  Other courts have found that when there is "no anchor for this fifty-percent assumption in the record of actual transactions," the model is nonprobative.  *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011); *see VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1333 (Fed. Cir. 2014).  An article cited by Professor Shapiro himself analyzed empirical evidence and found that the split favors certain programmers 72/28, which would eliminate the projected price increase.  FOF ¶ 202.

*Sixth*, the model ignores two mechanisms that vitiate its premise of increased bargaining leverage due to a threatened blackout:  (1) Turner's arbitration/no-blackout commitment ("Commitment"), and (2) the FCC's program access rules.  FOF ¶¶ 204-244; COL ¶¶ 20-25. These mechanisms are relevant not because they will *remedy* competitive harm, as the government characterizes it, but because they are economic facts and marketplace realities that negate Professor Shapiro's key assumption that AT&T will have greater leverage to extract higher prices.  FOF ¶¶ 207-208, 242.  The Commitment grants distributors unilateral rights to invoke arbitration and to preclude Turner from going dark while arbitration is pending, thereby *reducing* Turner's post-merger leverage and encouraging the parties to reach a deal before the distributor invokes its rights.  FOF ¶ 212.  And the "baseball" arbitration structure further promotes dealmaking on reasonable terms.  FOF ¶¶ 226-227.

Professor Shapiro explicitly refused to account for the Commitment in his model, not because he had objections to it, but because it was not part of his assignment and he was ostensibly deferring to *other* experts to address it.  FOF ¶ 209.  Professor Shapiro admitted that absent such additional testimony, his model would not apply, because the arbitration alternative would eliminate the "blackout threat" he was assuming, creating a "different world" his model did not address.  Tr. 2326.  At trial, however, the government *failed to call those experts*, leaving the record devoid of the testimony Professor Shapiro himself deemed necessary to validate his model.  COL ¶ 24.[7]

*Seventh*, the model disregards the important benefits the merger will create.  The evidence showed that benefits from increased advertising revenues, in particular, help relieve upward pressure on consumer pay-TV prices.  FOF ¶ 256.  More generally, it is widely

---

[7] Professor Shapiro also misunderstood the program access rules.  FOF ¶ 242.

understood that vertical transactions tend to "encourage product innovation, lower costs for businesses, and create efficiencies—and thus reduce prices and lead to better goods and services for consumers." *Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 990 (D.C. Cir. 2013) (Kavanaugh, J., concurring); *see Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) ("vertical integration creates efficiencies for consumers"); Douglas H. Ginsburg, *Vertical Restraints:  De Facto Legality Under the Rule of Reason*, 60 Antitrust L.J. 67, 76 (1991).  Yet the government's modeling evidence ignores these natural and expected benefits of vertical integration, even while admitting that the major benefit of eliminating double marginalization *should* be considered (although the government then understates it).  FOF ¶¶ 245-46.  The government's "efficiency" expert even went so far as to claim that this $100 billion merger would not produce *one penny* in cognizable cost savings (Tr. 3611)—a claim that says much more about the credibility of the government's case than it does about this merger.  Acknowledging the actual benefits proved at trial both further undermines the government's modeling results and confirms its failure to prove net consumer harm.

The foregoing errors collectively reveal two fundamental problems with Professor Shapiro's testimony.  The first is that his analysis is patently flawed.  He ignores comparable past transactions, even though he published an article explaining how important such events are in merger review.  He ignores existing long-term contracts that preclude his theoretical price increases.  He ignores arbitration and program access rules.  And he uses the wrong values for departures, cord-cutting, and margins.  Adjusting those values even slightly—"nitpicking," as the government puts it, or "being accurate," as anyone else would say—dramatically alters his result, showing how fragile and unreliable his model is.  These errors explain Professor Carlton's one-word answer to how much "confidence" the model's predictions deserve:  "None."  Tr. 2450.

A second problem is Professor Shapiro's alarming lack of objectivity.  He knew that more recent profit margin data were available and would lower his price estimate, but he ignored the data.  When that omission was exposed, he claimed that the updated margin data might be unreliable (Tr. 3847-48), even though they were drawn from the same ordinary-course business documents he had previously relied on (Tr. 189).  He estimated a departure rate of 9% based heavily on an advocacy-driven, manipulated Altman Vilandrie figure he admittedly misunderstood in multiple ways.  He then tried to support his 9% estimate with a demonstrative chart that omitted the most recent data, for reasons he could not initially explain.  Tr. 3921-22.  When he finally did produce an explanation, he again claimed to have suspected the data were unreliable (Tr. 3925), even though he never bothered to investigate the reliability of data he used to produce results favorable to the government.

Professor Shapiro's persistent one-way errors—and his dogged refusal to admit them— underscore his lack of objectivity, which is another reason the Court should give his views no weight.  And it is, at the same time, a stark illustration of the government's failure to proffer credible evidence that this merger would likely harm competition.

### B. Even Taken at Face Value, the Government's Projected Price Effects Do Not State a Claim Under the Clayton Act

Even if the government's predicted harm were proven factually, it would not suffice legally to establish a *substantial* lessening of competition.

*First*, as Professor Carlton demonstrated, the predicted 0.2% monthly price increase is so negligible and so dependent on uncertain inputs with a high risk of error that, as a practical matter, the claimed increase is statistically indistinguishable from zero.  FOF ¶ 82.  It thus predicts no harm at all—and whatever "substantial" means, it certainly means "more than zero."

*Second*, the trivial claimed increase does not reflect a meaningful constraint on the ability of rivals to discipline the merged company's prices. "The antitrust laws . . . were enacted for the protection of *competition* not *competitors*." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quotation omitted). That distinction is crucial for vertical mergers, which *often* disadvantage rivals by making the merged firm a more efficient and stronger competitor. In response, rivals must compete harder by reducing prices or offering more innovative products—outcomes antitrust law *encourages*. The government here is not alleging that the merged entity will obtain control of a necessary input that it withholds from rivals, leaving them unable to effectively discipline the defendant's prices. COL ¶ 6. The government concedes that Turner will not withhold content, and it concedes that the merged entity will reduce its own consumer pay-TV prices. And the government never proved that rivals would be unable to innovate and respond to the merged entity's lower prices. COL ¶¶ 31-33. For these reasons, a negligible price increase is a "dangerous standard" for blocking a vertical merger (Tr. 2451): it risks depriving consumers of the many benefits of vertical integration, while allowing rivals to avoid increased competition from the merged entity.

## II.    The Government Failed To Prove That the Merged Entity Will Likely Coordinate with Comcast/NBCU To Harm Virtual MVPDs

At trial, the government abandoned any claim that the combined firm would *unilaterally* withhold programming from virtual MVPDs. COL ¶ 36. The government instead contended only that AT&T might *coordinate* with Comcast to withhold Turner and NBC networks from virtual MVPDs. In the alternative, the government asserted that AT&T and Comcast will license virtual MVPDs *too much* programming, requiring them to buy more channels than their "skinny bundle" models supposedly can bear. The government failed to prove either theory at trial.

### A.    AT&T/Time Warner and Comcast/NBCUniversal Lack the Incentive and Ability To Coordinate To Deprive Virtual MVPDs of Their Networks

Coordination between rivals does not happen easily.  COL ¶ 38.  To prove that coordination is *likely*, the government must prove that the firms involved will be willing to suffer significant short-term sacrifices in the hopes of achieving uncertain longer-term benefits from the coordination.  COL ¶ 38.  Not only did the government fail to make that proof here, but its expert *affirmatively disclaimed* it.

Professor Shapiro testified that he had no opinion on whether coordination after the merger would be likely—or even whether the odds would be greater than 1%.  FOF ¶ 279.  AT&T/Time Warner and Comcast/NBCU would each sacrifice substantial profits if they withheld their respective programming networks from virtual MVPDs.  FOF ¶¶ 284-288.  Withholding from virtual MVPDs would make sense only if the companies expected to offset those immediate programming losses with whatever distribution profits they accrued by withholding from virtual MVPDs.  FOF ¶ 280.  Yet Professor Shapiro made no effort to quantify those hypothetical distribution-service gains—much less show that they would outweigh severe programming losses and justify a joint withholding scheme.  FOF ¶ 279.  Professor Shapiro's testimony is dispositive:  if the government's own expert cannot predict that coordination is likely, the Court itself cannot make any such finding.

Little more need be said about the government's coordinated-withholding theory.  What can be said in summary is that the trial evidence vindicated Professor Shapiro's unwillingness to predict likely coordination.  AT&T and Comcast witnesses alike sharply denied any interest in helping each other out.  FOF ¶ 281.  No testimony or document showed otherwise.  The evidence instead showed that joining Comcast to thwart virtual MVPD growth would be nonsensical for AT&T, because virtual MVPD services encourage viewing on mobile devices, which benefits

AT&T's wireless business—a service Comcast *does not have*.  FOF ¶ 284.  Further, the merged

entity will want to promote virtual MVPDs as the online alternative in an increasingly cord-

cutting world, because Turner can sell targeted advertising to customers of all virtual MVPDs

that view its content on mobile.  FOF ¶ 286.  Turner also will have incentives to contract with

virtual MVPDs because they carry *networks* like Turner's, unlike *show*-based SVOD services

like Netflix and Amazon.  FOF ¶ 287.  Other trial evidence confirmed multiple additional

barriers to successful coordinated withholding from virtual MVPDs:

- The intense and expanding competition among programmers and distributors includes constant entry and new products and services in both marketplaces, undermining key preconditions to successful coordination among rivals.  DOJ/FTC Horizontal Merger Guidelines § 7.2.

- Staggered carriage contracts preclude the merged company and Comcast from coordinating their negotiations to achieve common outcomes.  FOF ¶ 290.

- The Commitment precludes the merged entity from acting as a reliable "partner" for Comcast/NBCU in any negotiating strategy against virtual MVPDs.   FOF ¶ 289.

Against this overwhelming evidence refuting any likelihood of coordinating to withhold

content from virtual MVPDs, the government points to two irrelevant episodes where AT&T and

Time Warner employees allegedly sought to share information among industry participants.

Neither alleged incident involved virtual MVPDs, neither involved sharing between Turner and

NBCU, and neither involved any proven wrongdoing.  FOF ¶ 292.[8]  And mere "information

sharing" is not even a contested issue in this case—the only alleged coordination theory involves

---

[8] This case is thus completely different from *U.S. v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011).  That case involved a horizontal merger arguably facilitating coordination among the fewer remaining competitors, and a "highly persuasive historical act of cooperation" between the same two parties that allegedly would engage in post-merger coordination, which were the largest firms in the market.  *Id.* at 78.  None of that is true here.  There are no fewer competitors and no actual "historical act of cooperation," "highly persuasive" or otherwise.  There are only alleged communications between different entities in a different context on a different subject.

withholding from virtual MVPDs, and anybody can tell whether a programmer has a deal with a given virtual MVPD just by going on the Internet.  These incidents do nothing to support the claim of likely coordination the government could not persuade its own expert to endorse.

### B.     The Government's "Skinny Bundle" Coordination Theory Fails

The government at trial asserted a new, contrary theory of coordination:  rather than *withhold* programming from virtual MVPDs in parallel, Comcast/NBCU and AT&T/Time Warner will coordinate to demand that virtual MVPDs accept *too much* programming, thereby undermining their "skinny bundle" business models.  That theory fails for multiple reasons.

First, programmers seeking to persuade distributors to carry all their channels has nothing to do with *this merger*—it is an industry issue asserted *today* by many programmers, who for economic and reputational reasons strongly prefer that distributors carry more of their channels rather than fewer.  FOF ¶ 283.  The merger will do nothing to alter this existing market dynamic.

Second, the merged entity and Comcast/NBCU would have very different incentives, because Turner receives the lion's share of its revenues from just a few channels (and thus can work with skinny bundles much more easily than other programmers), and because AT&T wants to promote the mobile viewing experience associated with online MVPDs.  FOF ¶¶ 285-86.

Third, the government has not shown that a hypothesized scheme to sell only traditional bundles to virtual MVPDs could result in "substantially . . . lessen[ed] competition."  Sling was the *only* virtual MVPD to testify that it prefers "skinny bundles" of Time Warner programming.  Yet AT&T faces increasing competition from numerous MVPD and virtual MVPDs in addition to Sling.  FOF ¶ 35.  The government did not even attempt to show that these many *other* distributors would be unwilling to accept existing Turner bundles.  Displeasing Sling is not the same thing as substantially lessening competition marketwide.

**III.    The Government Failed To Prove That the Merged Firm Will Use HBO To Harm Competition**

The government's final theory is that the merged company will use HBO to harm competition, not by withholding it or raising its price (Tr. 2290), but solely by limiting its use as a *promotional tool* to attract and retain subscribers.  Yet again the government's theory could not survive its own expert's testimony:  according to Professor Shapiro, any restriction on distributors' use of HBO as a promotional tool "would not have such a big impact[ ] that it would substantially lessen competition."  Tr. 2276.  That testimony alone precludes any finding of harm, but Professor Shapiro also did not quantify a single dollar of potential consumer harm associated with this theory.  FOF ¶ 299.

Professor Shapiro's admissions and omissions are dispositive.  But so, too, is the government's failure to prove that other distributors lack adequate promotional alternatives to HBO.  In fact, they have many.  FOF ¶¶ 311-313.  Thus, even if the combined firm did restrict HBO's promotional uses, distributors could promote their services in other ways, just as they do today.  FOF ¶¶ 309-314.

But the combined firm of course would never impose such restrictions.  As the evidence showed, HBO needs MVPDs to promote HBO subscriptions much more than MVPDs need HBO to promote their services.  FOF ¶ 300.  Indeed, HBO seeks contractual *guarantees* that MVPDs will use HBO in their promotions, and HBO provides them substantial funds—sometimes millions of dollars—to support these efforts.  FOF ¶¶ 303-304.  HBO also will often waive fees or contractual requirements to induce a distributor to launch a special HBO-related promotion.

FOF ¶ 305.  The government adduced no evidence suggesting that the merger will in any way

diminish HBO's fundamental business need for distributor promotions.  FOF ¶ 307.[9]

## IV.    The Court Should Impose No Remedial Order Because the Government Has Not Carried Its Burden of Proving a Violation That Requires a "Remedy"

This is not a close case.  The government failed to meet its burden for multiple

independent reasons.  And all parties agree that absent a violation of § 7, no remedy is

permissible.  In the government's words, a violation is the "entry point" for a remedy.  Tr. 4091.

In that respect, this case differs fundamentally from a Tunney Act proceeding, as in the

Comcast/NBCU merger.  The Tunney Act, which applies only to DOJ antitrust *settlements*,

required this Court to confirm that DOJ had not granted Comcast an inappropriately lenient deal

and that the settlement was "in the public interest."  15 U.S.C. § 16(e)(1).[10]  This case involves

no such statutory mandate.  This is a fully litigated case, and the government failed to prove a § 7

violation.  Consequently, the only appropriate judgment is one that finds no legal violation,

denies the requested injunction, and brings the case to a prompt conclusion.

In fact, were the Court to find that the government failed to prove a violation of § 7, yet

nevertheless include in its judgment any provision the government could portray as "remedial"—

such as modifying the Commitment—the government will try to exploit such a provision to

---

[9] Defendants have not abandoned their selective enforcement defense.  Trial evidence confirmed the government's differential treatment of comparable vertical mergers.  But absent discovery, it was impractical for defendants to press the issue further at trial.

[10] "The Act was inspired largely by the DOJ's settlement of antitrust suits challenging International Telephone and Telegraph Corp.'s mergers with several other corporations during the Nixon Administration.  The settlements prompted allegations of improper influence by ITT because they contained far less relief than was sought in the original complaint and they came on the heels of a $400,000 donation by ITT to the Republican National Committee."  Joseph G. Krauss *et al.*, *The Tunney Act: A House Still Standing*, The Antitrust Source, at 2 (June 2007), https://www.americanbar.org/content/dam/aba/publishing/antitrust_source/Jun07_Krauss6_20f.a uthcheckdam.pdf.  The Tunney Act does not apply to settlements by the FTC, an independent multi-member agency considered less susceptible to improper political influence.

challenge the Court's underlying ruling. Specifically, the government would argue on appeal that such a provision *contradicts* the Court's finding of no liability because "[w]ithout liability there would be no basis for injunctive relief." *Franklin v. District of Columbia*, 163 F.3d 625, 630 (D.C. Cir. 1998).[11] The government would then seek to make the putative *remedy* the main focus of its appeal, arguing (as it did in closing) that under cases like *Ford Motor Co. v. U.S*, 405 U.S. 562 (1972), and *U.S. v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957), once some violation is found, "all doubts as [to] the remedy are to be resolved in [the government's] favor." Tr. 4018. The Court should avoid such confusion by simply holding that, as the record overwhelmingly showed, the government failed to prove a violation of § 7.

To that end, the Court should reject the government's persistent effort to portray the Commitment as a "remedy." It is not a remedy. The Commitment—just like Turner's existing long-term licensing agreements—is simply a real-world economic fact: it directly affects bargaining leverage, even when the distributor does not invoke its unilateral rights to compel arbitration and preclude Turner from going dark. *See supra* at 14. The government thus was required to consider the Commitment when modeling post-merger price effects. *See id*. The government's conscious refusal to do so was a fundamental failure of proof on liability issues and should be treated as such. *See Arch Coal*, 329 F. Supp. 2d at 159 (citing defendants' post-merger transaction commitment in rejecting claim of harm).

All this said, the Court can issue findings and conclusions about the Commitment that will confirm the rights and obligations it entails. The Commitment includes numerous provisions ensuring fair results: among other things, it requires good-faith negotiations, allows a

---

[11] At a minimum, the government would likely argue that any judgment that imposes additional obligations or asserts continuing jurisdiction at least suggests, incorrectly, that the government proved that the merger would be unlawful in the absence of the "remedy."

distributor to compel mediation, requires an arbitrator experienced in the industry, authorizes broad discovery of other carriage agreements and submission of any relevant evidence, mandates a prompt resolution (within 75 days), and provides a right of appeal to federal court.  FOF ¶ 220.

Further, the evidence (including defendants' testimony) shows that the Commitment:

- cannot and will not be revoked by the merged entity;

- will be enforceable against the merged entity;

- can be invoked by both existing and future distribution partners;

- can be invoked by NCTC to trigger arbitration on behalf of small cable companies; and

- includes a "fair market value" standard reflecting the terms that would be obtained in an arm's length transaction absent the merger.

FOF ¶¶ 206, 215-217, 220, 236; COL ¶¶ 21-22.  Especially given defendants' representations in this proceeding, these positions will be binding as a matter of judicial estoppel in any future dispute over the Commitment.  *See New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001); *Postscript Enters. v. City of Bridgeton*, 905 F.2d 223, 227-28 (8th Cir. 1990); COL ¶ 22.

The Court should also make clear, however, that the Commitment constitutes at most an *additional and independent* basis for finding that the government failed to prove likely substantial harm.  That is, the Commitment is only one of many real-world market facts distinctly negating the government's critical assumption that the merged entity will have increased bargaining leverage.

In all events, this Court should reject any "remedy" proposed by the government that would involve divesting DIRECTV or Turner.  Absent a violation, there is "no basis for injunctive relief."  *Franklin*, 163 F.3d at 630.  And divestitures here would destroy the very consumer value this merger is designed to unlock.  Divesting DIRECTV would eliminate the price decrease for millions of DIRECTV consumers predicted by the government itself, and

divesting Turner would eliminate the content innovations and the advertising benefits that put downward pressure on Turner prices.  On this record, there is no basis to impose any remedies at all, much less divestitures that would destroy the value of the transaction.

## CONCLUSION

Based on the law and the trial evidence, judgment should be entered for defendants.

Date: May 3, 2018

Respectfully submitted,

By: /s/ Daniel M. Petrocelli

Daniel M. Petrocelli (*pro hac vice*)
dpetrocelli@omm.com
M. Randall Oppenheimer (*pro hac vice*)
roppenheimer@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

By: /s/ Katrina M. Robson

Katrina M. Robson (D.C. Bar No. 989341)
krobson@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Counsel for AT&T Inc., DIRECTV Group Holdings, LLC, and Time Warner Inc.*

Peter T. Barbur (pro hac vice)
pbarbur@cravath.com
Kevin J. Orsini (pro hac vice)
korsini@cravath.com
Margaret Segall D'Amico (pro hac vice)
mdamico@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 8th Avenue

New York, NY 10019
Telephone: (212) 474-1140
Facsimile: (212) 474-3700

*Counsel for Time Warner Inc.*


Robert C. Walters (*pro hac vice*)
rwalters@gibsondunn.com
Michael L. Raiff (*pro hac vice*)
mraiff@gibsondunn.com
**GIBSON DUNN & CRUTCHER**
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
Telephone: (214) 698-3114
Facsimile: (214) 571-2932

*Counsel for AT&T Inc. and DIRECTV Group Holdings, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 3, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

By: /s/ Daniel M. Petrocelli
Daniel M. Petrocelli (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com