**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff*,<br><br>    v.<br><br>AT&T INC., DIRECTV GROUP HOLDINGS,<br>LLC, and TIME WARNER, INC.,<br><br>    *Defendants*. | Civil Action No. 1:17-cv-02511 (RJL)<br><br>**REDACTED** |

## POST-TRIAL BRIEF OF THE UNITED STATES

The Turner channels are carried by nearly every MVPD to nearly every cable and satellite customer in the country. For good reason—Turner has content customers want to watch live, so its channels are something MVPDs need to have. As one distributor summarized, "I can't not have … the Turner networks." Tr. 1404:14–15. The merger of AT&T and Time Warner would give the nation's largest MVPD the power to control its rivals' access to that content. The merged firm would exploit its newfound power in carriage negotiations with current and would-be MVPD competitors to the detriment of competition and consumers.

All negotiations have elements of kabuki theater, with both sides posturing as they fight for terms. The real-world implications of not reaching a deal, however, determine each side's leverage and, ultimately, the bargain they strike. Even catastrophic alternatives define high-stakes negotiations: in the Cold War, the most destructive weapons were never used, yet the arsenals and defenses available to each side undeniably influenced every negotiation between East and West. Leverage matters in video content negotiations because millions of dollars change hands depending on who blinks first. As Turner executives testified, these negotiations are "trench warfare," Tr. 559:10–23, and in recent years "Turner has gotten close to going dark with every major distributor," even over "a single penny" that it eventually won, Tr. 1033:8–14.

That's today. Tomorrow, if AT&T acquired Time Warner, Turner's leverage would increase because it would have the nation's largest MVPD with it in the trenches. The alternative to an agreement in every negotiation with a rival MVPD would be better for the merged firm because without a deal, DirecTV would steal valuable video subscribers away from that rival. Moreover, a combined AT&T-Time Warner would benefit from weakening DirecTV's competition in ways that Turner alone did not and could not. With new bargaining leverage and new incentives to hinder DirecTV's rivals, Turner would press for and win terms

1

that harm competition.

Although AT&T executives denied this ability and incentive to raise rivals' costs when they were on the witness stand, AT&T and DirecTV have advocated this view of the industry since at least 2010, when the FCC has considered instances of vertical integration between an MVPD and a content provider. *See* PX0001-083; PX0441-005; PX0443-079; PX0467-313. In reliance on DirecTV's assertions to that effect, the FCC held in its Comcast/NBCU Order that vertical integration would affect bargaining outcomes: "Unlike the pre-transaction NBCU, the integrated firm will take into account the possibility that any harm from failure or delay in reaching agreement would be offset to some extent by a benefit to Comcast." *In re Applications of Comcast Corp., et al.*, 26 F.C.C. Rcd. 4238 ¶ 37 (2011). Defendants' own economists endorsed this well-accepted bargaining model, quibbling instead with how *much* leverage would be gained and how it would apply to an arbitration offer defendants made with their Answer. Tr. 2461:4–18, 2407:16–19, 2695:16–19, 2750:16-19, 2825:15-22.

Defendants responded to this lawsuit with 1,000 half-baked letters unilaterally offering to arbitrate price increases because they know full well they would be able to raise their distribution rivals' costs post-merger. So they sought to try to recreate, as a remedy, an element of past regulatory remedies that the FCC found necessary in every recent instance of vertical integration. *See* Comcast/NBCU Order, ¶ 35 (summarizing same finding in prior proceedings). But a self-imposed remedy is no remedy at all—it does not replace the preferred free-market competition envisioned by the Clayton Act. Even more importantly, arbitration would not solve the problem in this case. Never before has the country faced a merger involving the largest video distributor acquiring content its rivals need, with a nationwide footprint that would provide no benchmarks for arbitration. And never before have the United States and the Court

2

been left without the assistance of the FCC to craft, impose, and supervise behavioral conditions. Moreover, such a remedy would not address the threat to competition from AT&T's control over HBO and the increased likelihood of coordination with Comcast/NBCU. Accordingly, after concluding this merger violates Section 7 of the Clayton Act, the Court should impose a market-based structural remedy to prevent its anticompetitive effects.

\* \* \* \* \*

Section 7 "subjects mergers to searching scrutiny," *California v. Am. Stores Co.*, 495 U.S. 271, 285 (1990), and reaches "incipient" harms, *Brown Shoe Co. v. United States*, 370 U.S. 294, 318 n.32 (1962). For that reason, and to ensure it is not American consumers who bear the risk of such a transaction, the legal standard for Section 7 liability is not "convincing proof…that this merger will substantially lessen competition," as defendants' counsel Mr. Petrocelli misleadingly argued at closing. Tr. 4026:20–22. Rather, the term "may be" in the statute requires only "a reasonable probability," *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 175 (1964), or "an appreciable danger," *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011) (quotation omitted), of harm to competition. The evidence presented at trial meets that standard.[1]

AT&T's proposed acquisition of Time Warner would harm competition by marrying the incentive and the ability to use Time Warner content to raise prices and stifle innovation, creating a "reasonable probability" of harm in violation of Section 7. Indeed, this is the same theory on which the United States determined the Comcast/NBCU transaction violated Section 7. Complaint, *United States v. Comcast Corp.*, No. 1:11-cv-00106-RJL (D.D.C. Jan. 18, 2011).

---

[1] The position of the United States is set out fully in its Proposed Conclusions of Law (PCOL) and Proposed Findings of Fact (PFOF). Citations to relevant sections appear throughout.

AT&T *has* the *incentive* to lessen competition. It recently purchased and now owns DirecTV, the nation's largest MVPD, and has an economic interest in weakening the competition DirecTV faces. It also has a significant interest in forestalling the competitive threat that innovative online rivals pose to its business model of selling the pay-TV "bundle," which has been a "cash cow" for DirecTV. Tr. 1733:13–18. AT&T executives scorn programmers that license their content to lower-cost, innovative entrants for "going around us," PX0047, and they are anxious to protect this current business model—the "golden goose," Tr. 1801:15–1802:17—from more pro-consumer competition.

With this merger, AT&T *would gain* a *new ability* to act on these incentives. No longer would it be limited to writing letters complaining when threatened by an innovation that "[s]ets [it] on fire." PX0228. It would own Time Warner, which controls highly valuable content that MVPDs and virtual MVPDs "must have" in order to compete, including Turner's marquee sporting events on TBS and TNT, a leading 24-hour news network (CNN), and the leading premium network (HBO). Post-merger, AT&T would be positioned to use that content as a weapon against DirecTV's rivals, by raising its price, restricting its use, or coordinating to deny it outright to nascent innovative online competitors.

**Unmatched Time Warner Content.** MVPDs and virtual MVPDs need Time Warner content to compete effectively. Turner offers networks, including TBS, TNT, and CNN, widely described as "must have." Mr. Schlichting, who runs Dish's consumer-friendly Sling and acquires all of Dish's content, considers Turner content "must have" because "if you don't have March Madness you're not in the pay-TV business," and because CNN has "a huge amount of viewing." Tr. 242:8–15, 245:13–23. Mr. Hinson, a Cox executive, believes it would be "very difficult" to compete without Turner networks because Cox "wouldn't have a level playing

field," and customers "would go somewhere else." Tr. 697:2–19.

Whether Turner content is labelled "must have" or not, however, the evidence overwhelmingly shows that it is competitively significant. Almost all of AT&T's rivals carry Turner content, and nearly every pay-TV subscriber—approximately ▮%—receives Turner content. PX0008-036; Tr. 3078:4–16. Turner's TBS and TNT networks are among the top-rated general entertainment networks. Tr. 524:1–9; PX0153-002-003; PX0008-035. Turner content commands superior affiliate fees compared to its peers, and its fees and margins have increased year after year. Tr. 528:6–529:5. Turner secured rate increases of ▮% in 2016 and 2017, and it expects an additional ▮% rate increase every year through ▮. PX0123-009; Tr. 995:18–997:16. As Professor Shapiro explained, the price Turner content commands is one of the best indicia of its competitive significance. Tr. 2239:10–17.

Turner's marquee sports programming is particularly important to distributors. In addition to owning rights to MLB playoff games and major PGA events, Turner pays billions of dollars annually for the rights to NBA games and NCAA's March Madness. Tr. 530:5–13, 543:15–544:25. These events are "must have sports" in Cox's view, Tr. 694:1–695:16, and "very valuable sport programming content," especially during March Madness, in Cable One's judgment, Tr. 2112:17–20. As Turner's CEO Mr. Martin told his Board, this "[t]op-tier sports programming has been and will continue to be a key factor in allowing [Turner] networks to receive the highest subscription rates." PX0020-0005; Tr. 541:6–10. Turner will retain this competitive leverage for years to come, as it controls MLB rights through 2021, NBA rights through 2025, and NCAA rights through 2032. DX640.0041; Tr. 548:20–549:2.

There is also no doubt about the value of HBO. It "sets the gold standard in premium video," in Mr. Bewkes' words. PX0459-010. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5

████████████████████████████████████████████. *See* PFOF at ¶ 28. It has

compelling original series and shows recently released blockbusters from multiple movie

studios. Tr. 1452:20–22, 1453:12–25. In AT&T's words, HBO has the "[b]est brand

name" and the "[o]verall best collection of content." Tr. 1521:11–19; PX0010-A-004.

 Defendants try to downplay the importance of Time Warner content. That does not

square with the purchase price of *$108 billion*; nor with Mr. Stephenson's statement to his

Board that Time Warner was the ███████████████████████████ DX0609-

0012; nor with Mr. Martin's statements that Turner has content that is "unmatched in terms of

consumer demand and live viewership, driving on-going value to distributors and advertisers,"

PX0021; Tr. 545:11–24. It is also contradicted by the fact that, contrary to defendants'

allegation that the launch of YouTube TV without Turner content "disproves" its importance,

Answer ¶ 5, YouTube was "anxious to add Turner" Tr. 1172:13–1173:10, and recently reached

an agreement to carry Turner content. Tr. 1848:17–1849:16.[2]

 What makes this merger different from most other vertical mergers, and creates a grave

threat to competition and consumers, is that there is nowhere else a distributor can go for Time

Warner content. Distributors don't just want this specific input to compete effectively, they

truly need it.

 ***End of Time Warner's Agnosticism.*** Today, the competitive reality is that Time Warner

has no incentive to favor one distributor over another. It has an incentive to achieve wide

distribution, and it licenses its content to a broad spectrum of distributors including emerging

virtual MVPDs. It works cooperatively with a variety of distributors, e.g., advising them on

---

[2] *See* PCOL at IV.E, V.C-E; PFOF at V.A.2.

how to use HBO to win and retain subscribers.

In AT&T's hands, Time Warner's economic calculus would change. AT&T would not want Time Warner content distributed in ways that increase competitive pressure on DirecTV. For example, when Time Warner acquired a stake in Hulu and Turner agreed to license content to Hulu for its new virtual MVPD service, Mr. Stephenson told Mr. Bewkes that he viewed the decision as "going around us," and threatened that it was "hard to imagine how it won't impact all of our relationships." PX0047. Post-merger, Time Warner would no longer be agnostic toward its rival distributors. Its economic incentives would be dramatically changed. Indeed, in notes prepared for a presentation to his Board, Mr. Stephenson pinpointed as one of two "Key issues" concerning the merger "[h]ow can you advantage your own distribution … without harming TW position as a wide distributor of content." Tr. 3487:8–14; DX0609-008. As detailed in the following sections, Time Warner could act in at least three, mutually reinforcing, ways to "advantage" DirecTV to the detriment of competition and consumers.

*Raising Rivals' and Consumers' Costs*. The merger would increase Time Warner's bargaining leverage; that increase would lead AT&T's rivals to pay more for Time Warner content; and those rivals would pass their higher costs on to consumers. Defendants decry this theory as "absurd" or "made-up"—something "[n]ot one person in the business thinks," Tr. 4043:2–5—but those assertions make a mockery of the judicial system. Defendants have asserted the exact opposite position to obtain favorable results before the FCC. Accordingly, defendants should be judicially estopped from denying that the change in bargaining leverage from vertical integration in this industry will enable the sort of harm the United States asserts. *See* PCOL VI.A. In any event, the testimony of industry participants, standard and widely recognized economic principles of bargaining, and economic modeling, as well as defendants'

own documents and testimony, all show that this merger threatens this harm.

Industry witnesses explained how the merger would increase Time Warner's leverage over distributors. Ms. Fenwick, Cox's negotiator, explained that, with the merger, "the leverage changes" because "AT&T has a different incentive now than they had before," and Cox knows that "if we don't agree to [AT&T's terms], we're in a position where we are going to lose customers … and that they're going to pick them up and grow their market share." Tr. 108:5–18. Mr. Montemagno, Charter's chief negotiator, testified that Charter is concerned about price increases and the loss of access to "critically important content," Tr. 1350:4–18, because "[e]ither I pay excessive increases or I lose the product and they have a more competitive distribution profile," Tr. 1352:1–3. Dish's Mr. Schlichting testified that Turner is a "really important supplier" that is "teaming up with our biggest adversary," which would "throw[] the card table up in the air" because "all of the incentives change at that stage." Tr. 261:12–262:6.[3]

Professor Shapiro's economic analysis framed this direct industry evidence. First, he explained that a party's bargaining leverage depends, in part, on its alternatives to a deal. Here, the fact that DirecTV would capture subscribers from a distributor that would not have Turner increases Turner's bargaining leverage. As Ms. Fenwick explained, Cox will "have to think about that if we do go dark, they have a benefit in picking up Cox customers," and would "know going into these negotiations [with Turner] that that additional leverage is there." Tr. 107:6–24. With this new power to use as a weapon, the combined AT&T-Time Warner's offer

---

[3] At closing argument, Mr. Petrocelli derided the concerns of these industry participants because they compete with DirecTV in addition to purchasing content from Turner, *see* Tr. 4034:3–10, yet, importantly, defendants did not elicit testimony from these witnesses to suggest that they worried that the merger would make AT&T's product more competitive.

to distributors would be like an "offer [they] can't refuse."[4]

Second, Professor Shapiro estimated the price increases using a bargaining model "very similar" to the one relied on by the FCC in its review of the Comcast/NBCU merger. Tr. 2390:12–16. The model "is as simple as possible, while still capturing the fundamental economic forces that are in play here to analyze the likely effects of this merger." Tr. 3800:5–18. Using conservative inputs reflecting industry realities, Professor Shapiro estimated fee increases for Turner content to AT&T's rivals of over $580 million a year, representing a double-digit percentage increase. *See* Tr. 2206:4–12, 2206:22–2207:10–16. After crediting defendants with elimination of double marginalization, he estimated a range of net annual cost increases of $235 million on the low end and $561 million on the high end. Tr. 2253:4–12, 3919:6–14, 3920:5–16. Even using an average of 2017 data to calculate margins, Professor Shapiro estimated that the range of likely annual net MVPD cost increases would be between $98 million on the low end and $348 million on the high end. Tr. 3850:6–22, 3920:17–3921:7.

The testimony of industry witnesses and AT&T executives indicates that █████████ of this cost increase would be passed on to subscribers as higher prices. *See, e.g.*, Tr. 708:2–14; PX0523-H. Professor Shapiro corroborated this testimony, estimating at least $285 million in annual harm to MVPD subscribers. Tr. 2255:7–22. Indeed, Professor Shapiro's *conservative* estimate of consumer harm is likely to grow as AT&T sells more profitable multiproduct bundles, and pursues its strategy of wireless video over its 5G network, Tr. 2247:19–25, 3381:24–3383:14, and as the importance of Turner content increases, Tr. 2256:21–2257:15.[5]

*Reining in a "Proven Acquisition Driver."* HBO is an important competitive tool in the

---

[4] THE GODFATHER (Paramount Pictures 1972).
[5] *See* PCOL at V.C; PFOF at IV.B.4.

pay-TV marketplace, and AT&T describes it as a "proven acquisition driver." Tr. 1521:20–23.

Distributors use HBO to win or retain customers—*i.e.*, to compete. AT&T itself sees HBO as a

means to ████████████ and ██████████████████████████ PX0261-010-11.

Post-merger, AT&T would have the incentive and the ability to limit its rivals' use of this

"proven acquisition driver." Distributors often need HBO's approval to offer free HBO to

customers or to use HBO content, characters, trademarks, or logos in advertising. Tr. 1458:1–

25, 1497:25–1498:6. AT&T would have the power to withhold approvals post-merger, as well

as add restrictions on the use of HBO in future contracts. Tr. 703:25–704:18. AT&T would

have every reason to do so because the value of a lifetime customer of DirecTV is significantly

greater than license fees that MVPDs currently pay for HBO. Tr. 705:8–9, 706:10–23. As

HBO's President acknowledged, "I have to do what my boss asks me to." Tr. 1479:13–17. It

would be in the combined AT&T-Time Warner's economic interest to do so.[6]

*From Friend to Foe.* To date, Time Warner has supported entry by virtual MVPDs. Its

strategy has been to ████████████████████████████████ e.g., by

████████████████████████████████████████████████████████

PX0008-005. Turner even has sought to position itself as an "anchor tenant" for virtual

MVPDs. Tr. 1065:12–1066:1. Time Warner, accordingly, has licensed its content to an array of

virtual MVPDs, including Sony Vue, Dish Sling, Hulu, and YouTube TV. Tr. 583:6–19.

Post-merger, control of Time Warner content would pass to a firm with very different

competitive incentives, to the detriment of consumers. MVPDs like DirecTV have begun to

lose customers to virtual MVPDs who offer more diverse packages, *see, e.g.*, Tr. 3450:15–22,

---

[6] *See* PCOL at V.D; PFOF at IV.B.3.a.

putting greater pressure on DirecTV margins, *see* Tr. 2262:24–2263:14. Some virtual MVPDs

are offering consumer-friendly "skinny" bundles that are less expensive than DirecTV's base

packages, *see* Tr. 583:25–584:13, a threat to the traditional DirecTV business model.

AT&T takes this threat to "the value of the bundle" seriously. Tr. 1615:6–25. When

content providers began licensing to Sling, DirecTV's Chief Content Officer, Mr. York,

branded them "short-sighted whores to whomever is willing to write them a new check for their

content." PX0042; Tr. 1657:5–1658:7. Furthermore, he complained that programmers had

"made their own bed" by "licensing their content to cheaper OTT options," triggering a

"pricing war and race to the bottom." Tr. 1700:1–9; PX0048. When Time Warner offered a new

feature for the online delivery of March Madness basketball games to the Apple TV device, Mr.

Stankey wrote that this "sets me on fire" because it "deteriorates the value of the bundle." Tr.

1615:6–1616:3; PX0228.  Mr. York had "the same visceral reaction," *id.*, and his team drafted

an email to Mr. Bewkes complaining about the "poor judgment" Time Warner showed by

"providing such rights to a company that to date has had a negative impact on your lucrative

Pay-TV business," Tr. 1654:19–1655:4; PX0040. This was a threat to their "cash cow."

Post-merger, AT&T could and would do a lot more than complain. It would control Time

Warner and decide whether and on what terms virtual MVPDs would have Time Warner's

content. By restricting access (e.g., refusing to license to a skinny bundle or setting prices

prohibitively high), AT&T could reduce the threat it faces from virtual MVPDs and prolong the

life of the traditional business model.

These tactics are far from theoretical. Mr. Schlichting explained that the new firm could

"break[] our model" by forcing Sling to add more Turner networks to its skinny bundles, raising

Sling's costs. Tr. 265:17–266:8, 268:9–23. The new firm could do these things because virtual

MVPDs need Time Warner.  As Mr. Martin wrote, Sling "is shit without Turner." Tr. 575:22–

577:4; PX0004. In fact, AT&T's corporate strategy group recognized that purchasing a content

player would give AT&T the ability to "[s]hape the ecosystem" enabling it to "reinforce [the]

pay TV bundle." Tr. 1770:3–15; PX0184-005.  "Reinforc[ing the] pay TV bundle" is another

way of saying "restricting competition for the benefit of the Pay TV bundle."

        Moreover, AT&T would not have to act alone. As the two largest MVPDs (together,

nearly 50% of the traditional video distribution market, Tr. 860:9–11, 3035:24–3036:1, 3451:8–

10), Comcast and AT&T would share an incentive to stem the threat from virtual MVPDs. And,

post-merger, as the only two vertically integrated MVPDs, they would share the ability. They

don't need to actually come to an illegal agreement under the antitrust laws to have this

anticompetitive effect.  Comcast has already demonstrated a willingness to play hardball with

NBCU content to benefit Comcast's own MVPD, e.g., "jamm[ing]" Sling's skinny bundle with

more NBCU networks, Tr. 279:17-24, and increasing penetration requirements on RCN so that

it could no longer offer its low-cost product and Comcast could enter more easily with its own

bundle, Tr. 2920:6–2921:15. AT&T executives have taken note of Comcast's incentives,

observing that, after the consent decree expires, "NBCU can choose not to license content

online to some players or may discriminate on price," and "OVDs could be looking at different

terms for NBCU content." PX0011; Tr. 1717:2–24.

        Together, the firms, both of whom are traditional MVPDs, would have a greater ability to

limit competition from new consumer-friendly virtual MVPDs by increasing content prices,

imposing more onerous contract terms, withholding content entirely, or other tactics. For

example, each of the two companies could decide not to grant a license to a new virtual MVPD

and "mutually forbear, without any communication between them." Tr. 2264:14–2265:13. The

loss of content from two important programmers would neuter a new virtual MVPD. In the words of one Turner executive, losing both Turner and NBCU content would be a "recipe for [] failure." PX0036; Tr. 1851:16–1852:2.[7]

\* \* \* \* \*

Defendants call this case a "preposterous" "house of cards" that is "absurd" and "defies logic," yet notwithstanding their certitude, they simultaneously suggest the Court invent a bevy of new legal barriers to the United States' case, while asking it to flip the burden of proof on their efficiencies defense and remedy proposal.  The law and the facts support neither their confidence nor their creativity.

**_Rewrite of Merger Law_.** Defendants would have the Court rewrite merger law. They do not just engraft on Section 7's text new elements like a safe harbor for "minor" price increases and a second market-definition element. They also reconceive the entire Section 7 enterprise, contending that the United States must show that harm is "likely" and quantify it precisely.

Neither Section 7's text, nor decades of precedents, demand such clairvoyance. "A predictive judgment, necessarily probabilistic and judgmental rather than demonstrable, is called for," _FTC v. H.J. Heinz Co._, 246 F.3d 708, 719 (D.C. Cir. 2001) (quotation omitted), and

---

[7]A number of factors set the stage for coordination of this sort. First, the markets are concentrated and barriers to entry are high. Tr. 988:14–22. Second, coordination would require only Turner and NBCU and thus be "relatively easy to achieve in comparison with other situations where you need many suppliers." Tr. 2260:24–2261:20. Third, AT&T or Comcast would quickly detect cheating by the other, e.g., observing what content a virtual MVPD offers to subscribers, the regular communications between the companies' executives, _see, e.g._, Tr. 1510:15–23, 1860:14–24, 1863:6–19; PX0048, or MFNs, PX0029. Fourth, AT&T's Mr. York, who will remain AT&T's head of negotiations, in the past communicated with his counterparts at competitors about business issues—in one instance, calling his competitor ("got it from the horse's mouth") for information about its new competitive offering. Tr. 1673:19–1674:2; PX0048; 2078:15–23, 2080:23–2081:16; PX0462.

there are "no definite quantitative or qualitative tests," *Brown Shoe*, 370 U.S. at 321. A court's

task is not to calculate the precise quantum of harm but instead to assess whether the merger

would give rise to a "reasonable probability" or an "appreciable danger" of harm. Section 7,

enacted in 1914, and amended to apply specifically to vertical mergers in 1950, cannot

plausibly demand such precision. [8]

**Potshots at Professor Shapiro's Model.** Professor Carlton did not present an economic

model of his own, or dispute the basic logic that vertical mergers can be anticompetitive as a

result of raising rivals' costs. Tr. 2521:9–19. Instead, he simply took potshots at inputs to

Professor Shapiro's model, used cherry-picked data provided by AT&T, and failed to address

the many undisputed ways those inputs conservatively estimated actual incentives.

To calculate the Subscriber Loss Rate (the loss of subscribers from a Turner blackout),

Professor Shapiro used an empirical analysis of two long-term blackouts involving Viacom, as

well as analyses used by Charter and Comcast in negotiations with distributors. Tr. 2235:1–

2238:22. He also looked to a survey by Professor Hauser to corroborate this real-world

evidence. Tr. 2237:23–2238:8. Although Professor Carlton argued for a lower rate, asserting

that Professor Shapiro's analysis of Suddenlink's blackout of Viacom did not account for a

change in industry trends, Tr. 2483:11–2484:22, Professor Shapiro examined the data and

determined that no such change occurred. Tr. 3804:12–18, 3916:22–3917:7. Professor Carlton

also relies on two short-term blackouts, but concedes that a long-term blackout is "the one you

want to rely on." Tr. 2478:15–2479:14, 2490:22–2491:13, 2524:19–2425–6.

Professor Carlton's criticism of the model's diversion ratios (how many lost subscribers

---

[8] *See* PCOL at II, III, V.C-E, VI.D-F.

would switch to DirecTV) is untenable. He contends that Professor Shapiro has undercounted the "outside good" (the number of people who would drop pay-TV altogether in response to a blackout). But Professor Carlton's calculation conflates the number of people without pay-TV with those who would drop it *in response to a Turner blackout*. Tr. 2505:5–2506:7. His mistake generates the illogical result that one in five subscribers who would cancel their subscription with a distributor specifically because it lost Turner networks would drop pay-TV entirely instead of switching to a provider that did carry Turner networks. Tr. 3807:10–3808:21.

Although Professor Carlton claims that the profit margin in the model is too high, to reach that conclusion he cherry-picked the lowest monthly number from a set of three months, ignored higher figures from earlier and later months, and disregarded the fact that a three-month average produces a figure 28% higher than his preferred outlier. Tr. 3810:24–3812:23. He also ignores all of the ways that Professor Shapiro's margin calculation *conservatively* understates the true value of subscribers AT&T would gain or retain. Tr. 3812:24–3821:23.

Finally, defendants' critique of Professor Shapiro's model misses the bigger picture: the model is but one part of Professor Shapiro's opinion, and his opinion is one part of the United States' evidence. The model confirms, and builds on, the testimony of industry participants and economic logic, all of which points to higher costs for AT&T's rivals and consumers.[9]

***Retrospectives.*** Far from "ignoring" prior mergers, as defendants charge, Tr. 4046:14–23, Professor Shapiro explained why Professor Carlton's conclusions about prior mergers were fundamentally flawed. Professor Shapiro looked at those mergers and concluded that the data was flawed, the market conditions were dissimilar, and consent decrees obscured the

---

[9] *See* PCOL at V.A-C; PFOF at IV.A-B.

competitive effects of the merger. Tr. 3829:4–3835:6. Moreover, the FCC reached the exact

opposite conclusion as Professor Carlton, finding as part of its analysis of the Comcast/NBCU

transaction that "evidence from past vertical transactions supports our conclusion that vertically

integrating a video distributor and a national cable programmer leads to higher programming

prices to rival MVPDs." Comcast/NBCU FCC Order, Appx. B at ¶ 52.

   ***A Free Pass for "Minor" Price Increases.*** Defendants' dismissal of Professor Shapiro's

predicted price increase as "minor"—based on disaggregating the harm to the level of the

individual consumer—disregards law and fact. Section 7 focuses on a merger's potential impact

on "competition" (not on the individual consumer), and an annual harm of hundreds of millions

of dollars plainly evidences a "substantial" distortion of the competitive process. *See Brown*

*Shoe*, 370 U.S. at 324. The law does not require quantification of harm or recognize a safe

harbor as the defendants seem to suggest. While Mr. Stephenson may dismiss AT&T's past

price increases as "inconsequential," Tr. 3506:22–23, Turner itself "fights for every last penny,"

Tr. 991:7–8, and the antitrust laws protect every last penny that competition saves consumers.

   ***Blackouts.*** Ignoring evidence from the industry—including testimony from defendants'

own negotiators—defendants maintain that, even after the merger, a blackout would be

"absurd" and the possibility of a blackout would not influence negotiations. Tr. 4043:3.[10] Mr.

Breland, Turner's former top negotiator, testified that blackouts are "a common occurrence" in

the industry, Tr. 1025:11–1027:7, and the Court heard evidence about multiple blackouts,

including blackouts by Turner, *see, e.g.*, Tr. 1042:20–1043:20. Thus in Turner's last negotiation

with DISH, they prepared a "Plan A" of reaching a deal, and a "Plan B" to "go nuclear and

---

[10] If the Court decides defendants are judicially estopped from denying the bargaining model, then it need not reach their disingenuous argument on this point.

excl[usive] with DIRECTV." PX0004.

Moreover, defendants conveniently ignore the point that it is the *threat* of a blackout (the alternative to a deal—the Plan B) that influences leverage. Witnesses from MVPDs and virtual MVPDs underscored this reality with testimony about steps they take to prepare for blackouts, e.g., preparing marketing messages and analyzing likely consequences. *See, e.g.*, Tr. 2111:8–2112:4, 246:10–20. Mr. Warren wrote that the threat of a blackout gives Turner "massive power" in negotiations, even before the merger. Tr. 1157:9–25, 1170:14–20.[11]

***"Speculative, Unproven and Untested" Efficiencies.*** Defendants' efficiencies (or, in their words, "synergies") rests "solely on speculative, self-serving assertions," *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1223 (11th Cir. 1991). Thus, they have not borne their legal burden to demonstrate their purported efficiencies are verifiable, merger-specific, and beneficial to consumers in the affected markets, *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 82 (D.D.C. 2015).

Defendants' evidence of claimed efficiencies was limited to the conclusory testimony of Mr. Stankey and a preliminary draft of the company's estimates (Version 41). DX0658. The Court admitted Version 41, but only for the limited purpose of showing defendants' state of mind. Tr. 3231:9–3232:23. Defendants offered nothing to substantiate Version 41 or to establish that any savings that AT&T actually realizes would be passed through to MVPD consumers.  In fact, Mr. Stankey testified that he did not know the basis for many of the projections in the document, *see, e.g.*, Tr. 3298:12–23, 3329:2–23, and suggested that the court should trust AT&T's projections because it has done a number of mergers over the years. But defendants provided more than sparse documentation only for a single deal—AT&T's

---

[11] *See* PFOF at IV.B.

acquisition of DirecTV—and that evidence reveals a very large miss on predicted revenue synergies. Tr. 3565:13–3566:7, 3682:10–14.[12]

The United States, in contrast, presented testimony from two experts on efficiencies. On verifiability, Mr. Quintero and Professor Athey found no support for the critical assumptions in Version 41. *See, e.g.*, Tr. 3547:10–3549:7, 3737:4–3738:3. On merger-specificity, defendants claim many synergies without showing why they cannot be achieved without the merger. *See, e.g.*, Tr. 3544:13–3545:11; Tr. 3720:4–3722:21; Tr. 3737:9–17. On consumer benefit, Mr. Quintero found no evidence that the claimed cost synergies involve variable costs, the type likely to be passed on to consumers. Tr. 3569:17–3570:4.

Defendants try to excuse their failure of proof by re-assigning the burden, suggesting that *the United States* has the duty to quantify defendants' claimed efficiencies. This argument at best disregards, and at worst misrepresents, basic Section 7 law that "[d]efendants bear the burden of demonstrating that their claimed efficiencies" meet the criteria of the efficiencies defense. *Sysco*, 113 F. Supp. 3d at 82. Defendants' suggestion that the Court trust the assertions of AT&T managers, if taken seriously, "might well swallow the whole of Section 7," because "management would be able to present large efficiencies based on its own judgment and the

---

[12]Defendants' own executives do not even believe their efficiencies defense. For example, Mr. Stankey characterizes "content intelligence" synergies as having no more than "specious buy-in" from Time Warner executives, and says they "will require significant behavioral and incentive work." Tr. 3333:15–25; PX0072. He learned during the integration process that Time Warner employees consider it "speculative, unproven and untested." Tr. 3330:17–3331:6. He even characterized one of the assumptions underlying a synergy calculation as a "SWAG" (politely, "a guess" unsupported by "any empirical data"). Tr. 3325:16–3326:22. Similarly, projections based on the creation of a programmatic advertising platform assume that the platform will attract other MVPDs, but Mr. Stephenson called that just an "aspiration." Tr. 3467:14–3468:9. Defendants also promise to combine AT&T data with Turner advertising inventory. But Turner already has plans that would realize 80% to 90% of the claimed synergies, Tr. 593:13–594:10; PX0067-006, rendering them non-merger-specific, even if they were verifiable.

Court would be hard pressed to find otherwise." *H&R Block*, 833 F. Supp. 2d at 91.[13]

   ***A Pledge of Good Behavior.*** Mr. Stephenson offered the self-serving pledge that Time Warner would be run independently so its content would not be used to benefit DirecTV. But the law holds that the arms of a corporation "pursue[] the common interests of the whole." *Copperweld Corp. v.  Indep. Tube Corp.*, 467 U.S. 752, 769–70 (1984). Any other rule would undercut merger enforcement—after litigation management could easily reverse such promises, *id.* at 771–72 ("the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests"), as Mr. Stankey improvidently conceded, Tr. 3271:19-3272:8.

   Moreover, the facts in this case are consistent with the law's assumption that the arms of a corporation act as "a single actor." *Copperweld*, 467 U.S. at 770. While claiming that Time Warner would be independent, Tr. 3502:5–3503:3, Mr. Stephenson acknowledged that all of AT&T's business units will report to him, and he will be in charge of strategic planning for all of them, Tr. 3471:11–3472:8. As CEO, he will have the obligation to maximize shareholder value, and that his senior management's pay will depend on overall shareholder value. Tr. 3472:9–21. He effectively conceded that his company would not realize certain efficiencies if its units operate independently. Tr. 3502:3–3503:3.[14] Notably, both Professors Shapiro and Carlton agree that a firm with multiple divisions will act to maximize profits across them. Tr. 2224:18–2225:1; Tr. 2525:19-25. In short, it would defy the facts, the law, and economic logic

---

[13] *See* PCOL at VI.E; PFOF at VI.A.

[14] NBCU's Mr. Bond claimed that he does not consider Comcast's interest in negotiating affiliate agreements. He could hardly testify otherwise given that, for the past seven years, his company has been operating under conditions imposed by the FCC's Order and the Court's antitrust consent decree. Further, Mr. Bond and Comcast Cable's Rigdon testified that Comcast's CEO has final approval authority for Comcast Cable's agreements with other programmers *and* NBCU's agreements with other distributors, Tr. 866:14–22, Tr. 1986:18–1987:25, much as Mr. Stephenson would for DirecTV and Turner.

to conclude that Time Warner would not act in AT&T's overall financial interest.[15]

***An Appeal to Regulation.*** The FCC's program-access rules will not prevent the merger's likely anticompetitive effects. Over the past 15 years, the FCC has repeatedly found that its program-access rules do not prevent post-merger price increases and as a result adopted further merger remedies. *See, e.g.*, Comcast/NBCU Order ¶ 49. Professor Shapiro relied on the FCC's conclusion that those rules do not prevent this kind of harm. Tr. 2328:24–2329:6, 2390:12–16.

The burden is on defendants to present evidence showing that regulation would forestall competitive harm, *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 47–48 (D.D.C. 2017), but they have offered nothing to establish that any offset for Professor Shapiro's harm calculations is required, nor any calculation of such an offset. Defendants' lone witness on this issue, Professor Katz, has no expertise on these rules, Tr. 2751, failed to perform a de novo analysis of the merger, Tr. 2648:17–25, and merely argued with the FCC's interpretation of its own rules. His unsupported claim that the FCC would take action against the price increases Professor Shapiro predicts ignores both that the rules *do not* require that every video distributor pay the same price, s*ee* 47 C.F.R. § 76.1002(b)(1) note 2, and that when using a model in Comcast-NBCU "very similar to" the one Professor Shapiro is using here, the FCC *itself* determined the rules would not prevent the price increases predicted by the model.

***The FAANG Strawman.*** Facebook, Amazon, Apple, Netflix, and Google are successful innovative companies, no doubt. But, for all their discussion of these companies, defendants have not explained how their successes with disparate offerings in different markets are relevant to the Court's analysis of the potential for harm in the markets at issue here. Professor

---

[15] *See* PCOL at VI.D; PFOF at IV.B.3.a.

Shapiro, using the well-established Hypothetical Monopolist Test, has demonstrated that the relevant product markets are Multichannel Video Distribution (which includes MVPDs and Virtual MVPDs) and All Video Distribution (which includes SVODs, as well as MVPDs and Virtual MVPDs). Only Google competes in Multichannel Video Distribution markets, and it has a small subscription base, Tr. 3455:7–11, and is dependent on Turner content like other distributors, Tr. 1172:9–1173:13. Amazon and Netflix have SVODs, but the evidence does not show that their presence would prevent harm in All Video Distribution markets. In fact, AT&T sees Facebook as a partner for the new firm, not a just a rival, with Mr. Stephenson already considering ways to work together. Tr. 3464:16–3465:22; PX0558.[16] Numerous industry participants testified that to the extent the FAANG firms provide video services, they are complements. Tr. 241:2-3; 860:24-861:3; 861:10-13; 83:16-18.

Moreover, defendants seem to be asking the Court to find a new defense to an illegal merger: "we are getting killed by new competition in different markets." To date, only one substantive exception to an anticompetitive merger has been accepted in the law, a "failing firm" defense. *See Citizen Publ'g Co. v. United States*, 394 U.S. 131, 138 (1969) (confining the failing-firm defense to "its present narrow scope."). The United States urges the Court to reject Defendants' efforts to invent a new defense that turns the antitrust laws on their head.

*A Self-Policed Promise.* Turner's unilateral arbitration offers have no place in the Court's liability determination. If defendants could avoid liability with a unilateral "promise" to behave, the United States' public-interest mandate would be supplanted by post-litigation assurances of private parties. *See generally* Mot. In Limine (Dkt. 85). The fact that Turner made

---

[16] *See* PFOF at IV.

its offers in response to this lawsuit, Tr. 1182:8–18, alone gives the Court reason to reject them,

*see Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008) (probative value

of evidence that "*could arguably* be subject to manipulation" by a defendant is "limited").

Relatedly, no relief can be premised on the unilateral promises of Turner, *H & R Block, Inc.*,

833 F. Supp. 2d at 82 (holding inadequate that "defendants ha[d] pledged to maintain

TaxACT's current prices for three years"), which are not enforceable by this Court, and may

not be enforceable at all as they lack consideration.[17] Rather, such relief would have to take the

form of an enforceable decree of the Court. Finally, if the Court considers defendants' proposed

remedy in determining liability, defendants plainly have not met the burden of showing that the

remedy would negate the anticompetitive effects of the merger. *FTC v. Staples, Inc.*, 190 F.

Supp. 3d 100, 137 n.15 (D.D.C. 2016).[18]

\* \* \* \* \*

***The Court Should Order Structural Relief.*** While the Court has discretion to fashion

---

[17] Defendants' arbitration offers may be revocable at Defendants' discretion. While Defendants have represented that the offers are "*irrevocable*" for seven years under "governing" New York law, Defs.' Opp. to Mot. in Limine at 4 (Dkt 83), some, if not all, of the arbitration offers appear to be governed by Georgia law. First, because the offer letters themselves do not contain choice of law provisions, they would be subject to conflict of law principles under which the state where the offers originated and where Turner is headquartered (Georgia) may supply the governing law. *See, e.g.*, PX0437 (arbitration offer letter to Cox, sent from Georgia address); *see also* PX0490 (same for Dish); DX0785 (same for NCTC). Second, the arbitration agreements attached to the offer letters incorporate by reference any choice of law contained in Turner's affiliate agreements, and some of the affiliate agreements specify Georgia law in the relevant clause. *See, e.g.*, PX0491 ¶ 7 (proposed arbitration agreement, incorporating by reference any choice of law provisions from Turner's affiliate agreements); ██████████████ affiliate agreement governed by Georgia law). Under Georgia law, Defendants may withdraw their arbitration offers unless and until they receive consideration. *See Amwest Sur. Ins. Co. v. RA-LIN & Assocs.*, 455 S.E.2d 106, 109 (Ga. App. 1995). This uncertainty confirms the necessity of *court*-ordered relief.

[18] *See* PCOL at VI.F; PFOF at IX.

relief for a Section 7 violation, the appropriate relief here is structural—either a permanent injunction against the proposed merger, or a targeted divestiture. The plain text of Section 7 reflects the judgment of Congress that structural relief is appropriate by providing that "No person . . . shall *acquire*" the stock or assets of another where "the effect of such *acquisition* may be substantially to lessen competition." 15 U.S.C. § 18 (emphasis added). The remedial provision states violations "shall be enjoined, or otherwise prohibit[ed]." 15 U.S.C. § 25

*A Permanent Injunction.* Because the United States has demonstrated that the proposed transaction would violate Section 7, the Court should enjoin this proposed acquisition. The Supreme Court has held that upon finding liability a complete divestiture is the "preferred remedy." *Am. Stores*, 495 U.S. at 280–81. Consistent with this principle, the United States' prayer for relief requests an injunction blocking the proposed acquisition. *See* Compl. ¶ 48(b). Where, as here, the United States has established "a violation of law … all doubts as to the remedy are to be resolved in its favor." *E. I. du Pont*, 366 U.S. at 334. The presumption in favor of the United States' requested remedy reflects the government's obligation "to obtain the relief necessary to protect the public from anticompetitive conduct." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170 (2004).

*Alternative Structural Relief.* While blocking AT&T's acquisition of Time Warner in its entirety would completely eliminate the threat to competition posed by the proposed transaction; the Court may order alternative structural remedies if it found that doing so would sufficiently reduce the risk of anticompetitive effects so as to redress the Section 7 violation. The evidence demonstrated that the bulk (though not all) of the anticompetitive effects flow from the combination of Turner with DirecTV. Accordingly, if the Court determines that it is only the combination of DirecTV with Turner that tends to cause anticompetitive effects, the

Court could tailor a remedy to redress this specific violation of Section 7 that would prevent the combination of those two assets within one corporate entity. *See, e.g.*, *United States v. Anthem*, 855 F.3d 345, 368 (D.C. Cir. 2017) (acknowledging the possibility of a narrow liability finding); *FTC v. PepsiCo, Inc.*, 477 F.2d 24, 29 n.8 (2d Cir. 1973) (partial divestiture may be appropriate where "the offending line of commerce, if disassociated from the merged entities, can survive as a viable independent entity"). This could be accomplished in various ways:[19]

- *A targeted divestiture of Turner.* The Court could issue an order allowing AT&T to acquire two of the three business units (Warner Brothers and HBO/Cinemax), but enjoining the acquisition of Turner.[20] Post-merger, AT&T could attempt to realize many of the purported benefits of vertical integration, Tr. 3396:12–24, while not being able to inflict the competitive harm that Turner would allow it to effect on competition.
- *A targeted divestiture of DirecTV.* The Court, alternatively, could issue an order requiring AT&T to divest DirecTV as a condition to acquiring all of Time Warner.

   ***Behavioral Relief Is Not an Appropriate Remedy Here.*** Behavioral relief is not appropriate because it would not be "effective to restore competition" and "redress the violation[]" that would follow from the proposed transaction. *E. I. du Pont*, 366 U.S. at 326. Behavioral remedies are disfavored in Section 7 cases because they "risk excessive government entanglement in the market," *Saint Alphonsus Med. Ctr.-Nampa Inc. v. Saint Luke's Health Sys., Ltd.*, 778 F.3d 775, 793 (9th Cir. 2015), and "there are usually greater long term costs associated with monitoring the efficacy of a conduct remedy than with imposing a structural solution," *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 573 (6th Cir. 2014).  While structural relief eliminates the risk of harm, behavioral relief assumes regulatory conditions can effectively constrain a business's natural incentives to maximize profits. *See generally*, Makan

---

[19] DirecTV has conceded that the Court is authorized to order such targeted divestitures. Defs.' Mot. at 3 (Dkt. 117) (recognizing the Court's authority to "order AT&T to divest itself of DIRECTV").

[20] The Court might also consider enjoining AT&T from acquiring a controlling stake in Turner.

Delrahim, Assistant Attorney General, Dep't of Justice, Antitrust Division, Remarks at

Competition and Deregulation Roundtable #2 (Apr. 26, 2018). Behavioral relief is also less

effective at protecting competition than structural market-oriented remedies because it "can

hardly be detailed enough to cover in advance all the many fashions in which improper

influence [over the acquired company] might manifest itself." *E.I. du Pont*, 366 U.S. at 334.

The United States is not aware of any Section 7 case in which a court's order of

exclusively behavioral relief over the objection of the United States survived appellate review.

*See id.* at 329–35 (vacating behavioral relief and ordering complete divestiture). Behavioral

relief has instead been ordered in conjunction with structural relief and at the request of the

United States. *See, e.g.*, *Ford Motor Co. v. United States*, 405 U.S. 562, 575–78 (1972)

(affirming conduct remedies "ancillary" to divestiture requested by the United States). This

case should not depart from over 100 years of Clayton Act precedent to order behavioral relief

over the United States' objection.[21]

* * * * *

The Court should find the effect of the merger may be substantially to lessen competition

and enjoin it.

---

[21] The harm from the proposed transaction would not be remedied simply by adopting conditions
similar to those in the Comcast–NBCU consent decree. *See* PCOL at VII.E; PFOF at IV.D.
Among other reasons, AT&T competes nationally through its DirecTV service, and the United
States has accordingly predicted harm at least throughout the country. *See, e.g.*, Tr. 2240:14–
2241:14. An arbitrator would have no natural benchmark to assess the "fair market value"—a
term not familiar to anyone in the industry—of Turner's content because prices for Turner
content are predicted to increase nationwide. And for virtual MVPDs offering skinny bundles
(e.g., Dish Sling), an arbitrator's use of inappropriate benchmarks could destroy their business
model by requiring broad inclusion of networks. Tr. 277:14–278:3, 280:3–281:3. Finally, as
explained in the PFOF and PCOL, Defendants' unilateral arbitration offers also suffer from
numerous other shortcomings. PCOL at VII; PFOF at IX.

Dated: May 8, 2018                                        Respectfully submitted,


                                                          /s/ Craig Conrath
MAKAN DELRAHIM                                            CRAIG CONRATH
Assistant Attorney General for Antitrust                 ERIC D. WELSH (D.C. Bar # 998618)

ANDREW C. FINCH                                          PATRICK M. KUHLMANN
Principal Deputy Assistant Attorney General             SANFORD ADLER
                                                         NATHAN BRENNER
DONALD G. KEMPF, JR.                                     ALEXIS BROWN-REILLY
Deputy Assistant Attorney General for                   DYLAN CARSON
Litigation                                               ALVIN H. CHU
                                                         ROBERT DRABA
BERNARD A. NIGRO, JR.                                    JULIE ELMER
Deputy Assistant Attorney General                       JENNIFER HANE
                                                         JUSTIN HEIPP
PATRICIA A. BRINK                                        JOHN HOGAN
Director of Civil Enforcement.                           ELIZABETH JENSEN
                                                         MATTHEW JONES
DAVID B. LAWRENCE                                        MELANIE KISER
Counsel to the Assistant Attorney General               PATRICK M. KUHLMANN
                                                         KATHRYN KUSHNER
CAROLINE J. ANDERSON                                     CERIN LINDGRENSAVAGE
Counsel to the Assistant Attorney General               ERICA MINTZER
                                                         LAUREN RIKER
WILLIAM J. RINNER                                        ANNA SALLSTROM
Counsel to the Assistant Attorney General               LISA SCANLON
                                                         MATTHEW SIEGEL
SCOTT SCHEELE                                            CURTIS STRONG
Chief, Telecommunications and Broadband                  FREDERICK S. YOUNG
Section
                                                         U.S. Department of Justice, Antitrust Division
JARED A. HUGHES                                          Telecommunications and Broadband Section
Assistant Chief, Telecommunications and                  450 Fifth Street, N.W., Suite 7000
Broadband Section                                        Washington, DC  20530
                                                         Telephone: (202) 514-5621
                                                         Facsimile: (202) 514-6381

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2018, I caused a true and correct copy of the foregoing to be served upon the parties of record via the Court's CM/ECF system.

Dated: May 8, 2018                    Respectfully submitted,


                                      /s/ Craig Conrath
                                      Craig Conrath

                                      U.S. Dept. of Justice, Antitrust Division
                                      450 Fifth Street, NW, Suite 7000
                                      Washington, DC 20530
                                      Phone: (202) 532-4560
                                      Email: craig.conrath@usdoj.gov

                                      *Attorney for United States of America*