**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          *Plaintiff*,<br><br>   v.<br><br>AT&T INC., DIRECTV GROUP<br>HOLDINGS, LLC, and<br>TIME WARNER INC.,<br><br>          *Defendants*. | Case No. 1:17-cv-02511-RJL<br><br>**REDACTED** |

## PROPOSED CONCLUSIONS OF LAW OF THE UNITED STATES

# TABLE OF CONTENTS

I.      Overview .......................................................................................................1

II.     Section 7 of the Clayton Act proscribes mergers that may substantially lessen
        competition. ................................................................................................1

        A.      To "arrest restraints of trade in their incipiency," Section 7 proscribes any
                merger creating a "reasonable probability" of harm. ................................2

        B.      Harm from the merger need not happen immediately for Section 7 to apply..........5

        C.      A Section 7 plaintiff does not need to quantify the potential harm. .......................6

        D.      Section 7 does not contain an exemption for "minor" price increases. ..................7

        E.      The same Section 7 standards apply to horizontal and vertical mergers. ...............9

III.    Courts analyze Section 7 claims through a burden-shifting framework...........................11

IV.     The law on relevant markets supports the United States' defined markets for
        Multichannel Video Distribution and All Video Distribution in Local Footprint
        Overlap Zones. ..........................................................................................13

        A.      Courts rely on expert testimony and the *Brown Shoe* factors to define product
                markets. ...........................................................................................13

        B.      Multichannel Video Distribution is a relevant product market. ...........................15

        C.      All Video Distribution is a relevant product market...........................................15

        D.      Local Footprint Overlap Zones are relevant geographic markets.........................15

        E.      Defendants' argument that the United States must demonstrate market power
                is meritless. ......................................................................................16

V.      A vertical merger may substantially lessen competition by giving the merged firm the
        incentive and ability to disadvantage its rivals. ...............................................20

        A.      Courts use real-world objective evidence, supported by expert testimony, to
                assess the potential competitive effects of a merger.........................................21

        B.      Courts "deem limited" the probative value of defendants' conduct during
                antitrust investigations or litigation. .....................................................26

        C.      When a vertical merger enables the merged firm to raise its rivals' costs,
                competition is lessened substantially...........................................................26

        D.      When a vertical merger enables the merged firm to encumber its rivals' access
                to a unique resource, such as HBO, competition is lessened substantially...........29

        E.      When a vertical merger enables the merged firm to impede innovation, either
                unilaterally or through coordination, competition is lessened substantially..........29

VI.     Defendants may rebut a prima facie case only by showing that competitive harm is
        not "reasonably probable."...........................................................................33

A.      Judicial estoppel prevents a litigant from prevailing on an argument that contradicts arguments it advanced in previous proceedings. ................................. 34

B.      A specialized corporate structure cannot rebut a prima facie case because the law assumes that a corporation's wholly owned subsidiaries and divisions pursue "the common interest of the whole." ........................................................ 36

C.      Entry would not be timely, likely, or sufficient to prevent the competitive harm from this merger. ...................................................................................... 39

D.      FCC regulation will not forestall competitive harm. ............................................ 40

E.      Claimed efficiencies, which arguably cannot ever save a merger, must withstand "rigorous analysis." ............................................................................. 43

        1.      Defendants bear the burden of their efficiencies defense. ........................ 44

        2.      Efficiencies must be reasonably verifiable, merger-specific, and likely to benefit consumers in the affected markets, and must offset the harms of the merger. ................................................................................. 47

        3.      The Court cannot credit Defendants' purported efficiencies. ................... 49

F.      A unilateral behavioral promise, such as Defendants' arbitration offers, cannot rebut a prima facie case. .......................................................................................... 51

VII.    The Court should order structural relief. ......................................................................... 54

A.      A remedy must "effectively preserve competition." ............................................. 54

B.      The Court should permanently enjoin the proposed transaction. ......................... 55

C.      The Court may order alternative structural relief. ................................................ 56

D.      Behavioral relief is disfavored in a litigated Section 7 action. ............................. 57

E.      Behavioral relief is particularly inappropriate in this action. ............................... 59

## TABLE OF AUTHORITIES

**Administrative Filings and Adjudications**

*In re Applications for Consent to the Assignment and/or*
   *Transfer of Control of Licenses Adelphia Commc'ns Corp.,*
   21 FCC Rcd. 8203 (2006)................................................................ 26, 35, 41

*In re Applications of Comcast Corp., Gen. Elec. Co. &*
   *NBC Universal, Inc. For Consent to Assign Licenses & Transfer*
   *Control of Licensees,* 26 FCC Rcd. 4238 (2011)........................... 35, 40, 41

*In re Gen. Motors Corp. & Hughes Elecs. Corp., Transferors*
   *& the News Corp. Ltd., Transferee,* 19 FCC Rcd. 473 (2004) .............................. 41

*In re Implementation of Sections 12 and 19 of the Cable Television*
   *Consumer Prot. and Competition Act of 1992 Dev.,* 8 FCC Rcd. 3359 (1993)................. 41, 42

*In the Matter of Applications of Comcast Corp., Gen. Elec. Co.*
   *& NBC Universal, Inc.,* 26 FCC Rcd. 4238 (2011) ........................... 19, 24

*In the Matter of Revision of the Commission's Program Access Rules,*
   *MB Docket Nos. 12-68, 07-18, 05-192, Notice of Proposed Rulemaking,*
   27 FCC Rcd. 3413 (2012)................................................................ 42

*In the Matter of Time Warner, Inc.,* File No. 961-0004 (Feb. 7, 1997)....................... 19

*In re Sky Angel U.S., LLC,* 25 FCC Rcd. 3879 (2010) .................................... 48, 49, 52

**Cases**

*Amwest Sur. Ins. Co. v. RA-LIN & Assocs.,* 455 S.E.2d 106 (Ga. Ct. App. 1995) ...................... 65

*AT&S Transp., LLC v. Odyssey Logistics & Tech. Corp.,* 803 N.Y.S.2d 118
   (N.Y. App. Div. 2005) ................................................................ 66

*Auburn News Co. v. Providence Journal Co.,* 659 F.2d 273 (1st Cir. 1981) .............................. 22

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209 (1993)................ 38, 39

*Brown Shoe Co. v. United States,* 370 U.S. 294 (1962) ........................................... passim

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 (1977) ........................................ 34

*California v. Am. Stores Co.,* 495 U.S. 271 (1990) ................................................. 2, 68

*Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104 (1986) .......................................... 7

*Cincinnati Fluid Power, Inc. v. Rexnord, Inc.,* 797 F.2d 1386 (6th Cir. 1986)............................ 61

*Cities of Anaheim, Riverside, Banning, Colton, & Azusa, Cal. v. F.E.R.C.,*
   941 F.2d 1234 (D.C. Cir. 1991)........................................................ 3

*Comcast Cable Commc'ns, LLC v. FCC,* 717 F.3d 982 (D.C. Cir. 2013)................................... 12

*Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752 (1984)...................................... 45, 46, 47

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480 (5th Cir. 1984) ........................ 35

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451 (1992) ................................... 22

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155 (2004) ........................................ 68

*Ford Motor Co. v. United States,* 405 U.S. 562 (1972)........................................... passim

*Fraser v. Major League Soccer, LLC,* 284 F.3d 47 (1st Cir. 2002) ........................................ 35

*Fruehauf v. FTC,* 603 F.2d 345 (2d Cir. 1979).................................................. 4, 5, 14

*FTC v. Advocate Health Care Network,* 841 F.3d 460 (7th Cir. 2016)...................................... 3

*FTC v. Arch Coal, Inc.,* 329 F. Supp. 2d 109 (D.D.C. 2004) ................................................ 5, 18

*FTC v. Cardinal Health, Inc.,* 12 F. Supp. 2d 34 (D.D.C. 1998) ................................... 18, 26, 27

*FTC v. CCC Holdings Inc.,* 605 F. Supp. 2d 26 (D.D.C. 2009) ........................................... passim

*FTC v. Elders Grain, Inc.,* 868 F.2d 901 (7th Cir. 1989) ........................................... 3, 40

*FTC v. H.J. Heinz Co.,* 246 F.3d 708 (D.C. Cir. 2001) ........................................... passim

*FTC v. Ind. Fed. of Dentists*, 476 U.S. 447 (1986) ........................................................ 20

*FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34 (D.D.C. 2002) ............................................... 21

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) ............... 53, 54, 59

*FTC v. PepsiCo, Inc.*, 477 F.2d 24 (2d Cir. 1973) ...................................................... 69

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ........................................... passim

*FTC v. ProMedica Health Sys., Inc.*, No. 3:11-cv-47, 2011 WL 1219281
    (N.D. Ohio Mar. 29, 2011) ...................................................................................... 30

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ..................................... passim

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ...................................... 3, 17, 18

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) .......................................... passim

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004) ........... 21

*Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785 (7th Cir. 2013) ...... 42, 43

*Grundberg v. Upjohn Co.*, 137 F.R.D. 365 (D. Utah 1991) ....................................... 29

*Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964 (5th Cir. 1977) ............... 12

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986) ................................. passim

*Int'l Wood Processors v. Power Dry, Inc.*, 593 F. Supp. 710 (D.S.C. 1984) ............... 37

*International Shoe Co. v. FTC*, 280 U.S. 291 (1930) .................................................. 6

*Kirk v. Raymark Industries, Inc.*, 61 F.3d 147 (3d Cir. 1995) .................................... 29

*Kreppel v. Guttman Breast Diagnostic Inst., Inc.*, No. 95-CIV-10830,
    1999 WL 1243891 (S.D.N.Y. Dec. 21, 1999) ...................................................... 29

*Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365 (Fed. Cir. 2000) .................. 42

*McInnis v. Fairfield Comms., Inc.*, 458 F.3d 1129 (10th Cir. 2006) .......................... 62

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) ........................................... 34, 35

*Mercantile Texas Corp. v. Bd. Of Gov.'s of Fed. Reserve System*,
    638 F.2d 1255 (5th Cir. 1981) ............................................................................... 67

*Morrison v. Murray Biscuit Co.*, 797 F.2d 1430 (7th Cir. 1986) ............................... 67

*Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831 (D.C. Cir. 2006) ..................... 13

*NCAA v. Bd. of Regents*, 468 U.S. 85 (1984) ........................................................... 23

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ....................................................... 42

*Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111 (N.D. Cal. 2011) .................. 31

*Pfizer Inc. v. Teva Pharm. USA, Inc.*, No. CIV.A. 04-754 (JCL),
    2006 WL 3041102 (D.N.J. Oct. 26, 2006) ............................................................ 29

*Polygram Holding, Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005) .................................. 15

*Practice Perfect, Inc. v. Hamilton Cty. Pharm. Ass'n*, 732 F. Supp. 798
    (S.D. Ohio 1989) .................................................................................................... 37

*ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014) ...................... 67, 70

*Rosenberg v. Rosenberg*, 601 P.2d 589 (Ariz. 1979) ................................................ 43

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
    778 F.3d 775 (9th Cir. 2015) ........................................................... 53, 54, 59, 70

*Smith v. Cain*, 565 U.S. 73 (2012) ............................................................................ 3

*Smith v. United States*, 568 U.S. 106 (2013) ........................................................... 15

*Sparks v. State*, 501 S.E.2d 562 (Ga. Ct. App. 1998) .............................................. 65

*Sprint Nextel Corp. v. AT&T, Inc.*, 821 F. Supp. 2d 308 (D.D.C. 2011) .................... 32

*Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409 (1986) ..................... 71

*Stone Mountain Properties, Ltd. v. Helmer*, 229 S.E.2d 779 (Ga. Ct. App. 1976) ..... 65

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ........................... 16

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) .................................................. 23

iv

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ............................................................ 21

*Transbay Auto Serv., Inc. v. Chevron USA Inc.*, 807 F.3d 1113 (9th Cir. 2015)......................... 29

*U.S. Steel Corp. v. FTC*, 426 F.2d 592 (6th Cir. 1970) ............................................................... 15

*United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898) ....................................... 11

*United States v. Aetna, Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ........................................... passim

*United States v. Aluminum Co. of Am.*, 377 U.S. 271 (1964) ......................................................... 5

*United States v. Alzanki*, 54 F.3d 994 (1st Cir. 1995)................................................................. 62

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ...................................... passim

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) .............................................. passim

*United States v. Badger*, No. 2:10-CV-00935-RJS, 2014 WL 3533981
   (D. Utah July 16, 2014)............................................................................................................ 29

*United States v. Badger*, 818 F.3d 563 (10th Cir. 2016) ............................................................ 29

*United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C. Cir. 1990).......................... 6, 11, 14, 21

*United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966
   (N.D. Cal. Jan. 8, 2014)..................................................................................................... 8, 19

*United States v. Churn*, 800 F.3d 768 (6th Cir. 2015)................................................................ 62

*United States v. Cohen*, 631 F.2d 1223 (5th Cir. 1980)............................................................... 62

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964) ............................................................... 16

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ............................................. 21

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ....................... 4, 9, 10, 20

*United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) .............................. passim

*United States v. El Paso Nat'l Gas Co.*, 376 U.S. 651 (1964)...................................................... 5

*United States v. El Paso Nat'l Gas Co.*, 376 U.S. 651 (1964) ...................................................... 6

*United States v. Engelhard Corp.*, 126 F.3d 1302 (11th Cir. 1997) ........................................... 20

*United States v. Franklin Elec. Co., Inc.*, 130 F. Supp. 2d 1025 (W.D. Wis. 2000) ................... 63

*United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974)..................................................... 49

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) .............................. passim

*United States v. Liu*, 654 F. App'x 149 (4th Cir. 2016)............................................................... 62

*United States v. Marine Bancorp., Inc.*, 418 U.S. 602 (1974)........................................... 5, 19, 20

*United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) ..................................................... passim

*United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004)....................................... 5

*United States v. Penn-Olin Chem. Co.*, 378 U.S. 158 (1964)................................................... 2, 5

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1962) ..................................................... passim

*United States v. Quinones-Chavez*, 641 F. App'x 722 (9th Cir. 2016)........................................ 62

*United States v. Samaniego*, 345 F.3d 1280 (11th Cir. 2003) ...................................................... 5

*United States v. Third Nat'l Bank in Nashville*, 390 U.S. 171 (1968) ........................................... 5

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972)........................................................ 59

*United States v. Trans-Mo. Freight Ass'n*, 166 U.S. 290 (1897)................................................. 64

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)............................................................... 64

*United States v. Warren*, 42 F.3d 647 (D.C. Cir. 1994).............................................................. 29

*Utah Pub. Serv. Comm'n v. El Paso Nat. Gas Co.*, 395 U.S. 464 (1969) .................................. 72

*VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014).............................................. 31

*Westman Commission Co. v. Hobart International, Inc.*, 796 F.2d 1216
   (10th Cir. 1986).......................................................................................................................... 36

*Worth v. Jackson*, 451 F.3d 854 (D.C. Cir. 2006) ...................................................................... 52

**Other Authorities**

ABA Section of Antitrust Law, Mergers and Acquisitions:
  Understanding the Antitrust Issues 367 (4th ed. 2015) ................................. 11
Aviv Nevo, Deputy Assistant Att'y Gen. for Econ., Antitrust Div.,
  U.S. Dep't of Justice, Mergers that Increase Bargaining Leverage,
  Remarks at the Stanford Institute for Economic Policy Research and
  Cornerstone Conference on Antitrust in Highly Innovative Industries (Jan. 22, 2014) .......... 24
Makan Delrahim, Assistant Attorney General, Dep't of Justice, Antitrust Division,
  Remarks at Competition and Deregulation Roundtable #2 (Apr. 26, 2018) ........................... 58
S. Rep. No. 1775, 81st Cong. 2d Sess .................................................................................... 3
Statement of Chairman Pitofsky, and Commissioners Steiger and Varney,
  *In the Matter of Time Warner, Inc.*, Docket No. C-3709 (Feb. 7, 1997) ................................. 19
*United States v. Comcast Corp.*, 1:11-cv-00106 (D.D.C. Jan. 18, 2011),
  ECF No. 1 ............................................................................................................................ 19
U.S. Dep't of Justice & Fed. Trade Comm'n,
  Horizontal Merger Guidelines (2010) ....................................................................... passim
U.S. Dep't of Justice, Antitrust Division Policy Guide to
  Merger Remedies (2011) ..................................................................................................... 6
U.S. Dep't of Justice, Non-Horizontal Merger Guidelines (1984) ...................................... 9

**Statutes, Regulations, and Rules**

15 U.S.C. § 18................................................................................................................. passim
15 U.S.C. § 25....................................................................................................................... 55
47 C.F.R. § 76.1002(b)(1)..................................................................................................... 40
47 C.F.R. §76.1003 (1)(i)-(iv) .............................................................................................. 42
Federal Rule of Evidence 801(d)(2)(B) ................................................................................ 23
Federal Rule of Evidence 803(3) .......................................................................................... 50

**Treatises and Articles**

C. Scott Hemphill & Tim Wu, *Parallel Exclusion*, 122 Yale L.J. 1182 (2013).......................... 31
Derek Bok, *Section 7 of the Clayton Act and the Merging of Law and Economics*,
  74 Harv. L. Rev. 226 (1960) ................................................................................................ 3
Lawrence Sullivan & Warren Grimes, The Law of Antitrust 549
  (3d ed. 2016) ................................................................................................................. 46, 71
Michael Riordan, *Competitive Effects of Vertical Integration*, *in*
  Handbook of Antitrust Economics 145 (Paolo Buccirossi ed., 2008)............................. 26
Moore's Federal Practice ........................................................................................... 33, 34, 36
Note by the United States: Organization for Economic Cooperation
  and Development (Feb. 15, 2007)......................................................................................... 9
Oliver Hart, *Incomplete Contracts and the Theory of the Firm*, 4 J. Law, Econ.
  & Org. 119 (1988)............................................................................................................... 46
Oliver Williamson, Markets and Hierarchies: Analysis
  and Antitrust Implications (1975)...................................................................................... 46
Jon Sallett, Deputy Ass't Atty Gen'l, Antitrust Div. U.S. Dep't of Justice,
  The Interesting Case of the Vertical Merger (Nov. 17, 2016)............................................. 10
Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (4th ed. 2017) ................... passim
Restatement (Second) of Contracts (Am. Law Inst. 1981)................................................ 53
Richard A. Posner, Antitrust Law 244 (2d ed. 2001)........................................................ 31

Ronald Coase, *The Nature of the Firm*, 4 ECONOMICA 386 (1937)............................................... 47

Ronald Coase, *The Problem of Social Cost*, 3 J. L. & ECON. 1 (1960)…………………………..47

STEPHEN MARTIN, INDUSTRIAL ORGANIZATION IN CONTEXT 366 (2010).................................... 46

Steven C. Salop & Daniel P. Culley, *Revising the*
  *U.S. Vertical Merger Guidelines: Policy Issues and an Interim*
  *Guide for Practitioners*, 4 J. ANTITRUST ENFORCEMENT (2016) ............................ 24, 26, 37, 46

Steven C. Salop & Michael H. Riordan, *Evaluating Vertical Mergers:*
  *A Post-Chicago Approach*, 63 ANTITRUST L.J. 515 (1995)...................................................... 26

Steven C. Salop, *Invigorating Vertical Merger Enforcement*, YALE L.J.
  (forthcoming 2018) ................................................................................................. 10, 17, 30, 46

Thomas G. Krattenmaker, *Anticompetitive Exclusion: Raising Rivals' Costs*
  *to Achieve Power over Price*, 96 Yale L.J. 209 (1986) ........................................................... 18

## I.     Overview

1.      The United States has sued to enjoin AT&T Inc. from acquiring Time Warner

Inc., alleging that the proposed merger would violate Section 7 of the Clayton Act. 15 U.S.C.

§ 18. The United States sets forth its proposed conclusions of law below.

2.      Section II sets forth the Section 7 standard, which requires a court to determine

whether a merger threatens a reasonable probability of harm to competition and consumers.

Section III describes the burden-shifting framework that courts apply in Section 7 cases.

Section IV identifies the relevant markets in which to assess the potential competitive effects of

the proposed merger. Section V describes the law relevant to the United States' allegations that

the merger would violate Section 7 by empowering the merged entity (1) to raise the costs of

AT&T's rivals, (2) to restrict AT&T's rivals' use of Time Warner's HBO network as a

competitive tool, and (3) to impede innovation unilaterally or through coordination with

Comcast–NBCU. Section VI addresses legal issues relevant to Defendants' rebuttal arguments.

Section VII concludes that, while the Court has broad discretion, the proper remedy for the

Section 7 violation is structural relief, namely, a permanent injunction enjoining the proposed

acquisition.

## II.    Section 7 of the Clayton Act proscribes mergers that may substantially lessen competition.

3.      Section 7 of the Clayton Act provides that "[n]o person . . . shall acquire [stock or

assets] . . . where in any line of commerce or . . . in any section of the country, the effect of such

acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15

U.S.C. § 18. Section 7 applies equally to mergers of all stripes. "All mergers are within the reach

of [Section] 7, and all must be tested by the same standard, whether they are classified as

horizontal, vertical, conglomerate or other." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577

(1967). Indeed, in 1950, Congress redrafted Section 7 in part "to make plain that § 7 applied not only to mergers between actual competitors, but also to vertical and conglomerate mergers whose effect may tend to lessen competition in any line of commerce in any section of the country." *Brown Shoe Co. v. United States*, 370 U.S. 294, 316–17 (1962).

4.      "The core question is whether a merger may substantially lessen competition, and necessarily requires a prediction of the merger's impact on competition, present and future." *Proctor & Gamble*, 386 U.S. at 577. "The principal objective of antitrust policy is to maximize consumer welfare by encouraging firms to behave competitively." *United States v. Anthem, Inc.*, 855 F.3d 345, 366 (D.C. Cir. 2017) (quotation and emphasis omitted). Section 7 proscribes mergers with the potential to harm the competitive process, and thereby result in harm to consumers, including higher prices, lower quality, and reduced innovation. *See, e.g.*, *Anthem*, 855 F.3d at 361, 366–67.

**A.      To "arrest restraints of trade in their incipiency," Section 7 proscribes any merger creating a "reasonable probability" of harm.**

5.      Section 7 "creates a relatively expansive definition of antitrust liability." *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990). To establish a Section 7 violation, a plaintiff must show that a pending acquisition has a "reasonable probability" of causing anticompetitive effects. *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 175 (1964); *Cities of Anaheim, Riverside, Banning, Colton, & Azusa, Cal. v. F.E.R.C.*, 941 F.2d 1234, 1249 (D.C. Cir. 1991); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1072 (D.D.C. 1997). "A certainty, even a high probability, need not be shown," and "doubts are to be resolved against the transaction."[1]

---

[1] The Supreme Court has said that a "reasonable probability" is something less than "more likely than not." *Smith v. Cain*, 565 U.S. 73, 75 (2012) ("A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to undermine[] confidence in the

*FTC v. Elders Grain, Inc*., 868 F.2d 901, 906 (7th Cir. 1989); *FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016).

6.      As the Supreme Court explained in a vertical-merger decision, "[t]he concept of reasonable probability conveyed by these words ['may be'] is a necessary element in any statute which seeks to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act." *Ford Motor Co. v. United States*, 405 U.S. 562, 567 n.4 (1972) (quoting S. Rep. No. 1775, 81st Cong. 2d Sess. 6). As the statutory text indicates, merger review is concerned with "probabilities, not certainties," *Brown Shoe*, 370 U.S. at *323*, given that Congress "intended to arrest anticompetitive tendencies in their 'incipiency,'" *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1962) (quoting *Brown Shoe*, 370 U.S. at 317).

7.      The standard of reasonable probability embodies "Congress' view that neither the [antitrust agencies] nor the courts should be charged with possession of powers of prevision that no one else has achieved." *Fruehauf v. FTC*, 603 F.2d 345, 351 (2d Cir. 1979). Given the importance Congress attached to preventing anticompetitive mergers, and its recognition of the challenges in predicting the potential competitive effects of a merger, Section 7 does not demand "certainties." *Brown Shoe*, 370 U.S. at 315–23. "All that is necessary is that the merger create an appreciable danger of [anticompetitive] consequences in the future." *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011) (quoting *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986)).

---

outcome of the trial." (alteration in original)); Derek Bok, *Section 7 of the Clayton Act and the Merging of Law and Economics*, 74 HARV. L. REV. 226, 255 (1960) ("[I]t is hard to believe that 'reasonable probability' should be construed to mean a 51 per cent likelihood, for unique and complex events such as mergers are hardly amenable to the statistics of probability.").

8.     Defendants erroneously contend that Section 7 requires a showing that competitive harm is "likely" or "probable." Dkt. # 77 at 27, 56.[2] ***The Supreme Court has repeatedly held otherwise***, instructing that Section 7 requires only a "reasonable probability" or a "reasonable likelihood" of harm. *E.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 607 (1957) ("We repeat, that the test of a violation of [Section] 7 is whether, at the time of suit, there is a reasonable probability that the acquisition is likely to result in the condemned restraints.").[3] The very cases cited by Defendants, *see* Dkt. # 77 at 27; Dkt. # 87 at 10, make this clear. *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 622 (1974) (Section 7 proscribes mergers when "a reasonable likelihood of a substantial lessening of competition in the relevant market is shown"); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 159 (D.D.C. 2004) (finding that FTC had not shown "a reasonable probability" of harm); *Fruehauf*, 603 F.2d at 351 (requiring only a "reasonable probability" of harm); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1109 (N.D. Cal. 2004) ("To establish a section 7 violation, plaintiffs must show that a pending acquisition is reasonably likely to cause anti-competitive effects.").

9.     Other cases cited by Defendants do not carry their argument. To the extent that the quotations picked by Defendants from lower-court decisions articulate a different standard,

---

[2] This document references Defendants' pretrial brief (Dkt. # 77) and Defendants' statement on the burden of proof at trial (Dkt. # 87). The United States anticipates that Defendants will continue to advance arguments previously asserted in these filings.

[3] *Accord Penn-Olin Chem. Co.*, 378 U.S. at 171, 175; *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 280 (1964) (merger "reasonably likely to produce a substantial lessening of competition within the meaning of § 7"); *Brown Shoe*, 370 U.S. at *325* ("It is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition."); *Proctor & Gamble*, 386 U.S. at 584 (Harlan, J., concurring) ("reasonable probability" is "measure of illegality under § 7"); *cf. United States v. Third Nat'l Bank in Nashville*, 390 U.S. 171, 182–83 (1968) (holding that "the tendency of the merger substantially to lessen competition is apparent"); *United States v. El Paso Nat'l Gas Co.*, 376 U.S. 651, 657 (1964) (asking whether the merger "had a sufficient tendency to lessen competition").

*see* Dkt. # 77 at 27; Dkt. # 87 at 10, the Supreme Court's interpretation controls, of course. To

the extent *International Shoe Co. v. FTC*, 280 U.S. 291 (1930), articulates a different standard,

that decision has been superseded by later decisions interpreting Section 7 as revised in 1950.

*See Brown Shoe*, 370 U.S. at 311 (providing background on "extensive efforts" to revise Section

7 which had been "considered by many observers to be ineffective in its then existing form").

### B.      Harm from the merger need not happen immediately for Section 7 to apply.

10.      Section 7 "requires not merely an appraisal of the immediate impact of the merger

upon competition, but a prediction of its impact upon competitive conditions in the future; this is

what is meant when it is said that [Section 7] was intended to arrest anticompetitive tendencies in

their 'incipiency.'" *Phila. Nat'l Bank*, 374 U.S. at 362; *see also United States v. El Paso Nat'l*

*Gas Co.*, 376 U.S. 651, 659–62 (1964) (determining effects on "new increments of demand"

despite long-term contracts). "Predicting future competitive conditions in a given market, as the

statue and precedents require, calls for a comprehensive inquiry." *United States v. Baker Hughes,*

*Inc.*, 908 F.2d 981, 988 (D.C. Cir. 1990).

11.      "[T]he proper timeframe for evaluating the effects of the merger on future

competition must be 'functionally viewed, in the context of its particular industry.'" *United*

*States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 79 (D.D.C. 2017). An assessment limited to the near

term "fails to determine 'the probable effect of the merger upon the future as well as the present,

which the Clayton Act commands the court to examine.'" *Id.* (quotation marks omitted); *see also*

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 117–18, 121–22 (1986) (explaining that

Section 7 prohibits mergers that create a risk of predatory pricing, which "reduc[es] competition

in the long run" even though the "short-term effect . . . may be to stimulate price competition").

A court may need to look years into the future in assessing a merger, as the potential harm may

not manifest immediately. *See Aetna*, 240 F. Supp. 3d at 79 (assessing the competitive effects of the merger three years into the future).

12.     The incentives and abilities of the merged firm are important tools in predicting the effects of a merger. *See, e.g.*, *Aetna*, 240 F. Supp. 3d at 47 (evidence indicated that the merged firm would have the incentive and ability to increase quality-adjusted prices); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 62 (D.D.C. 2015) ("This elimination of competition 'can significantly enhance the ability and incentive of the merged entity to obtain a result more favorable to it, and less favorable to the buyer, than the merging firms would have offered separately absent the merger.'"); U.S. DEP'T OF JUSTICE, ANTITRUST DIVISION POLICY GUIDE TO MERGER REMEDIES 5 (2011) ("[V]ertical mergers can create changed incentives and enhance the ability of the merged firm to impair the competitive process.").

13.     Even if a market is "technologically dynamic," that fact "does not appreciably alter [the Court's] mission in assessing the alleged antitrust violations." *United States v. Microsoft*, 253 F.3d 34, 49–50 (D.C. Cir. 2001). "The Court's mission is to assess the alleged antitrust violations presented, irrespective of the dynamism of the market at issue." *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966, at *76 (N.D. Cal. Jan. 8, 2014).

**C.     A Section 7 plaintiff does not need to quantify the potential harm.**

14.     Section 7 imposes "no definite quantitative or qualitative tests." *Brown Shoe*, 370 U.S. at 321. Indeed, it "reflects a conscious avoidance of exclusively mathematical tests" and liability can rest on findings "couched in general language." *Brown Shoe*, 370 U.S. at 321 n.36.

15.     "A predictive judgment, necessarily probabilistic and judgmental rather than demonstrable, is called for." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C. Cir. 2001); *see also Hosp. Corp.*, 807 F.2d at 1389 ("Section 7 does not require proof that a merger or other

acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future."). Indeed, "in the great majority of cases we can do no better than play a hunch about the magnitude of the competitive harms resulting from a merger." PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 976c1 (4th ed. 2017). As evidence mounts, "we can be increasingly confident that the merger is 'harmful on balance,' but drawing this conclusion is hardly the same thing as *quantifying* the degree of harm." AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 976c1.

16.     Thus, courts find liability under Section 7 without finding the specific magnitude of the potential harm, regularly without even discussing specific evidence of the amount of the potential price increase or other potential harm. *E.g.*, *H & R Block*, 833 F. Supp. 2d at 81–88 (D.D.C. 2011) (finding "a reasonable likelihood of unilateral effects" even though the United States' quantification of the likely effects was "imprecise"). In fact, some types of harm—e.g., a loss in "product variety, quality, [or] innovation"—are not susceptible to quantification. *Anthem*, 855 F.3d at 370; *accord FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1086 (N.D. Ill. 2012) (holding that the risk that a merger will induce adverse coordinated effects may not be susceptible to quantification or detailed proof). But an economic analysis quantifying the potential price increase from a merger (or other quantitative evidence) can aid a court in making an overall assessment of a merger's potential competitive effects. *See infra* Section V.A.

**D.     Section 7 does not contain an exemption for "minor" price increases.**

17.     Defendants' argument that "minor price increases" (as measured on a per-consumer basis) do not constitute "substantial" harm under Section 7 misconstrues the text, purpose, and precedent of Section 7. *See* Dkt. # 77 at 46. If accepted, such an argument would undermine a broad swath of antitrust enforcement: even mergers inflicting the largest harm on the economy would pass Section 7 scrutiny if only the harm is dispersed across enough victims.

18.     Section 7 prohibits any acquisition the effect of which "may be substantially to lessen competition." 15 U.S.C. § 18. Thus, Section 7 applies where "competition" is lessened substantially, not only where each consumer's welfare is lessened substantially. "Substantiality," the Supreme Court has confirmed, "can be determined only in terms of the market affected" because competition occurs on a market-wide basis. *E.I. du Pont*, 353 U.S. at 593.; *see also Brown Shoe*, 370 U.S. at 324 (same).[4] Thus, in assessing substantiality, the Supreme Court has considered the scope of the relevant market and the breadth of the merger's impact on that market, but not the bottom-line effect on any individual consumer. *See E.I. du Pont*, 353 U.S. at 595–96.

19.     The Supreme Court has held that a merger can violate Section 7 by harming competition in the sale of an input that is only a small part of a final consumer product. Most notably, in *Ford Motor Co. v. United States*, the Supreme Court enjoined a car manufacturer from acquiring a spark plug manufacturer. 405 U.S. 562, 570–71 (1972). Even though the spark plug is only a small part of the car ultimately purchased by consumers, the Supreme Court found that the merger violates Section 7 because the manufacturer "would have every incentive" to take actions that would "act as a clog on competition." *Ford Motor*, 405 U.S. at 570–71.

20.     More broadly, Defendants' proposed safe harbor for "minor price increases" would be contrary to the foundational premise of merger law, which is "to arrest anticompetitive tendencies in their 'incipiency.'" *Phila. Nat'l Bank*, 374 U.S. at 362 (quoting *Brown Shoe*, 370 U.S. at 317, 322). Additionally, Section 7 does not require any quantification of harm from a price increase, *see supra* Section II.C, and it would be perverse to penalize a plaintiff that does provide a quantification of the potential price increase, in order to aid the court in its holistic

---

[4] *Cf. NYNEX v. Discon, Inc.*, 525 U.S. 128, 137 (1998) (noting that it is "the competitive process that the antitrust laws seek to encourage").

analysis, by imposing some arbitrary threshold of harm (and to create a safe harbor when the

harm is a price increase but not for other harms). And Defendants' rule would have courts "set

sail on a sea of doubt," *see United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 284 (6th Cir.

1898) (Taft, J.), by requiring them to make unguided judgments about whether harm to an

individual consumer in a particular case is "minor."[5]

> ### E.      The same Section 7 standards apply to horizontal and vertical mergers.

21.      Defendants incorrectly maintain that a different set of standards applies because

this case involves a vertical merger and not a horizontal merger. The text of Section 7 and

Supreme Court precedent foreclose Defendants' argument. The same statutory language applies,

regardless of the categorization of the merger. Accordingly, the Supreme Court has instructed

that all mergers "must be tested by the same standard, whether they are classified as horizontal,

vertical, conglomerate." *Procter & Gamble*, 386 U.S. at 577.

22.      Nor do differences between vertical and horizontal mergers justify disparate

treatment. Vertical mergers "are less likely than horizontal mergers to create competitive

problems." U.S. DEP'T OF JUSTICE, NON-HORIZONTAL MERGER GUIDELINES § 4 (1984). But, like

vertical mergers, most horizontal mergers do not threaten competitive harm, and some enable the

merged firm to realize efficiencies that benefit consumers. *See, e.g.*, U.S. DEP'T OF JUSTICE &

FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES ("Merger Guidelines") § 1 (2010).

And, critically, like horizontal mergers, vertical mergers can inflict serious competitive harm

---

[5] For example, is the price increase measured in absolute terms (e.g., a price increase of less than
a dollar of year qualifies for the safe harbor), or on a percentage basis (e.g., a price increase of
less than 1% qualifies for the safe harbor), or both? Does the threshold differ based on the total
number of consumers impacted? Does the threshold differ based on when and how long the price
increase would occur? *Cf. Baker Hughes*, 908 F.2d at 988 ("Our uncertainty over the meaning
and implications of [a proposed new standard] makes us all the more resistant to the imposition
of such a requirement.").

under certain conditions. *E.g.*, *Brown Shoe*, 370 U.S. at 323 (explaining that the "primary vice of a vertical merger . . . is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a clog on competition" (quotation marks omitted)); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 985 (5th Cir. 1977) (finding that a vertical merger virtually precluded the plaintiff from selling any of its products). Thus, no matter its category, the very point of a trial is to engage in a fact-intensive inquiry in order to determine whether the particular merger at hand indeed has a reasonable likelihood of harming competition and consumers.[6]

23.     There is no presumption in the law that vertical mergers are "presumed pro-competitive," Dkt. # 77 at 29, or "presumptively efficient," Dkt. # 87 at 12,[7] such that the government would face a heightened burden of proof. Some scholars have in fact suggested the opposite. George J. Stigler, *Mergers and Preventive Antitrust Policy*, 104 U. PENN. LAW. REV. 176, 183 (1955) ("Where a firm has a fifth or more of an industry's output, its acquisition of more than five to ten per cent of the output capacity of industries to which it sells or from which it buys in appreciable quantities shall be presumed to violate the statute."); *cf. In re Applications for Consent to the Assignment and/or Transfer of Control of Licenses Adelphia Commc'ns Corp. et al. to Time Warner Cable Inc. et al.*, 21 F.C.C. Rcd. 8203, 8269 (2006) ("[W]e believe that

---

[6] *See, e.g.*, Steven C. Salop, *Invigorating Vertical Merger Enforcement*, YALE L.J. (forthcoming 2018) (manuscript at 13) ("in the real world of imperfectly competitive markets, the direction of the net competitive effect is a question of fact, not theory," and analysis "should be balanced and fact-based"); Jon Sallett, Deputy Ass't Atty Gen'l, Antitrust Div. U.S. Dep't of Justice, The Interesting Case of the Vertical Merger 2 (Nov. 17, 2016) ("we must go beyond simply the vertical nature of the business relationship to pose a series of questions about markets and competitive effects").

[7] The cases cited by Defendants make the well-accepted point that vertical integration often is procompetitive—while acknowledging that it can be anticompetitive. *See Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 990–91 (D.C. Cir. 2013) (Kavanaugh, J., concurring); *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006).

price increases of five percent or more would likely harm rival MVPDs' ability to compete and/or be passed on to consumers in some form, such as increased rates or reductions in quality or customer service.").

### III.     Courts analyze Section 7 claims through a burden-shifting framework.

24.     "A burden-shifting analysis applies to consider the merger's effect on competition." *Anthem*, 855 F.3d at 349. To establish a prima facie case, the plaintiff must (1) define the relevant market and (2) show that the merger has a "reasonable probability" of an anticompetitive effect in that market. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 191 (D.D.C. 2017). Once the plaintiff makes a prima facie case, the burden shifts to the defendant to produce evidence to rebut the case. *Anthem*, 855 F.3d at 349. "Upon rebuttal by the defendant, 'the burden of producing additional evidence of anticompetitive effect shifts to the [plaintiff], and merges with the ultimate burden of persuasion, which remains with the [plaintiff] at all times.'" *Anthem*, 855 F.3d at 350 (quoting *Baker Hughes*, 908 F.2d at 983). The plaintiff must prove a Section 7 violation by a preponderance of the evidence. *Aetna*, 240 F. Supp. 2d at 19.

25.     "[T]here are no precise formulas for determining whether a vertical merger may probably lessen competition." *Fruehauf*, 603 F.2d at 353 (citing *Brown Shoe*, 370 U.S. 294). Instead, vertical mergers are judged on a case-by-case basis considering the totality of the circumstances, *see Brown Shoe*, 370 U.S. at 329 (undertaking "an examination of various economic and historical factors in order to determine whether the arrangement under review is of the type Congress sought to proscribe"), and the government makes its prima facie case with case-specific evidence of a danger of future competitive harm, ABA SECTION OF ANTITRUST LAW, MERGERS AND ACQUISITIONS: UNDERSTANDING THE ANTITRUST ISSUES 367 (4th ed. 2015)

("Current antitrust treatment of vertical mergers tends to be fact specific, with emphasis on whether a likelihood of harm can be demonstrated in the particular transaction.").[8]

26.     Defendants erroneously argue that the Section 7 burden-shifting framework does not apply in vertical-merger cases (and, in fact, that there is no burden-shifting at all). Dkt. # 77 at 29. Burden shifting is common across antitrust law, including in actions challenging vertical mergers and vertical restraints.[9] Further, the burden-shifting framework serves the same purposes in a vertical-merger case as it does in a horizontal-merger case. Namely, antitrust defendants have information about potential pro-competitive effects (such as efficiencies, as well as any remedies they propose) uniquely in their possession. If the burden never shifts to the defendants, the plaintiff would be in the untenable position of, for example, having to guess the type and amount of benefits and other savings the defendants may ultimately claim, and the manner in which the defendants expect to realize those savings, or the particulars of a remedy fashioned unilaterally by the defendants. *See Smith v. United States*, 568 U.S. 106, 112 (2013) ("'[W]here the facts with regard to an issue lie peculiarly in the knowledge of a party,' that party is best situated to bear the burden of proof." (citation omitted)); AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 970c2 ("Placing the burden of [proving efficiencies] on defendants is sensible

---

[8] *Cf. Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 433 (5th Cir. 2008) ("The Government also provided ample other evidence [than market-concentration statistics] to establish its strong *prima facie* case, such as customer testimony, history of the market, and [the merging parties'] internal documents.").

[9] *E.g.*, *Anthem*, 855 F.3d at 349–50 (applying a burden-shifting framework for a Section 7 claim against a horizontal merger); *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506–07 (2d Cir. 2004) (same for a Sherman Act Section 1 claim against a vertical restraint); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (same for a Sherman Act Section 2 claim against anticompetitive conduct); *see also U.S. Steel Corp. v. FTC*, 426 F.2d 592, 609 (6th Cir. 1970) (holding in a Section 7 action against a vertical merger that the defendants bear the burden of proving the failing firm defense); *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 36 (D.C. Cir. 2005) (approving a burden-shifting framework applied by the FTC).

because they are in the best position to have knowledge of the types and magnitude of

efficiencies that will be gained . . . .").

IV.   **The law on relevant markets supports the United States' defined markets for
Multichannel Video Distribution and All Video Distribution in Local Footprint
Overlap Zones.**

27.    "A court may enjoin a merger based on proof of probable harm to any market

alleged." *Anthem*, 236 F. Supp. 3d at 193; *see also United States v. Cont'l Can Co.*, 378 U.S.

441, 461–62 (1964) (horizontal merger creating firm with 25% share in the relevant market held

unlawful because change from transaction made harm more likely). A relevant market has two

dimensions: product and geographic area. *Anthem*, 236 F. Supp. 3d at 193. "Congress prescribed

a pragmatic, factual approach to the definition of the relevant market, not a formal, legalistic

one." *Brown Shoe*, 370 U.S. at 336. "This is because '[t]he "market," as most concepts in law or

economics, cannot be measured by metes and bounds.'" *Anthem*, 236 F. Supp. 3d at 193 (quoting

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953)).

A.   **Courts rely on expert testimony and the *Brown Shoe* factors to define
product markets.**

28.    Relevant markets are defined by "reasonable interchangeability of use or the

cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370

U.S. at 325. Market definition is an inquiry into "whether two products can be used for the same

purpose, and if so, whether and to what extent purchasers are willing to substitute one for the

other." *Anthem*, 236 F. Supp. 3d at 194 (quotation marks omitted).

29.    Courts look to two types of evidence in defining the product market: "the

'practical indicia' set forth in *Brown Shoe* and testimony from experts in the field of economics."

*Sysco*, 113 F. Supp. 3d at 27.

30.     Courts give substantial weight to economic analysis in defining markets. *See, e.g.*, *Anthem*, 236 F. Supp. 3d at 198–99; *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 121–22 (D.D.C. 2016). Expert economists normally apply the Hypothetical Monopolist Test (HMT) set out in the Merger Guidelines. The HMT asks whether a profit-maximizing monopolist of all products within a proposed market likely would apply a "small but significant and nontransitory increase in price" (known as a SSNIP) on at least one product sold by the merging firms. *See Staples*, 190 F. Supp. 3d at 121–22.

31.     In *Brown Shoe*, the Supreme Court explained that the contours of a product market can be determined by examining such factors as "[1] industry or public recognition of the [relevant market] as a separate economic entity, [2] the product's peculiar characteristics and uses, [3] unique production facilities, [4] distinct customers, [5] distinct prices, [6] sensitivity to price changes, and [7] specialized vendors." 370 U.S. at 325. Courts in this District routinely consider these factors in defining the product market. *Staples*, 190 F. Supp. 3d at 118 (collecting cases).

32.     Within the "outer bounds" of a "broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325. Courts employ the same legal standards when analyzing submarkets. *Staples*, 970 F. Supp. at 1093 n.11 ("Whatever term is used—market, submarket, relevant product market—the analysis is the same."). Proof of harm in a submarket establishes a violation of Section 7. *See, e.g.*, *Staples*, 970 F. Supp. at 1075, 1080 (defining a submarket for consumable office supplies sold by office superstores within a broader retail office supplies market); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 47, 66 (D.D.C. 1998) ("the services provided by wholesalers in fact comprise a distinct submarket within the larger market of drug delivery").

14

**B.      Multichannel Video Distribution is a relevant product market.**

33.      Both the HMT and the *Brown Shoe* factors establish that the Multichannel Video

Distribution market is a relevant product market. *See* PFOF § II.A.1–.2.

**C.      All Video Distribution is a relevant product market.**

34.      Both the HMT and the *Brown Shoe* factors establish that the All Video

Distribution market is a relevant market. The Multichannel Video Distribution market is a

submarket within the All Video Distribution market. *See* PFOF § II.A.3.

**D.      Local Footprint Overlap Zones are relevant geographic markets.**

35.      The relevant geographic market is "the region in which the seller operates, and to

which the purchaser can practicably turn for supplies." *Arch Coal*, 329 F. Supp. 2d at 123

(quotation marks omitted). The inquiry is a "pragmatic, factual approach," rather than "a formal,

legalistic one," and a relevant geographic market must "correspond to the commercial realities of

the industry and be economically significant." *Brown Shoe*, 370 U.S. at 336–37. "The Supreme

Court has recognized that 'an element of fuzziness would seem inherent in any attempt to

delineate the relevant geographical market,' and therefore 'such markets need not—indeed

cannot—be defined with scientific precision.'" *Sysco*, 113 F. Supp. 3d at 48 (quoting *United

States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974) (quoting *Phila. Nat'l Bank*, 374 U.S. at 360

n.37)).

36.      If firms can discriminate on price based on customer location, geographic markets

may be based on the locations of targeted customers. *See United States v. Bazaarvoice, Inc.*, No.

13-CV-00133-WHO, 2014 WL 203966, at *30 (N.D. Cal. Jan. 8, 2014) ("Where, as here, a

hypothetical monopolist could price discriminate, i.e., set different prices for different customers

based on customer location, the geographic market is based on the location of the customers, not

the suppliers."); Merger Guidelines § 4.2.2 ("When the hypothetical monopolist could discriminate based on customer location, the Agencies may define geographic markets based on the locations of the targeted customers.").

37.     Pay-TV consumers in different areas of the country must choose between video distributors that offer service to their homes, so pay-TV competition occurs at a local level, and MVPDs compete only against distributors in their footprint or franchise area. PFOF § II.B. Because suppliers can identify a customer's location and set prices based on that location, Local Footprint Overlap Zones are relevant geographic markets. *See* PFOF § II.B.

> **E.     Defendants' argument that the United States must demonstrate market power is meritless.**

38.     Defendants' erroneously contend that the United States must not only define "downstream" distribution markets but also (1) define an "upstream" programming market and (2) show that Time Warner has "substantial market power" in that market. Dkt. # 77 at 29–30, 50–52. Defendants' arguments contravene both Section 7's text and precedent.

39.     Section 7 proscribes any merger that is likely to harm competition substantially in "any line of commerce" in "any section of the country." 15 U.S.C. § 18. Thus, under the plain text of the statute, the United States need define only one relevant market and show that competitive harm may arise there.

40.     Defendants' argument for a second market-definition exercise rests on the mistaken assertion that "determining market power requires identifying the market in which the power is created." Dkt. # 77 at 30. However, the opinions that Defendants cite for their assertion demonstrate only that the United States must define a relevant market. *See United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 618–23 (1974) (defining banking in Spokane, Washington, as the sole relevant market); *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593

(1957) ("Determination of *the relevant market* is a necessary predicate to a finding of a violation

of the Clayton Act . . . ." (emphasis added)); *United States v. Engelhard Corp.*, 126 F.3d 1302,

1306 (11th Cir. 1997) (describing the method for "determining *the relevant market*" (emphasis

added)). In this action, the United States has satisfied this relevant-market obligation by defining

downstream markets. *See supra* Sections IV.B–IV.D; PFOF § II.

41.     Nor have Defendants mustered any authority for their argument that Section 7 has

an unavoidable market-power requirement. Defendants cite a few Section 7 cases discussing

market power generally, but Defendants have missed the basic point. "[T]he purpose of the

inquiries into market definition and market power is to determine whether an arrangement has

the potential for genuine adverse effects on competition" and "is but a surrogate for detrimental

effects." *FTC v. Ind. Fed. of Dentists*, 476 U.S. 447, 460–61 (1986) (quotation marks omitted).

"'Proof of actual detrimental effects, such as a reduction of output,' can [therefore] obviate the

need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" *FTC v.

Libbey, Inc.*, 211 F. Supp. 2d 34, 49 (D.D.C. 2002) (alteration in original); *accord Geneva

Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 509 (2d Cir. 2004) (holding that if a

plaintiff challenging a vertical restraint "can demonstrate an actual adverse effect on competition

. . . , there is no need to show market power in addition"); *see also Toys "R" Us, Inc. v. FTC*,

221 F.3d 928, 937 (7th Cir. 2000) (explaining that a plaintiff can demonstrate market power

"through direct evidence of anticompetitive effects"). The text of Section 7, which targets

mergers that may "lessen competition," exhibits this principle.

42.     To insist on an independent proof of market power despite a demonstrated

likelihood of anticompetitive harm would contravene the basic principle that "economic realities

rather than a formalistic approach must govern review of antitrust activity." *United States v.

Dentsply Int'l, Inc.*, 399 F.3d 181, 189 (3d Cir. 2005); *accord Baker Hughes*, 908 F.2d at 988

(explaining that litigants should not "improperly narrow the Section 7 inquiry, channeling what should be an overall analysis of competitiveness into a determination of whether a [party] has shown particular facts"). Because the United States has demonstrated reasonably probable competitive effects, *see infra* Sections V–VI; PFOF §§ IV–V, no need exists to demonstrate market power separately.[10]

43.    Although neither law nor economics require it, the United States has indeed demonstrated Time Warner's market power.[11] Market power "is the power to force a purchaser to do something that he would not do in a competitive market," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) (quotation marks omitted), or "the ability to raise

---

[10] The economic literature comports with the legal precedent. That is, the United States need not demonstrate an upstream market or upstream market power because a vertically integrated firm can raise rivals' costs even without market power. Thomas G. Krattenmaker, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price*, 96 Yale L.J. 209, 224 (1986) ("Raising rivals' costs can be a particularly effective method of anticompetitive exclusion. This strategy . . . need not require classical market power as a prerequisite for its success . . . ."); *id.* at 251 (observing that a firm attempting to raise its rivals' costs "need not enjoy or acquire traditional market power to gain the ability to price above pre-exclusionary-rights competitive levels"). Further, even if market power were required to inflict anticompetitive harm, the United States would still not need to demonstrate that Time Warner has market power because the merger itself "can lead the merged firm to achieve . . . market power." Steven C. Salop, *Invigorating Vertical Merger Enforcement*, YALE L.J. (forthcoming 2018) (manuscript at 14), https://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=3020&context=facpub; *cf.* Merger Guidelines § 1 ("[M]ergers should not be permitted to create . . . market power.").

[11] Defendants half-heartedly assert that the United States must show not only that Time Warner has market power but also that AT&T has market power. Dkt. # 77 at 29–30, 50–52. Defendants' single authority—an out-of-context quotation from *Auburn News Co. v. Providence Journal Co.*, 659 F.2d 273 (1st Cir. 1981)—does not sustain their argument. Read in context, *Auburn News* recognizes that vertical integration can enable a firm with market power in only one market to inflict competitive harm on an upstream or downstream market. *See Auburn News*, 659 F.2d at 278 ("[M]onopoly at one level of the production-distribution continuum may carry with it the ability to affect competition in earlier or later phases."). Nonetheless, even if Defendants' have interpreted *Auburn News* accurately, the assertion they quote is dicta that lacks explanation, cites no precedent, and has not been followed by any other court.

prices above those that would be charged in a competitive market," *NCAA v. Bd. of Regents*, 468

U.S. 85, 109 n.38 (1984).

44.     The lynchpin in determining whether Time Warner has market power is therefore

whether its programming is sufficiently important as to enable Time Warner to cause "an actual

adverse effect on competition." *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001)

(Sotomayor, J.) ("If a plaintiff can show that a defendant's conduct exerted an actual adverse

effect on competition, this is a strong indicator of market power."). In this trial, the United States

has demonstrated that Time Warner has these abilities by presenting evidence that, among other

things, (1) Turner's unique, "must have" content is very important to viewers; (2) Turner has

exclusive rights to popular sports programming; (3) Turner's core networks are among the most

widely distributed cable networks; (4) without Turner content, a significant number of

subscribers would switch distributors in order to access Turner programming; (5) Turner obtains

high affiliate fees from MVPDs and virtual MVPDs; (6) Turner's affiliate fees have steadily

increased for years; and (7) the merger will cause hundreds of millions of dollars in annual harm

to the United States' economy. PFOF §§ IV.B.1, IV.B.2.b.ii–.iii. This is consistent with how the

FCC, the Department of Justice, and the Federal Trade Commission have all analyzed potential

harm in prior vertical mergers in the pay-TV industry. *See, e.g.*, *In the Matter of Applications of*

*Comcast Corp., Gen. Elec. Co. & NBC Universal, Inc.*, 26 FCC Rcd. 4238, ¶¶ 36–37 (2011)

(FCC holding that Comcast could disadvantage downstream rivals because the proposed joint

venture controlled "marquee programming" that was "important to Comcast's competitors and

without good substitutes from other sources," and because without NBCU content, "other

MVPDs likely would lose significant numbers of subscribers"); Complaint ¶¶ 48–50, *United*

*States v. Comcast Corp.*, 1:11-cv-00106 (D.D.C. Jan. 18, 2011), ECF No. 1 (alleging that NBCU

programming was "important" for MVPD and OVD rivals); Complaint ¶¶ 4, 9, *In the Matter of*

*Time Warner, Inc.*, File No. 961-0004 (Feb. 7, 1997) (FTC alleging that HBO and Turner content

was "'marquee' or 'crown jewel' service, i.e., those services necessary to attract and retain a

significant percentage of their subscribers"), https://www.ftc.gov/sites/default/files/documents/

cases/1997/02/c3709cmp.pdf; Statement of Chairman Pitofsky, and Commissioners Steiger and

Varney, *In the Matter of Time Warner, Inc.*, Docket No. C-3709 (Feb. 7, 1997) ("To state the

matter simply, the launch of a new 'Billiards Channel,' or 'Ballet Channel,' or the like will

barely make a ripple on the shores of the marquee channels through which Time Warner can

exercise market power."), https://www.ftc.gov/sites/default/files/documents/cases/c-3709_

statement_of_chairman_pitofsky_and_commissioners_steiger_and_varney.html.

45.     In short, Time Warner's market power stems from distributors' belief that its

content is "must have." Without a close substitute for this "must have" content, AT&T and Time

Warner could raise the price of programming above competitive levels, harming MVPDs who

can ill afford to do without content that they view as "must have." *See United States v. Microsoft

Corp.*, 253 F.3d 34, 56–57 (D.C. Cir. 2001) ("Structural market power analyses are meant to

determine whether potential substitutes constrain a firm's ability to raise prices above the

competitive level . . . .").

## V.     A vertical merger may substantially lessen competition by giving the merged firm the incentive and ability to disadvantage its rivals.

46.     A "primary vice" of a vertical merger is that, by giving the merged firm control of

a competitively significant supplier or customer, "the arrangement may act as a clog on

competition." *Brown Shoe*, 370 U.S. at 324 (quotations marks and citations omitted). In

particular, a vertical merger may reduce competition by "foreclosing competitors of the

purchasing firm in the merger from access to a potential source of supply, or *from access on*

*competitive terms.*" *Yankee Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 673 (S.D.N.Y. 2002) (emphasis added).

47.     The effect of the merger may be substantially to lessen competition by empowering the merged firm to use Time Warner content to limit competition from MVPDs and virtual MVPDs. *See* PFOF §§ IV–V.

> **A.     Courts use real-world objective evidence, supported by expert testimony, to assess the potential competitive effects of a merger.**

48.     In determining whether a merger is reasonably likely to result in competitive harm, the Court can rely on several forms of evidence, including objective documentary evidence from the industry; fact testimony, especially from non-party fact witnesses; and expert testimony, especially to the extent it comports with other evidence.

49.     Two important forms of evidence of anticompetitive harm are (1) testimony from fact witnesses, especially non-party witnesses from this industry, and (2) ordinary course-of-business documents, including those generated by the defendants. *E.g.*, *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 132–33 (D.D.C. 2016) (predicting harm based on customer testimony and the defendants' "own documents created in the ordinary course of their business"); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 64–65, 69–79 (D.D.C. 2015) (predicting harm based on "[t]he parties' ordinary course documents" and testimony from a "number of industry actors"); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 63–64 (D.D.C. 1998) (finding that "Defendants' own internal documents and public statements" were "compelling" evidence of likely competitive harm); *Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208, 1212–13, 1219 (11th Cir. 2012) (affirming an FTC decision on a violation of Section 7 based on testimony of customers and documents from the defendant).

50.     Indeed, the United States can establish its prima facie case based on this evidence

alone. *See, e.g.*, *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 433 (5th Cir. 2008) (finding

that the government presented a "strong *prima facie* case" based on evidence "such as customer

testimony, history of the market, and [the defendant's] internal documents"). Here, the United

States established its prima facie case through, among other things, the testimony of 7 third-party

witnesses from this industry; admissions from Defendants' witnesses; Defendants' ordinary

course business documents; and testimony from the United States' economic expert witness,

Professor Carl Shapiro.  *See* PFOF IV–V.

51.     Evidence of anticompetitive intent can also form the basis of a court's prediction

of harm. *See, e.g.*, *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 717 (D.C. Cir. 2001) (relying the

acquiring company's internal documents showing that it entered the merger "to end the vigorous

wholesale competition with [a competitor]"); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1220

n.27 (11th Cir. 1991) (relying on evidence showing that "appellees, *by their own admissions*,

intend[ed] to eliminate competition through the proposed acquisition"); *Cardinal Health*, 12 F.

Supp. 2d at 63–64 (relying on internal documents explaining that the merger would "curb

downward pricing pressure[]"). Evidence of intent can be highly probative "because knowledge

of intent may help the court to interpret the facts and to predict consequences." *Graphic Prods.

Distribs., Inc. v. Itek Corp.*, 717 F.2d 1560, 1573 (11th Cir. 1983) (quoting *Chi. Bd. of Trade v.

United States*, 246 U.S. 231, 238 (1918)). Here, Defendants' internal documents that predate the

merger announcement provide evidence of Defendants' appreciation of the anticompetitive

effects of this transaction. *See* PFOF § III.[12]

---

[12] Of course, an absence of evidence demonstrating anticompetitive intent—especially when the
acquiring company is, like AT&T, seasoned in acquisitions—suggests nothing. "[P]rospective
merging firms, unless oblivious of the law, will rarely be so foolish as to make discoverable
statements that are so damaging." AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 964c.

52.     Similarly, Defendants' statements made in external filings with governmental authorities can also be considered as evidence of Defendants' understanding of the anticompetitive effects that result from this transaction. *United States v. AT&T Co.*, 498 F. Supp. 353, 356–58 (D.D.C. 1980) (admitting in an antitrust trial judicially noticed statements made "at proceedings before the FCC" against the party who had made them); *see also, e.g.*, PFOF § III.

53.     Expert testimony can also aid the court in interpreting the potential competitive effects of a merger, confirming real-world evidence. *See, e.g.*, *United States v. H & R Block*, 833 F. Supp. 2d 36, 88 (D.D.C. 2011) (results of an economic model "tend to confirm the Court's conclusions based upon the documents, testimony, and other evidence in this case"); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 47 (D.D.C. 2017) (relying on an economic model "in part because its results [were] consistent with the other evidence regarding the likely competitive effects of the proposed merger"). Economic models need not provide precision and can provide useful assistance to the Court even with their limitations. *Sysco*, 113 F. Supp. 3d at 64; *Aetna*, 240 F. Supp. 3d at 46–47; *H & R Block*, 833 F. Supp. 2d at 88. Indeed, "any model is inherently a simplification of the real world," but economic models nonetheless help courts assess the potential competitive effects of a merger. *H & R Block*, 833 F. Supp. 2d at 88; *see also Sysco*, 113 F. Supp. 3d at 67 (relying on an economic model as "a reasonable approximation" of the real world); *Aetna*, 240 F. Supp. 3d at 39 (defining a relevant market even though "the Court [did] not (and [did] not need to) adopt [the supporting expert's] analysis in every detail").

54.     Antitrust economic analysis—including analysis endorsed by DirecTV— commonly relies on Nash bargaining models. *E.g.*, PX0001-083 (DirecTV's economist telling the FCC that the Nash bargaining "framework can be applied to estimate the impact on license

fees for national cable programming")[13]; Aviv Nevo, Deputy Assistant Att'y Gen. for Econ.,

Antitrust Div., U.S. Dep't of Justice, Mergers that Increase Bargaining Leverage, Remarks at the

Stanford Institute for Economic Policy Research and Cornerstone Conference on Antitrust in

Highly Innovative Industries (Jan. 22, 2014) (transcript available at https://www.justice.gov/atr/

file/517781/download); Steven C. Salop & Daniel P. Culley, *Revising the US Vertical Merger*

---

[13] Because DirecTV submitted this economist's analysis to the FCC as persuasive authority, DirecTV adopted the analysis under Federal Rule of Evidence 801(d)(2)(B). *Grundberg v. Upjohn Co.*, 137 F.R.D. 365, 369–71 (D. Utah 1991) (admitting expert reports against a party under Rule 801(d)(2)(B) because the party had "submit[ed] them to the FDA as a basis for approval of [a drug]"); *Pfizer Inc. v. Teva Pharm. USA, Inc.*, No. CIV.A. 04-754 (JCL), 2006 WL 3041102, at *4–5 (D.N.J. Oct. 26, 2006) (same for expert affidavits that the party had used "to support its European patent application"); *United States v. Badger*, No. 2:10-CV-00935-RJS, 2014 WL 3533981, at *8–9 (D. Utah July 16, 2014) (same for a fax and expert report that the party had provided "to his attorney, who in turn provided them to the SEC"), *rev'd in part on other grounds*, 818 F.3d 563 (10th Cir. 2016); *cf. United States v. Warren*, 42 F.3d 647, 655 (D.C. Cir. 1994) (same for a police officer's statements that the party had "submitted to a federal magistrate"); *Transbay Auto Serv., Inc. v. Chevron USA Inc.*, 807 F.3d 1113, 1115, 1118–22 (9th Cir. 2015) (citing *Grundberg*, 137 F.R.D. 365) (same for an appraisal that the party had submitted to a bank).

Citing *Kirk v. Raymark Industries, Inc.*, 61 F.3d 147 (3d Cir. 1995), counsel for Defendants asserted that the law "quite clear[ly]" contradicts this precedent. Tr. 3948:1–4. However, as several courts have observed in circumstances similar to this, *Kirk* is inapposite on both the facts and the litigation posture. *E.g.*, *Pfizer*, 2006 WL 3041102, at *5 n.6; *Kreppel v. Guttman Breast Diagnostic Inst., Inc.*, No. 95-CIV-10830, 1999 WL 1243891, at *1–3 & n.1 (S.D.N.Y. Dec. 21, 1999). As to the litigation posture, the proponent in *Kirk* offered an expert report as a statement "authorized" by the opposing party under Rule 801(d)(2)(C). *Kirk*, 61 F.3d at 163. By contrast, the United States offers the DirecTV expert's analysis as a statement "adopted" by an opposing party under Rule 801(d)(2)(B). As to the facts, *Kirk* assessed the admissibility of an expert's earlier testimony at trial. *Kirk*, 61 F.3d at 163–64. *Kirk* did not indicate "whether the testimony was on direct or cross-examination, and there was no suggestion that the defendant had adopted this particular testimony. Hence, the only theory for deeming it an admission was the notion that the witness had been an agent of the defendant by virtue of his status as an expert." *Kreppel*, 1999 WL 1243891, at *2. *Kirk* merely held that an expert's live testimony is not "automatic[ally]" imputed to the party that hired the expert. *Kreppel*, 1999 WL 1243891, at *2. By contrast, the DirecTV expert's analysis was not unfiltered, live testimony but a formal writing that DirecTV had reviewed and approved. *See Pfizer*, 2006 WL 3041102, at *5 n.6 ("[E]xpert testimony offered at trial differs significantly, in form and function, from expert affidavits submitted in support of a patent application."); *Kreppel*, 1999 WL 1243891, at *2 (contrasting live expert testimony with the report of an expert who subsequently appeared on a party's witness list).

*Guidelines: Policy Issues and an Interim Guide for Practioners*, 4 J. ANTITRUST ENFORCEMENT 1, 22 n.70 (2016) (describing the use of the Nash Bargaining equilibrium in analyzing vertical mergers); *see also FTC v. ProMedica Health Sys., Inc.*, No. 3:11-cv-47, 2011 WL 1219281, at *16–19 (N.D. Ohio Mar. 29, 2011) (finding that the merger would enhance the acquired company's bargaining leverage and enable the company to "obtain higher rates than it could on its own"). Indeed, DirecTV itself successfully encouraged the FCC to embrace Nash bargaining to assess the competitive effects of the Comcast–NBCU merger. *In the Matter of Applications of Comcast Corp., Gen. Elec. Co. & NBC Universal, Inc.*, 26 FCC Rcd. 4238, ¶39 (2011) ("To determine the likely magnitude of any post-transaction price changes, we adopt a Nash bargaining model originally proposed by . . . DIRECTV.").

55.     The thrust of Defendants' argument against the Nash bargaining model is that two intellectual-property opinions reject an expert's use of the Nash model in calculating damages, where case-specific evidence conflicted with the model's prediction. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332–33 (Fed. Cir. 2014) (rejecting the Nash model because it was "unjustified by evidence about the particular facts" of the case); *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011) (rejecting the Nash model where it had "no anchor . . . in the record of actual transactions"). In this action, however, the Nash bargaining model comports with the evidence elicited at trial. PFOF § IV.B.3.c.iv. More importantly, these opinions are inapposite because the United States' expert relies on the Nash bargaining model only to predict whether Defendants' merger will result in competitive harm, not to calculate a precise amount that one party must pay another. Unlike a damages request, a Section 7 claim requires only the appreciable risk of harm, not proof of a specific amount of harm. *See supra* Sections II.C–II.D.

**B.      Courts "deem limited" the probative value of defendants' conduct during antitrust investigations or litigation.**

56.      It is a "common-sense proposition that a firm's behavior undertaken with the aim of persuading the court or the government regarding the legality of a merger may not be predictive of how that firm will behave once the court or the government are no longer engaged." *Aetna*, 240 F. Supp. 3d at 80. The executives of defendants in a merger case "would be expected to publically disavow any improper conduct and not condone such conduct in the future," and thus this testimony "adds little to the analysis." *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1088 (N.D. Ill. 2012). Thus, the probative value of evidence that "*could arguably* be subject to manipulation" by a defendant (or a potential defendant) is "deemed limited." *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986) (holding that evidence was "entitled to little or no weight" because it "may have been made to improve [the defendants'] litigating position"). Accordingly, it is appropriate for the Court to discount the probative value of testimony and other post-merger announcement evidence from Defendants.

**C.      When a vertical merger enables the merged firm to raise its rivals' costs, competition is lessened substantially.**

57.      A vertical merger may harm competition if it results in rivals "paying more to procure necessary inputs." *Sprint Nextel Corp. v. AT&T, Inc.*, 821 F. Supp. 2d 308, 330 (D.D.C. 2011).[14] For example:

---

[14] *See also, e.g.*, Michael Riordan, *Competitive Effects of Vertical Integration*, *in* HANDBOOK OF ANTITRUST ECONOMICS 145, 155–59 (Paolo Buccirossi ed., 2008) (reviewing economic literature on raising rivals' costs); Steven C. Salop & Michael H. Riordan, *Evaluating Vertical Mergers: A Post-Chicago Approach*, 63 ANTITRUST L.J. 515, 528 (1995) ("Input foreclosure refers to exclusionary conduct by the upstream division of an integrated firm with the purpose of excluding rivals from access to important inputs or raising their costs of such inputs.").

> In situations where the upstream division of the merged firm negotiates prices with the downstream firms, the upstream firm might use the threat of foreclosure to negotiate higher prices from the rivals of the downstream firm. The bargaining power of the upstream division of the merged firm may be increased by the merger because a failure to reach agreement with a downstream firm would harm the upstream firm less than it did absent the merger.

Steven C. Salop & Daniel P. Culley, *Revising the US Vertical Merger Guidelines: Policy Issues and an Interim Guide for Practioners*, 4 J. ANTITRUST ENF'T 1, 29 (2015).

58.     The pay-TV industry is no exception. With DirecTV's encouragement, the FCC has observed that "[a] downstream firm that wholly owns the upstream affiliate has an incentive to raise the price of its programming for . . . its competitors in order to raise rivals' costs." *In re Applications for Consent to the Assignment and/or Transfer of Control of Licenses Adelphia Commc'ns Corp.* ("*Adelphia Order*"), 21 FCC Rcd. 8203, 8268 (2006) (citing DirecTV's comments). For example, "[i]n the MVPD market, a vertically integrated cable operator will likely charge the highest price that its [satellite] rivals are willing to pay . . . ." *Adelphia Order*, 21 FCC Rcd. 8203 ¶ 141; *cf.* AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1032b2 (describing how a vertical merger between a programmer and a cable company could lead the merged firm to "deny competing or potentially competing cable systems access to programming"). In this action, the effect of the merger may be to lessen competition substantially by giving the merged firm the incentive and the ability to raise the price of Time Warner content to its MVPD and virtual MVPD rivals, thereby harming competition and consumers. *See* PFOF § IV.A–.B.

59.     Defendants contend, without citation, that the United States' theory of harm fails as a matter of law if the merger will not cause DirecTV (and DirecTV alone) to raise its prices. Dkt. # 77 at 47. This argument misconceives Section 7 (and antitrust law generally). The inquiry is not whether the *defendant* (or a single competitor) would raise its price post-merger, but whether competition in the relevant market—and thus consumers—would be harmed. *Cf.*

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (antitrust laws protect "competition not competitors"). Further, Section 7's aperture is wider than the impact on price— as detailed above, the antitrust laws address a broader swath of competitive harms. *See, e.g.*, *Anthem*, 855 F.3d at 361 ("threat to innovation is anticompetitive in its own right").

60.     Defendants also incorrectly maintain that a Section 7 claim requires a showing that the merger would leave rivals "stunted" and prevent them from "providing meaningful price competition." Dkt. # 77 at 47–48. Those arguments rely on *McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015), and *United States v. Microsoft Corp.*, 253 F.3d 34, 71 (D.C. Cir. 2001), which both concern Section 2 of the Sherman Act, not Section 7 of the Clayton Act. These "statutory differences are more than merely formal." AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 760a. Section 2 of the Sherman Act concerns "monopolies," and thus a claim under that section is far more difficult to prove than a Section 7 claim. *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 61 (1st Cir. 2002) (explaining that a Section 7 claim "requires much less" than a Section 2 claim); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 491 (5th Cir. 1984) ("[S]ection seven is much broader than the Sherman Act."); AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 760a ("[A]ll provisions of the Clayton Act are more aggressive than § 2 of the Sherman Act.").[15]

---

[15] In addition, the quoted language from *McWane* (Defendants' primary authority) is not even the standard applied in the case. 783 F.3d at 837 (holding that "the government must show that the defendant engaged in anticompetitive conduct that reasonably appears to significantly contribute to maintaining monopoly power")

**D.     When a vertical merger enables the merged firm to encumber its rivals'
        access to a unique resource, such as HBO, competition is lessened
        substantially.**

61.     It is "the competitive process that the antitrust laws seek to encourage." *NYNEX v.
Discon, Inc.*, 525 U.S. 128, 137 (1998). A vertical merger may impair the competitive process by
"foreclosing competitors of the purchasing firm in the merger from access to a potential source
of supply, or *from access on competitive terms*." *Yankee Entm't & Sports Network*, 224 F. Supp.
2d at 673 (emphasis added). In this action, the effect of the merger may be to lessen competition
substantially by incentivizing the merged firm to restrict the use of HBO as a competitive tool,
and thereby impair the competitive process and deny consumers the benefits of discounted HBO
and other promotions. *See* PFOF § IV.C.

62.     Defendants mistakenly contend that the United States must show that there is no
"effective substitute" for HBO as a promotional tool. Dkt. # 77 at 62. But the authorities cited by
Defendants—one opinion and one treatise—simply do not support this proposed rule. The one
opinion Defendants cite, *Westman Commission Co. v. Hobart International, Inc.*, 796 F.2d 1216,
1220–21 (10th Cir. 1986), is inapposite; it simply describes the proper method of determining a
relevant market. And the treatise contradicts Defendants' argument; it explains that substitutes
need only be "inferior, inadequate, or more costly" to give rise to competitive harm. AREEDA &
HOVENKAMP, ANTITRUST LAW § 1008b.

**E.     When a vertical merger enables the merged firm to impede innovation, either
        unilaterally or through coordination, competition is lessened substantially.**

63.     "A merger can substantially lessen competition" not only by increasing prices but
also "by diminishing innovation." *Anthem*, 236 F. Supp. 3d at 229–30, *aff'd*, 855 F.3d 345, 361
(D.C. Cir. 2017) ("That threat to innovation is anticompetitive in its own right."). As explained
more below and elsewhere, *see* PFOF § V, the effect of Defendants' merger may be substantially

to lessen competition by giving the merged firm the incentive and ability to impede innovative virtual MVPDs, either unilaterally or in coordination with Comcast–NBCU.

64.     Just as a vertically integrated firm can unilaterally raise its rivals' costs and thus its rivals' prices, *see supra* Section V.C, a vertically integrated firm can unilaterally impede a disruptive rival's innovation. AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1012c ("[O]nce [a] programmer has acquired or been acquired by a cable systems monopolist, it creates an additional incentive to deter entry into the cable systems market by denying effective access to efficient programming . . . [or] by licensing the programming while charging a high price."); *see also Microsoft*, 253 F.3d at 54, 79 (holding that the antitrust laws apply to anticompetitive conduct "aimed at producers of nascent competitive technologies"); *Int'l Wood Processors v. Power Dry, Inc.*, 593 F. Supp. 710, 724 (D.S.C. 1984) (upholding a jury's damage award to a nascent competitor that had yet to turn a profit); *Practice Perfect, Inc. v. Hamilton Cty. Pharm. Ass'n*, 732 F. Supp. 798, 802 (S.D. Ohio 1989) ("The serious potential competitor is protected by the antitrust laws just as is the established business.").

65.     In certain circumstances, a vertically integrated firm can also impede innovation in coordination with another vertically integrated firm. As one scholar recently explained:

> [Vertical integration] can facilitate anticompetitive coordination in the upstream or downstream markets. When there are multiple vertically integrated firms, they have an increased ability and incentive to engage in input foreclosure against their unintegrated rivals. If there are multiple vertical mergers, perhaps in response to one another, the outcome may lead to a broad anticompetitive reciprocal dealing, coordination effects equilibrium with higher consumer prices. Barriers to entry also might rise from rivals facing higher costs.

Steven C. Salop, *Invigorating Vertical Merger Enforcement*, YALE L.J. (forthcoming 2018) (manuscript at 16), https://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=3020&context=facpub. (footnote omitted).

66.     Coordination can occur "either by overt collusion or implicit understanding," *Heinz*, 246 F.3d at 715 (quotation marks omitted),[16] and "involves a range of conduct, including unspoken understandings about *how* firms will compete or refrain from competing," *H & R Block*, 833 F. Supp. 3d at 77. Tacit coordination happens when producers recognize their "shared economic interests and their interdependence with respect to price and output decisions." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993). Tacit coordination is far more difficult to be controlled by the antitrust laws and, for this reason, "is feared by antitrust policy even more than express collusion." *Heinz*, 246 F.3d at 725 (quotation marks omitted).[17] This type of coordination is difficult to control under antitrust laws and therefore merger policy, under Section 7 of the Clayton Act, seeks to stop tacit coordination before it begins. *See* AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 901b2.

67.     Coordinated harm violates Section 7 just the same as unilateral harm. *See H & R Block*, 833 F. Supp. 2d 36, 77–81 (D.D.C. 2011) (finding that the United States established a prima facie case under a unilateral theory and a coordinated theory); *OSF Healthcare*, 852 F. Supp. 2d at 1086 ("A merger may [also] diminish competition by enabling or encouraging post-merger coordinated interaction among firms in the relevant market that harms competition.").

68.     Courts look to "market conditions, on the whole," to assess whether a merger is "reasonably likely" to cause coordinated harm. *H & R Block*, 833 F. Supp. 2d at 77, 81. Many

---

[16] *See generally* Merger Guidelines § 7 (explaining that a merger can lead to at least three types of coordinated interaction: "the explicit negotiation of a common understanding," a "similar common understanding that is not explicitly negotiated," and "parallel accommodating conduct not pursuant to a prior understanding").

[17] Section 7 of the Clayton Act casts a wider net than Section 1 of the Sherman Act, which requires an agreement. Because Section 7 does not require an agreement, a merger can be enjoined if the risk of tacit coordination may be substantially to lessen competition. *See* AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 916b.

characteristics of a market can indicate that coordinated harm is reasonably likely. Those factors

include competitors' recognition of a common interest, *Brooke Group*, 509 U.S. at 227, the

transparency of "key information," *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 62 (D.D.C.

2009) a limited number of firms in the market, *Hosp. Corp.*, 807 F.2d at 1387; *CCC Holdings*,

605 F. Supp. 2d at 66–67, opportunities for communication, *OSF Healthcare*, 852 F. Supp. 2d at

1087, the ability to detect deviations from the terms of coordination, *Hosp. Corp.*, 807 F.2d at

1387; *CCC Holdings*, 605 F. Supp. 2d at 60, the capacity for "simple terms" of coordination,[18]

*CCC Holdings*, 605 F. Supp. 2d at 65, prior price leadership, *Heinz*, 246 F.3d at 724, and

concentrated markets and high barriers to entry, *Heinz*, 246 F.3d at 724.[19]

      69.    Courts can also evaluate historical events in the market to assess whether a

merger is reasonably likely to lead to coordinated effects. *H & R Block*, 833 F. Supp. 2d at 78.

Historical coordination, in particular, can be "highly persuasive" in assessing the potential for

coordinated effects. *H & R Block*, 833 F. Supp. 2d at 78; *see also FTC v. Elders Grain, Inc.*, 868

F.2d 901, 905 (7th Cir. 1989) (noting the "history of efforts to fix prices in the industry"). Courts

also consider other forms of cooperation. *E.g.*, *Hosp. Corp.*, 807 F.2d at 1389 (assessing

---

[18] It can be easier for firms to coordinate to limit dealings with rivals than to coordinate on price.
*See* RICHARD A. POSNER, ANTITRUST LAW 244 (2d ed. 2001) ("Less coordination is required for
such an exclusionary campaign, since there is no need to agree on a succession of price
changes."); C. Scott Hemphill & Tim Wu, *Parallel Exclusion*, 122 YALE L.J. 1182, 1222–23
(2013) ("By contrast, the implementation of parallel exclusion is often simpler. In theory, the
action is often binary: each firm either deals or refuses to deal with a new entrant . . . ."):
Likewise, it can be easier to monitor compliance when coordination involves exclusion of
potential rivals rather than price, output, or other matters. C. Scott Hemphill & Tim Wu, *Parallel
Exclusion*, 122 YALE L.J. 1182, 1223 (2013) (explaining that "observing compliance with the
elevated price level is difficult" but exclusionary conduct is "much easier" to monitor because,
for example, it "is hard to secretly cut a deal with an innovative entrant").

[19] These cases involve horizontal mergers and assess the risk of horizontal coordination. Even
though this action involves a vertical merger, the coordination would be horizontal, i.e., would
involve competitors, AT&T and Comcast–NBCU.

hospitals' regular exchange of information in connection with joint applications to insurers); *H & R Block*, 833 F. Supp. 2d at 78 (noting that industry participants had previously "joined together and successfully lobbied the IRS"). Prior coordination of these sorts indicate that firms "are capable of acting in concert to protect their common interests." *H & R Block*, 833 F. Supp. 2d at 78.

70.     The markets at issue in this action exhibit the characteristics and history that are reasonably likely to result in coordinated harm to innovative virtual MVPDs. PFOF § V.B.

71.     Although Defendants will assert otherwise, the United States does not need to quantify the potential harm from anticompetitive coordination. *See supra* Section II.C. Indeed, courts almost always assess the risk of coordinated harm without even referencing quantitative evidence. *See, e.g.*, *H & R Block*, 833 F. Supp. 2d at 77–88 (finding liability on coordinated-effects theory without considering quantitative evidence regarding that theory); *Hosp. Corp.*, 807 F.2d at 1392 (affirming the Federal Trade Commission's finding of liability without discussing quantitative evidence); *OSF Healthcare*, 852 F. Supp. 2d at 1086–88 (granting preliminary injunction without discussing quantitative evidence). It would be particularly inappropriate to require a quantification of harm from coordinated effects of the merger, especially here, where the coordinated effects will likely result in non-price harms in addition to price effects. *See* Merger Guidelines § 7.1 ("[T]he risk that a merger will induce adverse coordinated effects may not be susceptible to quantification or detailed proof.").

## VI.    Defendants may rebut a prima facie case only by showing that competitive harm is not "reasonably probable."

72.     Once the plaintiff makes a prima facie case, the burden shifts to the defendant to produce evidence to rebut the case. *Anthem*, 855 F.3d at 349. "To do so, it must provide sufficient evidence that the prima facie case 'inaccurately predicts the relevant transaction's

probable effect on future competition,' or it must sufficiently discredit the evidence underlying the initial presumption." *Anthem*, 855 F.3d at 349. Defendants' factual arguments on rebuttal are all flawed as a matter of fact. *E.g.*, PFOF §§ VI–IX. Several of Defendants more notable rebuttal arguments—namely, their corporate-structure, program-access, efficiencies, and arbitration arguments—are also flawed as a matter of law. In short, Defendants have failed to rebut the United States' showing that the merger may lessen competition substantially.

## A.   Judicial estoppel prevents a litigant from prevailing on an argument that contradicts arguments it advanced in previous proceedings.

73.   Defendants should be judicially estopped from making several assertions that they previewed for the Court in their summation. "The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting 18 Moore's Federal Practice § 134.30). It applies even when the inconsistent position was taken in an administrative proceeding, such as the proceedings before the FCC that create estoppel here. *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1377 (Fed. Cir. 2000) (judicial estoppel "applies to administrative proceedings in which a party obtains a favorable order by making an argument that it seeks to repudiate in a subsequent judicial proceeding"); *see also* 18 Moore's Federal Practice § 134.30 n.9. The purpose of the doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Maine*, 532 U.S. at 749–50 (quotation marks and citations omitted); *see also Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013) (doctrine prevents "perversion of the judicial process" and "protects the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories" (quotation marks and citations omitted)). If Defendants were here allowed to deny basic logical

predictions about how vertical integration would affect the relationships between programmers and distributors—which positions they have pressed when expedient—they would indeed pervert the judicial process.

74.     *First*, Defendants should be estopped from denying the general factual prediction that bargaining outcomes shift in favor of a programmer as a result of vertical integration with a distributor, even if the integrated firm would not want to withhold the programming entirely. DirecTV[20] advanced that position as a party to the Comcast–NBCU proceeding before the FCC, *e.g.*, PX0441-005, and the FCC relied on it in its Order finding competitive harm from vertical integration.[21] DirecTV took the same position, and the FCC likewise relied upon it in the *Adelphia* proceeding. *In re Applications for Consent to the Assignment and/or Transfer of Control of Licenses Adelphia Commc'ns*, 21 FCC Rcd. 8203, ¶¶ 140–144 & n.488 (2006). Although each instance of vertical integration in the pay-TV industry will have some factual

---

[20] Consistent with the Court's discretion to apply judicial estoppel equitably, it is appropriate to impart DirecTV's positions to all Defendants here. *See Grochocinski*, 719 F.3d at 795–97 (statement of individual imparted to his estate for the purpose of judicial estoppel); *Rosenberg v. Rosenberg*, 601 P.2d 589, 592 (Ariz. 1979) (successor in interest judicially estopped from changing position taken by predecessor in interest). The equitable considerations weigh in favor of estoppel, too, because AT&T has advanced similar positions when expedient for it in proceedings before the FCC. *E.g.*, PX0467-313 (AT&T–DirecTV joint submission in 2014 stating, "Bargaining theory offers a better model of the private negotiations and agreements that characterize the purchase of video network carriage rights by MVPDs than does the standard theory of monopsony.").

[21] Finding that "Comcast–NBCU will negotiate more aggressively relative to the pre-transaction NBCU when selling NBCU content to Comcast's video distribution rivals. Unlike the pre-transaction NBCU, the integrated firm will take into account the possibility that any harm from failure or delay in reaching agreement would be offset to some extent by a benefit to Comcast, as reaching a higher price would raise the costs of Comcast's rivals. As a result, the transaction will improve Comcast–NBCU's bargaining position, leading to an increase in programming costs for Comcast's video distribution rivals." *In re Applications of Comcast Corp., Gen. Elec. Co. & NBC Universal, Inc. For Consent to Assign Licenses & Transfer Control of Licensees* (*FCC Comcast Order*), 26 FCC Rcd. 4238, ¶ 37 (2011),  *see also FCC Comcast Order*, 26 FCC Rcd. at ¶ 30 & n.63 (citing comments of DirecTV in summarizing party positions).

distinctions, the basic logic of bargaining theory and the prediction of higher affiliate fees deriving from the fact of being able to capture a rival's customers during a blackout is exactly the same proposition defendants seek to deny here.

75.     ***Second***, and more specifically, Defendants should be estopped from denying that the Nash bargaining model employed by Professor Shapiro is the best way to predict the magnitude of the change in bargaining outcomes. The FCC specifically cited DirecTV's submission urging it to use the Nash bargaining model in predicting the competitive harm from vertical integration in Comcast–NBCU.[22]

76.     There may be other instances of Defendants reversing themselves in their post-trial filings, which reversals the United States cannot specifically anticipate at this time. If such is the case, it would be appropriate for the Court to apply the doctrine of judicial estoppel *sua sponte* as the case requires. *See* 18 Moore's Federal Practice § 134.34 n.1.

> **B.     A specialized corporate structure cannot rebut a prima facie case because the law assumes that a corporation's wholly owned subsidiaries and divisions pursue "the common interest of the whole."**

77.     Eager to respond to the United States' prima facie case, Defendants' executives offered testimony directly contradicting decades of established law. They claimed that, following the merger, Time Warner's management will remain independent of AT&T and will not consider DirecTV's interests when negotiating licenses for Time Warner's content. The law, however,

---

[22] *FCC Comcast Order*, 26 FCC Rcd. at app. B ¶ 39 (2011) ("To determine the likely magnitude of any post-transaction price changes, we adopt a Nash bargaining model originally proposed by ACA and DIRECTV . . . . As commenters explain, the post-transaction increase in opportunity cost to the integrated firm of providing NBCU programming to one of its MVPD rivals is given by the product $(d \times \alpha \times \pi)$. As before, $d$ is the departure rate from the rival MVPD if Comcast withholds programming, $\alpha$ is the diversion rate of these subscribers to Comcast's cable system and $\pi$ is the per subscriber MVPD profits of Comcast." (citing Murphy report, excerpted at PX0443-079)).

categorically rejects arguments that individual units of a corporation are "separate economic actors, pursuing separate economic interests." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984); *see also* PFOF § IV.B.3.a (discussing the factual flaws in Defendant's corporate structure argument).

78.     "A division within a corporate structure pursues the common interests of the whole rather than interests separate from those of the corporation itself; a business enterprise establishes divisions to further its own interests in the most efficient manner." *Copperweld*, 467 U.S. at 770. A corporation and an unincorporated division or a wholly owned subsidiary "have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *Copperweld*, 467 U.S. at 771; *see also* AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 964b ("Antitrust generally presumes that a firm maximizes its profits in the environment in which it finds itself . . . .").

79.     The rationale for treating a corporation's divisions as "a single actor," *Copperweld*, 467 U.S. at 770, is especially appropriate when assessing vertical mergers and, in particular, when assessing this merger. Like most parties to a vertical merger, Defendants have claimed efficiencies—such as the elimination of double marginalization and the reduction of bargaining friction—that require coordination between upstream and downstream units. For AT&T to achieve these efficiencies, its divisions must coordinate to achieve the interest of the merged firm as a whole. *See* AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1004b ("[M]ost of the efficiencies that explain why vertical mergers occur in the first place are realized only through self-dealing."); Steven C. Salop & Daniel P. Culley, *Revising the U.S. Vertical Merger Guidelines: Policy Issues and an Interim Guide for Practitioners*, 4 J. ANTITRUST ENFORCEMENT

1, 35 (2016) (explaining that "double marginalization would not be eliminated" if "divisions treat one another at arm's length").

80.     The presumption of action in the common interest is important in merger cases generally because a policy of independence can be easily reversed later. After litigation has passed, a firm may centralize decision-making, either because the initial organization structure was (in part) the product of litigation strategy, *see Aetna*, 240 F. Supp. 3d at 80 ("a firm's behavior undertaken with the aim of persuading the court or the government regarding the legality of a merger may not be predictive of how that firm will behave once the court or the government are no longer engaged"), or for independent business reasons, *see Copperweld*, 467 U.S. at 771–72 ("They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests."). In other words, "the antitrust tribunal can hardly be sure that an internal policy against self-dealing or a profit-center organization will continue once the merger litigation is terminated." AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1004b.

81.     A rule permitting Section 7 defendants to offer evidence that the merging firms would somehow retain their managerial independence contrary to fundamentals of corporate structure, *see Copperweld*, 467 U.S. at 769–72, would undermine merger enforcement. *Cf.* Merger Guidelines § 13 (it is "a basic element of merger analysis" that "common ownership and control[] permanently and completely" eliminate competition between the merging parties); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1213–14 (11th Cir. 1991) ("[T]he district court's assumption that . . . a nonprofit entity[] would not act anticompetitively was improper."). Indeed, merging parties could make this argument in any type of merger litigation, horizontal, vertical, or other (e.g., in a merger of the only two widget manufacturers, the defendants could claim that prices would continue to be set independently post-merger). And "if the merger is to be tolerated

on this ground, that decision would apparently have to be subject to reexamination when the merged firm's internal arrangements are changed." AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1004b.

82.     Thus, the Court should not credit testimony that AT&T will negotiate carriage agreements without regard for company-wide profits. *Accord* PFOF § IV.B.3.a.

### C.     Entry would not be timely, likely, or sufficient to prevent the competitive harm from this merger.

83.     "Courts have held that likely entry or expansion by other competitors can counteract anticompetitive effects that would otherwise be expected." *H&R Block*, 833 F. Supp. 2d at 73. Defendants "carry the burden to show" that entry or expansion "is sufficient to fill the competitive void" that would result from the merger. *H&R Block*, 833 F. Supp. 2d at 73; *accord Anthem*, 236 F. Supp. 3d at 222.

84.     "The mere existence of potential entrants does not by itself rebut the anticompetitive nature of an acquisition." *Chi. Bridge & Iron Co.*, 534 F.3d at 436. Instead, "[e]ntry or expansion into a relevant market must be 'timely, likely, and sufficient in its magnitude, character, and scope' to counteract a merger's anticompetitive effects." *Anthem*, 236 F. Supp. 3d at 222. "Determining whether there is ease of entry hinges upon an analysis of barriers to new firms entering the market or existing firms expanding into new regions of the market." *H&R Block*, 833 F. Supp. 2d at 73 (quotation marks omitted).

85.     High barriers—such as infrastructure requirements; large programming costs that are even larger for non-traditional MVPDs; and economies of scale—render any entry or expansion by a content aggregator or video distributor too untimely, unlikely, and insufficient to counteract the merger's anticompetitive effects. PFOF § VII; *see also supra* Section IV.E (discussing the evidence of Time Warner's market power).

### D.   FCC regulation will not forestall competitive harm.

86.    The FCC program access rules will not prevent the predicted harm from this merger. *See* PFOF § VIII.[23]

87.    When assessing the effect of regulation, "[o]nly an examination of [a] particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of [a] merger." *Aetna*, 240 F. Supp. 3d at 19 (citing *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974)). If the existence of a regulatory structure is not "designed to deter and remedy anticompetitive harm," a court should not conclude that the United States' "prima facie case inaccurately predicts the [merger's] probable effect on future competition." *Aetna*, 240 F. Supp. 3d at 48.

88.    A regulatory scheme can be manipulated to avoid the impact of regulation. *See Aetna*, 240 F. Supp. 3d at 49 (describing how an agency's benchmark would be ineffective if the merged firm sought to increase premiums without violating the statutory cap on out-of-pocket costs). Furthermore, a court may decline to find that regulation prevents harm from a merger if it concludes that there is "little historical precedent" for an agency exercising regulatory authority. *Aetna*, 240 F. Supp. 3d at 51. Where, as here, a regulatory authority has not addressed a particular concern before a proposed merger, it is "very difficult" for a court to conclude that it would do so afterwards. *Aetna*, 240 F. Supp. 3d at 52.

89.    The Federal Communications Commission ("FCC") has explicitly acknowledged that the program access rules do not prevent vertically integrated firms from raising rivals' costs.

---

[23] Even if the program access rules were capable of preventing post-merger price increases, which they are not, the rules do not offer any protection to the newest competitors, internet-based virtual MVPDs. *In re Sky Angel U.S., LLC*, 25 FCC Rcd. 3879, ¶ 10 (2010). The FCC interprets "MVPD" to include only a distributor who controls part of the transmission pathway delivering video to customers, which excludes virtual MVPDs. *Sky Angel*, 25 FCC Rcd. at ¶ 10. No subsequent action by the FCC has applied the rules to virtual MVPDs.

When analyzing the Comcast–NBCU merger, the FCC stated that the "program access rules, which address discriminatory pricing, inadequately address the potential harms presented by the increased ability and incentive of Comcast–NBCU to uniformly raise Comcast's rivals' fees." *In re Applications of Comcast Corp., Gen. Elec. Co. & NBC Universal, Inc. For Consent to Assign Licenses & Transfer Control of Licensees* (*FCC Comcast Order*), 26 FCC Rcd. 4238, ¶ 49 (2011).[24] The FCC noted that "a strategy of uniform price increases for video programming would not necessarily violate our current rules because the price increases would not involve discriminatory conduct," given that "Comcast could pay the same fees as its MVPD rivals or could choose to pay the highest fee that NBCU charges a competing MVPD." *FCC Comcast Order*, 26 FCC Rcd. at ¶ 49. The FCC had reached this same conclusion twice before. *See In re Applications for Consent to the Assignment and/or Transfer of Control of Licenses Adelphia Commc'ns*, 21 FCC Rcd. 8203, ¶¶ 123, 140 (2006) (explaining that "so-called stealth discrimination," i.e., "imposing uniform price increases applicable to all MVPDs, including [the merged firm's] own systems," "is not prohibited by the Commission's program access rules"); *In re Gen. Motors Corp. & Hughes Elecs. Corp., Transferors & the News Corp. Ltd., Transferee* (*FCC Fox News–Hughes Order*), 19 FCC Rcd. 473, ¶ 82 (2004) ("[I]t may be difficult to detect [price discrimination] and anti-discrimination rules may not function effectively.").[25]

---

[24] Defendants' unsupported claim that the FCC will take action ignores both (1) that the program access rules do not require every video distributor to pay the same price, *see* 47 C.F.R. § 76.1002(b)(1) note 2, and (2) that the FCC itself determined, when assessing the Comcast–NBCU merger, that the rules would not prevent the price increases predicted by a model "very similar to" the one that Professor Shapiro has used in this action. Tr. 2390:12–16; *FCC Comcast Order*, 26 FCC Rcd. at ¶¶ 35, 46, app. B ¶ 39 (describing the FCC's use of the Nash Bargaining Model).

[25] Using the Nash Bargaining Model, the FCC found in Comcast–NBCU that the program access rules did not prevent programming prices from increasing following the Fox News–Hughes transaction. Specifically, the FCC found that the prices for Fox's cable networks, which were not subject to the arbitration remedy, increased after the transaction more than the prices of

90.     Nor is there any support for the claim that the FCC would rely on the "undue influence" provision to prevent the predicted price increases. This provision was adopted at the same time as the other program access rules at issue. *See* Tr. 2752:1–14; *In re Implementation of Sections 12 and 19 of the Cable Television Consumer Prot. and Competition Act of 1992 Dev.* (*FCC Implementation Order*), 8 FCC Rcd. 3359, ¶¶ 10–13, 32 (1993). And the FCC has never suggested that the provision could prevent the post-merger harm predicted in Comcast–NBCU, Adelphia, or News–Hughes. The undue influence provision plays only a supporting role in enforcement, and the FCC has acknowledged that undue influence "may be difficult for the [FCC] or complainants to establish" and may be successfully proven only when "information is available (such as might come from an internal 'whistleblower')." *FCC Implementation Order*, 8 FCC Rcd. at ¶ 145. [26]

91.     Finally, the Court must apply the law to the facts at hand given the legal framework that exists now." *Aetna*, 240 F. Supp. 3d at 90 n.45. Despite Defendants' claim that the FCC could modify the regulations to end the harms, *see, e.g.*, Tr. 2696:20–2697:1, a court "has no ability to predict" those changes, "nor is it the judiciary's place to do so." *Aetna*, 240 F. Supp. 3d at 90 n.45 (discussing future Congressional action); *cf. Worth v. Jackson*, 451 F.3d 854, 862 (D.C. Cir. 2006) (refusing to anticipate the Department of Housing and Urban

---

comparable programming that was not vertically integrated. *FCC Comcast Order*, 26 FCC Rcd. at ¶¶ 51, 52, app. B ¶ 45; *see FCC Fox News–Hughes Order*, 19 FCC Rcd. at ¶¶ 365, 368. The FCC's finding that Fox cable network prices had increased post-merger by an amount consistent with the price increases predicted by its bargaining model, *FCC Comcast Order*, 26 FCC Rcd. at ¶¶ 51, 52, demonstrates that the program access rules were ineffective at preventing that price increase.

[26] The program access rules would also not protect Turner distributors from blackouts post-merger. Despite a mechanism for an MVPD to petition for a standstill pending a determination of a program access complaint, 47 C.F.R. §76.1003 (1)(i)-(iv), the FCC has never granted such a standstill. The petitioner is required to make a showing akin to a preliminary injunction standard, *id.*, and the FCC has stated that granting a standstill order is seen as "extraordinary relief." *Sky Angel*, 25 FCC Rcd. at ¶ 10 (2010).

Development's future policies). Thus, given the purpose of the program access rules and the FCC's history of not relying on them to prevent post-merger price increases of the sort predicted here, the program access rules cannot rebut the United State' prima facie case.[27]

### E. Claimed efficiencies, which arguably cannot ever save a merger, must withstand "rigorous analysis."

92.    The Supreme Court has never recognized an efficiencies defense, and several circuits, including this Circuit, have explicitly questioned its viability as a defense. *Anthem*, 855 F.3d at 353 ("[I]t is not at all clear that [efficiencies] offer a viable legal defense to illegality under Section 7."); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 348 (3d Cir. 2016) ("[W]e are skeptical that such an efficiencies defense even exists."); *Saint Alphonsus Med. Ctr.- Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 790 (9th Cir. 2015) ("We remain skeptical about the efficiencies defense in general and about its scope in particular.").[28]

---

[27] Counsel may point in post-trial briefing to the FCC's request for comment "on whether and how we should revise our rules to address uniform price increases imposed by satellite-delivered, cable-affiliated programmers." *In the Matter of Revision of the Commission's Program Access Rules, MB Docket Nos. 12-68, 07-18, 05-192, Notice of Proposed Rulemaking*, 27 FCC Rcd. 3413, ¶ 102 (2012). But in the intervening six years the FCC has not proposed new rules or taken any other action on this issue, and there is no indication that the FCC will change its rules to address its long-standing concern about post-merger price increases such as those predicted here. Moreover, speculation that the FCC could change its rules cannot carry any weight here, where under the Clayton Act the court must evaluate the *likely* results of the proposed merger.

[28] Circuit courts have doubted the existence of an efficiencies defense because, among other reasons, the Supreme Court has all but rejected it. *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967) ("Possible economies cannot be used as a defense to illegality. Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition."); *Phila. Nat'l Bank*, 374 U.S. at 371 (holding that a merger cannot be "saved . . . on some ultimate reckoning of social or economic debits and credits" and that "some price might have to be paid" for Section 7's enforcement); *Brown Shoe*, 370 U.S. at 344 (recognizing that although "higher costs and prices might result from the maintenance of fragmented industries and markets," Section 7 "resolve[s] these competing considerations in favor of decentralization"); *see also Saint Alphonsus*, 778 F.3d at 790 (noting academic writings where Robert Bork and Richard Posner have "rejected the efficiencies defense"); *Ford Motor Co. v. United States*, 405 U.S. 562, 569–70 (1972) (rejecting

93.     To the extent the Court entertains Defendants' efficiencies defense, the Court

"must undertake a rigorous analysis" of the claimed efficiencies. *FTC v. H.J. Heinz Co.*, 246

F.3d 708, 720–21 (D.C. Cir. 2001); *accord Penn State*, 838 F.3d at 349 (holding that claimed

efficiencies must undergo "demanding scrutiny"). The requirements for a successful efficiencies

defense are so rigorous that in 2015, the court in *Sysco* observed, "The court is not aware of any

case, and Defendants have cited none, where the merging parties have successfully rebutted the

government's *prima facie* case on the strength of the efficiencies." 113 F. Supp. 3d at 82; *accord

Anthem*, 236 F. Supp. 3d at 236–37 ("[T]he defense has not pointed the Court to a single litigated

case in which the merging parties were successful in overcoming the government's case by

presenting evidence of efficiencies.").

### 1.     Defendants bear the burden of their efficiencies defense.

94.     Defendants "bear the burden of showing" that their claimed efficiencies can be

credited. *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 137 n.15 (D.D.C. 2016); *see also Anthem*,

855 F.3d at 364 (defendants "failed to show the kind of extraordinary efficiencies" needed to

offset competitive harm (quotation marks omitted)); *CCC Holdings*, 605 F. Supp. 2d at 73

(defendants "have not demonstrated" that their claimed efficiencies are verifiable or sufficient to

offset anticompetitive effects); Areeda & Hovenkamp, Antitrust Law ¶ 970c2 ("Placing the

burden of [proving efficiencies] on defendants is sensible because they are in the best position to

have knowledge of the types and magnitude of efficiencies that will be gained . . . .").

95.     Defendants concede that if their merger were horizontal, they would bear the

burden on efficiencies. Dkt. # 87 at 11–13. They contend, however, that because their merger is

vertical, the United States must account for the claimed efficiencies in making a showing of

---

categorically the defendants' argument that the merger would have the "beneficial effect [of]
making [the purchased company] a more vigorous and effective competitor").

competitive harm. Dkt. # 87 at 11–13. This argument fails in light of the Supreme Court's unambiguous instruction—in a case discussing efficiencies—that all mergers "must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate, or other." *Procter & Gamble*, 386 U.S. at 577 (footnote omitted). The approach of this Circuit is consistent with the Supreme Court's instruction. *See, e.g.*, *Anthem*, 855 F.3d at 353–55 (citing *Procter & Gamble*, 386 U.S. at 604) (discussing "an efficiencies defense to Section 7"); *Heinz*, 246 F.3d at 720 (same).

96.     The reasons for defendants' bearing the burden to demonstrate efficiencies apply whether a merger is horizontal, vertical, conglomerate, or another category altogether. First, as discussed above, defendants have information about efficiencies uniquely in their possession. *See supra* Section III. Second, efficiencies "are inherently 'difficult' to verify and quantify' and 'it is incumbent upon the merging firms to substantiate efficiency claims.'" *H & R Block*, 833 F. Supp. 2d at 89 (quoting Merger Guidelines § 10).[29] Thus, if the United States bore the burden on efficiencies, "the efficiencies defense might well swallow the whole of Section 7 of the Clayton Act because management would be able to present large efficiencies based on its own judgment and the Court would be hard pressed to find otherwise." *H & R Block*, 833 F. Supp. 2d at 91; *see also Univ. Health*, 938 F.2d at 1223 (explaining that because the burden is on defendants, they cannot rest "solely on speculative, self-serving assertions").

97.     Defendants repeatedly note that, compared to horizontal mergers, vertical mergers are less likely to cause competitive harm. Their general observation is misplaced. In a vertical

---

[29] *See also Anthem*, 855 F.3d at 364 ("Because 'the state of the science does not permit such refined showings,' commentators have recommended simply giving the government the benefit of the doubt in a close case." (citation omitted)); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1223 (11th Cir. 1991) (a burden on defendant appropriate because "it is difficult to measure the efficiencies a proposed transaction would yield and the extent to which these efficiencies would be passed on to consumers").

merger case, efficiencies become relevant only after the Court finds a prima facie case of likely competitive harm.

98.     Defendants also argue that every vertical merger presumptively generates substantial efficiencies and that cognizable efficiencies are categorically more likely in vertical mergers than in horizontal mergers. Dkt. # 77 at 28–29. Both arguments are mistaken. Contrary to Defendants' argument, there is no basis for "any blanket assumption that all vertical mergers generate substantial efficiencies." LAWRENCE SULLIVAN & WARREN GRIMES, THE LAW OF ANTITRUST 549 (3d ed. 2016). And although some efficiencies are more likely to arise from a vertical merger,[30] other efficiencies (including some of the ones most likely to be credited) are found much more commonly in horizontal mergers. *See, e.g.*, AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1040f ("[S]ome efficiencies, such as 'horizontal' economies of scale or scope or plant specialization economies that may save a horizontal merger, do not often apply when the merger is vertical, for of its own force the vertical merger does not increase the firm's output in any market."); Merger Guidelines § 10 (noting that shifting production among facilities to reduce incremental cost of production more likely to be cognizable than other efficiencies discussed); Steven C. Salop & Daniel P. Culley, *Revising the U.S. Vertical Merger Guidelines: Policy Issues and an Interim Guide for Practitioners*, 4 J. ANTITRUST ENFORCEMENT 1, 33 (2016) (explaining that some efficiencies "may be more difficult to achieve [in a vertical merger] than in a horizontal merger").

99.     Whether a merger is vertical or horizontal, assessing the magnitude and merger-specificity of any efficiency requires case-specific analysis. *See, e.g.*, LAWRENCE SULLIVAN &

---

[30] *See, e.g.*, OLIVER WILLIAMSON, MARKETS AND HIERARCHIES: ANALYSIS AND ANTITRUST IMPLICATIONS (1975); Oliver Hart, *Incomplete Contracts and the Theory of the Firm*, 4 J. LAW, ECON. & ORG. 119, 135 (1988); STEPHEN MARTIN, INDUSTRIAL ORGANIZATION IN CONTEXT 366, 411, 412 (2010).

WARREN GRIMES, THE LAW OF ANTITRUST 549 (3d ed. 2016) (rejecting "any blanket assumption" that "vertical integration is the only way of obtaining certain efficiencies"); Steven C. Salop, *Invigorating Vertical Merger Enforcement*, YALE L.J. (forthcoming 2018) (manuscript at 27) ("some or all [vertical] efficiencies (including [the elimination of double marginalization]) might be obtained without a merger" and substantial benefits "are not inevitable"), https:// scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=3020&context=facpub.[31]

## 2. Efficiencies must be reasonably verifiable, merger-specific, and likely to benefit consumers in the affected markets, and must offset the harms of the merger.

100. "[T]he court must undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior." *Heinz*, 246 F.3d at 721. "[B]oth prior to and when defending a merger[,] firms tend to exaggerate the magnitude of efficiencies that can be realized from a merger." AREEDA & HOVENKAMP ¶ 970a. To safeguard against this, claimed efficiencies must be "reasonably verifiable by an independent party." *H & R Block*, 833 F. Supp. 2d at 89. Independent verification requires that the defendants "specifically explain . . . how [the claimed] efficiencies would be created and maintained." *Univ. Health*, 938 F.2d at 1223. Arguments based on "estimation and judgment of experienced executives" cannot verify efficiencies. *H & R Block*, 833 F. Supp. 2d at 91. Although those arguments "may be perfectly sensible as a business matter, the lack of a verifiable method of factual analysis resulting in the cost estimates renders them not cognizable by the Court." *H & R Block*, 833 F. Supp. 2d at 91.

---

[31] For example, independent firms engaged in vertical transactions have incentives to minimize double marginalization and other transactions costs through contractual mechanisms (such as nonlinear pricing). *See generally* Ronald Coase, *The Nature of the Firm*, 4 ECONOMICA 386 (1937); Ronald Coase, *The Problem of Social Cost*, 3 J. L. & ECON. 1 (1960).

101.    An efficiencies defense cannot succeed on the argument that "the merger would allow the defendant to compete more efficiently *outside* the relevant market." *Saint Alphonsus*, 778 F.3d at 789. Competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972); *accord Phila. Nat'l Bank*, 374 U.S. at 370 (holding that a defendant cannot justify "anticompetitive effects in one market" with "procompetitive consequences in another"). Thus, any claimed efficiencies must occur *in the challenged markets*.

102.    Claimed efficiencies must also "pass[] through to consumers, rather than simply bolstering [the defendant's] profit margin." *Anthem*, 855 F.3d at 362; *accord Penn State*, 838 F.3d at 350 (requiring "*clear evidence* showing that the merger will result in efficiencies that will . . . ultimately benefit consumers" (emphasis added)); *CCC Holdings*, 605 F. Supp. 2d at 74; *Sysco*, 113 F. Supp. 3d at 82; *United States v. Aetna*, 240 F. Supp. 3d 1, 94 (D.D.C. 2017). In determining whether an efficiency will benefit consumers, a court should consider whether the efficiency affects a fixed or variable cost. Savings on fixed costs usually inflate the merged firm's profit margin, rather than benefit customers. *Aetna*, 240 F. Supp. 3d at 95 n.50 ("Reductions in fixed costs are even less likely to be passed on to consumers.").

103.    Claimed efficiencies must also be "merger specific." *Anthem*, 236 F. Supp. 3d at 238. "'[I]f a company could achieve certain cost savings without any merger at all, then those stand-alone cost savings cannot be credited as merger-specific efficiencies.'" *Anthem*, 236 F. Supp. 3d at 238 (quoting *H & R Block*, 833 F. Supp. 2d at 90). And "delayed benefits from efficiencies (due to delay in the achievement of, or the realization of customer benefits from, the efficiencies) will be given less weight because they are less proximate and more difficult to predict." *CCC Holdings*, 605 F. Supp. 2d at 73 (quoting Merger Guidelines § 4 n.37).

104.    Even claimed efficiencies that satisfy the rigorous requirements imposed by precedent cannot save a merger unless they offset the anticompetitive concerns of the merger. *Sysco*, 113 F. Supp. 3d at 86. But because "the state of the science does not permit" a simple dollar-to-dollar comparison of the predicted harm and the cognizable efficiencies, *Anthem*, 855 F.3d at 364, the Court should "give the benefit of the doubt to the government" in close cases. AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 971f, *cited favorably in Anthem*, 855 F.3d at 364.

### 3.    The Court cannot credit Defendants' purported efficiencies.

105.    The Court cannot credit Defendants' purported efficiencies. The only evidence Defendants have put forward that could possibly support a quantification of their efficiency claims was the testimony of one executive—who is biased[32]—and a single exhibit, which is a draft document designated as preliminary. *See* PFOF § VI.A. The evidence fails to demonstrate that the claimed efficiencies are merger-specific, reasonably verifiable, and likely to benefit consumers in the challenged markets. PFOF § VI.

106.    Defendants' testimonial evidence on efficiencies cannot be credited. In evaluating claimed efficiencies, a court should not rely solely on business testimony but on expert testimony informed by the antitrust requirements for cognizable efficiencies. *See FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1089 (N.D. Ill. 2012) (ignoring the defendants' business evidence of efficiencies and "instead . . . review[ing] the expert reports and testimony of Dr. Manning, defendants' economics expert, who evaluated the claimed efficiencies . . . within the framework of the *Merger Guidelines*").

---

[32] The Court should consider the financial bias that this witnesses has in determining his credibility. Tr. 3274:6–3276:17 (discussing Stankey's short-term compensation bonus if the merger goes through); *cf.* AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1126f ("[B]ias may contaminate evidence generated in the course of litigation about particular mergers.").

107.     The other half of Defendants' efficiencies evidence—a document describing the claimed efficiencies, DX0658—was admitted under Federal Rule of Evidence 803(3) only to show AT&T's state of mind. Tr. 3231:10–3233:10. But evidence showing AT&T's *intent* to achieve efficiencies cannot show that AT&T likely *will* achieve the efficiencies. *Cincinnati Fluid Power, Inc. v. Rexnord, Inc.*, 797 F.2d 1386, 1394–95 (6th Cir. 1986) (holding that Rule 803(3) "is properly utilized in cases where intent *per se* is at issue" and that, therefore, a landlord's previously stated intent to raise rental rates was not admissible under Rule 803(3) to prove the "amount of [the] future rents"). Stated differently, an "intention itself rarely, if ever, establishes the underlying facts," and the efficiencies defense in particular "must be demonstrated by objective evidence of merger-specific economies, not merely by the intent to achieve them." AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 964b.

108.     Further, while the document may establish AT&T's *belief* that it will achieve the claimed efficiencies, the document cannot establish *why* AT&T believes it will achieve the efficiencies. *McInnis v. Fairfield Comms., Inc.*, 458 F.3d 1129, 1143 (10th Cir. 2006) (holding that although Rule 803(3) applied to the declarant's "statements expressing his then existing state of mind," the reasons "*why* [he] had these feelings are expressly outside the state-of-mind exception").[33] In short, Defendants' only efficiencies document can identify—but cannot verify—AT&T's claimed efficiencies.

---

[33] *Accord United States v. Churn*, 800 F.3d 768, 775 (6th Cir. 2015) ("Federal Rule of Evidence 803(3) does allow the admission of statements as to the declarant's state of mind, but does not allow the admission of statements as to *why* the declarant has said state of mind."); *United States v. Liu*, 654 F. App'x 149, 154 (4th Cir. 2016); *United States v. Quinones-Chavez*, 641 F. App'x 722, 726 (9th Cir. 2016); *United States v. Samaniego*, 345 F.3d 1280, 1282–83 (11th Cir. 2003); *United States v. Alzanki*, 54 F.3d 994, 1008 (1st Cir. 1995); *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980).

109.    Accordingly, Defendants have failed to offer any reason to conclude that the claimed efficiencies are cognizable and sufficient to offset the harms of the merger. *Accord* PFOF § VI.

>    **F.    A unilateral behavioral promise, such as Defendants' arbitration offers, cannot rebut a prima facie case.**

110.    Defendants "bear the burden of showing that any proposed remedy would negate any anticompetitive effects of the merger." *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 137 n.15 (D.D.C. 2016).[34] That burden includes "producing evidence that the [remedy] will actually occur," *Aetna*, 240 F. Supp. 3d at 60, and "will remedy the anticompetitive effects of the merger," *Sysco*, 113 F. Supp. 3d at 78. As the Supreme Court has twice made clear in vertical merger cases, "all doubts as to the remedy are to be resolved in its favor." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961); *Ford Motor Co. v. United States*, 405 U.S. 562, 575 (1972). "The proper disposition of antitrust cases is obviously of great public importance," *E.I du Pont*, 366 U.S. at 323, and, no matter the type of merger, consumers should not bear the risk that a remedy would be ineffective. Further, as discussed above, Defendants have in their possession information about the remedy that they have designed and that they would administer. *See supra* Section III.

111.    Given the substantial questions of state law and choice-of-law surrounding Defendants' unilateral arbitration offers, this Court cannot depend on the arbitration offers to rebut the merger's harm.

---

[34] *See also CCC Holdings*, 605 F. Supp. 2d at 46, 56; *United States v. Franklin Elec. Co., Inc.*, 130 F. Supp. 2d 1025, 1033 (W.D. Wis. 2000) ("[D]efendants have the burden of proving their contention that because of the proposed licensing and supply agreement with [a third party] the number of competitors will not change.").

112.    When considering promises by a defendant to take steps after a merger to remedy competitive harm, a "common-sense proposition" applies: "a firm's behavior undertaken with the aim of persuading the court or the government regarding the legality of a merger may not be predictive of how that firm will behave once the court or the government are no longer engaged." *Aetna*, 240 F. Supp. 3d at 80. The probative value of evidence that "*could arguably* be subject to manipulation" by a defendant is "limited." *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008).[35] Indeed, if Defendants could avoid liability through a unilateral "promise" to behave, the Antitrust Division's mandate to protect the public interest would be supplanted by the post-litigation assurances of private parties eager to close the deal. *See generally* Dkt. # 85.

113.    Defendants argue that the arbitration offers are not mere promises because—even though the offers lack consideration—they are irrevocable under "governing" New York law. Dkt. # 77 at 45 n.22; Dkt. # 83 at 4. However, the arbitration offers themselves contain no choice of law provisions. *See, e.g.*, PX0437 (arbitration offer to Cox); PX0490 (same for Dish); DX0785 (same for NCTC). And the proposed arbitration agreement attached to each offer chooses not New York law but the law governing the MVPD's affiliate agreement with Turner. PX0491-002. At least some of the affiliate agreements are governed by law other than New York law. For example, ███████ affiliate agreement with Turner is governed by Georgia law. ███████ ███████. Thus, ███████ and any similarly situated MVPDs, Georgia (not New York) law governs the arbitration offer.[36]

---

[35] *Cf. United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) (courts have "rightly refused to grant defendants such a powerful weapon against public law enforcement"); *United States v. Trans-Mo. Freight Ass'n*, 166 U.S. 290, 309 (1897) ("The defendants cannot foreclose [the rights of the public], nor prevent the assertion thereof by the government as substantial trustee for the public [under the antitrust laws], by any such action as has been taken in this case.").

[36] If the choice-of-law provision in the proposed arbitration agreement does not govern the arbitration offer—a substantial, difficult question on its own—then the choice-of-law questions

114.    Unlike New York law, Georgia law holds, "If without consideration a continuing offer is made, although the person making it may state a time within which it may be accepted, there is no binding contract, and he may withdraw the offer before acceptance." *Sparks v. State*, 501 S.E.2d 562, 567 (Ga. Ct. App. 1998); *accord Amwest Sur. Ins. Co. v. RA-LIN & Assocs.*, 455 S.E.2d 106, 109 (Ga. Ct. App. 1995); *Stone Mountain Properties, Ltd. v. Helmer*, 229 S.E.2d 779, 784 (Ga. Ct. App. 1976).[37] Thus, despite Defendants' assertion otherwise, the arbitration offers—or at least some of them—are indeed revocable.

115.    Further, for any arbitration offers that are governed by New York law, Defendants have provided (and the United States has found) no New York precedent preventing a successor from revoking a predecessor's *offer*, especially where the offer was extended *after* the merger agreement. *See, e.g.*, *AT&S Transp., LLC v. Odyssey Logistics & Tech. Corp.*, 803 N.Y.S.2d 118 (N.Y. App. Div. 2005) (holding that a successor was bound by a predecessor's arbitration *agreement*, not offer, when the predecessor and successor agreed to a de facto merger "[s]ubsequent[]" to the predecessor entering the arbitration agreement). Accordingly, even where New York law applies, AT&T may still be able to revoke Time Warner's arbitration offer since Time Warner extended the offer after the merger agreement.

116.    Finally, regardless of whether Defendants' offers are revocable, the offers are ineffective at resolving the harms demonstrated at trial. *See* PFOF § IX. Thus, the arbitration offers cannot rebut the United States' prima facie case. *See H & R Block*, 833 F. Supp. 2d at 82

---

multiply beyond those detailed here. In that scenario, the most likely governing law is Georgia's law because the offers were mailed by a Georgia company (Turner) from a Georgia address. *See, e.g.*, PX0437 (arbitration offer letter to Cox, a Georgia company, sent from a Georgia address); PX0490 (arbitration offer letter to Dish from a Georgia address); DX0785 (same for NCTC).

[37] Most states' laws accord with Georgia law. *See* RESTATEMENT (SECOND) OF CONTRACTS § 42 cmt. a (Am. Law Inst. 1981) ("[T]he ordinary offer is revocable even though it expressly states the contrary, because of the doctrine that an informal agreement is binding as a bargain only if supported by consideration.").

(finding that the defendants' "promise" to maintain current prices after the merger failed to "rebut a likelihood of anticompetitive effects").

**VII.    The Court should order structural relief.**

117.    While the Court has broad discretion to fashion relief in cases brought under Section 7 of the Clayton Act, the appropriate relief here is structural—either a permanent injunction of the proposed transaction, or a targeted divestiture. Indeed, the plain language of Section 7 reflects the judgment of Congress that structural relief is appropriate by providing that "[n]o person . . . shall *acquire*" the stock or assets of another where "the effect of such *acquisition* may be substantially to lessen competition." 15 U.S.C. § 18 (emphasis added).

**A.    A remedy must "effectively preserve competition."**

118.    "The key to the whole question of antitrust remedy is of course the discovery of measures effective to restore competition." *E.I du Pont*, 366 U.S. at 326. A remedy must "effectively preserve competition in the relevant market" and "maintain the premerger level of competition." *Sysco*, 113 F. Supp. 3d at 72 (quotation omitted).

119.    The antitrust laws serve "to protect the competitive process as a means of promoting economic efficiency." *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1437 (7th Cir. 1986); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) ("harm [to] the competitive *process*" is "an anticompetitive effect"). A remedy that substitutes regulation or arbitration for competition does not "restore and encourage the competition adversely affected by the acquisition," and thus fails to redress the Section 7 violation. *Ford Motor*, 405 U.S. at 578; *see also ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 573 (6th Cir. 2014) (indicating that a divesture was favored over a conduct remedy).

**B.**     **The Court should permanently enjoin the proposed transaction.**

120.     "[I]t is well settled that once the Government has successfully borne the considerable burden of establishing a violation of the law, all doubts as to remedy are to be resolved in its favor."[38] *Ford Motor*, 405 U.S. at 575 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961)); *accord F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170 (2004); *E.I. du Pont*, 366 U.S. at 331 (explaining the "burden is not on the Government to show" that the defendants' proposed remedy would be ineffective).

121.     In order "to obtain the relief necessary to protect the public from . . . anticompetitive conduct," *Empagran*, 542 U.S. at 170 (citing 15 U.S.C. § 25; *E.I. du Pont*, 366 U.S. at 334), the United States prays for an injunction blocking AT&T's proposed acquisition of Time Warner, *see* Compl. ¶ 48(b). That request not only deserves deference but also aligns with Supreme Court precedent declaring that upon finding that the effect of an "acquisition may be substantially to lessen competition," 15 U.S.C. § 18, a complete divestiture is the "preferred remedy," *Cal. v. Am. Stores*, 495 U.S. 271, 280–81 (1990); *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961); *Ford Motor*, 405 U.S. at 573 (describing a "[c]omplete divestiture [as] particularly appropriate where asset or stock acquisitions violated the antitrust laws").

---

[38] Only after concluding that a merger would violate Section 7 does a court consider the proper remedy for the violation. 15 U.S.C. § 25 (authorizing courts "to prevent and restrain *violations* of this Act" (emphasis added)); *see also Mercantile Texas Corp. v. Bd. Of Gov.'s of Fed. Reserve System*, 638 F.2d 1255 (5th Cir. 1981) ("[B]oard may not deny approval to a proposed merger . . . without finding a violation of the antitrust standards explicitly incorporated into the statute."). Here, the potential remedies include a permanent injunction against the proposed merger and divestiture of a business unit of one of the merging parties.

### C.    The Court may order alternative structural relief.

122.    The Court may order alternative structural remedies if it were to conclude that doing so would sufficiently reduce the risk of anticompetitive effects so as to redress the Section 7 violation.[39] The evidence at trial demonstrated that the bulk of the anticompetitive effects flow from the proposed combination of Turner with DirecTV. Tr. 2296:3–7, 3210:9–12, 2383:8–19 (Professor Shapiro explaining that his model identifies anticompetitive effects from the combination of Turner and DirecTV). Accordingly, this Court could find that a structural remedy that prevents the combination of those two assets within one corporate entity would significantly reduce the likelihood of anticompetitive effects. *United States v. Anthem*, 855 F.3d 345, 368 (D.C. Cir. 2017) (acknowledging the possibility of a narrow liability finding); *FTC v. PepsiCo, Inc.*, 477 F.2d 24, 29 (2d Cir. 1973) (noting that partial divestiture may be appropriate where "the offending line of commerce, if disassociated from the merged entities, can survive as a viable independent entity"). This could be accomplished in various ways.[40]

123.    As a first alternative to an injunction blocking the acquisition in its entirety, the Court could issue an injunction expressly prohibiting AT&T from acquiring Turner while permitting AT&T to acquire Warner Bros. and HBO. Post-merger, AT&T could attempt to realize many of its purported benefits of vertical integration[41] by acquiring HBO and Warner Bros., while eliminating the anticompetitive effects that would flow from AT&T's acquisition of Turner. Tr. 2283:1–5 (Professor Shapiro explaining that if AT&T did not acquire Turner "the harm I've identified would be eliminated"); Tr. 3396:1–3397:25 (AT&T CEO Randall

---

[39] The presumption in favor of the United States' requested relief, *see supra* Section VII.B, should also apply to the alternative divestitures proposed in this section.

[40] DirecTV has conceded that the Court is authorized to order such targeted divestitures. Dkt. # 117 at 3 (recognizing the Court's authority to "order AT&T to divest itself of DIRECTV").

[41] The Court might also consider enjoining AT&T from acquiring a controlling stake in Turner.

Stephenson describing Warner Bros. as having "the best library in the world," and HBO as "wonderful premium video").

124.     A second alternative would be for the Court to issue an order requiring AT&T to divest DirecTV as a condition to acquiring Time Warner. Such an order would reduce the anticompetitive effects associated with combining the largest pay TV distributor (DirecTV) with Time Warner's content. The United States notes, however, this may be a less attractive alternative remedy because it would permit AT&T to advantage its broadband and wireless businesses through the distribution of Time Warner content.[42]

**D.     Behavioral relief is disfavored in a litigated Section 7 action.**

125.     Behavioral relief is not appropriate because it would not be "effective to restore competition" and "redress the violation[]" that would follow from the proposed transaction. *E.I. du Pont*, 366 U.S. at 326; *accord Ford Motor*, 405 U.S. at 573; *Sysco*, 113 F. Supp. 3d at 72 (holding that a remedy must "effectively preserve competition in the relevant market" and "maintain the premerger level of competition").

126.     Behavioral remedies are disfavored in Section 7 cases because they "risk excessive government entanglement in the market," *Saint Alphonsus Med. Ctr.-Nampa Inc. v. Saint Luke's Health Sys., Ltd.*, 778 F.3d 775, 793 (9th Cir. 2015), and "there are usually greater

---

[42] The evidence at trial showed that some content distribution is transitioning to some degree from traditional pay-TV providers to the Internet via broadband and wireless services. *See* Tr. 2228:22–2231:25 (describing a decline of approximately 1–2% per year in MVPD subscribers). By AT&T's own admission, AT&T's wireless business is "almost two times what [the company] do[es] in the entertainment side of things," Tr. 3253:14–3254:14, and "[i]n fact, the whole wireless environment is, in large part, what is driving this transaction." Tr. 49:22–50:1. Accordingly, as between these two forms of alternative relief, the United States prefers a remedy that would bar AT&T's acquisition of Turner.

long term costs associated with monitoring the efficacy of a conduct remedy than with imposing a structural solution," *ProMedica*, 749 F.3d at 573.

127.    While structural relief ensures that the risk of harm is eliminated, behavioral relief assumes that regulatory conditions can effectively constrain a business's natural incentives to maximize profits at the expense of robust competition. *See generally*, Makan Delrahim, Assistant Attorney General, Dep't of Justice, Antitrust Division, Remarks at Competition and Deregulation Roundtable #2 (Apr. 26, 2018), https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-antitrust-divisions-second; *see also Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 415 (1986) (holding that regulatory approval of rates as "reasonable and non-discriminatory" does not "foreclose the possibility that slightly lower rates would also have been within the zone of reasonableness"). Moreover, policing such remedies "involve[s] the courts and the Government in regulation of private affairs more deeply than the administration of a simple order of divestiture." *E.I. du Pont*, 366 U.S. at 334.[43] Behavioral relief is also less effective at protecting competition than structural remedies because it "can hardly be detailed enough to cover in advance all the many fashions in which improper influence [over the vertically related, acquired company] might manifest itself." *E.I. du Pont*, 366 U.S. at 334. Indeed, a behavioral remedy that allows an otherwise anticompetitive transaction to proceed risks friction with Congress's mandate "that tendencies toward concentration in industry are to be curbed *in their incipiency* . . . ." *Brown Shoe*, 370 U.S. at 346 (emphasis added).[44]

_____

[43] *See also* Sullivan & Grimes, The Law of Antitrust 554–55 (3d ed. 2016) (observing that monitoring a decree "may be a particularly frustrating and perhaps impossible task" and that an enforcer may lack "the knowledge and resources to monitor and enforce every turn of events in a constantly shifting marketplace").

[44] The United States is not aware of any Section 7 case brought by the United States in which a court's order of exclusively behavioral relief over the objection of the United States survived appellate review. *See E.I. du Pont*, 366 U.S. at 329–35 (vacating order directing behavioral

Accordingly, structural remedies, such as divestiture, "should always be in the forefront of a court's mind when a violation of [Section] 7 has been found." *E.I. du Pont*, 366 U.S. at 316.

### E.  Behavioral relief is particularly inappropriate in this action.

128.    Even if the Court were generally inclined to grant behavioral relief, this action does not present the appropriate circumstance. Defendants will argue that the Court should either (1) defer to Defendants' unilateral arbitration remedy or (2) impose an arbitration remedy similar to the Comcast–NBCU consent decree. However, Defendants "bear the burden of showing that any proposed remedy would negate any anticompetitive effects of the merger." *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 137 n.15 (D.D.C. 2016).[45] And in this action, the harm from the proposed transaction cannot be remedied by either form of behavioral relief. *See supra* Section VI.F; PFOF §§ III, IV.D, IX.

---

relief, which the district court entered over the government's objection, and instead ordering complete divestiture). Behavioral relief has instead been ordered in conjunction with structural relief and at the request of the United States. *See, e.g.*, *Ford Motor*, 405 U.S. at 575–78 (affirming conduct remedies "ancillary" to divestiture requested by the United States). This case should not depart from over 100 years of Clayton Act precedent to order behavioral relief over the United States' objection.

[45] Defendants may advocate for behavioral relief by bemoaning the inconvenience of structural relief. However, "the pinch on private interests is not relevant to fashioning an antitrust decree, as the public interest is [the] sole concern." *Utah Pub. Serv. Comm'n v. El Paso Nat. Gas Co.*, 395 U.S. 464, 472 (1969).

Dated: May 8, 2018                              Respectfully submitted,


                                                 /s/ Craig Conrath
MAKAN DELRAHIM                                  CRAIG CONRATH
Assistant Attorney General for Antitrust        ERIC D. WELSH (D.C. Bar # 998618)
                                                PATRICK M. KUHLMANN
ANDREW C. FINCH                                 CAMERON GOWER
Principal Deputy Assistant Attorney
General                                         ALVIN H. CHU
                                                ANNA SALLSTROM
DONALD G. KEMPF, JR.                            ELIZABETH JENSEN
Deputy Assistant Attorney General for          ERICA MINTZER
Litigation                                      FREDERICK YOUNG
                                                JOHN HOGAN
BERNARD A. NIGRO, JR.                           KATHRYN KUSHNER
Deputy Assistant Attorney General              MARISA DIEKEN
                                                MATTHEW JONES
PATRICIA A. BRINK                               MATTHEW SIEGEL
Director of Civil Enforcement.                  NATHAN BRENNER
                                                PETER SCHWINGLER
DAVID B. LAWRENCE                               SANFORD ADLER
Counsel to the Assistant Attorney General       SOMADINNA NWOKOLO

CAROLINE J. ANDERSON
Counsel to the Assistant Attorney General

SCOTT SCHEELE                                   U.S. Department of Justice, Antitrust Division
Chief, Telecommunications and Broadband         Telecommunications and Broadband Section
Section                                         450 Fifth Street, N.W., Suite 7000
                                                Washington, DC  20530
JARED A. HUGHES                                 Telephone: (202) 514-5621
Assistant Chief, Telecommunications and         Facsimile: (202) 514-6381
Broadband Section

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2018, I caused a true and correct copy of the foregoing to be served upon the parties of record via the Court's CM/ECF system.

Dated: May 8, 2018                    Respectfully submitted,


/s/ Craig Conrath
Craig Conrath

U.S. Dept. of Justice, Antitrust Division
450 Fifth Street, NW, Suite 7000
Washington, DC 20530
Phone: (202) 532-4560
Email: craig.conrath@usdoj.gov

*Attorney for United States of America*