**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, |
| *Plaintiff*, |
| v. |
| AT&T INC., DIRECTV GROUP HOLDINGS, LLC, and TIME WARNER, INC., |
| *Defendants*. |

Civil Action No. 1:17-cv-02511 (RJL)

**REDACTED**

## <u>PROPOSED FINDINGS OF FACT OF THE UNITED STATES</u>

# TABLE OF CONTENTS

I.   BACKGROUND.................................................................................................... 1

   A.  Parties and venue............................................................................................ 1

   B.  The proposed transaction ............................................................................... 2

   C.  The pay-television industry ............................................................................ 2

       1.  MVPDs deliver packages of linear channels and on demand content
           to subscribers via separate, dedicated transmission paths that
           each one controls.................................................................................... 2

       2.  Virtual MVPDs distribute linear channels and on demand content to
           subscribers over the internet.................................................................. 4

       3.  SVODs distribute on-demand content over the internet ........................... 6

   D.  Defendants recognize their own power within the pay-TV ecosystem............................ 7

II.  RELEVANT MARKETS...................................................................................... 10

   A.  Product Market: Multichannel Video Distribution is a relevant product market............ 10

       1.  A hypothetical monopolist over Multichannel Video Distribution
           services (MVPDs and virtual MVPDs) could profitably impose a small but
           significant non-transitory increase in price above competitive levels ...................... 10

       2.  Brown Shoe factors establish a distinct Multichannel Video Distribution
           product market......................................................................................... 11

       3.  Even an all video distribution services market meets the hypothetical
           monopolist test ...................................................................................... 12

   B.  Geographic Market......................................................................................... 13

       1.  Relevant downstream geographic markets are local, but they can be
           aggregated for analytical convenience ....................................................... 13

       2.  The competitive options for any given location vary................................ 15

III.  AT&T'S DOCUMENTS RECOGNIZE THAT VERTICAL INTEGRATION
      POSES A THREAT TO COMPETITION ...................................................... 16

IV.  THE PROPOSED MERGER WOULD LIKELY SUBSTANTIALLY LESSEN

COMPETITION IN THE ALL VIDEO DISTRIBUTION AND
MULTICHANNEL VIDEO DISTRIBUTION PRODUCT MARKETS IN LOCAL
MARKETS THROUGHOUT THE COUNTRY ................................................................. 20

A.  MVPDs and virtual MVPDs currently compete to attract and retain subscribers .......... 20

   1.  MVPDs compete with one another based on the programming they offer ............... 20

   2.  MVPDs compete with one another on price ............................................................. 22

   3.  MVPDs compete with one another based on innovative offerings ........................... 23

B.  The merger would enable AT&T to harm competition because MVPDs and virtual
    MVPDs need Turner content to compete effectively ..................................................... 23

   1.  Industry participants highly value Turner ................................................................ 24

      a.  Turner's content is valued by viewers ................................................................ 26

      b.  Turner has exclusive rights to popular sports programming ............................... 28

      c.  Turner's core networks are among the most widely-distributed
         cable networks ..................................................................................................... 30

      d.  Turner obtains high affiliate fees from MVPDs and virtual MVPDs ................. 31

      e.  Turner fees have steadily increased for years .................................................... 33

   2.  Turner's valuable content gives it leverage in negotiations with
     MVPDs and virtual MVPDs ..................................................................................... 35

      a.  Each of Turner's agreements with distributors is heavily negotiated ................. 35

      b.  Each side formulates its negotiating strategy based on what would
         happen if they did not reach an agreement .......................................................... 40

      i.  Currently, without an agreement, Turner would lose affiliate fees and
        advertising revenue due to reduced exposure to viewers .................................... 40

      ii.  Without an agreement, MVPDs and virtual MVPDs would lose customers ...... 41

      iii.  MVPDs have estimated their likely subscriber losses to inform their
         negotiating strategy .......................................................................................... 43

         a) Charter commissioned consulting firm Altman Vilandrie to
            conduct a detailed analysis to inform its negotiation strategy ................. 44

b) Comcast regularly analyzes viewership data to estimate potential subscriber losses ...................................................................................... 50

c) Cox estimated potential subscriber losses when considering whether to drop ██████ .............................................................................................. 54

d) Other MVPDs have estimated potential subscriber losses through viewership data .................................................................................. 55

c. Each side uses its leverage to negotiate the best deal it can ................................. 55

i. Turner uses the threat of going dark as leverage to get favorable agreement terms ......................................................................................... 56

ii. Turner uses its sports rights as leverage to get favorable agreement terms ........ 57

iii. Turner "prevailed nicely" over Cable ONE in the only blackout of all of Turner's networks, while Viacom remains off air on Cable ONE four years later ................................................................................................ 60

3. As a result of the merger, Turner's negotiating leverage would increase ................. 64

a. Post-merger, Turner will pursue a strategy that will maximize AT&T's overall profits ......................................................................................... 65

b. AT&T's rivals expect Turner to exercise its increased bargaining leverage ...... 68

c. Professor Shapiro's economic model predicts that Turner would be able to use additional leverage to increase fees beyond the regular annual price increases that would occur without the merger ............................. 72

i. Subscriber loss rate ............................................................................... 75

ii. Diversion rate ........................................................................................ 78

iii. AT&T profit margins ............................................................................ 79

iv. The bargaining split ............................................................................. 81

d. AT&T price reductions to itself resulting from the elimination of double marginalization (EDM) would not offset the price increases from this merger ...................................................................................... 82

4. Rival MVPDs would pass along Turner price increases to their subscribers ........... 84

C. The merger would enable AT&T to use control over HBO to harm competition ......... 86

1.  HBO is ████████████ .......................................................... 86

2.  HBO leverages its value in carriage negotiations with MVPDs and
    virtual MVPDs ........................................................................ 89

3.  MVPDs and virtual MVPDs use HBO as important tool to attract and retain
    subscribers from rival MVPDs.............................................................. 93

4.  MVPDs and virtual MVPDs do not have sufficient alternatives for HBO .............. 96

5.  The merged firm will have the incentive and ability to use HBO to harm rival
    distributors................................................................................... 98

D.  Prior vertical integration has raised significant concerns for industry participants ...... 101

V.  THE MERGER WOULD GIVE AT&T THE ABILITY TO HARM
    COMPETITION BY SLOWING THE GROWTH OF EMERGING, INNOVATIVE
    ONLINE DISTRIBUTORS ............................................................... 104

A.  The merger will allow AT&T to impede the growth of virtual MVPDs
    that increasingly compete with AT&T/DirecTV ........................................ 104

1.  AT&T has the incentive to impede the growth of virtual MVPDs ...................... 106

2.  The merger would give AT&T the ability to harm competition from
    virtual MVPDs by restricting their access to Time Warner content ..................... 107

3.  AT&T's provision of DirecTV Now does not reduce its incentive to
    harm competing virtual MVPDs ........................................................... 112

B.  The merger would increase the likelihood of anti-competitive coordination
    between two vertically integrated distributors ........................................... 113

1.  AT&T's acquisition of Time Warner would increase the ability of AT&T and
    Comcast to act on their shared incentives ............................................... 114

2.  The relevant markets are conducive to coordination .............................. 117

VI. EFFICIENCIES: THE PARTIES' CLAIMED EFFICIENCIES CANNOT
    JUSTIFY THE LIKELY HARM TO COMPETITION IN THE
    RELEVANT MARKETS.................................................................. 121

A.  Defendants have not met their burden of asserting evidence to substantiate
    their synergy claims .................................................................... 122

B.  Defendants have not established that the asserted cost synergy claims are verifiable or

merger-specific ................................................................................................... 124

    1.  Defendants have failed to show that their claimed marketing spend
       cost synergies are either verifiable or merger-specific............................. 125

    2.  Defendants have failed to show that their claimed vendor spend cost
       synergies are either verifiable or merger-specific .................................... 126

    3.  Defendants have failed to show that their corporate spend cost synergies
       are either verifiable or merger-specific .................................................... 127

C.  Defendants have not shown that their four categories of revenue synergies
    are verifiable or merger-specific .................................................................... 128

    1.  Defendants failed to show that their claimed combined asset revenue
       synergies are verifiable or merger-specific ............................................ 128

    2.  Defendants have failed to show that their claimed data-driven advertising
       revenue synergies are verifiable or merger-specific ............................... 129

    3.  Defendants failed to show that their claimed revenue synergies
       from a programmatic platform are either verifiable or merger-specific ................ 132

    4.  Defendants failed to show that their claimed content intelligence
       revenue synergies are either verifiable or merger-specific ..................... 135

D.  Defendants' generic arguments in support of most or all of their synergy
    claims do not render any of those claims verifiable....................................... 137

    1.  Defendants' asserted record of achieving synergy targets in prior
       mergers does not demonstrate that the claimed synergies are verifiable
       here ........................................................................................................ 137

    2.  Defendants' assertion that the merged firm will achieve its synergy targets
       because the company's managers will be held accountable for doing so
       does not render the claimed synergies verifiable .................................... 138

E.  Defendants have not even purported to provide quantification for several
    of their synergy claims, and thus those synergy claims cannot be verified ................. 138

F.  Defendants have failed to proffer evidence sufficient to show that any
    of the benefits from merging would offset the competitive harm that
    has been demonstrated in the relevant markets............................................ 139

G.  Defendants' desire to compete with Google and Facebook has no bearing
    on whether their proffered revenue synergies are merger-specific or verifiable ......... 140

VII. ENTRY WILL NOT BE TIMELY, LIKELY, OR SUFFIECIENT TO
PREVENT THE COMPETITIVE EFFECT OF THIS MERGER .................................... 141

VIII.     DEFENDANTS HAVE NOT ESTABLISHED THAT THE
PROGRAM ACCESS RULES WOULD PREVENT ANY OF THE HARM CAUSEDBY
THIS MERGER ............................................................................................................. 143

    A. The FCC has determined on multiple occasions that the program access
rules do not prevent a programmer from raising prices after merging with an MVPD  144

    B. Defendants have not established that any offset for Professor Shapiro's harm
calculations is required, nor offered any calculation for such an offset........................ 148

IX. DEFENDANTS' UNILATERAL OFFER OF PRIVATE ARBITRATION
FAILS TO PRESERVE/RESTORE COMPETITION AND FAILS TO PROTECT THE
PUBLIC INTEREST...................................................................................................... 151

    A. The Turner Arbitration Offer fails to remedy the harm caused by
AT&T's post-merger incentives to disadvantage rival video distributors ................... 152

        1. Neither the "standstill" provision nor the "shadow of arbitration" preserves
competition or otherwise eliminates Turner's post–merger leverage .................... 153

        2. Experience with Comcast/NBCU reflects that arbitration is risky and video
distributors are unlikely to invoke it ..................................................................... 153

        3. Arbitration presents risk and information asymmetry for distributors,
making them less likely to invoke arbitration ........................................................ 154

        4. Distributors do not view the Turner Arbitration Offer as a viable
remedy to their concerns with the merger .............................................................. 155

        5. The omission of HBO and other content creates a "hammer" for Turner
to use in negotiations.............................................................................................. 156

    B. The Turner Arbitration Offer is not designed to and does not preserve
competition................................................................................................................... 157

        1. "Fair Market Value" is undefined and not used by market participants
in the ordinary course of business .......................................................................... 158

        2. The complexity and multi-dimensionality of carriage agreements makes
baseball-style arbitration an ill-suited merger remedy ........................................... 159

        3. The arbitrator has no instruction on which benchmarks to use as
comparable data points............................................................................................ 161

4.  The arbitration mechanism would result in a time-consuming and expensive form of regulation by litigation. ........................................................ 161

C.  The Turner Arbitration Offer suffers from other deficiencies ..................................... 162

1.  The Turner Arbitration Offer does not cover all of the merged firm's content ...... 162

2.  The Turner Arbitration Offer does not include important oversight...................... 163

3.  The seven-year term of the Turner Arbitration Offer is too short........................... 164

4.  The Turner Arbitration Offer does not eliminate the potential for a "blackout" .... 165

5.  The Turner Arbitration Offer contains limited appeal rights. ................................. 165

6.  The law and venue governing disputes about the Turner Arbitration Offer will vary, and Defendants cannot show that it is irrevocable or enforceable in all cases. .................................................................................... 166

I.     **BACKGROUND**

    A.     **Parties and venue**

1.     Defendant AT&T Inc. ("AT&T") is a Delaware corporation headquartered in Dallas, Texas. Answer Resp. to ¶ 20. It is the country's second largest wireless telephone company, third largest home internet provider, and one of the largest providers of landline telephone services. Answer Resp. to ¶ 21. It has three multiple video programming distribution ("MVPD") offerings, which, combined have approximately 25 million video subscribers. PX0455-011; Answer Resp. to ¶ 21.

2.     Defendant DIRECTV Group Holdings LLC ("DirecTV") is a subsidiary of AT&T and a Delaware corporation headquartered in El Segundo, California. Answer Resp. to ¶ 22.

3.     Defendant Time Warner Inc. ("Time Warner") is a Delaware corporation headquartered in New York, New York. Answer Resp. to ¶ 23. It is a media company with essentially three business units: (1) Turner Broadcasting Systems, whose most popular networks include TNT, TBS, CNN, and Cartoon Network; (2) Warner Bros. Entertainment, Inc., which is one of the country's major television and movie studios; and (3) Home Box Office, Inc. (HBO) premium network, which also owns Cinemax, and has almost 50 million subscribers (the vast majority of whom access HBO through an MVPD). Answer Resp. to ¶ 23.

4.     This Court has personal jurisdiction over each Defendant. 15 U.S.C. § 22; Answer Resp. to ¶ 46 (acceding to the personal jurisdiction of this Court pursuant to agreement with the United States).

5.     Venue is proper in this district. 15 U.S.C. § 22; Answer Resp. to ¶ 47 (acceding the propriety of venue in this District pursuant to agreement with the United States).

6.     Defendants are engaged in, and their activities substantially affect, interstate commerce. 15 U.S.C. § 12; Answer Resp. to ¶ 45.

**B.     The proposed transaction**

7.      On October 22, 2016, AT&T and Time Warner entered into a merger agreement. Answer Resp. to ¶ 26. Under this agreement, AT&T would acquire Time Warner for a total transaction value of $108 billion. *See* Answer Resp. to ¶ 26 (admitting that $108 billion was the estimated value of the merger at the time it was announced).

**C.     The pay-television industry**

8.      The pay-television industry (sometimes referred to as the "pay-TV ecosystem"), *e.g.*, PX0153-003, consists of the companies and firms that create, bundle, and distribute televised and on-demand video content to consumers. *See* Tr. 80:4–16 (Fenwick/Cox); *see also*, *e.g.*, PX0031-010; PX0456-002. There are three levels to the pay-TV industry: content creation, content aggregation, and content distribution. *See* PX0031-013; *cf.* Tr. 77:15–18, 80:4–21 (Fenwick/Cox). Generally, content is created by a studio, like Warner Bros., aggregated by a network or network group, like Turner, and distributed by a video distributor, like DirecTV. *See* Tr. 80:4–21 (Fenwick/Cox); PX0456-004.

**1.     MVPDs deliver packages of linear channels and on demand content to subscribers via separate, dedicated transmission paths that each one controls**

9.      Most households in the United States receive video programming from MVPDs. *Compare* Tr. 3450:20–22 (Stephenson/AT&T) (confirming that 90 million U.S. households subscribe to pay-TV), *with* Tr. 3449:24–3450:1 (Stephenson/AT&T) (referencing a balance of 20 to 30 million households in the U.S. without a pay-TV subscription). An MVPD is an entity engaged in the business of making available for purchase by subscribers multiple channels of video programming over separate, dedicated transmission paths that each MVPD controls. *See* 47 C.F.R. § 76.1000(e); 47 U.S.C. § 522(13). MVPDs include cable television providers ("cable TV"), direct broadcast satellite providers ("DBS"), and telecommunications providers ("telcos").

Tr. 81:7–12, 81:23–82:2 (Fenwick/Cox); Tr. 860:18–21 (Rigdon/Comcast). Though different

technology is used to distribute content, all MVPDs provide a broad portfolio of video content.

Tr. 82:2–3 (Fenwick/Cox).

10.     In order to offer programming, MVPDs must obtain licenses from the networks

they desire to carry. Tr. 80:4–9 (Fenwick/Cox). To receive a license, an MVPD must negotiate

with a programmer and enter into a detailed contract, called an affiliate agreement, which

describes the precise rights being granted and the applicable terms and conditions. *See* Tr. 559:7–

14 (Martin/Turner); *see also, e.g.*, PX0409. Affiliate agreements generally run "between five and

eight years on average." Tr. 87:9–11 (Fenwick/Cox). They are often "complicated" and involve

lots of different terms. Tr. 1454:18–21 (Sutton/HBO). Typically, negotiations for affiliate

agreements last several months, and negotiations with programmers containing multiple

networks—such as Turner—can be even more "time consuming." Tr. 87:14–19 (Fenwick/Cox).

In fact, John Martin, the chairman and CEO of Turner described such negotiations as "trench

warfare." Tr. 559:10–14 (Martin/Turner). *See infra* IV.B.2.

11.     In addition, studios and programmers also negotiate the "windows" in which

programming will be made available. *See* PX0148-037. Windowing refers to time periods, after

content is released, when distributors can disseminate the content to their subscribers. *See* Tr.

92:1–6 (Fenwick/Cox). Distributors want to secure early windows because consumers desire to

view content as close to the initial release date as possible. *See* Tr. 92:4–6 (Fenwick/Cox).

Conversely, ████████████████████████████████████████

████████████████████████████████████. PX0008-060. Thus, ████████

████████████████████████████████████████████████. *See*

PX0148-037; *cf.* PX0008-059–060 ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

12.     After securing the necessary licenses, MVPDs combine multiple networks from different programmers to form a pay-TV package that can include anywhere between a few dozen to several hundred channels. *See* Tr. 80:4–9, 84:23–85:2 (Fenwick/Cox). These pay-TV packages include linear TV programming, on-demand content, and typically premium channels like HBO. Tr. 81:1–5, 14–19 (Fenwick/Cox); Tr. 1185:22–1186:1 (Warren/Turner). Linear programming refers to programming that is made available on a fixed schedule set by the network. Tr. 471:12–16 (Martin/Turner); Tr. 81:14–17 (Fenwick/Cox) (defining linear programming as "live TV").

13.     ████████████████████████████████████████████████

████████████ *See* PX0031-007. While the number of MVPD subscribers is slowly declining, pay-TV revenue continues to grow, providing a "cash cow business" for MVPDs. PX0008-006; PX0031-007, -014. Even programmers believe MVPDs are likely to remain highly profitable in the future because, as Turner stated, MVPDs "clearly provid[e] a lot of consumer value" and can support higher affiliate fees. PX0078-010–011.

> **2.     Virtual MVPDs distribute linear channels and on demand content to subscribers over the internet**

14.     Virtual MVPDs distribute linear channels and on demand content to subscribers over the internet, and include DirecTV Now, Sling TV, Sony Vue, Hulu Live, and YouTube TV. *See* Tr. 279:3–5 (Schlichting/DISH); Tr. 583:6–19 (Martin/Turner). Similar to MVPDs, virtual MVPDs offer linear pay-TV packages that bundle networks and on-demand content for a subscription fee to consumers. *See* Tr. 235:25–236:1, 241:5–7 (Schlichting/DISH); Tr. 485:22–

24 (Martin/Turner). Also like MVPDs, virtual MVPDs must obtain licenses to carry linear networks and must negotiate with programmers over the terms to include in their affiliate agreements. *See* PX0008-006; Tr. 578:3–5 (Martin/Turner).

15.     Virtual MVPDs deliver content over the internet, ███████████████████, instead of through dedicated infrastructure. PX0008-018; *see also* Tr. 238:13–14, 18–21 (Schlichting/DISH). ███████████████████████████████████████ ██████████████████████████████████████████████. *See* PX0008-018. As discussed in more detail below, virtual MVPDs offer skinnier bundles at lower prices while also covering a national footprint.

16.     On average, virtual MVPD prices are lower than MVPD prices. Tr. 239:8–12 (Schlichting/DISH). As Warren Schlichting of DISH explained "a typical pay-TV package…at DISH start[s] at $50" compared to the price of Sling TV which is "basically [$]20 or $25…by comparison." Tr. 239:8–12 (Schlichting/DISH); *see also* PX0008-018–019. Because of this, virtual MVPDs appeal to consumers who demand lower priced bundles that carry only the most watched networks. PX0151-004; *see also* PX0195-010. Virtual MVPDs may be able to provide lower priced bundles by offering packages with fewer channels. Tr. 236:2–11 (Schlichting/DISH); *see also* PX0151-004. As Schlichting testified, "one of the biggest complaints of consumers is . . . paying for networks that they don't watch. So we have I guess you call it a skinny bundle or a skinny base package." Tr. 236:8–11 (Schlichting/DISH). In order to carry a smaller number of channels, a virtual MVPD has to negotiate rights from the programmers involved to permit them to do so. Tr. 240:8–241:1 Schlichting/DISH).

17.     Nonetheless, virtual MVPDs need to carry content that subscribers want to watch. *See* PX0195-030; Tr. 583:20–24 (Martin/Turner). For instance, Turner programming is available

on almost all virtual MVPDs and Turner's research has found that, like for MVPDs, Turner

Networks "drives significant value for vMVPDs." Tr. 583:6–19 (Martin/Turner); PX0195-011.

For Sling TV, DISH selected "the most popular programming" with "an emphasis on live sports

and live news." Tr. 239:22–240:7 (Schlichting/DISH); *see also* PX0456-006 (discussing the

importance of sports programming). Therefore, as the above facts show, even though virtual

MVPDs have lower average prices when compared to MVPDs, they are still dependent on

programmers who have valuable content.

      18.    Finally, virtual MVPDs distribute content nationwide as opposed to certain

geographic areas. PX0008-018; *see also, e.g.*, PX0211-003 (████████████████████

████████████████████). This contrasts with cable companies, and telcos, who only

distribute content regionally. Tr. 81:6–12 (Fenwick/Cox); Tr. 2241:9–10 (Prof. Shapiro). Instead,

the distribution footprint for virtual MVPDs resembles the national footprint for DBS providers

like DirecTV and DISH. *Compare, e.g.*, PX0211-003, *with* Tr. 81:25–82:2 (Fenwick/Cox).

### 3.    SVODs distribute on-demand content over the internet

      19.    Subscription video on-demand services ("SVODs") are substantially different

from both MVPDs and virtual MVPDs. For a monthly fee, SVOD subscribers can have online

access to "a number of shows that are record[ed] and available literally on demand" when the

subscriber decides to view the content. Tr. 243:15–20 (Schlichting/DISH); *see also* PX0008-025;

PX0456-002. Instead of providing linear networks, SVODs stream previously aired, premium

prime-time broadcast programming and movies to subscribers. Tr. 486:10–11 (Martin/Turner);

*see* PX0008-025–026; *see infra* II.A.2. ████████████████████████

████████████████. PX0008-007.

      20.    ████████████████████████████████████

██████████████████████████████████████. PX0008-050. ██████████

████████████████████████████████████████████████████████████

████████████ PX0008-051. ████████████████████████████████████

████████████████████████████████ PX0008-051. ████████████████

████████████████████████████████████████████████████████████

██████████ PX0008-051. ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ PX0008-051. ████████

████████████ SVODs are viewed as a complement to linear pay-TV. Tr. 241:2–3
(Schlichting/DISH); *see infra* II.A.2.

  **D.**  **Defendants recognize their own power within the pay-TV ecosystem**

  21.  AT&T describes itself as a "leading provider of communications and digital

entertainment services in the United States and the world." PX0455-007. AT&T CEO Randall

Stephenson noted that in 2015, when AT&T acquired DirecTV, it became the largest pay-TV

provider in the United States. Tr. 3384:10–3385:14 (Stephenson/AT&T); PX0458-003. The

DirecTV acquisition gave AT&T "nationwide reach" for its video business. PX0455-008. Today,

AT&T has approximately 25 million video subscribers, which is about 27 percent of the pay-TV

market nationwide. PX0455-011. AT&T's Entertainment Group business segment (which

includes DirecTV) generated approximately $51 billion dollars in revenues in 2016 and 2017.

PX0455-135; PX0458-007.

  22.  AT&T similarly recognizes Time Warner's market influence. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ DX0609.0011; ██████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

DX0609.0011.

23.    AT&T's Entertainment Group CEO John Stankey characterized Time Warner, but

not Viacom, as having "must have content" in handwritten notes that he prepared and discussed

with Stephenson. PX0006; Tr. 3356:10–21 (Stankey/AT&T); *see also* Tr. 3357:4–12

(Stankey/AT&T) ("I put a note down there next to Time Warner that indicates must have with a

number of other players in the industry given the popularity of the content.").

24.    Time Warner also has acknowledged its own significance. Time Warner

executives reported to their Board of Directors in June 2016: ████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ PX0008-035; Tr. 471:25–472:3

(Martin/Turner); *see also* PX0153-006–007 (████████████████████████████

████████████████████████████████████████████ ); PX0148-

011, -032 (████████████████████████████████████████████

██████████ ).

25.    As Turner itself has touted, TBS and TNT are among the top ten most profitable

cable networks in the United States. Tr. 471:21–24 (Martin/Turner). Turner CEO John Martin

reported to the Time Warner Board of Directors, ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████ PX0153. From 2013 to 2016, TBS was the number one entertainment network. Tr. 472:4–6, 475:7–16 (Martin/Turner); PX0149-009.

26.     Turner also excels at original programming: for example, in 2016, Turner debuted eight new marquee original programs on TBS and TNT that were all renewed for another season. Tr. 475:17–476:13 (Martin/Turner); PX0149-009. Turner networks accounted for over half of all the daily top twenty telecasts that year. Tr. 477:7–19 (Martin/Turner); PX0149-009. Turner's 2016 U.S. entertainment and sports subscription revenues totaled $3.6 billion dollars, and its margin was 47 percent. Tr. 483:14–484:23 (Martin/Turner); PX0148-015.

27.     Turner's strong performance continued in 2017. See PX0151-005 ("TBS and TNT ranked as cable's #3 and #6 networks with P18-49 in primetime for the [first] quarter [of 2017].").; PX0151-005 (highlighting that TBS and TNT are high-ranking cable networks that Turner's sports programming yields strong ratings, that CNN continues to grow its viewership, and that Cartoon Network/Adult Swim continues to be a top-performing network for children and adults).

28.     Additionally, in the words of Time Warner's CEO Jeff Bewkes, HBO is "the gold standard in premium video." PX0459-010. ██████████████████████████ ████████████████████████████. See, e.g. PX0008-035, -038; PX0459-023; PX0456-009; PX0010A-003; Tr. 1453:8-22 (Sutton/HBO); Tr. 2910:25–2911:6 (Holanda/RCN).  In HBO's words, its brand carries a "halo," having won more prime time Emmys than any other network for 16 years running. Tr. 1453:1–7, 1509:20–22 (Sutton/HBO). Not surprisingly, the "great majority" of MVPDs carry HBO. Tr. 3073:9–13 (Bewkes/Time Warner).

29.     Bewkes testified that Time Warner achieved its projection of "strong financial

9

performance" in 2017: ▓ percent revenue growth, ▓ percent adjusted operating growth, ▓ percent adjusted Earnings per Share ("EPS"), and ▓ billion in free cash flow. PX0552; Tr. 3152:3–14 (Bewkes/Time Warner). ████████████████████████████████████████████ PX0552-002.

30.      Turner is also not the "trapped wholesaler" it claims to be. Turner has been innovating, introducing direct to consumer services. Tr. 589:14–24 (Martin/Turner). During the trial, Turner announced a new service "Bleacher Report Live," streaming live sports programming to consumers over the internet. Tr. 666:10–19 (Martin/Turner). As announced, "B/R Live is the latest move in Turner's overall strategy to innovate beyond the traditional television ecosystem." Tr. 666:20–667:1 (Martin/Turner). Turner has taken steps for several years to move directly to consumers, with Film Struck, Boomerang, and now Bleacher Report. Live. Tr. 666:2–19, 667:17–21 (Martin/Turner). Martin admitted that he recently stated publicly that "HBO is on fire right now. Warner Brothers had its most successfully year in its history in 2017, we did too." Tr. 678:3–7 (Martin/Turner). And significantly, Martin even admitted that Turner would be just fine without this merger. Tr. 677:24–678:13 (Martin/Turner).

## II.    RELEVANT MARKETS

### A.    Product Market: Multichannel Video Distribution is a relevant product market

#### 1.    A hypothetical monopolist over Multichannel Video Distribution services (MVPDs and virtual MVPDs) could profitably impose a small but significant non-transitory increase in price above competitive levels

31.      The Multichannel Video Distribution market satisfies the hypothetical monopolist test, which has been the standard method used by economist to define relevant markets for several decades. *See* Tr. 2185:6–14 (Prof. Shapiro). This means that a hypothetical monopolist over Multichannel Video Distribution services, including both MVPDs and virtual MVPDs,

could profitably impose a small but significant non-transitory price increase on its customers, because few customers would leave this market in response to such price increase. This strongly suggests that Multichannel Video Distribution is a relevant product market.

### 2. Brown Shoe factors establish a distinct Multichannel Video Distribution product market

32. There is broad industry recognition that Multichannel Video Distribution is a distinct product. Industry witnesses have testified about important differences between virtual MVPDs and SVODs. Tr. 82:9–83:22 (Fenwick/Cox); Tr. 243:15–20 (Schlichting/DISH); Tr. 409:22–410:3 (Schlichting/DISH). Professor Shapiro's testimony highlighted industry recognition that Multichannel Video Distributors primarily compete with each other.[1] *See* Tr. 2186:11–24 (Prof. Shapiro).

33. Additionally, Multichannel Video Distribution has peculiar characteristics and uses. One way SVODs differ from MVPDs and virtual MVPDs is that they do not license networks from programmers. Tr. 486:10–11 (Martin/Turner) ("The linear networks themselves are not delivered over SVODs, but we do license individual shows to SVOD[s]"). For example, Turner's contractual agreements with SVODs do not include popular network channels like CNN, TBS, or TNT. Tr. 487:6–16 (Martin/Turner). SVODs do, however, receive licenses for TV shows, permitting them to rebroadcast multiple past seasons of shows to subscribers. *E.g.*, PX0008-051; *see also* Tr. 410:1 (Schlichting/DISH).

34. Also, unlike MVPDs and virtual MVPDs, SVODs generally do not provide linear programming like live sports or live news. *See* Tr. 241:2–9, 409:24–410:3 (Schlichting/DISH).

---

[1] Furthermore, pay-TV providers do not consider Facebook to be a competitor. *See, e.g.*, Tr. 83:23–84:1 (Fenwick/Cox); *cf.* Tr. 860:18–23 (Rigdon/Comcast). Additionally, there is no evidence of a distributor licensing Facebook video content for subscribers, either.

Additionally, many SVOD subscribers have MVPD or virtual MVPD service as well. Tr. 83:15–
22 (Fenwick/Cox); 861:10–13 (Rigdon/Comcast). MVPDs and virtual MVPDs also employ a
different business model than SVODs, typically selling packages of networks rather than
individual programs, and earning revenue not just through subscriptions but also through
advertising. *See supra* I.C.3.

35.     Multichannel Video Distribution has distinct prices. ████████████████████
████████████████████████████████████████████ PX0008-018, -019, -030. In
addition, consumers of Multichannel Video Distribution are largely insensitive to price changes.
Despite a steady increase in the price of Multichannel Video Distribution services, *e.g.*, Tr.
3445:15–3447:5 (Stephenson/AT&T); Tr. 2912:1–13 (Holanda/RCN), consumers continue to
subscribe to these services.

36.     For all these reasons, MVPDs view SVODs as a complement to linear pay-TV
and not as a substitute. *See* Tr. 241:2–9 (Schlichting/DISH); Tr. 860:24–861:3; 861:10–13
(Rigdon/Comcast). In fact, many MVPDs now include Netflix, ██████████████████,
PX0008-025, as part of their user interface. *See, e.g.*, Tr. 83:15–22 (Fenwick/Cox); Tr. 410:9
(Schlichting/DISH); Tr. 886:8–886:15 (Rigdon/Comcast); Tr. 2914:11–23 (Holanda/RCN). As
Suzanne Fenwick from Cox testified, "[w]e do not view Netflix as a competitor. We have
actually recently partnered with Netflix in order to bring our customers a full portfolio of
product." Tr. 83:16–18 (Fenwick/Cox). Rather, Netflix is viewed as "really more of an adjunct to
[Cox's] overall portfolio." Tr. 83:21–22 (Fenwick/Cox).

> **3.      Even an all video distribution services market meets the hypothetical
> monopolist test**

37.     As Professor Shapiro testified, and the Defendants do not dispute, a market of All
Video Distribution services that includes SVOD services in addition to MVPDs and virtual

MVPDs likewise meets the hypothetical monopolist test. *See* Tr. 2184:18–2185:17 (Prof. Shapiro). In any event, as Professor Shapiro testified, using an All Video Distribution services market in his economic model does not change its results: consumer harm still occurs in a broader market. Tr. 2185:18–2186:10.

**B.     Geographic Market**

**1.     Relevant downstream geographic markets are local, but they can be aggregated for analytical convenience**

38.     Consumers throughout the United States will feel the effects of the proposed merger between AT&T and Time Warner. However, these effects will vary from one geographic region to another, based on which MVPDs serve that region and their market shares within that region. For that reason, it is useful and informative to divide the country into a number of local geographic markets for the purpose of reporting the competitive effects of the proposed transaction. These zones are defined based on the choices of video distributors that consumers in the relevant areas have and recognize that consumers in different areas of the country have different choices because different MVPDs have different footprints. *See* Tr. 2187:7–2188:1 (Prof. Shapiro).[2]

39.     As described in the Horizontal Merger Guidelines, geographic markets may be defined for both the Multichannel Video Distribution product markets and for the All Video Distribution product market based on the locations of customers. The two key conditions necessary to define geographic markets based on the location of customers are: (1) suppliers can identify a customer's location and set its price based on that location, and (2) customers cannot engage in arbitrage by purchasing video distribution services from a location other than their

---

[2] Professor Carlton does not dispute the geographic markets defined by Professor Shapiro. *See* Tr. 2188:2–4 (Prof. Shapiro); *see generally* Tr. 2431:2–2624:7 (Prof. Carlton).

residence. United States Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* § 4.2.2 (2010) ("HMG"). Both conditions are satisfied here because MVPDs deliver video content to residential customers over physical transmission paths—cable and telephone wires or satellite dishes physically connected to customers' homes—and maintain direct relationships with residential customers. Even virtual MVPDs and SVODs, which deliver video programming to consumers over the internet, can discriminate based on customers' locations.

40.     Because any given consumer is served by an identifiable set of video programming distributors, competition among distributors varies from one geographic region to another based on which set of distributors is serving that region. The effects of the proposed merger on consumers in a given geographic region depend on the market shares of the various MVPDs and virtual MVPDs in that region. *See* Tr. 2240:2–2241:20 (Prof. Shapiro)

41.     The predicted impact of the merger on consumers is driven by the competitive overlap between DirecTV and rival MVPDs. So long as one tracks these competitive overlaps at a sufficiently granular level, as Professor Shapiro has done by collecting detailed data by zip code, one can correctly identify the MVPD rivals that compete against DirecTV. Using these data, Professor Shapiro was able to group together zip codes into "Local Footprint Overlap Zones." He constructed these zones by aggregating all subscribers within each Designated Market Area ("DMA") where residents have access to video offerings from the same set of MVPD competitors. With this definition, there are 1,174 Local Footprint Overlap Zones in the United States. *See* Tr. 2187:21–2188:1 (Prof. Shapiro).

42.     Accordingly, the relevant geographic market is a local market. Generally, those in the pay-TV ecosystem assess market competition at a local level. *See, e.g.*, PX0147-003

14

(providing an analysis of penetration in local "DMAs"); *see also* Tr. 1039:22–1040:2 (Breland/Turner) ("DMA" describes "the metropolitan area[s] where cable companies have their footprints."); Tr. 1039:22–1041:2 (Breland/Turner) ("Most notable is Cleveland, where Charter has over 50 percent of the market.").

### 2. The competitive options for any given location vary

43.    Cable companies only compete against other distributors in their footprint, or "franchise area." Tr. 661:3–21 (Martin/Turner) (Time Warner Cable did not compete directly against Charter, Cox or Comcast and did not lose subscribers to these other MVPDs because Time Warner Cable's franchise area did not overlap with that of any other cable company).

44.    Most households can choose among only three competing MVPDs to purchase pay-TV service: a regional cable TV provider and the two DBS providers, DISH and DirecTV, which operate nationwide and are thus available throughout the country. *See* Tr. 2187:3–2188:1, 2240:23–2241:14 (Prof. Shapiro). *Cf.* Tr. 271:6–9 (Schlichting/DISH) (Q: "How does Comcast footprint compare to that of DirecTV?" A: "Geographically it's about thirty percent of national, yeah, DirecTV has a national footprint, so Comcast would be thirty percent of that.").

45.    In areas where telcos or overbuilders operate in addition to the local cable company, customers may have additional choices for their video service. Tr. 2240:23–2241:14 (Prof. Shapiro). An overbuilder, such as RCN, is a company that provides a third wire into a consumer's home "versus the incumbent cable company and the incumbent telephone company." Tr. 2904:19–23 (Holanda/RCN).

46.    Customers with access to broadband Internet access can also choose from virtual MVPDs that offer service to their locations. *See* Tr. 485:19–24 (Martin/Turner); PX0195-024

## III.   AT&T'S DOCUMENTS RECOGNIZE THAT VERTICAL INTEGRATION POSES A THREAT TO COMPETITION

47.    Despite claims that the United States' theory is "preposterous," Tr. 50:18 (Defendants' Opening Statement), "ridiculous," Tr. 3119:19–24 (Bewkes/Time Warner), and "absurd," Tr. 3430:1–11 (Stephenson/AT&T), AT&T's internal documents recognize that vertical integration between a popular programmer and distributor would give the vertically integrated firm leverage in negotiations with rival distributors and the ability to shape the ecosystem and slow the growth of innovative new forms of distribution.

48.    For instance, in an analysis of the impact of the expiration of the Comcast/NBCU consent decree—that is, the behavioral limitations on the most significant vertically-integrated programmer and distributor—AT&T concluded that ████████████████████████████████ ████████████████████ PX0030-007, because "NBCU could become a more formidable negotiating power." PX0030-010. Further, "[c]ontent costs could increase – $XB ███ ████████████████████ PX0030-010; Tr. 1714:3–10 (Gibson/AT&T) (explaining this meant X billion dollars). While AT&T thought that ████████████████████████ ████████████████████████████████, PX0030-007, it recognized that Comcast/NBCU would have the "[o]ption to raise price or withhold NBCU content from others," and be able to "[w]ithhold or reprice specific rights (e.g. stacking rights, library catalog) in order to differentiate its own service." PX0030-010. This work was sent to Tony Goncalves, the Senior Vice President of Strategy and Business Development. PX0030; Tr. 1709:22–1710:3 (Gibson/AT&T); Tr. 1707:16–1708:6 (Gibson/AT&T).

49.    Earlier work on the project recognized that the expiration of the Comcast/NBCU arbitration condition "means NBCU can play hardball and threaten blackout if they do not get the terms from MVPDs they want." PX0011; Tr. 1716:18–1717:1 (Gibson/AT&T). When the

Comcast/NBCU conditions on online video distribution expire, "NBCU can choose not to license content online to some players or may discriminate on price," and "OVDs could be looking at different terms for NBCU content. DIRECTVNow may not get the content or the rates that DIRECTV gets." PX0011; Tr. 1717:2–24 (Gibson/AT&T). This was written by the member of the strategy team who took the lead on pulling together information for the project. Tr. 1711:16–1712:3 (Gibson/AT&T); Tr. 1715:1–1716:2 (Gibson/AT&T).



50.    Likewise,

PX0184-005–006. It explained that

PX0184-005.

. PX0363-012

PX0363-013

see also PX0031-041 (

); PX0189-018

); Tr. 1743:24–1744:6 (Manty/AT&T)

51.    In fact, just two months prior to their merger announcement with Time Warner,

AT&T CEO Randall Stephenson echoed similar concerns when he received a phone call from Time Warner's CEO Jeff Bewkes, informing him that Time Warner had "take[n] a 10% stake in Hulu" and that Hulu was going to launch a virtual MVPD. PX047. With AT&T in the midst of standing up their own virtual MVPD service (Tr. 3475:21–22), Stephenson rejected Bewkes' notion that "he didn't think it would impact [AT&T's] relationship with [Time Warner]." PX0047. Stephenson countered that "it's hard to imagine that it won't impact all of our relationships." He noted that AT&T was "trying to figure out how we navigate a very new world where you folks are going around us while trying to preserve the old revenue streams and business models from us." PX0047. Stephenson explained that he just wanted to "make sure [AT&T got] the same access" to content after Time Warner becomes partially vertically integrated with Hulu in its virtual MVPD service. Tr. 3476:3–3477:1 (Stephenson/AT&T). In short, Stephenson was concerned—upon learning that Time Warner was vertically integrating in a small way (10 percent stake in a startup virtual MVPD)—that Time Warner might use its content to advantage its own distribution by not making its content available to AT&T on the same terms.

52.     Indeed, in his notes for a call with AT&T's Board of Directors regarding the prospect of buying Time Warner, AT&T CEO Randall Stephenson repeated this theme. He identified two "[k]ey issues/concerns" for the Board: 1) "How can you advantage your own distribution (TV, BB, Wireless) without harming TW position as a wide distributor of content to other SVOD, cable networks, and broadcast networks," DX0609.0008, and 2) "How do use distribution business to increase the value of the media business." DX0609.0008.

53.     On these two concerns, Stephenson wrote that "Jeff [Bewkes] and I discussed at length—it's not yet clear to me how we execute on this." DX0609.0008. Using Time Warner to

"advantage" AT&T's distribution is the source of the likely competitive harm. Tr. 3490:8–18. Stephenson's self-serving testimony is that he made his note about "advantage[ing] your own distribution" to tell his Board that AT&T should not plan to do that. Tr. 3407:16–24 (Stephenson/AT&T) ("So I was trying to tell my board that if there is a thought process that says we're going to use this content to enhance the distribution business, that means you're going to have to limit the distribution, do exclusive things with AT&T. That is counter to how you create value in one of these businesses. So that strategy is not a very good strategy. If that's how we are going to create value, that's not a good approach to creating value."). That explanation lacks credibility. In the notes, the two bullet points are parallel. Tr. 3488:13–18 (Stephenson/AT&T), and nothing indicates that Stephenson was rejecting the first approach, Tr. 3488:9–12 (Stephenson/AT&T). Only after this lawsuit was filed did Stephenson take the position that he intended his matter-of-fact statement, which he "discussed at length" with Bewkes, to be a cue to tell his Board it was *not* an option. Tr. 3490:19–34:91:12 (Stephenson/AT&T); DX0609.0008.

54.     Finally, although repeatedly asserting before the Court that the United States' theory is "absurd," "stupid," and "preposterous," AT&T and DirecTV have stated the opposite in a number of FCC filings.

55.     In one such filing, AT&T told the FCC that "vertically integrated programmers" that control popular content "have the incentive and ability to use (and indeed have used whenever and wherever they can) that control as a weapon to hinder competition to their downstream cable affiliates by withholding popular programming from competing MVPDs." PX0002-004; *see also* PX0442-004 (AT&T explaining that cable operators with affiliated programming "attempt to use their control over such programming to try to artificially limit competition in downstream video distribution markets.").

56.     Likewise, DirecTV's comments to the FCC in another proceeding explained that "vertical integration of programming and distribution can, if left unchecked, give the integrated entity the incentive and ability to gain an unfair advantage over its rivals. This ultimately results in higher prices and lower quality service for consumers." PX001-017.

57.     In the Comcast/NBCU merger proceedings, DirecTV also told the FCC that it and others had "presented voluminous economic and other evidence that the proposed transaction would enable Comcast to raise the prices paid by its MVPD rivals for NBCU programming." PX0441-005; *see also* PX0443-079 (DirecTV comments explaining that "vertically integrated MVPDs have an incentive to charge higher license fees for programming that is particularly effective in gaining MVPD subscribers than do non-vertically integrated MVPDs.").

58.     As will be explained in greater detail in Sections IV.B & C and V.A.2 this ability to harm rivals and shape the ecosystem flows from the power and value of Time Warner content.

## IV.   THE PROPOSED MERGER WOULD LIKELY SUBSTANTIALLY LESSEN COMPETITION IN THE ALL VIDEO DISTRIBUTION AND MULTICHANNEL VIDEO DISTRIBUTION PRODUCT MARKETS IN LOCAL MARKETS THROUGHOUT THE COUNTRY

### A.     MVPDs and virtual MVPDs currently compete to attract and retain subscribers

#### 1.     MVPDs compete with one another based on the programming they offer

59.     MVPDs compete on the content they offer customers. Tr. 85:25–86:4 (Fenwick/Cox). As part of that competition, MVPDs consider what content their competitors offer when making their own content carriage decisions. Tr. 85:25–86:4 (Fenwick/Cox); Tr. 86: 5–14 (Fenwick/Cox) ("[M]ust have is content that truly we believe as a company we have to have to serve the needs of our customers. From a customer standpoint it is, it's their favorite shows, their favorite channels that they watch on a regular basis."). *See also* Tr. 241:10–242:6

(Schlichting/DISH) (describing "must have" content as "popular content" for which there is "not a ready substitute" and without which an MVPD is "not going to be competitive"). If an MVPD does not have the content that consumers want, consumers will go to a rival MVPD that does. *See* Tr. 86:8–14, 91:14–92:6 (Fenwick/Cox); Tr. 262:7–22 (Schlichting/DISH); Tr. 697:2–19 (Hinson/Cox).

60.     Time Warner itself also recognizes that MVPDs compete based on the content that they offer. For example, in preparation for going dark with Charter, HBO developed marketing campaigns to provide Charter subscribers with information about Charter's competitors in its top 5 markets and where they could turn to obtain HBO programming if HBO went dark on Charter. *See* Tr. 1476:16–1477:13 (Sutton/HBO).

61.     For this reason, MVPDs are concerned about "content parity," that is, having access to the same content that their competitors are offering. Cox's Fenwick testified that a big concern for her in negotiations is "making sure that we have access to the same content that other distributors have. We want to make sure that we're on a level playing field and that we can deliver the same experience to our customer that others can." That includes, for example, ensuring that rival distributors don't have access to popular content such as HBO's Game of Thrones earlier than Cox does because it would put [Cox] at a definitive disadvantage and we'd have customers leave." Tr. 91:19–92:6 (Fenwick/Cox); *see also* Tr. 1350:11–1351:4 (Montemagno/Charter) (expressing concern over not having access to important content); Tr. 3474:5–3477:7 (Stephenson/AT&T) (expressing concern that AT&T would lose access to Time Warner content once it made a ten percent investment in Hulu, which was launching a new virtual MVPD service); PX047.

## 2.   MVPDs compete with one another on price

62.     MVPDs consider their competitors' prices when setting their own. Tr. 689:10–17 (Hinson/Cox) ("And the competitive intelligence team looks at competitive landscape data as to what's happening to our competitors on a weekly basis, for their offers, for their products. Changes that happen in the marketplace.").

63.     Although MVPDs generally raise their prices every year, they recognize that they face losing customers to their competitors if their prices are not competitive. *See* Tr. 1442:4–6 (Torres/AT&T); PX0012-004 ███████████████████████████████████████ ████████████████████ PX0012-004 ███████████████████████████████████████ ██████████ Tr. 707:14–708:6, 708:20–709:12 (Hinson/Cox); Tr. 2911:12–2913:4 (Holanda/RCN).

64.     Another way that MVPDs compete on price is by making offers to retain subscribers that are considering switching to a competing MVPD. In order to retain subscribers that seek to leave its service, AT&T offers retention credits. Tr. 1420:13–21 (Torres/AT&T). The amount of the save offer depends on the expected value the customer brings to the MVPD, so retention offers are tailored specifically to the individual customer, based on the information available to AT&T. Tr. 1421:1–8 (Torres/AT&T). Factors that affect the retention credit include the customer's tenure with AT&T as well as AT&T's margin from the customer. Tr. 1421:9–16 (Torres/AT&T).

65.     As discussed below, MVPDs can also use HBO as a retention tool. *See infra* IV.C. Other non-price retention tools may also be utilized. For example, AT&T's save desk attempts to retain customers by offering to move them from AT&T's traditional satellite service to DirecTV Now. Tr. 1421:20–23 (Torres/AT&T). Offering DirecTV Now is typically the last

offer that is made when a customer threatens to leave. Tr. 1422:18–21 (Torres/AT&T).

### 3.   MVPDs compete with one another based on innovative offerings

66.   MVPDs also compete through innovations that provide consumers with new features or capabilities as part of their video service. *See e.g.,* Tr. 709:1–12 (Hinson/Cox) (testifying that one way Cox competes in the video marketplace is through innovative offerings like "DVR service, advanced navigation" and "other features to the video product the consumers are looking for"); Tr. 2906:25–2907:6, 2914:1–10 (Holanda/RCN) (testifying that RCN has pursued a video strategy focused on differentiating itself through innovative offerings).

67.   AT&T recognizes the value of innovation in differentiating its products. For example, when negotiating for programming, AT&T/DirecTV's chief content negotiator Dan York asks himself these questions: "What rights do we get? Can we innovate? How are we trying to serve customers? How can we differentiate our service?" Tr. 1690:9–25 (York/AT&T).

68.   Several MVPDs have decided to incorporate SVODs as an innovation in their video offerings. For example, Cox "partnered with Netflix . . . [s]o that when a customer comes to Cox, they can . . . search for content across Netflix and the Cox networks as well. Tr. 83:17–20 (Fenwick/Cox). Similarly, DISH has "integrated [its] satellite service with Netflix." Tr. 410:9 (Schlichting/DISH). RCN also offers Netflix on its platform. Tr. 2914:11–23 (Holanda/RCN). And Comcast/NBCU has integrated DISH Sling and Netflix into its cable boxes. Tr. 885:19–886:10 (Rigdon/Comcast).

### B.   The merger would enable AT&T to harm competition because MVPDs and virtual MVPDs need Turner content to compete effectively

69.   The power and value of Turner's programming is clear from the evidence. In evaluating this transaction, Stephenson expressed the view that Turner had "high quality cable network assets" and lavished praise on Time Warner content. Tr. 3401:6–22, 3408:23–3409:6

(Stephenson/AT&T); DX0609.0011. By comparison, Stephenson told the AT&T Board that

Viacom's cable networks are "a disaster." DX0609.0012.

### 1.    Industry participants highly value Turner

70.    Turner content is important to distributors. Some in the industry, including the

Defendants' executives, express this fact by describing Turner content as "must-have"

programming. Turner's own CEO, John Martin, has repeatedly stated, both internally at Turner

and externally to the financial media, that Turner is "must-have content for distributors." Tr.

549:21–24 (Martin/Turner); *see also* PX0132-011 (Martin discussing "must-have" nature of

Turner sports programming at February 2016 Jeffries Media & Communications Conference);

PX0020-005 ███████████████████████████████████████████████████████

PX0021-005 ██████████████████████████████████████████████████████

██████████   AT&T's John Stankey agrees, calling Turner "must have content." *See* PX0006;

Tr. 3356:10–3357:9 (Stankey/AT&T).

71.    Other industry participants concur. For example, Cox negotiator Suzanne

Fenwick explained that "must have" content is what Cox "ha[s] to have to serve the needs of our

customers" and "consider[s] most of the Turner Networks as must have." Tr. 86:8–20

(Fenwick/Cox). *See also* Tr. 104:6–7 (Fenwick/Cox) (Turner "absolutely is" must have content

for Cox); Tr. 106:18–107:5 (Fenwick/Cox). If Cox "didn't have the Turner Networks, it could

significantly impact the viability of our video model." Tr. 128:17–21 (Fenwick/Cox). If Cox lost

Turner content, they would try to retain customers but "we can't replace the content[;] . . . [a]

discount isn't going to make it better for our customers. If they don't have the content, they'll

leave." Tr. 108:19–25 (Fenwick/Cox); *see also* Tr. 697:2–19 (Hinson/Cox) (Cox would not have

"the ability to compete" without Turner because Cox "wouldn't have a level playing field," and

if Cox didn't have access to Turner, customers "would go somewhere else.").

72.    Warren Schlichting, President of DISH Sling and the head of content acquisition and renewal for both Sling and DISH's traditional satellite service, testified that "must have content" is content for which there is no "ready substitute," which means DISH "might pay more than we think it is worth just because we have to have it" to be competitive. Tr. 241:10–242:6 (Schlichting/DISH). DISH considers Turner content to be "must have" because of Turner's "big investments in live sports," its "important news presence," and that it has an "important entertainment component." Tr. 242:16–243:1 (Schlichting/DISH) (explaining that "there are five groups that I guess I would say are the, that they're the five families, right, the way we refer to them internally. ABC, NBC, CBS, Fox and Time Warner are the five groups that you, you just, it's very hard to have a pay-TV service without them" because of the sports, news, and entertainment content they carry). Schlichting highlighted the lack of substitutability by noting, "if you don't have March Madness you're not in the pay-TV business," and that it is hard to "imagine coming around to midterm elections without CNN," Tr. 242:14-15, 245:14–15 (Schlichting/DISH).

73.    As Charter's executive vice president of programming acquisitions, Tom Montemagno, testified, Charter must have the Turner networks to compete. *See* Tr. 1404:14–15 (Montemagno/Charter) ("I can't not have the Disney ESPN networks and the Turner networks"); *see also* Tr. 1402:15–24 (Montemagno/Charter) (for Charter, TBS, CNN, and TNT are the most important Turner networks due to their live sports and exclusive news content, as well as their carriage of Turner's "higher quality original programming"); Tr. 1350:11–18 (Montemagno/Charter) (describing that Turner content is "critically important"). And Turner executives know that Charter needs them. *See* PX0203 (Martin reporting on a conversation with

Charter CEO that "[t]here is nothing earth shattering here. [Charter] acknowledged that … he needs to be in business with us").

### a.    Turner's content is valued by viewers

74.    Time Warner understands its content is highly viewed and valued by consumers. In 2017, Turner's research department conducted a quadrant analysis to compare its networks to those of its competitors based on the amount of time viewers were watching certain networks and the reach, or distribution, of these networks. Tr. 555:5–556:24 (Martin/Turner); PX0150. The analysis showed that consumers regard the Turner networks as "essential," based on the fact that "cable viewers have voted with their eyeballs and their remotes." PX0150-006; *see* Tr. 558:6–559:6 (Martin/Turner).

75.    Turner's quadrant analysis found that TNT, TBS, Cartoon Network, Adult Swim, Headline News, and CNN were in the high-reach, high-viewership quadrant. Tr. 556:1–13 (Martin/Turner); PX0150-002. Turner's research department also concluded 93.5 percent of Turner's revenues came from networks that appear in this quadrant, which is higher than what Turner's competitors earned for networks also in the same quadrant. Tr. 556:25–557:23 (Martin/Turner); PX0150-005. Four of Turner's networks—TNT, TBS, Cartoon Network, and CNN—account for about 85 percent of Turner's subscription revenue. Tr. 471:25–472:3 (Martin/Turner).

76.    This quadrant analysis ultimately shows that Turner's bundle of networks provides greater value to distributors when compared to other programmers' bundles because consumers spend more time watching a larger percentage of the networks in Turner's bundle. *See* Tr. 556:1–13; Tr. 556:25–557:23 (Martin/Turner); PX0150-002, -005.

77.    Other viewership metrics and measurements, including Nielsen ratings,

corroborate this finding. *See* Tr. 128:13–16 (Fenwick/Cox) ("Nielsen data says . . . CNN is

certainly popular, TBS, TruTV, TNT [and] . . . Cartoon Network.").

78.     Turner networks TBS and TNT are among the top general entertainment cable

networks by viewership. PX0153-002. 

. PX0153-002–003; Tr. 524:1–525:3 (Martin/Turner); *see also* PX0008-035

; DX0781.0043

DX0781.0044

79.     CNN is ranked number seven in terms of viewership. Tr. 717:5–8 (Hinson/Cox);

*see also* PX0008-035

80.

PX0008-035; *see also* DX0781.0059

In addition, "

DX0781.0043.

81.     As RCN's CEO Jim Holanda testified, Turner programming is "significantly

viewed" by RCN's customers. Tr. 2909:22–23 (Holanda/RCN). RCN knows what its customers

are viewing because it has technology that pulls all viewership data from its cable boxes every 15

minutes. Tr. 2909:24–2910:10 (Holanda/RCN). This viewership data shows that, over the last

several years, Turner networks rank "very high" among RCN's over 100 channels. Tr. 2910:2–

10 (Holanda/RCN). In fact, three Turner networks are in RCN's top ten channels. Tr. 2910:11–12 (Holanda/RCN).

### b.  Turner has exclusive rights to popular sports programming

82.     Turner's goal with its premium sports content is to "be in the business with sports that matter around events that matter" and Turner has staked out its brand on March Madness, NBA playoffs, and Major League Baseball playoff games. Tr. 501:7–502:7, 502:20–24 (Martin/Turner). Martin testified that premium sports are a key component of Turner's programming and business strategy. Tr. 492:11–23 (Martin/Turner); PX0021-001



Tr. 532:25–533:12 (Martin/Turner); PX0020-002

Turner told its Board of Directors that

PX008-035.

83.     For example, Martin wrote to Time Warner's Board of Directors that

PX0020-005.

84.     Turner pays approximately two billion dollars annually for all of its sports rights.

28

*See* Tr. 544:13–15 (Martin/Turner); PX0020 (█████████████████████████);

PX0021-002███████████████████████████████████████

████████████████████████████████

85.     Turner has the rights to carry 64 NBA games, as well as NBA playoff games, and

the rights to the NBA All Star games. Tr. 487:25–488:25 (Martin/Turner). Turner also carries

March Madness games. Tr. 489:1–7 (Martin/Turner). Turner broadcasts the games on its TBS,

TNT and TruTV networks. Tr. 489:14–16 (Martin/Turner). In a fifty/fifty partnership, Turner

and CBS carry the March Madness games every year, and alternate the right to air the Final Four

and Championship games. Tr. 489:8–9, 17–23, 541:25–542:15 (Martin/Turner); PX0021-001–

002.

86.     MVPDs recognize the importance of Turner's sports rights to both their

customers and their business. Charter believes that Turner's sports rights, both for professional

and college sports, are "pretty important programming" for it and its subscribers. Tr. 1350:19–

1351:4 (Montemagno/Charter). Charter's executive vice president of programming acquisition

testified that Charter would be competitively disadvantaged of Turner's sports programming was

not available through Charter. *See* Tr. 1350:19–1351:4 (Montemagno/Charter). It is not possible

to replace Turner programming in Cox's video packages because "March Madness, NBA

basketball, [MLB] baseball … is irreplaceable" and "CNN offers unique news content." Tr.

693:16–25 (Hinson/Cox); *see also* Tr. 2112:17–20 (Sejen/Cable ONE) (explaining that TBS and

TNT have "very valuable sport programming content, especially during the month of March,

with March Madness.").

87.     DISH agrees on the importance of Turner's premium sports content. Turner's

investment in live sports makes it "very hard to have a pay-TV service without" Turner's

networks. Tr. 242:16–243:1 (Schlichting/DISH). Schlichting testified that live sports are so

important because "the minute the game is over sports is stale" and watching sports live

distinguishes linear television from the time-shifted viewing on SVOD services like Netflix. Tr.

243:2–8 (Schlichting/DISH). Sports are a "critical piece" of a live linear television service, like

DISH. Tr. 243:2–8 (Schlichting/DISH).

88.     Turner's strong position in premium sports programming will persist for at least

the next several years. Turner's contract for NCAA March Madness expires in 2032, its NBA

contract expires in 2024, and its MLB contract expires in 2021. Tr. 548:20–549:2

(Martin/Turner); *see also* PX0153-010 ████████████████████████████████

████████████ ; DX640.0041 ████████████████████████████████

████████████████████████████████████████████████

████████ DX609.0011 ████████████████████████████████

████████████████████████████████

c.     **Turner's core networks are among the most widely-distributed
cable networks**

89.     As Time Warner CEO Jeffrey Bewkes testified, nearly every pay-TV subscriber

receives Turner programming. Tr. 3078:4–16 (Bewkes/Time Warner). Turner networks,

including CNN, TBS and TNT, are linear networks with live programming that are licensed to

and distributed by MVPDs and virtual MVPDs. Tr. 485:1–486:6 (Martin/Turner). *See also*

DX0640.0040 ████████████████████████████████████████

████████████

90.     Virtually every MVPD and virtual MVPD, including all of AT&T's major rivals,

carries Turner's core networks. *See* PX0127-002; Tr. 583:6–19 (Martin/Turner). As Time

Warner executives reported to their Board of Directors ██████████████████████████

████████████████████████████████ PX0008-035.

91.    Over █ percent of Cox's customers receive Turner content. Tr. 693:10–15

(Hinson/Cox); PX0523-A. Internal Turner analyses show that ██████████████

████████████████████████████████████████. PX0526-002;

*see also* PX0008-036 ████████████████████████████████████

██████████████

###### d.     Turner obtains high affiliate fees from MVPDs and virtual MVPDs

92.    As Time Warner executives reported to their Board of Directors ███████

████████████████████████████████████████████████

██████████████████████████ PX0008-035; *see*

*also* PX0153-003 ████████████████████ DX0640.0065 ████████

██████████████. In 2016, Turner earned about $5 billion dollars in affiliate revenue. Tr.

991:1–4 (Breland/Turner).

93.    The rates that distributors pay for Turner networks reflect the value that the

distributors see in carrying Turner's networks which is why a distributor agrees to pay Turner's

rates. Tr. 528:6–11 (Martin/Turner). As Professor Shapiro explained, "the most straightforward

measure of the value of the content is what . . . the distributors paid for it." Tr. 2233:4–7 (Prof.

Shapiro). Professor Carlton agrees. He testified that the price an MVPD pays for programming is

a reflection of the value that the MVPD places on that content. Tr. 2554:1–15 (Prof. Carlton).

94.    Part of Turner's ability to obtain high affiliate fees comes from its sports

programming. *See* Tr. 541:6–10 (Martin/Turner); PX0020-005 ████████████████████

████████████████████████████████████████████████

██████; *supra* at IV.B.1.b. Not all sports rights are equal; some are more important than others,

31

and the more important the sports, the more viewership they drive, which in turn increases ad revenue and subscriber fees. *See* Tr. 502:10–503:14 (Martin/Turner); PX0132-010–011 (Martin stating that a "disproportionate amount of [Turner's] sports are either playoff or tournament play, which is must-have.").

95.     Martin believes that "Turner would stand to lose substantial affiliate revenue <u>without</u> . . . NBA rights" because ███████████████████████████████████████ ████████████████████████████████ Tr. 535:6–536:3 (Martin/Turner); PX0020-002–003 (emphasis in original). Similarly, Turner is willing to pay such high fees for March Madness because it views it as highly valuable content and wants to ensure Turner has "access to this 'must have' video programming for an extended period at attractive annual price increases." PX0021-005; Tr. 545:1–10, 551:14–552:3 (Martin/Turner); *see also* Tr. 241:10–243:8, 251:17–25 (Schlichting/DISH) (explaining that sports programming fees are among the most significant expenses for MVPDs, but they are willing to pay them because sports programming is considered must-have content by subscribers).

96.     As Martin told the Time Warner Board of Directors, █████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████ PX0153-010. Turner obtains advertising rates for its live sports content that it cannot obtain from other programming. Tr. 536:4–17 (Martin/Turner). This is because advertisers place a high value on advertisements that air during live games because viewers are more engaged and watch the content live rather than on a delayed basis. Tr. 537:10–539:23 (Martin/Turner); *see also* Tr. 540:2–14 (Martin/Turner); PX0020-006 ███



### e.      Turner fees have steadily increased for years

97.      Turner has secured significant rate increases from every major MVPD in the past five years, including Time Warner Cable, Comcast, DirecTV, DISH, Cox, Altice, Verizon, and Charter. Tr. 998:16–1002:3 (Breland/Turner); PX0123-019. ████████████████████ ██████████████████████████████. PX0140. ████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████. PX0140. ███████████████ ████████████████████████████ PX0140. Cox has agreed to price increases from Turner year after year "[b]ecause the content is incredibly important to our portfolio." Tr. 153:25–154:8 (Fenwick/Cox).

98.      Turner uses its bargaining leverage to secure price increases. Tr. 995:15–17 (Breland/Turner). Martin testified that not only have Turner's affiliate rates increased year over year during his tenure with the company, so, too, have Turner's margins. Tr. 528:6–18 (Martin/Turner); PX0153-003.Turner's distribution and content licensing revenue grew ████ ████████████ between 2012 and 2016. PX0148-033; Tr. 662:1–20 (Martin/Turner). ████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████ PX0148-033; Tr. 662:1–20 (Martin/Turner).

99.      Turner continued to achieve above average increases in affiliate rates in 2016. PX0008-036; Tr. 520:21–521:17 (Martin/Turner). In fact, ███████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████████████████████

Turner is on pace to grow domestic affiliate revenue by 13 percent in both 2016 and 2017 and at

a 9 percent CAGR from 2015 to 2019, outpacing overall industry growth." PX0008-0036; *see also* Tr. 662:21–663:9 (Martin/Turner). Turner anticipates its revenue margins will remain steady for several years in the future. *See* Tr. 664:14–665:21 (Martin/Turner); DX0781.0056.

    100.    Turner secured ▮ percent rate increases in 2017, and plans to ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Tr. 995:18–997:16 (Breland/Turner); PX0123-009. Turner secured the large rate increases in 2016 and 2017 to coincide with the renewal of its sports licensing deals. Tr. 997:17–998:15 (Breland/Turner); PX0123-019.

    101.    Sports are an "important factor" driving affiliate rate increases. Tr. 529:2–5 (Martin/Turner). March Madness plays a critical role in Turner's ability to drive affiliate rate increases for TBS, TNT, and TruTV in order to achieve their targets. Tr. 546:4–7, 547:24–548:19 (Martin/Turner); PX0021-005. "By 2019, the aggregate affiliate revenue for these networks is planned to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ PX0021-003; Tr. 547:2–23 (Martin/Turner). For example, after adding two weekends of March Madness to TruTV, Turner secured ▮▮▮▮▮▮ price increase in 2015 from Time Warner Cable. Tr. 993:7–23, 994:19–995:8 (Breland/Turner); PX0403. Charter and Montemagno also testified there was a "massive increase" in its fees three years ago after Turner renewed its NBA license agreement and paid "triple" what Turner had been paying. Tr. 1351:5–14 (Montemagno/Charter).

    102.    Turner expects its rate increases to continue into the future. Coleman Breland, David Levy (Turner's President), and others were provided with talking points for the Upfronts (an advertiser/programmer conference that is also attended by the financial press) in May 2016 that included a Q&A: "Can the Industry Distribution Ecosystem Support Higher Affiliate Fees? Near a Tipping Point?" The answer was "Short answer is yes, we think it can – clearly providing

a lot of consumer value." Tr. 1002:8–1004:20 (Breland/Turner); PX0078-001, -010. The talking

points also say that "[t]here are many options for lower-priced packages, yet few consumers take

them," and that "MVPD's [sic] video businesses are very profitable." Tr. 1002:8–1004:20

(Breland/Turner); PX0078-011. Breland confirmed these upfront talking points were the

message that Turner executives were prepared to tell the press five months before the merger

announcement. Tr. 1005:5–1006:12 (Breland/Turner).

<div align="center">

**2.      Turner's valuable content gives it leverage in negotiations with MVPDs and virtual MVPDs**

</div>

103.      Turner tries to negotiate all of its networks at the same time in order to increase its

bargaining leverage with MVPDs. ████████████████████████████████████████

████████████████████ (Turner's ability to negotiate the affiliate agreements for all of its

networks to be co-terminous was considered a "tremendous advantage" and Breland noted it was

one of the "most controversial issues" in the deal with ████████ *infra* IV.B.2.c.ii (Turner-DISH

blackout).

<div align="center">

**a.      Each of Turner's agreements with distributors is heavily negotiated**

</div>

104.      Affiliate renewal negotiations can be very tough, and almost every point in

bargaining is contentious. Tr. 1022:21–1023:23 (Breland/Turner). Martin described negotiations

with distributors over affiliate agreements as "trench warfare." Tr. 559:10–18 (Martin/Turner).

105.      Affiliate agreements contain hundreds of separate provisions that must be

individually negotiated between a programmer and an MVPD. *See* Tr. 1454:18–21

(Sutton/HBO); *see also* Tr. 91:16–17 (Fenwick/Cox) ("We burn a lot of paper frankly on all of

the terms of the agreement"). These contracts typically include the following:

- Which channels of the programmer the distributor will carry. For example, Turner uses

  the importance of its most popular networks as leverage to force distributors to carry

<div align="center">35</div>

less important Turner networks. *See* Tr. 1402:6–14 (Montemagno/Charter) ("I don't

have an option. If I want the important ones, I have to take the ones that are less

important to me."); Tr. 724:3–6 (Hinson/Cox) (explaining that Cox cannot purchase just

one channel like Boomerang because "[its] contracts require multiple channels from

Turner"); Tr. 448:6–21 (Schlichting/DISH) (describing how, other than Sling, OTT

providers "ha[ve] been forced by the network groups with leverage to take a lot of

networks that they don't want and don't need and people don't watch"); Tr. 2102:21–

2103:8 (Sejen/Cable ONE) (stating that Turner took the position that Cable ONE could

not break up the Turner bundle and that Turner "had to make a very strong stand against

that").

- The net effective rate on a per subscriber per month ("PSPM") basis that an MVPD will
  pay for a programmer's content. Tr. 90:5–10 (Fenwick/Cox); Tr. 987:8–17
  (Breland/Turner); *see also* Tr. 2190:3–21 (Prof. Shapiro).

- An escalator clause that requires PSPM rates to increase each year of the contract term.
  Tr. 91:6–10 (Fenwick/Cox).

- One or more most-favored-nation ("MFN") provisions stating that if a programmer
  gives another distributor, ███████████████████████████, a more favorable
  term (such as a net effective per-subscriber rate), then the programmer will grant that
  same favorable term to the distributor. Tr. 1024:6–14 (Breland/Turner); *e.g.*, PX0422-
  028–029.

- Penetration rate requirements establishing the share of the MVPD's customers that must
  have access to the programmer's networks and specifying on what tiers a network will
  be carried by an MVPD. Tr. 90:11–17 (Fenwick/Cox); *see, e.g.*, PX0409-014.

- The technical rights describing how content is rated and delivered to subscribers. Tr. 92:16–18 (Fenwick/Cox).

- Volume discounts that allow MVPDs with more subscribers to pay lower licensing fees. *See* Tr. 117:15–18 (Fenwick/Cox); ██████████████████ *see also* Tr. 2911:18–25 (Holanda/RCN).

- Over-the-top ("OTT") distribution rights describing whether and how content can be transmitted over the internet. *See* Tr. 240:8–15 (Schlichting/DISH); *see also, e.g.,* ██ ████████████████████████████████████████ ████████████████████

- TV everywhere ("TVE") rights providing the ability for MVPD subscribers to access content away from home on an authorized device. Tr. 101:19–23 (Fenwick/Cox).

- The rights to set-top box data, collected by MVPDs, reflecting what a subscriber watches on TV. *See* Tr. 92:19–23 (Fenwick/Cox); *see also* Tr. 1274:16–21 (Bewley/Altman Vilandrie) (defining set-top box data); Tr. 2909:24–2910:10 (Holanda/RCN) (same).

106.    Negotiations between programmers and MVPDs also encompass advertising slots. Tr. 92:12–15 (Fenwick/Cox). Advertising slots are important contractual terms because programmers and MVPDs earn revenue from advertising income, in addition to affiliate fees (for programmers) or subscription fees (for MVPDs). *See* Tr. 523:15–20 (Martin/Turner); Tr. 153:16–24 (Fenwick/Cox); Tr. 448:24–449:2 (Schlichting/DISH). In a typical hour of television with 16 minutes of advertising, programmers usually retain the right to sell 14 minutes of advertising, while MVPDs retain the right to sell two minutes of advertising. Tr. 1405:8–12 (Montemagno/Charter).

107.     Turner bargains heavily over rates and penetration, which are two primary economic components of any affiliate deal. Tr. 1023:6–12 (Breland/Turner). Turner also bargains over most-favored-nations clauses ("MFNs"). Tr. 1024:6–9 (Breland/Turner).

108.     Turner bargains over price down to hundredths of a penny. Tr. 990:15–25 (Breland/Turner); PX0127-002. Those hundredths of a penny add up to millions of dollars when multiplied over Turner's millions of subscribers. Tr. 990:15–25 (Breland/Turner). Turner fights for every last penny, because "all pennies matter" and Turner does not want to leave any pennies on the table. Tr. 991:5–14 (Breland/Turner). For example, Turner almost went dark with Time Warner Cable over a single penny increase on one channel in 2012. Tr. 992:10–14, 994:4-18 (Breland/Turner); PX0403.

109.     The price and terms of agreements to license Turner content are set through individual negotiations. Several factors contribute to Turner's leverage when negotiating with MVPDs. As Suzanne Fenwick of Cox explained, key issues for affiliation agreements include license fees and penetration, Tr. 90:5–22 (Fenwick/Cox), as well as content and window parity, which means having access to the same content at the same time as other distributors, Tr. 91:14–92:6 (Fenwick/Cox), and also advertising, technical rights, and data. Tr. 92:12–24 (Fenwick/Cox), and finally "TV Everywhere" rights. Tr. 101:17–102:3 (Fenwick/Cox). Cox and Turner each made concessions in their most recent affiliation agreement negotiations. Tr. 104:18–23 (Fenwick/Cox).

110.     Larger MVPDs pay lower rates than medium and small MVPDs ██████ ████████ Tr. 988:5–13 (Breland/Turner); PX0127-002. As Stankey testified, AT&T hoped to gain bigger volume discounts and pay less for programming by virtue of having more subscribers after the DirecTV acquisition. Tr. 3208:3–7 (Stankey/AT&T). Larger MVPDs include Comcast,

AT&T/DirecTV, DISH, and Charter/Time Warner Cable. Tr. 988:14–22 (Breland/Turner);

PX0127-002. Medium-sized MVPDs include Verizon, Cox, Altice (Cablevision & Cequel), and

Mediacom. Tr. 989:2–13 (Breland/Turner); PX0127-002. Small MVPDs include the National

Cable Television Cooperative ("NCTC") and its members, among others. Tr. 989:14–990:6

(Breland/Turner); PX0127-002.

111.    Generally, virtual MVPDs operated by MVPDs like DirecTV Now and Sling TV,

 when compared to those virtual MVPDs who are not

affiliated with an MVPDs, like Hulu. *Compare* PX0409-065–067

*with* PX0211-060

. Unaffiliated virtual MVPDs also tend to pay higher rates for content compared to

MVPDs because they enter the market with no subscribers. Tr. 585:3–7 (Martin/Turner).

112.    For RCN, a medium-sized MVPD, programming costs are its largest business

cost. Tr. 2906:25–2907:6, 2911:7–11 (Holanda/RCN). RCN's programming costs have been

increasing "significantly" over the last five years, outpacing inflation by five to eight times. Tr.

2911:12–17 (Holanda/RCN). RCN believes that larger distributors have a 25 to 40 percent

programming cost advantage over RCN because of the volume discounts they receive. Tr.

2911:18–25 (Holanda/RCN).

113.    To make payments by different MVPDs to Turner comparable across different

MVPDs, which may distribute different sets of Turner networks and have different penetration

requirements, one can calculate a Turner-wide PSPM fee for each distributor by adding all

monthly payments to Turner for the distributor's set of Turner channels and dividing that amount

by the number of subscribers that have access to any Turner network.[3] *See* Tr. 2189:5–2190:5 (Prof. Shapiro).

### b. Each side formulates its negotiating strategy based on what would happen if they did not reach an agreement

114.    Both Turner and distributors threaten to go dark. Blackouts are a "common occurrence" in the industry. Tr. 1026:11 (Breland/Turner). Turner plans for the possibility of going dark when setting its negotiating strategy. For example, Turner noted that "doing a deal" with DISH was their "best option," but that they needed to have a "viable Plan B." PX004. Even though Turner would prefer not to go dark, it considers the possibility of not being able to reach an agreement in each of its negotiations. Tr. 559:19–23 (Martin/Turner).

115.    To date, Turner has been able to reach agreements with virtually all MVPDs and virtual MVPDs. Suzanne Fenwick testified that Turner currently has an incentive to get a deal done with Cox because "[t]here's no benefit for them in going dark." Tr. 107:2 (Fenwick/Cox). As such, "there's natural motivation for us [Charter and Turner] to both want to try and find an agreement and find a middle ground." Tr.1351:19–21 (Montemagno/Charter).

### i. Currently, without an agreement, Turner would lose affiliate fees and advertising revenue due to reduced exposure to viewers

116.    Turner keeps an ongoing estimate of the likely costs of going dark. *See* PX0144-117; Tr. 1029:15–18, 1030:2–7 (Breland/Turner). The "Go Dark Analysis" compares ███████

██████████████████████████████████████████████████

███████████████████████████████ PX0144-117.

---

[3] Note that this PSPM fee is different from the Net Effective Rate addressed above, *supra* IV.B.2.a, which is the effective per-subscriber rate for any given network (rather than across all Turner networks), and which does not take into account different penetration requirements.

117.    Turner does long-range plans and drop analyses to understand the financial ramifications of going dark. Tr. 1031:10–13 (Breland/Turner). Turner does this not as an academic exercise but because going dark "is a possibility" and because Turner thinks about how much it would hurt if Turner were to go dark with someone and lose fees. Tr. 1031:14–23 (Breland/Turner). For example, Turner's analysis predicts that if Turner went dark with ████, Turner would lose ██████████. It would cost Turner ████████ for a month-long blackout and ████████ for a six-month blackout. PX0144-117. ██████ ████████████████████████████████████████████████ ████████████

118.    Turner factors in the timing of potential "go-dark" events when negotiating termination dates in its affiliate agreements. *See, e.g.,* PX0146 (Breland summarizing for Martin the decision to issue an extension to Charter until April 30 because that date "lines Turner up with some of our most power programming (NBA Playoffs)").

### ii.    Without an agreement, MVPDs and virtual MVPDs would lose customers

119.    For their part, MVPDs and virtual MVPDs that fail to reach an agreement with Turner stand both to lose current subscribers, and to gain fewer new subscribers, than they would if they could reach an agreement, because their service would be less attractive to video subscribers. Tr. 2196:22–2198:12 (Prof. Shapiro). The reduction in new subscribers, or lost "gross adds," is "what matters in the long term" and primarily determines the long-term subscriber loss rate resulting from a loss of the Turner content to an MVPD. Tr. 2387:9–2388:18 (Prof. Shapiro).

120.    Even short-term losses of programming can have lingering effects. For example, Cox went dark with a local broadcast affiliate during the few weeks prior to the Super Bowl, and

experienced ██████████████ percent increase in churn during the go-dark period. Tr. 694:1–695:2 (Hinson/Cox). Cox continued to experience increased churn even after coming to an agreement to get the channel back up, despite the fact that Cox offered free antennas to its customers, and came to an agreement before the Super Bowl actually aired. Tr. 694:17–695:9 (Hinson/Cox). Cox's Marty Hinson views Turner's March Madness, NBA, and MLB content as being similar in quality to the Super Bowl, and are "must have sports." PX0523-B; Tr. 694:1–695:16, 695:10–16 (Hinson/Cox).

121.    Schlichting testified that "going dark with a programmer is almost always bad" for DISH because DISH loses subscribers and "no matter how much we try to educate subscribers about working on behalf of the consumer and trying to get lower prices and negotiating hard, at some point they'll be disgruntled or give up on it and . . . [go] to another provider." Tr. 250:17–251:9 (Schlichting/DISH).

122.    As Turner executives ████████ a blackout can ██████████████████ ██████████████████████████████████████████ PX0411. Consecutive blackouts with Turner and Fox caused DISH to lose a substantial number of subscribers. Tr. 1158:6–19 (Warren/Turner). When Turner knows that a distributor is vulnerable due to other recent blackouts, it provides Turner with "massive power" in the negotiation. Tr. 1157:13–25, 1170:14–20 (Warren/Turner); PX0411. Breland said that it was "good to get that message circulating. Need the brass to have belief in our leverage." PX0532; Tr. 1131:24–1132:2 (Breland/Turner). ██

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ PX0411. ████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████           PX0411; Tr. 1158:3–5

(Warren/Turner). Warren wanted to "highlight[] the leverage" Turner would have over DISH.

PX0411; Tr. 1170:14–20 (Warren/Turner). DISH was "already hurting" because of the

subscriber loss from the prior blackouts, and the threat of Turner going dark on DISH again

would be "particularly problematic for them[.]". PX0411; Tr. 1158:6–19 (Warren/Turner).

123.    MVPDs can try to mitigate losses from a blackout by using their "save desk" and

offering customers discounts or benefits as an incentive to stay. But, as Montemagno testified,

Charter's retention efforts are less effective in reducing customer churn when it is "missing

content that [Charter] can't replace." Tr. 1361:3–9, 1403:9–14 (Montemagno/Charter)

("[T]here's one World Series, there's one Super Bowl, there's one MLB Playoffs, it's not

replaceable. If I don't have that content, reducing the rate or giving [subscribers] a free month of

HBO or Showtime is not going to satisfy that customer. They're going to go . . . to a different

distributor to get that content."). Similarly, ████████████████████████████████████

██████████████████████████████   PX0012-006.

### iii.    MVPDs have estimated their likely subscriber losses to inform their negotiating strategy

124.    MVPDs, including AT&T, have attempted to estimate the likely consequences of

the long-term effects of dropping networks, with varying degrees of sophistication.

125.    AT&T and DirecTV have conducted analyses to understand the impact of long-

term blackouts. In fact, AT&T has a business analytics team whose responsibilities include

analyzing the effect of blackouts on AT&T's existing customers and its ability to obtain new

customers. Tr. 1428:4–1429:15 (Torres/AT&T). For example, in 2014, DirecTV prepared a

blackout analysis in advance of contract negotiations with Disney. Tr. 1438:6–17

(Torres/AT&T). This analysis included the impact on both new and existing customers of a blackout lasting different periods of time, including a long-term blackout of Disney lasting six years. Tr. 1438:18–1439:9, 1440:5–22 (Torres/AT&T). AT&T's effort to understand the likely effects of long-term blackouts on its subscribers underscores the significance of potential blackouts and illustrates how they factor into contract negotiations.

> ### a)  Charter commissioned consulting firm Altman Vilandrie to conduct a detailed analysis to inform its negotiation strategy

126.     One example of an in-depth go-dark analysis was the Altman Vilandrie study commissioned by Charter. As discussed below, this study showed the importance of Turner content and informed Charter's negotiations with programmers. Charter's lead content negotiator, Tom Montemagno, is supported by a staff of negotiators as well as an analytical team that does research to inform Charter's negotiations. When getting ready for a negotiation, Charter uses this research to "help[] [it] understand [its] leverage, the programmers' leverage . . . and just the overall leverage position." Tr. 1341:14–17, 1342:20–1343:5 (Montemagno/Charter). Charter has used analytics to decide whether to drop a programming group or programmer, including Charter's decision to drop the Sportsman network. Tr. 1343:20–1344:7 (Montemagno/Charter); *see also* Tr. 1343:6–8 (Montemagno/Charter) (stating that analytics "have been a component of many considerations").

127.     In the fall of 2016, Charter began discussions with Altman Vilandrie, a strategy consulting firm focused on telecom, media, and technology sectors, about a project to develop analytical tools to help inform negotiations with programmers. PX0366; Tr. 1239:9–17 (Bewley/Altman Vilandrie); *see also* Tr. 1355:11–23 (Montemagno/Charter) (stating that management within Charter had "ambitions of bringing more of an analytical approach to

programming decision-making"). In its proposal to Charter, the Altman team recognized that

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ PX0366-002. Charter

hired Altman Vilandrie in January 2017 to "quantitatively evaluat[e] the value of individual

cable networks and contract groups," across 150 television networks. PX0367-004–005; Tr.

1248:6–8, 1248:14–22, 1297:9–15 (Bewley/Altman Vilandrie). At the end of its first engagement

with Charter in April 2017, Altman Vilandrie delivered its results. PX0079; Tr. 1240:24–1241:1,

1249:9–16 (Bewley/Altman Vilandrie).

     128.    The analysis done by Altman Vilandrie has been helpful to Charter in preparing

for negotiations. Tr. 1349:3–6 (Montemagno/Charter). For example, to prepare for negotiations

███████████████████, Charter's content negotiation team created a presentation that "helped

guide" a conversation among Charter's negotiators, including Charter's CEO. PX0373; Tr.

1344:8–1345:10, 1345:14, 1348:11–24 (Montemagno/Charter). The presentation included

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ . PX0373-005, -022;

PX0079-006. Montemagno described the Altman Vilandrie analysis as "a helpful data point" in

preparing for negotiations. Tr. 1347:22–1348:10, 1349:3–6 (Montemagno/Charter). Defendants'

bald assertions that Charter's lead negotiator had "never heard of" the Altman Vilandrie analysis

and "had nothing to do with it," Tr. 4036:11–15 (Defendants' Closing Statement), are thus

starkly contradicted by the evidence. Charter's testimony undercuts Defendants' survey expert,

Professor Peter Rossi, who criticized the Altman Vilandrie study, yet testified that he was

unaware that Charter had incorporated the analysis into its internal studies. Tr. 2853:7–9 (Prof. Rossi).

129. Altman Vilandrie used three methodologies to understand the value of programming content to Charter customers: a survey methodology, set top box data analysis methodology, and a hybrid methodology that combined information from the other two. PX0079-005; Tr. 1271:16–1272:6 (Bewley/Altman Vilandrie). For each contract group of networks, each methodology produced an estimated video customer loss in the event that the contract group was not available to Charter customers. PX0079-006; Tr. 1278:13–1279:3 (Bewley/Altman Vilandrie). From these three estimates, Altman Vilandrie recommended the loss estimate it thought was most likely to take place for each contract group. PX079-006; Tr. 1280:5–13 (Bewley/Altman Vilandrie); *see also* Tr. 1297:7–13 (Bewley/Altman Vilandrie).

130. The survey methodology used responses from roughly ten thousand respondents identified by a third-party company. Tr. 1336:16–1337:5 (Bewley/Altman Vilandrie). Altman Vilandrie's survey included three different kinds of questions—a channel chooser section, a "max diff" section, and a conjoint analysis section. Altman Vilandrie combined the results of these different survey instruments through a confidential process to understand the value that existing and prospective customers place on different programming networks as well as to simulate potential changes to the marketplace, such as new offers of bundled services like video and internet. Tr. 1272:7–1273:1, 1273:4–21 (Bewley/Altman Vilandrie).

131. The set top box data methodology was based on analysis of the viewing data of existing Charter customers. Tr. 1274:7–2775:2 (Bewley/Altman Vilandrie). The basic idea behind the set top box data methodology is that the more a subscriber watches a network, the more important it is to them. Tr. 1275:3–7 (Bewley/Altman Vilandrie). Altman Vilandrie, based

on confidential analysis of Charter's set top box data, used the viewing time a subscriber spent on a given cable network to infer the importance of the cable network to the customer. Tr. 1274:17–1275:2 (Bewley/Altman Vilandrie). Professor Rossi criticized using set-top box data to estimate subscriber losses, but he had not reviewed trial testimony indicating that Cox and Comcast use set-top box data for this very purpose. Tr. 2857:4–17 (Prof. Rossi).

132.     The survey and set top box data methodologies each have strengths and weaknesses. Tr. 1271:19–1272:6, 1275:14–1276:12 (Bewley/Altman Vilandrie). While the survey allowed Altman Vilandrie to ask participants directly how much they valued different networks, people's stated preferences do not perfectly reflect their actions. Tr. 1274:7–1275:2 (Bewley/Altman Vilandrie). And while the set top box data included information about what subscribers actually watched, the set top box data could not reflect how much people engaged with or valued such content—for example, whether a channel was being viewed as background noise. Tr. 1275:14–1276:12 (Bewley/Altman Vilandrie). Altman Vilandrie designed the hybrid methodology to overcome those drawbacks by drawing on information from both the survey and set top box methodologies to provide an additional data point. Tr. 1271:19–1272:6, 1275:14–1276:12 (Bewley/Altman Vilandre).

133.     For the group of channels included in the "Turner Broadcast System 1" contract group, ███████████████████████████████████████████████ ███████████, Altman estimated that a permanent blackout of those channels would result in 9 percent subscriber loss using the hybrid methodology. PX0079-018; Tr. 1330:1–20, 1330:25–1331:8 (Bewley/Altman Vilandrie). Both the survey and set top box data methodology resulted in an estimated 14 percent subscriber loss in the event of a blackout of the Turner networks. PX0079-018; Tr. 1280:22–1281:6 (Bewley/Altman Vilandrie). Altman Vilandrie ultimately

recommended that Charter use the lower, 9 percent hybrid methodology loss estimate. PX0079-006; PX0373-022; Tr. 1281:12–17 (Bewley/Altman Vilandrie).

134.    Altman Vilandrie also estimated the effect of ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ PX0079-018.

Altman Vilandrie analyzed prospective customers because the impact of a blackout on existing

customers takes place substantially within the first year, but the impact on prospective customers

"goes into perpetuity," taking into account all the new customers that were not acquired due to

the reduced programming. Tr. 1325:4–1326:16 (Bewley/Altman Vilandrie). Therefore, Altman

Vilandrie considered it important to look at prospective as well as current customers to fully

evaluate the impact of dropping a group of networks. Tr. 1325:9–14 (Bewley/Altman Vilandrie).

135.    Defendants stated that the Altman Vilandrie study is not an ordinary course

document, and that Charter paid $700,000 to Altman Vilandrie "to create a document that was

then given to the government to oppose the merger." Tr. 4036:2–4 (Defendants' Closing

Statement). Defendants also claimed that Charter changed the estimated Turner departure rate

and "made it a higher number." Tr. 62:16–18, 62:21–23 (Defendants' Opening Statement). As

discussed below, Bewley's testimony regarding the work he and his team did for Charter, as well

as Charter and Altman Vilandrie's ordinary course documents related to the study, contradict

Defendants' assertions. *See* Tr. 1285:2–6 (Bewley/Altman Vilandrie); PX0366; PX0367;

PX0079; PX0373.

136.    First is the timing: Charter and Altman Vilandrie began discussions about this

engagement prior to November 29, 2016; commenced the first engagement in January 2017—

months before Charter met with the Department of Justice in connection with this matter—and

then re-hired Altman Vilandrie for additional work in the fall of 2017. PX0366-002; PX0367-004; Tr. 1242:3–14, 1249:4–16, 1286:16–24 (Bewley/Altman Vilandrie).

137.     Second, the recommendation to refine the hybrid methodology was made by Altman Vilandrie, based on Altman Vilandrie's own analysis. Tr. 1282:7–12, 1328:9–1329:4, 1331:17–1332:4 (Bewley/Altman Vilandrie); *see also* Tr. 1285:2–6 (Bewley/Altman Vilandrie); DX0681.0007 (███████████████████████████████████████████████████ ████████████). The change to the hybrid methodology did not result from a request made by Charter. Tr. 1285:4–6 (Bewley/Altman Vilandrie)

138.     Third, the recommendation to refine the hybrid methodology for Turner specifically, prior to implementing that change for other groups of networks, was based on quantitative analysis. Tr. 1282:10–1283:6 (Bewley/Altman Vilandrie). The original hybrid methodology assigned contract groups into one of three different thresholds: Group 1 had broadly popular content, Group 2 had moderately popular content, and Group 3 had niche or specialty content that is less popular. Tr. 1283:14–25 (Bewley/Altman Vilandrie). The Turner contract group initially fell on the edge of Groups 2 and 3; but the original hybrid methodology forced Turner into Group 3. Tr. 1281:18–22, 1282:13–1283:6 (Bewley/Altman Vilandrie). Turner was the only contract group whose hybrid estimate did not fall close to or between the other methodologies. Tr. 1282:13–1283:6 (Bewley/Altman Vilandrie).

139.     Fourth, Altman Vilandrie's recommended loss estimate for Turner content was revised *downward* from 14 percent, based on the set top box data methodology, to nine percent, based on the refined hybrid methodology. Tr. 1281:12–17, 1282:3–6, 1287:3–13 (Bewley/Altman Vilandrie).

140.     Lastly, Charter re-engaged Altman Vilandrie in the fall of 2017 to implement the

refinement in the hybrid methodology for the rest of the 150 television networks. Tr. 1284:15–21 (Bewley/Altman Vilandrie). Altman Vilandrie had been unable to do this work within the timing and scope of the previous project, but returned to work for Charter in the fall and completed the implementation of the refined hybrid methodology not just for Turner but for all 150 networks. Tr. 1284:19–1285:1, 1286:16–24, 1313:8–10 (Bewley/Altman Vilandrie).

### b) Comcast regularly analyzes viewership data to estimate potential subscriber losses

141.    When preparing for programming negotiations, Greg Rigdon, Executive Vice President of Content Acquisition for Comcast Cable, reviews internal analyses that attempt to quantify the value of that programming. Tr. 862:10–15; 859:1–4 (Rigdon/Comcast). These "drop analyses" project the number of subscribers that Comcast Cable would lose if it no longer carried certain programming, along with the financial impact of not having that content. Tr. 862:16–863:3, 864:9–20 (Rigdon/Comcast).

142.    The purpose of a drop analysis is 

Tr. 917:19–918:11 (Rigdon/Comcast). Though drop analyses are a little bit of art and a little bit of science,

. Tr. 962:1–963:19 (Rigdon/Comcast). For this reason, Rigdon

Tr. 962:1–963:19 (Rigdon/Comcast). When reviewing drop analyses,

Tr. 916:22–917:7 (Rigdon/Comcast).

143.    Comcast Cable relies on proprietary viewership data,

, and public data sources to create drop analyses. Tr. 862:16–863:3,

916:1-916:12, 962:1–963:19 (Rigdon/Comcast). Comcast Cable began producing drop analyses at Rigdon's request, ██████████████████████████. Tr. 863:4–12, 924:23–925:8 (Rigdon/Comcast). Rigdon and his team work closely with the Comcast group that produces drop analyses, asking them questions and providing them with input. Tr. 863:18–864:8 (Rigdon/Comcast).

144.    For example, Comcast Cable dropped YES Network, a regional sports network that carries Yankees games, ████████████████████████████████. Tr. 895:4–11, 934:2–10 (Rigdon/Comcast). ████████████ ████████████████████████████████████████ ████████████████████████████. Tr. 935:20–936:11 (Rigdon/Comcast). ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ Tr. 934:11–935: 2 (Rigdon/Comcast). ████████ ████████████████████████████████████████ ████████████ Tr. 934:5–10 (Rigdon/Comcast). ████████████ ████████████████████ Tr. 934:11–14 (Rigdon/Comcast). And Comcast ████████████████████████████████████████ ████████████ Tr. 924:23–925:8, 928:24–929:7 (Rigdon/Comcast), PX0385: PX0306.

145.    ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████



█████ Tr. 925:21–926:18 (Rigdon/Comcast); PX0385-011. ████████████

██████████████ Tr. 926:19–927:11 (Rigdon/Comcast). ███████████

████████████████████████████████████████████████

█████████████ Tr. 926:19–927:11 (Rigdon/Comcast); PX0385-011 (████

████████████████████████████████████████████████

████████████████). ████████████████████████████

████████████████████████████████████████████████

█████████████ Tr. 926:13–18, 927:12–14, 959:23–960:1 (Rigdon/Comcast). ████

████████████████████████████████████████████████

██████████ Tr. 934:11–935:2 (Rigdon/Comcast).

146.     Rigdon shares drop analyses with his boss, Comcast Cable CEO Dave Watson, and with executives from Comcast Corporate. Tr. 865:15–17, 866:5–7 (Rigdon/Comcast).

147.     In 2015, Comcast and Turner negotiated a new contract. Tr. 871:11–14 (Rigdon/Comcast). █████████████████████████████████████ Tr. 909:25–910:8 (Rigdon/Comcast). █████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████ PX0384-006. ████████████████████████████

████████████████████████████████████████████████

████████████ Tr. 917:19–918:21 (Rigdon/Comcast).

148.     ████████████████████████████████████████

███████████████████████ Tr. 918:22–919:2 (Rigdon/Comcast); *see also*

Tr. 999:4–9 (Breland/Turner); PX0123-019 (█████████████████████████

██████████████████████████████████). █████████████████████████

██████████████████████████████████████████████ Tr. 919:3–7

(Rigdon/Comcast). ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ Tr. 919:8–15

(Rigdon/Comcast). In addition, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████

149.    Comcast and Turner negotiated a new contract this year. Tr. 874:6–8

(Rigdon/Comcast). ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ PX0385-010, Tr. 923:18–20 (Rigdon/Comcast).

████████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████ Tr. 924:23–925:5 (Rigdon/Comcast).

████████████████████████████████████████████████████

PX0385-010. ████████████████████████████████████████

█████████████████████ Tr. 941:4–9 (Rigdon/Comcast); *see also* PX0385-010

(████████████████████████████████████████████████████

████████████████████████████████). █████████████████

███████████████████████████████████████████████

████████████████████████████ Tr. 927:15–21 (Rigdon/Comcast). ██████████████

███████████████████████████████████████████ Tr. 923:8–17

(Rigdon/Comcast). ████████████████████████████████████████

████████████████████ Tr. 941:10–13 (Rigdon/Comcast). In its new contract, Comcast

Cable again agreed to increase the rates it paid to Turner. Tr. 874:9–11 (Rigdon/Comcast).

### c) Cox estimated potential subscriber losses when considering whether to drop █████

150.     While Cox never analyzed dropping Turner, it did analyze dropping ██████. *See*

Tr. 695:17–696:10 (Hinson/Cox); PX0523-C. Cox conducted an analysis to determine the impact

that going dark on ████████ would have in advance of negotiating a renewal agreement to better

understand Cox's leverage, and Cox used this analysis as a starting point in the negotiations. Tr.

102:9–103:6 (Fenwick/Cox); Tr. 695:17–696:10 (Hinson/Cox); PX0523-C. Cox does not

conduct "go dark" analyses on all programmers unless they "have a concern about how popular .

. . the network may be." Tr. 103:7–13 (Fenwick/Cox). Cox has not conducted a similar analysis

for Turner "[b]ecause we had concerns whether that [other] network's content was valuable. We

don't have any concerns or questions about how valuable the Turner content is. We know it's

extraordinarily valuable." Tr. 154:16–155:1 (Fenwick/Cox).

151.     Based on its analysis, Cox concluded that it would not make financial sense to

drop ████████, even though it only has a single channel that is, sometimes, in the top twenty rated

channels. Tr. 695:17–696:10 (Hinson/Cox); PX0523-C. Turner is far more important than

████████, given that Turner has three channels in the top 20 rated channels (with CNN being

number seven), so dropping Turner would be even less viable than dropping ████████. Tr.

695:17–697:13 (Hinson/Cox); PX0523-C. Cox executive Suzanne Fenwick believes it is possible

that Cox could lose half a million subscribers without Turner content. Tr. 142:18–20

(Fenwick/Cox).

### d)   Other MVPDs have estimated potential subscriber losses through viewership data

152.     In preparing for a negotiation with a programmer, DISH will start six months in

advance. Tr. 246:10–13 (Schlichting/DISH). DISH will analyze viewership data from its set-top

boxes, review old contract pricing, analyze where the programmer is in the market, and

sometimes perform an analysis of what would happen if DISH went dark with the network. Tr.

246:10–20 (Schlichting/DISH). Viewership analysis includes examining the total hours viewed

by network, which indicates how popular a network is; total hours viewed per month by

household, which is a measure of whether the household is a "really passionate versus casual

viewer" of the network and is part of DISH's risk analysis if there is a chance of going dark with

the programmer; the "dollars viewed"—the amount DISH pays the programmer divided by the

hours viewed—by month, to check for any networks that are outliers in terms of price paid for

who is actually watching; as well as additional viewer metrics. Tr. 246:23–247:13

(Schlichting/DISH).

153.     RCN uses its own viewership data in making programming decisions; this data

informs RCN's opinion about how important Turner is. Tr. 2910:13–16, 2975:23–2976:7

(Holanda/RCN). This data shows that RCN has three Turner channels in its top ten channels. Tr.

2910:2–12 (Holanda/RCN). RCN is concerned that it would lose customers if it did not have

Turner programming, even though it does not know the exact loss. Tr. 2975:23–2976:16

(Holanda/RCN).

### c.      Each side uses its leverage to negotiate the best deal it can

154.     As the long-time chief negotiator for Turner testified, there is leverage on both

sides, and that leverage affects the terms that Turner is able to secure from distributors, as well as what the distributors are able to secure from Turner. Tr. 1025:11–13 (Breland/Turner). Breland agreed that reaching a deal can come down to a battle of competing bargaining leverage, and a programmer has to use whatever leverage it has to protect its networks. Tr. 1025:11–1026:2 (Breland/Turner). Breland even compared negotiations to "arm-wrestling." Tr. 1024:22–1025:10 (Breland/Turner). Programmers with more "must have content" have more leverage in negotiations with MVPDs. Tr. 89:17–90:4 (Fenwick/Cox). Distributors with more subscribers have more leverage in negotiations with programmers. *See* PX0205 (Bewkes and Martin discuss whether the DISH affiliate agreement should be negotiated before Turner signs a deal with Sony for its PlayStation Vue service. Bewkes noted that "Sony isn't going anywhere, and they don't have 14 million sub[]s to take dark.").

155.     AT&T executives have recognized the leverage that the threat of a blackout provides for programmers in negotiations, noting in June 2016 that "[e]xpiration of the [consent decree arbitration] condition means NBCU can play hardball and threaten blackout if they do not get the terms from MVPDs they want." PX0011; Tr. 1716:18–1717:1 (Gibson/AT&T).

156.     Turner believes that its valuable content gives it leverage in negotiations with distributors. For example, after DISH announced Turner content would be available on DISH Sling, the company's new virtual MVPD service, Martin wrote the announcement gave Turner "leverage" with DISH because Sling would be "shit without Turner." PX0004.

### i.     Turner uses the threat of going dark as leverage to get favorable agreement terms

157.     Turner has shown a willingness to go dark in the past when Turner does not get what it wants in negotiations. Turner has gone dark with distributors four times since 2006. Tr. 1042:20–23 (Breland/Turner). Turner went dark with Court TV (later TruTV) on Dish in 2006,

CourtTV (later TruTV) on Cable One in 2007, all Turner networks on Cable One in 2013, and all Turner networks other than TNT and TBS on Dish in 2014. Tr. 255:9–256:7 (Schlichting/Dish); Tr. 1042:20–1043:20, 1098:19–1099:1 (Breland/Turner); PX0144-121.

158.    Turner almost went dark with Time Warner Cable over a single penny increase on one channel in 2012. PX0403; Tr. 1033:12–14 (Breland/Turner). Indeed, in recent years, Turner has gotten close to going dark with "virtually every major distributor," including Time Warner Cable in 2012, DirecTV in 2013, DISH in 2015, Altice in 2016, and Charter in 2016. Tr. 1033:8–1034:3 (Breland/Turner).

159.    Turner came within ten minutes of going dark with Charter in 2016. Tr. 1034:4–7 (Breland/Turner). Turner told Charter that Turner would go dark if Charter did not agree to higher rates, which Charter ultimately agreed to pay. Tr. 1034:8–1034:13 (Breland/Turner); PX0146. Charter gave "concessions" and "surrendered to their demand to capture all more favorable terms and conditions." Tr. 1137:2–1137:21 (Breland/Turner); PX0146.

160.    Turner came close to going dark with Altice in October 2016 because Altice rejected the rate increases that Turner wanted. Tr.1041:13–19 (Breland/Turner). Coleman Breland informed Time Warner CEO Jeff Bewkes of the likelihood that Turner would go dark with Altice, and that Turner CEO John Martin, and Turner President David Levy were supportive of going dark. Tr. 1041:23–1042:7 (Breland/Turner). Ultimately, Altice agreed to Turner's rate to avoid going dark. Tr. 1042:16–1042:19 (Breland/Turner).

### ii.    Turner uses its sports rights as leverage to get favorable agreement terms

161.    Premium sports give Turner leverage when negotiating with distributors. *See* PX0132-011 ("And so if you look at the NBA playoffs, the NCAA championship and the Major League Baseball playoffs, a disproportionate amount of our sports are either playoff or

tournament play, which is must-have. . . . And let's face it, the sports is one of the big reasons why we [Turner] are able to extract the type of affiliate rate increases that we are.").

162.    In contentious negotiations, Turner executives consider lining up renewals with important sports events to make blackouts more painful for distributors. For example, Turner strategized to extend Charter's affiliate agreement so that it would expire during some of Turner's "most powerful programming, (the NBA playoffs)." PX0146. At trial, Breland testified that Turner would have more leverage negotiating during this time because Charter would not want to go dark during the NBA playoffs. Tr. 1037:22–1038:14 (Breland/Turner); PX0146. Turner even conducted research to identify markets serviced by Charter that had basketball teams in the NBA Playoffs as well as markets where NBA basketball is very popular to inform its strategy on how best to maximize its additional leverage in the negotiations. Tr. 1038:16–1041:11 (Breland/Time Warner); PX0147.

163.    In addition to the NBA, Turner also seeks to maximize its so-called "NCAA leverage," by setting contracts to expire during the middle of NCAA March Madness, when distributors would not want to be dark. Tr. 1144:24–1145:13 (Breland/Turner). As Breland testified, Turner will have "NCAA leverage" for the next fifteen years. Tr. 1145:14–1145:16 (Breland/Turner).

164.    For example, Turner used its blackout with DISH to increase its leverage by engineering its previously separate affiliate agreements to all expire during March Madness. Previously, DISH had two affiliate agreements with Turner, one for TBS and TNT and another for the rest of the Turner networks. *See* Tr. 255:11–18, 256:8–10 (Schlichting/DISH). In the fall of 2014 DISH was working to renew its affiliate agreement for the non-TNT and TBS networks, which both parties kept extending during the negotiations. Tr. 256:11–20 (Schlichting/DISH).

165.     It was important for DISH that the two Turner affiliate agreements have separate expiration dates because, DISH believed that negotiating carriage of all of Turner's networks at the same time would give Turner more leverage in the negotiations. Tr. 256:11–257:11 (Schlichting/DISH). Turner's own executive acknowledged that negotiating for all of Turner's networks together would provide them with more leverage. Tr. 1140:22–1141:4 (Breland/Turner). The extensions positioned Turner to have the affiliate agreement for the rest of the Turner networks expire around the same time as the expiration date of the TBS and TNT affiliate agreement. Tr. 256:11–20, 257:12–15 (Schlichting/DISH). DISH, worried about the shift in negotiating leverage, tried to extend the TNT and TBS affiliate agreement so that it would be negotiated separately. Tr. 459:21–460:12 (Schlichting/DISH). Turner refused, and Turner's networks—other than TNT and TBS—went dark on DISH for 31 days beginning in October, 2014. Tr. 255:9–256:7, 460:7–12 (Schlichting/DISH); Tr. 560:8–18 (Martin/Turner).

166.     In order to resolve the blackout, DISH made certain concessions to Turner,[4] and DISH ultimately paid Turner more than the "big, big, big check" it was already paying for Turner content. Tr. 460:13–461:12 (Schlichting/DISH). Significantly, the agreements for all of the Turner networks, including TNT and TBS, and even the affiliate agreement with HBO, were extended until March 31, 2015. Tr. 560:15–21 (Martin/Turner); Tr. 257:16–258:19, 260:11–17 (Schlichting/Dish). The March 31 expiration date was during the March Madness NCAA tournament, an intentional move on Turner's part. Tr. 560:19–561:5 (Martin/Turner).

167.     Turner CEO John Martin believed he could use March Madness to gain leverage

---

[4] DISH executive Warren Schlichting could not explain the specific concessions Dish made to Turner to end the blackout in open court as these terms are confidential. Tr. 460:13–19 (Schlichting/Dish).

over DISH. Tr. 564:3–25 (Martin/Turner). The head of Turner's research department emailed Martin with an analysis of subscriber impact if Turner went dark on DISH, interrupting the March Madness tournament. Tr. 572:22–573:20 (Martin/Turner); PX0130. Turner estimated that 24 percent of DISH households would watch the two Final Four games. Tr. 572:22–573:20 (Martin/Turner); PX0130. Martin warned DISH CEO Charlie Ergen that if there was not movement toward an agreement in 48 hours, Turner would begin putting advertisements on during March Madness warning DISH customers that they might not be able to watch the finals if Turner went dark at the expiration of the affiliate agreement. Tr. 563:11–564:11 (Martin/Turner); PX0131. And Turner went to the NCAA and got approval for language that Turner could use in blackout marketing during a potential blackout with DISH. Tr. 1144:4–11:44:23 (Breland/Turner).

168.    DISH sought protection to keep Turner from distributing its own content; Martin rejected this and called it a "go dark issue." PX0120. David Levy, President of Turner, agreed with Martin, noting wryly "the sweet 16 starts Thursday . . . smile . . . I am sure Charlie [Ergen] knows if his subscribers are watching…." PX0120; Tr. 574:11–575:10 (Martin/Turner). ██████

████████████████████████. *See* PX0409-006 (███████████████████████████

████████████████████████████████████████████████████████████).

### iii.    Turner "prevailed nicely" over Cable ONE in the only blackout of all of Turner's networks, while Viacom remains off air on Cable ONE four years later

169.    Cable ONE's blackout experiences demonstrate the importance and power of Turner. Cable ONE, a medium-size MVPD, has had programming blackouts with Turner and Viacom. Tr. 2092:3–9 (Sejen/Cable ONE). The way Cable ONE approached both blackouts demonstrates the importance of Turner content to an MVPD and the relative weakness of

Viacom. *See* Tr. 2096:6–2097:13 (Sejen/Cable ONE).

170.    As Cable ONE and Turner negotiated a new agreement in 2013, Cable ONE chief

negotiator Randy Sejen noticed a clause in the National Cable Television Cooperative ("NCTC")

agreement with Turner that allowed NCTC members to sign up for a subset of Turner networks,

rather than take all of its networks. Tr. 2097:2–2098:12 (Sejen/Cable ONE). Sejen told Turner

that Cable ONE was going to use the NCTC clause and only take three of Turner's networks. Tr.

2098:2–12 (Sejen/Cable ONE). The three Turner networks that Cable ONE wanted to keep were

Cartoon Network, TBS, and TNT. Tr. 2112:10–22 (Sejen/Cable ONE). TBS and TNT were

worth keeping because they had "very valuable sport programming content, especially during the

month of March, with March Madness." Tr. 2112:10–20 (Sejen/Cable ONE).

171.    Sejen expected that Turner would respond with a proposal for Cable ONE to carry

all of the Turner networks. Tr. 2098:5–12 (Sejen/Cable ONE). Instead, Turner "went to great

lengths to protect [its] bundle," using a financial audit of Cable ONE's license fees in order to

keep Cable ONE from joining the NCTC, thereby denying Cable ONE access to the NCTC

provision. Tr. 2098:14–2099:22, 2115:11–21 (Sejen/Cable ONE). The insignificant audit was

used "as a weapon" by Turner in the negotiations. Tr. 2099:6–22 (Sejen/Cable ONE). Sejen

believes that Turner did this because, "if a cable operator was allowed to just carry three of

[Turner's] eight or nine channels," it would cause "a major disruption to [Turner's] business

model." Tr. 2098:14–19 (Sejen/Cable ONE). Turner "dragg[ed] [its] feet for months on settling

this audit" and "wouldn't return phone calls." Tr. 2099:10–16 (Sejen/Cable ONE); *see also* Tr.

2098:13–2099:20 (Sejen/Cable ONE).

172.    Turner cut off its signals on September 30. Tr. 2098:13–2099:22 (Sejen/Cable

ONE); *see also* Tr. 1045:22–25 (Breland/Turner). The blackout lasted for about 30 days. Tr.

2116:3–5 (Sejen/Cable ONE); Tr. 1046:1–3 (Breland/Turner). During the blackout, Cable ONE

was in constant contact with its subscribers, through commercials and other media, in order to let

its customers know that Cable ONE was working diligently to resolve the issue. Tr. 2111:2–

2112:4 (Sejen/Cable ONE). The company also let its customers know that it expected to bring

Turner content back soon. Tr. 2111:2–23, 2118:5–15 (Sejen/Cable ONE). In order to retain

subscribers, Cable ONE offered its customers a credit for the month that Turner was off the air.

Tr. 2111:24–2112:4, 2118:22–2119:2 (Sejen/Cable ONE). Cable ONE did not experience a large

subscriber loss in the month of the blackout because even though it was the MLB playoffs during

that time period, there were "fortunately" no teams from the Cable ONE markets participating

that season in the playoffs and Cable ONE directed subscribers to MLB.com where customers

could watch the baseball playoffs that year. Tr. 2116:9–2117:11, Tr. 2117:21–2118:15

(Sejen/Cable ONE). Sejen testified that if the blackout had occurred during March, that would

have been "a whole different story," given the popularity of March Madness. Tr. 2117:21–

2118:15 (Sejen/Cable ONE).

173.    While some March Madness games were available online without a cable

subscription in 2017, Tr. 2121:11–16 (Sejen/Cable ONE), Sejen does not believe that is a

reliable alternative because programmers will eventually monetize their content and "Turner is

not going to broadcast these games for free" indefinitely, Tr. 2122:5–12 (Sejen/Cable ONE).

174.    Given the popularity of Turner programming, especially March Madness, Cable

ONE never considered a long-term drop of all of the Turner networks. Tr. 2119:10–21

(Sejen/Cable ONE). Instead Sejen thought all along that Cable ONE would come to an

agreement with Turner. Tr. 2089:17–22, 2090:1–2, 2107:25–2108:10 (Sejen/Cable ONE).

175.    After approximately one month without Turner content, Cable ONE agreed to

take all of Turner's networks except CNN International and CNN en Espanol, and agreed to

Turner's proposed price increases. Tr. 1046:1–13 (Breland/Turner). After reaching agreement

with Cable ONE, Coleman Breland emailed his boss David Levy to say that Turner "got what

[it] wanted" and that the deal was a "very good outcome" for Turner. PX0143; Tr. 1047:4–12

(Breland/Turner). Three years later, Breland again characterized the negotiations as a win for

Turner, stating that Turner had "prevailed nicely" over Cable ONE after going dark. PX0017; Tr.

1047:19–1048:16 (Breland/Turner). Cable ONE and Turner also settled the audit for a mere

$6,000, an insignificant amount compared to the total license fees that Cable ONE paid to

Turner. Tr. 2099:17–20 (Sejen/Cable ONE).

176.     By contrast, Cable ONE knew there was a good chance that it might walk away

from Viacom, given the programmer's rate increase demands and low network ratings. Tr.

2107:25–2108:17 (Sejen/Cable ONE). Cable ONE did a drop analysis on Viacom fairly early

and looked at potential replacement channels. Tr. 2107:25–17 (Sejen/Cable ONE). Ultimately, it

was "a very easy decision" to drop Viacom. Tr. 2096:6–25 (Sejen/Cable ONE). Cable ONE

replaced Viacom with better networks, Tr. 2112:5–8 (Sejen/Cable ONE), and the company has

not since brought Viacom back. Tr. 2125:3–7 (Sejen/Cable ONE). Unlike with Turner, because

Cable ONE was able to offer replacement channels, the company did not offer any rebates to its

subscribers upon dropping Viacom. Tr. 2111:24–2112:8 (Sejen/Cable ONE).

177.     Cable ONE's assessment of Viacom's relative weakness is corroborated by other

MVPDs. For example, DISH executive Schlichting testified that in comparison to Turner,

Viacom is no longer a must-have because the Viacom networks (which include MTV, BET,

VH1, CMT, Comedy Central, and Spike) are struggling and have seen "viewership declines." Tr.

244:3–24 (Schlichting/DISH). Similarly, RCN has found that Turner networks are ranked higher

than Viacom networks in terms of viewership. Tr. 2910:19–21 (Holanda/RCN). ████

████████████████████████████████████████████████████████

### 3.     As a result of the merger, Turner's negotiating leverage would increase

178.     Even though Turner would lose money in a blackout post-merger, its parent company AT&T would gain a benefit that partially offsets the loss. These gains would offset Turner's losses to a significant extent. Tr. 2313:1–13 (Prof. Shapiro). As Cox's chief negotiator explained, with the merger "the leverage changes" for Turner in negotiations with Cox. Tr. 108:5–18 (Fenwick/Cox). A combined AT&T and Turner could push Cox into a deal that may not give them the same content as AT&T customers, or could give content to Cox on a delayed timeline. Tr. 108:5–18 (Fenwick/Cox). Cox would know that if it didn't agree to these more egregious terms, it would lose customers, and that AT&T would "pick them up and grow their market share." Tr. 108:5–18 (Fenwick/Cox). In contrast, Cox did not have concerns about the Comcast/NBCU merger "because Comcast is not a competitor." Tr. 109:1–7 (Fenwick/Cox).

179.     Turner executives acknowledge that video distributors can lose subscribers if they go dark with Turner. Tr. 1049:24–1050:1 (Breland/Turner). In a November 2013 email exchange, Warren highlighted for Breland how a Time Warner Cable dispute and blackout had "irritated" its subscribers and "many have shifted to DirecTV." PX0142; Tr. 1050:18–1051:8 (Breland/Turner). Breland responded that it would not be smart for DirecTV to get into a dispute with Turner because DirecTV could lose those new subscribers. Tr. 1051:9–24 (discussing PX0142) (Breland/Turner). Breland wrote that a Turner blackout could cause DirecTV to "give them back" to Time Warner Cable. Tr. 1051:9–24 (Breland/Turner); PX0142.

180.     As a result of the merger, in the event of a Turner blackout on a rival MVPD such as Charter, some of the subscribers that the rival loses due to the lack of Turner content will

become AT&T subscribers instead, either because a subscriber will leave that rival and switch to AT&T, or because the rival, due to the lack of Turner content, will not be able to attract current AT&T video subscribers who may otherwise have switched to that rival. Tr. 2197:21–2198:2 (Prof. Shapiro). As an inevitable consequence of such a blackout, the AT&T subscribership base will grow over time. Tr. 2198:3–2198:5 (Prof. Shapiro).

181.    DirecTV is aware that it has the opportunity to gain subscribers due to programmers' blackouts with other distributors. For example, in December 2014 Dan York recognized that DirecTV might be able to gain subscribers based on rumors about upcoming expirations of deals between DISH and certain programmers. Tr. 1606:4–1608:3 (York/AT&T); PX0024 ("Of course, we don't want to publicly pile on, and by default support the programmers in these negotiations, but we may nonetheless get a lift in in-bound calls as a result of these disputes.").

182.    It is reasonable to assume that subscribers who leave an MVPD, or potential subscribers who decline to subscribe, because of a content blackout would choose a different MVPD or Virtual MVPD in roughly the same proportion as the distributors' local market shares, which reflect their relative popularity. Tr. 2239:24–2241:14 (Prof. Shapiro).

183.    AT&T's CEO testified that he does not believe that Turner will have more bargaining power after being acquired by AT&T. Tr. 3430:12–3431:4 (Stephenson/AT&T). This is inconsistent with his concern that Time Warner would use its content to advantage its own distribution after it purchased a 10 percent stake in a new virtual MVPD, Hulu, that competed with AT&T's virtual MVPD, DirecTV Now. Tr. 3476:18–3477:7 (Stephenson/AT&T); PX0047.

   a.    **Post-merger, Turner will pursue a strategy that will maximize AT&T's overall profits**

184.    It is a standard assumption of antitrust economics, and a common principle in

merger analysis, that a corporation and its wholly-owned subsidiaries operate in complete unity of interests. Tr. 2224:18–2225:1 (Prof. Shapiro). In other words, it is reasonable to assume that a combined firm is run so as to maximize joint profits. Tr. 2199:16–2200:2 (Prof. Shapiro). If the combined firm would not be run to maximize joint profits, it would essentially "leave money on the table." Tr. 2202:3–9 (Prof. Shapiro). Professor Carlton agrees that a firm will "try to" act to maximize its profits, and agreed that it was a "reasonable working hypothesis" that if a firm has multiple divisions it will maximize its profits across all of them. Tr. 2525:19–25 (Prof. Carlton).

185.    In the past, a Federal Trade Commission consent decree prevented Time Warner from tying the negotiations of HBO and Turner together. *In re Time Warner, Inc.*, 61 Fed. Reg. 50301, 50306 §V (FTC Sept. 25, 1996). That decree resulted from the merger between Time Warner and Turner in 1997, but expired after 10 years. Today, Turner and Time Warner are able to combine Turner and HBO in negotiations. Tr. 1010:24–1012:1 (Breland/Turner).

186.    Time Warner has made a conscious effort to try to line up the negotiations of HBO and Turner with major MVPDs. Tr. 1012:20–23 (Breland/Turner). Jeff Bewkes instructed Turner to align its renewal negotiations with HBO with respect to Time Warner Cable, Comcast, and Charter. Tr. 1013:11–23 (Breland/Turner); PX0090. The goal of aligning the negotiation was to "maximize leverage in each instance." Tr.1013:24–1014:5 (Breland/Turner); PX0090. Time Warner worked on aligning negotiations with HBO in a systematic way to increase Turner's bargaining leverage, including trying to align HBO and Turner's expiration dates, by bringing them closer together. Tr. 1014:6–1015:14 (Breland/Turner); PX0090; *see also* PX0131 ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████ *see also*
Tr. 1468:5–1469:8 (Sutton/HBO); PX0483 (when Bewkes' suggests HBO, Turner, and Warner
Bros. "coordinate [their] efforts", HBO CEO Richard Plepler reacts "oy" and Sutton responds
"Uh oh. We'll lose our ability to maximize HBO revenue of course").

187.    HBO also worked to coordinate its negotiations with Altice, YouTube and Charter
to coincide with Turner, which not only hurt HBO by delaying the close of their deals, but
caused HBO to sacrifice revenue for its business line. An HBO executive, Simon Sutton, wrote
that in 2016 HBO "disengaged with Altice as Turner did not have a deal," coordinated with
Turner's deal expirations in negotiations with both AT&T and Charter "held off" on a deal with
YouTube until Turner got an offer (sacrificing HBO revenue for 2017). PX0091; Tr. 1472:6–
1474:16 (Sutton/HBO). YouTube wanted to license Turner content, but sought prices that were
lower than any other distributor in the industry. Tr. 1006:15–20 (Breland/Turner). Additionally,
YouTube did not want to carry Turner's networks on its basic package. Tr. 1006:21–25
(Breland/Turner). YouTube was trying to break the model of carrying underperforming, weaker
cable networks in order to get the broadcast networks. Tr. 1008:14–1008:17 (Breland/Turner).
Agreeing to YouTube's proposal "would do irreparable harm to Turner's current business
model." Tr. 1007:13–1008:10 (Breland/Turner). After hearing YouTube's position, Coleman
Breland informed Jeff Bewkes, Time Warner's CEO, and Bewkes, in turn, instructed HBO to
stop negotiations with YouTube due to YouTube's position with respect to Turner. Tr. 1008:18–
1009:7 (Breland/Turner). HBO in fact stopped negotiating with YouTube because of YouTube's
unacceptable offer to Turner. Tr. 1009:21–1010:23 (Breland/Turner); PX0481.

188.    Time Warner even reported to its Board of Directors in 2016 that ████████
██████████████████████████████████████████████████████████████

PX0008-007.

Post-merger, the employees will continue to seek to maximize the profit of the entire company, not merely the profits of their specific divisions.

### b.      AT&T's rivals expect Turner to exercise its increased bargaining leverage

189.    Because of the benefits for AT&T's video services resulting from a blackout of the Turner content on a rival MVPD or virtual MVPD, which can also be viewed as a new cost of licensing the Turner content to AT&T rivals post-merger, Turner will gain additional leverage in negotiations with these distributors, as it will be less keen to reach a deal. *See* Tr. 2202:17–2203:22 (Prof. Shapiro). As Defendants' expert economist testified, it is in AT&T's interest for its rivals' costs to go up. Tr. 2522:2–4 (Prof. Carlton). "Every competitor would like its rivals to be a worse competitor." Tr. 2521:20–24 (Prof. Carlton).

190.    MVPDs are concerned about negotiating with Turner after it is owned by a rival distributor that competes with them because Turner will no longer have the same mutual interest in reaching an agreement. Charter's Tom Montemagno testified that before the merger in his negotiations with Turner, "there's natural motivation for us to both want to try and find an agreement and find a middle ground." Tr. 1351:19–21 (Montemagno/Charter). However after the merger this will no longer be the case. Tr. 1351:15–1352:3 (Montemagno/Charter).

191.    Similarly, Cox is "very concerned about what [the merger] will mean for [Cox] in our next negotiation because now really there's a benefit that is created in this merger that isn't there today" because "instead of negotiating with a company that it's [sic] sole job is to distribute its content, it's now owned by a company who is also a distributor and they want to gain customers." Tr. 107:6–24 (Fenwick/Cox).

192.    DISH believes that if the merger is consummated it would "throw[] the card table

up in the air" because "all of the incentives change at that stage." Tr. 261:24–262:1
(Schlichting/DISH). As Schlichting testified, Turner is a "really important supplier" who is
"teaming up with our biggest adversary, our head to head competition," and Schlichting is
concerned about what incentives Turner would have to get a deal done with DISH. Tr. 261:12–
262:6 (Schlichting/DISH). Today, Schlichting believes that when DISH and Turner negotiate,
they are engaged in a "mutual headlock" and fight like "cats and dogs" but know that they need
to reach a deal. Tr. 262:7–22 (Schlichting/DISH). Post-merger, Schlichting does not believe that
Turner will have the same incentive or motivation to "work and struggle . . . kick and fight to try
to meet in the middle," when Turner could use its leverage to extract higher fees or impose terms
that would make it difficult for DISH to remain competitive. Tr. 264:21–265:16
(Schlichting/DISH).

193.    MVPDs are concerned that the merged firm will use its increased leverage in
negotiations to raise the price rival distributors pay for Turner networks. Cox is "very concerned
that we are going to be presented with a horribly ugly deal [by Turner after the merger] and that
when faced with that deal, we have to think about that if we do go dark, they have a benefit in
picking up Cox customers" because AT&T/DirecTV is Cox's "biggest competitor" and Cox
"know[s] going into these negotiations [with Turner] that that additional leverage is there." Tr.
107:6–24 (Fenwick/Cox).

194.    Montemagno also expressed his concerns that the merger would decrease
Charter's leverage in carriage negotiations for Turner content, as Charter would go from
comprising about 15 percent of the revenue for the Turner portfolio to possibly less than one
percent of AT&T's overall revenue. Tr. 1351:15–1352:3 (Montemagno/Charter). With respect to
potential price increases, Montemagno testified that AT&T's distribution platforms may

incentivize the merged firm to "dramatically raise the rates" for the Turner portfolio and HBO, which Montemagno described as already "very, very expensive products." Tr. 1351:9–10, 1351:21–25 (Montemagno/Charter). Montemagno characterized the post-merger world as essentially a "win-win situation" for AT&T because either Charter pays "excessive [price] increases" for Turner content or Charter loses Turner content, causing churn from Charter's MVPD service and creating a "more competitive distribution profile" for AT&T, who competes with Charter for subscribers. Tr. 1352:1–3 (Montemagno/Charter).

195.    Schlichting explained that the leverage would change due to the merger because currently, Time Warner is an independent company, unaffiliated with a distributor. Tr. 263:1–18 (Schlichting/DISH). Post-merger, Turner would be owned by a company that also owns a nationwide MVPD satellite service and a nationwide virtual MVPD service, which compete directly with DISH's satellite and Sling services. Tr. 263:1–24 (Schlichting/DISH). The merger changes this leverage because Turner can raise its prices, which would allow Turner to make more money, and ultimately makes DISH less competitive since they have to pass the cost increase on to the consumer, and could cause DISH to lose subscribers. Tr. 261:12–262:22 (Schlichting/DISH); Tr. 264:21–265:16 (Schlichting/DISH).

196.    MVPDs are also concerned the merged firm would use its increased leverage to impose "onerous terms" on rival distributors through negotiations over Turner content. Charter's Montemagno raised concerns that, as a result of a change in leverage post-merger, Charter may be forced to carry AT&T's regional sports networks at a cost of tens of millions of dollars, or negotiate Turner and HBO carriage agreements simultaneously. Tr. 1352:4–13 (Montemagno/Charter); *see also* Tr. 1403:22–1404:23 (Montemagno/Charter).

197.    DISH's Schlichting similarly expressed concern that Turner would impose

"onerous terms" on DISH during negotiations that DISH would not be able to accept, and would result in a blackout of Turner content on DISH's service. Tr. 262:7–22 (Schlichting/DISH). This would cause DISH to "lose a lot of [subscribers]. It would be severe bleeding. And most of those [subscribers] would accrue to [AT&T's] benefit. Lose lose for us, win win for them." Tr. 262:14–22 (Schlichting/DISH). AT&T would win even though AT&T would not collect affiliate fees for Turner content from DISH during a blackout because "it's more lucrative to take [subscribers] than it is to… collect programming fees." Tr. 263:1–18 (Schlichting/DISH); Tr. 263:25–264:5 (Schlichting/DISH).

198.    MVPDs are concerned that the merged firm may decide to withhold some Turner rights or content from rival distributors. For example, Cox was not able to get █████████ rights in the most recent agreement negotiated with Turner, and while Cox has these rights with every other programmer and would expect to be able to reach an agreement on this term in the upcoming renewal negotiation, Cox believes that the merger would change that and Cox will be unlikely to get these rights from Turner if the merger goes through. Tr. 113:1–114:5 (Fenwick/Cox); PX0520.

199.    With respect to the threat of exclusive content offerings, Montemagno testified about the importance of Turner programming "particularly in the professional sports arena and the college sports arena" and his concerns that, post-merger, AT&T may make "critically important content" available exclusively to AT&T customers, making it harder for Charter to compete. Tr. 1350:6–1351:4 (Montemagno/Charter).

200.    Additionally, Montemagno testified that the merged firm would have the "ability to directly promote" DirecTV to Charter's customers. Tr. 1404:16–23 (Montemagno/Charter). Specifically, Montemagno explained that out of the 16 minutes of advertising generally available

per hour of programming, two minutes are allotted to distributors and programmers use the other

14 minutes. Tr. 1405:5–12 (Montemagno/Charter). If the merger goes forward, the merged firm

could use a greater percentage of advertising time per hour to steer Charter customers to

DirecTV. Tr. 1405:13–18 (Montemagno/Charter).

<div style="margin-left:2em">

**c.      Professor Shapiro's economic model predicts that Turner would be able to use additional leverage to increase fees beyond the regular annual price increases that would occur without the merger**

</div>

201.    Given the extensive trial testimony by industry witnesses about bargaining

leverage, *e.g.* Tr. 1025:11–1026:2 (Breland/Turner), and how they consider the alternatives to

reaching a deal, *e.g.*, ██████████████████████████ Professor Shapiro's choice of a

standard economic model, the Nash bargaining model, was well-founded. *See* Tr. 2193:2–

2194:13 (Prof. Shapiro). In Nash bargaining, the parties reach a negotiated result, which depends

on each side's best alternative without an agreement. *See* Tr. 2193:2–2194:13 (Prof. Shapiro).

This model is based on the simple intuition that the terms of a deal are based on bargaining

leverage and what would happen to each side if no deal was reached. Tr. 2193:21–2194:13 (Prof.

Shapiro); Tr. 995:15–17 ("Turner has used its bargaining leverage over the years to secure price

increases") (Breland/Turner). The model captures how the merger changes the leverage in

programmer-distributor bargaining and how "after the merger, AT&T will have more leverage as

the owner of the Turner content than Turner had before." Tr. 2196:3–15 (Prof. Shapiro). AT&T

will have more leverage post-merger because if no deal is reached (and there is a blackout of

Turner on a distributor), AT&T will benefit from having a weaker rival which, without Turner

content, will lose subscribers to AT&T and be unable to attract subscribers from AT&T. Tr.

2196:20–2198:2 (Prof. Shapiro). The model measures the value of AT&T's increased bargaining

leverage in terms of subscribers it would steal from a rival during a blackout and subscribers

AT&T would keep because a rival would not have valuable Turner content when it is trying to lure those subscribers away from AT&T. Tr. 2198:3–12 (Prof. Shapiro).

202.    This model is a standard model that is in economics textbooks and widely used by economists. *See* Tr. 3800:19–3801:10 (Prof. Shapiro). The model was accepted by the FCC in the Comcast/NBCU proceeding, and antitrust enforcement agencies routinely use it in merger analysis. Tr. 3801:11–17 (Prof. Shapiro); *In re Applications of Comcast Corp., Gen. Elec. Co. & NBC Universal, Inc. For Consent to Assign Licenses & Transfer Control of Licensees* (*FCC Comcast Order*), 26 FCC Rcd. 4238, app. B ¶ 39 (2011) ("To determine the likely magnitude of any post-transaction price changes, we adopt a Nash bargaining model originally proposed by ACA and DIRECTV"). Even one of the defendants' experts, Professor Katz, agreed that Nash bargaining is in the mainstream of bargaining analysis. Tr. 2750:13–19 (Prof. Katz). Indeed, contrary to their counsel's assertion that "the model is not consistent with the real world," Tr. 4078:13–14, AT&T and DirecTV themselves relied upon Nash bargaining theory in 2014 when seeking FCC approval for their merger. *See* PX0467-312–313 n.195 ("Bargaining theory offers a better model of the private negotiations and agreements that characterize the purchase of video network carriage rights by MVPDs than does the standard theory of monopsony. This fact appears to be well-recognized in the relevant economics literature, which models the interaction of buyers and sellers almost exclusively under a bilateral bargaining framework[.]").

203.    As demonstrated by its frequent use in this industry, Professor Shapiro's bargaining model fits market realities well. *See* PX0001-083 ("This [Nash Bargaining] Framework Can be Applied to Estimate the Impact on License Fees for National Cable Programming"); PX0442-004 (AT&T submission to FCC that "incumbent cable operators and their affiliated programming networks still attempt to use their control over such programming to

try to artificially limit competition in downstream video distribution markets"). Contrary to

Defendants' misguided argument that Professor Shapiro applied the bargaining model "in a

situation where nothing lined up with the facts of the case," Tr. 4043:21–4044:2 (Defendants'

Closing Statement), the bargaining model matches the testimony of industry witnesses at trial.

Tr. 3890:21–24 (Prof. Shapiro) ("[I]t's also quite clear that the distributors who stand to be

disadvantaged by this transaction if it goes forward do, indeed, indicate concerns that are

consistent with the bargaining model."); Tr. 144:17–23 (Fenwick/Cox); Tr. 263:1–20, 379:5–7,

463:10–15 (Schlichting/DISH).

204.   Applying this model to the proposed merger, the increase in Turner's bargaining

leverage can be determined by measuring the potential benefits from a blackout of the Turner

content on an AT&T rival. *See* Tr. 2216:10–23 (Prof. Shapiro). This analysis confirms the

market realities described in detail by industry witnesses, including the defendants themselves.

*See* Tr. 2193:21–2194:13 (Prof. Shapiro); *see also* PX0443-079 ("[V]ertically integrated MVPDs

have an incentive to charge higher license fees for programming that is particularly effective in

gaining MVPD subscribers than do non-vertically integrated MVPDs."). Professor Shapiro's

analysis flatly refutes Defendants' argument that there were no "hard evidence, no data, no

statistical studies, no analyses" put forward to confirm that AT&T's competitors will pay more

for Turner. Tr. 4033:18–21 (Defendants' Closing Statement).

205.   As a result of the merger, the increase in Turner's bargaining leverage will allow

it to increase prices for its content by an amount corresponding to the benefits that AT&T would

gain as a result of the blackout of the Turner content on its rivals. *See* Tr. 2215:13–2216:23

(Prof. Shapiro). The increase in bargaining leverage depends on three major inputs: (i) the

subscriber loss rate, which describes the number of subscribers that a MVPD would lose or be

unable to gain as a result of a Turner blackout; (ii) the diversion rate, which describes the portion

of subscribers lost to the rival that will switch to or stay with AT&T; and (iii) the profit margin

earned by AT&T on these subscribers. *See* Tr. 2217:6–24 (Prof. Shapiro).

### i.     Subscriber loss rate

206.     The subscriber loss rate related to a long-term blackout of the Turner content on a

rival MVPD is between 9 and 14 percent. *See* Tr. 2238:25–2239:9 (Prof. Shapiro). This range is

derived from various sources of evidence, including empirical data, documents, and survey

evidence. Tr. 2225:12–2226:7 (Prof. Shapiro).

207.     Both Professor Shapiro and Professor Carlton agree that long-term blackouts,

rather than short-term blackouts, are more informative for estimating the effect of a long-term

Turner drop. Tr. 2218:24–2219:21, 3874:4–12 (Prof. Shapiro); Tr. 2478:15–2479:14, 2524:19–

2525:18 (Prof. Carlton). Despite their own expert's statements about the limited usefulness of

short-term blackouts, Defendants nevertheless cite to the short-term Turner blackouts on DISH

and Cable ONE. *See* Tr. 4068:25–4069:10 (Defendants' Closing Statement). But as Professor

Carlton explained, long-term blackouts are "the most relevant" and "the one[s] you want to rely

on" because they allow for competitive responses. Tr. 2524:19–2525:18 (Prof. Carlton). The

only long-term drops of entire programming groups in the industry are the Suddenlink and Cable

ONE drops of Viacom. *See* Tr. 2225:17–21 (Prof. Shapiro); Tr. 2478:15–2479:14 (Prof.

Carlton).

208.     Professor Shapiro calculated that the long-term blackout of the Viacom networks

on Suddenlink caused a subscriber loss of 9.4 percent. Tr. 2226:8–12 (Prof. Shapiro); Tr.

2228:18–21 (Prof. Shapiro). Using the same empirical methodology, Cable ONE's drop of the

Viacom networks resulted in an even higher 16 percent subscriber loss rate. *See Tr.* 2231:22–

2232:11 (Prof. Shapiro). Defendants assert that Professor Shapiro failed to account for a change

in industry trends coinciding with the Viacom blackout on Suddenlink, but Professor Shapiro used actual data from industry participants, examined the data, accounted for the general downward trend in the industry, and determined that there was no change in that trend at the time of the Viacom blackout. *See* Tr. 2228:22–2230:7, 2231:18–21, 3804:12–3806:10 (Prof. Shapiro) ("There is no difference."). Professor Shapiro further explained that he did not use subscriber data from December 2016 because of an anomaly in data provided by DISH. *See* Tr. 3913:6–12 (Prof. Shapiro).

209.    Defendants have also put forward other estimates of the impact of the Suddenlink-Viacom blackout that purport to show lower subscriber losses. But as Professor Shapiro explained, these other estimates are based on short-term data and are not measuring the *long-term* subscriber loss rate that both he and Professor Carlton agree is the appropriate measurement for purposes of the merger analysis. *See* Tr. 3872:12–22, 3874:4–12 (Prof. Shapiro). Furthermore, in addition to being largely short-term estimates, these other sources are based on third-party information, including one from an investment bank that is not even an industry participant, instead of the actual subscriber data from Suddenlink that Professor Shapiro used. Tr. 2382:10–19 (Prof. Shapiro) ("I just don't see how some of these third parties coming up with some measures could be doing better than what I'm able to do with the actual data."); Tr. 2535:5–13 (Prof. Carlton).

210.    To determine the subscriber loss rate for Turner, an adjustment must be made for the fact that Turner's content is more important and valuable than the Viacom content. *See* Tr. 2232:12–23 (Prof. Shapiro). Indeed, Turner's license fees charged to MVPDs are around 30 percent higher than Viacom's license fees. *See* Tr. 2232:24–2233:22 (Prof. Shapiro). The subscriber loss rate for Turner would likely be even higher than the Viacom subscriber loss rate.

Tr. 2232:12–23 (Prof. Shapiro). Professor Shapiro's range of subscriber loss rates for Turner of 9 to 14 percent is, therefore, conservative. *See* Tr. 2233:14–16 (Prof. Shapiro) ("[T]o the extent I'm using those subscriber loss rates from the Viacom blackout, I'm going to be using a number that's too low, actually.").

211.    As described above, MVPDs like Comcast and Charter have conducted studies in the ordinary course to determine how many subscribers they would lose without Turner content. Included among these ordinary course studies is the analysis that Altman Vilandrie conducted for Charter, PX0079, and the drop analyses performed by Comcast, PX0384. The long-term subscriber loss rates from these documents are consistent with Professor Shapiro's empirical analysis of the Suddenlink and Cable ONE blackouts of Viacom. *See* Tr. 2236:18–2237:22 (Prof. Shapiro).

212.    Professor Shapiro's empirical analyses of the two long-term Viacom blackouts is further corroborated by a consumer survey conducted by MIT Professor John Hauser. Tr. 2237:23–2238:8 (Prof. Shapiro). Professor Hauser conducted an experiment in which some respondents were told that the Turner channels were not available on their current provider and that the blackout was expected to be permanent. Tr. 775:18–776:11 (Prof. Hauser). Respondents in a control group were not told about a blackout. Tr. 776:12–18 (Prof. Hauser). Respondents were then asked how likely they were to switch providers using an intention scale that has been shown to accurately predict real-world consumer behavior under similar conditions. Tr. 782:7– 18 (Prof. Hauser); Tr. 791:10–21 (Prof. Hauser) ("[The scale] would . . . predict quite well for Pay TV."). Professor Hauser was able to isolate the effect of the Turner blackout on respondents' choices by comparing the blackout group and the control group. Tr. 793:7–794:6 (Prof. Hauser); *see also* Tr. 762:6–22 (Prof. Hauser). He concluded that approximately 12.2 percent of pay-TV

subscribers would switch if faced with a permanent blackout of the Turner channels. Tr. 795:12–16.

213.     Professor Rossi criticized Professor Hauser's survey without having done a survey of his own, Tr. 2868:2–7 (Prof. Rossi), and despite agreeing with Professor Hauser about the basic elements of his survey design, Tr. 2868:20–2869:19, 2870:2–9 (Prof. Rossi). Professor Rossi argued that the type of intention scale used by Professor Hauser was not appropriate to the task, but he acknowledged he was unaware that AT&T has used such scales in the ordinary course of its business. Tr. 2876:10–15 (Prof. Rossi). Professor Rossi asserted that the Hauser survey inappropriately highlighted the Turner channels, but he conceded that only three out of the 1,600 survey respondents—less than 0.2 percent—understood that the survey was related to Turner. Tr. 2886:1–4, 2887:6–15 (Prof. Rossi).

### ii.     Diversion rate

214.     The diversion rate, which describes the share of subscribers that AT&T will gain or retain as a result of a Turner blackout on a rival distributor, can be estimated based on AT&T's market shares in the various local markets across the country. *See* Tr. 2239:24–2241:14 (Prof. Shapiro). Professor Shapiro assumed that subscribers leaving a distributor in the event of a Turner blackout would switch to other distributors proportional to their market shares. Tr. 2240:23–2241:3 (Prof. Shapiro) He performed this analysis for 1100 individual local markets across the country and then aggregated the results. Tr. 2241:11–14 (Prof. Shapiro).

215.     Diversion to AT&T will be reduced to some extent because some current subscribers of a rival MVPD that would leave that MVPD due to a loss of the Turner content will cancel their pay-TV service altogether (i.e., take neither an MVPD service nor a virtual MVPD service), rather than switch to AT&T or another MVPD that carries Turner. Tr. 2241:22–2242:18

(Prof. Shapiro). Based on the Altman Vilandrie report, the share of these subscribers can be estimated at approximately ten percent. Tr. 3871:4–15 (Prof. Shapiro); PX0079-018; *see also* Tr. 2242:11–15 (Prof. Shapiro).

216.    By contrast, Professor Carlton, who had not studied diversion, concluded that one in five people who switch in the event of a blackout will stop subscribing to linear television altogether. Tr. 2607:2–2608:12 (Prof. Carlton). His conclusion is based on SNL Kagan data regarding the total number of TV households that do not subscribe to pay-TV. Tr. 2605:19–25, 2609:5–9 (Prof. Carlton). But as Professor Shapiro explained, the relevant figure for the merger analysis is the number of people who would leave pay-TV in the event of a Turner blackout. Tr. 3806:22–3808:21 (Prof. Shapiro). That share is lower than the overall share of households without a pay-TV service, because it concerns current pay-TV subscribers that leave an MVPD as a result of the loss of the Turner content, and which are thus much more likely to switch to an MVPD that offers that content rather than to cancel their pay-TV service altogether. *See* Tr. 3807:10–3809:5 (Prof. Shapiro).

### iii.    AT&T profit margins

217.    AT&T measures the value of its customers using several different metrics that vary based on whether the customer is a current customer or a new one, the customer's expected life with the company, variable profit margin, and for new customers, the cost of acquiring them. Tr. 3020:8–19; 3030:8-16 (Christopher/AT&T). Lifetime value (LTV) is a measure of new customer profitability and a prediction about the customer's value into the future. Tr. 3019:15–17, 3030:8–11 (Christopher/AT&T). In contrast, active customer value (ACV) measures the value of existing subscribers. Tr. 3030:12-16 (Christopher/AT&T).

218.    To calculate monthly video margins, Professor Shapiro used data provided by

AT&T for LTVs and took an average for the three months in the second quarter of 2016. Tr. 3843:13–18 (Prof. Shapiro). Defendants have asserted that Professor Shapiro should have used a single month of LTV data from 2017 instead of averaging multiple months of LTV data. Tr. 2507:23–2508:8 (Prof. Carlton). However, as Professor Shapiro explained, using a single month of data would not be appropriate. *See* 3810:2–3812:23 (Prof. Shapiro). First, three months of data is more representative than one month of data. *See* Tr. 3023:7–3026:8 (Christopher/AT&T). The LTV for new subscribers can go up or down from month to month, and multiple months of LTV data are necessary to identify trends. *See* Tr. 3026:20–3027:1 (Christopher/AT&T). Second, Defendants' preferred data point, the LTV for the June 2017 cohort of new customers, is the lowest LTV that they could have chosen. Tr. 3029:5–7, 3034:16–19 (Christopher/AT&T). The average LTVs for July and August 2017 trended up from June. Tr. 3029:13–23 (Christopher/AT&T). Although defendants argued in closing that "you can't leave anything off just because it doesn't go your way," Professor Carlton did just that with his single outlier LTV. Tr. 4065:25–4066:1 (Defendants' Closing Statement). Professor Shapiro simply took an average of January, April, and June 2017 and found an LTV that is 28 percent higher than June alone. Tr. 3810:24–3811:25 (Prof. Shapiro). Third, churn is one of the components that goes into calculating LTVs, and AT&T's efforts to reduce churn, including the "Drive to 1.5," are working, meaning that LTVs will rise. *See* Tr. 3041:5–3042:3, 3042:12-16 (Christopher/AT&T); Tr. 1418:21-1420:1 (Torres/AT&T).

219.    The margin estimates that Professor Shapiro used are also conservative because they are based on LTVs, which measure the value of new customers. The value to AT&T of existing customers is significantly higher. *See* Tr. 3030:12–16 (Christopher/AT&T). Indeed, AT&T documents suggest that margins on existing customers are roughly ███ as high as

margins on new customers. *See* Tr. Tr. 3819:20–3820:15 (Prof. Shapiro). Because the long-term

benefit to AT&T from a Turner blackout on a rival is from reduced churn, some of the benefit to

AT&T is keeping customers that might otherwise leave, so using the value of new customers

instead of existing customers results in a significant underestimate of the potential harm from the

merger. *See* Tr. 2243:11–2245:2; 3819:20–3820:15 (Prof. Shapiro). Moreover, AT&T

documents indicate that the customers who have switched to DirecTV because of a blackout on a

rival tend to be "super low risk," and therefore higher value than new customers in general. Tr.

3820:16–3821:18 (Prof. Shapiro).

220.    Additionally, AT&T is gaining more subscribers with multi-product bundles. Tr.

3036:17–20 (Christopher/AT&T). The LTVs for multi-product subscribers are significantly

higher than for video-only subscribers. Tr. 3036:21–23 (Christopher/AT&T); *see also* Tr. 462:1–

18 (Schlichting/DISH). Customers with multiple AT&T products contribute more to the

company's revenue and also tend to stay longer with the company than customers that have only

a video subscription. Tr. 1417:14–21 (Torres/AT&T). Therefore, customers that have multiple

products tend to have much higher margins than video-only customers, and these customer

relationships are thus significantly more valuable to AT&T and DirecTV. Tr. 1417:22–1418:5

(Torres/AT&T). By using video-only margin estimates, Professor Shapiro further conservatively

understated the likely harm from the merger.

### iv.    The bargaining split

221.    Professor Shapiro testified that the parties to a negotiation will split the gains that

they realize after reaching a deal. Tr. 2193:2–20 (Prof. Shapiro). Professor Shapiro used this

"50/50" split to calculate how much of the gains from reaching a deal would be kept by Turner

before and after the merger. Tr. 2193:2–20 (Prof. Shapiro). The use of a 50/50 split is well

supported by the evidence. First, industry witnesses testified that Turner and the MVPDs it

negotiates with have roughly equal bargaining strengths. *See* Tr. 265:3–4 (Schlichting/DISH)

("Then we work and we struggle and, you know, kick and fight to try to meet in the middle.");

Tr. 1351:19–21 (Montemagno/Charter) ("[T]here's natural motivation for us to both want to try

and find an agreement and find a middle ground."); *see also* Tr. 2214:12–18 (Prof. Shapiro)

(explaining that Schlichting's testimony expresses the "same idea" as splitting the surplus

50/50). Second, the companies' similar costs of capital, which is a proxy for their patience in

bargaining, provides an empirical basis for splitting the gains from trade equally in this case. Tr.

2214:19–2215:12 (Prof. Shapiro). Finally, the use of a 50/50 split is a standard practice when

economists implement bargaining models. Tr. 2214:4–11 (Prof. Shapiro); Tr. 2214: 6–8 (Prof.

Shapiro) (explaining that the 50/50 split is "neutral . . . . It's just down the middle"). Defendants

pointed to an academic article that used a different 70/30 bargaining split, but Professor Shapiro

explained that the article was based on negotiations involving regional sports networks, not the

kind of programming content at issue in this case. Tr. 2375:10–14 (Prof. Shapiro).

> **d.      AT&T price reductions to itself resulting from the elimination of double marginalization (EDM) would not offset the price increases from this merger**

222.      Vertical mergers such as the proposed AT&T/Time Warner transaction may result

in an incentive for the combined firm to reduce prices due to a change in the profit-maximizing

price for the combined entity. Prior to the merger, each firm generally sets its own profit-

maximizing price without regard to the effect of its pricing on the other party. Post-merger, in

contrast, the combined entity will set its price so as to maximize its overall profits, which may

result in an incentive for AT&T to lower prices to attract additional subscribers. This effect,

created through the elimination of double-marginalization ("EDM"), is generally accepted as a

potential procompetitive benefit resulting from vertical mergers. *See* Tr. 2250:22–2252:12 (Prof. Shapiro).

223.    As a result, the overall EDM effect would, at most, result in a reduction of AT&T's marginal costs for the Turner Network of around $1.20 per subscriber per month (or around $352 million annually). *See* Tr. 2250:22–2253:15 (Prof. Shapiro). This price decrease to AT&T for the Turner content to AT&T is significantly lower than the harm from the expected post-merger cost increase for the Turner content to AT&T's rivals of around $587 million annually—not even taking into account other ways in which the merger will harm competition— which results in a net price increase to MVPDs of $235 million annually. *See* Tr. 2253:4–12 (Prof. Shapiro). Using lifetime value figures from 2017, the merger would lead to net increased costs of approximately $98 million. Tr. 3849:24–3850:22 (Prof. Shapiro).

224.    Defendants consistently ignore the fact that Professor Shapiro presented a range of estimates for the likely increase in MVPD costs, attempting instead to chip away at the low end. Even after EDM, the higher end of Professor Shapiro's estimated cost increases is $561 million annually, using a 14 percent subscriber loss rate and the average 2016 LTVs. Tr. 3918:21–3920:16 (Prof. Shapiro). Using a 14 percent subscriber loss rate and the average 2017 LTVs, the higher end of the net increase is $348 million. Tr. 3818:21–3921:7 (Prof. Shapiro). Defendants' argument that Professor Shapiro's estimates are "indistinguishable from zero," Tr. 4029:17–21 (Defendants' Closing Statement), is thus contradicted by the evidence showing cost increases of *at least* $98 million per year.

225.    Although defendants have argued that distributors' existing contracts with Turner provide some protection against these price increases, ███████████████████████████ ████████  will have to renegotiate their contracts with Turner either this year or next year. Tr.

2530:14–2532:15 (Prof. Carlton). In addition, a distributor can have renegotiations within the life of an existing contract, such as DirecTV's negotiations for the rights needed to launch DirecTV Now in 2016. Tr. 2620:12–2621:13 (Prof. Carlton).

**4. Rival MVPDs would pass along Turner price increases to their subscribers**

226. MVPDs would pass increased programming costs on to their subscribers. For example, a principal reason behind AT&T's price increase recommendation in 2016 was to "aim to cover programming cost increases through price increases" to its subscribers. Tr. 1444:12–20 (Torres/AT&T); PX0012-030. AT&T also sought to "align price increases with where AT&T experienced cost increase[s]" and to "[p]ass through cost increases on its a la carte services." Tr. 1444:21–1445:12 (Torres/AT&T); PX0012-030. The price increase recommendation was ultimately given to John Stankey and implemented by AT&T. Tr. 1445:13–23 (Torres/AT&T).

227. Similarly, Cox passes through ▮ percent of its cost increases to customers, and realizes above ▮ percent when accounting for retention credits offered to customers. Cox tracks this information to determine how many customers call after a bill increase, what percentage of those get retention discounts, and how much the discount is. Tr. 707:23–708:19 (Hinson/Cox); PX0523-H.

228. When Cox does not pass through all of its content cost increases, Cox's video margin declines. This affects Cox's ability to invest in the customer experience, such as for "DVR service, advanced navigation," and "other features to the video product the consumers are looking for." Tr. 708:20–709:12 (Hinson/Cox). Additionally, declining margins makes it more difficult for Cox to compete than for other competitors with lower cost structures. Tr. 708:20–709:12 (Hinson/Cox).

229. RCN and Grande have passed through about 80 percent of their programming cost

increases to their customers. Tr. 2912:1–8 (Holanda/RCN). Over the past three years, Wave has

passed on 100 percent of its programming cost increases. Tr. 2912:9–13 (Holanda/RCN). DISH

also passes through its cost increases to its customers because its profit margins are already

compressed and declining. Tr. 462:1–22 (Schlichting/Dish).

230.    This effect is corroborated by Professor Shapiro's "off-the-shelf" merger

simulation model, which predicts pass through of much of the rivals' cost increases but little of

AT&T's cost savings, resulting in significant net harm to consumers. *See* Tr. 3823:3–17 (Prof.

Shapiro). This model is used to predict how MVPDs will pass through cost changes to their

video subscribers depending on market shares, prices, and costs. *See* Tr. 2253:18–2255:6 (Prof.

Shapiro). The model predicts that AT&T's rivals will pass through to their subscribers a

significant portion of the increased costs for the Turner content, around 62 percent on average.

*See* Tr. 3825:18–20 (Prof. Shapiro). Although AT&T's cost for the Turner content will decrease,

resulting in an incentive to lower prices, it will simultaneously face higher prices by its MVPD

competitors, and thus ultimately likely pass through only a relatively small portion of its cost

decrease, around 22 percent on average. *See* Tr. 3824:19–3826:7 (Prof. Shapiro).

231.    Professor Shapiro's analysis predicts net harm for multichannel video subscribers

of $286 million annually based on the 2016 market configuration. *See* Tr. 2255:7–2256:15 (Prof.

Shapiro); Tr. 3824:19–3826:25 (Prof. Shapiro) (explaining asymmetric pass through); *see also*

PX0444-002–003 (AT&T statement to FCC noting that programmers' "bargaining power vis-à-

vis MVPDs has mushroomed" and resulted in "skyrocketing content fees, which like all

incremental costs are likely to be passed on to consumers to some extent in the form of higher

MVPD prices.").

232.    In light of the increasing importance of the Turner content, as reflected in its

subscriber loss rate and growing affiliate rates, as well as expected increases in AT&T's margins, the price of Turner's content to AT&T's rivals is expected to increase even more in the future, resulting in even higher net harm of $436 million based on 2017 data and of $571 million by 2021. *See* Tr. 2255:23–2256:20 (Prof. Shapiro).

233.    Finally, for all the reasons discussed above, Turner has market power. *See* United States' Proposed Conclusions of Law (PCOL) at IV.E.

### C.    The merger would enable AT&T to use control over HBO to harm competition

234.    HBO is another weapon AT&T would gain to harm competition. The merged firm would have the incentive and ability to prevent rival MVPDs and virtual MVPDs from using HBO to attract and retain customers. Overall, HBO is a highly valuable brand, which currently engages in significant promotional activities with MVPDs, both AT&T and its rivals. *See* Tr. 2267:8–16 (Prof. Shapiro); *see also, e.g.*, Tr. 245:24–246:5 (Schlichting/DISH) ("[I]t's hard to imagine having a pay-TV ad or marketing campaign that has no HBO."). Following the AT&T merger, "AT&T will have a disincentive to allow HBO to be used as a promotional tool by Charter and DISH and other MVPDs who compete against DirecTV, because, to some degree, those promotions pull subscribers away from DirecTV." Tr. 2266:19–23 (Prof. Shapiro). HBO will act in a way that best serves the parent company's interests, even if it is not in HBO's best interest. Tr. 1479:13–17 (Sutton/HBO) ("Q. Post-merger, if you're directed by your new AT&T management to take an action regarding price or availability of your product, you'll follow that direction, even if it doesn't maximize HBO's revenue; isn't that right? A. That is correct. I have to do what my boss asks me to do."); *see also* Tr. 2266:24–2267:2 (Prof. Shapiro).

### 1.    HBO is ██████████████████

235.    By all accounts, HBO is "the gold standard in premium video." PX0459-010.

Notably, in his talking points for pitching the Time Warner deal to the AT&T Board of

Directors, Randall Stephenson described HBO as ███████████████████████████████

DX0609.0011 (also noting HBO's ██████████████████████████████████████████████

████). In 2017 alone, HBO generated more than $6 billion in revenue and had the highest

subscriber growth rate in its history. Tr. 1453:23–1454:3 (Sutton/HBO).

236.    To start, HBO owns unparalleled content. In recognizing HBO's superiority to

other premium brands, AT&T lauded HBO for its ██████████████████████████████

█████████████████████████████████████████ PX0010A-004. HBO also boasts

compelling original series, including Game of Thrones and Westworld, and shows recently

released blockbuster movies from a wide variety of movie studios. Tr. 1452:10–25

(Sutton/HBO); PX0459-022–023. For example, in 2016, ████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████). PX0063-059. And in 2017, approximately 60 percent of the top fifty

feature films were shown on HBO. Tr. 1453:12–15 (Sutton/HBO).

237.    HBO has a well-established brand. According to John Martin, the Chairman and

CEO of Turner Broadcasting, "When people talk about HBO, they have a general sense of the

quality of programming that they are going to be able to see on HBO and it's delivered that for

15 years." Tr. 637:25–638:3 (Martin/Turner). HBO has led all networks—premium, basic cable,

broadcast, and SVOD—in Emmy Awards for 16 years in a row and won more Emmy Awards in

2017 than any other network. Tr. 1453:1–7 (Sutton/HBO); *see also* PX0063-059. HBO's Emmy

awards "provide a halo for the brand," Tr. 1496:2, 1509:20–22 (Sutton/HBO), and increase

HBO's press coverage. Tr. 1495:24–1496:3 (Sutton/HBO).

238.    In fact, ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ PX0008-038; *see also* Tr. 1453:8–11 (Sutton/HBO) (HBO

has about the same number of subscribers as Starz and Showtime combined). Moreover, in 2017,

HBO had a total of 54 million domestic subscribers (inclusive of HBO Now), making it the most

the widely distributed domestic multichannel premium. Tr. 1453:16–22 (Sutton/HBO). HBO's

viewership numbers stand out even when compared against non-premium networks, often

appearing in the top 25 networks. *See* Tr. 454:14–455:3 (Schlichting/DISH); Tr. 700:7–14

(Hinson/Cox).

239.    For these reasons, HBO is a critical input for MVPDs. More than 800 domestic

distributors have contracts with HBO, *see* Tr. 1450:24–1451:1 (Sutton/HBO), and MVPDs use

HBO promotions to attract and retain subscribers, Tr. 697:20–25 (Hinson/Cox); Tr. 899:25–

900:6 (Rigdon/Comcast). Indeed, HBO touts that it helps its affiliates achieve their business

goals by tailoring acquisition and retention tactics to meet the needs of its affiliates. Tr. 1454:12–

15, 1459:14–1460:11 (Sutton/HBO).

240.    AT&T itself has recognized the superiority of HBO. *See* PX0010A-004; Tr.

1521:11–1522:1, 1522:15–1523:5 (Patel/AT&T). In the summer of 2016, AT&T had an internal

discussion to select the premium network with whom AT&T should try to partner. Tr. 1517:23–

25, 1518:5–8, 1520:19–23 (Patel/AT&T). These discussions included John Stankey, CEO of

AT&T entertainment group, and Dan York, who oversees content acquisition. Tr. 1518:13–18

(Patel/AT&T). In a presentation for that meeting entitled "Going Big with Premiums," AT&T

considered the pros and cons of partnering with either HBO, Showtime, ████████████████

Tr. 1520:12–1521:7 (Patel/AT&T); PX0010A-004. AT&T's presentation described HBO as

having the "[b]est brand name," being the "most recognized" premium network, and having the

"[o]verall best collection of content" compared to other premiums. PX0010A-004; Tr. 1521:11–18 (Patel/AT&T). It also described HBO as being a "proven acquisition driver." Tr. 1521:20–23 (Patel/AT&T) (referencing PX0010A-004).

241.     In contrast, AT&T described Showtime as a ██████████ that is "[n]ice to have but not must see TV." PX0010A-004; Tr. 1522:15–17 (Patel/AT&T). And, while HBO was described a "[p]roven acquisition driver," AT&T described Showtime as only an "[a]cquisition helper." PX0010A-004; Tr. 1521:20–23, 1522:11–14 (Patel/AT&T). Moreover, AT&T's presentation did not even mention acquisition in relation to the remaining premiums, let alone describe them as acquisition drivers. PX0010A-004; Tr. 1522:23–1523:1 (Patel/AT&T).[5]

242.     At the premium partner meeting, Stankey instructed those in attendance to decide which premium to select for a partnership. Tr. 1523:6–10 (Patel/AT&T). Although HBO was AT&T's most expensive premium, PX0010A-004; Tr. 1522:2–10 (Patel/AT&T), AT&T's video marketing team recommended partnering with HBO as its preferred premium because HBO provides high value to AT&T due, in part, to its brand awareness. Tr. 1523:6–16, 1538:9–19 (Patel/AT&T). Ultimately, AT&T "chose that HBO would be the partner that [it] approach[ed] first" to become its preferred premium. Tr. 1523:20–23 (Patel/AT&T).

### 2.     HBO leverages its value in carriage negotiations with MVPDs and virtual MVPDs

243.     Due to the strength of its brand and the importance of its content, HBO has market power in negotiations with distributors. As demonstrated below, HBO's value enables it to increase rates even in the face of resistance from distributors.

---

[5] AT&T failed to mention acquisition as a benefit of partnering with Starz even though at the time AT&T had more Starz subscribers than any other premium, followed by Showtime. PX0010A-004; Tr. 1523:2–5, Tr. 1527:18–23 (Patel/AT&T).

244.   **Comcast.** Even when Comcast, the second largest MVPD in the country, *see*

*supra* V.B.2, ██████████████████████████████████████████████████████

███████████████████████████████████. Tr. 949:4–18, 931:20–22, 932:13–

14 (Rigdon/Comcast). Comcast Cable and HBO negotiated a new contract in 2017. Tr. 874:12–

15 (Rigdon/Comcast). Gregory Rigdon, the person responsible for negotiating Comcast's

agreements with content providers, testified that ██████████████████████████

██████████████████████████████████████████████████ Tr. 930:1–

2, 930:12–18, 947:3–16, 949:10–12 (Rigdon/Comcast) ████████████████████████

████████████████████████████████████████████████████. So,

starting in 2016, ██████████████████████████████████████████████

███████████ Tr. 949:10–18 (Rigdon/Comcast); Tr. 1506:3–13 (Sutton/HBO). In making

this change, ████████████████████████████████████████████████

███████████ Tr. 949:10–18 (Rigdon/Comcast).

245.   █████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ Tr. 952:7–18, 956:12–22 (Rigdon/Comcast);

DX0709.0003. In addition, ████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████ Tr. 950:10–15 (Rigdon/Comcast); Tr. 1507:7–24 (Sutton/HBO). But, ██████

████████████████ HBO executives believed that HBO would be more valuable to Comcast

than Netflix and gain Comcast more subscribers. Tr. 1509:11–15 (Sutton/HBO). And, in the end,

██████████████████████████████████████████████████████████ Tr.

949:16–18, 949:25–950:4 (Rigdon/Comcast).

246.    Before signing a deal with HBO, Rigdon requested a drop analysis. Tr. 874:14–18

(Rigdon/Comcast), PX0306. That drop analysis predicted that ███████████████████

████████████████████████████████████████████████████████████

███████████ PX0306-003; Tr. 929:13–19 (Rigdon/Comcast). ██████████

████████████████████████████████████ PX0306-003, Tr.

928:24–929:7 (Rigdon/Comcast). ████████████████████████

███████████████████████████████████████████████

████████████ Tr. 930:19–24 (Rigdon/Comcast). ████████████████

████████████████████████████████████████████████

████ Tr. 930:25–931:7 (Rigdon/Comcast).

247.    As part of its new contract, Comcast agreed to ██████████████████

██████████████. Tr. 931:20–932:6 (Rigdon/Comcast). As a result, ███

███████████████████████████████████████████████

███████████████████ Tr. 932:13–14 (Rigdon/Comcast). In fact, repackaging

had no effect on HBO's revenues. Tr. 1506:20–1507:3 (Sutton/HBO). And Comcast still bundles

HBO in some of its promotions today ██████████████████████████

███████████████████████████████████████████████

██████ Tr. 933:9–16 (Rigdon/Comcast). To this day, █████████████████

████████████████ Tr. 930:9–18 (Rigdon/Comcast) ████████████████

████████████████████████████████████████████

248.    **Charter.** In early 2016, HBO set a March 15, 2016 deadline for the completion of

its contract negotiations with Charter. Tr. 1474:17–23, 1476:2–4 (Sutton/HBO). HBO told

Charter that if a deal was not completed by the deadline, HBO would "go dark" or blackout HBO

and ███ programming to Charter subscribers. Tr. 1476:5–7 (Sutton/HBO). This was done to incentivize Charter to enter an agreement. Tr. 1476:8–11 (Sutton/HBO). HBO's willingness to go dark demonstrates the exercise of its leverage in contract negotiations. *See* Tr. 1476:8–11 (Sutton/HBO) (testifying that HBO threatened to go dark with Charter to get Charter to the negotiating table). Despite HBO's protestations now—that it made the decision not to go dark— HBO was busy mobilizing its team just days before the planned go-dark date with Charter, in preparation of the shutdown. Tr. 1476:12–1477:18, 1478:2–24 (Sutton/HBO). In particular, HBO developed a public relations strategy, planned a marketing campaign in Charter's top five market areas to lure Charter's subscribers to its competitors, and developed radio scripts and advertisements for newspapers, social media, digital display, and TV. Tr. 1476:16–1477:18, 1478:2–24 (Sutton/HBO). It had the technical ability to go dark on Charter then, and it has the technical ability to go dark on any distributor today. Tr. 1479:7–12 (Sutton/HBO).

249.    HBO's consideration of how to steer consumers to a rival affiliate during prior Charter negotiations demonstrates how the merged firm could poach consumers from rival distributors that do not agree to its terms during negotiations. Indeed, Sutton testified at trial that, post-merger, there would be nothing to prevent HBO from marketing to a distributor's subscribers in the event of a blackout or steering subscribers to HBO Now. Tr. 1477:19–1478:1 (Sutton/HBO).

250.    **Loss leader.** As illustrated below by testimony concerning Cox and ███ these MVPDs earn less margin on HBO than from other premiums and at times even use HBO as a loss leader, i.e., attracting new customers through below-cost HBO offers. Nonetheless, these MVPDs continue use HBO as their lead premium offer because of HBO's popularity.

251.    HBO costs Cox approximately ███ per subscriber per month, approximately █

███ more than Showtime, which costs around ███ per subscriber per month. Tr. 698:1–699:17 (Hinson/Cox), PX0523-D, -E. As such, HBO is the most expensive premium. Tr. 698:11–15 (Hinson/Cox). Because Cox charges its consumers the same price for each premium, HBO drives significantly less margin for Cox than other premiums. *Compare* Tr. 698:1–699:17 (Hinson/Cox), PX0523-D, -E ███████████████████████████████████████), *with* Tr. 701:6–9 (Hinson/Cox) (stating that Cox generally charges $15.99 per premium channel).

252.     ███, a virtual MPVD, also loses money on HBO subscriptions. Under its contract with HBO, ███ had an initial wholesale rate that exceeded the $15 per month retail price for HBO Now. Tr. 1456:23–1457:1 (Sutton/HBO). Despite paying more than $15 for each new HBO subscriber, ███ had planned to sell HBO for the a la carte price of $15 per month. Tr. 1457:2–9, 14–15 (Sutton/HBO). Under its contract structure, ███ would achieve an even lower wholesale rate if it grew its HBO subscribers to a certain benchmark. Tr. 1457:10–16 (Sutton/HBO). ███ however, continues to pay HBO a relatively high rate, as it has been "unsuccessful in climbing into [these] discounts" rates. Tr. 1456:23–1457:21 (Sutton/HBO) (omitting ███ name due to confidentiality).

### 3. MVPDs and virtual MVPDs use HBO as important tool to attract and retain subscribers from rival MVPDs

253.     HBO plays an important role in competition among MVPDs. MVPDs use HBO promotions to attract and retain subscribers, Tr. 697:20–25 (Hinson/Cox); Tr. 899:25–900:6 (Rigdon/Comcast). It is a "[p]roven acquisition driver," PX0010A-004, helping MVPDs "recapture video subscriber losses from other distributors." Tr. 1460:18–1461:3 (Sutton/HBO).

254.     Today HBO is a flexible partner, working with MVPDs and virtual MVPDs to help them use HBO to "address the affliate's plans and needs" to grow their business. *See* Tr. 1454:6–15 (Sutton/HBO) (agreeing that, with the exception of very small distributors, with HBO

"there's not really any form contract used when licensing HBO programming to affiliates [i.e.,

distributors]" and "[e]ach deal's a separately negotiated agreement."); Tr. 1459:14–1460:11

(Sutton/HBO) (agreeing that HBO "works with [distributors] to try to help them" achieve their

acquisition and retention goals); PX0008-008 ██████████████████████████

████████████████████████████████████████████████████

████████████████████████

255.    For many MVPDs, HBO features prominently in the promotions they use to

attract new subscribers and retain existing subscribers. *See, e.g.*, Tr. 699:18–25 (Hinson/Cox);

Tr. 1518:9–12, 1523:20–1524:2 (Patel/AT&T) (picking HBO as its preferred premium partner).

HBO encourages MVPDs to use HBO to sell more video subscriptions. Tr. 1460:15–20

(Sutton/HBO); *e.g.*, PX0061-002; Tr. 1463:23–1464:10 (Sutton/HBO) (discussing PX0061-002).

As HBO tells its distributors: "by leveraging the HBO brand in marketing and packaging,

distributors can recapture video subscriber losses from other distributors," Tr. 1460:18–1461:3

(Sutton/HBO); PX0061-002, i.e., ██████████████████████████ Tr. 1464:7

(Sutton/HBO) (discussing PX0061-002). According to Martin Hinson, the person at Cox

responsible for consumer analytics, Tr. 688:16–18 (Hinson/Cox), HBO is very important to

Cox's ability to compete for customers, Tr. 697:20–25 (Hinson/Cox), as it drives demand for

bundles. When Cox removed HBO from its Bronze bundle, it drove an increased demand for its

higher-priced Silver and Gold bundles (which continued to offer HBO) by approximately ██

percentage points. Tr. 701:10–23 (Hinson/Cox); PX0523-F.

256.    MVPDs also use HBO to help reduce churn. Cox has studied the effect of adding

HBO to reduce churn, using advanced analytics that correct for other variables such as

demographics and product combinations, to isolate the actual impact from HBO. Tr. 701:24–

702:13 (Hinson/Cox). When HBO is added in retention, churn drops by approximately ████ percent. Tr. 702:7–13 (Hinson/Cox); PX0523-G. For this reason, Cox considers HBO "highly significant" for retention purposes. Tr. 702:14–22 (Hinson/Cox).

257.    Others in the industry agree. According to Warren Schlichting of DISH, "it's hard to imagine having a pay-TV ad or a marketing campaign that has no HBO . . . . it's just expected by consumers." Tr. 245:24–246:5 (Schlichting/DISH). ████████████████

████████████████████████████████████████████████████

████████████

258.    AT&T is no different; it ████████████████████████████

████████████████████ *See* PX0261-035 ██████████████████

████, PX0261-038 ████████████████████████████████

████████████████████████████████████████████████

████████████; *see also* Tr. 1415:21–1416:2, 1416:18–1417:4 (Torres/AT&T) (discussing AT&T's use of promotions to get customers to sign up for multiple products). AT&T's 2016 contract renewal with HBO allowed AT&T to add HBO subscribers and drive profitable growth of AT&T itself. *See* Tr. 1524:9–14 (Patel/AT&T). Soon after AT&T signed a new contract with HBO in August 2016, ████████████████████████████████

████████████████████████████████████████

████████████████ PX0261-025; *see also* PX0261-013; Tr. 1540:15–24 (Patel/AT&T). As AT&T's competitors have noted, AT&T frequently features HBO in its promotions. Tr.

700:22–701:5 (Hinson/Cox).[6]

### 4.      MVPDs and virtual MVPDs do not have sufficient alternatives for HBO

259.    HBO is differentiated from other competitors and is a superior promotion and retention tool to other options. Its closest competitors—premium linear networks Showtime and Starz—are less useful promotional tools compared with HBO. *E.g.*, Tr. 1510:1–4 (Sutton/HBO); Tr. 86:21–25 (Fenwick/Cox). Similarly, SVODs and HBO's new OTT product HBO Now come up short as promotional tools. *See, e.g.*, Tr. 1509:3–10, 1451:20–1452:4 (Sutton/HBO).

260.    Overall, HBO has a better product than Showtime and Starz that resonates more with customers. *See* Tr. 1510:1–4 (Sutton/HBO). Even though more AT&T/DirecTV subscribers have Starz and Showtime, Tr. 1527:22–1528:5 (Patel/AT&T), when given a choice, consumers choose HBO over Showtime and Starz. Tr. 1510:1–4 (Sutton/HBO).[7]

261.    Testimony from MVPDs confirms that HBO is far more important than any other premium. *E.g.*, Tr. 86:23–25 (Fenwick/Cox). According to Suzanne Fenwick at Cox, "while [premium networks] all serve an important part of [Cox's] portfolio[,] HBO is by far one of the most popular networks for [Cox] customers." Tr. 86:23–25 (Fenwick/Cox). HBO regularly ranks in the top-ten most-watched channels for Cox customers with HBO. Tr. 700:7–14 (Hinson/Cox). ███████████ percent of Cox's overall customer base, and ███ percent of Cox's premium customer base, purchase HBO (exclusive of HBO-owned Cinemax), ███████████████████

---

[6] Despite Defendant's attempts to characterize Cable ONE as not "need[ing] HBO as a promotional tool," industry witness Randy Sejen clarified that its limited use of HBO had little to do with the value of HBO as a promotional tool and much more to do with Cable ONE's "decreased focus on video business." Tr. 2138:10–13 (Sejen/Cable ONE).

[7] Moreover, Starz's higher penetration rates at AT&T, Tr. 1527:22–23 (Patel/AT&T), is attributable to the way AT&T packages Starz "much like a basic cable network." Tr. 1610:20–1611:3 (York/AT&T).

█████████████████████████████████ Tr. 698:1–699:17 (Hinson/Cox); PX0523-D, -E. And

when Cinemax, HBO's sister premium channel, is included, a full ███ percent of Cox's premium

base purchases either HBO or Cinemax. Tr. 698:16–699:6 (Hinson/Cox), PX0523-D. Jim

Holanda at RCN testified about the value of having HBO in its video distribution, describing

HBO as RCN's "top viewed premium network." Tr. 2910:25–2911:6 (Holanda/RCN).

262.    For these reasons, MVPDs regularly use HBO as a retention tool, even though it

is often ██████████████████████████████████████ *See* PX0010A-004. Indeed,

when AT&T decided to █████████████████████████████████████████████████

████████████████████████████████████████████ PX0010A-004

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Tr. 1522:2–7, 1523:6–23 (Patel/AT&T) (ultimately choosing HBO as AT&T preferred

premium).

263.    To the extent that Starz and Showtime play a role in MVPDs' promotional

campaigns, they do so in response to competition. As AT&T has recognized, ██████████████

███████████████████████████████████████████████████████████

████████ PX0010A-004.

264.    Likewise, SVODs are an imperfect substitute for HBO to many viewers, and thus

SVODs are a poor substitute for MVPDs and virtual MVPDs to use in place of HBO in

promotional campaigns. In particular, HBO has better content than SVODs such as Netflix.

Randall Stephenson, AT&T's CEO, ████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████ DX0609.0011. Additionally, in terms of competing with

Netflix and other premium channels, HBO has better and more recent theatrical movies. *See* Tr. 1509:16–19 (Sutton/HBO).

265.     HBO is also a better partner for MVPDs than Netflix, offering more compelling price incentives to distributors than Netflix. Tr. 1509:3–10 (Sutton/HBO). And rather than being threatened by the rise of SVODs such as Netflix, HBO believes that direct competition between HBO and Netflix on MVPDs' set top boxes is good, because HBO's "price incentive [is] compelling" for MVPDs. Tr. 1509:11–15 (Sutton/HBO).

266.     HBO's launch of HBO Now, HBO's direct-to-consumer, over-the-top product, Tr. 1451:20–1452:4 (Sutton/HBO), has not altered its relationship with MVPDs. Subscribers still value access to HBO through their MVPDs, *e.g.*, Tr. 721:1–2 (Hinson/Cox), so MVPDs still need to negotiate contracts with HBO. For example, if DISH were to lose access to HBO, many of its subscribers would not be able to switch to HBO Now because "only about a third of [DISH's] subscribers are connected" to the internet. *See* Tr. 433:2–7 (Schlichting/DISH). Moreover, contrary to some consumers' preference to access HBO through their MVPD, use of HBO Now takes subscribers out of the MVPD's ecosystem. Tr. 721:1–2 (Hinson/Cox) ("Most consumers prefer to get HBO directly from Cox."); *see also* Tr. 1400:25–1401:4 (Montemagno/Charter).

### 5.     The merged firm will have the incentive and ability to use HBO to harm rival distributors

267.     MVPDs fear that, if the transaction closes, AT&T would be willing and able to use its ownership of HBO to impede competition. For example, Cox currently has flexibility in offering HBO, both in acquisition and retention. Tr. 703:12–24 (Hinson/Cox). Today, HBO has no real reason to restrict Cox's flexibility because HBO benefits when as many customers as possible have the service, regardless of which MVPD signs up the subscriber. Tr. 705:2–5

(Hinson/Cox). Cox describes HBO as "very cooperative when [Cox presents] offers in advertising to come to a common, common ground." Tr. 705:5–7 (Hinson/Cox). If, however, AT&T were to own Time Warner, AT&T could impose restrictions on Cox's use of HBO, several of which would not even require a renegotiation of the contract. Tr. 703:25–704:18 (Hinson/Cox). Such restrictions may include: (1) withholding HBO entirely; (2) delaying access to content (for example, delaying Game of Thrones by a week); (3) increasing penetration requirements for HBO (which do not exist today); and (4) "AT&T could simply say no, that [Cox] can't provide HBO in [its] offers, in [its] bundles, and [its] advertising. Tr. 703:25–704:18 (Hinson/Cox) [8]; *see also* Tr. 92:4–6 (Fenwick/Cox) (stating that if Game of Thrones was available to a distributor 30 days before it became available to Cox, Cox would be "at a definitive disadvantage and [would] have customers leave").

268.     These restrictions on MVPD's use of HBO would be more likely for the merged firm than they are today because "there would be a shift in the economics[: s]o from a AT&T perspective, the leverage would change because they'd be looking at . . . what's the value of the [entire] customer relationship" to the merged firm. Tr. 705:8–9, 706:10–23 (Hinson/Cox). As AT&T's rivals recognize, "the license fees [that an MVPD pays to HBO for each HBO subscriber] are significantly less than the value of the customer relationship. . . the whole relationship, the whole bundle." *See* Tr. 705:8–9, 706:10–23 (Hinson/Cox).

269.     HBO has a role in approving its distributors' advertisements of HBO. Tr. 1458:7–9, 1458:21–1459:2 (Sutton/HBO). Specifically, affiliates must obtain HBO's approval to use HBO art and trademarks in any way. Tr. 1458:18–20 (Sutton/HBO). Thus, a distributor would

---

[8] These concerns also apply to Cinemax. Tr. 704:19–20 (Hinson/Cox).

need HBO's approval if it wanted to feature the HBO logo in an advertisement, Tr. 1458:10–13 (Sutton/HBO), or highlight an image of a character or a scene from one of HBO's shows, Tr. 1458:14–17 (Sutton/HBO). At times, HBO has declined to agree to advertisements as proposed by a distributor. Tr. 1459:3–5 (Sutton/HBO). In these situations, HBO works with distributors but modifies the proposal to fit its criteria. *See* Tr. 1459:3–11 (Sutton/HBO).

270.    Specific clauses in HBO's contracts with distributors also give HBO significant rights over how MVPDs and virtual MVPDs conduct HBO-related marketing. Distributors who wish to offer HBO to subscribers for free must also obtain HBO's approval. Tr. 1497:25–1498:6 (Sutton/HBO). Cox is required to get HBO approval for "any promotional offers" and needs "permission for every single offer and advertisement." Tr. 702:23–703:3 (Hinson/Cox). Other current restrictions on Cox for the use of HBO include "restrictions on the amount of free trials [Cox] can provide," meaning "the time that HBO can be free," and restrictions on "certain terms [that] are not allowed in advertising." Tr. 703:4–11 (Hinson/Cox).[9] HBO will also be able to use its control over MVPD marketing funds to restrict or prevent the use of HBO to spur competition. A marketing fund is a discrete amount of money that HBO contributes to distributors' advertising and marketing campaigns to help them market and promote HBO. Tr. 1499:17–24 (Sutton/HBO). HBO plays a role in determining how such marketing funds will be used. Tr. 1499:25–1500:2 (Sutton/HBO). Additionally, some MVPDs, such as RCN, depend on the economic incentives that HBO provides them to be able to use HBO as a promotional tool. Tr. 2971:16–23 (Holanda/RCN). Given the demonstrated importance of HBO to its distributors,

---

[9] Notwithstanding Defendants' attempt to discount Hinson's personal knowledge of these restrictions, Hinson testified that it is part his job to understand what Cox can and cannot do in terms of promotional pricing with HBO. Tr. 724:10–26 (Hinson/Cox).

post-merger, AT&T will have the incentive and ability to withhold required HBO approvals for its own benefit.

271.    As set forth by the industry witnesses and Defendants' own documents and testimony, HBO's popularity, brand, and value provide the premium with bargaining leverage in carriage negotiations. Today HBO partners with distributors to the benefit of both—increasing revenue and subscribers for HBO while simultaneously acquiring and retaining video subscribers for distributors. Nonetheless, following the merger, HBO's incentives to engage in mutually-beneficial promotional activities with distributors would take a back seat to the interests of its parent company, which would possess the incentive and ability to use HBO as a weapon to hinder its competitors.

### D.    Prior vertical integration has raised significant concerns for industry participants

272.    RCN's experience illustrates the anticompetitive effect vertical integration between a popular programmer and major distributor can have. Unlike Charter, Cox, and other incumbent cable companies, RCN competes against Comcast Cable "in a lot of markets." Tr. 2907:19–22 (Holanda/RCN). NBCU imposed stricter penetration requirements on RCN after it merged with Comcast Cable and became a vertically-integrated RCN competitor. The result was to limit RCN's sales of a popular product. Tr. 2920:6–15 (Holanda/RCN). RCN offers a product called Broadcast Basic, which consists of the broadcast channels paired with government and public access channels. Tr. 2916:2–8 (Holanda/RCN). Customers might choose to buy Broadcast Basic instead of simply using an antenna because reception areas have shrunk since broadcast signals changed from analog to digital and because reception in high rises is often poor. Tr. 2916:9–20 (Holanda/RCN).

273.    In 2012, RCN paired Broadcast Basic with robust broadband services to "see if

that was something that customers wanted, and a funny thing happened, customers loved that product." Tr. 2916:21–2917:5 (Holanda/RCN). For roughly $40 or $50, RCN customers could buy high speed internet and the local news, live sports, and entertainment shows on broadcast channels. Tr. 2916:21–2917:5 (Holanda/RCN). "[I]t was a very popular package for [RCN's] customers," and "pairing Broadcast Basic with those other over-the-top services was certainly a product set that a lot of our customers liked." Tr. 2917:4–5, 11–12 (Holanda/RCN).

274.    RCN, however, cannot offer Broadcast Basic to all of its customers because of penetration requirements in several of its NBCU contracts. Tr. 2920:6–13 (Holanda/RCN). Following its merger with Comcast, NBCU changed its penetration requirements, making them more stringent and preventing RCN's sales of Broadcast Basic once it reaches a particular percentage limit. Tr. 2920:13–2921:15 (Holanda/RCN). Once RCN approaches that percentage limit, it "no longer offer[s] a low cost television solution for [its] customers." Tr. 2920:20–23 (Holanda/RCN). After RCN was "no longer able to sell that level of service, [RCN] saw Comcast come enter the marketplace with their own low cost double play offering . . . to compete in that marketplace knowing that [RCN] could not sell it anymore." Tr. 2921:10–15; *see* Tr. 2917:13–15 (Holanda/RCN). Although some companies besides NBCU have penetration requirements, the penetration requirements that prevent RCN from offering more Broadcast Basic are "entirely from Comcast-NBCU." Tr. 2977:22–2978:12; *see* Tr. 2953:19–2954:18 (Holanda/RCN).

275.    Holanda's past experiences, including with the Comcast/NBCU vertical merger, inform his concerns with the proposed AT&T-Time Warner merger. Tr. 2932:21–2933:18, 2934:2–14, 2939:23–2940:3 (Holanda/RCN). RCN's experience with NBCU using a non-rate term to disadvantage RCN vis-à-vis Comcast in selling Broadcast Basic is one basis for

Holanda's concerns. Tr. 2933:1–4 (Holanda/RCN). Holanda is concerned about the price of

Turner programming if it were to merge with AT&T. Tr. 2933:5–8 (Holanda/RCN). For

example, if, post-merger, Turner insisted on negotiating directly with RCN instead of NCTC, as

certain other distributors have already done, RCN would likely face higher prices because it

would not benefit from volume discounts. Tr. 2933:5–18 (Holanda/RCN). In addition, Holanda

is concerned about the terms Turner may impose on RCN's access to its programming after it has

merged with AT&T, an RCN competitor. Tr. 2907:23–2908:4, 2934:2–5 (Holanda/RCN). For

example, RCN is concerned that its customers' access to HBO Now over the internet may be

blocked after the merger, similar to when Viacom blocked Suddenlink and Cable ONE

customers from accessing Viacom programming over the internet. Tr. 2934:2–15

(Holanda/RCN). RCN also believes that ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ Tr. 2985:6–2986:7, 2987:13–2988:9

(Holanda/RCN). ████████████████████████████████████████████

████████████████ Tr. 2986:2–7 (Holanda/RCN).

276.    Today, RCN does not compete with Turner. Tr. 2933:19–24 (Holanda/RCN). But

AT&T (through DirecTV) does compete with RCN across RCN's entire footprint. Tr. 2907:23–

2908:4, 2933:25–2934:1 (Holanda/RCN). A merger between Turner and AT&T, therefore, may

change Turner's relationship with RCN. Holanda testified that, after Turner is owned by AT&T,

its incentives change such that "their actual incentive is to raise my pricing, make me drop the

services, and steal my broadband and video customers." Tr. 2957:1–7 (Holanda/RCN).

277.    RCN's experience contradicts Defendants' argument that prior vertical

integrations in the industry have not affected competition. They ignore RCN's testimony and

instead place a great deal of weight on incomplete data from these prior vertical deals, arguing variously that the data "indisputably" does not show price increases, Tr. 4035:15-21 (Defendants' Closing Statement), and that Professor Shapiro "ignore[d] those transactions entirely," Tr. 4046:14–23 (Defendants' Closing Statement). Neither claim is correct. As Professor Shapiro explained, he looked at the data regarding the prior deals but found it wanting. Tr. 2334:3–8, 2339:1–8 (Prof. Shapiro). The data on which Defendants rely is either insufficiently specific to isolate relevant price changes, *see* Tr. 3831:5–3832:24 (Prof. Shapiro), or it is based on too few contract negotiations to convey meaningful information about the effects of the prior mergers, Tr. 3833:9–22 (Prof. Shapiro). Defendants do not account for these problems with the data nor the experience of RCN in holding up these prior deals as "the absolute best evidence" of the likely impact of their own merger. Tr. 4047:4-5 (Defendants' Closing Statement).

## V.     THE MERGER WOULD GIVE AT&T THE ABILITY TO HARM COMPETITION BY SLOWING THE GROWTH OF EMERGING, INNOVATIVE ONLINE DISTRIBUTORS

278.    Time Warner has supported the entry and growth of innovative, new virtual MVPD services. But as the largest traditional distributor, AT&T has an incentive to slow this trend. Post-merger, AT&T would gain the ability to do so by restricting virtual MVPD access to Time Warner content. This threat is heightened by the fact that the other vertically integrated MVPD—Comcast/NBCU—shares AT&T's interest in protecting the traditional MVPD model. The harm to innovation would be compounded if AT&T and Comcast were to act in coordination.

### A.     The merger will allow AT&T to impede the growth of virtual MVPDs that increasingly compete with AT&T/DirecTV

279.    New virtual MVPDs have begun to bring new competition and new consumer

choice to the pay-TV industry. Indeed, as they have grown, traditional MVPDs have ████

████████████████████████████████████████████████████████

PX0363-006.

280.    Virtual MVPDs have been willing to offer "skinny" bundles of programming that are smaller and less expensive than the traditional MVPDs' base packages. *See* Tr. 583:25–584:13 (Martin/Turner) (agreeing that most virtual MVPDs seek to offer a smaller number of channels than traditional MVPDs at a lower price point). For example, DISH Sling offers a unique and innovative skinny bundle starting at $20 per month, a price well below that of traditional services. Tr. 236:16–18, 238:1–2, 239:8–12 (Schlichting/DISH). Sling also addresses other traditional customer pain points by providing service without requiring a term commitment or equipment fees—"no contract, no commitment, no equipment." Tr. 238:13–239:4 (Schlichting/DISH). Consumers benefit from having options like Sling available to them, and many have chosen to switch to these new distributors. Consumers have "voted with their checkbooks" in favor of Sling's model, and today Sling has 2.2 million subscribers. Tr. 265:20–266:8, 267:12–18 (Schlichting/DISH).

281.    The growth of virtual MVPDs has had an impact on traditional MVPDs, although the effect is operating slowly. In 2017, MVPDs had over 90 million subscribers and lost about 3 million. Tr. 3450:17–22 (Stephenson/AT&T); *see also* Tr. 2231:5–16 (Prof. Shapiro) (acknowledging that traditional pay TV is trending downward at a "gradual" rate). The pace at which conventional pay TV will decline in the future, and what it will be replaced with, are both "open questions." Tr. 3341:10–3342:11 (Stankey/AT&T). It is clear, however, that virtual MVPDs are partially responsible. Tr. 3157:5–13 (Bewkes/Time Warner).

1.      **AT&T has the incentive to impede the growth of virtual MVPDs**

282.    If the merger proceeds, AT&T will get to determine whether and on what terms virtual MVPDs have access to Time Warner content. Turner executives do not claim to "know any of AT&T's business" regarding whether AT&T will support these competitors in the future. Tr. 1139:9–22 (Breland/Turner). But virtual MVPDs threaten traditional MVPDs like AT&T "both in terms of pulling subscribers away and in terms of putting some pressure on their margins." Tr. 2262:24–2263:11 (Prof. Shapiro); *see also* PX0189-024 ███████████████

███████████████████████████████████████████████████

283.    AT&T executives have criticized programmers that license their content to virtual MVPDs. When asked why programmers had agreed to license their networks to Sling for inclusion in its skinny bundle, York answered that "[c]ontent providers are generally short–sighted whores to whomever is willing to write them a new check for their content." PX0042; Tr. 1657:5–1658:7 (York/AT&T). Similarly, when Time Warner acquired a small equity stake in Hulu and agreed to let Hulu include Turner content in its new virtual MVPD service, Stephenson told Bewkes that he viewed the decision as "going around us," and stated flatly that it was "hard to imagine how it won't impact all of our relationships." PX0047; Tr. 3474:16–3475:13, 3476:14–16 (Stephenson/AT&T).

284.    AT&T has had a similar reaction to other programmer actions that threaten the traditional MVPD bundle. When Turner launched an innovative new March Madness app for Apple TV, John Stankey objected that it"[s]ets me on fire"—because it "deteriorates the value of the bundle." PX0228; Tr. 1615:6–25 (York/AT&T). He said that he planned to "start writing letters to the top every time they intro a feature that deteriorates the value of the bundle and don't pass it through to us." Tr. 1615:6–16 (York/AT&T); PX0228. Dan York responded that

he had "the same visceral reaction" to the news. PX0228; Tr. 1616:1–3 (York/AT&T). Stankey

had his team draft an email to Time Warner CEO Jeff Bewkes to convey their reaction

to Turner's defection. Tr. 1616:4–1617:4 (York/AT&T).York's draft emphasized the "poor

judgment" Time Warner showed by "providing such rights to a company that . . . has had a

negative impact on your lucrative Pay-TV business." PX0040; Tr. 1654:19–1655:4

(York/AT&T). It further stated that the March Madness app, as well as the launch of HBO Now,

suggested that Time Warner was "taking [its] relationship with AT&T/DIRECTV, and Pay-TV

in general, for granted." PX0040; Tr. 1655:5–16 (York/AT&T); *see also* Tr. 1610:13–1613:18

(York/AT&T) (when Starz launched an innovative new direct-to-consumer application, York

said that he and his team "hated it"); PX0048 ██████████████████████████

████████████████████████████████████████████████████████████

██████████████; Tr. 1700:1–9 (York/AT&T).

> **2.     The merger would give AT&T the ability to harm competition from virtual MVPDs by restricting their access to Time Warner content**

285.     The merger would give AT&T the ability to restrict virtual MVPD access to Time

Warner content and thereby reduce the competition that it faces from these new entrants. This

ability arises from the importance of this content to virtual MVPDs.

286.     In 2014, AT&T's corporate strategy group conducted a project to "[p]rovide

clarity on AT&T's 3-5–year video content strategy," with participation of a number of senior

executives. PX0543-005, -008; Tr. 1746:15–21, 1747:18–1748:13 (Manty/AT&T). As part of

this project, the team considered ██████████████████████████████████

████████████████████████ Tr. 1769:16–1770:5 (Manty/AT&T); PX0184-004.

One of the rationales they recognized was that an acquisition would give AT&T the ability to

"[s]hape the ecosystem," which they defined as the ability to "reinforce [the] pay TV bundle."

PX0184-005; Tr. 1770:6–15 (Manty/AT&T). The team explained that "[c]ontent players have different incentives than AT&T." PX0184-005. Absent an acquisition, ██████████

██████████████████████████████████████████████████████████████

Tr. 1770:16–1771:6 (Manty/AT&T); PX0184-005. The team concluded that ████████████

████████████████████████████████████████████████████████.[10]

287.     Recognizing the same dynamic, the President of Sling, Warren Schlichting, expressed concern that the merged firm would use its control over Time Warner content to harm DISH's ability to compete through Sling. Tr. 261:9–266:22 (Schlichting/DISH); *see also supra* IV.B.1 (explaining that Turner content is "must have"). He believes that, with its increased leverage, the merged firm would have the ability to extract concessions from Sling. *See* Tr. 261:9–266:22 (Schlichting/DISH). As Schlichting explained, Sling's ability to offer a skinny and low-priced service depends on having the rights to carry only a few top networks from each programmer in its base package and putting the rest in genre tiers. Tr. 236:7–13, 265:17–266:8, 268:9–15 (Schlichting/DISH). DISH has been "single minded" in limiting the number of networks it takes in its Sling base packages. Tr. 265:17–266:8 (Schlichting/DISH). It "fought . . . long and hard" to limit Sling Orange to at most four networks per programmer. Tr. 268:9–15 (Schlichting/DISH). Today, Sling Orange has four Turner networks, and Sling Blue has five. Tr. 236:19–237:3, 237:22–25 (Schlichting/DISH).

288.     Sling's distinctive offering could disappear if it were forced to take more networks in its base packages or pay significantly higher rates for programming. Tr. 268:9–23,

---

[10] This project took place in 2014, but in July 2016, a director in AT&T's corporate strategy group, Greg Manty, sent documents containing the team's conclusions to the leader of that group, Mary (Mel) Coker. Tr. 1763:14–24 (Manty/AT&T); PX0184-001. AT&T's merger with Time Warner was announced in October 2016, just a few months later. Tr. 1764:3–4.

265:17–266:8 (Schlichting/DISH). Schlichting explained that being required to take eight Turner networks instead of four would "break[] our model." Tr. 265:17–266:8, 268:9–23 (Schlichting/DISH). He believes that, if Turner imposed such a requirement, other programmers would follow suit in future negotiations: "there's just no way we would be able to keep them at four if Turner had eight," and "it only takes a couple of those and the model is broken." Tr. 268:9–23 (Schlichting/DISH). Further, because Sling has thin margins, an increase in the cost of the Turner networks "would mean we'd have to raise prices almost certainly." Tr. 268:9–23 (Schlichting/DISH); *see also* Tr. 467:23–468:6 (Schlichting/DISH) ("If they have the content that you need, then they can not only coerce you to pay more, but carry these networks more broadly and that's why you have hundreds of networks and these bundles, and that's what we're trying to avoid with Sling.").

289.    DISH's concern should not be a surprise to the defendants. Stankey testified that he expected DISH might be concerned that AT&T would "blow up" Sling's skinny bundles after the merger. Tr. 3256:3–15 (Stankey/AT&T). And Turner's CEO recognizes the importance of the Turner networks to Sling—he wrote that the service would be "shit without Turner." PX0004; *see also* PX0411; Tr. 1158:24–1159:2 (Warren/Turner) (removing Turner's networks from DISH's Sling would be "terrible for DISH's business"); Tr. 575:22–577:4 (Martin/Turner) (Sling benefits from having the Turner networks on its service); Tr. 578:1–15 (Martin/Turner) (Turner networks drive ongoing value to virtual MVPDs). AT&T echoed a similar concern on its own behalf when Time Warner invested in Hulu—Stephenson explained that he was concerned that once Time Warner was the part-owner of a virtual MVPD, it would not give DirecTV Now the same access to its content. Tr. 3477:2–7 (Stephenson/AT&T).

290.    Virtual MVPDs that are not affiliated with an existing MVPD may be particularly

vulnerable to the merged firm's actions because these providers do not have an existing subscriber base to use as leverage in content negotiations. When Turner was in negotiations with Sony to be included in their Playstation Vue virtual MVPD service, Turner knew that "Sony [was]n't going anywhere" given its status as a new entrant—meaning that it didn't have many millions of "sub[scribers] to take dark." PX0205.

291.    Comcast has already demonstrated how vertically integrated distributors can harm competitors by imposing restrictive contractual provisions. Comcast "jammed" Sling's skinny bundle with more NBCU networks than Sling wanted to carry. Tr. 279:17–24 (Schlichting/DISH). And as a condition of carrying certain NBCU content, RCN had to agree to contract terms that prevented it from offering attractive packages. Tr. 2920:6–2921:15 (Holanda/RCN). *See infra* IV.D. AT&T would gain the ability to impose restrictive terms on distributors that license Turner content after the merger.

292.    RCN's future video strategy envisions



[11] RCN is concerned that

293.    AT&T would be able to use Turner content to harm virtual MVPDs because

Turner content is important to their success. Turner's decisions could "ignite or diminish the desires of new entrants" and can ███████████████ of these entrants. Tr. 1845:22–45 (Harran/Turner); PX0197. The importance of Turner content to virtual MVPDs is supported by Turner's own research. In November 2016, Coleman Breland presented conclusions from "Rubix," which was a research initiative where Turner did analysis of virtual MVPDs, to his supervisor, Turner President David Levy. Tr. 1016:2–12, 1018:3–7, 1019:3–6 (Breland/Turner); PX0195. The Rubix project concluded that "Turner networks drive significant value for vMVPDs." Tr. 1018:3–14 (Breland/Turner); PX0195-026. Specifically, "Turner drives as much demand to the vMVPD bundle as Fox and NBCU," and "removing Turner from the base package causes demand to drop as much as Fox and NBCU and more than every other network family except ABC-Disney." Tr. 1018:15–1019:6 (Breland/Turner); PX0195-030.

294.     The importance of Turner to virtual MVPDs is further confirmed by marketplace evidence. The President of Sling testified that Turner is must-have content. Tr. 241:10–23 (Schlichting/DISH); *see supra* IV.B.1. When the Complaint and Answer were filed in this case last November, the Defendants made much of the fact that YouTube TV launched without Turner. *Answer* Resp. to ¶ 5. But at the time, Turner was having continued conversations with YouTube about being on the platform. Tr. 1171:19–1172:2 (Warren/Turner). A Turner executive who had been involved in the negotiations believed that Turner had "the leverage." Tr. 1848:17–1849:16 (Harran/Turner); PX0038. Richard Warren's takeaway from these discussions was that YouTube was anxious to add Turner networks, and was "hopeful that [they] could reach agreement in advance of March Madness." Tr. 1172:13–1173:10 (Warren/Turner). Indeed, Turner and YouTube reached an agreement to include Turner networks on YouTube's service by

the time of the trial in this case. Tr. 1173:11–13 (Warren/Turner). [12]

### 3. AT&T's provision of DirecTV Now does not reduce its incentive to harm competing virtual MVPDs

295.    Defendants point to DirecTV Now as evidence that AT&T does not want to slow

the growth of virtual MVPDs, *see* Tr. 50:15–24 (Defendants' Opening Statement), but in fact

AT&T's strategy for DirecTV Now demonstrates AT&T's incentives to preserve the traditional

ecosystem. AT&T executives knew that DirecTV Now, like other virtual MVPDs, could threaten

its MVPD business. But unlike other virtual MVPDs, DirecTV Now is under AT&T's control, so

AT&T can manage the threat. AT&T set out to make DirecTV Now "as strong as possible

without killing the golden goose"—that is, the higher-margin MVPD business. Tr. 1801:15–

1802:17 (Merrill/AT&T); PX0046. AT&T executives also discussed "where to draw the line on

the features/benefits for [DirecTV Now] such that we don't aggressively cannibalize DBS,"

meaning DirecTV's satellite product. Tr. 1801:15–1802:5 (Merrill/AT&T); PX0046. AT&T told

content partners that, unlike others who were launching skinny bundles, DirecTV Now was

designed with a general intent of replicating the traditional DirecTV satellite packages that have

been good for the pay-TV ecosystem. Tr. 1702:7–1703:7 (York/AT&T).

296.    AT&T's Devin Merrill, who led the project that developed DirecTV Now,

recognized that DirecTV Now's cannibalization of the satellite product would be a "white-hot

topic." Tr. 1799:5–22 (Merrill/AT&T) (discussing Merrill's role in developing DirecTV Now);

---

[12] In addition to Turner, the merger would give AT&T the ability to determine whether and on what terms virtual MVPDs have access to HBO, which drives subscribership and viewership. *See supra* IV.C. HBO is important content for virtual MVPDs, so much so that some virtual MVPDs offer it at a loss in order to attract subscribers. At least one new virtual MVPD distributor ▮ agreed to a deal structure to pay HBO above the $15 retail rate of HBO Now. Tr. 1456:19–1457:1 (Sutton/HBO). That virtual MVPD planned to sell HBO a la carte for $15— a loss. Tr. 1457:2–9 (Sutton/HBO).

Tr. 1805:17–1806:7 (Merrill/AT&T); PX0164-003. AT&T therefore tracked DirecTV Now's

cannibalization of DirecTV in detail. Tr. 1806:1–1807:3 (Merrill/AT&T); *e.g.*, PX0164-003

███████████████████████████████████████████. For incoming customers,

AT&T executives pursued a sales strategy that would "lead with DBS" and "fallback" to the

DirecTV Now product in stores and call-in sales centers. Tr. 1815:15–1816:15 (Merrill/AT&T);

PX0178-027; PX0247. The AT&T executive with responsibility for retail store sales agreed with

this strategy and wrote back to "stress we must stick to strategy and make sure we do not hurt

premium sales." Tr. 1823:5–13 (Merrill/AT&T); PX0544; *see also* PX0051 (AT&T executives

used DirecTV Now as a "last resort" and sought to "do everything we can to keep [customers] on

satellite with credits versus migrating them to NOW," to avoid "accelerated margin dilution.");

Tr. 1426:19–1427:2 (Torres/AT&T) (same).

297.    This strategy was largely successful. No more than 15 percent of DirecTV Now

customers switched from DirecTV or U-Verse. Tr. 1828:20–1829:2 (Merrill/AT&T). In June

2017, Merrill sent an update on the impact of DirecTV Now's growth on the satellite product

with the "punchline" that there had been "no material impact" on the satellite product, "overall or

in [r]etail." Tr. 1836:16–1837:5 (Merrill/AT&T); PX0546. [13]

### B.    The merger would increase the likelihood of anti-competitive coordination between two vertically integrated distributors

298.    If the transaction were to proceed, the country's two largest MVPDs—AT&T and

---

[13] Nor does AT&T's announcement during trial that it plans to launch AT&T Watch, Tr.
3434:12–3435:4 (Stephenson/AT&T), demonstrate that it would allow *other* distributors
to launch skinny bundles that threaten to attract subscribers *away* from AT&T.

Comcast—would own two of the most important programmers—Time Warner and NBCU.[14]

These two firms share an incentive to protect their traditional video distribution businesses

against growing competition from virtual MVPDs. And after the merger, each would possess a

valuable tool to do so.

### 1.   AT&T's acquisition of Time Warner would increase the ability of AT&T and Comcast to act on their shared incentives

299.    As the only two vertically integrated traditional MVPDs, Comcast and AT&T

would share an incentive to slow the entry and growth of virtual MVPDs. *See* Tr. 2262:24–

2263:11 (Prof. Shapiro) (the growth of virtual MVPDs represents "a threat to the existing

distribution businesses, both in terms of pulling subscribers away and in terms of putting some

pressure on their margins"). They could act on this incentive by restricting virtual MVPDs'

access to their respective programming or withholding it altogether. Tr. 2259:24–2260:8 (Prof.

Shapiro); *see* Tr. 2263:12–25 (Prof. Shapiro) (AT&T and Comcast's distribution businesses

would benefit from slowed virtual MVPD growth). For example, each of the two companies

could decide not to license a virtual MVPD and "wait and see if the other did," enabling the two

companies to "mutually forbear" from licensing the virtual MVPD "without any communication

between them." Tr. 2264:14–2265:13 (Prof. Shapiro). This could be achieved without an

independently unlawful agreement. Tr. 2264:21–2265:13 (Prof. Shapiro); *see also* Tr. 2260:24–

2261:20 (Prof. Shapiro) (antitrust economists consider "what might happen in the industry

through tacit arrangements" or "mutual awareness" after a merger). Impeding competition from

emerging virtual MVPDs would benefit AT&T and Comcast but would harm consumers—there

---

[14] The cable channels owned by NBCU include NBC, NBC Broadcast, USA, SyFy, Bravo, CNBC, MSNBC, NBC Sports Network, digital channels such as Oxygen, Universo and Universo Kids, and several regional sports networks. Tr. 1980:21–1981:2 (Bond/NBCU).

would be "fewer choices" in the marketplace and "less margin pressure on the traditional packages," which means "consumers would pay more." Tr. 2264:14–20 (Prof. Shapiro). Contrary to Defendants' assertion that Professor Shapiro "effectively conceded away" any claim about coordination, Tr. 4038:12–20 (Defendants' Closing Statement), he testified that the merger increases the risk of coordination because the risk of coordination is a "new situation" created by this merger. Tr. 2261:14–20 (Prof. Shapiro); Tr. 2262:12–17 (Prof. Shapiro) ("[T]his is not a risk that is present at all prior to the merger.").

300.     During the integration planning process for this merger, AT&T and Time Warner

██████████████████████████████████████████████████████

████████████████████████████████ PX0031-033. AT&T recognized that consolidation in the industry has the potential to "ensure stability" and slow the rate of change. PX0363-037; *see also supra* III.

301.     AT&T executives have also recognized that vertical integration gives Comcast the incentive and ability to harm competing distributors. ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████ PX0030-010; *see supra* III.

302.     ██████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████



303.    Moreover, the merger would facilitate the exchange of information between AT&T and Comcast. Post-acquisition, AT&T's distribution unit would do business with Comcast's programming unit, and Comcast's distribution unit would do business with AT&T's programming unit. Today, the same executives at Comcast Corporation have final approval authority for both Comcast Cable's agreements with other programmers and NBCU's agreements with other distributors. Tr. 866:14–22 (Rigdon/Comcast); Tr. 1986:18–1987:25 (Bond/NBCU). These executives also receive updates on negotiations with specific distributors—Greg Rigdon, the executive vice president of content acquisition for Comcast, and Madison Bond, the chairman of content distribution at NBCU, each testified that they update

Comcast Corporation CEO Brian Roberts and other executives at Comcast Corporate on the

status of negotiations. Tr. 865:18–866:13 (Rigdon/Comcast); Tr. 1988:8–11 (Bond/NBCU); *see*

*also, e.g.*, ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ AT&T's CEO Randall Stephenson testified that all business units post-merger

will report up to him, and that he will be in charge of strategic planning for all of them. Tr.

3471:11–3472:7 (Stephenson/AT&T). This would give the two largest MVPDs in the United

States unprecedented insight into each other's dealings with key programmers. *See also* Tr.

2261:24–2262:11 (Prof. Shapiro) (the fact that the "the two companies are in communication all

the time" due to their "buyer–seller relationship" heightens "concerns about coordination").

304.    MFNs and similar contractual provisions could amplify the effect by giving

AT&T and Comcast further insight into each other's terms with virtual MVPDs. ███████████

█████████████████████████████████████████████████████████

███████████████████████████; Tr. 1661:7–22 (York/AT&T). █████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███; Tr. 1695:9–1696:15 (York/AT&T).

### 2.    The relevant markets are conducive to coordination

305.    As discussed in the PCOL, courts have identified factors potentially relevant to

assessing the likelihood of coordination, which include: market concentration, the need for only

a limited number of firms to coordinate, transparency of key information, opportunities for

communication, the ability to detect deviations from the terms of coordination, and historical

acts of coordination. *See* PCOL V.E. Applying these factors shows that the pay-TV industry is conducive to coordination today and the merger would heighten its vulnerability. AT&T itself has argued in FCC filings that the pay-TV industry is vulnerable to coordinated action against online competitors. PX0450-002 ("[E]merging competition is vulnerable to coordinated exclusionary actions by cable."); PX0449-009 ("[F]actors such as a small number of competitors, concentrated market shares, and high entry barriers" contribute to the risk of coordinated foreclosure of online video distributors) (expert report submitted by AT&T).

306.     *First,* a few large MVPDs provide service to the majority of MVPD subscribers in the United States. These MVPDs include Comcast, AT&T/DirecTV, Charter, and DISH. Tr. 988:14–22 (Breland/Turner); Tr. 234:22–24 (Schlichting/DISH). AT&T/DirecTV is the largest MVPD in the United States, with roughly 25 million subscribers across its platforms. Tr. 1678:6–9 (York/AT&T). Comcast is the second largest MVPD with approximately 20 million video subscribers. Tr. 860:9–11 (Rigdon/Comcast). ███████████████████████ ███████████████████ PX0030-005. DISH has the fourth most MVPD subscribers with over 12 million customers. Tr. 803:16–18 (Hauser); Tr. 234:22–24 (Schlichting/DISH). In 2017, there were 90 million pay-TV subscribers in the United States. Tr. 3450:17–22 (Stephenson/AT&T). This, Comcast and AT&T together account for roughly half the MVPD subscribers. An AT&T presentation prepared for an integration planning meeting for this merger included a graph showing that after the merger ███████████████████████████ ████████████████████████████████████████████ PX0031-041. AT&T itself recognizes that concentration at each level of the pay-TV marketplace serves as a safeguard against disruptive change. *See supra* III.

307.     *Second*, given the importance of Time Warner and NBCU content to virtual

MVPDs, AT&T and Comcast would not need to enlist other programmers to advance their common interest. *See* Tr. 2260:24–2261:20 (Prof. Shapiro) ("[I]f you have a coordinated scheme . . . that only involves two parties, then that's relatively easy to achieve in comparison with other situations where you need many suppliers."). A Turner executive with responsibility for digital licensing believed that Hulu faced the risk of Turner not participating in Hulu's virtual MVPD service. Tr. 1851:16–19 (Harran/Turner); PX0036. He also noted that NBCU might pull out after their consent decree expires, and that if Hulu didn't have Turner and NBCU content, this would be "a recipe for Hulu failure." Tr. 1851:20–1852:2 (Harran/Turner); PX0036. The executive explained that he believed that without Turner and NBCU, Hulu would fail in the strategy that it had chosen to launch its virtual MVPD. Tr. 1871:8–17 (Harran/Turner). Both Sling packages would also be vulnerable to coordinated action by AT&T and Comcast, since Sling carries Turner in both packages, and carries NBCU content in Sling Blue. Tr. 236:19–237:3, 237:22–25, 279:15–24 (Schlichting/DISH).

308.     *Third*, "key information" in the industry is transparent. Because senior executives at distributors change jobs frequently, large distributors have a lot of information about their competitors' rates when they enter negotiations with a programmer. Tr. 1510:15–23 (Sutton/HBO); *see also* ██████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ Programmers try to keep rates confidential, but information about contracts leaks. Tr. 1511:15–1512:2 (Sutton/HBO); *see also* ██████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████

██████████████████████████████████████████ Indeed, sharing such information can

be a contractual requirement. *See supra* V.B.1.

309.    Likewise, programmers have shared information with competitors about their

online distribution strategies. For example, an executive at Turner forwarded an analyst report to

his peers at Turner competitors NBCU and Disney, saying "[o]ur message is beginning to get

support from others who are not in the pool with us day over day." Tr. 1857:21–1858:11

(Harran/Turner); PX0217. The report read, "We have been pleading for several years now for the

big content owning media companies to signal SVOD licensing discipline to each other, so they

can coordinate their behavior[.]" PX0217-002. This Turner executive admits to maintaining

regular communications with his peer at NBCU, at times discussing business matters. Tr.

1860:14–24, 1863:6–19 (Harran/Turner).

310.    *Fourth*, MVPDs closely track the prices and terms their competitors offer to

subscribers. For example, the FCC has found that DirecTV has been a leader in introducing new

"fees" to consumers' bills, which has prompted other MVPDs to follow suit. *In the Matter of*

*Annual Assessment of the Status of Competition in the Market for the Delivery of Video*

*Programming*, 32 FCC Rcd. 568, ¶ 49 (2017) ("A relatively new strategy for addressing

increased programming costs involves listing 'broadcast fees' and 'regional sports fees'

separately on customers' monthly billing statements. The strategy raises monthly bills while

typically leaving the advertised prices for video packages unchanged. SNL Kagan explains that

MVPDs hope to deal with declining margins by adding on additional 'fees' to the monthly bill in

the form of sports and broadcast 'surcharges.' According to SNL Kagan, this practice began with

DIRECTV in September 2012, but by 2015 most large MVPDs were using this strategy.").

311.    *Fifth,* prior acts in this market demonstrate its susceptibility to coordination.

AT&T's Dan York—who was previously DirecTV's and AT&T's head of contract negotiations and who will remain AT&T's head of contract negotiations if this merger were approved, Tr. 1561:9–1561:18, 1562:1–1562:4, 1563:7–1563:21 (York/AT&T)—has communicated with his counterparts at competitors about business issues, including the Dodgers channel. Tr. 2081:9–2081:16 (York/AT&T).

312.     In 2014, DirecTV did not carry the Dodger's channel (SportsNet LA). Nor did most of DirecTV's competitors, including AT&T. York wanted to get a lower price for carrying the Dodgers channel. Tr. 2075:23–2076:3 (York/AT&T). In communicating with his boss, Mike White, about the subject, York readily agreed to White's statement that "seems like we may have more leverage if we all stick together," stating that "others holding firm is key" in carriage negotiations, a reference to the other distributors. Tr. 2078:15–23, 2079:24–2080:3, 2080:23–2081:16 (York/AT&T); PX0462. York's attempt to explain away this exhibit at trial was not credible and not supported by the exhibit itself. Tr. 2080:15–2081:8 (York/AT&T).

313.     In another instance, after requesting his subordinate to ███████████████ ███ to learn about important underpinnings ███████████████████ ██████████████████████████████████████████ York decided to directly contact his counterpart at Verizon to learn this information from him: "Just got it from the horse's mouth." Tr. 1673:19–1674:2 (York/AT&T); PX0048.

## VI.   EFFICIENCIES: THE PARTIES' CLAIMED EFFICIENCIES CANNOT JUSTIFY THE LIKELY HARM TO COMPETITION IN THE RELEVANT MARKETS

314.     Defendants seek to rebut Plaintiff's prima facie case by claiming approximately $1.5 billion per year in cost synergies and $1 billion per year in revenue synergies by 2020. DX0658.0092; Tr. 3233:19–3234:24, 3235:3–9 (Stankey/AT&T); *see* Tr. 3234:12–20

(Stankey/AT&T) (noting the 2020 predictions assumed a closing date in 2017). To be considered as a possible justification for this otherwise anticompetitive merger, the claimed efficiencies, referred to by Defendants as "synergies," would have to be verifiable and merger-specific. *See* Tr. 2276:25–2277:9 (Prof. Shapiro); Tr. 3531:23–3532:7 (Quintero); Tr. 3717:17–3718:2 (Prof. Athey). Verifiability requires that a synergy be reasonably verifiable by an independent party, and merger-specificity requires that the synergy cannot be achieved without the merger. *See* PCOL VI.E.2; Tr. 3532:11–20 (Quintero); Tr. 3717:17–3718:2 (Prof. Athey). In addition to being verifiable and merger-specific, synergies must be shown to benefit consumers, so as to offset the merger's anticompetitive effect. *See* PCOL VI.E.2; Tr. 2276:25–2277:12 (Prof. Shapiro). Defendants have failed to submit evidence sufficient to meet these basic requirements for their synergy claims.

### A. Defendants have not met their burden of asserting evidence to substantiate their synergy claims

315.    Defendants have not met their burden because they have offered no legally supportable evidence to quantify their claimed synergies, and have therefore defaulted on asserting a merger-efficiencies (or "merger-synergies") defense. Defendants put forward only two sources of evidence that could conceivably support a quantification of their synergy claims: DX0658, a PowerPoint presentation summarizing AT&T's synergy forecasts as of October 10, 2017 (referred to at trial as "Version 41"); and the testimony of John Stankey, AT&T's Senior Executive Vice President – AT&T/Time Warner Merger Integration Planning, who sponsored DX0658 at trial. Tr. 3291:18–3292:8, 3292:20–23, 3231:9–3234:3 (Stankey/AT&T).

316.    However, Version 41 is a preliminary draft document, subject to change based on diligence, which AT&T will continue to revise at least through the close of the transaction, Tr. 3292:9–19; 3293:16–22 (Stankey/AT&T), and thus it does not even purport to contain AT&T's

122

final synergy claims. More fundamentally, Version 41 was admitted into evidence not for the truth of the proposition that the synergies it quantifies will actually be attained, but only for the limited purpose of establishing AT&T's subjective state of mind concerning those synergies. Tr. 3231:9–3233:13. Therefore Version 41, by definition, cannot provide evidence of the underlying merit of Defendants' quantification of the synergy claims.

317.     Defendants have failed to supplement this state-of-mind evidence with any additional evidence that could lend substance to the synergy forecasts, because, as was demonstrated at trial, Stankey is also not qualified to testify to the truth of the claimed synergy amounts. Prior to becoming head of merger integration planning, Stankey was clearly an arm's-length consumer of this document: He admitted that the last version of the synergy summary he had seen before Version 41 was approximately "Version 22," likely in May of 2017. Tr. 3297:10–19 (Stankey/AT&T).

318.     Moreover, the synergy numbers set forth in Version 41 have not changed since July 31, 2017, at the latest, Tr. 3567:9–3568:5 (Quintero)—which was *before* Stankey assumed his position relating to merger integration planning, Tr. 3296:20–23 (Stankey/AT&T); Tr. 3568:6–9 (Quintero). And Stankey's subsequent work on merger integration has not served to familiarize him with important aspects of the methods and assumptions by which the claimed synergies were calculated. *See, e.g.,* Tr. 3293:23–3294:6, 3298:12–23 (Stankey/AT&T). In fact, some of the inputs to the calculations were contributed by Time Warner, and could not be shared with AT&T employees, such as Stankey, due to confidentiality concerns. *See* Tr. 3328:9–23 (Stankey/AT&T). In particular, the quantification of certain synergies required the use of assumed "conversion rates," which were often developed by Time Warner personnel, who never discussed them with Stankey. Tr. 3328:13–3329:23 (Stankey/AT&T).

319.     Asked in court ███████████████████████████ in AT&T's "Combined Asset" revenue synergy category, DX0658.0102, .0109, Stankey did not recall that such a claimed synergy exists. Tr. 3298:24–3299:4 (Stankey/AT&T). Asked about Version 41, Stankey incorrectly asserted that the document's synergy estimates had been revised since July. Tr. 3295:21–3296:1 (Stankey/AT&T); Tr. 3567:9–3568:9 (Quintero).

320.     For these reasons, Stankey lacks foundation to speak about the predictive value of the calculations behind the claimed synergies, an essential supplement to the state-of-mind evidence provided by Version 41. Indeed, consistent with this lack of foundation, Stankey did not provide testimony at trial on *any* detailed synergy calculations. Tr. 3204:1–3375:9 (Stankey/AT&T).

321.     If anything, Stankey's testimony renders the synergy claims in Version 41 even less credible than they otherwise would have been. When he was asked about one assumption used to estimate synergies in Version 41, Stankey confirmed that he had described that assumption in his personal notes as "a guess based on [someone's] personal experience." *See* Tr. 3325:13–3326:22 (Stankey/AT&T); DX0658.0109. Stankey's testimony is also colored by his personal interest in the outcome of this litigation. His job since November 2017 has included supporting the litigation effort, *see* Tr. 3266:1–12 (Stankey/AT&T), and if (and only if) the merger is approved, he stands to receive a very significant increase in compensation, Tr. 3266:24–3271:4 (Stankey/AT&T).

**B.     Defendants have not established that the asserted cost synergy claims are verifiable or merger-specific**

322.     Defendants claim that they will achieve $1.5 billion in annual cost synergies by 2020 as a result of this merger, and have identified three broad categories of cost synergies: marketing spend, vendor spend, and corporate spend, which are addressed below. *See* Tr.

3233:19–3234:24 (Stankey); DX0658.0007, .0074. Defendants have failed to proffer evidence establishing that any of their claimed cost synergies are either verifiable or merger-specific. Tr. 3533:1–13 (Quintero).

> ### 1.   Defendants have failed to show that their claimed marketing spend cost synergies are either verifiable or merger-specific

323.   Defendants claim they will achieve ██████████ by 2020 in annual cost synergies just from their marketing spend. DX0658.0074; Tr. 3529:11–17 (Quintero); PXD016-01.[15] This claim is not supported by evidence that the marketing spend synergies are verifiable or merger-specific. Tr. 3543:1–15 (Quintero). Defendants calculated all but one type of their marketing spend synergies by applying assumed savings percentages to Time Warner's expected expenditures on marketing, without providing any documentation that the assumptions were correct. Tr. 3543:1–15 (Quintero). For one particular marketing spend synergy, Defendants assumed an exact dollar amount of savings, rather than an assumed percentage, but in that case they did not provide evidence of how they obtained that assumed dollar amount. Tr. 3543:1–15 (Quintero). Defendants provided no data or analysis to support the percentages giving rise to their marketing spend synergy claims. Tr. 3543:17–3544:1 (Quintero).

324.   To illustrate, Defendants claim ██████████ of annual cost savings in "domestic paid media," a subcategory of marketing spend, representing the amount Defendants expect to save on paying for advertising for their own products. DX0658.0123; Tr. 3544:2–5 (Quintero).

---

[15] The cost synergy categories to which Stankey testified can be mapped onto those used by Quintero as follows: (1) Quintero's marketing spend category is equivalent to "Marketing" on DX0658A (i.e., DX0658.0092); (2) Quintero's vendor spend category is equivalent to the "Vendor" and "Network/IT" categories on DX0658A, taken together; and (3) Quintero's corporate spend category is equivalent to the "Corporate" and "Content/OTT" categories on DX0658A. *See* Tr. 3530:11–3531:6. A categorization similar to Quintero's is also found at DX0658.0075.

AT&T assumed in Version 41 that the merged company could save 15 percent on Time

Warner's domestic paid media expenditures by consolidating Time Warner's use of three media

buying services to one. Tr. 3544:6–10 (Quintero). However, Time Warner is a sophisticated

purchaser of advertising, already spending almost as much on domestic paid media as AT&T

spends. Tr. 3544:13–3545:11 (Quintero). So, in the absence of any explanation to the contrary by

Defendants, it is reasonable to conclude that Time Warner chooses to use the three buying

services for a valid business purpose. *See* Tr. 3544:13–3545:11 (Quintero). Additionally, the 15-

percent reduction in marketing costs is simply an assumption, Tr. 3544:11–12 (Quintero), one

that Stankey did not even attempt to explain. Tr. 3204:1–3375:11 (Stankey/AT&T). Defendants'

other marketing synergies suffer from the same lack of merger-specificity and verifiability, based

on the calculations used to derive them, or lack thereof. Tr. 3549:8–18 (Quintero).

### 2. Defendants have failed to show that their claimed vendor spend cost synergies are either verifiable or merger-specific

325.    Defendants also claim ███████████ per year in vendor spend cost synergies.

DX0658.0074; Tr. 3529:11–17 (Quintero). This category of synergies represents cost savings

AT&T claims it will achieve through a reduction in spending on third-party vendors, such as

professional service firms and transportation services. Tr. 3545:16–19 (Quintero). To calculate

synergies in the vendor spend category, the Defendants made assumptions of particular savings

percentages, as they did in the case of marketing spend claimed synergies, but in the case of the

vendor spend synergies the Defendants sometimes attributed different percentages to different

vendors—again, without providing underlying support that these assumptions were accurate. *See*

Tr. 3545:20–3546:9 (Quintero).

326.    For instance, AT&T claims that it will save ███████████ per year on its logistics

and distribution vendor spending. DX0658.0130; Tr. 3546:17–3547:14 (Quintero). This synergy

represents expenditures related to packaging, delivery, and the provision of office supplies. Tr. 3547:2–14 (Quintero). To calculate this synergy, AT&T assumes, without further explanation, that the merged company would enjoy a 30-percent savings on Time Warner's payments to three of the listed vendors, and a five-percent savings on its payments to the rest, and applies these unsupported savings percentages to projected Time Warner expenditures. Tr. 3547:15–3548:20 (Quintero). In fact, Time Warner spends more on logistics and distribution than AT&T does at five of these vendors, and in the case of two vendors AT&T spends nothing at all. Tr. 3548:8–11 (Quintero). AT&T has provided no explanation why these vendors would choose to provide the merged company with a price reduction under these circumstances. Tr. 3547:15–3578:20 (Quintero). AT&T's other vendor spend synergies have also not been shown to be verifiable or merger-specific, as the calculation methods used to support the logistics and distribution savings are representative of the calculation methods for the entire vendor spend category. Tr. 3549:4–7 (Quintero).

### 3. Defendants have failed to show that their corporate spend cost synergies are either verifiable or merger-specific

327.    The Defendants' third category of cost synergies, corporate spend, also has not been shown to be verifiable or merger-specific. Tr. 3533:1–13 (Quintero). Corporate spend synergies have been defined by Defendants to include the elimination of duplicative "corporate overheads," such as redundant legal departments, tax departments, and accounting departments, not all of whose employees will be needed post-merger. Tr. 3238:4–20 (Stankey/AT&T). In calculating a major category of these synergies, found at DX0658.0149, Defendants simply multiplied Time Warner's projected corporate costs by 75 percent to arrive at the expected savings. Tr. 3657:5–3659:20 (Quintero). An analysis shown at DX0658.0150 may provide a basis for the selection of the 75-percent figure, but that analysis itself consists of the application

of round savings percentages across-the-board. Tr. 3659:6–14 (Quintero). Defendants have not

provided documentation demonstrating that the corporate spend cost synergies are verifiable or

merger-specific. Tr. 3533:1–13 (Quintero).

### C. Defendants have not shown that their four categories of revenue synergies are verifiable or merger-specific

328.    Defendants claim that they will achieve $1 billion per year in revenue synergies

by 2020 as a result of the merger. Tr. 3235:7–9 (Stankey/AT&T); DX0658.0092. Again,

Defendants have failed to meet their burden.

#### 1. Defendants failed to show that their claimed combined asset revenue synergies are verifiable or merger-specific

329.    Defendants claim that they will achieve hundreds of millions of dollars in

"combined asset" revenue synergies, largely from cross-promotions and bundling of the merged

firm's products. Tr. 3533:18–3534:1 (Quintero); *see also* DX0658.0092. These claimed

combined asset revenue synergies, like the cost synergies, have not been demonstrated to be

merger-specific or verifiable. Tr. 3534:2–7 (Quintero).

330.    For example, Time Warner claims that the promotion of Warner Bros. movies in

locations such as AT&T wireless stores will result in additional revenue from these films. *See* Tr.

3550:23–3551:25, 3558:19–24 (Quintero); *see also* DX0658.0104. Defendants calculated this

synergy by layering numerous unsubstantiated assumptions on top of one another. *See* Tr.

3559:21–3561:12 (Quintero). This calculation is typical of the methods the Defendants used to

calculate the combined asset revenue synergies generally. Tr. 3561:13–16 (Quintero). Thus,

these synergies have not been shown to be verifiable. Tr. 3534:2–7 (Quintero).

331.    The combined asset revenue synergies also have not been shown to be merger-

specific. Tr. 3534:2–7 (Quintero). For example, Turner has negotiated cross-promotions, like

those that underlie a number of the combined asset revenue synergies, with major retailers in the

United States, and just this year AT&T and Warner Bros. have engaged in such a cross-promotion without the need for a merger. *See* Tr. 3561:17–3562:3 (Quintero); *see also* DX0658.0157.

> **2.  Defendants have failed to show that their claimed data-driven advertising revenue synergies are verifiable or merger-specific**

332.     Defendants claim data-driven advertising revenue synergies scaling up to several hundred million dollars by 2020. Tr. 3719:22–3720:1 (Prof. Athey); DX0658.0097; *see also* Tr. 595:10–17 (Martin/Turner) (defining data-driven advertising). These claimed synergies stem from applying AT&T's data to Turner's data-driven advertising products on both traditional linear television and television distributed over the internet. *See* Tr. 3719:8–21 (Prof. Athey).

333.     These revenue synergies are not verifiable. Tr. 3725:25–3726:10 (Prof. Athey). The numbers in Version 41 are "merely assumptions," with "no meaningful analysis underlying the magnitude that w[as] put forward." Tr. 3726:8–10 (Prof. Athey). These synergies depend on the assumption that after the merger, AT&T will "sell dramatically more of [Turner's data-driven advertising] product without lowering the price"—increasing from "low single digits of adoption to more than 40 percent of customers adopting this product" in 2020. Tr. 3726:18–24 (Prof. Athey); *see also* DX0658.0097. This is unsupported by any empirical analysis. Tr. 3726:25–3727:18 (Prof. Athey).

334.     Moreover, Defendants have not shown that a merger is needed to achieve the claimed data-driven advertising synergies. Tr. 3720:2–6 (Prof. Athey). These synergies, relating to the combination of AT&T's consumer data with Turner's ad inventory, could be achieved by contract, independent of the merger. Tr. 3720:4–6, 3720:9–3721:2 (Prof. Athey). Data contracts are "ubiquitous" in the advertising industry, including "dozens of examples of data contracts" involving the Defendants. Tr. 3721:17–20 (Prof. Athey).

335.     Defendants alluded to "bargaining frictions" as an impediment to AT&T and Turner reaching such a contract at arm's length, and suggested that those "frictions" would not serve as an impediment if the firm were vertically integrated. *See* Tr. 3222:23–3223:2 (Stankey/AT&T); Tr. 3104:15–3105:5 (Bewkes/Time Warner). However, Defendants did not establish that "bargaining frictions" would prevent contracts with programmers for data absent a merger. *See* Tr. 3720:4–3721:2 (Prof. Athey). Frictions are common in data transactions and are regularly overcome with tools such as trials and pilots that are "ubiquitous in this industry . . . for these types of data." *See* Tr. 3721:24–3722:3, 3723:14–3724:5 (Prof. Athey). There is no reason to believe that those tools would not work here. Tr. 3723:18–3724:5 (Prof. Athey). A data contract could also be structured to handle uncertainty, using revenue sharing, profit sharing, or a flexible structure that adjusts as new information becomes accessible. Tr. 3722:10–19 (Prof. Athey).

336.     Turner has reached agreements with distributors for data, demonstrating that a merger is not essential. Turner negotiated an arm's-length contract with Hulu that provides Turner the right to receive data from Hulu about who watches Turner content. Tr. 1019:8–1021:21 (Breland/Turner); PX0211-016, -031. This includes personally identifiable information, such as the first and last name of Hulu's customers, email addresses, and physical addresses. Tr. 1021:6–21 (Breland/Turner); PX0211-031. Turner also successfully negotiated a contract to obtain data from Google's YouTube TV. Tr. 1174:22–1175:4 (Warren/Turner). The contract provides █████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ DX0902.0031; *see also* DX0902.0029, .0027, .0030 ██████████████████

337.     AT&T and Turner would have tremendous incentive to reach an agreement for

Turner to contract for AT&T's data, if AT&T's data is as valuable as AT&T imagines. Tr. 3720:2–3721:2 (Prof. Athey). Prior to the proposed merger announcement, AT&T engaged in high-level talks with programmers, including Turner, about potential agreements to use AT&T data to target ads on programmer ad inventory. Tr. 3773:4–9, 3775:5–3776:1 (Prof. Athey); *see also* Tr. 3211:10–3212:15 (Stankey/AT&T). After these high-level meetings, in October of 2016 (shortly before the merger announcement), AT&T was hopeful about reaching a deal with programmers. Tr. 3775:5–3776:1 (Prof. Athey). However, before these discussions could continue any further, AT&T announced the proposed merger, which changed its strategy for monetizing data. Tr. 3775:5–3776:1 (Prof. Athey).

338.    Further, only the incremental value of AT&T's data applied to Turner's inventory would be merger-specific. *See* Tr. 3724:6–20 (Prof. Athey). Defendants have not established that AT&T's data would provide any incremental value over alternative data sources available to Turner. Tr. 3720:7–8, 3724:17–20 (Prof. Athey). A variety of opportunities exist for Turner to buy data for the purposes of targeted advertising. Tr. 3724:22–3725:3 (Prof. Athey); *see also* Tr. 696:22–697:1 (Hinson/Cox) (detailing data available from ComScore/Rentrak); Tr. 594:14–23, 626:7–18 (Martin/Turner) (detailing data available from Audience Content Recognition ("ACR") companies, which Turner considered acquiring before the merger announcement). Furthermore, as AT&T noted in an internal document regarding the initiative to sell AT&T's data to programmers, "Turner had a robust data solution already." Tr. 3775:22–23 (Prof. Athey). Turner rejected Comcast's data in 2015, Tr. 675:22–676:2 (Martin/Turner), because Turner was already getting most of the value from other commercially available data sources, Tr. 1022:13–20 (Breland/Turner).

339.    Without the merger, Turner would continue to improve data-driven advertising

products and revenues. Tr. 671:19–23 (Martin/Turner). John Martin, the Chairman and CEO of Turner, lauded the advertising innovation and monetization that Turner has been able to achieve to date. Tr. 590:14–591:1, 672:10–13 (Martin/Turner). Part of Martin's 2016 compensation at Turner was a result of his success innovating Turner's advertising strategy. Tr. 671:24–672:22 (Martin/Turner). Ultimately, Turner could achieve its advertising goals without AT&T. *See* Tr. 677:5–14 (Martin/Turner) (conceding that Turner could achieve its goals over time without AT&T).

340.    Furthermore, Turner has a Long Range Plan ("LRP") that includes data-driven advertising, independent of the merger. Tr. 591:5–13 (Martin/Turner). This LRP already accounts for 80 to 90 percent of the ████████████ from data-driven advertising ████████ ████████████████. PX0067-006; Tr. 593:13–594:10 (Martin/Turner).

### 3.    Defendants failed to show that their claimed revenue synergies from a programmatic platform are either verifiable or merger-specific

341.    Defendants' claimed "programmatic platform" synergies, scaling up to hundreds of millions of dollars by 2020, are not verifiable or merger-specific. Tr. 3728:16–24, 3730:5–8 (Prof. Athey).

342.    The programmatic platform synergies are speculative, and thus not verifiable, for several reasons. First, platform businesses are especially risky, particularly in the television industry. Tr. 3733:2–5 (Prof. Athey). Platforms create the most value when it is hard for buyers and sellers to interact without the platform. Tr. 3733:16–25 (Prof. Athey) (offering eBay as an example of a platform that provides value by connecting a high volume of buyers and sellers for whom the ability to interact and execute transactions would otherwise be problematic).

343.    The television advertising industry—which has a limited number of buyers and sellers—is not the type of market where a platform would provide much value. Tr. 3734:1–17

(Prof. Athey). Buyers and sellers of television advertising already have direct relationships and a process in place through which they contract directly, so it would be difficult to attract market participants to a platform where they would have to pay commission to AT&T. Tr. 3734:1–17, 3728:9–15 (Prof. Athey). For example, Google—a company that has been successful in creating other types of programmatic advertising platforms—failed in its attempt to create a platform for television advertising, in part because "participants didn't see the value of going through a platform." Tr. 3734:12–14, 3735:5–11 (Prof. Athey).

344.    Second, the synergies claimed from the programmatic platform depend on AT&T building an entirely new business from scratch. Tr. 3732:25–3733:5 (Prof. Athey). As AT&T's CEO Randall Stephenson has recognized, this will take time and require AT&T to acquire technology that it does not possess today. Tr. 3466:14–3467:7 (Stephenson/AT&T); *see also* Tr. 3733:7–12 (Prof. Athey). Not only is the programmatic platform envisioned by AT&T new to the company, it is new to the industry. Tr. 3243:1–4 (Stankey/AT&T). Stankey, AT&T's head of integration, agrees with Professor Athey about the significant risks associated with the platform. PX0072; Tr. 3334:1–4 (Stankey/AT&T).

345.    Third, even if AT&T were able to acquire all the components necessary to build the platform, AT&T would need to convince its competitors to contribute their ad inventory to the platform. Tr. 3734:18–3735:4 (Prof. Athey); *see* DX0658.0098, .0099. All of the synergies from the platform depend directly on the contributions of competitors' ad inventory. Tr. 3729:10–21, 3735:22–3736:1 (Prof. Athey); Tr. 3244:1–8 (Stankey/AT&T); *see* DX0658.0098, .0099. But AT&T has not supported its assumption that those programmers and distributors will join the platform and pay AT&T the modeled commissions. Tr. 3735:17–21 (Prof. Athey). As of February 2017, AT&T had not had discussions with those distributors about contributing their

inventory to the platform. Tr. 3338:14–22 (Stankey/AT&T). At trial, Stankey could not affirm

that distributors would contribute inventory. Tr. 3340:14–20 (Stankey/AT&T). Regarding

programmers, Stankey said that there "hasn't been anything put in front of [programmers]

around a specific set of deliverables in the programmatic platform." Tr. 3339:3–11

(Stankey/AT&T). Ultimately, as Stephenson testified, adding third-party inventory to the

programmatic platform is merely an "aspiration." Tr. 3467:14–3468:9 (Stephenson/AT&T).

346.    Additionally, the revenue synergies from the programmatic platform are not

merger-specific. In the first instance, this merger will not remove the challenges inherent to the

creation of a successful platform. Tr. 3730:9–16 (Prof. Athey). Furthermore, contrary to what

Defendants claim, AT&T does not need this merger to procure its "seed inventory," i.e., the

advertising inventory that would be used to start the programmatic advertising platform. Tr.

3730:17– 3731:9 (Prof. Athey). According to AT&T CEO Randall Stephenson, AT&T's

advertising platform "can be very successful with just our own ad inventory." Tr. 3468:14

(Stephenson/AT&T). Furthermore, there are a number of ways, independent of a merger, through

which AT&T could obtain additional ad inventory beyond its own. Tr. 3730:23–3731:2 (Prof.

Athey). For example, AT&T could offer revenue guarantees for programmers or distributors that

contribute inventory. Tr. 3731:24–3732:3 (Prof. Athey). Alternatively, AT&T could buy the

advertising inventory, which would reduce the risk of the transaction. Tr. 3732:4–6 (Prof.

Athey). As Professor Athey testified, "[T]hese techniques . . . are commonly used in

advertising," Tr. 3732:18–19 (Prof. Athey), and there is no reason to believe they would not

work in this case. Tr. 3732:11–17 (Prof. Athey). Successful ad exchanges, such as Google's

DoubleClick platform for banner ads, have launched using contracts for ad inventory. Tr.

3753:9–12 (Prof. Athey).

### 4. Defendants failed to show that their claimed content intelligence revenue synergies are either verifiable or merger-specific

347.    Defendants' "content intelligence" synergies, scaling up to hundreds of millions of dollars by 2020, are not verifiable or merger-specific. Tr. 3737:4–22 (Prof. Athey). For this category of synergies, Defendants claim AT&T data will improve scheduling optimization, content syndication, and creative development for Time Warner. DX0658.0114; Tr. 3736:12–22, 3737:1–2 (Prof. Athey).

348.    This category of synergies is speculative, and thus not verifiable. Defendants' own executives have expressed skepticism about these synergies. Time Warner employees have said these synergies are speculative, unproven, and untested. Tr. 3331:2–6 (Stankey/AT&T). Stankey noted that content intelligence had "specious buy-in" from Time Warner and would "require significant behavioral and incentive work," PX0072, after meeting with Time Warner employees as part of his integration work, Tr. 3330:17–3331:6 (Stankey/AT&T). Stankey communicated the concern about the "achievability risk" of content intelligence to the highest level at AT&T. While working with a colleague to prepare a presentation for Randall Stephenson on merger synergies, Stankey expressed his preference for the presentation to reflect those concerns. PX0072; Tr. 3332:15–3333:7 (Stankey/AT&T). Afterward, the presentation was updated, ███████████████████████████████████████████████████████████ ███████████████████████████████████████████. PX0323-001, -007. Ultimately, Stankey discussed this achievability risk with Stephenson, in lieu of including it in the presentation, and informed his colleague that "Randall [Stephenson] . . . gets the issue. No need to dwell in the room." PX0344; Tr. 3337:23–3338:5 (Stankey/AT&T).

349.    Content intelligence synergies are "hard[] to pinpoint," given that it is "a new area of the industry." Tr. 3245:10–16 (Stankey/AT&T). Even Time Warner CEO Jeff Bewkes could

not recall whether he had heard of it. Tr. 3168:2–7 (Bewkes/Time Warner). AT&T has not been able to test whether content intelligence will even work. Tr. 3330:13–16 (Stankey/AT&T). For the claimed "creative development" synergies, there is "skepticism and controversy about whether data was even useful . . . [a]nd there's no analytic justification." Tr. 3739:23–3740:5 (Prof. Athey). AT&T does not plan to use its data for content creation at HBO. Tr. 3375:1–6 (Stankey/AT&T). And the HBO management team does not believe that content intelligence would help them with content creation. Tr. 3374:8–21 (Stankey/AT&T).

350.    In addition to Defendants' own doubts, which evince the speculative nature of these synergies, the assumptions underlying Defendants' content intelligence claims in Version 41 lack substantiation and are not verifiable. Tr. 3737:18–22 (Prof. Athey). The claims "were not justified by meaningful analysis." Tr. 3737:19–20 (Prof. Athey). For example, Defendants' sole basis for the "scheduling optimization" synergies is an unsupported assumption of a 35 percent revenue uplift from scheduling a spin-off to a popular show immediately after the popular show airs. Tr. 3737:25–3738:25 (Prof. Athey). This example cannot bear the weight Defendants place on it. Tr. 3739:1–17 (Prof. Athey). It is not representative of the incremental benefit, if any, that AT&T data could provide over data sources already available to networks today. Tr. 3739:14–17 (Prof. Athey). Yet this is the only example upon which the entire category of scheduling optimization synergies is based.

351.    Nor have Defendants shown that the content intelligence synergies are merger-specific. Tr. 3737:9–17 (Prof. Athey). Content intelligence involves use of AT&T consumer data, similar to the advertising synergies. Tr. 3737:1–2 (Prof. Athey). AT&T has not shown that the merger is necessary for AT&T to be able to share its consumer data with Turner. Tr. 3737:10–13 (Prof. Athey). Nor has AT&T made any attempt to show what incremental benefit,

if any, its data could provide over data sources that are available today. Tr. 3737:14–17 (Prof.

Athey).

> **D.** **Defendants' generic arguments in support of most or all of their synergy claims do not render any of those claims verifiable**

> **1.** **Defendants' asserted record of achieving synergy targets in prior mergers does not demonstrate that the claimed synergies are verifiable here**

352.    At trial, Stankey testified that because AT&T had met its synergy targets in prior

mergers, the Court should credit AT&T's synergy assertions contained in Version 41. Tr.

3227:24–3229:9 (Stankey/AT&T). However, AT&T's asserted track record in prior mergers

does not make Defendants' claimed synergies in this merger verifiable. Tr. 3563:18–3564:2

(Quintero).

353.    Each merger is unique, and AT&T's ability to achieve synergy targets in prior

mergers, even if true, would not automatically imply an ability to achieve synergies in

subsequent mergers. *See* Tr. 3564:8–25 (Quintero). The prior mergers referenced in Stankey's

testimony are horizontal mergers. Tr. 3564:17–21 (Quintero). The AT&T/Time Warner merger

is a vertical one. Tr. 3633:14–19 (Quintero). It is much easier for a company to project potential

synergies from a horizontal merger—in which it understands the revenue and cost structure of

the company it is acquiring based on experience in the industry, and is able to eliminate

redundant costs—than from a vertical merger. Tr. 3564:17–25 (Quintero).

354.    Moreover, of the prior mergers referenced by Stankey, the only one for which

Defendants provided more than sparse documentation of synergies was AT&T's acquisition of

DirecTV, *see* Tr. 3682:6–14, 3564:8–25 (Quintero), and in that transaction AT&T fell materially

short of some or all of its revenue synergy targets. Tr. 3565:13–3566:7, 3682:20–3683:2

(Quintero). Additionally, the largest of the cost synergies in AT&T/DirecTV resulted from

reduced content costs, a purported synergy not reflected in the present merger. Tr. 3565:13–

3566:7 (Quintero).

> **2.      Defendants' assertion that the merged firm will achieve its synergy targets because the company's managers will be held accountable for doing so does not render the claimed synergies verifiable**

355.      Stankey also testified that Defendants' claimed synergies are reliable because the

managers who created the synergy estimates would be held accountable for achieving them. Tr.

3566:8–12 (Quintero). However, AT&T has not provided evidence that the managers who are

responsible for creating the synergy projections would, in fact, be the same ones who would run

the relevant assets post-merger. Tr. 3566:13–19 (Quintero). Moreover, some of the senior

managers at Time Warner have expressed the view that they do not accept the validity of

AT&T's approach to documenting synergies from this merger. *See* Tr. 3684:6–3685:8

(Quintero). Also, AT&T provided no evidence of incentives or penalties in place to indicate the

level or type of accountability for reaching (or not reaching) the asserted synergies. Tr. 3566:13–

3567:8 (Quintero). Despite falling materially short of some of its revenue synergy targets in the

AT&T/DirecTV merger, Tr. 3565:13–3566:7 (Quintero), AT&T continued to employ Stankey,

and is prepared to promote him to lead Time Warner after this merger. Tr. 3266:19–23

(Stankey/AT&T).

> **E.      Defendants have not even purported to provide quantification for several of their synergy claims, and thus those synergy claims cannot be verified**

356.      Defendants assert various innovation synergies, i.e., improvements in innovation

that they contend are likely to result from the merger. These claimed innovation synergies have

not been quantified as claimed incremental revenues or reduced costs, and thus cannot be

evaluated as to their verifiability. Tr. 3563:7–17 (Quintero). Therefore, they have not been

shown to be verifiable. Tr. 3563:7–17 (Quintero).

357.    AT&T also claims, without substantiation, that if its advertising revenues increase, the pay-TV subscription fees that it charges consumers will decrease. Tr. 3394:8–18 (Stephenson/AT&T). However, this general statement has not been substantiated with any quantification or analysis, and is belied by the fact that increases in AT&T's advertising revenues over the past four years have not resulted in lowered fees for subscribers. Tr. 3468:21–3469:10 (Stephenson/AT&T). Beyond speculative assertions from executives, there is no evidence in the record that higher prices for advertisers post-merger will result in lower consumer prices for pay-TV packages. Defendants did not call their advertising efficiencies expert, Professor Kearns, or their other synergies expert, Gohkale, to analyze pass through. The only evidence in the record about higher prices post-merger relates to consumers paying more for pay-TV subscriptions, not advertisers paying higher prices and consumers paying lower prices. Tr. 2177-14–19 (Prof. Shapiro).

### F.    Defendants have failed to proffer evidence sufficient to show that any of the benefits from merging would offset the competitive harm that has been demonstrated in the relevant markets

358.    In addition to being verifiable and merger-specific, claimed synergies must also be of a kind that will offset the harm in the relevant markets. *See* PCOL VI.E.2. Defendants have not proffered evidence showing that this additional prong has been met.

359.    In the case of cost synergies, to offset the competitive harm the synergies must affect costs that are variable, not fixed, in nature, because only reductions in variable costs put downward pressure on prices. Tr. 3828:8–21 (Prof. Shapiro); *see also* PCOL VI.E.2. Variable costs are those that change in direct response to changes in volume, such as the number of subscribers or MVPDs. Tr. 3532:21–25 (Quintero). Defendants have not even claimed that any of their cost synergies are variable in nature, Tr. 3569:17–3570:1 (Quintero), and none have been

shown to be, Tr. 3568:24–3569:2 (Quintero). In fact, a number of Defendants' cost synergy

categories involve expenses that are routinely regarded as fixed costs, such as corporate

overhead, advertising, and marketing. Tr. 3570:2–17 (Quintero).

360.     Another requirement for offsetting the competitive harm that has been

demonstrated is that cost and revenue synergies must affect the particular antitrust markets at

issue, i.e., those in which competitive harm has been shown. Defendants have not even attempted

to allocate any of the claimed synergies to the relevant antitrust markets at issue. DX0658.0007.

Some are clearly unrelated to those markets. *See, e.g.*, the Combined Asset synergy regarding

"Warner Bros. Film," DX0658.0104. This claimed synergy affects the business of theatrical

movie exhibition, which is not a market in which harm is alleged in the Complaint. Complaint

¶¶ 27-29.

### G.      Defendants' desire to compete with Google and Facebook has no bearing on whether their proffered revenue synergies are merger-specific or verifiable

361.     Defendants' executives have testified that they need the merger to better compete

with Google and Facebook. *See* Tr. 3219:15–3220:1, 3243:1–17 (Stankey/AT&T); Tr. 641:20–

25 (Martin/Turner); Tr. 3115:4–3116:1 (Bewkes/Time Warner); Tr. 3456:10–13, 3458:3–22,

3459:12–23 (Stephenson/AT&T).

362.     However, AT&T's desire to compete with Google and Facebook is not relevant to

whether the proffered efficiencies are merger-specific or verifiable. Tr. 3781:1–20 (Prof. Athey).

The existence of competitors might *decrease* the chances of achieving the asserted advertising

revenue synergies, making them more speculative. Tr. 3781:13–20 (Prof. Athey). It would

certainly not help verify the magnitude of any claimed synergies. Tr. 3781:13–20 (Prof. Athey).

363.     Moreover, the types of digital advertising offered by Google and Facebook do not

directly compete with television advertising, and can serve as complements to it. Tr. 3779:22–

3780:25 (Prof. Athey). Facebook's and Google's advertising revenues are from "digital advertising," Tr. 3456:14–17 (Stephenson/AT&T), while the merged firm would be selling "premium video" (or television) advertising. Tr. 3458:9–3459:9 (Stephenson/AT&T). As Stephenson testified, AT&T's "objective is not to pursue digital advertising." Tr. 3457:23–24 (Stephenson/AT&T). In fact, Stephenson communicated with the CEO of Facebook, Mark Zuckerberg, after the proposed merger announcement and mentioned the possibility of discussing ways that Facebook and AT&T could cooperate in the future. PX0558.

364.    Finally, Defendants contend that advertisers are shifting their spending from television advertising to Google and Facebook, resulting in pressure on consumer subscription prices. Tr. 3087:20–3089:1 (Bewkes/Time Warner). Digital advertising, however, has grown overall advertising spend, not diminished the amount spent on premium video advertising. Tr. 3171:24–3172:21 (Bewkes/Time Warner). The amount of revenue Time Warner earned from television advertising has remained consistent over the past five years. Tr. 3183:5–14 (Bewkes/Time Warner). And last year, AT&T's advertising revenue increased seven percent. Tr. 3468:21–3469:5 (Stephenson/AT&T).

## VII.   ENTRY WILL NOT BE TIMELY, LIKELY, OR SUFFIECIENT TO PREVENT THE COMPETITIVE EFFECT OF THIS MERGER

365.    Entry by a facilities-based MVPD is unlikely. Such entry would require connecting a third line to homes and businesses on the lines run by incumbent cable companies and telephone companies. *See* Tr. 2904:19–23 (Holanda/RCN). Moreover, because of volume discounts, any new entrant would face disproportionately high content costs. *See* Tr. 2911:12–25 (Holanda/RCN). In fact, content costs have risen so high that some existing midsized cable companies have exited the video business. *See* Tr. 2912:14–2913:22 (Holanda/RCN). Others, such as Cable ONE, have decided to shift their focus away from the video business. *See* Tr.

2106:6–2107:3 (Sejen/Cable ONE). Since Cable ONE did not want to pass through the rising

content costs to its subscribers, there was no profit in the video business. Tr. 2107:21–22,

2132:9–14 (Sejen/Cable ONE). By 2017, Cable ONE was breaking even, at best, on its video

business. Tr. 2107:18–22 (Sejen/Cable ONE).

366.     Likewise, virtual MVPDs face higher programming costs than traditional MVPD

distributors. Virtual MVPDs pay a higher rate for Turner because they are new entrants and have

a smaller number of subscribers. Tr. 1061:23–1062:10 (Breland/Turner). For example, Sony Vue

initially paid higher fees for Turner networks than the larger traditional MVPDs. Tr. 585:3–16,

1188:12–25 (Warren/Turner). There was a █ percent differential between the virtual MVPD

price and historical new entrants, which later went down when Sony obtained more subscribers.

Tr. 1063:13–1064:24, 1145:20–1150:5 (Breland/Turner); Tr. 1189:1–4 (Warren/Turner);

PX0535; *see also* Tr. 1006:13–1008:17 (Breland/Turner) (agreeing that YouTube TV lacked the

"leverage" to negotiate lower content rates and more favorable non-price terms). Turner itself

aims to charge new virtual MVPDs rates that are ███████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████ PX0127-002 (████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████ ████████████████████████████████████████████████████████

████████████████████████████████████████████████

367.     Content costs are a high hurdle even for digital leaders like Google. When

beginning its negotiations prior to launching its virtual MVPD, YouTube was trying to break the

model of carrying underperforming, weaker cable networks in order to get the broadcast

networks, but did not have the leverage. Tr. 1008:11–17 (Breland/Turner). In pursuit of this goal,

YouTube initially sought prices that were lower than any other distributor in the industry and did not want to carry Turner's networks on its basic package. Turner content negotiators thought that agreeing to YouTube's proposal "would do irreparable harm to Turner's current business model." Tr. 1006:13–1008:10 (Breland/Turner). As a result, Turner declined to license to YouTube. When YouTube finally licensed Turner content for its virtual MVPD service after this lawsuit was filed, YouTube had to raise its prices in connection with the acquisition of Turner content. Tr. 1138:24–1139:5, 1075:24–1076:4 (Breland/Turner).

368.    Though Professor Carlton argued in his expert report that Turner content was not necessary for entry, he has since withdrawn that opinion based on recent events. Tr. 2573:14–19; 2574:25–2575:13 (Prof. Carlton). He based his initial opinion on four virtual MVPDs who launched without Turner. Tr. 2573:14–19 (Prof. Carlton). One of those entrants, YouTube TV, has since signed a contract to carry Turner. Tr. 2573:20–2574:1 (Prof. Carlton). Another, CenturyLink, recently exited video. Tr. 2574:14–19 (Prof. Carlton). And Professor Carlton conceded that the remaining two entrants are "very recent" entrants who are "significantly smaller" than their rivals. Tr. 2574:20–24 (Prof. Carlton).

369.    Programmer entry is not likely to remedy the competitive harm because Time Warner content is highly valued by distributors, including Turner's long-term exclusive sports rights. *See supra* IV.B–IV.B.1.e.

## VIII.   DEFENDANTS HAVE NOT ESTABLISHED THAT THE PROGRAM ACCESS RULES WOULD PREVENT ANY OF THE HARM CAUSEDBY THIS MERGER

370.    Over the past 15 years, in two separate reviews of vertical mergers between programmers and MVPDs, the FCC has found that its program access rules do not prevent post-merger price increases. As a result, the FCC adopted specific merger remedies for those transactions rather than relying on the rules. Defendants' claim that the government's experts did

not "speak to program access rules" is incorrect. Tr. 4037:9–16 (Defendants' Closing Statement).

Professor Shapiro explained that he relied on the FCC's finding in Comcast/NBCU to conclude

that these rules do not offset the price increases he has predicted here, using the same kind of

bargaining model relied upon by the FCC to order relief in Comcast/NBCU.[16] Tr. 2328:24–

2329:6, 2390:12–16 (Prof. Shapiro). Defendants have offered no evidence to establish that any

harm offset for Professor Shapiro's calculations is required, nor have they provided any

calculation of such an offset. Professor Shapiro's calculations of the consumer harm caused by

this merger thus need no adjustment related to FCC regulation.

> **A.** **The FCC has determined on multiple occasions that the program access rules do not prevent a programmer from raising prices after merging with an MVPD**

371.    The FCC program access rules prohibit a vertically integrated MVPD from

engaging in certain practices that would restrict other MVPDs' access to its programming. *See*

47 U.S.C. § 548(b). Specifically, these rules prevent (a) a cable owner from engaging in undue or

improper influence over the programmer with which it is integrated; (b) discrimination in prices,

terms or conditions of carriage; and (c) exclusive contracts. 47 U.S.C. § 548(c)(2); 47 C.F.R. §

76.1002(b).

372.    Defendants rely on the non-discrimination rule and the undue influence rule. Tr.

2693:19–23 (Prof. Katz); Tr. 2330:3–7 (Prof. Shapiro). The non-discrimination rule prohibits

discriminatory pricing by requiring that differences in programming prices charged to "similarly

situated" distributors be justified by cost differences or other approved factors. 47 C.F.R. §

---

[16] DirecTV also stated in a Comcast/NBCU FCC filing that "[t]his [Nash Bargaining] Framework Can be Applied to Estimate the Impact on License Fees for National Cable Programming." PX0001-083.

76.1002(b). The undue influence rule prohibits an MVPD from exercising undue or improper influence over the programming vendor with which it is integrated. 47 C.F.R. § 76.1002(b). Both rules have been in effect since the rules were first adopted in 1993. Tr. 2752:1–10 (Prof. Katz); *see also In re Implementation of Sections 12 and 19 of the Cable Television Consumer Prot. and Competition Act of 1992 Dev.* (*FCC Implementation Order*), 8 FCC Rcd. 3359, ¶¶ 10–13, 37 (1993) ("The provisions of Section 628(c) that follow th[e] general prohibition make it clear that certain types of exclusive contracting, undue influence among affiliates, and discriminatory sales practices are to be treated as unfair methods of competition or unfair or deceptive acts.").

373.    Despite Defendants' repeated claims to the contrary, the program access rules do not prevent the sort of harm predicted here. Tr. 4037:13–16, 4051:25–4052:5 (Defendants' Closing Statement). As the FCC stated in its review of the Comcast/NBCU merger, "[n]otwithstanding the program access rules…it [is] necessary to impose additional transaction-related safeguards as conditions for approving vertical transactions between MVPDs and video programming networks." *In re Applications of Comcast Corp., Gen. Elec. Co. & NBC Universal, Inc. For Consent to Assign Licenses & Transfer Control of Licensees* (*FCC Comcast Order*), 26 FCC Rcd. 4238, ¶ 35 (2011). The program access rules do not require that all MVPDs pay the same price for the same programming.[17] For example, the rules specifically permit volume discounts, 47 C.F.R. § 76.1002(b)(3), and as a result, volume discounts have become a standard

---

[17] The FCC recognizes that prices can differ based on legitimate factors such as "reasonable requirements for creditworthiness, offering of service, and financial stability and standards regarding character and technical quality." 47 C.F.R. §76.1002(b)(1). This "offering of service" exception itself permits price differences based upon a number of factors, including: "a distributor's purchase of programming in a package or a la carte; channel position; importance of location for non-volume reasons;" "contract duration;" and "other legitimate factors as standardly applied in a technology neutral fashion." 47 C.F.R. § 76.1002(b)(1) note 2.

feature of programming contracts, with the largest distributors typically obtaining the lowest subscriber fees, *see, e.g.*, PX0127.

374.    Thus as the FCC explained in its Comcast/NBCU Order, to "facilitate the combined entity's exercise of a uniform-price-increase strategy, Comcast could pay the same fees as its MVPD rivals or could choose to pay the highest fee that NBCU charges a competing MVPD." *FCC Comcast Order*, 26 FCC Rcd. at ¶ 49. "Therefore," the FCC determined, "our program access rules, which address discriminatory pricing, inadequately address the potential harms presented by the increased ability and incentive of Comcast-NBCU to uniformly raise Comcast's rivals' fees." *FCC Comcast Order*, 26 FCC Rcd. at ¶ 49.[18]

375.    Accordingly, and contrary to Defendants' assertion that the United States "didn't have [Shapiro] speak to program access rules," Tr. 4037:9-16, Professor Shapiro properly concluded that the program access rules will not prevent the predicted price increases caused by the proposed merger. Tr. 2328:15–20, 2343:17–18 (Prof. Shapiro). As the largest distributor, and thus the distributor entitled to claim the largest volume discounts, AT&T could raise its own price for Time Warner content and then raise prices to rival MVPDs to that level (or even higher). *Cf. FCC Comcast Order*, 26 FCC Rcd. at ¶ 49. As Professor Shapiro testified at trial,

---

[18] The FCC stated this same conclusion in two previous merger decisions. *See In re Gen. Motors Corp. & Hughes Elecs. Corp., Transferors & the News Corp. Ltd., Transferee* (*FCC News/Hughes Order*), 19 FCC Rcd. 473, ¶ 82 (2004) (stating that "the integrated firm can always raise the internal transfer price of an input so that it equals the price charged to downstream competitors," and that "it may be difficult to detect" price discrimination); *In re Applications for Consent to the Assignment and/or Transfer of Control of Licenses Adelphia Commc'ns* (*FCC Adelphia Order*), 21 FCC Rcd. 8203, ¶ 119, 123 (2006) (stating that "a vertically integrated firm could disadvantage its downstream competitors by raising the price of an input to all downstream firms (including itself) to a level greater than that which would be charged by a non-vertically integrated supplier of the input, and that the program access rules would not prohibit such "stealth discrimination").

"the FCC's own order in Comcast and how they describe the operation of the rules" led him to conclude "that the rules would not prevent the price increases [he] predict[s]." Tr. 2328:24–2329:6 (Prof. Shapiro); *see also* Tr. 2329:15–16 (Prof. Shapiro) ("the key element I think is clear to me just from what the FCC said").[19] Contrary to Defendants' view that the FCC could prevent a post-merger price increase, the FCC recognized in its Comcast/NBCU Order that the program access rules are a non-discrimination regime, not a way for the FCC to control the overall prices of affiliate fees. Tr. 2331:14–17 (Prof. Shapiro).

376.    Although Defendants' program access witness, Professor Katz, did not offer any testimony that the "undue influence" provision would have any impact here, counsel's cross examination of Professor Shapiro suggests Defendants may claim that this provision could be used to address post-merger price increases. Tr. 2330:3–7 (Prof. Shapiro). But this claim would be incorrect as well. When it first adopted the program access rules in 1993, the FCC stated that proving an undue influence claim "may be difficult for the [FCC] or complainants to establish" without a "whistleblower." *FCC Implementation Order*, 8 FCC Rcd. at ¶ 145; *see also DISH Network L.L.C. v. Madison Square Garden, Inc*., 26 FCC Rcd. 6729, ¶ 7 (2011) (FCC rejecting undue influence claim because the complainant failed to allege anything more than common ownership between the MVPD and programmer). Defendants have cited no instance in which the FCC has granted an undue influence claim under the program access rules—in fact there are none—and they have cited nothing to support the supposition that the FCC would or even thinks

---

[19] In light of the FCC's repeated findings on this point, the Defendants' cross examination of Professor Shapiro with a statement from another expert who wasn't called is irrelevant. *See* Tr. 2333:17–21 ("Q: Would the parties take into account the likely outcome of an adjudication of a program access complaint in the event of a disagreement in their bargaining? A: Yes."). The question did not identify what kind of complaint and what likely outcome counsel had in mind, and as asked and answered it merely restates a truism.

it could rely on the undue influence provision to police a post-merger price increase. Indeed, in its News/Hughes and Comcast/NBCU decisions the FCC never mentioned the possibility that the undue influence provision could be pressed into service to prevent a post-merger price increase, instead adopting additional conditions like arbitration. This alone is persuasive evidence that the undue influence provision cannot prevent the predicted price increases here.

### B.    Defendants have not established that any offset for Professor Shapiro's harm calculations is required, nor offered any calculation for such an offset

377.    Although Defendants presented testimony from Professor Katz regarding the program access rules, he was not offered as—and is not—an expert on the program access rules. *See* Tr. 2646:7–9 (Prof. Katz) (offering Katz as an expert in the fields of antitrust economics and industrial organization). Professor Katz admitted that he has not authored a single book chapter, or published a single article that mentioned the program access rules in its title. Tr. 2751:1–6 (Prof. Katz). He admitted to never previously testifying on the program access rules prior to this proceeding. Tr. 2751:9–16 (Prof. Katz). And when asked if he had anything professionally to do with the program access rules since leaving the FCC, Professor Katz could only claim "professional discussions" of some unstated kind, with unstated individuals, that may have occurred more than 20 years ago. Tr. 2751:18–24 (Prof. Katz) (Q: "And as you sit here today, Professor Katz, can you think of anything you have done professionally since leaving the FCC in 1996 having anything to do with the Program Access Regulations?" A: "So I'm having trouble remembering if it was when I was at the FCC or afterwards. I certainly had professional discussions about the Program Access rules, but it may have been while I was there.").[20]

---

[20] In a telecommunications company as large as AT&T, one with a large regulatory staff and which has itself filed complaints under the program access rules, *see e.g.*, *AT&T Services Inc. & Pacific Bell Telephone v. Coxcom, Inc.*, 24 FCC Rcd. 2859 (2009), *AT&T Services, Inc. and Southern New England Telephone Co. v. Madison Square Garden, L.P. & Cablevision Systems*

378.     Professor Katz provided no de novo economic analysis to support a contention that the rules could reduce the harm from this merger. Tr. 2648:21–25 (Prof. Katz). Instead, he admitted that he "largely accepts Professor's Shapiro's analysis at face value and then just focuse[s] on changing…one part." Tr. 2649:5–7 (Prof. Katz). Professor Katz did not point to any actual instance in which a post-merger price increase was prevented solely by the rules, nor did he offer any model or other basis for calculating how much of an offset the program access rules would provide.

379.     Professor Katz offered three criticisms of Professor Shapiro's approach. First, he argued that Professor Shapiro is not predicting a uniform price increase because the predicted price increase percentages are not identical. Tr. 2694:10–2696:6 (Prof. Katz). But this argument ignores both that the program access rules do not require that every video distributor pay the exact same price, *see* 47 C.F.R. § 76.1002(b)(1) note 2, and that when using a model in Comcast/NBCU "very similar to" the one Professor Shapiro is using here, the FCC itself determined the rules would not prevent the price increases predicted by the model. Tr. 2390:12–16 (Prof. Shapiro); *FCC Comcast Order*, 26 FCC Rcd. at ¶¶ 35, 46, app. B ¶ 39 (describing the FCC's use of the Nash Bargaining Model). Thus, as the FCC has recognized, the rules do not prevent the merged firm from engaging in differential pricing or from using its increased post-merger leverage to raise prices in a way that does not run afoul of the non-discrimination provision.

380.     Second, Professor Katz relies heavily on the FCC's statement that a uniform price increase will "not necessarily" violate the current rules, claiming that Turner would have to

---

*Corp.*, 26 FCC Rcd. 13206 (2011), it is telling that AT&T opted to rely here on a witness with no qualifications or experience in this subject.

"gamble" when considering whether the FCC would intervene under the program access rules. Tr. 2696:13–18 (Prof. Katz). However, this argument ignores the FCC's own words in its prior decisions, including Comcast/NBCU. The FCC made clear its belief that "our program access rules are insufficient to remedy the potential harm," *FCC Comcast Order*, 26 FCC Rcd. at ¶ 49, which the FCC determined was "price increases that target MVPD rivals.[21]" *FCC Comcast Order*, 26 FCC Rcd. at ¶ 46. Professor Katz provides no economic evidence to show that the rules have ever prevented a post-merger price increase, nor has he made any effort to calculate how much of a supposed effect the rules have.

381.    Finally, Professor Katz argues that Congress gave the FCC authority to make new rules to prevent anti-competitive actions. Tr. 2696:20–2697:1 (Prof. Katz) (suggesting that "if we [*i.e.*, the FCC] learn that there are actions that need to be addressed, we can change our rules to go after those."). But Professor Katz offers no evidence at all to support the implicit claim that the FCC actually intends to make any such change, or when it might do so.

382.    For all of these reasons, Defendants have not met their burden to demonstrate how much the program access rules would reduce the price increases predicted by Professor Shapiro here, nor have they shown that the rules will reduce the predicted harm from this merger at all. Thus, Professor Shapiro is correct that the program access rules will not prevent the predicted price increases caused by the proposed merger. Tr. 2328:15–20, 2343:17–18 (Prof. Shapiro).

---

[21] As DirecTV has also stated, "[a]s the [FCC] has documented on many occasions, vertical integration of programming and distribution can, if left unchecked, give the integrated entity the incentive and ability to gain an unfair advantage over its rivals. This ultimately results in higher prices and lower quality service for consumers." PX0001-017.

## IX.    DEFENDANTS' UNILATERAL OFFER OF PRIVATE ARBITRATION FAILS TO PRESERVE/RESTORE COMPETITION AND FAILS TO PROTECT THE PUBLIC INTEREST

383.     The United States has alleged that the merger would violate Section 7 of the

Clayton Act by empowering the merged entity to (1) raise the costs of AT&T's rivals, (2) restrict

AT&T's rivals' use of Time Warner's HBO network as a competitive tool, and (3) use the

licensing of content to disadvantage emerging distributor rivals, including in coordination with

Comcast/NBUC. But, as discussed below, Defendants' arbitration offer does not "preserve

competition" lost by this merger or "maintain the premerger level of competition."

384.     In response to the filing of this lawsuit, Turner sent letters to approximately 1,000

video distributors, Tr. 1181:11–13, Tr. 1182:5–7 (Warren/Turner), purporting to offer

distributors "the right to continued carriage of the Turner Networks … pending the arbitration,"

in the event that Turner and the video distributor are unable to agree upon terms of carriage or

renewal terms ("Turner Arbitration Offer"). PX0490; *see also* PX0491.

385.     As an initial matter, the Turner Arbitration Offer addresses only the United

States' allegation that the merger would result in Turner's increased bargaining leverage and

incentives to raise prices and disadvantage rival video distributors. *See* Tr. 1182:8–18

(Warren/Turner). Since it is the only remedy Defendants have proposed, Defendants have failed

to address the other theories of competitive harm and cannot claim that their arbitration offer

meets their burden as to those claims.

386.     Moreover, Defendants have not shown that the Turner Arbitration Offer remedies

any harm, since they have failed to offer any empirical evidence or quantify any claimed

benefits. Rather, Defendants rely solely on the expert testimony of Professors Carlton and

Katz—neither of whom was offered as an expert on arbitration—for criticisms of the United

States' economic evidence and the testimony of market participants. Although Professor Katz's testimony was offered to support the Turner Arbitration Offer, he is not an expert on arbitration. Tr. 2708:25–2709:24, 2732:8–11 (Prof. Katz) (Professor Katz has never served as an arbitrator in a final offer arbitration; never published an article or book chapter with arbitration in the title; and never had a grant to study arbitration); Tr. 2709:10–24 (Prof. Katz) (Professor Katz has not listed on his CV any case in which he testified in court on the subject of arbitration, and since leaving the FCC in 1996 has not done anything professionally on arbitration other than review literature).

### A. The Turner Arbitration Offer fails to remedy the harm caused by AT&T's post-merger incentives to disadvantage rival video distributors

387.    Contrary to Defendants' repeated assertion that Professor Shapiro had no opinions about their arbitration remedy, *e.g.* Tr. 4052:7–8 (Defendants' Closing Statement ), he testified that arbitration would not replace market outcomes and would not alter the incentives created by the merger. Tr. 2280:16–2281:12, 2282:16–25 (Prof. Shapiro); *see also*; PX0001-017 (DirecTV stating to the FCC that, "[a]s the [FCC] has documented on many occasions, vertical integration of programming and distribution can, if left unchecked, give the integrated entity the incentive and ability to gain an unfair advantage over its rivals. This ultimately results in higher prices and lower quality service for consumers."). Only a structural remedy adequately addresses the incentive problem present post-merger. *See* Tr. 2282:16–25 (Prof. Shapiro). The Turner Arbitration Offer merely attempts to constrain the merged firm's ability to act on its anticompetitive incentives. *Cf.* PX0486 ███████████████████████████████ ███████████████████████████████████████████ For the reasons articulated below, it fails to do even that.

1. **Neither the "standstill" provision nor the "shadow of arbitration" preserves competition or otherwise eliminates Turner's post–merger leverage**

388.    To obtain a "standstill" under the Turner Arbitration Offer, a distributor is required to invoke arbitration. *See* Tr. 2325:20–2326:8 (Prof. Shapiro); PX0491. But third-party distributor testimony demonstrates that distributors have concerns about invoking arbitration under its terms. Tr. 277:14–279:6, 279:25–281:3, 445:25–446:23 (Schlichting/DISH); Tr. 1352:14–1353:20, 1406:4–12 (Montemagno/Charter); Tr. 111:1–112:21 (Fenwick/Cox) (standstill "alone does not . . .give this agreement any weight for [Cox]."); *see infra* IX.A.2.

389.    In fact, only about 20 out of 1,000 distributors have accepted the Turner Arbitration Offer to date, and Turner has not received a signed acceptance from a distributor with over a million subscribers. Tr. 1181:6–1182:4 (Warren/Turner).

390.    Arbitration does not constrain Turner if distributors are unwilling to invoke it because of the potential risks. *See* Tr. 2281:13–18 (Prof. Shapiro). Moreover, since this unwillingness is now public as a result of testimony in open court, neither Turner nor third-party distributors are—contrary to Professor Katz, Tr. 2651:17–2653:11 (Prof. Katz) — negotiating in the "shadow of arbitration."

2. **Experience with Comcast/NBCU reflects that arbitration is risky and video distributors are unlikely to invoke it**

391.    Past experience with the Comcast/NBCU consent decree demonstrates that video distributors view arbitration as a risky endeavor. *See, e.g.*, Tr. 273:17–274:19 (Schlichting/DISH) (DISH considered the risks involved with arbitration under the Comcast/NBUC order, and ultimately did not submit a final offer and agree to be bound by arbitration); *see also* Tr. 273:20–25 (Schlichting/DISH) (likened arbitration to a "noose" that DISH would be "put[ting] [its] head in" because of the risk that arbitration would carry); Tr.

2104:7–14 (Sejen/Cable ONE) (testifying that Cable ONE "never seriously considered" invoking arbitration under the Comcast/NBCU Order because it did not want to be "saddled with a contract" whose terms it did not know).

392.     For instance, while DISH did file a notice of arbitration with Comcast/NBCU, it did not include Sling, as it "did not want to put Sling at that sort of risk" in arbitration. Tr. 274:5–15 (Schlichting/DISH); *see also* Tr. 445:25–446:23 (Schlichting/DISH) (explaining that Sling faces risks in arbitration because it is "a unique model" and "could get blown up . . . just because there isn't another one like it out there"). However, under the terms of the Turner Arbitration Offer, any dispute for Turner content would involve both its satellite as well as its Sling businesses. Tr. 275:7–276:8 (Schlichting/DISH).

### 3.     Arbitration presents risk and information asymmetry for distributors, making them less likely to invoke arbitration

393.     Video distributors are reluctant to invoke arbitration for a variety of reasons, including the existence of risk and informational asymmetries that favor Turner.

394.     *Informational asymmetry*: Distributors must submit final offers without knowing what other MVPDs of similar stature and size pay to Turner. *See* Tr. 1352:14–1353:20 (Montemagno/Charter); Tr. 1184:22–1185:4 (Warren/Turner); Tr. 2943:2–6 (Holanda/RCN) (explaining that in baseball–style arbitration, RCN would not have sufficient information and "would be going [into arbitration] blindly without knowing what other distributors of similar size or scope would be paying upon which to make a decision to arbitrate").

395.     Defendants' counsel liken this criticism of the Turner Arbitration Offer to a game of poker, insinuating that distributors merely want to see Turner's cards first before placing their bet. Tr. 2967:24–2968:9 (Holanda/RCN). In Major League Baseball arbitration, the team owners

and the players all know the salaries of the baseball players going into the arbitration.[22]

Conversely, the Turner Arbitration Offer does not allow for discovery before final offers have to

be made. *See* Tr. 1353:10–12 (Montemagno/Charter) ("I have to blindly submit terms when I

have no transparency or visibility with what their other arrangements are and they have all that

knowledge."); Tr. 2942:21–2943:17(Holanda/RCN); *see also* Tr. 1408:3–1409:10

(Montemagno/Charter).

396.    Further, post-merger, nothing in the Turner Offer would prevent Turner from

obtaining AT&T's contracts with other programmers, thereby increasing Turner's informational

advantage. *See* Tr. 2718:17–20 (Prof. Katz).

397.    *Risk asymmetry*: Distributors also face greater risks than programmers. Tr. 278:7–

11 (Schlichting/DISH) ("It's not as risky for them as it is for us. We're going to put our business

at risk, and, you know, my view of the other side, they put monthly fees at risk for a while….

[T]hey're not putting their entire business at risk."); *see* Tr. 1352:19–1353:20, 1408:25–1409:10

(Montemagno/Charter) (noting distributor-specific terms that are tailored to individual

companies' unique features not being addressed by the arbitration offer and noting that Charter

might be handed "terms that we possibly couldn't even perform").

### 4.    Distributors do not view the Turner Arbitration Offer as a viable remedy to their concerns with the merger

398.    None of the distributors who addressed this point view the Turner Arbitration

---

[22] In contrast with actual "baseball arbitration," in which player salaries and player statistics are widely available, the detailed contracts between Turner and MVPD distributors have been admitted under seal in this lawsuit because they are highly variable and contain highly confidential information. *See* ███████████████████████████████████████████████████████████████████████████ Thus, MVPDs and content providers possess significantly different information about the fundamental value of the Turner networks being arbitrated.

Offer as a viable remedy in this case. Tr. 109:25–110:2 (Fenwick/Cox) (calling the offer "a very

one sided agreement in favor of Turner," and "really not something that [Cox] viewed as a

helpful tool"); Tr. 111:24–112:21 (Fenwick/Cox); Tr. 275:7–276:8 (Schlichting/DISH); Tr.

2104:7–2105:13 (Sejen/Cable ONE) (in the context of discussing negotiations with

Comcast/NBCU); Tr. 1352:14–1353:20 (Montemagno/Charter) (testifying that the Turner

Arbitration Offer is deficient in a number of respects, including that it does not cover HBO or the

sports networks); Tr. 2941:6–21 (Holanda/RCN) (testifying that the Turner Arbitration Offer is

"missing some very fundamental things" and is too narrow in scope, in that it does not include

HBO and regional sports networks).

### 5. The omission of HBO and other content creates a "hammer" for Turner to use in negotiations

399.   The absence of HBO in the Turner Arbitration Offer undercuts the effectiveness

of the arbitration mechanism. Each of the distributors who addressed this point view the

omission of HBO from the Turner Arbitration Offer as a serious deficiency. *See* Tr. 111:16–23

(Fenwick/Cox); Tr. 280:18–25(Schlichting/DISH); Tr. 1352:14–1353:20 (Montemagno/Charter);

Tr. 2941:6–23 (Holanda/RCN). While Defendants claim that HBO and Turner negotiations

differ, and rarely come up at the same time, this testimony is in tension with other aspects of

Defendants' own testimony and is at odds with that of third-party MVPD witnesses. *Compare*

Tr. 3129:9–3130:19 (Bewkes/Time Warner) (claiming Turner and HBO affiliate contracts

usually do not come up for renegotiation at the same time, but noting that in "certain cases, if we

can, we would" coordinate the timing of the contracts, to avoid allowing distributors to "divide

and conquer"), *with* Tr. 258:10–16, 384:18–25 (Schlichting/DISH) (discussing coterminous

agreements for Turner networks, including HBO). The omission of HBO from the arbitration

offer provides Time Warner with a "hammer"–"leverage outside of the arbitration" by "which [it

could] affect the arbitration." Tr. 280:22–23 (Schlichting/DISH).

400.    The evidence shows that the concern that HBO's leverage remains outside of the arbitration is well-founded. Post-merger, Turner will pursue a strategy that will maximize AT&T's overall profits. Time Warner has demonstrated that it will make sacrifices in its HBO negotiations in order to benefit its Turner negotiations, because the company's overall leverage is maximized by linking the two. *See supra* IV.B.3.a. Previously, as a result of the merger between Time Warner and Turner in 1997, an FTC consent decree prevented Time Warner from linking the negotiations of HBO and Turner. But after that decree ended, Time Warner has linked the two negotiations so as to maximize both Turner's and HBO's leverage. PX0090.

401.    Nothing in the Turner Arbitration Offer prevents the merged firm from continuing this existing strategy and thus use HBO to undermine a distributor's attempt to enter arbitration for the Turner networks. Nothing in the offer prevents Turner from aligning its negotiations with HBO's, to the detriment of rival video distributors. *See* PX0491; Tr. 1015:22–24 (Breland/Turner). And nothing in the Turner offer prevents the merged firm from refusing to continue negotiations on HBO or even allowing the HBO agreement to expire and blacking out HBO for a distributor in a Turner arbitration. Tr. 2739:13–19 (Prof. Katz). This "hammer" of HBO leverage could force a distributor to withdraw from Turner arbitration, exposing it to being blacked out on the Turner networks too and vitiating any benefit the arbitration offer might have offered.

**B.  The Turner Arbitration Offer is not designed to and does not preserve competition**

402.    The Turner Arbitration Offer is not designed to and will not preserve the benefits of the negotiations that would have occurred but for the merger. Rather, the arbitrator must decide which of the two proposals most closely approximates "fair market value." PX0491-004;

*see also* Tr. 276:9–18 (Schlichting/DISH). This would fail to preserve competition for the following reasons.

### 1. "Fair Market Value" is undefined and not used by market participants in the ordinary course of business

403. The Turner Arbitration Offer does not define "fair market value." Though it contains eighteen defined terms, "fair market value" is not one of them. PX0491-005; *see* Tr. 1205:13–22 (Warren/Turner). The evidence shows that market participants do not understand what "fair market value" means in the context of carriage agreement negotiations, nor is it a term that they use in the ordinary course of business. Tr. 1205:23–1206:1 (Warren/Turner) (Turner's lead negotiator testifying that "fair market value" is not a term that he uses in the ordinary course of business); Tr. 1674:9–14 (York/AT&T) (DirecTV's chief content officer testifying that he does not use the term "fair market value" in connection with his carriage contracts); Tr. 276:9–18 (Schlichting/DISH) (he does not really understand what "fair market value" means).

404. The only testimony Defendants offered on the definition of "fair market value" was from Professor Katz, who testified that a "natural interpretation" of "fair market value" was for the arbitrator to "replicate the balance of power absent the merger." Tr. 2655:12–2657:6 (Prof. Katz). No industry participants supported Professor Katz's definition, Tr. 2711:21–2712:2 (Prof. Katz), nor was Professor Katz aware of any instance in which an arbitrator had adopted his definition of "fair market value" in any arbitration conducted under a prior FCC merger order. Tr. 2713:5–19 (Prof. Katz). And nothing in the Turner Arbitration Offer would prohibit the merged firm from arguing for a definition of "fair market value" that would yield terms more advantageous to the merged firm than Professor Katz's proposed definition. *See* Tr. 2712:18–2713:4 (Prof. Katz).

405. But even if an arbitrator were to accept Professor Katz's definition of "fair market

value," neither final offer submitted by the distributor or by Turner would represent the terms that would have been agreed to in the "but-for" world. *See* Tr. 2739:20–2740:3, 2742:15–2743:2 (Prof. Katz). Professor Katz himself conceded that the process would only get fair market value "on average." Tr. 2680:25–2682:4 (Prof. Katz). This outcome fails to preserve competition.

### 2. The complexity and multi-dimensionality of carriage agreements makes baseball-style arbitration an ill-suited merger remedy

406.    Unlike arbitration in baseball, where the player's salary is the only term in dispute, carriage agreements between programmers and video distributors are complex, lengthy agreements containing price and numerous non-price terms. *See* Tr. 2728:19–2729:12 (Prof. Katz); *see also* PX0409. *See supra* IV.B.2.a. Professor Katz testified that only two terms need to be aligned in the final offer carriage agreements—the networks being arbitrated, and the length of a contract, *see* Tr. 2727:2–15 (Prof. Katz), which means that any number of other terms important and unique to a distributor's business could be in dispute when arbitrating any individual contract.

407.    Often, non-price terms are as important, if not more important than the price terms. *See* Tr. 111:3–15 (Fenwick/Cox) (explaining that one of the problems with the proposed arbitration mechanism is that it "fails to ask the arbitrator to focus on all of the other super critical, I can't express enough, critical components of the transaction," including non-price terms such as "TV Everywhere" rights, set-top box data, and various "technical terms and conditions"); Tr. 276:19–277:4 (Schlichting/DISH) (Schlichting spends about 80 percent of time in negotiations negotiating with programmers on terms *other* than rate);[23] Tr. 1352:19–1353:20

---

[23] *See also* Tr. 440:17–441:7 (Schlichting/DISH) (explaining that in the retransmission consent context, where the distributor is negotiating with a local broadcast affiliate, baseball-style arbitration makes sense because there are "easy comparables" and the dispute is typically about just one issue: the contract rate).

(Montemagno/Charter) (summing up the complexity of the agreements by noting that "these agreements are so intricate and they're often on noneconomic terms, they're often tailored to specific and uniqueness (sic) about the particular distributor").

408.     Previously, even under a consent decree, a vertically-integrated firm has caused harm using non-price terms. "[C]ustomers loved" RCN's Broadcast Basic, a low-cost, skinny bundle that RCN packaged with broadband internet. Tr. 2916:2–2917:5 (Holanda/RCN). After its merger with Comcast, NBCU imposed more stringent penetration requirements on RCN, which made it hard for RCN to sell Broadcast Basic in competition with Comcast. Tr. 2920:13–2921:15, 2977:22–2978:1 (Holanda/RCN). After RCN was no longer able to sell that level of service, Comcast entered the marketplace with its own package to compete in the space that RCN exited. *See* Tr. 2921:10–15, 2917:13–15 (Holanda/RCN).

409.     An arbitrator must pick the proposed final offer carriage agreement that most closely approximates "fair market value." *See* PX0491-004 § C.7 & -005 § D.6. However, the arbitrator lacks the opportunity to analyze each critical condition and to choose some provisions from each offer because it is an "all or nothing proposal." Tr. 110:22–25 (Fenwick/Cox). Accordingly, distributors are concerned with the final offer style of arbitration. Tr. 445:25–446:23 (Schlichting/DISH) (explaining that it is a "high risk proposition to put your entire business in the hand of a single arbitrator who may or may not understand your business, understand your contract, understand the gives and takes"); *see also* Tr. 447:16–448:5 (Schlichting/DISH) ("So coming in cold and reading documents that's (sic) kind of been presented here just doesn't do it justice nor does it capture the hundreds of millions of dollars, you know, maybe more that we've paid on satellite to actually create this skinny bundle that we believe is good for the consumer.").

### 3. The arbitrator has no instruction on which benchmarks to use as comparable data points

410.    The Turner Arbitration Offer does not specify which comparables an arbitrator should use in trying to determine "fair market value." While Professor Katz claimed that there are "a lot of benchmarks," Tr. 2658:7 (Prof. Katz), nothing instructs the arbitrator as to which benchmark to use. *See* Tr. 2717:1–19 (Prof. Katz). Nothing in the Turner Arbitration Offer prohibits a party from advocating for the benchmark that would be most advantageous to it. *See* Tr. 2720:13–2721:7 (Prof. Katz). Moreover, few—if any—truly comparable contracts exist for an arbitrator to use as a benchmark, particularly for innovative product offerings. *See* Tr. 277:14–278:3, 445:25–447:15 (Schlichting/DISH). Because the arbitrator needs benchmarks, arbitration actually tends to constrain innovations in contracting too. For example, AT&T believed that ███ did not want to provide an OTT MFN against ███ until after the Comcast NBCU decree sunsetted because to do so would create a "marketplace condition" —a benchmark. PX0487; Tr. 1667:2–13, 1668:15–19 (York/AT&T).

411.    *Comcast/NBCU* is inapposite because of DirecTV's nationwide footprint. *See* Tr. 271:6–9 (Schlichting/DISH); Tr. 860:12–17 (Rigdon/Comcast). Thus, any agreements the merged firm negotiates with video distributors post-merger will be tainted by the anticompetitive incentives created by the merger and would not be suitable comparables.

412.    Notwithstanding Professor Katz's optimism, *see* Tr. 2657:7–13 (Prof. Katz), he has never negotiated a program licensing agreement, Tr. 2753:24–2754:11 (Prof. Katz). DISH's Schlichting, who *has* negotiated such agreements, testified that there is "no one in the industry he would trust to decide the fate of his business." Tr. 234:11–15, 447:16–448:5 (Schlichting/DISH).

### 4. The arbitration mechanism would result in a time-consuming and expensive form of regulation by litigation.

413.    Finally, arbitrations conducted under the Turner Arbitration Offer are likely to be

complex and to resemble a full trial. *See* Tr. 2732:12–2734:14 (Prof. Katz). This is a time-consuming process that turns the arbitrators into regulators, setting rates in the market. *See* Tr. 2385:25–2386:17 (Prof. Shapiro) ("[A]rbitration, it's not quite government regulation, but it's a form of regulation where you've got some arbitrators who are setting rates in the market.").

414.    It is also expensive, especially for smaller video distributors. Moreover, and in contrast to the FCC's Comcast/NBCU Order,[24] there is no provision permitting smaller distributors to arbitrate collectively under the terms of the Turner Arbitration Offer. *See* PX0491, *e.g.,* PX0491–003 § A, PX0491–005 § D.4. No AT&T or Time Warner witness testified that the merged firm would allow a bargaining agent such as NCTC to arbitrate collectively on behalf of its members.

## C.    The Turner Arbitration Offer suffers from other deficiencies

415.    Defendants have likened the proposed arbitration in the Turner Arbitration Offer to the arbitration remedy set forth in the FCC Comcast/NBCU Order and DOJ Consent Decree. *See* Tr. 2650:11–2651:16 (Prof. Katz). The Turner Arbitration Offer, however, suffers from a number of deficiencies in comparison.

### 1.    The Turner Arbitration Offer does not cover all of the merged firm's content

416.    All networks that Comcast owned prior to the merger, including several regional sports networks, were subject to the conditions imposed by the FCC Comcast/NBCU Order. *FCC Comcast Order*, 26 FCC Rcd. at ¶¶ 10, 36–38 (explaining that such content was included because the combination of NBCU's programming and Comcast's regional sports networks could harm rival video distributors post-merger).

---

[24] *See FCC Comcast Order*, 26 FCC Rcd. at app. A, § VII (explicitly permitting a "bargaining agent" to arbitrate on behalf of MVPDs with 1.5 million or fewer subscribers).

417.    But the Turner Arbitration Offer does not include all content owned by either

Defendant. As testified to by a number of distributors, the Turner Arbitration Offer does not

include the AT&T regional sports networks or HBO. Tr. 1352:14–1353:20

(Montemagno/Charter); Tr. 2941:15–23 (Holanda/RCN).[25]

### 2.    The Turner Arbitration Offer does not include important oversight

418.    In contrast to the Comcast/NBCU Order (and other prior arbitration conditions

adopted by the FCC), the Turner Arbitration Offer is a private, unsupervised process that

provides much less protection to distributors. In Comcast/NBCU, the FCC and this Court entered

complementary orders designed to work together in an effort to avoid anticompetitive effects:

this Court's order governed disputes with Online Video Distributors ("OVDs"), and the FCC's

order governed disputes with MVPDs and OVDs. *See United States v. Comcast Corp.*, No. 1:11-

cv-00106, 2011 WL 5402137 (D.D.C. Sept. 1, 2011); *FCC Comcast Order*, 26 FCC Rcd. at ¶ 4.

Under the Turner Arbitration Offer, the FCC would not have oversight over Turner arbitration

proceedings, and distributors would not benefit from the right to obtain the FCC's de novo

review of any arbitration award. Tr. 2704:1–16 (Prof. Katz); 26 FCC Rcd. at app. A, § VII ("A

party aggrieved by the arbitrator's final award may file with the Commission a petition seeking

*de novo* review of the award."). Moreover, this Court is eliminated from hearing any appeal of

the arbitration or any of the distributor's concerns if the merged firm fails to honor and abide by

this offer. Tr. 2704:1–16 (Prof. Katz). Additionally, the Antitrust Division will not have an

oversight role. *See* PX0491. Thus, enforcement of an arbitration offer intended to remedy a

Clayton Act violation would be turned over solely to private actors working through private

---

[25] The transcript refers to "RCNs," where the intended meaning was RSNs, regional sports
networks. *See* Tr. 2511:2 (Prof. Carlton) (defining RSNs).

contracts, leaving the public interest without an advocate or guardian.

419.    Also, in contrast to the FCC's Comcast/NBCU Order and the Court's Consent

Decree adopted in that case, the Turner Arbitration Offer does not include any prohibitions

against Turner's ability to discriminate, retaliate or punish a video distributor from exercising its

rights under those decrees, or in this case, from invoking arbitration. *See FCC Comcast Order*,

26 FCC Rcd. at 126–27; *Comcast*, 2011 WL 5402137, at *10.

420.    Moreover, the FCC's order provided substantive rights that are not present in the

Turner Arbitration Offer, such as permitting small distributors to seek appointment of an

independent bargaining agent to act as a representative during arbitration. *FCC Comcast Order,*

26 FCC Rcd. at 131–32.

### 3.    The seven-year term of the Turner Arbitration Offer is too short

421.    The Turner Arbitration Offer lasts seven years. PX0491-002, at ¶ 6. But affiliation

agreements between content providers and distributors are often long-term, so the number of

opportunities for a distributor to avail itself of the arbitration offer would be limited. █████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ This

would give the merged firm the opportunity to structure future rounds of long term contracts to

game the arbitration process. Accordingly, as RCN's Holanda testified, the seven-year term is

not long enough. Tr. 2942:8–11 (Holanda/RCN). Additionally, the outcome of arbitration results

in a 3-year contract term, which Fenwick views as too short. Tr. 112:5–9 (Fenwick/Cox).

422.    Moreover, when the Turner Arbitration Offer expires, the harm to competition

caused by the merger may remain. *See* PX0011 (AT&T discussing the expiration of

Comcast/NBCU decree "means that NBCU can choose not to license content online to some players or may discriminate on price."). This time-limited nature is a fundamental weakness of conduct remedies. The merger would fundamentally change the market structure and dynamic and present new anti-competitive incentives for the post-merger AT&T, and there is no way to ensure that the risk of harm from will have dissipated in seven years.

### 4.    The Turner Arbitration Offer does not eliminate the potential for a "blackout"

423.    Per its terms, Turner's commitment to continue carriage of Turner content is dependent upon the distributor continuing to meet its obligations under the arbitration agreement. *See* PX0491, at Arbitration Procedures § B.1 ("Upon receiving timely notice of the Claimant's intent to arbitrate, Turner will allow carriage of the Turner Networks…as long as the Claimant continues to meet the obligations set forth in this Agreement.") While Warren of Turner testified that a distributor could "walk away" if it were "no longer interested in proceeding with the arbitration," Tr. 1199:22-1200:11 (Warren/Turner), the distributor would no longer be in compliance with its obligations under the arbitration agreement and Turner could impose a blackout.

### 5.    The Turner Arbitration Offer contains limited appeal rights.

424.    A distributor has limited rights to appeal an arbitrator's decision under the Turner Arbitration Offer. Specifically, the arbitrator's decision is binding and the distributor is committed to abide by the arbitrator's result subject only to any right of appeal under the Federal Arbitration Act. *See* PX0491, at ¶ 3 ("The decision of the arbitrator shall be binding on the parties and Turner shall abide by the arbitrator's decision, subject to any right of appeal pursuant to the Federal Arbitration Act.").

425.    In addition, a distributor that invokes arbitration under the Turner Arbitration

Offer would forfeit its right to any FCC dispute resolution process. *See* PX0491, at Arbitration Procedures § C.9 ("Arbitration under this Agreement is not available if a dispute between a Claimant and Turner concerning the same bundle of Turner Networks is the subject of any Federal Communications Commission dispute resolution process. Nor may Federal Communications Commission dispute resolution processes be utilized during or after arbitration regarding the same bundle of Turner Networks under this Agreement.").

> **6.  The law and venue governing disputes about the Turner Arbitration Offer will vary, and Defendants cannot show that it is irrevocable or enforceable in all cases.**

426.     The Turner Arbitration Offer letter does not itself address choice of law. *See* PX0490.

427.     Every Turner Arbitration Offer letter admitted into evidence originated from Turner's headquarters in Atlanta, Georgia. *See, e.g.*, PX0437 (letter to Cox, also located in Atlanta, Georgia); PX0490 (letter to DISH); DX0785 (letter to NCTC).

428.     The Turner Arbitration proposed agreement, attached to the offer letter, does not specify any choice of law or forum; while it does provide that any "choice of law" provision from the distributor's existing Turner agreement would apply, PX0491 ¶ 7, it has no provision for forum selection. And both the choice of law and venue are entirely unaddressed for any new distributor (such as a new virtual MVPD) seeking Turner content.

429.     Further, assuming an underlying network carriage agreement exists and that it contains a choice of law provision, even then the applicable law governing the Turner Arbitration Offer will vary between distributors. For ▮▮▮▮ Georgia law would apply, whereas for ▮▮▮▮ New York law would apply. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Given differences between state law and the different

venues for hearing disputes, the proposed remedy for this merger may be interpreted differently for different MVPDs.

430.    For the reasons stated above, Defendants' remedy does not and cannot redress the violations from this merger or preserve or restore the competition lost.

Dated: May 8, 2018

MAKAN DELRAHIM
Assistant Attorney General for Antitrust

ANDREW C. FINCH
Principal Deputy Assistant Attorney General

DONALD G. KEMPF, JR.
Deputy Assistant Attorney General for
Litigation

PATRICIA A. BRINK
Director of Civil Enforcement.

DAVID B. LAWRENCE
Counsel to the Assistant Attorney General

CAROLINE J. ANDERSON
Counsel to the Assistant Attorney General

SCOTT SCHEELE
Chief, Telecommunications and Broadband
Section

JARED A. HUGHES
Assistant Chief, Telecommunications and
Broadband Section

Respectfully submitted,

/s/ Craig Conrath
CRAIG CONRATH
ERIC D. WELSH (D.C. Bar #998618)

ALVIN H. CHU
DAVID J. SHAW
SANFORD ADLER
SHOBITHA BHAT
NATHAN BRENNER
ALEXIS BROWN-REILLY
DYLAN CARSON
MARISA DIEKEN
ROBERT DRABA
JULIE ELMER
CAMERON GOWER
ELIZABETH GUDIS
JENNIFER HANE
JUSTIN HEIPP
JOHN HOGAN
ELIZABETH JENSEN
MATTHEW JONES
CERIN M. LINDGRENSAVAGE
MELANIE M. KISER
KATHRYN KUSHNER
BRENT MARSHALL
DANIEL MONAHAN
SOMADINNA NWOKOLO
SARAH OLDFIELD
LAUREN RIKER
ANNA SALLSTROM
LISA SCANLON
RUEDIGER SCHUETT
MATTHIEW SIEGEL
CURTIS STRONG
FREDERICK S. YOUNG
RACHEL ZWOLINSKI

U.S. Dept. of Justice, Antitrust Division
450 Fifth Street, NW, Suite 7000
Washington, DC 20530
Phone: (202) 514-5621
Email: craig.conrath@usdoj.gov

*Attorneys for United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2018, I caused a true and correct copy of the foregoing to be served upon the parties of record via the Court's CM/ECF system.

Dated: May 8, 2018                    Respectfully submitted,

/s/ Craig Conrath
Craig Conrath

U.S. Dept. of Justice, Antitrust Division
450 Fifth Street, NW, Suite 7000
Washington, DC 20530
Phone: (202) 532-4560
Email: craig.conrath@usdoj.gov

*Attorney for United States of America*