**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
-------------------------------------------------------------- x
                                                    :
THE UNITED STATES OF AMERICA,                       :
                                                    :
                              Plaintiff,            :
                                                    :
               - v. -                               :    No. 1:17-cv-2511-RJL
                                                    :
AT&T INC., ET AL.,                                  :
                                                    :
                              Defendants.           :
                                                    :
-------------------------------------------------------------- x
```

**MOTION FOR LEAVE BY RCN TELECOM SERVICE, LLC, GRANDE
COMMUNICATIONS NETWORKS, LLC, AND WAVEDIVISION HOLDINGS, LLC,
AND AMERICAN CABLE ASSOCIATION TO FILE A BRIEF AS AMICI CURIAE IN
SUPPORT OF NEITHER PARTY**

  */s/ Joseph D. Wilson*
Joseph D. Wilson (D.C. Bar #466652)
Edward A. Yorkgitis (D.C. Bar # 418904)
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
jwilson@kelleydrye.com
cyorkgitis@kelleydrye.com

*Counsel for Proposed Amici*

## INTRODUCTION

Amici, RCN Telecom Service, LLC, Grande Communications Networks, LLC, and WaveDivision Holdings, LLC[1] (collectively, "RCN") and the American Cable Association ("ACA"), respectfully moves for permission to file the attached brief *amici curiae* in support of neither party.  Amici inquired by email dated May 14, 2018 as to whether the parties consented to the filing of this brief.  The U.S. Department of Justice ("DOJ") had no objection to such filing.  Defendants have not responded to Amici's request.

## I.      Identity of Amici[2]

RCN is the sixth largest cable company and the eleventh largest multichannel video programming distributor ("MVPD") in the United States.  RCN also offers broadband Internet access services and voice service.  In the video and broadband distribution markets, RCN competes with AT&T/DirecTV, and it purchases video programming from Time Warner subsidiaries.  In virtually all markets where it operates, RCN competes with vertically integrated distributors, including Comcast-NBC Universal ("Comcast-NBCU") in several of its largest markets.  RCN's Chief Executive Officer, James Holanda, who testified at trial in this matter, is a member of the Board of Directors for the National Cable Television Cooperative ("NCTC"), which has some 800 operator (distributor) members.  NCTC acts as a buying group for these members to negotiate with and obtain video content from programmers, including Defendant Time Warner entities.

---

[1]      RCN Telecom Service, LLC, Grande Communications Networks, LLC, and WaveDivision Holdings, LLC are affiliated entities owned by Radiate HoldCo, LLC.

[2]      Pursuant to Local Rule 7(o)(5), Amici affirm that no counsel for a party authored this brief in whole or in part and that no person other than Amici, their members, or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

ACA has approximately 700 small and medium-sized independent cable, phone, and fiber-to-the-home operator members, including RCN, all of whom are members of NCTC and most of whom provide service in smaller communities and rural areas.[3]  All ACA members compete in the video programming market with DirecTV, and a large number compete with AT&T in the video programming and broadband markets.  All ACA members carry video programming from Time Warner entities, obtained either through direct negotiations or agreements negotiated by NCTC.  ACA members also compete in the video and broadband distribution markets with Comcast-NBCU and carry NBCU programming, obtained either through direct negotiations or NCTC agreements.  As a result of its members' interests and those of NCTC, ACA has consistently advocated for full and fair competition, including to the DOJ in the transaction before the Court and to the DOJ and Federal Communications Commission ("FCC" or "Commission") in the 2011 Comcast-NBCU transaction,[4] so its members can continue to provide affordable video, broadband, and phone services to some seven million homes across the United States.  ACA members, including RCN, were covered by the arbitration and standstill conditions in the FCC decision approving the Comcast-NBCU transaction.

## II.     Amici's Interest

Amici bring a broad, industry-wide perspective to the issues before the court.  RCN competes directly with AT&T/DirecTV in all markets in which it operates and purchases video programming from Time Warner.  ACA has long sought to protect the interests of smaller video operators against anti-competitive harms caused by vertically integrated video distributors and

---

[3]     The vast majority of ACA members have fewer than 5,000 video subscribers.

[4]     *See Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc. For Consent to Assign Licenses and Transfer Control of Licensees*, MB Docket No. 10-56, Memorandum Opinion and Order, 26 FCC Rcd. 4238 (Jan. 18, 2011) (hereinafter, "FCC Comcast-NBCU Order")

programmers.  Amici are concerned that parties have presented the Court with limited options to address the harms resulting from the vertical combination of the Defendants (AT&T/DirecTV and Time Warner).   The DOJ has presented the Court with an all-or-nothing proposal:  namely, that if the Court finds a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, it may consider only the structural remedies proposed by the DOJ.  According to DOJ, behavioral relief, such as some sort of arbitration and standstill obligations, *e.g.*, a variation of those adopted by the FCC in the Comcast-NBCU merger, is not appropriate because of the risk of "government entanglement in the market" and "greater long-term costs."  DOJ Trial Br. at 24.  The Defendants, on the other hand, contend that the standstill and arbitration offer from Time Warner's subsidiary, Turner Broadcasting, (the "Turner Offer") constitutes a sufficient "commitment" that the Court should account for in finding the proposed transaction causes no harm – even though the offer is an effective acknowledgement of harm and was not agreed to by virtually any parties to whom it was offered.

Amici submit this brief to emphasize that the Court should, upon finding that the proposed combination is likely to result in substantial harm to competition, use its broad discretion to fashion appropriate relief and to impose, instead of or in addition to any structural remedy proposed by the DOJ, a behavioral remedy that provides a robust arbitration and standstill process.  The remedy advanced by Amici in their brief provides straightforward but significant improvements on the Turner Offer, is tailored to the expected harms of the merger, and avoids excessive Court or other government entanglement.

## CONCLUSION

Amici respectfully request that the Court grant this motion, allow them to participate in this action as *amici curiae*, and accept for filing the attached brief.

Date:  May 14, 2018

 /s/ Joseph D. Wilson
Joseph D. Wilson (D.C. Bar #466652)
Edward A. Yorkgitis (D.C. Bar # 418904)
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
Email: jwilson@kelleydrye.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2018, I filed this motion with the United States District

Court for the District of Columbia using the CM/ECF system, which will cause it to be served

on all counsel of record.

Dated: May 14, 2018

                       */s/ Joseph D. Wilson*
                       Joseph D. Wilson (D.C. Bar #466652)
                       Edward A. Yorkgitis (D.C. Bar # 418904)
                       KELLEY DRYE & WARREN LLP
                       3050 K Street, N.W., Suite 400
                       Washington, DC 20007
                       (202) 342-8400 (phone)
                       (202) 342-8451 (facsimile)
                       JWilson@kelleydrye.com
                       CYorkgitis@kelleydrye.com

                       *Counsel for Proposed Amici*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
----------------------------------------------------------------- x
                                                    :
THE UNITED STATES OF AMERICA,                       :
                                                    :
                            Plaintiff,              :
                                                    :
              - v. -                                :    No. 1:17-cv-2511-RJL
                                                    :
AT&T INC., ET AL.,                                  :
                                                    :
                            Defendants.             :
                                                    :
----------------------------------------------------------------- x
```

## BRIEF OF RCN TELECOM SERVICES, LLC, GRANDE COMMUNICATIONS NETWORKS, LLC, AND WAVEDIVISION HOLDINGS, LLC, AND AMERICAN CABLE ASSOCIATION AS AMICI CURIAE IN SUPPORT OF NEITHER PARTY

Joseph D. Wilson (D.C. Bar #466652)
Edward A. Yorkgitis (D.C. Bar # 418904)
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
JWilson@kelleydrye.com
CYorkgitis@kelleydrye.com

*Counsel for Proposed Amici*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTEREST OF AMICI CURIAE ........................................................................................... 1

INTRODUCTION AND SUMMARY ................................................................................... 3

RELEVANT BACKGROUND .............................................................................................. 5

      A.     FCC's Program Access Rules ............................................................... 5

      B.     The Safeguard Conditions Imposed on the Comcast-NBCU Merger ................... 6

      C.     The Defendants Extend the Turner Offer to Distributors .................................... 7

ARGUMENT ........................................................................................................................ 9

I.      THE COURT HAS BROAD DISCRETION TO FASHION A BEHAVIORAL REMEDY ...................................................................................................... 9

II.     THE COURT SHOULD CONSIDER A BEHAVIORAL REMEDY THAT ADDRESSES THE TURNER OFFER'S DEFICIENCIES. ........................................ 12

      A.     The Turner Offer Provides an Insufficient Remedy .......................................... 13

      B.     Proposed Improvements to the Turner Offer ..................................................... 16

      C.     The Proposed Behavioral Remedy Addresses DOJ's Primary Objections ......... 18

CONCLUSION .................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*E.I. du Pont de Nemours*,
    353 U.S. 586, 590 (1957 ............................................................................................. 11

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) ...................................................................................................... 3

*Ford Motor Co. v. United States*,
    405 U.S. 562 (1972) .................................................................................................... 11

*Int'l Salt Co., Inc. v. United States*,
    332 U.S. 392 (1947) .................................................................................................... 10

*New York v. Microsoft Corp.*,
    224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004) ................ 4, 10, 11

*Porter v. Warner Holding Co.*,
    328 U.S. 395 (1946) ................................................................................................ 4, 10

*United States v. Coca-Cola Bottling Co.*,
    575 F.2d 222 (9th Cir. 1978) .................................................................................. 9, 10

*United States v. First Nat. City Bank*,
    379 U.S. 378 (1965) ............................................................................................ 4, 10, 13

*United States v. Phillips Petroleum Co.*,
    367 F. Supp. 1226 (C.D. Cal. 1973), *aff'd mem.*, 418 U.S. 906 (1974) ................................ 10

**Statutes**

1992 Cable Act, 47 U.S.C. § 548 ........................................................................................ 5, 6

1992 Cable Act, § 628 ........................................................................................................... 5

Section 3 of the Clayton Act ................................................................................................ 10

Section 7 of the Clayton Act, 15 U.S.C. § 18 .............................................................. 2, 3, 10

**Other Authorities**

*Applications of Comcast Corporation, General Electric Company and NBC
    Universal, Inc. For Consent to Assign Licenses and Transfer Control of
    Licensees*, MB Docket No. 10-56, Memorandum Opinion and Order, 26 FCC
    Rcd. 4238 (Jan. 18, 2011) .................................................................................. *passim*

*General Motors Corporation and Hughes Electronic Corporation, Transferors,*
  *and The News Corporation Limited, Transferee*, Memorandum Opinion and
  Order, 19 FCC Rcd 473 (2004)..............................................................................................7

Local Rule 7(o)(5)..................................................................................................................1

Order, ECF No. 62...............................................................................................................17

## INTEREST OF AMICI CURIAE

Amici are RCN Telecom Service, LLC, Grande Communications Networks, LLC, and WaveDivision Holdings, LLC[1] (collectively, "RCN") and the American Cable Association ("ACA").[2]

RCN is the sixth largest cable company and the eleventh largest multichannel video programming distributor ("MVPD") in the United States. RCN also offers broadband Internet access services and voice service. In the video and broadband distribution markets, RCN competes with AT&T/DirecTV, and it purchases video programming from Time Warner subsidiaries. In virtually all markets where it operates, RCN competes with vertically integrated distributors, including Comcast-NBC Universal ("Comcast-NBCU") in several of its largest markets. RCN's Chief Executive Officer, James Holanda, who testified at trial in this matter, is a member of the Board of Directors for the National Cable Television Cooperative ("NCTC"), which has some 800 operator (distributor) members. NCTC acts as a buying group for these members to negotiate with and obtain video content from programmers, including Defendant Time Warner entities.

ACA has approximately 700 small and medium-sized independent cable, phone, and fiber-to-the-home operator members, including RCN, all of whom are members of NCTC and most of whom provide service in smaller communities and rural areas.[3] All ACA members compete in the video programming market with DirecTV, and a large number compete with

---

[1]     RCN Telecom Service, LLC, Grande Communications Networks, LLC, and WaveDivision Holdings, LLC are affiliated entities owned by Radiate HoldCo, LLC.

[2]     Pursuant to Local Rule 7(o)(5), Amici affirm that no counsel for a party authored this brief in whole or in part and that no person other than Amici, their members, or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

[3]     The vast majority of ACA members have fewer than 5,000 video subscribers.

AT&T in the video programming and broadband markets.  All ACA members carry video programming from Time Warner entities, obtained either through direct negotiations or agreements negotiated by NCTC.  ACA members also compete in the video and broadband distribution markets with Comcast-NBCU and carry NBCU programming, obtained either through direct negotiations or NCTC agreements.  As a result of its members' interests and those of NCTC, ACA has consistently advocated for full and fair competition, including to the U.S. Department of Justice ("DOJ") in the transaction before the Court and to the DOJ and Federal Communications Commission ("FCC" or "Commission") in the 2011 Comcast-NBCU transaction,[4] so its members can continue to provide affordable video, broadband, and phone services to some seven million homes across the United States.  ACA members, including RCN, were covered by the arbitration and standstill conditions in the FCC decision approving the Comcast-NBCU transaction.

Should the proposed combination of AT&T/DirecTV and Time Warner be consummated without adequate remedies to address the substantial harms, it would harm consumer welfare by enabling the merged entity to raise prices for its programming to ACA members in excess of those that would occur in a competitive market.  As explained herein, Amici are concerned that the remedies proffered in this case by the parties present an all-or-nothing choice, with no middle ground, and the parties overstate their claims that the Court has limited authority and discretion to impose another solution.  The DOJ has told the Court that if it finds a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, it may consider only the structural remedies proposed by the DOJ.  On the other hand, Defendants' (Turner Broadcasting's) November 2017 proposed

---

[4]     *See Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc. For Consent to Assign Licenses and Transfer Control of Licensees*, MB Docket No. 10-56, Memorandum Opinion and Order, 26 FCC Rcd. 4238 (Jan. 18, 2011) (hereinafter, "FCC Comcast-NBCU Order")

arbitration and standstill agreement offer to distributors ("Turner Offer") is so lacking in many material aspects that it is insufficient to address the harms from the proposed transaction. Not only has DOJ noted these shortcomings at length, but virtually no distributors have agreed to the offer. Amici submit this brief to emphasize that the Court has broad discretion to fashion a remedy and to impose, instead of or in addition to any structural remedy that it might order, a behavioral remedy that provides a robust arbitration and standstill process. The remedy proposed by Amici provides straightforward but significant improvements on the Turner Offer, is tailored to the expected harms of the merger, and avoids excessive Court or other government entanglement. More specifically, Amici's arbitration and standstill remedy would –

- Apply to all video programming managed and controlled by the post-merger entity,
- Address information asymmetries in the arbitration process,
- Ensure smaller distributors could use a bargaining agent and be entitled to fee shifting if they prevail,
- Prevent retaliatory actions against rivals' broadband subscribers, and
- Permit mid-course corrections to and extension of the remedy.

For these reasons, consideration of Amici's proposed remedy is in the public interest and will serve to meet the obligation "to protect the public from further anticompetitive conduct." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170 (2004).

## INTRODUCTION AND SUMMARY

Amici submit this brief in favor of neither party and with the starting assumption that the merger violates Section 7 of the Clayton Act as argued by the DOJ because its effect "may be to

substantially lessen competition" and as effectively conceded by the Defendants.[5]  Amici submit

two points concerning the remedy the Court might impose in the event it finds such a violation.

*First*, the Court has broad discretion to fashion a remedy, whether structural or

behavioral.  DOJ's preferred remedies—either an injunction blocking the merger or a

divestiture—are entitled to deference but still are only two options in a wider range.  As the

Supreme Court has stated, unless otherwise provided by statute, "all the inherent equitable

powers of the District Court are available for the proper and complete exercise of [equitable]

jurisdiction," and that in matters—such as this—implicating the public interest rather than a

purely private controversy, "those equitable powers assume an even broader and more flexible

character."  *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

*Second*, a behavioral remedy should be fashioned in lieu of, or in tandem with, a

structural remedy.  The Court's exercise of its equitable powers is not designed to be punitive,

and the remedy should therefore be no harsher than necessary to accomplish effective relief.  *See*

*New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 99–100 (D.D.C. 2002), *aff'd*, 373 F.3d 1199

(D.C. Cir. 2004) (stating that "[e]quitable relief in an antitrust case should not embody harsh

measures when less severe ones will do").  Tailoring the remedy to the facts of this case can

permit the transaction to go forward with the benefits anticipated by Defendants, while

preventing the merged entity from inflicting anti-competitive harm.  At the same time, the Court

should recognize that mere acquiescence in and reliance upon the terms of the Turner Offer is

---

[5]     Amici particularly disagree with Defendants' characterization of the Turner Offer as a
"commitment" (as opposed to a remedy intended to prevent or address harm).  Defendants'
characterization is belied by the fact that the Turner Offer is based on the FCC's Comcast-
NBCU arbitration and standstill condition, which was premised on the FCC's finding of harm
from the transaction.  *See* FCC Comcast-NBCU Order, ¶ 3 ("This transaction would effectuate
an unprecedented aggregation of video programming content with control over the means by
which video programming is distributed to American viewers offline and, increasingly, online
as well. The harms that could result are substantial.").

completely insufficient to address the harms and would produce a worse outcome than DOJ's preferred structural remedy.  Amici therefore propose herein another option to the Turner Offer and DOJ's remedy that addresses the Turner Offer's shortcomings as well as resolves many of DOJ's criticisms of it.

**RELEVANT BACKGROUND**

Without recounting the full background of this matter, Amici note certain information relevant to this brief, in particular, the relevant portions of the FCC program access rules ("Rules"), the safeguard conditions imposed on the Comcast-NBCU transaction, and the key terms and deficiencies of the Turner Offer.

### A.     FCC's Program Access Rules

The Rules were promulgated in 1992 as mandated by Congress to provide a set of safeguards to address congressional concerns that cable-affiliated vertically integrated program suppliers could (and would try to) favor their affiliated cable operators at the expense of competitors, new entrants, and new technologies.[6]

Section 628 of the Cable Act made it

> unlawful for a cable operator, a satellite cable programming vendor in which a cable operator has an attributable interest, or a satellite broadcast programming vendor to engage in unfair methods of competition or unfair or deceptive acts or practices, the purpose or effect of which is to hinder significantly or to prevent any multichannel video programming distributor from providing satellite cable programming or satellite broadcast programming to subscribers or consumers.[7]

---

[6]      *See* FCC Comcast-NBCU Order ¶ 34.

[7]      47 U.S.C. § 548(b).  The purpose of Section 628 is to promote the public interest, convenience, and necessity by increasing competition and diversity in the multichannel video programming market, to increase the availability of satellite cable programming and satellite broadcast programming to persons in rural and other areas not currently able to receive such programming, and to spur the development of communications technologies.  1992 Cable Act § 2(a)(5), 47 U.S.C. § 548(a).

The 1992 Cable Act mandated that the Commission promptly issue regulations to specify conduct that is prohibited by Section 628(b).[8]   In particular, the rules prohibit discrimination by a cable-affiliated programmer in the "prices . . . terms and conditions of sale or delivery" of such programming "among or between cable systems, cable operators, or other multichannel video programming distributors, or their agents or buying groups."[9]

Notwithstanding its Rules, in practice over the past twenty-six years, the FCC often has found it necessary to impose additional safeguards as conditions for approving certain vertical transactions between MVPDs and video programming networks.  FCC Order ¶ 35.  In deciding to impose such safeguards, the FCC determined that the vertical integration of certain video program networks with a particular MVPD would harm competition and enhance the integrated MVPD's market power despite the Commission's Rules.  *Id.*  In short, the Commission determined that the Rules were not enough to prevent (or remedy) potential harm from vertical mergers.[10]

### B.    The Safeguard Conditions Imposed on the Comcast-NBCU Merger

Of relevance to the present matter, in granting approval of the Comcast-NBCU merger on January 18, 2011,  the FCC concluded that its Rules were insufficient to remedy the potential harm in the transaction.  It therefore conditioned its approval on Comcast-NBCU taking affirmative steps to prevent the vertically integrated firm from harming competition in the video programming marketplace.  The core condition was the establishment of an arbitration process

---

[8]      *Id.* § 548(c)(1).  The Congress prescribed certain minimum elements of the regulations. *Id.* § 548(c)(2).  Among the critical flaws of the program access rules is that they do not guarantee continued carriage while a dispute is pending and would not bar a uniform pricing strategy under the ban on discrimination.  *See* FCC Comcast-NBCU Order, ¶ 49.

[9]      *See* Section 628(c)(2)(B).

[10]      Additionally, the Rules effectively prevent NCTC to act as an authorized bargaining agent and invoke them on behalf of its members.

for resolving disputes with rival MVPDs about prices, terms, and conditions for licensing

Comcast-NBCU's video programming.  In addition, the FCC required a standstill provision

prohibiting Comcast-NBCU from removing any of its programming (or "going dark") while the

arbitration process was underway.[11]  These conditions, which remained in effect for seven years,

also included the following aspects that are relevant to the instant case:

> (1) *Extension of Arbitration Standstill to All Programming*. The FCC extended the arbitration and standstill remedy to all video programming that Comcast-NBCU managed or controlled[12] for the simple reason that if it did not, the merged entity could engage in shifting valuable programming from a network subject to the arbitration and standstill condition to one that is not.  In such an event, rivals would have no arbitration remedy with respect to such "shifted programming" when they failed to reach a licensing agreement with reasonable prices, terms, and conditions.

> (2) *Bargaining Agent and Fee Shifting for Smaller Operators*.  The FCC allowed MVPDs with 1.5 million or fewer subscribers to appoint a bargaining agent to negotiate on their behalf for carriage of programming, and to invoke arbitration on their behalf.  Additionally, because the FCC recognized that the cost of pursuing arbitration would outweigh the benefit that a small MVPD might receive from prevailing, any MVPD with 600,000 or fewer subscribers (or its bargaining agent) that prevailed in arbitration was entitled to recover its legal fees and costs of arbitration.

FCC Order ¶¶ 50-54, 58.

### C.    The Defendants Extend the Turner Offer to Distributors

In November 2017, after this case was filed, Defendant Turner Broadcasting sent

distributors the Turner Offer, a unilateral offer conditioned on the merger closing.  Defs.

---

[11]    This was not the first instance in which the FCC imposed an arbitration and standstill condition as a remedy to address harms from a vertical combination.  *See e.g., General Motors Corporation and Hughes Electronic Corporation, Transferors, and The News Corporation Limited, Transferee*, Memorandum Opinion and Order, 19 FCC Rcd 473 (2004).  In each instance where the FCC imposed this remedy, it modified the terms to address flaws it found in the previous terms and generally improve the viability of the remedy.

[12]    *See* FCC Comcast-NBCU Merger Order, Appendix A.  "C-NBCU Programmer means Comcast, C-NBCU, their Affiliates and any entity for which Comcast or C-NBCU manages or controls the licensing of Video Programming and/or any local broadcast television station on whose behalf Comcast or NBCU negotiates retransmission consent."

Proposed Findings of Fact and Conclusions of Law, ECF No. 120 (hereinafter, "Def. FOF"), ¶ 205.  While the Turner Offer ostensibly is based on the conditions in the FCC's order approving the Comcast-NBCU merger, there are notable exceptions.

Like the Comcast-NBCU merger conditions imposed by the FCC, the Turner Offer contains provisions committing Turner Broadcasting to allow distributors to submit disputes over the prices and other terms of programming to binding arbitration and to guarantee continued access to that programming while arbitration is pending (i.e. an arbitration and standstill).  *Id*. The Turner Offer also has a seven-year term, applies to both traditional and online distributors, including virtual MVPDs, and applies to existing Turner networks and any of its future networks consisting of substantially the same programming.  Def. FOF ¶¶ 215-17.

Unlike the Comcast-NBCU conditions, however, the Turner Offer does not cover all programming that the merged entity will manage or control post-merger, including, most notably, HBO.  Tr. of Bench Trial Proceedings ("Tr.") at 2941:20-21 (Holanda/RCN testimony). This omission is significant to distributors such as RCN, for whom HBO is the most-viewed premium network and the second-most subscribed channel.  Tr. at 2911:5-6 (Holanda/RCN testimony).  Moreover, the Turner Offer does not authorize a smaller distributor to use a bargaining agent in arbitration[13] or to be compensated for its arbitration costs should the distributor seek arbitration on its own and prevail.

Further, the Turner Offer shares a fundamental failing of the Comcast-NBCU merger conditions that undermines the value of the arbitration standstill remedy:  it leaves unaddressed an information asymmetry prior to the start of the arbitration process and submission of final offers that greatly advantages the vertically-integrated programmer.  Specifically, while the

---

[13]     Defendants assert in their Post-Trial Brief that NCTC can be a party to the Turner Offer. Def. Post-Trial Brief, p. 24.  Amici note that NCTC received the Turner Offer.

arbitrator is to choose an offer of one of the two parties that best reflects fair market value, a distributor is required to submit its final offer without knowing what other MVPDs, especially those of comparable size, pay to Turner Broadcasting for the programming in dispute.  Proposed Findings of Fact of the United States, ECF No. 128 ("DOJ FOF"), ¶ 394.  On the other hand, prior to making its final offer, Turner Broadcasting knows how much all MVPDs in the market pay for its programming.

The Turner Offer also includes the same arbitrary term (seven years) as the Comcast-NBCU conditions, which permits it to end even if concerns about anti-competitive harms remain, and it does not permit adjustments during the pendency of the conditions to correct shortcomings.

Given the deficiencies, virtually none of distributors agreed to the Turner Offer (as written), not seeing it as a viable remedy to address the harms from the proposed transaction.  DOJ FOF ¶ 398.  RCN in particular has consistently expressed the view that: (i) the Turner Offer did not include key provisions of the Comcast-NBCU arbitration and standstill remedy; and (ii) the Comcast-NBCU conditions did not go far enough in preventing or remedying harm from the merger; and therefore regarded any offer that fell short of those conditions in the instant case as an insufficient remedy.  Tr. at 2941:6-14 (Holanda/RCN testimony) (explaining that the Turner Offer was "a good start" but "missing some very fundamental things . . . that we've learned through our experiences with Comcast-NBC").

## ARGUMENT

## I.    THE COURT HAS BROAD DISCRETION TO FASHION A BEHAVIORAL REMEDY.

The Court's equity jurisdiction permits it to craft "broad and flexible decrees molded to the necessities of the individual case." *United States v. Coca-Cola Bottling Co.*, 575 F.2d 222,

227–28 (9th Cir. 1978) (collecting cases detailing the Court's expansive powers in equity to design a remedy upon finding a Section 7 violation); *United States v. Phillips Petroleum Co.*, 367 F. Supp. 1226, 1261-62 (C.D. Cal. 1973), *aff'd mem.*, 418 U.S. 906, 94 (1974).  This is true particularly when the Court exercises its equity jurisdiction "to enforce federal statutory prohibitions." *Id.*, 1228; *see also Porter*, 328 U.S. at 398 ("[T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command."); *United States v. First Nat. City Bank*, 379 U.S. 378, 383 (1965) ("In such cases courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.").

Courts adjudicating antitrust cases apply their inherently flexible powers to fashion an appropriate remedy with special care because "the end to be served is not punishment of past transgression nor is it merely to end specific illegal practices," but rather to "effectively pry open to competition a market that has been closed by defendants' illegal restraints."  *Int'l Salt Co., Inc. v. United States*, 332 U.S. 392, 400-01 (1947) (interpreting Section 1 of the Sherman Act and Section 3 of the Clayton Act).  If a resulting decree "accomplishes less than that, *the Government has won a lawsuit and lost a cause.*" *Coca-Cola Bottling Co.*, 575 F.3d at 229 (citing *Int'l Salt Co., Inc.*, 332 U.S. at 400-01) (emphasis added)).

This does not mean, however, that the Court should approve the most extreme measure for "prying open" or preserving competition, and, in fact, the remedy affirmed by the Court in *International Salt* did not "mandate a divestiture of the defendant's assets or a structural division of the defendant, but merely regulated the terms pursuant to which the defendant could engage in its business of leasing or selling the salt machines." *Microsoft Corp.*, 224 F. Supp. 2d at 108

(citing *Int'l Salt Co., Inc.*, 332 U.S. at 398, n. 7).  The Government's larger cause would thus be

lost if the decree goes too far and over-corrects, veering into apparent punishment and using a

sledgehammer when a finer instrument would do.  *See id.* at 100 (stating that a remedy "should

be tailored to fit the wrong creating the occasion for the remedy" and "as specific as possible, not

only in the core of its relief, but in its outward limits, so that parties may know[ ] their duties and

unintended contempts may not occur.").  The Court's discretion to choose among a variety of

remedies is therefore essential to protecting the public from anti-competitive harm without

undermining the apparent benefits of the transaction.

　　　Both sides in this case surely recognize this well-established principle, yet each has, at

various points, intimated that the Court's discretion is more limited.  In response to this Court's

direction to the parties that they discuss options for such remedies, Defendants declined to do so.

Defs. Post-Trial Br. 22-24.  Defendants further suggested that the Court would only create

"confusion" by imposing any remedy other than divestiture, such as modifying the Turner Offer,

because the government would argue on appeal that under cases like *Ford Motor Co. v. United*

*States*, 405 U.S. 562 (1972) and *E.I. du Pont de Nemours*, 353 U.S. 586, 590 (1957), "all doubts

as [to] the remedy are to be resolved in the government's favor."  Defs. Post-Trial Br. at 23.  In

fact, although the Turner Offer would seem to be a type of remedy, if imposed by the Court,

Defendants have denied that it is to be viewed as any sort of "remedy" the Court might impose

rather than a "real world economic fact" the Court must consider in the first instance in deciding

whether there would be cognizable anticompetitive harm from the proposed merger.  *Id.*  As a

result, they have provided no options to the Court in the event it finds a violation other than those

proposed by DOJ.

DOJ, for its part, has insisted on a structural remedy and uses a single case law quotation as punctuation for any discussion as to remedy.  *See* Post-Trial Br. of the United States, ECF No. 126 ("DOJ Trial Br.") at 23 (stating that "all doubts as to the remedy as to be resolved in [the government's] favor"); Tr. at 4018 (government summation) (same).  According to DOJ, behavioral relief, such as some sort of arbitration and standstill obligations, i.e. a variation of those adopted by the FCC in the Comcast-NBCU merger, is not appropriate here because of the risk of "government entanglement in the market" and "greater long-term costs."  DOJ Trial Br. at 24.

Despite its current position reflected in its Post-Trial Brief, DOJ has previously acknowledged the Court's discretion to consider and craft remedies other than what it proposed. In its brief opposing DirecTV's Motion to Dismiss, DOJ noted that, while it sought to block the merger in its entirety, its Complaint also asked the Court to grant "such other and further relief as the case requires and the Court deems just and proper," which, it stated, "explicitly recognizes the Court's inherent authority to craft a range of possible alternative remedies. . . . ."  Pl. Opp. Mot. Summ. J., ECF No. 118, at 6.  Given that the Court has such authority, the public interest is best served by considering and choosing from a range of remedies, both structural and behavioral.

## II.     THE COURT SHOULD CONSIDER A BEHAVIORAL REMEDY THAT ADDRESSES THE TURNER OFFER'S DEFICIENCIES.

The parties offer only an all-or-nothing approach to the Court.  The Defendants want the Court to allow the transaction to proceed without any remedy and instead rely on a self-constructed remedy (the Turner Offer) that is less than what the Government has applied in the past and disregards the flaws in prior remedies.  DOJ wants the Court to block the merger entirely or force divestiture of Turner or DirecTV as a condition of the merger.  While Amici

recognize the deficiencies of the Turner Offer, they submit that their proposed modifications will adequately address DOJ's criticisms of the Turner Offer (and behavioral remedies in general), will prevent the anti-competitive effects of the merger, and comprise a remedy that is no more severe than necessary.

## A.     The Turner Offer Provides an Insufficient Remedy

DOJ and Amici agree that there are numerous deficiencies in the Turner Offer.  *See* DOJ FOF ¶¶ 387-430.  Overall, the Turner Offer provides fewer conditions restricting discriminatory conduct than those imposed on the Comcast-NBCU merger and is therefore a step backward.  Tr. at 2941:8-12 (Holanda/RCN testimony).  An acceptable remedy would, at a minimum, capture the most significant conditions on Comcast-NBCU merger and correct the clear shortcomings that DOJ and distributors have identified with the benefit of experience.  Set forth below are the most significant deficiencies in the Turner Offer based on Amici's experience with the Comcast-NBCU merger.

*First*, the Turner Offer fails to cover all video programming that the merged entity will manage or control post-merger, particularly HBO/Cinemax.  Tr. 2941:6-21 (Holanda/RCN).  *See also* DOJ FOF ¶¶ 416-17 (criticizing the Turner Offer for failing to cover all of the merged firm's content).  There is no reason to depart from the Comcast-NBCU condition that all programming managed or controlled by the merged-entity is covered by the arbitration and standstill provisions.  The Commission's rationale for requiring complete coverage in the earlier merger applies with equal force here.  Absent such a requirement, the merged entity could shift valuable programming (*e.g.*, March Madness) from Turner to another network outside of the scope of the arbitration standstill provisions (*e.g.*, HBO), which would eliminate the benefit the condition was intended to provide.  *See* FCC Order ¶¶ 52-53 (explaining that the merged entity could shift marquee programming to uncovered networks to the detriment of rivals).

*Second*, the Turner Offer's proposed arbitration process fails to provide an aggrieved rival MVPD with adequate information as to programming prices, terms, and conditions before making a final offer.  DOJ FOF ¶ 394.  Specifically, it requires that a video distributor submit its final offer without having access to data and information that an arbitrator would deem most relevant when making a determination about fair market value – data and information that the merged entity will already have – namely, the programming prices, terms, and conditions that the merged entity has agreed to with other video distributors *for the very same programming at issue in the arbitration*.  As RCN's CEO Jim Holanda explained, "We have no information . . . so we would be going blindly without knowing what other distributors of similar size or scope would be paying upon which to make a decision to arbitrate."  Tr. 2942:21-2943:6.  The availability of baseball-style arbitration is intended to drive the parties to an equitable agreement because it is assumed that both parties have an equal "threat" of prevailing, but that is only the case if the distributor will have access to the same information as the merged entity before making its final offer.  Without that information, the ultimate value of the arbitration and standstill, and its effectiveness as a remedy, is fundamentally questionable.

*Third*, the Turner Offer fails to accommodate smaller distributors who may be less able to bear the costs of commercial arbitration, "thus rendering the remedy of less value to them."  FCC Order ¶ 58.  To address this issue in Comcast-NBCU, the FCC permitted smaller operators to appoint a bargaining agent to invoke arbitration on their behalf, and allowed operators with fewer than 600,000 video subscribers to recover their fees and costs if they were the prevailing parties in arbitration against NBCU-Comcast.  *Id.*; DOJ FOF ¶ 420.  The Turner Offer, however,

does not expressly extend to bargaining agent associations such as the NCTC and provide for fee shifting.[14]

*Fourth*, the Turner Offer fails to prohibit retaliatory and punitive conduct by the merged entity against its rivals' high-value broadband subscribers.  This is a concern given that broadband subscribers increasingly obtain their video programming from online sources (streaming or on-demand) in lieu of, or in addition to, traditional cable (offline) sources.  If, for instance, the merged entity and distributor fail to reach a licensing agreement to carry any of the merged entity's video programming, the merged entity could block access by the distributor's broadband subscribers to such programming not only through the distributor video interface, but also through open and public means available to all other broadband subscribers, such as through a Turner Broadcasting or HBO website.  *See* Tr. 2934:7-14 (Holanda/RCN testimony) ("Just in terms of some real-world analogies, we have concerns that if HBO is only available through HBO Now or over -- provided only over the Internet, that a competitor could block IP addresses and prevent our customers from getting those services over-the-top like we saw Viacom do against Suddenlink and Cable ONE when they dropped the Viacom programming along with some smaller operators.").  Such punitive conduct toward a distributor's broadband subscribers could drive them to switch operators of both video and broadband services to avoid this retaliatory blocking and therefore also harm the distributor.  *See* Tr. 2954:20-22 (Holanda/RCN testimony) (stating that "[b]roadband customers are two to four times more profitable today than video customers.").

---

[14]     As discussed earlier, Defendants assert that the Turner Offer could be invoked by NCTC; however, Defendants have failed to address the specifics of NCTC's involved and the omission of the other small operator provisions.

*Finally*, the Turner Offer sunsets after an arbitrary period - seven years - which DOJ and Amici agree is inadequate. DOJ FOF ¶ 421; Tr. 2942:8-11 (Holanda/RCN). Although the term matches that of the Comcast-NBCU decree, the term of that decree has likewise met with criticism for being insufficient. DOJ FOF ¶ 422. *See also* Letter from Thomas Cohen, Counsel for RCN, to Marlene Dortch, Secretary, FCC (Dec. 11, 2017) (on file with FCC) ("Because the rationale supporting harm to competition and consumers in the Comcast-NBCU Order continues, an 'unleashed' Comcast-NBCU is certain to wreak havoc in the market, undermining rival distributors and harming consumers throughout the country.").

### B. Proposed Improvements to the Turner Offer

The deficiencies of the Turner Offer are significant but easily corrected. Amici thus propose the following amendments to the Turner Offer to make it a sufficiently robust and appropriately tailored behavioral remedy to prevent anti-competitive harms from the merger while retaining the Defendants' anticipated benefits.

(1) *Coverage*: The arbitration standstill remedy should cover all AT&T/Time Warner programming managed or controlled by the post-merger entity at any time during the term of the consent decree.

(2) *Bargaining Agent and Fee Shifting*: Smaller distributors should expressly be permitted to use a bargaining agent, such as the NCTC, to negotiate for programming rights as well as to invoke arbitration on its members' behalf. This would address the fact that smaller distributors may be less able to bear the costs of commercial arbitration than larger MVPDs, thus rendering the remedy of less value to them. Those with fewer than one million subscribers (or

their agents) should also be permitted to recover fees as prevailing parties in any arbitration with the merged entity.[15]

(3) *Arbitration Information Asymmetry*:  The parties should exchange information related to programming agreements prior to making final offers.[16]  Specifically, once a competing distributor gives notice of its intent to arbitrate, the merged entity would provide it with information on a confidential basis, including the rates, terms, and conditions in programming agreements with other video distributors, and the competing distributor would provide the post-merger firm on a confidential basis information with the rates, terms, and conditions in agreements for programming it acquires from other programmers.[17]

(4) *Prohibition on Punishing Broadband Subscribers of Competitors*:  The merged entity should be prohibited from engaging in retaliatory or punitive conduct against the distributor's broadband subscribers by blocking access to the entity's content or any other content that other broadband subscribers have access to through an entity's website or other online means.  In other words, the merged entity should not be permitted, especially by leveraging a licensing dispute

---

[15]     *See* FCC Comcast-NBCU Order, Appendix A, Section VII.D., for a complete description of the small operator provisions.  The FCC's condition provided that the fee shifting provision could be used by MVPDs with 600,000 or fewer subscribers.  Amici have increased that number to 1 million to account for more recent information that the costs of arbitration are significantly greater.

[16]     Both the Comcast-NBCU and Turner Offer arbitration processes permit discovery after final offers are submitted.  This discovery process can be used a template for providing access to information prior to the submission of final offers.

[17]     This Court has recognized the potential importance of this information in ordering DOJ to produce programming agreement data from distributors and programmers to Defendants.  *See* Order, ECF No. 62.  Whether and to what extent a distributor's agreements with other programmers is relevant to the fair market value of the merged entity's programming is a matter for the arbitrator to decide, although the burden should be on the merged entity to demonstrate the information is relevant.  Amici neither concede nor deny that relevance here.

against a distributor with which it competes, to target rivals' broadband subscribers for punitive, discriminatory treatment.

(5) *Mid-Term Review and Adjustment*:  The remedy should provide for a mid-term review by the parties and other stakeholders, and permit them to make recommendations to the Court (or an appointed Special Master) concerning changes and a possible term extension.  As DOJ points out, it is difficult for a behavioral remedy to "be detailed enough to cover in advance all the many fashions in which improper influence . . . might manifest itself."  DOJ Trial Br. at 25 (quoting *E.I. du Pont*, 366 U.S. at 334).  Allowing for a mid-course correction addresses this problem without excessive government entanglement at the start.

## C.    The Proposed Behavioral Remedy Addresses DOJ's Primary Objections

Were the Court to craft a remedy in accordance with the Amici's proposed improvements, they submit DOJ's primary objections to a behavioral remedy would be addressed.  DOJ's categorical objection to behavioral remedies—that they are time and resource-intensive for the government—would not apply here because the proposed relief is largely self-effectuating.  Private arbitrators would be used.  The government's role is limited to oversight and a mid-course correction, and the Court would continue to be engaged to protect the public interest.

As for DOJ's specific objections to the Turner Offer, DOJ unnecessarily proliferates them to stack the deck against behavioral remedies generally, ignoring the fact that there is a domino effect to its objections.  For example, two key DOJ criticisms of the Turner Offer are the informational and risk asymmetries in the arbitration process.  DOJ adds that these asymmetries make distributors unlikely to invoke arbitration, and that if distributors are unlikely to invoke it, then arbitration is useless and cannot meaningfully preserve competition.  *See* DOJ FOF ¶¶ 388-397.  However, if one addresses DOJ's primary concerns with arbitration as set out in the Turner

Offer, as the above improvements would do, distributors would be far more likely to avail themselves of the process, and the remedy, in turn, becomes meaningful.  Specifically, if the arbitration process were revised to allow smaller distributors to employ a bargaining agent, to recover arbitration fees, and to permit distributors access to relevant pricing and other information before making final offers, distributors would likely find far greater value in arbitration as a potential remedy, and be more likely to invoke it.  As a result, an appropriately tailored arbitration process would be effective at preserving competition.

Several of DOJ's other objections are easily addressed.  For instance, DOJ attacks the Turner Offer on the basis that "distributors do not view the Turner Arbitration Offer as a viable remedy to their concerns with the merger" (*Id*. at ¶ 398) but fails to note that distributors thought it was a "good start" and *could be* a viable remedy with fixes.  *See, e.g.*, Tr. 2941:6-21 (Holanda/RCN testimony). The proposed remedy also resolves DOJ's objections as to the Turner Offer's failure to include all programming (*see* DOJ FOF ¶¶ 399-401; 416-17), as well as its fixed seven-year term (*Id*. ¶¶ 421-22).  And, of course, if the Court were to *order* the remedy, it would resolve DOJ's objection that the Turner Offer "is a private, unsupervised process."  *Id*. ¶ 418.

Amici acknowledge that the proposed remedy, like the Turner Offer, does not define "fair market value," but this is no deficiency.  In arguing that "fair market value" is undefined, DOJ makes no attempt to explain why this vagueness will affect the arbitration process in a way that will advantage the merged entity. *See id.* ¶¶ 403-05.  Each side in an arbitration will presumably argue for a definition of "fair market value" that it believes would yield terms more advantageous to it.  At the same time, neither will know how the arbitrator will rule, so it remains unclear how omitting a definition of "fair market value" will affect the parties' leverage

in the arbitration.  Absent a clear competitive reason to include such a definition, the proposed

remedy is no worse for the omission.

## CONCLUSION

The Court has broad discretion to fashion an appropriate remedy.  Amici respectfully

request that in lieu of, or in addition to, DOJ's structural remedy, the Court consider a behavioral

remedy that provides straightforward but significant improvements on the Turner Offer, is

tailored to the expected harms of the merger, and avoids excessive Court or other government

entanglement.  This approach ensures that the remedy be no harsher than necessary to

accomplish effective relief without undermining the apparent benefits of the transaction.

Date: May 14, 2018

 */s/ Joseph D. Wilson*
Joseph D. Wilson (D.C. Bar #466652)
Edward A. Yorkgitis (D.C. Bar # 418904)
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
JWilson@kelleydrye.com
CYorkgitis@kelleydrye.com

*Counsel for Proposed Amici*

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
----------------------------------------------------------------- x
                                               :
THE UNITED STATES OF AMERICA,                  :
                                               :
                              Plaintiff,       :
                                               :
                    - v. -                     :        No. 1:17-cv-2511-RJL
                                               :
AT&T INC., ET AL.,                             :
                                               :
                              Defendants.      :
                                               :
----------------------------------------------------------------- x
```

**[PROPOSED] ORDER GRANTING MOTION FOR LEAVE BY RCN TELECOM**
**SERVICE, LLC, GRANDE COMMUNICATIONS NETWORKS, LLC, AND**
**WAVEDIVISION HOLDINGS, LLC, AND AMERICAN CABLE ASSOCIATION TO**
**FILE A BRIEF AS AMICI CURIAE IN SUPPORT OF NEITHER PARTY**

THIS MATTER came before the court on the Motion for Leave by RCN Telecom Service, LLC, Grande Communications Networks, LLC, and WaveDivision Holdings, LLC and the American Cable Association as *amici curiae* in support of neither party.  The Court, having considered the motion and any opposition, HEREBY ORDERS that the motion for leave to file a brief as *amici curiae* is GRANTED.

DATED this _____ day of _____, 2018

_____
The Honorable Richard L. Leon