# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>                    PLAINITFF,<br><br>v.<br><br>AT&T INC.;<br>DIRECTV GROUP HOLDINGS, LLC; AND<br>TIME WARNER, INC.;<br>DEFENDANTS. | Civil Action No. 17-cv-02511<br>(RJL)<br><br>Judge Richard J. Leon |
| JOSEPH M. ALIOTO, Proposed *Amicus Curiae*,<br>appearing *pro se* | |

## MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF

_____*/s/ Joseph M. Alioto*_____
Joseph M. Alioto
Alioto Law Firm
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:  415-434-8900
Facsimile:  415-434-9200
Email:  jmiller@aliotolaw.com

Proposed *Amicus Curiae*, appearing
*pro se*

## INTRODUCTION

Pursuant to Local Civ. Rule 7(o)(1)-(2), Movant, Joseph M. Alioto ("Alioto" or "Movant"), seeks leave to file an *Amicus Curiae* Brief in this case. Alioto's proposed brief makes two main arguments. The *first* concerns sealing and denying public access to portions of the record from the trial in this important and significant antitrust case by virtue of the confidential designation of documents and testimony by AT&T, Time Warner, and other third parties under the Protective Order entered in this case (ECF No. 58). The blanket Protective Order, which was entered by stipulation of the parties, without any specific showing of good cause for its entry as required by Fed. R. Civ. P. 26(c), bars the public from seeing <u>critical</u> evidence of the lessening of competition that <u>may</u> and most probably will flow from the proposed acquisition, impacting <u>millions</u> of Americans.

Alioto's *second* point addresses the legality of the proposed acquisition of Time Warner by AT&T under § 7 of the Clayton Act and provides a perspective on Supreme Court precedent that Alioto argues is binding on this Court. Such an approach to § 7 cases is not offered by any other party or *amicus curiae* in this case. Alioto's proposed *Amicus Curiae* Brief is attached hereto.

The parties have been notified of Alioto's intention to file this Motion. The Department of Justice indicated that it does not oppose the Motion. Counsel for AT&T and Time Warner oppose the Motion. Counsel for DIRECTV did not respond.

## ARGUMENT

### I.    LEAVE TO FILE AN *AMICUS CURIAE* BRIEF SHOULD BE GRANTED

#### A.    Standard Under Local Rule 7(o)

An *amicus curiae* "does not represent the parties but participates only for the benefit of the Court." *Hard Drive Productions, Inc. v. Does 1-1,495,* 892 F. Supp. 2d 334, 337 (D.D.C. 2012) (citations omitted). "The fact, extent, and manner" of participation by the *amicus* is solely within the Court's discretion to determine. *Id.* "An *amicus* brief should normally be allowed when a party is not represented competently or is not represented at all, when the *amicus* has an interest in some other case that may be affected by the decision in the present case…, or when the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Jin v. Ministry of State Sec.,* 557 F. Supp. 2d 131, 137 (D.D.C. 2008) (quoting *Ryan v. Commodity Futures Trading Comm'n,* 125 F.3d 1062, 1064 (7th Cir.1997)).

Local Civ. Rule 7(o)(1)-(2) sets forth the standard for requesting leave to file an *amicus curiae* brief in this District:

> (2) A motion for leave to file an amicus brief shall concisely state the nature of the movant's interest; identify the party or parties supported, if any; and set forth the reasons why an amicus brief is desirable, why the movant's position is not adequately represented by a party, and why the matters asserted are relevant to the disposition of the case. The motion shall state the position of each party as to the filing of such a brief and be accompanied by a proposed order.

### B.    Identity and Interest of the *Amicus Curiae*

Alioto, the proposed *amicus curiae*, prosecutes cases on behalf of private plaintiff litigants, often consumers and small businesses, challenging mergers and acquisitions that "may…substantially lessen competition" in violation of § 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.  Any decision in this case will impact current and future § 7 litigation undertaken by Alioto on behalf of private litigants, because it may be used by other federal district courts as instructive, guiding authority in § 7 litigation.

### C.   The Proposed *Amicus Curiae* Brief Provides a Unique, Unrepresented Perspective and is Relevant to the Disposition of this Case

No other movant or party has opposed the closed antitrust proceedings in this case.  Denial of public access to these proceedings threatens current and future potential § 7 litigation on behalf of private litigants, as it was the intent to Congress that any initial government action could and would be used to assist a later private action.  *Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 319 (1965) (Noting, that, "The Government's initial action may aid the private litigant in a number of other ways. The pleadings, transcripts of testimony, exhibits and documents are available to him in most instances. In fact, the rules of the Commission so provide. 16 CFR s 1.132(e)… Indeed, so useful is this service that government proceedings are recognized as a major source of evidence for private parties.")  Closure of these proceedings threatens to deprive current and future private litigants of important resources Congress intended them to have.  In this sense, Alioto, as a representative of current and future private litigants under § 7 of the Clayton Antitrust Act, will provide an important and unique perspective to the Court that is not represented by any party or *amicus* currently before the Court.

In addition, Alioto's proposed *Amicus Curiae* Brief offers a different perspective on the current state of the law under § 7 of the Clayton Act, 15 U.S.C. § 18.[1]  There is a line of Supreme Court precedent that is binding on this Court, never having been overruled, that requires this Court to enjoin the proposed acquisition.  This view of § 7

---

[1] Alioto's proposed *amicus curiae brief* is submitted in support of the government's case to the extent he argues that the proposed transaction should be enjoined, though he sets forth a view of merger law that differs in some respects from the view represented in the DOJ's Proposed Conclusions of Law.

law is neither developed nor represented by any other party or *amicus curiae* this case.  In this way, Alioto's perspective is unique and highly relevant to material issues upon which this Court's decision may turn.

Alioto will comply with any applicable brief page limitations and all other terms applicable to *amicus* participation, including filing deadlines, and will participate in oral argument only as, and to the extent, the Court may request such argument.

## CONCLUSION

In light of the foregoing, Alioto respectfully requests that this Court grant Alioto's Motion for Leave to File an *Amicus Curiae* Brief.

Respectfully submitted:

Dated:  June 8, 2018

*/s/ Joseph M. Alioto*
Joseph M. Alioto
ALIOTO LAW FIRM
One Sansome Street, 35th Fl
San Francisco, CA 94104
Telephone:  415-434-8900
Facsimile:  415-434-9200
Email:  jmiller@aliotolaw.com

Proposed *Amicus Curiae*, appearing *pro se*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of June 2018, I provided service of the foregoing Motion for Leave to file an *Amicus Curiae* Brief to all counsel of record via the Court's CM/ECF system.

*/s/ Joseph M. Alioto*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>              PLAINITFF,<br><br>v.<br><br>AT&T INC.;<br>DIRECTV GROUP HOLDINGS, LLC; AND<br>TIME WARNER, INC.;<br>DEFENDANTS.<br><br>―――――――――――――――<br><br>JOSEPH M. ALIOTO, Proposed *Amicus Curiae*,<br>appearing *pro se* | Civil Action No. 17-cv-02511<br>(RJL)<br><br>Judge Richard J. Leon |

<u>*AMICUS CURIAE* **BRIEF OF JOSEPH M. ALIOTO**</u>
<u>**IN SUPPORT OF THE UNITED STATES OF AMERICA**</u>
<u>**FOR AN ORDER ENJOINING THE PROPOSED ACQUISITION**</u>

          */s/ Joseph M. Alioto*
Joseph M. Alioto
Alioto Law Firm
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone: 415-434-8900
Facsimile: 415-434-9200
Email: jmiller@aliotolaw.com

Proposed *Amicus Curiae*, appearing
*pro se*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Local Rule 7(o)(5) and FRAP 29(a)(4) and 26.1, there is no parent corporation or publicly held corporation that owns 10% or more of the stock of the proposed *amicus curiae*.

## STATEMENT OF *AMICUS CURIAE* INDEPENDENCE

Pursuant to Local Rule 7(o)(5) and FRAP 29(a)(4)(E), Joseph M. Alioto states that:

(i)     no party's counsel authored the brief in whole or in part;

(ii)    no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and

(iii)   no person—other than the *amicus curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................................II

STATEMENT OF *AMICUS CURIAE* INDEPENDENCE ................................................III

TABLE OF AUTHORITIES .............................................................................................V

INTRODUCTION AND INTEREST OF THE *AMICUS CURIAE* ....................................1

ARGUMENT....................................................................................................................2

      I.     THE SEALING OF CRITICAL EVIDENCE AND PORTIONS OF
           THESE ANTITRUST PROCEEDINGS DEPRIVES THE PUBLIC
           AND FUTURE PRIVATE LITIGANTS OF MATERIAL EVIDENCE
           THAT CONGRESS INTENDED THEM TO HAVE ................................2

           A.     All Evidence and Testimony Upon Which this Court Will Base
                   Its Decision is Inaccessible to the Public ..........................................2

           B.     There is a Presumption in Favor of Open, Public Access to
                   Trials ..................................................................................................3

           C.     Congress Intended Private Antitrust Litigants to Have Access to
                   the Evidence this Court will Weigh in Rendering its Decision .......5

      II.    UNDER EXISTING SUPREME COURT PRECEDENT,
           THE PROPOSED ACQUISITION SHOULD BE ENJOINED..................6

      III.   THE TRANSACTION ELIMINATES COMPETITION FROM AT&T
           IN THE PROGRAMMING MARKET .....................................................11

      IV.   THE PROPOSED FINDINGS OF FACT SUBMITTED BY THE
           DEPARTMENT OF JUSTICE DEMONSTRATES THAT TIME
           WARNER IS ALREADY ENGAGING IN ANTICOMPETITIVE
           CONDUCT, AND THE PROPOSED ACQUISITION THREATENS
           TO EXACERBATE AND ENCOURAGE THAT UNLAWFUL
           CONDUCT ...............................................................................................15

CONCLUSION...............................................................................................................18

CERTIFICATE OF SERVICE.......................................................................................19

# TABLE OF AUTHORITIES

*Brown, et al. v. Board of Education of Topeka, et al.*,
    347 U.S. 483 (1954).............................................................................................7

*Brown Shoe, Co. v. United States*,
    370 U.S. 294 (1962)......................................................................................7, 11

*Craig v. Harney,*
    331 U.S. 367 (1947)............................................................................................3

*FTC v. Consolidated Foods Corp.*,
    380 U.S. 592 (1966)..........................................................................................12

*F.T.C. v. Proctor & Gamble*,
    386 U.S. 568 (1967)......................................................................................1, 12

*Gideon v. Wainwright,*
    372 U.S. 335 (1963)............................................................................................7

*Hospital Corporation of America v. FTC*,
    807 F.2d 1381 (7th Cir. 1986) ............................................................................8

*In re Knight Publishing Co.*,
    743 F.2d 231 (4th Cir. 1984) .............................................................................4

*International Salt Co. v. United States*,
    332 U.S. 392 (1947)..........................................................................................17

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959)..........................................................................................17

*Mapp v. Ohio*,
    367 U.S. 643 (1961)............................................................................................7

*Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.*,
    381 U.S. 311 (1965)............................................................................................6

*Miranda v. Arizona*,
    384 U.S. 436 (1966)............................................................................................7

*Northern Pacific Railroad Co. v. United States*,
    356 U.S. 1 (1958).............................................................................................16

*Pointer v. Texas*,
    380 U.S. 400 (1965)............................................................................................7

*Richmond Newspapers, Inc. v. Virginia*,
　　448 U.S. 555 (1980) ........................................................................................ 3

*Roe v. Wade*,
　　410 U.S. 113 (1973) ........................................................................................ 7

*Stone v. Univ. of Md. Med. Sys. Corp.*,
　　855 F.2d 178 (4th Cir. 1988) .......................................................................... 4

*Syngenta Crop Protection, LLC v. Willowood LLC*,
　　2017 WL 6001818 (M.D.N.C. December 4, 2017) ..................................... 4, 5

*United States v. Aluminum Co. of America*,
　　377 U.S. 271 (1964) ........................................................................................ 7

*United States v. Apple*,
　　952 F.Supp.2d 638 (S.D.N.Y. 2013) .......................................................... 13

*United States v. Continental Can Co.*,
　　378 U.S. 441 (1964) ........................................................................................ 7

*United States v. El Paso Natural Gas Company*,
　　376 U.S. 651 (1964) ...................................................................................... 12

*United States v. Falstaff Brewing Corp.*,
　　410 U.S. 526 (1973) ................................................................................... 7, 11

*United States v. General Dynamics Corp.*,
　　415 U.S. 486 (1974) ........................................................................................ 8

*United States v. Pabst Brewing Co.*,
　　384 U.S. 546 (1966) ........................................................................................ 7

*United States v. Penn-Olin Chemical Co.*,
　　378 U.S. 158 (1964) .................................................................................. 10, 12

*United States v. Philadelphia Nat. Bank*,
　　374 U.S. 321 (1963) ........................................................................................ 7

*United States v. Topco*,
　　405 U.S. 596 (1972) ...................................................................................... 17

*United States v. Von's Grocery Co.*,
　　384 U.S. 270 (1966) ........................................................................................ 6

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*,
   529 F.Supp. 866 (E.D. Pa. 1981) ........................................................................4, 5

**RULES AND STATUTES**

15 U.S.C § 18 ............................................................................................ *passim*

15 U.S.C. § 26 ........................................................................................... *passim*

Fed. R. Civ. P. 26(c) ...........................................................................................2

## INTRODUCTION AND INTEREST OF THE *AMICUS CURIAE*

This Court's decision will not only impact the media industry, but it will have a lasting impact on future vertical acquisitions.  While the ultimate issue to be decided by this Court is whether the multinational, mega-media conglomerate AT&T's proposed $85 billion acquisition of Time Warner "may…substantially…lessen competition" in violation of § 7 of the Clayton Act, practically speaking, the legitimacy of challenges to vertical mergers is also on trial.   One only need look as far as Defendants' recent submissions to discern their attack on vertical merger law.[1]  Under existing Supreme Court authority, vertical acquisitions must also pass muster under § 7 of the Clayton Act. *F.T.C. v. Proctor & Gamble*, 386 U.S. 568 (1967) ("All mergers are within the reach of s 7, and all must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate.")  Under that same authority, the proposed acquisition is illegal.

*Amicus Curiae* Joseph M. Alioto ("Alioto"), hereby submits this Brief: (1) in support of unsealing the record in this case so that the public and potential future private litigants may view the overwhelming evidence that weighs against this unlawful proposed acquisition; and (2) in support of an order enjoining this acquisition, as required by Supreme Court authority that is binding on this Court.

Alioto prosecutes cases on behalf of private plaintiff litigants, often consumers and small businesses, challenging mergers and acquisitions that "may…substantially lessen competition" in violation of § 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.[2]

---

[1] *See* Dkt. No. 121 at 5, claiming that, "[i]t is difficult to prove that any vertical merger is likely to harm competition…" and *see* Dkt. No. 121 at 2, 3, 7, 9, 14-15, 17.
[2] In addition, Alioto is also a consumer who is threatened with injury.

(Alioto Decl., ¶¶ 1-6).  Any decision in this case will impact current and future § 7

litigation undertaken by Alioto on behalf of private litigants, because it may be used by

other federal district courts as instructive, guiding authority in § 7 litigation.

## ARGUMENT

I.     **THE SEALING OF CRITICAL EVIDENCE AND PORTIONS OF THESE ANTITRUST PROCEEDINGS DEPRIVES THE PUBLIC AND FUTURE PRIVATE LITIGANTS OF MATERIAL EVIDENCE THAT CONGRESS INTENDED THEM TO HAVE**

Denying public access to material evidence and testimony in this case impairs

current and future potential § 7 litigation on behalf of private litigants and is against the

presumption of open, public access to trials, grounded in the First Amendment to the

United States Constitution.  This Court should unseal and make publicly available all

testimony and evidence that this Court intends to weigh to render its decision.

A.     **All Evidence and Testimony Upon Which this Court Will Base Its Decision is Inaccessible to the Public**

On December 8, 2017, this Court entered the Protective Order that was stipulated

to by the parties in this case.  (Dkt. Nos. 34 and 37).  It was amended on December 29,

2017.  (Dkt. No. 58).  The Protective Order permits a broad spectrum of documents to be

designated as confidential, far beyond "privileged" material, including, "any document,

transcript, or other material containing such information that has not been published or

otherwise made publicly available."  *Id*. at ¶ A(1)(b).  The blanket Protective Order was

entered without any specific showing of good cause for its entry as required by Fed. R.

Civ. P. 26(c).  During the course of trial, it was reported that the parties and third parties

were negotiating agreements to seal certain evidence, denying public access to critical

trial documents, exhibits, and trial testimony.

2

Following the conclusion on April 30 of the antitrust trial in a case that has the potential to impact millions of U.S. consumers, critical evidence remains sealed and publicly unavailable.  Compounding the problem, the nature and extent of what has been sealed is unknowable by review of the docket in this case.  There is no exhibit or witness list, redacted or otherwise, viewable by the public on the docket.  Not a single trial exhibit presented by the Government or the Defendants is available publicly on the docket.  Vague docket entries, entitled "sealed document," do not identify what filings purport to be even generally.  (Dkt. Nos. 75, 82, 84, 86, 119, 122, 123, 124, 125).  Other filings are simply entitled "sealed motion" without specifying the type of motion or subject of the motion.  (Dkt. Nos. 78, 110, 114).[3]

In addition, there are about 3,000 pages of trial transcripts in this case, and approximately 160 of those pages are redacted.  Ordering transcripts of the trial in this case at the lowest cost for preparation would cost over $2,500, rendering them inaccessible to the public *de facto*.

When the Court ultimately renders its decision in this case, the public will not have access to any of the evidence upon which this Court will base its decision.

> **B.**  **There is a Presumption in Favor of Open, Public Access to Trials**

A "trial is a public event. What transpires in the court room is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947).  The Supreme Court has

---

[3] The names and titles of these filings are not protected trade secrets or privileged.  To the extent the parties may argue that some of this evidence was available publicly at the trial, in a case of this magnitude, impacting millions of consumers, the number of people able to fill a courtroom is insufficient to be deemed open, public access.  Further, even evidence that is not sealed is inaccessible for public viewing.

recognized a First Amendment right of public access to judicial proceedings, including civil proceedings. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 599 (1980) (J. Stewart, concurring) ("[T]he First and Fourteenth Amendments clearly give the press and the public a right of access to trials themselves, civil as well as criminal.")  The public has a particular interest in antitrust proceedings, like those at issue in this case. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 529 F.Supp. 866, 895 (E.D. Pa. 1981).

The court's recent ruling in *Syngenta Crop Protection, LLC v. Willowood LLC,* 2017 WL 6001818 (M.D.N.C. December 4, 2017) is instructive on the issue of making the evidence and testimony in this case public.  In the *Syngenta* case, Syngenta sued Willowood for patent infringement and after summary judgment, the remaining issues were tried to a jury.  *Id.* at *1.  Following the trial, Syngenta sought to seal certain trial exhibits and to redact others.  *Id.*  In conducting its analysis, the court first looked at whether the notice requirements set forth in *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 181 (4th Cir. 1988) had been met.  *Stone*, citing *In re Knight Publishing Co.*, 743 F.2d 231 (4th Cir. 1984), requires a court to, "first give the public notice of a request to seal and a reasonable opportunity to challenge it… the court must notify persons present in the courtroom of the request, or docket it 'reasonably in advance of deciding the issue.'  *Id.* The court must consider less drastic alternatives to sealing and, if it decides to seal documents, must 'state the reasons for its decision to seal supported by specific findings, and the reasons for rejecting alternatives to sealing in order to provide an adequate record for review.'"  *Id*. at 181.  It is impossible to discern from the docket whether <u>any</u> of these requirements were met before critical evidence and testimony was sealed.  What is discernable is that there has been no public notice of a request to seal in

4

this case, there is nothing on the docket in advance of a decision on the issue at trial, nor are there any reasons that are publicly available in support of sealing these records.

In *Syngenta*, the court next evaluated, "whether Syngenta has shown that the information sought to be sealed is confidential; whether disclosure would harm Syngenta's competitive standing or otherwise harm its business interests; whether the motion is narrowly tailored; and whether the interests in non-disclosure are compelling and heavily outweigh the public's interest in access to the information. In weighing the competing interests, the Court considers, among other things, whether access to the evidence is needed to understand what happened at trial and the degree of harm that disclosure would be likely to cause." *Syngenta*, at *3.  Again, it is impossible from reviewing the publicly available docket in this case to discern whether any type of comparable analysis was ever undertaken by this Court.

Ultimately, the *Syngenta* court determined that, "[t]he public's right of access can be overcome only by a very strong showing by litigants seeking to keep secret the information used by judges and juries to decide cases. In this case, Syngenta has met that burden as to limited categories of confidential business information not particularly helpful to understanding the jury's decision and those documents will be maintained under seal, subject to further order of the Court. But as to the information required to understand the trial and its result, the motion will be denied." *Syngenta*, at *8.   The Court here should adopt a similar rule.  Any and all evidence required for the public to understand the trial and this Court's ultimate decision should and must be made available to the public.

    **C.**    **Congress Intended Private Antitrust Litigants to Have Access to the Evidence this Court will Weigh in Rendering its Decision**

Private litigants bringing actions under the Clayton Act are "private attorneys general" and "vindicate important societal interests." *Zenith*, 529 F.Supp. at 905. Denial of public access to the evidence in these proceedings will impair current and future potential § 7 litigation by private litigants, as it was the intent of Congress that any initial government action could and would be used to assist a later private action. *Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co*., 381 U.S. 311, 319 (1965) (Noting, that, "The Government's initial action may aid the private litigant in a number of other ways. The pleadings, transcripts of testimony, exhibits and documents are available to him in most instances. In fact, the rules of the Commission so provide. 16 CFR s 1.132(e)… Indeed, so useful is this service that government proceedings are recognized as a major source of evidence for private parties.") Blocking the public from access to material evidence deprives current and future private antitrust litigants of important resources Congress intended them to have—the very evidence that this Court will use to render its decision.

## II.     UNDER EXISTING SUPREME COURT PRECEDENT, THE PROPOSED ACQUISITION SHOULD BE ENJOINED

In enacting and amending § 7 of the Clayton Act, "Congress sought to preserve competition among many small businesses by arresting a trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies." *United States v. Von's Grocery Co.,* 384 U.S. 270, 277 (1966). [Emphasis added.] The Supreme Court explained that:

> The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy.' To arrest this 'rising tide' towards concentration into too few hands and to halt the gradual demise of the small businessman, Congress decided to clamp down with vigor on mergers…Thus,

> where concentration is gaining momentum in a market, we must be alert to carry
> out Congress' intent to protect competition against ever increasing concentration
> through mergers…If ever such a merger would not violate § 7, certainly it does so
> when it takes place in a market characterized by a long and continuous trend
> toward fewer and fewer owner-competitors which is exactly the sort of trend
> which Congress, with the power to do so, declared must be arrested.

*Id.* at 276-278. "[Section] 7 'requires not merely an appraisal of the immediate impact of

the merger upon competition, but a prediction of its impact upon competitive conditions

in the future; this is what is meant when it is said that the amended s 7 was intended to

arrest anti-competitive tendencies in their "incipiency." *United States v. Philadelphia*

*Nat. Bank*, 374 U.S. 321, 362 (1963).

A line of binding Supreme Court precedent recognized and developed what is

known as the "incipiency doctrine": *See Brown Shoe, Co. v. United States*, 370 U.S. 294

(1962); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963); *United States v.*

*Aluminum Co. of America*, 377 U.S. 271 (1964); *United States v. Continental Can Co.,*

378 U.S. 441 (1964); *United States v. Pabst Brewing Co*., 384 U.S. 546 (1966); *United*

*States v. Von's Grocery Co*., 384 U.S. 270, 277 (1966); and *United States v. Falstaff*

*Brewing Corp*., 410 U.S. 526 (1973).[4] These rulings still stand today, never having been

overruled or diminished by later authority. Taken together they "…establish the illegality

---

[4] The Defendants spokespeople claim these controlling cases are old and somehow not
applicable.  These cases were decided at the same time as these other landmark decisions:
*Brown, et al. v. Board of Education of Topeka, et al*., 347 U.S. 483 (1954)
(desegregation); *Mapp v. Ohio*, 367 U.S. 643 (1961) (evidence obtained by searches and
seizures in violation of the Fourth Amendment is inadmissible in a state court); *Gideon v.*
*Wainwright*, 372 U.S. 335 (1963) (requiring state courts to appoint attorneys for indigent
criminal defendants); *Pointer v. Texas*, 380 U.S. 400 (1965) (establishing the right to
confront a witness); *Miranda v. Arizona*, 384 U.S. 436 (1966) (establishing the right of
interrogated suspects in custody to remain silent  and to obtain an attorney); *Roe v. Wade*,
410 U.S. 113 (1973) (examining the constitutionality of laws criminalizing and restricting
access to abortions).

of any nontrivial acquisition of a competitor, whether or not the acquisition was likely either to bring about or shore up collusive or oligopoly pricing. The elimination of a significant rival was thought by itself to infringe the complex of social and economic values conceived by a majority of the Court to inform the statutory words 'may…substantially…lessen competition.'" *Hospital Corporation of America v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986).[5]  If the decisions by the Supreme Court are to be amended or overruled, that can only be done by the Supreme Court itself or the Congress of the United States.  No one else can disregard or ignore them, notwithstanding a legion of economists who may disagree.  In this case, it is of no consequence that both the Defendants and even the DOJ have been conspicuously silent about these binding decisions.

There has been a substantial trend in concentration in the media industry, including the 2011-acquisition by Comcast of NBCUniversal, the 2015-acquisition by AT&T of DirecTV, the 2016-merger of Charter Communications and Time Warner, and Time Warner's recent purchase of a 10% stake in Hulu in 2016.[6]  Attached hereto is a

---

[5] In addition, in the *Hospital Corporation of America* case, Judge Posner differentiated *United States v. General Dynamics,* 415 U.S. 486 (1974), noting that it involved, "highly unusual facts, having no counterpart in this case, that required discounting large market shares..."  *Id.* at 1385.  Similarly, the facts of *General Dynamics* have no "counterpart in this case."  Further, in *HCA*, Judge Posner held that, "Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight*." Id.*  This refutes the suggestion here that arbitration will secure fair pricing with distributors.
[6] https://www.npr.org/sections/thetwo-way/2016/10/22/498996253/timeline-at-ts-merger-with-time-warner-follows-decades-of-industry-deals; https://www.npr.org/sections/alltechconsidered/2016/10/28/499495517/big-media-companies-and-their-many-brands-in-one-chart, last accessed on June 8, 2018.

chart[7] (Annex at p. 6-7) depicting the recent trend towards concentration in the media industry.  In December 2017, the Walt Disney Company announced it would acquire 21st Century Fox for $52.4 billion.[8]  Defendants AT&T and Time Warner are themselves products of successive mergers and acquisitions.  (*See* Annex A at p. 7).

Indisputably, AT&T's proposed acquisition of Time Warner is non-trivial. AT&T will pay $85.4 billion to acquire Time Warner and will re-shape the United States media industry landscape.  (*See* Annex A, at p. 6-7).  AT&T controls 26% of the MVPD market with U-Verse and DirecTV.  (*See* Annex A at p. 5).  U-Verse and DirecTV serve over 24 million pay television subscribers combined in the United States.  (*See* Annex, at p. 1).  Time Warner is an important "must have" content provider, with HBO, the Turner Networks (TBS, TNT, and CNN), and Warner Brothers all falling under the Time Warner umbrella, including its recently acquired 10% stake in Hulu.  (*See* Annex A at p. 1).

Of further note, Hulu, of which the to-be acquired Time Warner now owns a 10% stake, is a joint venture between the Walt Disney Company (30%), 21st Century Fox (30%), Comcast (through NBCUniversal) (30%), and Time Warner (through Turner, 10%)[9].  The acquisition will add AT&T to the joint venture, joining together the major content producers and distributors in the United States under one umbrella.[10]  Supreme

---

[7] The data in these charts is based on publicly available information, since access to data in this case is limited.

[8] https://www.thewaltdisneycompany.com/walt-disney-company-acquire-twenty-first-century-fox-inc-spinoff-certain-businesses-52-4-billion-stock/, last accessed on June 8, 2018.

[9] https://variety.com/2017/digital/news/hulu-disney-fox-deal-future-tv-streaming-1202640711/, last accessed on June 8, 2018.

[10] The Proposed Findings of Fact acknowledge the fact that Hulu launched a competing virtual MVPD and that Time Warner is now a partially vertically integrated competitor of AT&T.  AT&T was in the midst of developing their own virtual MVPD service when the Time Warner-Hulu deal was announced.  (Dkt. No. 128, ¶ 51).  But the elimination of

Court precedent recognizes the competitive threat posed by such a joint venture, especially one that stands to add conglomerate AT&T to an already anticompetitive mix. *See United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 169 (1964) ("The joint venture, like the 'merger' and the 'conglomeration,' often creates anticompetitive dangers. It is the chosen competitive instrument of two or more corporations previously acting independently and usually competitively with one another. The result is 'a triumvirate of associated corporations.' If the parent companies are in competition, or might compete absent the joint venture, it may be assumed that neither will compete with the progeny in its line of commerce. Inevitably, the operations of the joint venture will be frozen to those lines of commerce which will not bring it into competition with the parents, and the latter, by the same token will be foreclosed from the joint venture's market.")

It's worth reminding the Court of AT&T's well-known history with antitrust enforcement.  In 1974, the Department of Justice instituted an antitrust action against AT&T, Western Electric, Bell Laboratories, and the Bell operating companies for conspiracy to monopolize in violation of the Sherman Act[11].  At the time, AT&T was the sole provider of telephone service in most of the United States.  *Id*.  The Department of Justice alleged that AT&T was using *its monopoly profits from vertically integrated telephonic equipment producer, Western Electric, to subsidize its network*.[12]  Ultimately,

---

this actual competition is unaddressed in the PFOF, the DOJ's Trial Brief, and the Proposed Conclusions of Law.

[11] http://www.businessinsider.com/att-breakup-1982-directv-bell-system-2018-02, last accessed June 8, 2018.

[12] Sullivan, Lawrence and Hertz, Ellen, Berkeley Technology Law Journal, "The AT&T Consent Decree:  Should Congress Change the Rules" 5 Berkeley Tech. L.J. 233, 238-239 (1990), available at http://scholarship.law.berkeley.edu/btlj/vol5/iss2/1.

by consent decree in 1982, AT&T agreed to divest itself of the Bell operating companies, which provided local telephone service in the United States. *Id.* The broken-up Bell operating companies ultimately began to merge after antitrust enforcement was relaxed and most have joined together into what is now Defendant AT&T.[13] Now, AT&T seeks to acquire a vertically integrated, "must have" content producer and will ultimately be joined under a joint venture with most of the major content producers and distributors in the U.S. If there is any hope of preventing history from repeating itself—in a different, but adjacent industry--this acquisition must be enjoined.

### III.   THE TRANSACTION ELIMINATES COMPETITION FROM AT&T IN THE PROGRAMMING MARKET

While this acquisition has been touted as a vertical one, there are horizontal aspects to this acquisition that appear to be either unexplored or unargued by the DOJ. This transaction eliminates AT&T as an actual and potential independent competitor in the programming business. Put another way, the acquisition of content producer Time Warner eliminates AT&T as a competitively independent producer of content.

When an acquiring company (here, AT&T) has the wherewithal to enter into the seller's business (Time Warner), the threatened elimination of that actual and potential competition is sufficient to block an acquisition under § 7 of the Clayton Act. *See Falstaff Brewing Corp.*, 410 U.S. at 544 (acknowledging that a company with the "financial capability," the "interest" and the "capability to enter the market" is the most likely potential "new competitor" in that market); *Brown Shoe*, 370 U.S. at 345, fn.72 ("A company's history of expansion; through unilateral growth. Internal expansion is

---

[13] http://money.cnn.com/infographic/technology/att-merger-history/?iid=EL, last accessed on June 8, 2018.

more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry."); *FTC v. Consolidated Foods Corp.,* 380 U.S. 592, 594 (1966) ("We hold at the outset that the 'reciprocity' made possible by such an acquisition is one of the congeries of anticompetitive practices at which the antitrust laws are aimed. The practice results in 'an irrelevant and alien factor,' —- F.T.C., p. —-, intruding into the choice among competing products, creating at the least 'a priority on the business at equal prices.' (citations omitted)"); *United States v. Penn-Olin Chemical Co*., 378 U.S. 158, 173 (1964) ("There still remained for consideration the fact that [the transaction] eliminated the potential competition of the corporation that might have remained at the edge of the market, continually threatening to enter. Just as a merger eliminates actual competition, this [transaction] may well foreclose any prospect of competition between [the defendants]…"); *United States v. El Paso Natural Gas Company*, 376 U.S. 651, 660 (1964) ("Unsuccessful bidders are no less competitors than the successful one. The presence of two or more suppliers gives buyers a choice.  [The acquired company] was no feeble, failing company; nor was it inexperienced and lacking in resourcefulness…"); and *F.T.C. v. Procter and Gamble Company*, 386 U.S. 568, 577 (1967).

In April 2016, before the acquisition was announced, AT&T Entertainment Group CEO John Stankey announced that AT&T would double its spending on content.  (Alioto Decl., **Exhibit A**).  In 2015, AT&T's entertainment division "generated $35.3 billion in revenues in 2015, which made it bigger than most Big Media companies including Time Warner, Fox, Viacom, and CBS."  *Id*.  In an interview with <u>Deadline</u>, Stankey was asked:

> *Deadline:   <u>Have you thought of buying a major content creator</u>?*
>
> Stankey:  We think about things over long horizons here.  In the near term we want to integrate DirecTV.  The second part is we've got to get the core product and the service experience right.  And the third thing is, you want to take that capability – that audience and that platform – and start to move further up the content ecosystem<u>.  I don't think that necessarily requires you to go out and buy a big content company.</u>
>
> *Deadline:  But you're also expanding content spending now.  How much?*
>
> Stankey:  We're not working with a Netflix kind of budget.  But we're doubling our budget on content this year.  We want to make sure we get to a point where we have enough scale and people start to think:  <u>'Gee, I want to have a relationship with AT&T because I can get content that I can't get elsewhere.'</u>  We're not quite at that level yet, beyond *NFL Sunday Ticket* and our sports relationships.
>
> ***
>
> *Deadline:  Any interest in producing movies or backing productions?*
>
> Stankey:  Sure.  Longform has its place.  If you were to think about the <u>priorities of investing, number one would be what I would call television-form scripted</u>.  Two, you to the fragmented side.  And then, three, you go to longform.  Our goal would be to be in a position where we could possibly do some collaborative work, and get some <u>improved windowing</u>[14].

---

[14] Windowing is "the process of managing the release sequence for content so as to maximize the returns from intellectual property rights…" http://journals.sagepub.com/doi/pdf/10.1177/1527476416641194, last accessed on June 1, 2018.  In *United States v. Apple*, 952 F.Supp.2d 638, 650 (S.D.N.Y. 2013), the defendant publishers utilized a synchronized strategy of windowing.  The court noted that, "In order for the tactic of windowing to succeed, the Publishers knew they needed to act together. That several Publishers synchronized the adoption and announcement of their windowing strategies was thus no mere coincidence. For example, Hachette's Young

*Deadline: Improved windowing with theaters, or with premium TV channels?*

Stankey:  Both.

***

*Deadline:  Some executives say that there's a glut of original TV shows.  Why do you think there's room for more?*

Stankey: I'm not worried that we're overinvesting in content.   We're of the mind-set that we should step it up a bit.  People don't fully appreciate that [overall spending] should be going up because the number of opportunities to distribute content are going up.  The hours in the day that people can gain access to content are going up.  Will it be a little more fragmented?  And are we going to have to change our expectations for how much we invest in some of that?  I think the answer to that is 'yes.'  That's why we're focused on our personal development [of shows] to make sure we're getting the right bang for the buck.  We've been pretty disciplined about that.

*Id.*

The above interview with Stankey establishes that AT&T, pre-acquisition, is and was a competitor in the programming business, with plans to develop and grow its own content.  The $85.4 billion price tag for this acquisition by AT&T could be spent on the development of new content and technology in competition with Time Warner.  Instead of competing in the programming market, as it planned to do, AT&T decided to acquire an actual and potential competitor, Time Warner.  Any acquisition that eliminates an

---

told Nourry in late Fall 2009, "[c]ompletely confidentially, Carolyn [Reidy] has told me that they [S & S] are delaying the new Stephen King, with his full support, but will not be announcing this until after Labor Day. 'Understanding the impropriety of this exchange of confidential information with a competitor, Young advised Nourry that 'it would be prudent for you to double delete this from your email files when you return to your office.' When HarperCollins soon followed with its own windowing announcement, delaying the digital release of Sarah Palin's *Going Rogue,* Hachette's Nourry congratulated Murray on his decision: 'Well done for the Palin book,' Nourry wrote, 'and welcome to the Club!'"  *Id.*  This is an analogous situation.  With AT&T joining the other major content players under the Hulu joint venture umbrella, opportunities abound for coordination as to windowing strategy, which pre-acquisition, AT&T has demonstrated a desire to pursue aggressively.

actual and potential competitor in a market violates § 7 of the Clayton Act, as noted in the

Supreme Court's holdings in *Falstaff, Penn-Olin, El Paso Natural Gas, and Proctor &*

*Gamble.*[15]

> **IV.  THE PROPOSED FINDINGS OF FACT SUBMITTED BY THE DEPARTMENT OF JUSTICE DEMONSTRATE THAT TIME WARNER IS ALREADY ENGAGING IN ANTICOMPETITIVE CONDUCT, AND THE PROPOSED ACQUISITION THREATENS TO EXACERBATE AND ENCOURAGE THAT UNLAWFUL CONDUCT**

Lastly, no party has confronted the conspicuous, pre-existing anticompetitive

behavior of Time Warner.  The Department of Justice's Proposed Findings of Fact are

rife with factual examples of Time Warner's violations of the Sherman Act, yet the DOJ

falls short of calling a spade a spade.  While numerous MVPD competitors denounced

Time Warner's program bundling, requiring distributors to pay for programming they do

not want to access programming they need (the "must have" content), no one has called it

just what it is:  illegal tying in violation of § 1 of the Sherman Act.

By way of example, the DOJ's Proposed Findings of Fact ("PFOF")

acknowledges that, "Turner uses the importance of its most popular networks as leverage

to force distributors to carry less important Turner networks."  (Dkt. No. 128 at 35-36).  It

continues to cite examples from other MVPD's, including, "(Montemagno/Charter) ("I

don't have an option. If I want the important ones, I have to take the ones that are less

important to me."  *Id*. at 35.  And again, it cites, "Tr. 724:3–6 (Hinson/Cox) (explaining

---

[15] As noted above, in footnote 10, Time Warner competes with AT&T through its virtual MVPD Hulu Live.  The acquisition eliminates this actual competition between AT&T and Time Warner.

that Cox cannot purchase just one channel like Boomerang because "[its] contracts require multiple channels from Turner")."  *Id*.

The PFOF also describes the lengths Turner went through to prevent Cable ONE from accessing a narrower bundle through the NCTC by using an audit of Cable ONE's licensing fees in order to prevent them from joining the NCTC.  (Dkt. No. 128 at ¶ 171). Sejen of Cable ONE testified that Turner did this because, "if a cable operator was allowed to just carry three of [Turner's] eight or nine channels," it would cause "a major disruption to [Turner's] business model." Tr. 2098:14–19 (Sejen/Cable ONE).  *Id.* Turner cut off its signals and a blackout lasted for 30 days.  *Id*. at ¶¶ 172, 173, 174, 175.

Turner uses its "must have" content to coerce MVPDs into carrying channels they do not want.  This unlawful bundling forecloses independent networks, like Cinémoi, from the market.  (*See* Dkt. No. 135-1 at 2-3).   By way of example, if Turner forces an MVPD to take Turner Classic Movies in its bundle, even though the MVPD may not want or need that network, the MVPD will not allocate additional resources to pick up a competing independent network like Cinémoi.  Time Warner's tying of "must have" content to less desirable content is a *per se* violation of § 1 of the Sherman Act.  *See Northern Pacific Railroad Co. v. United States*, 356 U.S. 1 (1958).  This acquisition would give Time Warner license, not only to continue such anticompetitive practices, but to expand them with the backing of a better funded, more powerful parent.

Further, at the December 7, 2016, Senate hearing reviewing this acquisition, Daphna Ziman of Cinémoi, testified that, MVPD's are "shutting the doors on independents on innovation, on good quality, original programming.  Unless you are a

bundle, you don't have any negotiating power."[16]  She testified that, "the industry is

currently structured to shut out new entrants, which are mostly independent programmers

and keep channels like Cinémoi from making it and providing competition to incumbents

in the industry."[17]  The exclusion of one independent programmer, such as Cinémoi, is

sufficient to enjoin this acquisition, as noted by the Supreme Court in *United States v.*

*Topco,* 405 U.S. 596, 610 (1972) [emphasis added]:

> Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta
> of free enterprise. They are as important to the preservation of economic freedom
> and our free-enterprise system as the Bill of Rights is to the protection of our
> fundamental personal freedoms.  And the freedom guaranteed each and every
> business, no matter how small, is the freedom to compete—to assert with vigor,
> imagination, devotion, and ingenuity whatever economic muscle it can muster.
> <u>Implicit in such freedom is the notion that it cannot be foreclosed with respect to
> one sector of the economy because certain private citizens or groups believe that
> such foreclosure might promote greater competition in a more important
> sector of the economy</u>. Cf. *United States v. Philadelphia National Bank,* 374 U.S.
> 321, 371, 83 S.Ct. 1715, 1745, 10 L.Ed.2d 915 (1963).

*See also, Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 213 (1959) (Holding

that, "As such it is not to be tolerated merely because the victim is just one merchant

whose business is so small that his destruction makes little difference to the

economy. Monopoly can as surely thrive by the elimination of such small businessmen,

one at a time, as it can by driving them out in large groups. In recognition of this fact the

Sherman Act has consistently been read to forbid all contracts and combinations 'which

'tend to create a monopoly, " whether 'the tendency is a creeping one' or 'one that

proceeds at full gallop.' *International Salt Co. v. United States*, 332 U.S. 392, 396, 68

---

[16] December 7, 2016, Senate Hearing testimony, Daphna Ziman, Cinémoi, https://www.c-span.org/video/?419533-1/att-time-warner-ceos-testify-merger&start=8153, at 2:18:42 – 2:18:55.
[17] *Id*. at 57:39 – 57:55.

S.Ct. 12, 15, 92 L.Ed. 20."); *International Salt Co. v. United States*, 332 U.S. 392, 396

(1947) *abrogated on other grounds*, (Holding that, "it is unreasonable, *per se*, to

foreclose competitors from any substantial market.")  The exclusion of independent

content programmers, like Cinémoi, from the market, is a lessening of competition that

requires this Court to block this proposed acquisition.

## <u>CONCLUSION</u>

Millions of consumers and businesses are threatened with loss or damage that

threatens to flow from the proposed acquisition.  The presumption of public access

requires that the transcripts of these proceedings and the evidence in this case be made

public.  Congress intended private antitrust litigants to have access to the evidence in this

case.  Thus, Alioto respectfully requests that this Court unseal the documents and

testimony that this Court will weigh to render its decision.

An acquisition by a multi-national conglomerate, of a company already

demonstrating an ongoing willingness to violate the antitrust laws, obviously *<u>may</u>*

"substantially…lessen competition or…tend to create a monopoly…" in violation of § 7

of the Clayton Act.  Complex economic analyses are not required to show that which is

clear as a matter of common sense.

The proposed transaction eliminates AT&T as an actual and potential competitor

in the content production market.  Under existing Supreme Court authority, *supra*, this

acquisition must be enjoined.

Respectfully submitted:

Dated:  June 8, 2018                     */s/ Joseph M. Alioto*
                                        Joseph M. Alioto
                                        ALIOTO LAW FIRM

One Sansome Street, 35th Fl
San Francisco, CA 94104

Proposed *Amicus Curiae*, appearing
*pro se*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 8th day of June 2018, I provided service of the

foregoing Motion for Leave to file an *Amicus Curiae* Brief to all counsel of record via the

Court's CM/ECF system.


<u>*/s/ Joseph M. Alioto*</u>

**ANNEX A**

# What's at Stake in Proposed AT&T Acquisition of TimeWarner



Source: https://www.statista.com/chart/11932/time-warner-and-att-merger, November 21, 2017

001

# Market Capitalization of Media Firms



# Market Capitalization of Media Firms



Source:  https://www.wsj.com/articles/how-the-dojs-face-off-with-at-t-could-alter-american-business-1521137209, March 15, 2018,
https://www.wsj.com/articles/at-t-is-in-advanced-talks-to-acquire-time-warner-1477061850, October 21, 2016

003

# Market Capitalization of Media Firms



Source:  https://www.wsj.com/articles/how-the-dojs-face-off-with-at-t-could-alter-american-business-1521137209, March 15, 2018,
https://www.wsj.com/articles/at-t-is-in-advanced-talks-to-acquire-time-warner-1477061850, October 21, 2016

# Market Share of Content Distributors (Pay TV Operators)



Source: https://www.fiercecable.com/cable/top-6-cable-satellite-and-telco-pay-tv-operators-q4-ranking-comcast-charter-and-more, March 15, 2017

005

# Recent Media Mergers and Proposed Conglomerate Mergers Awaiting AT&T/TimeWarner Decision





# History of AT&T and TimeWarner Mergers/Acquisitions



# Likely Results of AT&T Acquisition of Time Warner



**Higher prices for both delivery and content**



**Less innovation**



**Fewer competitive choices**



**Fewer jobs**



**Reduced R&D**



**Potential for exclusive dealing**

008

# Key Section 7 Cases
## Market Share and Rankings, Pre-Merger vs. Post-Merger

| Acquiring Company Market Share | Acquired Compan(ies) Market Share | Merged Entity Market Share | Result |
|---|---|---|---|
| **VONS** • 4.7% share • #3 in market | **Shopping Bag** • 4.2% share • #6 in market | • 7.5% share • #2 in market | **ENJOINED** |
| **ALCOA** • 27.8% share • #1 in market | **ROME CABLE** • 1.3% share • #9 in market | • 29.1% share | **ENJOINED** |
| Pabst Blue Ribbon • 5.48% share tri-state • #10 nationwide • #4 statewide (WI) • #7 tri-state (WI, Ill, Mich) | Blatz • 5.84% share tri-state • #18 nationwide • #1 statewide (WI) • #6 tri-state (WI, Ill, Mich) | • 11.32% share tri-state • #5 nationwide • #1 statewide (WI) • 4.49% share nationwide • 23.95% share statewide | **ENJOINED** |
| Brown Shoe • 6% manufacturing share • #3 in manufacturing | **Kinney shoes** • .05% manufacturing share • #12 in manufacturing • 2% retail share | • 6% manufacturing share • #3 in manufacturing • 9.5% retail share • #2 in retail market | **ENJOINED** |
| **PNB** THE PHILADELPHIA NATIONAL BANK • #2 in market | GIRARD TRUST CORN EXCHANGE BANK • #3 in market | • #1 in market • 36% share (of assets) | **ENJOINED** |

009

22

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>                    PLAINITFF,<br><br>v.<br><br>AT&T INC.;<br>DIRECTV GROUP HOLDINGS, LLC; AND<br>TIME WARNER, INC.;<br>DEFENDANTS. | Civil Action No. 17-cv-02511<br>(RJL)<br><br>Judge Richard J. Leon |
| JOSEPH M. ALIOTO, Proposed *Amicus Curiae*, appearing *pro se* | |

## DECLARATION OF JOSEPH M. ALIOTO IN SUPPORT OF MOTION FOR LEAVE TO FILE AN *AMICUS CURIAE* BRIEF IN SUPPORT OF THE UNITED STATES OF AMERICA

I, Joseph M. Alioto, declare as follows:

1.      I am the owner/founder of the Alioto Law Firm in San Francisco, California.  I am a proposed *amicus curiae* in the case before this Court.

2.      I submit this Declaration in support of my Motion for Leave to File an *Amicus Curiae* Brief in Support of the United States of America.

3.      I have personal, first-hand knowledge of the facts set forth in this Declaration. If called as a witness, I could and would competently testify to these facts under oath.

4.      I am licensed to practice law in the State of California, and I have been admitted to practice in all California federal district courts and the United States Court of Appeals for the Ninth Circuit.  I am admitted to practice in the United States Supreme

Court and have been admitted to practice in the United States Court of Appeals for the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and District of Columbia.  I have been admitted *pro hac vice* in federal district courts in approximately forty states, including New York, New York; Boston, Massachusetts; Atlanta, Georgia; Minneapolis, Minnesota; Wichita Kansas; Fort Worth, Dallas, and Amarillo, Texas; Las Vegas and Reno, Nevada; Boise, Idaho; Seattle/Tacoma, Washington; Salt Lake City, Utah; Honolulu, Hawaii; Phoenix, Arizona; Albuquerque, New Mexico; Philadelphia, Pennsylvania; and others

5.      I have been prosecuting antitrust actions on behalf of private plaintiffs for over 48 years, representing plaintiffs in many industries, including:  accounting, farm equipment, processing, wool, manufacturing, advertising, finance brokers, professional services, yellow pages, agriculture, glass, publishing, air transportation, grapes, radios, aluminum, healthcare, railroads, appraising, heating equipment, real estate, automobiles, rendering, barges, high precision tooling, retailing, baseball, hospitals, rice, beer, ice cream, satellite services and equipment, cable television, insurance, cattle ranching, laptop computers, shipping ship to shore, chemicals, livestock, compact discs, medical devices, wireless, computer hardware, milk, soft drinks, computer networks, mining, steam shipping, computer software, mortgages, banking, stocks and bonds, construction, moving services, talk radio, N.F.L. Football, telecommunications, developers, newspapers, televisions, consumer electronics, oil, corn, wet milling, optic fibers, monitors, tickets, cosmetics, overhead doors, tomatoes, crane certification, pacemakers, trading currency exchange, peripheral manufacturing, travel industries, credit cards,

photo-finishing, trucking, distilled spirits, pharmaceuticals, VCRs, potash, wheat, DVDs, potatoes, and wine.

6.      As part of my work representing private plaintiffs in antitrust actions, I have filed numerous cases under the authority of § 16 of the Clayton Act, 15 U.S.C. § 26, which authorizes injunctive relief, including orders enjoining acquisitions, for violations of § 7 of the Clayton Act, 15 U.S.C. § 18.   Presently, I represent private plaintiffs in pending actions brought under the authority of §§ 7 and 16 of the Clayton Act, and I intend to continue to do so in the future.

7.      Attached hereto as **Exhibit A** is a true and correct copy of an April 8, 2016, article from Deadline.com, entitled, "AT&T Entertainment Boss John Stankey on Plan to Double Content Spending in 2016," which includes an interview with AT&T Entertainment Group CEO John Stankey.  The article is accessible online at:

https://deadline.com/2016/04/john-stankey-att-interview-content-spending-plan-1201732912/, last accessed on June 8, 2018.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 8th day of June 2018.

By: */s/ Joseph M. Alioto*_____
Joseph M. Alioto (CA SBN 42680)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200

Proposed *Amicus Curiae*, appearing *pro se*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of June 2018, I provided service of the

foregoing Motion for Leave to file an *Amicus Curiae* Brief to all counsel of record via the

Court's CM/ECF system.


<u>*/s/ Joseph M. Alioto*_____</u>

**EXHIBIT A**



**DEADLINE | HOLLYWOOD**

○ "Article Only"
○ "Article with Comments"
○ "Comments Only"   🖶 Print

# AT&T Entertainment Boss John Stankey On Plan To Double Content Spending In 2016

By David Lieberman *on* Apr 8, 2016 9:11 am



**at&t**

AT&T

**EXCLUSIVE:** AT&T Entertainment Group CEO John Stankey's days as the media industry's most anonymous mogul are probably numbered. After years of working mostly behind the scenes helping the Dallas-based telco make deals and manage operations, the company gave him the keys to one of the nation's biggest entertainment empires last year when it paid $47.4 billion for DirecTV.

And he's starting to make decisions that will ripple through Hollywood, including one to double AT&T's spending this year on content — a subject he hasn't discussed in depth, until now.

Stankey, 53, commands a lot of firepower. AT&T's entertainment unit generated $35.3 billion in revenues in 2015, which made it bigger than most Big Media companies including Time Warner, Fox, Viacom, and CBS. DirecTV and the U-verse wired systems collectively have 25.4 million pay TV subscribers — beating Comcast's 22.4 million. The operation also funnels entertainment to AT&T's nearly 55 million wireless consumers —

a group in his domain — which goes up to 137 million if you include the company's business customers.



That's important because Stankey believes original content can help AT&T stand out from its cable and wireless rivals. He's seen that work with DirecTV's sports programming, including *NFL Sunday Ticket*. The satellite company is also establishing itself as a buyer of original scripted programming with dramas *Kingdom*, *Full Circle*, and *Rogue* and sitcom *You Me Her*.

DirecTV will introduce three nationwide streaming services around October offering TV channels and other content live and on-demand.

AT&T's also becoming a new media power via its 43.4% stake in Otter Media, the production venture led by former Fox exec Peter Chernin. Their digital investments include Crunchyroll, Rooster Teeth, and Fullscreen — which on April 26 will launch a global, Netflix-like, ad-free subscription video on demand service for teens and young adults.

Wall Street is watching. Company shares have appreciated nearly 17% over the last 12 months as investors mostly applauded the DirecTV deal. But MoffettNathanson Research's Craig Moffett, for one, says the company simply doubled down on a declining industry. Last week he urged clients to sell, saying that "there is simply no convincing source of growth for the company going forward."

We caught up with Stankey this week to see what he has in mind for content. Here are his thoughts, edited for length and clarity.

**DEADLINE:** *DirecTV has conventional scripted TV series and sports, and you have a big stake in Otter Media's digital short-form content. What do you think you need more of?*

**STANKEY:** It's both. It's not one or the other. We are in an environment that's going to continue to fragment. At the same time we're doing scripted work we also understand that there is a generation that wants a different type of content and we have a great platform that really enables different content. So we want to have our foot in both places.

**DEADLINE:** *What types of scripted shows interest AT&T?*

**STANKEY:** Our goal is not to out-Netflix Netflix. Our goal is to offer our customers a little different experience. So we're looking to be a place where the creative community can come to try some things that maybe haven't worked in what I'll call mainstream media. We're looking for good bang for the buck. We have a good track record of doing that where we can find very talented up-and-coming production talent, up-and-coming writers that have some fresh new ideas, and let them try them out on production budgets that maybe aren't what I would call the blockbuster level. And then have them come and bring that to an audience that's diverse in its distribution.

**DEADLINE:** *Do you have a demographic you're looking to attract?*

**STANKEY:** We have two dynamics we have to work with. We've got a lot of high-value customers in our wireless business and in our pay-TV business. That demographic tends to skew a little bit more traditional. We are very interested in making sure we cater to that base. We also have this huge tail of millennials and Gen Xers that are members of their family's entertainment service and their parents' wireless plans. That's why, for example, what we do with Otter is targeted at that space as well.

**DEADLINE:** *Have you thought of buying a major content creator?*

**STANKEY:** We think about things over long horizons here. In the near-term we want to integrate DirecTV. The second part is we've got to get the core product and the service experience right. And the third thing is, you want to take that capability – that audience and that platform – and start to move further up the content ecosystem.

I don't think that necessarily requires you to go out and buy a big content company. But I do believe that, as we're successful in doing those things, we will continue to move deeper and deeper in our relationships with the content community in developing capabilities that are right for AT&T and AT&T's customer base. That will be an ever-evolving relationship and probably get deeper and deeper over time.

**DEADLINE:** *But you're also expanding content spending now. How much?*

**STANKEY:** We're not working with a Netflix kind of budget. But we're doubling our budget on content this year. We want to make sure we get to a point where we have enough scale and people start to think: "Gee, I want to have a relationship with AT&T because I can get content that I can't get elsewhere." We're not quite at that level yet, beyond *NFL Sunday Ticket* and our sports relationships.

**DEADLINE:** *Were you interested in the* Thursday Night Football *rights?*



**STANKEY:** As a general policy I don't comment publicly about things that we've been involved with from a business development or negotiation perspective. I will tell you that we're a big company and given our experience with the NFL and the great properties that we already have, it's something that we obviously look at and pay attention to. We're not ever going to say that were not interested in looking at really good content – especially content that extends our existing franchises.

**DEADLINE:** *Any interest in producing movies or backing productions?*

**STANKEY:** Sure. Longform has its place. If you were to think about the priorities of investing, number one would be what I would call television-form scripted. Two, you go to the fragmented side. And then, three, you go to longform. Our goal would be to be in a position where we could possibly do some collaborative work, and get some improved windowing.

**DEADLINE:** *Improved windowing with theaters, or with premium TV channels?*

**STANKEY:** Both.

**DEADLINE:** *It sounds like this is still in the conceptual phase. You don't have any concrete plans.*

**STANKEY:** That's correct. You're always scanning and always talking. But I can't tell you that I have a deal signed to solve a problem there.

**DEADLINE:** *This would all be to promote your wireless and wired distribution platform, not to build a separate profit center?*

**STANKEY:** Correct.

**DEADLINE:** *Some executives say that there's a glut of original TV shows. Why do you think there's room for more?*

**STANKEY:** I'm not worried that we're overinvesting in content. We're of the mind-set

that we should step it up a bit. People don't fully appreciate that [overall spending] should be going up because the number of opportunities to distribute content are going up. The hours in the day that people can gain access to content are going up. Will it be a little more fragmented? And are we going to have to change our expectations for how much we invest in some of that? I think the answer to that is "yes." That's why we're focused on our personal development [of shows] to make sure we're getting the right bang for the buck. We've been pretty disciplined about that.

*DEADLINE: What's your strategy with Otter Media? Is it your entrée into Hollywood?*

**STANKEY:** We're trying to work with more traditional content on our own, internally, and will continue to do that. But we've used Otter aggressively to tap into the less developed form of content that fit more of the Gen X and millennial dynamic that we haven't spent as much time on. That line isn't bright. I can't tell you that we don't have slop-over. But that's generally where we're oriented right now. At the end of the day we're just a voice at the table among many [at Otter]. We give them the autonomy to do what they need to do and try to run the business in the way they think is appropriate.



*DEADLINE: Otter's Fullscreen just announced plans for a major subscription streaming service for teens and young adults, that AT&T will back and offer. Is that a blueprint for other initiatives we're likely to see?*

**STANKEY:** It's a good example of how we're working with Otter. To the extent that we're successful, we expect to do more. We have the Ellation [branded venture] that includes Crunchyroll and over 700,000 paid subscriptions for Japanese anime. We're looking at what we can do to broaden the portfolio of other subscription services under the Ellation brand.

*DEADLINE: What audiences are underserved right now?*

**STANKEY:** When you get away from audiences of 20 million and you start thinking about what you can do with 1 million you get a very long list. We believe there's some great opportunities with at-home mothers that are into a variety of things whether it be gardening, cooking, or crafts. Media and content can come together to serve them in a way that's different than it does today. We believe that there are certain segments of the sports market that are underserved — what I would call nonmainstream sports.

**DEADLINE:** *What nonmainstream sports are you looking at?*

**STANKEY:** I don't want to go any further on that. All that does is create problems for how much I've got to pay to get stuff.

**DEADLINE:** *Lots of sports leagues and producers want to deal directly with consumers.*

**STANKEY:** There's certainly a segment of the population that's willing to spend hours and hours and hours doing their own curation and discovery. But there's a segment of the population that probably is not willing to do that. Our job is to be a good curator and a good aggregator, to be sure we're bringing them really good content. And when you think about it, this content is consumed over connectivity. That connectivity doesn't come for free. Our goal is to prefer our connectivity by tying really good content next to it.

**DEADLINE:** *How confident are you that the new programming you're generating won't cannibalize your existing stuff?*

**STANKEY:** I don't think you ever go into new innovation and change things and don't have some degree of cannibalization. But if we allowed cannibalization to be our guiding decision point, we would've never gone into the broadband business. We knew that it was going to cannibalize voice telephone service, and we went into wireless knowing that it was going to ultimately make voice telephone service in the house extinct. That's just the nature of the beast. You can do it in a disciplined fashion. You think about how you offer products to make sure that you're getting the right service to the right person and adding a continuum of features. We've used that strategy in our prepaid [wireless phone] business and wireless post-paid business. We'll do the same thing in entertainment.

**DEADLINE:** *But you've said that you don't want to offer skinny bundles. Many other pay TV distributors say they'd like to offer fewer channels than the expanded basic bundle includes, at a lower price.*

**STANKEY:** We don't think skinny bundles meet many customers' needs. It's probably because of how the content industry wants to sell their content in a bundle. If you just get one skinny bundle then you really can't self-construct it. If I come out with a skinny bundle of 28 or 30 networks – that might be well-suited to my wife, but if there's no sports in it then it is probably not going to meet John Stankey's needs very well. So the skinny bundle just doesn't have a broad enough appeal.

**DEADLINE:** *Would you like to see providers break up the packaging so you could buy networks individually?*

**STANKEY:** We all have our likes. In an ideal world I'd like to have a car for free. In an ideal world I'd have 500 channels and not have to pay for it. Unfortunately we don't live in these ideal worlds. People who develop really good content have demonstrated that they can deliver high-value because they're able to get [networks] bundled together and sold together. Sometimes developing a new concept requires a degree of cross subsidy. That's their business model and I don't think it's going to go away overnight. So we all might want to have à la carte and only watch my favorite 12. [But] newer content and the nascent stuff that doesn't have an audience would disappear. Ultimately that would lead to an ecosystem that doesn't have the broad choice that's available today.

**DEADLINE:** *Hollywood is famous for being a clubby town built on connections. You come from a different club in telecom and businesss. Do you have the background and skills to navigate the content world?*



**STANKEY:** One of the reasons we've established the relationship with the Chernin Group is that we're trying to bolster talent and capabilities in certain areas where we think we need to get better. We'll continue to do that. I'm not going to sit here and tell you that I believe AT&T is the best programmer out there, and I'm not going to tell you that I believe we are the masters of the universe in Hollywood. It's important for us to continue to get better and continue to build relationships.

That said, at the end of the day, people are involved, and at AT&T we know how to work with people. We're a company that knows how to build long-term relationships and treat our partners fairly. We've demonstrated that we can work with folks to distribute content and make money. And I think if you can help people further their business models and get a return for their shareholders, treat them fairly, and have good human relationships that are long-term in nature, you can ultimately establish those kinds of business relationships that are healthy. I think I do know how to do that. It takes time and I think we're making progress. But we're not as good today as were going to be three years from today.

**DEADLINE:** *What are your favorite movies and TV shows that don't come from AT&T?*

**STANKEY:** I don't watch a lot of movies. I don't have a lot of time to do that. Right now

I'm watching *Homeland* – trying to get through some past seasons and get caught up on that. It's a good show and I thoroughly enjoy it. It's probably my one guilty pleasure right now in terms of discretionary time.

---

This article was printed from https://deadline.com/2016/04/john-stankey-att-interview-content-spending-plan-1201732912/

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>                    PLAINITFF,<br><br>v.<br><br>AT&T INC.;<br>DIRECTV GROUP HOLDINGS, LLC; AND<br>TIME WARNER, INC.;<br>DEFENDANTS. | Civil Action No. 17-cv-02511<br>(RJL)<br><br>Judge Richard J. Leon |
| JOSEPH M. ALIOTO, Proposed *Amicus Curiae*, appearing *pro se* | |

**[PROPOSED] ORDER GRANTING MOTION FOR LEAVE BY
JOSEPH M. ALIOTO TO FILE AN *AMICUS CURIAE* BRIEF IN
SUPPORT OF THE UNITED STATES OF AMERICA**

THIS MATTER came before the Court on this Motion for Leave by Joseph

M. Alioto as *amicus curiae* in support the United States of America for an Order

Enjoining the Proposed Acquisition.  The Court, having considered the motion and

any opposition, it is HEREBY ORDERED that the motion for leave to file a brief

as *amicus curiae* is GRANTED.

DATED this _____ day of _____, 2018.


_____

The Honorable Richard L. Leon