```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,       :
                                :
              Plaintiff,         :        CV No. 17-2511
        vs.                      :
                                :        Washington, D.C.
                                :     Monday, March 19, 2018
AT&T, INC., ET AL.,             :          2:45 p.m.
                                :
                                :
              Defendants.        :
----------------------------x



                      AFTERNOON SESSION
              TRANSCRIPT OF EVIDENTIARY HEARING
            BEFORE THE HONORABLE RICHARD J. LEON
               UNITED STATES DISTRICT SENIOR JUDGE
```

APPEARANCES:

For the Government:    Craig W. Conrath, Esquire
                       Eric D. Welsh, Esquire
                       Donald G. Kempf, Jr., Esquire
                       Curtis W. Strong, Esquire
                       Alexis K. Brown-Reilly
                       Elizabeth A. Gudis
                       Nathan D. Brenner, Esquire
                       U.S. DEPARTMENT OF JUSTICE
                       Antitrust Division
                       450 Fifth Street, NW
                       Washington, DC  20530
                       (202) 532-4560
                       craig.conrath@usdoj.gov
                       eric.welsh@usdoj.gov
                       donald.kempf@usdoj.gov
                       curtis.strong@usdoj.gov
                       alexis.brown-reilly@usdoj.gov
                       elizabeth.gudis@usdoj.gov
                       nathan.brenner@usdoj.gov

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1    Appearances Continued:

 2    For Defendant AT&T        Katrina M. Robson, Esquire
      and DirecTV Group         O'Melveny & Myers LLP
 3    Holdings, LLC:            1625 Eye Street, NW
                                Washington, DC  20006
 4                             (202) 220-5052
                                krobson@omm.com
 5
                                Daniel M. Petrocelli, Esquire
 6                              M. Randall Oppenheimer
                                O'MELVENY & MYERS LLP
 7                             1999 Avenue of the Stars
                                8th Floor
 8                              Los Angeles, CA  90067
                               (310) 553-6700
 9                              dpetrocelli@omm.com
                                roppenheimer@omm.com
10
                                Robert C. Walters, Esquire
11                             GIBSON, DUNN & CRUTCHER LLP
                                2100 Mckinney Avenue
12                              Suite 1100
                                Dallas, TX 75201
13                             (214) 698-3350
                                rwalters@gibsondunn.com
14
      For Defendant            Kevin J. Orsini, Esquire
15    Time Warner, Inc.,:      Peter T. Barbur, Esquire
                                CRAVATH, SWAINE & MOORE LLP
16                              Worldwide Plaza
                                825 Eighth Avenue
17                              New York, NY  10019
                               (212) 474-1140
18                              korsini@cravath.com
                                pbarbur@cravath.com
19
      Court Reporter:          Crystal M. Pilgrim, RPR, FCRR
20                              United States District Court
                                District of Columbia
21                             333 Constitution Avenue, NW
                                Room 4700-F
22                              Washington, DC  20001
                               (202) 354-3127
23                              crystal_pilgrim@dcd.uscourts.gov

24

25
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2            THE DEPUTY CLERK:  Your Honor, recalling civil action

 3   number 17-CV-2511, the United States of America v. AT&T, Inc.,

 4   et al.

 5            THE COURT:  All right counsel, let's take a look at,

 6   see if I've got your updated PX 005.

 7            MR. CONRATH:  Your Honor, may I interrupt with a

 8   preliminary matter?

 9            THE COURT:  Sure.

10            MR. CONRATH:  I apologize.

11            THE COURT:  Not a problem.

12            MR. CONRATH:  I've been deputized by this

13   distinguished array of people who represent third parties over

14   here.

15            THE COURT:  Okay.

16            MR. CONRATH:  To encourage, there are people that

17   have concerns about confidentiality, to encourage the Court if

18   it's possible to work in a confidentiality discussion sometime

19   during this afternoon.  At least one of the counsel has a

20   serious personal commitment for tomorrow.

21            THE COURT:  Okay.

22            MR. CONRATH:  If I could add our own, we're of course

23   in the process today and tomorrow of preparing witnesses who

24   will appear on Wednesday and Thursday for whom there are

25   confidentiality issues.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    So the sooner we can get the Court's guidance and how,

2    that will help us prepare for a smooth presentation that

3    respects confidentiality in open court.

4             THE COURT:  Sure.

5             MR. CONRATH:  So I pass those two things on and I'm

6    sorry for interrupting.

7             THE COURT:  Okay, that's fine.

8        Let me, we still haven't had a chance on our side to go

9    through your revised chart.  And now that I have looked at your

10   revised chart and compare it to my chart, I see that one of the

11   exhibits, well actually, three of the exhibits that I was going

12   to ask you about, looks like you're not using them anymore.

13            MR. PETROCELLI:  May I approach?

14            THE COURT:  Yes.

15            MR. PETROCELLI:  May I address the Court on this?

16            THE COURT:  Yes.  It was 005, 0013 and 0028.

17            MR. PETROCELLI:  So here's the explanation.

18            THE COURT:  Are they still going to use them or you

19   don't have an objection or both?

20            MR. PETROCELLI:  Our objection was that they needed a

21   witness to address the document in court.  So on the assumption

22   that there will be witnesses to address the documents, we

23   didn't have any further issue with the document.

24            THE COURT:  Okay.

25            MR. PETROCELLI:  So in the shorter list that you

1   have, it does not include for the most part documents that if

2   presented through a witness we would have little issue.  So

3   that's why you see fewer documents on here.

4           THE COURT:  I see.  I think what we might do then is

5   break a little early today so I can do a comparative of these

6   two.

7           MR. PETROCELLI:  Yes.

8           THE COURT:  For tomorrow's discussion.  I feel like

9   I'm a little bit out of sequence with where the parties are.

10          MR. PETROCELLI:  So for example, on the newer and

11  shorter list the next exhibit would be Exhibit 49.

12          THE COURT:  Yes.

13          MR. PETROCELLI:  And if you will see, Your Honor,

14  from Exhibit 49 all the way through the following page up to

15  Exhibit 163, there's about 7, 8 exhibits there.

16      All of those exhibits are the same issue which is that

17  that's a third party and if the third party does not come in,

18  we object on hearsay.

19      If the third party comes here and testifies about the

20  documents, then they may meet the requirements for admission,

21  but that's the nature of those objections.

22      And you'll see that many of the documents on this list

23  fall in the category of third parties and until and unless the

24  witness takes the stand and can establish the necessary

25  foundation, we have asserted various hearsay objections among

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  others.

2       THE COURT:  So these won't be, we don't know yet if

3  they're going to have someone, right?

4       MR. PETROCELLI:  Exactly.

5     Now the next, the next non third party exhibit, Your

6  Honor, is Exhibit 200.  You'll see that's a Time Warner

7  document.

8       MR. WELSH:  Your Honor, may I be heard on the

9  subject?

10       THE COURT:  Which one?

11       MR. WELSH:  Just on the prior ones just to comment.

12       THE COURT:  Sure, absolutely.

13       MR. WELSH:  Thank you.

14     So Your Honor, we will have, to Mr. Petrocelli's point, we

15  will have witnesses that will come in, third parties as well as

16  party witnesses on these documents.

17     So we, I wanted to know too at the onset following up from

18  conversations had with the Court last week and then hearing

19  again today.  We're mindful of the Court's view of the

20  sponsorship issue.  And we also greatly appreciate the Court's

21  time that you're willing and in the generous nature of that and

22  giving time to us.

23     So we will be adding some additional witnesses and will be

24  talking with the defendants about that with regard to

25  sponsorship issues.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1          THE COURT:  Right.

2          MR. WELSH:  If appropriate, Your Honor, I thought

3   what might help a little bit on, in terms of the relevance

4   argument here is to maybe provide a little bit more background

5   and context for the Court, at least from the government's

6   perspective.  It might help cut across all of these different

7   documents and issues that we're talking about here.

8          So if I may, if we just step back a minute and think about

9   what the government has to do here.

10          The government has to come into the Court and through the

11  witnesses and through the documents tell the Court what the

12  existing state of affairs is in this market today.  So who are

13  the players in it?  We've got AT&T of course is one of the

14  largest distributors in the country of video content.

15          And then we have on top of that other distributors, both

16  in terms of the traditional distribution models is the cable

17  companies, Telecom and satellite companies such as DISH that

18  are distributing.  They're also the virtual distributors out

19  there that are going over the top.  So we have to present that

20  to Your Honor.

21          We also have to present the other part of this equation in

22  the virtual integration that the defendants want to do which is

23  on the programming side.

24          So we have Turner as a programmer.  And Turner has very

25  important and very popular content which has been referred

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   throughout in the industry as being must have content.

2       So we present our witnesses and we'll present exhibits to

3   Your Honor that you'll be able to understand what the

4   importance of Turner's content is.

5       And that's because post merger, if the merger were to

6   occur, it's the government's position that AT&T and DirecTV

7   will have an incentive and be in line to take that content that

8   they obtain, this must have content.  This very important

9   content of Turner and use that to its advantage and against the

10  other distributors out there, AT&T's competitors.

11      So we bring in the evidence and the exhibits and the

12  witnesses to set that ground for you and that's why we have so

13  many documents.  And that's why we go to the FCC filings so

14  that Your Honor can understand how industry players and in

15  particular AT&T and DirecTV have viewed this situation up to

16  now.

17      So for example, when we look at Exhibit PX Exhibit 2 which

18  we had briefly touched on before the break, that is a document

19  that was -- excuse me -- that was submitted by AT&T and as to

20  some program access rules and in that document AT&T talks about

21  virtual integration of programmers and it talks about how they

22  would have the incentive and ability to use that programming

23  and to control that as a weapon to hinder competition

24  downstream.

25      So again, the relevance of these statements is that this

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    tells the Court this is the view of AT&T back in 2012 that the

2    very type of thing that is going on here now today that they

3    propose today to do with this merger that in 2012 they were of

4    the view well, that can actually be used as a weapon to hinder

5    competition and to harm consumers downstream.  So that's why we

6    bring these documents in as an example, Your Honor, of what

7    we're doing here.

8         Another one, Your Honor, is PX 355 which is an AT&T and

9    DirecTV submission in 2015.  Now this submission was made in

10   connection with the AT&T and DirecTV merger and again, picking

11   up on the point I mentioned a moment ago when we talk about

12   Turner here today and the importance of Turner content to

13   distributors which Your Honor will hear about from witnesses on

14   the stand, AT&T told the FCC back in 2015, AT&T and DirecTV

15   they made the very point that don't worry about this

16   acquisition because we're not getting any must have content.

17        So they were distinguishing the situation where there

18   might be some competitive issues if you're getting must have

19   content versus if you're not getting it.

20        And another one, Your Honor, is PX 450.  Again, this is

21   another FCC filing, this one from AT&T in October of 2015.

22   This was in connection with a review of the Charter, Time

23   Warner cable merger and in that case again AT&T stated to the,

24   and represented to the FCC in its filings that there was an

25   incentive to share programming with each other at reasonable

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1   rates while using that programming to raise their rival's cost.

2   That's on PX 450003.

3       Again, issues that are going centrally to the government's

4   case here about this vertical merger will give them the ability

5   and incentive to raise rival's cost which will be the other

6   distributors out there.  So whether it be Charter or Cox or

7   Comcast, AT&T would use the Turner content to be able to

8   increase the cost of those rivals in the market place.  And

9   then that gets passed down to the consumer in higher prices.

10      So that's why all of these, I just want to put some

11  context of why the FCC filings matter and why they're important

12  because it's back then the defendant said one thing which go

13  directly to what the government is alleging and arguing here

14  and will present evidence on here and now today they're coming

15  into court and basically saying a lot of hand waiving, don't

16  worry about it because it's not going to be an issue.

17      The other thing I'll just say again, it comes back to

18  documents and it also comes back to their own witnesses, Judge.

19  Again, you see a lot of email.  You'll see a lot of decks,

20  power point decks and slides.  The reason why is that the

21  people that are in the business today at AT&T, DirecTV, Time

22  Warner, they're the same people that are going to be in that

23  business if this merger goes forward.

24      So the statements that they make in their emails among

25  each other, the statements that they make in their power point

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1   about how they view the industry today, what they would do in

2   some cases if the merger goes through, but in other cases just

3   what they do and how they operate, that's going to I think be

4   helpful and informative to Your Honor so you can then take it

5   and move forward.

6        Because what Your Honor has to do here is a predictive

7   exercise of looking forward if the merger were to occur, what

8   would be the state of affair in terms of competition in the

9   industry and the consumer harm.  So all of this evidence that

10  we bring to Your Honor goes to these points.

11       One final thing and then I'll pass to Mr. Petrocelli.  We

12  talked before the lunch break about the Google document PX 003,

13  Your Honor, that power point deck.  With respect to that, Your

14  Honor, again it's confidential so I can't get into a lot in

15  great detail, but I would say which is public and I can talk

16  about is that the defendants in their answer in paragraph 5 of

17  their answer they make the points the first sentence Google's

18  YouTube TV service is a powerful and recent example that

19  disproves the government's central thesis.  They have just

20  squarely put it on Google, the fact that Google YouTube TV did

21  not carry Turner, that that completely undercut the

22  government's case, that's it.

23       Google, the exhibit, Google as a witness will come in and

24  will tell the Court through testimony that Turner is valued.

25  And that they now have Turner on YouTube TV.  And Your Honor

*1REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*1

 1   will understand again, I can't get into it explicitly now

 2   because of the public session, but you'll understand why.

 3        Thank you, Your Honor.

 4        THE COURT:  Okay, thank you.

 5        Mr. Petrocelli.

 6        MR. PETROCELLI:  Yes, Your Honor.

 7        I'd like to respond to counsel's argument.  And I think

 8   the purpose of that argument was to revisit the issue of the

 9   various regulatory filings in the other matters.

10        As I indicated before, while those documents may have had

11   some pertinence or relevance to the prior proceedings, the

12   government cannot prove this case by what somebody, even if it

13   were AT&T for example, said with respect to another set of

14   issues in another matter.  It depends on this particular

15   transaction which is a very specific transaction, Your Honor.

16        Now to give you an example.  He was quoting various

17   statements that were made with respect to the other, those

18   other deals.  In this case, Your Honor, I call this the

19   incredible shrinking case, there is, AT&T is acquiring Time

20   Warner.  Time Warner consists of three sets of assets.

21        Number one is Warner Brothers, movies, TV shows, cartoons,

22   et cetera.

23        Number two is HBO, Sopranos, Game of Thrones.

24        Number three are the Turner cable networks.  There is no

25   broadcast networks so you have TNT, you have CNN, Cartoon

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1    Network and some others.

2         The government is making no claim in this case because

3    after a year and a half they had no evidence that there will be

4    any withholding of any of this programming by AT&T or Time

5    Warner post merger.  No withholding of Warner Brothers.  No

6    withholding of programming from others of HBO and no

7    withholding of the networks by Turner.

8         Their own expert has admitted it would not be profitable

9    post merger to withhold these assets.  It would not be

10   profitable.

11        There's no claim of a price increase with respect to

12   Warner Brother assets, with respect to HBO assets.

13        There's a single claim of a price increase in this case,

14   Your Honor, one claim.  And it's the claim that I mentioned in

15   court before.  On day one it started out as 27 cents per month

16   per sub and the per subscriber and then a couple of weeks

17   later, frankly after I made my comment in court, the expert

18   changed his numbers and their expert now is up to 45 cents.

19        So what you are going to hear is that this merger ought to

20   be blocked on the basis of a 45 cent per month per subscriber

21   price increase which comes to about $5 a year on a cable bill.

22        Now you're going to hear from us that the academic

23   bargaining model that was used to come up with that $5 a year

24   is completely misapplied in this case and when you do it the

25   right way, you don't come up with a price increase to the

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   consumers, you actually come up with a price decrease to the

2   consumers.

3       Then one final thing.  In paragraph 38 of their complaint,

4   they alleged that as a result of this merger the prices of

5   DirecTV after the merger to its own consumers and subscribers

6   will increase.

7       Their expert after he did his analysis agreed with us.

8   The prices will not increase.  In fact, the DirecTV prices will

9   go down to consumers.

10      So the comments that Mr. Welsh was  adverting to in other

11  cases involve situations that have none of the characteristics

12  of this case which is down to frankly a very narrow issue about

13  this 45 cent price increase.

14      They have a second argument that they say that we're now

15  going to, the benign word, the benign word is coordinate but

16  it's a polite way of saying collude that after this merger that

17  Time Warner AT&T are going to somehow collude with Comcast

18  NBCU.  Those are the two arguments that they're making.  These

19  arguments were not present in these other cases, Your Honor,

20  and so there's no utility to reading hundreds and hundreds of

21  pages of advocacy pieces.

22      And frankly, the government has switched sides on some of

23  these positions.  In the Comcast NBCU case they filed a

24  competitive impact report and you're dealing with a broadcast

25  network.  You're dealing a venerable broadcast network, namely

*[REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER]*

1   NBC.  You are dealing with Regional Sports Network, a much,

2   much greater than what you have in this case.

3       Yet they said in that case that all of this would be fine

4   with a simple remedy of an arbitration and standstill clause.

5   In this case when we volunteered on our own to offer our

6   distributors that very same mechanism, they now say it's

7   completely ineffective.  So they're making the opposite

8   argument that they made in that case.

9       Now both sides can play this game.  The reality is it's of

10  no help to the Court because the Court is going to have to

11  decide the case not what somebody said five years ago in

12  connection with a different transaction, but what the evidence

13  is on this case.

14      And this issue that counsel said about must have that

15  Turner's networks are must have because right now there's

16  basketball games, they call it March Madness that are on the

17  Turner networks.

18      Your Honor, you are going to hear evidence in this case

19  that every single programming, whether it's ESPN, whether it's

20  NBC, whether it's you name it, everybody says all of their

21  programming is must have.  It's a marketing term and it's what

22  they say in the industry in order to sell their stuff.  There's

23  no antitrust significance at all to that.

24      You're not going to get any value from reading those

25  materials on these kinds of issues.  You will get value from

*[REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER]*

1   talking to the witnesses, the people who live this business.

2       We're going to be calling key Turner witnesses.  We're

3   going to be calling the chairman and CEO of Time Warner.  We're

4   going to be calling the chairman and CEO of AT&T.  We're going

5   to be calling other high executives.

6       These are the people that you are going to look in the

7   eye.  You're going to see whether they're rationale for this

8   merger makes sense to you, whether it's truthful.  And as far

9   as the documents are concerned, you won't see a document in

10  this case, Your Honor.

11      And the government is trying to suggest that because I

12  have been arguing vehemently that there should be witnesses to

13  talk about documents, that's not a novel proposition.  I have

14  been trying cases for 40 years, that's how documents are

15  introduced.

16      We in no way are distancing ourselves from our documents.

17  There's nothing wrong with our documents, Your Honor.  The

18  government keeps taking snippets and cherry picking them and

19  that's why they want to put four boxes of documents into the

20  record without a witness.  Once the witnesses talk about the

21  documents, you'll see that the documents make perfect sense in

22  the context of this case and what's going on in this case.

23      You won't see any document for example that's going to say

24  hey, let's do this merger so we can get more money from

25  consumers, so we can raise prices.  Hey, let's do this merger

17 REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    because we want to withhold programming.  You're going to see

2    none of those documents, Your Honor.

3        Instead, they want to talk about documents that go back

4    ten years before, five, six years before AT&T even acquired

5    DirecTV.  I think that's not only irrelevant but it's going to

6    prejudice the record to have all of that material strewn

7    throughout the record.  So we would stand on those prior

8    objections.

9        Beyond that, Your Honor, what I was about to tell you is

10   that on the sheet that you do have, beside the third party

11   documents which are numerous, and would require a witness to

12   come in, they're not that many additional company documents on

13   here.  And a number of the company documents on here to which

14   we have noted in a hearsay objection, that can be dealt with

15   very easily.

16       I heard Mr. Welsh say they are not planning to introduce

17   any of these documents for any multiple hearsay purposes.  So

18   if the document reports on some hearsay, it's not being offered

19   for the truth of the matter.

20       With that representation many of these hearsay objections

21   can come off the list if that's what they're representing to

22   the Court and to us that they're not intending to offer any of

23   these documents for the truth of the matter asserted with

24   respect to multiple levels of hearsay.

25       And we're prepared to go through these one by one.  I

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1    appreciate that this was just given to you and your staff this

2    morning, Your Honor,  and you've not had a chance to review

3    this.  But we can go through them now or whenever you would

4    like.

5           THE COURT:  What's your thinking on emails from the

6    third parties, from one of your company, one of the companies

7    you represent?

8           MR. PETROCELLI:  An email let's say between AT&T and

9    the third party?

10           THE COURT:  Yes, like this one PX 0089.  I don't know

11    if that's still one of your objections.  Let me look at your

12    objection list.

13           MR. PETROCELLI:  It is.

14           THE COURT:  Yes, so this is to a --

15           MR. PETROCELLI:  That looks like it's from two

16    people.

17           THE COURT:  Mr. Bond?

18           MR. PETROCELLI:  Yes, he doesn't work for us.  This

19    looks like it's an internal Comcast email.  Mr. Burke to

20    Mr. Bond.  I don't think there's --

21           THE COURT:  So that's in a different company all

22    together?

23           MR. PETROCELLI:  Yes, I believe all of these

24    documents that you'll see where it says the beginning Bates

25    range, you'll see Sienna, Goog, Comp these are the names of the

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

```
 1   third parties and that's how you can kind of tell they're third

 2   parties.  And these are, I believe, almost entirely within the

 3   third party companies.  They don't involve Time Warner or AT&T.

 4            MR. WELSH:  Your Honor --

 5            MR. PETROCELLI:  If there are, there may be some

 6   exceptions, but I'm not sure.

 7            MR. WELSH:  Just a note that PX 89 is a Comcast

 8   document.

 9            MR. PETROCELLI:  Internal Comcast.

10            MR. WELSH:  Internal Comcast.

11            MR. PETROCELLI:  Yes, that's what I thought.

12            THE COURT:  That's an email from someone at Comcast

13   to --

14            MR. PETROCELLI:  I have it right here.  Yes, it's to

15   people within Comcast, Your Honor.  There are no other people

16   copied on this email.

17            THE COURT:  I see.  Your objection there is hearsay?

18            MR. PETROCELLI:  Hearsay and yes, we need witness

19   testimony.

20            MR. WELSH:  There'll be a witness for this.

21            THE COURT:  There's going to be a witness for this

22   one?

23            MR. WELSH:  Yes.

24            THE COURT:  All right.  Let me see if there's any

25   other in my notes.
```

[REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER]

1       I think what I'll do, I'm going to look at this stuff

2  later this afternoon, after we break and then I'll be in a

3  better position to compare the two and then ask you questions

4  about it tomorrow.

5            MR. PETROCELLI:  Thank you, Your Honor.

6            THE COURT:  Mr. Welsh, do you have anymore to say on

7  this particular point that we've been going over or should we

8  switch to a different topic?

9            MR. WELSH:  I think we can switch to a different

10 topic.

11      Are you talking about in terms of the point FCC filings?

12           THE COURT:  Yes, those files or just the relevancy

13 objections in general.  Do you have anything further on that

14 point?

15           MR. WELSH:  No, Your Honor, I think I have stated

16 what the government's position is.

17           THE COURT:  Okay.

18           MR. WELSH:  Thank you.

19           THE COURT:  All right, so let's spend a little time

20 on the confidentiality issue that you want to talk about for a

21 confidentiality draft.  I think I have a copy.

22           MR. WELSH:  May I approach, Your Honor?

23           THE COURT:  Yes, you may.

24           MR. WELSH:  Your Honor, with respect to

25 confidentiality I believe that there are two proposed orders

*[REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER]*

1   that have been submitted to the Court.

2        One for plaintiff, one for defendants.  I think that the

3   proposals are very similar in most respects.  I think the

4   difference that exists is if not entirely it's largely in

5   paragraph two which talks about the use of confidential

6   information at trial.

7        The plaintiff's proposal is to have the following language

8   which I understand defendants have not incorporated into their

9   draft.

10       The plaintiff's position would be that the language would

11   read in examining or cross examining witnesses counsel shall

12   make no public disclosure of information or materials

13   designated confidential information.

14       If either party anticipates the need to seal the courtroom

15   for a particular testimony, counsel shall notify the Court and

16   all other parties at least 24 hours in advance of the witness's

17   testimony.

18       I believe that that is the only or at least the most

19   salient difference between the two.  I think that that may be

20   it.

21       We have included this language, Your Honor, out of I guess

22   a couple of different, for a couple of different reasons.

23       One I think the first statement is rather unobjectionable

24   that there won't be public disclosure of information and we

25   want to continue that in this order because of concerns that

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1   the existing order, the amended protective order has some

2   language that says unless the Court issues another order and

3   the documents and testimony that's confidential that might be

4   submitted could lose its protection if it's on the exhibit list

5   and comes into a courtroom.

6       So we want to have an order that will speak to that issue.

7   So that's what goes to that sentence.

8       The other sentence, Your Honor, is really out of concern

9   for a couple of different things.  One is we want to protect

10  the third parties information.  They have expressed concerns.

11  Several of the third parties are represented here today and

12  might wish to speak to Your Honor about their concerns in this

13  regard.

14      But we do think that it's helpful to have at least a

15  sentence in here that will talk about the possibility of trying

16  to deal with things in a closed session.  Both sides as I

17  understand, certainly the plaintiff, I can't speak for defense,

18  but I understand that they've articulated this, that we're

19  going to try to do our best to bring this case to Your Honor

20  and to do it in a public session as much as we possibly can.

21      We appreciate though that there will be a time when that

22  may not be possible, whether it be with third parties or even

23  with the defendant's own witnesses.

24      And so having a sentence in here that would permit the

25  opportunity to go ahead and to move into closed session we

17REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*1

1  think is going to be helpful.  We will try not to do that too

2  much.  But to have the ability to notify Your Honor in advance,

3  24 hours in advance, that we have a witness coming up.  They

4  have expressed some concern, there is a potential problem here

5  of some disclosure issues and so we feel that we may have to go

6  and take some of that examination into a closed session, so

7  that's why that sentence is there, Your Honor.

8       We have seen in this case some tension here between what

9  the defendants are saying in terms of confidentiality and their

10 wanting to have an open courtroom and then what is happening in

11 practice.  And that causes some concern.  That leads to some

12 views that we are maybe going into these closed sessions.

13      So for example, Your Honor, we know and again, some of

14 this is confidential so I am going to be careful in how I

15 phrase this.  We have an example where there's a contractual

16 term between Turner, Time Warner and a third party distributor.

17      In deposition testimony that has been presented, they are

18 designating information to be confidential that cannot be

19 shared in a courtroom, the public courtroom.  Turner has

20 designated, Time Warner has designated it.

21      We have the third party who on the very same subject was

22 asked in their deposition they designated that testimony as

23 well.  Virtually the same as you look at it.

24      Unfortunately what has happened though is that the

25 defendants then have been pursuing this third party and telling

1   them no, those pages are overly designated.  And you need to

2   withdraw those designations and pull back.

3        So we're seeing some tension here where on the one hand

4   the defendants say one thing and on the other hand they are

5   asking something different of the third parties.  That creates

6   a real problem and it's a fairness issue.

7        So Your Honor, that's just one example of how this is

8   happening and I have got the documents if you're interested.  I

9   can give you the deposition transcript pages and you can see as

10  well as a letter from counsel to the third party.

11       We're also seeing a problem though, Your Honor, with

12  respect to there are confidentiality designations as to their

13  own exhibits.  This is the defendant's exhibits.

14       So for example, Your Honor, and I can hand this to you,

15  you've got a copy of the document but not with their

16  designations.  This is PX Exhibit 8.  This is a Time Warner

17  document, it's a board book, board briefing strategy book.

18       The whole thing has been designated confidential, Your

19  Honor.  Every single word of this document has been designated

20  confidential.  If we put a witness on the stand because

21  Mr. Petrocelli says we have to have sponsorship of all of our

22  exhibits with the witness.  I put an executive of the Time

23  Warner on the stand and start asking questions about this, I

24  think the most I can ask him is do you have PX Exhibit 0008 in

25  front of you.  I'm not sure I can ask him another question in

1   open session.  So it's a problem.

2       This is another example, Your Honor, PX 460.

3           THE COURT:  Why couldn't you?  For example, why

4   couldn't you ask well, did you create this document?

5           MR. WELSH:  I could ask him that and I could set a

6   foundation.  You're right, Your Honor.  But if I wanted to get

7   into the substance of the document.

8       So if I wanted to say Mr. Bewkes, who's on the board, the

9   chairman CEO of the company.  So you received this document.

10  Let's go and look at page 21 of the document.  I want to direct

11  you to the paragraph that begins X.  I want to talk to you

12  about that subject.

13      I can't do that because they've designated that page.

14  They've designated that paragraph confidential.

15      Another example is on PX 460 which is a document that they

16  have given to our, it was attached to one of their experts.

17  This document again, the entirety of the document every single

18  page has a red box around it which means it's confidential.

19  Every single page.  We cannot explore this in open court.  So

20  it's a real problem, Your Honor.  These are just a few

21  examples.

22          THE COURT:  Is that a board document?

23          MR. WELSH:  This is not.  This is a document that

24  actually wasn't produced to us in the litigation.  It showed up

25  for the first time attached to their expert's report.  So I use

```
 1   these only --
 2           THE COURT:  Are they slides?
 3           MR. WELSH:  It's a power point deck, Your Honor.
 4   Happy to hand one to Your Honor if you would like to take a
 5   look at it.
 6           THE COURT:  Yes.
 7           MR. WELSH:  You probably have enough paper but I'll
 8   hand up that one as well as the PX 0008.  There are many other
 9   examples that I've got others here.  I don't think I need to
10   belabor the point.  But it's essentially a two fold concern,
11   Your Honor.
12       One is with respect to the treatment of the third parties
13   and their information which they have legitimate concerns over.
14       The other is how are we going to go about presenting our
15   case in court when we have designations both of documents and
16   exhibits that go far, far beyond what we understood Your Honor
17   was talking about the other day, the word by word sort of
18   designation.
19       Here we have entire decks, entire emails, entire sections
20   of important documents, important exhibits that have been
21   designated confidential by the other side.
22       And while we try to work these things out, at some point
23   we're in first day of trial and we haven't been able to work
24   these things out so that we can make sure that this goes on as
25   smoothly as it possibly can in open court.  So that's an issue.
```

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1            THE COURT:  Were you able in the case of say PX 460,

2    which like you say is a bunch of slide decks.

3            MR. WELSH:  Correct.

4            THE COURT:  Were you able to engage in a discussion

5    with the opposing counsel as to why, I mean go through it and

6    say why is this marked as confidential?

7            MR. WELSH:  I don't know the status of that, Your

8    Honor.  I do know with many of these others we have gone

9    through this process of trying to pull back as much as we can.

10        It's actually a very laborious process. We've got a number

11   of attorneys at the division who are working on this going

12   through the documents and saying well, we don't agree with

13   this, we don't agree with that.  We send that list back to

14   defendants.

15        They then are looking at it and they'll make some

16   adjustments if they can.  Some cases they do, in some cases

17   they don't and then it comes back to us.

18        Then we look at it again and say yes or no.  But the

19   process is just taking an inordinate amount of time and we're

20   left in a situation where we are going to have and again, I do

21   have some others where in fact, if I show Your Honor one I

22   think this might be helpful to your point.

23        Your Honor, this is PX 12.  This is I think illustrative

24   of what's going on so we have a pricing and again there is a

25   deck with an email and a deck attached.

17REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER11

1       Now on this one some of the redactions, the confidential

2  nature of it has been designated in these red boxes and some of

3  them are directly on prices which is fine.

4       They can do the prices, but then we get to entire pages

5  such as PX 12-006 and PX 12-008.  And those bulleted points

6  there are, they have been designated as confidential.  So we're

7  precluded from going into those pages in open court with the

8  witness.

9       So again, there are many other examples like this, but

10 that's how the process has gone.

11          THE COURT:  Were you able to have a discussion on

12 this one?

13          MR. WELSH:  I'm sorry?

14          THE COURT:  Were you or your team members able to

15 have a discussion on this one with opposing counsel?

16          MR. WELSH:  I believe so and I believe that's why we

17 have the boxes the way that we do.

18          THE COURT:  Okay.

19          MR. WELSH:  Originally when all of these documents

20 were produced to us they were of course all designated

21 confidential across the board without any of these red boxes.

22      Your Honor, that's what I think led to at least the need

23 and the concern including the language into our proposed order

24 that is before you.

25          THE COURT:  What's the government's, what's the

1    government's thinking on whether something should be marked

2    confidential?  What would need to be demonstrated by the party

3    who's marking confidential that it would necessarily result of

4    substantial likelihood result in harm to the company?

5            MR. WELSH:  Well, I think there are a number of

6    different criteria that one could take whether it's trade

7    secret and confidential in that respect.  Whether it would be

8    harmful to the company I think is a too generous of a position,

9    because what we've seen also and it's important to note is that

10   much of what we see coming back from the defendants that they

11   put these little red boxes around tends to be the statements

12   that are the most disquieting to them.  And they don't want

13   that into the public realm, so we run into this issue.

14       It's not a question of, it's the, the percent number

15   that's on the page that they've redacted out, but it's

16   something that's a statement made by one person to another

17   which is a significant part of the document.

18       Suddenly we see a red box around that information to keep

19   that from public scrutiny.  That's not, that's not what

20   confidentiality is about, and I don't think and it's certainly

21   not the government's position that that sort of information

22   should be protected from disclosure to the public.

23       Thank you, Your Honor.

24           THE COURT:  Did you want to challenge their claim of

25   confidentiality in that situation?

[[REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER]]

1          MR. WELSH:  Well, under the amended protected order

2    it's the obligation of the defendants in this case to move the

3    Court to seek protection of the information.  The burden is

4    placed on them under the amended protective order.

5          So we have been trying to work with them to see if we can

6    reduce the concerns as much as possible and hopefully not bring

7    these to Your Honor.  We've not been successful in that regard.

8          We of course will continue to do, to work with them to see

9    if we can get there, but we are running into a bit of an issue.

10          THE COURT:  So what does your third party -- you're

11    the one that more so than the defendants that have third party

12    witnesses who, you know, who are in need of protection as to

13    their business confidential information.

14          MR. WELSH:  Correct, Your Honor.

15          THE COURT:  For fear that it might endanger their

16    ability to deal effectively in future negotiations, any of the

17    defendants or a merge entity.

18          MR. WELSH:  Right.

19          THE COURT:  So it's understandable that they would

20    have concerns like that.

21          So your proposal as it's currently structured, you believe

22    would be completely satisfactory to those third parties; is

23    that right?

24          MR. WELSH:  We hope so.  They're here and maybe they

25    would be better to speak for them  because I certainly wouldn't

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1   do that, but we tried.

2           THE COURT:  Have they seen it, your proposal that is?

3           MR. WELSH:  They did not see it before we submitted

4   it to Your Honor.

5           THE COURT:  Okay.

6           MR. WELSH:  So again, they are here and can speak to

7   the issue, but we have tried to do what we could to meet Your

8   Honor's concerns.

9       We share those about the public setting.  At the same time

10  there is a legitimate need for confidentiality to apply.

11  Certainly for the third parties and we know that this District

12  Court has a long standing history and there's, there's case law

13  in this regard where the third party is afforded greater

14  protection and is the Hubbard case, if I recall correctly, U.S.

15  v Hubbard out of this Circuit Court here.

16      The third party is typically given a little bit more

17  protection because they're not the ones that come to this court

18  as part of the merger, the merger transaction.

19          THE COURT:  So as to those portions of its documents

20  that they wish to be designated as confidential, do they go to

21  you in the first instance to say here's what we want to have

22  marked as confidential to see if you'll agree with them?

23          MR. WELSH:  I think the way the process worked is

24  that we receive their millions of pages of documents with

25  everything being stamped confidential.

17REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER"1

1          THE COURT:  Everything.

2          MR. WELSH:  Everything.  You name it.  So if it was

3    even a public press release statement.

4          THE COURT:  That's not very helpful.

5          MR. WELSH:  It's not, Your Honor.  So we have gone

6    through that and we have focused our attention of course on the

7    exhibits and not on the rest of the production and we have gone

8    back to them and said we disagree.  We don't think that this

9    document can possibly be confidential.

10       They then engage and we get something back and then we

11   look at and say, you know, we agree and we have agreed on some.

12   Or we say no, we can't agree on that and you need to go back

13   and look at that further and refine it and correct it so that

14   we can try to get it to a manageable amount so that we can

15   actually have a worthwhile examination of a witness in open

16   court.  That's the process.  And it's been unfolding.  It's

17   been a slow process let's say that.

18         THE COURT:  How many witnesses do you think you'll

19   have that are third parties that pose this kind of problem,

20   dilemma?

21         MR. WELSH:  I think that it's going to probably be a

22   potential concern for most.  Maybe not all, but most where

23   there'll be some portion that I'm sure they're going to want

24   the examination to be in closed session.

25         THE COURT:  You've explained to them that we can't do

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

 1   that?

 2          MR. WELSH:  I also think that what we're going to see

 3   with defendants is exactly the same problem.  I think that

 4   almost every single one of their witnesses and I'm having

 5   trouble thinking of an exception that we'll get into their

 6   documents on the stand, even more so today than yesterday

 7   because of where we are with the need for getting the documents

 8   in front of the witnesses and we will have to have them explain

 9   in some detail what's going on in these documents and on

10   particular topics.

11          As it stands now with most of those documents we would

12   have some problems.  And certainly with respect to some of the

13   more important issues.  When we get into financial figures for

14   example, that we might be looking at, we won't be able to

15   examine the witness in open court on that because of

16   designations.

17          There will be other pages too where just talking about

18   their position on negotiations and contract, Turner's

19   negotiations and contracts with other distributors, they're

20   going to take the position that that's confidential and can't

21   be in a public setting.  That is their position.  They've

22   expressed it in their documents with these red boxes.

23          We will not be able to ask a witness on the stand about

24   when you had a negotiation with this particular third party

25   distributor back in 2015 that you were of the view of X.  We

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  cannot ask that question as it stands now on the stand because

2  of their designations.

3      They take the position that what happened in 2015, what

4  happened in 2014 that because those relate to contracts that

5  were entered into by Turner with distributors, with third party

6  distributors that are long term contracts, some of these go

7  out, five, six years, that because those negotiations back

8  there have not come around again, even if they have come around

9  again, they are confidential apparently to them.

10     So they don't want that out in the public because they

11 don't want the third party to hear about their thinking about

12 how they're going about the negotiations.

13     So I'm just wanting to alert the Court that things that we

14 talk about here and have been talking about openly that one of

15 the key issues here is how do negotiations occur between a

16 programmer Turner and a distributor and AT&T or Cox and how

17 that might change post merger.  We won't be able to go into

18 that in sufficient detail at all in a public setting based on

19 where we stand with the confidentiality designations.

20     So again, that's why the language has been added so that

21 again we will try our best to keep it to a minimum, but it's

22 unfortunately going to be a reality I fear.

23          THE COURT:  What is it about your case that requires

24 you to need, not want, need third party testimony?

25          MR. WELSH:  We absolutely need third party testimony.

17 REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER 11

1          THE COURT:  What is it about your case that requires

2    you to have that?

3          MR. WELSH:  We need the third parties to come in and

4    to tell Your Honor these are third party distributors.

5          THE COURT:  Right.

6          MR. WELSH:  That are competing with AT&T.  They're

7    going to come in and tell Your Honor that we have negotiated

8    with Turner about this way in the past.  We view Turner's

9    content as being important, as being must have content that we

10   need to have in our business.

11         THE COURT:  Yes.

12         MR. WELSH:  They're going to tell Your Honor that

13   they're concerned about this merger.  They're going to tell

14   Your Honor that their concern is that the merger is going to

15   result in AT&T having control over Turner and over Turner's

16   content, that they'll be able to then increase the price to

17   them of Turner content and if they don't pay for the Turner

18   content, then they turn off the tab and they don't get a

19   renewed contract.

20       They're going to talk to Your Honor and tell Your Honor

21   about the negotiations that occur pre merger today in the past,

22   in the last three years about how that dynamic works between

23   the parties and how important it is.

24       And then they're, Your Honor is going to hear other

25   evidence in this case that will show you that that bargain

1    that's occurring between Turner and the distributor, that

2    bargain, that leverage is going to change post merger, it's

3    going to shift because of AT&T's control over Turner.  That's

4    what the third parties are going to come in and tell Your

5    Honor.

6              THE COURT:  So basically it's their prognostication

7    as to what will happen should the merger go through, right?

8              MR. WELSH:  No, no, it's not.  It's part.

9         What they're going to talk to Your Honor about is today,

10   yesterday, how they view Turner.  How they viewed the content.

11   Why it matters to their business.  How they operate their

12   business.

13             THE COURT:  But why would that thinking which they're

14   willing to testify in court about be confidential?  The part

15   that's confidential isn't it like profit margins and

16   calculation of profit and how they structure their negotiations

17   with, how they would structure their negotiations with AT&T so

18   that they would get the best deal that they could under the

19   circumstances?

20             MR. WELSH:  I think all of that is, and I'm not going

21   to speak for them.  I'm not going to speak for what their

22   concerns are on  confidentiality but I agree with what you're

23   saying.  I think there are other things too.

24        I think that their view and their approach of how they go

25   at it with the defendants, I think is if they feel that's

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1  confidential and something that needs to be heard only in a

2  closed courtroom, I'm not in a position to say yes or no on

3  that.  So I leave that to explain to Your Honor and that's

4  again what our proposed order is also designed to do.

5          THE COURT:  With that kind of data that I was just

6  alluding to, whatever form it takes, I don't know from

7  knowledge yet because I haven't seen the exhibits.

8          MR. WELSH:  Yes, Your Honor.

9          THE COURT:  I don't know what form it would take, but

10 what I'm trying to discern is the extent to which they need

11 that to be known to the Court in order to prove their

12 conclusion.

13     We know what their conclusion is.  You've just said it in

14 open court.  It's not a surprise to anybody.

15     They think that it will put them at a competitive

16 disadvantage.  They're afraid that if this were to go through,

17 this is their conclusion, if this goes through they'll be in a

18 worse position than they're in now and it's going to cost them

19 more money to get those must haves that AT&T, the merged entity

20 would have to offer, okay, fine.  We know that's what the

21 conclusion is.

22     And they're willing to say it in open court apparently.

23 But I've closed the doors for them to say those things.

24     What I'm trying to figure out is the stuff that's

25 confidential, business confidential that they want to keep out

1   of the public eye and out of AT&T's possession I might add too.

2   Do they need that to prove the basis for their prognostication

3   or is the prognostication really just based on instinct?  Their

4   feeling based on prior experience?  That's what I'm trying to

5   figure out.  What's the relationship between the two things of

6   the conclusion and the secret data, how is it linked?

7           MR. WELSH:  I don't have the ability to answer that

8   question because I'm just not, I'm not them.

9           THE COURT:  That's for the expert?

10          MR. WELSH:  I think it's for the third parties to

11  express to Your Honor their view and again the proposed order,

12  I think both parties proposed order permits this that before

13  someone is going to get into confidential information the third

14  party has the ability to approach the Court to raise a concern

15  about that.

16      So I think that it's important.  Again, many of the third

17  parties are represented here today and I understand they may

18  have, they're available to speak to Your Honor.  There might be

19  an issue with one person not being available tomorrow or more

20  than one.

21      So if it's possible that they could be heard, I think that

22  might be helpful and it would certainly answer some of Your

23  Honor's questions.

24          THE COURT:  Let's hear from Mr. Petrocelli.

25          MR. WELSH:  Thank you, Your Honor.

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

 1          MR. PETROCELLI:  Your Honor, I need to round out the

 2   picture a little bit.

 3          First of all, we objected to putting in the order anything

 4   about sealing the courtroom because as I told the government,

 5   that is solely within the province of the Judge.  And I didn't

 6   want to be presumptuous about writing anything in an order

 7   about sealing a courtroom.

 8          It's a rare thing to do and logistically it would be

 9   extremely difficult in this trial to be constantly closing the

10   courtroom for every witness essentially and my view was that

11   the lawyers for the third parties are going to be here and Your

12   Honor invited them to sit in front of the bar and if there's an

13   issue, it can be addressed at that time, at side bar or

14   whatever.

15          So that was the first problem that I had with their order.

16          The second problem is you need to understand, Your Honor,

17   these are competitor witnesses who I think every single one of

18   them will tell you they oppose this merger.  They're working

19   very closely with the government.  They have met many, many

20   times.

21          The government is working with them and scripting out

22   their testimony.  We have to cross these people on the blind.

23   I don't know what they're going to be asked and in the meantime

24   --

25          THE COURT:  But you know what the bottom line is.

1          MR. PETROCELLI:  I know what the bottom line is and

2     to that point it is all prognostication.  There's not a single

3     witness you're going to hear in this trial, none of these third

4     parties are going to say that they heard a witness say that any

5     of these things are going to happen.  That they read any

6     documents that said any of these things are going to happen.

7     They are simply going to say I'm afraid it's going to happen.

8          THE COURT:  Have you deposed these folks?

9          MR. PETROCELLI:  We did, Your Honor.

10          THE COURT:  Now when you deposed them obviously, it

11     wasn't in an open setting, right?

12          MR. PETROCELLI:  Correct.

13          THE COURT:  Closed door setting.

14          MR. PETROCELLI:  Correct.

15          THE COURT:  While you're in that setting were they

16     willing and able to allude to and reference confidential

17     information that was in their possession?

18          MR. PETROCELLI:  Well, they're taking the position

19     that all the negotiations are confidential and it's just too

20     broad.  And I said to you the last time I was here that what's

21     good for the goose is good for the  gander.  So the rules have

22     to apply to all of these parties as well as the third parties.

23          My hope was to be able to conduct the examination very

24     much along the lines that you were just doing.  I don't need to

25     get into any secret data or anything.  I mean this is all

1   basically common sense.

2           THE COURT:  Well I'm kind of sitting here thinking

3   and I could be absolutely incorrect, absolutely wrong; that

4   there is no necessary correlationship between anything that's

5   confidential from prior negotiations and their concern and

6   their prognostication that a merged entity would put them at

7   some kind of a competitive disadvantage.  They've reached that

8   conclusion independent of it.  That it's just their, it's their

9   concern based on years of being in the industry and, you know,

10  facing up more formidable, more sizable, more well-financed

11  institution.  I don't know.  But it's not as if there were,

12  there's some kind of like a mathematical equation that's based

13  on premises, based on prior negotiations on finance structure

14  or something that's confidential that they would be alluding

15  to.

16          MR. PETROCELLI:  They have no mathematical

17  calculations or any even financial calculations, Your Honor.

18  It's all speculation about what could happen.  Because they

19  think the company is going to have more leverage.  It's that

20  simple.  You're going to hear that like ten times.  I just

21  don't think we're going to need to get into the details.

22          The problem with this case is overkill, Your Honor.  We

23  have tons and tons of documents.  And thousands and thousands

24  of pages of deposition testimony.  Most of the documents are

25  completely irrelevant.  There may be one word or two or one

 1  page in there.

 2      Now we have added a team of lawyers working around the

 3  clock for weeks trying to get this right with the government.

 4  We have gone over these documents a couple of times, the most

 5  resent time we did these red boxes.  He cherry picked a few of

 6  the ones.  But trust me, there are many, many documents where

 7  there's just a fact or figure that's red boxed.  The government

 8  was suppose to get back to us on whether they disagreed with

 9  these red boxes.  We have not heard back from them.

10      We are more than willing to keep this process going.  But

11  I'm telling you, most of these documents contain irrelevant

12  information that isn't going to be used in court.  And if it is

13  used in court they can simply say Mr. Witness look at that

14  document, look at that page and you can look at it, Your Honor,

15  and we can get through it without closing the courtroom.

16      On the third party side, Your Honor, the government has

17  not challenged a single designation of the third party.  So

18  we're getting whipsawed here.  They're challenging everything

19  on our end.  Nothing on the third parties, that's

20  understandable because they're working together.  But we have

21  to be prepared to cross a witness that they're working with and

22  I'm seeing a deposition and I'm reading it to get ready for the

23  cross examination and page after page after page it's just

24  talking about negotiations and, yeah, they're a really tough

25  negotiator.  They beat us up on this point.  It's not

*[REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER]*

1    confidential Judge.

2          THE COURT:  Well let's turn the coin over.  The

3    things that your clients want to have treated as confidential

4    what extent of those like --

5          MR. PETROCELLI:  It has to be same, Your Honor.

6    We're not asking for any preferential treatment.  I think that

7    what's happening here is that --

8          THE COURT:  Are they finance numbers, profit margin,

9    percentage of profits?

10          MR. PETROCELLI:  I just saw this document that he

11    showed the Court.  This says deep dive data in platform.  This

12    is some very technical document that some expert relied on.  I

13    highly doubt any of this is going to see the light of day in

14    the courtroom.

15      Briefing Book for Board Strategy Session.  This is the

16    document they said was entirely marked as confidential.  I'm

17    happy to go back and revisit this and see if we can pare all of

18    that down, but I don't know whether they intend to use this or

19    not.

20          THE COURT:  Remind me again this document you're

21    alluding to PX 460.  What company is this from?

22          MR. PETROCELLI:  This is AT&t, 460 Your Honor?

23          THE COURT:  Yes.

24          MR. PETROCELLI:  I see AT&T logo.  I can't make heads

25    or tails out of this document.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

 1              THE COURT:  So this is an AT&T document that was,

 2    again these are these slide things, that was prepared for who,

 3    for the Board?

 4              MR. PETROCELLI:  No, this was prepared for an expert

 5    I'm told.  One of our experts.  Is that right, an expert?

 6              THE COURT:  Check.

 7              MR. PETROCELLI:  I'm getting blank stares.

 8              THE COURT:  I can see that.

 9              MR. PETROCELLI:  Nobody wants to help me out.

10              THE COURT:  You want to take a time out and talk to

11    your team?

12              MR. PETROCELLI:  I think Mr. Welsh helped us out

13    because he indicated this was a document that was not produced

14    in the litigation, but was made available to them when we

15    delivered our expert reports as a document on which one of our

16    experts --

17              THE COURT:  At the bottom of the sheet if you take a

18    look Mr. Petrocelli, at the bottom of the second page.

19              MR. PETROCELLI:  Second page.

20              THE COURT:  It says AT&T proprietary restricted for

21    use in AT&T, TWX merger planning only.

22              MR. PETROCELLI:  I see that.  It's on all the pages.

23              THE COURT:  It seems to be on all of the pages.

24              MR. PETROCELLI:  Right, right.

25              THE COURT:  Now here's the problem.  By the way, this

1   problem is not a problem limited to the business word.  I've

2   seen this problem in the national security arena.

3           MR. PETROCELLI:  I know you have, Your Honor.

4           THE COURT:  There's a natural desire by the people

5   who are the designators to paint with a broad brush, everything

6   is to be confidential, everything is to be protected.  And then

7   the process of clawing back to figuring out what really is

8   confidential here.  What really can be said in public and what

9   really can't.  When will the national security be actually

10  threatened or not?  When will the business interests of the

11  company be actually threatened or not?  It's a difficult pain

12  staking process in no small part because you have these very

13  protective counsel who are erring on the side of painting with

14  a broad bush.  There's just no way that all of this stuff

15  that's in here, just to use this as an example since it's in

16  front of me.  There's no way that all of this should be

17  confidential.

18      Now if that's true for an AT&T document, I'm sure it's

19  equally true for some of these third party documents, if not

20  all of them.  Which gets me back to the point that I've been

21  trying to get your help to discern.  Where's the linkage

22  between what's really confidential and the conclusion that

23  these witnesses are going to come in here and testify under

24  oath to.  Which is we believe, apparently if this merger goes

25  through it'll be harmful to our company and It's ability to do

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

 1  business in the future with a merged entity because it will

 2  have less leverage.  The other side will have more leverage.

 3  We're going to be at a competitive disadvantage from where we

 4  are now, and is that a judgment conclusion or is it based upon

 5  data that really is confidential, that can't be known in the

 6  public forum, but can be known in a closed courtroom.

 7      I'm not an expert on this.  You all are.  You've been

 8  wrestling with this stuff now for months if not years.  So

 9  tonight, that's one of your assignments tonight.  Talk to your

10  folks and then tomorrow we'll revisit this issue more fully.

11  Because I'm kind of thinking that it might well be we can put

12  all of these third party people on without using any of these

13  confidential documents because we don't really need them.

14  Maybe we can't.  Maybe there's a reason why you're going to

15  have to have them.  But the clawback is so painful, it's so

16  difficult, there's so much. By the way, this is on both sides.

17  They're going to want to have access to this AT&T and other

18  documents that you're saying, oh they're all confidential.

19      I think I'm stating the obvious when I say trying cases of

20  this magnitude in closed courtrooms is inconsistent with the

21  concept of trials in the United States.  We're not into the

22  secret forum business, you know.

23      Now that's not to say there are some things that protect

24  the national security, yes; to protect the financial security

25  and wherewith all companies; yes, we have to keep confidential,

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1   but I think we should take a time out for today and I'm going

2   to take a look at your pared down agenda and I'll leave it to

3   you all to talk to your third party lawyers and work it out and

4   figure it out.  And we'll talk about it tomorrow morning again.

5                MR. PETROCELLI:  Thank you, Your Honor.

6                MR. COVE:  Your Honor, I'm sorry, may I be heard?

7                THE COURT:  No.  Who do you work for?

8                MR. COVE:  My name is John Cove.  I represent Sony

9   Interactive.  The reason I'm interrupting, Your Honor --

10               THE COURT:  Who do you work for?

11               MR. COVE:  For Shearman and Sterling for Sony

12  Interactive.

13               THE COURT:  Sherman and Sterling is one of the

14  largest law firms in the world.

15        Sir, when I talk you stop.

16               MR. COVE: Yes, sir.

17               THE COURT:  You've never been in this courtroom

18  before.  My reporters are great, but they can't take us both

19  down at once.  Wait until I'm done.  You hear me?

20               MR. COVE:  Yes, I hear you, Your Honor.

21               THE COURT:  Shearman and Sterling has lots of

22  lawyers.  If you can't be here tomorrow, they've got others who

23  can.

24        So I've tried to explain nicely.  Apparently it didn't

25  register with you.  We're done for today.  If you can't be here

```
 1   tomorrow, talk it through with the very able AT&T, excuse me,

 2   government counsel and government counsel will represent your

 3   concerns tomorrow.  Good night.

 4           MR. COVE:  Thank you, Your Honor.

 5           THE COURT:  Yes, anything else from counsel for the

 6   government or counsel for the defense before we reconvene

 7   tomorrow at 10:30.

 8           MR. PETROCELLI:  Thank you, Your Honor.

 9           THE COURT:  We'll go till 5:30 tomorrow, 10:30 to

10   5:30 with breaks in the morning.

11           MR. PETROCELLI:  I mentioned this to Mr. Conrath

12   earlier.  He has no objection.  During opening statement if

13   you, a few of my clients including the chairman and CEOs of

14   both companies would like to be here.

15           THE COURT:  Of course.

16           MR. PETROCELLI:  Okay, thank you.

17           THE COURT:  They'll have seats.

18           MR. PETROCELLI:  Yes, I just wanted to make sure.

19           THE COURT:  Well for starters, I don't know how

20   you're going to do this, but you've got a lot of folks in your

21   front row. You might have to have, some of them are going to

22   have to go next door and listen to an audio.  Unfortunately

23   you'll have to figure that out.

24           MR. PETROCELLI:  We'll figure that out, Your Honor.

25           THE COURT:  You all don't have your laptop person
```

1   here yet.  See they have theirs in the first seat.

2          MR. CONRATH:  We didn't need it today, Your Honor,

3   but --

4          THE COURT:  Right, you'll need it Wednesday.

5          MR. CONRATH:  -- when the time comes, yes, Your

6   Honor.

7          THE COURT:  Right, so plan accordingly is all I'm

8   saying. You've got to save room for that person.

9          MR. CONRATH:  Yes, you're absolutely right.

10         MR. PETROCELLI:  Thank you, Your Honor.

11         THE COURT:  Does the government have any other issues

12  for today?

13         MR. CONRATH:  We do not, Your Honor.

14         THE COURT:  So do your best to talk to your

15  respective sides about this confidentiality issue and maybe it

16  is that we don't have to put anything more in writing.  We can

17  just deal with it on a person by person basis, witness by

18  witness basis, I should say.  Do your best to level Shearman

19  Sterling's concerns.  Stand in recess.

20         (Proceedings adjourned at 4:00 p.m.)

21                        -oOo-

22

23

24

25

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1                          CERTIFICATE

2        I certify that the foregoing is a true and correct

3   transcript, to the best of my ability, of the above pages, of

4   the stenographic notes provided to me by the United States

5   District Court, of the proceedings taken on the date and time

6   previously stated in the above matter.

7        I further certify that I am neither counsel for, related

8   to, nor employed by any of the parties to the action in which

9   this hearing was taken, and further that I am not financially

10  nor otherwise interested in the outcome of the action.

11

12  /s/ Crystal M. Pilgrim, RPR, FCRR     Date: March 19, 2018

13

14

15

16

17

18

19

20

21

22

23

24

25

**[*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*]**

```
                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      :
                               :
              Plaintiff,       :        CV No. 17-2511
       vs.                     :
                               :        Washington, D.C.
                               :    Tuesday, March 20, 2018
AT&T, INC., ET AL.,            :           2:50 p.m.
                               :
                               :
              Defendants.      :
------------------------------x



                       AFTERNOON SESSION
           TRANSCRIPT OF EVIDENTIARY HEARING (CONT'D)
             BEFORE THE HONORABLE RICHARD J. LEON
               UNITED STATES DISTRICT SENIOR JUDGE



APPEARANCES:

For the Government:      Craig W. Conrath, Esquire
                         Eric D. Welsh, Esquire
                         Donald G. Kempf, Jr., Esquire
                         Curtis W. Strong, Esquire
                         Alexis K. Brown-Reilly, Esquire
                         Elizabeth A. Gudis, Esquire
                         Nathan D. Brenner, Esquire
                         U.S. DEPARTMENT OF JUSTICE
                         Antitrust Division
                         450 Fifth Street, NW
                         Washington, DC  20530
                         (202) 532-4560
                         craig.conrath@usdoj.gov
                         eric.welsh@usdoj.gov
                         donald.kempf@usdoj.gov
                         curtis.strong@usdoj.gov
                         alexis.brown@usdoj.gov
                         elizabeth.gudis@usdoj.gov
                         nathan.brenner@usdoj.gov
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1   Appearances Continued:

 2   For Defendant AT&T        Katrina M. Robson, Esquire
     and DirecTV Group         O'Melveny & Myers LLP
 3   Holdings, LLC:            1625 Eye Street, NW
                               Washington, DC  20006
 4                             (202) 220-5052
                               krobson@omm.com
 5
                               Daniel M. Petrocelli, Esquire
 6                             M. Randall Oppenheimer, Esquire
                               O'MELVENY & MYERS LLP
 7                             1999 Avenue of the Stars
                               8th Floor
 8                             Los Angeles, CA  90067
                               (310) 553-6700
 9                             dpetrocelli@omm.com
                               roppenheimer@omm.com
10
                               Michael L. Raiff, Esquire
11                             Robert C. Walters, Esquire
                               GIBSON, DUNN & CRUTCHER LLP
12                             2100 Mckinney Avenue
                               Suite 1100
13                             Dallas, TX 75201
                               (214) 698-3350
14                             mraiff@gibsondunn.com
                               rwalters@gibsondunn.com
15
     For Defendant             Kevin J. Orsini, Esquire
16   Time Warner, Inc.:        Peter T. Barbur, Esquire
                               CRAVATH, SWAINE & MOORE LLP
17                             Worldwide Plaza
                               825 Eighth Avenue
18                             New York, NY  10019
                               (212) 474-1140
19                             korsini@cravath.com
                               pbarbur@cravath.com
20
     Court Reporter:           Crystal M. Pilgrim, RPR, FCRR
21                             Official Court Reporter
                               United States District Court
22                             District of Columbia
                               333 Constitution Avenue, NW
23                             Washington, DC  20001
                               (202) 354-3127
24                             crystal_pilgrim@dcd.uscourts.gov

25
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
1                    P-R-O-C-E-E-D-I-N-G-S

2           THE DEPUTY CLERK:  Your Honor, recalling civil action

3    number 17-2511, the United States of America v. AT&T, Inc., et

4    al.

5           THE COURT:  All right counsel, I want to give you a

6    chance to express any issues or concerns you have with regard

7    to groupings that I've done of the objections.

8           We've been through them, my clerks and I and kind of have

9    them grouped into categories.  The first group is comments from

10   prior regulatory proceeding.  We've discussed that one, so I'm

11   not going to belabor that point and we're not going to go over

12   that.

13          Second one is defendant's documents or statements, both

14   AT&T, DirecTV and Time Warner now.  There's 14 exhibits that

15   relate to that.  Under one category we have potential live

16   witnesses and since they're going to be, these documents are

17   going to be introduced through live witnesses that will give

18   defense counsel a chance to ensure that foundation is

19   established in order to not have to deal with that problem for

20   the purpose of admissibility.

21          So we've got live witnesses under the AT&T group, HBO

22   group, Time Warner and Turner group.

23          Then the one that's probably the most likely to raise some

24   issues would be third party documents of statements.  Now this

25   is the category that's going to have witnesses coming in.
```

*[REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER]*

1    We're going to have confidentiality issues; Google/YouTube,

2    Sony Playstation, Comcast NBCU, Charter, CenturyLink, DISH

3    Network, Cable One, RCN.  But it appears that there's a live

4    witness in each category through whom these exhibits can come

5    in.  So once again, it would appear that defense would be in a

6    position to raise any questions it has about foundation and

7    then be in a better position to determine to what extent there

8    may be a problem even with the business record exception or

9    with 801.

10       We talked about the next category which is deposition

11   designation objections.  Since we're going to have the live

12   witnesses, we're not going to be introducing the depositions.

13   So that seems to be pretty much taken care of.

14       And that leaves us with the fifth category objections to

15   expert report figures.  Of course, Mr. Shapiro himself will be

16   a witness in the case and if there's an exhibit that relates to

17   one of his reports that's a summary maybe or something of that

18   kind we'll deal with it at that time, but my guess is that that

19   probably, problem won't be much of a problem frankly.  Now

20   that's as to defenses objections.

21       As to the government's objections we got, I also have

22   basically the same, same issues.  We have four categories.

23   We've got the defendant's own documents or statements.  We've

24   got third party documents or statements.  So that's LT, SAR CN

25   Cable One, CenturyLink, Comcast, NBC and Charter.  There's live

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1   witnesses for each of those.

2           MR. PETROCELLI:  Not on LTs, Your Honor.

3           THE COURT:  Not on LTs?

4           MR. PETROCELLI:  We would withdraw that exhibit.

5           THE COURT:  Want to withdraw it, okay good, thank

6   you.  One less thing to think about.  So we've got five groups

7   that.

8           MR. PETROCELLI:  For the record, that's Exhibit 600.

9           THE COURT:  600, that's right.  Good, that'll be

10  stricken.

11      So that'll leave RCN, Cable One, CenturyLink, Comcast

12  NBCU, and Charter.  There will be a live witness for all of

13  them.  Exhibits can be put in through them and any foundational

14  issues or hearsay exemption issues can be worked on at that

15  time.

16      Then there's news article transcripts.  No offense to the

17  press, but I don't usually allow news articles introduced into

18  evidence.  I'll wait to see what you've got.  But trial by

19  newspapers, it's not, it's dangerous.  So we'll see, but I'm

20  giving you fair notice here.

21      We have expert impeachment material potentially that might

22  be relevant to Exhibits 908 to 912.  I don't know, I guess

23  we'll see if that comes in.

24      Do you have any of these you want to address, counsel,

25  that you want to, do you have any like omnibus reflexions that

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    you want to bring to my attention before we have to deal with

2    this?

3           MR. WELSH:  Your Honor, I don't have any comments

4    about those groupings but there were a couple of other

5    documents in one grouping in particular that Your Honor didn't

6    mention that we could speak about now.

7           THE COURT:  Sure, go ahead.

8           MR. WELSH:  So with respect to, there's a grouping,

9    it starts with DX 658.  It includes 646, 655, 657 and 669.

10      They're all related documents, Your Honor.  But the

11   fundamental point is going to be directed at 658, the first one

12   I mentioned.

13      This is a document, Your Honor, that is purportedly given

14   to us by the defendants that's an assortment of efficiency

15   calculations for this merger.  You heard Mr. Conrath speak

16   earlier about their claims, the defendant's claims of

17   deficiencies, the good things that they claim they're going to

18   bring to this merger if it goes through.

19           THE COURT:  Sure.

20           MR. WELSH:  The document that we're talking about

21   here is that, it is unfortunately for Your Honor it's another

22   powerpoint slide deck.  It's rather lengthy.

23           THE COURT:  When in Rome.

24           MR. WELSH:  There's an awful lot of information in

25   here.

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1   This particular document is, it's called Version 41 which

2   I think is important to note.  It also notes on every page that

3   it's preliminary, it's a preliminary draft.

4           THE COURT:  Who authored it?

5           MR. WELSH:  That's part of our problem, Your Honor.

6   It's been submitted to us and produced by AT&T.  We object to

7   it on a number of grounds, hearsay and foundation, the ones

8   I'll talk about right now.

9           THE COURT:  Who do you think, who do, who do they

10  want to put it in through?

11          MR. WELSH:  We don't know.  Let me explain.  We got

12  this in discovery.

13          THE COURT:  I think he'll answer that question.

14          MR. PETROCELLI:  Yeah, our corporate representative

15  John Stankey who headed up the integration effort and also who

16  is going to be in charge of the new entertainment unit if the

17  merger is cleared.

18          THE COURT:  Will he know the answer to the question

19  who authored that?

20          MR. PETROCELLI:  Oh, yeah, he was very much involved

21  in that.

22          MR. WELSH:  I would beg to differ just on what

23  counsel said.

24      So Mr. Stankey was presented as the 30(b)(6) corporate

25  representative of AT&T in a series of depositions to speak

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1     about this document.

2          He was asked a lot of questions about its origin and where

3     key numbers and assumptions and calculations came from.

4          What became very clear in the deposition, Your Honor, and

5     I do have some pages I could hand up if you would like to see

6     it.

7          But what became very clear in the deposition was that

8     much of the information was originating from Time Warner and

9     not AT&T.  This is not a AT&T business document that's created

10    in the ordinary course of their business.

11         Information came from Time Warner.  It went into some

12    parlor rooms that exist between the two sides.  When a merger

13    happens sometimes these parties will create these parlor rooms

14    where a participant from the one side of the transaction and

15    another side would get together and I think that's how they

16    described it.

17         Calculations, conversion rates, key assumptions, all of

18    these get baked into this document.  Mr. Stankey testified

19    about that.  When asked about so where did that conversion rate

20    come from?  How was that derived?  He could not answer any of

21    those questions.

22         When asked about what assumptions went into this, he would

23    say the assumptions come from long standing employees with

24    knowledge of this business, but those employees are Time Warner

25    employees and it's not Mr. Stankey.  So as a corporate

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   representative here he's unable to speak to those issues first

2   of all.

3       What we have here is a document that's really based on

4   several levels of hearsay.  We've got information that's

5   evidently coming from Time Warner, so we're told.  It gets put

6   into this document.

7       We don't have an opportunity to examine the document and

8   by the person that created those key assumptions, those key

9   calculations, those key conversion rates that become the very

10  central part of how they determine what the dollar amount is

11  that they're going to present to Your Honor to say that this

12  merger is such a great thing.

13      So we just don't have that ability to -- you know, if they

14  want to put Mr. Stankey on the stand to sponsor this document,

15  he's not going to be able to say anything different there than

16  he said in his 30(b)(6) deposition when it came to these key

17  assumptions and key calculations.  So that's a fundamental

18  problem for us, Your Honor.  It basically at this point is just

19  a big red box.

20      So if we look at 803 again, it's just a document that

21  they put together for this litigation so it's not prepared in

22  the ordinary course of business which would be a requirement

23  under 803.

24      The four counts and information that's in here is not done

25  in, not done in a regularly conducted business of course of

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1    AT&T.  They don't do this, these sorts of synergy analysis day

2    in and day out as part of their business.

3         It's based on hearsay and double hearsay as I have

4    mentioned, Your Honor, and the witness cannot speak to those

5    issues or cure those issues in any way.  Because again, much of

6    this information comes from presumably a vast number of people

7    on the Time Warner side that we will never see in this

8    courtroom nor never be able to question about it.

9         So we don't believe, Your Honor, that it bears the

10   reliability, the trustworthiness that's required.  And we also

11   just as a complete issue of the fairness that goes on in this

12   proceeding, we don't think their ability to put this document

13   in as sort of a summary of where they are on Version 41 in a

14   draft document to be able to say this is what we think is going

15   to happen down the road, and we don't have the ability to

16   examine how they even got to those determinations in this

17   particular version on this particular day.

18             THE COURT:  Okay.

19             MR. WELSH:  Thank you, Your Honor.

20             MR. PETROCELLI:  Mr. Walters will address this, Your

21   Honor.

22             THE COURT:  That's fine.

23             MR. WALTERS:  Thank you, Your Honor.

24        Your Honor, this is a quintessential business record.  Let

25   me explain what this is.

*[REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER]*

1        This is in effect, and I have a copy if Your Honor would

2    like to see it.  This is in effect the magna carta of the

3    integration effort.  Every time AT&T does an acquisition, it

4    engages in the same rigor, same protocol, same process of

5    integrating the company.  It is done as a matter of their

6    regular course of business.

7        They have done 13 billion plus acquisitions in the last 20

8    years.  Every time they say they follow the same process, same

9    protocol in order to integrate them.  This document reflects

10   that effort.  It's an effort involving thousands of man hours,

11   millions of pieces of data.  And tens of thousands of documents

12   that gets rolled up into what reflects the synergies, the

13   efficiencies of this merger.

14       Beyond that, each of the business units that, if this

15   merger is approved, will actually be accountable to and have to

16   live with the efforts that are reflected in this document.

17       It was all done contemporaneously.  It was all rolled up

18   into this comprehensive business record and it is absolutely

19   done in the course of their regular course of business.  It

20   would be done with or without any regulatory approval.  It is

21   absolutely germane to the acquisition and integration.

22       Is there hearsay?  Well, the way we're proposing that this

23   be admitted as a business record under 803(6), yes, it has some

24   hearsay elements, it's an exception to the hearsay rule.

25       Now as for whether they could, if there's bits and pieces

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1   within this that Mr. Stankey might or might not be able to

2   speak to, He's both frankly the 30(b)(6) witness to the

3   overwhelming elements that rolled up in this.

4        If that's the issue, they have had ample opportunity and

5   did depose many people from Time Warner, many people from AT&T

6   who were intimately involved in this comprehensive integration

7   effort.

8        So I'm not sure what to say other than this is their,

9   there could be no record that is more of a business record than

10   this integration and we will through Mr. Stankey more than

11   amply establish the foundation and predicate necessary under

12   803(6).

13           THE COURT:  He would, is he in a position to recall

14   who actually put together these particular aspects of the

15   documents that Mr. Welsh was just alluding to, the certain

16   formula that he alluded to that I can't remember the name of?

17           MR. WALTERS:  Yes, sir.

18           THE COURT:  He would have some knowledge?

19           MR. WALTERS:  Yes.  He is in charge of this

20   integration effort.  That has been his principal

21   responsibility.

22        By the way, this effort started before the announcement of

23   the merger and was ongoing for a year.  So and yes, he would

24   know, and it was a substantial team, lots of lieutenants who

25   would go out.  They would gather up information.  They would

1    confer with Time Warner in this parlor process which you

2    absolutely have to do.  It doesn't involve lawyers; otherwise,

3    you're susceptible to gun jumping issues.

4         That all gets integrated in because what they're doing is

5    they are exploring what exactly will be the virtues of this

6    merger and it falls into two basic buckets.

7         One are the so-called cost synergies.  Obviously when you

8    pull two companies together, there are back office

9    efficiencies.  There are cost efficiencies very carefully

10   assessed.  So what this document reflects is on an annual run

11   rate the companies will achieve approximately 1.5 billion

12   dollars in cost synergies a year.

13        Let me give you a simple example.  AT&T today will pay

14   let's say a dollar a unit for a UPS or Federal Express charge.

15   Time Warner will spend a dollar ten a unit.  They get together,

16   they examine their contracts and they determine you know what,

17   we think that we can bring Time Warner's cost down to where

18   AT&T's cost are, so we spend a dollar a unit across the entire

19   purchase.

20        How do they know that?  They have done this time and time

21   and time again.  And for these cost synergies in the vast

22   majority of instances AT&T has an absolutely sterling record of

23   having achieved these cost synergies.

24        So that's what they want, a very rigorous elaborate

25   process all of which rolls up, that's half of it.

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1    The other is about a billion dollars worth of these

2  so-called revenue opportunities.  Revenue synergies which makes

3  for a combined two and a half billion dollars a year of virtues

4  that would have flow through from the combination of these

5  complimentary assets.

6    What are those revenue synergies?  They are enhanced

7  advertising revenues for some of the things that Mr. Petrocelli

8  discussed.  They are when you combine the Time Warner assets,

9  right, with the AT&T assets, when you combine Time Warner's

10 peanut butter with our chocolate, it becomes a better product.

11 You can bundle things, you can cross promote.

12    It is the ability of take some of this customer

13 information and inform the content.  It's called content

14 intelligence to make the content more valuable.  Precisely what

15 Netflix has been doing.  You might recall the House of Cards

16 and Kevin Spacey and be able to use that data.

17    So you take all of those things and say how are we going

18 to get more juice out of this?  Though the combination of these

19 assets.  Again, a very carefully orchestrated process where the

20 Time Warner folks and the AT&T folks based on their previous

21 experience going to industry bench marks, going to all of the

22 information available to them, role this all up and then it is

23 reflected here.

24    Now there are thousands and thousands of pages and we'll

25 bring them in the courtroom.  There will be binder after binder

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1    after binder that backs all of this up.  And this then reflects

2    what is going to be achieved by this combination, this

3    efficiencies, the synergies.

4         But it was done absolutely as a business exercise, of

5    course it is.  Again, with or without any regulatory process,

6    the company does this each and every time according to, with

7    the same rigor and the same discipline with the same

8    accountability.  So it's absolutely reliable.

9              THE COURT:  Okay.

10             MR. WALTERS:  Thank you, Your Honor.

11             MR. WELSH:  Your Honor, the document is not qualified

12   as a business record.  AT&T is not in the business of doing

13   acquisitions.  That's not their business model.  That's what's

14   going to be required as an initial step in determining whether

15   or not this qualifies as a business record.

16        Moreover, if you look at the document itself, this deck

17   which is preliminary in draft, these are projections of what we

18   just heard.  These are projections out into the future.  This

19   is not something that's done historically taking down what

20   happened in the past and how it impacts the business today.

21   This is their looking out into the future.

22        That's not what is envisioned by being a business record

23   and certainly not a business record for AT&T and its telephone

24   or its video distribution business.  I don't think it begins to

25   qualify under the hearsay exception.

*REDACTED IN ACCORDANCE WITH JULY 31, 2048 DISTRICT COURT ORDER*

1          In addition, Your Honor, even if we got past that point we

2     still don't have the answers to the reliability and the

3     trustworthiness that we need.  Nor do we have an answer to the

4     double hearsay problem that clearly exists.  And again, that

5     was borne out by Mr. Stankey's 30(b)(6) testimony where he

6     doesn't know about these key assumptions and he doesn't know

7     about the details of this.  And that's important to understand,

8     Your Honor.

9          He was asked in his deposition do you recall what the

10    conversion rate was?

11         No, I do not recall what the conversion rate was.

12         He was asked about a key model that was used in this

13    document and he said that the model was not, to his knowledge,

14    was not in the parlor room because of these concerns about

15    confidentiality.

16         So we have a bunch of information that even their witness

17    can't testify about that seems to be somewhere over on the Time

18    Warner side of the business and that's embedded now in this

19    document that they want to admit into evidence.

20              THE COURT:  Did you ask him who would know the answer

21    to those questions?

22              MR. WELSH:  He did not know the answer to that

23    question.

24         There are a bunch of people at Time Warner that were

25    apparently working on this.  He was asked questions like that,

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1   Your Honor.  His answers were I did not speak to these people

2   directly.  I do not know who some of these people were.  I'm

3   sure that he knows some, but as to specific questions that were

4   asked in the deposition about some key things he did not know

5   and it was just pure and simple as that, Your Honor.

6       In fact, one point on the conversion rate when he was

7   asked in his deposition and this is a quote, he said no.  He

8   was asked about the conversion rate and if he had seen the

9   conversion rate or discussed the rate with Time Warner and he

10  responded no, I was not a working member on any of these teams.

11      That's his testimony from the 30(b)(6) deposition, Your

12  Honor.  That's creating a huge problem for this document in

13  terms of this double hearsay and that doesn't get fixed at all

14  by counsel's argument of this being a business record which

15  again, we would assert that that's not the case.

16      I would also note we do have a foundation objection as

17  well, Your Honor, and we believe that there's case law to

18  support the proposition that a calculation, a court cannot

19  admit a calculation into evidence without admitting the

20  underlying data into evidence as well.  And we have citations

21  there including the Hiram Ricker case at 501 F2d, 550.  That's

22  a First Circuit case, Your Honor.

23      So that's a problem because the model; for example, these

24  assumptions that their employees, Time Warner employees

25  apparently brought to this document that Mr. Stankey knew

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

 1   nothing about.  Those are never going to be here, so we can't

 2   possibly deal with that, Your Honor.

 3            THE COURT:  What do you think they're offering it

 4   for?

 5            MR. WELSH:  I think they're trying to offer evidence

 6   to support their speculation of what's going to happen in the

 7   future with their claimed synergies and efficiencies.

 8            THE COURT:  They don't have to do that do they?  They

 9   don't have any burden of proof here.

10            MR. WELSH:  I believe they do, Your Honor.  And

11   Mr. Conrath raised that earlier that we believe that they do

12   bear the burden.

13            THE COURT:  What's the basis for that?

14       Is that a Conrath question?

15            MR. WELSH:  I would defer to Mr. Conrath but I

16   believe we briefed that previously with Your Honor.  I would

17   defer to my colleague.

18            THE COURT:  The burden is on the government is it

19   not?

20            MR. WELSH:  The burden of persuasion is on the

21   government, Your Honor.

22            THE COURT:  And the burden of proof.

23            MR. WELSH:  Not as to efficiencies, Your Honor.  We

24   believe that burden rests with --

25            THE COURT:  I thought Mr. Petrocelli said earlier

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*1

1   today they're not raising any defense of efficiencies.

2           MR. WELSH:  I heard Mr. Petrocelli and the government

3   respectfully disagrees with Mr. Petrocelli and his view of

4   their burdens and obligations here.

5           THE COURT:  Remember now, if that's Mr. Petrocelli's

6   position, he can tell me if it is or isn't again.

7           MR. WELSH:  Yes.

8           THE COURT:  Then he'll be held to that.

9       If he tries to introduce evidence that suggests that he's

10  proving efficiencies, he won't be allowed to because he would

11  have already told me that that's not his defense.

12      I mean, he has to choose what's his defense if he's got

13  one.  I assume he's got one.

14          MR. WELSH:  Thank you, Your Honor.

15          MR. PETROCELLI:  May I respond to that?

16          THE COURT:  Sure.

17          MR. PETROCELLI:  Yes.  It's our position that this

18  is, this area of how much money we're going to save and how

19  much revenue the merged company will create is not an

20  affirmative defense such that we have the burden of proving it

21  beyond a, by a preponderance of the evidence.

22      It's our position that the government having received all

23  of the information about our efficiencies, including this

24  document and massive amounts of other information, has to

25  either negate that material in the way that they're trying to

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  by saying it's speculation or whatever, they have to take it

2  into account if they can't negate it.

3      I'm not saying to the Court that we are not presenting

4  evidence about all of the cost savings and all of the

5  efficiencies.

6      What I am saying in presenting that evidence we as the

7  defendant do not bear the burden of having to convince you by a

8  preponderance of the evidence that those efficiencies or

9  synergies are achievable under the same law that governs for

10  example horizontal mergers?

11          THE COURT:  So you're not offering it to prove the

12  truth of the matter asserted, right?

13          MR. PETROCELLI:  We are offering it to prove that if

14  this merger goes forward, it is more likely than not -- excuse

15  me.

16      We are presenting the evidence to put the government to

17  its burden of demonstrating why --

18          THE COURT:  No, hold on a second.

19      If the government doesn't meet its burden, this case can

20  be thrown out on a Rule 30 motion.

21          MR. PETROCELLI:  And we, we believe that part of its

22  burden is to deal with this evidence of our efficiencies.  They

23  simply can't ignore it.

24      Let me give you an example.  Here's what I'm saying to be

25  clear.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1          THE COURT:  Yes.

2          MR. PETROCELLI:  Let's say the government puts on its

3   case and doesn't say a single word about our efficiencies, our

4   cost savings, nothing, even though they have all of the

5   discovery and evidence from us.

6      Let's say they put on a case, they try to show a price

7   increase and they rest.

8          THE COURT:  Yes.

9          MR. PETROCELLI:  I would argue to you that the

10  government has failed to meet its burden for putting aside the

11  inadequacy of their price increase evidence.  I would argue in

12  addition they have failed to take into account both sides of

13  the equation.

14     On the one hand they're trying to present evidence of a

15  price increase.  On the other hand they are ignoring the

16  offsetting benefits to the price increase such as the

17  synergies.

18     And if they argue to you, you know, Mr. Petrocelli is

19  absolutely right.  We intend to put on no evidence regarding

20  that at all in our case in chief.  Which I think may be their

21  position.  I think we actually have a legal question as to

22  whether they have failed to meet their burden of proof.

23     I believe what the --

24          THE COURT:  Which would take up the Rule 50 motion.

25          MR. PETROCELLI:  Exactly, right.

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1    Now if Your Honor then agreed, didn't grant that motion

2 and now it's a defense time to put on its case.

3    THE COURT:  Right.

4    MR. PETROCELLI:  We would be putting on this

5 evidence.  We would be putting on Mr. Stankey and other

6 witnesses to demonstrate to the Court the other side of the

7 equation.

8    Not only should you take into account the government's

9 evidence on whether or not there's going to be a price

10 increase, but you also need to take into account evidence that

11 we are presenting as to the benefits that would offset the

12 price increase because the ultimate question is whether

13 consumers are better off or worse off.  You have to take

14 everything into account.

15    Now the cases say, Your Honor, as Mr. Welsh and Mr.

16 Conrath both said that it is the government who bears the

17 ultimate burden of persuasion.  That's no different from saying

18 the government bears the ultimate burden of proof.

19    They have to prove at the end of the day when all of the

20 evidence is taken into account, presented by the government,

21 presented by the defense, that it's more likely than not, more

22 probable than not that there will be harm to competition.

23    And in assessing whether they have met that burden whether

24 it's at the end of their case or the end of the entire case,

25 all of the evidence must be taken into account.  Not just their

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1  evidence of an alleged price increase, but also the evidence of

2  the synergies.

3       And what they're attempting to do now is to essentially

4  prevent us from putting on that evidence because the document

5  that Mr. Walters addressed is sort of the summary document that

6  summarizes this massive effort of estimating what those savings

7  and --

8            THE COURT:  Let me ask you a question.  Obviously, I

9  haven't reviewed the document.

10      At first blush it would seem to me that the document might

11 be offered to prove what AT&T believes, the likely affect would

12 be of a merger.

13           MR. PETROCELLI:  I think that's, well, both parties I

14 would say, but I think that's a --

15           THE COURT:  Right.

16           MR. PETROCELLI:  -- that's a fair statement.

17      Yeah, just like they're trying to prove what these third

18 parties believe and what the expert believes might happen,

19 everybody in a sense is in this predictive mode.

20           THE COURT:  That's exactly right.

21           MR. PETROCELLI:  Okay, so yes, the evidence is being

22 received for that purpose.

23           THE COURT:  It's being received for that limited

24 purpose.

25           MR. PETROCELLI:  That is correct.

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1          THE COURT:  It's not being offered to prove what will

2   in fact happen because that's --

3          MR. PETROCELLI:  Nobody knows.

4          THE COURT:  There's only one person that knows that

5   and he's not around.  He's been dead a long time.

6          MR. PETROCELLI:  Yes, this is true, Your Honor.

7          THE COURT:  We are in Easter season though.

8          MR. PETROCELLI:  Yes, we are.

9          THE COURT:  I mean the practical reality here is that

10  both sides are seeking to offer evidence that it believes --

11  excuse me -- of what it believes the likely events will be in

12  the future.

13          MR. PETROCELLI:  That is correct.  That is absolutely

14  correct.

15     And I think what the government is now trying to do is

16  prevent Your Honor from seeing the other side of the equation

17  so that you can have the whole picture in front of you.

18          THE COURT:  Of course, the Court can evaluate and

19  must evaluate to what extent the evidence offered for that

20  purpose is believable, makes sense, seems accurate, whatever.

21  I have to evaluate that.

22          MR. PETROCELLI:  Your Honor, Mr. Welsh read you a

23  couple of answers.  Mr. Stankey testified for three straight

24  long days.  We are talking many, many, many pages.

25          THE COURT:  He won't be doing that here.  You can

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1    tell him that now.

2          MR. PETROCELLI:  Your lips to God's ears, Your Honor,

3    because --

4          THE COURT:  That's not going to happen.  That's not

5    going to happen.

6          MR. PETROCELLI:  And there are other witnesses who

7    know about these synergies as well and the government knows

8    everything they need to know about this.  They have been

9    drilling down on this for a year and a half.

10       Thank you.

11         THE COURT:  What do you want to talk about?

12         MR. CONRATH:  I would like to talk about burden, Your

13   Honor.

14         THE COURT:  You want to talk about burden, huh?

15         MR. CONRATH:  Yes, just briefly because Your Honor

16   did ask both sides to put in statements of position on burden

17   and I would ultimately rest on what we wrote there as a more

18   careful --

19         THE COURT:  Yeah, I know.

20         MR. CONRATH:  -- statement than what I'm about to

21   say.

22         THE COURT:  Yes.

23         MR. CONRATH:  But I just want to call out what our

24   position is because we do disagree with the statement of burden

25   that the defendants posit.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1          THE COURT:  You don't believe you have the burden of

2    proof?

3          MR. CONRATH:  We have the burden of proof,

4    absolutely.  Absolutely.  We have the burden of proof.

5        If we don't prove our case at the end of the day we lose.

6          THE COURT:  You don't get over Rule 50.

7          MR. CONRATH:  Exactly, we agree with that.

8        What we don't agree with is the idea of it as part of

9    proving our case, we have to negate whatever case they might

10   make about efficiencies.

11         THE COURT:  Hold on now.  Remember now, when you're

12   proving your case, he hasn't started proving his case yet.

13         MR. CONRATH:  That's right.

14         THE COURT:  So you don't know for sure.  I mean, in

15   theory he doesn't even have to put a case on, right?

16         MR. CONRATH:  Correct.

17         THE COURT:  In theory.  We know he's going to.

18         MR. CONRATH:  Maybe he wins on Rule 50.

19         THE COURT:  Well, I guess it's a theoretical

20   possibility, sure.

21        But the fact of the matter is that you have to proceed in

22   the way that proves what you have to prove and not being

23   certain what they're going to try to prove.  Although you have

24   some signals or indications of what they're going to try to

25   prove.

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1          MR. CONRATH:  Right.

2          THE COURT:  So okay, fine.

3      On the one hand, you think you want to prove the

4  efficiencies, but on the other hand, you say he says this isn't

5  an efficiency defense.  Maybe there's a little schizophrenia

6  here or something, I don't know.

7          MR. CONRATH:  Well, I think, Your Honor, we would

8  rest on the cases that have addressed efficiencies including

9  Anthem in this Circuit of last year for the proposition of how

10  this is generally treated.

11      But I just want to call out how striking their position

12  is.  Because I think it's different from what one might hear

13  from the traditional efficiencies defense.

14      It is that as part of our you might say prima facia case

15  or getting to our first burden, we have to disprove what they

16  might say.  I think that's a pretty extreme claim.

17          THE COURT:  Hold on a second, I want to make sure I

18  follow you here.

19      If he comes in, you put your case on.

20          MR. CONRATH:  Right.

21          THE COURT:  You get over Rule 50, this is my

22  hypothetical now, he puts his case on.  If it turns out to a

23  thinly veiled efficiency case, you can rebut.

24          MR. CONRATH:  Yes.

25          THE COURT:  Then you put on your rebuttal case.

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1   You'll get your chance.  Believe me, you can put on witnesses,

2   you can put in documents.  If he opens the door, so-to-speak,

3   to an efficiency defense through his questioning and his

4   exhibits, whatever, you're going to get to rebut that or chance

5   to rebut it if you can.

6          MR. CONRATH:  That is, what Your Honor just described

7   is exactly how we envision this case will go.  We'll put on our

8   case in chief.

9          THE COURT:  Right.

10          MR. CONRATH:  Be a Rule 50 motion, let's hope we pass

11   it.  They're going to put on their case.

12          THE COURT:  Right.

13          MR. CONRATH:  Which is going to include efficiencies

14   whether you use the word defense or not, but I think it's

15   traditionally the courts think of it as a defense, so I'm going

16   to call it that.

17          THE COURT:  Yes.

18          MR. CONRATH:  So they put on their efficiencies,

19   response, whatever you call it.

20          THE COURT:  Judge Kavanaugh call it that?

21          MR. CONRATH:  I believe he called it a defense.

22          THE COURT:  Defense.

23          MR. CONRATH:  I can't remember.

24          THE COURT:  He wrote about that.

25          MR. CONRATH:  He wrote about it, yes.

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1           THE COURT:  I need to bone up on that.

2           MR. CONRATH:  I'm not going to try to recall memory,

3     do a memory test right on the spot.

4           But the point is the suggestion as I just heard it was

5     that just because we heard about something in discovery before

6     we even get to a Rule 50 motion, we have to disprove it and I

7     just want to be clear, we don't think that's the law and we

8     don't think there's any support for it.

9           We'll be prepared to meet it at the appropriate time which

10    is our rebuttal case.  Our rebuttal case will show how what

11    they're proposing is neither not really an efficiency.  It is

12    speculative, unproven and untested or is something that could

13    be done without the merger.  And we'll address that when the

14    time comes.

15          THE COURT:  It's no secret that this is my first

16    trial of this kind.

17          MR. CONRATH:  Yes, Your Honor.

18          THE COURT:  It's not my first trial.  But my first

19    trial of this kind.  And I would be less than honest if I said

20    to you it is a little unsettling to have a case in trial the

21    whole purpose of which is to test prognostication ability on

22    both sides of the coin.

23          This is about who's the better guesser.  Who's got the

24    better ability to prognosticate where this is all going.  I

25    mean frankly, I don't know if there's an analogy to this

1?REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER?1

1  anywhere else in the law.  This is very unusual.  Very unusual.

2          MR. CONRATH:  I've had that same thought, Your Honor,

3  in trying to describe this --

4          THE COURT:  Unsettling.

5          MR. CONRATH:  -- kind of jurist prudentially what

6  else is like this where the Court is called upon to make, by

7  the statute and a Supreme Court precedent, is called upon to

8  make a prediction about the future.

9          THE COURT:  Exactly.

10         MR. CONRATH:  I'm glad I'm on this side of the bench,

11  not the other because it's a hard job.

12         THE COURT:  I love telling parties look, I don't have

13  a crystal ball, you don't have a crystal ball.

14     In this case I guess I have to get a crystal ball, go and

15  find one or something.  I don't know where I'm going to get

16  one.  Maybe one of these secondhand stores somewhere in

17  Bethesda, but it's crazy.

18         MR. CONRATH:  I agree.  So it's not, a traditional

19  civil trial is often is what happened.  You know, was there a

20  contract?  Was there a tort?  This is what's likely to be the

21  outcome in the future.

22     And look, we have the burden of persuading you on that

23  point and we know it and frankly, it's a challenging burden.

24     But there are some guideposts.  That's part of what, the

25  reason why we need to call witnesses who know about the

17 REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1   industry, who have some sense who can put in facts that will

2   help explain why what we're predicting is a rational

3   prediction.

4        Economics is a tool for looking at the future and that's

5   why economists are frequently called, normally called in merger

6   cases.  That's why sometimes we look at, often why we look at

7   what the company was saying internally before it started

8   thinking about the merger, how were they thinking about the

9   market internally before they were trying to prepare their

10  documents for a merger litigation because sometimes that can

11  give you a clue about where the future of the market was going.

12  All of those are tools.

13       They're tools to get market facts in front of the Court.

14  It is at the end of the day, and then the parties argue and try

15  to make inferences to say what, Your Honor, are the inferences

16  that you reasonably can draw.

17       There's some observing facts that are in the current

18  market, the past market.  What are the reasonable inferences

19  you can draw about what could happen in the future if this

20  merger goes through and compare it to what would happen if the

21  merger does not go through.

22       That is the job of the Court and I think you're entirely

23  correct to observe that it is a, unique may be too strong, but

24  it's pretty unusual.

25            THE COURT:  It's pretty unusual.

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

```
 1          MR. CONRATH:  And it's a hard job.  We know we have

 2   the burden to do it, to be persuasive at the end of the day,

 3   Your Honor.

 4          MR. PETROCELLI:  I just need to clarify one thing.

 5       I think what's causing the legal issue that we're debating

 6   right now is because there's actually no cases on point on this

 7   issue.

 8       In the horizontal merger like the Anthem case and other

 9   cases that involve horizontal mergers, the law has become quite

10   settled where the government gets a benefit of a presumption

11   and if they prove certain market concentration.

12       And at that point in time anti-competitive harm is now

13   presumed and the cases then say the burden shifts to the

14   defendant to now prove efficiencies and benefits that would

15   overcome the anti-competitive harm.

16       However, and this is the important distinction.  However,

17   even in the horizontal cases, the burden shifting to the

18   defendants is not a burden of proof.  It is a burden of

19   producing evidence so that means the defendant starts calling

20   witnesses and starts presenting evidence of their efficiencies.

21       So at the end of the trial the Court then has to take into

22   account the evidence both sides presented but ultimately the

23   burden rests on the government to prove that it's more likely

24   than not taking into account the efficiencies evidence as well

25   that there will be anti-competitive harm.
```

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1          In no case, even in the horizontal context does it ever

2     say that the defendant has the burden of proof.

3          When I think of an affirmative defense, Your Honor, like

4     the statute of limitation or something or a contract waiver,

5     that's a situation where the defendant has the burden of

6     proving by a preponderance of the evidence that the defense has

7     merit.  That's not what the cases are talking about here.

8          There's no such burden ever put on the defendant.  At the

9     very most the burden that we have is to come forward with some

10    evidence and we for sure are going to be presenting such

11    evidence in our case in chief if they get past their case in

12    chief.  We will be presenting evidence detailing significantly

13    the benefits of the merger to consumers.

14          THE COURT:  See, this exhibit that generated all of

15    this discussion 658 it was, that was the number?

16          MR. PETROCELLI:  Is that the number?

17     Yes, Your Honor.

18          THE COURT:  Is that the number 658?

19          MR. PETROCELLI:  Yes.

20          THE COURT:  If it's not being offered to prove the

21    truth of the matter asserted; that is, that this is what the

22    future will, this is what will result in the future.

23          But it's being offered to prove what AT&T believes would

24    happen in the future.

25          MR. PETROCELLI:  That is correct, Your Honor.

1              THE COURT:  That's not hearsay.

2              MR. PETROCELLI:  That's probably correct.

3              THE COURT:  It's not even a business record exception

4    issue because we don't need an exception.

5         It's not being offered to prove what will happen in the

6    future.  It's being offered to prove what AT&T thought would

7    happen.

8              MR. PETROCELLI:  And the reasonableness of that

9    belief.

10             THE COURT:  Yes.  So we don't really have to deal

11   with the exemption in that, and that would equally apply to

12   theirs.

13        If they're offering documents to show what their third

14   parties thought would happen in the future, it's not being

15   offered to prove what will happen in the future but what they

16   think will happen in the future.  What they believe will happen

17   in the future.

18             MR. PETROCELLI:  Your Honor has to decide what weight

19   to give that.

20             THE COURT:  That's a question of weight?

21             MR. PETROCELLI:  Correct.

22             THE COURT:  And obviously cross-examination will deal

23   with any prejudices or biases or exaggerations that are

24   reflected in the analysis and the prognostication that's being

25   done, but it's really no one has a crystal ball.

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1          MR. PETROCELLI:  Thank you, Your Honor.

2          THE COURT:  It's tough.

3      How's that leave you feeling there, Mr. Conrath?  Feel

4  okay?

5          MR. CONRATH:  I'm feeling okay.  Every merger case

6  I've ever had to try we've had this same burden and that's just

7  the way, and every trust case, that burden is there.  It's our

8  obligation to be persuasive at the end of the day.

9      There's just a couple of things that I might note because

10  the reference to horizontal cases and that precedent.  So

11  there's one statute that has one standard that is whether the

12  merger may have, the affect of the merger may be substantially

13  to lessen competition.

14      It's true that in many horizontal cases one way for the

15  government to prove the anti-competitive effect is to just

16  proving through proof that gets you to the presumption because

17  of meeting concentration factors.  But the ultimate thing that

18  that presumption gets you is proving an anti-competitive

19  effect.

20      We will in this case and in some horizontal cases where

21  the presumption doesn't apply, if the plaintiff gets to the

22  point of proving anti-competitive effect, then the defendants

23  have the opportunity to offer their efficiencies or synergies

24  evidence and it comes back to as a defense or whether it's

25  literally a defense or response which is kind of not there, we

REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER

1   have the burden of going forward at that point.

2       So there is a distinction between horizontal and vertical

3   cases but as to whether the burden on, coming forward with

4   evidence on efficiencies, there shouldn't be once the

5   government in whatever fashion in vertical or horizontal case

6   has shown a likely on a competitive effect.

7       Another way to think about this the point of the plaintiff

8   has the burden to prove the things of anti-competitive effect

9   if the defendant believes that something would be pro

10  competitive, or efficient or synergy, it's their burden to come

11  forward with the evidence.

12      We agree a hundred percent at the end of the day we're the

13  plaintiff, we have got to be persuasive on the balance of those

14  two and that's why we have a rebuttal case.

15          THE COURT:  Look, why don't we take a break.  And

16  before we go to our last segment of the day, I'm going to go do

17  a little weather watching and talk to the Chief Judge about

18  tomorrow, how she sees it heading, where it's heading.  It's

19  her call, not mine.

20      If the courthouse is shut down, if that's her decision,

21  that's it.  The courthouse is shut down.  It goes on the

22  website.

23      If it's a delayed opening, then we push back the starting

24  time.  So instead of 10:30, we start at 11, something like

25  that.  Push it back an hour, whatever.

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

 1        But that decision is usually made like at 5 in the

 2   morning, 5:30 in the morning, based on where the weather is and

 3   where it's going.  All of those kinds of things.

 4        So I mean, I hate to lose a day obviously.  I know you all

 5   hate to lose a day.  I'm sure you have some folks on both of

 6   your sides who want to come to the opening arguments.  I know

 7   how that works and think.  Well, I was going to say, it might

 8   even be just easier to use the day for other purposes and start

 9   on Thursday.  But I hate to do that, but talk among yourselves.

10        We'll come back in 15 minutes or so and figure out if

11   there's anything else we need to talk about.  Otherwise, you

12   can go back to your war rooms and work on opening arguments,

13   things like that, your witness preps for tomorrow.

14        All right, see you in a little bit.

15        (Recess at 3:46 p.m.)

16        (Proceedings resumed at 4:10 p.m.)

17        THE DEPUTY CLERK:  Your Honor, recalling Civil Action

18   Number 17 dash 2511, United States of America v. AT&T,

19   Incorporated, et al.

20        THE COURT:  All right, counsel, I guess the question

21   on the table is going to be a problem for you to take tomorrow

22   off and start on Thursday?  Rather than deal with all of these

23   uncertainties and problems.

24        MR. CONRATH:  We're willing to do whatever the Court

25   wants.  I mean, we'd be prepared to go ahead.  And I think --

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*

1           MR. PETROCELLI:  I think we have the same position.

2    We're both prepared to go tomorrow.  We understand the

3    logistical uncertainty.  So, you know, we obviously will defer

4    to the Court's good judgment on that.

5           THE COURT:  They're's projecting snow all day long,

6    three to six inches during the course of the day in D.C., more

7    north.  An inch or so overnight, so add that inch on, and then

8    an inch tomorrow evening.  This city, this is not Burlington,

9    Vermont.  They don't deal with snow well here.  It's not even

10   Manhattan.  It's really a different --

11          MR. PETROCELLI:  It's certainly not Los Angeles.

12          THE JUDGE:  It's certainly not Los Angeles.  So, you

13   know, I know I realize you have people flying in.  You probably

14   have some people who have put this on their schedule that are

15   highly scheduled individuals that -- and it's going to cause

16   them issues, but on the other hand, we could find out tomorrow

17   morning at five o'clock the courthouse is closed for the day.

18   So it's really more a question of just sort of giving your

19   people more advanced notice and say, look, it's just neater and

20   cleaner, Thursday is supposed to be a clean day, no snow

21   projected.  It's going to be in the 40s, mid-40s, it's going to

22   be a big melt off.

23          MR. CONRATH:  Given what you describe as a weather

24   report and someone who has lived here a long time.

25          THE COURT:  It's going to be a mess, it's not

1   happening.

2       So I think, look, I remember being in your shoes, it never

3   hurts to have an extra day.  You can use it to think about,

4   plenty of work on.  It's a little inconvenience, sure, but, you

5   know, it's better than -- and, of course, we've got all these

6   people who want to be here and there's going to be a lot of

7   uncertainties tomorrow.

8           MR. CONRATH:  It's better to know now, Your Honor,

9   frankly, so we appreciate that.

10          MR. PETROCELLI:  Thank you, Your Honor.

11          THE COURT:  All right.  Is there anything either side

12  wants to address or argue, not argue, but just raise or

13  pontificate about?  Oh, I didn't see you there, Mr. Welsh.

14          MR. WELSH:  Your Honor, we have one last exhibit to

15  discuss with Your Honor.

16          THE COURT:  What would that be?

17          MR. WELSH:  This is DX 824.

18          THE JUDGE:  DX 824.

19          MR. WELSH:  Yes, Your Honor.  This is a Microsoft

20  Excel data file that was given to us attached to the expert

21  rebuttal report that the defendants' economic expert, Professor

22  Carlton, has provided to us in this matter.

23      Your Honor, we have a number of problems here, one is a

24  hearsay objection.  But another is just really a fundamental

25  issue of fairness that's going on with the document.  And I can

1    explain that.

2              THE COURT:  Sure, go ahead.

3              MR. WELSH:  Okay.  When we -- after we filed the

4    action we had discussions with the other side about what cutoff

5    dates would we use for purposes of pulling -- their pulling

6    documents and data that would come to us.  And as part of that

7    negotiation and agreement, the defendants were resisting moving

8    that date back further and further.  They finally, AT&T and

9    Time Warner both agreed to November 27, 2017 as being that line

10   in the sand.  AT&T did, frankly in a letter they wrote to us,

11   they dated it based on the fact that Time Warner had already

12   agreed to it, so they said, fine, we'll go with that date.

13       What we have here is this data.  This data file was never

14   produced to us during the course of the litigation, and

15   importantly the data was pulled from some computer system on

16   February 20th of this year.  The data was from the properties,

17   which we can go into the computer and look at the properties

18   for the documents, so we can see that it was created on

19   February 20th, and then it was modified on February 22nd.  It

20   was then attached to Dr. Carlton's rebuttal report and provided

21   to us on February 26th.  So that's the first time that we have

22   seen the document and that data.

23       Then we went to Dr. Carlton's deposition, and that was in

24   March, and he was asked about this.  And his testimony when he

25   was asked about this data, and the question was:

*[REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER]*

1          "So where did this data come from?"

2          His answer:  "My understanding is from AT&T."

3          The question:  "So it's your understanding that

4     it wasn't something that was produced in discovery

5     prior to the backup of your report?"

6          His answer:  "I don't know when what was

7     produced. "

8          The question was:  "You or your colleagues got it

9     from AT&T."

10          He said:  "That is my understanding, yes."

11     So he's not able to tell us really anything about the

12 data, but what we do know from him are a couple things besides

13 that.  One is that it wasn't in his initial report that came to

14 us, the first time again is in the rebuttal.

15     The second thing he said is that I am assuming that the

16 plaintiff's economic expert had not seen it because it was

17 provided to him in this way as well.

18     And that's the problem is that we haven't had a chance

19 through discovery to examine to understand the data.  We

20 haven't had the ability to probe it with a fact witness because

21 it was produced to us after the discovery cutoff here in this

22 case.  Nor has our economic expert had the ability to look at

23 what we learned in discovery.

24     So, there are a couple of different things going on here,

25 one being, as it stands now, it's hearsay.  We don't have any

1  foundation for it.

2      And then secondly, we do have this fundamental fairness

3  issue with the discovery coming in as late as it has and our

4  not having the opportunity to really delve into and understand

5  the document and the data, this Microsoft data program called

6  statistical analysis software.  I'm not too sure what that is.

7              THE COURT:  What does it demonstrate, can you tell?

8              MR. WELSH:  We're struggling with that ourselves.

9  They're looking at it, and Dr. Carlton has testified about it,

10  how it goes to some issues of the longterm value -- lifetime

11  value, excuse me, of the subscribers in terms of margins and

12  that sort of thing.

13      But it's an important piece for us to be able to

14  understand because he did express opinions based on this data

15  file, Your Honor.  And again, we don't have the ability to

16  probe any of that.

17              THE COURT:  Well, I mean, if this will make you sleep

18  better at night.  If you can't understand what it is from

19  looking at it, I don't know how in God's name I'll understand

20  what it is.  And I'm not likely to allow him to admit it if

21  it's, on its face, so obtuse that I'll never understand what it

22  is.

23              MR. WELSH:  Well, my concern too, Your Honor, thank

24  you.

25      And my concern too is, and I appreciate that, we would be

1  in the same position.  My concern is that we certainly would

2  want, if they're going to put on an expert that's going to

3  testify about it and try to get it into evidence that way.

4           THE COURT:  Well, they're going to have an expert.

5  The only question is, is he going to be allowed to go into this

6  stuff?

7           MR. WELSH:  Right.  And also, if he's going to talk

8  about it or use it as a basis for his opinion, then that's a

9  problem for us in terms of discovery because we have not had

10 the ability to delve into it so that our expert can respond to

11 it, and that's a problem.  So we -- if the Court is inclined to

12 let their economic expert rely on if it, whether it comes into

13 evidence or not, then we would respectfully request an

14 opportunity to take some further limited discovery with respect

15 to that data so that we can understand it better and present to

16 Your Honor our positions with respect to it.

17          THE COURT:  Well, let's find out if they're planning

18 on using it.

19          MR. WELSH:  Okay, thank you, Your Honor.

20          MR. OPPENHEIMER:  Your Honor, good afternoon.

21          THE COURT:  You got the short straw.

22          MR. OPPENHEIMER:  I did.  You know, it's daunting

23 late in the afternoon just before a snow day to be talking to

24 you about computer records, but here I go.

25          THE COURT:  Just don't scare me.

*[REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER]*

1                    THE DEPUTY CLERK:  Identify yourself, please.

2                    MR. OPPENHEIMER:  Randy Oppenheimer.

3          Your Honor, I'll just take one quick second to describe

4    what these things are because it's actually quite

5    straightforward.

6          The government's expert has a model that you've heard a

7    little bit about today which purports to identify how people

8    will behave in negotiations.  And that model is very, very

9    sensitive to inputs.  And there are three basic inputs to that

10   model.  This set of materials has to do with one of those

11   inputs.  The model tries to look at what subscribers would move

12   to the merged entity after a blackout, which you heard a little

13   bit about today.  And it tries to value what those people are

14   worth.  And so what it tries to do is figure out how many

15   people would leave and how many people who left would come to

16   DirecTV in the merged entity. And importantly, what they would

17   be worth.  Because they have to be worth something so that you

18   can add up what it's worth if all these people come to you.

19                   THE COURT:  What do you mean what they're worth?

20   What their net worth is?

21                   MR. OPPENHEIMER:  No, what their worth to DirecTV as

22   a business.  In other words, the theory is that if there's a

23   blackout some people will leave from a competitor who doesn't

24   have product, and the theory is some of those will migrate over

25   to DirecTV, which would then be an affiliate, and that those

1   people would therefore be worth something to you.  But in order

2   to know whether they're worth something to you, you have to

3   know what you can make from them.  What their worth as

4   customers, as new customers.  So there you look at their profit

5   margins, what is a new customer worth?

6        Now, what this data is is actually very simple.  When

7   Professor Shapiro, who is the government's expert, did his

8   initial report, which was provided on February 2nd, he for the

9   first time revealed his full theory, and one of the things he

10  did was to talk about subscribers he estimated would leave

11  under certain circumstances the competitor.  And how many would

12  come to DirecTV and what they would be worth.  Let's call that

13  margin data.  It's actually, in the industry it's called

14  longterm value or LTV.

15       And he was using for his study material that had been

16  provided to him by AT&T during the discussions with the

17  government through one of AT&T/Time Warner's economists,

18  Mr. Israel.  And so he took that data and he ran his

19  calculations.  It was all AT&T data, and for shorthand we can

20  call it longterm value of new customers, LTV of new customers.

21  And it came from the business records of AT&T, there were

22  certain files.  And he did those for his initial report, which

23  we saw for the first time on the 2nd.

24       The data was then responded to by our expert, Professor

25  Dennis Carlton, who is a professor at the University of

 1  Chicago, was the DOJ's chief economist, and a very

 2  well-respected economist, as both these gentlemen are.  And the

 3  only thing that our expert, Professor Carlton, did with this

 4  part of Professor Shapiro's report was to update it.  That's

 5  all he did.  He said it's important if you're going to be

 6  talking about the value of new customers to take into account

 7  whether the value is going up or down.  Because it makes a huge

 8  difference to Professor Shapiro, the government's witness, a

 9  huge difference.

10      Your Honor, this one factor in Professor Shapiro's model,

11  this one factor, and there are many factors we will talk about

12  in the trial, but this one factor reduces the harm or price

13  increase that Professor Shapiro talks about by over 80 percent,

14  just this one factor.  Just by going from what a customer is

15  worth based on the data that Professor Shapiro used and what a

16  customer is worth based on more current information.  Which was

17  all supplied, all of it to the government when the rebuttal

18  reports were provided on the 26th of February.  And that is

19  completely consistent with paragraph 21 of the case management

20  order, which says that materials relied upon by the expert are

21  to be revealed and provided when they supply their reports.

22  There was no way for to us have done that on the 2nd because we

23  had not yet seen Professor Shapiro's report.

24      When he filed his report on the 2nd of February, we saw

25  what his theory was.  We saw how important it was for him to

*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   claim that there were these profit margins associated with

2   these customers he evaluated.  And we realized then that the

3   problem with Professor Shapiro's approach was that he was using

4   data, profitability data for these customers that was on a

5   downward trend, and he wasn't taking into account the trend.

6   So Professor Carlton used the next most recent data which

7   clearly shows that trend.  And by doing so dramatically changes

8   the results in Professor Shapiro's model because the

9   government's expert's model is very, very sensitive to these

10  inputs.

11       Now, I may have you buried the headline, Your Honor, in my

12  comments today because earlier in the day Mr. Conrath and

13  Mr. Petrocelli discussed the fact that we're happy to just

14  treat this as 703 reliance material, which we're perfectly

15  willing to do, which eliminates most all of the issues about

16  whether it's independently admissible.  It doesn't need to be.

17  And taking really Your Honor's guidance, I think it's a fair

18  statement that none of the lawyers nor perhaps Your Honor is

19  going to spend a lot of time looking at these data files.  What

20  we're going to be doing is listening to the experts talk to us

21  about them and about how their opinions are based on them.

22       And so we're happy to have it treated just as 703

23  material.  And in that sense I'm really not sure there's

24  anything for us to do today.

25            THE COURT:  All right.  Mr. Welsh.

[REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER]

```
 1              MR. WELSH:  Thank you, Your Honor.

 2              THE COURT:  Does that take your blood pressure down a

 3    little?

 4              MR. WELSH:  Well, Your Honor, it doesn't address a

 5    few of the central issues here, though.  What I hear

 6    Mr. Oppenheimer talk about is how important this data is.  What

 7    I didn't hear Mr. Oppenheimer talk about was, well, that it

 8    came to the government in discovery so that we had an

 9    opportunity to examine it with some of their witnesses.  And

10    that's a fundamental problem here, is that again it shows up

11    after the close of discovery when it goes in with an expert.

12    And we had an understanding here.  There was a line, and we've

13    used data from that line, and they're now trying to move the

14    goalpost and say, well, we're going to just continue to go out

15    and pull data, and we don't know anything about it, nor did the

16    expert know anything about it when he was asked in a

17    deposition, "Why did you pick these dates?  Why did you pick

18    these particular dates to pull this data?"  He didn't know the

19    answer to that question.  None of us do.  And so I don't think

20    it's a question of cross-examining their expert on it, I think

21    it's a question for us, Your Honor, at a minimum we need to

22    have some limited discovery to be able to understand more about

23    this data pull that they have given us, and so that we can be

24    in a comparable position at least to understand its impact and

25    what it means in terms of their business.  And we don't have
```

1   that, Your Honor, at this point.

2       It looks to be cherry-picked, and we think that we are

3   entitled to at least some limited discovery if Your Honor is

4   going to -- even if they're going to just take it for purposes

5   of something that can be relied upon the expert without it

6   coming into evidence.

7           THE COURT:  Why don't you do this:  Why don't you

8   provide tomorrow a list of questions to Mr. Oppenheimer that he

9   has to answer with regard to this information, where it came

10  from, who created it and blah, blah, blah.  And see to what

11  extent those questions, if he can answer them, you know, get

12  you to where you need to be in terms of, you know, objecting to

13  this stuff.  If it doesn't, then we'll deal with it further on

14  Thursday.

15          MR. WELSH:  Okay.  And that will be acceptable, Your

16  Honor.  We're just trying to learn about this.

17          THE COURT:  Right, and it may be when you get the

18  answers to the questions and you give them to your expert, it's

19  a "he," right?

20          MR. WELSH:  Yes.

21          THE COURT:  So he'll look at it and, you know, maybe

22  it will allay any concerns he has about what it is and where it

23  came from and how valuable it is.  And it doesn't sound like

24  it's that critical, but --

25          MR. WELSH:  We're just trying to learn more about it,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Your Honor, so that our expert can address it when he's before

2   you.

3              THE COURT:  Send him a letter tomorrow.

4        Mr. Oppenheimer, get him the answers that he needs, okay?

5              MR. OPPENHEIMER:  Certainly, Your Honor.

6              MR. WELSH:  Thank you, Your Honor.

7              THE COURT:  All right.

8        Mr. Conrath, what have you got, you got anything?

9              MR. CONRATH:  I think just one thing.  There was a

10  topic that we talked about the other day about some evidence

11  that will be -- will be -- is potentially coming in, and Mr.

12  Kempf, my colleague, would address that if we've got a minute.

13             THE COURT:  Sure.  Is this the confidential stuff?

14             MR. KEMPF:  It's the drafts, Your Honor.  So that the

15  drafts of the presentations versus the final.

16             THE COURT:  Oh.

17             MR. KEMPF:  We spent a fair amount of -- we spent

18  time on it almost every day and yesterday a fair amount.

19        Let me just add one footnote to the efficiencies thing.

20  As I was listening to it, I said, gee, where did we come up

21  with this fuzzy notion that they're asserting in their

22  efficiences affirmative of defense, and I found the answer to

23  that, it's from their answer.  Their answer on page 28 says,

24  "Here are our affirmative defenses."  And number four reads:

25                  "The overwhelming efficiencies that will result

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1               from the transaction will benefit consumers such that

2               the transaction is in the public interest."

3          So that's where we came up with that fuzzy notion, Your

4     Honor, we read their answer.

5               THE COURT:  Well, maybe you guys have changed your

6     thoughts in some parts of the case, and maybe they changed

7     their thoughts.

8               MR. KEMPF:  Be surprising if we don't, Your Honor.

9               THE COURT:  That's why we litigate these things.

10              MR. KEMPF:  Absolutely.  What I'd like to spend just

11    a few moments on, Your Honor, is the question of why is it that

12    the government believes that these draft reports are powerful

13    and probative evidence as to whether there's a section 7

14    violation here or not, and it all begins with the --

15              THE COURT:  Which reports are we talking about now?

16              MR. KEMPF:  The ones yesterday, they said, well, you

17    know, this one was not shown to the board.  Or actually, it

18    began on the very first pretrial conference we had,

19    Mr. Petrocelli said, you know, they want to put in draft

20    reports, not the stuff that went to the board.

21              THE COURT:  Expert reports?

22              MR. KEMPF:  No, no.

23              THE COURT:  No?

24              MR. KEMPF:  These decks, the slide presentations

25    about the merger.  And he said, you know, they don't want to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  put in the stuff that went to the board of directors, they want

2  to put in the preliminary drafts.  And the answer is you bet we

3  do, Your Honor.  And I'd like to take a moment to explain why.

4      It all begins with the statutory scheme.  Under the,

5  what's called the Hart-Scott-Rodino Act passed in the mid-70s.

6  Those who want to merge, they're big companies, have to file

7  with the Department of Justice and the FTC a report and certain

8  documents.

9      And large among those are the, what are called 4C

10  documents, that's just the chapter that lists what they are.

11  And those are the planning documents that go to the board.

12      Well, they know that that's going to come to us to look

13  over.  So those are scrubbed six ways from Sunday by the time

14  we get them.  And I've never been in a Section 7 case where

15  those have any use to the government at all.  They're all --

16          THE COURT:  Sanitized.

17          MR. KEMPF:  They're sanitized.  Good word.  So what

18  we do next is we have the ability under the statute to file a

19  second request.  And we say to them, hey, give us the

20  preliminary drafts of these documents.  And we believe that

21  those are instructed to finding out what the business people

22  really think.  And so we do that.  And then we get back their

23  planning documents.

24      And Mr. Petrocelli knows this document is -- it's a series

25  of documents, it's not helpful to him, so he attacks it as a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  draft the first day.  Yesterday he attacks the author.  If

2  y'all recall, he's the guy who is less than a year out of

3  business school, doesn't understand the business, doesn't know

4  what he's talking about.  We didn't send him a request that

5  said, please give us a presentation and a study and an analysis

6  done by a dope who doesn't know what he's talking about, we

7  just said send it to us.  And they picked who did the analysis.

8  We didn't pick who did the analysis.

9       So we look at it, and we then find what we think is the

10  real truth of what's going on.  If I can, I'd like to, I have

11  one, I've got some backs that are attached to it, but I have

12  one document I want to go through that sort of summarizes this,

13  and if I could, I'll -- may I approach and pass this up to the

14  Court?

15           THE COURT:  Well, make sure the government and

16  defense --

17           MR. KEMPF:  Yeah, no, I've got one for them too.

18  I've got a summary on the top, Your Honor, and then the rest is

19  just backup, I'm not going to reference that.

20       But it starts with draft number 1, and they start off, and

21  we believe this is the reality.  This is what their core

22  belief, number one, really is.  And it has some stuff in there

23  about it will ensure stability.  And then they talk about how

24  they want to race to the future.  And it says, a slow structure

25  decline in history reducing the risk of bad things happening, a

**\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\***

```
 1   dramatic --

 2             THE COURT:  Are you talking about this document here?

 3             MR. KEMPF:  Yes.  I'm reading the top line.

 4             THE COURT:  So this is a summary.

 5             MR. KEMPF:  Yes, it's excerpts from three of the --

 6   what it is, it shows the progression.  I should have made this

 7   clearer.  It shows the progression from the first draft to the

 8   final draft.

 9             THE COURT:  You don't want to introduce this into

10   evidence?

11             MR. KEMPF:  No.

12             THE COURT:  That's your work product.

13             MR. KEMPF:  Yes, we're going to use the actual

14   documents, and we'll call the person who prepared them to the

15   stand.  And they can attack him as a dope who doesn't know what

16   he's talking about, he happens to be the guy they chose to do

17   it.

18             THE COURT:  All right.

19             MR. KEMPF:  Okay.  And they start off saying, this is

20   the first one, the April 8th draft.  And they start off saying,

21   "Hey, this will ensure stability.  And we're going to -- are we

22   going to race to the future?"  By the way, this is six months

23   after they make the deal.  This is not, you know, looking, you

24   know, something that may or may not happen.  This is six months

25   after they've done the deal.
```

1          THE COURT:  All right.

2          MR. KEMPF:  And they're saying, okay, what's going on

3   here.  Well, this will ensure stability.  We can move slowly

4   into the future and we can avoid any downturn.  There's all

5   kind of good stuff in here.

6          And so the higher ups look at it, and they say, whoo, I'm

7   not sure we can say that.  So they change it, they sanitize it,

8   to use your words.  And all of a sudden ensuring stability

9   becomes it will encourage stability.  And then the other parts,

10  the slow decline and avoiding the downturn, those disappear all

11  together and it comes in with something kind of bland.  As the

12  ecosystem evolves, and then they look at it and they say, you

13  know, and this is the blowup in the middle there in the blue,

14  Your Honor, is I feel this has come kind of too bland.  But I

15  know that the lawyers will be all over it.  And were they?  You

16  bet they were, Your Honor.

17          THE COURT:  Whose words are those?

18          MR. KEMPF:  That's one of their people.  He's the --

19  he's above the guy who wrote it, and he's saying, you know,

20  after they turn it around, they then say, well, gee, this is

21  becoming pretty bland.  It's not revealing our stuff, it's just

22  Pablum.  So he says, but I also know that the lawyers will be

23  all over it.  And what do we see in the final one, Your Honor?

24  The blandest of the bland.  This is the line that says major TV

25  players will continue to support traditional creation,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   aggregation, distribution, and value chain.  So now is it

2   bland?

3       This is a variation that if you look -- if it looks in the

4   mirror and says, "Mirror, mirror on the wall, what's the

5   blandest of them all," this is it.  They've succeeded in doing

6   this.  And does this reflect the business people?  No.  You'll

7   see this is their yellow highlighting, not mine own.

8   Previously updated by A.G., which we think is Akin Gump, who's

9   been working on this and Cravath.

10      So the final version, is that the views of the business

11  people?  Not on your life, Your Honor.  That's the views of the

12  lawyers who are reviewing to make sure it doesn't bite them in

13  the fanny if they ever have to go to trial.  And they've

14  cleaned it up and made it bland as bland can be, and we think

15  that that's why if you trace the history of these things going

16  back, you find that there's a lot of probative evidence as to

17  what they think is really going on.  It's -- the final version

18  isn't the thoughts of the business people.  That's the cover

19  story of the lawyers involved.  And as you go further back, you

20  find more and more of what the business people think.

21      Now, they can attack their guy all they want.  And by the

22  way, one thing we looked for in the file was, well, did they

23  send them a letter or an e-mail or something that said, Greg,

24  the guy's name is Greg.  You know, you're just out of business

25  school less than a year.  You're new to the business.  You

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  don't know what's going on.  Your work product stinks.  They

2  didn't send him that.

3       They did send him something commenting on his work, and

4  it's two words, very simple.  "Nice work."  That's what they

5  told him.

6       Now, they can attack him all they want, and that's fine.

7  They're going to have other attacks on him.  They're going to

8  say, you know, and you know Mr. Stevenson will say this.

9  Strategic planning group, they don't count for anything.  Their

10  views don't matter.  Why?  Because I'm the guy who makes all of

11  the strategic planning decisions, not them.  But they play

12  millions for strategic planning, and not only that, they hire

13  Mitt Romney's old company, Bain, to come in, and they paid them

14  hundreds of thousand more to help in this process.  And they

15  can dismiss it out of hand all they want.  We think it's

16  probative and powerful, Your Honor.  And that's why we cant to

17  bring it in so the Court can weigh it, and you consider for

18  what it's worth, and we think it's worth a lot.

19       Now, one last thing.  You're going to love trying this

20  case, Your Honor.  They tell me that I've tried more of these

21  than anybody who's every lived.  And I've never checked that,

22  but I assume it's true.  And you've got good lawyers on both

23  sides.  They work very hard, and you're going to see witnesses

24  who have been well prepared.

25            THE COURT:  Uh-huh.

1        MR. KEMPF:  And I think at the end of the day you're

2   going to have a lot of fun in this case, Your Honor.  It's a

3   predictive exercise.  But it's, as someone who's done a lot of

4   them, I find them to be fascinating and fun.  And it's been --

5   it's been fun for the lawyers on both sides to work together.

6   I'm reminded of Shakespeare's admonition.  His most famous

7   lawyer quote is probably by Dick the butcher, the first thing

8   you do, let's kill all the lawyers.  But the one I like best is

9   from "Taming of the Shrew," and it's, "And let us do as

10  adversaries do at law, strive mightily, but eat and drink as

11  friends."  That's the way we prepared the case.  And I think

12  that that will continue, and I think that you and we will

13  benefit from that, and we'll have a lot of fun together.  I'm

14  looking forward to it, Your Honor.

15        THE COURT:  Great.

16        MR. KEMPF:  That's all I have.

17        THE COURT:  Okay.  Well, let's give Mr. Petrocelli a

18  chance to respond.

19        MR. PETROCELLI:  Yes.

20        THE COURT:  You kind of threw a lot of meat on the

21  table there, Mr. Kempf.

22        MR. PETROCELLI:  Yeah, I'm not quite sure what all

23  that was about, but I will say this, Your Honor.  Unlike

24  Mr. Kempf who's tried many, many antitrust cases, and I admire

25  him, I've tried a total of zero.  So this is my first one, and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   I'm looking forward to it as well.

2           THE COURT:  You and me both.

3           MR. PETROCELLI:  But I've been around the block a

4   couple of times, and --

5           THE COURT:  I'll take judicial notice of that.

6           MR. PETROCELLI:  Yeah.  So, you know --

7           THE COURT:  As have I.

8           MR. PETROCELLI:  In all due respect to Mr. Kempf,

9   first of all, he only read part of what is stated in the

10  answer.  He forgot to read the following part.  "Defendants

11  assert the following defendants, quote, without assuming the

12  burden of proof on such defenses that would otherwise rest with

13  plaintiff," end of quotes.  And then out of an abundance of

14  caution, we set forth the issues without acknowledging, of

15  course, any burden of proof on the defense.  So that's the full

16  citation.

17      Secondly, you know, if -- it's interesting because this

18  discussion about drafts, Your Honor, came up not in connection

19  with some objection that we made about excluding certain

20  documents.  It came up with respect to frankly my insistence,

21  going back a couple of months, that we have something as basic

22  as having a witness get on the witness stand to talk about the

23  document, and I think we finally have gotten there.  But the

24  government, of course, has been rather insistent on trying to

25  put these documents into the record for you to see for the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    first time after the trial was over, and now, of course, we are

2    going to have the opportunity to question the witnesses about

3    it.

4              THE COURT:  Sure.

5              MR. PETROCELLI:  And what you will learn, for

6    example, take this document.  And this document is prepared by

7    a young man who was fresh out of business school and nobody

8    called him a goffer except Mr. Kempf.  We certainly didn't.  We

9    think he's a very fine young employee.

10             THE COURT:  What number are you talking about?  Do

11   you have a PX number on this?

12             MR. PETROCELLI:  Yes, it's this document.

13             THE COURT:  0363037?

14             MR. PETROCELLI:  Yes.  Plaintiff's Exhibit 363,

15   Plaintiff 31, Plaintiff 189.  Incidentally, this young man, the

16   DOJ initially wanted to use eleven documents in their opening

17   slides, and they've trimmed that down now.  Six of them were

18   from this fellow.  Six of them.  None from the chairman and

19   CEO.  None from the top executives, but six from this fellow,

20   Mr. Manty, who they apparently intend to call, and we look

21   forward to that.

22             THE COURT:  What slides are you talking about?

23             MR. PETROCELLI:  Well, Mr. Conrath has some slides,

24   and I had objections --

25             THE COURT:  For his opening argument?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1            MR. PETROCELLI:  Yes, he has some slides, and I've
 2   objected --
 3            THE COURT:  I've never seen those.
 4            MR. PETROCELLI:  Well, he'll have to show them to
 5   you.  I only have --
 6            THE COURT:  We do old school opening arguments around
 7   here, we talk at the lectern.  Maybe, if you --
 8            MR. PETROCELLI:  I have a board, Your Honor.
 9            THE COURT:  If you have a board --
10            MR. PETROCELLI:  I have a board.
11            THE COURT:  You can use a board.
12            MR. PETROCELLI:  It's a big board, and I can put it
13   there, and we won't have any problem seeing it.
14            THE COURT:  I don't know about slides, Mr. Conrath.
15   You need to reevaluate that.
16            MR. CONRATH:  I have boards, Your Honor.
17            THE COURT:  Good.
18            MR. PETROCELLI:  He turned his slides into boards.
19   Okay, so here's an example of what's going on here, and why I'm
20   so glad we're going to be able to talk to our witnesses.
21   Mr. Manty is a director in the strategy group.  Nobody reports
22   to him, unfortunately, because he's at the bottom of the ladder
23   right now.  Hopefully, he'll climb up.
24            THE COURT:  Okay.
25            MR. PETROCELLI:  Your Honor, there are four thousand,
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    five hundred directors at AT&T.

2            THE COURT:  Directors?

3            MR. PETROCELLI:  Directors, that's a title.  He is

4    one of four thousand, five hundred directors at AT&T.

5        He was out of business school a year or two.  Now I think

6    it's maybe four years or so, maybe a little bit more.  He is

7    four or five levels below the chairman and CEO.  And he's only

8    had one substantive meeting with the chairman and CEO, and it

9    wasn't about the video business.  So the point is, is that

10   there are a lot of people in the company who do a lot of

11   things, and it goes through a natural process of being reviewed

12   and reviewed and revised and reviewed until it gets to a point

13   where somebody up the chain can present it to management.

14   That's how the business works.

15       AT&T is a regulated business.  So it has -- the company

16   has over 600 lawyers, Your Honor.  Bigger than most law firms.

17   It's a regulated business.  And so many, many documents, many

18   reports have to be reviewed to make sure that they are

19   appropriate from the compliance standpoint.  This one, I think

20   the example that was used on this document is particularly

21   egregious in my view.  Because this was generated during the

22   parlor process, and the parlor process means the process after

23   the merger was announced where the parties are trying to plan

24   for the world when the merger has been cleared, but there are

25   gun jumping rules which prohibit them from doing certain

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

 1   things.

 2       So in order to comply with the law, the merging parties

 3   hire law firms.  And one of them was Akin Gump, and then

 4   Cravath, Swaine and Moore has been very much involved since day

 5   one, and these lawyers reviewed these materials to make sure

 6   that nobody goes too far and gets near the line, for example,

 7   on these gun jumping rules.

 8       And these documents are a product of that process.  It

 9   would be irresponsible, and the government would be all over us

10   if we didn't have lawyers reviewing these materials.

11   Furthermore, no meeting at all happened to have been changed

12   here, and Mr. Manty was examined about these lawyer revisions,

13   and he was asked at the end, "Does this accurately convey what

14   you were trying to say," and he said, "I believe so."  And he

15   will so testify.

16       So, since Your Honor has now ruled that the witnesses will

17   have an opportunity to explain these documents, you will hear

18   their testimony about them.  And so that's about it.  Thank

19   you.

20           THE COURT:  Okay.  Well, Mr. Conrath, what do you

21   think?

22           MR. CONRATH:  Got a question about my boards, Your

23   Honor.  I just want to make sure I'm doing what is appropriate.

24           THE COURT:  You going to put them on an easel?

25           MR. CONRATH:  On an easel, we have an easel, and

1    where shall we place the easel?  If you'll tell me --

2            THE COURT:  Well, you can put it right there if you

3    want to.

4            MR. CONRATH:  That will work.  Can I have a colleague

5    assist me with moving them while I stay at the podium?

6            THE COURT:  Sure, that's perfectly fine.

7            MR. CONRATH:  Okay.  I just want to make sure.

8        A couple of the boards --

9            THE COURT:  How many you got?

10           MR. CONRATH:  Five.

11           THE COURT:  That's not that bad.

12           MR. CONRATH:  I think we -- the other side has three,

13   so maybe they beat us.

14           THE COURT:  Okay.

15           MR. CONRATH:  But I think a couple of them are

16   documents that we plan to admit.  Of course, they haven't been

17   admitted yet.  Because we haven't had -- as long as that's okay

18   with you, we'll --

19           THE COURT:  You don't have the problem you would have

20   if you had a jury.

21           MR. CONRATH:  Precisely, precisely.  So, all right,

22   that's fine.  And we'll look forward to --

23           MR. KEMPF:  And the other side has seen them?

24           MR. CONRATH:  Yes.  And we've seen theirs.

25           THE COURT:  And they've seen yours.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1          MR. PETROCELLI:  I do have objections to the exhibits

2    he's showing on his boards.  We've argued them to Your Honor,

3    but I had no issue with Your Honor seeing the exhibits on the

4    board because at some point you're going to rule whether the

5    exhibits come in or not.  And if they don't come in, then they

6    don't come in.

7          THE COURT:  Exactly.  Exactly.

8          MR. PETROCELLI:  Thank you.

9          THE COURT:  And this is argument anyway, so it's not

10   evidence.

11         THE DEPUTY CLERK:  Thursday at 10:30.  No Friday.

12         THE COURT:  Thursday 10:30.  Well, that will give you

13   a little more sleep, and maybe Don will host a lunch for

14   everyone tomorrow, you know, at the Capital Grille, Don?  Get a

15   little steak in your system so you're ready for action.  That a

16   boy.

17       All right.  Is there anything else for the defense?

18         MR. PETROCELLI:  No thank you, Your Honor.

19         THE COURT:  All right, be careful in the snow.

20         (Proceedings adjourned at 4:50 p.m.)

21                          -oOo-

22

23

24

25

CERTIFICATE

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the stenographic notes provided to me by the United States District Court, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____          _____
Crystal M. Pilgrim, RPR,FCRR              Date:  March 20, 2018

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,       :
                                :
              Plaintiff,         :          CV No. 17-2511
          vs.                   :
                                :              Washington, D.C.
                                :          Thursday, March 22, 2018
AT&T, INC., ET AL.,             :              2:55 p.m.
                                :
                                :                 Day 1
              Defendants.        :
-----------------------------x



                    AFTERNOON SESSION
                TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE RICHARD J. LEON
                UNITED STATES DISTRICT SENIOR JUDGE



APPEARANCES:

For the Government:    Craig W. Conrath, Esquire
                       Eric D. Welsh, Esquire
                       Jared A. Hughes, Esquire
                       Donald G. Kempf, Jr., Esquire
                       Lisa A. Scanlon, Esquire
                       Alexis K. Brown-Reilly, Esquire
                       U.S. DEPARTMENT OF JUSTICE
                       Antitrust Division
                       450 Fifth Street, NW
                       Washington, DC  20530
                       (202) 532-4560
                       craig.conrath@usdoj.gov
                       eric.welsh@usdoj.gov
                       jared.hughes@usdoj.gov
                       donald.kempf@usdoj.gov
                       lisa.scanlon@usdoj.gov
                       alexis.brown@usdoj.gov
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1   Appearances Continued:

 2   For Defendant AT&T        Katrina M. Robson, Esquire
     and DirecTV Group        O'Melveny & Myers LLP
 3   Holdings, LLC:           1625 Eye Street, NW
                              Washington, DC  20006
 4                            (202) 220-5052
                              krobson@omm.com
 5
                              Daniel M. Petrocelli, Esquire
 6                            M. Randall Oppenheimer, Esquire
                              O'MELVENY & MYERS LLP
 7                            1999 Avenue of the Stars
                              8th Floor
 8                            Los Angeles, CA  90067
                              (310) 553-6700
 9                            dpetrocelli@omm.com
                              roppenheimer@omm.com
10
                              Michael L. Raiff, Esquire
11                            Robert C. Walters, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
12                            2100 Mckinney Avenue
                              Suite 1100
13                            Dallas, TX 75201
                              (214) 698-3350
14                            mraiff@gibsondunn.com
                              rwalters@gibsondunn.com
15
     For Defendant           Kevin J. Orsini, Esquire
16   Time Warner, Inc.:      Peter T. Barbur, Esquire
                              CRAVATH, SWAINE & MOORE LLP
17                            Worldwide Plaza
                              825 Eighth Avenue
18                            New York, NY  10019
                              (212) 474-1140
19                            korsini@cravath.com
                              pbarbur@cravath.com
20
     Court Reporter:         Crystal M. Pilgrim, RPR, FCRR
21                            Official Court Reporter
                              United States District Court
22                            District of Columbia
                              333 Constitution Avenue, NW
23                            Washington, DC  20001
                              (202) 354-3127
24                            crystal_pilgrim@dcd.uscourts.gov

25
```

```
 1                        Table of Contents

 2                              Direct  Cross Redirect  Recross

 3   On behalf of the Government:

 4       Suzanne Fenwick

 5         By Ms. Scanlon            77

 6
         By Mr. Petrocelli                 114
 7

 8

 9

10

11                       E-X-H-I-B-I-T-S

12                                    Marked  Received

13   On behalf of the Government:

14   Exhibit No. PX 0422                          105

15   Exhibit No. PX 0437                          110

16   Exhibit No. PX 0491                          110

17

18   On behalf of the Defendant:

19   Defendant's Exhibit Number 916        119

20

21

22

23

24

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2            THE DEPUTY CLERK:  Your Honor, recalling civil action

 3   number 17-2511, United States of America v. AT&T, et al.

 4            THE COURT:  All right, Mr. Conrath, ready to call

 5   your first witness?

 6            MR. CONRATH:  Good afternoon, Your Honor.

 7        The government's first witness is Suzanne Fenwick from Cox

 8   Communications.  She negotiates agreements with programmers

 9   like Turner, she's going to testify about --

10            THE COURT:  She'll tell us, all right.

11            MR. CONRATH:  Thought you would like a little

12   preview.  For those who don't, I don't give it.

13        My colleague Lisa Scanlon will be handling Ms. Fenwick,

14   Your Honor.

15            THE COURT:  All right.

16            MS. SCANLON:  Good afternoon, Your Honor.  Lisa

17   Scanlon for the United States.

18        The United States calls Suzanne Fenwick of Cox

19   Communications.

20            THE COURT:  All right.  Okay.

21            MS. SCANLON:  Your Honor, I'd like to hand up some

22   binders if I may.

23            THE COURT:  All right.

24                GOVERNMENT WITNESS SUZANNE FENWICK SWORN

25            MS. SCANLON:  May I proceed, Your Honor?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  You may.

 2              MS. SCANLON:  Your Honor, before I begin, I wanted to

 3   state that as Mr. Conrath explained I think on Tuesday --

 4              THE COURT:  No speech.  Question the witness.

 5              MS. SCANLON:  All right.

 6                        DIRECT EXAMINATION

 7   BY MS. SCANLON:

 8   Q.   Good afternoon, Ms. Fenwick?

 9   A.   Good afternoon.

10   Q.   Are you, do you understand you're here pursuant to a trial

11   subpoena?

12   A.   I do.

13   Q.   Okay.  Ms. Fenwick, where do you work?

14   A.   I work at Cox Communications.

15   Q.   What is Cox's business?

16   A.   We sell, from a product standpoint, we sell video

17   services, we sell high speed data, we sell telephone and home

18   security.

19   Q.   Okay, where does Cox operate?

20   A.   Our corporate headquarters are in Atlanta.

21   Q.   Are you here from Atlanta today?

22   A.   I am.

23   Q.   Where does Cox operate around the country?

24   A.   So we are in several areas of the country.  We're not a

25   national player.  But we're in Fairfax, Virginia, we're in
```

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1   Louisiana, Phoenix, San Diego, a number of markets.

2   Q.   How long have you worked at Cox?

3   A.   Nineteen years.

4   Q.   Would you describe the jobs that you've had at Cox?

5   A.   Sure.  So I started in mergers and acquisitions.  I've

6   done corporate development.  I've done, I led our commercial

7   business in finance.  And then I started in content acquisition

8   about six years ago.

9   Q.   What is your current title?

10  A.   Vice chairman of content acquisition.

11  Q.   What do you do in that job?

12  A.   I negotiate for the rights to put cable networks or

13  channels on our TV platform.  And a good example would be like

14  an ESPN.

15  Q.   How many contracts have you negotiated in your time in

16  that position?

17  A.   Easily hundreds.  We are constantly going through and

18  opening up agreements and doing amendments.

19  Q.   Ms. Fenwick, you're in the content acquisition department;

20  is that right?

21  A.   That's correct.

22  Q.   Okay, and how many people are in that department at Cox?

23  A.   It's small.  There's six or seven of us.

24  Q.   Who do you report to?

25  A.   I report to Andy Albert.  He's the senior vice-president

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  of content acquisition.

2  Q.   Are there other departments in Cox?

3  A.   Yes, many.  Our department is actually part of our finance

4  organization and reports up through the CFO.  But certainly

5  we've got marketing and IT and product to name a few.

6  Q.   Do you interact with employees of Cox that work for other

7  departments?

8  A.   Yes, absolutely on a regular basis.  I spend a lot of time

9  with our marketing and product teams to make sure I understand

10  what new products they may be developing or new functionality.

11      I spend time with our technology group to make sure I

12  understand changes in technology and how that may influence the

13  products so I can negotiate for those rights.

14      And then certainly I spend a lot of time with my counter

15  parts at monthly and quarterly meetings discussing issues in

16  the business, competition, financial results, that sort of

17  thing.

18  Q.   So you mentioned monthly meetings.  Can you describe the

19  monthly meetings you have with your colleagues at Cox?

20  A.   Sure.  As an officer group we get together once a month to

21  talk about issues, maybe in the industry, it may be in the

22  business, competitive threats that we have concerns about.

23      And so it's sort of a regular meeting for us to get

24  together and make sure we are all apprised of what is changing

25  in the business and in the industry.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.   Is that a meeting of who works at Cox?

2  A.   No, it's just officers.  So there's probably about 80 to

3  90 officers in the company.

4  Q.   Ms. Fenwick, how does Cox get the programming that it

5  offers to consumers?

6  A.   So we actually are negotiating with either a single

7  network or a network group which, you know, includes several

8  networks or several channels, and we will license that content

9  to put it on our cable system.

10 Q.   Do you have an understanding of how the network groups get

11 the content that they in turn resell to companies like Cox?

12 A.   Sure.  So networks will either produce content for

13 themselves or they will buy it from third parties like a studio

14 such as Warner Studios or Lions Gate.  They will, if they are

15 carrying sports, they will license sports rights from the

16 actual sports leads like the NFL.

17 Q.   And you use the term network group a moment ago.  What is

18 a network group?

19 A.   I just mean a company that owns multiple networks.  Good

20 example is Turner owns multiple network.  ESPN owns multiple

21 networks, so it's a group of them.

22 Q.   Are there major network groups that Cox licenses content

23 from?

24 A.   Sure.  There's probably at least eight large network

25 groups that certainly includes a big chunk of our content.

1  Q.   Beyond a major network groups, are there other networks

2  that Cox negotiates for content?

3  A.   Sure.  So I mentioned independent networks, but we also

4  negotiate for premium channels like in HBO or Showtime or

5  Stars.

6  Q.   You mentioned earlier that Cox doesn't operate nationally.

7  Is Cox known as a regional cable distributor?

8  A.   We are.

9  Q.   Are there other regional cable distributors in the

10  country?

11  A.   Sure.  So Comcast or Charter or Cable One, they are all

12  regional players as well.

13     Generally we do not compete in the same markets.

14  Q.   Are you familiar with the term linear television?

15  A.   I am.

16  Q.   What does that term mean to you?

17  A.   It's really just live TV.

18  Q.   Does Cox offer linear television?

19  A.   We do.

20  Q.   Do the other regional cable companies offer linear

21  television?

22  A.   They do.

23  Q.   Are there other pay-TV distributors beyond the regional

24  cable companies?

25  A.   Sure.  So there are certainly national satellite providers

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  like DirecTV or DISH that offer services in every single

2  market.  It's a little bit different technology, but it's the

3  same kind of broad portfolio video content.

4  Q.   Do you understand whether those companies offer linear

5  television?

6  A.   They do.

7  Q.   Do you Cox compete with DISH and DirecTV?

8  A.   We do.

9  Q.   Beyond the regional companies and the national satellite

10 companies, are there other types of pay-TV companies out there

11 in the market?

12 A.   Sure.  So more that's developed over the last few years,

13 there's a category, a larger category called OTT which is over

14 the top.  And I think there are probably sub categories within

15 that.

16     There's a large universe.  DirecTV has their own OTT

17 product called DirecTV Now that competes with a full portfolio

18 product and is a direct competitor for Cox.

19     DISH offers a OTT service called Sling which offers

20 skinnier bundles.  It's a subset of the overall portfolio that

21 we would offer and certainly smaller packages that are

22 available to customers.

23 Q.   You mentioned DirecTV Now.  Is that a company that offers

24 linear television?

25 A.   Yes, they do.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.    And the other one you mentioned was Sling.  Do you

2  understand whether Sling offers linear television?

3  A.    They do.

4  Q.    Are there other OTT companies offering linear television

5  services?

6  A.    Sure.  So there's another category of well, I see them as

7  categories of OTT providers like Netflix or in Amazon that

8  don't traditionally have linear networks but they have a lot of

9  video content.

10      A lot of that content is content that they have produced

11  for themselves.  It's original content that's not available

12  elsewhere, but they also have some movies or older TV shows

13  that may have been available in the eco system at some point in

14  time.

15  Q.    Does Cox compete with Netflix?

16  A.    We do not view Netflix as a competitor.  We have actually

17  recently partnered with Netflix in order to bring our customers

18  a full portfolio of product.  So that when a customer comes to

19  Cox, they can, they can bring up our guide and they can search

20  for content across Netflix and the Cox networks as well.

21      So we think it's really more of an adjunct to our overall

22  portfolio.

23  Q.    Do you know, Ms. Fenwick, if Facebook is a paid TV

24  provider?

25  A.    I'm not aware that they are.  It's certainly not one that

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

84

1  we worry about.

2  Q.   We have talked about several different kinds of

3  distributors who sell television packages to the public.  Are

4  there some of those that Cox competes closely with?

5  A.   In terms of the biggest competitors?

6  Q.   Yes?

7  A.   Yes.  So DirecTV, AT&T and DirecTV Now are all part of

8  really the same portfolio is our biggest competitor.  They're

9  in more of our markets more than anyone else.  I shouldn't say

10 anyone else.  DISH is also national, but they are our biggest

11 most, they are our toughest competitor I should say.

12 Q.   Is DISH a tough competitor?

13 A.   They are, but we don't, we don't worry about them as much

14 as we do DirecTV.

15 Q.   Why is that?

16 A.   Because DirecTV has several platforms to offer similar

17 services to Cox.  They're very aggressive in their marketing

18 campaigns and from a overall market share perspective we think,

19 you know, there are a lot of customers that we lose to them.

20 Q.   Ms. Fenwick, I want to ask you about the products that Cox

21 sells to consumers.  Does Cox offer different video packages to

22 customers?

23 A.   Sure, absolutely.  So we offer a number of packages but

24 just as examples, we'll offer a broadcast basic package.  We do

25 have an economy package.  It's, we are limited in terms of how

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    much we can sell.  And then we also have, probably our largest

2    which is called expanded basic that has 50 plus networks in it.

3    Q.    Why does Cox offer different packages to consumers?

4    A.    So we are trying to make sure we're appealing to all of

5    our customer needs.  Some customers are more price sensitive,

6    some like sports, some are into entertainment.

7         I should have added too that we also offer tiers as well

8    that are a little more genre specific like a movie tier or

9    sports information tier.

10   Q.    Switching topics a little, Ms. Fenwick.

11        Do you know if customers sometimes leave Cox?

12   A.    They do, yes.

13   Q.    Does Cox track that information?

14   A.    So we certainly understand at a high level where we're

15   losing market share and where others are gaining market share.

16   We do try to understand when customers leave where they're

17   going.  We don't always get the best information but we do have

18   a general sense of where they're going.

19   Q.    I want to ask you now about the networks that Cox carries.

20   Does Cox carry every network that's available in the market?

21   A.    So certainly not every network, but our strategy is

22   certainly to provide a very fulsome video product for our

23   customers.  And we have to make decisions based on content

24   that's important to our customers and weigh that with price.

25   Q.    Does Cox look at what it's competitors are offering in the

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  market when it's thinking about what networks to offer?

2  A.   Sure.  We want to make sure we're competitive and it's

3  super important that we have the most important content

4  available to our customers that our competitors do.

5  Q.   Ms. Fenwick, you use the term must have in your work at

6  Cox?

7  A.   Sure, absolutely.

8  Q.   What does that mean to you, what does must have mean to

9  you?

10 A.   It's exactly as it sounds.  It is, must have is content

11 that truly we believe as a company we have to have to serve

12 the needs of our customers.  From a customer standpoint it is,

13 it's their favorite shows, their favorite channels that they

14 watch on a regular basis.

15 Q.   Could you give the Court some examples of programming that

16 Cox considers to be must have?

17 A.   Sure.  So we certainly consider most of the Turner

18 Networks as must have.  We certainly consider ESPN and Disney

19 as must have.  A lot of NBC and Fox Networks, broadcast

20 channels.

21 Q.   Does Cox consider any of the premium networks to be must

22 have?

23 A.   We do.  So while they all serve an important part of our

24 portfolio HBO is by far one of the most popular networks for

25 our customers.

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  Q.    Ms. Fenwick, I want to talk to you about the job that you

2  do for Cox as the VP of content acquisition?

3  A.    Sure.

4  Q.    Without getting into confidential information, I want to

5  ask you about the negotiation process.

6      Do you typically negotiate for the content that you get

7  from programmers?

8  A.    Yes, I do.

9  Q.    How long does an agreement once it's signed usually run

10  for?

11  A.    Somewhere between five and eight years on average.

12  Sometimes they're a little bit longer, sometimes a little bit

13  shorter.

14  Q.    How long does it typically take you to negotiate an

15  agreement?

16  A.    Frankly, it depends on the complexity of the deal.

17  Certainly more networks is more time consuming, depending on

18  what issues are of concerns to both us and the network group.

19  But on average I would say three or four months.

20  Q.    Do you prepare for these negotiations?

21  A.    Yes, definitely.

22  Q.    What do you do?

23  A.    So we will certainly review our existing contract to

24  understand do we have any issues there?  Is there any new

25  technology?  You know, new regulation that we need to be aware

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   of.

2       We will spend time with our marketing and product teams to

3   make sure that we are asking for rights and functionality to do

4   things that we know we plan to launch in the future.

5       We will, if we have concerns about whether the content is

6   really that popular, we will spend time with our marketing and

7   finance teams to look at is the, how popular really is the

8   content and we can do that in a variety of ways looking at

9   Nielsen Third Party information and looking at some internal

10  data.

11  Q.   You mentioned trying to determine how popular the content

12  is.  Why is that something that you do prior to that

13  negotiation?

14  A.   Well, certainly to the extent it's content that we feel

15  like may not be as popular, we want to, we want to validate

16  that and then it's certainly, it has an impact on how we think

17  about price and where we think we will end up in the

18  negotiations.

19  Q.   Does Cox set goals prior to entering into negotiation?

20  A.   So yes.  What we will do is put together a list of things

21  that we have concerns about.  It can be rates or penetration.

22  There are a variety of factors.

23      And we'll put our proposal together or our notes together

24  on what we're looking for and then typically a network will

25  give us their first, the first proposal and we will respond

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  from there.

2  Q.    Before you go into the negotiation, do you think about

3  what the network group might be looking for in the negotiation?

4  A.    Sure.  To the extent we're dealing with a group that has a

5  lot of must have content, we know that they're going to have

6  quite a bit of leverage in negotiations and then we try to

7  think through what their paying points may be versus what our

8  paying points may be.

9      We'll spend some time looking at publicly available

10  information to get a feel of what they may be expecting in

11  license fees or what functionality they have issues with.

12  Q.    How does that information help you get ready for

13  negotiation?

14  A.    It just gives us some insight on what to perhaps expect in

15  terms of a proposal so that we're thinking about what, frankly

16  where we may end up.

17  Q.    Do you think about whether the content is must have as you

18  go into a negotiation?

19  A.    Yes, absolutely.  The more must have the content is and

20  the more networks of must have content, certainly we know that

21  that group is going to have more leverage in those negotiations

22  and we know it's going to be a tough negotiation.

23      But at the end of the day even for those networks that have

24  must see content, we really believe that both parties are

25  incentived to get something done.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    We are dealing with network groups where their goal a

2   hundred percent distribution.  Our goal is to keep continuity

3   in content for our customers.  There's no benefit for anyone to

4   walk away.

5   Q.   Are there specific terms that come up again and again in

6   negotiations with network groups?

7   A.   Sure, and I can give you a handful of some of the larger

8   terms.  I mentioned a little bit licensing fees.  This is the

9   per subscriber cost that we will pay a network to license their

10  content.

11    Penetration is increasingly becoming a big issue in the

12  industry.  When I talk about penetration I mean how many, how

13  many tiers and do we have to carry those networks or the

14  network groups or individual networks in.

15    So if we've got a 90 percent penetration requirement, that

16  means we have to deliver the content to 90 percent of our

17  customers.  And we're being charged for 90 percent.

18    It's a bad thing for us and frankly for customers because

19  it gives us less flexibility to offer smaller packages, genre

20  specific packages because we have to put everything in most of

21  our packages.  And it really does handcuff our ability to be

22  more versatile in our content offering.

23  Q.   Going back to the rates.  In a negotiation which side

24  typically proposes the rate?

25  A.   Typically the network will make the first proposal which

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  includes rate, but it can include a number of other terms or

2  they can just simply send us a full agreement.

3  Q.    How does the rate that's typically proposed compare to the

4  rate in the prior contract?

5  A.    It is always higher, that I know.

6  Q.    Are the rates in these contracts constant over the term of

7  the contract?

8  A.    No, they increase year over year.

9  Q.    Is that called an escalator?

10  A.    Yes, that's one word for it, yes.

11  Q.    What do you call it?

12  A.    We just call it rate increases every year.

13  Q.    Okay.

14      Does Cox negotiate over these escalators or year over year

15  rate increases?

16  A.    Yes, definitely.  We go back and forth.  We burn a lot

17  paper frankly on all of the terms of the agreement.

18      And I had talked a little bit about license fees and

19  penetration.  But certainly there are other really big factors.

20      One of them that we haven't talked about is what we like to

21  call content parity.  So that really is about making sure that

22  we have access to the same content that other distributors

23  have.

24      We want to make sure that we're on a level playing field

25  and that we can deliver the same experience to our customer

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1   that others can.  But it also can be a round window parity.  So

 2   meaning that we want to make sure that we're not disadvantaged

 3   in when the content is available.

 4       So if Game of Thorns was available to a distributor 30 days

 5   earlier than for our customer base, that would put us at a

 6   definitive disadvantage and we'd have customers leave.

 7   Q.   One more question about rate?

 8   A.   Sorry.

 9   Q.   Does the rate that you sign the contract, the contract

10   rate, is it generally higher than what Cox is trying to pay?

11   A.   Almost, most always, yes.

12   Q.   We talked about rate penetration, content parity.  Are

13   there other terms that often come up in these negotiations?

14   A.   Sure.  We talk about advertising, you know, making sure we

15   have a certain share of advertising, minutes in the content.

16       We talk about a lot of technical rights in terms of how

17   content gets delivered, who pays for it, what the security

18   looks like.  Is the content rated or not rated.

19       One of the increasingly bigger issues that we've been

20   focused on is the requests from networks for data.  And so

21   they're looking to understand more and more about what our

22   customers watch, how long they watch it, and they're looking,

23   they have an endless appetite for that information.  They're

24   certainly looking for that on almost a daily basis.

25              THE COURT:  Let me see counsel, please.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          Step down and sit in that chair over there, please.

2                (Witness leaves the stand.)

3                (Sealed bench conference.)

4                THE COURT:  Where is this going?  It seems like

5     that's an education system.  Why is this witness here?

6                MS. SCANLON:  Your Honor, this witness is here to

7     explain how a company like Cox negotiates a contract with a

8     company like Turner.

9                THE COURT:  This is general discussion.  I'm trying

10    to figure out when you are going to get to why is this witness

11    going to be here.

12               MS. SCANLON:  Your Honor, we're going to turn to

13    Turner in a moment with the content.

14               THE COURT:  You are going into confidential

15    information with this witness?

16               MS. SCANLON:  Your Honor, what I was hoping to do is

17    to talk about Turner negotiations generally, to talk about the

18    merger generally, to talk about the Arbitration Agreement.

19          There are a couple of things about specific contract terms

20    that Cox considers confidential.  So I would ask the Court to

21    close the courtroom for that portion of the testimony when she

22    talks about for example, when the contract is expiring.  That's

23    important to Cox because if other programmers know when

24    contracts --

25               THE COURT:  Why do I need to know that? What

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    difference does it make?

2          MS. SCANLON:  Okay, I would just point that out.

3       If Your Honor would like to hear -- sorry, Your Honor.

4          THE COURT:  As you may or may not have been here to

5    hear closing down of this courtroom is a major undertaking.  It

6    takes at least 20 minutes to do it and the Court has already

7    expressed its strong preference to try as much of this case in

8    open as possible.  Understanding there may be a need at times

9    to close it. So if you're going to ask this witness any

10   questions that are going to require the court to be closed, I

11   would prefer from a logistics point that that be at the very

12   end of the examination.

13         MS. SCANLON:  Of course.

14         THE COURT:  Now about the time we go into a recess.

15   Is your examination about an hour and a half?

16         MS. SCANLON:  Probably shorter, Your Honor.

17         THE COURT:  What's your estimate now?

18         MS. SCANLON:  Another half hour with the closed

19   portion.  I know that takes time to close the courtroom.

20         MR. PETROCELLI:  I'd like to be heard on the closed

21   portion because I don't think it's necessary, Your Honor. I

22   represent Turner and I don't have an objection.

23         THE COURT:  The closed portion relates to the

24   testimony, documents or both?

25         MS. SCANLON:  Her testimony about the contract, about

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  what Cox sought from Turner on the contract for what they got

2  from Turner in the contract.

3      Cox's concern as has been represented to me is that's

4  information that other programmers find useful in negotiating.

5          THE COURT:  But the question I want you to ask

6  yourself --

7          MS. SCANLON:  Yes.

8          THE COURT:  -- if you haven't already already asked

9  yourself is this something I really need to put on the record

10  in order to make my case.

11      I don't know the answer to that question.  By the way, I'm

12  not suggesting, you know your case better than I know your

13  case.  I assure you of that, but I want to be sure before I

14  close anything down, if you're going to do that that the party

15  seeking that needs, not wants.  That's an important

16  distinction.

17          MS. SCANLON:  Sure.

18          THE COURT:  I raised that the other day with

19  Mr. Conrath was here.  I don't remember if you were here when

20  that discussion came up.

21      But my point is that this is, we're just getting going.

22  This is our first witness.

23          MS. SCANLON:  Sure.

24          THE COURT:  I think it's really important that we get

25  off in the right direction with these kind of issues.

```
 1        What I'm inclined to do is take a brief recess.  I want

 2   you to talk to your team since this is the first time.  You can

 3   talk to whoever you need to talk to.

 4        I understand your concern about doing this as little as

 5   possible, Mr. Petrocelli.  I understand that.

 6        That would be my preference as well with the caveat that

 7   we have to protect confidential information issues of both

 8   sides.

 9        I think we'll take a brief recess, like ten minutes. Talk

10   to your team, talk to yours, come back.  Probably come back to

11   the bench for a second just to see what y'all planned.  Then

12   we'll figure out how to finish this witness.

13             MS. SCANLON:  May I ask one question, Your Honor?

14             THE COURT:  Yes.

15             MS. SCANLON:  Part of closing this is I would assume

16   Mr. Petrocelli -- can I ask Mr. Petrocelli, are you going to

17   have questions that would go to the terms of the contract?  So

18   that -- okay that's helpful to understand.

19             MR. PETROCELLI:  I'm going to be much broader than

20   that.  If you will just share with me what you think is

21   confidential, I could probably get you a green light from

22   Turner.

23             MS. SCANLON:  That's not the concern though. The

24   concern is from Cox's perspective.  So the question for us is

25   whether we need to elicit that testimony.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           THE COURT:  We'll take a break and you two can talk.

2  You figure that out.

3           MR. PETROCELLI:  Are we on the record now?

4           THE COURT:  Yes, we're on the record, but not in

5  open.

6           MS. SCANLON:  Thank you, Your Honor.

7           THE COURT:  Take a brief recess.

8           (Open court.)

9           THE COURT:  Ma'am, will you come up, please?

10          (Witness resumes the stand.)

11          THE COURT:  A legal issue has come up that I wanted

12  to discuss with counsel obviously.  I'm going to ask counsel,

13  we'll take a brief recess for counsel to discuss among

14  themselves.

15          THE WITNESS:  Okay.

16          THE COURT:  Hopefully, we'll get it all resolved.  It

17  relates not only to the law, but logistics.  So that's a little

18  bit -- there's a lot to it.

19      You are a witness under oath now in the case, so here's

20  the rules.

21          THE WITNESS:  Okay.

22          THE COURT:  You're not allowed to discuss your

23  testimony so far.

24          THE WITNESS:  Okay.

25          THE COURT:  Or what it might when we return with

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1   anyone, with anyone, even lawyers for the government.  You

 2   can't discuss it with anyone.

 3              THE WITNESS:  Understood.

 4              THE COURT:  You have to be able to answer the

 5   question under oath if you're asked; have you discussed your

 6   testimony so far with anyone?  You have to be able to answer

 7   honestly no.

 8              THE WITNESS:  Understood.

 9              THE COURT:  Stay independent of all others until your

10   testimony is completed.

11              THE WITNESS:  Okay.

12              THE COURT:  You can step down.

13              THE WITNESS:  Okay.

14              (Witness excused.)

15              THE COURT:  We'll take a ten minute recess and the

16   parties have their direction.

17              (Recess at 3:35 p.m.)

18              (Proceedings resumed at 4:00 p.m.)

19              (Witness resumes the stand.)

20              THE DEPUTY CLERK:  Your Honor, recalling civil action

21   number 17-2511, the United States of America v. AT&T, et al.

22              (Sealed bench conference.)

23   ████████  ████  ████ █  ████ ████  ████  ████

24   ████  ████  ████  ████  ████  ████  ████  ████

25   ████  ████  ████  ████  ████  ████  ████  ████
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

99



\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*



1

2

3

4          (Open court.)

5          THE COURT:  All right counsel, consistent with the

6    discussion at the bench, you may proceed.

7          MS. SCANLON:  Thank you, Your Honor.

8    BY MS. SCANLON:

9    Q.   Ms. Fenwick, I just want to ask about one more contract

10   term.

11        Does Cox negotiate for the right to share content on mobile

12   devices?

13   A.   Share Cox's content?

14   Q.   The content that it buys from programmers on mobile

15   devices?

16   A.   No, we do not.

17   Q.   Does Cox look for digital rights to, in order to enable

18   its customers to take their content with them?

19   A.   So we certainly negotiate for what we call TDE rights

20   which is TV everywhere and those would be rights for customers

21   to take their content from their home when they travel.  If

22   they were in New York come to Los Angeles and they can watch it

23   there.

24   Q.   Why does Cox negotiate for that right?

25   A.   That is increasingly how customers want to view their

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1   content.  They want to be able to view it wherever they are.

2   While viewership has been rather low for TDE at its origin, it

3   is certainly growing.

4   Q.   Ms. Fenwick, what if Cox does not reach an agreement with

5   a network?

6   A.   Then what happens is we go, the industry term is to go

7   dark.  Meaning we no longer have the content available for our

8   customers.

9   Q.   Has Cox done any analysis to determine the impact of going

10  dark with any particular network?

11  A.   Yes, we have before.

12  Q.   Without naming that network could you describe the

13  analysis Cox undertook?

14  A.   Sure.  So we, there was a network or series of networks

15  where we had concerns about how valuable the content still was.

16  We had seen a decline in ratings and we, several other

17  distributors had dropped them in the past.

18      And so we took a hard look at our set top box data to

19  understand from our customer base who was really watching.  And

20  certainly we wanted a sense of this because there had been a

21  lot of discussion in the press by this network group that they

22  were looking for very high license fees.

23      So we really wanted to understand what kind of negotiation

24  leverage we had in going through this process.

25  Q.   Did you use that information as you entered the

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  negotiation with that network?

2  A.   So it certainly, we did this analysis before we started

3  negotiations and it definitely gave us a starting point.

4     We knew that this content while it was important to some

5  customers, it wasn't important to every one, but we knew

6  without it we would lose customers.

7  Q.   Do you do a similar negotiation for all your negotiations

8  with networks?

9  A.   No.  Typically well, I shouldn't say that.  We definitely

10  look at Nielsen data if it is available.

11     We don't typically go through all of the set top data at an

12  aggregated level to look at usage unless we have a concern

13  about how popular or how the network may be.

14  Q.   Does Cox try to avoid going dark?

15  A.   Absolutely, it's not good for your customers.

16  Q.   In your experience do networker groups try to avoid not

17  going dark?

18  A.   Yes.

19  Q.   What is your experience?

20  A.   Because at the end of the day, we both have the same

21  incentive to get a deal done.  A network group wants full

22  distribution, they want their license fees, advertising dollars

23  and we certainly want, you know, the right deal for our

24  customers, so content is important to us.

25  Q.   Ms. Fenwick, does Cox have an agreement with Turner?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Yes, we do.

2  Q.    Were you involved in negotiating that agreement?

3  A.    I was.

4  Q.    What was your role?

5  A.    I was the lead negotiator on that transaction.

6  Q.    Is Turner must have content for Cox, Ms. Fenwick?

7  A.    It absolutely is.

8  Q.    Did you prepare for that negotiation with Turner?

9  A.    Yes, we did.

10 Q.    What did you do in preparation?

11 A.    So similar to as we discussed before looking at the

12 contract, looking at publicly available information, looking at

13 Nielsen ratings.

14    We didn't spend time on set top box data because we knew

15 these were very important networks to our customers.  And

16 really we knew how important they were and that at the end of

17 the day we really needed to get a deal done.

18 Q.    Did you get a deal done with Turner?

19 A.    We did.

20 Q.    Did Cox make concessions to get that deal done?

21 A.    Yes, we did.

22 Q.    Did Turner make concessions to get that deal done?

23 A.    Yes, they did.

24 Q.    Ms. Fenwick, I'd ask you to look at your binder that's in

25 front of you.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1       The first tab is marked PX 0422?

2    A.   Yes.

3    Q.   Do you know what PX 0422 is?

4    A.   Yes.  This is our affiliation agreement with Turner.

5    Q.   This is the agreement you were involved in negotiating?

6    A.   Yes, it was.

7    Q.   And this is an agreement, does Cox keep these types of

8    agreements in the ordinary course of its business?

9    A.   Oh, yes.

10   Q.   I'm going to ask you to take a look at the very first

11   line?

12            THE COURT:  You've got to admit it first before you

13   go into a big discussion of it.

14            MS. SCANLON:  Sorry, Your Honor.

15       Your Honor, I move for admission of Plaintiff's Exhibit

16   0422 into evidence under seal.

17            THE COURT:  Mr. Petrocelli, any issues?

18            MR. PETROCELLI:  No objection to admission under

19   seal.

20            MS. SCANLON:  Thank you.

21            THE COURT:  Be admitted.

22       (Government's Exhibit Number PX 0422 received into

23   evidence under seal.)

24   BY MS. SCANLON:

25   Q.   Ms. Fenwick, would you look at the first line that states

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  a date called the effective date, do you see that?

2  A.   I do.

3  Q.   Was that the date this agreement was signed and made

4  effective?

5  A.   Yes.

6  Q.   I want to ask you to turn to page 16.  And near the bottom

7  of the page, let me give you a minute to get there.

8  A.   Yes.

9  Q.   Near the bottom of the page there's a number 6 that says

10 term and rates.  And A also has a date.  Do you see that?

11 A.   I do.

12 Q.   Is that the date this contract will end?

13 A.   It is.

14 Q.   So after that date you won't have a contract with Turner

15 unless you renegotiate?

16 A.   That's correct.

17 Q.   Thank you.

18    Without stating when this contract will expire, have you

19 begun thinking about negotiating the next Turner agreement?

20 A.   Sure, we have.  We certainly know that Turner has a number

21 of networks that have important content for our customers must

22 have content.  We know that Turner is a top negotiator and that

23 they do have a lot of leverage in pushing through terms that

24 are favorable to them.

25    But again we've had, in the past we've always been able to

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1    reach an agreement and we do believe that Turner wants full

2    distribution.  There's no benefit for them in going dark.

3    There's no benefit for us in going dark.  I think that has

4    always kept both parties very focused on getting to a deal that

5    we can both live with.

6    Q.   Ms. Fenwick, you're aware we're here about the merger of

7    Time Warner and AT&T?

8    A.   Yes.

9    Q.   Have you considered that possible merger when thinking

10   about your upcoming Turner negotiations?

11   A.   Yes, absolutely.  We are certainly very concerned about

12   what that will mean for us in our next negotiation because now

13   really there's a benefit that is created in this merger that

14   isn't there today.  So essentially now instead of negotiating

15   with a company that it's sole job is to distribute its content,

16   it's now owned by a company who is also a distributor and they

17   want to gain customers.

18       We are very concerned that we are going to be presented

19   with a horribly ugly deal and that when faced with that deal,

20   we have to think about that if we do go dark, they have a

21   benefit in picking up Cox customers.

22       They're our biggest competitor.  They're in all of our

23   markets and certainly we know going into these negotiations

24   that that additional leverage is there.

25   Q.   Ms. Fenwick, have you considered whether the merger would

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  change the view of the Turner content to Cox?

2  A.   The value is still the same.  It's more a question of what

3  we would have to pay and what rights we may have in order to

4  keep the content.

5  Q.   So if the view of the content doesn't change, what

6  changes?

7  A.   So the leverage changes.  So we believe Turner has, AT&T

8  has a different incentive now than they had before.  There's a

9  benefit for them.

10      In looking at the negotiations they can really put a deal

11  together that they know they may be able to push through with

12  us that is egregious on license fees that may not give us the

13  same content that they give their own customers or may give it

14  to us in delayed windows.

15      And we know that if we don't agree to that, we're in a

16  position where we are going to lose customers.  We think we're

17  going to lose a lot of customers and that they're going to pick

18  them up and grow their market share.

19  Q.   Ms. Fenwick, when Cox loses customers, do they try to

20  retain them as the customer calls up to cancel?

21  A.   Sure, of course.

22  Q.   And would Cox do that if they lost Turner?

23  A.   We can try but we can't replace the content.  That's

24  really the issue.  A discount isn't going to make it better for

25  our customers.  If they don't have the content, they'll leave.

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  Q.   Ms. Fenwick, are you aware that Comcast bought NBC

2  Universal several years ago?

3  A.   I am.

4  Q.   Did Cox have similar concerns about that merger?

5  A.   No, not at all because Comcast is not a competitor.

6  Q.   Comcast doesn't compete with Cox?

7  A.   They do not.

8  Q.   Ms. Fenwick, I would like you to turn to the second tab in

9  your binder which is PX 437.

10      Do you know what this document is, Ms. Fenwick?

11  A.   Yes.  This is the letter that went along with the

12  arbitration offer that Turner sent to us some time after the

13  litigation was announced.

14  Q.   Would you look at the next tab, PX 491?

15  A.   Yes.

16  Q.   What is that document?

17  A.   This is the Arbitration Agreement that they sent to us.

18  Q.   When Cox received this did you review it?

19  A.   We did.

20  Q.   Did you personally review it?

21  A.   I did.  We weren't quite sure what to do with it because

22  from our perspective it seemed to be a little bit of

23  gamesmanship in the fact that it was thrown out there to

24  potentially mitigate the litigation.

25      When we looked at it, we viewed it as a very one sided

***REDASTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    agreement in favor of Turner.  It's really not something that

2    we viewed as a helpful tool.

3           MS. SCANLON:  Your Honor, I'd like to move for

4    admission of PX 437 and 491.

5           MR. PETROCELLI:  No objection.

6           THE COURT:  Are either one under seal or not?

7           MS. SCANLON:  No, Your Honor.

8           THE COURT:  Okay, fine, it will be admitted.

9      (Government Exhibit Numbers PX 437 and PX 491 received

10   into evidence.)

11   BY MS. SCANLON:

12   Q.   Ms. Fenwick, have you, what is your understanding of the

13   arbitration process that's laid out in PX 491?

14   A.   Sure.  So our understanding the way this is set up is a

15   baseball style arbitration.  And what that means from our

16   perspective is that an arbitrator is instructed to pick one

17   proposal versus a second proposal.

18     So meaning Cox would put together a contract with all of

19   the terms and conditions that were critical for us.  Turner

20   would do the same thing and the arbitrator would be asked to

21   choose between the agreements.

22     There's not the ability for the arbitrator to look at each

23   important critical condition in the agreement and make a

24   decision on it, on its merit.  It's kind of an all or nothing

25   proposal.

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  Q.   And does Cox, has Cox analyzed this agreement or this

2  offer?

3  A.   We have.  Certainly our biggest concern besides the

4  structure of the baseball style arbitration is that the way we

5  interpret this is that the arbitrator is instructed to pick a

6  deal based on fair market value and fair market value appears

7  to be very narrowly defined in this agreement.

8      It asks the arbitrator to look at subscribers and license

9  fees and Nielsen ratings which frankly never come into play in

10  a negotiation.

11      But it fails to ask the arbitrator to focus on all of the

12  other super critical, I can't express this enough, critical

13  components of the transaction.  So content parity that we've

14  talked about TVE, set top box data, lots of technical terms and

15  conditions that would be involved.

16  Q.   Do you understand what content is covered by this

17  arbitration offer?

18  A.   So yes.  This offer covers the Turner Networks.  It does

19  not cover HBO.

20  Q.   Is that a concern for Cox?

21  A.   Yes.  We would want certainly, if this was something that

22  we were going to utilize, we would want something that covers

23  all of the content.

24  Q.   We talked earlier about the idea of going dark.  Do you

25  understand whether the arbitration offer addresses going dark?

**\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\***

1  A.   It certainly provides a standstill and a process for the

2  parties to work through an agreement.  But again, based on the

3  narrow interpretation of fair market value and the structure of

4  picking one agreement over the other, it's a concern.

5       The other thing is that, you know, the arbitrator is and

6  each side is instructed to prepare three year terms.  That's

7  really short in our industry and that just means that we're

8  going to be looking at really big rate increases in three years

9  instead of five or six years.

10      Then the other thing is that while a more balanced

11  agreement could be helpful, it's only seven years and once we

12  get through a renewal or two, we're frankly in the same place

13  again.

14  Q.   Does Cox view the standstill we just talked about as a

15  benefit of the arbitration offer?

16  A.   I think having a standstill would be a benefit for an

17  arbitration offer, but it alone does not, does not give this

18  agreement any weight for us.

19  Q.   Does the arbitration offer as Cox understands it address

20  Cox's concerns about this merger?

21  A.   No, it does not.

22           MS. SCANLON:  Your Honor, I have two more questions

23  about the topic that if I may hand this to the witness?

24           THE COURT:  You may.

25  BY MS. SCANLON:

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   Ms. Fenwick, I've handed you what we call PX Exhibit 520,

2   it's got a term on it.  I don't want to say it out loud.

3       I want to ask you is this a term that Cox negotiated for

4   with Turner when you signed your agreement?

5   A.   It is something that we did discuss in our negotiation,

6   yes.

7   Q.   Did Cox get the rights of those terms in its agreement?

8   A.   Not at the time, but again, because, because it was a

9   relatively nascent space, we felt like we could, there were

10  other things that were more important at the time and that we

11  would ultimately be able to negotiate for, for this term at a

12  later date.

13  Q.   Did Cox and Turner agree to do that after the contract was

14  signed?

15  A.   We did and we have spent a lot of time trying to get

16  there.  We have not been able to reach an agreement on this

17  term, but I think it's really because there wasn't the

18  incentive of a larger negotiation at play, but it's something

19  that we believe in the current environment we would be able to

20  obtain in the next negotiation.

21  Q.   Does your thinking on that change if the merger goes

22  through?

23  A.   Absolutely.  I think that this is, this is a term that,

24  that Turner may unlikely be able to, will be unlikely to give

25  us in that kind of environment.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    Q.    Ms. Fenwick, does Cox have the rights encompassed in that

2    term from other programmers?

3    A.    We have it from every other major network group and most

4    of the independents that we have negotiated recently with the

5    exception of Turner and HBO.

6          MS. SCANLON:   Nothing further at this time, Your

7    Honor.

8          THE COURT:   All right, cross examine.

9                    CROSS EXAMINATION

10   BY MR. PETROCELLI:

11   Q.    Ms. Fenwick, I'm Dan Petrocelli, how are you?

12   A.    I'm great.  How are you?

13   Q.    We have never met before?

14   A.    No.

15   Q.    Never spoke before, right?

16   A.    No, I don't recall.

17   Q.    But you have met quite a few times with Department of

18   Justice in connection with this matter; is that correct?

19   A.    That is correct.

20   Q.    You met with him before and after the couple of

21   depositions that you gave; is that correct?

22   A.    That is correct.

23   Q.    You met with him in Atlanta, right?

24   A.    That is correct.

25   Q.    You met with them in their offices to propose conditions

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   to this merger, correct?

2   A.   They asked us to come to Washington to discuss our

3   concerns.

4   Q.   And you actually proposed conditions for this merger,

5   right?

6   A.   Again, they asked us to talk about the things we were

7   worried about.  So we were prepared to go through that with

8   them at the meeting.

9   Q.   Well, my question was did you propose conditions for this

10  merger, yes or no?

11  A.   We gave them a list of things that we believed would be

12  important to achieve if the merger went through.

13  Q.   And some of those conditions included things that you were

14  unable to negotiate for back in 2013 when you had your last

15  negotiation with Turner, correct?

16  A.   Can you be specific about, I'm not sure what you're

17  referring to.

18  Q.   You don't remember?

19  A.   I mean, there are a lot of components of it.  I think a

20  list of the conditions that we had proposed were things that we

21  felt like would be new threats after the merger.

22      We also, there was actually a document that we put together

23  that had some other items on there that we wanted to discuss

24  while we were meeting with the Justice Department.  But we

25  frankly didn't spend as much time on it.

1  Q.   So when you said you were here under subpoena, I think in

2  response to the first question, you in fact had been meeting to

3  go over the testimony you would give today as well, right?

4  A.   We have, I mean, I have met with the Department of Justice

5  to understand the themes and some of the things that they

6  wanted to ask me and discuss.

7       We also talked a little bit about confidentiality.

8  Q.   Now with respect to the conditions that you folks asked

9  the government for when you met with them, one of them

10  concerned the thing that you wrote on that paper, correct?

11  A.   I believe it did.

12  Q.   Okay.  Now on that particular item that involves a matter

13  of technical capability in whether certain files can be

14  delivered in the manner in which Cox has requested them,

15  certain video files; is that true?

16  A.   So delivery is certainly a part of it, yes.

17  Q.   Now you said you have this delivery in the matter that Fox

18  requires them from all other programmers, do you recall

19  answering that question?

20  A.   Repeat the question?

21  Q.   You said you have those rights from all of the other

22  programmers, right?

23  A.   Oh, yes, yes, sir.

24  Q.   Isn't it also true that Turner has provided that item to

25  all other distributors, correct?

1   A.    I frankly don't know.

2   Q.    You haven't checked?

3   A.    I don't, I haven't checked to see what other groups they

4   have provided rights to.

5   Q.    Well, it's a matter of public knowledge isn't it?

6   A.    It may be.

7   Q.    You can go right on the computer and you can find out,

8   can't you?

9   A.    Not necessarily.  They could have the rights and just not

10  have launched them.

11  Q.    Now you have complained that you don't like volume

12  discounts, correct?

13  A.    We certainly don't like volume discounts, we don't think

14  that they're equitable.

15  Q.    But every programmer has volume discount arrangements with

16  distributors, correct?

17  A.    I don't know if every one has it, but I do believe that

18  most do.

19  Q.    And you testified in this case that in your past

20  negotiation with Turner you were unhappy because they have a

21  volume discount arrangement too, correct?

22  A.    Sure, yes.

23  Q.    And I think you --

24  A.    It's a problem in the industry.

25  Q.    I think you testified that you feel as a smaller

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   distributor that you don't have the same pricing advantages

2   that large distributors have, correct?

3   A.   That's correct.

4   Q.   And you said you don't like volume discounts, right?

5   A.   That's correct.

6   Q.   But you acknowledge that they are common in the industry,

7   correct?

8   A.   I acknowledge that they're common.  We don't like them.

9   Q.   Now you actually asked the government to impose a

10  condition that Turner wouldn't give you, Turner would be

11  required to give you the same price that a distributor five

12  times larger than you would get, correct?

13  A.   Well, I certainly don't think it makes a difference

14  whether they're larger.

15       But we didn't, we didn't necessarily propose that in our

16  discussion with the DOJ.  We raised it as an issue in the

17  industry.

18  Q.   Did you not suggest a condition to the DOJ that Cox be

19  able to get pricing without regard to the number of subscribers

20  that it has such that you would get the same pricing that

21  someone five times bigger would get?  Did you not ask the DOJ

22  to do this as a condition to approving this merger?

23       Can you answer that yes or no?

24  A.   I can't really because it mischaracterizes it.

25  Q.   Let me show you a document.

1          MR. PETROCELLI:  I'm going to mark this, they have

2   marked this as confidential, Your Honor, so I'm just going to

3   show it to her and give a copy to Your Honor, okay?

4          THE COURT:  You're not going to seek to admit it.

5          MR. PETROCELLI:  That's correct.  I'm going to use it

6   for impeachment, okay.

7          THE COURT:  So mark it for identification.

8          MR. PETROCELLI:  Correct, mark it for identification

9   as Defendant 916.

10     (Defendant's Exhibit 916 marked for identification.)

11         MR. PETROCELLI:  May I approach?

12         THE COURT:  You may.

13  BY MR. PETROCELLI:

14  Q.   Could you go to the page entitled suggested conditions?

15  It's Bates number 31819.  Actually, strike that.

16     31817, Roman II, suggested conditions.  Do you see that?

17  A.   I do.

18  Q.   And do you see the first condition that's listed there?

19  A.   Yes.

20  Q.   With no size base distinctions?

21  A.   I do.

22  Q.   And that's what you asked the DOJ, correct?

23  A.   I think, I think what I had said earlier is that we

24  prepared this document as a, as a discussion point in the

25  meeting.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    And we wanted to raise things that weren't just conditions

2   to the deal that we felt like were problems in the industry.

3   And this is something that we frankly didn't spend a lot of

4   time with.

5   Q.   Well, it does say --

6   A.   I agree it's in the powerpoint but it's not something that

7   we discussed.

8   Q.   But you did ask the DOJ to impose this, correct?

9   A.   Again, this is not something we gave them.  This is

10  something we prepared to walk through in our concerns.

11  Q.   Now you also look at the end, the last item in their

12  concerns the very condition that's written on that piece of

13  paper, right?

14  A.   Yes, it does.

15  Q.   Now you asked for these things.  You wanted a change of

16  volume discount.  You wanted a change of that item on that

17  piece of paper.  You wanted changes of other things that you

18  had been dealing with Turner for the past number of years prior

19  to the announcement of this merger, correct?

20  A.   So --

21  Q.   Can you answer that yes or no, please?

22    You had been dealing with Turner on these items long before

23  Turner announced it was going to merge, correct?

24  A.   On which item?  There are a lot of items.

25  Q.   Well, take the two that I mentioned?

1   A.   Certainly we had, we have had volume discounts, yes.

2   Q.   Discussions?

3   A.   Discussions.

4   Q.   With Turner?

5   A.   Well, certainly it's a part of negotiations.

6   Q.   So my question is a pretty simple question.

7        Prior to the announcement of this merger which I will

8   represent to you occurred on or about October 22, 2016, you had

9   been dealing with Turner on these issues, correct?

10  A.   So it wasn't an active issue.  It was certainly something

11  that we had argued about when we first negotiated the deal.

12       But certainly the item that was on the piece of paper that

13  was previously given to me was an ongoing issue.

14  Q.   You also asked the DOJ for arbitration, correct?

15  A.   Yes, we did.

16  Q.   Just like in the Comcast case, could you turn to page

17  31818.

18       You see that?

19  A.   I do.

20  Q.   And this discussion with DOJ occurred in the summer of

21  2017, correct?

22  A.   That sounds right.

23  Q.   And that was before you received, before this lawsuit was

24  filed, correct?

25  A.   Yes.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.    And before you received the arbitration offer from Turner,

2  correct?

3  A.    That is correct.

4  Q.    So you asked for an arbitration provision like in Comcast

5  NBCU in July, correct?

6  A.    Again, as an item that we would feel would be appropriate

7  if the merger was passed or was agreed upon, it was something

8  that we felt like would be important if conditions were

9  imposed.

10  Q.    And you got a Comcast NBCU like offer from Turner about

11  four or five months later?

12  A.    We disagree with that.

13  Q.    Well, you got an arbitration offer, correct?

14  A.    We did, yes.

15  Q.    In your deposition you remember being somewhat confused

16  about the provisions of the arbitration offer and what it

17  actually meant?

18  A.    I don't remember being confused.

19  Q.    Do you remember testifying that you don't even think it

20  allowed you to introduce your Carriage Agreement?

21  A.    We certainly talked about the fact that we had concerns

22  that when we first read this Arbitration Agreement that it

23  could potentially limit the contracts that could be involved in

24  the analysis by the arbitrator.

25  Q.    I'm sorry, finish in your answer?

1  A.   We still believe the language is odd.  So that was

2  certainly a concern.  It wasn't our largest concern.

3  Q.   By the way, did you ever pick up the phone and call the

4  folks at Turner to ask them about any possible questions that

5  you had about how the arbitration offer worked, what the terms

6  were that you may not have understood?

7  A.   We did not --

8  Q.   Did you ever call them?

9  A.   We did not.

10  Q.   Did you write them?

11  A.   We did not.

12  Q.   And you've worked with lawyers, right, regarding this?

13  You consulted with your counsel regarding this Arbitration

14  Agreement, correct?

15  A.   Sure, but we honestly didn't think it was something real

16  to respond to.

17  Q.   Wasn't real?  Who told you it wasn't real?

18  A.   That was our opinion based on the way it was thrown out in

19  the market place.

20  Q.   But bottom line is I think you called Turner a partner.

21  You didn't pick up the phone and call your partner to find out

22  anything about this pretty extensive document that they sent

23  you along with a letter, true?

24  A.   We did not.

25  Q.   Okay.  Now you did talk to DOJ about it, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  A.    Yes, they asked us questions about it.

 2  Q.    And you had a meeting about it in fact, didn't you?

 3  A.    We had a meeting where we talk about it, yes.

 4  Q.    So you had a big meeting with DOJ but not even a single

 5  phone call with Turner, true?

 6  A.    That is true.

 7  Q.    Now can you take a look, you have the document in front of

 8  you, the Arbitration Agreement?

 9         THE COURT:  Do you have an exhibit number for that,

10  Mr. Petrocelli?

11         MR. PETROCELLI:  Yes, it's the Plaintiff's Exhibit

12  491.  It's the one that they introduced, Your Honor.  I'm just

13  working off the same one.

14         THE COURT:  Okay, thank you.

15  BY MR. PETROCELLI:

16  Q.    Okay, you say you have that in front of you?

17  A.    I do.

18  Q.    First of all, your last contract with -- well, is that

19  confidential, the date of your contract?

20  A.    It is.

21  Q.    With Turner.  Okay, let me do it this way then.

22     Take a look at paragraph 4 under extradited arbitration

23  rules.  You see where it says 4 A, Carriage Agreements in

24  effect on or after October 22, 2014 between the claimant?

25  A.    I'm sorry, I wasn't -- I was in the first page.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1        Are you on the 4995 page?

 2   Q.   I'm on 4996.  Paragraph 4 A, Carriage Agreements in effect

 3   on or after October 22, 2014, do you see that?

 4   A.   I see that.

 5   Q.   That's pretty clear is it not?

 6   A.   I think the language was odd.

 7   Q.   Odd?  Was your agreement in effect as of that date?

 8   A.   Our agreement was in effect as of that date.

 9   Q.   Okay?

10   A.   We didn't feel like this provision was clear.

11   Q.   Okay.  To be clear, your Carriage Agreement with Turner

12   was in effect as of October 22, 2014, correct?

13   A.   It was.

14   Q.   Let me ask you about another provision.

15        Go to paragraph 5.  Do you see there where it says Turner

16   and the claimant, that would be Cox, are each entitled to

17   submit any additional relevant evidence to the arbitrator.

18        Do you see that?

19   A.   I do.

20   Q.   Did I hear you testify that you thought that the

21   arbitrator in such a proceeding was somehow limited in the

22   information the arbitrator could receive to decide the matter?

23   A.   So our interpretation is that the primary factors, the

24   major factors that were articulated were around subscribers and

25   rate and readings and that was part of the definition of fair
```

1   market value.

2       And I think later in the agreement it talks about the

3   arbitrator picking which offer based on fair market value.

4   Q.   Then you see in paragraph 6 it says there shall be a

5   presumption that for each Carriage Agreement used as evidence

6   of fair market value, the number of subscribers, the total

7   payments and revenues, et cetera, et cetera, shall be relevant

8   evidence.

9       Do you see that?

10  A.   I do.

11  Q.   And then 5 says the arbitrator can consider any other

12  relevant evidence.

13      Do you see that?

14  A.   I see it.

15  Q.   Did you have a belief that there was some type of evidence

16  the arbitrator was not permitted to receive?

17  A.   No.

18  Q.   Okay.  I think you said that you would only be allowed to

19  submit an offer for an agreement of three years; is that

20  correct?

21  A.   I believe there was somewhere in this agreement that the

22  terms proposed would be three years, yes.

23  Q.   Can you go to paragraph six on page 4995.  And you'll see

24  at the bottom it says the final offers, and I'm skipping some

25  words, shall be for a term of three years unless the parties

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    agree to a different term.

2        Do you see that?

3    A.    I see that, but there would be no incentive for them to go

4    longer than three years.

5    Q.    So you and the DOJ have talked quite a bit about this

6    incentive issue, haven't you, in the various conversations that

7    you've had?

8    A.    We've talked about it, yes.

9    Q.    Yes.  Did you ever hear of something called the Nash

10   Bargaining model?

11   A.    No.

12   Q.    Let me talk to you a little bit about this idea of

13   incentive that you keep talking about.

14       Let's begin with must have, okay.  You kept saying Turner

15   is must have, must have, must have.

16       Now to be clear all the programmers say their works are

17   must have, is that a fair statement?

18   A.    Certainly if they're in marketing mode and they come in

19   they generally find some statistics to say they're number one.

20   Q.    It's a sales pitch term, isn't it?

21   A.    It could be from a network perspective, yes.

22   Q.    Now and you rattled off NBC, Fox, Disney, ESPN and there

23   are others as well?

24   A.    Sure.

25   Q.    Who claim their works are must have, must see, must watch.

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1    The term is widely used to refer to popular programming,

2  correct?

3  A.   Yes, in some cases, yes.

4  Q.   Now with respect to Turner, I think I heard you say most,

5  but apparently not all of the Turner Networks are must have in

6  your opinion, right?

7  A.   Well, certainly from a ratings perspective some are more

8  popular than others.

9  Q.   Which are the ones that are not popular?

10  A.   Well, I can certainly sitting here today that are less

11  popular, Turner Classic Movies is not going to be as popular.

12  Boomerang may not be as popular.

13  Q.   Which are of the ones that are popular in your opinion?

14  A.   Well, certainly from what the Nielsen data says as well as

15  my opinion, CNN is certainly popular, TBS, TruTV, TNT are

16  among, Cartoon Network.

17  Q.   You're not suggesting that Cox couldn't do business

18  without the Turner Networks, you're not telling that to the

19  Court, are you?

20  A.   I think that if we didn't have the Turner Networks, it

21  could significantly impact the viability of our video model.

22  Q.   Let's follow up on that a bit.  Have you done any analysis

23  before coming here to testify about, have you personally done

24  any analysis to testify about what your subscriber losses would

25  be if you didn't have Turner?

```
1   A.   No.

2   Q.   You have not?

3   A.   I have personally not done that, no.

4   Q.   Does your company Cox have any historical record of

5   subscriber losses from a Turner blackout?

6   A.   We have not gone dark with Turner in the past.

7   Q.   And Turner has not gone dark with you in the past,

8   correct?

9   A.   Correct.

10  Q.   Even though you had these very tough negotiations, there's

11  been no blackouts with Turner, correct?

12  A.   There have not been.

13  Q.   And in fact, Cox has never done a drop analysis to study

14  the potential effects of going dark on Turner, correct?

15  A.   We felt like that was not something we even needed to do

16  because we certainly knew how important the networks are.

17  Q.   Well, that wasn't any question.

18       My question was isn't it true that you, your company has

19  never once done a drop analysis with respect to Turner?

20  A.   Not to my knowledge.

21  Q.   Okay.  And a drop analysis for the Court's benefit is when

22  you assess how many subscribers you might lose if you're not

23  able to reach a deal with the programmer, correct?

24  A.   That's correct.

25  Q.   And you have done drop analysis for other companies,
```

1  correct?

2  A.    We have.

3  Q.    But not Turner, correct?

4  A.    No.

5  Q.    And before coming in here to give your testimony, you

6  didn't do any math or any calculations or computations about

7  how many subscribers Turner, your company Cox would lose if it

8  didn't have these so-called must have Turner Networks, correct?

9  A.    No, that's not something that I normally do.

10 Q.    But other people in your company are capable of doing it?

11 A.    Sure.

12 Q.    Did they do it?

13 A.    Not to my knowledge.

14 Q.    So you're just basing this on your background, your

15 experience, your opinion then that the company would suffer

16 losses?

17 A.    Well, not just my opinion.  Certainly we know even looking

18 at third party data how important Nielsen networks are.  We

19 also know that if the merger goes through Turner has a benefit

20 that they didn't have before --

21 Q.    I'll get to that.  You're going ahead of me now.  We're

22 pre merger right now, okay?

23       But besides Nielsen and this thing, your company was

24 perfectly capable before you took the stand today to do a drop

25 analysis to determine what the effect would be if you didn't

**\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\***

```
 1   have Turner.

 2      And the answer as I understand your testimony is that no

 3   such drop analysis has been performed, correct?

 4   A.   Not to my understanding.

 5             THE COURT:  This be a good time to take the afternoon

 6   recess?

 7             MR. PETROCELLI:  Yes, Your Honor.

 8             THE COURT:  All right, we're going to take a ten

 9   minute recess.

10      You remain a witness under oath.  As you know, you're not

11   allowed to discuss your testimony so far with anybody.

12             THE WITNESS:  Understood.

13             THE COURT:  So step down, be back in ten minutes.

14             THE WITNESS:  Okay.

15             THE COURT:  All right, we're going to take a ten

16   minute recess.  We're going until 5:30 today.

17             (Witness excused.)

18             (Recess at 4:50 p.m.)

19             (Proceedings resumed at 5:05 p.m.)

20             (Suzanne Fenwick resumed the witness stand.)

21             THE DEPUTY CLERK:  Your Honor, recalling civil action

22   number 17-2511, the United States of America v. AT&T, Inc., et

23   al.

24             THE COURT:  Proceed when you're ready,

25   Mr. Petrocelli.
```

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

```
1              MR. PETROCELLI:  Thank you.

2                 CROSS-EXAMINATION (Cont'd)

3   Q.   Before I return to the discussion we were having, just a

4   couple of quick facts about your company.  Cox Communication is

5   the largest private telecommunications company in the United

6   States, correct?

7   A.   I believe that's correct.

8   Q.   And you're the third largest cable company in the United

9   States, correct?

10  A.   That doesn't sound correct, no.

11  Q.   Well, Comcast is bigger, Spectrum is bigger, and you're

12  next, right?

13  A.   I think you're not taking into account the other DirecTV

14  and Dish.

15  Q.   Well, I said cable.

16  A.   Well, we consider them all part of the same ecosystem.

17  Q.   But my question was cable.  You're the third largest

18  cable, not satellite, cable?

19  A.   I actually am not sure if that's correct.

20  Q.   Well, who's bigger than you besides Spectrum and Charter?

21  A.   So Verizon may be.

22  Q.   Well, that's a telco, right?

23  A.   But they provide the same type of business service.  So

24  again, we look at it in the same ecosystem.

25  Q.   What's the publically reported number of subscribers,
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   video subscribers that Cox has?

2   A.   We don't publically report subscribers.

3   Q.   But Kagan reports it publically, right?

4   A.   I frankly don't know.

5   Q.   If I told you that they reported four million subscribers

6   for Cox around that ballpark, would that be in the

7   neighborhood?

8   A.   It's probably in the neighborhood.

9   Q.   Four million, okay, I'm going to return to that number in

10  a minute.

11       The parent company is Cox Enterprises, correct?

12  A.   That's correct.

13  Q.   And Cox Enterprises owns fourteen broadcast television

14  stations, including one in Atlanta and one in Boston, true?

15  A.   That may be correct, I don't know how many.

16  Q.   It owns six daily newspapers, true?

17  A.   I don't know how many.

18  Q.   Sixty radio stations, true?

19  A.   Potentially.

20  Q.   Over a hundred commercial websites, right?

21  A.   I don't know.

22  Q.   It even owns the Kelly Blue Book, right?

23  A.   That's correct.

24  Q.   And a website called dealer.com and auto trader, correct?

25  A.   That's correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   And it has over fifty-five thousand employees and twenty

2  billion dollars in revenue, correct?

3  A.   I'm not sure what the total numbers are.

4  Q.   Okay.

5       So let's go back to the must have again.  Let me follow up

6  on that.  And then you're going to go to probably my final

7  topic.

8       On must have, can you tell me how many of the top 500 rated

9  television shows in 2017 of the top 500, okay.  You with me?

10 A.   I'm with you.

11 Q.   Okay.  How many did Turner have?

12 A.   I frankly couldn't tell you that sitting here today.

13 Q.   Well, using your best judgment given your testimony about

14 how must have they are, you must have some idea of how many

15 within the 500 they have.

16 A.   I couldn't tell you.

17 Q.   Not at all?

18 A.   No.

19 Q.   What if I told you the number was zero, would you believe

20 that?

21 A.   No that doesn't necessarily make a lot of sense, and I

22 think that's probably not including sports.

23 Q.   I'm going to get to sports.  I said television shows,

24 okay?

25 A.   Yeah, I frankly don't know sitting here looking at show by

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   show.

2   Q.   What about, you mentioned NBC, let's say the top five

3   hundred rated shows last year.  How many did NBC have?

4   A.   I don't know.

5   Q.   If I told you one hundred or over one hundred, would you

6   dispute that?

7   A.   I frankly don't know.

8   Q.   Now, let's talk a bit about sports.

9        Do you know what -- do you know what the percentage of

10  national sports viewing in 2017 was represented by Turner

11  sporting events?

12  A.   I do not.

13  Q.   No idea?

14  A.   No.

15  Q.   Let's go to the top five hundred highest rated sports

16  telecasts of 2017?

17  A.   I can't tell you that sitting here.

18  Q.   Where do you think Turner fell?

19  A.   I don't know.

20  Q.   If I told you it was a hundred and sixty-one, you wouldn't

21  dispute that, right?

22  A.   I just don't know.

23  Q.   You know there are over four thousand major league

24  baseball games in a season, not counting playoffs, how many do

25  you think Turner telecasts?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   I really don't have an idea how many.

2  Q.   If I told you thirteen out of four thousand plus, would

3  you dispute that?

4  A.   I frankly don't know.

5  Q.   How many NBA regular season games, a couple thousand or

6  more?

7  A.   Potentially.

8  Q.   And how many do you think Turner has?

9  A.   I couldn't tell you how many.

10 Q.   If I told you 64, would you dispute that?

11 A.   No, I don't know.

12 Q.   How many NFL games does Turner telecast a year?

13 A.   They don't carry the NFL.

14 Q.   Okay.  How about hockey?

15 A.   I don't know.

16 Q.   They don't carry hockey, do they?

17 A.   I don't believe so.

18 Q.   What about golf?

19 A.   I don't know sitting here.

20 Q.   Okay.  Well, you're in the television business, so you

21 know about golf telecasts, right?

22 A.   I do.

23 Q.   Do they telecast any golf tournaments?

24 A.   I couldn't tell you sitting here.

25 Q.   What if I told you that every golf tournament of the year

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  that's telecast on TV, Turner telecast two rounds, not even a

2  whole tournament, would you dispute that?

3  A.   I don't know.

4  Q.   Thursday and Friday of the PGA championship tournament

5  telecast by Turner, that's what they have, would you dispute

6  that?

7  A.   I'm not sure how to keep saying I don't know.

8  Q.   I guess I realize you don't know.  I'll move on.

9     On this incentive thing that you talked to DOJ about and

10  told the Court about, I think you went so far as to say that if

11  this merger occurs when you have to do your next deal with

12  Turner, it's going to be horribly ugly, those are the words I

13  think you used, right?

14  A.   Yes.

15  Q.   Horribly ugly.  Let's talk about horribly ugly.  Right now

16  there's no merger, right?

17  A.   Correct.

18  Q.   Okay.  Now, if you're in a negotiation the day before the

19  merger and then we're going to do the day after the merger,

20  okay?  So let's -- let's focus now on the day before.

21     You're not able to make a deal with Turner because they

22  want more money than you want to pay and whatever the disputes

23  are, but you can't make a deal, and you're going to lose the

24  networks, they're going to go dark, you're going to go dark,

25  whatever, that's the scenario, okay?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  A.    Okay.

2  Q.    Now, to be clear, you've never, your company has never

3  actually analyzed this scenario, right?

4  A.    We have not, to my knowledge.

5  Q.    Your counsel or the DOJ, I should say, asked you about a

6  going dark analysis that your company did on the direct exam,

7  but that wasn't about Turner, right?

8  A.    That's correct.

9  Q.    And in that going dark analysis, was that analysis of one

10 week, four weeks, or forever, do you know?

11 A.    I think we looked at it in two different ways.  One was a

12 short-term and one was a long-term scenario.

13 Q.    Now, and there has never been in the case of the Turner

14 Networks ever a long-term blackout, correct?

15 A.    Not with Cox.

16 Q.    Okay.  Now, so the day before the merger, let's use four

17 million subscribers for Cox, and I'm going to make up a number

18 for the price of the Turner Networks, a hypothetical number.

19 I'm going to say six dollars for all the Turner Networks per

20 sub, per month, okay?

21 A.    Okay.

22 Q.    Now, there's four million, if Turner goes dark or you go

23 dark on Turner, that's six dollars a sub times four million,

24 that's twenty-four million dollars a month that Turner does not

25 receive from Cox, correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    That is correct.

2  Q.    Okay.  I'm putting that down, twenty-four million.  And

3  that loss goes on month after month after month, correct?

4  A.    Correct.

5  Q.    Okay.  Now, they would also lose, because four million

6  people are not watching Turner on your system any longer, they

7  would also have a reduction in advising revenues because they

8  have to make good to the advertisers for the rates that were

9  charged with the expectation that four million additional

10 viewers would be watching, you tracking me?

11 A.    I'm tracking you.

12 Q.    Okay.  So if I told you that -- do you know how much that

13 would be to Turner?

14 A.    I don't know.

15 Q.    So if I told you that Turner roughly has 50/50

16 subscription fee, 50/50 advertising fees, so we'll put another

17 twenty-four million.  That's forty-eight million dollars a

18 month, okay?

19 A.    Okay.

20 Q.    That Turner loses in a going dark situation every month,

21 month after month, unrecoverable, do you agree?

22 A.    I agree.

23 Q.    Okay.  Now, let's go to Cox.  That was the Turner part.

24 Now we're going to go to Cox, okay?

25      Now, Cox, you're now saving twenty-four million dollars a

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  month, right?

2  A.   Yes, we are, but we're [sic] also have lost a lot of

3  customers.

4  Q.   Well, we'll get to the customer part.  But immediately

5  you're saving twenty-four dollars a month [sic], right, because

6  you're not paying for the Turner Networks?

7  A.   Correct.

8  Q.   I assume, I think you testified in your deposition that

9  you like to be very sensitive to your consumers' cable bills,

10  you don't even pass on all of your content costs, do you

11  remember testifying to that?

12  A.   Yes.

13  Q.   Okay.  And you would agree that cable bills are sort of --

14  people are at the gag point right now, aren't they?

15  A.   They're very high, yes.

16  Q.   Right.  And so with your saving twenty-four dollars a

17  month if Turner went dark, you could pass that savings on to

18  your subscribers by lowering their cable bills, right?

19  A.   Yes, that's --

20  Q.   And if you lower you cable bills and the price is lower,

21  you could actually get more subscribers, couldn't you?

22  A.   No, because we don't have enough content to compete.

23  Q.   Wait.  You only are losing the Turner Networks, you've

24  still got everybody else, right?

25  A.   Customers will leave if we don't have them.

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1   Q.   So let's talk about that.  How many customers are going to

2   leave even with the reduction in your price to your cable

3   subscribers, how many?

4   A.   We don't know.

5   Q.   Have you tried to compute it?

6   A.   I have not.

7   Q.   You have no idea?

8   A.   We believe that it's a large number.

9   Q.   I know you believe that, but do you have any evidence, any

10  information, any hard facts?

11  A.   I don't have a churn analysis for you, no.

12  Q.   By the way, the word "churn" means when you lose

13  subscribers, right?

14  A.   That is correct.

15  Q.   Now, you understand that you came into court today to give

16  testimony to oppose this merger.  You knew that, right?

17  A.   I came in to tell you what I know about the business.

18  Q.   Well, Cox is opposing the merger, correct?

19  A.   We feel like it, yes.

20  Q.   Do you think you had an obligation in giving testimony to

21  oppose a merger of this importance that you would do some

22  homework and run some numbers?

23  A.   No, we felt like our job was to point out how the leverage

24  changes.

25  Q.   So you think you could just come in here and give your

1  opinion that the leverage is going to change and you're going

2  to lose all of these customers even though you have no idea how

3  many customers you're going to lose and you've never done a

4  single bit of quantitative analysis; is that true?

5  A.    Sure.

6  Q.    Now, let's go to the day -- let's assume that you lose,

7  since you don't have any idea, I'm just going to pick a number.

8  Well first of all, do you know what number the government has

9  picked through its expert?

10  A.    I have no idea.

11  Q.    Did government tell you that their expert is taking the

12  position that if Turner is not on a system like Cox they will

13  lose twelve and a half percent of their subscribers?

14  A.    Okay.

15  Q.    In your case that's -- what's twelve and a half percent

16  times four million, is that like a half a million?

17  A.    Close to it.

18  Q.    Do you think you would lose a half million subscribers if

19  Turner wasn't on the air?

20  A.    I think it's possible.

21  Q.    By the way, does your -- were you authorized by your CEO

22  to come in here and testify that it's possible that you could

23  lose a half a million of your subscribers without doing a

24  single bit of quantitative analysis, does your boss know that

25  you're giving this testimony?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  A.   He does.   In fact, I heard from my boss, and I heard from

2  our CEO the night before, and he knows why I'm here to testify.

3  Q.   And did you discuss that you would give testimony that

4  your company could lose as much as a half a million

5  subscribers?

6  A.   That's your number, not my number.

7  Q.   My question is, did you discuss that with them?

8  A.   I did not discuss five hundred thousand.

9  Q.   And yet you're telling the Court that it's possible that

10  you could lose that much without doing a single bit of

11  homework?

12  A.   I told you I don't have a number, but you asked me if I

13  could conceive of it, and I do.

14  Q.   You want to conceive of it, correct?

15  A.   I really don't want to conceive of it.

16  Q.   Now, let's go to the day after the merger, okay?  Let's

17  assume you lose, I'm just going to pick a number.  I'm going to

18  say you lose ten thousand subscribers because you don't have

19  Turner.  It's my number, you don't have to agree with it, okay?

20  A.   Fine.

21  Q.   Now, the day after the merger, you're in this negotiation

22  with Turner.  You're negotiating over the identical content,

23  correct?

24  A.   That's correct.

25  Q.   Now, if you don't reach a deal, you're going to save the

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  identical amount of money, twenty-four million, correct?

2  A.   That's correct.

3  Q.   Turner is going to lose the 48 million in my hypo,

4  correct?

5  A.   Correct.

6  Q.   You're still going to lose the identical number of

7  subscribers that you would the day before the merger, correct?

8  A.   I'm not sure I understand the question.

9  Q.   Well, if ten thousand people are going to leave your

10 system because you don't have Turner the day before the merger,

11 the same ten thousand are going to leave your system --

12 A.   Oh.

13 Q.   -- if you don't have Turner the day after the merger.

14 A.   Yes.

15 Q.   That number doesn't change, correct?

16 A.   Correct.

17 Q.   Now, there is one difference, though.  Some of those

18 subscribers might go over, some of the subscribers might join

19 another Pay-TV provider, right?

20 A.   They could.

21 Q.   The people that leave Cox because they don't have Turner

22 are going to go elsewhere, right?

23 A.   That is correct.

24 Q.   Some of them will go over the top, as they say, to one of

25 the online distributors, cut the cord and say I've had it with

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  cable, correct?

2  A.   Sure, DirecTV now would be an option.

3  Q.   You always say DirecTV now.  Of course, there's a number

4  of other ones, like there's Hulu, correct?

5  A.   Hulu is not the same type of OTT competitor.

6  Q.   They do have a live feed, don't they?

7  A.   They do, but it's limited.

8  Q.   What about YouTube, they have a live feed, right?

9  A.   Again it's limited, it's not --

10  Q.   And Sony Play Vue, right?

11  A.   Yes, it's limited.

12  Q.   And Sling, right?

13  A.   Again, limited.

14  Q.   Okay.  Limited, meaning in a good way, right, because

15  they're offering lower prices to consumers for smaller bundles

16  of channels?

17  A.   For consumers that are targeted by that type of product,

18  but certainly Hulu and Amazon and Netflix have very unique

19  content.

20  Q.   And DirecTV, now, what do you think their price is to

21  consumers?

22  A.   I don't know what their price is.

23  Q.   How about if I told you it was only thirty-five dollars?

24  A.   Okay.

25  Q.   Do you know how many channels a consumer can get for just

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  thirty-five dollars if they sign up with DirecTV now?

2  A.   I don't know.

3  Q.   If I told you it was sixty channels, would you dispute

4  that?

5  A.   I really haven't looked at it, so I don't know.

6  Q.   You said it's very different from Hulu and YouTube.

7  A.   It's more of a replicate product from my understanding of

8  what DirecTV is.

9  Q.   Well, how does the sixty channels differ from what the

10  other ones do?  Do you know how many channels the others give

11  out?

12  A.   I know that it is less.

13  Q.   You know for a fact it's less?

14  A.   I know that Sling is less, and that some of the OTT

15  providers don't provide the same type of content.

16  Q.   Now, the truth is you don't really have any idea what

17  these other providers, the number of channels, the pricing

18  offerings, how they compare exactly to DirecTV now.  You don't

19  have -- you haven't done that homework either, right?

20  A.   I have a sense of it.

21  Q.   Okay.  Now, I want to get back to the day after the

22  merger.  I got a little sidetracked there.

23     The day after the merger I told you that some of these

24  subscribers, I believe Cox, are going to go over the top.  We

25  talked about that.  Some are going to sign up for other

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  systems, right?  Verizon Fios would be one, correct?

2  A.   Just in certain geographic areas.

3  Q.   Correct.  And DirecTV, Dish might be one, correct?

4  A.   It could.

5  Q.   And Dish is national, right?

6  A.   That's correct.

7  Q.   And DirecTV might be one, right?

8  A.   That's correct.

9  Q.   So what percentage, what percentage of the subscribers

10 that leave Cox because Turner is not there would actually go to

11 DirecTV as opposed to all these other places?

12 A.   I can't tell you an exact number.  But we know that Direct

13 is one of our largest competitors.

14 Q.   But have you done any analysis or any quantification to

15 determine how many would actually go to DirecTV?

16 A.   I have not, no.

17 Q.   But your whole argument about ugly, horrible and incentive

18 post-merger has to do with the idea that the merged company is

19 now going to profit because it's going to pick up those

20 additional subscribers, correct?

21 A.   Yes.

22 Q.   But you have no idea how many are actually going to be

23 picked up, correct?

24 A.   No, I know that the incentives change and that the

25 leverage changes.  And that they have the -- certainly the

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  incentive to pick up customers, that's good for their business

2  because it could potentially drive out a competitor.

3  Q.   But you're not -- you're not answering my question.  My

4  question was, you have no idea how many are going to go to

5  DirecTV, correct?

6  A.   I have no idea how many.

7  Q.   And you have no idea how much additional money DirecTV

8  would earn by getting however many subscribers depart from Cox

9  and divert to DirecTV?

10  A.   I don't know.

11  Q.   You don't know.

12      Now, let's assume of the ten thousand, I'm just going to

13  pick 25 percent because of the other places they could go.

14  Let's pick 25 percent.  That's twenty-five hundred subscribers

15  would go to DirecTV.  Do you know how much profit DirecTV would

16  earn from getting twenty-five hundred new subscribers?

17  A.   I do not.

18  Q.   But you do know that, and we just went over this, that

19  Turner is still losing in this example the forty-eight million

20  dollars every single month, correct?

21  A.   Yes.

22  Q.   But maybe it's not forty-eight million anymore, maybe it's

23  like forty-seven million that they're losing or forty-six

24  million because they're going to pick up a little bit of profit

25  from the DirecTV subscribers that join DirecTV from Cox,

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   correct?

2   A.   I think you're oversimplifying.

3   Q.   Well, you say I'm oversimplifying, but you have not done

4   this math, have you?

5   A.   I have not done this math.

6   Q.   Okay.  Did you sit down to do it with DOJ?

7   A.   No.

8   Q.   Did you run the numbers with DOJ?

9   A.   No.

10  Q.   Did they show you any of these numbers?

11  A.   They did not.

12  Q.   So the bottom line is here's what your incentive argument

13  boils down to, the day before the merger Turner has an

14  incentive to do a deal because if it doesn't, it's going to

15  lose in my hypo forty-eight million dollars a month, month

16  after month after month.  The day after the merger it's going

17  to lose forty-seven million, forty-six million, forty-five

18  million, forty million, some number less than forty-eight, but

19  a big number nonetheless, correct?

20  A.   Again, I think you're oversimplifying.

21  Q.   Well, are you suggesting to the Court that there would be

22  so many people who would join DirecTV from Cox that would more

23  than make up for the forty-eight million dollars of losses?

24  A.   I think it's more complicated than that.

25  Q.   Can you answer that question?  This is a math question.

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  I'm trying -- the incentive is only there if it's going to make

2  a meaningful difference economically, do you agree?

3  A.   That is your view of it.

4  Q.   Do you agree?

5  A.   I think that that is the license fees are one part of it.

6  I think that the subscribers are one part of it.  But if the

7  other terms of the agreement are egregious, we're going to

8  continue to bleed customers, and I think then Direct's in a

9  position to push Cox and others out of the business.

10 Q.   But DirecTV, but the merged company, forgive me, would

11 have no incentive to put onerous terms on you if you could go

12 dark or not do a deal when they would just end up losing the

13 same amount of money as before, but maybe a tiny bit less?

14 A.   They would if it pushed us out of business.

15 Q.   Okay.  I think I've run that to ground.

16     Now, did I hear you say that you don't consider -- your

17 company doesn't consider Netflix a competitor?

18 A.   They're a partner.

19 Q.   Yeah, but my question is, does your company consider

20 Netflix a competitor, yes or no?

21 A.   Not today, we don't.

22 Q.   Okay.  Starting when, when did they cease to be a

23 competitor?

24 A.   I frankly can't answer that question.  I know today that

25 we're partnering with them, and we think that that is a good

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   experience, a good relationship for our customers.

2   Q.   But when you say you're partnering with them, what you

3   mean by that is that a Cox customer can turn on their TV and

4   download it as the Netflix app, right?

5   A.   Well, they can, it's not just that, they can sign up for

6   it.  They can also search all of their content through our

7   guide to make it a better user experience for them.  Netflix

8   has distinct unique content that is a benefit to our overall

9   portfolio.

10  Q.   Would you say that Netflix was a competitor of Cox in

11  2016?

12  A.   Frankly, I don't know.  I'm not in the marketing team.

13  But I can tell you where we are today.

14  Q.   Well, if I told you that your company reported to

15  financial investors that our video services are subject to

16  competition from a range of over-the-top providers of

17  programming, including Netflix, Apple TV, Hulu and Amazon, and

18  that that was written in 2016 to the investment community, you

19  wouldn't dispute that, would you?

20  A.   I frankly don't know what you're reading from and what it

21  is.

22  Q.   Do you dispute it?

23  A.   I don't know what the broader company's opinion was at

24  that point in time.  I can tell you where we are today.

25  Q.   What if I told you that I was reading from an offering

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1    memorandum by Cox Communications, Inc.?

 2    A.   I've never seen it.

 3              MR. PETROCELLI:  I'll mark this for impeachment,

 4    Plaintiff's Exhibit, what is it, 91?

 5              THE COURT:  Defendant's.

 6              MR. PETROCELLI:  I'm sorry.  Defendant's 917.  I'm

 7    wrapping up, Judge, getting very late.

 8              THE COURT:  Yeah, this is exhibit what now for

 9    identification?

10              MR. PETROCELLI:  It's Defendant's Exhibit 917.

11              THE COURT:  917.

12       (Defendant's Exhibit No. 917 marked for identification.)

13              MR. PETROCELLI:  May I approach?

14              THE COURT:  You may.

15    BY MR. PETROCELLI:

16    Q.   Can you turn to page 5, under "risk factors."  The

17    heading, "We face a wide range of competition in an area served

18    by our cable systems which could adversely affect our future

19    results of operations."  Do you see that heading?

20    A.   I do.

21    Q.   And do you see about halfway down the sentence that I read

22    previously?

23    A.   I do.

24    Q.   And do you agree with that sentence?

25    A.   I don't sitting here today, no.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   Q.    Okay.

2          MR. PETROCELLI:  Your Honor, I have nothing further.

3          THE COURT:  All right.

4    How much redirect have you got?

5          MS. SCANLON:  About four to five minutes, Your Honor.

6          THE COURT:  Go for it.  Finish this witness.

7          MS. SCANLON:  Thank you, Your Honor.

8                        REDIRECT EXAMINATION

9    BY MS. SCANLON:

10   Q.    Ms. Fenwick, earlier Mr. Petrocelli was asking you some,

11   what he called math questions, do you recall that?

12   A.    I do.

13   Q.    Okay.  And those were just assumptions about the numbers

14   that were going into those math questions; is that right?

15   A.    Absolutely.

16   Q.    He also asked you about what Turner might lose and what

17   Cox might lose if there was a go dark situation, do you recall

18   that?

19   A.    I do.

20   Q.    Is it right that Cox also loses ad revenues in that

21   circumstance?

22   A.    Sure, we lose customers, we lose ad revenue, and quite

23   frankly, if we lose enough customers, that is going to have a

24   huge impact on whether we can sustain our video business.

25   Q.    Ms. Fenwick, is it right that Cox has agreed to price

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  increases from Turner year after year?

2  A.   Absolutely.

3  Q.   And that's a business decision Cox has made; is that

4  right?

5  A.   We have.

6  Q.   And why has Cox made that decision?

7  A.   Because the content is incredibly important to our

8  portfolio.

9  Q.   Mr. Petrocelli had some questions about baseball and NBA

10 games.  Do you know whether the Turner Networks carry baseball

11 playoffs?

12 A.   They do.  They also carry March Madness, which is

13 incredibly important to our customers.

14 Q.   Do you know if they carry NBA playoffs?

15 A.   My understanding is they do.

16 Q.   Last thing, Mr. Petrocelli had some questions about a drop

17 analysis or the concept of a drop analysis.  And we talked

18 earlier about the fact that Cox had done a drop analysis for a

19 network that we didn't name.  Do you recall that?

20 A.   I do.

21 Q.   So why did Cox do the analysis for that network, but not

22 do one for Turner?

23 A.   Because we had concerns whether that network's content was

24 valuable.  We don't have any concerns or questions about how

25 valuable the Turner content is.  We know it's extraordinarily

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1   valuable.

 2           MS. SCANLON:  No further questions, Your Honor.  I

 3   would like to offer PX 520 into evidence under seal, please.

 4           MR. PETROCELLI:  What exhibit is that?

 5     No objection.

 6           THE COURT:  All right, that will be admitted under

 7   seal.

 8       (Plaintiff's Exhibit No. PX 520 was received in evidence.)

 9           MR. PETROCELLI:  Nothing further.

10           THE COURT:  Okay.

11     You're excused.  You can step down.

12           THE WITNESS:  Okay, thank you.

13       (Witness excused.)

14           THE COURT:  So, Mr. Conrath.

15           MR. CONRATH:  Yes, Your Honor.

16           THE COURT:  Let's take a look at Monday's game plan.

17           MR. CONRATH:  All right.

18           THE COURT:  Who's first?

19           MR. CONRATH:  Warren Schlichting from DISH Sling.

20           THE COURT:  Your estimate previously was two hours on

21   direct, how does that sound today?

22           MR. CONRATH:  I think it will be shorter.

23           THE COURT:  You want to give me a guesstimate?

24           MR. CONRATH:  Can I say an hour and a half?

25           THE COURT:  All right, sounds better than two.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1                 MR. CONRATH:  Yes.

2                 THE COURT:  And who would be after that person?

3                 MR. CONRATH:  Mr. Martin from defendants.

4                 THE COURT:  Your earlier estimate on that one was an

5       hour and a quarter.  Do you want to make any adjustments on

6       that one?

7                 MR. CONRATH:  I think that's -- may I get a more

8       informed opinion?

9                 THE COURT:  Yeah, go ahead.  I'm not going to hold

10      you to an exact number.

11                MR. CONRATH:  We understand.

12                THE COURT:  Trying to get a rough idea how many

13      witnesses we can get done on Monday.

14                MR. CONRATH:  Probably about two hours for

15      Mr. Martin, Your Honor.

16                THE COURT:  All right.  So assuming direct and cross

17      are about the same, that's -- we're not getting to a third

18      witness on Monday.

19                MR. CONRATH:  That sounds correct to me, Your Honor.

20                THE COURT:  Especially since we break at five because

21      I have to leave for teaching.

22           So have those two witnesses.

23           Now, with regard to those two witnesses, are you

24      anticipating any issues of dealing with confidential

25      information that may necessitate any kind of closing of the
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    courtroom or anything like that?

2           MR. CONRATH:  I can't speak for Mr. Martin, but for

3    Mr. Schlichting, yes, we are, Your Honor.  And if we can, I'd

4    like to, not now, but Monday morning if I have the chance to

5    address that.  We obviously are working, we developed some

6    technique that worked out well today, and we were going to work

7    on that in preparation, but I suspect it will be a core of

8    testimony that is very important for us to be able to get in

9    front of the Court for which we will be asking something like

10   that.

11          THE COURT:  All right, so first thing on Monday

12   morning we'll deal with that.

13          MR. CONRATH:  Okay.

14          THE COURT:  At the bench.

15          MR. CONRATH:  Sure.

16          THE COURT:  How about any other issues that you might

17   anticipate for Monday's proceeding?

18          MR. CONRATH:  We don't have any other issues, Your

19   Honor.

20          THE COURT:  All right, Mr. Petrocelli, do you have

21   any issues you're anticipating for Monday's session?

22          MR. PETROCELLI:  We do not, Your Honor.

23          THE COURT:  All right.  So next week we'll have four

24   days, Monday through Thursday, 10:30 to 5:00 on Monday, 10:30

25   to 5:30 Tuesday, Wednesday, and Thursday.

1          MR. PETROCELLI:  Yes.

2          THE COURT:  All right.  We won't have court next

3   Friday.  The courthouse will be closed.

4          MR. PETROCELLI:  Good Friday.  Thank you, Your Honor.

5          THE COURT:  Any other issues, counsel?

6          MR. PETROCELLI:  No.

7          THE COURT:  We stand in recess.

8          (Proceedings adjourned at 5:35 p.m.)

9                              -oOo-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1                                    CERTIFICATE

2              I certify that the foregoing is a true and correct

3    transcript, to the best of my ability, of the above pages, of

4    the stenographic notes provided to me by the United States

5    District Court, of the proceedings taken on the date and time

6    previously stated in the above matter.

7              I further certify that I am neither counsel for, related

8    to, nor employed by any of the parties to the action in which

9    this hearing was taken, and further that I am not financially

10   nor otherwise interested in the outcome of the action.

11

12   _____      _____

13   /s/Crystal M. Pilgrim, RPR,FCRR        Date:  March 23, 2018

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )     CV No. 17-2511
                                   )
                                   )     Washington, D.C.
     vs.                           )     March 26, 2018
                                   )     10:30 a.m.
AT&T, INC., ET AL.,                )
                                   )     Day 2
          Defendants.              )
_____)
```

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                             Eric D. Welsh
                             Timothy B. Walthall
                             Andrew Finch
                             Lisa A. Scanlon
                             Melanie Kiser
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Washington, D.C. 20530
                             (202) 532-4560
                             craig.conrath@usdoj.gov
                             eric.welsh@usdoj.gov
                             timothy.walthall@usdoj.gov
                             andrew.finch@usdoj.gov
                             lisa.scanlon@usdoj.gov
                             melanie.kiser@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

Katrina M. Robson
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 220-5052
krobson@omm.com

Daniel M. Petrocelli
M. Randall Oppenheimer
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067
(310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Robert C. Walters
Michael L. Raiff
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
(214) 698-3350
rwalters@gibsondunn.com
mraiff@gibsondunn.com

For Defendant
Time Warner, Inc.:

Kevin J. Orsini
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1140
korsini@cravath.com
pbarbur@cravath.com

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                  Registered Merit Reporter
                                  Certified Realtime Reporter
                                  Official Court Reporter
                                  U.S. Courthouse
                                  333 Constitution Avenue, NW
                                  Room 6511
                                  Washington, D.C. 20001
                                  (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

163

```
1                    P R O C E E D I N G S
2              DEPUTY CLERK:  All rise.  The United States
3    District Court for the District of Columbia is now in
4    session, the Honorable Richard J. Leon presiding.  God save
5    the United States and this Honorable Court.  Please be
6    seated and come to order.
7              Good morning, Your Honor, Civil Action
8    No. 17-2511, the United States of America v.
9    AT&T, Inc., et al.
10             Counsel for the parties, please approach the
11   lectern and identify yourselves for the record.
12             MS. KISER:  Melanie Kiser for the United States.
13             MR. WALTHALL:  Timothy Walthall for the
14   United States, Your Honor.
15             THE COURT:  Welcome.
16             MR. CONRATH:  Good morning, Your Honor.
17   Craig Conrath for the United States.
18             THE COURT:  Welcome.
19             MR. FINCH:  Good morning, Your Honor.
20   Andrew Finch for the United States.
21             THE COURT:  Welcome.
22             MR. WELSH:  Good morning, Your Honor.  Eric Welsh
23   for the United States.
24             THE COURT:  Welcome.
25             MS. SCANLON:  Good morning, Your Honor.
```

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 208 of 3826

164

```
1    Lisa Scanlon for the United States.

2              And with us is Lindsey Roschen, our legal

3    assistant for the morning.

4              THE COURT:  Welcome.

5              MR. PETROCELLI:  Good morning, Your Honor.

6    Daniel Petrocelli for defendants.

7              THE COURT:  Welcome.

8              MR. RAIFF:  Good morning, Your Honor.  Mike Raiff

9    for AT&T and DirecTV.

10             THE COURT:  Welcome.

11             MR. OPPENHEIMER:  Good morning, Your Honor.

12   Randy Oppenheimer for the defendants.

13             THE COURT:  Welcome.

14             MS. ROBSON:  Good morning, Your Honor.

15   Katrina Robson for the defendants.

16             THE COURT:  Welcome back.

17             MR. WALTERS:  Good morning, Your Honor.

18   Rob Walters here for AT&T and DirecTV.

19             THE COURT:  Welcome.

20             MR. BARBUR:  Good morning, Your Honor.

21   Peter Barbur representing Time Warner.

22             THE COURT:  Welcome.

23             MR. ORSINI:  Good morning, Your Honor.

24   Kevin Orsini for Time Warner.

25             THE COURT:  Welcome.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1          All right, Mr. Conrath.  Do you want to call your

2   second witness?

3          MR. CONRATH:  Your Honor, if I may, there's one

4   matter that I would like to raise at the bench if I could

5   have that privilege.

6          THE COURT:  Uh-huh.

7          MR. CONRATH:  May we approach?

8          (Sealed bench conference)

9          MR. CONRATH:  So, Your Honor --

10         THE COURT:  Speak into this.

11         MR. CONRATH:  Your Honor, we learned last night

12  that the witness received a copy of the Thursday transcript,

13  not from us; from his counsel.  It is my understanding from

14  his counsel that he reviewed it or browsed it for about five

15  minutes before he got the word that he was not supposed to

16  have it and then ceased.

17         But since that, obviously, runs against the rule

18  on sequestration, I wanted to call it to the Court's

19  attention immediately.  And obviously, cross-examination on

20  that is fully appropriate, to whatever extent it is.

21         THE COURT:  Who got a copy of the transcript, a

22  lawyer for the witness or the witness or both?

23         MR. CONRATH:  Well, I think the lawyers ordered

24  it.

25         THE COURT:  Say again.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1            MR. CONRATH:  If I understand, the lawyers ordered

2    it from --

3            THE COURT:  Who's the lawyer?

4            MR. CONRATH:  All right.  So it is Steptoe &

5    Johnson.

6            THE COURT:  Yes.

7            And who's the lawyer?

8            MR. CONRATH:  And the lawyer is -- and

9    I don't know within, but their lead lawyer is Pantelis,

10   P-a-n--

11           THE COURT:  That's a first name?

12           MR. CONRATH:  Yes.

13           P-a-n-t-e-l-i-s, Michalopoulos, M-i-c-h-a-l --

14           THE COURT:  M-i-c-h-a-l --

15           MR. CONRATH:  -- p-o-u -- I'm spelling it wrong.

16   Michalopoulos.

17           THE COURT:  That's a lawyer for Steptoe?

18           MR. CONRATH:  That's correct, Your Honor.

19           THE COURT:  In a Washington office?

20           MR. CONRATH:  Yes.

21           THE COURT:  Is he here?

22           MR. CONRATH:  Yes.

23           So he ordered a copy, that's my understanding.

24           THE COURT:  And he gave it to his client?

25           MR. CONRATH:  I don't know if he did -- I think
```

1  he said he did not.  I'm repeating what I heard.  But I

2  understand that he did not but someone associated with him

3  did.

4       THE COURT:  Someone from Steptoe?

5       MR. CONRATH:  That's my assumption, but I am not

6  speaking of personal knowledge here.

7       THE COURT:  What's the witness' name again?

8       MR. CONRATH:  Warren Schlichting.  Warren like

9  Warren.  And Schlichting, S-c-h-l-i-c-h-t-i-n-g.

10      THE COURT:  He's outside?

11      MR. CONRATH:  Yes.

12      MR. PETROCELLI:  Can I inquire, Your Honor?

13      THE COURT:  Yes.

14      MR. PETROCELLI:  There's no issue, as I understand

15  it, if he read the opening statement.  But are you saying he

16  read the Cox examination?

17      MR. CONRATH:  I don't know that.

18      All I know is that he -- my understanding is he

19  browsed the transcript for approximately five minutes.

20  That's why --

21      MR. PETROCELLI:  The entire transcript?

22      MR. CONRATH:  Well, as -- my understanding is he

23  had the entire transcript.

24      MR. PETROCELLI:  Well, Your Honor, I would

25  certainly -- this is -- and I'm also wondering, Your Honor,

1   since this doesn't involve confidentiality, why does this

2   have to be in a confidential portion of the transcript?

3             THE COURT:  It won't be in about three minutes.

4             MR. CONRATH:  Yes.

5             MR. PETROCELLI:  Okay.  I'm concerned about the

6   fact that this is being put in a confidential transcript and

7   I don't understand -- I'm just learning this, and so I don't

8   understand the circumstances.

9             He told me right before Your Honor came out that

10  this occurred, but I have not had a chance to inquire.

11            Maybe we should voir dire the witness.

12            THE COURT:  Well, it's a first.  I must say, in 16

13  years of doing this business, I haven't seen this happen

14  before.

15            Now, of course, Mr. Michalopoulos should know

16  better, but that's a separate issue.  He'll have to deal

17  with me separately.

18            MR. PETROCELLI:  And, of course, we're not going

19  to be able to inquire, Your Honor, about conversations

20  between that lawyer and Mr. Schlichting.

21            And the cross, if it's communicated to other

22  witnesses, I think they have a decided advantage.  So

23  anyway, it's an issue for us.

24            I'm also told this witness and his lawyer are

25  insisting to go into confidential, closed, sealed setting.

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 213 of 3826

169

1    And I have real objection to that, and I'd like to be heard

2    on that at some point.

3            THE COURT:  Well, you will be heard on it at the

4    appropriate time.

5            So we'll take it in baby steps.

6            Have Mr. Schlichting come in here at the bench --

7            MR. CONRATH:  Okay.

8            THE COURT:  -- with the two of you here, and

9    I'm going to ask him some questions, okay?

10           MR. CONRATH:  Sure.  That's fine.

11           THE COURT:  Not Mr. Michalopoulos.  I'll ask him

12    questions separately after I'm done with Mr. Schlichting.

13           MR. CONRATH:  May I?

14           Just following up on the question of

15    confidentiality, I think at the end of last week, Your Honor

16    told me to be prepared to address that when we got here

17    Monday.  I'm prepared to do that whenever the Court --

18           THE COURT:  Are you doing the direct of this

19    witness?

20           MR. CONRATH:  So I'm not doing the direct.

21           THE COURT:  Well, who's going to do the direct?

22           MR. CONRATH:  So Melanie Kiser, the woman sitting

23    in the front K-i-s-e-r.

24           I guess my point is, I'm the one who's prepared to

25    argue the broader question of confidential treatment, and if

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1    I could be permitted to do that, whenever the Court wants to

 2    hear it, either in advance or --

 3              THE COURT:  Would she be planning to, if you know,

 4    go into the confidential information at the end of the

 5    direct?

 6              MR. CONRATH:  Yes.  Yes.  Absolutely.

 7              THE COURT:  The direct, as I am -- the estimate is

 8    about an hour, an hour and a half.

 9              MR. CONRATH:  About an hour -- our estimate is

10    about an hour and a half of open and about 15 minutes of

11    confidential, best estimate.

12              THE COURT:  We can deal with that at the break --

13              MR. CONRATH:  Okay.  Sure.

14              THE COURT:  -- I mean, your position on that.

15              MR. CONRATH:  All right.  Thank you.

16              THE COURT:  And why don't you get Mr. Schlichting.

17              MR. CONRATH:  I will do -- will do, Your Honor.

18              MR. PETROCELLI:  Should I return to the bench?

19              THE COURT:  Yeah, you can.  Hang out if you want.

20              MR. PETROCELLI:  I'll just stay here.

21              (Pause)

22              THE COURT:  Mr. Schlichting, come over here.

23              MR. SCHLICHTING:  How are you?

24              THE COURT:  Welcome.

25              MR. SCHLICHTING:  Thank you.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  Consider yourself under oath.

 2              MR. SCHLICHTING:  Okay.

 3              THE COURT:  You understand?

 4              MR. SCHLICHTING:  I think so.

 5              THE COURT:  So how you answer the following

 6    questions will be treated as if you are under oath.

 7    I haven't fully sworn you yet.

 8              MR. SCHLICHTING:  Okay.

 9              THE COURT:  But the questions I'm going to ask

10    you, you must view them as if you are under oath.

11              Do you understand that?

12              MR. SCHLICHTING:  I do.

13              THE COURT:  Okay.

14              I understand that you were provided a copy of the

15    transcript of Thursday's proceedings in this Court; is that

16    accurate?

17              MR. SCHLICHTING:  That is.  It was emailed to me.

18              THE COURT:  It was emailed to you?

19              MR. SCHLICHTING:  That's right.

20              THE COURT:  Who emailed it to you?

21              MR. SCHLICHTING:  I believe it was the associate,

22    Andy Golodny.

23              THE COURT:  Say the last name again.

24              MR. SCHLICHTING:  G-o-l-o-d-n-a-y [sic].

25              THE COURT:  He's an associate?  He works with
```

1   Mr. Michalopoulos.

2            MR. SCHLICHTING:  Yes.  Steptoe.

3            THE COURT:  So he's an associate in the firm?

4            MR. SCHLICHTING:  That's right.

5            THE COURT:  Do you remember if he was, if he

6   mentioned in the email whether he had been directed to do

7   this, if you can recall.

8            MR. SCHLICHTING:  I don't.  No.

9            THE COURT:  When did he send it to you,

10  approximately?

11           MR. SCHLICHTING:  I'm trying to think when that

12  happened.  It was over the weekend.

13           THE COURT:  Okay.

14           MR. SCHLICHTING:  I can't be more specific than

15  that.

16           THE COURT:  Did he inform you, if you can recall,

17  in the email, about any restrictions on what portion or

18  portions of it you could look at?

19           MR. SCHLICHTING:  I don't recall.  I mean, it was

20  sort of this email from an associate that I don't know very

21  well.

22           THE COURT:  So you don't recall him saying you can

23  look at this, but you can't look at this?  Anything like

24  that?

25           MR. SCHLICHTING:  Not really, no.

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Filed 08/06/18 Page 217 of 3826

173

1          THE COURT:  You don't remember any restrictions

2    being placed on that --

3          MR. SCHLICHTING:  No, I don't.

4          THE COURT:  -- as to what you could look at?

5          Okay.  It was a whole day's transcript, so it's

6    lot of pages.

7          MR. SCHLICHTING:  Yeah.

8          THE COURT:  Did you read them all?

9          MR. SCHLICHTING:  I did not.

10          THE COURT:  What portion or portions did you read?

11          MR. SCHLICHTING:  So the time between, when I got

12    the e-mail and when I got an email saying, don't read them,

13    was fairly short.  So I started down the path of trying to

14    figure out if I needed to read those first pages, which were

15    lot of proceedings.

16          So I was -- I sort of skimmed through and I looked

17    at certain pieces, but it was fairly short.

18          THE COURT:  Do you recall what pieces you looked

19    at?

20          MR. SCHLICHTING:  Well, I was actually --

21          THE COURT:  There were two opening arguments.

22          MR. SCHLICHTING:  Okay.

23          THE COURT:  Each went for about 45 minutes.

24          MR. SCHLICHTING:  Okay.

25          THE COURT:  And then there was a witness who

1  testified, both direct and cross-examination.

2          MR. SCHLICHTING:  Right.

3          THE COURT:  Let's start with the opening

4  arguments.  Do you remember skimming through those?

5          MR. SCHLICHTING:  Kind of.  I mean, it's like, you

6  know, generally, yeah.

7          THE COURT:  And how about the witness' testimony?

8  Do you remember the witness' name?

9          MR. SCHLICHTING:  So I remember the witness's

10  name, I think, Suzanne --

11          THE COURT:  Uh-huh.

12          MR. SCHLICHTING:  -- from Cox.

13          THE COURT:  Do you remember who she worked for?

14          MR. SCHLICHTING:  Cox.  Yeah.  She's a Cox.

15          It's a fairly small group.  So, you know,

16  frankly -- the group of people in the industry that

17  negotiate these deals.

18          THE COURT:  Yeah.

19          Do you know her?

20          MR. SCHLICHTING:  I don't.

21          THE COURT:  You don't.

22          MR. SCHLICHTING:  Which was, frankly, the biggest

23  takeaway.  I thought, wow, how could I not know somebody

24  doing this?  But anyway.

25          THE COURT:  Yeah.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1            MR. SCHLICHTING:  So I was eager to figure out

 2    what she had testified, and that's about when that email

 3    came in from Jeff.  And I go, okay, I'm out.

 4            THE COURT:  Wait a minute.  That's a third name.

 5    Jeff who?

 6            MR. SCHLICHTING:  Jeff Blum is on the -- is a

 7    Dish -- he's a Dish attorney.

 8            THE COURT:  Dish attorney.

 9            And he sent you an email.  Give me a rough

10    estimate how long between the email sending you the

11    transcript --

12            MR. SCHLICHTING:  Right.

13            THE COURT:  -- and then the e-mail from Mr. Blum.

14    Give a rough estimate.

15            MR. SCHLICHTING:  I don't know.  I'm going to

16    say --

17            THE COURT:  Same day.  The same day?

18            MR. SCHLICHTING:  Same day.  I'm guessing, same

19    day.

20            THE COURT:  Within an hour?

21            MR. SCHLICHTING:  Between the two emails, I think

22    there was probably more than an hour.  Between -- it took me

23    a while to -- you know, I said, I'll save that email; I came

24    back to it.

25            THE COURT:  Do you have your iPhone with you?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. SCHLICHTING:  It's in a locker.

2          THE COURT:  Does it have your email on it?

3          MR. SCHLICHTING:  It does, yeah.

4          THE COURT:  Your homework assignment, okay, will

5    be in a few minutes, to go get your email -- I mean, go get

6    your iPhone, because I want to know the times.

7          MR. SCHLICHTING:  The two email times?

8          THE COURT:  Those two emails.

9          MR. SCHLICHTING:  Yeah.

10         THE COURT:  Were there any other emails related to

11   this issue?

12         MR. SCHLICHTING:  I don't think so.

13         I shot back an email immediately saying, okay.

14         And the piece that -- I don't know if it's

15   relevant, but I started reading -- coincidentally, I started

16   reading late.  I'd saved that email.  And so for no

17   particular reason, I read, and Jeff's email came in -- those

18   were close together.  It wasn't choreographed.  It was just

19   coincidental that I had left it, you know, thought, oh, I'll

20   come back to that email.  And when I did, Jeff's email came

21   in.  And so I just --

22         THE COURT:  And his email apparently was --

23   correct me if I am wrong -- don't look at anything?

24         MR. SCHLICHTING:  Don't look at it.

25         THE COURT:  Don't look at it at all?

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 221 of 3826

177

1           MR. SCHLICHTING:  Don't read it.

2           THE COURT:  Did he indicate in it that it was a

3     mistake that you had gotten it or anything like that?

4           MR. SCHLICHTING:  I don't think so.  I mean, that

5     was my --

6           THE COURT:  Have you ever heard the expression of

7     the rule of witnesses?

8           MR. SCHLICHTING:  No.

9           THE COURT:  So going back to the transcript

10    itself, Suzanne's testimony, you looked at her direct exam?

11          MR. SCHLICHTING:  That was the intention.

12    I didn't really get to see --

13          THE COURT:  So you started looking at it?

14          MR. SCHLICHTING:  Yeah.  I wanted to get some --

15          THE COURT:  You didn't finish her.

16          MR. SCHLICHTING:  No.

17          THE COURT:  And how about the cross-examine?

18    Did you get into that at all?

19          MR. SCHLICHTING:  Oh, I'm sorry.  So the --

20          THE COURT:  The direct was done with by

21    Mr. Conrath.

22          MR. SCHLICHTING:  Uh-huh.

23          THE COURT:  The cross was done by Mr. Petrocelli.

24          MR. SCHLICHTING:  Okay.

25          THE COURT:  If that'll help you.

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

 1              Excuse me.  Excuse me.  That's right.  Scanlon did

 2      the direct.

 3              MR. PETROCELLI:  Scanlon.

 4              THE COURT:  Petrocelli did the cross, if that

 5      matters.  Excuse me.

 6              MR. SCHLICHTING:  So I saw bits of both, but I

 7      realized I was kind of spending too much time on the first

 8      part.  And what I was hoping to go to was the cross, and

 9      that's about the time that Jeff's email came in and said,

10      don't look.

11              THE COURT:  So your recollection is you didn't get

12      to the cross?  Am I understanding you correctly?

13              MR. SCHLICHTING:  I got to -- I literally was just

14      like getting there.  So --

15              THE COURT:  About to start it or something?

16              MR. SCHLICHTING:  Yeah.  So I don't know if

17      that --

18              THE COURT:  This happened on Saturday or Sunday?

19              MR. SCHLICHTING:  I'm trying to think when I was

20      actually reading that.

21              THE COURT:  At home?  Were you at home?

22              MR. SCHLICHTING:  I took the -- you know,

23      I apologize.  I cannot --

24              THE COURT:  That's okay.

25              Well, the emails will tell us.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. SCHLICHTING:  Yeah, they will.

2          THE COURT:  The emails will tell us all that.

3          MR. SCHLICHTING:  Yeah.

4          THE COURT:  So why don't you have someone from

5    your staff go down with him to make sure he doesn't have any

6    problems with the marshals.  Explain that he's under a

7    direction from the Court to get this information and to

8    bring it up so that he can report it back to the Court.

9          MR. CONRATH:  Do you want him to bring the cell

10   phone into court?

11         THE COURT:  That's fine.  That would be fine.

12   I have no objection to that.

13         MR. CONRATH:  Okay.

14         THE COURT:  It is evidence.

15         MR. SCHLICHTING:  Okay.

16         THE COURT:  Now, I'm directing you not to discuss

17   what we've just discussed with anyone.

18         MR. SCHLICHTING:  It's a deal.

19         THE COURT:  No one.  You need to be able to answer

20   under oath honestly that you've not discussed with it

21   anyone --

22         MR. SCHLICHTING:  Okay.

23         THE COURT:  Next time I see you.

24         MR. SCHLICHTING:  Okay.

25         THE COURT:  So if your lawyers want to talk to you

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   about it, tell them you're under direction from the Court to
 2   not discuss it.
 3            MR. SCHLICHTING:  Okay.
 4            THE COURT:  All right?  Stay independent of all
 5   others --
 6            MR. SCHLICHTING:  Okay.
 7            THE COURT:  -- until we sort of figure out exactly
 8   what happened here.
 9            MR. SCHLICHTING:  Okay.
10            THE COURT:  And then I'll be talking to them,
11   believe me, at some point, but that's a separate issue.
12   That's not your concern.
13            All right?  So we're going to take a little
14   timeout now.  You go down.
15            And have someone go with him.
16            MR. CONRATH:  Yeah.  It's right across the hall,
17   so it could be really fast.  It's where work room is, on an
18   elevator bank.
19            THE COURT:  Oh.  I thought it was down in
20   security.
21            MR. SCHLICHTING:  Actually, my phone is downstairs
22   in a locker.
23            MR. CONRATH:  Okay.
24            MR. SCHLICHTING:  Yeah.  Yeah.
25            THE COURT:  So he's going to need a few minutes.
```

1         MR. SCHLICHTING:  Yeah.

2         THE COURT:  Don't rush yourself.

3         MR. SCHLICHTING:  Okay.

4         THE COURT:  Believe me, we want to sort this out,

5    okay?

6         MR. SCHLICHTING:  All right.  Perfect.

7         THE COURT:  You can head down.  I'm going to keep

8    talking to them.

9         MR. SCHLICHTING:  To these two?  All right.

10        THE COURT:  You go right ahead.

11        Have someone on your team take him down.

12        (Pause)

13        THE COURT:  All right, Counsel.  We're going to

14   take a little recess, give each side a chance to digest a

15   little bit what's gone on, give a little more thought to any

16   suggestions or concerns you have.

17        He'll be back probably in 15 minutes.  My guess is

18   he won't be able to do it much quicker than that.  And we'll

19   see what this says.  My guess is he's got the e-mail still.

20   He'll be able to retrieve it.

21        Each side has to discuss it with its colleagues,

22   and then I'll obviously entertain any suggestions each side

23   has as to how to best proceed.  But at some point, I will be

24   having the Steptoe people come up here so that I can make

25   sure what their story is.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1              And then at some point, I will publicly

2    acknowledge that we have this issue and problem, and here's

3    what we're doing to deal with it.

4              So unless you've got something else right now that

5    you want to throw in or add --

6              MR. PETROCELLI:  No, Your Honor.

7              I just want to point out that he said he was eager

8    to read the cross.

9              THE COURT:  He did.  And he also said that he had

10   just started it -- at least my recollection of what he said

11   was --

12             MR. PETROCELLI:  He did say that.

13             THE COURT:  -- he had just started when he got

14   email No. 2.

15             MR. PETROCELLI:  I would like an opportunity to

16   examine him at the appropriate time on this subject.

17             THE COURT:  Okay.  Well, of course, as part of

18   your cross, you'll be able to do that --

19             MR. PETROCELLI:  Yes.

20             THE COURT:  -- assuming you're doing the cross.

21             MR. PETROCELLI:  I am doing it, yes.

22             THE COURT:  All right.  We'll see what the e-mails

23   say.

24             MR. CONRATH:  Sure.

25             THE COURT:  He can read them into the record, the

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   emails themselves --

2           MR. CONRATH:  Yeah.  Right.

3           THE COURT:  -- time, date, and all that stuff.

4           MR. CONRATH:  Sounds fine to me.

5           MR. PETROCELLI:  Thank you.

6           THE COURT:  Anything else you want to throw in?

7           MR. CONRATH:  Only direct me as to what I can

8   communicate to his lawyer.

9           THE COURT:  Well, his lawyer's aware, I assume, of

10  what we're talking about topic-wise.

11          MR. CONRATH:  Of course.

12          THE COURT:  Tell him that the Judge is trying to

13  get to the bottom of this situation.

14          He, at some point, will be asking his counsel

15  questions to see what his recollection of the events is

16  before he makes, well, and he would hear from counsel for

17  both sides as to any suggestions they have as to how to best

18  proceed, and then he'll make a decision and then announce

19  his decision.

20          MR. CONRATH:  Okay.  Very well.

21          I just didn't want to have a conversation that

22  wasn't --

23          THE COURT:  But you can also mention or reinforce

24  the fact that I directed his client not to discuss it with

25  him or anyone else.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
1              MR. CONRATH:  No.  Of course.  Thank you.

2              THE COURT:  Anything else, Counsel?

3              MR. PETROCELLI:  No.  Thank you.

4              (Open court)

5              THE COURT:  All right.  We'll stand in a brief

6    recess.

7              DEPUTY CLERK:  All rise.

8              This Court will now take a brief recess.

9              (Recess from 11:05 a.m. to 11:23 a.m.)

10             DEPUTY CLERK:  The United States District Court

11   for the District of Columbia is again in session, the

12   Honorable Richard J. Leon presiding.  God save the United

13   States and this Honorable Court.  Please be seated and come

14   to order.

15             Your Honor, re-calling Civil Action No. 17-2511,

16   the United States of America v. AT&T, Inc., et al.

17             (Sealed bench conference)

18             THE COURT:  Well, you found it.  All right.

19             MR. SCHLICHTING:  Yes, I did, yep.

20             THE COURT:  Let's start with the date and time.

21             MR. SCHLICHTING:  Okay.  Of the?

22             THE COURT:  The first one.

23             MR. SCHLICHTING:  The first email?

24             THE COURT:  Right.

25             MR. SCHLICHTING:  So it was Friday, on March 23rd.
```

1              THE COURT:  March 23rd.

2              MR. SCHLICHTING:  At 5:13.

3              THE COURT:  5:13 p.m.

4              MR. SCHLICHTING:  From Andrew Golodny, so that's

5    the name that --

6              THE COURT:  Andrew G.  I got his name right here.

7              MR. SCHLICHTING:  And then Jeff Blum's email was

8    at --

9              THE COURT:  Hold on now.

10             MR. SCHLICHTING:  Oh, sorry.

11             THE COURT:  As to that particular one, what's the

12   message prior to the attachment?

13             MR. SCHLICHTING:  So it says, "Attached please

14   find the transcript of yesterday's afternoon court session.

15   The transcript includes the direct and cross-exam and

16   redirect of Suzanne Fenwick, Cox vice chairman of content

17   acquisition.

18             AT&T's lawyer, Petrocelli, conducted the cross.

19   We have highlighted some of the questions in yellow on the

20   transcript.  Cross-exam appears on numbered page 114.

21   Here's a summary of the topics discussed.

22             I can let you look at the summary if you like.

23             THE COURT:  All right.  I want this email with the

24   attachment forwarded to Mr. Conrath's email so that we can

25   print it out from your war room, okay?

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 230 of 3826

186

 1                MR. CONRATH:  Yes.

 2                THE COURT:  The transcript itself, the one that's

 3    highlighted, where's that located right now?

 4                MR. SCHLICHTING:  So --

 5                THE COURT:  Is it out in your war room out there?

 6                MR. SCHLICHTING:  It was never printed.

 7                I mean, I didn't print it, so it would appear as

 8    an attachment.

 9                MR. CONRATH:  So if he forwards that to me, I can

10    print it.

11                THE COURT:  Okay.

12                And, presumably, it has -- do you remember seeing

13    any highlights on questions?

14                MR. SCHLICHTING:  I don't.  That was where I was

15    actually saying, I want to get to --

16                THE COURT:  To the highlights?

17                MR. SCHLICHTING:  -- the good stuff.  Yeah.

18                THE COURT:  That you never got to?

19                MR. SCHLICHTING:  Right.

20                The email actually from --

21                THE COURT:  Come on now.  We're doing the first

22    one first.

23                Is there anything else that's on there?  You were

24    about to say there's a summary.

25                MR. SCHLICHTING:  There was a list of -- let's

1   just see the rest of it.  It's a long email.

2            THE COURT:  So we're going to print that out, and

3   we'll take a look at that.

4            Other than that summary, is there any, like,

5   closing remark or something like that?

6            MR. SCHLICHTING:  No.

7            THE COURT:  No?

8            And that was at 5:13 p.m.

9            Okay.  Now, the next email, No. 2, was at what

10  time?

11           MR. SCHLICHTING:  That was --

12           THE COURT:  Or what day and what time?

13           MR. SCHLICHTING:  Same -- same day, March 23rd, at

14  6:25 p.m.

15           THE COURT:  6:25 p.m.

16           And that was from Mr., you said, Blum?

17           MR. SCHLICHTING:  Jeffrey Blum, B-l-u-m.

18           THE COURT:  Remind he who he is again.  He's in

19  the general counsel's office?

20           MR. SCHLICHTING:  He's a Dish attorney.

21           THE COURT:  Is he in-house or is he a law firm?

22           MR. SCHLICHTING:  He's in-house.

23           THE COURT:  In-house.

24           MR. SCHLICHTING:  And he is titled -- you know,

25  I'm not sure.

 1          MR. PETROCELLI:  He's senior vice president and

 2   deputy general counsel.

 3          MR. SCHLICHTING:  Perfect.  Thank you.

 4          THE COURT:  And why don't you -- is this a long

 5   one or a short one?

 6          MR. SCHLICHTING:  From Jeff?

 7          THE COURT:  Yeah.

 8          MR. SCHLICHTING:  Oh, short.

 9          THE COURT:  Why don't you read that into the

10   record.

11          MR. SCHLICHTING:  Warren, comma, please do not --

12   "not" is in all caps -- review this.

13          THE COURT:  All right.  And that was it?  That was

14   the whole thing?

15          MR. SCHLICHTING:  That was it.

16          THE COURT:  And then you said you shot him an

17   email back?

18          MR. SCHLICHTING:  Then I sent an email back at

19   6:47.

20          THE COURT:  6:47 p.m.

21          Same day, obviously?

22          MR. SCHLICHTING:  Same day.

23          And I said, okay.

24          THE COURT:  That was --

25          MR. SCHLICHTING:  That was it.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

189

```
 1              THE COURT:  All right.  I want you to print out
 2    all three -- forward all three of those to Mr. Conrath so he
 3    can print them out on his printer in his war room over
 4    there.
 5              MR. SCHLICHTING:  Okay.
 6              THE COURT:  Were there any other emails --
 7              MR. SCHLICHTING:  No.
 8              THE COURT:  -- in the next two days, whatever,
 9    since then --
10              MR. SCHLICHTING:  No.
11              THE COURT:  -- about this topic?
12              MR. SCHLICHTING:  No.
13              THE COURT:  Okay.
14              So correct me if I am wrong, or I misunderstood
15    you:  You started to look at the cross-examination, but you
16    didn't --
17              MR. SCHLICHTING:  I got right up to the edge.
18    I realized I had spent too much time on the --
19              THE COURT:  Opening arguments?
20              MR. SCHLICHTING:  The Conrath, wherever that
21    appears.
22              THE COURT:  That's this guy over here.
23              MR. SCHLICHTING:  Yeah.  Exactly.
24              So the way, when you do your email, the things
25    come in and distract you.  Well, the one from Blum comes in.
```

Case 1:17-cv-02511-RJL  ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***  Document 158  Filed 08/06/18  Page 234 of 3826

190

1    And I go, oh, heck, so I shut it down.  So --

2         THE COURT:  So you never got to the highlighted

3    questions, if I understand you correctly?

4         MR. SCHLICHTING:  I was literally on the edge of

5    the diving board with the highlight, and had I gotten the

6    email from Jeff.

7         MR. PETROCELLI:  Can I ask a question, Your Honor?

8         THE COURT:  You may.

9         MR. PETROCELLI:  Does the text of the email

10   contain any -- did you read the whole email?

11        MR. SCHLICHTING:  The email that describes -- it's

12   fairly factual.  It doesn't have any goods or bads.  You'd

13   be able to see it.  But, you know, prior discussion about

14   the merger testimony.

15        THE COURT:  Well, I think at this point, we're

16   going to get these printed out.

17        MR. PETROCELLI:  Yeah, okay.

18        THE COURT:  We're going to give a copy to

19   Mr. Conrath obviously.  We'll give a copy to Mr. Petrocelli

20   and to the Court.  We're all going to take a look at that.

21        In the meantime, I'm going to talk to the lawyers

22   representing you --

23        MR. SCHLICHTING:  Okay.

24        THE COURT:  -- okay?

25        So you can go back to the witness room, wherever

1    you were, and just chill.

2              MR. SCHLICHTING:  Hang out?

3              MR. PETROCELLI:  Your Honor, may I?

4              Can he also present the attachment, which is the

5    highlighted transcript?

6              THE COURT:  Oh, yes.  Well, he's going to forward

7    it with attachment.

8              MR. CONRATH:  I will print it.

9              MR. SCHLICHTING:  What's your email address?

10   I'll do it right now.

11             THE COURT:  Okay.

12             Now, I'm going to -- you're under continued

13   direction from the Court not to discuss what we've been

14   discussing up here with anyone.

15             MR. SCHLICHTING:  Sure.

16             THE COURT:  Okay?

17             MR. SCHLICHTING:  That's fine.

18             THE COURT:  Okay.

19             And probably by the next time I see you, I will

20   have had a chance to review this stuff.  I just haven't seen

21   it yet.

22             MR. SCHLICHTING:  Okay.  All right.

23             THE COURT:  You can just go back and relax.

24             MR. SCHLICHTING:  Good.  I don't have any email

25   with me, so...

```
 1              Okay.  So I'll send you the --

 2              MR. CONRATH:  Send me all three.

 3              THE COURT:  All three.

 4              And the one with attachments.

 5              MR. SCHLICHTING:  I've sent you the thread so you

 6    have all three.

 7              Let me get the other one just so we're doing it in

 8    realtime here.

 9              MR. CONRATH:  It's probably superior if you send

10    each -- it's a good idea to do the thread but better to send

11    me all three as they came to you.

12              MR. SCHLICHTING:  Okay.  You'd like them

13    separated?

14              THE COURT:  Yeah.

15              MR. SCHLICHTING:  I'm happy to do that.  Okay.

16              All right.  Should I continue here?

17              THE COURT:  You can go back to the room.

18              MR. SCHLICHTING:  All right.  Thanks.

19              THE COURT:  And then we're going to talk to your

20    counsel.

21              You're excused.

22              MR. SCHLICHTING:  Okay.  Thanks.

23              MR. MICHALOPOULOS:  Good morning, Your Honor.

24              THE COURT:  Mr. Michalopoulos, this is what you

25    need to speak into.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

193

```
 1              MR. MICHALOPOULOS:  I'm sorry?

 2              MR. CONRATH:  If I'm going to get those emails

 3    printed --

 4              THE COURT:  Your team can print it for you.

 5    Do you have someone on your team who can go back to the

 6    printer?

 7              MR. CONRATH:  Yeah.  Not until I tell them to go

 8    print.

 9              THE COURT:  Okay.  Go ahead.

10              MR. CONRATH:  May I excuse myself to do that?

11              THE COURT:  Yeah, take a minute.

12              We're just taking a timeout here.

13              (Pause)

14              MR. CONRATH:  Sorry for the time, Your Honor.

15              THE COURT:  All right.

16              MR. CONRATH:  Gave my email information to my

17    colleague.  They'll print them and bring them in.

18              THE COURT:  So, Mr. Michalopoulos, you should

19    consider yourself under oath.

20              MR. MICHALOPOULOS:  (Nodding head.)

21              Of course.  Yes, Your Honor.

22              THE COURT:  The answers that you give to the Court

23    are considered as if you were under oath.

24              MR. MICHALOPOULOS:  Of course.

25              THE COURT:  Now, it's my understanding that an
```

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Filed 08/06/18 Page 238 of 3826

194

```
 1   attorney working in your law firm under your supervision, a

 2   Mr. Golodny, on Friday afternoon, or evening, I should say,

 3   sent an email to the witness in this case, Mr. Schlichting,

 4   with an attachment in the form of a transcript of the

 5   testimony that took place on Thursday and that -- I have not

 6   seen the email yet, but my understanding is that the email

 7   is such -- he read me portions of it, that the transcript

 8   had been highlighted in certain locations --

 9            MR. MICHALOPOULOS:  (Nodding head.)

10            THE COURT:  -- and he was being directed to look

11   at, review the highlighting of the transcript with regard to

12   certain portions of it, I think, both direct and cross, but

13   it might have been just the cross.  I'm not sure because

14   I haven't seen it.

15            Did he do that at your direction?

16            MR. MICHALOPOULOS:  He did that against my

17   specific direction.

18            So here's how the facts unfolded.

19            On Wednesday, we were discussing those matters

20   regarding the transcripts, and I had specifically issued

21   direction that we should not provide the witness with a

22   transcript of the testimony that was going to be received by

23   this Court on Thursday.

24            By the time that this email was sent --

25            THE COURT:  You told Mr. Golodny this personally?
```

1          MR. MICHALOPOULOS:  I told -- Mr. Golodny was in

2     the room, and I told a group of people, including

3     Mr. Golodny --

4          THE COURT:  A group of lawyers.

5          MR. MICHALOPOULOS:  -- and my junior partner,

6     Ms. Roy.

7          And so I see this email when I was at the airport

8     trying to fly from someplace to some other place.

9          THE COURT:  Hold on now.  Slow down.

10          MR. MICHALOPOULOS:  Yes.

11          THE COURT:  So this was on Wednesday --

12          MR. MICHALOPOULOS:  This was on Wednesday.

13          THE COURT:  -- that you directed the team members,

14     including Mr. Golodny, that the transcript should not be

15     provided.

16          MR. MICHALOPOULOS:  Correct.

17          THE COURT:  You ordered the transcript --

18          MR. MICHALOPOULOS:  Yes.

19          THE COURT:  -- for your counsel, for yourself.

20          MR. MICHALOPOULOS:  Of course.

21          THE COURT:  Okay.

22          MR. MICHALOPOULOS:  Yes, sir.

23          THE COURT:  Okay.  And so you were flying from

24     some location, doesn't matter where, to back to Washington?

25          MR. MICHALOPOULOS:  No.  I was trying to go from

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   Washington to Switzerland.  That didn't happen.

2           THE COURT:  Okay.

3           MR. MICHALOPOULOS:  But while I was screaming at

4   Delta Air Lines, I saw the email.

5           THE COURT:  So he cc'ed you on the email?

6           MR. MICHALOPOULOS:  Yes, I was cc'ed on the email.

7           THE COURT:  Do you know who else was cc'ed on the

8   email?  I mean, we're going to get it.  I just don't have it

9   right now.

10          MR. MICHALOPOULOS:  Yeah.  It was Ms. Roy and one

11  or two clients' counsel.

12          THE COURT:  So like Mr. Blum, for example?

13          MR. MICHALOPOULOS:  Mr. Blum, Ms. Minea,

14  Ms. Kogan.

15          THE COURT:  Who's that last name?

16          MR. MICHALOPOULOS:  Ms. Minea.

17          THE COURT:  How do you spell that?

18          MR. MICHALOPOULOS:  M-i-n-e-a.

19          And Ms. Kogan, I believe.  Of course, as you say,

20  we'll confirm.

21          THE COURT:  We're going to get it.

22          MR. MICHALOPOULOS:  The first thing I did was to

23  call Andy and asked why he had sent it.  And Andy told me,

24  I was being very careful because I remembered your

25  directions.  And so I resorted to Stephanie Roy with my

1    absence.

2            And, by the way, the plan was that I would be

3    absent from this hearing because I have longstanding plans.

4            THE COURT:  To be in Switzerland?

5            MR. MICHALOPOULOS:  To go to Switzerland and that

6    somebody else was managing.  And he had gotten two specific

7    instructions from Ms. Roy, authorizations to send that

8    transcript.

9            THE COURT:  I'm confused.

10           MR. MICHALOPOULOS:  Yeah.

11           THE COURT:  So you called Andy.  Do you know what

12   time it was that you called him, roughly?

13           MR. MICHALOPOULOS:  It was in the early afternoon,

14   as soon as I saw the email.

15           THE COURT:  How long after you got the e-mail?

16   Did you see it right at 5:13?

17           MR. MICHALOPOULOS:  Was the email at 5:13?

18           THE COURT:  5:13 p.m., according to him.

19           MR. MICHALOPOULOS:  I have the impression that

20   it was earlier.  But --

21           So -- so --

22           THE COURT:  You can check your cell phone.

23           MR. MICHALOPOULOS:  I'll check and I'll show you

24   the email that I then sent to Stephanie --

25           THE COURT:  I want you to print it.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

198

```
 1              MR. MICHALOPOULOS:  -- after this conversation.

 2              THE COURT:  I want you to print that out too.

 3         Stephanie Roy, right?

 4              MR. MICHALOPOULOS:  Yeah.

 5         And so I spoke with Andy Golodny.

 6         And then after that --

 7              THE COURT:  Now, what did he say to you, that he

 8    got --

 9              MR. MICHALOPOULOS:  That he was authorized by

10    Stephanie Roy.

11         So I then emailed Stephanie Roy.  And I will find

12    that email here.

13         Stephanie -- and she was acting totally in good

14    faith.  She said to me, I forgot your direction.  Sorry.

15    I authorized this.

16              THE COURT:  Okay.

17              MR. MICHALOPOULOS:  And then I sent --

18              THE COURT:  Do you know what -- you don't know how

19    much time had elapsed between the email that was sent and

20    your phone call to her?

21         The email is at 5:13.

22              MR. MICHALOPOULOS:  The email from Andy?

23              THE COURT:  From Andy to --

24              MR. MICHALOPOULOS:  And I will find the timing of

25    my email to her.
```

1          THE COURT:  Okay.

2          So the call preceded your email, obviously?

3          MR. MICHALOPOULOS:  Of course.

4          All right.  So the email from Mr. Golodny was,

5    indeed, sent at 5:12:32.

6          THE COURT:  5:12.

7          MR. MICHALOPOULOS:  And then my call to

8    Mr. Golodny followed.

9          Then at 6:40 --

10         THE COURT:  Six what?

11         MR. MICHALOPOULOS:  6:40.

12         THE COURT:  Four-zero?

13         MR. MICHALOPOULOS:  Four-zero.

14         THE COURT:  You sent an email?

15         MR. MICHALOPOULOS:  To Ms. Roy.

16         THE COURT:  So you sent an email at 6:40?

17         MR. MICHALOPOULOS:  Yeah.

18         So, again, I didn't see the email at 5:12 because

19   of my tumultuous stay at the airport.  But as soon as I saw

20   it, I called Mr. Golodny.

21         My email to Ms. Roy happened at 6:40.  It says,

22   I had suggested holding back on sending transcripts?

23         Those are my -- and the response was, Sorry.

24   I authorized.  Forgot the conversation and was thinking

25   about the coming weekend prep.

1            THE COURT:  So I want you to forward your email to

2    Golodny, excuse me, to Stephanie Roy --

3            MR. MICHALOPOULOS:  Yeah.

4            THE COURT:  Did you send an email to Golodny?

5    I can't remember.

6            MR. MICHALOPOULOS:  No.  I spoke with him.  Yeah.

7            THE COURT:  I want you to forward your email to

8    Mr. Conrath to Stephanie Roy and her email back to you --

9            MR. MICHALOPOULOS:  Yeah.

10           THE COURT:  -- to Mr. Conrath, because he has a

11   printer.  He's going to print that out.

12           MR. MICHALOPOULOS:  Yeah.

13           THE COURT:  Or any other emails that relate

14   directly to this issue.

15           MR. MICHALOPOULOS:  Yeah.  There's an email where

16   I wrote to the client and I said, I apologize.  I still

17   don't know how this happened.

18           THE COURT:  What time would that have been?

19           MR. MICHALOPOULOS:  After this correspondence,

20   right after.

21           THE COURT:  The same day?

22           MR. MICHALOPOULOS:  Oh, yeah, yeah.  A few minutes

23   after.

24           THE COURT:  Okay.  So send that one also to

25   Mr. Conrath.

```
 1              MR. MICHALOPOULOS:  All right.

 2              THE COURT:  Now, how much -- what's your best

 3    recollection of how much time elapsed between your speaking

 4    to Mr. Golodny and your sending that email at 6:40 to

 5    Ms. Roy?

 6              MR. MICHALOPOULOS:  Minutes.

 7              THE COURT:  So if I understand the situation

 8    correctly, you probably didn't see the 5:13 email from

 9    Golodny until somewhere around 6:30-something or something

10    like that?

11              MR. MICHALOPOULOS:  No -- yeah, perhaps, yeah.

12              THE COURT:  Because --

13              MR. MICHALOPOULOS:  Yeah.

14              THE COURT:  -- if it was just minutes after you --

15              MR. MICHALOPOULOS:  Yeah, yeah.

16              THE COURT:  How long a conversation did you have

17    with him, a couple minutes?

18              MR. MICHALOPOULOS:  Yes.  Very brief one.

19              MR. PETROCELLI:  Can I ask a question, Your Honor?

20              Where was Mr. Blum located when you sent him the

21    email, was he sitting?

22              MR. MICHALOPOULOS:  Here in Washington, D.C.

23              MR. PETROCELLI:  Mr. Blum was?

24              MR. MICHALOPOULOS:  Yeah.

25              MR. PETROCELLI:  And so was Mr. Schlichting?
```

1    Were they all in Washington?

2          MR. MICHALOPOULOS:  No, I don't think

3    Mr. Schlichting was in Washington.

4          MR. PETROCELLI:  Was he in Denver?

5          MR. MICHALOPOULOS:  He was.  No.  He was traveling

6    on the East Coast, but he was not in Washington.

7          MR. PETROCELLI:  You don't know where he was?

8    Yeah.

9          There may have an issue with the time zone here,

10   Your Honor.

11         MR. MICHALOPOULOS:  There was no different -- no.

12         MR. PETROCELLI:  In terms of Mr. Schlichting's

13   6:25 email from Mr. Blum saying, please do not review.

14         I just -- we'll see in the emails whether they're

15   all in the same time zone.

16         THE COURT:  Exactly.

17         MR. MICHALOPOULOS:  They were all in the same time

18   zone.

19         And meanwhile, of course, there had been the email

20   from Mr. Blum to Mr. Schlichting saying, do not read.

21         THE COURT:  Right.  That was that one was at

22   6:25 p.m., and I'm assuming East Coast time for the moment.

23         MR. PETROCELLI:  Do you know how Mr. Blum learned

24   that the transcript had been sent to --

25         MR. MICHALOPOULOS:  He was copied.

```
 1              MR. PETROCELLI:  He was copied.

 2              THE COURT:  He was copied on the Golodny email --

 3              MR. MICHALOPOULOS:  Correct.

 4              THE COURT:  -- at 5:13 p.m. Eastern time.

 5              Okay.  Now, this Stephanie Roy, is she here in the

 6    courtroom?

 7              MR. MICHALOPOULOS:  She's here.

 8              THE COURT:  She's here.  Okay.

 9              So I'd like to speak to her.

10              MR. MICHALOPOULOS:  Okay.

11              Again, our profuse apologies as a firm for this

12    huge distraction.

13              THE COURT:  Very good.

14              Oh, and I don't want you discussing our

15    conversation up here with anyone at this time --

16              MR. MICHALOPOULOS:  Yeah, of course.

17              THE COURT:  -- including your witness.

18              MR. MICHALOPOULOS:  Yeah.

19              THE COURT:  I told him not to discuss with anyone.

20              MR. MICHALOPOULOS:  Yeah, yeah.  So I'll summon

21    Stephanie.

22              THE COURT:  Yeah.  Have her come up.

23              MR. CONRATH:  I'm going to accompany him to get

24    the email printed process.

25              (Pause)
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MS. ROY:  Yes, Your Honor.

 2              THE COURT:  Hi.  You're Ms. Roy?

 3              MS. ROY:  I'm okay.

 4              THE COURT:  You are?

 5              MS. ROY:  I'm nervous.

 6              THE COURT:  You're Ms. Roy?

 7              MS. ROY:  Yes, I am.  Yes.

 8              THE COURT:  And you're a partner at Steptoe?

 9              MS. ROY:  I am.

10              THE COURT:  And you're working on this matter with

11    Mr. --

12              MS. ROY:  Michalopoulos.

13              THE COURT:  -- Michalopoulos?

14              MS. ROY:  Yes, I am.

15              THE COURT:  Very good.

16              Now, it's my understanding -- you should treat

17    this conversation as if you're under oath.

18              MS. ROY:  Yes.

19              THE COURT:  That's how I'm treating it.  Consider

20    yourself under oath.

21              My understanding is that at 5:13 on Friday

22    afternoon, Mr. Golodny, who's an associate in your law firm

23    who was operating under your direction --

24              MS. ROY:  Yes, Your Honor.

25              THE COURT:  -- forwarded a copy of the transcript
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 249 of 3826

205

1   of the testimony in this case from Thursday to

2   Mr. Schlichting; is that correct?

3           MS. ROY:  That's correct.  Yeah.

4           THE COURT:  And I haven't seen it yet, although I

5   will be seeing it shortly.  I understand the attachment, the

6   transcript that was attached had certain questions and

7   answers highlighted for his review, that he was being

8   basically directed to take a look at things that were

9   highlighted in it.

10          MS. ROY:  Yes, Your Honor.

11          THE COURT:  Were you aware of that highlighting

12  that was going on?

13          MS. ROY:  Yes, Your Honor.

14          THE COURT:  And it was being sent by Mr. Golodny

15  at your direction; is that correct?

16          MS. ROY:  That's correct, Your Honor.

17          THE COURT:  And were you familiar with the rule

18  against witnesses in this Court's proceedings?

19          MS. ROY:  I understood that once the witness

20  started to testify, we were not to discuss the case and the

21  matter with the witness until the conclusion of the

22  testimony.

23          I was not aware of any restriction on transcript,

24  reading the transcript of -- that had proceeded.  And if

25  that's error --

1          THE COURT:  Well, the rule against witnesses has a

2     couple of components to it.  One of the components is that

3     witnesses are not permitted to observe any other witnesses'

4     testimony.

5          MS. ROY:  Yes, Your Honor.

6          THE COURT:  They're not permitted to be in the

7     courtroom to hear other witnesses' testimony, direct and

8     cross-examination.

9          So I think it would follow logically, if you think

10    about it, that they're not permitted to see a transcript of

11    the testimony either, because that would give them some

12    potential unfair advantage as a witness in the case.

13         MS. ROY:  Okay.

14         THE COURT:  So the actual providing of the

15    transcript, although it's not generally addressed in the

16    rule against witnesses, it's a logical extension of the rule

17    against witnesses that you do not provide a copy of the

18    transcript to the witness.

19         MS. ROY:  Okay.

20         THE COURT:  So now, Mr. Golodny probably hasn't

21    been in court at all, but you have been, have you not?

22         MS. ROY:  No, I have not, Your Honor.

23         THE COURT:  So this is the first time you have

24    been in court in this case?

25         MS. ROY:  Yes, Your Honor.  I am a regulatory

1    attorney --

2              THE COURT:  I see.

3              MS. ROY:  -- here because familiarity with my

4    client's business over ten years of practice with them,

5    and --

6              THE COURT:  Your practice is on what's

7    confidential?  What might be in his testimony that's

8    confidential, is that what you're focusing on?

9              MS. ROY:  Yes.

10             And my role in preparing him in terms of

11   I understand the industry, and so I understand what he's

12   saying and so can help kind of translate that for --

13             THE COURT:  Now, had Mr. Michalopoulos given any

14   direction about the transcript being provided to the witness

15   in advance of his testimony?  One way or the other?

16             MS. ROY:  All right.

17             He -- I think we had a conversation, although

18   I don't recall it very well, about holding off on not

19   providing the transcript.  But I don't -- he reminded me of

20   the conversation after I sent it, but I had not recalled it

21   at the time that I sent it.

22             THE COURT:  I see.

23             MS. ROY:  And I still don't quite recall it, but

24   there was a lot going on.

25             THE COURT:  So you don't have the clear

1   recollection of him telling you that the transcript should

2   not be provided to the witness?

3           MS. ROY:  No, Your Honor.

4           THE COURT:  But he did tell you after the fact --

5           MS. ROY:  That's correct.

6           THE COURT:  -- that he had told you that.  And

7   did you acknowledge that that was what he told you?

8           MS. ROY:  If he said he told me that, then he told

9   me that.

10          THE COURT:  You sent him an email, right?

11          MS. ROY:  I don't recall sending him an e-mail.

12          THE COURT:  How did you learn about the problem on

13  Friday afternoon?

14          MS. ROY:  Oh, Jeffrey Blum, who is counsel, inside

15  counsel for Dish --

16          THE COURT:  Right.

17          MS. ROY:  -- replied all, "Warren, do not review

18  this."

19          THE COURT:  I see.

20          That was at 6:25.

21          I'm not sure -- I think it was Eastern Standard,

22  but it might have been --

23          MS. ROY:  It's Eastern Daylight now, Your Honor.

24          THE COURT:  Eastern Daylight time.

25          So when Blum sent that email at 6:25 p.m., you saw

1    it?

2              MS. ROY:  Yes, I did, Your Honor.

3              THE COURT:  And what did you do in response to

4    seeing it, if you remember?

5              MS. ROY:  I remember I almost immediately shortly

6    thereafter saw Warren's reply email to that, saying,

7    "Okay" --

8              THE COURT:  Okay.

9              MS. ROY:  -- although I do understand he read some

10   portion of it before that.

11             THE COURT:  Uh-huh.

12             MS. ROY:  I believe I may have emailed Pantelis

13   and Andy, Mr. Golodny, saying, I didn't under -- that there

14   was no order about -- I didn't understand that that was

15   restricted.

16             THE COURT:  Do you remember getting an email from

17   Mr. Michalopoulos?

18             MS. ROY:  Yes.  Mr. Pantelis --

19   Mr. Michalopoulos -- Pantelis, emailed me back, I thought I

20   said we should hold off on sending the transcript.

21             That's when I said, I didn't recall that

22   conversation.

23             THE COURT:  And you responded to him?

24             MS. ROY:  I don't recall if I responded on email

25   or telephone call, Your Honor.

```
 1                    THE COURT:  I'd like you to look at your email --

 2                    MS. ROY:  Okay.

 3                    THE COURT:  -- and -- regarding this series of

 4          events?

 5                    MS. ROY:  Okay.

 6                    THE COURT:  Do you have it with you?

 7                    MS. ROY:  I have it turned off in my purse.

 8                    THE COURT:  All right.

 9                    So why don't you go get your cell phone.

10                    MS. ROY:  Okay.

11                    THE COURT:  And then we'll come back and we'll

12          take a look at the sequence of emails.

13                    MS. ROY:  Okay.

14                    THE COURT:  Go ahead.

15                    (Pause)

16                    THE COURT:  Let's take a look at that time frame,

17          Friday afternoon and see Andy's at 5:13 that you were copied

18          on.

19                    MS. ROY:  I'm sorry.  It's still powering on.

20                    THE COURT:  Oh, I see.

21                    Hold on.  Wait till he gets back.

22                    MS. ROY:  Oh, sorry.

23                    THE COURT:  All right.  What have you located?

24          Have you got the Andy's at 5:13?

25                    MS. ROY:  Yes.  I have the initial email here.
```

1          THE COURT:  Okay.  You've got a copy of that,

2   right?

3          MS. ROY:  Yes.

4          THE COURT:  All right.

5          MS. ROY:  Here.

6          THE COURT:  So that was at 5:13 p.m.

7          MS. ROY:  5:12:32.  5:12:32, it says to me.

8          THE COURT:  5:12.

9          All right.  So what's the next one in sequence

10  that relates to these issues?

11         MS. ROY:  Well, on this chain, from -- back to --

12  so intervening here would be Mr. Blum's email and Warren's

13  response to that.

14         THE COURT:  6:25, go ahead.

15         MS. ROY:  But it's a different chain.  Do want me

16  to pull that up?

17         THE COURT:  Yeah, go ahead.  Show me what you got.

18         MS. ROY:  That's Andy's original email, 6:25,

19  Mr. Blum to Warren:  "Please do not review this."

20         And 6:47, Warren's response:  "Okay."

21         And then separately --

22         THE COURT:  One at 6:40 from Mr. Michalopoulos?

23         MS. ROY:  Yes, correct.  Correct.

24         THE COURT:  What's that one say?

25         MS. ROY:  Said, "I had suggested holding back on

1    sending transcripts."

2             THE COURT:  That's his email to you?

3             MS. ROY:  Correct.

4             MR. PETROCELLI:  Suggested?  Is that what it says?

5             THE COURT:  Read it as exactly as it says.

6             MS. ROY:  "I had suggested holding back on sending

7    transcripts."

8             THE COURT:  There's not a question mark at the end

9    of that, is there, or an exclamation point?  It's just a

10   period, right?

11            MS. ROY:  There's a question mark.

12            THE COURT:  There's a question mark.

13            I had suggested.

14            So they put a question mark in there.  I had

15   suggested, all right?

16            All right.  Now, go ahead to the next one.

17            That was at 6:40.  What's the next one?  So the

18   next one would have been --

19            MS. ROY:  Mine is at 7:35.

20            THE COURT:  All right.

21            MS. ROY:  "Sorry.  I authorized.  Forgot our

22   conversation and was thinking about the coming weekend

23   prep."

24            THE COURT:  All right.

25            MS. ROY:  That is --

1            THE COURT:  That was at 7:40?

2            MS. ROY:  Yes.

3            7:35 --

4            THE COURT:  7:35.

5            MS. ROY:  -- is what I have.

6            That is -- yes.  This is Pantelis's soft way of

7    saying, I told you to hold back on sending the transcripts.

8    This Pantelis's soft way of saying, I told you to hold back

9    on sending transcripts --

10           THE COURT:  So when he --

11           MS. ROY:  -- okay, stylistically.

12           THE COURT:  So when he says --

13           MS. ROY:  We discussed sending transcripts.  Why

14   are you sending transcripts?

15           THE COURT:  Right.

16           But the way he worded it was, I suggested -- is

17   that the word?

18           MS. ROY:  That's correct.

19           "I had suggested holding back on sending

20   transcripts."

21           THE COURT:  So your interpretation of that is that

22   was a soft way of saying --

23           MS. ROY:  Correct.

24           THE COURT:  -- I had said to?

25           MS. ROY:  Correct.

1          THE COURT:  Is that your recollection?

2          MS. ROY:  Correct.

3          THE COURT:  Now, is there anything after the 7:35?

4          MS. ROY:  8:25 email from Pantelis back to me that

5     says, "Okay."

6          I was letting him know that I sent -- I'm sorry --

7     well, 7:35, we talked about that.

8          THE COURT:  All right.

9          MS. ROY:  I wanted to make sure that he knew that

10    I had authorized Andy to send them.

11         THE COURT:  All right.

12         So I'd like you to make a forward of those emails

13    that we just went over to Mr. Conrath.  He'll give you

14    his -- I have one other question.

15         MS. ROY:  Yes, sir.

16         THE COURT:  When Mr. Golodny was tasked with going

17    over the transcript, who gave him directions as to what to

18    review, what questions to highlight?  Who was giving him

19    directions on that?

20         MS. ROY:  He was exercising his discretion as to

21    what would be interesting, stylistically, and general

22    topics, given what we were --

23         THE COURT:  Concerned about?

24         MS. ROY:  -- concerned about and the information

25    that we were thinking would come out.

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 259 of 3826

215

1          THE COURT:  Okay.

2          And was there any input from anyone outside of

3   Steptoe & Johnson or the in-house attorneys at Dish --

4          MS. ROY:  No, sir.

5          THE COURT:  -- about any of these issues?

6          MS. ROY:  No, sir.

7          THE COURT:  No one from the Justice Department had

8   contacted you --

9          MS. ROY:  No, sir.

10          THE COURT:  -- about how to prepare this witness

11  in any way?

12          MS. ROY:  No, sir.

13          THE COURT:  And I haven't seen it yet; but

14  I understand his email, Mr. Golodny's email, has, like, a

15  summary of items.

16          MS. ROY:  That's correct.

17          THE COURT:  Did you review those before it was

18  mailed out to Mr. Schlichting.

19          MS. ROY:  Schlichting.

20          I don't recall.  I didn't make any edits.

21          I believe, if he had -- if he showed it to me

22  beforehand, I would give it a glance and say, that's what

23  I'm looking for, and told him to send.

24          THE COURT:  And if you take a look at that 5:12

25  email, the Andy email, who's being cc'ed on that.  Remind me

```
 1   again.

 2           MS. ROY:  Mr. Schlichting; Jeffrey Blum, head of

 3   regulatory for Dish; Hadass Kogan, regulatory counsel for

 4   Dish; Alison Minea, regulatory counsel for Dish; Pantelis;

 5   and myself.

 6           THE COURT:  Okay.

 7           So from your firm, just you and Golodny -- well,

 8   obviously, Mr. Golodny is sending it -- you and Pantelis?

 9           MS. ROY:  Correct.

10           THE COURT:  Any questions?

11           MS. ROY:  Your email doesn't come up on my thing.

12   I was -- I forwarded it to Melanie.

13           THE COURT:  He'll give it to you in a minute.

14           Do you have any questions, Mr. Petrocelli?

15           MR. PETROCELLI:  Well, did you indicate that the

16   Department of Justice was not involved at all in preparing

17   Mr. Schlichting, did not meet with him or discuss his

18   preparations for the counsel?

19           MS. ROY:  No, I didn't -- I didn't suggest that.

20   The Department of Justice did meet with Mr. Schlichting as

21   he -- I mean, but it was before and after the deposition.

22           THE COURT:  I was just asking about these emails,

23   whether they had any involvement in --

24           MR. PETROCELLI:  I'll wait to see the emails,

25   Your Honor.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1              MS. ROY:  I forwarded them to Melanie.

 2              THE COURT:  You're going to do that over there off

 3   the record, okay?

 4              MS. ROY:  Okay.

 5              THE COURT:  Do you have any other questions?

 6              MR. CONRATH:  No.

 7              THE COURT:  All right.  You can go get

 8   Mr. Conrath's contact information.

 9              MS. ROY:  All right.

10              (Pause)

11              THE COURT:  All right.  Well, we've got a bunch of

12   emails coming in now, so I don't know where that'll leave

13   us, but we'll at least have that set of emails to look at.

14              MR. CONRATH:  I have some of them.

15              THE COURT:  Why don't we wait until it's complete.

16   I rather have it all in one place at one time.

17              I mean, obviously, I'm spending as much time on

18   this as I am because we want to get this right for -- as

19   precedent for what I anticipate to be a whole bunch of other

20   third-party witnesses who are going to have their own

21   counsel.  And I want to make clear to them, when they go

22   public, what the rules are.  I thought they were already

23   pretty clear, but I want to be sure it's crystal clear --

24              MR. CONRATH:  Thank you.

25              THE COURT:  -- and not have this -- not have to
```

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

```
 1   have this problem again.

 2           MR. CONRATH:  Right.

 3           THE COURT:  So let's take a look at all of them

 4   when they get in.  And then we'll hear argument from counsel

 5   as to what, if any, remedy is appropriate beyond, of course,

 6   publicly alerting counsel to avoid this problem at all

 7   costs.

 8           MR. PETROCELLI:  Thank you, Your Honor.

 9           MR. CONRATH:  Thank you.

10           THE COURT:  We'll take an early, I guess, wait

11   till -- we'll probably have everything in about 15,

12   20 minutes.

13           MR. CONRATH:  It should be no more than that.

14           I don't think the later one -- I think what the

15   time was probably with printing the one with the long

16   attachment.  I assume these were the shorter ones.

17           THE COURT:  Yeah.

18           But it's going to take a while to review them, and

19   then it's going to be the lunch break.  So I just don't see

20   us reconvening before 2:30.  I'll just tentatively say we'll

21   reconvene at 2:30, and we'll do it that way.

22           MR. CONRATH:  How can I get them to chambers?

23           THE COURT:  Oh.  Just contact John here.

24           MR. CONRATH:  Will do.

25           THE COURT:  John will make sure.
```

1          (Open court)

2          THE COURT:  All right.  We're going to break early

3     for lunch today.  The issues that the Court is currently

4     wrestling with with counsel is going to take a little while

5     to sort out as to what actually happened and what, if any,

6     consequences there should be to what happened under the

7     circumstances.

8          So we're going to have a whole bunch of emails to

9     review.  I'm going to have a bunch of emails to review.  And

10    then I'll entertain some argument from counsel as to what

11    would be the appropriate remedy under the circumstances, if

12    any.

13         And my sense is we will not be in a position,

14    because of what we have to review and think through the best

15    way to proceed before the luncheon recess.  And certainly,

16    I'm going to have a luncheon recess.

17         So I would say we'll shoot to return at 2:30.

18    We'll be going until 5:00 today.  Remember that.  And

19    hopefully, by then, we'll have had a chance to review all

20    this information, do an analysis of it, and then have a

21    chance to hear from the parties as to what would be the best

22    way to proceed from their point of view.

23         And then the Court will have to ultimately make

24    its own decision as to how to best proceed here.

25         Thank you for your patience, Counsel.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

220

1          DEPUTY CLERK:  All rise.

2          This Honorable Court will stand in recess until

3     the return of court.

4          (Proceedings concluded at 12:11 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: March 26, 2018_____   /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      :
                               :
                Plaintiff,     :        CV No. 17-2511
        vs.                    :
                               :        Washington, D.C.
                               :        Monday, March 26, 2018
AT&T, INC., ET AL.,            :           2:40 p.m.
                               :
                               :           Day 2
                Defendants.    :
-----------------------------x



                       AFTERNOON SESSION
                  TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE RICHARD J. LEON
             UNITED STATES DISTRICT SENIOR JUDGE



APPEARANCES:

For the Government:    Craig W. Conrath, Esquire
                       Eric D. Welsh, Esquire
                       Timothy B. Walthall, Esquire
                       Andrew Finch, Esquire
                       Lisa A. Scanlon, Esquire
                       Melanie Kiser, Esquire
                       U.S. DEPARTMENT OF JUSTICE
                       Antitrust Division
                       450 Fifth Street, NW
                       Washington, DC  20530
                       (202) 532-4560
                       craig.conrath@usdoj.gov
                       eric.welsh@usdoj.gov
                       timothy.walthall@usdoj.gov
                       andrew.finch@usdoj.gov
                       lisa.scanlon@usdoj.gov
                       melanie.kiser@usdoj.gov
```

```
 1   Appearances Continued:

 2   For Defendant AT&T       Katrina M. Robson, Esquire
     and DirecTV Group        O'Melveny & Myers LLP
 3   Holdings, LLC:           1625 Eye Street, NW
                              Washington, DC  20006
 4                            (202) 220-5052
                              krobson@omm.com
 5
                              Daniel M. Petrocelli, Esquire
 6                            M. Randall Oppenheimer, Esquire
                              O'MELVENY & MYERS LLP
 7                            1999 Avenue of the Stars
                              8th Floor
 8                            Los Angeles, CA  90067
                              (310) 553-6700
 9                            dpetrocelli@omm.com
                              roppenheimer@omm.com
10
                              Michael L. Raiff, Esquire
11                            Robert C. Walters, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
12                            2100 Mckinney Avenue
                              Suite 1100
13                            Dallas, TX 75201
                              (214) 698-3350
14                            mraiff@gibsondunn.com
                              rwalters@gibsondunn.com
15
     For Defendant           Kevin J. Orsini, Esquire
16   Time Warner, Inc.:      Peter T. Barbur, Esquire
                              CRAVATH, SWAINE & MOORE LLP
17                            Worldwide Plaza
                              825 Eighth Avenue
18                            New York, NY  10019
                              (212) 474-1140
19                            korsini@cravath.com
                              pbarbur@cravath.com
20
     Court Reporter:         Crystal M. Pilgrim, RPR, FCRR
21                           Official Court Reporter
                             United States District Court
22                           District of Columbia
                             333 Constitution Avenue, NW
23                           Washington, DC  20001
                             (202) 354-3127
24                           crystal_pilgrim@dcd.uscourts.gov

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1                          Table of Contents

2                                    Direct   Cross  Redirect   Recross

3    On behalf of the Government:

4         Warren Schlichting

5          By Ms. Kiser              233

6

7

8

9

10                         E-X-H-I-B-I-T-S

11                                        Marked   Received

12   On behalf of the Government:

13   Exhibit No. PX 409 Sealed                        233

14

15

16

17

18

19

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1                     P-R-O-C-E-E-D-I-N-G-S

2              THE DEPUTY CLERK:  Your Honor, recalling civil case

3   number 17-2511, United States of America versus AT&T, Inc., et

4   al.

5              THE COURT:  See counsel.

6              (Sealed Bench Conference.)

7              THE COURT:  I've had a chance to review it counsel.

8   I'll take whatever thoughts you have.

9              MR. PETROCELLI:  Your Honor, I've done a little

10  research.  I've reviewed the emails.  The natural remedy for a

11  violation of the rule is exclusion of the witness.

12      However, what I would suggest is the opportunity to,

13  before the witness is examined by the government, to voir dire

14  the witness about these events so at least the Court first of

15  all what comes out on the witness stand may suggest a need for

16  exclusion.  But even if it doesn't, it would help put in

17  context the witness's testimony and credibility based on my

18  examination.

19      I know that the witness has had extensive meetings over

20  the weekend.  The witness did not delete the email and the

21  attachment, has had full possession of it.  Has been meeting

22  with lawyers, has been meeting with the DOJ.  I'm still not

23  clear to what extent he read or did not read the transcript.

24      As you saw on the cover email which he undoubtedly read,

25  it summarized by topic my entire cross examination.
```

1          So in my view there's been a violation of the rule, but my

2    suggestion would be to have an opportunity to voir dire him.

3          THE COURT:  Why not just let you voir dire this on

4    cross examination?

5          MR. PETROCELLI:  Well, that's the second alternative

6    which I clearly will.  I think it might benefit the Court to

7    hear his testimony initially before the government puts him on

8    for an hour and a half or two hours.

9          THE COURT:  Mr. Conrath.

10         MR. CONRATH:  Certainly I think exclusion would be an

11   extreme remedy and I understand.  I'm not seeking it here.

12         THE COURT:  I'm not entertaining that.

13         MR. CONRATH:  Okay.

14         THE COURT:  But I would entertain the other two

15   alternatives.

16         MR. CONRATH:  Sure.  And I think cross examination is

17   the, is the perfectly appropriate remedy.

18      I have looked.  There's an excellent case where a

19   sequestration issue came up with Judge Kollar-Kotelly in this

20   District.  It was a question of excluding relators and the

21   theory that they might coordinate their testimony.

22      She said -- may I quote?

23      The defendant has an effective corrective measure readily

24   at its disposal should the relators attempt to alter their

25   testimony at trial; specifically, the defendant has the

1  powerful tool of cross examination.

2      So this is a witness who's been deposed twice.  Once

3  during our investigation.  Once during the pre-litigation phase

4  by defendants.

5      If there's any attempt by him to alter his testimony, I'm

6  sure it will be well exposed and I think the Court can take

7  note that one of the most well recognized cross examiners in

8  the country will be doing the examination and that ought to

9  provide adequate correction.

10      MR. PETROCELLI:  Briefly, Your Honor.  I just think

11  the Court would benefit from really getting a full airing of

12  these events before you hear his direct testimony.  That's why

13  I suggest that I be given 10 or 15 minutes to examine him

14  initially.  I don't see any prejudice to the government.

15      THE COURT:  Although obviously the limited question I

16  did at the bench was on the fly so-to-speak.

17      MR. PETROCELLI:  Exactly.

18      THE COURT:  Before I got to read emails.  I think I

19  got certainly if I didn't get all of the notes, I got the

20  melody of what happened.

21      Either there's some maybe loose ends in there which I'm

22  sure you're going to tighten up on cross.  But I think at this

23  point I have an essence of what the story is, and because time

24  is somewhat of the moment, right, I think I'm inclined right

25  now to let him do his direct knowing he's going to be cross

     1   examined on this topic.  Fair game.  And you'll get wide

     2   latitude on this topic.  They can object if they want to, so

     3   you're going to get a lot of leash.  If for no other reason

     4   than to let other future counsel in similar situations realize

     5   this is a really big mistake to make and it's not going to be

     6   tolerated.  So actually I think the violation is the witness

     7   struck.  It's as simple as that and I'm going to say that.

     8       So I appreciate your situation.  It's a difficult one that

     9   you're in here, Mr. Petrocelli, but I think on balance a

    10   vigorous cross examination provided whatever we already know,

    11   which is not insubstantial, will solve the problem.

    12          MR. PETROCELLI:  Very well, Your Honor.  Thank you

    13   very much.

    14          THE COURT:  Let me educate the audience that's

    15   wondering what the heck is going on here.  Then at some point

    16   I'll have to deal with Steptoe & Johnson more specifically.

    17          MR. PETROCELLI:  Thank you very much, Your Honor.

    18          MR. CONRATH:  Thank you.

    19          (Open Court.)

    20          THE COURT:  All right, we're going to proceed with

    21   this witness in a minute.  Before we do, I think those

    22   assembled should be entitled to a little explanation of what's

    23   been going on here and also I need to reiterate some basic

    24   ground rules that we are operating under here.

    25       This is a trial that's going to have a number of third

1    party witnesses.  These are people who do not work for AT&T or

2    DirecTV or Time Warner.  And they come to the witness stand

3    with concerns about confidentiality of their business secrets

4    and business interests.  These are people who are competitors

5    of the defendants to a certain extent.

6          And because they're competitors and because they have

7    concerns about sensitive confidential information, they're

8    represented by counsel other than the counsel seated at the

9    table.  I should say in addition to.

10          Most of these witnesses will be appearing on behalf of the

11   government, these third party witnesses with outside counsel.

12   But some will be appearing, I believe, for the defense as well.

13          The Court has endeavored in past hearings, at least one

14   past hearing in particular, to make it very clear as to the

15   rule against witnesses as it applies in this case.  Indeed,

16   Mr. Conrath himself at one point last week I believe it was, if

17   not the week before, said can we just before we get going,

18   Judge, be clear, crystal clear as to how the Court applies this

19   rule and how it's going to apply because it is done on a case

20   by case basis.

21          Well, the situation we had here today was a violation of

22   the rule against witnesses.  Mr. Conrath informed the Court

23   that he learned this morning, at least that's my recollection

24   of what he told me, last night.  He learned last night that the

25   counsel for the witness about to take the stand, Mr.

1   Schlichting, provided him with the transcript of the opening

2   arguments in this case on Thursday, and the more specifically

3   and more importantly perhaps, the testimony of the first

4   witness who appeared on Thursday both direct and cross

5   examination.

6        Of course doing that was in direct contravention of the

7   rules against witnesses in this case.

8        Now as is often the case when transgressions of this kind

9   occur there are lots of facts that the Court has to assemble to

10  figure out exactly what happened and that's what we were doing

11  this morning to try to figure out by reconstructing the events

12  through obtaining emails, talking to the participants in the

13  events and trying to figure out exactly what happened.

14       And to the full extent at this point that I can discern

15  what occurred, there was a mess up by a counsel.  Shouldn't

16  have occurred and they've apologized for it.  And the Court had

17  to weigh the decision whether or not to strike the witness all

18  together, which is and has been recognized by courts as an

19  appropriate remedy for violation of the rule against witnesses.

20       The idea of course is that no witness will gain the

21  advantage over any other witness by having the opportunity to

22  observe the testimony of other witnesses.  Exceptions are made

23  to that rule, expert witnesses and party representatives such

24  as these two gentlemen seated right over here who will testify

25  at some point in this case.  But they are exceptions to the

1   rule that are well known to the lawyers litigating this case.

2       Ultimately it's the lawyers litigating the case that have

3   to ride heard on the lawyers who are serving as outside counsel

4   to witnesses to make sure that compliance is taking place and

5   they'll be the ones who are held accountable going forward in

6   no uncertain terms.

7       So let me be very clear, in the words of Jack Nicholson,

8   crystal clear.  Witnesses will not be permitted to listen to,

9   read or be briefed about the testimony of any other witness in

10  this case prior to their testimony.  The only exceptions are

11  experts and party representatives.

12      Any person who provides a transcript of a prior witness's

13  testimony or briefs a witness on that prior testimony of

14  another witness will be held in contempt of court.

15      It is the duty of the attorney representing third party

16  witnesses, in this case Justice Department, but it could be

17  AT&T and Time Warner in another situation, to make sure that

18  those third party witness's counsel are not only extra sure

19  that they're aware of this rule, that they're complying with

20  the rule to the fullest extent possible.

21      And with regard to transcripts, one of the problems with

22  cases like this is there are daily transcripts being made.  And

23  outside counsel for these third party witnesses are purchasing

24  them as they're permitted to do.  But just because they

25  purchased them, doesn't mean they can just show them to anyone.

1          So rather than band them from purchasing them, I'm giving

2    them this rather public warning about the consequences of

3    misapplying and using them by sharing them with future

4    witnesses, in particular their future client in the case.

5          Should this happen again, hopefully it will not, the

6    witness will be strucken.  So let the Department of Justice

7    lawyers and the AT&T lawyers be on notice that that's going to

8    be the consequence of it.

9          We can't really afford the time and the arguments and the

10   issues that we've had to devote to this today over and over

11   again throughout the rest of this trial.  I mean, we've devoted

12   essentially a half day's time to this issue now and that's

13   pretty much all we can devote.  Ideally, we wouldn't have put

14   this much time into it, but we're setting a precedent for the

15   future.

16         As far as the mix up in this case, I'll deal with that law

17   firm separately and I'll be in touch with them as to the

18   consequence there, but that's a separate issue.

19         So any questions for the government, Mr. Conrath?

20              MR. CONRATH:  No, Your Honor.

21              THE COURT:  Any questions for the defense, Mr.

22   Petrocelli?

23              MR. PETROCELLI:  No, Your Honor, other than I be able

24   to cross examine the witness.

25              THE COURT:  You will have absolute carte blanche to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   question on any and all of these issues in this cross

2   examination.

3         Ms. Kiser, call your witness.

4             MS. KISER:  Melanie Kiser for the United States.

5         The United States calls Warren Schlichting of DISH Network

6   to the stand.

7             THE COURT:  Go get him.

8             MS. KISER:  Your Honor, as a preliminary matter we

9   would like to introduce one exhibit through this witness.

10        We have cleared it with counsel and if it's okay with the

11  Court, we would like to admit Plaintiff's Exhibit 409 now.

12            THE COURT:  Well, let me see it.

13            MS. KISER:  May I approach?

14            THE COURT:  Right here.  This is the gentleman you

15  need to talk to.

16            MS. KISER:  Yes, and this is under seal.

17            THE COURT:  All right, no objection Mr. Petrocelli?

18            MR. PETROCELLI:  No objection.

19            THE COURT:  It'll be admitted under seal.

20        (Government Exhibit No. 409 received in evidence under

21  seal.)

22            THE COURT:  Come on up, Mr. Schlichting, and be

23  sworn.

24            GOVERNMENT WITNESS WARREN SCHLICHTING SWORN

25                      DIRECT EXAMINATION

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1          THE WITNESS:  Good afternoon.

2          MS. KISER:  Your Honor, may I proceed?

3          THE COURT:  You may.

4  BY MS. KISER:

5  Q.    Good afternoon, Mr. Schlichting?

6  A.    Good afternoon.

7  Q.    Where do you work?

8  A.    I work at DISH.

9  Q.    Where is DISH located?

10  A.    In Denver, Englewood to be exact.

11  Q.    Can you tell the Court a little bit about what your

12  responsibilities and role are at DISH?

13  A.    Sure.  I oversee Sling.  I'm the president of Sling.

14      I also oversee the programming, the negotiating team, as

15  well as ad sales.

16  Q.    What services does DISH offer?

17  A.    Pay-TV services both satellite under DISH and Over the Top

18  internet delivered with Sling.

19  Q.    How many subscribers does DISH have between the two

20  services?

21  A.    Between the two just over 13 million.

22  Q.    How does that compare to other pay-TV providers?

23  A.    We're the fourth, second largest satellite, fourth largest

24  overall.

25  Q.    Going back to your responsibility.  How long have you been

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  president of Sling?

2  A.   Since early December of 2017.

3  Q.   What was your title prior to that?

4  A.   EVP in charge of marketing for Sling and DISH, programming

5  and media sales.  It's kind a mouthful, sorry.

6  Q.   When did you take charge of programming for DISH and

7  Sling?

8  A.   The middle of September, 2014.

9  Q.   Do you still oversee programming for both satellite?

10  A.   I do, I do.

11  Q.   So now let's take a step back and talk about DISH.  How

12  long has DISH been in the pay-TV industry?

13  A.   In the current form since I think 1996.

14  Q.   How has DISH positioned itself in the market?

15  A.   Well, DISH is always the challenger brand.  We've been

16  number two a long time, so we're sort of try harder disruptive

17  force in the industry.

18  Q.   When did DISH launch Sling?

19  A.   In February of 2015.

20  Q.   Was anybody else offering an internet delivered pay-TV

21  service at that time?

22  A.   Not at the time.

23  Q.   So what does Sling have in common with traditional pay-TV

24  services such as satellite and cable?

25  A.   Well, it has, the networks that Sling carries are

1   typically carried by the pay-TV service.

2   Q.   Do you carry all the same channels as other pay-TV

3   services?

4   A.   Certainly not all of them.  One of the places that we

5   tried to innovate is to carry fewer channels, many fewer

6   channels.

7   Q.   What do the packages available to consumers look like?

8   A.   This is where I think we've tried to do, you know, one of

9   the biggest complaints of consumers is networks paying for

10  networks that they don't watch.  So we have I guess you call it

11  a skinny bundle or a skinny base package.

12       And then to that you can add genre packs that from a like,

13  like networks in certain packages kids and news, Lifestyles.

14  Q.   How many base packages are there?

15  A.   There are two base packages, Sling Orange and Sling Blue.

16  Q.   So let's talk about Sling Orange first?

17       What is the price for the Sling Orange base packet?

18  A.   The Sling Orange package is $20.

19  Q.   What are the main networks that a consumer gets with Sling

20  Orange?

21  A.   So we have four, ESPN, Disney Networks.  So ESPN 1, ESPN

22  2, Disney and Freeform.  You can also access ESPN 3 from that.

23       We have four Turner Networks.  So PBS, TNT, Cartoon and

24  CNN.

25       We have one network Performance 1, we have three from

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Scripts.  And we have, that covers most of the big ones.  We

2  have a few independents as well.  I think there are almost 30

3  total.

4  Q.   Was Sling Orange the original base package that DISH

5  offered?

6  A.   It was.

7  Q.   When did Sling Blue launch?

8  A.   Sling Blue launched, I am going to be general about this.

9  I think it launched late in 2015, maybe early 2016.

10 Q.   Can you tell the Court a little bit about the differences

11 between Sling Blue and Sling Orange?

12 A.   Sure.  Sling Orange is restricted to just one stream.

13 It's a single stream service.  What that means is that only one

14 person at a time can log on one device at a time.

15    So Sling Blue is a multi stream service.  There are three

16 streams, three devices at a time which more closely mimics a

17 household with two or three televisions in it.

18    That service does not include the three stream service

19 Blue, does not include the Disney Networks, but it includes

20 nearly all the networks, the rest of the networks that are in

21 Sling.

22 Q.   Does it include any additional networks not in Sling?

23 A.   It does.  There are a few.  So let's see, it has Fox

24 Networks.  And it has NBC Universal Networks.  I believe it has

25 one extra Turner Networks and two extra Viacom Network.

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1   Q.   What's the price for the Sling Blue package?

2   A.   The base package is $25.

3   Q.   You mentioned that you can add on genres here.  How does

4   that work?

5   A.   So similarly, many are almost exactly the same.  If you

6   don't have kids, why pay for Kids Networks.  So we have a kids

7   pack.  You can take it or not.  We have a Hollywood Extra pack.

8   If you're interested in movies, great.  If you are not, no need

9   to pay for that.

10       Same thing with news, we have a Lifestyle which is a little

11  bit more general package.  So in each case you can add or not

12  add as your interest dictate.

13  Q.   So other than the skinny bundle element is there anything

14  else that sets Sling apart from traditional pay-TV services?

15  A.    Well, it's just, we try to go after all of the complaints

16  in the pay-TV industry.

17       So there's no contract, you can add, you can come and go as

18  you please.  We don't sell you any equipment.

19       There is, if you don't have a smart TV you'll need a

20  streaming box, but we don't sell that to you.

21       So no contract, no commitment, no equipment are three other

22  places where we feel like we were trying to meet the consumer

23  and deal with the paying points, deal with the consumer

24  complaints.

25  Q.   Can a consumer sign up instantly for stream?

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  A.   Yes, they can.  We try to get people to watch TV under two

2  minutes.

3  Q.   How about canceling?

4  A.   It's very easy to cancel too.

5  Q.   Have other internet based TV providers entered since Sling

6  launched?

7  A.   They have, there have been quite a few.

8  Q.   How does Sling pricing compare to traditional pay-TV

9  providers, satellite and cable?

10 A.   Typically it's a lot lower.  There are all sorts of

11 promotions but a typical pay-TV package at least at DISH starts

12 at $50.  So it's basically 20 or $25 versus 50 by comparison.

13 Q.   How does it compare to the internet delivered services

14 that have entered since Sling on pricing and channeling up?

15 A.   So I believe Sling is less expensive than nearly all.  I

16 believe it's a file which doesn't have any sports in it.

17    Compared to DirecTV Now I believe that their base package

18 is 35.  Hulu TV is like YouTube TV, it was at 35.  I think they

19 just raised their price to 40.

20    And so it's a comparison of 20 or $25 and our basic package

21 compared to 35 or $40 at the lowest end on others.

22 Q.   How did DISH decide what programming to put in the

23 original Sling Orange package?

24 A.   It was really just programming we felt we needed to create

25 a pay-TV service.  By that I mean, you know, the most popular

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  programming.

2  Q.   Were there certain types of programming that were higher

3  priority than others?

4  A.   There were.

5      Besides being popular, this is a live internet streaming

6  service so that typically means there's an emphasis on live

7  sports and live news.

8  Q.   In negotiating with programmers for the rights to Sling

9  were there certain terms that were especially high priority for

10  Sling?

11  A.   There were.  We typically negotiated, well, there are a

12  couple of pieces to this answer.  But we would insist that the

13  pricing for OTT which is Sling be the same so the rate would be

14  the same as satellite.  Typically most programmers tried to

15  upcharge us for over the internet or over-the-top rights.

16      And then there are a number of other pieces with respect to

17  the way that our tiers work.  I guess I would say are a little

18  bit competitively sensitive I guess if we have to walk through

19  that.

20  Q.   Sure, we'll return to that later.

21      You said that you were able to pay the same rate for Sling

22  for satellite.  How did you accomplish that?

23  A.   Well, almost every trade that we made including this we

24  paid for, you know, we have this large platform that is, that

25  buys a lot of programming and so we typically made some give on

1  that side to get what we wanted on the Sling side.

2  Q.    Does Sling compete with services like Netflix?

3  A.    We see Netflix as complimentary.  I guess in the broadest

4  sense you would say for eyeballs because there are a lot of

5  ways to view video now.  But Sling is live linear, so live

6  linear streaming which means live news, live sport in current

7  seasons.

8      Netflix is past seasons and then increasingly they are

9  doing their own original content as well.

10  Q.    Have you heard the term must have content before?

11  A.    I have.

12  Q.    Is that a term that you use in your business?

13  A.    We do, yeah.

14  Q.    And what does it mean to you when you use it?

15  A.    I guess it's a must have content, it's popular content.

16  So, you know, you are going to have to have some, some of these

17  you are just going to have to have a pay-TV service.

18      I guess I would say must have also I guess means when I

19  think about it from a have it or don't have it.  It's hard to

20  substitute for it.  You don't have a ready substitute.

21      And I would say as well that you would, I mean I hate to

22  say this, is it okay to say we might pay more than we think it

23  is worth just because we have to have it.

24  Q.    So you said --

25  A.    It's a terrible thing for a negotiator to say.

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1   Q.   You have to have it to have a pay-TV service?

2   A.   Yes.

3   Q.   What do you mean by that.

4   A.   Well, there's just certain things that you are, you are

5   just not going to be competitive if you don't have certain

6   pieces of programming.

7       So I don't know, did that answer your question?

8   Q.   Yes.  You also said that it's harder to substitute for

9   must have content.  How is that?

10  A.   So if you have, the best example is probably like kid's

11  content.  Kid's content often gets very high viewing hours but

12  it's frankly not that hard to find some other kid's content

13  whereas I'm just thinking about right now during March Madness,

14  if you don't have March Madness you're not in the pay-TV

15  business.  So sort of the two ends of the spectrum.

16  Q.   Who has must have content?

17  A.   So there are five groups that I guess I would say are the,

18  that they're the five families, right, the way we refer to them

19  internally.  ABC, NBC, CBS, Fox and Time Warner are the five

20  groups that you, you just, it's very hard to have a pay-TV

21  service without them.

22  Q.   What distinguishes those five programmers from others?

23  A.   Well, they've all made big investments in live sports.

24  Almost all of them have some sort of important news presence,

25  and then they have, you know, most of them have important

1   entertainment content as well.

2   Q.    Why is it important that they've invested in live sports?

3   A.    Well, more and more you've got time shifted viewing so

4   Netflix is a good example.  Hulu is another good example where

5   you can access prior seasons or prior content, but really

6   sports, the minute the game is over sports is stale.

7        So if you're going to have a live linear service, then

8   sports is a critical piece of that.

9   Q.    You mentioned time shifting, can you explain?

10  A.    It's an industry term.  It just means that it's recorded,

11  previously recorded content.  And you might watch it a month

12  later, a year later, many years later.  It's just something

13  that's, it's content that's been recorded and somebody has the

14  rights to.

15  Q.    You also mentioned that Netflix is an SVOD?  What is an

16  SVOD?

17  A.    It's a subscription video on demand.  So it just means

18  that you pay a monthly fee and they have a number of shows that

19  are recording and available literally on demand when you decide

20  to watch.

21  Q.    Are all sports rights of equal importance?

22  A.    No.  They're certainly some events that are bigger than

23  others, Super Bowl is a huge event, must have.  March Madness I

24  would put in that category.

25       The finals of different various sports leagues in terms of,

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  in terms of sports there are certainly some that outrank

2  others.

3  Q.   I notice that Viacom is not in the top five programmers

4  you mentioned.  What networks does Viacom have or what are its

5  main brands?

6  A.   So Viacom has about 27 which frankly I think is part of

7  the problem.  But their big brands are MTV, BET, VH1, CMT,

8  Comedy, Spike.  I think that's probably seven or eight that

9  those are the primary brands and then there's MTV 2 and 3 and,

10 you know.

11 Q.   Can you explain for the Court why you don't consider

12 Viacom must have?

13 A.   I think Viacom would have been must have five, six, seven

14 years ago.  But they've really stopped investing in their

15 product.  I think this is generally accepted.  It's written

16 about.

17     And so you've seen viewership declines, you have seen, you

18 know, Viacom struggling a bit in the market now.  Their current

19 CEO has been very sort of open with the craft that they are

20 going to reinvest in five of those networks.

21     So they have actually started to putting money back into

22 the networks, investing in shows.  I think the hope is, their

23 hope anyway that in the next few years they get back to the

24 place where they're considered must have.

25 Q.   What networks are must have from Time Warner?

1  A.    So Time Warner I guess I would say, you know, TBS, TNT,

2  CNN, I would put HBO in that for sure.  I guess I would say on

3  the bubble is, you know, Cartoon Network gets a lot of viewing.

4  To my other comments, I don't know if that, if that absolutely

5  falls into must have.  So I would say, those are the four or

6  five that must have networks.

7  Q.    So why are TBS and TNT must have?

8  A.    TBS and TNT are mostly about sports rights in terms of

9  must have.  They have done a good job with not only March

10  Madness but they have got NBA content as well.  A great all

11  star game on Turner.  So those have been important sports

12  networks for us.

13  Q.    How about CNN, why is CNN must have?

14  A.    Well, imagine coming around to midterm elections without

15  CNN, right.  There are probably three networks that have a huge

16  amount of viewing.  I would say two that get the lions share

17  and then you've got MSNBC, Fox News.  MSNBC is by far the third

18  in terms of volume.

19      Then CNN is just a very important news source.  You know,

20  it's important, it's been important really since the last

21  election.  They've risen in popularity considerably.  But

22  coming into midterms that will only become a more important

23  network for us.

24  Q.    How about HBO, why is it must have?

25  A.    You know, HBO has just been a part of the pay-TV fabric.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    We have almost one and five subscribers on the satellite side

2    that watch or that subscribe to HBO.

3        So it's a big number and it raises, it's hard to imagine

4    having a pay-TV ad or a marketing campaign that has no HBO.  I

5    mean, it's just expected by consumers.

6    Q.   I'd like to shift gears a little bit and talk about your

7    negotiations with programmers.  Do you prepare for negotiations

8    with programmers?

9    A.   We do.

10   Q.   Can you tell the Court a little bit about what you do to

11   prepare for your negotiations?

12   A.   Yeah, we do a lot of homework.  We probably start six

13   months in advance.  We look at view measurement data.

14   Typically that's our own data from our own set up boxes.

15       We look at old contracts with the press.  We look at any

16   number of factors to try to figure out where they are in the

17   market, what their motivation is.  We'll do, sometimes we'll do

18   analysis of what would happen if they, if we were to go dark

19   with this network.  We really try to have all of the angles

20   covered.

21   Q.   So let's go back through those in a little bit more

22   detail.

23       What kind of viewership analysis do you do?

24   A.   Well we, we have a couple of things that we do on a

25   regular basis.  So the first cut is we look at viewership data,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    just total gross hours, the biggest bucket.  Then we'll look at

2    hours viewed in a month by households.

3        We'll look at dollars viewed by, the amount we pay the

4    programmer divided by the hours viewed.  And we'll do that not

5    only on a monthly basis.  This by the way, we do every month

6    regardless.

7        But then when we're preparing for the deal, we'll look for

8    seasonality.  We will look for individual blips, if they've got

9    premiere.

10       So I don't know if that, does that get your question?  We

11   cut the data in a lot of different ways.

12   Q.   Yeah.  So what do, what is the gross viewing hours tell

13   you about a programmer?

14   A.   Just overall popularity.  That's just the most, that's the

15   basic, that's the basic measure of how popular a network is.

16   Q.   And how about hours viewed per household?

17   A.   So there we try to figure out, that's directly related to

18   if there's some chance of going dark, how many households are

19   just really passionate versus casual viewers of a network.

20       So you might have huge viewing hours but if they're all

21   concentrated in 15 or 20 percent of the homes, that's different

22   than if you've got a very, you know, a big viewing hours, but

23   it's evenly distributed.  Just in different risk profiles.

24   Q.   How do the risk profiles differ?

25   A.   Well, the best example again this would be on one side of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   the spectrum.  But if you have a regional sports network and in

2   a certain region you've got 20 or 30, 40,000 fans that watch

3   that network, I don't know.  They might watch 30 hours a month.

4       Okay, those are committed fans and you take it away and

5   you're going to lose those subs.  Versus on the other end of

6   the spectrum you can imagine casual viewing dipping in and out

7   spread across many, many households.

8       Again, does that answer your question?

9   Q.   Yeah.  You also mentioned dollars per viewing hour.  Why

10  do you look at that?

11  A.   Well, we pay programmers, you know, these huge amounts.

12  So we're just trying to figure out where they, where these

13  prices fit.

14      Many of these contracts are just, they're just kind of like

15  ancient Greece where one foundation is built on the next.

16      One of the networks I just talked about a little bit about

17  have had these prices that continued to advance but their

18  programming has not.

19      So we check for anomalies just to make sure that we're not

20  completely, that this is not a complete outlier that we're

21  paying for in terms of dollars per hour.

22  Q.   Are there reasons you would pay more per hour for some

23  networks than others?

24  A.   Sure.  I mean, there are some networks that you need, you

25  want, you just must have.  So there are absolutely the group of

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1   networks that you'll pay a lot for.

2   Q.   You also mentioned that you look at where in the market

3   the programmer is and what their motivations might be.

4        How do you go about doing that?

5   A.   Well, we're, we try to observe if they're on the rise or

6   if they're investing or if they've just signed.

7        One of the classic piece of information is if they've just

8   signed a big contract with a network or sorry, with a league.

9        We'll say okay, they'll come at us with what we call a rate

10  reset.  It's not just 5, 6, 7 percent move upward.  If they've

11  just signed with the NBA or somebody else there'll be a

12  significant bump.  That's one, when we say in the market place,

13  that's what I mean.

14  Q.   Do you do anything to try to get inside of the shoes of

15  programmers and understand what they may be asking for?

16  A.   Well, we do actually occasionally, not every time, but

17  we'll do mock negotiations.

18       I kind of like that because it gives the junior team

19  members a chance to go up against the more seasoned

20  negotiators.  So I don't know if that's the kind of thing

21  you're thinking about.

22       But we let them take a few swings, and they do homework as

23  if they are, you know, the programmer.  It always yields a

24  couple of interesting kernels, you know.  It's basically the

25  junior guys are trying to stump the more senior negotiators.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   Do you use anything that you have learned in the mock

2   negotiations with the actual negotiations?

3   A.   We will.  Mostly it's uncovering weak spots in our own

4   negotiating team.

5   Q.   You mentioned earlier that one of the reasons you look at

6   hours per subscriber is for if you might go dark with the

7   programmer.

8        What does it mean to go dark?

9   A.   It just means that we don't have the right to display the

10  content anymore.  So, you know, if you come, so many of these

11  expirations are at midnight.  So midnight on the, whatever the

12  20th of the month, we will either be far apart, both sides will

13  still be shooting at each other or we won't be so far apart.

14       We can't display the content unless we have the rights to

15  do it and if the network decides that we're not close enough to

16  keep going or extending, they'll pull the rights.

17  Q.   What's the effect if DISH goes dark with the programmer?

18  A.   Typically, typically pretty bad.

19       I would say the more popular the content the worse it is.

20  Probably makes obvious sense.  But we don't like take downs.

21  We typically -- actually, I didn't make this up.  I kind of

22  wish I had.

23       But our sales guy said once that it's like having a heart

24  attack.  And you can come back, you can get yourself in shape

25  again after a heart attack, but you're never quite all the way

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1   back to where you were before.

2       So going dark with a programmer is almost always bad for

3   us.

4   Q.   Why is it bad for you?

5   A.   We lose subscribers.  And we lose their, no matter how

6   much we try to educate subscribers about working on behalf of

7   the consumer and trying to get lower prices and negotiating

8   hard, at some point they, they'll be disgruntled or give up on

9   it and say you know what, I'm going to go to another provider.

10  Q.   So what is your message to consumers when you go dark with

11  a programmer?

12  A.   Well, we try to let them know with sort of mixed success

13  that it's not about us.  We're always negotiating for lower

14  prices and trying to slow down this crazy freight train of

15  programming prices.  So we try to communicate that either in

16  video or in press or whatever.

17  Q.   You mentioned a crazy freight train of programming prices,

18  what are you referring to?

19  A.   Well, sports rights have spiraled out of control.  I was

20  hopeful a couple years ago that we had seen the peek but

21  clearly we haven't.

22      So those rates go, they get more and more expensive with

23  every passing year.  And growing much, much faster than the

24  cost of living or even the cost of other, other entertainment

25  networks.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Then the other one that has really taken off which is

2   disturbing if you are trying to run a pay-TV service are the

3   retransmission consent deals.

4    Those deals are with the local affiliates, the broadcast

5   affiliates and their owners that have sort of amassed

6   affiliates in different cities.  Those are incredibly high

7   prices or are high growth rates.  So those are the two quote

8   unquote freight trains.

9   Q.   When you say local affiliates, are you talking about local

10  broadcast stations like local ABC, NBC affiliates?

11  A.   Yes, exactly.

12  Q.   Back on rate increases are you typically accepting rate

13  increases in negotiations of programmers?

14  A.   You know, programming rates only go one direction.  They

15  go up and so the question, our negotiations are typically about

16  how do we limit the increases.

17  Q.   Have you ever seen your programming rates go down in the

18  time you've been at DISH?

19  A.   You know, very, I mean, one or two times in very small

20  networks that didn't have, just didn't have any programming to,

21  you know, to consider.

22  Q.   Do you have a sense of how many customers you lose when

23  you go dark?

24  A.   It varies by network groups.  So we do keep track of it.

25  If we ever do go dark we do keep track.

1  Q.    How do you try to keep track of it?

2  A.    Well, the primary way on satellite is to when people call

3  up to disconnect we ask them, say where are you going, what's

4  happening, why are you disconnecting?  And sometimes they'll

5  tell us, sometimes they won't.

6     On Sling it's harder.  We make it so easy, some might say

7  too easy.  But we make it very easy to cancel and it's harder

8  to know what's happening on that one, why someone is leaving.

9  Q.    So other than the subscribers that call up and say I'm

10  canceling because you lost this programming, are there any

11  other effects from going dark?

12  A.    We have a general, general I said disgruntlement before.

13  You do damage your sub base.  So even if they don't disconnect

14  this time, we look at overlap.

15     So particularly retransmission consents are a good example.

16  If somebody owns affiliates in 20 cities and then we have the

17  chance of another, another chance to go dark and there's

18  overlap in cities, if you're a subscriber and you're going to

19  have a second black out or you're going to go dark, those

20  subscribers are much more likely to leave.

21     So every time you do this you just, you end up having this

22  sort of really tough knock on affect.

23  Q.    Does going dark have any affect of you signing up new

24  subscribers?

25  A.    Absolutely.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   How so?

2   A.   Well, so whenever you're dark, you know, with a local

3   affiliate, you are just not going to be able to sign up subs in

4   those cities.

5        If you're dark with a popular national network, your entire

6   acquisition is going to slow to a crawl.  You're only going to,

7   you're only going to sign up people that don't care about that

8   particular network.

9   Q.   Do you ever see other pay-TV providers taking advantage of

10  DISH or other distributors going dark?

11  A.   We do.  We see people a little bit more, marketing more

12  aggressively if you are a dark network.  Yeah, that's a fairly

13  common affect.

14  Q.   You said a minute ago you try to track where subscribers

15  go?

16  A.   We do.

17  Q.   Where do they go when they cancel with DISH?

18  A.   Where do they go when they cancel with DISH?

19  Q.   Yeah?

20  A.   Well, we're a satellite provider, so people have typically

21  identified themselves as more, as predisposed to satellite if

22  they go with DISH.  So it's a really good chance that they'll

23  go to DirecTV, the other satellite choice.

24  Q.   If going dark is so detrimental to DISH's business, why

25  does it ever happen?

1  A.   You know, we're part negotiators for better pricing and if

2  you look at the number one consumer complaint, it's the prices

3  are too high.  They're too high and we're paying for hundreds

4  of networks that we don't watch.

5      So we do everything we possibly can to try to keep prices

6  low.  We've kind of staked out the value end of the spectrum

7  for better or for worse.  So we have got to keep the prices

8  down or we're not going to be in business.

9  Q.   Has DISH ever gone dark with any Time Warner Networks?

10  A.   We have.

11  Q.   Can you tell the Court a little bit about what networks

12  went dark?

13  A.   Sure.  And in September 2014 I was brand new to the job,

14  so I was a real welcome party there.  We were negotiating with

15  the Turner Networks, not TBS and TNT, but CNN, HLN, Crew and

16  Cartoon and Boom was part of that as well.

17      And we ended up going dark, I guess it was near the end of

18  November of 2014.

19  Q.   Was near the end of November is that the beginning or the

20  end of the going dark period?

21  A.   Yeah, I have to remember.  I think we, you know what, it

22  might have been end of October that we actually went dark.

23  Q.   Did you say --

24  A.   I think we went dark for about a month.

25      Go ahead.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.   Did you say that you didn't go dark with TBS and TNT?

2  A.   That's right.  They were on another contract.

3       So I think we got within, so if I remember right their TBS,

4  TNT contract was due, I guess it's okay to say, right.  We

5  don't use these dates anymore.  December 5th, and so it would

6  have been sort of October 20th I think we went dark with, with

7  the Turner Networks.

8  Q.   So you had two different contracts for the Turner

9  Networks?

10  A.   That's right.  And a third by the way for HBO.

11  Q.   And CNN, Cartoon and some others besides TBS and TNT, they

12  expired around October 20th?

13  A.   What had happened was we had been extending.  We hadn't

14  been able to reach agreement.  So the two sides mutually agreed

15  to extend a number of times.  But we are, you know, we were

16  fearful that if the two, TBS, TNT was not extending.  So we

17  were fearful that if the rest of the Turner Networks got too

18  close to that expiration, that all of the networks together

19  would be negotiated and that would certainly put DISH in a

20  weaker position.

21  Q.   Why would that put DISH in a weaker position?

22  A.   Well, it's already very strong.  These are tough

23  negotiations.  First of all, the Turner team is very, they're

24  good.  They're hard core negotiators.

25       But secondly, we would be negotiating for even more

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1    networks and TBS, TNT are important networks to us.  So we

2    wanted to keep those expirations apart.

3    Q.    How did the importance of TBS and TNT compare to the other

4    networks at that time?

5    A.    I think TBS and TNT were probably, it's hard to say.  I

6    would say they were more important at the time.  They certainly

7    were, they've always been good networks.  So it's a little bit

8    more subjective.  More important or less important.

9    Q.    You mean more important than the other networks?

10   A.    Right.  CNN, CNF had surged in popularity since then.  So

11   it wasn't quite as important to us then as it is now.

12   Q.    And so did I understand correctly that you had been

13   extending the CNN contract, but not extending the TBS, TNT

14   contract so they had inched closer and closer together?

15   A.    That's exactly right.

16   Q.    Did you ultimately reach a deal to put CNN and the other

17   networks back up?

18   A.    You mean after they went dark?

19   Q.    Yes?

20   A.    We did, we did.

21   Q.    When did you put the networks back up?

22   A.    I think it was about a month after that.  So I think

23   that's the November date.  Maybe November 20, 21.

24   Q.    How long did you extend the agreement for that time?

25   A.    So we had sort of a tricky situation where we had a, well

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1   I guess all extensions are temporary.  But we had an extension

2   through the, I think this is probably through the end of March.

3   In fact, I'm, so it's through the end of March.

4       So we had an agreement to put it back up.  We had this go

5   ahead to launch with Sling, but we had to get everything else

6   done including HBO by March 31st or the thing would blow up

7   again.

8   Q.   When was HBO set to expire?

9   A.   March 31st.

10  Q.   So they all ended up with the same expiration date?

11  A.   Because of that agreement, this is a call between Charlie

12  and I thought it was John Martin, it might have been Jeff

13  Bewkes.

14      A call between Charlie and Turner, Time Warner, all three

15  ended up on March 31st which from a negotiating team's

16  perspective wasn't ideal, but that's our --

17  Q.   You said March 31st, so is that just four months out from

18  when you had gone dark?

19  A.   Yes, March 31st, 2015.

20  Q.   Where was Sling at that time?  Had it launched yet?

21  A.   It had not.  We launched in February of '15, so we

22  launched with that permission.  It's crazy when I look back

23  that we did that.

24      But we did that and I guess we were reasonably confident we

25  would get to a deal.  Although there were certainly a lot of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  negotiating all the way up to March 31st.

2  Q.   So when you say it was crazy that you did that, what are

3  you referring to?

4  A.   Well, we took a risk.  We launched with Turner Networks

5  but it's possible they would have come right back off the

6  service if we hadn't gotten there March 31st.

7  Q.   Did you go dark with any other cable networks during this

8  period between October of 2014 and March 2015?

9  A.   We did.  We went, we had a hard time with Fox News and

10 Business.

11 Q.   Without disclosing any confidential numbers, did you lose

12 any subscribers due to these take downs?

13 A.   We did.

14 Q.   Do you know where the subscribers who left went?

15 A.   We have a pretty good idea.  We certainly know, you know,

16 as I mentioned before, there's a whole group of people that

17 will say where they're going.

18     So we know if they went to DirecTV or cable or some place

19 else.  But then there's a whole group of folks that won't

20 necessarily tell you and there's, you know, a couple of

21 different buckets here of folks that you're estimating.

22 Q.   What are the buckets?

23 A.   Well, I have, you mentioned before I would say there are

24 the, there's the group that calls up and says we're

25 disconnecting.  Some will tell, you some can't.  In a way,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   there are two buckets there.  Some will tell you, some won't.

2      Then there's a group of people that won't buy you.  It's

3   just your acquisition, your subscriber acquisition really

4   dwindles.  We measure that for a certain period of time,

5   certainly like 90 days.

6      After that you have a tale.  And the tale is just this

7   general, you know, A, you're not, you're sort of viewed poorly

8   in the market place.

9      And B, if you have that second, if you go dark with anyone

10  else there's a chance you lose those subscribers.

11  Q.   So just to step back and go through the timeline here.

12  You were negotiating for CNN and the other networks and went

13  dark with them around October 20 of 2014?

14  A.   That's right.

15  Q.   At that time your TBS, TNT contract was set to expire

16  December 5th?

17  A.   That's right.

18  Q.   And the CNN contract had been getting closer and closer to

19  that date?

20  A.   It had been.

21  Q.   Then you were dark for about a month?

22  A.   We were.

23  Q.   But TBS and TNT never went dark?

24  A.   That's right.

25  Q.   And then you reached an agreement to push it out for about

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   four months to March 31st?

2   A.   Right.   Sort of a temporary extension to get everything

3   wrapped up.

4   Q.   Did you ultimately reach deals with Turner and HBO by

5   March 31st?

6   A.   We did.

7   Q.   We'll come back to this topic in a sealed setting?

8   A.   Okay.

9   Q.   But moving on for now, let's talk about the merger between

10  AT&T and Time Warner?

11  A.   Yes.

12  Q.   Do you expect that to have any effect on your next

13  negotiations with Time Warner?

14  A.   Absolutely.

15  Q.   How so?

16  A.   I mentioned before these negotiations with Turner are

17  tough, you know, without any merger on the table.   It's great

18  content.   They're a good team.   They are truly a good

19  negotiating team.

20      So that's the tough negotiation and there are a couple of

21  things about the way the last contract ended that I can share

22  at the right time.   But with no merger, that's going to be a

23  really, you know, hard negotiation.

24      I'd say with a merger, that kind of throws the card table

25  up in the air.   I think all of the incentives change at that

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1   stage.

2       You've got a really important supplier or we've got a

3   really important supplier, teaming up with our biggest

4   adversary, our head to head competition.  And I just don't know

5   what insensitive Turner would then have or Time Warner would

6   then have to really get to a deal with us.

7   Q.   Why do you say that?

8   A.   Well, I mean, we need each other now.  I mean again, I use

9   the term internally, I hope it doesn't sound too aggressive.

10  It's a mutual headlock.

11      We and Turner have each other in this mutual headlock.  But

12  we know we got to get to a deal and we might fight like cats

13  and dogs.

14      I think with the merger that really just changes 180,

15  right.  If I put myself in their shoes, they can raise prices

16  and make more money and make us less competitive, or they can

17  raise, they can present onerous terms that we can't accept.

18  And if we don't accept it, we don't have a business or we lose.

19   I wouldn't say we don't have a business, but we would

20  certainly lose a lot of subs.  It would be severe bleeding.

21  And must of those subs would accrue to their benefit.  Lose

22  lose for us, win win for them.

23  Q.   Would you expect that costs to Time Warner to be any

24  different after the merger than it is now?

25  A.   How do you mean?

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1   Q.   I'm trying to understand how, how the incentives would be

2   different.

3        What exactly would change in the negotiating dynamic?

4   A.   I just think right now they have, they're an independent

5   company with separate P and L statement.  They don't have a

6   pay-TV service.  They provide programming to pay-TV services.

7        I think if you, but if you combine that with a national,

8   not one but two, maybe even three, depending on how you cut it.

9   But DirecTV has national pay-TV service with satellite and they

10  have a national pay-TV service with DirecTV Now.  So it's

11  always, it's more lucrative to take subs than it is to, you

12  know, collect programming, programming fees.

13       Or typically in my, the way I would think of it is you can

14  raise the rates and create terms that are onerous for us.  If

15  we choose to accept, they win.  We become less competitive.

16       If we choose not to accept, it's easy to see our subs

17  walking across the street to either the other satellite

18  provider or the other over-the-top provider.

19  Q.   And the other satellite provider is DirecTV?

20  A.   DirecTV.

21  Q.   And the other, over the top, what does over-the-top mean?

22  A.   Over-the-top is Sling, our internet service.

23  Q.   What DirecTV property does Sling compete with?

24  A.   DirecTV Now.

25  Q.   So you said it's more lucrative to take DISH's subscribers

1  than to get programming fees from you.

2      Why is that?

3  A.   Well, I guess if you look at the gross profit of a

4  subscriber on a monthly basis, it's many times the programming

5  fee that we would pay Turner.

6  Q.   So would you expect to be more likely to go dark if the

7  merger goes through?

8  A.   I would.

9  Q.   How would that affect DISH's approach to the negotiation

10  with Time Warner?

11  A.   It's a great question.  I don't think we've quite figured

12  out what we would do.  I mean, we really are the, you know,

13  it's a Hobsion (sic) choice for us.  They're going to come to

14  us with extraordinary terms and the reason I say that is almost

15  every negotiation starts there.

16      This time on the other hand, when they want to present us

17  with these high rates and onerous terms and we're going to say,

18  no, no, no, you got to be down here.  I don't know how the

19  negotiating proceeds from there.  What happens next.  I just

20  don't see them having any incentive to move.

21  Q.   You said it's a Hobsion choice between taking the onerous

22  terms or losing Turner.  What does that mean?

23  A.   In a typical programming negotiation, a programmer

24  especially one with clout like Time Warner or the other four

25  that I mentioned will come and say we want every network

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  distributed broadly to your subscribers and we need large rate

2  hikes.  That's sort of the playbook.  It's been the playbook

3  for programmers for some time.  Then we work and struggle and,

4  you know, kick and fight to try to meet in the middle.

5      This time I just don't see them having any motivation to

6  move.  So the Hobsion choice is we accept onerous terms which

7  is bad.

8      A, we certainly would hurt our chances of profitability.

9      B, it could mean that we raise rates to the point where

10 we're not competitive.  That's one side, or we don't accept.

11     But this time if we don't accept there's, we don't know

12 what happens.  Because if we go dark our subs that we lose in

13 that period just easily go across the street.  In fact, it

14 accrues to their benefit.

15     So I just don't know what incentive, what motivation they

16 would have to budge, to move, to get to an agreement with us.

17 Q.   You talk about onerous terms.  Would you expect any of

18 these terms to affect Sling?

19 A.   I do, absolutely.

20 Q.   How so?

21 A.   We've fought hard and one of the big holdups there were a

22 number of unsettled issues when we did the, the last

23 negotiation.

24     But one of the places we just, just been single minded is

25 limiting the number of networks in our Orange and Blue, but

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  Orange in particular.  And so it's easy to imagine somebody

2  with this sort of clout and this sort of incentive coming in

3  and saying we need to take all eight.  Once that happens, that

4  breaks our model.

5     I mean it's sort of a fragile existence that we have

6  innovated.  We've got subscribers who are voting with their

7  checkbooks, you know, with a leader in this and it could just

8  go away if we're forced to take eight networks.

9  Q.   Would you expect it to be any more likely to get a

10  proposal like that from a merged Time Warner than from a

11  independent Time Warner today?

12  A.   Yes.

13  Q.   Why?

14  A.   Because they now have a competing service and DirecTV Now.

15  So the switching, in the satellite business you actually have

16  to call up.  You have to have somebody come visit your house.

17  They have to be there, they take the equipment, there's a lot

18  of inefficiency.

19     So the switching cost is much higher than if you go to your

20  phone, you go to the site and you just say cancel.  So the

21  switching cost is almost zero for Sling.  And you can see our,

22  the sub base that we've managed to build dissipate quickly.

23  Q.   So you said that you think you would be more likely to go

24  dark with Time Warner if it were owned by AT&T.

25     Would the effects on DISH going dark be any worse?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   I think it would be more dramatic.  You know, we went dark

2  once.  This example that we talked about in fall of '14.  At

3  the time that was just satellite to satellite.

4     Here we would have Sling to DirecTV Now.  And those, I

5  personally think those subs would go faster.

6  Q.   So you're saying that during the 2014 going dark at the

7  sub, Sling wasn't in existence yet?

8  A.   That's right, had not launched yet.

9  Q.   So people were just going satellite to DirecTV or where

10  ever else?

11  A.   Right.

12  Q.   Now Sling is in existence, how many subscribers does it

13  have?

14  A.   2.2 million.

15  Q.   How does that compare to the other internet based pay-TV

16  providers?

17  A.   It's about twice as large as the number two, DirecTV Now,

18  if I remember the numbers right.

19  Q.   Would you anticipate there to be any affects on the

20  satellite side of the business as opposed to just the Sling

21  side?

22  A.   There would be.  Those are certainly valuable customers as

23  well, but we would absolutely lose subs.

24  Q.   Could DISH just choose to drop Turner from the Sling

25  programming line rather than accept more networks?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   We could, but that gets back to this idea that, you know,

2  what kind of, what kind of service would we have?

3     I keep thinking about March Madness because we're right in

4  the middle of it.  But it's hard to imagine having Sling with

5  no March Madness.  It's hard to imagine getting to an election

6  without no CNN.  It's hard to imagine getting NBA, NBA finals

7  without TNT.  It's possible, but certainly not what we built

8  our business on.

9  Q.   So if you were forced to take more networks into the Sling

10 package or pay significantly higher rates than you're

11 expecting, how would that affect the Sling product and its

12 customers?

13 A.   So we've fought as I mentioned before long and hard to

14 limit Sling Orange to four cable networks.  Some have fewer

15 still.  Folks say Scripps only got three.

16 Q.   And Scripps that's HGTV, Food Network and Travel Channel?

17 A.   That's right.  So A there would be more cost, right.  And

18 we're already on razor thin margins with Sling.  So that would

19 mean we'd have to raise prices almost certainly.

20    But then secondly, whoever the next group is in 2019 to

21 negotiate would, there's just no way we would be able to keep

22 them at four if Turner had eight.

23    So it only takes a couple of those and the model is broken.

24         THE COURT:  Is this a good time to take the afternoon

25 recess?

1           MS. KISER:  Yes, Your Honor.

2           THE COURT:  All right, we're going to take a 15

3    minute recess.  You are a witness under oath in the case.

4           THE WITNESS:  Okay.

5           THE COURT:  What that means is you're not allowed to

6    discuss your testimony so far or what it might be when you

7    return with anyone, including your own lawyer.  You can't talk

8    to anyone about it.  You have to be able to answer the question

9    under oath, did you discuss your testimony with anyone and say

10   no.

11       So stay independent of all others.  Be back in 15 minutes

12   and we're going to go to five o'clock today.

13       (Witness excused.)

14          THE COURT:  Now how much longer do you have on

15   direct?

16          MS. KISER:  I would say 30 minutes.

17          THE COURT:  Thirty minutes, very good.

18          (Recess at 4 o'clock p.m.)

19          (Proceedings resumed at 4:20 p.m.)

20          THE DEPUTY CLERK:  Your Honor, recalling Civil Action

21   Number 17 dash 2511, United States of America versus AT&T,

22   Inc., et al.

23          THE COURT:  All right.  You remain under oath.

24       Proceed when you're ready.

25          MS. KISER:  Thank you, Your Honor.  We'd like to show

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   the witness the sealed exhibit that we introduced earlier.   May

 2   I approach?

 3                THE COURT:  Yes.

 4                     DIRECT EXAMINATION (Cont'd)

 5   BY MS. KISER:

 6   Q.   Could you please turn to page 38 of Exhibit 409.

 7   A.   Okay.

 8                THE COURT:  You have to identify what this document

 9   is for the record.

10   BY MS. KISER:

11   Q.   Mr. Schlichting, what is this document?

12   A.   This is the Carriage Agreement for Turner Networks, dated

13   April 1st, 2015.

14                THE COURT:  All right.

15   BY MS. KISER:

16   Q.   So if you'll turn to page 38, paragraph A-2.

17   A.   Okay.

18   Q.   Under 7, term and rates, do you see the date there in

19   paragraph A?

20   A.   I do.

21   Q.   Is that the expiration date of your agreement with Turner?

22   A.   It is.

23   Q.   All right.  You can set Exhibit 409 aside.

24   A.   Okay.

25   Q.   So before the recess we were talking about the AT&T Time
```

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1   Warner merger.

2   A.    Okay.

3   Q.    Are you aware that Comcast acquired NBC Universal seven

4   years ago?

5   A.    I am.

6   Q.    How does Comcast footprint compare to that of DirecTV?

7   A.    Geographically it's about thirty percent of national,

8   yeah, DirecTV has a national footprint, so Comcast would be

9   thirty percent of that.

10  Q.    Does that difference have any implications for your view

11  of that vertical integration versus this one?

12  A.    It does.

13  Q.    How so?

14  A.    Well, this satellite is a national wide service.  So we

15  compete, you know, we really compete in all of the nooks and

16  crannies of the entire U.S.

17      So, you know, by comparison we would only compete against

18  Comcast and thirty percent of the geography.

19  Q.    And why would that affect your view of their mergers?

20  A.    It's just, you know, it's our -- I mean, DirecTV is our

21  primary competitor.  And every single subscriber that we

22  potentially acquire is also potentially a DirecTV subscriber,

23  whereas with Comcast it's more than likely not the case that,

24  you know, that Comcast would be able to acquire that sub.

25  Q.    Have you negotiated with NBCU since it was acquired by

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  Comcast?

2  A.    I have.

3  Q.    When was that negotiation?

4  A.    That was in spring of 2016.

5  Q.    Were the FCC order and consent decree related to the

6  Comcast NBC merger in effect at that time?

7  A.    They were.

8  Q.    And what was your understanding at a high level of the

9  arbitration provisions in those?

10  A.    If we couldn't come to terms, then we could file, we could

11  give notice that we wanted to go to arbitration.  There was

12  some time in between, ten to fifteen days, I think it was, not

13  less than ten, not more than fifteen, set aside for a cooling

14  off period.  But we had to decide after ten days if we wanted

15  to proceed and make an offer, which would have been done, you

16  know, would have been our offer in arbitration.

17  Q.    Okay.  So it was a baseball style arbitration?

18  A.    Yes, baseball style arbitration where you choose one.

19  Q.    And the first step to invoking would be filing a notice?

20  A.    Yes.

21  Q.    And then you mentioned a cooling off period.  What is

22  that?

23  A.    So I think it's just a period during which both sides take

24  a chance to figure out if they really want to go through with

25  this.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   And then after the cooling off period, you said that's

2   when you would submit your offer?

3   A.   Right.

4   Q.   And what's your understanding of what would happen once

5   you submitted a final offer to arbitration?

6   A.   So the way I think it works is that -- I mean, you've

7   got -- the way this is written, the way the Comcast NBC

8   Universal consent decree is written, there's a single

9   arbitrator who looks at, you know, the market comparables and

10  collects as much market data, at least hopefully, as they can.

11  And then chooses one of the offers.

12  Q.   Was NBC Universal and Sling at the time of the

13  negotiation?

14  A.   They were not.

15  Q.   Were you seeking rights to put them in a Sling package?

16  A.   We were, we were.

17  Q.   And at any point during negotiation, did you come close to

18  going dark with NBC?

19  A.   Not really.  We ended up, we -- this arbitration, the way

20  it's written for sure, it's just risky.  It's a risky

21  consideration, so prior to giving notice, we thought long and

22  hard about whether or not we should put our -- the way we think

23  about it, for better or for worse, is put our head in the

24  noose, this arbitration, because that carries with it a lot of

25  risk.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    But then on the other side, the risk was going dark.   And

2   so those we weighed that decision before we gave notice.   So in

3   danger of going dark, no.   We were trying to choose between the

4   two.

5   Q.   So what happened after you gave notice of intent to

6   arbitrate it?

7   A.   So after we gave, I think we did that -- I think it was

8   the 18th of March.   And I think the contract expired on the

9   20th.   So then we had a period during which we really had to

10   figure out if we wanted to give the go ahead, right.   And by

11   the way, it was for -- that was for satellite only.   We did not

12   want to put Sling at that sort of risk.   So it was just sort of

13   an uneven process that carried with it a lot of risk for our

14   business.   And so we spent a lot of time chasing around whether

15   or not this was a good thing or not, you know, it could blow up

16   on us.

17   Q.   Did you ever submit a final offer and agree to be bound by

18   arbitration?

19   A.   We did not.

20   Q.   Did you reach a deal with NBC?

21   A.   We, I think we did eventually.   I mean, I can't say it was

22   a very -- I don't know.   I wouldn't -- I didn't like that deal,

23   but what happened next was that I think we must have both

24   agreed that we would try again, and so we extended for a longer

25   period of time.   And I think it was maybe three months later

1   that we finally signed a deal.  It was a long time.

2   Q.   So let's talk about the arbitration offer that's on the

3   table in this case.  Have you received an offer from Turner?

4   A.   We have.

5   Q.   When did you receive that?

6   A.   Sometime in November, I don't remember the exact date.

7   Q.   Does it resolve the concerns you've discussed about this

8   merger?

9   A.   It does not.

10  Q.   Why not?

11  A.   Well, for the same -- the same reason that I was just

12  talking about with NBC Universal, but more of it.  It's -- this

13  is a complicated -- these deals are complicated.  And so one of

14  the biggest risks to my mind is that an arbitrator will even

15  understand what the documents say and that puts and takes,

16  gives and gets, there's just so much trading going on that the

17  written word is not going to tell you what was given before,

18  sacrificed, you know.  So it's complicated.

19      It's an all or nothing proposition, so the risk is really

20  high in our mind that you have this.  It's, you know, and by

21  the way, the way I understand the offer from Time Warner,

22  you've got to do both, you know.

23      And so it's both meaning satellite and Sling, and that --

24  that's just hard to -- that's a hard proposition for us in

25  terms of the risk.  Not only do you have risk in satellite,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  which is a little bit better established, but this Sling is,

2  it's just new, and it's innovative and it's different and

3  unique, and it's just so easy to see that thing get crushed.

4      So we see the risk really as it's asymmetrical risk from

5  the standpoint that, you know, it's -- it's -- we're all in

6  when we go to arbitration.  Whereas the other side, I would --

7  I mean, I don't want to minimize it, but it's a temporary blip

8  for them if things don't go exactly as planned.

9  Q.   Let's go back to the first thing you said for a minute

10  about fair market value.  Do you have an understanding of what

11  that term means?

12  A.   Well, I don't really.  I mean, I guess if you -- if you

13  say that it equals rate, then there's just a whole host of

14  things.  I mean, these deals are more about everything else

15  than they are about rate.  So I would -- that -- I feel uneasy

16  about that because fair market value could only be concrete if

17  it's about rate.  If it's about everything else, then I don't

18  really know what it means.

19  Q.   How much of the time you spend negotiating with

20  programmers is on rate versus other terms?

21  A.   Oh, I don't know.  I think when I got to the job I thought

22  it was going to be sort of 80 percent about rate and, you know,

23  that's sort of the way the legend works.  Twenty percent on

24  everything else.  I'd say it's probably flip-flop.  It's

25  probably eighty percent about all these other complicated

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  rights on digital and over the top and B.O.D.  There's just a

2  lot of digital negotiation that goes on now.  So I would say, I

3  mean, it's a guess, but I would say the majority of the time is

4  on -- is not about rate.

5  Q.   Do those other terms affect Sling or satellites'

6  competitiveness?

7  A.   They do.  They really do.  They affect both, but Sling in

8  particular.

9  Q.   Why is it Sling in particular?

10  A.   Well, Sling is, you know, all digital and so it's fairly

11  new ground in a lot of respects.  And so Sling is fledgling,

12  it's digital, those are new rights.  And so it wouldn't -- it

13  doesn't take much of a shift to really impact Sling's future.

14  Q.   Do you know what evidence the arbitrator would look at in

15  determining fair market value?

16  A.   Well, that's another, you know, with respect to Sling,

17  that's actually, that's an interesting -- so we think Sling is

18  unique, truly unique.  But if you think about it, if it is

19  unique and we're right, then I don't know what the comparable

20  is out there.  I mean, if I look at the way we fought so hard

21  to keep our skinny bundle.  If every other service has these

22  big bloated, you know, all the networks in the base package or

23  many networks in the base package, that would be the

24  comparable, so I guess that's really where a lot of our fear

25  comes from is that if the arbitrator looks at the comparables,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  we could have a deal that looks like them and that would be

2  really bad for us.  I mean, that would break what we think is a

3  unique model.

4  Q.   You also mentioned an asymmetric risk, can you explain to

5  the Court what you're talking about there?

6  A.   Yeah, that might be -- I don't know, that's kind of a

7  fancy term.  It's not as risky for them as it is for us.  We're

8  going to put our business at risk, and, you know, my view of

9  the other side, they put monthly fees at risk for awhile.  It

10 just doesn't seem like the same risk.  They're -- for sure

11 they're not putting their entire business at risk.  And I feel

12 like, as president of Sling, I would be putting all of it at

13 risk.  It would just --

14 Q.   Why do you think you'd be putting all of the Sling

15 business at risk?

16 A.   Well, it would just be our model, you know, I don't want

17 to be too dramatic there.  But we are really competing, you

18 know, we're trying to listen to the consumer and say, you don't

19 have to pay these high prices, you don't have to pay for scads

20 of networks that you don't want, don't watch.  And as soon as

21 the programmers have their way, they will jam as many networks

22 as possible into those base packages, and then suddenly you've

23 got this bloated pay-TV bundle again.

24     I mean, again, I don't want to disrespect the others, but I

25 feel like the innovation we've brought is by just keeping it to

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1   three, or sometimes two, two, three or four networks.  And

2   every other package that you see out there has many, many

3   networks.  They basically duplicated the pay-TV on cable or

4   pay-TV on satellite, they've duplicated those packages, and

5   it's just over the Internet now.  So I don't know, you know,

6   I'll just -- I'll stop there.

7   Q.   When you say two, three or four networks, are you talking

8   about Sling orange or Sling blue?

9   A.   Well, in both cases we've fought like crazy to keep

10  network numbers low, but particularly in orange, Sling orange,

11  we have fought to say it's four cable networks, right?  And

12  even in blue, we've, you know, we haven't been able to hold

13  the -- put the lid on it quite as much.  But we fight to keep

14  networks out.

15  Q.   What's the most networks of any programmer in the blue

16  package?

17  A.   So technically we have four NBC Universal cable networks

18  but they were able to jam us with NBC broadcast.

19  Q.   Is that in all the NBC markets or just the ones that --

20  A.   No just the own and operated.  So we've said no to all the

21  affiliates, but they've jammed us with that.  Then they've got

22  the RSNs in there.  And then when the Olympics come around

23  they've got the Olympics in there.  So, you know, it's four

24  core cable networks, but they kind of got us with the others.

25  Q.   Another issue you mentioned is that you think you'd have

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  to arbitrate for satellite and Sling.

2  A.   Yes.

3  Q.   If you could just arbitrate for satellite, would that --

4  would that solve that issue?

5  A.   It would not.

6  Q.   Why not?

7  A.   It would not.  Well, the -- I think the issue remains, I

8  mean, I'm going to back up here a second.

9      So if they can jam eight networks into that basic package

10  because those are the comparables in arbitration.  Then you

11  say, okay, we'll take Sling out of arbitration and have that

12  stand alone.  Sling is then orphaned from its parent, which is

13  where it gets all of its power in these negotiations.  So it

14  might be even easier to jam, you know, eight networks or pick

15  your number into Sling if it had to negotiate on the standalone

16  basis.  But neither of those, just neither of these is a good

17  scenario for us, right.

18  Q.   And what networks are covered by the arbitration offer?

19  A.   I believe all of the Turner Networks and not HBO.

20  Actually, you should ask the question.  HBO scares me, because

21  if I'm in their shoes as negotiator, I hold HBO out, and now

22  I've got a hammer to -- I've got leverage outside of the

23  arbitration with which I can affect the arbitration is probably

24  the best way to say it.  It's like waive your rights.  That's

25  an obvious one, there are less obvious ways to do it too.

1  Q.   Does the arbitration offer mitigate any of your concerns

2  related to the effects on Sling?

3  A.   Not really.  Not really.

4       MS. KISER:  Your Honor, at this time that concludes

5  the questions we can -- that I can ask publicly.

6       So we would ask that we close the courtroom or put on the

7  husher to go through a few more questions.

8       THE COURT:  We're going have to do a -- you'll have

9  to make a proffer to the Court at the bench as to why you need

10 to do this.  And then Mr. Petrocelli, if he wishes to oppose

11 it, will get to make his arguments as to why he wants to oppose

12 it.

13      So you can have a seat, sir.  Just step down right over

14 there and sit there.

15      (Witness withdrew from the witness stand.)

16      (Sealed Bench Conference.)

17

18

19

20

21

22

23

24

25



**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**



\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*







\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*





\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*



**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***





**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**



**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**





22      (Open Court.)

23      (Witness resumed the witness stand.)

24          THE COURT:  All right.  Here's the situation.

25      We've got to get to the bottom of a couple of legal

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   questions over night.  Tomorrow morning we will start by

2   addressing those in a closed courtroom.  So you won't be in

3   here for that.

4          THE WITNESS:  Okay.

5          THE COURT:  But the DOJ team will have someone who

6   will have you close by, closer by than before.  Where did you

7   have him, in the basement, in lockup or something?  So keep him

8   closer than that, please.

9       So you should be ready to go at 10:30, but you won't be

10  actually going at 10:30 because we're going to have some

11  arguments in here.

12         THE WITNESS:  Okay.

13         THE COURT:  Then we're going to have to let the --

14  either let the people back in or I have to make a decision to

15  have a portion of your testimony in closed session.

16         THE WITNESS:  Okay.

17         THE COURT:  I have to figure that part out with the

18  added assistance of counsel.  So what that means is you're a

19  witness under oath over night.

20         THE WITNESS:  Got it.

21         THE COURT:  Which means you can't discuss your

22  testimony so far or what it might be when you return with

23  anyone, including your lawyers or the Justice Department

24  lawyers or anyone else, including your in-house counsel,

25  nobody.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1              THE WITNESS:  Okay.

 2              THE COURT:  Tomorrow morning you have to be able to

 3   answer under oath you haven't talked with anybody about your

 4   testimony since you left here today, okay.

 5              THE WITNESS:  Okay.

 6              THE COURT:  You're excused.

 7              THE WITNESS:  Will do, thanks.

 8              THE COURT:  Step down.

 9         (Witness excused.)

10              THE COURT:  All right.  Anything else for the

11   government?

12              MR. CONRATH:  Nothing, Your Honor.

13              THE COURT:  Anything else for defense?

14              MR. PETROCELLI:  No, thank you, Your Honor.

15              THE COURT:  Have a nice evening.

16              (Trial adjourned at 5:05 p.m.)

17                             -oOo-

18

19

20

21

22

23

24

25
```

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1                              CERTIFICATE

2             I certify that the foregoing is a true and correct

3    transcript, to the best of my ability, of the above pages, of

4    the stenographic notes provided to me by the United States

5    District Court, of the proceedings taken on the date and time

6    previously stated in the above matter.

7             I further certify that I am neither counsel for, related

8    to, nor employed by any of the parties to the action in which

9    this hearing was taken, and further that I am not financially

10   nor otherwise interested in the outcome of the action.

11

12   _____          _____

13   /s/Crystal M. Pilgrim, RPR, FCRR          Date: March 27, 2018

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CV No. 17-2511 |
| | ) | |
| | ) | Washington, D.C. |
| vs. | ) | March 27, 2018 |
| | ) | 10:48 a.m. |
| AT&T, INC., ET AL., | ) | |
| | ) | Morning Session |
| Defendants. | ) | |
| _____ | ) | Day 3 |

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                            Eric D. Welsh
                            Timothy B. Walthall
                            Andrew C. Finch
                            Nathan D. Brenner
                            Melanie Kiser
                            U.S. DEPARTMENT OF JUSTICE
                            Antitrust Division
                            450 Fifth Street, NW
                            Washington, D.C. 20530
                            (202) 532-4560
                            craig.conrath@usdoj.gov
                            eric.welsh@usdoj.gov
                            timothy.walthall@usdoj.gov
                            andrew.finch@usdoj.gov
                            nathan.brenner@usdoj.gov
                            melanie.kiser@usdoj.gov

**\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\***

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

Katrina M. Robson
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 220-5052
krobson@omm.com

Daniel M. Petrocelli
M. Randall Oppenheimer
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067
(310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Michael L. Raiff
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
(214) 698-3350
mraiff@gibsondunn.com

For Defendant
Time Warner, Inc.:

Kevin J. Orsini
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1140
korsini@cravath.com
pbarbur@cravath.com

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

**\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\***

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|

GOVERNMENT'S:

WARREN SCHLICHTING          332

– – –

INDEX OF EXHIBITS

– – –

| DEFENDANT'S | IDENTIFIED | ADMITTED |
|-------------|------------|----------|
| 919 – | 365 | |
| 920 – | 376 | |

– – –

INDEX OF EXHIBITS

– – –

| PLAINTIFF'S | IDENTIFIED | ADMITTED |
|-------------|------------|----------|
| 414 | | 385 |



1          P R O C E E D I N G S

2       (Sealed proceedings held)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

306

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

308

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

309

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

310

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

313



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

314





***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

318

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

320

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

328

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

330



(Recess from 11:25 a.m. to 11:51 a.m.)

1    DEPUTY CLERK:  The United States District Court

2    for the District of Columbia is again in session, the

3    Honorable Richard J. Leon presiding.  God save the United

4    States and this Honorable Court.  Please be seated and come

5    to order.

6            Your Honor, re-calling Civil Action No. 17-2511,

7    the United States of America v. AT&T, Incorporated, et al.

8            THE COURT:  All right.

9            The witness can resume the stand.  You remain

10   under oath.

11           Mr. Petrocelli, when you're ready,

12   cross-examination.

13           MR. PETROCELLI:  Thank you, Your Honor.

14           MR. CONRATH:  Your Honor, may I ask a process

15   question I should have asked before the break?

16           THE COURT:  All right.

17           MR. CONRATH:  If there are -- if there are

18   questions that are objectionable on privilege or

19   confidentiality, we may not know or be in a position to

20   object; and as a general issue with third-party witnesses,

21   may the third-party witnesses' counsel object on grounds of

22   privilege or confidentiality?

23           THE COURT:  No.

24           MR. CONRATH:  Very well.

25           THE COURT:  No.  All objections are done by

1    Justice Department attorneys.

2              MR. CONRATH:  Thank you.

3              THE COURT:  If you need to confer with them, you

4    can, but one lawyer per witness, per side.

5              MR. PETROCELLI:  Thank you, Your Honor.

6              May I proceed?

7              THE COURT:  You may.

8              MR. PETROCELLI:  Thank you.

9    WARREN SCHLICHTING, WITNESS FOR THE GOVERNMENT, HAVING BEEN

10   PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS

11   FOLLOWS:

12                        CROSS-EXAMINATION

13   BY MR. PETROCELLI:

14        Q    Mr. Schlichting, Dish regards DirecTV as its

15   primary competitor; is that right?

16        A    I believe that's right.

17        Q    And your company's opposing the merger --

18        A    We are.

19        Q    -- correct?

20             Okay.  And in connection with your company's

21   opposition to this merger, you've met with the Department of

22   Justice, you and others from the company, on a number of

23   occasions, correct?

24        A    I have, yes.

25        Q    And a written submission was made to the

Case 1:17-cv-02511-RJL **\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*** Document 158 Filed 08/06/18 Page 377 of 3826

333

1    Department of Justice last summer, expressing opposition to

2    the merger, correct?

3         A    That's correct.

4         Q    And, also, proposing conditions to this merger in

5    the event the merger were to be approved, correct?

6         A    The in the event it's approved.

7         Q    Now, in preparing your testimony, you've worked

8    with the Department of Justice lawyers, right?

9         A    I have.

10        Q    And how long have you been in Washington, D.C.

11   prior to taking the stand yesterday?

12        A    In D.C., I was here -- I arrived on Saturday, left

13   on Thursday, I believe, when -- or I guess it was Friday

14   when we didn't have court on Friday.

15             So it was sort of day for day.  I kept waiting to

16   go on the stand.

17        Q    And you met with the Department of Justice over

18   the weekend, correct?

19        A    On Sunday afternoon.

20        Q    Right.

21             Into the evening, right?

22        A    Yes.  I mean, we started late in the afternoon.

23        Q    Now, where were you when you received the email

24   attaching the transcript of Ms. Fenwick's testimony?

25        A    It was actually on an Amtrak train.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    Q    You were on the East Coast?

2    A    Yes.  I was training from D.C. to, I guess it must

3  have been from New York to Philadelphia.

4    Q    And the email attached the transcript of Ms. Cox's

5  testimony, excuse me, Ms. Fenwick's testimony and also

6  highlighted portions of my cross-examination of her,

7  correct?

8    A    It did.

9    Q    Yeah.

10       And there was also a summary of the topics that I

11  covered with her, correct?

12   A    So I guess those feel like one and the same, but

13  there was a list of various topics that you covered.

14   Q    And you read the email, including the listing of

15  the topics, right?

16   A    I did.

17   Q    And you opened up the transcript, which had the

18  actual testimony, correct?

19   A    I did.

20   Q    Okay.  And you saw a number of highlighted

21  portions of the testimony, correct?

22   A    As I mentioned yesterday, I got just to the

23  highlighted portions when I received the email from

24  Mr. Blum.

25   Q    Well, you didn't receive the email until about an

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

335

1  hour and 15 minutes after you had received the transcript,

2  correct?

3      A    Right.  But I didn't open up the email right away.

4  I was doing my email on the train.

5      Q    So it's your testimony that the moment you were

6  starting to read the transcript, you saw the email and you

7  stopped?  Is that your testimony?

8      A    No.

9           My testimony is that I spent too much time on the

10  non-highlighted piece.

11      Q    That wasn't my question.

12           My question is, are you telling the Court that you

13  did not review any of the actual testimony that was in the

14  transcript?

15      A    So you have to --

16           MS. KISER:  Objection; mischaracterizes his

17  testimony.

18           THE COURT:  Objection overruled.

19           Answer the question that's been propounded,

20  please.

21           THE WITNESS:  Yeah.  I might be misunderstanding

22  it.

23           THE COURT:  Well, ask for clarification if you

24  don't understand it.

25           THE WITNESS:  Okay.  Would you clarify what you

1    mean by "testimony."

2    BY MR. PETROCELLI:

3         Q    You don't understand what "testimony" means?

4         A    Well, I think I mentioned that I spent time

5    reading the first part of that, right?

6              And so if it's the --

7    BY MR. PETROCELLI:

8         Q    Sir, I have the email here.  The email is one, two

9    paragraphs.  It covers about a half a page.  That took you,

10   what, 20 seconds to read?

11        A    So the email or the testimony?

12        Q    The email.

13        A    Okay.

14             So the email I read.

15        Q    You read the email?

16        A    Yes.

17        Q    Okay.  Then there was a transcript.

18        A    Yes.

19        Q    And you know what a transcript means.  A

20   transcript of a trial proceedings, correct?

21        A    I do.

22        Q    And it was highlighted for you in yellow?

23        A    Okay.  I started, to my recollection, there are no

24   highlighted yellow pieces where I started.  And I started

25   reading from the beginning of this transcript.

1          And, yes, when I got to the -- you know, I really

2     felt like I had just gotten to the good stuff when I got the

3     email from Jeff Blum.

4          Q    But you didn't get to the good stuff, almost to

5     it?

6          A    I did not read through the testimony.

7          Q    And you didn't delete the email with the

8     transcript, correct?

9          A    I did not.

10         Q    You still have it, right?

11         A    I still do.

12         Q    And you had it all weekend, right?

13         A    I did.

14         Q    Now, you mentioned that -- let me rephrase the

15     question.

16          It is correct that in your business, it's a

17     relatively tight-knit community of people that do these

18     negotiations, and they frequently talk with one another,

19     correct?

20         A    No, we do not frequently speak with each other.

21         Q    Did you not tell that yesterday in our conference,

22     that it was a small community of people?

23         A    I said it was a small group.

24         Q    And did you not say that they often talk to one

25     another?

1       A    I did not -- or at least I don't recollect saying

2   that.

3       Q    And you said that you had never heard of

4   Suzanne Fenwick, correct?

5       A    I said it surprised me that I did not know

6   Suzanne Fenwick.

7       Q    Because you know most of the people who do these

8   deals, right?

9       A    I do.

10       Q    How long have you been in the business?

11       A    Which business?

12       Q    The business you're in.

13       A    So I started with Comcast in 2002.

14            And I started with Dish in 2011.

15       Q    And so you were at Comcast for nine years?

16       A    I was.

17       Q    And what did you do there?

18       A    I oversaw their advanced advertising business.

19       Q    And then when you came to Dish in 2011, what did

20   you do?

21       A    Advanced advertising -- or, actually, I oversaw

22   the entire media sales group.

23       Q    And then you started doing, heading up

24   negotiations of the carriage agreements in or about the fall

25   of 2014?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

339

```
 1        A    That's right.

 2        Q    And --

 3        A    In mid September.

 4        Q    And you continue to do that in addition to you're

 5   now the President of Sling, right?

 6        A    I do.

 7        Q    Okay.  And your boss is Charlie Ergen?

 8        A    My boss technically is Erik Carlson, who's the CEO

 9   of Dish, but I do speak with Charlie fairly often.

10        Q    Well, Mr. Ergen is the founder of Dish, right?

11        A    He is.

12        Q    And he's the chairman of the company, right?

13        A    He is.

14        Q    And he's the principal stockholder, correct?

15        A    He is.

16        Q    And no major decisions get made without him,

17   correct?

18        A    I would say that's fairly accurate.

19        Q    Dish doesn't take any anybody dark without

20   Mr. Ergen's approval, correct?

21        A    He is typically in the loop.

22        Q    More than in the loop.  That's his call, isn't it?

23        A    So certainly when I began in programming, it was.

24   He has given us additional latitude over the years on some

25   of the transactions.
```

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

340

1      Q    Now, yesterday, you gave some testimony about
2  Turner being must have.

3      A    I did.

4      Q    Now, this, to be clear, this phrase "must have" is
5  commonly used in the industry, right?

6      A    Yeah.  I'm not sure it has a commonly accepted
7  definition, but it is a, sort of a turn of phrase that's
8  used.

9      Q    And it's used a lot in sales pitches, right?

10     A    Certainly, in sales pitches.

11     Q    Programmers pitching their content, right?

12     A    That's right.

13     Q    Now, I want to talk with you first about
14  Turner Sports, okay?

15          Do you know what percentage of national sports
16  viewing is accounted for by Turner programming?

17     A    Can you define that further for me.

18     Q    Yes.

19          Of all sports viewing, national sports viewing on
20  television, let's say, in 2017, what percentage is Turner,
21  do you know?

22     A    It's not really a metric we use.  It's not a
23  metric we find relevant.

24     Q    I asked you if you knew.

25     A    Yeah.  No, I don't know.

```
 1       Q    You do know that Turner doesn't carry the NFL,

 2   right?

 3       A    I do.

 4       Q    Okay.  So no football games, right?

 5       A    That's right.

 6       Q    Never had the Super Bowl on Turner, right?

 7       A    No.

 8       Q    Doesn't carry any NCAA football games, correct?

 9       A    That's correct.

10       Q    That's regular season, as well as college

11   playoffs, correct?

12       A    That's correct.

13       Q    No NASCAR, correct?

14       A    No NASCAR.

15       Q    Doesn't carry National Hockey League, correct?

16       A    That's right.

17       Q    No Major League Soccer, correct?

18       A    I believe that's right.

19       Q    No rights to the Olympics --

20       A    That's right.

21       Q    -- correct?

22            On the NBA, do you know how many regular-season

23   games did they broadcast?

24       A    Again, it's just not a metric we look at.

25       Q    I didn't ask you about the metrics.  I'm simply
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  asking you whether you know.

2       A    So since we don't look at it, since we don't find

3  it relevant, no.

4       Q    So the answer is you don't know.

5       A    It's --

6       Q    I didn't ask you if it was relevant.  I simply

7  asked you if you know how many games --

8       A    Sense it's not relevant, no.

9       Q    That's not my question.

10      A    I answered it.  I just answered it.

11      Q    It's the Court's province to determine what's

12  relevant.  I'm simply asking questions, okay?

13           Do you know how many basketball games the NBA

14  broadcasts?

15      A    We did not look at that number.

16           THE COURT:  Sir, you really have to answer the

17  question.

18           THE WITNESS:  But I answered "no."  I said,

19  because we don't look at the -- because find it relevant,

20  no.

21           Then he asked again.  So I'm not sure where to go

22  next.

23           MR. PETROCELLI:  Your Honor, I move to strike his

24  explanatory reasons for why he doesn't know certain things.

25  I'm entitled to ask these questions.  They're

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

343

```
1    straightforward.
2             THE COURT:  Just -- look.  We don't need fencing
3    here.
4             THE WITNESS:  Okay.
5             THE COURT:  Listen to his question.  If you don't
6    understand it, you can ask for clarification.  Just answer
7    the question he asks.
8             THE WITNESS:  Okay.
9    BY MR. PETROCELLI:
10        Q    Do you know how many --
11            THE COURT:  If you need to explain your answer,
12   you can ask to explain.
13   BY MR. PETROCELLI:
14        Q    Do you know how many NBA games Turner carries in a
15   year, regular season?
16        A    I do not.
17        Q    Okay.  Do you know whether they carry NBA playoff
18   games?
19        A    I don't.
20        Q    Now, yesterday, I thought I heard you say that you
21   can catch the NBA finals on Turner.  Do you recall saying
22   that?
23        A    I think I corrected that to say the all-star game.
24        Q    Basketball all-star game, correct?
25        A    Yes.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

344

1      Q    So not the finals?

2      A    That's right.  When I said "finals," I realized

3  that that was --

4      Q    And Turner has never had the NBA finals, correct?

5      A    To my knowledge.

6      Q    That's on the broadcast station, correct?

7  Is that right?

8      A    Yes.

9      Q    Okay.  Major League Baseball games, do you know

10  how many Turner carries in a year, regular season?

11     A    I do not.

12     Q    If I told you 13, would you accept that?

13     A    I look at hours viewed.  So I wouldn't know.

14     Q    It's never had -- it's carried some

15  Major League Baseball playoff games?  Do you know that?

16     A    If you say so.

17     Q    No.  Do you know?

18     A    No, I don't.

19     Q    Okay.  Has it ever had the broadcast rights to any

20  World Series?

21     A    I don't believe so.

22     Q    Does it have a regional sports network?

23     A    It does not.

24     Q    And Dish does not carry all regional sports

25  networks that are available, correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        A    We do not.

 2        Q    Now, you gave quite a bit of testimony about March

 3   Madness.  In fact, I think you said yesterday, if you don't

 4   have March Madness, you're not in the pay-TV business.

 5             Do you recall saying that?

 6        A    I do.

 7        Q    Okay.  So let's follow up on that.

 8             Now, you mentioned that right now we're in March

 9   Madness, right?

10        A    That's right.

11        Q    But the Final Four is available on the Internet

12   right now for free, right?

13        A    Three hours for free.

14        Q    Per device, correct?

15        A    Sure.  I mean, if you want to go get a second and

16   third device, you can continue to sort of game the system.

17        Q    And you can watch the -- and there are apps that

18   you can download to watch these games for free right now?

19        A    That's correct.

20        Q    And so your subscribers who may not have Turner,

21   for example, they can get March Madness for free, correct?

22        A    When you say our subscribers, do you mean

23   satellite or Sling.

24        Q    Well, let's take some of your -- on your Dish

25   subscribers, on the satellite, not everybody subscribes to
```

1  Turner, right?

2       A    It's pretty broadly subscribed to.  It's been both

3  Orange and Blue on Sling, so --

4       Q    Let's stick with satellite.

5            Not everyone has the Turner network?

6       A    Not 100 percent.

7       Q    So those people that don't subscribe to the Turner

8  networks as part of your satellite package, they can get it

9  for free on the Internet, right?

10      A    If they have the Internet.

11      Q    If they have the Internet.  Okay.

12           And you are aware that Mr. Ergen has publicly

13  commented that folks can get March Madness on the Internet

14  for free, correct?

15      A    Can you give me the time or reference or some sort

16  of context for that.

17      Q    Well, tell me if you recall Mr. Ergen saying the

18  following:  "A lot of programming is available elsewhere.

19  It would be a little bit tougher if their original

20  programming" -- and this was talking specifically about

21  Turner now.

22      A    When was this?

23      Q    This is third quarter, 2014?

24      A    So we were in the midst of negotiations then?

25      Q    Well, I'm asking the questions, okay?

1          So let me put the statement to you, and you can

2     confirm that you're aware that Mr. --

3          MS. KISER:  Objection, Your Honor.

4     BY MR. PETROCELLI:

5     Q     -- Ergen made this statement.

6          THE COURT:  Hold on.  What's your objection?

7          MS. KISER:  Mr. Ergen's statements are hearsay.

8          THE COURT:  You can approach.

9          Step down, sir.

10         (Sealed bench conference)

11         MS. KISER:  Your Honor, Mr. Petrocelli has stated

12    already that he plans on going through a lot of these

13    earnings calls.

14         Mr. Schlichting, as far as I know, hasn't got on

15    any earnings calls until first quart of this year.  So

16    admitting those statements from Mr. Ergen, there's not

17    really a proper basis.

18         THE COURT:  He isn't moving to admit.

19         MR. PETROCELLI:  I'm not moving to admit, no.

20         THE COURT:  They're not being offered, are they?

21         MR. PETROCELLI:  No.  I'm asking if he's aware of

22    all of these public statements that were made.  It's

23    inconceivable, whether he was there or not, Your Honor, that

24    he wouldn't know of public statements, and there are many of

25    them.  And they directly contradict the matters that he said

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

348

1    on the witness stand, including that Turner is the easiest

2    of the networks to take down; CNN is not must-have, and so

3    on and so on and so on.

4              I intend to confront him with these statements.

5    I'm not seeking to offer these documents, at least not right

6    now, through this witness.

7              MS. KISER:  We will redirect on that, Your Honor,

8    but defendants have had the opportunity to depose

9    Charlie Ergen.  And Mr. Schlichting was on our witness list

10   from the first exchange.  They did not even try to subpoena

11   Mr. Ergen to depose him.

12             So then to try to read in tons of statements from

13   Mr. Ergen against Mr. Schlichting, I think the proper

14   solution would have been for them to depose and call

15   Mr. Ergen.

16             MR. PETROCELLI:  We don't have to try the case

17   that way, Your Honor.

18             THE COURT:  No, they don't have to do that.  The

19   objection is overruled.

20             You don't need to make any further objections of

21   this kind as to these issues.  I know what your position is.

22             So the Court will permit it.  It's not being

23   offered to prove the truth of the matter asserted, and it's

24   not hearsay.

25             So he can use them to confront him.  And then if

 1  you want to on redirect deal with the issue, clean it up in

 2  some way that's helpful to the government, fine.

 3          MR. PETROCELLI:  Your Honor, I don't want to fence

 4  with the witness, but he's continuing not to respond to the

 5  questions.

 6          THE COURT:  I know.  I'm giving him a little bit

 7  of an opportunity to correct himself.

 8          MR. PETROCELLI:  It's just going to make this last

 9  longer.  That's all.  I'm trying to get through the

10  material.

11          Okay.  Thank you.

12          MS. KISER:  I would ask, though, that when the

13  witness asks for a clarification, as he did a moment or two

14  ago, that it be answered.

15          MR. PETROCELLI:  He can't ask for a clarification

16  on every question.

17          MS. KISER:  That's true.

18          THE COURT:  Especially if it's not --

19          MR. PETROCELLI:  Yes.

20          THE COURT:  -- a question that warrants

21  clarification.

22          MR. PETROCELLI:  Right.

23          THE COURT:  So I'm not going to let him play that

24  game, if that's the game he wants to play.

25          So we'll take it question by question.

```
 1              MR. PETROCELLI:  Thank you.

 2              THE COURT:  And hopefully he's going to realize at

 3    some point that it's in his interests, and everyone else's,

 4    frankly, to just answer the question that's asked.

 5              All right.  And no speaking objections.  Remember

 6    that.  All objections are done at the bench.

 7              MS. KISER:  Just the one-word basis or just

 8    "objection" and then approach?

 9              THE COURT:  Just "objection," then approach.

10              (Open court)

11              THE COURT:  You may proceed, consistent with the

12    discussion at the bench.

13              MR. PETROCELLI:  Thank you, Your Honor.

14    BY MR. PETROCELLI:

15    Q    So were you aware that on November 4th, 2014,

16    speaking about Turner specifically, Mr. Ergen publicly

17    stated, with respect to Turner, "A lot of their program is

18    available elsewhere.

19              "It would be a little tougher if the original

20    programming was a success, like AMC.  But their original --

21    in fact, I don't know of an original program that they have

22    that that's in that category.  And so a lot of the rerun

23    stuff is available on other avenues.  Even the NBA is going

24    to be, a majority of it is on the ESPN and the NBA network.

25    And even things like the Final Four stuff are on the
```

1    Internet now."

2            Are you aware that the chairman of your company

3    made those comments publicly?

4        A    I am.

5        Q    Now, Turner, on your Sling package, you have the

6    Orange and the Blue package, correct?

7        A    That's correct.

8        Q    And the Blue package has no broadcast stations at

9    all, correct?

10       A    No, that's not correct.

11       Q    Excuse me.  The Orange package has none, correct?

12       A    The Orange base pack has no broadcast stations.

13   It has an opportunity to subscribe to ABC in a tier.

14       Q    For extra money, right?

15       A    Yes.

16       Q    Okay.  But the basic $20 package that you talked

17   about, the Orange package, has no broadcast stations,

18   correct?

19       A    That's correct.

20       Q    And it doesn't have CBS, correct?

21       A    That's correct.

22       Q    And the Blue package doesn't have CBS, correct?

23       A    That's correct.

24       Q    CBS is not available at all on Sling, correct?

25       A    Through Sling, it's not.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        Q    Through -- that was my question.  It's not
 2   available at all if you want to get Sling.  You cannot get
 3   CBS, correct?
 4        A    That's true.
 5        Q    Okay.  Now, you're aware that CBS and Turner split
 6   March Madness, correct?
 7        A    I'm aware.
 8        Q    So if you're a Sling customer and you want to
 9   watch March Madness, you can't watch all the games because
10   some of them are on CBS, true?
11        A    We encourage people to subscribe to
12   CBS All Access.
13        Q    Well, that was not my question.
14             Let me repeat my question.
15             So if you're a Sling customer and you want to
16   watch March Madness, you cannot watch all the games in
17   March Madness because a number of them are on CBS, correct?
18        A    You cannot watch all the games through Sling; that
19   is correct.
20        Q    Okay.  And so -- and every other year, Sling and
21   Turner alternate as to who gets the Final Four 4 and the
22   championship game, correct?
23        A    You mean CBS and Turner?
24        Q    Excuse me.  CBS and Turner.  Forgive me.
25        A    They do.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

353

1      Q    Okay.  So this year, Turner has it, right?

2      A    That's right.

3      Q    And next year CBS has it, right?

4      A    That's correct.

5      Q    And so next year if you're a Sling subscriber,

6   through Sling, you could not get the Final Four or the

7   championship game, which will be aired on CBS, correct?

8      A    Through Sling, that's correct.

9      Q    And there are a number of other sporting events

10  you can't get on Sling, correct?

11     A    I'm sure that's the case.

12     Q    So, for example -- well, let's stick with CBS.

13  They have the Super Bowl next year.  So you can't -- if

14  you're a Sling customer, you can't watch the Super Bowl next

15  year on Sling, correct?

16     A    Right.

17          Nothing that comes through CBS would appear on

18  Sling.

19     Q    And on the Orange package, doesn't have NBC,

20  right?

21     A    That's true.

22     Q    And so you couldn't have watched the Super Bowl

23  this year on Sling, right?

24     A    That's true.

25     Q    And last year --

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1      A      Well, actually, on Sling Blue, you could have.

2      Q      Not on Orange, right?

3      A      That's correct.

4      Q      And on Sling Orange you couldn't have watched the

5   Super Bowl the year before when it was on Fox, right?

6      A      That's correct.

7      Q      And the Masters is going to be on CBS in about a

8   week or so, correct?

9      A      That's true.

10     Q      Can't watch that on either Sling Orange or

11  Sling Blue?

12     A      That's true.

13     Q      And ESPN, you would agree that ESPN is the

14  dominant sports network, right?

15     A      What do you mean by "dominant"?

16     Q      Well, didn't you say that it accounts for about

17  80 percent of sports telecasts?

18     A      Can you refresh my memory.  That seems high.

19     Q      Did you say that the biggest sports Cable Network

20  out there has 80 percent with most of its groups, and that

21  would be ESPN?

22     A      So I don't remember that.  That seems high.  But

23  perhaps you can give me more context.

24     Q      Would you agree that among the Cable Networks,

25  ESPN has, by far, the lion's share of sports programming, if

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    you exclude broadcast networks?

2         A    I guess I would say that ESPN has more than any

3    other individual network.

4              But in total, I don't know if it's the

5    lion's share or not.

6         Q    And ESPN is not available on Blue; is that right?

7         A    That's correct.

8         Q    And in terms of going beyond sports, in terms of

9    general entertainment, you said Turner was also must-have,

10   did I understand you correctly, because it has general

11   entertainment programming?  Is that right?

12        A    So I think my statement was that the suite of

13   Turner networks is must-have because of their sports,

14   entertainment -- live sports, live news, and entertainment.

15        Q    Well, let's talk about entertainment for a moment.

16             Do you know how many, let's say, of the top-rated

17   500 shows of 2017, how many were Turner programs?

18        A    So, again, I've never looked at that metric, so

19   no.

20        Q    And in contrast, do you know how many CBS had?

21        A    Again, it's the same answer.  Because I don't look

22   at that metric, I don't know.

23        Q    Do you know how many NBC had?

24        A    No.

25        Q    Would you agree with me that NBC alone has greater

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

356

1    viewership than all the Turners combined?

2         A    I would not agree with that.

3              I don't have the specific numbers, but

4    I don't know that I can agree with that.

5         Q    So Sling Orange, for example, has no NBC, right?

6         A    That's true.

7         Q    And if I told you that the NBC broadcast network

8    viewership share, is higher than all the Turner networks

9    combined, would you agree with that?

10        A    Certainly not -- you know, when I look at Sling,

11   that's not the case.

12             We have NBC owned and operated in Blue.  But

13   between Orange and Blue, hours viewed is not significantly

14   different.

15        Q    So Sling, you said, was doing quite well, correct?

16        A    We think it's doing well.

17        Q    But you're doing quite well even though there's a

18   large segment of sports programming that that's not

19   available on Sling, as we just went through, correct?

20        A    Well, we went through Sling Orange sports program

21   that's not available there.

22             Then we went through some of the things that are

23   not available through CBS.

24             But I would say, you know, one way or another, we

25   have a fairly healthy offering of sports across the two.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

357

 1        Q    But as we have been through, there's significant

 2    chunk of sports that you can't get on either Sling Orange or

 3    Sling Blue?

 4        A    There are some events, some of the large events.

 5             I mean, Super Bowl was available on NBC this year,

 6    so that would have been Sling Blue.

 7             But we won't have the Masters, for instance,

 8    unless you subscribe to CBS All Access.

 9        Q    Were you comparing Super Bowl to March Madness in

10    terms of viewership and popularity?

11        A    I wasn't.

12        Q    Okay.

13        A    I was actually saying that there are a number of

14    tentpole events that are important.

15        Q    And you would agree with me that the viewership of

16    the Super Bowl, for example, is four or five times higher

17    than March Madness, right?

18        A    Yeah.  The Super Bowl is the granddaddy of them

19    all.

20        Q    Now, you also said HBO scares you.  Do you recall

21    that?

22        A    Can you give me more context.

23        Q    Well, yesterday on the witness stand, you said,

24    quote, HBO scares me, end of quotes.

25             Do you recall saying that?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

358

```
1        A    You've just got to give me more.
2             I don't remember the context in which I said that.
3        Q    You don't remember testifying to that?
4        A    I'm asking you for the context.
5             What did I -- what was the question that that was
6    the answer to?
7        Q    Well, I'll take it that you don't remember saying
8    it.
9        A    I said HBO, outside of the Consent Decree, is
10   scary, because it, you know -- I don't know if I used the
11   word "hammer," but it can be used against us.
12       Q    Well, let me talk about how -- about HBO for a
13   second.
14            I think I heard you say yesterday that only one in
15   five of Dish describers actually gets HBO; is that right?
16       A    That's a huge number for us.
17       Q    But is that correct?
18       A    It's roughly, roughly correct, approximately.
19       Q    Okay.  And hasn't HBO and folks at Time Warner
20   told you and told your boss, Charlie Ergen, that you -- that
21   Dish is absolutely the worst distributor of HBO?
22       A    They have.
23       Q    And haven't they told you that Dish's HBO
24   penetration is lower than any other distributor?
25       A    As part of their sales pitch, they have.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    Q    Oh, you think that the data doesn't back it up?

2  Is that what you're suggesting?

3    A    When we looked at the data, what we saw was that

4  nearly 90 percent of our subscribers had been exposed to

5  HBO.  And the fact that roughly one in five subscribe tells

6  us that these, you know, that these sort of 18 to 20 percent

7  that do subscribe are hard-core and that everybody else has

8  chosen not to.

9    Q    And, in fact, HBO is now available without even

10  getting a cable subscription.  You tell get it over the top

11  under HBO Now, correct?

12    A    Again, if you have Internet.

13    Q    And CBS, for example, is also available over the

14  top, correct?

15    A    That's correct.

16         Can I explain just something about why I keep

17  saying that?

18         You know, we pushed -- we've really tried to get

19  out of the urban areas with our satellite product.  So we

20  pushed more and more rural.

21         And so many of our customers -- in fact, a growing

22  percentage -- do not have Internet or do not have Internet

23  that is video-capable.

24         So as we try to get out of the way of Comcast and

25  some of these big MSOs or MVPDs, we're pushing more towards

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    the hinterlands.  So there are millions of our subscribers

2    who, many millions, who don't have really high-quality

3    broadband.

4        Q    But your Sling business, which you spent most of

5    your time talking about, that's a business that depends

6    heavily on Internet connectivity --

7        A    It does; that's correct.

8        Q    -- correct?

9        A    Right.  That's correct.

10            So just to be clear, the HBO numbers that we were

11   just talking about, one in five, that's a satellite number,

12   so --

13       Q    And let's now turn to CNN.

14            I think I heard you say CNN was also a must-have,

15   that you can't imagine an election without CNN; is that what

16   you said?

17       A    It's grown in popularity.

18       Q    Well, you went dark on CNN right in the middle of

19   an election back in 2014, correct?

20       A    We did.

21       Q    So you imagined, at that time, you could go dark

22   on CNN, right in the middle of mid-year elections, when

23   every single congressperson is up for reelection, correct?

24       A    That's correct.

25       Q    And Mr. Ergen publicly stated at that time that

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 405 of 3826

361

1    CNN, 20 years ago, was must-have.  It's not a must -- it's

2    not a top-10 network today anymore.  He made that comment

3    publicly in the fall of 2014, correct?

4        A    I call that negotiating in the press.

5        Q    Well, he made that comment to investors.

6             Are you suggesting he was misleading investors; he

7    was lying to investors?

8        A    I say that's negotiating in the press.

9        Q    Well, that wasn't my question, sir.

10            You are aware that Mr. Ergen told investors on an

11   earning analyst --

12       A    I'm aware of it.

13       Q    Excuse me.  I didn't finish my question.

14            20 years go, that CNN was a must-have.  It's not a

15   must.  It's not a top-10 network today anymore.

16            He told that to investors, correct?

17       A    That's correct.

18       Q    Was he being truthful or was he lying?

19       A    He was being truthful.

20       Q    It's true that he also said CNN is not quite the

21   product that they used to be.

22            You can imagine CNN down on an election night

23   would be a disaster, 15, 20 years ago, but now, it's --

24   there's plenty of other places for people to get news.

25            And when Mr. Ergen made that public statement, he

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

362

```
 1    was also being truthful, correct?

 2              MS. KISER:  Objection, Your Honor.  May we

 3    approach?

 4              THE COURT:  You may.

 5              (Sealed bench conference)

 6              THE COURT:  Okay.  What's your objection?

 7              MS. KISER:  Yes, so it's a form objection.  But,

 8    you know, there's a difference between being truthful and

 9    being honest, lying to investors --

10              THE COURT:  This will be interesting to hear this.

11              MS. KISER:  Well, so he said that he's not

12    admitting these statements for the truth of the matter

13    asserted.

14              THE COURT:  He isn't.  He's asking him whether or

15    not the statement was truthful.

16              MS. KISER:  So to me, that seems like he's

17    offering it for the truth of the matter.

18              MR. PETROCELLI:  He can tell us whether he's --

19              THE COURT:  He's not offering the statement.  He's

20    asking his opinion.  He's asking his opinion as to whether

21    that statement was truthful.

22              It might be as to what his position is.

23              MS. KISER:  I would just request that it be clear.

24    Is he asking whether Charlie was correct factually or --

25              THE COURT:  I think it was a clear question.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Overruled.

2    (Open court)

3    THE COURT:  You may proceed, consistent with the

4  discussion at the bench.

5    MR. PETROCELLI:  Thank you.

6  BY MR. PETROCELLI:

7    Q    And, in fact, in the midst of an election, just in

8  two thousand and -- back in 2014, one of the reasons you

9  went dark on CNN is because you thought they were asking for

10  too much money, right?

11    A    The terms of the proposed deal, not just the money

12  piece, but the terms were -- we were pretty far apart, so it

13  wasn't just about the money.

14    Q    Isn't it true that in an earnings call, Mr. Ergen

15  referred to double-digit price increases, when CNN's

16  viewership is half as much as it used to be?

17    Do you recall him making those statements?

18    A    I don't.

19    But those are roughly congruent with the numbers

20  that we would see, or the numbers that we saw at the time.

21  CNN's gained popularity since then.  But at the time, that

22  was -- I think that was our belief.

23    Q    In fact, you're in litigation with CNN -- with

24  Turner right now over CNN, correct?

25    A    That's true.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

364

1     Q     And your position in that litigation is that you

2     have been overpaying for CNN, correct?

3     A     According to the contract, we believe we've been

4     overpaying.

5     Q     And when you did go dark on CNN and the other

6     Turner networks other than TNT and TBS, Mr. Ergen publicly

7     stated that it was a non-event, correct?

8     A     I believe he did state that.

9     Q     A non-event, correct?

10          In fact, he went even further than that.  He

11    stated that by going dark on Turner, by not carrying Turner,

12    Dish "would not have to raise our prices next year, and that

13    would be slightly cash positive for us, from a cash flow

14    perspective.  And, yes, we'd lose some customers, but we'd

15    save a big, big, big check from a cash-flow perspective."

16          Do you recall those statements?

17    A     I don't recall those specific statements.

18          You'll have to help me out there a little bit.

19    Q     I will help you out.  I'll show you the

20    statements.

21          MR. PETROCELLI:  Can I have the -- I'm marking for

22    identification as Exhibit 919, Your Honor, the Dish earnings

23    call transcript of November 4, 2014.

24          This is defendant's, for identification, 919.

25          May I approach?

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

```
 1              THE COURT:  You may.

 2                              (Defendants' Exhibit 919
                                (was marked for identification.)
 3              THE WITNESS:  Sorry.  I've got two copies here.

 4   Are they the same?

 5              Which page are you referring to?

 6   BY MR. PETROCELLI:

 7        Q    Turn to page 7.

 8              Do you have that in front of you?

 9        A    I do.

10              Where are you in that, on page 7?

11        Q    If you turn, middle of the paragraph, second part

12   of the page.

13              Do you see where it says, "And you're in a

14   situation now, for example, with Turner," about two-thirds

15   down into the paragraph?

16        A    I do see that.

17        Q    It says, And you're in a situation now, for

18   example, where Turner, do you not do -- if Turner, we

19   can't -- if we're not going to be in a relationship with

20   Turner, we would not have to raise our prices next year,

21   all right?  And that would be slightly cash positive for us

22   from a cash-flow perspective.  And, yes, we'd lose some

23   customers, but we'd save a big, big, big check from a

24   cash-flow perspective.

25              Do you see that?
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

366

```
 1        A    I do.

 2        Q    And do you see above that, about the fifth line

 3   down, beginning of that paragraph, in reference to going

 4   dark on CNN and the other Turner networks that you went dark

 5   on, Mr. Ergen publicly stated, "So it's not had a major

 6   impact on our business yet."

 7             Do you see that?

 8        A    I do.

 9        Q    And you agree with those statements, right?

10        A    Can I explain the analysis that we did that goes

11   behind those?

12        Q    No.  I simply asked you if you agree with those

13   statements.  You can say "yes" or "no."

14             THE COURT:  You can explain it on redirect.

15             THE WITNESS:  Pardon me?

16             THE COURT:  You'll get to explain it on redirect

17   exam.

18             THE WITNESS:  Okay.  With the letter of these

19   statements, I would agree.

20   BY MR. PETROCELLI:

21        Q    And turn to page 10 on that document.

22             And you'll see Mr. Ergen's comments on page 10,

23   again, to the investment community, to the analysts.

24             Do you see that?

25        A    I do.
```

1      Q    And down in the middle of the page, he says,

2    quote, We don't want any of our programmer partners to drop

3    off, but they'll self-select.  And somebody's going to drop

4    off, and we'll keep our prices lower.  And we'll lose some

5    subscribers, but we'll net-net be cash-flow positive on it,

6    which is how we look at it.

7            I hope it's not Turner, because Turner was the

8    very first company who signed with us in DVS.  So that's

9    like the last -- it's one of the easier ones to take down,

10   in my opinion.

11           But it's like the last one I personally want to

12   take down, because they're the guys that helped us get in

13   business.

14           Now, Mr. Ergen's statement that the Turner

15   networks are among the easier ones to take down, one of the

16   easier ones to take down, you agree with that?

17      A    You could get rid of all your customers and save a

18   lot of money, and it wouldn't be a business.

19      Q    So do you think Mr. Ergen was actually telling the

20   investment community that he was going to get rid of all of

21   his customers, go out of business?

22      A    We were in the midst of negotiations.

23      Q    So you're saying that Mr. Ergen made these

24   statements, even though they were not truthful, just for

25   purposes of gaining an advantage in negotiations; is that

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

368

 1    now your testimony?

 2         A    These are true statements, and you can make true

 3    statements that are in the middle of negotiations and are --

 4    you know, and send a message.

 5         Q    So the statements were true; Turner is one of the

 6    easier --

 7         A    The statements are absolutely true.

 8         Q    Turner is one of the easier of all the networks to

 9    take down, true?

10         A    So Turner is not a network.

11         Q    The Turner networks are among the easiest ones to

12    take down.

13         A    Right.  I just want to make sure we distinguish

14    between CNN, which at the time was on its heels, and all

15    Turner networks.

16         Q    Well, I'm talking about "I hope it's not Turner."

17    He didn't say "CNN."  He said "Turner."  And you know

18    Turner -- at that time you were licensing how many networks

19    from Turner?

20         A    You know, I guess all eight, in some form or

21    fashion.

22         Q    My simple question is, do you agree that among all

23    the networks, Turner is the easiest one to take down?

24    Do you agree or disagree?

25         A    So I guess personally I would have to disagree.

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1     Q     Now, I think I heard you say yesterday that you

2   don't -- your company doesn't like to go dark; is that

3   right?

4     A     That's correct.

5     Q     And I think you actually said that when your

6   company goes dark, it's like having a heart attack.

7           Do you remember that?

8     A     I do.  It hurts us.

9     Q     But your company's had a lot of heart attacks,

10   hasn't it?

11     A     We negotiate hard.

12     Q     But you had a lot of heart attacks, right?

13     A     We have.

14     Q     More than any other distributor, right?

15     A     I think they correspond with our sub decline.

16     Q     So you take programmers down left and right, don't

17   you?

18     A     I wouldn't say we take them down.  I would say

19   that we negotiate hard and there's, when there's a gap, we

20   can't continue to display their content without their

21   permission.  It takes two to tango on that.

22     Q     But, for some reason, you guys take programmers

23   down more than any other distributor, and that's part of

24   your strategy to do that, correct?

25     A     Our strategy is to --

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

```
1        Q    Is that part of your strategy, yes or no, sir?

2        A    I choose not to answer.  It's just, our strategy

3   is about a lower price to the consumer.  So we have to

4   negotiate hard.

5        Q    You choose not to answer?

6        A    Well, then I did answer, so --

7        Q    Is it true that Charlie is a wildcat, and he's a

8   strong negotiator; is that true?

9        A    I said that.  I believe it.

10       Q    Is it true that one of Charlie's maxims is "If you

11  let them push you around once, they'll push you around next

12  time for sure"?

13       A    Yes.

14       Q    And you know you testified to that in your

15  deposition --

16       A    I do.

17       Q    -- correct?

18            And you also testified that if you don't let them

19  push you around, hopefully, everybody in the neighborhood

20  sees Dish.  Be careful, because Dish will take you down or

21  might take you down.

22            That's what you testified to, correct?

23       A    I did.

24       Q    And you testified to that, not because you were

25  negotiating, because you were telling the truth, correct?
```

**\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\***

1    A    That's correct.

2    Q    Now, let's talk about how many times you've taken

3  programmers down, to use your words.

4         You took CBS, the broadcast network, down just

5  last Thanksgiving, correct?

6    A    So, again, I just want to be clear.  We were far

7  apart on terms, and we can't display their content without

8  their permission.

9    Q    Sir, I don't want to get into this semantic issue.

10 I'm referring to your testimony here:  Dish will take you

11 down, okay?

12        And what you're talking about is, "Dish will take

13 you down" is when there's an impasse and Dish does not want

14 to agree the programmer's terms; Dish won't agree, such that

15 the programming will go dark, correct?

16   A    We have -- we are unable to display programming

17 without the programmer's permission.  So it takes two to

18 tango in this.

19   Q    You're not suggesting to the Court that it's the

20 programmer who's taking you dark against your will, are you?

21   A    The programmer has as much to do with this as we

22 do in terms of coming to some sort of agreement.

23   Q    But you can simply agree with the programmer's

24 demands, and then you can broadcast the programming,

25 correct?

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1       A    We could.

2            But by the same token, we, with CBS, for instance,

3   we offered to extend on whatever terms that we agreed to

4   eventually so they would be retroactive.  And CBS chose not

5   to.

6       Q    But Dish --

7       A    So in that case, it's a great example of a

8   programmer going dark with us.

9       Q    So are you suggesting that it's always the

10  programmer's fault when you take down all these networks?

11      A    So I said "in that case."

12           So I'd say -- I think I've also testified it's

13  50/50.  I don't know if that's 50/50, 60/40.  But it's a

14  clear example of them going dark, even though we offered to

15  true up, retroactively.

16      Q    But they must have had good reasons why they

17  didn't want to agree to your terms?

18      A    Both sides think they have good reasons every

19  time.  That's 100 percent.

20      Q    So without getting into who you're going to blame

21  for going dark, I just want to talk about the times in which

22  Dish has been involved in a blackout of a program.

23           So just bear with me, okay?

24           CBS in November of 2017, correct?

25      A    Correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

373

1        Q    CBS in 2013, correct?

2        A    That's right.

3        Q    Fox News and Fox Business in December of 2014,

4    correct?

5        A    That's true.

6        Q    And that's right after the Turner networks were

7    taken down, correct?

8        A    They saw a weak spot and they tried to take

9    advantage of it.

10            MR. PETROCELLI:  I move to strike as

11   non-responsive, Your Honor.

12            THE COURT:  Granted.

13   BY MR. PETROCELLI:

14       Q    Can you please answer the question.

15            You had a takedown of Fox News and Fox Business in

16   December of 2014, right after the Turner blackout, correct?

17       A    That's true.

18       Q    By the way, Fox is an important network for Dish,

19   correct?

20       A    Which Fox?

21       Q    Fox News?

22       A    It is important.

23       Q    As important as it is, Mr. Ergen has publicly

24   stated, "If we had to live without Fox, we would have lost

25   more customers, but we would have gained customers long term

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1    because of the cost savings."

 2              Do you recall Mr. Ergen saying that in reference

 3    to Fox?

 4         A    May I explain his negotiating strategy?

 5         Q    No.  I just asked you if you recall his having

 6    said so, publicly, to investors.

 7         A    Yes.

 8         Q    In 2012, Dish took down AMC, correct?

 9         A    I believe so.  I wasn't -- I did not oversee

10    programming at that time.

11         Q    AMC, of course, had the Breaking Bad, Mad Men, and

12    The Walking Dead, right?

13         A     I believe so.

14         Q    Those are all major, hit shows, right?

15         A    They are.

16         Q    In 2010, there was a blackout of ESPN news

17    high-def channels.

18              Do you recall that?

19         A    I don't.

20         Q    Disney HD and ABC Family HD, also in 2010, do you

21    recall that?

22         A    That was before I joined the company.

23         Q    Madison Square Garden in October 2010, do you

24    recall that?

25         A    I joined in 2011.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        Q    I know, but you probably familiarized yourself
 2   with the company's history.
 3        A    I don't recall it.
 4        Q    The Weather Channel, 2010, do you recall that?
 5        A    I don't.
 6        Q    Lifetime in 2006, do you recall that?
 7        A    No.
 8        Q    OLN, do you know what that stands for?
 9        A    Outdoor Life Network.
10        Q    Which is now what?
11        A    I believe it's Outdoor.
12        Q    You took the blackout there in 2005, correct?
13        A    If you say so.
14        Q    Viacom, 2004, correct?
15        A    (Shaking head.)
16        Q    In fact, Mr. Ergen has publicly stated that there
17   is not a single channel that he wouldn't take down, correct?
18        A    Again, if I could explain the negotiating
19   strategy.
20        Q    That's not my question.
21             He has publicly stated that, correct?
22        A    So I don't recall that specific statement.
23        Q    Okay.  Let me see if you recall this.
24             "There's not any channel I go to sleep at night
25   that I say, if the price is too high for our consumers based
```

1  on our analysis, that we wouldn't be willing to take down."

2          Do you recall Mr. Ergen saying that publicly?

3      A    I don't.  Perhaps you could give me just a little

4  bit more detail.

5      Q    Yes, I will.

6          MR. PETROCELLI:  Can I have the next one,

7  Exhibit 920, please.

8          May I approach, Your Honor?

9          THE COURT:  You may.

10                              (Defendant's Exhibit 920
                                was marked for identification.)
11  BY MR. PETROCELLI:

12     Q    This is an interview, Charlie Ergen, on the state

13  of OTT --

14     A    What page are you on?

15     Q    -- adopted September 27th, 2017, page 10 and 11.

16         THE COURT:  What are you marking these as for

17  identification?

18         MR. PETROCELLI:  Yes, as Defendant's 920,

19  Your Honor.

20         THE WITNESS:  Yes.

21  BY MR. PETROCELLI:

22     Q    Reading at page, starting at page 10 at line 17:

23  "And so today, in today's market, Altice could take ESPN

24  down and survive it.  Five years ago, that would not have

25  been an option.  That would have been -- that would have

1   been suicidal.  But today, they —— they could do it.

2   It would be painful, but they could do it.  And there's not

3   any channel —— there's not any channel that I go to sleep at

4   night that the price is —— that I say if the price is too

5   high for my —— for our consumers, based on our analysis,

6   that we wouldn't be willing to take down."

7           Do you agree with those statements that your

8   chairman made?

9       A   I don't necessarily agree with the statement.  I

10  agree that he made them.

11      Q   That's all I'm asking.

12      A   Okay.

13      Q   Now, you would agree with me that if this merger

14  is approved —— let's say we're at the day after the merger

15  and in negotiation now with Turner —— Charlie Ergen is still

16  going to be the wildcat, isn't he?

17      A   Charlie is Charlie.

18      Q   Charlie Ergen is still going to be the strong

19  negotiator who will take anybody down if the price isn't

20  right, correct, merger or no merger, true?

21      A   You know, I can't speculate.  We take each deal

22  one at a time.

23      Q   Well, you were giving a lot of predictions and

24  prognostications in your direct testimony about what might

25  happen if there was a merger.

```
 1              Do you recall that?

 2       A    I recall saying that we would lose subs if we go

 3  dark.

 4       Q    Now --

 5       A    That's different than saying --

 6       Q    Now I'm asking you to make another protection.

 7  Do you think that Mr. Ergen, as the founder and chairman of

 8  your company, is going to pay a nickel more than what he

 9  thinks the content is worth?

10       A    We paid a nickel more in HBO last time, a lot more

11  than a nickel.

12       Q    And that was your decision, even though only one

13  out of five get it?

14       A    That was our decision because we felt we needed to

15  have it.

16       Q    And Mr. Ergen isn't going to crumble and give in

17  to unjustified demands, given his public track record of

18  taking down programmer after programmer and stating that

19  there isn't a single one he wouldn't take down if the price

20  is right; he'll continue to be the same Charlie Ergen the

21  day after the merger, correct?

22       A    So under a merger, I think it changes everything,

23  I think it changes our calculation of sub loss.  It changes

24  our analysis of what we look at.

25              So I would -- I would --
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q    We're going to get to that.

2      A    Charlie is incredibly rational.

3      Q    We're going to get to that, sir, but I'm simply

4  trying to make a very, very simple point.

5      A    Okay.  So I would answer the simple point with

6  Charlie is rational; and the day after the merger,

7  everything is different.

8      Q    Yeah.

9           And Charlie will be different too?

10     A    Charlie is rational, so he'll look at a different

11 set of facts.

12     Q    Well, we'll talk about that.

13          Now, let's talk -- let's work ourselves to that by

14 first talking about this dispute or this negotiation in

15 which you guys decided to take down the Turner networks.

16          Now, I think you testified on direct that you were

17 negotiating two sets of agreements, one covering TNT and TBS

18 and the other one covering CNN, Cartoon Network, and the

19 other networks, right?

20     A    That's correct.

21     Q    And they were on separate timelines?

22     A    That's correct.

23     Q    And -- but over the course of the summer of 2014,

24 as this negotiation was going on and on and on and on, these

25 extensions, these timelines or expiration dates continued to

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

380

```
 1   get extended and extended sometimes week by week by week,

 2   correct?

 3        A    Yes.  I joined -- I joined programming in sort of

 4   mid-September.  And so by then, that had been going on for a

 5   while.

 6             But that's roughly correct.

 7        Q    And now we're in the middle of October of 2014.

 8   And one of the agreements is going to expire in a week or

 9   so, and the other one is going to expire, let's call it a

10   couple of months later.

11        A    Six weeks.

12        Q    Six weeks, okay?

13             And do you know what happened, then, on

14   October 15, 2014, that interfered with these negotiations?

15        A    I, you know, day by day, I don't have a specific

16   event.  I mean, if you're referring to --

17        Q    Well, let me see if I can refresh your

18   recollection.

19        A    Okay.

20        Q    On October 15, 2014, in the midst of these

21   negotiations that have been going on and on and on for

22   months, there was a public announcement by Time Warner, by

23   HBO in particular, that it was launching its HBO Now

24   over-the-top service.

25             Do you recall that?
```

1      A    Actually, I didn't remember that it was in the

2  midst of those negotiations.

3      Q    And do you recall that Mr. Ergen was extremely

4  unhappy about that?

5      A    I don't recall that piece of it.

6           What I recall is that --

7      Q    Well, I just asked you that question.

8      A    Okay.

9      Q    Do you recall that Mr. Ergen reached out to

10 Time Warner, in fact, to the chairman of Time Warner,

11 Jeff Bewkes, to the complain about this consumer offering

12 that HBO is making available?

13          Do you recall that?

14     A    So I was not a part of that call.  I'm sure he

15 must have.  He had a couple of calls with Jeff Bewkes.

16     Q    And it was shortly thereafter that after all the

17 extensions and all the work that had been going on over the

18 summer, suddenly, Mr. Ergen made a decision to stop

19 negotiating with Turner, correct?

20     A    Those two are not linked, in my recollection.

21     Q    I didn't ask you if they're linked, okay?

22     A    So coincidentally --

23     Q    I asked you -- I didn't say -- I didn't ask you

24 about coincidentally.

25          After Mr. Ergen's phone calls with Jeff Bewkes and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

382

1    communications about HBO Now being launched and being made

2    available to the consumer, Charlie Ergen directed that the

3    company would go dark on Turner one week later, correct?

4         A    I do not remember that as a sequence of events or

5    that directive.

6         Q    But it is true that one week later, the blackout

7    occurred, correct?

8         A    For reasons of contract expiration dates.

9         Q    And it's also true that Mr. Ergen called

10   Mr. Martin up, or Mr. Martin called Mr. Ergen up; and in

11   that conversation, Mr. Martin agreed to fly out to Denver in

12   order to put off the blackout.

13             Do you recall that?

14        A    I do.

15        Q    And do you recall that Mr. Ergen said, nah, we're

16   going to go dark.  We'll make more progress negotiating when

17   we go dark?

18             Do you recall Mr. Ergen making that statement?

19        A    I don't.

20        Q    Mr. Ergen is known for saying, "Real negotiating

21   starts when we go dark."

22        A    I don't -- I don't remember a quote like that, but

23   I'll take your word for it.

24        Q    You don't recall Mr. Ergen ever making that

25   comment or words to that effect?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

383

1    A    I don't recall it.  That doesn't mean he didn't

2    say it.

3    Q    Okay.  Now, counsel showed you an agreement that

4    was marked and put into evidence under seal a contract that

5    was entered into, I think, dated on or about April 1,

6    2015 --

7    A    April 1st, 2015.

8    Q    -- right?

9    A    That's right.

10   Q    But that wasn't the first contract that was

11   entered into.  There was a prior one that you were not

12   shown, correct?

13   A    So you have to clarify there.  We have a lot of

14   contracts with Turner.  Which one are you referring to?

15   Q    Well, the blackout lasted one month,

16   approximately, correct?

17   A    It did.

18   Q    Okay.  And that blackout got resolved when an

19   agreement was made in or about November of 2014, correct?

20   A    That's correct.

21   Q    But that agreement was only for four months or so

22   to expire March 31 --

23   A    That's correct.

24   Q    -- 2015?

25   A    That's correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1     Q    Now, you talked about making concessions.

2     A    Uh-huh.

3     Q    Turner made substantial concessions --

4     A    Both sides did.

5     Q    -- correct.

6          Well, I'm talking about Turner.  You said -- you

7     made a concession because you agreed to bring these dates

8     together for the Turner, TBS, and TNT contract and the

9     contract on the other networks, right?

10    A    Plus we had a claim of about 40 million as well.

11    Q    I'm going to get to it.

12    A    Okay.

13    Q    Now, you said it was an advantage to the

14    programmer when the distributor decided to make all the

15    networks come -- due for renegotiation at the same time,

16    correct, Yes?

17    A    Correct.

18    Q    But hasn't Mr. Ergen taken the position that it's

19    actually an advantage of Dish?  Hasn't he said it's an

20    advantage of Dish because when you have all the networks

21    together, including HBO, you can play them off against one

22    another?  You can play the deals off against one another?

23    A    That doesn't sound even remotely like Charlie.  If

24    he said that, that's -- the deal team cringed when he came

25    back with the coterminous give on our part.

1      Q    So I'm going to show you now an exhibit.  It's

2  actually a plaintiff exhibit.  It's Exhibit 414.  And this

3  is the November agreement.

4           MR. PETROCELLI:  There's no objection to this,

5  Your Honor.

6           THE COURT:  November of what year?

7           MR. PETROCELLI:  This is November 2014.

8           THE COURT:  Okay.

9           MR. PETROCELLI:  May I approach?

10          THE COURT:  You may.

11          MR. PETROCELLI:  This one I will move into

12  evidence together with the one that counsel moved in, both

13  under seal, Your Honor.

14          THE COURT:  Any objection?

15          MS. KISER:  No objection.

16          THE COURT:  It will be admitted under seal.

17                                    (Plaintiff's Exhibit 414
                                      received into evidence.)
18  BY MR. PETROCELLI:

19     Q    Okay.  Now, I'm going to do this without being all

20  that specific, okay?

21          So I want you to look at the contract.

22          And let's see paragraph 5.  Okay?

23     A    Okay.

24     Q    Do you see there that Turner, the Turner networks,

25  are releasing, entering into a release of claims?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1        A      I do.

2        Q      And who's being released as your company, correct?

3        A      That's correct.

4        Q      And without getting into specifics, that involved

5   a release of money claims, correct?

6        A      That's true.

7        Q      And now look at paragraph 6.

8               Paragraph 6, Turner is agreeing to pay money,

9   correct?

10              And the amount is specified there.

11       A      So it's a most favored nation payment.

12       Q      Well, okay.  And that was a payment by Turner to

13  Dish, correct?

14       A      Yes.

15       Q      Okay.  And in addition to this, Turner agreed to

16  allow four of its networks to be used in the trial run of

17  Sling, correct?

18       A      Yes -- trial run, I guess you mean, we sought --

19  beta launch of Sling, yes.

20       Q      Correct.  Okay.

21              And when this agreement, with this agreement,

22  then, the networks were turned back on, correct?

23       A      That's correct.

24       Q      Okay.  And then a new agreement was entered into

25  at the end of March, early April, correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        A     That's correct.

2        Q     And then under that new agreement, to be clear,

3    there's only one contract now for all the Turner networks,

4    correct?

5        A     Yes.  That is -- yes.

6        Q     And Dish is licensing the rights to carry all

7    eight or more of the Turner contracts, correct -- Turner

8    networks, correct?

9        A     So I guess I want to be clear.  HBO is a separate

10   piece of paper.

11       Q     Separate piece of paper.

12       A     You're talking about just Turner?

13       Q     Just Turner, right.

14       A     That's true.

15       Q     You also did a deal with HBO at or about the same

16   time?

17       A     At exactly the same time.

18       Q     The same time.  Okay.  So you got it all done,

19   Turner and HBO?

20       A     That's right.

21       Q     But on the Turner contract, that's for essentially

22   all the Turner networks, right?

23       A     That's true.

24       Q     But you had the right under that Turner contract

25   to only use four of the Turner networks in your Sling

1  bundle, correct?

2      A    That's true.

3      Q    And that would be TNT, TBS, CNN, and

4  Cartoon Network, right?

5      A    That's true.

6      Q    So you don't have a separate contract for Sling

7  and the four networks.  It's part of the bigger carriage

8  agreement for all the networks?

9      A    I believe that's correct.

10     Q    Now, did you do any analysis, sir, of how many

11 subs, how many of your subscribers Dish lost, if any, as a

12 result of the Turner blackout?

13     A    We did.

14     Q    Do you know what that number is?

15     A    Well, sir, as I mentioned yesterday, we have a --

16     Q    I just asked you if you know what the number is,

17 sir.

18     A    So the number that we use internally is roughly

19 30,000.

20     Q    Okay.  Let me stop you there.

21          30,000 subscribers, okay.

22          Now, 30,000 subscribers is what percentage of --

23 I think you had at the time -- there's been, I know, some

24 cord cutting.

25     A    Right.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

389

```
 1        Q    But at the time you probably had 12, 13 million?

 2        A    Give or take, yeah.

 3        Q    Okay.  So using your 30,000 figure, that's --

 4    what's that, .2 percent?  It's less than 1 percent, right?

 5        A    It's less than 1 percent.

 6        Q    Now -- but that 30,000, and, again, accepting your

 7    figure of 30,000, that 30,000 also takes into account the

 8    people who canceled on account of going dark on Fox News and

 9    Fox Business, right?

10        A    No.

11             What I've said is that it's --

12             MS. KISER:  May we approach on a confidentiality

13    issue?

14             THE COURT:  All right.

15             (Sealed bench conference)

16

17

18

19

20

21

22

23

24

25
```



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***





16          (Open court)

17          THE COURT:  All right.  We're going to take -- you

18  can sit down.

19          THE WITNESS:  All right.

20          THE COURT:  We're going to take the luncheon

21  recess.

22          THE WITNESS:  Okay.

23          THE COURT:  So you remain a witness under oath in

24  the case.

25          THE WITNESS:  Okay.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
1              THE COURT:  You know the rules:  Don't discuss

2    your testimony so far or what it might be when you return

3    with anyone, including your counsel or the Justice

4    Department or anyone.  Just stay independent of all others.

5              So be back here and ready to go at 2:30.

6              THE WITNESS:  Okay.

7              THE COURT:  And we're going to finish the

8    cross-exam; and then if there's redirect, there will be

9    redirect and then you'll be done.

10             THE WITNESS:  Great.

11             THE COURT:  All right?

12             So you can step down.  You're excused.

13             THE WITNESS:  Appreciate it.

14             THE COURT:  All right.

15             THE WITNESS:  What about these?  Do these stay?

16             THE COURT:  You leave that there.

17             THE WITNESS:  Okay.

18             THE COURT:  So, Counsel, please spend some portion

19   of the time over the break dealing with the issues that we

20   discussed in the closed session and this last bench

21   conference so that any necessary steps can be taken to

22   protect confidentiality.  So make sure you engage in those

23   kind of cautionary work to protect them.

24             MR. PETROCELLI:  Will do, Your Honor.

25             THE COURT:  All right.  We'll stand in recess.
```

1           DEPUTY CLERK:  All rise.

2           This Honorable Court will stand in recess until

3    the return of court.

4           (Proceedings concluded at 1:04 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

C E R T I F I C A T E

       I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: March 27, 2018_____   /S/__William P. Zaremba_____

                        William P. Zaremba, RMR, CRR

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      :
                               :
             Plaintiff,        :        CV No. 17-2511
        vs.                    :
                               :        Washington, D.C.
                               :        Tuesday, March 27, 2018
AT&T, INC., ET AL.,            :            2:40 p.m.
                               :
                               :            Day 3
             Defendants.       :
----------------------------x



                      AFTERNOON SESSION
                 TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE RICHARD J. LEON
              UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:    Craig W. Conrath, Esquire
                       Eric D. Welsh, Esquire
                       Timothy B. Walthall, Esquire
                       Andrew Finch, Esquire
                       Nathan D. Brenner, Esquire
                       Melanie Kiser, Esquire
                       U.S. DEPARTMENT OF JUSTICE
                       Antitrust Division
                       450 Fifth Street, NW
                       Washington, DC  20530
                       (202) 532-4560
                       craig.conrath@usdoj.gov
                       eric.welsh@usdoj.gov
                       timothy.walthall@usdoj.gov
                       andrew.finch@usdoj.gov
                       nathan.brenner@usdoj.gov
                       melanie.kiser@usdoj.gov
```

```
 1   Appearances Continued:

 2   For Defendant AT&T      Katrina M. Robson, Esquire
     and DirecTV Group       O'Melveny & Myers LLP
 3   Holdings, LLC:          1625 Eye Street, NW
                             Washington, DC  20006
 4                           (202) 220-5052
                             krobson@omm.com
 5
                             Daniel M. Petrocelli, Esquire
 6                           M. Randall Oppenheimer, Esquire
                             O'MELVENY & MYERS LLP
 7                           1999 Avenue of the Stars
                             8th Floor
 8                           Los Angeles, CA  90067
                             (310) 553-6700
 9                           dpetrocelli@omm.com
                             roppenheimer@omm.com
10
                             Michael L. Raiff, Esquire
11                           GIBSON, DUNN & CRUTCHER LLP
                             2100 Mckinney Avenue
12                           Suite 1100
                             Dallas, TX 75201
13                           (214) 698-3350
                             mraiff@gibsondunn.com
14
     For Defendant           Kevin J. Orsini, Esquire
15   Time Warner, Inc.:      Peter T. Barbur, Esquire
                             CRAVATH, SWAINE & MOORE LLP
16                           Worldwide Plaza
                             825 Eighth Avenue
17                           New York, NY  10019
                             (212) 474-1140
18                           korsini@cravath.com
                             pbarbur@cravath.com
19
     Court Reporter:         Crystal M. Pilgrim, RPR, FCRR
20                           Official Court Reporter
                             United States District Court
21                           District of Columbia
                             333 Constitution Avenue, NW
22                           Washington, DC  20001
                             (202) 354-3127
23                           crystal_pilgrim@dcd.uscourts.gov

24

25
```

Table of Contents

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| On behalf of the Plaintiff: | | | | |
| Warren Schlichting | | | | |
| By Ms. Kiser | | | 440 | |
| By Mr. Petrocelli | | 399 | | 463 |
| John Martin | | | | |
| By Mr. Welsh | 468 | | | |

E-X-H-I-B-I-T-S

|  | Marked | Received |
|---|---|---|
| On behalf of the Plaintiff: | | |
| Exhibit No. PX 149 | | 473 |
| Exhibit No. PX 151 | | 479 |
| Exhibit No. PX 148 | | 483 |
| Exhibit No. PX 132 | | 500 |
| On behalf of the Defendants: | | |
| Exhibit No. 921 | 410 | 411 |
| Exhibit No. 922 | 419 | |
| Exhibit No. 923 | 425 | |

```
 1                     P-R-O-C-E-E-D-I-N-G-S

 2          THE DEPUTY CLERK:  Good afternoon, Your Honor.

 3   Recalling civil action number 17-2511, the United States of

 4   America versus AT&T, Inc., et al.

 5       GOVERNMENT WITNESS WARREN SCHLICHTING PREVIOUSLY SWORN

 6          (Witness resumes the stand.)

 7          THE COURT:  Witness remains under oath.

 8       Mr. Petrocelli, you may proceed when you're ready.

 9          MR. PETROCELLI:  Thank you, Your Honor.

10                     CROSS EXAMINATION

11   BY MR. PETROCELLI:

12   Q.   Mr. Schlichting, you mentioned the 30,000 figure estimate

13   of sub loss before the lunch break, do you recall?

14   A.   I did.

15   Q.   Now I believe you testified in your deposition that's the

16   number that you believe was based on people who actually called

17   up DISH and said they were leaving on account of Turner not

18   being available; is that correct?

19   A.   So there are three buckets of --

20   Q.   Just stick with me.

21       On the 30,000, was that just the category or bucket of

22   people who you believe called up to say they were leaving on

23   account of Turner, am I correct or incorrect?

24   A.   That's not technically correct.  No.

25   Q.   Okay.  Well then, explain it to me?
```

1  A.    So we have folks that call that actually say I'm leaving

2  because you're dark with Turner.

3      We have folks that call up and say I'm leaving and don't

4  give a reason.

5      I put those sort of in the same bucket because they're

6  calling us.

7      We also have subs that we're unable to acquire, never have

8  a tale.

9      So we have a rough estimate of sub blocks and that's so the

10  30,000 isn't the number that we talk about internally.

11  Q.    That's the number you testified to in your deposition,

12  correct?

13  A.    That is.

14  Q.    When you mentioned the 30,000 in your deposition, what

15  categories did that encompass?

16  A.    Well, so these are rough estimates so we stop measuring

17  after 90 days.  That encompassed those buckets that I'm talking

18  about.

19  Q.    Okay?

20  A.    It's hard to know how long that sub loss continues.

21  Q.    That wasn't counting subs that you lost in the ensuing

22  blackout with Fox News and Fox Business, correct?

23  A.    It's hard to tease those apart.

24  Q.    So you can't break them out whether it's Fox or Turner is

25  what you're saying?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   Back to the heart attack example.  You have a second heart

2  attack, which one caused it.  Was it the first or the second, I

3  don't know.

4  Q.   It's correct, sir, that you have not ever seen a study

5  quantifying any loss resulting from the Turner take down in

6  October and November of 2014, correct?

7  A.   What do you mean by study?  I have seen a spread sheet.

8  Q.   Well, you don't remember a specific document that

9  contained that information, correct?

10 A.   So I have seen a specific spread sheet that has a number,

11 I think 13,700 on it.  Those are folks that actually

12 specifically called.

13 Q.   But you remember testifying at your deposition as follows:

14     Question, did you ever see a study quantifying any loss

15 resulting from the Turner take down in October, November 2014?

16     Answer, I don't remember a specific document that has that.

17     Do you recall giving that testimony?

18 A.   I do.  It's been subsequent to that testimony.

19 Q.   So now you have seen a document and you think the number

20 is 13,700?

21 A.   That's the number of calls that we recorded that are

22 specific to this case.

23 Q.   You haven't provided that document to us, have you?

24 A.   I don't know.

25 Q.   You didn't correct your deposition, did you?

1  A.    I won't, when you say corrected.

2  Q.    You didn't change it.  You didn't indicate that you have

3  now seen such a document and you have new information, did you?

4  A.    When would I have done that?

5  Q.    When you received your deposition?

6  A.    I hadn't seen it.

7  Q.    No one gave you a transcript of your deposition to review

8  and sign?

9  A.    That's not what I said.  I said when I saw the transcript

10  I had not seen that document.

11  Q.    It was after?

12  A.    It was.

13  Q.    Do you have that document available today?

14  A.    Personally I don't.

15  Q.    Okay, 13,700, is that your estimate of total subs that you

16  believe were lost on account of the take down?

17  A.    Again, those are the subs that called more specifically.

18  Q.    You don't know that they called.  You don't know

19  personally, that's what you saw on a piece of paper, correct?

20  A.    That's correct.

21  Q.    Okay.  Now you say those are the people who called.  Does

22  the piece of paper have other numbers that attribute loss of

23  subs to Turner?

24  A.    I'm not aware of it.

25  Q.    Okay.  You are aware of reporting subscribers in

1  connection with your statements to Turner which you render on a

2  what, monthly basis?

3  A.    Yes.

4  Q.    Do you recall that the statements that you rendered to

5  Turner actually reflected a lower loss of subs than the number

6  13,700?

7  A.    I'm not aware of that.

8  Q.    Are you aware that the report that you sent to Turner

9  indicated that this lower number of subs was consistent with

10  the number of subs lost in the year before and in the year

11  before that?

12      Do you recall that?

13  A.    When you say the lower number of subs.

14  Q.    Lower than 13, 13,700?

15  A.    So just if you could clarify how you're doing the math.

16  Q.    You report to Turner the number of subs that you net gain

17  or net lose?

18  A.    That's true.

19  Q.    You have that broken down by month, correct?

20  A.    We pay them monthly so I think you're referring to a pay,

21  a pay reconciliation?

22  Q.    Correct?

23  A.    Okay.

24  Q.    Then if you recall that for the month of November 2014,

25  that there was a net loss of subs, but at a number and I'm

1  deliberately not saying the number at the request of counsel?

2  A.   Thank you.

3  Q.   But at a number less than 13,700?

4  A.   So I haven't, I don't see pay sheets, so I'm not aware of

5  the sub numbers.

6  Q.   You're not aware.  We'll deal with it with somebody else

7  then.

8     But whether it's 13,700 or some lower number, or even

9  30,000, we're talking about less than 1 percent of your total

10  subs at the time, correct?

11  A.   Right.  That was just for the CNN Networks, not including

12  TBS, TNT.

13  Q.   Okay. I want to turn to, I have two more topics or areas

14  that I want to cover with you.  I want to turn to the subject

15  of this merger, okay.  And your testimony that everything is

16  different after the merger, okay?

17  A.   Okay.

18  Q.   Everything is different.  So the way I want to do this is

19  I want to talk about pre merger like the day before the merger

20  and then post merger, the day after the merger, okay?

21  A.   Okay.

22  Q.   You don't have any calculations about how many subs DISH

23  would lose or Sling would lose if there were a blackout let's

24  say today.  You haven't seen any recent calculations to that

25  effect, correct?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  A.   If they went dark pre merger?

2  Q.   Yes, today?

3  A.   No.

4  Q.   And you wouldn't know how many, you haven't seen any

5  calculations or any data showing how many subs who might leave

6  today because of a Turner blackout would actually go to

7  DirecTV, correct?

8  A.   You know, on that one we actually do try to keep track of

9  that.  So we have our own internal estimates.

10 Q.   What percentage do you attribute sub departs DISH that

11 will divert over to DirecTV?

12 A.   So we've seen, you know, it's roughly two-third.  I've

13 seen numbers as high as 70 percent.

14 Q.   You don't have any documents that reflect that do you, any

15 analyzes, any calculations or anything like that, correct?

16 A.   I think we do.  I mean, it's normal ordinary course of

17 business, we track where people go.

18 Q.   You haven't turned any of that over, right?

19 A.   I wouldn't know.

20 Q.   Okay.  Well, you know you have turned over pricing data to

21 the government in connection with its investigation, you know

22 that?

23 A.   I do know that.

24 Q.   Were you aware that the pricing data that you turned over

25 to the government in the course of its investigation of this

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   merger showed that during the Turner blackout in 2014, DISH

2   actually gained net subscribers?

3   A.    It doesn't sound right.

4   Q.    Have you checked the data?

5   A.    I haven't.  It's hard to imagine gaining subscribers

6   during that period.

7   Q.    But you haven't checked the data, the pricing data?

8   A.    When you say pricing data, how are you relating that back

9   to sub numbers?

10  Q.    Data of all of the subs not only the ones that carry

11  Turner but all subs including those few who you say don't have

12  Turner, total subs, gained during that period of months.  Would

13  you, are you aware of that?

14  A.    Sir, I guess what's the period you're talking about

15  because --

16  Q.    October, November 2014?

17  A.    Okay.  So we typically look at sub losses after going dark

18  over a longer period than that.

19  Q.    But the bottom line is you don't, you've not seen any

20  analysis of that data, correct?

21  A.    I've not.

22  Q.    Okay.  Let me go back to my question about pre merger and

23  we were talking about customers that may sign up for DirecTV.

24     I think you indicated that it's not very convenient for a

25  customer to actually cancel a subscription because they got to

```
1   get through, they got to take the day off and all of that,
2   correct?
3   A.    It's less convenient for satellite than for Sling.
4   Q.    Okay.  Some of those sub goes to the cable guys, right?
5   A.    A portion.
6   Q.    You indicated that Comcast, Comcast is the larger cable
7   provider in the country, right?
8   A.    That's true.
9   Q.    Over, well over 20 million subscribers, right?
10  A.    That's true.
11  Q.    Okay.  And I think you indicated that they only cover
12  one-third of the --
13  A.    Geography.
14  Q.    But that's geographically, right?
15  A.    That's true.
16  Q.    You compete in every area where Comcast sells, sells
17  programming to subscribers, correct?
18  A.    So to be clear, we're actually pushing away from urban
19  areas and into rural.  Comcast is a beast and we're trying to
20  stay out of their path.
21  Q.    But you said you were a national provider?
22  A.    We are a national provider.
23  Q.    So every one of those 20 plus million Comcast customers is
24  a potential customer of Dish, correct?
25  A.    Theoretically.
```

1   Q.   And wherever Comcast does serve customers it is the

2   dominant provider, correct?

3   A.   I think that's accurate.

4   Q.   Because the cable guys came in first back in, even as

5   early as the '60s and they got exclusive franchises to put

6   cable in, correct?

7   A.   That's how they got started.

8   Q.   And then over time then the satellite companies, DISH and

9   DirecTV got involved, but that wasn't until some time until the

10   mid '90s or so, correct?

11   A.   That's correct.

12   Q.   Then ten years later or so in the mid 2000 the telephone

13   company, you call them TelCos, also started to push video

14   through their phone lines, correct?

15   A.   That's correct.

16   Q.   So the incumbents have always been the cable companies,

17   correct?

18   A.   That's true.

19   Q.   Okay.  Now if, so a customer who does leave DISH could

20   sign up with the cable company, correct?

21   A.   They could.

22   Q.   Now they could also go to one of the TelCos other than

23   AT&T and Verizon Fios, correct?

24   A.   If they offer video in that area.

25   Q.   But they could also decide to cut the cord?

1   A.   They could.

2   Q.   If they cut the cord they could go to various internet

3   distributors, correct?

4   A.   That's true.

5   Q.   One of them might be Sling, right?  Another might be

6   DirecTV Now, true?

7   A.   That's right.

8   Q.   And there are others as well, there's Hulu Live, correct?

9   A.   Yes.

10  Q.   There's YouTube TV?

11  A.   That's correct.

12  Q.   There's FuboTV?

13  A.   Correct.

14  Q.   And there's FiloTV?

15  A.   That's true, but Filo doesn't have a sports offering.

16  Q.   And Filo doesn't carry Turner at the current time,

17  correct?

18  A.   I think that's correct.

19  Q.   And Fubo doesn't carry Turner at the current time?

20  A.   I didn't realize that but I think that sounds right.

21       I know YouTube just acquired Turner rights.

22  Q.   Some of these cord cutters could also go to Netflix,

23  right?

24  A.   It's a different offering.  Sling in particular is live

25  linear current season, live news, live sports.

1    Netflix is really all about previous seasons and more and

2 more they're, they are making original content that, you know,

3 that they fund themselves.

4 Q.   But nonetheless I mean, watching Netflix shows is watching

5 television and Netflix is a company your company considers to

6 be a competitor, correct?

7 A.   In the broadest sense that there's competition for

8 eyeballs but we think it's complimentary to the point that

9 we've even integrated our satellite service with Netflix.

10 Q.   Sure, you know what a 10K is, right?

11 A.   I do.

12 Q.   You know that's a public filing of the Securities and

13 Exchange Commission, right?

14 A.   I do.

15 Q.   You know that a company has to be truthful and accurate in

16 what it states in their public filings, correct?

17 A.   Uh-huh.

18 Q.   So let's take a look at, which I'll mark as the next

19 exhibit?

20       THE DEPUTY CLERK:  Defendant's 921.

21    (Defendant's Exhibit Number 921 marked for

22 identification.)

23       MR. PETROCELLI:  May I approach, Your Honor?

24       THE COURT:  You may.

25       MR. PETROCELLI:  There is no objection to this

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  exhibit, Your Honor, so I would move it into evidence.

2       THE COURT:  All right.  It will be admitted.

3     (Defendant's Exhibit Number 921 received into evidence.)

4       THE WITNESS:  What page are you looking at?

5  BY MR. PETROCELLI:

6  Q.   Take a look at page 6.

7     Technically, the first full paragraph.

8     We also face increasing competition from content providers

9  and other companies who distribute video directly to consumers

10  over the internet.

11     Do you see that?

12  A.   I do.

13  Q.   And then if you skip down so I don't have to read the

14  whole thing.

15     Video content distributed over the internet includes

16  services with live linear television programming such as

17  DirecTV Now, Sony Playstation View, YouTube TV, Fubo TV, and

18  Filo TV.  Single program, programmer offering such as HBO Go,

19  CBS All Access, STARZ and Showtime and offerings of large

20  libraries of On Demand content including in certain cases

21  original content by companies such as Netflix, Hulu, Apple,

22  Amazon, Alphabet and Verizon.

23     I'll represent to you that there are similar statements

24  about your facing competition from Netflix on page 27 and page

25  28.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1       And you would not dispute the statements exactly as they

2  are written in this Exhibit 921, correct?

3  A.   Yes, as a competitive service, yes.  It doesn't mean that

4  it's a substitute then.

5  Q.   I didn't ask you about that, did I?  I was asking you if

6  you faced competition from them?

7  A.   You asked if somebody disconnected with Sling if they go

8  to Netflix.  It's not a substitute.

9  Q.   Did you put in the 10K that they're not a substitute?

10 A.   I did not.

11 Q.   Did your company put that in the 10K?

12 A.   What was the question you asked me before?

13 Q.   That's not a substitute?

14 A.   I was just asking what question was two questions ago?

15 Q.   Did the company put in its 10K?

16 A.   I meant the one about Netflix if you leave out.

17         THE COURT:  Woe, woe.  Let him finish his question,

18 then you give him the answer.

19 BY MR. PETROCELLI:

20 Q.   The company did not include your position that Netflix is

21 not a substitute when it made statements in its public filings

22 to the SEC, correct?

23 A.   My answer was to your question.

24 Q.   Can you answer that question?

25 A.   Sorry, repeat it.

1  Q.   The company did not make your, include your position in

2  its public filings that Netflix is not a substitute?

3  A.   They did not.

4  Q.   And in fact, Mr. Ergen has said Netflix is the most

5  powerful content aggregator in the world and there's nobody

6  that's even close, correct?

7  A.   That's true.

8  Q.   Okay.  So you don't have any calculations or

9  quantifications about how many of your customers who might

10 decide to leave DISH due to a Turner blackout would go to one

11 of these numerous internet distributors?

12 A.   So in a, if we went dark how many would go to a --

13 Q.   My question was more specific.

14    Do you have any calculations or any quantification of the

15 percentage of customers that would go to the internet provider?

16 A.   We do not.

17 Q.   Okay.  Now once the merger occurs, now we're the day after

18 the merger?

19 A.   Okay.

20 Q.   And to be sure before I go to the day after the merger,

21 the day before the merger you don't have any calculation as to

22 how much DirecTV would earn from any subscribers it might pick

23 up who left DISH, correct?

24 A.   We do have those calculations.

25 Q.   Based on your own internal projections of DirecTV's profit

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  margin?

2  A.    No.   This is based on, this is an external third party

3  study.

4  Q.    Okay.   And by the way, pre merger you do know that in a

5  Turner blackout, Turner would lose a substantial amount of

6  money, correct?

7  A.    Potentially I don't.   I mean, it all depends on the

8  assumptions.

9  Q.    Let's just take, let me make up some numbers.   Let's say

10 that $6 per sub per month, okay, for the Turner Networks.

11     And let's say you have 12 million.   They're subs, okay, and

12 you're dark for one month.   By my math that's 72 million

13 dollars, am I correct?

14 A.    Sure, if you're dark for a month.

15 Q.    Yes?

16 A.    That's 72 million.

17 Q.    And that doesn't count the advertising, right?

18 A.    That's true.

19 Q.    Didn't you say in your deposition that the advertising is

20 50/50?

21 A.    More or less.

22 Q.    So you can throw in another, anywhere up to another 70

23 million dollars, that's a 150 million dollars a month lost to

24 Turner, correct?

25 A.    If they were down for a month.

```
 1  Q.    Which they were for example in 2014 with the exception of
 2  TNT and TBS, correct?
 3  A.    That's right.
 4  Q.    Let's go to the day after the merger.  Turner is still
 5  going to lose the same amount of programming, affiliate fees
 6  and advertising, correct?
 7  A.    If they're down for a month those numbers are --
 8  Q.    The numbers are the same?
 9  A.    Okay.
10  Q.    And we're talking about transacting in the identical
11  programming, the identical networks with the identical content
12  the day after the merger, correct?
13  A.    I don't know.
14  Q.    Well, you don't have any reason to believe otherwise,
15  right?
16  A.    I think their incentives changed, that's what we talked
17  about yesterday.
18  Q.    I know you think that.  But you don't have any evidence
19  that they're suddenly going to change all their networks
20  around, correct?
21      Have you seen a document that would suggest that?
22  A.    No, I think it's a fair comment.  Based on my business
23  judgment though --
24  Q.    Well, I'm --
25  A.    I think there --
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   I'm not asking about your business judgment right now.

2  I'm asking you about specific evidence, okay?

3  A.   What evidence could there be?

4  Q.   Did anybody tell you such a thing?

5  A.   Could you define evidence?

6  Q.   Did anybody tell you such a thing, yes or no?

7  A.   I mean --

8  Q.   Did anybody tell you that after the merger Turner is going

9  to change all of its programming around?

10 A.   That they're going to ask us to take eight networks

11 instead of four in Sling?

12 Q.   No.  First of all, did anybody tell you they're going to

13 change their programming or their content after the merger?

14    Can you answer that performance simple question?

15 A.   No.

16 Q.   Have you seen a document to that effect?

17 A.   To what effect?  That they would --

18 Q.   Change their content, change their programming?

19 A.   Sir, are you saying that have I seen a document that would

20 keep everything status quo?

21 Q.   Do you have trouble answering my question, sir?  Let me

22 put it to you again?

23 A.   I'm trying to understand your question.

24 Q.   Okay, bear with me then?

25 A.   Thank you.

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  Q.   Have you seen any documents that would tell you that the

2  day after the merger Turner is going to change its content or

3  program from what it currently exist the day before the merger?

4       Yes or no?

5  A.   No document that presents that.

6  Q.   Thank you.

7       Now the negotiators on both sides are going to be the same,

8  correct?

9  A.   Most likely.

10 Q.   And Charlie Ergen is going to be equally as rational post

11 merger as he is pre merger?

12 A.   One would think.

13 Q.   Are you aware that the government's expert economist in

14 this case has given the opinion that it would not be profitable

15 for the merged company to withhold the Turner Networks from

16 DISH and other distributors?

17 A.   I'm not.  I'm aware of a study that shows that it would be

18 profitable.

19 Q.   But you're not aware -- has the government shared that

20 with you?

21 A.   I've seen an external economist study that shows that

22 temporary foreclosure would indeed be profitable.

23 Q.   Well, do you understand that the government's position in

24 this case based on its economic expert that it will be calling

25 to the stand is that foreclosure of Turner Networks would not

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  be profitable?

2     Am I to understand you are not aware of that until I just

3  told you that right now?

4  A.   The document that I seen shows profitability with

5  temporary foreclosure.

6  Q.   Are you talking about the document from the government's

7  expert Professor Shapiro?

8  A.   So I don't, I guess I'm, there must be a second document

9  if it shows lack of profitability.

10 Q.   I don't know what document you are talking about.  I'm

11 talking about Professor Shapiro's expert opinions submitted in

12 this matter?

13 A.   I'm talking about something called the Brattle Economic

14 Analysis.

15 Q.   Let's stick with Professor Shapiro's analysis?

16 A.   I have not seen that.

17 Q.   And you have not been told about that, correct?

18 A.   No.  That's the first time that they would somehow lose

19 money.

20 Q.   Are you aware that the government is not contending in

21 this case that there will be a foreclosure of content from

22 MVPDs whether temporary, permanent or otherwise?  Are you aware

23 of that, sir?

24 A.   Can you back up and just saying that they're not

25 contending that there would be?  They're speculating that they

1  would be.

2  Q.   Are you aware that in this case the government has not

3  alleged and is not alleging that there will be a withholding of

4  the Turner Networks either on a temporary or on a permanent

5  basis from MVPD such as DISH?

6  A.   That's just common sense.  Maybe it's just me.

7  Q.   So the answer is you're not aware?

8  A.   I guess not, no.

9  Q.   I previously showed you Mr. Ergen's testimony.  Excuse me,

10 Mr. Ergen's public statements that your company could actually

11 make more money by taking programming down, correct?

12 A.   I believe you said save money, and I believe when you save

13 money you could save your way all the way to zero, to zero

14 subscribers.

15 Q.   Let's take a look then.  Let me show you the next exhibit

16 that I will mark for identification, that's Exhibit 923.

17          THE COURT:  22.

18          MR. PETROCELLI:  22?

19      (Defendant's Exhibit Number 922 marked for

20 identification.)

21      May I approach, Your Honor?

22          THE COURT:  You may.

23 BY MR. PETROCELLI:

24 Q.   Could you turn to the, this is the DISH earnings called

25 transcript of February 3, 2015 and turn to page 10, please.

1      Do you have that in front of you?

2  A.   I do.

3  Q.   And you see where it states and you end up in a situation

4  where I said this before, the programmers will self select the

5  last for a price that's so high that we or others will just say

6  based on our viewership we make more money long term by taking

7  you down and not providing your program.

8      Do you see that?

9  A.   I do.

10  Q.   Okay.  That statement that DISH will make more money by

11  taking down the programming and not providing it rather than

12  paying a price increase that's so high would also apply after

13  the merger, correct?

14  A.   I don't think that's the case.

15  Q.   So --

16  A.   I can't make the connection.

17          THE COURT:  Wait, wait.  One at a time.  Let him

18  finish his thought.

19          THE WITNESS:  What is the connection between those

20  two thoughts?

21  BY MR. PETROCELLI:

22  Q.   Well, if I were on the witness stand, I would answer your

23  question, but let me put another question to you, okay.

24      Your position is that just because of the merger, just

25  because of the merger and because some subscribers could leave

1  DISH and go to DirecTV, all other things being equal, that you

2  are going to recommend to your boss to pay more money for the

3  identical programming; is that correct?

4  A.   I have to think about that for a second.

5      Why would we recommend that we pay more money?  I mean, if

6  we've still got this sort of strange choice, right.  We can

7  pay, at some point you get to a tipping point, right.

8      They can put onerous terms to us post merger.  The higher

9  our prices go, the higher, the more we have to raise our

10  prices.  That makes us less competitive.

11  Q.   You can simply say no?

12  A.   We can.

13  Q.   You can say no and you can go dark as you've many, many

14  times?

15  A.   That's the Hobson's choice that I mentioned yesterday.

16  You go dark and then you lose subscribers even faster.

17  Q.   But you've been doing that, the company has been doing

18  that since day one.

19      And according to Mr. Ergen it actually makes more money to

20  go dark plus it teaches the programmer a lesson?

21  A.   I think I've said --

22  Q.   Are you suggesting that philosophy will suddenly vanish

23  just because of the merger?

24  A.   I think in a declining sub market which we're in, you can

25  save money and lose subs until you're out of business.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.   Well, apparently your boss doesn't agree with you.

2  A.   I believe his comments are from three years ago, almost

3  four.

4  Q.   I think I showed you the comment just in September of 2013

5  where he said he'd go to sleep any night not worrying about

6  taking anybody down including ESPN.

7     That wasn't three years ago was it?

8  A.   I also think it wasn't a long term, long term take down

9  that he was referring to.

10  Q.   By the way, Turner couldn't threaten to take you down or

11  go dark on you any way because they made a unilateral binding

12  offer never to go dark in your negotiations over the next seven

13  years, correct?

14  A.   So that --

15  Q.   Is that correct?

16  A.   You know, I have to confess, I really don't understand

17  that offer.

18  Q.   Well, did you pick up the phone and ask them?

19  A.   That would have been an unusual call.

20  Q.   Well, they gave you a heads up before this came out,

21  right?

22  A.   See, I know our attorneys spoke.

23  Q.   Did Richard Warren reach out to you?

24  A.   To say that it was coming, yes.

25  Q.   When you got the offer did you call him up and say you

1  know, I don't understand this part or I don't understand that

2  part?

3  A.    Not really my place to do that in the midst of this.

4  Q.    You really did not do it, correct?

5  A.    Our attorneys, our representatives of DISH did.

6  Q.    In fact, you have been a big proponent of baseball style

7  arbitration, haven't you?

8  A.    In certain cases, we had --

9  Q.    You've actually written to Congress people advocating that

10 they impose baseball style arbitration on programmers, haven't

11 you?

12 A.    On these simpler deals I have.

13 Q.    And you've also taken out ads to that effect, haven't you?

14 A.    Again, simpler deals mostly about rate.

15 Q.    And you've also invoked the arbitration clause in the

16 Comcast NBCU decree, didn't you?

17 A.    We did notice.  We never actually arbitrated.

18 Q.    But you gave notice and by giving notice that they

19 couldn't go dark on you?

20 A.    That's true.

21 Q.    So you took advantage of that, right?

22 A.    We needed more time to close the gap.

23 Q.    And you negotiated under the shadow of arbitration and

24 were then able to make a deal, correct?

25 A.    We, I guess if that's the way you want to characterize it.

1  Q.   And you are aware even though you say you don't understand

2  everything about the Turner offer, you are aware that it does

3  provide for a standstill mechanism, a no blackout mechanism

4  very much like the Comcast NBCU one?  You know that much don't

5  you?

6  A.   What's to prevent HBO --

7  Q.   Can you answer that question?

8  A.   I'm trying to answer it.

9  Q.   Answer the question.  It doesn't apply to HBO so we don't

10  have to talk about HBO.

11  A.   It does because if you want to get a deal done with HBO,

12  they could ask us to waive --

13  Q.   I'm not asking you about all the things that you can think

14  of.  I'm asking a simple question.

15      You are aware that the Turner offer contains a mechanism

16  not allowing Turner to blackout at the option and election of

17  the distributor, correct?  Simple question, do you know that

18  much?

19  A.   You cannot look at that in isolation.

20          MR. PETROCELLI:  Your Honor, please answer the

21  question?

22          THE COURT:  You really have to answer the question.

23      You can explain later on redirect.

24          THE WITNESS:  Okay.  I've never done this before, so

25  I apologize.

```
 1              THE COURT:  That's all right, you're doing fine.

 2        Go ahead.

 3              THE WITNESS:  Okay.

 4   BY MR. PETROCELLI:

 5   Q.   You are aware that it has a standstill mechanism is my

 6   simple question?

 7   A.   For the Turner Networks.

 8   Q.   For the Turner Networks, correct?

 9   A.   Yes, I'm aware of that.

10   Q.   Okay.  And you've, and in fact, with respect to the

11   Comcast NBCU arbitration mechanism and the standstill mechanism

12   Mr. Ergen made public comments praising it, correct?

13   A.   When was that?

14   Q.   Do you remember that?

15   A.   I don't remember the time or date.

16   Q.   Let me show you that.

17              MR. PETROCELLI:  That would be the next exhibit in

18   the order, Your Honor, for identification.

19              THE COURT:  923.

20              MR. PETROCELLI:  Yes, another called July, 2016.

21        May I approach?

22              THE COURT:  You may.

23        Marked for identification?

24              THE DEPUTY CLERK:  Yes.

25        (Defendant's Exhibit Number 923 marked for
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   identification.)

 2   BY MR. PETROCELLI:

 3   Q.   Could you please turn to page 18?

 4   A.   Okay.

 5        You said July.  I think this is dated April 20th.

 6        Do I have the right document?

 7   Q.   You have the wrong one.

 8             THE COURT:  Mine says April also.

 9             MR. PETROCELLI:  So does mine, Your Honor.  I'll get

10   you the right one.

11   BY MR. PETROCELLI:

12   Q.   While he's looking for it let me read it and tell me if it

13   rings a bell, page 17, 18 of the July 21, 2016 analyst call.

14        Quote, and we've been very vocal about the fact that

15   baseball arbitration is a good way to do it.  And by baseball

16   arbitration I mean each side picks a number of what they think

17   they should be paying and the arbitrator has to pick one of

18   those two numbers.

19        And when you do that people get pretty close before you

20   ever get to arbitration and nine times out of ten, they

21   resolve, they resolve the issue without that.  It's just a

22   stimulus to get to a deal that makes sense in the first place

23   without the, and the consumer never loses their channel.

24        So we've done that baseball arbitration is something that

25   Comcast signed in the consent decree.  Regional sports have had
```

1  it in the past.  It's worked very well in the market place.

2      And I'll apologies for that mix up.  This is Defendant's --

3          THE COURT:  923.

4          MR. PETROCELLI:  -- 923.

5  BY MR. PETROCELLI:

6  Q.   I won't reread it but you'll see that on page 17, Mr.

7  Schlichting.

8  A.   I don't see it.  Here, maybe page 18.

9  Q.   Yes, on 18.

10     The question is were you aware that Mr. Ergen made those

11 comments?

12 A.   Give me one second.

13     Right, so he's speaking of Tribune.

14 Q.   Where he specifically calls out to Comcast?

15 A.   Right.  So we did get to a deal on Comcast.  But this is

16 really with respect to retransmission consent deals.

17 Q.   You are aware that under this arbitration offer that

18 Turner made, you have the ability to arbitrate any of the

19 networks that you have licensed in the next negotiation

20 including any specific bundles that you are carrying, correct?

21 A.   Not aware of that.

22 Q.   Well, have you reviewed the Arbitration Agreement

23 language?

24 A.   I have and it's not clear.

25 Q.   Well, let me just show you.  I think this has previously

1    been marked, but I'll get you another copy.

2           MR. PETROCELLI:  The plaintiffs already marked the

3    arbitration as 491, Your Honor.

4           THE COURT:  Defendant's 491?

5           MR. PETROCELLI:  No, it was plaintiff's 491.

6           THE COURT:  Plaintiff's 491.

7    BY MR. PETROCELLI:

8    Q.   Paragraph two of that says a claimant may demand a stand

9    alone offer or offers for a bundle of all Turner Networks or

10   any bundles of Turner Networks that Turner has licensed to

11   AT&T, the claimant or another video distributor for

12   distribution to consumers on or after October 22, 2014.

13        Now your current license agreement, I think you indicated

14   is for eight or so of the Turner Networks on --

15   A.   On satellite.

16   Q.   But it also allows you to put the four network bundle on

17   Sling?

18   A.   I think it --

19   Q.   It's the same agreement, correct?

20   A.   It forces us to do that, right.  We have to do both

21   together.

22   Q.   But you asked to put the four networks on Sling, correct?

23   Not all eight, you wanted four?

24   A.   That's right but my question is you have to arbitrate

25   together, correct?

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  Q.   Well, if you have a dispute I was simply asking you, you

2  have the ability to elect arbitration with respect to the

3  entire carriage agreement including that piece of it that

4  relates to the four, four network bundle on Sling?  You are

5  aware of that, correct?

6  A.   Right, and we feel that's highly risky.

7  Q.   Well, you said that yesterday about --

8  A.   I did.

9  Q.   -- highly risky?

10  A.   Yeah.

11  Q.   But, you know, there are other, there are other virtual

12  MVPDs, other online distributors out there and you would be

13  able to, an arbitrator would have the benefit of looking at

14  information from all of these in order to figure out for in the

15  case of Sling what might be a fair market value, correct?

16  A.   That's exactly what we're worried about.

17  Q.   But you, the arbitrators are required to be highly

18  qualified and experienced in the business, correct?

19  A.   It says to look at comparables.  We don't believe there

20  are comparables.

21  Q.   Well, it goes way beyond that doesn't it?  It says the

22  arbitrator can review all relevant evidence, right?

23  A.   It does.

24  Q.   And also it provides, I think you were talking about a

25  time out to do negotiation, it provides actually several

1  opportunities to do mediation in the course of the arbitration

2  process before a final decision is rendered, correct?

3  A.    I believe it does.

4  Q.    Importantly, if you elect it, Turner can't even threaten

5  any leverage to go dark on you, correct?

6  A.    I know you're going to hate this, but HBO sits out apart

7  from this agreement.

8  Q.    We're not talking about HBO.  We are talking about the

9  Turner Networks?

10  A.    I can't answer the question in isolation.

11  Q.    But you've been negotiating for years a Turner agreement

12  separate from the HBO agreements?

13  A.    That's true.

14  Q.    Okay?

15  A.    And now they would not be separate anymore.

16  Q.    But they're not one contract?

17  A.    They're not.

18  Q.    They're not one contract and the HBO, the HBO contract has

19  nothing to do with this, correct?

20  A.    That's not correct.

21          THE COURT:  Let him finish his answer.

22      Go ahead.

23          THE WITNESS:  So --

24  BY MR. PETROCELLI:

25  Q.    You said it's not?

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1          MS. KISER:  Your Honor, may we approach on a

2    confidentiality issue?

3          THE COURT:  Hold on.

4       Unless he's about to say something confidential

5    unknowingly, he can finish his answer.  Otherwise, you can

6    approach.

7          THE WITNESS:  I think I probably just did, but any

8    way --

9          THE COURT:  Well then hold on, just have a seat.

10      (Witness leaves the stand.)

11      (Sealed Bench Conference.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25



20          (Open Court.)

21          THE COURT:  All right, you can proceed consistent

22   with the discussion at the bench.

23          We're going to go off to a different question at this

24   point.

25          (Witness resumes the stand.)

1  BY MR. PETROCELLI:

2  Q.   Let's put Turner to the side now and talk about HBO.

3       If the HBO Networks were somehow not made available to

4  let's say DISH, DISH subscribers could readily get them over

5  the top by subscribing to HBO Now for what is it 15, $18 a

6  month, something like that?

7  A.   So only about a third of our subscribers are connected.

8  Q.   But the answer is if you have internet connections you can

9  get HBO Now, correct?

10 A.   That's correct.

11 Q.   I want to ask you a couple of questions about this skinny

12 bundle issue?

13 A.   Okay.

14 Q.   And I think you were suggesting in your testimony that

15 post merger Turner might not be so willing to allow you to have

16 four bundles or words to that effect?

17 A.   Certainly possible.

18 Q.   Four networks.  Pre merger all the programmers, all the

19 programmers want you or your company to take as many networks

20 as they can persuade you to take, correct?

21 A.   That's true.

22 Q.   Because if a programmer can't get a distributor to take

23 all its networks and the distributor can just pick off the one

24 or two best of them, the programmer is concerned that those

25 networks are going to die on the vine and become irrelevant and

```
 1   they'll lose a lot of revenue and they will lose advertising

 2   revenue, correct?

 3            MS. KISER:  Objection, compound.

 4            THE COURT:  I think you could reconstitute that

 5   question a little more clearly.

 6            MR. PETROCELLI:  Will do.

 7   BY MR. PETROCELLI:

 8   Q.   So programmers are concerned that if they can't convince a

 9   distributor to take all of their networks, some of them may

10   fade away, correct?

11   A.   Sure.

12   Q.   And they could lose a lot of money if that happens, right?

13   A.   It's subjective a lot, but there are probably a lot of

14   networks that probably should fade away.

15   Q.   But that's been the battle back and forth, right, between

16   distributor and programmer?

17   A.   That's true.

18   Q.   And that ain't going to change post merger for

19   programmers.  They are always going to want distributors to

20   take more channels than distributor really wants to take,

21   right?

22   A.   It changes their ability to force those on somebody.

23   Q.   First of all, on the ability point we just went over that.

24   We are now talking Turner.  We are now talking the bundle of

25   four.  You still have the arbitration mechanism should you
```

1  choose to invoke it, correct?

2  A.   Yes.

3  Q.   That would be available to you as an option?

4  A.   I don't believe the arbitration mechanism as currently

5  worded protects us.  So I'm not assured by your --

6  Q.   Well, I'm not trying to assure you.  I'm not your lawyer

7  --

8  A.   Sounds like it.

9  Q.   -- and I'm sure you have able legal counsel.

10     But there is a provision in the Arbitration Agreement that

11  does allow you to among other things identify the specific

12  bundles that you want within the license networks, correct,

13  under your carriage agreement?

14  A.   Assuming we go to arbitration with our entire business,

15  that's correct.

16  Q.   Now the, you testified earlier that Sling is really for

17  people who want to use it in the mobile environment on the

18  internet, right?

19  A.   Those are different.

20  Q.   Well, let's, let me stick to mobile environment.

21     Sling is designed for people who want to be able to access

22  the programming not just at home in the living room but

23  wherever they are, correct?

24  A.   I'm curious to know when that was, the date of that

25  testimony.

1    Q.    You're getting use to this, right.

2        So are you suggesting that I have a statement by Mr. Ergen

3    to that effect?

4        (Laughter in audience.)

5    A.    I'm suggesting that when you go to over the past months

6    and maybe last year we have discovered that mobile customers

7    are not as high quality, they turn faster.  And so folks that

8    watch television with a ten foot, you know, basically a

9    television on the wall and the couch in the living room are

10   perhaps better.

11       So that's why I'm asking for clarification.

12   Q.    Let me read to you this statement from Mr. Ergen.

13       Sling is part of a strategy to take content to a more

14   mobile basis.  To a more wireless basis.  Because that's the

15   way the next generation is going to watch television.

16       They're going to watch as much or more television on a

17   phone or a tablet or a computer as they are in a big screen TV.

18       You recall Mr. Ergen making those comments?

19   A.    That's what we thought out of the box, we're going to

20   serve millennials, we are going to make it graphical, we are

21   going to make it colorful and people like the grid guy.  Not so

22   many millennials, it's just different.

23       So my guess is that's a few years old.

24   Q.    But you're not suggesting that, that you're no longer

25   looking to sell Sling to people who want to use it on a mobile

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  device, are you?

2  A.   I'm not.

3  Q.   Okay.  And you know that AT&T has a very significant

4  wireless network, right?

5  A.   I do.

6  Q.   So you know that people who actually watch Sling on a

7  mobile device may actually be watching it on the AT&T wireless

8  network, right?

9  A.   It's possible.

10 Q.   And you understand that the more people that are engaged

11 on the AT&T wireless network, that's good for AT&T's wireless

12 business, correct?

13 A.   Because Sling customers will be paying for that data.

14 Q.   Well, the simple point I'm asking you is that if Sling

15 customers are watching Sling on a mobile device on a wireless

16 device and they are an AT&T subscriber consumer, that's good

17 for AT&T's wireless's business, right?

18 A.   I couldn't tell you.

19 Q.   More use, more use on its wireless network, better for

20 AT&T?

21 A.   More data use is more cost to them.

22 Q.   So are you suggesting that the more people that are

23 engaged on the AT&T wireless network, the worse it is for AT&T?

24 A.   I'm saying the more data they use.  I'm, I don't profess

25 to be a wireless expert.

```
 1   Q.   You don't need to be a wireless expert to know that the

 2   more people that are using AT&T's wireless network, the more

 3   money they could be making, correct?

 4   A.   I don't see the connection there.

 5   Q.   Well, they might want to have multiple devices.  You pay

 6   for more multiple devices, correct?

 7   A.   I don't know that business.

 8        THE COURT:  Let's move on.  Let's move on.

 9   BY MR. PETROCELLI:

10   Q.   Well, my point is that AT&T wireless business would

11   actually suffer if for example companies like Sling and Hulu

12   Live and Fubo and Filo no longer distributed video over the

13   internet?

14   A.   I see no connection between those two.

15        MR. PETROCELLI:  Your Honor, I have nothing further

16   at this time.

17        THE COURT:  Okay.  I need to see counsel.

18        Would you step down.

19        (Witness leaves the stand.)

20        (Sealed Bench conference.)

21   ████ ████  ████ ██  ████

22    ███ ███ ███  ███ ███ ███  ████ ████ ████ ███

23  ████ ███ ████ ███ ████ ████ ████ ████ ████ ███

24  ████ ████ ███ ████ ████ ████ ████ ███ ███ ████

25  ████ ████ ███ ████ ██████ ███ ████ ████ ████ ████
```



██████  ████  ██████  ████  ████  ████

████  ██████  ████  ████  ████  ██████  ████  ████

██████  ████  ████  ████████  ████  ████  ████  ████

4          (Open Court.)

5              THE COURT:  All right, you may proceed with redirect.

6          (Witness resumes the stand.)

7                      REDIRECT EXAMINATION

8    BY MS. KISER:

9    Q.   Mr. Schlichting, let's start by talking about the

10   arbitration remedy that you were just discussing with

11   Mr. Petrocelli?

12   A.   Okay.

13   Q.   Well, actually first, what we'll talk about the, some of

14   the other statements that have been made related to

15   arbitration?

16   A.   Okay.

17   Q.   So you've advocated for these baseball style arbitration

18   and the retransmission consent context?

19   A.   I have, we have as a company.

20   Q.   Can you explain for the Court what retransmission consent

21   context is?

22   A.   Yes.  It's a basic negotiation with local affiliates.  I

23   mean Broadcast affiliates, the ABC, CBS station in your

24   particular area, the contracts are fairly similar across most

25   affiliates, so it's typically about rate or the majority is

1  about rate.

2      So in that case baseball style arbitration makes sense.

3  They're easy comparables, or typically comparables in the

4  market.  It's about a single number where you can have the next

5  two or three years worth of rates.

6      So we recommend baseball style arbitration when we can't,

7  when we're at an impasse on the local affiliates.

8  Q.   You mentioned a few things there.

9      The first was that the contracts are pretty simple and

10  mostly similar.

11      Why are they more simple than contracts with groups like

12  Turner?

13  A.   They're broadcast contracts, so they're typically not, on

14  the affiliate side by the way, on the owned and operated side

15  where Fox and NBC, they all own a few stations of their own in

16  the big markets.  Those are complicated.

17      So this is really because they get embedded in the cable

18  network negotiations.  So that's a big bowl of spaghetti and as

19  we've talked about, just a lot of moving parts.

20      With retransmission consent when it's only about an

21  affiliate, there just aren't other networks with which to

22  leverage negotiations or somehow there aren't that many levers

23  to pull.

24  Q.   You also mentioned that there are plenty of comparables in

25  the retransmission consent context.

1       What do you mean by that?

2  A.   I just mean that typically because of the FCC broadcast

3  ownership rules, you can't have more than two stations in most

4  markets.  Almost all markets.

5       So even within that market there will be two other

6  affiliates where you could actually have a price comparable.

7  Part of the idea with comparables is same market, same, you

8  know, you want to have as few variables as possible.

9       So you almost always have a market comparable.  Even if you

10  don't, you've got similar markets across the U.S.

11  Q.   About how many local retrans markets are there?

12  A.   Well, there are 210 DMAs total.  I think we have deals

13  with affiliates in almost all of those, if not all.

14       So that doesn't mean there are 210 different affiliate

15  owners.  There are probably at least that many that we do deals

16  with every couple years.

17  Q.   DMA is designated market area?

18  A.   Right, it's a Nielsen term.  Designated market area which

19  is a city area, urban area.

20  Q.   So if you were to arbitrate in the retransmit context, say

21  you are arbitrating with NBC, would you have a supply of

22  potentially 200 plus other NBC affiliates in different DMAs

23  across the country to compare the rates and terms?

24  A.   Yeah.  I want to be careful.

25       NBC typically refers to the parent company, so on the own

1  and operated put that aside because that's gummed up in all of

2  rest.

3  Q.   I shouldn't have chosen NBC.  Let's say CBS, is that

4  easier?

5  A.   No, like you know Tribune, TEGNA, Sinclair.

6  Q.   Those are groups that own local affiliates?

7  A.   Right, they own many, many local affiliates across the

8  U.S.

9      So in that case you would have a pretty good idea on

10 comparables for most of their affiliates, for most of their

11 affiliate stations.

12 Q.   Does DISH seek retransmission consent rights for Sling?

13 A.   We don't.  We've had to take a few.  We've feel like it's

14 a competitive advantage for us.  Those costs are spirling.

15     So to the extent that we offer a service that doesn't have

16 these ever spiraling costs, we are going to have a structural

17 advantage.  So we've been forced to take Fox 0 and 0s but we've

18 limited it to that and only in Blue.

19 Q.   O and O?

20 A.   Sorry, owned and operated station.

21 Q.   So as opposed to being owned by the Sinclair premium

22 station groups, they're owned by the --

23 A.   Parent company.

24 Q.   -- parent company?

25 A.   That's right.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.    Do consumers have other ways to watch local broadcast

2  content?

3  A.    They often do.  The point I was trying to make earlier was

4  that if you have internet, if you have, if you're watching

5  Sling that means by definition you have video quality internet.

6      If you have video quality internet, then we would prefer

7  that you proscribe to CBS All Access as an example and take us

8  out from this weird dynamic where when we try to negotiate for

9  better prices for our subscribers, they look at us as the bad

10 guy.

11     It's like hey, you know what, we don't make any money on

12 locals anymore or very little.  So buy directly from CBS.  Go

13 get CBS All Access.  If the price is too high, then it's on

14 CBS's shoulders, not ours.

15 Q.    How about antennas, do people use antennas anymore?

16 A.    We certainly encourage it.  That's a great way for

17 consumers to get TV for free.  I've got a mantra internally

18 called keep free TV free.  So we encourage all of our Sling

19 subscribers to go out and get an antenna.

20     They are pretty easy to use.  We intergrate.  We make it

21 possible to intergrate the OTA signals into our guide so you

22 are not switching inputs HDMI 1, HDMI 2.  You do have to do

23 that.  We're high on the idea of antennas, it's free.  Frankly,

24 they're riding on tax air waives and spectrum.

25 Q.    So you mentioned that you've made it easy to use antennas

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 489 of 3826

445

1  without changing inputs.  What does that mean?

2  A.   Well, you know, you have got all of those remotes in front

3  of your television.  One is for your television, one is for

4  your box, one is for something else.

5     We try to make it so you don't have to pick up the one for

6  your television and change from the HDMI 1 which might be Sling

7  to HDMI 2 which might be your antenna or something else.

8     We try to make that an integrated experience for the

9  consumer.  Let's say you save 10, 12, $15 by doing it and we

10  try to make it easy.

11  Q.   Has DISH done anything else to make it easy for consumers

12  or their antennas to get broadcast content?

13  A.   We also have two different boxes that one is a streaming

14  box and one is a WiFi transmission box.

15     If you look at what it takes, the consumers are just use to

16  not lifting a finger and then complaining about high prices.

17  So we're in this weird position where we are saying hey, much

18  lower price, really a great value but, you know, no one even

19  owns a screwdriver anymore.

20     So we are trying to make it super simple.  Put an antenna

21  on the window, put the air TV box, connect it and then assuming

22  you have a smart TV or a streaming box, you should have all of

23  the locals again for free Over-the-air.  So we're trying to

24  make it easy for the consumer.

25  Q.   Going back to the Turner arbitration offer.  I think you

1  got off a few times earlier when you were trying to explain why

2  it doesn't work for you.

3      Do you want to explain that now?

4  A.   Yeah, I've love to.  We've read it a few times and I just

5  want to be clear that I would never call Rich Warren about a

6  document that he sent over to start asking questions that just

7  given where we are in this trial, it was an inappropriate call.

8  Our attorneys are certainly more in touch.

9      But the idea that fair market value is a term used there.

10  So the arbitrator gets a chance to look at comparables and

11  determine fair market value.

12      I just don't know what that means.  Does it mean rate?  If

13  so, that's kind of woefully inadequate in terms of the span of

14  the rest of the deal.

15      If it's more than just rate, then I really don't know what

16  it means and that scars me.  That's a high risk proposition to

17  put your entire business in the hand of a single arbitrator who

18  may or may not understand your business, understand your

19  contract, understand the gives and takes.

20      And then when you go to the market place for Sling, it's a

21  unique model.  We feel like we've innovated on behalf of the

22  consumer and that could get blown up as well just because there

23  isn't another one like it out there.

24  Q.   That was another question you were asked about earlier was

25  Mr. Petrocelli directed you to a provision in the arbitration

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  offer saying that arbitrators could consider all relevant

2  evidence.

3      Is there evidence out there that would substitute for a

4  comparable contract?

5  A.  So I think that's part of the problem.  That's, you're

6  putting a huge amount of responsibility on an arbitrator, who

7  knows if he's qualified or understands this.

8      And then compound, that's compounded by the idea that there

9  really isn't another comparable to Sling on a couple different

10 fronts.  To us that feels like a very high risk proposition for

11 a business that is early in it's, you know, it's only three

12 years old.  And we're fighting for survival against other folks

13 that are practically giving away their OTT streaming product.

14     So I, you know, that would be a hard, a very hard decision

15 to make.

16 Q.  Mr. Petrocelli also pointed out to you that the arbitrator

17 would have to be highly qualified.

18     Is there anybody in this industry that you would trust to

19 make this decision?

20 A.  Not that I can think of.  And I'll tell you why.  Nobody,

21 there's nobody that really has, unless it's somebody from DISH

22 and of course that's, I'm sure that wouldn't be allowed.

23     You just don't know all of the gives and takes.  We've

24 sacrificed mightily on the satellite side to give birth to this

25 Sling entity.

1    So coming in cold and reading documents that's kind of been

2  presented here just doesn't do it justice nor does it capture

3  the hundreds of millions of dollars, you know, maybe more that

4  we've paid on satellite to actually create this skinny bundle

5  that we believe is good for the consumer.

6  Q.    Just to be clear on the point about comparables, why

7  aren't the other virtual MVPDs good comparable data points for

8  what Sling is?

9  A.    It's where the fear comes in frankly.  Because every

10  other one of these OTT providers has been forced by the network

11  groups with leverage to take a lot of networks that they don't

12  want and don't need and people don't watch.

13    So all of these bundles, I think I mentioned this yesterday

14  but all of the packages that the other competitors offer are

15  just chopped full of stuff and we're trying so hard to get rid

16  of stuff and it's hard.

17    Every programmer comes at you oh, you have got to have X,

18  Y, Z.  We're saying no.  The number one complaint that the

19  consumer has is I'm paying too much for stuff I don't use and

20  don't watch.

21    So that's where we have a unique model.  There are a couple

22  of things about the way our genres are structured as well, and

23  we think they are very customer friendly.

24    I mean, frankly on our side, we keep thinking if we keep

25  answering consumer's complaints, and we're trying hard, then

1  we'll win their love and win their subscription and we'll win

2  their monthly dollars.

3      So far it's been a touch and a kind of iffy existence, but

4  we're the number one live linear streamer I think because

5  customers have voted with their pocketbooks.  I could go on.

6  Q.   So your price is, just as a refresher, it's 20 or $25 for

7  the base package.  How much are these other virtual MVPDs

8  starting at?

9  A.   The other MVPDs I believe the least expensive now is

10 DirecTV Now at 35, and YouTube TV at 40.  Five O is out there

11 with an entertainment only non-sports very limited package for

12 16.  But other than that, Sling is the most robust package and

13 by far the lowest starting price.

14 Q.   Do you have the Arbitration offer in front of you?

15 A.   I don't believe I do.

16         MS. KISER:  Your Honor, may I have a moment?

17         THE COURT:  Yes.

18     (Pause.)

19 BY MR. PETROCELLI:

20 Q.   Do you recall Mr. Petrocelli asking you some questions

21 about whether your bundle of four networks in the base package

22 would be protected by arbitration?

23 A.   I do.

24 Q.   What is your understanding of your right for stand alone

25 offers?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  A.   So I don't think they are protected.  I guess I note to

 2  self we should just re-read that.  It just doesn't feel like

 3  they are protected.

 4      You know, if we arbitrate for four, does that mean that we

 5  can't then be stuck with more?  Even before you get to the HBO

 6  hammer, my reading is that there's nothing that prevents them

 7  from pushing more on us.

 8  Q.   If you could separate satellite and Sling, would that fix

 9  this issue?

10  A.   It wouldn't.

11      As I mentioned, we paid handsomely with our cash flow from

12  satellite to achieve this skinny bundle.  So if you put them

13  together, there's risk of being jammed with more networks,

14  higher prices or else.

15      If you take them apart, then Sling is orphaned and so we

16  don't have any leverage of the parent.  So neither of those is

17  a great, you know, just from a negotiating standpoint, neither

18  of those is attractive in the least.

19  Q.   I'd like to look at the language specifically of the stand

20  alone offer position.

21      May I pass up what's been marked for identification as

22  Plaintiff's Exhibit 491 which is a copy of these Arbitration

23  Agreement.

24          THE COURT:  Sorry, I didn't hear you?

25          MS. KISER:  May I approach to hand the witness?
```

```
 1              THE COURT:  You may.

 2   BY MS. KISER:

 3   Q.   If you could turn to page 3, paragraph A 2 of the

 4   arbitration offer, let me know when you're there.

 5   A.   So I've got large type 1, 2, but then small type 1, 2, 3,

 6   4.

 7   Q.   That's right.  It should be one without columns and two

 8   pages with columns?

 9   A.   Okay, so which is page 3?

10   Q.   So it says arbitration procedures underlined at the top?

11   A.   Uh-huh.

12   Q.   You see initiation of arbitration?

13   A.   Yes.

14   Q.   Then the second paragraph a claimant made demand?

15   A.   Okay.

16   Q.   So it says a claimant may demand a stand alone offer or

17   offers for a bundle of all Turner Networks or any bundles of

18   Turner Networks that Turner has licensed to AT&T, the claimant

19   or another video distributor for distribution to consumers on

20   or after October 22nd, 2014.

21       Do you have an understanding of what the word bundle means

22   here?

23   A.   I believe I do.

24   Q.   What do you believe it means?

25   A.   It's a good question.  I'm assuming it means, I'm assuming
```

1   it means --

2           THE COURT:  Don't assume.  Tell us what you think it

3   means.

4           THE WITNESS:  Oh.

5           THE COURT:  What do you think it means?

6           THE WITNESS:  Well, what I think it means is the idea

7   that we have four networks on Sling, that that would be a

8   bundle of -- I say four networks on Sling, it could be clearer

9   for sure.  A bundle probably isn't the right term there or

10  maybe I'm, I don't know.  Maybe I'm misunderstanding.

11  BY MS. KISER:

12  Q.   Does the word bundle have a fixed meaning in the industry,

13  a single fixed meaning?

14  A.   I don't think it does, not really.

15  Q.   What else could it mean if it doesn't mean that it

16  protects that, the bundle that's in the base package of Sling?

17  A.    Well, we use bundle for the broader, the broader word or

18  the broader description of packages and then interesting you

19  should ask.

20     But we also, we use the term bundle for when we put

21  promotional offers out there with hardware, hardware, software

22  or we, you know.  So I guess, yeah, it could be clearer.

23  Q.   So if you look to the next sentence in paragraph A 2, it

24  says for the purposes of sub part one in this paragraph.

25  Bundles of Turner Networks shall include all Turner Networks

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  licensed to the video distributor whether through a single

 2  carriage agreement or multiple carriage agreements.

 3      Does that inform your understanding of what the word bundle

 4  means here?

 5  A.   I guess by that description, you know, almost every one of

 6  the distributors have licenses with all of the networks.

 7      So let me just -- bundles of Turner Networks shall include

 8  all Turner Networks licensed to a video distributor.  So there

 9  it gets less clear.

10  Q.   Is the language clear enough that you would be willing to

11  go to arbitration on Sling based on Mr. Petrocelli's

12  interpretation?

13  A.   No, definitely not.

14  Q.   Moving on, Mr. Petrocelli early on asked you some

15  questions about the percentage of sports viewing that occurs

16  outside of Turner Networks.

17      Do you remember that?

18  A.   I do.

19  Q.   And you said you don't look at the, that metric or a few

20  others that he provided to you?

21  A.   That's correct.

22  Q.   Why not?

23  A.   I just look at the metrics I mentioned before.  I look at

24  tonnage, our people watching our networks.  I mean, they could

25  have, I don't know.  Whatever brings in viewers is what we're

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    interested in.

2        And so I don't try to be a programmer.  Programmers are in

3    the business of hit shows, what makes a hit show, what brings

4    in viewers.  I'm a little bit more part of the distribution,

5    you know, kind of, we just care about tonnage.  We care about

6    how many hours people are watching networks.

7        Frankly, one of the kind of best things has happened

8    frankly is that I'm not a, personally I'm not a media junkie.

9    A lot of people in the business are.  I just don't care as much

10   as a lot of folks about a hit show.

11       I care about other people watching, tonnage and how many

12   hours per household, how many dollars per hour, those are the

13   sorts of things that we, very dispassionate.

14   Q.   How does Turner do on total hours and hours per household

15   and please be cautious of, to be if any of this is

16   confidential, just let me know?

17   A.   Sure.  They do well.  I mean, I can probably give you some

18   ballpark statistics without breaking confidence or without not

19   breaking confidence, but you, know, providing confidential

20   information.

21   Q.   Please do?

22   A.   But I think they in terms of just tonnage, hours watched,

23   they have at least two and it depends on the time of year.

24   Sometimes where they have at least two in the top ten of all

25   networks.  And they have five in the top 25, six if you include

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  HBO.

2      So they have a large share of those top 25 networks in

3  terms of the viewing.

4  Q.   Mr. Petrocelli also asked you about a number of sports

5  rights that belong to programmers besides Turner?

6  A.   That's right.

7  Q.   Does the fact that others have those sports make Turner

8  sports any less important to you?

9  A.   No.  I mean, each of the sports group, each of the leagues

10 has their own following.  Each of the RSNs has their own

11 crazies that either love you while you have them or leave you

12 if you don't.

13     You have all sorts of sports fans out there.  So typically

14 it's one of the beauties of sports that they have these unique

15 followings of passionate people so you wouldn't substitute the

16 Masters for March Madness for instance.

17 Q.   While we're on the sports subject.  I'd like to ask about

18 the importance of March Madness to Sling and Turner without

19 bringing you into any confidential information.

20     How significant of an event is March Madness for Sling and

21 then just answer that to the extent you can without going into

22 confidential information?

23 A.   Okay, it's pretty important to us.  Probably leave it at

24 that.

25              THE COURT:  Good time to take the afternoon recess?

1          MS. KISER:  Yes, Your Honor.

2          THE COURT:  We're going to take a 15 minute recess.

3    You remain a witness under oath in the case.  Refrain from

4    discussing your testimony with anyone, even your own counsel.

5          We'll return in 15 minutes.  We may or may not be going

6    with you until 5:30, but we'll be going until 5:30.

7          (Witness excused.)

8          (Recess at 4:05 p.m.)

9          (Proceedings resumed at 4:25 p.m.)

10          THE DEPUTY CLERK:  Your Honor, recalling Civil Action

11    Number 17-2511, United States of America versus AT&T,

12    Incorporated, et al.

13          THE COURT:  All right, you remain under oath, sir.

14    You may continue.

15          MS. KISER:  Thank you Your Honor.

16       (Witness resumed the witness stand.)

17                    REDIRECT EXAMINATION (Cont'd)

18    BY MS. KISER:

19    Q.   Do you recall Mr. Petrocelli asking if you had done any

20    specific analysis for this litigation about the effects of the

21    merger?

22    A.   I do.

23    Q.   And the answer was that you haven't done an analysis

24    specifically for the negotiation -- for the litigation?

25    A.   I'm sorry, say that again?

1  Q.    An answer to his question was that you hadn't created an

2  analysis for the purpose of this litigation?

3  A.    I have not, that's correct.

4  Q.    So what you've testified about is work and information you

5  look at in the ordinary course of business?

6  A.    It is.

7  Q.    And you also mentioned your business judgment during

8  cross.  What did you mean by that?

9  A.    I just meant that it's not hard to make the leap that if

10  we lose subs, they gain subs, then it just becomes a question

11  of how many they gain and, you know, that's what I meant by my

12  business judgment.  I don't need a study to know if that's

13  what's going to happen.

14  Q.    Mr. Petrocelli also gave you some hypotheticals and

15  assumptions about Turner's cost, do you remember that?

16  A.    I do.

17  Q.    And whatever the actual costs for Turner during the CNN

18  takedown were, they did actually go dark with you, right?

19  A.    They did.

20  Q.    And did you have a sense of whether they were willing to

21  go dark with you again in March 2015?

22  A.    We were very concerned about that.  It's harder on us

23  typically to go dark a second time than it would be on them.

24  Q.    And do you have -- would you expect Turner's costs of

25  going dark with DISH, the cost to Turner to be any higher after

```
 1   it's acquired by DirecTV?

 2   A.    The cost of going dark?  No.  The cost wouldn't change,

 3   they would -- I mean, they would be an offset potentially.

 4   Q.    So in the cost benefit equation, it's the benefit to Time

 5   Warner of going dark that changes?

 6   A.    That's right.

 7   Q.    Mr. Petrocelli asked you a number of questions around the

 8   2014 and 2015 negotiation, do you remember that?

 9   A.    Uh-huh.

10   Q.    And when he was asking you about this and CNN, you

11   mentioned that you had done some analysis at the time and

12   offered to explain it, but weren't able to, do you recall that?

13   A.    Analysis at the time of the going dark.

14   Q.    I believe so.

15   A.    I don't remember the specific, the specifics on that.  We

16   do a lot of analysis for each one of these deals.  So I don't

17   remember exactly which one you're talking about.

18   Q.    You also mentioned CNN's more important now than it was

19   back in 2014.

20   A.    That's right.

21   Q.    Can you elaborate on that?

22   A.    Sure.  Just in terms of overall viewing hours and

23   households, but really it's more about hours per household.

24   Those have grown substantially.  So overall viewing hours have

25   grown, and so you see an upward trend in terms of the amount of
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1   time people spend watching CNN.

 2   Q.    And what had been the trend in CNN viewing at the time of

 3   the 2014 takedown?

 4   A.    It had been going down.  It had been negative, at least

 5   with respect to DISH viewers.  Now, that's as special cut of

 6   the U.S. to be sure.  But since the election, that has -- CNN

 7   has really surged.

 8   Q.    And Mr. Petrocelli asked you some questions about some

 9   statements Mr. Ergen made on that -- the earnings call or

10   during the takedown?

11   A.    Oh, right.

12   Q.    Do you remember that?

13   A.    Uh-huh.

14   Q.    And those statements were made November 4th, 2014?

15   A.    That's correct.

16   Q.    So that's about two weeks into the takedown?

17   A.    That's right, about halfway through.

18   Q.    And then two weeks later you reached an agreement with

19   Turner and put the networks back up?

20   A.    We did.

21   Q.    To the extent that you're comfortable, which may not be at

22   all, and that's fine, why did DISH and Turner go dark in your

23   view?

24   A.    You know, the deal, these deals are complicated.  You

25   start with a hundred plus open issues.  Some big, some small.
```

1   And so as we worked through that list, we were still a long

2   ways apart, and we didn't want to take the risk that they would

3   be able to put TBS and TNT into the negotiations.  And we got

4   to within six weeks.  And so there were many open issues, but I

5   think the reason that the sort of straw that broke the camel's

6   back is that they would not extend the TBS, TNT contract.

7   Q.   Did you -- would you have continued negotiating rather

8   than going dark had they agreed to do that?

9   A.   We would have.  We asked for a day per day extension.

10  Every day that they extended CNN and the rest of the Turner

11  Networks, we asked them to extend TBS and TNT the same number

12  of days and they refused.

13  Q.   So to end the takedown, did DISH make concessions?

14  A.   We did.

15  Q.   Are any of those concessions something you'd be willing to

16  testify about in open court?  And again, it's okay if it's not.

17  A.   Yeah, I'd rather not.  But there were a number of

18  concessions.  I guess we shouldn't talk about that in open

19  court.

20  Q.   All right.  So without describing specifics, how

21  significant were the concessions for DISH?

22  A.   Oh, significant, I mean --

23  Q.   Mr. Petrocelli also quoted Mr. Ergen from the third

24  quarter earnings call from the takedown saying that DISH could

25  save a big, big check by dropping Turner, do you remember that?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A.    I do.

2    Q.    But DISH ultimately agreed to keep paying Turner that big,

3    big, big check, right?

4    A.    We did, we ultimately agreed to pay them more than that

5    big, big, big check.

6    Q.    Why did you do that?

7    A.    We needed them.  End of the day.  We'll go, you know,

8    Charlie's words are that if you end up going dark with

9    somebody, you should be prepared to stay down.  But I think the

10   fact that we got back together is sort of a clear sign that we

11   needed them.  Hopefully they needed us, but we sure needed

12   them.

13   Q.    Mr. Petrocelli also asked you about some of DISH's other

14   past blackouts, do you remember that?

15   A.    I do.

16   Q.    Does DISH like going dark?

17   A.    We don't.

18   Q.    So why does that ever happen?

19   A.    You know, it's about the only recourse we really had.  If

20   we're not able to close the gap, the programmer decides not to

21   extend, we can either, you know, pay these high prices or go

22   dark.  And so it's very hard, I mean, we talk about negotiating

23   a lot, but I don't know what else there is to do at that stage.

24   So we, you know, we lose subs, we -- it's -- we do not like

25   doing that, but it's sometimes the only avenue we feel we have.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   What would happen if instead of going dark on any of those

2  occasions you just accepted the rates and terms the programmer

3  had proposed to you?

4  A.   Well I think there are many, many distributors of pay-TV

5  who are negative.  They're losing money on video.  DISH is

6  still making some money on video, but our margins have been

7  compressed.  You see how hard we negotiate, even so, our

8  margins, our profit margins are declining.  And the programmers

9  have shown no remorse that they're killing the golden goose,

10  right.  You've got plenty of cable companies out there that are

11  literally losing money on video, and the only reason they do

12  that -- the only reason they can do that is because they have

13  broadband to help subsidize theme, broadbands have very high

14  margin product.

15     We don't have that, and so from an echo system standpoint

16  we're the canary in the coal mine.  We're still trying to make

17  money on video.  And we're not subsidizing other products with

18  it.

19  Q.   What would happen to DISH and Slings's pricing if you

20  accepted whatever price increase programmers put on the table?

21  A.   You know, obviously, it would have to increase

22  significantly.

23  Q.   You were asked some questions about, I believe

24  Mr. Petrocelli said Mr. Ergen wouldn't pay a nickel more after

25  the merger than he would before, do you remember that?

1    A.    I do.

2    Q.    And you said that things will change after the merger.

3    And then you were cut off.  Can you explain how that would

4    change and why that was relevant to this question about what

5    you would accept?

6    A.    Yeah, I believe I said, well, we did pay a nickel more on

7    HBO.  We have paid so much more that -- maybe not in an open

8    courtroom, but that is just -- that is not a good deal for us.

9    I'll leave it at that for now.

10       And so if you imagine we were prepared to do that before

11   the merger, you can only imagine what the incentives changed.

12   Why would Time Warner budge an inch?  They know that we have to

13   pay whatever price they put out there, and if we don't pay,

14   they collect our subs.  So it would change 180 degrees the day

15   after the merger.

16             MS. KISER:  No further questions, Your Honor.

17             THE COURT:  Any cross from the redirect?

18             MR. PETROCELLI:  Just a couple, Your Honor.

19                          RECROSS-EXAMINATION

20   BY MR. PETROCELLI:

21   Q.    On the arbitration issue, Mr. Schlichting, just to be

22   clear, in your arbitration election with Comcast NBCU, you did

23   testify that the thread of arbitration worked pretty well.  And

24   you don't know how you would have gotten to the finish line

25   without it, correct?

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

```
 1  A.   Better than nothing.

 2  Q.   But you did give that testimony?

 3  A.   I did.

 4  Q.   And did you settle up -- you settled up without actually

 5  having to go to the arbitration proceeding, right?

 6  A.   That's -- we got the deal that we both signed.

 7  Q.   Okay.  And did that take care of everything, including

 8  Sling?

 9  A.   It did not.  There were networks left on the side of the

10  road that, you know, to this day I wish we -- I'm looking at,

11  now that I'm actually running Sling, I'm looking at FIFA

12  without Telemundo.  So it was not satisfactory, but we did sign

13  a deal.

14  Q.   And the arbitration language in the Comcast NBC mechanism

15  was also fair market value, right?

16  A.   I believe it is.

17  Q.   And, in fact, your company proposed an arbitration

18  mechanism in this matter last summer, correct?

19  A.   I believe we did that at the request of the DOJ assuming

20  that the merger takes place.

21  Q.   And the language that you folks included in your

22  arbitration proposal was also fair market value of the

23  programming carriage rights at issue, correct?

24  A.   It's certainly broader than that.  The proposal that our

25  team put together just takes any number of other pieces into
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   account.
 2   Q.   But you do agree with me that the language that was
 3   submitted says the arbitrators are directed to choose the final
 4   offer of the party which most closely approximates the fair
 5   market value of the programming carriage rights at issue?
 6   A.   I do.
 7   Q.   Okay.
 8            MR. PETROCELLI:  Nothing more, Your Honor.
 9            THE COURT:  Let me ask a question.
10            THE WITNESS:  Uh-huh.
11            THE COURT:  You've talked about the skinny packages
12   being --
13            THE WITNESS:  Right.
14            THE COURT:  -- critical to your business model,
15   right?
16            THE WITNESS:  Uh-huh.
17            THE COURT:  And you've talked about how programmers
18   try to force you to accept more programs or more networks, I
19   guess you call it.
20            THE WITNESS:  Right.
21            THE COURT:  Than your customers are really interested
22   in having, right?
23            THE WITNESS:  That's true, yes.  We've tried to
24   arrange it so that if you want to see a group of networks, you
25   know, if you have kids, you buy kids, but if you don't, you
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    don't need to pay for them, yeah.

2           THE COURT:  Exactly.  So what I was wondering is

3    between these negotiations, let's say you have a negotiation

4    where you agree to take some networks that, as part of the

5    deal, that you know your customers aren't really going to be

6    wild about.

7           THE WITNESS:  Right.

8           THE COURT:  But you take them because you want to

9    make the deal.

10          THE WITNESS:  Right.

11          THE COURT:  Do you have the ability with your

12   technological setup the way it is to acquire data as to the

13   extent to which those networks are actually not being used at

14   all so that at the next negotiation, you can go with data to

15   the people you negotiate with and say, look, last time we

16   accepted five networks from you all that --

17          THE WITNESS:  Yeah, yeah.

18          THE COURT:  -- we knew our people wouldn't want.

19   Well, here's the data, they didn't watch them.

20          THE WITNESS:  Yeah.

21          THE COURT:  Do you have the ability to accumulate

22   that kind of data to use in subsequent negotiations?

23          THE WITNESS:  We do, and we --

24          THE COURT:  Do you do it?

25          THE WITNESS:  We do.  We say exactly that at the

1   beginning of our negotiations.  We'll show, look, our data

2   shows that you've got, you know, three winners, two so-so, and

3   ten losers, and we don't want the ten.  That has almost no

4   bearing on the outcome, the bearing on the outcome --

5          THE COURT:  What's their argument back, you know, we

6   want you to buy things that no one is going to look at or use.

7   They can't possibly argue that with a straight face, can they?

8          THE WITNESS:  It's not an argument.  They tell us,

9   you know, what we're going to take, where we're going to be

10  carried, and then we will go back and forth.  But almost, it's

11  very rare that we are able to unplug any network.  It's not

12  logical, you know, we come in with logic, and we really try to

13  --

14         THE COURT:  So you have data that you --

15         THE WITNESS:  We do.  I could show you reams and

16  reams of data from these negotiations where you've got these

17  networks that should never have been born in the first place,

18  people are not watching.  We wouldn't receive a call.  Frankly,

19  it's what kept CBS, you know, it was the heart of the CBS

20  negotiations.  There are extra networks that every programmer

21  has that are just dogs, and we can show them just how bad they

22  are.  So it's not a --

23         THE COURT:  Does the FCC know this is how it works?

24         THE WITNESS:  Well, the FCC only has jurisdiction

25  over broadcast.  So for cable, it's really unregulated.  Or

1  it's certainly not regulated by FCC.  So it's just, you know,

2  it's I keep coming back to leverage.  It's just a leverage

3  game.  If they have the content that you need, then they can

4  not only coerce you to pay more, but carry these networks more

5  broadly and that's why you have hundreds of networks and these

6  bundles, and that's what we're trying to avoid with Sling.

7            THE COURT:  Okay.  You're excused.

8            THE WITNESS:  Does that make sense?

9            THE COURT:  You're excused.

10           THE WITNESS:  I'm excused excused?

11           THE COURT:  Yeah.

12           THE WITNESS:  Okay, thank you.

13           THE COURT:  Step down.

14      (Witness excused.)

15           THE COURT:  Government call it's next witness.

16           MR. WELSH:  Your Honor, the United States calls

17  Mr. John Martin as an adverse party witness.

18           THE COURT:  All right.  You may be permitted to use

19  leading question.

20           THE DEPUTY CLERK:  Please raise your right hand.

21         JOHN KEVIN MARTIN, JR., GOVERNMENT WITNESS, SWORN

22           MR. WELSH:  May I proceed, Your Honor?

23           THE COURT:  When you're ready.

24           MR. WELSH:  Thank you.

25                         DIRECT EXAMINATION

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1   BY MR. WELSH:

2   Q.   Could you please state your name for the record, sir?

3   A.   John Kevin Martin, Junior.

4   Q.   Mr. Martin, nice to see you again.

5   A.   Nice to see you too.

6   Q.   Mr. Martin, you're employed at Turner Broadcasting,

7   correct?

8   A.   Yes, that's correct.

9   Q.   You are the chairman and CEO of the company; is that

10  right?

11  A.   Yes.

12  Q.   And you report to Jeff Bewkes; is that correct?

13  A.   Yes, that's correct.

14  Q.   Mr. Bewkes is the chairman an CEO of Time Warner, right?

15  A.   Yes.

16  Q.   Okay.  Now, in your position as the chairman and CEO of

17  Turner, you've been in that position since January 1 of 2014;

18  is that correct?

19  A.   Yes.

20  Q.   All right.  Prior to that time, in a stint you were the

21  chief financial officer and administrative officer of Time

22  Warner, true?

23  A.   Yes that's true.

24  Q.   Okay.  And that was approximately from 1993 through 2000,

25  I believe; is that right?

1  A.    That was from the year 1998 through 2000 -- the end of

2  2013.

3  Q.    Okay.  So you've been at Time -- with the Time Warner

4  organization for a little over eleven years total; is that

5  right?

6  A.    No, that's not correct.

7  Q.    How many years have you been with Time Warner, sir?

8  A.    Since 1993.  I did various other positions.

9  Q.    Okay.  You consider yourself to be pretty knowledgeable

10  about the business; is that true?

11  A.    Yes, I would say so.

12  Q.    About Turner and Time Warner?

13  A.    Yes.

14  Q.    Now, in your current position as the chairman and CEO of

15  Turner, you're accountable for the strategy, the organization,

16  setting the goals and the priorities of the company, right?

17  A.    Yes.

18  Q.    Okay.  Ultimately you are responsible for the financial

19  performance of Turner, correct?

20  A.    Yes, that's correct.

21  Q.    Let's start with some basic points here if we can.  Spend

22  a few minutes on this.

23      So Turner broadcasting has network programming, right?

24  A.    Yes.

25  Q.    You oversee those networks as the chairman and CEO,

1  correct?

2  A.    Correct.

3  Q.    All right.  In the United States those networks would be

4  TBS, TNT, CNN, Cartoon Network with Adult Swim, true TV,

5  headline News; is that right?

6  A.    That's a subset of them, but yes.

7  Q.    But you do oversee those networks, right?

8  A.    Yes, that's correct.

9  Q.    And those networks are what we would be refer to as being

10  linear programming, right?

11  A.    Yes, linear networks.

12  Q.    And linear programming, we've heard some testimony about

13  it.  Let's just make sure we're all on the same page.  Linear

14  programming would mean that you're on a fixed schedule, right,

15  so you can pull it up at a particular time of day, correct?

16  A.    Yes, that's correct.

17  Q.    Okay.  Now, looking at TBS and TNT, just those two,

18  networks they are by far and away the largest revenue producers

19  at Turner, correct?

20  A.    Correct.

21  Q.    All right.  TBS and TNT are among the top ten most

22  profitable cable networks within the United States; isn't that

23  true?

24  A.    I believe that to be true.

25  Q.    Four of your networks, TNT, TBS, Cartoon Network and CNN,

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  those four networks account for about 85 percent of Turner

2  subscription revenue, true?

3  A.   Yes, that's true.

4  Q.   Now, from the time frame of 2013 to 2016, TBS was the

5  number one entertainment network; isn't that true?

6  A.   Within the ad supported TV cable universe, yes.

7  Q.   Okay.

8          MR. WELSH:  Your Honor, I have some binders of some

9  exhibits if I may get those and hand those up to the Court as

10  well as the witness?

11          THE COURT:  Fine.

12          MR. WELSH:  Thank you.

13       May I approach, Your Honor?

14          THE COURT:  You may.

15  BY MR. WELSH:

16  Q.   Mr. Martin, I've handed you a binder that has some

17  exhibits in it.  If you could turn to what we've identified and

18  marked for identification as PX 149.  Tell me when you're

19  there, sir.

20  A.   Yes, I am there.

21  Q.   Okay. great.  Now, PX 149 first off is an e-mail to you on

22  February 15, 2017, correct?

23  A.   Yes, that's correct.

24  Q.   All right.  And the purpose of this e-mail was to provide

25  you with some materials to prepare you for a press lunch that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   would occur in connection with a Time Warner's earnings call,

 2   true?

 3   A.   Yes, that's true.

 4   Q.   Okay.  And that's one of your jobs at Turner, as the

 5   chairman and CEO, you participate in earnings calls, and you

 6   meet with the media, specially the financial media to talk

 7   about Turner's business; isn't that right?

 8   A.   Yes.

 9   Q.   Okay.  Now --

10        MR. WELSH:  Your Honor, I would move for admission of

11   PX 149?

12        THE COURT:  Who's it from?

13   BY MR. WELSH:

14   Q.   Mr. Martin, this e-mail is from a Warren Herbitz; is that

15   correct?

16   A.   Yes, that's correct.

17        THE COURT:  Who is she?

18        THE WITNESS:  She was ex-head of communications for

19   Turner.  And she's no longer with the company.

20        THE COURT:  Any objection.

21        MR. PETROCELLI:  No, Your Honor.

22        THE COURT:  Be admitted.

23     (Plaintiff's Exhibit No. PX 149 was received in evidence.)

24   BY MR. WELSH:

25   Q.   Mr. Martin, if could turn to PX 0149009.  The numbers are
```

1  at the bottom of the page.

2  A.    (Witness complies.)

3  Q.    Are you there, sir?

4  A.    Yes, I am.

5  Q.    Okay, great.  Now, this is the earnings prep materials for

6  Time Warner and Turner, more specifically for the fourth

7  quarter fiscal year 2016; is that right?

8  A.    Yes, this is our internal earnings prep, yes.

9  Q.    Okay.  And this is dated, as we see at the top, February

10  of 2017, correct?

11  A.    Yes.

12  Q.    And this would be an example of the type of earnings prep

13  materials that would be provided to you as a chairman and CEO

14  of Turner so that you, again, as part of your job, your

15  responsibilities, could go out and talk to the financial media

16  about Turner and Time Warner, correct?

17  A.    Yes.

18  Q.    All right.  And this particular page is titled, as our

19  others of this type for Turner, "Strategy updating key themes,"

20  do you see that?

21  A.    Yes, I do.

22  Q.    And again, these are the key themes that you would share

23  with the media, including the financial media, correct?

24  A.    Yes, correct.

25  Q.    And one of the things that you're prepared to tell the

1  media in February of 2017 was that Turner had the number one

2  entertainment network for the fourth consecutive year, right?

3  A.    I'm just trying to see where that is.

4  Q.    Sure, if you look at the section where it says TBS, TNT

5  and Adult Swim, do you see those logos on the left?

6  A.    Yes, I do.

7  Q.    First bullet point there says, at the end of that first

8  bullet, "TBS is number one entertainment network for the fourth

9  consecutive year," correct?

10  A.    Yes, I see it now.

11  Q.    So that would be the 2013 to 2016 timeframe?

12  A.    Yes, I believe that's true.

13  Q.    Okay.  And that was correct, right, when you were getting

14  ready to talk to the financial media, that information was

15  correct, right?

16  A.    I would assume so, yes.

17  Q.    Okay.  And let's look at the third bullet point down from

18  the top.  There we have some more information which was

19  prepared so that you could share factual information correctly

20  and accurately with the financial media.  Do you see that,

21  where it says, "Our efforts produced results"?

22  A.    I'm sorry, again, you said third bullet point, I don't see

23  it.

24  Q.    Yes, where it says, "Our efforts produced results across

25  the entire portfolio as evidenced by the following achievements

```
 1    and highlights."  Do you see that, sir?

 2    A.   Yes, I see it now.

 3    Q.   Okay.  And that was information again given to you to

 4    impart to the financial media in February of 2017, right?

 5    A.   Yes.

 6    Q.   So, for example, Turner had eight new marquee originals at

 7    TBS and TNT, all which were renewed, right?

 8    A.   Sure.

 9    Q.   And that was important that they were renewed, right,

10    you're telling the financial media these are important marquee

11    pieces of original content, right?

12    A.   Yes, it means that they were good enough to get a second

13    season.

14    Q.   All right.  And Turner increased it's domestic affiliate

15    revenue by 14 percent there, right?

16    A.   Yes, I see that.

17    Q.   Okay.  And domestic affiliate revenue, what we're talking

18    about there is the revenue that Turner gains from its carriage

19    contracts with the distributors, true?

20    A.   True.

21    Q.   So for that period of time Turner had increased its

22    domestic affiliate revenue 14 percent, right?

23    A.   Yes.

24    Q.   Okay.  And also during this time, you not only grew your

25    affiliate revenue, but at the same time you grew your domestic
```

1  advertising, didn't you?

2  A.    In this period, yes.

3  Q.    So your advertising went up by four percent in this

4  period; is that right?

5  A.    Yes, it looks that way, yes.

6  Q.    At the same time your affiliate revenues are rising.

7     Now, Turner Networks accounted for over half of all of the

8  daily top 20 telecasts in 2016, right?

9  A.    Yes, with one point of clarification.  May I clarify?

10  Q.   Well, you can clarify with your counsel if he wants to ask

11  you questions.  But that was the information that was given to

12  you, right, to go and talk to the financial media, that your

13  networks accounted for over half of all the daily top 20

14  telecasts in 2016, true?

15  A.   Yes.

16  Q.   Okay.  And all of that information that was given to you

17  that day, that information you were ready to disseminate to the

18  financial media because it's true, right?

19  A.   Yes.

20  Q.   Okay.  Now, in 2017, Turner had three of the top five

21  networks for prime time viewing for millennials, didn't it?

22  A.   Yes, among the ad supported universe, yes.

23  Q.   Well, let's turn to PX 151 in your binder, if we can.

24  Tell me when you're there.

25  A.   I'm there.

```
 1   Q.    Okay.  Now, first off here, this is an e-mail from Ada

 2   Peyton to you sending you the earnings prep materials for

 3   2/1/2017, true?

 4   A.    Yes, that's the way it looks, yes.

 5   Q.    All right.  And those earning prep materials, the Q1 2017

 6   earning prep materials, they're actually attached to that

 7   email, right?

 8   A.    Yes.

 9   Q.    And these particular earnings prep materials, now, they're

10   dated May 2017, true?

11   A.    True.

12   Q.    And these -- and Ada Peyton is an employee of Time Warner,

13   correct?

14   A.    Yes, it's Audie Peyton.

15   Q.    Thank you for correcting my pronunciation.  So Audie

16   Peyton is the Time Warner employee, correct?

17   A.    Yes, he is.

18   Q.    Right.  And these materials were provided to you similar

19   to what we saw before with the prior exhibit.  They were

20   provided to you so that you could participate in an earnings

21   call, correct?

22   A.    Yes, as background materials, correct.

23   Q.    So again, you could be prepared to talk knowledgeably

24   about Turner and its business to the media, including the

25   financial media and investors, correct?
```

1    A.    Yes.

2              MR. WELSH:  Your Honor, I move for admission of PX

3    151?

4              MR. PETROCELLI:  No objection, Your Honor.

5              THE COURT:  All right, it will be admitted.

6        (Plaintiff's Exhibit No. PX 151 was received in evidence.)

7    BY MR. WELSH:

8    Q.    Mr. Martin, if you could go to PX 151-002.  And this is

9    the earnings prep, starting of the earnings prep materials,

10   correct?

11   A.    Yes, that's correct.

12   Q.    And similar to what we saw before again, these are some of

13   the highlights that are given to you so you could present them

14   to the financial world and investors, right?

15   A.    Yes.

16   Q.    And if we look at the TBS, TNT, Adult Swim logos there, we

17   would see that Turner had three of the top five networks for

18   millennials during this time, right?

19   A.    Sure.

20   Q.    And that would be -- the reference there would be the TBS,

21   TNT and Adult Swim.  Those were the three networks that you had

22   for millennials that were of the top ones, right?

23   A.    Yes, that's true.

24   Q.    Okay.  And it also notes further down about CNN, doesn't

25   it, it talks about CNN.  And it says that CNN audiences grew

1    over twenty percent in the first quarter of 2017, correct?

2    A.    Yes, that's correct.

3    Q.    And it notes too that the first quarter of 2017 was CNN's

4    most watched quarter in over fifteen years, right?

5    A.    Right.

6    Q.    And all of this information we've just gone through here,

7    all of that information was accurate, right?

8    A.    To the best of my knowledge, my team provides me with

9    accurate information.

10   Q.    Right.  And that's what you expect of your team, to give

11   you accurate information before you go out for these different

12   meetings with the financial analysts, with the financial media,

13   earnings calls, other things like that, you expect and receive

14   correct and accurate information from your teams, right?

15   A.    Yes.

16   Q.    Okay.  Now, Mr. Martin, Turner's distributed to 90 million

17   homes across America, right?  You can put that to the side,

18   sir.  We're done with that for the time being.

19   A.    Each of our networks have different levels of

20   distribution.  So I can't make a characterization that we're

21   just blankly delivered to 90 percent because that would not be

22   correct.

23   Q.    Well, you told me in your deposition, and I'll hand it to

24   you if you'd like to look at it.  But you told me in your

25   deposition that it's as many as eighty-five million homes

1  across America that Turner is distributed in, do you remember

2  that?

3  A.   I don't remember that specific reference.  But again, it

4  would depend, I think -- I don't know what you're looking at.

5  I thought we were talking more in average and generalities.

6  Because on average we have widely distributed networks, but our

7  networks are distributed at different percentage levels.

8  They're distributed different percentage levels on a by network

9  basis as well as on a by distributor basis.

10 Q.   Certainly your core networks of TNT, TBS, CNN and Cartoon

11 Network, certainly those networks are in anywhere between 80 to

12 85 million homes across this country, you don't dispute that,

13 do you?

14 A.   Well, they are some of our more distributed networks.

15 Q.   Im sorry?

16 A.   They are some of our most highly distributed networks.

17 Q.   And as to those networks, you don't dispute that they're

18 in at least 85 million homes across America, do you?

19 A.   I believe that we probably have some networks with some

20 distributors that are distributed at lower percentages.  So I

21 don't have an average right off the top of my head.  But fully

22 distributed would mean somewhere in the 80 to 85, possibly as

23 high as 90.

24 Q.   Okay.  Now, in 2016, Mr. Martin, Turner subscription

25 revenue alone for its U.S. entertainment and sports business,

1  that was 3.6 billion dollars; isn't that true?

2  A.    I would have to refresh my recollection.  I can't remember

3  exactly what the number was in 2016.

4  Q.    All right.  Look at tab -- or look at PX 148, if you

5  would, of the binder.

6  A.    (Witness complies.)

7  Q.    And tell me when you're there.

8  A.    I'm at the tab.

9  Q.    Now, PX 148 starts off with an e-mail from Chris Carpenter

10 to you and some of your colleagues at Time Warner; is that

11 right?

12 A.    Yes, that's correct.

13 Q.    All right.  And what was going on here, we talked about

14 this in your deposition, but what was going on here was that

15 this e-mail and the PowerPoint deck that was attached to the

16 e-mail was provided to you in advance of an initial

17 get-to-know-you kind of meeting with AT&T personnel related to

18 this merger, right?

19 A.    Yes.

20 Q.    And it was provided by your team so that you could have

21 that information for that get-to-know-you meeting with AT&T,

22 correct?

23 A.    Yes, that's correct.

24 Q.    And you actually participated in both the preparation of

25 the document, the PowerPoint deck that was sent to you, as well

1  as participated in the meeting itself, correct?

2  A.   Yes, I reviewed the document, I did not put it together,

3  but yes.

4  Q.   Okay.

5       MR. WELSH:  Your Honor, I move for admission of PX

6  148?

7       MR. PETROCELLI:  No objection.

8       THE COURT:  Be admitted.

9     (Plaintiff's Exhibit No. PX 148 was received in evidence.)

10 BY MR. PETROCELLI:

11 Q.   Now, Mr. Martin if you'd look at PX 148-015.  Again, the

12 pages are on the bottom, tell me when you're there?

13 A.   I'm there.

14 Q.   All right.  Now, this is a page that has the Turner

15 subscription revenues that you were being -- presenting to AT&T

16 in this get-to-know-you meeting, correct?

17 A.   Yes.

18 Q.   And in looking at the revenue portion for U.S.

19 entertainment and sports, do you she left column?

20 A.   Yes, I do.

21 Q.   Okay.  And what's the figure there for the subscription

22 revenue?

23 A.   3.6 billion dollars.

24 Q.   3.6 billion?

25 A.   Yes, that's correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Okay.  So that was the amount just for the U.S.

2  entertainment and sports business in 2016 for Turner, correct?

3  A.   Correct.

4  Q.   All right.  Now, during this timeframe of 2016, again just

5  looking at the U.S. entertainment and sports business?

6          THE COURT:  What page are you on there?

7          MR. WELSH:  I'm sorry, Your Honor, it's PX 148 dash

8  015.  There's a chart there with -- it's 2016 in billions.

9  BY MR. WELSH:

10  Q.   The.left column is the U.S. entertainment and sports; is

11  that right Mr. Martin?

12  A.   Yes, that's right.

13  Q.   Okay.  And then if we carry down in the left, the far left

14  column we have revenue with subscription advertising underneath

15  that, do you see that?

16  A.   Yes.

17  Q.   Okay.  So the subscription figure is 3.6 billion dollars

18  for the U.S. entertainment, right?

19  A.   Yes.

20  Q.   Okay.  And then the margins for the U.S. entertainment and

21  sports business for Turner during 2016, that was 47 percent; is

22  that correct?

23  A.   Yes.

24  Q.   Okay.  You can put that to the side for now, thank you,

25  we'll come back to that later.

```
 1      Now, mr. Martin, Turner's linear networks with its live

 2   programming, now, that's all -- that's distributed through

 3   MVPDs correct?

 4   A.   Yes, among others, but yes.

 5   Q.   Well, let's talk about MVPDs, we'll get to the others.

 6   And I want to focus just on the linear programs, the CNN, TBS,

 7   TNT, that type of programming, those networks, okay?

 8   A.   Okay.

 9   Q.   All right.  And as to those, they're distributed through

10   MVPDs, which is the multichannel video programming deliveries,

11   correct?

12   A.   Yes, that's correct.

13   Q.   And that would include the cable companies such as Charter

14   and Cox, correct?

15   A.   Yes.

16   Q.   And then it also includes the satellite companies, so DISH

17   and DirecTV, correct?

18   A.   Yes.

19   Q.   All right.  Now Turner also distributes its programming

20   through what are called virtual MVPDs, correct?

21   A.   Yes.

22   Q.   Okay.  And the virtual MVPDs are the ones that would offer

23   your linear programming over the Internet, correct?

24   A.   Yes, that's correct.

25   Q.   All right.  And so a couple of examples of those would be
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   DISH Sling, right?

2   A.    Uh-huh, yes.

3   Q.    Sunny View?

4   A.    Yes.

5   Q.    And YouTube TV recently?

6   A.    Yes.

7   Q.    Okay.  Now, your linear programming that we're talking, so

8   CNN, TBS, TNT, those are not distributed over what are called

9   SVODs, correct?

10  A.    The linear networks themselves are not delivered over

11  SVODs, but we do license individual shows to SVOD.

12  Q.    But SVOD is a subscription video on demand, right?

13  A.    Yes, that's correct.

14  Q.    And that means I can go, and I can pull up, you know, if I

15  want to watch a rerun of something, I can go on to an SVOD and

16  pull that up whenever I want to do that, right?

17  A.    Yes, on an on demand basis, yes.

18  Q.    Okay.  But what we're talking about is your linear

19  programming that's on that fixed schedule that we talked about

20  before.  So if I want to watch something that's on your TBS

21  channel, your network at, nine o'clock at night, okay, you

22  follow me?

23  A.    I follow you.

24  Q.    The linear stuff?

25  A.    Yes.

1  Q.   All right.  I can't go to an SVOD and pull that up?

2  A.   That's correct.

3  Q.   Okay.  And the SVODs that we're talking about, just some

4  examples here would be Netflix, right, as an example?

5  A.   Yes.  Yes.

6  Q.   I can't go on to Netflix and find TBS's linear programming

7  on Netflix?

8  A.   That is being exhibited live on TNT, yes.

9  Q.   That's right, that's my point.  And Amazon.  I can't go on

10 to Amazon, I can't pull up your linear live TBS, TNT, CNN on

11 Amazon, right?

12 A.   That's correct.

13 Q.   All right.  So your linear networks, they're distributed

14 through the MVPs and the virtual MVPDs, those linear live

15 networks, but they're not through the SVODs?

16 A.   Yes, that's true.

17 Q.   Let's talk about your content and your contracts here.

18    Now, Turner Networks carry sports content, we've heard

19 something about this already in this trial.  But that's true;

20 is it not?

21 A.   Yes, that's true.

22 Q.   Okay.  So TNT carries NBA basketball games, for instance,

23 right?

24 A.   Yes.

25 Q.   All right.  And it was the suggestion last week in this

1  courtroom by the defense counsel that Turner only carries, I

2  think it was 64 NBA games out of thousands.  Now, does Turner

3  only carry 64 NBA games out of thousands?

4  A.    I believe that's correct, it's less than 8 percent of all

5  of the NBA games.

6  Q.    Okay.  But you do carry those 64 games, right?

7  A.    I believe it's 64.  It's in and around 64.

8  Q.    And you don't carry all the other NBA games because you've

9  secured the rights to those 64 games, and that's because you've

10  secured the rights to NBA playoff games, correct?

11  A.    Yes.

12  Q.    Okay.  And you also have the rights to the All Star, the

13  NBA All Star games, right?

14  A.    Yes, we do.

15  Q.    All right.  In fact, that was on TNT, I think, if I recall

16  correctly, about two months ago, right?

17  A.    I believe so, yeah.

18  Q.    All right.  And Turner gained the rights for these NBA

19  games for a reason, because Turner wants the best games and the

20  best sports program, right?

21  A.    We want popular sports programming.

22  Q.    You want the best, though, in that area of NBA basketball,

23  correct?

24  A.    Well, we'd like the best games in all aspects if we could

25  get it.

```
 1  Q.   Turner carries NCAA men's basketball games, right?

 2  A.   The men's basketball championship, yes.

 3  Q.   That's right, you don't carry regular season games, do

 4  you?

 5  A.   No.

 6  Q.   But you carry the NCAA tournament games, right?

 7  A.   Yes.

 8  Q.   All right.  You carry March Madness?

 9  A.   In partnership with CBS, we have a fifty/fifty partnership

10  with CBS.

11  Q.   Sure, and we'll talk more about that, but you carry,

12  Turner carries the NCAA tournament games, correct?

13  A.   Yes.

14  Q.   All right.  And you carry those games on three networks.

15  TBS, TNT and True TV, correct?

16  A.   Yes.

17  Q.   And you mentioned CBS.  Well, this year Turner has the

18  right to the final four and the finals of the NCAA men's

19  basketball tournament, March Madness, correct?

20  A.   That's true, yes.

21  Q.   You alternate with CBS, so last year CBS had it, this year

22  you guys have it, correct?

23  A.   Yes.

24  Q.   All right.  So the last time you had it was 2016, Turner

25  had it, correct?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   A.    Yes, that's correct.

 2   Q.    All right.  And this year in this tournament, we actually

 3   saw a number 16 team, the University of Maryland, Baltimore

 4   County beat the number one Virginia team, right?

 5   A.    Yes.

 6   Q.    And that was on TNT, correct?

 7   A.    I can't recall which network it was on.

 8   Q.    It was on your network, wasn't it?

 9   A.    I believe it was one of our three, yes.

10   Q.    The number 16 team, the upset of the -- of all time being

11   number one, you're going to tell this Court you don't know it

12   was on your network.  Are you going to tell us that, sir,

13   today?

14   A.    I'm not a basketball fan, sir.

15   Q.    You're not a basketball fan.

16   A.    I haven't seen one game.

17   Q.    Okay.  We saw the number 11, excuse me, Loyola, Chicago

18   team beat Kansas State just the other day, true?

19   A.    Yes, I believe that's true.

20   Q.    All right.  The Cinderella story with Sister Jean and the

21   Loyola Ramblers, right?

22   A.    Uh-huh.

23   Q.    It's in the press, correct?

24   A.    Yes, I read it in the press.

25   Q.    It's a big deal, right?  It all unfolded on TBS; isn't
```

1  that true?

2  A.    Again, I don't know which network that upset was on.

3  Q.    And moving forward in this tournament, it's going to be on

4  your networks, right, because you've the final four in the

5  finals this coming week, right?

6  A.    Yes, for this year, yes.

7  Q.    So we'll see what happens there, and it's exciting for

8  these teams, especially Loyola, in terms of what they're doing,

9  and it's exciting for the distributors that carry these games,

10  isn't it?

11  A.    We think it's popular programming.

12  Q.    And it's also profitable for Turner, isn't it?

13  A.    There's a lot that goes into profitability.  It costs a

14  lot to secure these rights.  And we believe we had a lot of

15  value to the distributors by virtue of caring these rights.

16  Q.    Is it your testimony here today to this Court that it's --

17  that business is not profitable?

18  A.    There are many different ways to look at profitability as

19  it relates to March Madness.

20  Q.    We'll come back and talk more about March Madness in a

21  minute.  Turner carries major league baseball games, right?

22  A.    Yes.

23  Q.    You don't carry all games, do you?

24  A.    No, we do not.

25  Q.    You secure the playoff games, right?

1   A.    We share the playoff games with Fox.

2   Q.    Okay.  So Turner carries premium sports, correct?

3   A.    I would characterize those sports as premium, absolutely.

4   Q.    In your deposition, though, you didn't want to

5   characterize it as premium sports, right, do you remember that?

6   A.    Well, popular sports.  There's a lot of sports out there,

7   and whether it's premium or not is depending upon whether

8   you're a fan of that particular sport.  There's a lot of

9   leagues that I think would also be considered premium sports

10  that we have no involvement in.

11  Q.    But today you're okay with it saying premium sports, and

12  the NCAA, the NBA playoff games, the NCAA tournament games,

13  rather, March Madness, the NBA playoff games, major league

14  baseball playoff games, those are premium sports, right?

15  A.    I believe they are.

16  Q.    All right.  And premium sports are a key to Turner's

17  programming and business strategy, true?

18  A.    Yes, it's one component of it, but yes.

19  Q.    Well, it's not just one component, it's the strategy for

20  your business, right?

21  A.    Strategy is to have a portfolio programming that includes

22  sports and other premium scripted an non-scripted entertainment

23  shows.

24  Q.    But as to TBS and TNT and True TV, sports, your premium

25  sports, they are the key to Turner's programming business

1  strategy, correct?

2  A.   I'm not sure I would agree with that characterization.

3       MR. WELSH:  Your Honor, I've just handed to defense

4  counsel something we've identified as PX 521 and 522.  521 is a

5  CD that contains a video clip of Mr. Martin from January of

6  2016, January 6th, 2016.

7       We've also handed to defense counsel as PX 522 a

8  transcript of the portion of the videotape that we have

9  recorded on 521.  May I hand these to Your Honor?

10       MR. PETROCELLI:  May I approach, Your Honor?

11       THE COURT:  Yes.  Step down, sir.  There's a chair

12  right over there you can sit in.

13       THE WITNESS:  Thank you.

14     (Witness withdrew from the witness stand.)

15     (Sealed bench conference.)

16       THE COURT:  What's this about?

17       MR. PETROCELLI:  I've never seen these before.

18  They're not produced, and I guess this is supposed to be some

19  kind of --

20       THE COURT:  Television and TV?

21       MR. WELSH:  It is, and it's impeachment to what the

22  witness's last answer was.

23       MR. PETROCELLI:  And I can't vouch for this

24  transcription either, Your Honor.  Because I have no idea, it's

25  not been professionally prepared.  And I don't know if it's a

1   full accurate transcription of the interview or anything.

2          MR. WELSH:  We would intend, Your Honor, to play the

3   videotape right now in the courtroom, and defense counsel would

4   be able to follow along with the transcript.

5          THE COURT:  Have you seen the video?

6          MR. WELSH:  I don't know if he has, Your Honor, or

7   not, but it's impeachment.

8          MR. PETROCELLI:  You know, Your Honor, I don't know

9   what's on this.  I don't know whether he has the entirety of

10  the interview or he just cherrypicked a sentence or two.

11         MR. WELSH:  That's not relevant.

12         MR. PETROCELLI:  Can I --

13         MR. WELSH:  I'm doing a portion of the response that

14  he gave in an interview with CNBC in January of 2016 in

15  response to his testimony.

16         MR. PETROCELLI:  How long is the interview?

17         MR. WELSH:  It's a little bit longer than this.  I

18  don't know how much longer.

19         MR. PETROCELLI:  Well, I need to -- I don't know if

20  it's an accurate --

21         MR. WELSH:  Well, this is the relevant portion as to

22  what this witness's testimony --

23         THE COURT:  What testimony do you plan to impeach

24  with it?

25         MR. WELSH:  That the sports strategy, the premium

1   sports strategy is key to their business at Turner, which the

2   witness just said he disagreed with.

3         MR. PETROCELLI:  That's not actually what he said.

4   You were trying to collapse it into one word key, he was saying

5   is a component.

6     My objection is that there's been no authentication for

7   this interview and it's inappropriate.

8         MR. WELSH:  I'm not putting the interview into the

9   record. I'm using it for impeachment purposes.

10        MR. PETROCELLI:  It doesn't matter, because I have no

11   idea whether this is --

12        MR. WELSH:  Well, the witness is here.  He can

13   certainly respond to whether that's --

14        THE COURT:  Whoa, whoa, whoa.  One at a time.  One at

15   a time.  One at a time.  Let him finish.  Go ahead.

16        MR. PETROCELLI:  Thank you, Your Honor.

17     I'm just saying this is not a document that I can look at.

18   It's a tape.  I don't know if it's a complete tape.  There's

19   nobody who's verified the transcription.

20        THE COURT:  How long is this CD?  I guess it's a CD

21   disc, how long is the program on it?

22        MR. WELSH:  The clip here is probably about 30

23   seconds.

24        MR. PETROCELLI:  How long is the interview?

25        MR. WELSH:  I don't know how long the interview was.

1          MR. PETROCELLI:  How I'm going to find this

2     interview?  It's unnecessary.  It's not even impeachment.

3          THE COURT:  I'm not going to let you play it right

4     now.  I want you to provide the full interview to both counsel

5     and give them a chance to review it over night.  And if you're

6     going to this particular excerpt, again, I'm not so sure.  He

7     was just saying, as I understood his testimony, that they were

8     trying to put together a portfolio of premium programs for

9     their clients or customers, whatever word he used.  But I don't

10    see how this is really contradictory.

11         MR. WELSH:  He's saying here that sports is

12    incredibly important for Turner.  We are in the premium sports

13    business.  And he goes on talking about the NCAA.  And he talks

14    about how it's sementing must have value for its networks to

15    bring distributors to the consumers.

16         THE COURT:  Does this come up in his deposition?

17         MR. WELSH:  This particular interview --

18         THE COURT:  This issue.

19         MR. WELSH:  This issue.  I'm sorry.

20         THE COURT:  Was he questioned in his deposition about

21    the importance of the sports premium?

22         MR. WELSH:  Absolutely, and he walked back from the

23    premium sports and fought all over that in his deposition.  He

24    fought on calling it premium sports in his deposition.  And I'm

25    happy to go through that with him as well.

```
1          THE COURT:  Well, at the moment why don't you
2  confront him with his testimony in his deposition on this
3  issue.  If that will be of assistance to you.  That will give
4  Mr. Petrocelli a chance to review this material.
5          MR. PETROCELLI:  Thank you, Your Honor.
6          THE COURT:  Then he'll be in a better position after
7  he's done that to make whatever arguments he thinks are
8  appropriate with regard to its relevancy and fairness, and then
9  you can confront him with the deposition testimony.  If you
10  think it's inconsistent with what he just said, you can make
11  whatever points you want to make on that.  And, of course, we
12  are only five minutes away from ending today, so do you have
13  any deposition stuff with you?
14          MR. WELSH:  I do. it might take me a minute to find
15  that particular page.
16          THE COURT:  All right.
17          MR. WELSH:  We'll proceed that way.  Can we revisit
18  this issue then in the morning?
19          THE COURT:  You can revisit it after Mr. Petrocelli
20  has a chance to review it.
21          MR. PETROCELLI:  Thank you, Your Honor.
22      (Open Court.)
23          THE COURT:  Come on back.
24      (Witness resumed the witness stand.)
25          THE COURT:  You may proceed consistent with the
```

```
1   discussion at the bench when you find whatever you need to

2   locate there.

3       (Pause.)

4           MR. WELSH:  May I approach, Your Honor?

5           THE COURT:  You may.

6   BY MR. WELSH:

7   Q.   Mr. Martin, I've handed you a binder that contains the

8   transcripts of your two depositions in this case.  I'm going to

9   direct you to the second one, which is the deposition you gave

10  on January 26th, 2018, this year.  Are you there, sir?

11  A.   Yes, I'm at the tab.

12  Q.   All right.  And you look at page 80 of that transcript.

13          THE DEPUTY CLERK:  Is there an exhibit number on

14  that?

15          MR. WELSH:  I'm sorry, there's not.

16          THE DEPUTY CLERK:  Thank you.

17  BY MR. WELSH:

18  Q.   And at page 80, line 11, I asked you the question that

19  day:

20          "Do you use the term internally at Turner to

21          describe your sports content as either being premium

22          or marquee sports?"

23          Line 15, you answered:  "I think we use many

24          terms to describe our sports.  I would say they all

25          would fall under the umbrella of being popular."  Do
```

1           you see that?

2   A.   Yes, I see that.

3   Q.   All right.  Now, today you want to say -- you agree in

4   this court today that you have premium sports, right?

5   A.   Yes, I see all of those words as describing something that

6   could mean premium.

7   Q.   Okay.  Now, put that question and answer to the side.

8   That was your testimony that day where you weren't going to say

9   it was premium, it's just popular sports.  But you told this

10  Court earlier today that Turner sports are premium sports,

11  right?

12          MR. PETROCELLI:  Your Honor, object.

13          THE COURT:  I'm going to sustain the objection.  You

14  can recast your question consistent with his testimony so far.

15  Break it down a little bit, too.

16  BY MR. WELSH:

17  Q.   In January of this year you gave this testimony, correct?

18  A.   Correct.

19  Q.   All right.  And then earlier today you told His Honor that

20  you thought Turner sports were premium sports, true?

21  A.   Yes.

22  Q.   Okay, thank you.  You can put that to the side.

23      Now, Mr. Martin, Turner has had a strategy for years to not

24  try to replicate the volume of sports on ESPN, right?

25  A.   Yes, that's true.

1    Q.    Instead, Turner has followed a path to focus on sports

2    that matter, around events that matter, right?

3    A.    Yes.

4    Q.    That's been Turner's strategy and philosophy, true?

5    A.    True.

6    Q.    If you turn to PX 132 in your binder of exhibits.

7    A.    (Witness complies.)

8    Q.    Tell me when you're there, sir.

9    A.    I'm there.

10   Q.    All right.  Now, PX 132 is a transcript of an interview

11   that you gave on February 23, 2016 with Jeffress media,

12   correct?

13   A.    Yes, I believe that is correct.

14   Q.    You gave that interview to Jeffress media as the chairman

15   and CEO of Turner, correct?

16   A.    That's correct.

17   Q.    And that was within your area of responsibility for the

18   company to speak to Jeffress media that day, correct?

19   A.    Yes.

20          MR. WELSH:  Your Honor, I move for admission of PX

21   132?

22          MR. PETROCELLI:  No objection.

23          THE COURT:  All right, be admitted.

24    (Plaintiff's Exhibit No. PX 132 was received in evidence.)

25   BY MR. WELSH:

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   Q.   Mr. Martin, if you could look at PX 132 dash 010.

2   A.   (Witness complies.)

3   Q.   I'm going to direct you to the last paragraph, there's a

4   question that's asked of you, it starts off, "Let's stick with

5   the NBA for a second," do you see that?

6   A.   I do see that.

7   Q.   All right.  It goes on to then say, "What's Turner's

8   philosophy and were you able to monetize to the point where you

9   can make money given the setup?"  Do you see that whole

10  question there?

11  A.   Yes, yes.

12  Q.   Okay.  And if we look at the next page, page 11.  That's

13  your answer, correct?

14  A.   May I have a moment to read it?

15  Q.   Yes, please do.

16       (Witness perusing document.)

17  A.   Okay.

18  Q.   You responded to the interview question by saying in that

19  first paragraph on 011, "Oh, yeah, yes, resounding yes.  Look,

20  Turner, and this preceded me, Turner for years and years has

21  been in the sports business in a very targeted way and not

22  trying to replicate the volume of sports of saying ESPN or a

23  regional sports network, but be in the business with sports

24  that matter around events that matter," correct?

25  A.   Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   That was your statement in that interview that day, right?

2  A.   It appears that way, yes.

3  Q.   All right.  And that was a correct statement that you made

4  then, wasn't it?

5  A.   Yes.

6  Q.   And that's correct today?

7  A.   Yes.

8  Q.   So some sports matter more than others, right?

9  A.   In our opinion, everything comes at a price.

10  Q.   Some sports matter for Turner more than others and some

11  sports matter for distributors more than others, true?

12  A.   Okay.

13  Q.   And for Turner sports that matter are March Madness, the

14  NBA playoffs, major league baseball playoff games, right?

15  A.   Well, they are the relationships that we have, yes.

16  Q.   Okay.  And you told me in your deposition in January that

17  table tennis championships are just not at the same level as

18  NCAA men's basketball games, right?

19  A.   Yes.

20  Q.   You haven't staked out your brand at Turner on the table

21  tennis championship matches, you've staked it out on March

22  Madness, NBA playoffs and major league baseball playoff games,

23  right?

24  A.   That's correct.

25  Q.   So some sports content is just more important than other

```
 1  sports content, right?

 2  A.    That's true.

 3  Q.    Now you agree that distributors are in the business of

 4  obtaining subscribers, aren't you?

 5  A.    Yes, that's correct.

 6  Q.    All right.  And they would want -- the distributors would

 7  want more subscribers rather than less to be a good business,

 8  right?

 9  A.    Yes.

10  Q.    And having sports content that matters in events that

11  matter, that would be of aid to distributors that are wanting

12  to add subscribers, true?

13  A.    If they're looking for subscribers who like the popularity

14  of the sports we have.

15  Q.    And conversely, if a distributor were to lose -- I'm

16  sorry.  Conversely, distributors would lose subscribers if they

17  weren't able to distribute that important sports programming

18  like March Madness, right?

19  A.    That's unclear.

20            THE COURT:  Why don't we break for the day.

21            MR. WELSH:  Thank you, Your Honor.

22            THE COURT:  Mr. Martin, you're witness under oath in

23  the case.

24            THE WITNESS:  Yes, yes, Your Honor.

25            THE COURT:  What that means is that you're not at
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  liberty to discuss your testimony so far or what it might be

2  when you return tomorrow with anyone, including your own

3  lawyers.

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  You can't discuss it with anyone, your

6  suppose, your lawyers, your friends, nobody.

7          THE WITNESS:  Yes, Your Honor.

8          THE COURT:  You have to be able to answer the

9  question under oath honestly:  I have not discussed my

10  testimony so far or anything about it with anybody, okay?

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  See you back tomorrow morning at 10:30.

13          THE WITNESS:  Thank you, Your Honor.

14          THE COURT:  You can step down.

15      (Witness excused.)

16          THE COURT:  Can I see counsel for a second?

17      (Sealed Bench conference.)

18          THE COURT:  You make your own decision how you want

19  to proceed Mr. Welsh.

20          MR. WELSH:  Yes.

21          THE COURT:  But based on what I just heard, I don't

22  think we need this tape thing, this video thing.

23          MR. WELSH:  Okay.

24          THE COURT:  I'm not sure it would add anything,

25  frankly, and I don't think it's worth the time it's going to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  take to reproduce it, for you to listen to it, for you to

2  figure out what the excerpt is.  You made your point with these

3  other documents and the deposition and this other thing, this

4  interview here.

5         MR. WELSH:  Okay.

6         THE COURT:  So I think you've made your points.  I

7  don't think you need to be spending time and Mr. Petrocelli

8  spending time on this kind of stuff.

9         MR. WELSH:  Okay.

10         THE COURT:  Now, the one thing I will caution you

11  about and this would equally apply to Mr. Petrocelli to the

12  extent that he would do something like this.  I don't know what

13  his plans are obviously with this witness.  Be careful about

14  asking him questions and seeking to get him to essentially

15  guess or prognosticate or opine on what other people's thinking

16  is as to their strategy.

17         He's not in a position necessarily to be saying that

18  he knows what his company knows.  But he can't -- how can he

19  know exactly what these other companies are thinking that he's

20  making deals with that's what's in their mind.  You'll have

21  witnesses who will address those issues.

22         But you know Turner is out trying to sell its

23  products to various distributors.  I mean they know what they

24  think, but they're really guessing or having an opinion as to

25  what they think the people they're trying to sell to think.  So

1   be careful about trying to get him to -- because at some point

2   I might have to stop you and say, well wait a minute now.  I

3   mean --

4           MR. WELSH:  This came out in his --

5           THE COURT:  Say to him do you really know, are you

6   just guessing or is this just an opinion you have?

7           MR. WELSH:  Right.

8           THE COURT:  Because you know he knows what his

9   company knows.  But I don't know if he's really in a position

10  to give his insight or his opinions about what other people

11  think.

12          MR. WELSH:  This came out of his deposition, Your

13  Honor, that's why I asked the question.

14          THE COURT:  All right, just be careful.

15          MR. WELSH:  Okay.

16          MR. PETROCELLI:  Depositions of course there's no way

17  to object.  Everything comes in in a deposition.

18          THE COURT:  Yes, and this is all being done at warp

19  speed.  Everybody is rushing to get stuff done.  And obviously

20  some are not as flexible a situation.  But I just don't want

21  to, I don't want to put witnesses in a position.  And I don't

22  want to be publicly questioning them when you guys are asking

23  questions.

24          MR. WELSH:  Sure.

25          THE COURT:  Well, how do you know that?  What's your

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  basis to know that?  I mean, are you just guessing?  Is this

2  just an opinion you have?  How can he know what his customers

3  are thinking unless they tell him?  Now if they told him,

4  that's different.

5          MR. WELSH:  Okay, I understand, Your Honor.

6          THE COURT:  Be cautious about that.

7          MR. WELSH:  Thank you.

8          MR. PETROCELLI:  Thank you very much, Your Honor.

9          THE COURT:  Do you have any issues you need to deal

10 with tomorrow morning?

11         MR. PETROCELLI:  Looking forward to dinner.

12         THE COURT:  It's been a long day.

13         MR. PETROCELLI:  It's been a long day.

14         THE COURT:  You might want to have an adult beverage

15 or two.

16    (Open Court.)

17         THE COURT:  All right, counsel, any other issues for

18 the record before we adjourn?

19         MR. CONRATH:  One.

20         THE COURT:  Mr. Conrath seems to have one, all right.

21 That's all right, that's his prerogative.

22         MR. CONRATH:  Always the guy with the housekeeping

23 questions, Your Honor.  We, of course, have been purchasing

24 transcripts for our use which include the public portion.  I

25 wonder, and the court reporter appropriately wouldn't -- said

```
 1   that we can't get the part that includes the bench conferences.

 2   Obviously only the parties could get that, but if you would

 3   confirm that that's okay for us to get it.

 4            THE COURT:  Okay.

 5            MR. CONRATH:  Only the parties, obviously.

 6            THE COURT:  Yes, but my concern is that they could

 7   accidentally end up in the wrong hands.  I mean, you all know

 8   what you've been talking about here at the bench.  And you're

 9   in a position to brief whoever needs to know about it other

10   than you.

11       My concern is that accidental transmission.  We've already

12   experienced accidental transmissions.

13            MR. CONRATH:  Indeed.

14            THE COURT:  And I'm not interested in dealing with

15   those problems certainly any more than I have to.  Hopefully

16   not at all.  I mean, again.  So I think for the moment we're

17   going to keep the bench conferences off limits.  You all know

18   what you talked about, you have recollections, and I realize

19   they're not perfect.

20            MR. CONRATH:  That's the question.

21            THE COURT:  But this is the old school way.  There

22   wasn't anything like this years ago.  There was no such a thing

23   as real time, it didn't exist.  This is a luxury, frankly, that

24   only a case of this expense can afford.  So I mean I think at

25   this point it's best to just keep it that way for now.
```

```
 1              Now while I have you there, though, let's talk about
 2   tomorrow.  At least what you foresee.
 3              MR. CONRATH:  Right.
 4              THE COURT:  Mr. Welsh, your exam another hour, a half
 5   hour, two hours, I mean, what do you think?
 6              MR. WELSH:  Probably somewhere between an hour to an
 7   hour and half maybe.
 8              THE COURT:  Okay.  So you'll probably pass the
 9   witness in the morning at some point?
10              MR. WELSH:  I believe so, Your Honor.
11              THE COURT:  Two hours.
12              MR. PETROCELLI:  (Indicating with two fingers.)
13              THE COURT:  So probably it will go till after lunch,
14   we're not going to get all that done before lunch.
15         Okay, and then who will be the next witness, Mr. Conrath,
16   for the government?
17              MR. CONRATH:  I'm refreshing my recollection, Your
18   Honor.
19         MR. WELSH: Henson.
20              THE COURT:  Mr. Henson, and what's your estimate on
21   direct there?
22              MR. CONRATH:  I think about an hour.
23              THE COURT:  About an hour.  Cross about the same?
24              MR. PETROCELLI:  Probably a little less, Your Honor.
25              THE COURT:  A little less.  Well, actually, we
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    didn't -- yeah, you said two hours, that's right.  So we might

2    get to, with any luck we'll get to Henson tomorrow and we'll

3    finish Henson tomorrow.

4         All right, so have him in the ready position so he'll know

5    what we're doing.  Do you have any other issues?

6              MR. CONRATH:  No, Your Honor.

7              MR. PETROCELLI:  No, Your Honor.

8              THE COURT:  Do you have any other issues?

9         Have a nice evening, counsel.

10        (Proceedings adjourned at 5:43 p.m.)

11                              -oOo-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

CERTIFICATE

1

2          I certify that the foregoing is a true and correct

3  transcript, to the best of my ability, of the above pages, of

4  the stenographic notes provided to me by the United States

5  District Court, of the proceedings taken on the date and time

6  previously stated in the above matter.

7          I further certify that I am neither counsel for, related

8  to, nor employed by any of the parties to the action in which

9  this hearing was taken, and further that I am not financially

10 nor otherwise interested in the outcome of the action.

11

12 _____     _____

   /s/Crystal M. Pilgrim, RPR, FCRR      Date: March 28, 2018
13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CV No. 17-2511 |
| | ) | |
| | ) | Washington, D.C. |
| vs. | ) | March 28, 2018 |
| | ) | 10:30 a.m. |
| AT&T, INC., ET AL., | ) | |
| | ) | Morning Session |
| Defendants. | ) | |
| _____ | ) | Day 4 |

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:   Craig W. Conrath
         Eric D. Welsh
         Peter J. Schwingler
         Andrew C. Finch
         Alvin H. Chu
         Dylan M. Carson
         U.S. DEPARTMENT OF JUSTICE
         Antitrust Division
         450 Fifth Street, NW
         Washington, D.C. 20530
         (202) 532-4560
         craig.conrath@usdoj.gov
         eric.welsh@usdoj.gov
         peter.schwingler@usdoj.gov
         andrew.finch@usdoj.gov
         alvin.chu@usdoj.gov
         dylan.carson@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

Katrina M. Robson
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 220-5052
krobson@omm.com

Daniel M. Petrocelli
M. Randall Oppenheimer
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067
(310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Michael L. Raiff
Robert C. Walters,
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
(214) 698-3350
mraiff@gibsondunn.com
rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:

Kevin J. Orsini
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1140
korsini@cravath.com
pbarbur@cravath.com

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

*** REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER ***

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|

GOVERNMENT'S:

JOHN KEVIN MARTIN, JR.  518  595

– – –

INDEX OF EXHIBITS

PX153                                     522

PX20                                      531

PX21                                      546

PX150                                     554

PX131                                     562

PX130                                     566

PX120                                     574

PX0004                                    576

PX205                                     579

PX203                                     582

PX78                                      587

PX67                                      593

P R O C E E D I N G S

1          DEPUTY CLERK:  All rise.  The United States

2  District Court for the District of Columbia is now in

3  session, the Honorable Richard J. Leon presiding.  God save

4  the United States and this Honorable Court.  Please be

5  seated and come to order.

6          Your Honor, good morning.  We have Civil Action

7  No. 13-2511, the United States of America v.

8  AT&T, Inc., et al.

9          Counsel for the parties, please approach the

10  lectern and identify yourself for the record.

11          MR. WELSH:  Good morning, Your Honor.  Eric Welsh

12  for the United States.

13          THE COURT:  Welcome back.

14          MR. SCHWINGLER:  Good morning, Your Honor.

15  Peter Schwingler for the United States.

16          THE COURT:  Welcome back.

17          MR. FINCH:  Good morning, Your Honor.

18  Andrew Finch for the United States.

19          THE COURT:  Welcome back.

20          MR. CONRATH:  Good morning, Your Honor.

21  Craig Conrath for the United States.

22          THE COURT:  Welcome back.

23          MR. CONRATH:  Thank you.

24          MR. CHU:  Alvin Chu for the United States.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  Welcome back.

 2              Good morning, Your Honor.

 3              MR. CARSON:  Dylan Carson for the United States.

 4              THE COURT:  Welcome back.

 5              MR. PETROCELLI:  Good morning, Your Honor.

 6    Daniel Petrocelli for defendants.

 7              THE COURT:  Welcome back.

 8              MS. ROBSON:  Good morning, Your Honor.

 9    Katrina Robson for the defense.

10              THE COURT:  Welcome back.

11              MR. OPPENHEIMER:  Good morning, Your Honor.

12    Randy Oppenheimer for the defendants.

13              THE COURT:  Welcome back.

14              MR. BARBUR:  Good morning, Your Honor.

15    Peter Barbur representing Time Warner.

16              THE COURT:  Welcome back.

17              MR. WALTERS:  Good morning, Your Honor.

18    Rob Walters here for AT&T and DirecTV.

19              THE COURT:  Welcome back.

20              MR. RAIFF:  Good morning, Your Honor.  Mike Raiff

21    for AT&T and DirecTV.

22              THE COURT:  Welcome back.

23              MR. ORSINI:  Good morning, Your Honor.

24    Kevin Orsini for Time Warner.

25              THE COURT:  Welcome back.
```

1              All right, the witness can resume the stand.

2              Mr. Martin, good morning.  You remain under oath,

3    okay?

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  Have a seat.

6              You may proceed whenever you're ready.

7              MR. WELSH:  Thank you, Your Honor.

8    JOHN KEVIN MARTIN, JR., WITNESS FOR THE GOVERNMENT, HAVING

9    BEEN PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED

10   FURTHER AS FOLLOWS:

11                   DIRECT EXAMINATION (CONTINUED)

12   BY MR. WELSH:

13       Q    Mr. Martin, good morning.

14       A    Good morning.

15       Q    Mr. Martin, I want to come back to the subject of

16   Turner's affiliate rates and the value of Turner's networks.

17              But before I do that, I just want to follow up on

18   the Court's direction to you last night.  I just wanted to

19   confirm that you have not spoken to anyone about your

20   testimony either yesterday or what you'd be testifying to

21   today to; is that correct?

22       A    That's correct.  I've spoken with no one.

23       Q    Okay.  And you weren't provided any information

24   about what might be shown to you or discussed with you

25   today?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

519

```
 1       A     That's also correct.

 2       Q     Okay.  Thank you.  I just -- I assumed that was

 3   the case; I just wanted to make sure.

 4             Let's come back and talk about your affiliate

 5   rates, then, if we can, sir, and the value of Turner's

 6   networks.

 7             Now, Mr. Martin, it's correct, isn't it, that

 8   Turner secures above-industry-average affiliate rates from

 9   its distributors?

10       A     I'm not sure I understand the question of "above

11   average."

12       Q     Sure.

13             Have you seen in the Turner documentation going to

14   your Board of Directors at Time Warner the fact that Turner

15   secures above-industry-average affiliate rates?

16       A     We had above-average growth for a three-year

17   period, if that's what you're referring to.

18       Q     Well, let's look at your binder in front of you,

19   if we can.  Maybe I can help you out there, sir.

20             If you look at the exhibit binder with PX8.

21             And tell me when you're there, sir.

22       A     I'm there.

23       Q     Okay.  Now, this is a strategy briefing book for

24   the board of Time Warner for 2016, correct?

25       A     Yes, that's correct.
```

1      Q      And you and your team at Turner contributed to

2    this presentation, correct?

3      A      Correct.

4      Q      Okay.  And you're familiar with the content of it,

5    right?

6      A      Yes.

7             MR. WELSH:  Okay.  Your Honor, I move for

8    admission of PX8 for the record.

9             THE COURT:  Any objection?

10             MR. PETROCELLI:  No objection, although I think

11    this may be kept filed under seal.

12             MR. WELSH:  We're happy to file it under seal.

13    I don't know if it was indicated as such.  But if that's

14    what they want, that's fine.

15             THE COURT:  It will be admitted at least for now

16    under seal; and if there's some decision otherwise, we'll do

17    that later.

18             MR. WELSH:  That's fine, Your Honor.

19    Thank you very much.

20    BY MR. WELSH:

21      Q      Mr. Martin, if I could direct you to the bottom

22    page, which is PX0008-36.

23             Again, tell me when you're there.

24      A      I'm here.

25      Q      Okay.  And do you see the section there,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Mr. Martin, where it says "Executing Deals with Affiliates"?

2        A    Yes, I see that.

3        Q    Okay.  And if we look down in that section in the

4   third paragraph, it sets out Turner's priorities and

5   negotiations which were being presented to the Time Warner

6   board, correct?

7        A    Yes, correct.

8        Q    All right.  And there are a couple of items there.

9   And we'll talk about some of this later as well.

10            But one of the items is listed.  In fact, I think

11   it's the first.  It says, "Continuing to achieve above

12   average increases in affiliate rates," correct?

13        A    Yes, that's correct.

14        Q    Okay.  And the above-average increases in

15   affiliate rates, that's as compared to your competitors,

16   right?

17        A    Yes, that's correct.

18        Q    You can put that document to the side.

19            So let me ask you, if I can, to turn to PX153 in

20   your binder.

21            Again just tell me when you're there, sir.

22        A    I'm here.

23        Q    Now, this is a memorandum that you sent to the

24   Board of Directors to Time Warner, correct?

25        A    Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

522

1      Q    And this was dated January 21, 2016; am I correct?

2      A    Yes.

3      Q    And you were involved in the preparation of this

4    material that went to the Time Warner board;

5    is that correct?

6      A    Yes.

7           MR. WELSH:  Your Honor, I'd move for admission of

8    PX153 into the record.

9           MR. PETROCELLI:  There's no objection.  There are

10   a couple of figures in here which have been marked as

11   confidential, but we can work this out later on.

12          THE COURT:  All right.  Well, for now, we'll admit

13   it as confidential, and then just be cautious about going

14   into those, obviously, in open court anyway.

15          MR. WELSH:  I plan on doing so, all right.

16          THE COURT:  Yeah.

17                                 (Government's Exhibit PX153
                                    received into evidence.)
18   BY MR. WELSH:

19     Q    All right.  Mr. Martin, let me have you look at

20   PX153003 if you would.

21     A    I'm there.

22     Q    Okay.  Great.

23          Now, we see on this page, and this is one of the

24   pages that defense counsel had mentioned is confidential or

25   has confidential information designated by Time Warner.  So

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

523

```
 1   I'm going to be careful, and I think we all need to be

 2   careful about how we talk about this.

 3           But you see figure 2 on this page, correct?

 4       A    Yes, that's correct.

 5       Q    Right.  And what we have here is the viewing,

 6   advertising revenue, and affiliate rates for some of your

 7   Turner networks as compared to your competitors for 2015;

 8   is that right?

 9           THE COURT:  Which page is this, Mr. Welsh?

10           MR. WELSH:  I'm sorry, Your Honor.  It's PX153003.

11           THE COURT:  153003.  Okay.  Thank you.

12           MR. WELSH:  You're welcome.

13           THE COURT:  Go ahead.

14   BY MR. WELSH:

15       Q    Okay.  And, again, so we have the 2015 comparisons

16   of some of your Turner networks in terms of viewing

17   advertising revenue and affiliate rate, as compared to your

18   competitors, correct?

19       A    Toward general entertainment competitors, that's

20   correct.

21       Q    Okay.  And, again, I can't get into the specific

22   numbers here because I think those have been designated as

23   confidential, so we'll just talk maybe more generally about

24   it.

25       A    Okay.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

524

1      Q    When we look at the viewing on the left, this,

2   again, compares some of your networks.  And TBS is listed as

3   being at the top of that comparison against your competitors

4   in the general entertainment area, correct?

5      A    Yes.

6      Q    And if we look over at the advertising revenue, we

7   see TNT being at the top, as compared to your competitors in

8   the general entertainment area; is that correct?

9      A    Yes, that's correct.

10      Q    All right.  And then if we look over at the

11   affiliate rates -- so this is, again, what you're charging

12   your distributors for the carriage of your networks,

13   correct?  That's what affiliate rates are?

14      A    Yes.

15      Q    And if we look at the affiliate rates, we see that

16   TNT is, by far, well above the affiliate rates that your

17   competitors have; isn't that's true?

18      A    For the general entertainment competitors, that's

19   correct.

20      Q    Okay.  And, again, I can't talk about the specific

21   numbers, but we're looking at a magnitude that's pretty

22   substantial in comparison to your competitors; that's a fair

23   statement, isn't it?

24      A    I think that's fair.

25      Q    All right.  And the information that we're looking

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  at here in figure 2, that was accurate to the best of your

2  understanding and knowledge, correct?

3       A    Yes.

4       Q    And you see from your affiliate rates what you've

5  been able to achieve during your tenure at Turner; that

6  Turner has had some pretty good competitive success;

7  isn't that true?

8       A    Over the last several years, that's correct.

9       Q    So, in fact, if we look at just the next

10  paragraph, you go on to report about your competitive

11  success, correct?

12      A    Which paragraph are you referring to?  I'm sorry.

13      Q    Where it starts, I think, "In addition to the

14  competitive success," right?

15      A    Oh.

16      Q    Is that correct, sir?

17      A    Just give me a moment to read it you don't mind.

18      Q    Absolutely.

19      A    Okay.

20           Yes, I would agree with that.

21      Q    And the paragraph there -- so it starts off by

22  saying that in addition to the competitive success, so it's

23  referring to the rates success that you've had for TNT and

24  TBS above, right?

25      A    Right.

1      Q    Okay.  And then it goes on to say that TNT and TBS

2  produced strong financial performance, both growing revenue

3  by an average in the middle single digits and operating

4  income by the high single digits over the last five years.

5           And then it goes on to report about your operating

6  income.

7           And those numbers have been designated as

8  confidential by Time Warner, as I understand it, so I can't

9  repeat those in open court.

10          But is the information that's there in that

11 paragraph and those numbers, is that accurate, sir?

12     A    I would assume it to be accurate, yes.

13     Q    Okay.  Now, if I could have you turn to PX148 in

14 your binder.

15          And this is the document that we talked about

16 yesterday.  It's been admitted.  This is the document that

17 was shared with AT&T, that "get to know you" meeting that

18 you had, correct?

19     A    Yes, correct.

20     Q    Okay.  And if we could look at PX148-017.

21     A    I'm at the page.

22     Q    Okay.  Great.

23          And, again, this is information that was shared

24 with AT&T so that you could present what was Turner's

25 business and how that was looking at that time, correct?

1      A    Yes, that's right.

2      Q    Okay.  And here, we have on 017, you're reporting

3 on your compound annual growth, as compared to your

4 competitors; isn't that's true?

5      A    Yes, that's true.

6      Q    Okay.  And so from 2012 to 2016, we're seeing that

7 Turner, as compared to your competitors, has a superior

8 annual growth, compounded annual growth; isn't that's true?

9      A    Yes, that's true.

10      Q    And according to this, the numbers are actually

11 far superior to Viacom, which is on the right; isn't that

12 true?

13      A    Yes, through 2016, that's correct.

14      Q    And you're also reporting to AT&T on this page

15 about Turner's margins and how they compare to your

16 competitors, correct?

17      A    Yes, that's correct.

18      Q    And, again, looking at 2016, Turner's margins were

19 superior to all of your competitors that are listed there,

20 correct?

21      A    Yes.

22      Q    You can put that one to the side for now.

23          Mr. Martin, your success that you've achieved at

24 Turner with your -- that we've just looked at in terms your

25 rates and your margin, your success is attributable to your

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

528

```
 1   success with your affiliate contracts; isn't that's true?

 2        A    The affiliate contracts were an important

 3   component of that success, but not the only one.

 4        Q    Okay.  But it was an important component, right?

 5        A    Yes.

 6        Q    Okay.  And your affiliate rates that we've been

 7   talking about, your affiliate rates that you get for your

 8   networks, CNN, TBS, TNT, those rates reflect the value that

 9   distributors see in your networks, right, and that's why

10   they pay it?

11        A    Yes.

12        Q    Okay.  Now, Turner's affiliate rates -- during

13   your tenure, Turner's affiliate rates have increased year

14   over year, correct?

15        A    Yes, that's correct.

16        Q    And your margins have increased during this time

17   year over year as well, correct?

18        A    Also correct.

19        Q    Okay.  And Turner's ability to obtain the superior

20   affiliate rates that we're talking about as compared to your

21   competitors, that's due, in large part, to your sports

22   content, isn't it?

23        A    In -- I don't -- I want to be careful about the

24   characterization of "large."  Sports is important, but there

25   were other factors that drove those increases.
```

```
 1              But, yes, sports is an important component of it.
 2       Q     Okay.  Well, sports is one of the big reasons why
 3  Turner's able to extract the type of affiliate rate
 4  increases that you're able to get, true?
 5       A     It's an important factor.
 6       Q     Let's go and talk about your NBA contract if we
 7  can, okay?
 8       A     Sure.
 9       Q     Now, you were involved in efforts to renew the NBA
10  contract for Turner, right?
11       A     Yes.
12       Q     So you could get that content and then distribute
13  it that through your network, correct?
14       A     Yes.
15       Q     If you look at PX20 in your binder.
16       A     I'm there.
17       Q     Now, PX20 is a memorandum from you to the
18  Time Warner Board of Directors, correct?
19       A     Yes, it is.
20       Q     And it's dated September 16, 2014, right?
21       A     Yes.
22       Q     Now, the purpose of this memorandum was to secure
23  or try to secure the Time Warner board's approval for the
24  renewal of Turner's contract with the NBA, correct?
25       A     Yes, that's correct.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

530

1      Q    Okay.  And you were personally involved in both

2  the preparation of the memo, as well as providing it on to

3  the Board of Directors of Time Warner; is that right?

4      A    Yes.

5      Q    And if I understood what you told me before in

6  your deposition, you had to seek out this approval from the

7  Time Warner board for this transaction because of the size

8  of the annual fee that would be paid, right?

9      A    Yes, that's right.

10     Q    All right.  And I think you told me in your

11 deposition that the fee was annually $1.1 billion?

12     A    I'd have to re-review the memo, but that sounds

13 approximately right.

14          THE COURT:  Did you say billion?

15          MR. WELSH:  Billion.

16          THE COURT:  That was the fee to NBA?

17          MR. WELSH:  Yes.

18 BY MR. WELSH:

19     Q    Now, the amount that you're paying, this amount

20 was over the threshold that you were allowed to do on your

21 own, so you had to get the board's approval on that;

22 is that correct?

23     A    Yes, that's correct.

24     Q    And this was an important decision for Turner to

25 get this approval; is that fair?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

531

```
 1        A    Yes.

 2             MR. WELSH:  Your Honor, I move for admission PX20.

 3             MR. PETROCELLI:  There's no objection.  Again,

 4   there are some figures that are marked confidential, but

 5   virtually all these documents are.  So I have to repeat

 6   myself, but no objection.

 7             THE COURT:  All right.  It will be admitted under

 8   seal at the moment, subject to cleanup.

 9
                                   (Government's Exhibit PX20
10                                   received into evidence.)

11             MR. WELSH:  Thank you, Your Honor.

12   BY MR. WELSH:

13        Q    Now, Mr. Martin, first off, Turner successfully

14   renewed this agreement, correct?

15        A    Yes, that's right.

16        Q    You got the approval, and then you renewed it with

17   NBA?

18        A    Yes.

19        Q    And the NBA contract here with Turner, that runs

20   until the year 2024; is that correct?

21        A    Yes, that's true.

22        Q    So from now up until that time, you've got the

23   rights that are set out in that contract to be able to carry

24   NBA playoff games, for example, correct?

25        A    Regular season and playoff games, yes.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

532

```
 1         Q    Now, locking in the NBA season rights for all the

 2    way through that 2024-2025 season, that was important to

 3    Turner, correct?

 4         A    Yes, correct.

 5         Q    And let me come back to one thing here.

 6              So let's look at PX20, and I'll have you look at

 7    002.

 8         A    I'm there.

 9         Q    Okay.  And this is your lead-in hearing.  And

10    I want to direct you to the first paragraph where you're

11    asking the board to authorize Turner to enter into the

12    renewal contract.

13              Do you see that paragraph?

14         A    Yes.  May I have just a second to read it?

15         Q    Please.

16         A    Yes, I've read it now.

17         Q    Okay.  And what you told the board to get this

18    approval -- because I'm assuming that you wanted to be as

19    accurate as you could possibly be to the board to obtain

20    this approval; is that right?

21         A    Yes, that's correct.

22         Q    Because this was a very important decision for

23    Turner to get the renewal of the NBA rights, correct?

24         A    Yes.

25         Q    Because you're paying $1 billion for 64 games a
```

1    year.  This was pretty darned important to Turner, true?

2        A    True.

3        Q    And what you told the board in this paragraph,

4    this lead-off paragraph, is you said, "Our current agreement

5    expires in 2016, and this renewal will provide Turner with

6    regular-season and post-season NBA telecasts through the

7    2024-2025 NBA season, thereby locking in long-term rights to

8    NBA programming that is a cornerstone, cornerstone, of the

9    overall programming, branding, affiliate renewal, and

10   advertising strategies for TNT."

11            That's what you told the board, right?

12       A    Yes.

13       Q    So it's the cornerstone of your strategies.

14            Now, Mr. Martin, we talked about Premium Sports

15   yesterday, the NBA, its Premium Sports.

16            Now, Premium Sports are scarce in this industry,

17   aren't they?

18       A    Yes.

19       Q    And, in fact, you told your board -- let me direct

20   you to the third paragraph of that page about mid-way down.

21   You told the board -- you see the paragraph that says "under

22   the proposed terms?

23            Do you see that paragraph, sir?

24       A    Yes.  I'm just taking a second to read if that's

25   okay.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

534

1          Q      That's okay.

2          A      Okay.  I've read it.

3          Q      Okay.  So what you told your board about mid-way

4     down in that paragraph, you said that, as the board

5     discussed in its strategy session in June, the NBA rights

6     are coming up for renewal during a period of extreme

7     scarcity of available Premium Sports rights, correct?

8          A      Correct.

9          Q      All right.  And then that was what you told them

10    so that they would approve your transaction here, right?

11         A      Yes.

12         Q      Okay.  And so the types of sports where we're

13    going to see the Premium Sports, again, that you have the

14    NBA being one, March Madness being another, correct?

15         A      Yes.

16         Q      All right.  And now you see the NBA rights as

17    being valuable to Turner, and that's why you got this

18    approval, correct?

19         A      Yeah, that's correct.  Yes, that's correct.

20         Q      You also see that the distributors that you do

21    business with, that they also place great value on this

22    content too, don't you?

23         A      I believe the NBA is valuable content for the

24    distributors.

25         Q      Okay.  And, in fact, if we look at that page at

```
1    the bottom --

2              THE COURT:  You're still on 002?

3              MR. WELSH:  Yes, Your Honor.

4              THE COURT:  All right.

5    BY MR. WELSH:

6         Q    If you look at the bottom there, the very last

7    sentence, you say to your board, "In addition, Turner would

8    stand to lose substantial affiliate revenue without these

9    NBA rights."  And you emphasize the "without," correct?

10        A    That's correct.

11        Q    All right.  And you then said, "As certain

12   affiliates place such importance on this renewal, that

13   their" -- and there's a term there that I can't go into in

14   open court because it's been designated as confidential.

15   It's got one of those little red boxes around it.

16             But what you listed there is accurate, correct?

17        A    Are we referring to the last sentence of that

18   paragraph?

19        Q    That's correct.

20             And I can't say it in open court, because

21   Time Warner's designated it as confidential.

22        A    Yes, I believe that's accurate.

23        Q    Okay.  So the last sentence on 02, when it carries

24   over to 03, that's what I want to make sure we're all

25   talking about the same thing, that sentence is accurate,
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

536

1  correct?

2      A    Yes, that's what we believe.

3      Q    Okay.  Thank you, sir.

4           Now, having Premium Sports, Turner's having

5  Premium Sports, that matters to Turner for affiliate rates;

6  but it's also, it matters because of what you can get from

7  advertisers; isn't that right?

8      A    Yes, that's correct.

9      Q    And, in fact, Turner has found that it gets more

10  from advertisers, gets paid more from advertisers because of

11  your Premium Sports content than not, right?

12      A    Yes.

13      Q    All right.  The NBA, in particular, you found that

14  that drives premium advertising rates that simply are not

15  attainable from your other program -- in your general

16  entertainment programming, true?

17      A    True.

18      Q    And, in fact, if we look at PX20-006 -- and

19  there's a black bullet point there that's titled "Attracts

20  top-tier advertising and grows advertising pricing."

21          Do you see that paragraph there?

22      A    I do see that paragraph.

23      Q    And the point that we're just talking about, about

24  how the NBA -- driving premium advertising CPMs, they're not

25  attainable by other entertainment programming, that's set

1   forth in your justification to the Time Warner board for the

2   approval of this transaction, correct?

3       A    Yes, that's true.

4       Q    And the numbers that are there, again, I can't go

5   into those numbers because they've been designated as

6   confidential by Time Warner, but the numbers that are there

7   were accurate; is that correct?

8       A    Yes.

9       Q    Thank you, sir.

10          So Turner can charge for more advertising because

11  the NBA games are valued more by advertisers, correct?

12      A    Yes.

13      Q    And you found that viewers that want live sports

14  are engaged, correct?

15      A    Correct.

16      Q    They're engaged with that content, right?

17      A    Yes.

18          THE COURT:  What does that mean, "they're

19  engaged"?  They're watching it?

20  BY MR. WELSH:

21      Q    You find that they're more passionate about the

22  content; is that right?

23      A    They're fans, you're right.  So they tend to pay

24  attention to the live event.  Plus they'll watch more of

25  this event live than they will our other entertainment

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

538

```
1    programming where they're watching it more and more on a

2    delayed basis.  That's valuable to advertisers.

3              THE COURT:  How do you know this?

4              THE WITNESS:  Excuse me, Your Honor?

5              THE COURT:  How do you know this kind of thing?

6              THE WITNESS:  We --

7              THE COURT:  How do you evaluate that?  How

8    do you know that that's true?

9              THE WITNESS:  We look at just the aggregate number

10   of audiences that tune in for these events, and then we'll

11   actually do surveys to try to evaluate what we call

12   "fandom" --

13             THE COURT:  Okay.

14             THE WITNESS:  -- which is how passion this

15   audience is and engaged as it is.

16             THE COURT:  So you're doing a statistical analysis

17   of the data --

18             THE WITNESS:  To the best we can --

19             THE COURT:  -- that you have.

20             THE WITNESS:  To the best we can, Your Honor.

21             MR. WELSH:  Thank you, Your Honor.

22   BY MR. WELSH:

23        Q    Now, you found that sports drives the value to

24   distributors and to advertisers because of its popularity

25   with consumers and this engagement that you're just talking
```

1   about, true?

2      A    Yes, that's true.

3      Q    And live viewing, the live viewing aspect of your

4   content at Turner, that remains an important component of

5   Turner's business model today and into the future;

6   is that fair?

7      A    We would like it to be.

8      Q    Okay.  And having the NBA, for example, as one of

9   your Premium Sports content, now that's good for Turner

10   because of it being resistant to this time-shifted viewing,

11   I think you were just referring to; is that right?

12      A    Yes, that is right.

13      Q    All right.  So consumers, they value it because

14   they want to watch it live and they want to watch it live on

15   your linear programming, right?

16      A    Yes, that's true.

17      Q    They don't want to look at it two hours later, but

18   they want to catch it live, right?

19      A    Yes.

20      Q    And as a result of their wanting it live, you're

21   going to get paid more from your distributors and get paid

22   more by your advertisers, right?

23      A    True.

24      Q    And we talked earlier, there's a reference to

25   CPMs, but I just want to get that into the record.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    I'm not sure we talked about it earlier in this trial.

2         What are CPMs?

3         A    CPM is industry jargon for costs per thousand

4    viewers.  And it's essentially how the advertising currency

5    is quoted.

6         Q    And so if you get a higher CPM, that's a good

7    thing for Turner; you're getting paid more by the

8    advertisers for that content, correct?

9         A    Yes, that's true.

10        Q    So in your documents submitted to the Time Warner

11   board for the NBA approval, you told them that it would

12   drive higher -- getting the approval with the NBA rights

13   would drive higher CPMs for Turner, correct?

14        A    That's correct.

15        Q    And going back to the affiliate rates for a

16   second, it's true that in the past, even before this period

17   when you got the renewals, that the NBA programming rights

18   had enabled Turner to increase TNT's carriage and affiliate

19   rates; isn't that's true?

20        A    It's an important component but not the only

21   component.

22        Q    Well, you told the board -- correct me if I am

23   wrong, but you told the board when you got the approvals

24   that it was actually critical to Turner for maintaining

25   carriage and achieving the planned affiliate rate increases

1  for TNT, didn't you?

2      A    Yes, we did.

3      Q    Okay.  And it's in the memorandum that we have in

4  front of us, PX20, correct?

5      A    I saw that.

6      Q    You also told the board that the top-tier sports

7  programming has been and will continue to be a key factor in

8  allowing networks to receive the highest subscription rates.

9  That was the statement that you made to your board, right?

10     A    That's correct.

11     Q    Okay.  And that was an accurate statement, right?

12     A    Yes.

13     Q    Let's switch to talk about March Madness, if we

14  can, for a few minutes, okay?

15          Now, you were involved in the contract

16  negotiations for Turner for the right to -- when you renewed

17  that contract, to get those rights for March Madness; is

18  that right?

19     A    I was the CEO of the company, but I had a team

20  that was doing actual negotiation.  But, yes, I oversaw

21  that.

22     Q    Okay.  Sure.  You were the CEO, chairman of the

23  company at the time of those negotiations, correct?

24     A    That's correct.

25     Q    And this contract was, in fact, renewed in 2016;

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

542

```
 1   is that right?

 2        A    Yes.

 3        Q    And the contract was extended -- these rights to

 4   March Madness were extended out to the year 2032;

 5   is that right?

 6        A    That's correct.

 7        Q    Okay.  So from this point all the way through

 8   2032, Turner's got the rights that are set out in that

 9   contract for March Madness for TNT, TBS, TruTV?

10        A    Yes.  In partnership with CBS.

11        Q    Right.

12             Okay.  And under that agreement, again, you would

13   alternate with CBS in terms of the final four and the

14   finals; is that correct?

15        A    Yes.

16        Q    Now, to get that extension, you had to do a

17   memorandum to your board, the Time Warner board, for that

18   approval as you did with the NBA contract; is that right?

19        A    Yes, that's correct.

20        Q    And if we look at PX21 in your binder sir, and

21   just tell me when you're there.

22        A    I'm there.

23        Q    Now, PX21 is a memorandum from you to the Board of

24   Directors, dated January 21, 2016, right?

25        A    Yes.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

543

```
 1        Q    And that would be the Board of Directors of

 2    Time Warner, correct?

 3        A    Yes, correct.

 4        Q    Okay.  And the purpose of this memorandum that we

 5    have here, similar to what you did with the NBA, was to get

 6    the Time Warner board's approval of this renewal for the

 7    NCAA men's tournament, basketball tournament, March Madness;

 8    is that right?

 9        A    Sure.

10        Q    And, again, you had to submit this memorandum

11    because it exceeded the threshold that you could get -- that

12    you could do on your own.  You had to get board approval,

13    right?

14        A    Yes, that's correct.

15        Q    And I think the amount here was, again, in the

16    approximates of a billion dollars annually; is that right?

17        A    It would be somewhere close to that.  I'd have to

18    refresh my memory by looking at the memo again.

19             THE COURT:  That's just for your eight years?

20             You're only doing half.  CBS is doing half, right?

21             THE WITNESS:  Correct.

22             THE COURT:  So CBS is doing a billion too?  So the

23    NCAA is getting $2 billion?

24             THE WITNESS:  I'd have to refresh my memory by

25    reading the memo.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

544

```
 1              THE COURT:  Well, the 1 billion is just your piece
 2     of the contract, right?
 3              THE WITNESS:  Well, the billion dollars was
 4     correct for the NBA.  I'm just trying to find the part of
 5     this memo --
 6              THE COURT:  All right.  Take a look.
 7              THE WITNESS:  -- that talks about --
 8     BY MR. WELSH:
 9         Q    Does it sound to you to be approximately correct,
10     that it was a billion dollars, sir?
11         A    I see something here that says $771 million
12     average per year.
13              I do know at Turner that we spend approximately
14     $2 billion annually on sports rights.
15              That's all sports.
16     BY MR. WELSH:
17         Q    If I could direct you to the third paragraph on
18     PX21.  Does it say under the proposed renewal terms the
19     average annual rights fee from 2025 to 2032 would be
20     $1.1 billion?
21         A    Yes.  But it says "paid by Turner and CBS."
22         Q    And this would be a total payment, then, of
23     $8.8 billion?
24         A    I believe that's correct.
25              Yes.
```

1      Q     So Turner was interested and willing and paying a

2    very large sum of money for the rights for March Madness,

3    correct?

4      A     Yes.

5      Q     Because you saw value in that, right?

6      A     Yes.

7      Q     And you saw value here because, as with the NBA,

8    the live-sports viewership was driving value to distributors

9    of Turner programming, correct?

10     A     Yes.

11     Q     So if we look at, again, PX21 and you look at

12   page 1, paragraph 2 -- and I'll direct you to the second

13   sentence.

14          And you say there, "Our view is that

15   Premium Sports will continue to be unmatched in terms of

16   consumer demand and live viewership, driving ongoing value

17   to distributors and advertisers."

18          Correct?

19     A     Yes.

20     Q     And when you say that it's going to drive ongoing

21   value to distributors, the distributors' value that you're

22   talking about is gaining subscribers in the marketplace,

23   right?

24     A     Presumably, yes.

25     Q     Now, Turner's March Madness basketball

1    programming, that drives affiliate rate increases for Turner

2    were, correct?

3         A    It's certainly helpful.

4         Q    And March Madness has been an important factor in

5    Turner's ability to drive affiliate rate increases for TBS,

6    TNT, and TruTV; isn't that's true?

7         A    It's been an important factor.

8         Q    Well, you told your board, I think, that the NCAA

9    March Madness has been an important factor in Turner's

10   ability to drive affiliate rate increases for those three

11   channels, didn't you?

12        A    Yes.  I just -- I thought I just said it's an

13   important factor.

14        Q    Okay.  And if we look at PX21-003 --

15             MR. WELSH:  Oh, Your Honor, move to admit PX21.

16   I apologize.  I thought I had done that.

17             MR. PETROCELLI:  No objection, Your Honor.

18             THE COURT:  All right.  Does that need to be under

19   seal because of the information in it?

20             MR. PETROCELLI:  Yes.

21             THE COURT:  All right.  Subject to modification,

22   it's admitted.

23             MR. WELSH:  Thank you, Your Honor.

24                                    (Government's Exhibit PX21
                                       received into evidence.)
25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

547

```
 1    BY MR. WELSH:

 2        Q    So if we look at PX21-003, and here, you've got

 3    Turner Entertainment affiliate revenue.

 4             Do you see that graph there?

 5        A    Yes, I do.

 6        Q    And, again, these numbers have been designated as

 7    confidential by Time Warner, so I'm not going to go into the

 8    actual numbers.

 9             But it's reflecting that from 2010 to 2015, that

10    your affiliate revenues increased as to those amounts; is

11    that true?

12        A    Yes.

13        Q    Okay.  And you were projecting now for the

14    board -- as part of getting your approvals for the

15    March Madness renewal, you were projecting out that your

16    affiliate revenues would increase again to 2019 by the

17    amount that's listed there; is that correct?

18        A    Yes.  That was our forecast at the time.

19        Q    Okay.  And the information that's there, both as

20    to your current numbers, so 2010, 2015, as well as your

21    forecast, those were accurate to the best of your

22    understanding; is that correct?

23        A    Yes, that's correct.

24        Q    And we talked about profitability a bit yesterday

25    for March Madness.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

548

1           Now, you told your board that Turner believes that

2    with the incremental affiliate revenue that would be derived

3    from March Madness here, that that would take care of and

4    offset the cost that would be associated with obtaining the

5    content, correct?

6           A     Yes.  We had made assumptions about increases in

7    affiliate fees, and we attributed them to -- somewhat

8    arbitrarily to March Madness.

9           Q     But the affiliate rates and revenues that we've

10   talked about yesterday and today, those have been increasing

11   over the course of time, as have your margins, correct?

12          A     Yes, that's correct.

13          Q     Okay.  And March Madness plays a critical role in

14   Turner's targeted affiliate rate increases; isn't that true?

15          A     Yes, it's an important factor.

16          Q     Well, it's not just an important fact; it has a

17   critical role in what you're doing in your business at

18   Turner, true?

19          A     As do all of our sports, yes.

20          Q     Now, remind me, sir, when does your contract with

21   March Madness expire?

22          A     2032.

23          Q     And when does your NBA contract expire?

24          A     2024.

25          Q     And when does your Major League Baseball contract

1   expire?

2        A     2021.

3        Q     Now, it was suggested, I think, last week in this

4   courtroom that, by defense counsel, that the words "must

5   have," they don't really mean anything; that everyone uses

6   it.  You don't agree with that, do you?

7        A     I do believe -- as it's used in the industry, I do

8   believe we have must-have programming, as do other

9   programmers.

10       Q     Right.

11             But you view the Turner networks as being

12   must-have programming for distributors and for the consumer,

13   don't you?

14       A     "Must have" is a term that is often used in the

15   industry by us and other programmers.  And whether it means

16   must have -- do distributors absolutely need our

17   programming?  I don't think I would agree with that

18   statement.

19             "Must have" is another way of saying, we have

20   popular programming.

21       Q     You have said, both internally at Turner and

22   externally to the financial media, that Turner is must-have

23   content for distributors; isn't that's true?

24       A     I have said that.

25       Q     You told, in an interview on CNBC in January of

```
1    2016, that your sports at Turner cements the must-have value

2    that our networks bring to distributors and consumers.

3         Correct?

4    A    I don't specifically remember that interview, but

5    I've used the term "must have" a number of times.

6    Q    Well, I'm happy to play the interview for you if

7    that would refresh your memory.

8         THE COURT:  You can approach.  You can step down.

9         (Sealed bench conference)

10        THE COURT:  Mr. Welsh, maybe my memory is failing,

11   but we specifically said yesterday we were disposing of this

12   issue.

13        What are you doing resurrecting it without

14   checking with the Court?

15        I ruled on this yesterday.  What are you doing?

16        MR. WELSH:  I understood that we would talk about

17   it again today.

18        I provided --

19        THE COURT:  We're not talking about it again

20   today.

21        MR. WELSH:  That's fine.

22        THE COURT:  It's stricken.  It will be stricken

23   from the record.

24        Don't pull that kind of crap again in this

25   courtroom.  Do you understand me?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

551

```
1                MR. WELSH:  I'm sorry, Your Honor.  I didn't --

2                THE COURT:  Yeah.  We talked about it.  We put it

3    to bed.  And now you're coming back to it.  Don't do that

4    again or you'll be publicly admonished.

5                MR. WELSH:  I understand, Your Honor.

6                THE COURT:  Step back.

7                MR. WELSH:  Thank you.

8           (Open court)

9                THE COURT:  The last line of questioning will be

10   stricken.

11               Move forward.

12               MR. WELSH:  Thank you, Your Honor.

13   BY MR. WELSH:

14       Q    Let's look at PX21-005, if you would.

15       A    I'm there.

16       Q    All right.  If you look at the second paragraph.

17            Are you ready, sir?

18       A    I am ready, yes.

19       Q    In that second paragraph, you told your board at

20   Time Warner that by renewing the NCAA March Madness

21   agreement, Turner was ensuring it will have access to the

22   must-have video programming for an extended period at

23   attractive annual price increases.

24            Do you see that?

25       A    I do see that.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

552

```
 1        Q    So that's what you told your board again to get

 2   your approval of this contract, right?

 3        A    Yes.

 4        Q    And let's go back to PX20 if we can briefly.

 5        A    I'm there.

 6        Q    Now, if you look at PX20-005.

 7        A    I see that.

 8        Q    And we have the strategic rationale listed there,

 9   correct?

10        A    Yes, that's correct.

11        Q    Okay.  And there, you say -- in the paragraph

12   above that, you say by renewing the rights to televised NBA

13   games on TNT, Turner is ensuring that the network will

14   continue to have high value, "must have" programming for

15   many years to come, right?

16             MR. PETROCELLI:  "Must have" is in quotes in both

17   documents.

18             THE WITNESS:  Yes, I see that.

19   BY MR. WELSH:

20        Q    That's, again, what you told your board to get the

21   approvals for the NBA contract, correct?

22        A    Correct.

23        Q    You can put that to the side for now.

24             Thank you, sir.

25             Now, we talked a little bit about the work that
```

1    Turner does to track viewership and that sort of thing with

2    its networks in response to His Honor's question to you.

3            Turner tracks its networks and how consumers

4    perceive them out in the marketplace, correct?

5        A    We track them daily in terms of using

6    Nielsen-rated data.  And from time to time, we'll do brand

7    studies.

8        Q    I'm sorry.  I missed that.

9        A    We'll do brand perception studies.

10       Q    Okay.  Well, Turner does do Nielsen ratings

11   studies.  It also looks at something called a quadrant

12   analysis; is that right?

13       A    I'm unfamiliar with what it's called, but

14   I think -- I think I may know what you're referring to, but

15   I don't know what it's called.

16       Q    Well, let's look at PX150 in your binder.  Again,

17   tell me when you're there, sir.

18       A    I'm there.

19       Q    Now, PX150 is, it's an email from Tom Cattapan;

20   is that right?

21       A    Yes.

22       Q    October 17, 2017, to you and a number of other

23   people at Time Warner, including Mr. Zucker.  And he's the

24   President of CNN; is that right?

25       A    Yes, that's right.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

554

1      Q    And then also Mr. Levy, he's the President of TBS;

2  is that right?

3      A    He's the President of all of Turner, yes.

4      Q    Thank you.

5           And Mr. Cattapan was head of Turner Research; is

6  that right?

7      A    He didn't head up -- he was a VP in the research

8  group.  He was not the research head.

9      Q    And the email that Mr. Cattapan sent to you had a

10  document attached to it, what's called a quadrant analysis.

11          Do you see that?

12      A    I do.

13          MR. WELSH:  Your Honor, I move for admission of

14  PX150 into the record.

15          MR. PETROCELLI:  No objection.

16          THE COURT:  It will be admitted.

17          MR. WELSH:  Thank you.

18                              (Government's Exhibit PX150
                                received into evidence.)
19  BY MR. WELSH:

20      Q    Now, Turner Research, the email indicates that

21  Turner, that this was the second year that Turner Research

22  had provided this sort of an analysis.

23          Do you see that?

24      A    I do.

25      Q    Okay.  And you were aware of this analysis, having

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    looked at an earlier, the earlier year's version of that,

2    correct?

3        A    I don't remember seeing two versions, but I

4    remember seeing one version.

5        Q    Well, on this version, again, looking at this

6    quadrant analysis, what's going on here is that

7    Turner Research is trying to place the different networks

8    into these quadrants based upon the viewership, the time

9    spent viewing, as well as by the reach of the networks; is

10   that right?

11       A    Yes, that's right.

12       Q    Okay.  And so by "reach of the networks," we're

13   talking about essentially how many people are viewing those

14   networks; is that true?

15       A    Yes; the unique number of individuals that will

16   view the network.

17       Q    And then the spent time viewing is the actual time

18   spent by the individual watching the network, correct?

19       A    Yes.

20       Q    Okay.  And so then you have your quadrants broken

21   out with your high-reach, your high-time viewing in your

22   upper-right quadrant.  And then it breaks down whether it's

23   lower time, lower reach and et cetera, correct --

24       A    Yes, that's right.

25       Q    -- all four combinations?  Okay.

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

556

1          And if we look at 150-002, we see the layout of

2   what Turner's research department had done at that time for

3   the quadrant analysis; is that right?

4          A    Yes, that's right.

5          Q    And it's looking at the Q316 to Q217 time frame;

6   is that right?

7          A    Yes.

8          Q    Okay.  And over that time frame, what the research

9   department of Turner had found is that TNT, TBS,

10  Cartoon Network, Adult Swim, Headline News, and CNN, all of

11  those were within that high-reach, high-time -- high-viewing

12  quadrant in this -- for these networks; is that right?

13         A    Yes, with different levels of success, but yes.

14         Q    Okay.  And now, Turner's research department also

15  concluded and advised you that the Turner networks, that

16  they stacked up better than most of your competitors as well

17  based on revenue coming out of these quadrants, correct?

18         A    Yes.  Understanding that this is only the cable

19  universe and doesn't include the broadcast networks.

20         Q    But looking at the cable universe here, they

21  advised you of how your network stood up against the

22  competitors when it came to the revenue by quadrant, right?

23         A    Where do you see that, sir?

24         Q    Sure.

25              Let me direct you to PX150-005.  Tell me when

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    you're there.

2        A    Yes.  I'm looking at it now.

3        Q    So what we have here is a chart.  And it says,

4    percent of revenue from each quadrant, Q316 to Q217.

5             Do you see that chart?

6        A    Yes, I do.

7        Q    Okay.  And what's reflected here is that Turner,

8    for the high-viewing, high-reach category, so that

9    upper-right quadrant that we were just talking about, Turner

10   has 93.5 percent in that area, is that correct, for revenue?

11       A    Yes.

12            But can I -- is it okay to clarify?

13       Q    Is that correct, that it's 93.5 percent?

14       A    I don't know if the way you asked the question is

15   correct.

16       Q    What it lists for Turner in this chart -- again,

17   looking at that top-right quadrant -- is that it's

18   93.5 percent for Turner, correct?

19       A    It says that we derive 93.5 percent of our

20   revenues from networks that are in that top-right quadrant.

21       Q    And that's higher than what your competitors have,

22   right, for that high-reach, high-viewing quadrant?

23       A    Correct.

24       Q    Okay.  And that was the point that was being made,

25   as you understood it from this memorandum, right?

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

558

1      A     That we have a concentrated portfolio of networks.

2      Q     Okay.  And your research department actually

3   concluded and advised you that the Turner networks are among

4   those that viewers see as being essential, correct?

5      A     I'm sorry.  Where do you see that, sir?

6      Q     If you look at PX150-006 and look at the last

7   paragraph on that page.

8            Do you see that?

9      A     Yes, I see that.

10     Q     Your Turner research department said Turner

11  networks cost the consumer money, but cable viewers have

12  voted with their eyeballs and their remotes.  Turner

13  networks are among those for whom the cable viewers regard

14  as essential.

15           Correct?

16     A     I do see that, yes.

17     Q     That was the statement made by Turner Research to

18  you, to Mr. Zucker, and Mr. Levy, among others; is that

19  right?

20     A     Yes.

21     Q     And you don't dispute that statement?

22     A     It's a bit of a qualitative statement.

23     Q     You didn't come back and talk to your research

24  department to say that that was wrong?

25     A     I didn't think it was important enough to do that.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1        Q    And, in fact, am I correct, sir, that you've told

 2   the media outside that if you have high-reach,

 3   high-time-spent viewing in this quadrant analysis, if you

 4   have those two and you're in that upper-right category

 5   there, you're valuable?

 6        A    Yes.

 7        Q    Let's talk about your contract negotiations with

 8   distributors, move to that subject if we can.

 9        A    Okay.

10        Q    Now, in your deposition, I think you described

11   negotiations with distributors over these affiliate

12   agreements as being trench warfare.

13             Do you remember that?

14        A    I do remember that.

15        Q    And that's your perception of it, that it's akin

16   to trench warfare?

17        A    I've never been in the military, so I can't

18   specifically say.  But these are difficult negotiations.

19        Q    And as part of those negotiations, you do consider

20   the possibility of not concluding a contract; is that true?

21        A    I think in every negotiation, we consider the

22   possibility of not concluding, although we always try to

23   conclude.

24        Q    And part of that is the possibility that you would

25   end up going dark with the distributor; is that right?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

560

1      A    Yes.

2      Q    Now, Dish is one of Turner's distributors,

3  correct?

4      A    Yes, that's correct.

5      Q    And Turner, back in 2014, Turner had a contract

6  with Dish that was set to expire; is that right?

7      A    That's correct.

8      Q    And Turner and Dish, you ended up going dark, I

9  think it was in October of 2014; is that right?

10      A    Yes.  They pulled us dark, I believe, on

11  October 21st.

12      Q    Right.  And that was for about a three-week

13  period; is that right?

14      A    I believe it was 31 days.

15      Q    And that did not include that when the network

16  went down -- that was CNN -- it didn't include TBS and TNT,

17  correct?

18      A    That is correct.

19      Q    Now, the contract, then, ended up getting extended

20  to March 31 of 2015, true?

21      A    True.

22      Q    And that happened to coincide with March Madness;

23  is that right?

24      A    Yes.

25      Q    And the fact that the contract negotiations that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

561

```
 1    were leading up to this termination date that coincided with

 2    March Madness and the finals, that wasn't an irrelevant

 3    point to Turner in its negotiations, was it?

 4        A    This was -- we knew -- well, yes.  It was not

 5    irrelevant.

 6        Q    You had, during the -- you were involved in those

 7    negotiations with Dish, correct?

 8        A    Yes, I was.

 9        Q    And you were involved personally in communications

10    with Dish, as well as with your colleagues at Turner and

11    Time Warner about those negotiations; is that right?

12        A    Yes.

13        Q    Okay.  If you could turn to PX131 in your binder.

14             And tell me when you're there, sir.

15        A    I am there.

16        Q    Okay.  Great.

17             Now, PX131, that's an email from you, March 16,

18    2015; is that right?

19        A    Yes, that's correct.

20        Q    And you sent the email to Mr. Bewkes, Jeff Bewkes.

21    You testified yesterday he's the chairman and CEO of

22    Time Warner, correct?

23        A    Yes, that's correct.

24        Q    He's your boss, right?

25        A    Yes.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

562

1      Q    And then to Mr. Plepler, Richard Plepler, now he's

2  the CEO of HBO; is that right?

3      A    That's correct.

4      Q    Okay.  And this email that you sent, this related

5  to the Dish negotiations and discussions that were going on

6  at that time frame; is that right?

7      A    That's right.

8      Q    And all of this related to the negotiations that

9  were occurring at that time between Turner and Dish;

10  is that right?

11      A    That's right.

12           MR. WELSH:  Your Honor, I move for admission of

13  PX131.

14           MR. PETROCELLI:  No objection.

15           THE COURT:  It will be admitted.

16           MR. WELSH:  Thank you, Your Honor.

17                                    (Government's Exhibit PX131
                                        received into evidence.)
18  BY MR. WELSH:

19      Q    Now, Mr. Martin, you made it known to Dish at this

20  time that you were prepared to go dark if you didn't strike

21  a deal with them; isn't that true?

22      A    I'm trying to read -- I haven't read the whole

23  entire email.

24           THE COURT:  Take a minute and look at it.

25  BY MR. WELSH:

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

563

```
 1        Q    Please.

 2        A    Thank you.

 3             Okay.  I'm finished reading.

 4        Q    You're ready?

 5        A    Yes.

 6        Q    Okay.

 7             If you look at the, it says a few other points,

 8   and then there's a second bullet point.

 9             Do you see that?

10        A    Yes.

11        Q    So what you communicated to Mr. Bewkes was that

12   you warned Mr. Ergen that if we don't see meaningful

13   movement on the document in the next 48 hours, then we're

14   going to start communicating directly to the Dish customers

15   (using March Madness), that there's a danger that they might

16   miss the Final Four championship game that begins Thursday

17   of this week.

18             Do you see that statement?

19        A    I do see that statement.

20        Q    Okay.  And am I correct that the "him" that you

21   referred to in that paragraph, that that's Mr. Ergen,

22   Charlie Ergen, of Dish?

23        A    Yes.

24        Q    And the meaningful movement on the document,

25   you're referring to the distribution contract;
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

564

1    is that right?

2         A     Yes, that's correct.

3         Q     And what you're communicating to Mr. Ergen that

4    you relayed to Mr. Bewkes was that you were -- that you had

5    used the March Madness point about going dark as part of

6    your leverage in that negotiation with Dish; isn't that

7    true?

8         A     Well, we were going to use March Madness as a

9    vehicle to warn customers that they may not be able to see

10   the Final Four.  Those would be viewers that are

11   particularly interested in the tournament.

12        Q     But you saw that as a point of leverage that you

13   might be able to gain over Dish in those negotiations; isn't

14   that true?

15        A     I saw it as a way to try to reach conclusion,

16   because I thought that the distributor would want to carry

17   March Madness.

18        Q     Right.  Because if they didn't carry

19   March Madness, they would lose their subscribers, and that's

20   how you saw it?

21        A     I don't necessarily know if they would have lost

22   subscribers or not.

23              I mean, this was a very contentious negotiation

24   where he had already dropped most of our networks once, and

25   I was concerned that he would do it again.

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1    Q    Well, during this time frame that we're talking

2  about here with these negotiations with Dish, you and your

3  colleagues at Turner were talking internally about how many

4  Dish subscribers would be impacted if Turner went dark,

5  correct?

6    A    Correct.

7    Q    So if you look at PX130.

8         Tell me when you're there.

9    A    I am there.

10    Q    Great.

11         Now, PX130, there's an email from you to Mr. Levy.

12  There's also an email before that, and that's on March 30th,

13  2015.

14         And then there's an email from Mr. Levy to you,

15  again, at 6:31.

16         Do you see that?

17    A    Yes.

18    Q    And some information is being provided to you by

19  this email, correct?  That's down below.  It's being

20  forwarded on to you?

21    A    Yes, that's correct.

22    Q    And what we see here in this series of emails on

23  March 30th, this had to do with your, again, your contract

24  negotiations with Dish; is that right?

25    A    Yes, that's correct.

1       Q     All right.  And we've talked about Mr. Levy, and

2    we also have Mr. Shimmel.

3             Do you see him there?

4       A     Yes.

5       Q     He was an employee Turner at the time, correct?

6       A     Yes.

7       Q     Was he head of Turner Research?

8       A     Yes.

9       Q     And, again, all the email chain that we're talking

10   about here, this related to the Turner direct -- excuse me,

11   Turner-Dish negotiations, right?

12      A     That's correct.

13            MR. WELSH:  Your Honor, I would move for admission

14   of PX130 into the record.

15            MR. PETROCELLI:  No objection.

16            THE COURT:  It will be admitted.

17                                  (Government's Exhibit PX130
                                    received into evidence.)
18            THE COURT:  Would this be a good time to take the

19   morning recess?

20            MR. WELSH:  Yes, Your Honor.  That would be fine.

21            THE COURT:  Mr. Martin, we're going to take a

22   15-minute recess.  You remain a witness under oath in the

23   case.  Refrain from discussing your testimony with anyone,

24   including your own counsel.  See you back in 15 minutes.

25            THE WITNESS:  Yes, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  You can step down.

 2              THE WITNESS:  Thank you, Your Honor.

 3              THE COURT:  Let me see counsel.

 4         (Sealed bench conference)

 5              THE COURT:  Now, my recollection of your estimate

 6   at the end of the day yesterday was you had about an hour

 7   more with this guy; you've spent an hour and a quarter.

 8   I kind of feel like you're beating a dead horse, going over

 9   the same points four, five, six, eight times.  I don't need

10   to hear it four, five, six, eight times, you made your

11   point.

12              MR. WELSH:  I understand, Your Honor.

13              THE COURT:  How much more do you have?

14              MR. WELSH:  Probably about a half hour.

15              THE COURT:  Are you sure?  You need to re-evaluate

16   that.

17              MR. WELSH:  I'll look at it, Your Honor, but I am

18   trying to move through different subject matter.

19              THE COURT:  If you start repeating stuff again,

20   I'm going to publicly tell you --

21              MR. WELSH:  Okay.

22              THE COURT:  -- "I've heard this.  Move on."

23              MR. WELSH:  I understand, Your Honor.

24              THE COURT:  I don't want to do that, but I will do

25   it.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

568

```
 1              MR. WELSH:  All right.  I will try not to repeat

 2   myself.

 3              THE COURT:  Seriously look at your notes before

 4   you proceed again.

 5              MR. WELSH:  I will, Your Honor.

 6              THE COURT:  Who do you have for cross?  Well, it's

 7   not really cross.  You know what I mean.

 8              MR. PETROCELLI:  It's really my direct exam.  He's

 9   kind of our first witness.

10              THE COURT:  I understand.

11              MR. PETROCELLI:  And I'm going to lay out some

12   information for you about the nature of his business, and

13   I'm thinking I can do it within an hour and a half.

14              THE COURT:  Okay.  That's fine.

15              MR. PETROCELLI:  But I want to give you a heads-up

16   so you'll know it might not be directly responsive to some

17   of the things he's doing here.

18              THE COURT:  Yeah, because this guy has already

19   been on -- I think he's on an hour yesterday.

20              MR. PETROCELLI:  Yeah.

21              THE COURT:  So an hour, an hour --

22              MR. WELSH:  I thought it was about 45 minutes, but

23   I could be wrong.

24              THE COURT:  We can go back and look at my

25   transcript.
```

*** REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER ***

569

```
1              He's been on at least a couple hours, basically.
2    Say it's 45 minutes.  You're going on two hours.
3              MR. WELSH:  I understand, Your Honor.
4              THE COURT:  And, you know, I get the point about
5    March madness, for God's sake.
6              MR. WELSH:  Right.
7              THE COURT:  We've gone over it 40 times.
8              So, look, six to eight weeks is my estimate.
9              MR. WELSH:  Yeah.
10             THE COURT:  At this pace, it will be eight to ten.
11             So I'm not telling you how to try your case,
12   fellows.  But, listen, one witness a day ain't getting this
13   job done, because no one is saying things like, well, we're
14   going to go from 15, 20 witnesses each to like two or three.
15             You know, no one is cutting back that much.  Nor
16   am I telling you you have to.  I'm just saying we will be
17   here a long time at this pace.
18             MR. PETROCELLI:  I will tell you, Your Honor --
19   and I told the government -- I do plan on cutting back
20   significantly, Your Honor, because we cannot be here that
21   long.
22             THE COURT:  Okay.  That's point 1.
23             And point 2 is, and it should be obvious to all of
24   you, but it may not be obvious, if this trial ends in the
25   beginning of May, there's no way I'm getting an opinion out
```

1  by June 21st, I'm telling you right now.

2          MR. PETROCELLI:  We've got to get that.

3          THE COURT:  Because we're talking here, if you do

4  proposed findings of fact, you're going to need at least two

5  weeks to do that probably.  Do closing arguments.  You're

6  talking about conservatively 150-, 200-page opinion.

7          Do the math, fellows.  I mean, we're willing to

8  work seven days a week in my chambers, and we will.  But we

9  can't turn something like that out in like three weeks.  We

10  just can't.

11          MR. PETROCELLI:  Your Honor, given circumstances,

12  we might need to ask Your Honor to impose time limits on

13  both sides because we need to get this done by the end of,

14  no later than the end of April.  We really have a hard stop.

15  We have to give Your Honor that time.

16          THE COURT:  Yeah.  And I'm not even talking now --

17  I'm not factoring in the eight-week criminal trial I have

18  starting the first week of June, which I'm going to have to

19  push back.

20          This is a person who has a criminal trial against

21  her.  So I want to bring this ship into port by June,

22  whatever it is, 21st, 20th, 21st.  But it's not realistic at

23  this pace to think that can be done.  It's just not

24  legitimate.  So both sides have to think that through.  Talk

25  among yourselves.  Focus on need as opposed to want.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

571

```
1              I understand this is not easy to do.  I'm not in

2    your shoes.  But I'm telling you, at this pace, June 21 is

3    not happening.

4              MR. PETROCELLI:  Judge --

5              THE COURT:  It's not happening.

6              MR. WELSH:  Okay.  We'll go back and we'll talk,

7    and we'll talk with counsel as well and see what we can do,

8    Your Honor.

9              MR. PETROCELLI:  I don't need to hear from ten

10   competitors to say we have incentive here.

11             THE COURT:  You don't need to billow it, fellows.

12   You don't need to billow it.  You make your points and move

13   on.  There's no jury here.  It's just me.  Okay?

14             MR. WELSH:  Your Honor, if I may, I want to

15   apologize.  I did not understand Your Honor that way

16   yesterday.  I do apologize to the Court profusely.

17             THE COURT:  Apology accepted.

18             MR. WELSH:  Okay.  I understand, Your Honor.

19             THE COURT:  Look, if we resolve an issue, we put

20   it to bed, that's the end of the issue.  We don't go back

21   and resurrect it without talking to the Court in advance and

22   having a reason to resurrect it.  We can't do that.  We

23   don't have the luxury.  We don't have the luxury.

24             MR. WELSH:  Thank you, Your Honor.  Appreciate it.

25             (Open court)
```

```
1              DEPUTY CLERK:  All rise.

2              This Honorable Court will now take a brief recess.

3              (Recess from 11:51 a.m. to 12:08 p.m.)

4              DEPUTY CLERK:  The United States District Court

5      for the District of Columbia is again in session, the

6      Honorable Richard J. Leon presiding.  God save the United

7      States and this Honorable Court.  Please be seated and come

8      to order.

9              Your Honor re-calling Civil Action No. 17-2511,

10     United States of America v. AT&T, Inc., et al.

11             THE COURT:  You may proceed when you're ready.

12             MR. WELSH:  Thank you, Your Honor.

13     BY MR. WELSH:

14        Q    Mr. Martin, before the break, we were talking

15     about the Dish negotiations.  I just want to spend a few

16     more minutes on that, and then we'll move on to another

17     topic.

18             And we were looking at PX130, which I think we

19     just moved into the record.

20             Do you remember that exhibit?

21        A    Yes, I do.

22        Q    So let's just talk briefly about that one.

23             Now, Mr. Shimmel is reporting to you that their

24     research has determined that 24 percent of the Dish homes

25     will be watching either Final Four game on Saturday.
```

573

```
 1              Do you see that reference?
 2         A    I don't see.  Can you be more specific where you
 3    see that.
 4         Q    Yeah.  Do you see Mr. Shimmel's email on
 5    March 30th, 2015, to Mr. Levy, which was then forwarded on
 6    to you?
 7         A    Yes.  I see it now.  Yes.
 8         Q    And he says, "Jay's team is estimating that
 9    24 percent of the Dish homes will watch either the
10    Final Four games on Saturday."
11              Right?
12         A    Yes.
13         Q    And that was again coinciding with where you were
14    on the negotiations.
15              And the Turner folks, under Mr. Shimmel, they were
16    actually able to look at the geographic location of the
17    subscribers to be able to determine what these, how many of
18    the subscribers would be potentially impacted if the network
19    were to go dark, correct?
20         A    Yes, correct.
21         Q    And if we could turn to PX120 in your binder.
22    Just tell me when you're there, sir.
23         A    I'm there.
24         Q    All right.  And this is another email exchange
25    between yourself and Mr. Levy as it relates to the Dish
```

1  negotiations; is that correct?

2      A    Yes, that's correct.

3      Q    All right.  And this was in March of 2015, right?

4      A    Yes, that's correct.

5           MR. WELSH:  Your Honor, I move for admission of

6  PX120.

7           MR. PETROCELLI:  No objection.

8           THE COURT:  It will be admitted.

9                           (Government's Exhibit PX120
                             received into evidence.)
10  BY MR. WELSH:

11     Q    All right.  Mr. Martin, on this email exchange,

12  you indicate to Mr. Coleman Breland, who -- he was your lead

13  negotiator for Turner on Dish; is that right?

14     A    Yes, that's right.

15     Q    And you were commenting to him that there was an

16  issue that was in negotiations with Dish that you felt was a

17  go-dark issue, correct?

18     A    Yes.  I referred to something that we would --

19  yes, that's correct.

20     Q    Okay.  So the provision that you were discussing

21  was so important to you, you're willing to take the network

22  down?

23     A    Possibly, yes.

24     Q    Okay.  And then Mr. Levy responds back to you.

25  And he says, "Agreed," with respect to that go-dark issue,

1    right?

2         A    Yes.

3         Q    And then he says, "The Sweet 16 starts Thursday,

4    smile.  I'm sure Charlie knows if the subscribers are

5    watching it."

6              That was his comment to you?

7         A    Yes, it was.

8         Q    And Sweet 16 would be the basketball tournament,

9    correct?

10        A    Correct.

11        Q    Okay.  Now, let's change subjects here if we can.

12   And I want to talk about -- and this, again, relates to

13   Dish.  But you felt that the Turner networks, that they

14   provided great value to Dish, both as to Dish, the satellite

15   company, but also Dish as to the Sling property that they

16   were coming out with; isn't that's true?

17        A    Yes, that's true.

18        Q    All right.  And I understand that the Sling

19   negotiations were also involved with this, this time period;

20   is that right?

21        A    Yeah.  They were happening at the same time.

22        Q    Okay.  And you actually, as part of this, when you

23   were talking with your boss, Mr. Bewkes, you made a comment

24   to him that Sling, Dish's Sling over-the-top product, that

25   that was not worth much without Turner?

1      A    Yes, that's correct.

2      Q    If you look at PX4, if you would.

3           Are you there, sir?

4      A    Yes.

5      Q    Is this an email from you to Mr. Bewkes,

6   January 6th, 2015?

7      A    Yes, it is.

8      Q    All right.  And is the email that you sent to

9   Mr. Bewkes related to the Dish Turner negotiations?

10     A    Yes.

11     Q    And --

12          MR. WELSH:  Your Honor, I move for admission of

13   PX0004.

14          MR. PETROCELLI:  No objection.

15          THE COURT:  It will be admitted.

16                                (Government's Exhibit PX0004
                                   received into evidence.)

17   BY MR. WELSH:

18     Q    Okay.  Mr. Martin, in that email to your boss, and

19   I won't say the profanity, but he used profanity when he

20   talked about Dish's OTT as being crap without Turner, right?

21     A    Yes.

22     Q    And the OTT is Sling, correct?

23     A    Yes.

24     Q    Okay.  You felt that the value of your networks

25   were so great that Dish Sling would need Turner, right?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    A    I thought the number of offerings of networks that

2    they had were so skinny that they would have benefited

3    clearly by having our networks, which I try to get all of

4    our networks on, didn't succeed.

5         Q    But what you told your boss is listed here, right?

6         A    Correct.

7              I was also trying to rally by boss, who was

8    negotiating with Charlie, who's among the smartest and

9    toughest negotiators in the industry, to not give in on some

10   important points.

11        Q    I didn't ask you about that point.  But what I

12   asked you about was, what you put here is what you sent to

13   your boss, right?

14        A    Yes, that's correct.

15        Q    Now, you also talked to your boss about, well,

16   maybe there's a plan B which you call a nuclear option,

17   right?

18        A    Yes.

19        Q    And that was to go exclusive with DirecTV,

20   something that your folks were discussing?

21        A    Yes.

22        Q    And the idea was to go with DirecTV, because then,

23   exclusively with DirecTV, then subscribers would end up

24   leaving Dish, right, for DirecTV?

25        A    Yes.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

578

```
 1         Q    Okay.  Let's change subjects here a little bit and

 2    talk about the virtual MVPDs.

 3              Now, Turner has been pursuing getting contracts

 4    with virtual MVPDs; is that right?

 5         A    Yes, that's right.

 6         Q    And, as with the MVPDs, you see that Turner

 7    networks, that they drive ongoing value to even those

 8    virtual MVPDs as the television landscape continues to

 9    evolve, correct?

10         A    I hope so.

11         Q    Well, that's your belief?

12         A    That's my belief.

13         Q    All right.  And that's what the Time Warner people

14    say in their internal documents, right?

15         A    Yes.

16         Q    Now, if we could look at -- well, actually, so you

17    believe that, and Turner believes that the virtual MVPDs are

18    going to get this value and the evolving ecosystem.

19              But you also see the emergence of these virtual

20    MVPDs as being a threat to traditional distributors, the

21    traditional pay-TV companies, don't you?

22         A    I see them as being additional competition.

23         Q    You saw that back in 2015, you saw the virtual

24    MVPDs, though, that the traditional pay-TV companies would

25    perceive it as a threat, these virtuals, right?
```

 1      A    That's what we considered how they would perceive

 2  it, yes.

 3      Q    So if we look at PX205.  You can just tell me when

 4  you're there, sir.

 5      A    Sorry.  I seem to be having binder issues here.

 6  Hold on.

 7           Sorry.  I'm there.

 8      Q    And this is a series of emails between you and

 9  others at Turner, correct?

10      A    Yes.

11      Q    And this is in March of 2015; is that right?

12      A    Yes.

13      Q    And this has to do with Sony OTT.  That would be

14  Sony's over-the-top product; is that right?

15      A    Yes, that's correct.

16      Q    Sony Vue; is that right?

17      A    Yes.

18           MR. WELSH:  Your Honor, I move for admission of

19  PX205.

20           MR. PETROCELLI:  No objection.

21           THE COURT:  All right.  It will be admitted.

22                              (Government's Exhibit PX205
                                received into evidence.)
23  BY MR. WELSH:

24      Q    Now, if we look, Mr. Martin, at the bottom email,

25  on 001, it's from you to Mr. Bewkes and others at Turner,

```
1    March 1, 2015.

2            Do you see that?

3       A    Yes.

4       Q    And it carries over to the next page.  We didn't

5    get much on this one.

6            And what you told Mr. Bewkes in part in your email

7    is that the, in the third paragraph on 002, that the

8    traditional MVPDs will see this being Sony OTT and their

9    virtual MPVD as being a threat, correct?

10      A    Yes.

11      Q    And in the time period that followed, sir, you had

12   discussions with some of the traditional providers about

13   going over the top with Turner; isn't that true?

14      A    I don't believe we had any substantive discussions

15   about Turner going over the top.

16      Q    Well, about -- I'm sorry, about the traditional

17   pay-TV companies going over the top.  I misspoke.

18      A    There have been on-and-off discussions about that

19   possibility for some time.

20      Q    If you look at PX203 in your binder.

21      A    I may need to bring a magnifying glass in order

22   to -- stronger --

23      Q    I apologize.  That's how the documents were

24   presented to us.

25      A    I understand.
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 625 of 3826

581

1      Q    Are you there, sir?

2      A    I am there.

3      Q    Okay.  Great.  Now, this is your email on

4  September 7, 2016; is that right?

5      A    Yes.

6      Q    Again, to Mr. Breland and also was sent -- well,

7  to Mr. Breland; is that correct?

8      A    To -- am I -- 203, it's from John Martin to

9  Pascal Desroches.

10     Q    All right.  So this one went to Mr. Desroches.

11          And this is September 7, 2016, correct?

12     A    Yes.

13     Q    And you're describing a meeting that you had had

14  with Mr. Tom Rutledge; is that right?

15     A    Right.

16     Q    Mr. Rutledge was the CEO of Charter?

17     A    Yes.

18     Q    And this was part of your responsibilities, again,

19  at Turner, to have discussions with some of your

20  distributors, such as Charter; is that right?

21     A    Yes, that's correct.

22          MR. WELSH:  Your Honor, move for admission of

23  PX203.

24          MR. PETROCELLI:  Your Honor, no objection;

25  however, to the extent this is reporting statements of

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 626 of 3826

582

1    Mr. Rutledge on that, I would object to hearsay and would

2    offer it for the truth.

3              THE COURT:  Well, I'll admit it at the moment, but

4    not for the truth of the matters asserted as to

5    Mr. Rutledge's statements.

6              MR. WELSH:  Thank you, Your Honor.

7
                                   (Government's Exhibit PX203
8                                   received into evidence.)

9    BY MR. WELSH:

10        Q    Now, Mr. Martin, you're describing your

11   conversation with Mr. Rutledge of Charter here, and you

12   indicate in your email that you were urging him to be more

13   innovative; is that right?

14        A    Yes.  I recall that as being part of the

15   conversation.

16        Q    And part of the discussion was whether they would

17   go over the top, right?

18        A    Yes.

19        Q    And you were encouraging them to do so.  In the

20   process, though, you were telling them, you might have to

21   make a choice; is that right?

22        A    Yes.

23        Q    So the choice was whether you would continue to

24   support their traditional pay-TV providers or whether you

25   would shift to the virtual?

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 627 of 3826

583

1     A    Or support both.

2     Q    You were at a bit of a crossroads at the time,

3  right?

4     A    Yes.  There was some general discussion about how

5  we would need to support the new entrance.

6     Q    You have entered into contracts with the virtual

7  MVPDs, right?

8     A    Many of them, yes.

9     Q    So Sony Vue, you have a contract with them?

10    A    Yes.

11    Q    You have a contract with Dish Sling?

12    A    Yes.

13    Q    You have a contract with Hulu?

14    A    Yes.

15    Q    You have a contract with DirecTV Now, right?

16    A    Correct.

17    Q    Okay.  And then just recently, you entered into a

18  contract with YouTube TV, correct?

19    A    Yes.

20    Q    The virtual MVPDs that we talk about now, as with

21  the traditional pay-TV distributors, it's your understanding

22  that they would want to carry content that the subscribers,

23  the consumer would want to see, correct?

24    A    Yes.

25    Q    All right.  And the virtual MVPDs, they offer

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

584

```
1    packages that are a smaller number of channels, smaller

2    number of networks, than the traditional pay-TV packages

3    that we would see when I sit down and put on my remote with

4    Charter or with Cox or with AT&T?

5         A    That's true for most but not all.

6         Q    Okay.  And what they're doing, though, with the

7    ones that do this is that they're offering these skinny

8    bundles that we hear about, right, and the Court's heard

9    about?

10        A    Yes, that's correct.

11        Q    And the skinny bundles are designed to bring these

12   networks to the consumer at a lower price point, right?

13        A    Yes.

14        Q    Okay.  And that would include the ones that we

15   talked about here that you ventured into contracts with,

16   correct?

17        A    Right.

18        Q    Okay.  And I think you've made the point before

19   that Turner's networks are actually well-positioned for the

20   virtual MVPDs because of the fact that your four -- four of

21   your key networks, TBS, TNT, CNN, and Cartoon Network,

22   account for over 85 percent of your revenues, affiliate

23   revenues, right?

24        A    Right.

25        Q    So that well positions you to get into the virtual
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

585

1    MPVDs who want fewer channels.

2         A    We think so.

3         Q    Okay.  All right.  And the virtual MVPDs, though,

4    they pay -- for Turner, they pay a higher rate, though,

5    compared to the MVPDs because of the fact that they just

6    entered the market with no subscribers, right?

7         A    Yes, initially, yes.

8         Q    And I don't want you to reveal what the amount is,

9    okay?  But if we look at Sony Vue, they're paying a higher

10   rate for the Turner networks than, say, the cable companies

11   are with you, correct?

12        A    Initially, that was true.

13             Subsequently, we've done a new contract with

14   Sony Vue, where their rates are much more comparable with

15   the equivalent small cable system that would have a

16   comparable number of subscribers.

17        Q    Now, Turner has -- let's change subjects.  I want

18   to talk about Turner's work and innovation.

19             Turner has tried to innovate; is that correct?

20        A    Yes.

21        Q    So if we look, I'll direct you to PX78.

22             Tell me when you're there, sir.

23        A    Oh, I'm sorry.  I am there.

24        Q    Okay.  Great.

25             So this an email from Mr. Sal Petruzzi to Mr. Levy

Case 1:17-cv-02511-RJL \***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*** Document 158 Filed 08/06/18 Page 630 of 3826

586

1   and Mr. Breland May 17, 2016.

2           Do you see that?

3       A   Yes.

4       Q   Mr. Petruzzi is who?

5       A   He runs communications for all of David Levy's

6   businesses.

7       Q   Okay.  And Mr. Petruzzi notes in his email that

8   he's -- that you're going to be appearing before CNBC the

9   next day.

10          Do you see that?

11      A   Yes.

12      Q   And attached to this email are some talking points

13  for that interview; is that right?

14      A   Yes.

15          MR. WELSH:  Your Honor, I move for admission of

16  PX78 into the record.

17          MR. PETROCELLI:  There's no objection.  I don't

18  see Mr. Martin on the email, so --

19          THE COURT:  That's what I'm trying to figure out.

20          Is this something he --

21          MR. WELSH:  He's listed in the email itself.  It

22  says, "John Martin will appear on CNBC tomorrow at

23  7:30 a.m."

24          THE COURT:  Yeah, but that's not my question.

25          My question is, did he receive this email?

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158   Filed 08/06/18   Page 631 of 3826

587

1                    MR. WELSH:  I'll ask, Your Honor.

2      BY MR. WELSH:

3          Q    Mr. Martin, the email and the talking points that

4      are attached, did those get to you for your interview with

5      CNBC?

6          A    I don't know.  I don't recall ever receiving this,

7      although it's possible.  I received so much information.

8          Q    You did participate in the interview with CNBC,

9      correct?

10         A    I believe so, yes.

11         Q    Okay.  And you typically receive interview --

12     briefings for those interviews before you attend those?

13         A    Sometimes, yes.  Sometimes, not.

14                    THE COURT:  Subject to connection.  I'll admit it

15     subject to connection.  But unless you can get some kind of

16     foundation for its creation and its distribution, I'm not

17     going to admit it completely.

18                    MR. WELSH:  Thank you, Your Honor.

19                                        (Government's Exhibit PX78
                                          received into evidence.)
20     BY MR. WELSH:

21         Q    Mr. Martin, is it true that Turner, in this time

22     frame of 2016, May 2016, that it was continuing to strive to

23     innovate beyond the traditional television universe and

24     ecosystem?

25         A    Yes.  That's been the strategy for some time.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

588

```
1        Q    Okay.  So whether it's in this document or

2   elsewhere, that's the strategy of Turner Your Honor,

3   correct?

4        A    Yes.

5        Q    Okay.  And in that regard, Turner launched

6   FilmStruck; is that right?

7        A    Yes, that's correct.

8        Q    FilmStruck was the company's first

9   direct-to-consumer product in the United States; is that

10  right?

11       A    For Turner, that's correct.

12       Q    For Turner, right?

13       A    Yes.

14       Q    And it was all -- and you also added after that a

15  product called Boomerang; is that right?

16       A    Yes.

17       Q    All right.  And that's also a direct-to-consumer

18  product for Turner?

19       A    Yes, it is.

20       Q    And you launched 22 over-the-top services;

21  is that correct?

22       A    Where does it say that?

23       Q    Does that number sound right to you, that you've

24  launched 22 over-the-top services?

25       A    No.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1      Q    Turner was set to announce a portfolio-wide

2  initiative to launch apps on set-top devices that would

3  include Apple TV, Amazon Fire, Roku, and Google in May of

4  2016; is that right?

5      A    Those, I would characterize those as absent.

6  They're not over-the-top services.

7      Q    But you were moving forward with apps to get your

8  network content out, correct?

9      A    Yes.  We were striving to get our content to

10  devices so consumers could see the content.  A lot of it is

11  this concept of authenticated, though.  In other words,

12  somebody would have to have an MVPD subscription in order to

13  have access to our content on an app.

14      Q    You've been pursuing at Turner, though, going with

15  the direct-to-consumer over-the-top, whether through these

16  or FilmStruck or Boomerang, correct?

17      A    Yes, that's correct.

18      Q    Okay.  And I think you told me in your deposition

19  that you haven't pursued the over-the-top direct-to-consumer

20  as much because you've had some other priorities that have

21  taken issue?

22      A    We're still moving ahead and pursuing innovation,

23  and some of the product roadmap does include over-the-top

24  services.

25           THE COURT:  I want to see counsel.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              (Sealed bench conference)

 2              THE COURT:  That's 20 minutes.  You got ten more.

 3              MR. WELSH:  All right.  I'm trying to get through,

 4    Your Honor.

 5              THE COURT:  I'm not going to give you another

 6    warning.

 7              MR. WELSH:  Okay.

 8              THE COURT:  Watch your watch.  Ten minutes from

 9    you, I'm pulling the plug on this.

10              MR. WELSH:  Okay.  Thank you, Your Honor.

11              THE COURT:  Let's go.

12              (Open court)

13    BY MR. WELSH:

14         Q    Mr. Martin, on another subject, innovation, Turner

15    has also been innovating in the advertising area; is that

16    right?

17         A    Yes, that's correct.

18         Q    So, for example, you've been doing work in

19    targeted advertising; is that correct?

20         A    Yes.

21         Q    All right.  And I think you reported publicly that

22    you had, in the middle of 2017, that you -- I'm sorry.

23              You reported publicly in 2017 that you had a

24    20 percent lift in your targeted audience delivery campaign;

25    is that right?
```

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

591

1      A    For that particular product, yes.

2      Q    Okay.  And you're continuing to implement

3   innovative advertising products; isn't that's true?

4      A    Yes, that's true.

5      Q    Now, we've heard in this case that the parties

6   claim there to be some efficiencies, synergies that would be

7   achieved here.  I want to talk briefly about this subject.

8           So a large percentage of the synergies the

9   defendants are claiming here in this merger, they're

10   actually already in Time Warner's long-range plan; isn't

11   that's true?

12      A    We had a long-range plan draft where we had very

13   ambitious advertising targets.

14      Q    Okay.

15      A    That assumed that we would be able to develop new

16   ad products to go to market.

17      Q    Well, let's look at PX67 if we can.

18           This is an email from -- you're there, sir?

19      A    Yes, I am.

20      Q    All right.  This is an email from Mr. Desroches to

21   you, November 19, 2017; is that right?

22      A    Yes.

23      Q    And he's attaching the AT&T-Time Warner

24   integration executive update; is that correct?

25      A    Yes.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

592

1      Q    And Mr. Desroches, just for the record, is the

2    Chief Financial Officer of Turner; is that right?

3      A    Yes.

4      Q    And he was working within the areas of his

5    responsibility for Turner when this was sent to you?

6      A    That's correct.

7          MR. WELSH:  Your Honor, I move for admission of

8    PX67.

9          MR. PETROCELLI:  Your Honor, there's no objection

10   to the email, but I would ask for foundation on whether --

11   with respect to the deck.  There's an attachment, and there

12   needs to be foundation laid.

13         THE COURT:  Sustained.

14         Why don't you lay some foundation for that.

15   BY MR. WELSH:

16     Q    Was it your understanding that Mr. Desroches was

17   working with the integration efforts with AT&T?

18     A    Yes.  Pascal, I had appointed him to lead the

19   Turner integration efforts and coordinate with everybody

20   else who was working on the various work streams.

21     Q    Okay.  And the document that's attached to this

22   email that was sent to you relates to those efforts; isn't

23   that's true?

24     A    I assume so, although he and I never went through

25   and reviewed this document.

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 637 of 3826

593

1      Q     Right.

2            But what you see attached is your understanding --

3      even if you didn't review it with him, your understanding is

4      it relates to the integration efforts that Mr. Desroches was

5      tasked to lead for Turner -- Time Warner?

6      A     Yes, although it was a work-in-progress draft,

7      yes.

8            MR. WELSH:  Your Honor, is that sufficient?

9            THE COURT:  That's sufficient.  It's admitted.

10           MR. WELSH:  Thank you, Your Honor.

11                                  (Government's Exhibit PX67
                                     received into evidence.)
12     BY MR. WELSH:

13     Q     If you could look at PX67-006.

14           And I think the numbers here are confidential, so

15     I won't say it publicly.  But we see here it has "Turner

16     Estimates."

17           Do you see that on the left column?

18     A     Yes.

19     Q     And then we have "data driven" under that.

20           Do you see that?

21     A     Yes.

22     Q     All right.  And then there's some numbers in three

23     columns that follow that.

24           Do you see that?

25     A     Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

594

1      Q    For different time frames, right?

2      A    Yeah.

3      Q    And if you look, then, at the key outstanding

4   issues below.  And item 1 says, 80 to 90 percent of that

5   number we just looked at above, of those columns up above on

6   Turner's ad revenues already in our LRP.

7           Do you see that?

8      A    I do see that.

9           THE COURT:  What's LRP?

10          THE WITNESS:  Long-range plan.

11  BY MR. WELSH:

12     Q    And you can put that to the side for now.  Thank

13  you, sir.

14          Mr. Martin, right before the merger was announced,

15  Turner was considering acquiring a number of data technology

16  companies; is that correct?

17     A    Yes, that's correct.

18     Q    And this was for your advertising innovation

19  effort that you were undertaking, correct?

20     A    Yes.

21     Q    And when the merger was announced, you put -- your

22  boss, Mr. Bewkes, put the brakes on that, didn't you?

23     A    Yes.

24          MR. WELSH:  That's all I have for now, Your Honor.

25          Thank you very much.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  All right.

2          Mr. Petrocelli.

3                    CROSS-EXAMINATION

4     BY MR. PETROCELLI:

5     Q    While we're on Exhibit 67, just for the

6     convenience of the Court, since Mr. Welsh just asked you

7     about it, the comment where it said 80 to 90 percent in the

8     long-range plan?

9     A    Yes.

10    Q    Could you explain to the Court what data-driven

11    advertising is?

12    A    This would assume that we would have been able to

13    develop new ad products, assuming that we would have had

14    enough data to be able to create these products and bring

15    them to the advertising marketplace and be able to derive

16    higher CPMs, higher value for such products.  It was an

17    aspirational forecast.

18    Q    And was that aspirational forecast included in,

19    let's say, the first year of the budget?

20    A    No.

21    Q    So when was it included, if it wasn't in the first

22    year?

23    A    Well, I didn't go through the buildup of all of

24    these numbers in any level of detail.  I was assuming that

25    they were in the out-years of the plan.

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1      Q      Now, you can put that aside.

2             So I'd like to clarify what your actual work

3      experience is very quickly, because it didn't come out so

4      clear on direct.

5             But from 1989 to 1983, what did you do?

6      A      Until '93?

7      Q      Yeah.  '89 to '93.

8      A      Yeah.  I was an Auditor with Ernst & Young.

9      Q      And your next job, from 1993 to 2000, what did you

10     do?

11     A      I was in various capacities within Time Warner,

12     including managing SEC financial reporting, Chief of Staff

13     for Dick Parsons, who was the then president of Time Warner,

14     and I ran investor relations for a couple of years.

15     Q      That was at the corporate level?

16     A      Yes, Time Warner corporate.

17     Q      And you then left the company for a couple of

18     years?

19     A      I did, yes.

20     Q      And where did you go?

21     A      I went to go work as a securities analyst on

22     Wall Street.

23     Q      And then you came back?

24     A      I came back in February of 2002.

25     Q      And what did you do from 2002 to 2005?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      A     I ran investor relations for Time Warner.

2      Q     At the parent level?

3      A     Yes.

4      Q     What did you do from 2005 to 2007?

5      A     I was the Chief Financial Officer of

6   Time Warner Cable.

7      Q     And could you tell the Judge what

8   Time Warner Cable was and what its relationship with

9   Time Warner, the parent company, was?

10     A     So Time Warner Cable was a cable company,

11  traditional MVPD, with approximately 11 million subscribers.

12  And during that time, we took the company public; but it was

13  a majority-owned subsidiary of Time Warner which owned

14  85 percent of the company.

15     Q     And then did there come a time when Time Warner,

16  the parent company, spun out Time Warner Cable, the cable

17  company?

18     A     Yes; in 2009.

19     Q     And so prior to spinning out Time Warner Cable in

20  2009, Time Warner Cable was vertically integrated within the

21  Time Warner family that included the Turner networks,

22  correct?

23     A     Yes, that's correct.

24     Q     And it stopped being a vertically integrated

25  company when it was spun out?

598

```
 1        A    Correct.

 2        Q    Okay.  We're going to come back to that in a

 3   minute.

 4             So you were Chief Financial Officer for a couple

 5   of years at Time Warner Cable, you said, ending in about

 6   2007.

 7             What was your next job?

 8        A    The Chief Financial and Chief Administrative

 9   Officer of Time Warner, the parent company.

10        Q    From 2008 to 2013?

11        A    Yes.

12        Q    And then you went to your current job in 2014?

13        A    Yes, that's correct.

14        Q    And that is, as chairman and CEO of Turner, right?

15        A    Yes.

16        Q    Now, I want to talk about your experience, then,

17   as a Chief Financial Officer of Time Warner Cable, an MVPD.

18   Who were some of its competitors?

19        A    Comcast, Charter, Cox, Dish, DirecTV.  Every

20   traditional MVPD that was in the United States.

21        Q    Okay.  And in your role as Chief Financial

22   Officer, did you become, just generally, familiar with the

23   carriage negotiations that we've heard so much about in this

24   case?

25        A    Yes.
```

1      Q    And then when you went up to the corporate parent

2  and became CFO there, Turner was a wholly owned subsidiary;

3  is that right?

4      A    Yes, that correct.

5      Q    And in your role as Chief Financial Officer of now

6  the parent company, were you familiar with the negotiations

7  that Turner had, for example?

8      A    Yes.

9      Q    And as well as Time Warner Cable until it got spun

10  out, right?

11      A    Yes.

12      Q    Okay.  Now, are you generally aware that the

13  government in this case is claiming that if this merger were

14  to go through and Turner and DirecTV would be in a vertical

15  integration relationship -- first of all, do you understand

16  that that would be the case if this merger goes through?

17      A    Yes, I understand.

18      Q    Now, do you understand, then, that if the merger

19  goes through and there's now a vertical integration,

20  it would be just like it was when Time Warner had

21  Time Warner Cable?

22      A    That's what I would expect.

23           MR. WELSH:  Objection.

24           THE COURT:  All right.  You can approach.

25           (Sealed bench conference)

1              THE COURT:  What's your objection?

2              MR. WELSH:  Leading.  Would counsel just not lead

3    so much?

4              MR. PETROCELLI:  I'll try not to.  But,

5    Your Honor, it's background and I'm trying to speed up.  And

6    he's chairman and CEO and not the kind of witness that's

7    going to be led.

8              MR. WELSH:  He's just comparing the two, the two

9    mergers --

10             MR. PETROCELLI:  I'll do my --

11             THE COURT:  Hold on.  Let him finish.

12             Go ahead.

13             MR. WELSH:  He was comparing the two mergers.

14   I think if he could do it in a non-leading way, it would be

15   appropriate.

16             THE COURT:  Go ahead and do it in a non-leading

17   way.  All right.  Go ahead.

18             (Open court)

19             THE COURT:  Come on up.  You may proceed,

20   consistent with the discussion at the bench.

21   BY MR. PETROCELLI:

22        Q    Now, do you understand that the government is

23   contending that if the merger goes through, that the Turner

24   company will have more leverage with distributors in

25   carriage negotiations by threatening a blackout of Turner,

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 645 of 3826

601

1    thereby causing the distributors to pay more because they

2    won't want to lose subs to DirecTV, which will be part of

3    the same company as Turner?

4            MR. WELSH:  Objection, Your Honor.

5            THE COURT:  Overruled.

6    BY MR. PETROCELLI:

7        Q    Do you understand that that is the theory of the

8    government in this case?

9        A    Yes, I understand.

10       Q    So with that theory in mind, I want to ask you

11   some questions about when you were in a vertically

12   integrated company that had Turner and a very significant

13   cable company, okay?

14       A    Okay.

15       Q    At any time, did you ever hear anyone suggest that

16   Turner should use its relationship with Time Warner Cable to

17   threaten to black out distributors in order to get higher

18   prices?

19       A    No.

20       Q    Did that thought ever occur to you in your role as

21   CFO of either Time Warner Cable or the parent company?

22       A    No.

23       Q    Did you ever hear anyone say that Turner would

24   have more leverage because Time Warner Cable and Turner were

25   in the same family?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

602

1        A    No, I did not.

2        Q    Did you ever learn of or participate in any

3    discussions about using Turner to divert subs of

4    distributors to Time Warner Cable?

5        A    No, I have not.

6        Q    Did you ever form the view, as the Chief Financial

7    Officer, that Turner's prices were kept higher, artificially

8    higher, because it was affiliated with Time Warner Cable?

9        A    No, I did not.

10        Q    Did you ever hear that Turner had an incentive to

11    demand higher prices or other concessions from distributors

12    because it was affiliated with Time Warner Cable?

13        A    No, I did not.

14        Q    Or that it had the ability to do so?

15        A    No, I did not.

16        Q    Now, at the time Time Warner spun off

17    Time Warner Cable, you were involved in that?

18        A    Yes, I was.

19        Q    By the way, can you just briefly tell the Judge,

20    why did the company get spun off.

21        A    Your Honor, at the time, a few factors.

22    I don't think at the time we, at Time Warner, fully

23    understood the importance of what data and customer

24    information would mean in the future as it relates to

25    advertising and making decisions.  So that was something we

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   could not see at that time when we spun it off in 2009.

2           The second is that the way the company was being

3   run, it was -- these were really companies that were being

4   run for their own mutual benefit; in other words,

5   Time Warner Cable would make decisions that was in its best

6   interest, and Turner and HBO and Warner Brothers, for that

7   matter, would make decisions in what was in their best

8   interest.

9           And we thought having these companies

10  unencumbered, at the time, we thought would have been the

11  best for both companies.

12      Q   Now, did it also relate to what the stock

13  valuation of the company might be?

14      A   Yes, that was taken into consideration.

15      Q   And what about streaming of video; was that

16  happening back then?

17      A   No.  We couldn't see that that was happening or

18  would have happened.

19      Q   Now, at the time of the spin-off, were there any

20  discussions that Turner's prices to distributors would go

21  down after the disintegration on the theory that they were

22  artificially propped up during the vertical integration?

23      A   No.

24      Q   And afterwards, did you observe that Turner's

25  pricing, I mean after the spin-off, suddenly went down?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1      A     That did not happen.

 2      Q     Now, can you explain to the Court why -- let me

 3  back up a second.

 4            The government is also, are you familiar with the

 5  fact that the government in this case is also alleging that,

 6  in coordination with Comcast, the merged company might try

 7  to withhold Turner networks, together with NBC networks,

 8  from virtual MVPDs?  Are you familiar with that general

 9  allegation?

10      A     Yes, I am.

11      Q     Okay.  Is it in Turner's interest, based on your

12  role as the chairman and your vast experience, to withhold

13  its networks from distributors?

14      A     Absolutely not.

15      Q     Is broad distribution of the Turner networks an

16  imperative for Turner?

17      A     I believe that distribution is the most important

18  variable for success for any programmer.

19      Q     Now, I want you to explain to the Court why that

20  is so.

21      A     Because our business model is principally based on

22  two revenue streams, one being subscription revenues and the

23  second being advertising.

24            Distribution affects both of those.

25            In order to drive subscriber revenues, it's the

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1 simple math of:  How many homes are you in?  How vastly are

2 you distributed in?  And then what are you getting paid by

3 the virtual MVPDs, the MVPDs, or any other platform?

4          So that's simple math.

5          But maximizing distribution maximizes subscriber

6 revenues.

7          On the other side, advertising, our goal is to

8 have our networks in front of as many eyeballs as possible.

9 So that a function of, again, distribution:  Are we getting

10 in front of as many people as possible?

11          And then it's up to us:  Are we making popular

12 programming so that people actually want to tune in and

13 watch it?

14          And then we have to price the advertising high

15 enough that we can make money.

16          But the one variable that actually affects both

17 revenue streams is distribution, and distribution right now

18 is under extreme pressure.

19     Q    Why is distribution under extreme pressure?

20     A    For a number of reasons.

21          One, there are more and more households in the

22 United States who are, quote, unquote, cutting the cord.

23          Is the Court familiar with that term?

24     Q    I believe the Court is familiar with cutting the

25 cord.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

606

1        A    Okay.

2             So they're either cutting the cord or they're

3   moving to skinnier bundles, these more economically priced

4   bundles, which won't have as many networks in them.

5             So Sling is a good example, where our job, my goal

6   would be to sell in -- I would like every distributor to buy

7   every network I have and agree to carry it at 100 percent

8   penetration.

9             The distributors are pushing back increasingly.

10  They want the flexibility to carry at lower penetration

11  levels to fewer homes.

12            And Sling is a good example where we could only

13  get four of our networks in on the initial go-round, and we

14  really had to argue hard in order to get them to accept our

15  four networks.

16            All of this chips away at the breadth of our

17  distribution and -- and means that we're going to be

18  fighting upwind in terms of being able to grow our

19  distribution revenues.

20            And, in fact, our distribution revenue growth is

21  decelerating.

22       Q    Is it your observation that, as the cord

23  cutting -- and I guess there's also the cord nevers.  What

24  are the cord nevers?

25       A    Cord nevers are individuals that would never take

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  either an MVPD or a virtual MVPD package.  They may be happy

2  getting Netflix and getting Hulu and getting Sling, and

3  that's good enough for them.

4      Q    Is it your observation, that with the cord nevers

5  and the cord cutting, that consumers are moving into the

6  Internet distribution world?

7      A    Yes.

8      Q    And is that someplace where you want to go and

9  take Turner as well?

10     A    Yes.

11     Q    Does Turner have an interest to hurt virtual MVPDs

12 or other online distributors?

13     A    No.  It's actually the opposite.  We're embracing

14 virtual MVPDs and any other distributors that might enter

15 the marketplace, because, again, we need to be distributed

16 to as full distribution as possible.

17          In fact, if you look at the universe, virtual

18 MVPDs today are the only source of growth in subscriptions.

19     Q    So what's happening with the MVPDs?

20     A    They are experiencing subscriber shrinkage.

21     Q    Do you receive subscriber -- do you receive

22 affiliation foes from online distributors like Sling and

23 Sony and others just like you do from the MVPD distributors?

24     A    Yes, we do.

25     Q    Is it generally similar kind of rates?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

608

```
1        A     Generally, yes.

2        Q     Are they a little bit higher in the beginning.

3              Counsel asked you about Sony Play Vue at some

4   point.  Do you recall that?

5        A     Yes.  It's --

6        Q     When a new service launches, what is your pricing

7   philosophy, brand-new service, no subs?  That was the case

8   with Sony, correct?

9        A     Correct.

10       Q     Explain to the Court.

11       A     So our -- in some respects, the way to think about

12  it is, this is a bit of a volume-discount business.  So if

13  you're in business with a distributor that has 25 million

14  subscribers and you're partners with them, they would almost

15  expect to pay slightly less than somebody who has zero

16  subscribers.

17             THE COURT:  All right.

18             THE WITNESS:  The difference in pricing actually

19  in absolute dollars doesn't tend to be all that much, but

20  there are volume discounts for the biggest providers.

21  BY MR. PETROCELLI:

22       Q     What about for someone brand new like when

23  Sony Vue knocked on your door and they wanted the Turner

24  networks?

25       A     We charged them for some time a premium.  And then
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

609

```
 1   once they reached the number of subscriber levels, that

 2   premium comes down.

 3        Q    Is there any risk, by the way, in just giving the

 4   Turner networks to a brand-new virtual service that is

 5   unproven?

 6        A    Absolutely.  There's reputational risk.  There are

 7   administrative costs that we have to incur in order to, from

 8   a technology standpoint, make sure that we can make our

 9   networks available in the manner in which they need to

10   distribute them.

11             So there are costs.  That also gets taken into

12   account as we think about the price that we charge.

13        Q    What do you mean by "reputational risk"?

14        A    We would prefer not to have our networks that is

15   in a package that just -- that has no consumer acceptance.

16        Q    Why?

17        A    It just -- it makes it look like our networks are

18   not that important.

19        Q    I see.

20             Now, moving from distribution to advertising, you

21   said that's the other source of your revenue, right?

22        A    Yes.

23        Q    Now, how many minutes in an hour on a TV show,

24   let's say, does Turner get to sell advertising?  And does it

25   split any of those minutes with the distributor?
```

1      A    It's roughly 18 minutes per hour.  And within each

2  hour, in a typical situation, the distributors would receive

3  two of those minutes.  And the national network, such as

4  ours, would get about 16 minutes.

5      Q    And can you briefly describe to the Court what the

6  trend has been in your business with respect to advertising

7  revenue?

8      A    Advertising revenue is under a lot of stress.  For

9  example, last year, our advertising revenues for the entire

10  company did not grow.  They were down 2 percent.

11          The year before, they were either flat or up

12  1 percent.

13          The reason is that our viewership trends are

14  declining due to an explosion of choice of programming that

15  consumers have and the declining subscriber base that's

16  happening in the United States amongst traditional MVPDs.

17          And the fact that there really hasn't been lot of

18  innovation in the advertising business in years and years

19  and years.

20      Q    When your advertising revenue gets stressed, what

21  effect does that have on, let's say, the affiliate fee

22  revenue?

23      A    It puts more stress on the other revenue stream.

24      Q    And is it the affiliate fees that the distributors

25  end up passing on to the consumer?

```
 1        A    Yes.

 2        Q    Is it the case, then, that if you were able to

 3   increase your advertising revenue, that would cause less

 4   pressure on programming costs and, hence, consumer prices?

 5        A    Absolutely.

 6             We need to make advertising better.  In fact, what

 7   I'm calling it internally is we're going to have to do more

 8   with less.  So what does that mean.

 9             We're also competing as an ad-supported network

10   against platforms like Netflix that has no ads.  And people

11   like to watch platforms that have no ads.

12             We have too many ads, in my opinion, on our

13   networks to be able to effectively compete.

14             So we've already made announcements that we're

15   going to reduce the amount of advertising units or numbers

16   of minutes during the program that will be dedicated to

17   advertising.

18             So that means every unit that we have has to

19   become significantly more valuable for us to not experience

20   a meaningful decline in our ad business.

21        Q    So will this merger help Turner derive greater

22   advertising revenue and help relieve pressure on consumer

23   prices?

24        A    Yes, I believe so.

25        Q    Can you explain to the Court how that is so?
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

612

```
 1        A    At Turner, we don't have much -- you hear the word

 2   "data" a lot.  Let's call it "customer information."

 3             We're a wholesaler sort of stuck in the middle.

 4   We don't know who our viewers are.

 5             And as a result of that, we can't market directly

 6   to them.  We can't speak to them.  We don't even know how to

 7   make programming that we know for sure that they will like.

 8             And we certainly don't know what type of

 9   advertisements might resonate with them where they actually

10   might like that.

11             So if we had access to AT&T's customer

12   information, I think it would give us a tremendous

13   jump-start to improving our advertising capabilities to try

14   to make more relevant advertising for the benefit of

15   consumers.

16        Q    Well, let me follow up on that.

17             You said you don't know who your viewers are.

18   I take it from that that that's because you're the

19   wholesaler and the distributors know?

20        A    Yes.

21        Q    Well, why don't you just ask the distributors to

22   tell you?

23        A    We do.

24        Q    And what is the response?

25        A    "No."
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

613

```
 1              THE COURT:  That might be a good point to take the

 2    lunch break.

 3              MR. PETROCELLI:  This is a good time, Your Honor?

 4              THE COURT:  All right.  We're going to take the

 5    luncheon recess.

 6              THE WITNESS:  Okay.  Thank you, Your Honor.

 7              THE COURT:  So you remain a witness under oath.

 8    You know the rules.

 9              THE WITNESS:  Yes.

10              THE COURT:  Don't discuss your testimony with

11    anybody.

12              THE WITNESS:  Yes, Your Honor.

13              THE COURT:  Either what you've said or what you

14    might say, and we'll come back.  All right?

15              THE WITNESS:  Yes, Your Honor.

16              THE COURT:  See you at 2:30.

17              THE WITNESS:  Thank you, Your Honor.

18              THE COURT:  All right.  We're going to go till

19    5:30 today.  We'll reconvene at 2:30.  We'll take a break

20    somewhere in the middle of the afternoon.

21              Enjoy your lunch.

22              DEPUTY CLERK:  All rise.

23              This Honorable Court now stands in recess until

24    the return of court.

25              (Proceedings concluded at 1:00 p.m.)
```

C E R T I F I C A T E

       I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: March 28, 2018_____   /S/__William P. Zaremba_____

                          William P. Zaremba, RMR, CRR

```
                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      :
                               :
              Plaintiff,       :        CV No. 17-2511
        vs.                    :
                               :        Washington, D.C.
                               :     Wednesday, March 28, 2018
AT&T, INC., ET AL.,            :          2:40 p.m.
                               :
                               :           Day 4
              Defendants.      :
----------------------------x



                      AFTERNOON SESSION
                  TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE RICHARD J. LEON
                UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:    Craig W. Conrath, Esquire
                       Eric D. Welsh, Esquire
                       Peter J. Schwingler, Esquire
                       Andrew Finch, Esquire
                       Alvin H. Chu, Esquire
                       Dylan M. Carson, Esquire
                       Curtis W. Strong, Esquire
                       U.S. DEPARTMENT OF JUSTICE
                       Antitrust Division
                       450 Fifth Street, NW
                       Washington, DC  20530
                       (202) 532-4560
                       craig.conrath@usdoj.gov
                       eric.welsh@usdoj.gov
                       peter.schwingler@usdoj.gov
                       andrew.finch@usdoj.gov
                       alvin.chu@usdoj.gov
                       dylan.carson@usdoj.gov
                       curtis.strong@usdoj.gov
```

**\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\***

```
1   Appearances Continued:

2   For Defendant AT&T        Katrina M. Robson, Esquire
    and DirecTV Group         O'Melveny & Myers LLP
3   Holdings, LLC:            1625 Eye Street, NW
                              Washington, DC  20006
4                             (202) 220-5052
                              krobson@omm.com
5
                              Daniel M. Petrocelli, Esquire
6                             M. Randall Oppenheimer, Esquire
                              O'MELVENY & MYERS LLP
7                             1999 Avenue of the Stars
                              8th Floor
8                             Los Angeles, CA  90067
                              (310) 553-6700
9                             dpetrocelli@omm.com
                              roppenheimer@omm.com
10
                              Michael L. Raiff, Esquire
11                            Robert C. Walters, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
12                            2100 Mckinney Avenue
                              Suite 1100
13                            Dallas, TX 75201
                              (214) 698-3350
14                            mraiff@gibsondunn.com
                              rwalters@gibsondunn.com
15

16  For Defendant             Kevin J. Orsini, Esquire
    Time Warner, Inc.:        Peter T. Barbur, Esquire
17                            CRAVATH, SWAINE & MOORE LLP
                              Worldwide Plaza
18                            825 Eighth Avenue
                              New York, NY  10019
19                            (212) 474-1140
                              korsini@cravath.com
20                            pbarbur@cravath.com

21  Court Reporter:           Crystal M. Pilgrim, RPR, FCRR
                              Official Court Reporter
22                            United States District Court
                              District of Columbia
23                            333 Constitution Avenue, NW
                              Washington, DC  20001
24                            (202) 354-3127
                              crystal_pilgrim@dcd.uscourts.gov
25
```

Pages 615-730

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1                          Table of Contents

2                               Direct  Cross  Redirect  Recross

3    On behalf of the Plaintiff:

4        John K. Martin

5           By Mr. Welsh                             661

6           By Mr. Petrocelli              622

7

8        Martin Hinson

9            By Mr. Strong            688            721

10           By Mr. Petrocelli            710

11

12                          E-X-H-I-B-I-T-S

13                                       Marked   Received

14   On behalf of the Plaintiff:

15   Exhibit No. 456                               669

16   Exhibit No. 0523                              710

17

18   On behalf of the Defendants:

19   Exhibit No. 781                               646

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1                    P-R-O-C-E-E-D-I-N-G-S

2              (Sealed Bench conference.)

3              THE COURT:  You both need to know this if you don't

4    know it already.

5          Last night the Court Reporter sent daily copy to the

6    lawyer, I assume your team, in which she accidentally did not

7    delete the bench conference.

8              MR. PETROCELLI:  Wasn't aware of it, Your Honor.

9              THE COURT:  This morning at 10:50 a.m. someone from

10   the government's team recognized that that had happened and

11   notified her that it had happened.

12         So that's eight and a half hours later.  Now there's no

13   excuse for it to have happened at all, no good excuse, but it

14   did.

15         My point is that however your teams gets these things,

16   they need to review them sooner than eight and a half hours

17   later.  And if they see a problem, they should immediately

18   bring it to the attention of the Court.  If you see it, you

19   bring it to Mr. Petrocelli's attention.  If Mr. Petrocelli sees

20   it, he brings it to your attention so that before they are sent

21   out to non-parties the problem is corrected.

22         Now we're lucky here in that the subject matter did not

23   include confidential information, but what if it had?

24             MR. PETROCELLI:  Right.

25             THE COURT:  What if it had?
```

*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\**

```
 1        So your people need to understand on both sides that
 2   although it's maybe not in their job description, that they
 3   have to be diligent.
 4        MR. PETROCELLI:  Will do.
 5        THE COURT:  In the event a mistake of confidential
 6   information accidentally gets not deleted or I should say
 7   redacted, that we need to be able to swing into action.
 8        In the meantime, I am informing my Court Reporter that
 9   transcripts to non-parties do not have to be provided to
10   non-parties, not you two, do not have to be provided until say
11   2 o'clock in the afternoon the following day.  And that will
12   give you each a little added time to review the one you got to
13   make sure there was no error made, bring it to our attention,
14   to the Court Reporter's attention particularly and get it fixed
15   before it's sent out to the, what I'm told is a 25 page list of
16   companies and institutions that are requesting this transcript.
17        MR. PETROCELLI:  Amazing.
18        MR. CONRATH:  I did not know it was that many, Your
19   Honor.
20        MR. PETROCELLI:  We had no idea that this thing went
21   out, so obviously no one saw it.
22        MR. CONRATH:  As soon as we saw it, we identified it
23   to the reporter.
24        THE COURT:  You did and that's good.  I'm glad you
25   did.
```

1          MR. PETROCELLI:  If you catch it next time let us

2    know and I'll let you know.

3          THE COURT:  I would certainly want it to get out

4    sooner rather than later.  I haven't read this, but I'm told it

5    doesn't include any confidential information.

6          MR. CONRATH:  That's my recollection as well.

7          THE COURT:  This appears to be the bench conference

8    we had with Mr. Welsh was about using for impeachment purposes

9    the CD, right?

10          MR. PETROCELLI:  Right.

11          THE COURT:  An excerpt on the CD.

12          MR. PETROCELLI:  Well it's just an evidence issue,

13    it's not a confidential issue.

14          MR. CONRATH:  Right.

15          THE COURT:  Basically at the end of the bench

16    conference I suggested among other things give you a chance to

17    review the materials and then decide how you want to proceed.

18          And then of course in the next bench conference is when

19    you said, Your Honor, we don't need it.  We're just not going

20    to use it which of course was the reason why today's little

21    turn of events was so --

22          MR. CONRATH:  I apologize, Your Honor.

23          THE COURT:  It's not acceptable.

24          MR. CONRATH:  I apologize.  We obviously didn't hear

25    it correctly and will pay close attention in the future.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           I guess at some point when we have, to say free time

2   that's a joke, but if we could take a minute and ask just so we

3   understand.  So we had perfectly appropriate impeachment the

4   other day of Mr. Schlichting with prior statements with prior

5   statements of Mr. Ergen; an out of court statement by in this

6   case this witness if that was that is not written, but in video

7   form.

8           If we can have an opportunity outside of, you know, to

9   talk about is there an appropriate way we could use that

10  assuming it's proper impeachment, of course that's the critical

11  assumption, a way to do it.  I don't suggest to discuss that

12  now, but it is a prior statement of the witness and that it's

13  not written, probably doesn't make it unusable, but we don't

14  want to do it.  We want to have a chance to talk about it and

15  what would be appropriate.

16          THE COURT:  We'll find an opportunity.

17          MR. CONRATH:  Thank you very much, Your Honor.

18          MR. PETROCELLI:  The witness may think there's an

19  issue with him or his testimony.  You might want to just

20  mention Your Honor had nothing to do with that. He looks

21  concerned.  Thank you.

22          (Open court.)

23          THE COURT:  Our discussion at the bench had nothing

24  to do with this witness or his examination.

25          For those third parties, non-parties who are requesting

1    daily copy of transcripts, the Court for reasons I am not at

2    liberty to discuss at this point, is directing the Court

3    Reporters to provide daily copy to those who have requested it

4    who are not parties in the case by two o'clock in the

5    afternoon, not by ten something in the morning.

6         Let's go back to the witness.

7         (Witness resumes the stand.)

8              MR. PETROCELLI:  Thank you, Your Honor.

9         GOVERNMENT WITNESS JOHN K. MARTIN, PREVIOUSLY SWORN

10                  CROSS EXAMINATION (Continued)

11   BY MR. PETROCELLI:

12   Q.   Mr. Martin, before the lunch break, I was asking you why

13   you couldn't take data from distributors and you said they

14   wouldn't give it to you.

15        Have you attempted to purchase data from distributors?

16   A.   Yes.

17   Q.   Have those efforts been successful?

18   A.   Not to date with the one exception we have an agreement to

19   get a minor set of data from one of virtual MVPDs, but all of

20   the others for a variety of reasons we've been unsuccessful.

21   Q.   Can you explain to the Court those reasons that you have

22   heard from distributors why they won't sell you data?

23   A.   Either they think it's proprietary for their own business

24   and they don't want to be in the business of selling data or

25   the data that they have and the manner in which it is organized

1   is just not particularly useful to us at this time.

2   Q.   Okay.   Now with respect to the use of data for purposes of

3   advertising, can you explain to the Court what impact Facebook

4   and Google among others have had on that issue?

5   A.   Well, they have a tremendous amount of data.   They are

6   operating at a scale that we at Turner, we're not even playing

7   in the same league yet.

8       So what they can do is they can dynamically serve ads to

9   their users because they know who their users are, they know

10  what their likes are, they know what they're more likely to be

11  receptive to.

12      So if I like to buy sneakers and go on a sneaker ad, all of

13  a sudden I'm served another sneaker ad by Facebook.

14      By having access to that data they can demonstrate to the

15  marketers a big ROI on the advertising dollars that they're

16  putting into Facebook and Google.

17  Q.   What is ROI?

18  A.   I'm sorry, return on investment.

19  Q.   What does that mean?

20  A.   The effectiveness of the advertising.

21      So marketers know when they put a dollar into Facebook and

22  Google what they are getting back with respect to that dollar.

23  And so as a result of what has been happening over the last

24  number of years, if you look at the overall advertising market,

25  the digital advertising market is now larger than the

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

624

```
 1  traditional TV ad market.

 2      Those two companies, Facebook and Google, we believe, I

 3  have seen, I've read various reports have taken anywhere

 4  between 85 percent and a 100 percent of that shift in dollars.

 5  Q.   That shift from where to where?

 6  A.   From TV to digital.

 7  Q.   Does the merger with AT&T provide Turner an opportunity to

 8  confront that challenge?

 9  A.   Yes, because for the first time we believe because of the

10  customer relationships that AT&T has through it's MVPD as well

11  as through its mobile relationships, they will have a

12  tremendous amount of first person data where we think we can

13  work together to build products where we can actually for the

14  first time since we've been wholesalers, we can get out of that

15  wholesale position and actually begin to market and advertise

16  directly to people in a much more effective and efficient way.

17  Q.   You said you don't know the names of your viewers?

18  A.   That's correct.  We know the names of almost no one.

19  Q.   Do you have their personal contact information?

20  A.   No.

21  Q.   Do you have their email addresses?

22  A.   Very few.

23  Q.   Do you know how much time they spend watching your shows?

24  A.   We only get aggregate data from Nielsen, but nothing down

25  to the household or an individual level.
```

1  Q.    How do you compare the ability to sell advertising based

2  on Nielsen ratings with what Google and Facebook are doing in

3  the world of digital advertising?

4  A.    We are at a huge disadvantage.  We are selling in TV what

5  they call demographics which is just adults, I'm making this

6  up, adults 18 to 49 for example.

7      We are selling advertising based on day parts where we

8  could pay more money if somebody is watching a television show

9  in prime time versus late night.  We're getting paid different

10 amounts of money based on whether something appears on TNT,

11 TBS or TruTV.

12     Whereas Facebook and Google, it doesn't matter.  It doesn't

13 matter if somebody engaged on an advertisement at two o'clock

14 in the morning or 8 p.m.  They have got a much better sense of

15 who that individual is and they can personally serve those ads

16 to them.  We don't have any ability to do that.

17 Q.    AT&T through its DirecTV and U-Verse service, does it have

18 set top box data that could be useful to Turner?

19 A.    Yes.

20 Q.    What could you do with that set top box data that you

21 currently do not have?

22 A.    Eventually it would be trying to replicate the best of

23 what Facebook and Google can do.

24 Q.    Have you made efforts to buy companies that can provide

25 data?  I think, I think the government lawyer asked you a

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  question to that affect.

2      Do you recall that question?

3  A.   Yes, I recall the question.

4      Yes, we were in due diligence discussions with three

5  companies that had a particular technology that would have

6  helped but not have been a cure for what we were seeking.

7  Q.   Would those companies have provided you the same type and

8  quality of data that for example would come from AT&T and the

9  merger?

10 A.   No, it would have been a subset of that.

11 Q.   Can you just briefly describe how it would not have been

12 as sufficient?

13 A.   What these companies where they're called ACR companies,

14 automated content recognition and they have chip sets that are

15 embedded in what is referred to as smart TVs, TVs that are

16 connected to the internet.

17     They could have provided us sort of frame by frame analysis

18 of what shows were being watched down to the household level.

19 But we still would not have had personalized information of who

20 was in the household, who watched the data, and we wouldn't

21 have had any other information about what those individuals may

22 have been susceptible in terms of marketing or not.

23 Q.   So if it wasn't going to be that adequate, why were you

24 pursuing buying those companies?

25 A.   Because we're starting from a position where we are very,

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  very far behind.  Those companies we thought would have

2  provided at least a step in the right direction.

3      Although we knew that that would not have been an end game

4  with respect to a comprehensive data strategy.  We thought the

5  strategy would have had to involve a fair bit of acquiring

6  companies.

7  Q.   Okay.  Now you were asked some questions about various

8  research that your company does.  You were shown various

9  exhibits, Exhibit 150, 151, 149 that Mr. Welsh showed you.

10  Those are all plaintiff exhibits.  I'm not going to take the

11  time to walk you through all of them.

12      But have you made changes to the way you do research?

13  A.   We just reorganized our entire research department.

14  Q.   Why did you reorganize it?

15  A.   Because I think before it was a very decentralized

16  organization.  We have traditional myth and research that was

17  decentralized in each of our brands.  We had recently hired a

18  chief analytics officer but we were finding that the brands

19  were hiring their own chief analytics officer.  For the small

20  amount of data that we had, it was being used in very different

21  and ineffective ways.

22      So the reorganization was really meant to streamline

23  everything together and bring us more into the modern world of

24  advertising because we were stuck in the traditional world of

25  TV operators have been operating for years.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Just as a quick example if you could turn to one of the

2  documents that Mr. Welsh showed you, Plaintiff's Exhibit 150,

3  should be in front of you at page 2.  It was that graph that

4  had all of those dots on it if you recall?

5  A.   Yes, I recall.

6  Q.   He showed you several other documents related to this

7  topic comparing your cable networks to other cable networks.

8      Did the documents that he show compare your networks to all

9  networks or your networks to just cable networks?

10 A.   This document that we're looking at PX 0150 is essentially

11 comparing us just to the advertising supported television

12 network universe.  So it's a subset of everyone that we compete

13 against.

14     So for example, networks are not included here such as NBC,

15 CBS, Fox, ABC, HBO, Showtime, STARZ and now importantly our new

16 competitors, Facebook, YouTube, Hulu, Netflix.  This was just a

17 subset of the universe that we're actually competing with.

18 Q.   Okay, we can move forward then.

19     I want to ask you a couple of follow up questions on

20 sports.  You were shown a couple of sports contracts.

21     Are you guys sort of late to the game in getting into

22 sports, premium sports as Mr. Welsh called it?

23 A.   I don't know if I would characterize us as being late but

24 we're small.

25     So for example, in 2017 Turner represented five percent of

1    all sports viewing in the United States of America.  All four

2    broadcast networks again the CBS, NBC, Fox, ABC networks, they

3    all have considerably more sports than we could do and

4    considerably more premium sports than we do.

5        For example, we are not in business with the NFL.  The NFL

6    out ranks our highest rank March Madness show by five times.

7    That's a premium sport.

8        We don't do business with NASCAR.  We don't do business

9    with college football.  Even in golf we only have two rounds of

10   one of the major tournaments.

11       So we're, the sports we have are good sports and they

12   appeal to those individuals that want to watch them.  But

13   there's plenty of other sports to watch in the world.

14   Q.   Why don't you have more sports?  Why don't you have NFL

15   football games?

16   A.   We tried.  We attempted twice.  We were out bid, we

17   couldn't afford it.

18   Q.   Did I hear you say that you spent about two billion

19   dollars annually?

20   A.   That's correct.

21   Q.   On these sports rights?

22   A.   Yes.

23   Q.   And is there any risks involved in making a contract or a

24   series of contracts that commits your company to two billion

25   dollars per year?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.    There are plenty of risks.

2   Q.    Can you describe to the Court some of the risks your

3   company takes when it signs these contracts paying all this

4   money to the sports leagues?

5   A.    So these contracts are fixed in terms of license costs in

6   the sense that whether we're penetrated on a network at 95

7   percent or 65 percent, we still have to pay the same amount of

8   money to the league.

9   Q.    Can you stop right there.  You used the word penetrating.

10  Can you explain what penetrating means in your business?

11  A.    That means if there's a hundred million TV households, if

12  our network reaches 90 million of that hundred million,

13  penetration is really just meant as a fraction.  It's 90 over

14  the hundred, we would say it's 90 percent penetrated.

15        So right now distribution is under pressure.  Our networks

16  are not as fully distributed today as they were five years ago.

17  Because as we've gone through these contract renewals, the

18  distributors want more and more flexibility to move networks

19  around and carry them on skinnier bundles.  That's something

20  that we try to protect against but we can only do it so far.

21        So one of the risks in sports is that we won't have enough

22  distribution in order to get paid for the sports that we're

23  airing.

24        The second risk goes without saying which is that maybe as

25  sports becomes less popular, ratings go down and we bear all of

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  the risk so that the sports league do not.

2  Q.  So for example, if people continue to cut the cord or

3  they're not watching these games as much, you still have to pay

4  all of that money?

5  A.  Yes.

6  Q.  There's been a lot of talk about March Madness and

7  starting to become what I'll call it Madness in March.  So I'm

8  not going to ask you too many questions about it but just very

9  briefly.

10     What percentage of all of your programming on the Turner

11  networks is comprised by March Madness?

12  A.  I don't have a percentage off of the top of my head.  It's

13  small.  This is a tournament that runs for a few months.

14     Just to put it in perspective, the highest ranked March

15  Madness game that we had in terms of ratings without rank as

16  the 161st most popular sporting event that was viewed in the

17  United States.

18     To put that in perspective, if there are any dancing fans

19  in the court, that's the average rating of an ABC show called

20  Dancing With The Stars.  And we had at Turner 12 percent of the

21  top 500 shows that aired in sports in the United States last

22  year.

23     So we're, we love the sports we have.  We love the business

24  that we're in, but we're small.

25  Q.  When you said the March Madness tournament lasted a few

1   months, did you mean a few weeks?

2   A.   Yes.  It spans a few months, but it's several weeks.

3   Q.   Okay.  Now moving forward then, beyond sports when you

4   took over as CFO, excuse me, chairman and CEO of Turner did

5   you, in 2014 did you conduct a kind of comprehensive review of

6   the business?

7   A.   Yes.

8   Q.   And as a result of that, did you prepare a memo to the

9   board making strategic suggestions and recommendations?

10  A.   Yes, I did.

11  Q.   And Mr. Welsh showed you that document.  I think he marked

12  it as Plaintiff's Exhibit 153; is that right?  Can you take a

13  look at that.

14     I'm going to, it's a lengthy document, we're not going to

15  take time to go through all of these pages, but I just want to

16  have you explain to the Court a couple of the observations that

17  he made about the state of the business, okay?

18  A.   Okay.

19  Q.   The memo is dated January 21, 2016?

20  A.   Yes.

21  Q.   And is that before there was any talk about merging with

22  AT&T?

23  A.   Yes, I believe so, yes.

24  Q.   So if you could turn to, I'm going to go by, because I

25  have a different copy than the Plaintiff's Exhibit.  But I'm

 1    going to go by the page numbers that you actually put on the

 2    memo.

 3         You see where it says page 3 of 16 at the bottom?

 4    A.   Yes.

 5    Q.   Okay.  So I just want to take you through some of the

 6    headings here and I'd like you to explain to the Court what you

 7    intended to convey with respect to some of these topics.

 8         So number one, changing the TV ecosystem and viewing

 9    behaviors, what was that about?

10    A.   That means that and keep in mind, this was in 2016 we've

11    seen an acceleration of all of the trends that were highlighted

12    here.  But we're seeing a declining in subscriber level-ship in

13    the United States because of all of the alternatives that

14    people can, can now consume content that doesn't necessarily

15    have to be with an MVPD or a VMVPD.

16         In addition, the number of professionally produced

17    television shows in the United States has doubled in the last

18    five years alone.  So in 2017, 487 new television shows were

19    premiered and aired.  So there's an explosion of choice for

20    people to go and watch on different platforms.  They don't have

21    to watch something on TNT.  They could go watch Google, they

22    could go watch Hulu.  They can go just watch Netflix and binge

23    all of their shows advertising free.  So that was a significant

24    trend.

25         It wasn't just a trend for Turner.  We're seeing declines

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  in viewership happen across almost the entire ad supported

2  television landscape.

3  Q.   How did that analysis of that trend factor into your

4  thinking about what the company had to do going forward?

5  A.   We needed to do a number of different things.  We needed

6  to, the biggest fear that I have or concern that I have as the

7  CEO of Turner is we need to keep our brands relevant in the

8  next five and ten years against a backdrop that's going to

9  become only increasingly competitive.

10    So we had to dramatically improve our, the quality of the

11  original programming that we were making.  We had to have

12  access to data so that it can form, not only improve our

13  advertising but also improve our ability to market our product

14  and services directly to people who we might know what they

15  would like.  And then over time maybe even inform the programs

16  that we made themselves.

17    We also need to develop new revenue streams that are

18  outside of the ecosystem which is one of the reasons why we

19  completely embraced the virtual MVPDs and we realize that over

20  time we need to create more and more over-the-top products that

21  go directly to the consumer.

22  Q.   Does the merger with AT&T enable Turner to further those

23  objectives?

24  A.   Yes.

25  Q.   How so?

**\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\***

1  A.   Well again, coming back to the word data.  All of the

2  customer relationships that AT&T has, the scale in which they

3  have in technology is significantly bigger than anything we can

4  do on our own.

5     And their ability to reach consumers in new and innovative

6  ways particularly in mobile is something that might allow us to

7  actually earn additional revenue streams outside of the

8  ecosystem and give consumers what they want.

9  Q.   Take a look at the next topic and some of these you have

10  covered and so I don't want you to repeat yourself because the

11  Court only needs to hear it once.

12     But declining subscribers in viewership.  What were you

13  intending to convey in that regard?  What was the impact of

14  that?

15  A.   This is a -- there's less and less video being consumed

16  live.  So there's declining subscribers overall.

17     The reason why there's declining viewership is people don't

18  have to watch shows when they're live anymore.  There's video

19  on demand.  There is subscription video on demand.  There is

20  advertising video on demand.  There's alternative platforms.

21  More and more people are watching shows on a delayed basis.

22     The way we get paid in advertising, if someone doesn't

23  watch our show within the first seven days it's aired, we don't

24  get paid.

25  Q.   Can you explain that?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   Meaning that the contracts that we have with our

2   advertisers specifically states that the viewership has to be

3   done within the first seven days after it's aired live;

4   otherwise, the advertiser does not have to pay despite the fact

5   that their ad may have been viewed by a consumer.

6   Q.   So does the advertiser get paid because the show was

7   distributed to let's say 90 percent of the homes?  Is it based

8   on subscribers or is it based on viewership?

9   A.   Viewership.

10   Q.   What is the difference between those two?

11   A.   Well, viewership is the actual eyeballs that are watching

12   the show.  I tried to explain a little bit earlier.  The number

13   of eyeballs that watch a show is a function of distribution

14   because we need to get our shows in front of people.

15       And then it's a function of how good and how effective is

16   the show that we can actually attract and retain people to come

17   and want to spend time with you.

18   Q.   What happens if the viewership numbers don't add up to

19   what the advertiser was expecting within the seven day period?

20   A.   We lose.

21   Q.   What does that mean?

22   A.   There's a term in the advertising business called make

23   good.  In other words, we have to provide free inventory over

24   time to essentially get them up to the impressions that they

25   paid for.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1       But that's an opportunity cost.  That means that's a piece

 2  of inventory of advertising that we can't sell then to a third

 3  party to make money.

 4  Q.   Again, does the merger with AT&T assist specifically on

 5  this issue?

 6  A.   Yes.

 7  Q.   For the reasons you've described?

 8  A.   Yes.

 9  Q.   Okay.  Your next item, large scale GE networks such as TNT

10  and TBS have been disproportionally affected by these viewing

11  trends.

12       What does GE stand for?

13  A.   General entertainment.

14  Q.   Can you explain to the Court what you meant by that?

15  A.   That means that there has been, there has been, as this

16  gets back to the explosion of choice of available high quality

17  content on multiple platforms.

18       So in the past, I mean, if you think of the original

19  general entertainment networks with the broadcast networks.

20  There use to be only three of them, ABC, CBS and NBC.

21       Now that's broadened out.  TNT and TBS would be considered

22  general entertainment.  But where the audiences have migrated

23  more to are nicher, more branded environments that have a

24  better brand promise than GE, than TBS or TNT.

25       For example, a fantastic branded network is HBO.  When
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    people talk about HBO, they have a general sense of the quality

2    of programming that they are going to be able to see on HBO and

3    it's delivered that for 15 years.

4        We thought TBS and TNT were going to have to have their

5    branded brands really sharpened up to be a better brand promise

6    to consumers; otherwise, they were in danger of just becoming

7    less and less relevant.

8    Q.    By the way, how do ratings for television shows on the

9    broadcast networks compare to the top cable networks?

10   A.    They are multiple times higher.

11   Q.    Broadcast ratings are higher?

12   A.    Considerably higher.

13   Q.    Next item, changing consumer behavior and expectations.

14       What did you mean by that, on page 4, the bottom?

15   A.    There it is, I'm sorry.

16       This is what I was saying before.  Changing behavior.

17   People don't feel like they have to watch a schedule anymore.

18   If you love a TV show like The Alienist.  We aired The Alienist

19   on TNT on Monday nights at ten o'clock, people feel like they

20   don't have to tune in on Monday at ten o'clock.  They can catch

21   it on demand.  They can catch it three weeks later on demand.

22   So that's a change in behavior.  That's one version of that.

23       The second change in behavior is the expectations of the

24   quality of experience in television of consumers has

25   significantly increased.  So new services like YouTube TV or

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  Netflix that have beautiful user inter-facers that are

 2  available on any and all devices they work all the time.  The

 3  quality of the video is quite high and they have

 4  recommendations.

 5       They have abilities, they have better mouse traps than

 6  traditional MVPDs who still have inferior user interface

 7  guides.  And it's a real impediment to the user experience.

 8  Consumers now just expect better.

 9  Q.   That's what you also meant by the next item growth in on

10  demand viewing and viewing on unmeasured devices.

11       What's an unmeasured devices and what's that about?

12  A.   Certain video content consumption that's happening on

13  devices such as iPads and phones, Nielsen doesn't even have

14  products to measure yet.

15       So we can tell that there's viewing happening on those

16  devices, but the advertisers aren't willing to pay for it.

17  Q.   Again, does the AT&T data assist in this area?

18  A.   Absolutely.

19  Q.   What about this next one, potentially reduced tolerance

20  for advertising, what does that mean?

21  A.   If you look at the explosive growth in viewership and

22  subscriber-ship in Netflix there's a chance we're habituating

23  an entire population to no longer expect or want to see ads.

24  Q.   What are companies like your company doing about that or

25  trying to do about that?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A.    We're trying to reduce the number of ads per hour which

2    gets back to what I said before lunch.    The challenge for a

3    company like ours then is we need to make every advertising

4    unit that much more valuable.    So that we can make up for lost

5    revenue because consumers will be seeing overall fewer ads on

6    our networks.

7    Q.    Finally, you have increasing competition for original

8    programming.    Explain to the Court what you meant by that?

9    A.    I think the best example is the doubling of the

10   professionally produced shows in the last five years.    There's

11   just an explosion of things for people to watch.    That doesn't

12   even include all of the user generated content that goes up on

13   YouTube where my son doesn't watch Cartoon Network anymore.    He

14   watches people playing video games and that to him is content.

15   It doesn't matter that it's not on a traditional network.

16   Q.    After setting forth in detail these various observations

17   and more, you then identified a strategy for the company going

18   forward that you were recommending to the board and I won't

19   take the time to go over all of the things that you

20   recommended.

21       But if I could just turn to the first one, you indicate

22   transition from an advertiser and affiliate centric company to

23   a consumer centric company.    And that's on page 7 of the

24   exhibit.

25       Do you see that?

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  A.    Yes.

2  Q.    And then you have different categories within that that

3  recommended strategy; content, marketing, monetization, user

4  experience and data.

5       Could you just speak to us about, about the strategy that

6  you recommended?

7  A.    In it's simple form the history of Turner being a

8  wholesaler really was much more concerned about pleasing

9  advertisers and distributors and didn't really, because they

10 didn't know who their fans and viewers were, they didn't really

11 think about them.

12 Q.    They being who?

13 A.    Turner, let's say Turner Circa five, seven, eight years

14 back.  When I came in I realized that we had to literally turn

15 the company on its ear.  We had to put the fan or the consumer

16 in the center of every single decision that we do.  Because if

17 we don't understand who our consumer is, who our fans are, then

18 we can't succeed over the longer term continuing to be a stuck

19 in the middle wholesaler.  That's just not going to work

20 because the world is moving towards addressability.  It's

21 moving towards the advertising of what Facebook and Google is

22 doing and so we're in an arms race to develop what makes them

23 unique and good and then hopefully we do it faster than they

24 can develop their own capabilities of building quality premium

25 content.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   You said addressability, can you explain to the Court what

2  you meant by that?

3  A.   It's essentially a one to one advertising ability.  So if

4  we were both watching the same television show, but I know that

5  you like Chevy and I like Ford, you could receive a Chevy ad

6  watching the same show and I can receive a Ford ad.

7  Q.   Does the merger with AT&T enable that kind of addressable

8  advertising?

9  A.   It should, yes.

10 Q.   Is that because of the data that they have?

11 A.   Yes.

12 Q.   And then finally on your recommended strategy, it says

13 expand aggressively outside the traditional TV ecosystem.

14      Could you please speak to that?

15 A.   Again, we need because we have so much pressure right now

16 on our distribution revenues and advertising revenues, we need

17 to build new revenue streams.

18      So we need to build products and services that can get

19 directly to consumers.  We have this fantastic brand Adult Swim

20 that was mentioned earlier has been number one in the adults 18

21 to 34 demographic for the last decade.

22      It sounds incredibly impressive and it is.  It's no small

23 feat, but that's the demographic of people.  That's the age

24 group of people who are actively rejecting traditional TV right

25 now.  They don't want to watch traditional TV.

1       So even though Adult Swim remains number one, it's number

2  one but its audience numbers are going down.  And so this is a

3  brand that we need to figure out how can we develop products

4  and services that can live outside of the traditional

5  ecosystem, embrace new technologies through innovation and get

6  this brand directly into consumers in a manner in which they

7  want to consume it.

8  Q.    For clarity, Adult Swim is the same channel as Cartoon

9  Network; is that right?

10 A.    Yes, that's correct.

11 Q.    When does it switch over to Adult Swim, in the evening?

12 A.    Eight o'clock in the evening Eastern time.

13 Q.    The rest of the day it's Cartoon Network?

14 A.    Yes.

15 Q.    Now with that work you did when you came in and surveyed

16 the situation and made your recommendations and you've already

17 discussed you signed these new big sports contracts with NCAA

18 and NBA, right?

19 A.    Yes.

20 Q.    Did you then set on a strategy to increase the prices of

21 Turner programming to the various distributors?

22 A.    That was the strategy that we began.  I believe the

23 strategy was begun to put, be put in place prior to me even

24 becoming the CEO because of the length of these contracts,

25 because they're typically years in length.

1      We had to set the strategy probably in 2013 for it to begin

2  to show up in '15, '16 and '17.  And the strategy really was

3  one of in our mind Turner had fallen behind its peers and

4  competitors in terms of the price that it had been charging

5  relative to the strength of the network.  So the strategy was

6  really one of catch up.

7  Q.   You said Turner had fallen behind?

8  A.   In the past.

9  Q.   What do you mean by that?

10  A.   In the past the price increases that Turner had sought

11  were less aggressive than that of it's competitors such as

12  Disney and Fox.  So we decided that we had to try to catch up

13  the affiliate rates and also in understanding that we were

14  making big sports commitments and we needed to try to push our

15  rates back up to be competitive.

16  Q.   How many years did it take to catch up?

17  A.   I don't even know if we've completely caught up yet, but

18  it took about five years.

19  Q.   And did you have let's say double digit rate increases

20  during those years?

21  A.   Three of the five.

22  Q.   For three of the five?

23  A.   Yes.

24  Q.   And what about for this upcoming year, have you caught up

25  basically?

1  A.   Well, our rate increases are going to decline dramatically

2  now for the foreseeable future.

3      So we're going to go from rate increase or subscriber

4  revenue increases in 2017 that were approximately 13 percent.

5  We anticipate in 2018 it's going to be low single digits.

6  Q.   Let me show you a document and you can just run that by

7  the Court again with the document in hand.  That would be

8  Exhibit 781.

9          MR. PETROCELLI:  May I approach, Your Honor?

10         THE COURT:  All right, yes.

11 BY MR. PETROCELLI:

12 Q.   Are you familiar with this document?

13 A.   Yes.

14 Q.   What is it?

15 A.   This is our 2018 budget.

16 Q.   Was this document prepared by people acting under your

17 direction and control?

18 A.   Yes.

19 Q.   This document contains your input and your review?

20 A.   Yes, that's correct.

21         MR. PETROCELLI:  Your Honor, I move this into

22 evidence.

23         THE COURT:  All right, any objection?

24         MR. WELSH:  No objection, Your Honor.

25         THE COURT:  You want this under seal?

1          MR. PETROCELLI:  Yes, Your Honor, thank you.

2          THE COURT:  Be admitted.

3      (Defendant's Exhibit Number 781 received into evidence

4  under seal.)

5  BY MR. PETROCELLI:

6  Q.    Can you turn to page, it would be these DX numbers, it

7  would be 19.  Do you have that in front of you?  The title of

8  it is domestic subscription-key assumptions.  There's a box

9  called rate strategy.

10      You're looking at it, Mr. Martin?

11  A.    Oh, yes, I'm sorry, yes.

12  Q.    The first sentence says following completion of its prior

13  affiliate renewal cycle, 2017 was the final year of double

14  digit rate increases across Turner's top four networks.

15      Is that what you were just describing?

16  A.    Yes.

17  Q.    Okay.  Can you then turn to the page, two pages later,

18  Page 21 of Defense Exhibit 781 and there's a chart entitled

19  domestic subscription revenue.

20      Tell me when you have that?

21  A.    I see it.

22  Q.    Now you see the line under domestic revenue subtotal U.S.

23  linear?

24  A.    Yes.

25  Q.    You indicated 13 percent, is that the number that's

1   reflected in 2017?

2   A.   Yes.

3   Q.   Now you see the numbers that are in the years 2018, '19,

4   '20, '21, and '22 without saying them out loud?

5   A.   Yes, I see them.

6   Q.   Okay, and do you see that those, are those the low single

7   digit numbers that you previously mentioned?

8   A.   Yes, they are.

9   Q.   And those single low digit numbers represent lower price

10  increases; is that right?

11  A.   That's correct.

12  Q.   Okay, thank you.

13       MR. PETROCELLI:  We're actually turning, Your Honor,

14  to our last topic which is Dish in the Dish blackout.

15  BY MR. PETROCELLI:

16  Q.   How many times can you recall Turner having been blacked

17  out by a distributor?

18  A.   Twice, two times.

19  Q.   Two times, what were the two times?

20  A.   One preceded me when I was the CEO.  I believe it was

21  2013.

22  Q.   Okay.

23  A.   And that was with a distributor and the dark period lasted

24  24 days.

25       The second time was with Dish which was in 2014 and that

1    lasted 31 days and that didn't include all of our networks.

2    Q.   Okay.  Now the Court has heard a lot of testimony about

3    this already.  So I don't want to go through the whole story,

4    but I just want to hit on some particular parts of the story,

5    okay.

6        What happened on -- did you understand that there were

7    negotiations going on let's say in the summer of 2014 to get a

8    deal done with Dish on the various networks?

9    A.   Yes.

10   Q.   Okay.  And did something happen to bring those discussions

11   to an abrupt stop?

12   A.   Yes.

13   Q.   What happened?

14   A.   Time Warner never announced that it had plans to launch

15   HBO Now as an over-the-top stand alone product.

16   Q.   Explain to the Court.  Well, first of all, when did that

17   happen?

18   A.   I believe it was the middle of October.  I think it was

19   October 15th.

20   Q.   October, 2015?

21   A.   I believe that was --

22   Q.   Excuse me, October 15, 2014?

23   A.   Correct, yes.

24   Q.   Okay.  And explain to the Court what the launch of HBO Now

25   meant?

1    A.    So this would have represented the first time in the

2    history of HBO that it would be available to consumers without

3    being part of a package of MVPD channels.

4        So a consumer could just pay let's just for the sake of

5    argument $15 and receive over the internet directly an HBO

6    service without having to have any other channels attached to

7    it.

8    Q.    Did you receive a reaction from Mr. Charlie Ergen of Dish

9    regarding that announcement?

10   A.    Yes.  He immediately expressed his disappointment and

11   frustration that we would be willing to launch a product like

12   that.

13            MR. WELSH:  Objection, Your Honor.

14            THE COURT:  Hold on.  An objection?

15            MR. WELSH:  Yes, Your Honor.

16            THE COURT:  Come on up.

17            (Witness leaves the stand.)

18            (Sealed Bench Conference.)

19            MR. WELSH:  It's hearsay, Your Honor.

20            MR. PETROCELLI:  It's not hearsay.  He had

21   conversations.  It's not offered for the truth of what Charlie

22   Ergen said, but to explain the basis for the blackout and what

23   happened thereafter.  It's classic testimony not for the truth.

24            THE COURT:  Give me a proffer of what he's going to

25   say.

1          MR. PETROCELLI:  He's going to say as a result of

2  being upset with the launch of this product because he,

3  Mr. Ergen, was going to launch Sling, that he instructed his

4  negotiators basically to go dark on Turner.

5          MR. WELSH:  This is the truth?

6          MR. PETROCELLI:  Yes.  So it's not offered for the

7  truth of what Mr. Ergen said, but the affect of his statements

8  on Turner and then I'm just going to quickly then go through a

9  couple of the documents.

10          MR. WELSH:  It seems to me, Your Honor, he is trying

11  to offer it for the truth of the matter stated; what

12  Mr. Ergen's thinking was about what he did and what his

13  reaction was.

14          MR. PETROCELLI:  It's not.  I think counsel is wrong

15  on this, Your Honor.

16      A witness is entitled to recount conversations that he has

17  had and how it affected his conduct and his company's conduct.

18  It's not offered for the truth.

19          THE COURT:  I will let him testify as to what he

20  believed the situation was and what they did to respond.  It's

21  not going to be admitted for the truth of the matter.

22          MR. PETROCELLI:  And it's not offered for that.

23          THE COURT:  Okay.

24          MR. PETROCELLI:  Just so I don't misunderstand the

25  Court's instruction, how would you like me to phrase the

```
 1   question?

 2            THE COURT:  You can ask him what was happening.

 3            MR. PETROCELLI:  I can continue -- what was said?

 4            THE COURT:  What he believed was happening and what

 5   they decided to do in response to it.

 6            MR. PETROCELLI:  Okay, thank you.

 7            (Open court.)

 8            THE COURT:  All right, you may proceed consistent

 9   with the discussion at the bench.

10        (Witness resumes the stand.)

11   BY MR. PETROCELLI:

12   Q.   Were you aware at the time of hearing from Mr. Ergen, by

13   then were you already aware of the plans that he had to launch

14   his over-the-top service called Sling?

15   A.   Yes.

16   Q.   Thereafter is that when or shortly thereafter the blackout

17   occurred?

18   A.   Yes.  The blackout occurred I believe on October 21st.

19   Q.   Now did you have any discussions with Mr. Ergen to try to

20   stop the blackout?

21   A.    Yes.  Mr. Ergen called me about an hour before he took

22   our signal dark and communicated to me that he was going to

23   take us dark.

24        I immediately asked him not to do it and offered to get on

25   an airplane, fly to Denver, have lunch with him tomorrow, try
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   to continue the conversation in a constructive way while the

2   service stayed on.

3   Q.   When did you receive that phone call?

4   A.   Eleven o'clock in the evening Eastern time.

5   Q.   When did he say he was going to take you down?

6   A.   Midnight.

7   Q.   Okay.  So when you offered to continue the discussions and

8   fly to Denver, what was the response?

9   A.   He rejected the offer and took us down an hour later.

10  Q.   And then you were dark for 31 days; is that right?

11  A.   Yes, that's correct.

12  Q.   Okay.  And then we essentially heard from other witnesses

13  that there was a temporary agreement reached in November?

14  A.   Yes.  We had to make some accommodations in order to get

15  the signal put back up temporarily while we had an extension

16  that went out through the end of March.

17  Q.   And then what then with this four month or so extension

18  that bought you time until the end of March, what then was

19  happening let's say after the holidays.  Did you begin

20  discussions with Dish again to try to get these deals done?

21  A.   Yes.  The team started to renegotiate in more earnest

22  beginning I believe January of 2015.

23  Q.   Now I believe you were shown, I'm just going to show you a

24  couple of documents.  I think Mr. Welsh may have shown them to

25  you.  They're all plaintiffs exhibits.  One of them is

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   Plaintiff's Exhibit 4.

2           MR. PETROCELLI:  Four is in already, Your Honor.

3           THE COURT:  Yes.

4   BY MR. PETROCELLI:

5   Q.   Do you have Plaintiff's Exhibit 4 in front of you?

6   A.   Yes, I do.

7   Q.   Okay.  So what's going on with this?  You talking about

8   plan A, plan B, and so forth.

9        What is plan A?

10  A.   Plan A would be to get a deal done with Dish.

11  Q.   Now the first sentence of the second paragraph says what?

12  A.   We all agree -- do you want me to read it?

13  Q.   Yes?

14  A.   I can barely see it.

15  Q.   Read slowly so the Court Reporter can get it?

16  A.   "We all agree on the Turner side that doing a deal with

17  Dish is the best option, but we have to have a viable plan B

18  even if it's a long shot."

19  Q.   Even if it's a long shot is in parentheses, right?

20  A.   Yes.

21  Q.   Did you try to develop a plan B?

22  A.   We thought we needed to do a plan B because Charlie Ergen

23  had threatened to be out of business with us forever.  That's

24  what he had said on numerous occasions.

25  Q.   So?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    A.    So --

2    Q.    I'm sorry, continue?

3    A.    So as a business person if one of your large partners says

4    I may drop you and never be in business with you again, that

5    would be economically catastrophic.

6         So we started to brain storm only what might be

7    alternatives to try to make up those lost revenues.  Remember,

8    not only on the subscriber side, but when you lose distribution

9    we would have lost a lot of advertising revenue as well.

10        One of the ideas that we internally circulated was perhaps

11   if we had gone to DirecTV and said you can be satellite

12   platform exclusive.  Would that be something of interest to

13   you?  Meaning that we would still be in business with the local

14   cable operator in any particular territory, but if someone in

15   that territory wanted to have a satellite, the only place they

16   could go would be DirecTV.

17        So we ran a math exercise on how much money we thought we

18   would lose from Dish and how much of a premium we would need to

19   get from DirecTV in order to make the economics even look close

20   to similar.

21        We quickly concluded the math just simply doesn't work.  So

22   we never went anywhere with the plan which is why I called it a

23   math exercise.  It was a silly idea.

24   Q.    Did you ever discuss it with DirecTV?

25   A.    No.

 1  Q.   So there was no plan B?

 2  A.   No.

 3  Q.   Okay.  Let me show you now, let me make sure I've covered

 4  this.  Yeah, let me show you the next exhibit.  Plaintiff's

 5  205.

 6      Do you have that?

 7  A.   Yes, I'm there.

 8  Q.   Okay.  By the way, when you and Mr. Ergen spoke at 11 p.m.

 9  an hour before he took you down, did you and he or did he make

10  any comment to you about any further negotiations?

11  A.   Yes, he did.  He said listen, in my experience going dark

12  is a way to actually put pressure on the teams to get together

13  and finally get a deal done.

14  Q.   While you were dark, while he took you dark, did the team

15  --

16          MR. WELSH:  Objection, Your Honor.

17          THE COURT:  Yes, come on up.

18      (Witness leaves the stand.)

19      (Sealed Bench Conference.)

20          MR. WELSH:  For the record, if that's the same point

21  about the hearsay not being for the truth that some sort of

22  reactionary response, I don't know whether that's where he's

23  going with it though.  So I wanted to make sure --

24          MR. PETROCELLI:  That is.  I have one question.

25      Did the teams continue to negotiate?  It's not offered for

1   the truth.  It's offered for the affect on what happened.

2          THE COURT:  It's the state of mind.

3          MR. PETROCELLI:  Yeah.

4          THE COURT:  Just sort of what his belief was and what

5   he told his people to do I guess.

6          MR. PETROCELLI:  Exactly.

7          THE COURT:  Okay, it's all right.

8          (Open court.)

9          THE COURT:  You may proceed consistent with

10  discussion at the bench.

11     (Witness resumes the stand.)

12  BY MR. PETROCELLI:

13  Q.   After Mr. Ergen made that comment to you, did your teams

14  attempt to continue to negotiate while you were dark?

15  A.   Yes, after a brief, a brief breathing period I think, I

16  believe, yes.

17  Q.   Okay, and that's what led to that November agreement?

18  A.   Yes.

19  Q.   So going back to Exhibit 205, okay.  Was there any issue

20  that was affecting your negotiations with Mr. Ergen that had to

21  do with Sony Play Vue?

22  A.   I'm not sure I understand the question.

23     There wasn't an issue, but Mr. Ergen had had on several

24  occasions communicated that he was particularly concerned about

25  Sony becoming an extremely competitive force against his own

1   service.

2   Q.   What did you understand that to refer to?

3   A.   Meaning that he said of all of the potential virtual MVPDs

4   I fear Sony the most because they have embedded connected

5   devices, an incredibly engaged group of fans that come back and

6   use the Sony Playstation every day.  They have credit cards.

7   They have information and he thought that they would have, that

8   the data would give them a big leg up against, against his

9   Sling product.

10  Q.   Now when you write in this email and I'm referring now to

11  the end of the second paragraph.

12      As we discussed before, our Turner networks have to be

13  included in as many OTT packages as possible as the ecosystem

14  inevitably becomes dis-intermediated.

15      What does that refer to?

16  A.   As there were going to be more and more entrants, the

17  bearer's entry of distribution were beginning to fall and are

18  continuing to fall and I wanted to make sure that there was

19  agreement that at least among the Turner and Time Warner side

20  that we need to embrace these new entrants because that's the

21  only way we can ensure that we can maintain adequate

22  distribution as the traditional ecosystem has the risk of

23  continuing to decline.

24  Q.   What you wrote in the next paragraph.  "He will not react

25  well to this.  But I think we should press ahead with speed on

1    this."  What did that refer to?

2    A.    We knew that Mr. Ergen would not take kindly to us signing

3    up with Sony.

4    Q.    Did you ultimately do the deal with Sony?

5    A.    Yes.

6    Q.    Okay, my final document is Plaintiff's Exhibit 120.  Mr.

7    Welsh showed this to you.

8        Again, this is during the time in March prior to concluding

9    the deal with Dish, correct?

10   A.    That's correct.

11   Q.    And the email at the bottom says: "Draft came in last

12   night.  They behaved on the MFN.  Plenty of wood to chop given

13   new language in data and TBE and other issues such as Dish

14   still seeking protection against us as a distributor." And then

15   up above it says thanks you write: "We will never agree to that

16   protection.  This is a go dark issue."

17       Can you describe to the Court what that issue was?

18   A.    Mr. Ergen was trying to prevent the notion of in the

19   future any portion of Time Warner becoming its own distributor.

20       In other words, if we ourselves instead of, think of it as

21   we could ourselves become a virtual MVPD.  If we took all of

22   the Turner networks and possibly HBO, we could have gone direct

23   to consumers ourselves and he was trying to prevent us from

24   doing that.

25   Q.    Did you ultimately agree to that?

1  A.    We never agreed to that.

2  Q.    One final set of questions.  During the blackout that did

3  occur, do you have any general understanding of the, of whether

4  Dish lost any subs?

5  A.    We believe during the period with which they were dark

6  they lost subscribers that represented meaningful less than one

7  percent of their overall subscriber base.

8      But what was interesting when we looked at that, they lost

9  the same number of subscribers in the same period a year ago

10  when we were not dark on them.

11      So it was very unclear whether we had any affect whatsoever

12  during the period with which our networks were dark.

13  Q.    And are you aware that in this case the government expert

14  economist named Professor Shapiro has predicted there will be a

15  price increase solely on account of the merger and he bases

16  that price increase on a 12 percent departure rate meaning that

17  if a distributor cannot have access to the Turner networks,

18  that distributor would lose 12 percent of its subscribers.

19      In your experience is that remotely possible?

20  A.    That's preposterous.  In my experience, again keeping in

21  mind that over the last decade we've only gone dark twice for a

22  month each because it's very bad for business to go dark.

23      I would think that any maximum loss from the Turner

24  networks being off would be low single digits at most.  We

25  represent now six percent share of all video content viewing in

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   the United States.  We're just not that big.

2   Q.   And I'll represent to you that another government expert

3   fellow who does surveys named Professor Hauser said that if

4   there's a one month blackout of the Turner networks that there

5   would be a departure rate of eight percent.  That's Professor

6   Hauser, eight percent meaning that a distributor would lose

7   eight percent of it's subscribers in the event of a one month

8   blackout.

9        In your experience and based on what actually happened with

10  the one month blackout, is that remotely possible?

11  A.   No, that's absurd.

12             MR. PETROCELLI:  Nothing further, Your Honor.

13             THE COURT:  All right, we're going to take the

14  afternoon recess.

15       You remain a witness under oath in the case.  Refrain from

16  discussing your testimony with anyone, with counsel or anyone

17  else.  Be back in 15 minutes to do redirect, okay.

18             THE WITNESS:  Thank you.

19             THE COURT:  Step down.

20       (Witness excused.)

21       (Recess at 3:45 p.m.)

22       (Proceedings resumed at 4:07 p.m.)

23             THE COURT:  All right.

24       You may do redirect when you're ready.

25             MR. WELSH:  Thank you, Your Honor.

```
 1                      REDIRECT EXAMINATION

 2  BY MR. WELSH:

 3  Q.   Mr. Martin, you were asked some questions by defense

 4  counsel going back to your time when you were with Time Warner

 5  cable.  I want to come back to that setting, okay?

 6  A.   Okay.

 7  Q.   All right.  And you were asked a bunch of questions about

 8  whether you recall hearing this or that or learning this or

 9  that about other cable companies and whether any business was

10  lost.  And do you remember generally those questions that were

11  asked by Mr. Petrocelli?

12  A.   Yes.

13  Q.   Okay.  Back in that time frame, sir, Time Warner cable did

14  not compete with Charter, with Cox or with Comcast, correct?

15  A.   Directly compete, that's correct.

16  Q.   Okay.  Because your cable companies, you have franchise

17  areas, right?

18  A.   Yes, that's correct.

19  Q.   So you're not losing subscribers for Time Warner cable to

20  Comcast, for example, correct?

21  A.   Correct.

22  Q.   Okay.  You testified, if I recall correctly, that I think

23  you said, and this may be a quote, that your distributor growth

24  has been decelerating, do you remember that, sir?

25  A.   Yes.
```

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  Q.   If you would look at PX 148, which has been admitted.  And

2  I want to direct you to 033.  This is the document that you

3  gave to AT&T in this get-to-know-you sort of meeting, and we

4  looked at PX 33.  This is your distribution and content

5  licensing revenue growth; is that right?

6  A.   Yes that's correct.

7  Q.   And I think these figures are confidential so I won't say

8  them in open court.  But if we look at the top.  There's two

9  sets of figures on the bottom.  There's a rate increase

10  percentage and then there's a revenue increase percentage; is

11  that correct?

12  A.   Yes, that's correct.

13  Q.   And did we see for the rate increase that it's moving from

14  a single digit number in 2012 going to a double digit number in

15  2016; is that right?

16  A.   Yes, that's correct.

17  Q.   Okay.  And if we look at the revenue increase number, we

18  look at 2012 a single digit number and it's doubled in 2016; is

19  that right?

20  A.   Yes, that's correct.

21  Q.   Okay.  Now, if you would look at PX 8.  This is your

22  briefing strategy book that we talked about earlier.  I want to

23  direct you to page PX 8-036.  And under the title, "Executing

24  deals with affiliates," you told your board that terms on pays

25  to grow the domestic affiliate revenue by 13 percent in both

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  2016 and 2017; is that right?

2  A.   Yes, that's correct.

3  Q.   And a nine percent CAGR from 2015 to 2019; is that right?

4  A.   Yes, at the time, that was the forecast.

5  Q.   Okay.  Out pacing the overall industry growth; is that

6  correct?

7  A.   The forecast as of two years ago, yes.

8  Q.   And CAGR is what?

9  A.   Compound annual growth rate.

10 Q.   Thank you.

11    Now, you were asked some questions about DX 781.  Maybe you

12 can pull that in front of you.

13    I'm sorry, it may be loose, it's DX, Defendant's Exhibit

14 781, sir.

15    I think that's it.

16 A.   Okay.

17 Q.   This is the long-range plan document, correct?

18 A.   Yes, that's correct.

19 Q.   Now, the document, first off, it's -- this was prepared in

20 November of 2017; is that right?

21 A.   Yes, that's correct.

22 Q.   So we're looking at a year after this merger was

23 announced, right?

24 A.   That's correct.

25 Q.   Okay.  So it's a post-merger related document.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1     And then on this one you talked about the revenue numbers.

2   I know this whole document has been marked confidential, so

3   we'll be careful.  But despite all of what you're projecting

4   here, and you've had double digit growth in your affiliate

5   rates, isn't that true, during the time up till today, correct?

6   A.   Up through the send of 2017.

7   Q.   Okay.  And throughout that time of double digit affiliate

8   rate growth, you haven't lost any MVPDs, have you, they haven't

9   terminated with you?

10  A.   That's correct.  Other than the go dark period with Dish.

11  Q.   Okay.  And you're still -- you've still got a network

12  streaming out to them, right?

13  A.   That's correct.

14  Q.   Okay.  Now, if we look at this document, DX 781, and if

15  you look at their page number DX 781-0056.

16  A.   My apologies.  I'm having a hard time following the page

17  numbers.

18  Q.   It's difficult, it's on the, sort of the bottom of this --

19  the side of the document, the bottom of the page, 8 and half by

20  11.

21  A.   Oh, I see it.  Would you repeat the page?

22  Q.   Absolutely.  0056.

23  A.   I'm at that page.

24  Q.   I want to make sure we're on the same page.  So I don't

25  think I'm going to be doing something out of hand, just to say

```
 1   it's the 2018 budget and long-range plan, that's what it says

 2   at the top.  Are you on the same page as me?

 3   A.    Yes.

 4   Q.    Okay.  And if we look down at the bottom and it has

 5   percentages for margins, do you see that?

 6   A.    Yes, I do.

 7   Q.    And it's projecting that out to some years into the

 8   future, correct?

 9   A.    Yes.

10   Q.    Okay.  And the margins, as it goes out, are pretty steady

11   aren't they?

12   A.    Steady but tracking.

13   Q.    Well, for example --

14   A.    Oh, I'm sorry, you're going all the way at the bottom,

15   there's a line in there called the planning gap, which means we

16   have to go figure out how to make up earnings that we have no

17   idea how we can get them.

18   Q.    And those numbers, though, are pretty steady on your

19   percentage margin as is the bottom figure straight across,

20   correct?

21   A.    That's correct.

22   Q.    Okay, thank you.  You can put that to the side for now.

23         Now, you testified, and I think what you said was that you

24   didn't want to be a wholesaler that was stuck in the middle,

25   words to that effect?
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   A.    Yes.

2   Q.    Okay.  Now, you do have film struck, is that right, so you

3   can go directly to the consumer with that?

4   A.    Yes.

5   Q.    And you have boomerang; is that right?

6   A.    Yes, that's correct.

7   Q.    And Time Warner has HBO now so it can go direct to

8   consumer with that product; is that right?

9   A.    Yes.

10  Q.    And you've also added -- Turner just added something

11  called B/R Live, Bleacher Report Live; is that right?

12  A.    Yes.

13  Q.    And that just was announced, I guess yesterday; is that

14  right?

15  A.    Yes.

16  Q.    And B/R Live is streaming some live sports programming; is

17  that right?

18  A.    Yes, B/R Live will allow consumers to essentially purchase

19  portions of games.

20  Q.    Okay.  And in the news release that Turner issued on this,

21  it said that, "B/R Live is the latest move in Turner's overall

22  strategy to innovate beyond the traditional television

23  ecosystem."  Do you recall that?

24  A.    Yes, I do.

25  Q.    And that's an accurate statement?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.    Yes.

2   Q.    And again, in the press release that went out, Mr. Levy,

3   the president of Turner, said that, "With respect to Bleacher

4   Report, that it was acquired in 2012 and that we knew the

5   definition of a network was changing, and we anticipated a time

6   when Bleacher Report would become a virtual network.  Today is

7   a significant step in that direction."  Do you recall that

8   statement?

9   A.    Yes, that's an ambitious statement.

10  Q.    Okay.  And that an accurate statement by Mr. Levy?

11  A.    Accurate, but possibly ambitious.

12  Q.    Okay.  But that's where you are and that's what you

13  disclosed to the public that you're going to be taking your

14  programming, moving in that direction, taking it out to the

15  consumer directly; is that right?

16  A.    Yes.

17  Q.    So even though you say you're a trapped wholesaler, you

18  don't want to be a trapped wholesaler, you're actually taking

19  steps and have been taking steps for several years to move

20  directly to the consumer with your content, true?

21  A.    With these nascent businesses, that's correct.

22  Q.    And let's talk about advertising if we can.  Now, I think

23  you talked about that and said that your advertising is getting

24  stressed, and I think you said that, in answer to some

25  questions, that when you're advertising dollars, when the

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  revenue from your subscription are up, your advertising dollars

2  can move down and vice versa.  Did I get the gist of your

3  testimony correctly?

4  A.   I'm not sure I understood the question.

5  Q.   I think you testified that if you have more subscription

6  revenue, then you don't need as much advertising revenue, but

7  the same is not true if you had more advertising you could have

8  less subscription revenue, correct?

9  A.   I think they're two different concepts if I might explain?

10     What I said was that to the extent that you have greater

11  distribution, you have a higher probability of having higher

12  advertising because you have the capability of being in front

13  of more eyeballs, which we can then monetize in advertising.

14     The second statement I made was to the extent that we

15  succeed at growing our advertising revenue on the overall

16  business model, it would put less pressure on the subscription

17  revenue.

18  Q.   Okay.  Well, let's look at PX 456 as to that latter point.

19     Tell me when you're there, sir?

20  A.   I'm there.

21  Q.   PX 456 is a 10K for Time Warner.

22        MR. WELSH:  Your Honor, I understand there's no

23  objection to the admission of the document?

24        MR. PETROCELLI:  Will you give me a second?

25     (Pause.)

```
1              MR. PETROCELLI:  No objection.

2              THE COURT:  All right, be admitted.

3              MR. WELSH:  Thank you, Your Honor.

4         (Plaintiff's Exhibit No. 456 was received in evidence.)

5    BY MR. WELSH:

6    Q.   If you would look, Mr. Martin, at page 065.

7    A.   I'm there.

8    Q.   Okay.  Now, I think in your answers to Mr. Petrocelli's

9    questions you said that your rates were -- your advertising was

10   at one percent if I recall, you said one percent or flat.  If

11   we look at the 2016, 2017 time frame, did we see that

12   advertising was at three percent?

13   A.   2016 versus 2015, that's correct.

14   Q.   I'm sorry, 2016 versus 2015 was at three percent, thank

15   you for correcting me.  Is that right?

16   A.   Yes, that's correct.

17   Q.   And during this same time period your subscriptions were

18   also up 12 percent, correct?

19   A.   Yes.

20   Q.   So both were up for that same timeframe, right?

21   A.   Yes.

22   Q.   Okay.  Now, if you look at the next page which gives the

23   explanation for what's happened with your advertising for the

24   2016, 2017 timeframe.  Do you see that at the top there?

25   A.   Yes, at the very top, correct.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.   Okay, yes, sir.  And it says there that it's --

2         MR. PETROCELLI:  Excuse me, I can't follow where he

3  is, Your Honor.  Having trouble hearing.

4         THE COURT:  Break it down.

5         MR. WELSH:  Okay.

6         THE COURT:  Page 65 of Exhibit?

7         MR. WELSH:  465, page 65.

8         THE COURT:  456, right?

9         MR. WELSH:  456, you're right.

10         THE COURT:  Exhibit 456.

11         MR. WELSH:  456.

12         THE COURT:  Page 65, 66.

13         MR. WELSH:  Correct.  I was directing him to page 66.

14  BY MR. WELSH:

15  Q.   In the top paragraph on 66, it's talking about the

16  decrease in advertising revenues for December 31, 2017; is that

17  right?

18  A.   Yes.

19  Q.   And it says that the reasons why there was a decrease then

20  was primarily due to the lower audience delivery of Turner

21  Entertainment Networks and the comparison to the revenues

22  associated with the prior year when you had the Division One,

23  men's basketball championship tournament, this March Madness

24  we've been talking about, correct?

25  A.   Yes.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    Q.    Okay.  When the disclosure was made, there's no disclosure

2    in there about a decrease in advertising and having to do with

3    Google or Facebook, Apple, Amazon or Netflix, correct?

4    A.    I don't see them in there, I think that's correct.

5    Q.    That's what your employer put out to the FCC.

6         And I'm correct then from what was there that Turner gets

7    more advertising revenue when it airs the NCAA tournament for

8    the final four in the championship games than when it doesn't,

9    right?

10   A.    Yes.

11   Q.    When your advertising got stressed, as you put it, am I

12   correct that you didn't sit placidly, you actually did

13   something to try to work through that, right?

14   A.    Yes, we're always actively trying to grow advertising.

15   Q.    So among other things that you did, you engaged in these

16   innovative steps that we talked about earlier with your

17   addressable advertising; isn't that right?

18   A.    Yes.

19   Q.    And I think your testimony was that you're continuing and

20   would continue to do that even if this merger didn't occur,

21   correct?

22   A.    Yes, although today addressable advertising represents a

23   very, very small percentage of our overall advertising dollars.

24   Q.    But you're continuing.  And, in fact, isn't it the case,

25   sir, that Turner, in 2016 Turner had over a hundred audience

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  driven deals in place for its addressable advertising?

2  A.   I believe that's correct.

3  Q.   Okay.  And that was actually part of the self-assessment

4  that you had submitted so that you could get paid for the year,

5  right?

6  A.   Well, I assumed that's accurate, yes.

7  Q.   And something you're proud of so that you could get a

8  payment from your employer, right?

9  A.   Yes.

10 Q.   Okay.  And you were making significant progress as well

11 during this time frame of 2016 in monetizing programmatic video

12 and mobile advertising business; isn't that true?

13 A.   Yes.

14 Q.   And you leveraged the Turner data cloud which you had at

15 the time as well for your sales efforts that I just mentioned,

16 right.  That was something else that you were proud of that you

17 were doing, right?

18 A.   Yes.

19 Q.   All right.  So you've been moving forward and innovating

20 in your advertising as well.

21     If you'll look back at PX 148.  Tell me when you're there?

22 A.   I'm there.

23 Q.   Okay.  And again, this is the presentation shared with

24 AT&T, and if I can direct you to PX 148 028.

25 A.   Yes, I'm there.

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  Q.   Okay.  Now, this is a listing of the various, various

2  efforts undertaken at that time by Time Warner with respect to

3  data and advising, correct?

4  A.   Correct.

5  Q.   And it's Turner eight, nine capabilities and these are all

6  the various things that you were working on at that time,

7  right?

8  A.   Yes.

9  Q.   All right.  And if we look at the next page, this is a

10  summary of the advanced advertising solutions that you again

11  presented to AT&T; is that right?

12  A.   Yes.

13  Q.   And in that you told AT&T, "We're able to bundle advance

14  advertising products"?  Do you see that?  The right side.

15  A.   Yes, I see it.

16  Q.   Okay.  You can put that to the side, thank you.

17     I think you told us previously in a deposition that you

18  believed that AT&T was not in the business, the advertising

19  business and that Time Warner was, and so Time Warner was the,

20  in your view, the expert, not AT&T?

21  A.   I don't recall those exact words.  I would have to

22  understand the greater context, because I've been saying for a

23  long time that the two together should be complementary.

24  Q.   Oh, let me see if I can help you out.

25          MR. PETROCELLI:  Page number, please.

1          MR. WELSH:  We'll come back to that.

2   BY MR. WELSH:

3   Q.   I heard you talk in your examination with Mr. Petrocelli

4   about data.  I think you said that wasn't available, wasn't

5   usable, that sort of thing, get you back to that testimony.  Is

6   that your general testimony about it?

7   A.   Who's that it wasn't available, I'm sorry.?

8   Q.   Well, I think you said you need AT&T's data; is that

9   right?

10  A.   Yes.

11  Q.   Okay.  And I think you said that the data that you have is

12  not -- or the data that's out there is just otherwise not

13  available or not usable today. Did I mishear you?

14  A.   We do buy data from third party data companies and we have

15  some first party data, but we just don't have a lot of it.

16  Q.   Okay.  And what you, in fact, have told the investing

17  public as recently as May of 2016 is that Turner is leveraging

18  its data to power it's own marketing campaigns and user

19  experiences, but also to better enable advertisers to target

20  the right audiences, and there's more data available to us than

21  ever before.  Do you recall that statement sir?

22  A.   Yes.

23  Q.   That was accurate in May of 2016?

24  A.   Yes.

25  Q.   If you would look at your CID deposition, which is the

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1    first one in your binder there.  I'm going to direct you to

2    page 163.  And I'll just see if I can refresh your memory.  If

3    you'd look at page 163, line 18, and read that through page

4    164.

5             MR. PETROCELLI:  Which deposition?

6             MR. WELSH:  The CID.

7    BY MR. WELSH:

8    Q.   If you read that through page 164, line 15, and just tell

9    me when you're done?

10   A.   (Reading document.)

11       I see that.

12   Q.   Okay.  Put that to the side, if you would.

13       Does reading that refresh your recollection that you

14   testified previously that AT&T is not in the ad business to the

15   extent that Time Warner is and Turner is and that you're the

16   advertising experts, they are not?

17   A.   Yes.

18   Q.   Okay.  And that's the case, right?

19   A.   Pardon?

20   Q.   That's your view, right?

21   A.   Yes.

22   Q.   Now, Comcast offered you some data; is that right?

23   A.   I believe back in 2015 there was a negotiation where there

24   was a discussion of us buying data.

25   Q.   Okay.  I think you told us in your deposition that Turner

1  wasn't interested in the Comcast data, correct?

2  A.   As it was presented at the price it was presented at.

3  Q.   Okay.  And I asked you the question at your deposition

4  about whether the AT&T data was any different from the Comcast

5  data, and you replied that you had no knowledge one way or

6  another of that; is that --

7  A.   That's correct.

8  Q.   That's correct even today, correct?

9  A.   That's correct.

10  Q.   Okay.  So you can't tell us whether it's bad or worse than

11  Comcast, right?

12  A.   Right.

13  Q.   Okay.  You testified about a number of goals and

14  aspirations that you have for Turner regarding the use of data,

15  correct?

16  A.   Yes.

17  Q.   All right.  And you testified that access to that data,

18  AT&T's data, would assist Turner in achieving these goals,

19  correct?

20  A.   Yes.

21  Q.   And am I correct, though, that that's not -- you're not

22  saying it's impossible to get to where you want to be without

23  AT&T, right?

24  A.   I think AT&T would allow us to do it much more quickly

25  than if we were trying to go out and secure data from many

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  other sources.  As I said, up until now no one has really been

2  willing to give it to us.  And even Comcast, though they're a

3  large distributor, they're a regional distributor, not a

4  national distributor, and they no mobile data.

5  Q.   And I want to be clear, and I appreciate your answer.  But

6  I want to be clear.  You're not saying that you can't get to

7  where you want to be without AT&T, you're just saying it's

8  going to take longer?

9  A.   I believe it would take much longer.  I don't have an

10  estimate of how much longer, but I believe that we -- that

11  Turner Time Warner working with AT&T would be able to

12  supercharge the time to creating a viable commercial ad

13  platform in a way that's a product that could benefit, not only

14  Turner, but the entire industry.

15  Q.   You, about a month ago, I guess, had another one of your

16  interviews, and this one was with an outfit called Recode

17  Media; is that right?

18  A.   Yes.

19  Q.   And you went to a conference there, right?

20  A.   Yes.

21  Q.   That was in February of 2018, I think it was February 14;

22  is that right?

23  A.   Yes.

24  Q.   And you were asked a question there about, "Well, what

25  happens if the merger doesn't occur and you have to have a plan

1    B?"  Do you remember that question?

2    A.    I do.

3    Q.    Okay.  And did you respond in part that, "HBO is on fire

4    right now.  Warner Brothers had it's most successful year in

5    its history in 2017, we did too."  Do you remember responding

6    that way?

7    A.    Yes.

8    Q.    Okay.  And you also responded, said, "Whatever happens

9    happens, you know, I actually think that, you know, the future

10   is really bright, no matter what happens."

11   A.    Yes.

12   Q.    You remember responding that way, too?

13   A.    Yes.

14   Q.    Continues to be your view today, right?

15   A.    Well, I think I said we'd be fine.  I would as prior to be

16   better than fine.

17   Q.    Now, with this data, I think you said that things like --

18   Mr. Petrocelli asked you whether you got the user names, right?

19   A.    Yes.

20   Q.    And I think you said, no, you don't, right; is that

21   correct?

22   A.    Yes, that's my understanding.

23   Q.    And you don't have the e-mail addresses or other addresses

24   for those users; is that right?

25   A.    I think we have e-mail addresses, just not that many.

1  Q.   Okay.  And you don't have other personal data about those

2  users, isn't that right, isn't that what you told

3  Mr. Petrocelli.

4  A.   Yes.

5  Q.   And what you're telling the Court is that want with this

6  merger is to be able to get access to all of that personal

7  data, right?

8  A.   Yes.

9  Q.   And then one of the things you told the Court is that you

10  want to get access to that personal data so that you can go out

11  and do what Facebook is doing with its data, right?

12  A.   To -- I didn't make a direct comparison to Facebook is my

13  recollection.  But what I would say is that having first party

14  data and actually understanding names and attributes and what

15  people might like will allow us to evolve over time to be able

16  to sell advertising in a way that's more similar to how

17  Facebook and Google does today.

18  Q.   Okay.  What you want is to be able to do what Facebook and

19  Google are doing in advertising and to get this data so that

20  you can use it the way they're using it, right?

21  A.   Do you want he to repeat the answer I just repeated?  I

22  think I just answered that question.

23          MR. WELSH:  No further questions, Your Honor.

24          THE COURT:  Redirect.

25          MR. PETROCELLI:  Just a couple.

REDIRECT EXAMINATION

BY MR. PETROCELLI:

Q.    Do you have data for -- of any -- withdrawn.

    Your advanced advertising that you were being asked about,

does it have any scale at all?

A.    No, it represents less than five percent of our

advertising revenues?.

Q.    Okay.  Mr. Welsh showed you the 10K, do you recall that?

A.    Yes.

Q.    And he pointed you to a page, if I can find it.  It's

Exhibit 456-065, 456, Plaintiff's Exhibit, page 65.  He pointed

you to the column of 2016 versus '15 with a three percent

uplift in advertising.  Do you see that?

A.    I'm sorry, Mr. Petrocelli, you got there faster.  What

page again?

Q.    It's Exhibit 456.

A.    I'm at the exhibit, just remind me of the page number,

please?

Q.    Sixty-five.

A.    Now I'm there.

Q.    Okay.  He pointed you out the 2016 versus 2015 uplift of

three percent.  What does it say for the following year, 2017

versus 2016?

A.    It's down two percent.

Q.    He indicated to you that there was no disclosure regarding

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

 1  Google and Facebook in the page to which you directed you,

 2  correct?

 3  A.    Yes.

 4  Q.    Could you turn to page 24 of that same exhibit, 456.

 5  A.    (Witness complies.)

 6  Q.    Tell me when you're there?

 7  A.    I'm there.

 8  Q.    Do you see where it says, "The company's results of

 9  operation could be adversely affected if there are further

10  declines in television advertising spending which could be

11  caused by a number of factors.  Do you see that?

12  A.    Yes.

13  Q.    And do you see that, and I won't read the whole thing

14  because it's too long.  But do you see the sentence that says,

15  "The advantages of digital advertising and the increased amount

16  of consumer time spent on line and on mobile activities have

17  resulted in advertisers shifting more of their advertising

18  budgets away from traditional television advertising to digital

19  advertising, and Google and Facebook with their large user

20  base, high consumer engagement and ability to use their data to

21  target customers and consumers," and it goes on and on.

22      I won't bother repeating it, I'll spare the reporter.  But

23  do you see that's specific disclosure of risk factors related

24  to Google and Facebook?

25  A.    Yes.

1  Q.   You were asked about some over-the-top services, one of

2  them was Boomerang.  Do you know how many subs Boomerang has?

3  A.   I believe it's, I'm going to estimate, but I'll be close,

4  it's between a hundred and two hundred thousand.

5  Q.   And what about Film Struck?

6  A.   Probably two hundred thousand.

7  Q.   And that's what you meant by nascent?

8  A.   Yes.

9  Q.   Okay.  And he asked you, I think this first set of

10  questions about whether when you were at Time Warner cable,

11  Time Warner cable competed with other cable companies, do you

12  recall that?

13  A.   Yes.

14  Q.   Did Time Warner cable, during the years that you were

15  there while it was owned by Time Warner compete with Dish?

16  A.   Yes.

17  Q.   Did it compete with DirecTV?

18  A.   Yes.

19  Q.   Did it compete with any of the Telcos that started selling

20  video?

21  A.   Yes.

22        MR. PETROCELLI:  No further questions.

23        THE COURT:  All right.

24    Let me ask you a question, Mr. Martin.

25        THE WITNESS:  Yes, Your Honor.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1          THE COURT:  When you were testifying earlier, you

2  were talking about how you wanted to get this more data as part

3  of the merger so that you could have more targeted

4  advertisements, right?

5          THE WITNESS:  Yes.

6          THE COURT:  Do you remember that?

7          THE WITNESS:  Yes.

8          THE COURT:  Yes, at one point you were talking about

9  how you don't know -- you don't know, for example, what people

10  are actually watching, how much of their watching, and your

11  advertisers are requiring you to somehow demonstrate that

12  they -- the show has to be watched, it's not real time, within

13  seven days.  Do you remember that testimony?

14          THE WITNESS:  Yes, Your Honor.

15          THE COURT:  How is it you know it's been watched in

16  seven days?

17          THE WITNESS:  We rely on an outside service called

18  Nielsen Measurement System.

19          THE COURT:  Okay.  And is there concern, the

20  advertisers' concern that people are taping your shows, and

21  then when they watch it later, not in real time, but later,

22  they just sort of go over, go past the ads.  They don't even

23  look at their ads.

24          THE WITNESS:  Yes, that is --

25          THE COURT:  Is that what their major concern is, that

1    they're skipping the ads?

2           THE WITNESS:  There's two concerns.  One concern

3    would be that they're skipping the ads altogether.  And the

4    second concern is that by the time they're finally getting

5    around to watching the show, it's so late that the

6    advertisement is not relevant.

7        So just by way of example, if I'm a movie studio and I

8    want to launch a movie, it's very important for me that my

9    advertisement is reviewed on a timely basis.

10          THE COURT:  Right.

11          THE WITNESS:  Because if someone watches the show 30

12   days later, it's too late, and that person doesn't provide any

13   value.

14          THE COURT:  Right.  Now, if you have one of those, I

15   think you call it top of the TV box systems?

16          THE WITNESS:  Cable set-top box.

17          THE COURT:  Cable set-top box.  If you have one of

18   those systems, you're in a better position to know when

19   something is watched and whether they watch the ads or no?

20          THE WITNESS:  To a certain extent yes.  To a

21   certainly extent no.  But at least you know within a household

22   which channel was tuned in to, and you can better because a lot

23   of the cable set-top boxes are actually connected to other

24   devices in the home.

25          THE COURT:  Um-hum.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE WITNESS:  You can start to understand that

2    somebody who owns an iPhone watched the TV show, and then they

3    went to a Chevy ad, and so through decision sciences, you can

4    begin to put together a pattern of behavior that might make you

5    smarter, but it's still somewhat limited.

6          THE COURT:  And, of course, in a situation like the

7    one you were describing, say, for example it's a sports event,

8    which is live TV.

9          THE WITNESS:  Yes.

10         THE COURT:  The ad could come on, the person could be

11   watching the program, but when the ad came on, he could go to

12   the restroom.

13         THE WITNESS:  Right.

14         THE COURT:  Or he could go to the kitchen and get a

15   beer or something and not watch the ad at all.

16         THE WITNESS:  Yes, Your Honor.

17         THE COURT:  There's no way to prove, is there, or is

18   there a way to prove that someone actually watched the ad?

19         THE WITNESS:  I believe that's correct, Your Honor.

20   I'm smiling because there's been a long saying in the

21   advertising industry where the advertiser would always say, I

22   know I'm wasting half of my money, I just don't know which

23   half.  So there's always been this term called "waste and

24   imperfection."  And so with the addition of knowledge, through

25   customer information, we're trying to reduce, we'll never be

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    able to eliminate it entirely.

2                THE COURT:  No.

3                THE WITNESS:  But we're trying to reduce the amount

4    of inefficiency while at the same time improve the quality of

5    the ad so that hopefully people will be more receptive to them.

6                THE COURT:  So when you talk about having fewer

7    minutes of ads, but better quality ads, is that kind of the

8    concept behind the Super Bowl ads which everybody, they talk

9    about the next day.

10               THE WITNESS:  Yes.

11               THE COURT:  It's the subject of water cooler

12   discussions.

13               THE WITNESS:  Yes, same concept.

14               THE COURT:  To make them interesting, make them

15   more --

16               THE WITNESS:  Make the creative better.

17               THE COURT:  -- vital.

18               THE WITNESS:  But even that is not personalized.

19   Those are just meant to be entertaining ads that would hit a

20   huge audience.

21               THE COURT:  Right.  So it's not as targeted as you

22   ideally would like it to be.

23               THE WITNESS:  Those are not targeted, no.

24               THE COURT:  No, okay.  Thanks, you're excused.

25               THE WITNESS:  Thank you, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        (Witness excused.)

2            THE COURT:  You can just leave all that there, we'll

3   come and get it.

4        All right, who's your next witness?  Mr. Conrath?

5            MR. CONRATH:  Your Honor, our next witness is Marty

6   Hinson.  My colleague, Curtis Strong, will be presenting this

7   witness.  We anticipate --

8            THE COURT:  What's the last name again?

9            MR. CONRATH:  I'm sorry, Hinson, H-I-N-S-O-N.

10           THE COURT:  All right.

11           MR. CONRATH:  I note Mr. Hinson is from Cox, but

12  we've taken care to make sure that with the possible exception

13  of a setup question here and there, we're talking about

14  specifics and Ms. Fenwick did not talk about their four

15  specific facts that are more detailed.  And we anticipate about

16  a half an hour of direct.

17           THE COURT:  And his first name is Marty?

18           MR. CONRATH:  Marty, Martin I presume.

19       This is Mr. Strong, Your Honor.

20           THE COURT:  All right.

21           MR. STRONG:  Good afternoon, Your Honor.

22           THE COURT:  Good afternoon.

23           MR. STRONG:  May it please the Court, the United

24  States calls Marty Hinson to the stand.

25           THE COURT:  All right.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1            MR. STRONG:  I've been asked to speak a little bit

 2   louder, Your Honor.

 3            THE COURT:  All right.

 4            MR. STRONG:  So the United States calls Marty Hinson

 5   to the stand.

 6            THE COURT:  Okay, all right.

 7            THE DEPUTY CLERK:  Please raise your right hand.

 8            MARTIN HINSON, PLAINTIFF WITNESS, SWORN

 9            THE DEPUTY CLERK:  Please be seated.

10            MR. STRONG:  Your Honor, may I proceed?

11            THE COURT:  You may.

12                        DIRECT EXAMINATION

13   BY MR. STRONG:

14   Q.   Mr. Hinson, where do you work?

15   A.   Cox Communications.

16   Q.   And what is your position at Cox?

17   A.   I'm the vice-president of marketing; responsible for

18   pricing, consumer analytics, and competitive intelligence.

19   Q.   How long have you been in that role?

20   A.   Six years.

21   Q.   What did you do before joining Cox?

22   A.   So I was a pricing consultant for the Boston Consulting

23   Group.

24   Q.   How long were you there?

25   A.   About six and a half years.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   Q.   And could you explain to the Court what your current

2   responsibilities are with respect to video products?

3   A.   So for video products my team is responsible for pricing.

4   We do acquisition pricing, retention pricing, as well as

5   determining the list price, which is the maximum price for the

6   service.

7   Q.   You mentioned that you were -- you had some responsibility

8   with respect to intelligence and analytics.  Can you explain to

9   the Court what you meant by that?

10  A.   Sure.  So consumer analytics uses advanced statistical

11  analysis to determine insights for specific business questions.

12  So things like who's mostly likely to churn, who's most likely

13  to buy certain products, like video packages.  And the

14  competitive intelligence team looks at competitive landscape

15  data as to what's happening to our competitors on a weekly

16  basis, for their offers, for their products.  Changes that

17  happen in the marketplace.

18          MR. STRONG:  Your Honor, I'd like to mark Plaintiff's

19  Exhibit, it's got some confidential information that Mr. Hinson

20  can point to.  So that will be Plaintiff Exhibits PX 0523.

21          MR. PETROCELLI:  May we approach, Your Honor?

22          THE COURT:  Yes.

23      You can step down.  There's a chair on the side that you

24  can sit down in.

25      (Witness withdrew from the witness stand.)

1        (Bench conference under seal.)

2              MR. STRONG:  This is just going to be some

3    confidential information.  This was Mr. Petrocelli's, if I

4    recall his suggestion early last week so that we avoid closing

5    the courtroom and that kind of thing.

6              THE COURT:  Has he seen this thing?

7              MR. STRONG:  No, this would be just the same figures

8    that he would -- that we would elicit in testimony so we can --

9    we're going provide it to you.

10             MR. PETROCELLI:  Your Honor, we were told there would

11   be no exhibits for this witness so.

12             THE COURT:  Let him finish.

13             MR. PETROCELLI:  If these are exhibits, but this is

14   confidential information that's going to be coming from the

15   witness, is that what this is?

16             MR. STRONG:  Yeah, right.

17             MR. PETROCELLI:  It would have been helpful to get it

18   in advance.

19             THE COURT:  Yes.

20             MR. STRONG:  Well, if it --

21             THE COURT:  Where is it from, his deposition?

22             MR. STRONG:  No, these are just facts and figures

23   that Cox uses that's confidential, but I could elicit if we

24   were, say, in a closed courtroom.  It would just be like having

25   normal testimony.  But instead of doing it in a closed

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    courtroom, we'll just have him point to the page, right, so

2    that way --

3              MR. PETROCELLI:  How much is it?

4              MR. STRONG:  There's just a few pages here.  You can

5    see, there's just like facts and figures.

6              MR. PETROCELLI:  I don't want to delay things, so

7    it's fine, Your Honor.  I'm justing pointing out that I had no

8    knowledge of this, so I didn't know.

9              THE COURT:  I don't want any ambush going on.

10             MR. STRONG:  No, no, we're not trying to ambush.  It

11   would just be the equivalent of, you know, if I could just ask

12   him, he could say the percentage, right?

13             MR. PETROCELLI:  Are these duplicates?

14             MR. STRONG:  Yeah, you can have that one.  And I'll

15   give one to the witness.

16             THE COURT:  Give one to my law clerk.

17             MR. PETROCELLI:  You've got page numbers here?

18             MR. STRONG:  Yeah, they do.  It's A, B and C.

19             MR. PETROCELLI:  Okay, Your Honor, thank you.

20             THE COURT:  All right.  So you'll ask him a question

21   and point to something and say would that be the right answer?

22             MR. STRONG:  Yes, well, he gave us this information.

23   So he'll be able to tell you what all that means.

24             MR. PETROCELLI:  He, being the witness?

25             MR. STRONG:  The witness, yes, that's right.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1              MR. PETROCELLI:  It's hard to tell when you get a

 2   blank page.

 3              MR. STRONG:  Right, it will all have context once

 4   he's --

 5              MR. PETROCELLI:  I guess he's happy, it's being

 6   introduced into evidence.

 7              MR. STRONG:  We'll do it at the end after he's given

 8   context to it all, and we'll do it under seal if that's okay.

 9              THE COURT:  Let's see how it goes.

10       (Open court.)

11              THE COURT:  Come on back up, sir.

12       (Witness resumed the witness stand.)

13              THE COURT:  All right, we're going to try to --

14   government's counsel has got this choreographed approach here

15   to get this information from you under oath without revealing

16   it to the public in an executive session where we have to close

17   the doors and take everyone out because it's confidential,

18   okay.

19              THE WITNESS:  Okay.

20              THE COURT:  So let's see how this works.  We'll give

21   it a try.

22              MR. STRONG:  May I proceed, Your Honor?

23              THE COURT:  You can try.

24   BY MR. STRONG:

25   Q.   Mr. Hinson, can you describe for the Court what this
```

**\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\***

1  exhibit is?

2  A.   So this contains confidential information that I have

3  provided.

4  Q.   And are these facts and figures that exist in the ordinary

5  course of your business?

6  A.   Yes.

7  Q.   And would the public disclosure of these facts and figures

8  be harmful to Cox?

9  A.   It would.

10 Q.   Okay.  What percentage of Cox customers currently receive

11 Turner programming?

12 A.   It's a large percentage, that percentage who has Turner

13 programming is in Exhibit A.

14 Q.   When you say "Exhibit A," do you mean PX 0523 on page A?

15 A.   Yes.

16 Q.   Okay.  If you had to replace Turner channels in your

17 packaging, what would you replace it with?

18 A.   So Turner Broadcasting our content is not replaceable.

19 There's unique content, if you look at CNN, TBS and TNT are

20 frequently in the top 20 channels that are viewed by our

21 customers.  As well as CNN offers unique news content that is

22 irreplaceable.  Turner offers sports content such as March

23 Madness basketball, NBA basketball and baseball that is

24 irreplaceable, and consumers are looking for that specific

25 content.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.    You mentioned sports.  Have you ever gone dark with a

2  station that had popular sports before?

3  A.    We have about two years ago, there was a local broadcast

4  affiliate which we went dark on for four weeks leading up to

5  the Super Bowl.

6  Q.    And could you just explain for the Court what a local

7  affiliate is?

8  A.    So a local broadcast affiliate is owned by a smaller

9  company than the parent company.  So, for example, they would

10  offer ABC, CBS, NBC in a local market.  So you're probably

11  familiar with those having local news, local weather

12  broadcasting and still be owned by the parent company.

13  Q.    So those are the stations you can get with an antenna?

14  A.    Correct.

15  Q.    How long were you dark for?

16  A.    Four weeks.

17  Q.    And did you come to an agreement to get the channel up

18  before the Super Bowl came on?

19  A.    We did go back live before the Super Bowl.

20  Q.    And when you went dark, what happened?

21  A.    There was a significant increase in churn for the entire

22  four weeks as well as a churn increase even after we brought

23  the channel back up.

24  Q.    And how hutch did Cox churn increase during the month that

25  you were dark?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.    So that increase is confidential, so the increase in churn

2   during the four week period is in Exhibit PX 0523 dash B.

3   Q.    And did you try to mitigate that church in any way?

4   A.    We did.  So customers were informed widely that they could

5   go to our Cox retail stores to pick up fee antenna which would

6   give them the Super Bowl without any interruption.

7   Q.    And so the churn increase that you indicated before, that

8   was even with this free offer?

9   A.    That's correct.

10  Q.    Could you just explain to the Court what conclusions you

11  draw from that experience about your ability to exclude Turner

12  in your packages?

13  A.    So given that Turner also has popular sports content, like

14  I mentioned before with March Madness, NBA basketball and

15  baseball, it has similarities as far as must have sports

16  content that our consumers demand.

17  Q.    Have you ever done a drop analysis for Turner?

18  A.    Not specifically for Turner, no.

19  Q.    And why not?

20  A.    We don't need to because we've done similar analysis for

21  another large content provider.  Also about two years ago it

22  was a request by the content acquisition team.

23  Q.    And what net work group was that?

24  A.    That is confidential, and is -- the network is listed in

25  exhibit PX 0523 dash C.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.   What did you conclude in that analysis without giving any

2  confidential information away?

3  A.   So the conclusion was, you know, we looked at customer

4  relationship churn, video churn, acquisition impact, so

5  acquiring new customers as well as substitutes for content.  So

6  we actually looked at set-top box to see what other channels

7  are these consumers watching that were watching the potential

8  dropped content.  And the conclusion was that financially it

9  did not make sense for Cox to drop the content even with a

10  increase in price.

11  Q.   And how does Turner compare to that other -- to that other

12  company in terms of viewership?

13  A.   So Turner's content based on the viewership data from

14  set-top boxes is higher than the other large company that we

15  did the analysis on.  And actually with Turner having three

16  channels in the top 20 viewed, whereas this other company only

17  had one.

18  Q.   When you say that other company only had one, is it always

19  in the top 20?

20  A.   It is not.

21  Q.   And how do you know that?

22  A.   So I on a regular basis look at what's called rent track

23  data, it's a consolidated or aggregated set of data from cable

24  companies like Cox, so it includes other large MSOs.  That data

25  is available, since we subscribe to it, to see actual

1  viewership data which is highly accurate.

2  Q.    And what conclusions do you draw from that analysis with

3  respect to Turner?

4  A.    So with Turner, it's similar because Turner has actually

5  more popular content given more viewed channels, higher rated

6  channels that would actually lead to higher churn.  So if

7  there's higher churn, if we had to drop Turner content or

8  didn't have access to Turner content, it would result in higher

9  churn in this example, and we would come to the same logical

10  conclusion that it doesn't make sense because of the churn to

11  drop the content or there's definite bad consequences from both

12  a current customer churn perspective as well as acquiring new

13  customers.  We would not the ability to compete.

14  Q.    So do you believe you could compete with your competitors

15  without Turner?

16  A.    We could, but it would be very difficult.  We wouldn't

17  have a level playing field because customers are looking for

18  specific content.  And that's something if we didn't have

19  access to, they would go somewhere else.

20  Q.    So let's talk about HBO for just a bit.  How important is

21  HBO to Cox's ability to compete for customers?

22  A.    So HBO is also very important.  It's highly popular with

23  consumers.  We use HBO often to acquire new customers, so it's

24  part of our bundles, and we also use HBO as a retention

25  mechanism.

1  Q.   How much of your total customer base purchases HBO?

2  A.   So that is also confidential, it's in Exhibit PX 0523 dash

3  D, item number 1.

4  Q.   And of your customers that purchase premium networks, how

5  many of them take HBO?

6  A.   So that's in Exhibit PX 0523 dash D, item number two, and

7  again, that's the total premium customer mix that has HBO.

8  Q.   Okay.  And are those figures higher or lower than other

9  premiums?

10  A.   HBO is the highest.

11  Q.   How much does Cox pay per subscriber per month for HBO?

12  A.   So what we pay to HBO from a cost perspective is in

13  Exhibit PX 0523 dash D, item number 3.

14  Q.   Do any other premiums cost more than that?

15  A.   No, they do not.

16  Q.   Does HBO own any other premiums?

17  A.   Yes, Cinemax.

18  Q.   And of your premium subscribers, how many subscribe to

19  Cinemax?

20  A.   So the subscription for Cinemax, the percentage is in

21  Exhibit PX 0523 dash D, item number 4.

22  Q.   And is that in addition to the number that you just gave

23  the Court for HBO?

24  A.   Correct.  So the combined HBO plus Cinemax would be

25  Exhibit PX 0523 dash D, item number 1, plus item number 4.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.    In terms of popularity, which premium is the highest after

2  HBO?

3  A.    Actually, can I make a correction?  It's item number 2

4  plus item number 4.

5  Q.    Okay.  That was in response to my last question?

6  A.    Correct, sorry about that.

7  Q.    Okay.  In terms of popularity, which premium is the next

8  highest after HBO?

9  A.    So the next most popular is Showtime.

10  Q.    And what percentage of Cox's premium sales does Showtime

11  represent?

12  A.    So Showtime represents the percentage in Exhibit PX 0523

13  dash E, item number 1.

14  Q.    And how much does Cox pay per subscriber per month for

15  Showtime?

16  A.    So the Showtime cost per subscriber per month is in

17  Exhibit PX 0523 dash E, item number 2.

18  Q.    Can you explain to the Court how Cox offers HBO today?

19  A.    So we include HBO in bundles.  We've included it

20  historically in the bronze bundles, silver bundle and gold

21  bundle.  So that's what we advertise to acquire new customers.

22  We currently have it included in silver and gold, not in

23  bronze.  As well as in retention, so for customers who call in

24  asking questions about their bill, we have HBO as a retention

25  offer as well.

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  Q.  Do you offer HBO a la carte as well?

2  A.  We do, so it is always available a la carte.  We also

3  sometimes -- which means selling it individually, right, at any

4  time.  That's often at list price, but for current customers we

5  will sometimes have like a one for -- one premium for $10, two

6  for fifteen, that sort of thing.

7  Q.  Are those customers that take HBO, where does HBO rank in

8  terms of viewership?

9  A.  So based on consumer research and our own data, HBO rates

10  in the top ten for the viewed, our viewership data for those

11  consumers with HBO.

12  Q.  And how consistently is it rated in the top ten?

13  A.  Consistently, based on our consumer research internally

14  and third party research, it's always in the top ten.

15  Q.  Do you keep abreast of the competitive offerings of your

16  competitors involving HBO?

17  A.  We do.  So the competitive intelligence team who reports

18  to me, as part of that weekly update is looking at when HBO is

19  included in our competitors' acquisition offers, when it's

20  included in advertising so we know when our competitors are

21  using it.

22  Q.  And how common is the use of HBO amongst your competitors?

23  A.  It's extremely common.  So AT&T has frequently used HBO,

24  as an example, in advertising for many months.  It hasn't

25  changed.  It's also with our other competitors like Verizon

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Fios and CenturyLink, they all have HBO and use it for

2   advertising purposes and offers.

3   Q.   Are there any of your competitors that do not offer HBO to

4   your knowledge?

5   A.   No, they all do.

6   Q.   How much does Cox charge its customers for premiums?

7   A.   So premiums are either at the list price, which is 15.99

8   per premium or they're occasionally the promotional offer is

9   like one for ten, two for fifteen.

10  Q.   You mentioned you currently offer HBO in your silver and

11  gold bundles.  Could you tell the Court if you've observed any

12  benefits of having HBO in those bundles?

13  A.   We have.  So I mentioned that we previously had HBO in the

14  bronze bundle, which was the lowest price advertised bundle of

15  the most advanced TV or contoured advanced TV.  That's -- we

16  saw when we removed HBO from the bronze bundle, but kept it in

17  silver and gold.  We saw a significant increase in silver and

18  gold.  Some customers with choosing silver and gold because of

19  HBO, that was the only change that we made to the offers.

20  Q.   And how much did demand increase as a result for your

21  silver and gold packages?

22  A.   So the increase for the silver and gold packages is

23  confidential and it's in Exhibit PX 0523 dash F.

24  Q.   What effect does the use of HBO have on Cox's retention

25  rates?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  A.    So we've done advanced analytics, so the consumer

2  analytics team has an ongoing basis looked at what helps retain

3  customers.  One of those recently has actually been conducted

4  in the past two months shows that there's a significant

5  reduction in churn, so there's retention benefit of current

6  customers adding HBO.

7  Q.    How much does your churn go down when you add HBO?

8  A.    So that information is confidential.  It's in Exhibit PX

9  0523 dash G.  So that's the number of the percentage of

10  improvement in retention for customers who add HBO.  And I just

11  want to point out that advanced analytics corrects for other

12  things, like demographics, product combinations, to isolate

13  what the actual impact from HBO.

14  Q.    Have you done a drop analysis for HBO?

15  A.    We have not.

16  Q.    And why not?

17  A.    We haven't really needed to because we know from other

18  analytics, the importance of HBO from an acquisition

19  perspective, I mentioned the example earlier about the bronze

20  bundle and silver and gold, as well as we know the benefit for

21  retention purpose is highly significant.  So there's no reason

22  for us to have to do a drop analysis for HBO.

23  Q.    Do you have to get HBO approval before using HBO for

24  certain promotional offers?

25  A.    Yes, we do have to have HBO's approval for any promotional

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  offers so if we want to discount it at all or to advertise HBO,

2  we have to have permission for every single offer and

3  advertisement.

4  Q.    And without providing any confidential information, does

5  HBO impose any restrictions on your ability today to offer or

6  otherwise promote HBO?

7  A.    So in addition to what I just mentioned about the approval

8  process, we do have restrictions on the amount of free trials

9  we can provide so the time that HBO can be free.  As well as

10  certain terms are not allowed in advertising, so there's a few

11  terms that we cannot use.

12  Q.    Can you provide -- let me back up.  Do you have any

13  flexibility in offering HBO today?

14  A.    We do have flexibility, but we have to go through that

15  approval process.

16  Q.    And can you provide some examples of HBO offers, public

17  HBO offers that Cox has used to obtain or retain customers?

18  A.    So the examples I gave earlier was including HBO and the

19  bronze, silver and gold bundles, and which are our most popular

20  bundles.

21  Q.    And do you use it in retention?

22  A.    Yes, in retention we do have a set of HBO offers, some of

23  them very deeply discounted to reward our most highly valued

24  customers.

25  Q.    If one of your competitors, say AT&T, were to own HBO, are

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  there ways in which it could restrict your flexibility to offer

2  HBO to customers?

3  A.   Yes, so the most extreme would be if we didn't have access

4  to HBO at all, which would be detrimental, given how popular

5  the content is with our consumers.  If we did have access to

6  HBO, there could be restrictions on when we had access to the

7  content.  So "Game of Thrones" is highly popular.  If we can't

8  get that when it's live and it's delayed by a week, two weeks,

9  et cetera, that is a feasible restriction as well.

10      Penetration requirements, so I don't know if you're

11  familiar with those, but I can explain that penetration

12  requirements require so many of our video customers have to

13  have that product without a penalty.  So that could be added

14  for HBO as well.  And the most immediate change, which doesn't

15  even require a new contract with HBO, is going back to my point

16  around we have to have approval to use HBO in offers and

17  advertising, and AT&T could simply say no, that we can't

18  provide HBO in our offers, in our bundles and our advertising.

19  Q.   And do those concerns also apply to Cinemax?

20  A.   They do.

21  Q.   What impact would those restrictions have on Cox and your

22  customers?

23  A.   Given how popular HBO is, there would be significant

24  increases in churn.  Given the information as far as how many

25  of our subscribers have HBO and they're looking for that

1    content.

2    Q.   But couldn't HBO already restrict your flexibility today?

3    A.   They could, there's no real reason to because HBO wants as

4    many customers, whether they're our customers or anyone's

5    customers, to have the service.  They're very cooperative when

6    we go and present offers in advertising to come to a common,

7    common ground.

8    Q.   But wouldn't that be the same after the merger that we're

9    talking about between AT&T and Time Warner?

10   A.   Well, if AT&T owns Time Warner or HBO, both, there would

11   be a shift in the economics.  So from a AT&T perspective, the

12   leverage would change because they'd be looking at, well,

13   what's the value of the customer relationship.

14          THE COURT:  Well, that's not what they think.  That's

15   what you think, right?

16          THE WITNESS:  My understanding of the economics of

17   the industry.

18          THE COURT:  You need to be clear about that.

19   BY MR. STRONG:

20   Q.   Yeah, let me be clear on the question.

21          THE COURT:  Hold on, whoa.

22          MR. STRONG:  I'm sorry, Your Honor.

23          THE COURT:  Don't interrupt me, please.

24          MR. STRONG:  I'm sorry.

25          THE COURT:  My reporter can't take us both down at

1    the same time.

2            MR. STRONG:  Understood.

3            THE COURT:  You have to be clear when you testify as

4    to what you think someone else thinks.  You can't represent

5    what someone else thinks.

6            THE WITNESS:  Okay, that makes sense.

7            THE COURT:  Unless you know for certain, then you

8    have a basis to say, you know, okay.  So keep that straight.

9            THE WITNESS:  Will do.

10           THE COURT:  Go ahead, you may answer.

11           THE WITNESS:  So based on the information I have, a

12   customer relationship is highly valuable.  So I work in the

13   world of economics to determine the margin of customers, the

14   lifetime value of customers.  And I understand how much a

15   customer is worth.  And I know how much we pay for license fees

16   for HBO.  So those license fees are significantly less than the

17   value of the customer relationship.

18       So my understanding of the industry would say the

19   negotiation leverage changes if now HBO is owned by a

20   competitor who is looking at it from that perspective to say,

21   well, I can acquire or use HBO to acquire new customers, and

22   the whole relationships, the whole bundle versus just getting a

23   license fee.

24   BY MR. STRONG:

25   Q.   So I've got just a few more questions about pricing to

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  customers.

2      We talked about acquisition a moment ago.  Without

3  disclosing any confidential information, what is your general

4  process for creating promotional prices?

5  A.   So for acquisition promotional prices we look at the

6  competitive information that I mentioned, so on a weekly basis

7  we see what our competitors are offering.  We look at

8  historical data, so we analyze what's worked in the past, what

9  hasn't worked as far as drive and demand and connects.

10     And then we occasionally, we also use consumer research so

11  we want to understand what's popular with consumers, not just

12  based on the viewership data, but what do they really want in

13  terms of prices and offers.

14  Q.   And again, without viewing any confidential information,

15  how do you set prices for your existing customer base, your

16  list price customer base?

17  A.   So as a reminder, the list price is the maximum price we

18  charge for our service, which affects must of our current

19  customers.  That price is determined based on looking at the

20  historical cost increases over the past twelve months, and we

21  would factor that in.  So we need to make sure that we can

22  cover costs through some of our price increases.

23  Q.   Has Cox ever faced content cost increases in the past?

24  A.   Every single year.

25  Q.   And what do you do in response to those cost increases?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  A.   So we increase the list price.

2  Q.   And what percentage of your cost increase do you typically

3  add to your customers' bills as a result of the cost increase?

4  A.   So that's confidential, it's part of our pricing strategy.

5  So that percentage which we pass on to our customers is on

6  Exhibit PX 0523 dash H, item number 1.

7  Q.   And when your account for retention credits that you offer

8  customers, what percentage of your cost increase gets passed

9  through, does it go down from the number that you just gave?

10 A.   It does.  So looking at what happens to consumers, some

11 respond to their bill and ask questions about the bill.  There

12 are specific targeted retention discounts that we can provide,

13 and that brings the previous number I gave down, which is

14 confidential, and in Exhibit PX 0523 dash H, item number 2.

15 Q.   And how do you know that information?

16 A.   So we do analysis working with our finance team to look at

17 the impact of how many customers call after a bill increase,

18 what percentage of those get retention discounts and how much

19 that discount is.

20 Q.   Now, Cox does not realize all that's passed through, how

21 does that affect your margins?

22 A.   So every year as video content costs continue to increase

23 and all it doesn't go to the bottom of the bill or the bottom

24 of the line, sorry, bottom line for Cox, our video margin does

25 continue to decline.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.    And does that affect your ability to compete in the

2  marketplace at all?

3  A.    It does for a couple of reasons.  The first is our video

4  costs are not necessarily the same as our competitors.  So

5  there isn't always a level playing field as far as cost is

6  concerned.

7       But secondly, we use part of our profit margin to reinvest

8  into the experience.  So whether it's DVR service, advanced

9  navigation, there's other features to the video product the

10 consumers are looking for.  That if we continued to lower

11 margins, there's less that we can invest in to improve the

12 customer experience.

13 Q.    I just have one more question.  I'm going to use an

14 average figure that the Court has heard before even though this

15 figure may be higher for Cox.  But if Cox were to increase its

16 price to customers by say 45 cents per subscriber per month.

17 More than it otherwise would as a result of this merger, what

18 would be the impact to Cox and its customers?

19 A.    So our consumers would end up paying tens of millions of

20 dollars more per year for the exact same content.

21            MR. STRONG:  I have no further questions at this

22 time, Your Honor.

23            THE DEPUTY CLERK:  Mr. Strong, did you move in 523?

24            MR. STRONG:  Oh, thank you for the reminder.  May I

25 move into evidence PX 0523 under seal, Your Honor?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. PETROCELLI:  No objection.

2          THE COURT:  All right, admitted under seal.

3      (Plaintiff's Exhibit No. PX 0523 was received in evidence

4  and under seal.)

5                      CROSS-EXAMINATION

6  BY MR. PETROCELLI:

7  Q.   In your role at Cox as VP of marketing you are not

8  responsible for actual marketing or advertising to customers;

9  is that correct?

10 A.   When you say actual marketing, that covers a lot of

11 ground.  Can you clarify?

12 Q.   Is it correct that your group, you're responsible for the

13 promotional pricing sign, but there's another team that you

14 work with who actually does the marketing and advertising; is

15 that true, sir?

16 A.   The advertising piece is true, we work with the team on

17 marketing our offers to perspective customers.

18 Q.   So my statement is true then.  There's another team that

19 you work with who actually does the marketing and advertising.

20 Is that true?

21 A.   For advertising, but marketing covers many things,

22 including my function.

23 Q.   Well, let me show your deposition then.

24          MR. PETROCELLI:  May I approach, Your Honor?

25          THE COURT:  You may.

1   BY MR. PETROCELLI:

2   Q.   Please turn to page 10, line 25.

3   A.   (Witness complies.)

4   Q.   Are you there?

5   A.   I am.

6           Q.   "Question:  Is your group responsible for

7           marketing to new customers?

8               "Answer:  We're responsible for the promotional

9           pricing side, but there's another team that we work

10          with who actually does the marketing and advertising."

11      Is it also true, sir, that you do not have anything to do

12   with the use of premium programming, premium content for

13   promotional purposes; is that also true?

14   A.   Please repeat the question.

15   Q.   Is it correct that you do not have anything to do with use

16   of premium programming and premium content for promotional

17   purposes; is that true?

18   A.   No, I've already given examples.  We do use HBO and

19   promotional pricing.

20   Q.   And could you please turn to page 97 of your deposition,

21   line 3.

22   A.   (Witness complies.)

23   Q.   Tell me when you're there.

24               "Question:  Do you have anything to do with use

25           of premium programming, premium content for

1          promotional purposes?

2     "Answer:  I do not."

3     Now, you haven't participated directly in any of the prior

4 negotiations for Turner or HBO over licenses, correct?

5 A.   Not directly in the negotiation, but I'm familiar with the

6 leverage in those negotiations.

7 Q.   Well, sir I didn't ask you if you were familiar with the

8 leverage of the negotiation, can you please just answer my

9 questions?  I'll ask you one more time then.

10    Have you -- it is true, sir, that you have not participated

11 in any of the prior negotiations for Turner, or HBO over

12 licenses; is that true?

13 A.   Yes, not directly in the negotiation.

14 Q.   Thank you.

15    Is it also true, sir that your group has never conducted a

16 drop analysis for HBO?

17 A.   That is true, we didn't see the need to.

18 Q.   Again, just try to answer my question.  The government's

19 lawyer can ask you to explain your answers.  Let me ask you

20 again then.

21    You have not conducted a drop analysis for HBO; is that

22 true?

23 A.   That is true.

24 Q.   You have not conducted a drop analysis for any of the

25 Turner Networks; is that true?

1  A.    True, given that we have similar analysis, we didn't need

2  to do that.

3          MR. PETROCELLI:  Your Honor, I move to strike his

4  explanatory answers, he's not answering my questions.

5          THE COURT:  All right.  Answer the question.  If you

6  need to explain it further, your counsel will do redirect.

7  We'll strike the end of the last answer.

8      Go ahead.

9  BY MR. PETROCELLI:

10  Q.    You haven't done any quantitative analysis of the relevant

11  importance of different content to Cox subscribers, correct?

12  A.    Of any content?  Can you please clarify?

13  Q.    Yes.  Other than the one example that you described

14  confidentially, you've not done any other quantitative analysis

15  of the relative importance of different content to Cox

16  subscribers; is that correct?

17  A.    The content includes many different things, so we have

18  done additional analysis for HBO as an example.

19  Q.    Can you please turn to page 94 of your deposition, line

20  24.  Tell me when you're there.

21  A.    Yes.

22          "Question:  You're not, you're not, you haven't

23          done any quantitative analysis of the relative

24          importance of different content to Cox subscribers,

25          right?

1           "Answer:  The exception was the one blank

2       example."

3      You've seen no documents that would indicate that

4  post-merger Turner content is not going to be available to Cox,

5  correct?

6  A.   Please restate the question.

7  Q.   You've seen no documents that would indicate that post

8  merger, Turner content is going to be unavailable to Cox, true?

9  A.   True.

10  Q.   You've seen no documents post merger to, you seen no

11  documents that would indicate post merger that HBO is going to

12  be unavailable to Cox, correct?

13  A.   Correct.

14  Q.   You've seen no documents to indicate that post merger

15  there's going to be a price increase in Time Warner content

16  that is different from resent history, correct?

17  A.   Correct.

18  Q.   And you've never had -- Cox has never had a blackout of

19  Turner, correct?

20  A.   Not to my knowledge.  I've been in at Cox six years.

21  Q.   Since you've been there?

22  A.   Correct.

23  Q.   And never been a blackout of HBO correct?

24  A.   Correct, as far as I'm aware during that six-year period.

25  Q.   And you've seen no documents to indicate that post merger

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   AT&T is going to somehow restrict the use of HBO as a

 2   promotional tool, correct?

 3   A.   Correct, I haven't seen a document like that.

 4   Q.   And you haven't spoken to anybody who told you that's

 5   going to happen, correct?

 6   A.   Correct.

 7   Q.   Now, did I hear you say that Turner was replaceable?  Is

 8   that what you said?

 9   A.   Yes, from a consumer perspective.

10   Q.   Well, you said Turner.  So I'm not quite sure what you

11   meant by Turner.  So let me follow up on that for a second.

12        Is Boomerang irreplaceable?  Is that your testimony?

13   A.   For some customers, no, it's not replaceable.

14   Q.   How many -- have you done any studies to determine whether

15   Boomerang is irreplaceable?

16   A.   For Boomerang, no.

17   Q.   What about Headline News, is that irreplaceable?

18   A.   It's still popular for certain consumers.

19   Q.   Have you done any studies to determine if that is

20   irreplaceable?

21   A.   I had actual set-top box data that I'm basing this on.

22   Q.   Well, does it tell you that it's absolutely irreplaceable?

23   A.   No, but it's still popular.

24   Q.   Okay.  A lot of channels are popular, right?

25   A.   Of course.
```

1   Q.   Outside of Turner, right?

2   A.   They are, but.

3   Q.   You're not saying that Turner stands above all other

4   networks and Turner alone is irreplaceable, that's not what

5   you're telling the Court, are you?

6   A.   The examples you gave are not --

7   Q.   You're not telling the Court that, are you, that only

8   Turner is irreplaceable?

9   A.   That only Turner is irreplaceable?

10  Q.   Yes.

11  A.   Other content is irreplaceable as well.

12  Q.   A lot of channels, right?

13  A.   For some consumers, yes.

14  Q.   Okay.  And so you haven't done any studies that would

15  distinguish among the various Turner Networks to determine

16  their irreplaceability, correct?

17  A.   All networks have different ratings, and there are three

18  of the Turner Networks in the top 20, which makes them more

19  important than the examples you gave, which are far less in the

20  viewership.

21  Q.   Does that include, by the way, all of the broadcast

22  stations?

23  A.   It does.

24  Q.   Are they above Turner?

25  A.   Yes.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.   Who are the broadcast stations?

2  A.   ABC, NBC, CBS, Fox.

3  Q.   Who else is above Turner?

4  A.   It varies every month.

5  Q.   Give me some examples?

6  A.   Well, CNN is number 7, so we mentioned the broadcast

7  channels, ESPN, sometimes depending on the content, is above

8  Turner for that month.

9  Q.   Now, your company, I think you said uses HBO as a

10  promotional tool, right?

11  A.   Correct.

12  Q.   But it uses other things for promotional purposes too in

13  order to retain or acquire subs, right?

14  A.   Yes.

15  Q.   Can you give the Court examples of the many, many

16  different options that your company uses for promotions?

17  A.   So the examples, consumers are looking for many different

18  things, so examples of promotional offers include the price

19  itself, so a discounted price.  We have included other premiums

20  like Showtime.  We've included gift cards in the past, as our

21  competitors do as well.  And things like free install.

22  Q.   Free receiver rentals?

23  A.   That is included in some of our bundles, yes.

24  Q.   Prepaid gift cards?

25  A.   Gift cards have been used in the past, yes.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.   Have you ever done a study that would show how affected

2  the bundle promotion for silver and gold would be with the

3  three premiums, but without HBO?

4  A.   The example I gave shows the impact of removing HBO from

5  the bronze bundles.

6  Q.   Can I refer you to your deposition at page 79 -- at page

7  5, excuse me, line 5.

8     Five to 15, are you with me?

9  A.   Sorry, to clarify --

10  Q.   I'll start at line 9.

11  A.   -- page 78, did you say?

12  Q.   Seventy-nine.

13  A.   Seventy-nine.

14  Q.   I'll start at line 9 to shorten it.

15          "Have you ever done a study that would show how

16       affected the bundle promotion for silver and gold

17       would be with the three premiums, but without HBO?

18          "Answer:  We have not because again, we're

19       contractually required to include HBO in Silver and

20       gold bundles."

21     Now, did I hear you also say that you need to get HBO's

22  permission every single time you want to use HBO in a

23  promotion?

24  A.   That's my understanding.

25  Q.   Well, is it your understanding or do you know?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  A.   Based on what I've been informed by the content

2  acquisition team, that is --

3  Q.   Well, so your testimony then was based on what somebody

4  told you?

5  A.   It's an important source given that they work on the

6  negotiations in contracts.

7  Q.   Did you read the contract?

8  A.   I have read parts of the contract, yes.

9  Q.   So you haven't even read the whole contract before you

10 came into court to tell the Judge that you can't do any of

11 these promotions without getting HBO's permission every single

12 time?

13 A.   That's what we have as a guiding principle based on what's

14 in the contract.

15 Q.   Do you think the contract is the best evidence of whether

16 permission is required every single time?

17 A.   Given that HBO and our content acquisition team is heavily

18 involved in the contract writing, they know what's in the

19 contract.

20 Q.   But you don't know what's in the contract?

21 A.   They have informed me what our contract restrictions are.

22 Q.   But they're not testifying, you are?

23 A.   Correct.

24 Q.   Okay.  Now, are you aware that in the contract there's

25 actually pre-approval given for certain promotional uses?  Are

1    you aware of that, yes or no?  Did they tell you that, these

2    folks that work in your company that supposedly read the

3    contract?

4    A.   Yes, that's part of the approval process that some things

5    are preapproved.

6    Q.   Now, do you understand that if, for example, your company

7    wanted to do an HBO promotion where you used a scene or even an

8    image from, let's say "Game of Thrones" or an actor, that that

9    might involve intellectual property rights with respect to the

10   people depicted in the image.  Are you aware of that

11   circumstance?

12   A.   Yes.

13   Q.   And so -- do you think in that circumstance you might, you

14   might have to go back to HBO so they can make sure that they

15   have clearance to allow you to use the image of somebody else?

16   A.   That's --

17   Q.   Are you familiar with those kinds of details?

18   A.   That is one area we have to get approval, but I know my

19   team also has to get pro approval for promotional offers.

20   Q.   An you only know that because that's what they told you?

21   A.   I know that based on what we have in our contracts based

22   on who works on those contracts.

23   Q.   You've done no analysis of the impact to Cox if HBO were

24   only available through HBO now, the over-the-top service; is

25   that true?

1  A.    Correct.  Most consumers prefer to get HBO directly from

2  Cox.

3  Q.    Again, you're adding all kinds of things that I'm not

4  asking you about, but I'll move forward.

5        MR. PETROCELLI:  In fact, I won't move forward, Your

6  Honor.  I have nothing further.

7        THE COURT:  Was kind of hoping you'd say that.

8        MR. STRONG:  May I, Your Honor.

9                    REDIRECT EXAMINATION

10  BY MR. STRONG:

11  Q.    Do you have your deposition there with you?

12  A.    I do.

13  Q.    Could open back up to page 10, line 25?

14  A.    (Witness complies.)

15        THE COURT:  Can you do this in five minutes?

16        MR. STRONG:  I think so Your Honor, yep.

17  BY MR. STRONG:

18  Q.    So let's turn to page 11 where it says your answer.  Am I

19  right that you told Mr. Frackman during your deposition, "We're

20  responsible for the promotional pricing side in response to

21  that question whether you're responsible for marketing?

22        MR. PETROCELLI:  What line, please?

23        MR. STRONG:  There's some lines that you read, so

24  we're on page 10, 25, and then starting on page 11.

25        MR. PETROCELLI:  Thank you.

**\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\***

1          MR. STRONG:  With the answer at line 3.

2          THE WITNESS:  Right, so we're responsible for the

3    promotional side of marketing, it's part of marketing.

4    BY MR. STRONG:

5    Q.   Well, let's turn to page 97.  So the question at the top

6    of the page where do you have anything to do with the use of

7    premium programming, premium content for promotional purposes.

8        And if you look down at the bottom there's some explanation

9    there in the middle of the page that if we look at line 21 on

10   page 97.  Can you just read what you said there in your

11   deposition?

12         MR. PETROCELLI:  Will he please read the question,

13   Your Honor.

14         MR. STRONG:  Yep, I can do that.

15   BY MR. STRONG:

16   Q.   If you can read the question also, that begins on line 19.

17   A.   So on line 19 the question is, "Either to promote Showtime

18   or to promote Cox."

19       And line, 21 which is my answer.  "My team does make

20   decisions on bundles like the bronze, silver, gold bundle

21   although contractually we're required to include the premiums

22   in silver and gold but my team is not involved in the actual

23   advertising."

24   Q.   So is that what you meant, your team is not involved in

25   the actual advertisement, but as far as promotion of this

1   silver and gold packages, you're involved with the marketing

2   there?

3   A.   Correct.  On line 4 the word "promotional" was related to

4   advertising.

5   Q.   Okay.  Great.

6       Mr. Petrocelli asked you about whether you had done any

7   quantitative analysis for your testimony today with respect to

8   Turner?

9   A.   Correct.

10  Q.   Are you aware of any requests from the defendants in

11  discovery of this litigation that has asked Cox for a

12  quantitative analysis?

13  A.   I do not.

14  Q.   Okay.  And the testimony that you are giving the Court

15  today, is that -- what is that based on?

16  A.   So it's based on the prior analysis we have done in

17  similar situations.  We have done a drop analysis for a large

18  content provider.  We have done analysis for a broadcast

19  station that has popular sports content that resulted in high

20  churn.

21  Q.   Is that information that's available to you in the

22  ordinary course of business?

23  A.   It is.

24  Q.   Okay.

25      Mr. Petrocelli asked you about certain network programs

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    like Boomerang for Turner.  Do you recall that?

2    A.   I do.

3    Q.   Do you know if Cox is able to purchase just Boomerang on

4    its own?

5    A.   No, we cannot.  Our contracts require multiple channels

6    from Turner.

7    Q.   Okay.  Mr. Petrocelli also asked you about the contract

8    for HBO.

9    A.   Yes.

10   Q.   And the information that -- you said that you had read

11   some of the contract; is that right?

12   A.   That's correct.

13   Q.   Okay.  And is it part of your job to understand what you

14   can and cannot do in terms of promotional pricing with HBO?

15   A.   Yes.

16   Q.   Okay.

17            MR. STRONG:  I think that's all I've got, Your Honor.

18            THE COURT:  You're excused.

19       (Witness excused.)

20            THE COURT:  Mr. Conrath.

21            MR. CONRATH:  Yes, Your Honor.

22            THE COURT:  What's on deck for tomorrow?

23            MR. CONRATH:  An expert.  Professor Hauser, who is

24   talking about his survey based analysis.

25            THE COURT:  He's your next expert witness?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
1              MR. CONRATH:  Yes.

2              THE COURT:  Professor Hauser.

3              MR. CONRATH:  Right.

4              THE COURT:  What's your estimate on direct?

5              MR. CONRATH:  Between an hour and hour and fifteen

6   minutes, Your Honor.

7              THE COURT:  An hour, an hour and fifteen minutes.

8   Any challenge to his expert status or is that conceded?

9              MR. PETROCELLI:  We're not challenging it, Your

10  Honor.

11             THE COURT:  Okay, so an hour and a quarter?

12             MR. CONRATH:  I have been wrong before, but that's

13  what I understand.

14             THE COURT:  You're not alone.

15        What's cross?

16             MR. PETROCELLI:  Mr. Barbur.

17             THE COURT:  Mr. Barbur's going to do it?

18             MR. BARBUR:  Approximately an hour, Your Honor.

19             THE COURT:  Okay, so that's the morning pretty much.

20  What have you got in the afternoon?

21             MR. CONRATH:  Mr. Rigdon.

22             THE COURT:  Hold on now, I've got to look this person

23  up.  Rigdon?

24             MR. CONRATH:  Yes.

25             THE COURT:  R-I-G-D-O-N?
```

```
 1              MR. CONRATH:  That's right.

 2              THE COURT:  Comcast?

 3              MR. CONRATH:  Yes.

 4              THE COURT:  What's your estimate on that person?

 5              MR. CONRATH:  I believe that's an hour, Your Honor.

 6              MR. PETROCELLI:  Same.

 7              THE COURT:  Hour each?

 8              MR. PETROCELLI:  Yeah.

 9              MR. CONRATH:  Your Honor, there will be -- we will, I

10  believe, need to raise a confidentiality issue with respect to

11  Mr. Rigdon.

12              THE COURT:  Okay.  In advance?

13              MR. CONRATH:  Yes.

14              THE COURT:  That might take the rest of the

15  afternoon.

16              MR. CONRATH:  It's possible.  It may be predictable.

17              THE COURT:  Okay.  Well, who would be your third if

18  you got to a third?

19              MR. CONRATH:  Mr. Breland.

20              THE COURT:  Mr. Breland?

21              MR. CONRATH:  Yes.

22              THE COURT:  What's the length of direct on that?

23              MR. CONRATH:  Hour and a half to two hours.

24              MR. PETROCELLI:  One and a half.

25              THE COURT:  Well, that takes care of this week.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. CONRATH:  Yes.

 2              THE COURT:  All right.

 3              MR. PETROCELLI:  Your Honor, we need more witnesses.

 4   I've been asking the government.  We only have witnesses

 5   through next Tuesday, and we would like to know the balance of

 6   the witnesses and the order because we've been moving our folks

 7   schedules around.  With respect to a couple of people they've

 8   moved them two or three times already.  And these people live

 9   out of state.  And I can't keep, you know, yo-yoing them like

10   that.  So I need to get a list that we can depend on for the

11   balance of the government's case.

12              MR. CONRATH:  Your Honor, we have made adjustments in

13   response to snow and other reactions, and I think in my

14   experience in trials like this is there are adjustments, and we

15   obviously try to minimize them.  They affect our witnesses as

16   well, who, as the Court knows, other than experts we do not

17   control.  And we work very hard both to -- to minimize the

18   inconvenience to third parties and to defendant witnesses and

19   not put ourselves --

20              THE COURT:  Let's put it this way.  I think what's

21   going to happen is this weekend both sides are going to sit

22   back and reevaluate how many witnesses they need to make this

23   case.  Because as I indicated before, if this trial goes to

24   May, there will be no opinion probably doable of the quality

25   and quantity expected by the Court of Appeals by June 21st.  It
```

1   can't get done that fast.  This is going to be a probably

2   somewhere between the finding of fact and conclusions of law is

3   going to be somewhere in the order of a two hundred page

4   opinion.

5       And with the level of detail and the level of accuracy

6   that's understandably expected by all sides and the Court of

7   Appeals, you can't do something like that in four weeks, five

8   weeks.  It's just not -- it's not doable.  So if we're going to

9   get this case done prior to that deadline, we've got to move.

10  And my tolerance to date has been very high for redundancy,

11  it's going to become increasingly lower.  Which means that

12  counsel is going to find themselves at the short end of the

13  stick, they're's going to start getting whipped.

14      So I mean, I think this weekend both sides are going to

15  need to go to their respective tables and sit down with their

16  clients, their teams, and make some hard decisions about what

17  they need versus what they want.  So that we can bring this

18  case to fruition sooner rather than later so.

19          MR. CONRATH:  Your Honor, we reevaluate in the middle

20  of cases regularly, and we'd already identified that that was

21  one of our tasks this weekend and probably next weekend and the

22  weekend after.  Our assessment is that there should be no risk

23  of going into May, that's our assessment.  And if we can, we

24  will make it substantially shorter.

25          THE COURT:  Remember, you've got two sides to this

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   coin.

2           MR. CONRATH:  Of course.

3           THE COURT:  And you're going to need a week to do the

4   proposed findings of fact and conclusions of law.  And you're

5   going to need with good reason a couple days to prepare for the

6   closings.

7           MR. CONRATH:  Yes.

8           THE COURT:  So you've got to build all that into this

9   process.  Certainly I'm building it into this process.  So a

10  word to the wise is sufficient.

11          MR. PETROCELLI:  Thank you, Your Honor.

12          MR. CONRATH:  Thank you, Your Honor.

13          THE COURT:  See you tomorrow.

14          (Trial adjourned at a 5:45 p.m.)

15                              -oOo-

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2              I certify that the foregoing is a true and correct

3    transcript, to the best of my ability, of the above pages, of

4    the stenographic notes provided to me by the United States

5    District Court, of the proceedings taken on the date and time

6    previously stated in the above matter.

7              I further certify that I am neither counsel for, related

8    to, nor employed by any of the parties to the action in which

9    this hearing was taken, and further that I am not financially

10   nor otherwise interested in the outcome of the action.

11

12   _____        _____

13   /s/Crystal M. Pilgrim, RPR, FCRR        Date: March 29, 2018

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,               )
                                        )
          Plaintiff,                    )      CV No. 17-2511
                                        )
                                        )      Washington, D.C.
          vs.                           )      March 29, 2018
                                        )      10:40 a.m.
AT&T, INC., ET AL.,                     )
                                        )      Morning Session
          Defendants.                   )
_____)      Day 5


            TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
           BEFORE THE HONORABLE RICHARD J. LEON
            UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                             Eric D. Welsh
                             Timothy B. Walthall
                             Andrew C. Finch
                             Justin T. Heipp
                             Cerin M. Lindgrensavage
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Washington, D.C. 20530
                             (202) 532-4560
                             craig.conrath@usdoj.gov
                             eric.welsh@usdoj.gov
                             timothy.walthall@usdoj.gov
                             andrew.finch@usdoj.gov
                             justin.heipp@usdoj.gov
                             cerin.lindgrensavage@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

Katrina M. Robson
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 220-5052
krobson@omm.com

Daniel M. Petrocelli
M. Randall Oppenheimer
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067
(310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Michael L. Raiff
Robert C. Walters,
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
(214) 698-3350
mraiff@gibsondunn.com
rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:

Kevin J. Orsini
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1140
korsini@cravath.com
pbarbur@cravath.com

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

– – –

WITNESS INDEX

– – –

WITNESSES                      DIRECT CROSS REDIRECT RECROSS

GOVERNMENT'S:

JOHN R. HAUSER, Sc.D.      755      795

– – –

INDEX OF EXHIBITS

– – –

GOVERNMENT'S                    IDENTIFIED      ADMITTED
0915 –                             796

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

735

```
 1                    P R O C E E D I N G S

 2            DEPUTY CLERK:  All rise.  The United States

 3   District Court for the District of Columbia is now in

 4   session, the Honorable Richard J. Leon presiding.  God save

 5   the United States and this Honorable Court.  Please be

 6   seated and come to order.

 7            Your Honor, we have Civil Action No. 17-2511,

 8   United States of America v. AT&T, Incorporated, et al.

 9            Will counsel for the parties please approach the

10   lectern and identify yourself for the record.

11            MR. HEIPP:  Good morning, Your Honor.

12   Justin Heipp for the United States.

13            THE COURT:  Welcome.

14            MS. LINDGRENSAVAGE:  Good morning, Your Honor.

15   Cerin Lindgrensavage for the United States.

16            THE COURT:  Welcome.

17            MR. WELSH:  Good morning, Your Honor.  Eric Welsh

18   for the United States.

19            THE COURT:  Welcome.

20            MR. CONRATH:  Good morning, Your Honor.

21   Craig Conrath for the United States.

22            THE COURT:  Welcome.

23            MR. CONRATH:  Thank you.

24            MR. FINCH:  Good morning, Your Honor.

25   Andrew Finch for the United States.
```

```
 1              THE COURT:  Welcome.

 2              MR. WALTHALL:  Good morning, Your Honor.

 3    Tim Walthall for the United States.

 4              THE COURT:  Welcome.

 5              MR. PETROCELLI:  Good morning, Your Honor,

 6    Daniel Petrocelli for defendants.

 7              THE COURT:  Welcome.

 8              MS. ROBSON:  Good morning, Your Honor.

 9    Katrina Robson for defendants.

10              THE COURT:  Welcome.

11              MR. OPPENHEIMER:  Good morning, Your Honor.

12    Randy Oppenheimer for the defendants.

13              THE COURT:  Welcome.

14              MR. WALTERS:  Good morning, Your Honor.

15    Rob Walters here for AT&T and DirecTV.

16              THE COURT:  Welcome.

17              MR. BARBUR:  Good morning, Your Honor.

18    Peter Barbur representing Time Warner.

19              THE COURT:  Welcome.

20              MR. ORSINI:  Good morning, Your Honor.

21    Kevin Orsini for Time Warner.

22              THE COURT:  Welcome.

23              MR. RAIFF:  Good morning, Your Honor.  Mike Raiff

24    for AT&T and DirecTV.

25              THE COURT:  Welcome.
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 781 of 3826

737

1          Well, which had one of your 29 lawyers are going

2    to call this witness?

3          MR. CONRATH:  Your Honor, the first witness is

4    going to be presented by my colleague, Mr. Heipp.

5          THE COURT:  "Heipp"?

6          MR. CONRATH:  "Heipp," H-e-i-p-p.

7          THE COURT:  Okay.

8          MR. CONRATH:  Your Honor had said yesterday --

9    I told you there was a confidentiality issue.  You raised

10   the question of discussing it in advance.  I want to know if

11   you meant now or just prior to the witness coming on.

12         THE COURT:  You can approach.

13         (Sealed bench conference)

14   ████████████    ████████████████████

15   ██████

16   ████████████  ██████████  ████████████████████

17   ██████████

18   ████████████  ██████████

19   ████████████████████████  ████████████████

20   ██████████████████████████████████████████

21   ████████████  ██████████  ████████████████

22   ████████████████████████████████████████

23   ██████

24   ████████████  ████████

25   ████████████████████████████████

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

738



739

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

741



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

742



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

743



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

744



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

745





\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

748

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

749



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

750



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

751



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

752





18          (Open court)

19          THE COURT:  All right.  Call your next witness.

20          MR. HEIPP:  Good morning, Your Honor.

21  Justin Heipp for the United States.

22          The government calls Professor John Hauser as an

23  expert witness.

24          THE COURT:  All right.

25          MR. HEIPP:  I also have some binders.  May I

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

754

1    approach to distribute those?

2              THE COURT:  My Deputy Clerk.

3              MR. HEIPP:  Your Honor, Professor Hauser has also

4    prepared demonstratives.  May we present those as we did

5    during the opening statements?

6              Set up the easel over there to the left side.

7              THE COURT:  I want to see them.

8              MR. HEIPP:  Sure.

9              THE COURT:  Do you have a paper rendition of them?

10             MR. HEIPP:  Yes.  Actually, they are the first tab

11   in your binder.

12             THE COURT:  All right.  Has the defense seen them?

13             MR. HEIPP:  Yes.  They were disclosed to the

14   defendants 48 hours ago.

15             Do you have any issues with them?

16             MR. BARBUR:  I'm certainly going to cross-examine,

17   but I don't have any issue with them being used.

18             THE COURT:  No.  Okay.  Very good.

19             All right.  You can set these all up over here.

20             MR. HEIPP:  Thank you, Your Honor.  May my

21   colleague, Ms. Roschen, move the board around during the

22   examination?

23             THE COURT:  Yeah; just don't block the view of the

24   parties.

25             MR. HEIPP:  Thank you, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1              THE COURT:  Stand up, please, sir.

2              DEPUTY CLERK:  Raise your right hand.

3              (Witness is placed under oath.)

4              DEPUTY CLERK:  Please be seated.  The chair will

5      swivel.

6              MR. HEIPP:  May I proceed, Your Honor?

7              THE COURT:  You may.

8      JOHN R. HAUSER, Sc.D., WITNESS FOR THE GOVERNMENT, HAVING

9      BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

10                        DIRECT EXAMINATION

11     BY MR. HEIPP:

12         Q    Good morning, Professor Hauser.

13         A    Good morning.

14         Q    Do you please introduce yourself to the Court.

15         A    My name is John Hauser.

16         Q    And what do you do for a living, Professor Hauser?

17         A    I'm the Kirin Professor of Marketing at the

18     Massachusetts Institute of Technology.

19         Q    Have you been retained by the United States to

20     provide expert testimony in this case?

21         A    Yes, I have.

22         Q    We'll get into more details on this in a moment,

23     but can you briefly describe what you were asked to do.

24         A    Yes.  I was asked to estimate what would happen in

25     the event of a Turner blackout of either permanent or

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    short-term.

2         Q    And how did you conduct that research?

3         A    I used an experiment-based or survey-based

4    experiments.

5         Q    Before we get to the details about that, I'd like

6    to ask you just a few questions briefly about your

7    qualifications as they relate to the work that you did for

8    this case.

9              You said that you were a professor of marketing at

10   MIT?

11        A    Yes, that's correct.

12        Q    You're also the head of the marketing department

13   there?

14        A    Yes, that's correct.

15        Q    Do you also have academic degrees from MIT?

16        A    Yes.  I have four degrees.  My highest degree is a

17   doctor of science from operations research.

18             I studied with Professor John Little, who's

19   considered the founder of marketing science.

20        Q    Have you designed and implemented surveys as part

21   of your academic work?

22        A    Yes, I have.

23        Q    About how many would you say?

24        A    Well, it's hard to count.  Probably about 5 to 10

25   for per year for the last 40 years or so.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        Q    And were any of those surveys similar to the one

 2   that you designed for this case?

 3        A    Yes, they were.

 4        Q    Have you published peer-reviewed articles

 5   involving surveys?

 6        A    Yes, I have.  I've published approximately

 7   80 peer-reviewed articles.

 8        Q    And did any of those papers involve surveys or

 9   methodologies similar to the ones you used in this case?

10        A    Yes, most of them did, and very similar to

11   methodologies I used that I'll be talking about today.

12        Q    Have you been retained by businesses to conduct

13   marketing research?

14        A    Yes, I have.

15        Q    Were any of the surveys or market research studies

16   that you've done for businesses similar to the one that you

17   designed for this case?

18        A    Yes, they have.  I've done forecasting for a large

19   number of businesses.

20        Q    What are some of the businesses that you've worked

21   for?

22        A    Well, certainly the auto industry, General Motors.

23   I've worked with Chrysler and Ford as well.  I've worked

24   with IBM.

25             I've done work on laundry with Procter & Gamble.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    And there's a few others.

2        Q    Have you been retained as an expert in litigation

3    before?

4        A    Yes, I have.

5        Q    Have you ever been retained in litigation related

6    to the pay-TV industry?

7        A    Yes, I have.

8        Q    Can you give me an example of a case involving the

9    pay-TV industry.

10        A    Well, in one case, I was involved for the

11    Dish Network, and we were trying to understand the impact of

12    commercial skipping in terms of their particular product.

13    It was called the Hopper and PrimeTime All the Time [sic].

14        Q    Did your work for that case involve a survey?

15        A    Yes, it did.

16             And we also analyzed set-top box data.  Both the

17    survey and the set-top box data gave roughly the same

18    answer.

19        Q    Have you been retained an as expert in antitrust

20    litigation?

21        A    Yes, I have.

22        Q    Have you ever been excluded from testifying as an

23    expert?

24        A    No, I have not.

25             MR. HEIPP:  Your Honor, at this time the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    United States offers Professor Hauser as an expert in the

 2    fields of marketing science, marketing research, and survey

 3    design.

 4              MR. BARBUR:  No objection, Your Honor.

 5              THE COURT:  Give me those three again, please.

 6    Marketing science --

 7              MR. HEIPP:  Marketing science, marketing research,

 8    and survey design.

 9    BY MR. HEIPP:

10        Q    Professor Hauser, you said at the outset that you

11    designed a --

12              THE COURT:  Sir --

13              MR. HEIPP:  I'm sorry, Your Honor.

14              THE COURT:  Do you want to hear the ruling?

15              MR. HEIPP:  Oh, yes, Your Honor.  I apologize.

16              THE COURT:  Have you done this before?

17              MR. HEIPP:  Not with an expert, no, Your Honor.

18              THE COURT:  That's why you're not waiting.

19              It's kind of important to have the ruling, isn't

20    it?

21              MR. HEIPP:  Yes.

22              THE COURT:  If you don't have the ruling, you

23    can't do what?

24              MR. HEIPP:  Continue questioning, Your Honor.

25              THE COURT:  There's also something else you can't

1   do in your questioning.

2           You can't ask hypotheticals.

3           Your request is granted.

4           MR. HEIPP:  Thank you, Your Honor.  May I proceed?

5           THE COURT:  Yes.

6   BY MR. HEIPP:

7       Q    Professor Hauser, you said at the outset that you

8   designed a survey to assess consumers' choices in the event

9   of a blackout?

10      A    Yes, I did.

11      Q    Did your survey ask consumers about their future

12  choices in the event of a Turner blackout?

13      A    Yes, it did.

14           There was a potential Turner blackout, and I asked

15  them what their likelihood of switching to other providers

16  would be.

17      Q    Can surveys accurately predict consumers' future

18  choices?

19      A    Yes.  We use them all the time, and I've certainly

20  used them in both my academic work and in my business

21  consulting.

22      Q    Did you reach an opinion about what consumers

23  would do in the event of a Turner blackout?

24      A    Yes, I did.

25           In the event of a permanent Turner blackout,

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    consumers, roughly about 12 percent, would switch their

2    providers, if that provider was blacked out and the others

3    were not.

4        Q    So you found that for a permanent blackout of

5    Turner channels, about 12 percent of subscribers would

6    switch?

7        A    Yeah, roughly 12 percent.

8             THE COURT:  Sir, you don't need to repeat his

9    answer.  He gives the answer; you ask the questions.

10            MR. HEIPP:  Yes, Your Honor.

11            THE COURT:  We don't have time for both you and he

12   to give the answers.

13            MR. HEIPP:  I will be careful, Your Honor.

14            THE COURT:  Proceed.

15            MR. HEIPP:  Thank you.

16   BY MR. HEIPP:

17       Q    Now I would like to ask you about how you reached

18   your conclusion.  Generally speaking, is there a term for

19   the methodology that you used?

20       A    Yes, an experiment.

21       Q    Can you explain what the term "experiment" means?

22       A    Well, the important part of an experiment is to

23   both have a test and control.  And in this case, I had three

24   test cells and one control cell.  And in the test cell --

25       Q    I'm sorry.  What do you mean by the term "cell"?

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1      A      Okay.  In this case, some people are randomly

2   assigned to experience the Turner blackout or experience the

3   potential of a Turner blackout, and other people are

4   assigned to a set of questions that were basically pretty

5   general about just television watching in general.

6      Q      Is an experiment a way to isolate a variable that

7   you're looking at?

8      A      Oh, absolutely.

9             An experiment, you can control many things.  For

10  example, if you were testing the effect of aspirin on heart

11  attacks, you would assign some people to receive the small

12  aspirin; and other people in the control group would receive

13  the sugar pill or a placebo.  It's known what a sugar pill

14  is.

15            And, therefore, you would then measure the number

16  of people who avoided heart attacks in the test cell and the

17  number of people who avoided heart attacks in the control

18  cell.  Recognize there will be some heart attacks for other

19  reasons in the control cell.

20            So the causal effect of the aspirin would be the

21  difference between the number of heart attacks avoided in

22  the test and in the control cell.

23     Q      Did you consider looking at data from past

24  blackouts?

25     A      Yes, I did.

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 807 of 3826

763

1        Q       Did you look at any of that data?

2        A       No, I did not.  A blackout is inherently -- a

3    permanent blackout is inherently hypothetical.

4        Q       So why did you use an experiment instead?

5        A       With an experiment, I can control what I'm telling

6    the respondents.

7                I tell the respondents about the blackout in one

8    cell and not in the other.  And to the best of my ability, I

9    then keep everything else constant.

10               So I can tease out that the blackout is causing

11   the switching, rather than all the other things that you

12   would have -- you observed that might cause switching, sort

13   of normal churn or just the fact that there's an experiment.

14       Q       Is an experiment like yours an appropriate tool to

15   measure the effect of a blackout that hasn't happened yet?

16       A       Yes, it is.

17       Q       So after deciding to do an experiment, what was

18   the next step that you took?

19       A       Well, the next step is I did qualitative research.

20       Q       What does qualitative research mean?

21       A       Well, qualitative research is really just talking

22   to consumers to understand how they make decisions.

23               Now, I had experience in the category, but

24   I wanted to confirm that experience and make sure I

25   understood how they thought about television viewing, how

1    they thought about pay providers, et cetera.

2             So it's a set of open-ended interviews, where the

3    respondent is reacting to the consumer to more or less

4    experience the experience of the consumer.

5        Q    And what did you learn from the consumers in these

6    interviews?

7        A    Well, one thing we learned is people don't

8    necessarily think of channels.  Sometimes, they think of

9    shows.  So, for example, I'm an NCIS fan.  When I think of

10   NCIS, I don't think of the fact that it's on CBS.

11            So some people think of shows.

12            Other people, for example, do think of channels.

13   For a sports fan may say, I watch ESPN.

14            And still other people think in terms of special

15   events, like I watch the *Oscars*; I watch the NCAA Final

16   Four; or I watch a political debate.

17       Q    Did you ask interview subjects about programming

18   blackouts?

19       A    Yes, I did.

20            They're generally aware of blackouts, although

21   none of them, of course, experienced a permanent blackout.

22            And they were generally aware of what happens in

23   terms of blackouts.

24       Q    So now that we've talked about the overall design

25   of the survey and the interviews?

1          THE COURT:  Hold on.

2          How many people did you interview?

3          THE WITNESS:  Well, in the experiment, 1600.

4          In the qualitative data, we just talked to eight.

5          And then we had another 20 in the pre-test --

6          THE COURT:  So you interviewed eight people?

7          THE WITNESS:  What?

8          THE COURT:  You interviewed eight people?

9          THE WITNESS:  Just qualitatively to confirm my own

10  experience.

11          But the experiment itself was 1600.

12          THE COURT:  Did you interview 1600 people

13  personally?

14          THE WITNESS:  No.  It was an Internet survey.

15          THE COURT:  It was an Internet survey?

16          THE WITNESS:  Yes.

17          THE COURT:  So you only personally interviewed

18  eight people?

19          THE WITNESS:  Initially, yes, before the

20  experiment.

21          THE COURT:  Thank you.  Go ahead.

22          MR. HEIPP:

23  BY MR. HEIPP:

24     Q    You just mentioned an Internet survey,

25  Professor Hauser.  Can you describe how you got the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  respondents that you got for your actual survey?

2      A    Yes.

3           I used a professional panel, in this case,

4  Survey Sampling International.  It's a very well-respected

5  panel.

6           These panels have literally tens of millions of

7  people who have agreed to take surveys.  They're

8  prescreened.  Lot of quality control with IP fingerprinting

9  and other quality controls.  They're balanced.

10          By and large, an Internet panel is the way one

11 does marketing research these days.

12     Q    Do Internet panels provide representative samples?

13     A    Yes, they do.

14     Q    And what does it mean for a sample to be

15 representative?

16     A    Well, "representative" means that if I ask

17 questions of the panel or sample of the panel, I'll get the

18 same answers as I would if I asked them randomly in the

19 population.

20          So if I'm trying to forecast a blackout or, say,

21 the sales of a General Motors vehicle, I can use a panel

22 that's, again, been highly screened to ask these Internet

23 questions.

24     Q    And I think you say you started with 1600 of

25 those --

1        A     Yes, I did.

2        Q     -- people?

3             Did you start with a representative sample of the

4    U.S. population?

5        A     Yes.

6             The sample was -- the inbound sample was balanced

7    to the U.S. population.

8        Q     What do you mean with the term "inbound sample"?

9        A     Well, the inbound sample are the people coming

10   into the survey before the screener.

11           MR. HEIPP:  Ms. Roschen, if we could put up the

12   first demonstrative, please.

13   BY MR. HEIPP:

14       Q     Professor Hauser, can you tell us what's depicted

15   on this board?

16       A     Yes.

17           This is the general flow of the survey and the

18   experimental design, which you can see on the fourth line.

19       Q     So a moment ago you mentioned the inbound sample,

20   which is the group of people who starts the survey.

21           What's the first thing that they experience in

22   this survey?

23       A     Well, not everybody in the sample will be pay-TV

24   prescribers.  So one of the questions we asked are whether

25   people are pay-TV prescribers.  That includes both online

1    and traditional.

2            Another question we asked is we made sure that

3    they were decision-makers or decision-influencers in the

4    household, and so they could answer these questions.

5            And, finally, we made sure that they were likely

6    to be in an area or subscribe to a package that would have

7    Turner channels.

8        Q    The questions that you just described, are those

9    the screener questions that are listed in the first box on

10   the report?

11       A    Right.  The first part of the questionnaire are

12   the screener questions, and that gets us from the inbound

13   sample to the final sample.

14       Q    And why did you screen down to that population?

15       A    Well, these are the people who are going to be

16   affected by it, a blackout.  If they don't subscribe to

17   pay TV, they're not going to be affected.

18           So I want random; and then within that, the people

19   who are first randomly are chosen, who are affected by the

20   blackout.

21       Q    Are you familiar with the concept of a probability

22   sample?

23       A    Yes, I am.

24       Q    What is that?

25       A    A probability sample is a technical definition.

1          What it says is that each respondent in the U.S.

2    population has an equal probability of being in the sample.

3          Q    Do you need to have a probability sample in order

4    to have a sample that's representative?

5          A    Well, I don't know of anybody who has a real

6    probability sample.

7          We used to do random-digit dialing, but these

8    days, nobody picks up their phone -- many people don't pick

9    up their phone; they're out of the household, et cetera.  So

10   random-digit dialing is no longer what it once was.

11         Random emails are just as bad.

12         A long time ago, we would go door to door.  But

13   that's even getting more difficult.  And, at this point,

14   probably an Internet sample from a good panel is probably

15   the closest you're going to get to a probability sample.

16         Q    Did you do any checks to ensure that your sample

17   was representative?

18         A    Yes, I did.

19         I mean, I have confidence in these panels.  I've

20   used them before.

21         But I certainly looked at things like, do we get

22   the percent of virtual providers right?  Do we get the

23   percent of sort of the main providers, the market shares,

24   roughly correct?  We're actually within two share points,

25   which is about all you're going to expect by both random

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   sampling and the fact that any data we would base upon that

2   is also, will have some caveats, might be a different

3   snapshot time frame, et cetera.

4          So within two share points is really quite good.

5          So it matches up to what we would expect on the

6   questions we know the answers to.

7      Q    Just to make sure I understand what you were

8   saying there, did the sample that you ended up with, the

9   market shares of the pay-TV providers, match the market

10  shares in the real world with the two share points?

11     A    That's right.  Yes.  In the screener, we asked

12  people, of course, what their provider was.  So we have a

13  statement of that.

14         And then we have publicly available data, again,

15  which is itself an estimate, but we have public available

16  data of what the shares are of the various providers.  And

17  the two of those match up, they match up within two share

18  points.

19     Q    Let's talk about the second category of questions

20  listed on the board.

21         Can you describe what that section of questions

22  means?

23     A    The second question, set of questions were what

24  would be called distractor questions.

25     Q    What is a distractor question?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    A distractor question -- well, let me back up a

2    little bit.

3            One of the things we worry about in a survey is

4    something called a demand artifact, and I realize that's a

5    technical term.

6            What that means is that sometimes the people

7    answering the questions will try and please the interviewer,

8    in this case, please the survey designer, or sometimes

9    displease.  Usually it's please, but you never know.

10           So you don't want them to guess the purpose of the

11   survey.  You certainly don't want them to guess your

12   hypotheses.

13           So you have a series of questions, in this case,

14   about general television watching.  We were asking them what

15   televisions they would buy from a certain set.  And we are

16   also introducing them to the scales, our measurement methods

17   that we're going to be using later in the survey.

18    Q    Is a --

19    A    Go ahead.

20    Q    Is a demand artifact a type of bias?

21    A    Well, you don't know which way it would go,

22   whether it's positive or negative.  But it's noise, and it

23   could be considered a bias.

24           You definitely want to do everything you can to

25   minimize demand artifacts.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

772

1      Q    Is there a way to test for demand artifacts?

2      A    Yes.

3           In both the pretest -- these were the people who

4    sort of took the survey while we listened to them and

5    monitored them.

6           And, also, in the survey itself, we asked

7    questions, having them try to guess the purpose of the

8    survey or having guessed a hypotheses.  And so we're able to

9    examine whether or not we were successful in eliminating or

10   almost completely eliminating demand artifacts.

11     Q    Did you do those tests for your survey in this

12   case?

13     A    Yes, I did.

14     Q    What did those tests show?

15     A    Well, of the 1600 respondents, there were three

16   that said, well, this survey is about the Turner networks.

17   That's 3 out of 1600, which is a fairly low number.

18          And also, the survey is about Turner blackouts,

19   but they didn't guess either our hypotheses or the direction

20   that we were looking for in terms of switching.

21     Q    Let's look back at the board to the third category

22   of questions.  It's labeled "TV Content Section."  What was

23   that section about?

24     A    Well, at this point, I very much want people to be

25   engaged in the survey.  And so we asked a series of general

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    questions:  What are your favorite programs?  Actually,

2    programs within each genre.  We also talked to them about

3    what channels they would watch, what special events they

4    would watch, basically, a series of questions, because we

5    want these consumers to be in roughly the same situation,

6    same set of mind they would be were they to be making a

7    decision about, to either subscribe or switch from their

8    current provider.

9            So you can think of them as essentially setting

10   the stage for the experiment that's coming.

11   Q    You mentioned earlier having conducted open-ended

12   interviews with eight individuals.  What was the purpose of

13   doing those interviews?

14   A    Well, again, the purpose was so that when I could

15   phrase these questions, they were in the words and phrases

16   that people would normally use, and that I felt that I could

17   capture what it takes to get people engaged.

18           Now, of course, it's not just the eight people;

19   it's the fact that I've done surveys in this category before

20   and was fairly familiar with this industry.

21   Q    And did those open-ended interviews inform how you

22   constructed the section, the TV content section?

23   A    Yes.  It said that I had to get them thinking

24   about television shows, about special events, about

25   channels, when that made sense.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

774

1           And, also, I basically had to get them thinking

2    both forward and backwards; that sometimes you think of the

3    coming season -- television season, the coming season or the

4    season behind.  So I prompted them to think forward and

5    backwards.

6           So the whole purpose of this -- and it's given to

7    everybody, both to test and control -- is really to get them

8    engaged in the survey and the scenario that they're going to

9    be in.

10      Q    Was it important to put people in the same frame

11   of mind that they would be in during an actual blackout?

12      A    Absolutely.  That was my goal.

13      Q    And why is that important?

14      A    Well, that's going to -- I think it's

15   self-explanatory.  But if I'm going to make good forecasts,

16   I want the forecast to be relevant to the decisions that

17   consumers are going to be faced with.

18      Q    In this section, the TV content section, did you

19   include the logos of different channels?

20      A    Oh, yes.

21          People are used to seeing logos.  If I just say

22   something like "the Turner channels," they don't know what

23   that means.  They not necessarily distinguish the TNT and

24   the Cartoon Network would be on Turner, so we have to prime

25   these logos, but also for all the networks.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           So they could possibly have seen up to 107

2    different logos.  The average person saw about 30 to 60

3    logos.

4           And so the whole point is they're familiar with

5    logos; they're thinking about television.  And, in general,

6    it's all the networks' logos.

7       Q    And so after this section, the TV content section,

8    what came next?

9       A    Well, now we come to the actual experiment.

10          And so now, the 1600 people go through the first

11   three steps.

12          In this step, we put 400 people randomly selected

13   into the control, and 400 people randomly selected into each

14   of the test groups.

15          MR. HEIPP:  Ms. Roschen, can you please put up the

16   next demonstrative.

17   BY MR. HEIPP:

18      Q    Professor Hauser, what does this board show?

19      A    This shows, in general, the scenario that was

20   given to the people who were to experience the potential of

21   a Turner blackout.

22      Q    Looking at the first box there, it's labeled

23   "scenario description controller blackout."  What was the

24   scenario given to the blackout groups?

25      A    Well, in this case, they're told that the Turner

1 channels would be blacked out.  Some of them were told,

2 would be for -- it's been a week, and we expect it to end

3 pretty quickly.  The other it's been a month and we expect

4 it to end quickly.

5          "Others" is a statement that the blackout is

6 expected to be permanent.

7          So they're described, again, just to test people,

8 that there's a blackout coming.

9          And in this case, we actually do show them the

10 Turner logos because we want them to know what the Turner

11 channels are, because that's the way they think.

12     Q    And what was the scenario that was presented to

13 the control group?

14     A    Well, in the control group, we have questions of

15 roughly the same length, but they're really just general

16 television-watching questions.  So they're both getting

17 essentially a scenario.  But the one case, there's a

18 blackout; in the other case, there's no blackout.

19     Q    Let's look at the next two boxes there labeled

20 "two initial offers and one counteroffer."  What were those

21 boxes?

22     A    Well, again, I'm trying to stimulate -- yeah,

23 simulate a scenario that would be real to consumers.

24          And what normally happens, even in a short

25 blackout, is the other competitors get fairly aggressive and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    they make offers.  And, as a result, if I now call up or if

2    I try and switch away from my provider, the provider itself

3    is going to make a counter-offer.

4            So I'm really, again, being -- making the

5    scenarios as rich and as realistic as possible by having

6    offers from one traditional provider and one online

7    provider.

8        Q    Why did you provide those two offers, one

9    traditional and one online?

10       A    Well, I certainly want to be sensitive to what the

11   marketplace would be.

12           I should point out here that we knew what their

13   provider was, and we also knew their ZIP code.  So we know

14   exactly what providers would be in the ZIP code.

15           So this would be not their provider but

16   competitive providers.

17           And in almost every ZIP code, there's at least one

18   traditional and, of course, the online providers for most

19   people who have Internet.

20       Q    And why did you show respondents the providers

21   that were available in their ZIP code?

22       A    Well, again, I wanted to make it realistic.  It's

23   something that most people know.

24           And these would be the providers they'd be

25   choosing among, if they got off -- if a blackout occurred

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

778

1    and if they got those counteroffers -- those offers and the

2    counteroffer.

3        Q    How did you decide what details of the different

4    offers to provide to respondents?

5        A    Well, we did some research.  This is publicly

6    available.  You can see what happens in a blackout.  There

7    is offers that are made.

8            Now, we can't have every possible offer, so we

9    choose the ones that are more likely and the ones that

10   essentially are going to be representative of the type of

11   offers that are made.

12           We do this both for the initial providers and for

13   the counteroffer, there's these scripts that are sort of

14   save scripts that tell you what -- tells what happens when

15   someone calls up and tries to cancel their traditional

16   provider, and then they get essentially a counteroffer, and

17   how you so-call save that person and keep them from

18   switching.

19           Now, of course, it's a little bit different for

20   you online, but we made sure we were tailored to the

21   particular provider that the consumer had.

22       Q    You mentioned the idea of needing to call your

23   provider to cancel.  Did you tell respondents about the

24   things that they would need to do to switch providers?

25       A    Yes.

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

779

1          This is very important.  Again, people in this

2   situation would experience some cost of switching providers.

3   Some are monetary.  Some are the fact that you have to call

4   up the provider.  Some of them are you may have to arrange

5   to get a new cable box, and you have to schedule an

6   appointment.

7          So we made all of those salient so that people are

8   at least reminded of the switching costs that they actually

9   have in the environment.

10      Q    And other than the scenario description of the

11  blackout, were the offers and the switching costs the same

12  in the control and blackout groups?

13      A    As near as possible.

14          There were some offers in the blackout group that

15  are specific to blackouts.  So sometimes you say, we're

16  going to give you $5 off for the length of the blackout.

17  That, of course, made no sense in the control group.

18          But other than those minor changes, by and large,

19  what the test group got is exactly what the control group

20  got so that each one would be affected by the same types of

21  offers.

22          And, again, these are representative of the

23  offers, not totally complete.  If I had every offer that's

24  available out there, it would take two to three hours to get

25  through the survey.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

780

1    So I had to have a reasonable survey, but, again,

2  I did my best to make sure they were representative of what

3  people get in the marketplace.

4    Q    Was it a conservative or a cautious choice to

5  present them with similar offers and counteroffers in the

6  control and the blackout groups?

7    A    Yes, it was, because we know in a blackout

8  scenario, they're very likely to get offers and

9  counteroffers.  That's a little bit less likely when you're

10  not getting a blackout.

11    So that would make the control a little bit

12  higher.  The switching would be lower in the control, which

13  would mean the difference between the test and the control

14  would be higher.  So there's a subtraction there.

15    So even though we're essentially -- the goal here

16  is to put people in exact, pretty much, as best as I could,

17  the exact information state that they would be in the test

18  and in the control, and, therefore --

19    Q    What do you mean by "information state"?

20    A    Well, the information state they would have in the

21  marketplace.

22    So we're providing information.  Again, it's

23  typical in a blackout situation; it's less typical in the

24  control.  But it would be inappropriate to not give them

25  information and control, because then I couldn't do the

1    subtraction.  I couldn't compare the test to the control.

2            MR. HEIPP:  Let's move on to the next section.

3            Ms. Roschen, if you could put up the next

4    demonstrative, please.

5    BY MR. HEIPP:

6        Q    Professor Hauser, the title of this board is

7    "Integrated Two-Step Filter Process."  Can you explain what

8    that means?

9        A    Yes.  This is now getting to the key questions

10   that were asked of all respondents.

11       Q    What was the first question?

12       A    Well, the first question, which is labeled the

13   filter question here, it's basically, would you consider

14   switching?

15       Q    What is a filter question?

16       A    Well, it's recommended both in the Federal

17   Guidelines and also in standard experimental design.  We've

18   been using it, oh, for about 30 to 40 years, in terms of

19   forecasting.

20            Basically, I don't want to ask questions of people

21   and say, you know, "How likely are you to switch?" if they

22   have already told me, "I wouldn't even consider switching."

23            So, as a result, we first have this question,

24   would consider switching.  And then this reduces the noise,

25   particularly among the people who would not consider

Case 1:17-cv-02511-RJL *\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\* Document 158 Filed 08/06/18 Page 826 of 3826

782

1    switching.

2         Q     So what was the question that respondents were

3    asked in that step one, the filter question?

4         A     Well, paraphrasing, there's actually a question in

5    the survey, but paraphrasing, it's basically, would you

6    consider switching providers?

7         Q     So looking at the left-hand side of the board

8    there, what happened to respondents who said that they would

9    consider switching?

10        A     Okay.  So these are now people who themselves

11   select and say, I would consider switching.

12              So now I can ask them a question, which is, how

13   likely are you to switch?

14              And so now we come down to the bottom over here.

15   And the bottom we have, it's known as a Juster Scale.  It's

16   also known as intention scale.  It measures people's

17   intention to switch, the probability that they're going to

18   switch.

19        Q     The Juster Scale, is that the sliding scale there

20   on the bottom of the demonstrative?

21        A     Yeah.  That's a sliding scale on the bottom.  It

22   sort of looks like a thermometer laying on its side.

23              But this is an established scale.  It's been used,

24   actually, almost 60 years now.

25        Q     I'll ask you a few more questions about that in a

1    moment, but let's go back to the board.

2           What happened on the right side to the people who

3    said that they would not consider switching?

4       A    Okay.  On the right now side now, this is someone

5    who's now told me they wouldn't even consider switching.  So

6    I know it would be totally inappropriate to do anything

7    other than to say they're not going to switch, because I

8    definitely don't want to overestimate switching.

9           And the other thing we know from both the academic

10   research and business practice is very often, a lot of the

11   effect is in the consideration.  So what happens here is a

12   lot of people who sort of get the test blackout scenario,

13   they're going to be more likely to consider switching.  And

14   so we get more people who are considering switching in the

15   blackout scenario and less people in the control situation.

16   So those are real data.

17          So it's essentially important to assign them no

18   likelihood of switching.

19      Q    Was it the case in your study that in the blackout

20   groups, more people said that they would consider switching?

21      A    Yes.  I think it was approximately 60 people.

22      Q    So why not look only at the people who said that

23   they would consider switching?

24      A    Well, you no longer have a random or

25   representative sample.  Those people have already said, I

1    would consider switching.

2           And so when you measure the probability, they're

3    now -- you're really measuring how likely they are to act on

4    the statement that they're willing to consider switching.

5           So, again, it's very important that I not count

6    the people who say they would not consider switching.  So

7    think of it is as consider, then choose.

8    Q    Let's talk more about that second step, the choose

9    step.  You described it as an intention scale or the Juster

10   Scale.

11          Can you explain what that is.

12   A    Yes.

13          Dr. Juster managed to get a scale named after him

14   based on an article he published.  That was in 1966.  He was

15   working for the U.S. Census at the time, and they were

16   trying to develop ways to measure purchase intentions.

17          So the scale that you see here has been modified

18   slightly, because over, essentially, 60 years, we've

19   learned, 50-some years, we've learned how to ask the scale

20   in a much better manner.

21   Q    Are these kinds of scales, these intention scales,

22   used by businesses?

23   A    Yes.

24          There's published reports that somewhere between

25   70 and 90 percent of the market research companies use

1    these.  If you look at some of the academic articles, they

2    talk about one of the most-used scales.

3          I've certainly used it in my own research, and

4    they're just used quite widely.

5    Q    Do you know whether AT&T has used intention scales

6    in its business?

7    A    Yes.  AT&T has used it when they're trying to, for

8    example, decide if actions are going to hold on to

9    subscribers.

10          They use a slightly different scale but it's

11   called an intention scale.

12   Q    Are these keeps of scales, the Juster Scale, the

13   intention scale, are they good at predicting consumer

14   behavior?

15   A    In 2018, they are.

16          Unfortunately, I've been in this business for a

17   while.  Back in the sort of '60s and '70s, people knew that

18   they worked sometimes, but they didn't work all the time.

19          And in the late 1970s, early 1980s, there were a

20   few authors that put them on a firm scientific basis.

21          But even up until the '90, we were talking about

22   adjustment factors.

23   Q    What's an adjustment factor in this context?

24   A    Well, for example, when I was forecasting for

25   General Motors, we used a 10 percent adjustment for the

1   electric vehicle, which was new in the early 1990s.  It was

2   a really new product; we felt we had to adjust the scale

3   slightly.

4           Now, in 2018, we're fortunate that researchers in

5   peer-reviewed journals have looked across a large number of

6   applications and they've determined the conditions where

7   these intention scales predict well and situations where

8   they don't predict well.

9           And so now when we use them, we can essentially

10  use them when they work, and we have to use other methods or

11  use adjustments when they don't work.

12          MR. HEIPP:  Ms. Roschen, can you please put up the

13  next board.

14  BY MR. HEIPP:

15      Q    Professor Hauser, you were just talking about the

16  conditions when these scales work.  What does this

17  demonstrative depict.

18      A    Well, this demonstrative indicates five conditions

19  when the scales work well, when they're both highly

20  correlated and do actually predict consumer behavior.

21      Q    I'd like to ask you just to a couple questions

22  about each one of the conditions.  The first one listed

23  there is existing products.  Can you explain that.

24      A    Yes.

25          If you think of a sort of forecasting for an

1    established nameplate of automobiles, it's going to be an

2    existing product, and people are familiar with the

3    nameplate, et cetera.

4              Back when we were doing the electric vehicle, it

5    was then called the EV and it was very new.  People weren't

6    familiar with the electric vehicle.

7              So it's sort of the difference between a product

8    that's existing on the marketplace and a new or really new

9    product.

10             So people, by and large, when it's something

11   they're familiar with, they can make a good decision.

12        Q    Did your survey in this case involve existing

13   products?

14        A    Yes, it did.

15             The existing providers and the providers that were

16   available and the respondent ZIP code.

17        Q    The second condition listed there is durable

18   goods.  Can you define a durable good.

19        A    Yeah.

20             In this case, it means something that's high

21   involvement, involved, heavily involved in making a

22   decision.  It's important to you.  It's moderately

23   expensive.  And it's not something you're sort of making

24   day-to-day repeat purchases of, repeat decisions on.

25             Pay TV is certainly, in this, by those

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 832 of 3826

788

1   definitions, a durable good, as would be automobiles, as

2   would be smartphones or computers.

3       Q    What would be the opposite of a durable good?

4       A    Well, a durable good is frequently purchased good;

5   for example, when we're doing laundry detergents, laundry is

6   you make an initial decision, then you make a series of

7   buy/rebuy decisions.  So if you're a Tide user, you continue

8   to use Tide.  And so people are familiar with just a

9   relatively small set of these products.

10          And there are other forecasting systems, other

11  intent scales that one would have to use for frequently

12  purchased goods.

13          THE COURT:  I'll take the morning recess.  We'll

14  take a 15-minute recess.

15          You are a witness under oath in the case, which

16  means you're not allowed to discuss your testimony with

17  anyone, including your counsel --

18          THE WITNESS:  Thank you.

19          THE COURT:  -- or anyone else.

20          THE WITNESS:  Okay.

21          THE COURT:  Be back in 15 minutes.

22          DEPUTY CLERK:  All rise.

23          This Honorable Court will stand in recess until

24  the return of court.

25          (Recess from 11:46 a.m. to 12:08 p.m.)

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    DEPUTY CLERK:  The United States District Court

2  for the District of Columbia is again in session, the

3  Honorable Richard J. Leon presiding.  God save the United

4  States and this Honorable Court.  Please be seated and come

5  to order.

6    Your Honor, re-calling Civil Action No. 17-2511,

7  United States of America v. AT&T, Inc., et al.

8    THE COURT:  You may proceed.

9    MR. HEIPP:  Thank you, Your Honor.  I have just a

10  few more minutes of questions.

11    THE COURT:  Good.

12  BY MR. HEIPP:

13    Q    Before the break, you were describing the

14  conditions in which the intention scale or the Juster Scale

15  is correlated with actual behavior.  You talked about the

16  first two on the board.  Can you describe what the third one

17  is that says "shorter elapsed time."

18    A    Well, basically, if you ask questions of

19  respondents, so they're making a decision soon after you've

20  introduced the scenario, it's going to be fairly accurate or

21  accurate, actually.

22    If you, say, delay that decision or you're asking

23  about what are you going to do in the next year or next two

24  years, it's not going to be as accurate.

25    Q    Did your survey for this case ask respondents to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    make a decision shortly after giving them the relevant

2    information?

3        A    Yes, it did.

4        Q    Moving down to the fourth condition, it says

5    "specific brands."  What does that mean?

6        A    Basically, when these questions were first

7    designed, they would ask general questions, such as, how

8    likely you are to buy an appliance in the next year.

9             What the academic literature I've discovered,

10   actually, has been that it's much better if you're asking

11   for a very specific brand, like a brand of laundry

12   detergent, a specific brand of automobile, or, in this case,

13   the specific providers.

14            Again, the general theme here is that people are

15   familiar with the situation you're asking about.

16       Q    And if people are familiar with the situation

17   you're asking about, are they better able to predict their

18   own behavior?

19       A    Yes, they are.

20       Q    The final condition listed on this demonstrative,

21   it's multiple product options.  Did your survey in this case

22   present respondents with multiple product options?

23       A    Yes, it did.  They were presented with the current

24   provider, as well as two additional providers in the ZIP

25   code.

1     Q    So given the five conditions that you've

2  described, can you give an example of a situation where a

3  scale like the one you used would poorly predict consumer

4  behavior?

5     A    Well, if you're asking about, "Would you buy a

6  laundry detergent in the next year?" well, that would be

7  almost certain, for many people.  But if you were asking,

8  "Would you buy a cell phone in the neck year?" that would be

9  more a more difficult question to predict.

10    Q    How about an example where it would work in

11 predicting consumer behavior?

12    A    Well, certainly used for predicting existing

13 brands of automobiles.  So how likely am I to buy a

14 particular nameplate within the Chevrolet line, particularly

15 if I've already said I would consider buying in the next

16 three months.

17    Q    What about pay-TV services?

18    A    It would definitely be -- predict quite well for

19 pay TV.  They fit all five of these conditions.  And it's

20 the type of situation where I'd expect them to predict quite

21 well.

22    Q    And how do you know that these conditions are

23 correlated with actual behavior?

24    A    Well, as I've indicated before, there's some

25 excellent academic research in the top peer-reviewed

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 836 of 3826

792

1    journals.  And that is looked across a number of different

2    categories, a number of different applications.  And they've

3    come up with these five situations, these five scenarios, so

4    that -- well, not scenarios, but these five characteristics

5    of the questions.

6              And we know that in these situations, they predict

7    well.  They're highly correlated with actual behavior, and

8    no adjustment factors are needed.

9        Q    So finally, looking at the statement on the bottom

10   of this slide, is it your opinion that your survey meets the

11   criteria for accurate prediction of consumer reactions?

12       A    Yes, it does.

13             Of course, it's predicting what would happen in a

14   blackout, whether the blackout happens with a merger or not.

15   But it's -- if the merger were to effect a blackout, and I

16   have no opinion on that, this is how people would react in a

17   blackout.

18       Q    And would you expect these five conditions to

19   exist after the merger as they do before it?

20       A    Yes, that's true.

21       Q    So, Professor Hauser, after you collected the

22   survey responses, did you analyze those results?

23       A    Yes, I did.

24       Q    And those results were for both people who said

25   that they would consider switching and people who said that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1   they would not consider switching, right?

2       A    Yes, that's true.  Both were included in the

3   analysis.

4            MR. HEIPP:  Ms. Roschen, could you please put up

5   the final demonstrative.

6   BY MR. HEIPP:

7       Q    Professor Hauser, what does this slide depict?

8       A    Well, this indicates how the actual numbers were

9   calculated.

10           If you look at the top, the top talks about the

11  control group.  And it indicates that 16.4 percent of the

12  people would switch just under normal situations.

13           Now, again, this is the full information in making

14  that decision.

15           And if you look at the bottom, you see it's

16  28.6 percent say they would switch into permanent blackout

17  scenario.  So if I subtract those two numbers, 28.6 minus

18  16.4, I get the 12.2 percent.

19           And that's the best, most likely estimate of what

20  people would do.

21      Q    So you compared the control group and the blackout

22  groups?

23      A    Yes; just in the aspirin example.  Like earlier,

24  some people would have heart attacks in the normal course of

25  happening, so we want to look at the difference between what
```

1    the control group does and what the test group does.

2           And it allows me to control for other noise and

3    other things in the survey that I couldn't fully control.

4           So, again, it's the difference that matters

5    between what happens in the test and what happened in the

6    control.

7    Q    Is your conclusion of 12.2 percent switching

8    statistically significant?

9    A    Yes.  There is a statistical range on this.  It's

10   called a confidence interval.  And although 12.2 is by far

11   the most likely outcome, there's a 2-point, very small

12   chance that it can be lower, say, 7.4 percent and a very

13   small chance that it could be higher, as high as 17 percent.

14   Q    But I think you said the 12.2 percent is the most

15   likely in that range?

16   A    Yes, that's correct.

17   Q    Can you explain to the Court how you know that

18   respondents saying they will switch means that they will

19   actually switch.

20   A    In this case, I have to rely on both my experience

21   and experience of the literature that when these scales are

22   used well, within the right situations, they have been shown

23   to predict well.

24   Q    In your opinion, is this methodology one that

25   would pass peer review if you were to submit it to an

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

795

1   academic journal?

2       A    Yes.

3            And, in fact, I've published a number of

4   peer-reviewed articles that use this methodology.

5       Q    And is this methodology one that you would use

6   with your business clients?

7       A    Yes, it is.

8            I've used it to forecast for General Motors and

9   others as well.

10           Generally, forecasts based upon this methodology

11  are quite accurate, within confidence intervals.

12      Q    And your conclusion for a permanent blackout of

13  Turner channels is that 12.2 percent of subscribers would

14  switch?

15      A    Yes, approximately 12.2 percent of subscribers

16  would switch in the event of a permanent blackout.

17           MR. HEIPP:  No further questions at this time,

18  Your Honor.

19           THE COURT:  All right.

20                        CROSS-EXAMINATION

21  BY MR. BARBUR:

22      Q    Good morning, Professor Hauser.

23      A    Good morning.

24      Q    We have met once before in a different case.

25      A    Oh, okay.

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 840 of 3826

796

1    Q   I'm going to begin by handing out what's been

2  marked as Defendant's Exhibit 0915.  What this is, it's

3  appendix M from your expert report.  It's the pictures of

4  the actual slides that were used in your survey.

5          MR. BARBUR:  May I approach, Your Honor?

6          THE COURT:  Uh-huh, you may.

7          THE WITNESS:  Thank you.

8                    (Defendant's Exhibit 0915
                      was marked for identification.)

9  BY MR. BARBUR:

10    Q   Could you take a look at what we've marked as

11  Defendant's Exhibit 915.

12    A   Yes.

13    Q   And do you recognize this as the screenshots from

14  the survey that were attached to your expert report?

15    A   These are the screenshots.

16         Now, it's important to recognize that not

17  everybody saw every one of these, that there's different

18  conditions, and they were tailored to many characteristics.

19         The actual survey was much shorter than this would

20  imply.

21    Q   Yes, I understand that, and we'll go through that

22  in just a moment.

23         MR. BARBUR:  And, Your Honor, I'd move for

24  admission into evidence of Defendants' Exhibit 915.

25         MR. HEIPP:  Objection, Your Honor.  This is just

1   part of the report.

2           MR. BARBUR:  Should we approach, Your Honor?

3           THE COURT:  Yeah.

4           You can step down, sir, and sit in that chair on

5   the side there.

6           (Sealed bench conference)

7           MR. BARBUR:  We didn't want to admit his entire

8   expert report --

9           THE COURT:  I wouldn't have admitted it.

10          MR. BARBUR:  We just picked out the slides because

11  that's the part that actually shows what survey respondents

12  were presented with and how they responded, just to

13  illustrate the kinds of questions that they got.

14          THE COURT:  It was a computer survey, right?

15          MR. BARBUR:  It's an Internet-based survey.

16          THE COURT:  Internet.

17          MR. BARBUR:  Basically, people sat at their

18  computers and saw certain screens and had to respond in

19  certain ways based on the information they were provided.

20  And this is just pictures of the actual screens that they

21  saw when they filled out this Internet survey.

22          MR. HEIPP:  But without the context of the whole

23  report, it's difficult to understand exactly what you're

24  seeing in the screenshots because the way that the survey

25  was presented to people is sort of dynamic based on what

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 842 of 3826

798

1 people entered, if they entered their ZIP code as one thing

2 they would be shown.  Providers tailored to their location.

3          So it's hard to understand, when it's presented in

4 a linear way on paper.  So without the context of how it's

5 set up, which is explained in the report -- we're happy to

6 have the whole report admitted, but without --

7          THE COURT:  Well, that's not an option.

8          However, this looks like there's something in the

9 order of 180-something screenshots.

10          MR. BARBUR:  What I'm actually going to do,

11 Your Honor, is show him certain subsections of these as

12 demonstratives.  But I wanted to get these into evidence so

13 I could show him the demonstrative and walk through just a

14 handful of these slides to explain how he presented

15 information.

16          Frankly, one of my key lines of cross-examination

17 was going to be that these are extremely misleading and

18 biased slides, that he presented information in a very, very

19 biased way to make Turner seem extra important to the survey

20 respondents.

21          So it's very important for me to walk through

22 these slides to demonstrate to Your Honor that this was an

23 extremely biased survey.

24          THE COURT:  All right.  I'll let you do it.

25          You can do the redirect if there's anything that

1    comes out of this that's confusing or unfair.

2            Introducing the whole report is unnecessary and

3    inappropriate.

4            MR. HEIPP:  Just to clarify, is it in evidence or

5    are they just as demonstratives?

6            THE COURT:  No.  I'm going to let him introduce

7    them into evidence.

8            (Open court)

9            THE COURT:  Come on back up.

10           You may proceed, consistent with the discussion at

11   the bench.

12           MR. BARBUR:  Thank you, Your Honor.

13   BY MR. BARBUR:

14   Q    Just before we get into the main part of your

15   survey, just a few follow-up questions from some of the

16   testimony you provided in response to Mr. Heipp's questions.

17           First, you mentioned that there were some

18   qualitative interviews done of eight interviewees;

19   is that correct?

20   A    Yes.  That was to supplement my understanding in

21   the category.

22   Q    But the beginning, before you designed the survey.

23   A    Yeah, before I ever designed the survey.

24   Q    But those interviews were not done by you, were

25   they?

1      A    No, they were not.

2      Q    They were done by some consulting firm that you

3  hired?

4      A    They were done at my direction.  I was fully

5  briefed on these interviews.

6      Q    And you mentioned that this is an Internet survey

7  and that you used an Internet panel, correct?

8      A    Yes, that's correct.

9      Q    And you mentioned a company called SSI?

10     A    Yeah.  It's actually now SSI Research Now.

11     Q    And SSI Research Now recruits people who become

12  basically professional survey takers; they sign up to take

13  surveys and they take multiple surveys after they have

14  signed up, right?

15     A    Yes.  They've taken -- some can take multiple

16  surveys.  There's like every 10 million people in this

17  sample.

18          It's the way it's done, things now, yes.

19     Q    And when, just so we're clear and the Court is

20  clear, this survey, what -- is administered on a computer.

21  People had a screen.  They got various screens that you

22  designed, and then they responded, correct?

23     A    Yes, that's correct.

24     Q    And how much are these survey respondents paid?

25     A    They're given standard incentives.  Basically,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   it's sort of -- it's not actual money.  It's points towards

2   what they get for taking the survey.

3        Q    It's de minimis?

4        A    What?

5        Q    It's de minimis, the amount that they're paid?

6        A    "De minimis"?

7        Q    The compensation that they get is very small; is

8   that correct?

9        A    It's moderately small; that's correct.

10       Q    So I think you mentioned, in response to some of

11  Mr. Heipp's questions, that you did not examine the results

12  of actual past blackouts; is that correct?

13       A    That's correct.

14       Q    But you mention in your report that you were aware

15  that there are and have been blackouts in the past, correct?

16       A    Yes, that's correct.

17       Q    You mention an AT&T U-verse blackout with

18  Univision, for example, in your report, right?

19       A    Yes, that's correct.

20       Q    You mention a Viacom-Cable ONE blackout, a

21  Viacom-Suddenlink blackout, correct?

22       A    Yes.  These were all temporary blackouts.

23       Q    And you didn't calculate how many actual

24  subscribers were lost in any of those blackouts, correct?

25       A    No.  They were, for example, Viacom, short-term

1    blackouts, different scenarios.

2          In this case, I felt that an experiment was the

3    best way to do it, to actually get the estimates.

4    Q    You predict results for short-term blackouts as

5    well as long-term blackouts, don't you?

6    A    Yes, that's correct.

7    Q    But you didn't look at the results of any of these

8    actual blackouts that were short-term, correct?

9    A    That's correct.  I wanted to get an independent

10   estimate.

11   Q    And are you aware that there have been two

12   blackouts of Turner content in the last ten years, five to

13   ten years?

14   A    Well, this was content.  Was this all of the

15   Turner channels?

16   Q    Well, I'm going to go through that.

17         Are you aware that there was a blackout of certain

18   Turner content on Dish in 2014?

19   A    Yes, I'm aware of that.

20   Q    And that was a blackout of seven of the nine

21   Turner channels on Dish, correct?

22   A    I don't know the exact number, but I'll gladly

23   accept seven.

24   Q    And are you aware that Mr. Schlichting from Dish,

25   your former client, that he came here and testified in

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

803

1   court?

2        A    Oh, you mean, he works for Dish, okay.

3        Q    Right.

4        A    I don't know if he was my client, but he worked

5   for Dish.

6        Q    He worked for Dish, which is your former client,

7   right?

8        A    Yes.

9        Q    And he came to court and testified.  Are you aware

10  of that?

11       A    Actually, no, I'm not.

12       Q    And he testified that during this one-month

13  blackout on Turner with Dish, that they lost 30,000

14  subscribers.  Are you aware of that?

15       A    I'll accept those numbers, yes.

16       Q    And you know that Dish has well over 12 million

17  subscribers, right?

18       A    Yes.  Well, I accept that as well, but --

19       Q    So in his estimate, they lost .25 percent of their

20  subscribers during this Turner blackout.

21            Do you understand that?

22       A    Yes, some of the Turner channels, correct.

23       Q    And you can't reconcile that with your estimate

24  that there would be an 8.2 percent blackout -- departure for

25  a one-month blackout of Turner, can you?

1        A     Different situations, different channels,

2    short-term blackouts, no, I can't.  I believe my numbers are

3    accurate.

4        Q     And are you aware that there was a blackout of all

5    Turner channels on Cable ONE, which is another distributor,

6    in 2013?  Are you aware of that?

7        A     I knew there was a blackout.  I'm accepting that

8    it's all the Turner channels.

9        Q     It was about a month long.  Are you aware of that?

10       A     I'm accepting that as well.

11       Q     And are you aware that Cable ONE has given both

12   testimony in this case and provided documents and they're

13   going to produce a witness to testify in court.

14             Are you aware of that?

15       A     No, I'm not aware of the witness list.

16             THE COURT:  Well, hold on now.

17             If you answer, "I'll accept that," that means you

18   don't know, right?

19             THE WITNESS:  That's correct.  If that's how you

20   want me to answer, I will.

21             THE COURT:  Well, I'd like you to answer it

22   whether you know or you don't know.  And if you don't know,

23   then say if you want to accept it or if you're willing to

24   accept it.

25             THE WITNESS:  Thank you.

```
 1              THE COURT:  I want the record to be clear on this.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  Go ahead.

 4   BY MR. BARBUR:

 5        Q    And are you aware that Cable ONE, in its testimony

 6   and documents, says that they lost less than 1 percent of

 7   subscribers and that they described the losses as

 8   insignificant?  Are you aware of that?

 9        A    No, I'm not aware of that.

10        Q    Assuming that those facts are true, that can't be

11   squared with your estimate that a one-month blackout of

12   Turner would result in an 8.2 percent departure rate,

13   correct?

14        A    I don't know all the situation -- yeah, everything

15   that you're describing, all the situations.  I was careful

16   in my situation, so I'm not going to say that they can't be

17   reconciled.

18              You also may be picking and choosing, so I just --

19   I don't know.  I can't answer that.

20        Q    Picking and choosing what, sir?

21        A    You're giving me a scenario; you're not describing

22   the entire scenario to me.

23              I have not made that reconciliation.  I believe my

24   numbers are accurate.

25        Q    Are you aware of any blackouts of Turner content
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    other than on Cable ONE and on Dish?

2         A    Not that I'm aware of.

3         Q    So instead of looking at real-world data on

4    blackouts, you were retained by the Department of Justice to

5    do a survey, right?

6         A    I was retained by the Department of Justice to do

7    a survey, correct.

8         Q    And you knew that the departure rate that they

9    wanted you to calculate, was a very important input into

10   their case, correct?

11        A    I knew it was an input to their case and the fact

12   that they hired me, I assumed it was important.

13        Q    And you understand that the Department of Justice

14   has an expert, Professor Shapiro, who has a model to predict

15   harm from the merger?  Are you aware of that?

16        A    I'm aware that Dr. Shapiro is going to be

17   testifying.  I have not seen his model.

18        Q    And are you aware that one of the key inputs into

19   Dr. Shapiro's study is the departure rate from a distributor

20   in the event of a Turner blackout?

21        A    I would assume that he would be using those

22   numbers, yes.

23        Q    And are you aware that he, in fact, relies, among

24   other things, on your survey results?

25        A    I'm generally aware of that, but I haven't seen

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Dr. Shapiro's report.

2         Q    And so you knew, when you designed the survey,

3    that the Department of Justice was looking for a substantial

4    departure rate in order to support its theory of the case,

5    right?

6         A    No, I certainly did not know that.

7         Q    You thought that if you came up with the 1 percent

8    departure rate, that would be just fine with the Department

9    of Justice?

10        A    I do the survey to my best of ability.

11             I get the answers.  The facts are the facts.

12   I believe I'm an independent witness.  If they didn't like

13   the numbers, they wouldn't call me to the stand.

14        Q    And your testimony is you didn't have any idea

15   whether they -- it would be better for the Department of

16   Justice and Dr. Shapiro to have a high departure rate or a

17   low departure rate from your survey?

18        A    I have to go on my academic integrity.  I've been

19   doing -- been an academic for about 45 years.  I am going to

20   stick to the science to the best of my ability.  If the

21   client doesn't like the answer, then they don't call me.

22        Q    You could have done a conjoint survey in this

23   case, correct?

24        A    A conjoint survey would be another way of getting

25   the data.  It's not an experiment.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1            In this case, I felt the need for a control group,

2    so I felt that the experiment would be the better

3    methodology.

4        Q    You have done conjoint surveys in other litigation

5    matters, haven't you?

6        A    Yes.  When they're appropriate, I do conjoint

7    studies.

8            Very often, if you're trying to partial-out, say,

9    the effect of a patent, a conjoint study is an excellent way

10   to do it, to actually get an estimate of the impact of that

11   patent.

12       Q    But you decided to do your experiment, as you call

13   it, in this case, right?

14       A    Well, it is an experiment; but, yes, I decided

15   that would be the best way to get an unbiased estimate.

16       Q    And you designed the entire structure of the

17   survey as it was presented to respondents, correct?

18       A    Well, I also had a support team, who was helping

19   me -- could feed off -- I mean, I would give them ideas;

20   they'd feed off.  These are people I've trained, many of

21   them.  They know the language I speak.  It's people I work

22   with, yes, but I certainly had a support team.

23       Q    You were in charge of deciding how this survey was

24   going to be designed and administered, correct?

25       A    Oh, absolutely.

1      Q      And you got to design the types of questions that

2  were going to be asked of survey respondents, correct?

3      A      Yes, I did.

4      Q      And you had various sections, as you described in

5  your prior testimony.  One of them was sort of a priming

6  section, right?

7      A      Well, it's really trying to engage the

8  respondents, a better description.

9      Q      You did use the word "priming."

10     A      What?

11     Q      You did use the word "priming" in your prior

12 testimony this morning.

13     A      Did I?

14     Q      Yes.

15     A      Okay.  Describing that?  Okay.

16     Q      In any event, you also testified in your

17 deposition about priming, didn't you?

18     A      Yeah, I testified about priming a lot.  I've done

19 research on it.  I'm well-aware of what priming does.

20            This is sort of an unbiased engagement.  If you

21 want to call it priming, that's an acceptable word.

22     Q      But you got to decide which slides were going to

23 be used to prime the survey respondents, right?

24     A      Yes; however, it's certainly led by experience, by

25 looking at what's relevant in the marketplace and what's --

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1     Q     Sir, perhaps you can just answer my questions and

2     let your counsel at the Department of Justice follow that

3     up.

4     A     Okay.  I'll do my best.

5     Q     You got to decide which channels would be shown in

6     these priming slides, right?

7     A     Yes; however, it was, again, based on research.

8     Q     And you got to decide what kind of font and what

9     logos would be shown in the priming slides, right?

10    A     I think we showed most of the logos; but, yes, of

11    course.

12    Q     And then you had various test scenarios that you

13    walk through in your prior testimony, where you showed

14    slides to people to set up the decision as to whether to

15    switch providers, right?

16    A     Yeah.  I had both test and control, correct.

17    Q     And you got to design the structure of all of

18    those slides as well, correct?

19    A     Yes.  I made it as realistic as possible based

20    upon the information that was available to me.

21    Q     Again, sir, if you could just answer my questions,

22    this will go a lot more quickly.

23          And you got to decide how the questions were

24    phrased in that part of the survey, correct?

25    A     Yes, as based upon listening to respondents.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1      Q     And you got to decide what size font would be used

2   for the questions and for the logos in these various slides

3   that were shown to the test respondents, right?

4      A     That's part of survey design, correct.

5      Q     And you got to decide how the competing offers

6   would be presented to the survey respondents, right?

7      A     Well, you keep saying I got to decide.

8            I did research to develop those offers, which

9   I think is a more accurate description.  I didn't just

10  decide.

11     Q     Somebody had to decide at the end of the day which

12  slides would be shown to the survey respondents and which

13  ones wouldn't be, right, sir?

14     A     Yes, but it didn't come out of my head, you know,

15  like Athena came out of -- well, I won't do Greek analogies.

16           But it was based upon scripts and everything

17  else -- yes.

18     Q     And there was a slide on switching costs, which

19  I think you described earlier as well, right?

20     A     Yes, again, based on research.

21     Q     And you got to decide how those switching costs

22  were described to the survey respondents, right?

23     A     Yes, that's correct.  And all of these were

24  pretested.

25     Q     I'm going to hand you what we've marked as

 1    Defendant's Exhibit 9115A, and this is just two pages that

 2    come from DX915.

 3            We printed these out from the actual survey

 4    Website, because some of the items were not terribly

 5    legible, but I'm going to hand that out now.

 6            MR. BARBUR:  May I approach, Your Honor?

 7            THE COURT:  Uh-huh.

 8            MR. BARBUR:  May I approach, Your Honor?

 9            THE COURT:  You may.

10    BY MR. BARBUR:

11        Q    Do you recognize Defendant's Exhibit 9115A as two

12    of the pages?

13        A    I do recognize this.  Just give me a second to --

14        Q    And this is one of the blackout scenario test

15    groups.  You're presenting the choices that the survey

16    respondent would have, and then there's the slider scale

17    that you talked about earlier, right?

18        A    Yes.

19            These are what one respondent would have seen.

20    Remember, these were customized.

21        Q    So I understand they're customized and randomized.

22            But this is an accurate example of slides that

23    would have been seen.

24        A    Yes, this is definitely an accurate example.

25        Q    So on the first page, as we discussed before, the

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  question that's presented is:  Would the respondent consider

2  switching, correct?

3      A    Yes.  That's down at the bottom of the page.

4      Q    You could have said, "Would you switch?" on this

5  slide.  But, instead, you said, you -- "Would you consider

6  switching?"  Right?

7      A    That's correct.  And there's -- I can provide

8  reasons if you would like.

9      Q    And then if someone said that they would consider

10 switching, they go on to the next page, which is this slider

11 scale that I think you've called the Juster Scale, right?

12     A    Yes.  Do you want to go over how it works or not?

13     Q    No.  I think you've explained that in your prior

14 testimony.  I just want to ask you some questions about it.

15          There are numbers presented here as percentages,

16 and then there are verbal descriptions as well, such as very

17 slight possibility, slight possibility, some possibility,

18 correct?

19     A    Yes, that's correct.

20          And, also, it's -- there's a third description.

21 As you move that slider back and forth, that number changes.

22     Q    Correct.

23          You're not asking people on this page to say

24 whether they would actually switch, right?

25     A    No.  They're forecasting their own actions.

1       Q    So instead of asking them whether they would

2   switch, you asked them to calculate the likelihood of

3   switching on a 1 to 99 scale, correct?

4       A    Yes.  That's proven far more accurate.  And it's

5   also a much more reliable scale.

6       Q    And when people were looking at this, you don't

7   know whether they were focusing on those numbers or on the

8   verbal descriptions or both or any combination, right?

9       A    Oh, that certainly correct.

10          All we know is the scale has been developed over

11   time and that it's an accurate predictor.

12          But we don't know what they mean by those phrases,

13   whether there might be better phrases.

14          But we just know that in certain situations, it

15   predicts quite well.

16       Q    So some of these descriptions are very slight

17   possibility, slight possibility, some possibility, fair

18   possibility.

19       A    Yes.

20          But, remember, it's encoded numerically as well.

21       Q    But you don't know whether people were looking at

22   the numbers or the verbal distributions, right?

23       A    No.  All we know is the scale predicts well.

24       Q    And you didn't provide a definition of this.  Do

25   you think there's a common understood definitional

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

 1    difference between slight possibility and some possibility?

 2         A    Again, I can just rely on experience here in

 3    academic research that these are the words that are standard

 4    in the scale.  The scale works well.

 5              And maybe I should explain that.  What that means

 6    is if --

 7         Q    Why don't you wait and save your explanations for

 8    when the Department of Justice is asking you.  I'm just

 9    asking you some simple yes-or-no questions.

10         A    Okay.

11         Q    This will go a lot faster if you answer yes or no

12    to my yes-or-no questions.

13              Do you understand that?

14         A    I understand that.

15         Q    Do you understand that it's possible that

16    different people might have different understandings of what

17    slight possibility means versus some possibility?

18         A    Oh, that's true.  That's true.  This scale is a

19    good aggregate predictor.

20         Q    And so let's assume, hypothetically, that every

21    survey respondent had said "very slight possibility."

22         A    Okay.

23         Q    You would then have concluded that 10 percent of

24    them would actually switch, correct?

25         A    Yes, and that's exactly what it means.  It means

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    if 10 percent of the people -- well, if everybody says

2    10 percent, then 10 percent, in general, will switch.  So

3    they don't have to know what the actual words mean.  It's

4    just a scale works well.

5         Q    So if they said "very slight possibility," it's

6    10 percent of them would switch.  But if they said "slight

7    possibility," 20 percent of them would switch in your

8    analysis, correct?

9         A    Well, they could also be looking at the numbers.

10        But if they put 20 -- if they said 20 percent,

11   then basically it's a good estimate that 20 percent would

12   switch.

13        Q    And if everyone had said "some possibility" as

14   opposed to "slight possibility" and "very slight

15   possibility," you would assume that 30 percent of them would

16   actually switch in the real world, right?

17        A    Yes.  If they put the scale at 30, then I would

18   expect that a roughly 30 percent would switch.

19        Q    So a lot is riding on these words, "very slight

20   possibility," "slight possibility," and "some possibility,"

21   right?

22        A    No.  A lot is riding on the scale.

23        Again, if they put it at 30 percent, some people

24   think numerically, we actually -- this is cognitive -- you

25   don't explanations.  Okay.  Sorry.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    Q    So I want to switch topics and talk about priming.

2  You mentioned that you did these eight interviews or you

3  actually had these eight interviews done and that one of the

4  things you learned is that people tend to think in terms of

5  shows and programs as opposed to channels or networks,

6  right?

7    A    No.  Some people think in terms of channels.  Some

8  people think in terms of shows and programs.

9    Q    But you were concerned that some people were

10 thinking in terms of programs or shows rather than networks

11 or channels; and, therefore, you wanted to prime them to get

12 them thinking about channels and networks, right?

13   A    I wanted to get them thinking in the way that was

14 most natural to them.  So the people were asking -- were

15 asked questions about shows and channels and also special

16 events.

17   Q    You said in your expert report, "Therefore, in

18 order to get respondents in a frame of mind to think about

19 the effect of a channel-specific blackout, it was important

20 first to guide them from thinking about content to thinking

21 about the intersection between content and channels."

22      Correct?

23   A    Yes.  If that's the way they think about things,

24 that's the way I want them to think about things.

25      Again, people don't always know networks.  If I

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  say I'm on NCIS, people may not know that's CBS.  Or people

2  may not know that the NCAA Final Four is on a Turner

3  channel.

4          So, yes, we do have to make some of those

5  connections in order to ask the blackout questions.

6     Q    And so you're seeking to prime or guide people to

7  think in a particular way in order to facilitate your

8  survey, correct?

9     A    I'm trying to guide them in a way that -- yes,

10 I am.  I mean, I have to do a blackout, so I have to make

11 sure they understand what a blackout is.

12         But, otherwise, the majority of the survey is

13 really just trying to get them thinking, get the juices

14 running so they're in the right situation.

15    Q    And as you testified in your deposition, you did a

16 lot of priming in this particular survey, right?

17    A    Yes.  We -- that's a fairly long section.

18    Q    I mean, the idea of priming is to get people to

19 change the way that they're thinking without understanding

20 that they're changing the way they're thinking, right?

21    A    Oh, I certainly don't accept that definition.

22    Q    Well, you could have just said, why don't you try

23 to -- to the survey respondents:  I understand some of you

24 focus on programs or shows rather than networks or channels.

25 I want you to focus on networks or channels.

1          You didn't do that?

2     A    Well, that certainly would be less natural, and

3    that might induce a demand artifact.

4     Q    So let's go through some of your priming slides.

5          I'm going to hand up what's been marked as

6    Defendant's Exhibit 915B.

7          MR. BARBUR:  May I approach, Your Honor?

8          THE COURT:  Uh-huh.

9    BY MR. BARBUR:

10    Q    And do you recognize Defendant's Exhibit 915B as

11   an example of the priming slides that would have been shown

12   to some survey respondents?

13    A    Yes, and we can go through these if you would

14   like.

15    Q    Yeah.  We're going to go through some of these,

16   indeed.

17          Why don't we start with DX095021B.  There's a few

18   pages in.  And this is the special events priming slide that

19   I think you referenced in your prior testimony.

20          Do you see that?

21    A    This is an engagement slide, correct.

22    Q    It says "Special Events" at the top, doesn't it?

23    A    Yes.  We're engaging respondents, that's correct.

24          Well -- yep, special events.

25    Q    And this list of special events was taken from a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    list of the top 100 prime-time telecasts of 2016 among

 2    adults, according to Nielsen, and aggregated according to

 3    broadcast type, correct?

 4         A    Yes, that's correct.

 5         Q    And then in appendix h to your expert report,

 6    which you have in front of you --

 7         A    Yes.

 8         Q    -- there's an actual copy of this Nielsen survey,

 9    right?

10         A    Yes, there should be.

11         Q    Why don't you take a look at appendix H to your

12    report.

13              It's -- the page is H7.  It's appendix H,

14    Exhibit 1.

15         A    Are you sure it's here?

16         Q    Well, I'm pretty sure it's here.  If not, I have

17    another copy I can provide.

18              This one has a tab.  It might be a little easier

19    to use.

20              MR. BARBUR:  May I approach, Your Honor?

21              THE COURT:  Uh-huh.

22              THE WITNESS:  Okay.  What page again?

23    BY MR. BARBUR:

24         Q    Page H7 of appendix H.

25         A    Okay.
```

1      Q    And this is the Nielsen study on which your

2   special events slide was based, correct?

3      A    Yes, that's correct.

4      Q    And there are 100 events shown on here, the

5   top 100 special events in 2016, according to Nielsen, and

6   there's only one Turner event on this chart, correct?  If

7   you read No. 84, the NBA Western Conference finals game,

8   which is on TNT?

9      A    Yes, I see that.

10      Q    That's the only one on this chart that was on

11   Turner network, correct?

12      A    Yes, that's correct.

13      Q    So now, let's go back to Defendant's Exhibit 915B

14   at page 21.

15          You do, in fact, include the NBA playoffs, and you

16   mention if it's on ABC and TNT, but you also added

17   March Madness, correct?

18      A    Yes, that's correct.

19      Q    And March Madness was not on the top 100 list from

20   the Nielsen study that you had, right?

21      A    Well, this was a list that guided us.  There were

22   other programs, yes, that we added.

23      Q    Yes.

24          And so you decided to add March Madness so you

25   could add three more Turner logos to this priming slide;

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   isn't that correct, sir?

 2        A    That's certainly not the reason I did it.  I was

 3   trying to be as representative as possible.  But I guess

 4   that's the net effect.  This is actually the first time I

 5   counted the Turner logos on this slide.

 6        Q    Do you understand that over the last week in

 7   court, we've heard endless testimony from government

 8   witnesses about the alleged importance of March Madness?

 9        A    I'm sorry.  I wasn't in court.

10        Q    But in any event, you independently decided to add

11   March Madness to this chart?

12        A    Yes, it's added.  I tried to do this as randomly

13   as possible.  There's other special events, such as

14   political events, we -- I added.

15             But I certainly had no intent, one way or the

16   other, in adding Turner stations here.

17        Q    And on the Nielsen top 100 list, the only

18   presidential debate was a Republican presidential debate on

19   Fox, correct?

20        A    Yes, that's correct.

21        Q    But, instead, you decided to include all of the

22   Republican and Democratic party primary debates and general

23   election debates, correct?

24        A    Well, the last thing I wanted to do was choose one

25   party over the other.
```

1      Q    Well, you could have just gone off the top 100

2  list, which is what you said you were going to do, right?

3      A    Well, this and I believe there was also another

4  list, but -- although that might have been another part of

5  the survey.

6           I just -- certainly, I tried to get this

7  represent -- random -- not random, but this would be

8  reasonable.  I was not picking Turner events here, per se,

9  no.

10     Q    But in any event, as a result of changing that

11 part of the Nielsen study, you were able to add a CNN logo,

12 right?

13     A    That wasn't my intent.

14     Q    Okay.

15          So if you'd gone just strictly based on the

16 Nielsen survey, there would have been one Turner event on

17 this slide and one Turner logo.

18          But through the changes that you made, we now have

19 five Turner logos over three events, correct?

20     A    Well, again, I was doing my best here.  That

21 certainly was not my intent.

22     Q    Let's move ahead to the news and talk part of

23 these priming slides, page 24 here.

24          Do you have that?

25     A    Yes, I have that.

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1       Q    And you include TBS, which is a Turner network,

2  CNN, Headline News, and you even have CNN en Español, right?

3       A    Yes, that's correct.

4       Q    So 4 of the 10 or 12 here are Turner networks,

5  correct?

6       A    Yes, that's correct.

7            And this happens to both the test and the control.

8       Q    And, for example, you show NBC here, but you don't

9  show CNBC or MSNBC, which are also in the talk category,

10  aren't they, or the news or talk category?

11      A    Yes, they are.

12      Q    And you show Fox, but you don't show the Fox

13  business channel, right?

14      A    That's correct.

15      Q    So let's skip ahead to the -- the sports page that

16  you have, which is on -- towards the back.  It's maybe the

17  last one.  It's page 30.

18           Do you have that?

19      A    Yes, I do.

20      Q    And you included on here TBS, TNT, and TruTV,

21  which are all Turner networks, right?

22      A    Yes.  Those are on there, correct.

23      Q    Do you understand that those are general

24  entertainment networks?  They have some sports, but they

25  have all kinds of other programming as well.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

825

```
 1              Do you understand that?

 2      A    Yes, but they definitely have sports.

 3      Q    Okay.

 4              Other than those three, every other network listed

 5   here only has sports programming, correct?

 6      A    Yes, that's correct.

 7      Q    And you didn't include in here the broadcast

 8   networks:  ABC, NBC, Fox, and CBS, right?

 9      A    They are not here.

10      Q    And they also have sports, don't they?

11      A    Yes, they do.

12      Q    And for TBS, you have them down for March Madness.

13              Do you see that?

14      A    Yes, I see that.

15      Q    And do you understand that March Madness is

16   actually split between TBS and CBS?

17      A    Yes, that's correct.

18      Q    But you've only got TBS down here, right?

19      A    Yes.

20      Q    And you have the NBA playoffs under TNT, right, on

21   this chart?

22      A    Yes.

23      Q    And the NBA playoffs are actually split by ABC and

24   TNT, aren't they?

25      A    I didn't know that.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

826

```
 1          Q     Well, you didn't include it?

 2          A     No, it's not included.  But, remember, both the

 3    test and control are seeing these.

 4          Q     So now I want to walk through some of the actual

 5    choice slides, the test group and the control group.  So

 6    I'm going to hand up what's been marked as 915C, which is

 7    the test group, and 915D, which is -- or, excuse me.

 8                915C is the control group, and 915D is the test

 9    group.

10                MR. BARBUR:  May I approach, Your Honor?

11                THE COURT:  You may.

12    BY MR. BARBUR:

13          Q     So take a look at DX915C.  This is a

14    representative sample of the choice questions that would

15    have been presented to the test group, correct?

16          A     That's correct.

17          Q     And DX915T is representative slides that would

18    have been shown to the test group, correct?

19          A     That's correct.

20          Q     So I just wanted to compare the two.  The first

21    slide of each is an introductory slide, right?

22          A     That's correct.

23          Q     And the test group sees just three lines of text

24    in the introductory slide, right?

25          A     That's correct.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1    Q    And the test group sees a few more lines of text,

2    and then it sees ten extremely large logos for the Turner

3    networks, right?

4    A    Yes.  I think I've explained why these are here,

5    but I could do that for you.

6    Q    And you actually have down ten networks here.

7    There's really only nine, right?

8    A    No.  I think this slide is accurate.

9    Q    Cartoon Network and Adult Swim are on the same

10   network, aren't they, sir?

11   A    Well, they're really targeted to two different

12   groups.  Not everybody understands that Adult Swim is the

13   same at Cartoon Network.

14   Q    Adult Swim is a certain programming segment in the

15   evening on the Cartoon Network, is it not, sir?

16   A    Yes, and it has its own image.

17   Q    But you -- in your preface, you say, the following

18   channels.  Adult Swim isn't a channel, is it?

19   A    Some people think of Adult Swim; some people think

20   of Cartoon Network.  It was appropriate to have both.

21   Q    But, anyway, you thought it was appropriate to

22   have some small type at the top and then these extremely

23   large logos.  The font is probably ten-times larger in the

24   logos than it is in the text, right?

25   A    People read the text, and they really need to be

 1    reminded of what are the Turner channels, and so I use

 2    logos.

 3        Q    And the test, the control group got only one

 4    introductory slide, but the test group got additional

 5    introductory slides, right?

 6        A    Yes.  I had to -- I absolutely had to tell the

 7    test group about the blackout.  I had to make sure they

 8    understood what was being blacked out and that there would

 9    be a blackout.

10        Q    And so if we look at DX915144, that's the next

11    introductory slide for the test group.  And, again, we see

12    two small lines of text and ten enormous logos for the

13    Turner networks, right?

14        A    Yes.  It's as if the -- it's just a way of

15    implementing as if the logo stayed on the screen while we

16    changed the text.  And so people saw the logos, and I think

17    it was effective in terms of making them aware that it

18    was -- what was being blacked out.

19             THE COURT:  Would this be a good time to take the

20    luncheon recess?

21             MR. BARBUR:  That's fine, Your Honor.

22             THE COURT:  Okay.  We're going to take the

23    luncheon recess, sir.  You remain a witness under oath in

24    the case, which means you're not at liberty to discuss your

25    testimony so far or what it might be when you return with

 1   anyone, including the counsel in the case.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  So stay independent of all others and

 4   be able to answer honestly the questions you haven't spoken

 5   with anyone about your testimony.

 6              THE WITNESS:  No, no, I haven't.

 7              THE COURT:  No.  When you return, I mean, you'll

 8   be able to say that.  Okay?

 9              THE WITNESS:  Oh, I'm able to say that, yes.

10              THE COURT:  You will be able to say that when you

11   return; that's what you want to be able to do.

12              All right.  So you can step down.  You're excused.

13   Be back at 2:30.

14              And we'll see counsel at 2:30.

15              DEPUTY CLERK:  All rise.

16              This Honorable Court will stand in recess until

17   the return of court.

18              (Proceedings concluded at 1:00 p.m.)

19

20

21

22

23

24

25

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

C E R T I F I C A T E

       I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: March 29, 2018_____     /S/__William P. Zaremba_____

                                   William P. Zaremba, RMR, CRR

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      :
                               :
               Plaintiff,      :        CV No. 17-2511
         vs.                   :
                               :        Washington, D.C.
                               :        Thursday, March 29, 2018
AT&T, INC., ET AL.,            :           2:40 p.m.
                               :
                               :           Day 5
               Defendants.     :
----------------------------x



                     AFTERNOON SESSION
                  TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE RICHARD J. LEON
                UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:    Craig W. Conrath, Esquire
                       Eric D. Welsh, Esquire
                       Timothy B. Walthall, Esquire
                       Andrew Finch, Esquire
                       Justin T. Heipp, Esquire
                       Cerin M. Lindgrensavage, Esquire
                       Shobitha Bhat, Esquire
                       U.S. DEPARTMENT OF JUSTICE
                       Antitrust Division
                       450 Fifth Street, NW
                       Washington, DC  20530
                       (202) 532-4560
                       craig.conrath@usdoj.gov
                       eric.welsh@usdoj.gov
                       timothy.walthall@usdoj.gov
                       andrew.finch@usdoj.gov
                       justin.heipp@usdoj.gov
                       cerin.lindgrensavage@usdoj.gov
                       shobitha.baht@usdoj.gov
```

```
 1    Appearances Continued:

 2    For Defendant AT&T         Katrina M. Robson, Esquire
      and DirecTV Group          O'Melveny & Myers LLP
 3    Holdings, LLC:             1625 Eye Street, NW
                                 Washington, DC  20006
 4                               (202) 220-5052
                                 krobson@omm.com

 5
                                 Daniel M. Petrocelli, Esquire
 6                               M. Randall Oppenheimer, Esquire
                                 O'MELVENY & MYERS LLP
 7                               1999 Avenue of the Stars
                                 8th Floor
 8                               Los Angeles, CA  90067
                                 (310) 553-6700
 9                               dpetrocelli@omm.com
                                 roppenheimer@omm.com

10
                                 Michael L. Raiff, Esquire
11                               Robert C. Walters, Esquire
                                 GIBSON, DUNN & CRUTCHER LLP
12                               2100 Mckinney Avenue
                                 Suite 1100
13                               Dallas, TX 75201
                                 (214) 698-3350
14                               mraiff@gibsondunn.com
                                 rwalters@gibsondunn.com

15
      For Defendant             Kevin J. Orsini, Esquire
16    Time Warner, Inc.:        Peter T. Barbur, Esquire
                                 CRAVATH, SWAINE & MOORE LLP
17                               Worldwide Plaza
                                 825 Eighth Avenue
18                               New York, NY  10019
                                 (212) 474-1140
19                               korsini@cravath.com
                                 pbarbur@cravath.com

20
      Court Reporter:           Crystal M. Pilgrim, RPR, FCRR
21                               Official Court Reporter
                                 United States District Court
22                               District of Columbia
                                 333 Constitution Avenue, NW
23                               Washington, DC  20001
                                 (202) 354-3127
24                               crystal_pilgrim@dcd.uscourts.gov

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

<div align="center">Table of Contents</div>

|                                      | Direct | Cross | Redirect | Recross |
|--------------------------------------|--------|-------|----------|---------|
| On behalf of the Plaintiff:          |        |       |          |         |
| John R. Hauser                       |        |       |          |         |
| By Mr. Heipp                         |        |       | 841      |         |
| By Mr. Barbur                        |        | 834   |          |         |
| Gregory Rigdon                       |        |       |          |         |
| By Ms. Bhat                          | 858    |       |          |         |
| By Mr. Orsini                        |        | 881   |          |         |
| Confidential Session                 |        |       |          | 901-970 |

<div align="center">E-X-H-I-B-I-T-S</div>

|                                      | Marked | Received |
|--------------------------------------|--------|----------|
| On behalf of the Plaintiff:          |        |          |
| Exhibit No. 384 under seal           |        | 871      |
| Exhibit No. 385 under seal           |        | 873      |
| Exhibit No. 306 under seal           |        | 875      |
| Exhibit No. 708 under seal           |        | 945      |
| Exhibit No. 709                      |        | 953      |
| On behalf of the Defendants:         |        |          |
| Exhibit No. 925 under seal           | 889    |          |

1                    P-R-O-C-E-E-D-I-N-G-S

2            THE DEPUTY CLERK:  Your Honor, recalling civil action

3    number 17-2511, United States of America versus AT&T, Inc., et

4    al.

5            THE COURT:  Witness remains under oath.

6            THE WITNESS:  Thank you.

7         GOVERNMENT WITNESS JOHN R. HAUSER PREVIOUSLY SWORN

8                    CROSS EXAMINATION (continued)

9            MR. BARBUR:  May I proceed, Your Honor?

10           THE COURT:  You may.

11   BY MR. BARBUR:

12   Q.   Back before the lunch break, Professor Hauser, we were

13   looking at DX 095 C and the D versions.

14      Do you have that in front of you?  These were the slides

15   from the test and control groups?

16   A.   09?

17   Q.   The one, the C and D the ones that are actually pictures

18   of the slides?

19   A.   Oh, these?

20   Q.   Yes.  Should be one ending in C and one ending in D in the

21   lower right hand corner.

22      Do you see that?

23   A.   Yes.  Which ones?

24   Q.   Just have them in front of you, I'll ask you questions

25   about them?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Okay.

2  Q.    I think we established that for C which is the control

3  group there was one introductory question and then we walked

4  through the first two introductory questions in D which was the

5  test group; correct?

6  A.    Yes.

7  Q.    There was actually a third introductory slide for the test

8  group as well, that's on page 145.

9      Do you see that?

10 A.    Yes, that's correct.

11 Q.    So once again, we have small font at the top text and then

12 we have these large logos, correct?

13 A.    That's correct.

14 Q.    So whereas the test group had one page with no logos, the

15 control group, where the control group had one page and no

16 logos, the test group had three pages each with the logos for

17 each of the Turner channels, correct?

18 A.    Yes, I have two B C block out.

19 Q.    Then you proceed to questions where you ask both the

20 control group and the test group about their favorite TV

21 program, right?

22 A.    Yes.

23 Q.    For the control group you simply say describe the ways

24 that you watch your favorite TV programs, right?

25 A.    Yes, that's correct.

\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*

1  Q.   But for the test group which is on D, page 146, you say

2  among other things, given that your TV provider has no current

3  plans to resume airing the channel, what would you do to watch

4  your favorite programs on these channels that were blacked out

5  on your TV subscription, right?

6  A.   Yes, that's correct.

7  Q.   By this point in the survey you had not established that

8  any survey respondent had any favorite programs on any Turner

9  channel, had you?

10 A.   No.  They would be, if they didn't have any favorite

11 channel they would say I, they would answer this truthfully.

12 Q.   Well, you say what would you do to watch your favorite

13 programs on these channels that have been blacked out, right?

14 A.   That's right.

15 Q.   And you're implying to these people that they have

16 favorite programs on the Turner channels, right?

17 A.   Not really.  They would simply say I don't have any

18 favorite channels.

19     We've got a very sufficient what you call priming what I

20 call engagement.

21 Q.   Let's go to the next slide on favorite programs for the

22 control group on C, that's page 33.  Again, you're asking what

23 would they do to find other ways to watch their favorite

24 programs, right?

25 A.   That's correct.

Q.   And for the test group you say you might have already said

this, but what would you do, would you or would you not try to

find another way to watch your favorite programs from TBS, CNN

and Español, HLN, Bommerang, Turner Classics Movies, Cartoon

Networks, CNN Adult Swim, TruTV and TNT that were blacked out

on your TV subscription, right?

A.   That's right.  We reminded people of the Turner channels.

Q.   Yes and you did it in bold so that for the Turner channels

as opposed to the other fonts here, right?

A.   Yes.  I wanted them to be aware of the Turner channels.

Q.   Yes, you wanted to emphasize the Turner channels, that's

for sure.

     Again, you say what would you do to watch your favorite

programs from all of those various Turner networks, correct?

A.   Yes.

Q.   And again, you had not established by this point in time

that the survey respondent had ever watched a single Turner

show on a single Turner network, correct?

A.   That's correct.  They would answer no.  If they had no

favorite channels.

Q.   So now we move on to the actual setting up for the choice

slides, right?  So let's flip to page 34 on the C slide and

page 148 on the D slide.

     And you're setting up the offers that are going to be made

to them and the test, the control group gets text, the test

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  group gets text but they're now seeing for the fourth time all

2  of the large representations of the logos for the Turner

3  channels, correct?

4  A.   Yes.  This is the way I implemented keeping those logos up

5  there.

6  Q.   Yes, you sure do.

7      Then for, flip ahead to the next slide, this would be 35 C

8  on the C version and 149 D.

9      Again, you're setting them up for getting competing offers

10 from various distributors, right?

11 A.   Yes.

12 Q.   And for the control group they just get text, for the test

13 group they see text but they also see the Turner logos for now

14 the fifth time, correct?

15 A.   Yes.  By this point they're very aware that there's a

16 Turner blackout.

17 Q.   The next slide is where you describe switching costs,

18 right?

19 A.   Yes.

20 Q.   For the control group they get just text describing

21 switching costs, right?

22 A.   That's correct.

23 Q.   But for the test group they get the same test but again, a

24 very large representation of the Turner logos, right?

25 A.   That's correct.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.   For the sixth time?

2  A.   It's as if these logos stayed on the screen while we asked

3  them questions.

4  Q.   But they had to click from screen to screen to screen,

5  right?

6  A.   Yeah, but if you've ever been through a survey the

7  questions change and the logos more or less stay the same.  It

8  could have been implemented the other way, we would have got

9  the same results.

10 Q.   By the way, focusing on the switching cost page, you

11 describe in a textual form the kinds of switching costs you

12 think that a subscriber would face if they wanted to change

13 providers; is that correct?

14 A.   No.  We have some evidence that, what these are switching

15 costs.  But these are the switching costs that indicate the

16 types of switching costs people would attain.

17    Now this one is of course I think it's for a traditional

18 provider.  It's a little different for a non-traditional

19 provider.

20 Q.   I understand that.

21    But it's text describing for the survey respondent the kind

22 of switching costs they might face, correct?

23 A.   That's correct.

24 Q.   Wouldn't you agree with me that it's one thing to read

25 about switching costs in a paragraph on a survey and another

1   thing to actually have to call up and cancel one provider, set

2   up an appointment to have that equipment taken out, call

3   another provider, set up an appointment to have that equipment

4   brought in, all the time associated with that.

5       Isn't it a very different thing to actually go through this

6   in real live as opposed to reading it on a page?

7   A.   I'm not sure it is.  People are aware of what these

8   switching costs are.  I'm not sure there's any other way that

9   could have introduced switching cost.

10  Q.   One switching cost is an information cost; that is, just

11  figuring out what the competing offers are, right?

12  A.   Yes, that's correct.

13  Q.   Here you completely eliminated that switching cost because

14  you actually just provided three offers to the survey

15  respondents, right?

16  A.   Yes.  In both the test and control which lowers the

17  control relative to the test.  Or I should say likely lowers

18  the control.

19  Q.   So switching topics.  When you stated that there's a 12.2

20  percent departure rate that you calculate, that rate was not

21  stated without error, correct?

22  A.   Yes, I gave the confident intervals.  The later question

23  that I was asked.

24  Q.   In your report though, you didn't provide confidence

25  intervals, right?

1   A.    Right.  We provided standard errors.  Anybody familiar

2   with this knows you multiply the standard errors and you get

3   the confidence intervals.

4   Q.    But it was only during your deposition that you actually

5   laid out what the range was on a 95 percent confidence level,

6   right?

7   A.    In most of the academic articles, it's standard to provide

8   standard errors which is what I did here assuming that anybody

9   could then quickly calculate the confidence intervals.

10  Q.    And at a 95 percent competence level the range is 7.4

11  percent to 17 percent, correct?

12  A.    That's correct.

13  Q.    You say that 12.2 percent is like the, is the most likely,

14  but within a 95 percent confidence level you don't know if it's

15  going to be 7.4 percent or 17 percent, right?

16  A.    What that means is that there's a 2.5 percent chance, half

17  of 95 from one and then divide by two.  It's a 2.5 percent

18  chance by random error that you might be below 74.4.

19      There's also a 2.5 percent chance that you would be above

20  17.  But it is about, well, it's roughly a bell shaped curve,

21  you get to that in a little bit.

22      So most of the, the density is going to be much closer to

23  12.2.

24  Q.    Can you answer my question?

25      My question was within a 95 confidence level you can't say

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  whether it's 7.4 percent to 17 percent, correct?

2  A.   I can give probabilities but I cannot give a 01 estimate,

3  no.

4  Q.   One of the things that leads to error in a survey like

5  this is sample size, correct?

6  A.   That's correct.

7  Q.   And just so we're clear about the sample size here you

8  referred to 1600 at some point in your prior testimony?

9  A.   Yes, and those were split between four groups.

10  Q.   But some of those people were screened out before the

11  actual survey was administered, correct?

12  A.   Not those 400 people.

13  Q.   You started with 1600, but when you actually administered

14  the survey less than 400 people were surveyed as part of the

15  test group and less than 400 people were surveyed as part of

16  the control group, correct?

17  A.   Yeah.  There's 400 in each group and then a few people

18  eliminated from the analysis because they answered the question

19  too fast.  These again are standard quality control methods.

20  Q.   You understand that Professor Shapiro is relying on your

21  analysis to testify and support the Department of Justice's

22  position, this hundred billion dollar merger should be blocked

23  and you based your survey on two groups of 400 respondents; is

24  that correct?

25  A.   Yes, that's correct.

1  Q.    You mentioned this morning that your testimony has never

2  been thrown out of the Court case.

3        Do you remember that?

4  A.    Not that I know of.

5  Q.    You testified in the Apple versus Samsung litigation in

6  California, didn't you?

7  A.    Yes, I did.

8  Q.    That was a patent case?

9  A.    That's correct.

10  Q.    It involved Apple devices, iPhones and tablets, right?

11  A.    That's correct.

12  Q.    And you did a conjoint survey in that case, right?

13  A.    That's correct.

14  Q.    You were trying to establish the relative value of certain

15  features on the iPhone and the tablets, right?

16  A.    Not quite.  I was trying to determine consumer's

17  willingness to pay which is different than the relative value.

18      It's up to an economist or an accountant to use the

19  willingness to pay to come up with a relative value.

20  Q.    So you were trying to determine consumer's willingness to

21  pay for certain features on iPhones and Apple tablets?

22  A.    That's correct.

23  Q.    Judge Koh didn't agree with your analysis in that case,

24  did she?

25  A.    Actually, she did agree with me. If you look at that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   opinion, I testified as I have now it wasn't a value, it was

2   just willingness to pay.

3       She actually cited me in stating that it was not relative

4   value, that it was willingness to pay.

5   Q.   Well I'll just read you some of the quotes from Judge

6   Koh's opinion.

7       "The Court finds Dr. Hauser's survey results are undermined

8   because the survey appears to have failed to adequately account

9   for non-infringing alternatives to the patented features."

10      She said that, right?

11  A.   Yes.

12  Q.   She similarly said, she said "similarly the survey

13  highlights the patented features using various attention

14  drawing graphic effects", right?

15  A.   That's right.

16  Q.   And she criticized you for that, didn't she?

17  A.   It's a criticism.  She ultimately accepted the testimony.

18  I was allowed to testify and, in fact, she accepted the

19  results.

20      There's criticisms just as there are now.

21  Q.   The Court in that case also said:  "The Court finds that

22  the extra attention given to the patented feature in the survey

23  through these various graphic effects and presentation methods

24  likely inflated their price premiums.  Consequently, the survey

25  results likely overstate consumer's relative willingness to pay

1  for the patented features", correct?

2  A.   I'm not familiar with that, but that could be there, yes.

3  Q.   So you used certain graphics to call attention to certain

4  features and you were criticized about that by Judge Koh,

5  correct?

6  A.   Yes, and I disagreed with the criticism then.

7       In fact, the other expert used a survey that was quite

8  biased.

9  Q.   Also speaking of graphics and presentation, I want to go

10  back to the demonstrative exhibits that were handed to you at

11  the beginning of your testimony.

12       Do you have those?

13  A.   I'm not sure I do.

14           MR. BARBUR:  Well, I've got extra copies here. May I

15  approach, Your Honor?

16           THE COURT:  You may.

17  BY MR. BARBUR:

18  Q.   These are the demonstrative exhibits that Mr. Heipp took

19  you through or at least some of them this morning when you

20  began your testimony, right?

21  A.   Yes, that's correct.

22  Q.   And these are things that you prepared in conjunction with

23  the Department of Justice, right?

24  A.   That's correct.

25  Q.   And I know you didn't get to this, but I want to go to the

1  slide that says examples of switching costs permanent blackout

2  group, do you see that?

3  A.   Yes, that's correct.

4  Q.   And this was a slide that was presented to illustrate a

5  slide that would have been in the survey, correct?

6  A.   Yes, that's correct.

7  Q.   I want you to compare that to DX 915, page 150 D in the D

8  package.

9     Do you see that?  Do you have both of those in front of

10  you?

11          THE COURT:  Which page in the D packet?

12          MR. BARBUR:  Page 150 915-015D.

13          THE COURT:  All right, 150D.

14  BY MR. BARBUR:

15  Q.   Do you have that, Professor Hauser?

16  A.   Yes, I have that.

17  Q.   They're similar, the text is the same and the logos are

18  the same, but in the illustration you picked for the Court you

19  made the font on the question in the preceding description much

20  larger than it was in the actual survey, didn't you?

21  A.   I apologize.  I have older eyes and I wanted to be able to

22  read it from across the room.

23  Q.   That had the affect of making the logos look less

24  prominent relative to the text than they were in the actual

25  survey; isn't that correct, sir?

1    A.    That certainly wasn't my intent.

2              MR. BARBUR:  I have no further questions, Your Honor.

3              THE COURT:  All right.  Redirect.

4              THE DEPUTY CLERK:  Mr. Barbur, are you going to move

5    any of A through D?

6              MR. BARBUR:  No.

7              THE DEPUTY CLERK:  Okay.

8                        REDIRECT EXAMINATION

9    BY MR. HEIPP:

10   Q.    Just a couple of topics to talk to you about, Professor

11   Hauser.

12      At the beginning of Mr. Barbur's questioning of you, you

13   were asked about a couple of prior blackout events involving

14   Turner; do you remember that?

15   A.    Yes, I do recall that.

16   Q.    You were first asked about a blackout involving Dish.

17      Do you know how many channels were involved in that

18   blackout?

19   A.    I think he might have said it, but I don't recall.

20   Q.    Then you were asked about Cable One Turner blackout.  Are

21   you aware of how Cable One responded publically to the Turner

22   blackout in that instance?

23   A.    No, I'm not.

24   Q.    Are you aware of the basis for the churn estimates that

25   Mr. Barbur provided you?

1   A.   No, I'm not.

2   Q.   Did you need to look at prior data from blackout events to

3   construct or analyze your study?

4   A.   No.  I want to do an independent study and in an

5   independent study I can do a test and control.

6        And furthermore, whatever happens in a real world there's a

7   lot of things you have to control for and you normally can't do

8   that.

9        In addition, this particular, you know, all the channels

10  for a permanent blackout is in hypothetical.

11  Q.   Is there a benefit to doing an experiment like yours

12  versus looking at data like that?

13  A.   Yes.  You can isolate the effect, it gives you causality.

14  Q.   Mr. Barbur asked a number of questions about the survey

15  itself and walked you through some pages.

16       You were first asked about the list of content that you

17  provided to respondents.

18       Do you remember that?

19  A.   Yes, I recall that.

20  Q.   There was some talk about priming.  Is priming a term that

21  you use in your academic and professional work?

22  A.   Yes, it has multiple meanings.

23       In this case, what we're trying to do is we're trying to

24  bring things out of memory to put people in a situation that's

25  realistic to them.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.    That's something that you have done before?

2  A.    Yes.

3  Q.    What is the purpose of doing that, what was the purpose of

4  doing that in this case?

5  A.    Well, I wanted to have these consumers in as realistic a

6  situation as I possibly could within the confines of the

7  survey.

8      So I wanted to have a series of questions about within each

9  genre of which channels they watch.  What television shows they

10  watch, et cetera.

11     So they would start thinking about these.  They would be

12  aware of their favorite channels, their not favorite channels,

13  basically be put in a frame of mind of essentially television

14  watching.  And hopefully in a frame of mind of things they

15  would do for either getting a provider or switching providers

16  if that's what they were going to do or staying with the

17  provider.

18  Q.    When respondents were shown that section of the lists of

19  content, was that shown to both the control and the test

20  groups?

21  A.    Yes, it was.

22  Q.    It was also quite a lot of talk about logos.

23     Do you recall about how many logos respondents would have

24  seen in the survey?

25  A.    Well, there were a 107 possible logos, but the average

1  respondent I think saw between 30 and 60 logos.  Now some of

2  those wouldn't be unique.

3     For example, CBS has both drama shows and comedy shows.  If

4  they had chosen drama and comedy, the two things they wanted to

5  look at, they would have seen the CBS logo twice.

6  Q.   But you did show respondents the logos for the Turner

7  channels in the blackout questions?

8  A.   Yes, I did.

9  Q.   Was it important for respondents to understand the content

10 they might be losing?

11 A.   Yes, it is.

12    A lot of people are aware of channels, they might not

13 associate the Cartoon Network and CNN are really both owned by

14 Turner.  I wanted to make sure that they were not assuming

15 channels beyond Turner, but in fact just assuming the Turner

16 channels.  So I wanted to make sure that they understood that

17 if it was a blackout, it was just in Turner channels.

18 Q.   Would it have been possible to present respondents with a

19 blackout of Turner channels without referring to the Turner

20 channels?

21 A.   No, it would be difficult and it would be difficult with

22 text only.

23 Q.   Why is that?

24 A.   Well, people are familiar with logos, they see logos a

25 lot.  And that's how often they think of the channels, et

1  cetera.

2      I mean, we often forget what TNT actually stands for.

3      I could tell a story about TBS.  MIT use to own the name so

4  Turner bought MIT a long time ago.

5  Q.   You were also asked about your work for the Apple Samsung

6  case.  It was a conjoint survey that you did in that case?

7  A.   Yes. Two cases.

8  Q.   Can you explain what a conjoint survey is?

9  A.   Well, a conjoint survey is where there's a large number of

10 features and you want to vary those features.  And you

11 basically want to find the value of one or a small number of

12 those features and so you will still have a lot of distracter

13 features in.

14     So it's the type of study you would do.  It's not an

15 experiment, it's just a question to people that you can do to

16 measure willingness to pay.

17 Q.   Was the study that you did for that case comparable to the

18 study that you did for this case?

19 A.   No.  This was basically an experiment as opposed to just a

20 conjoint survey.  It included a test and control and rather

21 than conjoint we used the juster scale after the filter

22 question.

23 Q.   In the blackout set of questions could respondents have

24 been reminded of how little they watch the Turner channels?

25 A.   Yes, that's certainly true.  If they don't recognize these

1  logos or if they don't watch those channels or if they don't

2  have any favorite channels on those shows, they would be

3  reminded of that fact.

4  Q.  Did you test in your survey to determine whether

5  respondents improperly focused on the Turner channels?

6  A.  Yes, we did.  We tested it as I described earlier.  We had

7  a number of questions that the, at the end of the survey and if

8  this type of bias came up they likely would have mentioned

9  that.

10     Remember, only three of the 1600 people mentioned that this

11  was about Turner channels.  So if you do take those out you get

12  basically the same result.  Otherwise the remaining people.

13     Also, we did a pretest and a pretest is when you give the

14  survey to someone, a set of people beforehand and you have an

15  interviewer on the phone while they're doing it.  These people

16  think out loud as they're taking the survey, and the

17  interviewer is noting what they say.

18     Then there are even stronger questions in that to pick up

19  these effects that might be due to logos, et cetera.  If they

20  were, if they had come up, I would have changed the survey.

21  Q.  Is there any evidence either from that pre test that you

22  described or from the questions in the survey that your

23  conclusions are affected by that kind of bias?

24  A.  No, three out of 1600 is a small number.  There's minimal,

25  if any, focus on, extra focus on the Turner channels, beyond

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    the fact that we induce them for the blackout.

2           MR. BARBUR:  I don't have any further questions, Your

3    Honor.

4           THE COURT:  Who had screened the 1600 for you?

5           THE WITNESS:  Well, 1600 we got from the internet

6    panel and we choose them randomly from their panel.

7           THE COURT:  What's the internet panel?

8           THE WITNESS:  Okay, Survey Sampling International

9    they recruit people.  In this case they have about ten million

10   people, a little bit more than ten million people.  And these

11   people agree to take surveys because if you send out a random

12   email you're not going to get very much response.

13      They get paid a minimal amount.  They do take surveys.

14          THE COURT:  What's a minimal amount, $50, $100?

15          THE WITNESS:  I think it's less than that.  I think

16   it's less.  I actually don't know the number.

17          THE COURT:  They get paid by the survey?

18          THE WITNESS:  They get paid by the survey.  They get

19   paid more for longer surveys.  Ours was a moderately short

20   survey.

21          THE COURT:  Okay.

22          THE WITNESS:  So survey sampling then balances this,

23   balances their sample, in this case to the U.S.  They also have

24   international samples.

25      And they do a number of caller controls.  They're always

1  checking to see if respondents go too quickly, if they answer

2  all the same thing.  If they're just doing it for pay, they get

3  rid of them.

4       And back in 2000s, I had headed a project for the NSF,

5  and we were just learning the panels by then.

6       By 2018 these panel companies provided a very good

7  representative sample.

8            THE COURT:  Did you give them contours where the 1600

9  had to come from, what kind of TV systems they had in place,

10  whether they are pay-TV or internet TV access?  What kind of

11  contours did you give them?

12           THE WITNESS:  Well, the sample that we used was

13  balanced in terms of demographics to U.S. Census, basically by

14  location, by gender, by age.  It might have been something else

15  but at least those three.  Then that's the inbound sample.

16       We then asked them questions to determine whether or not

17  they have pay-TV, whether or not they are a key decision maker,

18  and combined with --

19           THE COURT:  What does that mean?

20           THE WITNESS:  What?

21           THE COURT:  What does that mean key decision maker?

22           THE WITNESS:  Well, we don't want, you don't want

23  someone in your sample who someone else makes a decision for.

24           THE COURT:  So you want the wife of the house?

25           THE WITNESS:  Well, I wouldn't go that far.

1              THE COURT:  Most homes.

2              THE WITNESS:  Yeah.

3              THE COURT:  How do you know they're telling you the

4   truth, they're the key decision maker?  You have no way of

5   knowing do you?

6              THE WITNESS:  No, of course you don't.

7              THE COURT:  And frankly, you have no way of knowing

8   if any of the answers that they give on the survey are actually

9   what they believe.

10             THE WITNESS:  No.

11             THE COURT:  They can just whip through it.

12             THE WITNESS:  They can except that a survey sampling

13  would be quickly out of business if you did, if you did a lot

14  of the surveying with survey sampling and they didn't predict

15  well.  I think they have, I forget the number of clients like

16  3500 or so market research companies and all of the Fortune 500

17  companies.  If you get bad results, like there were world panel

18  companies that went out of business that paved (sic) bad

19  results.  Survey Sampling, Research Now, Prodigy MR, GFK,

20  they're  are all top panels.

21             THE COURT:  Is there a difference between predicting

22  what a person is like, what kind of automobile a person is

23  likely to purchase or what kind of clothing they might be

24  willing to purchase or likely to purchase in a given situation

25  from what they would do to deal with or respond to a

1  situational problem, i.e. a blackout and given a situation.

2  Aren't those really very different things?

3           THE WITNESS:  No, no, they're not.  There's a few

4  papers I've written on this.

5           THE COURT:  Really.  Where were they published?

6           THE WITNESS:  Journal of Marketing Research, might

7  have been one in Management & Science, but certainly Journal of

8  Marketing Research.  In fact, it won an award.

9           THE COURT:  Oh good.

10          THE WITNESS:  But then we academics give a lot of

11  rewards to one another.

12          THE COURT:  Of course you do.

13          THE WITNESS:  But in that case we were dealing with a

14  lot of things in the paper.  Physicians dealing with blood

15  analyzer checks.  To get physicians, you have to go to a very

16  special panel for that.

17          THE COURT:  Yes.

18          THE WITNESS:  Of course the automobile example.  My

19  memory there's a few others.  But the key concept here is to

20  accelerate people's information so that as they go through the

21  survey, they're in the information state that they would be in

22  when they're actually making that decision.

23      It's actually called information acceleration.

24          THE COURT:  What if they're not sure they have enough

25  information but they feel like they have to give an answer in

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  order to move forward and get the survey done?

2         THE WITNESS:  That's one of the purposes of the

3  filter question.  They're, if they want to get through the

4  survey as quickly as possible, but again, we're timing them,

5  we're screening them out if they do that.

6         THE COURT:  But what if they got a situation where

7  they feel they need more information but they have no way to

8  get it?  They can't call anyone, they can't put it on pause,

9  call you at MIT and say I need more information, right?

10        THE WITNESS:  No.

11        THE COURT:  They can't do that?

12        THE WITNESS:  That's absolutely true.  I think we

13  have to rely on that we've done a good job in introducing the

14  information.

15     Again, these filter questions are very important.  And

16  that's why they're in the federal guidelines that you don't

17  want to ask the key question of anybody who basically wouldn't

18  consider or feels they can't answer the survey.

19     It's actually a quicker way to get through the survey.

20  But no, these are all issues that we have to worry about.

21        THE COURT:  Excused.

22        THE WITNESS:  Thank you.

23     (Witness excused.)

24        THE COURT:  Call your next witness.

25        MR. CONRATH:  Your Honor, my colleague Shobitha Bhat

1    will be presenting the witness.

2              THE COURT:  How do you spell that?

3              MR. CONRATH:  B-H-A-T.

4              THE COURT:  B-H-A-T?

5              MS. BHAT:  Yes.

6              THE COURT:  First name?

7              MR. CONRATH:  Shobitha.

8              THE COURT:  How you spelling that?

9              MS. BHAT:  S-H-O-B-I-T-H-A.

10             THE COURT:  Who is the witness?

11             MS. BHAT: Gregory Rigdon of Comcast, R-I-G-D-O-N.

12             MR. HEIPP:  Your Honor, may I approach to collect the

13   books?

14             THE COURT:  Yes.

15             MS. BHAT:  Your Honor, we have exhibits for

16   Mr. Rigdon.  May we approach the well to give him the binders?

17             THE COURT:  Not yet.

18             MS. BHAT:  Not yet, okay.

19             GOVERNMENT WITNESS GREGORY RIGDON SWORN

20             MS. BHAT:  Your Honor, may I proceed?

21             THE COURT:  Yes.

22                        DIRECT EXAMINATION

23   BY MS. BHAT:

24   Q.   Mr. Rigdon, what company do you work for?

25   A.   Comcast Corporation.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   Q.   What is your position?

2   A.   Executive vice-president of content acquisition.

3   Q.   How long have you held that position?

4   A.   A little over seven years.

5   Q.   In your position what are your general responsibilities?

6   A.   General responsibilities are to negotiate and manage the

7   relationships with our content providers.

8   Q.   What do you mean by content providers?

9   A.   So networks, studios, things of that nature, NBC, Fox.

10  Q.   Would those also be programmers?

11  A.   Yes.

12  Q.   Are you personally involved in negotiation with

13  programmers?

14  A.   I am.

15  Q.   Were you, were you personally involved in Comcast

16  negotiations with Turner in 2015?

17  A.   Yes.

18  Q.   Were you personally involved in Comcast recent

19  negotiations with Turner this year?

20  A.   Yes, I was.

21  Q.   Were you involved in Comcast negotiations with HBO in

22  2017?

23  A.   Yes.

24  Q.   In your current role who do you report to?

25  A.   I report to Dave Watts the CEO of Comcast Cable.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.    What's the relationship between Comcast Cable and NBC

2  Universal?

3  A.    They're both part of the same corporation.

4  Q.    Is there a common parent company?

5  A.    Comcast Corporation.

6  Q.    Currently what services does Comcast Cable offer?

7  A.    We offer video, high speed internet, Telephony, Home

8  Security are the primary services that we offer.

9  Q.    Let's focus on the video services.  How many video

10  subscribers does Comcast Cable have in the United States today?

11  A.    Approximately 20 million.

12  Q.    Can you describe for the Court Comcast Cable's video

13  footprints?

14  A.    Yes.  I mean, we're in many different states in the

15  country.  But we're not in every single state in the country.

16  Q.    Do you know how many states you're in?

17  A.    Off the top of my head, I don't know the number of states.

18  Q.    Who does Comcast Cable compete with for video subscribers?

19  A.    For video subscribers in terms of direct competition we

20  compete with the satellite providers, Dish and DirecTV and we

21  compete with the TelCos, AT&T and Verizon.

22      And more recently we compete with what we call the virtual

23  MVPDs, groups like Hulu Live and YouTube TV.

24  Q.    Does Comcast Cable compete with the SVODs for video

25  subscribers?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   They also operate in the video environment.  You can call

2   them competition.  You can also call them complimentary.  It

3   depends on the situation.

4   Q.   In what way would they be competition?

5   A.   You know, an SVOD service like in Netflix provides a wide

6   array of entertainment choices.  So people have limited time in

7   the day.  So where they're going to spend their time for

8   entertainment in that respect Netflix competes with traditional

9   TV providers.

10  Q.   In what way are SVODs complimentary?

11  A.   It can be complimentary in that it doesn't mean that if

12  you subscribe to Netflix you won't subscribe for example to

13  Comcast Cable TV.

14  Q.   How does Comcast Cable compare with other video

15  distributors in terms of size?

16  A.   One of the largest.

17  Q.   Do you know who is larger?

18  A.   AT&T, DirecTV together is larger.

19  Q.   Is there anybody else who is larger than Comcast Cable

20  today?

21  A.   No.

22  Q.   Let's talk a little bit about negotiations with

23  programmers.  Are you involved in formulating Comcast Cable's

24  negotiation strategy?

25  A.   Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  Q.   Who besides you within Comcast Cable is involved in

 2  formulating that strategy?

 3  A.   I would say I'm the lead person for formulating strategy.

 4      I have a team that I work with to develop that strategy.

 5  And then I work with other various executives in the company to

 6  finalize strategy.

 7  Q.   Do you review information when you are preparing for

 8  negotiations?

 9  A.   I do.

10  Q.   What kinds of information do you review?

11  A.   I'll review contracts, I'll review things related to the

12  market in general, the company with which I'm negotiating,

13  things about that company.

14      And I'll review internal analyses of how valuable we think

15  the content is that we're negotiating for.

16  Q.   Can you explain for the Court what the internal analyses

17  are that you are reviewing to figure out how valuable the

18  content is?

19  A.   Sure.  So typically we call them drop analyses is sort of

20  the colloquial term for it.  And they are produced for us by

21  the EBI group, Enterprise Business Intelligence, which looks at

22  a variety of different data sets.  Some that are publically

23  available, some that are priority.

24      For example, viewership information from our set top boxes

25  as well as information about the customers that are actually
```

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

```
 1  doing the viewing.  To then come up with some estimates on what

 2  we think the proper value is of the content that we're

 3  licensing.

 4  Q.  Who requested that Comcast start creating drop analyses?

 5  A.  I would say the general man in my group did, I did.

 6  Q.  Were you personally involved in that?

 7  A.  Yes.

 8  Q.  When did you make that request?

 9  A.  Well, we only had access to the set top box data for the

10  last several years.  So essentially as soon as that information

11  became available and usable, we started asking for the drop

12  analyses, you know, as soon as it was available.

13  Q.  Why did you request that Comcast start creating drop

14  analyses?

15  A.  Well, any insight you can get into how your customers are

16  engaging with content gives you better information to judge the

17  value of that content to your customers.

18  Q.  Over the last three years have you had discussions with

19  EBI about the drop analyses?

20  A.  Yes.

21  Q.  Do you provide them with input on the drop analyses?

22  A.  Yes.

23  Q.  Do you ask them questions about the drop analyses?

24  A.  Yes.

25  Q.  Why engage them at all on the drop analyses?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   Well, on the one hand you like to understand sort of what

2  goes into the drop analyses.  You know, it's a little bit of an

3  art.  It's a little bit of a science, because we don't have a

4  lot of direct experience with dropping networks.

5      So it's a bit of a process to look at what data is being

6  utilized, which data sets they are utilizing and whether or not

7  we think we are looking at them all the right way to make sure

8  that we're coming up with the most accurate assessments.

9  Q.   Without disclosing the concept of any particular drop

10 analysis can you describe to the Court what it is you are

11 looking for when you review the drop analysis?

12 A.   Sure.  So at the highest level looking at all of the data

13 sets combined with probably the most important being viewership

14 information.  What we're trying to get a sense of is if we

15 don't carry the content that we're trying to price, what is the

16 impact to Comcast Cable?  How many subs might we lose and what

17 might the financial impact be if we no longer have that

18 content.

19     That's a good proxy for figuring out what is the value of

20 that content for our video subscribers.

21 Q.   In what way is it a good proxy?

22 A.   Well, you would have a sense of what the business

23 implications will be if you no longer have the content.

24 Q.   Do you request drop analyses for all of the programmers

25 you're negotiating with?

1  A.    Not all of them.

2  Q.    When do you make those requests?

3  A.    You know, it's a little bit on an ad hock basis but if

4  we're talking about licensing a substantial, or rather if the

5  license fees are substantial in size, I will typically ask for

6  a drop analysis.

7  Q.    In any given year how often do you request a drop

8  analyses?

9  A.    I'm not sure what the, what the cadence would be.  It

10  really depends on what contracts are expiring or what kind of

11  a, projections I'm trying to do looking forward into the

12  future.  So I'd say it varies.

13  Q.    Do you share the results of drop analyses with your team?

14  A.    I do.

15  Q.    Do you share them with the CO Comcast Cable?

16  A.    I do.  I should say not in all circumstances but we

17  absolutely review those kinds of things with Dave Watson.

18  Q.    Let me talk a little bit about your interactions with the

19  parent company, Comcast Corporate.

20     Do you ever speak to executives at Comcast Corporate about

21  your negotiations?

22  A.    I do.

23  Q.    Why do you speak with them?

24  A.    Well, the content acquisition budget is one of the larger

25  expense items in the company.  And some of these negotiations

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  involve large sums of money and, you know, can have a

2  significant impact on our video business.

3      So I, for major negotiations I will often discuss those

4  with executives of Comcast Corporation.

5  Q.   Do you ever share drop analyses results with executives

6  from Comcast Corporate?

7  A.   I do.

8  Q.   Are there any restrictions on what you can tell executives

9  at Comcast Corporate about your negotiations with programmers?

10 A.   No.

11 Q.   Are there any restrictions on what you can share about

12 your contract terms?

13 A.   Not with Comcast Corporation's executives.

14 Q.   Do executives at Comcast Corporate provide you with input

15 on the strategy?

16 A.   Sometimes.

17 Q.   Ultimately, whose decision is it whether to sign a deal

18 with the programmer?

19 A.   At the end of the day it's the CEO and chairman of Comcast

20 Corporation.

21 Q.   Who is that today?

22 A.   Brian Roberts.

23      MS. BHAT:  Your Honor, at this point I would like to

24 turn to the exhibits.

25      May I approach the witness with the binders?

```
1              THE COURT:  Yes, you may.

2              MS. BHAT:  Your Honor, may I also approach the bench?

3              (Counsel handed exhibits to the Deputy Clerk.)

4   BY MS. BHAT:

5   Q.   Mr. Rigdon, I asked you about your 2015 negotiations with

6   Turner.

7        As part of those negotiations did you request a drop

8   analysis?

9   A.   I did.

10  Q.   If you wouldn't mind turning to tab PX 384 in your binder.

11  That's been marked PX 384 for identification.

12       For the record, this document has been designated as

13  confidential by Comcast.

14       Mr. Rigdon, do you recognize this document?

15  A.   It looks familiar, yes.

16  Q.   What is this document?

17  A.   It's a, a document that's going over the upcoming

18  negotiation that we're going to have with Turner.

19  Q.   Who created this document?

20  A.   This document was created I think by a number of different

21  people, including people on my team and people from EBI.

22  Q.   Was this document prepared at your direction?

23  A.   Yes.

24  Q.   Was it prepared in the ordinary course of your

25  responsibilities?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A.    Yes.

2    Q.    Did you use this document in the ordinary course of your

3    responsibilities?

4    A.    Yes.

5    Q.    How did you use it?

6    A.    I used it as a means of understanding of what some of the

7    issues were that we were going to be negotiating and

8    communicating with other people in the company what some of

9    those issues might be.

10   Q.    Mr. Rigdon, are the contents of this document

11   confidential?

12   A.    Yes.

13   Q.    Why are they confidential?

14   A.    Well, there's proprietary information about how we look at

15   negotiations and the kind of analyses that we do.  The drop

16   analysis in particular, those are all sort of proprietary tools

17   that we use to prepare for negotiations.

18   Q.    Have you shared with programmers you're negotiating with

19   the content of PX 304?

20   A.    No.

21   Q.    Do you share it with your rivals?

22   A.    No.

23          MS. BHAT:  Your Honor, at this point we move to admit

24   PX 384 under seal.

25          THE COURT:  Any objection?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. ORSINI:  Your Honor, we do object.

2     May I approach?

3          THE COURT:  You may.  Step down and sit in that chair

4  there please.

5     (Witness leaves the stand.)

6     (Sealed Bench Conference.)

7          THE COURT:  What's the objection Mr. Orsini?

8          MR. ORSINI:  The objection is lack of foundation,

9  Your Honor.

10     They're going to be using this analysis based on what they

11  have done at the depositions to walk Mr. Rigdon through what

12  the numbers are, what the significance of the numbers are.

13  It's a complex analysis.  They haven't established the

14  foundation that he actually knows how the numbers are

15  calculated, how the data sources are analyzed, how these

16  projections are created.

17     He's obviously testified he's used these, but the point of

18  the exhibit being offered, as I understand it, is to get into

19  the nitty gritty of the results.

20     I don't think there's a proper foundation that he's the

21  witness who can explain both how they got there and allow us to

22  test fully the veracity of those results.

23          MS. BHAT:  Your Honor, he's testified that he request

24  these analyses and he incorporates them into his decision

25  making.

1        We're not actually examining him on the nitty gritty of

2   how it's created.  We're examining him on the way in which

3   these numbers influence his negotiation strategy and generally

4   how he understands the numbers.

5        So he does have proper foundation to testify as to that.

6            THE COURT:  So they're not being offered to prove the

7   truth of the matter asserted?

8            MS. BHAT:  Well, they are being --

9            THE COURT:  Because if they are then the people who

10  created them are going to have to testify.  Are you planning on

11  bringing them in?

12           MS. BHAT:  We are not, Your Honor.

13       They're being offered as accurate copies of the estimates

14  that Comcast had of what these job results would be.

15           THE COURT:  I'll let you admit it for the limited

16  purpose of proving what his state of mind was in the

17  negotiations.  But as to the proof of the matter asserted, I

18  will not allow it for that purpose unless you have the people

19  who actually created them.

20           MS. BHAT:  All right, thank you, Your Honor.

21           THE COURT:  Good enough for you?

22           MS. BHAT:  I can work with it, thank you.

23           THE COURT:  You can work with it.

24       Mr. Orsini, can you live with that?

25           MR. ORSINI:  I can, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           THE COURT:  There you go.  Look at that we solved our

2   problem.

3           (Open court.)

4           (Witness resumes the stand.)

5           THE COURT:  It will be admitted for the limited

6   purpose of demonstrating what his state of mind was, but not

7   for the proof of the matter asserted.

8        (Plaintiff's Exhibit Number PX 384 received into evidence

9   under seal.)

10  BY MS. BHAT:

11  Q.   Mr. Rigdon, we're going to -- well, I'm sorry.

12       I had asked you about negotiations with Turner in 2015.

13  Did you sign a new contract with them?

14  A.   We did.

15  Q.   And as part of that contract did you agree to new rates

16  with Turner?

17  A.   We did.

18  Q.   Without disclosing any sensitive information, what did you

19  agree to do to Turner's rates in the new contract?

20  A.   To raise them.

21  Q.   How did the increase compare to inflation for those years?

22  A.   I'd probably say that gets into the realm of confidential

23  information from our perspective.

24  Q.   Okay.

25       Let's talk about your most recent negotiation with Turner

1    in 2017.

2        As part of those negotiations did you request a drop

3    analysis?

4    A.   I did.

5    Q.   If you wouldn't mind turning to PX 385.

6        Do you recognize this document?

7    A.   Yes.

8    Q.   I should have said for the record this document is marked

9    PX 385 for identification.  And it is confidential.

10            THE COURT:  All right.

11   BY MS. BHAT:

12   Q.   What is this document?

13   A.   This is also a document that my team and I put together to

14   provide an overview of what was, what were the issues and

15   economic analysis for the upcoming negotiations with Turner in

16   2017.

17   Q.   Where did you get the information in this document?

18   A.   It was put together by my team with input from EBI.

19   Q.   Was the document prepared at your direction?

20   A.   Yes.

21   Q.   Was it prepared in the ordinary course?

22   A.   Yes.

23   Q.   Did you use the document in the ordinary course?

24   A.   Yes.

25   Q.   Is the information in this document confidential?

```
1   A.    Yes.

2   Q.    Why is it confidential?

3   A.    Same reasons I gave before.

4         MS. BHAT:  Your Honor, we move to have this document,

5   PX 385, admitted under seal.

6         THE COURT:  All right.

7      Same objection?

8         MR. ORSINI:  Yes.

9         THE COURT:  Same ruling.

10      It will be admitted under seal but for the limited purpose

11   of proving the state of mind of the negotiation team and this

12   particular witness.

13      (Plaintiff's Exhibit Number 385 received into evidence

14   under seal.)

15         MR. ORSINI:  Thank you.

16         THE COURT:  Not for the proof of the matter asserted.

17      Let me ask you what is PP it says in the cover email here.

18   Updated PP, latest PP?

19         THE WITNESS:  Powerpoint.

20         THE COURT:  Powerpoint.

21      Those are slides, right?

22      (Laughter from audience.)

23         THE WITNESS:  Yes.

24         THE COURT:  Do you allow that over there at Comcast?

25         THE WITNESS:  We try to do as little as possible but
```

 1   it's a useful communication tool.

 2           THE COURT:  We don't do a lot of that here.

 3           THE WITNESS:  Okay.

 4           THE COURT:  You won't see a lot of that here.

 5   BY MS. BHAT:

 6   Q.   Mr. Rigdon, as part of your negotiations with Turner did

 7   you sign a new deal this year?

 8   A.   Yes.

 9   Q.   Again, without disclosing any sensitive information, what

10   did you agree to do with Turner's rates?

11   A.   We agreed to raise their rates.

12   Q.   Mr. Rigdon, final set of questions for the open portion or

13   what can be discussed in open portion.

14       You renegotiated with HBO in 2017; is that right?

15   A.   Yeah, yes.

16   Q.   As part of those negotiations did you request a drop

17   analysis?

18   A.   Yes.

19   Q.   If I could direct your attention to the final document, PX

20   306, which has been marked as confidential.

21       Do you recognize this document?

22   A.   Yes.

23   Q.   What is it?

24   A.   This is a drop analysis.

25   Q.   Who prepared the information in this document?

1   A.   This would have been prepared primarily by EBI.

2   Q.   Who requested the document?

3   A.   I did.

4   Q.   Was the document prepared at your direction?

5   A.   Yes.

6   Q.   Did you use the information in the ordinary course?

7   A.   Yes.

8   Q.   Was the document prepared in the ordinary course?

9   A.   Yes.

10       MS. BHAT:  Your Honor, at this point -- one more

11  question.

12  BY MS. BHAT:

13  Q.   Is this information confidential?

14  A.   Yes.

15  Q.   Is it for the same reason as the other documents?

16  A.   Yes.

17       MS. BHAT:  Your Honor, at this time we move to have

18  PX 306 admitted under seal.

19       MR. ORSINI:  That would be the same objection, Your

20  Honor.

21       THE COURT:  Same ruling.

22      Admitted under seal for limited purpose, not for the proof

23  of the matter asserted.

24      (Plaintiff's Exhibit Number PX 306 received into evidence

25  under seal.)

1   BY MS. BHAT:

2   Q.   Again Mr. Rigdon, the same set of questions, did you sign

3   a new account with HBO in 2017?

4   A.   We did.

5   Q.   Without disclosing any confidential information, what did

6   you agree to do to HBO's rates?

7   A.   I think that the answer to that, that question is too

8   complicated and involves confidential information.

9   Q.   Okay.

10       MS. BHAT:  Your Honor, at this point we have asked

11  all of the questions we can ask of him in the public record and

12  we ask that the courtroom be sealed.

13       THE COURT:  How much time do you need for a closed

14  courtroom examination?  What's your estimate?

15       MS. BHAT:  Probably 20 to 25 minutes just running

16  through fairly quickly the documents.

17       MR. PETROCELLI:  Your Honor, may I approach?

18       THE COURT:  You may.  You can step down sir.

19       THE WITNESS:  Okay.

20       (Witness leaves the stand.)

21       (Sealed Bench Conference.)

22  ███████  ████  ████  ████ █  ████  ████

23  ███  ████  ██████  ██████  ████  ████  ████  ████  ████

24  ████  ███  ███  ██████  ████  ████  ███  ████  ████

25  ███  ██  ████████



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



1       ████  █████████   █████  █████

2           (Open Court.)

3           THE COURT:  All right, we're about to embark on a

4    novel approach to putting on a it's a novel trial.

5           We're going to pass the witness to Mr. Orsini for cross

6    examination on that which we have heard in open session.  Then

7    we're going to, we'll probably take the break and when we come

8    back we're going to be in closed session for direct exam on the

9    portions of the testimony of this witness that are confidential

10   and have to be in closed session.  Then Mr. Orsini will follow

11   that up with his cross examination of the closed session

12   portion of the testimony immediately thereafter.

13          So come on up and do your cross of the open session

14   portion.

15          (Witness resumes the stand.)

16          MR. ORSINI:  Thank you, Your Honor.

17       May I proceed, Your Honor?

18          THE COURT:  You may.

19                          CROSS EXAMINATION

20   Q.   Good afternoon, Mr. Rigdon?

21   A.   Good afternoon.

22   Q.   I think you testified a few minutes ago that you've been

23   negotiating carriage agreements for roughly a decade, correct?

24   A.   I said I've been at Comcast for about seven years.

25   Q.   Prior to that you were at Charter?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Correct.

2  Q.    When you were at Charter you were also negotiating with

3  programmers for distribution on Charter's cable system,

4  correct?

5  A.    That is correct.

6  Q.    You were there for at least three or so years?

7  A.    Yes.

8  Q.    For about the last ten years you have been in the

9  trenches, as has been described in this courtroom, negotiating

10 carriage agreements, correct?

11 A.    That is correct.

12 Q.    And there was some questions that Ms. Bhat asked you about

13 the corporate structure of Comcast.

14     You understand that Comcast is a vertically integrated

15 company today, correct?

16 A.    I do.

17 Q.    And notwithstanding that, you have no reason to believe,

18 do you sir, that the fact that NBC is owned by a company that

19 also owns a cable company has had any impact on its negotiating

20 strategy with other distributors?

21 A.    That's correct.

22 Q.    You haven't told NBC that they should go dark on one of

23 your competitors because then you might pick up some

24 subscribers, right?

25 A.    I have not.

1   Q.    You haven't suggested to them to hold out for a little bit

2   more in affiliate fees because that will harm your competitors?

3   A.    I have not.

4   Q.    You have no reason to believe that NBC actually even

5   thinks about those kind of issues in negotiating with your

6   competitors do you?

7   A.    Correct.

8   Q.    You haven't seen any document suggesting they do?

9   A.    No.

10  Q.    No discussions with them suggesting they do?

11  A.    No.

12  Q.    You also understand, don't you sir, that the government's

13  primary theory in this case is that if Time Warner and AT&T are

14  vertically integrated now Turner's negotiating strategy will

15  change.

16      Do you understand that generally?

17  A.    Generally, yes.

18  Q.    You understand generally that the theory is that Turner

19  will suddenly have significantly increased leverage by virtue

20  of being vertically integrated?

21      You understand that?

22  A.    Generally, yes.

23  Q.    And that they will have that leverage because they'll do

24  all of the things that you just described Comcast doesn't do.

25      Do you understand that?

1   A.    I do.

2   Q.    Okay.  Now as you sit here, you don't actually think

3   that's going to happen, do you, sir?

4   A.    I don't know how they're going to operate the company, but

5   I don't have any reason to believe that it will impact my

6   negotiations with Turner or HBO.

7   Q.    And you just wrapped up a negotiation with Turner,

8   correct?

9   A.    I did.

10  Q.    And you had no concerns that if you didn't do it now and

11  you had to wait until after this merger closed, should the

12  Court permit it to close, that suddenly your leverage position

13  would be different, correct?

14  A.    Correct.

15  Q.    Now do you also understand, sir, that the government's

16  alternative theory in this case is that if the Court permits

17  this merger to close, your company will coordinate with AT&T

18  and Time Warner to harm competition for virtual MVPDs?

19  A.    I understand that generally, yes.

20  Q.    Do you have any reason to believe that's true?

21  A.    No.

22  Q.    Have you discussed that with anyone within Comcast?

23  A.    No.

24  Q.    Have you discussed it with anyone from AT&T?

25  A.    No.

 1   Q.   No one from Turner?

 2   A.   No.

 3   Q.   You've seen no document suggesting this is a plan?

 4   A.   No.

 5   Q.   You have no plans that have been put in place to think

 6   about how that might occur, correct?

 7   A.   Correct.

 8   Q.   In fact, you described earlier virtual MVPDs as

 9   competitors of Comcast, correct?

10   A.   That is correct.

11   Q.   There's some instances in which you also view them as

12   compliments, right?

13   A.   Yes.

14   Q.   Sling is a virtual MVPD?

15   A.   That is correct.

16   Q.   The Court has heard from Warren Schlichting who works for

17   Sling, he is actually the head of Sling, correct?

18   A.   Correct.

19   Q.   Notwithstanding the fact that you view them as a

20   competitor, you've actually integrated Sling into your cable

21   boxes, haven't you?

22   A.   Correct.

23   Q.   So that means if I'm a Comcast Cable subscriber, you have

24   provided me with a mechanism to actually access the Sling

25   virtual MVPD, correct?

1  A.   That is correct.

2  Q.   I believe you also described Netflix as a competitor of

3  yours, correct?

4  A.   In certain circumstances they can be characterized as a

5  competitor, yes.

6  Q.   And in others you viewed them as a compliment?

7  A.   Yes.

8  Q.   And as with Sling you have incorporated Netflix into your

9  set top box, correct?

10 A.   That is correct.

11 Q.   You market Netflix to new subscribers, yes?

12 A.   Yes.

13 Q.   It's on your website as one of the benefits Comcast

14 subscribers can have, correct?

15 A.   Yes.

16 Q.   Netflix is also a competitor to HBO isn't it?

17 A.   It could be characterized as that, yes.

18 Q.   You, sir, in fact, have characterized it as a competitor

19 to HBO and a substitute for HBO in your negotiations with HBO

20 haven't you?

21 A.   Yes.  It is another offering that you can give to

22 consumers instead of HBO or Showtime, yes.

23 Q.   Just sticking for a second with the virtual MVPD concept,

24 Comcast recently announced something called Xfinity Instant TV,

25 correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   Correct.

2  Q.   Xfinity Instant TV is an internet delivered television

3  service, correct?

4  A.   It's actually IP delivered over cable systems.

5  Q.   Okay, so can you explain the difference between that and

6  the internet just at the highest level?

7  A.   At the highest level it's essentially the same service

8  that we deliver to customers today known as Cable TV.  It's

9  just instead of using our qualm technology, we use our IP

10 technology to deliver it.

11 Q.   And that's something that's available only to people who

12 subscribe to Comcast Broadband Services, correct?

13 A.   That is correct.

14 Q.   And you actually have a skinny base package for Xfinity

15 Instant TV don't you?

16 A.   We do.

17 Q.   And that base package doesn't include a single one of the

18 Turner networks?

19 A.   That is correct.

20 Q.   Now just stepping back to a little bit more macro level of

21 the industry.  You agree, sir, that programming has never been

22 more competitive than it is right now, correct?

23 A.   There are lots of choices for consumers, yes.

24 Q.   You have Facebook, Amazon and Google all increasing

25 significantly their investments in new content?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   A.    That's correct.

 2   Q.    And Netflix has been dramatically increasing its

 3   investments, correct?

 4   A.    Correct.

 5   Q.    You believe that this has put increased pressure on

 6   programmers like my client, Turner, correct?

 7   A.    Yes.

 8   Q.    And it's forced them to fight even harder for their

 9   position in the distribution market place, correct?

10   A.    You know, I don't know that I would characterize it that

11   way.

12       I would say all this competition is competition for

13   consumer's time and attention.

14   Q.    Okay.  If I can provide you with a copy of your deposition

15   transcript.

16       You recall, sir, that I took your deposition a few months

17   ago?

18   A.    I do.

19            MR. ORSINI:  Your Honor, may I approach the witness?

20            THE COURT:  You may.

21   BY MR. ORSINI:

22   Q.    And sir, if you could turn --

23            MR. ORSINI:  We'll just pause for a moment so the

24   Court has it.

25            THE COURT:  All right.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  BY MR. ORSINI:

2  Q.   If you could turn to page 46 of your deposition?

3           THE COURT:  You want to mark this for identification,

4  Mr. Orsini?

5           MR. ORSINI:  Sure, Your Honor.

6      We can mark it for identification as Defendant's Exhibit

7  924.

8           THE COURT:  For identification only?

9           MR. ORSINI:  Sorry, Your Honor, 925.

10          THE COURT:  All right, 925 for identification.

11     All right, proceed when you're ready.

12          MR. ORSINI:  Thank you, Your Honor.

13     (Defendant's Exhibit Number 925 marked for

14  identification.)

15  BY MR. ORSINI:

16  Q.   Mr. Rigdon, if you look at page 46 of your deposition

17  transcript line 17.

18     I asked you:  "And that includes fighting for their

19  position on distributor platforms?"

20     And you answered yes, correct?

21  A.   Correct.

22  Q.   And we were talking in that context about the competition

23  in the programming market place, correct?

24  A.   Correct.

25  Q.   You can put that aside.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1          Thank you, sir.

 2                THE COURT:  What page was that on?

 3                MR. ORSINI:  Page 46, Your Honor, line 17 to 19.

 4                THE COURT:  All right, thank you.

 5   BY MR. ORSINI:

 6   Q.    Now Mr. Rigdon, you also agree that the video distribution

 7   market place is as competitive as it has ever been, correct?

 8   A.    Yes.

 9   Q.    That includes not only the traditional satellites and

10   TelCos, but the virtual MPVDs?

11   A.    Yes.

12   Q.    And in some instances the SVODs as you've described it?

13   A.    Yes.

14   Q.    Now you are currently I believe you listed AT&T is your

15   largest competitor; is that fair?

16   A.    Combined with DirecTV, yes.

17   Q.    And you'll continue competing with them once this merger

18   closes, correct?

19   A.    Yes.

20   Q.    While you are competitors you also have some differences

21   in your business models, do you not?

22   A.    We do.

23   Q.    AT&T for example has quite a significant wireless

24   business?

25   A.    Correct.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1   Q.   Somewhere north of a hundred million subscribers, correct?

2   A.   I'll take your word for it.

3   Q.   And Comcast has launched a wireless business, correct?

4   A.   Correct.

5   Q.   And you currently have what, about 300,000 subscribers?

6   A.   I don't know the current numbers but a lot smaller than a

7   hundred million.

8   Q.   Does 300,000 sound about right?

9   A.   It could be.

10  Q.   You also offer phone services, correct?

11  A.   We do.

12  Q.   Over the last ten or 20 years you've seen a trend in

13  cutting the phone cord haven't you?

14  A.   Correct.

15  Q.   Meaning people are not getting their home phones anymore.

16  They're relying on their cell phones?

17  A.   That is a general trend, yes.

18  Q.   You are also seeing an increasing trend in cord cutting as

19  it relates to cable, correct?

20  A.   Cable TV services, yes.

21  Q.   Pay-TV services?

22  A.   Yes.

23  Q.   You are also seeing an increasing trend in the consumption

24  of video over mobile devices, correct?

25  A.   Correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   Q.    So I want to be careful here, Mr. Rigdon.  I do want to
 2   talk a little bit about these drop analyses but I don't want to
 3   run afoul of any confidentiality restrictions.  So if I ask you
 4   a question and you believe that goes too far, please let me
 5   know?
 6   A.    Okay.
 7   Q.    Now you didn't personally develop the methodology used in
 8   those calculations did you?
 9   A.    I did not.
10   Q.    That's the EBI team?
11   A.    Correct.
12   Q.    They don't report to you do they?
13   A.    They do not.
14   Q.    Report to some other executive in the Comcast
15   organization?
16   A.    They do.
17   Q.    You're not familiar with all of the details as to how they
18   actually did that analysis are you?
19   A.    In terms of the actual functioning of the models, I'm not
20   aware of all of the details, no.
21   Q.    Have you actually seen the model itself?
22   A.    No.
23   Q.    Have you ever asked to see the model?
24   A.    No.
25   Q.    So you don't know for example precisely how that model
```

1  calculates departure rates, correct?

2  A.    No, not precisely.

3  Q.    You don't provide the actual data inputs for that model,

4  correct?

5  A.    I do not.

6  Q.    You don't run the model itself?

7  A.    I do not.

8  Q.    You just get the results?

9  A.    Correct.

10  Q.    You would agree with me wouldn't you, sir, that generally

11  speaking these are designed to be conservative; is that fair?

12  A.    That is correct.

13  Q.    And by conservative what I mean and I think you mean, but

14  you'll confirm if I'm right, by conservative you mean if

15  anything it would overstate the number of subscribers that you

16  might lose in the event that you went dark with say the Turner

17  networks?

18  A.    That is how they're designed in their estimates, yes.

19  Q.    You also testified earlier that you view these as a bit of

20  art and bit of science, correct?

21  A.    Correct.

22  Q.    And that it's certainly possible given a lack of internal

23  data that they could be materially off, correct?

24  A.    It's possible.

25  Q.    These analyses, I don't think this gets into confidential

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  information but you'll tell me if you're not comfortable

2  answering.

3      These analyses don't actually have any calculation as to

4  where the subscribers might go if they leave Comcast, correct?

5  A.   Why don't we keep that for the closed session.

6  Q.   Okay.  Now these analyses that I'm not going to get into

7  the specifics, but the analyses rely on a variety of different

8  data inputs I think you described earlier, correct?

9  A.   Correct.

10  Q.   In your view some of those are more reliable than others

11  are?

12  A.   Yes, that's correct.

13  Q.   And the truth isn't it, sir, that Comcast has never once

14  gone dark with Turner?

15  A.   Not to my knowledge.

16  Q.   And Comcast has never once gone dark with HBO?

17  A.   Not to my knowledge.

18  Q.   So you haven't had an opportunity for example to test real

19  world departure data against what these drop analyses might

20  predict, correct?

21  A.   On Comcast systems that is correct.

22  Q.   And in fact, in Comcast history at least that you're aware

23  of they've only been two go dark situations, correct?

24  A.   That I'm aware of recollecting right now, yes, that's

25  correct.

1  Q.   One was a Spanish language channel that you dropped in

2  three markets, correct?

3  A.   Correct.

4  Q.   And the other was the YES Network?

5  A.   Correct.

6  Q.   The YES Network is the partially Yankee owned RSN,

7  correct?

8  A.   That is correct.

9  Q.   It's a sports network on which you can see a significant

10  portion of the Yankees regular season games, right?

11  A.   That is correct.

12  Q.   You actually dropped that for well over a year, correct?

13  A.   That is correct.

14  Q.   In the Yankees home markets?

15  A.   That is correct.

16  Q.   And that included a drop that covered an entire baseball

17  season?

18  A.   That is correct.

19  Q.   Before you made the decision to drop the YES Network you

20  had one of these drop analyses prepared, correct?

21  A.   That is correct.

22  Q.   Then after the drop was complete, after they had been off

23  the air for a year and a full season of baseball, someone went

24  back to look and see how the real world data actually compared

25  with the projection of the front end, correct?

1  A.    That is correct.

2  Q.    I've been told that this is not a confidential number.

3       Before I say it, do you have a different view?

4  A.    I'd say let's keep that to the closed session.

5  Q.    So we'll talk about the number later, but suffice it to

6  say that what you determined was that the actual departures

7  were a fraction of what had been projected up front?

8  A.    You know, I'd prefer to keep commentary on that until the

9  confidential session.

10  Q.    Mr. Rigdon, the last witness who the Court heard from was

11  a survey expert brought in by the government to testify to the

12  results of a survey he did about potential departures.

13       I'll represent to you that he testified based upon his

14  survey that he was predicting an eight percent subscriber loss

15  from a one month blackout of Turner networks.

16       Is it fair to say that's inconsistent with anything you've

17  ever seen?

18  A.    I'd say let's keep that to the confidential session.

19            THE COURT:  I think that's one you can answer and you

20  should answer.

21            THE WITNESS:  Okay, then I would say --

22            THE COURT:  The answer is based generally on your

23  experience.  Have you seen anything like that in your

24  experience generally?

25       He wasn't specifying at Comcast.  He just said in your

1    general, your experience have you ever seen anything like that?

2           THE WITNESS:  In one month that seems like a big

3    number in one month.

4    BY MR. ORSINI:

5    Q.   He also testified that he was projecting out for 12

6    months, an over 12 percent departure rate.

7        Again, not just Comcast, anything you've seen in your

8    experience in over a decade in this business, that's not

9    consistent with what you've observed, correct?

10   A.   You know, I don't think I've seen a major group off for 12

11   months since I've been in the industry.

12   Q.   We'll talk about your long term analyses more in the

13   closed session.

14       Mr. Rigdon, are you aware that these drop analyses don't

15   take into account certain steps that Comcast might take if it

16   were to drop networks?

17   A.   Sorry, could you repeat the question?

18   Q.   Sure.

19       You understand don't you, sir, that these drop analyses

20   which project potential subscriber losses don't take into

21   account actions that Comcast might take in the event it decides

22   to for instance go dark with the Turner networks?

23   A.   Yeah, I'd rather keep all sort of discussion of how those

24   drop analyses are constructed for the confidential session.

25       Just one thing to go back to my other answer in terms of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  the, you know, over a year when I said not a major group.  I

2  really mean like sort of Turner caliber.  So just to clarify.

3  Q.   But in terms of any group you've ever seen dropped, have

4  you ever seen anything approaching a 12 percent --

5  A.   That seems like a big number.

6  Q.   Okay, thank you.

7      Now in your ten years of negotiating with programmers, they

8  use the possibility of a blackout as leverage with you don't

9  they?

10 A.   Yes.

11 Q.   And you use the possibility of a blackout with them as

12 leverage for you, right?

13 A.   It depends on the circumstance, but yes, we can also use

14 that.

15 Q.   Okay.  So as we sit here today, Mr. Breeland is here, you

16 have had plenty of trench warfare with him, both sides use the

17 possibility of a blackout as leverage depending upon the

18 circumstance of a negotiation, fair?

19 A.   Both sides can use it, yes.

20 Q.   Both sides do use it?

21 A.   Yes.

22 Q.   You understand that Turner has sent to you and other

23 distributors an Arbitration Agreement with a standstill in the

24 event that this merger closes, correct?

25 A.   Yes.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1  Q.    You understand that that includes, the standstill

2  effectively means if you invoke it, they can't go dark, you

3  understand that?

4  A.    I do.

5  Q.    And so you understand that if you were to sign that

6  arbitration clause it would take away that piece of leverage

7  they've used before, correct?

8  A.    That's correct.

9  Q.    Now since your testimony generally relates to these drop

10  analyses and your state of mind as to whether or not you need a

11  particular network.  The Court has heard a lot about the term

12  must have and I'll only touch on it briefly.

13      But I believe you testified in your deposition that to you

14  must have is just a term of art that means something is

15  popular, right?

16  A.    That's correct.

17  Q.    So you think the Turner network is using that definition

18  of popular, correct?

19  A.    Yeah, yes, that's correct.

20  Q.    But so are a whole lot of others, right?

21  A.    Yes.  At the end of the day what matters is the price for

22  the value that you're getting.  So nothing is must have if it's

23  over charged for, you know, so yes, in general it's a term of

24  art saying it's popular.

25  Q.    Okay.  Sir, a few years ago -- well, stepping back.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

```
 1        It's true as a general matter that Comcast markets HBO to

 2   its subscribers and potential new customers, correct?

 3   A.    We do market HBO.

 4   Q.    You use it as a device to at times attract new subscribers

 5   or retain existing subscribers?

 6   A.    It can be used that way, yes.

 7   Q.    We will try to be careful here because I understand some

 8   of this we can talk about and some of it we can't.  So you tell

 9   me if I cross the line.

10        But back in 2016 and 2017 Comcast decided to stop marketing

11   as much as HBO as much as it had been, correct?

12   A.    Yeah, I'd prefer to keep all that to the confidential

13   session.

14              THE COURT:  Are you close or should we take a break?

15              MR. ORSINI:  I think we're at the end of the public

16   piece given that, Your Honor.

17              THE COURT:  All right, we're going to take a 15

18   minute recess.

19        You're a witness under oath in the case which means you

20   cannot discuss your testimony so far or what it might be when

21   you return with anyone including your counsel, anyone from your

22   company, anyone.  You have to stay independent of all others,

23   not discuss your testimony with anyone, be in a position to

24   testify truthfully under oath that you've not discussed your

25   testimony with anyone, okay.
```

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1        THE WITNESS:  Understood.

2        THE COURT:  All right, so see you back in 15 minutes.

3    Now when we come back in 15 minutes, it's going to be a

4    closed courtroom, witness, parties, and the counsel, that's it.

5    So well actually, the parties won't be here for that.

6    So closed courtroom and closed overflow room too.  So and

7    hopefully, that can be done, direct and cross I'm hoping in

8    about a half hour total, 15 minutes each.  But it may take

9    longer, I don't know.

10    We have to wait and see how it goes.  The estimate from

11    the government on the closed direct was about 15 minutes, 20

12    minutes and usually cross is about the same, but it doesn't

13    have to be.

14        MR. ORSINI:  I would not expect to go longer than

15    that, Your Honor.

16        THE COURT:  So I would guesstimate that we're back

17    here in 15 minutes.  We'll be able to open the courtroom back

18    up in about a half hour later roughly and we'll be going until

19    5:30. Stand in recess.

20        (Witness stands down.)

21        (Recess at 4:07 p.m.)

22        (Proceedings resumed at 4:30 p.m.)

23        (Confidential Session reported and Sealed, pgs. 901-970)

24        (Proceedings adjourned at 6:02 p.m.)

25                              -oOo-

1                              CERTIFICATE

2          I certify that the foregoing is a true and correct

3    transcript, to the best of my ability, of the above pages, of

4    the stenographic notes provided to me by the United States

5    District Court, of the proceedings taken on the date and time

6    previously stated in the above matter.

7          I further certify that I am neither counsel for, related

8    to, nor employed by any of the parties to the action in which

9    this hearing was taken, and further that I am not financially

10   nor otherwise interested in the outcome of the action.

11

12   _____        _____

13   /s/Crystal M. Pilgrim, RPR, FCRR        Date: March 29, 2918

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )      CV No. 17-2511
                                    )
                                    )      Washington, D.C.
        vs.                         )      April 2, 2018
                                    )      10:40 a.m.
AT&T, INC., ET AL.,                 )
                                    )      Morning Session
            Defendants.             )
_____)      Day 6


            TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
           BEFORE THE HONORABLE RICHARD J. LEON
            UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:            Craig W. Conrath
                               Eric D. Welsh
                               Donald G. Kempf, Jr.
                               Curtis W. Strong
                               Scott A. Scheele
                               Dylan M. Carson
                               U.S. DEPARTMENT OF JUSTICE
                               Antitrust Division
                               450 Fifth Street, NW
                               Washington, D.C. 20530
                               (202) 532-4560
                               craig.conrath@usdoj.gov
                               eric.welsh@usdoj.gov
                               donald.kempf@usdoj.gov
                               curtis.strong@usdoj.gov
                               scott.scheele@usdoj.gov
                               dylan.carson@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

Katrina M. Robson
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 220-5052
krobson@omm.com

Daniel M. Petrocelli
M. Randall Oppenheimer
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067
(310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Michael L. Raiff
Robert C. Walters,
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
(214) 698-3350
mraiff@gibsondunn.com
rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:

Kevin J. Orsini
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1140
korsini@cravath.com
pbarbur@cravath.com

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

– – –

WITNESS INDEX

– – –

WITNESSES          DIRECT CROSS REDIRECT RECROSS

GOVERNMENT'S:

COLEMAN BRELAND     982  1052

– – –

INDEX OF EXHIBITS

– – –

| GOVERNMENT'S | IDENTIFIED | ADMITTED |
|---|---|---|
| PX127 – – – – | 985 | 986 |
| PX403 – – – – | 992 | 993 |
| PX123 – – | | 996 |
| PX140 – – | | 1001 |
| PX78 – – | | 1003 |
| PX0531 – – | 1007 | |
| PX90 – – | | 1013 |
| PX195 – – | | 1017 |
| PX211 – – | | 1020 |
| PX144 – – | | 1029 |
| PX146  – – | | 1037 |
| PX147 – – | | 1039 |
| PX143 – – | | 1047 |
| PX17 – – | | 1048 |
| PX142 – – | | 1050 |

```
 1                  P R O C E E D I N G S

 2            DEPUTY CLERK:  All rise.  The United States

 3     District Court for the District of Columbia is now in

 4     session, the Honorable Richard J. Leon presiding.  God save

 5     the United States and this Honorable Court.  Please be

 6     seated and come to order.

 7            Good morning, Your Honor.  We have Civil

 8     Action No. 17-2511, the United States of America v.

 9     AT&T, Inc., et al.

10            Counsel for the parties, please approach the

11     lectern and identify yourselves for the record.

12            MR. CARSON:  Good morning, Your Honor.

13     Dylan Carson for the United States.

14            THE COURT:  Welcome.

15            MR. STRONG:  Good morning, Your Honor.

16     Curtis Strong for the United States.

17            THE COURT:  Welcome.

18            MR. WELSH:  Good morning, Your Honor.  Eric Welsh

19     for the United States.

20            THE COURT:  Welcome.

21            MR. WELSH:  Thank you.

22            MR. CONRATH:  Good morning, Your Honor.

23     Craig Conrath for the United States.

24            THE COURT:  Welcome.

25            MR. CONRATH:  Thank you.
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 952 of 3826

977

1          MR. KEMPF:  Good morning, Your Honor.  Don Kempf

2    for the United States.

3          It's good to be back.  A week ago yesterday, I was

4    doing some mock examinations, and I came down with a bad

5    case of the flu.  So while everybody else was working last

6    week, I was home in bed sleeping mainly.  But I'm back and

7    bad and coast to coast.

8          THE COURT:  Good to have you back.

9          MR. KEMPF:  Thank you.

10          MR. SCHEELE:  Good morning, Your Honor.

11    Scott Scheele on behalf of the United States.

12          THE COURT:  Welcome.

13          MR. PETROCELLI:  Good morning, Your Honor.

14    Daniel Petrocelli for defendants.

15          THE COURT:  Welcome.

16          MS. ROBSON:  Good morning, Your Honor.

17    Katrina Robson for defendants.

18          THE COURT:  Welcome.

19          MR. OPPENHEIMER:  Good morning, Your Honor.

20    Randy Oppenheimer for the defendants.

21          THE COURT:  Welcome.

22          MR. WALTERS:  Good morning, Your Honor.

23    Rob Walters here for AT&T and DirecTV.

24          THE COURT:  Welcome.

25          MR. BARBUR:  Good morning, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   Peter Barbur for Time Warner.

 2             THE COURT:  Welcome.

 3             MR. ORSINI:  Good morning, Your Honor.

 4   Kevin Orsini for Time Warner.

 5             THE COURT:  Welcome.

 6             MR. RAIFF:  Good morning, Your Honor.  Mike Raiff

 7   for AT&T and DirecTV.

 8             THE COURT:  Welcome.

 9             All right, Counsel.  Call your next witness.

10             MR. CONRATH:  May I address something the Court

11   left us with last week, Your Honor?

12             THE COURT:  At the bench or here?

13             MR. CONRATH:  I have one item at the bench and one

14   that doesn't have to be.

15             THE COURT:  Well, come on up.

16             (Sealed bench conference)

17             MR. CONRATH:  So just a small thing, Your Honor,

18   but since you raised it in chambers, I wanted to discuss it

19   at the bench.

20             I want to tell you that we've listened very

21   carefully and appreciate your comments to me on Friday.  And

22   over the course of this week and really the rest of the

23   trial, you'll be seeing more very gray hair, Your Honor.  So

24   I just wanted to let you know we've heard you and we're

25   acting.
```

```
 1                THE COURT:  Well, again, the object of this
 2     exercise is efficiency --
 3                MR. CONRATH:  Yes.
 4                THE COURT:  -- and completeness and effectiveness.
 5     Right?  So we just want to move things along and have people
 6     doing that.
 7                MR. CONRATH:  Right.  We will do that.
 8                We've also talked your advice to us to think
 9     highly over the weekend about the schedule and streamlining,
10     and I think we actually see the schedule the same way, which
11     is our case finishing April 12th, and then defendants' case
12     and our -- any rebuttal we have finishing by the remaining
13     days in April so we'll be done by May 1st.
14                THE COURT:  Well, I have a few curveballs to you
15     guys, which I haven't talked to you about yet, in my
16     schedule.
17                MR. CONRATH:  Okay.
18                THE COURT:  I think we're going to lose a day.
19     It's not a lot, but it's a day.
20                MR. CONRATH:  Okay.
21                THE COURT:  We're going to have to do a Friday --
22     in order to not lose two days, we'll have to do a Friday.
23     So I don't have the calendar with me now, but we'll talk
24     about it today or sometime, but it's not that complicated.
25     But it's the week of the 24th.
```

Case 1:17-cv-02511-RJL **REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER** Document 158 Filed 08/06/18 Page 955 of 3826

980

1         MR. CONRATH:  That last week of April.

2         MR. PETROCELLI:  That'll be easy to accommodate.

3         THE COURT:  That's the week I'm talking about.

4   Nothing before that.

5         MR. PETROCELLI:  So he is going to finish his case

6   this week and next week, with the eight days that we have.

7   We'll start Monday, the 16th.  And we're going to try to jet

8   through our case, leave a little time for rebuttal.  We have

9   ability to accommodate the curveball.

10        THE COURT:  Yeah.  I'm thinking -- we'll say the

11  2nd, 9th, 16th, 23.  So --

12        MR. PETROCELLI:  And 30th is a Monday?

13        MR. CONRATH:  Right.

14        THE COURT:  Right.

15        So I'm thinking, these are Mondays.

16        MR. CONRATH:  Correct.

17        THE COURT:  So my problem is the 24th, I'll do a

18  half-day.  The 25th, I'm out of town, New York City.  And

19  then half a day on the 26th.  So what I was going to do is

20  the Friday before.  So 16, 17, 18, 19, 20.

21        MR. PETROCELLI:  That would work perfectly.

22        THE COURT:  It would be Friday, the 20th.  That

23  way -- so we do a five-day week that week, and that way we

24  only lose, effectively, one day instead of two days.

25        MR. PETROCELLI:  That works perfectly.

```
 1                MR. CONRATH:  I'm sure we can work that out.

 2                MR. PETROCELLI:  I hope you had a good Easter.

 3                THE COURT:  Sitting here a fair amount of it.

 4           It was fine.

 5                MR. CONRATH:  Sorry to cause that.

 6                THE COURT:  No, no.

 7                MR. PETROCELLI:  I did get to go home for the

 8      first time and see my kids and my wife.

 9                THE COURT:  I'm glad to hear that.

10                MR. CONRATH:  Well, that's good.

11                THE COURT:  How old are they?

12                MR. PETROCELLI:  I've got two older ones and two

13      younger ones and three grandkids.

14                THE COURT:  The younger ones have to have their

15      Easter eggs.

16                MR. PETROCELLI:  They needed their dad a little

17      bit.

18                THE COURT:  So what's your other issue?

19                MR. CONRATH:  I was going to talk about the

20      schedule and our gray hair.  Those were the two.

21                THE COURT:  I see some people with no hair.

22                MR. CONRATH:  I hope that counts.  I hope that

23      counts.

24                MR. PETROCELLI:  Okay.  Judge, thank you very

25      much.
```

```
1              MR. CONRATH:  All right.  Thank you.

2              THE COURT:  All right.

3              (Open court)

4              MR. CONRATH:  Your Honor, my colleague,

5    Dylan Carson, will be doing our first witness today?

6              THE COURT:  All right.  Call your witness.

7              MR. CARSON:  Good morning, Your Honor.  The

8    government calls Coleman Breland as an adverse witness.

9              THE COURT:  All right.  You may use leading

10   questions.

11             DEPUTY CLERK:  Sir, please raise your right hand.

12             (Witness is placed under oath.)

13             DEPUTY CLERK:  Please be seated.  The chair will

14   swivel.

15             THE WITNESS:  Thank you.

16             MR. CARSON:  May I proceed?

17             THE COURT:  You may when you're ready.

18   COLEMAN BRELAND, ADVERSE WITNESS FOR THE GOVERNMENT, HAVING

19   BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

20                       DIRECT EXAMINATION

21   BY MR. CARSON:

22        Q    Please state your name for the record.

23        A    Breece Coleman Breland.

24        Q    Mr. Breland, you're a president at Turner?

25        A    That's correct.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

983

```
 1        Q    And you have three prejudicial titles?

 2        A    I do.

 3        Q    You're the president of Turner Classic Movies?

 4        A    Yes.

 5        Q    You're the president of Content Experiences?

 6        A    Correct.

 7        Q    And you're the President of FilmStruck?

 8        A    That's correct.

 9        Q    You're the corporate representative at this trial

10   for Time Warner, correct?

11        A    Yes, that is correct as well.

12        Q    You've been in the courtroom every day of trial,

13   correct?

14        A    Yes, I have.

15        Q    And you've worked at Turner for over 23 years?

16        A    That's correct.

17        Q    And for almost all of those 23 years, you've

18   worked in content distribution?

19        A    That's correct.

20        Q    You worked your way up.  You were the president of

21   content distribution for three years, right?

22        A    Yes.

23        Q    From 2014 to 2017, true?

24        A    Yes; June of 17'.

25        Q    And you left the position of president of content
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

984

```
 1   distribution and were succeeded by Mr. Rich Warren, correct?

 2        A    That is correct.

 3        Q    And so as president of content distribution, you

 4   were the top negotiator for Turner's content deals, correct?

 5        A    That's correct.

 6        Q    But in your new position, you're no longer

 7   involved in content distribution negotiations, true?

 8        A    That is true.

 9        Q    And you report to Turner president, David Levy,

10   today?

11        A    Yes.

12        Q    And we met when I took your deposition back in

13   January, right?

14        A    Yes, we did.

15        Q    Good to see you again, sir.

16        A    And you.

17             MR. CARSON:  Your Honor, we have some binders to

18   assist Mr. Breland in his testimony.  May I approach?

19             THE COURT:  Yes.

20             MR. CARSON:  May I proceed, Your Honor?

21             THE COURT:  When you're ready.

22   BY MR. CARSON:

23        Q    Thank you, Your Honor.

24             Mr. Breland, let's talk about Turner's rate

25   strategy.  Now, during your three years as president of
```

1    content distribution, you were responsible for the revenue

2    that Turner brought in for its cable networks, correct?

3         A    Correct.

4         Q    Now, the majority of Turner's affiliate fee

5    revenue comes from what you call the big four MVPDs,

6    correct?

7         A    That's correct.

8         Q    Can you please turn to PX127 in your binder.

9              MR. CARSON:  Your Honor, PX127 is marked for

10   identification.  It's been provided to defense counsel.

11             May I proceed?

12             THE COURT:  Yes.

13                            (Government's Exhibit PX127
                                was marked for identification.)
14   BY MR. CARSON:

15        Q    Mr. Breland, PX127 is a May 2016 email from you,

16   Turner CEO and president, about Turner's rate strategy;

17   is that correct?

18        A    Yes.  I see that.

19        Q    And you and your team put together some revenue

20   and rate information to deliver to Turner's chairman,

21   Mr. Martin, and Turner's president, Mr. Levy?

22        A    Yes.  Can I have a moment to look at the back

23   page?

24        Q    The spreadsheet is the attachment on page 2 of

25   PX123 that you attached to your email, correct?

1       A     Yes.  This is an affiliate rate strategy page.

2       Q     And the purpose of this attachment was to discuss

3  Turner's rate strategy with its various customers, correct?

4       A     That's correct.

5             MR. CARSON:  Your Honor, I move to admit PX127.

6             THE COURT:  All right.  Any objection?

7             MR. ORSINI:  No, objection, Your Honor.

8             THE COURT:  All right.  It will admitted.

9                                 (Government's Exhibit PX127
                                   received into evidence
10                                 under seal.)

11  BY MR. CARSON:

12      Q     If you turn to page 2, Mr. Breland.  On the top of

13  the table, there are two groups of affiliates.

14            Do you see those?

15      A     I do.

16      Q     The top group consists of different-sized MPVDs,

17  right?

18      A     That is correct.

19      Q     And the bottom group consists of virtual MVPDs?

20      A     That is correct.

21            Different rate levels for virtual MVPDs.

22            MR. ORSINI:  Your Honor, if I may for one second.

23  I apologize for interrupting.  I should state we have no

24  objection as long as the document is under seal, because

25  there are confidential rates inside of them.

1           THE COURT:  All right.  It will be admitted under

2    seal.

3           Go ahead.

4    BY MR. CARSON:

5      Q    Now, on the left side of the table, those are the

6    rates from 2016 to 2019?

7      A    That is correct.

8      Q    Now, the rates are listed as a per-scriber,

9    per-month rate, right?

10     A    That is correct.

11     Q    And that PSPM, that's what you call the net

12    effective rate?

13     A    Correct.

14     Q    And this net effective rate, that's the average

15    rate for a network spread across a distributor's

16    subscribers?

17     A    Correct.

18     Q    And the rates that are listed for all of the

19    Turner channels combined for those MVPDs, right?

20     A    That is correct.

21          And all in total rate.

22     Q    And it's the net rate, you see where it says, "Sum

23    of network rates after discounts," right?

24     A    I do.

25     Q    Now, in general, Turner's rate strategy is

1    proportional to size; is that true?

2         A    There's a slight variance with the MVPDs.  There

3    are four categories here.  So there's a slight variance

4    between the small and the medium and the large.

5         Q    So in general, the MVPDs or bigger MVPDs pay lower

6    rates than smaller MVPDs, true?

7         A    That is true.  There are values that being a large

8    distributor can bring to Turner so there are benefits there

9    in the rate.

10        Q    And then on the right side of the top table, you

11   list the rate differential between the groups of MVPDs and

12   vMVPDs, correct?

13        A    That's correct.

14        Q    Now, as far as who's in the groups of MVPDs,

15   there's a guide halfway down on the left.

16        A    Yes.  I see that.

17        Q    So, first, there's the big four.

18             Do you see that?

19        A    Correct.

20        Q    Those are Comcast, AT&T-DirecTV, Dish, and

21   Charter-Time Warner Cable?

22        A    Yes.

23        Q    And then in that middle column under

24   "Percentage '16 Rev," that's the percentage of annual

25   revenue for each of those groups of distributors for 2016?

1        A    That is correct.

2        Q    And then next below the big four are the

3    medium-sized MVPDs?

4        A    Yes.

5        Q    And that's Verizon, Cox -- it says Cablevision,

6    Cequel, and Mediacom.

7             Do you see that?

8        A    Yes, I do.

9        Q    And now, Cablevision, Cequel, that's now Altice?

10       A    Yes, that's correct.

11       Q    So Altice bought Cablevision and Cequel, another

12   firm called Suddenlink?

13       A    That's correct.

14       Q    The next below the medium is NCTC.

15            Do you see that?

16       A    I do.

17       Q    And the NCTC is the

18   National Cable Television Cooperative?

19       A    That's correct.

20       Q    And NCTC is a cooperative of smaller cable

21   companies who bargain collectively with Turner, true?

22       A    True.

23       Q    And you see their subscribers and percentage of

24   revenue on their row?

25       A    I see that.

```
 1       Q    Next below them is the small/final line.

 2            Do you see that?

 3       A    I do.

 4       Q    And those are the small MVPDs who are not a part

 5  of NCTC right?

 6       A    That's correct.

 7       Q    And then you have the mid-row.

 8            Do you see that?

 9       A    I do.

10       Q    And that lists Sony.

11            Do you see where it says, "Sony min guarantee"?

12       A    Yes, I see that, right.

13       Q    Sony Vue, that's a virtual MVPD, right?

14       A    Correct.

15       Q    Now, looking at all these rates from 2016 to 2019,

16  all those prices are calculated out four decimal points,

17  right?

18       A    That's correct.

19       Q    And that's down to the hundredth of a penny, true?

20       A    That's true.

21       Q    And if you take those fractions of a penny and

22  multiply by the millions of subscribers that these MVPDs

23  have and you multiply that by 12 months, then you get

24  millions of dollars, right?

25       A    That's fair, yes.
```

1       Q    Or in this case, at least in 2016, if you multiply

2   all of these, you get about -- over $5 billion, true?

3       A    I believe that was about -- that's a good

4   approximate for affiliate revenue for that year.

5       Q    And those pennies matter, true?

6       A    In distribution, yes, all pennies matter.

7       Q    Turner fights for every last penny, true?

8       A    Yes, we do.

9       Q    You spent 22 years in distribution fighting over

10  pennies, true?

11      A    That is true.

12      Q    You don't want to leave any pennies on the table,

13  do you?

14      A    No, I do not.

15      Q    Isn't it true that Turner almost went dark with a

16  distributor because of a one-penny price increase of a

17  single channel?

18      A    Can you give me more definition of which -- in

19  distribution deals, you want to get a deal done.  If you get

20  to an impasse, there's either an extension, and maybe

21  another extension, or else there is the unfortunate option

22  of going dark.

23           So I'm not sure exactly which one you're talking

24  about when you say "penny," so I just need more

25  clarification, please.

```
1        Q    Do you recall, in your history of bargaining with

2   affiliates, that Turner almost went dark with a distributor

3   over a one-penny increase to one channel?

4        A    I don't remember which one.  That could be that

5   goes down to one penny.

6        Q    If you could put that aside, I want you to turn to

7   PX403.

8        A    I'm sorry.  Say that again, please.

9        Q    PX403, please.

10            MR. CARSON:  Your Honor, PX403 has been marked for

11  identification and shared with defense counsel.  May I

12  proceed?

13            THE COURT:  Yes, you may.

14                            (Government's Exhibit PX403
                               was marked for identification.)
15  BY MR. CARSON:

16       Q    Mr. Breland, this is a July 2015 email to Turner's

17  CEO and president from an exchange with you and Mr. Martin

18  and Mr. Levy on the status of negotiations with

19  Time Warner Cable.

20            Do you see that?

21       A    I do.

22            MR. CARSON:  Your Honor, we move to admit PX403.

23            MR. OPPENHEIMER:  No objection, Your Honor, under

24  seal.

25            MR. CARSON:  I'm sorry, Your Honor.  Under seal,
```

1    yes.

2           THE COURT:  All right.  It will be admitted under

3    seal.

4                               (Government's Exhibit PX403
                                received into evidence
5                               under seal.)

6    BY MR. CARSON:

7        Q    Mr. Breland, if you look at the bottom email

8    under -- from you to Mr. Martin and Mr. Levy, you see

9    bullet 3 of your email, where it says "rates"?

10       A    I see that.

11       Q    Now, the end of the top line, you wrote that

12   Turner was looking for a large price increase for TruTV.

13           Do you see that?

14       A    I do.

15       Q    That Turner was looking to nearly trouble the

16   price of TruTV, right?

17       A    At this time, Time Warner Cable had a very

18   deflated rate compared to the industry, so we were bringing

19   them up to industry standards.

20       Q    And so as part of the bringing them up to industry

21   standards, you asked Time Warner Cable to almost double the

22   rate of TruTV, true?

23       A    That is correct.

24       Q    Now, the next line down, you write, "The TruTV

25   increase is likely to be the most problematic, given we

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

```
 1    almost went dark over a one-penny increase in 2012."

 2            Do you see that?

 3        A    I do.

 4        Q    So in 2012, you almost went dark with

 5    Time Warner Cable over a single penny, true?

 6        A    There's always the threat of going dark.  I would

 7    only like to clarify, when you say, "You almost went dark,"

 8    it sounds like that I'm driving to go dark, and that's just

 9    an alt -- that's one of the options that could come, but

10    that's never our intention to drive it.

11            But, yes, I see what's written here.

12        Q    So I appreciate your explanation.  Your counsel

13    have plenty of opportunity to ask you questions.  If you

14    could focus on my question, I'd appreciate it.

15            My question was:  In 2012, Turner almost went dark

16    with Time Warner Cable over a single-penny increase for one

17    channel, true?

18        A    Yes, true.

19        Q    Now, in these 2015 negotiations with

20    Time Warner Cable, Turner got the large price increase it

21    was seeking, true?

22        A    Yes, we did.

23        Q    Now, TruTV is a Turner channel that used to be

24    Court TV, right?

25        A    That's correct.
```

1      Q     Its content was mainly live court proceedings,

2   right?

3      A     That's correct.

4      Q     Very exciting, true?

5      A     To a lot of people.

6      Q     And now TruTV carries two weekends of

7   March Madness, right?

8      A     That's correct.

9      Q     Now, let's talk more about price increases.

10          You can put that aside.  Thank you.

11          As president of content distribution, you were

12   responsible for the price increases for Turner's networks,

13   true?

14      A     That's correct.

15      Q     And Turner has used its bargaining leverage over

16   the years to secure price increases, true?

17      A     True.

18      Q     Can you turn to PX123 in your binder.

19      A     I'm sorry.  Was that PX123?

20      Q     123, yes.

21          Let me know when you're there.

22      A     I'm here.

23          MR. CARSON:  May I proceed, Your Honor?

24          THE COURT:  Yep, you may.

25

 1   BY MR. CARSON:

 2        Q    Mr. Breland, this is an October 2016 email to you,

 3   sending the 2017 forecast and budget presentation for a

 4   meeting with your boss, Mr. Levy, correct?

 5        A    Correct.

 6        Q    And your team put the information together for a

 7   meeting with Mr. Levy on the, what's called the long-range

 8   plan, LRP, right?

 9        A    That's correct.

10             MR. CARSON:  Your Honor, we move to admit PX123

11   under seal.

12             MR. ORSINI:  No objection, Your Honor.

13             THE COURT:  It will be admitted under seal.

14                                 (Government's Exhibit PX123
                                    received into evidence
15                                  under seal.)

16   BY MR. CARSON:

17        Q    If you can turn to PX123009.  It's on the bottom

18   in the middle.

19        A    I'm there.

20        Q    All right.  Now, this entire page has been

21   designated confidential, so I'll be careful with my

22   questions.

23             There's a bar chart here under "Executive Summary"

24   that shows Turner's content revenue growth, right?

25        A    That's correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q     And this is the annual distribution revenue.

2    Those are the numbers that appear above each bar from 2015

3    to 2020, right?

4      A     That is correct.

5      Q     And do you see the revenue figure, where it says,

6    "Revenue growth, '16 and '17, driven by higher rates"?

7      A     Yes, I see that.

8      Q     And you're saying here that the price increases

9    were the cause of this projected revenue growth that's in

10   this kind of middle, colored block line that carries out?

11     A     Yes, that's correct.

12     Q     And on the right side, you say, "Rate resets in

13   '16 and '17 drive that number in incremental revenue, which

14   continues throughout the plan."

15           Do you see that?

16     A     Yes, I do.

17     Q     Can you go to page 19.

18           This page is about -- or this chart, there's two

19   tables here.  This is about Turner's rate strategy again,

20   right?

21     A     That's correct.

22     Q     And the top table lists the average rate for

23   individual Turner channels, correct?

24     A     That is correct.

25     Q     So let's take an example.  TNT, there in the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    middle of the chart, the fifth row down, do you see that?

2         A    I do.

3         Q    And the rates for TNT grow from left to right for

4    the years 2015 to 2020, right?

5         A    That's correct.

6         Q    And in the last column on the right, you see where

7    it says NCAA in '16, NBA renewal in '17?

8         A    Yes, I see that.

9         Q    And those are references to the NBA and the NCAA

10   sports deals that show kind of why those rates are

11   increasing, right?

12        A    That's correct.

13        Q    And Turner secured rate increases to coincide with

14   the renewal of its sports licensing deals, right?

15        A    That's correct.

16        Q    And in the -- while we're here, the

17   Time Warner Cable column in the bottom, you see that large

18   price increase for TruTV, right?

19        A    I do.

20        Q    Now, in the past five years, Turner secured

21   significant rate increases from every major MVPD, true?

22        A    We've done well, yes, in our rate increases.

23        Q    Well, let's be specific.

24             There are significant increases for

25   Time Warner Cable in this row -- in this column, sorry, on

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

999

```
 1   the right, for 2016.

 2            Do you see that?

 3       A    I do.

 4       Q    And there are significant price increases for

 5   Comcast and DirecTV in that last column.

 6            Do you see those?

 7       A    The one for 2017, correct?

 8       Q    Correct.

 9       A    Yes, I see that.

10       Q    Now, Turner has secured significant rate increases

11   for Dish in the past five years, true?

12       A    That's true.

13       Q    Turner has secured significant rate increases from

14   Cox in the past five years, correct?

15       A    That's true.

16       Q    Turner has secured significant rate increases from

17   Altice in the past five years, true?

18       A    That's true.

19       Q    Turner has secured significant rate increases from

20   Verizon in the past five years, true?

21       A    True.

22       Q    And Turner has secured significant rate increases

23   from Charter in the past five years, true?

24       A    True.

25       Q    Let's get a sense of some of those rate increases
```

```
1   for the MVPDs not listed here.  If you can turn to PX140.

2        A    I'm there.

3             MR. CARSON:  Your Honor, PX140 has been provided

4   to counsel.  May I proceed?

5             THE COURT:  Yes, you may.

6   BY MR. CARSON:

7        Q    Mr. Breland, this is an email from November of

8   2013 to one of your colleagues at Turner referencing fill

9   Phil's goals.

10            Do you see that?

11       A    I do.

12       Q    And that refers to Phil Kent, who was then the

13  president of content distribution before you?

14       A    No.  Phil Kent was the chairman of Turner.

15       Q    Okay.

16            Did Phil Kent have the President of content

17  distribution title before you?

18       A    No.  There really wasn't a title for president of

19  content distribution.  I believe Mr. Levy may have had a

20  title president of distribution.  Titles sort of flow

21  sometimes, but --

22       Q    So Mr. Kent preceded Mr. Martin as the chairman of

23  Turner?

24       A    That's correct.

25            MR. CARSON:  Your Honor, move to admit PX140 under
```

1    seal.

2              MR. ORSINI:  No objection.

3              THE COURT:  Admitted under seal.

4              MR. CARSON:  Thank you, Your Honor.

5                                   (Government's Exhibit PX140
                                     received into evidence
6                                    under seal.)

7    BY MR. CARSON:

8        Q    At the top of your email, you write, "Affiliates

9    execute strategy for superior double-digit rate increase for

10   deals expiring in 2013.

11             Do you see that?

12       A    I do.

13       Q    And in this email, you are listing some of the

14   superior double-digit rate increases that you secured from

15   various MVPDs, correct?

16       A    That is correct.

17       Q    And you've got Dish, Verizon, and Cox, right?

18       A    Yes.

19       Q    And then there's a couple of the smaller ones,

20   NCTC and Cable ONE at the bottom, right?

21       A    That is correct.

22       Q    Isn't it true, sir, that Turner believes that

23   MVPDs will keep accepting the price increases that Turner

24   has secured because their businesses are very profitable?

25       A    That the MVPD businesses are profitable?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1002

```
 1        Q    Correct.

 2        A    I think they can bear cost to a certain level,

 3   yes.

 4        Q    And that's why they will keep accepting Turner's

 5   price increases, true?

 6        A    I don't know how they'll behave in the future.

 7        Q    You could put that aside.

 8             If you could turn to PX78.

 9        A    I'm there.

10        Q    PX78 is a May 2016 email from Turner's top

11   communications executive to you and other top executives

12   like Mr. Levy and Mr. Daniels.

13             Do you see that?

14        A    I do.

15        Q    And the email was sent to you and those other

16   executives to provide you with talking points to the media,

17   including the financial press at what are called the

18   up-fronts?

19        A    I'm not sure if it's the financial press as much

20   as it's advertisers.

21        Q    Do you know whether the Wall Street Journal and

22   CNBC attend the up-fronts?

23        A    I do not know.

24        Q    Well, the up-fronts are an industry gathering to

25   introduce Turner's lineup of programming, right?
```

1    A    That's correct.

2         MR. CARSON:  Your Honor, we move to admit PX78.

3         No objection, Your Honor.

4         THE COURT:  It's already in?  I guess it was

5    already admitted, then, under Mr. Martin.

6         MR. CARSON:  It's been marked.  And I believe we

7    used it with Mr. Martin, subject to linking, tying it up.

8    And I can tie it up with this witness as he was a recipient.

9         MR. ORSINI:  No objection, Your Honor.

10        THE COURT:  All right.  It will be admitted under

11   seal.

12        MR. CARSON:  I don't know that it needs to be

13   admitted under seal, Your Honor, in that there's nothing

14   designated confidential by the defendants in this document.

15        THE COURT:  Okay.

16        MR. ORSINI:  That's correct, Your Honor.

17        All right.  It will just be admitted then.

18                                 (Government's Exhibit PX78
                                    received into evidence.)
19   BY MR. CARSON:

20   Q    If you turn to PX78, page 10 at the bottom, 010.

21        Let me know when you're there.

22   A    I'm there.

23   Q    Under "Sampling of Potential Q&A," the third

24   question down reads, "Can the industry distribution

25   ecosystem support higher affiliate fees near a tipping

1    point?"

2           Do you see that?

3       A    I do.

4       Q    And the first answer is in the top bullet below:

5    "Short answer is, yes, we think it can."

6           Do you see that?

7       A    I do.

8       Q    Then those answers continue on the top of page 11

9    if you go there.

10          Next answer is, "There are many options for

11   lower-priced packages, yet few consumers take them."

12          Do you see that?

13      A    I do.

14      Q    Then the next bullet says, "MVPDs' video

15   businesses are very profitable."

16          Do you see that?

17      A    I do.

18      Q    You received this document to prepare for meetings

19   with the press at the up-fronts, right?

20      A    That's correct.

21      Q    And after you received this document, you didn't

22   write back to Mr. Petruzzi, the top communications

23   executive, and tell him that these talking points were all

24   wrong, did you?

25      A    No, I did not.

**REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER**

1      Q    You didn't write back and say, MVPDs and consumers

2  are at a choking point; they're not going to accept higher

3  prices, did you?

4      A    No, I did not say that.

5      Q    Now, the next question on page 11 says, "Risk from

6  move to smaller bundles."

7           Do you see that?

8      A    I do.

9      Q    And then there's a couple bullets at the bottom

10 that one of the answers is, "Believe we're really

11 well-positioned if distributors move to smaller bundles."

12          Do you see that?

13     A    I do.

14     Q    And the final bullet reads, "Over time, a shift to

15 smaller bundles could actually benefit larger networks like

16 ours, allowing us to increase share and affiliate fees."

17          Do you see that?

18     A    I do.

19     Q    So you were armed by Turner's communications team

20 to tell the media that Turner could benefit from more skinny

21 bundles, right?

22     A    Yes.

23     Q    And if you -- I guess there are bullets above, but

24 they're in the shape of an arrow.  Do you see right above

25 the question where it says, indented, "Second, some

1006

1    rationalization of the bundle would arguably be good for

2    us."

3              Do you see that?

4    A    I do.

5    Q    And more -- right under that, "More money for the

6    biggest networks like ours."

7    A    I do.

8    Q    Do you see that?

9              And this was the message that Turner executives

10   were prepared to tell the press five months before the

11   merger announcement in this case, true?

12   A    True.

13   Q    All right.  You can put that aside.  Let's talk

14   about YouTube.

15             In 2016 YouTube TV wanted to license Turner

16   content for its virtual MVPD service, true?

17   A    True.

18   Q    Now, YouTube initially sought prices that were

19   lower than any other distributor in the industry, correct?

20   A    That is my recollection, yes.

21   Q    YouTube did not want to carry Turner's networks on

22   its basic package, right?

23   A    There was lot of back-and-forth on how they would

24   package.  But, yes, one of their proposals was that they

25   would not carry it there.

1    Q    And the proposal that became kind of the sticking

2    point in the negotiation was they wanted to put Turner

3    channels on a second tier or an optional tier for

4    subscribers, right?

5    A    As I recall, they were going to take some of the

6    networks and put in the basic package and others up.  It was

7    really a price issue more than packaging.  We never got past

8    the pricing.

9    Q    Well, they wanted -- one of the proposals, was

10   they would break up Turner's networks, have some in the

11   basic package and then some on an optional package?

12   A    Not uncommon in the industry today, yes.

13   Q    And you told YouTube that agreeing to that

14   proposal would do irreparable harm to Turner's business

15   model, true?

16   A    I don't recall if I said the model or the prices,

17   so I'm not quite sure there.

18        MR. CARSON:  Your Honor, we've marked for

19   identification PX0531.  May I approach?

20        THE COURT:  Yes.

21        MR. CARSON:  May I proceed, Your Honor?

22        THE COURT:  Yes.

23                            (Government's Exhibit PX0531
                               was marked for identification.)
24   BY MR. CARSON:

25   Q    Mr. Breland, if you can read to yourself in your

1  email of September 16th, 2016, at the first bullet, kind of

2  halfway down, starting with the words "the precedent."

3         And let me know when you're done.

4    A    Hold up.  First bullet, correct?

5    Q    Yes.  About the fourth line down, "the precedent."

6    A    Yes, I'm up now.

7    Q    You told YouTube that agreeing to their proposal

8  would do irreparable harm to Turner's current business

9  model, correct?

10   A    I see those words here, yes.

11   Q    All right.  You can put that aside.

12        Turner was trying to break the -- I'm sorry.

13 Strike that.

14        YouTube was trying to break the model of carrying

15 underperforming, weaker Cable Networks in order to get the

16 broadcast networks, but they didn't have the leverage, true?

17   A    That is my recollection, yes.

18   Q    And after receiving this position from YouTube,

19 you informed Time Warner's CEO, Jeff Bewkes, true?

20   A    That is true.

21   Q    And Mr. Bewkes instructed HBO to stop negotiations

22 with YouTube because of its position with respect to Turner,

23 correct?

24   A    I know Mr. Bewkes was involved in discussions

25 regarding how to proceed with HBO but I was not in all of

 1    those meetings.  But my recollection is, yes, Jeff had

 2    conversations with HBO.

 3         Q    And Mr. Bewkes instructed HBO to stop negotiating

 4    with YouTube because of its position with respect to Turner

 5    that would do the irreparable harm to Turner's business

 6    model, correct?

 7         A    Correct.

 8         Q    Can you turn to PX481 in your binder.

 9              MR. CARSON:  May I proceed, Your Honor?

10              THE COURT:  Yes.

11    BY MR. CARSON:

12         Q    PX481 is a September 16th -- I'm sorry,

13    September 2016 email chain with you and Turner's CEO,

14    Mr. Martin, about the YouTube negotiations, correct?

15         A    I see that, yes.

16              MR. CARSON:  Your Honor, we move to admit PX481.

17              THE COURT:  Any objection?

18              MR. ORSINI:  No objection, Your Honor.

19              All right.  It will be admitted.

20    BY MR. CARSON:

21         Q    You wrote to Mr. Martin that HBO, you see in the

22    top email, you wrote, "HBO delivered the message to YouTube

23    that it was ceasing negotiations with YouTube."  True?

24         A    This is 481?

25         Q    Yes.

1       A    You said the top email.

2       Q    Top email from you to Mr. Martin.  You see on the

3  last line --

4       A    I do.  I see three bullet points.

5       Q    Yes.  After those bullet points.

6       A    Yes, I see it now.

7       Q    You say, "On another note, just spoke with HBO,

8  and they delivered the message to YT on Friday."

9            Do you see that?

10      A    Yes, I see that.

11      Q    And that's a reference -- that YT is YouTube,

12  true?

13      A    That's true.

14      Q    And then if you go down to the bottom email,

15  before that, you wrote to Mr. Martin in the second line,

16  "Reached out to HBO this morning to see when they plan to

17  let YouTube know they are ceasing negotiations based on

18  YouTube position with Turner."

19            Do you see that?

20      A    I do.

21      Q    And HBO stopped negotiating with YouTube because

22  of this unacceptable Turner offer, correct?

23      A    That is my recollection, yes.

24      Q    Now, in the past, there was a Federal Trade

25  Commission Consent Decree that prevented Time Warner from

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  tying the negotiations of HBO and Turner together, true?

2      A    That's correct.

3      Q    And that consent decree was entered as part of the

4  merger of Turner and Time Warner back in 1997, correct?

5      A    Yes, that's the timeline.

6      Q    And when Time Warner bought Turner, the FTC said

7  that Time Warner could not make HBO available only if a

8  distributor carried Turner channels, correct?

9      A    Could not make HBO available.  I just want to make

10 sure I'm understanding the statement.

11     Q    I'll try to rephrase.

12     A    Thank you.

13     Q    Time Warner could not condition the purchase of

14 HBO on the availability of Turner channels, right?

15     A    That's correct.

16     Q    And that affected your ability to sell Turner

17 channels during the length of that consent decree, true?

18     A    I didn't consider that as a possibility at the

19 time because it wasn't an option.

20     Q    Well, that decree expired after ten years,

21 correct?

22     A    That's correct.

23     Q    And now that there's no longer a decree,

24 Time Warner can tell a distributor, like YouTube:  No,

25 Turner, no HBO, true?

1       A       That's true.

2       Q       Now, alignment of HBO and Turner is a corporate

3   goal of Time Warner today, true?

4       A       I'm not sure if I would agree, respectfully, with

5   the word "goal," but I think there is open communication.

6               When I was there, I didn't have a goal for my --

7   in my plan of, you must communicate with HBO; you must align

8   your deal.  So for clarity, thank you.

9       Q       Fair.

10              So alignment of HBO and Turner is now part of the

11  bargaining strategy that Turner has for -- or Time Warner

12  has for those two sources of programming, right?

13      A       Again, respectfully, I don't think it's a

14  strategy, we want to be aware when one side of the company

15  is also negotiating with a distributor.

16      Q       Well, it's not just that you want to be aware.

17  You've gone out and taken steps to formally align the

18  contract expirations of Turner and HBO, true?

19      A       Not in all instances, no.

20      Q       But you've made a conscious effort to try to line

21  up the negotiations of HBO and Turner with major MVPDs,

22  true?

23      A       In some situations when they've come up, yes.

24      Q       If you can -- you can put that aside and turn to

25  PX90.

1    And PX90 is a May 2015 email from you to the

2  Turner CEO and president about aligning HBO and Turner in

3  negotiations with Time Warner Cable and Charter, correct?

4    A    Yes, that's true.

5         MR. CARSON:  Your Honor, we'd move to admit PX90.

6         THE COURT:  Any objection?

7         MR. ORSINI:  No objection, Your Honor.

8         It will be admitted.

9                             (Government's Exhibit 90
                                received into evidence.)

10 BY MR. CARSON:

11   Q    In that second sentence, Mr. Breland, at the top,

12 you wrote, "What I heard Jeff say was that he agrees with

13 coordination and alignment between HBO and Turner, and he

14 would convey that to HBO, which must have happened since HBO

15 reached out."

16        Do you see that?

17   A    I do.

18   Q    And so Time Warner's CEO, Jeff Bewkes, wanted

19 Turner to align its renewal negotiations with HBO with

20 respect to Time Warner Cable, Comcast, and Charter.

21        Do you see that subject of the email?

22   A    I do.

23        In those instances, that's correct.

24   Q    And down in the third line of the email, you

25 wrote, "The goal was to maximize leverage in each instance."

1    Do you see that?

2    A    I do.

3    Q    And those were the instructions that you received

4    from Time Warner's CEO, Jeff Bewkes, correct?

5    A    That is correct.

6    Q    And you worked on aligning negotiations with HBO

7    in a systematic way to increase Turner's bargaining

8    leverage, right?

9    A    If that were possible in the situation, that's

10   correct.

11   Q    And so you met with HBO and sat down to work

12   through when HBO's contracts expired and when Turner's

13   contracts expired, right?

14   A    That's correct.  We did not have any prior

15   knowledge on when contracts would expire between the two

16   companies.

17   Q    And so you did what you called front-end alignment

18   and back-end alignment, right?

19   A    Front-end alignment meaning the communication when

20   the deals are up.  Back end on how we would use that

21   together.

22   Is that your definition?

23   Q    Well, let me try to use your definition, I think.

24   A    Okay.

25   Q    Front-end alignment, you found out when deals were

1  expiring, and you would -- HBO and Turner would be somewhat

2  coterminous for existing deals, right?

3      A    That's correct.

4      Q    And on the back end, you looked out to see where

5  HBO and Turner's deals would expire in the future to see in

6  the next round of bargaining if you could line up those

7  expiration dates, right?

8      A    Now I understand your definition, yes, that's

9  correct.

10     Q    So you met with HBO, and you identified those

11 MVPDs where expiration dates could be moved closer together

12 to try to maximize bargaining leverage in each instance,

13 true?

14     A    True.

15     Q    Well, while we're on HBO, you are aware, sir, are

16 you not, of Turner's offer to distributors, if this merger

17 goes through, they can arbitrate, right?

18     A    That's correct.  I do know that.

19     Q    Now, HBO is not included in any of the potential

20 offers to arbitrate, true?

21     A    That is my understanding, true.

22     Q    And that arbitration promise doesn't prevent

23 Turner from aligning its negotiations with HBO, correct?

24     A    That is my understanding, correct.

25     Q    Let's finish up on YouTube.

*** REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER ***

1016

```
 1              You can put that aside.

 2              If you can turn to PX195 in your binder, sir.

 3              PX195 is a November 2016 email to you about a

 4    leadership meeting with Mr. Levy, just after the merger

 5    announcement.

 6              Do you see that?

 7       A    I do.

 8       Q    The subject says, "Breland's deck"?

 9       A    I see that.

10       Q    And the attachment, is your presentation on

11    distribution strategies, right?

12       A    That's correct.

13       Q    And you see in that first line where it says, of

14    the email, "Attached is Coleman Breland's file."

15       A    I see that.

16       Q    And then down below, it says, "Mr. Adija was

17    included on this email because he was extremely helpful

18    putting this together."

19              Do you see that?

20       A    I do.

21              MR. CARSON:  Your Honor, we move to admit PX195.

22              MR. ORSINI:  No objection under seal, Your Honor.

23              THE COURT:  All right.  Admitted under seal.

24              MR. CARSON:  Thank you, Your Honor.

25
```

```
 1                                      (Government's Exhibit PX195
                                        received into evidence
 2                                      under seal.)

 3   BY MR. CARSON:

 4       Q    If you can turn to page 24, 024, Mr. Breland.

 5            Let me know when you're there.

 6       A    195024, I am there.

 7       Q    Correct.

 8            And this is a chart that says vMVPD landscape.

 9            Do you see that?

10       A    I do.

11       Q    And this was the competitive landscape for virtual

12   MVPDs, just after the merger announcement?

13       A    That's correct.

14       Q    And all of these vMVPDs -- well, only two of them

15   were in the market at the time, true?

16       A    Can I look back at the date or will you give me

17   the date again, please.

18       Q    Sure.  This was November 2016 of your email, and

19   Sling and PlayStation Vue were already in the marketplace,

20   correct?

21       A    That's correct.

22       Q    DirecTV, Hulu, and YouTube had not launched yet,

23   true?

24       A    I don't believe so.

25       Q    And Amazon listed there has never launched, true?
```

1    A    That's correct.

2    Q    If you can flip forward to 26.

3         You see the heading that says Rubik's summary?

4    A    I do.

5    Q    Rubik's, that was a research initiative where

6    Turner did analysis of virtual MVPDs?

7    A    Yes, I believe that's correct.

8    Q    And you see that third bullet down that says,

9    "Turner networks drive significant value for vMVPDs.  We

10   should position ourselves as anchor tenant"?

11   A    I see that.

12   Q    And "anchor tenant" meant that Turner wanted to be

13   part of the core programming of any virtual MVPD, right?

14   A    That's correct.

15   Q    If you can flip to page 30, 030, this slide says,

16   "Turner drives as much demand to the vMVPDs bundle as Fox

17   and NBCU.

18        Do you see that?

19   A    I do.

20   Q    And on the left side, removing Turner from the

21   base package causes demand to drop as much as Fox and NBCU

22   and more than every other network family except ABC-Disney.

23        Do you see that?

24   A    I see those words, yes.

25   Q    And this was the result of the Rubik's research

1   that your research department did, right?

2       A    That's correct.

3       Q    And you presented these research conclusions to

4   your boss in discussing whether Turner should seek to become

5   the anchor tenant of any new vMVPDs, right?

6       A    That's correct.

7       Q    Okay.  You can put that aside.

8            Let's talk MVPD about another vMVPD called Hulu.

9            Hulu is partially owned by Time Warner, correct?

10      A    That is correct.

11      Q    Time Warner has a 10 percent passive investment in

12  Hulu?

13      A    That's correct.

14      Q    Despite that partial ownership, you dealt with

15  Hulu in an arm's-length transaction, right?

16      A    That's correct.

17      Q    And you were here in the courtroom last week to

18  hear Mr. Martin testify about Turner's seeking data from

19  distributors, but it has been told no.

20           Do you remember that testimony?

21      A    I do.

22      Q    Can you turn to PX211 in your binder.

23      A    I'm there.

24      Q    Okay.  PX211 is an email to you, dated August

25  2016, attaching the Turner-Hulu affiliate agreement, right?

1      A     That is correct.

2      Q     And you received this as part of your

3   responsibilities as president of content distribution,

4   right?

5      A     That's right.

6      Q     And you signed this contract, true?

7      A     That is correct.

8            MR. CARSON:  Your Honor, we move to admit PX211.

9            THE COURT:  All right.

10           MR. ORSINI:  No objection under seal, Your Honor.

11           THE COURT:  It will be admitted under seal.

12                                  (Government's Exhibit PX211
                                    received into evidence
13                                  under seal.)

14   BY MR. CARSON:

15     Q     If you go to page 16 of PX211, there's a

16   Section 15 there on data collection and reporting.

17           Do you see that?

18     A     I do.

19     Q     And this section gives Turner the right to receive

20   data about who is watching Turner content on Hulu, correct?

21     A     That's correct.

22     Q     And the specific data that Turner is entitled to

23   receive is on -- you flip to page 31.  It's referenced in

24   Exhibit C.

25           Let me know when you're there.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1021

```
 1        A    Okay.  I'm there.

 2        Q    And this lists the form of customer information

 3   that Turner will receive from Hulu, this Exhibit C on data.

 4             Do you see that?

 5        A    I do.

 6        Q    If you go to Section 1.1.1, do you see where it

 7   says "PII"?

 8        A    I do.

 9        Q    And that provides that Turner will receive

10   personally identifiable information, right?

11        A    That's correct.

12        Q    So Turner gets the first and last name of Hulu's

13   customers?

14        A    My understanding, that is correct for those who

15   opt to give it.

16        Q    And Turner gets, for those who opt, their email

17   address, correct?

18        A    That is correct.

19        Q    And Turner gets their physical address for

20   billing, right?

21        A    That's correct.

22        Q    You can put that aside.

23             Let's talk about Comcast data.

24             In 2015, you were negotiating with Comcast over an

25   affiliate renewal, right?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1022

```
 1        A    That's correct.

 2        Q    And you had conversations about set-top box data

 3   with Comcast, true?

 4        A    We did.

 5        Q    Comcast wanted Turner to purchase

 6   Comcast-originated data, true?

 7        A    They offered us the opportunity to buy a certain

 8   type of data; that's correct.

 9        Q    And you sent your team of data experts to

10   Philadelphia to check out the data that they were offering,

11   right?

12        A    That's correct.

13        Q    And you determined that Turner did not want to buy

14   Comcast data because it was already getting most of that

15   data from third parties, true?

16        A    That is true.

17        Q    And ultimately, when you renewed the Comcast deal,

18   that did not include purchasing any of the Comcast data,

19   true?

20        A    That's true.

21        Q    Let's talk about bargaining leverage.

22             What you have done for the last 20, 22 years,

23   before you moved into your current role, right?

24        A    That's correct.

25        Q    Affiliate renewal negotiations, those can be
```

1  tough, right?

2      A    They can be very tough.

3      Q    Almost every point in bargaining is contentious,

4  true?

5      A    That is true.

6      Q    You bargain over rates, right?

7      A    Yes.

8      Q    You bargain over penetration?

9      A    Yes.

10     Q    Rates and penetration, those are the two primary

11 economic components of any affiliate deal, right?

12     A    I would say they are two of the primary, yes.

13     Q    Now, penetration, that's the percentage of a

14 distributor's subscribers that receive a given channel,

15 right?

16     A    That's correct.

17     Q    So most pay-TV prescribers get CNN, true?

18     A    Most do, yes, that's correct.

19     Q    So the penetration rate around -- is very high,

20 true?

21     A    The penetration rate?

22     Q    For CNN is pretty high?

23     A    Yes, that's correct.

24     Q    And that's what you call highly penetrated,

25 correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1     A     Correct.  When you say "penetration rate,"

2  I thought you were talking dollars.  You're talking about

3  number, correct?

4     Q     Correct.

5     A     Thank you.

6     Q     And you bargain over what are called MFNs, right?

7     A     Yes.

8     Q     And those are most favored nations clauses?

9     A     Correct.

10     Q     An example of an MFN would be if you give a

11  distributor a lower price, then you have to give a lower

12  price to everyone who has an MFN against that distributor,

13  right?

14     A     Fair.

15     Q     So if DirecTV had an MFN against Dish, then

16  DirecTV gets whatever you give Dish, true?

17     A     That's true.

18     Q     So anytime you bargain with a distributor, you

19  have to consider how it affects all the other distributors

20  who have MFNs, right?

21     A     That's right.

22     Q     Now, on bargaining, both sides are trying to get

23  the best deal you can, right?

24     A     That's correct.

25     Q     You called it -- at a variety conference, you

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1025

1    called it arm wrestling, right?

2        A    I could have said that.

3             I was at a variety conference.  I just don't

4    recall my words.

5        Q    I think it was about the launch of FilmStruck and

6    whether we should go over the top, direct to consumers, or

7    arm wrestle with distributors to add another linear channel.

8             Do you remember that?

9        A    I remember variety.  I'll, yes, take your words

10   that I said "arm wrestle."

11       Q    In bargaining, both sides -- there's leverage on

12   both sides, true?

13       A    Yes, that's true.

14       Q    And Turner's bargaining leverage affects the terms

15   that it's able to secure from distributors, true?

16       A    True.

17       Q    And the distributor's bargaining leverage affects

18   the terms that it's able to secure from Turner, right?

19       A    That's true.

20       Q    So reaching a deal in the end can come down to a

21   battle of the competing bargaining leverages, fair?

22       A    Fair.

23       Q    So leverage matters in bargaining, right?

24       A    That's correct.

25       Q    You would agree, sir, that a programmer has to use

1  whatever leverage it has to protect its networks, right?

2      A    I would say that's a fair statement.

3      Q    Well, one of the pieces that -- of leverage that

4  Turner has is its ability to go dark, correct?

5      A    Yes, that's correct.  I only hesitate -- I'll just

6  say yes.  Thank you.

7      Q    So that network blackouts, that's going dark,

8  right?

9      A    That's correct.

10     Q    And you told me in your deposition, they are a

11 common occurrence in the vMVPD industry, correct?

12     A    Yes.

13     Q    You testified in your deposition that there's been

14 so many blackouts over the years, it's hard to keep track of

15 them, true?

16     A    That's true.

17     Q    Now -- and you also testified almost every

18 negotiation comes down to someone saying, Well, I think

19 I'm going to take you off the air, correct?

20     A    That sounds common, yes.

21     Q    So distributors threaten to go dark on Turner,

22 true?

23     A    True.

24     Q    And Turner threatens to go dark on distributors,

25 true?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    I'm not sure -- yes, true, that can happen.

2    Q    And it has happened, true?

3    A    It has happened, in rare occasions, yes.

4    Q    And some blackouts can be long, correct?

5    A    Some can.  I think that's much more rare.

6  Usually, blackouts are temporary, temporary being days weeks

7  or maybe a month.

8    Q    Let's go back to PX123.

9         If you flip to page 21.

10        Now, this was your October 2016 presentation to

11  Mr. Levy?

12   A    Yes.  Can you give me the page number again.

13   Q    Yes.  Page 021 at the bottom in the middle.

14   A    Overview of deals/operators?

15   Q    Yes.

16        So the page there, there's a number of MVPDs

17  listed at the top, and this is an overview of their M&A

18  activity, right?

19   A    That's true.

20   Q    And under the Altice column, do you see that

21  bottom bullet that says, "Viacom dark on Suddenlink since

22  October 2014"?

23   A    I see that.

24   Q    So this was in October 2016, and all of Viacom's

25  networks like MTV and Nickelodeon, they were off the air

1   with Suddenlink for over two years, right?

2        A    That's true.

3        Q    And the Viacom-Suddenlink blackout ended in 2017,

4   right?

5        A    I'm not sure of the exact date, but I will go with

6   that.

7        Q    Well, Turner produces what it calls a go-dark

8   analysis in the regular course of its business planning,

9   correct?

10       A    That's correct.

11       Q    You can put that aside -- not put it aside.

12  Sorry.

13            Can you turn to PX144.

14       A    I'm there.

15            MR. CARSON:  May I proceed, Your Honor?

16            THE COURT:  Yes.

17  BY MR. CARSON:

18       Q    All right.  PX144, this is an October 11th, 2013

19  email to you, with the 2014 long-range plan attached.

20            Do you see that?  The subject says "LRP."

21       A    I'm sorry.  Is it 141?

22       Q    I'm sorry.  144.

23       A    144.

24            Okay.  I've got the document.  Yes, that's

25  correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q    And this was a strategy deck prepared for a

2  meeting with the chairman, Mr. Kent?

3    A    That's correct.

4         MR. CARSON:  Your Honor, we move to admit PX144.

5         MR. ORSINI:  No objection under seal.

6         THE COURT:  Okay.  It will be admitted under seal.

7                              (Government's Exhibit PX144
                                received into evidence
8                               under seal.)

9  BY MR. CARSON:

10    Q    If you turn to page 117, all the way in the

11  back --

12    A    Got it.

13    Q    -- where it says, "go-dark analysis"?

14    A    Yes, I see that.

15    Q    This is an example of a go-dark analysis that

16  Turner uses to prepare for potential blackouts, correct?

17    A    Yes; to give us visibility into what the impact is

18  if we go dark.

19    Q    And you see that go-dark date listed in the middle

20  column.

21         Do you see that?

22    A    I see that.

23    Q    And that's the date when a contract with a

24  distributor would expire; and without an extension or a

25  renewal, there would be a blackout, right?

1       A     That's correct.

2       Q     And then to the right in the table are the

3   financial consequences of going dark for Turner, right?

4       A     That's correct.

5       Q     And they're calculated by day, week, month,

6   quarter, and half year there?

7       A     That's correct.

8       Q     If you flip to -- and those are all calculated out

9   for each of the affiliates listed in the rows on the left

10  side, right?

11      A     That is correct.

12      Q     If you flip to 121, let me know when you're there.

13      A     I'm there.

14      Q     There's a table here that says "Past Network

15  Drops."

16            Do you see that?

17      A     I do.

18      Q     And this lists the past blackouts of cable

19  networks in the MVPD industry?

20      A     It does.

21      Q     And some of these blackouts are pretty long,

22  right?

23      A     I see durations --

24      Q     Let me be specific.

25      A     Looks like 849 days may be the longest.

1    Q    And it says 849-plus days.

2         Do you see that?

3    A    I do.

4    Q    And do you see in the rows where it says

5    "ongoing"?

6    A    I do.

7    Q    And "ongoing" means that at least those blackouts

8    are permanent as of this date, right?

9    A    As of that date, correct.

10   Q    And you do -- Turner does go-dark analysis in the

11   course of its business because it matters, right?

12   A    Yes.  You want to understand ramifications; that's

13   correct.

14   Q    This isn't just some academic exercise, right?

15   A    Well, I wanted to say an academic exercise if you

16   can, but it is a possibility.

17   Q    And you do go-dark analysis to inform your

18   bargaining strategy, true?

19   A    More to inform my bosses on the impact to our

20   budget long-range plan.

21   Q    Well, you think about, how much is it going to

22   hurt if we go dark with someone and lose fees, right?

23   A    That's correct.

24        THE COURT:  Would this be a good time to take the

25   morning recess?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. CARSON:  Yes, Your Honor.

 2              THE COURT:  All right.  We're going to take a

 3    15-minute recess.  You're a witness under oath in the case,

 4    which means do not discuss your testimony so far or what it

 5    might be with anyone, your own counsel, even, nobody.  Stay

 6    independent of all others.

 7              THE WITNESS:  I understand, Your Honor.

 8              THE COURT:  You will have to be able to answer the

 9    question that you haven't spoken to anyone while you're

10    under oath.

11              THE WITNESS:  I understand.

12              THE COURT:  See you in 15 minutes.

13              DEPUTY CLERK:  All rise.

14              This Honorable Court now stands in recess until

15    the return of court.

16              (Recess from 11:53 a.m. to 12:18 p.m.)

17              DEPUTY CLERK:  The United States District Court

18    for the District of Columbia is again in session, the

19    Honorable Richard J. Leon presiding.  God save the United

20    States and this Honorable Court.  Please be seated and come

21    to order.

22              Your Honor, re-calling Civil Action No. 17-2511,

23    the United States of America v. AT&T, Inc., et al.

24              THE COURT:  All right.  You may proceed.

25              You may main under oath.
```

 1           MR. CARSON:  Thank you, Your Honor.

 2           THE COURT:  Yes.

 3  BY MR. CARSON:

 4      Q    Mr. Breland, we were talking about a go-dark

 5  analysis that Turner does in the regular course of its

 6  business, right?

 7      A    Correct.

 8      Q    Now, Turner does what you'd call go-dark analysis

 9  because, in recent years, Turner has gotten close to going

10  dark with virtually every major distributor, correct?

11      A    I think that's fair, yes.

12      Q    Turner got close to going dark with

13  Time Warner Cable over that single penny in 2012, right?

14      A    That's correct.

15      Q    Turner got close to going dark with DirecTV in

16  2013?

17      A    That's correct.

18      Q    Turner went dark with Dish in 2014?

19      A    Yes, that's correct.

20      Q    Turner got close to going dark again with Dish in

21  2015?

22      A    That's true.

23      Q    Turner got close to going dark with Altice in

24  2016?

25      A    True.

1    Q    And Turner got close to going dark with Charter in

2    2016 as well?

3    A    That's correct.

4    Q    Let's talk about Charter.

5         In December 2016, Turner came within ten minutes

6    of going dark, correct?

7    A    I think that's fair, yes.

8    Q    Turner told Charter it would go dark if Charter

9    did not agree to higher rates, right?

10   A    Yes, that's correct.

11   Q    And to avoid going dark, Charter agreed to pay

12   those higher rates to Turner, right?

13   A    That's correct.

14   Q    Can you turn to PX146 in your binder, sir.

15        Let me know when you're there.

16   A    I'm here.

17        MR. CARSON:  May I proceed, Your Honor?

18        THE COURT:  Yes, you may.

19   BY MR. CARSON:

20   Q    PX146 is a December 2016 email from you to

21   Turner's CEO, John Martin, about a several-month extension

22   with Charter to avoid a blackout, true?

23   A    True.

24        MR. CARSON:  Your Honor, we'd move to admit PX146.

25        MR. ORSINI:  No objection, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1035

```
1        THE COURT:  It will be admitted.

2        MR. CARSON:  Thank you.

3        MR. ORSINI:  I think it needs to be under seal,

4   Your Honor.

5        THE COURT:  It does or it doesn't?

6        MR. ORSINI:  I believe it does.  I was trying to

7   check.

8        THE COURT:  Take your time.  Figure that out.

9        MR. ORSINI:  I think this one does, Your Honor,

10  because it reflects termination dates of agreements.

11       THE COURT:  All right.  Any objection from the

12  government on that?

13       MR. CARSON:  Yes, Your Honor.

14       THE COURT:  Yes, you object?

15       MR. CARSON:  Yes, we object.

16       THE COURT:  All right.  Come on up.  We can

17  discuss it.

18       Sit down there, Mr. Breland.

19       (Sealed bench conference)
```



1

2

3

4

5

6

7

8

9

10

11          (Open court)

12          THE COURT:  I'm going to admit it but not under

13   seal.

14                              (Government's Exhibit PX146
                                received into evidence.)
15          THE COURT:  You may proceed.

16   BY MR. CARSON:

17       Q    Mr. Breland, in this email string, you informed

18   Mr. Martin that Charter accepted our rates after insisting

19   they would only extend if they paid the 2016 rates in 2017.

20          Do you see that?

21       A    Yes, I do.

22       Q    And you wrote that the April 30, 2017, extension

23   date lines Turner up with some of our most powerful

24   programming, NBA playoffs.

25          Do you see that in the third hyphened line?

1       A       Yes, I do.

2       Q       And by "powerful programming" here, you're

3  referring to the leverage that Turner would have at the end

4  of April, because Charter would not want to go dark during

5  the NBA playoffs, true?

6       A       That would be my hope, yes.

7       Q       And that's why you wrote, in that next line down,

8  "While prepared to go dark today and we could find ourselves

9  in a similar place in April."

10              Do you see that?

11      A       I do.

12      Q       And you were referring to being ready to go dark

13  during the NBA playoffs in April, true?

14      A       That's correct.

15      Q       Put that aside.

16              If you can turn to -- well, actually, why don't

17  you flip to PX147.

18      A       I'm there.

19      Q       PX147 is an April 2017 email from Mr. Warren to

20  you and Mr. Levy.

21              Do you see that?

22      A       I do.

23      Q       And the subject is "Charter NBA Markets."

24              Do you see that?

25      A       I do.

1    Q    And Mr. Warren was sending you a spreadsheet of

2    NBA playoff team markets in Charter's footprint, right?

3    A    That's correct.

4         MR. CARSON:  Your Honor, I would move to admit

5    PX147.

6         MR. ORSINI:  No objection, Your Honor.

7         THE COURT:  It will be admitted.

8                                  (Government's Exhibit PX147
                                    received into evidence.)

9    BY MR. CARSON:

10   Q    Looking at the attached spreadsheet on page 3,

11   PX147003, this is an analysis of NBA playoff games in

12   Charter markets.

13        Do you see that?

14   A    I do.

15   Q    And this -- there's also -- so there's a list at

16   the top of playoff teams, teams that made the playoffs and

17   where the Charter Time Warner Cable markets had the -- where

18   those teams lined up with Charter and Time Warner Cable's

19   footprints.

20        Do you see that?

21   A    I do.

22   Q    And then there's a column of the penetration of

23   the DMA?

24   A    Yes.

25   Q    And the DMA is the term for the metropolitan area

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   where cable companies have their footprints?

2        A    That's correct.

3        Q    And then the standings down to who was leading who

4   in which playoff series for those teams in those markets,

5   right?

6        A    That's correct.

7        Q    And then there's a list below of the teams not

8   currently in the playoffs, where Charter also has their

9   footprint?

10       A    That's correct.

11       Q    And then the list at the bottom are other sizable

12  markets and/or high affinity for NBA.

13            Do you see that?

14       A    I do.

15       Q    And so those are places where NBA fans who have

16  Charter might want to watch the NBA playoffs, right?

17       A    That's correct.

18       Q    And you did this -- or at least Mr. Warren did

19  this analysis and sent it to you to help assess how powerful

20  the NBA playoffs would be as programming, if you needed to

21  go dark?

22       A    That's correct.

23       Q    And he writes in his email, in that last line in

24  the first paragraph:  "Most notable is Cleveland, where

25  Charter has over 50 percent of the market."

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1041

1    Do you see that?

2    A    I do.

3    Q    And he sent it to you saying he thought

4    it would be helpful for us.

5    Do you see that?

6    A    I do.

7    Q    And so it would be helpful for your bargaining

8    negotiations with Charter in late April 2017 on the eve of a

9    potential blackout, to know where Charter has customers who

10    would -- might be watching the playoffs, right?

11    A    That's correct.

12    Q    All right.  You can put that aside.

13    Let's talk about Altice.

14    In October 2016, Turner came very close to going

15    dark with Altice, true?

16    A    True.

17    Q    Turner was prepared to go dark with Altice because

18    Altice rejected the rate increases that Turner wanted right?

19    A    That's correct.

20    Q    Or put together way, Turner rejected Altice's

21    request to actually lower its rates, fair?

22    A    That's fair.

23    Q    And you informed Time Warner's CEO of the growing

24    likelihood that Turner would go dark with Altice, right?

25    A    Time Warner, meaning Jeff Bewkes; is that correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q    Correct.

2    A    Yes, likely he would be on any correspondence.

3    Q    And you told Mr. Bewkes that Turner's CEO,

4  Mr. Martin, and Turner president, Mr. Levy, were supportive

5  of going dark.

6         Do you remember that?

7    A    Yes, I do.

8    Q    Now, you wouldn't tell Mr. Bewkes about the

9  likelihood of going dark, because Turner had made an empty

10 threat, would you?

11   A    No.

12   Q    That was part of your responsibilities, to inform

13 your superiors about the likelihood of a blackout with a

14 major distributor, true?

15   A    True.

16   Q    And now, to avoid going dark, Altice agreed to

17 Turner's rate increases, correct?

18   A    That was one of the conditions, yes.  They

19 accepted our rates.

20   Q    Now, Turner has gone dark three times with a

21 distributor, correct?

22   A    Actually, four if we reach way back into like

23 2006, I believe.

24   Q    And that's -- the fourth was when Court TV was

25 called Court TV and not TruTV, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    That's correct.  I think we were just taking over

2    the second half of the ownership of Court TV, so it was

3    transitioning into our portfolio somewhere in that window.

4        Q    And by transitioning, when Turner was acquired by

5    Time Warner, Time Warner had Court TV and that became part

6    of Turner's stable of networks, true?

7        A    My recollection was Court TV was jointly owned by

8    Viacom, and we bought the other half out somewhere in the --

9        Q    But it wasn't a Turner network that came with the

10   merger to Time Warner, right?

11       A    That's correct.

12       Q    It was a Time Warner network --

13       A    That's correct.

14       Q    -- via --

15       A    It was not in our portfolio.

16       Q    Now, Turner went dark with Dish, 2014?

17       A    Yes, we did.

18       Q    And Turner had a blackout with Cable ONE in 2013,

19   correct?

20       A    That's correct.

21       Q    Now, the Cable ONE blackout was the first time

22   that all the Turner networks went off the air with the

23   distributor, true?

24       A    That's true.

25       Q    Cable ONE is a small distributor with less than a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1044

1    million subscribers?

2        A    Probably in the 700,000 sub range.

3        Q    And before the blackout in 2013, Turner and

4    Cable ONE bargained down to where the difference between the

5    two deals was about $200,000, right?

6        A    That's correct.

7        Q    And then at the last-minute curveball, Cable ONE

8    came in and said, we want to take less than all of Turner's

9    networks, right?

10       A    That's what they said, yes.

11       Q    And allowing a small MVPD with less than a million

12   subs to just take a subset of Turner's network would be a

13   very bad precedent for Turner, true?

14       A    It could have ramifications, but there was a lot

15   more to this.

16       Q    It could do irreparable harm to Turner's business

17   to allow a small distributor to take less than the full

18   suite of Turner networks, true?

19       A    Not necessarily.  Depends on what the conditions

20   are and the rates that they paid for those networks.

21       Q    If another distributor had an MFN against a

22   smaller distributor like Cable ONE, your Cable ONE deal

23   could affect your other deals with distributors, right?

24       A    I don't believe there are any conditions at that

25   time that restricted -- that basically said if you're

***REDACTED IN ACCORDANCE WITH JULY 31 2018 DISTRICT COURT ORDER***

1   carrying eight networks and another distributor takes three,

2   that you can automatically take three.  I don't recall any

3   restrictions like that.

4        Q    Well, Turner pulled all of its channels from

5   Cable ONE, correct?

6        A    No.  Cable ONE dropped, I believe, five or six of

7   the networks.

8        Q    And Cable ONE only wanted to carry three, right?

9        A    We found that out on the last day; yes.

10       Q    And as a result, Turner said, you can't have any

11   of them, can you?

12       A    After they broke the relationship, we reconsidered

13   our business relationship going forward.

14       Q    And you pulled all your channels from Cable ONE,

15   true?

16       A    Only the three that were left after they dropped

17   the others.

18       Q    So if you don't take all of them, you're not going

19   to have any of them, right?

20       A    That's not true.  That's not how we negotiated the

21   deal.

22       Q    Well the Cable ONE blackout was ultimately

23   Turner's choice to have no channels on Cable ONE, true?

24       A    We made the step, yes, of removing the other three

25   networks.

1    Q    And the Cable ONE blackout lasted about a month,

2  correct?

3    A    That's correct.

4    Q    Now, in order to end the blackout, Cable ONE

5  agreed to take all of Turner's networks, right?

6    A    I believe eight.  I don't think they took

7  CNN International or maybe CNN en Español, but the majority

8  of the networks, yes.

9    Q    Though CNN International and CNN en Español are

10  often included with CNN?

11    A    They can be.

12    Q    Now, Cable ONE agreed to price increases, true?

13    A    That's correct.

14    Q    And you reported to your boss, Mr. Levy, that the

15  new Cable ONE deal was a very good outcome for Turner,

16  correct?

17    A    Anytime you can get a relationship back on track,

18  yes, I think that's a good outcome.

19    Q    Why don't you turn to PX143.

20        And PX143 is an email string, including one with

21  you and Mr. Levy, about the resolution of the Cable ONE

22  blackout, right?

23    A    That's correct.

24        MR. CARSON:  Your Honor, we to move admit PX143.

25        MR. ORSINI:  No objection, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  It will be admitted.

 2                                   (Government's Exhibit PX143
                                      received into evidence.)
 3    BY MR. CARSON:

 4       Q    Now, after the announcement of the end of the

 5    blackout, Mr. Levy asked you if we, Turner, got what we

 6    needed.

 7              Do you see that on the 25th?

 8       A    I do.

 9       Q    And you responded, "Yes, got what we wanted,

10    three-year term, a very good outcome."

11              Do you see that?

12       A    I do.

13       Q    You can put that aside.

14              Now, can you turn to PX17.

15              MR. CARSON:  May I proceed, Your Honor?

16              THE COURT:  You may.

17              THE WITNESS:  Okay.  I'm there.

18    BY MR. CARSON:

19       Q    PX17 is a September 2016 email to the Turner CEO

20    and president, where you mentioned how Turner prevailed

21    nicely over Cable ONE after going dark, correct?

22       A    Correct.

23              MR. CARSON:  Your Honor, we move to admit PX17.

24              MR. ORSINI:  No objection, Your Honor.

25              THE COURT:  It will be admitted.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1048

```
 1                                  (Government's Exhibit PX17
                                    received into evidence.)
 2     BY MR. CARSON:

 3          Q     In your bottom email, you're writing in 2016 about

 4     the renewal of the Cable ONE deal from 2013, right?

 5          A     That's correct.

 6          Q     And in parentheses, you write there on the top

 7     line, "You'll recall that in 2013 with a last-minute

 8     sucker-punch by Cable ONE, we went dark for 25 days but

 9     prevailed nicely.

10                Do you see that?

11          A     I do.

12          Q     And Mr. Levy, the Turner president, responded,

13     "Cable ONE, while small, is a big one to close for many

14     reasons."

15                Do you see that?

16          A     I do.

17          Q     Now, after the blackout with Cable ONE in 2013,

18     your team tracked Cable ONE's subscribers, right?

19          A     I believe that's true.

20          Q     You can put that side.

21                Thank you.

22                Mr. Warren sent you some information about how

23     Cable -- about Cable ONE's loss of subscribers after the

24     blackout, right?

25          A     I don't recall the exact document, but that seems
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    like normal procedure, yes.

 2         Q    Let me show you your deposition.

 3              MR. CARSON:  May I approach, Your Honor?

 4              THE COURT:  You may.

 5    BY MR. CARSON:

 6         Q    Mr. Breland, do you have your deposition

 7    transcript.  If you turn to page, which has been marked as

 8    PX530, for identification.

 9              If you turn to page 262 of the second deposition

10    from January.

11              If you could read line 17 to 24 at the bottom.

12              THE COURT:  To yourself.

13    BY MR. CARSON:

14         Q    To yourself.  Let me know when you're done.

15         A    17 to 24?

16         Q    Yes.  On 262.

17         A    Yes, I've read that.

18         Q    Let me ask you, again, Mr. Warren sent you

19    information about Cable ONE's loss of video subscribers

20    after the blackout, correct?

21         A    I believe that's true.  I just don't recall the

22    actual document.

23         Q    All right.  You can put that aside.

24              It is true, Mr. Breland, that video distributors

25    can lose subscribers if they go dark with Turner, correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1050

```
 1      A      That is a possible outcome, yes.

 2      Q      Let's talk about DirecTV.

 3             MR. CARSON:  Can you pull up PX142.

 4             May I proceed, Your Honor?

 5             THE COURT:  You may.

 6             THE WITNESS:  Okay.  I'm there.

 7   BY MR. CARSON:

 8      Q      PX142 is a November 2013 email string with you and

 9   Mr. Warren about a Time Warner Cable blackout causing

10   subscribers to shift to DirecTV.

11             Do you see that?

12      A      I do.

13             MR. CARSON:  Your Honor, we'd move to admit PX142.

14             MR. ORSINI:  No objection, Your Honor.

15             THE COURT:  All right.  It will be admitted.

16                                     (Government's Exhibit PX142
                                        received into evidence.)
17   BY MR. CARSON:

18      Q      Mr. Warren forwarded you some information about

19   the subscribers of Time Warner Cable being irritated by a

20   dispute and a consequent blackout, right?

21      A      That's correct.  I see the headline below.  Is

22   this where it says DTV USA form?  Am I correct?  Am I

23   reading the right spot?

24      Q      Right.

25             In the last line of the email or in the last
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1051

1    indented section, "With TV fans irritated by

2    Time Warner Cable's dispute with and consequent blackout,

3    many have shifted to DirecTV."

4         Do you see that?

5    A    I do.

6    Q    And Mr. Warren forwarded you this information, and

7    you responded in that November 9th, 5:11 p.m., email, right?

8    A    That's correct.

9    Q    And you wrote to Mr. Warren, "It would not be

10   smart for DirecTV to get into a dispute with Turner because

11   DirecTV could lose subscribers."

12        Correct?

13   A    That's correct.

14   Q    And your comment to Mr. Warren was that a Turner

15   blackout could cause DirecTV subscribers to shift to

16   Time Warner Cable, right?

17   A    I don't see the reference to Time Warner Cable.  I

18   see, "We should hope they're smart enough not to give them

19   back."  So I understand your inference, then, to

20   Time Warner Cable.

21   Q    "Giving them back" means the DirecTV subscribers

22   that they picked up during a blackout of Time Warner Cable

23   might shift back to Time Warner Cable, right?

24   A    Yes.  That's the banter, correct.

25        MR. CARSON:  That's all we have, Your Honor.

1    THE COURT:  All right.

2    MR. ORSINI:  May I proceed, Your Honor?

3    THE COURT:  You may.

4              CROSS-EXAMINATION

5    BY MR. ORSINI:

6    Q    Mr. Breland, I just want to step back a little bit

7    and talk about your responsibilities briefly.  You got into

8    that a little bit with the government's examination.

9         So you switched into your current role last year;

10   is that correct?

11   A    June 17, correct.

12   Q    Why did you make that change?

13   A    Really, it was a succession plan I put in place at

14   the end of '15 talking to Mr. Levy and Mr. Martin.  After

15   20-plus years, you look at the right time to hand off

16   something as important as distribution.

17        There was only one deal up in '17, and that seemed

18   like the perfect time to transition.

19   Q    And in your current position, you were the

20   President of Turner Content Experiences, correct?

21   A    That's correct.

22   Q    Can you explain for the Court at a high level what

23   your responsibilities are in that position.

24   A    Yes.

25        The -- it's important to look at what's taking

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  place in the market.  We spent lot of time talking about how

2  networks are rated, and that is a metric.  But that doesn't

3  really capture what's taking place right now.

4       And what I mean by that is, in 2016, Netflix

5  created 126 originals in films.  This year, they'll spend

6  almost $8 billion and create 700.  We have to take that in

7  consideration, what that does to our content.

8       You have to look at Amazon.  And if you sign up

9  for shipping service, you can now get free video and what

10 that means.

11      We have to look at the fact that every day over a

12 billion hours of content, video content, is consumed on

13 YouTube.

14      We have to look at the fact that Facebook bid over

15 $600 million for sports rights for cricket.  I don't think

16 they won but they bid, and they have singled -- they made

17 billions of dollars in play to spend more money on sports.

18 So you have to look at the entire marketplace and say,

19 what's transpiring here?

20      And what's taking place is that there are

21 formidable, very impressive competitors that want to pull

22 eyeballs away.  So content experience, understand, is two

23 very important points.

24      There's only 24 hours in a day, and we compete

25 with anything and everything you can do with a screen.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1054

1    We're actually in the engagement business.  We're not

2    really -- as much as we talk about ratings, we're in the

3    engagement business.  We want people who can now pick up a

4    device and they can spend time on movie services; they can

5    download music; they can check their emails, check eBay.

6    That's all competition for us.

7              So you have to find what is the best experience

8    you can create with your content to reach customers in a

9    time when technology has given them a tremendous amount of

10   power and voice to say what they want, and we have to be

11   responsive to that.

12             So gone are the days where you just think about

13   how you might want to schedule a linear network what comes

14   on at 7:00 and 8:00 and one show leads to another.  That's

15   not what's happening now.

16             The disruption is like Mount Vesuvius on top of

17   Pompeii.  These are massive changes to the marketplace.

18        Q    Thank you.  We'll come back to some of that later.

19             You're also president of FilmStruck, correct?

20        A    That's correct.

21        Q    What is exactly is FilmStruck?

22        A    FilmStruck is the first direct-to-consumer product

23   that we've launched at Turner Broadcasting.  It is -- it's

24   really an offshoot of the beginning of how we thought about,

25   how do we reach an audience?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1055

1    So Turner Classic Movies, while last year a top-30

2    rated network, right now is scheduled, is on track between

3    2014, 2021, to lose over 22 million subscribers.  That's

4    attrition out of the cable industry and being repackaged and

5    moved on tiers or dropped.

6    So if you're going to grow in the film business,

7    you have to say, what am I going to do differently?

8    We made it -- we weren't going to launch another

9    cable network and try to force that in.  I do not have the

10   leverage to do that.  And I think it's irresponsible at a

11   time when there are absolutely too many linear cable

12   networks.

13   So we said, we're going to launch a movie service.

14   We're going to take all the things we do right with

15   Turner Classic Movies, tremendous branding, promotion, the

16   programming, the way we put an experience together, and

17   we'll go direct to consumers.

18   A little bit different audience, however.  This is

19   toward a younger audience.  So we put together the largest

20   independent art house film library in the country, and we

21   launched in November of 2016.

22   Q    How many subscribers do you currently have to

23   FilmStruck?

24   A    We're closing in on about 100,000 and probably,

25   just so you have the full picture, good to mention that last

1   month, we also expanded the offering.  The No. 1 request we

2   got from the FilmStruck fans and potential fans, for the

3   ones that would maybe reach out to our blog or Websites:

4   When you going to put Golden Age of Hollywood?

5           So we did a joint venture with our sister company,

6   Warner Brothers, and we added about 600 Golden Age of

7   Hollywood movies to the service last month.

8       Q    What do you mean by Golden Age of Hollywood?

9       A    1920s to 2070s [sic].

10      Q    What is Boomerang in terms of its, the DirecTV --

11  direct to consumer?

12      A    Boomerang started as a linear network, which is a

13  Hanna-Barbera library.  That's Jonny Quest, Jetsons,

14  Flintstones, those classics.

15          Started as a linear network, really was stimied in

16  its growth, I think.  And at its best it probably got to

17  40 million subscribers.

18          It's easy to see in kids' behavior when you look

19  at consumption of linear television that it's going down,

20  linear.  They want on-demand product.

21          So, once again, a joint venture with

22  Warner Brothers whereby we took the Hanna-Barbera library,

23  put it together with Looney Tunes, and made it a

24  direct-to-consumer product.  So for 4.99, you can get access

25  to over 3,000 shows.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1057

1    Q    How many subscribers does Turner have for that

2    direct-to-consumer product?

3    A    I believe it's around 150,000.

4    Q    So let's go back to what you did for the preceding

5    25-or-so years, the content distribution negotiations.

6    A    Okay.

7    Q    Ballpark it.  How many actual affiliate agreement

8    negotiations do you think you took part in during that time?

9    A    Around 100 probably.

10   Q    And which networks were you actually negotiating

11   contracts for?

12   A    For all of the linear networks.

13   Q    For the Turner networks too?

14   A    For the Turner networks, only the Turner networks.

15   Q    And which type of distributors were you

16   negotiating with?

17   A    Well, it started out before I got there.  Turner

18   had already started distributing to cable operators, then

19   direct broadcast satellite, direct dish to other satellite

20   providers were there.  We did deals with them.  We did deals

21   with the TelCos when they started to get into the business,

22   and we do deals with virtual MVPDs.

23   Q    Which virtual MVPDs did you negotiate with?

24   A    I was involved in the negotiations on Sony, on

25   Sling, on Hulu, and on DirecTV Now.

1    Q    Now, when you're engaged in these affiliate

2   negotiations, were you typically negotiating for carriage of

3   all the Turner networks together?

4    A    Yes.

5    Q    Why?

6    A    Efficiency.  If you had to start every contract

7   over, every contract would not just be 100 pages; you'd have

8   800 pages of documents.

9         And there are a lot of similar terms: security,

10  force majeure, termination.  There are different pieces in a

11  contract that are common.  So it's really efficiencies is

12  why you do it.

13   Q    What responsibilities did you have for negotiating

14  the carriage of HBO?

15   A    None.

16   Q    Was it typical to negotiate with a distributor

17  over the Turner networks at the same time that HBO was

18  negotiating?

19   A    There were -- over the last few years, I remember

20  a conversation with Mr. Bewkes.  And he said, Are you in

21  HBO?  Do you even know what each other are doing?  Probably

22  smart to have a conversation and see what you're involved

23  in.

24        But we've never sat down at the table.  I've never

25  been at the table and had HBO next to me when I negotiate a

1    deal.

2       Q    So I think the conversation you just referenced

3    was something that the government asked you about, the

4    conversation you had with HBO.  Whatever came of that

5    exercise?

6       A    Again, I look at it as -- that's why I said

7    I don't have a goal.  It wasn't a mandate for Mr. Bewkes to

8    say, you must align all the deals; you must negotiate these

9    together; you must trade off terms.

10          I took it as a know what each other's doing; let's

11   communicate and see how this works.

12          So words like "strategy" and "goal" get mixed in.

13   I understand that.  But I never had a set goal that that's

14   what you should do.  I look at it as smart business.  If I'm

15   Mr. Bewkes, I want to know what my different divisions are

16   doing.

17      Q    What impact did that conversation with HBO have

18   upon your strategy going forward for negotiating the Turner

19   networks?

20      A    It didn't.  I only considered the Turner networks.

21      Q    Generally speaking, what is your opinion based on

22   your experience as to whether or not it's helpful for Turner

23   to be negotiating simultaneously with HBO?

24      A    Well, if you look from the outside, you would

25   always think more is better, correct?  But if it were

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18   Page 1035 of 3826

1060

1   15 years ago, that might help me.

2          But today, I don't believe that that helps me at

3   Turner, and here's why.

4          My understanding -- and I've never seen an HBO

5   contract.  But my understanding is this is like a

6   consignment business.  If someone, a subscriber subscribes

7   to HBO, they pay a certain amount of money.  And what HBO

8   and distributor discuss is how do they split that money.

9   And that's how that works.

10          But if I had to take HBO into consideration in the

11   way I have to get my deals done, I have to already balance

12   up to 10 networks at any given time and what the tradeoffs

13   are for those networks.

14          And what concerns me about putting them together

15   is a distributor saying, you know what?  I'm going to drop

16   HBO, because when I drop HBO, they can't turn the

17   subscribers back on, is my understanding.  They have to

18   start from zero and build that sub base back up.

19          So the liability, they've now become more of a

20   liability to me as I look at the Turner portfolio because

21   now I have to take that into consideration.  If they were to

22   do that and say, You've got to lower your rate by X or

23   I'm going to take action, I look at it as something else I

24   would now have to defend rather than the fact that that

25   might help me.

1    Q    When you said they have to start at zero and build

2    their subscriber base back --

3    A    Meaning HBO.  So if they go, if I go dark, when I

4    come back on, my networks come back on.

5         And I bleed profusely during the period I'm dark.

6    But my understanding is with HBO, this type of premium

7    product, when you subscribe to it, if it were to be turned

8    off -- and I don't believe there's been a time HBO's turned

9    off.  I'm not sure, but I don't believe they've ever been

10   turned off.  But I've always heard HBO say, you know, I'm

11   nervous about getting close with you guys because at the end

12   of the day, if I go dark, I have to start over getting the

13   subscribers.

14        First of all, I don't have any of their core

15   information to contact them, but I start from square one.

16   Q    We'll come back to YouTube in a moment.

17        But currently, the Turner networks are carried by

18   YouTube, correct?

19   A    That's my understanding, yes.

20   Q    And what's the status of HBO being carried by

21   YouTube?

22   A    I do not know.

23   Q    You were also shown an exhibit which set forth the

24   rate strategy that Turner has.  Do you recall that, that it

25   had various different categories for rates?

1       A    I do.

2       Q    And you were here when Mr. Martin testified about

3   the notion that new entrants pay slightly higher fees when

4   they come into the markets.

5            Do you recall that?

6       A    I do.

7       Q    And has that been your general understanding?

8       A    Yes.  When direct broadcast satellite came on,

9   they paid a slight premium.  Same thing when the TelCos came

10  on.  And same thing with the virtual MVPDs.

11      Q    What, if any, implications do your MFNs with large

12  distributors have on the prices you can offer to new

13  entrants?

14      A    Well, if I were not shackled with MFNs, I could be

15  much more flexible in considering certain things.  But right

16  now, a new entrant comes in.  If I give them a rate that's

17  lower or above every distributor above them, that can trip

18  MFNs, which will cost hundreds of millions of dollars

19  potentially.

20      Q    You were also asked a series of questions by

21  Mr. Carson about the rate increases that Turner was able to

22  negotiate in the 2013 to 2017 time frame.

23           Do you recall that?

24      A    I do.

25      Q    And what was the general reason for Turner's

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1063

1   strategy of seeking rate increases during that time period

2   with distributors?

3        A    We had made investments in original programming of

4   sports, and we also looked at it as a catch-up period.  For

5   example, Cartoon Network, to our understanding, was -- had a

6   big gap compared to a competitor like Nickelodeon.  And CNN

7   was behind Fox News.

8             So we looked at these as this is catch-up period

9   for us to get back to where we should be.  We had done

10  smaller increases, even CPI increases at certain times.  And

11  we were way behind the market, so this was a catch-up tour

12  of duty.

13       Q    Now, speaking on this issue of new entrants, you

14  were involved with the negotiations with PlayStation, Sony,

15  in 2015, right?

16       A    That's correct.

17       Q    What do you generally recall about those

18  negotiations, just at a high level?

19       A    Look, we were excited.  It was a new platform.

20  PlayStation has tens of millions of credit card.  I think

21  I've got two PlayStations in my house.

22            So we were excited by that.

23            There were some limitations in the way they were

24  talking about rolling out.  I believe they only started in

25  four markets, but we were glad to get in business with them.

1    Q    And what do you recall about how their rate in

2  that original agreement compared to, without specifying the

3  numbers, rates paid by traditional MVPDs?

4    A    There was a slight differential, as it had been in

5  the past, historically, with the new entrants.

6    Q    Was there a later renegotiation with Sony?

7    A    There was.

8    Q    And, again, without revealing the specific

9  numbers, what happened with their rates at that point?

10    A    Their rates were lower because they had achieved

11  sort of like a smaller cable operator level, so their rates

12  would mirror those.  So they went down.

13    Q    I'm sorry.  Can you explain that last piece, they

14  would mirror a smaller cable company?

15    A    Yes.  When you start, you have zero subs.  So the

16  way -- in the document that Mr. Carson showed me, it shows

17  sort of an opening offer if you're negotiating with a new

18  entrant, sort of a mid-point of where you could go.  This is

19  for the negotiating team, really, so they know what their

20  limits are negotiating.  So there's an open, there's a mid,

21  and there's a final.

22        The final is actually very close, I believe, to

23  where the small operator is.  So when they re-negotiated,

24  they had subscribers, and we rewarded that performance.

25    Q    Generally speaking, when you were the President of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Turner content development, what was your strategy with

2   respect to negotiating with the new entrant virtual MVPDs?

3       A    I want to be on every platform that comes.

4   That's --

5       Q    Why?

6       A    Because you don't know who's going to be

7   successful, right?  If we had been shortsighted -- we were

8   the first people to sign up Charlie Ergen.  Can you imagine

9   if we hadn't gotten on Dish Network and you missed all of

10  that tremendous growth and what they have done with that

11  business?  So you want to be on every platform.

12      Q    There was a reference in one of the documents that

13  Mr. Carson showed you to the concept of an anchor tenant.

14           Do you recall that?

15      A    I do.

16      Q    And what do you understand that concept to mean?

17      A    I think that means that this is a network that

18  would do well in a base package.  Let's say a skinny bundle,

19  for example.

20      Q    And what risks would Turner face if it were not

21  part of those skinny bundles when they were launched?

22      A    Well, I think it's a question of, if a skinny

23  bundle has launched and we're not part of it, then we really

24  get left behind.  You've got to find your way to get back

25  in, which is why you want to be in every, on every platform

```
 1    and with every distributor that launches.

 2              MR. ORSINI:  Your Honor, I'm about to start a

 3    specific negotiation topic.  Might now be a good time, or

 4    should I keep going?

 5              THE COURT:  Yeah, we'll take the luncheon recess.

 6              So you remain a witness under oath in the case.

 7    Refrain from discussing your testimony with anyone,

 8    including your own counsel.

 9              Stay independent of all others.  We'll return at

10    2:30 for the afternoon session, okay?

11              THE WITNESS:  I understand, Your Honor.

12              THE COURT:  We'll see you then.

13              THE WITNESS:  Thank you.

14              THE COURT:  All right, Counsel.  Do you have an

15    estimate of how long you'll be going this afternoon?

16              MR. ORSINI:  Give or take 45 minutes to an hour.

17    I don't imagine it will be longer than that.

18              THE COURT:  Okay.  So the government will have to

19    have another witness ready?

20              MR. ORSINI:  And we have the next witness here.

21    It's another Turner executive.  He's here, Your Honor.

22              THE COURT:  Oh, okay.  Very good.  We'll stand in

23    recess.

24              DEPUTY CLERK:  All rise.

25              (Proceedings concluded at 1:00 p.m.)
```

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: April 2, 2018_____   /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR

```
                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        :
                                 :
              Plaintiff,         :          CV No. 17-2511
        vs.                      :
                                 :          Washington, D.C.
                                 :        Monday, April 2, 2018
AT&T, INC., ET AL.,              :            2:40 p.m.
                                 :
                                 :            Day 6
                                 :
              Defendants.        :
---------------------------------x
```

                          AFTERNOON SESSION
                       TRANSCRIPT OF BENCH TRIAL
                  BEFORE THE HONORABLE RICHARD J. LEON
                   UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:    Craig W. Conrath, Esquire
                       Eric D. Welsh, Esquire
                       Timothy B. Walthall, Esquire
                       Andrew Finch, Esquire
                       Dylan M. Carson, Esquire
                       Justin T. Heipp, Esquire
                       Cerin M. Lindgrensavage, Esquire
                       Shobitha Bhat, Esquire
                       U.S. DEPARTMENT OF JUSTICE
                       Antitrust Division
                       450 Fifth Street, NW
                       Washington, DC  20530
                       (202) 532-4560
                       craig.conrath@usdoj.gov
                       eric.welsh@usdoj.gov
                       timothy.walthall@usdoj.gov
                       andrew.finch@usdoj.gov
                       justin.heipp@usdoj.gov
                       dylan.carson@usdoj.gov
                       cerin.lindgrensavage@usdoj.gov
                       shobitha.bhat@usdoj.gov

```
 1   Appearances Continued:

 2   For Defendant AT&T       Katrina M. Robson, Esquire
     and DirecTV Group        O'Melveny & Myers LLP
 3   Holdings, LLC:           1625 Eye Street, NW
                              Washington, DC  20006
 4                            (202) 220-5052
                              krobson@omm.com
 5
                              Daniel M. Petrocelli, Esquire
 6                            M. Randall Oppenheimer, Esquire
                              O'MELVENY & MYERS LLP
 7                            1999 Avenue of the Stars
                              8th Floor
 8                            Los Angeles, CA  90067
                              (310) 553-6700
 9                            dpetrocelli@omm.com
                              roppenheimer@omm.com
10
                              Michael L. Raiff, Esquire
11                            Robert C. Walters, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
12                            2100 Mckinney Avenue
                              Suite 1100
13                            Dallas, TX 75201
                              (214) 698-3350
14                            mraiff@gibsondunn.com
                              rwalters@gibsondunn.com
15
     For Defendant           Kevin J. Orsini, Esquire
16   Time Warner, Inc.:      Peter T. Barbur, Esquire
                              CRAVATH, SWAINE & MOORE LLP
17                            Worldwide Plaza
                              825 Eighth Avenue
18                            New York, NY  10019
                              (212) 474-1140
19                            korsini@cravath.com
                              pbarbur@cravath.com
20
     Court Reporter:         Crystal M. Pilgrim, RPR, FCRR
21                            Official Court Reporter
                              United States District Court
22                            District of Columbia
                              333 Constitution Avenue, NW
23                            Washington, DC  20001
                              (202) 354-3127
24                            crystal_pilgrim@dcd.uscourts.gov

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1                         Table of Contents

 2                              Direct  Cross  Redirect  Recross

 3   On behalf of the Plaintiff:

 4       Coleman Breland

 5         By Mr. Carson                              1130

 6         By Mr. Orsini                      1071

 7       Richard Warren

 8         By Mr. Schwingler       1151

 9

10                      E-X-H-I-B-I-T-S

11                                     Marked  Received

12   On behalf of the Plaintiff:

13   Exhibit No. 414                               1115

14   Exhibit No. 411                               1122

15   Exhibit No. 532                               1132

16   Exhibit No. 534                               1142

17   Exhibit No. 535                               1149

18

19   On behalf of the Defendant:

20   Exhibit No. 927                       1109

21

22

23

24

25
```

1          P-R-O-C-E-E-D-I-N-G-S

2          THE DEPUTY CLERK:  Your Honor, recalling civil action

3     number 17-2511, The United States of America v. AT&T, Inc., et

4     at.

5          THE COURT:  Mr. Orsini, when you're ready you may

6     proceed.

7          You remain under oath.

8          (Witness resumes the stand.)

9          MR. ORSINI:  Thank you, Your Honor.

10              GOVERNMENT WITNESS COLEMAN BRELAND

11              CROSS EXAMINATION (Continued.)

12    BY MR. ORSINI:

13    Q.   Mr. Breland, before we broke for lunch we were talking

14    about virtual MVPDs.  Let's talk a little bit about the

15    negotiations that Turner had with YouTube Television.

16        What was your role in those negotiations?

17    A.   I was not there when the deal was recently signed.  But in

18    2016, I was the point person.

19    Q.   Can you just generally explain what you recall about those

20    negotiations with YouTube TV?

21    A.   Yes.  It was unusual in that YouTube had actually set

22    their retail price before they had done the wholesale deals

23    which I had never really ever seen that happen before.

24        Meaning that they said it's $35 a subscriber per month.

25    Then they backed into the model adding different networks and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  working towards that price.

2  Q.  Can you explain what you mean by that backing into the

3  price?

4  A.  Yes, they did a deal.  Originally in my conversations with

5  YouTube they said we believe probably we'll launch with two

6  broadcasters.  Then it, and by broadcasters they meant they,

7  one of the assumption they would be taking the cable networks

8  that would go with a Disney and you get the Disney Networks or

9  NBC, you would get those.  So they knew there would be more

10  than the broadcasters.

11      Over time they added the third broadcasters, then the

12  fourth broadcasters.  By the time they got back to us,

13  basically they had run out of what they believed were their

14  funds to buy programming, so we were not in the package.

15  Q.  When you said that if you bought Disney, you got the cable

16  networks.  Can you explain what you mean by that?

17  A.  Yeah, that means that the four broadcast networks also

18  have a bouquet of cable networks that go with them.

19      As often happens those networks are part of a deal when

20  you're doing a broadcast deal.  They can also be involved in

21  that especially with a new distributor.

22  Q.  Let's take ABC for example.  What are the cable networks

23  that are affiliated with ABC?

24  A.  Disney and the variations of Disney Networks, ESPN and the

25  their suite of networks as well.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.    What were the implications for your negotiations of the

2  fact that they had already signed up deals with the

3  broadcasters?

4  A.    We thought we would be early at the party.  We were

5  actually late to the party and they launched without us.

6  Q.    What do you recall about the rate discussions with

7  YouTube?

8  A.    They were wanting to be creative in the way that they

9  approached us.  They came to us with different models.

10     Again, the rates were our biggest issue because no matter

11 how they proposed another solution like we'll take some of your

12 networks, your more popular networks and we will put them on a

13 tier and at the base package, the one that everyone would buy

14 into would be networks maybe like NAT GEO and some, I'll call

15 them not as popular networks in the process.

16     But no matter what they proposed it never went very far

17 because we were so far apart economically.

18 Q.    When you say far apart economically, what do you mean by

19 that?

20 A.    The rates they proposed were some of the lowest that I'd

21 seen in the industry.  There's a lot, there's Kagan data that's

22 out there.  Kagan is an independent that to the best of their

23 abilities they will make an estimate of what they think the

24 rates are for all of the cable networks out in the market

25 place.

1    If you're a new distributor and you want to get a gauge for

2  what you think prices may be, Kagan might be a place you would

3  go to try to get a sense of how you would buy product and put

4  it in the package and what that would cost.

5    So I believe they were under the impressions that based on

6  Kagan data that our rates would be lower.

7  Q.   Why didn't Turner agree to the rates that they were asking

8  for?

9  A.   Because it would have a cascading effect with my MFNs.   If

10  I gave a new entrant YouTube or anyone else lower rates than

11  what I already had in the market because of the MFN conditions

12  that we have upon our rates as we have spoke of earlier, then

13  that would cost me money with every one of those distributors.

14  Meaning that I would have to lower my rate to every one above a

15  new entrant that has a most favoured nations clause.

16  Q.   When you say every one above, what do you mean by that?

17  A.   Size wise in terms of subscribers.

18  Q.   Do you have a general sense as to ballpark what that

19  impact would have been if you had gone with their rates?

20  A.   Hundreds of millions of dollars.

21  Q.   How, if at all, does that relate to the questions that

22  Mr. Carson was asking you earlier about whether the YouTube

23  model, the YouTube proposal would have irreparably harmed the

24  Turner model?

25  A.   Well, the model is harmed because they were trying to find

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   creative ways for example to say maybe we'll put some of your

2   networks in a less distributed tier, meaning it would get fewer

3   subscribers but maybe we would pay you on phantom subs.

4       That means you are not going to have the eyeballs for ad

5   sales.  So it just became a very contorted exchange and I

6   appreciate their efforts to be creative but it just didn't fit

7   into a model that we could make work financially.

8   Q.   What do you mean by phantom subs?

9   A.   I will carry your network, I'll take one of your networks

10  Turner and I'm going to put it in this package.  This package

11  may not, I'm using this as an example, I will guarantee you, I

12  will pay you on 85 percent of the subscribers that I have in my

13  base package even though 85 won't take the tier with your

14  network in it which means they would pay on subscribers that

15  aren't receiving the service.

16      Does that make sense?  I'm sorry, I know this is a little

17  complicated at times.

18  Q.   It does.  Why was that something that would be a problem

19  for Turner?

20  A.   First of all, I'm going to lose, we want every distributor

21  to be successful.  When they are successful, it means I'm not

22  going to be getting ad eyeballs on those networks.  So I'm

23  going to be losing ad revenue if do that model.

24  Q.   How did those negotiations wrap up, the YouTube

25  negotiations you were involved in?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  A.   I don't know.  It didn't come together when I was in

 2  charge of distribution.

 3       I know we recently signed a deal, but I don't have any

 4  details of it.

 5  Q.   You were shown a document by Mr. Carson, it's Plaintiff's

 6  Exhibit 195 which will still be in that binder in front of you.

 7       If you turn to page 26, 19526.

 8       This is something I believe you said was called Rubik; is

 9  that correct?

10  A.   Yes, that's how this is titled Rubik summary.

11  Q.   What was Rubik?

12  A.   Rubik was an attempt, as far as I know it was an attempt

13  by research to try to gain some degree of insight into consumer

14  behavior.

15  Q.   When you say research, what do you mean?

16  A.   The internal research department at Turner.

17  Q.   What, if anything, did you use, well -- strike that.

18       What was the general subject matter of what Rubik was

19  looking at?

20  A.   I think they were looking at how would subscribers react

21  in different packages and different platforms.  I don't really

22  recall, I didn't use the data to help me establish any

23  strategies going forward.

24  Q.   When you say different distributors, what type of

25  distributors do you mean?
```

1  A.    Virtual MVPDs.

2  Q.    Who had overall responsibility for the strategy for

3  affiliate negotiations for virtual MVPDs at that time?

4  A.    I did.

5  Q.    What, if anything, did you use Rubik for?  You said a

6  moment ago you didn't use it for strategy.  What, if anything,

7  did you use it for?

8  A.    I don't recall if there were one, two, five or ten

9  different Rubik studies.  There were a lot of presentations and

10  decks that flowed through Turner.  It was one of them, but I

11  don't recall a lot of details from it.

12  Q.    You can put that aside.

13       You can, actually if you can turn in that binder to

14  Plaintiff's Exhibit 78.  Sticking on the MVPD issue.

15       Do you have that, sir?

16  A.    I do.

17  Q.    This is a document that Mr. Carson showed you that relates

18  to the upfront.  Just again, what are up-fronts?

19  A.    Upfront is an annual event that networks do normally in

20  New York as far as I know.  They bring talent.  They put the

21  talent on stage.  They roll out their shows, they talk about

22  the hits.  It's a big presentation of here's what is coming

23  this year on network.  Every network does this.

24  Q.    What is the purpose of having an upfront?

25  A.    It's to get the advertising community talking about the

1   programming that is going to be on our network.  I believe most

2   of them meaning Turner will do one, Disney will do one, every

3   one will do one.

4       I believe they pretty much fall on a very tight time frame

5   in a week.  So it's a bit like going from circus to circus in

6   terms of rolling out the talent, talking about the program.

7   Q.   What is your role at the Turner upfront?

8   A.   Just watch.  It's an advertiser base.  I don't talk to

9   media, I don't talk to the clients.  I don't have distribution

10  clients there.  So I'm in the audience.  I'm there in a

11  supportive capacity.

12  Q.   There are a number of talking points attached that

13  Mr. Carson walked you through.  What, if anything, did you use

14  those for at the up-fronts?

15  A.   I didn't really talk to anybody at the upfront except my

16  colleagues.

17  Q.   Take a look at page 11, PX 78-011, please?

18  A.   I'm sorry, the number again?

19  Q.   Page 11?

20  A.   Page 11.  Okay, I'm there.

21  Q.   These are some of the bullet points that Mr. Carson

22  pointed you to.  If you look towards the top there are three

23  actual bullets and then a series of arrows.

24      Do you see that?

25  A.   I do.

1  Q.   The last arrow says that we feel we're well positioned

2  even if packages get smaller.

3      Do you see that?

4  A.   I do.

5  Q.   That's something that Mr. Carson pointed you to.

6      What do you generally understand that to mean in the

7  context of Turner's business?

8  A.   Well, Turner I believe I mentioned before we were very

9  judicious in the number of linear networks that we launched.  I

10  think we had two networks back in the early 2000, CNN Sports

11  Illustrated and CNN Financial News Network.

12      We actually shuted those networks on our own.  We sort of

13  thinned the heard.  This means we are well, we do believe

14  packages will get smaller over time.  As I have stated publicly

15  and maybe in this courtroom, there are probably too many linear

16  networks.

17      I think everybody has to look at their portfolio and say am

18  I well positioned.  Since the majority of my revenue comes from

19  four networks, I think that means I am well positioned in a

20  world where there will be smaller packages.

21  Q.   Give me an example, if you could, of a type of a family of

22  networks that is not as well positioned and if you could

23  explain why they are not as well positioned?

24  A.   I think any portfolio that is large, if you've got over

25  12, 13, 14, 15 networks, I think you've created a scenario

1    where you are trying to keep so many networks alive.

2        Again, we've shuttered two.  We are moving Boomerang

3    really, there's a linear network for Boomerang.  We are moving

4    this to a direct consumer product.  So we are already thinking

5    about what this looks like in a world where there will be fewer

6    linear networks.

7        That goes back to content experiences because to be

8    successful it won't just be the best content.  There's a show

9    on Netflix called Stranger Things, top rated show in 13 years.

10   But it's not just the show.  It's actually the fact that they

11   will give you the entire season all at once.  You don't have to

12   wait on a weekly basis.

13       In the case of Netflix there's no ads there.  So they give

14   a better experience.  I think if you are going to succeed and

15   prosper in the future you're going to have to look at your

16   portfolio and not think about brands per se as much as you

17   think about content and how consumers are going to want it

18   because the game has changed dramatically.

19       We're looking at it and saying that we don't have to, I

20   don't have to feed 20 networks for example.  I have got 10.  Of

21   those 10 four of them is the core of the revenue for Turner.

22   So the better I make those four, and that could end up costing

23   me one day with the other networks, I understand that.

24       So to make those four as flexible and as viable for the

25   fans themselves, if you are going to go through the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  distributors you want to work with all of the distributors and

2  you want to get that product to the fan to make it as good as

3  possible to compete in a world where technology has made it so

4  much easier for consumers.

5     I am one of those.  You get to set your own rules and that

6  is very exciting for consumers and you want to be where the

7  eyeballs are and you want to be on all of those platforms.

8  Q.   So you mentioned contact experiences, so is skinny bundles

9  something you're looking at as the president of content

10 experience?

11 A.   Yes.

12 Q.   What is Turner's view with respect to skinny bundles?

13 A.   That skinny bundles they're already here.  This is not a

14 concept.  They are actually here.

15    The industry talks about it like it's one thing.  Like it's

16 one boat.  A certain number of networks are going to go into.

17 Actually, my personal belief is that there will be a lot of

18 different skinny bundles depending on the makeup of the

19 household and what people want in terms of the experience.

20 They are looking and saying which of our networks would work

21 and what type of skinny bundle.

22    We are also looking at, we are trying to get a gauge, but I

23 don't have enough information to do this.  If I knew that for

24 example, you were a big fan of the animation content on Adult

25 Swim.  You were also a fan of a show called Practical Jokers on

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  TruTV.  You also liked a couple of shows on TBS.  I might be

2  able to put an offer together for you specifically.  I just

3  don't know who you are and if you exist at this stage.  But we

4  are thinking to that degree.

5  Q.  So I want to come back to the information point later.

6      You have been in the courtroom throughout the course of

7  this trial as Mr. Carson established and you were, weren't you,

8  sir, when Mr. Schlichting from Dish testified?

9  A.  I was.

10 Q.  You recall one of the topics he testified about was the

11 importance to Dish of being able to have a smaller number of

12 Turner Networks in their Sling package.

13     Do you recall that?

14 A.  Yes, I do.

15 Q.  As Turner's business is structured right now, what is the

16 minimum number of networks that a distributor can license?

17 A.  One.  Each network is available on a stand alone basis.

18 Q.  If a distributor like Dish for example were to decide to

19 only license a single network what, if any, impact would that

20 have on the rate they pay for that network?

21 A.  The rate card, I've got a separate rate card for each of

22 the individual networks.

23 Q.  Can you explain what that means in terms of how the rate

24 will differ based on the number of networks carried?

25 A.  Yes.  For example, I'd rather not name the network if

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  that's okay.  Let's say it's in the four cores, how's that?  I

2  want to be careful with confidential information.

3      There's one of the networks in there that has a penetration

4  scale on the rate card.  Meaning that if you only carry us from

5  0 to 29 percent of your subscriber base, your rate may be

6  higher and it needs to be higher because it means the other

7  side of the revenue stream ad sales won't be able to monetize

8  those eyeball.  That's one.  And then the rate goes down as you

9  give us better carriage.  The more eyeballs you give us, the

10  lower the rate.

11      There's another network that is in the top four that is

12  just one rate, it doesn't even have a penetration base rate

13  card.

14  Q.    Putting aside the penetration issue, just trying to

15  understand how if the distributor decides they want this single

16  network versus they want eight networks, the price they are

17  going to pay differs for the one network stand alone versus in

18  the bundle?

19  A.    No, it doesn't.  I don't have a penalty based rate card.

20  Q.    One of your networks is HLN, correct?

21  A.    That's correct.

22  Q.    What is HLN?

23  A.    HLN stands for Headline News that launched I believe in

24  1982.

25  Q.    Generally speaking if a distributor carries CNN, what is

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  the rate that it will pay for HLN?

2  A.   We waive the license fees for HLN if you carry CNN.

3  Q.   There's no fee for HLN?

4  A.   There's no fee.

5  Q.   And CNN International, if someone carries CNN, what's the

6  rate for that?

7  A.   We waive the license fee for that as well.

8  Q.   We talked a fair bit about MFNs and the Court has heard a

9  lot about those from you and others.

10      In your 20 plus years of negotiating with distributors, who

11 is it that is typically asking for MFN?  Is it you or is it the

12 distributors?

13 A.   It's the distributors.

14 Q.   We have heard about rate MFNs.  Generally speaking, what

15 is your view as to rate MFNs?

16 A.   I understand the concept that if I'm a buyer I want some

17 degree of equilibrium of how my rate may compare to someone

18 else in the market place but the problem with MFNs, well here

19 is an example.

20      So I had a small distributor who had an issue on how to pay

21 his own gratis accounts which gratis accounts would be schools,

22 government buildings, and they had gone above their limit.

23 That came up in an audit.

24      They called me and said this is a lot of money, can you fix

25 this.  I would have been thrilled to have fixed this for them

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  but I had a very large distributor who had a rate MFN that

2  would have captured this which would have cost me multiple,

3  multiple, multiple times of what that one issue is.

4      I actually brought it up with the large distributor and

5  said I know you want some degree of assurance but this is why

6  the MFNs restrict us from solving problems along the way inside

7  of our business.

8  Q.   What sort of none rate MFNs do you have generally

9  speaking?

10 A.   Literally any term and condition in a contract can have an

11 MFN attached to it.  It can be the number of ad avail a minute

12 which means the number of minutes per hour an affiliate gets to

13 sell on our network.  Description of service.  I mean, there's

14 just a multitude.

15 Q.   Are you familiar with content parity provisions?

16 A.   I am.

17 Q.   What are those?

18 A.   Content parity.  Distributors want to make sure that in

19 addition to the linear networks.  If you are going to offer

20 additional content and let's take this in a couple of quick

21 buckets.

22     The first is video on demand.  If you are going to make

23 your shows available to any other distributor on a video on

24 demand basis which means after it airs linear it goes over here

25 in the on demand category so if you are a subscriber to a MVPD

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   or a virtual MVPD if they have video on demand you will have

2   access to that.

3       They want to make sure that we wouldn't favor one

4   distributor over another with video on demand, with full season

5   stacking rights which is basically where we say to a

6   distributor I'm going to give you the entire season as it

7   builds.  There are 13 episodes.

8       Right after one episode airs you'll start stacking them

9   until you have the entire season of them.  They want to make

10  sure that we won't discriminate against them.

11  Q.   For example, Turner was to provide certain on demand

12  rights to DirecTV.  What would the implication be to your other

13  contracts and distributors?

14  A.   I have to provide it to other distributors and the ad

15  sales team would want other distributors to have this because

16  the only way you are going to modify video on demand is through

17  ad sales.  Distributors do not pay an incremental fee for video

18  on demand.

19  Q.   We have talked a little about data.  How did data come up

20  in the negotiations that you had on behalf of Turner with

21  distributors?

22  A.   For the most part with some of the ones that have been

23  named in earlier speaking with Mr. Carson, it would be in the

24  context of the negotiation.

25      And I appreciate creativity.  Any time you can expand a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  value exchange that's good.  This is an important point.

2      If, first of all, the data has to be a value to us.  So if

3  a distributor says this is the data I will sell you, I don't

4  know if that's the best they've got.  It's just what they've

5  offered to sell me.

6      Which is why I send the data experts to look at it and say

7  is this worth buying.  If they came back and said it's worth

8  buying, I have to be very prudent, honorable and respectful

9  here because if it's happening inside a negotiations, I have to

10  make sure that I'm buying this at fair market value.

11      That's because we honor our MFNs and we treat these as

12  sacred territory.  What I mean by that if someone is to say

13  hey, I know we were negotiating on the broader deal, I want you

14  to buy data and the price is thirty million dollars.

15      And I go okay, I'll take it.  Because I think they can use

16  that to factor it into the rate.  I can't buy it higher than

17  market value.  It's a very important point.  I have to treat

18  that as though it's a transaction that I would make any other

19  day of the year.

20      Otherwise, it could be interpreted that I'm buying down the

21  rate.  Which is why I would always rather for the most part

22  have a negotiation like that work through the networks or other

23  parts of the company because I don't want to blur the lines

24  between what someone is paying for the network.

25      I hope that makes sense.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   So let me unpack that a little bit.

2       What did you mean by buying down the rate?

3   A.   Buying down the rate in other words, the way the MFNs work

4   it talks about net effective rate which means I want to make,

5   if I'm a distributor, I want to make sure that you're not

6   paying a distributor because they have a cable system in Boston

7   and I don't have the ability to have a cable system in Boston

8   that I don't catch that right.

9       So you want to be honorable in your MFNs and make sure that

10  they're no loop holes.  There are ways that you can work around

11  that.  I want to make sure that if I were to ever buy data it

12  has to be a legitimate -- first of all, it has to be data that

13  is valuable to Turner.  The experts have to make that decision.

14      And then you have to make sure, I don't, I wouldn't mind

15  buying it but I would have to be one hundred percent sure that

16  the price is fair for that.  I can't have any question to the

17  fact that I'm buying it but I really don't want it but it helps

18  you with your economic model back to your management to say

19  hey, Turner wanted X in rates.  Because I sold them some data I

20  got it down.

21      I think that's another reason that we struggle, you know,

22  sometimes not only is it the right data or they are offering us

23  what's of value but what would be the price points.  One of the

24  reasons we to date haven't done a bigger deal except with a new

25  virtual MVPD that came in.

1  Q.   You mentioned the data experts that you would deploy.

2       Who were those data experts?

3  A.   They work at the technology end of the company.  They

4  understand a lot about these are privacy attorneys, these are

5  technicians who understand how you would collect data and put

6  it into your overall model of how you would evaluate

7  opportunity for ad sales and targeting.

8  Q.   Do you know an individual named Stepfano Camit Turner?

9  A.   I do.

10 Q.   What's his role?

11 A.   He recently got promoted into a, on a broader role.  We

12 all look at him as he's the data guru of Turner.

13 Q.   Mr. Carson mentioned the Comcast data during his

14 questioning.  Did you have a sense as to how much of Comcast

15 data they were actually willing to sell to you?

16 A.   When the teams went up because I wanted to treat it

17 respectfully.  The teams went up and came back and said it's

18 not valuable.  It's data that we can get elsewhere.  It's not

19 what we were hoping that we would get in this type of offer.

20      So it moved off the table.

21 Q.   Did you have a sense during those negotiations whether

22 there was additional Comcast data they might possess?

23 A.   My tech team thought they would be seeing more than they

24 got.

25 Q.   Mr. Carson asked you about Hulu.  Generally speaking do

1  you know how many subscribers Hulu has?

2  A.    Currently I do not.  I'm not in distribution.  I'm not on

3  that correspondence, so I don't know.

4  Q.    Do you have ballpark sense?

5  A.    I don't, I'm sorry.

6  Q.    Okay.

7      Are there any other ways, well you said you've not

8  traditionally been able to get data.  Were you, did you have

9  negotiations with DirecTV about data?

10  A.    Our big deal with DirecTV was in 2013.  And then in '16

11  the AT&T U-verse deal came up.  We also did the DirecTV Now

12  deal.  I don't remember any conversations about that at that

13  time.

14  Q.    Which other large MVPDs have you been able to acquire data

15  from?

16  A.    I have not acquired from any.

17  Q.    Are there any other ways in which data comes up other than

18  as something you are trying to negotiate to purchase in the

19  context of these affiliate negotiations?

20  A.    Not really.

21  Q.    In the course of these affiliate negotiations, the Court

22  has asked a couple of distributors questions about how they

23  come back to you, the programmer, and talk about the value or

24  lack thereof of viewer networks.

25      Generally speaking how do those conversations go in your

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  experience?

2  A.   Not always well.  They have access to set top box data so

3  they understand they can go much further than a Nielsen rating

4  which is a small sample of the entire country.

5      So they would have access to know how long someone watched

6  the networks.  My understanding from the experts is that they

7  could probably tell us total viewing time.  I think I heard

8  Orange 16 talk about that, that they look at viewing time of

9  the networks.

10     So they have got an awful lot of information there.  And

11 they can use it in the negotiation to say this is the value

12 that I equate to your network.

13 Q.   Is that something that has actually happened?

14 A.   Yes.

15 Q.   What is your general response when they run those sorts of

16 arguments at you?

17 A.   I don't have any data to talk back to that.  So that's

18 just data coming towards me.  It's not like I have got my

19 version of data as well.

20 Q.   In sticking on this topic of how you were talking about

21 the value of the networks.  You're familiar with the term must

22 have.  We have heard a fair bit about it, correct?

23 A.   Yes, like best cup of coffee.  Well, best cup of coffee,

24 yes.

25 Q.   What do you mean by that?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   I mean I think Greg Rigdon who I have negotiated with for

2   over a decade is probably the third one when he said last week

3   everybody says they have must have, I am paraphrasing,

4   something to that extent.  It just made me think about all of

5   the signs in restaurants and diners say well, best cup of

6   coffee.

7       So Greg and I actually agreed without any debate.  So it's

8   a magic moment for me at that juncture.

9   Q.   Is that a term that you use when you are negotiating with

10  distributors?

11  A.   It's a term that's been around forever.  I don't recall

12  the word must have coming from my lips.

13      We don't go into distributors.  We use to do this 20 years

14  ago.  You would go in with, we call it a brag book.  You would

15  talk about your animated shows and the creator.  We don't do

16  that any more.  Everyone knows about the product per se.  You

17  get straight down to business.

18      So the idea that, I agree with the definition of must have

19  means it's popular, means hopefully they recognize that your

20  brand is somehow connected to your programming.  But I don't in

21  a literal sense mean that I must have this content or I can't

22  be successful.  I don't believe that there's a single network

23  in the world that we live in that you have to have it to be

24  successful in video.

25      No offense to my competitors in the content business or my

1  own brands.  There are just too many other things you can do to

2  get news, entertainment, information and even certain sports.

3  Q.    You are the president of Turner Classic Movies?

4  A.    Yes.

5  Q.    You include that in what you just about what is or is not

6  must have?

7  A.    Yes, I do.

8  Q.    That hurt.

9  A.    But yes, I do.

10  Q.    Let's move on to blackouts and going dark.

11      As a general matter how many negotiations that you had over

12  the course of the couple decade came down to the last minute

13  when the deal was going to expire?

14  A.    I maybe signed one deal two or three days ahead in all of

15  those years.  They always come down to the last day and

16  sometimes the last handful of minutes.

17  Q.    Why is that?

18  A.    The industry took a turn around 2010.  This was, it was a

19  growth business.  So every year the industry was adding a

20  million plus subscribers which means every one like me could go

21  to budget meetings and there would always be some degree of

22  just organic growth that would happen with more people coming

23  into market.

24      Then new options started to come about.  People started to

25  say well, maybe I could go into that spot service and they

1 started to leave the industry.

2      There were probably other economic issues.  When people

3 would start families, when they would start jobs and the

4 dynamics totally changed.

5      When that happened it meant that there was pressure on just

6 the day to day revenue stream that came in and that I think

7 upped the intensity.  It's like there's not enough water at the

8 watering hole for all of the animals so everyone panics.

9 Q.   You were shown a couple of documents by Mr. Carson about

10 the preparations for going potentially, having the go dark

11 experience with the distributor?

12      Do you recall that?

13 A.   I do.

14 Q.   The drop analyses I believe he called them?

15 A.   Yes.

16 Q.   Why do you sort of prepare those?

17 A.   Because you are going to get questions from your

18 management.  This has now become much more common in the

19 industry that there could be situations where networks go off

20 the air.

21      You want to be prepared for every scenario.  By the way,

22 you never want to go dark if you are a programmer.  You bleed

23 instantly.  But you have to be prepared because they will want

24 to factor that into their thinking of how the year is

25 performing from a budget wise, and maybe a long range plan

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    wise.  It's just prudent math.

2    Q.    You said a moment ago in that answer that you never want

3    to go dark because you bleed instantly.

4        What did you mean by that?

5    A.    I mean that when the networks come off the air, license

6    fees stop coming into Turner, and we, our networks start under

7    delivering in terms of the number of eyeballs and impressions

8    that they promise the advertisers who bought spots on our

9    networks.  So that happens as soon as it goes off.

10   Q.    What are the implications of under delivering on the ad

11   agreements?

12   A.    It means that let's say you have bought ads time on the

13   Turner Networks.  And I said you going to get your ads in

14   front of X number of eyeballs.  Because I have now lost the

15   percentage of the market, it means I have to give you inventory

16   that I was going to sell to somebody else, to use that revenue.

17   Or I have to give up promotional inventory where I was going to

18   promote my own shows to try to increase the performance.

19   Q.    I want to do this in open court, so we won't use specific

20   numbers.

21       But just sizing it, if you were to go dark with one of your

22   big four distributors, Comcast, DirecTV, Dish, one of those,

23   and we won't say which one, ballpark how much revenue from the

24   lost subscriber fees and the advertising revenue would Turner

25   lose per month if it was dark?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.    Per month?  You are probably looking in the 75 million

2   dollar a month range, minimum.

3   Q.    Would Turner get that money back once it's networks went

4   back up?

5   A.    No.  In my outages with Cable One and Dish, I received no

6   compensation back for the lost revenue of ads sales or for

7   license fees.

8   Q.    We'll come to Dish and Cable One in a moment.

9       Does it make a difference to Turner in terms of its

10  financial exposure if it goes dark in the doldrums of summer

11  when nothing popular is on TV versus going dark during should

12  I say at March Madness?

13  A.    Let's break this down.  License fees you pay the same rate

14  throughout a calendar year.  So I'm going to lose the same

15  amount of --

16  Q.    That's the rate, I just want to make sure.

17  A.    That's the monthly rate you would pay me.  So I am making

18  it up.  You are going to pay me fifty cents for a network.

19      So if you go off the air, you take me dark and we go off in

20  June I lose the same amount of money as I do in November in

21  license fees.

22      Your question to be thorough was what about total revenue.

23  If I go off and I'm in a moment of reruns that will not hurt ad

24  sales as much as in your example if we go off in March Madness.

25      This is one of the quandaries, this concept that everyone

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  likes to talk about it going dark and how horrific this is.  If

2  we go dark in March Madness, it means not only do you lose your

3  license fees again standard for each month, but you are going

4  to lose higher volume of ad dollars because live sports bring a

5  premium for ad sales.

6      You probably also put your relationship in jeopardy with

7  NCAA or if it's NBA or MLB of the league.  So you have now

8  created, not you, the situation has created a tremendous amount

9  of angst and strain on the system of what happens.

10     So I understand, lining up your programming or your

11 explorations around popular programming is prudent in one

12 sense.  But it also chains you to the event itself.  Meaning if

13 it goes dark, you have to live with the carnage that goes as

14 well as the other side.

15     So I have always looked at it as we both must be focused.

16 Mutual destruction is bad for us both.  We don't want to go

17 dark.

18     So in some ways I think it keeps both sides very focused

19 when you have high profile programming, live sports, both sides

20 are I am hoping are more motivated because the outage will just

21 be bad for both sides' positions.

22 Q.  Can you pull up Plaintiff's Exhibit 144.  It's another

23 document that Mr. Carson showed you.

24 A.  I'm there.

25 Q.  Take a look at page 117.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.    I got it.

2   Q.    This is one of those go dark analyses, correct?

3   A.    Yes, it is.

4   Q.    And the last bullet point on the page references ad

5   revenue loss.  Takes into account timing of major sporting

6   events.

7         Do you see that?

8   A.    I do.

9   Q.    That's on page 117.  What does that mean?

10  A.    That means that as you try to factor and anticipate, it's

11  really what I was just saying.  You have to think about the

12  lost revenue.

13        You are going to lose more ad revenue inside of a March

14  Madness game than you would in a summer rerun.

15  Q.    You flip to the other page Mr. Carson showed you, 121.

16  A.    Got it.

17  Q.    Which distributor has the most drops?

18  A.    DISH Network.

19  Q.    Mr. Carson was asking you about some of the longer drops

20  on here.  How many of the drops on this page were actually

21  Turner Networks?

22  A.    On this page?  This was in 2014, so three on this page.

23  Q.    What three?

24  A.    Court TV with Cable One.  That was in 2007.  All of the

25  networks in September of 2013.  And then Court TV with Dish

1  Network in December of 2006.

2  Q.    Which was the longest of those drops?

3  A.    The longest of those drops was Court TV with Dish was five

4  weeks.

5  Q.    For DirecTV one of the numbers that I think you mentioned

6  was 718 day drop, it references the G4 network?

7  A.    I see that one, yes.

8  Q.    What's the G4 network?

9  A.    I believe it's a gaming network.  A game network.

10 Q.    One of the other long ones you mentioned was 849 days

11 which was Disney HD?

12     Do you see that?

13 A.    I do.

14 Q.    What is the significance of the fact that this says Disney

15 HD?

16 A.    I look at that and say it's not one of their core

17 networks.  I'm not that familiar with G4 and Disney HD.  It

18 just says select nets, but I don't know which ones are included

19 there.

20 Q.    You can put that aside.  Thank you.

21     Given what you've described about the impact on Turner in

22 going dark, what are the circumstances in which Turner as it

23 engages in negotiations considers the possibility that it might

24 have to say to a distributor we can't sign that deal even if it

25 means that you won't carry our networks?

1  A.    If it's detrimental to your long range plan, if it is

2  going to trip an MFN, are you going to put an MFN out there

3  that will hinder your ability to be innovative or run your

4  business.

5  Q.    Sir, can you give me an example of an MFN without naming

6  the distributor, an example of the type of MFN that might have

7  been proposed by someone that Turner was unwilling to agree to?

8  A.    Yes.  An MFN that would say I distributor want protection

9  against you as a distributor Turner.  Meaning that if you

10 decide to take your networks and go direct to consumer and

11 maybe you don't pay yourself, then I would get access to that

12 exact same content and I wouldn't have a license fee.

13 Q.    Is that a hypothetical example or --

14 A.    No, that's a real example.

15 Q.    You also might consider this in a circumstance where it

16 would trigger other MFNs, correct?

17 A.    That's correct.

18 Q.    Let's look at another document that Mr. Carson showed you

19 which is Plaintiff's Exhibit 146.

20 A.    Got it.

21 Q.    This is an email that you sent to Mr. Martin in December

22 of 2016, correct?

23 A.    That's correct.

24 Q.    This relates to Charter?

25 A.    That's correct.

1   Q.   So if you go down looks like there's an email that's being

2   forwarded in here from you to John.

3       And you say John document signed.

4       Then a line or two down it references Charter accepting

5   2017 rates rather than paying 2016 rates in 2017.

6       Is that correct?

7   A.   That's correct.

8   Q.   What are the implications of that issue in the Charter

9   negotiations?

10  A.   Well, if Charter could say look, I'm going to continue to

11  negotiate but I'm going to pay you 2016 rates into 2017.

12      There's a fundamental problem with that which means to

13  honor my other MFNs we will have to send out MFN letters and

14  say to other distributors for this month and going forward

15  there's a distributor who is paying a lower rate.

16      The distributor who receives the MFN letter would probably

17  say thank you very much, I'm glad to lower my rate.  Which is

18  why the turn of the calendar is very important in deals.  If

19  you don't secure the rates, you put your revenue stream times X

20  in jeopardy because you may inadvertently lower the rates for

21  everyone.

22      It's why we, you have to finally finish a deal.  Because

23  you can't have a distributor pay '16 rates in '17 without

24  having, in most instances and definitely in this one, without

25  having it impact massive amounts of revenue above it.

1  Q.   Mr. Carson asked you the question earlier whether Charter

2  had extended its agreement a number of times since 2016?

3  A.   Yes.

4  Q.   And the answer was yes?

5  A.   Yes, they have.

6  Q.   First of all, were you involved in discussions with

7  Charter back in late '16, early '17?

8  A.   No.  Late '16, early '17, yes I was.

9  Q.   What do you generally recall about discussions with

10 Charter over whether they would sign a long term agreement?

11 A.   Well, it was interesting because in one conversation there

12 was some musings and statements on their side, maybe we'll just

13 wait.  Yeah, we'll just wait until after the merger and we'll

14 negotiate with you then which is what it felt like.

15     We had already put a lot of things on the table to try to

16 motivate them to sign because you want to sign a deal and move

17 on because you'll never get through the stream of deals.

18     But they seemed comfortable waiting until the merger would

19 sign.

20 Q.   Without getting into the specific, how did the terms that

21 you had put on the table for Charter compare to terms that were

22 agreed to by their peers?

23 A.   Very good terms.

24 Q.   Do you know what the current status of the Charter

25 discussions is?

1   A.   I do not.  I think it's still extending.  But I do not

2   know.

3   Q.   Mr. Warren would know about that?

4   A.   Yes, he would.

5   Q.   You were also asked questions by Mr. Carson about Altesse

6   in some negotiations that almost resulted in a possible

7   blackout.

8        Do you recall that?

9   A.   I do.

10  Q.   So can you give the Court a little bit of context about

11  what was at issue in the those negotiations and why it was

12  something that came down to the wire?

13  A.   Yes.  I think you have to start with the fact that, how

14  Altesse, a foreign base company it started by a U.S. cable

15  company.

16  Q.   You said foreign base?

17  A.   Yes, foreign base, a European base company, Altesse.

18  Started by a U.S. Cable Systems.

19       When they did this there was a lot of pontificating in the

20  trade publications about how they were going to take a very

21  very aggressive stance.  They assembled a new team.  They had

22  cablevision.

23       But they assembled a new team of negotiations, experienced

24  but a new team to Altesse.  And the challenge, you didn't know

25  if their team was what degrees and authorities they had to

1  negotiate because you only knew what you were reading in the

2  press and we got some, some proposals from them.  Again,

3  there's no way that we could entertain because of what it would

4  do to our budget long range plan.

5  Q.    Did those rates have any implications for your MFNs?

6  A.    Yes, they did.

7  Q.    Do you have a general recollection of how significant the

8  impact would have been across your business?

9  A.    I don't remember the model but I just remember they were

10  ridiculously low.  We didn't even know how to counter, they

11  were so low.

12  Q.    How were those negotiations wrapped up?

13  A.    We got a deal done, a few bumps along the way, but we got

14  a deal done.

15  Q.    Moving on to the two backouts that we have heard the most

16  about.  There was a Cable One blackout in 2013, correct?

17  A.    Correct.

18  Q.    Mr. Carson asked you some questions about that earlier.

19      What's your general recollection as to how the negotiations

20  with Cable One proceeded and what was at issue that ultimately

21  led to the blackout?

22  A.    Well, the team believed on the final day that we were

23  $200,000 apart in economics.  We had a solution to close that.

24      So we had, had all reason to believe based on how the

25  negotiation had gone for multiple months that we would wrap it

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   up that day.  And I believe my word was sucker punched.

2      On the last day this wasn't small change.  This is a

3   fundamental change.  When someone starts a negotiation says

4   Turner, I want to carry a limited number of your networks, I'm

5   glad to have that conversation.

6      To start that conversation when the clock is almost out of

7   time because the clock is the most important element in these

8   negotiations.

9      So I look at it as we were having a very genuine

10  negotiation.  But on the day you're suppose to sign a deal,

11  they change to that degree.  I did not interpret as a we woke

12  up and changed our mind versus I played the clock.  I'm now

13  going to do this.  You won't have time to come in and convince

14  me and negotiate with me on why I should carry more than those.

15  I've got you.

16     I have never seen that in all of my negotiations and I have

17  been in some really tough rooms.  Charlie Ergen is a tough guy.

18  I have been in some really tough rooms.  I have never had

19  anyone do that.

20     And for us at that moment, as rough as these negotiations

21  get, you're still friendly with Gregory.  Despite the fact that

22  you suit up across the table from each other.

23     But in this instance never before have I seen someone take

24  the trust of a relationship and break it like that and say no

25  time left on the clock.  Although I do think we extended to

1  noon the next day.

2  Q.   You mentioned that you had a solution to close the

3  $200,000 gap.

4      What did you mean by that?

5  A.   We had found a way to have economic stream in their favor

6  to close the economic gap.  We thought that was the last thing

7  we had to do.  We didn't think we were going to start over with

8  no time left on the clock.

9      And sort of brand new negotiations.  That's why I felt like

10  it was gaming the system and playing us in the process.

11  Q.   How many networks did they want to continue to carry?

12  A.   They wanted to carry three.

13  Q.   What was the relevance of the NCTC to these conversations?

14  A.   The way I look at it, they ran the clock down on purpose.

15  And then wanted to go under the, they were members of NCTC.  A

16  cable operator can be a member of the buying group.  They

17  wanted to run under there.

18      I think they looked and said we can run the clock down, we

19  have got safe haven and we'll go under NCTC.

20  Q.   Were they entitled to carry those three networks under

21  their NCTC agreement?

22  A.   If they were in good standing, yes.

23  Q.   What does that mean, in good standing?

24  A.   If they pay the money due to Turner and make sure that

25  they honor their contract and honor going forward.

1  Q.   Were they in good standing when they tried to go under the

2  NCTC agreement?

3  A.   They had money in arrears.

4  Q.   Do you recall why?

5  A.   I don't, I don't know.

6  Q.   Do you recall them taking steps to try and get themselves

7  into what they viewed as good standing?

8  A.   Yes, they sent us a check.

9  Q.   What do you recall about that?

10  A.   I don't recall any, I don't remember the research.  If I

11  knew it was a right amount or whatever.  At this stage we

12  looked at it and said we are getting gamed.

13  Q.   Now how long did that blackout last?

14  A.   I believe 21 days.

15  Q.   How did it ultimately get resolved?

16  A.   We found a path to a deal and that deal continued I

17  believe until 2016 when that deal expired with Cable One.  I

18  believe they went under the NCTC deal the last time around.

19  Q.   You mentioned that at the time you went dark there was a

20  $200,000 gap.

21      How was that resolved in the final deal that brought the

22  networks back up?

23  A.   It cost me more to get back on.  You might think that the

24  deal would change.  Right.  I would make the deal worse to get

25  back on.

1    Honestly, you're desperate when you are off the air.  You

2  are bleeding money.  Your phone rings every day from those

3  above you wanting to know when this is going to stop because

4  you are losing money.

5    So it ended up so the $200,000 gap I think the number was

6  closer to a million dollars that went in favor of benefits and

7  rates with NCTC.

8  Q.   Do you have a general recollection as to how much revenue

9  that Turner lost during the course of that blackout?

10 A.   I believe between license fees, ad sales and there were

11 some degree of marketing, I think we did some social network

12 marketing, probably in the neighborhood of four and a half,

13 five million dollars.

14 Q.   Mr. Carson showed you page 263 of your deposition.

15 A.   Would you like me to go back there?

16 Q.   Sure.  I believe it's on page 262 and 263.

17    And just for the record, this has been marked as

18 Plaintiff's 530 for identification.

19 A.   Okay, I'm on 262.

20 Q.   He pointed you to some testimony that you had provided and

21 the questions that were asked about an exhibit to your

22 deposition.

23    Do you see that?

24 A.   I do.

25 Q.   And the issue that Mr. Carson was touching upon before was

1    some information Mr. Warren had forwarded to you about the

2    number of subscribers Cable One lost during the blackout.

3        Do you see that?

4    A.   I do.

5    Q.   Do you recall what the information Mr. Warren sent to you?

6    A.   No, it could have been a trade article that basically said

7    I think that Cable One had lost a certain number of subscribers

8    in the third quarter which would then make me ponder I wonder

9    what the third quarter would look like.

10         MR. ORSINI:  I would like to mark a document which

11   would be DX 927 for identification.

12       See if I can refresh the witness's recollection.

13       (Defendant's Exhibit Number DX 927 marked for

14   identification.)

15         MR. ORSINI:  Your Honor, may I approach?

16         THE COURT:  Yes.

17   BY MR. ORSINI:

18   Q.   Mr. Breland, I've marked as Defendant's 927 for

19   identification the document that was in fact Plaintiff's

20   Exhibit 18 to your deposition.

21       Does this refresh your recollection as to what the

22   information Mr. Warren provided, established in terms of Cable

23   One subscriber loss?

24   A.   It does.  It looks like it's an article or a part of an

25   article from FierceCable.

*** REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.    What do you recall that he was telling you in terms of

2  what they were reporting their subscriber loss was?

3  A.    He just forwarded this to me and the headline speaks for

4  itself, Cable One shed 15,000 video, 5,000 internet subs in Q

5  3, 2013.

6      My response back to my colleague was going to be

7  interesting to see the fourth quarter meaning I wonder what

8  will happen when their networks were down.

9  Q.    So 15,000 video subs, I believe you testified earlier

10 Cable One has how many subs?

11 A.    At this time I believe around 700,000.

12 Q.    What percentage of their subs would 15,000 be?  I'm sorry

13 to make you do math --

14 A.    I am glad you are going to make me do math.  I don't think

15 I can do the math like this.

16 Q.    It's about two percent?

17 A.    That looks right.

18 Q.    Okay, thank you?

19 A.    I'm looking to see if I see 700, I just remember 700,000.

20 Q.    Assuming 700,000 was right?

21 A.    Yes, two percent.

22 Q.    You can put that aside.

23     The other significant blackout that Turner has experienced

24 that we've all heard a lot about is the Dish blackout; is that

25 correct?

1  A.    That's correct.

2  Q.    How many times over the course of your career have you

3  negotiated with Mr. Ergen?

4  A.    Starting back in the mid '90s, every time a deal was up.

5  Q.    How would you compare negotiations with Mr. Ergen and Dish

6  to your negotiations with others?

7  A.    It's like entering a vortex of unpredictability really.

8  Q.    What do you mean by that?

9  A.    I mean Mr. Ergen is a lot like Ted Turner, right;

10  macuricle (sic) incredibly creative, genius level in terms of

11  someone who can see something and create it.  So I have a

12  tremendous amount of respect for Ted Turner and I have a

13  tremendous amount of respect for Charlie Ergen and to see what

14  he's built over all the years.  Doesn't mean he's an easy

15  person to negotiate with however.

16  Q.    So I don't want to touch upon parts of this story that

17  we've already heard.  We don't need to repeat that.

18      But I would like to just get your broad recollection of how

19  the negotiations were going during the summer and early fall of

20  2014 leading up to the actual decision by Dish to take your

21  networks down?

22      Can you just provide that for the Court, please?

23  A.    Sure.  A few important points.  We had a few fits and

24  starts.  There were three different heads of programming for

25  Dish.  I believe Dave Showel who I dealt with before was

1   leaving.  A gentlemen named Steve Swain came in and took the

2   job for about two months.  And then Warren I believe got there

3   August, September of 2014.

4   Q.   Warren Schlichting?

5   A.   Yes, Warren Schlichting.  A bit of changes in horses.

6   Took them a while for us to get a red line, you know, changes

7   back to the draft.  We sent them a draft and they had been

8   working on it for a while.

9        Look, it's always slow slogging through the mud in these

10  kind of negotiations.  But there were some interesting points

11  to me and these came directly from Charlie.  I remember we --

12            MR. CARSON:  Objection, Your Honor, hearsay.

13            THE COURT:  You can approach.

14            (Sealed Bench Conference.)

15            THE COURT:  What is he going to say?

16            MR. ORSINI:  He's going to talk about the give and

17  take of the negotiations.  It's being offered for content.

18  It's not for the truth of any of the statements that are given

19  to inform the decisions that were made by Mr. Breland.  And his

20  state of mind in making those decisions during negotiations.

21            MR. CARSON:  Can I add to my objection on cumulative

22  Your Honor?  I think we've heard from Mr. Martin and

23  Mr. Schlichting on the Turner negotiations ad nauseam.

24            THE COURT:  Is this like two minutes?

25            MR. ORSINI:  It's going to be a couple of minutes,

1    Your Honor.  It's going to be quick.

2              THE COURT:  Overruled.

3              (Open Court.)

4              THE COURT:  You may proceed consistent with the

5    discussion at the bench.

6    BY MR. ORSINI:

7    Q.   Again high level, we can keep it fairly brief.  Your

8    recollection of the give and take of the negotiations and the

9    events leading up to the blackout?

10   A.   We thought we were in pretty good shape.  Something

11   changed.  The mood had changed of the negotiation suddenly.  It

12   was instant.  You could feel -- I got a call from Warren on

13   Friday evening.  He said I know our deal is up the first of

14   next week. We've got to get the deal done.  There was a concern

15   in his voice that I'd never heard.  I knew then from all of my

16   dealings with Dish that something was wrong.  I just didn't

17   know what it was, but the tenor had changed.

18        There's no way to get this deal done in three days.  It's

19   too much paper, laws of physics you couldn't do it, but

20   something had happened.  Something had changed.  I remember

21   calling John Martin and saying I don't know what's happened,

22   but this has taken a really bad turn.

23   Q.   Did you ever get a sense as to what had happened?

24   A.   No, I heard Mr. Martin speak last week about HBO Now had

25   launched a week before and Mr. Ergen had reached out to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Mr. Bewkes.  He had some I believe some concerns about that.

2  That was the only event that I know that could affect us.

3  There was nothing between my negotiating team and the Dish

4  negotiating team other than just the normal exchange of

5  negotiating.

6  Q.   Now Mr. Schlichting testified about this issue of the

7  contract for the networks that went dark.  Getting closer to

8  the expiration of the TBS and TNT contract.  Do you recall

9  that?

10 A.   I do.

11 Q.   What do you recall about how, if at all, that was relevant

12 to your negotiation strategy?

13 A.   It wasn't relevant at all.  The terms you had TNT and TBS

14 expiring in December.  I believe there was about six months

15 originally between the two.

16     As heads of programming changed and extensions continued,

17 neither side it never occurred to us that they're getting

18 closer together per se.  Because again, a lot of what you're

19 negotiating terms and conditions and contracts for the other

20 networks beyond TNT and TBS would be the same.

21     So we didn't factor this and think oh this is strategic,

22 we're going to get them altogether.  That never entered my

23 thinking whatsoever.

24 Q.   During the time when the networks were actually dark on

25 Dish, how much revenue generally did Turner lose in terms of

1  subscriber fees and advertising revenue?

2  A.   North of 30 million dollars.

3  Q.   I'd like to hand up if I could, Your Honor, documents

4  marked as Plaintiff's Exhibit 414.

5      May I approach, Your Honor?

6          THE COURT:  Yes.

7  Q    (By Mr. Orsini) Mr. Breland what is Plaintiff's Exhibit

8  414?

9  A.   This is the extension agreement to get the networks back

10 on the air which takes us through March 31st, 2015.

11 Q.   About a four month extension?

12 A.   That's correct.

13 Q.   And you'll see that on the third page which is 414-3, this

14 is signed by Mr. Schlichting and Mr. Warren correct?

15 A.   That is correct.

16         MR. ORSINI:  Your Honor, we offer this agreement into

17 evidence under seal?

18         MR. CARSON:  No objection.

19         THE COURT:  Be admitted under seal.

20     (Plaintiff's Exhibit No. 414 received in evidence under

21 seal.)

22 BY MR. ORSINI:

23 Q.   Mr. Breland, I'd like to walk through a couple of the

24 provisions.  I want to be careful because we have

25 confidentiality issues, so I think we do it in open court with

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   the document.

2       If you take a look at paragraph 2 of this agreement.  Do

3   you see that?

4   A.   I do.

5   Q.   Can you generally describe what paragraph 2 contains?

6   A.   This improved the Dish MFN.

7   Q.   Why did you improve the Dish MFN.

8   A.   It's one of the things I needed to do to get back on.

9   Q.   If we look at paragraph four, there's a reference to

10  affiliates over-the-top service, do you see that?

11  A.   I do.

12  Q.   Is that Sling?

13  A.   That is.

14  Q.   There's a reference to Exhibit 2.  If you could turn to

15  414010, you'll see Exhibit 2?

16  A.   Yes, I do.

17  Q.   These were the terms for them to carry your networks on

18  Sling?

19  A.   That's correct.

20  Q.   Paragraph 2 carriage, talks about a requirement that they

21  have a certain number of unaffiliated networks on their system,

22  on their service before they launch with Turner.  Do you see

23  that?

24  A.   I do.

25  Q.   What's the purpose of this provision?

1   A.   The purpose of this provision is basically we wanted to be

2   surrounded by strong product, popular product if we're going to

3   be launched, we didn't want to be the only ones in.  You don't

4   want to be the only ones in or only maybe one of two in because

5   you want to be successful and offering to consumers that failed

6   would be a poor reflection.  We took it as a degree of

7   seriousness.  If you're serious then just have seven of the top

8   35 non-Turner networks.

9   Q.   Let's go back to the first page of 414.  Paragraph 5, what

10  generally is paragraph 5 providing?

11  A.   It's basically a clean slate for any money due to Turner

12  from Dish from audits.

13  Q.   What do you mean by audits?

14  A.   There's a third party audit process that goes through that

15  every one goes through with programmers and distributors where

16  an auditor will go to the distributor, get binders like this

17  full of data.  They'll look at how many subscribers Dish had

18  each month, what they're suppose to pay us, the conditions of

19  the contract and then report what they owe us.  And in some of

20  the past audits there were monies due to Turner.

21  Q.   Do you recall roughly how much money was released by

22  Turner under this paragraph for these audits of Dish?

23  A.   Under these audits of Dish probably a 120 million dollars.

24  Q.   Those were monies that were owed to Turner by Dish?

25  A.   That's correct.

1  Q.    Then the next paragraph, paragraph six?

2  A.    Yes.

3  Q.    Can you explain generally what that means?

4  A.    Yes, just give me one second.

5     These are monies that were due from Turner to Dish and it

6  says we will release these dollars to Dish.

7  Q.    What do you mean by release these dollars to Dish?

8  A.    These were MFN, these are dollars that they're MFN

9  captured.  So it was money that we owed them and we paid that

10 money.

11 Q.    So you can put this aside sir.  So all in with the loss

12 revenue plus the audit and not accounting for any impact the

13 improved MFN had, how much did it actually cost Turner to go

14 dark with Dish and then get back up to the four months?

15 A.    You're talking a 120 on the audit, those are monies that

16 we believe were due to us.

17    You've got north of 30, let's do easy math and call it 30

18 that's a 150 million dollars that it cost me to get back on in

19 loss revenue.  Then we also released these additional dollars,

20 the MFN money to Dish.

21 Q.    Why did Turner give up all of that money to get back on

22 for four months?

23 A.    I'm bleeding, I'm losing a tremendous amount of money.  I

24 have to get back on.

25 Q.    Mr. Schlichting testified that Dish was the one who made

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   significant gives in this document to end the blackout.  What's

2   your recollection or you can look at the document as to what

3   actual gives Dish made?

4   A.   I don't see gives for Dish here.

5   Q.   Once this contract was signed you then went into another

6   around of negotiations with the expiration in March of 2015?

7   A.   That's correct.

8   Q.   Just at a high level again, keep it short because we've

9   heard some of this already, but I want to get your perspective

10  on it. What was the nature of those negotiations and the open

11  issues?

12  A.   One of the big issues at the end that almost tripped us up

13  again was data as a matter of fact.  Dish had presented to us

14  that one of the great benefits of Sling was that they would

15  provide us with viable consumer usage data which of course our

16  networks were very excited about.  It's great insight.

17  Remember you've got Netflix using artificial intelligence to

18  track behaviors and we're sort of making fire with sticks so we

19  were very excited about that.

20     But at the last minute late ate night they informed us that

21  we're still going to give you the data, but you can't put it

22  with any other data and use it and have your ad sales group use

23  that to sell.

24  Q.   What did that mean from Turner's perspective?

25  A.   It's like having a bicycle and you can ride it inside.  It

1  means I can't use the data to monetize.  So I can get it, but

2  if I can't put it with third party data then it means the ad

3  sales I've given them a hollow shell. There's nothing they can

4  really use to monetize.

5  Q.   How was that issue resolved?

6  A.   It was very testy.  To the point that I remember getting

7  on the phone with Mr. Martin and Bewkes talking us through

8  because this was a very serious issue and it was part of what

9  we thought we were getting in the negotiations.  We acquiesced

10 because we needed to get a deal done.

11 Q.   Your Honor, I'd like to hand out another exhibit.

12      MR. ORSINI:  May I approach, Your Honor?

13      THE COURT:  Yes.

14 BY MR. ORSINI:

15 Q.   Mr. Breland, I've handed you a document that's been marked

16 as Plaintiff's Exhibit 411.  It's a one page e-mail from Rich

17 Warren to you and David Levy, copying Donna Northington on

18 March 25th, 2015.  And on the back page there is a -- there's a

19 series of graphs, a line graph and a chart, do you see that?

20 A.   I see it.

21      MR. CARSON:  May I approach, Your Honor?

22      THE COURT:  Yes.

23      (Sealed Bench Conference.)

24      MR. CARSON:  So when the defendants identified

25 Mr. Breland as a witness they identified that they had -- they

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1   anticipated no exhibits, working with him in his direct

2   testimony.  This is the second exhibit that's come up.  I don't

3   know how many more we have, but --

4          THE COURT:  You should be about done.

5          MR. ORSINI:  I'm very close, Your Honor.  I actually

6   believe this is my final document.  There might be one more,

7   but this is, you know, as the trial has proceeded and reacting

8   to what they did on cross-examination.  And it's a document I

9   know it's on their list, so there's no prejudice here, and Mr.

10  Breland actually received the e-mail.

11         MR. CARSON:  And that's fine, they've just got a

12  stack of additional documents.  I'm not sure how many, but I

13  just don't want to head down this road where we're again

14  fighting over new documents that we had no notice would be used

15  during Mr. Breland's examination.

16         MR. ORSINI:  I know they deposed him on this

17  document, Your Honor.  I have maybe one more after this, but I

18  don't even know that I have one more after this.

19         THE COURT:  We're going to take the break after this.

20         MR. ORSINI:  Okay, thank you, Your Honor.

21         (Open court.)

22         THE COURT:  You may proceed consistent with the

23  discussion at the bench.

24         MR. ORSINI:  Thank you, Your Honor.

25  BY MR. ORSINI:
```

1  Q.   Mr. Breland, Mr. Warren worked for you at this time,

2  correct?

3  A.   That's correct.

4  Q.   And who is Ms. Northington?

5  A.   Donna Northington heads up financial and strategic

6  planning for distribution.

7  Q.   Okay.  And there's a reference, just to establish the last

8  piece of foundation here without getting into the substance.

9  There's a reference in the first line of this e-mail to some

10 payment backup data from DISH.  Do you see that?

11 A.   I do.

12 Q.   What is payment backup data?

13 A.   We receive subscriber data from all of our affiliates that

14 basically says this is how many subs I had in this month, and

15 this is the change on a month to month basis so they know how

16 many subs to pay us on.

17 Q.   And Ms. Northington has access to that data?

18 A.   Yes, she does.

19        MR. ORSINI:  Your Honor, I offer Plaintiff's 411

20 under seal.

21        MR. CARSON:  No objection, Your Honor.

22        THE COURT:  Accepted.

23        MR. ORSINI:  Thank you, Your Honor.

24    (Plaintiff's Exhibit No. 411 was received under seal.)

25 BY MR. ORSINI:

1   Q.   Mr. Breland, we've got to be a little careful here with

2   confidentiality, but Mr. Warren says in the first line that

3   he's attaching a graph slash chart which illustrates the

4   massive sub loss of some number during the month of January.

5   And he says, "I believe that this demonstrates the result of

6   going dark with the Turner networks.  We generated a downward

7   spiral in terms of sub loss, and as a consequence going dark

8   with Fox had an even more pronounced impact on the DISH sub

9   base.  Do you see that?

10   A.   I do.

11   Q.   Now, if you look at the graph, can you explain to us where

12   that number -- can't say it out loud because it's DISH

13   confidential information.  But where that number that

14   Mr. Warren refers to in his cover e=mail appears on the back of

15   this document?

16   A.   There's a box at the bottom of the page, this would make a

17   reference to a subscriber change in the month of January 2014.

18   Q.   So you're looking at the chart --

19   A.   I'm sorry, 2015.

20   Q.   You're looking at the chart at the bottom of the page?

21   A.   Yes, I am.

22   Q.   And so there are three different sets of rows labeled

23   "total subs for '14, '13 and '12."  Do you see that?

24   A.   That's correct.

25   Q.   What does that reflect?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.    It's just a -- it's a comparison chart to say how many

2   subscribers in '12, '13 and '14 for each of the calendar

3   months.

4   Q.    Okay.  And then let's stick with '14, we see numbers with

5   12s on them in the first row.  What are those numbers?

6   A.    That would be a million, that's the total number of

7   subscribers, that's the number of total DISH subscribers as

8   they report to us.

9   Q.    Okay.  And then the numbers below that, some of which are

10  in parentheses and some of which aren't?

11  A.    That's correct, if they're in parentheses it designates a

12  loss; if not, it's a gain to subscribers.

13  Q.    A loss, so, for example, in February, without showing the

14  number, it shows a loss, a loss as compared to what?

15  A.    A loss as compared to the month prior.

16  Q.    Okay.  And the loss of?

17  A.    Subscribers.

18  Q.    And the number that Mr. Warren refers to, I believe you

19  said is all the way to the right at the top in January?

20  A.    That's correct, it's on the line for '14, but it's January

21  2015.

22  Q.    Okay.  And which networks were dark with DISH the

23  preceding month?

24  A.    All of the Turner networks except for TNT and TBS.

25  Q.    I'm sorry, the month preceding January of 2015?

1  A.    Oh, in December, the networks that were dark.  We were

2  dark from December 21st through -- I'm sorry, October 21st to

3  November 22nd.

4  Q.    Right, and so which network group?

5  A.    I'm sorry, they were dark with Fox, I'm following up here.

6  Q.    Okay.  So looking at this chart, again, without using the

7  numbers, but we can do it in relative figures.  For the month

8  when DISH was actually dark with Turner in November of 2014,

9  what percentage of their subscribers does this report that they

10 lost?

11 A.    You're saying when the Turner networks were off the air?

12 Q.    Correct.

13 A.    Which includes the month of November, basically, in 2014.

14 Q.    Correct.

15 A.    If my math is right, that is probably less than one tenth

16 of one percent in the month of November when the Turner

17 networks that were dark were off the air.

18 Q.    And how does that sub loss figure compare to the preceding

19 Novembers just in relative terms?

20 A.    It's right there in the same neighborhood.

21 Q.    And was Turner dark in those preceding Novembers?

22 A.    We were not.

23 Q.    Okay.  So going back to the e-mail that Mr. Warren sent.

24 In the description he has of massive sub loss and downward

25 spiral.  What's your interpretation of Mr. Warren's e-mail.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        MR. CARSON:  Objection, Your honor.

2        THE COURT:  Overruled.  You can limit your answer to

3   your impression of what it meant.

4        THE WITNESS:  My impression of the e-mail, these are

5   very intense negotiations.  To me the most important part of

6   this e-mail is what Mr. Warren puts in parens because he talks

7   about we have leverage, we have leverage.  And it's like a --

8   it's a bit of a battle cry when you're in the zone of

9   negotiating.

10       But to me, what is so revealing is when he says, "But it

11  helps," and in parentheses, "at least it helps me to remember

12  that we do not need to be deleveraged by Ergen."

13       So we went off the air.  And we don't know why we went off

14  the air.  We're 21 days, are we going to go off the air again?

15  We're in the dimension of unpredictability that comes with

16  DISH.  And so I read it as it's -- I've got to keep myself --

17  we've got to stay pumped up.  We've got to believe we can

18  prevail though this again even though we're not quite sure

19  what's going to happen.

20       The numbers on the back don't match that.  The use of

21  words, I think I even said in one of my depositions that I

22  didn't necessarily agree with my colleague on the use of the

23  word "massive."  But this is what you do to get yourself pumped

24  up, but the numbers don't watch the words.

25       MR. ORSINI:  Okay, thank you, Mr. Breland.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1       Your Honor, I'm done with this document.

2           THE COURT:  All right.  We're going to take the

3   afternoon recess.  We'll be going until five o'clock today.

4       You're a witness under oath, remain independent of all

5   others.  Do not discuss your testimony so far with anybody or

6   what it might be when you return.

7       Stand in recess for fifteen minutes.

8       (Recess at 3:52 p.m.)

9       (Proceedings resumed at 4:15 p.m.)

10          THE COURT:  All right, you remain under oath, sir.

11      You may continue.

12          MR. ORSINI:  Thank you, Your Honor.

13      (Breece Coleman Breland resumed the witness stand.)

14                  CROSS-EXAMINATION (Cont'd)

15  BY MR. ORSINI:

16  Q.  Mr. Breland, one last topic, and perhaps even one last

17  question, sir, to follow up.

18      You've been here for the last two weeks during this trial,

19  and you've heard the government theory that as a result of this

20  merger, if the Court permits the merger to go through, Turner

21  will have enhanced bargaining leverage and will be able to

22  extract higher affiliate fees as a result of using a blackout

23  tool given their shared ownership with AT&T, DirecTV.  Do you

24  generally understand that theory?

25  A.  I do.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.    And what's your view based on your decades of experience

2   as the lead Turner negotiator as to whether or not that theory

3   actually holds any water?

4          MR. CARSON:  Objection, Your Honor, calls for

5   speculation.

6          THE COURT:  Overruled, he can answer.

7          THE WITNESS:  The concept that Turner would push

8   although going dark is good for us, I believe I've given

9   examples today of why it's just the opposite.  I lose money the

10  minute I go dark.  It can be catastrophic to my business, and I

11  also get a share of the blame in the eyes of the subscribers

12  who bought the service.

13         The idea that a lot of people will leave, I think is not

14  accurate whatsoever.

15         I've got two real market examples, DISH Network, and I

16  believe I said one tenth of one percent when they were dark,

17  albeit without TNT and TBS.  But when we were dark with Cable

18  One, I believe their word about the outage was something along

19  the lines of insignificant.

20         So then the issue of could we control?  Maybe we want to

21  go dark because we can control where subscribers go.  And I

22  don't believe we have any chance of controlling.  It's like

23  taking a vase breaking it with a thousand marbles and they

24  scatter on the floor.  I don't have their e-mails, I don't know

25  their names, their phone numbers, their addresses.  How would I

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   motivate them to go anywhere?

2       Oh, and by the way, yet another outage probably means some

3   of those people may just say I've had it with the MVPD world.

4   It's just too disruptive, I'll leave.

5       And finally, the last point about how would we behave as a

6   vertically integrated company.  I've been in Turner when we

7   were a vertically integrated company and had a sister company

8   called Time Warner Cable.  And I can tell you at no time during

9   my tenure there did anyone ask me to consider in my

10  negotiations and how I dealt with other distributors the

11  outcome and impact at Time Warner Cable, I was never asked to

12  consider that nor would I consider that.  And, in fact, we

13  would run extensive marketing campaigns with satellite

14  distributors pushing subscribers and potential subscribers into

15  the likes of Best Buy, Montgomery Ward, Circuit City, HH Gregg

16  to say buy a satellite dish.

17      So I just -- you will do what's best for your business.

18  When you're in distribution it's all about the scale and reach.

19  You have to be on all the platforms.  Otherwise you don't have

20  to a chance of being successful in this business, you have to

21  be on every platform.  And you favor none over the others;

22  that's all.

23  Q.  You mentioned the satellites, was DISH one of the Time

24  Warner cable competitors you negotiated with?

25  A.  Yes.

1   Q.   When the company was vertically integrated?

2   A.   That's correct.

3   Q.   And was Mr. Schlichting at DISH at that time?

4   A.   He was not, I believe he came in August or September of

5   '14.

6           MR. ORSINI:  Thank you.  No further questions, Your

7   Honor.

8           THE COURT:  All right, redirect.

9                      REDIRECT-EXAMINATION

10  BY MR. CARSON:

11  Q.   Mr. Breland, let's start at the end with DISH.  Can you

12  turn to Exhibit 411 in your binder?

13  A.   (Witness complies.)

14  Q.   And this is the same exhibit, right, correct?

15  A.   Yes.

16  Q.   Okay.  With the e-mail from Mr. Warren to yourself where

17  you highlighted the language with Mr. Orsini about what this

18  means as we have massive power here and Mr. Warren was telling

19  you?

20  A.   Correct.

21  Q.   And above, two lines above it says, "We generated a

22  downward spiral in terms of sub loss," do you see that?

23  A.   I do.

24  Q.   And then he wrote later, "I recognize that in terms of

25  highlighting the leverage we have here I'm telling you

1   something you already know."  Do you see that?

2   A.   I do.

3   Q.   And you responded to Mr. Warren's e-mail, correct?

4   A.   I did, although I don't see it on 411.

5           MR. CARSON:  May I approach, Your Honor?

6           THE COURT:  You may.

7   BY MR. CARSON:

8   Q.   I'll give you what's marked as PX 532 for the record.

9           THE COURT:  532?

10          MR. CARSON:  532.

11      May I proceed, Your Honor?

12          THE COURT:  Mine says 22.  532.  All right, go ahead.

13  BY MR. CARSON:

14  Q.   And this was your e-mail response to Mr. Warren.  First he

15  forwarded -- his e-mail was to you and Mr. Levy, the president

16  of Turner, do you see that?

17  A.   I do.

18  Q.   And Mr. Levy responded, "Here we go, good info."  Do you

19  see that?

20  A.   I do.

21  Q.   And Mr. Warren reminded you and Mr. Levy, "Let's not

22  forget they still had TBS and TNT on the air," do you see that?

23  A.   I do.

24  Q.   And your response to Mr. Warren was, "Good to get that

25  message circulating.  Need the brass to have belief in our

1    leverage," do you see that?

2    A.   I do.

3    Q.   And when -- your reference to the brass there were the

4    people above you like Mr. Levy, correct?

5    A.   Correct.

6         MR. CARSON:  Your Honor, we move to admit PX 532 into

7    evidence?

8         MR. ORSINI:  No objection under seal, Your Honor, the

9    numbers here DISH is claiming confidentiality over.

10        THE COURT:  All right, be admitted under seal.

11       (Plaintiff's Exhibit No. 532 was received in evidence under

12   seal.)

13   BY MR. CARSON:

14   Q.   Let's go to Cable One.  Do you have the e-mail, your

15   Plaintiff's Exhibit 18 from your deposition in front of you?

16   A.   The FierceCable blurb, correct?

17   Q.   Correct, the one where Mr. Warren forwarded you the

18   article that said, "Subscriber losses will likely increase in

19   Q4 considering the quarter began on the first day of the

20   blackout."

21        THE COURT:  What's the number of this?

22        MR. CARSON:  This is -- well, we'll call this PX 533,

23   Your Honor.

24        THE COURT:  Oh, this is something we don't have up

25   here?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. CARSON:  No, you do.  Mr. Orsini provided it to

2  you, it's the one that says 18 on the bottom.

3          THE COURT:  Well, let's not get confused about this.

4  How many notations do we need?

5          MR. CARSON:  It was the Deposition Exhibit 18, we can

6  mark it with another orange sticker that says PX 533 if that

7  would help the record.

8          MR. ORSINI:  Your Honor, if I may, I marked it for

9  identification, identification only to refresh the witnesses.

10          THE COURT:  Yes, it wasn't admitted.

11          MR. ORSINI:  That's correct, it was marked for

12  identification as Defendant's 927.

13          MR. CARSON:  927?

14          THE COURT:  This is the one that says's Plaintiff's

15  Exhibit 18?

16          MR. CARSON:  Yes.  So DX 927, Your Honor.

17          THE COURT:  DX 927.  All right.

18          MR. CARSON:  And for the record, then, we move to

19  admit DX 927 into evidence, Your Honor.

20          THE COURT:  Any objection?

21          MR. ORSINI:  We do have an objection, Your Honor, as

22  to this coming in as substantive evidence.

23          THE COURT:  Okay, you can approach.

24          (Sealed Bench Conference.)

25          MR. ORSINI:  It's hearsay, Your Honor.  It's hearsay,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    I was using it simply to refresh because he was questioning

2    about -- he was questioned about this document in his

3    deposition.

4           THE COURT:  So this is a --

5           MR. ORSINI:  It's an e-mail from Mr. Warren to Mr.

6    Breland where he copies and pastes a press release from Cable

7    One, so that that's the hearsay, the Cable One statements.

8           MR. CARSON:  It's not hearsay to the extent that the

9    article says, "Subscriber losses will likely increase in the

10   fourth quarter."  And he's responding to say, "It's going to be

11   interesting to see the fourth quarter."  So for context, what

12   he's referring to are the subscriber losses that will likely

13   increase.  It's a news article about their earnings release

14   because the Washington Post owned Cable One at the time and

15   were reporting publicly what the subscriber losses for their

16   MVPD were.

17          THE COURT:  I'm not going to let this in.  You can

18   ask him what he meant when he said going to for the fourth

19   quarter.  You can show it to him to look at, but I mean I'm not

20   going to let it in.

21          MR. CARSON:  Okay, thank you, Your Honor.

22          (Open court.)

23          THE COURT:  You may proceed consistent with the

24   discussions at the bench.

25   BY MR. CARSON:

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q.    Quick question, Mr. Breland, on DX 0927.  Your comment,

2    "Going to be interesting to see fourth quarter," do you see

3    that?

4    A.    I do.

5    Q.    And that was a reference to the reported subscriber losses

6    that Cable One had as a result of the blackout with Turner,

7    correct?

8    A.    Correct.  If this was a third quarter, I was just

9    pondering what would a fourth quarter bring.

10   Q.    And your reference to the fourth quarter was tied to the

11   reference in the information that Mr. Warren sent you

12   highlighting that the subscriber losses might increase will

13   likely increase in the fourth quarter, true?

14   A.    I don't know what would happen.  I'm simply saying it

15   would be interesting to see subscriber loss or no loss.

16   Q.    Thank you, put that aside.

17   A.    (Witness complies.)

18   Q.    Now, with Cable One, you said it came down to the last day

19   just like every other negotiation since 2010, do you remember

20   that?

21   A.    I do.

22   Q.    Now, you could have extended Cable One's contract for, say

23   a month, true?

24   A.    True.

25   Q.    And you have extended contracts that are set to expire all

1  the time, right?

2  A.    True.

3  Q.    But instead, you -- well, you didn't extend with Cable

4  One, right?

5  A.    We did, we extended until October 1st.

6  Q.    So you gave them another twelve hours, right?

7  A.    I'm sure we would have taken as much time as we could

8  possibly get.  The rates don't change until January.  I would

9  welcome more time.

10  Q.    But you didn't give an extension to January, you took them

11  dark the next day, true?

12  A.    They took our networks dark.

13  Q.    And the three networks that were still up, you took them

14  dark after your twelve hour extension, fair?

15  A.    That's correct, if they wanted another extension, I would

16  have given them another extension.

17  Q.    Can you turn to PX 146.

18  A.    (Witness complies.)

19  Q.    And this was the e-mail about the charter extension to

20  April 2017, right?

21  A.    That's correct.

22  Q.    And you see at the bottom you're writing to Mr. Martin,

23  you believe his relationship with Mr. Rutledge and personal

24  assurance on how we run our business factored into the

25  confessions he offered, do you see that?

1  A.    I do.

2  Q.    And so Charter made concessions to Turner in order to

3  extend the carriage agreement, correct?

4  A.    I wouldn't consider based on some of the requests they

5  made to be anything that we would consider so I wouldn't call

6  it necessarily a concession if it was something I wouldn't

7  consider, but they did agree to take our rates into 2017.

8  Q.    And that was your word, the concessions that Charter

9  offered, right?

10  A.    Yes, and I wanted to amend my statement to say they took

11  the rates.

12  Q.    And not only that, but in the second bullet under the

13  increased rates that Charter paid in order to avoid going dark,

14  Charter -- you wrote, "Charter surrendered under demand to

15  capture all more favorable terms and conditions," do you see

16  that?

17  A.    I do.

18  Q.    So Charter wanted an MFN on terms and conditions?

19  A.    Every term and condition in the contract.

20  Q.    And they surrendered on that demand, true?

21  A.    That is the word I used.

22  Q.    Okay.  Put that the aside.

23  A.    (Witness complies.)

24  Q.    Now, you talked about the explosion of content since 2010

25  and the change in the industry dynamics with your counsel,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  true?

2  A.    True.

3  Q.    And you indicated that the change in the industry dynamics

4  has upped the intensity on you in negotiations, true?

5  A.    True.

6  Q.    Can you take a look at PX 123 and go to page 9.

7  A.    (Witness complies.)

8  Q.    And this is that executive summary slide we looked at

9  before with the bar charts of the increasing revenues over time

10  for Turner?

11  A.    Yes, I recall.

12  Q.    And there's a row under the bar charts that says, "TCD

13  rate increase percentage," do you see that?

14  A.    I do.

15  Q.    And the first two years indicated there 2016 and 2017, do

16  you so those?

17  A.    I do.

18  Q.    So in the context of the explosion of content you were

19  able to secure these double digit rate increases for Turner's

20  content, correct?

21  A.    That's correct.

22  Q.    You can put that aside.

23  A.    (Witness complies.)

24  Q.    You talked about YouTube.  And you recall testifying that

25  YouTube signed up for Turner content and launched Turner this

1    year, right?

2    A.    That's correct.

3    Q.    You're aware that YouTube raised its prices in connection

4    with the acquisition of Turner content?

5    A.    Yes, I believe I read that in the trade.

6    Q.    And Mr. Orsini asked you about Turner wanting to be on

7    every distribution platform, do you remember that?

8    A.    I do.

9    Q.    And you said that Turner wants every distributor to be

10   successful, do you remember that?

11   A.    That carries our content, yes, I do.

12   Q.    Do you know whether AT&T wants every distributor to be

13   successful?

14   A.    I can't protest to know any of AT&T's business.

15   Q.    You said Turner was looking at skinny bundles and wanted

16   to be kind of the anchor tenant of any new skinny bundle, do

17   you remember that?

18   A.    I remember the research saying anchor tenant, yes.

19   Q.    Do you know whether AT&T wants to support skinny bundles

20   in the future?

21   A.    I've had no conversations with AT&T on their plans going

22   forward.

23   Q.    You testified that distributors can license just one

24   Turner network, do you remember that?

25   A.    That's correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   There are no major MVPDs that license just one Turner

2   network, correct?

3   A.   That's correct.

4   Q.   If you can flip to PX 144.  And go back to page 121.

5   A.   144, 121?

6   Q.   Yes, and this is the slide from the long range plan that

7   shows the past network drops, do you see that?

8   A.   I do.

9   Q.   And if I heard you right, you said the longest Turner

10  blackout was five weeks with DISH, right?

11  A.   On Court TV, that is correct.

12  Q.   But that wasn't correct, was it?  If you go down to Cable

13  One with Court TV, it says ten months, do you see that?

14  A.   I do.

15  Q.   So the Court TV drop of -- with Cable One of ten months,

16  that was, in fact, the longest drop that Turner experienced,

17  true?

18  A.   That was.  I was making reference to the last five years,

19  but you were correct on this chart, I misread that, ten months.

20  Q.   Thank you, you can put that aside.

21  A.   (Witness complies.)

22  Q.   You testified that Turner tries to negotiate all of its

23  networks at the same time because it's more efficient?

24  A.   Correct.

25  Q.   But it's not just efficient, it gives Turner increased

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  leverage in bargaining to have all of its networks coterminous

2  with each other, correct?

3  A.   I would say the more I have on the table, it improves,

4  yes.

5  Q.   Was that -- did that provide you any leverage with -- was

6  that a goal of yours in the DISH negotiations that you

7  discussed?

8  A.   No.

9  Q.   Do you know whether Turner became coterminous all of its

10 networks as a result of the DISH negotiations?

11 A.   We did.

12 Q.   Will it help in the future with DISH to have Turner being

13 coterminous with DISH?

14 A.   It might, or perhaps Charlie Ergen sees something I don't

15 and the leverage swings to him because all my networks are up

16 at once.

17 Q.   Was making all of Turner networks coterminous one of the

18 most controversial issues in the Comcast renewal in 2015?

19 A.   I don't believe so.  It was a pretty even keeled

20 negotiation.

21         MR. CARSON:  May I approach, Your Honor?

22         THE COURT:  You may.

23    (Pause.)

24         MR. CARSON:  Your Honor, we've marked for

25 identification PX 534.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   BY MR. CARSON:

 2   Q.   Mr. Breland, to yourself, if you could read the first line

 3   of the second paragraph of PX 534 and let me know when you're

 4   done.

 5   A.   I'm done.

 6   Q.   And let me ask you again, was making all Turner networks

 7   coterminous one of the most controversial issues in the Comcast

 8   renewal in late 2015?

 9   A.   I see, yes, but two years ago I used the word.

10   Q.   And was getting the Turner networks coterminous a

11   tremendous advantage to Turner?

12   A.   I see that written here, yes.

13          MR. CARSON:  Your Honor, we move to admit PX 534?

14          MR. ORSINI:  No objection, Your Honor.

15          THE COURT:  Admitted.

16     (Plaintiff's Exhibit PX 534 was received in evidence.)

17   BY MR. CARSON:

18   Q.   You can put that aside.

19   A.   (Witness complies.)

20   BY MR. CARSON:

21   Q.   Mr. Breland, you testified about a catch-up period that

22   Turner went through in recent years with respect to rate

23   increases?

24   A.   That's correct.

25   Q.   And that catch-up period meant that Turner was able to
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   secure double digit rate increases for its networks, true?

2   A.   That's correct, we thought we were behind with CNN,

3   Cartoon Network and truTV.

4   Q.   And some of those price increases were in the upper double

5   digits that we saw in an earlier exhibit, true?

6   A.   I believe there was truTV when that was in the upper

7   double digits.

8   Q.   And there was TBS and TNT that were kind of in the half

9   the mid-double digits, do you remember those?

10   A.   I do.

11   Q.   And that truTV rate increase with Time Warner cable, that

12   was not when Time Warner cable had already been spun off from

13   Time Warner at the time, right?

14   A.   I believe so.

15   Q.   And so that was an arm's length transaction with Time

16   Warner cable as a separate company, true?

17   A.   That's correct.

18   Q.   And Turner was able to secure those rate increases from

19   Time Warner cable and others because it had the bargaining

20   leverage to impose those price increases, true?

21   A.   I'm hoping we also brought value in our product and

22   benefits such as video on demand and other pieces to the table,

23   yes.

24   Q.   You mentioned you wouldn't want to go dark during the NCAA

25   tournament because you wouldn't want to anger the NCAA, do you

1  remember that?

2  A.    That would possibly be one of the outcomes, that's

3  correct.

4  Q.    As part of your DISH negotiations, Turner went to the NCAA

5  to get approval for the language that Turner would use in any

6  kind of blackout marketing during any potential blackout with

7  DISH, true?

8  A.    I believe that's true.  I did not do that personally nor

9  my team, that would have probably come to the sports division.

10  Q.    I think I asked you in your deposition whether Turner

11  reached out to the NCA [sic], and you heard back from, I think

12  Ms. Mirgorod on the NCA's approval of the scroll language at

13  the bottom of the screen for the potential DISH blackout, do

14  you remember that?

15  A.    I believe that's correct, yes.

16  Q.    So your team was involved in making sure that the NCAA was

17  aware that DISH, that Turner might go dark with DISH during the

18  NCA tournament, true?

19  A.    No, I don't believe Ms. Mirgorod had those conversations,

20  she was probably conveying the message from Turner sports.

21  Q.    But your team was aware of the conversations with the NCA

22  over the approval of any blackout related marketing, true?

23  A.    Yes.

24  Q.    And you refer to the ability of Turner to go dark during

25  the NCA tournament as Turner's NCAA leverage, true?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   A.    That's true.

 2   Q.    And you use that term because setting a contract to expire

 3   during the middle of March would give Turner leverage because a

 4   distributor would not want to go dark in the middle of the

 5   tournament, right?

 6   A.    That is one possibility or the leverage could swing the

 7   other way and the affiliate wants to go dark and cause me

 8   problems with others.  I'm just saying that the door swings two

 9   ways.  So I have to be cognizant of that if I'm going to put

10   more popular programming in harm's way.

11   Q.    And your use of the -- well, you use the term NCAA

12   leverage, true?

13   A.    True.

14   Q.    And for the next fifteen years Turner will have NCAA

15   leverage, true?

16   A.    If it's leveraged during that fifteen years, yes.

17   Q.    You talked about -- you testified about Sony, do you

18   remember that?

19   A.    I do.

20   Q.    You testified that Sony paid a slight differential in

21   rates when it entered as a new virtual MVPD, do you remember

22   that?

23   A.    I do.

24   Q.    But the premium that Sony paid wasn't slight, was it?

25   A.    I don't remember the exact percentage.  I do know,
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  according to certain MVPDs who have shared that they have seen,

2  based on what they thought they were going to get, a hundred to

3  two hundred percent increases based on rates from others.

4  Q.   So your testimony is that Sony thought that it would get a

5  hundred to two hundred percent premium above?

6  A.   No, I'm saying that I look at it as a slight compared to

7  what I had heard others had been asking Sony and other new

8  entrants to pay over time.  Same thing with Telco, same thing

9  with DDS.

10          MR. CARSON:  May I approach, Your Honor?

11          THE COURT:  Okay.

12          MR. CARSON:  Your Honor, I've handed up what's been

13  marked as PX 535.

14      May I proceed, Your Honor?

15          THE COURT:  What do you want to do?

16          MR. CARSON:  So I'd like to refresh his recollection.

17  He's indicated he did not remember.

18          THE COURT:  Read it to himself.

19          MR. CARSON:  Okay.

20  BY MR. CARSON:

21  Q.   So, Mr. Breland, if you can look at your e-mail from March

22  13th, 2015 to Mr. Washington of the last -- read the last

23  paragraph to yourself, starting with, "From A."  And let me

24  know when you're done?

25  A.   I'm done.  I'm done.

1  Q.   The rate premiums that Sony paid in 2015 as a new entrant

2  were not slight, were they?

3  A.   I don't know what the market would necessarily bear.  I do

4  notice that it came down ten percent the following year.

5  Q.   The rate listed there in that paragraph, that's the -- for

6  2015, that's the premium that Sony paid for that -- the year

7  that it entered, true?

8  A.   That is correct.  That is with no subscribers.

9  Q.   And then the -- the premium that was paid -- Sony paid in

10 2016 is listed in the -- right after 2015, right?

11 A.   Correct, and it came down ten percent from the 15 number.

12 My point being that you start and you earn great benefits as

13 you go, and time moves in the contract.

14         MR. CARSON:  Your Honor, we move to admit PX 535?

15         THE COURT:  Admit?

16         MR. CARSON:  Yes.

17         MR. ORSINI:  No objection, Your Honor.

18         THE COURT:  You can approach.

19         (Sealed Bench Conference.)

20 ██████ ████  █ ████ █████ ████ ████ ████ ████ ████

21 █████████████ ████ ████ ████ ████ ████ ████

22    ████ ████ ████ ████ █ █ ████ ████ ████

23    ████ ████ ████ ████ ████████

24    ████ ████ █ ████ ████ ████ ████ ████ ████

25 ████ ████ ████ ████ ████ ████ ████ ████ ████ █

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



19        (Open court.)

20        MR. CARSON:  May I proceed, Your Honor?

21        THE COURT:  Go ahead.

22        MR. CARSON:  And for the record, is PX 535 admitted?

23        THE COURT:  It's admitted.

24      (Plaintiff's Exhibit No. PX 535 was received in evidence.)

25  BY MR. CARSON:

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Mr. Breland, every new virtual MVPD could pay the premium

2  that Sony was paying in 2015, true?

3  A.   They could have, I'm not sure where they all ended up.

4  Q.   Well, these are the rate premiums that Sony paid, true?

5  A.   That's correct.

6  Q.   And you wouldn't characterize those as slight, would you?

7  A.   When you're starting with no subs, it's not a big impact

8  to -- to the overall expense.  In other words, this isn't a --

9  I won't say the number, but the percentages and across a

10 million subscribers, for example, or two hundred million or two

11 million, three million.

12     So yes, I understand that it's a percentage differential

13 and this told me the market would bear the price and Sony was

14 prepared to pay.

15 Q.   And you were able to impose that rate premium on Sony,

16 correct?

17 A.   Yes, but again, I think it's important to point out that

18 we didn't do this and say I'll see you when your deal's up, we

19 already built in a benefit in the second year the drop in ten

20 percent from this number.

21          MR. CARSON:  Okay.  That's all I have.  Thank you,

22 Your Honor.  Thank you for your time, sir.

23          THE WITNESS:  Thank you.

24          MR. ORSINI:  No questions, Your Honor.

25          THE COURT:  You're excused, you may step down.

1     (Witness excused.)

2          THE COURT:  Call your next witness.

3          MR. SCHWINGLER:  Peter Schwingler for United States,

4  Your Honor.

5          THE COURT:  Who?

6          MR. SCHWINGLER:  Peter Schwingler.  We're calling

7  Richard Warren as an adverse party witness.

8          THE DEPUTY CLERK:  Would you raise your hand?

9          RICHARD WARREN, GOVERNMENT WITNESS, SWORN

10         MR. SCHWINGLER:  May I proceed, Your Honor?

11         THE COURT:  Yes.

12                    DIRECT EXAMINATION

13  BY MR. SCHWINGLER:

14  Q.   Good afternoon, Mr. Warren.  Would you please state your

15  name for the record?

16  A.   Richard Warren.

17  Q.   Mr. Warren, you're the current president of Turner Content

18  Distribution; is that correct?

19  A.   I am.

20  Q.   You took over from Mr. Breland in June of last year?

21  A.   That's correct.

22  Q.   And before that, you were executive vice-president of

23  content distribution strategy, correct?

24  A.   That's correct.

25  Q.   And when you were in that role you were also an attorney

1  in Turner's general counsel's office, correct?

2  A.   I was in our legal and business affairs department, yes.

3  Q.   And as executive VP of content distribution and strategy,

4  you were involved in affiliate renewal negotiations for the

5  Turner networks?

6  A.   Correct.

7  Q.   And today you run the division of Turner that handles

8  those negotiations?

9  A.   Yes, I manage the team that handles the negotiations, yes.

10        MR. SCHWINGLER:  Your Honor, we have some binders

11  that may help the witness.  May I hand them up?

12        THE COURT:  Yes.

13  BY MR. SCHWINGLER:

14  Q.   Mr. Warren, I direct your attention -- well, let me pause

15  for a moment.  The Court has heard some testimony about

16  Turner's negotiation with DISH in 2015.  I'd like to discuss

17  one document that you wrote in connection with that.  And I'll

18  direct your attention to PX 411 in your binder.

19        MR. SCHWINGLER:  And, Your Honor, this was admitted

20  during Mr. Breland's testimony this afternoon.  And this is

21  under seal.

22  BY MR. SCHWINGLER:

23  Q.   Are you there, sir?

24  A.   I am.

25  Q.   Mr. Warren, this is an e-mail from you to David Levy and

1  Mr. Breland on March 10 of 2015, correct?

2  A.   Yes, sir.

3  Q.   And you copied Donna Northington, correct?

4  A.   I did.

5  Q.   Ms. Northington is one of your direct reports, right?

6  A.   At the time she was not, but she currently is, yes.

7  Q.   And attached to the e-mail in this exhibit is a graph that

8  Ms. Northington prepared at your request; is that right?

9  A.   If you would give me one moment.

10     Yes, as I recall, she did.

11 Q.   And this was at your request, correct?

12 A.   I had requested that she furnish some subtrend data, and

13 she put it into a chart form, yes.

14 Q.   I'd like to discuss the context of this exhibit.  So at

15 this point in March 2015, Turner was negotiating with DISH for

16 all of the Turner networks, correct?

17 A.   Yeah, we had gone off the air and came back, we resumed

18 being back on the air, and we were negotiating -- we were back

19 up for a short period of time, and we were negotiating again

20 for a long term deal.

21 Q.   And my question, sir, is simply at this time you were

22 negotiating with DISH for all of the Turner networks, correct?

23 A.   Correct.

24 Q.   And as you mentioned, the previous fall some of the Turner

25 networks had gone dark with DISH for about a month, correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   That's correct.

2   Q.   And after Turner's partial blackout with DISH ended, DISH

3   then had another blackout, this time with Fox, correct?

4   A.   Yes.

5   Q.   And so now fast-forward to March 2015, your team had

6   informed you that DISH had a significant subscriber loss a few

7   months earlier, correct?

8   A.   My team had indicated today me that, as I said here, DISH

9   lost a certain number of subscribers, yes.

10  Q.   And you asked Ms. Northington to prepare a graph to map

11  the fallout, correct?

12  A.   That's my recollection, yes.

13  Q.   You wanted a graph so you could see subscriber trends and

14  draw conclusions about the reasons for those trends; is that

15  right?

16  A.   I wanted to see trends both historical and current so that

17  we could be thinking about what might have caused those trends,

18  yes.

19  Q.   And my question, sir, was you wanted the graph so you

20  could draw conclusions about the reasons for those trends?

21  A.   I don't know if I would say conclusions, but certainly

22  hypothesize and think about what may have caused those trends,

23  yes.

24  Q.   It may help to take a look at your deposition transcript.

25        MR. SCHWINGLER:  Your Honor, may I hand up binders

1    with the transcripts?

2              THE COURT:  Hand him his.

3              THE WITNESS:  Thank you.

4              MR. SCHWINGLER:  And, Your Honor, Mr. Warren's

5    transcripts have been marked for identification as PX 527,

6    that's the individual transcript, and PX 528 for the 30(b)(6).

7    BY MR. SCHWINGLER:

8    Q.   And, Mr. Warren, I'll direct your attention to your

9    individual deposition transcript PX 527 and page 97, 4 through

10   21.  And I asked you the following question.

11   A.   I'm sorry, can you just give me one second to get there?

12   Q.   Absolutely.  Page 97, lines 4 through 21.

13   A.   Okay, I'm now with you.

14             Q.   "Question:  What do you mean by trending data?

15             "Answer:  So what I meant there was month by

16             month payment backup.  And when I was asking Donna

17             earlier is this accurate, I wanted to know really what

18             it was based on.  And I don't get into the weeds on

19             payment backup, but I wanted some assurance that what

20             I would be looking at was as reasonably accurate as we

21             could have at the time.

22             "So what I wanted to do, and I think I said it in

23             here, perhaps a graph or something that illustrates it

24             so that we could look at month over month and see

25             subtrends and draw some conclusions as best we could

1           about the reason for those trends."

2     And I asked you that question and you gave that answer at

3 your deposition, correct?

4 A.   I did, and later on, sir, I did say so we could interpret

5 the data as best as we could based on that information.  But

6 yes, we were drawing some, either conclusions or

7 interpretations based on that data.

8 Q.   If you could set your deposition aside and return to PX

9 411.  PX 411, your e-mail conveys your conclusions to your

10 superiors, correct?

11 A.   Yes, my e-mail gives my superiors my sort of view in

12 posturing on what was occurring at the time.

13 Q.   Sir, my question is, PX 411 conveys your conclusions to

14 your superiors?

15 A.   Again, it's my -- PX 411, that e-mail conveys my

16 interpretation, and what I was trying to position to them

17 internally, yes.

18 Q.   Why don't we take a look at what you wrote in the e-mail.

19 In the first sentence you informed your superiors that DISH had

20 a massive subscriber loss a few months earlier, correct?

21 A.   I was, yes, referencing the Fox blackout, yes, sir.

22 Q.   The word you used was "massive," correct?

23 A.   I did.

24 Q.   You then wrote, "I believe that this demonstrates that as

25 a result of going dark with the Turner networks, we generated a

1   downward spiral in terms of sub loss and as a consequence going

2   dark with Fox had and even more pronounced impact on the DISH

3   sub base."  Do you so he that?

4   A.   I do.

5   Q.   And by going dark with the Turner networks, you were

6   referring to the partial blackout the previous fall, correct?

7   A.   I was referring to the period of time that we were off the

8   air with DISH for several of our networks, yes.

9   Q.   And turning to the next sentence, first you wrote, "What

10  this means is that we have massive power here."  Do you see

11  that?

12  A.   I do.

13  Q.   And when you use the phrase, "we have massive power here,"

14  you were referring to negotiations with DISH, correct?

15  A.   Well, I was referring to the atmosphere as to what was

16  going on, and that my team and particularly my superiors should

17  be thinking about what was in DISH's mind at the time, having

18  gone off the air with Fox as well.  And as I said further in

19  here, I knew that we didn't want to be de-leveraged.  And I was

20  worried that people internally, particularly my bosses, would

21  not understand what was going on on the ground level and would

22  be making decisions that I thought would be problematic for our

23  business, in large measure because they were things we hadn't

24  done and also from an MFN perspective that it would travel to

25  other deals.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   Respectfully, sir, you will have your opportunity on cross

2   to explain more.

3      My question is simply this e-mail was about your

4   negotiations with DISH, correct?

5   A.   Yes, sir.

6   Q.   And you went on to explain, "Among other things, they are

7   already hurting.  The impact of going dark with the Turner

8   networks yet again will be particularly problematic for them."

9   Do you see that?

10  A.   That's what I wrote, yes.

11  Q.   DISH was already hurting because of the previous

12  blackouts, right?

13  A.   I was referencing the Fox blackout that, yes, I was

14  referencing Fox.

15  Q.   You were also referencing the prior blackout with the

16  Turner networks, that's very clear from the face of your

17  e-mail, correct?

18  A.   I was referencing it along with data that indicated the

19  sub loss for both blackouts, yes.

20  Q.   You ended the sentence by stating, "Removing our networks

21  from the Sling TV product will be terrible for DISH's

22  business," do you see THAT?

23  A.   Yes, again positioning for my bosses, but yes.

24  Q.   So my question is, did you write, "Removing our networks

25  from the Sling TV product will be terrible for DISH's

1  business"?

2  A.   I did.

3  Q.   And losing Turner would have been terrible for DISH and

4  for Sling because Sling was relatively new in the market at

5  that time, correct?

6  A.   Again, I was positioning for my bosses but that was

7  certainly something that I thought we should have been

8  contemplating whether DISH would want to go and take us dark

9  again, yes.

10  Q.   Sir, my question is the reason losing Turner from the

11  Sling TV product would have been terrible for DISH's business

12  was because Sling was relatively new in the market at that

13  time?

14  A.   I was trying to understand from a Sling/DISH position

15  whether another customer disruption would be something they

16  would be thinking about yes.

17  Q.   And this was because they were relatively new at the time,

18  correct?

19  A.   They were relatively new nascent in the marketplace, yes?

20  Q.   And at that time --

21          THE COURT:  All right, we're going to take the

22  evening recess.

23      You're a witness under oath in the case.

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  So that means you're not allowed to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    discuss your testimony so far or what it might be when you

2    return tomorrow morning at 10:30 with anyone, including your

3    attorney.

4            THE WITNESS:  Yes, Your Honor.

5            THE COURT:  Anyone, you have to be able to say you

6    didn't discuss it with anyone.

7            THE WITNESS:  Yes Your Honor.

8            THE COURT:  All right.

9            THE WITNESS:  Thank you.

10           THE COURT:  You're excused.  You can step down.

11           THE WITNESS:  Thank you, sir.

12       (Witness excused.)

13           THE COURT:  All right.  How much more have you got?

14           MR. SCHWINGLER:  Probably 25 minutes.

15           THE COURT:  All right.  And how long is the cross?

16           MR. ORSINI:  Thirty to 40 minutes max, Your Honor.

17           THE COURT:  All right.  And then we're going with

18   Mr. Bewley, is that the next witness?

19           MR. CONRATH:  Mr. Bewley is the next witness, Your

20   Honor.

21           THE COURT:  All right.

22           MR. CONRATH:  There will be confidentiality issues

23   with the next two witnesses.  I have affidavits.  If the Court

24   would like them now, I'd be glad to pass them up.

25           THE COURT:  All right.  You can leave those with my

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1   deputy clerk.

2           MR. CONRATH:  I will.

3           THE COURT:  Now, that should take the rest of --

4   pretty much the rest of the day, although Mr. Torres might be

5   able to fit in at the end, I think.  Possibly.

6           MR. CONRATH:  I think it's Mr. Bewley,

7   Mr. Montemango, Mr. Torres, and so we may get to Mr. Torres.

8           MR. PETROCELLI:  Well, he's available, Your Honor.

9           THE COURT:  He's available?

10          MR. PETROCELLI:  Yeah, he's one of our people.  We're

11  obviously going to have to have a discussion with you tomorrow

12  about this confidentiality issue.

13          THE COURT:  All right.  We can deal with that.

14          MR. PETROCELLI:  Okay.

15          THE COURT:  10:30 to 5:30 tomorrow.

16          MR. PETROCELLI:  Right.

17          THE COURT:  Any other issues?

18          MR. PETROCELLI:  No, thank you.

19          MR. CONRATH:  Thank you.

20          (Proceedings concluded at 5:06 p.m.)

21                          -oOo-

22

23

24

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1                          CERTIFICATE

2          I certify that the foregoing is a true and correct

3   transcript, to the best of my ability, of the above pages, of

4   the stenographic notes provided to me by the United States

5   District Court, of the proceedings taken on the date and time

6   previously stated in the above matter.

7          I further certify that I am neither counsel for, related

8   to, nor employed by any of the parties to the action in which

9   this hearing was taken, and further that I am not financially

10  nor otherwise interested in the outcome of the action.

11

12  _____        _____

    /s/Crystal M. Pilgrim, RPR, FCRR        Date:  April 3, 2018
13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     )
                                )
          Plaintiff,      )     CV No. 17-2511
                                )
                                )     Washington, D.C.
      vs.               )     April 3, 2018
                                )     10:47 a.m.
AT&T, INC., ET AL.,         )
                                )     Morning Session
          Defendants.     )
_____)     Day 7

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:        Craig W. Conrath
                          Eric D. Welsh
                          Donald G. Kempf, Jr.
                          Peter J. Schwingler
                          Andrew C. Finch
                          U.S. DEPARTMENT OF JUSTICE
                          Antitrust Division
                          450 Fifth Street, NW
                          Washington, D.C. 20530
                          (202) 532-4560
                          craig.conrath@usdoj.gov
                          eric.welsh@usdoj.gov
                          donald.kempf@usdoj.gov
                          peter.schwingler@usdoj.gov
                          andrew.finch@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

Katrina M. Robson
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 220-5052
krobson@omm.com

Daniel M. Petrocelli
M. Randall Oppenheimer
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067
(310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Michael L. Raiff
Robert C. Walters,
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
(214) 698-3350
mraiff@gibsondunn.com
rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:

Kevin J. Orsini
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1140
korsini@cravath.com
pbarbur@cravath.com

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| GOVERNMENT'S: | | | | |
| RICHARD WARREN | 1169 | 1185 | 1204 | |
| STEFAN BEWLEY | 1239 | | | |

– – –

INDEX OF EXHIBITS

– – –

| DEFENDANT'S | IDENTIFIED | ADMITTED |
|-------------|------------|----------|
| DX902 – | | 1174 |

– – –

INDEX OF EXHIBITS

– – –

| GOVERNMENT'S | IDENTIFIED | ADMITTED |
|--------------|------------|----------|
| PX410 – – | | 1176 |
| PX526 – – | | 1180 |
| PX490 – – | | 1181 |
| PX366 – – | | 1243 |
| PX367 – – | | 1246 |
| PX79 – – | | 1258 |

```
 1                    P R O C E E D I N G S

 2            DEPUTY CLERK:  All rise.  The United States

 3    District Court for the District of Columbia is now in

 4    session, the Honorable Richard J. Leon presiding.  God save

 5    the United States and this Honorable Court.  Please be

 6    seated and come to order.

 7            The matter before the Court is Civil Action

 8    No. 17-2511, the United States of America v. AT&T, Inc.,

 9    et al.

10            Counsel, please come forward and identify

11    yourselves for the record.

12            MR. SCHWINGLER:  Good morning, Your Honor.

13    Peter Schwingler for the United States.

14            THE COURT:  Welcome.

15            MR. KEMPF:  Good morning, Your Honor.  Don Kempf

16    for the United States.

17            THE COURT:  Welcome.

18            MR. CONRATH:  Good morning, Your Honor.

19    Craig Conrath for the United States.

20            THE COURT:  Welcome.

21            MR. WELSH:  Good morning, Your Honor.  Eric Welsh

22    for the United States.

23            THE COURT:  Welcome.

24            MR. FINCH:  Good morning, Your Honor.

25    Andrew Finch for the United States.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1          THE COURT:  Welcome.

 2          MR. PETROCELLI:  Good morning, Your Honor.

 3   Daniel Petrocelli for defendants.

 4          THE COURT:  Welcome.

 5          MS. ROBSON:  Good morning, Your Honor.

 6   Katrina Robson for defendants.

 7          THE COURT:  Welcome.

 8          MR. OPPENHEIMER:  Good morning, Your Honor.

 9   Randy Oppenheimer for the defendants.

10          THE COURT:  Welcome.

11          MR. WALTERS:  Good morning, Your Honor.

12   Rob Walters here for AT&T and DirecTV.

13          THE COURT:  Welcome.

14          MR. BARBUR:  Good morning, Your Honor.

15   Peter Barbur for Time Warner.

16          THE COURT:  Welcome.

17          MR. ORSINI:  Good morning, Your Honor.

18   Kevin Orsini for Time Warner.

19          THE COURT:  Welcome.

20          MR. RAIFF:  Good morning, Your Honor.  Mike Raiff

21   for AT&T and DirecTV.

22          THE COURT:  Welcome.

23          Come on up, Mr. Warren.

24          You remain under oath.

25          MR. SCHWINGLER:  May I proceed, Your Honor?
```

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 1144 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1169

 1          THE COURT:  You may.

 2   RICHARD WARREN, WITNESS FOR THE GOVERNMENT, HAVING BEEN

 3   PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS

 4   FOLLOWS:

 5                    DIRECT EXAMINATION (CONTINUED)

 6   BY MR. SCHWINGLER:

 7        Q     Good morning, Mr. Warren.

 8        A     Good morning, Mr. Schwingler.

 9        Q     And have you spoken with anyone between yesterday

10   and today about your testimony in this case?

11        A     No, sir.

12        Q     When we left off, we were discussing

13   Plaintiff's Exhibit 411, and I have just a few more

14   questions on that, and then we'll move on to another topic.

15        A     Okay.  Would you like me to turn to it?

16        Q     Yes, please.

17        A     Thank you.

18        Q     When we left off, Mr. Warren, we were discussing

19   the part of this email where you wrote, "Removing our

20   networks from the Sling TV product will be terrible for

21   Dish's business."

22              And I had asked you whether this was because Sling

23   was relatively new in the market.  And your answer was, "I

24   was trying to understand from a Sling/Dish -- "

25              THE COURT:  Sir, you don't have to repeat his

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 1145 of 3826

1170

1    answer in the question.

2            Ask him a question.  Let's go.

3    BY MR. SCHWINGLER:

4        Q    And at this time, sir, Dish was trying to build a

5    customer base for the Sling product, correct?

6        A    Correct.

7        Q    And you sent this email because you wanted your

8    superiors to consider how losing the Turner networks would

9    impact Sling from a marketing perspective, given that it was

10   new in the market?

11       A    I sent it so that they could consider Dish's

12   potential or Sling's perspective on going dark with Turner

13   yet again and taking us off the air, yes.

14       Q    And as your last sentence in your email indicates,

15   you were highlighting Turner's leverage in that situation,

16   correct?

17       A    I was.  And as I said, reminding the team and my

18   superiors that we shouldn't make bad decisions and be

19   deleveraged, in this instance, I said by Ergen, meaning

20   Mr. Ergen, who was chairman of Sling and Dish.

21       Q    You can set that document aside, sir.

22            We heard yesterday from Mr. Breland about the

23   first round of negotiations between Turner and YouTube TV

24   that did not result in a deal.  I'd like to ask you just a

25   few questions about what's happened more recently?

1    A    Okay.

2    Q    And when the United States filed this lawsuit on

3  November 20th of last year, YouTube TV did not carry the

4  Turner networks at that time; is that correct?

5    A    That's correct.

6    Q    And when the defendants filed their answer about a

7  week later on November 28th, YouTube TV did not carry the

8  Turner networks at that time, correct?

9    A    That's correct.

10        And in the answer in paragraph 5, the defendants

11  alleged, "Google's YouTube TV service is a powerful and

12  recent example that disproves the government's central

13  thesis.  When Google launched YouTube TV as an alternative

14  to traditional pay-TV services, it did not include any

15  Time Warner networks."

16        Were you aware of that allegation, sir?

17    A    I was aware that Google – YouTube had launched

18  without the Turner networks, yes.

19    Q    And at the time that the complaint and answer were

20  filed in this case last November, your team was already in

21  negotiations with YouTube to add the Turner networks to

22  their platform, correct?

23    A    We had been hoping and having conversations with

24  YouTube for a long time, hoping that we could be a part of

25  that platform.  And so at or about that time, I believe we

1    were having continuing conversations with them for this

2    second round, yes.

3        Q    In fact, just a few days before the United States

4    filed the lawsuit, your team met with the YouTube team in

5    Atlanta to discuss adding Turner networks to YouTube TV,

6    correct?

7        A    From a timing perspective, I don't know, but I

8    know we met with the YouTube team in Atlanta, yes.

9        Q    And last fall, you personally spoke with

10   Heather Moosnick, the executive who ran YouTube TV within

11   Google, correct?

12       A    I had several conversations with her, yes.

13       Q    Your takeaway from those discussions was that

14   YouTube was anxious to add Turner to the YouTube TV product,

15   correct?

16       A    They were anxious to add us because they had

17   evolved their business and were going a different direction

18   and were going to be going to the market with a marketing

19   campaign, which she shared she wanted Turner to be a part of

20   that as she was marketing the next iteration of the product,

21   yes.

22       Q    And not only was YouTube anxious to add Turner,

23   but YouTube was pressing to add the Turner networks in

24   advance of this year's March Madness tournament, correct?

25       A    She, again, was hopeful that we could reach

1   agreement in advance of March Madness, yes --

2        Q    And you used --

3        A    -- as was I.

4        Q    Are you finished, sir?

5        A    Yes.

6        Q    And you used this fact to Turner's advantage when

7   negotiating with YouTube, correct?

8        A    I knew, as I said, that they were about to launch

9   the second generation, where they were expanding the number

10  of networks, so certainly I used that to my advantage, yes.

11       Q    And as we stand here today, Turner is now under

12  contract with YouTube TV?

13       A    Yes.  We signed an agreement with YouTube.

14       Q    Could you turn to tab D in your binder.

15            MR. SCHWINGLER:  Your Honor, this has been marked

16  for identification as DX902, Defendant's Exhibit, and this

17  has been marked "confidential."

18            THE WITNESS:  I'm sorry, tab D.

19  BY MR. SCHWINGLER:

20       Q    Tab D, right at the end.

21       A    Okay.

22            Yes, sir.

23       Q    This is the affiliate agreement between Turner and

24  Google, correct?

25       A    Yes, sir.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1174

1    Q    And this agreement provides for carriage of the

2    Turner networks on YouTube TV?

3    A    This is the operative licensing agreement, yes.

4         MR. SCHWINGLER:  Your Honor, United States offers

5    DX902 into evidence under seal.

6         MR. ORSINI:  No objection, Your Honor.

7         THE COURT:  It will be admitted.

8                                    (Defendants' Exhibit DX902
                                     received into evidence
9                                    under seal.)

10   BY MR. SCHWINGLER:

11   Q    Mr. Warren, because this document is confidential,

12   we have to be careful with our words.

13        If you could turn to page 31 of the exhibit, which

14   is entitled "Schedule B."

15        And, Mr. Warren, please let me know when you're

16   ready to proceed?

17   A    I will.

18        Okay.

19   Q    And without getting into any of the specifics,

20   Schedule B is about data, correct?

21   A    Yes.

22   Q    And as part of its contract with YouTube TV,

23   Turner will be acquiring data from YouTube?

24   A    My understanding -- and I was not at the table for

25   this portion of the negotiation -- is that there were

```
 1    discussions about data.  And we tried to get as much data as

 2    we could.

 3             And this lays out some of it, but you would have

 4    to talk to the data experts.

 5        Q    You can set that aside, sir.

 6             Actually, if you could turn to PX410, I have one

 7    other affiliate agreement to ask you about.

 8             MR. SCHWINGLER:  Your Honor, this has been marked

 9    for identification as PX410 and provided to opposing

10    counsel.

11             May I proceed?

12             THE COURT:  Yes.

13    BY MR. SCHWINGLER:

14        Q    Mr. Warren, this is a letter agreement between

15    Turner and the National Cable Television Cooperative in

16    2016, correct?

17        A    It appears to be, yes.

18        Q    And the NCTC, it's not a distributor, but it's a

19    cooperative of medium and small distributors?

20        A    Correct.  It's a buying group, yes.

21        Q    And you sent this letter agreement to the NCTC on

22    Turner's behalf, correct?

23        A    Yes.

24        Q    And the letter agreement references an affiliate

25    agreement which begins at page 10 of the exhibit.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1176

```
 1        A    No.  I'm sorry.  You're going to have to get me

 2   caught up.

 3             At page 10 of the letter?

 4        Q    Page 10 of Exhibit 410 --

 5        A    Okay.

 6        Q    -- should be the start of an affiliate agreement.

 7        A    Okay.  I'm with you now.

 8        Q    And this affiliate agreement provides for carriage

 9   of the Turner networks by NCTC's members; is that right?

10        A    It does.

11             MR. SCHWINGLER:  Your Honor, the United States

12   offers PX410 into evidence under seal.

13             MR. ORSINI:  No objection, Your Honor.

14             THE COURT:  It will be admitted.

15                                   (Government's Exhibit PX410
                                      received into evidence
16                                    under seal.)

17   BY MR. SCHWINGLER:

18        Q    Mr. Warren, could you turn to the tab PX139 in

19   your binder.

20             MR. SCHWINGLER:  Your Honor PX139 has been marked

21   for identification, provided to opposing counsel.

22             May I proceed?

23             THE COURT:  You may.

24   BY MR. SCHWINGLER:

25        Q    Mr. Warren, PX139 is an email from Ms. Northington
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1177

1    to Jennifer Mirgorod in November of 2017, correct?

2        A    Correct.

3        Q    And attached to that email is a report setting

4    forth the carriage requirements and penetration rates that

5    Turner had with eight major distributors at the time;

6    is that right?

7        A    I would have to look at it.  I'm not a recipient

8    of the email, but let me look.

9            THE COURT:  Yeah.  I'll see counsel.

10           You can step down, sir.

11           (Sealed bench conference)

12           THE COURT:  He didn't send it.  He didn't receive

13   it.  He didn't draft.  It attached to it.  Why are you

14   putting it in through him?

15           MR. SCHWINGLER:  So I do think he did receive it.

16   It's a regularly generated --

17           THE COURT:  Whoa, whoa, whoa.  What's your basis

18   for that?  He's not on the email.  What's your basis?

19           MR. SCHWINGLER:  Ms. Northington testified in her

20   deposition that this document was a regular report that she

21   provides to Mr. Warren.

22           I have an earlier version where he's copied on the

23   email, and I'm happy to work off of that version.  This was

24   just a more recent version.

25           But I do have an earlier version where he was

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1178

```
1    copied.

2           THE COURT:  You better ask him a question to

3    determine whether or not he actually received this thing.

4           If he doesn't remember receiving it, you'll have

5    to refresh his recollection with whatever else you got.

6           MR. SCHWINGLER:  If he doesn't remember receiving

7    this, may I withdraw the exhibit and then move forward to

8    the version where he was copied?  It's a little bit older.

9           THE COURT:  That's fine.

10          MR. SCHWINGLER:  All right.  Well, I'll try to be

11   quick with it.

12          THE COURT:  You've got only got about ten more

13   minutes.

14          MR. SCHWINGLER:  Yeah.

15          THE COURT:  That's it.

16          MR. SCHWINGLER:  Understood.

17          THE COURT:  Do you understand?

18          MR. SCHWINGLER:  Yes.

19          (Open court)

20          THE COURT:  You may proceed, consistent with the

21   discussion at the bench.

22   BY MR. SCHWINGLER:

23     Q    Mr. Warren, do you receive penetration and

24   carriage reports in the ordinary course of business?

25     A    I do.
```

1    Q    And is that an example of one of those reports

2    attached to this email?

3    A    I apologize.  I closed the binder.  Can you direct

4    me to the tab again.

5         THE COURT:  139.

6         MR. SCHWINGLER:  139.

7         THE WITNESS:  Apologies, Your Honor.

8         THE COURT:  It's all right.

9         THE WITNESS:  This is similar to the types of

10   reports that I, on occasion, do see, yes.2.

11   BY MR. SCHWINGLER:

12   Q    And do you know whether you received this

13   particular report?

14   A    I do not.

15   Q    All right.  If you could turn to tab C in your

16   binder.

17        MR. SCHWINGLER:  This has been marked for

18   identification as PX526, Your Honor, and provided to

19   opposing counsel.

20   BY MR. SCHWINGLER:

21   Q    And can you look at the first page of that

22   exhibits, Mr. Warren, and confirm that you were copied on

23   the transmittal email.

24   A    Yes, sir, I was.

25   Q    And this is an e-mail from Ms. Northington copying

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1180

```
 1    you that attaches one of these master carriage and

 2    penetration reports?

 3         A    Yes, sir.

 4              MR. SCHWINGLER:  Your Honor, the United States

 5    offers PX526 into evidence under seal.

 6              MR. ORSINI:  No objection, Your Honor.

 7              THE COURT:  It will be admitted.

 8                                  (Government's Exhibit PX526
                                    received into evidence
 9                                  under seal.)

10    BY MR. SCHWINGLER:

11         Q    Mr. Warren, I'd like to ask you a few questions

12    about the arbitration offer that you sent Turner's

13    distributors shortly after this lawsuit was filed.

14              PX490 in your binder, which has already been

15    admitted into evidence, is a letter from you to

16    Warren Schlichting of Dish Networks on November 28th,

17    correct?

18         A    It is.

19         Q    And this is the cover letter that you sent to the

20    various distributors with the arbitration offer, correct?

21         A    It is, correct.

22         Q    If you could turn to the next tab.  That's PX491.

23         A    Okay.

24              MR. SCHWINGLER:  And -- oh, I'm sorry, Your Honor,

25    PX490 has not been admitted.  The United States offers it
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1181

1    into evidence.

2              MR. ORSINI:  No objection, Your Honor.

3              THE COURT:  All right.  It will be admitted.

4                                    (Government's Exhibit PX490
                                     received into evidence.)
5    BY MR. SCHWINGLER:

6         Q    Mr. Warren, if you turn to the next tab, PX491,

7    this is already in evidence.

8              And this is the arbitration offer that was sent

9    out with the letter in PX490, correct?

10        A    This is the arbitration agreement, yes.

11        Q    And you sent an identical offer to about 1,000

12   distributors, right?

13        A    That's correct, yes.

14        Q    And along with each one, you sent an identical

15   cover letter, correct?

16        A    Yes, sir.

17        Q    And of the approximately 1,000 distributors that

18   received this offer, only about 20 have accepted?

19        A    To date, approximately 20 have responded accepting

20   it in writing.

21        Q    And no distributor with over a million subscribers

22   has accepted so far?

23        A    No distributor with over a million subscribers has

24   actually sent us back something signed; but I don't know

25   where they've accepted it and they're holding it, waiting to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   send it to us.

2       Q    So you have not received a signed acceptance from

3   any distributor with over a million subscribers?

4       A    Correct.

5       Q    And these offers were sent in response to the

6   government's lawsuit, correct?

7       A    Yes.

8       Q    And the offers were intended to address the

9   government's allegations about Turner's bargaining leverage,

10  fair?

11      A    As I understand it, the arbitration agreement and

12  the offer was sent to address the government's concern that,

13  as a result of being owned, commonly owned by AT&T, we would

14  have an incentive to drive prices higher and go dark with

15  our affiliates.

16      Q    That's the only harm that these offers were

17  intended to address, correct?

18      A    Correct.

19      Q    I'd like to talk about the basics of this type of

20  arbitration.  This is called baseball-style arbitration,

21  correct?

22      A    It is.

23      Q    And each side makes a final offer, and then the

24  arbitrator picks one, correct?

25      A    That's my understanding, yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q    And the arbitrator can't modify either offer,

2    right?

3    A    No.  The arbitrator considers all the evidence in

4    the record, then looks at the final offer and chooses one or

5    the other.

6    Q    And the arbitrator --

7         THE COURT:  Can I see counsel?

8         (Sealed bench conference)

9         THE COURT:  Have you not been in court?

10        MR. SCHWINGLER:  I have.

11        THE COURT:  I heard testimony ad nauseam on

12   baseball-style arbitration.  What are you trying to do?  Why

13   are you replowing this territory for the 20th time?  Tell

14   me.  What is it you're trying to do --

15        MR. SCHWINGLER:  Just --

16        THE COURT:  -- besides wasting my time?

17        What are you trying to do?  You've got two

18   minutes.  What are you trying to accomplish?  Tell me right

19   now.

20        MR. SCHWINGLER:  I'll move to one of the --

21        THE COURT:  Tell me what you're trying to

22   accomplish with this man.  Why are you going through all

23   this all over again?

24        MR. SCHWINGLER:  I just have one point with him,

25   and I'll move directly to it.

1       THE COURT:  What's your point?  Tell me the point.

2       MR. SCHWINGLER:  When a distributor submits itself

3   to binding arbitration, it does not yet have all of the

4   evidence in front of the arbitrator that will be bearing on

5   the ultimate question of fair market value.

6       THE COURT:  What's the point?

7       MR. SCHWINGLER:  It goes to the risks that

8   distributors face in submitting themselves to this

9   arbitration.

10       THE COURT:  Do you have a reason to believe he'd

11   say this?

12       He was deposed, right?  Did he acknowledge that in

13   his deposition?

14       MR. SCHWINGLER:  He will confirm that the

15   distributor does not have all of the evidence that's

16   relevant to fair market value.

17       THE COURT:  Ask him a direct question on that

18   point and move on.  You've got two minutes.  Do you hear me?

19       MR. SCHWINGLER:  Understood, yeah.

20       (Open court)

21   BY MR. SCHWINGLER:

22       Q   Mr. Warren, can you confirm that when a

23   distributor makes its binding, final offer in the

24   arbitration process set forth in these agreements, that it

25   does not at that time have access to all of the evidence

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1185

1    that the arbitrator will be considering when deciding

2    whether the distributor's offer best approximates fair

3    market value of the Turner networks?

4         A    That's correct.  Neither party has that evidence.

5              MR. SCHWINGLER:  We'll pass the witness,

6    Your Honor.

7              THE COURT:  Okay.

8              MR. ORSINI:  Thank you, Your Honor.

9              May I proceed?

10             THE COURT:  You may.

11                        -  -  -

12                     CROSS-EXAMINATION

13   BY MR. ORSINI:

14        Q    Mr. Warren, in your nearly 20 years at Turner in

15   content distribution, ballpark, how many negotiations have

16   you been involved in?

17        A    50, 60, maybe 70 affiliate negotiations.

18        Q    I'd like to talk about just a few of those fairly

19   quickly.

20        A    Okay.

21        Q    First one is Cox.  What is TV Everywhere?

22        A    TV Everywhere is a product offering where, by

23   virtue of having a paid television subscription to a 24/7

24   network package, the subscriber within the home and outside

25   the home has access to either live networks and/or all of

1  the on-demand accompanying content.

2      Q    And how does the Turner content available to a Cox

3  subscriber through TV Everywhere compare to the Turner

4  content available to a subscriber to, say, AT&T?

5      A    The Cox subscriber has access to the same content

6  as any other distributor.

7      Q    And so what issue with respect to TV Everywhere is

8  still under negotiation with Cox?

9      A    It's really right now a question of delivery and

10  technical delivery, how we get them that content.

11          Cox, as I understand it, through my team, is using

12  a different standard relative to what we've used for

13  everyone else; but we're still making the content

14  accessible, and we're working through the technical

15  negotiation.

16      Q    You're responsible for the Charter account,

17  correct?

18      A    I am.

19      Q    What's the current status of the Charter account?

20      A    We have entered into a series of extensions, and

21  we have extended into this year, waiting at Charter's behest

22  until -- to see whether this Court approves the merger.

23      Q    You've negotiated with Time Warner Cable, correct?

24      A    Yes, sir.

25      Q    Since it was spun off from Time Warner?

1     A     Yes.  And prior to, yes.

2     Q     Okay.

3           And there's been some reference in court to a

4     potential go-dark situation over a penny.

5           Were you involved in negotiations with

6     Time Warner Cable back in 2012 related to TruTV?

7     A     I played a role, yes.

8     Q     What do you recall about those negotiations?

9     A     I recall that for context, Time Warner had -- we

10    had acquired Court TV, which was the predecessor to TruTV.

11    And Time Warner had a legacy deal which was a very favorable

12    deal in the industry, and we were negotiating with

13    Time Warner to get them more in line with market rates.

14          And they were insistent on two things.  One was

15    paying only a modest penny increase, versus where we were

16    relative to the rest of the market; and then, two, paying

17    the lowest rate, regardless of how they carried the service.

18          So, in other words, they look at it system by

19    system, if they were carrying in it a certain system to a

20    low penetration, they said, regardless, they should pay that

21    penny lower rate.

22    Q     And what was the outcome of those negotiations?

23    A     We ended up agreeing to the penny year-over-year

24    rate increases.

25    Q     Did Turner go dark with them?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    No, sir.

2    Q    Did that agreement have any implications for

3 Turner's relationship with other distributors?

4    A    It didn't at the moment, but it certainly impeded

5 our ability to go out and accelerate those rate increases to

6 get others in line with what was the fair market value,

7 because others had accepted the higher rate.  So it slowed

8 our ability, based on MFNs, to go out and then get other

9 rates in the marketplace.

10    Q    Have you been involved in negotiations with Sony?

11    A    I have.

12    Q    And the original deal that Sony signed for

13 Sony Vue, how did their rates compare generally to those in

14 the marketplace for other distributors?

15    A    You're asking about the first deal?

16    Q    The first deal.

17    A    The first deal that Sony signed was, in essence,

18 in line but higher than our deals we might have with someone

19 having 10 million, 5 million subscribers, in large measure

20 because Sony was telling us that they were going to pay

21 minimum guarantees in terms of dollar value and that they

22 would pay higher rates and they were touting that.

23         So we -- it's in line with other OTT or virtual

24 MVPD deals, but it was higher at the time than other deals

25 that we had.

1    Q    And the subsequent renegotiation, what did that do

2  to their rates?

3    A    They are now within a single-digit percentage to

4  distributors having 7, 8 million subscribers.

5    Q    In your decade-plus experience negotiating with

6  these distributors, who do you believe has more leverage,

7  Turner or the distributor?

8    A    I think the distributor does.

9    Q    And why is that?

10    A    And it's something that we wrestle with all the

11  time as we're doing these deals, is thinking through the

12  impact.

13        But for Turner, if we go dark with a distributor,

14  we immediately lose both subscriber revenue, which has

15  massive implications to us -- from day one, we lose it; and

16  then we also lose advertising revenue.

17        And there's also a disruption to our flow in terms

18  of leagues, sports leagues, that is, acquired programming.

19  They want to look at Turner as being widely distributed and

20  viewed.  And if there are interruptions, the impact to us

21  there is in terms of relationships as well.

22    Q    And do you have an understanding as to what you

23  expect your position at Turner to be if the Court permits

24  this merger to close?

25    A    I anticipate that I will continue negotiating

1  distribution deals on behalf of Turner.

2      Q    And have you thought about what those negotiations

3  might look like if this merger closes?

4      A    I have.

5      Q    And we'll get the arbitration clause in one

6  second, and we'll address that briefly.

7          But putting the arbitration issue aside, you're

8  aware of the government's theory that these post-merger

9  negotiations will allow you to achieve higher prices by

10  threatening to blackout distributors; do you understand that

11  generally?

12      A    I am.

13      Q    And what's your view of that?

14      A    I don't think that's a realistic perspective.

15  We didn't do that when we were part of Time Warner Cable.

16  I just don't think it's realistic to take that view that

17  that would be something that we should consider or would do.

18      Q    I'd like to address the arbitration offer briefly.

19          Mr. Schwingler talked about the number of

20  signatures that have been returned of the arbitration offers

21  sent out.

22          Does it surprise you that you've only received the

23  number you've received?

24      A    No.

25          And as I said earlier, I don't know whether other

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  distributors have actually accepted it internally but

2  they're waiting to send it.

3         I think a number of distributors are waiting to

4  determine when they come up for renewal, because they have

5  the ability to accept this at any point within seven years,

6  assuming this Court were to approve the merger, within seven

7  years.

8         So we're going to have a series of renewals.  And

9  they could, at the day, the last opportunity, present me

10 with a signed arbitration agreement and tell me that they

11 want to invoke arbitration.

12     Q     How is that seven-year duration for the

13 arbitration offer selected?

14     A     It was selected for two reasons.  One is, it's

15 largely based on what was approved in the Comcast-NBCU

16 merger.

17        But, also, more pragmatically, seven years is a

18 pretty long period of time in this industry that's evolving

19 quickly.  And so I think there are going to be massive

20 changes, and there will be opportunities for multiple

21 renewals with many of our affiliates during that seven-year

22 period.

23     Q     The default term of the agreement that will be

24 subject to arbitration, the affiliate agreement that's

25 presented to the arbitrator --

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    Yes, sir.

2    Q    -- is three years, correct?

3    A    It is.

4    Q    And how is that selected?

5    A    It was selected largely because, typically, most

6    of our deals are two, three, four years, sometimes five at

7    the outspot [sic]-- at the outspot.  So that's really within

8    the sweet spot.

9    Q    And there, I believe, is going to be an argument

10   made that Turner can circumvent the arbitration provision by

11   creating new networks or moving its content around from

12   existing networks to new networks.

13         What's your view as to whether or not that will be

14   possible?

15   A    Well, first, under the terms of the arbitration

16   agreement, Turner network -- and, if I could, is defined --

17   it lists out the networks.  And it says, as well as any --

18         THE COURT:  Whoa, whoa.  What are you looking at?

19         THE WITNESS:  I am sorry, Your Honor.  I am

20   looking at the definitional section, D14.

21         THE COURT:  What exhibit?

22         THE WITNESS:  PK0491.

23         THE COURT:  0491?

24         THE WITNESS:  Yes, sir.

25

1  BY MR. ORSINI:

2      Q    Now, Mr. Warren, there are little page numbers at

3  the bottom in the middle.  Which page are you on?

4      A    I am on 005.

5           THE COURT:  Okay.  So that's what you're referring

6  to now?

7           THE WITNESS:  Yes, sir.

8           THE COURT:  All right.  Do you want to quote that?

9           THE WITNESS:  I just want to look at it for

10 reference, if I could.

11          THE COURT:  You look at it to refresh your

12 recollection what it says.

13          THE WITNESS:  Thank you.

14          Yes.  So definitionally, it lists the Turner

15 networks.  And it says, as well as any affiliated network in

16 the future, that it consists substantially of the same video

17 programming.

18          So that, in and of itself, would preclude us from

19 moving programming to an end run around this arbitration

20 agreement, because it captures networks, were we to

21 contemplate moving product to another network.

22     Q    Are there any other limitations in your experience

23 on Turner's ability to move programming around and create

24 new networks?

25     A    Yeah.

1    Setting aside the arbitration agreement, in a

2  number of my contracts, I have commitments.  So I, for

3  example, may have a commitment that says the Final Four will

4  appear on X network.

5    So were I to do that, I would be in breach of that

6  underlying agreement.

7    And then we also have commitments to our sports

8  partners, where in the agreement that we do with them, it

9  indicates that it has to be on one of the following

10  networks.

11    So presumably -- and I'm not in the sports world,

12  but I'm knowledgeable enough to know that as we've talked

13  about it, it has to appear on one of the enumerated

14  networks.

15    So, again, I think I would be in breach, Turner

16  would be, if we were to move it to a yet-unnamed network or

17  even an existing network where we move that programming.

18    Q    The Court has heard some testimony from

19  distributors about what bundles are available under

20  arbitration.  Can you just explain, at a high level, what

21  sort of bundles the distributor can invoke or seek through

22  this arbitration mechanism?

23    A    So the distributor can look to ask for or demand a

24  bundle on a stand-alone basis of all of our networks or any

25  smaller bundle of networks that we have offered into the

1    marketplace as of October 2014 or going forward.

2           So it captures October 22nd, 2014, through the

3    duration of this agreement, any bundle that we have in the

4    marketplace.

5       Q    So if a smaller bundle then currently exists was

6    made available to DirecTV, what would that mean under this

7    arbitration agreement?

8       A    It would mean that the distributor could demand or

9    say, I want that smaller bundle that you've made available

10   to DirecTV.

11      Q    And would that include the current bundle that

12   Sling has?

13      A    It would.

14      Q    Can Turner condition the carriage of the Turner

15   networks on the carriage of HBO in the bundles it submits to

16   the arbitrator?

17      A    It cannot.

18      Q    Why not.

19           MR. SCHWINGLER:  Objection, Your Honor.

20           THE COURT:  You can approach.

21           (Sealed bench conference)

22           THE COURT:  What's your objection?

23           MR. SCHWINGLER:  We're getting into legal

24   conclusions, interpreting the agreement.

25           THE COURT:  What's the legal conclusion you think

1   he's looking for?

2           MR. SCHWINGLER:  Interpreting whether Turner can

3   condition, bring HBO into the process somehow to circumvent

4   the arbitration agreement.

5           MR. ORSINI:  It goes to state of mind, Your Honor,

6   their interpretation of it.  They've argued extensively that

7   this HBO issue is a work-around.  So all I'm establishing is

8   what Turner believes this actually provides.

9           THE COURT:  Yeah.

10          And he's a negotiator, so he's in this world of

11  conditions, and he has requirements.  I'm not aware of him

12  pretending to be a lawyer.  He's not giving -- offering

13  legal advice.  I see your point, but I think it's okay under

14  this circumstance.

15          Now, if he starts expanding his answer in such a

16  way as to suggest he's got some kind of legal knowledge of

17  the General Counsel's Office or something, then we'll have

18  to cut him off.  But you'll make sure he doesn't get too

19  expansive on this.

20          MR. ORSINI:  I'm almost done, Your Honor.  Just a

21  covering a couple more criticisms there have been.  I'll

22  make sure we don't get expansive.

23          THE COURT:  All right.

24          MR. ORSINI:  Just one thing I want to make clear

25  for the record so the Court understands, Mr. Warren actually

 1   was trained as a lawyer, although he's not a practicing

 2   lawyer.

 3            THE COURT:  Oh, I see.  All right.  Well, okay,

 4   then, okay, we'll be even doubly cautious.

 5            MR. ORSINI:  I wanted to make sure the Court

 6   understood that.

 7            THE COURT:  All right.  Yes.  Thank you.

 8            (Open court)

 9            THE COURT:  All right.  You may -- you know, ask

10   the question again, consistent with our discussion at the

11   bench, and we'll see how this goes.

12            MR. ORSINI:  Okay.

13   BY MR. ORSINI:

14       Q    Mr. Warren, what is your understanding as a Turner

15   executive as to whether or not it can, Turner can, condition

16   the carriage of Turner networks on also the carriage of HBO

17   under this arbitration agreement?

18       A    So I don't believe we can do it by virtue of the

19   language in the agreement.

20       Q    And if you could just look quickly at PX491, which

21   you have in front of you.

22       A    Yes.

23       Q    And in particular on page 001, there's a

24   Section 4.1 down at the bottom of that page.

25            Do you see that, sir?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1198

1      A    Yes.

2      Q    And there's a reference to Turner's ability to

3  withhold licensing Turner networks until the distributor has

4  license at least eight of the top 35 unaffiliated networks.

5          Do you see that?

6      A    I do.

7      Q    What's the purpose of this paragraph?

8      A    The purpose of this -- and it pre-dates the

9  arbitration agreement.  This is a provision that we have had

10  in a number of our other agreements.  And in part, it's to

11  ensure that there's some legitimacy to the platform.

12          And by that, I mean that by virtue of the fact

13  that Turner is associated with it, we want to make sure that

14  things like security, signal quality, customer experience

15  have been vetted.

16          And presumably, if a distributor comes to us and

17  says, look, we have other deals out there, these are the

18  kinds of things that the industry is looking at.  And

19  they've presumably negotiated it and gone through a QA kind

20  of process.

21      Q    And, Mr. Warren, are you aware that the government

22  has alleged in this case that if the deal closes, if the

23  Court permits the deal to close, that Time Warner, now owned

24  by AT&T, will coordinate with Comcast to harm virtual MVPDs?

25      A    I am.

1199

1    Q    And are virtual MVPDs entitled to use this

2   arbitration offer?

3    A    They are.

4    Q    And if they invoke the arbitration offer, what

5   rights do they have in terms of the carriage of the Turner

6   networks while the arbitration is proceeding?

7    A    So a new entrant as in the case of a virtual

8   vMVPD, while the arbitration is pending, can carry and

9   distribute the networks while that arbitration is pending

10  based upon the offer that Turner has presented.

11       And then the arbitrator, making her or his

12  decision, can retroactively apply terms if they determine

13  that and choose the other side's offer.  While the virtual

14  MVPD is carrying our network, there might be a retroactive

15  fee application that runs to the benefit of the virtual

16  MVPD.

17   Q    How many subscribers does a distributor have to

18  have in order to invoke this clause?

19   A    The distributor doesn't have to have any

20  subscribers.  They don't have to have launched, so they can

21  have zero subscribers in order to take advantage of this.

22   Q    And does the distributor have any options in terms

23  of how it might proceed in the arbitration once it sees

24  Turner's final offer?

25   A    Yes.

1    Q    And what options are those?

2    A    There are several options.  The distributor can

3  decide that they no longer want to pursue arbitration.  They

4  can also proceed with mediation.  And in a number of

5  instances, there are different provisions that address

6  mediation.

7         But the distributor can be the one to invoke

8  mediation.

9         And, likewise, they can walk away at any time and

10  say, we're no longer interested in proceeding with the

11  arbitration.

12    Q    And what options does Turner have once the final

13  offers are exchanged?

14    A    There isn't an opportunity to walk away from the

15  arbitration, so we don't have any option but to wait and see

16  how it plays out.

17    Q    And under what circumstances can Turner itself

18  invoke this arbitration clause?

19    A    Turner doesn't have any ability to invoke

20  arbitration.  It's all the distributors' option to elect

21  arbitration.

22    Q    Have you undertaken any preparations within the

23  business for the possibility that the Court permits the

24  merger to close and this arbitration clause will be in

25  effect?

1  A    We're in the process right now of reviewing a

2  procedure and process so that we can notify new entrants.

3  We can determine, for example, who we want as counsel for

4  briefs and things of that nature that would be submitted to

5  the arbitrator, and that's what we're going through

6  internally as a process right now.

7  Q    I want to ask you under oath whether I'm being

8  considered as counsel.

9       As part of those preparations, have you given

10 thought, as the lead content negotiator to how this

11 arbitration clause and the existence of this arbitration

12 clause might impact your negotiations?

13 A    I've given a lot of thought to it.

14 Q    And what are your views?

15 A    My perspective right now is, with this arbitration

16 procedure in place, we have, are in a weakened bargaining

17 position.  And by that, I mean, today, as we negotiate our

18 deals, inevitably, both parties could either overtly or more

19 subtlety say that issue is insurmountable; it's a go-dark

20 issue.

21      I now have to be thinking about the fact that I

22 could always be at the arbitration table, and I don't have

23 the ability to walk away.

24      And I also have to be navigating things like my

25 most favored nations provisions.  Right?

1    So as I'm doing these deals, I not only need to be

2  thinking about the issue at hand, meaning the single deal

3  that we're arbitrating or negotiating, but I need to think

4  very carefully about a couple of things.

5    One is the potential cascading impact to my

6  business, which could be pretty profound.

7    And, two, the arbitrator is going to see the

8  entire course of conduct between the parties, all of the

9  negotiations, prior deals.  So I better look at it through

10  that lens.

11    And as I've talked to my team, I don't even

12  know -- at some point during negotiations, sometimes you

13  open extreme, because that's what parties do in negotiation

14  to close the gap.

15    We're still contemplating.  But I'm thinking, I'm

16  not sure I could even open extreme, because the arbitrator

17  is going to see everything and might say, you were gaming

18  them.

19    So I, again, think that I'm in a weakened

20  position.  And I need to be navigating through all of that,

21  which makes my job that much harder.

22    Q    What was the cascading impact you referenced?

23    A    So from a most favored nations perspective, if

24  I've got a provision out there that says to another party,

25  if I offer something more favorable or grant something more

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  favorable to party A, I have to give it to party B, that is

2  something that I need to think about, because if the

3  provision that the arbitrator chooses, meaning party B, I

4  then would have to offer it to party A and potentially

5  others.  And there could be economic and other implications

6  to the business as a result of that, and they could be very

7  significant for us financially and otherwise.

8      Q    And what are your views on whether or not the

9  outcome of the arbitration is likely to reflect the same

10  deal that would have been negotiated today?

11     A    I've also thought about that, and I don't think it

12  does.  I think it's worse for Turner, because of what I just

13  discussed.  It contemplates the fact that I have this

14  binding arbitration that is always out there that I can't

15  invoke but the other side can.

16     Q    And just one quick question on the YouTube

17  negotiations that Mr. Schwingler asked you about.

18     A    Yes.

19     Q    You mentioned in your answer to one of his

20  questions that you had understood that they had changed

21  their model, I believe, was your terminology.  What did you

22  mean by that?

23     A    So they had originally started the product

24  offering as a smaller broadcast only, a handful of

25  broadcasters, and then they expanded.

1       And as I understood it, they were going through

2   yet another sort of iteration, if you will, where they would

3   be announcing a number of other content partners, which, in

4   fact, they did.  They announced NBA TV, MLB, and some other

5   content offerings that then went this next round for them as

6   they launched sometime in February -- January and February.

7           MR. ORSINI:  No further questions, Your Honor.

8           THE COURT:  Redirect, limited to recross.

9                   REDIRECT EXAMINATION

10  BY MR. SCHWINGLER:

11      Q    Mr. Warren, you were asked whether, from your

12  perspective, distributors or programmers have more

13  bargaining leverage, correct?

14      A    Yes.

15      Q    And you have never negotiated on behalf of a

16  distributor, correct?

17      A    I have not, no.

18      Q    And so you just gave your perspective based on

19  your experience on the programming side?

20      A    Correct.

21      Q    And you were asked your views about the

22  government's theory about how this merger could impact

23  Turner's bargaining leverage.

24           Do you recall that?

25      A    Yes.

1     Q     And you have not reviewed any of the expert

2     reports in this matter, have you?

3     A     I have not.

4     Q     You've not reviewed the entire body of evidence

5     available to the Court, correct?

6     A     I have not.

7     Q     You looked at the definitions within the

8     arbitration agreement in PX491, if you could turn back to

9     that page.

10    A     Are you on 005, sir?

11    Q     Yes.

12    A     Okay.

13    Q     And under these arbitration procedures, the

14    ultimate question for the arbitrator relates to the fair

15    market value of the Turner networks, correct?

16    A     Correct.

17    Q     And Section D of the agreement entitled

18    "Definitions" has 18 different definitions, right?

19    A     It does.

20    Q     And fair market value is not one of them, is it?

21    A     It's not a defined term, but there are other

22    factors in the agreement that lay out fair market value.

23    Q     Fair market value is not a term that you, as

24    Turner's lead negotiator, use in the ordinary course of

25    business, is it?

1    A    That's correct; I do not use it.

2    Q    And you probably couldn't tell me -- well, you

3  couldn't tell me, as you sit here today, what TNT's fair

4  market value is?

5    A    Well, sir, as I think I told you at deposition,

6  it's not just one number; it's an amalgam.  It's a holistic

7  look.  So I think you're looking at it, again, pardon me,

8  but I think too myopically, because you're assuming it just

9  nets down to a number.  And I don't think that's the case.

10 I think you've got to look holistically about things like

11 the bundle of rights and all of the stuff that goes into the

12 deal.

13   Q    The arbitrator must consider all of the terms in

14 deals that could range north of 50 pages, correct?

15   A    The arbitrator considers all of the evidence that

16 is put into the record, including the agreements, yes.

17   Q    And that includes the terms of Turner's agreement

18 with other distributors, correct?

19   A    Correct.

20   Q    The price terms and the non-price terms, correct?

21   A    The entirety, yes.

22   Q    You discussed whether this agreement allows Turner

23 to condition carriage of the Turner networks on carriage of

24 HBO.

25        Do you recall that?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1207

1      A    Yes.

2      Q    The agreement doesn't prevent HBO from taking any

3  action whatsoever, does it?

4      A    Are you asking me whether there's a specific

5  provision in the agreement.

6      Q    I'm asking you whether the agreement limits HBO's

7  conduct in any way.

8      A    The agreement only applies to Turner.

9      Q    You noted that the arbitrator will be looking at

10 other prior contracts, correct?

11     A    From both parties, yes.

12     Q    And you're concerned that the arbitrator's

13 decision could have a cascading impact to Turner's business,

14 correct?

15     A    Correct.

16     Q    That because if the arbitrator chooses the

17 programmer's contract, you're stuck with everything in that

18 contract, correct?

19     A    Well, it's binary, right?  It's one or the other.

20 So the arbitrator is not only going to look at my

21 agreements, but the arbitrator looks at the agreements that

22 the distributor has with others as well to determine fair

23 market value.  So there's certainly a risk there.

24     Q    And if the arbitrator picks Turner's agreement,

25 that risk would apply to the programmer as well?

1    A    I don't know that the programmer has the same risk

2    in terms of a cascading effect through MFNs.

3         Again, I think the risk to Turner is much more

4    significant.

5    Q    If Turner puts a term in its final offer in this

6    arbitration and the arbitrator picks Turner's offer, the

7    programmer is stuck with that term, correct?

8    A    I guess.

9         But what I'd say and what I said earlier is that

10   the distributor can always walk away, right?  Even after the

11   final offer is on the table, if they believe it's too

12   onerous, they don't need to proceed to a final order.  I do.

13   And so that's a risk to me.

14   Q    And they walk away, then they're subject to a

15   blackout.

16   A    Again, they have offers in front of them, and

17   presumably, they've known that I've looked -- I've tried to

18   put my best foot forward to get a deal done.  And that's a

19   decision and prerogative that they can make.

20        Again, I don't have that opportunity.  I'm always

21   going to have to be mindful and thinking of the fact that

22   arbitration is out there, and I can't invoke it but they

23   can.

24   Q    My question was limited just to the distributor.

25   And if they walk away from the arbitration, they are now

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1209

1    subject to a blackout, correct?

2        A    Right.

3            But then they can also come back again and

4    arbitrate down the road.  So the risk to them is that they

5    could decide to go on a blackout, right, that they've made

6    that decision.  They can later come back as a new entrant,

7    as a -- invoke arbitration yet again, so they have that

8    option.

9            MR. SCHWINGLER:  Your Honor, object to the portion

10   of the response after the affirmative response as

11   non-responsive and move to strike.

12           MR. ORSINI:  Your Honor, I believe it was

13   responsive to the question that was being asked.  He was

14   explaining his response.

15           THE COURT:  The objection is overruled.

16           MR. SCHWINGLER:  All right.  No further questions.

17           THE COURT:  Do you have anything limited to the

18   redirect?

19           MR. ORSINI:  Nothing, Your Honor.

20           THE COURT:  You're excused, Mr. Warren.

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  Call your next witness.

23           MR. CONRATH:  Your Honor, our next witness is

24   Stefan Bewley.  There are confidentiality issues.  We'd be

25   prepared to discuss them at this time, or if you want me to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1210

1  do the open-court portion and --

2          MR. PETROCELLI:  Your Honor, I would prefer to

3  discuss them at this time.

4          THE COURT:  All right.  Come on up.

5          (Sealed bench conference)





***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1212



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1213



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1214



\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1215



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1216





***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1218



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1219



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1220



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1222



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1223



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1224





***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1227



25    (Open court)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1228

```
1        DEPUTY CLERK:  All rise.

2        This Honorable Court will stand in recess until

3   the return of court.

4        (Recess from 11:58 a.m. to 12:27 p.m.)

5        DEPUTY CLERK:  The United States District Court

6   for the District of Columbia is again in session, the

7   Honorable Richard J. Leon presiding.  God save the United

8   States and this Honorable Court.  Please be seated and come

9   to order.

10        Your Honor, re-calling Civil Action No. 17-2511,

11   United States of America v. AT&T, Inc., et al.

12        MR. CONRATH:  May we approach to finish our

13   conversation, Your Honor?

14        THE COURT:  Yes.

15        (Sealed bench conference)
```



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1229



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1230



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1231



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1232



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1233



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1234



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1235



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1236



\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*



1238

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19          (Open court)

20          MR. CONRATH:  Your Honor, the United States calls

21   Stefan Bewley.

22          THE COURT:  All right.

23          DEPUTY CLERK:  Sir, while you're standing, please

24   raise your right hand.

25          (Witness is placed under oath.)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              DEPUTY CLERK:  Please be seated.

2              MR. CONRATH:  May I proceed, Your Honor?

3              THE COURT:  You may proceed.

4              MR. CONRATH:  Thank you.

5    STEFAN BEWLEY, WITNESS FOR THE GOVERNMENT, HAVING BEEN DULY

6    SWORN, TESTIFIED AS FOLLOWS:

7                        DIRECT EXAMINATION

8    BY MR. CONRATH:

9         Q    Could you please state your name for the record.

10        A    Stefan Kyle Bewley.

11        Q    Mr. Bewley, where are you currently employed?

12        A    Altman Vilandrie & Company.

13        Q    And what is Altman Vilandrie & Company?

14        A    We're a strategy consulting firm, focused on

15   telecom, media, and technology.

16        Q    What is your position at Altman Vilandrie?

17        A    I'm a director and an equity partner.

18        Q    And where are you located?

19        A    San Francisco, California.

20        Q    What does your work at Altman Vilandrie involve?

21        A    I advise clients for business strategy purposes on

22   a handful of different areas, including the video ecosystem,

23   mobile, Internet infrastructure, and B2B business models.

24        Q    Does Altman Vilandrie have any opinion about this

25   merger that's the subject of this trial?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1240

```
 1        A    I certainly don't.

 2        Q    And does Altman Vilandrie do work for a number of

 3   large telecommunications companies?

 4        A    Yes, we do.

 5        Q    And you did not meet with anyone from the

 6   Department of Justice to prepare for your deposition,

 7   did you?

 8        A    No.  The Department of Justice asked some

 9   questions back in August when we produced information,

10   but --

11        Q    During the investigation, you were interviewed

12   twice about the subject of your work, right?

13        A    Correct.

14        Q    But to prepare for your deposition, you didn't

15   meet with us?

16        A    No.

17        Q    And you didn't meet with us to prepare for your

18   testimony today?

19        A    No.

20        Q    In fact, I just met you about 15 minutes ago?

21        A    That's true.

22        Q    Have you worked for Charter Communications?

23        A    I have in the past.

24        Q    Did you do a study for Charter in 2017 related to

25   their video business?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1241

```
1        A     We did.

2        Q     How did Altman Vilandrie come to do a study about

3    the video business for Charter in 2017?

4        A     Charter has been a client of ours, and we have a

5    methodology that we think helps evaluate the value of

6    different programming, video programming.  And we told them

7    about that methodology, and they were interested in

8    potentially having us help them with content and programming

9    negotiations.

10       Q     Did you eventually do a proposal to Charter for

11   work?

12       A     Yes.

13       Q     And do you recall when that was?

14       A     The proposal was submitted at the end of 2016, and

15   we started the work in 2017.

16       Q     And had you been talking to Charter about doing

17   this work before you submitted the proposal to them?

18       A     Yeah.  We had a meeting to explain our

19   methodology.

20             MR. CONRATH:  Your Honor, I have a binder to give

21   to Mr. Bewley.  May I offer that up?

22             THE COURT:  You may.

23             MR. CONRATH:  May I approach the witness?

24             THE COURT:  You may.

25             MR. CONRATH:  May I proceed?
```

```
 1              THE COURT:  Yes.

 2   BY MR. CONRATH:

 3       Q    Would you turn in the binder that I gave you, not

 4   the deposition, but the other binder, to PX366.

 5              Would you -- PX366 is your, is an email within

 6   Altman Vilandrie and an attached letter dated November 26th,

 7   2016.

 8              Do you see that?

 9       A    I do.

10       Q    And did you sign that letter?

11       A    I did.

12       Q    And was it prepared in the ordinary course of

13   Altman Vilandrie's work?

14       A    It was.

15              MR. CONRATH:  Move the admission of PX366,

16   Your Honor.

17              MR. PETROCELLI:  No objection.

18              MR. CONRATH:  All right.

19              THE COURT:  So is this under seal or not?

20              MR. CONRATH:  Yes.

21              THE COURT:  Does it need to be under seal?

22              MR. CONRATH:  So it has been -- yes.  There are

23   several items within it that are confidential.  I can submit

24   a redacted version that omits those later for the Court, if

25   that's appropriate.
```

1    THE COURT:  We'll put it under seal for now.

2    MR. CONRATH:  Okay.

3                        (Government's Exhibit PX366
                          received into evidence
4                          under seal.)

5    MR. CONRATH:  May I proceed?

6    THE COURT:  Yes.

7  BY MR. CONRATH:

8    Q    What's the date of the letter that was your

9  submission?

10   A    The date of the proposal was November 29th, 2016.

11   Q    Thank you.

12        What was your role in this Altman Vilandrie

13  project for Charter?

14   A    I led the project, so that means that I was the

15  lead member of the team that was doing the presentation, the

16  development of this proposal, and then I worked with the

17  team to do the proposal -- the work that was proposed.

18   Q    And as the leader, were you responsible for the

19  output?

20   A    Yes.

21   Q    The project was done at your direction?

22   A    Yes.

23   Q    Did Altman Vilandrie deliver a report to Charter

24  at the end of this project?

25   A    We did.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1244

1      Q    Did Altman Vilandrie have a contract for the --

2   for doing this project?

3      A    We did.

4      Q    Would you please look at PX367 in your binder.

5           Do you have it?

6      A    I do.

7      Q    Is PX367 a series of emails and an attached

8   statement of work?

9      A    Yes.

10     Q    And was this statement of work for the Charter

11  project?

12     A    It was.

13     Q    The email at the top was to you, and you received

14  a copy of the others; is that right?

15     A    Yes.

16     Q    Was the attached statement of work, starting at

17  the fourth page of PX367, prepared at your direction as the

18  leader of the project?

19     A    Yes.

20     Q    And was it part of the business of

21  Altman Vilandrie to regularly prepare statements of work

22  when clients request them?

23     A    Yes.  This is actually the client's template that

24  they have us fill out when we do projects for them.

25     Q    And was PX367 kept in the ordinary course of the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1245

```
 1   business Altman Vilandrie?

 2        A     Yes.

 3             MR. CONRATH:  Your Honor, I move for admission of

 4   PX367 under seal.

 5             MR. PETROCELLI:  Your Honor, no objection to the

 6   admission.  But I do object to confidentiality with respect

 7   to the cover email that discusses their compensation.

 8   I don't think that should be kept confidential.

 9             THE COURT:  Come on up.

10             You can step down.

11             (Sealed bench conference)

12             MR. CONRATH:  This version shows the portions as

13   to which confidentiality has been claimed.  The red boxes

14   are the confidentiality there.

15             THE COURT:  I don't have that version.

16             MR. CONRATH:  Yeah.  It's provided to counsel for

17   purposes of saying what's not confidential.  We can submit a

18   redacted version of this.  The red boxes, as with

19   defendants, are the claims of confidentiality.

20             So to the --

21             MR. PETROCELLI:  I just don't want to -- I'm just

22   going to elicit from him -- I guess now you're going to

23   maybe.  I think it goes to --

24             THE COURT:  That's fair.

25             You can't keep that confidential.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1246

```
 1              MR. CONRATH:  Right.  It's their claim.  But --

 2              THE COURT:  Who's claiming it, Charter?

 3              MR. CONRATH:  Charter.  No, no, no.  I'm sorry.

 4      Altman.

 5              THE COURT:  So if that's their claim, I'm

 6      overruling their claim.  What they get paid, how much they

 7      get paid is fair game for cross-examination.  So if you want

 8      to bring it out in direct, you're welcome to.  If not -- so

 9      I'm not going to delete that from here.

10              (Open court)

11              THE COURT:  The objection is sustained.

12              You may proceed.

13              MR. CONRATH:  Okay.  And is the document admitted?

14              THE COURT:  The document is admitted as is.

15              MR. CONRATH:  Right.

16              THE COURT:  With regard to those numbers.

17              MR. CONRATH:  Yes.

18                                  (Government's Exhibit PX367
                                     received into evidence.)
19      BY MR. CONRATH:

20          Q    Would you look at the seventh page, the page

21      numbered at the bottom PX367-7.

22          A    Yes.

23          Q    You see at the bottom of the page there where it

24      says "consultant's manager"?

25          A    Yes.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1247

1     Q     And was that you in this case?

2     A     That's correct.

3     Q     And this part of the statement of work says,

4   "Qualifications required are experience in STB analysis and

5   detailed primary research."

6           Do you see that?

7     A     I do.

8     Q     And what does STB mean in this context?

9     A     Set-top box.

10    Q     And do you have experience in set-top box

11  analysis?

12    A     I do.

13    Q     And detailed primary research, what does that mean

14  in this context?

15    A     In this context, it means advanced primary

16  research techniques.

17    Q     That includes surveys?

18    A     Yes.

19    Q     And you have that experience?

20    A     I do.

21    Q     Would you look at the page 367-4.

22          Do you see that?

23    A     Yes.

24    Q     Paragraph 5 is entitled "Engagement."  Does that

25  describe the work that you were going to do under the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1248

1    Charter project?

2         A    That's correct.

3         Q    And staying within the framework of what's

4    described there, can you tell us Altman Vilandrie was

5    contracted to do for Charter under this statement of work?

6         A    We were quantitively evaluating the value of

7    individual cable networks and contract groups.  And we did

8    that through a number of analytic methods.

9         Q    And was part of what you were supposed to do --

10   when you say "contract groups," do you mean a company like

11   Turner Broadcasting or Disney?

12        A    Yes, both that and sometimes companies break their

13   up their cable networks into separate contract groups.

14        Q    And was part of your analysis to look at, make an

15   estimate of what might be the effect on Charter if it

16   removed certain contract groups or networks from its video

17   service?

18        A    That's right.  We produced a financial analysis

19   around that.

20        Q    And you did that for how many networks or

21   channels?

22        A    Roughly, 150 channels.

23        Q    Would you look at the next page, page PX367-5.

24   Do you see the box there?

25        A    I do.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1249

1    Q    And what's in that box?

2    A    These were the individual work streams that were

3  part of the overall engagement.

4    Q    And what was the time period of the project, going

5  from the start date to the end date?

6    A    The start date, the first start date was

7  January 3rd, 2017, and the final end date was April 14th,

8  2017.

9    Q    And near the end, the fifth item, it says,

10 "Preparation and presentation of executive summary."

11 Did you prepare a report, an executive summary for the

12 client in this case?

13   A    We did.

14   Q    And was that on or around April 14th?

15   A    Yeah.  It was a few weeks delayed because of delay

16 in collecting some data.

17   Q    Would you look, please, in your binder, at PX79.

18        Mr. Bewley, PX79 is a document, a presentation,

19 entitled "Content Valuation Project Update, Final Readout,"

20 dated April 27th, 2017; is that right?

21   A    That's correct.

22   Q    And were you personally involved in the

23 preparation of this document?

24   A    I was.

25   Q    And as a team leader, you're ultimately

1    responsible for it?

2        A    That's correct.

3        Q    And do you recognize PX79 as one of the final

4    reports that you provided to Charter near the end of that

5    project?

6        A    That's correct.

7        Q    And it's part Altman Vilandrie's regular business

8    to prepare such reports for clients?

9        A    That's correct.

10           MR. CONRATH:  Your Honor, we offer PX79 into

11   evidence under seal.

12           THE COURT:  You can approach.

13           MR. PETROCELLI:  No objection.

14           (Sealed bench conference)

15           THE COURT:  All right.  Now, I understand you're

16   steeped in this.

17           MR. CONRATH:  Right.

18           THE COURT:  I'm looking at this document, this is

19   not a report.

20           MR. CONRATH:  Okay.

21           THE COURT:  You can use the word "report" if you

22   want to use it, but it's not accurate.

23           MR. CONRATH:  Okay.

24           THE COURT:  This is a slide show.

25           MR. CONRATH:  Okay.  Fair enough, Your Honor.

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 1226 of 3826

1251

1    THE COURT:  This is a series of slides.  God only

2  knows why they call this a report.

3    I don't call it a report.  And I certainly am not

4  going to call a report an opinion of it.  This is a slide

5  show.

6    MR. CONRATH:  Yes.  Yes, it is.  It's a

7  presentation, Your Honor.

8    THE COURT:  It's a presentation and chunks of

9  pages.  I mean, one page at a time as if they were standing

10 in some projector.  Okay.  Here's what we're showing on this

11 page.

12    So I'm not going to buy this being called a

13 report.  So you can either modify what you just did --

14    MR. CONRATH:  Sure.

15    THE COURT:  -- or I can clarify it.

16    MR. CONRATH:  No.

17    THE COURT:  But to me, this is not a report.

18    MR. PETROCELLI:  And that's the document that was

19 given to Professor Shapiro --

20    THE COURT:  Okay.

21    MR. PETROCELLI:  -- that he said was the most

22 important piece evidence, and we'll get the pages.  But

23 there isn't any report, Your Honor.

24    THE COURT:  Now, obviously, there are things in

25 the exhibit I'm looking at that are boxed in red and marked

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 1227 of 3826

1252

 1   as recommended methodology.

 2          MR. CONRATH:  I think that red is in the original,

 3   Your Honor.

 4          MR. PETROCELLI:  That's their red, Your Honor.

 5          THE COURT:  Oh, that's their red.

 6          MR. PETROCELLI:  They're pointing at links that

 7   they're recommending to the client by putting it in red

 8   boxes, the red diamonds.

 9          MR. CONRATH:  This document does not have red

10   boxes for confidentiality.  The confidentiality claim is as

11   to the entire document.

12          THE COURT:  All right.  Well, so as an exhibit, it

13   will have these self-presumptive red designations by the

14   Altman Company, right?

15          MR. CONRATH:  Yeah.  They're not -- the red that's

16   in there is not a confidentiality claim.

17          THE COURT:  And they want this under seal?

18          MR. CONRATH:  Yes.

19          THE COURT:  All right.  You're not objecting to

20   that?

21          MR. PETROCELLI:  No, Your Honor, although I am

22   going to bring out some of the information in that document

23   and I'll keep it at a high level.

24          THE COURT:  Well, you've only been given

25   permission so far to do those two numbers.  So if you're

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  going to go beyond those, then you better be checking in,

2  which it's lunchtime right now.  Are you almost done with

3  like a segment of your questioning?

4          MR. CONRATH:  I'm actually about to start a

5  segment of my questions.

6          THE COURT:  You're going to start.  We might as

7  well just take a luncheon recess.

8          (Open court)

9          THE COURT:  Why don't you correct that issue that

10  we just went over, and then we'll take a luncheon recess.

11          MR. CONRATH:  May I proceed?

12          THE COURT:  Yeah.

13  BY MR. CONRATH:

14      Q    Mr. Bewley, PX79 is a slide deck?

15      A    Correct.

16      Q    It's a presentation?

17      A    That's correct.

18      Q    And you used it to give information to Charter

19  about the work that you'd done on the project?

20      A    Yeah.  We used PowerPoint presentations for our

21  final reports.

22      Q    All right.  It's your way of communicating the

23  output of your project to the client?

24      A    Yes.

25      Q    And there isn't a separate report that would look

```
 1   like a written text, right?  And this is not a report in the

 2   sense of being a written text; is that right?

 3        A    That's true.  We don't produce a written Word doc

 4   report.

 5             THE COURT:  All right.  We're going to take the

 6   luncheon recess.

 7             Now, you're a witness under oath in the case.

 8   Have you testified before anywhere?

 9             THE WITNESS:  Only at that deposition.

10             THE COURT:  Okay.

11             Well, you've never testified in court, then?

12             THE WITNESS:  No.

13             THE COURT:  All right.  So here's what this means.

14   This means that you're not at liberty to discuss your

15   testimony so far or what it might be when you return with

16   anyone, including your lawyer.  You can't talk to anyone

17   about what you've been talking about or what you might talk

18   about when you return.  You have to stay independent of all

19   others.

20             If you're asked a question under oath, which you

21   might be, "Have you discussed your testimony with anyone

22   since you left the stand?" your answer has to be "no."  If

23   it isn't "no," then we have a problem.

24             You have to stay independent of all others.  You

25   cannot talk to anyone about your testimony so far or what it
```

1255

```
 1    might be when you return.

 2             Do you understand that?

 3             THE WITNESS:  I do.

 4             THE COURT:  You can step down.  I'll see you in an

 5    hour and a half.

 6             THE WITNESS:  Thank you.

 7             MR. CONRATH:  May I approach, Your Honor?

 8             THE COURT:  Yes, you can approach.

 9             You can step down.  Go ahead.  Go to lunch.

10             (Sealed bench conference)
```



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1256



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1257



1258



8          (Open court)

9                                (Government's Exhibit PX79
                                  received into evidence
10                                under seal.)

11         THE COURT:  See you at 2:35.

12         DEPUTY CLERK:  All rise.

13         This Honorable Court will stand in recess until

14    the return of court.

15         (Proceedings concluded at 1:06 p.m.)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: April 3, 2018_____    /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        :
                                 :
               Plaintiff,        :          CV No. 17-2511
        vs.                      :
                                 :          Washington, D.C.
                                 :          Tuesday, April 3, 2018
AT&T, INC., ET AL.,              :               2:40 p.m.
                                 :
                                 :               Day 7
                                 :
               Defendants.       :
---------------------------------x


                         AFTERNOON SESSION
                    TRANSCRIPT OF BENCH TRIAL
              BEFORE THE HONORABLE RICHARD J. LEON
                 UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:     Craig W. Conrath, Esquire
                        Eric D. Welsh, Esquire
                        Donald G. Kempf, Jr., Esquire
                        Peter J. Schwingler, Esquire
                        Andrew Finch, Esquire
                        Lisa A. Scanlon, Esquire
                        U.S. DEPARTMENT OF JUSTICE
                        Antitrust Division
                        450 Fifth Street, NW
                        Washington, DC  20530
                        (202) 532-4560
                        craig.conrath@usdoj.gov
                        eric.welsh@usdoj.gov
                        donald.kempf@usdoj.gov
                        andrew.finch@usdoj.gov
                        lisa.scanlon@usdoj.gov

```
1    Appearances Continued:

2    For Defendant AT&T        Katrina M. Robson, Esquire
     and DirecTV Group        O'Melveny & Myers LLP
3    Holdings, LLC:           1625 Eye Street, NW
                              Washington, DC  20006
4                             (202) 220-5052
                              krobson@omm.com
5
                              Daniel M. Petrocelli, Esquire
6                             M. Randall Oppenheimer, Esquire
                              O'MELVENY & MYERS LLP
7                             1999 Avenue of the Stars
                              8th Floor
8                             Los Angeles, CA  90067
                              (310) 553-6700
9                             dpetrocelli@omm.com
                              roppenheimer@omm.com
10
                              Michael L. Raiff, Esquire
11                            Robert C. Walters, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
12                            2100 Mckinney Avenue
                              Suite 1100
13                            Dallas, TX 75201
                              (214) 698-3350
14                            mraiff@gibsondunn.com
                              rwalters@gibsondunn.com
15
     For Defendant            Kevin J. Orsini, Esquire
16   Time Warner, Inc.:       Peter T. Barbur, Esquire
                              CRAVATH, SWAINE & MOORE LLP
17                            Worldwide Plaza
                              825 Eighth Avenue
18                            New York, NY  10019
                              (212) 474-1140
19                            korsini@cravath.com
                              pbarbur@cravath.com
20
     Court Reporter:          Crystal M. Pilgrim, RPR, FCRR
21                            Official Court Reporter
                              United States District Court
22                            District of Columbia
                              333 Constitution Avenue, NW
23                            Washington, DC  20001
                              (202) 354-3127
24                            crystal_pilgrim@dcd.uscourts.gov

25
```

1                        Table of Contents

2                          Direct   Cross   Redirect   Recross

3    On behalf of the Plaintiff:

4        Stefan Bewley

5            By Mr. Conrath        1271              1325

6            By Mr. Petrocelli            1290                 1332

7        Thomas Montemagno

8            By Ms. Scanlon        1340

9            By Mr. Walters               1354

10

11

12                       E-X-H-I-B-I-T-S

13                                        Marked   Received

14   On behalf of the Plaintiff:

15   Exhibit No. 373                                  1347

16

17   On behalf of the Defendant:

18   Exhibit No. 106                         1308

19   Exhibit No. 107                         1308

20   Exhibit No. 681                                  1315

21   Exhibit No. 684                                  1315

22   Exhibit No. 687                                  1319

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1                              -oOo-
                        AFTERNOON SESSION
2

3            THE COURT:  Remain under oath.  All right.

4            MR. CONRATH:  Your Honor, may I approach one more

5    time?

6            THE COURT:  Sure.

7            (Sealed Bench Conference.)



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



1   MR. PETROCELLI:  Your Honor, there's a gentleman

2   sitting up in front of the bar and one of the lawyers on my

3   side asked who he was.

4   THE COURT:  First row?

5   MR. PETROCELLI:  First row in front of the bar.  He

6   refused to identify himself.  So when I saw him down in the

7   cafeteria --

8   THE COURT:  Where is he now?

9   MR. PETROCELLI:  He's right there, he has the pink

10  tie on, okay.

11  THE COURT:  The third one in?

12  MR. PETROCELLI:  Third one in from the aisle.

13  So I politely went up to him in the cafeteria and I

14  asked him who he was.  He told me that he was, it was like

15  cross examination a little bit.  But the bottom line was he

16  told me he's a consultant for the Department of Justice.  That

17  he's a lawyer and he's a consultant for the Department of

18  Justice.

19  I don't understand why consultants are sitting where

20  they are and I just wanted to raise the issue and find out what

21  he's doing here.  He said he was consulting on this case.

22  MR. CONRATH:  Yes, he's a litigation consultant on

23  this case by giving us advice.  He is a lawyer.  We have other,

24  as I believe the other side.

25  THE COURT:  I know who he is.

1           MR. PETROCELLI:  You know who he is?

2           THE COURT:  Well, I don't know what he's doing in

3    this case.

4           MR. PETROCELLI:  Okay.

5           THE COURT:  But he is someone I have met and know who

6    he is.  He's an attorney, he's a partner at Kirkland and Ellis.

7    Is he still with Kirkland and Ellis?

8           MR. CONRATH:  He is not.

9           THE COURT:  He left Kirkland?

10          MR. CONRATH:  Yes, that's right.

11          MR. PETROCELLI:  Just a week ago.

12          MR. CONRATH:  Recently.

13          THE COURT:  I don't know that.

14          MR. PETROCELLI:  A lawyer in a law firm for AT&T.  I

15   don't know, the whole thing was just sort of jarring to hear

16   about a consultant sitting above the bar, but I just wanted to

17   point it out to the Court.

18          MR. CONRATH:  I think both sides have non-lawyers

19   when they are assisting lawyers sitting.  So the person that

20   runs our computer system is not a lawyer for example.  That may

21   be true on the other side as well.

22          THE COURT:  What's his name?

23          MR. CONRATH:  Rob Gasaway.

24          MR. PETROCELLI:  What's his name?

25          MR. CONRATH:  Gasaway.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  I know him.  I've met him.  He's not a

 2  personal friend, someone I socialize with or anything like

 3  that.  I'll see him at occasional events, but that's it.

 4              MR. PETROCELLI:  Okay, thank you.

 5              MR. CONRATH:  He's advising us, trying to help us do

 6  a good presentation, Your Honor.

 7              MR. PETROCELLI:  Thank you.

 8              MR. CONRATH:  Thank you.

 9              (Open court.)

10         GOVERNMENT WITNESS STEFAN BEWLEY PREVIOUSLY SWORN

11                 DIRECT EXAMINATION (Continued)

12  BY MR. CONRATH:

13  Q.   Mr. Bewley, would you turn to PX 79, page 5 of the PX 79?

14  If you would.

15  A.   Yes.

16  Q.   Does page 5 of PX 79 describe the methodology that you

17  used in the project for Charter?

18  A.   Yes.

19  Q.   And are you able to discuss in more detail the methodology

20  that you used in the Charter project without disclosing

21  confidential information?

22  A.   Yes.  So what I can describe is the key objective as the

23  page states is to understand the value of programming content.

24     We have a couple of different methods to do that.  One

25  method is through a survey.
```

1      Another method is through set top box analysis.  Both of

2  these methods have their strengths and weaknesses, so using

3  both of them can help triangulate a correct answer.

4      And then we have a third method which is called a hybrid

5  where we take data from each of those two methods to help

6  further provide an additional data point.

7  Q.   Can you describe IN more detail than that without

8  disclosing confidential information?

9  A.   Sure.  So for the survey broadly what we're trying to do

10 is we're trying to understand what people perceive to be the

11 value of different programming.

12     And we do this by being able, the benefit of the survey is

13 that you can ask them directly.  However, what we and other

14 people that practice surveys have found it's very hard for

15 somebody to understand exactly what the value of one component

16 is when they're buying an overall service that includes brand,

17 price, broadband speed and a variety of television networks.

18     So we use instruments in the survey called a channel

19 chooser, a Max stiff and a conjoint.  And the ultimate goal

20 there is to be able to truly understand the customer's

21 underlying preferences for the individual cable networks.

22 Q.   Are all of those standard tools used in survey research?

23 A.   The Max stiff and the conjoint is.  The channel chooser is

24 just a specific way of asking a very standard question which is

25 how much of a priority is a given cable network.  I think the

confidential aspect is how we combine those.

Q.   All right.  That was your explanation of a survey?

A.   Right.

Q.   Have I exhausted what you feel you can tell us without disclosing confidential information about the survey?

A.   One final piece of information that's not confidential which is that after we have the survey done and we analyze the results of the survey, fundamentally what you're getting is the individual utility or the value of these different components. Not only the cable networks but also like I mentioned before, a brand prize, broadband speed and others.

     The benefit of this beside that information itself is that you can put that into a simulator and then you can simulate potential changes to the current market place.  Such as what would happen if a particular set of cable networks were not available or if somebody changed their price or if they changed their broadband speed or a variety of different simulations and so that's part of how we got to the findings in our report.

Q.   All right?

A.   And then the final piece is that we evaluated both existing customers and prospective customers call prospects.

Q.   Have you now told us what you can tell us without revealing confidential information?

A.   Yes.

Q.   All right.  Is there more that you could tell us if you

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  could reveal confidential information?

2  A.   Yes.

3  Q.   I'm not going to ask you TO do that at this point.

4      You said the second topic or the second methodology

5  involved a set top box?

6  A.   Right.

7  Q.   Can you explain more about what that is without revealing

8  confidential information?

9  A.   Yes.  So one of the benefits of the survey is that you get

10  to ask people directly what they, how much they value these

11  different components of a telecom offer.

12     One of the challenges though is that stated preferences and

13  sometimes despite the best methods that we just described,

14  those preferences are not perfectly reflecting of exactly

15  people's actions.

16     So the set top box data measures people's true actions and

17  what this is it's really just the viewing data to which the TV

18  was tuned to.

19     So for example, if you're watching ABC or NBC, then the set

20  top box data will record that and record how long you're

21  watching that.

22     The client provided us that information for individual

23  existing customers anonymized and then we could evaluate that

24  to understand how much viewing time was spent on a given cable

25  network and we used that plus some confidential analysis to

1  infer how important a cable network was by inference on how

2  much time they spent viewing it.

3  Q.   So the idea is if I watch it more, it's more important to

4  me?

5  A.   Correct.

6  Q.   That's the basic idea?

7  A.   Right.

8  Q.   Have you told us what you can tell us about the set top

9  box data without revealing confidential information?

10  A.   Yes.

11  Q.   Is there more that you could tell us if you could reveal

12  confidential information?

13  A.   Yes.

14  Q.   I'm not going to ask you that.

15      But you said the third was a hybrid methodology.  Can you

16  explain that without revealing confidential information?

17  A.   Yes.  The, both the set top box and the survey method have

18  their strengths and their draw backs.  One of the draw backs to

19  the set top box method is that you understand how much people

20  have viewed.  You don't really understand how much value they

21  got out of it.  Maybe they were viewing that because that was

22  just what was on the background or maybe they really cared

23  about it.

24      So we can take set top box data, but we can also know from

25  the survey how much they've stated they actually care about it.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  And what we've noticed in our data analysis is that channels

2  that are more niche where a smaller percentage of the people

3  care about it, actually those people that do care about it view

4  it for a higher percentage of their time.  So not as many

5  people care about it but they really care about it.

6      And so that plus combining the survey data where people

7  supposedly state where they care about it and the set top box

8  data where you understand how much they view it in the hybrid

9  method, we combine those, took into account the observation

10  that we understood from the regressions and modified the point

11  at which we thought a cable network being absent would cause

12  somebody to churn or leave.

13          THE COURT:  Are you saying that the people that

14  you're surveying are the same people who set top box data you

15  have or are they different people?

16          THE WITNESS:  We can't do a one to one match because

17  a set top box data is anonymized.  But generally we know when

18  we are doing a survey the broad geography i.e. the Washington

19  D.C. area and we know if they are a customer or not.  So we

20  have that but we're not trying to do a one to one

21  identification.

22  BY MR. CONRATH:

23  Q.   Would explaining more about the hybrid methodology require

24  you to reveal confidentiality information?

25  A.   Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Is there more you could explain?

2  A.   Yes.

3  Q.   I'm not going to ask.

4       Would you turn to page 6 of PX 79?

5       Does this page describe the results that you delivered to

6  Charter about loss estimates?

7  A.   That's correct.

8  Q.   So are you able to discuss in detail the results that you

9  report in Charter without disclosing confidential information?

10 A.   I can describe what's on the page.

11 Q.   Why don't you describe it at a level that in your view

12 does not disclose confidential information?

13          THE COURT:  Well, hold on now.

14      Let's keep straight the distinction between what your

15 company views as confidential and what your clients view as

16 confidential.  Because there, there might be some situations

17 where there isn't an overlap.

18      For example, you may have proprietary analytics.  Your

19 client doesn't care if you reveal those or not, that's your

20 business.

21          THE WITNESS:  Right.

22          THE COURT:  There may be some information that your

23 study yielded that they view as confidential but you don't

24 particularly.

25          THE WITNESS:  There could be.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  There could be.

 2         So let's keep clear the distinction between what your

 3  company views as confidential.

 4              THE WITNESS:  Right.

 5              THE COURT:  What your client views as confidential or

 6  what both view as confidential.

 7              THE WITNESS:  Okay.

 8              THE COURT:  All right, go ahead.

 9              THE WITNESS:  This is with respect to my company's

10  confidentiality.

11              THE COURT:  Right.

12  BY MR. CONRATH:

13  Q.   So could you describe at a high level what is the

14  information contained on page 6 of page PX 79?

15  A.   Yes.  So there are a number of different contract groups

16  that we evaluated.  The points above each contract group

17  represent the estimated video customer loss.

18     If that contract group was not available in the client's

19  pay-TV line up, so the three methods that we just discussed are

20  there.  Survey, set top box and hybrid.

21     There's a diamond over the recommended one for each of the

22  different, three different methods.  For one of the contract

23  groups there was also some, and this is public information,

24  that a cable company several years ago dropped Viacom

25  programming and so the external bench mark is an estimate of
```

1  the customer losses on that, not from our analysis, but from

2  data reviewing that customer information from someone dropped

3  Viacom.

4  Q.   Was that from media reports from public sources?

5  A.   We were, that's public information to my knowledge.  We

6  were provided it by our client.

7       I just wanted to explain that external bench mark point.

8       Then below that chart you see individual cable networks

9  that are associated as part of that contract group that we

10  believe are in some cases potentially causing the survey value

11  to be higher than the set top box data or not.

12      And without naming it, the way to think about this is that

13  sometimes for example you have content that is what we call

14  highly substitutable.  So an example is sometimes children's

15  programming there's widely available beyond pay-TV on the

16  internet and elsewhere.

17      And so although that might have a high percentage of

18  viewing on a set top box data, what you find in the survey data

19  is that it's not as valuable.  And so that's one example of

20  these different cable networks that are here to help explain

21  some of the deviants from the three methods.

22  Q.   Could I keeping in mind the Court's direction to focus on

23  all of the Vilandrie's confidential information.  If I ask you

24  a question that you believe focuses on something that is

25  Charter confidential or that your contract with Charter

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  requires, would you tell us and we'll resolve it, but if you

2  know that I ask a question like that, please let me know and

3  then I'll think of whether I can rephrase it?

4  A.   Okay.

5  Q.   So the recommended approach, can you explain what that

6  means?

7  A.   Yes.  So we have three different answers from our three

8  different methodologies.  And we, the recommended is the one

9  where we thought it was most likely to actually take place.

10  Q.   That's recommended to Charter as what they should use?

11  A.   Right.  They're going to take into account a variety of

12  factors in their negotiations and this is what we recommended

13  they use in terms of the economic analysis.

14  Q.   All right.  I'd like to focus you on the column for Turner

15  Broadcasting System One.

16     Do you see that?

17  A.   I do.

18  Q.   All right.  I'm going to ask you about the numbers in this

19  and I want you to understand the Court has ruled that we can

20  talk about these numbers?

21  A.   Okay.

22  Q.   Ms. Wood confirmed that for me earlier.

23     So there are three numbers, these are loss estimates for

24  Turner, correct?

25  A.   For Charter if Turner is dropped.

1    Q.    Sure, sure.  Thank you.

2        The top two really they are very close are 14 percent; is

3    that right?

4    A.    That's correct.

5    Q.    And those represent which methodologies?

6    A.    Those represent the survey and the set top box.

7    Q.    All right.  And the third one represents 9 percent; is

8    that right?

9    A.    That's correct.

10    Q.    And what methodology is that?

11    A.    That's the hybrid methodology.

12    Q.    And which is the recommended meth -- which is the

13    recommended loss estimate for Charter to use?  The one that

14    Altman Vilandrie recommended?

15    A.    The hybrid methodology.

16    Q.    That's the 9 percent, right?

17    A.    Correct.

18    Q.    So there was an earlier hybrid estimate for Turner that

19    was lower than 9 percent; is that right?

20    A.    That's correct.

21    Q.    And that was around 5 percent?

22    A.    That's correct.

23    Q.    And at the time that the hybrid, the stage of the process

24    when the hybrid estimate was 5 percent, what was the

25    recommended number, the recommended loss estimate for Charter

1  to use?

2  A.   Fourteen percent.

3  Q.   So when the adjustment was made from 5 to 9, the

4  recommendation, the recommendation from Altman Vilandrie went

5  up or down?

6  A.   The recommendation went down from 14 to 9 percent.

7  Q.   Now when you made the change from 5 to 9, was that Altman

8  Vilandrie or Charter who decided to make that change?

9  A.   We decided to make the change, Altman Vilandrie.

10 Q.   Was that Altman Vilandrie's decision based on a

11 quantitative analysis?

12 A.   It was.  Would you like me to explain that?

13 Q.   Explain as much as you can without revealing confidential

14 information.  Yes, please do?

15 A.   The hybrid methodology had forced cable networks into

16 three groups and the rational for that was because of not the

17 analysis, but because of the financial model required it to fit

18 into three groups.

19    Because of that then you would as opposed to getting the

20 underlying weighted average of a given cable contract group,

21 you instead push it into one of these three categories.

22    And for Turner the, it was right in the middle between

23 group two and group three.  We pushed it into group three

24 because we had to given that constraint that caused the earlier

25 estimate.  Turner was the only one on this page where the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   hybrid was significantly far away and not either close to or in

 2   between the other two methodologies.

 3       So because of both the fact that it was between group two

 4   and group three and because it was a deviation from the other

 5   methodologies, we went back and used the actual weighted

 6   average as opposed to forcing it into those groups.

 7               THE COURT:  What do those groups represent?

 8               THE WITNESS:  Broadly they were different categories

 9   of how popular content was.  So there was extremely popular

10   mass market content.  There was kind of broadly popular but not

11   mass market and then there was niche content like --

12               THE COURT:  Is that 1, 2 and 3?

13               THE WITNESS:  Yeah.

14               THE COURT:  So the first one was what, broadly

15   popular?

16               THE WITNESS:  Broadly popular as quantitatively

17   measured by the percent must have from our survey.

18       Just as a rough example a cable network like ABC.

19               THE COURT:  Okay and the second one was what?

20               THE WITNESS:  Moderately popular.  Again,

21   quantitatively measured by percent must have.

22               THE COURT:  The last one is niche?

23               THE WITNESS:  Niche, less popular.

24               THE COURT:  Specialty?

25               THE WITNESS:  Yeah, specialty.  MTV, Univision.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  TCM?

 2              THE WITNESS:  Perhaps.  I can't remember exactly.

 3  But yes.

 4              THE COURT:  All right.

 5  BY MR. CONRATH:

 6  Q.   In this document, PX 79, did you make that same change to

 7  a weighted average hybrid method for other networks than

 8  Turner?

 9  A.   Not in this document.

10  Q.   That's for the reason that you just explained?

11  A.   Correct.

12  Q.   It was the only one with the deviation and close to the

13  line?

14  A.   The combination of those two factors.

15  Q.   All right.  Did you subsequently make that same adjustment

16  to a weighted average method for other networks?

17  A.   We did and we refined it for all of the networks even

18  further in October.

19  Q.   Charter paid you to apply the adjusted methodology to all

20  of the networks in October?

21  A.   That's right.  It was one part of a statement of work.

22  Q.   Why didn't you do it in this document, this April PX 79?

23  A.   Two reasons.  One, it wasn't part of our scope.

24     And two, we were at the end of the project.

25  Q.   Time to deliver your report?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1   A.   Correct.

2   Q.   Did anyone tell you what the number had to be for Turner?

3   A.   No.

4   Q.   Did anyone tell you to change the Turner number, anyone

5   from outside of Altman Vilandrie?

6   A.   No.

7   Q.   Now at the time of delivering this project to Charter, did

8   you deliver them a tool?

9   A.   We delivered a couple of tools.

10      You want me to explain that?

11  Q.   Explain that again within the question of confidentiality?

12  A.   One was a simulator.  A simulator so that they could run

13  their own scenarios about different cable TV lineups.

14     And another one was an Excel financial model that they can

15  understand the financial implications of different scenarios.

16  Q.   This was for them to do the kind of analysis that you had

17  done for future scenarios?

18  A.   Right.  The point being that they were going to be, they

19  would want to run their own scenarios.

20  Q.   They paid you to deliver this tool?

21  A.   Correct.

22  Q.   And that was delivered around the time of this April 27th

23  presentation?

24  A.   Shortly thereafter.

25  Q.   And when you delivered that did you have to hard code
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    something into that tool?

2    A.    Into the financial Excel model we had to.

3    Q.    And can you explain why you had to?

4    A.    Sure.

5    Q.    Tell me what you hard coded?

6    A.    So we hard coded the weighted average value from the

7    hybrid method for Turner.  And the reason why we did that was

8    as I mentioned before, the whole reason why we forced the

9    contract groups into group one, group two, group three was

10   because the Excel model couldn't accommodate all of the custom

11   results for each of the contract groups.

12       So the Excel model still functioned as accepting either

13   group one, group two or group three for Turner because we had

14   made that adjustment, we had to hard code that value.  But that

15   was only within the financial model.

16   Q.    Did you do later an updated version of the spread sheet in

17   the second project that you did for Charter?

18   A.    Right.  We, this financial model which just takes the

19   output of the customer loss, it doesn't do that analysis.

20       We made a larger and more flexible such that for each

21   contract group they had their own customized hybrid weighted

22   average value.

23   Q.    And you delivered that to Charter?

24   A.    In October.

25   Q.    And it didn't have any, it implemented the weighted

1   average methodology for all of the channels?

2   A.   That's correct.

3   Q.   So if we would look back again at the page 6 that we were

4   looking at of PX 79 just to be clear, the result of doing this

5   adjusted methodology, the weighted average methodology was that

6   Altman Vilandrie's hybrid estimation went from 5 to 9; is that

7   correct?

8   A.   That's correct.

9   Q.   The Altman Vilandrie recommendation of Charter went from

10  14 to 9?

11  A.   That's correct.

12  Q.   It went down?

13  A.   The recommendation went down.

14         MR. CONRATH:  No further questions, Your Honor.

15         THE COURT:  All right.  Let me ask you a question

16  before we turn to cross.

17      Who did you meet with at the company to explain all of

18  this to you?

19         THE WITNESS:  So our working team that we met with

20  would be Julie Unrue and Julya Friedman.

21      Then we had a select number of presentations to David

22  Ellen.

23         THE COURT:  David who?

24         THE WITNESS:  David Ellen.

25         THE COURT:  How do you spell that?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           THE WITNESS:  E-L-L-E-N.

2           THE COURT:  Oh, David Ellen.

3       What was his position if you remember?

4           THE WITNESS:  He's EVP.  I think he has a couple of

5   responsibilities but one of them is programming.

6           THE COURT:  And the two ladies you mentioned, what

7   were their jobs?

8           THE WITNESS:  Julie Unrue is a GVP group

9   vice-president and I couldn't give you the exact title but she

10  generally is in charge of programming, or analyzing

11  programming.

12          THE COURT:  Analytics?

13          THE WITNESS:  Yep.

14          THE COURT:  Were any of these negotiating people,

15  people who do negotiations?

16          THE WITNESS:  No, they're part of that team.  But I

17  don't, to my knowledge I couldn't say for sure, but I don't

18  believe that they're the negotiators.

19          THE COURT:  They're analysts?

20          THE WITNESS:  To my knowledge.

21          THE COURT:  Okay.

22      You can step down a second.

23      (Witness leaves the stand.)

24      Counsel.

25      (Sealed Bench Conference.)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  All right.  Now that's as much as you can

2   do with non confidential, right?

3          MR. CONRATH:  That's right.

4          THE COURT:  So I'm going to give you a chance to do

5   your cross based on that and obviously, the information that's

6   come out today.

7          MR. PETROCELLI:  I think I can do pretty much all of

8   my cross, if not all cut off at some point.  Take him through

9   the whole time line.

10          THE COURT:  These people that he just mentioned, are

11   any of these people your witnesses in this case?

12          MR. PETROCELLI:  No.

13          THE COURT:  So the person who is next?

14          MR. CONRATH:  Montemagno.

15          THE COURT:  Montemagno.

16          MR. PETROCELLI:  Not involved.

17          THE COURT:  He didn't even meet with them?

18          MR. PETROCELLI:  Not involved.

19          THE COURT:  Take a ten minute break.

20      (Open court.)

21      (Witness resumes the stand.)

22          THE COURT:  Going to take a ten minute recess.

23      You're a witness under oath in the case.  You know the

24   rules.  Don't talk to anyone, even your own lawyers, don't talk

25   to anyone about your testimony so far or what it might be when

```
 1   you return, all right.

 2         You can step down.

 3         (Witness excused.)

 4         (Recess at 3:22 p.m.)

 5         (Proceedings resumed at 3:35 p.m.)

 6         (Witness resumes the stand.)

 7              THE COURT:  All right, you remain under oath.

 8              THE WITNESS:  Your Honor, just one clarification.

 9         I was helping the Court Reporter spell Julie Unrue's

10   last name and saw that her title in the contract was GVP

11   programming finance.

12              THE COURT:  Okay.

13              THE WITNESS:  So I wouldn't know all of her

14   responsibilities beyond what I told you.

15              THE COURT:  That's fine.

16         Thank you.  Appreciate the clarification.

17         All right, Mr. Petrocelli, when you're ready.

18              MR. PETROCELLI:  Thank you.

19                     CROSS EXAMINATION

20   BY MR. PETROCELLI:

21   Q.   Mr. Bewley, Mr. Conrath asked you if your company is

22   opposing the merger.

23        Do you recall that?

24   A.   I recall the question being if I had an opinion on the

25   merger.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q.    Now you do know that your client Charter was opposing the

2    merger and is opposing the merger, correct?

3    A.    I don't know what Charter's position is other than what I

4    have read in the newspapers.

5    Q.    Well, you do know that they turned over your materials to

6    the Department of Justice, correct?

7    A.    I do know that.

8    Q.    Do you know the answer to that question, it's a simple

9    question.

10        Do you know whether or not they turned over your materials

11   to the Department of Justice, yes or no?

12   A.    I know they gave them the materials.

13   Q.    Okay.  And in fact, you yourself spoke to the Department

14   of Justice in a couple of lengthy phone calls, right?

15   A.    We had two phone calls.  Yes.  We had two phone calls.

16   Q.    And they lasted at least an hour or so, right?

17   A.    That's correct.

18   Q.    And you discussed these materials in the phone call,

19   correct?

20   A.    We discussed the materials for reporting in the phone

21   calls, correct.

22   Q.    And you also discussed in the phone call that you made a

23   change to the Turner number, correct?

24   A.    That was one of the topics, correct.

25   Q.    That you discussed with the Department of Justice back in

1   August of 2017, true?

2   A.   Correct.

3   Q.   Okay.  Now you know, you are aware that your materials

4   have been provided to the government's chief expert in this

5   case Professor Kaul Shapiro, correct?  You are aware of that,

6   right?

7   A.   I wasn't aware of that until your lawyer told me during my

8   deposition.

9   Q.   Okay.  And let me put up the first demonstrative.

10           MR. PETROCELLI:  This is the demonstrative 102, Your

11  Honor.

12           THE COURT:  Okay.

13  BY MR. PETROCELLI:

14  Q.   You are aware that Mr. Shapiro, referring to Plaintiff's

15  Exhibit 79 which Mr. Conrath went over with you, said that it

16  was the single best document for these purposes?  He said the

17  single best document for these purposes is an analysis by

18  Charter that considers the impact of losing all of the Turner

19  content.

20      And I'll represent to you that he was discussing the

21  subject of the subscriber loss rate.

22      You came out with conclusions about the subscriber loss

23  rate for Turner.  Mr. Conrath went over those with you,

24  correct?

25  A.   This is the first time that I'm reading that text, but

*** REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER ***

1  it's correct that I definitely came out with conclusions around

2  subscriber loss rate.

3  Q.   And you see that Mr. Shapiro goes on to say using the

4  lower end of the range, now that's the lower end of your range,

5  using the lower end of the range for both the loss of existing

6  and prospecting subscribers from the Altman Vilandrie studies,

7  I estimate the long term subscriber loss rate to be 10 percent.

8      Now the lower end of the range for Exhibit, in Exhibit 79

9  after you made the change was 9 percent, correct?

10 A.   Correct.

11 Q.   The lower end of the range before you made the change was

12 5 percent, correct?

13 A.   Correct.

14 Q.   Let me show you the next demonstrative, Demonstrative 103.

15     Professor Shapiro was deposed and asked the following

16 question:  Were you aware that the only adjustment in the

17 Altman Vilandrie study from April of 2017 that was hard coded

18 in was an increase in the departure rate for Turner and Turner

19 only?

20     Answer, I don't know what you're referring to there.

21     No, I'm not familiar with such a thing.

22     Now in your conversation with the Department of Justice you

23 are certain that you described to them the fact of the change

24 and the reason for it, correct?

25 A.   To the best of my recollection.

1   Q.   Who were the lawyers or people on the phone?  Was it a

2   phone interview?

3   A.   It was a phone call.

4   Q.   Both of them, right?

5   A.   Both.

6   Q.   Who did you speak to at the Department of Justice?

7   A.   I don't remember the names.

8   Q.   Do you remember a single one of them?

9   A.   No.

10  Q.   Did they introduce themselves to you?

11  A.   I suppose so.  Honestly, the effort was to try to minimize

12  our involvement in this proceeding.

13  Q.   Was there any economist on the phone call?

14  A.   I can understand that.

15       Sorry.

16  Q.   Let's try to stay with my questions, okay?

17  A.   Sorry.

18       What was your question?

19  Q.   Were there any economist on the phone?

20  A.   In the first one, no.

21       In the second one there were people other than lawyers.  I

22  believe they may have been economists, but I don't remember the

23  specifics.

24  Q.   Did they tell you that they were going to give your report

25  with the new low range, the 9 percent low range, not the 5

1  percent low range?  Did they tell you that they were going to

2  give that slide show presentation to their, for use in the

3  merger case or the merger review, did they tell you that?

4  A.   They were asking questions for the merger review, but they

5  didn't tell me how they were going to use materials.

6  Q.   Did they tell you that they were going to give it to their

7  chief expert in this case?

8  A.   No.

9  Q.   Did you ask them what they were going to do with it?

10 A.   No.

11 Q.   Did you tell them they couldn't use it?

12 A.   We -- no.  I know that our lawyers had conversations with

13 them about trying to minimize the amount of materials that we

14 handed over which resulted in those phone calls, but.

15 Q.   Are you aware that Professor Shapiro used the second of

16 your low ranges 9 percent to predict a 45 percent per sub per

17 month price increase?

18 A.   I wasn't aware of that.

19 Q.   Are you aware that Professor Shapiro received your first

20 low end of the range, 5 percent, there would have been a price

21 increase of zero?  Are you aware of that?

22 A.   I wasn't aware of that.

23 Q.   In preparation for your testimony today, you didn't come

24 in here cold.  By the way, I noticed that Mr. Conrath said that

25 you and he never met before.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    But you had some idea of what you were going to be asked,

2  right?

3  A.   I had the deposition that your team took of me.

4  Q.   Now you, I'm going to take you through a chronology here,

5  okay.  And in fact, I'm going to mark first of all the second.

6  The first slide or the first demonstrative was Defendant's 102.

7    The second one with the Shapiro deposition testimony was

8  Defendant's 103, and this next one is a timeline which I will

9  mark as Defendant's 104.  If I could put that up as I walk

10  through the events here.  I don't know that I'm going over all

11  of them.

12    Now you were, your firm received approximately $700,000 for

13  doing this work for Charter, correct?

14  A.   Yes.

15  Q.   And Charter, Charter is a big client of your firm, right?

16  A.   Certainly not our largest client.

17  Q.   But a significant client, right?

18  A.   It is an important client to us, but it's not, it's not in

19  our top three clients.

20  Q.   And you're an equity partner in the firm?

21  A.   Correct.

22  Q.   And you've done other assignments for Charter beside this

23  one, right?

24  A.   I have.

25  Q.   But this is the first assignment that you did in the video

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    dealing with the video eco system, correct?

2    A.    For Charter?

3    Q.    For Charter?

4    A.    (Nodding.)

5    Q.    Correct?

6    A.    Yes.

7    Q.    You have to answer audibly.  The Court Reporter cannot

8    take down nods of the head.

9        Now I think you testified that the purpose of this

10   engagement was to provide information to assist in contract

11   negotiations with programmers, correct?

12   A.    Right.  To quantify.

13       Sorry, would you like me to explain further?

14   Q.    Is that correct what I just said?

15   A.    That's correct.

16   Q.    Okay.  Now do you know who the head of programming

17   negotiations, or do you know who Tom Montemagno is?

18   A.    I learned of him in the deposition.

19   Q.    But all during your work on this project designed to

20   inform negotiators dealing with programmers, you never met the

21   head negotiator Tom Montemagno?

22   A.    I never met Tom.

23   Q.    Never spoke to him, correct?

24   A.    Correct.

25   Q.    And to your teams's knowledge he had nothing to do with

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   this assignment, correct?

 2   A.   I wasn't aware of anything.

 3   Q.   You didn't deal with him and your team members didn't deal

 4   with him, right?

 5   A.   That's correct.

 6   Q.   You dealt with who?

 7   A.   Julie Unrue, Julya Friedman and David Ellen.

 8   Q.   Now David Ellen is like the number two person in the

 9   company like Tom Rutledge?

10   A.   Very senior.

11   Q.   Very senior guy.  He's a lawyer isn't he?

12   A.   Could be.

13   Q.   He use to work at the FCC.  Did you know that?

14   A.   No.

15   Q.   And then at Cablevision?

16   A.   I knew he use to work at Cablevision.

17   Q.   And now he's at Charter.  And he was the top person with

18   whom you dealt, right?

19   A.   Correct.  Our day to day person was Julie Unrue but we

20   presented to Ellen.

21   Q.   Were you aware during your work on this assignment that

22   David Ellen was meeting with the DOJ to oppose this merger?

23   A.   I was not aware.

24   Q.   You were not aware that the very day that you met to go

25   over your slide show presentation, that was on April 26th,
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  right?

2  A.   I don't remember the exact date, but yes, roughly.

3  Q.   Do you know that on that same day that Mr. Ellen was

4  meeting with the DOJ to oppose this merger?

5  A.   I wasn't aware of that.

6  Q.   And are you aware that immediately after the meeting a

7  request was made for your materials?

8  A.   I wasn't aware of that.

9  Q.   And you were not aware that your materials were then

10  promptly sent to the DOJ?

11  A.   I know the only time I learned of the DOJ having our

12  materials is when they submitted a request to us for in August

13  of 2017.

14  Q.   Did you ever, given the purpose of this assignment,

15  didn't you think it was odd to meet with the mediator

16  Mr. Montemagno?

17  A.   No.  Our purpose was to try to understand the quantitative

18  value and as we heard from our clients, that information was

19  being used in preparation for negotiations.

20  Q.   But you saw no reason to talk to Mr. Montemagno about how

21  he might use it in the preparations for negotiations?

22  A.   No, we were still -- remember, this is a phased approach.

23  And we still had more phases to do after April.

24  Q.   But you did meet with Mr. Ellen, deep into work on March

25  21st, correct?

1  A.   Roughly that time frame.

2  Q.   And did Mr. Ellen tell you that he would then be using

3  your material and giving it to the DOJ to block this merger?

4  A.   No.

5  Q.   Now Mr. Conrath showed you the second slide show

6  presentation.  I want to talk about the first one, okay?

7  A.   Okay.

8       MR. PETROCELLI:  And that's exhibit, it's in the

9  binder, Your Honor.  Your Clerk and you have binders, so does

10 the witness and so does Mr. Conrath.

11 BY MR. PETROCELLI:

12 Q.   I think we're going to be looking at Exhibit 681, Defense

13 Exhibit 681.  Now before I go to Defense Exhibit 681, you

14 transmitted this document to Charter on Friday, April 21st,

15 correct?

16 A.   Do you want me to look to confirm that?

17 Q.   I'll tell you, I'll make it a little bit easier on you.

18    Take a look at Defense Exhibit 365 in your binder.

19       THE DEPUTY CLERK:  Is that defense or plaintiff?

20 BY MR. PETROCELLI:

21 Q.   Excuse me, that's actually a Plaintiff's Exhibit 365.

22 A.   I see it.

23 Q.   Do you have that?

24 A.   I do.

25 Q.   Okay.  Now this is an email chain and Kate Rodriguez was

1 the number two person who worked with you, correct?

2 A.    Correct.

3 Q.    At Altman Vilandrie and then Julya Friedman and Christine

4 Edmonds and Stefan Bewley also received a copy, that's you,

5 right?

6 A.    Yes.

7 Q.    And so if you go down to the bottom half of this chain,

8 April 21st at 9:03 p.m, okay?

9 A.    Yes.

10 Q.    Julie, Julya, those are the two women at Charter, right?

11 A.    Correct.

12 Q.    And this is coming from your team, right?

13 A.    Correct.

14 Q.    As discussed we wanted to share the final, you see the

15 word final?

16 A.    I do.

17 Q.    The final read out deck for Wednesday's meeting.

18    I'll recommend to you that April 21 is a Friday.  That

19 would mean Wednesday is April 26th, the date you met with the

20 Charter people to go over this, correct?

21 A.    Okay.

22 Q.    Now you also see in the Re line, if you go up to the next

23 email it says from Julya Friedman to you and your team and

24 Julya is asking a question which I will go over in a minute.

25    But you see the subject line, half co (sic) content

1   evaluation project, final read out materials.

2       Do you see that?

3   A.   I do.

4   Q.   So when this was presented, this was presented as labeled

5   as a final read out document, correct?

6   A.   Correct.

7   Q.   The document that you sent was exhibit, Defense Exhibit

8   681, correct?

9       If you need to turn to page 20, it would be page 23,

10  681.0023, you'll see the numbers there.  You can confirm that

11  that's the final document that has the 5 percent as the low

12  range.

13      Do you see that?

14  A.   Yes.

15  Q.   In this email you will agree with me that you did not

16  indicate in the email of the 21st that this was preliminary,

17  that there was a problem with the Turner assessment or anything

18  like that, correct?  The email, the transmittal email makes no

19  such statement, correct?

20  A.   The email doesn't say that.

21  Q.   Now Julya Friedman of Charter writes on April 25th, that's

22  the day of your meeting, going through the deck it appears that

23  you've identified pure STB data methodology.  That's set top

24  box data methodology as the recommended methodology for Turner

25  at 14 percent loss.  Could you explain why?

1    Now 14 percent loss means the loss subscriber rate or the

2  churn rate or the departure rate; however, those terms are

3  synonomous, correct?

4  A.    Correct.

5  Q.    Okay.  And that was the recommended loss subscriber rate

6  that appeared in this, in this final read out that was sent on

7  the 21st?

8  A.    Right.

9  Q.    Now a member of your team then responds to Julya at

10  Charter.

11        MR. PETROCELLI:  And by the way, that Julya is

12  J-U-L-Y-A, Ms. Reporter.

13  BY MR. PETROCELLI:

14  Q.    Julya responds -- Kate of your team responds to Julya

15  explaining how you got to the 14 percent loss subscriber rate,

16  correct?

17  A.    Correct.

18  Q.    And it is explained in the email that the Turner group

19  based on your analysis and your methodology that you applied

20  equally and even handily to all of the networks that you were

21  reviewing in the contract groups, meaning the families that

22  owned the networks, the Turner group ended up in what you

23  called group three, correct?

24  A.    Correct.

25  Q.    And you explained why the Turner group ended up in group

1  three, correct?

2  A.  We didn't give the full explanation, but we do highlight

3  that it's falling between group two and group three.

4  Q.  Well, we'll get to that.

5     But to be clear you said, you said that Turner was assigned

6  to group three in our mapping of regression results.

7     Do you see that?

8  A.  I do.

9  Q.  Due to a handful of niche i.e, lower percentage must have

10 networks within the group.

11    Do you see that?

12 A.  I do.

13 Q.  What you were telling Julya of Charter is that the reason

14 why Turner ended up in group three is because it had a number

15 of these lower percentage must have networks, right?

16 A.  Correct.  We go on to explain.

17 Q.  We'll get there.

18    The lower percentage must have networks were all the Turner

19 networks except for TNT, TBS and CNN, correct?

20 A.  I don't remember the specific ones.

21 Q.  But if your document were to so state, I can refresh your

22 recollection in it in a bit, does that ring a bell that it was

23 a, but those three that were in the so-called lowest percentage

24 of must have networks?

25 A.  It's possible.  It would be helpful to look at a document.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.    We'll get there.

2       Now and by the way, when you say lower percentage must

3  have, what it is you're referring to is this consumer survey

4  that you did, right?

5  A.    That's correct.

6  Q.    And one part of the, by the way, this was an internet

7  survey?

8  A.    It was.

9  Q.    So like what 10,000 people?

10 A.    Yeah, close to 10,000 people.

11 Q.    And you don't know who they are, right, they're anonymous?

12 A.    They're anonymous, they're a demographic profile in terms

13 of income and geography.

14 Q.    One of the things they were asked was whether for a 150

15 networks whether somebody answering this internet thing thought

16 they were a must have network, right?

17 A.    We asked them to categorize the networks, that's true,

18 between must have, somewhat interested and not interested.

19 Q.    But to be clear, in putting those three choices to the

20 10,000 people on their computer, you never once defined what

21 must have meant, correct?

22 A.    Correct.  That was a prelude to the more detailed

23 instruments that we talked about earlier today.

24 Q.    I'm talking about when they had to answer one of those

25 three things, what did you say, must have was one?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.    Somewhat interested.

2   Q.    Somewhat interested?

3   A.    Not interested.

4   Q.    Not interested.  When they were filling that out there was

5   nowhere where they could find a definition of what must have

6   meant; is that correct?

7   A.    That's correct.

8   Q.    And they couldn't call you up, right?

9   A.    No, they could not.

10  Q.    There's nobody to talk to to say what do you mean must

11  have, what does that mean?  There was no ability to do that,

12  right --

13  A.    Correct.

14  Q.    -- in these internet surveys?

15      Now you indicate further on in your email that the group

16  three assignment, now you're talking about the decision that

17  your company made to put Turner in group three after all things

18  were considered, correct?

19  A.    At this point, yes.

20  Q.    Yes.  The group three assignment results in an adjustment

21  of the churn floor to 14.7 percent viewing concentration in the

22  hybrid method.  That 14.7 percent viewing concentration under

23  your modeling converted to a 5 percent churn rate, correct?

24  A.    For the customers, correct.

25  Q.    That meant that if the Turner channels were no longer

1   available, you estimate 5 percent of the Charter subscribers

2   would leave, right?

3   A.   Correct.

4   Q.   Okay.  Now you add in here that you do think the answer

5   falls somewhere between 14 percent and the 5 percent.  The 14

6   percent was the much higher churn rate that you derived from

7   the other two methods, the survey method and the pure set top

8   box method, right?

9   A.   Right.  Which we were recommending at this point.

10  Q.   You indicated what the range was, it was 5 to 14 and you

11  go on to say you felt going all the way down to the lower end

12  of the range was too extreme.

13       Do you see that?

14  A.   I do.

15  Q.   And you say in here we do think the answer falls somewhere

16  in between, right?

17  A.   Correct.

18  Q.   But to be clear, you designed this methodology, it was a

19  result of a lot of work that went back to January, right?

20  A.   Correct.

21  Q.   You came up with an approach that put all these network

22  groups into three buckets, group one, group two, group three,

23  correct?

24  A.   Correct.

25  Q.   You made the judgment that Turner belonged in group three,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  might have been close, should have been in group two, but you

2  made the ultimate determination that Turner belonged in group

3  three when you sent this final document to your client on April

4  21st, correct?

5  A.   Correct.

6  Q.   Now let's go to Exhibit 681 which is the document.

7         MR. PETROCELLI:  And Your Honor, because this

8  document is so -- I have, I think what I'll do is I have the

9  key page but just one page from the original final document.

10      And then I have the key page from the second one that

11 they did when they made the change and it's just easier to

12 compare having these two side by side.

13         THE COURT:  Is it marked?

14         MR. PETROCELLI:  I will mark the Defense Exhibit 681

15 page as I'll call it a demonstrative, what's the next one,

16 Katy?

17         THE DEPUTY CLERK:  106.

18         MR. PETROCELLI:  106.  And the page from Exhibit 75

19 will be 107.

20      (Defendant's Exhibit Numbers 106 and 107 marked for

21 identification under seal.)

22      This is for the Court.

23      This is for the Clerk.

24      May I approach, Your Honor?

25         THE COURT:  You may.

```
 1            MR. PETROCELLI:  Did I do that right?  Do you have

 2   one from Exhibit 79 and one from Exhibit 681?

 3            THE COURT:  681, PX 79.

 4            MR. PETROCELLI:  Okay, good.

 5   BY MR. PETROCELLI:

 6   Q.    Now focusing on Exhibit 681 which is the original one.

 7   Could you turn to what was page 23.  And you'll see there the

 8   14 percent subscriber loss rate for the survey, right?

 9   A.    Correct.

10   Q.    You came out with the same number for the set top box,

11   right?

12   A.    Correct.

13   Q.    And you came out with 5 percent for the hybrid analysis,

14   right?

15   A.    Correct.

16   Q.    And you'll see all of the Turner stations there at the

17   bottom of the document?

18   A.    Correct.

19   Q.    And does that refresh your recollection that all but TNT,

20   TBS and CNN were the niche lower percentage must haves

21   identified in the consumer survey?

22   A.    There's also a page later on that would specifically

23   categorize those.

24   Q.    You want to identify it for the record what that page is?

25   If you can't find it, maybe we'll come back to it?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    I believe it's page 79.

2  Q.    79 of 681?

3  A.    Yep, and you're correct.  Those other than the TBS, TNT

4  and CNN.  The rest fall into group three on page 79.

5  Q.    Indeed, when you submitted your final document on April

6  21, under commentary, you said in the second bullet lower churn

7  estimates in the hybrid approach are a result of adjusting the

8  churn propensity floor to 14.7 percent group 3.  From 4 percent

9  Turner assigned to group three due to long tail of niche, i.e.

10 lower percentage must have networks within the group.

11     And those are the ones that you've just identified.  All of

12 them except CNN, TBS and TNT?

13 A.    Correct.

14 Q.    Okay.  Now you went to the meeting then on the 26th,

15 correct?

16 A.    Correct.

17 Q.    And at that meeting there was discussion specifically

18 about this Turner issue, correct?

19 A.    It was one of the topics, yes.

20 Q.    Okay.  And after the meeting -- you flew in for the

21 meeting, right?

22 A.    I did.

23 Q.    And after the meeting you e-mailed your team that they

24 should make a change to the Turner number, correct?

25 A.    Correct.

1  Q.   Okay.  And let's look at that email.  It is Defense

2  Exhibit 684.

3       Rob, can you put it up.

4       To be clear, when you left the meeting with the Charter

5  people had you made the decision that you would be changing the

6  low end of the Turner analysis?

7  A.   I had and I can I recap why.

8  Q.   Not there yet.  But you had made that decision, correct?

9  In agreement and in consultation with the Charter executives

10 who were there?

11 A.   No.  They gave us permission to extend the project so that

12 we had the time to do this extra analysis.

13 Q.   Well, let me talk about that.  They gave you permission to

14 extend the analysis just to change the Turner number, correct?

15 A.   Correct.

16 Q.   Okay?

17 A.   We --

18 Q.   You didn't change any?

19          MR. CONRATH:  Objection, objection, he interrupted

20 the witness.

21          THE COURT:  He can finish his answer.

22       Go ahead.

23 BY MR. PETROCELLI:

24 Q.   Finish your answer.

25 A.   As I mentioned before, that was the only one that we felt

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   needed to be changed before we revised the entire methodology

2   in October for the reasons that --

3   Q.   You didn't feel that it needed to be changed as of April

4   21 when you sent a final document to your client?

5   A.   We didn't feel that we had the time within that phase to

6   do that.

7   Q.   So you send a document to your client, called it final,

8   thought it was erroneous, and on a key set of networks and

9   didn't ask for more time before you could send the final

10  document, is that what you're testifying to?

11  A.   I'm saying that we submitted the final within the three

12  categories.  We had a recommendation for the 14 percent.  When

13  we decided that we had more time, then we went and improved

14  that methodology.

15  Q.   Your email doesn't ask for more time?

16  A.   That's true.

17  Q.   Your email doesn't say hey, I need more time, we have a

18  problem with Turner.  We don't know what to do with it, we

19  might want to do something different.

20      Nothing like that in the email, correct?

21  A.   That's true.

22  Q.   So you discussed all of this and they gave you -- well,

23  how much time did it take to make this one change, an hour, two

24  hours?

25  A.   Something less than a couple of days.  It was within a day

1   that we were able to turn this around.

2   Q.   Didn't you suggest to them at the time if you're going to

3   change Turner and do it in a different way, you should do all

4   of them in a different way?

5   A.   That would have taken a lot more time.

6   Q.   How much time would that have taken?

7   A.   I did that in October and it took a couple of weeks.

8   Q.   Why didn't you just ask for a two week extension back in

9   April, and do them all at once?

10  A.   We were on a fixed fee contract.

11  Q.   You're saying that you wouldn't have been paid for it?

12  You got paid for the October additional work didn't you?   In

13  fact, it was another 70 grand wasn't it?

14  A.   It was initially.

15  Q.   Yeah, did you ask them, let us do all of them?   Because

16  that would be the proper way to do it, not just make an

17  exception for one.

18      Did you suggest that to the client in the April 26th

19  meeting?

20  A.   We didn't think that we needed to make an exception for

21  everything else because as we talked about before, the hybrid

22  methodology fell in between a set top box and survey

23  methodology for all of the other contract groups.

24  Q.   But you included Turner in group three rather than remove

25  it entirely in group three and indicate that you were unable to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   place it?

2   A.    That's true we did.

3   Q.    Okay.  Now was there some time emergency that you had to

4   get this done by?  Was it just a money issue, is that what

5   you're saying?

6   A.    We had, I mean, it was a, we had a deadline to finish the

7   project.  So it was a deadline and a resource issue.

8   Q.    You didn't get permission to redo the rest of the networks

9   the same way you made the exception for Turner until October;

10  is that right?

11  A.    Well, we talked about at the time there was going to be a

12  refresh later on.

13  Q.    But you didn't do it until late October, right?

14  A.    Correct.

15  Q.    By that time you had already spoken to the DOJ?

16  A.    We talked to them in August.

17  Q.    You already spoke to the DOJ about the fact that you had

18  made the change for Turner and only Turner, correct?

19  A.    We told them that, correct.

20  Q.    It was after you told that to DOJ that you then went back

21  and did the additional work in October for the additional

22  $70,000, correct?

23  A.    Yes, we did that in October.

24  Q.    Now I want to go to the email.  After you leave the

25  meeting, you're standing in line waiting to get on an airplane.

1  And that's Exhibit 684.

2     Do you have that in front of you?

3  A.   I do.

4        MR. PETROCELLI:  By the way, Your Honor, I move

5  Defense Exhibit 3, Defense Exhibit 681 into evidence.  There's

6  no objection to it.

7        THE COURT:  681?  What's the other one?

8        MR. PETROCELLI:  The other one was Plaintiff's 79,

9  that was already in evidence and I also referred to the April

10 21 document.

11       THE COURT:  So what exhibit number was that?

12       MR. PETROCELLI:  The other one is 684, Your Honor.  I

13 move that into evidence as well.  No objection to that.

14       MR. CONRATH:  Your Honor, no objection, but we ask

15 these be admitted under seal.  So other relayed documents

16 should be under seal as well.

17       THE COURT:  All right, 684 and?

18       MR. PETROCELLI:  681.

19       THE COURT:  681 will be admitted under seal.

20     (Defendant's Exhibit Numbers 681 and 684 received into

21 evidence under seal.)

22 BY MR. PETROCELLI:

23 Q.   I'm showing you your email exchange with your team at the

24 meeting the same day as the meeting, Defense Exhibit 684.

25     Do you have that?

1   A.    I do.

2   Q.    If you go to the second page, S B, that's you, making

3   notes on an email that your team sent you following the

4   meeting, correct?

5   A.    Correct.

6   Q.    SB is Stefan Bewley, correct?

7   A.    Correct.

8   Q.    Now you'll see down here, you said we are also going to

9   edit Turner that the hybrid threshold is 9.5 percent viewership

10  concentration.  Kate has a recommended approach here.  Run

11  Turner at 9.5 percent viewer concentration threshold in pure

12  STB and determine that loss percentage.  Do you see that?

13  A.    I do.

14  Q.    So instead of using the group three viewership

15  concentration threshold which was 14.7, you used 9.5 percent to

16  make this change, correct?

17  A.    Correct.

18  Q.    And when you made the change to 9.5 percent, that yielded

19  a subscriber loss percentage of 9 percent, correct?

20  A.    Correct.  That doesn't state it here, but you're right,

21  that's what it turned out to be.

22  Q.    That's what it turned out to be.

23      Then you say hard code that loss percentage, do you see

24  that?

25  A.    I do.

1  Q.   Hard code that loss percentage into the override.  So your

2  macros are still valid.

3       Do you see that?

4  A.   I do.

5       Do you want me to explain that?  Sorry.

6  Q.   The thing you wanted hard coded into the override was the

7  loss percentage of 9 percent, correct?

8  A.   Correct.

9  Q.   Okay.  Mr. Conrath asked you a question about whether you

10  just hard coded the 9.5 viewership concentration and you

11  answered yes, but that wasn't correct.

12      What you hard coded was the actual 9 percent departure

13  rate, correct, and you hard coded it into a financial

14  evaluation model?

15  A.   Correct.

16  Q.   You had to hard code it because the methodology that you

17  had designed going back to January had room for the three

18  buckets but not this new one you were creating, correct?

19  A.   Correct, not until October.

20  Q.   Well, we're in April right now, that's true.  We'll get to

21  October.

22      So after, so you decided then to do this hard coding and

23  that resulted in the new number of 9 percent in Exhibit 79 that

24  Mr. Conrath showed you, right?

25  A.   That's correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   So if you look at Exhibit 79 and compare it to Exhibit 681

2   for one moment, please.  Look at the short version that you

3   pulled out.

4       You'll see that what has now vanished is the lower range of

5   5 percent and the newest lowest range is 9 percent, correct?

6   A.   That's correct.

7   Q.   Okay.  And you decided at this point in time in

8   consultation with Charter to make an exception to Turner,

9   correct?

10  A.   We proposed the exception.  They said that it was okay to

11  take the time to make that.

12  Q.   Okay.  Now after you made the exception for Turner but no

13  one else, you then got a phone call or an email wanting

14  clarification the day before Charter was meeting with the DOJ,

15  correct?

16  A.   I don't know when Charter met with the DOJ.

17  Q.   Okay, let's take a look.  Let's take a look at Exhibit

18  687, please.  In your binder.

19           MR. PETROCELLI:  Your Honor, the prior exhibit is

20  that already, did we move that already?  What's the exhibit

21  number, 684.

22       I'd like to move 684 into evidence, Your Honor.  There's

23  no objection to it.

24           THE COURT:  I moved into evidence 681 and 684.

25           MR. PETROCELLI:  Okay, now I'm going to move in 687.

1     THE COURT:  Under seal.

2     MR. PETROCELLI:  That's the one I'm looking at now.

3  And Mr. Bewley, there's also no objection to this one.

4     THE COURT:  All right.

5     687 will be admitted under seal as well.

6     (Defendant's Exhibit Number 687 received into evidence

7  under seal.)

8  BY MR. PETROCELLI:

9  Q.   You see that this is an email from Charter to Kate and

10 you, right?

11 A.   I do.

12 Q.   Now go back to the second page of the email and it's

13 referring to the exchange that occurred on June 2, 2017 at 2:53

14 p.m.

15    Do you see that?

16 A.   Yes.

17 Q.   And Charter is asking once again for clarification on what

18 caused the change, right, that you had made in April?

19 A.   It's asking how do we come up with the hybrid methodology

20 for the prospects.  Is that the email?

21 Q.   Let me direct you to the paragraph.  The end of the email

22 that I just identified, the very last sentence starts with the

23 word however.

24    Are you there?

25 A.   Yes.

1   Q.   However.

2           MR. CONRATH:  What page are you on?  I'm sorry.

3           MR. PETROCELLI:  I'm on page 2 of Defense Exhibit

4   681.

5           MR. CONRATH:  I don't see a paragraph.

6           MR. PETROCELLI:  It's at the end of the -- look right

7   here.

8   BY MR. PETROCELLI:

9   Q.   You got it now.  Are you with me?

10  A.   I'm with you.

11  Q.   However, based on our prior discussions, meaning the

12  discussions between Altman Vilandrie and Charter, correct?

13  A.   (No response.)

14  Q.   Correct, sir?

15  A.   This is saying --

16  Q.   I'm just asking you if this refers to the discussions that

17  you had with Charter?

18  A.   Not to, yes.

19  Q.   Okay?

20  A.   There's further detail if you want to discuss that.

21  Q.   I'm coming to it.

22      However, based on our prior discussions we made an

23  exception for Turner, we used the weighted average 9.5 percent

24  rather than the group three floor, 15 percent as we felt the

25  group three assignment was resulting in too low of a churn

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   estimate.

        Do you see that?

2

3   A.    I do.

4   Q.    And the too low of the churn estimate was your original 5

5   percent, correct?

6   A.    That's correct.

7   Q.    Now you also made one other adjustment unrelated to Turner

8   that I think you mentioned in your examination with

9   Mr. Conrath.  That concerned Viacom, right?

10  A.    The external bench mark.

11  Q.    Yeah.  Could you turn to page, could you turn to page --

12  first go to the original document, Defense Exhibit 681 at page

13  6.

14      Tell me when you have Defense Exhibit 681 at page 6, where

15  you have your recommendations.

16      Do you see that?

17  A.    I do.

18  Q.    And you see that you have a recommendation for Viacom,

19  right?

20  A.    Yes.

21  Q.    I won't say the number, but I'm now going to have you

22  compare that number in Exhibit 79 which is at page 6 also.

23  A.    I see that.

24  Q.    Do you see that the number for Viacom that you recommended

25  has also been changed, right?

1  A.   Yes, I see that.

2  Q.   But that change was based on the fact as you mentioned

3  during your direct examination that you had been given some

4  pricing data from Charter about a sudden link Viacom blackout

5  which you then used as a reference point, correct?

6  A.   It wasn't pricing data, it was subscriber data.

7  Q.   Excuse me, you're right, subscriber loss data?

8  A.   Correct.

9  Q.   When you saw the actual subscriber loss data that was

10  provided, you lowered, you lowered your recommended departure

11  rate, correct?

12  A.   That's correct.

13  Q.   And the reason you lowered it is because the subscriber

14  loss data for the actual blackout suggested that your number

15  was too high and had to be lowered, right?

16  A.   For Viacom, yes.

17  Q.   Now did Charter provide you any of the similar subscriber

18  loss data for the Turner Dish blackout, so that you could use

19  that as a reference point?

20  A.   We discussed it, but they didn't have it available.

21  Q.   Did you try to find it publicly?

22  A.   We made a cursory but not exhaustive review.

23  Q.   What did you do, did you look up the Kagan data?  What did

24  you do to find the actual reported figures if there were any

25  for that Turner Dish departure loss?

1  A.    I didn't do it myself so I couldn't describe what a team

2  member did.

3  Q.    So there has been testimony in this case that it's less

4  than 2 percent, maybe even less than 1 percent, blackout for

5  one month of all stations except TBS and TNT.

6      Would you have benefited from having access to that

7  information?

8  A.    All information is useful.

9  Q.    Now were you provided any blackout information, subscriber

10 loss information for the Cable One Turner blackout which was

11 all Turner networks for some 21 days?

12 A.    No.   Again, the information that we had and we did have

13 some Cable One information as well, but 21 days with public

14 information doesn't give you much time to actually evaluate

15 something.

16 Q.    Well, but I'm asking whether it was made available or you

17 made any attempt to identify, locate it and consider it?

18 A.    We had subscriber data from Charter about Cable One.   I

19 don't remember if it was specific with respect to the Turner

20 blackout.

21 Q.    To be clear then, you didn't take into account either of

22 the actual Turner blackouts, correct?

23 A.    Not with respect to the Turner recommendations here, no.

24 Q.    And were you aware that with the Cable One the 21 day

25 blackout for all Turner channels was less than 1 percent?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    We didn't have that data.

2  Q.    Okay.  Now you met with the DOJ.

3      Rob, can you take that down.

4      On August 31, you met with the DOJ about the hard coding.

5  It was a telephone interview you said, right?

6  A.    We had a call with them.

7  Q.    Do you know whether they had a copy of your original final

8  document, the one with the low end, the 5 percent?

9  A.    We gave them our project folder, so I don't remember the

10  exact date that they got that project folder, but in that

11  project folder it would have had a number of files including

12  both of these that we've been discussing.

13  Q.    Both Plaintiff's Exhibit 79 and Defense Exhibit 681?

14  A.    Correct.

15  Q.    Was there any discussion about any further work that you

16  would do?

17  A.    I don't recall whether or not we discussed that.

18  Q.    But it wasn't long thereafter when you got the permission

19  to go ahead and make all of the other networks go through the

20  same revised process that you did for Turner, right?

21  A.    Correct.

22          MR. PETROCELLI:  That's all I have right now.

23          THE COURT:  All right.

24      Redirect.

25          MR. CONRATH:  May I proceed, Your Honor?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    THE COURT:  You may.

2                    REDIRECT EXAMINATION

3   BY MR. CONRATH:

4   Q.    Mr. Bewley, would you turn to 18 of PX 79?

5   A.    I'm there.

6   Q.    All right.  Without -- there are two boxes up there.  One

7   for customers and one for prospects?

8   A.    Correct.

9   Q.    Would you remind us what the difference is?

10  A.    Customers are existing Charter customers and prospects are

11  currently not customers but could become customers in the

12  future.

13  Q.    And it's important to evaluate both of those?

14  A.    Correct.

15  Q.    And over time does the affect on prospects become more

16  important?

17  A.    Yes.  What happens is if you drop a cable contract group

18  the customer impacts happens in the relatively near term

19  substantially all within the first year.

20      Whereas the prospect affect goes into perpetuity because

21  every year there were gross ads that you don't get because of

22  the reduced programming.

23  Q.    So does that mean that estimating a 21 day blackout or a

24  one month blackout is useful for estimating what would happen

25  if you had a permanent removal of a particular contract group?

1  A.   I've never had that data, so it's hard for me to comment

2  specifically, but I do think it's important that you look at

3  longer periods to fully evaluate the impact.

4  Q.   So you use the word there gross ads which I think we may

5  not have defined yet.

6       Could you explain what that means?

7  A.   So out of the prospects the non customers, when they

8  become a customer at that point they're called a gross ad or

9  that's often what we refer to them as.  It's a new customer.

10 Q.   And the upshot of that how useful is a 21 day blackout to

11 telling you what's going to happen if ever there's a permanent

12 removal of one contract group from video service?

13 A.   Again, I haven't had that data so I can't comment

14 definitively.  But it is important to be able to look at both

15 the impact on existing customers and the impact on prospects or

16 new customers.

17 Q.   You were asked some questions about whether you had met

18 with Mr. Montemagno.

19      Do you recall those?

20 A.   Yes.

21 Q.   The people that you were working with or people who work

22 with Mr. Montemagno?

23 A.   They all report to David Ellen.  I wouldn't comment on how

24 they interact.

25 Q.   But you understood the purpose of your project was to

1   assist in content negotiations?

2   A.   Yes, and we received some feedback that was helpful in

3   that I don't know to what extent it was used.

4   Q.   Your project proceeded in some phases from January through

5   April?

6   A.   Correct.

7   Q.   And the earlier version of the slide was sent on Friday in

8   advance of a Wednesday meeting.  What's the reason for sending

9   it on Friday in advance of a Wednesday meeting?

10  A.   We wanted to share it with Julya and Julie, ahead of the

11  meeting with David Ellen.

12  Q.   All right.  Did you get some feedback in the course of

13  that process?

14  A.   We got the email, the question on the methodology for

15  Turner.

16  Q.   And after you had the meeting you sent the email that is,

17  or you participated in the email that is at DX 684.  That's in

18  our binder or the other binder?

19  A.   Correct.

20  Q.   And the S B comment there.  Comments are from you?

21  A.   Correct.

22  Q.   And there are three items under model updates.  Three,

23  four items under slide updates and three items under handoff.

24      Do you see that?

25  A.   I do.

```
 1   Q.   Are those all things that came out of the meeting?

 2   A.   Yes.

 3   Q.   They're all things that were, that were all except one of

 4   those involved something other than Turner?

 5   A.   That's correct.

 6   Q.   You were responding to the meeting and making those other

 7   changes as well?

 8   A.   Correct.

 9   Q.   In your note on DX 684 on the second page, the one that

10   was up on the board?

11   A.   Correct.

12   Q.   Do you see that?  It says, the second sentence is Kate has

13   a recommended approach here?

14   A.   Correct.

15   Q.   Do you see that?  Who is Kate?

16   A.   Kate's a member of my team.

17   Q.   So that's somebody within Altman Vilandrie?

18   A.   Correct.

19   Q.   Someone within Altman Vilandrie came up with the

20   recommended approach?

21   A.   Correct.

22   Q.   And recommended approach is what you described earlier as

23   the weighted average?

24   A.   That's correct.

25   Q.   That idea came from Altman Vilandrie?
```

1  A.    Correct.

2  Q.    Who proposed making an exception for Turner, was that

3  Charter or Altman Vilandrie?

4  A.    We did.

5      Would you like me to explain further?

6  Q.    Please do?

7  A.    As I mentioned earlier, during the meeting we described

8  how we felt Charter had the hybrid methodology was the only one

9  -- sorry -- for Turner the hybrid methodology was the only one

10 that fell outside of the survey or the set top box.

11     Because it fell way outside and because it was on the

12 borderline between the group two and group three, that it was

13 warranted for an update and they said Charter said that it

14 would be fine to take the time to make that change.

15 Q.    You were asked some questions about the hard coding.

16     Do you recall that?

17 A.    I do.

18 Q.    The thing that you had hard coded was that the product of

19 your weighted average method?

20 A.    The analysis to get to that weight average method was not

21 hard coded at all.  The financial model which then took that

22 and ran through the financial implications as I mentioned

23 before only accepted group one, group two or group three.

24     So we had to hard code that financial model, not the loss

25 analysis.

1  Q.   So the analysis, the weighted average analysis that you

2  did was there any hard coding in that?

3  A.   No.  And in fact, there's a page even from the earlier

4  final version, the one sent on April 21st that already has that

5  9.5 percent in it.

6  Q.   What page is that?

7  A.   It's page, this is Exhibit 681.

8  Q.   And if you go to page 80.  8-0.

9  A.   8-0.  This page shows for different contract groups what

10  the weighted average analysis that I described earlier would

11  result and so you can see in Turner System One is that 9.5

12  percent that we've been discussing.

13      And then the last column there, the most closely matched is

14  how we forced each of these contract groups into group one, two

15  or three.  And so coming up with that 9.5 percent as I

16  mentioned earlier was already done even in this earlier version

17  of the final report.

18      It was the work to adjust that Excel financial model to

19  accommodate something other than group one, two or three.  That

20  was the work that we did in the second financial report.

21  Q.   All right.  So just so we get that Turner Broadcasting

22  System One is in the left-hand column about halfway down,

23  right?

24  A.   That's correct.

25  Q.   And then the 9.5 percent is what value?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   That's the weighted average result of the churn threshold,

2   not the subscriber loss, but the churn threshold.

3        That was the more nuanced result, but because of the way I

4   described it before, we had to force groups into one, two and

5   three.  What you see in that third column how we forced groups

6   into one, two or three.

7        So right above Turner AMC was pushed into group two and

8   right below, Turner System One was pushed into group three.

9   Q.   This work was done at the time you said DX 681?

10  A.   Yeah, this was the one that was mailed on April 21st.

11          MR. CONRATH:  May I consult with my colleague for a

12  moment?

13          THE COURT:  Yes.

14     (Pause.)

15          MR. CONRATH:  Few more questions.

16  BY MR. CONRATH:

17  Q.   Who's decision, was it yours or Charter, Altman Vilandrie

18  or Charter to use the weighted average method for Turner in PX

19  79?

20  A.   It was our methodology.

21  Q.   Did anyone tell you that you had to make a change in

22  Turner?

23  A.   No.

24  Q.   The upshot of the change that you made from the hybrid

25  methodology from the prior report to the second report, what

1   was the change in the recommended number for Turner channels to

2   Charter, the recommended number?

3   A.   The recommended churn loss changed from 14 percent to 9

4   percent.

5           MR. CONRATH:  No further questions, Your Honor.

6           THE COURT:  All right.

7       Do you have any recross limited to redirect?

8                   RECROSS EXAMINATION

9   BY MR. PETROCELLI:

10  Q.   Let's be clear.  This 9.5 percent weighted average, that

11  already had been part of your methodology was used for the

12  purposes of identifying which bucket the various network groups

13  would belong; 9.5 percent weighted average was what was

14  computed for Turner, correct?

15  A.   Correct.

16  Q.   And based on that just like you did with all of the other

17  changes, you put Turner in group three, correct?

18  A.   Correct.

19  Q.   Now you also -- could you take a look at Exhibit 79 for

20  example at page 6?

21      In addition to the 5 percent that was changed to 9 percent

22  for Turner, there were other networks, I won't say the numbers,

23  but there were other networks that had some significant gaps

24  between the different methodologies, correct?

25      Can you see that?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    I can.  No other group had the hybrid method fall outside

2  of the other two.

3  Q.    But you do have some big gaps between the others, correct?

4  A.    That's correct.

5  Q.    And there was no changing of any of the other networks or

6  channels, only Turner, right?

7  A.    That's correct.

8  Q.    The other thing that your company concluded based on all

9  of this was that Charter would save money by canceling Turner?

10  A.    That's true.

11          MR. CONRATH:  Beyond the scope, Your Honor.

12          MR. PETROCELLI:  Just have one follow up question or

13  two.

14          THE COURT:  I want to hear argument on this.

15      (Witness leaves the stand.)

16      (Sealed Bench Conference.)

17

18

19

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   ████████ ████████ ████████ ████████ ████████

2        ████████ ███ █ ████████ ████████ ████████ ████████ ████ ████

3   ████████ ████████ ███ █ ████████ ████████ ████ ████████ ████████ ████

4           (Open court.)

5           (Witness resumes the stand.)

6           THE COURT:  You may proceed consistent with the

7   discussion at the bench and limited to the discussion at the

8   bench.

9   BY MR. PETROCELLI:

10  Q.   Your analysis concluded that Charter would be better off

11  and would save a lot of money canceling Turner; is that true?

12  A.   From my perspective, yes.

13          MR. PETROCELLI:  Thank you, Your Honor.

14          THE COURT:  Let me ask you a question.

15          THE WITNESS:  Yes.

16          THE COURT:  I think you said the survey was 10,000

17  people.

18          THE WITNESS:  Roughly.

19          THE COURT:  Roughly.

20        The survey was done on computer, right?

21          THE WITNESS:  Correct.

22          THE COURT:  Who was it that you had to identify who

23  these 10,000 people that would be selected to participate?

24          THE WITNESS:  Right.

25          THE COURT:  Who did that?

1    THE WITNESS:  So redirected a third party company so

2  they have panels of people that are, that are already

3  identified.  Then we give them criteria in terms of the number

4  of people by geography and age and income to make sure that

5  it's representative.

6    THE COURT:  What's their incentive to participate in

7  this?  What are they getting as an insensitive to answer these

8  questions?

9    THE WITNESS:  They get, I don't know the exact

10  amount.  They get some type of financial or point basis item

11  that then they redeem for prizes.  So there's some type of

12  reward for them to participate.

13    THE COURT:  So you have been involved in picking what

14  the reward was or not?

15    THE WITNESS:  No.

16    THE COURT:  That's what they do?

17    THE WITNESS:  No.  We just pay them to deliver an

18  email link to these panelists that goes to the survey that

19  we've designed and created.

20    THE COURT:  How do you know that they give an answer,

21  that they actually believe what the answer is?  How do you know

22  they actually believe it?

23    Obviously, they're trying to get through it to get their

24  reward.  How do you know that any answer they give along the

25  way is an answer they really believe?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE WITNESS:  That's a good question.

2          THE COURT:  That's why I asked it.

3          THE WITNESS:  We have a number of quality control

4    checks.  So we check for a couple of things, broadly speed.  So

5    if you finish it in ten seconds, you probably didn't answer

6    everything.

7          THE COURT:  That's for sure.

8          THE WITNESS:  It's more lengthy than ten seconds.

9          We also check for consistency of answers.  So earlier in

10   the survey you mentioned that you were an AT&T subscriber, then

11   later on, so anyway, consistency of answers.

12         And then the third one is that we also are trying to

13   make sure that we're getting just the representative sample

14   sides so to that point, you have large numbers we can accept

15   that even if you get one or two people who may be answering

16   truthfully but aren't representative of say a certain age

17   demographic or income statement.  Then as long as you get

18   enough of them then we think we're getting a right answer.

19         But I do think what you're fundamentally highlighting is

20   why we do multiple methodologies.  So we thought it was very

21   important to have both the survey but also the set top box data

22   to compare and contrast.

23         Not that we have, we don't know the same individual, but

24   we know how a population responded to the survey, and we know

25   how a population responded to or behaved with respect to set

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   top box data.

 2             THE COURT:  But that data is anonymous.

 3             THE WITNESS:  Both data is anonymous.

 4             THE COURT:  You can step down.

 5             THE WITNESS:  Thank you.

 6             (Witness excused.)

 7             THE COURT:  We're going to take a ten minute recess

 8   before we call the next witness.  You have your next witness

 9   ready to go?

10             MR. CONRATH:  Yes, Your Honor.

11             THE COURT:  All right.

12         So we'll take a ten minute recess.  When we return we'll

13   be going until 5:30.

14             (Recess at 4:53 p.m.)

15             (Proceedings resumed at 5:11 p.m.)

16             THE DEPUTY CLERK:  Your Honor, recalling Civil Action

17   Number 17-2511, the United States of America versus AT&T, Inc.,

18   et al.

19             THE COURT:  Call your next witness.

20             MS. SCANLON:  Good afternoon, Your Honor, Lisa

21   Scanlon for the United States.  The United States calls Tom

22   Montemagno.

23             THE COURT:  All right.

24             THE DEPUTY CLERK:  Would you please raise your right

25   hand?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              TOM MONTEMAGNO, GOVERNMENT WITNESS, SWORN

2          MS. SCANLON:  May I proceed, Your Honor?

3          THE COURT:  You may.

4                        DIRECT EXAMINATION

5   BY MS. SCANLON:

6   Q.    Good afternoon, Mr. Montemagno.

7   A.    Good afternoon.

8   Q.    Where do you work, sir?

9   A.    Charter Communications.

10  Q.    What does Charter do?

11  A.    Charter, our primary products are Internet, phone and

12  cable television service.

13  Q.    Where does Charter offer those services?

14  A.    We offer our services across 41 states in the United

15  States.

16  Q.    What is your job at Charter?

17  A.    I am executive vice-president of programming acquisition,

18  I negotiate all of our relationships with content providers.

19  Q.    How long have you been with the company?

20  A.    About a year and a half.

21  Q.    Where were you before you came to Charter?

22  A.    Cablevision Systems Corporation.

23  Q.    What was your job when you were at Cablevision?

24  A.    Similarly, I was executive vice-president of programming.

25  Q.    You negotiated carriage agreements there as well?
```

1  A.    I did.

2  Q.    And how long were you at Cablevision?

3  A.    Twenty-seven years.

4  Q.    So in total, how long have you been working in the cable

5  TV business?

6  A.    About 28 years negotiating agreements for probably 25

7  years of that.

8  Q.    Sir, three topics I want to cover with you today,

9  Mr. Montemagno.  First, I want to talk to you about getting

10 ready for those contract negotiations and the folks at Charter

11 who help you do that.  So, do you prepare for your contract

12 negotiations?

13 A.    We do.

14 Q.    And are there people at Charter who help you get ready for

15 that?

16 A.    Yes, I've got a staff of negotiators and an analytical

17 team.

18 Q.    First I should ask you, who do you report to?

19 A.    Charter senior executive vice-president David Ellen.

20 Q.    And you mentioned you have a staff of negotiators, how

21 many people work on that team?

22 A.    It's about fourteen on my team.

23 Q.    And I think you also mentioned an analytics group; is that

24 right?

25 A.    Correct, they support my team.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   And how big is that analytics group?

2   A.   There's about four or five on the analytic side, and then

3   there's another four or five on the research side.

4   Q.   Who runs the analytics team?

5   A.   Ms. Julie Unrue.

6   Q.   And do you work with Ms. Unrue?

7   A.   Very closely.

8   Q.   What is her job, what is Ms. Unrue's job?

9   A.   She supports us on all of our financials, the programming

10  financials, all of our analytics, deal support, doing financial

11  analysis against our negotiations.  She runs our contract

12  administration and does a lot of our sort of viewership and

13  research analytics.

14  Q.   And does she have people who work for her?

15  A.   She does.

16  Q.   Do you know of a woman named Julya Friedman?

17  A.   I do.

18  Q.   She does she work for Julie Unrue?

19  A.   She works for Julie Unrue.

20  Q.   Now, you've mentioned analytics a few times.  Does Charter

21  conduct any analytics in-house when you're getting ready for a

22  contract negotiation?

23  A.   We do, we like to be well prepared before we enter into

24  discussions with our counterpart.

25  Q.   And how do those analytics help you get ready for your

1  negotiations?

2  A.   It helps us understand our leverage, the programmers'

3  leverage, what the state of the business is for them, for us,

4  what our vulnerabilities are, what their vulnerabilities are,

5  and just the overall leverage position.

6  Q.   Has Charter ever used any analytics to decide to drop a

7  programming group or a programmer?

8  A.   We have, it's been a component of many considerations.

9  Q.   And what kind of analytics would you have looked at in

10 that situation?

11 A.   Primarily viewership.  How many customers watch

12 programming network on a regular basis, and, you know, try to

13 determine if it's meaningful, and we compare that to how much

14 money we're paying for the network and do a little assessment

15 of, you know, do we think we're getting the right value for a

16 carriage.

17 Q.   You mentioned viewership, is that set-top box data that

18 you look at?

19 A.   Primarily, yes.

20 Q.   And could you give the Court an example of a programming

21 group you dropped based on some analytics that you ran inside

22 Charter?

23 A.   In the short time I'm here, I know we did that for the

24 Sportsman channel is the one that we decided not to carry any

25 longer based on the lack of viewership.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   And who did the write-up of the analytics that you looked

2  at to decide to drop Sportsman channel?

3  A.   Julie Unrue's team and with close support from one of my

4  main reports.

5  Q.   And were you involved personally in the decision to drop

6  the Sportsman channel?

7  A.   Yes, I was.

8          MS. SCANLON:  Your Honor, I'm handing up what's been

9  marked as PX 373 for identification.

10         May I approach the witness, please?

11         THE COURT:  You may.

12 BY MS. SCANLON:

13 Q.   So Mr. Montemagno, I want to ask you some questions about

14 this without referring to some of the information that's

15 confidential to Charter so we'll be careful here.

16    Could you tell the Court, without naming the company that

17 this pertains to, what this document is?

18 A.   This is a preparation document as we ready to enter into

19 negotiation with a big programming portfolio.  I was going to

20 have an early conversation with our CEO to establish our

21 thoughts on approaching the negotiation and being prepared to

22 enter into it.

23 Q.   So this was done prior to that negotiation?

24 A.   Correct.

25 Q.   And who put together this analysis?

1 A.   It was a combination of Julie Unrue's team, my team and

2 myself.

3 Q.   Did you review it before it was presented?

4 A.   Yes.

5 Q.   Okay.  And was it eventually presented within Charter?

6 A.   It was.

7 Q.   To who was it presented?

8 A.   I believe the CEO, and then I mentioned David Ellen who I

9 report to, Julie who was there, I was there, and there may have

10 been one or two from my team.

11 Q.   And was this the document you looked at in the meeting as

12 opposed to an informal written memo, was it this spreadsheet --

13 I'm sorry, this PowerPoint deck?

14 A.   Yes, this helped guide our conversation.

15        MS. SCANLON:  Your Honor, I move for the admission of

16 PX 373 under seal.

17        MR. WALTERS:  No objection, Your Honor.

18 BY MS. SCANLON:

19 Q.   So again, Mr. Montemagno, without revealing any --

20        THE COURT:  I haven't ruled.

21        MS. SCANLON:  I apologize, Your Honor.

22        THE COURT:  It helps to wait.

23        MS. SCANLON:  I'm sorry.

24        THE COURT:  Please approach.

25      Step down and sit in that chair, please?

1    (Witness withdrew from the witness stand.)

2    (Sealed Bench Conference.)

3         MS. SCANLON:  Sorry, Your Honor.

4         THE COURT:  Why do we need all of this?  Why is it

5    relevant?

6         MS. SCANLON:  Sure, Your Honor.  One reason is the

7    Altman Vilandrie document that we saw earlier is incorporated

8    in this deck.  It will demonstrates that Charter looks at that

9    information.

10         THE COURT:  We've already got that on the record,

11    what do you need this for?

12         MS. SCANLON:  To show that Charter looks at that

13    information and uses it in their business.

14         THE COURT:  There's no question that they look at it,

15    he's already testified to that.  I don't understand what the

16    importance, relevance is.

17         MR. PETROCELLI:  There is one point in this deck that

18    we believe is important, Your Honor.  And it is when they do

19    these drop assessments, they'll take a certain percentage.  In

20    ███████ ████ ████ ███ ████ ████ ████ ████ ████ ████

21    ███████████ ████ ████ ████ ████████ ████ ████ ███ ████

22    ████ ████ ████ ████████ ████ ████ ████ ████ ████ ████

23    ████████ ████ ████ ████ ████ ████ ████ ████ ████ ████

24    ████ ████ ████ ████ ████ ████ ████ ████

25    ████████ ████ ███ ████ ████ ████ ████ ████ ████

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1        ██████  ████████  ████

 2            THE COURT:  So you want it as well as they do?

 3            MR. WALTERS:  Yes, for that point.

 4            THE COURT:  Is it confidential?

 5            MS. SCANLON:  We can talk about it, but I'm certainly

 6    not asking you to close the courtroom.  I want to ask him about

 7    specific pages without getting into the numbers in there.

 8            THE COURT:  All right.

 9            MS. SCANLON:  All right.  I will look at two or three

10    pages, Your Honor.

11            THE COURT:  I'll admit it.

12            MS. SCANLON:  Thank you.

13            THE COURT:  Under seal.

14            MS. SCANLON:  Yes, thank you.

15            MR. WALTERS:  Thank you.

16        (Open court.)

17            THE COURT:  It will be admitted under seal.

18        (Plaintiff's Exhibit No. PX 373 was received under seal.)

19            MS. SCANLON:  May I proceed, Your Honor?

20            THE COURT:  You may.

21    BY MS. SCANLON:

22    Q.   So Mr. Montemagno, would you turn to PX 0373, page 5,

23    please?

24    A.   (Witness complies.)

25    Q.   And without revealing what company this study was the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    subject of, could you explain what the information on page 5

2    shows?

3    A.    Sure.  This is a prediction of the number of customers we

4    might lose if we didn't renew this agreement and no longer

5    carried this programming portfolio.  And there's a couple of

6    different methods that estimates were made on the subscriber

7    loss potential.

8    Q.    And was this information helpful to you as you entered

9    that negotiation with the company we're not naming?

10   A.    It was one data point.  It was a helpful data point.

11   Q.    Okay.  If you look over on the right side there's a column

12   that says third party analysis, do you see that?

13   A.    I do.

14   Q.    What does that refer to, Mr. Montemagno?

15   A.    I believe we had hired a consultant to help us perform

16   some of these analytics so that was one of the methods that was

17   used to make this prediction.

18   Q.    And would you turn now to page PX 373-22?

19   A.    (Witness complies.)

20   Q.    Is this the third party analysis that we just talked

21   about?

22   A.    Yes.

23   Q.    And that was done by Altman Vilandrie?

24   A.    It was.

25   Q.    And did you look at this analysis when you reviewed this

1  deck with your co-workers and the CEO of the company?

2  A.   We did.

3  Q.   And was this information helpful to you when you were

4  thinking about your negotiations with the programmer at issue

5  here?

6  A.   Yes, it was helpful.

7  Q.   Mr. Montemagno, were you involved in the commissioning of

8  the Altman Vilandrie study?

9  A.   I was not.

10 Q.   Who was involved in that?

11 A.   It was commissioned before I started with the company, I

12 started in September of '16, 2016, and Julie Unrue was the

13 principal, and I believe she consulted with David Ellen on

14 that.

15 Q.   Were you presented with the final product at some point?

16 A.   I was.

17 Q.   And did you review that?

18 A.   Very briefly.  Julie gave -- walked me through and talked

19 me through the high points.

20 Q.   And Charters incorporated that information in internal

21 studies from time to time; is that right?

22 A.   Correct.

23 Q.   Like the deck PX 373 we just looked at?

24 A.   Correct.

25 Q.   I want to move on to my next topic.  You understand we're

1    here today about the proposed merger between AT&T and Time

2    Warner?

3    A.    I do.

4    Q.    Does AT&T compete with Charter?

5    A.    Yes.

6    Q.    Have you considered how the merger could affect your

7    ability to negotiate against Turner in the future?

8    A.    I have.

9    Q.    And what have you thought about that?

10   A.    I've had a few concerns about the impact on Charter.

11   Q.    What concerns have you had?

12   A.    My concern's mainly around what's going to happen with

13   excessive price, pricing increases.  Will we lose access to

14   critically important content that AT&T may take exclusive away

15   from our customers and make it harder for me to compete.  I'm

16   concerned about them bundling in other arrangements that are

17   not related to the Turner products, for example, that will make

18   it harder for me to negotiate an agreement.

19   Q.    You mentioned a few things there.  One was a concern about

20   exclusive content.  Could you explain to the Court what your

21   concern is?

22   A.    Yes, the Turner portfolio has pretty important programming

23   rights, particularly in the professional sports arena and the

24   college sports arena, and our customers are used to receiving

25   that content from us.  And if that was no longer made

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  available, for example, on TNT and only made available if

2  you're an AT&T mobile customer or things like that nature, I

3  was concerned that we may be in that position where we won't

4  have as rich a product as our competition.

5  Q.   You mentioned also, I think the term is used "excessive

6  price increases"; is that right?

7  A.   Yes.

8  Q.   Why do you have that concern?

9  A.   The Turner portfolio in particular and HBO, they're very,

10 very expensive products.  And I've in my career negotiated a

11 number of agreements with them, and over the past few years

12 there were some rights renewals, Turner renewed their MBA

13 license agreement, I think.  They paid triple what they were

14 paying, and we saw a massive increase about three years ago.

15 Q.   So if that's the case today, what would change after the

16 merger?

17 A.   Well, you know, my concern there is, you know, right today

18 Charter is probably, I'm guessing, fifteen percent of the

19 revenue for the Turner portfolio, and there's natural

20 motivation for us to both want to try and find an agreement and

21 find a middle ground.  And post-merger, I might -- I don't

22 know, maybe I'm less than one percent of AT&T's overall

23 revenues and maybe they want to take this product and compete

24 with their new platforms and not review my agreement or, you

25 know, dramatically raise the rates.

1   It could be a win/win situation.  Either I pay excessive

2   increases or I lose the product and they have a more

3   competitive distribution profile.

4   Q.   The third thing you mentioned was the potential for

5   bundled products.  What do you mean by that?

6   A.   So in a post-merger environment AT&T owns Root Sports,

7   it's AT&T sports networks, they're regional sports channels I

8   don't carry today in part of Texas.  In my career I've always

9   negotiated my Turner agreement separate from my HBO agreement.

10  And if they mash all that together, the leverage changes, and

11  they could say to me, you have to carry, you know, this sports

12  service now which is going to cost tens of millions of dollars

13  more than you were paying before.  So it's a concern.

14  Q.   Last topic, Mr. Montemagno, did you receive an arbitration

15  offer from Time Warner?

16  A.   I did.

17  Q.   And did you review that?

18  A.   I did.

19  Q.   Without telling us anything that you talked about with

20  your lawyers, did you have any reaction to that offer?

21  A.   I thought it was a helpful start.  But that it was -- it

22  was deficient in a number of areas from a business perspective.

23  I think separately there were some legal concerns, which I

24  won't speak to.

25      But my concerns, it didn't cover HBO.  It didn't cover ROOT

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  SPORTS.  It talked about rates, you know, in a gross fashion,

2  and in these agreements there's lots of different value

3  exchanges, and it didn't guarantee me that we would have an

4  outcome that was as favorable a rate as everyone else.

5      And then, you know, I personally just -- these agreements

6  are so intricate and they're often on noneconomic terms,

7  they're often tailored to specific and uniqueness about the

8  particular distributor.  So our infrastructure, our platform,

9  our packaging and a baseball style arbitration puts me, I

10 think, at a great disadvantage because I have to blindly submit

11 terms when I have no transparency or visibility with what their

12 other arrangements are and they have all that knowledge.

13     So if I'm off on one little term, I could lose the whole

14 arbitration.  And I could be forced into an agreement where I

15 might not even be able to comply with certain terms, just the

16 way we -- our operation is set up.  So it's something I, you

17 know, I'd be very reluctant to casually enter into as a, you

18 know --

19 Q.   I take it you haven't signed it to date?

20 A.   I have not.

21 Q.   Okay.  Is Turner -- I'm sorry.  Is Charter currently in

22 negotiations with Turner?

23 A.   We're -- yes, we are operating under a short-term

24 extension.

25 Q.   How long is that extension or series of extensions been

1   going on?

2   A.    We've been extending since the initial expiration in, I

3   believe it was October, November of 2016.

4   Q.    And is Charter trying to prolong that extension period

5   until after this merger?

6   A.    We have mutually extended it through June of this year.

7   Q.    And so that was a decision by Turner as well as Charter?

8   A.    Yes.

9           MS. SCANLON:   Nothing further, Your Honor.

10          THE COURT:   Cross-exam.

11                      CROSS-EXAMINATION

12  BY MR. WALTERS:

13  Q.    Good afternoon, Mr. Montemagno.

14  A.    Good afternoon.

15  Q.    You joined Charter in September of 2016; is that right?

16  A.    Correct.

17  Q.    And you have been in the content negotiation business your

18  entire career, almost thirty years; is that right?

19  A.    Correct.

20  Q.    And you did it as a career at Cablevision before you

21  joined in September of 2016; is that right?

22  A.    Correct.

23  Q.    Okay.  And within a month or so of you joining Charter,

24  AT&T and Time Warner announced this merger; is that right?

25  A.    Correct.

1  Q.   And then within a month or so of that, Charter hired --

2  retained Altman Vilandrie to do that study; isn't that right?

3  A.   I was unaware when that occurred.

4  Q.   Okay.  So even though you're the head of content

5  negotiation, you had no involvement in commissioning or

6  generating that study; is that right?

7  A.   Correct.

8  Q.   In fact, you never even heard of Altman Vilandrie before

9  the last several months; isn't that right?

10  A.   That's right.

11  Q.   And you don't recall anyone at Charter explaining to you

12  how the study came about, why it was commissioned, and what its

13  overall objectives were, right?

14  A.   No, I knew that we had ambitions of bringing more of an

15  analytical approach to programming decision-making.  I worked

16  with David Ellen, who I report to at Cablevision.  So we had

17  history there, and I knew when he was taking this business role

18  that he liked some of the analytical work that we did at

19  Cablevision, and he wanted to amplify that in his role at

20  Charter.

21      So I was familiar that that was an objective, and we were

22  going to make investments to have that capability for Charter.

23  But I wasn't familiar with this particular study.

24  Q.   Well, are you familiar, you do recall that you provided a

25  deposition, didn't you?

1  A.   Yes.

2  Q.   Let me give you a copy of that deposition.

3         MR. WALTERS:  May I approach, Your Honor?

4         THE COURT:  You may.

5         THE WITNESS:  Thank you.

6         THE COURT:  You can mark it for identification.

7  BY MR. WALTERS:

8  Q.   Now, you recall at your deposition we talked about this

9  very subject, don't you?

10  A.   Yes.

11  Q.   Why don't you look at page 204, line 6 through 9.

12         THE COURT:  What are we marking it as, what are we

13  marking it for identification?

14         MR. WALTERS:  929, Your Honor.

15         THE COURT:  Go ahead.

16     (Defendant's Exhibit No. 929 was marked for

17  identification.)

18  BY MR. WALTERS:

19  Q.   And if you'll at line 6, do you see that, Mr. Montemagno?

20  A.   Yes.

21  Q.   You explain there, don't you, that, "I don't recall it

22  ever being explained to me how this came about, how it was

23  commissioned, why, what the overall objectives are for," do you

24  see that?

25  A.   Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   And we were talking about the Altman Vilandrie study; were

2   we not?

3   A.   Yes.

4   Q.   All right.  And you recall that we talked at the

5   deposition also about the study itself.  Do you remember that?

6   A.   Yes.

7   Q.   And do you remember that right there in the study on page

8   2, it says that the study's primary purpose, that it was done

9   primarily for content negotiation, you recall that, don't you?

10  A.   I remember it saying that, yeah.

11  Q.   And you recall that -- that at least based on that slide

12  that you saw, you learned that that was the purpose of the

13  study, correct?

14  A.   Yes.

15  Q.   But no one at Charter had ever conveyed that to you

16  before, that notwithstanding the fact that you were head of

17  content negotiations, nobody had ever explained that the

18  primary purpose of that study was purportedly for content

19  negotiations, no one had ever done that, had they?

20  A.   No I don't recall that.

21  Q.   In fact, the first time you ever heard that was when you

22  and I met at your deposition, right?

23  A.   Yes.

24  Q.   And don't you think it's a little strange that the company

25  would spend $700,000 on a study for content negotiations that

1  you had nothing to do with, you thought that was a little

2  strange, didn't you?

3  A.   No, that was in the works before I joined Charter.  That

4  was already in the works.

5  Q.   But that's not true, is it?  The company actually retained

6  Altman Vilandrie in December of 2016 after you had joined the

7  company, right?

8  A.   That doesn't mean it wasn't discussed and considered and

9  then researched on who was going to help us.

10  Q.   But in any event you had nothing to with securing that

11  study, and you had no idea it was for content negotiations, its

12  primary purpose, fair?

13  A.   I did not.  We had a separate analytics team that was

14  responsible.

15  Q.   Okay.  And, in fact, you never spent much time with the

16  study, did you?

17  A.   I did not.

18  Q.   And to this day you have only skimmed the study, or at

19  least as of your deposition you had only skimmed the study;

20  isn't that right?

21  A.   I've relied on Julie Unrue to point out the important

22  pieces.  She relies on it more heavily.

23  Q.   So to this day, you have only skimmed that study, right?

24  A.   Yes.

25  Q.   Okay.  And, in fact, you even view the judgments that

1  Altman Vilandrie has in that study as being simply a

2  presentation of mathematical outputs that lack qualitative

3  judgment.  You offered that opinion, did you not?

4  A.   I did.

5  Q.   And you can't, as we sit here now, you can't say whether

6  that study is reasonable or whether the methodologies employed

7  were appropriate, as head of content negotiations you have not

8  reached that conclusion, have you?

9  A.   I have not.

10 Q.   And you don't know whether that study is accurate or even

11 purports to estimate long-term departure rates, short-term

12 departure rates or what kind of departure rates.  You don't

13 know that, do you?

14 A.   There's not a lot of these blackouts that have existed

15 that we can draw from, so I don't.

16 Q.   And, in fact, but you do know it was based on sort of a

17 survey mechanism of some kind, don't you?

18 A.   I'm unfamiliar with the methodologies.

19 Q.   All right.  But you at least, you have some scepticism,

20 don't you, as the head of content negotiations for Charter, you

21 have some scepticism about estimating the number of customers

22 who would cancel their service if a programmer's channels were

23 not available, you have skepticism about surveys suggesting

24 those kinds of answers, don't you?

25 A.   I'm -- it's tough to pinpoint what the exact outcome is

1   going to be.  In the industry there's not many of these that

2   have been measured over a prolonged time.  So, but we have a

3   couple different ways to determine how important it is a

4   programming service or a portfolio decisional for a consumer.

5   And we've looked -- we've tried to look at engagement of

6   viewership to help us better understand and better predict

7   that.  But I don't know precisely if it's accurate.

8   Q.    It is tough to estimate.  In fact, it's an inherently

9   speculative undertaking; is it not?

10  A.    It's tough to estimate.

11  Q.    And, in fact, the best evidence of what actually happens

12  when there isn't programming is the real world evidence, right,

13  what actually happens when there's a drop.  That's the best

14  evidence, correct?

15  A.    Sure.

16  Q.    And I want to get into this in a second.  But you don't

17  know whether that Altman Vilandrie study accounted for these

18  so-called countermeasures, you don't know that, do you?

19  A.    No.

20  Q.    Okay.  And so that's kind of industry jargon.  And I want

21  to make sure we're communicating on that.  Countermeasures just

22  means what you do to try to keep your customers, right?

23  A.    Correct.

24  Q.    Because nobody, Charter certainly, you don't sit on your

25  hands and just let the customers go away if you don't have a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  particular content, you fight to keep them, don't you?

2  A.   We do.

3  Q.   Yeah, and you have a "save" desk, and you can offer

4  promotionals, and you have all kinds of tools in your toolbox

5  to try to keep your customers, that's an important thing to do,

6  right?

7  A.   We have a retention desk, but it's hard to, when somebody

8  is missing content that I can't replace, that's -- it's less

9  effective.

10  Q.   All right.  And so if the Altman Vilandrie study was going

11  to be worth its weight, right, to really understand or at least

12  do a complete analysis of what would actually happen, it would

13  have to take into account the so-called countermeasures,

14  wouldn't it?

15  A.   Not necessarily, it could be helpful, but I don't think

16  it's imperative.

17  Q.   Well, it would be awfully helpful, wouldn't it, and you

18  have, in fact, done that with other studies, haven't you?

19  A.   Some internal analysis.

20  Q.   Well, why don't we just look at the one that Ms. Scanlon

21  put in front of you, the Viacom one, do you have that in front

22  of you?

23  A.   Yes.

24  Q.   Let's look at that one.

25           MS. SCANLON:  Your Honor, objection, may we approach?

```
 1            THE COURT:  Sure.

 2          (Sealed Bench Conference.)
```



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



21      (Open court.)

22      (Witness resumed the witness stand.)

23          THE COURT:  You may proceed consistent with the

24  discussion at the bench.

25  BY MR. WALTERS:

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Now, that assessment that the government introduced, that

2  is actually an assessment, an internal preparation slide deck

3  in advance of a negotiation; is that fair, is that what that

4  is?

5  A.   Correct.

6  Q.   And I won't ask you about the date on it, all right?  Now,

7  but I will ask you if you will go to page 4.

8  A.   (Witness complies.)

9  Q.   And that was the page Ms. Scanlon asked you about,

10 correct?

11 A.   No, I don't think we talked about this page.

12 Q.   Well, don't you see the third party analysis over there on

13 the far right?

14 A.   Am I on the wrong page?

15 Q.   Well, page 005, the deck says page 4, but page 005, do you

16 see that?

17 A.   Yes.

18 Q.   Okay.  Now, that's the page that Ms. Scanlon asked you

19 about, correct?

20 A.   Correct.

21 Q.   And if you look at that page on the internal assessment,

22 do you see where it says "pre-mitigation"?

23 A.   Yes.

24 Q.   Do you see that number?

25 A.   Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q.    And by the way, for this company -- well, strike that.

2       That is an assessment that you at Charter had made

3    independently, correct?

4    A.    Correct.

5    Q.    Okay.  Now, what I'm most interested in is the line that

6    says mitigation percentage, do you see that?

7    A.    Yes.

8    Q.    And the mitigation percentage, do you see there that it

9    says fifty percent?

10   A.    Correct.

11   Q.    Okay.  And so mitigation, that's the same thing as

12   countermeasures, right, that is the kinds of things you do to

13   keep your customers?

14   A.    Yes.

15   Q.    And so the conclusion that Charter is reaching in this

16   deck is that whatever the so-called, the pre mitigation, or the

17   internal assessment, the drop rate at the top, and I won't ask

18   you to identify the percentage number, right?

19   A.    Right.

20   Q.    What Charter is saying that if we're any good at what we

21   do, our save desk, right, our mitigation measures, our

22   countermeasures, our promotions, that what we should be able to

23   do is cut in half the number of customers who will truly

24   depart, that's what that conclusion reaches, right?

25   A.    For this particular portfolio programming networks where

1   there's no sports involved.

2   Q.   Okay.  For this particular -- okay, well, look, for this

3   particular network, and we don't need to identify it, but it's

4   a top five network, isn't it?

5   A.   I don't know the answer to that.

6   Q.   Well, and it's oftentimes compared to Turner, isn't it,

7   same grouping?

8   A.   It's a portfolio of many networks, so I don't know if

9   you're focusing on one individual, I can't --

10  Q.   I'm focusing on the group of networks compared to the

11  group of Turner networks, they are oftentimes compared to one

12  another; are they not?

13  A.   I don't know that, I can't --

14  Q.   But in all event, for this major network system, right,

15  Charter itself reached a conclusion that whatever this

16  so-called drop rate is, we can slash that in half with our

17  countermeasures, right?

18  A.   That was -- that's what this analysis shows.

19  Q.   And so any analysis that anybody does, if you're really

20  interested in trying to understand what might really happen,

21  you would have to take into account countermeasures, wouldn't

22  you?

23  A.   Yeah, I think this number would differ based on the type

24  of programming dramatically.

25  Q.   But for this one, this particular network, you guys

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   reached a conclusion that we would cut it in half, right?

2   A.   Somebody did, yes.

3   Q.   Well, yes, somebody did, and this was -- this information

4   you discussed with your CEO, didn't you?

5   A.   No, we didn't debate -- I mean, we showed them, that's not

6   something we debated.  We took it on face value just to get a

7   sense of the analysis.

8   Q.   That information was presented to your CEO?

9   A.   Yes.

10  Q.   Okay.  Now, back to this Altman Vilandrie study, were you

11  aware that there were different iterations of the Altman

12  Vilandrie study, one on April 26th, one on April 27, were you

13  aware of that?

14  A.   No.

15  Q.   Okay.  Were you aware of the fact that in the first Altman

16  Vilandrie study that the so-called Turner hybrid number was

17  five percent and that a day later it was changed to nine

18  percent, were you aware of that at all?

19  A.   No.

20  Q.   Okay.  Were you aware of the fact, by the way, you have

21  met with DOJ on many occasions have you not?

22  A.   I have met with them.

23  Q.   Well, you had three telephone conversations, you,

24  yourself?

25  A.   That sounds about right.

1  Q.    In 2017?

2  A.    That sounds about right.

3  Q.    And in January of 2018, you had a separate meeting with

4  DOJ; did you not?

5  A.    Correct.

6  Q.    Okay.  And have you had any meetings since January of 2018

7  and today?

8  A.    One.

9  Q.    And when was that?

10  A.    Yesterday.

11  Q.    And now you also know that your boss, Mr. Ellen, has been

12  meeting separately with DOJ, right?

13  A.    I don't know, you say meeting like it's a continuing

14  thing, I don't know that.

15  Q.    Well, did you know that on April 26th, when this report

16  came out, that Mr. Ellen was meeting with DOJ with others from

17  Charter laying out the case in opposition to this merger, did

18  you know?

19  A.    I'm aware of one meeting that took place.

20  Q.    Now, Mr. Ellen, he is a lawyer by training, correct?

21  A.    Correct.

22  Q.    General counsel at Cablevision, right?

23  A.    Correct.

24  Q.    Okay.  He was, you know formally an FCC lawyer, right?

25  A.    Correct.

1  Q.   Okay.  And he has come over to Cablevision -- I mean,

2  excuse me, to Charter as the number two person, right?

3  A.   He's one of the top four executives in the company, I

4  would say.

5  Q.   And he actually, he, as well as -- he's got a lot of skin

6  in the game at Charter, doesn't he?

7  A.   I don't know what you mean by that.

8  Q.   Well, what I mean by that is last year his income was

9  reported and it was largely equity of 22 million dollars,

10 right?

11 A.   Okay.

12 Q.   And Mr. Rutledge, his income last year was reported

13 something like 78 million dollars, right, but largely in

14 equity, right?

15 A.   I can't confirm the number, but I know that his

16 compensation is largely in equity.

17 Q.   And those numbers are largely dependent on Charter being

18 financially successful, correct, those equity allocations, you

19 know that, don't you?

20 A.   Correct.

21 Q.   Okay.  And so both of them have very healthy incentives

22 for Charter to prosper, right?

23 A.   Correct.

24 Q.   Now, you -- Mr. Ellen and his meeting or meetings, and do

25 you know how many times he has interacted with DOJ either in

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    person or by telephone, do you know?

2    A.    I'm only familiar with one.

3    Q.    All right.  And Mr. Ellen never has included you in any of

4    those interactions with DOJ, has he?

5    A.    No.

6    Q.    And Mr. Ellen never included you in any of the process or

7    the transmission of the Altman Vilandrie study or any other

8    information to DOJ, has he?

9    A.    No.

10   Q.    And I take it that Mr. Ellen has never offered any

11   explanation of how that five percent was hardcoded to nine and

12   a half percent in the next iteration of the Altman Vilandrie

13   study, is that true?

14   A.    I never had a conversation with him about that.

15   Q.    All right.

16       Mr. Montemagno, let's visit for a few minutes about

17   something the DOJ has put forward as a pricing study, okay?

18   A.    I'm sorry?

19   Q.    A pricing study.  Now, you're basically aware that DOJ has

20   suggested that as a consequence of this merger there could be a

21   price increase, you're aware of that notion?

22   A.    Correct.

23   Q.    Okay.  Now, one of the considerations, one of the factors

24   in that pricing model concerns the so-called departure rate,

25   you're aware of that, aren't you?

```
 1   A.   Departure rate?

 2   Q.   Yes.

 3   A.   Meaning like customer dissatisfaction?

 4   Q.   Yes, exactly.  You're aware of that, aren't you?

 5   A.   I'm not familiar with their analysis or study.  But that

 6   is one of the things I raised as a concern.

 7   Q.   All right.  And all that means is, that's just fancy

 8   language if you didn't have Turner content, what would happen,

 9   right, how many customers would depart, you understand that?

10   A.   Yes.

11   Q.   All right.  Now, I want to be clear about this.  You are

12   not here today offering to this Court any real world evidence,

13   any empirical data, any facts about what would happen if

14   Charter didn't have Turner content; is that right?

15   A.   No, just my experience and some of the analysis that we've

16   done.

17   Q.   Because you have never had a Turner blackout, correct?

18   A.   I have not, I've had many others.

19   Q.   Okay.  But you've had no -- you have no hard core

20   empirical data about what would happen in the absence of Turner

21   networks at Charter, correct?

22   A.   I don't.

23   Q.   All right.  Well, let's go look for a couple of clues, if

24   you don't mind, within sort of the Charter information.

25        Now, and I don't want to mention the date.  But it wasn't
```

1  that long ago that you were preparing for negotiations with

2  Turner, the negotiations that Ms. Scanlon asked you about, that

3  you guys have been bumping along for some period of time,

4  right?

5  A.    Correct.

6  Q.    Okay.  And at that time that you were evaluating the

7  Turner networks, they had actually dropped in their viewership

8  from something like nine percent and seven percent of

9  viewership, you know that, don't you?

10  A.    I was aware there was a drop, not the magnitude.

11  Q.    Okay.  And as part of that process of getting ready for

12  those negotiations, the company comes up with talking points or

13  position points, right?

14  A.    Public relation points, yes.

15  Q.    Yes.  Okay.  And that's typical of Charter to do as it's

16  approaching a negotiation like it was with Turner, correct?

17  A.    When there's a high likelihood of potential blackout, us

18  not coming to terms and Turner had been suggesting that might

19  happen, so yes, we were beginning to prepare.

20  Q.    Okay.  In one of those talking points you'll recall that

21  we spoke about in your deposition was that Charter's position,

22  its talking points, was that it didn't think it was worth the

23  increase in the -- for Turner programs when, quote, similar

24  programs can be found on more affordable networks or through

25  OTT services such as Hulu.  That was one of your talking

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  points, right?

2  A.    I remember seeing that in a draft that said potential

3  talking points.  I didn't write them, the public relations team

4  did.

5  Q.    Yeah, you didn't, but you agree with that, don't you?

6  A.    To some extent.

7  Q.    Well, you agree, and you told me in your deposition

8  that -- that indeed there are similar programs to Turner's that

9  can be found on more affordable networks or through OTT or

10  Internet services, you recall that, don't you?

11  A.    Some of the less important programming on the Turner

12  networks.

13  Q.    Well, but you went on and said more than that, didn't you?

14  You said that that included all kinds of Turner programming,

15  that description, syndicated programs, cartoon programming,

16  children's programming that can be found on more affordable

17  networks, you offered that observation conclusion, didn't you?

18  A.    Yes, syndicated programming like reruns, Seinfeld,

19  Friends, things of that nature that is available.

20  Q.    Well, that was one of them, but you also included cartoon

21  programming, you included children's programming as well,

22  didn't you?

23  A.    I did.  The Internet and YouTube and children are finding

24  entertainment on more than traditional television these days,

25  that's the dramatic shift in our industry.

1  Q.    And, in fact, you went on to tell me, didn't you, that the

2  only Turner program, the only Turner program that does not fit

3  that statement is Turner's limited sports and some, but not all

4  live news, correct?

5  A.    Sports and news, I did mention, yes.

6  Q.    So otherwise, besides sports, okay, and besides some live

7  news, all other Turner programming is fungible, isn't it?  It

8  can be found elsewhere on more affordable networks, that's what

9  you told me, right?

10  A.    Yes, I don't know that it's just live news, I think I said

11  there's personalities like Anderson Cooper and Chris Cuomo, and

12  there's political slants in the different news networks, that

13  for somebody is very important.

14  Q.    All right.

15  A.    So it was just more than just live.

16  Q.    So besides sports and news, everything is just fungible,

17  interchangeable, right?

18  A.    That's what I said in the deposition, yes.

19  Q.    And it is, and that was true then, wasn't it?

20  A.    Yes.

21  Q.    And it's true now, right?

22  A.    I haven't thought about, again, I think I said to you as

23  well, they program a dozen networks 24/7, I didn't have the

24  grid in front of me to go through all of the programming and

25  tell you, like what is important and what is not.  I didn't do

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  that off the top of my head.  I answered your question, that's

2  what came to mind.  That's what I think is more decisional for

3  consumers --

4  Q.  Sure, you were trying to --

5            THE COURT:  Let me see counsel.

6       (Sealed Bench Conference.)

7            THE COURT:  I thought maybe we could finish this

8  witness today.  But I'm starting to feel like that's not

9  likely.  How much more do you have?

10           MR. WALTERS:  I think I have 20 or 30 minutes, Your

11  Honor.

12           THE COURT:  All right.  Well, we'll take the evening

13  recess.  It's six o'clock.  That will be kind to the court

14  reporter and the courthouse.  We'll reconvene in the morning.

15           MR. WALTERS:  Very good.  Thank you, Your Honor.

16       (Open court.)

17           THE COURT:  We're going to take the evening recess.

18           THE WITNESS:  Sure.

19           THE COURT:  You are a witness under oath in the case,

20  so what that means is you're not at liberty to discuss your

21  testimony so far or what it might be when you return tomorrow

22  morning with anyone, including your own attorney.

23           THE WITNESS:  I understand.

24           THE COURT:  Don't talk to anyone.

25           THE WITNESS:  I understand, sir.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  Your family members, your friends,

 2   nobody.  You have to be able to answer the question under oath

 3   honestly that you haven't spoken with anyone since you've been

 4   excused.

 5              THE WITNESS:  I understand.

 6              THE COURT:  Okay?

 7              THE WITNESS:  Okay.

 8              THE COURT:  You can step down, I'll see you 10:30

 9   tomorrow morning.

10              THE WITNESS:  Okay, thank you.

11              THE COURT:  You're excused.

12         (Witness excused.)

13              THE COURT:  All right, counsel, let's go over next --

14   tomorrow's batting order.  This will be probably another half

15   hour, 45 minutes, something like that.

16              MR. CONRATH:  Then we're going to go, Your Honor, to

17   Mr. Torres.

18              THE COURT:  That's still -- the estimate, is that

19   still about a half hour each?  Is that the rough estimate?

20              MR. CONRATH:  That's the rough estimate.  We're going

21   to take a look at the rest of them and see if we can make -- do

22   any pruning before -- where we go next after that.

23              THE COURT:  But Benefield would be next after that?

24              MR. CONRATH:  That would be the most logical next

25   person.  Sutton and Patel.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  All right.

 2              MR. PETROCELLI:  All tomorrow?

 3              THE COURT:  So realistically, the most we can do

 4  tomorrow is three?

 5              MR. CONRATH:  Probably right.

 6              THE COURT:  So that would be Torres, Benefield

 7  Sutton, right?

 8              MR. CONRATH:  As I said, we're going to look, after

 9  Mr. Torres, we're going to look and evaluate so streamlining as

10  we've committed to Your Honor all along, so.

11              THE COURT:  All right.  So -- but at least have those

12  three in the ready position.

13              MR. CONRATH:  Sure.

14              THE COURT:  So we don't want to get to the

15  midafternoon and not have a witness available.  So that's not a

16  good option.

17              MR. PETROCELLI:  Well, Your Honor, if Mr. Conrath

18  might prune some of these witnesses, they're all our witnesses.

19         Maybe you can let us know this evening?

20              MR. CONRATH:  Absolutely, immediately, yeah, very

21  shortly.

22              MR. PETROCELLI:  Tonight.

23              MR. CONRATH:  Yes.

24              MR. PETROCELLI:  Okay.

25              MR. CONRATH:  Of course.
```

*** REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER ***

 1           MR. PETROCELLI:  Because we have to have additional

 2  witnesses available to be here, Your Honor, and they're all our

 3  witnesses.

 4           THE COURT:  I see your point.

 5           MR. PETROCELLI:  Yeah, so if you go down this list,

 6  the next, like ten witnesses are all our people, and if he's

 7  going to eliminate a few, we need to make sure the others are

 8  available.  So that's why I think we should be getting prompt

 9  notification.

10           THE COURT:  Are they out of town, most of the ones

11  who would be next?

12           MR. PETROCELLI:  The next few are here, but others,

13  yes, are out of town, exactly.

14           MR. CONRATH:  We're not envisioning changing the

15  order if we do anything, Your Honor.

16           THE COURT:  All right.  Well, I just want to make

17  sure we have --

18           MR. CONRATH:  Yes.

19           THE COURT:  -- a bullpen with plenty of witnesses in

20  it so that we don't find ourselves losing blocks of time

21  tomorrow afternoon.

22           MR. CONRATH:  Understood, Your Honor.

23           THE COURT:  And then Thursday too.

24           MR. CONRATH:  Yes.

25           THE COURT:  Do we have any of these confidentiality

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    issues alleged for these next group of witnesses?

 2             MR. CONRATH:  There's a potential -- if I could

 3    consult with Ms. Scanlon for one moment?

 4             THE COURT:  Yes.

 5             MR. CONRATH:  No, Your Honor.

 6             THE COURT:  All right.  Any other issues we need to

 7    address tonight?

 8             MR. PETROCELLI:  No, Your Honor, thank you.

 9             MR. CONRATH:  No thanks.

10             THE COURT:  Stand in recess.

11             (Proceedings adjourned at 6:01 p.m.)

12                               -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

CERTIFICATE

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the stenographic notes provided to me by the United States District Court, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.


_____        _____

/s/Crystal M. Pilgrim, RPR, FCRR        Date:  April 4, 2018

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        :
                                 :
          Plaintiff,             :          CV No. 17-2511
          vs.                    :
                                 :          Washington, D.C.
                                 :          Wednesday, April 4, 2018
AT&T, INC., ET AL.,              :              10:45 a.m.
                                 :
                                 :              Day 8
                                 :
          Defendants.            :
---------------------------x


MORNING SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:    Craig W. Conrath, Esquire
                       Eric D. Welsh, Esquire
                       Donald G. Kempf, Jr., Esquire
                       Scott A. Scheele, Esquire
                       Lisa A. Scanlon, Esquire
                       Cerin M. Lindgrensavage, Esquire
                       U.S. DEPARTMENT OF JUSTICE
                       Antitrust Division
                       450 Fifth Street, NW
                       Washington, DC  20530
                       (202) 532-4560
                       craig.conrath@usdoj.gov
                       eric.welsh@usdoj.gov
                       donald.kempf@usdoj.gov
                       scott.scheele@usdoj.gov
                       lisa.scanlon@usdoj.gov
                       cerin.lindgrensavage@usdoj.gov

```
 1  Appearances Continued:

 2  For Defendant AT&T        Katrina M. Robson, Esquire
    and DirecTV Group         O'Melveny & Myers LLP
 3  Holdings, LLC:            1625 Eye Street, NW
                              Washington, DC  20006
 4                           (202) 220-5052
                              krobson@omm.com
 5
                              Daniel M. Petrocelli, Esquire
 6                            M. Randall Oppenheimer, Esquire
                              O'MELVENY & MYERS LLP
 7                            1999 Avenue of the Stars
                              8th Floor
 8                            Los Angeles, CA  90067
                             (310) 553-6700
 9                            dpetrocelli@omm.com
                              roppenheimer@omm.com
10
                              Michael L. Raiff, Esquire
11                            Robert C. Walters, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
12                            2100 Mckinney Avenue
                              Suite 1100
13                            Dallas, TX 75201
                             (214) 698-3350
14                            mraiff@gibsondunn.com
                              rwalters@gibsondunn.com
15
    For Defendant             Kevin J. Orsini, Esquire
16  Time Warner, Inc.:        Peter T. Barbur, Esquire
                              CRAVATH, SWAINE & MOORE LLP
17                            Worldwide Plaza
                              825 Eighth Avenue
18                            New York, NY  10019
                             (212) 474-1140
19                            korsini@cravath.com
                              pbarbur@cravath.com
20
    Court Reporter:           Crystal M. Pilgrim, RPR, FCRR
21                            Official Court Reporter
                              United States District Court
22                            District of Columbia
                              333 Constitution Avenue, NW
23                            Washington, DC  20001
                             (202) 354-3127
24                            crystal_pilgrim@dcd.uscourts.gov

25
```

Pages 1381-1485

<pre>
 1                          Table of Contents

 2                       Direct  Cross  Redirect  Recross

 3  On behalf of the Plaintiff:

 4  Thomas Montemagno (Resumed)
       By Mr. Walters          1385
 5     By Ms. Scanlon                   1401
       By Mr. Walters                             1406
 6

 7  Vincent Torres
       By Mr. Welsh            1410
 8

 9  Simon Sutton
       By Mr. Scheele          1447
10

11

12

13                      E-X-H-I-B-I-T-S

14                                   Marked  Received

15  On behalf of the Plaintiff:

16  Exhibit No. PX 536               1416

17  Exhibit No. PX 51                          1427

18  Exhibit No. PX 12                          1443

19  Exhibit No. PX 61                          1462

20  Exhibit No. PX 483                         1467

21  Exhibit No. PX 91                          1471

22

23

24

25
</pre>

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1                     P-R-O-C-E-E-D-I-N-G-S

2             THE DEPUTY CLERK:  Good morning, Your Honor.

3             We are on the record in Civil Matter 17-2511.  The

4   United States of America versus AT&T, Incorporated, et al.

5             If all counsel will please approach the lecturn and

6   identify yourselves for the record.

7             MS. SCANLON:  Good morning, Your Honor, Lisa Scanlon

8   for the United States.

9             THE COURT:  Good morning.

10            MS. LINDGRENSAVAGE:  Good morning, Your Honor, Cerin

11  Lindgrensavage for the United States.

12            THE COURT:  Welcome.

13            MR. KEMPF:  Good morning, Your Honor, Don Kempf for

14  the United States.

15            THE COURT:  Good morning.

16            MR. CONRATH:  Good morning, Your Honor, Craig Conrath

17  for the United States.

18            THE COURT:  Good morning.

19            MR. WELSH:  Good morning, Your Honor, Eric Welsh for

20  the United States.

21            THE COURT:  Good morning.

22            MR. SCHEELE:  Good morning, Your Honor, Scott Scheele

23  appearing on behalf of the United States.

24            THE COURT:  Good morning.

25            MR. PETROCELLI:  Good morning, Your Honor, Daniel
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   Petrocelli for defendants.

 2            THE COURT:  Good morning.

 3            MS. ROBSON:  Good morning, Your Honor, Katrina Robson

 4   for defendants.

 5            THE COURT:  Good morning.

 6            MR. OPPENHEIMER:  Good morning, Your Honor, Randy

 7   Oppenheimer for the defendants.

 8            THE COURT:  Good morning.

 9            MR. WALTERS:  Good morning, Your Honor, Rob Walters

10   here for AT&T and DirecTV.

11            THE COURT:  Good morning.

12            MR. BARBUR:  Good morning, Your Honor, Peter Barbur

13   for Time Warner.

14            THE COURT:  Good morning.

15            MR. ORSINI:  Good morning, Your Honor, Kevin Orsini

16   for Time Warner.

17            THE COURT:  Good morning.

18            Witness remains under oath.  You may resume the

19   stand.  Good morning, have a seat.

20       TOM MONTEMAGNO, PLAINTIFF WITNESS, PREVIOUSLY SWORN

21            THE COURT:  Where's Walters?  There you go.  When

22   you're ready.

23            MR. WALTERS:  May I proceed, Your Honor, thank you.

24            THE COURT:  When you're ready.

25                      CROSS-EXAMINATION (Cont'd)
```

1  BY MR. WALTERS:

2  Q.    Good morning, Mr. Montemagno.

3  A.    Good morning.

4  Q.    Now, I just have a handful of things for you this morning.

5  But you know, don't you, that the DOJ and its economist have

6  put forward as a model that suggest the possibility of a price

7  increase stemming from an increased threat of blackout as a

8  consequence of the merger, you're aware of that; are you not?

9  A.    Generally aware.

10  Q.    Okay.  And you understand that that is a key premise, it's

11  a point of departure of this model, you understand that as

12  well, don't you?

13  A.    I do.

14  Q.    Okay.  But you know that given what we're dealing with

15  here, the real world facts that we're confronted with, you know

16  that's not right, don't you?

17  A.    I don't.

18  Q.    Well, you discussed yesterday the Turner arbitration and

19  standstill offer, didn't you?

20  A.    Yes.

21  Q.    Okay.  And Turner has provided Charter this standstill and

22  arbitration agreement, it did so in November of 2017; did it

23  not?

24  A.    Yes.

25  Q.    Okay.  And what I want to focus on is the standstill

1  aspect of it, okay?

2  A.    Okay.

3  Q.    And the standstill aspect of it, that's effectively a

4  content guarantee, it is a guarantee against blackouts; is it

5  not?

6  A.    Yes.

7  Q.    The standstill in the arbitration mechanism, it

8  effectively eliminates the ability of Turner to withhold

9  content from Charter, right?

10  A.    If exercised by Charter.

11  Q.    If exercised, and you have that right, don't you?

12  A.    We do.

13  Q.    Okay.  And you can exercise it at any point, right?

14  A.    I do, but there are lots of risks with exercising it.

15  Q.    All right.  And so therefore, and this is the important

16  point, to the extent that the government projects a Turner

17  price increase stemming from a threat of blackout, Turner

18  completely loses that ability with its standstill and

19  arbitration commitment.  That's right, isn't it?

20  A.    If exercised.

21  Q.    If exercised, that's right.

22  A.    Correct.

23  Q.    So utterly loses the ability to raise prices stemming from

24  a threat of blackout by virtue of this arbitration and

25  standstill commitment, true?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    I don't agree.  They can still raise the price and it gets

2  arbitrated.  They can't take the signal away from you during

3  the arbitration.

4  Q.    They cannot take the signal away from you, right?

5  A.    Right.

6  Q.    And so to the -- here's the point.  To the extent the

7  government projects a Turner price increase stemming from an

8  increased threat of blackout, Turner loses that ability with

9  its standstill and arbitration commitment, right?

10 A.    Correct.

11 Q.    Okay.  And, in fact, Charter's position is it would rather

12 have a satisfactory standstill and arbitration agreement in a

13 post-merger environment, an environment after AT&T and Time

14 Warner come together than to not have either pre-merger, right?

15 A.    Correct.

16 Q.    That's your position?

17 A.    That standstill would be helpful, yes.

18 Q.    Okay.  And, in fact, you at Charter have had a highly

19 satisfactory experience with having a standstill and

20 arbitration tool in your toolbox available to you as a

21 negotiating aid, haven't you?

22 A.    Yes, once.

23 Q.    And without getting into the date, Charter finalized not

24 that long ago a content agreement with NBCU, correct?

25 A.    Correct.

1  Q.   Okay.  And NBCU, as part of that, agreed to lesser rate

2  increases after Charter advised NBCU that it would pursue

3  remedies, including its arbitration and standstill right,

4  correct?

5  A.   I don't know if I'd categorize it as lesser increase, the

6  negotiations became more productive, and we ultimately

7  concluded an agreement.

8  Q.   Well, let's look at, it's right in front of you, page 195

9  of your deposition.  I want to make sure you and I are

10  connecting on it.  And if you look at line 13, I asked you the

11  question about a sentence in a document.

12         MS. SCANLON:  Your Honor, may I approach before

13  Mr. Walters begins?

14         THE COURT:  All right.

15         (Sealed Bench Conference.)

16         MS. SCANLON:  Your Honor, Turner has designated this

17  material as confidential.  Mr. Walters is simply asking him to

18  read it to himself and agree with it, and that protects

19  Charter's interest.  I'm not sure what Mr. Walters' intentions

20  are here.

21         MR. WALTERS:  I'm only planning on confirming just

22  the direction that the negotiations, no terms, no prices, and

23  they have designated, we don't think that any of this is

24  confidential.  But I'm happy to defer on the dates and terms.

25         THE COURT:  Rather than having to hash out the issue

1    of whether it is or isn't confidential, why don't you just have

2    him read it to himself.

3              MR. WALTERS:  Very good.

4              THE COURT:  And ask him the question you want to ask

5    him.  If it becomes cumbersome or problematic, we'll revisit

6    the issue.

7              MR. WALTERS:  Very good, I'll  handle it that way.

8    Thank you.

9              (Open court.)

10             THE COURT:  You may proceed consistent with the

11   discussion at the bench.

12   BY MR. WALTERS:

13   Q.   Mr. Montemagno, why don't you just read that to yourself,

14   if you wouldn't mind, on page 129 line 13 through line 24.

15   A.   (Witness complies.)

16        Okay.

17   Q.   And would you agree with me then that NBCU agreed to

18   lesser rate increases, okay, less dramatic rate increases after

19   Charter advised NBCU of the possibility of invoking

20   arbitration?

21   A.   Yes, the value exchange, which is complex and comes in

22   many different forms, got improved for Charter.

23   Q.   Okay.  And, in fact, you yourself communicated this

24   message to NBCU.  You told NBCU that Charter would invoke

25   arbitration unless NBCU came to the table and began to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   negotiating more productively, right?

2   A.   I did.

3   Q.   And, in fact, Charter invoking arbitration was an impetus

4   in causing NBCU to negotiate more reasonably, fair?

5   A.   We didn't exercise it, but the threat of it did improve

6   the situation.

7   Q.   Right.  Having it available to you, right, having the

8   specter of it caused NBCU to negotiate more reasonably, fair?

9   A.   Correct.

10  Q.   Okay.  You didn't have to go to arbitration, right?

11  A.   Correct.

12  Q.   Okay.  And so the Turner standstill in arbitration

13  offering commitment that you received, you know that the Turner

14  commitment of standstill and arbitration, you know that that's

15  modeled on the NBCU Comcast arbitration agreement, you know

16  that, don't you?

17  A.   I'm familiar in concept, but I haven't compared the two

18  offers to validate that, but in concept, yes.

19  Q.   But in concept, okay.  And in your experience with the

20  NBCU arbitration agreement, you and Charter, you found nothing

21  deficient about the NBCU arbitration agreement, right?

22  A.   I don't know if I'd say that.  I, as I shared yesterday,

23  it's a very risky tool to exercise, in my opinion, and it's not

24  something that -- that I typically would comfortably go right

25  to, it's sort of a last resort tool, there's a lot of risk in

1  that for -- more for the distributor.

2  Q.  Well, there's a lot of risk on both sides, isn't there?

3  A.  I don't know if there's the same amount of risk for the

4  other party.

5  Q.  Well, hang on, I thought that the programmers, if they met

6  bet wrong in arbitration, they have those MFN agreements, don't

7  they, most favored nations.  They don't have this knock on,

8  this ripple effect if they bet wrong, true?

9  A.  Possibly if they have --

10  Q.  But let me just ask you, let's get back to what we were

11  talking about.  Let me just ask you if you'll look at page 196

12  of your deposition.  And if you'll go down to line 25, do you

13  see that?

14  A.  Yes.

15  Q.  And I asked you the question, "Was there anything about,

16  is there anything about the Comcast arbitration mechanism that

17  you injected in the conversation with NBC Universal that you

18  find deficient?"  Do you see that?

19  A.  Yes.

20  Q.  And what was your answer?

21  A.  My answer was, I didn't raise anything with NBC.

22          THE COURT:  You got to give the answer that's in the

23  deposition.

24  BY MR. WALTERS:

25  Q.  What was your answer in the deposition?  Line 6.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   "I did not."

2  Q.   "I did not."

3       And you remember at the deposition, I mean, you understood

4  the gravity of the deposition, that you were there to tell the

5  truth just as you are here today?

6  A.   Correct.

7  Q.   I mean, there was -- nothing about that was lost on you,

8  right?

9  A.   No, you asked me did I raise it, I didn't -- I said I did

10 not raise it, but I didn't make an assessment of whether the

11 arbitration was deficient or not.  I just didn't raise anything

12 with NBC.

13 Q.   All right.  Now, let me ask you about another component of

14 this pricing model.  Yesterday we talked a little bit about the

15 departures, you remember that?

16 A.   I'm sorry?

17 Q.   The departures, what kind of subscribers you might lose if

18 you didn't have Turner, do you remember that conversation?

19 A.   Right.

20 Q.   Okay.  Now I want to focus on just another piece of it

21 which is where would they go, you with me?

22 A.   Yes.

23 Q.   Okay.  Now, in your view, Mr. Montemagno, the video

24 distribution industry has never been more competitive in the 28

25 years you've been in the business than it is today, as we sit

1  and speak today, correct?

2  A.   I agree.

3  Q.   Okay.  And consumers, they have many, many more options on

4  where to go to get their video then ever before, true?

5  A.   True.

6  Q.   And that's due to a whole variety of factors, but two big

7  ones are the ability to deliver high resolution video through

8  the Internet, that's one reason, isn't it?

9  A.   Yes.

10 Q.   And it's also the emergence of very wealthy entrants like

11 Google and Apple with deep pockets and the ability to be

12 disruptive, right?

13 A.   Yes.

14 Q.   And, in fact, today there are cost advantages that

15 Internet competitors enjoy because they don't have to spend as

16 much money on infrastructure to operate their systems, right?

17 A.   Yes.

18 Q.   Okay.  And the result of those advantages is the cost of

19 entering into video distribution is substantially less than it

20 has ever been in the past, right?

21 A.   I believe their infrastructure, their entrance capital is

22 less, but I believe that their content costs are higher and a

23 lot of these products are launching with no or negative

24 margins.

25 Q.   Right, which is highly disruptive to the industry, isn't

1  it?

2  A.   Correct.

3  Q.   Okay.  And this high speed Internet ability has created

4  competitors like Sony Vue and Dish Sling and Google YouTube,

5  hasn't it?

6  A.   Yes.

7  Q.   Okay.  And these are formidable companies, aren't they?  I

8  mean, you have Sony, you have Google, they're formidable

9  companies that have dived into this virtual MVPD world to

10  compete with you and DirecTV and the others, right?

11  A.   Yes.

12  Q.   And you're worried about the size and the resources of

13  these new entrants and their ability to make a big dent in the

14  video business, you're concerned about that, aren't you?

15  A.   Yes.

16  Q.   And when you're talking about those companies that you're

17  concerned about, you're thinking about the Googles and the

18  Amazons and the Netflix, the Fang, aren't you?

19  A.   All of my competitors.

20  Q.   All of them, but including those?

21  A.   Sure.

22  Q.   Okay.  And, in fact, just since this merger was announced

23  16 months ago, this effort for Time Warner and AT&T to come

24  together to create a more competitive enterprise, just in that

25  time we've seen a tremendous slew of new entrants into the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  business, haven't we?

2  A.    There have been a few more.

3  Q.    Well, let's just talk about the new direct to consumer

4  offerings and those are those vertical offerings, right, where

5  programmers are offering their products directly to consumers

6  like Fox News, Epics, Disney, CBS.  The other day ESPN for 4.99

7  you can sign up and get it.  Those have all come about in the

8  last year or so, haven't they?

9  A.    Yeah, most of them have.  Some of them are not content

10  that's on the channels that we license.  It's -- ESPN has

11  announced that it's content that's not otherwise being produced

12  for television.

13  Q.    But there are new entrants into video distribution that's

14  just direct to consumers, right?

15  A.    I agree.

16  Q.    And then there are these new -- there have been new

17  virtual MVPDs just since this merger was announced, YouTube TV,

18  Hulu Live, Filo, right, those are all announced in the last

19  year or 14 months or so, haven't they?

20  A.    They're new, I don't know the timing of this.

21  Q.    And there have been new over-the-top Internet video on

22  demand offerings like Facebook Watch, Amazon NFL streaming,

23  Disney, Facebook college football.  Those have all come about

24  just from the last year or so, haven't they?

25  A.    They're new as well, yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Yeah, so there's been a veritable explosion of OTT

2  offerings just since we've had this high speed Internet

3  phenomenon in the last five, seven years, right?

4  A.   Yes.

5  Q.   Okay.  And Charter, Charter, you're trying to adapt and

6  evolve in response to this intense new competitive environment,

7  aren't you?

8  A.   Yes.

9  Q.   In fact, you created your own streaming service, Spectrum

10  Stream to respond to the competitive threat of the lower price

11  Internet offerings, you have done that, haven't you?

12  A.   We have, it's not an Internet offering, though.

13  Q.   Okay.  But it's certainly an offering to respond to these

14  lower price Internet offerings, correct?

15  A.   Yes, it's an effort to offer similarly a lower price for

16  products.

17  Q.   And so Charter, you have made the decision not only to

18  fight them, but to join them, right?

19  A.   We are experimenting with a lower price point.  I do have

20  constraints on my ability to sell them widely due to the

21  constraints in some of my programming agreements, including the

22  Turner networks.

23  Q.   Right, you're talking about those penetration rights,

24  aren't you?

25  A.   Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   And those exist today, right?

2   A.   They do.

3   Q.   And they don't have anything to with this merger, you're

4   just dealing with those today, right?

5   A.   Correct.

6   Q.   Okay.  And so what you're doing is exactly what Dish,

7   AT&T, Comcast, all the others are doing.  They're evolving and

8   adapting to this new competitive environment, true?

9   A.   Ours is an Internet product, but we are trying something

10  new, lower price offerings.

11  Q.   All right.  And you would agree with me, wouldn't you,

12  that although this intense new competition might be challenging

13  for Charter, if there was ever a time for us not to worry about

14  whether we had enough entrants for us not to worry about

15  whether we had enough competition and video distribution, it

16  would be right here today, right?

17  A.   I don't understand the question.

18  Q.   If there was ever a time, and we talked about this before

19  in your deposition, if there was ever a time not to worry about

20  whether we have enough entrants, whether we have enough

21  competitors and video distribution, it would be right now, the

22  most intense competitive environment you've participated in in

23  your career, fair enough?

24  A.   I don't understand your double negatives, but it's more

25  competitive now than I've ever experienced in my career.

1   Q.   All right.

2          THE COURT:  Let's move on, you've made this point.

3          MR. WALTERS:  All right.

4   BY MR. WALTERS:

5   Q.   Now, let's go on to another component of this pricing

6   model and it concerns profitability, okay.

7          Now, at Charter, and you don't need to get into any of

8   the details, none of the specific numbers.  But your margins at

9   Charter, they have considerably eroded over the past few years;

10  have they not?

11  A.   Video, yes.

12  Q.   Video margins, not broadband, I'm just talking about

13  video, okay?

14  A.   Right.

15  Q.   And your whole cost structure has outpaced your ability to

16  charge for the video services; have they not?

17  A.   Yes.

18  Q.   Okay.  And you're not, as a consequence, you're not

19  passing on your full increased cost structure to your

20  consumers, right?

21  A.   Correct.

22  Q.   Okay.  And you have no reason to think that that's not

23  occurring with DirecTV and the other traditional MVPDs as well,

24  that they're encountering the same kind of margin squeeze,

25  right?

1   A.   I presume, yes.

2   Q.   Okay.  And you see on that phenomenon of a margin squeeze,

3   you see no relief in sight, do you?

4   A.   I don't.

5   Q.   Okay.  One last item.  HBO, Charter has articulated a

6   public position on HBO, hasn't it?

7   A.   Can you be more specific?

8   Q.   I can be more specific.  What I have in mind in particular

9   is that your CEO, Tom Rutledge, has publicly taken the position

10  that Charter doesn't need HBO anymore in order to satisfy its

11  customers, you're aware of that, haven't you?

12  A.   I'm aware of the quote before I joined Charter to that

13  extent.  I don't know the context of how it was said, what he

14  meant, I wasn't there.  But I don't personally agree that HBO

15  is important.

16  Q.   But Charter and your chairman has taken that position,

17  hasn't he?

18  A.   I don't know that he's taken that position.  I don't know

19  how the context of how and why he said that.

20  Q.   Well, you understand, don't you, that -- that

21  Mr. Rutledge's statement that Charter does not need HBO anymore

22  to satisfy its customers to be referring to the HBO direct to

23  consumer product, HBO Now, you understand that, don't you?

24  A.   Yes.

25  Q.   Okay.  And the reason is, is because consumers can get HBO

1   directly today and they don't need to get it through a

2   distributor, they can just get on the Internet and pay 14.99

3   for it, right?

4   A.    Yes, I believe it's more expensive to do it that way.

5   Q.    All right.  So at least according to your chairman,

6   Mr. Rutledge, HBO is not only not must have, it doesn't need

7   HBO at all in light of this direct availability of HBO Now,

8   that was his position, right?

9   A.    That was a quote, I don't believe that that's his -- how

10  he feels and that's Charters's position relative to HBO.

11  Q.    But that's certainly what he stated publicly, correct?

12  A.    He did one time, yes, in the interview.

13          MR. WALTERS:  All right.  Thank you, Mr. Montemagno.

14          THE WITNESS:  Thank you.

15          THE COURT:  Redirect?

16          MS. SCANLON:  May I proceed, Your Honor?

17          THE COURT:  You may.

18                  REDIRECT EXAMINATION

19  BY MS. SCANLON:

20  Q.    Mr. Montemagno, I have a few topics to go back to.

21        The term "Fang," is that one you use in your work?

22  A.    I don't.

23  Q.    Have you heard that before you heard it from Mr. Waters?

24  A.    No.

25  Q.    Yesterday, Mr. Waters asked you some questions about the

```
1   importance of different Turner networks, do you remember that?

2   A.   Yes.

3   Q.   And I believe your testimony was essentially that some

4   Turner networks are more important than others for Charter?

5   A.   In my opinion, yes.

6   Q.   And so my question is, why does Turner take those --

7   sorry, why does Charter take those Turner networks that are not

8   as important to it?

9   A.   We're forced to, I don't have an option.  If I want the

10  important ones, I have take the ones that are less important to

11  me.

12  Q.   So does that mean the important ones that are important

13  enough that you'll's take the less important ones?

14  A.   Yes.

15  Q.   And those are TBS and CNN and TNT?

16  A.   Those are the three that are most important.

17  Q.   And what is the content on those networks that make them

18  important enough to Charter that you'll take the other networks

19  as well?

20  A.   The professional and important college live sports is one

21  component, and that's where they tend to put their higher

22  quality original programming and things of that nature.

23  Q.   And CNN has exclusive news content, is that fair?

24  A.   Correct.

25  Q.   Mr. Walters asked you about some retention efforts that
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Charter makes to keep customers when they call up to say

2  they're's going to leave, do you remember that?

3  A.   Yes.

4  Q.   And I think you mentioned that retention efforts vary in

5  success based on the programming that people are calling about;

6  is that right?

7  A.   Yes.

8  Q.   Could you just explain that to the Court?

9  A.   Sure.  There's's -- there's one World Series, there's one

10  Super Bowl, there's one MLB Playoffs, it's not replaceable.   If

11  I don't have that content, reducing the rate or giving them a

12  free month of HBO or Showtime is not going to satisfy that

13  customer.  They're going to go and find that -- go to a

14  different distributor to get that content.  Whereas if it's

15  children's programming and there's other content in the

16  category that could be sufficient replacement, it's a different

17  outcome.

18  Q.   Yesterday Mr. Walters asked you about whether you had done

19  any study of the harm that could happen from this merger, do

20  you remember that?

21  A.   Yes.

22  Q.   I just want to ask you, in your experience as a

23  negotiator, do you believe the leverage could change here after

24  the merger when you're negotiating with Turner for the next

25  time?

1  A.    Sure.

2  Q.    And could you explain to the Court why that would change?

3  A.    I think, and there's a number of factors that could come

4  into play.  You know, one I'll call bundling, they could

5  leverage other products into the negotiation.  We talked about

6  products that I don't necessarily want to carry or pay for that

7  I have to.  There could be more of that with HBO and AT&T

8  sports and other things that they may buy or develop.

9        The -- look, I mean, one of the things that if I don't --

10 if I lose one portfolio, if it's not the Turner networks and

11 it's a different important portfolio, my ability to lose a

12 second one and have a sort of first class video service is

13 greatly diminished, and then I'm really in a vulnerable spot,

14 and I feel like I sort of have to do the deal.  I can't not

15 have the Disney ESPN networks and the Turner networks.

16       And so, you know, the environment is changing, and that

17 massive leverage and their ability to directly promote our

18 customers to move to their platform today.  Before they, you

19 know, in the prior world, the customer had to disconnect.  They

20 had to put a Dish on their house, now it's an instantaneous

21 click on the remote and that entry, you know, cost is not there

22 anymore.  So it's easy and, you know, for the customer to just

23 make that move.

24 Q.    And I think you said that they would have the ability to

25 directly reach out to your customers.  Who are you talking

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   about there?

2   A.   Turner networks.

3   Q.   And is that today, they could do that today?

4   A.   They could do that today to a degree.

5   Q.   Do you think that changes if they're owned by AT&T?

6   A.   My concern is today their ability to promote their

7   products, they buy advertising in the open marketplace and they

8   pay market dollars for advertising.  In a world where they own

9   the Turner networks generally, Your Honor, there's like 16

10  minutes of advertising minutes per hour of programming.  The

11  distributor takes about two minute and the programmer uses the

12  other 14 minutes.

13       And so you may find some smattering of promotion, but in

14  the new world, you know, when they own the networks, they could

15  use ten minutes, they could use twelve minutes of that time to

16  just flood ads, you know, Charter is no good, take DirecTV now.

17  It's a concern of mine that I would try to address

18  contractually, and I've raised that with Turner as a concern.

19  Q.   Last series of questions about the arbitration offer that

20  Mr. Walters asked you about.

21       Now, my understanding is that if it was a satisfactory

22  arbitration offer, then the standstill would be of benefit; is

23  that right?

24  A.   Yes.

25  Q.   Is the -- the offer that they put to you, they sent to you

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    in November, does that meet that standard of being

2    satisfactory?

3    A.    No, I don't believe so.

4    Q.    And you testified yesterday about the reasons for that,

5    and could you just briefly remind the Court?

6    A.    Sure, it didn't address services like HBO and AT&T sports,

7    it wasn't aspecific to the rates being sort of net rates

8    instead of gross rates.  The, just nature of baseball

9    arbitration and the lack of transparency and the blind sort of

10   risk that I face in that process makes it difficult from a

11   business perspective.  I think there were legal procedural

12   mechanical concerns that, you know, my lawyers have as well.

13          MS. SCANLON:  No further questions, thank you, Your

14   Honor?

15          THE COURT:  One minute to redirect.

16          MR. WALTERS:  Your Honor, I just have a quick thing.

17          THE COURT:  Yes.

18                    RECROSS-EXAMINATION

19   BY MR. WALTERS:

20   Q.    Mr. Montemagno, Turner bundles its channels today just

21   like other programs, doesn't it?

22   A.    Yes.

23   Q.    And bundlings is not unusual in the industry, is it?

24   A.    It's not.

25   Q.    Programmers have resisted breaking up their bundles, which

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  a phenomenon that you understand, don't you?

2  A.   Yes.

3  Q.   Okay.  Today nothing would prohibit Turner and HBO or ROOT

4  SPORTS from bundling, there's absolutely nothing that would

5  prohibit it, right?

6  A.   ROOT SPORTS, it's not the same company.

7  Q.   I know, but there's nothing that would prohibit any of

8  these kinds of bundles from occurring in the marketplace today,

9  right?

10 A.   Other than my ability to negotiate separate agreements for

11 the different buckets of services.

12 Q.   But all of these issues, bundling, penetration packaging,

13 all those issues exist today, and you deal with those every

14 day, don't you?

15 A.   Correct.

16 Q.   Okay.  And none of those issues are a result of this

17 merger, they all exist in the marketplace today, don't they?

18 A.   Correct.

19 Q.   And AT&T, DirecTV, if it wanted to buy ads on Turner or

20 anybody else in order to try to lure your customers away, they

21 could do that today, they could do that yesterday, couldn't

22 they?

23 A.   They can buy them yes.

24      MR. WALTERS:  Okay, all right.  That's all I have,

25 Your Honor, thank you.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           THE COURT:  Let me ask you a question.

2           THE WITNESS:  Sure.

3           THE COURT:  It sounds like, and correct me if I'm

4    wrong, one of the problems you have with arbitration as it's

5    been proposed is this blind aspect to it; is that right.

6           THE WITNESS:  Correct.

7           THE COURT:  What if the arbitration were restructured

8    so that there was no blinding, but there was still arbitration.

9    Is there a way that you could envision arbitration could be

10   differently structured that would be mutually beneficial and

11   mutually fair?

12          THE WITNESS:  Yes, I believe so.

13          THE COURT:  Non-baseball style arbitration.

14          THE WITNESS:  Yes, I even offered to Turner to engage

15   on that, but they never pursued that conversation with me.

16          THE COURT:  Well, obviously they like the idea,

17   right?

18          THE WITNESS:  Right.

19          THE COURT:  And you don't like the idea.

20          THE WITNESS:  Correct.

21          THE COURT:  Others don't like it, but there's others

22   that don't think it's as bad as you think it is, obviously.

23   But you've obviously been in this business a long time.

24          THE WITNESS:  I have.

25          THE COURT:  That blind part is the part that sticks

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    in your throat, it sound like to me.

2          THE WITNESS:  Yeah, as I said yesterday, you know,

3    these agreements, they're very complex, and you typically

4    tailor things for the uniqueness of your operation and your

5    packaging and things like that, and that would go out the

6    window, and there just could be handed to me terms that we

7    possibly couldn't even perform and we'd breach, and then the

8    whole result to the arbitration and agreement could just be

9    breached and null.  So I've never -- I've never gone through

10   one.

11         THE COURT:  But it sounds like you also know from

12   experience that threatening to go that route can have a

13   positive effect on a negotiation?

14         THE WITNESS:  Yes.

15         THE COURT:  You've seen that firsthand, right?

16         THE WITNESS:  Yes.

17         THE COURT:  You're free to go.

18         THE WITNESS:  Thank you, Your Honor.

19         (Witness excused.)

20         THE COURT:  Call your next witness.

21         MR. PETROCELLI:  Your Honor, Mr. Oppenheimer is going

22   to be handling this examining.

23         THE COURT:  Okay.

24         MR. WELSH:  Good morning, Your Honor, Eric Welsh for

25   the United States.  The United States calls Mr. Vince Torres as

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1    an adverse party witness.

2              THE COURT:  All right.

3              THE DEPUTY CLERK:  Please remain standing and raise

4    your right hand.

5              VINCE TORRES, ADVERSE PARTY WITNESS, SWORN

6              THE DEPUTY CLERK:  You can be seated.

7              MR. WELSH:  May I proceed, Your Honor?

8              THE COURT:  You may.

9              MR. WELSH:  Thank you.

10             THE COURT:  And you may use leading questions to an

11   adverse party.

12             MR. WELSH:  Thank you, Your Honor.

13                        DIRECT EXAMINATION

14   BY MR. WELSH:

15   Q.   Could you please state your name for the record, sir?

16   A.   Sure, Vincent Torres.

17   Q.   Mr. Torres, good morning.

18   A.   Good morning.

19   Q.   Mr. Torres, I just have a few subjects to cover with you

20   this morning.  I'd like to first start off with a little bit of

21   some discussion about your background, if we may, okay?

22   A.   Sure.

23   Q.   Great.  Now, you are employed by AT&T is that correct?

24   A.   I am.

25   Q.   And you're the senior vice-president of planning, pricing
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   and promotions and go to market strategy for AT&T, true?

2   A.   I am, that's essentially my responsibilities are to

3   acquiring customers and to retain existing customers.

4   Q.   Okay.  And you report today to David Christopher; is that

5   right?

6   A.   That's correct.

7   Q.   All right.  And Mr. Christopher is the president of the

8   entertainment group at AT&T, right?

9   A.   That's correct.

10   Q.   And the entertainment group at AT&T, now this include the

11   company's video business; is that right?

12   A.   It's the video business, the broadband business and our

13   wireless business.

14   Q.   Okay.  Now, you started working for DirecTV in 2011; is

15   that right?

16   A.   November 2011.

17   Q.   Okay.  And over your time at DirecTV, so you started in

18   2011, you continued with DirecTV, then AT&T all the way until

19   today; is that right?

20   A.   That's right.

21   Q.   All right.  And during that time you've had

22   responsibilities related to the pricing of the video products

23   for DirecTV and then AT&T, true?

24   A.   At different times in my career, at my time there I was

25   responsible for pricing.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   Okay.  And just so it's clear, when we're talking about

2   video products, we're talking about -- today we're talking

3   about AT&T's television distribution businesses, so DirecTV and

4   the universe product, correct?

5   A.   That's right.  I also work with DirecTV now.

6   Q.   Okay.  And for most of your time, so again looking at your

7   time at DirecTV and AT&T, for most of your time you have been

8   the person primarily responsible for setting the prices of the

9   company's video products, true?

10  A.   I have.

11  Q.   Okay.  And you continue to have that responsibility today,

12  right?

13  A.   I do today.

14  Q.   Okay.  Now, in 2014, you became the vice-president of

15  revenue, strategy and planning for DirecTV; is that true?

16  A.   Yeah, I believe in the middle of 2014.

17  Q.   Okay.  And in that role you were also the leader of the

18  revenue, strategy and planning group for DirecTV, right?

19  A.   That's correct.

20  Q.   And I think you just referred to this a little bit ago,

21  but your job then was to have responsibility for new customer

22  acquisition and the strategies associated with that, true?

23  A.   That is correct.

24  Q.   And so what we're talking about here is DirecTV acquiring

25  new subscribers, new customers to its business, true?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    It was our acquisition strategy and our retention

2  strategy.

3  Q.    And the retention strategy, that involved, then, thinking

4  about how you're going to keep the customers that you have,

5  right?

6  A.    That's right, what investments we were going to make and

7  to our customers and how we would manage that.

8  Q.    Okay.  Now, in the beginning of 2015, you took over the

9  leadership of the business analytics team at DirecTV; is that

10  true?

11  A.    That's correct.

12  Q.    All right.  And the business analytics team, that conducts

13  the analyses that support the business decision that the

14  company makes as to the video products, right?

15  A.    A number of different marketing, we support a number of

16  different marketing decisions.

17  Q.    Okay.  But one of the decisions that you're helping to

18  support is the business decision that the company makes when it

19  goes into its video negotiations, right?

20  A.    That's right, we do some work to support that team.

21  Q.    And one of the functions that your business analytics team

22  does is to help to measure the subscriber value for AT&T and

23  DirecTV; is that right?

24  A.    We manage the LTVs of the business and the existing

25  customer values, which are called ACVs, so the values of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   individual subscribers, yes.

2   Q.   Okay.  And LTV, I think the Court's heard a little bit

3   about it, but let's just make sure we're all talking the same

4   way here.  That would be the lifetime value of the subscriber?

5   A.   That's right.  That's an estimate of the lifetime value of

6   the subscriber at the point of acquisition.

7   Q.   And so what you're looking at is how much value that new

8   video subscriber contributes to the company, true?

9   A.   It's a measure of the margin of that subscriber for their

10  estimated time with us, so what we estimate is how long they

11  would stay with us as a customer, and then you subtract out the

12  cost of acquiring that customer.

13  Q.   Okay.  And in addition to looking at the subscriber value

14  that you just talked about, the LTVs, another function that you

15  do in the business analytics team is to measure the impact of

16  potential programming disputes on the business; is that right?

17  A.   That's right.  We'd estimate the short-term impact on

18  churn, and to some extent gross ads, but to a much lesser

19  degree.

20  Q.   Okay.  And so what we're talking about here is that

21  there's a blackout in the negotiation resulting from a failed

22  negotiation or going dark, you look at that, that impact on

23  AT&T and DirecTV's business, correct?

24  A.   That's right, just to understand to give us another data

25  point to our the programming acquisition team so that they know

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   what our potential exposure is for any type of short-term

 2   dispute that we may have.

 3   Q.    Okay.  And we'll come back and talk a little bit more

 4   about this in a minute.  So let's just finish off with your

 5   background here.

 6         So in your current role as the senior vice-president --

 7   planning, pricing, promotions and the go to market strategy,

 8   you have responsibilities related to AT&T's promotions; is that

 9   right?

10   A.    I do.

11   Q.    And these would include the promotions for both the new

12   subscribers that you would bring in; is that right?

13   A.    That's right.

14   Q.    And it's also for the promotions directed at the existing

15   customers of AT&T, true?

16   A.    That's true.

17   Q.    Okay.  So let's take these one at a time briefly if we

18   can.  I want to talk first about the efforts to acquire new

19   customers, okay, for AT&T?

20   A.    Got it.

21   Q.    All right.  Now, one way that AT&T uses promotions is to

22   get customers to sign up for multiple products; isn't that

23   right?

24   A.    Very -- most of our promotions are product-centric, so

25   they focus on the success of the individual products.  There
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  might be some elements of those promotions that where it

2  benefits to take multiple product, but we do both.

3  Q.   All right.

4        MR. WELSH:  Your Honor, I have the deposition

5  transcript if I may hand that up.

6        THE COURT:  All right.

7        MR. WELSH:  Your Honor, may I approach the witness?

8        THE COURT:  You may.

9        MR. WELSH:  Your Honor, we'll mark for identification

10  purposes the deposition transcript as 536.

11        THE COURT:  All right.

12        MR. WELSH:  PX 536.

13        (Plaintiff's Exhibit No. PX 536 was marked

14     for identification.)

15        MR. WELSH:  May I proceed, Your Honor?

16        THE COURT:  You may.

17  BY MR. WELSH:

18  Q.   Mr. Torres, you gave a deposition in this matter; is that

19  true?

20  A.   I did.

21  Q.   Okay.  And you have in front of you the deposition

22  transcript.  I'd like you to take a look at page 43 of that

23  transcript.  And I'm going to direct you to line 16.  The

24  question was asked of you that day, "Do you offer promotions to

25  people to get them to subscribe to multiple products with

1  AT&T?"

2      And your answer there was on line 19 was "Yes"; is that

3  correct?

4  A.    That's correct.

5  Q.    Okay.  You can put that to the side.

6      Now, when you offer the promotions on multiple products,

7  this would include situations like TV and wireless cell phone

8  service; is that true?

9  A.    That's correct.

10 Q.    All right.  And you offer them in multiple products, you

11 do that because there are benefits to AT&T if the customers

12 have multiple products with the company; isn't that true?

13 A.    There are.

14 Q.    All right.  So customers with multiple products AT&T has

15 found they contribute more revenue to the company, right?

16 A.    They do.

17 Q.    Okay.  And those customers AT&T has found, they tend to

18 stay longer with the company than those that just have a video

19 subscription, correct?

20 A.    Those that can afford multiple products tend to stay

21 longer with us.

22 Q.    And those that have the multiple products, those multiple

23 product customers that AT&T has, those tend to have much higher

24 margins than the video customers; isn't that true?

25 A.    They do.

1  Q.   So those customers that have the multiple products, they

2  tend to be a lot more valuable to AT&T and DirecTV; isn't that

3  right?

4  A.   If a customer has multiple products, that relationship is

5  more valuable to us.

6  Q.   Okay.  Let's talk about AT&T's efforts to retain existing

7  customers, okay?

8       Now, you're familiar with the contempt of churn, right?

9  A.   I am.

10 Q.   And we've heard about that a little bit here.  So I'm not

11 going to go into too much detail, but Churn is the term when

12 you have a disconnect where the customer leaves, in this case

13 AT&T or DirecTV, right?

14 A.   It's when they disconnect the service with us.

15 Q.   Okay.  And you and your team are responsible at AT&T and

16 DirecTV for tracking that churn; is that correct?

17 A.   I do, I track churn.

18 Q.   And AT&T tries to reduce the rate of the churn, doesn't

19 it?

20 A.   We do.

21 Q.   And today at AT&T there is a plan underway to try to drive

22 that churn down; isn't that true?

23 A.   Yes, churn has been increasing substantially over the last

24 couple of years.  And so there are plans to at least control

25 it.  I don't know if we'll be able to drive it down, but at

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  least control it.

 2  Q.    Well, there's a plan in place called driving to, and then

 3  there's a number.  I don't know whether that number is

 4  confidential or not so I'm pausing on that.  But there is a

 5  plan called drive to a particular number; isn't that true?

 6  A.    There is, that's once you take away the impact of those

 7  customers that pick over-the-top services.  So it's a number

 8  that accounts for taking that type of churn out of the

 9  equation.  It's an internal initiative.

10            MR. WELSH:  Your Honor, if I may confer with defense

11  counsel for a second?

12            THE COURT:  Go ahead.

13            (Pause.)

14            MR. WELSH:  Thank you, Your Honor.

15            THE COURT:  You may proceed.

16  BY MR. WELSH:

17  Q.    Mr. Torres, I just conferred with defense counsel and was

18  told that the number is not confidential so I can talk openly

19  about this so it makes our lives and the Court's life here a

20  lot easier.

21        The plan that's in place is called drive to one five oh,

22  correct?

23  A.    That's correct.

24  Q.    Okay.  And the idea of that plan is to actually drive the

25  churn down to 1.5 percent per month; is that right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   That's right.  We had -- that's consistent with what the

2   churn was several years ago, and so the initiative is to

3   control for when you take all the core cutting out of the

4   equation for that that's not related to core cutting, can we at

5   least manage that a little bit better .

6   Q.   The plan that's in place is one that your boss is working

7   on along with Jay Carey and you; is that correct?

8   A.   There's a lot of people working on it.

9   Q.   And the plan is one that's continuing to be implemented,

10  right?

11  A.   It's one that we've had to fund and one that will take

12  time to get there.  But yes, we're working on it.

13  Q.   Okay.  Now, let's -- So when AT&T, Mr. Torres, when AT&T

14  seeks to retain a customer, prevent them from leaving, prevent

15  this churn, AT&T might offer them a retention offer; is that

16  right?

17  A.   Yes, it usually starts with -- well, retention credits is

18  what we call them.  That's when we adjust, most customers are

19  calling us because of price concerns, and so we adjust their

20  bill down to something that they can better manage, and so

21  those are retention credits.

22  Q.   And you go through the, initially the save desk at AT&T,

23  right, to try to retain these customers?

24  A.   When the customers are calling to disconnect, they usually

25  call the save desk.

1   Q.   Right.  And when they call the save desk and they want to

2   disconnect and AT&T is trying to keep them with the service,

3   there are particular retention offers that are given to the

4   customer that are tailored to the particulars of that customer;

5   is that right?

6   A.   That's right.  It's the credits are tailored specifically

7   to what -- to who that customer is and what we know about that

8   customer.

9   Q.   So among other things, the retention offers that are given

10  to the customers, they are based on the customer's tenure with

11  AT&T, true?

12  A.   That's one of the several factors.

13  Q.   And another factor that they're based upon is the

14  customer's margin that they have had with AT&T as well,

15  correct?

16  A.   That's correct.

17  Q.   So how much money AT&T is gaining from that customer,

18  correct?

19  A.   That's correct.

20  Q.   Now, one of the retention offers that's used by the save

21  desk here is to move customers from AT&T's traditional

22  satellite services to DirecTV now, right?

23  A.   Yes.

24  Q.   Okay, but DirecTV now is part of a save desk offer that

25  only has limited use at AT&T by the save desk; isn't that true?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   It is, it's not something we focus on because if we can

2  keep the customer on DirecTV, which is what they're used to

3  using, it's the experience they're used to, that's the

4  preferred experience for most customers.  And so that's what we

5  try to accomplish.

6  Q.   Well, you're interested in keeping the customer on the

7  satellite business here rather than moving them over to DirecTV

8  now because the satellite business is one that's more

9  profitable to AT&T for that customer, right?

10 A.   The reason we try to keep them on the satellite product is

11 you're trying to keep them from disconnecting.  And so the

12 customer's used to using our service, there's no sense in

13 disrupting the experience that they're used to interacting with

14 if you can solve it with price.  And price is usually the

15 primary reason they're calling to disconnect.

16 Q.   Well, let's break this down so I want to make sure that

17 I'm understanding you.

18      DirecTV now as an offer, that's not the first offer, in

19 fact, that's the last offer that's typically made when a

20 customer is threatening to leave, true?

21 A.   That's true, for the reasons I just mentioned.

22 Q.   All right.  And in your opinion, though, Mr. Torres, AT&T

23 should do everything it can to keep the customers on the

24 satellite platform versus migrating them to DirecTV Now because

25 on the satellite side there's a much better ability for AT&T to

1  up-sell those customers; isn't that true?

2  A.   Well, there's a lot of different reasons.  As I mentioned,

3  they're used to an experience, they're calling about price is

4  the primary reason, and so if they're calling about price you

5  address the price concern.  There are things that we can't

6  offer on DirecTV Now, so if they had NFL Sunday ticket, for

7  instance, in the past, we don't offer that on DirecTV Now.  And

8  so there's -- there are a lot of reasons why you want to keep

9  them on the platform they're used to and address their price if

10 you need to address their price.

11          MR. WELSH:  Your Honor, I have a document which we've

12 marked for identification as 537, PX 537, for impeachment

13 purposes.  May I hand it to the clerk?

14          THE COURT:  You may.

15          MR. WELSH:  May I approach the witness, Your Honor?

16          THE COURT:  You may.

17          MR. WELSH:  May I proceed, Your Honor?

18          THE COURT:  You may.  It's a one-page document?

19          MR. WELSH:  I'm sorry, Your Honor?

20          THE COURT:  It's a one-page document?

21          MR. WELSH:  It is, Your Honor.

22          THE COURT:  Two sided?

23          MR. WELSH:  Two sided, I'm sorry, yes, Your Honor.

24 BY MR. WELSH:

25 Q.   Mr. Torres, you have Plaintiff's Exhibit 537, do you see

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  there, sir, that there's an e-mail from a Mr. Scott House which

 2  you're copied on October 27th, 2016?

 3  A.   I do.

 4  Q.   Okay. Now, Mr. House works for you, correct?

 5  A.   He does.

 6  Q.   Okay.  He's in your group?

 7  A.   Yes.

 8  Q.   And do you value Mr. House's opinions?

 9  A.   I do.

10  Q.   All right.  Mr. House was of the opinion on October 27,

11  2016, that --

12          MR. WELSH:  I'm sorry, Your Honor, give me one

13  second.

14          THE COURT:  Yes.

15          (Pause.)

16          MR. WELSH:  Your Honor, I'll withdraw that exhibit

17  for the time being.

18          THE COURT:  Okay.

19          MR. WELSH:  I have binders if I may hand them up to

20  Your Honor?

21          THE COURT:  Sure.

22          MR. WELSH:  May I approach the witness, Your Honor?

23          THE COURT:  You may.

24          MR. WELSH:  Thank you.

25          Let's try this again, Your Honor, apologies.
```

1          THE COURT:  All right.

2          MR. WELSH:  May I proceed?

3          THE COURT:  You may.

4          MR. WELSH:  Thank you.

5   BY MR. WELSH:

6   Q.    Now, Mr. Torres, if you'd look at your binder that's in

7   front of you, and I'd like you to look at Plaintiff's Exhibit

8   51 if you would.

9   A.    (Witness complies.)

10  Q.    Tell me when you're there, sir?

11  A.    PX 0051?

12  Q.    Correct, sir.  On this page we have a series of e-mails.

13  The bottom e-mail is dated October 19, 2017.  Do you see that,

14  sir?

15  A.    October 19th, yes.

16  Q.    Okay.  And this is an email from you; is that right?

17  A.    No, this is from Jay Carey to David Christopher and

18  myself.

19  Q.    The bottom e-mail on October 19th at 1:58 says Vincent

20  Torres, and it says you wrote, do you see that?

21  A.    I'm sorry?  Oh, okay.  This is from David to Jay, it's the

22  first -- I see an e-mail from David Christopher to Jay Carey

23  and me, and then I see a response from Jay Carey to David.

24  Q.    Right.  And I'll just direct you to the bottom of PX 51,

25  so the first page.

```
1   A.    First page.

2   Q.    On October 19, 2017 at 1:58 p.m., there's an e-mail from

3   you, correct?

4   A.    That's correct.

5   Q.    Okay.  And this e-mail chain is related to the save

6   efforts at AT&T, correct?

7   A.    That's correct.

8   Q.    Okay.  And the e-mail exchanges here are with your boss,

9   Mr. Christopher and Mr. Carey, who you mentioned earlier,

10  correct?

11  A.    That's correct.

12          MR. WELSH:  Your Honor, I move for admission of PX

13  51?

14          MR. OPPENHEIMER:  No objection, Your Honor.

15          THE COURT:  Be admitted.

16          (Plaintiff's Exhibit No. PX 51 was

17      received in evidence.)

18  BY MR. WELSH:

19  Q.    Now, looking at your e-mail on October 19th, 2017, Mr.

20  Torres, you stated:  "In my opinion we should do everything we

21  can to keep them on satellite with credits versus migrating

22  them to Now, given that we have the ability to up-sell and

23  offer a richer value product on satellite."  Those were your

24  words that day?

25  A.    They were.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   And Now is DirecTV Now, correct?

2  A.   Now is DirecTV Now.

3  Q.   Okay.  You can put that to the side, thank you, sir.

4        MR. OPPENHEIMER:  Your Honor, my apologies, that

5  should go in under seal.

6        THE COURT:  Any objection?

7        MR. WELSH:  No objection, I think can hopefully

8  sort out if there's a small amount that needs to be addressed

9  in it.

10        THE COURT:  All right, it will be admitted under

11  seal.

12        (Plaintiff's Exhibit No. PX 51 was

13     received in evidence under seal.)

14  BY MR. WELSH:

15  Q.   Let's change topics a little bit if we can, Mr. Torres.  I

16  want to talk about programming and programming disputes.  You

17  mentioned that earlier in your testimony, okay?

18  A.   (No verbal response.)

19  Q.   Now, you testified earlier, Mr. Torres, that you became

20  the leader of the revenue, strategy and planning team in 2014,

21  right?

22  A.   I did.

23  Q.   And you took over responsibilities for the business

24  analytics team in 2015?

25  A.   That's correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   And you still have responsibilities today with the

2   business analytics functions at AT&T, right?

3   A.   I do.

4   Q.   Now, one of the functions I think you testified about

5   earlier that the business analytics teams handles is the

6   impact, looking at the impact of programming disputes on the

7   business, correct?

8   A.   That's correct.

9   Q.   And this would include programming disputes that end up

10  resulting in blackouts themselves, correct?

11  A.   That's right, there's been three instances of those in my

12  time.

13  Q.   But regardless of how many, when there is a blackout or

14  potential blackout situation, your group will do the analytics

15  on that?

16  A.   That's correct.  Sorry, yes.

17  Q.   Now, the business analytics team has a methodology which

18  it uses for forecasting the effect of a potential blackout on a

19  company, true?

20  A.   Yes, we do.

21  Q.   All right.  And you use a methodology today at AT&T that

22  you -- is similar to what you used when you were with DirecTV

23  in that timeframe, correct?

24  A.   Yes, it's evolved slightly, but it's very similar.

25  Q.   Okay.  Now, when your team is forecasting the effect of a

1  potential dispute, a carriage dispute, it looks at the

2  potential effect on churn, correct?

3  A.    That is the primary focus of the conversation,

4  particularly for the weeks following around the negotiation.

5  Q.    Okay.  Well, you look at the loss of the existing

6  customers for that churn, right?

7  A.    That's correct.

8  Q.    Another metric, though, that you do look at, your team

9  looks at is the forecast of the effect of the programming

10 dispute on new subscribers, correct?

11 A.    It's something that we look at.  We don't put a lot of

12 science behind it, but we do look at it.

13 Q.    Okay.  And I think in your business you refer to them as

14 gross ads, right, or gross additions?

15 A.    Gross ads are new customers.

16 Q.    New customers, okay.  And that's what we're talking about

17 is how many, in addition to how many you might lose in a

18 carriage dispute if there were the possibility of going dark,

19 how many AT&T customers we lost, but how many new subscribers

20 would not be gained during this period of time by AT&T and

21 DirecTV, correct?

22 A.    That's right, assuming we did nothing, that's usually the

23 going in assumptions.  If we did nothing, what is the potential

24 losses on gross ads over a short period of time.

25 Q.    And the new subscribers of the gross ads, now, they're

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  among the most important metrics that your team tracks; isn't

2  that true?

3  A.    I'm sorry, can you repeat that?

4  Q.    Sure.  The new subscribers or the gross ads here that

5  we're talking about, those are among the most important of the

6  metrics that your team tracks, right?

7  A.    For the purposes of these disputes, it's actually the

8  disconnects that we're most focused on, but we do track gross

9  ads, but it's -- and disputes is disconnects.

10 Q.    Well, if you look at your deposition transcript that you

11 have in front of you, sir?

12 A.    Sure.

13 Q.    Do you have it in front of you, sir?

14 A.    I do.

15 Q.    If you could open it up to page 30.

16 A.    (Witness complies.)

17 Q.    And I'm going to direct you to line 9.  The question was

18 asked of you that day, "You have mentioned some of them, but

19 what are the most important metrics that you track?"

20       Your answer on line 12, "There's a variety, the gross ads,

21 disconnects and net ads across -- across our posts, our

22 wireless business, our premium TV business, our broadband

23 business, and our DirecTV Now business."  Correct?

24 A.    Those are the metrics we track in our business, yes, for

25 our business, that's what we track.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1            MR. OPPENHEIMER:  Your Honor, for the completeness I

 2   think the prior question should be read.

 3            Oh, I have it already.

 4            THE COURT:  You'll get a chance to do that on cross.

 5            Go ahead.

 6            MR. WELSH:  May I proceed, Your Honor?

 7            THE COURT:  You may.

 8            MR. WELSH:  Thank you.

 9   BY MR. WELSH:

10   Q.   Now, I'd like to direct you to a document that's in the

11   other binder in front of you, if you'd look at that, please,

12   sir.

13   A.   Sure.

14   Q.   It's Plaintiff's Exhibit 108 for identification purposes.

15            MR. OPPENHEIMER:  Your Honor, may we approach?  We

16   will have an objection to this.

17            THE COURT:  All right.  Come on up.

18            Mr. Torres, step down, sit in that chair over there.

19            (Witness withdrew from the witness stand.)

20            (Sealed Bench Conference.)

21            THE COURT:  What's the problem here with this one?

22            MR. OPPENHEIMER:  Your Honor --

23            THE COURT:  108?

24            MR. OPPENHEIMER:  108, this is Exhibit 108.  This is

25   a slide presentation that was prepared back in 2014.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  All right.

2          MR. OPPENHEIMER:  It's a DirecTV slide presentation.

3          THE COURT:  In-house?

4          MR. OPPENHEIMER:  In-house, produced prior to the

5   acquisition of DirecTV by AT&T.  Point two, it had to be

6   cleared.  This witness in his -- then existing did produce a

7   portion of this document, but certainly not the whole document.

8          But this is a document that involves an analysis of

9   forecast of loss of subscribers with respect to negotiation for

10  a Disney product back in 2014 having nothing to do with Turner

11  and having nothing to do with the current AT&T management.

12         And the objections under 402 and 403 for the

13  following reasons.  We're all working mightily to constrain the

14  number of witnesses and shorten up the case and stay focused.

15  This is not a Turner job.  This is not a Turner analysis.  This

16  is a forecast with respect to an event that never occurred with

17  the prior company, and again, having nothing to do with Turner

18  forecast.  We have no problem discussing actual blackouts.  We

19  have no problem, obviously, discussing Turner forecasts.

20         THE COURT:  What's the probative value?

21         MR. OPPENHEIMER:  Very limited.  And it's really,

22  it's taking time on a subject that's not focused on what we're

23  trying to deal with.

24         MR. WELSH:  We're not going to be long with the

25  document, Your Honor, but we do disagree completely with the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    view of defense about the document.

2         It is probative.  First of all the witness did a

3    significant portion of it.  He did the analysis, he and his

4    team did the analysis on the chart.  We believe that that's

5    probative.  It doesn't have to just be with Turner.  We've

6    heard examples, other examples come into this court of the

7    third parties have been looking at Turner analysis, drop

8    analysis unrelated to Turner to be able to look at how they're

9    going about planning their business.

10        We wanted to establish that DirecTV, AT&T does

11   exactly the same thing, first of all, Your Honor.

12        Secondly, this document and the work that this

13   witness did has, we believe, a key admission in it that is

14   highly relevant to the case.  You heard the witness --

15        THE COURT:  What would that be?

16        MR. WELSH:  That would be, Your Honor, that they did

17   long-term analyses, long-term drop analyses.  It's not -- you

18   heard the witness just a few minutes ago talk about how this,

19   you know, they looked it at for a week, they looked at it for a

20   couple weeks.  We've heard defense go on and on about it's only

21   a couple of weeks sort of thing.  This document goes directly

22   against that proposition.  It shows that they looked at

23   long-term drop analyses, Your Honor.  So we think that it's

24   probative in that respect.  We also think that it's an

25   admission by DirecTV and AT&T in that respect as well, Your

1   Honor.

2           THE COURT:  I didn't follow that last sentence.

3           MR. WELSH:  It's an admission, Your Honor, that they

4   looked at a long-term nature of what the churn, what the drop

5   and the loss of gross ads would be.  It's not just something

6   that's on a weekly or a monthly basis, which is really one of

7   their main defenses.

8           THE COURT:  I understand.  You kind of went from that

9   to --

10          MR. WELSH:  I'm sorry.

11          THE COURT:  -- I thought a different idea, which was

12  what is exhibited here.  I'm not quoting, this is the essence.

13          MR. WELSH:  Yes, sir.

14          THE COURT:  What's exhibited here is also beyond the

15  circumstances here, i.e., the Disney situation to DirecTV in

16  general.

17          MR. WELSH:  What I'm trying to say, Your Honor.

18          THE COURT:  Did he say that?  Has he said that in his

19  deposition?

20          MR. WELSH:  What I'm trying to say, Your Honor, is

21  that the fact that they do a long-term and never did a

22  long-term analysis here is certainly evidence in this document

23  108.

24          THE COURT:  In this case.

25          MR. WELSH:  Is evidence that they think about doing

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  long-term analysis.  That they think about what the long-term

2  effect of the --

3          THE COURT:  Was he asked those questions in his

4  deposition, whether they do a long-term analysis for DirecTV,

5  was he asked that?

6          MR. WELSH:  This analysis was done for DirecTV

7  involving the Disney renewal, which he was asked about.  He was

8  asked about where did this word come from.

9          THE COURT:  You want to show they do it for other

10  things?

11          MR. WELSH:  What I wanted to show, Your Honor, is

12  that contrary to what the defense has argued here, they have in

13  the past looked at the long-term effects of what a drop would

14  be.  I think that the experts in this case are both going to be

15  looking to that issue and talking to Your Honor about that.

16          And so the fact that we've heard this witness just a

17  few minutes ago say, well, we looked at it just for a couple

18  weeks, that's really not true.  What they looked at was going

19  out for --

20          THE COURT:  Why don't you ask him the question

21  directly.  You can lead, obviously.

22          MR. WELSH:  Yes.

23          THE COURT:  Ask him the question directly.  If he

24  denies that they do it for more than just a couple of weeks,

25  confront him with this to see if he --

1       MR. WELSH:  That's fine.  I'll start with that, Your

2  Honor.

3       THE COURT:  Now, I think Mr. Oppenheimer's point is a

4  good one.  You don't need to get into the intricacies of what

5  happened in this situation here.  It's just an example of the

6  situation where they looked at it long-term.  So we don't need

7  to get into all the details here.  It would be a side show.

8       MR. WELSH:  I'm not -- as I said at the onset, I'm

9  not planning on spending much time with this, with this witness

10  on this issue.

11       THE COURT:  The estimate on this witness was a half

12  hour of direct and a half hour of cross.  You've already done

13  over half an hour.  How much more have you got?

14       MR. WELSH:  I don't think I have an awful lot left.

15       THE COURT:  That doesn't tell me anything.  Give me

16  minutes, five?

17       MR. WELSH:  Can I go get my outline, Your Honor?

18       THE COURT:  Yes, yes, go, if it will help you.

19       (Pause.)

20       MR. WELSH:  Your Honor, I have questions about this

21  document, and then I have questions about one other document

22  and that's it.

23       THE COURT:  You haven't given me a number yet.

24       MR. WELSH:  I think it would be ten minutes, Your

25  Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  Okay, so including this thing we're

 2   talking about right now, right?

 3              MR. WELSH:  Yes, Your Honor.

 4              THE COURT:  So I'm going to hold you to ten minutes

 5   because then we're going to take a break.

 6              MR. WELSH:  I understand, Your Honor.

 7              THE COURT:  I don't think I can wait much longer.

 8              MR. WELSH:  I understand, Your Honor, I'm trying to

 9   move forward as quickly as I can.

10              THE COURT:  All right, let's not get sidetracked.

11              MR. WELSH:  I understand, Your Honor.

12              MR. OPPENHEIMER:  And, Your Honor, can I just make

13   one point?  There was a reference to an admission.

14              THE COURT:  What?

15              MR. OPPENHEIMER:  There was a reference to an

16   admission.  As Your Honor knows, this is a DirecTV premerger

17   document.

18              THE COURT:  Well, let's see what he says about the

19   answer to the question.  If it goes the way you think it's

20   going to go, you might need to confront him.  But if doesn't go

21   the way you think it's going to go, you don't need to do this.

22   You won't need it.

23              (Open court.)

24              THE COURT:  Come on up, Mr. Torres.

25              (Witness resumed the witness stand.)
```

```
 1              THE COURT:  You may proceed consistent with the

 2    discussion at the bench.

 3              MR. WELSH:  Thank you, Your Honor.

 4              THE COURT:  Yes.

 5    BY MR. WELSH:

 6    Q.   Mr. Torres, you and your team in 2014 worked on a

 7    presentation involving a Disney renewal; is that correct?

 8    A.   We did some work in advance of the Disney renewal.

 9    Q.   Okay.  And that's part of what you do in the ordinary

10    course or did in the ordinary course back then for DirecTV,

11    right?

12    A.   We did.

13    Q.   Okay.  And as part of that you looked at, again, these

14    economic impacts of what might happen with the loss of the

15    carriage of Disney, correct?

16    A.   We did, we did some work to help inform the team that was

17    negotiating it.

18    Q.   Okay.  And you looked at the loss of the gross ads as well

19    as the churn that might result, correct?

20    A.   We always include something in there for gross ads, but

21    the focus of the discussion and the attention around the

22    disconnects.

23    Q.   And with this analysis you actually did, you and your team

24    did an analysis that went out for six years; isn't that true?

25    A.   We, I think we ran out of calculation for multiple years
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    for some reason.  But the analysis really was around the one

2    week, one month period.

3    Q.   All right.  The analysis that you did was based on one

4    week, one month.  It also went for one year, and then went for

5    six years as well; isn't that true?

6    A.   I don't remember specifically if -- I think that's

7    accurate.  The calculation was extended for a period of time.

8    But if you could point me to the document, that would be

9    helpful.

10             MR. WELSH:  Your Honor, may I point the witness to PX

11   108?

12             THE COURT:  See if it refreshes his recollection.

13             MR. WELSH:  I'll start with that, Your Honor, thank

14   you.

15   BY MR. WELSH:

16   Q.   If you'd look at PX 108 in your binder.

17   A.   Okay.

18   Q.   And if you'd look at 046, which is a color copy -- the

19   page?

20   A.   (Witness complies.)

21   Q.   The numbers, I understand have been designated as

22   confidential, so I'm not going to --

23             THE COURT:  Just read it to yourself, just read it to

24   yourself.  Then he'll ask you a question.

25

1  BY MR. WELSH:

2  Q.   If you'd take a look at that and tell me when you're done,

3  sir.

4  A.   I'm done.

5  Q.   And in looking at the document, does that refresh your

6  memory, sir, that DirecTV at the time looked at a one week, one

7  month and one year and six year calculations of the economic

8  impact from the drop of Disney?

9  A.   Yeah, you can see by looking at this that some of these

10  numbers were simply multiplied out.  So it's a very simple

11  calculation without any work done to understand mitigating

12  actions that we would take or countermeasures that we would

13  take.  So the one month or one year is simply multiplied by

14  six.  The one month is, I can see here is multiplied by twelve

15  for gross ads in particular.  So it's a very simple, simplistic

16  extension of the calculation.

17  Q.   My question was directed, and I'll just come back to it

18  again.  But the analysis that your team did at that point

19  included a six year analysis, correct?

20  A.   I just want to be clear.  The analysis focused on the one

21  week and one month.  The rest was just a calculation that was

22  extended out.

23  Q.   Well, the number that's there for the six year term at the

24  bottom, which I can't talk about, that's also found on page 42

25  of this document; isn't that true?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1                MR. OPPENHEIMER:  Your Honor, may we approach?

 2                THE COURT:  Yes.

 3                Step down.

 4                (Witness withdrew from the witness stand.)

 5                (Bench Conference.)

 6                MR. OPPENHEIMER:  Your Honor, this is what I was

 7      concerned about.  It's clearly not impeachment.  He said he

 8      didn't remember at first, but he's talking about the document.

 9      We're now going into details of the document.  I can represent

10      to Your Honor if we go down this road, I have to go back into

11      this document so with the context although the witness has

12      already described that extension.

13                THE COURT:  I think you are beating a dead horse

14      there Mr. Welsh.  You've made your point.

15                MR. WELSH:  I was just trying to impeach him with

16      this provision, Your Honor.

17                THE COURT:  You made your point.

18                MR. WELSH:  Okay.

19                THE COURT:  I'm not trying to tell you how to try

20      your case, but you've made your point.

21                MR. WELSH:  I'll move on, thank you.

22                THE COURT:  It's break time.

23                (Witness resumed the witness stand.)

24                (Open court.)

25      BY MR. WELSH:
```

1  Q.   Mr. Torres, let's move to one last subject if we can.  I

2  want to talk about pricing with you, okay?

3  A.   Sure.

4  Q.   All right.  Now, AT&T increases the prices for its TV

5  products, its video services on an annual basis, correct?

6  A.   We do.

7  Q.   And for most of the time at the company, you've been the

8  person responsible, primarily responsible for those pricing

9  recommendations, correct?

10  A.   For most of my time with the company, yes.

11  Q.   All right.  And that was the case in -- for the price

12  increase for 2016, correct?

13  A.   The price increase that was implemented in 2016, yes, I

14  was responsible.

15  Q.   All right.  If you'd look at your binder again at PX 12

16  for identification purposes.  Are you there, sir?

17  A.   PX 12?

18  Q.   Yes.

19  A.   Yes.

20  Q.   Now, this is a cover e-mail from you, Mr. Torres, to Mr.

21  Bentley, Brad Bentley on October 16, 2015, correct?

22  A.   That's correct.

23  Q.   And what you're attaching here are the updated price

24  increase slides for AT&T, correct?

25  A.   That's correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   Q.   And the attachment's titled "2016 A.E.I.S. pricing,"

 2   right?

 3   A.   Yes.

 4   Q.   A.E.I.S. would be AT&T Entertainment and Internet

 5   Services, correct?

 6   A.   That's correct.

 7   Q.   All right.  And Mr. Bentley was your boss at the time; is

 8   that right?

 9   A.   Yes, he was.

10   Q.   You sent this presentation to Mr. Bentley for a meeting

11   that was to be had with Mr. John Stankey; is that correct?

12   A.   That's correct.

13   Q.   And Mr. Stankey at that time was the head of the

14   entertainment group for AT&T, right?

15   A.   Yes, he was.

16   Q.   All right.  And your team made a recommendation to

17   Mr. Bentley that related to the 2016 price increase; is that

18   right?

19   A.   We did.

20   Q.   And that was in the attachment, correct?

21   A.   That's correct.

22        MR. WELSH:  Your Honor, I move to admit PX 12?

23        MR. OPPENHEIMER:  Your Honor, no objection under

24   seal.

25        THE COURT:  Be admitted under seal.
```

1    (Plaintiff's Exhibit No. PX 12 was

2    received in evidence under seal.)

3    MR. WELSH:  Thank you, Your Honor.  May I proceed?

4    THE COURT:  You may.

5  BY MR. WELSH:

6  Q.  Now, Mr. Torres, we look at PX 12-030.  Tell me when

7  you're there, sir.

8  A.  I'm there.

9  Q.  Okay.  Now, these are the guiding principles for the 2016

10  price increase, is that right?

11  A.  That's right.

12  Q.  And the number one guiding principle here was to aim to

13  cover the programming cost increases through price increases,

14  do you see that?

15  A.  I do, that was one of the things we tried to accomplish.

16  It becomes more difficult, but that's a guiding principle.

17  Q.  Right.  That was the number one guiding principle for 2016

18  was to aim to cover the programming cost increases through

19  price increases, right?

20  A.  That was the first one we listed here, yes.

21  Q.  And the number two guiding principle was to align the

22  price increases with where we are experiencing the cost

23  increase, correct?

24  A.  That's right.

25  Q.  And the number three was to pass through cost increases on

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    our a la carte services, do you see that?

2    A.   I do.

3    Q.   All right.  And these were the guiding principles that

4    went into the price increase recommendation that you were

5    making to your boss and ultimately to Mr. Stankey, correct?

6    A.   Those were the principles that would help guide us through

7    how we would approach our recommendation.  That's -- those are

8    the principles we used.

9    Q.   And these were the principles that you and your team

10   followed when you were recommending this price increase to Mr.

11   Stankey ultimately in 2016, right?

12   A.   We did.

13   Q.   And those guiding principles were the ones that your team

14   advanced to Mr. Bentley and Mr. Stankey before this merger was

15   announced, correct?

16   A.   This is a few years ago.  Two years ago, but those were

17   the principles back then.  As I mentioned, it's been hard to

18   deliver on those principles these days, but those were the

19   principles then.

20   Q.   And those were the principles that were followed for the

21   2016 price increase that AT&T put out that was before this

22   litigation began as well, correct?

23   A.   That's right.

24   Q.   All right.

25            MR. WELSH:  That's all I have, Your Honor, thank you.

1          THE COURT:  All right.  We're going to take the

2   morning recess.

3          You're a witness under oath in the case now.  So

4   you're not at liberty to discuss your testimony so far or what

5   it might be when you return with anybody, even your own

6   counsel.  You can't talk to anybody.

7          THE WITNESS:  Got it.

8          THE COURT:  You have to be able to say I haven't

9   discussed my testimony with anybody, okay?

10          THE WITNESS:  Okay.

11          THE COURT:  All right?

12          So we'll take a fifteen minute break, we'll see you

13   back here in fifteen.  Step down.

14          THE WITNESS:  Great, thank you.

15          (Witness excused.)

16          (Recess at 11:59 a.m.)

17          (Proceedings resumed at 12:21 p.m.)

18          THE DEPUTY CLERK:  Your Honor, recalling Civil Action

19   Number 17-2511, the United States of America versus AT&T, Inc.,

20   et al.

21          THE COURT:  All right, the witness remains under

22   oath.

23          (Vince Torres resumed the witness stand.)

24          THE COURT:  Cross-examine.

25          MR. OPPENHEIMER:  But perhaps for only a short time,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   Your Honor, we have no further questions for this witness.

 2          THE COURT:  Okay.  Well, that doesn't happen every

 3   day.  Maybe they're finally listening to me.

 4          All right.  Well, let's see if I have any questions.

 5          (Pause.)

 6          THE COURT:  No, you're excused.

 7          THE WITNESS:  Thank you.

 8          (Witness excused.)

 9          THE COURT:  All right, call your next witness.

10          MR. SCHEELE:  Good morning, Your Honor, for the

11   record, Scott Scheele appearing on behalf of the United States.

12          THE COURT:  All right.

13          MR. PETROCELLI:  Your Honor, Mr. Barber is handling

14   this examination.

15          THE COURT:  Okay.

16          MR. SCHEELE:  Your Honor, the United States calls

17   Simon Sutton as an adverse party witness.

18          THE COURT:  Simon?

19          MR. SCHEELE:  Sutton.

20          THE COURT:  All right.

21          THE DEPUTY CLERK:  Sir, please raise your right hand.

22           SIMON SUTTON, ADVERSE PARTY WITNESS, SWORN

23          THE DEPUTY CLERK:  Please have a seat.

24          THE COURT:  You may begin with leading questions.

25          MR. SCHEELE:  Thank you, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1                        DIRECT EXAMINATION

 2  BY MR. SCHEELE:

 3  Q.   Mr. Sutton, please state your name for the record.

 4  A.   Simon Sutton.

 5  Q.   Mr. Sutton, we haven't met.  My name is Scott Scheele,

 6  I'll be conducting the examination this morning.

 7       You're currently employed by Home Box Office; is that

 8  correct?

 9  A.   That is correct.

10  Q.   And that's otherwise known as HBO?

11  A.   That is correct.

12  Q.   And that's part of Time Warner, Inc., correct?

13  A.   That is correct.

14  Q.   And you're HBO's president of global distribution?

15  A.   Actually my title was recently changed to president and

16  chief revenue officer of HBO.

17  Q.   Thank you.  I'm going to talk a little bit about your

18  professional background.  You have an MBA from Stanford

19  University?

20  A.   That's correct.

21  Q.   You've worked in the television industry for over 20

22  years; is that right?

23  A.   That is correct.

24  Q.   And you began working with HBO in 2005?

25  A.   That is correct.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   And you had been the president of global distribution for

2  about two to three years before your recent title change?

3  A.   That is correct.

4  Q.   And with your title change, is there any change in your

5  roles and responsibilities?

6  A.   I had the responsibility for some additional groups within

7  HBO, predominantly technology, consumer research, IT, and our

8  playing (sic) facilities.

9  Q.   Congratulations on the promotion then.

10  A.   Thank you.

11  Q.   Your department is responsible for the relationship with

12  distributors that market HBO products to consumers, yes?

13  A.   That is correct.

14  Q.   And the distribution group has a staff of approximately

15  250 employees in the United States?

16  A.   That is correct.

17  Q.   And in your role you report directly to HBO's CEO and

18  chairman, Richard Plepler, right?

19  A.   That is correct.

20  Q.   You and your group are responsible for overseeing HBO's

21  relationships with its distributors?

22  A.   That is correct.

23  Q.   And the term "distributors," that includes anyone who

24  sells your product directly to consumers, right?

25  A.   That is anybody, yes, who retails HBO or Cinemax on to its

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    customers.

2    Q.   And you sometimes use the term "affiliate" instead of the

3    term "distributor"; is that right?

4    A.   That is correct.

5    Q.   They're essentially synonomous?

6    A.   They're essentially synonomous.

7    Q.   And HBO's product offerings consists of networks or

8    channels of premium programming, right?

9    A.   That is correct.

10   Q.   And would you define what we mean by premium programming

11   in that context?

12   A.   Premium programming is programming the customers pay

13   discreet fee for on a subscription basis that doesn't contain

14   advertising.

15   Q.   And the products that -- the premium programming products

16   that HBO offers are HBO and Cinemax, correct?

17   A.   That is correct.

18   Q.   And you're responsible for the revenue of the company,

19   right?

20   A.   That is correct.

21   Q.   Your group is responsible for negotiating HBO's contracts

22   with its distributors as well, right?

23   A.   That is right.

24   Q.   And in total, HBO has over 800 distributors in the United

25   States?

1  A.    That is approximately correct, yes.

2  Q.    And your three largest distributor are AT&T, Comcast and

3  Charter?

4  A.    Yes, that is correct as of today.

5  Q.    Under the HBO affiliate contracts, distributors can sell

6  HBO and Cinemax in two different ways, one would be a la carte

7  and the other would be part of a package or bundle of programs;

8  is that right?

9  A.    Yes, that's right.  You can divide it those two ways.

10  Q.    And a la carte sales of HBO would be sales that are in

11  addition to the selling of a basic programming package; is that

12  right?

13  A.    A la carte means you're buying that channel on its own

14  without anything else.

15  Q.    And when it's being sold in a bundle or a package, it can

16  be bundled with other premium channels?

17  A.    It can be bundled with almost anything.

18  Q.    Or with basic channels, right?

19  A.    Correct.

20  Q.    HBO Now, that is a digital application that customers can

21  get through a digital distributor such as Apple or Amazon,

22  right?

23  A.    That is correct.

24  Q.    And HBO Now is what's often called an over-the-top

25  offering, right?

1   A.    It is called that.

2   Q.    And that's because it's offered over the Internet; is that

3   right?

4   A.    That's right.

5   Q.    Shifting gears just a little bit.  The product that you

6   made available to consumers include HBO's movies and original

7   programming, right?

8   A.    HBO Now consists of the same programming that is on the

9   HBO service.

10  Q.    Okay. thank you.  I'm just talking in general, the content

11  that you offer, the product that you offer.  That's made

12  available to distributors, that you offer to distributors.

13  That includes movies and original programming, right?

14  A.    It does.

15  Q.    And this includes popular series like Game of Thrones and

16  West World, correct?

17  A.    That is correct.

18  Q.    And those are examples of original programming, right?

19  A.    That is correct.

20  Q.    And the programming that HBO offers includes movies from a

21  wide variety of movie studios, right?

22  A.    That is also correct.

23  Q.    You consider HBO's programming to be very compelling,

24  don't you?

25  A.    I do.

1   Q.   And HBO has been recognized as having very compelling

2   programming.  It recently won in 2017 more prime time Emmies

3   than any other network; is that right?

4   A.   That is correct.

5   Q.   In fact, HBO has led all networks in prime time Emmies for

6   16 years in a row, right?

7   A.   That is correct.

8   Q.   HBO currently has about the same number of subscribers as

9   Starz and Showtime combined; isn't that right?

10  A.   I actually haven't checked recently, but it sounds about

11  correct.

12  Q.   In 2017, approximately 60 percent of the top fifty feature

13  films were exhibited exclusively on HBO, right?

14  A.   Yeah, exclusively for the window that they come to HBO

15  for.

16  Q.   And in 2017, HBO had fifty-four million domestic

17  subscribers including the HBO Now subscribers, right?

18  A.   That's right.

19  Q.   As a result, HBO was the most widely distributed domestic

20  multichannel premium paid television service in 2017; is that

21  correct?

22  A.   That's correct.

23  Q.   For 2017, HBO generated revenue of over six billion

24  dollars; is that right?

25  A.   That is right.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   And in 2017, HBO had the highest subscriber growth rate in

2  its history; is that right?

3  A.   That is correct.

4  Q.   I want to move now to the topic of HBO's affiliate

5  agreements.

6       Other than possibly with some of the really small

7  distributors, there's not really any form contract used when

8  licensing HBO programming to affiliates; is that right?

9  A.   That is correct.

10 Q.   Each deal's a separately negotiated agreement?

11 A.   That is correct.

12 Q.   In negotiating these affiliate agreements, you seek to

13 address the affiliate's plans and needs while maximizing the

14 income to HBO, right?

15 A.   That is correct.

16 Q.   And affiliate agreements, they get complicated, right?

17 A.   Sorry, could you repeat?

18 Q.   The affiliate agreements, they can get complicated?

19 A.   They can be complicated.

20 Q.   They involve lots of different terms?

21 A.   They do.

22 Q.   And in negotiations, they can get so complicated that HBO

23 has even created computer models to project an impact on HBO's

24 revenues of proposed deal structures; isn't that right?

25 A.   Yes, we do model each deal, that is correct.

1   Q.    And your goal in that process is to maximize the revenue

2   to HBO?

3   A.    That is -- that is my goal, yes.

4   Q.    And the contract involved payment of a fee to you for

5   rights to the distributors to sell the programming to

6   consumers, right?

7   A.    That is correct.

8   Q.    And not all distributors pay the same rates for the HBO

9   programming; isn't that right?

10  A.    That is correct.

11  Q.    In general, larger distributors have more leverage over

12  you and they generally pay lower rates; is that correct?

13  A.    In general larger distributors pay lower rates on average,

14  yes.

15  Q.    And that's because they have more leverage over you?

16  A.    It varies in the number of things we actually want to

17  incent [sic] them to grow, so what we do is in our deal

18  structure, as they add subscribers, they generally pay less on

19  the increment so larger subscribers who tend to be more

20  successful will be paying less on average because they're more

21  successful, not necessarily because they have more leverage.

22  Q.    Okay.  Well, we'll get back to the leverage point in a

23  little while.

24        But in addition to larger distributors, you also enter

25  affiliate agreements with new distributors such as the virtual

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   MVPDs, correct?

2   A.   That is correct.

3   Q.   And, for example, you've entered agreements with virtual

4   MVPDs such as Sony Vue, Amazon and Hulu; is that right?

5   A.   Yes, we want to be as widely distributed as possible.

6   Q.   And with new entrants, you generally negotiate a rate with

7   a discount structure; is that right?

8   A.   Yes, again, it's very broad brush.  But in general we'll

9   have a rate, and then we incent people to grow subscribers by

10  providing discounts as they add subscribers.

11  Q.   But HBO looks for a guarantee for a minimum number of

12  subscribers before it applies that discount, right?

13  A.   We will generally look for a guarantee, particularly if a

14  new entrant has no subscribers at all.

15  Q.   And if they do meet that benchmark for a minimum number of

16  customers, if they don't meet that, then there's no discount

17  applied, right?

18  A.   If they're under a guaranteed structure, that is correct.

19  Q.   I need to be careful with my next questions because of

20  confidentiality issues.  So I'm going to be very careful the

21  way I phrase it, and please listen to the way I phrase the

22  question.

23       At least one virtual MVPD contract had an initial

24  wholesale rate that is above the fifteen dollar retail price of

25  HBO Now; is that right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    That is correct.

2  Q.    And that virtual MVPD planned on selling HBO for fifteen

3  dollars a month, right?

4  A.    That MVPD which I believe you are referring to, I actually

5  can't speak to their plans on retail, but they were mainly

6  planning to sell HBO in bundles is my understanding.

7  Q.    And you understood them to be selling it for a price of

8  about fifteen dollars a month?

9  A.    For the a la carte price, yes.

10 Q.    And that contract structure with that virtual MVPD, that

11 allowed the virtual MVPD to obtain a lower wholesale rate or

12 discounted rate if it achieved certain volume thresholds,

13 correct?

14 A.    It had a lower wholesale rate if it bundled HBO, which was

15 predominantly as planned, and it, of course, achieved a lower

16 wholesale rate if it grew to a certain benchmark.

17 Q.    Right.  But you believe that, to use your words, that

18 virtual MVPD was unsuccessful in climbing into their discount

19 rates; is that right?

20 A.    It turns out that, yes, it was unsuccessful into -- in

21 climbing into discounts.

22 Q.    I want to shift gears a little bit and talk to you about

23 the HBO brand.  You believe that the HBO brand is effective in

24 helping to market the product, don't you?

25 A.    I do.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.    And in their marketing and promotions distributors often

2  use HBO's art and trademarks; isn't that right?

3  A.    They often do.

4  Q.    And, for example, they use the HBO brand name or the HBO

5  logos, correct?

6  A.    Yes, that is correct.

7  Q.    And when they do, HBO has a role in approving the

8  distributor's advertisings of HBO; isn't that right?

9  A.    That is correct.

10 Q.    A distributor needs HBO's approval if they want to use the

11 HBO logo?

12 A.    They need our approval if they're using our trademarks or

13 they're using our talent in any way.

14 Q.    So if they're using -- they need HBO's approval if they

15 want to use a character or a scene from an HBO show?

16 A.    That is correct because we are restricted in how we can

17 grant those rights.

18 Q.    They need HBO's approval if they want to use HBO's art or

19 trademark in any way?

20 A.    That is correct.

21 Q.    And when distributors want to run an advertisement that

22 features HBO or its content, your distribution team determines

23 whether HBO will grant those approvals; is that correct?

24 A.    Yeah, we work with them to create an ad or an approval

25 that works for both -- us.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   So the answer to my question is yes?

2   A.   Yes.

3   Q.   Sometimes HBO decides it cannot agree to the proposed

4   advertising; isn't that true?

5   A.   That is correct.

6   Q.   And in those cases HBO can work with a distributor to try

7   to find a way that meets HBO's criteria, right?

8   A.   Yes, it makes us achieve what we're both trying to do

9   there.

10  Q.   And that's done on a case by case basis, correct?

11  A.   It is done by a case by case basis.

12  Q.   So I want to ask you now some questions about HBO and

13  distributor marketing and promotional campaigns.

14       You think of acquisition, retention and upgrades as three

15  different types of marketing promotional campaigns, don't you?

16  A.   Yes, that's one way to look at it.

17  Q.   In that context acquisition is when HBO helps a

18  distributor to acquire new subscribers, correct?

19  A.   That is correct.

20  Q.   And retention is when HBO helps a distributor retain its

21  existing subscribers using HBO as a tool to keep them, right?

22  A.   That is correct.

23  Q.   And then upgrades would be when HBO helps a distributor

24  sell HBO to its existing customer base, correct?

25  A.   That is correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Okay.  So regardless of which of these three a distributor

2  is focused on, HBO works with them to try to help them achieve

3  these goals, right?

4  A.   Yes, we like to be in as many promotions as possible.

5  Q.   And HBO tailors its campaigns to, depending upon which of

6  three goals you and a distributor are trying to accomplish,

7  right?

8  A.   That is correct.

9  Q.   You employ different tactics, depending on the type of

10 campaign?

11 A.   That is correct.

12 Q.   Let's focus on acquisition for a minute.  HBO works with

13 distributors to help the distributors sell more HBO, right?

14 A.   That is correct.

15 Q.   And HBO helps distributors grow their underlying business,

16 correct?

17 A.   We hope so.

18 Q.   HBO works with distributors to help them grow their basic

19 subscribers, correct?

20 A.   That is correct.

21 Q.   And some of the new customers that a distributor may sign

22 up may be coming from other pay-TV providers, right?

23 A.   That may be the case, yes.

24 Q.   In fact, your department has noted that by leveraging the

25 HBO brand in marketing and packaging, distributors can

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  recapture video subscriber losses from other distributors;

2  isn't that right?

3  A.    That is correct.

4  Q.    Let's see if we can look at a document that talks about

5  this.

6            MR. SCHEELE:  May I have a moment, Your Honor?

7            THE COURT:  Yes, you may.

8            (Pause.)

9            MR. SCHEELE:  May I approach, Your Honor?

10           THE COURT:  You may.

11           MR. SCHEELE:  May I approach the witness, Your Honor?

12           THE COURT:  You may.

13           MR. SCHEELE:  May I proceed, Your Honor?

14 BY MR. SCHEELE:

15 Q.    I'd like you to turn in your binder to PX 61, please.  I

16 believe it is the last tab.

17           MR. SCHEELE:  Your Honor, PX 61 has been marked for

18 identification, and copies have been provided to defense

19 counsel.

20 BY MR. SCHEELE:

21 Q.    Mr. Sutton, are you at PX 61?

22 A.    I am there.

23 Q.    You are there?

24 A.    Yes.

25 Q.    Okay.  This is an e-mail from you, is that correct, at the

1   top?

2   A.   Yes, that is correct.

3   Q.   And you are e-mailing your boss, Richard Plepler; is that

4   correct?

5   A.   That is correct.

6   Q.   And you attach, there's an attachment about an HBO

7   affiliate, Altice; is that correct?

8   A.   That is correct.

9   Q.   And you sent it to him in preparation for a, I think the

10  word you used is chat about Altice; is that correct?

11  A.   That is correct.

12          MR. SCHEELE:  Your Honor, we would move the admission

13  of PX 61.  There are material that's under seal so we move its

14  admission under seal.

15          THE COURT:  All right.

16          MR. BARBUR:  No objection, Your Honor.

17          THE COURT:  Be admitted unseal.

18          (Plaintiff's Exhibit No. PX 61 was

19      received in evidence under seal.)

20  BY MR. SCHEELE:

21  Q.   Mr. Sutton, I'd like to direct your attention to the

22  bottom of the second page to begin with.  There's a heading

23  there that says footprint, which refers to the footprint of

24  Altice; is that right?

25  A.   That is correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   And the last bullet point under the heading "footprint"

2  says Verizon.  Now, Verizon is a video distributor; is that

3  correct?

4  A.   That is correct.

5  Q.   It says, "Verizon overlaps nearly sixty percent of CSC

6  territory."  CSE, you understand that to be a subset of

7  Altice's territory; is that correct?

8  A.   Yes.

9  Q.   It refers to the old the cablevision systems; is that

10 right?

11 A.   The cablevision systems, correct.

12 Q.   So in other words a competitor overlaps nearly sixty

13 percent of a subset of Altice's territory; is that right?

14 A.   That is correct.

15 Q.   Okay.  Now I'd like to call your attention up to about the

16 top third under the heading "HBO Opportunity."  I'd like to

17 direct your attention to the third bullet point.  And I'll read

18 that to you.

19      "By leveraging the HBO brand in marketing and packaging,

20 as other distributors have done successfully, Altice can drive

21 higher ARPU."  And ARPU is average revenue per user?

22 A.   That is correct.

23 Q.   "And recapture video subscriber losses," parentheses,

24 "particularly from Verizon in the optimum systems."  Do you see

25 that?

1  A.    I do.

2  Q.    And what's this intended to convey?

3  A.    It's intended to convey that in the same footprint we had

4  affiliates with much higher HBO penetration.  Altice,

5  particularly the next cablevision systems, we felt was much

6  lower penetrated than it could be, and by adopting a similar

7  strategy from Verizon it could become more competitive.

8  Q.    And by a -- the similar strategy you're referring to is by

9  using HBO brand and marketing in its packaging, right?

10  A.    That is correct.

11  Q.    Thank you.  I don't have any further questions on that,

12  you can set that aside.

13  A.    (Witness complies.)

14  Q.    In terms of how distributors use HBO to attract new

15  customers, they say they sometimes will offer, for example,

16  three months of free HBO to new customers; isn't that right?

17  A.    That is correct.

18  Q.    So I want to switch gears now to retention offers as

19  opposed to acquisition offers.

20       We touched on this point earlier in the trial with the

21  distributor.  So I want to focus on the HBO side of the issue

22  instead of related to distributors.

23       HBO works with its distributors to help them improve their

24  customer retention; isn't that right?

25  A.    That's correct.

1  Q.    And one retention tactic that distributors use involves

2  offering a customer free HBO if they stay with that

3  distributor, right?

4  A.    That is correct.

5  Q.    And sometimes HBO extends discounts to those distributors

6  who use free HBO as a way to retain its customers, right?

7  A.    Yes, we traditionally allow them to offer discounts up to

8  a certain period, and if they want to do it longer, they come

9  back to us and we'll discuss that with them.

10  Q.    And the retention discounts that we're talking about are

11  different from the discounts for new customers, right, they're

12  not acquisition, they're retention?

13  A.    Yeah.

14  Q.    And often these retention discounts are in addition to the

15  arrangements HBO has made under its affiliation contract; isn't

16  that right?

17  A.    That is correct.

18  Q.    They're a supplement, it has nothing to do with the

19  contract, it's a supplement to the contract, right?

20  A.    That is correct.

21  Q.    And whether in the context of negotiating an affiliate

22  agreement or supplementing the funding that's part of an

23  affiliation agreement, these retention discounts are completely

24  at HBO's discretion, right?

25  A.    That is correct.

1  Q.   It's HBO's choice whether to grant the discounts or not?

2  A.   Well, beyond what's already in the contract.

3  Q.   Well, in the context of negotiating, HBO can choose

4  whether or not to grant the discounts, right?

5  A.   Well, the discounts that are granted is a part of the

6  contract as a result of negotiation between the two parties.

7  When they come to us and want additional discounts beyond that,

8  then that is a further discussion about what they're trying to

9  achieve.

10  Q.   Okay, thank you.  HBO also helps distributors with

11  retention by increasing consumer engagement with their video

12  products; isn't that right?

13  A.   Yes, we try to.

14  Q.   And you know that because HBO has researched it, right?

15  A.   We research, yes.

16  Q.   During negotiations with your larger distributors, you

17  keep people from Time Warner Corporation in the loop, don't

18  you?

19  A.   Generally yes, we do.

20  Q.   And you sometimes meet with Jeff Bewkes, the CEO of Time

21  Warner Corp?

22  A.   Occasionally, yes, we do.

23  Q.   And sometimes you meet with Harold Averill, the CFO?

24  A.   Harold Averill, yes.

25  Q.   Thanks.  And Mr. Bewkes and Mr. Averill sometimes provide

1    input into HBO negotiations; isn't that right?

2    A.    They do sometimes.

3    Q.    Let's talk a little bit about Turner.  I'd like to ask you

4    to turn to PX 483 in your binder.

5    A.    (Witness complies.)

6          MR. SCHEELE:  Your Honor, PX 483 has been marked for

7    identification.  A copy has been provided to defense counsel.

8    May I proceed?

9          THE COURT:  You may.

10   BY MR. SCHEELE:

11   Q.    Mr. Sutton, this is an e-mail exchange you had with

12   Richard Plepler and Tom Woodbury; isn't is that right?

13   A.    That is correct.

14   Q.    The e-mail concerns negotiations with directors?

15   A.    That is correct.

16   Q.    And the subject line of the e-mail is affiliate deals U.S.

17   and international, right?

18   A.    That is the subject line, yes.

19         MR. SCHEELE:  Your Honor, I move for the admission of

20   PX 483.

21         MR. BARBUR:  No objection, Your Honor.

22         THE COURT:  Admitted under seal?

23         MR. BARBUR:  I don't believe this needs to be under

24   seal.

25         THE COURT:  All right.  It will be admitted.

1       MR. SCHEELE:  Thank you, Your Honor.

2       (Plaintiff's Exhibit No. PX 483 was

3   received in evidence.)

4   BY MR. SCHEELE:

5   Q.   I want to direct first your attention to the bottom of

6   this e-mail chain.  This is an e-mail Jeff Bewkes sent Richard

7   Plepler and the heads of other Time Warner divisions; isn't

8   that right?

9   A.   That is correct.

10  Q.   It's dated November 6th, 2015?

11  A.   It is.

12  Q.   And in that first paragraph Mr. -- I'm sorry, Mr. Bewkes

13  wrote with affiliate agreements he wanted Time Warner Corp to,

14  quote, coordinate our efforts; isn't that right?

15  A.   Yes, that is correct.

16  Q.   Now directing your attention to the second paragraph,

17  Mr. Bewkes designated two people in corporate to coordinate our

18  efforts; isn't that right?

19  A.   That's correct.

20  Q.   And in the third paragraph Mr. Bewkes said that Time

21  Warner corporate would work with the divisions to, quote,

22  figure out how to make this all work in practice, right?

23  A.   That is correct.

24  Q.   Mr. Plepler then forwarded the e-mail to you and Mr.

25  Woodbury, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   That is correct.

2   Q.   And Mr. Plepler wrote, "Oui."

3   A.   That is correct.

4   Q.   And you wrote, "Uh-oh."

5   A.   That is correct.

6   Q.   And you added that these instructions meant that you would

7   lose your ability to maximize HBO revenue; isn't that right?

8   A.   That is correct.

9   Q.   But you testified a few minutes ago that your goal in

10  negotiations is to maximize revenues for HBO, right?

11  A.   That is my goal.

12  Q.   But despite your concern that you stated in the e-mail

13  that the "uh-oh" concern, despite that concern you followed

14  Mr. Bewkes's instructions, didn't you?

15  A.   I don't think he was actually giving instructions.  He

16  said, Howard and Oloff (sic) will be in touch to coordinate.

17  But yes, we do what Time Warner asks us to do.

18  Q.   And you do what Time Warner asks you to do in the context

19  of coordinating with Time Warner, right?

20  A.   That's correct.

21  Q.   I think that's all I'm going to have for that document,

22  you can set it aside, thank you.

23  A.   (Witness complies.)

24  Q.   Let's quickly walk through some examples of how this

25  coordination worked in practice since the time of that e-mail.

1    The Court has already heard about coordination of HBO with

2   Turner in the context of Dish and YouTube so I'll move straight

3   to Altice.

4    In the course of HBO's 2016 negotiations with Altice, HBO

5   disengaged from those negotiations; isn't that right?

6   A.   If we did, it was very briefly.

7   Q.   And the reason for disengaging was because Turner did not

8   have a new deal, right?

9   A.   To be honest, once we started with Altice, we didn't

10  engage.  I think we may have delayed an initial kickoff month

11  being a get-to-know-you meeting, but that's the extent of it.

12  Q.   Well, let's take a look at a document that speaks to this.

13  Can you turn to PX 91 in your binder.

14  A.   (Witness complies.)

15  Q.   It should be the first tab.

16       MR. SCHEELE:  PX 91 has been marked for

17  identification.  And a copy has been provided to defense

18  counsel.  May I proceed, Your Honor?

19       THE COURT:  You may.

20  BY MR. SCHEELE:

21  Q.   This is the e-mail exchange you had with Ed MacDonald; is

22  that right?

23  A.   That is correct.

24  Q.   And he's the senior VP and controller at HBO?

25  A.   Yes, that is correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   He reports to the CFO, Joe Tarulli?

2  A.   He does.

3  Q.   And the context was a, quote, 2016 goal assessment, end

4  quote; is that right?

5  A.   That's correct.

6  Q.   And what does that mean in this context?

7  A.   At the end of the year Ed compiles a list of things that's

8  whether the company has achieved certain goals that were set

9  out by Time Warner at the beginning of the year.

10 Q.   So these are goals of HBO and reporting whether HBO has

11 achieved its goals to Time Warner; is that correct?

12 A.   I believe this one was specifically Richard Plepler's

13 goals.

14 Q.   Okay.  So the goals of your boss?

15 A.   Yes.

16 Q.   And Mr. MacDonald was asking you about HBO collaboration

17 with other Time Warner divisions; isn't that right?

18 A.   Yes, he's asking for examples to put next to the goal

19 requirement.

20 Q.   And you provided the information listed here in the middle

21 e-mail; is that correct?

22 A.   That's correct.

23        MR. SCHEELE:  Your Honor, I move to admit under seal

24 because there is one confidential portion of the document, I

25 move to admit PX 91 under seal.

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1    MR. BARBUR:  No objection, Your Honor.

2    THE COURT:  Be admitted under seal.

3    (Plaintiff's Exhibit No. PX 91 was

4    received in evidence under seal.)

5  BY MR. SCHEELE:

6  Q.    Let me direct your attention to the heading, "affiliate,"

7  in the middle e-mail that you wrote.

8    There are three -- there are three bullets points there.

9  I'll read the first one to you.

10    "Coordination with Altice.  We disengage with Altice as

11  Turner did not have a new deal.  This has held up our own

12  deal."  Do you see that?

13  A.    I do.

14  Q.    And was that accurate?

15  A.    I realize I'm reading this, I wrote this.  But in all

16  honesty once we started the Altice deal, there was no holdup.

17  I think what we did is we just stopped the first initial

18  kickoff meeting.

19  Q.    So it's your testimony here today that you were making an

20  inaccurate report to your boss that was closer in time that it

21  is today?

22  A.    This is not a report to my boss.  This is a report to Ed

23  MacDonald in which we are trying to show that we achieved

24  various goals, so I'm including all examples where I can think

25  that they might look like they've been -- been achieved.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Let's go to the next bullet point.  "YouTube.  Despite

2  YouTube agreeing with HBO on rates per carriage, we have held

3  off on a deal until Turner gets an offer."  Paren, "Sacrificing

4  revenue for 2017."  Do you see that?

5  A.   I do.

6  Q.   And that was accurate?

7  A.   That is accurate.

8  Q.   And then on the last bullet point, "On both AT&T and

9  Charter, we can coordinate it Turner's deal expirations."  Was

10 that accurate?

11 A.   I think it's referring to something more general than --

12 because our deal expirations are not the same as Turner and

13 AT&T and Charter, so that is not accurate.  That is the process

14 of a negotiating Charter, for example, we have a follow-on

15 agreement, we coordinated that with Turner's deal expiration.

16 Q.   So you coordinated with -- you ultimately coordinated with

17 Turner's deal expiration?

18 A.   Not the expiration of our deals.

19 Q.   The follow-on agreement?

20 A.   Yeah, the process in the middle of negotiating.

21 Q.   Okay.  So the HBO agreements with those firms were synced

22 with the Turner agreements because that's what Time Warner

23 wanted?

24 A.   Well, they were not synced.  AT&T and Charter were not

25 synced with Turner.

1  Q.    The follow-on agreement with respect to AT&T and Charter

2  were synced because that's what Time Warner wanted?

3  A.    There was no follow-on agreements from AT&T, so to be

4  honest I can't remember what I was referring to there.   In

5  Charter's case, there was a six month deadline because we were

6  under a lot of time pressure to get the main part of the deal

7  done.   There was six months in which some additional technical

8  requirements needed to be negotiated.   We synced that six month

9  deadline with Turner deal expiration.   In fact, we never got

10  the deal done so the deal never was done.

11  Q.    So you synced it because that's what Turner wanted to do.

12  A.    We synced it because we thought it would help us in the

13  part two follow-on agreement.

14  Q.    Then it wasn't something that Charter asked for?

15  A.    They asked for follow-on agreement.   We mutually agreed on

16  the deadline, and it turned out that it became irrelevant.

17  Q.    Okay.   Let's talk about going -- our last topic.   You can

18  set that aside.   Going dark with Charter.

19        HBO negotiated a contract with Charter in 2016; isn't that

20  right?

21  A.    That is correct.

22  Q.    And HBO wanted to finalize the deal?

23  A.    Yes, we did.

24  Q.    You wanted to finalize the deal before Charter completed

25  its merger with Time Warner, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.    We wanted a deal.  We had not had a deal for two years

2   with Charter.

3   Q.    But you were concerned about the merger being consummated;

4   isn't that right?

5   A.    Yes, I was very concerned.  We had gone for two years

6   without a deal with Charter.  They were paying us what they

7   decided to pay us, not what was under the contract, and they

8   were about to buy a company three times their size.  If they

9   applied what they were doing in the past to that larger

10  company, we would have been in trouble.  So I very much wanted

11  to get a deal done before they applied Time Warner Cable.

12  Q.    You were concerned that once the merger was consummated,

13  the merged firm would have increased the leverage from the

14  merger; isn't that right?

15  A.    Yes, and they'd already shown us that they were not

16  abiding by the contract with us.

17  Q.    And you believed that the merger of Charter and Time

18  Warner Cable would give the merged firm more leverage in

19  negotiations with HBO?

20  A.    Not just more leverage, as I say, they were already not

21  paying us the correct amount of money.  So when a larger firm

22  would not pay us the correct amount of money would be a bigger

23  problem.

24  Q.    So when you say it's not just leverage, the answer to any

25  question is yes, that was part of --

1  A.    Yes, that was part of it.

2  Q.    HBO, in order to try to get the negotiations completed,

3  set a deadline of March 15, 2016; isn't that right?

4  A.    Yes, at one point we did, yes.

5  Q.    And HBO told Charter if the deal wasn't done by then, HBO

6  would go dark, right?

7  A.    That is correct.

8  Q.    You thought the threat to go dark would give Charter the

9  incentive to reach an agreement?

10  A.    We certainly hoped it would bring them to the table

11  because we had tried everything else.

12  Q.    And after HBO communicated this to Charter, your

13  distribution department made preparations to go dark on

14  Charter, didn't it?

15  A.    Absolutely.

16  Q.    Let's look a little bit at the HBO plan for the Charter

17  takedown in February and March of 2016.

18      HBO developed a marketing PR strategy in the event HBO

19  went dark on Charter, didn't it?

20  A.    We did.

21  Q.    Pursuant to the strategy HBO planned a marketing campaign

22  in Charter's top five DMAs right?

23  A.    We didn't actually plan the campaign, we said what

24  campaign would be.  It's not like we bought ad space or

25  anything like that.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   But you planned for it, you strategically decided how to

2  approach the campaign?

3  A.   Yeah, we had to have a plan if we were going to do it.

4  Q.   And HBO analyzed the video distribution competitors that

5  Charter faced in those areas, right?

6  A.   That is correct.

7  Q.   And the strategy involved the comprehensive marketing

8  effort to target Charter customers, right?

9  A.   That is correct.

10 Q.   Part of that campaign provided Charter subscribers with

11 information about Charter's competitors, where those subs could

12 turn to obtain HBO programming?

13 A.   That is correct.

14 Q.   And part of the marketing campaign contemplated providing

15 incremental marketing funding to Charter's competitors to help

16 those competitors lure subs seeking HBO programming from

17 Charter, right?

18 A.   That is correct.

19 Q.   And post-merger in the event of a blackout with a

20 distributor like Charter, HBO's marketing campaign could market

21 to that distributor's subs, right?  There's nothing preventing

22 it?

23 A.   Nothing preventing it.

24 Q.   And post-merger such an HBO campaign could direct the

25 distributor's subs to HBO Now, right?

```
1   A.    That is correct.

2   Q.    HBO is -- going back to what happened in 2016.  HBO

3   developed detailed marketing and advertising creative to use

4   once HBO went dark on Charter, right?

5   A.    That is correct.

6   Q.    It developed a web page called "Keep my HBO.com?

7   A.    We did.

8   Q.    And this landing page had a box to click to switch

9   providers away from Charter, right?

10  A.    Yes, I believe so.

11  Q.    And HBO's advertising creative developed consumer print

12  ads for newspapers?

13  A.    We did.

14  Q.    And it developed digital display and social media

15  advertisements?

16  A.    We did.

17  Q.    These ads had boxes saying act now that links to the Keep

18  My HBO.com landing page, right?

19  A.    That is correct.

20  Q.    And you developed radio scripts?

21  A.    We did.

22  Q.    And you developed a story board for a TV advertisement,

23  correct?

24  A.    That is correct.

25  Q.    HBO -- but HBO did not end up taking down Charter, right?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Yes, we did not go dark on Charter, that is correct.

2  Q.    And that didn't happen because you eventually had a

3  contract with them, right?

4  A.    Yes, eventually we negotiated a contract.

5  Q.    But you were preparing to do so, weren't you?

6  A.    We were preparing to do so.

7  Q.    You had the technical ability to go dark on Charter,

8  right?

9  A.    We did.

10  Q.    You have the technical ability to go dark on any

11  distributor today, right?

12  A.    We do.

13  Q.    Post-merger, if you're directed by your new AT&T

14  management to take an action regarding price or availability of

15  your product, you'll follow that direction, even if it doesn't

16  maximize HBO's revenue; isn't that right?

17  A.    That is correct.  I have to do what my boss asks me to.

18          MR. SCHEELE:  No further questions, Your Honor.

19          THE COURT:  All right, we'll take the luncheon

20  recess.  You're a witness under oath in the case now,

21  Mr. Sutton, which means you're not at liberty to discuss your

22  testimony so far or what it might be when you return with

23  anyone, including your own counsel?

24          THE WITNESS:  Okay.

25          THE COURT:  You can't talk to anybody about it.  Stay

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    independent of everyone else.  So we're going take a break

 2    until 2:30.  Be back at 2:30 to continue your examination, all

 3    right?

 4              THE WITNESS:  Okay, thank you, Your Honor.

 5              THE COURT:  You can step down.

 6              (Witness excused.)

 7              THE COURT:  All right, we'll see counsel at the

 8    bench.

 9              (Sealed Bench conference.)

10              THE COURT:  So what have we got?

11              MR. PETROCELLI:  You mean with respect to this

12    witness?

13              THE COURT:  No with Benefield.

14              MR. CONRATH:  We decided to streamline.

15              THE COURT:  So this will go another probably, I don't

16    know, hour or so. That's Patel next?

17              MR. CONRATH:  Yes.

18              MR. PETROCELLI:  Short witness, Your Honor.

19              THE COURT:  Then York, who's after those guys?

20              MR. CONRATH:  After York is Gibson.  After Gibson

21    would be Manty.

22              MR. PETROCELLI:  These are all short witnesses, Your

23    Honor.

24              THE COURT:  Gibson hour, three quarters, Gibson.

25              MR. CONRATH:  Gibson will be short.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1            MR. PETROCELLI:  Manty is an hour and three quarters.

 2   That was an ad on.

 3            THE COURT:  So what you do you think Gibson's direct

 4   will be?

 5            MR. CONRATH:  I think Gibson's direct will be 30 to

 6   45 minutes.

 7            THE COURT:  What about cross?

 8            MR. PETROCELLI:  Half an hour.

 9            MR. CONRATH:  Maybe shorter.

10            MR. PETROCELLI:  Maybe shorter.  York will be longer,

11   that's tomorrow.

12            MR. CONRATH:  York is.  I mean I think good news it

13   would move faster.  We have decidedly faster.

14            THE COURT:  I agree with you more.

15            MR. CONRATH:  I should say there's a schedule this

16   out including people we have to bring in from out of town we

17   don't control. So there's a possibility that we get to a point

18   where we don't have a witness, but the good news is --

19            THE COURT:  What about tomorrow?

20            MR. CONRATH:  I don't think we're --

21            MR. PETROCELLI:  We're stacking the witnesses, Your

22   Honor, so we have them.

23            MR. CONRATH:  So get a couple of witnesses who cannot

24   be here on Monday, but will be here on Tuesday.  So my bigger

25   point is we're committed to finishing by the end of next week
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   so the defendants can start the following week.  We both agree

2   we can finish this in April.

3            MR. PETROCELLI:  Wait a second.  If you finish

4   earlier, I want to start.

5            MR. CONRATH:  Okay.

6            MR. PETROCELLI:  I want to start.  I don't want to

7   lose a couple of days, Your Honor.  We'll be ready to call our

8   first witness.

9            MR. CONRATH:  I misunderstood then.  I don't want the

10  good news of going faster to get us to the point where we get

11  to the point where we just don't have anyone and we have no

12  control.

13           THE COURT:  Keep close watch.

14           MR. CONRATH:  Can I raise a different sort of

15  question to you.

16           THE COURT:  Yes.

17           MR. CONRATH:  This comes from my bosses.  There is

18  next week in Washington a conference that involves a lot of

19  senior international enforcers coming to Washington.  And

20  there's interest from some of those people in seeing how

21  anti-trust enforcement is done here.  I want to float the idea

22  to the court.  We're not looking for an answer now, whether a

23  part of the row that's observed for court personnel will be

24  possible to for us to enable some of those people to come.

25           THE COURT:  I'm not giving them a whole row.

1           MR. CONRATH:  No, no, a half a row, third of the row,

2    whatever.

3           THE COURT:  Let me think about that.

4           MR. CONRATH:  Yes, sure.

5           THE COURT:  We can probably do a couple of seats at

6    least.

7           MR. CONRATH:  That will be much appreciated.

8           MR. PETROCELLI:  Can I raise an issue too, Your

9    Honor.

10           I don't want to say who it is because I don't want

11    to, I want it to be anonymous.  One of our lawyers on our team

12    was asked to make an anonymous contribution to a fund for the

13    unveiling of your portrait.  He would like to do so and I

14    cleared it with Mr. Conrath, but it's totally anonymous.

15           THE COURT:  I have no involvement in the collection

16    process for the portrait as is the standard practice of all

17    judges.

18           I was asked to provide my committee with names of

19    people who are friends and I have had cases with over the

20    years, but of course it's highly solicited what they say all of

21    that, I don't even know who gives anything.

22           MR. PETROCELLI:  I just didn't want it to be any

23    issue here.  The other question is are any of the lawyers

24    invited to attend.  I understand it's in the ceremonial

25    courtroom.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  It is.  It is a public event.  So

 2  technically, yes, you both have so many lawyers.  There'll be

 3  an overflow courtroom too with video and audio.  Well I assume

 4  that, if we need them.  You never know.  I might be boycotted.

 5              MR. PETROCELLI:  I doubt it.

 6              MR. CONRATH:  Seems improbable, Your Honor.

 7              MR. PETROCELLI:  Congratulations on that, Your Honor.

 8              MR. CONRATH:  Congratulations.

 9              THE COURT:  Comes with sitting here long enough.

10              MR. PETROCELLI:  Thank you very much for everything.

11              THE COURT:  I think that's not an issue, but I don't

12  even know who gives.  The only thing I know I give a list of

13  friends and people who have had cases in front of me who may

14  want to contribute and the committee does the work.  I don't

15  get involved in it.  I don't see who gives.  I don't

16  participate in any of the callings or the discussions.

17              MR. PETROCELLI:  Okay, thank you very much.

18              THE COURT:  All right, have a nice lunch.

19              (Open court.)

20              THE COURT:  All right, we'll stand in recess.

21              (Luncheon recess at 1:06 p.m.)

22                               -oOo-

23

24

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

CERTIFICATE

1

2          I certify that the foregoing is a true and correct

3    transcript, to the best of my ability, of the above pages, of

4    the stenographic notes provided to me by the United States

5    District Court, of the proceedings taken on the date and time

6    previously stated in the above matter.

7          I further certify that I am neither counsel for,

8    related to, nor employed by any of the parties to the action in

9    which this hearing was taken, and further that I am not

10   financially nor otherwise interested in the outcome of the

11   action.

12

13   _____         _____

14   /s/Crystal M. Pilgrim, RPR, FCRR         Date:  April 4, 2018

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　)　　CV No. 17-2511
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Washington, D.C.
　　　　vs.　　　　　　　　　　　　)　　April 4, 2018
　　　　　　　　　　　　　　　　　　)　　2:39 p.m.
AT&T, INC., ET AL.,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Afternoon Session
　　　　　　Defendants.　　　　　　　)
_____)　　Day 8


TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:　　　　　　Craig W. Conrath
　　　　　　　　　　　　　　　　Eric D. Welsh
　　　　　　　　　　　　　　　　Donald G. Kempf, Jr.
　　　　　　　　　　　　　　　　Peter J. Schwingler
　　　　　　　　　　　　　　　　Andrew C. Finch
　　　　　　　　　　　　　　　　Scott Alan Scheele
　　　　　　　　　　　　　　　　U.S. DEPARTMENT OF JUSTICE
　　　　　　　　　　　　　　　　Antitrust Division
　　　　　　　　　　　　　　　　450 Fifth Street, NW
　　　　　　　　　　　　　　　　Washington, D.C. 20530
　　　　　　　　　　　　　　　　(202) 532-4560
　　　　　　　　　　　　　　　　craig.conrath@usdoj.gov
　　　　　　　　　　　　　　　　eric.welsh@usdoj.gov
　　　　　　　　　　　　　　　　donald.kempf@usdoj.gov
　　　　　　　　　　　　　　　　peter.schwingler@usdoj.gov
　　　　　　　　　　　　　　　　andrew.finch@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

                     Katrina M. Robson
                     O'MELVENY & MYERS LLP
                     1625 Eye Street, NW
                     Washington, D.C. 20006
                     (202) 220-5052
                     krobson@omm.com

                     Daniel M. Petrocelli
                     M. Randall Oppenheimer
                     O'MELVENY & MYERS LLP
                     1999 Avenue of the Stars
                     8th Floor
                     Los Angeles, CA 90067
                     (310) 553-6700
                     dpetrocelli@omm.com
                     roppenheimer@omm.com

                     Michael L. Raiff
                     Robert C. Walters,
                     GIBSON, DUNN & CRUTCHER LLP
                     2100 McKinney Avenue
                     Suite 1100
                     Dallas, TX 75201
                     (214) 698-3350
                     mraiff@gibsondunn.com
                     rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:

                     Kevin J. Orsini
                     Peter T. Barbur
                     CRAVATH, SWAINE & MOORE LLP
                     Worldwide Plaza
                     825 Eighth Avenue
                     New York, NY 10019
                     (212) 474-1140
                     korsini@cravath.com
                     pbarbur@cravath.com

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

– – –

WITNESS INDEX

– – –

WITNESSES            DIRECT CROSS REDIRECT RECROSS

GOVERNMENT'S:

SIMON SUTTON                 1490    1509
HANNY PATEL          1514   1525    1537
HANNY PATEL                 1541
DANIEL YORK          1560
                            – – –

INDEX OF EXHIBITS

– – –

GOVERNMENT'S                      ADMITTED


PX10                              1520

PX10A                             1525

PX261                             1540

PX24                              1606

PX228                             1615

PX40                              1617

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1490

```
 1              P R O C E E D I N G S

 2              DEPUTY CLERK:  The United States District Court

 3    for the District of Columbia is again in session, the

 4    Honorable Richard J. Leon presiding.  God save the United

 5    States and this Honorable Court.  Please be seated and come

 6    to order.

 7              THE COURT:  Come on back up.

 8              DEPUTY CLERK:  Your Honor, re-calling Civil Action

 9    No. 17-2511, the United States of America v. AT&T, Inc.,

10    et al.

11              THE COURT:  All right.  Witness remains under

12    oath.

13              MR. BARBUR:  May I proceed, Your Honor?

14              THE COURT:  Mr. Barbur, whenever you're ready.

15    SIMON SUTTON, WITNESS FOR THE GOVERNMENT, HAVING BEEN

16    PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS

17    FOLLOWS:

18                        CROSS-EXAMINATION

19    BY MR. BARBUR:

20        Q    Good afternoon, Mr. Sutton.  You were asked a

21    number of background questions about HBO in the prior

22    session, and I just want to follow up on a couple of points.

23              Does HBO distribute its services direct to

24    consumer?

25        A    Yes, we do.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q    How does that work?

2    A    Thru HBO Now, you can go to the Apple store or the

3  Amazon platform or a number of places, download the app and

4  subscribe directly.

5    Q    In that situation, is HBO a wholesaler?

6    A    We're -- we a -- we act as -- the platforms act as

7  our agent.

8    Q    The customer actually deals with Apple; is that

9  what you're saying.

10   A    Yes.  They pay Apple, and then Apple remits the

11  money to us.

12   Q    And for the HBO linear service, does HBO

13  distribute that directly to customers?

14   A    The traditional service is wholesaled to cable and

15  satellite and Telecom companies that send out directly.

16   Q    Mr. Scheele had asked you about a distribution

17  staff of 150 people.

18        Do you recall that?

19   A    I do.

20   Q    Could you describe in a little more detail what

21  that staff is and what it does?

22   A    Yes.  In the vast majority of the staff that were

23  referred to earlier, they're to encourage our affiliates to

24  promote HBO and Cinemax as much as possible.  They are going

25  out to our affiliates' call centers, encouraging the agents

1    there to push HBO and Cinemax to customers who call in.

2             They're visiting the marketing and management

3    staff of our various affiliates and making arguments as to

4    why HBO and Cinemax should be included in promotions and

5    bundles to encourage them to sell as much HBO and Cinemax as

6    possible.

7        Q    Why does HBO have a staff of 150 people devoted to

8    that task?

9        A    Because we find being included in promotions and

10   bundles and marketing campaigns across our many of different

11   affiliates.  We have about 800 affiliates domestically.  It

12   is a highly effective way of increasing HBO's penetration

13   and, therefore, HBO's subscriber numbers and revenue.

14       Q    Do basic cable networks have the same sort of

15   organizations?

16       A    No.  They don't have the same kind of organization

17   because they're not a separate purchase; they're included in

18   the basic tier.

19       Q    Who are HBO's competitors?

20       A    We compete directly with a number of video

21   subscription services.  So most immediately, Netflix, but

22   also Prime Video, Hulu, Showtime, Starz, Epix.  Disney is

23   about to launch a service.  Apple looks like it's about to

24   launch a service.

25       Q    Just slow down a little bit.

1    A    There are a lot of competitors in the premium

2    video space.

3         But indirectly, we compete really with anything

4    that takes up people's time.  We're an entertainment

5    product.  If people want to entertain themselves in other

6    ways, in some ways that worse for us.

7         So to the extent people are playing video games or

8    using Facebook, they're less likely to subscribe to us.  So

9    anything that's an entertainment product can be a competitor

10   to us.

11   Q    HBO is what is sometimes referred to as a premium

12   network, correct?

13   A    That's correct.

14   Q    What does that mean?

15   A    It means we're not supported by advertising, and

16   we are -- can be bought as a separate product.  It's a

17   separate, discrete purchase.

18   Q    And in what way does a premium network like HBO

19   compete with an SVOD like Netflix?

20   A    We compete in many different ways.  We bid for the

21   same programming when we make our shows.  Netflix is often

22   trying to get the talent to make the same shows.

23        We compete for our customers' time.  People can

24   sometimes decide whether they're subscribing to Netflix or

25   to HBO.

1     And Netflix is in many of our affiliates' set-top

2  boxes now.  So we're actually competing for distribution as

3  well.

4     Q    You referred to Prime.  What does Prime mean.

5  Prime is Amazon's video product.

6     And is HBO distributed through Prime?

7     A    So HBO is distributed through Amazon.  If you buy

8  Prime, you can buy HBO on top of Prime Video.

9     Q    You also consider Prime to be a competitor, is

10  that --

11     A    Yes.  Prime also offers its own programming.  They

12  make their own shows.

13     Q    And how has the competitive landscape that HBO

14  faces changed in the last ten years?

15     A    It's become much more competitive.

16     There was a time when very few people were making

17  the kind of shows we make.  Now, it seems that almost every

18  week, there's an announcement of somebody else making it.

19     But the Internet has allowed a number of new

20  competitors to come into the space, as I've mentioned,

21  Netflix; Hulu makes shows and so does Prime Video.

22     But it looks like even more people will be

23  entering the space soon.

24     I mentioned Disney has announced it's going to do

25  a premium product.  And Apple is commissioning programming,

 1   will announce, we believe, a competitor as well in the

 2   future.

 3        Q    So HBO competes for viewers, right?

 4        A    That's correct.

 5        Q    Does HBO also compete for programming?

 6        A    We compete for programming.  And so we're

 7   competing for the sourcing of our programming on our

 8   service, and then we're competing for distribution and for

 9   viewers as well.

10        Q    And how has competition for programming changed in

11   recent years?

12        A    So the cost it takes to make shows, shows like the

13   shows we make, has escalated significantly.

14        Q    Why is that?

15        A    Because more people are bidding for the talent

16   involved.

17        Q    Mr. Scheele reminded you that HBO has won a number

18   of Emmys.

19             Do you recall that?

20        A    That is correct.

21        Q    Have services like Netflix and Amazon also won

22   Emmys and other awards?

23        A    Yes.  Many of those services have won Emmys.

24        Q    And do you view Emmy awards as closely related to

25   viewership of HBO?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      A    No.  They can frequently not be related to

2  viewership.  But they provide a halo for the brand.  It gets

3  us talked about in the press, so that's good.

4      Q    And do you know whether Turner has won any Emmys?

5      A    I actually do not, do not know.

6      Q    You were asked a number of questions also about

7  the use of HBO as a promotional tool by distributors.

8           Do you recall that?

9      A    I do.

10     Q    Does HBO benefit when distributors use HBO as a

11  promotional tool?

12     A    Absolutely.  We want to be included.  We want to

13  be promoted as much as possible.  Because we're a discrete

14  purchase, we rely on our affiliates to promote and sell us

15  as much as they can.

16     Q    Does HBO's business model depend on promotions?

17     A    Absolutely.

18     Q    There's been testimony previously in the case

19  about "penetration rate."

20          Are you familiar with that term?

21     A    I am.

22     Q    And does HBO track its penetration rate with its

23  distributors?

24     A    We do.

25     Q    Do promotions affect HBO's penetration rate?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1         A    Yes, they can.  Promotions, packaging,

 2    marketing -- all these things affect the penetration rate.

 3         Q    Do you know whether your distributors use all

 4    tools other than HBO for promotions?

 5         A    Yes, they certainly do.  They're using more and

 6    more tools than they used to.  They use not just our direct

 7    competitors, but they bundle their video services with

 8    anything from gift cards to devices.  I think Verizon had a

 9    promotion where it bundled with iPads.  There's a lot of

10    different promotions out there.

11         Q    Do your distributors use Netflix as a promotional

12    tool?

13         A    Yes, they do.

14         Q    And who decides which promotional tools a

15    distributor will use?

16         A    The affiliate, the distributor decides.

17         Q    And are all distributors promoting HBO all the

18    time?

19         A    No, they're not.  We would hope that they are, but

20    they're not.

21         Q    There was also some testimony or questions this

22    morning about getting approvals for promotions.

23              Do you recall that?

24         A    I do.

25         Q    Under what circumstances does a distributor need
```

1   HBO's approval in order to use HBO as a promotional tool?

2       A    There are few circumstances.  So there is when

3   they're using our trademark and brand, when they're using

4   talent from our shows, and also when they're asking, as they

5   frequently are, for us to allow them to use the HBO

6   subscribers for free.

7       Q    Why is HBO's approval required where a distributor

8   wants to use imagery or talent from HBO?

9       A    So we're under certain restrictions about how our

10  talent can be used in promotions.  Our talent, by which

11  I mean the cost of our programs, they don't want to look

12  like they're endorsing a product that they haven't signed up

13  to.

14          And we have in the past been sued by talent who

15  have felt that they have been used in promotions

16  incorrectly.  So we like to make sure that the promotions

17  won't cause any legal issues for us.

18      Q    And you also mentioned that sometimes HBO gives

19  free HBO as part of promotions, right?

20      A    That is correct.

21      Q    Why does HBO do that?

22      A    Because we want to be included in a promotion.

23  And an affiliate will come to us and say, we've had this

24  promotion.  We would like to include HBO if you give us

25  license fee waivers; in other words, if you don't charge us

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  for this.  So as we want to be included and the implication

2  is they might not include us if we didn't, we will agree to

3  that.

4       Q    So if a distributor is not asking for free HBO or

5  using HBO imagery or talent, does it need approval from HBO

6  in order to promote HBO?

7       A    It doesn't.

8       Q    Does HBO frequently deny approval for promotions?

9       A    No.  I can't think of one.

10      Q    I'm sorry.  I didn't hear you.

11      A    I can't think of one where we've denied.  If it

12  there is an issue, we try to work with our affiliate to

13  create a promotion that does work.

14      Q    Would it be in HBO's interest to prevent a

15  distributor from promoting HBO?

16      A    It is not in our interest to prevent it.

17      Q    Are you familiar with the term "marketing funds"?

18      A    Yes.

19      Q    What does that mean in the context of HBO?

20      A    So sometimes with our contracts with our

21  affiliates, we will agree to provide certain marketing funds

22  to enable them, which is a discrete amount of money, which

23  we will contribute to their advertising and marketing

24  campaigns in order for them to market and promote HBO.

25      Q    And does HBO work with the distributor in figuring

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1500

1  out how to use the marketing funds?

2       A    Yes, we do.

3       Q    And why does HBO provide these marketing funds?

4       A    Because we want to be promoted as much as

5  possible.

6       Q    You also got some questions from Mr. Scheele about

7  coordinating with Turner.

8            Do you recall that?

9       A    I do.

10      Q    And there's one situation involving YouTube TV

11  that he mentioned, I recall?

12      A    That's correct.

13      Q    How was it, how did it come about that HBO

14  coordinated with Turner with respect to YouTube TV?

15      A    So what happened with YouTube TV was we were in

16  negotiations with YouTube TV to carry HBO as a product

17  I believe at the same time Turner was.

18           Time Warner corporate requested that we cease our

19  conversations with YouTube until Turner had reached a deal,

20  because I think there was a concern that Turner might not be

21  able to.

22           YouTube subsequently then went ahead and launched

23  its service without either of this and then, subsequent to

24  that, did a deal with Turner.  So Turner is now carried on

25  YouTube TV, but we are not.

1   Q    So the original idea from Time Warner was to use

2   HBO as leverage to get YouTube to take Turner?

3   A    That was the original idea, yes.

4   Q    And did that work?

5   A    Not really.

6   Q    Why not?

7   A    Well, because they launched without Turner; and

8   subsequently, it's pretty clear that we weren't that much

9   leverage because they never -- have not carried us to this

10  date.

11  Q    So as of today, does YouTube TV carry Turner?

12  A    They do.

13  Q    Does it carry HBO?

14  A    It does not.

15  Q    And why not?

16  A    We're still in negotiations with them, and there

17  are a number of discussion points we have around the

18  presentation of HBO within the YouTube environment.

19       We like HBO to look very distinctly as if it's a

20  premium service and not have advertising or anything else

21  around it.  So that's been a sticking point in the

22  negotiation.

23  Q    I want to switch gears and talk about blackouts.

24  There have been lot of testimony in this case so far about

25  blackouts, and I think you were questioned by Mr. Scheele

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1502

1    about a potential blackout with Charter.

2           Do you recall that?

3    A    I do.

4    Q    Has HBO ever, in fact, had a blackout with a

5    distributor?

6    A    No, we have not.

7    Q    Why not?

8    A    Because it's such a devastating step for us,

9    because we're a discrete purchase that relies on being

10   promoted to our affiliates' customers.

11          If we bent dark on an affiliate, we would

12   immediately have zero subscribers; and then we would have to

13   start again from the bottom climbing our way up.  So it is a

14   drastic step to have to take.

15   Q    If HBO did have a blackout with a distributor and

16   then subsequently reached an agreement, would HBO

17   automatically go back into all of the same packages it was

18   in before the blackout?

19   A    Well, it entirely depends on what negotiation

20   agreement we came back to.

21          Some affiliates have very simple packaging, and

22   some do not.  Some don't really have much packaging at all.

23          So it really depends on the agreement.  So it's

24   not necessarily true that we would go back in the same

25   packages.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1503

1     Q     And as I mentioned, you were asked by Mr. Scheele

2  about a potential blackout with Charter.

3           Do you recall that?

4     A     I do.

5     Q     Just describe the circumstances that led to the

6  threatened blackout with Charter.

7     A     So Charter had -- a deal with Charter had expired,

8  and they continued to pay us but not pay us the amount that

9  we thought they should pay us under the contract.  And that

10  had gone on for a considerable amount of time.

11          During that period, they had sent us letters

12  saying, if you disagree with the amount you are paying us,

13  you should de-authorize us; in other words, we should go to

14  a blackout.

15          And then they announced that they were acquiring a

16  much bigger company, so we had a problem where we had an

17  affiliate, a sizable affiliate, that wasn't paying us the

18  amount that we felt they should, was sending us letters

19  saying, if you disagree, you should take us dark, and had

20  announced that it was buying a much bigger company.

21          So we felt we had to say -- to negotiate a deal,

22  we had to send a letter saying, we will go dark with you.

23     Q     And you'd mentioned buying a larger company.  That

24  was another cable company; is that right?

25     A     Yeah.  That was Time Warner Cable.

1    Q    So it was a horizontal merger?

2    A    That's correct.

3    Q    Ultimately, you didn't have a blackout with

4  Charter, correct?

5    A    That is correct.

6    Q    And what effect did threatening to have a blackout

7  have on the negotiations with Charter?

8    A    Well, we started negotiating.

9         The effect of the letter was, we actually ended up

10 having a negotiation.

11   Q    And I think you mentioned that there's a two-year

12 period.  During that two-year period, was there a binding

13 contract between HBO and Charter?

14   A    There were these extension letters.  So there was

15 a disagreement as to what the terms were.

16   Q    You were also asked some questions about Sony.

17        Do you recall that?

18   A    I do.

19   Q    Just describe the negotiations at the -- between

20 HBO and Sony at the launch of the Sony Vue product.

21   A    So this was fairly soon, I believe, after I had

22 taken over responsibility for the domestic part of HBO's

23 business.  Previous to that, I had been responsible for the

24 international side.

25        And I came into a role where a significant number

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1505

```
 1    of our affiliates, 80 percent of our domestic distribution

 2    deals were up.

 3              So I was focused on Charter, the upcoming Comcast,

 4    AT&T, and Altice deals.  And so we had a number of new

 5    entrants, like the one you mentioned.

 6              And so we had a team in my group working on that,

 7    and they seemed to be doing a pretty good job.

 8              Subsequent to reaching that deal, I came to the

 9    conclusion that our wholesale rates in general were too

10    high.  It was forcing our retail price to be too high and

11    discouraging people from subscribing to the service.

12              In order to maximize revenue, I thought we needed

13    to in some ways lower our prices so we would increase

14    volume.

15              We subsequently did lower our wholesale rates for

16    a lot of our smaller affiliates.  And the Sony deal was kind

17    of one of the last ones we did at those higher rates, and it

18    was always on my list of, we should really go back and

19    adjust that.  And we are actually discussing a new rate

20    structure for them at the moment.

21        Q    But under the current deal, are there any

22    discounts available to Sony?

23        A    Yes.  They can -- if they bundle HBO -- and they

24    do offer a number of packages.  If they bundle HBO in those

25    packages, they have a significantly discounted rate.
```

1    Q    Do they get volume discounts?

2    A    They do.

3    Q    There has also been some testimony in the case

4  about a de-packaging by Comcast in 2016.

5         Are you familiar with that?

6    A    I am familiar with that.

7    Q    Could you describe what happened from HBO's

8  perspective.

9    A    So what happened was, before we came up to our

10 deal expiration, Comcast deliberately excluded us from a

11 number of their double- and triple-play packages, really

12 just a number of their packages.  And they started shedding

13 HBO subscribers at a pretty substantial rate.

14   Q    Was this part of the negotiating strategy?

15   A    Well it was to sort of flex their muscles in a

16 way, show how powerful they are, how we depend on them

17 for -- HBO depends on them to be packaged.  And they were

18 just showing by removing us from their packages, that

19 we would significantly see subscriber drops.

20   Q    These lost subscribers, was Comcast paying for

21 them at that time?

22   A    They were in a -- most of their subscribers, those

23 subscribers were free to Comcast.

24   Q    And what was the effect on HBO of this

25 de-packaging?

```
 1        A    So we had to report lower subscriber growth in

 2   aggregate than we would have liked because of this action,

 3   but it did not affect our revenue.

 4        Q    Do you care about your reported subscriber

 5   numbers?

 6        A    It's important to us, yes.

 7        Q    And are you aware of something called the

 8   Watchathon at Comcast?

 9        A    I am.

10        Q    What is that?

11        A    That is a yearly promotional period where they

12   allow all of their subscribers to see all their channels and

13   encourage people to sample channels that they don't

14   necessarily subscribe to.  They do lot of promotion and

15   marketing around it, and it really is a good tool to

16   encourage subscriptions to premium services.

17        Q    Has HBO traditionally participated in the

18   Watchathon?

19        A    We have traditionally participated in it, yes.

20        Q    What happened in 2017?

21        A    They excluded us from it.

22        Q    Do you know why?

23        A    Oh, because they wanted, again, to show that they

24   were a powerful affiliate and that they could punish us.

25        Q    What about Netflix?  Was Netflix in the
```

1   Watchathon?

2        A    Netflix was their lead product in the Watchathon.

3        Q    For 2017?

4        A    That's right.

5        Q    Do you understand that the government in this case

6   is taking the position that if AT&T and Time Warner are

7   permitted to merge, then AT&T would have the incentive and

8   ability to prevent competing distributors from using HBO as

9   a promotional tool?

10       A    I understand that.

11       Q    Does that make any sense to you?

12       A    It would be devastating to our business.

13       Q    Why is that?

14       A    Because we rely -- our whole business is relying

15   on our affiliates to promote us.  If we can't do that, then

16   our entire business model is destroyed.

17       Q    And if AT&T were to suggest to you that they were

18   thinking about doing that -- that is, preventing

19   distributors from promoting HBO -- what would you tell AT&T?

20       A    I would strongly argue against it.

21            MR. BARBUR:  Thank you.  I have no more questions.

22            THE COURT:  All right.

23            Redirect?

24            MR. SCHEELE:  Yes, Your Honor, very briefly.

25            THE COURT:  All right.

1                    REDIRECT EXAMINATION

2  BY MR. SCHEELE:

3      Q    Mr. Sutton, you testified a moment ago in response

4  to the questions from Mr. Barbur about Netflix.  I just want

5  to confirm, you talked with Mr. Joyce in your deposition

6  about Netflix.  And I believe you said then -- correct me if

7  I am wrong -- that you believe that HBO price incentives are

8  more compelling to large distributors than Netflix's are;

9  isn't that right?

10     A    That's correct.

11     Q    And you believe that HBO going head to head

12  against Netflix on Comcast boxes would gain more subscribers

13  and be more valuable to Comcast; isn't that right?

14     A    That is correct, because I thought our price

15  incentive was compelling to Comcast.

16     Q    And in terms of competing with Netflix and other

17  premium channels, you believe HBO has better theatrical

18  movies, don't you?

19     A    I believe they have, yes, more recent movies.

20     Q    And you believe the HBO brand, I think you

21  described it as having a halo from all its Emmys, right?

22     A    I do.

23     Q    And you believe it resonates more with

24  subscribers, don't you?

25     A    I do.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1510

1    Q    And when distributors offer customers a choice

2  between HBO, Showtime, and Starz at the same price, your

3  research shows that most customers choose HBO, don't they?

4    A    Yes; between those three, yes.

5         MR. SCHEELE:  No further questions.

6         THE COURT:  Let me ask you a question.

7         You talked about, earlier in your examination

8  about your goal of maximizing revenue --

9         THE WITNESS:  Yes, Your Honor.

10        THE COURT:  -- in the negotiation setting and how

11 your rates adjust depending upon who the distributor is and

12 how big a customer base they have, that kind of thing.  You

13 were talking about that.

14        THE WITNESS:  That's correct, yeah.

15        THE COURT:  What's your impression when you're

16 doing these negotiations as to how much the distributor

17 knows about what other people's rates are?

18        THE WITNESS:  That is a good question.

19        I think, amongst the large distributors, they have

20 a sense, because a number of the senior executives move

21 between distributors and they move fairly frequently.  So I

22 certainly know that Altice, for example, knows the Comcast

23 rates.  Charter --

24        THE COURT:  They're supposed to be confidential,

25 aren't they?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1511

1    THE WITNESS:  Well, if it's the same employee who

2  moves around -- they move around a lot, so I think it's hard

3  for them to forget.

4    THE COURT:  But in theory --

5    THE WITNESS:  In theory, they're confidential.

6    THE COURT:  When you're doing a deal, say, with

7  someone, some distributor, the terms of the deal are to keep

8  these numbers confidential, right?

9    THE WITNESS:  That is correct.

10    THE COURT:  We've been going through quite an

11  exercise here to keep certain information confidential.  And

12  that's --

13    THE WITNESS:  I appreciate that.

14    THE COURT:  That's fine.

15    But I kind of have the impression -- and I think

16  you're confirming it.  Tell me if I'm wrong -- that there's

17  an information out -- there's information out there among

18  the distributors where they have a good reason to think they

19  know what the other rates are and how the deal is comparing

20  to the one that they're negotiating with you.

21    THE WITNESS:  So you're correct; the information

22  is confidential.  We certainly try to keep it confidential.

23  Because employees at our distributors move around a lot and

24  because they merge frequently, I think some of that

25  information does leak, to our disappointment.  And sometimes

1    they think they know when actually they don't, so it's a

2    mixture.

3              THE COURT:  They also pick up some intelligence,

4    do they not, about those situations where other distributors

5    are getting, in your situation, an HBO -- a free HBO

6    offering for a promotion, right?  They know about those,

7    right.

8              THE WITNESS:  They do.

9              THE COURT:  And they know in those situations, the

10   distributor is not paying you anything, because it's free;

11   there's credits of some kind.

12             THE WITNESS:  They will make an assumption, but

13   they will track in the press if there's an ad.  And they may

14   call us and say, hey, how does this one work?

15             THE COURT:  Okay.

16             As other people are tracking that as to other

17   distributors, whatever, you have your own people doing your

18   tracking of what's going on out there too, right?

19             THE WITNESS:  That's correct.

20             THE COURT:  And you're using that in your

21   negotiation setting, right?

22             THE WITNESS:  That's correct.

23             THE COURT:  You can step down.

24             THE WITNESS:  Thank you, Your Honor.

25             THE COURT:  Thank you.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1513

```
 1            Call your next witness.

 2            MR. CONRATH:  Your Honor, Mr. Schwingler will be

 3   handling the next witness for us.

 4            THE COURT:  All right.

 5            MR. PETROCELLI:  Your Honor, Mr. Oppenheimer will

 6   be handling the witness.

 7            THE COURT:  Okay.

 8            MR. SCHWINGLER:  Good afternoon, Your Honor.

 9            United States calls Hanny Patel, an adverse party

10   witness.

11            THE COURT:  What was the first name?

12            MR. SCHWINGLER:  Hanny Patel.

13            Your Honor, we have a very brief preliminary

14   matter we were hoping to call to your attention if we can

15   have a moment.

16            THE COURT:  All right.  Well, let's get him in

17   here and get him sworn, and then we'll deal with it.

18            Adverse witness, you say?

19            MR. SCHWINGLER:  Adverse witness, yes.

20            DEPUTY CLERK:  Please raise your right hand.

21            (Witness is placed under oath.)

22            THE WITNESS:  I do.

23            DEPUTY CLERK:  Okay.  You may have seated over

24   here.

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    THE COURT:  All right.  We're going to start off

2    with a bench conference.  So see that chair on the ground

3    over there?  You just need to sit on that, okay?  Thank you.

4         (Sealed bench conference)

5         MR. SCHWINGLER:  So the exhibit we were going to

6    use with this witness, there was a legibility issue.  And so

7    we found another version of the document that's more

8    legible, provided it to opposing counsel last night.

9         And it doesn't have the cover email with all the

10   foundation.  So what we've done is we have Exhibit 10; and

11   then 10A is the alternative version that will be, I think,

12   easier for the witness, for the Court, and everyone else

13   involved to review.

14        So we wanted to raise that and make sure that was

15   okay.

16        MR. OPPENHEIMER:  That's fine with us, Your Honor.

17        THE COURT:  Okay.  I'll see how it works.

18        (Open court)

19        THE COURT:  Come on up.

20        MR. SCHWINGLER:  May I proceed, Your Honor?

21        THE COURT:  You may.

22   HANNY PATEL, ADVERSE WITNESS FOR THE GOVERNMENT, HAVING BEEN

23   DULY SWORN, TESTIFIED AS FOLLOWS:

24                        DIRECT EXAMINATION

25

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 1490 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1515

1    BY MR. SCHWINGLER:

2         Q    Good afternoon, Ms. Patel.  Could you please state

3    your name for the record.

4         A    Hanny Patel.

5         Q    And you are AT&T's vice president of video

6    marketing; is that correct?

7         A    Correct.

8         Q    Yes.

9              And you've had that job for just over two years,

10   right?

11        A    Yes.

12        Q    Before that, you were senior director of revenue

13   marketing for DirecTV; is that right?

14        A    Yes.

15        Q    And so combined, you've worked in marketing for

16   AT&T and DirecTV for about seven years total?

17        A    Yes, that's right.

18        Q    And in your current role, part of your job is to

19   evaluate content strategy; is that right?

20        A    Yes, that's right.

21        Q    And what that means is you're responsible for

22   evaluating the value of a particular network to AT&T's

23   business; is that fair?

24        A    Yes, that's fair.

25        Q    And in your role as vice president of video

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   marketing, you interact with a number of teams within AT&T's

2   marketing department; is that right?

3        A    Yes, I do.

4        Q    And one team you interact with is the offers team,

5   correct?

6        A    Yes, on occasion.

7        Q    The offers team puts together offers to attract

8   new customers to AT&T's video platforms; is that right?

9        A    Yes, that's their responsibility.

10       Q    And you also work with the retention marketing

11  group, is that correct?

12       A    On occasion.

13       Q    Their job is to keep customers from leaving,

14  right?

15       A    Yes, that's right.

16       Q    And for both the offers team and the retention

17  team, you assist with content-based offers; is that right?

18       A    Yes, on occasion.

19       Q    And a content-based offer means a promotional

20  offer using video content that AT&T licenses from a

21  programmer like an HBO, correct?

22       A    Yes, that's right.

23       Q    And so now, I believe DirecTV is offering a

24  promotion for three months of free HBO, Showtime, Starz, and

25  Cinemax for new subscribers; is that right?

1     A    Yes.  That's been going on for quite a while now.

2     Q    And that's an example of the type of content-based

3  offer that you deal with?

4     A    Yes, that's right.

5     Q    And in addition to acquisitions and retentions,

6  your work also involves upgrades, correct?

7     A    Yes.  That's primarily my role.

8     Q    And an upgrade just means taking a current

9  subscriber to a higher-paying package, correct?

10    A    Yes.

11         MR. SCHWINGLER:  Your Honor, I have a binder of

12  documents for the witness.  May I approach?

13         THE COURT:  Sure.

14         MR. SCHWINGLER:  May I approach the witness,

15  Your Honor?

16         THE COURT:  Yes.

17         MR. SCHWINGLER:  May I proceed, Your Honor?

18         THE COURT:  You may.

19  BY MR. SCHWINGLER:

20    Q    Ms. Patel, I have a few questions for you about

21  AT&T's relationship with HBO outside of the context of the

22  proposed merger.

23         You were involved in the renewal of AT&T's

24  contract with HBO leading up to August 2016, correct?

25    A    Yes, I was.

1    Q    And in that process, your team helped AT&T's

2  finance team analyze whether HBO's proposals would be

3  profitable for AT&T, correct?

4    A    Yes, we did.

5    Q    And in the summer leading up to the renewal in

6  2016, you were also involved in internal discussions within

7  AT&T about partnering with a premium network; is that right?

8    A    Yes.  I was involved in those conversations.

9    Q    Basically, AT&T was looking to pick a premium

10  network like an HBO or Showtime to have a deeper

11  relationship, correct?

12    A    Yes, that's right.

13    Q    And this internal discussion with HBO involved

14  John Stankey, the CEO of AT&T entertainment group, correct?

15    A    Yes, that's right.

16    Q    It also involved Dan York, who was in a charge of

17  content acquisition?

18    A    Yes.

19    Q    If you could, I'll direct your attention to PX10

20  in your binder.

21        MR. SCHWINGLER:  Your Honor, PX10 has been marked

22  for identification and provided to opposing counsel, and

23  this is the document we discussed.

24        May I proceed?

25        THE COURT:  Yes.

1    BY MR. SCHWINGLER:

2        Q    Ms. Patel, this is an email from you to Mr. York

3    and several others in June of 2016, correct?

4        A    Yes.

5        Q    And the email was sent also to Lydia Zapata, and

6    she was Mr. Stankey's administrative assistant;

7    is that right?

8        A    I believe that's right.

9        Q    And you understand that this email or at least the

10   presentation attached to it made its way to Mr. Stankey,

11   correct?

12       A    I believe so, yes.

13       Q    And the attachment to your email is a presentation

14   for a meeting to occur to discuss premium networks; is that

15   right?

16       A    Yes.

17       Q    Your team within AT&T was involved in creating

18   this presentation?

19       A    Yes, amongst other teams.

20       Q    And you personally reviewed this presentation

21   before you sent it to Mr. Stankey and Mr. York, correct?

22       A    Yes.

23            MR. SCHWINGLER:  Your Honor, we offer PX10 into

24   evidence under seal.

25            MR. OPPENHEIMER:  No objection under seal.

1           THE COURT:  Admitted under seal.

2                         (Government's Exhibit PX10
                          received into evidence under seal.)
3    BY MR. SCHWINGLER:

4       Q    Ms. Patel, there's some difficulty reading one of

5    the slides.  And so if you turn to PX10A in your binder.

6            This has been marked for identification as PX10A.

7            Can you confirm that this is the same presentation

8    that was attached to PX10?

9       A    Yes, it is.

10      Q    And I'll keep you on PX10A if that's okay.  That's

11   a little bit more legible.

12           Looking at the first slide in the presentation,

13   the very cover actually, this is entitled "Going Big with

14   Premiums"; is that right?

15      A    Yes, that's right.

16      Q    And right on the front page there, it says "Video

17   Marketing."  That's your department, correct?

18      A    Yes.

19      Q    And this presentation, the meeting that this

20   presentation was for was part of this discussion within AT&T

21   about picking a premium to partner with, correct?

22      A    Yes.  It was the beginning of the evaluation

23   process.

24      Q    If you could turn to slide 3.

25           This is entitled "Pros and Cons of Each Premium to

1    Push Broadly."

2           Do you see that?

3       A   I see that.

4       Q   And the premiums listed on this page, those are

5    the premiums that AT&T was evaluating as candidates to have

6    a partnership with, correct?

7       A   Yes, evaluating and that we carried at the time.

8       Q   And you reviewed this specific slide before you

9    sent the presentation to Mr. Stankey, correct?

10      A   Yes.

11      Q   Let's take a look at the pros for HBO.

12          It says here that HBO has the best brand name and

13   is the most recognized.

14          Do you see that?

15      A   Yes, I see that.

16      Q   It then says HBO has the best overall collection

17   of content.

18          Do you see that on the page?

19      A   Yes.

20      Q   The next bullet says HBO is a proven acquisition

21   driver.

22          Do you see that?

23      A   I see that.

24      Q   And then the last pro for HBO refers to motivating

25   other premiums, correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1522

1       A     Yes.

2       Q     Under cons for HBO, it says HBO's the most expense

3    of the premiums.

4             Do you see that?

5       A     Yes, I do.

6       Q     That was true at the time, correct?

7       A     Yes, it was true.

8       Q     And that's still true today?

9       A     It is true from a per-sub basis; but from a growth

10   perspective, it's not true anymore.

11      Q     If you look under Showtime, the next premium, it

12   describes, under pros, Showtime is an acquisition helper,

13   not an acquisition driver, correct?

14      A     That's what it says.

15      Q     Under cons, showtime is described as nice to have

16   but not "Must-See TV," correct?

17      A     Yes.

18            But I think I could say that about all the

19   premiums.

20      Q     But the document says that about Showtime

21   specifically, correct?

22      A     That's right.

23      Q     And if you look at the other premiums on the page,

24   under pros, none of them are identified as acquisition

25   drivers, are they?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1523

1     A     No, they're not.

2     Q     In fact, none of them -- none of their

3   descriptions in the pro column mentions acquisitions at all

4   except for HBO and showtime, correct?

5     A     That's correct.

6     Q     During the meeting where this presentation was

7   made, Mr. Stankey instructed the group in attendance,

8   including yourself, to make a decision on which premium to

9   partner with; is that right?

10    A     Yes.  That's what we were asked to do.

11    Q     Your team recommended HBO, correct?

12    A     Yes, we did.

13    Q     Your team viewed HBO as providing high value to

14  AT&T; is that right?

15    A     We felt that HBO was a high-value option for us to

16  explore, as would all the premiums be.

17    Q     You personally recommended partnering with HBO,

18  didn't you?

19    A     Yes, I did.

20    Q     And, in fact, AT&T did select HBO as its partner,

21  correct?

22    A     Yes.  Ultimately, we chose that HBO would be the

23  partner that we would approach first to go big with.

24    Q     And then over the course of the summer, you

25  reached a deal with HBO that resulted in this partnership

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   relationship, correct?

2        A    Yes, ultimately, we reached that deal.

3        Q    At the beginning of your examination, we

4   discussed -- and just one thing to be clear for the record.

5             All of these discussions with HBO about being a

6   partner, that occurred outside the context of this merger,

7   correct?

8        A    Yes, that is correct.

9        Q    At the beginning of your examination, we discussed

10  acquisition offers, retention offers, and upgrades.  And

11  isn't it the case that this new relationship with HBO in

12  late 2016 provided AT&T opportunities in all three of those

13  areas?

14       A    Yes, that's correct.

15            MR. SCHWINGLER:  Your Honor, I apologize; I forgot

16  to move PX10A into evidence, so I'll do that now.

17            THE COURT:  It doesn't have the emails.

18            MR. SCHWINGLER:  That's correct.

19            THE COURT:  You don't care about that?

20            MR. SCHWINGLER:  Well, we've moved PX10 in, so

21  we would ask for 10A to be admitted so the record has the

22  legible version.

23            THE COURT:  Okay.  All right.

24            MR. OPPENHEIMER:  We have no objection, still

25  under seal.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  All right.  It will be admitted under

 2    seal.

 3                        (Government's Exhibit PX10A
                             received into evidence under seal.)
 4              MR. SCHWINGLER:  I have no further questions for

 5    this witness.

 6              THE COURT:  All right.

 7              Cross-exam.

 8              MR. OPPENHEIMER:  Your Honor, with the Court's

 9    permission, I thought I might actually ask a few questions.

10              THE COURT:  Please.

11              MR. OPPENHEIMER:  Thank you.

12                        CROSS-EXAMINATION

13    BY MR. OPPENHEIMER:

14        Q    Good afternoon, Ms. Patel.

15        A    Good afternoon.

16        Q    Let's talk briefly about this negotiation in 2016,

17    which was to pick a premium channel to be your -- what was

18    the term that was used in the discussions?

19        A    Our preferred partner.

20        Q    Your preferred partner.

21             Before we do that, I'd like to just very quickly

22    go into your background a little bit more, because you've

23    actually seen this, I think, from both sides.

24             How long have you been in the video business?

25        A    Just a little over 25 years.
```

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1    Q    So you've been an executive here for 25 years.

2    Would you tell the Judge what you did -- when did you get to

3    DirecTV?

4    A    2011.

5    Q    And what did you do in the years before that?

6    A    So for the 19 years before that, I used to work at

7    Showtime Networks.

8    Q    And in that capacity, you were on the programmer

9    side; would that be correct?

10   A    Yes.  I was on the side of distribution and

11   working to sell Showtime to our affiliate partners.

12   Q    All right.  So in effect, you would have been in

13   the HBO position vis-à-vis DirecTV?

14   A    Yes, that's right.

15   Q    All right.

16        So let's talk briefly about this 2016 negotiation.

17        First and foremost, when you ultimately decided to

18   choose HBO as your preferred partner, was it because it was

19   absolutely the single best subscriber acquisition mechanism

20   that you could imagine?

21   A    No.  We could have partnered with any of the

22   premiums.

23   Q    So there were other factors that went into your

24   decision?

25   A    Yes, there were a number of factors.

1       Q    All right.

2            So let's start, first, with, why did AT&T decide

3   to pick a preferred premium partner in 2016 to begin with?

4       A    So early 2016, we had just merged the video,

5   entertainment, broadband, and voice businesses with the

6   mobility businesses.  And so at the time, we were looking

7   and John Stankey's ask was we think about how we distribute

8   content across all of our platforms, including mobile.

9            And so we were looking for a new grant of rights

10  from our programmers.  So that was an opportunity for us to

11  look to one partner to start a relationship with, and that

12  was what prompted this whole thing.

13      Q    Okay.  Now, before you made the decision to pick a

14  preferred premium, what premium channels did AT&T offer its

15  video subscribers?

16      A    At the time AT&T carried, Starz, Showtime, HBO,

17  Cinemax.  And on U-verse, we also had Epix.

18      Q    And during that time, was HBO AT&T's most popular

19  premium?

20      A    No, it was not.  It was our third most popular

21  premium.

22      Q    And what were the first two most popular premiums?

23      A    Starz was the most popular, followed by Showtime.

24      Q    Now, why did AT&T sell more Starz and Showtime

25  subscriptions than HBO or other premiums in 2016?

Case 1:17-cv-02511-RJL Document 158 Filed 08/06/18 Page 1503 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1528

1    A    We'd had a longstanding history with Starz.  They

2    have always been good partners.

3         Showtime and Starz both had more favorable deal

4    terms and offered better incentives for us to sell them than

5    HBO did at the time.

6    Q    Now, just on the subject of giving you incentives

7    to promote, a suggestion has been made that distributors

8    such as DirecTV and its competitors need HBO, desperately

9    need HBO to attract and retain subscribers, and that the

10   distributors need HBO more than HBO needs the distributors.

11        You've been on both sides of this.  Is that your

12   perception of the situation after 25 years as an executive?

13   A    No, not at all.

14   Q    Would you explain to the Judge what your

15   perception is.

16   A    Sure.

17        So while at Showtime for my 19 years, my job every

18   day was to work with my partner, and for the last 12 years,

19   which was DirecTV, to get them to sell Showtime to their

20   customers on my behalf.  And so I needed DirecTV to make

21   sure they were selling to their customers.

22   Q    And why was it important to Showtime, to a

23   programmer like Showtime or HBO to have the distributor

24   working on their behalf like that?

25   A    Because the distributor, DirecTV, AT&T, owns the

1  relationship with the customer.  So without that partnership

2  with DirecTV, we, Showtime, would not have access to the

3  customers.  So we relied on them to talk to the customers

4  and market on our behalf.

5       Q    All right.  So let's go back to this 2016

6  negotiation.

7            At the time you were considering H -- well, at the

8  time you were considering whom to pick as a preferred

9  partner, what was HBO's penetration on DirecTV's video

10 platform like with respect to the rest of the industry?

11      A    We under-indexed relative to the rest of the

12 industry.

13      Q    And what does that mean?

14      A    What that means is at the time HBO had

15 approximately 30 million households with about 90 million to

16 100 million pay-TV households.  So nationally, around a

17 30 percent penetration, and we were well under that number.

18      Q    So of all the people that watch HBO, about -- have

19 video on these systems, about 30 percent HBO, and you were

20 below that.

21      A    We were, yes.

22      Q    All right.  And why?  What was your understanding

23 of why?

24      A    A lot of it had to do with our financial terms

25 with HBO, which were not favorable and did not have strong

1    incentives for us to grow.

2            And the incentives we did have were kind of out of

3    our reach.  And so we were unable to take advantage of any

4    of the incentives that were even offered.

5        Q    So how is it you chose to go to HBO -- well, first

6    of all, were you considering all of these premium channels

7    as potential preferred partners?

8        A    Yes.  All of them were under consideration.

9        Q    And how did you decide to go to HBO first to start

10   the negotiation?

11       A    A few factors, but because we didn't have

12   favorable terms with HBO, this was an opportunity, if we

13   were looking for someone to partner with and put first, to

14   fix the economic situation with HBO.  So we had a lot of

15   upside, we felt, I felt, on the economics to approach HBO.

16           And then also because of its brand awareness.  So

17   there were two components that were the major components

18   amongst other things.  But I thought if we can pick that

19   partner and fix the financial terms, that would be great.

20           And then the final factor is we had some deals on

21   the table already, and HBO had shown a willingness to work

22   with us on the wireless and OTT products.  And we did not

23   have the wireless component offered to us by Starz and

24   Showtime at the time.

25       Q    All right.  Now, the government has suggested HBO

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  is AT&T's only real choice as a preferred premium in this

2  context; is that right?

3      A    No, that's not right.

4      Q    So ultimately, what tipped your decision in favor

5  of going with HBO as a preferred partner?

6      A    To -- I'd say to fix the economic situation that

7  we had with HBO to try to get a better deal from them.  This

8  is our opportunity to do it, because we had something to

9  offer them, which is preferred positioning, since they were

10  No. 3 for us in terms of penetration.

11          And then also because they had very good, strong

12  brand awareness that I thought it would make a good starting

13  point.

14      Q    And does HBO want to be your preferred partner?

15      A    HBO did -- at the time, once we started the

16  conversations, they did want to be our preferred partner.

17      Q    And did all of the other premium channels also

18  want to be a preferred partner?

19      A    You know, we really focused on HBO while we were

20  having conversations with the others.  But if we had really

21  focused on either one of Showtime or Starz, I'm sure they

22  would have wanted the same thing and the same opportunity.

23      Q    And why is that?  What's the benefit to the

24  premium channel for being a preferred partner?

25      A    Because if they're a preferred partner, they're

1    positioned first in everything we do; and they get more

2    opportunities in front of our customers, for promotions, and

3    so it helps drive their customer base up.

4        Q    Do you have something called a national offer?

5        A    We do.

6        Q    And what is that?

7        A    The national offer is the offer that we use to

8    drive customers to activate to DirecTV, to sign new

9    customers up for DirecTV.

10           And the national offer usually consists of a price

11   point for programming; a hardware offer, so how many rooms

12   would we install for a certain period of time.  And that's

13   the main focus.

14           Sometimes, there's cash gift cards that we add on

15   top of that.

16           So that's the base of the national offer.

17           And then for customers that come in at a certain

18   base package and above, they also get four free months --

19   sorry, three free months of all four premiums, and that's

20   the -- those are the components of the national offer.

21       Q    Then your national offer, is it very beneficial to

22   an HBO Showtime to be showcased in that national offer?

23       A    Yes, very beneficial.

24       Q    So as a result of all that, did you get an offer

25   from HBO?

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18   Page 1508 of 3826

1533

1     A     Yes, we did.

2     Q     And how would you describe that offer?

3     A     Their offer was very aggressive.

4     Q     And aggressive in what way?

5     A     In a very --

6     Q     Aggressive good or aggressive bad?

7     A     It was very aggressive good.  It was very

8  aggressive.  In my 25 years, I've never seen an offer that

9  strong in terms of incentive for growth.

10    Q     Incentive to you to take them?

11    A     Incentive for us to grow them.

12    Q     Would you tell the Court briefly what were the

13 components of that offer that made it so aggressive in a

14 good way.

15    A     Sure.

16          The components were they lowered our rate per

17 subscriber.  They offered us a promotional band for growth

18 and also lowered the benchmark for which we needed to get to

19 that.  So we were immediately within the promotional band.

20          They gave us --

21    Q     Before you leave promotional band, would you

22 explain that in a little more detail.  Is that a band where

23 you do not have to pay for each subscriber.

24    A     So it can work differently with different

25 programmers.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1534

1    But the concept is you have a benchmark to which

2    you pay a certain number, which is the full rate.  And then

3    above that, there are -- any subscriber above that number,

4    there are discounts.  And that could be free or it could be

5    50 percent off or whatever.  And for HBO, that band was

6    free, free growth for us.

7    Q    So you could add subscribers while you were in

8    that free band and not have to pay HBO any additional fee

9    for doing so?

10    A    That's right.  We get to keep 100 percent of that

11    margin.

12    Q    That improves your margins, does it not?

13    A    Yes, it does.

14    Q    You mentioned previously in response to a question

15    by the government that HBO is expensive and it didn't have

16    some of the best margins you had.

17    Did their offer give you an opportunity to improve

18    that situation?

19    A    Yes, it did.

20    Q    Okay.  I'm sorry I interrupted you.  But if you go

21    on with the other aspects of this offer from HBO to DTV.

22    A    Sure.  There was a significant marketing budget

23    that they offered to us to grow their subscribers.

24    They also gave us the grant of rights that we were

25    looking for for delivering our over-the-top service, as well

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1535

1    as distribution via wireless.

2              And they also included the Cinemax, Cinemax as

3    part of the deal.  So we were able to complete two premiums

4    at the same time.

5         Q    And did they also give you a rate reduction?

6         A    Yes, they did.

7         Q    Okay.  Now, I don't want to throw around the

8    specific numbers, but can you give us a sense of the

9    magnitude of how valuable it was to DirecTV to have that

10   free band that they were offering?

11        A    It's very valuable.  It not only gives us

12   marketing flexibility to do the types of offers we would

13   want to, but it also, from a value perspective, equates to

14   hundreds of millions of dollars a year.

15        Q    What about the rate reduction; can you give us an

16   idea of the magnitude of that value to DirecTV?

17        A    Also, over the course of the deal, it's over --

18   it's hundreds of millions of dollars.

19        Q    And these were all things that HBO put on the

20   table in order for you to pick them as the preferred partner

21   in 2016?

22        A    Yes, that's right.

23        Q    The government in this case has suggested that

24   after the merger in this case, that AT&T would be less

25   willing to allow HBO to be used in offers to attract new

 1    subscribers.  So I'd like to ask you about that.

 2            How does a distributor like DirecTV attract new

 3    subscribers?  And how important is HBO or another premium

 4    channel to that effort?

 5       A    So I would say that from an acquisition

 6    perspective of a new DirecTV customer, price point is the

 7    most important thing, which is why -- and I don't work in

 8    this area, but we know that we focus on that initial price

 9    point that a customer sees to bring them onto the platform.

10            And we use that as a vehicle to attach the

11    premiums.  And so it's really beneficial for the premiums to

12    be included in the national offer, because that, for

13    DirecTV, is actually the biggest source of new premium

14    additions to our platform.

15       Q    So the government has also suggested that, after

16    the merger, it might be beneficial for the combined company

17    to withhold HBO in some way from programs and promotionals

18    that would attract new customers but allow it to be used in

19    what you do, which is to upgrade existing customers, and

20    that that might happen.

21            From your experience in 25 years, does that make

22    sense either?

23       A    No, it doesn't make any sense.

24            Acquisition -- being attached to acquisition is

25    the best way for a premium to get onboard.  There just

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    aren't enough leads and customer touchpoints to do it all

2    through upgrades.

3              So, for example, acquisition represents two-thirds

4    of all new premium units that are added onto the DirecTV

5    platform each year.

6         Q    Last couple of questions, Ms. Patel.

7              If, in your business, you did not have HBO to work

8    with, in terms of promotions, what would you do?

9         A    We would turn to the other premiums because

10   they're all willing and eager to work with us.  And so

11   that's how we would respond to that.

12        Q    And do you believe, based on your experience, that

13   that would be a significant detriment or any detriment in

14   the work of securing and retaining subscribers?

15        A    I do not believe that would be the case.

16             MR. OPPENHEIMER:  Thank you very much.

17             THE COURT:  Redirect.

18             MR. SCHWINGLER:  Just a few questions, Your Honor.

19             THE COURT:  Yes.

20             MR. SCHWINGLER:  May I proceed?

21             THE COURT:  You may.

22                      REDIRECT EXAMINATION

23   BY MR. SCHWINGLER:

24        Q    Ms. Patel, you were asked a question about what's

25   most important in an acquisition offer from the perspective

Case 1:17-cv-02511-RJL  Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18  Page 1513 of 3826

1538

1  of the customer; is that correct?

2      A     Yes.

3      Q     And you stated, in the midst of your answer, that

4  you don't work in that area, correct?

5      A     That's right.

6      Q     That's a different part of the company, different

7  personnel, correct?

8      A     Yes.

9      Q     You mentioned one reason that you recommended

10  choosing HBO as the preferred premium is brand awareness,

11  correct?

12      A     Yes, I did.

13      Q     As someone who works in marketing, you would agree

14  that brand is very important, wouldn't you?

15      A     Brand is very important, yes.

16      Q     And in the information that you provided to

17  Mr. Stankey, PX10A on slide 3, the very first pro under HBO

18  was best brand name and most recognized, correct?

19      A     Yes.

20      Q     When you were discussing national offers, you said

21  they're intended to drive customers to sign up for DirecTV,

22  correct?

23      A     Yes.

24      Q     And right here in the materials provided to

25  Mr. Stankey, next to HBO, it says it's a proven acquisition

1  driver, correct?

2      A    It says that.  But in this context, in my world,

3  acquisition is acquisition of a premium.

4          So we use it to discuss upgrades.  And so that's

5  what this is referring to, which is acquisition of an HBO

6  from an existing DirecTV customer.

7      Q    Are you suggesting that the word "acquisition"

8  means "upgrade"?

9      A    Acquiring a new HBO subscriber, we use that term

10  in the upgrade business as well.

11      Q    Could you turn to tab PX261 in your binder.

12          MR. SCHWINGLER:  Your Honor, this has been marked

13  for identification as PX261 and provided to counsel.

14          May I proceed?

15          THE COURT:  You may.

16  BY MR. SCHWINGLER:

17      Q    Ms. Patel, this is an email from Benjamin Jack to

18  Julia Thomas and copying you in September of 2016, correct?

19      A    Yes, it is.

20      Q    And this is transmitting your final slides for an

21  ops review meeting with Mr. Stankey for around that time

22  frame, correct?

23      A    Yes.

24          However, the meeting didn't actually happen.

25      Q    The meeting didn't occur, but you prepared these

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  slides as -- in anticipation that you may present them to

2  Mr. Stankey, correct?

3        A    Yes, that's right.

4        Q    And can you turn to slide 12.

5             This is PX261-013.

6             And this, these slides were prepared after AT&T

7  renewed its contract with HBO in August of 2016, correct?

8        A    Yes, that's right.

9             MR. SCHWINGLER:  And, Your Honor, United States

10 offers PX261 into evidence under seal.

11            MR. OPPENHEIMER:  No objection, Your Honor.

12            THE COURT:  It will be admitted under seal.

13                          (Government's Exhibit PX261
                              received into evidence under seal.)
14 BY MR. SCHWINGLER:

15       Q    So you've recently entered this new relationship

16 with HBO, and you have these slides to present to the CEO of

17 AT&T Entertainment, correct?

18       A    Yes, that's right.

19       Q    And on slide 12 under "Video Opportunity," it

20 discusses three ways that AT&T might use HBO programming

21 under this new deal, correct?

22       A    Yes, that's right.

23       Q    And one way is upgrades, correct?

24       A    Yes.

25       Q    And another way is acquisitions?

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 1516 of 3826

1541

1    A    Yes.

2    Q    And in this context on this slide, upgrades and

3  acquisitions are two different things, aren't they?

4    A    They are two different things.

5         On this slide, the upgrades is what we discussed

6  before, which was something we could do under the old deal.

7         The new deal allowed us more flexibility on the

8  acquisition side as well, so that is referring to new

9  DirecTV acquisitions.

10   Q    Ms. Patel my only question is on this slide

11 upgrades and acquisitions are two different things, correct?

12   A    Yes, they are.

13        MR. SCHWINGLER:  No further questions, Your Honor.

14        MR. OPPENHEIMER:   Your Honor, just briefly, if I

15 may.

16        THE COURT:  Okay.  Limited to redirect.

17                    RECROSS-EXAMINATION

18 BY MR. OPPENHEIMER:

19   Q    Ms. Patel, just very briefly, the last document

20 you were just shown, Plaintiff's Exhibit 261, the slideshow

21 that you were just shown --

22   A    Yes.

23   Q    -- was that ever, in fact, presented to the ops

24 meeting?

25   A    No, it wasn't presented, and it was never really

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18   Page 1517 of 3826

1542

 1  executed.  These were ideas that we were sharing with

 2  Mr. Stankey to say that the new deal now affords us these

 3  opportunities, and so this was our way of listing out some

 4  of the new opportunities that we had.

 5          MR. OPPENHEIMER:  Thank you very much.

 6          THE WITNESS:  You are welcome.

 7          THE COURT:  So you were just spitballing?

 8          THE WITNESS:  A little more than spitballing.

 9  These are things that we could do, putting in front of the

10  other teams to see if they wanted to use it.  If the

11  acquisition team felt it was worthwhile, then they could do

12  that.  But we now had this flexibility with the deal.

13          THE COURT:  Okay.

14          You can step down.

15          Call your next witness.

16          MR. PETROCELLI:  Your Honor, may we approach?

17          (Sealed bench conference)

18          MR. PETROCELLI:  So, Your Honor --

19          THE COURT:  York?

20          MR. PETROCELLI:  Yes.  His name is Dan York.  He's

21  head of content negotiations for DirecTV.  I've been

22  involved in an ongoing dispute with the government about

23  this witness.  Mr. Walters is going to be doing the

24  examination.

25          THE COURT:  I see.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1543

 1          MR. PETROCELLI:  But I want to address an issue

 2   with you.

 3          The government, apparently, intends to delve into

 4   with Mr. York an incident that occurred back in 2013 and

 5   2014 before the acquisition of DirecTV by AT&T, in which the

 6   government believed that Mr. York was communicating with

 7   others in the industry regarding the new regional sports

 8   network for the Los Angeles Dodgers.

 9          That was an enormous, big controversy in

10   Los Angeles and elsewhere.  And to this day, a number of the

11   distributors don't carry the Dodgers, because when the

12   Dodgers changed ownership, they made some monster deal to

13   sell the TV rights.

14          And the distributor was asking for -- I mean, the

15   Dodgers' regional sports network called SNSL --

16   SportsNet LA, SNLA, was asking for extraordinary fees in

17   order for distributors to carry it.  And so DirecTV couldn't

18   make a deal; others couldn't make a deal.

19          The government then accused Mr. York of kind of

20   talking to the others about not making a deal with the

21   Dodgers.  And this ended up becoming a regulatory

22   investigation, and then --

23          THE COURT:  Investigation?

24          MR. PETROCELLI:  Yeah; like they looked into it.

25          And then the government filed a lawsuit, a civil

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    lawsuit against the company regarding this.

 2              THE COURT:  Against DirecTV?

 3              MR. PETROCELLI:  Yes.

 4              And then DirecTV filed a motion to dismiss.

 5              And while that motion was pending and -- the

 6    government then settled it, with no admission of liability

 7    or fault, okay?

 8              Now, the government -- I asked the government to

 9    agree not to get into this issue, because it has absolutely

10    no relevance whatsoever.

11              What they have come back and said, well, it's

12    relevant to the idea that you might coordinate with Comcast.

13              This has nothing to do with Comcast.  The

14    allegation was that York was talking to someone at

15    Cox Communications and someone at Charter, not even Comcast.

16    And it involved the Dodgers, which is a big controversy to

17    this day in L.A., and has nothing to do with any issue of

18    this case.

19              And so I told the government, if you refuse to

20    stay out of this issue, then I want your entire

21    investigatory file, because it's not fair for you to be

22    asking this witness questions about that while you are

23    sitting on materials in your file.

24              We had this same issue, Your Honor, if you recall,

25    around pricing data.  And you mentioned hot potato.
```

1     The same issue here, but they refused to turn the

2   material over to us, okay?

3     So they have witness depositions.  They have

4   statements, they have documents from Cox, from Charter

5   regarding this whole incident, that they don't want to turn

6   over to us, yet they want to question this witness about it.

7     And so our position is that under 402 and 403,

8   this has absolutely no probative value as to the issue of

9   whether Comcast -- whether NBCU-Comcast and AT&T-Time Warner

10  in the future might coordinate regarding virtual MPDs, which

11  is the only coordination issue they raised in this case and,

12  frankly, something as to which they have no evidence in any

13  event.

14     But to be bringing in an event that occurred four

15  or five years ago involving the Dodgers, involving different

16  companies, and puts us in a position where, then -- and by

17  the way, Judge, they have like 28 documents -- 34 documents

18  under exhibit list regarding this, under seven exhibits.

19  One exhibit consists of 28 separate documents that were

20  exhibits to a CID deposition in this California case.

21     So we are going to get way off track if we have to

22  go into this.  It would be highly prejudicial.

23  ████████████████████████████████████

24  ████████████████████████████████████

25  ████████████████████    ████████████████



23        THE COURT:  You say "government."  FTC?  FCC?

24        MR. PETROCELLI:  It was the DOJ, I believe.

25        And the bottom line, based on all these

1   investigations, that there was no merit at all to these

2   accusations.  Nothing was proved.  The government dropped

3   their case.

4         They entered into a consent decree, basically,

5   making sure that AT&T's new corporate policies would be

6   adhered to.

7         Remember, this happened prior to the acquisition

8   of DirecTV.

9         So apparently, I can tell by all these binders,

10  the government intends to get into this issue.  And we

11  vehemently object and think it's completely irrelevant and

12  it's taking us off track.  And we're trying to stay

13  completely focused on the narrow issues that are in this

14  case.

15        MR. WELSH:  Your Honor, as you know in the

16  complaint, we've alleged that there's a coordinated effects

17  case here.  And the case law is pretty clear that past

18  attempts at coordination and collusion in an industry is

19  evidence that there could be collusion and coordination in

20  the future.  It's one of the factors that the courts look

21  at.

22        For Your Honor, it's United States versus

23  H&R Block in this District in 2011, finding a highly

24  persuasive historical act of cooperation between H&R Block

25  and Intuit supporting the government's coordinated effects

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 1523 of 3826

1548

1  theory.

2         THE COURT:  Is he wrong when he said the

3  government dropped the case?

4         MR. WELSH:  The case was settled.  It was not that

5  the government dropped the case.  The parties came together

6  and settled the case.  They settled the case, and there was

7  a consent decree that was entered by AT&T-DirecTV in that

8  matter.

9         MR. PETROCELLI:  With no finding of fault or

10 liability.  That's explicit.

11        MR. WELSH:  That may well be; but the fact that

12 there's past efforts and attempts by Mr. York, who is the

13 witness that Your Honor will hear, when he was coordinating,

14 sharing information with his competitors, that is a relevant

15 fact before you.

16        THE COURT:  It concerns what he's going to do in

17 the future.

18        MR. WELSH:  Exactly.  What happened in the past,

19 Your Honor, can be evidence --

20        THE COURT:  What's past is prologue.

21        MR. WELSH:  Absolutely.  Absolutely.

22        THE COURT:  Let me ask you this.

23        MR. WELSH:  It's certainly a factor.

24        ███████    ████████████████████████████

25 ███████████████████████████

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1549



        And Your Honor will hear from the testimony of the

witness, if he's going to be candid and explain to

Your Honor what happened, he did reach out to his

counterparts in these other organizations, he said these

competitors, and was talking with them about things.

        And it doesn't even have to be -- Your Honor, it

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1550

```
1    doesn't even have to be about the Dodgers' channel.  The

2    fact that they are talking among the counterparts is

3    evidence right there that the industry is susceptible to

4    this sort of behavior in the future.

5            But on top of that, we do have here, and I think

6    Your Honor will see -- because I don't think Mr. York will

7    be credible on this point at all.  You will see, Your Honor,

8    that the witness was talking with his counterpart at AT&T's

9    before the merger -- was talking with his counterpart at

10   AT&T about deal terms.  And they were using code,

11   essentially, for the deal terms.

12           But you will see it from the evidence that we

13   bring out in court.

14           And I think that this is absolutely probative,

15   Your Honor, of the fact that they did this in past and they

16   will do it in the future.

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6          THE COURT:  We have an expression in the criminal

7   world -- which you may not have familiarity it with since

8   you do civil litigation.

9          MR. WELSH:  That's true, Your Honor.

10          THE COURT:  We have an expression in the criminal

11   world when we're on trial.

12          MR. WELSH:  I'm sorry.  I'm having trouble hearing

13   you.

14          THE COURT:  When we're trial.

15          MR. WELSH:  Yes, Your Honor.

16          THE COURT:  We don't want to have a trial within

17   the trial.

18          MR. WELSH:  Correct.

19          THE COURT:  And this is what this feels like, to

20   me.  This feels like creating a trial within a trial.

21          And based on the limited knowledge I have -- and

22   this is the first time I've ever heard of this, just for the

23   benefit of the Court of Appeals clerks, who someday might

24   read this or the judges who might read this, although they

25   probably wouldn't read it.  The clerks will read it -- I've

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   never heard of anything about this.  This is the first time

 2   I've ever heard of this.

 3            Slow down.

 4            And instinctively, it doesn't feel right to me to

 5   turn this trial into a trial on something that is

 6   complicated, elaborate, nuanced, has all kinds of dimensions

 7   to it that neither side knows.

 8            You don't have their internal investigation.

 9   Okay.  Fine.

10            They don't have some of the executive -- the

11   investigatory file that you have.

12            Both sides are boxing in the dark, in the shadows.

13   They don't know everything about this.  God knows I'm never

14   going to know everything about it.  And we're in a trial

15   where we've got to keep this thing moving, and this looks to

16   me looks like a sideshow.

17            So if you want to try to make some arguments in

18   writing in a motion or brief or something, try to make the

19   case better for it; but as of right now, I'm not letting you

20   go into any of this, none of it.

21            MR. WELSH:  Your Honor, can I --

22            THE COURT:  This guy you're not going to get done

23   today, probably, right?  You're saying an hour and a half

24   for direct.

25            MR. WELSH:  Right.

1553

```
 1              THE COURT:  Okay.

 2              MR. WELSH:  Well, it's impacted by the decision.

 3              THE COURT:  Okay.  Well, then, for the moment, you

 4     have a choice to call someone else.

 5              MR. WELSH:  I'm sorry?

 6              THE COURT:  You can call someone else.  You don't

 7     have to call him.  You can call another witness and think

 8     about it overnight or do a brief.  And believe me, I don't

 9     need a lot more to read.  But if you feel this strongly

10     about it -- they'll get a chance to respond to any brief.

11              I know from his oral argument that he just made a

12     lot of what his response is likely going to be.

13              But the fact remains that you're both boxing in

14     the dark here, the shadows here.  You don't know everything,

15     by your own admission.  He doesn't know everything by his

16     own admission.

17              He hasn't seen your files.  You haven't seen his

18     files.  This strikes me as a sideshow.

19              A settlement was reached.  I doubt that the

20     settlement would have been reached if it was something that

21     was really, really that bad.

22              And I just feel like this is going to take us down

23     side alleys that we shouldn't be down, and it will be

24     unfairly prejudicial in its probative value, and the final

25     analysis will be very limited.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1          And, frankly, what makes it even more

 2   disconcerting to me is that you're trying to use this as a

 3   basis to project that something might happen in the future.

 4   Who the heck knows what's going to happen in the future?

 5          MR. WELSH:  That's the way that Your Honor will be

 6   able to determine what's going on in the industry.

 7          Can I respond just to two other things?

 8          THE COURT:  I would be highly unlikely to reach

 9   that conclusion without knowing more about what actually

10   happened here.  And you're not in a position to put all that

11   on the record, and he's not in a position to defend it.  So

12   I'm telling you right now --

13          MR. WELSH:  Can I just explain something that

14   Mr. Petrocelli said?

15          THE COURT:  Go ahead.  You can have 30 seconds to

16   respond.

17          MR. WELSH:  Okay.  Mr. Petrocelli said that they

18   didn't receive the file.  I wanted to be clear to the Court

19   that we gave them everything that we had in our file that we

20   could give them.

21          Now, they chose not to pursue this with

22   Your Honor.  They objected to the documents and chose not to

23   raise that in the first two days of this trial with

24   Your Honor and decided to wait till now.

25          So, you know, I don't think that that's entirely
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1555

```
 1   appropriate of Mr. Petrocelli to, at this point raise it.

 2            But the important point that I wanted Your Honor

 3   to understand is that we gave them our file.  We told them

 4   that we cannot give you the files for the third parties.

 5            Consistent with what Your Honor told us before, we

 6   followed the exact same procedure that Your Honor had us

 7   follow before.

 8            THE COURT:  The third-party --

 9            MR. WELSH:  The third-party files from our

10   investigations.  Remember, Your Honor, we had a hearing on

11   this previously, and we said that we couldn't give the

12   investigatory files for some of the third parties unless we

13   had their consent.

14            Well, we followed --

15            THE COURT:  Who would "they" be in this case?

16            MR. WELSH:  In this case, Cox and Charter.

17            THE COURT:  These are competitors, aren't they?

18            MR. WELSH:  Exactly, Your Honor.  But that's what

19   Mr. Petrocelli is talking about.

20            So we told him that they're not consenting to the

21   release of the documents.  You, Mr. Petrocelli, can go ahead

22   and subpoena them if you want and go ahead and pursue that.

23            They chose not to do any of that here and instead

24   just waited for today and to make this argument.

25            THE COURT:  No.  This is --
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1          MR. WELSH:  I just want to be clear, we've

 2   complied and given them everything that we are able to

 3   comply and give them under the rules and Your Honor's

 4   procedures.

 5          THE COURT:  That's not going to be -- that

 6   wouldn't be enough.

 7          Look, I don't want to get this trial sidetracked.

 8   We're closing in on the end of the third week.  We've got to

 9   keep this train on the track.  We've got to keep moving

10   forward.  We're going to get sidetracked with this.

11          You can call another witness if you want to.  If

12   you want to rethink your position or reargue it or however

13   you want to do it in writing, you can do that.  They'll get

14   a chance to respond.  We can deal with it next week.

15          But as of today, I'm not going into this stuff

16   today based on what I know here.

17          MR. WELSH:  Your Honor, can I ask one more

18   question just for clarification?  That's all it is, for

19   clarification just so I understand Your Honor's ruling.

20          THE COURT:  You're not getting into it at all,

21   zero.

22          MR. WELSH:  That's the --

23          THE COURT:  Zero.

24          MR. WELSH:  All right.  Thank you.  I just wanted

25   to --
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1557

```
1              THE COURT:  You can't be coy when you're here.

2              MR. WELSH:  Okay.  Thank you.

3              THE COURT:  You know what?  I'm going to take the

4    afternoon break.

5              MR. WELSH:  Okay.  Thank you.

6              (Open court)

7              THE COURT:  All right.  Well, that took up more

8    time than I thought it would.

9              So we're going to take -- my reporter has been

10   working awfully hard for a long time here.  We're going to

11   take a 15-minute recess.  When we return, the government

12   will call its next witness.  And we'll be going until 5:30.

13   We'll stand in recess.

14             DEPUTY CLERK:  All rise.

15             (Recess from 3:58 p.m. to 4:22 p.m.)

16             DEPUTY CLERK:  The United States District Court

17   for the District of Columbia is again in session, the

18   Honorable Richard J. Leon presiding.  God save the United

19   States and this Honorable Court.  Please be seated and come

20   to order.

21             Your Honor, re-calling Civil Action No. 17-2511,

22   the United States of America v. AT&T, Inc., et al.

23             THE COURT:  Ready to call your next witness?

24             MR. WELSH:  May we approach, Your Honor.

25             MR. PETROCELLI:  Is it the same issue?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1558

```
 1                MR. WELSH:  It is.

 2                (Sealed bench conference)

 3                THE COURT:  We're not re-arguing the issue.  We're

 4      done on the issue.  Don't wear out your welcome, Mr. Welsh.

 5      Do you hear me?

 6                MR. WELSH:  Yes, Your Honor.

 7                THE COURT:  Don't wear out your welcome.  This

 8      issue is behind us.  Either you call him or you don't.  What

 9      is your choice?

10                I asked you a question.  What's your choice?

11                MR. WELSH:  I'm sorry.

12                THE COURT:  What's your choice?

13                MR. WELSH:  We're going to call the witness,

14      Mr. York.  I just was simply going to ask Your Honor,

15      we would like to submit tonight a brief to Your Honor, a

16      point, because we believe that this is an important point

17      for us.  We believe that this does go into a substantial

18      right.  And we would like Your Honor to hear our argument

19      this evening, if that's --

20                THE COURT:  I'm not doing this overnight.  I told

21      you, call the witness.  If you want to submit --

22                MR. WELSH:  We don't have another witness that we

23      can put on right now, Your Honor.

24                THE COURT:  Why not?  Don't you have --

25                MR. PETROCELLI:  We do.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1559

```
1           THE COURT:  -- witnesses standing by?

2           MR. PETROCELLI:  Katie, we have our witness here?

3           THE COURT:  What about this next witness --

4           MR. PETROCELLI:  Yeah, we do.  Gibson is here.

5           MR. WELSH:  What we don't understand is why the

6   defendants didn't raise this in a motion in limine earlier.

7           MR. PETROCELLI:  Your Honor, this is not --

8           THE COURT:  We're not re-arguing this issue.

9           MR. WELSH:  I'm not trying to re-argue it.  We

10  don't have another witness that could go right now,

11  Your Honor.

12          THE COURT:  Yes, you do.  Gibson is ready.

13          MR. PETROCELLI:  He's ready.

14          THE COURT:  You can call Gibson.

15          MR. PETROCELLI:  We will get him right now.

16          THE COURT:  Call Gibson.

17          MR. WELSH:  May I confer with Mr. Conrath for a

18  second?

19          THE COURT:  Go ahead, sure.

20          (Pause)

21          (Open court)

22          MR. WELSH:  Your Honor, the United States calls

23  Daniel York as an adverse party witness.

24          THE COURT:  All right.

25          DEPUTY CLERK:  Please raise your right hand.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              (Witness is placed under oath.)

2              DEPUTY CLERK:  Please be seated.

3              THE COURT:  You may proceed.

4              MR. WELSH:  May I proceed?

5              THE COURT:  You may use leading questions.

6              MR. WELSH:  Thank you, Your Honor.

7    DANIEL YORK, ADVERSE WITNESS FOR THE GOVERNMENT, HAVING BEEN

8    DULY SWORN, TESTIFIED AS FOLLOWS:

9                        DIRECT EXAMINATION

10   BY MR. WELSH:

11        Q    Could you please state your name for the record.

12        A    Daniel York.

13        Q    Good afternoon, Mr. York.  Good to see you again.

14        A    Good to see you.

15        Q    Mr. York, you've been with AT&T or DirecTV for

16   about 14 years, is that correct, in total?

17        A    Yeah, about 13 and a half.

18        Q    You have had, I guess, a number of different

19   stints with AT&T and DirecTV; is that true?

20        A    Yes, straight through, from late 2004.

21        Q    Okay.  So let's just go back briefly and talk

22   about your background here.

23             So in 2004, you started with AT&T; is that right?

24        A    Yes.  At the time, it was SBC.

25        Q    And then you worked there, if my recollection is
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   correct, about seven and a half years, right?

2        A    Correct.

3        Q    And at that time, you left AT&T, that company, and

4   you went to DirecTV; is that correct?

5        A    Correct.

6        Q    All right.  And then that was about 2012, right,

7   when you went to DirecTV?

8        A    Correct.

9        Q    And when you started at DirecTV in 2012, you were

10  the executive vice president, chief content officer for the

11  company; is that right?

12       A    At DirecTV?

13       Q    Yes, sir.

14       A    Yes.

15       Q    And you reported to Mike White, correct?

16       A    That's correct.

17       Q    Mike White was the CEO of DirecTV, true?

18       A    True.

19       Q    Then in 2015, AT&T and DirecTV merged, correct?

20       A    Correct.

21       Q    AT&T acquired DirecTV in that?

22       A    Merged, acquired.

23       Q    Okay.  And then at that point, you joined AT&T,

24  true?

25       A    True.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1562

1    Q    You were the executive vice president and chief

2  content officer of AT&T, DirecTV at that point in time,

3  correct?

4    A    Correct.

5    Q    And you held that position from 2015 until August

6  of 2017, right?

7    A    True.

8    Q    And you reported, during that time, to

9  John Stankey?

10    A    Correct.

11    Q    And Mr. Stankey, you've heard a little bit about

12  in this court already.  Mr. Stankey at the time was the CEO

13  of AT&T Entertainment Group; is that right?

14    A    Yes.

15    Q    And you were, more recently, promoted within the

16  organization, right?

17    A    I have a different title, but my job hasn't

18  changed.

19    Q    Okay.  Your title is now senior executive vice

20  president and chief content officer at AT&T-DirecTV;

21  is that right?

22    A    Yes.

23    Q    Now, since the merger between DirecTV and AT&T

24  back in 2015, that time frame, you've had responsibility

25  over the content and programming group at AT&T and DirecTV,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1563

1    right?

2        A    Correct.

3        Q    And that group is responsible for contract

4    negotiations with programmers for linear content for

5    DirecTV's satellite business and for U-verse, right?

6        A    Yeah, amongst other things, yes.

7        Q    Okay.  And at both AT&T and DirecTV, you were and

8    are today the chief content negotiator with the programmers

9    for AT&T and DirecTV?

10       A    I would say I oversee the group, but I'm not

11   necessarily the chief negotiator.

12       Q    But you oversee the group in terms of those

13   contract negotiations, right?

14       A    The deal folks, not the legal team, yes.

15       Q    And if this merger were to be consummated, if it

16   went forward, you expect to continue to remain in your

17   position with AT&T-DirecTV, right?

18       A    I'm not certain.  I would hope so.

19       Q    You told me, I think, in your deposition, no one's

20   told you otherwise at this point, right?

21       A    That's correct.

22       Q    Now, Mr. York, you're generally aware, aren't you,

23   of the allegations in this lawsuit, why we're here today?

24       A    Generally, yes.

25       Q    Okay.  You're aware of the allegation that if this

1    merger were to be consummated, AT&T and DirecTV would have

2    greater leverage and negotiations with distributors for

3    Turner content.  You're aware of that, aren't you?

4        A    I'm aware of that allegation, yes.

5        Q    And you're aware of the allegation that with that

6    merger, that AT&T and DirecTV could increase the costs of

7    Turner content by threatening permanent blackouts of that

8    content?

9             You're generally aware of that?

10       A    I'm aware of that allegation, yes.

11       Q    And that by doing so, that that would be

12   profitable to AT&T-DirecTV because new and existing

13   customers of AT&T-DirecTV, faced with that blackout, they

14   would go to AT&T, right?

15       A    I believe that's an assumption that some of them

16   may, yes.

17       Q    Now, the concepts that we've just talked about

18   here, those aren't new to you, are they?

19       A    What concept are you referring to?

20       Q    Well, the concepts and the points we just talked

21   about, that if the merger were to occur, that AT&T and

22   DirecTV would have greater leverage in the negotiation of

23   distributors for Turner -- for content, that's not a new

24   point to you, is it?

25       A    I understand the concept.  I don't necessarily

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  agree with it.

2       Q    And the point that I made and in the concept here

3  that it would increase the cost of Turner to rivals and

4  that, that's not a concept that's foreign to you, is it?

5       A    The concept that a programmer could increase their

6  prices?

7       Q    In a situation where there's an acquisition here,

8  a vertical integration, an acquisition, that that could

9  cause the cost of Turner content to be increased to rivals,

10 that's something that's not -- that concept right there is

11 not foreign to you, is it?

12      A    It is.  In my experience, ownership or affiliation

13 of the content company doesn't really have an impact on the

14 price of the content.

15           MR. WELSH:  Your Honor, I have some binders, if I

16 may approach?

17           THE COURT:  You may.

18           MR. WELSH:  May I approach the witness,

19 Your Honor?

20           THE COURT:  You may.

21 BY MR. WELSH:

22      Q    Mr. York, you have a binder in front of you.  I'd

23 like to direct your attention to PX231.  It's been marked

24 for identification.

25           MR. WELSH:  It's also been given to defense

 1   counsel, Your Honor.

 2              May I proceed?

 3              THE COURT:  You may.

 4   BY MR. WELSH:

 5       Q    Mr. York, I'd like you to look at it PX231, and

 6   I'm going to direct you to page 231-13.

 7              MR. WALTERS:  Your Honor, may we approach?

 8              THE COURT:  Step down.  Sit in that chair over

 9   there, okay?

10              THE WITNESS:  Sure.

11              (Sealed bench conference)

12              MR. WALTERS:  Your Honor --

13              THE COURT:  What's your issue?

14              MR. WELSH:  PX231.

15              MR. WALTERS:  The objection is relevance.  This is

16   before the acquisition; am I right?  Before the acquisition

17   by AT&T?

18              MR. WELSH:  It's before the acquisition of AT&T --

19   by AT&T-DirecTV.

20              MR. WALTERS:  So it has nothing to do -- it's pre.

21   It's a DTV.  It dates back to 2013, pre-acquisition of AT&T.

22   And I don't think there's anything probative in this

23   document on the issues that are currently pleaded.

24              MR. WELSH:  Your Honor --

25              THE COURT:  What is this thing?  It's a slide

1    deck, obviously.

2            MR. WELSH:  It's a slide deck, Your Honor.

3            THE COURT:  From January 2013?

4            MR. WELSH:  Correct, Your Honor.

5            And the point that I'm going to be asking about is

6    the statements that are made on page 13, page 14 -- excuse

7    me, 12 and 13.

8            THE COURT:  Now, what is his title?  This slide

9    deck, how is he related to it?

10           MR. WELSH:  How is he related to it?

11           THE COURT:  Yes.  Did he author it?  Did he seize

12   it?

13           MR. WELSH:  No, no.  I'm using this for

14   impeachment purposes right now.

15           MR. WALTERS:  He hasn't said anything to be

16   impeached.

17           THE COURT:  What is he being impeached for?

18           MR. WELSH:  What I'm asking him about is that

19   he said that he was not aware of the concept of if he had a

20   content producer -- if DirecTV were to acquire a content

21   program, which is on this page, that it could influence the

22   content availability of pricing, and also the very

23   allegations here in this lawsuit, taking advantage of

24   carriage disputes, bundling networks, the things that we're

25   talking about here in this lawsuit, Judge.

1     MR. WALTERS:  Your Honor, that's not proper

2  impeachment.  He didn't say anything like that.  All he said

3  was, I didn't know which concept you're talking about.

4  There are about five concepts wrapped up in the question.

5  He said, I don't know which concept you're talking about.

6  That's not impeachment.

7     THE COURT:  My notes indicate he said -- and

8  I'm not taking, obviously, verbatim notes, but ownership of

9  content by a company does not necessarily have an impact on

10  the price of the product.

11     MR. WELSH:  He said he didn't agree with my

12  question.  So that's why I was going back to the document to

13  show them they, in fact, were made aware of this.

14     And the very point that I'm hearing from defense

15  counsel is my point, that you heard this back in 2013, years

16  and years ago, the very allegations that we've heard defense

17  counsel after defense counsel after defense counsel come and

18  question their witnesses on the stand about, does this make

19  any sense?  Does the government's theory make any sense to

20  you?

21     And here we have a document back in 2013 that has

22  exactly the same type of allegations that we brought on

23  this.

24     THE COURT:  He was with DirecTV at the time,

25  right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    MR. WALTERS:  2013, yes.

2    MR. WELSH:  Yes, that's right.

3    THE COURT:  All right.  So if you want to ask him

4    if this was the thinking of DirecTV back at that time,

5    go ahead and ask him.

6    MR. WELSH:  Okay.

7    THE COURT:  But I don't think that necessarily is

8    inconsistent with what he said.

9    Now, if you want to try, I'm not inclined to let

10   the whole thing in, the whole exhibit in.

11   MR. WELSH:  Okay.

12   THE COURT:  You don't have any foundation for the

13   exhibit.

14   So if you want to show it to him and ask him if

15   this refreshes his recollection as to whether or not that

16   was the thinking where he worked in 2013 and ask him that

17   and does he disagree with the thinking of what was going on

18   at DirecTV at the time, you can ask him that.

19   MR. WALTERS:  Thank you, Your Honor.

20   THE COURT:  Try that.

21   MR. WELSH:  Thank you, Your Honor.

22   THE COURT:  All right.

23   (Open court)

24   THE COURT:  You may proceed, consistent with the

25   discussion at the bench.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1           MR. WELSH:   Thank you, Your Honor.

 2    BY MR. WELSH:

 3      Q    Mr. York, you have Exhibit PX231 in front of you.

 4    And that's a deck from January of 2013 called "DirecTV

 5    Content Project Workshop on Strategic Moves," correct?

 6      A    That's what it's titled, yes.

 7      Q    And you were with DirecTV at the time in January

 8    of 2013, correct?

 9      A    Yes.

10      Q    And I think we looked at this document in your

11    deposition.  This document came from your file, didn't it?

12      A    I believe so.

13      Q    And -- excuse me.

14           Back in that time frame of January 2013, DirecTV

15    was looking at a number of different strategic options, one

16    of which was acquiring a content producer or programmer.

17    That was an option that was being discussed, true?

18      A    I wouldn't say that that topic at all was actively

19    discussed, no.

20      Q    Well, it was discussed in the context of this

21    PowerPoint deck that we have here; isn't that fair?

22      A    It is one of the items on one of the pages in this

23    PowerPoint that McKinsey did five years ago, yes.

24      Q    And that -- the pages that we're talking about

25    would be 012 and 013, right?

1       A       I'm sorry.  Can you repeat the question.

2       Q       Yes.

3               The pages that talk about DirecTV acquiring a

4       content programmer, those would be on PX0231-012 and the

5       next page, 013, correct?

6       A       Correct.

7               MR. WELSH:  Your Honor, I move for admission of

8       the document if I've laid sufficient foundation.

9               MR. WALTERS:  May we approach?

10              THE COURT:  Yeah.

11              (Sealed bench conference)

12              MR. WALTERS:  Your Honor, he just testified,

13      there's no foundation for this document.  It was prepared by

14      an outside consultant, McKinsey.  There's absolutely no

15      foundation for its admission.  And it's not relevant to any

16      issue that we're talking about in this case.

17              This is done in 2013, pre-acquisition, by these

18      consultants.  And it's just not probative to any issue.

19              There's no foundation for this to admit this

20      document.  He did what he could in terms of trying to use it

21      for impeachment.  There was nothing to impeach.  No basis

22      for its admission.

23              MR. WELSH:  Your Honor, I believe it comes in as

24      an adoption that was prepared as strategic options that

25      they're looking at, DirecTV, in January of 2013.  Two of the

1    pages here have to deal with the potential acquisition of

2    the program, where, again, it's relevant, because it goes to

3    the very issues that we're talking about in this case.

4            THE COURT:  I'll tell you what.  I'm going to let

5    you introduce these two pages only.

6            MR. WELSH:  Okay.

7            THE COURT:  And you can confront him with the

8    representations that are being made by, not by the company

9    DirecTV, but by a consultant.

10           Now, he may or may not agree with the

11   representations being made by this consultant.  We will find

12   out what his answer is to that.  And he can explain himself

13   if he wishes.

14           We're not going to read in this whole darned

15   thing.  This bullet point that you're concerned about on 12

16   starts with influence of the distribution platforms.  That's

17   the one you're concerned about, right?

18           MR. WELSH:  Yes.  It's that one going down,

19   I think, right below it.  Yes, Your Honor.  And then two.

20           THE COURT:  Okay.  And then No. 2, paragraph No. 2

21   on 013.  If you want to have him read them to himself, ask

22   him questions about it, you can do that.  All right?

23           I don't want you getting into the rest of this

24   stuff.  I'm not going to admit the other stuff.  And I think

25   this has potentially some relevance, but we'll see.  This is

1  cross.

2          MR. WELSH:  Should I move to admit those two

3  pages?  Is that appropriate?

4          MR. WALTERS:  There's no foundation for that.  I

5  mean, as a third party, it's hearsay.  There's no business

6  record exception.  I don't know what we're talking about on

7  the adoption.  Sure, he can use it simply to have him read

8  it, but it shouldn't be admissible.

9          THE COURT:  I don't have at my fingertips his

10  deposition.  But I heard him admit or acknowledge that this

11  was part of the records that came over from his deposition.

12  It was in his file.  He worked at the company.

13          MR. WALTERS:  Yes, Your Honor.

14          THE COURT:  So presumably, based on that alone,

15  it's official company records that he got in his capacity as

16  the head of the -- chief MVP of content.  He had access to

17  it by virtue of his position.  And now he may or may not

18  have ever reviewed it.

19          You're going to have to establish whether he ever

20  looked at this.  He may have never seen it or may have never

21  spent any time with it.  He knew the name of it, the company

22  that created it.

23          MR. WALTERS:  Yes, and it was in his files.

24  There's no question.  He did have access to it.  It's just

25  no found --

 1          THE COURT:  Was he questioned about it during his

 2   deposition?

 3          MR. WALTERS:  I believe he was questioned about it

 4   at his deposition.

 5          THE COURT:  So he obviously -- there's some

 6   testimony out there under oath that shows the familiarity

 7   with this document from his deposition.

 8          MR. WALTERS:  Just so we're clear, they were very

 9   helpful.  This is his testimony at his deposition.  I don't

10   remember this deck from five years ago.

11          This clearly looks like McKinsey work.  But just

12   the layout of the deck -- and maybe it was a bit of an

13   offshoot so he was just guessing about it when he was

14   confronted with it at his deposition.

15          THE COURT:  If that's the answers he gives now,

16   then we're going to move on.

17          MR. WELSH:  He did testify that there were

18   strategic options that they were working on at the time.

19   And he was generally aware of that.  And then this deck was

20   submitted, as I understand his testimony, as part of that.

21          THE COURT:  What you're trying to demonstrate is

22   whether or not that which is reflected in this McKinsey

23   document was indeed the position or the thinking, I should

24   say, of DirecTV at the time and him.  You can just ask him

25   that straight out.

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158  Filed 08/06/18  Page 1550 of 3826

1575

1       MR. WELSH:  I will.

2       THE COURT:  Was this the thinking of DirecTV at

3  this time?  Was this your thinking at this time?

4       I don't know what his answer is going to be.  If

5  you want to answer him that, you can ask him.

6       MR. WELSH:  Can I read that in so I can ask him

7  that question, the very question.

8       THE COURT:  Yeah.  You can confront him with it.

9       MR. WELSH:  That's fine.

10      THE COURT:  Look at this.  Read that.  Read that

11  to yourself.

12      MR. WELSH:  That's find.

13      MR. WALTERS:  Read it to himself is a matter of

14  impeachment but not admissibility.  Right?

15      THE COURT:  Read it to yourself.  And then, are

16  you familiar with this document?  Did you review it at the

17  time?  You know, that kind of thing.  And then see what he

18  says.

19      I don't know what he's going to say.

20      MR. WELSH:  Thank you.

21      MR. WALTERS:  Thank you, Your Honor.

22      THE COURT:  All right.

23      (Open court)

24      THE COURT:  Come on back up, Mr. York.

25      Let's try this again.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   BY MR. WELSH:

 2       Q    Mr. York, I'm going to direct you to 231-012, and

 3   the top of that just says "Acquired Content, Producer

 4   Programmer."  I just want to make sure we're on the same

 5   page.  Same page?

 6       A    Yes.

 7       Q    So I'm going to direct you down to the first

 8   bullet -- or second bullet point, excuse me.  It begins with

 9   "influence."  Just take a look at that.  Read that to

10   yourself, with the two sub bullet points, if you would.

11       A    Are you talking about in the yellow box here?

12       Q    It starts in the yellow dashed box and then looks

13   like it carries down further.  There's two bullet points,

14   sub bullet points below that.

15       A    The dash says, "Influence new distribution

16   platforms"?

17       Q    Yeah, that's the line we're talking about.  If

18   you'd read that and then the content that's right below

19   that.

20       A    Underneath that it says, content partner --

21       Q    Read it to yourself.

22            THE COURT:  Read it to yourself.

23            THE WITNESS:  Oh, sorry.

24            I see that, yes.

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   BY MR. WELSH:

2       Q    Now, the language that's there, that was something

3   that you and your colleagues at DirecTV were thinking about

4   in this time frame of January 2013, right?

5       A    I wouldn't say we were -- I wouldn't say we were

6   really thinking about this at all.

7       Q    Well, you had this deck, and you had these two

8   pages that we're looking at here of 012 and 013, right?

9       A    Correct.

10      Q    Okay .and what we just looked at here and the

11  language that you just read to yourself, now, that involves

12  a situation where the concept was DirecTV buying a content

13  programmer, right?

14      A    That is the concept in these bullet points, yes.

15      Q    Okay.  And that's what's going on in this merger

16  here, is that AT&T-DirecTV wants to buy a content

17  programmer, right?

18      A    Correct.

19      Q    And back in this time frame of 2013, you said

20  McKinsey did this.  McKinsey was a big consultant that you

21  worked with at that time, right?

22      A    Mr. White used McKinsey from time to time, yes.

23      Q    Well, McKinsey was actually very much involved in

24  this business and worked on the AT&T-DirecTV merger, right,

25  on the efficiencies?  You know that.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      A    I'm not sure what role they played in that merger.

2      Q    Jonathan Dunn is with McKinsey?

3      A    Yes, at least he was then, yes.

4           MR. WELSH:  Your Honor, we have marked for

5      identification PX538.  We want to try to use it for

6      refreshing the witness' recollection.

7           THE COURT:  Yes.  Show it to Mr. Walters.

8           MR. WELSH:  May I approach?

9           May I approach the witness?

10          THE COURT:  You may.

11     BY MR. WELSH:

12     Q    Mr. York, you have PX538.  I'd like you to take a

13     look at that.  And I'm going to ask you to look at -- the

14     email at the top is from you to Jonathan Dunn.  And then

15     there's an email below that from Mr. Dunn to you in July of

16     2015.  If you would please read that to yourself and tell me

17     when you're done.

18     A    Okay.  I've read it.

19     Q    Put that to the side.

20          Does that, looking at PX538, help to refresh your

21     recollection that McKinsey had been working on the

22     AT&T-DirecTV merger back in July of 2015 with you?

23     A    Yeah.  I recall they were involved.  I didn't know

24     that they were working on synergies per se.

25     Q    But you know that they were involved and have done

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 1554 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1579

1    ongoing work for AT&T and DirecTV over the years, right?

2        A    I first encountered them when I joined DirecTV,

3    because Mr. White used them from time to time.

4        Q    He used them, the CEO of the company, used

5    McKinsey, right?

6        A    Occasionally, yes.

7        Q    And they were trusted.

8             And AT&T continued to use DirecTV even after the

9    merger or as part of this merger, correct?

10       A    I didn't make that decision but somebody decided

11   to use them, yes.

12       Q    In any event, back in this time frame of January

13   2013, the proposition of DirecTV possibly buying a content

14   programmer and what the impact of that is that the content

15   partner could influence content availability and pricing

16   into the future of new platforms, that was something that

17   was aired and you were aware of back in that time frame,

18   true?

19       A    I see it on this page.  I don't have any

20   recollection of discussing that as part of this subset of a

21   much bigger project.

22       Q    Well, back in 2013, again, in the concept of

23   DirecTV acquiring a content programmer, similar to what

24   we're talking about here, the concept that that would give a

25   greater advantage to DirecTV in competitors' carriage

1   disputes by prolonging negotiations when beneficial to it,

2   that was something that was discussed and something that was

3   raised internally at DirecTV; isn't that true?

4        A    I don't recall that being discussed and raised,

5   other than seeing it here under the column entitled "What

6   you'd have to believe" on this page by McKinsey.

7        Q    But these are the very concepts -- on these pages

8   that we're looking at, these are the types of concepts that

9   are being raised today and that we're all talking about in

10  this litigation; isn't that right?

11       A    Other than the filing, I'm not sure exactly what's

12  being talked about.  I'm sorry.

13       Q    You can put that to the side.

14            MR. WELSH:  Your Honor, I would renew, if we could

15  move for admission of those two pages that we talked about,

16  012 and 013.

17            MR. WALTERS:  Objection, Your Honor; no

18  foundation.

19            THE COURT:  Yeah.  I'm going deny the request, for

20  the reasons given at the bench.

21  BY MR. WELSH:

22       Q    All right.  Mr. York, let's talk about your

23  contract negotiations with programmers for linear

24  programming, okay?

25       A    Okay.

1    Q    All right.  Now, in contract negotiations, you

2    think about the concept of leverage; isn't that's true?

3    A    It's a phrase that everybody throws around, yes.

4    Q    And I think in your deposition you said that you

5    like to talk about it more in terms of negotiating power,

6    right?

7    A    I think that's in the context of any business

8    of -- doing a negotiation.  If somebody uses the phrase

9    "leverage," it probably would equate to something like that,

10   yes.

11   Q    So we can use those interchangeably?  Is that okay

12   with you?  Leverage, negotiating power, you consider those

13   to be the same?

14   A    Not by definition, but they're similar, yes.

15   Q    You agree that in contract carriage negotiations

16   that you've worked on, that the more must-have that the

17   programmer has, the most must-have content that a programmer

18   has, the greater the leverage that programmer has in the

19   negotiations; isn't that's true?

20   A    Yes.  That's a concept that's probably true.

21   Q    So all content is not created equal, right?

22   A    Just as all people aren't, no.

23   Q    And the economic impact to AT&T of losing a

24   network is not the same from network to network; isn't that

25   fair?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    It's really hard to predict exactly what the

2  impact would be with any one piece of content, but I would

3  assume that it would be different by the channel, yes.

4    Q    All other things being equal, if you were to lose

5  a programmer, that the harm, the economic harm impact, if

6  you will, to AT&T-DirecTV, that's going to differ based on

7  programmer to programmer; isn't that a fair statement?

8    A    I think that's fair, yes.

9    Q    And some programmers simply have better, stronger

10  content than other programmers.  In your deposition, you

11  talked about something called DOGTV.

12         Do you remember that?

13    A    I do.

14    Q    That was the example you threw out, right?

15    A    I think I did, yes.

16    Q    And DOGTV, if I understood -- I've never heard of

17  it before that day?

18    A    You should check it out.

19    Q    Okay.  I'll put it on my bucket list.

20         But DOGTV is, I guess, a channel or a network

21  where it's designed for dogs to actually watch TV;

22  is that right?

23    A    That's what it is, yes.

24    Q    And we talked about that in comparison to --

25         MR. WELSH:  I had the same reaction, Judge.

1583

1    THE COURT:  Bizarre.

2    THE WITNESS:  So did I when we got the pitch.

3    BY MR. WELSH:

4    Q    We talked about that in relationship to TBS and

5    TNT, for example.

6    Do you remember that?

7    A    I do.

8    Q    I think you'll disagree with us, but the economic

9    impact to DirecTV or AT&T of dropping DOGTV, fair to say

10   it's going to be far less of an impact than if you were to

11   drop Turner, right?

12   A    That's fair to say, yes.

13   Q    Because the Turner content across America is going

14   to be a heck of a lot stronger and more valuable than DOGTV?

15   A    Than DOGTV, yes.

16   Q    Thank you.

17   Now, you have also grouped, in the past, you've

18   grouped programmers in tiers by their importance to DirecTV;

19   isn't that right?

20   A    We may have, yes.

21   Q    Well, if you'd look at your binder, and I'm going

22   to direct you to PX154.

23   Tell me when you're there, sir.

24   A    Yes, I see it.

25   MR. WELSH:  PX154 is for identification purposes,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1584

```
 1    Your Honor.  It's been provided to defense counsel.

 2    BY MR. WELSH:

 3         Q    Mr. York, this is an email from you to Mike White

 4    on April 3, 2015, right?

 5         A    Yes.

 6         Q    And, again, this is the CEO of DirecTV, correct?

 7         A    Correct.

 8         Q    And the purpose of this email was you were

 9    preparing a list of programmers for Mr. John Stankey,

10    correct?

11         A    Yes, I believe so.

12         Q    You wanted to -- the merger was going to go

13    through.  You wanted to let Mr. Stankey have a list of who

14    the programmers were so that he could introduce himself or

15    become better acquainted with them, correct?

16         A    No.

17         Q    Well, you were providing this list and you got it

18    to your boss, Mike White, for purposes of getting it

19    Mr. Stankey, true?

20         A    What happened was Mr. White requested from me a

21    list of some of the content CEOs that he thought Mr. Stankey

22    may want to know if he didn't already.

23         Q    Okay.  That's fine.

24              But it was ultimately going to go to Mr. Stankey?

25         A    I'm not sure what Mr. White did with it.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q    All right.  But you understood that he wanted the

2  list from you, Mr. White did?

3    A    That was his request to me.

4    Q    And you went ahead and you put together this list.

5         And you, in putting it together -- and you

6  provided it to Mr. White, right?

7    A    Yes, I did.

8    Q    Correct?

9         MR. WELSH:  Okay.  Your Honor, I move for

10  admission of PX154.  I believe there's some personal

11  information in it that's been designated as confidential, so

12  we'll file this under seal and deal with that issue later.

13         MR. WALTERS:  Your Honor, briefly, may we

14  approach?

15         (Sealed bench conference)

16         THE COURT:  All right.  If you must.

17         MR. WALTERS:  All right.

18         This is a document, this is pre-acquisition.  It

19  should not be admitted against AT&T.  This is -- should be

20  only admitted against DirecTV provisionally at best, based

21  on Your Honor's previous --

22         THE COURT:  I can't hear you.

23         MR. WALTERS:  -- based on Your Honor's previous

24  guidance on this issue that it is pre-AT&T.

25         It is a -- it's before the acquisition.  It should

```
 1   not be --
 2           THE COURT:  The mere fact that it's before the
 3   acquisition does not give the basis to not be admitted.
 4   You've got to have more than that.
 5           MR. WALTERS:  Well, it should only be
 6   provisionally admitted against DirecTV and not AT&T in light
 7   of Your Honor's previous guidance on the DirecTV issue.
 8           That's the objection.
 9           THE COURT:  I don't know what guidance you're
10   talking about there.  What guidance are you talking about?
11           MR. WALTERS:  About whether it is admitted -- the
12   distinction between DirecTV and AT&T --
13           MR. WELSH:  I'm lost.
14           MR. WALTERS:  -- without limitation.
15           THE COURT:  I'm not familiar with what guidance
16   you're referring to now.
17           There was a time a couple weeks ago when
18   Mr. Petrocelli made an argument along the lines of maybe
19   DirecTV should be dismissed from this case and he would
20   someday at the appropriate time file a motion to that
21   effect.  But that was a couple weeks ago, and we haven't
22   heard anything about that since then.  So, I mean, what's
23   the relevance to this witness of this?
24           MR. WELSH:  It's an email that he wrote, and he's
25   continuing in his position today as head of content for
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  AT&T.

2        THE COURT:  Right.  But what's the -- what does it

3  have a probative value to demonstrate?

4        MR. WELSH:  Sure, Your Honor.  He distinguishes

5  between a tier A and tier B in the programmers, which goes

6  to the body of the content.

7        Tier B, he puts companies such as AMC, Discovery,

8  Scripps, Showtime, and Starz.  He doesn't put Turner.  He

9  doesn't put HBO.  They're clearly the tier A of the

10 programmers.  That's a simple point I'm trying to make,

11 Your Honor.

12       THE COURT:  But remember now, you're supposed to

13 be doing the form of direct examination, albeit it's a

14 hostile witness.  But, I mean, my guess is if you just ask

15 him the question, you could establish that he believes that

16 those would be in tier A, wouldn't he?

17       MR. WELSH:  I'll try, Your Honor, but I'm not sure

18 that he will.  That's why I wanted to put the document in.

19 We did talk about this document in his deposition.

20       THE COURT:  Why don't you ask him the question as

21 to how he divides the groups.  And tier A would include the

22 ones that you believe this email suggests that he thinks is

23 in there.

24       MR. WELSH:  Sure.

25       THE COURT:  And if it turns out that he does agree

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    with it, we don't even need this.

2         MR. WELSH:  Okay.

3         THE COURT:  But now if it turns out that he

4    doesn't, then you can confront him with this and say, well,

5    wait a minute.  This is what you said.  Let's see how that

6    plays out.

7         MR. WELSH:  Thank you, Your Honor.

8         (Open court)

9         THE COURT:  You may proceed when you're ready.

10        MR. WELSH:  Thank you, Your Honor.

11   BY MR. WELSH:

12   Q    Mr. York, when you look at the programmers, you do

13   consider Turner to be the top tier -- in the top tier of

14   programmers, don't you?

15   A    I wouldn't necessarily put it that way in the

16   context of this.  I mentioned that there are five

17   programmers that are more tier B, which I guess that would

18   leave out of 16, Time Warner, one of the top 11 that

19   isn't -- that's not as much tier B, if that answers your

20   question.

21   Q    Well, I'm asking the question separate from this

22   document right now, which is you consider Turner and HBO to

23   be in a top tier, the tier A of programmers; isn't that

24   true?

25   A    I think that depends.  Depends on the context.

1    They're important programmers to us.

2        Q    You put them at a much higher level than you do

3    programmers such as AMC, Discovery, Scripps, Showtime, and

4    Starz; isn't that the fact?

5        A    No.

6        Q    Look at PX154.  This is an email that you wrote to

7    your boss, April 3, 2015, true?

8        A    Yes.

9        Q    And down below, you list Turner networks,

10   Time Warner, and HBO, among other companies, don't you?

11       A    Yes, among 16.

12       Q    And what you listed here when you -- up above that

13   in the paragraph beginning with "obviously," you said,

14   "Obviously, companies like AMC, Discovery, Scripps,

15   Showtime, and Starz are more tier B."

16            Did I read that correctly?

17       A    Yes.  More tier B, yes.

18       Q    You can put that to the side.

19            Now, when you go into negotiations with

20   programmers, one of the things that you do is you consider

21   the economic loss to DirecTV or AT&T if you're unsuccessful

22   in those negotiations, and the network or networks go down,

23   go dark; isn't that right?

24       A    Out of the hundreds of license agreements that we

25   do every year, we rarely do some analysis on projected

1  subscriber churn if we lose the content.

2      Q    And you talk about them being drop analysis, churn

3  analysis or drop analysis, right?

4      A    That's what they're -- when they're done, that's

5  what they're sometimes referred to.

6      Q    And you do them for some of the more important of

7  your programmers in terms of the content and the dollar

8  values that are at stake; isn't that fair?

9      A    Not necessarily.

10          We don't do them much, if at all, anymore.  It

11  just really depends on how the bid and the ask look as we go

12  into the negotiation.

13      Q    Well, you did them at DirecTV, true?

14      A    We did them more at DirecTV than we certainly have

15  done in the last few years.

16      Q    And you've also done them at AT&T?

17      A    I think we've done a couple in the last couple

18  years.

19      Q    And let's look at an example of a drop analysis.

20  If you'd look at PX74 in your binder.

21          Tell me when you're there, sir.

22      A    I'm there.

23      Q    Now, PX74 is your December Board of Directors

24  deck; isn't that's true?

25          MR. WALTERS:  Your Honor, may we approach?

1          THE COURT:  You may.

2          (Sealed bench conference)

3          MR. WALTERS:  Your Honor, this is a deck that

4  concerns Disney.  It's the same issue Your Honor dealt with

5  earlier today.  It does not concern Turner.  It's a deck

6  that concerns Disney drop analysis before the AT&T

7  acquisition.  Same issues Your Honor confronted earlier

8  today with Mr. Torres.

9          MR. WELSH:  This is a document, Your Honor -- it's

10  a deck that he provided to the Board of Directors of DirecTV

11  in December of 2014.

12          THE COURT:  Who's "he" in that sentence?

13          MR. WELSH:  Mr. York.  He's on it.

14          THE COURT:  Where is the --

15          MR. WELSH:  If you look on the next page on 02,

16  Your Honor.

17          This is his deck.  He provided it to the Board of

18  Directors of DirecTV.  He's talking about renewals of

19  contracts, including Disney ESPN.

20          THE COURT:  Yeah.

21          MR. WELSH:  And we believe that it's important and

22  relevant to the issues regarding his economic analysis

23  impact analysis that he was talking about that they would

24  follow with some of the bigger program contracts that they

25  were involved with.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. WALTERS:  Your Honor, this is the same

 2   economic impact that you dealt with earlier today.  It's the

 3   identical one, and it concerns Disney.  It has nothing to do

 4   with Turner.

 5              THE COURT:  Talking about the one for McKinsey?

 6              MR. WALTERS:  No, no.  The one with Mr. Torres

 7   earlier today, if you'll recall.

 8              THE COURT:  Oh.

 9              MR. WALTERS:  The Disney deck and the six-year

10   issue and all of that.  And Your Honor sustained that

11   objection because it had nothing to do with Turner.

12              This is the exact same thing.

13              THE COURT:  Tell me why this is relevant and

14   probative.

15              MR. WELSH:  Yes, Your Honor.

16              This gentleman, Mr. York, is over content

17   programming.  He's over DirecTV.  He's over content

18   negotiations at AT&T, same position.

19              What we want to do is just establish and explore

20   with him that they do these analyses -- they did an analysis

21   here when it came to Disney ESPN.

22              THE COURT:  He'll acknowledge all that.

23              MR. WELSH:  I think that's right, Your Honor.

24              THE COURT:  But you don't need this here for that

25   purpose.
```

1     MR. WELSH:  Well, what I wanted to establish --

2     THE COURT:  What -- you've gotten here what you

3  need.

4     MR. WELSH:  What I would like to establish,

5  Your Honor, is that the economic impact studies showed that

6  ███████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████

8  ███████████████████████████████████████████████

9     THE COURT:  Why?

10     MR. WELSH:  -- to come into the record.

11     It's important for -- I think the experts are both

12  talking about this.  The economic experts are talking about

13  this issue, Judge.  And we would like to get this fact into

14  record that when you look at a long-term blackout here --

15  and this one is a long-term blackout -- that the harm

16  here -- we're not talking about hundreds of thousands or

17  millions of dollars here, which is what the defense would

18  have you, I think, believe.  What we're talking about here

19  to these companies is billions of dollars that are at stake.

20     So if they go dark, post merger, if Turner were to

21  go dark with some of these companies, the kind of harm that

22  we're talking about is going to be in that sort of a

23  magnitude, Judge.

24     And it's going to really harm those companies.

25  It's going to harm the consumers down the path.  So that's

1    the point, simple point of just establishing that fact,

2    Judge.

3              MR. WALTERS:  Your Honor, we need to be clear

4    about this.

5              This is the deck, the so-called analysis that

6    Mr. Torres testified earlier about today.  Remember he said

7    the focus was on a week, a couple weeks.  It's short term.

8    All somebody did was draw a line out to six years.

9              He was responsible for that.  This man is not.

10   He's even further removed from it.  That was Mr. Torres'

11   responsibility.

12             And when they attempted to get that analysis in on

13   that basis and, of course, Your Honor sustained it.  It has

14   nothing to do with Turner --

15             THE COURT:  Six-year projection.

16             MR. WALTERS:  Yeah, it was a six-year projection.

17   But it was just a straight line.  The focus was on the

18   short-term drop.  That was the testimony -- let me finish.

19             That was the testimony this morning.

20             And he was responsible for it.  Mr. York is not

21   even responsible for any of this.  It was input into this

22   deck that Mr. York then had.

23             So for all of the same reasons Your Honor

24   sustained the objection this morning go to this effort to

25   try to put it in and even one more, which is he was he

1   wasn't even responsible for it.

2          MR. WELSH:  Your Honor, it's his --

3          THE COURT:  Why don't you ask him some questions

4   to find out his knowledge and recollection about the issue

5   of the consequences to the company of going black.

6          You have some reason to doubt that he would

7   acknowledge that it would be very expensive to the company

8   to go black.  The company would sustain huge losses if it

9   went black.

10          My guess is he will say the opposite, that he'll

11   say it would do that.  My guess is, and it's a guess,

12   that -- I mean, you did the deposition.  You know what he's

13   going to say in response to these questions.  You know it.

14          MR. WALTERS:  If I'm allowed, he does know what

15   he's going to say.  And he's going to say is, if we would

16   have lost X billions of dollars, we would have saved even

17   more because we wouldn't have had to pay Disney.  That's

18   what he's going to say.

19          MR. WELSH:  That's the defense counsel's argument.

20          THE COURT:  That's his testimony in the

21   deposition.  You obviously know that.  You know what he's

22   likely to say.

23          This deck here --

24          MR. WALTERS:  It's just not Turner.

25          MR. WELSH:  Am I allowed -- the issue of it not

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   being Turner is not the point.

2          THE COURT:  If you use it to refresh his

3   recollection, you can.  You can use it.  You can confront

4   him with statements he's made previously in his deposition

5   or whatever.  And if they're inconsistent with what's in

6   here, I just don't see --



1              ████████  ████████████

2              ████████  ████████████████████████

3              ████████  ████████

4              (Open court)

5    BY MR. WELSH:

6         Q    Mr. York, I want to come back and talk to you

7    about PX74 a bit, okay?  We're going to talk just generally

8    about it, all right?

9         A    Yes.

10        Q    I just want to be clear, that this is a deck that

11   you presented to the Board of Directors of DirecTV, right?

12        A    I don't recall if I actually presented this deck

13   at the meeting.

14        Q    Well, all right.

15             "Presented" is probably the wrong way of talking

16   about it.

17             You prepared decks in advance of the board

18   meetings at DirecTV, right?

19        A    Not for every board meeting, from content, no.

20        Q    But you did do a board deck here for December of

21   2014 for the Board of Directors; isn't that true?

22        A    It appears so, yes.

23        Q    And the board deck here is talking about a number

24   of different renewals, one of which is the -- some of the

25   programmers, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    They're -- yeah.  There are multiple renewals that

2    each have a page in this deck, yes.

3    Q    And back in this time frame of 2014, you were

4    having renewal negotiations and discussions, DirecTV was,

5    with Disney, correct?

6    A    Yes.  Their deal expired in December of '14.

7    Q    And as part of those discussions, impact analyses

8    were done internally at DirecTV so that you could get a

9    better understanding -- you and your team could get a better

10   understanding of what it would mean if the company were to

11   go dark with Disney; isn't that the case?

12   A    I wouldn't say that they gave us much of an

13   understanding on what might happen in the future.  We didn't

14   place much stock in these drop analyses.  We were just

15   trying to work off the deal that just was expiring.

16   Q    But you did have the analysis so that you had some

17   input, whatever weight you wanted to give it, that you would

18   have that input into the -- what would happen if it went

19   dark, that carriage went dark; isn't that a fact?

20   A    That work product created a future-looking

21   estimate.

22   Q    And you had that estimate.  That's what I'm trying

23   to establish.  You said that estimate?

24   A    It was created, yes.

25   Q    And the -- your understanding is, if you were to

1  lose Disney back in that time frame, the negotiations didn't

2  work out the way that you hoped and you lose Disney, there

3  would be an economic loss to DirecTV associated with that;

4  isn't that true?

5      A    There would.

6           There would also be a substantial content cost

7  savings as a result of that as well.

8      Q    But the loss would be the loss of the revenues

9  coming in for the subscribers of that constant, the loss,

10  the churn that results in the loss of the gross ads; isn't

11  that true?

12      A    Theoretically, yes.

13      Q    And that loss, with a company, programmer such as

14  Disney, that type of content, the loss of the subscribers,

15  the churn and the gross ads, that could be very significant

16  in terms of a dollar value looking out over -- year over

17  year to DirecTV?

18      A    It could be significant.

19           We never really looked a it on a year-over-year

20  basis.  It was really a short-term view that we focused on.

21      Q    So you never looked at it over a year --

22  I'm sorry, year-over-year basis?

23      A    Occasionally, we would -- whoever did this in the

24  marketing group, they would take -- I've never seen a really

25  long view.  Occasionally, they would do one.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1600

```
 1          But the purpose of it, the use of it was really
 2   what would happen if it were off for a day or a week or a
 3   couple weeks, maybe a month.  That's about as long as drops
 4   usually are in our experience at DirecTV.
 5        Q    For York, I'm going to ask you to look at PX108,
 6   and I'm going to direct you to page -- this is for
 7   identification and impeachment, Your Honor.  I'm going to
 8   have you look at page 46, which is a color copy of this
 9   PowerPoint.
10          Are you there?
11        A    Yes.
12        Q    The top of it says "Economic Impact Summary,"
13   correct?
14          MR. WALTERS:  Your Honor, we need to approach.
15          THE WITNESS:  Correct.
16          THE COURT:  All right.
17          (Sealed bench conference)
18          MR. WALTERS:  This is the very document, the very
19   document that you sustained the objection to, and the
20   witness has now testified that he didn't even do it;
21   somebody in the marketing group did it.  There is no basis
22   for the admission of this document or the use of it.
23          MR. WELSH:  I'm not asking to have it admitted.
24   I'm using it for impeachment.  I thought I was fairly clear
25   in my point.  It was marked for identification, and I'm
```

 1   using it for impeachment purposes.

 2        MR. WALTERS:  There is absolutely -- there's no

 3   impeachment value to it.  He is -- he literally just

 4   testified these are done for short-term.  Every once in a

 5   while, they'll stretch out.  They will just straight-line it

 6   to fill a gap.  There's nothing to impeach here.

 7        MR. WELSH:  Well, counsel wants to testify.

 8   That's not what the witness' testimony was.  What the

 9   witness' testimony was, that goes on very short-term.  Every

10   once in a while we go out to a year.  That was his

11   testimony.

12        MR. WALTERS:  No, no, it wasn't.  He said -- no,

13   no, no.  He said every once in a while we'll go out -- every

14   once in a while we'll go out year after year, but the focus

15   of the analysis, the analysis is short-term.  That's what he

16   said.

17        There's nothing inconsistent about this document

18   with his testimony.  He's just trying to circumvent the

19   earlier rulings.

20        MR. WELSH:  I am not trying to do that.

21        THE COURT:  I'm not going to admit it.

22        He's using it to refresh his recollection.  But in

23   some situations, there were whatever your call these things,

24   charts done, slides done, that would carry it out more than

25   a week or a month, something like that.

 1         Now, let's be very clear about this.  He has

 2    testified under oath.  He's locked in that he didn't pay

 3    much attention to anything beyond weeks and months because,

 4    in his experience, he never went usually more than days or

 5    weeks.

 6         Do you understand?

 7         MR. WELSH:  I understand.

 8         THE COURT:  He's locked in on that, so we're not

 9    going to beat this dead horse.

10         MR. WELSH:  I'm not trying to beat the dead horse.

11         THE COURT:  If you show it to refresh his

12    recollection to establish the point that they would

13    sometimes run out past weeks or months, he's either going to

14    say it refreshes or it doesn't refresh.  But we're not going

15    to read this into the record.

16         MR. WELSH:  All I was going to do -- I just want

17    to impeach him with the document.  I think his testimony is

18    inconsistent.

19         All I was going to say is this document, this page

20    goes out six years, doesn't it?  That's my only question on

21    that page, Your Honor.  Okay?

22         THE COURT:  See if he remembers that.

23         MR. WALTERS:  Thank you, Your Honor.

24         THE COURT:  You can do that.

25         (Open court)

1    THE COURT:  You may proceed, consistent with the

2  discussion at the bench.

3    MR. WELSH:  Thank you, Your Honor.

4  BY MR. WELSH:

5    Q    Mr. York, you have page 46 in front of you,

6  correct?

7    A    Yes.

8    Q    And do you see there, sir, that the analysis there

9  goes out -- this economic impact analysis goes out six

10  years, right?

11    A    Yes.

12    Q    Okay.  Thank you.

13    Now, let's move to a different topic, if we can,

14  Mr. York.  It's a related topic, though, involving carriage

15  disputes, okay?

16    A    Okay.

17    Q    Now, you look at going dark for your contract

18  negotiations sometimes.  But you also look at the

19  distributors going dark with a programmer as a potential

20  opportunity for AT&T-DirecTV; isn't that true?

21    A    It's something that we've noted that others have

22  disputes, yes.

23    Q    If a distributor, one of your competitors, has a

24  dispute, loses the programming, goes dark, then the consumer

25  that they have, if they want that programming that's gone

1  dark, they're going to be looking for another way of getting

2  that programming, right?

3      A    They may.

4      Q    Okay.  And in that case -- again, we hear about

5  churn.  They would leave that competitor, that distributor,

6  and they would go to another distributor who carries the

7  content, right?

8      A    If they're disconnecting because that content is

9  not available, they'll have a multitude of places to switch

10  to, yes.

11      Q    And one of those places, though, would be DirecTV

12  or AT&T, assuming that you have the content, right?

13      A    Depending on the content, that would be true of

14  about eight or nine or ten.

15      Q    Now, in 2014, Dish was in a contract dispute with

16  Fox.  His Honor's heard some about this, so I'm not going to

17  spend too much time on it.  But do you remember that

18  situation?

19      A    What year was that?

20      Q    2014.

21      A    I vaguely recall it.

22      Q    And do you recall, sir, that, as a result of that

23  dispute, Fox went dark with Dish?

24      A    I vaguely recall Dish having a dispute with Fox.

25      Q    Let me see if I can help your recollection a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1605

```
1    little bit.  If you look at the binder at PX24.

2              Are you there, sir?

3         A    Yes.

4              MR. WELSH:  PX24 has been marked for

5    identification purposes, Your Honor.  And provided to

6    defense counsel.

7    BY MR. WELSH:

8         Q    Mr. York, this is an email from you December 18,

9    2014, to Paul Guyardo and Ed Balcerzak; is that right?

10        A    Yes.

11        Q    And Mr. Guyardo is the head of revenue for DirecTV

12   at the time?

13        A    Yeah, marketing.

14        Q    Marketing, revenue, okay.

15             And you copied this to a couple people, but one of

16   them is Mr. White, your boss, right?

17        A    Correct.

18        Q    Now, this email here is talking about a

19   programming dispute that Dish was involved with at the time;

20   is that right?

21        A    Yes.

22             MR. WELSH:  Your Honor, I move for admission of

23   PX24.

24             MR. WALTERS:  No objection, Your Honor.

25             THE COURT:  It will be admitted.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1606

```
1           MR. WELSH:  Thank you.

2                               (Government's Exhibit PX24
                                received into evidence.)
3    BY MR. WELSH:

4        Q    Now, look at this e-mail, if you would, sir,

5    because I know a minute ago you were a little bit fuzzy on

6    some of the details back in that time frame.

7            So here we're talking about a carriage dispute

8    between Dish and Fox; isn't that true?

9        A    Yes.  You said Fox.  This is really Fox News.

10       Q    All right.  Fox News.

11       A    It's a different deal.

12       Q    Okay.  So there was a carriage dispute between

13   Fox News and Dish, correct?

14       A    I don't know if this came to dispute.  I don't

15   recall where this ended up.

16       Q    But the email that you wrote to the folks at

17   DirecTV, including your boss, was talking about Dish

18   programming disputes, possible drops.

19           Do you see that?

20       A    Yes.

21       Q    And the point that you're making to your

22   colleagues and your boss at DirecTV was that you wanted to

23   give them a quick heads-up on some upcoming gross ad

24   opportunities, right?

25       A    That's what the sentence says, yes.
```

1    Q    Okay.  And the gross ad opportunities would be the

2  potential for DirecTV adding subscribers that might fall off

3  from Dish should Dish go dark with Fox News, correct?

4    A    Yes.  I say we may get a lift in inbound calls as

5  a result of these disputes, yes.

6    Q    So you saw that as being an opportunity when one

7  of your competitors goes dark with popular programming?

8    A    I wouldn't call it an opportunity.  I was giving

9  the folks responsible for call centers a heads-up that the

10  phone may ring a bit more if these channels come off.

11    Q    Sure.

12         You saw it as an opportunity for DirecTV, and

13  that's why you told the call center to have their ears out

14  and open for calls from customers because they would want to

15  leave Dish and come to DirecTV?

16    A    I wouldn't phrase it that way.

17         THE COURT:  Put it in your own words.

18         THE WITNESS:  I was giving them a heads-up that

19  Dish was -- publicly reported these disputes were looming

20  and just letting the folks know who handle the inbound

21  calls, Ed Balcerzak and his boss, Mike, and Paul, who does

22  marketing and revenue, and his boss, Mike, hey, heads-up,

23  these channels may come off; you may get some calls -- may

24  get some calls.

25    Q    But you saw it, again, as an opportunity for

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    DirecTV to pick up customers, subscribers?

2        A     Yeah, you described it as hoping.  I didn't

3    describe it that way in this document or ever.

4        Q     Let's change subjects, if we can.

5              So the Court's heard about traditional pay TV, the

6    traditional pay-TV system.  I want to come back and talk

7    about this subject a bit.

8              So when I think of traditional pay TV, I think

9    about the companies like the cable companies, the satellite

10   companies with these, the big bundles of channels and

11   networks is.  That also your understanding?

12       A     Traditional pay TV isn't about big bundles,

13   per se, if that's what you're referring to.

14       Q     Well, traditional pay TV is the cable companies

15   and the satellite companies and the TelCo companies; isn't

16   that true?

17       A     In most sizable markets, there would be a cable

18   operator, multiple in a DMA, in a market.

19             There would be a TelCo.  There would be two

20   satellite companies.  In a lot of markets, there's another

21   private entity that would be kind of considered another

22   over-builder.  So those would be five kind of traditional

23   MVPDs, if that's the question.

24       Q     All right.  Let's talk and refer to -- talk about

25   and refer to them as being traditional MVPDs for discussion

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 1584 of 3826

1609

 1   purposes.

 2           So AT&T U-verse and DirecTV's satellite business,

 3   you would put those into the traditional pay-TV category?

 4       A    Yes.  That's how they're typically defined in the

 5   industry, yes.

 6       Q    And then distributors that are trying to get their

 7   programming out over the Internet, we've heard some about

 8   that.  They would not be part of this traditional pay-TV

 9   ecosystem, the virtual MVPDs?

10       A    You're talking about, you said programmers or --

11       Q    I'm talking about the distributors are trying to

12   get the program, the content out, that are going over the

13   top, over the Internet.  The virtual MVPDs, you don't put

14   that into the category of the traditionals?

15       A    Aside from the category I just defined, there is

16   something that's considered a virtual MVPD, which is a

17   company that offers linear channel bundles and other things

18   over the Internet, over wireless, without owning the

19   satellite infrastructure or the closed network with a local

20   franchise agreement.  Some of those virtual MVPDs also

21   happen to be owned by traditional MVPDs.

22       Q    But in terms of your, the way you described it a

23   moment ago, you didn't put the virtual MVPDs into that

24   grouping of the traditionals; isn't that a fair statement?

25       A    You asked me, what is a traditional MVPD?  And

1    that's basically how the industry has come to define them.

2         Q    So you accept the definition that traditional is

3    separate from the virtual MVPDs?  You accept that for

4    purposes of today?

5         A    I think the industry as a rule, that's how they're

6    defined.

7         Q    Let's go with that.  Let's go with the industry

8    definition here.

9              And then programmers who were trying to go direct

10   to consumer, that would also be outside the traditional,

11   wouldn't it, based on the industry?

12        A    Typically, yes.

13        Q    Now, in the past, you and your colleagues at AT&T

14   have not been too keen when the programmers have tried to go

15   around AT&T or DirecTV with their offerings; isn't that

16   true?

17        A    Depending on the nature of what was going on, were

18   we getting offered parity for our business and our

19   customers, we may have been unhappy.

20        Q    Well, Starz is a premium channel.  We've heard a

21   little bit about them in this case.  They're a premium

22   channel, correct?

23        A    They are.

24        Q    And DirecTV --

25        A    Can I amend that answer?

 1          They're considered a premium, but their channels

 2   are often packaged much like a basic cable network in some

 3   instances.  They're kind of a mix from time to time.

 4        Q    Okay.

 5             Now, DirecTV distributed Starz in 2016; is that

 6   true?

 7        A    Yes.

 8        Q    And Starz came out with a direct-to-consumer app

 9   at that time, didn't it?

10        A    It did.

11        Q    And with that app, the way it worked, a consumer

12   could bypass DirecTV-AT&T and could go directly to the

13   consumer; isn't that true?

14        A    Much like many programmers do direct to consumer,

15   yes.

16        Q    And you and your content group became aware of

17   this app, and you talked with or you sent an email off to

18   your boss, Mr. Stankey, talking about it, right?

19        A    I don't recall.  I may have.

20        Q    All right.  Let's see if I can help you with your

21   recollection on it.

22             MR. WELSH:  May I approach, Your Honor?

23             THE COURT:  You may.

24             MR. WELSH:  May I approach the witness,

25   Your Honor?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1            THE COURT:  You may.

 2  BY MR. WELSH:

 3       Q    Mr. York, if you look at PX539, which has been

 4  marked for identification purposes, it's a single page with

 5  the two emails, one from Mr. Stankey to you, on April 22,

 6  with your response on April 22.  If you could read that to

 7  yourself, sir.

 8       A    Okay.

 9       Q    Now, looking at 539, sir, does that help to

10  refresh your recollection as you had an email exchange with

11  your boss, Mr. Stankey, in 2016 regarding Starz, with their

12  app going directly to the consumer?

13       A    It does.

14       Q    And in responding to Mr. Stankey's email to you

15  about what we're doing, you see his email there?

16       A    Yes.

17       Q    Then you responded back on April 22, commenting to

18  him about what you and the content group believed, true?

19       A    What we believed?

20       Q    What you and the content group felt about this,

21  correct?

22       A    Yes.

23       Q    And what you told Mr. Stankey was, in preview,

24  that you and -- and the content, that's reference to the

25  content group, isn't it, your group?
```

1    A    Yes.

2    Q    That you hate it, meaning the app that Starz had,

3  correct?

4    A    Let me be clear.  What we hated was not the

5  existence of this direct-to-consumer app.

6         What Starz did, they took two channels, Starz and

7  Encore, which we offer two different ways to 25 million

8  customers, and blended them into one experience.  And we

9  didn't have the ability to do that.

10        So our customers, if they wanted to get

11  authorized, over TV Everywhere, would be incredibly confused

12  as to what service they were actually getting.  That's what

13  we hated.

14   Q    You didn't say any of that in the email back to

15  Mr. Stankey, did you?

16   A    If you read the app, that's exactly what the -- or

17  read the news and what we had been discussing to the

18  company, that's all this was about.

19   Q    My question was, I think, simple, so we'll try it

20  again.

21        You didn't say that to Mr. Stankey in the email

22  that you wrote to him that day, true?

23   A    I didn't need to.  It had already been discussed.

24   Q    Now, in 2016, Mr. York, you found out that Turner

25  had offered split-screen viewing to Apple TV, right?

*** REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER ***

1     A     Yes.

2     Q     And it wasn't offered to AT&T-DirecTV; isn't

3  that's true?

4     A     It was available to our customers on someone

5  else's devices and platforms but not ours.

6     Q     And you would agree with me that Apple TV would

7  not be in the industry definition of traditional pay TV,

8  right?

9     A     Yes.

10    Q     Okay.  So I'd like you to look at PX0228 in your

11 binder.  It's been marked for identification.  228, yes.

12          Are you there, sir?

13    A     I am.

14    Q     Now, 228 is an email, starts off from Mr. Stankey

15 to you, March 8th, 2016, raising this issue about the split

16 screen that's offered to Apple TV for March Madness, right?

17    A     Again, it was offered for customers of DirecTV and

18 other affiliates to experience it that way on Apple TV.

19    Q     Mr. Stankey writes you about this split screen,

20 correct?

21    A     Yes.

22    Q     And then you responded back to Mr. Stankey on

23 March 9, 2016, as well, right?

24    A     Correct.

25          MR. WELSH:  Your Honor, I would move for admission

 1   of PX228.

 2          MR. WALTERS:  No objection, Your Honor.

 3          THE COURT:  It will be admitted.

 4                              (Government's Exhibit PX228
                                 received into evidence.)
 5   BY MR. WELSH:

 6      Q    Now, Mr. Stankey in his email to you about the

 7   split screen, he writes to you, I feel like we should start

 8   writing letters to the top every time they intro a feature

 9   that deteriorates the value of a bundle and don't pass it

10   through to us.

11          Do you see that?

12      A    I do.

13      Q    And the top he's referring to, that would be the

14   top CEOs of the companies to which he would want the letters

15   written and complained, correct?

16      A    I didn't write it, but I would assume so.

17      Q    And he goes on to say, after he talks about it

18   deteriorating the value of the bundle -- you understand the

19   bundle to be the type of channels and networks that DirecTV

20   has with its bundle on DBS satellite, right?

21      A    I'm not sure.  It may be that.  It may be other

22   kind of bundles as well.

23      Q    But what he then goes on to say is, "It sets me on

24   fire," right?  That was Mr. Stankey's words to you?

25      A    That -- he wrote that, yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1616

1     Q    And in response, he wrote, "You had the same

2   visceral reaction, didn't you?"

3     A    I did.

4     Q    And then you went on and you actually prepared a

5   draft letter that would go to the top of Time Warner, didn't

6   you?

7     A    I believe I did.

8     Q    And that was going to go to Jeff Bewkes, the CEO

9   of Time Warner, right?

10    A    I believe so.

11    Q    If you look at PX40.

12         Now, PX40, which is for identification purposes,

13  PX40 is your email to Mr. Stankey on March 9, 2016, right?

14    A    Yes.

15    Q    And here, consistent with the other email we just

16  looked at, this exchange about the dual screen for

17  March Madness, here, you're providing your draft letter to

18  Mr. Jeff Bewkes on this Apple TV exclusivity point, correct?

19    A    I don't know if it was about exclusivity, no, but

20  this is a draft note, but not necessarily about exclusivity.

21    Q    But it's a draft note in response to the other

22  email we just looked at about the split-screen Apple TV

23  issue that set Mr. Stankey on fire and you had the same

24  visceral reaction about; isn't that connected to this?

25    A    That this is a draft note, yes.

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 1592 of 3826

1617

1    Q    And the draft note that you prepared, it says,

2  "Dear Jeff."  That was your intention that it go to

3  Jeff Bewkes of Time Warner, correct?

4    A    Correct.

5         MR. WELSH:  Your Honor, I move for admission of

6  PX40.

7         MR. WALTERS:  Your Honor, we have no objection to

8  its admission.  There are two specific numbers in there,

9  dollars numbers, that are under -- that we would ask to be

10 admitted under seal, and they're identified in the

11 documents.

12        THE COURT:  It will be admitted under seal.

13                              (Government's Exhibit PX40
                                received into evidence
14                              under seal.)

15        THE COURT:  Would this be a good time to take the

16 evening recess?

17        MR. WELSH:  It would, Your Honor.

18        THE COURT:  Okay.

19        Mr. York, you're a witness under oath in the case.

20 That means that you're not at liberty to discuss your

21 testimony so far or what it might be when you return

22 tomorrow morning with anybody.

23        THE WITNESS:  Okay.

24        THE COURT:  Family, friends, your counsel, nobody.

25        THE WITNESS:  Understood.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  You'll be asked probably, tomorrow

 2    morning, under oath, have you discussed your testimony?

 3              You have to be able to say no.

 4              THE WITNESS:  Absolutely.

 5              THE COURT:  So see you back at 10:30 tomorrow

 6    morning.  You can step down.

 7              THE WITNESS:  All right.  Thank you.

 8              THE COURT:  I'll see counsel.

 9              (Sealed bench conference)

10              THE COURT:  Where are we?

11              MR. WELSH:  Do you want me or do you want

12    Mr. Conrath -- probably Mr. Conrath based on your question.

13              THE COURT:  Well, we've got to find out what you

14    and your counterpart, how much time you need for this

15    witness.  So why don't you get --

16              MR. PETROCELLI:  I have.

17              THE COURT:  Do you know?

18              MR. PETROCELLI:  I have an idea, Your Honor.

19              THE COURT:  All right.  I'm trying to figure out

20    tomorrow's schedule.

21              MR. PETROCELLI:  And I want to address another

22    issue.

23              THE COURT:  All right.  Well, Conrath can come up

24    if he wants.

25              MR. WELSH:  You want Mr. Conrath?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  Well, if he wants to.

 2              How much more have you got on direct or cross,

 3    whatever you want to call it?

 4              MR. WELSH:  Because of all the interruptions, I'm

 5    a little behind, Your Honor, so I do apologize.

 6              THE COURT:  A half hour?

 7              MR. WELSH:  I would say -- give me one second to

 8    look because a lot's being potentially excluded.

 9              So probably a half hour to 45 minutes, I would

10    think, Your Honor.

11              THE COURT:  All right.

12              MR. PETROCELLI:  I would say about one hour total

13    for cross.

14              THE COURT:  Okay.  So an hour for you all?

15              MR. PETROCELLI:  He's got another 45, did you say,

16    in addition to what you just did?  So I would say an hour

17    total for us.

18              THE COURT:  All right.  So that's kind of

19    tomorrow.  All right.

20              So now who's after this person?

21              MR. WELSH:  I'm going to pass it to Mr. Conrath.

22              THE COURT:  All right.  Pass it on.

23              Is that Gibson?

24              MR. PETROCELLI:  Gibson.

25              MR. CONRATH:  Can I -- I'm sorry.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    MR. PETROCELLI:  Manty and Sambar, right?

2    MR. CONRATH:  I'm sorry.  I couldn't hear.

3    MR. PETROCELLI:  Who's next?

4    MR. CONRATH:  Your Honor, I just wanted to get the

5    times we have so far.

6    THE COURT:  Three quarters --

7    MR. CONRATH:  Right.

8    THE COURT:  -- for you and one hour for them.

9    MR. CONRATH:  Got it.  Okay.

10    So --

11    THE COURT:  Which gets us to Gibson, I think.

12    MR. CONRATH:  Gibson is next, right?

13    THE COURT:  Yeah.

14    What's your thinking on him?

15    MR. CONRATH:  30 minutes.

16    THE COURT:  All right.  I'll put three quarters to

17    be safe, just to be safe.

18    MR. PETROCELLI:  30 minutes --

19    THE COURT:  Half hour.

20    MR. PETROCELLI:  -- or less.

21    THE COURT:  All right.

22    And then after Gibson is -- who's after Gibson?

23    MR. CONRATH:  Mr. Manty.

24    THE COURT:  Manty.

25    Manty.

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1621

```
 1              MR. CONRATH:  Can I consult with my colleague

 2     before I get the time on that?

 3              THE COURT:  Oh, no.  Go ahead.

 4              (Pause)

 5              MR. CONRATH:  An hour to an hour and 15 minutes,

 6     Your Honor.

 7              MR. PETROCELLI:  Less than that for us,

 8     45 minutes.

 9              THE COURT:  What's his position?

10              MR. PETROCELLI:  He's the young kid out of

11     business school that I talked about in opening statement or

12     some of the arguments.  He's now like been at the company

13     about four or five years, I think.

14              THE COURT:  Oh, okay.

15              MR. PETROCELLI:  These are related to various

16     documents.

17              THE COURT:  All right.

18              MR. CONRATH:  He's in the strategic planning

19     department, so it's about strategic issues.

20              THE COURT:  Okay.  So who's after him?  There's

21     likely to be room for at least one more.

22              MR. PETROCELLI:  For sure.

23              MR. CONRATH:  Yeah, I think so, definitely.

24              THE COURT:  Now, we leave early tomorrow.

25              MR. PETROCELLI:  4:30.
```

1       MR. CONRATH:  What time?

2       MR. PETROCELLI:  Is that what you said?

3       THE COURT:  I thought I said 4:00, but I'll

4  double-check.  I've got to go over to Georgetown.

5       MR. CONRATH:  That's what we thought.  The other

6  Georgetown, not the law school.

7       THE COURT:  The university.

8       Who's after Manty?

9       MR. CONRATH:  That's 20, 30 minutes.

10       THE COURT:  Who's after Manty?

11       MR. PETROCELLI:  Sambar.

12       MR. CONRATH:  Oh, S-a-m-b-a-r.  Sambar.

13       THE COURT:  Okay.  How long is that's going to

14  take?

15       MR. CONRATH:  20 to 30.

16       MR. PETROCELLI:  I'd say --

17       THE COURT:  Say a half hour?

18       MR. PETROCELLI:  20 minutes.

19       THE COURT:  Okay.  That'll take care of tomorrow.

20       You won't get -- I mean, it would be great if we

21  could, but I don't think that's realistic to do all of those

22  tomorrow.  We can try.

23       MR. PETROCELLI:  Your Honor, I wanted to address

24  an issue -- and I apologize for any confusion.  You know, I

25  was listening in on the bench conferences with the

 1   earphones.

 2          And when we were in the arguments before opening

 3   statement dealing with various exhibits, I had indicated to

 4   you that certain exhibits should not be admitted because

 5   they are DirecTV materials prior to the acquisition of AT&T.

 6   And the law is that they are not admissions against the new

 7   owner, let alone Time Warner.

 8          I indicated to Your Honor that --

 9          THE COURT:  There's only a few documents that fall

10   in that category, right?

11          MR. PETROCELLI:  Well, there's only been a couple

12   so far; and only, I think, one has come into evidence so

13   far.

14          But here's the issue.  We intend to move to

15   dismiss DirecTV, but, of course, I was waiting until --

16          THE COURT:  The end of the government's case?

17          MR. PETROCELLI:  Exactly.

18          And so -- but on this exhibit binder that they

19   gave us for this witness, there are a number of

20   pre-acquisition documents.  So far you have only let one in.

21          And we didn't want to keep coming up and

22   interfering or taking up the Court's time or counsel's time.

23   But we do have this issue that if those documents are going

24   to be otherwise admissible on the theory that they're in the

25   case, then they need to be provisionally admitted to being

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  subject to exclusion if Your Honor were to grant that

2  motion.

3          THE COURT:  I don't remember those being admitted

4  as admissions against AT&T.

5          MR. PETROCELLI:  Well, there would be no other

6  basis to admit them.

7          Well, they would only be admissible against

8  DirecTV; but if DirecTV is no longer in the case, then those

9  exhibits don't have any --

10         THE COURT:  I see.

11         MR. PETROCELLI:  And, you know, I didn't want to

12 get into a legal argument now.  We obviously will give you

13 the law on that issue, which, frankly, is quite simple, that

14 unless your --

15         THE COURT:  I think that's correct.

16         MR. PETROCELLI:  Unless the party is going to be

17 buying or selling the assets, which DirecTV is not doing --

18 AT&T is acquiring Time Warner; DirecTV is disposing of

19 nothing or buying nothing.  In a pre-merger case, it's not

20 appropriate as a party.

21         In a post-merger case, if it was -- let's say the

22 merger was being attacked five years or later.  Some of the

23 cases say you can name a particular subsidiary.  It would be

24 relevant to the remedy of divestiture, because it's already

25 a merged company.  And maybe you'll want to divest an

 1    entity.  But we're in not in that situation now.

 2              So we'll give you the law on this, but I've been

 3    sort of quarterbacking the team from the desk here to come

 4    up and remind Your Honor of that issue, and I apologize if

 5    we've left it at bay.

 6              THE COURT:  Which is the one that you said I've

 7    admitted?

 8              MR. PETROCELLI:  The last one that came in.  It

 9    was the -- two documents ago.  It was an email --

10              THE COURT:  024?

11              MR. PETROCELLI:  024.

12              024, yeah.

13              Can I see it, please?

14              THE COURT:  Yeah.

15              MR. PETROCELLI:  This document here.  By my count,

16    it's the only pre-acquisition, wholly internal DirecTV

17    document that has come in.  And it can be admitted --

18              THE COURT:  Pre-acquisition of DirecTV?

19              MR. PETROCELLI:  Pre-acquisition of DirecTV,

20    exactly.

21              It could come in provisionally.  But if DirecTV is

22    dismissed from the case, there would be no basis for this

23    document to be admitted against AT&T or Time Warner.

24              THE COURT:  All right.  I'll give you a chance to

25    respond to that.

1        Don't cover that mic up.

2        MR. CONRATH:  So I think there are -- let's

3    remember there are a couple possible bases for documents to

4    come in.  So an admission of a statement, that of which --

5    we used to say an admission of a statement of a party

6    opponent, I think is the modern word there, but that would

7    apply to this.

8        But we've had documents in this case from business

9    records of Cox, of Charter, of various other third parties.

10   They're not admissible because they're defendants, though.

11   They're admissible because they're business records or

12   they're admitted to prove the state of mind or they're

13   admitted for other reasons and because they're admissible

14   and they're relevant to an issue in the case.

15       And so, for example, I think some of the documents

16   that we've proffered that come from DirecTV, even if they're

17   not admissible as a statement of a party opponent, they're

18   admissible because they're a business record of a company in

19   the business addressing an issue that is before the Court.

20       And obviously the Court decides what weight to

21   give them, just as you decide what weight to give AT&T

22   documents and the Charter, the Cox, or the Dish documents.

23       The fact that they don't have to come from the

24   defendant doesn't mean they're not admissible.  So I think

25   that might apply to some of the documents that we've talked

1   about today on which that issue came up.

2          THE COURT:  I'm going to look at this one

3   overnight, and I'll tell you tomorrow morning what by ruling

4   is.

5          MR. CONRATH:  And I heard another thought, I mean

6   if I can just mention it, the thought that one of the

7   reasons why a named subsidiary is appropriate as in a

8   litigation like this would be if it's necessary for a

9   divestiture.

10         And, of course, we've talked here about a remedy.

11         And I noticed Your Honor asked some questions of

12  the witness about the arbitration and be thinking about

13  whether it could be -- it prompts me to think about whether

14  there's a -- we would want to have an opportunity sometime

15  to address remedy, because, of course, we've talked about a

16  compete divestiture.  But in order to divest AT&T would make

17  DirecTV be made DirecTV-relevant or an injunction that says,

18  not -- you can't not block a whole transaction, but you

19  block only the acquisition of Turner.  Those are other

20  possible remedies that are available in the case.

21         And if we have a chance at some point -- since

22  Your Honor raised some questions about remedy, it made me

23  think there are those -- there's a range of issues that

24  might come up, including tweaking, as the question went to

25  the arbitration remedy, but also more narrow injunctions,

 1   another possibility that we would love to have the

 2   opportunity at some point to talk about.

 3          THE COURT:  Well, we're not going to get the cart

 4   ahead of the horse.

 5          MR. CONRATH:  I just wanted to say at some point

 6   we need to have the chance to address those since it kind of

 7   comes up in some of the discussions.

 8          MR. PETROCELLI:  Your Honor, their complaint makes

 9   no reference to any partial divestiture.  The idea that they

10   could seek the divestiture of Turner or DirecTV is nowhere

11   to be found in their complaint and would destroy the

12   complete economics of this deal.

13          They have alleged this case, and we have litigated

14   this case from day one on the basis that they are trying to

15   block the entire transaction.  That's number one.

16          Number two, they have resisted every opportunity

17   to deal with this arbitration remedy.

18          If this case, if they have an interest in dealing

19   with the arbitration issue, I'm happy to talk with them

20   about it.  But there's been no discussion about that.

21          And the idea that they can use this case somehow

22   to seek some partial remedy that is not alleged would put us

23   into a very serious case of not being able to meet any of

24   these new claims that I hear counsel starting to assert.

25          MR. CONRATH:  It's not a new claim.  It is

 1    effectively a lesser included.  It's clearly within the

 2    power of the Court, and I don't want to go any further than

 3    that.  It's within the --

 4              THE COURT:  Let's save this for another time.

 5              MR. CONRATH:  Another time.  I agree.  I just --

 6              THE COURT:  Now, I will tell you this, though.  If

 7    you're serious about making a motion to dismiss DirecTV --

 8              MR. PETROCELLI:  Yes.

 9              THE COURT:  -- then you need -- the two of you

10    need to be talking through how to best pursue that, because

11    if you're going to write a brief, they need time to respond

12    to it.

13              MR. PETROCELLI:  Of course, Your Honor.

14              THE COURT:  I don't want to find myself in a

15    situation where it's next Thursday morning and someone hands

16    me a 25-, 30-, 40-page brief from you.  They haven't had a

17    chance to even review the darned thing and respond to it.

18    That's not a good option.

19              MR. PETROCELLI:  No.

20              THE COURT:  So I think --

21              MR. PETROCELLI:  Not a good option.  I agree.

22              THE COURT:  If they're going to finish their case,

23    hopefully, by next Thursday, that's fine.  That's good.

24    That would be excellent.  Then they're going to need time to

25    respond to anything you put in a motion.

1     MR. PETROCELLI:  This is going to be a very short

2  motion because it's going to be based on the complete

3  absence of any evidence that DirecTV is involved in the

4  transaction at issue.  And it will be just some law on it.

5  It will be a very short brief.

6     But I'm happy to work out -- I could file it on

7  Monday.  I just didn't want to jump the gun.

8     THE COURT:  All right.  Think about how to -- talk

9  about that.

10     MR. PETROCELLI:  So we'll talk about.

11     THE COURT:  I don't want to get ambushed.

12     MR. PETROCELLI:  Absolutely.

13     THE COURT:  I've got enough to do here.

14     MR. PETROCELLI:  You do, Your Honor.

15     THE COURT:  I don't want to get ambushed.

16     MR. PETROCELLI:  That's why we're not filing

17  motions with the Court.

18     THE COURT:  Well, that's good.

19     MR. PETROCELLI:  Yes.

20     THE COURT:  Keep up the good work, both of you.

21     Now --

22     MR. CONRATH:  Now, I don't know.  There's come a

23  point -- I've got two questions.  One is a scheduling

24  question.

25     So we have a witness, Mr. Holanda from RCN, who

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   was scheduled to appear.  We had him here, had to send him

 2   home because he -- because we couldn't get him in because

 3   of, first, the snow and then the day -- the time that we

 4   spent with the transcript.

 5              THE COURT:  What's his name?

 6              MR. CONRATH:  Holanda, H-o-l-a-n-d-a.

 7              THE COURT:  Holanda.  Keep talking.  I'm

 8   listening.

 9              MR. CONRATH:  And so I am --

10              THE COURT:  Here he is.

11              MR. CONRATH:  Right.  So we had him there.  He

12   couldn't -- he got pushed back because of the snow a day and

13   a half a day because of the transcript, and we couldn't get

14   him in.

15              And so the next day he was able to come back is

16   the 12th.  At one point I thought that would be time to be

17   our last witness.  We may be done before that.

18              So I might be asking the Court, in cooperation

19   with counsel, for time to call him out of order and just --

20   I think they were going to get him here.  I hope that

21   wouldn't be a problem.

22              MR. PETROCELLI:  No.  I will work with you on

23   that.  That's not going to be a problem.

24              THE COURT:  That should be easy enough.

25              MR. CONRATH:  I think we're moving fast.  We're
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1632

```
 1    moving faster than I expected, Your Honor.

 2              And, finally, the other thing is --

 3              THE COURT:  What day is Shapiro?

 4              MR. CONRATH:  Well --

 5              THE COURT:  Because that's a long one.

 6              MR. CONRATH:  So I was --

 7              THE COURT:  That's the longest witness left.

 8              MR. CONRATH:  Right.  So I was expecting Shapiro

 9    to be Wednesday.

10              THE COURT:  Next Wednesday?

11              MR. CONRATH:  But we have moved faster.  Now --

12              THE COURT:  Could be Tuesday?

13              MR. CONRATH:  Could be Tuesday.  I'm worried that

14    we might get there Monday.

15              THE COURT:  Oh, really?  What about all these

16    other people?

17              MR. CONRATH:  Well, we've -- so we've eliminated

18    some of those, and so that's where we are.

19              THE COURT: All right.

20              MR. CONRATH:  I've got -- well, I'll just -- just

21    to get all my scheduling problems out for full disclosure,

22    I've got two other third-party witnesses that I couldn't get

23    here.  They're scheduled to go Tuesday.  I don't think I can

24    get them here Monday.  I tried.  So if we start Shapiro --

25              THE COURT:  If it's a question of we miss an hour
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   or something, that's not the end of the world.

 2          MR. PETROCELLI:  Can't miss a whole day, though.

 3          THE COURT:  We break an hour early on Monday or

 4   something.  I have to teach Monday anyway.  So if we break a

 5   little early, it's not the end of the world.  Don't feel

 6   like it.  I'm not going to bark at that.  Come on.

 7          MR. CONRATH:  I will do my best.

 8          MR. PETROCELLI:  Yeah.

 9          THE COURT:  That's a given.

10          MR. CONRATH:  Okay.  Thank you.

11          And, finally, we are going to carefully think

12   about whether we do need to protect our rights by filing

13   something on this issue of the work, coordinated effects of

14   the issue.  I think that's a substantial right for us.  And

15   I think we said, let's file something if you want.  And

16   I don't --

17          THE COURT:  Well, I gave you the option of going

18   with the other witnesses.  Hold off on York.  File a brief.

19   I want to give them a chance to respond.

20          Look, if you're going to write a brief, I'm going

21   to let him respond to it.

22          MR. CONRATH:  Okay.

23          THE COURT:  They can't do that in ten minutes.

24   They've got a big team, but they can't do it that fast.

25          MR. CONRATH:  No.  And I guess -- we request.

1    And we know that obviously it's a hurdle.  We're going to

2    request an opportunity to re-call him and give that

3    testimony.  And obviously Your Honor has to make a decision.

4    But we need to make that request --

5              MR. PETROCELLI:  But he's not going anywhere.  He

6    works for us, and so we just need an appropriate time to

7    respond.

8              THE COURT:  Look, you file whatever brief you

9    want, just understand they're going to get a fair amount of

10   time to respond to it.  But obviously I have to read the

11   darned thing.  I'll read it.

12             If you want to make an argument, we can make an

13   argument.  If he needs to be re-called, he can be re-called.

14   But you've heard my concerns about this issue.

15             MR. CONRATH:  Yes, absolutely.

16             THE COURT:  I have very serious concerns about

17   this issue.

18             MR. CONRATH:  We'll address that.

19             And if we got it by the end of the day tomorrow,

20   would that be sufficient?

21             THE COURT:  So then they need --

22             MR. PETROCELLI:  Is that sufficient?  How big of a

23   brief are you filing?

24             THE COURT:  Keep it under ten pages.

25             MR. CONRATH:  Absolutely.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1            THE COURT:  So they could turn something out in

 2    two days, right?

 3            MR. PETROCELLI:  Yes, two days we can, yes.

 4            THE COURT:  He has lots of boys.  Not as many as

 5    him, but he has lots.

 6            MR. PETROCELLI:  No.  He has way more.

 7            MR. CONRATH:  They have many, many more.  It's

 8    just that theirs aren't here, Your Honor.  They're hidden.

 9            MR. PETROCELLI:  Speaking of that, some of these

10    witnesses that they're going to call are not

11    upper-management people.  And because they're coming up

12    quickly -- and I'm sensitive to Your Honor's concern, but

13    I was going to have my colleague, Ms. Robson, handle a

14    witness.  She's done witnesses in antitrust trials --

15            THE COURT:  That's fine.

16            MR. PETROCELLI:  -- before.  I didn't want to --

17            THE COURT:  I mean, he's had lot of youngsters

18    come up.

19            MR. PETROCELLI:  She's a partner.

20            THE COURT:  She's not a youngster.

21            MR. PETROCELLI:  She's not a youngster.  Yeah.

22    Actually, she's had more antitrust experience than I have,

23    okay?

24            THE COURT:  She's not a youngster.

25            MR. CONRATH:  Be careful of what you say.

```
 1              MR. PETROCELLI:  Okay.  Thank you very much,

 2      Judge.

 3              THE COURT:  Have a nice drink.  You'll feel

 4      better.

 5              MR. PETROCELLI:  Two.

 6              THE COURT:  Get two.

 7              (Open court)

 8              THE COURT:  I'll see you at 10:30, Counsel.

 9              DEPUTY CLERK:  All rise.

10              This Honorable Court now stands in recess until

11      the return of court.

12              (Proceedings concluded at 6:00 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E

       I, William P. Zaremba, RMR, CRR, certify that

the foregoing is a correct transcript from the record of

proceedings in the above-titled matter.


Date: April 4, 2018_____      /S/__William P. Zaremba_____

                                  William P. Zaremba, RMR, CRR

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CV No. 17-2511 |
| | ) | |
| | ) | Washington, D.C. |
| vs. | ) | April 5, 2018 |
| | ) | 10:50 a.m. |
| AT&T, INC., ET AL., | ) | |
| | ) | Morning Session |
| Defendants. | ) | |
| _____ | ) | Day 9 |


TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                            Eric D. Welsh
                            Donald G. Kempf, Jr.
                            Lawrence A. Reicher,
                            Jared A. Hughes
                            Julie S. Elmer
                            U.S. DEPARTMENT OF JUSTICE
                            Antitrust Division
                            450 Fifth Street, NW
                            Washington, D.C. 20530
                            (202) 532-4560
                            craig.conrath@usdoj.gov
                            eric.welsh@usdoj.gov
                            donald.kempf@usdoj.gov
                            lawrence.reicher@usdoj.gov
                            jared.hughes@usdoj.gov
                            julie.elmer@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:                        Katrina M. Robson
                                     O'MELVENY & MYERS LLP
                                     1625 Eye Street, NW
                                     Washington, D.C. 20006
                                     (202) 220-5052
                                     krobson@omm.com

                                     Daniel M. Petrocelli
                                     M. Randall Oppenheimer
                                     O'MELVENY & MYERS LLP
                                     1999 Avenue of the Stars
                                     8th Floor
                                     Los Angeles, CA 90067
                                     (310) 553-6700
                                     dpetrocelli@omm.com
                                     roppenheimer@omm.com

                                     Robert C. Walters,
                                     GIBSON, DUNN & CRUTCHER LLP
                                     2100 McKinney Avenue
                                     Suite 1100
                                     Dallas, TX 75201
                                     (214) 698-3350
                                     mraiff@gibsondunn.com

For Defendant
Time Warner, Inc.:                   Kevin J. Orsini
                                     Peter T. Barbur
                                     CRAVATH, SWAINE & MOORE LLP
                                     Worldwide Plaza
                                     825 Eighth Avenue
                                     New York, NY 10019
                                     (212) 474-1140
                                     korsini@cravath.com
                                     pbarbur@cravath.com

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

– – –

INDEX OF EXHIBITS

– – –

| GOVERNMENT'S | IDENTIFIED | ADMITTED |
|---|---|---|
| PX24 | | 1644 |
| PX42 | | 1656 |
| PX180 – | 1660 | 1662 |
| PX29 | | 1664 |
| PX487 | | 1667 |
| PX486 – | 1670 | 1670 |
| PX48 – | 1672 | 1676 |
| PX541 – | 1698 | |
| PX542 – | 1702 | |
| PX30 | | 1710 |
| PX11 | | 1716 |

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GOVERNMENT'S: | | | | |
| DANIEL YORK | 1653 | 1677 | 1692 | |
| TIMOTHY GIBSON | 1706 | 1718 | 1722 | |

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

P R O C E E D I N G S

DEPUTY CLERK:  All rise.  The United States
District Court for the District of Columbia is now in
session, the Honorable Richard J. Leon presiding.  God save
the United States and this Honorable Court.  Please be
seated and come to order.

Good morning, Your Honor.  We have Civil Action
No. 17-2511, the United States of America v. AT&T, Inc.,
et al.

Counsel for the parties please approach the
lectern and identify yourselves for the record.

MR. WELSH:  Good morning, Your Honor.  Eric Welsh
for the United States.

THE COURT:  Welcome back.

MR. WELSH:  Thank you.

MR. REICHER:  Good morning, Your Honor.
Lawrence Reicher for the United States.

THE COURT:  Welcome.

MR. HUGHES:  Good morning, Your Honor.
Jared Hughes for the United States.

THE COURT:  Welcome.

MR. CONRATH:  Good morning, Your Honor.
Craig Conrath for the United States.

THE COURT:  Welcome.

```
1              MR. CONRATH:  Thank you.

2              MR. KEMPF:  Good morning, Your Honor.  Don Kempf

3    for the United States.

4              THE COURT:  Welcome.

5              MS. ELMER:  Good morning, Your Honor.  Julie Elmer

6    for the United States.

7              THE COURT:  Welcome.

8              MR. PETROCELLI:  Good morning, Your Honor.

9    Daniel Petrocelli for defendants.

10             THE COURT:  Welcome.

11             MS. ROBSON:  Good morning, Your Honor.

12   Katrina Robson for defendants.

13             THE COURT:  Welcome.

14             MR. OPPENHEIMER:  Good morning, Your Honor.

15   Randy Oppenheimer for the defendants.

16             THE COURT:  Welcome.

17             MR. WALTERS:  Good morning, Your Honor.

18   Rob Walters here for Defendants AT&T and DirecTV.

19             THE COURT:  Welcome.

20             MR. BARBUR:  Good morning, Your Honor.

21   Peter Barbur for Time Warner.

22             THE COURT:  Welcome.

23             MR. ORSINI:  Good morning, Your Honor.

24   Kevin Orsini for Time Warner.

25             THE COURT:  Welcome.
```

1     All right.  I took under advisement the issue

2  yesterday of admissibility PX24.  The Court's reviewed it.

3  The Court will admit it as a business record under the

4  Business Records Exception to the Hearsay Rule, not as an

5  admission against the party.

6                               (Government's Exhibit PX24
                                 received into evidence.)

7            THE COURT:  All right.  I want to see counsel for

8  both sides.

9            (Sealed bench conference)

10           THE COURT:  Now, I haven't read it yet, but

11  I understand you all filed some motion about unsealing bench

12  conferences or something?

13           MR. CONRATH:  It was my request.

14           THE COURT:  What do you need it for?  You have two

15  people listening to every bench conference, one standing

16  here, one sitting there.  What is this for?

17           MR. CONRATH:  So I --

18           THE COURT:  What do I need it for?

19           MR. CONRATH:  I took extensive notes, so we'll be

20  able to respond to everything he said.

21           THE COURT:  You can respond to that, Craig.  You

22  know what was said.

23           MR. CONRATH:  Okay.

24           THE COURT:  Let me tell you something.  If we

25  start unsealing bench conferences, the risk starts rising

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1645

```
 1   precipitously something will accidentally get released to

 2   the press and the public, or just someone may strategically

 3   release something.

 4              MR. CONRATH:  Okay.

 5              THE COURT:  This trial -- I don't even want to say

 6   what I'm about to say, but I'm going to say it.  We've been

 7   dressed that we haven't had a lot of leaks.

 8              MR. CONRATH:  True.

 9              THE COURT:  A lot of confidential stuff that's

10   discussed at this bench, whatever.  Once we set that

11   precedence, I think it's risky.  I think it's dangerous.

12   We're moving along.  We picked up momentum.

13              I don't know.

14              What's your position, Mr. Petrocelli?

15              MR. PETROCELLI:  Our position was to defer to the

16   Court.  And, to be clear, we've been arguing about this

17   issue for a long time, so they know exactly what our

18   arguments are.

19              THE COURT:  Yeah.

20              MR. PETROCELLI:  And we just gave a brief summary.

21   And they don't -- we don't think it's necessary, but we

22   wanted to defer to Your Honor.

23              THE COURT:  Yeah.  I mean, look, you all know the

24   arguments.  I'm frankly, if I may pat myself on the back,

25   bending over backwards.
```

```
 1              MR. CONRATH:  Okay.

 2              THE COURT:  Normally, in a normal trial, I've

 3    ruled.  That's it.  We move on.

 4              I'm giving you a second bite at the apple, in

 5    essence, to submit something in writing.  They'll get a

 6    chance -- counsel is going to get a chance to respond in

 7    writing.  And if it becomes appropriate and necessary to

 8    bring this to your case for a limited purpose, then we'll do

 9    it.  But I'm not saying I will or I won't.  I don't know

10    yet; I will rule on it.

11              But you know how I've already ruled.

12              MR. CONRATH:  Yes.

13              THE COURT:  And in essence, this is a motion for

14    reconsideration.

15              MR. PETROCELLI:  It is.

16              THE COURT:  This is basically what it is, a motion

17    for reconsideration.

18              MR. CONRATH:  Right.  I think it was effectively a

19    motion in limine, but our position should have been filed

20    before.  And we're moving to reconsider; that exactly

21    correct.

22              MR. PETROCELLI:  There's no rule for timing of

23    motions in limine in a bench trial.  You can object to

24    evidence at any time.

25              In any event, Your Honor, we worked out the
```

 1   schedule.

 2            THE COURT:  You two work out.

 3            MR. PETROCELLI:  Yeah, we worked out the schedule.

 4            THE COURT:  You guys do it.  File under seal.

 5   File your response under seal.

 6            MR. PETROCELLI:  Okay.

 7            MR. CONRATH:  Okay.

 8            MR. PETROCELLI:  Now, we do have some good news

 9   for you, Your Honor, just to brighten up your day.

10            THE COURT:  Something.

11            MR. PETROCELLI:  Just to brighten up your day.

12            THE COURT:  I made the mistake of going by the

13   Tidal Basin this morning, a very big mistake.

14            MR. CONRATH:  Your Honor, about the schedule, we

15   think we may have a proposal on the schedule.

16            MR. PETROCELLI:  Here's what I'd like to discuss

17   with Your Honor.  He's going to finish the case next week,

18   and we're going to start our case next week.  And I think

19   we're going to be done the following week, at the end of

20   that following week.

21            THE COURT:  Really?

22            MR. PETROCELLI:  You gave us that five days that

23   week, right?

24            THE COURT:  I think that's the week of five.  Now,

25   if you can go four, I'd prefer to go four.

1    MR. PETROCELLI:  Well, you know what?  We don't

2  need to go the fifth day.  We can come back the following

3  week.

4    But what I'm saying is I think our case is really

5  going to shrink.

6    THE COURT:  You've pruned it down?

7    MR. PETROCELLI:  Yes.  Now, here's where we are.

8    He has a couple of witnesses —— and he's cutting

9  back too.  He has a couple witnesses on Monday.  He has a

10  couple witnesses on Tuesday.

11    THE COURT:  Let's get to Manty there today,

12  though, right?

13    MR. PETROCELLI:  Yeah, they're there.  Today, we

14  have a pretty good day.

15    But he might not have full days on Monday and

16  Tuesday.  And if it's all right with the Court, it's

17  all right with us; because on Wednesday and Thursday, we

18  have flown in our back-to-back experts.

19    Professor Shapiro and Professor Carlton will be

20  sitting in listening.  And then Professor Carlton

21  immediately testifies, and Professor Shapiro will be sitting

22  listening.

23    They both are professors at universities, and

24  we would like to lock in on Wednesday and Thursday to

25  complete both of their examinations.

1    So I decided to call him first in my case so that

2    you would have the benefit of hearing them both together.

3          THE COURT:  Okay.  That sounds smart.

4          MR. PETROCELLI:  Yeah, okay.

5          MR. CONRATH:  So that would be a full schedule for

6    next week, with a possibility that Monday or Tuesday --

7          THE COURT:  Bring them in early one day or both.

8          MR. CONRATH:  We will break both a little bit

9    early in order to have the prescheduled day.

10          THE COURT:  That sounds like progress.

11          MR. CONRATH:  We have the first four, I understand

12    now, the first planned four witnesses for defendants, and

13    I guess I'm waiting on some additional information so we can

14    get ready --

15          MR. PETROCELLI:  I'll give him some additional --

16    I'll give him some additional witnesses.

17          So if we finish Shapiro and Carlton on Wednesday

18    and Thursday of next week, when we come back on the 16th, he

19    has maybe one possibly or two witnesses he wants to put in

20    in our case.

21          THE COURT:  This is going out of order.  You want

22    to close in this case quickly.

23          MR. CONRATH:  Yes.

24          MR. PETROCELLI:  That's fine with me.

25          And then I'm going to call a couple of experts and

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 1625 of 3826

1650

1   a couple of facts witnesses, Your Honor.

2           I haven't made a decision; but, as I've told you

3   before --

4           THE COURT:  You're not going to have problems with

5   the AT&T CEO?

6           MR. PETROCELLI:  I am calling him and the

7   Time Warner CEO, both of them.

8           THE COURT:  So they would be the week of the 16th?

9           MR. PETROCELLI:  They're going to be the week of

10  the 16th.

11          Okay.  And then some other witnesses -- and, you

12  know, less is more.  And we've been doing this for a while

13  now.  I think you're kind of getting the picture of the

14  case.  We don't want to wear out our welcome.

15          THE COURT:  Well, you're not going to wear your

16  welcome out.  But I certainly appreciate any effort by

17  either or both sides to narrow the issues and focus the

18  issues on what they really think is most important to get

19  through it.

20          MR. PETROCELLI:  That's what we're trying to do.

21          THE COURT:  That's a win-win -- win-win-win.

22          MR. PETROCELLI:  Right.

23          MR. CONRATH:  We were -- I knew we were working to

24  streamline, but we went faster the last couple days than I

25  expected, which is why we might have a little downtime on

1    Tuesday.  So that's good.

2              THE COURT:  All right.  So Mr. Welsh, I believe,

3    said he has about another half hour or so, roughly, or

4    three-quarters of an hour with Mr. York.

5              MR. PETROCELLI:  We'll have less than I thought.

6              THE COURT:  He'll be released subject to recall.

7              MR. CONRATH:  Sure.  Thank you, Your Honor.

8              THE COURT:  And he'll be directed not to discuss

9    his testimony so far or what it might be when you come back.

10             If he's not called back, then he's released, so to

11   speak, to talk to whomever he wants to talk to whenever he

12   wants to.  All right?  You'll have to make sure that no one

13   on your side talks to him because he's going to be subject

14   to cross.

15             MR. PETROCELLI:  Well, I guess I would ask, then,

16   that you file that, and I'll respond right away so that we

17   can have that determined.

18             THE COURT:  You'll know the decision on all this

19   by Monday.

20             MR. PETROCELLI:  Okay.  Good.

21             THE COURT:  Because you're going to do yours;

22   you're going to respond.

23             MR. PETROCELLI:  Oh, right away, I'll respond.

24             THE COURT:  And then if there's any need for

25   argument, it will be first thing Monday morning.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1652

```
 1              MR. CONRATH:  Okay.

 2              THE COURT:  Then after the argument, I'll make a

 3     ruling immediately.  I'm not going to write an opinion, for

 4     God's sakes.

 5              MR. PETROCELLI:  You don't need to write an

 6     opinion.

 7              THE COURT:  No need.

 8              MR. PETROCELLI:  It's just in evidence.

 9              THE COURT:  No need.  But you know what the issues

10     are.  You know what my concerns were.  You know what his

11     concerns certainly are.

12              MR. CONRATH:  Okay.

13              MR. PETROCELLI:  Thank you.

14              THE COURT:  All right.

15              MR. PETROCELLI:  Hold on.

16              Your Honor, are we finishing at 4:30 or 4:00

17     today?  You have to go to Georgetown.

18              THE COURT:  4:00.  I've got to go through

19     rush-hour traffic to get there for an event that starts at

20     5:00.  So 4:30 would be too close.  I want to make it 4:00.

21              MR. CONRATH:  Well, maybe we could even stop in

22     place before we get to that point.

23              MR. PETROCELLI:  Thanks, Judge.

24              THE COURT:  All right.

25              (Open court)
```

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1653

1       THE COURT:  The witness can resume the stand.

2       Mr. York, you remain under oath, all right?

3       THE WITNESS:  Yes.

4       THE COURT:  Have a seat.

5       When you're ready, Mr. Welsh, you may proceed.

6       MR. WELSH:  Thank you, Your Honor.

7   DANIEL YORK, ADVERSE WITNESS FOR THE GOVERNMENT, HAVING BEEN

8   PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS

9   FOLLOWS:

10              DIRECT EXAMINATION (CONTINUED)

11  BY MR. WELSH:

12      Q    Good morning, Mr. York.

13      A    Good morning.

14      Q    Mr. York, I just want to get us back to where we

15  were at the break yesterday.

16          So I think when we stopped, we were talking about

17  Turner's innovation that they have with that split-screen TV

18  for March Madness viewing, which they provided to Apple TV.

19  And then your and Mr. Stankey's negative visceral reaction,

20  I guess is how you phrased it, to that development, okay?

21      A    Okay.

22      Q    And when you received that email from Mr. Stankey

23  and you responded back with your visceral reaction, you went

24  ahead and you drafted a proposed letter, note, I think, is

25  how you described it, to Mr. Jeff Bewkes, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1654

1      A      Yes.

2      Q      And what you proposed to have Mr. Stankey write to

3  Mr. Bewkes was to chastise Time Warner for its poor judgment

4  of providing such rights to a company that, to date, had had

5  a negative impact on your lucrative pay-TV business; isn't

6  that true?

7      A      May I look at the document.

8      Q      Can you answer my question?

9      A      I don't recall the exact wording.

10     Q      That was the essence of what you told Mr. Stankey

11  or that you proposed Mr. Stankey send to Mr. Bewkes.

12     A      In that case, do you mind repeating the sentence.

13     Q      That you were chastising Mr. Bewkes and

14  Time Warner for its poor judgment in providing such rights

15  to a company that has, to date, had a negative impact on the

16  lucrative pay-TV business.

17     A      I don't know if it's chastising other than just

18  expressing our frustration and disappointment.

19     Q      Well, look at PX40 in your binder.

20            And I'm going to direct you to your note that you

21  wrote where it says "Dear Jeff."

22            Do you see that?

23     A      Yes.

24     Q      And what you wrote midway down in that paragraph

25  was, "Beyond the poor judgment of providing such rights to a

1    company that, to date, has had a negative impact on the

2    lucrative pay-TV business."

3          Do you see those words?

4    A    Yes.

5    Q    Now, you went on and you told Mr. Stankey that you

6    were proposing that he also tell Mr. Bewkes that AT&T was

7    concerned because Time Warner's recent actions of giving the

8    exclusive March Madness deal to Apple and introduction of

9    HBO Now, that that suggested that they were taking the

10   relationship that they had with AT&T for granted, right?

11   A    Yes.

12   Q    And you also suggested that he tell Mr. Bewkes

13   that not only were they taking the relationship with AT&T

14   for granted, but that they were taking for granted pay TV in

15   general; isn't that true?

16   A    That's what the sentence says, yes.

17   Q    Now, a year earlier, you had a similar negative

18   reaction, didn't you, when you learned that programmers were

19   providing content to Dish Sling, which is a skinny bundle;

20   isn't that true?

21   A    I may have.  I don't recall.

22   Q    Look at PX42 in your binder, if you would.

23         Mr. York, PX42 is a series of emails between

24   yourself and Mr. White, the CEO of DirecTV, in July of 2015,

25   true?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1656

```
 1        A     True.

 2        Q     The topic of these email exchange here relates to

 3   Dish Sling, correct?

 4        A     Correct.

 5              MR. WELSH:  Your Honor, I move for admission of

 6   PX42.

 7              THE COURT:  Any objection?

 8              MR. WALTERS:  Same basis as the prior ruling,

 9   Your Honor.

10              THE COURT:  Same basis.

11              MR. WALTERS:  Business record and not the

12   admission against interest.

13              THE COURT:  Right.  It will be admitted as a

14   business record.

15              MR. WELSH:  Thank you, Your Honor.

16                                  (Government's Exhibit PX42
                                     received into evidence.)
17              THE WITNESS:  May I ask for -- we had a bottle of

18   water yesterday, right?

19              THE COURT:  Oh, sure.

20              MR. WELSH:  Absolutely.  Yes, sir.

21              THE COURT:  If you can give him one, please.

22              MR. WELSH:  May I approach the witness,

23   Your Honor?

24              THE COURT:  You may.

25              THE WITNESS:  My apologies.  Thank you.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1657

```
1          MR. WELSH:  You're welcome.

2          May I proceed?

3          THE COURT:  You may.

4    BY MR. WELSH:

5      Q    Mr. York, so PX42 is a series of emails between

6    yourself and Mr. White.  And Mr. White begins the exchange

7    by asking the question about Sling and the programmers

8    providing content to Sling to say, how can the programmers

9    license their content with that kind of attack on the

10   industry?

11         Do you see that comment at the bottom?

12     A    Yes, I do.

13     Q    And then you had an exchange and a response.  And

14   then Mr. White clarified his question and said that he

15   wasn't referring to the content in the ad, the Sling ad, but

16   that he was referring to the licensing of content to Sling

17   more generally, right?

18     A    Yes.

19     Q    Okay.  And then you provided your response to the

20   CEO of DirecTV, didn't you?

21     A    I did.

22     Q    All right.  And your response there was that, was

23   a negative response about what was happening with Sling,

24   wasn't it?

25     A    I think I balanced my negative comments with just
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    a statement of the overall state of the industry at that

 2    point in time and today.

 3         Q    What you told Mr. White was that content providers

 4    are generally shortsighted whores to whomever is willing to

 5    write them a new check for their content.

 6              You wrote that, didn't you?

 7         A    I did.

 8         Q    And that's because the content, the programmers,

 9    the content providers, were giving Sling, the skinny bundle,

10    content that was then undermining the pay-TV ecosystem;

11    isn't that true?

12         A    I didn't put it in that context, no.

13         Q    But that was your sentiment when you wrote this

14    email, when you called the programmers being content -- that

15    the programmers were being shortsighted whores, is because,

16    like with Apple TV and Turner giving Apple that innovation,

17    they were undermining the pay-TV model, the pay-TV

18    ecosystem.

19         A    No.  I think I said in the -- in the next sentence

20    is really the context for that statement.  "It illustrates

21    how quickly the product and category definitions have all

22    blurred."  That is the point of that sentence.

23         Q    And it's been driving things down, it's been

24    driving the price down so that your large bundles that you

25    have at DirecTV and at AT&T are being undermined?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1659

1    A    I disagree with that.  We have skinnier bundles as

2    well.

3    Q    And Your DBS satellite business, that's not a

4    skinny bundle, is it?

5    A    We have a package called Select that's quite

6    affordable.

7    Q    Let's change subjects.  I want to talk about --

8    and this is the final subject I want to talk with you about

9    today.  I want to talk about MFN provisions, okay?

10   A    Okay.

11   Q    Now, His Honor has heard a bit about these.  These

12   are most favored nations provisions, correct?

13   A    Correct.

14   Q    And we've heard that there are pricing-term MFN

15   provisions, and then there are MFN provisions that have

16   non-pricing terms, right?

17   A    There are a multitude of MFN structures in our

18   deals.

19   Q    Okay.  Now, MFN provisions -- and AT&T and DirecTV

20   have MFN provisions with programmers, correct?

21   A    Generally, yes.

22   Q    Now, MFN provisions allow AT&T, DirecTV to see

23   into the terms of competitors' contracts with programmers;

24   isn't that true?

25   A    Not -- I wouldn't say with specificity.  They're

Case 1:17-cv-02511-RJL Document 158 Filed 08/06/18 Page 1635 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1660

 1    really intended to tell us if someone else gets a better

 2    term than what we bargained for, under what terms would we

 3    get those -- under what terms and conditions would we be

 4    offered those terms.

 5         Q    Well, let's talk more about that in the level of

 6    specificity.

 7              Let's look at PX180 in your binder.

 8         A    You said 180?

 9         Q    Correct, sir.

10              MR. WELSH:  PX180 has been marked for

11    identification, Your Honor.  It's been provided to defense

12    counsel.

13              May I proceed?

14              THE COURT:  Yes.

15                            (Government's Exhibit PX180
                               was marked for identification.)
16    BY MR. WELSH:

17         Q    So, Mr. York, PX180 starts with an email from

18    Kerry Brockhage to Robert Thun.

19              Mr. Thun works for you, correct?

20         A    Correct.

21         Q    He's right under you in the content group,

22    correct?

23         A    Correct.

24         Q    And this email is December 22, 2014, correct?

25         A    Correct.

1    Q    And this is providing an offer for, as related to

2  an MFN provision that DirecTV had at the time; isn't that

3  true?

4    A    I'm not sure if this was triggered by an MFN

5  provision.  I'm not sure of those sections of the agreements

6  that are referenced in the next page.

7    Q    When you see that this is a letter on page 2

8  that's directed to you, correct, as the chief content

9  officer of DirecTV?

10    A    Correct.

11    Q    All right.  And it's from one of the programmers.

12  I'm not going to mention the name.  I'm not sure if this has

13  been designated as confidential.  But you see that from one

14  of the programmers?

15    A    Yes.

16    Q    And this is talking about an offer that's being

17  made in that first paragraph under the affiliation

18  agreement, correct?

19    A    Yes.  It's described as an OVD distribution notice

20  and not an MFN offer.

21    Q    So this OVD notice, though, is attached, right?

22    A    A summary of terms is attached.

23        MR. WELSH:  Your Honor, I move for admission of

24  PX180.

25        MR. WALTERS:  Your Honor, we have no objection as

1  long as it's admitted on the same basis as the previous

2  exhibit, pre-acquisition document.

3          THE COURT:  Okay.  It will be admitted as a

4  business record, not as an admission.

5                              (Government's Exhibit PX180
                                received into evidence under seal.)

6  BY MR. WELSH:

7      Q    Now, under this summary OVD agreement here,

8  DirecTV is being provided by the programmer with terms that

9  it has with other distributors; is that correct?

10     A    I'm sorry.  Repeat the question.

11     Q    Yes.

12          The terms that are being offered, that are being

13  presented here to DirecTV to you in this letter are terms

14  that the programmer that we're talking about here had with

15  another distributor; is that right?

16     A    Like I said, I'm not certain if this notice was

17  sent to us pursuant to an MFN or if this programmer might

18  have had a legal obligation to offer these terms.  I'm not

19  sure what this section of the agreement is referring to.

20     Q    But you understand that the terms that are

21  provided to you, regardless of whether it's under an MFN or

22  some other legal obligation, that these are terms that they

23  had with another distributor; isn't that true?

24     A    I don't know.

25     Q    Well, let's look at PX29 in your binder.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    PX29 is an email, starts off as an email from

2  Michelle Barney to you, December 23, 2015, correct?

3    A    PX -- I'm sorry.  Which number?

4    Q    0029.

5    A    Oh, sorry.  I was looking at 229.

6         Yes.

7    Q    And in this mail, Ms. Barney's providing --

8  Ms. Barney works for you, correct?

9    A    She does.

10   Q    She worked for you at the time in December of

11 2015, correct, at AT&T?

12   A    Correct.

13   Q    And Ms. Barney's providing you with information

14 that had been obtained regarding MFN offers; isn't that

15 true?

16   A    It's a couple of things.  It's a summary of deals

17 and offers we've received.

18   Q    And attached to this is the summary.  It's called

19 "Replicate OTT Rights Granted," correct?

20   A    Yes.

21   Q    And it's summarizing terms of deals and terms that

22 come from MFNs on these pages; isn't that true?

23   A    There are -- there's one page with four deals that

24 it looks like either we've got an agreement in principle or

25 have closed an agreement.

1     Q    And this has been designated as confidential, so

2    I'm not going to get into the substance of the comments.

3         MR. WELSH:  Your Honor, first of all, I move for

4    admission of PX29.

5         MR. WALTERS:  Your Honor, we have no objection.

6    This document should be -- because it has confidential

7    information, we'd ask that it be admitted under seal.

8         Likewise, the previous exhibit, and I apologize

9    for the omission, likewise has confidential information.

10   We would ask that it be admitted under seal as well.

11        THE COURT:  All right.  And this one, is this one

12   pre-merger?

13        MR. WALTERS:  This one is post-merger, Your Honor.

14        THE COURT:  Post?

15        MR. WALTERS:  Yes.

16        THE COURT:  All right.  It will be admitted under

17   seal well.

18                              (Government's Exhibit PX29
                                received into evidence
19                              under seal.)

20   BY MR. WELSH:

21        Q    Mr. York, what's being provided to you by

22   Ms. Barney here in this chart are terms that come from

23   the -- that are linked up with the programmers here.  And

24   they're also tied to the distributors, aren't they?

25        A    No.  This page, "Replicate OTT Rights Granted," is

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    a list of just some high-level points of deals that we have

 2    closed on the first page.

 3         Q    What we have here, though, are a list of license

 4    fees, correct?

 5         A    Every one of these basically shows that our

 6    current license fees would apply if we were to launch a

 7    replicate OTT service.  There's no specificity on any of

 8    these on any page.

 9         Q    What it reflects here are license fees,

10    penetration, and replicate OTT packaging, for example,

11    correct?

12         A    For example, yes.

13         Q    And it has that for each one of the programmers

14    that are listed there, correct?  They're at the top row.

15         A    Yes.

16         Q    And it has underneath that the OTT partner that's

17    associated with that; isn't that true?

18         A    No.

19         Q    Do you see -- read into the record what's listed

20    there on the first line under -- on the left, under the

21    shaded box.

22         A    Right.  It --

23         Q    What does it say there, sir?

24         A    "OTT Partners."

25         Q    And then going across that column, there are a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1666

```
 1   list of names there, are there not?

 2        A    There are.

 3        Q    And those are companies that are what are called

 4   OTT distributors, correct?

 5        A    I -- yes.

 6        Q    Thank you.

 7        A    I think you're confused.

 8        Q    Thank you.

 9        A    Okay.

10             THE COURT:  Your counsel will get to ask you

11   questions.

12             THE WITNESS:  Okay.  Sure.

13             THE COURT:  If he doesn't want you to explain

14   something, your counsel can give you a chance to explain it.

15             THE WITNESS:  I apologize.

16   BY MR. WELSH:

17        Q    Let's look at another example, if we can, 487 in

18   your binder, sir.

19        A    Repeat again.  Which tab?

20        Q    PX487.

21             Mr. York, this is an e-mail from Mr. Thun to you

22   in June of -- June 25, 2016, correct?

23        A    Correct.

24        Q    And you testified a few minutes ago Mr. Thun

25   worked for you at that time, correct?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    Correct.

2    Q    And this has to do with -- I'm not going to

3  mention the name of the programmer and the deal that the

4  programmer had, but it is one of the programmers that you do

5  business with, correct, at AT&T?

6    A    Correct.

7    Q    And it's one of the -- the company that your

8  programmer was doing business with and this email is about

9  is what would be one of the over-the-top distributors,

10 correct?

11   A    Yeah.  It references one by name, but it also

12 talks about what would be a marketplace condition, which

13 would be two deals.

14         MR. WELSH:  Okay.  Your Honor, move for admission

15 of PX487 into the record.

16         MR. WALTERS:  No objection, Your Honor.  We would

17 ask that it be admitted under seal, though.

18         THE COURT:  All right.  It will be admitted under

19 seal.

20                              (Government's Exhibit PX487
                                received into evidence.)
21 BY MR. WELSH:

22   Q    Now, what Mr. Thun has stated to you in this

23 email, saying he's reporting on what the programmer has

24 agreed to do with AT&T, correct?

25   A    It appears to be what their offer would be to us

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   to grant these rights.

2       Q    What the programmer has said or what Mr. Thun said

3   in the first paragraph was that the programmer had agreed to

4   grant AT&T access to the over-the-top company's MFN;

5   isn't that true?

6       A    No.  It's our MFN.

7       Q    But he said it wasn't going to happen until after

8   the DOJ merger conditions sunset on NBCU, true?

9       A    That's what that sentence says, yes.

10      Q    Because the concern was that they didn't want

11  to -- the programmer didn't want to create what's called a

12  marketplace condition.  That's a benchmark, right?

13      A    I can't speak to what the programmer's concern

14  was.

15      Q    But that sentiment was communicated to you by

16  Mr. Thun in June of 2016, that they weren't going to go

17  ahead and let you have this provision till after the Consent

18  Decree had sunsetted, correct?

19      A    That's what this sentence says, yes.

20      Q    But the programmer was going to go ahead, even

21  though they couldn't do this, they were going to go ahead

22  and give you some clarity into the term of their deal with

23  this OTT distributor, true?

24      A    There's a couple of sentences of kind of

25  highlights of carriage obligations, yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q    So they're telling you, we can't go into the

2  specifics of this until that consent decree goes away.  But

3  let's go ahead and we're going to tell you -- we're going to

4  give you some clarity into this deal right now so that we

5  can all be on the same page; isn't that right?

6    A    I don't see it that way.

7    Q    When you got this email from Mr. Thun, you didn't

8  express any sort of alarm when you received it, did you?

9    A    I don't know if I ever read this email till just

10  now.

11    Q    Do you have a practice of not reading emails that

12  you receive from your colleagues?

13    A    I get hundreds of emails every day.  I don't read

14  them all.

15         I don't recall seeing this one.  I'm sorry.

16    Q    You think, sir, don't you, that NBCU is only

17  philosophically bound by the Comcast-NBCU decree, don't you?

18    A    No, I don't.

19    Q    Look at PX486 in your binder, if you would.

20         Are you there, sir?

21         MR. WELSH:  Your Honor, PX486 is marked for

22  identification and has been provided to defense counsel.

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1670

```
 1                                    (Government's Exhibit PX486
                                      was marked for identification.)
 2     BY MR. WELSH:

 3          Q    Mr. York, this is, again, a series of emails

 4     between you and Mr. Stankey in April of 2016, correct?

 5          A    Correct.

 6          Q    And the subject of the email exchange here is MFN,

 7     most favored nations, correct?

 8          A    Correct.

 9               MR. WELSH:  Your Honor, move for admission of

10     PX486.

11               MR. WALTERS:  No objection, Your Honor.  We'd ask

12     it be admitted under seal.

13               THE COURT:  It will be admitted under seal.

14                                    (Government's Exhibit PX486
                                      received into evidence
15                                    under seal.)

16     BY MR. WELSH:

17          Q    Now, Mr. York, in your discussions with

18     Mr. Stankey in this email on April 22, 2016, you respond

19     back where you start off by saying, sorry.  I misunderstood

20     the question.

21               Do you see that?

22          A    Yes.

23          Q    And then you go on in that next paragraph.  In the

24     last sentence of that paragraph, you say, "Also, NBCU has

25     their merger conditions which keep some reins on them, at
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1671

```
 1   least philosophically."

 2           Right?

 3     A     Yes.

 4     Q     Those were your words, right?

 5     A     Yes.

 6     Q     Now, Mr. York, during your time with AT&T and

 7   DirecTV, you do talk with your counterparts at the other

 8   companies, the other distributor companies, don't you?

 9     A     I have in the past, yes.

10     Q     And you talk to them about contract terms that are

11   in place that they have with their programming, don't you?

12     A     Not about specific contract terms, confidential

13   contract terms, no.

14     Q     Well, you talk with them about getting the

15   information regarding their costs, don't you?

16     A     I don't believe so, no.

17     Q     Look at PX48 in your binder.

18           THE COURT:  480.

19           MR. WELSH:  Oh, 0048, Your Honor.

20           THE COURT:  48?

21           MR. WELSH:  48, yes.

22           Your Honor, PX48 has been marked for

23   identification and provided to defense counsel.

24           THE COURT:  Yes.

25           MR. WELSH:  May I proceed?
```

 1          THE COURT:  You may.

 2                              (Government's Exhibit PX48

                                was marked for identification.)

 3    BY MR. WELSH:

 4          Q    Mr. York, PX48 is an exchange of emails between

 5    yourself and your colleagues at DirecTV on April 21, 2015,

 6    correct?

 7          A    Correct.

 8          Q    And the exchange of emails here relates to the

 9    FiOS TV packages, correct?

10          A    Correct.

11          Q    And you had, for context, you had seen an

12    announcement publicly about the FiOS package, right?

13          A    Yes.  It was public and discussed in our company.

14          Q    When you got, when you saw that, when you saw that

15    announcement, you then wanted to have your team to look at

16    getting under this offering to look at the penetration rates

17    of the existing files FiOS packages and what the contract

18    language would look like so that you could gauge the caps,

19    the ACPU, the AMPU, et cetera, right?

20          A    That's what it says, yes.

21          Q    And ACPU is what?

22          A    ACPU, that would be the average content cost per

23    unit per subscriber.

24          Q    So you sent your team off to try to get that

25    information, right?

1673

1        A     Using our data and our language, yes.

2        Q     And then you, instead of waiting for your team,

3    you decided that you were going to go to -- FiOS is Verizon,

4    correct?

5        A     Correct.

6        Q     So instead of waiting for your team, you decided

7    you were going to go right to Verizon to talk with your

8    counterpart, didn't you?

9        A     I was under pressure to find out how they could

10   launch something that we didn't, that our marketing folks

11   didn't think we had the rights to do, even though I told

12   them we did and we already have.

13       Q     So when you wanted to find out about the contract

14   terms and about the ACPU, you decided, you know what?  I'm

15   going to go ahead and just pick up the phone and call

16   Terry D. at Verizon, right?

17       A     I found out nothing about contract terms or ACPU,

18   nothing confidential.

19       Q     What you wrote here is, "I'll call Terry D. today,

20   to see if I can get more color," right?

21       A     More color, correct.

22       Q     Terry D. is Terry Denson of Verizon, right?

23       A     Correct.

24       Q     And then you report back to your team on the top

25   email, "Just got it from the horse's mouth."

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1     Right?

2     A     Correct.

3     Q     So you can pick up the phone when you want and

4  call your counterparts at the competitors and talk to them

5  about the terms and the underlying information regarding

6  their offers; isn't that right?

7     A     The terms and the information underneath them?

8  No.

9     Q     Mr. York, I just have a couple final questions for

10  you.

11          Mr. York, you don't use the term "fair market

12  value" in connection with your carriage contracts; isn't

13  that true?

14     A     I don't use it.  I may have in the past.

15          MR. WELSH:  May I approach, Your Honor?

16          THE COURT:  You may.

17          MR. WELSH:  May I approach the witness,

18  Your Honor?

19          THE COURT:  You may.

20          MR. WELSH:  Thank you.

21  BY MR. WELSH:

22     Q     Mr. York, we've handed you a binder which has your

23  deposition transcripts that you -- of the depositions you

24  gave in this case.

25          I'm going to direct you to the second tab, which

1   is the transcript of your deposition in the CID portion of

2   the investigation, dated April 14, 2017.

3          MR. WELSH:  Your Honor, it's been designated as

4   Exhibit 540.  It's 540 for identification.

5          THE COURT:  All right.

6          What page?

7          MR. WELSH:  May I proceed, Your Honor.

8          THE COURT:  What page?

9          MR. WELSH:  73, Your Honor.

10          THE COURT:  All right.

11  BY MR. WELSH:

12     Q    Mr. York, I'm going to direct you to page 73, and

13  I'm going to direct you to line 14 of your deposition.

14          You were asked a question that day:  "When you're

15  looking at all of the parts of a contract, do you use a term

16  'fair market value' to estimate the value of the company?"

17          And your answer was, "Are you asking if it's a

18  term that I personally use?"

19          Then on line 19, question was, "Yes."

20          And then your answer was, "I would say it's a term

21  that I very rarely use in that context personally."

22          Do you see that?

23     A    I do.

24     Q    Is that your testimony you gave that day?

25     A    I believe it is.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1676

```
 1       Q    And the term "fair market value" is not one --

 2    it's one that you've rarely heard used at AT&T internally;

 3    isn't that true?

 4            Can you answer my question, sir?

 5       A    I'm just looking at my testimony.

 6            True.

 7            MR. WELSH:  Your Honor, I don't believe I moved

 8    for admission of PX48, and I'll go ahead and do that at this

 9    point in time.

10            THE COURT:  48?

11            MR. WELSH:  Yes, PX48.  We were just looking at

12    that.

13            THE COURT:  Oh.

14            MR. WALTERS:  Your Honor, this is pre-acquisition

15    so -- this document was before the acquisition of DTV, and

16    we believe it should be admitted under the protocol,

17    Your Honor, that were done previously.

18            THE COURT:  So under seal?

19            MR. WALTERS:  Yes, sir, Your Honor.

20            THE COURT:  Okay.  Under seal, it's an admission,

21    but only as against DirecTV.

22                                  (Government's Exhibit PX48
                                     received into evidence
23                                   under seal.)

24            MR. WELSH:  That's all I have at this time,

25    Your Honor.  Thank you.
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 1652 of 3826

1677

1    THE COURT:  All right.

2    MR. WALTERS:  May I proceed, Your Honor?

3    THE COURT:  When you're ready.

4                   CROSS-EXAMINATION

5    BY MR. WALTERS:

6    Q    Good morning, Mr. York.

7    A    Good morning.

8    Q    I just have a handful of items I want to follow up

9    on this morning, and I think we can be brief.

10         Mr. Welsh asked you about the issue with the split

11   screen and Apple.

12         Do you recall that discussion?

13   A    Yes.

14   Q    And do you recall the discussion where you had a

15   visceral reaction, you and Mr. Stankey, to that offer?

16   A    Yes.

17   Q    Could you explain for us, what was the offer?  And

18   why did you have the reaction you did?

19   A    I had the reaction for several reasons.  First of

20   all, there was no offer to us at all.

21         AT&T has been the presenting sponsor of

22   March Madness for many years.  And we -- I personally made

23   very earnest attempts to get Turner to give us an

24   interesting, innovative experience around March Madness.

25         Split screens, interactivity, we tried to get them

1   to do 4K ultra-high def for March madness and even called

2   the President of Turner and got a resounding no.

3           And then didn't get a call when I found out from

4   Mr. Stankey that they had done a split screen with Apple.

5   I was quite disappointed.

6       Q    Now, at the time, how many subscribers did DTV

7   have and for Turner's broadcasts?

8       A    Much like we do today, around 25 million

9   subscribers across our platforms.

10      Q    And was it your view that with that level of

11  subscribership, that you would at least be entitled to what

12  they were offering to Apple, by way of this split screen?

13      A    As I said in the note, the courtesy of a call

14  would have been nice.

15          Again, these were our customers going to another

16  device to experience the subscription that they pay us for.

17  And if it doesn't work, they're probably going to call us.

18          We never even knew it was going on, after all of

19  our attempts to try and innovate.

20      Q    Now, there was another line of questioning that

21  Mr. Welsh pursued with you about your frustrations on skinny

22  bundles.

23          Do you recall that?

24      A    Yes.

25      Q    Okay.  What was your frustration there?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1679

1        A    What are you referring to specifically.

2        Q    Well, it was, I think it was -- pull up

3    Plaintiff's Exhibit 42 in front of you, if you don't mind.

4             What's the issue in Plaintiff's Exhibit 42?

5        A    The issue here is Mr. White had seen the ad, and

6    we saw Sling bashing what they called "old TV," even though

7    Sling is owned by Dish, who -- and as I said in the note,

8    that is still Charlie's core business.

9             But I go on to say that illustrates how quickly

10   the product and category definitions have all blurred, and

11   virtually every relationship between the players is now one

12   of frenemies.

13            So it's really just the macro situation that's

14   going on.  Just trying to give Mr. White, who was relatively

15   new to the media business, a sense of how the world is

16   changing.

17       Q    And you mentioned to Mr. Welsh that, indeed, you

18   are now offering skinny bundles.  Can you say more about

19   that?

20       A    We were already offering skinny bundles.  This

21   isn't about bundles and size of packages.  We had tried --

22   we continue to try -- we have always tried, as long as I've

23   been involved in the business, at least at DirecTV, to get

24   rights that make the content available over the top, over

25   the Internet, not just tethered to satellites.  And we did

1   not have success.

2          The best we could ever get were very tightly

3   controlled most favored nations provisions.

4   Q    Now, if you'll look at Plaintiff's Exhibit 29,

5   this is that exhibit that talks about the over-the-top

6   summary and the different OTT MFN offer summary.

7          Do you see that?

8   A    I do.

9   Q    Now, it seemed to me that you wanted to explain

10  something about this document to Mr. Welsh.

11         Do you recall that?

12  A    Correct.

13  Q    Could you explain to us now what you wanted to

14  explain then?

15  A    He was trying to imply that this was -- this

16  document was saying, here are all the terms of other

17  people's deals.  It is far from that.

18         It is handful, a couple of, basically, our

19  requirements to get other programmers in to be able to even

20  launch an over-the-top service.

21         It's our packaging requirements.

22         There's no real specificity on any economics,

23  other than some minimum payments from maybe one of the

24  programmers.

25         And to allude that this is basically the deal with

1    others is not what this document says.

2            It does list their -- it does list OTT partners

3    that they currently have.  And in some cases, it's multiple

4    partners.  It gives us no real insight into anybody else's

5    deal at all.

6    Q    Mr. Welsh did ask you about MFNs.  So could you

7    explain for us exactly what MFNs are.  And how do you use

8    them at DirecTV?

9    A    And we've used them in my experience at AT&T when

10   we did deals with zero subscribers.

11           They're really just intended to give our customers

12   parity with their neighbors who might get their pay-TV

13   service from a different provider.  That is really what

14   they're about.  It's about fairness.

15           And the way they tend to work -- and they can run

16   a gamut.  You know, we do hundreds of deals, and we have

17   hundreds of flavors of most favored nations.

18           If there's one particular material term that is

19   protected by an MFN, the programmer would have an obligation

20   to notify us of that, but tell us all the terms and

21   conditions we would have to meet to be able to afford that

22   to our customers.

23           In almost every case, all the bells and whistles

24   that get attached to it are such that it probably isn't

25   worth it.

1    Q    Okay.  Well, just say a little bit more about

2    that.

3         So what does a programmer send you when they have

4    an obligation under an MFN?

5    A    They will send a letter with an attached outline

6    of the condition that's better, the term that's better and

7    all the terms and conditions, no insight, no statement as to

8    who the other provider may be that got this one or two

9    different term, different, more beneficial term.

10        And usually we have a window to respond whether we

11   want to take them up on the offer.

12   Q    And does that give you any transparency or any

13   visibility into the full array of specific terms that a

14   programmer might have with another distributor?

15   A    No.

16   Q    Now, Mr. Welsh also asked you -- and if you'll

17   look at PX48, he asked you about this document.  And it was

18   an email regarding the new FiOS TV package.

19        Do you recall that?

20   A    I do.

21   Q    Now, let's go to the language that Mr. Welsh

22   focused on where you write, "Just got it from the horse's

23   mouth.  My outline of their POV is accurate."

24        Do you see that, the first line?

25   A    Yes.

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 1658 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1683

1    Q    And then you write further, "Like all affiliates,

2    they have floor pen rates they have to maintain, and they

3    still plan to do just that, just as we do with our new

4    packages."

5         Do you see that?

6    A    Yes.

7    Q    So when you write, "My outline of the POV is

8    accurate," what are you saying?  What are you communicating?

9    A    So what he didn't reference is my earlier email

10   that day, where I said they probably have a few percentage

11   points to be able to set up new packages to manage down to

12   their penetration minimum, as we had done, as I said in the

13   note, at DirecTV, when we launched our entertainment package

14   and our select package and other packages that we've

15   launched.

16        I can explain how this concept works more if you'd

17   like.

18   Q    Well, what I'm interested in in that, in what you

19   write there, "Like all affiliates, they have floor pen rates

20   they have to maintain," do you see that?

21   A    Yes.

22   Q    In securing that basic sentiment, did that divulge

23   any confidential information about the specifics of their

24   arrangement?

25   A    No.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1       And, again, if I can just explain a little bit.

2       Q    Please.

3       A    You take a channel that their contract says we

4  need to be carried to no less than, let's say, 70 percent of

5  your customers; if we have that channel carried in a package

6  that's to 95 percent of our customers, that would afford us

7  the ability to set up another package that doesn't have that

8  channel in it that could go up to 20 percent penetration to

9  manage down to that minimum penetration rate.

10      We've done it multiple times.  Verizon set up a

11  new package.  I explained to everyone this is pretty obvious

12  what they're doing.

13      But folks just didn't quite believe it.  And

14  I just said, let me just call and see if I'm missing

15  something.  And that's exactly what I put in the note.

16      Q    Thank you.

17      Just two more quick things and we'll be done.

18      You mentioned to Mr. Welsh yesterday and again

19  this morning briefly this, in negotiations with programmers,

20  this concept of frictions.

21      Do you recall that?

22      A    Yes.

23      Q    Okay.  What are you alluding to there?  What are

24  you talking about?

25      A    By friction or maybe kind of negotiation or

1  bargaining friction, we're always trying to find ways to get

2  more value for the prices that we pay for our customers and

3  try to innovate.

4       Now, I don't fault the person on the other side of

5  the table whose job it is to try to get more consideration,

6  money for those incremental rights.

7       But what I've seen in 30 years of doing this is

8  this friction just is constant, and nothing truly innovative

9  really gets done when we have an arm's-length commercial

10  negotiation like this.

11       I see innovation with Netflix and Amazon and Apple

12  and others that are more vertical, and they can do things

13  with their own content.

14       So it's really both parties not knowing what this

15  innovation or new grant of rights will deliver in the

16  future.  It's the uncertainty; it's the risk.  We both have

17  it.

18       But because we can't assign a value around that

19  uncertainty, nothing gets done.  And you've got constant

20  friction.

21       Q    Well, help me with that a little bit.

22       When you say that there's uncertainty about the

23  value, just unpack that a little bit.  What do you mean?

24       A    So if you think about TV Everywhere, TV Everywhere

25  is a very simple, consumer-friendly, good thing to do.  It

1  has taken this industry over a decade to get to the, I would

2  say, rather mediocre state of TV Everywhere today.  A lot of

3  analysts call it "TV Nowhere."  That is inherent friction

4  because no one's been able to figure out what really is the

5  value to the parties -- we know there's value to the

6  consumers.  So that would be an example of trying to just

7  unpack the value.

8         I went through it in so many cycles with so many

9  content providers trying to figure out how they could

10 extract more to grant something that's just so easy to do.

11    Q    All right.  Now I'm about to embarrass myself with

12 my clicker, which is, what is TV Everywhere?

13    A    So TV Everywhere, the general concept is, if you

14 subscribe to cable or satellite, you have a set-top box and

15 you watch it on your television.  The notion is, using your

16 password on your phone, your laptop, your computer, you

17 would be able to enjoy your pay-TV subscription everywhere.

18 It's TV Everywhere, across any device.

19    Q    Are there other examples where these -- this

20 uncertainty of how do you value the incremental right is

21 what I hear you saying.

22    A    Sure.

23    Q    How do you do that, the uncertainties around that,

24 where it has, those frictions have led to a lack of

25 innovation that you have experienced, specific examples?

1    A    Okay.

2        DirecTV Now is a good example.  Even though folks

3    call that innovative, the fact of the matter is it took us

4    well over a year to just secure the rights that are

5    basically the same offering that we have on DirecTV.  But,

6    in truth, it's less innovative than DirecTV, because

7    programmers, for those incremental grant of rights,

8    restricted our ability to offer that select package, that

9    skinnier package.

10       It is less innovative at the end of the day.  It

11   has other -- a lot of restrictions around how many different

12   people can enjoy the subscription at the same time, how many

13   streams at the same time, advertising restrictions, DVR

14   restrictions.

15       And the other very frustrating thing about

16   DirecTV Now, when we went to programmers, we tried to do

17   something a little innovative called DirecTV mobile.  And

18   the concept there was, maybe we could give them their

19   pay-TV subscription but only on a mobile device.  We -- you

20   know Millennials tend to consume their younger markets.

21       The notion was we would discount the price, just a

22   straight percentage to consumers, good for them, with

23   limitations.  We would discount what we pay the programmers,

24   and that was dead on arrival.  So there was no

25   DirecTV mobile.

1    Q    So what are the kinds of things that you would

2    like to do?  And what are the kinds of things that you're

3    thinking about doing?  And would it help to have both the

4    rights and those innovation opportunities under the same

5    tent?

6    A    We have a laundry list of things that the

7    technology would permit us to do, a couple sitting here

8    right now.  One would be something called download,

9    download-and-go rights.  To explain that, if you have your

10   pay-TV subscription, while you're on a plane or don't have

11   access to the Internet or don't want to use your data plan,

12   you could download a movie or TV show or game and watch it

13   loaded onto your device.

14        We have gotten a tiny amount of rights of all the

15   channels and content that we offer for download rights.

16        Meanwhile, Netflix, with all the content that they

17   own and produce, has full downloading rights to all their

18   content.

19   Q    Hang on, though.

20   A    Yeah.

21   Q    Why have you been unable to secure those rights?

22   A    Friction.  Risk, unknown value, uncertainty.  It's

23   just, we just really haven't been able to get much traction

24   with the way that we're set up negotiating arm's length with

25   programmers.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q    Any others that come to mind of things you'd like

2  to do where you haven't been able to do them?

3    A    I would say we'd like to have more interactivity

4  as you watch a movie or TV show or game, whether it's on the

5  screen itself.

6         There's a concept of second screen experiences.

7  So if you're watching a movie and you want to just kind of

8  know about the actors on the screen, with the press of a

9  button, that stuff could come up on the screen or on a

10 second screen.

11         We've had very little success doing that.

12         And I look at what Amazon does with their

13 experiences.  It's great.  They tend to do it more with the

14 content that they own and create themselves.

15         We've really gotten nowhere on that.

16         Oh, boy.  There's a lot of stuff.

17         I said download, interactivity, second screen.

18 Those would be just a couple things off the top of my head.

19    Q    Okay.  And so, again, what is it about having the

20 rights to do these things and then also the ability to do

21 these things in the same entity, that vertical integration,

22 what is it about that that will enable you to do these

23 things, in your judgment?

24    A    You get a little bit more alignment and

25 willingness to experiment, to trial and see if there's value

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    and prove these concepts out.

2           This whole thing is a chicken and the egg.  And

3    when you kind of just take that out of it and just see if

4    something will work, you get a chance to try and innovate

5    and better serve your customers.

6      Q    Okay.  One last issue, one last question.  You've

7    been now in the content negotiation business for how long?

8      A    Some context since 1987.

9      Q    And so when you go about negotiating poor content,

10   what do you focus on in deciding how much you're willing to

11   pay and what terms you're willing to agree to secure that

12   content?

13     A    There's a variety of factors.  You know, it

14   depends on what we're trying to accomplish in the deal, what

15   deal did we have before.  I mean, there's a multitude.

16          What rights do we get?  Can we innovate?  How are

17   we trying to serve customers?  How can we differentiate our

18   service?  What is the price that we're getting?  What are

19   the parity protections that we're getting.

20          There's a multitude -- there's literally, if you

21   ask our marketing department who we represent, they've got

22   marketing priorities that they would like, our technology

23   and product folks, legal, finance.  There's literally

24   hundreds of items that go on kind of a priority list on

25   what's the right deal.

1    Q    And in all this time that you have negotiated

2  content for a distributor, most recently DTV, has it ever

3  mattered to you who owns the program -- programmer or, more

4  particularly, who the programmer might own as you grow out

5  the business assessing what are you prepared to do for the

6  benefit of your consumers?

7    A    I have engaged in those types of negotiations many

8  times, and I don't give that -- I personally don't give that

9  any consideration whatsoever.

10        It's all about what is the content, what is the

11  right deal for our customers.

12        MR. WALTERS:  Thank you, Mr. York.  That's all

13  I have.

14        THE WITNESS:  Thank you.

15        THE COURT:  Mr. Welsh, do you have any redirect?

16        MR. WELSH:  Yes, I do, Your Honor.

17        THE COURT:  How much?

18        MR. WELSH:  Probably 15 minutes or so.

19        THE COURT:  We'll take the morning recess, then.

20        All right.  You're a witness under oath in the

21  case.

22        THE WITNESS:  Yes.

23        THE COURT:  You know the rules.  Refrain from

24  discussing your testimony with anyone, including your

25  counsel --

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1            THE WITNESS:  Right.

2            THE COURT:  -- until we get back.  See you in

3    15 minutes.  All right.

4            DEPUTY CLERK:  All rise.  This Honorable Court

5    will now take a brief recess.

6            (Recess from 11:51 a.m. to 12:11 p.m.)

7            DEPUTY CLERK:  The United States District Court

8    for the District of Columbia is again in session, the

9    Honorable Richard J. Leon presiding.  God save the United

10   States and this Honorable Court.  Please be seated and come

11   to order.

12           Your Honor, re-calling Civil Action No. 17-2511,

13   United States of America v. AT&T, Inc., et al.

14           THE COURT:  All right.  Witness remains under

15   oath.

16           MR. WELSH:  May I proceed, Your Honor?

17           THE COURT:  You may.

18           MR. WELSH:  Thank you.

19                    REDIRECT EXAMINATION

20   BY MR. WELSH:

21       Q    Mr. York, I'm going to start with -- you were

22   asked some questions, and I want to start off with the

23   split-screen issue with Turner and Apple TV.  Do you recall

24   you were asked some questions by defense counsel about that?

25       A    Yes.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1693

1      Q    Okay.  Now, if I got your testimony correct,

2   I think you said that, despite all your efforts, you're

3   engaged in all these efforts to try to get that split screen

4   from Turner, despite all that, you couldn't get it, right?

5      A    Yes.

6      Q    Okay.  Now, Apple TV, though, they got it, didn't

7   they?

8      A    Yes.

9      Q    All right.  And there's no bargaining frictions

10  that prevented Apple TV from offering whatever they offered

11  so that they could get those rights; isn't that true?

12     A    I don't know how that negotiation went, but I

13  would assume there were frictions.

14     Q    Well, you would assume that they did a deal,

15  right?  They concluded that deal, which is what you had your

16  visceral reaction to, correct?

17     A    They did a deal, yes.

18     Q    And is it your testimony that Turner is not going

19  to take more money from AT&T to give the rights for

20  something like that to them -- to you?

21     A    Whether -- we offered to pay for the 4K.  We

22  didn't even get an offer on trying to do an interactive

23  split screen.

24     Q    I'm talking about the split screen, though.  It's

25  not your testimony that you couldn't off more money to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Turner to get those rights so that they wouldn't give them

2    top Apple; that's not your testimony, is it, today?

3         A    We may have offered more money for more rights.  I

4    don't recall the specific of the negotiation.

5         Q    The bottom line is, though, that Apple took away

6    those rights and they're not integrated with Turner,

7    correct?

8         A    That is correct.

9         Q    All right.  Now, you also talked about, I think

10   you threw out a couple things that you claimed were

11   innovations that you just couldn't do today but, boy, down

12   the road, you might be able to do it.  And I think you

13   talked about a download to go, right?

14        A    Correct.

15        Q    Now, it's the case, isn't it, that Netflix and

16   Amazon both do download to go?

17        A    I believe they do.

18        Q    And Netflix, though, they don't own any of the

19   pipes to transmit their signal, their content, do they, to

20   the consumer?

21        A    I don't believe so.

22        Q    Right.  So what they require is they require AT&T

23   and Verizon, those pipes, to be able to get that content out

24   there; isn't that right?

25        A    Any ISP or wireless carrier, their content would

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  flow over those pipes, as you call them, yes.

2      Q    And the same is true with Amazon; they don't own

3  the pipes that get their content out to the consumer, right?

4      A    I don't believe so.  They may.

5      Q    So they have to go to through DirecTV -- or,

6  excuse me, through AT&T or Verizon, as examples; isn't

7  that's true?

8      A    Or cable or other wireless carriers, any ISP or

9  wireless carrier, yes.

10      Q    Let's look at PX29 in the binder, if we can.

11          Now, you were asked some questions by defense

12  counsel about PX29.  This is the OTT high-level summary page

13  from Michelle Barney to you, right?

14      A    Correct.

15      Q    Now, I want the record to be clear here.

16  Ms. Barney writes to you in her email on December 23, does

17  she not, that pages 2 to 4 of the attachment summarize the

18  MFN offers we've received to date, and is updated to reflect

19  the revised MFN we received yesterday.  And then there's a

20  programmer's name listed there, correct?

21      A    Correct.

22      Q    And if we look at the attachment and look at those

23  pages, there are term after term after term that are listed

24  there pursuant to what Ms. Barney just mentioned, 'isn't

25  that true?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1     A     There are generally six terms on this spreadsheet.

2     Q     Right.  There are over 20 categories that are

3  listed on the spreadsheet, isn't that true, of information

4  regarding the programmers that are associated with the

5  distributors there, true?

6     A     In terms of terms, on pages 2 through 4, I

7  count one, two, three, four, five, and other key terms would

8  be six.

9     Q     And it does include other key terms, correct?

10    A     Yes.  Only one of them has any other key terms.

11    Q     And this is information that AT&T compiles and

12 keeps track of in your business in the content group; isn't

13 that true?

14    A     We keep track of the deals and offers that we

15 receive, yes.

16    Q     Let's look at PX180, if we can.

17          Now, I want to make sure that I understand your

18 testimony with respect to PX180, Mr. York.

19          Is it your testimony that, as to the terms that

20 are attached here, pursuant to this distribution notice, is

21 it your testimony that you're unaware of who the distributor

22 is that's listed -- or the provider of this information?

23 Excuse me.

24    A     I'm sorry.  Who the --

25    Q     Who the identity of the distributor to which the

1    information applies.

2         A    Upon receipt of this in December of 2014?

3         Q    Yes, sir.

4         A    I don't know if I looked at it.  It's not clear to

5    me by looking at this who -- again, I don't know this is an

6    MFN offer, what this provision in the agreement is.

7    I don't know if this programmer has a legal obligation

8    because it's listed OVD distribution notice.

9              I'm not sure, sir.

10             It is not entitled an MFN offer.

11        Q    My question was, is it your testimony, though, as

12   to what's attached here that was provided to you

13   December 21, 2014, pursuant to this distribution notice, is

14   it your testimony that you're unaware of the identity of the

15   distributor to which the information applies?  That's my

16   question.

17             THE COURT:  At that time?

18             MR. WELSH:  At that time, yes, Your Honor,

19   December of 2014.

20             THE WITNESS:  Almost four years later,

21   I don't recall if I was aware at the time who this may have

22   been, if I deduced it at that time.

23   BY MR. WELSH:

24        Q    Were your colleagues that worked under you aware

25   of it, sir?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1       A    I don't know what they were aware of at the time,

2   sir.

3            MR. WELSH:  May I approach, Your Honor?

4            THE COURT:  You may.

5            MR. WELSH:  Your Honor, we've marked this document

6   as PX541 for identification purposes.

7            May I proceed?

8            THE COURT:  You may.

9                           (Government's Exhibit PX541
                             was marked for identification.)
10  BY MR. WELSH:

11      Q    Mr. York, you see at the bottom of PX541, it's the

12  same email, December 22, 2014, that we were just looking at,

13  correct?

14      A    This is -- attached to this is the OVD

15  distribution notice, yes.

16      Q    Correct.

17           And this went to Mr. Thun, as we established

18  earlier, correct?

19      A    Yes.

20      Q    And Mr. Thun, then, is reporting right above that.

21  I'd like you to read that to yourself on the OVD

22  distribution notice there.

23      A    Okay.

24      Q    Does that refresh your recollection that Mr. Thun

25  is right under you at AT&T, that he was able to determine

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1699

1    who the distributor was, the OTT distributor was, from which

2    this information came?

3        A    I'm nowhere on this email thread, so this is the

4    first time I've ever seen this.

5             So what is your question?

6        Q    My question is, does reading this refresh your

7    recollection that Mr. Thun is right under you at AT&T at the

8    time, that he was -- that he had put together who -- which

9    distributor, which OTT distributor had provided that

10   information to AT&T?

11       A    To answer your question, I recall that Mr. Thun

12   reported to me at the time.  I have no recollection of this

13   email because I've never seen it before.

14       Q    You were asked some questions -- final subject I

15   want to get into.  You were asked some questions about PX42.

16            And I think in response to defense counsel's

17   questions, you talked about how all this is just, what

18   you're trying to get across is that everything is blurred,

19   right?  Wasn't that the point that you made?

20       A    Yeah, that was one of the points, yes.

21       Q    And what, in fact, though, was troubling to you at

22   the time was that the content providers, by giving their

23   content to Sling, the skinny bundle, that that was upending

24   your ecosystem with your big bundles; isn't that true?

25       A    I didn't say that, and I wouldn't say that.

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 1675 of 3826

1700

1    Q    But you did say in PX48 that we looked at earlier

2    that the content providers themselves are the ones, either

3    owning or licensing their content to cheaper OTT options,

4    which has triggered this pricing war and race to the bottom.

5         right?

6    A    That's what it says, yes.

7    Q    And they're racing to the bottom, dropping price.

8         And you said they made their own bed, right?

9    A    Yes.  That sentence is in here, yes.

10    Q    And what your sentiment here to your colleague at

11    DirecTV at the time is that they're upending your cash cow,

12    right?

13    A    I didn't say that at all.

14    Q    That was what you were talking about, though, in

15    this email when you said they're racing to the bottom here.

16    They're foolish.  They're upending your cash cow.

17         Isn't that right?

18    A    I never said "foolish."  I never said "cash cow."

19    Q    So, Mr. York, you were also asked some questions

20    about your offerings, and I think you talked about how

21    DirecTV has a skinny bundle, right?

22    A    We have a variety of different packages that we

23    offer, some skinnier than others, yes.

24    Q    Well, in fact, you don't have anything that's even

25    remotely close to Dish Sling, isn't that's true, in terms of

1  skinniness?

2      A    I can't sit here and recite the channel counts of

3  some of our packages versus some of theirs.  I'm sorry.

4          We probably have things that are very close and

5  certainly close on retail price.

6      Q    So you came to court today to talk about your

7  bundles being skinnier, but you can't tell this Court how

8  many channels that Sling has?

9      A    No.  There are hundreds of packages in the market.

10  I can't recite to you Sling's channel count.

11      Q    What you did tell, in 2017, in January 2017,

12  though, you did comment to a representative of

13  Major League Baseball that, unlike others who are going

14  skinny, which is AT&T with DirecTV Now, is coming to a

15  market with a replicate of its DirecTV DBS satellite

16  packages; isn't that true?

17      A    Without our skinnier package, that's correct.

18      Q    So what you told back in January 2017 is that, as

19  to DirecTV Now, that that was designed to be a replicate of

20  your satellite channel package, your fat package, right?

21      A    I have no idea what conversation you're referring

22  to, sir.

23          MR. WELSH:  May I approach, Your Honor?

24          THE COURT:  You may.

25          MR. WELSH:  Your Honor, this has been marked for

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    identification as PX542.  It's been handed to defense

 2    counsel.

 3              May I proceed?

 4              THE COURT:  You may.

 5                              (Government's Exhibit PX542
                                 was marked for identification.)
 6    BY MR. WELSH:

 7        Q    Mr. York, I see that this is pretty small type.

 8    I apologize for that, but that's the way the document came

 9    to us.

10              But do you see that this is an email from you

11    January 31, 2017?

12        A    Yes.

13        Q    You wrote this to a Bob Bowman.  Is that right?

14        A    Yes.

15        Q    Mr. Bowman is who?

16        A    Pardon me?

17        Q    Mr. Bowman is who?

18        A    He was an employee of Major League Baseball

19    Advanced Media at the time.

20        Q    And I'm going to ask you to look at the second

21    paragraph of that.  And if you'd read that to yourself.

22              Are you done reading that paragraph, sir?

23        A    Yes.

24        Q    Does reading that refresh your recollection that

25    you told Mr. Bowman that you're providing an overview of
```

```
 1    DirecTV Now offerings, which unlike others who are going

 2    more skinny, it's designed with a general intent of

 3    replicating their traditional DirecTV DBS packages that have

 4    been good for the pay-TV ecosystem.

 5            Does that refresh your recollection of having said

 6    that?

 7       A    Yes.

 8            MR. WELSH:  That's all I have, Your Honor.

 9            Thank you.

10            THE COURT:  All right.  Do you have anything

11    limited to redirect?

12            MR. WALTERS:  Nothing, Your Honor.

13            THE COURT:  Oh, okay.

14            So there's a legal issue that the government and

15    the defense have raised for me to consider about your

16    testimony.  But they want to do a little brief.  Each side

17    is going to do a brief on it.

18            And depending upon how it comes out in the next

19    few days, there's a chance that you might have to be

20    re-called.

21            THE WITNESS:  Okay.

22            THE COURT:  So I'm going to excuse you, subject to

23    re-call.  And what that means is this, basically.

24            And we'll know the answer to this question by

25    Monday morning.
```

1    THE WITNESS:  Okay.

2    THE COURT:  So if you're going to have to come

3    back for a limited questioning on the topic of this legal

4    research that they're working on, it will be limited just to

5    that.  And we'll know it by Monday morning.

6    But between now and Monday, between now and your

7    returning, if you have to return, you can't talk about your

8    testimony which you've given so far.

9    THE WITNESS:  Understood.

10   THE COURT:  So you've got to stay independent of

11   all others, including your own lawyers.  You're going to

12   have to be able to answer Monday morning the question that

13   invariably you would get if you had to come back:  Have you

14   discussed your testimony so far with anybody?  You have to

15   able to say "no" under oath.

16   THE WITNESS:  Right.

17   THE COURT:  So stay independent of all others.

18   Tell family and friends it was a lot of fun.

19   THE WITNESS:  That's true.

20   THE COURT:  We're having a ball, you know.  You're

21   earning your hazardous duty pay.  Whatever.

22   But you can't go into what you said.  You can't go

23   into what you might say.  You just can't do it.

24   THE WITNESS:  I understand.

25   THE COURT:  You're excused, subject to recall.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1705

```
1              THE WITNESS:  All right.  Thank you.

2              THE COURT:  You can step down.

3              Call your next witness.

4              MR. CONRATH:  Your Honor, the United States calls

5    Tim Gibson as an adverse party witness.

6              THE COURT:  All right.

7              MR. PETROCELLI:  Your Honor, Ms. Robson will be

8    handling the witness.

9              THE COURT:  All right.

10             DEPUTY CLERK:  Sir, please raise your right hand.

11             (Witness is placed under oath.)

12             THE WITNESS:  I do.

13             DEPUTY CLERK:  Please be seated.

14             THE COURT:  You're going to have to speak into

15   that microphone because you'll be competing with our air

16   conditioning system, which, by the way, it's a good thing to

17   be competing with, because this room gets warm very quickly.

18             THE WITNESS:  I'll do my best.

19             THE COURT:  150 people sitting out there.  So

20   trust me.

21             Mr. Conrath.

22             MR. CONRATH:  May I proceed, Your Honor?

23             THE COURT:  When you're ready.

24             MR. CONRATH:  All right, thank you.

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1706

1    TIMOTHY GIBSON, ADVERSE WITNESS FOR THE GOVERNMENT, HAVING

2    BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

3                         DIRECT EXAMINATION

4    BY MR. CONRATH:

5        Q    Mr. Gibson, would you state your full name for the

6    record.

7        A    Timothy David Gibson.

8        Q    Mr. Gibson, you are the vice president of strategy

9    and business development for AT&T's entertainment group;

10   is that correct?

11       A    That's correct.

12       Q    And you've held that position since the

13   AT&T-DirecTV merger in July of 2015?

14       A    Yes.

15       Q    AT&T's entertainment group includes the company's

16   broadband, mobile, and video products, correct?

17       A    Yes.

18       Q    Your responsibilities as VP of strategy and

19   business development cover all of those products within the

20   entertainment group; is that right?

21       A    For the most part, I focus on our video products,

22   but, generally, yes.

23       Q    Prior to the close of AT&T-DirecTV merger, you

24   were employed by DirecTV; is that right?

25       A    Yes.

1    Q    And you were the vice president of strategy and

2   business development for the digital entertainment products

3   group at DirecTV?

4    A    Yes.

5    Q    And that started around 2010 or 2011?

6    A    That's about right, yes.

7    Q    And so you've held strategy positions in the

8   pay-TV industry at DirecTV and then at AT&T for more than

9   seven years?

10    A    Yes.

11    Q    So I want to ask you questions about a project

12   that was discussed in your deposition called the MVPD

13   concessions scenarios.

14        Do you recall that?

15    A    I do.

16    Q    In June of 2016, you worked on this MVPD

17   concessions scenarios project; is that right?

18    A    Yes.

19    Q    And at that time, you were the vice president of

20   strategy and business development?

21    A    Yes.

22    Q    And you reported directly to Tony Goncalves?

23    A    Tony Goncalves, yes.

24    Q    Goncalves, it's an S?

25    A    Soft C.

1     Q     Soft C.

2     A     Yes.

3     Q     Thank you.

4           At that time, Mr. Goncalves was the senior vice

5     president of strategy and business development?

6     A     Yes.

7     Q     And Mr. Goncalves asked you initially to look at

8     what the scenarios might be for AT&T as a result of a

9     consent decree involving Charter and Time Warner Cable,

10    right?

11    A     Yes.

12    Q     And you suggested adding also, thinking about what

13    would be the implications of the expiration of the

14    Comcast-NBCU consent decree, right?

15    A     At the time there was some because around those

16    conditions, so yes.

17    Q     I'd like to ask you to look -- well, I'd like to

18    hand you a document.

19          Your Honor, may I approach?

20          THE COURT:  You may.

21          MR. CONRATH:  May I approach the witness?

22          THE COURT:  You may.

23          THE WITNESS:  Counsel, if it's no trouble, could

24    I have some water?

25          THE COURT:  We'll get you one of those.

1    THE WITNESS:  Great.

2    MR. CONRATH:  May I approach with water?

3    THE COURT:  Yes.

4    THE WITNESS:  Thank you.

5  BY MR. CONRATH:

6    Q    Mr. Gibson, you have a document in front of you

7  that's been marked for identification as

8  Plaintiff's Exhibit 30.

9         The first page of PX30 is a cover email from you

10  to Tony Goncalves on June 21st, 2016, correct?

11    A    Yes.

12    Q    And the subject is competitive merger

13  implications, correct?

14    A    Yes.

15    Q    And the email has an attachment that is described

16  as MVPD concessions scenarios V15, correct?

17    A    Yes.

18    Q    And if you turn to the attachment on page 2 of

19  PX30, it has the title "MVPD Concessions Scenarios" and the

20  date of June 2016, correct?

21    A    Yes.

22    Q    And this is work on a project your boss,

23  Mr. Goncalves, had asked you to do?

24    A    Yes.

25    Q    And you were involved in the preparation of this

1   presentation that you sent to your boss?

2        A    Yes.  This was us trying to get educated about

3   some merger conditions.

4        Q    In fact, you had made extensive handwritten edits

5   to an earlier draft of this document; is that right?

6        A    It's very common.  I make a lot of handwritten

7   edits to things, yes --

8        Q    Right.

9        A    -- much to my team's chagrin.

10       Q    All right.  Well, we're glad to hear that you're

11   on the job.

12            So you thought this document was at the right

13   stage to send it to your boss, right?

14       A    We send documents to my boss at various stages.

15            MR. CONRATH:  Your Honor, the United States moves

16   for the admission of PX30 into evidence.

17            THE COURT:  All right.

18            MS. ROBSON:  No objection, Your Honor.  But we ask

19   that be kept under seal.

20            THE COURT:  It will be admitted under seal.

21                         (Government's Exhibit PX30
                             received into evidence under seal.)
22   BY MR. CONRATH:

23       Q    Please turn, if you would, Mr. Gibson, to page 3

24   of PX30.

25            This describes the project brief that you're --

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    about the project that you were working on, right?  That's

 2    the title?

 3         A    Yes.

 4         Q    And under key questions, the second bullet reads,

 5    "As the CMCSA/NBCU merger Consent Decree expires, what are

 6    the potential scenarios and impact to AT&T's business?"

 7              Do you see that?

 8         A    That's what it says, yes.

 9         Q    And CMCSA is Comcast?

10         A    Yes.

11         Q    So in this project, you were looking at the

12    potential impact on AT&T's business of the Comcast-NBCU

13    merger Consent Decree expiring?

14         A    This probably, we were trying to understand what

15    those merger conditions were.

16         Q    Sure.

17              And if you see in the kind of lower left, it lists

18    the project team.

19         A    Yes.

20         Q    And the first one there is Bill Belden;

21    is that right?

22         A    Yes.

23         Q    And who's Mr. Belden?

24         A    He used to work for me.

25         Q    And what was his title at this time?
```

```
 1        A     He was the AVP of strategy.

 2        Q     AVP is assistant vice president?

 3        A     Assistant vice president.

 4        Q     And the key stakeholders described here are you

 5   and Mr. Goncalves, right?

 6        A     Correct.

 7        Q     Please turn to page 10 of PX30.

 8              And in page 10, you're examining the impact of

 9   expiring conditions on Comcast-NBCU merger, correct?

10        A     Again, we were trying to understand what these

11   conditions were, and this was our attempt to try to lay that

12   out.

13        Q     And to look at the potential impact on AT&T?

14        A     Again, brainstorm the what-ifs, sure.

15        Q     And Comcast -- just to be clear, Comcast at this

16   point, Comcast, a cable company, owns NBCU, a content

17   company?

18        A     That's correct.

19        Q     Look in your -- look at the column under "Impact

20   on Ecosystem."  Do you see that, the center column?

21        A     I do, yes.

22        Q     And here you're analyzing what Comcast-NBCU may be

23   able to do when the conditions that come out of the consent

24   decree expire, right?

25        A     Yeah, what they may be able to do.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1713

1       Q     The first bullet under Impact Under -- on

2    ecosystems says, "Option to raise price or withhold NBCU

3    content from others."

4             Do you see that?

5       A     I see that.

6       Q     And that's stated as an impact on the pay-TV

7    ecosystem?

8       A     Yes.  It's the direct inverse of the condition.

9       Q     And the second bullet says, "Withhold or re-price

10   specific rights, e.g., stacking rights, library, catalog, in

11   order to differentiate its own service."

12            Correct?

13      A     Yes.  Again, like all our programming partners.

14      Q     Well, it doesn't say anything about all of your

15   other programming partners, does it?

16      A     It doesn't.  I'm just trying to be helpful.  But

17   that's what we said.

18      Q     The next column over is "Impact to AT&T," right?

19      A     Yes.

20      Q     And the first bullet says, "NBCU could become a

21   more formidable negotiating power."

22            Correct?

23      A     That's what it says.

24      Q     And that was the view you reported to your boss at

25   the time?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1714

1      A      This was our, again, draft understanding of some

2    pretty complicated merger conditions.

3      Q      And the second bullet under "Impact to AT&T" says,

4    "Content costs could increase XB."

5             X billion, is that?

6      A      Yes.

7      Q      So some unknown number of billion dollars in

8    programming costs in 2016, correct?

9      A      Again, this was a draft.  We hadn't finished this

10   work.

11     Q      But that was the information that you reported as

12   ready to send to Mr. Goncalves?

13     A      I sent this document to Mr. Goncalves.

14     Q      All right.  You can set that document aside for

15   the moment.

16            MR. CONRATH:  Your Honor, I have another document.

17   May I approach?

18            THE COURT:  Yes.

19            MR. CONRATH:  May I approach the witness?

20            THE COURT:  You may.

21            MR. CONRATH:  May I proceed?

22            THE COURT:  You may.

23   BY MR. CONRATH:

24     Q      Mr. Gibson, you have in front of you PX11?

25     A      I do, yes.

1715

1    Q    And PX11 is an email chain.  The top one is from
2  Mr. William Belden?
3    A    Yes.
4    Q    Do you see that?
5         And that's the person who you told us a moment ago
6  works for you?
7    A    Correct.
8    Q    And he was, at that time, the assistant vice
9  president of business strategy?
10   A    Yes.
11   Q    And he sends this email to you on Friday,
12  June 3rd, 2016?
13   A    Yes.
14   Q    And this is about -- the subject matter is about
15  the same project that we were looking at in the previous
16  document, correct?
17   A    Yes.
18   Q    And this email is earlier in time than the
19  document we looked at previously, correct?
20   A    Yes.  This is his first very rough understanding
21  of these conditions.
22   Q    And you had asked Mr. Belden to work on this
23  project of MVPD concession scenarios?
24   A    Yes.
25   Q    And as AVP of strategy Mr. Belden took the lead on

1    pulling together information for this project?

2         A    Yes.

3         Q    And in Plaintiff's Exhibit 11 Mr. Belden is

4    reporting to you about MVPD concession scenario project?

5         A    Yes.  And I think, just to, again, to be helpful,

6    this is pretty early in that process, as evidenced by his

7    lots of holes in here, statement upfront.

8              MR. CONRATH:  Your Honor, the United States moves

9    for admission of PX11 into evidence.

10             MS. ROBSON:  No objection, Your Honor.

11             THE COURT:  All right.  It will be admitted.

12                                   (Government's Exhibit PX11
                                       received into evidence.)
13   BY MR. CONRATH:

14        Q    Mr. Gibson, on the first page of PX11, below the

15   first paragraph, there's a heading "Comcast-NBCU

16   Assessment," correct?

17        A    Yes.

18        Q    And the first topic in that outline is

19   "arbitration for linear programming," correct?

20        A    Yes.

21        Q    And below that at Ai, Mr. Belden writes to you,

22   "Expiration of condition means NBCU can play hardball and

23   threaten blackout if they do not get the terms from MVPDs

24   that they want."

25             Is that correct?

1        A     I see that statement, yes.

2        Q     And the second topic in the outline is "online."

3    Mr. Belden there is analyzing the expiration of the

4    Comcast-NBCU Consent Decree on online video distribution,

5    correct?

6        A     I believe that's what he interpreted the condition

7    to be, yes.

8        Q     And below that at Ai, Mr. Belden wrote to you,

9    "Expiration means NBCU can choose not to license content

10   online to some players or may discriminate on price."

11            That's what he wrote to you, right?

12       A     That's what he said, yes.

13       Q     And the statements that he's writing to you is

14   what he understood at that time would be the implications of

15   NBCU and Comcast no longer having conditions on the way they

16   behave in the marketplace, correct?

17       A     These were the statements of an individual who

18   reported to me reading merger conditions for the first time.

19       Q     And at Bi under "online," Mr. Belden write to you,

20   "Expiration means OVDs could be looking at different terms

21   for NBCU content.  DirecTV Now may not get the content or

22   the rates that DirecTV gets."

23            Do you see that?

24       A     Yes.

25       Q     And that's, again, what Mr. Belden was reporting

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    to you as a result of expiration of the Consent Decree?

2        A    Again, this is someone junior to me reading some

3    pretty complicated merger conditions for the first time.

4        Q    And you understand that if this merger goes

5    through, AT&T will be in one company, combining a

6    distribution company with a content company, correct?

7        A    Yes.

8        Q    It would be -- do you know the term "vertically

9    integrated"?

10       A    Yes.

11       Q    And that is what Comcast and NBCU are;

12   is that correct?

13       A    That is what Comcast and NBCU are, yes.

14            MR. CONRATH:  No further questions, Your Honor.

15            THE COURT:  Okay Ms. Robson.

16            MS. ROBSON:  May I proceed?

17            THE COURT:  When you're ready.

18            MS. ROBSON:  Thank you.

19                        CROSS-EXAMINATION

20   BY MS. ROBSON:

21       Q    Mr. Gibson, the government showed you two

22   documents.  The first was MVPD concession -- or, excuse me,

23   the second was the MVPD concession scenarios marked PX11.

24            And I think you were explaining to the Court that

25   this was a very early email in the process.  Could you

1    describe the Court where this was in the process?

2        A    I believe this may have been one of the first

3    things my team did to try to understand what these

4    conditions were all about.  As I'm sure you know, they're

5    quite complicated.  And it wouldn't be uncommon for my team

6    to spit out an email like this to me with their initial

7    thoughts.

8        Q    Now, Mr. Gibson, are you a regulatory expert?

9        A    I'm not.

10       Q    Are you a lawyer?

11       A    No.

12       Q    Ever studied law?

13       A    No.

14       Q    Is Mr. Belden a regulatory expert?

15       A    No.

16       Q    Is he a lawyer?

17       A    No.

18       Q    Has he ever studied law?

19       A    No.

20       Q    Did you and Mr. Belden actually read the

21   Comcast-NBC conditions?

22       A    We did not.

23       Q    Now, the second document that he showed to you,

24   PX30, this draft set of slides -- and I think you mentioned

25   it was a draft earlier.  Could you point the Court to the

1   language in this slide deck that indicates that it is a

2   draft.

3       A    If you look at the top right-hand corner of the

4   document, it says "Preliminary Draft."

5           And I should note for the Court that if you look

6   at our footer as well, it says "Strategy Group Opinion

7   Only," which, again, is very typical for this type of

8   document that is intended to be our team seeking to educate

9   itself about a complicated topic.

10      Q    And the next line in that footer that you pointed

11  us to says, "Subject to contradiction, our alternate

12  evaluation by other organizations."

13          Could you explain to the Court what that means.

14      A    Well, typically, once something got to the point

15  of being more official for the company, it would go through

16  a series of experts -- clearly, in this case, someone who

17  understands merger conditions, who would vet the conclusions

18  and make it more of an official, final work product.

19      Q    And I think you mentioned that PX30 was the

20  document that was sent to your boss, Mr. Goncalves?

21      A    Yes.

22      Q    And after you sent this document to your boss,

23  Mr. Goncalves, did the slide, draft slides change?

24      A    These slides changed dramatically.

25          If you'd like me to explain how, I can.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q    Please.

2    A    You know, part of what we do, Your Honor, is look

3    at competitive trends, technology trends, regulatory trends.

4         In my role, it's kind of see where the puck is

5    going.

6         And what we concluded from our high-level

7    understanding of these merger conditions is that it was

8    apparent that there were regulatory tailwinds in support of

9    the proliferation of online video.

10        That was great, and we had just decided to do

11   DirecTV Now, go over the top ourselves with online video,

12   and this strengthened our conviction.

13   Q    Now, the government read some language to you from

14   both of these documents.  Did that language remain --

15   I understand that you continued to iterate on these slides;

16   is that correct?

17   A    Yes.

18   Q    Did the language that the government read to you

19   remain in the subsequent iterations of slides after your

20   boss saw this?

21   A    No, it didn't.

22        MS. ROBSON:  Thank you.

23        Thank you, Your Honor.  No further questions at

24   this time.

25        THE COURT:  All right.  Any redirect?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1722

1       MR. CONRATH:  Yes, if I may proceed, Your Honor.

2       THE COURT:  All right.

3                   REDIRECT EXAMINATION

4   BY MR. CONRATH:

5       Q    You were asked some questions about the

6   proposition that you're not a regulatory expert or a lawyer,

7   correct?  Do you remember that discussion?

8       A    I do.

9       Q    And it is the job of the strategy group, right, to

10  understand the industry and what's going on in the industry?

11      A    We do a good deal of brainstorming about our

12  industry, yes.

13      Q    You remember the footer in the document that you

14  were pointed by Ms. Robson?

15      A    Yes.

16      Q    It's says "subject to change"?

17      A    Yes.

18      Q    In fact, you sent the PX30, the first document I

19  showed you, shortly after you sent it -- you sent it to the

20  legal department for review, correct?

21      A    That wouldn't be uncommon.  Yes.

22      Q    And after -- do you know that after the versions

23  that were sent to the legal department and were -- that came

24  back were blacked out when they were produced to the

25  Department of Justice so that we couldn't see what was said?

1        A     I'm not sure what -- about any of that.

2        Q     And you understand, there is a legal -- an

3    attorney-client privilege that permits that?

4        A     I understand the concept of attorney-client

5    privilege, yes.

6        Q     And after the review with the legal department,

7    then you got to go over to what Ms. Robson said was a

8    changed version that doesn't include the statements that

9    we're looking at here?

10        A     The final version of this work was substantially

11    different than this.

12             MR. CONRATH:  Okay.  No further questions,

13    Your Honor.

14             THE COURT:  Do these disclaimers usually appear in

15    these kind of early documents?

16             THE WITNESS:  Yes, they do.

17             THE COURT:  Subject to contradiction or alternate

18    evaluation by other organizations; that means within AT&T,

19    right?

20             THE WITNESS:  Exactly, Your Honor.

21             We throw things against the wall, a series of

22    what-ifs, try to cause some discussions.

23             Certainly, nothing we write is the gospel.

24             THE COURT:  So internal use only?

25             THE WITNESS:  Absolutely, yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1724

```
 1              THE COURT:  You're excused.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  You can step down.

 4              All right.  We're going to take the luncheon

 5     recess.  I believe Mr. Manty will be the witness after

 6     lunch?

 7              MR. CONRATH:  That's correct, Your Honor.

 8              THE COURT:  Based on the estimates previously

 9     given, you should take the rest of the afternoon.

10              MR. CONRATH:  That sounds right to us.

11              THE COURT:  We're breaking early today at 4:00.

12              MR. CONRATH:  I recall that, Your Honor.

13              THE COURT:  Any other issues or questions at this

14     time, Counsel?

15              MR. CONRATH:  Not from us, Your Honor.

16              MR. PETROCELLI:  No.

17              THE COURT:  No?

18              All right.  Have a good lunch.

19              DEPUTY CLERK:  All rise.

20              This Honorable Court will stand in recess until

21     the return of court.

22              (Proceedings concluded at 12:56 p.m.)

23

24

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

C E R T I F I C A T E

          I, William P. Zaremba, RMR, CRR, certify that

the foregoing is a correct transcript from the record of

proceedings in the above-titled matter.


Date: April 5, 2018_____      /S/__William P. Zaremba_____

                                 William P. Zaremba, RMR, CRR

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      :
                               :
              Plaintiff,       :        CV No. 17-2511
        vs.                    :
                               :        Washington, D.C.
                               :      Thursday, April 5, 2018
AT&T, INC., ET AL.,            :           2:35 p.m.
                               :
                               :           Day 9
                               :
              Defendants.      :
----------------------------x




                    AFTERNOON SESSION
                 TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE RICHARD J. LEON
            UNITED STATES DISTRICT SENIOR JUDGE



APPEARANCES:

For the Government:          Craig W. Conrath, Esquire
                             Eric D. Welsh, Esquire
                             Donald G. Kempf, Jr., Esquire
                             Jared A. Hughes
                             Julie S. Elmer, Esquire
                             Lawrence A. Reicher, Esquire
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Washington, DC  20530
                             (202) 532-4560
                             craig.conrath@usdoj.gov
                             eric.welsh@usdoj.gov
                             donald.kempf@usdoj.gov
                             jared.hughes@usdoj.gov
                             julie.elmer@usdoj.gov
                             lawrence.reicher@usdoj.gov
```

1   Appearances Continued:

2   For Defendant AT&T          Katrina M. Robson, Esquire
     and DirecTV Group           O'Melveny & Myers LLP
3   Holdings, LLC:              1625 Eye Street, NW
                                 Washington, DC  20006
4                                (202) 220-5052
                                 krobson@omm.com
5
                                 Daniel M. Petrocelli, Esquire
6                                M. Randall Oppenheimer, Esquire
                                 O'MELVENY & MYERS LLP
7                                1999 Avenue of the Stars
                                 8th Floor
8                                Los Angeles, CA  90067
                                 (310) 553-6700
9                                dpetrocelli@omm.com
                                 roppenheimer@omm.com
10
                                 Michael L. Raiff, Esquire
11                               Robert C. Walters, Esquire
                                 GIBSON, DUNN & CRUTCHER LLP
12                               2100 Mckinney Avenue
                                 Suite 1100
13                               Dallas, TX 75201
                                 (214) 698-3350
14                               mraiff@gibsondunn.com
                                 rwalters@gibsondunn.com
15
     For Defendant              Kevin J. Orsini, Esquire
16   Time Warner, Inc.:         Peter T. Barbur, Esquire
                                 CRAVATH, SWAINE & MOORE LLP
17                               Worldwide Plaza
                                 825 Eighth Avenue
18                               New York, NY  10019
                                 (212) 474-1140
19                               korsini@cravath.com
                                 pbarbur@cravath.com
20
     Court Reporter:            Crystal M. Pilgrim, RPR, FCRR
21                               Official Court Reporter
                                 United States District Court
22                               District of Columbia
                                 333 Constitution Avenue, NW
23                               Washington, DC  20001
                                 (202) 354-3127
24                               crystal_pilgrim@dcd.uscourts.gov

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1                    Table of Contents

2                         Direct  Cross  Redirect  Recross

3  On behalf of the Plaintiff:

4      Gregory Manty

5          By Ms. Elmer          1729

6          By Mr. Oppenheimer          1776

7

8

9

10                 E-X-H-I-B-I-T-S

11                                    Marked    Received

12  Exhibit No. PX 363                          1732

13  Exhibit No. PX 31                           1734

14  Exhibit No. 189                             1742

15  Exhibit No. 543                             1748

16  Exhibit No. 184                             1769

17

18

19

20

21

22

23

24

25
```

Pages 1726 - 1791

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1                    P-R-O-C-E-E-D-I-N-G-S

2          THE DEPUTY CLERK:  Good morning, Your Honor.

3          We are on the record in Civil Matter 17-2511.  The

4  United States of America versus AT&T, Incorporated, et al.

5          THE COURT:  All right.  Government ready to call its

6  next witness?

7          MR. CONRATH:  Yes, Your Honor, my colleague, Julie

8  Elmer, will be taking care of the next witness.

9          THE COURT:  All right.  Welcome.

10          MS. ELMER:  Good afternoon, Your Honor.

11          THE COURT:  Welcome.

12          MS. ELMER:  The United States calls Gregory Manty as

13  an adverse party witness.

14          THE COURT:  All right.

15          THE DEPUTY CLERK:  Sir, please raise your right hand.

16          GREGORY MANTY, ADVERSE PARTY WITNESS, SWORN

17          THE DEPUTY CLERK:  Please be seated.

18          MS. ELMER:  May I proceed, Your Honor?

19          THE COURT:  You may.  You may use leading questions

20  if you wish.

21                    DIRECT EXAMINATION

22  BY MS. ELMER:

23  Q.   Mr. Manty, please state your full name for the record?

24  A.   My name is Gregory Steven Manty.

25  Q.   And you're a director and AT&T's corporate strategy group,
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   right?

2   A.   Yes.

3   Q.   You joined that group in July of 2014?

4   A.   Yes.

5   Q.   And in 2017, you did some work on merger integration

6   planning, correct?

7   A.   Yes.

8   Q.   And you worked on a team that focused on content

9   distribution strategy for the company post-merger, right?

10  A.   Yes.

11  Q.   And you prepared a document to be used at a meeting of the

12  AT&T and Time Warner merger integration teams in April of 2017,

13  correct?

14  A.   Yes.

15         MS. ELMER:  Your Honor, I have some binders, may I

16  approach?

17         THE COURT:  Okay.

18         MS. ELMER:  Your Honor, may I proceed?

19         THE COURT:  You may.

20  BY MS. ELMER:

21  Q.   Mr. Manty, please turn to the first tab in your binder, PX

22  363.

23         MS. ELMER:  And, Your Honor, this document has been

24  marked for identification as PX 363, and defense counsel has

25  been given a copy.  May I proceed?

1    THE COURT:  You may.

2  BY MS. ELMER:

3  Q.    PX 363, Mr. Manty, is an email from you to Tony Driscoll

4  attaching a draft PowerPoint presentation, correct?

5  A.    Yes, ma'am.

6  Q.    And Mr. Driscoll was your supervisor during the time that

7  you worked on merger integration planning in 2017, correct?

8  A.    He was one of the supervisors, I wasn't reporting directly

9  to him.

10 Q.    In any event, he was superior to you; is that right?

11 A.    Yes, ma'am.

12 Q.    And the date of your e-mail is April 8th of 2017?

13 A.    Yes.

14 Q.    And the attachments line of your e-mail says, CD 417 draft

15 GM version 1, right?

16 A.    Yes, ma'am.

17 Q.    And GM means that you personally worked on this draft,

18 correct?

19 A.    Yes.

20 Q.    And CD means content distribution?

21 A.    Yes.

22 Q.    And you prepared this draft for an April 2017 meeting

23 between AT&T and Time Warner merger integration teams, right?

24 A.    Yes, I believe so.

25 Q.    And you attended this meeting?

1  A.   Yes.

2              MS. ELMER:  Your Honor, plaintiff moves to admit PX

3  363 into evidence?

4              THE COURT:  All right.

5              MR. OPPENHEIMER:  Your Honor, no objection,

6  confidential.

7              THE COURT:  It will be admitted under seal.

8              (Plaintiff's Exhibit No. PX 363 was

9         received in evidence under seal.)

10             MS. ELMER:  May I proceed?

11             THE COURT:  You may.

12  BY MS. ELMER:

13  Q.   And, Mr. Manty, in your cover e-mail you wrote, "Tony,

14  attached is a revised draft as previously discussed.  Note that

15  for each of the core beliefs I've haded 'so what' to the notes

16  for our reference."  Do you see that?

17  A.   Yes.

18  Q.   And let's go to the page with PX 0363 dash 012 in the

19  bottom center.  I'll give you a minute.

20      Are you there yet?

21  A.   Yes, ma'am.

22  Q.   And the top of the slide says, "Core belief number one,"

23  you see that, sir?

24  A.   Yes.

25  Q.   And core belief number one is the economic incentives of

1  major pay-TV firms will ensure stability through the slow

2  structural decline of the industry reducing the risk of a

3  dramatic downturn period," right?  That's what it says?

4  A.    That's what it says, yes.

5  Q.    And you worked on this slide?

6  A.    Yes, I believe so.

7  Q.    And you also added the speaker's notes for this slide on

8  the following page, correct?

9  A.    Yes, I believe so.

10 Q.    And let's look at that page.  It has PX 0363 dash 013 on

11 the bottom, are you with me?

12 A.    Yes, ma'am.

13 Q.    And, Mr. Manty, that speaker note says, "So what.

14 Traditional pay-TV will be a cash cow business to AT&T for many

15 years to come during which we can slowly pivot the broader

16 strategy.  Dramatic strength changes don't need to happen

17 overnight."  And that's what you wrote, correct?

18 A.    Yes, I believe so.

19 Q.    And this slide was sanitized before the meeting between

20 the AT&T and Time Warner merger integration teams, wasn't it?

21 A.    I don't know if I would characterize it that way.

22 Q.    Core belief number one was watered down, correct?

23 A.    I think it went through several iterations of change.

24 Q.    It was made more bland?

25 A.    A few different iterations, I think I used bland as a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    descriptive, yes.

2    Q.   And it was made more bland because the lawyers would be

3    all over it if it was not watered down, correct?

4    A.   No, not necessarily.

5    Q.   Sir, if you could please turn to the second tab in your

6    binder, PX 31.

7            MS. ELMER:  And, Your Honor, this document has been

8    marked for identification as PX 31, and defense counsel has

9    been given a copy.  May I proceed?

10           THE COURT:  You may.

11   BY MS. ELMER:

12   Q.   Mr. Manty, PX 31 is an e-mail from you to Tony Driscoll

13   attaching a draft PowerPoint presentation; is that right?

14   A.   Yes, ma'am.

15   Q.   And that e-mail has a date of April 9, which is one day

16   after of the draft we just looked at, correct?

17   A.   Yes, I believe so.

18           MS. ELMER:  Your Honor, plaintiff moves to admit PX

19   31 into evidence?

20           MR. OPPENHEIMER:  No, Your Honor, no objection under

21   seal.

22           THE COURT:  It will be admitted under seal.

23           (Plaintiff's Exhibit No. PX 31 was

24       received in evidence under seal.)

25   BY MS. ELMER:

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   And the e-mail at the bottom of the chain on the first

2  page is your April 8 e-mail that we just looked at a moment

3  ago, correct?

4  A.   Yes, I see that.

5  Q.   And Mr. Driscoll wrote back to you, "Nice work," right?

6  A.   Yes.

7  Q.   But he watered your draft down, didn't he?

8  A.   I think he made few different changes, we were still in

9  the process of drafting this.

10 Q.   He made core belief number one too bland, in your opinion?

11 A.   I was pushing back a little bit to see what his response

12 would be.

13 Q.   And because it's easier to read than the back and white

14 PDF version, I'd like to look at the native version of this

15 document, which is toward the back of this particular exhibit

16 on the page with PX 0031 dash 041.  Are you with me, sir, on

17 that page?

18 A.   Yes, ma'am.

19 Q.   And, Mr. Manty, in this version of the document, core

20 belief number one reads, "The economic incentive of major

21 pay-TV players will encourage stability as the ecosystem

22 evolves," correct?

23 A.   Yes.

24 Q.   And this was Mr. Driscoll's revision to your earlier

25 draft, right?

1   A.   Yes, I believe so.

2   Q.   And you wrote a note to him at the top right of this page,

3   didn't you?

4   A.   Yes, ma'am.

5   Q.   And your note says, "Can we say," quote, "as the industry

6   experiences slow structural decline," unquote, "or that there's

7   a reduced risk of, quote, a dramatic downturn period," unquote,

8   "I feel like this one has become too bland, but I also know the

9   lawyers will be all over it."  That's what you wrote, correct?

10  A.   Yes, I believe so.

11              THE COURT:  What are you looking at?

12              MS. ELMER:  I'm looking at the box, the blue box in

13  the top right-hand of the slide that has --

14              THE COURT:  Where is it on 0031?

15              MS. ELMER:  I'm sorry?

16              THE COURT:  Where is it in 0031?

17              MS. ELMER:  It's on the page with PX 0031 dash 041 at

18  the bottom.

19              THE COURT:  041?

20              MS. ELMER:  Yes, sir.  And it's a box in the upper

21  right-hand side that's in blue.

22              Your Honor, may I proceed?

23              THE COURT:  Not yet.

24              MS. ELMER:  Okay.

25              Pause.)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  Did you say there's two versions of this

 2  here?

 3              MS. ELMER:  Your Honor, that's black and white

 4  version, and then there's the color.  In that particular

 5  Exhibit PX 31, they're identical to each other, but the version

 6  that we were just discussing earlier, 363, is an earlier

 7  version of the document.

 8              THE COURT:  363?

 9              MS. ELMER:  Yes, sir, yes, Your Honor.

10              THE COURT:  Is that supposed to be in this notebook I

11  have?

12              MS. ELMER:  I believe it was tab -- the first tab of

13  your notebook, Your Honor.  I can give you a cite.

14              THE COURT:  Hold on.

15              What's the reason we have two versions of the same

16  document?

17              MS. ELMER:  Your Honor, it's just for the ease of

18  viewing because the color version is easier to see.  It's very

19  difficult to read the box in the black and white version.

20              THE COURT:  In 31?

21              MS. ELMER:  Of 31, yes, Your Honor.

22              THE COURT:  Because my version of 31 is colored as

23  well.  All kinds of color in it.

24              MS. ELMER:  All right, my bad, I'm sorry for having

25  too much paper in the record.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    May I proceed, Your Honor?

2         THE COURT:  If you're ready.  What's next?

3    BY MS. ELMER:

4    Q.   Mr. Manty, you can set that document aside, sir.

5        Now, sir, core belief number one was watered down even

6    further in a later version of this document, correct?

7    A.   I believe, I mean, this whole deck changed a little bit

8    through the interim process that we go through.

9    Q.   And the lawyers sanitized it had between the meeting

10   between the AT&T and the Time Warner merger integration teams,

11   correct?

12   A.   I wouldn't use the word "sanitize."  It's through the

13   parlor in process so there's legal review.

14   Q.   Mr. Manty, if you could turn to the third tab in your

15   binder, PX 189.

16        MS. ELMER:  And, Your Honor, this document has been

17   marked for identification as PX 189 and defense counsel has

18   been given a copy.  May I proceed?

19        THE COURT:  You may.

20   BY MS. ELMER:

21   Q.   Mr. Manty, PX 189 is an e-mail from you to Mel Coker dated

22   May 5th of 2017 regarding CD deck, do you see that?

23   A.   Yes, ma'am.

24   Q.   And you wrote to Ms. Coker, "Mel, please find attached

25   deck from our content distribution work stream," and that's

1    what you wrote to her, correct.

2    A.   Yes.

3    Q.   And this was the final version of the deck used at the

4    April meeting between the integration teams, right?

5    A.   I believe what was forwarded, at the time I was under the

6    impression it was the final, but I later, I think, realized

7    later that it was not, in fact, the final.

8    Q.   In any event, this is a later version of the document than

9    the two that we just looked at, correct?

10   A.   I believe so.

11           MS. ELMER:  Your Honor, plaintiff moves to admit PX

12   189 into evidence.

13           MR. OPPENHEIMER:  Your Honor, objection, foundation.

14           THE COURT:  You can approach.

15           Step down, sir, sit over there.

16           (Witness withdrew from the witness stand.)

17           (Sealed Bench Conference.)

18           THE COURT:  What's your objection, Mr. Oppenheimer?

19           MR. OPPENHEIMER:  Well, Your Honor --

20           THE COURT:  What's missing?

21           MR. OPPENHEIMER:  What's missing, I believe, is his

22   knowledge for how this document came into existence or why any

23   changes were made.  He's very far down in the drafting

24   hierarchy, and I don't think we've laid a foundation that he

25   knows how the subsequent iterations occurred.

1    I also haven't been objecting to the word

2  "sanitization."  I think there's a real limit to his knowledge

3  about what happens to these document as they go through the

4  process after they leave his hands.

5    MS. ELMER:  Your Honor --

6    THE COURT:  Hold on.  It indicates here that he's the

7  one sending it to her, Coker, it's from Manty to Coker.  He's

8  saying to her that this is the deck from the content

9  distribution work stream.  It certainly suggests that he's --

10 that he was working on it and knowledgeable about it.  Why is

11 that not enough?

12   MR. OPPENHEIMER:  I think what he's doing is passing

13 it on.  She's being asked questions about how it came to take

14 its current form.  And I just don't think we've asked him

15 whether he knows it.

16   MS. ELMER:  Your Honor, I think that the other two

17 drafts that we discussed establish that he was involved in the

18 iterations of the deck and how it changed over time and was

19 involved in the drafting of the deck, the changes in form, and

20 he was assigned to content distribution team, into part of that

21 team.

22   THE COURT:  Why don't you ask him a few more

23 questions about how this deck got finalized to the point it

24 did.  What other units or groups within the company, if he

25 remembers, reviewed it and put input in if he remembers before

*\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\**

1   it got to this point.

2           MS. ELMER:  Thank you, Your Honor.

3           MR. OPPENHEIMER:  Thank you.

4           (Open court.)

5           THE COURT:  Come on back up.

6           (Witness resumed the witness stand.)

7           THE COURT:  You may proceed consistent with the

8   discussion at the bench.

9   BY MS. ELMER:

10  Q.   Mr. Manty, you testified earlier that these decks were

11  created as part of a parlor process, correct, you mentioned the

12  word "parlor"?

13  A.   The parlor in process, yes, ma'am.

14  Q.   And there were attorneys and consultants involved in this

15  process; is that right?

16  A.   Yes, ma'am.

17  Q.   And then the content distribution team that you were

18  working on was also involved in this process, correct?

19  A.   Yes.

20  Q.   And so in going through the iterations of the deck, you

21  worked with other people on your team like Mr. Driscoll; is

22  that right?

23  A.   Yes.

24  Q.   And then also the consultants and the attorneys were

25  involved in iterations of the deck, correct?

```
 1  A.    Yes, ma'am.

 2  Q.    And then the deck was ultimately used at a meeting between

 3  the Time Warner and AT&T merger integration teams at a parlor

 4  meeting that was overseen by the consultants and the legal team

 5  as part of the clean team process, right?

 6  A.    Yes, ma'am.

 7          MS. ELMER:  Your Honor, plaintiff moves to admit PX

 8  189 into evidence?

 9          MR. OPPENHEIMER:  Your Honor, I still say foundation.

10          THE COURT:  Objection overruled, I'm going to admit

11  it under seal.

12          (Plaintiff's Exhibit No. PX 189 was

13      received in evidence under seal.)

14          MS. ELMER:  I'm sorry Your Honor.

15          THE COURT:  Go ahead.

16  BY MS. ELMER:

17  Q.    Mr. Manty, if you could please turn to the page with PX

18  0189-011 at the bottom center.

19  A.    (Witness complies.)

20  Q.    Are you with me, sir, on that page?

21  A.    Yes, ma'am.

22  Q.    And, sir, in this version core belief number one states,

23  "Major pay-TV players will continue to support the traditional

24  creation, aggregation, distribution value chain," do you see

25  that there?
```

```
 1   A.   Yes.

 2   Q.   And this revision is even blander than the one

 3   Mr. Driscoll wrote, correct?

 4   A.   No, I would say that this is maybe, perhaps a better

 5   discussion starter.  It doesn't draw to, you know, a dramatic

 6   conclusion to kick off the discussion.

 7   Q.   Sir, if you could flip a few pages to the page with PX

 8   0189-018 at the bottom.

 9   A.   (Witness complies.)

10   Q.   And this page contains a summary of core beliefs, correct?

11   A.   Yes.

12   Q.   And the very top left of this page it says, "Previously

13   updated by AG and Cravath, updates in red, new text matches

14   approved headline from page 10," do you see that?

15   A.   Yes.

16   Q.   And that's the approved by the lawyers, correct?

17   A.   I don't really know what that -- I don't know what that

18   note was from.

19   Q.   And coming down to item number 1, we see that the approved

20   headline is the version that we just looked at on page PX 0189

21   dash 11, correct?

22   A.   Yes, I believe so.

23   Q.   And this is the --

24             THE COURT:  Do you know what AG means?

25             THE WITNESS:  It's a law firm, yes.
```

```
 1              THE COURT:  AG, updated by AG, do you know what that

 2  means?

 3              THE WITNESS:  I think Akin Gump.

 4              THE COURT:  Akin Gump?  Do you know what Cravath is?

 5              THE WITNESS:  They're a law firm, yes, sir.

 6              THE COURT:  All right.

 7  BY MS. ELMER:

 8  Q.   And, sir, the version that appears here on the slide is

 9  even blander than Mr. Driscoll's version, isn't it?

10  A.   No, I don't know if I would describe it that way.

11  Q.   It's the version that was sanitized by the lawyers, isn't

12  it?

13  A.   I don't think I would describe it as sanitizing.

14  Q.   Mr. Manty, you can set that particular document aside, but

15  keep your notebook, please.

16              MS. ELMER:  Your Honor, I have one more subject area

17  to cover with this witness.

18              THE COURT:  All right.

19  BY MS. ELMER:

20  Q.   Mr. Manty, in the ordinary course of your job duties at

21  AT&T, you've worked with consultants hired by AT&T, correct?

22  A.   Yes, ma'am.

23  Q.   And sometimes you've worked with consultants to create

24  documents?

25  A.   Yes.
```

1   Q.   And sometimes those documents are in the form of

2   PowerPoint slides?

3   A.   Yes.

4   Q.   And during your time at --

5           THE COURT:  Sometimes?  Is there any evidence to the

6   contrary that there's anything else?  That's all these folks

7   do.

8   BY MS. ELMER:

9   Q.   And Mr. Manty, during your time at AT&T, you've worked

10  with consultants from Bain on some AT&T projects; is that

11  right?

12  A.   Yes, ma'am.

13  Q.   And one of those projects was a video strategy project in

14  2014, correct?

15  A.   Yes.

16  Q.   And this was a big project at AT&T?

17  A.   It was the -- one of the first projects I worked on.  I

18  couldn't tell you if it was considered a big project for the

19  corporation.

20  Q.   Lots of people worked on it, right?

21  A.   Yes.

22  Q.   And it was an important project at AT&T?

23  A.   I can't speak to its importance for the corporation.

24  Q.   The working team for the project reported up to a steering

25  committee of more senior executives, didn't they?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   From what I remember there were some senior folks in the

2  steering committee, yes, ma'am.

3  Q.   And that committee in turn reported up to AT&T senior

4  governance team, correct?

5  A.   I don't -- I don't remember.

6          MS. ELMER:  Your Honor, I've marked for

7  identification PX 543.  May I have permission to approach?

8          THE COURT:  You may.

9          MS. ELMER:  May I proceed?

10         THE COURT:  You may.

11         MS. ELMER:  Your Honor, this document has been shared

12  with defense counsel as well.

13         THE COURT:  I hope so.

14  BY MS. ELMER:

15  Q.   Mr. Manty, PX 543 is an e-mail dated October 2, 2014 from

16  Mr. Wallingford to you and many others at AT&T and Bain,

17  correct?

18  A.   Yes, ma'am.

19  Q.   And a video content strategy kickoff deck dated October 2,

20  2014 is attached to his e-mail, correct?

21  A.   Yes.

22  Q.   And if you turn to the second page of this document, the

23  AT&T globe logo is on the cover page of the deck; is that

24  right?

25  A.   Yes.

1  Q.    And let's look at slide number 3 of the deck, working team

2  introductions, do you see that?

3  A.    Yes, ma'am.

4  Q.    And do you see your name and picture on the AT&T side of

5  the slide?

6  A.    I do.

7  Q.    Along with eleven other AT&T employees?

8  A.    Yes.

9  Q.    And you see Chris Sambar's name there, he was a

10 vice-president at AT&T?

11 A.    Yes, ma'am.

12 Q.    You also see twelve Bain and Company employee names and

13 photos on the other side of this slide, correct?

14 A.    Yes.

15 Q.    And so this deck was the kickoff deck for the project that

16 you were working on; is that right, sir?

17 A.    Looks like it, yes.

18 Q.    And if you turn to slide number 7.

19 A.    (Witness complies.)

20 Q.    This one says, "Project governance roles and

21 responsibilities" at the top, do you so see that?

22 A.    Yes.

23 Q.    Do you see your name in the core team box on the left side

24 of the page?

25 A.    Yes, I do.

```
 1   Q.   And you see seven AT&T executives listed in the steering
 2   committee box above that?
 3   A.   Yes.
 4   Q.   And you see four senior AT&T executives in the senior
 5   governance team box at the very top of the AT&T slide on the
 6   page?
 7   A.   Yes, I see that.
 8   Q.   And that includes Mr. Donovan?
 9   A.   Yes.
10   Q.   Mr. Stankey?
11   A.   Yes.
12   Q.   Ms. Lee?
13   A.   Yes.
14   Q.   And so a lot of important people had eyes on this video
15   strategy project, didn't they?
16   A.   Looks like this was what was proposed at the kickoff.  But
17   I really don't remember too much about this project.
18            MS. ELMER:  And, Your Honor, plaintiff moves to admit
19   PX 543 into evidence?
20            MR. OPPENHEIMER:  No objection.
21            THE COURT:  Be admitted.
22            (Plaintiff Exhibit No. 543 received in evidence.)
23   BY MS. ELMER:
24   Q.   Mr. Manty, you were assigned to lead a sub-team on this
25   project, correct?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   I really don't remember too much about what my role was on

2  this project.

3  Q.   Right.  Well, Mr. Manty, let's look at your binder again.

4  And please turn to the fourth tab, PX 190.

5           MS. ELMER:  And, Your Honor, this document has been

6  marked for identification as PX 190, and defense counsel has

7  been given a copy.  May I proceed?

8           THE COURT:  Yes.

9  BY MS. ELMER:

10 Q.   And, Mr. Manty, PX 109 is an October 6th, 2014 e-mail, an

11 attachment from Scott Wallingford to you and others, correct?

12 A.   Yes.

13 Q.   And Mr. Wallingford was one your superiors at AT&T?

14 A.   Yes.

15 Q.   And Mr. Wallingford's e-mail outlined some of the

16 assignments for the video strategy project, correct?

17 A.   It looks like he called it the initial work team

18 alignment.

19 Q.   And you see your name there?

20 A.   Yes.

21 Q.   And the video strategy project was a team effort, right?

22 A.   Yes.

23 Q.   And the AT&T employees and the Bain employees worked

24 together?

25 A.   Yes.

1  Q.    Now, Mr. Wallingford's e-mail lists some immediate action

2  items for the team, you see those?

3  A.    Yes.

4  Q.    And item number 1 is, "See attached templates," correct?

5  A.    Yes.

6  Q.    And those templates are contained in the slides that are

7  attached to Mr. Wallingford's e-mail, right?

8  A.    Yes.

9  Q.    And if you'll look in the immediate action items, item

10  number 3, that's marketplace evolution, correct?  Flip back,

11  I'm sorry, to the cover e-mail.  And item number 3 says,

12  "Marketplace evolution"?

13  A.    Yes.

14  Q.    And that's the team that you were assigned to, correct?

15  A.    That's what it looks like, yes.

16  Q.    And the assignment that he gave was, "Develop one page

17  description for each scenario, see attached template, to

18  catalog the potential scenarios."  Do you see that under

19  immediate action items?

20  A.    Yes.

21  Q.    And the template that he's directing you to use is

22  attached to his e-mail in these slides, correct?

23  A.    Yes.

24         MS. ELMER:  Your Honor, plaintiff moves to admit PX

25  190 into evidence?

1    MR. OPPENHEIMER:  Your Honor, we have an objection.

2    THE COURT:  See counsel.  Step down.

3    (Witness withdrew from the witness stand.)

4    (Sealed Bench Conference.)

5    THE COURT:  What is the relevance of this?  I don't

6    see what relevance it is.

7    MS. ELMER:  Well, we believe that it's relevance to

8    show the state of mind of AT&T.  It was during this project to

9    predict possible scenarios including vertical integration, and

10   so it is relevant to --

11   THE COURT:  This is in 14, right.

12   MS. ELMER:  That's right.

13   THE COURT:  This is way before the merger.

14   MS. ELMER:  Well, Your Honor, I think we're going to

15   be able to connect it up and show that this project was still

16   relevant as late as 2016, and we're going to be able to lay a

17   foundation.

18   THE COURT:  Explain that to me.

19   MS. ELMER:  Well, there are documents later where

20   AT&T employees are continuing to talk about and forward and

21   discuss and rely upon the work product that was generated

22   during this 2014 video strategy project.

23   THE COURT:  What does this video strategy project

24   have to do with the actual merger that took place later.

25   They're completely different, aren't they?

```
1              MS. ELMER:  Your Honor, we believe that --

2              THE COURT:  This isn't with Time Warner.

3              MS. ELMER:  Well, actually, if I'm allowed to ask the

4    witness some more questions, some of the slides do contemplate

5    a merger with Time Warner, and they are predictive of potential

6    impacts of the merger on competition, which could assist the

7    Court with the ultimate issue in this case, which is the

8    predictive effects of this merger on competition.  And we're

9    able to show that these documents continued to be generated and

10   forwarded well into 2016.  And were shared with upper level

11   management, shared it with the board.

12             THE COURT:  This is the work of a corporate strategy

13   group, right?

14             MS. ELMER:  It is the work of a corporate strategy

15   group overseen by senior governance team.

16             THE COURT:  Well, hold on now.  The strategy group is

17   coming up with ideas about possible ways to improve the company

18   and into the future and the marketplace, whatever the words

19   are, but that's the essence of it.

20             So they're brainstorming basically.  It's kind of an

21   organized brainstorming of various options that the company

22   might have, right?  That's not a commitment to anything.

23             MS. ELMER:  Well, Your Honor --

24             THE COURT:  You're saying it represents their

25   thinking?  It's brainstorming, isn't it?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        MS. ELMER:  Well, Your Honor, we believe that the

2   work of the corporate strategy group, together with Bain,

3   together with senior executives is probative of the potential

4   impacts of the merger.  If I could be allowed to lay a

5   foundation.

6        THE COURT:  Potential, what's your problem?

7        MR. OPPENHEIMER:  Well, Your Honor, it's pretty much

8   the same.

9        THE COURT:  The same as what?

10        MR. OPPENHEIMER:  It's the same as the observation,

11   it's 2014, it's unrelated to anything we're doing today.  Bain

12   is not part of the solution to this problem, it's part of the

13   problem because Bain is throwing out ideas, they're getting

14   incorporated in documents.  We're going to have to get into

15   which is Bains, which is not Bains. I don't think it leads to

16   anything that's relevant to what we're trying to do in this

17   trial.

18        THE COURT:  This seems far afield to me.  You said

19   you're going to link it up with something.  How are you going

20   to link stuff up?

21        MS. ELMER:  Your Honor, I will be able to link it up.

22        THE COURT:  How?

23        MS. ELMER:  Into 2016.

24        THE COURT:  How?

25        MS. ELMER:  With this witness there are documents

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    where he is forwarding them to senior level people in 2016 at

 2    their request.

 3              And perhaps the correct way to deal with this would

 4    be allowing these arguments of the age of the documents --

 5              THE COURT:  Why don't you ask him questions?

 6              MS. ELMER:  -- to go to the weight.

 7              THE COURT:  Put the documents aside.

 8              MS. ELMER:  I can ask him questions.

 9              THE COURT:  Just ask him questions.

10              MS. ELMER:  But, Your Honor, these documents are

11    documents that are important to the government's case.

12              THE COURT:  I understand that.  I have to weigh the

13    probative value of them, the prejudicial impact of them.

14    Whether they have any real value as being representative of

15    what a company was thinking at a given point in time.

16              At this point I have no reason to think this is

17    necessarily what the company is thinking.  This is spit

18    balling, they're coming up with ideas.  The strategy people are

19    giving people stuff to look at.  How can I say that that's what

20    the company thinks at that point in time?  There's no way I can

21    do that.

22              MS. ELMER:  Well, Your Honor --

23              THE COURT:  So if you want to ask him about his

24    involvement in the strategy to merge the two companies or

25    something like that, that's different.  But I don't see how

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    what you're trying to do makes sense.
 2            MS. ELMER:  Your Honor, the government believes that
 3    these issues of the age of the document could go to the weight,
 4    but that shouldn't be applied to the admissibility.  It's
 5    prejudicial to the government's case to exclude these documents
 6    altogether.  They are admissions of party opponent.  Bain was
 7    an agent of AT&T.
 8            THE COURT:  What do you say about that?
 9            MR. OPPENHEIMER:  Well, they're not.  Bain is
10    providing materials for discussion.
11            THE COURT:  This is pre-merger.
12            MR. OPPENHEIMER:  This is oh way pre-merger and, you
13    know, just looking at this document itself for example is
14    talking about game boarding.  Game boarding is sort of spit
15    balling, you get paid a lot of money to get a consultant to do.
16    And we're going to have to go through each of these documents
17    and sort out which is from Bain, which is not.  They're not
18    authorized to make any statements.  They're just consultants
19    working on a concept situation.
20            THE COURT:  I'm not letting 190 in, sorry.  If you
21    want to ask him some questions about his involvement with
22    merging two companies; if he did e-mails contemporaneous with
23    the merger, if he did e-mails that was involved in documents
24    that show his role in helping to meld the two companies
25    together, that's fair game to look at that.  But this, no.
```

```
1              MS. ELMER:  But, Your Honor --

2              THE COURT:  I've ruled.

3              MS. ELMER:  Okay, thank you, Your Honor.

4              THE COURT:  End of discussion.

5              (Open court.)

6              (Witness resumed the witness stand.)

7    BY MS. ELMER:

8    Q.   Now, Mr. Manty, the AT&T working team used the template

9    that Mr. Wallingford attached to his e-mail, correct?

10             THE COURT:  You better put a time frame on that

11   question, ma'am.  Did you hear me?

12             MS. ELMER:  Yes, Your Honor.

13             THE COURT:  Modify your question.  Put a timetable on

14   it.

15             MS. ELMER:  Yes, Your Honor.

16   BY MS. ELMER:

17   Q.   So, Mr. Manty, we were talking about an assignment that

18   you received from Mr. Wallingford, your superior, in October of

19   2014, correct?

20             THE COURT:  That's out of bounds.

21             MS. ELMER:  Okay.

22             THE COURT:  Consistent with the discussion at the

23   bench.

24   BY MS. ELMER:

25   Q.   All right.  Mr. Manty, you can set that document aside.
```

1   A.   (Witness complies.)

2   Q.   So work on the video strategy project continued after --

3   continued after 2014, correct?

4   A.   Actually I don't remember when it ended.

5   Q.   The work that the video strategy team did in 2014

6   continued to be important to AT&T in 2016, true?

7            THE COURT:  If you know.

8            THE WITNESS:  Yeah, I don't know.

9   BY MS. ELMER:

10  Q.   Mr. Manty, please turn to the sixth tab in your binder, PX

11  34.

12           MS. ELMER:  And, Your Honor, this document has been

13  marked for identification as PX 34, and defense counsel has a

14  copy.  May I proceed?

15           THE COURT:  Hold on a minute.

16  BY MS. ELMER:

17  Q.   Mr. Manty --

18           THE COURT:  Ma'am, I said hold on a minute.

19           MS. ELMER:  I'm sorry.

20           THE COURT:  Listen.

21           MS. ELMER:  Getting old here, I'm sorry.

22           THE COURT:  Yeah, listen.

23           Approach.  Step down.

24           (Witness withdrew from the witness stand.)

25           (Sealed Bench Conference.)

1    THE COURT:  Where are you going with this?

2    MS. ELMER:  To show that it was still something that

3  they were talking about and retaining this, this is a business

4  record.  You'll see that those slides were stored on a drive at

5  AT&T.  They were continuing to use them, discuss them and

6  forward them well into 2016.

7    I have another document that will show the same.

8  That it went up to higher level executives.  That this work

9  product was -- these ideas were still important and are

10  relevant to the AT&T state of mind.  So they fall within an

11  exception, 803, to the hearsay rule.

12    THE COURT:  What was the date of the merger

13  announced?  What was the date?

14    MR. OPPENHEIMER:  The date of the announcement was,

15  I'll have to check.  I don't know the --

16    THE COURT:  When was it consummated?  Go find out.

17    MR. OPPENHEIMER:  I will find out.

18    (Pause.)

19    MR. OPPENHEIMER:  October 22nd, 2016.

20    THE COURT:  Which, announcement or consummation?

21    MR. OPPENHEIMER:  That's the announcement for this

22  merger.

23    THE COURT:  October?

24    MR. OPPENHEIMER:  Twenty-second.

25    THE COURT:  Twenty-seventh?

```
 1              MR. OPPENHEIMER:  Twenty-second.

 2              THE COURT:  Twenty-second, of '16, right?

 3              MR. OPPENHEIMER:  Correct.

 4              THE COURT:  So that's when it was announced.  Was it

 5   actually done before that or is that the same day?

 6              MR. OPPENHEIMER:  I think that same day.

 7              THE COURT:  Do you have any reason to think it's

 8   different?

 9              MS. ELMER:  I do have reason to believe that

10   discussions began, documents show that discussions began in

11   August of 2016.  So the announcement was October of '16.

12              THE COURT:  Discussions?

13              MS. ELMER:  Yes, sir.

14              THE COURT:  All right.  Now, this is a February

15   e-mail, months before discussions even commenced, based on your

16   data.  All right.

17              Now, what possible relevance does this have now as to

18   what AT&T is thinking at this point in time?

19              MS. ELMER:  Well, usually corporations, Your Honor,

20   do begin strategic planning for very large and important

21   transactions months in advance.  And this is the beginning of

22   the talks, and then we have one other document.

23              THE COURT:  No, you said the beginning talks were in

24   August.

25              MS. ELMER:  Well, the beginning of internal
```

1  discussions to prepare for making such an acquisition.

2       THE COURT:  You can ask him questions about that.

3  You want to establish that fact.  You haven't established that

4  fact yet.  This is when they were beginning discussions

5  internally to determine how to proceed from a strategy point of

6  view, if you want to do that.

7       Look, look, let's cut to the chase.  I know what

8  you're doing.  You're trying to use this e-mail as a predicate

9  to introduce this deck of slides.  That's what's going on here,

10  all right?  I'm not letting you introduce this deck of slides

11  unless and until a foundation has been found.  As far I can

12  tell from looking at these two e-mails, there is no foundation

13  here for this deck of slides.  Its probative value, if there's

14  any, is way outweighed, and its prejudicial effect is, I guess

15  Mr. Oppenheimer is going to point out is obvious because this

16  precedes greatly the actual merger, precedes the actual

17  discussions of a merger.

18     Do you want to use this to, through kind of an admission

19  of the way AT&T was thinking.

20       MR. OPPENHEIMER:  Well, Your Honor, there's an

21  additional problem.

22       THE COURT:  What's that?

23       MR. OPPENHEIMER:  Because this is a facilitator's

24  guide.  This is a guide to having a discussion and what the

25  testimony will show, and it just seems like a detour we don't

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   need.  Is that this little indicator down here, and there are a

2   couple of other documents, it's hard to see.  It says DAL is

3   for Dallas.

4          THE COURT:  That's Dallas?

5          MR. OPPENHEIMER:  That's the Dallas office of Bain.

6   These aren't even company documents.  These were just used --

7          THE COURT:  These are Bain documents?

8          MR. OPPENHEIMER:  They're put on AT&T letterhead and

9   they're supplied by the consultant Bain, and they're used for

10  discussions.  That's all they're used for.

11         THE COURT:  Is that true?

12         MS. ELMER:  Your Honor, he's already testified --

13         THE COURT:  I asked you a question.  Is that true or

14  false, are these Bain documents or not?

15         MS. ELMER:  They say AT&T proprietary.

16         THE COURT:  I asked you a question.

17         MS. ELMER:  I don't know.

18         THE COURT:  You don't know the answer?

19         MS. ELMER:  I haven't gotten the answer from the

20  witness yet.

21         THE COURT:  You don't know the answer.  Were they

22  produced by Bain or AT&T?

23         MS. ELMER:  They were produced by AT&T.

24         THE COURT:  Are you sure of that?

25         MS. ELMER:  They have AT&T's Bates number on them,

1    Your Honor.

2           MR. OPPENHEIMER:  Your Honor, we did produce them.  I

3    believe he testified at his deposition and he certainly will,

4    this is a Bain produced material.

5           MS. ELMER:  Mr. Manty just testified that the Bain

6    and AT&T employees were both on the working team, that they

7    worked together.  And these are adopted by AT&T because they

8    were used by AT&T.  They were incorporated into the AT&T work

9    product.  They were together to create work product.

10          Bain is an agent of AT&T.  Bain's work was adopted by

11   AT&T, and is therefore an AT&T admission under 801(d)(2).  And

12   it is also a business record of AT&T.  Because as Mr. Manty's

13   e-mail shows, it is retained on a drive at AT&T, and it's been

14   retained there for a year and a half, at least at the time that

15   he forwarded the slide to Mr. Gaff (sic).

16          MR. OPPENHEIMER:  May I address that, Your Honor?

17   This can't be an admission by anybody at the company. This is a

18   facilitator guide to a discussion produced by a consultant that

19   was delivered with consultant signatures.

20          THE COURT:  That's not even an option.  The question

21   is, is it a business record?  Deal with the business record.

22          MR. OPPENHEIMER:  Well, if it were to come in, Your

23   Honor, we still have hearsay within hearsay because this

24   certainly isn't something that can be entered for the truth of

25   the facilitator throwing out ideas.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1          THE COURT:  It's not admitted for the truth of the

 2  matter.

 3          MR. OPPENHEIMER:  Your Honor, then if we have to

 4  spend time going through, if we we're just pulling sound snips

 5  out here, and then I have to pull out sound snips out there,

 6  and we're going to be spending our time talking about a deck

 7  that was designed to start, start a discussion of the corporate

 8  strategy, which itself is just throwing out ideas.

 9          THE COURT:  I'm sustaining the objection.  I'm not

10  letting it in.  Go on to something else.

11          (Open court.)

12          (Witness resumed the witness stand.)

13  BY MS. ELMER:

14  Q.   Mr. Manty, you sent documents from the 2014 video strategy

15  project to some senior executives in July 2016, correct?

16  A.   I don't recall.

17  Q.   You sent them to senior vice-president Mel Coker less than

18  half an hour before a prep session for a board of directors

19  meeting in July of 2016; is that right?

20  A.   I believe so.  But I don't remember what the time, that

21  half hour that you just mentioned.

22  Q.   Mr. Manty, you do recall sending documents from the 2014

23  video strategy project to Ms. Coker in July of 2016, correct?

24  A.   I believe I sent an excerpt from the work to her, yes.

25  Q.   And that was just a couple of months before the

 1    announcement of this merger, correct?

 2    A.    That sounds right.

 3    Q.    The merger was announced in October of 2016?

 4    A.    Yes.

 5              THE COURT:  October.

 6    BY MS. ELMER:

 7    Q.    Mr. Manty, if you could turn to the last tab in your

 8    binder, PX 184.

 9              MS. ELMER:  Your Honor, this document has been marked

10    for identification as PX 184, and defense counsel has a copy.

11    May I proceed?

12              THE COURT:  You may.

13    BY MS. ELMER:

14    Q.    Mr. Manty, PX 184 is an e-mail with attachments from you

15    to Mel Coker on July 12th, 2016, right?

16    A.    Yes, ma'am.

17    Q.    And Ms. Coker is a senior vice-president at AT&T?

18    A.    Yes.

19    Q.    And you copied Jennifer Robertson, another vice-president

20    at AT&T?

21    A.    Yeah, at the time I think that she was a vice-president.

22    Q.    And one of the attachments to your e-mail was a talk track

23    that you prepared for a board of directors meeting, right?

24    A.    I believe so, yes.

25    Q.    And you prepared that talk track for Mr. John Donovan to

1  present?

2              THE COURT:  What's a talk track?

3              THE WITNESS:  Speaking notes, parts, some more

4  background, talking notes.

5              THE COURT:  Talking points?

6              THE WITNESS:  Yeah.

7              THE COURT:  You don't use that phrase, talking

8  points?

9              THE WITNESS:  Talking points, yeah.

10             THE COURT:  Talk track.  Go ahead.

11             THE WITNESS:  I'm sorry.  Yes, I believe this was

12 prepared for Mr. Donovan, I think it's still in draft form.

13 BY MS. ELMER:

14 Q.   And the other attachment that you e-mailed Ms. Coker in

15 July 2016 was an excerpt from the December 2014 video strategy

16 steer co meeting presentation correct?

17 A.   Yes.

18 Q.   And as you testified earlier, the working team that you

19 were on reported up to a steering committee for this video

20 strategy project, correct?

21 A.   From the project in 2014?

22 Q.   That's right.

23 A.   Yes, I believe so.

24             MS. ELMER:  Your Honor, plaintiff moves to admit PX

25 184 into evidence?

```
 1            MR. OPPENHEIMER:  Your Honor, objection, same

 2    grounds, plus an addition.

 3            (Sealed Bench Conference.)

 4            MR. OPPENHEIMER:  Your Honor, this is really a

 5    continuation of the same problem.  There are two items that are

 6    on here. We introduced this document.  We're now introducing

 7    this excerpt from the 2014 video strategy session.  Once again,

 8    what the testimony will show and it was the subject of his

 9    deposition.  I actually have the pages right here.  Once again

10    we have the same Bain document just resurfacing.  It's just

11    being picked up by him.

12            THE COURT:  What is that document?

13            MR. OPPENHEIMER:  This is, Your Honor, 184-005.  And

14    he testified in his deposition to this effect this is a Bain

15    doc, just a piece of one of those old Bain documents that's

16    still circulating.

17            THE COURT:  This is an excerpt from the earlier slide

18    deck?

19            MR. OPPENHEIMER:  Correct, correct, one of them.  And

20    he's already testified that that's the case.

21            THE COURT:  You want to introduce this as some kind

22    of an admission by AT&T, that's your position?

23            MS. ELMER:  Your Honor, it's an admission by AT&T,

24    because AT&T adopted the Bain slides.  They used the Bain

25    slides.  They worked together with Bain.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           THE COURT:  When did they adopt them?

2           MS. ELMER:  Mr. Wallingford directed his team to use

3   the Bain templates in creating their product.  The slides at

4   the bottom all say AT&T proprietary.

5           THE COURT:  The fact that it says AT&T proprietary,

6   doesn't mean anything to me.  Where did the company, the board

7   or its most senior management say we're adopting this?  Where

8   did that happen?

9           MS. ELMER:  Your Honor, PX 543, which was admitted,

10  shows that the objectiveness of this project was to determine

11  AT&T's three to five year strategy, and as we saw in that

12  document, there was a steering committee and a senior

13  governance team that oversaw this project.  And so the folks

14  who were spit balling were helping to develop the three to five

15  year strategy for the company.  And here we are still within

16  that three to five year window.  And the ideas that team

17  generated are still relevant one month before talks began in

18  this merger, July 2018.  Talks began in August 2018.

19          THE COURT:  2016.

20          MS. ELMER:  I'm sorry, 2016, you're right on both

21  counts.

22          THE COURT:  We haven't gotten to July 2018.

23          MS. ELMER:  And I hope we get there.

24          THE COURT:  We're going to get there.  Go ahead,

25  finish your thought.

 1          MS. ELMER:  So, Your Honor, we contend that it's a

 2  business record under 803.  It shows AT&T's state of mind the

 3  month before the merger talks began.

 4          THE COURT:  Forget about that argument.

 5          MS. ELMER:  803, and it's an admission of party

 6  opponent under 801(d)(2).

 7          THE COURT:  It may be a business record.  Whether

 8  it's an admission of party opponent.  No way.  Business record,

 9  maybe.  Why is it a business record?

10          MR. OPPENHEIMER:  It's a --

11          THE COURT:  Kept in the ordinary course of business.

12          MR. OPPENHEIMER:  It's a third party, a piece of a

13  third party document that they kept in their files that he

14  retrieves because he's asked to retrieve it.  It wasn't created

15  by the company in the normal course of their business. It was

16  received by him.  It would be like if I had a file in my office

17  for notices of my colleagues that they moved to another law

18  firm.  Is that my business record even though I keep it?  I

19  don't think so.

20          MS. ELMER:  Your Honor, they kept a folder for this

21  stuff and hung onto it all this time, and they are still

22  sending it up to senior level executives who are preparing for

23  a board meeting mere weeks before talks began relating to this

24  transaction that we're here about today.

25      I believe it is a business record.  It's been kept ever

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  since the project.  So it's almost two years later.  All of the

 2  documents are still there, and they're's still relying on them.

 3          THE COURT:  I'm going to let it in as a business

 4  record.  But admission of a party?  No way.  You don't have

 5  anywhere near the foundation you need for that in my opinion.

 6      You can ask him some questions about it.  Of course, he'll

 7  get to ask some questions too.

 8          MS. ELMER:  Understood, Your Honor, thank you.

 9          THE COURT:  How much more you got?

10          MS. ELMER:  I'm almost done.

11          MR. OPPENHEIMER:  Thank you, Your Honor.

12          (Open court.)

13          THE COURT:  You may proceed consistent with the

14  discussion at the bench.

15  BY MS. ELMER:

16  Q.   Mr. Manty, could you turn to the page with PX 184 dash 004

17  at the bottom?

18          THE COURT:  It will be admitted under seal,

19  Mr. Oppenheimer, or not?

20          MR. OPPENHEIMER:  Under seal, Your Honor.

21          THE COURT:  Be admitted under seal.

22          (Plaintiff's Exhibit No. PX 184 was

23      received in evidence under seal.)

24          THE COURT:  What page?

25          MS. ELMER:  Your Honor, it's PX 184-004.

1    THE COURT:  All right.

2  BY MS. ELMER:

3  Q.   Mr. Manty, the title of this page is, Content Player

4  Acquisition Logic Flow, correct?

5  A.   Yes, ma'am.

6  Q.   If we go to the next page that has PX 184-005 at the

7  bottom.  This slide is titled, Vertical Integration potential

8  Logic Paths," correct?

9  A.   Yes.

10  Q.   And the second column is the shape the Ecosystem Logic

11  Path, correct?

12  A.   Yes.

13  Q.   And that's defined here on the pages purchase content

14  player to reinforce pay-TV bundle?

15  A.   That's what the definition under that column, yes.

16  Q.   And one of the strategic rationales that the video

17  strategy team identified is in the second column, which reads,

18  Content players have different incentives than AT&T, i.e., they

19  will move to the grade or destroy the bundle; is that correct?

20  A.   I don't, I don't remember if that was a team effort or if

21  that was a Bain quote there.

22  Q.   Well, those slides say AT&T on them, right, they have the

23  AT&T globe on them; is that right?

24  A.   They have the globe on there, yes.

25  Q.   And as we saw earlier, your team, your core working team

1   of AT&T employees worked with the Bain employees together on

2   this project, correct?

3   A.   We worked as a team, yes.

4   Q.   And you worked together to create documents for this

5   project, right?

6   A.   Yes.

7   Q.   And Mr. Wallingford directed you and others on the AT&T

8   team to use templates provided by Bain in doing your work on

9   the project, correct?

10  A.   I mean, we looked at that document earlier.  I think that

11  that's how I remember it, looking at it now.  But I can't

12  really recall.  That was a couple of years ago.

13  Q.   Okay.  Now, but this particular e-mail is not a couple of

14  years ago, is it?  You sent this to Ms. Coker in July of 2016,

15  correct?

16  A.   I sent it in July 2016.

17  Q.   Let's see.  So I want to look at the far left column.

18          THE COURT:  Counsel approach, please.

19          (Sealed Bench Conference.)

20          THE COURT:  You can clean this up or I'm going to.

21  Do you understand?

22          MS. ELMER:  I do.

23          THE COURT:  That slide came from 2014.  You know

24  that.  Don't make this record look wrong and inaccurate.

25          MS. ELMER:  I understand.

```
1          THE COURT:  Don't try to pull that kind of crap in

2   this courtroom.  Understand?

3          MS. ELMER:  I understand.

4          THE COURT:  You be direct and honest about what

5   you're doing.  You work for the Department of Justice.  You get

6   it?

7          MS. ELMER:  Your Honor, I understand.

8          THE COURT:  That slide came from 2014, not 2016.

9   I'll spare you the embarrassment this time, but I will not the

10  next time.

11         MS. ELMER:  I understand.

12         (Open court.)

13         THE COURT:  You may proceed consistent with the

14  discussion at the bench.

15  BY MS. ELMER:

16  Q.   Mr. Manty, the vertical -- I'm sorry, video strategy

17  document that you forwarded to Ms. Coker in July of 2016 was a

18  document from December of 2014, correct, the slide that we were

19  just looking at?

20  A.   Yeah, I mean, I can't -- I don't remember, it says

21  December 3rd, 2014.  It sounds like that that was when it was

22  created.

23  Q.   So your e-mail to her was a 2016 e-mail, but you were

24  attaching some materials from 2014?

25  A.   Yes.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q.    And so the page that we're looking at, PX 0184-006, that

2    is a page from December of 2014, correct, sir?

3    A.    Yes, all of these pages are, yes.

4              MS. ELMER:  I just have a few more questions, Your

5    Honor.

6    BY MS. ELMER:

7    Q.    In the far left corner of this page is a column entitled

8    acquisition type.  Do you see that, sir?

9              THE COURT:  What are you looking at, at 006?

10             MS. ELMER:  Yes, sir, yes, Your Honor.

11             THE COURT:  All right.

12             THE WITNESS:  Acquisition type, yes.

13   BY MS. ELMER:

14   Q.    And each acquisition type has its own row on the slide,

15   right?

16   A.    That's what it looks like, yes.

17   Q.    And the acquisition type in the first row is major

18   integrated players, e.g., Disney, Time Warner.  Do you see that

19   there?

20   A.    I see that, yes.

21   Q.    And sticking with that first row, there's a checkmark in

22   the second column, correct?

23   A.    In that cell, yes.

24   Q.    And the second column is entitled, shape the ecosystem; is

25   that right?

1  A.   Yes.

2  Q.   And acquiring Time Warner would achieve that goal,

3  according to this slide, correct?

4        MR. OPPENHEIMER:  Foundation, Your Honor.

5        THE COURT:  You can clean that up.  Ask some other

6  questions.

7  BY MS. ELMER:

8  Q.   The checkmark that is on this slide shows that the team

9  that prepared this slide believed that acquiring Time Warner

10 would achieve the goal of shape the ecosystem, correct?

11       MR. OPPENHEIMER:  Same objection, Your Honor.

12       THE COURT:  Step down.

13       (Sealed Bench Conference.)

14       MR. OPPENHEIMER:  Your Honor, these are all Bain

15 again.  Asking this young man what Bain found.  Everybody knows

16 they got things from them back in '14, pulled it out later.

17 And that's what the question answered.

18       THE COURT:  You don't know what, if any, role he had

19 in putting that checkmark there.  We don't know what, if any,

20 role he had in the confusion and that that represents.  We

21 don't know what, if any, role he had in that whole slide when

22 created.  These are all foundational questions that you have

23 not gone into.

24    Based on his performance so far, I would conclude he

25 doesn't know anything about it.  A bunch of Bain people did

1  that, and why they did it, for what reason they did it, we

2  don't know.  And yet you want to suggest, at a minimum, that

3  that's proof of something that the corporation made.  You're

4  not even in the right neighborhood.

5      Now, you read his deposition, I haven't.  Do you have any

6  reason to believe that he had any role in that checkmark being

7  put there?

8          MS. ELMER:  Your Honor, I do believe that he worked

9  on the team that did prepare --

10         THE COURT:  That's too amorphous, let's be specific.

11         MS. ELMER:  Specifically, no.

12         THE COURT:  Was he confronted on his deposition the

13  questions regarding that conclusion, yes or no?

14         MS. ELMER:  I didn't take his deposition.  I do

15  think --

16         THE COURT:  Do you remember if you asked him about

17  it?

18         MS. ELMER:  I don't remember if he was asked about

19  that checkmark specifically at his deposition, Your Honor,

20  since I was not the person that took that.

21         THE COURT:  You what?

22         MS. ELMER:  I was not the person that took the

23  deposition.

24         THE COURT:  You were present for it?

25         MS. ELMER:  No.

```
 1                THE COURT:  Have you reviewed it in preparation for

 2  this testimony today.

 3                MS. ELMER:  I have.

 4                THE COURT:  And you just don't remember?

 5                MS. ELMER:  I don't remember that specific.

 6                THE COURT:  Do you remember, Mr. Oppenheimer?

 7                MR. OPPENHEIMER:  I don't believe he knows how these

 8  were generated, just that they were received from Bain.

 9                THE COURT:  He's the wrong witness to be asking these

10  questions to.  Do you have another topic?

11                MS. ELMER:  Judge, I am essentially done.

12                THE COURT:  All right.

13                (Open court.)

14  BY MS. ELMER:

15  Q.   Mr. Manty, I have --

16                MS. ELMER:  Your Honor, I have no further questions

17  for Mr. Manty at this time.  I'll pass the witness.

18                THE COURT:  Mr. Oppenheimer.

19                MR. OPPENHEIMER:  May I proceed, Your Honor?

20                THE COURT:  You may.

21                MR. OPPENHEIMER:  I'll be very brief.

22                          CROSS-EXAMINATION

23  BY MR. OPPENHEIMER:

24  Q.   Good afternoon, Mr. Manty.

25  A.   Good afternoon.
```

1  Q.   Just very quickly, early in the examination this afternoon

2  you were asked some questions by the government about some

3  lawyer review of some documents.  Do you recall that?

4  A.   Yes, sir.

5  Q.   All right.  And you referred to something called the

6  parlor process?

7  A.   Yes.

8  Q.   Okay.  Would you just very briefly explain to the Court

9  your understanding of the parlor process?

10  A.   My understanding is that it's put in place.  It's highly

11  regulated when two entities have agreed to -- on a transaction,

12  but have not closed that transaction.  And it's a way to not

13  share sensitive information between those two entities, and

14  it's highly regulated.  And that's why it's overseen by lawyers

15  and counsel.

16  Q.   Okay.  Other than collecting some information, have you

17  had anything to do with the decision regarding the Time Warner

18  merger?

19  A.   No, sir.

20  Q.   Have you had anything to do with its implementation?

21  A.   I'm sorry?

22  Q.   Other than the parlor process that you just described,

23  you've been collecting some information for that, have you had

24  anything to do with the implementation of this merger?

25  A.   No, sir.

1  Q.   Did you have anything to do with deciding whether it

2  should occur in any team of any kind?

3  A.   No.

4  Q.   Okay.  Is one of the main --

5          MR. OPPENHEIMER:  Your Honor, no further questions.

6          THE COURT:  Redirect?

7          MS. ELMER:  No, Your Honor.

8          THE COURT:  You're excused.

9          THE WITNESS:  Thank you, Your Honor.

10          (Witness excused.)

11          THE COURT:  Call your next witness.

12          MR. CONRATH:  May I consult for one moment, Your

13  Honor?

14          THE COURT:  Go right ahead.

15          (Pause.)

16          MR. CONRATH:  Your Honor, we've decided not to call

17  Mr. Sambar, who would be the next witness.  So we don't have an

18  additional witness here for today.  We can proceed according to

19  the schedule we discussed this morning.

20          THE COURT:  All right.  I'll see counsel.

21          (Sealed Bench Conference.)

22          MR. PETROCELLI:  I had trouble hearing you.

23          MR. CONRATH:  As we talked about, we're not going to

24  call Sambar, and we're prepared to proceed with the witnesses

25  we talked about for Monday.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1            MR. PETROCELLI:  You were going to get back to me on

 2    Hawthorn?

 3            MR. CONRATH:  Oh, yes.

 4            MR. PETROCELLI:  Thank you.

 5            THE COURT:  All right.  So you're not going to call

 6    Sambar.  Who's next?

 7            MR. CONRATH:  Either Harran or Merle.

 8            THE COURT:  Well possibly York, in theory, we'll see.

 9            MR. CONRATH:  Okay, that's a possibility.

10            THE COURT:  Let's put him aside for the moment.

11            MR. CONRATH:  Okay, then Merle.

12            MR. PETROCELLI:  Harran. Devin Merle, I don't think

13    he's on there because I think they added --

14            MR. CONRATH:  Right.

15            MR. PETROCELLI:  They added him at the last minute.

16            MR. CONRATH:  Devin, D-E-V-I-N.

17            THE COURT:  So what do you think, government and

18    defense?

19            MR. PETROCELLI:  Very short.

20            MR. CONRATH:  Thirty.

21            MR. PETROCELLI:  Fifteen, forty-five minute witness

22    at most.

23            THE COURT:  Half hour, you think?

24            MR. PETROCELLI:  No more than an hour total.

25            MR. CONRATH:  Yeah, I think that's right.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. PETROCELLI:  What about Harran?

 2              MR. CONRATH:  Harran is probably the same thing, half

 3   an hour.

 4              THE COURT:  Haran?

 5              MR. CONRATH:  Harran, H-A-R-R-A-N.

 6              MR. PETROCELLI:  Same thing, Your Honor, half and

 7   half.

 8              MR. CONRATH:  Yes, same.

 9              MR. PETROCELLI:  That's all they have for Monday,

10   Your Honor, because they have two other witnesses who are only

11   available on Tuesday.  So it looks like two half days.

12              THE COURT:  So what's on Tuesday?

13              MR. CONRATH:  Tuesday is Mr. Bond.

14              THE COURT:  James?

15              MR. PETROCELLI:  One of my favorites.

16              MR. CONRATH:  I'm working on his first name, it's not

17   coming up.

18              MR. PETROCELLI:  His name is Madison Bond.

19              MR. CONRATH:  Madison Bond.

20              MR. PETROCELLI:  Madison Bond.

21              THE COURT:  Is that a woman or a man?

22              MR. CONRATH:  He.

23              MR. PETROCELLI:  A man.  He's at Comcast.  No, NBC,

24   I'm sorry, not Comcast, NBC.

25              THE COURT:  What's his projection or is he not even
```

1    in the projection category?

2             MR. PETROCELLI:  He should be on your list.

3             MR. CONRATH:  Yes, he should be there.

4             THE COURT:  There it is.  One hour each.

5             MR. PETROCELLI:  It won't be that long.

6             MR. CONRATH:  I suspect that's approximate.  And

7    Mr. Sejen, S-E-G-A-E-N -- S-E-J-E-N.

8             THE COURT:  I know that name.  The estimate is three

9    quarters each for that one.

10            MR. CONRATH:  Yes, that's right.

11            MR. PETROCELLI:  Then we have our two economists back

12   to back on Wednesday and Thursday.  And we need to finish them

13   each in one day.  They have travel schedules.

14            THE COURT:  Shapiro is Wednesday?

15            MR. CONRATH:  Yes.

16            MR. PETROCELLI:  Yes, and Professor Carlton,

17   C-A-R-L-T-O-N.  We'll have to admonish our professors not to be

18   so windy.  We might need your help a little bit, Judge, because

19   we need to get through those examinations.

20            THE COURT:  Even a panda has claws.

21            MR. PETROCELLI:  Excuse me.

22            THE COURT:  Even a panda has claws.

23            MR. CONRATH:  We'll advise them.

24            THE COURT:  Should advise them accordingly.

25            MR. PETROCELLI:  They never want to answer a

1    question.

2            MR. CONRATH:  They're both experienced.

3            MR. PETROCELLI:  They're both top shelf guys.

4            THE COURT:  Quintessential professors.

5            MR. PETROCELLI:  You got it.

6            THE COURT:  All right.  So that's, what we'll do

7    probably if I had to guess.  Where is York headquartered?

8            MR. PETROCELLI:  He's in L.A.  And, you know, we

9    vigorously oppose that, so we're going to send you some papers

10   while we get theirs.

11           THE COURT:  Can he be available Monday if he needs to

12   be?  I mean, I haven't ruled on it, obviously, but I've got to

13   see the stuff before I rule.

14           MR. PETROCELLI:  Well, you know --

15           THE COURT:  I mean, if he flies to L.A., that doesn't

16   make any sense.  He's going to have to come back.  You see the

17   dilemma?

18           MR. PETROCELLI:  Yes, I will make sure that he will

19   be available here in case you need him on Monday morning.  But

20   I would ask you to reserve judgment until you read these

21   papers.

22           THE COURT:  Look, the other option is that we have

23   what we're going to have Monday morning then he comes another

24   time.

25           MR. PETROCELLI:  That would make more sense to me,

1   and that's what I thought you had in mind, Judge.

2         THE COURT:  Well, that's fine.  I mean, frankly, I'm

3   not saying that that doesn't work. We've got time on Tuesday.

4         MR. PETROCELLI:  Yeah, you can always bring him back

5   in.

6         THE COURT:  So if I were to rule Monday morning,

7   hypothetically, that okay, he's got to come back for a limited

8   line of examination.

9         MR. CONRATH:  He could be here Tuesday afternoon.

10        THE COURT:  Tuesday afternoon.

11        MR. CONRATH:  Yeah, that could work.

12        MR. PETROCELLI:  We can make that happen.

13        THE COURT:  How about that?

14        MR. PETROCELLI:  That's better.

15        THE COURT:  Be thinking about that option.

16        MR. CONRATH:  That works.

17        MR. PETROCELLI:  Thank you, Judge.

18        THE COURT:  What else you got?  When are you going to

19   submit your, you're going to submit your brief tomorrow?

20        MR. CONRATH:  Tonight.

21        THE COURT:  Your.

22        MR. PETROCELLI:  Saturday.  Mail it to your clerk.

23        THE COURT:  You've got two days.  Having fun yet?

24        MR. PETROCELLI:  Starting to see the light at the end

25   of the tunnel.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1              MR. CONRATH:  Feels like we're more than halfway,

 2    that's a good thing.

 3              MR. PETROCELLI:  We're more than halfway.

 4              THE COURT:  We are.

 5              MR. PETROCELLI:  I think we're two-thirds of the way.

 6    There is a chance that we'll finish for sure with time to spare

 7    in April.

 8              MR. CONRATH:  Yes, absolutely.  We'll be done in

 9    April there's no question.

10              THE COURT:  There's no pressure whatever.  If we can

11    not have to use this Friday, I can move all this stuff.  This

12    is Friday the 20th.  If you can be done.

13              MR. PETROCELLI:  Well, I don't know that we would be

14    done Thursday.  I think if we have Friday, there's a good

15    chance we'll finish.

16              THE COURT:  Okay.

17              MR. CONRATH:  We obviously have a rebuttal case, I

18    presume, but that would be the week after.

19              MR. PETROCELLI:  A short rebuttal case.

20              MR. CONRATH:  Depends on what the defense case is.

21              MR. PETROCELLI:  You know what the defense case is.

22              THE COURT:  Probably two days.

23              MR. CONRATH:  Probably.

24              THE COURT:  That week I go to New York.  I will be

25    there all day Wednesday, get back for the afternoon session on

1    Thursday.

2              MR. CONRATH:  Okay, so Wednesday is a full day.

3              THE COURT:  Wednesday I'm in New York.

4              MR. PETROCELLI:  What are the full days you have the

5    following week?

6              THE COURT:  This stuff I can move.  I can move this

7    stuff Friday so we can sit Friday.

8              MR. PETROCELLI:  Yes, that would be great if you

9    could do that.

10             THE COURT:  Why don't we do that.  The following week

11   we've got Monday all day.  Half day Tuesday, right.  No day

12   Wednesday, half day Thursday.

13             MR. PETROCELLI:  Got it.  If we get Friday next week,

14   and Monday all day.

15             THE COURT:  Friday the 20th.

16             MR. PETROCELLI:  Not next week, the following week.

17             MR. CONRATH:  So Friday, the 20th, we will and the

18   week after, that Wednesday and the two half days a session.

19             THE COURT:  Then closing arguments the 30th.

20             MR. PETROCELLI:  Wednesday he's not here.  He's in

21   New York.

22             MR. CONRATH:  Yes, correct.

23             MR. PETROCELLI:  Monday, half day Tuesday.

24             MR. CONRATH:  Monday, half day Tuesday, half day

25   Thursday.

1    MR. PETROCELLI:  Closing argument the following week.

2    MR. CONRATH:  I guess, I mean, we were, as we

3  originally said we would be done by the 30th.  I don't -- I

4  just don't know how long they're going to go or how long

5  rebuttal is required.  I just don't to rule out, I don't expect

6  --

7    THE COURT:  Any slip from the cup to the lip.

8    MR. PETROCELLI:  Your Honor, seven days from the last

9  witness under our order we will be submitting our closed

10  findings and conclusions of law.  I assume that there will be

11  no trial briefs beyond those conclusions of law.  Because we

12  wanted to make sure.

13    MR. CONRATH:  Want to make sure we're preparing the

14  right thing, proposed findings and conclusions not a separate

15  trial brief.  That's your preference?

16    THE COURT:  I wasn't envisioning that because you're

17  going to do closing arguments.

18    MR. CONRATH:  Sure, sure.

19    THE COURT:  That would be redundant.

20    MR. PETROCELLI:  Sure would Your Honor.

21    MR. CONRATH:  I've seen it done both ways, Your

22  Honor. Sometimes the trial brief is a helpful way to put it all

23  together.

24    THE COURT:  Let me put it this way.  Let me think

25  about it.  I really wasn't thinking about a trial brief per se.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1          MR. PETROCELLI:  Your Honor, the findings of facts

 2   and conclusions of law will give you everything you need,

 3   everything.  They're going to be extensive documents.  They're

 4   going to lay out all the findings and all the conclusions for

 5   each side.

 6          MR. CONRATH:  That's true, of course. And all I say

 7   is I've seen instances when it's been helpful to have, in

 8   essence, a trial brief that puts it together and says these are

 9   the facts and the law, they're together, here's why, in

10   essence, it's a written form of the argument, and that's useful

11   to keep with the Court.

12          THE COURT:  Can that be done in like fifteen pages?

13          MR. CONRATH:  Probably more like twenty-five.

14          MR. PETROCELLI:  Your Honor, we're speeding up to

15   give Your Honor more time.  And I just think putting more paper

16   on you is not the objective here.

17          THE COURT:  Depends on what's in the paper.

18          MR. CONRATH:  Yeah, it could actually be helpful.

19          THE COURT:  A synthesis, that might be beneficial.

20          MR. CONRATH:  A synthesis should be the point of a

21   good trial brief, that's a good description of what it ought to

22   do.

23          MR. PETROCELLI:  You might want to hear closing

24   arguments and take a look at the findings of fact and see if it

25   means anything. I think you'll have pretty much everything you
```

1    need.  It will be up to you.

2            THE COURT:  How long do you think the findings of

3    fact will be?

4            MR. PETROCELLI:  Nexus of a hundred pages, lengthy

5    documents.

6            THE COURT:  They'll be linked.

7            MR. PETROCELLI:  All linked, all laid out for you.

8    Just pick one of them, Your Honor.  Put a signature on it.

9            THE COURT:  If it were that simple.

10           MR. PETROCELLI:  And take the rest of the day off.

11           MR. CONRATH:  Look my pitch is something that's got

12   synthesis is probably helpful.  I think our recommendation

13   would be to take a trial brief that gives you that synthesis of

14   facts and law.  I think it's helpful.

15           I'd love to say I can argue perfectly to synthesize

16   it more.

17           THE COURT:  I understand.

18           MR. CONRATH:  You can do some stuff better in

19   writing.

20           THE COURT:  Let me mull over that.  This is not

21   exactly the every day trial you have around here.  I mean, I

22   know we're going to do proposed findings of fact and

23   conclusions of law, that's a given.  But maybe something if it

24   could be kept to 20 pages or less, it would help succinct.

25           MR. PETROCELLI:  If you're going to do that, Your

1  Honor, I would suggest that we do it at the time we file the

2  proposed findings of fact and conclusions of law so there's no

3  further delay, just give it to you all at the same time.

4          MR. CONRATH:  Yeah, that would be our recommendation.

5          THE COURT:  Is that going to be after your closing

6  argument or before?

7          MR. PETROCELLI:  Yes, after -- no, we'd like to close

8  within a few days when we can pick a day right before you, then

9  you'll get the findings of fact.

10         THE COURT:  The evidence closes, then three days

11  later or something.

12         MR. PETROCELLI:  Closing arguments and then your

13  documents.

14         MR. CONRATH:  Yeah, I mean, whatever is, I guess I

15  would say whatever seems helpful to you.  I've seen judges who

16  say first I want to get the papers and then I want to come in

17  and ask you guys questions.  Some will say I want to hear the

18  arguments while it's fresh off the evidence.  And they're both,

19  there's no right answer here.

20         THE COURT:  No.

21         MR. CONRATH:  So whatever seems more helpful to you.

22         MR. PETROCELLI:  From our preference we'd like to do

23  it sooner while it's fresh rather than waiting.

24         THE COURT:  Well, that makes good sense to me.

25         MR. PETROCELLI:  Thank you, Your Honor.

1    MR. CONRATH:  Thank you.  Thank you, Your Honor.

2    THE COURT:  Have a good weekend.

3    (Open court.)

4    THE COURT:  All right, witnesses are concluded for

5    today.  We'll reconvene at 10:30 on Monday morning.  We'll be

6    going until 5:00 on Monday.  Stand in recess.

7                    (Trial adjourned at 3:55 p.m.)

8                              -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                          CERTIFICATE

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1          I certify that the foregoing is a true and correct

 2   transcript, to the best of my ability, of the above pages, of

 3   the stenographic notes provided to me by the United States

 4   District Court, of the proceedings taken on the date and time

 5   previously stated in the above matter.

 6          I further certify that I am neither counsel for,

 7   related to, nor employed by any of the parties to the action in

 8   which this hearing was taken, and further that I am not

 9   financially nor otherwise interested in the outcome of the

10   action.

11

12   _____      _____

13   /s/Crystal M. Pilgrim, RPR, FCRR      Date: April 5, 2018

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )      CV No. 17-2511
                                    )
                                    )      Washington, D.C.
       vs.                          )      April 9, 2018
                                    )      10:45 a.m.
AT&T, INC., ET AL.,                 )
                                    )      Morning Session
          Defendants.               )
_____)          Day 10


          TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
        BEFORE THE HONORABLE RICHARD J. LEON
          UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                             Eric D. Welsh
                             Donald G. Kempf, Jr.
                             Peter J. Schwingler
                             Anna E. Sallstrom
                             Matthew R. Jones
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Washington, D.C. 20530
                             (202) 532-4560
                             craig.conrath@usdoj.gov
                             eric.welsh@usdoj.gov
                             donald.kempf@usdoj.gov
                             peter.schwingler@usdoj.gov
                             anna.sallstrom@usdoj.gov
                             matthew.jones3@usdoj.gov

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

      Katrina M. Robson
      O'MELVENY & MYERS LLP
      1625 Eye Street, NW
      Washington, D.C. 20006
      (202) 220-5052
      krobson@omm.com

      Daniel M. Petrocelli
      M. Randall Oppenheimer
      O'MELVENY & MYERS LLP
      1999 Avenue of the Stars
      8th Floor
      Los Angeles, CA 90067
      (310) 553-6700
      dpetrocelli@omm.com
      roppenheimer@omm.com

      Michael L. Raiff
      Robert C. Walters,
      GIBSON, DUNN & CRUTCHER LLP
      2100 McKinney Avenue
      Suite 1100
      Dallas, TX 75201
      (214) 698-3350
      mraiff@gibsondunn.com
      rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:

      Kevin J. Orsini
      Peter T. Barbur
      CRAVATH, SWAINE & MOORE LLP
      Worldwide Plaza
      825 Eighth Avenue
      New York, NY 10019
      (212) 474-1140
      korsini@cravath.com
      pbarbur@cravath.com

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

– – –

WITNESS INDEX

– – –

WITNESSES          DIRECT CROSS REDIRECT RECROSS

GOVERNMENT'S:

DEVIN MERRILL      1798 1824    1830
DEVIN MERRILL           1837
JOHN HARRAN        1840 1866    1870

– – –

INDEX OF EXHIBITS

– – –

GOVERNMENT'S           IDENTIFIED       ADMITTED

PX164                                    1804

PX247                                    1819

PX544                                    1823

PX546                                    1836

PX197                                    1843

PX36                                     1851

PX217                                    1857

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              P R O C E E D I N G S

2          DEPUTY CLERK:  All rise.  The United States

3    District Court for the District of Columbia is now in

4    session, the Honorable Richard J. Leon presiding.  God save

5    the United States and this Honorable Court.  Please be

6    seated and come to order.

7          Good morning, Your Honor.  This morning we have

8    Civil Action No. 17-2511, the United States of America v.

9    AT&T, Inc., et al.

10         Counsel for the parties, please approach the

11   lectern and identify yourself for the record and the party

12   or parties you represent, please.

13         MR. SCHWINGLER:  Good morning, Your Honor.

14   Peter Schwingler for the United States.

15         THE COURT:  Welcome back.

16         MS. SALLSTROM:  Good morning, Your Honor.

17   Anna Sallstrom for the United States.

18         THE COURT:  Welcome.

19         MR. WELSH:  Good morning, Your Honor.  Eric Welsh

20   for the United States.

21         THE COURT:  Welcome back.

22         MR. CONRATH:  Good morning, Your Honor.

23   Craig Conrath for the United States.

24         THE COURT:  Welcome back.

25         MR. CONRATH:  Thank you.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1            MR. KEMPF:  Good morning, Your Honor.  Don Kempf
 2    for the United States.
 3            THE COURT:  Welcome back.
 4            MR. JONES:  Good morning, Your Honor.
 5    Matthew Jones for the United States.
 6            THE COURT:  Welcome.
 7            MR. PETROCELLI:  Good morning, Your Honor.
 8    Daniel Petrocelli for defendants.
 9            THE COURT:  Welcome back.
10            MS. ROBSON:  Good morning, Your Honor.
11    Katrina Robson for defendants.
12            THE COURT:  Welcome back.
13            MR. OPPENHEIMER:  Good morning, Your Honor.
14    Randy Oppenheimer for the defendants.
15            THE COURT:  Welcome back.
16            MR. WALTERS:  Good morning, Your Honor.
17    Rob Walters here for AT&T and DirecTV.
18            THE COURT:  Welcome back.
19            MR. BARBUR:  Good morning, Your Honor.
20    Peter Barbur representing Time Warner.
21            THE COURT:  Welcome back.
22            MR. ORSINI:  Good morning, Your Honor.
23    Kevin Orsini for Time Warner.
24            THE COURT:  Welcome back.
25            MR. RAIFF:  Good morning, Your Honor.  Mike Raiff
```

```
 1    for AT&T and DirecTV.

 2              THE COURT:  Welcome back.

 3              All right.  The next witness is Merrill, right,

 4    Mr. Merrill.

 5              MR. SCHWINGLER:  Peter Schwingler for the

 6    United States.  Your Honor, we call Devin Merrill, an

 7    adverse party witness.

 8              THE COURT:  All right.

 9              MR. PETROCELLI:  Your Honor, Ms. Robson will be

10    handling this witness.

11              THE COURT:  All right.  That's fine.

12              DEPUTY CLERK:  Please raise your right hand.

13              (Witness is placed under oath.)

14              DEPUTY CLERK:  Please be seated.

15    DEVIN MERRILL, ADVERSE WITNESS FOR THE GOVERNMENT, HAVING

16    BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

17              MR. SCHWINGLER:  May I proceed?

18              THE COURT:  Proceed when you're ready.

19                        DIRECT EXAMINATION

20    BY MR. SCHWINGLER:

21         Q    Good morning, Mr. Merrill.  Please state your name

22    for the record.

23         A    Devin Merrill.

24         Q    And today, you're the vice president of digital

25    strategy, experience, and execution for AT&T; is that right?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1799

1       A      That is correct.

2       Q      And in your current job, you run the AT&T and

3    DirecTV Websites; is that right?

4       A      Yes, it is.

5       Q      Before you took your current job, you helped to

6    develop and launch the DirecTV Now product, correct?

7       A      I was responsible for developing it, launching it,

8    and then managing it post launch.

9       Q      And you became -- you were responsible for the

10   general management of DirecTV Now starting in spring of

11   2016, correct?

12      A      I officially joined the team, I think, in early to

13   mid-April of 2016.

14      Q      And then you were responsible for the general

15   management of that project and how DirecTV Now launched in

16   late November of 2016, correct?

17      A      Yes, I did support it through launch.

18      Q      And then I think, as you said, you then continued

19   to be the general manager of the DirecTV Now product for a

20   period of time after the launch, I believe, till July of

21   2017; is that right?

22      A      Yes, that's correct.

23      Q      And you were referred to as the general manager of

24   the project, correct?

25      A      Yes.  That was one aspect of the role,

1    particularly after launch.

2        Q    And you were also referred to as the program

3    owner.  Does that sound right?

4        A    Yes.  I was responsible for coordinating a

5    cross-functional effort to launch the program.

6        Q    As the general manager and program owner for

7    DirecTV Now, it was important for you to understand AT&T's

8    strategic objectives for that product, wasn't it?

9        A    It was, yes.

10           MR. SCHWINGLER:  Your Honor, I have a binder with

11   some exhibits for the witness.  May I hand them up?

12           THE COURT:  Sure.

13           MR. SCHWINGLER:  May I approach the witness,

14   Your Honor?

15           THE COURT:  You may.

16   BY MR. SCHWINGLER:

17       Q    Mr. Merrill, I'll direct your attention to PX0046

18   in your binder.

19           MR. SCHWINGLER:  Your Honor, PX46 has been marked

20   for identification and provided to opposing counsel.

21           May I proceed?

22           THE COURT:  You may.

23   BY MR. SCHWINGLER:

24       Q    Mr. Merrill, PX46 is an email that you wrote to

25   Aaron Tell and Kelly Zeigler on April 28th, 2016, correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1801

```
1          A      That is correct.

2          Q      And Mr. Tell and Ms. Zeigler were both part of the

3     research team that was supporting the DirecTV Now project?

4          A      That's correct.

5          Q      And the email that you wrote to them relates to

6     the features and the benefits of that DirecTV Now product,

7     correct?

8          A      Yes.  This was the first month of the project, and

9     we were trying to determine the features and benefits.

10             MR. SCHWINGLER:  Your Honor, United States offers

11    PX46 into evidence.

12             MS. ROBSON:  No objection, Your Honor.

13             THE COURT:  All right.  It will be admitted.

14    BY MR. SCHWINGLER:

15         Q      Mr. Merrill, the subject line of your email is

16    "Cannibalization, DBS versus OTT Differentiation."

17             Do you see that?

18         A      I do, yes.

19         Q      In DBS, in this context, refers to the DirecTV

20    satellite product, correct?

21         A      It does, yes.

22         Q      And OTT, in this context, refers to the

23    DirecTV Now product that you were in the process of

24    developing, right?

25         A      It does, yes.
```

1    Q    And in this email, you requested research on where

2    to draw the line on features/benefits for OTT, such that we

3    don't aggressively cannibalize DBS.

4         Do you see that?

5    A    I do see that, yes.

6    Q    You in the wrote, "We want to make OTT as strong

7    as possible, without killing the golden goose."

8         Do you see that?

9    A    I do see that, yes.

10   Q    And in then in parentheses, you wrote, "E.g. will

11   two or three streams cut into DBS?"

12        Do you see that?

13   A    I do, yes.

14   Q    And by, sir, by "golden goose," you were referring

15   to the DirecTV satellite product, correct?

16   A    Yes.  I'm referring to the premium satellite

17   product.

18   Q    And you were aware at that time, sir, that the

19   margins for the Internet product you were developing would

20   be significantly lower than the margins for the satellite

21   product.

22   A    Yes.  It was an entrepreneurial new product.

23   Q    But specifically, sir, you were aware that the

24   margins for the Internet product would be significantly

25   lower than the margins on satellite?

1       A     Yes, sir.

2       Q     And the reason you asked for the research in this

3  email is because you wanted to avoid aggressively

4  cannibalizing sales of that higher margin product, correct?

5       A     We had a great premium product.  And what we

6  wanted to do was also build a great -- build and lunch

7  launch a great OTT product as well that was different.

8       Q     But, specifically, you didn't want this new OTT

9  product to harm the sales of the higher margin satellite

10  product, didn't you?

11       A     That was not a specific objective.

12       Q     If you could, I'll direct your attention to PX164

13  in your binder.

14             Your Honor, PX164 has been marked for

15  identification and shared with opposing counsel.

16             May I proceed?

17             THE COURT:  You may.

18  BY MR. SCHWINGLER:

19       Q     Mr. Merrill, PX164 is an email exchange related to

20  DirecTV Now from November of 2016; is that right?

21       A     It is, yes.

22       Q     And if you look at the bottom of the second page

23  of the exhibit, carrying over to the third page, you can see

24  that you personally wrote the first email in that exchange;

25  is that right?

1    A    I did, yes.

2    Q    And then you also wrote the last email on the

3   exchange, sending it to Mr. Bentley; is that right?

4    A    I did yes.

5    Q    Mr. Bentley is Brad Bentley, and he was your boss

6   at that time, correct?

7    A    He was, yes.

8    Q    And attached to this email exchange is a sample

9   migrations report for the DirecTV Now product, correct?

10    A    Yes.  They did mock up a report.

11         MR. SCHWINGLER:  Your Honor, United States offers

12   PX164 into evidence under seal.

13         MS. ROBSON:  No objection, Your Honor.

14         THE COURT:  It will be admitted under seal.

15                        (Government's Exhibit PX164
                           received into evidence under seal.)
16   BY MR. SCHWINGLER:

17    Q    Mr. Merrill, I'd like to talk to you about the

18   first email in the exchange, the one that starts at the

19   bottom of the second page and carries over to the third

20   page.

21         And this is an email that you wrote on November

22   12th of 2016, right?

23    A    Yes, it is.

24    Q    And at that point, the company was just a few

25   weeks away from launching the DirecTV Now product to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1805

1    consumers?

2        A    Yes, we were.

3             I would consider this to be on the eve of the

4    launch.

5        Q    Yes.  And the subject of your email was, NOW, in

6    all caps, cannibalization/migration analysis.

7             Do you see that?

8        A    I do, yes.

9        Q    And then when it says "NOW" in all caps, that's a

10   reference to the DirecTV Now product?

11       A    It is, yes.

12       Q    And migration, that refers to a customer moving

13   from the satellite product on to the Internet-based

14   DirecTV Now product, fair?

15       A    Yes.  I consider that a synonym for

16   cannibalization.

17       Q    And what you told this group -- and all of the

18   people that you wrote this email to were AT&T employees,

19   correct?

20       A    Yes, they're all internal employees.

21       Q    And what you wrote on November 12th, 2016, was,

22   "I think we all know cannibalization and migration is going

23   to be a white-hot topic/question with the launch of Now."

24             Do you see that?

25       A    I do see that.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1806

1      Q      And, in fact, the entire purpose of this email

2   exchange was to get a team prepared to measure and analyze

3   the extent of any migrations that would occur upon lunch?

4      A      Yes.

5           It was critical that what we had what I would call

6   a robust and multifaceted view of the dynamics across these

7   products.

8      Q      And specifically, you wanted to measure the extent

9   to which the new Internet product cannibalized sales from

10   the higher-margin satellite market, correct?

11      A      That was part of it.

12      Q      And you wanted to be prepared to answer any

13   questions that you, as the general manager of DirecTV Now,

14   might get from other parts of the company on that topic?

15      A      That's right.

16           I think the most important thing here that I was

17   wondering at the time would be, can we measure the types of

18   customers that we're bringing on to this new product?  And

19   are we doing a good job meeting their needs?

20      Q      And after the product launched, you would, from

21   time to time, report up the chain information about this

22   topic of cannibalization and migration, correct?

23      A      Yes.  It was included in various updates.

24      Q      And, in fact, your team prepared information to be

25   presented to Randall Stephenson, the chairman and CEO of

1    AT&T, on that topic?

2        A    We did prepare some analysis on the migration

3    dynamics, yes.

4        Q    Mr. Merrill, I'll direct your attention to PX178

5    in your binder.

6            MR. SCHWINGLER:  Your Honor, PX178 has been marked

7    for identification and provided to opposing counsel.

8            May I proceed?

9    BY MR. SCHWINGLER:

10       Q    Mr. Merrill, PX178 is an e-mail that you wrote to

11   Kevin Gonzalgo on July 23rd, 2016, correct?

12       A    It is, yes.

13       Q    And attached to your email is the final version of

14   a presentation that had recently been made to John Stankey,

15   correct?

16       A    Yes.

17            This is a deck that had been prepared for

18   John Stankey, but not all of these slides were presented to

19   Mr. Stankey.

20       Q    And the purpose of the meeting where these slides

21   were presented was to keep Mr. Stankey apprised of how the

22   project was developing, correct?

23       A    Yes.  We provided regular updates.

24       Q    And you helped to consolidate the slides from

25   various teams before this went to Mr. Stankey, correct?

1    A    Yes.

2         MR. SCHWINGLER:  Your Honor, United States offers

3    PX178 into evidence.

4         MS. ROBSON:  No objection, Your Honor.

5         THE COURT:  Now, hold on.

6         Is it your testimony that all of the slides in

7    this deck were given to Mr. Stankey?

8         THE WITNESS:  No, it is not.

9         THE COURT:  It is not.

10        Which ones were not?

11        THE WITNESS:  There is an appendix after the --

12        THE COURT:  Whereabouts?  Show me.

13        THE WITNESS:  Let me see if I can find it for you.

14        It's after the large globe.

15        THE COURT:  There's a lot of globes in this thing.

16        THE WITNESS:  I know.

17        THE COURT:  There's a lot of large globes in these

18   things.

19        THE WITNESS:  A lot of slides too.

20        the4 co:  So are you talking about 39, that globe?

21        Look at page 039 at the bottom.  Is that the globe

22   you're referring to?

23        THE WITNESS:  Yes, sir.  Yes, Your Honor.

24        THE COURT:  Okay.

25        So you're telling me what, now, that page like 40,

 1   41, none of those were given to Mr. Stankey?

 2           THE WITNESS:  Yes.  The team would have prepared

 3   slides for the appendix for our backup purposes should a

 4   question come up.  But we would have not shared the

 5   appendices with Mr. Stankey.

 6           THE COURT:  I'm confused still.

 7           So let's start with basics.

 8           040 to 0 -- well, to 103, okay, those slides,

 9   okay, that's the remainder of the slides.  Do I understand

10   you correctly that none of those were given to Mr. Stankey?

11           THE WITNESS:  That is correct.

12           THE COURT:  You can approach.

13           Step down.

14           (Sealed bench conference)

15           THE COURT:  All right.  Why am I letting those in?

16   Mr. Stankey was never given them.

17           MR. SCHWINGLER:  We're happy to withdraw those

18   slides.  This was just how the documents were produced to

19   us.  But we can work off of the first 40 slides; that's

20   fine.

21           THE COURT:  Okay.  Do you have any problem with

22   that?

23           MS. ROBSON:  I have no problem with that,

24   Your Honor.

25           MR. SCHWINGLER:  I could clarify one thing for the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    record.  This is one of those PowerPoints where we have the

2    black and white followed by the color slides.  But I'm happy

3    to just work off the first 40 black-and-white slides, just

4    to make it easier for the record.

5              THE COURT:  Okay.  The color doesn't matter, does

6    it?

7              MR. SCHWINGLER:  No.  It just has to do with the

8    pagination of what you let in or not.  We can work off of

9    those.

10             MS. ROBSON:  Actually, for the black-and-white,

11   I think the black-and-white have talking points in them that

12   may not have been shown to Mr. Stankey.  So I'm not clear.

13   We may need to ask the witness about that.

14             MR. SCHWINGLER:  We'd be happy to just do the --

15             MS. ROBSON:  Just to the color version.

16             MR. SCHWINGLER:  -- starting with the color

17   version and just to the first 40 slides, and I can --

18             THE COURT:  What page number are you talking

19   about?

20             MR. SCHWINGLER:  So it starts on page 059.

21             THE COURT:  Those are all gone.  I thought page

22   040 to the end are now going to be removed.

23             MR. SCHWINGLER:  So I apologize for the confusion.

24             So what we had done is we had put the color

25   version after the black-and-white version.  I think when the

1   witness testified that everything after 40 was part of the

2   appendix, he wasn't aware of that.

3          So the color version starts at 59, and then this

4   is -- 89 is where the appendix would start.  So we could go

5   through 089 with the witness if that would be the cleanest.

6          THE COURT:  That's fine.  Just that one's wrong?

7          MR. SCHWINGLER:  Well, I think when you asked him

8   everything after page 40, I think he was thinking about the

9   slide deck.  He hadn't reviewed every single page in the

10  exhibit because I hadn't pointed him to the color slides

11  yet, but that's just my fault.

12         THE COURT:  All right.  Let's get this right.

13         You're telling me, and he would confirm this now,

14  because you're going to have him confirm it --

15         MR. SCHWINGLER:  Yes.

16         THE COURT:  -- that everything from 089 to the

17  end, the color, was never given to Stankey?  Is that what

18  you're telling me?

19         MR. SCHWINGLER:  Well, I -- so what I can have him

20  confirm is that from 059 to 089, that's the color version of

21  the PowerPoint presentation, and I understand his testimony

22  to mean everything after 89 is the appendix that was not

23  necessarily shown to Mr. Stankey.

24         THE COURT:  But his testimony was from 039.

25         MR. SCHWINGLER:  That's just because we were

1   working off the black and white.  I'm happy to work off the

2   black and white if it's easier, and we can just have him

3   confirm that the speaker notes weren't necessarily shown to

4   Mr. Stankey.

5           MS. ROBSON:  That's fine.

6           MR. SCHWINGLER:  So we can go -- I think

7   it would be easier, Your Honor, to work off the black and

8   white, and we'll just make clear that we're not relying on

9   the speaker notes.

10          MS. ROBSON:  So we would just remove -- the

11  speaker notes would not come into evidence; just the slides?

12          MR. SCHWINGLER:  Exactly.  Exactly.

13          THE COURT:  What are the speaker notes?

14          MS. ROBSON:  The speaker notes are -- can you turn

15  to the page so I can see it.

16          Speaker notes are the kinds of things that would

17  not actually appear in the slide show as was being presented

18  to Mr. Stankey.  It would be something that the person

19  presenting might be looking at.

20          THE COURT:  What pages were the speaker notes on?

21          MS. ROBSON:  Throughout.

22          MR. SCHWINGLER:  Interspersed throughout.

23          THE COURT:  How are we going to remove those from

24  the exhibit?

25          MR. SCHWINGLER:  I guess the solution I would

1    suggest for today's purposes is that we make a record that

2    we're not relying on the speaker notes; that only the slides

3    themselves are offered in.  And then we'll be careful when

4    we cite into the record not to cite the speaker notes.

5              MS. ROBSON:  We'd be happy to redact them for

6    Your Honor.

7              And then we can fix it later, yeah.

8              THE COURT:  All right.

9              MR. SCHWINGLER:  Okay.

10             THE COURT:  Have him confirm what you've just told

11   me.

12             MR. SCHWINGLER:  Okay.

13             (Open court)

14             THE COURT:  All right.  We've got some

15   clarifications to do here.  So listen carefully to counsel,

16   and then I think this will sort it out.

17             THE WITNESS:  Thank you.

18   BY MR. SCHWINGLER:

19        Q    Mr. Merrill, if you look at the first 40 pages or

20   so of Exhibit 178, do you see the pages that are labeled

21   "speaker notes" that are interspersed throughout?

22        A    I do see those, yes.

23        Q    And do you recall whether those pages were shared

24   with Mr. Stankey?

25        A    They would not have been.

Case 1:17-cv-02511-RJL  Document 158  ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18  Page 1789 of 3826

1814

1      MR. SCHWINGLER:  Your Honor, United States offers

2  PX178 without the speaker notes.

3      THE COURT:  That's not the clarification that

4  you're supposed to be doing.

5      MR. SCHWINGLER:  I apologize, Your Honor.

6      THE COURT:  You can do that as well, but we have

7  pages here that have to be removed.

8      MR. SCHWINGLER:  Understood.

9      THE COURT:  He needs to help you clarify which

10  pages need to be removed.

11  BY MR. SCHWINGLER:

12      Q    And I'll direct your attention, Mr. Merrill, to

13  the page ending in -039, so PX178-039.

14      A    Yes.

15      Q    And then my question for you, sir, is, are the

16  pages following that, starting on 040, are those the

17  appendix that you referred to?

18      A    Yes, they are.

19      Q    And that would run until, I think -- if you could

20  look to page 058, that's the last page of the

21  black-and-white version of the appendix, correct?

22      A    That is correct.

23      THE COURT:  058.

24      MR. SCHWINGLER:  Through 058, that's the appendix.

25      THE COURT:  0035 through 058 needs to be removed,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1815

```
 1    correct?

 2              MR. SCHWINGLER:  Correct.

 3              THE COURT:  Removed.

 4              Now what?

 5              MR. SCHWINGLER:  And is it my understanding that 1

 6    through 39 are in evidence, absent the slides?

 7              THE COURT:  Yes.

 8              Absent the speaker notes --

 9              MR. SCHWINGLER:  Thank you.

10              THE COURT:  -- which would be excised, will be

11    admitted, if modified.

12              MR. SCHWINGLER:  Understood.

13              THE COURT:  Okay.  Go ahead.

14    BY MR. SCHWINGLER:

15        Q    Mr. Merrill, I'll direct your attention to the

16    page ending in -027.

17              And the title of that slide is "Channel Strategy";

18    is that correct?

19        A    I do see that, yes.

20        Q    And this slide depicts how DirecTV Now would be

21    sold across AT&T's various sales channels; is that right?

22        A    This was the working recommendation of the channel

23    enablement team at the time of this presentation.

24        Q    And just so we have a clear record, "the channel"

25    refers to a sales channel, right?
```

1    A    Yes.  It would be our call-in sales centers, call

2  centers.  It would also be our retail stores.

3         This does not include the largest sales channel;

4  that would be our digital sales channel, selling the product

5  over the Internet.

6    Q    And if you look on the left side of the slide, it

7  says for the sales strategy, "Lead with DBS."

8         Do you see that?

9    A    I do see that, yes.

10   Q    And, again, on this context, DBS a reference to

11 the DirecTV satellite product, correct?

12   A    It is, yes.

13   Q    And then it says, next to, there's the No. 3,

14 "Fallback OTT discussion," correct?

15   A    I do see that, yes.

16   Q    And this strategy of leading with the satellite

17 products and then only falling back to the Internet product,

18 that would help prevent this cannibalization of the

19 higher-margin satellite product, fair?

20   A    That is not a fair characterization.

21   Q    All right.  You understood, though --

22        THE COURT:  Whoa, whoa.  You said that is or is

23 not?

24        THE WITNESS:  That is not a fair characterization,

25 Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1817

1      THE COURT:  All right.

2  BY MR. SCHWINGLER:

3      Q    And you understood, though, that there was a

4  concern with within AT&T to avoid cannibalizing the

5  higher-margin satellite product?

6      A    At a high level, there may be some folks who had

7  question, but I can tell you that the leadership, myself

8  included and above, were very clear and resolute in that not

9  being a strategic driver.

10     Q    And you said -- I don't want to put words in your

11 mouth, but was this a working draft or a preliminary sales

12 strategy?

13     A    Yeah.

14          At this time, I was still debating with the sales

15 channel team the best way to articulate our sales strategy

16 of how to integrate this new product.  And we landed on a

17 strategy called needs-based selling, which has a facet of

18 leading with DirecTV satellite in some cases.  It's just

19 that this slide doesn't reflect the mature and evolved

20 strategy.

21     Q    And Glenn Lurie, he is an AT&T executive at the

22 time, correct?

23     A    He was.  He's no longer with the company.

24     Q    And he was the CEO of the mobility business and

25 the sales organization, correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1818

```
1        A    I know he was responsible for leading all of the

2   sales channels.

3        Q    And you were involved in discussions with him

4   about how to sell DirecTV Now, correct?

5        A    Yes.  We were working through options of how to

6   provision it.

7        Q    I'll direct your attention to tab 247, PX247 in

8   your binder.

9             MR. SCHWINGLER:  Your Honor, PX247 has been marked

10  for identification and shared with opposing counsel.

11            May I proceed?

12            THE COURT:  You may.

13  BY MR. SCHWINGLER:

14       Q    Mr. Merrill, PX247 is an e-mail exchange about the

15  DirecTV Now sales strategy from January of 2017; is that

16  right?

17       A    That's correct.  This is a month or two after

18  launch.

19       Q    And the first email on the bottom half of the

20  exhibit, you wrote that email to Mr. Lurie and a few other

21  executives on January 22nd, correct?

22       A    Yes.  I was summarizing a discussion.

23       Q    And then you forwarded your summary to your own

24  direct reports, correct?

25       A    Yes.  There were numerous action items around
```

1     provisioning the product that I sent to my team.

2              MR. SCHWINGLER:  Your Honor, United States offers

3     PX247 into evidence.

4              MS. ROBSON:  No objection, Your Honor.

5              THE COURT:  It will be admitted.

6                              (Government's Exhibit PX247
                                received into evidence.)

7     BY MR. SCHWINGLER:

8        Q    So, Mr. Merrill, I'll direct your attention to the

9     first email, the one you wrote to Mr. Lurie and the others.

10    And that, you would agree, summarizes an alignment among the

11    executives about the sales strategy for DirecTV Now?

12       A    It does for the call centers and the retail store

13    organization, but not for the digital organization.

14       Q    And then you passed that strategy on to your team

15    so they could execute on it, correct?

16       A    Yes.

17              There were four or five action items, all of which

18    would result in increased sales momentum across the sales

19    channels.

20       Q    And in your first e-mail to Mr. Lurie, there's a

21    bullet in bold that says "strategy alignment."

22              Do you see that?

23       A    I do see that, yes.

24       Q    And the second bullet underneath that says "needs

25    based selling approach."

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1820

```
 1              And then in parentheses says, "Lead with DBS, fall
 2    back to now."
 3              Do you see that?
 4         A    I do see that, yes.
 5         Q    And you were instructed, coming out of this
 6    meeting, to follow that strategy and also to avoid harming
 7    sales of the premium satellite product, weren't you?
 8         A    I was never instructed to do the latter.
 9         Q    You were not --
10              THE COURT:  Approach, please.
11              (Sealed bench conference)
12              THE COURT:  Who are you alleging instructed him to
13    do that?
14              MR. SCHWINGLER:  I will --
15              THE COURT:  Do you have a basis to make that, to
16    ask that question?
17              MR. SCHWINGLER:  Mr. Lurie.
18              THE COURT:  Who?
19              MR. SCHWINGLER:  Mr. Lurie.
20              THE COURT:  Mr. Lurie.  What's your basis?
21              MR. SCHWINGLER:  I have a document, an email
22    response that I'm prepared to show to the witness.
23              THE COURT:  What's the email indicate?
24              Is Lurie giving him a directive?
25              MR. SCHWINGLER:  His exact quotes -- and
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    I don't want to mischaracterize it.

2            THE COURT:  You better not be.

3            MR. SCHWINGLER:  I do agree with the actions, but

4    stress we must stick to strategy and make sure we do not

5    hurt premium sales.

6            THE COURT:  That's a directive?

7            MR. SCHWINGLER:  Well, I maybe misunderstand -- I

8    could ask him if it is one.

9            THE COURT:  Confront him with it and let him

10   explain it.  Don't be making allegations like that unless

11   you can back them up.

12           Do you understand that?

13           MR. SCHWINGLER:  I understand.

14           I was just trying to move it along without having

15   to show the exhibit.

16           THE COURT:  Mind your words.

17           MR. SCHWINGLER:  I understand.

18           THE COURT:  Pick your words carefully.

19           If that's not a directive and he says it's not a

20   directive, then you have gone out on a limb here.

21           Watch your words.  Don't pull that kind of stuff

22   in this courtroom.

23           MR. SCHWINGLER:  Understood.

24           THE COURT:  If you say he was given a directive,

25   you better be able to show that he did.  You better be able

1    to show it, or you're going to look pretty foolish.

2             MR. SCHWINGLER:  I understand.

3             (Open court)

4             THE COURT:  You may proceed, according to the

5    discussion at the bench.

6             MR. SCHWINGLER:  Your Honor, we've marked PX544

7    for identification.

8             May I approach?

9             THE COURT:  You may.

10   BY MR. SCHWINGLER:

11       Q    Mr. Merrill, PX544 is an email from Mr. Lurie to

12   you, responding to the email that you wrote in PX247.

13            THE COURT:  To whom?

14            How many people?

15            MR. SCHWINGLER:  Oh.

16   BY MR. SCHWINGLER:

17       Q    Mr. Merrill, PX554 is an email from Mr. Lurie

18   to you, Vicki Jones, David Christopher, Brian Shay,

19   Jamie Barton, Mark Collins, and Brad Bentley.  And he sent

20   that in response to the e-mail you wrote in PX247;

21   is that correct?

22       A    Yes, that is his response to my e-mail.

23       Q    And he wrote to you on -- well --

24            MR. SCHWINGLER:  Your Honor, we offer PX544 into

25   evidence.

 1          MS. ROBSON:  No objection, Your Honor.

 2          THE COURT:  It will be admitted.

 3                              (Government's Exhibit PX544
                                received into evidence.)

 4     BY MR. SCHWINGLER:

 5          Q    And, Mr. Merrill, Glenn Lurie, when we wrote this

 6     email, was the President and CEO of AT&T mobility and

 7     consumer operations, correct?

 8          A    I don't know technically if that's his total, but

 9     he had a very big job.

10          Q    And you understood that he was responsible for the

11     sales channels, these retail stores that were at issue here,

12     correct?

13          A    Yes.  He had ultimate responsibility.

14          Q    And so it was ultimately his stores and his part

15     of the company that would be executing on this strategy; is

16     that right?

17          A    That's right.

18               But I did not report to Glenn Lurie.

19          Q    And he wrote in this email to you, "I do agree

20     with the actions but stress we must stick to strategy and

21     make sure we do not hurt premium sales."

22               Do you see that?

23          A    I do see what he wrote there, yes.

24          Q    Did you construe Mr. Lurie's email as an

25     instruction about how to execute on this sales strategy?

1    A    Candidly, I took it with a grain of salt in that

2  the real instruction around what we did with this product

3  would come from Brad Bentley and also Mr. Stankey, who would

4  have been Glenn Lurie's boss.

5            THE COURT:  So this was not a directive, in your

6  opinion, at the time?

7            THE WITNESS:  Yes, Your Honor.  It was not a

8  directive.

9            THE COURT:  He wasn't your direct boss?

10            THE WITNESS:  He was not.

11            THE COURT:  Thank you.

12            Move on.

13            MR. SCHWINGLER:  We have no further questions for

14  the witness, Your Honor.

15            THE COURT:  Cross.

16            MS. ROBSON:  Thank you, sir.

17            THE COURT:  When you're ready.

18                          CROSS-EXAMINATION

19  BY MS. ROBSON:

20    Q    Good afternoon, Mr. Merrill -- or good morning,

21  actually.

22    A    Good morning.

23    Q    You launched DirecTV Now in November of 2016?

24    A    I did, yes.

25    Q    What was the launch offer?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1825

```
 1       A     It was $35 for 100 channels.  It included the

 2   option for a free Apple TV if a customer prepaid for three

 3   months.

 4             And we also offered HBO and Cinemax for $5.

 5       Q     And what was your -- how would you characterize

 6   that particular launch offer?

 7       A     That was an exceptionally compelling and even -- I

 8   would say somewhat surprising offer.

 9       Q     In what way?

10       A     In that we weren't originally contemplating

11   launching with something quite so bold and compelling.

12       Q     And what was your understanding of where the

13   direction came to offer such a bold and compelling product

14   in the market?

15       A     Again, not long before launch -- and I don't

16   exactly know when -- but it became clear that

17   Randall Stephenson was leaning in and had an idea to launch

18   boldly and weighed in on the price point for the number of

19   channels.  So it was really Randall's direction that led to

20   that offer.

21       Q     And you mentioned that the offer was for $35 for

22   100 channels.  How many consumers took that offer?

23       A     I think 98 or 99 percent of all takers took that

24   offer during the offer window.

25       Q     And you mentioned that there was a free Apple TV
```

1   offered as well.  How many consumers took that offer?

2       A    I think close to 70 percent of takers took

3   advantage of that offer.

4       Q    And how many stores were empowered to sell this

5   product?

6       A    All 5,200-something of our retail stores were

7   prepared, and we did marketing in those stores to help sell

8   DirecTV Now.

9       Q    And could you turn back to PX178.  It was one of

10  the documents the government showed you.

11          And they asked you to look at page 26.  It's

12  actually PX178-027.

13      A    Yes.

14      Q    And you remember this was the channel strategy.

15          And you explained what the channel strategy

16  ultimately became.  What was the channel strategy when you

17  launched?

18      A    The channel strategy was needs-based selling,

19  which meant different things depending on the channel.

20          So in our digital channel, which was 60 or

21  70 percent of our volume at the time, it was lead with

22  DirecTV Now.

23          If a customer types in DirecTV Now.com, we know

24  that's what they want.

25          In some channels like 1-800-DirecTV, which would

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  be the call center number, if someone calls us looking for

2  1-800-DirecTV, we know that that's what they want, so you'd

3  lead with DirecTV.  And then you would fall back and pivot

4  to DirecTV Now.

5           In some cases, retail was a bit more fuzzy.  Many

6  customers, most customers were probably seeking DirecTV, so

7  it made sense to start there.

8           But the ultimate strategy was to listen to the

9  customer, triage their needs, and fit them into the right

10  product.

11      Q    So if you could turn just one page in this

12  presentation, could you explain what we're looking at on the

13  very next page.

14      A    Well, it's a little hard to see in black and

15  white, but that looks like, and that is, mockups of our

16  in-store merchandising our in-store advertising that we were

17  looking to do around this product.

18      Q    And could you describe a little bit what a

19  consumer might see if they came into a retail store during

20  this launch period?

21      A    Yes.  We had -- I was pleased with the execution.

22  We had an entire wall, called it the DirecTV Now wall.  We

23  had a television with a looping reel that demoed the

24  product.

25           There were window clings.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              And then the retail store reps were wearing

2    DirecTV Now T-shirts.

3              MS. ROBSON:  And just for the record, that page

4    that we were looking at was PX0178-028.

5    BY MS. ROBSON:

6         Q    Now, why did you ask your team to track migration

7    of customers from the satellite product to the DirecTV Now

8    product?

9         A    Ultimately -- well, we had two products in play

10   here.  So as good business stewards, it was important to

11   understand the dynamics.

12             Ultimately, for me, understanding the profile of a

13   customer who would want this new product was critical.  We

14   were trying to serve a need that was unmet by pay TV, and we

15   needed to know what those customers looked like who might be

16   migrating from our core premium service but be unsatisfied

17   in a way and then more satisfied with this product.  So we

18   were measuring the dynamics of what that migration looked

19   like.

20        Q    Okay.  And how many customers migrated from your

21   premium satellite product and your U-verse product to the

22   DirecTV Now product?

23        A    Well, I looked at it from the perspective of

24   incoming DirecTV Now sales.  So of 100 DirecTV Now sales,

25   about 15 of those DirecTV Now sales customers also had
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1829

 1   U-verse or DirecTV.

 2         So 15 percent of our sales.

 3    Q    And what percentage of DirecTV Now subscribers

 4   were coming from just the general pay-TV universe?

 5    A    The inflow of our product had about half of the

 6   customers who were effectively what I would characterize as

 7   sort of -- pay TV was not meeting their needs.  They were

 8   dissatisfied in some way because of the price point or the

 9   hurdles or the price value, et cetera.

10         And then the other half was customers who are not

11   in the pay-TV ecosystem.

12         So cord-nevers, cord-cutters, maybe, et cetera.

13    Q    And after you saw these metrics, what changes, if

14   any, did you make to your DirecTV Now strategy?

15    A    Zero.

16         We continued accelerating.

17    Q    Okay.  And, in fact, did you make some -- did you

18   increase some of the strategies being used to sell

19   DirecTV Now?

20    A    Yes.

21         The email pointed out from January, that exchange

22   with Glenn Lurie, that was really about doing a better job

23   getting the call centers and our retail reps enabled to

24   sell.

25         Be changed some processes to make it better for

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   the customer.  We added sales targets to ensure they were

2   accountable for selling the product.

3           And we just changed general processes and

4   guidelines to better facilitate the sale in our traditional

5   channels.

6       Q    Would you characterize the launch of DirecTV Now

7   as successful?

8       A    I would consider it a big success.

9       Q    How many subscribers are currently on the

10  DirecTV Now platform?

11      A    There are over a million subscribers on the

12  platform.

13          MS. ROBSON:  Thank you very much.

14          No further questions, Your Honor.

15          THE COURT:  All right.

16          Redirect.

17                    REDIRECT EXAMINATION

18  BY MR. SCHWINGLER:

19      Q    Mr. Merrill, you mentioned the $35 introductory

20  price point for DirecTV Now; is that correct?

21      A    Yes.

22      Q    And that, you mentioned, had roughly 100 channels;

23  is that right?

24      A    That was the introductory offer, yes.

25      Q    And now, today, for $35, that would be a smaller

1  package, correct?

2      A    Today, it's $35 for 60 channels.

3      Q    And you mentioned that there's different sales

4  channels within AT&T, correct?

5      A    That's correct.

6      Q    And that you use different strategies for selling

7  DirecTV Now, depending on the channel; is that right?

8      A    Not necessarily.

9           It was needs-based selling across the board, but

10  some channels over-indexed on customer intentions coming in.

11      Q    And would you agree that there was still a

12  preference in the retail store sales channel to lead with

13  the satellite product and fall back to DirecTV Now if the

14  customer was not a good fit?

15      A    I wouldn't characterize it as a reference.  I

16  would say that we did a lot of advertising of DirecTV, plus

17  our wireless business.  So most of the inbound traffic, the

18  foot traffic to the stores, that customers were seeking out

19  the premium product.

20      Q    Do you recall whether you used the phrase, "lead

21  with DBS or DirecTV and fall back to now" in sales materials

22  for the retail channel?

23      A    It's possible.

24           I tried to minimize it wherever I could because I

25  feel like it clouded the needs-based selling message.

 1     Q    So I just want to make sure I understand.  You

 2   don't recall whether you did?

 3     A    It's very possible.  I personally tried to avoid

 4   use of that phrase.

 5     Q    Perhaps a document might help refresh.

 6          MR. SCHWINGLER:  Your Honor, we've marked PX545

 7   for identification.

 8          May I approach?

 9          THE COURT:  You may.

10   BY MR. SCHWINGLER:

11     Q    Mr. Merrill, I've handed you PX545 for

12   identification.  Could you review that to yourself and let

13   me know when you're ready to proceed.

14          And I'll actually direct your attention to the

15   third slide in the attachment.

16          THE COURT:  Not yet.

17          (Sealed bench conference)

18          THE COURT:  All right.  Are you going to seek to

19   admit this?

20          MR. SCHWINGLER:  I was just going to refresh his

21   recollection.

22          THE COURT:  You better.

23          Now, what does his cross-examination relate to?

24          MR. SCHWINGLER:  It just relates to the fact that

25   in the retail sales channels, that the sales force was

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1833

1    encouraged to leave the DirecTV satellite product before

2    trying to sell the Internet product.

3              THE COURT:  That's what these slides show?

4              MR. SCHWINGLER:  The third slide under DirecTV Now

5    sales strategy says, "Lead with DBS," this page right here,

6    Your Honor.

7              This is several months four or five months after

8    launch.

9              THE COURT:  You're not admitting these?

10             MR. SCHWINGLER:  Yes.

11             THE COURT:  Just refresh his recollection.

12             All right.

13             MR. SCHWINGLER:  May I direct his attention to

14   that slide?

15             THE COURT:  Of course.

16             To refresh his recollection.  You're not reading

17   it in.

18             MR. SCHWINGLER:  Yep.

19             (Open court)

20   BY MR. SCHWINGLER:

21        Q    Mr. Merrill, I'll direct your attention to the

22   third slide in the attachment.  And if you could read that

23   to yourself and let me know when you're ready to proceed.

24        A    Yes, I see the slide.

25        Q    And having read -- you can set that aside, sir.

1    Having read that, is it the case that you did

2    present information to retail sales channel personnel about

3    leading with the satellite product before falling back to

4    the Internet product?

5    A    If you look at this slide, there's two headers.

6    One says "Sell direct to be to every customer," and

7    underneath, which it does say, "Lead with DBS.  Fall back to

8    Now."

9    And on the right, it says, "Needs-based selling,

10   fit the customer."

11   And then it talks about fitting customers under

12   different scenarios.

13   Q    And you presented both of those concepts in this

14   presentation, correct?

15   A    Well, I personally didn't present this.

16   Dan Ferguson presented this slide.

17   Q    You can set that aside.

18   You were asked a few questions about where some of

19   the customers came from for DirecTV Now, including from the

20   satellite product.

21   Did I hear you correctly?

22   A    That is correct.

23   Q    And we talked on your direct examination about

24   Mr. Lurie, correct?

25   A    We did talk about Mr. Lurie, yes.

1    Q    And shortly before you left your role and took

2  your new position, you -- do you recall presenting Mr. Lurie

3  information about the impact of the DirecTV Now push or

4  marketing on the sales of the satellite product?

5    A    I do recall that -- I don't know if it was Glenn

6  or someone else, but I do recall a discussion around or some

7  sort of analysis done around the impact to retail run rates

8  on the different video products.

9         MR. SCHWINGLER:  Your Honor, we've marked PX546

10  for identification and I would like to get this admitted

11  into evidence or at least to attempt to.

12         Could I approach?

13         THE COURT:  You may.

14  BY MR. SCHWINGLER:

15    Q    Mr. Merrill, you've been handed PX546.

16         And this is -- this is an e-mail from you to Devin

17  director's team on June 16th of 2017, correct?

18    A    It is, yes.

19    Q    You were forwarding an email that you wrote to

20  Mr. Lurie, copying several others, earlier that day,

21  correct?

22    A    Yes, I do see that.

23    Q    And the subject of your e-mail to Mr. Lurie was

24  the impact of DirecTV Now's recent growth on the satellite

25  product; is that right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1836

1    A    I'm sorry.  Could you repeat the question.

2    Q    The subject of this email was the impact of

3  DirecTV Now's recent growth on sales of the satellite

4  product; is that fair?

5    A    That was a piece of what was discussed here, yes.

6    Q    And attached to that email is a slide that has

7  some information on that topic, correct?

8    A    That's right.

9         MR. SCHWINGLER:  Your Honor, United States offers

10  PX546 into evidence.

11        MS. ROBSON:  If we can put if under seal,

12  Your Honor, no objection.

13        THE COURT:  It will be admitted under seal.

14                        (Government's Exhibit PX546
                           received into evidence under seal.)

15  BY MR. SCHWINGLER:

16    Q    So Mr. Merrill, this PX546, this was sent in the

17  middle of June of 2017, correct?

18    A    That's correct.

19         Not long before I left the team.

20    Q    And you had mentioned in your cross-examination

21  that you had actually increased some of the sales strategies

22  for DirecTV Now, correct?

23    A    We did.

24         I think from launch until now, we've seen

25  continued growth of the retail channel.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q    And the email you wrote to Mr. Lurie on June 16th

2  of 2017 was, in the second paragraph says, "The punch line

3  is, no material impact on DBS (overall or in retail)."

4         Do you see that?

5    A    I do, yes.

6         MR. SCHWINGLER:  We have no more questions,

7  Your Honor.

8         THE COURT:  All right.

9         Recross, limited to redirect.

10         MS. ROBSON:  Yes, Your Honor, just a few

11  questions.

12                    RECROSS-EXAMINATION

13  BY MS. ROBSON:

14    Q    Mr. Merrill, are you familiar with the packages,

15  the DTV Now packages that are being offered in the market?

16    A    I am, yes.

17    Q    And we mentioned the $35 for 60 channels?

18    A    That's correct.

19    Q    Could you list the other offers and channels

20  being -- excuse me, the other channel and price points in

21  the DirecTV Now offers?

22    A    The current non-promotional?

23    Q    Yes, please.

24    A    It's $35 for Live a Little.

25         It's $50 for, I think, Gotta Have It.  Then -- or

1   just, I'm sorry.

2            Just Right is $50.

3            And then it's $60 for Go Big, which was the

4   100-channel package.

5            And then it was $70 for Gotta Have It.

6       Q    And the Gotta Have It had 120 channels?

7       A    That sounds right.

8       Q    Okay.  And could you explain again for the Court

9   what the needs-based selling approach is.

10      A    Yes.  Needs-based selling involves listening to

11  our customers and getting them into the right product.

12      Q    Would this last email indicate that you were

13  listening to your customers and getting them into the right

14  product?

15      A    I remember writing this email.  To me, this

16  embodies the success of the product.

17           What it tells me here -- and this is an important

18  point -- is that we are reaching an entirely new set of

19  customers; that people want our premium product or continue

20  to want and value that product, but then there's a whole new

21  tranche of customers where it was either too expensive or

22  they couldn't get it or they couldn't afford it; and all of

23  a sudden, they're coming in droves to take this conduct.

24           Now, we did see some migration because there were

25  customers dissatisfied with our premium product.  And we

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    were happy to have them on DirecTV Now, which would have

 2    been a better fit for them now that we had a second product.

 3         Q    What was the consistent guidance you got from

 4    your -- from the individuals that you reported to,

 5    Mr. Stankey and Mr. Bentley, regarding DirecTV Now and the

 6    strategy and the approach you were to take?

 7         A    My job with launching DirecTV Now was lot of fun

 8    because there was crystal-clear clarity about what the

 9    objective was.

10         Brad Bentley, John Stankey -- and I never talked

11    to Randall, but through those leaders, I got the direction,

12    they were committed, unwavering, and resolute in us bringing

13    this product to market to serve these customers in a bold

14    and compelling way.  It was my job to grow this product.

15              MS. ROBSON:  Thank you, Your Honor.

16              No further questions.

17              THE COURT:  You may step down.

18              Call your next witness.

19              MR. PETROCELLI:  Mr. Orsini will be handle this

20    witness, Your Honor.

21              THE COURT:  Okay.

22              MR. CONRATH:  Your Honor, the United States calls

23    John Harran, H-a-r-r-a-n.

24              THE COURT:  All right.

25              DEPUTY CLERK:  Sir, please raise your right hand.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1840

```
 1              (Witness is placed under oath.)

 2              DEPUTY CLERK:  Take a seat.

 3   JOHN HARRAN, ADVERSE WITNESS FOR THE GOVERNMENT, HAVING BEEN

 4   DULY SWORN, TESTIFIED AS FOLLOWS:

 5              MR. CONRATH:  May I proceed.

 6              THE COURT:  When you're ready.

 7              MR. CONRATH:  All right.

 8                      DIRECT EXAMINATION

 9   BY MR. CONRATH:

10        Q    Mr. Harran, please state your name for the record.

11        A    John Harran.

12        Q    And you are the senior vice president of digital

13   distribution, business development, and strategy

14   partnerships at Turner?

15        A    I am.

16        Q    And you're part of the Turner content distribution

17   group; is that correct?

18        A    Yes.

19        Q    Until June of 2017, that group was run by Coleman

20   Breland?

21        A    That's right.

22        Q    And, today, it is run by Richard Warren?

23        A    Yes.

24        Q    You have been working at Turner since around 2003

25   or 2004?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1841

1       A    That's correct.

2       Q    And you've been in business development since you

3   started at Turner; is that right?

4       A    Yes.

5       Q    You're involved with digital content negotiations;

6   isn't that right?

7       A    Yes.

8       Q    And in some cases, you yourself are responsible

9   for some of the negotiation with digital partners?

10      A    In some cases, yes.

11      Q    And that includes digital partners like, for

12  example, YouTube or Snapchat?

13      A    Correct.

14      Q    Would you characterize yourself as a digital

15  strategy leader at Turner?

16      A    I'd like to think of myself that way, yes.

17      Q    You believe that Turner had the opportunity to

18  influence the direction of new over-the-top entrants;

19  isn't that right?

20      A    I don't know if that's fair.

21           MR. CONRATH:  I have some documents.  May I

22  present them?

23           THE COURT:  Sure.

24           MR. CONRATH:  May I approach?

25           May I approach the witness, Your Honor?

*** REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER ***

1842

```
 1              THE COURT:  You may.

 2              MR. CONRATH:  May I proceed?

 3              THE COURT:  You may.

 4   BY MR. CONRATH:

 5       Q    Mr. Harran, if you look in the binder that I put

 6   in front of you, would you look at the tab marked PX0197.

 7       A    Yes.

 8       Q    Do you have that in front of you?

 9       A    I do.

10              MR. CONRATH:  Your Honor, PX0197, marked for

11   identification.

12   BY MR. CONRATH:

13       Q    Mr. Harran, this is an email with an attachment

14   from you, Mr. Harran, to Mr. Coleman Breland and

15   Ms. Jennifer Mirgorod; is that right?

16       A    Yes, that's correct.

17       Q    And at that time, Mr. Breland was head of Turner

18   content distribution?

19       A    He was.

20       Q    And Ms. Mirgorod is your boss; is that right?

21       A    That's correct.

22       Q    She reported to Mr. Breland?

23       A    That's correct.

24       Q    And this email relates to your business

25   development responsibility at Turner, correct?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    Let me read it really quickly.

2    Q    Sure.

3    A    Yeah.  This looks like I was summarizing some of

4    the market intel that I had learned in the marketplace.

5    That's the way I would characterize this.

6    Q    Right.  And you prepared the attachment as well;

7    is that correct?

8    A    I did, yes.

9         MR. CONRATH:  Your Honor, I offer PX197 into

10   evidence.

11        MR. ORSINI:  No objection, Your Honor, as long as

12   it goes in under seal.  There are a couple of confidential

13   things in the attachment.

14        THE COURT:  Is that agreeable to the government?

15        MR. CONRATH:  Yes, it is, Your Honor.

16        THE COURT:  It will be admitted under seal.

17                        (Government's Exhibit PX197
                           received into evidence under seal.)
18   BY MR. CONRATH:

19   Q    Mr. Harran, you said here you're summarizing some

20   of the market intelligence, correct?

21   A    That's correct.

22   Q    And the subject of what you're summarizing is

23   about a number of possible over-the-top entrants, correct?

24   A    That's correct.

25   Q    And in the last paragraph on the email, you write,

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 1819 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1844

1    "It's hard to handicap how many of these services will

2    launch over the next 9 to 12 months," right?

3         A    Correct.

4         Q    And the date of this email is March 14th, 2016,

5    correct?

6         A    Correct.

7         Q    And, in fact, as of the time that this had been

8    written, in the attachment, the only one of those who's

9    mentioned who had launch at that point was Sony Vue; was

10   that correct?

11        A    I believe that's true, yes.

12        Q    And the rest of them were potentially going to

13   enter; is that right?

14        A    That looks right, yes.

15        Q    And it was your strong opinion at the time that

16   Turner should participate in every one of those services as

17   launched; is that right?

18        A    It was, yes.

19        Q    You thought it was in Turner's interest to be in

20   all the services that launch, right?

21        A    I did.

22        Q    Now, in your email to Mr. Breland and to

23   Ms. Mirgorod, you wrote that Turner's decisions could ignite

24   or diminish the desires of new entrants to enter.

25             Do you see that in the last paragraph there?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1845

1        A     Yes.

2        Q     And you also wrote that Turner had an opportunity

3    to influence the direction of these new over-the-top

4    services, correct?

5        A     Let me read.

6              I think what I meant there was TCD, our division,

7    had the opportunity to influence our internal approach, not

8    Turner itself.

9        Q     Your division had the opportunity to influence the

10   direction that the OTT entrants followed; is that what

11   you're saying?

12       A     No.

13             I think it's fair to say that these were a bunch

14   of new entrants, all who had very uneven and nonstandard

15   terms they were bringing to the table.

16             We are a fairly siloed company, and we really

17   didn't have policy decisions around many of these things,

18   such as rates and packaging and ad rights.

19             And so I think what I recall my thought there was,

20   we, TCD, have an opportunity to influence how we manage

21   those policy decisions within the company.

22       Q     And those, the policy decisions that Turner had,

23   could ignite or diminish the desires of the potential

24   entrants.  That's what you write here, isn't it?

25       A     Yeah.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1846

1          I mean, it would be up to the distributors to

2   choose whether they wanted to carry our services or not

3   based on those policy decisions; that's correct.

4          Q    So Turner could establish policies and then stick

5   to them?

6          A    Well, I guess what I'm saying is, many of these

7   new entrants had non-conforming, nonstandard terms that they

8   were presenting to us, and so we needed to come up with a

9   point of view on what implication those terms would have on

10  our multi-distributed business.  And we had not done that,

11  and so that's the point.

12         Q    And you were proposing that Turner come up with a

13  standard policy to apply to all of them?

14         A    I was proposing that TCD, the distribution

15  division, put forward a strong opinion on some of these

16  policies, because we were closest to the business.

17         Q    Could I ask you to turn to PX38 in the binder.

18         A    38?

19         Q    Yes.

20              Do you have that?

21         A    I do.

22         Q    And the bottom email of this chain was sent from

23  your boss, Jennifer Mirgorod; is that right?

24         A    Yes.

25         Q    And you're one of the recipients?

```
1         A    Yes.

2         Q    And it links an article about YouTube TV?

3         A    Yes, looks that way.

4         Q    And you sent a reply to a number of people at

5    Turner?

6         A    Yes.

7         Q    And the topic of your discussion is YouTube TV?

8         A    Yes.

9         Q    And the date of this is October 31st, 2017?

10        A    Yes.

11             MR. CONRATH:  Your Honor, I offer PX38 into

12   evidence.

13             MR. ORSINI:  No objection.

14             THE COURT:  It will be admitted.

15             MR. CONRATH:  Thank you, Your Honor.

16   BY MR. CONRATH:

17        Q    At this point in time, October 2017, YouTube TV

18   did not include Turner content; is that correct?

19        A    I believe that's the case, yes.

20        Q    And you yourself had previously been involved in

21   the negotiation about whether to put Turner content on

22   YouTube TV; isn't that right?

23        A    Yes; in the beginning stages, I was.

24        Q    So back in this email, your email to a large group

25   of people makes a number of observations about YouTube TV,
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    right?

2         A    Correct.

3         Q    And you're observing that YouTube TV wasn't

4    anything new; is that right?

5         A    I think I was commenting on the fact that they

6    were a service offering networks through an application

7    wasn't anything new.  I believe that's the first

8    observation.

9         Q    And a subsequent observation in the

10   next-to-the-last paragraph there is that YT TV -- that's

11   YouTube TV, right?

12        A    Correct.

13        Q    -- is betting on price point, broadcasters, and

14   sports, along with YouTube integration of other YouTube

15   services, right?

16        A    Correct.

17        Q    You forwarded this email on to another member of

18   the Turner content distribution team, Scott Miller, correct?

19        A    I did, yes.

20        Q    And Scott Miller was, at that time, then, involved

21   in the negotiations with YouTube TV about putting Turner

22   content on YouTube TV, correct?

23        A    I don't recall whether we were back at the

24   negotiating table with them or not at this point.

25        Q    But Mr. Miller had responsibility for that,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    correct?

2         A    He does, yes.

3         Q    And you wrote to Mr. Miller, "FYI, we have the

4    leverage."

5              Correct?

6         A    I did, yes.

7         Q    And that line was sent only to Mr. Miller, not the

8    broader distribution of the other email?

9         A    It was, yes.

10        Q    And Mr. Miller was, at least at that point, or was

11   about to be involved, responsible for the YouTube

12   negotiations?

13        A    I believe that's the case, yes.

14        Q    And, in fact, YouTube -- Turner content is now on

15   YouTube TV, is it not?

16        A    It is, yes.

17        Q    Let's talk about another virtual MVPD.  Hulu

18   launched a virtual MVPD in 2017, correct?

19        A    I believe that was the date, yes.

20        Q    And you believed that Hulu would be at risk if

21   Turner did not participate in their virtual MVPD bundle; is

22   that right?

23        A    I don't recall thinking that, no.

24        Q    Would you look at PX36 in your binder, please.

25        A    I'm sorry, 36.

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 1825 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1850

1      Q    36, correct.

2           MR. CONRATH:  Your Honor, PX36 for identification

3    is an email from John Harran, March 22nd, 2016.

4    BY MR. CONRATH:

5      Q    Do you see that?

6      A    I do, yes.

7      Q    And it was sent to Douglas Shapiro?

8      A    Correct.

9      Q    And you reported to Mr. Shapiro at that time;

10   is that right?

11     A    At this time, I think I did have a dotted line to

12   Doug.

13     Q    You sent this email at Mr. Shapiro's request?

14     A    I don't know that I sent it at his request.

15     Q    Let me ask you to look at the lower email on the

16   first page of PX36.  Do you see there where, in the second

17   paragraph, it says, "Do you mind sending me the Coleman

18   spreadsheet?"

19     A    Oh, yes.  I'm sorry.  That's -- yeah.

20     Q    So you were responding to a request from your

21   boss?

22     A    I was, yes.

23          MR. CONRATH:  Your Honor, I move PX36 into

24   evidence.

25          MR. ORSINI:  No objection under seal.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1851

```
 1            THE COURT:  All right.  Admitted under seal.

 2                         (Government's Exhibit PX36
                            received into evidence under seal.)
 3   BY MR. CONRATH:

 4       Q    At this time in March 2016, Hulu was negotiating

 5   for content to include in their virtual MVPD; is that right?

 6       A    I believe that was the case.  I don't know if we

 7   started at that point, but shortly after for sure.

 8       Q    In this email to Mr. Shapiro, you say that we --

 9   that's Turner -- "We have a better shot to be in all the

10   skinny bundles."

11            Do you see that?

12       A    I do.

13       Q    And Turner wanted to be in all the skinny bundles;

14   is that right?

15       A    That's correct.

16       Q    In this email to Mr. Shapiro, you express that

17   Hulu faced the risk of Turner not participating in their

18   virtual MVPD, is that right?

19       A    Yes.

20       Q    And you also expressed the idea that NBC might --

21   NBCU might pull out after their Consent Decree expires,

22   right?

23       A    That's correct.

24       Q    And you wrote that if Hulu doesn't have Turner

25   content and doesn't have NBCU content, this would be, quote,
```

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***   Filed 08/06/18   Page 1827 of 3826

1852

1    a recipe for Hulu failure; isn't that right?

2         A    I see that, yes.

3         Q    Would you look at PX --

4              THE COURT:  Would this be a good time to take the

5    morning recess?

6              MR. CONRATH:  I'm sorry, Your Honor?

7              THE COURT:  Repeat.

8              MR. CONRATH:  Certainly, Your Honor.

9              THE COURT:  We're going to take a 15-minute

10   recess, Mr. Harran.

11             THE WITNESS:  Okay.  Yes, Your Honor.

12             THE COURT:  You're a witness under oath in the

13   case.  What that means is you are not at liberty to discuss

14   your testimony so far or what it might be when you return

15   with anyone, including your own lawyers.

16             THE WITNESS:  Okay.

17             THE COURT:  You have to stay independent of

18   everyone else.

19             Be back in 15 minutes, and we'll continue your

20   exam.

21             THE WITNESS:  Okay.

22             THE COURT:  You can step down.

23             THE WITNESS:  Leave this book here?

24             THE COURT:  You can step down.  That's fine.

25             All right.  Counsel, we'll be back in 15 minutes

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1853

```
 1    for the morning recess.

 2              MR. CONRATH:  Thank you, Your Honor.

 3              DEPUTY CLERK:  All rise.

 4              This Honorable Court will now take a brief recess.

 5              (Recess from 11:54 a.m. to 12:16 p.m.)

 6              DEPUTY CLERK:  The United States District Court

 7    for the District of Columbia is again in session, the

 8    Honorable Richard J. Leon presiding.  God save the United

 9    States and this Honorable Court.  Please be seated and come

10    to order.

11              THE COURT:  The witness remains under oath.

12              DEPUTY CLERK:  Your Honor, re-calling Civil Action

13    No. 17-2511, the United States of America v. AT&T, Inc.,

14    et al.

15              THE COURT:  Mr. Conrath, you may proceed when

16    you're ready correct me if I am wrong.

17              MR. CONRATH:  Thank you, Your Honor.

18    BY MR. CONRATH:

19        Q    Mr. Harran, would you please look in your binder

20    at PX217.

21              What's been marked as PX217 for identification,

22    Mr. Harran, that is an email from you?

23        A    Yes.

24        Q    And it's dated May 8th, 2015?

25        A    Yes.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1854

```
1        Q     And it's to Ronald Lamprecht at NBC Universal?

2        A     Yes.

3        Q     And also to Matt Murphy at Disney ESPN;

4   is that right?

5        A     Yes.

6        Q     And it has an attachment that is about SVODs?

7        A     Yes.

8        Q     It's an article about SVODs, right?

9        A     Yes, I see that.

10       Q     And the subject of the email is managing windows?

11       A     Yes.

12       Q     And in this context, "windows" means a period of

13  time when content is licensed to an SVOD?

14       A     Yeah.

15             I think library seasons primarily, yes.

16             MR. CONRATH:  Your Honor, I offer PX217 into

17  evidence.

18             MR. ORSINI:  Your Honor, we do have an objection.

19  May I approach?

20             THE COURT:  You may.

21             Step down, sir.

22             (Sealed bench conference)

23             MR. ORSINI:  It's a hearsay objection, Your Honor.

24  The attachment to this is an article.  It's a public

25  article.  It's not an internal document written by
```

1    Bernstein.

2            And then if you look at the email itself, the

3    bolded text is simply a copy of some of the language from

4    the article.  I can point Your Honor to where it appears it

5    if that would be helpful.

6            THE COURT:  The "in contrast."

7            MR. ORSINI:  The "in contrast," exactly.

8            If you turn to -- yeah.

9            MR. CONRATH:  Your Honor, if I may, we're not

10   offering the article for the truth, obviously.  And as for

11   the part that he copied and put it in, I'm going to ask him

12   about the reason why he did that.

13           But it's offered solely, A, for completeness of

14   the document and, B, because it's indicates what he's

15   communicating with these two gentlemen who are his

16   counterparts at competitor companies, what he's

17   communicating about.  Not offered for the truth.

18           THE COURT:  What do you think it shows?

19           MR. CONRATH:  So it shows that he's communicating

20   about competitively significant matters with his

21   counterparts at NBCU in this case.  Nothing more than that.

22           MR. ORSINI:  And this has come up with, I believe,

23   a number of the other documents Your Honor.

24           We also do have a relevance concern about this.

25   This is communicating the SVODs, Netflix and Hulus of the

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158    Filed 08/06/18    Page 1831 of 3826

1856

1    world, which the government has consistently said aren't a

2    part of this case, aren't even a part of the market, and are

3    trying to get testimony elicited from their third-party

4    witnesses that they won't use them as competitors.

5            So this is all in furtherance, as Mr. Conrath just

6    suggested, of their coordination theory, which relates fully

7    and entirely to virtual MVPDs, not SVODs.

8            MR. CONRATH:  But, Your Honor, the coordination

9    theory relates to over-the-top entrants, but particularly

10   virtual MVPDs.  But this is a discussion with competitors

11   about how it might relate to SVODs.  And I want to be clear.

12   The evidence, I think, has been pretty clear.  And our

13   theory is that SVODs are, which is like Netflix, Hulu Plus,

14   are mostly a complement but there are some things a

15   substitute.

16           And that's what's alleged in our complaint.

17   They're a substitute for watching some content and mostly a

18   substitute because they're used in conjunction with a pay-TV

19   service.

20           So it's relevant simply to show he's communicating

21   with competitors about a competitively significant matter.

22   And I don't make more of it or less of it than that.  That's

23   important.  And it is a critical part of why coordination is

24   possible.

25           THE COURT:  Why is this excerpt here?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              MR. CONRATH:  Well, that's -- I want to ask him

2     about that.

3              The prior statement says, "Our message is

4     beginning to get through."

5              I believe he's trying to call that excerpt to the

6     attention of the other two.  And that's a reasonable

7     question to put to him.

8              THE COURT:  I'll let it in.

9              MR. CONRATH:  All right.  Thank you, Your Honor.

10             (Open court)

11             THE COURT:  You may proceed, consistent with the

12    discussion at the bench.

13             It will be admitted.

14             MR. CONRATH:  Thank you, Your Honor.

15                                 (Government's Exhibit PX217
                                    received into evidence.)
16             THE COURT:  Do you understand the attachment is

17    not for the truth of the matter asserted?

18             MR. CONRATH:  Correct, Your Honor.  The attachment

19    is not for the truth.

20    BY MR. CONRATH:

21        Q    Now, Mr. Harran, you attached this analyst report

22    to your email, right?

23        A    I did.

24        Q    And you wrote in your message to Mr. Lamprecht and

25    Mr. Murphy -- the second sentence there says, "Our message
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1858

```
 1    is beginning to get support from others who are not in the

 2    pool with us day over day."

 3              Do you see that?

 4        A     I do see that, yes.

 5        Q     And that's what you wrote to the two of them,

 6    right?

 7        A     Yes.

 8        Q     And then the bolded text at the bottom of your

 9    email, that's an excerpt from the report, the analyst

10    report, right?

11        A     That's true, yes.

12        Q     And this text asks readers to imagine if the

13    big-content companies had not licensed content to Hulu Plus

14    and put it on a cable or satellite video on demand instead,

15    right?

16        A     Yes, that's what the quote says.

17        Q     Are you trying to say there that this -- the text

18    you copied is related to our message that you refer to in

19    your first line?

20        A     My recollection of this was that we were all in

21    the business for a long time, and we were very frustrated

22    with the fact that we didn't have a competitive product.

23    And we were -- I was happy that people outside of the

24    industry were now recognizing that we had an inferior

25    product, is my recollection of that reference.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q    So our message is, when you say, "Our message is

2   beginning to get support," the "our" there is you,

3   Mr. Lamprecht, Mr. Murphy, right?

4      A    Anyone who has been in this business for a long

5   time, this issue of managing windows was widely reported in

6   the press, talked about on panels at various forums.  And so

7   anyone who has been in the business for a long time, that's

8   what I was referencing.

9           Bernstein is not in the business, so my

10  recollection is that's what I was referring to there.

11     Q    And Hulu Plus is the Hulu SVOD service;

12  is that right?

13     A    Hulu -- I'm sorry.  The question again?

14     Q    Yes.

15          Hulu Plus is the Hulu SVOD service, right?

16     A    I believe that's the case.  I'm not that familiar

17  with their different, varied product titles.

18     Q    So when you copied this text, you were saying that

19  someone outside you, our message was getting to others

20  outside?

21     A    Someone outside the industry was finally

22  recognizing there was a way to improve the product and

23  compete better with others.

24     Q    And whether to license to SVODs or to the cable

25  satellite VOD instead was a question that you'd been

1    discussing with Mr. Lamprecht and Mr. Murphy previously?

2        A    I don't think that's fair.

3             I think we generally discuss our frustration, as

4    many people do in the industry, around this topic of

5    windows.  But I don't remember talking specifically about

6    this particular initiative.

7        Q    Well, you wrote "our message."  "Our message"

8    meant you and Mr. Lamprecht and Mr. Murphy?

9        A    Again, my recollection was, I was referencing

10   anyone who is in the industry, of which certainly Ron and

11   Matt and myself are.  We've been in for a long time.  But my

12   recollection was anyone who's been in for a long time.  They

13   just happen to be friends of mine.

14       Q    Mr. Lamprecht of NBCU is someone that you speak

15   with or communicate with quite often; isn't that right?

16       A    I do, yeah.  He's a good friend.

17       Q    And he's your peer at NBCU, right?

18       A    I don't think any longer.  At the time, he may

19   have been.

20       Q    At the time.

21            And you said that -- you told us that

22   Mr. Lamprecht works at NBCU on similar things to those what

23   you work on at Turner, is that right?

24       A    He does in some things, yes.

25       Q    Could you turn to PX214 for identification,

 1    please.

 2              MR. ORSINI:  Your Honor, may we approach?

 3              (Sealed bench conference)

 4              MR. ORSINI:  That is the nature of our objection.

 5    We object to this as an appropriate exhibit for any purpose.

 6              What this is a compilation of 84 different emails.

 7              THE COURT:  84?

 8              MR. ORSINI:  84 different emails over an 18-month

 9    period that they've cobbled together to try to suggest, as

10    Mr. Conrath was just beginning to argue through his

11    questioning, that there's routine communications between him

12    and Mr. Lamprecht.

13              The fact of the matter is if he acts Mr. Harran

14    how many of these actually relate to business issues, the

15    answer is going to be "a small percentage."

16              And that's obvious if you go through this,

17    Your Honor, because there are -- and I can point you to

18    specific pages, but there are emails in here where, for

19    example, he asks Mr. Lamprecht, who works at NBC, about an

20    internship that Mr. Harran's niece is applying for, to see

21    if Mr. Lamprecht knows anything about it.

22              The last two emails in here are about setting up a

23    dinner that never gets up.  It gets canceled.

24              There's a congratulatory email for a public

25    announcement at NBC.  This is 403.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1        MR. CONRATH:  So, Your Honor, this is a

2   compilation of emails between him and Mr. Lamprecht.  And it

3   is, it is, in fact -- of the documents that were received,

4   it's every one between the two of them assembled in

5   chronological order.

6        I want to ask him about it simply for the simple

7   fact that he is in communication with his counterpart at

8   NBCU.

9        THE COURT:  He just said that they're good

10  friends.

11       MR. CONRATH:  And so I want to establish the fact

12  of him being in regular communication with them.  And this

13  is a device -- I didn't want to come in and say, here's

14  214A, here's 214B, here's 214C, there are 284.

15       And I think if he would do that, that's -- if

16  Your Honor would prefer, I'll ask him questions intending to

17  establish the fact of his regular communication.

18       THE COURT:  We're not going to introduce any of

19  these.  You don't need to.

20       MR. CONRATH:  If he candidly admits that, then

21  I don't need to.

22       THE COURT:  All right.  I don't think he's going

23  to, because he already said they're friends.

24       MR. CONRATH:  He said a part of it.

25       MR. ORSINI:  He will indeed.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1863

```
 1              THE COURT:  So we're not admitting any of these.

 2              MR. CONRATH:  All right.  So I'll ask him those

 3      questions.  Thank you.

 4              (Open court)

 5      BY MR. CONRATH:

 6         Q    Mr. Harran, you were in regular communication with

 7      Mr. Lamprecht at NBCU; is that right?

 8         A    I talk to Ron often, sure.

 9         Q    Right.  And you email him often also?

10         A    I email him on occasion, sure.

11         Q    And sometimes you talk about personal things?

12         A    Sure.

13         Q    And sometimes you talk about business things?

14         A    Sometimes, yes.

15         Q    And you see him at panels sometimes?

16         A    On occasion, yes.

17         Q    And he's somebody with whom you share some

18      perspectives?

19         A    Yeah, he and others, sure.

20         Q    Let's talk about another digital partner,

21      Snapchat?

22         A    Okay.

23         Q    You had a leadership role in negotiating an

24      agreement with Snapchat; is that right?

25         A    I did.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1864

1    Q    And Snapchat is a social media company?

2    A    They are.

3    Q    And Turner reached an agreement with Snapchat?

4    A    We did, yes.

5    Q    And that was a little over a year ago?

6    A    That sounds right.

7    Q    And one part of that agreement is that a Turner

8  property called Bleacher Report provides content for a

9  publisher channel on Snapchat; is that right?

10   A    That's correct, yes.

11   Q    And another part of the agreement with Snapchat

12 relates to something called Snapchat shows?

13   A    Yes, that's true, yes.

14   Q    And that's where Turner provides short-form video

15 to be included on Snapchat shows?

16   A    That was the plan, yes.

17   Q    And that would be a show made specifically for

18 mobile?

19   A    That's correct.

20   Q    And those would generally be three to five minutes

21 in length?

22   A    That sounds right.

23   Q    And another part of Turner's relationship with

24 Snapchat is something called live stories at March Madness?

25   A    That's true, yep.

1    Q    And that's enabling people who were at the event

2  with cell phones to share video of their experience over

3  Snapchat?

4    A    That's fair.

5    Q    And then live stories from March Madness is

6  something that's been going on for a couple of years?

7    A    That's true.

8    Q    And, again, you were involved in negotiating

9  agreements with Snapchat?

10   A    I was involved, yes.

11   Q    And how long did it take you to negotiate that

12 most recent agreement with Snapchat?

13   A    Well, there was lot of earlier agreements that

14 were already in place.

15   Q    Okay.

16   A    So pulling them together and then adding -- I

17 would say over a year or a year.

18   Q    And you were able to negotiate an agreement that

19 was good enough for Turner that Turner was able to sign it?

20   A    Yeah.

21        We didn't know if it was going to be good or bad.

22 It was more of, I would call some of these platforms a bit

23 of R&D for us.  But, yes, we were hopeful it was going to be

24 good for Turner.

25   Q    And Snapchat obviously signed it as well?

```
 1        A     Yes.

 2        Q     And obviously, just to be clear, Snapchat is an

 3    independent company.  It's not part of Time Warner?

 4        A     That's correct.  That's right.

 5        Q     And were you involved in the Time Warner deal with

 6    Snapchat that was announced last summer of 2017 that

 7    includes HBO and Warner Brothers as well?

 8        A     Are you referring to the marketing deal?

 9        Q     Yes.

10        A     I was not.

11        Q     You were not.  Okay.

12              MR. CONRATH:  No further questions, Your Honor.

13              THE COURT:  All right.  Cross.

14              MR. ORSINI:  Very briefly Your Honor.

15                         CROSS-EXAMINATION

16    BY MR. ORSINI:

17        Q     Mr. Harran, just a few follow-up questions.

18              I want to make clear to the Court what your

19    responsible are and what they aren't.

20        A     Okay.

21        Q     Let's start with traditional MVPDs, the cable

22    camps, satellites, TelCos.  Do you have any responsibility

23    for negotiating linear carriage with traditional MVPDs?

24        A     I do not.

25        Q     Do you have any responsibility for setting Turner
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   strategy with respect to its linear deals with the

2   traditional MVPDs?

3        A    I do not.

4        Q    Did you have any responsibilities at all

5   concerning traditional MVPDs?

6        A    In some cases, yes.

7        Q    And what are those?

8        A    I many times participate as part of a broader deal

9   team on topics that are leaning more towards the digital

10  side of the spectrum, VOD, TV Everywhere, ad rights, certain

11  things in the digital space.

12       Q    How many people report to you, sir?

13       A    Six.

14       Q    And you report currently to whom?

15       A    To Jennifer Mirgorod.

16       Q    And she reports to Rich Warren, correct?

17       A    That's correct, yep.

18       Q    And you mentioned earlier that you had had a

19  dotted line to Mr. Shapiro.  What is a dotted-line reporting

20  relationship?

21       A    I never quite understood the difference between a

22  dotted line and a solid line.  He was just another direct

23  report of mine.  I think it's more of an HR term.

24       Q    Now, Mr. Conrath also asked you a number of

25  questions about digital distribution.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1868

1      A     Yep.

2      Q     Do you have responsibilities within Turner --

3    do you have the authority within Turner to set strategy

4    concerning how Turner engages with virtual MVPDs?

5      A     I do not.

6      Q     Do you have authority within Turner to negotiate

7    virtual MVPD linear agreements?

8      A     I do not.

9      Q     There was a discussion about YouTube earlier.

10   Were you involved in any of the negotiations in what I think

11   you referred to as the second round that led to YouTube

12   carrying Turner networks?

13     A     Not in the second round, no.

14     Q     You mentioned, in response to some questions from

15   Mr. Conrath, this issue of library rights, which is, as

16   I understand it, back-season content; is that fair?

17     A     That's right.

18     Q     What authority do you have within Turner to

19   determine what rights Turner will license from studios?

20     A     I do not have that authority.

21     Q     And what authority do you have within Turner to

22   decide what rights Turner will license to distributors,

23   whether they be virtual MVPDs or traditional MVPDs?

24     A     I do not have that authority either.

25     Q     If you could please take a look at, in your

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 1844 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1869

1   binder, Mr. Harran, PX36.

2           MR. ORSINI:  Your Honor, this document is in

3   evidence.  Mr. Conrath offered it.

4           THE COURT:  All right.

5           THE WITNESS:  Let me get to it.  Hold on.

6           Okay.

7   BY MR. ORSINI:

8       Q    Mr. Conrath pointed you to the last two sentences

9   of the email on top, which reference, among other things,

10  the possibility, the recipe for Hulu failure.

11          Do you see that, sir?

12      A    Yes, I do.

13      Q    Can you describe for the Court what you actually

14  meant by that.

15      A    Yeah.  I think many of us understood their

16  strategy to be one of a replicate strategy.  They wanted to

17  carry as many networks as the more traditional MVPDs.

18          And my recollection around that failure was that

19  by not carrying Turner or NBC, they certainly would fail on

20  that strategy, which I thought, you know, my recollection is

21  what I was thinking at the time.

22      Q    Were you suggesting in that language that if Hulu

23  did not carry Turner or NBC, that it would fail as a virtual

24  MVPD?

25      A    I was not, no.

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 1845 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1870

1     Q     And was that your view at the time?

2     A     No.  There are many other factors that could play

3  into their failure, I certainly wasn't commenting on that.

4           MR. ORSINI:  I have no further questions,

5  Your Honor.

6           THE COURT:  All right.

7           Redirect.

8                     REDIRECT EXAMINATION

9  BY MR. CONRATH:

10    Q     Mr. Harran, you told us earlier that your job is

11  to develop strategic partnerships and business development;

12  is that right?

13    A     That's part of it, yes.

14    Q     And you have a -- you work horizontally across the

15  different various vertical parts of Turner, correct?

16    A     I do, yes.

17    Q     And so like the example you gave us earlier when

18  we were talking about virtual MVPDs, your suggestion was to

19  try to get the different silos to work together to come up

20  with an approach, right?

21    A     Yeah, I think that was part of the intention, yes.

22    Q     And you were asked some questions about -- and you

23  were involved, actually, in the YouTube TV negotiations,

24  correct?

25    A     In the very initial stages, I was involved with

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1871

```
 1   them.

 2       Q    And you were involved in the Snapchat

 3   negotiations, correct?

 4       A    I was, yes.

 5       Q    And you are an advisor on the team for a variety

 6   of other negotiations; isn't that correct?

 7       A    Yes.  I have an opinion on those, yes.

 8       Q    And you were asked some questions about the recipe

 9   for Hulu failure.

10            Do you remember that?

11       A    I do, yes.

12       Q    And what you said, to be clear, is that your view

13   was that Hulu would fail on the strategy that Hulu had

14   chosen if they didn't include Turner and NBCU.  That's what

15   you said, right?

16       A    That's right; they would fail against their

17   strategy.

18            MR. CONRATH:  No further questions, Your Honor.

19            THE COURT:  All right.  You can step down, sir.

20            THE WITNESS:  Leave this here?

21            THE COURT:  Yes.

22            Call your next witness.

23            MR. CONRATH:  Your Honor, can we approach to talk

24   about the schedule?

25            THE COURT:  Yes.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              (Sealed bench conference)

2              MR. CONRATH:  So as Your Honor recalls, what we

3    discussed at the end of last week is that we have these two

4    for today.  Bond is next.  He was unavailable today; and,

5    therefore, we've talked about the possibility of finishing

6    earlier than expected today.  And we are much earlier than

7    expected, frankly.

8              THE COURT:  It's 15 minutes to lunch.

9              MR. CONRATH:  So for Mr. Bond.

10             THE COURT:  We can do the argument over the other

11   thing.

12             MR. CONRATH:  Sure, we can do that.

13             And I should say, tomorrow, we have Mr. Bond.  And

14   we've decided, in streamlining, not to call Mr. Sejen, so

15   we'll be short again.  And, of course, we've got to talk

16   about the --

17             THE COURT:  This is two hours.  I mean, that's

18   almost the whole morning.

19             MR. CONRATH:  Yeah.

20             MR. PETROCELLI:  A couple comments, Your Honor.

21             THE COURT:  You're going to have someone else

22   after lunch?

23             MR. CONRATH:  Yeah.

24             MR. PETROCELLI:  We were hoping they would call

25   Mr. Sejen, because he is the only witness with the only
```

1    company that involves a drop of all the Turner networks.

2    And he will testify that the impact was completely

3    insignificant.

4            And if they don't want to call him, we would.  And

5    it would be very brief; or else, Your Honor, I could give

6    you his deposition admissions.  I could read them into the

7    record.

8            But I think it would be very important to the

9    Court.

10           THE COURT:  Who's he work for.

11           MR. PETROCELLI:  He works for a company called

12   Cable ONE.  And Cable ONE had a blackout of Turner for 21

13   days of every Turner station.

14           It turns out that Professor Shapiro never

15   considered this blackout, and so we want to get into

16   evidence that it happened and that the company's witness

17   said under oath it was insignificant.

18           Remember, Professor Shapiro is claiming --

19           THE COURT:  He's Wednesday?

20           MR. PETROCELLI:  He's Wednesday.

21           So if I could just read his deposition admissions

22   into the record since he's not going to be available, or

23   else I could call him in our case if you would prefer.  But

24   either way, I think --

25           THE COURT:  Are you talking about three-quarters

1  of an hour?

2         MR. PETROCELLI:  Excuse me?

3         THE COURT:  He'd only be three-quarters of an hour

4  would you say?

5         MR. PETROCELLI:  Yeah.  He's very short.  Less

6  than that, I think, actually.

7         MR. CONRATH:  Less than that.

8         MR. PETROCELLI:  Yes.

9         MR. CONRATH:  I should say about him -- I should

10  be more precise.  What I want to say is we're not going to

11  call him in our case-in-chief.  We've opened the option if

12  he's relevant to rebuttal.  And, of course, we have no

13  objection if defendants want to call him.

14         MR. PETROCELLI:  Yes.

15         MR. CONRATH:  He will testify that they had a drop

16  of Turner.  He knew -- he's retired from Cable ONE, by the

17  way.

18         THE COURT:  He's a former.

19         MR. CONRATH:  Right, former employee.

20         So he would testify that he knew they needed

21  Turner.  They only dropped it by stumbling it, in my words,

22  not his.  But stumbling into it.

23         They dropped Viacom, which is something that's

24  been compared with Turner by others.  And he says, there's

25  no comparison.  They made a decision to drop Viacom.  They

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1875

```
 1    could live without it.  They couldn't do that with Turner.

 2    So he's very supportive of what I --

 3              MR. PETROCELLI:  Maybe he'll come in tomorrow.

 4              MR. CONRATH:  I don't think he's available

 5    tomorrow.

 6              MR. PETROCELLI:  We just learned today,

 7    Your Honor -- I was not given advanced warning.  We just

 8    learned today they were not calling him, and apparently that

 9    decision had been made before today.

10              MR. CONRATH:  Last night.

11              MR. PETROCELLI:  In any event, I can read his

12    deposition and direct admissions into the record, or I can

13    just hand them to Your Honor and submit them that way.

14              THE COURT:  How long would it take to do the

15    reading in?

16              MR. PETROCELLI:  Oh, I think it would probably

17    take 15 minutes.

18              THE COURT:  Put someone up here and read it back

19    and forth with question and answer.

20              MR. PETROCELLI:  Yeah.  In fact, I've never been

21    on the witness stand.  That would be kind of fun.

22              MR. CONRATH:  That would be exciting.

23              MR. PETROCELLI:  Maybe Your Honor could ask me a

24    few questions.

25              THE COURT:  You've never been broken in.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1876

```
 1           MR. CONRATH:  Your Honor, I'd rather have him
 2    live, and I'll call him in our rebuttal case if need be.
 3    We'll call him for a substantive part.
 4           I think we get to choose how to do our case, if we
 5    want to call him.
 6           THE COURT:  No.  Well, I understand, but
 7    Mr. Petrocelli's point is that he thinks it's important in
 8    terms of the preparation or setup for Mr. Shapiro --
 9    Professor Shapiro to have the information that's contained
10    in his deposition.
11           And obviously he thinks it's preferable that the
12    guy be live.  But if he's not going to be live because he's
13    in -- if he was in Bethesda, he'd be here tomorrow.  I can
14    assure you of that.  Or, frankly, just getting him here, if
15    he was getting a flight from New York, getting a flight from
16    Arizona now...
17           MR. PETROCELLI:  So I would just ask for an
18    opportunity to read that so it would be helpful for
19    Your Honor.
20           THE COURT:  Do you know if he's canceled his
21    flight?
22           MR. CONRATH:  I assume so.  I don't know.  I
23    assume so.
24           MR. PETROCELLI:  Before hearing Professor Shapiro,
25    I think it's important for Your Honor to hear that
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    testimony.

2            MR. CONRATH:  Your Honor, this is perfectly

3    appropriate cross-examination material to ask if Mr. Shapiro

4    was involved with that.

5            MR. PETROCELLI:  It's not in on the record,

6    though.

7            MR. CONRATH:  But I would be perfectly prepared,

8    if we're going to hear from Mr. Sejen, then I would prefer

9    to call him live.

10           I mean, we can come -- we can ask Mr. Shapiro,

11   Professor Shapiro, about this.  We'll call him later.

12           THE COURT:  We can have them both.  We could have

13   our cake and eat it too.

14           I mean, he can read in whatever you want to read

15   in.

16           MR. PETROCELLI:  Right.

17           THE COURT:  And you can read in whatever you want

18   to read it.  I'm sure there are some things that were said

19   in the deposition.  Without having read it myself, I'd be

20   confident that there would be portions that both sides

21   liked.

22           MR. PETROCELLI:  Right.

23           THE COURT:  You can read in what you want,

24   Mr. Petrocelli; you can read in what you want, Mr. Conrath,

25   with the understanding that he will be available live to

```
 1    both sides at a later time.

 2            MR. PETROCELLI:  I have no objection to that, and

 3    I wasn't suggesting that he couldn't call him in rebuttal.

 4            MR. CONRATH:  Right.

 5            And the only thing I would say is since he's a

 6    witness that we were going to call, we would not ask as many

 7    questions in the deposition that we normally -- as we would

 8    if he were an unavailable witness.

 9            THE COURT:  No.

10            MR. CONRATH:  So just using the deposition is not

11    appropriate.

12            THE COURT:  It's a stop-gap measure.  It's just

13    kind of an accommodation of the current circumstances;

14    that's all it is.  You'll get a full opportunity whenever he

15    appears live to question him.

16            MR. PETROCELLI:  I have another --

17            THE COURT:  You might even change your mind and

18    decide to call him in your case-in-chief.  I don't know.

19    I mean, that's up to you to make that decision.

20            MR. PETROCELLI:  So we'll read his depo admissions

21    in tomorrow, then.  We'll take 15 or 20 minutes.

22

23

24

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1879



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1880



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1882



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1883



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1884



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1885



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1886



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1887



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1888



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1889



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1890



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1891



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1892



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1893



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1894



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1895



1

2

3

4

5

6

7

8

9

10

11

12

13          THE COURT:  You know, you might feel better after

14   you've had something to eat.

15          MR. PETROCELLI:  I know.  I'm working --

16          THE COURT:  You're tired.

17          MR. PETROCELLI:  I'm working late.

18          THE COURT:  You're hungry.  You need to get

19   something in your stomach.

20          MR. PETROCELLI:  You sound like my good friend.

21   I'll settle down.

22          THE COURT:  We'll go over this, all right?

23          MR. CONRATH:  Thank you.

24          (Open court)

25          THE COURT:  All right.  As may be obvious to those

1    of you sitting in the audience, there are a number of legal

2    questions that need to be resolved in the case that we can't

3    discuss in open forum because of the confidential nature of

4    the issues.  We're going to use this afternoon for that

5    purpose.

6              So there will not be any open session of court

7    this afternoon.  The only people allowed in the courtroom

8    will be people who have authorization to have access to the

9    confidential information that we'll be discussing and the

10   issues we'll be discussing.

11             So we're completed with witnesses for today.

12   There will be witnesses tomorrow, at least two, maybe

13   three -- well, excuse me, at least -- yeah, I'd say at least

14   one, maybe two.

15             Well -- yeah, that's right.  At least one, maybe

16   two tomorrow.

17             There's one that's kind of maybe deposition

18   entries will be read.  So that's a separate question.

19             So anyway, this brings to a close the public

20   portion of today's proceedings.  There will be no other

21   witnesses called this afternoon for testimony in open court.

22             So for those of you in the audience, we'll see you

23   10:30 tomorrow morning.

24             DEPUTY CLERK:  All rise.

25             This Honorable Court will stand in recess until

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1898

1    the return of court.

2              (Proceedings concluded at 1:11 p.m.)

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-titled matter.


Date: April 9, 2018_____   /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      :
                               :
              Plaintiff,       :        CV No. 17-2511
         vs.                   :
                               :        Washington, D.C.
                               :     Tuesday, April 10, 2018
AT&T, INC., ET AL.,            :        10:45 a.m.
                               :
                               :        Day 11
              Defendants.      :
-----------------------------x




                    MORNING SESSION
              TRANSCRIPT OF BENCH TRIAL
         BEFORE THE HONORABLE RICHARD J. LEON
           UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:     Craig W. Conrath, Esquire
                        Eric D. Welsh, Esquire
                        Donald G. Kempf, Jr., Esquire
                        Andrew Finch, Esquire
                        Claude F. Scott, Esquire
                        Frederick Young, Esquire
                        Lawrence A. Reicher, Esquire
                        Shobitha Bhat, Esquire
                        U.S. DEPARTMENT OF JUSTICE
                        Antitrust Division
                        450 Fifth Street, NW
                        Washington, DC  20530
                        202) 532-4560
                        craig.conrath@usdoj.gov
                        eric.welsh@usdoj.gov
                        donald.kempf@usdoj.gov
                        andrew.finch@usdoj.gov
                        claude.scott@usdoj.gov
                        frederick.young@usdoj.gov
                        lawrence.reicher@usdoj.gov
                        shobitha.bhat@usdoj.gov
```

```
 1    Appearances Continued:

 2    For Defendant AT&T        Katrina M. Robson, Esquire
      and DirecTV Group        O'Melveny & Myers LLP
 3    Holdings, LLC:           1625 Eye Street, NW
                               Washington, DC  20006
 4                             (202) 220-5052
                               krobson@omm.com
 5
                               Daniel M. Petrocelli, Esquire
 6                             M. Randall Oppenheimer, Esquire
                               O'MELVENY & MYERS LLP
 7                             1999 Avenue of the Stars
                               8th Floor
 8                             Los Angeles, CA  90067
                               (310) 553-6700
 9                             dpetrocelli@omm.com
                               roppenheimer@omm.com
10
                               Michael L. Raiff, Esquire
11                             Robert C. Walters, Esquire
                               GIBSON, DUNN & CRUTCHER LLP
12                             2100 Mckinney Avenue
                               Suite 1100
13                             Dallas, TX 75201
                               (214) 698-3350
14                             mraiff@gibsondunn.com
                               rwalters@gibsondunn.com
15
      For Defendant            Kevin J. Orsini, Esquire
16    Time Warner, Inc.:       Peter T. Barbur, Esquire
                               CRAVATH, SWAINE & MOORE LLP
17                             Worldwide Plaza
                               825 Eighth Avenue
18                             New York, NY  10019
                               (212) 474-1140
19                             korsini@cravath.com
                               pbarbur@cravath.com
20
      Court Reporter:          Crystal M. Pilgrim, RPR, FCRR
21                             Official Court Reporter
                               United States District Court
22                             District of Columbia
                               333 Constitution Avenue, NW
23                             Washington, DC  20001
                               (202) 354-3127
24                             crystal_pilgrim@dcd.uscourts.gov

25
```

<pre>
 1                        Table of Contents

 2                        Direct   Cross  Redirect   Recross

 3   On behalf of the Government:

 4       Madison Bond  (Open Session)

 5           By Mr. Scott          1979

 6           By Mr. Orsini         2013

 7           (Closed Session)

 8           By Mr. Scott          2024

 9

10

11

12

13                        E-X-H-I-B-I-T-S

14                                       Marked    Received

15   Plaintiff's Exhibit Number 382               1991

16   Plaintiff's Exhibit Number 379               1994

17   Plaintiff's Exhibit Number 376               1997

18   Plaintiff's Exhibit Number 380               1999

19   Plaintiff's Exhibit Number 381               2004

20   Plaintiff's Exhibit Number  89               2006

21

22

23

24

25
</pre>

```
 1                     P-R-O-C-E-E-D-I-N-G-S

 2            THE DEPUTY CLERK:  Your Honor, we have civil case

 3   number 17-2511, the United States of America v. AT&T, Inc., et

 4   al.

 5            Counsel for the parties please approach the lectern,

 6   identify yourselves for the record.

 7            MR. SCOTT:  Claude Scott on behalf of United States,

 8   Your Honor.

 9            THE COURT:  What's your name?

10            MR. SCOTT:  Claude Scott.

11            THE COURT:  Claude Scott, okay.

12            MS. BHAT:  Good morning, Your Honor.  Shobitha Bhat

13   on behalf of the United States.

14            THE COURT:  Welcome.

15            MR. FINCH:  Good morning, Your Honor.  Andrew Finch

16   on behalf of the United States.

17            THE COURT:  Welcome.

18            MR. CONRATH:  Good morning, Your Honor.  Craig

19   Conrath for the United States.

20            THE COURT:  Welcome back.

21            MR. KEMPF:  Good morning, Your Honor.  Don Kempf for

22   the United States.

23            THE COURT:  Welcome back.

24            MR. YOUNG:  Good morning, Your Honor.  Fred Young for

25   the United States.
```

```
 1                 THE COURT:  Fred Young.  How many people are we going

 2    to have from the United States?  What are we up to, 30?

 3                 MR. PETROCELLI:  Daniel Petrocelli.  I'm not from the

 4    United States.  I represent the defendants.

 5                 THE COURT:  I know that.  I take judicial notice of

 6    that.

 7                 MS. ROBINSON:  Good morning, Your Honor.  Katrina

 8    Robson for defendants.

 9                 THE COURT:  Ms. Robson, good to see you, welcome

10    back.

11                 MR. OPPENHEIMER:  Good morning, Your Honor.  Randy

12    Oppenheimer for the defendants.

13                 THE COURT:  Welcome back.

14                 MR. WALTERS:  Good morning, Your Honor.  Rob Walters

15    here for DirecTV and AT&T.

16                 THE COURT:  Welcome.

17                 MR. BARBUR:  Good morning, Your Honor.  Peter Barbur

18    for Time Warner.

19                 THE COURT:  Welcome.

20                 MR. ORSINI:  Good morning, Your Honor.  Kevin Orsini

21    for Time Warner.

22                 THE COURT:  Welcome.

23                 MR. WRIGHT:  Good morning, Your Honor.  Mike Wright

24    for DirecTV and AT&T.

25                 THE COURT:  Welcome.
```

```
 1          See counsel.

 2          (Sealed bench conference.)

 3             THE COURT:  So Mr. Conrath.

 4             MR. CONRATH:  Yes.

 5             THE COURT:  I have a Federal Judge calling me.  You

 6   know about that?

 7             MR. CONRATH:  I heard that might happen.  I heard

 8   that last night.

 9             THE COURT:  Yeah, I don't know if the Judge is being

10   passively aggressive or what he's doing, but he wants to make

11   sure I know that he expects Mr. Shapiro to be in Richmond to

12   testify Thursday.  That's the first time I'm hearing of this.

13   I have no idea Mr. Shapiro or Professor Shapiro has another

14   trial going on somewhere else and I don't know what assurances

15   you've given him, but there's no guarantee he'll be done

16   Thursday.  We're going to try to get him done Thursday because

17   Mr. Petrocelli has someone he wants to call.  Excuse me

18   Wednesday?

19             MR. CONRATH:  Wednesday, yes.

20             THE COURT:  And Mr. Petrocelli has someone he wants

21   to call Thursday, I understand that.  But as we all know now

22   after four weeks of doing this, this case is, these cases take

23   on a life of their own.

24             MR. CONRATH:  I agree.  We certainly gave no

25   assurances.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  Mr. Shapiro, I think needs to hear from

 2   you about some of these topics because I don't know what he's

 3   telling Judge Payne down in Richmond.  I've not spoken with

 4   Payne yet.  He's called twice.  I personally don't do those

 5   kinds of things.  I have with other judges, but when he starts

 6   calling me to tell me he's got a witness he's putting on

 7   Thursday.  The only way I can take that is hey buddy, get it

 8   done so that I can do what I got to do on Thursday and

 9   obviously, he's your guy.

10              MR. CONRATH:  He's our witness, he's here.

11              THE COURT:  You mean here in the city?

12              MR. CONRATH:  Yes, yes.

13              THE COURT:  Okay.

14              MR. CONRATH:  I can't account for other Federal

15   Judges and how they, how they see things, so I obviously --

16              THE COURT:  Have you made it clear to Professor

17   Shapiro that there's no guarantee he'll be done Wednesday?

18              MR. CONRATH:  Yes, of course.

19              MR. PETROCELLI:  Your Honor, this is the first I'm

20   hearing of this.  I spoke to Mr. Conrath for Mr. Welsh

21   yesterday.  Mr. Welsh is doing the examination.  I said, you

22   know, we have to finish both of these guys in one day, so let's

23   plan our time.

24              MR. CONRATH:  We are planning our time.

25              MR. PETROCELLI:  I am concerned that he gave me like
```

1    a three and a half hour time estimate.  That isn't going to

2    work.

3              MR. CONRATH:  No, he said two and a half.

4              MR. PETROCELLI:  We're down to two and a half?  Well

5    then I need a couple of hours.  Can we go later?

6              THE COURT:  We can go later.  We don't have any

7    jurors here. If we've got to go to 6, we'll go to 6.  If we've

8    got to go to 6:30, we'll go to 6:30.  I'd rather not go to

9    6:30.  My reporters --

10              MR. PETROCELLI:  They're tired and they're doing

11    yeoman's work, Your Honor.  They really are.

12              THE COURT:  I know they are, believe me.  The problem

13    isn't me.  I'll go to 7 or 8.  I'm going to be here anyway, it

14    doesn't matter. But the point is we've seen enough to know

15    already these things have unexpected twists and turns.

16         Mr. Shapiro needs to be told under no uncertain terms

17    don't be giving any Judge somewhere else the assurance that

18    he'll be there on Thursday morning.  He can't be doing that.  I

19    don't know what he's telling the Judges there.  More

20    importantly, the lawyers who are trying the case down there.

21              MR. CONRATH:  I don't know.

22              THE COURT:  Do you know what case it is?  Is it an

23    antitrust case?  You guys should know about it.

24              MR. CONRATH:  It's an antitrust case, I believe if

25    it's the one in Richmond.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1                 THE COURT:  It's Richmond.

2                 MR. CONRATH:  It involves a vertical merger in the

3     door industry.

4                 MR. PETROCELLI:  I don't know anything about it.

5                 MR. CONRATH:  It's a private case, Your Honor.  We

6     have nothing to do with it.

7                 THE COURT:  Oh you don't?

8                 MR. CONRATH:  We're not involved in it at all.

9                 THE COURT:  Oh, private.

10                MR. CONRATH:  That's why this was news to me when I

11    heard it last night.

12                THE COURT:  All right.

13                MR. PETROCELLI:  Do you want to address the

14    confidentiality issue?

15                MR. CONRATH:  Yes.

16                THE COURT:  Well I figured you'd get to that.

17                MR. CONRATH:  We'd get to that eventually.  Can I

18    before we get to that raise an additional issue.

19                THE COURT:  Yes, go ahead.

20                MR. CONRATH:  I think where we, if I ask you to

21    reconsider where we came out, where I think we came out

22    yesterday on the question of --

23                THE COURT:  Filing a second motion to reconsider?

24                MR. CONRATH:  No, on the question of Sejen.

25                THE COURT:  Sejen, hold on.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1       MR. CONRATH:  We were going to call him and then we

2   didn't call him. Then Mr. Petrocelli suggests what if we read

3   his transcript.  He's not on their witness list.  He's on our

4   witness list.  If the Court wants to hear him in person, we'll

5   bring him in person.  But I think reading the transcript

6   because we've designated and they've designated.

7       THE COURT:  He indicated it would be like ten

8   minutes.

9       MR. CONRATH:  It's long.  We counter designated,

10  they're about equal, but it's not going to be.

11      MR. PETROCELLI:  Your Honor, we spent last night

12  extracting the portions we want to read and so did they.  And

13  the Court has inherent authority to control the statements of

14  evidence especially in a bench trial.

15      I think it's extremely important that the Court hear his

16  testimony before the experts testify.  I'm going to be

17  confronting Dr. Shapiro with it anyway and it would benefit

18  Your Honor to hear his testimony about the insignificant impact

19  the Turner blackout had.

20      THE COURT:  I thought I solved the problem by

21  saying--

22      MR. PETROCELLI:  You did.

23      THE COURT:  -- you could read excerpts.

24      MR. PETROCELLI:  But now he's objecting.

25      THE COURT:  Hold on now.  I said could read excerpts,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   but you then also have the option both of you to call him.

 2             MR. PETROCELLI:  Yes.

 3             MR. CONRATH:  So my suggestion is let's save the

 4   trouble of reading excerpts.  We'll just call him.  He doesn't

 5   live in this area, but we'll bring him in as we've reached out.

 6             THE COURT:  Today?

 7             MR. CONRATH:  No, no.  We can't get him here today.

 8             THE COURT:  That's the point.  My point is he wants

 9   to do it before he confronts Shapiro.

10             MR. CONRATH:  We're in our case, he's not on their

11   witness list.  So the claim that they were really essential to

12   have him here before Professor Carlton's testimony can't be

13   true because he was never on their witness list.  He was only

14   ever on our witness list.

15             MR. PETROCELLI:  He was on your witness list.

16             MR. CONRATH:  As we both know, people fall off of

17   witness list as you streamline.

18             THE COURT:  Let me ask you.

19             MR. CONRATH:  Sure, sure.

20             THE COURT:  How are you going to be in any way

21   prejudiced or harmed by him reading in some excerpts of a

22   transcript? He's trying to help me.  At least that's what he

23   says.

24             MR. PETROCELLI:  That's what I'm saying, Your Honor.

25             THE COURT:  If it's going to harm your case in some
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    way. I'm not familiar with it enough to know.

 2            MR. CONRATH:  No, no.  I'm trying to help you as

 3    well, Your Honor.  Which is to hear the live witness and hear

 4    the full context and be able to evaluate the witness.

 5            THE COURT:  Look in an ideal world, I always prefer

 6    to have a live witness always. But this isn't an ideal world.

 7    He was suppose to we thought on today.

 8            MR. CONRATH:  Right.

 9            THE COURT:  But for whatever reason he isn't on

10    today.

11            MR. PETROCELLI:  I only found out yesterday.

12            THE COURT:  He's not easily accessible.  He doesn't

13    live in Bethesda.  We can't just pull him in.

14            MR. CONRATH:  Let me ask, we're in the middle of

15    presenting our case, so this is --

16            THE COURT:  Middle, you're at the tail end.  Hey,

17    don't keep telling me you're in the middle.  You're over.

18            MR. CONRATH:  No, no.

19            THE COURT:  How many more witnesses are you going to

20    have?

21            MR. CONRATH:  Shapiro and then the one out of order

22    Holanda and Sejen if we do.  I meant in the middle only in the

23    sense that we're in our time, not their time.

24            MR. PETROCELLI:  And Your Honor I have accommodated

25    him about calling witnesses in our case.  I told him I have no

 1    problem.  He's calling a witness in our case.

 2        It's often the case that Courts receive depo testimony and

 3    live testimony.

 4             THE COURT:  I'll make it clear.  I'm letting you go

 5    out of order.

 6             MR. PETROCELLI:  Yes.

 7             THE COURT:  This is your case, not his case.

 8             MR. PETROCELLI:  Okay.

 9             THE COURT:  I'll also make it clear that you both

10    have the option at a later time calling this person live, but

11    I'm expecting Mr. Petrocelli's estimate to be respected.  It's

12    only going to be about twenty minutes each.

13             MR. PETROCELLI:  Twenty minutes each.

14             THE COURT:  That's it.

15             MR. PETROCELLI:  Put us on the clock.

16             MR. CONRATH:  Okay, I'll try.  We're prepared to

17    provide, presumably we want to read the whole thing in

18    sequence.

19             THE COURT:  I like having someone sit in like it's a

20    witness.

21             MR. PETROCELLI:  Yes, we're doing that.

22             MR. CONRATH:  We'll provide the questioner and the

23    reader and we can go from obviously read it sequentially not

24    first their designation and then ours because then they'd be

25    out order, but we're prepared to do that.  Is that the way to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   proceed?

2          THE COURT:  You want to read first or you want him to

3   read first.

4          MR. PETROCELLI:  We're going to read first.

5          THE COURT:  Whatever way you want.  You want to read

6   first?

7          MR. CONRATH:  Here's what I want.

8          THE COURT:  You want him live.

9          MR. CONRATH:  Yes, my second --

10         THE COURT:  Fallback.

11         MR. CONRATH:  -- fallback is that his testimony

12  should be read in the sequence in which it was given.  Because

13  part of what we're designating is they want to designate, you

14  know, two questions and answers.  We want to designate the next

15  two to put it in context for the preceding two.

16         MR. PETROCELLI:  We have a reader here.  Let us have

17  our person just read the whole thing.  Give us your counter

18  designations.  You're not judging credibility.

19         MR. CONRATH:  No, no. Somebody has got to read it.

20  My only request is that it not be read out of sequence where

21  you miss the context.  We're prepared to do all of them.

22         THE COURT:  Look, if you've got the deposition marked

23  so that the questions and answers that both sides want to ask

24  are marked.

25         MR. CONRATH:  Yes, they're marked.

```
 1              THE COURT:  You could have a person sitting there
 2    pretending to be the witness.
 3              MR. PETROCELLI:  Yes, exactly.
 4              THE COURT:  And then you can take turns being the
 5    questioner as if you were in a deposition.
 6              MR. CONRATH:  Can we go in such a way that the
 7    questions and answers go in the order they were asked in the
 8    deposition?
 9              THE COURT:  If it's the same reader.
10              MR. PETROCELLI:  Yes.  We have Mr. Rosen here.
11              MR. CONRATH:  We've got Mr. Reicher here.
12              MR. PETROCELLI:  Mr. Rosen is the vintage of
13    Mr. Sejen.  He's semi-retired and he more looks the part, Your
14    Honor.  We central casted this.  Do you know Rich Rosen?
15              THE COURT:  No.
16              MR. PETROCELLI:  He's the lawyer with the bald head
17    there.
18              THE COURT:  We having fun yet?
19              MR. CONRATH:  Yeah.
20              MR. PETROCELLI:  I am.  It's been, in all seriousness
21    it's been a real pleasure litigating this.
22              MR. CONRATH:  And we're not done, but we're closing
23    in. Will we have one questioner or will the questioners
24    alternate?
25              MR. PETROCELLI:  Give us your designations, I'll have
```

1    my guy read it in order.

2           MR. CONRATH:  Why don't I offer, we'll have our guy

3    read it and we'll have our guy read all the questions.  Really

4    it doesn't matter, Your Honor, as long as they're in sequence.

5    I think the most efficient thing is to have our actor and our

6    questioner, he'll read the defendant's questions and our

7    questions and we'll get it all done.

8           THE COURT:  I don't know which ones are the

9    defendant's question.  That's important for me to know that.

10          MR. CONRATH:  We can give you the transcript.

11          MR. PETROCELLI:  I suggest you let each side read

12   their own designations.  We'll give you the transcript and you

13   can see it.

14          THE COURT:  Here's what we're going to do. We're

15   going to have the same witness, okay.  Flip a coin.

16          MR. CONRATH:  I'm heads.

17          THE COURT:  It's tails.

18          MR. PETROCELLI:  Tails, Mr. Rosen.

19          THE COURT:  Rosen is the reader.  I always wanted to

20   do that.  I always wanted to do that.

21          MR. CONRATH:  That's awesome.

22          THE COURT:  That's the first time in 16 years.

23          MR. CONRATH:  Should we have our questioner read all

24   of the questions?

25          THE COURT:  No, I didn't get to that point yet.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   That's the reader, then at the podium will read both questions.

2           MR. CONRATH:  Sure, okay.

3           THE COURT:  So your guy will read the question that

4   you like.  And then if the next question happens to be your

5   question. The two of you won't say anything.

6           MR. PETROCELLI:  Oh, that's brilliant.  That's

7   absolutely brilliant.  I've never heard that before.  That is a

8   great idea.

9           MR. CONRATH:  That will work.  Shall we talk about

10  confidentiality?

11          THE COURT:  Why not, we have to anyway.

12  ██████  ████  ████   ████  ████  ████  ████

13  ██████  ████   ████  ████  ██  ████

14  ██████  ████████   ████  ████████  ████  ████  ████

15  ████████  ████  ███  ████████  ████  ████  ████  ████  ████████

16  ████████  ████  ████  ███████  ████  ████  ████

17  ████████████

18  ██████  ████  ████  ████  ████  ████

19  ██████  ████   ████  ████

20  ████  ████   ████  ████

21  ██████  ████  ████   ████  ████  ██  ████  ████

22  ████████  ████  ████  ████  ████  ████

23  ██████  ████  ████  ████  ████  ████

24  ██████  ████  ████  ████  ████  ████

25  ██████  ████   ████  ████  ████  ████  ████

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  ████████  ████  ████  ██ █  ██  ████

 2       ████  ████  ████  ████  ████  ████  ████  ██

 3  ████████  ████  ████  ████  █████████

 4       ████  ████  ████  ████  ████  ████  ████

 5       ████  ████  ████  ████  ████  ████  ████

 6  ████████  ████████  ████  ████  ████  ████████

 7  ███████  ████████  ████  ██  ████  ████████  ████████

 8  ██████

 9       ████  ████████  ████  ████  ████  ████  ████████

10            MR. CONRATH:  So we have a way to proceed.  Mr. Scott

11  will do the open court portion.

12            THE COURT:  Feel better now?  Today's date is 13th.

13  Did you know that?  Today's date.

14            MR. CONRATH:  Is that right?

15            THE COURT:  He's witness 18, correct? I'm on page 134

16  of my notes.

17            MR. PETROCELLI:  What kind of book is that, Your

18  Honor?

19            THE COURT:  A notebook.  My official records with

20  some law school, go through all my files.

21            MR. CONRATH:   They can look at it and it'll look

22  like an official record.

23            MR. PETROCELLI:  This one you've got to -- it's a big

24  one.

25            MR. CONRATH:  This is a big one, absolutely.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1           MR. PETROCELLI:  The future of the industry.

 2           MR. CONRATH:  Right, one way or the other.

 3           MR. PETROCELLI:  Thank you, Your Honor.

 4           MR. CONRATH:  All right, thank you.

 5        (Open court.)

 6           THE COURT:  All right, counsel.  I think we have a

 7  game plan, so let's execute it and call the next witness,

 8  please.

 9           MR. SCOTT:  Thank you, Your Honor.

10        The United States calls Madison Bond, the chairman of

11  content and distribution for NBCUniversal.

12           THE COURT:  All right, thank you.

13             GOVERNMENT WITNESS MADISON BOND SWORN

14           MR. SCOTT:  Your Honor, may I proceed with the

15  witness?

16           THE COURT:  When you're ready, sir.

17           MR. SCOTT:  Thank you.

18                      DIRECT EXAMINATION

19  BY MR. SCOTT:

20  Q.   Mr. Bond, could you state your full name for the record,

21  please?

22  A.   Madison Bond.

23  Q.   Where are you currently employed, sir?

24  A.   I'm employed by NBCUniversal.

25  Q.   What is your position with that company?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   I'm the chairman of content distribution.

2   Q.   All right, sir, could you describe for the Court what your

3   duties and responsibilities are in that position?

4   A.   I'm responsible for the distribution of the broadcast and

5   cable television networks that are owned by NBCUniversal

6   respected distribution to cable company, satellite providers

7   and TelCo and virtual MVPD, what are called virtual MVPDs.

8   Q.   Is there any content that is owned by NBCUniversal that

9   you are not responsible for the licensing of?

10  A.   Yes.  We have a film division and a television studio

11  division that creates television shows and creates films

12  obviously and those are distributed to theaters and other

13  networks and other distributors and I'm not responsible for

14  that.

15      I am solely responsible for the television networks.

16  Q.   That would include the cable channels that are owned by

17  NBCUniversal?

18  A.   Yes.

19  Q.   What channel -- I'm sorry?

20  A.   Domestic.

21  Q.   What channels would they include?

22  A.   There's a number of channels that would include NBC, NBC

23  Broadcast, O and O, owned and operated television stations.  It

24  includes USA, SyFy, Bravo, CNBC, MSNBC, NBC, Sports Network.

25      A number of digital channels such as Oxygen and Universo

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  and Universo Kids.  And then several RSNs, Regional Sports

2  Networks.

3  Q.   Sir, how long have you held that position?

4  A.   Since 2011.

5  Q.   Prior to that, where were you employed?

6  A.   I was employed at Comcast Cable as the executive

7  vice-president of content acquisition.

8  Q.   What were your responsibilities in that position?

9  A.   I was essentially on the other side of the table from my

10 current job.  I was responsible for doing deals with various

11 programming groups including NBC, but also including all other

12 programming groups that sold content to Comcast such as the

13 Walt Disney Company or Fox or Discovery, the Scripps Networks,

14 et cetera.

15 Q.   Were you the equivalent of that time period of Mr. Rigdon

16 today?

17 A.   Yes.

18 Q.   So now how long have you been in the position that you

19 currently hold with NBCUniversal?

20 A.   Since 2011, since the acquisition.

21 Q.   Do you today have any direct responsibilities for

22 anything, anything associated with the cable networks that are

23 owned by, I mean, I am sorry, the cable systems that are owned

24 by Comcast?

25 A.   No.

1  Q.   Now who do you report to within the company?

2  A.   Steve Burke.

3  Q.   Who is Mr. Burke?

4  A.   Mr. Burke is the CEO of NBCUniversal.

5  Q.   Do you report to anyone within the Comcast organization?

6  A.   No.

7  Q.   Do you have, was the consent decree that was entered in

8  relation to the NBC Comcast merger in place when you took your

9  current position?

10 A.   It was.

11 Q.   So all the negotiations that you have undertaken with

12 distributors for your programming have been under the umbrella

13 of that decree?

14 A.   Correct.

15 Q.   Are you aware of the conditions that are in that decree

16 that relate to NBCUniversal sales, the licensing of its

17 content?

18 A.   Yes.

19 Q.   And those conditions do they come up or have any relevance

20 to the negotiations that you have with distributors?

21 A.   Yes.

22      Well, just a point of clarification.  There's a consent

23 decree and a FCC order and are you referring to either of

24 those?

25 Q.   Either?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Yes.  Yes, they have.

2  Q.    All right, sir.  And how did you become aware of the

3  conditions that come into play when you are negotiating

4  licensing agreements?

5  A.    Well, the conditions were described to me in various

6  training materials from the lawyers at NBCUniversal and then of

7  course in the day to day negotiation when arbitration has been

8  raised by various distributors.  I've had to get involved in

9  the details of the arbitration process.

10  Q.    Broadly speaking, can you point to any negotiation you had

11  that in some way did not implicate the conditions in the

12  consent decree in the FCC order?

13  A.    It did not implicate it?

14  Q.    That did not?

15  A.    The arbitration conditions probably came up I would say in

16  almost every, what we would call traditional MVPD deal that

17  we've done.  Certainly any of size.

18     So that category would include cable operators, Telco

19  operators and satellite providers.  So arbitration was

20  typically an issue that was discussed in the context of those

21  negotiations.

22     With respect to the distributors that I referred to

23  earlier, that I call virtual MVPDs which would include

24  companies like Hulu, YouTube, Sony, arbitration really didn't

25  come up at all in those situations.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   But other conditions of the consent decree were applicable

2  to those conditions?

3  A.   Yes.

4  Q.   And to your knowledge do you know when the decree, when it

5  ends, when it expires?

6  A.   In September.

7  Q.   This year?

8  A.   The consent decree, yes.

9  Q.   In your position do you, are you personally involved in

10 the negotiations between your company and the distributors who

11 are trying to license your programming?

12 A.   Yes.

13 Q.   And are you, is there a category that you're involved in

14 or do you pretty much get involved in every one of them?

15 A.   No, I'm involved in every one of them though I have a

16 sales team.  I'm not the person that's typically in the room

17 with the negotiations.  I have a sales team that is responsible

18 for the day to day negotiations but that sales team of course

19 reports to me.

20 Q.   All right, sir.  And based on using subscriber count as a

21 measure, who are the largest distributors that you license your

22 product to?

23 A.   So our largest distributors are DirecTV, Comcast, Charter,

24 and Dish Network and then beyond that, the other large

25 distributors are Cox, Altice and Verizon.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   All right, sir.  In negotiating the agreements between

2  NBCUniversal and the various distributors that you license

3  product to, are you given any guidelines or goals regarding the

4  financial of the terms that you can agree to?

5  A.   Well, we develop our own internal plans in terms of what

6  we believe is achievable for the NBC portfolio.

7      And then we seek to effectuate that plan in the program in

8  deals that we do.

9  Q.   All right, sir.  Are those plans sent to anyone for

10  approval?

11  A.   Yes.

12  Q.   And who has the approval function in relation to your

13  business plans?

14  A.   The finance organization and ultimately Steve Burke, the

15  CEO.

16  Q.   Steve Burke, could you identify, you've identified him

17  earlier as the CEO of NBCUniversal?

18  A.   Correct.

19  Q.   Does anyone in Comcast what I call Comcast Corporate get

20  involved in either setting goals for you or reviewing your

21  business plans as they're reviewed and approved?

22  A.   Well, our plans are not strictly speaking as business

23  plans.  They're really just plans for one line item; that is,

24  affiliate revenue that gets incorporated into a much larger

25  business plan that involves other sources of revenue and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    expenses and things of that sort.

2        So we provide one input into the creation of those business

3    plans.  I believe those business plans as they're ultimately

4    done are reviewed by Comcast Corporate.

5    Q.   By Comcast Corporate could you explain what you are

6    referring to?

7    A.   Well, I'm referring to the Comcast Corporate organization,

8    not the cable organization but rather the organization that

9    sits above NBCUniversal and NBCUniversal will take a business

10   plan across all its lines of business which is more than just

11   the television networks.  It includes a number of other line

12   items, other lines of business in one business plan and that is

13   submitted to Comcast Corporate for review.

14   Q.   All right, do you know who at Comcast Corporate conducts a

15   review of those plans?

16   A.   I don't.  I would expect it's folks in the, in the finance

17   organization.

18   Q.   All right, sir.  Now in relation to the distribution

19   agreements that you negotiate, do you have final authority to

20   say yes or no to a deal?

21   A.   Well, in the context of negotiations obviously we take out

22   positions or we state positions, we ultimately negotiate a

23   deal.

24       However, the NBC has a contracts approval process that

25   applies to programming agreements.  It applies to all

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  agreements of NBCUniversal, so there is an approval process

2  that has to be observed.

3  Q.   All right, sir.  Can you describe generally what that

4  approval process consists of?

5  A.   With respect to programming deals we send, we distribute

6  an approval memo that will contain a summary of the agreement

7  and that is distributed to a number of executives that are in

8  the approval process.

9  Q.   And are people in the approval process restricted to

10 executives that are in NBCUniversal or does corporate, Comcast

11 Corporate also get involved?

12 A.   It does get approved by certain people of Comcast

13 Corporate.

14 Q.   Do you know who those people are?

15 A.   Yes.  Mike Cavanagh, Michael Cavanagh who is the CFO.

16 David Cohen and Brian Roberts.

17 Q.   Who is Mr. Cohen?

18 A.   I don't know what his specific position is but he's a

19 lawyer.

20 Q.   All right, sir.  And Mr. Roberts, Brian Roberts, who is

21 he?

22 A.   He's the CEO of Comcast.

23 Q.   Those three individuals have to sign off on the contract

24 before you can execute it?

25 A.   Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   During the scope of negotiations of these agreements, do

2  you have contact with anyone at Comcast Corporate to discuss

3  with them where you are, how the negotiations are going, that

4  type of thing?

5  A.   I've certainly had occasions where I've had conversations

6  with people from Comcast Corporate but it's not in the ordinary

7  course.  It's not an ordinary thing.

8  Q.   Have you had conversations with Mr. Roberts regarding

9  where you were with various negotiations for licensing

10  agreements?

11  A.   Sometimes.

12  Q.   And do you communicate him, with him on occasion

13  regarding, by email regarding the status of various

14  negotiations?

15  A.   Sometimes, not typically.

16          MR. SCOTT:  Your Honor, I have a notebook of

17  documents to show the witness.

18      May I approach and pass up copies for you and the

19  witness?

20          THE COURT:  Yes.

21          MR. SCOTT:  Thank you.

22      Your Honor, may I approach the witness?

23          THE COURT:  You may.

24          MR. SCOTT:  Thank you.

25          THE WITNESS:  Thank you.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        MR. SCOTT:  May I proceed, Your Honor?

2        THE COURT:  You may.

3   BY MR. SCOTT:

4   Q.   All right, Mr. Bond, if you would turn in your notebook to

5   the tab that has PX 0382.

6        MR. SCOTT:  This has been marked for identification

7   as Exhibit, Plaintiff's Exhibit 382, Your Honor.  And counsel

8   for the defendants have been provided with a copy.

9        THE WITNESS:  Yes, I'm looking at it.

10       MR. SCOTT:  Your Honor, may I proceed to examine the

11  witness on the document?

12       THE COURT:  Uh-hmm.

13       MR. SCOTT:  Thank you.

14  BY MR. SCOTT:

15  Q.   Now, Mr. Bond, before we begin questioning of the

16  document, let me raise the confidentiality issue.  I'll caution

17  you if I ask a question that is going to draw information that

18  you believe to be confidentially sensitive, please let me know

19  that?

20  A.   Okay.

21  Q.   And we are going to be very careful about how we approach

22  these documents, all right?

23  A.   Thank you.

24  Q.   Now the document that you have in front of you, it is an

25  email that is dated April 21st, 2016.

1     Do you see that?

2  A.    I do.

3  Q.    And this email indicates that it was written by you; is

4  that correct?

5  A.    It does.

6  Q.    And the email was sent to Steve Burke who you indicated

7  was the president of NBCUniversal, the CEO?

8  A.    CEO.

9  Q.    CEO.  Correct?

10 A.    Yes, sir.

11 Q.    This document was written to you in the ordinary course of

12 your duties and responsibilities at NBCUniversal?

13 A.    Yes, written by me.

14 Q.    Yes.  And you sent it to -- do you routinely or regularly

15 inform Mr. Burke by email or other means of the status of the

16 negotiations that you have ongoing with distributors?

17 A.    Sometimes.  Often times it's done in person.

18 Q.    All right, sir.  Without revealing any confidential

19 information, can you describe generally what the subject matter

20 of this email is?

21 A.    This email relates to a negotiation we were having at this

22 point in time with respect to a renewal agreement with Dish

23 Network for the NBC television networks, cable and

24 broadcasting.

25 Q.    Is there information in this email that you believe to be

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   competitively sensitive?

2   A.    There is.

3   Q.    Why is that?

4   A.    Well, these and I think other documents detail our

5   negotiating strategy.  How we perceive certain issues in these

6   deals.  How we approach certain issues.

7         Some of them refer to terms, like this one talks about

8   certain terms of those agreements.  All of those agreements are

9   highly sensitive and highly confidential.

10        Each of the distributors which are the subject of our

11  agreements obviously compete with one another and we obviously

12  have to do deals with each of these entities.

13        So to the extent that positions that these distributors are

14  taking or rights that they have granted or our view in some of

15  these provisions or how we look at the negotiating strategy for

16  these agreements, if that were all revealed could potentially

17  harm us in terms of our ability to do deals going forward and

18  also result in confidential information being spread amongst a

19  variety of competitors.

20            MR. SCOTT:  Your Honor, United States moves PX 382

21  into evidence under seal.

22            MR. ORSINI:  No objection.

23            THE COURT:  All right.  It will be admitted under

24  seal.

25            (Plaintiff's Exhibit Number 382 received under seal into

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    evidence.)

2    BY MR. SCOTT:

3    Q.    Is there then information in this e-mail that you do not

4    believe to be competitively sensitive that we can talk about in

5    open court?

6    A.    No.  I think this goes into our negotiating strategy and

7    also has a number of terms and conditions of the agreement set

8    forth in it.

9    Q.    All right.  Well, we'll set that aside for the moment?

10   A.    Okay.

11   Q.    Let me ask you, sir, if you would turning your notebook to

12   tab with the number 379.

13   A.    Yes.

14           MR. SCOTT:  May I proceed, Your Honor?

15           THE COURT:  Uh-hmm.

16   BY MR. SCOTT:

17   Q.    Now 379 is a two page document that includes a number of

18   emails, correct?

19   A.    Yes, sir.

20   Q.    And on I believe all of these emails you are either a

21   recipient or author, correct?

22   A.    Yes.

23   Q.    And the email, one of the other individuals on the email

24   we've talked about Steve Burke and his identity.

25       Who is Mack Budill, B-U-D-I-L-L?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  A.    Budill, he runs the sales organization that I referred to
 2  earlier in my testimony.
 3  Q.    The sales organization that handles other programming or
 4  the sales organization under you?
 5  A.    Under me.
 6  Q.    These emails were discussions between, back and forth
 7  between you and Mr. Budill, Mr. -- well, primarily you and
 8  Mr. Budill.  And these were exchanges in the ordinary course of
 9  your duties and responsibilities at NBCUniversal?
10  A.    Yes, sir.
11  Q.    Now without disclosing anything that you believe to be
12  confidential regarding these chain of emails, could you
13  describe for me in general terms what the subject matter of
14  these discussions are?
15  A.    This is a series of emails about the open issues and terms
16  in one of the renewal agreements we were trying to get done at
17  the end of 2016 with one of our distributors.
18  Q.    Do you consider those discussions reflected in the
19  documents to be competitively sensitive?
20  A.    I do.
21  Q.    Can you explain to the Court the name of the distributor?
22          THE COURT:  You can say the name of the distributor?
23          THE WITNESS:  Yes.  It was Charter, it's Charter.
24  BY MR. SCOTT:
25  Q.    Other than that, is there anything in here that you
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  believe that could be discussed in open court without running

2  the risk of causing you competitive harm?

3  A.   No.  The subject of this email is a list of open issues in

4  the negotiation which would cite not only those issues, but our

5  review of them and then also what the terms of those agreements

6  are.

7  Q.   And these emails were exchanged in January of 2017?

8  A.   Yes, sir.

9       MR. SCOTT:  Your Honor, the United States moves

10  Exhibit 379 into evidence under seal.

11       MR. ORSINI:  No objection.

12       THE COURT:  All right.  It will be admitted under

13  seal.

14       (Plaintiff's Exhibit Number 379 received under seal into

15  evidence.)

16  BY MR. SCOTT:

17  Q.   Now take a minute, review the email?

18  A.   Yes, sir.

19       MR. SCOTT:  I'm sorry, may I proceed, Your Honor?

20       THE COURT:  Uh-hmm.

21  BY MR. SCOTT:

22  Q.   Take a moment, look at the email, and tell me if you can

23  identify anything in there that we can discuss in open court

24  that you do not believe to be competitively sensitive?

25  A.   Okay.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      (Pause.)

2      No, other than the nine emails at the beginning that say

3  FYI or see below.

4  Q.   All right, you may set that aside.

5      Let me ask you to look at the tab in your notebook that's

6  marked as PX 376.

7  A.   Yes, sir.

8  Q.   Now --

9          MR. SCOTT:  May I proceed, Your Honor?

10          THE COURT:  Uh-hmm.

11  BY MR. SCOTT:

12  Q.   PX 376 is an email from Steve Burke, CEO of NBCUniversal

13  to you, correct?

14  A.   Yes, sir.

15  Q.   And this is dated again January of 2017?

16  A.   It is.

17  Q.   And without, and this document, this email exchange was

18  something that you did in the conduct of your ordinary

19  responsibilities at NBCUniversal?

20  A.   It was.

21  Q.   And you said that you routinely discuss in one form or the

22  other with Mr. Burke the status of negotiations between your

23  company and various distributors?

24  A.   Yes, sir.

25  Q.   Now in this particular case, can you identify what

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   negotiation, who the negotiation that you are discussing is

2   with?

3   A.    This is another email relating to the Charter negotiation

4   at the end of 2016.

5   Q.    Now could you describe in general terms without revealing

6   confidential information what the subject matter of this email

7   is?

8   A.    This is an update from myself to Mr. Burke on the status

9   of the negotiation and talking through a number of the issues

10  that remain in the deal.

11  Q.    Do you consider those discussions to be confidential and

12  competitively sensitive?

13  A.    I do.  Actually, this is more than just Charter.  I see

14  here there's a paragraph also relating to a deal with Verizon.

15  Q.    Same question, that you've identified two, do you consider

16  the discussions about the negotiations with Charter and Verizon

17  to be competitively sensitive?

18  A.    Yes.

19  Q.    Why is that?

20  A.    For the same reasons, this email discusses our position

21  and view point on a number of issues relating to those

22  distributor's issues that they're raising, terms that we've

23  offered to them, terms that they're going to receive.

24      So if the document were discussed in open court, it would

25  essentially show both our position and view of some of these

1    issues but it would also reveal the positions and view points

2    of these competitive entities to one another.

3            MR. SCOTT:  Your Honor, United States moves Exhibit

4    376 into evidence under seal.

5            MR. ORSINI:  No objection.

6            THE COURT:  Be admitted under seal.

7        (Plaintiff's Exhibit Number 376 received under seal into

8    evidence.)

9            MR. SCOTT:  May I proceed, Your Honor?

10           THE COURT:  Uh-hmm.

11   BY MR. SCOTT:

12   Q.   All right, Mr. Bond, would you take a look in your

13   notebook behind the tab that's marked 380?

14   A.   Yes, sir.

15           MR. SCOTT:  380, Your Honor, is a document that has

16   been marked as PX 380 for identification and counsel has a copy

17   of this.

18   BY MR. SCOTT:

19   Q.   Can you identify this as an email chain upon which you

20   were a participant, sir?

21   A.   Yes, sir.

22   Q.   And the email chain is dated December 26th, 2016, at least

23   the top email?

24   A.   Yes.

25   Q.   And the email chain is an exchange in this one between you

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  and Brian Roberts?

2  A.   Yes.

3  Q.   And Mr. Roberts you testified was the CEO of Comcast

4  generally?

5  A.   Yes.

6  Q.   And without disclosing any confidential information, can

7  you talk about in general terms what the discussion here

8  references?

9  A.   This is an update.  This is forwarding a message that,

10 that I wrote to Mr. Burke regarding an update on the deal

11 activity we had in 2016.

12 Q.   Can you identify what distributors were discussed in here

13 without revealing confidential information?

14 A.   It looks like Charter, Altice and Verizon.

15 Q.   So that's three separate cable companies?

16 A.   Yes.

17 Q.   In this email you are discussing the status and strategy

18 relating to those three transactions?

19 A.   Yes.

20 Q.   And with, is there anything in the email beyond the

21 identity of the distributors that you would be comfortable

22 talking about in open court because you believe it to be, not

23 to be competitively sensitive?

24 A.   Really only the beginning of the email chain which was

25 from Mr. Burke to myself which said how are things going.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1       But the remainder of the email is a summary of the status

2   on the December 26th, where we were with various deals that

3   were under negotiation for renewal.

4       It deals with terms of those agreements, positions that the

5   other parties were taking, positions we're taking.  And it also

6   actually has financial information in there, rating

7   information.

8   Q.   Why would this information be harmful to you if it were

9   openly disclosed?

10  A.   Well, all of our distribution agreements are highly

11  confidential and they're kept so really by every participant in

12  the media industry whether it's program or distributors.

13      So we're not in the practice or habit of seeing terms of

14  agreements or negotiating strategy revealed publicly.

15          MR. SCOTT:  Your Honor, United States move PX 380

16  into evidence under seal.

17          MR. ORSINI:  No objection, Your Honor.

18          THE COURT:  Be admitted under seal.

19      (Plaintiff's Exhibit Number 380 received under seal into

20  evidence.)

21          MR. SCOTT:  May I proceed, Your Honor?

22          THE COURT:  Uh-hmm.

23  BY MR. SCOTT:

24  Q.   Mr. Bond, would you turn in your notebook to the document

25  which has been marked for identification as PX 3881?

1          MR. SCOTT:  Counsel for defendants has been provided

2  with the copy, Your Honor.

3          THE WITNESS:  Yes, sir.

4  BY MR. SCOTT:

5  Q.   Exhibit 381, at least the top part of it here, seems to be

6  an email chain between yourself and Steve Burke?

7  A.   Yes.

8  Q.   And this was, email chain is dated December 14th, 2016?

9  A.   Yes, sir.

10 Q.   And in this, well, the email chain was prepared by you in

11 the ordinary course of your duties at NBCUniversal?

12 A.   It was.

13 Q.   Can you describe, without revealing confidential

14 information, the subject matter of this email chain?

15 A.   This email is once again, an update email to Steve

16 relating to the status of the negotiations we had at the end of

17 2016.

18 Q.   Can you identify without revealing any confidential

19 information what, who the distributor was that was the subject

20 of these negotiations?

21 A.   It was the three I referred to previously plus Sony.

22 Q.   So that would be Altice, Charter --

23 A.   Verizon.

24 Q.   Verizon and Sony is now added in as part of the

25 discussion?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Yes.

2  Q.    Beyond the identity of the companies that you were

3  negotiating with, is there anything in here that you would deem

4  to be not confidential?

5       (Pause.)

6  A.    No, sir.

7            THE COURT:  I'll see counsel.

8         You can step down, sir.

9         (Witness leaves the stand.)

10        (Sealed bench conference.)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



1 ████ ██ ████ ████ ████ ████

2 ████ ████ ██ ████

3          (Open court.)

4          THE COURT:  Come on back up, Mr. Bond.

5          (Witness resumes the stand.)

6          THE COURT:  All right, you may proceed consistent

7 with discussion at the bench.

8      You want to move 381?

9          MR. SCOTT:  Yes, Your Honor, we move that in under

10 seal.

11          THE COURT:  Mr. Orsini, is that all right with you

12 all?

13          MR. ORSINI:  Sorry, Your Honor?

14          THE COURT:  381 under seal?

15          MR. ORSINI:  No objection.

16          THE COURT:  No objection, under seal.

17      (Plaintiff's Exhibit Number 381 received under seal into

18 evidence.)

19          THE COURT:  All right, let's go on to the next one.

20 BY MR. SCOTT:

21 Q.  All right, Mr. Burke, (sic) if you will look in your

22 notebook at PX 889?

23          THE COURT:  Which one?

24          MR. SCOTT:  89.

25          THE COURT:  89.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE WITNESS:  Yes. I'm sorry counsel, what was the

 2   number?

 3              MR. SCOTT:  89.

 4              THE COURT:  You may proceed.

 5              MR. SCOTT:  Thank you, Your Honor.

 6   BY MR. SCOTT:

 7   Q.   Mr. Burke, this is an email that was --

 8        I'm sorry.  Mr. Bond, this was an email that was sent to

 9   you from Steve Burke on March 18th, 2016, correct?

10   A.   Yes.

11   Q.   And was this dock, this email exchange conducted in the

12   ordinary course of your duties and responsibilities at

13   NBCUniversal?

14   A.   It was.

15   Q.   Could you describe briefly, without revealing any

16   confidential information, the subject matter of this?

17   A.   This is a status report to Mr. Burke about what was going

18   on in our Dish negotiation at this time.  Dish renewal

19   negotiation.

20   Q.   Do you consider the information regarding the status of

21   those negotiations to be confidential?

22   A.   I do.

23   Q.   Do you believe it would cause harm, competitive harm to

24   your company if it was publicly revealed?

25   A.   I do.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   Is there anything in the document other than the identity

2   of Dish as being the company you are negotiating with that you

3   could discuss in open court without revealing confidential

4   information?

5   A.   No, sir.

6         MR. SCOTT:   Your Honor, United States moves PX 89

7   into evidence under seal.

8         THE COURT:   All right.

9         MR. ORSINI:   No objection.

10         THE COURT:   Admitted under seal.

11     (Plaintiff's Exhibit Number 89 received under seal into

12   evidence.)

13         MR. SCOTT:   Your Honor, as it turns out there's only

14   one more.

15         THE COURT:   All right.   Good.   Let's do it.

16   BY MR. SCOTT:

17   Q.   All right.   Could you take a look at, in your notebook at

18   Exhibit PX 117, 117.

19   A.   Yes, sir.

20   Q.   Now this is an email covering a report of deck of some

21   type, correct?

22   A.   Yes, sir.

23   Q.   And could you describe what, without revealing

24   information, what the subject matter of the attached

25   presentation consists of?

1  A.    It's a Regional Sports Network Business outlook and

2  strategy document.

3  Q.    Now on the front of this document, there is an email

4  that's to you and a number of other people including Comcast

5  and NBCUniversal employees, correct?

6  A.    Yes, sir.

7  Q.    And were you forwarded a copy of this?

8  A.    Yes, sir.

9  Q.    Were you a participant in discussions regarding the

10  subject matter of the presentation?

11  A.    Yes, sir.

12  Q.    And is there, do you consider the contents of this

13  document to be confidential?

14  A.    I do.

15  Q.    Why is that?

16  A.    Well, this one is a little different than the documents we

17  were discussing previously.

18     This is an internal document relating to our view of the

19  long term outlook for the Regional Sports Network business

20  generally.  So this is a document that contains our business

21  thinking about the Regional Sports Network Business going into

22  the future.  At least at the time it was written in July of

23  2015.

24     So this really is a very sensitive document about our

25  internal business strategy as it relates to this business line.

1          MR. SCOTT:  Your Honor, the United States moves PX

2     117 into evidence under seal.

3          MR. ORSINI:  Your Honor, we do have an objection to

4     this under seal.

5          May we approach?

6          THE COURT:  You may.

7          Step down, sir.

8          (Witness leaves the stand.)

9          (Sealed bench conference.)

10         MR. ORSINI:  Your Honor, the objection on this is a

11    relevance objection.  This is a document that relates to

12    Regional Sports Networks as the witness just testified and

13    there's language in here effectively what his deposition

14    testimony was is they had a meeting for which he only has a

15    vague recollection of what actually happened.  But what was

16    being discussed in this document was whether or not Comcast as

17    a company ought to continue to license sports rights and

18    continue to have Regional Sports Networks that they can then

19    offer up for distribution.  Nothing to do with the issues in

20    this case.

21         MR. SCOTT:  The document, Your Honor, talks about

22    furthering (sic) that they have available.  And although the

23    arguments were made by defendants that programming and delivery

24    entirely different systems and they do not overlap and they do

25    not take into account and rely on the future.  This document

1   has content which shows that in determining whether to go

2   forward with these in addition to the programming side in the

3   sales limit, they were taking into account the impact of

4   Comcast structure.

5           THE COURT:  All right, I'm going to, I'm not going to

6   admit it right now.  I'm going to give you a chance in closed

7   session to tie this in on its relevancy to your case.

8           MR. SCOTT:  Yes, sir.

9           THE COURT:  At this point I don't see it.  I don't

10  see enough here.

11      First of all, it's a multi page deck.  It's 30 pages or

12  something like that or more.  I don't know the exact number.

13  And there's just a lot of stuff thrown in there.  I don't know

14  if it's really at this point relevant to introduce the whole

15  thing.

16      So I'll wait to see how it progresses with the further

17  examination when we're in the closed session.  So at the moment

18  I'm not going to admit it.

19          MR. ORSINI:  If I may go back to our last discussion

20  quickly, Your Honor, because I was handed a document that's

21  relevant to it.

22      Counsel's argument as to the relevance of all of these

23  documents we've laboriously marched through and put into the

24  record is that it shows in their view the ineffectiveness of

25  the Comcast consent decree.  We obviously don't think that's

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    what it shows and we will establish it isn't going to show.

2         What's important is we served interrogatories on the

3    government in this case.  And interrogatory number nine

4    specifically asked them to identify any evidence they have and

5    whether they were taking a position as to whether or not the

6    consent decree that Your Honor approved in the Comcast NBCU

7    transaction was effective, ineffective, neutral.  And the

8    answer that we got from them was beyond some general

9    observations which didn't take a position, the United States

10   does not at this time have a position as to whether or not the

11   decree was effective.

12        So we asked them whether they had a position and by the

13   time they answered these interrogatories their position was we

14   have no opinion.  We haven't analyzed it.  We haven't looked at

15   whether or not its effective.

16             THE COURT:  When did you get those, roughly?

17             MR. ORSINI:  The date?

18             THE COURT:  The 17th, right?

19             MR. ORSINI:  In 2017.  It was either late '17 or

20   early '18.

21             THE COURT:  Yes, okay.  That's okay, all right, well

22   --

23             MR. ORSINI:  So we could take this up further later,

24   but I think it's important for Your Honor to understand.

25             THE COURT:  Yes, let's see first if he can get with

1 further questioning establish the sufficient foundation to give

2 him the relevance.

3        That's your last one?

4        MR. SCOTT:  Yes, sir.

5        THE COURT:  Okay.

6        (Witness resumes the stand.)

7        (Open court.)

8        THE COURT:  All right, we're going to take the

9 morning recess.

10        When we return Mr. Orsini is going to do the open court

11 cross exam and then we're going to have to close the Court for

12 the continuation of the direct exam that's on confidential

13 information.  That's in a closed setting.

14        And the continuation of the cross examination of the

15 confidential material which will be in a closed session.

16        So we'll take a fifteen minute recess and when we return

17 we're going to pass the witness for the open portion of cross

18 examination.

19        Now, that means you're a witness under oath in the case,

20 sir.  We're going to take this recess.  As a result, you're not

21 at liberty to discuss your testimony with anybody,  including

22 your own counsel.  You can't talk to anyone about what you've

23 already testified to or what you might testify to when you

24 return here, okay.

25        THE WITNESS:  I understand.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              THE COURT:  Step down.

2              THE WITNESS:  Thank you.

3              THE COURT:  See you in fifteen minutes.

4         All right, counsel, see you in fifteen minutes.

5         (Witness excused.)

6         (Recess taken at 12:05 a.m.)

7         (Proceedings resumed at 12:20 p.m.)

8              THE DEPUTY CLERK:  Your Honor, recalling Civil Action

9    Number 17-2511, United States of America v. AT&T, Inc., et al.

10             THE COURT:  You remain under oath.

11             THE WITNESS:  Thank you.

12        (Madison Bond resumed the witness stand.)

13             THE COURT:  All right, you may proceed when you're

14   ready, Mr. Orsini.

15             MR. ORSINI:  Thank you, Your Honor.  Before I do that

16   I have the date of that document you asked me before, if you'd

17   like me to give that to you.

18             THE COURT:  Okay.

19             MR. ORSINI:  It was --

20             THE COURT:  Hold on, let me write this down.

21        Go ahead.

22             MR. ORSINI:  January 4th, 2018.

23             THE COURT:  2018?

24             MR. ORSINI:  Yes, sir.

25             THE COURT:  Okay.  Thank you.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           MR. ORSINI:  May I proceed?

2           THE COURT:  All right, you may.

3                         CROSS-EXAMINATION

4    BY MR. ORSINI:

5    Q.   Good afternoon, Mr. Bond.

6    A.   Good afternoon.

7    Q.   So I just have three topics that I'd like to discuss with

8    you during this session, none of which involve documents and

9    none of which will go into specifics of particular

10   negotiations, okay?

11   A.   Yes.

12   Q.   So just to recap, Comcast is today a vertically integrated

13   company as you understand it, correct?

14   A.   Yes.

15   Q.   It has both a programming arm and a distribution arm,

16   correct?

17   A.   Yes.

18   Q.   And of the traditional distributors and programmers, it's

19   the only one out there that's vertically integrated, correct?

20   A.   Yes.

21   Q.   The other recent example of such a vertically integrated

22   company was when Time Warner owned Time Warner Cable at the

23   time that it also owned Turner, correct?

24   A.   Yes, Cablevision also owned programming aspects.

25   Q.   Okay, that's correct, thank you.  And what were those

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   programming assets just for the record?

2   A.   They owned AMC and a few digital members, IFC.

3   Q.   Thank you.  And you obviously can't speak to Time Warner

4   Cable's and Turner's experience in negotiating as a vertically

5   integrated company, but you can speak based upon seven years of

6   experience to how Comcast has behaved, correct?

7   A.   Yes, sir.

8   Q.   And those seven years of experience are as the lead

9   programming negotiator for that vertically integrated company,

10  correct?

11  A.   Yes.

12  Q.   Now, in the course of those responsibilities you've

13  negotiated with many of Comcast Cable's competitors, right?

14  A.   Yes.

15  Q.   AT&T?

16  A.   Yes, sir.

17  Q.   Dish?

18  A.   Yes.

19  Q.   Verizon?

20  A.   Yes.

21  Q.   And in the course of those negotiations with Comcast

22  cable's competitors, you never once took into account the

23  interest of Comcast cable in trying to negotiate a carriage

24  agreement, correct?

25  A.   Yes, that's correct.

1   Q.   It doesn't factor at all into your negotiations, right?

2   A.   No, sir.

3   Q.   And so you don't, for example, as you're negotiating with,

4   say, Dish consider the possibility that if you withhold NBC

5   content for Dish some subscribers might go over to Comcast

6   cable?

7   A.   No.

8   Q.   Never thought about that?

9   A.   No.

10  Q.   No one from Comcast cable ever asked you to think about

11  that, did they?

12  A.   No.

13  Q.   No one from Comcast corporate ever asked you to think

14  about that, did they?

15  A.   No, no, sir.

16  Q.   And, in fact, what you were doing is trying to maximize

17  the revenue of NBC as a programmer in those negotiations,

18  correct?

19  A.   Yes, sir.

20  Q.   You described earlier in general terms the contract

21  approval process, do you recall that?

22  A.   I do.

23  Q.   And generally speaking, these contracts get approved by

24  the higher levels of the organization because they're big

25  deals, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   Yes, that process applies not just to programming deals,

2  they apply to any agreements.

3  Q.   Is there a threshold?

4  A.   There is.

5  Q.   Okay.  I won't ask you what the specific threshold is, but

6  the point is any deal that's over a certain monitary threshold

7  for the company has to go up to the highest levels of the

8  corporation, right?

9  A.   Yes, sir.

10  Q.   And in the course of that contract review process, I take

11  it based on your testimony so far that Comcast executives never

12  came back to you and said, no, we're not approving this deal,

13  go get something better because that might help Comcast cable?

14  A.   No, that did not happen.

15  Q.   Nothing like that ever happened?

16  A.   No, sir.

17  Q.   You also mentioned during your testimony earlier that the,

18  I believe your words were, the arbitration provision has come

19  up in just about every negotiation you've had with a major

20  distributor correct?

21  A.   Yes, sir.

22  Q.   And that's the arbitration provision that was in effect as

23  part of the overall set of remedies related to the actual

24  merger of Comcast and NBC, correct?

25  A.   Yes, sir.

1  Q.   And there have been two actual arbitrations that were

2  initiated, correct?

3  A.   Yes.

4  Q.   Okay.  We can get into those more later.  But again, aside

5  from those two, it comes up in just about every big

6  negotiation?

7  A.   Yes.

8  Q.   And your perception as the programming negotiator is that

9  the distributor is raising it to try to get some leverage over

10 you, correct?

11 A.   Yes.

12 Q.   And it's your view that by them raising the arbitration

13 provision they have, in fact, gained some leverage over you,

14 correct?

15 A.   I think that's fair.

16 Q.   Now, in the course of these negotiations with various

17 distributors, are there times when they propose terms, it could

18 be rate, it could be TV everywhere, it could be anything, that

19 from your perspective are out of line with the market?

20 A.   Yes, sir.

21 Q.   So they propose terms that are not consistent with what

22 other major distributors have actually agreed to?

23 A.   I think every time.

24 Q.   Sorry?

25 A.   Every time.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Every time, okay.

2       And is it fair to say that in the course of those

3  negotiations one point that you make to them is that this term

4  you've asked for is completely out of wack with what your

5  competitors have agreed to?

6  A.   Yes, sir.

7  Q.   And you explained to them that if you were to agree to it

8  it would be fundamentally different than what's out there in

9  the marketplace, right?

10 A.   Yes.

11 Q.   Now, you do that without disclosing specific confidential

12 information to them, I suppose, correct?

13 A.   Yes, it's not -- yes, it's not related to a particular

14 term or a particular distributor.  It has to be more with

15 marketplace conditions.

16 Q.   And so to the extent that a negotiation has broken down

17 and gone to arbitration, you have put the distributor on notice

18 that if they continue to insist on that out of market term the

19 other agreements you have with distributors will show that it

20 is, in fact, out of market, fair?

21 A.   Yes, typically we will have given them proposals that, you

22 know, typically represent where we are in the marketplace

23 position.

24 Q.   And you'll describe that to them when you give them the

25 proposal?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Yes, sir.

2  Q.    Okay.  So before they go into the arbitration, you have

3  said to them these terms that I'm putting on the table for you

4  are consistent with what I have across the industry?

5  A.    Yes, sir.

6  Q.    And they know that before they make a decision to go into

7  arbitration, right?

8  A.    Yes, if they believe what I'm saying.

9  Q.    Fair enough.  And they know that if they go into

10  arbitration those other agreements will be part of the record,

11  correct?

12  A.    I assume so.

13  Q.    Last topic.  Virtual MVPDs.

14  A.    Yes, sir.

15  Q.    We spoke at your deposition about a variety of industry

16  trends.  I'd just like to hit the highlights right now.  And in

17  particular over the last number of years, what trend have you

18  seen in the marketplace with respect to virtual MVPD

19  subscribers?

20  A.    Well, we've seen over the last few years a launch of a

21  number of virtual MVPDs which are essentially multichannel

22  video distributors who, rather than distribute their program

23  and our programming and other people's programming over a

24  proprietary cable system or satellite system, they distribute

25  it over the Internet.  And we've licensed all of those

1    distributors, and now they have well over three million subs in

2    total.  Subscribers.

3    Q.   Why --

4    A.   I'm sorry, didn't mean to cut you off, sorry.

5    Q.   Why have you decided to license your networks to each of

6    those virtual MVPDs?

7    A.   Well, simply we're interested in getting the most amount

8    of distribution that we can get, and they represent an

9    important new pathway of distribution.  As I said, they now

10   have well over three million subscribers in total.  Meanwhile,

11   the traditional MVPD universe, that is, those customers that

12   are reflected in cable and satellite and Telco, those

13   subscribers are all declining.

14   Q.   So do you view the emergence of these virtuals as a

15   positive or negative for NBC's business?

16   A.   Well, I think as a positive as I sit here now because if

17   we were not on those platform we would have, you know, three

18   million less subs, fewer subs.

19   Q.   And you said in your answer a moment ago that you believe

20   these are important distributors to NBC; is that right?

21   A.   Yes, sir.

22   Q.   And it's also your belief that they will continue to be

23   important distributors going forward, correct?

24   A.   Yes, I think they'll continue to grow.

25   Q.   And I believe you said in your deposition that you believe

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  that as they continue to grow, their importance to you as a

2  programmer will also continue to grow, fair?

3  A.    Yes, sir.

4  Q.    Now, when you've negotiated these deals with the virtuals,

5  we'll call them virtuals if that's okay because it's less of a

6  tongue tyer than MVPD.

7  A.    Certainly.

8  Q.    The virtuals, when you negotiate these deals with them,

9  they are competitors to your Comcast cable sister company,

10  correct?

11  A.    Yes, sir.

12  Q.    And you understand don't you, sir, that it's possible that

13  someone might decide that they like Sling, so they're going to

14  subscribe to Sling instead of Comcast cable, correct?

15  A.    Yes.

16  Q.    And that would be a bad outcome for Comcast cable,

17  correct?

18  A.    Correct.

19  Q.    Is that something you ever take into account when you're

20  negotiating these licensing deals with the virtuals?

21  A.    No.

22  Q.    Has anyone at Comcast cable ever come to you and said, you

23  know, Mr. Bond, what are doing, you're taking my customers

24  away, keep that in mind as you negotiate these deals?

25  A.    No, sir.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.    Nothing remotely like that?

2  A.    No.

3  Q.    And no one from Comcast corporate has come to you and said

4  you should not license a virtual because it might hurt your

5  sister company, the cable company, correct?

6  A.    Correct, that did not happen.

7  Q.    That has not happened.  Nothing remotely like that has

8  happened, correct?

9  A.    No, sir.

10 Q.    And so when you have made decisions about what you would

11 or would not be willing to agree to with a virtual, is it Fair

12 to say that's been based entirely upon your view of what's best

13 for NBC as a programmer?

14 A.    Yes, sir.

15 Q.    And not based upon any consideration of what it might mean

16 for your cable company sister company?

17 A.    That's correct.

18        MR. ORSINI:  That's all I have for now, Your Honor.

19        THE COURT:  Very good.

20     All right.  We're going to now have to take a five

21 minute recess, clear the courtroom, and shift into the

22 confidential portion of the direct exam, and if time permits

23 before the lunch break, start the cross-exam in the

24 confidential setting.  Otherwise, if we do not complete the

25 confidential portion of direct and cross, when we return from

1  the lunch break, we will start back up wherever we left off,

2  and we'll continue in executive session, so-to-speak, until we

3  are done.  And then we can open the courtroom back up to the

4  public.

5       So I can't tell the public at the moment we'll be done

6  for certain after the lunch break.  I just don't know the

7  answer to that question yet.  So we'll take a brief recess to

8  clear the courtroom, the witness remains under oath.  He's not

9  at liberty to discuss his testimony with anybody.  And we'll be

10  starting back up in about five minutes or so.

11      (Proceedings recessed at 12:32 p.m.)

12      (Proceedings resumed at 12:40 p.m.)

13      (Closed Session reported thru page 2049, not transcribed

14  herein.)

15      (Open court.)

16      (Luncheon recess at 1:10 p.m.)

17                              -oOo-

18

19

20

21

22

23

24

25

 1          DEPUTY CLERK:  The United States District Court

 2   for the District of Columbia is again in session, the

 3   Honorable Richard J. Leon presiding.  God save the United

 4   States and this Honorable Court.  Please be seated and come

 5   to order.

 6          Your Honor, we are back in public session,

 7   re-calling Civil Action No. 17-2511, the United States of

 8   America v. AT&T, Inc., et al.

 9          THE COURT:  All right.  Re-call your next witness.

10          MR. WELSH:  Thank you, Your Honor.

11          The United States re-calls Mr. Daniel York as an

12   adverse party witness.

13          THE COURT:  All right.

14          Mr. York, you remain under oath, okay?

15          THE WITNESS:  Okay.

16          THE COURT:  Very Good.

17   DANIEL YORK, ADVERSE WITNESS FOR THE GOVERNMENT, HAVING BEEN

18   PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS

19   FOLLOWS:

20          MR. WELSH:  May I proceed, Your Honor?

21          THE COURT:  You may proceed.

22          MR. WELSH:  Okay.  Thank you, Your Honor.

23                      DIRECT EXAMINATION

24   BY MR. WELSH:

25      Q    Mr. York, good afternoon.

1        A     Good afternoon.

2        Q     First of all, Mr. York, I just want to start off

3    by asking you, when we broke with your testimony last week,

4    His Honor spoke to you about your testimony and not --

5    telling you you should not be speaking with others about it,

6    and I wanted to just follow up on that.

7              Have you spoken with anyone about the testimony

8    that you gave last week, sir?

9        A     No, sir.

10       Q     And with respect to the upcoming testimony today,

11   have you spoken with anyone, including your counsel, about

12   that?

13       A     No, sir.

14       Q     Have you been provided any notes or any comments

15   by anyone, including counsel, about your testimony?

16       A     No, sir.

17       Q     Okay.  Great.

18             Let's now just move on to questions I have for you

19   today, which are very few.

20             Mr. York, in 2014 -- I want to get us all

21   situated.  So back in 2014, you were familiar with the

22   Dodgers channel; is that correct?

23       A     Correct.

24       Q     Okay.  And that was SportsNet LA; is that correct?

25       A     That's the name of it, yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2075

1     Q    All right.  And Time Warner Cable owns

2  SportsNet LA and was licensing the rights out at that time;

3  is that true?

4     A    No.  Guggenheim actually owns SportsNet LA.

5  Time Warner Cable funds the network.

6     Q    Okay.  But Time Warner Cable is involved in the

7  aspect of SportsNet LA, correct?

8     A    Correct.

9     Q    Okay.  And now, back then, DirecTV did not carry

10  the Dodgers channel, true?

11     A    We did not carry SNLA, no.

12     Q    SNLA, right, SportsNet LA, right?

13     A    Correct.

14     Q    And AT&T at that time also did not carry

15  SportsNet LA, true?

16     A    Correct.

17     Q    And Charter also did not carry SportsNet LA, true?

18     A    In 2014?

19     Q    Yes, sir, uh-huh.

20     A    Correct.

21     Q    Okay.  Again, in 2014, Cox did not carry

22  SportsNet LA, true?

23     A    Amongst others, yes.

24     Q    Now, again, from your perspective at DirecTV at

25  the time in content negotiations, you were interested in

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    getting the price of SportsNet LA down lower than what it

2    was being offered to DirecTV at the time; isn't that fair?

3         A    Yeah.

4              As we do in many negotiations, we try and get a

5    good price.

6         Q    And you had conversations with your boss,

7    Mike White.  He was a CEO of DirecTV.  You had

8    communications with him during that time frame about this

9    situation involving SportsNet LA; isn't that right?

10        A    Some, I believe so.

11        Q    All right.  And in your communications with

12   Mr. White, Mr. White told you that DirecTV would have more

13   leverage in the negotiations regarding SportsNet LA if

14   DirecTV and the other distributors stuck together in those

15   negotiations, true?

16        A    I don't believe that's true.

17             MR. WELSH:  Your Honor, I have an exhibit,

18   consistent with Your Honor's order.

19             May I approach?

20             THE COURT:  What's the number?

21             MR. WELSH:  It's PX462, Your Honor.

22             THE COURT:  Yes.  Okay.

23             MR. WELSH:  May I approach the witness,

24   Your Honor?

25             THE COURT:  You may.

1    BY MR. WELSH:

2        Q    Mr. York, you have Plaintiff's Exhibit PX462.

3    Do you recognize that, sir, as an exchange of e-mails

4    between yourself and your boss, Mr. White, March 15 and

5    March 16, 2014?

6        A    I do.

7        Q    You see the bottom email is from Mr. White to you,

8    and then you have your response; is that correct?

9        A    Correct.

10       Q    And the exchange that's occurring here, the "re"

11   line is Dodgers, correct?  Do you see at the very top of the

12   exhibit?

13       A    Yes.

14       Q    And what's going on in your exchange with

15   Mr. White on these, in these emails, on these two days

16   relates to the status of the offers being made with respect

17   to the Dodgers SNL -- SportsLeague -- SportsNet LA offering,

18   correct?

19       A    Yes.  This email is primarily about suggestions on

20   new proposals that we could make for carriage.

21       Q    But it had to do with the Dodgers channel --

22       A    Correct.

23       Q    -- simply put, correct?

24       A    That -- yes.

25            MR. WELSH:  Okay.  Your Honor, I move for

1    admission of PX462.

2           MR. WALTERS:  Your Honor, we have no objection if

3    it's under seal and that it be admitted on a basis that the

4    Court has admitted pre-transactions since 2014 documents as

5    well under that protocol.  On that basis, we have no

6    objection.

7           THE COURT:  It will be admitted under seal and

8    will be treated only as to the company he's worked for at

9    the time -- the company he was working for at the time.

10                              (Government's Exhibit PX462
                                 received into evidence under seal.)
11           MR. WELSH:  May I proceed, Your Honor?

12           THE COURT:  You may.

13           MR. WELSH:  Thank you.

14   BY MR. WELSH:

15      Q    Now, Mr. York, Mr. White starts off the email at

16   the bottom by talking about the Dodgers channel, correct?

17   He's been thinking further about the Dodgers?

18      A    Correct.

19      Q    And Mr. White goes on to mention in his email to

20   you, he states, "Seems like we may have more leverage if we

21   all stick together."

22           He says that, correct?

23      A    That's one of the sentences, yes.

24      Q    And, again, what he was telling you in his email

25   was that if the distributors all stuck together with

1    DirecTV, there would be greater leverage to get the price

2    down from the offering by Time Warner Cable; isn't that

3    true?

4         A    I wouldn't say that definitively as what he meant

5    at all.

6         Q    Well, you see when he says there that he had

7    not -- he had not realized that Time Warner only has

8    something like a 35 percent share.

9              Do you see that?

10        A    Yes.

11        Q    And what he's talking about there and what you

12   understood was that Time Warner only had a small share of

13   the market for the Dodgers channel, correct?

14        A    It depends on the definition of the market, the

15   Dodgers footprint is very expansive.  It goes to Hawaii,

16   down almost, I believe, to the Mexican border, to Nevada.

17             Their footprint or their marketshare in that broad

18   footprint was probably around this number.  They probably

19   have two-thirds marketshare actually in the Dodgers foot

20   present, which is really Los Angeles, L.A. County.

21        Q    But what he's referring to there is the 35 percent

22   marketshare; isn't that true?

23        A    Yeah, that's what it says.

24        Q    And takeaway from that, at least from his

25   understanding as it was communicated to you, was that with

 1    the 35 percent marketshare, that left 65 percent with the

 2    other distributors; isn't that the case?

 3        A    That would be the math, yes.

 4        Q    Okay.  And he's suggesting here that if the other

 5    65, including DirecTV, stuck together, then that could help

 6    drive price down, right?

 7        A    I don't -- it could have been about internal

 8    discussions that we were having.  We had lot of debate about

 9    what to offer, how did we value it, finance, marketing, PR,

10    external affairs.

11            We had a debate on how we were going to

12    communicate internally and externally in trying to get

13    everybody aligned on that.  That could have been what he's

14    referring to.

15        Q    But that's not what you understood because that's

16    not how you responded.

17            You didn't respond back to him to say, hey, well

18    our internal folks, yeah, I agree our internal folks need to

19    be on the same page.

20            You didn't say that, did you?

21        A    I did not.

22        Q    Right.

23            What you actually said in response was, "Agreed.

24    Others holding firm is key."

25            Those are your words, sir, aren't they?

```
 1        A    Yes.

 2             After many sentences about what the offer should

 3   be.

 4        Q    Right.  But what you told him in exchange was,

 5   "Others holding firm is key."

 6             And then you went on to mention other

 7   distributors, didn't you?

 8        A    I did, yes.

 9        Q    And in 2014, you had communications with your

10   counterparts at these distributors about the Dodgers

11   channel, didn't you?

12        A    Yes.  There were many business issues that we

13   discussed, yes.

14        Q    And that would include Mr. Slater at AT&T before

15   the merger, correct?

16        A    That's correct.

17             MR. WELSH:  No further questions, Your Honor.

18             Thank you.

19             THE COURT:  All right.

20             Cross-exam or redirect?

21             MR. WALTERS:  Very briefly, Your Honor.

22             THE COURT:  I don't know what to call it, really.

23                          -  -  -

24                    CROSS-EXAMINATION

25   BY MR. WALTERS:
```

1      Q    Mr. York, was it your view during this time frame

2   that -- well, let me back up.

3           Why is it that you ultimately, at DirecTV, decided

4   not to sign up the Dodgers?

5      A    It, in my 30 years of doing content licensing,

6   I have never seen a worse deal than the deal that was

7   presented to us to carry the Dodgers.

8           Just before that offer came in, we carried a

9   network that had the Dodgers, the Clippers and the Ducks on

10  it that cost us probably almost a dollar less per subscriber

11  per month than the offer we got from SNLA for carriage of

12  the Dodgers.  It was an insane offer.

13          We made a very aggressive set of counterproposals,

14  got no movement whatsoever, and couldn't come to terms to

15  carry it.

16          We desperately wanted to carry the Dodgers and

17  still do.

18     Q    Do you carry the Dodgers to this day?

19     A    We do not.

20     Q    How is it that you came to understand or believe

21  that others might not likewise sign up the Dodgers during

22  this time frame?

23     A    Numerous sources, starting with Time Warner Cable

24  themselves.  In the very first meeting that we had where

25  they pitched the network to us, they said, these are our

1    economics; we assume that there will never be Dish carriage.

2            It was widely reported in the press.  I think Dish

3    was out with a public statement.

4            We had multiple reporters calling us saying that

5    it appears they're not having any luck with carriage.

6            We had Time Warner Cable coming after us saying,

7    it's really about you.

8            We had Time Warner Cable run a full-page ad in the

9    L.A. Times touting examples or specific confidential points

10   in our proposal to them, only about DirecTV.

11           It was pretty obvious that they were not having

12   much luck getting distribution with anybody but

13   Time Warner Cable themselves.

14   Q    In your email with Mr. White, you write that it

15   was -- that it didn't look like Dish was going to carry the

16   Dodgers.

17           Do you recall that?

18   A    Yes.

19   Q    Okay.  How did you come to believe that was the

20   case?

21   A    This was a few months after, two and a half months

22   after Time Warner told us that.  And it was, I believe it

23   was out in the press where Dish had made some statement that

24   they didn't intend to care the Dodger network.

25           MR. WALTERS:  Your Honor, I'd like to mark, just

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   for identification, DX933.

 2            THE COURT:  What's the number?

 3            MR. WALTERS:  933.

 4            THE COURT:  For identification?

 5            MR. WALTERS:  Yes, sir.

 6            May I approach, Your Honor?

 7            THE COURT:  You may.

 8   BY MR. WALTERS:

 9       Q    Now, Mr. York, this is a March 4th L.A. Times

10   article regarding the issue of the Dodgers.

11            Do you see that?

12            THE COURT:  What year?

13            MR. WALTERS:  March 4th of 2014, Your Honor.

14            THE COURT:  '14?

15            MR. WALTERS:  Yes, sir.

16            THE COURT:  All right.

17   BY MR. WALTERS:

18       Q    And could you recall for us the date of the other

19   exhibit, the Exhibit 462.  I believe that's dated

20   March 16th?

21       A    March 16th, yes, 2014.

22       Q    So this March 4th article in the L.A. Times

23   relates that -- do you see in the second full paragraph, it

24   begins "negotiations"?

25       A    Yes.
```

1      Q    In the second sentence, it says, "But one provider

2   is unlikely to carry the channel, according to Joe Flint of

3   the L.A. Times.  Dish Network Executive Vice President

4   David Shull discussed their stance."

5           It goes on to say, "Satellite broadcaster

6   Dish Network isn't interested in playing ball with the

7   Dodgers.  In an interview, David Shull said the majority of

8   Dish's LA customers don't care about getting SportsNet LA,

9   the new Dodger-owned pay-TV channel that launched last

10  month."

11          Do you see that?

12     A    I do, yes.

13     Q    Do you recall this article as being one of several

14  that announced what Dish's position was at the time?

15     A    Yes.

16     Q    And was it on that basis that you communicated to

17  Mr. White some two weeks later?

18     A    Absolutely.

19     Q    One last question.

20          To the very best of your recollection, Mr. York,

21  did you in any way coordinate, collude, or conspire

22  regarding the terms of carriage of the L.A. Dodgers with any

23  other distributors?

24     A    Absolutely not.

25          MR. WALTERS:  Thank you, sir.

1           THE COURT:  You're excused.

2           THE WITNESS:  Thank you.

3           THE COURT:  You may step down.

4           All right.  We have some deposition excerpts that

5    the defense would like to be read out of order as part of

6    its case, and the government is going to read some of its

7    own from the same deposition.

8           Correct?

9           MR. PETROCELLI:  Yes, that's correct, Your Honor.

10          THE COURT:  So this is a deposition of -- let's

11   put the name on the record there of who.

12          MR. WALTERS:  His name is Randy Sejen, S-e-j-e-n.

13          THE COURT:  And what's his position?

14          MR. WALTERS:  He was the content negotiator at

15   Cable ONE, which is based in Phoenix.  It's a mid-sized

16   MVPD, and he was the content negotiator until March of 2017.

17          THE COURT:  All right.

18          And he was deposed when?

19          MR. WALTERS:  He was deposed earlier this year.

20          MR. JONES:  February 13th, 2018, Your Honor.

21          THE COURT:  All right.  He couldn't be with us

22   today, unfortunately.  We would like to get this -- the

23   parties would like to get this in before the expert

24   witnesses testify in the next two days.

25          So who's going to be playing the role of

 1    Mr. Sejen.

 2              MR. WALTERS:  We have Mr. Rich Roschen.

 3              THE COURT:  Come on up, Mr. Roschen.

 4              THE WITNESS:  Thank you.

 5              THE COURT:  We're going to swear you to read it

 6    exactly as it's in that -- read it exactly like it's in

 7    there, all right?

 8              THE WITNESS:  To the best of my ability,

 9    Your Honor.

10              THE COURT:  All right.

11              And who's going to be questioning him?

12              MR. WALTERS:  So, at Your Honor's direction, both

13    I and --

14              MR. CONRATH:  Your Honor, from our side, my

15    colleague, Fred Young will be handling the questions.

16              THE COURT:  All right.  Mr. Young.

17              MR. WALTERS:  And unless you prefer to do

18    otherwise, we understand the way we will do this is I will

19    ask our questions, and the DOJ will then ask their

20    questions.  And we'll just do this in sequence in the way

21    that the testimony appears in the deposition.  And we're

22    prepared to do so if that works for you.

23              THE COURT:  I thought the idea was that you were

24    going to read them in the order in which they appear.

25              MR. WALTERS:  Yes, sir.  In the deposition.

1          So we'll go back and forth as they appear in the

2     deposition.

3               THE COURT:  Right.

4          So you'll read the ones you want in, and he'll

5     read the ones he wants in as they appear throughout the

6     text?

7               MR. JONES:  Jones, that's correct, Your Honor.

8               MR. WALTERS:  That's correct, Your Honor.

9               THE COURT:  Very good.

10               MR. WALTERS:  If that's your pleasure.

11               THE COURT:  That would be great.

12               MR. WALTERS:  We'll do that.

13          We also have, for the Court, copies of the

14     transcript and a coversheet that actually identifies the

15     particular pages.

16          I thought the court reporter would prefer that; as

17     well as there are four or five deposition exhibits that are

18     discussed.  They're used as point of departures.  We don't

19     intend to offer any of those into evidence.  They're simply

20     for context and reference.

21               THE COURT:  Okay.

22               MR. WALTERS:  And the number for the deposition

23     transcript is DX930, marked for identification.

24               THE COURT:  All right.  What page are we starting

25     on here?

```
 1              MR. WALTERS:  And happily, Your Honor, both sides

 2    have agreed there will be no -- nobody will interpose any

 3    objections.  So we'll do this as efficiently as possible.

 4              THE COURT:  Okay.

 5              (Randolph Sejen deposition read into the record.)

 6    BY MR. WALTERS:

 7         Q    Good morning, Mr. Sejen.

 8         A    Good morning.

 9              THE COURT:  Very realistic courtroom.

10              MR. WALTERS:  We're nothing if not literal,

11    Your Honor.

12    BY MR. WALTERS:

13         Q    I'd like to learn a little bit about your

14    background and how you fit into the content negotiation

15    aspect of Cable ONE's business.  But this might help focus

16    and maybe even, with any luck, limit the deposition today.

17              If I understand correctly, you're retired; is that

18    right?

19         A    Yes.  I retired in March of last year, so it's

20    been almost a year now.

21         Q    So March of 2017?

22         A    '17, correct.

23         Q    Okay.

24              Page 9.

25         A    Oh.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              And the last four years I was at Cable ONE, I was
 2    the chief content negotiator.
 3              THE COURT:  Huh-uh.  Chief contract negotiator.
 4              THE WITNESS:  Chief contract negotiator.
 5    Thank you, Your Honor.
 6              THE COURT:  All right.
 7              THE WITNESS:  I apologize.
 8              THE COURT:  Let's get it right.
 9              THE WITNESS:  So I had dealt with Turner through
10    two contract renewals, as well as virtually all other
11    programmers had contracts expire or be renewed within that
12    four-year period that I was overseeing the process.
13    BY MR. WALTERS:
14         Q    Let's turn to page 12, line 7.
15              Okay.  Well, that's helpful.  Why don't -- this
16    would also help me focus a little bit on the questioning.
17              Can you just give me a brief description of your
18    background in particular, how you got into content
19    negotiations and what your role was here at Cable ONE.
20         A    Okay.
21              I worked for Cable ONE for 31 years before
22    retiring last year.  And the first 27 of those years I was
23    in finance department, primarily worked on budgets,
24    forecasts, but also oversaw programming costs.
25         Q    Uh-huh.
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 1958 of 3826

2091

1      A     And eventually or throughout a course of 15 years,

2    I gravitated more and more toward the programming world,

3    I think.

4           And I started out just providing financial

5    analysis of potential deals to our chief negotiator at that

6    point in time.

7      Q     Page 13, continue, please.

8      A     And gradually, like I said, over the course of

9    15 years, I took on more and more responsibilities in the

10   programming area.

11          And then, when Jerry retired or kind of moved on

12   in his last year with Cable ONE, I became the chief

13   negotiator for the last four years.

14     Q     Was that, were those your exclusive

15   responsibilities, or did you also have finance

16   responsibilities?

17     A     By the time I moved to programming for the last

18   four years, that was all I did.

19     Q     Okay.  All right.

20          Now, was there any particular training that went

21   into that, or was it just sort of a learn on the job?

22     A     Primarily, learn on the job.

23          Like as I said, I had been involved in the process

24   for many years, and I sat in on all the meetings with Jerry

25   and took the lead in many of the negotiations.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2092

1          I read some books about negotiating and whatever

2     else, but I didn't have any formal training.

3          Q    Page 15, please, sir.

4          Okay.  If I understand correctly -- and I'm not

5     sure I do -- but were there under your tenure, if you will,

6     were there three blackouts or takedowns or whatever you want

7     to call it, Turner, Viacom, and maybe Northwest

8     something-or-other; is that right?

9          A    Turner and Viacom, yes.  I don't recall Northwest.

10         Q    Okay.

11         Okay.  And maybe not.  I could be wrong.

12         A    It could be a retran.

13         MR. WALTERS:  All right.

14    BY MR. JONES:

15         Q    Okay.  Did you have in mind when you went into a

16    negotiation, based on those considerations and your own

17    assessment, for what you were prepared to pay and what you

18    were prepared to do; and then beyond that, you were prepared

19    to potentially go dark on a particular network or channel?

20         A    Cable ONE had evolved to that point, yes, had

21    evolved to that point.

22         The concept of a cable operator just walking away

23    from a programming family was somewhat unheard of until

24    2013, 2014, I think.

25         The industry had evolved to a point where I think

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    the partnership was honestly broken and that the programmers

2    were just trying to raise rates to anything that they could

3    get from you.  And they were trying to force us to carry

4    secondary or minor networks at very little significance just

5    to earn more license fee money from us.

6            We knew going in, we knew what our programming

7    budget and forecast was for costs, what we could afford, to

8    some extent.  It was a major decision, though, to draw a

9    line in the sand and say, we're willing to walk away from

10   this.

11       Q    Sure.

12           THE COURT:  What page are you on there?

13           MR. JONES:  Page 24.  I just read line 23,

14   Your Honor.

15           THE COURT:  24.  All right.

16           Because it's not highlighted in this one.

17   Interesting.

18           It's not on the index either.

19           MR. WALTERS:  That --

20           THE COURT:  You better make sure you identify page

21   and line number, because this -- the copy I have is not

22   highlighted.

23           MR. JONES:  Very well.  Your Honor, we'll clean

24   that up after.

25           MR. WALTERS:  We provided the designations, our

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2094

```
 1    designation.  I think you guys have a list as well, don't

 2    you, of designations?

 3               MR. JONES:  I understood from our conversations,

 4    counsel, that you had put all of the designations into the

 5    copy that you were presenting to His Honor.

 6               MR. WALTERS:  There should be a version with that.

 7    We should double-check that.

 8               THE COURT:  If there is a version, you should

 9    probably have two different colors.  The yellow would

10    theirs, and yours would be the orange or something like

11    that.

12               MR. WALTERS:  I apologize.  I think your Clerk has

13    that version.  We should switch.

14               THE COURT:  Oh, well...

15               MR. WALTERS:  Very good.

16               And the green is our designations.  The pink is

17    the government's.  And the blue is counterdesignations.

18               THE COURT:  Green, pink and --

19               MR. JONES:  Yellow, I think, Your Honor.

20               MR. WALTERS:  Yellow.

21               We're on page 24.

22               MR. JONES:  And when I began reading, Your Honor,

23    it was the bottom of page 23.

24               THE COURT:  All right.  Thank you.

25               So had government is in pink?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2095

1          MR. JONES:  I imagine so, Your Honor, if that's

2    the color that you have.  It's in blue in mine but --

3          MR. WALTERS:  Yes, sir.

4          THE COURT:  Blue excerpts.

5          All right.  Go ahead.

6          MR. JONES:  So, Mr. Roschen, picking up at line 23

7    of page 24, I'll just repeat.

8          THE WITNESS:  Sure.

9          It's a tremendous disruption for subscribers, and

10   it's a tremendous operation or disruption to your operations

11   team.  And it's not an easy decision to make, not one

12   we would take lightly.

13   BY MR. JONES:

14   Q    Okay.  So do I understand correctly, so would it

15   be fair to say -- correct me if I am wrong -- but at least

16   in the case of some of these negotiations, like Turner or

17   like Viacom, where you did actually have a brief backout and

18   then a more extended blackout, that Cable ONE made an

19   internal decision about what it was prepared to pay; and if

20   it couldn't get a deal on those terms, it was prepared to go

21   ahead and go dark?

22   A    I don't know that we ever drew a line in the sand,

23   like I said, that early in the process.

24         We certainly would make a counteroffer that would

25   be reflective of what we thought was a reasonable price to

 1    pay.  But we maintain flexibility throughout the process.

 2    And I am sure in every negotiation, we made subsequent

 3    counteroffers that were higher than our first one.

 4         We were always looking for ways to come to an

 5    agreement, certainly.

 6    Q    Okay.  In the end, you must have made the

 7    judgment, say in the case of Viacom, that you could perceive

 8    that your business was better off without the Viacom

 9    programming than with it at the pricing and terms they were

10    demanding?

11    A    That's true.

12         Viacom was looking for a very aggressive rate

13    increase from us.  Their ratings were low, and their ratings

14    were it declining.  Their channels were not popular channels

15    in our markets.

16         Like I said before, we operated in smaller rural

17    markets, and the programming just wasn't that relevant.

18         It was actually a very easy decision in the end

19    when they refused to budge from what they were asking for,

20    and we were prepared to put out replacement networks.

21         And I told numerous people after the fact that

22    I think our channel lineup is stronger now than it was when

23    we had the Viacom channels on, just because we put on some

24    very popular networks that our subscribers had been asking

25    for for years.

1      Q      Okay.

2             And you as a company made the same judgment

3      vis-à-vis the Turner network in the fall of 2013?

4      A      Not really.

5             The Turner negotiations were very different than

6      Viacom.  We really had no intention of dropping any of the

7      Turner networks.  The negotiations were proceeding very

8      normally for several months.  And we got to the end of

9      September, I guess it was, and we really were not

10     100 percent satisfied with the deal terms.

11            And I had noticed what I can only describe as an

12     oddity in the contract that Turner had with the NCTC, the

13     National Cable Television Cooperative.

14     Q      Uh-huh.

15     A      There was a clause in that agreement that said

16     that an NCTC member could sign up for Turner programming for

17     any or all networks.  And I look at -- I kind of read that

18     and said, wow, what does that say?  And I took it literally,

19     and I checked with our in-house attorney.

20            And he said, well, yeah, you're reading it right.

21     You can take one Turner network, or you can take ten Turner

22     networks.

23            I called the NCTC, and they seemed a little

24     surprised that that language was even in agreement.  But

25     everybody seemed to have agreed with it that, yes, you can

1    take some Turner networks and not all.

2            So more as a negotiating ploy, although it wasn't

3    an idle bluff, we were more than willing to drop some of the

4    Turner networks.

5        Q    Uh-huh.

6        A    We told Turner that we were going to join the NCTC

7    for just three of their networks and discontinue carriage

8    for the remaining five or six, whatever it was.

9            And I didn't really expect them to accept that

10   offer, but I thought they would come back to me and say,

11   well, let's talk.  I mean, we can do this instead.  What can

12   we do to preserve the carriage of all networks?

13       Q    Uh-huh.

14       A    But instead, they went to great lengths to protect

15   their bundle, at least in my opinion, went to great lengths

16   to protect their bundle.  And I think that would have been a

17   major disruption to the business model if a cable operator

18   was allowed to just carry three of their eight or nine

19   channels, whatever the count was.

20           And then going on in the background during the

21   last couple of months of this negotiation process was

22   something I tried not to get involved in.  But, like most

23   programmers, they had done a financial audit of the license

24   fees we had paid them for, I think it was 2011 or a couple

25   of years prior.  And they thought we had underpaid them here

1    and there some relatively insignificant amounts.

2           And they said, well, because you have these audit

3    findings out there, we're not going to let you join the

4    NCTC; and, therefore, we're just going to cut off all

5    their -- all signals on September 30th.  Boom, you're done.

6           Cable ONE was a very honest company, I think, in

7    that we didn't try to fudge our license fees.  We paid what

8    we were owed -- what we're due, rather, what we owed.  And

9    we never had any significant audit findings.

10          And Turner had been dragging their feet for months

11   on settling this audit, which I was aware of.  And I tried

12   to push them on it.

13          They wouldn't return phone calls, and they were

14   just holding it out there as a weapon, I think, to use at

15   the end of the negotiations, if necessary, and they

16   certainly did that.

17          But in the end when we settled the contract, a

18   month later, we settled the audit at the same time, and we

19   paid them just over $6,000.  And we paid them over

20   $20 million in license fees during the audit period.

21          So it certainly was an insignificant thing, but,

22   nonetheless, they used it against us.

23          MR. WALTERS:  Bottom of page 30, line 24.

24   BY MR. WALTERS:

25       Q    The programmers tend to bundle their product,

1    don't they?

2        A    They do.

3            I mean, some will tell you they have an à la carte

4    rate card where you can buy channels, à la carte rate card

5    where you can buy channels individually, but usually by the

6    time you buy even two networks out of eight or ten, it's

7    going to cost them more on an à la carte basis than it would

8    to buy the entire bundle that you're currently carrying.  So

9    the system is rigged, in other words.

10   BY MR. WALTERS:

11       Q    Page 32, line 13.

12           Do I understand what you, as a distributor, are

13   prepared to do or not prepared to do, what you're prepared

14   to pay or not pay, or the terms you're prepared to enter

15   into is, do I understand correctly that that's based on your

16   assessment of the value and the quality and the quantity of

17   the content for the purposes of your viewers?  Is that a

18   fair statement?

19       A    Mostly, yes.

20           I mean, we certainly look at the ratings, and we

21   look at the license fees per rating point, like I said

22   earlier.  And at some point in time, you've got to say,

23   well, gee, this just isn't worth it.  I mean, it is an

24   overpriced network right now for what they're offering.

25           The ratings are declining, and they want a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1 | 20 percent rate increase.  I mean, that just doesn't make
 2 | any sense.
 3 |     Q    Okay.  Now, here's what I'm getting at.
 4 |          Is it fair that -- I mean, do you care what the --
 5 | let's say the content provider, do you care who the content
 6 | provider's owned by or any of their corporate affiliations
 7 | or who they might own or any of -- does that enter into --
 8 | is that relevant at all to your assessment of what you're
 9 | prepared to pay and the terms you're prepared to pay to
10 | enter into with that content provider?
11 |     A    Not really.
12 |          I mean, we know some programming entities are
13 | huge.  I mean, like, NBCUniversal, and Comcast and Fox is
14 | certainly big.
15 |          And we know that we're going to pay more dollars
16 | for that corporate entity than we are to say, like, an AMC
17 | or a Crown Media.  But, nonetheless, we do recognize value
18 | in certain networks.  And if the value's there and the
19 | license fee in place seems reasonable, well, if Disney gets
20 | paid twice as much as, say, Discovery Networks does, well,
21 | so be it.
22 |          I mean, they have twice as many channels maybe,
23 | and they have very important programming to our subscribers,
24 | and we have to pay it.
25 |

1  BY MR. WALTERS:

2      Q    But who owns Disney or who Disney owns is not

3  relevant.  It's the considerations you've raised, the

4  content and reach and those issues; is that right?

5      A    Correct.

6           I mean, it doesn't matter to us who owns the

7  network and what is the network.

8      Q    Okay.

9           Or who the network owns?

10     A    It really doesn't matter.  It doesn't really

11 matter.

12 BY MR. JONES:

13     Q    Turning to page 36, line 5.

14          Make sure I understand what you're saying, so the

15 increase in the number of the proliferation of distributors,

16 you think, gave more negotiating prowess or power to the

17 programmers?

18     A    I think it did, yes, just because of competition

19 amongst cable companies.

20     Q    Turning to page 37, line 7.

21          Okay.  Do you believe that from, that the

22 programmers' most important source of leverage in

23 negotiations is the ability to withhold content, to just go

24 dark, if you will?

25     A    I mean, that would certainly be their ultimate

 1   weapon, but hopefully, most programmers still have or want

 2   to maintain some semblance of partnership with you.

 3           I think in the case of the Turner blackout,

 4   I mean, that was more vindictive on their part.  They were

 5   just going to say, well, you cannot break our bundle up, and

 6   they had to make a very strong stand against that.  So they

 7   forced us to go dark for a period of time until we were able

 8   to get back together.

 9   BY MR. WALTERS:

10       Q    Yeah, and I do want to come back to Turner.

11   I appreciate that.  I want to come back to the Turner

12   specifics.

13           But I'm just talking about in terms of your

14   negotiation across with programmers.  Is it your view that

15   the, that if not the principal source of leverage in the

16   negotiation is the ability to withhold programming itself?

17       A    That's probably the ultimate weapon, like I said.

18   I mean, other than that, what leverage do they have?  I

19   mean, they could ask you to carry channels, ask you to pay

20   higher fees, but what's the option?  Not carrying them.

21           MR. JONES:  Turning to page 39, line 12.

22   BY MR. JONES:

23       Q    Well, you're there with these, and maybe --

24   I don't know.  Did you ever, in the course of your

25   negotiations, ever deal with NBCU between 2013 and '17?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    I did twice, yes.

2    Q    Okay.  Did you -- and you're aware you had the

3  right, if you could not reach terms to insist on carriage

4  and then invoke the arbitration mechanism?  Were you aware

5  of that?

6    A    We were aware of that, yes.

7    Q    Did you consider that to be of value to you in

8  your negotiations with NBCU, that in the end, they couldn't

9  go dark on you and you had the right to potentially

10  arbitrate if you couldn't reach agreement?

11    A    Well, we were aware of it, but we never seriously

12  considered doing that or invoking that clause.  I did not

13  want to subject the company to being saddled with a contract

14  we didn't know the terms of.

15    Q    Right.  Right.

16         The -- have you ever been involved in this

17  so-called baseball arbitration mechanism in one of those

18  proceedings?

19    A    No, I have not.

20    Q    Okay.  And as a distributor, would you rather have

21  the right to guaranteed content, the so-called standstill,

22  and, in an arbitration mechanism, than to not have it?

23    A    Well, I think it's a nice concept or idea, but

24  I don't know how practical it is.

25         Once again, I just would not want to cede my

1    control over the company's programming costs.

2        Q    You could always -- you don't have to cede your

3    own control, right?  You can always negotiate it to a

4    resolution?

5        A    Well --

6        Q    You don't have to invoke it, right?

7        A    Well, you don't have to.

8             But I thought your question was, if we get to the

9    point in time where we don't want to lose the content, we

10   could use that as a fallback position.

11            But to me it's not a fallback position because I

12   do not want to settle, for all practical purposes, an

13   agreement without knowing what the terms are.

14       Q    Continuing on line 17.

15            So if -- let me ask you this way to make sure, if

16   a programmer's pricing power or ability to exact a price or

17   raise a price stems from its -- the threat of blackout, that

18   threat of termination, if they don't have that threat of

19   termination, if they have to guarantee the content, does

20   that eliminate the power over price?

21       A    I don't think it does, no.

22            Just because at some point you reach a limit as to

23   what you're willing to pay for content.  And even if an

24   arbitrator can point to instances where another cable

25   company is paying fees that the programmer's asking you to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2106

```
 1   pay, that could still be too high for my company to pay.

 2        Q    Continue on page 45, line 18.

 3             May I proceed, Your Honor?

 4             THE COURT:  You may.

 5   BY MR. JONES:

 6        Q    Well, if I understand correctly, you were not

 7   passing on those rate increases that you were taking it out

 8   of margin or reducing your cost structure.  And in the end,

 9   you got to the point where the video component of your

10   business just wasn't profitable.

11             Is that a fair summary?

12        A    Mostly.

13             I mean, like I said, we did not want to penalize

14   our subscribers.  I'm not sure what we thought the long-term

15   solution was.  But, I mean, it was a big move for a cable

16   company that was always videocentric to get to the point to

17   say, well, gee, I don't know that the video business is

18   sustainable anymore.

19             We have another product out there, high-speed

20   data; it's a very robust product, very much in demand,

21   growing demand.  It certainly did have a higher profit

22   margin than video did.  And the way the video business was

23   trending, it just didn't make sense to continue to focus on

24   it.

25             And we got to the point that we were going to,
```

1   perhaps, drop networks if we couldn't get a reasonable rate.

2   And we decided we were no longer going to subsidize the

3   video business with our HSD revenue.

4   BY MR. WALTERS:

5        Q    During these years that you were, '13, '14, '15,

6   '16, and into '17 that you were doing content negotiation,

7   what percentage of the rate hikes were you passing on?  Was

8   it a quarter? a third?  And to what extent was your

9   margin -- and to what extent was your margin on video

10  decreasing?

11       A    Well, it probably changed over the course of my

12  term.  I think by 2016 into 2017, we were taking 8 and $10

13  increases on the video product, compared to maybe taking 5

14  or $6 rate increases every other year for several years.

15            So in '13 and '14, we might only have been passing

16  along, I don't know, 25 percent of the increase.  That's

17  just a rough estimate on my part.

18            By '16 and '17, it was probably higher.  But we

19  still were not -- at best, we were breaking even on video by

20  2017.  There was no profit there.

21       Q    No profit at all?

22       A    Not in video, no.

23  BY MR. JONES:

24       Q    Picking up again on page 48, line 21.

25            Okay.  In your negotiations, did -- I mean,

1  did you regularly do drop analyses?  Or when would you do

2  them and when would you not do them?

3       A    Oh, there were very few contract negotiations that

4  I entered into, not really thinking we would come to an

5  agreement.

6            I certainly thought all along we would come to an

7  agreement with Turner.

8            Like I said, we never really thought we were going

9  to drop Turner.  But we didn't drop Turner; Turner dropped

10 us.

11           But anyway, Viacom we knew, with the extent of

12 what they were asking for on increases and given their

13 ratings and their popularity in our markets, we knew fairly

14 early on that it was a good chance we might walk away from

15 Viacom.  So we did drop analysis on that fairly early.

16           We looked at potential replacement channels, but

17 that was really the exception, not the norm.

18 BY MR. WALTERS:

19      Q    Page 50, line 12.

20           Okay.  So Viacom is one of the big six or seven

21 major content networks; is that true?

22      A    Yes, it is.  It's probably within the top five.

23      Q    And you did make the decision that you -- you

24 could -- a decision in 2014, that you could run your video

25 business, component of your business without Viacom, without

1  one of those five?

2      A    Yes.

3          Given popularity in our markets of their channels

4  and the rates they were asking us to pay and the

5  availability of potential replacement networks, they made it

6  a fairly easy decision for us.

7  BY MR. JONES:

8      Q    Turning to page 51, line 17.

9          So in -- so I guess my question is a little

10 different; make sure we're connecting on this.

11         If you really want to understand how many

12 customers you're going to lose if you don't carry Disney or

13 don't carry AMC or don't carry any particular -- and you're

14 not going to carry them for a long period of time or

15 indefinitely, wouldn't you also have to consider what you

16 might do to intervene not to lose those customers?

17     A    Well, traditionally, yes.

18         But once you realize you're not making any money

19 on these customers, it's a different ballgame.

20 BY MR. WALTERS:

21     Q    Well, I'm not just talking -- I'm not confining it

22 to a circumstance where you're not making any money?

23     A    Uh-huh.

24     Q    But in a circumstance where you have a viable

25 business and you're making money, to understand what the

```
1   impact of dropping any particular channel or particular

2   network, wouldn't you also have to consider what you might

3   do to keep those customers, such as promotions or price

4   decreases or whatever it might be?

5       A    In theory, yes, but that's not the situation we're

6   operating under.

7       Q    Because you weren't making money anyway?

8       A    Correct.

9       Q    Okay.  But I'm talking about a hypothetical

10  situation where you are making money.

11      A    Sure.  Well, hypothetically, yes, but reality, no.

12      Q    For your reality?

13      A    Uh-huh.

14      Q    Because if you're not making any money, who cares

15  whether you're losing them; is that right?

16      A    Correct.

17           And, yeah, in my opinion, that's correct.

18           But Cable ONE was not the only cable operator in

19  this position.

20           I mean, we paid similar rates to every mid- to

21  small-sized cable operator, and the business had changed to

22  the point where nobody was making money on video.  And it

23  really called for a new way of analyzing and thinking about

24  the business, and a lot of cable companies were much slower

25  than Cable ONE at coming to that realization.
```

1    BY MR. JONES:

2        Q    If you did want -- if you lost a network and you

3    did want to keep those customers, okay, and you weren't in

4    the opposite mode where you're not making any money so you

5    don't care whether you keep them or not but you actually

6    want to keep them, what are the most effective ways of

7    keeping them in response to losing content?

8        A    I think you would have to keep the subscribers

9    informed as to what's going on in the negotiating process

10   and let them know that we're doing everything we can to

11   resolve this as quickly as possible, things like this

12   Walking Dead promo, I think, would have been helpful, if

13   necessary.

14            I think it's more than just an information -- it's

15   more just an information exchange.

16            I mean, I know during the Turner blackout, we were

17   in constant contact with our subscribers through on-air

18   commercials and whatever else, just stating that we were

19   working diligently to resolve all this and we expect to come

20   to a settlement in the near future.  But -- and then you

21   just hope they stick with you for a while.

22            But once again, the reality was, we weren't making

23   any money; so if we lost them, well, okay.

24       Q    Okay.  And if you did want to keep those

25   customers, presumably, you could offer price decreases,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   right, because you're paying less for content because you're

2   not taking some content; is that fair?

3       A    Yes.  We actually gave rebates to our subscribers

4   for the month that Turner was off -- went off.

5       Q    Did you do that in the Viacom instance?

6       A    We did not, just because we replaced the Viacom

7   channels with other networks that we thought were better

8   networks.

9       Q    Turning to page 57, last line, line 25.

10          Okay.  But weren't the ratings on TBS, TNT, and

11   the Cartoon Network, they were declining as well at this

12   juncture, were they not?

13       A    They probably were.

14          I don't remember the specifics, but Cartoon was

15   targeted to a very narrow audience, obviously, and that was

16   one we felt was worth keeping.

17          TBS and TNT had some very valuable sport

18   programming content, especially during the month of March,

19   with March Madness, the NCAA basketball tournament that we

20   felt we had to continue to provide to our subscribers.

21       Q    Okay.

22       A    So we chose those three to keep.

23   BY MR. WALTERS:

24       Q    Was there anything about what TNT and TBS offered,

25   other than the sports program that you considered -- other

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    than the sports programming, that you considered to be

2    necessary to keep?

3         A    No.  The only thing that was unique to those

4    channels was their sports programming, both the NBA,

5    Major League Baseball, and NCAA basketball.

6         Q    Okay.  But nothing else?

7         A    Not in my view.

8              I mean, to me, it's --

9         Q    I'm just asking about your view.

10        A    It's run-of-the-mill dramas and whatever else.

11   And it doesn't matter whether you watch them on U.S.A. or

12   one of the four major networks or TNT.

13             I mean, it's very common, ordinary programming.

14   BY MR. JONES:

15        Q    Okay.  In this -- in fact, in the second

16   paragraph, it says, Mr. Might, there's a quote attributable

17   to him that says, "However, Turner's demand increase of

18   nearly 50 percent for channels with steadily declining

19   ratings.

20             Do you see that?

21        A    Yes, I do.

22        Q    Okay.  Does that refresh your recollection about

23   the ratings on these channels?  Or is it -- do you know or

24   do you recall?

25        A    Well, I don't recall that.  I'm sure Tom might

 1    have looked at the data.  We shared the data amongst us, and

 2    these were Nielsen, SNL Kagan.  I'm sure they were correct.

 3            And I remember the 50 percent for one particular

 4    network that they were asking for an increase for, and

 5    I know that's factual yes.

 6    BY MR. WALTERS:

 7        Q    Okay.  And in the first sentence, the penultimate

 8    paragraph, it says, the historical -- quote, "The historical

 9    video subscription business model is in decline, and a new

10    video model is taking shape, built on the Internet and

11    consumer choice."

12            Do you see that?

13        A    Yes.

14        Q    Did you agree with that sentiment?

15        A    Yes, I do.

16            I mean, the old business model was certainly in

17    decline and was broken.  I think the new model taking shape

18    was happening very slowly, but nonetheless, you could see a

19    transition coming.

20    BY MR. JONES:

21        Q    Skipping several pages, now to page 65, line 16.

22            What caused you to look at that NCTC agreement?

23        A    The NCTC had an existing agreement at that point

24    in time that was on a different timeline or term than the

25    Cable ONE agreement.  And as fallback position, I thought

1  we would just join the NCTC agreement, but there were some

2  clauses or stipulations in that contract that were not

3  attractive to us that we just couldn't abide by.  So that

4  really was not an option.

5          But when I saw that it also gave you the option to

6  pick and choose which services you wanted to subscribe to,

7  that was certainly of interest to me.

8      Q    Were you -- I assume you were a member of NCTC?

9      A    We were, yes.

10     Q    Turning to page 67, line 4.

11         Okay.  Now, of course, Turner's view was that that

12 contractual provision did not permit programmers to take

13 just the -- or to cherry-pick or to take just the particular

14 channels that they wanted.  That was at least their view;

15 was it not?

16     A    No, they never told us that was the reason they

17 weren't allowing us to join the NCTC.

18         They told us they weren't allowing us to join the

19 NCTC because we owed them money from 2011 due to this audit.

20     Q    Uh-huh.

21     A    That was their way of escaping this.

22     Q    Okay.  But you don't recall them articulating

23 that, that they disagreed with that contractual

24 interpretation?

25     A    No, there was no way they could do that.

```
 1    BY MR. WALTERS:

 2         Q    Page 69, line 16.

 3              Okay.  And so they were -- the programming was

 4    discontinued for how long?

 5         A    About 30 days.

 6         Q    About 30 days.  Okay.

 7              And if you'll go to the bottom of page 71,

 8    line 25.

 9              And so do I understand correctly, then -- correct

10    me if I am wrong, so the absence of Turner really didn't

11    have any real impact; I mean the loss of a few video

12    subscribers, but that was about it?

13         A    That's pretty much true.  I mean, this was during

14    the period in time when Cable ONE, like most cable

15    operators, was losing video subscribers anyway.  And it was

16    always very difficult to determine why you lost a

17    subscriber.  Was it just because of general, circumstances,

18    what you're charging, or had they moved to DirecTV.

19              I mean, they often wouldn't tell you exactly why

20    they were leaving.

21              But there was no seismic shift in subscriber loss

22    during the month that Turner was off.

23         Q    Okay.  And so did that tell you that the absence

24    of Turner was sort of not a big deal to your subscriber

25    base, that it wasn't really causing any real departures to
```

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 1984 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2117

1   worry about?

2       A     Well, yes and no.

3             I mean, during the month of September, there were

4   Major League playoff -- Major League Baseball playoff games

5   on TBS and TNT, but, fortunately, there were no teams from

6   our markets participating that season in the playoffs.

7             So, once again, there was no real must-have

8   programming on Turner during that month.  If a blackout had

9   occurred during the month of March, I mean, I think you

10  would have seen a whole different story, then, given the

11  popularity of the NCAA basketball tournament.

12      Q     Page 74, line 20.

13            And then on the third bullet, you talk about, we

14  had a bunch of volunteers ready to work, but we ended up

15  sending them home.  Is that just because you, perhaps,

16  overestimated the impact of losing, of going dark on Turner?

17      A     Probably, yes.

18            I mean, we wanted people there to man the phones,

19  and the call volume was just not that significant.

20  BY MR. JONES:

21      Q     Okay.  Now, in the fourth bullet you say, The loss

22  of MLB playoffs was not a significant event, as we planned

23  for it being.

24            And then you say in that second bullet, we were

25  successful in pointing fans to mlb.com, where all the games

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2118

```
 1    are available.

 2         A    Uh-huh.

 3         Q    Do you see that?

 4         A    Yep.

 5         Q    So talk about that a little bit, about -- is that

 6    one of those mitigation efforts that we talked about earlier

 7    to sort of help customers deal with the eventuality of not

 8    particular content?

 9         A    I think so, yes.

10              It was just a way of informing our subscribers of

11    what alternatives were available.

12              And I mean, once again, in the background,

13    I'm sure we were always saying, we believe this is a

14    temporary situation; but in the meantime, there are other

15    alternatives available for you.

16         Q    So at least in the event of Turner and MLB

17    consumers -- of Turner and MLB, consumers were able to wire

18    around this by accessing mlb.com if they needed to see a

19    particular playoff game that would not be available?

20         A    Correct.

21    BY MR. WALTERS:

22         Q    And in the final bullet, you say, we promise

23    customers a credit, and it will show up in their November

24    bills.  Most customers thought that was a strong gesture on

25    our part.  That's yet again another mitigation effort, is it
```

1  not?

2      A    Sure.

3      Q    And you could envision that if you had lost Turner

4  indefinitely, that you could have done something like that

5  through a price decrease; that would have been a mitigation

6  effort as well?

7      A    Either that or adding replacement networks like we

8  did for Viacom.

9  BY MR. JONES:

10     Q    And what kind of replacement networks would you

11  envision adding if you had lost Turner indefinitely or would

12  you have to, given U.S.A. and other networks' availability,

13  AMC, whatever it might be?

14     A    Well, given the popularity of certain months of

15  the year of some of the Turner programming, we never

16  honestly considered a longtime drop -- a long-term drop of

17  Turner.

18  BY MR. WALTERS:

19     Q    And the popularity you're talking about is, first

20  and foremost, March Madness; is that right?

21     A    Absolutely, yes.

22     Q    Okay.  Anything, anything beyond that?

23     A    Not really.

24          I mean, Turner did have some other sports

25  programming, MLB and NBA, but there were other outlets for

```
 1    that.

 2         Q    Okay.

 3         A    I mean, ESPN and your local regional sports

 4    networks.

 5         Q    So other than -- other than March Madness,

 6    everything else was pretty fungible?

 7         A    I believe so, yes.

 8         Q    Mr. Sejen, this is --

 9              MR. WALTERS:  And this is on page 78, Your Honor.

10    BY MR. WALTERS:

11         Q    Mr. Sejen -- at line 12 -- it looks like an

12    SNL Kagan interview with Julie Laulis.

13              Do you see that?

14         A    Uh-huh.

15         Q    Who is Ms. Laulis?

16         A    She was our Chief Operating Officer at the time.

17         Q    Is she now the CEO?

18         A    She is, yes, as of January 1st.

19         Q    On page 80, at line 10, she says, quote, "Given

20    that, we made the decision about Turner.  The effect really

21    hasn't been that big, okay?  The worst part of this was

22    it happened around Major League Baseball.  Once we told our

23    customers about mlb.com and that they could get the games,

24    they got it.  No one was denied their baseball."

25              Do you see that?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2121

```
1        A     Uh-huh, yes.

2        Q     Is that a fair, accurate statement?

3        A     Yes, it is.

4        Q     Okay.

5              And what she's saying there is, in effect, the --

6    I'm sorry.

7              What she is saying there is the effect of losing

8    Turner really hasn't been that big on Cable ONE, consistent

9    with our previous conversation.

10       A     Uh-huh, that's true.

11       Q     By the way, today, isn't it available in the

12   marketplace that if you don't have a cable subscription or

13   your cable provider doesn't provide, if it doesn't have

14   Turner, that you can go elsewhere for March Madness?

15       A     I believe most of the content was available online

16   last year, yes.

17       Q     Okay.

18       A     That probably was not the case several years ago.

19             But just, once again, the evolution of technology

20   and so forth, so...

21       Q     Right.  So this was back in 2013, correct?

22       A     Yes.

23   BY MR. JONES:

24       Q     Okay.

25             So presumably, if you were confronted with the
```

1    same situation today and it were March, you could just, a

2    distributor could do the same thing and point customers to

3    online availability of March Madness?

4         A    Potentially.

5              I think it's fair to say that most content

6    providers want to monetize their content.  And I know at

7    least last year, the viewing of March Madness did not

8    require -- did not require authentication through your cable

9    operator.

10             But at some point in time, that's bound to change,

11   I think.  I mean, Turner is not going to broadcast these

12   games for free, obviously.

13        Q    Right.

14             When you say "the content provider," are you

15   talking about the NCAA or are you talking about Turner?

16        A    Turner.

17   BY MR. WALTERS:

18        Q    Okay.  But in any event, if you didn't have

19   Turner, if you didn't have TNT or TBS, whoever does

20   March Madness today, a consumer could do what they did back

21   in 2013 with Major League Baseball by finding March Madness

22   online?

23        A    If it's available, yes.

24   BY MR. JONES:

25        Q    Okay.

1           And presumably, that would address the sort of

2    must-have nature of March Madness, in the same way it did

3    with MLB back in 2013?

4        A    It could, as long as the content is available and

5    does not require authentication, yes.

6    BY MR. WALTERS:

7        Q    Page 83, line 18.

8           But it sounds like, at least in terms of Turner

9    sports programming, what they do, it's either replaceable,

10   fungible with others, or you can somehow wire around and

11   find it on the Internet.

12          Is that what I'm hearing?

13       A    That was true for March Madness in 2017, yes.

14       Q    Line 17, I just want to ask you a couple questions

15   about the Viacom drop, and I literally, this is -- looks

16   like a Cable ONE conference call.

17       A    Uh-huh.

18       Q    And I really just have a question about something

19   at the top of page 2, which is part of Mr. Might's comments.

20       A    Uh-huh.

21       Q    Now, he says at the very top, he says, at the top

22   of page 2, 2, dropping Viacom was not your strategy.  It was

23   a small tactic that fit our strategy very well.  It costs

24   just 2 percent of our video subs, not 20 percent.

25          Do you see that?

1       A     Yes.

2       Q     What is he talking about there, if you know?

3       A     Well, what I think he's trying to indicate is that

4   we didn't necessarily plan to drop Viacom.  That was not a

5   strategy in and by itself.  But our strategy is to focus

6   more on high-speed data and not video.  And within that

7   strategy, you need to be somewhat selective in what video

8   content you carry.

9            And then the second part of the sentence is,

10  I think, pretty self-explanatory.  The losses attributable

11  to Viacom are very, very small in the general and were not

12  significant.

13      Q     So he's saying, look, because the way -- you tell

14  me if I misread this, but the -- we choose, we do not carry

15  Viacom.  We choose not, and the losses of subscribers as a

16  consequence were very, very small.  And it's not a

17  technically profitable business anyway.

18           So it makes perfect sense for us to go this

19  direction and not carry that network.  Is that the thrust of

20  it?

21      A     Yes.

22           With also the knowledge that there were very good

23  replacement channels available for Viacom, so we could still

24  offer a great product for our customers.

25      Q     Let me show you what we'll mark as Exhibit 6.

2125

1   BY MR. JONES:

2       Q    Okay.  Turning to page 87, line 8.  Okay.

3            Okay.  How did that -- how did Viacom get back on

4   Cable ONE?

5       A    Viacom, to this day, is not back on Cable ONE.

6       Q    Oh, so still don't carry it?

7       A    Correct.

8   BY MR. WALTERS:

9       Q    And so consistent with Mr. Might's observation,

10  the elimination of Viacom portfolio of channels in their

11  network, did that, in retrospect, was that a good business

12  judgment for Cable ONE to make, the savings you achieve,

13  minus the negligible effect?

14      A    In my mind, yes, it was.

15  BY MR. JONES:

16      Q    Continuing at the bottom.

17           How would you -- how did you go about, or if you

18  did at all, to try to figure out if people are actually

19  dropping as a result of the loss of Viacom?

20      A    Well, as part of standard operating procedure, any

21  time a subscriber called to discontinue the subscription, we

22  asked them why.  Most subscribers would, like I said, they

23  just tell you, oh, we're moving, or make some story up just

24  to get off the phone.

25           At that point in time, they've already made the

1    decision.  They don't want to get transferred to a retention

2    specialist.

3            I mean, they just want to make it quick and easy

4    and get off the phone.

5            So it's very hard to track the impact, so

6    especially when we were all ready in a declining

7    environment, like I said earlier.

8        Q    Turning to page 91 at the bottom.

9            Okay.  So this I want to ask you.  Have you ever

10   seen this, the chart that's -- this is a correspondence

11   between Mr. Jimenez of Cable ONE and the Department of

12   Justice on some data that was provided to them as part of

13   DOJ's investigation.  And I just had some questions about

14   the attached page.

15           And are you familiar with this page at all?

16       A    I don't recall seeing this before, no.

17       Q    Okay.  Let me ask you a couple of questions and

18   see if you can help me understand it a little bit.

19           And there is some explanation on page 1 about what

20   it is.  Why don't you glance at that, and then I'll ask you

21   a question or two and see if you can help me.

22       A    Well, I can try to answer your questions.  But,

23   like I said, this document was prepared after I left

24   Cable ONE, and I've never seen it before, but --

25

Case 1:17-cv-02511-RJL Document 158 Filed 08/06/18 Page 1994 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2127

1    BY MR. WALTERS:

2        Q    But if you'll look at the chart itself, what it

3    seems to purport to do is for 2013, you'll see in October --

4    I guess that is the period of the Turner blackout, right?

5        A    Yes, yes, October 13.

6        Q    And then the 2014 in April is the start of the

7    cessation of Viacom; is that right?

8        A    Yes, in April.

9        Q    And it looks like there's a sort of percentage,

10   monthly churn.  And then there's some total residential

11   video numbers below.

12           Do you see that?

13       A    Uh-huh.

14       Q    But look in the upper right-hand column.  The

15   text, it says, Turner, the churn rates jump by .6 seasonally

16   during the month of dropping Turner.  Loss stabilizes after

17   two months.

18           Do you see that?

19       A    Some of those words I see, yeah.

20       Q    Okay.  Page 94, line 23.

21           So is that number of .6 seasonally during the

22   month of dropping Turner, Mr. Sejen, is that consistent with

23   your recollection of the impact of the Turner drop during

24   October 2013?

25       A    Well, .6 percent sounds very small to me.  And

 1    I know, or I believe anyway, that our subscriber losses were

 2    fairly insignificant, so it sounds about right.

 3    BY MR. JONES:

 4        Q    Okay.

 5        A    But I'm not sure how the math was done, I guess.

 6        Q    Continuing on page 96.

 7             And then -- but if you look at it in 2014,

 8    September to October, that pops up a little bit.  So I guess

 9    the idea would be -- and I'm not asking you to verify the

10    numbers, but the idea would be that if you just, that if you

11    adjust it for what normally occurs, the increment associated

12    with Turner would be .6 of a percent; is that at least the

13    idea?  I'm not asking you to vouch for the numbers.

14        A    I think that's the idea, but I can't tell you how

15    the numbers were calculated, so --

16        Q    Okay.

17        A    I mean, I don't know where the .6 came from, so --

18        Q    Can you tell from the cover information sort of

19    who did these numbers?

20        A    No.

21        Q    Phil Jimenez referred to our analyst.

22    Phil Jimenez is one of our in-house attorneys, but

23    I don't know who the analyst was.

24    BY MR. WALTERS:

25        Q    And I know you're at Cable ONE for 31 years.

1   Would you expect that Cable ONE, in generating these numbers

2   for a Department of Justice investigation, would endeavor to

3   make them as accurate as possible?

4        A    I would certainly think so.

5        Q    And would you expect that this information would

6   be generated based on the records and information kept in

7   the normal course of business by Turner -- I'm sorry,

8   Cable ONE?

9        A    I would, yes.

10       Q    Top of page 98.

11            And to the best of your knowledge, the data and

12   records and information that Cable ONE keeps that would

13   underlie these tables, to the best of your knowledge based

14   on your experience at Cable ONE, would be accurate numbers?

15       A    I have no reason to doubt it.

16       Q    Okay.  Thank you.

17            If you look at the second line below the Turner --

18   below Turner, it says Viacom, "Viacom, the impact of

19   dropping Viacom was seen over four to five months."

20            Line 24:  Is that consistent with your

21   recollection?

22       A    It is.

23            Just because I recall making the statement at the

24   time, that after six months, our video losses were less than

25   they'd been in years prior.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2130

1      Q    Okay.  So was it your experience that the

2   permanent drop of Viacom, that the impact of it was felt and

3   absorbed within about a four- to five- or six-month period?

4      A    Yes, that's true.

5      Q    Okay.  And didn't continue past that to the best

6   of your recollection?

7      A    Yes, that is true.

8           Just because we put up some very viable

9   replacement networks.

10      Q    Line 22.

11           So through those mitigation efforts or efforts to

12   address the absence of Viacom, you were able to confine any

13   impact to the loss of Viacom to the four- or five- or

14   six-month period.

15      A    For the most part, yes.

16      Q    Page 103, line 21.

17           So you heard that.  You heard that a lot from

18   programmers, didn't you?

19      A    That's pretty much standard language, yes.

20      Q    Yeah.  And, I mean, did you hear from pretty much

21   all programmers that, I mean, that's their job, right?

22      A    Of course.

23      Q    Did you hear from them kind of coming and pitching

24   that their content was must-have content?

25      A    Oh, absolutely, yes.

1      Q    Okay.  You would expect to hear that from all

2  programmers?

3      A    Pretty much, yeah.

4      Q    And did you just kind of take that with a grain of

5  salt?

6      A    Of course.

7      Q    Page 105, line 15.

8           Would you agree with me, though, that if any

9  particular programmer, whether it was NBC or whomever or

10 Turner, merely describing their product as must-have doesn't

11 make it must-have?

12     A    Not in my mind.

13     Q    Page 106, line 8, this will be Exhibit 9.  Go to

14 the top of page 107, line 2.

15          In that he says -- Mr. Mite, in that he says,

16 quote, "Residential linear video and phone for many reasons

17 produce very modest operating cash flow today, and no free

18 cash flow to speak of.  That is, they have no real margin

19 left and volumes are challenges.  Consumers want to migrate

20 to alternatives like smartphones and OTT video.  That is,

21 cutting, trimming, shaving, avoiding, or whatever, the

22 cord," closed quote?

23     A    Uh-huh.

24     Q    Do you agree that as of March 2016, do you think

25 Mr. Mite's statement there is a fair assessment -- is a fair

1   assessment, a fair statement?

2       A    Yes, I do.  I know there was definitely a

3   migration going on, yes.

4       Q    Okay.  And for a traditional MVPD like you at

5   Cable ONE, was it accurate that there really was no margin

6   left in the product?

7       A    Oh, yes.  That's absolutely true, yes.

8       Q    Top of page 108.

9            And that was -- that was in large part because at

10  least as of this juncture, you had made the decision not to

11  pass through a lot of those big programming cost increases

12  and take it out of your own margin?

13      A    That's true, because we were trying to protect our

14  subscribers from excessive rate increases.

15      Q    Sure.  So you were taking the bullet yourselves?

16      A    We were, for several years, yes.

17      Q    Is Cable ONE -- Cable ONE is still, of course, in

18  the video business today, isn't it?

19      A    Correct.

20      Q    And why is that, if there's no money to be made?

21      A    Well, we're a full-service, full-service cable

22  provider.  And I think I mentioned, before we make the

23  service available, we -- the video service available, we do

24  not actively market the service, but it's there if a

25  subscriber wants it.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q    Okay.  It sounds like more of a convenience or an

2   accommodation to customers who are your Internet customers

3   to make it more attractive that they either stay or

4   attracted to your Internet service; is that fair?

5      A    It might be easier to bundle the service, yes.

6      Q    And then line 13.

7      A    More convenient for the subscriber.

8      Q    Okay.

9           Next one is page 112, line 20.

10          Mr. Sejen, I think you said this earlier, but

11   correct me if I have this wrong, but did you -- as

12   competition for Cable ONE increased, including from

13   telephone companies, cable overbuilders and OTT video

14   providers, as well as DBS television providers, in other

15   words, has competition at the distribution level increased

16   over the last five, seven years?

17      A    Yes, it has.

18      Q    Line 14.

19          Just in terms of with the OTT providers, the

20   Amazons, the Googles, the overbuilders, all of the things

21   I just mentioned, would you say that the last five, seven,

22   eight years, would you say that competition has increased

23   substantially over the last five, seven, eight years for the

24   traditional cable companies?

25      A    I would, yes.

1      Q      In your 31 years in the industry, have you ever

2    seen it more competitive at the distribution level?

3      A      No.

4      Q      Top of 114.

5            And do you think that -- I mean, just looking in

6    your crystal ball, particularly given the nature of the

7    Internet and cost structure of the Internet, would you

8    anticipate that it would continue to get even more

9    competitive in these non-traditional providers?

10     A      It seems to be heading in that direction,

11   certainly.

12     Q      Okay.  Page 118, line 22.

13            But do you believe that because of these

14   accelerating price increases from programmers, that we sort

15   of reached a gag point with consumers that is causing,

16   galvanizing a lot of this change, unbundling, OTT,

17   fragmentation?

18     A      In my opinion, yes.

19     Q      Page 121, line 20.

20            But just at the programming level, would you agree

21   that you've never seen it in your -- seen it in your time in

22   the industry any more competitive and fragmented at the

23   programming level?

24     A      If you mean that there were more and more content

25   providers out there, then, yes, there is more competition

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***   Filed 08/06/18   Page 2002 of 3826

2135

1    and more providers.

2        Q    Page 126, line 21.

3            So were you ever, through your MFNs, were you ever

4    able to really learn anything about other terms that other

5    distributors enjoyed with their programmers or programmers

6    gave to distributors?  I mean, was there any visibility into

7    that just by virtue of MFNs?

8        A    No, there really wasn't.

9        Q    So just occasionally, twice in the 31 years, over

10   the transom came a notice saying, we're going to adjust your

11   rate based on something else?

12       A    Yeah, exactly.

13       Q    And you had to take that on faith?

14       A    Pretty much.

15           MR. WALTERS:  Your Honor, page 134, line 2.

16   BY MR. WALTERS:

17       Q    Mr. Sejen, and is it fair to say that HBO is a --

18   supports and advocates for using HBO as a promotional tool?

19       A    Historically, within the cable business, they did,

20   but Cable ONE certainly had moved away from promoting

21   premium services such as HBO, just because it increased

22   churn and it just wasn't worth the effort anymore.

23       Q    So -- line 23.

24           So Cable ONE, if I hear you correctly, didn't

25   really need or want HBO as a promotional tool?

1      A      That's essentially the case, yes.

2      Q      Line 13.

3             Now, HBO itself has always pushed to have you as a

4      distributor use HBO, has it not?

5      A      To use it as a promotional tool?

6      Q      Yes, sir.

7      A      They were always interested in that.  They want

8      to -- yes, they want to grow their subscriber base, of

9      course.

10     Q      And is it your understanding that HBO has a pretty

11     high churn rate so it really needs to keep pushing its

12     product to replace that churn?

13     A      Uh-huh.  I believe that's accurate, yes.

14     Q      Top on of page 136, line 3.

15            And so at least from, in your experience in the

16     industry, HBO, as a promotional device, was coming more from

17     the HBO end than it certainly was from the distributor end,

18     at least you as a distributor, Cable ONE?

19     A      Particularly in later years, yes.

20     Q      Was there any particular, even at the time you

21     were using it as a promotional device, were there any

22     particular restrictions as to how you would use it as a

23     promotional device at Cable ONE that were onerous or

24     difficult or somehow made it very difficult for you to use

25     as a promotional device?

1      A    No.  It was just -- it was more just surrounding

2  the marketing effort and the operations effort, the call

3  center time; and then knowing that, I don't know, 50, 60, 70

4  percent of those subscribers would disconnect at the end of

5  their three-month promo period or one-month promo period,

6  whatever it was.

7      Q    Just wasn't wort the candle?

8      A    No, no.

9  BY MR. JONES:

10     Q    Continuing on the next page, page 137.

11          Okay.  And if you were to use a premium service

12 hike HBO, would you be just as content to use Starz or

13 Cinemax or some of the other ones?

14     A    Oh, I think HBO is the oldest, most-respected

15 premium service out there.  And it probably made sense to

16 pony up with them as opposed to somebody else.

17 BY MR. WALTERS:

18     Q    Have you ever used Starz or Cinemax in any

19 promotions that you know?

20     A    Starz, we have, yes.

21          Cinemax, probably not.  Cinemax is obviously owned

22 by Time Warner and HBO, and tended to focus on HBO and not

23 Cinemax.

24     Q    Fair enough.

25          But Starz you have?

1          A    Yes, we have.

2          Q    Okay.  And did you have the same experience with

3     Starz, that it just wasn't worth the candle in the same way

4     as HBO?

5          A    Pretty much, yeah.

6               Whenever you have a cliff that you fall off of at

7     the end of the promotional period and someone goes from zero

8     to $5 to $10, whatever, subscribers just aren't going to

9     stand for that.

10         Q    Okay.  Bottom line, Cable ONE is a distributor,

11    doesn't need HBO as a promotional tool?

12         A    Given our decreased focus on video business, yes,

13    that's true.

14              MR. WALTERS:  That's all we have, Your Honor.

15              THE COURT:  All right.  You can step down.

16              Let me see counsel.

17              (Sealed bench conference)

18              THE COURT:  All right.  What the latest on where

19    we are for tomorrow?  Anything new?

20              MR. CONRATH:  So Professor Shapiro?  I would like

21    to discuss the question we had about the information about

22    the -- the margin information about DX824.

23              THE COURT:  Say it again.  The margin information?

24              MR. CONRATH:  The information that

25    Professor Carlton used in DX824 that we discussed, I think

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 2006 of 3826

2139

1   at the end of the day yesterday.

2          We sent the request by close of business for

3   some -- information to the other side.

4          THE COURT:  Oh, yes.  Why don't we take a break

5   and come back and talk about that.

6          MR. CONRATH:  Okay.  Sure.

7          THE COURT:  Because the reporter has been working

8   a long hour, hour and a half.

9          MR. CONRATH:  Yeah, sure.

10         THE COURT:  Let's take a 15-minute recess.  We'll

11  come back; we'll discuss that issue.

12         MR. PETROCELLI:  Can I at least know what the

13  issue is?

14         MR. CONRATH:  I just -- shall I start?

15         THE COURT:  It was the issue that -- remember

16  yesterday?

17         MR. PETROCELLI:  We gave him all the documents.

18         THE COURT:  You gave him documents?

19         MR. PETROCELLI:  Yeah.

20         THE COURT:  They were looking at the documents,

21  and then they were going to decide --

22         MR. PETROCELLI:  We gave them 450 documents

23  overnight.  People worked all through the night, Your Honor,

24  a whole team of people.

25         MR. CONRATH:  Yes.  There weren't 450 documents.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. PETROCELLI:  I said 450 pages of documents,

2    yes.

3          MR. CONRATH:  My bad, Your Honor.

4          THE COURT:  That's still a lot.

5          MR. PETROCELLI:  Your Honor, it's fully

6    responsive.

7          MR. CONRATH:  It is not fully responsive.

8          I think we have a reasonable --

9          THE COURT:  We'll come back and discuss it.  And

10   then, other than that, do we have anything else we have to

11   do?

12         MR. CONRATH:  No.

13         THE COURT:  Okay.

14         (Open court)

15         THE COURT:  All right.  We're going to take a

16   15-minute recess and come back.  We'll have some further

17   discussions, probably at the bench, at least initially, with

18   regard to the expert testimony the next two days.

19         DEPUTY CLERK:  All rise.

20         This Honorable Court will now take a brief recess.

21         (Recess from 5:00 p.m. to 5:21 p.m.)

22         DEPUTY CLERK:  The United States District Court

23   for the District of Columbia is again in session, the

24   Honorable Richard J. Leon presiding.  God save the United

25   States and this Honorable Court.  Please be seated and come

Case 1:17-cv-02511-RJL Document 158 Filed 08/06/18 Page 2008 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2141

 1    to order.

 2           Your Honor, re-calling Civil Action No. 17-2511,

 3    the United States of America v. AT&T, Inc., et al.

 4           (Sealed bench conference)

 5           THE COURT:  So --

 6           MR. PETROCELLI:  We've worked it out.

 7           THE COURT:  -- remind me how things left off.

 8           MR. CONRATH:  So we sent --

 9           THE COURT:  You requested this, you made this?

10           MR. CONRATH:  I made a request, and they said our

11    request is too broad.  But they gave us 20-some documents.

12    Most of the documents, some Excels.

13           I've asked for the information that goes around

14    them that would normally come in discovery like a cover --

15    none of them have a cover email or who wrote it or anything

16    like that.

17           I don't have any way of knowing the extent to

18    which these were cherry-picked or not.

19           But -- and we see in there some of the things we

20    were worried about.  As I suspected, after the lowest month

21    that Professor Carlton used, things started going back up

22    again after that.

23           But -- so we're in a position, I think, where what

24    we're prepared to do is use those documents to cross-examine

25    Professor Carlton on Friday.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1          And if the defendants are expecting that someone,

 2   a fact witness, will testify about facts in these documents,

 3   we've asked for the opportunity to depose that person over

 4   the weekend.

 5          THE COURT:  What about talking about deposing

 6   Cartwright again?

 7          MR. CONRATH:  Carlton?  No.

 8          THE COURT:  Carlton?

 9          MR. PETROCELLI:  David Christopher.

10          MR. CONRATH:  Christopher.

11          THE COURT:  What about Christopher?

12          MR. CONRATH:  Yes.  So he's the one.

13          THE COURT:  He's the one who gathered the

14   information, right?

15          MR. CONRATH:  So under his supervision.  He

16   supervises 5,000 employees, so somebody did it for him.

17          THE COURT:  5,000?

18          MR. PETROCELLI:  He's the president.

19          MR. CONRATH:  I don't think he gathered it in the

20   traditional sense.

21          MR. PETROCELLI:  He actually helped gather it.

22          Let me briefly respond, Your Honor.

23          First of all, we have a team of people that worked

24   all night, all night in L.A. and here.  And we confirmed

25   that the most recent final profit margin information for the

 1   purpose that Mr. Shapiro is using it is, as I told you

 2   yesterday, June of 2017, $812.

 3           Mr. Shapiro was using a number from June 2016,

 4   $1,324.

 5           Now, even though this was out of the date range

 6   that you specified, we pored through the records, and we

 7   provided the additional drafts of the profit margin

 8   documents that we have.

 9           The most recent one that's been worked on is

10   September.

11   ████████████████████████████████████████████████

12   ████████████████████████

13   █████████████████████████

14   ██████████████████

15   ████████████████████████████

16           And that's the most recent work product that there

17   is.

18           So it's kind of like the stock market.  It

19   fluctuates.

20           But as you can see, Your Honor, there's a

21   significant trend downwards from the top number that

22   Mr. Shapiro uses.

23           In any event, given these materials, he's fully

24   able to cross-examine Professor Carlton about them.

25           No. 2, we said in our letter last night that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   Mr. Christopher would be available today for an interview, a

 2   phone conference.  No one ever contacted us.  He was here

 3   waiting to be contacted.

 4           THE COURT:  Yeah.  We're talking about a possible

 5   video conference.

 6           MR. PETROCELLI:  Yes.  And, in fact, I did better

 7   than that.  I flew him out here.

 8           THE COURT:  You did.

 9           MR. PETROCELLI:  He took a red-eye.  Yes.

10           And we wrote a letter to the DOJ saying, please

11   let us know.  He's available starting at 3:00 p.m. in the

12   afternoon today, and nobody contacted us.

13           That said, because I want to put this issue to

14   rest, I told Mr. Conrath that I will make him available this

15   weekend for a deposition if he wants, okay?

16           MR. CONRATH:  That's where we requested him.

17   That's acceptable to us.

18           MR. PETROCELLI:  Okay.

19           MR. CONRATH:  As you can see, Professor Carlton is

20   the absolute lowest of these numbers; and they start to pick

21   up, which is one of the things that I was observing was a

22   concern about the -- so if we hadn't had this information,

23   we wouldn't have known that.  So we appreciate the

24   opportunity.  You know, I don't know if this is complete or

25   what it is.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2145

```
 1            But anyway, our proposition --

 2            THE COURT:  It sounds like this is an

 3   up-to-date --

 4            MR. CONRATH:  As far as we know, this is as up to

 5   date as it can be.

 6            MR. PETROCELLI:  It's as up to date as it can be.

 7            Because, Your Honor, as I explained yesterday,

 8   this is not a normal company.

 9            Mr. Shapiro was the one who came up with this idea

10   to use --

11            MR. CONRATH:  No, that's not true.

12            MR. PETROCELLI:  That's -- he's using a special

13   type of equation to try to measure how much money DirecTV

14   would make if another distributor lost a subscriber and

15   moved over to DirecTV, okay?

16            And let's say that it's Comcast or whoever and

17   somehow they move over to DirecTV.  Mr. Shapiro is trying to

18   calculate, how much money does DirecTV make from a new

19   subscriber, okay?

20            And as I explained yesterday, as Mr. Oppenheimer

21   explained, the company measures the value of the subscriber;

22   but it takes several months to do that, because you have to

23   figure out how long he's going to stick with him.

24            I don't know if Your Honor is aware of this; but

25   when DirecTV gets a new subscriber, they have to sign a
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2146

```
 1    two-year contract, because a lot of equipment comes out to
 2    the home.  They've got to put a satellite on the roof.
 3    They've got to put a set-top box in your house.  It's like a
 4    half-day job.  And that costs a lot of money to the company.
 5               And so they ask subscribers to sign a contract
 6    that they'll stay with them for at least two years so they
 7    can make up the money that they just spent.
 8               So this is --
 9               THE COURT:  Comcast do that too?
10               MR. PETROCELLI:  No, no, no.
11               THE COURT:  DirecTV?
12               MR. PETROCELLI:  Comcast, they come in your house
13    and I guess they put a cable in your wall.  DirecTV, they've
14    got to go on your roof and put a satellite.
15               THE COURT:  Yeah.
16               MR. PETROCELLI:  And it has to face the southern
17    sky, because these satellites are orbiting 22,000 miles
18    above the earth's surface.  And it's fascinating.
19               But in any event, what this is all about is trying
20    to figure out, how much is a subscriber worth?  Okay?
21               And it was worth a lot more a couple of years ago.
22    And as you can see, the trend has gone down.
23               Now, all I'm saying is that we have given the
24    government everything that we have.  There's no conceivable
25    prejudice.  They can take this guy's deposition over the
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 2014 of 3826

2147

1   weekend.

2           And the other thing I want to tell you that I told

3   Mr. Conrath is that I have made it a tentative decision,

4   after these two experts testify, to drastically shorten my

5   case.

6           So next week, I'm going to put on the two

7   chairmans of the board, Jeffrey Bewkes of Time Warner and

8   Randall Stephenson of AT&T.  I'm going to put on

9   Mr. Stankey.  He's going to run this business if the merger

10  is approved.

11          And I'm only going to put on a couple more

12  witnesses.

13          THE COURT:  What?

14          MR. PETROCELLI:  Just a couple more witnesses

15  after that.

16          THE COURT:  Like five or six witnesses?

17          MR. PETROCELLI:  Exactly.

18          Okay.  Two experts on Monday, the two chairmen,

19  Mr. Stankey.

20          THE COURT:  Those will each be a day, I assume.

21          MR. PETROCELLI:  I don't plan to put them on that

22  long.

23          But we could conceivably rest our case, depending

24  on the Court's schedule.

25          THE COURT:  We might not need to sit Friday.

```
 1              MR. PETROCELLI:  Pardon?

 2              THE COURT:  We might not need to sit next Friday.

 3              MR. PETROCELLI:  We could rest our case certainly

 4   before Friday.

 5              MR. CONRATH:  Well, rebuttal.

 6              And remember, we have this one

 7   out-of-order witness that we scheduled for Friday.  But he

 8   will not take -- he would not take a whole day.  But we

 9   would have a rebuttal case.

10              MR. PETROCELLI:  He could start his rebuttal case

11   as early as Thursday or Friday of next week.

12              THE COURT:  All right.

13              MR. PETROCELLI:  So, Your Honor, I think we're

14   about a week ahead of schedule.

15              Now, look, I told Mr. Conrath that I can't commit

16   to this.

17              THE COURT:  No, no.  You've got to do what you've

18   got to do.

19              MR. PETROCELLI:  But I wanted to see how the

20   experts did and all of that.  And I didn't want to leave him

21   in the lurch, because if he's going to put on any witnesses

22   in a rebuttal case, I wanted him to have fair notice.

23              THE COURT:  So you're looking at --

24              MR. PETROCELLI:  I can tell you what the order is

25   right now.
```

 1                THE COURT:  Two and a half -- I'm not going to do

 2    that right now.

 3                You're going to do two and a half hours on direct?

 4                MR. CONRATH:  Yes.

 5                THE COURT:  You're going to do two and a half

 6    hours on cross tomorrow?

 7                MR. CONRATH:  Yes.

 8                MR. PETROCELLI:  Yes.

 9                MR. CONRATH:  10, 15 minutes each for redirect.

10                THE COURT:  Redirect and recross.

11                MR. CONRATH:  Right.

12                THE COURT:  So it would be two and a half, two and

13    a half, 15, 15.  So that's Wednesday.

14                MR. PETROCELLI:  That's five and a half hours each

15    day of testimony.

16                THE COURT:  Thursday should be basically the same

17    layout, right?

18                MR. CONRATH:  Yeah.

19                MR. PETROCELLI:  Same layout on Thursday, right.

20                And then I guess we're off Friday, right?

21                MR. CONRATH:  Yes.

22                THE COURT:  Yes.

23                MR. PETROCELLI:  We're off Friday.

24                Okay.  So then on Monday, I'm calling a couple of

25    experts and then the other fact witnesses.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2150

1      I have two experts on Monday, and that'll probably

2  take most of the day, okay?

3      I think we've probably -- we'll probably end up

4  going into Thursday.  It's possible we could even get to

5  Friday, depending on the examinations exchange.

6      MR. CONRATH:  If we get --

7      THE COURT:  I'm going to have you do the briefs,

8  by the way, 25-page maximum.

9      MR. CONRATH:  25 pages.  Okay.  Got it.

10      THE COURT:  Maximum.  That doesn't mean you have

11  to use 25 pages.

12      MR. CONRATH:  We understand.

13      THE COURT:  25 pages max.

14      MR. PETROCELLI:  We'll file them at the time.

15      THE COURT:  Same time, as we do proposed findings

16  of fact and conclusions of law.

17      MR. CONRATH:  If defendants finish on Thursday, we

18  put on Mr. Holanda on Friday, do you want us to -- because I

19  need to start planning now if we're going to need to put on

20  other rebuttal witnesses.  Or do you want the rest of the

21  day Friday for the Court's other work, and let's begin

22  Monday the rebuttal as we planned?

23      THE COURT:  I'll have to think about that.

24      MR. CONRATH:  Okay.

25      THE COURT:  Because the following week --

1          MR. PETROCELLI:  But, see, you have a choppy week

2     that week, Your Honor.

3          THE COURT:  It's a choppy week.

4          MR. CONRATH:  I'd rather -- well, I just need to

5     know what your preference is, and we'll work around it.

6          THE COURT:  I'm not going to -- I don't see

7     closing arguments that week.

8          MR. CONRATH:  No, no, not that week.

9          THE COURT:  Closing arguments are going to be

10    about two hours each.

11         MR. PETROCELLI:  Yes.

12         MR. CONRATH:  Probably.

13         MR. PETROCELLI:  Can we set that Monday of the

14    following for closing argument?

15         THE COURT:  What would that be?

16         MR. PETROCELLI:  The 30th?

17         THE COURT:  Today's the 10th, right?  9, 16, 23.

18    So that's the 30th.

19         MR. PETROCELLI:  Yeah.  If we could do the 30th,

20    that would work perfectly, Your Honor, because the chairman

21    of the board of AT&T and Time Warner will want to be here

22    definitely.  They definitely need to be here and I need

23    to --

24         THE COURT:  Are you available?

25         MR. CONRATH:  I don't know, but I could ask.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          But let me --

2          THE COURT:  He'll be available.

3          MR. CONRATH:  He'll be available, I'm sure.

4          Your Honor had talked about us finishing our

5    rebuttal, I mean, which I don't think we're going to go

6    there, but finishing our rebuttal case.

7          THE COURT:  No rebuttal?  Don't go too fast,

8    because the seven-day clock starts running when the evidence

9    stops being introduced.

10          MR. CONRATH:  Yes, that's right.  So I've got to

11   be careful.

12          THE COURT:  So we might not want to sit that

13   Friday.  We might want to sit that Monday, get the clock

14   running Tuesday maybe before I leave for New York.

15          You need to think about that clock --

16          MR. CONRATH:  Okay.  I will.

17          THE COURT:  -- especially as it relates to when

18   you're going to do the closing arguments.

19          MR. CONRATH:  Right.

20          THE COURT:  I mean, I have no problem with

21   April 30th for closing arguments.  I have no problem with

22   that.

23          MR. CONRATH:  If I had a preference, it would be a

24   day or two later just to have time to do a better job.

25          MR. PETROCELLI:  The fresher you are, the better

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    it is; trust me.

 2             MR. CONRATH:  Yeah.

 3             And I suspect after our last day, we'll both want

 4    to have a day of sleep.  It's just a wild guess.

 5             MR. PETROCELLI:  I want to see my family.

 6             MR. CONRATH:  Same point.

 7             THE COURT:  Yeah.

 8             MR. CONRATH:  We're ahead of schedule.  We are

 9    ahead of schedule.  That's good news.

10             THE COURT:  You deserve a rest, both of you.

11             All right.  So -- okay.

12             MR. PETROCELLI:  Thank you, Your Honor.

13             MR. CONRATH:  I think we're good.

14             THE COURT:  Anything else we need to discuss in

15    open court?

16             MR. CONRATH:  No, I don't think so.

17             (Open court)

18             THE COURT:  All right.  The parties, having worked

19    out a number of issues that were causing concerns, happy to

20    report that we can break now for the evening.

21             We will have the government's expert,

22    Professor Shapiro, tomorrow.  It will be a very full day.

23    Each side is on the clock, two and a half hours each; that's

24    all you're getting.  If you don't finish, well, it's too

25    bad.
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 2021 of 3826

2154

1          There will be 15 minutes redirect and recross at

2     the end of that.

3          So direct and cross, five hours.  We'll probably

4     be going late, probably won't break until 6:00, something

5     like that.

6          It will be a long day, but I'm happy to say that a

7     number of the issues that had to be ironed out prior to his

8     appearing have been ironed out by some very hard work and

9     some, I think, thoughtful negotiations.  Let's just call it

10    that.

11          So I appreciate that, and I applaud both counsel

12    for making it a smoother transition to tomorrow and the next

13    day when we'll have the witness, the expert witness for the

14    defense, Professor Carlton.

15          So -- and they have the same ground rules for

16    Thursday as well, I might add.  So come Thursday night,

17    you'll definitely need a break.

18          Have a nice evening.

19          DEPUTY CLERK:  All rise.

20          This Honorable Court will stand in recess until

21    the return of court.

22          (Proceedings concluded at 5:39 p.m.)

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2155

C E R T I F I C A T E

        I, William P. Zaremba, RMR, CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-titled matter.




Date: April 10, 2018_____   /S/__William P. Zaremba_____

                               William P. Zaremba, RMR, CRR

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CV No. 17-2511 |
| | ) | |
| | ) | Washington, D.C. |
| vs. | ) | April 11, 2018 |
| | ) | 10:41 a.m. |
| AT&T, INC., ET AL., | ) | |
| | ) | Morning Session |
| Defendants. | ) | |
| _____ | ) | Day 12 |


TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                             Eric D. Welsh
                             Donald G. Kempf, Jr.
                             Dylan M. Carson
                             Justin T. Heipp
                             Ruediger R. Schuett
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Washington, D.C. 20530
                             (202) 532-4560
                             craig.conrath@usdoj.gov
                             eric.welsh@usdoj.gov
                             donald.kempf@usdoj.gov
                             dylan.carson@usdoj.gov
                             justin.heipp@usdoj.gov
                             ruediger.schuett@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:                          Katrina M. Robson
                                        O'MELVENY & MYERS LLP
                                        1625 Eye Street, NW
                                        Washington, D.C. 20006
                                        (202) 220-5052
                                        krobson@omm.com

                                        Daniel M. Petrocelli
                                        M. Randall Oppenheimer
                                        O'MELVENY & MYERS LLP
                                        1999 Avenue of the Stars
                                        8th Floor
                                        Los Angeles, CA 90067
                                        (310) 553-6700
                                        dpetrocelli@omm.com
                                        roppenheimer@omm.com

                                        Michael L. Raiff
                                        Robert C. Walters,
                                        GIBSON, DUNN & CRUTCHER LLP
                                        2100 McKinney Avenue
                                        Suite 1100
                                        Dallas, TX 75201
                                        (214) 698-3350
                                        mraiff@gibsondunn.com
                                        rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:                      Kevin J. Orsini
                                        Peter T. Barbur
                                        CRAVATH, SWAINE & MOORE LLP
                                        Worldwide Plaza
                                        825 Eighth Avenue
                                        New York, NY 10019
                                        (212) 474-1140
                                        korsini@cravath.com
                                        pbarbur@cravath.com

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
                        _ _ _

                   WITNESS INDEX

                        _ _ _

WITNESSES              DIRECT CROSS REDIRECT RECROSS

GOVERNMENT'S:

CARL SHAPIRO, Ph.D. 2167
CARL SHAPIRO, Ph.D. 2176
```

```
 1                    P R O C E E D I N G S

 2          DEPUTY CLERK:  All rise.  The United States

 3   District Court for the District of Columbia is now in

 4   session, the Honorable Richard J. Leon presiding.  God save

 5   the United States and this Honorable Court.  Please be

 6   seated and come to order.

 7          Good morning, Your Honor.  This morning we have

 8   Civil Action No. 17-2511, the United States of America v.

 9   AT&T, Inc., et al.

10          Will counsel for the parties please approach the

11   lectern and identify yourselves for the record.

12          MR. WELSH:  Good morning, Your Honor.  Eric Welsh

13   for the United States.

14          THE COURT:  Good morning.

15          MR. CARSON:  Good morning, Your Honor.

16   Dylan Carson for the United States.

17          THE COURT:  Good morning.

18          MR. KEMPF:  Good morning, Your Honor.  Don Kempf

19   for the United States.

20          THE COURT:  Good morning.

21          MR. CONRATH:  Good morning, Your Honor.

22   Craig Conrath for the United States.

23          THE COURT:  Good morning.

24          MR. HEIPP:  Good morning, Your Honor.

25   Justin Heipp for the United States.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2161

```
 1                THE COURT:  Good morning.

 2                MR. SCHUETT:  Good morning, Your Honor.

 3   Ruediger Schuett for the United States.

 4                THE COURT:  What's your name?

 5                MR. SCHUETT:  Ruediger Schuett.

 6                THE COURT:  Say it again.

 7                MR. SCHUETT:  Ruediger Schuett.

 8                THE COURT:  Do you want to spell that.

 9                MR. SCHUETT:  S-c-h-u-e-t-t.

10                The court reporter has my card.

11                THE COURT:  Say again.

12                MR. SCHUETT:  The court reporter has my card.

13                THE COURT:  He does?

14                MR. SCHUETT:  Yes, he does.

15                THE COURT:  He needs it.

16                MR. PETROCELLI:  Good morning, Your Honor.

17   Daniel Petrocelli for defendants.

18                THE COURT:  Welcome back.

19                MS. ROBSON:  Good morning, Your Honor.

20   Katrina Robson for defendants.

21                THE COURT:  Welcome back.

22                MR. OPPENHEIMER:  Good morning, Your Honor.

23   Randy Oppenheimer for defendants.

24                THE COURT:  Welcome back.

25                MR. WALTERS:  Good morning, Your Honor.
```

1   Rob Walters here for AT&T and DirecTV.

2           THE COURT:  Good morning.

3           MR. BARBUR:  Good morning, Your Honor.

4   Peter Barbur for Time Warner.

5           THE COURT:  Good morning.

6           MR. ORSINI:  Good morning, Your Honor.

7   Kevin Orsini for Time Warner.

8           THE COURT:  Good morning, Mr. Orsini.

9           MR. RAIFF:  Good morning, Your Honor.  Mike Raiff

10  for AT&T and DirecTV.

11          THE COURT:  Good morning.

12          MR. PETROCELLI:  May I have 30 seconds with

13  Your Honor?

14          (Sealed bench conference)

15          MR. PETROCELLI:  How are you, Judge?

16          THE COURT:  Good morning.

17          MR. PETROCELLI:  I just want to go over the

18  schedule.  I think he's probably going to go up until the

19  lunch hour.  I'll need a little bit of set-up time, binders

20  and stuff like that, when the direct is over.  And so if I

21  can -- if we're in the middle of a session, if I can have

22  like five minutes or so.

23          THE COURT:  All right.

24          MR. PETROCELLI:  But I think we're going to end up

25  breaking around the lunch --

1          THE COURT:  Well, what I was going to tell counsel

2     was that if you don't use all two and a half for direct and

3     cross, whatever you don't use could be used for redirect and

4     recross.

5          MR. PETROCELLI:  Okay.

6          MR. CONRATH:  Okay.

7          THE COURT:  Now --

8          MR. PETROCELLI:  Because five hours isn't going to

9     take us --

10         THE COURT:  Well, I'm naively hoping that he won't

11    need three and a half on direct and cross.  Maybe I'm being

12    naive here.  But it seems to me, it should be.

13         MR. PETROCELLI:  Yeah.

14         THE COURT:  I'm being generous.  Let me put it

15    that way.  I think I'm being generous.

16         MR. PETROCELLI:  We appreciate it.

17         THE COURT:  You know, I've given you a day for

18    this guy, but --

19         MR. PETROCELLI:  Okay.

20         THE COURT:  But I don't expect it to take long; it

21    shouldn't take that long.

22         MR. PETROCELLI:  Well, on that subject,

23    Your Honor --

24         THE COURT:  Unless you're anticipating lots of

25    bench conferences, objections to documents, whatever.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. PETROCELLI:  I don't think.

 2              But here's the situation.

 3              THE COURT:  You're putting exhibits in today,

 4    right, I mean, really?

 5              MR. PETROCELLI:  No, I'm not, no.

 6              I think the issue is going to be this, Your Honor.

 7    I've read his deposition.  I didn't take it.  I've never met

 8    this guy before.

 9              On direct exam, you're going to see how much he

10    speaks.  I'm going to have trouble getting him to answer my

11    questions on cross.  He won't answer yes or no.

12              I'm going to -- I may need some assistance from

13    the Court.

14              THE COURT:  I'll give you some wiggle room.

15              MR. PETROCELLI:  Hopefully, if he'll just answer

16    my questions and not argue with me, I'll be able to get

17    through this.

18              THE COURT:  I'll put a reminder in there.

19              MR. PETROCELLI:  Thank you.

20              MR. CONRATH:  I think that's unfair.

21              MR. PETROCELLI:  Have you read his deposition?

22              MR. CONRATH:  I've read Carlton's deposition as

23    well.  Everyone feels the same way about his --

24              THE COURT:  This applies to both.  Experts are

25    notoriously like this.  It's their nature.  They think
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   they're the smartest thing ever and they know all the

2   answers and they know all the nuances and blah, blah, blah.

3            MR. PETROCELLI:  And I only mention it because

4   we're on a clock; that's all.

5            And you'll have the same -- I will make sure

6   Mr. Carlton answers your questions.

7            THE COURT:  Look, I've already told the

8   government, just like I've told you, neither side can

9   guarantee that their expert with only do one thing.

10  I don't know what's going to happen here today more than you

11  two.

12           MR. CONRATH:  That's true.

13           MR. PETROCELLI:  Right.  Yeah.

14           THE COURT:  So all he's going to be late for -- I

15  mean, Shapiro's going to be late for some appointment in

16  Federal Court in Richmond tomorrow, tough luck.  I mean,

17  frankly, it's stunning to me.

18           MR. PETROCELLI:  Yeah, it is.

19           THE COURT:  It's actually stunning to me.

20           MR. PETROCELLI:  It's a private case, too.

21           THE COURT:  This man is coming here to testify in

22  one of the largest antitrust cases by the characterization

23  of the government in the last 50 years.  He's come here and

24  he's scheduled to be in Richmond tomorrow?  I know you

25  didn't know this.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. CONRATH:  I don't know that he did know it.

 2              THE COURT:  You didn't know it.  So I don't know

 3     what he's -- I don't know this guy.  I don't know what his

 4     game plan is or how he does things.

 5              But I can tell you right now, we're going to get

 6     his testimony on this record and cross, obviously, direct,

 7     and cross; and if it means we have to spill into tomorrow,

 8     we'll spill into tomorrow.  And that's -- I can't believe

 9     that he put himself in this position.  It's stunning to me.

10              MR. CONRATH:  I don't know that he had any control

11     over whatever is going on.

12              MR. PETROCELLI:  But he could have given advanced

13     notice, though.

14              MR. CONRATH:  I don't know.

15              MR. PETROCELLI:  And it's a private civil lawsuit.

16              THE COURT:  It's not even --

17              MR. PETROCELLI:  It's nothing like this case.  I

18     checked into it.

19              THE COURT:  I mean, it's just -- I don't know.

20     I don't get it.  Okay.  Look, we are where we are.

21              MR. PETROCELLI:  Okay.  We'll get the show on the

22     road.

23              THE COURT:  We'll end, and that's it.  Let

24     Mr. Welsh know who's going to do -- you're doing it?

25              MR. PETROCELLI:  I'm doing it.
```

```
1              THE COURT:  All right.  So let Mr. Welsh know --
2    oh, he's listening, so he can hear us so he knows.  If he
3    doesn't use all two and a half, he can leave part of it for
4    the redirect.
5              MR. PETROCELLI:  Thank you, Your Honor.  I'll just
6    need a little set-up time; that's all.  Thanks.
7              (Open court)
8              THE COURT:  All right.  The government can call
9    its next witness.
10             MR. WELSH:  Your Honor, the United States calls
11   Professor Carl Shapiro.
12             DEPUTY CLERK:  Sir, please raise your right hand.
13             (Witness is placed under oath.)
14             DEPUTY CLERK:  Please be seated.
15             THE WITNESS:  Good morning.
16             THE COURT:  Good morning.
17             MR. WELSH:  May I proceed?
18             THE COURT:  Proceed when you're ready.
19             MR. WELSH:  Thank you, Your Honor.
20   CARL SHAPIRO, Ph.D., WITNESS FOR THE GOVERNMENT, HAVING BEEN
21   DULY SWORN, TESTIFIED AS FOLLOWS:
22                  DIRECT EXAMINATION ON QUALIFICATIONS
23   BY MR. WELSH:
24        Q    Could you please state your name for the record.
25        A    Carl Shapiro.
```

1       Q    Good morning, Professor Shapiro.

2            Professor, I'd like to start off with you

3  providing a little bit about your background to His Honor so

4  he'll get to understand some of your qualifications.

5            So if we could start off and if you could tell us

6  on or about your educational background, please.

7       A    Yes.

8            I earned my Ph.D. in economics in 1981 from MIT.

9            Prior to that, I had undergraduate degrees in

10 mathematics and economics and a master's degree -- from MIT

11 and a master's degree in mathematics from the University of

12 California, Berkeley.

13      Q    And if you could also tell His Honor about your

14 academic positions that you've held.

15      A    So after I got my Ph.D., I went to

16 Princeton University.  I was a professor there for about ten

17 years.

18            And then in 1990, I moved to the University of

19 California, Berkeley.  I've been a professor there since

20 1990.

21      Q    And you're still at Berkeley?

22      A    Yes, I am.

23      Q    Okay.  What is your field of academic research,

24 sir?

25      A    My field within economics is called industrial

1    organization economics.

2           The applied side of that would include antitrust

3    economics, industrial organization in our field.  We study

4    how firms compete, how markets are structured.  And that

5    includes as well a range of government regulation of

6    business.

7      Q    And you mentioned within industrial organization,

8    there's the antitrust economics.  Can you just briefly

9    explain to His Honor what that field is or that

10   specialization.

11     A    Well, over the last 50 years or so, there's been

12   an increase in demand for economic analysis in antitrust for

13   legal purposes and enforcement purposes.  And scholars in my

14   area have developed the literature and studies and then, of

15   course, the applied side of that.

16          So this would involve using economics for mergers,

17   such as we're talking about here, but also monopolization

18   cases, cartel cases as well.

19     Q    Have you published research on industrial

20   organization and antitrust economics?

21     A    Yes.  A good -- most of my published work is in

22   the field of industrial organization.  Some spills over into

23   intellectual property and patent issues.  And particularly

24   in the last, I don't know, 10 or 15 years, especially

25   antitrust issues in my published work.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1     Q    And with respect to those publications, have they

2   been in what you would consider to be respected academic

3   journals?

4     A    Yes.  I have a good number of publications.  In

5   the coin of the realm of academia are peer-reviewed

6   journals, a good number of publications in top peer-reviewed

7   journals, but also in other similar practitioner outlets as

8   well.

9     Q    I think you may have mentioned this, but have you

10  actually published a merger analysis?

11    A    Yes, I have.

12         For example, I have a paper in 1990 I'm rather

13  proud of in one of the top journals, the American Economic

14  Review, with my colleague, Joe Farrell, on horizontal

15  mergers.

16    Q    Now, have you worked as an antitrust regulator in

17  the past?

18    A    I don't like to use the word "regulator."

19    Q    Okay.

20    A    But I have served in the Justice Department

21  antitrust division as the chief economist.  Formally, the

22  title is Deputy Assistant Attorney General for Economics.

23         I served in that role from 1995 to 1996.  And then

24  I came back again in 2009 to 2011, again, chief economist in

25  the antitrust division.

1      Q     Can you explain to His Honor what your general

2   responsibilities were as the chief economist at the

3   antitrust division.

4      A     Well, I would describe it in a couple of ways.

5            There are about 50 Ph.D. economists who work in

6   the antitrust division.  So the chief economist comes in --

7   it's a political division, political appointee.

8            THE COURT:  Political appointment?

9            THE WITNESS:  Yeah.

10           Comes in and supervises that cadre of civil

11  servants and then as part of the team assembled by the

12  Assistant Attorney General for antitrust and so, as the

13  chief economist, gives advice to the assistant

14  Attorney General for enforcement matters and also typically

15  has a pretty good role in what we call competition advocacy

16  for the division is telling the rest of the government and

17  the world what their views are on competition issues.

18     Q     And in addition to what you just described,

19  did you also, during this time as the chief economist, help

20  to provide any economic analysis when it came to either

21  horizontal or vertical mergers?

22     A     Yes.

23           So essentially all the matters that the division

24  handles that would involve economics, the chief economist

25  would be involved or the person working under the chief

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    economist, and that would certainly include mergers.  There

2    would usually be maybe a dozen-or-so mergers would get a

3    close look, a second request per year, give or take.  And I

4    would be involved in those when I was there at the Justice

5    Department.

6         Q    And your work here in terms of the economic

7    analysis, that would be both for horizontal and vertical,

8    what we call vertical mergers; is that correct?

9         A    Yes.  And we handled both types when I was at the

10   Justice Department most recently.

11        Q    Have you also, Professor, worked for the

12   White House?

13        A    Yes.  After I left the Justice Department in 2011,

14   I served as a member of the President's Council of Economic

15   Advisers.  There are three members.  It's a Senate-confirmed

16   position.  And so I was -- had the honor of serving on the

17   CEA for that period of time after I was at DOJ.

18        Q    And can you just describe, generally speaking,

19   what sort of responsibilities you had there.

20        A    Well, by statute, the Council of Economic

21   Advisers, its job is to give the President of the

22   United States objective economic advice on all manner of

23   topics.

24             And so as a member, we were working in the

25   Executive Office of the President to do that.

1              We would split up the portfolio.  So since, given

2    my expertise, I would be handling things more

3    industry-oriented, such as trade with China or housing

4    finance or environmental regulations; and another member,

5    Katharine Abraham, who was my colleague, would handle more

6    of the labor market issues and some other macro issues, for

7    example.

8              So I had a wide range of topics there that were in

9    my area as a member.

10   Q    And do you recall when it was that you were on the

11   President's council of economic advisers.  That was 2011 to

12   2012.

13             Okay.  Now, other than the work that you've

14   described in academia and then in your various positions

15   with the government, have you also been involved in

16   antitrust cases in other roles or capacities?

17   A    Yes.

18             I, on a fairly regular basis, will either work for

19   private companies, maybe if they're considering a merger or

20   some other antitrust case, non-merger, and I have been

21   retained by the U.S. Government, either the Justice

22   Department or the Federal Trade Commission, to serve as --

23   to analyze matters, more often mergers than not, and testify

24   if it comes to that.

25   Q    So have you testified, then, as an economic expert

1    in any merger litigations?

2         A    Yes, I have, a number of times.

3         Q    Can you give His Honor maybe an example of a

4    recent case.

5         A    So I guess it's just two years ago, probably right

6    down the hall here, I testified in Judge Sullivan's court on

7    the -- on behalf of the Federal Trade Commission.

8              This was the proposed merger between Staples and

9    Office Depot that, in the end, he decided to block.  And

10   that was two years ago.  That's one good example of my

11   testimony on a merger.

12        Q    And in terms of this work that you've been doing,

13   has any of that involved vertical mergers, sir?

14        A    Yes.

15             More of my work has involved horizontal mergers,

16   but I've also looked at vertical mergers.

17             15 years ago, actually, I looked at the merger, it

18   wasn't a merger.  It was a partial ownership arrangement

19   between DirecTV and Fox.  Somebody's called it the

20   News-Hughes transaction, on behalf of DirecTV, and

21   News Corp.  That's a while ago.

22             More recently, for example, when I was at the

23   Justice Department, we -- I was there when the DOJ reviewed

24   the Comcast-NBCU merger, which I know Your Honor is very

25   familiar with.

1      Q    Now, you mentioned a moment ago in your testimony

2   that the testimony you gave in FTC versus Staples.  Have you

3   been recognized by courts, sir, as an expert?

4      A    Yes.  I have testified.

5      Q    Has any court ever excluded you from testifying as

6   an expert witness?

7      A    No, sir.

8           MR. WELSH:  Your Honor, we would offer

9   Professor Shapiro as an expert in industrial organization

10  and antitrust economics.

11          THE COURT:  Okay.

12          MR. PETROCELLI:  No objection.

13          THE COURT:  The Court will so rule.

14          You may question him accordingly.

15          MR. WELSH:  Thank you, Your Honor.

16          May I proceed?

17          THE COURT:  You may.

18          MR. WALTERS:  Your Honor, we have some

19  demonstratives for Professor Shapiro's testimony.  There are

20  some boards here.

21          THE COURT:  I see.

22          MR. WELSH:  And we also have some handouts, if I

23  may approach.

24          THE COURT:  Sure.

25          MR. WELSH:  We have marked those as PXD11,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Your Honor.

2              And these have been provided to defense counsel

3    previously, pursuant to the Court's order.

4              THE COURT:  Thank you.

5              MR. WELSH:  May I approach?

6              THE COURT:  Yes.

7              MR. WELSH:  May I approach the witness,

8    Your Honor?

9              THE COURT:  You may.

10             MR. WELSH:  May I proceed?

11             THE COURT:  Yes.

12             MR. WELSH:  Thank you, Your Honor.

13                       DIRECT EXAMINATION

14   BY MR. WELSH:

15        Q    Professor Shapiro, let's start with your

16   assignment with regard to the analysis of this proposed

17   acquisition of Time Warner by AT&T.  Can you please briefly

18   describe that for His Honor.

19        A    I'm sorry?

20        Q    Yeah.  Would you please tell His Honor what your

21   assignment was with regard to this analysis of the proposed

22   acquisition.

23        A    So the Justice Department asked me to look at the

24   transaction and evaluate the competitive effects, what would

25   be likely the result of this transaction if it went through.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q    And this would be the likely effects, then, on

2  competition?

3      A    Well, when I do that in a merger, I'm looking at

4  the competitive effects.  I guess that's a more precise

5  term.  And I'm particularly --

6      Q    Yeah.

7      A    -- looking at what the impact would be on

8  consumers.

9      Q    Okay.

10     A    So I would be applying and am applying here the

11  consumer welfare standard.

12     Q    All right.  At a high level, what opinions did you

13  reach about the likely effects of the merger on competition?

14     A    So there are three main opinions I'm here to

15  offer.  The first is, it's my opinion that the merger will

16  likely lead to an increase in the fees that Turner is able

17  to charge to other multichannel video program distributors,

18  MVPDs, and that that will, in turn, lead to higher prices

19  for consumers for their pay-TV packages.

20          So that's the first.

21     Q    Okay.

22     A    Second, I think there's also a danger that the

23  merger will lead to -- a risk that the merger will lead to

24  some coordination between AT&T and Comcast to withhold

25  programming content from virtual MVPDs and slow down their

1    growth.

2              Third, the merger will create incentives for AT&T

3    to restrict the use of HBO as a promotional tool for rival

4    MVPDs -- that is, rival to DirecTV.

5              So all of these effects will be -- will reduce

6    competition in the market for video programming

7    distribution.

8        Q    Now, based on these three opinions that you just

9    outlined for us, did you reach a conclusion about whether

10   the merger would substantially lessen competition?

11             MR. PETROCELLI:  Objection.  May I approach,

12   Your Honor?

13             THE COURT:  You may.

14             Professor, you have to step down and sit at that

15   chair there against the wall.

16             (Sealed bench conference)

17             THE COURT:  We were going so smoothly.  I was

18   hoping we may be able to go a couple hours without doing

19   this.

20             MR. WELSH:  I was hoping so too, Your Honor.

21   I was optimistic.

22             MR. PETROCELLI:  I know this is a bench trial,

23   Your Honor, so I think the question of whether this merger

24   substantially lessens competition is a question for

25   Your Honor.  I don't think that's a -- that is a legal for

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    Your Honor.  He can give facts about the competitive

 2    marketplace and all that, but I don't think he should be

 3    proclaiming what is your decision in this case.

 4              So that's my objection.

 5              MR. WELSH:  He's providing input and testimony,

 6    Your Honor, from an economic -- his economic perspective on

 7    his stance as an expert to help Your Honor with this.

 8              THE COURT:  If you want to rephrase the

 9    question --

10              MR. WELSH:  I can do that.

11              THE COURT:  -- so that you don't put it in terms

12    of ultimate issue.

13              MR. WELSH:  That's fine, Your Honor.

14              THE COURT:  I know he wants to opine on that.  But

15    that's -- you know, that's not his province.

16              MR. WELSH:  I understand, Your Honor.  I'll tweak

17    that.

18              THE COURT:  All right.

19              MR. WELSH:  Thank you.

20              THE COURT:  Thank you, Mr. Petrocelli.

21              (Open court)

22              THE COURT:  You can rephrase the question,

23    consistent with the discussion at the bench.

24              MR. WELSH:  Yes, Your Honor.  Thank you.

25
```

1   BY MR. WELSH:

2      Q    Professor, based on your opinions that you just

3   outlined and looking at it from your perspective as an

4   economist here and your background as an expert in antitrust

5   economics and industrial organization, have you reached, in

6   that capacity, reached a conclusion as to whether the merger

7   would substantially lessen competition?

8      A    Well, I apply the consumer welfare standard.  So

9   the opinions I'm going to present to Your Honor, I've

10  concluded that the merger will, in fact, harm consumers.

11  And the harm is significant, in my view, in terms of the

12  dollar amount.  That's my conclusion.

13     Q    Okay.  Now, you mentioned the consumer welfare

14  standard.  Can you elaborate a little bit for His Honor

15  about that.  What is the goal for understanding the consumer

16  welfare standard here?

17     A    Well, the -- I would put it this way.  The merger

18  will, is certainly beneficial to DirecTV.  They're going to

19  acquire Time Warner assets.  That's going to -- that's

20  welcomed to them.

21          It's unwelcomed and it's going to raise the cost

22  of the rivals, for reasons I'll explain, such as Charter or

23  Dish.

24          How do we balance that?

25          Okay.  The competitors don't like it.  It's good

1    for DirecTV.  The way to assess that, at least the analysis

2    I'm presenting, is to see what is the effect on consumers.

3            And that -- so there's going to be some tradeoffs

4    in doing that, pluses and minuses.  And it's that tradeoff

5    that I'm able to quantify and conclude that the consumers

6    will be hurt.

7            And they will be hurt because the competitors to

8    DirecTV will have higher costs.

9        Q    Now, when you look at this, Professor, do you look

10   at the incentives as well as the changes in market

11   structure?  And if so, can you elaborate on that for

12   His Honor?

13       A    So to make these predictions -- I mean, we're

14   talking about predictions -- this is where antitrust

15   economics come into play.

16           And I start, my field, we start that we've got a

17   change in the ownership of assets.  We've got a combination

18   between DirecTV and Time Warner.

19           And then we want to trace through, how will that

20   change in ownership of assets affect incentives, okay?

21           The core methodological working assumption of

22   economics is that the firm will operate to make the most

23   profits as a combined entity.  And when they do that, how

24   will they behave differently?  How will their incentives be

25   different because of the merger?

1          And so we trace through the effect of the

2    ownership change on incentives, and we're really hardcore

3    about incentives, okay?  That's what we do, antitrust

4    economists.  And you'll see that in my analysis to come.

5          And then we're using our tools to then predict the

6    effects in the market of those changed incentives.

7      Q    And when you do this, when you look at the

8    structure, market structures here and the incentives, do you

9    look at the merger both from the perspective of the good

10   parts of the merger, as well as the bad parts?

11     A    Well, that's what I was indicating before.

12         I'm going to see some positive elements of the

13   merger in terms of DirecTV, having lower costs, but there

14   are going to be negative aspects in terms of its competitors

15   having higher costs.

16         So I'm going to need to trade those off.  This is

17   somewhat different than horizontal merger analysis.  We're

18   talking about vertical merger analysis here.

19         And it's ultimately going to be impact on

20   consumers that we're looking for.  That's the methodology

21   I'm bringing.

22     Q    And how does your training in economics, sir,

23   assist you in this predictive exercise that you've been

24   talking about.

25     A    Vastly.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          The -- everything I've been talking about, in

2     order to trace through the impacts of incentives, we need to

3     bring economics to bear.  You're going to hear about a

4     bargaining model.  You're going to hear about bargaining.

5     You'll hear about cost changes and those passing through the

6     price changes.  All of that is applications of the field of

7     industrial organization economics.

8          Q    Okay.  And you mentioned that you're making

9     predictions.  I mean, do economists have a crystal ball here

10    that they can use?

11         A    No.  Our field has not advanced to the state of

12    having a crystal ball.

13              I would say --

14              THE COURT:  Don't feel bad.  Ours isn't either.

15              THE WITNESS:  I'm hoping we can have a good set of

16    binoculars --

17              THE COURT:  Okay.

18              THE WITNESS:  -- instead so that we can look

19    forward and have reasonably accurate predictions.

20              But, look, I'm not going to -- I don't want the

21    Court to think I can predict things perfectly.  What we have

22    to do in merger analysis is to predict to the best of our

23    ability generally what the incentives and the changes will

24    be.  And that's what I'm going to do today.

25         Q    Okay.  Now, you're aware that the defendants have

1    an economic expert as well, Professor Carlton; is that

2    correct?

3         A    I am.

4         Q    Okay.  Are you aware, sir, of Professor Carlton's

5    approach to analyzing this vertical merger?

6         A    I have read his reports in detail.  Yes.

7         Q    And is he in general agreement on this approach

8    that you've mentioned?

9         A    First, I have a great respect for

10   Professor Carlton.  I think we do -- at a high level,

11   I think the methodology I've described, Your Honor, he would

12   agree with.  And the need to make tradeoffs, in this case

13   I think he would agree with.  It turns out we balance things

14   a little bit differently, but there is a starting point of

15   some agreement.

16        Q    Well, let's just plow through this right now and

17   get started here.

18             So often in mergers, we talk about market

19   definitions.  Let's start there.  Do you define a relevant

20   product market in this case?

21        A    Yes, I have.

22             I've actually defined two relevant product

23   markets.  These are the same as you'll find in the

24   complaint.  One is the multichannel video programming

25   distribution market.  That includes basically MVPDs and

1   virtual MVPDs.

2            And then there's a broader market as well.

3   I think we're calling it the all-video distribution market

4   that includes those firms but also the subscription

5   video-on-demand firms such as Netflix.

6       Q    And what methodology did you use to get to those

7   two product markets for defining those?

8       A    So I used what economists call the hypothetical

9   monopolist test.  This is the standard method that antitrust

10  economists have been using to define relevant markets for at

11  least 35 years, widely used, more often in horizontal

12  mergers, but in other cases, antitrust cases as well.

13  That's -- I applied that method, and it's explained in my

14  reports.

15      Q    And you used that for both of your product

16  markets; is that right?

17      A    Yes, that's correct.

18      Q    Now, for ease of analysis, do you focus on a

19  market for the multichannel video programming distribution

20  encompassing both?

21      A    Yes.  I think that that's -- I think it's, to me,

22  easiest if we really talk in terms of the slightly narrower

23  market, the MVPD market, we'll call it, although that also

24  includes virtual MVPDs.

25      Q    If there's harm in the smaller market, do you have

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    a view about whether there would be harm in the broader

2    market, sir?

3         A    Well, the harm that I'm measuring is, I'm

4    calculating certain harms, and those are occurring no matter

5    what market you situate them in.  And they involve the

6    higher prices that consumers will be paying for their pay-TV

7    packages.

8              And so that harm is what it is, no matter which,

9    whether you situate it in the somewhat, in the narrow market

10   or the somewhat broader market.

11        Q    Okay.  So you talked about the hypothetical

12   monopolist test in terms of your markets.  Did you also see

13   other evidence in the case that supported the product

14   markets that you've defined?

15        A    Yes, particularly the MVPD market.

16             This is really, I think, pretty much standard

17   industry recognition that this is a market that the firms

18   recognize each other's competitors.  And year in and year

19   out, the Federal Communication Commission publishes

20   something like an MVPD.

21             I don't know exactly what it's called, but they

22   look at this market and define this market in their own

23   proceedings and in their studies.  So I think it's generally

24   recognized in the industry.

25        Q    Does Professor Carlton dispute your conclusion as

1    to the product markets?

2         A    No, he has not.

3         Q    Okay.  Now, did you also define a geographic

4    market here or geographic markets?

5         A    Yes.  There are actually a large number of them,

6    and I did define them.

7         Q    What was your methodology there for defining

8    geographic markets?

9         A    So the key idea in thinking about the geographic

10   markets is, think of yourself as a consumer, as a household.

11   What are you choices for your video distribution to your

12   home?  And different people that live in different areas

13   have different choices.

14            Mostly, in D.C., I think that the most, a lot of

15   the area here, people would have Comcast; and they might

16   have Verizon through the FiOS; and then, of course, the two

17   satellite offerings, DirecTV and Dish.

18            But other parts of the country, they're different,

19   right?  Comcast is in some areas; Charter is in other areas,

20   et cetera.

21            So basically, the zones that are the relevant

22   markets are defined based on the choices that the consumers

23   in those areas have.

24            And when I do that systematically throughout the

25   country, I end up with about 1100 geographic areas.  It's

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   quite a few, but it's the big country.

2        Q    And, again, Professor, does Professor Carlton

3   dispute your conclusion on geographic markets here?

4        A    No, he has not.

5        Q    All right.  So let's -- you mentioned you have

6   your three opinions.  So let's discuss the first one, that

7   AT&T would charge higher prices to its rivals for the Turner

8   content, which would result in higher prices to the

9   consumers.  So we're going to focus on that, first.

10        A    Okay.

11             MR. WELSH:  And this will take some time,

12   Your Honor, in terms of the questions here.

13   BY MR. WELSH:

14        Q    Where is the best place for us to start here with

15   Turner and its fees?

16        A    Well, I would just level-set things by making it

17   clear to the Court what -- the object of analysis now are

18   the Turner affiliate fees that they charge to distributors.

19   And so we have our first demonstrative here shows just what

20   those fees were in 2016.

21             And we're going to use the term here, Your Honor,

22   "per sub, per month."  I think you've heard it a bunch

23   already.

24             THE COURT:  Yes.

25             THE WITNESS:  And so that's what this chart shows

1   here.

2         I think the numbers are actually confidential, so

3   I shouldn't say them out loud?  I'm not clear.

4   BY MR. WELSH:

5      Q    I believe that's right.  So if you can just talk

6   more generally about what we see here.

7      A    Okay.

8         So if you take, for example, the orange bar,

9   that's what the Turner fees that DirecTV and AT&T have been

10  paying per sub, per month -- were paying in 2016.  And then

11  you can see there's some variation.

12        And these distributors listed along the horizontal

13  axis will be the ones that we're going to be focusing on

14  here.

15        THE COURT:  What's this for, though.  What are

16  they getting from Turner, the four big networks or more than

17  that?

18        THE WITNESS:  Okay.

19        More than that.  So they -- well there are seven

20  networks in general --

21        THE COURT:  Okay.

22        THE WITNESS:  -- for Turner, okay?

23        THE COURT:  But four of them are the major ones.

24        THE WITNESS:  Right.  Right.

25        THE COURT:  That's where they make their money,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2190

```
 1    apparently.

 2              THE WITNESS:  Right.  That's true.

 3              So what we've done here is add up all the fees

 4    that Turner is getting for all of their networks and

 5    calculated that on a per-sub/per-month basis.

 6              THE COURT:  So in this chart here, all of these

 7    distribute -- all of these distributors listed at the

 8    bottom, are they all getting the same number of networks or

 9    are they getting a different combination of numbers?

10              THE WITNESS:  They would be -- I'm sorry.

11              THE COURT:  Go ahead.

12              THE WITNESS:  They would be getting some different

13    combinations.  In part, the one reason the numbers vary here

14    is because there would be different penetration rates.

15              THE COURT:  I see.

16              THE WITNESS:  So if one distributor has a much --

17    a higher distribution a penetration, for example, the

18    Cartoon Network, Adult Swim channel, then they would be

19    paying more because more of their subscribers.  And that

20    would show up as a higher number here than another

21    distributor who had less penetration.

22              THE COURT:  So hypothetically, if I'm looking at

23    like the amount is that AT&T-DirecTV is paying and comparing

24    it, say, to Sling, all right?

25              THE WITNESS:  Okay.
```

1           THE COURT:  From looking at this chart, I can't

2    tell -- at least I don't think I can tell, how many of those

3    networks that Turner has that Sling is using and how many

4    that AT&T-DirecTV is using, right?

5           THE WITNESS:  That's correct.

6           THE COURT:  So the numbers, they may be the same,

7    but they may not be the same --

8           THE WITNESS:  Correct.

9           THE COURT:  -- on this chart?

10          THE WITNESS:  Right.

11          And I'm not putting forward these numbers to

12   indicate that one distributor is paying more or higher price

13   or a lower price.  I'm just showing you generally what the

14   prices look like.

15          THE COURT:  Okay.

16          THE WITNESS:  So the variation is, in part,

17   because of different penetration of networks.

18          THE COURT:  Okay.

19          THE WITNESS:  That's absolutely correct.

20          THE COURT:  All right.  Thank you.

21   BY MR. WELSH:

22      Q    Is this, in essence, a baseline for your analysis?

23      A    Yes.

24          This was really for the very limited purpose of

25   just kind of getting a sense of the scale of these numbers,

1    and these are the fees we're talking about.  And then we'll

2    talk about how they will change as a result of the merger.

3              THE COURT:  So this is page 2 of 11?

4              Well, it says "2" in the lower right corner.  It's

5    actually the first page.

6              MR. WELSH:  It is the first page.  We had some

7    other slides, Your Honor, which we, to be more efficient for

8    Your Honor, we took out.

9              THE COURT:  All right.

10             I'm going to call this the first page of PXD11.

11             MR. WELSH:  Understand.  Thank you, Your Honor.

12             THE COURT:  Go ahead.

13             MR. WELSH:  Thank you.

14   BY MR. WELSH:

15        Q    Professor, so with respect to the fees that we're

16   looking at here, how are those determined in this industry?

17        A    So these fees are determined based on some rather

18   tough negotiations that take place between Turner and the

19   respective distributors.

20        Q    Is that through -- we've heard some testimony here

21   about a bargaining process.  I think you mentioned it

22   earlier even in your testimony.  Is that through bargaining,

23   sir?

24        A    Absolutely.

25             And I think the Court has heard quite a bit about

1    those negotiations and bargaining.

2         Q    And you mentioned earlier in your testimony about

3    a bargaining theory.  Could you just explain to His Honor

4    what the bargaining theory is.

5         A    So since we're going to be trying to predict how

6    the fees will change, we need some model or some way of

7    doing that.

8              The bargaining theory I'm going to be applying is

9    very straightforward.  It's basically what I would call

10   "split the difference" bargaining, which is that when we

11   bargain and there are some gains to be had, we split those

12   gains.

13             "Gains to be had" means there's a mutual --

14   there's a deal to be had.  We're better off doing a deal

15   than walking way, that we're going to split those gains.

16             And so the key things for bargaining theory are

17   that both sides have leverage, and the leverage is based on

18   what would happen if there were no deal.  And we're going to

19   pursue that in considerable detail for a while here now in

20   my testimony.

21        Q    So you mentioned the leverage, and you also

22   mentioned what happens if you don't have a deal.

23             With respect to bargaining in general, did you

24   find evidence that this is a factual reality in the pay-TV

25   industry?

***REDACTED IN ACCORDANCE WITH JULY 31 2018 DISTRICT COURT ORDER***

1    A    Absolutely.  I don't think there's any doubt about

2  it.  Many of the witnesses you've heard both from Turner and

3  from the distributors, they understand what -- they have to

4  think about what'll happen if there's a blackout.  If we

5  don't have a deal and the Turner content doesn't appear,

6  let's say, on Charter, they need to study how bad will that

7  be for Charter.  And, of course, Turner needs to think about

8  how bad would it be for them.

9         So that's what the leverage is based on.  What

10  happens if there's an impasse and no deal?  And that's --

11  people are studying that in the industry.  And that's

12  exactly -- the bargaining theory exactly reflects that.

13  Those leverage points are key.

14    Q    Did you find, from your review of evidence in this

15  case, Professor, that both sides in a negotiation look at

16  their relative strength, positions of strength, and their

17  leverage in the negotiation process?

18    A    Absolutely.  I mean, Mr. Breland from Turner made

19  that clear, and I think Mr. Schlichting from Dish.  I don't

20  think there's any question that's what's going on in this

21  industry.

22    Q    And you mentioned also that, if you don't reach a

23  deal, that's part of the calculus here.

24         If you don't reach a deal, we've heard testimony

25  about there being blackouts or going dark.  Have you

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   reviewed any evidence regarding blackouts in this case?

 2        A    Absolutely.  I've spent quite a bit of time

 3   looking at blackouts.

 4        Q    Explain to His Honor why blackouts are relevant

 5   here for this discussion today.

 6        A    Well, even though they don't happen very much,

 7   that's the key to leverage, okay?  It's really anytime

 8   you're negotiating, your leverage is based on -- I'm saying

 9   like, I don't like the deal you're offering me; I'm going to

10   walk away.  So we need to figure out what do I do if I walk

11   away.

12             And so that's the blackout here.  And so that's --

13   we're going to be looking at that closely.

14        Q    Have you seen evidence in the record about the

15   parties themselves conducting blackout analyses to

16   anticipate what might happen should they not reach a deal?

17        A    Yes.

18             So one important piece of evidence that I'll be

19   relying on will be analysis by Charter, in particular, about

20   what they think the impact would be on their distribution

21   business if there were a long-term blackout of Turner; that

22   is, if they did not have the Turner -- could not display the

23   Turner content to their subscribers.

24             But that's just one example we have.  Comcast has

25   also looked at blackouts.
```

1          This is what the negotiators have to do to

2    understand the bargaining situation they're facing.

3          Q    So why would the Turner fees increase due to the

4    merger?  Can you explain that?

5          A    Well, this is the key economic point that

6    underlies this whole part of my testimony, Your Honor.

7               The idea is that the merger will give AT&T greater

8    leverage in these negotiations.

9               I'm going to use the example of Turner negotiated

10   with Charter, as an example, but we could talk about other

11   distributors as well.  But just to make it specific, and we

12   do have this use of quite informative Charter document.

13              So the idea is that the -- after the merger, AT&T

14   will have more leverage as the owner of the Turner content

15   than Turner had before.

16              Now, that has to be explained.  Why?  Why are they

17   going to have more leverage?

18              But the focus would be on how will the merger

19   change incentives and leverage.

20              You're looking at me like maybe I should actually

21   explain why they should have more leverage.

22         Q    Please.

23         A    So what changes with the merger?

24              After the merger, AT&T recognizes that if there is

25   a backout, let's say Charter, then what's new -- what's new

1    is that AT&T will recognize that their DirecTV and U-verse

2    businesses will benefit if Charter doesn't have the Turner

3    content.  Okay.  Why is that?

4              If Charter and Turner can't come to a deal,

5    Charter is going to be a weaker competitor.  They're going

6    to start to lose some subs, some subscribers without the

7    Turner content.

8              So we have to think through what happens in the

9    event of a blackout, because that's what the leverage is

10   based on.

11             So if we just go through the logic, I'm going to

12   just -- this is fundamental that we're going to do a lot of

13   calculations later.  But this is the fundamental idea, so

14   I'm going to just go pretty slowly.

15             So let's think through.  If Charter does not have

16   Turner to show, their service is less attractive.  Some of

17   their subscribers are going to leave.  And some of their --

18   and they're going to have trouble attracting subscribers in

19   the future.  Both of those are important.  So over time,

20   they're going to have fewer subscribers.

21             Okay.  Now, the key thing is that in terms of the

22   merger effect is that when that happens, some of those

23   subscribers are going to turn out to be DirecTV subscribers

24   instead, either because a Charter subscriber will depart and

25   go to DirecTV or U-verse, or because Charter will not be

 1   able to attract a DirecTV subscriber due to Charter's lack

 2   of the Turner content.

 3          So the inevitable consequence of this blackout

 4   will be that DirecTV subscribership base will grow over

 5   time.  That is a benefit to AT&T.

 6          That was not something that would be part of these

 7   negotiations prior to the merger, but it is part of the

 8   negotiations after the merger.

 9          To put it a little bit dramatically, perhaps,

10   after the merger in these negotiations, the AT&T person

11   negotiating the Turner content could say to Charter, look,

12   we would love to do a deal with you, but we want more money.

13          THE COURT:  Why are you assuming it would be an

14   AT&T person negotiating as opposed to a Turner person

15   negotiating?

16          THE WITNESS:  So, well, Turner is now owned by

17   AT&T.

18          THE COURT:  Oh, I understand that.

19          But you've been reading the testimony in this

20   case, haven't you?

21          THE WITNESS:  Yes, I have.

22          THE COURT:  And you have been present for some of

23   it probably too?

24          THE WITNESS:  I have not.

25          THE COURT:  You haven't.  But you've been reading

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2199

```
 1    all of the daily copy?

 2            THE WITNESS:  Yes.  I'm a couple days behind, but

 3    I've been reading a lot of it.

 4            THE COURT:  Okay.  Well, then you know from

 5    testimony that's already been provided in court that in

 6    situations where mergers have already occurred, like, say,

 7    NBC-Comcast, right?

 8            THE WITNESS:  Okay.

 9            THE COURT:  The Comcast people do negotiation, not

10    NBC.

11            THE WITNESS:  So --

12            THE COURT:  They do the negotiation with the

13    distributors.

14            THE WITNESS:  I think you meant the other way

15    around; the NBC people do the negotiations?

16            THE COURT:  The NBC do the negotiations.  They do

17    their own negotiating, and they're not taking -- I believe

18    the testimony was they don't take orders from NBCUniversal

19    as to how to structure the negotiation, how to present it,

20    how to -- I mean, that's what they said.  Is this correct?

21    Or do you have a different understanding or something?

22            THE WITNESS:  No.  I am aware of that testimony.

23            And so I think there's a very serious tension

24    between that testimony and the working assumption for

25    antitrust economists that Professor Carlton and I share;
```

1    that the company after the merger will be run to maximize

2    their joint profits.

3              THE COURT:  So you have reason to believe or

4    suspect that DirecTV will not do its own negotiations; AT&T

5    will step in to do the negotiations for DirecTV?

6              THE WITNESS:  For Turner, I think you mean.

7              THE COURT:  For Turner?

8              THE WITNESS:  Isn't that what you mean?  I don't

9    want to -- okay.

10             I would put it this way, that --

11             THE COURT:  Start with answering that question.

12   Do you have a basis to believe that?  Or what is your basis

13   to believe that?

14             THE WITNESS:  Okay.

15             So I'm not in a position to say how AT&T will

16   structure who will be at the negotiations and --

17             THE COURT:  A crystal ball won't predict that,

18   will it?

19             THE WITNESS:  No.  I'm not -- no.

20             And I don't have a crystal ball, on top of that.

21             So -- no.

22             So what I'm saying is that it will be in AT&T's

23   interests to play this -- to use this leverage in the

24   negotiations.  It will be in their interest --

25             THE COURT:  So that's an assumption that you're

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    making?

2         THE WITNESS:  Yes, it is.  Okay.

3         THE COURT:  But you don't have an independent

4    basis of evidence for that?

5         THE WITNESS:  That is fair.

6         THE COURT:  That's an economist assumption?

7         THE WITNESS:  That is true.  That is true.

8         THE COURT:  Okay.

9         THE WITNESS:  And let me say, I think it's -- the

10   reason I'm comfortable making that and would hope you would

11   accept that, Your Honor, is that I think it's -- I'll use

12   the word "dangerous" or certainly "worrisome" to allow

13   companies to merge on the contrary assumption that they will

14   not use their combined assets and power in their interest of

15   their -- in the combined interests of their shareholders.

16        THE COURT:  Well, is there evidence that when

17   Comcast and NBC merged that this assumption took place, to

18   your knowledge?  To your knowledge.

19        THE WITNESS:  No, I don't -- not to my knowledge.

20   Of course, we have an order there.  We have a consent decree

21   and so forth.

22        THE COURT:  No.  I understand.  But we've had

23   witnesses testify about this.

24        THE WITNESS:  Right.

25        THE COURT:  And they say it doesn't.  They say

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   it's --

 2            THE WITNESS:  So I would say --

 3            THE COURT:  Comcast is over here and NBC is over

 4   here.  And NBC is maximizing its profits, and Comcast is

 5   doing its thing.

 6            THE WITNESS:  Look, I think if you accept that,

 7   which, from my point of view, would not be in the combined

 8   interests of the new company.  They would be leaving money

 9   on the table.

10            THE COURT:  Okay.

11            THE WITNESS:  If you accept that, then this

12   bargaining leverage would not come into play.

13            THE COURT:  Okay.

14            THE WITNESS:  Okay.  That's the way it is.

15            THE COURT:  Okay.

16   BY MR. WELSH:

17       Q    Professor, so you talk about the -- post-merger,

18   you talk about the benefit to AT&T if there's a blackout of

19   a rival.  Charter, I guess, is the example we were talking

20   about.

21            Is there a flip side of this discussion that we

22   should be talking about in terms of the cost to AT&T?

23       A    So -- yes.

24            So another way to think about this is, again, I'm

25   taking the perspective of the merged company, AT&T, that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1    when they license the Turner content to Charter, it makes

2    Charter a stronger competitor.  And that imposes some costs

3    on DirecTV.  They end up with fewer subscribers.

4         Q    Okay.

5         A    So a very good way, as an economist, at least,

6    that I'll, I guess, urge upon the Court, to think about that

7    the merger creates an additional cost to AT&T of licensing

8    the Turner content to Charter, and that's sort of

9    fundamental.

10             And then we're going to ask, what are the

11   implications of that higher cost?

12             THE COURT:  Okay.

13   BY MR. WELSH:

14        Q    And I understand from your testimony that you see

15   a change, then, in the bargaining dynamic that would occur

16   after the merger; is that right?

17        A    Right.

18             So we can think of this two ways.  It's

19   equivalent.  One is, AT&T will have a higher cost, so they

20   will be less inclined to license.

21             Another way would be, they have more leverage in

22   the negotiations, because they're less keen to cut a deal.

23             THE COURT:  Okay.

24   BY MR. WELSH:

25        Q    Have you seen evidence in this case from some of
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   the third-party distributors about whether they're concerned

2   about there being a change in this bargaining leverage

3   post-merger?

4        A    Yes.

5             And I think this is also responsive to

6   Your Honor's series of questions.

7             You hear from Mr. Schlichting or you hear from

8   Ms. Fenwick.  They -- and I'll interpret a little bit.  They

9   instinctively, since they are nervous that their competitor,

10  DirecTV, is now going to own an important input that they

11  need, Turner, okay?

12            And that, I think very real business sense, is

13  inconsistent with the view that somehow Turner will be

14  operating on its own and not be -- and not part of the

15  overall company.  So they're fearful -- I hope I'm not

16  overstating it -- about that.

17            And so that's the other side of it from the

18  distributor feeling they'll be in a weaker bargaining

19  position with AT&T controlling Turner.

20       Q    Okay.  Let's get back now to the fee increases as

21  part of your opinion.

22            What is your conclusion as to how much the Turner

23  fees will increase if the merger were to go forward?

24            THE WITNESS:  Okay.  So this is our next

25  demonstrative, Your Honor.

2205

```
 1              THE COURT:  Okay.  Same packet?

 2              MR. WELSH:  That's right.

 3              THE WITNESS:  Page 3, which I think we're going to

 4    rename 2.

 5              THE COURT:  Yeah.

 6              THE WITNESS:  See, I picked up pretty quickly on

 7    that.

 8              THE COURT:  Well, you went to MIT.

 9              THE WITNESS:  Thank you.

10    BY MR. WELSH:

11        Q    What do we have here on this particular

12    demonstrative, sir?

13        A    So there's a lot here to take in.  Just the

14    title -- let's start with the title:  "Predicted Turner

15    monthly fee increases for rival MVPDs."

16              And this is bases on the market configuration, how

17    things looked in 2016.

18              I've got some additional analysis where we carry

19    that forward in time, but I'm going to start with 2016.

20              And --

21        Q    I'll just caution you, sir, that I understand that

22    the column on the percentage increase has been designated as

23    confidential, so the rest of it is not.  But if you would

24    just keep that in mind as you're testifying.

25        A    Okay.  That's helpful.  Thank you.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1            So if you go down to the bottom, the bolded,

2    overall, this is literally the bottom line.

3            THE COURT:  Yep.

4            THE WITNESS:  The prediction is that, added up

5    across all these distributors, the Turner fees will go up

6    76 cents per month, okay?  And that comes to --

7            THE COURT:  That's per subscriber?

8            THE WITNESS:  That's right.

9            So this is per subscriber, per month, 76 cents.

10           And then when we multiply by all the subscribers,

11   we get about 48, $49 million a month.  And that comes to the

12   586 million a year.

13           THE COURT:  Okay.

14           THE WITNESS:  Okay?

15           So -- and this is why I had showed the previous

16   chart -- so we can put the 76 cents in context in comparison

17   with the bars that you saw previously, which I won't say

18   those numbers.

19           THE COURT:  Yeah, I know.

20           THE WITNESS:  But that's the context.

21           THE COURT:  I got you.

22           THE WITNESS:  So -- and you can see the percentage

23   columns that these are significant percentage increases for

24   the Turner fees.  For reasons we'll explain later, soon,

25   it's not the same for all the different distributors.

1          THE COURT:  No.

2          THE WITNESS:  Some face higher or lower percentage

3   increases.

4          But the bottom line there is that 76 cents per

5   subscriber per month, $586 million a year.

6          So we're going to spend the next chunk of my

7   testimony explaining where I came up with these numbers.

8          THE COURT:  Okay.

9   BY MR. WELSH:

10     Q    Okay.

11          And I won't mention the actual number on the

12   percentage increase, but that's a double-digit number,

13   correct --

14     A    Yes, sir.

15     Q    -- for the overall?

16     A    Yes.

17     Q    Okay.  And the data that went into this, where did

18   that data come from, sir?

19     A    Right.

20          So this is data from the merging parties.  And

21   then third parties, basically all these distributors, the

22   various distributors provided data to the Justice Department

23   that I had access to.

24          THE COURT:  And, again, they're not equal in terms

25   of the number of networks or anything, right?  They're all

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    different packages?

2              THE WITNESS:  That's right, yes.

3              Different -- I would emphasize different

4    penetration rates, which is --

5              THE COURT:  But the fees are a function of how

6    many networks you are getting from the company --

7              THE WITNESS:  Yes, yes, they are.

8              THE COURT:  -- from the distributor.

9              THE WITNESS:  Right.  But -- yes.

10             They tend to get -- but what causes the difference

11   in fees that you're asking about is not so much whether they

12   get the networks but how many of their viewers see them, the

13   penetration rate.  But it's the same idea, yes.

14             THE COURT:  Okay.  I see.

15             THE WITNESS:  But each distributor, so we'll talk

16   about Charter, is paying a certain amount for a certain set

17   of networks.  And then we're going to see how that's going

18   to change, distributor by distributor.

19             THE COURT:  Okay.

20   BY MR. WELSH:

21       Q    Professor, before we leave this particular

22   demonstrative, does the analysis take into account the

23   current contracts of the MVPDs or the proposed arbitration

24   remedy that we've heard about?

25       A    So, no, it does not.

1          I want to really emphasize this and flag this for

2    Your Honor.

3          THE COURT:  All right.

4          THE WITNESS:  The -- and, you know, you'll hear

5    about this on cross-examination, I'm pretty sure.

6          The -- there are two things that I've set aside in

7    doing this calculation.  One is, there are certain contracts

8    that Turner has with distributors that prevent them from

9    raising the fees for some number of years.  And I have not

10   included that here, okay?

11         And the reason is, I'm trying to evaluate the

12   fundamental incentives and changes in the market created by

13   the merger and these contracts will, of course, expire in

14   time.  And so I'm trying to understand, with the market as

15   we see it, what would the effects of the merger be if those

16   effects were not temporarily constrained by these contracts?

17         But I'm happy -- I fully acknowledge the actual

18   effects will only occur gradually, because these contracts

19   will prevent the prices from going up right away.

20         THE COURT:  Yeah.

21         THE WITNESS:  So there's that point.

22         The other point, the arbitration, my analysis

23   here, all this that you're about to hear in the next hour or

24   so, does not include any remedies.

25         I'm analyzing the merger as structured and the

1   fundamental incentives created be the merger without

2   possible behavioral remedies, such as arbitration.  That is

3   not included here.

4           THE COURT:  Okay.

5   BY MR. WELSH:

6       Q    And we'll be coming back to this demonstrative

7   later in your testimony as well.

8           But I know you've testified about this being --

9   you're trying to predict what's going to happen post-merger.

10  Are you trying to get this down to the last penny?

11      A    Well, it actually is down to the last penny, but

12  I don't want to convey the idea that there's that degree of

13  precision.

14          So, for example, when I talk about the bargaining,

15  I talk about "split the difference" bargaining, I'm not

16  saying that every bargain, people exactly meet in the

17  middle.

18          THE COURT:  So it's binoculars.  It's not a

19  microscope.

20          THE WITNESS:  Thank you.  That's good.

21          So, no.  I think this is the best we can

22  reasonably do.  But, of course, the real world is messy and

23  it's imperfect.

24  BY MR. WELSH:

25      Q    Okay.  Well, let's talk about the bargaining model

1    here.

2            First, could you explain to His Honor how

3    bargaining models work?

4       A    Well, we have the demonstrative just to go through

5    what I hope will be very quick, the basic idea of bargaining

6    and leverage.

7            THE COURT:  Do you want to go to the next one?

8            THE WITNESS:  Yes, please.

9            THE COURT:  Number -- I'll call it 3.

10            THE WITNESS:  Okay.

11            MR. WELSH:  Yeah.  I believe it's No. 4, and we'll

12    just call it 3.

13            THE COURT:  Yeah.

14            THE WITNESS:  So I'm going to try to go through

15    this quickly; but if it's not clear, Your Honor, please stop

16    me, okay?

17            The basic idea of splitting the gains from trade

18    is -- so my example here is you're negotiating to sell a

19    used car.  The car -- I'm the buyer.  I'm willing to pay

20    10,000 for the car.  You're -- you could sell it to somebody

21    else probably for 6,000.  So we've got 4,000 gains.

22    Because, you know, I'm willing to pay ten; anything over

23    six, you're okay with.

24            If we're going to negotiate, the neutral

25    assumption is we're going to split the gains; we're going to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   get up at 8,000.  So we end up in the middle.

 2          And the way economists think about that is at

 3   8,000, you get $2,000 surplus; you get 8,000 when your other

 4   person would have only given you six, and I get 2,000

 5   surplus because I was willing to pay ten but I got it for

 6   eight.

 7          Okay.  So that's this slide.  And this is a --

 8   BY MR. WELSH:

 9     Q    How does the merger change that?

10     A    So then the key thing that we're going to -- the

11   operative, what we're going to do now to analyze the merger

12   is we want to understand how when the seller's cost goes up,

13   the negotiated price changes.

14          Remember I said as a result of the merger, AT&T's

15   cost of licensing the Turner content to Charter will go up.

16   So we want to understand, when the seller's costs go up,

17   what happens to the negotiated price.

18          And this chart is meant to do that in simplified

19   form.  So let's take the same example.

20     Q    Are you referring to what's page 5 we're going to

21   call 4 of your demonstrative?

22     A    Yeah.  So the one that says, "An increase in

23   seller's cost leads to a negotiated price increase."

24          Are you with me?

25          THE COURT:  I got you.

1           THE WITNESS:  Okay.

2           So now be basically take this same simple example.

3    And suppose it turns out you get a better offer from

4    somebody else, 7,000 for the car, okay, instead of six.

5    Well, now we only have 3,000 gain to trade.  If we split the

6    difference now, we're going to sell it for 8500 instead of

7    8,000, okay?

8           So if we believe in equal bargaining split, when

9    your costs go up, which is to say you have a better

10   alternative, then you're going to get a higher price.

11          You might ask, how's that's going to happen?

12   Okay?  And bargaining is a dark art in many ways.

13          But the idea is you have more leverage now because

14   you have a better offer.  And you will be more -- you're

15   willing to apply that leverage.  And some of them are

16   willing to walk away, if necessary.  And so the price will

17   end up at 8500.

18          If we believe that the, these leverage points

19   matter for bargaining, then better outside offers make one

20   party stronger in those negotiations.

21          So the key takeaway would be when the seller's

22   costs go up, in this case by a dollar, the negotiated price

23   goes up by 50 cents.

24          So this logically follows from "split the

25   difference" bargaining.

1            And we're going to now use that and apply that to

2    the merger.

3    BY MR. WELSH:

4        Q    And when we look at splitting the surplus from the

5    trade, is that a neutral assumption?

6        A    Yes, I would say it's neutral in the sense that

7    we're not assuming that one side or the other gets the

8    lion's share of the gains.  It's just down the middle.

9            This is the standard assumption, both in the

10   literature and when bargaining models have been used in

11   practice, indeed, in earlier mergers and so forth.

12       Q    Have you seen some testimony in this case from

13   some of the third-party witnesses with respect to this issue

14   of splitting the surplus?

15       A    There are a couple of witnesses, maybe

16   Mr. Schlichting, I think, said -- talked about ending up in

17   the middle.  It's not as quite precise as 50/50, but the

18   same idea.

19       Q    And, Professor, did you look at the cost of

20   capital in relation to the bargaining split?

21       A    Yes.  So I should say, while 50/50 is a neutral

22   assumption, the bargaining theory as economists have

23   developed it does recognize that if one party is very

24   impatient and eager to make a deal, then they will be in a

25   weaker position.

1          And so there's -- part of the theory is how if

2    there are very different degrees of impatience, the

3    bargaining split could move against the impatient party.

4          And I've been able to test that here by looking

5    at -- you wouldn't expect that to be a big factor when you

6    have large corporations negotiating with each other.

7          But I did look at the cost of capital of the

8    different companies, and there are some differences.  But it

9    doesn't move the -- if you apply that, it doesn't move the

10   split much off of 50/50.  If anything, it stays pretty

11   close.  So I think we've got some empirical basis as well

12   for the 50/50 split here.

13   Q    Does the bargaining theory that you're talking

14   about, does that help you to understand AT&T's costs from

15   this merger?

16   A    Well, yes.  What we're going to go now do is look

17   at the increased cost to AT&T of licensing the Turner

18   content and then recognize that gives them more leverage,

19   quantify those increased costs.

20          And just like the dollar in my example, well, what

21   is that number for AT&T?  How does their cost of licensing

22   the Turner content go up as a result of the merger?  Again,

23   the cost coming from -- it makes Charter a stronger

24   competitor.  And that's exactly what we want to measure now.

25   So that's the exercise we have to march through.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2216

1      Q      Okay.  We'll get to that in a second.

2             So the cost goes up --

3      A      It can't wait.

4      Q      -- and then prices also get pushed up to the

5   consumer?

6      A      Right.

7             So we're talking now about higher Turner fees and

8   then those will, in turn, lead to higher costs for consumers

9   in terms of their subscription prices for pay TV.

10     Q      How does the bargaining theory help you to measure

11  this change that you're seeing in the bargaining leverage

12  itself?

13     A      Well, again, it's directing us to measure these

14  increased costs at AT&T, and we're going to do that by

15  measuring the benefits to DirecTV and U-verse, if there's a

16  blackout, okay?

17            So that's what's new from the merger.  If there's

18  a Turner blackout -- we'll use Charter as our example --

19  what are the benefits to DirecTV and U-verse?  And that is

20  the thing -- we want to measure that, and that's what's

21  going to constitute the additional leverage.

22            Again, with my ongoing assumption that AT&T will

23  operate this in the joint interests of the whole company.

24     Q      And one final question on this point, but why

25  would distributors agree to pay this higher price for the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Turner content post-merger?

2         A    Well, they're not going to be happy about it, but

3    that's nature of bargaining.  When one side has greater

4    leverage, they do better in the negotiations.  That's the

5    basic idea.

6         Q    So let's discuss now your bargaining theory.  How

7    did you go about calculating the benefits here?  Take us

8    through that approach.

9         A    Okay.  Well, we kind of -- I think I kind of

10   previewed this a little bit.

11        We want to measure the benefits to DirecTV and

12   U-verse if there's a blackout of Turner on Charter.  I know

13   I've said that a few times.

14        Q    Okay.

15        A    And the benefits come from lost subscribers at

16   Charter due to the blackout.  So we're going to call that

17   the subscriber loss rate.

18        And then how many of those subscribers are going

19   to wind up going to or staying at DirecTV, we're going to

20   call that diversion rate.

21        And then how profitable would those subscribers be

22   for DirecTV?

23        And we'll measure that as a profit margin at

24   DirecTV and U-verse.

25        Q    Okay.  And we'll go through each one of those

1    individually.

2            Once you have those parameters, those inputs, what

3    do you do with it, just generally speaking?

4        A    So that gives us this cost increase, this leverage

5    increase that AT&T has.  And then we're going to -- that's

6    going to lead to higher Turner fees due to that leverage.

7            And that's going to -- I'm going to calculate that

8    for each distributor, for Charter, then Dish, Comcast, and

9    so forth.  And that will tell us how much higher the cost

10   will be that these distributors will bear for Turner

11   content.

12       Q    Okay.

13       A    I should say -- I think we skipped over it.

14   I'm not saying that after the merger, Turner will deny its

15   content to the other distributors.  This is not a

16   foreclosure-withholding story.  It's a bargaining-leverage

17   story.

18           Okay.  I considered whether there would be

19   withholding.  And that has been a concern in some private --

20   prior vertical mergers.  And I did not think that would

21   happen.  So this is a bargaining leverage higher price,

22   "raising rivals' costs" effect, not a foreclosure effect of

23   denying the programming.

24       Q    Let's talk about the first component piece of

25   this, the, what you call the subscriber loss rate.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      What does that -- tell His Honor a little bit more

2  about what that specifically means and entails.

3      A    So the question we're now asking is if -- I'll

4  use, continue to use Charter as an example.

5          If there is a long-term blackout of Turner content

6  on Charter, what will the impact be on Charter's subscriber

7  base?  Okay.

8          And you've heard a fair bit of testimony about

9  people estimating this and so forth, and here's how it's

10  going to get used in my analysis.

11         I should highlight, we're talking about a

12  long-term blackout, not a temporary one.

13     Q    And why is that?  Why are we looking at long-term

14  versus a temporary?

15     A    Because that's really ultimately what the

16  bargaining leverage is based on, if the two parties don't

17  come to a deal, what's going to happen to both of them in

18  terms of Turner losing some subscribers and Charter --

19  Turner losing affiliate fees and advertising revenue and

20  Charter losing subscribers and the margins on those

21  subscribers.

22     Q    Are you aware that Professor Carlton has stated

23  that a blackout must be long-lasting in order to be

24  informative about the importance of Turner?

25     A    Yes.  This is an area where Professor Carlton and

1    I are very much in agreement, that the proper place to look

2    is at long-term blackouts.  And what we're trying to measure

3    is the subscriber loss rate from a long-term blackout.

4            MR. PETROCELLI:  Objection.

5            THE COURT:  Hold on.

6            You have an objection?

7            MR. PETROCELLI:  I do, yes.

8            THE COURT:  You'll have to step down, Professor.

9            (Sealed bench conference)

10           MR. PETROCELLI:  Your Honor, I don't think it's

11   appropriate for Mr. Welsh to be trying to preempt to

12   Dr. Carlton by putting in his questions or having the

13   witness answer that Dr. Carlton agrees with him.

14           Dr. Carlton does not agree with him on some of the

15   things that he has been saying, and he's trying to convince

16   you, before Dr. Carlton testifies, that he's right and

17   Carlton agrees with him.

18           For example, on this point, Dr. Carlton examines

19   both long-term and short-term.  There has never been a

20   long-term blackout of Turner, never.  He ignored entirely

21   the short-term ones.  Dr. Carlton does not.  I'm going to be

22   crossing him on this.

23           So my objection is he's loading up these questions

24   with facts that are not based on the record.

25           And so I would ask that he simply ask questions

 1    and keep Dr. Carlton out of it.

 2            MR. WELSH:  I'm asking him for his views and his

 3    reaction and opinions.  He's certainly subject to

 4    cross-examination by Mr. Petrocelli.

 5            Dr. Carlton will be testifying, as I understand

 6    it, tomorrow.  He can talk about what his views are.  I'm

 7    just simply trying to get this witness' views in his

 8    testimony.

 9            THE COURT:  Yes.  I mean, look, the practical

10    reality is, Mr. Petrocelli, that he's going to be

11    cross-examined by you on differences of opinion, I'm sure,

12    between him and Carlton.  It's just going to happen.

13            So I think it's fair game for the government to

14    say, look, there are things that you and Dr. Carlton agree

15    on.

16            MR. PETROCELLI:  But he's not representing

17    accurately what Carlton has said.

18            THE COURT:  I'm not -- look, you're in a better

19    position --

20            MR. PETROCELLI:  Right.

21            THE COURT:  -- both of you are to know how

22    accurate the question is.  I haven't obviously read the

23    reports or the depositions of Carlton for a while or this

24    witness, for that matter.

25            I mean, look, if we're going to get into a

1    back-and-forth on a regular basis on the issue of whether

2    Mr. Welsh's questions accurately reflect what Carlton said,

3    whatever, we're going to here for a couple days and we are

4    not going to finish this witness today.  It's not going to

5    happen.

6              MR. PETROCELLI:  It's just a question about -- he

7    can ask what his opinion is.  He doesn't have to ask what

8    Dr. Carlton -- anyway, I've made my objection.  You know the

9    issue, and I just wanted to raise it for the record.

10             THE COURT:  I understand your point.

11             MR. PETROCELLI:  And I won't object on it anymore,

12   okay?

13             THE COURT:  I mean, frankly, he's choosing, which

14   is his choice, to use precious time of his question pointing

15   out what Carlton's thinking is.  He doesn't have to do that.

16             Now, he's trying to do is for whatever he thinks

17   is a good thing to do.  I'm not questioning his judgment.

18             I'm just saying, he's making that choice.  And if

19   he's inaccurately representing it, hypothetically, you can

20   point it out.  You can point that out.  You can make that

21   point.

22             MR. PETROCELLI:  Okay.  I just wanted to know --

23             THE COURT:  We're going to take the morning break.

24             MR. PETROCELLI:  Okay.  Thank you, Your Honor.

25             THE COURT:  All right.  And we'll probably go to

 1    1:15 for lunch.  So at that point, you're going to be pretty

 2    close to using two and a half hours.

 3                MR. WELSH:  I'll try to pick up the pace.

 4                THE COURT:  So just be mindful of that reality.

 5                MR. PETROCELLI:  Thank you, Your Honor.

 6                THE COURT:  All right.

 7                (Open court)

 8                THE COURT:  All right.  We're going to take the

 9    luncheon recess -- not lunch, the morning recess.

10                So come on up.

11                So as you know, you're a witness now under oath in

12    the case.  You're not at liberty to discuss your testimony

13    with anybody, including your own counsel and the Justice

14    Department.  In other words, nobody.  You have to stay

15    independent of all others --

16                THE WITNESS:  Yes, sir.

17                THE COURT:  -- until you come back.

18                So we're going to take a brief recess, 15-minute

19    recess, and we'll see you back here.  And we'll probably be

20    going until about 1:15 before we take the lunch break.

21                THE WITNESS:  Thank you.

22                THE COURT:  Okay?

23                You can step down.

24                Counsel, do you have any questions we should

25    review before then?

1          MR. WELSH:  Nothing here, Your Honor.

2          THE COURT:  Okay.  We'll take a recess.

3          DEPUTY CLERK:  All rise.

4          This Honorable Court is now in a brief recess.

5          (Recess from 11:55 a.m. to 12:16 p.m.)

6          DEPUTY CLERK:  The United States District Court

7   for the District of Columbia is again in session, the

8   Honorable Richard J. Leon presiding.  God save the United

9   States and this Honorable Court.  Please be seated and come

10  to order.

11          Your Honor, re-calling Civil Action No. 17-2511,

12  the United States of America v. AT&T, Inc., et al.

13          THE COURT:  All right.  The witness remains under

14  oath.

15          You may proceed when you're ready.

16          MR. WELSH:  Thank you, Your Honor.

17  BY MR. WELSH:

18      Q    Professor, earlier this morning, His Honor asked

19  you some questions about Comcast and NBCU and their pricing

20  decisions.  And I just want to come back to this briefly.

21          Professor, in your experience, is it a common

22  principle in merger analysis that a corporation and its

23  wholly owned subsidiaries, that they would operate in

24  complete unity of interest?

25      A    That is a standard working assumption of antitrust

1  economics, yes.

2      Q    Okay.  I think you were trying to say that

3  earlier.

4          Let me come back now to where we were talking

5  about the subscriber loss rates and that issue.

6          So you talked about how the permanent losses is

7  what you're looking at.  Were there any permanent blackouts

8  of Turner?

9      A    There have not been any permanent blackouts of

10  Turner content that I'm aware of or during the period where

11  we have information.

12     Q    So what did you do instead, then, to look at the

13  subscriber loss rate in light of that fact?

14     A    So in the end here, Your Honor, I'm going to rely

15  on three types of evidence to estimate this subscriber loss

16  rate.

17         First, we have a long-term blackouts of Viacom

18  content on two other distributors.  One is Suddenlink; the

19  other is Cable ONE.  So we have long-term blackouts of a

20  different package of content, but that's very informative.

21  And that's a first.

22         So actual blackouts of comparable content.

23         The second is studies done in the normal course of

24  business.  And in particular, I'll emphasize the study done

25  by Charter regarding what they predicted or expected the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2226

```
 1    impact on their subscribership would be from a long-term

 2    Turner blackout.

 3              So that's "normal course of business" documents,

 4    which were developed as part of the negotiation process or

 5    to inform negotiation.

 6              And then the third, we have the survey of

 7    Professor Hauser that you've heard about from his testimony.

 8        Q    So let's take these one at a time.

 9              So with respect to Suddenlink, what is your

10    estimate of Suddenlink's subscriber loss rate as a result of

11    the Viacom blackout?

12        A    I estimate a subscriber loss rate of 9.4 percent.

13        Q    Do you have a demonstrative, sir, on this point?

14        A    Yes, we do.

15        Q    Okay.  Can we go to that.

16              Is that what's listed as page 7, but page 6, I

17    guess, of the actual demonstrative?

18        A    This is, it's titled "Suddenlink's Continuing

19    Subscriber Loss Due to Loss of Viacom."

20        Q    And, again, sir, where did the data come from

21    here?

22        A    This, again, would be directly from Suddenlink.

23    The Justice Department was able to get these data.

24        Q    And if you could just walk us through briefly

25    what's reflected on this demonstrative.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  Would be page 5.

2          MR. WELSH:  I'm sorry.  Page 5, Your Honor.

3   I misspoke.

4          THE WITNESS:  Okay.  Good.

5          MR. WELSH:  Thank you.

6          THE COURT:  Uh-huh.

7          THE WITNESS:  Okay.  So we have data here,

8   Your Honor, from January 2013 through the end of 2017.

9   That's the horizontal axis.

10          THE COURT:  Yep.

11          THE WITNESS:  The vertical axis is the number of

12   virtual subscribers at Suddenlink.  The gray dots are what

13   they have reported their monthly subscribers.  So that's the

14   actual data, the gray dots.

15          The black line in the middle there, October 2014,

16   that's when the Viacom blackout took place.

17          So we have data before and after.

18          So what I've done is basically look at the trend

19   beforehand, and that's the green line.  That's the -- that

20   is the trend based on their subscriber data before the

21   blackout.

22          And then the orange line would be the

23   continuation.  So that would be our estimate of what their

24   subscribers would have been if they'd continued the trend

25   they had, which was somewhat declining subscribership

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2228

```
1    without a blackout.

2            But that's not what happened.  The subscribership

3    fell off rather sharply after the blackout, as seen in their

4    actual data.

5            And the dashed green line shows the new trend line

6    after the blackout.

7            And the gap between the orange and the dashed

8    green line is our measure or estimate of how much -- how

9    many subscribers they lost over time as a result of the

10   Viacom blackout.

11           This is a pretty straightforward piece of data

12   analysis, and it's this that underlies the 9.4 percent

13   figure that I've calculated for the long-term subscriber

14   loss rate.

15           I should say the losses don't reach that level

16   after two years, because they are continuing.  And the 9.4

17   is a long-term figure.

18       Q    And to arrive at the 9.4 percent figure that

19   you've testified about, did you do a regression analysis to

20   get there using the data?

21       A    Yes.  That's what shown here.

22       Q    Now, when you did this, did you consider whether

23   Suddenlink's decline here, as you've listed, was caused by

24   any sort of industry trends, rather than as a result of the

25   loss of the Turner content?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1       A    Yes, I did.

2            So the -- I also wanted to just check that there

3    was no general industry trend that would explain the loss,

4    and that's the next slide in this packet.

5       Q    So that would be slide 6, what was 8.

6            Can you take us through that?

7       A    Yes.

8            So this is basically measuring -- I'll start with

9    the orange line.  That the same data we saw from Suddenlink.

10   It's just normalized so that we're comparing their

11   subscribers in any given month to what they were right

12   before the blackout.

13           And we can see beforehand, they were -- we can see

14   their subscribership is falling.  And then it falls more

15   sharply, like we already saw.  That's the orange.

16           So this compares their pattern to the pattern in

17   the rest of the industry.

18           And all the other colors are different measures of

19   what's happening to other MVPDs in terms of their

20   subscribers.

21           I think you've heard that there's been a general

22   decline of MVPDs subscribership, and you see that here.

23           For example, the red is the whole country, all

24   MVPDs.  And it's declining about a percent or two a year,

25   okay, and that's the red line shows that.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2230

1          I also did some of the other lines here are

2    looking in Suddenlink's own geographic areas, just as a

3    check that the other MVPDs who serve their geographic areas

4    did not experience a decline that they did.

5          So this, I think, completely convincingly shows

6    that the Suddenlink decline after the backout was, indeed,

7    due to the Turner content and not some other industry trend.

8          THE COURT:  Now, do the MVPD subscribers tend to

9    be, a high percentage of them tend to be older folks,

10   60-plus?

11         THE WITNESS:  I don't know the actual numbers,

12   Your Honor.  You mean in general in the whole country?

13         THE COURT:  Yeah.  I mean, the impression I have

14   is that young folks want to do things over the computers.

15         THE WITNESS:  Right.

16         THE COURT:  They don't want to have cables and

17   satellite Dishes and all that kind of thing.

18         It's us older folks that like to have that stuff.

19         THE WITNESS:  I think there's something to that,

20   that the virtual MVPDs, for example, are more popular a bit

21   on the younger set.  And that is, I think, an issue for the

22   very long term for the industry.

23         THE COURT:  Right.

24         THE WITNESS:  But I don't have the data on the age

25   breakdown.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2231

```
 1            THE COURT:  That's because if, hypothetically, the

 2    MVPD subscribers are, a large percentage are 60 and older,

 3    they're dying off too.

 4            THE WITNESS:  Well not that fast, please.

 5            THE COURT:  Well, yeah, but they are.

 6            So, you know, that might account, in part, for

 7    this decline nationwide, in part.

 8            THE WITNESS:  I think the demographics are part of

 9    the picture, yes.  I don't have the data on that, but I

10    agree with that in general.

11            I will caution you, though, that the decline here

12    is very gradual --

13            THE COURT:  Okay.

14            THE WITNESS:  -- okay, and one or two percent a

15    year.  And I wouldn't -- just don't overstate it.

16            THE COURT:  Okay.

17    BY MR. WELSH:

18       Q    Professor, what we're looking at here, again, this

19    is Suddenlink's drop with Viacom, right?  This is not

20    Turner?

21       A    Right.

22       Q    Okay.  Great.

23            Now, if we could turn to the next subject, which

24    is Cable ONE, I think you mentioned that there was a drop

25    there with Viacom; is that right?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1       A     Yes.

2             So the other long-term blackout that we have data

3       about is also Viacom content, but the distributor is

4       Cable ONE.  And this is shown on our next slide.

5       Q     So that would be page 6 of the renumbered 7?

6       A     I think it's 7.

7       Q     Seven, excuse me, of the renumbered.  Right?

8       A     So I'll be very quick here.  This is exactly the

9       same analysis as was done for Suddenlink, identical method,

10      and it leads to actually a larger number for the long-term

11      subscriber loss rate of 16 percent in this case.

12      Q     Okay.  So we had the 9.4, and we had the

13      16 percent.  And what does that tell you, then, about the

14      subscriber loss rate for the Turner content?

15      A     So the -- we have to think about possible

16      adjustment.  How do we compare the Viacom content to the

17      Turner content?

18            And I think it's quite clear that the Turner

19      content is more important, more valuable, and would have a

20      higher subscriber loss rate than the Viacom content.

21            So these numbers we've just seen would be too low

22      for Turner because they're coming from the Viacom

23      experience.

24      Q     Have you seen evidence in the case to indicate

25      that the value of the Turner content is higher than the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    value of the Viacom content, sir?

2        A    Yes, and that's our next slide.  So what'll now

3    become 8.

4        Q    What are you presenting here, sir?

5        A    So this, the most straightforward measure of the

6    value of the content is what are the affiliate fees, what

7    the distributors paid for it.

8            And this chart shows the Turner and Viacom

9    affiliate fees in per sub per month.

10           And you can see that in the most recent number

11   here, 2016, there's -- I don't know what I'm allowed to say

12   exactly, but a substantial premium for Turner over Viacom

13   content.

14           So to the extent I'm using those subscriber loss

15   rates from the Viacom blackout, I'm going to be using a

16   number that's too low, actually.

17       Q    And do you, roughly speaking, do you have a

18   percentage difference between the Turner content and the

19   Viacom content based on this slide?

20       A    Well, we would have -- the difference here is

21   about 30 percent premium for Turner over Viacom.  So that's

22   a number worth knowing.

23       Q    So let's now turn to the next part of this, so we

24   now have talked about the subscriber loss rates.  Let's talk

25   about the industry analysis that you talked about earlier.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              Can you describe for His Honor the types of
 2   analyses that you reviewed that were "ordinary course of
 3   business" documents?
 4       A    Right.
 5              So I had my team look quite extensively for
 6   evidence in the record where --
 7              THE COURT:  Who's your team?
 8              THE WITNESS:  Oh, I'm sorry.
 9              So there's a lot of work involved here.
10              So I have other economists who help support me.
11   I don't do it all myself.  There's -- the consulting firm is
12   called Bates White that's helping me on this.  That's what I
13   meant.  And the economist --
14              THE COURT:  That's another firm?
15              THE WITNESS:  Yes.  Yes.
16              THE COURT:  So you review their work?  You direct
17   their work.
18              THE WITNESS:  I ask them to look into things.
19   This is the standard in this line of work, if you will.  So,
20   yeah, they work under my supervision, but it's a lot more
21   than one person could do.  There's so much to look at.
22              Yes.
23              So -- and I also make queries of the
24   Justice Department lawyers and economists to further find
25   things in the record and help me do my investigation.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   BY MR. WELSH:

2       Q    So getting back to the documents, did you look at

3   a study -- I think you mentioned in your testimony about

4   Charter, that there was a study done for them.

5            Did you pursue that?

6       A    Yes.

7            So I was saying, I look -- I had -- I look

8   generally for instances where there was analysis of the

9   effects that were predicted or expected of a long-term

10  Turner blackout, a very specific question.

11           And the study done for Charter by Altman Vilandrie

12  that you've heard about and you had Mr. Bewley here

13  testifying, that was the single best document and analysis

14  that I was able to -- that I found.

15      Q    Did you consider that document to be reliable?

16      A    I do.

17      Q    Can you explain to His Honor why.

18      A    Well, there's -- this is done -- there's clearly a

19  lot of analytical work goes into this.  It addresses exactly

20  the question I'm interested in.

21           They're looking at a variety of scenarios.

22  They've got both the set-top box and the survey analysis and

23  the hybrid.

24           So now, I've not reviewed their work.  I'm not

25  doing that.  But, as I look -- as I'm used to looking at

1    materials, this is a serious in-depth analysis.  It's not

2    just somebody throwing up a number, which you sometimes see,

3    kind of guessing.

4         Q    Okay.  And you said it was going to a question

5    that you're interested in.  Is that the permanent drop that

6    you're talking about?

7         A    Yes.  It's exactly the question that we're asking

8    about here:  What would happen to subscribership if there

9    was a long-term blackout of Turner, in this case, on

10   charter.

11        Q    And did also look at other content other than just

12   the Turner networks?

13        A    Yes.  They looked at a number of different

14   programming groups.

15        Q    Was that useful for you?

16        A    Yes.  We can see how Turner compares to some of

17   the other groups, for example.

18        Q    What did you conclude, sir, based on the

19   Altman Vilandrie study that was done for Charter?

20        A    I would say the other thing that they do that's

21   quite important is they estimate how many subscribers

22   Charter would lose, current subscribers they would lose

23   because they don't have Turner as people leave.

24             But also how they would have difficulty attracting

25   subscribers into the future, the gross adds, the fewer gross

1  adds at Charter.

2        And they had numbers on both of those, which is

3  exactly what I need to do my estimates.

4        And when I took their inputs and calculated the

5  subscriber -- the long-term subscriber loss rate using their

6  findings, I got a range -- well, they have a range.  And so

7  I have a range as well that's reflecting their range, which

8  is 9 percent to 14 percent.

9     Q    And without getting into confidential information

10  here, were there any other analyses of Turner subscriber

11  loss rates that you also considered in addition to this

12  Altman Vilandrie study?

13     A    Yes, there were.  And the one that comes to mind

14  is Comcast had a study, and I think --

15     Q    I think they have designated the information there

16  confidential, so I would ask that you not repeat that

17  openly.  But did you -- maybe you can just describe

18  generally for His Honor.

19     A    So they were also trying to estimate subscriber

20  loss rates.  I don't think they went out as far as in time;

21  but they came out with a number that is comparable, closer

22  to the lower end of this range that I'm using.

23     Q    Now, I think you also said, in addition to the

24  Altman Vilandrie study and then the drops with Suddenlink

25  and Cable ONE, that you also considered Professor Hauser's

1    survey that was in this case.

2           Can you explain to His Honor your thoughts on

3    Professor Hauser's work here and how that impacted your

4    work.

5    A    Well, he has a 12 percent long-term subscriber

6    loss rate.  And so that, I would say, corroborates the data

7    points I'm getting and the range I'm using from these other

8    sources.

9    Q    Did you also look at subscriber loss rates for the

10   virtual MVPDs as well, sir?

11   A    Yes, I did.  And there's some evidence that --

12   again, comparable range here, I know there's some Turner

13   analysis of that, where they estimated the impact of their

14   programming on one or more of the virtual MVPDs.

15   Q    So let's just sum up, if we can, briefly, the

16   subscriber loss rates that you found.  It will be

17   9.4 percent, 16 percent for the two blackouts with Viacom;

18   is that right?

19   A    Yes.

20   Q    And then the 9 to 14 for Altman Vilandrie; is that

21   right?

22   A    That's the range coming from their analysis.

23   Q    And then Professor Hauser's 12 percent?

24   A    That's correct.

25   Q    Okay.  What measurement did you ultimately decide

1   to use for your calculation on the cost to AT&T of licensing

2   the Turner content to its rivals?

3       A    So I'm -- the primary numbers I'll be presenting

4   to you and were in that chart, actually, already were based

5   on the lower end, the 9 percent.  But in my reports, I also

6   provide some alternative calculations at the higher end,

7   more to the 14 percent.

8            Again, there's a range which reflects the fact

9   that we don't know exactly.

10      Q    And I think you alluded to this earlier, but I

11  just wanted the record to be clear.  Do you find that the

12  subscriber loss rates tell you anything about the market

13  power?

14      A    Well, these are, I think -- the subscriber loss

15  rates and the affiliate fees that Turner commands are the

16  best measures of the commercial significance of the Turner

17  content.

18           And in this sense, Turner has market power.  They

19  have the power to move subscribers around in a significant

20  way downstream, subscribers who are subscribing to large

21  bundles of programming.  And that's, to the economist,

22  that's the measure of their commercial power and

23  significance.  I would point to the subscriber loss rates.

24      Q    So we've talked about subscriber loss rates.

25  Let's talk about the second component here, your diversion

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   rates.

2          Can you take us through that about what the

3   diversion rate is as an input and then how you went about

4   calculating that.

5       A    So just to remind the Court, we're calculating how

6   much DirecTV and U-verse benefit when there's long-term

7   blackout of Turner content on Charter.  We've estimated how

8   many Charter subscribers will be lost over time.

9          Now we have to figure out what fraction of those

10  will end up as DirecTV subscribers, either by moving to

11  DirecTV or by staying at DirecTV and not going to Charter,

12  either way.  So we'll bill the DirecTV and U-verse

13  subscriber base.  So that's the diversion rate.

14         THE COURT:  To what extent does there geographical

15  location overlap with one another?

16         THE WITNESS:  This is very much a geographical

17  question.  Right.

18         So in general --

19         THE COURT:  Is that diagram situation or is it

20  that they completely overlap?

21         THE WITNESS:  Well, so DirecTV is national.

22         THE COURT:  All right.

23         THE WITNESS:  So what we're going to do is we're

24  going to look at Charter and each of these 1100 local

25  markets.  And if they lose subscribers, we're going to --

1    those subscribers are going to move and I'm going to assume

2    they move to the other, in each local market, to the other

3    distributors proportional to their marketshare.

4           And so in most of the country, then, DirecTV will

5    get a substantial share of those subscribers moving from

6    Charter, because they would basically, most of the time, be

7    either going to Charter -- excuse me, leaving Charter will

8    go to DirecTV or Dish, the two satellite options.

9           In some regions, there would be another option.

10   Maybe U-verse or FiOS would be an option.

11          So I have to do this diversion in each of the 1100

12   markets and then add it up across the country.  And that's

13   the next step, and we do that calculation.  I do that

14   calculation.

15      Q    And you did that for those 1100, approximately,

16   geographic markets?

17          THE WITNESS:  Was that clear enough?  I'm not

18   sure.

19          THE COURT:  Yes.

20          THE WITNESS:  Okay.  Thank you.

21   BY MR. WELSH:

22      Q    Now, we've heard something about cord cutting

23   here.  Can you explain to His Honor what your understanding

24   of cord cutting is and then tell us whether you took that

25   into account here.

1       A    Right.

2            So we're talking about cord cutting.  We're

3  talking about people who drop their MVPD subscription.  And

4  they basically exit the market we're talking about.  And

5  they no longer have a pay-TV package, either virtual or

6  traditional MVPD.

7            So I've accounted for the fact that some fraction

8  of the Turner, excuse me, the Charter subscribers who leave

9  when they don't have Turner, will just pull the plug -- will

10  not move to any other MVPD package.

11           And I have a number on that from the same

12  Altman Vilandrie study.  They actually -- part of what they

13  report is their estimate of the share of the lost

14  subscribers at Charter that would not pick another pay-TV

15  package.  So I use that.

16           And some of the lost subscribers will pull the

17  plug, will cut the cord; and that will reduce, of course,

18  the number that go to DirecTV.  I have a counter for that.

19      Q    So we have the subscriber loss rate.  We have the

20  second factor now of diversion, which you calculated.  And

21  the third, I think, was the profit margin; is that correct?

22      A    Yes.  The profit margin that DirecTV and U-verse

23  earn on the additional subscribers that they will have due

24  to the blackout of Turner on Charter.

25      Q    Why is that an important input into this calculus?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2243

1        A     Well, since we're trying to figure out how DirecTV

2   benefits from this blackout, it's one thing to get

3   subscribers, but how much are they worth to DirecTV?  How

4   much money will they make.  And this -- we can use their

5   data on the lifetime value of the subscribers and so that's

6   the next step.

7        Q     Okay.  And you've talked about the new adds, these

8   gross new adds, and then there's also churn that exists with

9   subscribers; is that correct?

10       A     Yes.

11       Q     So did you look at the margins for both of those?

12       A     Well, now we're getting into the, some of the data

13   limitations here.

14             So just to be clear what we're trying to do,

15   I want to measure how much extra money, let's talk about

16   DirecTV, earns, because they have more subscribers due to

17   this blackout at Charter.

18             So, as I've said before, this comes in two parts.

19   First, they will get some inflow of subscribers who have

20   left Charter.  Some will come to DirecTV.  And those are

21   gross adds, okay.  And we have data on the lifetime value of

22   gross adds.

23             But in the long-term, the more important factor is

24   reduced churn.  DirecTV will keep its subscribers longer

25   because they won't be -- fewer of them will be going to

1    Charter, because Charter doesn't have the Turner content.

2              And so that value of reduced churn, I don't have

3    as good a measure as I would like of that.

4              The value of retaining a customer is much higher

5    to DirecTV than the value of getting a new one, because to

6    get the new one, there are certain subscriber acquisition

7    costs, including possibly installing a satellite Dish in

8    their house.

9              So I am unhappy that I don't have a proper measure

10   of the margin on the retained subscribers, and I've had to

11   do what I can with the data that was available to me and use

12   the margin on the gross adds.

13             But I know that's too low.  So this is one of

14   the -- like I said, I'm unhappy about it.  But the

15   consequences of my margin figure is definitely understated

16   and substantially understated because I don't have the

17   proper data on the value of the retained customers.

18             And I have reason -- the data I have tells me that

19   would be probably 50 percent higher than the value of the

20   new gross adds, because of these subscriber acquisition

21   costs are significant.

22             So I'm using the gross add margins.  And you've

23   heard about this, and Professor Carlton has a measure and I

24   have a measure.  That's what we're talking about here.

25             But, again, the data I have available, I'm using

1    those gross add margins.  And I know that they're

2    substantially too low, but it's the best I have.

3         Q    Okay.  So let's look at what you did do.

4              Do you have a demonstrative that talks about the

5    margins?

6         A    Yes.  That's our next demonstrative.

7              So these are AT&T's margins, per subscriber per

8    month, based on this gross add data that I've been talking

9    about.

10             And --

11        Q    And that's gross -- excuse me.

12             That's gross add data that came from AT&T?

13        A    Yes.  It's the same data we got.

14        Q    Okay.  Go ahead.

15        A    And these are the 2016 data that I used.

16             And I think the numbers may be confidential.

17   Let's just say the reason there are so many bars here,

18   Your Honor, is the blue is the DirecTV; and the margins are

19   higher if the subscriber has more services, right?  Video,

20   telephone, and Internet has a significantly higher margin

21   than video only.  Those are the blue bars.

22             And then the orange bars are the U-verse margins,

23   which also are higher if the subscriber has more services.

24             And so I've basically -- I have these margin data

25   based on the gross add lifetime value numbers I got from

 1   AT&T, and I use those to calculate the value to AT&T, either

 2   U-verse or DirecTV, of additional subscribers.

 3        And that's the third piece of the calculations.

 4        It's ultimately going to that big table that we

 5   showed you before, and I'm pretty sure we're about to show

 6   you again.

 7   Q    So the margin -- just so the record is clear, the

 8   margins here, which I think they have designated as

 9   confidential, the margins here, though, would reflect them

10   being much higher when you look at the bundling of the

11   video, telephone, and Internet?

12   A    Yes.

13        Well, the margins are higher if people -- for

14   people who have subscribed to multiple services.

15        What I've done is assumed that the additional

16   subscribers that DirecTV and U-verse would get due to the

17   blackout on Charter would be -- have to follow the same mix

18   of packages as DirecTV's and U-verse's current subscriber

19   base, which I have data on.

20   Q    And two other quick questions with respect to

21   margins, Professor.

22        So you talked about the problem with the data and

23   the subscriber acquisition cost a few minutes ago.

24        Was there any other issue about whether the data

25   reflected higher-margin customers coming as a result of the

1   blackouts?

2       A    Well, there are actually two other reasons why my

3   margin estimates are too low.  First is the one you just

4   mentioned, which is, there's evidence from AT&T that when

5   they get subscribers in the result -- as a result of a

6   blackout on another distributor, that those subscribers are

7   very attractive.  "Super-low risk" was the word they used.

8           And this came from the instance when there was a

9   blackout on Dish of some Fox programming.  And so the point

10  is, the subscribers who leave another -- let's say Charter,

11  in our case, because Turner content is not there, those are

12  likely to be subscribers with -- tilted towards a higher

13  value, lifetime value, lower churn rates, basically, I think

14  would be a big part of it.

15          So I haven't accounted for that, okay?

16          I don't know how big that is, so I can't --

17  I don't have a number to put on that, but I know my margin

18  estimate will be too low for that reason.

19          The other thing is I'm not including the wireless

20  margins.  We did not have sufficient data to add the

21  wireless piece here.  And that's -- we know that's going to

22  be increasingly a part of AT&T's business strategy,

23  wireless.  So that would lead to higher margins as well.

24          So there are a number of reasons why my margin

25  numbers are too low.

1          I'm not doing that out of the goodness of my

2    heart.  I would like to have a more accurate number, but

3    I can't.  But I know it's too low.

4          Q    So taking the margin numbers as you do have with

5    the diversion rate and then with your subscriber loss rate,

6    did you then do a calculus to determine what the effect on

7    the merger would be on the fees that Turner could charge

8    Charter or other MVPDs?

9          A    So now we've got all the pieces that we laid out

10   before, to allow us to basically see how the AT&T's leverage

11   goes up as a result of the merger.

12         We put the pieces together, and we get the chart

13   that you saw earlier with the per-sub/per-month increases in

14   the Turner fees.

15         Q    And you were correct in your prediction.  We are

16   going to go back to that.  So let's look at the earlier

17   slide on that.

18         A    Slide 2 by the new numbering?

19         Q    Sloyd 2 by the new numbering, correct.

20         And what does the chart tell you now based on the

21   calculations that you've done?

22         A    So we went through the numbers before.

23         Q    Okay.

24         A    I guess I would just -- now that we've been

25   through all this detail, just explain to Your Honor that one

1    reason the different MVPDs face different price increases

2    here, the ones that are where there's particularly high

3    diversion to DirecTV that are competing on average across

4    the country closer to DirecTV will be experiencing the

5    higher increases.  That's where DirecTV will have the --

6    AT&T will have the greater leverage.

7            And, again, I don't want to go into the numbers

8    because that's confidential; but because the diversions

9    depend on the geographies and that depends on exactly who's

10   who in different parts of the country, that's why the fees

11   differ.

12           But we've already gone through the bottom-line

13   number, and now we've done the analysis to get there.

14       Q    Okay.  And could you just remind His Honor what

15   the subscriber loss rate was that you used for these

16   calculations.

17       A    Right.

18           So this is -- oh, that's good.

19           So this is based on the 9 percent subscriber loss

20   rate.

21           And if we used the 14 percent, remember I said

22   I was going to a use a range 9 to 14 percent?  The numbers

23   would be about 50 percent larger across the board here.

24   Okay?  Basically, you multiply by 14 over 9.  So the

25   586 million would be closer to 900 million.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2250

1      Q     And if we --

2      A     That's a range -- again, I'm reporting the lower

3   end, and I can't give you more precision than that.

4      Q     And you also talked about the margins.

5            And if you used a larger margin because you dealt

6   with the subscriber acquisition cost issue that you talked

7   about, what would that do to your figures here?

8      A     Right.

9            So I don't know if I said this, but the harm

10  figures here or the costs to the rivals are proportionate to

11  each of these measures I put in.

12           So if the margin should be 20 percent higher than

13  I gave, then these numbers should be 20 percent higher.  So

14  it's straightforward in that way.  That's proportionality.

15           And I said, I think we do know that there's

16  this -- reasonably, the margins on the retained customers

17  are substantially higher than margins on new adds because

18  it's the subscriber acquisition cost.

19           So we do have evidence there to put in a higher

20  number for -- on that basis.  So there, again, we have a

21  range that we could calculate.

22     Q     Now, you've explained, Professor, how AT&T's

23  rivals will pay more for the Turner content.  Did you

24  balance that against the lower cost that AT&T would pay?

25     A     Yes.

1          So the -- I said way back at the beginning,

2   there's some balance in here.  And I expect DirecTV to have

3   lower costs of the Turner content now that they're in the

4   same company.

5          Actually, this is a good example, going back to

6   the question Your Honor raised.

7          I'm assuming that the Turner and DirecTV will work

8   together in the joint interests of AT&T, and so Turner will

9   lower the price that it charges DirecTV.

10          If you want to tell me that Turner is going to

11   operate independently, then that wouldn't happen.  But

12   I think that's the right assumption, that they're going to

13   operate in the joint interests of the company, of the

14   overall company.

15          And with that standard assumption, I see some

16   efficiencies here.  This is called elimination of double

17   marginalization which is a mouthful.  EDM is the acronym.

18   Q    Can you explain that a little bit for us.

19   A    Well, basically, the -- right now, Turner is

20   charging DirecTV a certain amount.  We saw that in the very

21   first chart.

22          So Turner earns a margin on its content it sells

23   to DirecTV, and DirecTV earns a margin in selling to final

24   consumers.  Those two margins get stacked on top of each

25   other in terms of what consumers have to pay.

1          And in the interests of the joint company, it's

2    desirable to shrink that total margin so there's one instead

3    of two.

4          That's the theory.  I'm applying that here.  And

5    that leads to a lower cost for DirecTV of the Turner content

6    of about a dollar 20 per subscriber per month.  So it's

7    significant.

8          And that comes from this, again, this core

9    assumption of antitrust economics that the merged company

10   will operate to maximize its joint profits, including

11   coordination among different divisions, in this case,

12   DirecTV and Turner.

13   Q    Have you calculated out -- and you said it's a

14   dollar 20 per-subscriber/per-month reduction.  Have you

15   calculated that out on a monthly basis, as well as a year?

16   A    Yes, we have.

17         So I see the annual number here.  I don't have the

18   monthly number memorized.

19         The annual number is $352 million of cost savings

20   at DirecTV due the lower price of the Turner content.  And

21   this is on the next slide.

22         Am I getting ahead of you?

23   Q    No.  That's fine.  Which slide is that, sir?

24   A    Well, it's going to be No. 10 now.  It was 13 in

25   the old days.

1          Q      Great.

2                 So tell His Honor, if you would just briefly,

3     what's on this slide and what you're reflecting here.

4          A      So I said at the beginning there's a balancing to

5     be done.  Here is where we do the balancing.

6                 The large, red area is the extra costs for Turner

7     content that will be paid by the rival MVPDs, 587 million.

8                 The blue is the cost savings at DirecTV from

9     paying less for the Turner content.  That's 352 million.

10                And then when you net them out, we have a net

11    increase in MVPD costs, looking at them all together, of

12    235 million.

13                And that's the key balancing that I'm able to do,

14    Your Honor.  And this tells us that the costs will overall

15    be going up, not down, for the Turner content.

16         Q      After the merger if it were to occur?

17         A      That's what I'm talking about.

18         Q      And so looking at this, how did these cost

19    increases that you're talking about, this net cost increase,

20    how does that translate, then, into the higher consumer

21    prices that you testified about?

22         A      So all this discussion has been about the cost

23    that distributors are paying for Turner content.  We are, in

24    the end, interested in what that'll mean for consumers under

25    our consumer welfare standard.

1          So the next step is to try to figure out what

2    will -- how will the prices that they all charged to

3    consumers change as a result of the changed cost of the

4    Turner content?

5          And there's -- I want to say a simple way to do

6    that and a more sophisticated way to do that.

7          The simple way would be to simply say, well, the

8    costs of the MVPDs as a group went up by $235 million, or

9    will go up as a result of the merger by $235 million a year.

10   And that will be passed through to consumers.

11         We're not quite sure how much.  If it was

12   100 percent pass-through, then that would be the same figure

13   for the consumer harm.  If it's 75 percent pass-through, you

14   multiply it by 75 percent and you get a smaller number.

15         And that's not an unreasonable way to proceed,

16   although it's hard to know exactly what the pass-through

17   rate is.

18         What I've done as well is the more sophisticated

19   approach, I'm calling it, which is to have a model of how

20   the firms -- the distributors compete.

21         I've taken a standard model of competition, sort

22   of a simulation model, and then calibrated, in each

23   geographic market, to the market shares and the prices and

24   the costs and estimated, using that model, the effect on the

25   prices.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          And I have done that.  It needs to be done

2     geography by geography because the market structure among

3     the distributers is different in different parts of the

4     country.  And that's what I've done, and that allows us to

5     come up with a more accurate, in my view, estimate of the

6     effect on the consumers ultimately.

7          Q    And what is the effect on consumers in the

8     multichannel video consumer market here?

9          A    So that's the next slide.

10          New slide 11.

11          Predicted Turner monthly fee increases for

12     consumers, using -- again, this is a 2016 market

13     configuration.

14          And we see the annual impact there is $286 million

15     and that there's a monthly calculation done.

16          And then we multiply it by 12 to get the annual

17     amount.

18          But the answer is $286 million annual impact.

19          Q    To the consumer?

20          A    That's the annual extra charges for consumers as a

21     result of the -- flowing through from the higher Turner fee

22     increases as a result of the merger.

23          Q    And this is the -- based on the data for the 2016

24     market configuration, can you just remind His Honor why you

25     looked at the 2016 here.

1       A    Well, this was the last year for which we had a

2  complete set of data, including, especially, the subscriber

3  loss rate data.

4            But I then did do some projections to go forward

5  in time to get a sense of whether it would be going up or

6  down as market conditions change.

7       Q    And can you take us through that.

8       A    Yes.  So that's the next and last slide.  I guess

9  it will be 12.

10           So just keeping it at a very high summary level,

11 the first row here shows -- and let's look at the right-hand

12 column:  Net harm to all MVPD consumers -- customers.  Those

13 are the consumers.  The $286 million figure that we've

14 already seen was for 2008, excuse me, 2016 market

15 configuration.

16           Then I was able to update to 2017, and the number

17 goes up quite a bit to 436 million.

18           And I was also able to project to 2021, but the

19 number rises further to $571 million per year in consumer

20 harm.

21      Q    Can you explain to His Honor why, looking at the

22 2017 numbers, why those numbers increased, what that was

23 based on.

24      A    Right.

25           So the main reason that there's an increase in

1   2017 is that the Turner fees -- affiliate fees are going up

2   quite a bit, when we see that they actually went up quite a

3   bit from 2016 to 2017.

4          And so what I've done is project a higher Turner

5   subscriber loss rate that corresponds with the higher Turner

6   affiliate fees.

7          I guess one way to think about it is why -- the

8   fact that Turner -- their affiliate fees are going up

9   substantially, did go up substantially from 2016 to '17,

10  indicates that their content is even more valuable to

11  distributors.  And that is -- reflects a higher subscriber

12  loss rate, holding other things constant.

13         And so that gives a higher number for 2017.

14         There are some other adjustments as well, but

15  that's the primary one.

16      Q    Was there also a higher diversion used?

17      A    Yes.

18         Well, the diversion -- actually, I can't quite

19  remember that sitting here right now, the diversions.

20      Q    Okay.

21      A    May have changed somewhat.  I'd have to check my

22  report.

23      Q    Let's look at the 2021 figures.  Can you explain

24  why those numbers are the way they are.

25      A    So I also did this calculation for 2021.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          My binoculars are pretty good, but that's getting

2     out there a ways.

3          But I think this is -- this is, I think, useful

4     and reliable for Your Honor.

5          The -- let me just indicate directionally, the

6     reason these numbers go up is that -- for two reasons,

7     I think.  One is -- primary reasons.  One is AT&T's margins

8     will -- multi-product margins are expected to go up.  Okay.

9     That's based on some of their own projections.

10          And this is because of their -- largely driven by

11     their strategy to sell larger bundles to customers.  So that

12     leads to higher margins.

13          And then there's also some increase in the Turner

14     affiliate fees that are projected.

15          So I know you've heard from Turner people that

16     there's all this other content out there.  And it's true;

17     there's a lot of content.

18          But the projection is that the Turner

19     subscriber -- the affiliate fees will continue to rise, and

20     that indicates the Turner content will continue to be

21     important and even more important.  So those, directionally,

22     is why the numbers are going up over time.

23     Q     So it's your prediction and opinion that the net

24     harm to consumers, looking at 2016, of 286 million,

25     approximate, 2017 of $436 million in 2021 of $571 million,

1    that's your opinion prediction based on your merger

2    analysis?

3        A    Yes.  That's what I'm telling the Court.

4             Again, I want to say that we could -- I realize

5    there are ranges here.  These are based on, we're starting

6    from the low end, 9 percent subscriber loss rate, and

7    projecting that.  So if we started with the 14 percent, we'd

8    have higher numbers.

9             If we had a higher margin, which we should, the

10   numbers would be higher.

11            And on the other hand, if my projections of the

12   subscriber loss rate going -- are going up too fast, which

13   could be, then we would take them down a little bit.

14       Q    Let's switch gears now.  Let's talk about the

15   second aspect of your opinion, which I think you talked

16   about coordination, coordinated effects.  Can we talk about

17   that for a few minutes.

18       A    Whatever you want.

19       Q    All right.  Professor, what type of -- in terms of

20   your opinion, did you analyze whether the merger creates a

21   risk that AT&T will coordinate with other firms in the

22   marketplace?

23       A    Yes, I did.

24       Q    And can you explain to His Honor what type of

25   coordination you're concerned about in this case.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2260

```
 1        A    The specific type of coordination that I'm

 2   concerned about is that -- is between AT&T and Comcast and

 3   that they will coordinate to withhold their content.

 4             AT&T, after the merger, having the Time Warner

 5   content, Comcast owning the NBCUniversal content, to

 6   coordinate to withhold that content from virtual MVPDs, who

 7   are growing and posing a threat to Comcast and to AT&T's

 8   traditional MVPD businesses.

 9        Q    Right now, premerger, have you seen evidence that

10   Turner wants the virtual MVPDs to have its content?

11        A    Well, yes, they have been interested and have

12   licensed the virtual MVPDs.

13             And, of course, for them, it's a way to reach some

14   additional subscribers.

15        Q    Now, post-merger, you talked about earlier in your

16   testimony the analysis when you look at incentives.

17   Do you see those incentives changing for the combined entity

18   post-merger?

19        A    No.  I think standing alone, acting unilaterally,

20   the -- AT&T will still want to license the Turner content to

21   virtual MVPDs.

22             The concern here is what might happen if they

23   coordinate with Comcast.

24        Q    Okay.  Would the industry be vulnerable to that

25   kind of coordination post-merger?
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 2128 of 3826

2261

1    A    Well, the reason I'm concerned about this is

2  because it really only takes two companies to -- who need to

3  coordinate.  So -- as antitrust economists, when we think

4  about post-merger coordination, we're not just talking about

5  illegal cartels or Section 1 violations.  We're talking

6  about just what might happen in the industry through tacit

7  arrangements or just through -- just a mutual awareness.

8          And if you have a coordinated scheme -- I'll use

9  that word cautiously -- that only involves two parties, then

10 that's relatively easy to achieve in comparison with other

11 situations where you need many suppliers.  So this -- so

12 that's why I'm concerned about this, because it only takes

13 two.

14         And this is a situation created by this merger, or

15 would be created, where you have the two companies with

16 substantial distribution presence and substantial

17 programming ownership assets.  And that would be new, a new

18 situation that was not created by the Comcast-NBCU merger.

19 It's created by the second merger.  And then you have the

20 danger of coordination.

21    Q    And the two companies you're referring to would be

22 Comcast-NBCU, AT&T-Time Warner?

23    A    Yes, sir.

24    Q    And would you see a natural level of communication

25 between those companies in terms of their contractual

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 2129 of 3826

2262

1    dealings in the ordinary course anyway?

2        A    Well, one of the reasons to be concerned is that,

3    of course, the two companies are in communication all the

4    time.  They have to be, because they're in a buyer-seller

5    relationship.  NBCU has to be talking to Comcast, and Turner

6    has to be talking to DirecTV.

7            And as opposed to a situation where you had

8    competitors who had no business talking to each other at

9    all.  So because of the vertical structure, they've got

10   communications.  It just raises the concerns about

11   coordination.

12       Q    And in post-merger, would AT&T gain the means to

13   be able to coordinate in such a way that it would harm these

14   virtual MVPDs?

15       A    Well, this is not a risk that's present at all

16   prior to the merger, because AT&T does not have the

17   Time Warner content.

18       Q    What will change for Comcast post-merger on this

19   subject?

20       A    Well, Comcast is not -- their asset ownership

21   structure is not changing, but they will have a partner with

22   whom to coordinate if they can achieve that and if that's

23   mutually profitable.

24       Q    Why do you see the virtual MVPDs being a threat

25   right now to the traditional distributors like AT&T and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Comcast?

2       A    Well, I think the general projections, I think

3    AT&T projects this, that the virtual MVPDs will be growing

4    in their share of the MVPD market overall, and it's probably

5    because of the younger people that Your Honor mentioned.

6            And that is a threat to the existing distribution

7    businesses, both in terms of pulling subscribers away and in

8    terms of putting some pressure on their margins.

9            Now -- so that -- I think that's understood.  And

10   so that's the type of threat that could be potentially

11   reduced through this type of coordination.

12      Q    Would AT&T and Comcast, if they were to do this,

13   would they jointly benefit from reducing the competitiveness

14   of these virtual MVPDs?

15      A    Well, that would be the benefit, because their

16   distribution businesses, Comcast and DirecTV/U-verse, would

17   benefit; but there would be a cost in terms of not getting

18   the licensing fees for their content from these virtual

19   MVPDs.

20           If they can substantially reduce the growth of

21   those virtual MVPDs, then they wouldn't bear as much of a

22   cost, because they would still get the affiliate fees from

23   the existing pay-TV packages.

24           But there are some tradeoffs there involved in

25   order for that to be mutually profitable.

1      Q    Have you quantified the likelihood of this

2  coordination occurring between AT&T, Comcast, if the merger

3  were to go forward?

4      A    No, I'm not able to do that.

5      Q    Is it your opinion that the merger increases the

6  risk of coordination even though you can't quantify it?

7      A    Yes, that's right.  There's no risk of this type

8  of coordination prior to the merger.  It becomes a risk

9  because of the merger.

10      Q    And why is it that you're unable to quantify it?

11      A    Because I don't yet have a crystal ball.

12      Q    Okay.

13      A    That's just beyond the capabilities of my field.

14      Q    Sir, if coordination does occur, would that be a

15  substantial lessening of competition, in your opinion?

16      A    Yes.  I think that would be quite bad news for

17  consumers, because they would be -- have fewer choices for

18  these virtual MVPDs.  And there would be less margin

19  pressure on the traditional packages, so consumers would pay

20  more there too.

21          THE COURT:  Would it be illegal?

22          THE WITNESS:  Well, then it depends on the

23  specific type of coordination you have in mind.

24          The one I really have in mind, I'm not thinking

25  that it would be illegal.  It wouldn't require an agreement

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   in Section 1 sense.

 2           So, for example, each of the two companies could

 3   simply decide not to renew license or not to license to a

 4   new virtual MVPD and wait and see if the other did, okay?

 5           It's like, well, I'll wait; and they could

 6   mutually forbear, without any communication between them.

 7   And that might very well, as I understand these things, not

 8   be a Section 1 violation.

 9           If you -- the merger guidelines talk about

10   coordinated effects.  And they do not include -- excuse me.

11           They include modes of coordination that are very

12   much not Section 1 violations.  And that's how I think of it

13   certainly as an antitrust economist.

14   BY MR. WELSH:

15      Q    Professor, earlier when you talked about the

16   natural communications that occur today, I just want to come

17   back to that, because I think maybe there was a misspeak.

18           But NBCU, who would they be dealing with on a

19   contractual side, looking at AT&T-DirecTV, for example?

20      A    I'm sorry.  I don't understand.

21      Q    Yeah.

22           Would NBCU be working out contracts with

23   AT&T-DirecTV?

24      A    Yes.

25      Q    Okay.  I think --

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1         A    I misspoke perhaps.

2         Q    I think you misspoke earlier.

3         A    All I meant is that NBC programming is licensed to

4    DirecTV, and Turner programming licensed to Comcast.

5         Q    To Comcast.  That's fine.

6         A    So the companies, as a whole, are in

7    communication.

8              I'm not suggesting any illegal communication, like

9    I said, I'm just saying but the fact that there are these

10   interconnections is something that's relevant in thinking

11   about coordinated effects.

12        Q    Let's briefly touch on HBO and then I want to go

13   to the remedy.

14             So with respect to HBO, that was a third part of

15   your opinion.  Can you just tell His Honor what your opinion

16   is there as to the effects of the merger on HBO.

17        A    Yes.  This is, I think, straightforward and should

18   be very brief.

19             The -- after the merger, AT&T will have a

20   disincentive to allow HBO to be used as a promotional tool

21   by Charter and Dish and other MVPDs who compete against

22   DirecTV, because, to some degree, those promotions pull

23   subscribers away from DirecTV.

24             So it's simply the very general idea that now that

25   AT&T will control this asset, HBO, they will not view it

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2267

1   neutrally anymore, as HBO does.  And they will want to favor

2   DirecTV and disfavor the rivals.

3           I'm not saying they're going to cease doing HBO

4   promotions on Charter, for example, or Dish.  It's just

5   going to be a minus, and they will be less inclined to do

6   that and would be -- the incentive would be to curtail some

7   of those promotions.  That's all.

8       Q   And have you seen evidence pre-merger of

9   distributors using HBO in order to win customers over to

10  their distribution?

11      A   Yes, there is lot of evidence about HBO.  It's a

12  valuable brand, a lot of co-promotion, other promotional

13  activities.  I think HBO is quite proud of that, and rightly

14  so.

15          That's clear, I think, from the evidence.  There's

16  a lot of that cited in my report.

17      Q   And post-merger, you see that changing, if I

18  understand your testimony?

19      A   I'm just saying it will be like a thumb on the

20  scale against doing some of those promotions, because -- to

21  the extent they would pull subscribers away from DirecTV.

22          THE COURT:  Let me see counsel.

23          Step down, please.

24          (Sealed bench conference)

25          THE COURT:  All right.  It's 1:15.  We'll take the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2268

```
1   luncheon recess.  My rough estimate is you've had about two

2   hours and change.

3            MR. WELSH:  I think I can get through the next ten

4   minutes.

5            THE COURT:  2:05, something like that.

6            MR. WELSH:  Okay.

7            THE COURT:  So --

8            MR. WELSH:  I'm hoping for ten minutes,

9   Your Honor, and should be able to conclude it.

10           THE COURT:  Ten minutes, then that's fine.  And

11  we'll switch to the cross when we reconvene.

12           So then you can use the -- you can use 10 minutes;

13  that would leave you 15 extra minutes for redirect.

14           MR. WELSH:  Okay.  Understand.

15           MR. PETROCELLI:  Is he going to do the ten minutes

16  now, Your Honor?

17           THE COURT:  No.  We're going to take the luncheon

18  recess now.

19           MR. PETROCELLI:  Okay.

20           THE COURT:  So we'll break until 2:45.  So

21  obviously we're going late tonight, you know, going till

22  6:00, maybe 6:30.

23           MR. PETROCELLI:  The reason I suggested is because

24  we need some downtime to get everything set up and

25  everything distributed when he finishes his direct, does it
```

1    make sense to just let him finish now?

2          MR. WELSH:  It would probably help me to focus my

3    time during the break.

4          THE COURT:  The problem is the cafeteria, which

5    everyone in this room is probably stuck using.

6          MR. PETROCELLI:  We'll figure it out.

7          THE COURT:  1:30 it starts shutting down.

8          MR. WELSH:  It's actually an excellent cafeteria.

9          THE COURT:  I'll make a note of that.

10          MR. WELSH:  I like it.  My waist doesn't, but I

11    like it.

12          THE COURT:  So I think the practical reality is --

13    plus the reporter is working along; they need a break.

14          So when you're done with your direct, we'll take a

15    five-minute recess, whatever, just to get set up.

16          MR. PETROCELLI:  Just get set up.  Thank you.

17          MR. WELSH:  Thank you, Your Honor.

18          THE COURT:  Is there anything else we need to deal

19    with now?

20          MR. PETROCELLI:  I don't believe so, no,

21    Your Honor.

22          MR. WELSH:  Excuse me?

23          THE COURT:  Anything else we need to deal with

24    now?

25          MR. WELSH:  No, Your Honor.

1          MR. PETROCELLI:  No, Your Honor.

2          MR. WELSH:  Thank you.

3          (Open court)

4          THE COURT:  We're going to take the luncheon

5   recess.

6          You're a witness under oath in the case.  Refrain

7   from discussing your testimony so far or what it might be

8   when you return, including the trial lawyers.

9          Anybody.  All right?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  Stay independent of all others.  We'll

12  be beck and reconvene at 2:45.

13         THE WITNESS:  Thank you.

14         THE COURT:  All right.  We'll be going late,

15  probably be going till 6:00 or 6:15 tonight.

16         We'll stand in recess.

17         DEPUTY CLERK:  All rise.

18         This Honorable Court will stand in recess until

19  the return of court.

20         (Proceedings concluded at 1:18 p.m.)

21

22

23

24

25

C E R T I F I C A T E

        I, William P. Zaremba, RMR, CRR, certify that

the foregoing is a correct transcript from the record of

proceedings in the above-titled matter.

Date: April 11, 2018_____    /S/__William P. Zaremba_____

                              William P. Zaremba, RMR, CRR

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      :
                               :
              Plaintiff,       :        CV No. 17-2511
       vs.                     :
                               :        Washington, D.C.
                               :    Wednesday, April 11, 2018
AT&T, INC., ET AL.,            :          2:50 p.m.
                               :
                               :          Day 12
              Defendants.      :
-----------------------------x



                    AFTERNOON SESSION
                TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE RICHARD J. LEON
             UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:     Craig W. Conrath, Esquire
                        Eric D. Welsh, Esquire
                        Donald G. Kempf, Jr., Esquire
                        Dylan M. Carson, Esquire
                        Andrew Finch, Esquire
                        Justin T. Heipp, Esquire
                        Frederick Young, Esquire
                        Lawrence A. Reicher, Esquire
                        Ruediger R. Schuett, Esquire
                        U.S. DEPARTMENT OF JUSTICE
                        Antitrust Division
                        450 Fifth Street, NW
                        Washington, DC  20530
                        202) 532-4560
                        craig.conrath@usdoj.gov
                        eric.welsh@usdoj.gov
                        donald.kempf@usdoj.gov
                        andrew.finch@usdoj.gov
                        lawrence.reicher@usdoj.gov
                        dylan.carson@usdoj.gov
                        ruediger.schuett@usdoj.gov
```

```
1   Appearances Continued:

2   For Defendant AT&T       Katrina M. Robson, Esquire
    and DirecTV Group        O'Melveny & Myers LLP
3   Holdings, LLC:           1625 Eye Street, NW
                             Washington, DC  20006
4                            (202) 220-5052
                             krobson@omm.com
5
                             Daniel M. Petrocelli, Esquire
6                            M. Randall Oppenheimer, Esquire
                             O'MELVENY & MYERS LLP
7                            1999 Avenue of the Stars
                             8th Floor
8                            Los Angeles, CA  90067
                             (310) 553-6700
9                            dpetrocelli@omm.com
                             roppenheimer@omm.com
10
                             Michael L. Raiff, Esquire
11                           Robert C. Walters, Esquire
                             GIBSON, DUNN & CRUTCHER LLP
12                           2100 Mckinney Avenue
                             Suite 1100
13                           Dallas, TX 75201
                             (214) 698-3350
14                           mraiff@gibsondunn.com
                             rwalters@gibsondunn.com
15
    For Defendant            Kevin J. Orsini, Esquire
16  Time Warner, Inc.:       Peter T. Barbur, Esquire
                             CRAVATH, SWAINE & MOORE LLP
17                           Worldwide Plaza
                             825 Eighth Avenue
18                           New York, NY  10019
                             (212) 474-1140
19                           korsini@cravath.com
                             pbarbur@cravath.com
20
    Court Reporter:          Crystal M. Pilgrim, RPR, FCRR
21                           Official Court Reporter
                             United States District Court
22                           District of Columbia
                             333 Constitution Avenue, NW
23                           Washington, DC  20001
                             (202) 354-3127
24                           crystal_pilgrim@dcd.uscourts.gov

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1                          Table of Contents

2                               Direct   Cross  Redirect   Recross

3

4   On behalf of the Government:

5       Carl Shapiro

6         By Mr. Welsh            2275

7         By Mr. Petrocelli               2288

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2              THE DEPUTY CLERK:  Your Honor, recalling civil action

 3   number 17-2511, United States of America v. AT&T, Incorporated,

 4   et al.

 5              THE COURT:  All right.  The witness remains under

 6   oath.

 7              MR. WELSH:  Good afternoon, Your Honor.

 8         May I proceed?

 9              THE COURT:  You may proceed when you're ready.

10              MR. WELSH:  Thank you, Your Honor.

11                      DIRECT EXAMINATION (Continued)

12   BY MR. WELSH:

13   Q.   Good afternoon, Professor.  Before the break we were

14   talking about HBO.  I want to come back to that subject very

15   briefly if I can.

16         You were testifying about the changes that would occur with

17   HBO after the merger and the use of HBO in that capacity.

18         The strategy that you discussed and outlined during your

19   testimony previously, would that in your opinion reduce the

20   competitiveness of AT&T's rivals if that were to occur?

21   A.   Yes.  To some degree, yes, because they would no longer,

22   excuse me, they would have a reduced ability to use HBO for

23   promotional purposes to attract and retain subscribers.

24   Q.   And is it your opinion, sir, as an antitrust economist

25   here that AT&T's acquisition of HBO would contribute to a
```

1  substantial lessening of competition if the merger were to

2  occur?

3  A.   Yes.  I think it would be a step in the wrong direction in

4  terms of competition in the MVPD market.

5          THE COURT:  Answer the question.

6      Is it substantial less?  Do you have an opinion as to

7  whether it would substantially lessen competition?  Can't duck

8  that.

9      Yes or no?

10         THE WITNESS:  Okay.  So he asked me if it would

11  contribute to that.  I would say contribute.  On its own it

12  would not have such a big impact, that it would substantially

13  lessen competition, this element of conduct alone.

14         THE COURT:  Okay.

15  BY MR. WELSH:

16  Q.   You are aware that the defendants have come to this court

17  talking about efficiencies that might occur with the merger?

18  A.   I am.

19  Q.   Now sir, did you analyze any potentially pro competitive

20  efficiencies that might arise from the merger?

21  A.   I have included efficiency in the elimination of double

22  marginalization as part of my analysis.

23  Q.   You testified about that this morning; is that right?

24  A.   Yes, sir.

25  Q.   As an economist how do you approach proposed efficiencies

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   in an antitrust review?  Can you briefly describe that for His

2   Honor?

3   A.   Yes, I'm happy to.

4       The efficiencies as an antitrust economist we generally

5   credit efficiencies in mergers if they are merger specific.  If

6   they're likely to actually be achieved which usually involves

7   some sort of verifiability.

8       If they would offset the anti competitive effect that

9   would otherwise arise, if there are such.

10  Q.   And if those aren't met then do you not, you don't credit

11  the efficiencies?  Is that the way the analysis would go?

12  A.   That's correct.

13  Q.   Have you made any assessments in this case?  I know you

14  talked about the EDM, so I want to put that aside.

15      Have you made any assessments of other efficiencies claimed

16  by the parties here?

17  A.   I have not independently done that, no.

18  Q.   What have you done instead on that subject?

19  A.   I'm aware of and I'm relying on the other experts who have

20  been retained by the Justice Department; namely Mr. Quintero

21  and Professor Athey, who have looked at these efficiencies.

22  I'm relying on them.

23  Q.   What's your understanding generally speaking of their

24  opinions on the subject?

25  A.   Their opinion, their opinions are that these claimed

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  efficiencies do not meet these requirements and therefore are

2  not credited.

3  Q.   Again, I want to put the EDM to the side.

4     Separate from that, do you credit any of the party's

5  efficiencies in terms of the work that you are doing here

6  today?

7  A.   No.  I am not crediting it in that respect.

8     I am relying on these two other experts.

9  Q.   If we take into account now the EDM that you talked about,

10 is it your opinion, sir, as an antitrust economist that the

11 merger would lead to a substantial lessening of competition in

12 the markets that you have identified?

13 A.   Yes, that's correct.

14 Q.   Let's switch topics now.

15    Are you aware that the parties have proposed a remedy here?

16 A.   I am.

17          MR. PETROCELLI:  Your Honor --

18          THE COURT:  You want to approach?

19          MR. PETROCELLI:  Yes.

20       (Witness leaves the stand.)

21       (Sealed bench conference.)

22          MR. PETROCELLI:  The good news is, Your Honor, I

23 don't need a break.  I can just jump right up and start the

24 cross.  I don't want to interrupt the proceedings.

25          On this issue, Your Honor, we're not proposing a remedy.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1              THE COURT:  Say that again.

2              MR. PETROCELLI:  The questions that defense has

3    proposed a remedy, we have not.  It's a binding unilateral

4    offer that was made to the various distributors.  They have

5    seven years to accept it conditioned on the merger being

6    approved.  I don't think it's appropriate to call it a remedy

7    in the form of his question.

8          So I just wanted to be clear on the record given that

9    he said it was a remedy.  A remedy is something that addresses

10   a harm and this is a contractual offer that was made.

11             THE COURT:  Is he familiar with it?

12             MR. PETROCELLI:  He's done no work on it at all.

13   That's one of the flaws of his analysis.

14             THE COURT:  You can restructure the question and

15   characterize it as what it is.

16             MR. PETROCELLI:  It's a contractual offer.

17             MR. WELSH:  Well, I think the witness uses it as

18   being a remedy and he will testify about that.

19             THE COURT:  Asks him if he views it as a remedy.

20             MR. WELSH:  That's fine, thank you.

21             MR. PETROCELLI:  Thank you.

22         (Witness resumes the stand.)

23         (Open court.)

24             THE COURT:  You may proceed consistent with the

25   discussion at the bench.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. WELSH:   Thank you, Your Honor.

 2   BY MR. WELSH:

 3   Q.   Professor, are you aware of a proposal that's been, of a

 4   contractual proposal that's been offered by the defendants?

 5   A.   Yes, I am.

 6   Q.   Will this proposal that's been presented, will that

 7   eliminate the anti competitive incentives created by the merger

 8   that you've described for the Court?

 9   A.   No.

10   Q.   Does your analysis of the bargaining for the Turner

11   content does it include this proposal that the defendants

12   offer?

13   A.   We're referring to the arbitration proposal?

14   Q.   That's right, the arbitration proposal, yes.

15   A.   It does not.

16   Q.   Can you explain why you did not include the arbitration

17   proposal in your analysis?

18   A.   Certainly.  I think I did mention this this morning.  But

19   my analysis is, in my way of thinking of the merger as proposed

20   and the market structure incentives it would create without any

21   fixes or patches or remedies.

22   Q.   Is that how you view this proposal, this arbitration

23   proposal?

24   A.   Yes, that is.

25   Q.   Does the arbitration proposal replicate market outcomes
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  that would occur separate from that?

2  A.  I don't believe it will do that, no.

3  Q.  Can you explain to His Honor your thinking on that front?

4  A.  Well, the market prior to the merger or without the merger

5  going forward would proceed in a certain way.  The, it's hard

6  to know what that will be.  I've analyzed the affect of the

7  changes from the merger.

8      The arbitration proposal as I understand it has a provision

9  for fair market value that the rates would be set at.  And I

10 guess I don't know exactly what that will be and I don't know

11 that that would correspond to what I would call a competitive

12 rate that would otherwise be less.

13 Q.  Is the arbitration offer proposal relevant to your

14 analysis of the Turner fees here if distributors are unwilling

15 to invoke that offer?

16 A.  Well, if the distributors would, are unwilling to invoke

17 the offer, then my analysis could go to unchanged, the analysis

18 I have already present.

19 Q.  Have you heard testimony from market participants about

20 their views of the shortcomings as to that arbitration offer?

21 A.  Yes.  I've read the trial transcript I think of Mr.

22 Schlichting talked about that, Ms. Fenwick.  I think

23 Mr. Montemagno, if I have his name right, did as well.  So they

24 have identified the shortcomings from their perspective, I'm

25 aware of that.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   Can you identify for the Court some of the shortcomings

2   that you heard from the testimony elicited in this trial?

3          THE COURT:  No.  No, he can't do that.  It's already

4   been testified to.

5          MR. WELSH:  Thank you.

6   BY MR. WELSH:

7   Q.   Professor, have you seen any evidence that any major

8   distributor will accept that arbitration offer?

9   A.   I am not aware of acceptances by major distributors as of

10  this date.

11  Q.   Now even if the distributors accepted this offer, does the

12  arbitration offer provide a permanent solution to the harm that

13  you testified about here that would be caused by this merger?

14  A.   No.  My understanding is it lasts for a fixed period of

15  time, seven years.

16  Q.   What remedy or what solution would there be to completely

17  eliminate the anti competitive harm that, and the incentives

18  that you discussed in your testimony here that would be created

19  by this merger?

20  A.   Well, to completely eliminate these incentives would

21  require some sort of structural remedy.

22  Q.   And structural, would that be a, in essence a divestiture

23  as one example?

24  A.   Not combining the assets that we're talking about that

25  create the incentives that I described.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Okay.  If AT&T did not acquire Turner, Turner Broadcast,

2  would consumer harm be eliminated in that context?

3  A.   Well, yes, the harm I've identified would be eliminated

4  because that's the comparison I'm using, the acquisition versus

5  not.

6         MR. WELSH:  Your Honor, in order to address the

7  confidentiality concerns that existed with the demonstratives

8  and the testimony of the witness, there were certain

9  percentages that the witness was unable to testify to openly in

10  court.

11         We would move for admission of PXD 11 into evidence so

12  that Your Honor would have those figures to cite to as you

13  chose?

14         MR. PETROCELLI:  Your Honor, may I approach?

15         THE COURT:  You may.

16      (Witness leaves the stand.)

17      (Sealed bench conference.)

18         MR. PETROCELLI:  Your Honor, two things happened in

19  that last line of testimony.

20         First of all, the government and you were informed by

21  Mr. Orsini yesterday took the position in his sworn

22  interrogatory answer that they are not taking any position

23  regarding the effectiveness of the Comcast arbitration decree.

24         Now we have a witness who did no work on this

25  arbitration at all render an opinion about it.  And I guess

1    I'll bring it out on cross that he did no work on this.

2         Secondly, Your Honor, he's asking questions about

3    remedies divesting Turner.  There's nothing in this complaint

4    about divesting Turner.  It is all for nothing, Your Honor.

5         And he's having this witness suggest to Your Honor that

6    this could be solved by divesting Turner and that is outside of

7    the scope of this case and it's never been an issue in this

8    case, Your Honor.

9         I just wanted to make an objection and I don't think his

10   testimony on this issue is fair and appropriate.

11        MR. WELSH:  First of all, I think that if counsel has

12   an issue with the witness's testimony, he can certainly cross

13   examine the witness on the testimony.

14        I don't think it's outside the scope of what's relevant

15   and certainly for Your Honor to understand this witness's views

16   of this merger and the competitive issues have come out for

17   this merger.

18        MR. PETROCELLI:  The relief on the complaint is to

19   block the merger in its entirety, Your Honor, not to try to

20   clean off the company.

21        THE COURT:  Where does this come from?  Where do you

22   come up with this idea cutting off part of the company would be

23   a structure remedy to letting the deal go through?

24        MR. WELSH:  I was using it as an example to show

25   which it mirrors what he said earlier in his testimony about

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   the Turner result of this merger impacting Turner fees how that

 2   goes to the distributor's upstream and then there's going to be

 3   a cost increase downstream.  The simple point being that if

 4   there were something happened with Turner didn't go with AT&T

 5   then obviously that harm that he's testified about would not

 6   result here. It's a simple point.

 7            MR. PETROCELLI:  It was a suggestion to Your Honor

 8   that you could resolve this case by cleaning off Turner and

 9   that's not something they have ever alleged.  Moreover, it

10   would destroy the entire deal.

11            MR. WELSH:  I don't think --

12            MR. PETROCELLI:  He didn't need to say that.  He got

13   his points across about Turner price increases, Your Honor.

14            THE COURT:  Think he was trying to influence me

15   subconsciously?

16            MR. PETROCELLI:  Not subconsciously, explicitly, Your

17   Honor.  Anyway, I needed to object for the record.  I don't

18   think it was appropriate and I don't want there to be any

19   suggestion that we in any event acquiesce in this proposal.

20            THE COURT:  How about my being able to look at these

21   charts in my opinion?

22            MR. PETROCELLI:  Excuse me?

23            THE COURT:  He wants me to be able to use --

24            MR. PETROCELLI:  Obviously, so those are not in

25   evidence, Your Honor.  Those can't go in.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1          MR. WELSH:  That was my motion to have it brought

 2  into evidence so that it would aid Your Honor because the

 3  witness was able to go into specific numbers in open court

 4  because of defendants telling us that --

 5          MR. PETROCELLI:  Documents --

 6          MR. WELSH:  The red boxes that we got around this

 7  told us that we could not --

 8          MR. PETROCELLI:  Excuse me.

 9          MR. WELSH:  Could I finish?

10          MR. PETROCELLI:  Please.

11          MR. WELSH:  That we could not discuss it in open

12  court.  So that's why I've made the motion because it's an

13  alternative way for Your Honor to get in for the record.

14          THE COURT:  It's a demonstrative.

15          MR. WELSH:  I agree it's demonstrative.  But Your

16  Honor the testimony of the witness where he pointed to and he

17  explained there's -- may I, Your Honor.  Sorry I should have

18  brought my copy up, I  apologize.

19          THE COURT:  It's all right.

20          ██████ ██████  ██████  ██████ ██████ ██████  ████

21  ████ ██████ ██████ ██████ ████ ██████ ██████ ██████ ████

22          ██████ ██████  ██████ ██████  ██████  ██████ █████

23  █████  ██████ ████  ██████

24          MR. PETROCELLI:  He did.

25          THE COURT:  And they didn't object to it.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1          MR. PETROCELLI:  I object to demonstratives coming

 2   into evidence.  It's not appropriate.  It's not evidence.

 3          MR. WELSH:  We're just trying to help Your Honor.

 4          THE COURT:  I understand.

 5          MR. WELSH:  Okay.

 6          THE COURT:  It's a demonstrative.

 7          MR. PETROCELLI:  Anyway, I've made my objections for

 8   the record.

 9          THE COURT:  If I were you, I wouldn't mind too much

10   about me being subconsciously manipulated.

11          MR. PETROCELLI:  I didn't want there to be some

12   suggestion that we were acquiescing in that.  That's why I

13   needed to make it clear to Your Honor, okay.

14          MR. WELSH:  We're not trying to subconsciously

15   manipulate any.  We're trying to get through an examination

16   here.

17          MR. PETROCELLI:  We're not negotiating here, Your

18   Honor.

19          THE COURT:  You've used up about --

20          MR. WELSH:  I'm done, I'm passing the witness.

21          THE COURT:  You've got about ten more minutes to add

22   to your witness.

23          MR. WELSH:  Okay, that's great, thank you.

24          THE COURT:  If you want, you don't have to.

25          MR. WELSH:  If I don't need it, I won't take it, Your

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  Honor.

 2          THE COURT:  So I'm going to put ten minutes for you

 3  to add what you wish.

 4          MR. WELSH:  If I want.

 5          THE COURT:  To add to redirect.  All right, Mr.

 6  Petrocelli?

 7          MR. PETROCELLI:  I'm ready to go.

 8          THE COURT:  Okay, thank you.

 9          MR. WELSH:  Thank you, Your Honor.

10       (Open court.)

11          THE COURT:  All right, you can come back up.

12       You're going to switch?

13       (Witness resumes the stand.)

14          MR. WELSH:  I'll pass the witness, Your Honor.

15          THE COURT:  You'll pass the witness and we'll do the

16  cross examination.

17                          CROSS EXAMINATION

18  BY MR. PETROCELLI:

19  Q.   We've never met Professor, right?

20  A.   I believe not.

21  Q.   We have a little housekeeping to do.

22       I'm going to give you a binder of your deposition that was

23  taken in this case and your reports and I think I also have

24  Professor Carlton's reports in case we need them?

25  A.    Okay.  I already have my reports, but I can take that.

1          MR. PETROCELLI:  May I approach?

2          THE COURT:  You may.

3          THE WITNESS:  Or we can put it aside.

4          THE COURT:  Yes, put it on the side.

5     BY MR. PETROCELLI:

6     Q.   Now Professor, as a housekeeping matter, because I'm on

7     the clock here, I just want you to work with me in trying to

8     answer my questions as succinctly yes or no whenever you can so

9     that we can get through this, okay?

10    A.   Okay.

11    Q.   Thank you.

12         Now I want to just clarify for the record the things --

13         THE COURT:  Hold on a second.

14         Bear this in mind.  Your counsel, the government, is

15    going to get to redirect you.  So if there's something you need

16    to explain more fully some time, they can get you to explain

17    later, okay.

18         THE WITNESS:  Okay.  My question for Your Honor

19    though sometimes I feel like a short yes or no maybe misleading

20    or incomplete.

21         THE COURT:  Okay, it's case by case.  But just bear

22    in mind you'll be able to explain things more fully on

23    redirect.

24         THE WITNESS:  I'm aware, thank you.

25         THE COURT:  Okay, good.

```
 1  BY MR. PETROCELLI:

 2  Q.    I want to first run through the things you're not opining

 3  on with respect to this merger, okay?

 4  A.    Okay.

 5  Q.    And you understand the merger between AT&T and Time Warner

 6  includes three basic business units within Time Warner, one of

 7  which is Warner Brothers, right?

 8  A.    I do.

 9  Q.    And you've rendered no opinion regarding Warner Brothers,

10  correct?

11  A.    Correct.

12  Q.    No withholding of any Warner Brothers content and no price

13  increases, correct?

14  A.    Correct.

15  Q.    With respect to HBO, let me follow up just briefly.  You

16  don't claim that post merger HBO will be withheld from any

17  MVPD, correct?

18  A.    That's correct.

19  Q.    Or any virtual MVPD?

20  A.    That is correct.

21  Q.    And you don't claim that a post merger of the prices for

22  HBO will be increased just on account of the merger, correct?

23  A.    That's correct, apart from the promotional topic.

24  Q.    Well, I'm going to get to that.

25        The only theory of harm that you considered relating to HBO
```

1  is this issue that perhaps some promotional, some promotion of

2  HBO might be curtailed, right?

3  A.    That's fair.

4  Q.    But to be clear, you have done nothing to quantify that

5  purported harm or any purported harm to distributors or

6  consumers related to that theory, correct?

7  A.    That is correct.

8  Q.    Now with respect to coordination, you've made no claim

9  that AT&T post merger would have a unilateral incentive to

10 withhold Turner content from virtual MVPDs, correct?

11 A.    Correct.

12 Q.    So your theory or your concern I think is what I heard is

13 that that might happen in coordination with Comcast NBCU,

14 correct?

15 A.    That is correct.

16 Q.    In response to a question that Mr. Welsh posed, you were

17 asked if coordination occurs, would it substantially lessen

18 competition?  If coordination occurs, and you answered yes to

19 that.

20     Do you recall that?

21 A.    I do.

22 Q.    So let's focus on the if for a moment.  You don't know

23 that coordination will occur, correct?

24 A.    I don't know for sure that it will, that is correct.

25 Q.    Well, when you say for sure, you've not quantified any

1  risk whatsoever that it could occur, correct?

2  A.   I cannot quantify that probability, that is correct.

3  Q.   And you cannot give the Court any probability that it will

4  occur, correct?

5  A.   That's what I meant, that's correct.

6  Q.   And you're not in a position to say it's more likely to

7  happen than not, correct?

8  A.   That is correct.

9  Q.   And in fact, at your deposition you wouldn't even say

10  whether there's a one percent chance that coordination will

11  happen, correct?

12  A.   I don't have a way of accessing the probability, that's

13  what I was intending to convey.

14  Q.   And lastly in rendering your opinion about coordination,

15  you did not take into account that AT&T would have no ability

16  to withhold content from virtual MVPDs unilaterally or in

17  coordination with Comcast on account of the arbitration

18  commitment and standstill that it has offered to distributors,

19  you don't take that into account, correct?

20  A.   I was analyzing the merger without the arbitration

21  proposal remedy, that's correct.

22  Q.   That's correct, right?

23  A.   That's what I just said, yes.

24  Q.   Okay.  Now with that out of the way, I want to turn to

25  Turner, okay?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1   A.    Yes, sir.

2   Q.    Now you made quite clear on your direct exam that the

3   merged company will continue to license Turner content,

4   correct?

5   A.    In general, yes.  I'm not sure who you mean to whom but

6   generally.

7   Q.    To distributors?

8   A.    To MVPDs.

9   Q.    And you're not contending and you've rendered no opinion

10  that they will withhold Turner content from MVPD, correct?

11  A.    That's correct.

12  Q.    Or as we said unilaterally from virtual MVPDs, correct?

13  A.    Also correct.

14  Q.    And that's because it would be profitable for the firm

15  post merger to continue to license Turner there would be games

16  from trade, correct?

17  A.    The games from trade is the key to me, that's correct.

18  Q.    Okay.  Now your model, I want to, we're going to talk a

19  lot about this model.

20       This is an academic model, correct?

21  A.    I'm an academic and is this a model?  I'm not sure what

22  you mean other than that.

23  Q.    Well, that's close enough.  I'll take that, okay?

24  A.    Okay.

25  Q.    Your model, your bargaining model does not literally
```

1  predict that price increases will occur in negotiations in the

2  real world, correct?

3  A.   It does predict the price increases.  I would think of it

4  as sort of a central tangency.  I am not sure what you mean by

5  literally predict.

6  Q.   Let's go to page 202 of your deposition that you have in

7  front of you.  That would be tab 1.

8  A.   Volume I?

9  Q.   There's two binders?

10 A.   I got it.  Page what?

11 Q.   202 of your deposition, question at page 1?

12     Do you have that?

13          THE COURT:  202?

14 BY MR. PETROCELLI:

15 Q.   You have that?

16 A.   Yes, page 202?

17 Q.   Yes.

18     Question, are you saying the bargaining model literally

19 predicts the price increases that will occur in negotiations in

20 the real world?

21     Answer, no, of course not.

22     The real world negotiations there's going to be other hairy

23 stuff going on and uncertainties and personalities and who

24 knows what.

25     That was your testimony, correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Yes, I stand by that.

2  Q.    So you agree that your model does not and cannot capture

3  all of the uncertainties and personalities and unpredictable

4  factors and hairy stuff that might effect negotiations between

5  distributors and programmers, correct?

6  A.    I agree.

7  Q.    I want to see if I understand this correctly, okay.

8      By the way, I did get an economics degree when I went to

9  college, but I didn't do very well, so I picked something else,

10 so just bear with me, okay?

11 A.    Somehow I think you understand it very well.

12     (Laughter from audience.)

13 Q.    Well, I think I will prove you wrong but we'll see what

14 happens, okay.

15     This bargaining model, given that there isn't going to be

16 any actual foreclosure of Turner content, we're talking about

17 whether the negotiators to a carriage agreement are going to

18 change their behavior particular on the Turner side post

19 behavior because of what you called the change incentive due to

20 the ownership of Turner by AT&T, correct?

21 A.    Yes.  I'm talking about the change incentive due to the

22 ownership of Turner by AT&T.

23 Q.    But you said in your direct exam that their behavior will

24 change.  They will behave differently.

25     Do you remember saying that?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   I don't remember specifically that but I was trying to

2  convey the notion of leverage.

3  Q.   The leverage that you are talking about is the leverage

4  you say post merger Turner will have because they now have

5  another member of the family so-to-speak, they have DirecTV in

6  there, right?

7  A.   That's correct.

8  Q.   And this extensive model that you did and that you walked

9  us through, this is something as I understand it that you're

10  suggesting or are you not, that the people who are negotiating

11  the deals are going to be thinking about?

12  A.   I don't necessarily think that.  I wouldn't put it that

13  way.

14  Q.   Well, are they going to be thinking that they have more

15  leverage because of all of those things that you explained to

16  the Court?

17          MR. WELSH:  Your Honor.

18          THE COURT:  Yes.

19          MR. WELSH:  Can I be heard?

20          THE COURT:  Need to approach, okay.

21      (Witness leaves the stand.)

22      (Sealed bench conference.)

23          MR. WELSH:  I just wanted to make sure that the

24  witness has the, he gave his full answer out.  Counsel is

25  cutting him off.  I don't think that's appropriate.  So if he

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    would just wait until the witness finishes his answer.

 2              THE COURT:  I must say I didn't notice that he was

 3    cutting him off.

 4              MR. WELSH:  Seemed to me he was trying to get out the

 5    rest of his answer.

 6              THE COURT:  You've made your point, all right.

 7              MR. WELSH:  Thank you, Your Honor.

 8              THE COURT:  All right.

 9         (Witness resumes the stand.)

10         (Open court.)

11              THE COURT:  You may proceed consistent with the

12    discussion at the bench.  Repeat the question.

13              MR. PETROCELLI:  Yes.

14    BY MR. PETROCELLI:

15    Q.   What I'm trying to understand, Professor, is whether with

16    this extensive model that you did to illustrate the changed

17    incentive post merger and the additional leverage that you

18    claim Turner will have.

19         Are you suggesting that the people doing these deals are

20    going to be thinking about the things you're, you illustrated,

21    thinking about departure, thinking about a diversion, thinking

22    about profit margin and using all of this to kind of figure out

23    how much more leverage they have so they can increase prices?

24         Do you follow what I'm asking you?

25    A.   I think I mostly follow, yes.
```

1  Q.   And is that what you're suggesting is going to happen in

2  the real world, that people are going to be, you know,

3  following the bargaining model and the leverage that you've

4  tried to illustrate?

5  A.   I think people will evaluate.  First of all, I'm not a

6  mind reader so I'm not going to say what I think people are

7  thinking and their personalities, that's already been conceded.

8  Happily conceded.

9       The, I would think -- let me put it this way.

10      After the merger if AT&T were to do an analysis of the

11 affect of a blackout and they hired a consulting firm to do it,

12 then I would expect that consulting firm to account for the

13 effects on DirecTV which was not true before the merger and

14 provide that type of analysis to the negotiators.

15      There would be a new factor involved and if they did their

16 job well in my view they would have an analysis very similar to

17 the one I presented to the Court.

18 Q.   Well, I want to return to that?

19 A.   Please.  Why not now?

20 Q.   Because I have a couple of follow up questions that I want

21 to get to first before we talk about whether they hired someone

22 for example, like you, to assist them in their negotiations?

23 A.   Okay.

24 Q.   We can do that.  But before I do that, I'd like to talk a

25 little bit about what the people in this trial have actually

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   testified to?

2   A.   Okay.

3   Q.   You've read the record, right?

4   A.   Most of it.

5   Q.   Okay.  And you are aware for example that Mr. Bond of NBCU

6   testified that he is uneffected in his negotiations on behalf

7   of NBCU by the fact that a sister company as Comcast cable, you

8   heard that testimony, right?

9   A.   I was not here in the courtroom, no.

10  Q.   Forgive me.  You read that testimony, correct?

11  A.   I did read his testimony.  I don't remember that

12  particular passage, but I will accept your representation.

13  Q.   Okay.  Well, the question was you have no reason to

14  believe do you, sir, that the fact that NBC is owned by a

15  company that also owns a cable company has any impact on its

16  negotiating strategy with other distributors?

17       Answer, that's correct.

18       Did you read the testimony of John Martin?

19  A.   I did.

20  Q.   Okay.  You know that Mr. Martin who is currently the

21  chairman and CEO of Turner, right?

22  A.   Yes.

23  Q.   And he's been with Time Warner for a long time and

24  including when Time Warner was vertically integrated and had

25  Time Warner Cable.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Did you read Mr. Martin's testimony that when Time Warner

2   was vertically intergrated and he was the chief financial

3   officer of Time Warner Cable, he never heard any suggestion

4   along the idea that you have illustrated in your testimony that

5   Turner might have some added leverage because of the fact that

6   they were vertically intergrated with Time Warner Cable?

7      You read that testimony, correct?

8   A.   I did.

9   Q.   And did you also read his testimony that after Time Warner

10  Cable spun off of Time Warner there wasn't any discernible drop

11  in prices post, post spin off?

12  A.   I did read that testimony.

13     I think the prices went up because Turner content was

14  getting better and better at that period of time.

15  Q.   But you might expect that there could be, all other things

16  being equal, a drop in prices if vertical integration is

17  somehow propping them up, correct?

18  A.   That could be, possibly be true for some distributors.  Of

19  course, only the ones that Time Warner Cable competed against

20  which would be a minority, that's correct.

21  Q.   Well, they competed against Dish, they competed against

22  DirecTV?

23  A.   Yes, the satellite companies but not the cable companies.

24  Q.   The Telcos, Verizon?

25  A.   Right, whose ever in their footprint, I would agree.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Did you read the testimony of Coleman Breland --

2  A.   I did.

3  Q.   -- of Turner who is sitting right here?

4  A.   I did.

5  Q.   And he's been doing this his whole life.

6      He was at Turner during the time that it was vertically

7  integrated with Time Warner Cable through Time Warner, Inc. and

8  you read his testimony that at no time did this ever, that

9  thought ever enter his head that he would have this kind of

10 bargaining leverage that you are suggesting?

11     You read that testimony too, correct?

12 A.   I read his testimony.

13          MR. WELSH:  Objection, Your Honor, objection.

14      May I approach?

15          THE COURT:  All right.

16      (Witness leaves the stand.)

17      (Sealed bench conference.)

18          MR. WELSH:  Your Honor, I don't think it's

19 appropriate that counsel tried to recite from his memory the

20 testimony that has occurred in this courtroom from various

21 witnesses and then throw in a comment to the expert witness

22 here.

23      I'm not sure what the point of this is and why he's --

24          THE COURT:  Well it's cross examination.

25          MR. WELSH:  I understand it's cross examination, Your

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Honor.  But to say well, you heard the testimony of Coleman

2    Breland and then he's presenting it to the witness as if he's

3    got it down verbatim from the transcript when I don't think

4    that that's the case.

5           THE COURT:  He's asking if he remembers seeing it.

6    Then if he says he does, he does. If he says he doesn't.

7           MR. PETROCELLI:  Just to be clear in my outline I

8    have actually in my outline I have actual trial testimony.

9           THE COURT:  I'm sure you do.

10          MR. PETROCELLI:  And I'm trying to spend -- let me

11   explain to you why I'm asking these questions.  I'm about to

12   move to a different part of this examination.

13          Because he's got a model that is devoid of reality and

14   people in this business are not doing any of the things that he

15   says that will happen and so that's highly relevant evidence.

16          In fact, Your Honor asked that very question.

17          THE COURT:  I know.

18          MR. WELSH:  I'm not arguing about that.  I'm arguing

19   about the way in which he's going about this by paraphrasing

20   what the testimony has been.

21          THE COURT:  I think it's fair.  I think it's fair.

22          MR. PETROCELLI:  He said he read the trial record.

23          (Witness resumes the stand.)

24          (Open court.)

25          THE COURT:  You may proceed consistent with the

1    discussion at the bench.

2    BY MR. PETROCELLI:

3    Q.    So to be clear you did read Mr. Breland's testimony where

4    he said those kinds of thoughts and ideas never occurred to the

5    folks at Turner?

6    A.    I don't remember that specific passage, but I did read his

7    testimony.

8    Q.    You're not disputing that's what he testified to, correct?

9    A.    No, sir.

10   Q.    Okay.  Now I do want to go back to what you invited me to

11   do earlier, okay.

12       I notice that you switched, in your report you were talking

13   about Dish as kind of a representative MVPD.  But you switched

14   it to Charter in your direct testimony.  Okay.

15       I'm going to go back to Dish because I got use to reading

16   your report.  And you know who Charlie Ergen is, right?

17   A.    I do.

18   Q.    He's the chairman and owner of Dish, right?

19   A.    Yes.

20   Q.    And let me give you the following scenario.  Let's assume

21   that this merger goes through.  And that Mr. Ergen hires you to

22   help him in negotiations after having keenly tracked these

23   trial proceedings?

24   A.    Seems far fetched but I'll go with you.

25              THE COURT:  It's a hypothetical.

```
 1  BY MR. PETROCELLI:

 2  Q.   It's a hypothetical.  You said consultant, I am putting

 3  you in the consultant's role?

 4  A.   I appreciate it.

 5  Q.   Honestly, you're probably one of the top guys who could

 6  consult on, on this bargaining model.  You would agree with

 7  that, right?

 8  A.   No.

 9       (Laughter in audience.)

10  Q.   Okay, I'll take that too.

11       So --

12            THE COURT:  Got a feeling I might hear that again.

13         (Laughter in audience.)

14            MR. PETROCELLI:  And you might read it too, Your

15  Honor.

16            THE WITNESS:  What are you going to do?

17  BY MR. PETROCELLI:

18  Q.   If this merger closes and there's a negotiation between

19  Dish and Turner and Mr. Ergen asks you hey, you know, I was

20  very interested in what you had to say on the stand.  I want

21  you to help me out and tell me what these guys are going to

22  hold me up for, okay.

23       And you would have essentially done the analysis that you

24  did and in fact, you've come up with a, with numbers for the

25  price increase that Turner would demand from Dish post merger,
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  have you not?

 2      And that's on one of your boards, I think.  Can we look at

 3  slide two.

 4          MR. PETROCELLI:  Your Honor, I think these numbers --

 5          THE COURT:  Slide two?

 6          MR. PETROCELLI:  Yeah.

 7  BY MR. PETROCELLI:

 8  Q.   Are these numbers, are these percentages and numbers all

 9  confidential?

10  A.   I was told the percentages were confidential but not the

11  other numbers on this table.

12          MR. PETROCELLI:  Well, can you put up slide two

13  somebody?

14          THE COURT:  The middle column.

15          MR. PETROCELLI:  Your Honor, no, no.

16          THE COURT:  Mr. Petrocelli, the middle column we were

17  told was confidential.  Percentage of increase in PSPM

18  affiliate base.

19          MR. PETROCELLI:  I can use the dollar amounts though,

20  can't I?

21          THE COURT:  Those are fine.

22          THE WITNESS:  I did on direct.

23          THE COURT:  He used them.

24          THE WITNESS:  I did on direct.

25          MR. PETROCELLI:  You did on direct.  Okay, so let's
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    put that up.

2    BY MR. PETROCELLI:

3    Q.    Now this is your demonstrative slide two which I will

4    represent to you is figure 13 in your report, okay.

5         Are you turning to your report?

6    A.    I am.

7    Q.    To refresh your recollection, right?  Because you're not

8    suppose to be reading your report.  But you can look at it?

9    A.    If you don't want me to, I won't.

10   Q.    It's all right.  It's at page 61 of your report.  It's

11   figure 13 in that board, that slide that your lawyers put

12   together, the DOJ lawyers.  It's taken from them.

13             THE COURT:  It's more than a slide.

14             MR. PETROCELLI:  Well right, Your Honor, it's a

15   board.  Not a slide.

16   BY MR. PETROCELLI:

17   Q.    So you see that what the monthly charge there for the

18   price increase 7.5 million, you see that?

19   A.    Yes, I do.

20   Q.    You have a copy of those right in front of you from, you

21   can look at that if it's easier?

22   A.    I see it.

23   Q.    So that's per month, right?  And you multiply that times

24   twelve, you are looking at over $90,000,000 in one year, is

25   that right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   Seven times twelve, about right.

2   Q.   I'll represent to you that it's 91,000,000, okay?

3   A.   Okay.

4   Q.   Let's assume that it's a three year deal, so that's

5   $270,000,000, right, three times 90?

6   A.   Correct.

7   Q.   So here's the deal.  The merger closes, the negotiations

8   starts.  Mr. Ergen asks you to run the numbers on your model.

9   You run that number and you come up and say Mr. Ergen, it's

10   going to cost you $270,000,000 in just a price increase

11   attributed solely to the merger.

12      Now to be clear, we are talking about the identical content

13   that was licensed before the merger, correct?

14   A.   That is correct.

15   Q.   And do you have any reason to believe that Mr. Ergen is

16   going to pay almost $300,000,000 in additional money just

17   because Turner merged?  Do you think he would yield to that

18   demand?

19   A.   I am not trying to get into the head of Mr. Ergen, believe

20   me.  I'm sure it's an uncomfortable place to be.

21      Let's just be clear.  The percentage increase we're talking

22   about as shown in this row as well.

23   Q.   And it's very substantial isn't it?

24   A.   It is substantial.

25   Q.   Yes?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1   A.   And my point there is that this 300,000,000 needs to be

2   put in the context of the size of the overall deal which I

3   won't say, that will give away the percentage.

4            THE COURT:  It's double digits. You can say that.

5            THE WITNESS:  Well, the percentage increase is double

6   digits and the overall deal is in the billions, the three year

7   deal we're talking about.  So 300,000,000 is not, you know,

8   something like a tripling or something.

9   BY MR. PETROCELLI:

10  Q.   I don't want to quibble about billions, do you think

11  Charlie Ergen would pay a nickel more, a nickel for the

12  identical content all other things being equal just because of

13  the merger?

14  A.   My analysis is not about Charlie Ergen or its particular

15  individuals.  I'm describing the leverage that will be created

16  by the new market structure that the merger will create.

17  Q.   You did read the testimony of Mr. Schlichting.  I heard

18  you refer to it a number of times, right?

19  A.   I did.

20  Q.   And you did read that Mr. Schlichting was confronted with

21  public statements by Mr. Ergen that Dish takes down programmers

22  if the price is not right, they take them down, they black them

23  out.

24       You did read that, right?

25  A.   You read quite a few of them into the record as I recall.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   And you are aware that they blackout programmers more than

2  anybody, right?

3  A.   I think that was stated.  I don't know if that's true or

4  not.  I heard, I read that.

5  Q.   And you heard the, Mr. Ergen's statement that he goes to

6  sleep at night knowing there isn't a single network he won't

7  take down if the price isn't right including ESPN, you read

8  that too, right?

9  A.   I did read that.  I also heard him say that the real

10  negotiations begin after the blackout and that is a good reason

11  why the costs and benefits associated with the blackout really

12  matter in negotiations.

13  Q.   You also heard him say that Turner is one of the easiest

14  of all networks to take down?

15  A.   I think he said that when they were fighting with Turner

16  and he would probably say that about another network when they

17  were fighting with them.

18  Q.   He said that publicly to his analyst, in an earnings call.

19   You are not suggesting that he was being untruthful are you?

20  A.   No, sorry.  I did not mean to suggest that.  I was being a

21  little flip, I apologize.

22      What I was trying to convey was that in my experience as an

23  antitrust economist, people will say some strong things in

24  negotiations to benefit them and it's part of the back and

25  forth and he was doing that at that time.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   But you ran these numbers and came up with these price

2  increases to suggest to the Judge this is really going to

3  happen.

4     That's the sum and substance of your testimony, right?

5  A.   This is the prediction, yes, that's right.  This is what

6  I, this is the prediction based on the change in market

7  structure incentives associated with the merger, I stand by

8  that.

9  Q.   The change incentives, the change in market structure

10 you're talking about is that AT&T now owns Turner, right?

11 A.   Yes.  As you said, they're in the same family as between

12 DirecTV and Turner are the same company.

13 Q.   Now did you also review the testimony of Mr. Rigdon of

14 Comcast?

15 A.   I did.

16 Q.   In which he said that, in which he was asked if he had any

17 reason to believe that the merger will impact his negotiations

18 with Turner.

19    Do you remember reading that?

20 A.   I don't remember specifically reading that.

21 Q.   And do you remember him testifying that it would not

22 effect his negotiations with Turner post merger?

23 A.   I do, I think that's correct.

24 Q.   Okay.  And you do think it's relevant to take into account

25 the things that you are predicting these very people will do,

1    they have testified about what they're going to do.

2        You read their testimony, correct?

3    A.    I did.

4    Q.    Okay.  But you haven't taken into account that they are

5    telling the Court under oath that they're not going to do any

6    of the things that you're suggesting?

7        Is that a fair statement?

8    A.    I think they're describing how they conduct negotiations

9    and have in the past and in a number of these cases there is,

10   this goes along with the questions you asked this morning, Your

11   Honor.

12       I absolutely agree with you.  There's a strong tension

13   between these statements and the, my working assumption any

14   antitrust economist working assumption that the merged company

15   will act in the combined interest of the assets that they own.

16       As I said to Your Honor this morning, if we think that's

17   not going to happen, I don't think that's a very good way to do

18   merger analysis or policy, but then, then these concerns would

19   not arise.

20   Q.    But the people who are going to be doing these

21   negotiations post merger are testifying under oath that it will

22   not happen and it has not happened in the past.

23       You read their testimony?

24   A.    I did.

25   Q.    Okay.  Now I want to continue this just a little bit more.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        You understand, sir, that a blackout is extremely costly
 2   and can be catastrophic to a programmer who loses affiliate
 3   fees and advertising revenue, right?
 4   A.    I certainly understand that a programmer loses substantial
 5   revenues during a blackout.  Yes.
 6   Q.    Okay.  And in this and post merger in this hypothetical
 7   blackout because there isn't really going to be one because the
 8   deal is going to be made.  But in this hypothetical blackout
 9   the programmer is still going to suffer catastrophic losses
10   post merger, still not going to get the advertising revenue and
11   still not going to get the affiliate fees, right?
12   A.    The affiliate fees and the advertising revenues that
13   you're talking about would be lost in a blackout before or
14   after the merger.  Those don't change as a result of the
15   merger.
16        I'm looking at the things that do change.
17   Q.    So post merger then the programmer isn't going to think he
18   has any greater incentive to raise prices because if there's a
19   blackout, the programmer is going to suffer catastrophic
20   losses, correct?
21   A.    No, that's not correct.
22   Q.    Why is that not correct?
23   A.    Because there isn't an additional incentive that comes
24   into play as a result of the merger namely; the diversion to
25   DirecTV which is now under the same corporate ownership.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   So following up on that then, let's just take some

2  examples.  If you're going to lose $140,000,000 a month pre

3  merger, and because you might pick up a few diverted

4  subscribers post merger, and you run some numbers and instead

5  of losing a 140,000,000, you're going to lose a 130,000,000 or

6  a 110,000,000.

7       You're still going to lose a lot of money.

8       But you're saying he'll lose a little less post merger

9  because DirecTV may benefit if subs leave the rival distributor

10 and come to DirecTV, correct?

11 A.   Mostly correct.  It's not a little bit less though.

12      The numbers indicate it's a lot less because that's why we

13 end up with these significant percentage increases.

14 Q.   Well, it's a lot less if one accepts the inputs of your

15 model, right?

16 A.   That's true.

17 Q.   It's a lot less if we accept a 9 percent departure rate,

18 for example, right?

19 A.   I was referring to the inputs that I have used when I made

20 my previous answer, that is correct.  Nine to 14 is my range

21 for, for the subscriber loss rate.

22 Q.   You are aware that Professor Carlton in his rebuttal

23 report at page 3, using your own model and without making any

24 corrections to it, just using your model as you laid it out to

25 the Judge, actually computed the Delta pre merger and post

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   merger for a hypothetical blackout of the big distributor.

2       Do you recall that from his report?

3   A.   No, I do not.

4   Q.   And both of those numbers exceeded a 100,000,000 both pre

5   merger and post merger without getting any more specific than

6   that?

7       You don't recall that, right?

8   A.   I could look at his report.  I don't, obviously that's

9   going to depend on the particular distributor we're talking

10  about.

11  Q.   Well, you know what, take a quick look at it just to

12  confirm what I just said.

13      It's page 3, Professor Carlton's rebuttal report note 7.

14      (Pause.)

15  A.   I see the numbers there.  I see what you're referring to.

16  Q.   Okay.  You can put that away.

17      I'd like to talk about your model in a little more detail.

18  This is your bargaining model, right?  To be clear there's a

19  couple of models that you actually use.  One is this bargaining

20  model that you spent most of your time on, right?

21  A.   Yes, we have split the difference bargaining.

22  Q.   Then you have another model, a merger simulation model.

23  The results of the bargaining model go into the simulation

24  model, right?

25  A.   To compute the affect on final consumers, correct.

1    Q.    So if for example there were erroneous inputs going into

2    the merger simulation model, that would spit out erroneous

3    results, correct?

4    A.    That's true.

5    Q.    If there were correct inputs going into the merger

6    simulation model but the merger simulation model itself had

7    flaws, that would also spit out incorrect results, correct?

8    A.    There would be flaws as well.

9    Q.    So the models and all of these numbers that you put out

10   there, these predicted numbers, they're only as good as the

11   inputs, right?

12   A.    Well, the three key inputs, those are very important,

13   yeah.

14   Q.    By three key inputs for the record, you were referring to

15   the subscriber loss rate, the diversion rate and the DirecTV

16   U-verse and profit margin, right?

17   A.    Yes, that's correct.

18   Q.    I think you brought this up on your direct and said you

19   anticipated that you might be crossed on it.  In this one sense

20   I will say one of your predictions is correct.

21       (Laughter in audience.)

22   A.    Very gracious of you, thank you.

23   Q.    That has to do with these contracts, right?  You made

24   clear both in your report and in your direct examination that

25   you're doing all of this predictive numbering and figuring out

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   pretending there are no long term fixed contracts in place,

2   correct?

3   A.   Yes.   I'm looking at the market configuration without

4   those contracts.

5   Q.   Okay.   But as you know in the real, in this real world

6   there's nothing but multi page lengthy and long term contracts,

7   right?

8   A.   There are a number of contracts, they have different

9   expiration dates, but yes.

10   Q.   And so the, if we could go back to let's say that we can

11   go back to that chart, I think that will work just fine.

12   That's the second board, it's your slide number 2 there.

13   A.   Okay.

14   Q.   Now you know that some of these contracts actually don't

15   expire including some very significant ones for a long time

16   after this merger closes, right, many years?

17   A.   I'm aware of one that last for several years that I would

18   call significant one.

19   Q.   I was a little bit amused by your reference to the

20   binoculars that I think you said that your binoculars when you

21   were projecting out to 2021, you know, they're getting, that's

22   getting a little out there.

23       Do you recall saying that?

24   A.   It sounds like me.

25   Q.   But you might need a telescope actually for looking down

1  the road at some of these contracts, including that very big

2  one that you and I shouldn't discuss publicly, right?

3  A.  Well, you know, good enough binoculars, the bounded

4  binoculars, and telescopes, it's a little hard to say.  But I

5  think I get your point, it gets harder.

6  Q.  So let's be clear about this when you put those numbers up

7  there in that figure 13 from your report and in that board

8  where it talks about you said $586,000,000 of annual price

9  increase to all of the MVPDs and a couple of virtual in there,

10  right?

11  A.  That's the number there.

12  Q.  So just to be clear, this isn't going to happen.  This

13  isn't going to happen let's say in the year after the merger,

14  right?  That can't happen?

15  A.  That is true.

16  Q.  Okay.  And it can't happen in the second year, can it?

17  A.  No.  This is more what will happen as the contracts

18  expire.  I think I was clear that these effects will come into

19  play over time as contracts expire.

20  Q.  One of them expires beyond the good lens of your

21  binoculars, and so we don't know what the world is going to

22  look like then, do we?

23  A.  Well, we know a fair bit about it.  We have projections.

24  It seems a little bit sweeping to say we don't know anything.

25  Q.  And actually, on the one that we're talking about without

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  naming it, that's over a third of the total price increase that

2  you're predicting isn't it?

3  A.   I am not -- hold on.

4  Q.   Let's call it one-third?

5  A.   I see your point here.

6      Yes, that's correct.  It's about one-third.

7  Q.   I won't take you through the contract in the interest of

8  time.  But let's look at the, at another one of your charts.

9      It's figure 14 in your report and it's your original report

10 and it's at page 65.

11          MR. PETROCELLI:  And you have a copy?  Yeah, let me

12 mark that.

13          Your Honor, it might be easier if I showed you a page as

14 demonstrative.  What's the --

15          THE COURT:  It's number 10 of the slide, this one,

16 right?

17          MR. PETROCELLI:  Is it?

18          THE WITNESS:  The report is monthly and the

19 demonstrative is annual.

20 BY MR. PETROCELLI:

21 Q.   That's what I thought.  The report is monthly and the

22 demonstrative is annual.

23      I wanted to use the monthly one.  So that's in your report.

24 A.   I see that.

25 Q.   So if you looked at the red, that's the price increase to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  the rivals, right?

2  A.   Yes, that's right.

3  Q.   And the blue, that's the cost savings to DirecTV to AT&T

4  from earning, from owning Turner, that's your elimination of

5  double marginalization, right?

6  A.   That's correct.

7  Q.   Then you net them out and you come out with a number of

8  roughly $20,000,000, right?

9  A.   Correct.

10 Q.   But if we reduce, if we reduce the price increase by just

11 the single amount of that one contract which isn't going to

12 expire for a number of years, do you have any idea how much

13 that reduces the price increase and do you know what the net

14 gain that is?

15 A.   Well, if we take away a third, you take away the vast

16 majority of the net effect.

17 Q.   You take away the vast majority of the net effect and

18 you're going to be down instead of a 20,000,000 potential price

19 increase, that's going to be reduced to 3,000,000, correct?

20 A.   That sounds like your math is right, that's per month.

21 Q.   Three million per month just on taking into account that

22 one contract from that one distributor, right?

23 A.   Right.  For the period of time, for so long as the

24 contract is in effect, that's the right number there using this

25 market configuration.

***REDACTED IN ACCORDANCE WITH JULY 31 2018 DISTRICT COURT ORDER***

1  Q.   And incidentally, did you read the testimony of Rich

2  Warren who is the head negotiator now for Turner?

3  A.   I'm not sure about that one.

4  Q.   Did you, so you don't recall Mr. Warren testifying about

5  yet another MVPD called Charter?

6  A.   I do not.

7  Q.   Okay.  And his testimony that Charter does not want to

8  enter into a new deal with Turner until after the merger.

9       Do you recall reading that?

10 A.   If the merger goes through?

11 Q.   If the merger goes through, right?

12 A.   I recall he was, they -- I guess I got the impression they

13 wanted to wait and see how this case turned out actually.

14      But maybe I don't remember it quite right.

15 Q.   Well, that wouldn't be, under your theory that wouldn't

16 make any sense because if Charter has an opportunity to do the

17 deal now with Turner, waiting until after the merger, if you

18 are correct, would only give Turner more leverage to increase

19 prices, correct?

20 A.   Well, I think Turner will have more leverage later.  I

21 don't know what the negotiations look like right now, so I'm

22 not sure about that.

23 Q.   I'll move on then.

24      I want to talk about other things that you did not take

25 into account.  You talked about the contracts, I could go over

1   other contracts.

2       You know there were a number of contracts, not just the one

3   we spoke about, right?

4   A.   That are currently in force?

5   Q.   Correct?

6   A.   Yes, I've looked at that.

7   Q.   And you didn't take into account any of them in cranking

8   out these numbers, right?

9   A.   Again, that's my methodology.  This is my way of accessing

10  the longer term impact of a new market structure, yes.

11  Q.   You also testified that you took into account double

12  marginalization, right?

13  A.   Elimination of it in fact.

14  Q.   Elimination of double marginalization, forgive me.

15      That does result under your analysis in an actual

16  predicted, excuse me, in a predicted price increase --

17  withdrawn.

18      Your analysis of the elimination of double marginalization

19  results in a predicted price decrease to the consumers to the

20  subs of DirecTV, correct?

21  A.   Yes, that's correct.

22  Q.   And you illustrated that in your report and I think you

23  said it was, I think a twenty-six cent price decrease per sub,

24  per month if the merger goes through?

25  A.   Right.  This would be after applying the merger simulation

```
 1   model so we get to the downstream consumer level, that's

 2   correct.

 3   Q.   So 25,000,000 subs or so would have a price decrease, not

 4   a price increase, correct?

 5   A.   Yes, that's correct.

 6   Q.   Okay.  And you did not take into account any other

 7   benefits or efficiencies of the merger, correct?

 8   A.   The other efficiencies that AT&T is claiming I have not

 9   credited, that is correct.

10   Q.   So you are assuming for purposes of all of these numbers

11   that those efficiencies don't exist?

12   A.   I'm not counting them.

13   Q.   So they don't exist.  You gave them zero, right?

14   A.   No, it's not to say they don't exist.  It's that they're

15   not, they don't need the screen so that they would be, take

16   merger specificity for example.  They would be achieved, for

17   example some of the advertising efficiencies would be achieved

18   by contract.

19       So they do exist.  It's just they'll exist with or without

20   the merger.  It's not a matter of assuming them away.  It's

21   whether they count against the anti competitive effects.

22   Q.   But you have no opinions on whether any of them meet the

23   merger test because you weren't asked to do that work, correct?

24   A.   That is correct.

25   Q.   You are relying completely on Mr. Quintero and Professor
```

1   Afphie, correct?

2   A.   Athey.

3   Q.   Athey, forgive me.  So just to be clear, you've done no

4   independent evaluation, right?

5   A.   Of those efficiencies, that is correct.

6   Q.   And for the purpose of your model, you have assigned the

7   number zero to those other efficiencies, correct?

8   A.   Those efficiencies, they are not counted in my model, that

9   is correct.

10  Q.   Okay.  Now, let's talk about something else you didn't

11  take into account.  And that was the binding unilateral offer

12  by Turner to other distributors that if this merger is approved

13  and proceeds, they will have the ability to sign that and

14  exercise all rights under that agreement.

15      And you've read that agreement, right?

16  A.   I have.

17  Q.   But you did not take that into account at all in coming up

18  with these numbers, right?

19  A.   That is true.

20  Q.   And you were not and you testified in your deposition that

21  you didn't think it was your role to do so, right?

22  A.   That was not what I was doing.  It was not the assignment

23  I had, that's correct.

24  Q.   Didn't you say that it was not your role in this drama to

25  get into this issue?

1  A.    Okay, I did think I said that.

2  Q.    That would be at page 228 of your deposition I'll

3  represent to you.

4      Now so you assigned a factor of zero to any impact that

5  this arbitration and standstill agreement would have for the

6  purposes of your model, right?

7  A.    My analysis does not include the arbitration proposal.

8  It's the merger without any remedies or fixes.  Let me be very

9  clear about that.

10  Q.    But you know that this arbitration offer was made, and you

11  read the documents, right?

12  A.    I have.

13  Q.    And you could have taken it into account, correct?

14  Nothing was stopping you?

15  A.    I could have.  That would be a different analysis, a

16  different assignment.

17  Q.    Did DOJ ask you to take it into account?

18  A.    I don't specifically recall.

19  Q.    Did you have any discussions with DOJ about whether you

20  should take it into account since it's out there and since over

21  20 small distributors have already signed it?

22  A.    Yes.  Well, we had some discussion after, as I recall this

23  arbitration proposal was made after the litigation started and

24  if my memory is right.

25  Q.    About three or four days later, maybe a week later?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Yes.  I have been working regularly with DOJ and we did

2  discuss how my analysis might be altered and at some point

3  there I learned that DOJ had hired a separate expert, Professor

4  John Kwoka who would be addressing the arbitration part more

5  specifically.

6  Q.    Before you learned about Professor Kwoka, did you run some

7  numbers or do some analysis taking into account the arbitration

8  and standstill commitment?

9  A.    No, I don't think this model.  This model is very much

10 based on the leverage associated with blackouts.  Leverage on

11 both sides.

12     So it would take a completely different model to model

13 arbitration.  It's not something -- the bargaining model is

14 well established in the literature and in the practice, and

15 there is no model that I'm aware of that would be comparable

16 for arbitration so no, I didn't go in that direction.

17 Q.    But your whole bargaining model is about the leverage

18 caused by the ability to threaten a blackout, right?

19 A.    That's the leverage that drives the model, absolutely.

20 Q.    And the arbitration and standstill commitment eliminate

21 the ability of Turner to have that leverage because if the

22 distributor exercises its right and elects arbitration, there

23 can be no threat and there can be no blackout by Turner,

24 correct?

25 A.    Well, the distributor who invokes arbitration would not be

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   subject to the blackout threat, but the question then arises

2   whether distributors would choose to do that.  And they would

3   have a choice invoking or negotiating with the post merger

4   Turner as part of AT&T and paying the price increases that I've

5   estimated.  So how they would choose between those two will

6   depend on how attractive they find the arbitration.  And that's

7   not something I'm able to analyze.  I've heard the witnesses on

8   that.

9   Q.   But assuming that a distributor does exercise his rights

10  under the arbitration and standstill commitment, you would

11  agree that the very leverage that you're positing will drive

12  these price increases won't exist?

13  A.   If they choose to invoke the arbitration then this would

14  not be the leverage.  We'd be in a different world where they

15  would be participating in the arbitration and I have not

16  analyzed that out come.

17  Q.   Okay so you don't have any opinion about whether this

18  leverage at all would exist if the arbitration then is taken

19  into account because you haven't modeled it right?

20  A.   Well I have not modeled the bargaining that would take

21  place if the distributor chooses to invoke arbitration.

22  Q.   Okay.  You know it's baseball style arbitration, right?

23  A.   I'm aware of that.

24  Q.   And you've, you have written about the positive affects or

25  the positive features of baseball style arbitration, haven't

1  you?

2  A.    Yes, I've written about that in the context of patent

3  licensing.

4  Q.    But in the literature or the article that you wrote you

5  said that there are two particular features of baseball style

6  arbitration that are very beneficial.  One is that it tends to

7  make the bid asked closer, do you recall that?

8  A.    Yes, in comparison with some other forms of arbitration.

9  Q.    Right, and two you described it as bargaining in the

10  shadow of arbitration which you said tends to lead people to

11  make a deal, correct?

12  A.    If the arbitration is well crafted and designed, the

13  context I was talking about was trying to establish reasonable

14  royalties for patents, port folies of patents actually; then I

15  think it has some very good properties.  It's going to depend

16  on bench marking and some other things.  But in that context,

17  yes, particularly my co-author Mark Lemley and I we were

18  favoring baseball style arbitration over other types of

19  arbitration in that context.

20  Q.    You would agree then that if this merger goes through and

21  distributors elect arbitration baseball style, the benefits

22  that you describe; the compressing of the differences between

23  the competing proposals and the ability to bargain in the

24  shadow of arbitration and reach a deal would apply to this

25  situation as well, correct?

1  A.    I think generally there are these benefits of baseball

2  style arbitration over other forms so Professor Lemley and I

3  wrote positively about that.  I don't think most of what we

4  said in that article applies here because of this kind of

5  unknown to me about the fair market value.  I don't know what

6  that is and how that would replicate or how it could replicate

7  competitive outcomes.

8      In the context of the article we were talking about

9  reasonable royalties and we talked about the bench marks there,

10 so it's different context.  But in comparing different forms of

11 arbitration, I do see advantage of baseball over others.

12 Q.    And those advantages would exist in this situation over

13 others, correct?

14 A.    Over other forms of arbitration, yes.

15 Q.    You also didn't take into account the FCC's program access

16 rules in modeling these figures, right?

17 A.    No, I did.

18 Q.    Well you gave it no credit, right?

19 A.    No credit?  I don't think they will prevent these price

20 increases from occurring.

21 Q.    Now you're not an expert on FCC program access rules,

22 right?

23 A.    I am not.

24 Q.    You assume that the program access rules would not be

25 effective post merger to deal with any price increase issue,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  correct?

2  A.    I didn't assume that.  We went through my deposition,

3  there's part of my report or I cite the FCC's own order in

4  Comcast and how they describe the operation of the rules and

5  based on that, I believe that the rules would not prevent the

6  price increases that I'm predicting.

7  Q.    But you're not the expert that DOJ hired on that issue,

8  right? There's another expert, right?

9  A.    That would be Professor Wilkie.

10 Q.    You're relying on Professor Wilkie's opinion that these,

11 the FCC rules would not have any impact; is that you what

12 you're saying or you're relying on your own opinion?

13 A.    I guess I'm relying on him.  I've read his report.

14 There's a lot of nuances about the rules that I'm not an expert

15 on.  But the key element I think is clear to me just from what

16 the FCC said.  If you want to tell me to make a different

17 assumption or that I'm misinterpreting the rules as they stated

18 them, then I can address that.

19 Q.    Let me unpack that a little bit okay?

20 A.    Okay.

21 Q.    You do agree, these program access rules were promulgated

22 by the FCC pursuant to the 1992 Cable Act, correct?

23 A.    That's correct.

24 Q.    And you agree that if this merger goes forward Turner

25 would become subject to these FCC program access rules given

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  its affiliation with DirecTV, right?

2  A.    That's my understanding, yes.

3  Q.    You also know that one purpose of these rules is to

4  prevent vertically integrated distribution affiliates from

5  exercising undue influence over the prices vertically

6  integrated programmers charge, correct?

7  A.    That sounds familiar that language, yes.

8  Q.    If the Court -- you would also agree that it is

9  essentially a legal issue whether or not the program access

10  rules and in particular the protection against undue influence

11  and pricing would apply to any post merger price increases

12  attempted by Turner?

13  A.    I'm not sure about that.  It strikes me as sort of a

14  practical issue about how the rules would operate.

15  Q.    Well let me make sure I understand that.  You do know that

16  distributors for example can make complaints with the FCC,

17  correct?

18  A.    I do.

19  Q.    And they can make the very complaint we're talking about

20  that post merger Turner is raising prices.  I listen to the

21  trial proceedings and I heard about this bargaining leverage

22  and I think they're's using it on me and they could make that

23  complaint, right?

24  A.    I believe they could.

25  Q.    And it would be up to a, to the FCC the administrative

1  judge or even a reviewing court to decide whether or not that

2  distributor had standing to make that claim, right?

3  A.   Well, standing, yes, I would think.  That sounds very much

4  like a legal question.

5  Q.   You're not here to testify that such a claim would be

6  dismissed because in your view you don't read the rules that

7  way?

8  A.   No, I'm not talking about standing.  I'm talking about the

9  effectiveness of the rules.

10 Q.   Are you suggesting that the case would be dismissed on its

11 merits because a price increase post merger is not subject to

12 the rules?

13 A.   No, I didn't talk about a case being -- I wasn't saying

14 the case would be dismissed.  But what I read from the Comcast

15 order was that the FCC recognized that it was a non

16 discrimination regime.  It wasn't a way of controlling the

17 overall level of price, of affiliate fees.

18 Q.   Just so just to be clear, you're just relying on what you

19 read in that order, right?

20 A.   Yes, I am relying on that.

21 Q.   If your reading of the order is incomplete or if your

22 state of knowledge is incomplete, you would acknowledge you can

23 be mistaken about your conclusion, correct?

24 A.   That's fair.

25          THE COURT:  Is this a good time to take the afternoon

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  recess?

2          MR. PETROCELLI:  It is.

3          THE COURT:  We're going to take a fifteen minute

4  recess.  You remain a witness under oath in the case.

5          MR. PETROCELLI:  How much time --

6          THE COURT:  Yes.

7          MR. PETROCELLI:  How much time do I have?

8          THE COURT:  Left, you have an hour and a half.

9          MR. PETROCELLI:  Hour and a half, thank you.

10         THE COURT:  Yes.

11     You remain a witness under oath in the case.  Refrain from

12  discussing your testimony with anyone including your own

13  counsel and I'll see you back in fifteen minutes.

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Okay.

16         (Recess at 4:06 p.m.)

17         (Proceedings resumed at 4:29 p.m.)

18         THE DEPUTY CLERK:  Your Honor, now recalling Civil

19  Action Number 17-2511.  The United States of America v. AT&T,

20  Inc., et al.

21         THE COURT:  All right, witness remains under oath.

22  You may proceed when you're ready, Mr. Petrocelli.

23         MR. PETROLCELLI:  Thank you, Your Honor.

24

25

1                        CROSS-EXAMINATION (Continued)

2    BY MR. PETROCELLI:

3    Q.   One final thing, Professor, about program access rules.

4    You indicated Professor Wilkie is the expert on that retained

5    by DOJ?

6    A.   Yes.

7    Q.   And you know Professor Wilkie has not yet testified in the

8    trial yet?

9    A.   I'm aware of that.

10   Q.   But you have read Professor Wilkie's deposition, right?

11   A.   I have not.

12   Q.   You have not.  Okay.  Well, I will represent to you that

13   Professor Wilkie gave the following testimony at page 125

14   regarding whether and to what effect program access rules

15   affect the bargaining process, okay?

16   A.   Okay.

17           Q.   "Question:  Would the parties take into account

18           the likely outcome of an adjudication of a program

19           access complaint in the event of a disagreement in

20           their bargaining?

21       "Answer:  Yes."

22       You did read Professor Wilkie's report, right?

23   A.   I did.

24   Q.   Okay.  Now, I'd like to talk about something else which I

25   believe, based on your deposition, you did not take into

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    account in your modeling, and that's pricing effects of prior

2    vertical transactions, okay?

3        Now, am I correct, sir, that you have not examined the

4    pricing effects and data in connection with prior transactions

5    to test whether the bargaining model accurately predicts

6    outcomes in this industry?

7    A.   I've looked at those data.  I'm aware of the analysis.  It

8    is not part of what I put in my report.

9    Q.   When you say you looked at it, you have not received all

10   the data from the DOJ with respect to the various merger

11   transactions for the purpose of doing a comprehensive analysis

12   of the data; is that true?

13   A.   I'm not -- which all of the merger transactions?

14   Q.   Yes.

15   A.   I wasn't quite sure what you were referring to there.

16   Q.   You were aware that we sought to obtain from DOJ pricing

17   data from a number of prior transactions, Comcast, NBCU, Time

18   Warner Cable, Charter, of the attempt of Comcast and Time

19   Warner to merge and DirecTV, AT&T's merger, you understand that

20   DOJ has possession of extensive pricing data in its files in

21   connection with those various merges, right, or merger

22   investigations, I should say?

23        MR. WELSH:  Objection, Your Honor.  May I approach?

24        THE COURT:  Did that cure it, the qualification or do

25   you have something --

1            MR. WELSH:  What was the qualification?

2            MR. PETROCELLI:  Merger investigations.

3            THE COURT:  Called it investigations.

4            MR. WELSH:  May I approach?

5            THE COURT:  Okay.

6        (Sealed bench conference.)

7            MR. WELSH:  And I don't know where Mr. Petrocelli is

8    going with this.  But if there's some sort of discovery

9    dispute, it wasn't raised before.  And I don't understand why

10   he's now talking about the data wasn't given to him.  Sought it

11   from the DOJ.  I have no idea why he's going into this at this

12   point.

13           MR. PETROCELLI:  Highly relevant, Your Honor, because

14   he has not examined or tested any of the data that the

15   government had in order to determine how it affects or whether

16   it affects, whether it's consistent or inconsistent with his

17   predictions.  We've fought hard to get that data.  We got it.

18   Professor Carlton is going to be going through the prior

19   transactions, and I want to establish that he has done no such

20   thing.

21           THE COURT:  You asked him the date on the NBC Comcast

22   merger?

23           MR. PETROCELLI:  It's the date that you issued the

24   hot potato ruling when the DOJ wouldn't give it to us and we

25   had to come to court, and we ultimately got that data.  The

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  expert has done an analysis of it. It's not just Comcast NBC.

2  It's a number of merger investigations where they got data.

3  And I want to establish that this witness has not done any

4  testing or analysis of the data in these.

5          THE COURT:  Why don't you ask him if he got any data

6  from a prior merger that he was able to evaluate and, you know,

7  apply his models.

8          MR. PETROCELLI:  That's what I'm doing.

9          MR. WELSH:  Well, without suggesting that the

10  Department of Justice is keeping data from him.

11          MR. PETROCELLI:  Well, wait a minute.  Two things,

12  Your Honor, if the Department of Justice has the data, I want

13  to first understand whether it was made available to him.

14          THE COURT:  Ask him that.

15          MR. PETROCELLI:  Okay.  Thank you.

16          THE COURT:  Ask him that question.

17          MR. PETROCELLI:  Okay, thank you.

18          THE COURT:  And then I'll see where it goes.

19      (Open court.)

20          THE COURT:  You may proceed consistent with the

21  discussion.

22          MR. PETROLCELLI:  Thank you.

23  BY MR. PETROCELLI:

24  Q.  Did the Department of Justice make available to you the

25  pricing data in its files from the various merger

1  investigations that I identified?

2  A.   I don't believe so.  I'm not certain.  Let me -- if I may,

3  I'm sorry.

4     I was interested in certain vertical transactions that

5  were, I thought were more informative.  I addressed those in my

6  initial report.  Some of the transaction you mentioned did not

7  fall into that category so it's a broader set.

8  BY MR. PETROCELLI:

9  Q.   Well, you didn't conduct any comprehensive analysis of the

10 effects of any prior transaction, right?

11 A.   I looked at these transactions and there was some analysis

12 provided by AT&T's experts during the DOJ investigation, but I

13 did not end up doing my own separate analysis, that's correct.

14 Q.   Okay.  And the prior -- but did you ask DOJ for the

15 pricing data from various prior merger investigations?

16 A.   I don't think I asked for data from other investigations,

17 that's not normally -- I don't believe I did.

18 Q.   Okay.  And let me just go through a couple of them with

19 you, okay?  One of them, of course, is Comcast NBCU, right?

20 And I think you said you worked on that transaction while at

21 the DOJ, right?

22 A.   That's correct.

23 Q.   Okay.  You made a decision early on in your work on this

24 case that it would not be fruitful to study that data; is that

25 true?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   Any further than what I had already seen, that's correct.

2   Q.   Well, you had discussions with your team whether that line

3   of inquiry would be fruitful and would provide a test of the

4   bargaining model and you determined that it would not; is that

5   true?

6   A.   There was a certain point that that was true, yes.

7   Q.   Okay.  And if you had looked at the pricing data related

8   to the Comcast NBCU merger in depth, you would have not

9   expected to see evidence of post-merger price increases beyond

10  the overall industry increases, correct?

11  A.   Well, for most of the MVPDs, that would be correct.

12  Q.   Okay.  And you believe --

13  A.   Because they don't compete with Comcast.

14  Q.   And you believe that's in part because of the provisions

15  of the FCC decree that had an effect in constraining Comcast's

16  pricing for NBCU content, correct?

17  A.   In part, and in part my previous answer that there are a

18  number -- maybe of the distributors don't compete against

19  Comcast because they're not in Comcast's footprint, but also

20  because of the reason you just gave namely the presence of the

21  FCC order.

22  Q.   You also did not investigate what happened to prices when

23  Time Warner Cable spun off from Time Warner in 2009, correct?

24  A.   Again, beyond what was already available to me and

25  presented, I did not go further.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q.    When you say "beyond what was already," you mean by -- by

2    whom?

3    A.    AT&T's experts presented some of this analysis, and we

4    looked at those data.

5    Q.    Okay.

6    A.    And I think I understand what's happening in those data,

7    and there are considerable problems with those data, and I did

8    not believe that going further would be fruitful either.

9    Q.    So what you're saying is that AT&T during the regulatory

10   phase of this proceeding provided some data to the DOJ, you

11   looked at it and you made a judgment not to pursue it

12   independently on your own?

13   A.    Well, during the investigative phase, I would prefer to

14   call it more accurate.  But the --

15   Q.    Correct.  But my statement is correct, right?

16   A.    Not exactly.  I would say that the data, we agreed on the

17   data that was available, and I understood limitations of the

18   data and what AT&T's experts had found or not found in that

19   data, and I did not believe further analysis would be

20   additionally informative.

21   Q.    So you did no independent analysis in depth of that data

22   to determine the pricing effects once cable spun off from Time

23   Warner, correct?

24   A.    I didn't do further analysis.  I know what's in those

25   data.

1  Q.   Okay.  And same thing with News Corp DirecTV.  You

2  actually worked on, on the -- I thought you heard you say you

3  worked on the initial transaction when News Corp acquired

4  DirecTV; is that right?

5  A.   Well, it was a partial ownership, thirty-four percent

6  ownership stake in 2003.

7  Q.   Right.

8  A.   I did work on that.  And that was one of the transactions

9  of interest to look at, and I believe the data is quite poor

10 going back during that period of time that was available.  It

11 is something that the FCC looked at.

12 Q.   Well, let me -- let me -- let me try to do question and

13 answer here a little bit more succinctly.

14 A.   Okay.

15 Q.   First of all, when you -- you were retained by News Corp

16 in connection with its acquisition of DirecTV back in 2003,

17 right?

18 A.   Again, that partial ownership interest, that's correct,

19 yes.

20 Q.   And you rendered an opinion, that was a vertical

21 transaction, correct?

22 A.   Yes, that's correct.

23 Q.   And you rendered an opinion in that case that it is likely

24 that the proposed transaction will benefit consumers, correct?

25 A.   That is correct.

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

1  Q.   And you rendered an opinion in that case that the proposed

2  transaction would clearly be pro-competitive, correct?

3  A.   Well, I think we went through that part of my deposition,

4  and that sentence is referring to a previous sentence, if those

5  effects were found.

6  Q.   Well, I will read the previous sentence.

7  A.   Okay.

8  Q.   "The proposed transaction offers the prospect of

9  strengthening DirecTV in part due to the efficiencies that are

10  expected to flow from it.  A stronger DirecTV would be better

11  able to compete even more aggressively against cable operators

12  in multichannel video programming distribution markets in many

13  geographic areas.  In that sense the proposed transaction would

14  clearly be pro-competitive."  And that's the opinion that you

15  rendered, right?

16  A.   I think that's correct.

17  Q.   Now, five years later DirecTV spun off from News Corp,

18  right?

19  A.   Yes, 2008, I think it was you're saying?

20  Q.   Around 2008 or so?

21  A.   We agree.

22  Q.   And you did not examine the pricing effects in connection

23  with the spinning off of DirecTV from News Corp, correct?

24  A.   Again, it's the same answer as with the previous

25  transaction, which was there was data available, I looked at

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  it, and I did not have additional things to say about that.

 2  Q.    Now, you are aware that Professor Carlton has examined the

 3  pricing effects in those prior transaction, right?

 4  A.    I am.

 5  Q.    And you are aware that he has rendered opinions about

 6  those transaction, right?

 7  A.    I am.

 8  Q.    Again, and you are aware that he has concluded that there

 9  is a -- that the data is sufficient to make informed opinions,

10  correct?

11  A.    I believe that is his opinion, yes.

12  Q.    And you are aware that his opinion is, is that the effects

13  in those actual transactions do not support your conclusion in

14  this case, correct?

15  A.    I'm aware of that.

16  Q.    We will hear from him tomorrow.

17      Now, just to sum up, then, before I move into some of the

18  inputs in your model.  You -- your model predicts or attempts

19  to predict underlying incentives, but does not literally

20  predict the price increases that are going to occur in the

21  ensuing years, correct?

22  A.    I think we had that quote before.  We talked about the

23  "literally."

24  Q.    Your model does not take into account long-term contracts,

25  correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A.    That is correct.  It looks at the effects once the -- over

2    time as the contract expire.

3    Q.    Other than the elimination of double marginalization your

4    model has not taken into account or made any adjustments for

5    any additional efficiencies that may be achieved as a result of

6    the merger; that's true also, right?

7    A.    That is correct.  They're not credited based on my

8    reliance on the other experts.

9    Q.    Your model does not make any adjustment for Turner's no

10   blackout arbitration offer, we've gone through that, correct?

11   A.    We have, that's correct.

12   Q.    And your model does not make any adjustments for the

13   applicability of the FCC's program access rules, correct?

14   A.    I disagree with you on that.

15   Q.    Well, you concluded that they won't be operative to

16   address price increases, correct?

17   A.    I don't believe they will be effective in preventing the

18   predicted price increases.

19   Q.    Now, I want to go over the inputs of your model, and you

20   indicated that there were three essential inputs, right, the

21   departure, the diversion and the profit margin, correct?

22   A.    Yes, sir.

23   Q.    And I'd like to start with the last one first.  And that's

24   the profit margin, okay?  And again, the idea here is that

25   direct -- the merged company is going to benefit if and to the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   extent there were a blackout, customers might leave another

2   MVPD, go over to DirecTV.  That should be taken into account in

3   the negotiations, right?

4   A.   That's correct.

5   Q.   Now, on these profit margins, well, we talked about

6   binoculars, remember that?

7   A.   I do.

8   Q.   We talked about a telescope, right?

9   A.   I do.

10  Q.   Okay.  Now, I'm going to ask about a mirror.

11  A.   Eww, I like it.

12  Q.   And you looked backwards, back to -- back to 2016 in using

13  a profit margin or an LTV in order to determine profit margin

14  for the purpose of your analysis, correct?

15  A.   I used the 2016 lifetime values to calculate the margins,

16  that is correct.

17  Q.   And the number that you used, Professor, was one that was

18  as of June 2016, correct?

19  A.   Well, I had several months of data.  I think that was --

20  it went through June, if I recall correctly.

21  Q.   And I think you will agree with me that we are in the year

22  2018 now, almost two years later, right?

23  A.   I really don't like to fight.

24  Q.   Okay.  And so it would be useful if more current profit

25  margin data were used to do your calculations, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   Having additional data would be helpful.

2  Q.   Okay.  And you know that over the ensuing couple of years

3  margins have gone down, haven't they?

4  A.   The video margins have gone down.  The multiproduct

5  margins are going up.

6  Q.   Now, you didn't -- you didn't -- you use a number of one

7  thousand three hundred and twenty-four; is that correct?

8  A.   Is that as a lifetime value?

9  Q.   Yes.

10  A.   I'd have to check that.

11  Q.   You don't remember?

12  A.   No, I remember the margins, but they're derived from that

13  number, I'd have to check.

14  Q.   Well, I'll represent to you that's the number that's in

15  your report, okay?

16  A.   Okay.

17  Q.   Okay.  Now, you know who David Christopher is, right?

18  A.   That's familiar, it's not quite ringing a bell.

19  Q.   It doesn't ring a bell?

20  A.   No, it does not.

21  Q.   Well, if I told you he was in charge of video at DirecTV,

22  does that ring a bell?

23  A.   Not especially, no.

24  Q.   If I told you that you cited to his deposition in your

25  report, does that ring a bell?

1  A.   No.

2  Q.   Well, did you read his deposition?

3  A.   I did not.

4  Q.   Well, take a look at tab three, which is your rebuttal

5  report, and look at pages 36 to 37, note 131, where you cite

6  and rely on the deposition testimony of David Christopher, who

7  I'll represent to you is currently the president of mobility

8  and entertainment.  Do you see the reference to him?

9  A.   I do.

10  Q.   Now, you said in your report, and you did two reports,

11  right, let's back this up a bit.  You did a report on February

12  2, your initial report, right?

13  A.   I did.

14  Q.   And then you did another one, a rebuttal report on

15  February 26th, right?

16  A.   Yes.

17  Q.   Okay.  And you updated various numbers when you did your

18  rebuttal report, right?

19  A.   I did.

20  Q.   Okay.  And the result of your updating those numbers

21  caused the alleged price increase under your calculation to go

22  up, correct?

23  A.   Yes.

24  Q.   But you didn't update any price -- excuse me, any profit

25  margin data or any profit margin calculation, correct?

1   A.   I think that's correct.

2   Q.   In fact, you said that, quote, I do not have updated

3   margin estimates for 2017, right?  You wrote that in your

4   rebuttal report?

5   A.   Okay, I don't remember that specific line, but I'm not

6   disputing it.

7   Q.   That's at page 54, okay?

8   A.   Okay.

9   Q.   Now, but you did know that the LTV, your thirteen hundred

10  number had dropped significantly as of the time you wrote your

11  rebuttal report, correct?

12  A.   I was unaware of that fact.

13  Q.   Well, you read the -- you didn't read the deposition of

14  Mr. Christopher even though it cited in your report?

15  A.   No, my support staff would be looking for information and

16  they -- they're the ones who found this quote.

17  Q.   Okay.  But you -- you sponsored the report, you're the

18  expert, right?

19  A.   Of course.

20  Q.   And you're telling us, and now the Court that you didn't

21  have updated margin information in 2017, and you didn't realize

22  that it was in the very deposition that you cited in your

23  report?

24  A.   Well, I don't know what information is in that deposition.

25  If somebody puts a number in a deposition, unless there's

1  something more reliable, I wouldn't necessarily use it.  But

2  no, I was not aware of that at the time I wrote my report.

3  Q.    You're not suggesting it wasn't reliable because you never

4  read it?

5  A.    No, I'm just saying I don't know what that number is.

6  Q.    Okay.

7  A.    And so I would need to look at it in order to determine

8  whether it was usable and how to use it.

9  Q.    If you had looked ten pages more than the pages you cited,

10  you would have seen the number eight hundred and twelve dollars

11  in the very deposition that you cited, but you didn't look at

12  the ten pages because apparently you never read anything in the

13  deposition, correct?

14  A.    I did not read that deposition.

15  Q.    And that's at page 61 of Mr. Christopher's deposition

16  cited in your report.

17      Now, having not read those pages or any pages of

18  Mr. Christopher's report, you must have not also reviewed any

19  of the additional updated margin data that was provided on to

20  DOJ on February 26th, correct?

21  A.    Well, there was some updated margin data provided as the

22  backup to Professor Carlton's rebuttal report, is that what

23  you're referring to?

24  Q.    Did you receive and process and review any of the updated

25  margin data that was provided with the February 26th, report?

1  A.   That's what I'm asking, with professor Carlton's rebuttal

2  report.

3  Q.   Yes.

4  A.   So yes, my team, we became aware of that, of course.

5  Q.   Your team or you?

6  A.   Both.

7  Q.   Okay.  Now, did you see the --

8          THE COURT:  Hold on a second.  How many are on this

9  team?

10          THE WITNESS:  Well, I would say there's three or four

11  people at Bates White who I'm really thinking of when I say

12  that.  And then there's -- we work together with the economists

13  at the antitrust division, who also are reviewing information,

14  and we talk with them.

15          THE COURT:  So the antitrust division staff helps to

16  helps you write and prepare your expert report?

17          THE WITNESS:  No.

18          THE COURT:  Is that what you're saying?

19          THE WITNESS:  No, that's not what I'm saying, Your

20  Honor.

21          THE COURT:  Okay, let's be clear about that.

22          THE WITNESS:  When we have questions about, the data

23  would come in and be provided to Justice Department, and then

24  we would get it from them so we wouldn't actually communicate

25  with them.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1            THE COURT:  But the actual analysis of the data and

2   modeling and all that, that's you and your team, right?

3            THE WITNESS:  Yes, sir.

4            THE COURT:  And the team is you and three or four

5   other people?

6            THE WITNESS:  Yes, sir.

7            THE COURT:  And this Bates and White, is that a

8   company in -- near Berkeley as in San Francisco --

9            THE WITNESS:  No, it's a consulting company here,

10  they're based here in Washington, D.C.  Keith Waeher is the

11  lead person helping me there, he's one of the partners there.

12           THE COURT:  Keith Waeher.  Do they have offices in

13  San Francisco?

14           THE WITNESS:  No, I don't believe so, no.  No.

15           THE COURT:  So you deal with them here?

16           THE WITNESS:  I usually work with a different

17  consulting company actually, but in this case I'm working them.

18           THE COURT:  Okay.  Did you pick them?

19           THE WITNESS:  Yes, I did.

20           THE COURT:  Okay, go ahead.

21  BY MR. PETROCELLI:

22  Q.   Now, with Professor Carlton's report on February 26th, you

23  received pricing -- excuse me, margin data for June 2017, one

24  full year later than the number you used, right?

25  A.   This was what we got from the backup materials to
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Professor Carlton's rebuttal report, yes.

2  Q.   Now, did you and your team, did you run your model using

3  the eight hundred dollar figure from the information provided

4  to you in lieu of your outdated thirteen hundred dollar figure

5  from a year earlier?

6  A.   I -- we did, we can easily estimate if you put in the

7  eight hundred, whatever the lower number was, I believe it was

8  about a forty percent drop in value or margins that Professor

9  Carlton was reporting.  So that would lead by the

10 proportionality I mentioned earlier, would lead to a forty

11 percent drop in the harm calculations if one accepted that

12 number.  I don't think that's the right thing to do.  But we

13 did run those numbers, that's very straightforward.

14 Q.   Okay.  But you never issued any supplemental report with

15 those calculations, correct?

16 A.   That is correct.

17 Q.   Okay.  And instead you've come to court today trying to

18 block this merger with profit margin information that goes no

19 later than June 2016, almost two years ago.  Is that true?

20 A.   I'm not trying to block the merger.

21 Q.   Well, I'm glad to hear that?

22 A.   I'm trying to give the Court my opinion.

23 Q.   Did I understand you to say on direct examination that you

24 think that even your higher profit margin of thirteen hundred

25 is understated?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Yes, that's correct.

2  Q.    And this is not an opinion that you previously expressed,

3  is it?

4  A.    Yes, I did.

5  Q.    And you're expressing it now because you know that the

6  profit margin data going back to June 16 is obsolete by now?

7  A.    Maybe you didn't hear my previous answer.  I did express

8  this opinion in my initial report at footnote 414.

9  Q.    One line.  You did no calculations, correct?

10  A.    It's a rather long footnote, it's not one line.

11  Q.    Did you write that footnote?

12  A.    Yes.

13  Q.    You're sure you wrote that footnote.  And --

14  A.    Well, let me --

15  Q.    Withdrawn.  It doesn't matter.  Let me ask my next

16  question in the interest of time.

17       I heard you say --

18  A.    Let me be clear.  I don't write every word.  Some of the

19  footnotes in the appendices the other folks do write, and I

20  review it.  The entire body of the report, I do write myself.

21  Q.    Now, I heard you explain on direct examination why you

22  think even this old outdated profit margin should even be

23  higher, and one of the reasons that you gave, as I understood

24  your testimony, hearing it for the first time, is that the

25  subscribers that DirecTV has instead of those that it acquires

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  are of higher value, right?

2  A.   Lifetime value because one does not need to deduct the

3  subscriber acquisition cost since they've already been

4  acquired.

5  Q.   And as I understood the logic that you were spinning out,

6  and you used Charter as an example, right?  If there were a

7  blackout of Charter, right, then -- excuse me.  Turner blackout

8  with Charter, Charter subscribers wouldn't have Turner,

9  correct?

10  A.   Correct.

11  Q.   Okay.  And as a result, existing subscribers of DirecTV

12  might not decide to cancel their DirecTV subscriptions and go

13  to Charter because Charter doesn't have Turner, correct?

14  A.   Yes, that's part of the reduced gross ads at Charter that

15  would be reflected by reduced churn at DirecTV.

16  Q.   Where did you get the idea that a customer who's sitting

17  there at DirecTV, according to your view, a long-term valuable

18  customer, would ever want to cancel his subscription and walk

19  across the street to Charter?

20  A.   Because there's quite a bit of churn in this industry,

21  it's around two percent a month.

22  Q.   But you haven't measured in any of your analysis, you

23  haven't actually identified the number of these supposed happy

24  DirecTV customers who are going to cancel their long-term

25  subscriptions and go across the street to Charter.  You've done

1  no quantitative measurement of that; is that correct?

2  A.   Well, that would be counted for in my diversion rate,

3  which I have measured by geographic market.

4  Q.   But you've measured people who would leave other MVPDs to

5  go to DirecTV, I haven't seen any measurement of people who

6  would leave DirecTV to go to Charter but for the Turner

7  blackout.  Do you have that calculation anywhere broken out

8  separately?

9  A.   This is in the diversion rate, as I said, which is

10  proportional to market shares.

11  Q.   Other than proportional to market shares, you haven't

12  separately isolated and identified these happy DirecTV

13  customers who would then march across the street to Charter,

14  that's all I'm asking?

15  A.   Well, I don't think it's the happy ones that march across

16  the street.  Churn is for other reasons, usually not the happy

17  ones.

18  Q.   Did you also say that the customers that would come over

19  to DirecTV from Charter in your example were high value

20  customers likely to stick around for a long time?

21  A.   I said that would be another factor that would, but I have

22  not accounted for that.  If accounted for would lead to higher

23  lifetime value, yes.

24  Q.   But isn't it the case that the people who cancel are

25  typically people who are not long-term customers are the ones

1  with the quick trigger, and they leave one place, they go to

2  another, and they're probably going to leave the other place

3  soon too.  Isn't that normally how it works?  They're not

4  sticky, in other words?

5  A.   That may be true in general for churn, but what we learned

6  from AT&T's own experience in the DISH clock's blackout WAS

7  that the customers they were acquiring were these super low

8  risk, or words close to that.  And so they were getting

9  customers who would not normally move, but moved because they

10 valued the Turner content so much, and they were very valuable

11 customers because they are sticky, and it took the absence of

12 the Turner content to get them to move.

13 Q.   So let me, in the interest of time, I'm going to move on

14 to your departure rate, because I don't want to -- I have to

15 cover this with you, okay?  Your departure rate is nine

16 percent, right?

17 A.   I use the term long-term subscriber loss rate because

18 departure and arrival are different.

19 Q.   Same thing?

20 A.   Well, it's not the same.

21 Q.   Well, you're counting both, though, right, the people who

22 leave and the people who would have joined, right?

23 A.   Yes, exactly.

24 Q.   I use it to mean both, but if it makes you more

25 comfortable, I'll use subscriber loss rate, but you can correct

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   me if I use departure, okay?

 2   A.   I just don't want to be misleading.

 3   Q.   Understood, understood, okay.

 4        So you have a nine percent subscriber loss rate, right?

 5   A.   I do, long-term.

 6   Q.   And that's what leads to these numbers, right?

 7   A.   That's correct.

 8   Q.   Have you calculated what the subscriber loss rate would

 9   have to be in order to have no predicted price increase?

10   A.   Well, it would have to be zero.

11   Q.   No, what if I told you five percent.  All other things in

12   your model being equal, if there were a five percent, 5.6

13   percent subscriber loss rate, it would zero out the price

14   increase.  Does that sound right to you?  If it doesn't, I'll

15   move on.

16   A.   I'm not sure.  In order for there not to be a cost

17   increase for the other MVPDs, the subscriber loss rate would

18   have to be zero.

19   Q.   Well --

20   A.   For proportionality.

21   Q.   If the subscriber loss rate generated an amount that was

22   equal to the elimination of double marginalization, doesn't

23   that get us to zero?

24   A.   Right, so the price is downstream.  Your number could well

25   be right for the downstream price effects.  I was addressing
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  the upstream cost effects.

2  Q.  Ah, thank you.  I meant downstream.

3  A.  Okay.

4  Q.  Downstream, consumers at a five to six percent subscriber

5  loss rate that translates downstream into no price increase to

6  consumers, right?

7  A.  That does not sound unreasonable.

8  Q.  Okay.  Now, when you were coming up with this nine

9  percent, I heard you testify that you focused on long-term

10 blackouts, right?

11 A.  Yes.

12 Q.  But to be sure there's never been a long-term blackout of

13 Turner, right?

14 A.  No, that's why I looked to Viacom.

15 Q.  But there have been short-term blackouts, right?

16 A.  Yes.

17 Q.  And two in particular, right?

18 A.  Yes.

19 Q.  Cable One blacked out all of the Turner networks in 2013

20 or so, and then Dish, Charlie Ergen, did the same except for

21 TNT and TBS in 2014, right?

22 A.  That's correct, each of those was about a month or

23 slightly less, around a month.

24 Q.  And you agree that those short-term blackouts can be

25 informative, right?

1    A.    Somewhat informative, but I have much better information

2    from other sources, especially the long-term blackout.

3    Q.    Now, on the Cable One Turner blackout, you actually had

4    forgotten all about that when your deposition was taken,

5    correct?

6    A.    It did slip my mind at the deposition, although it's in my

7    report, that's correct.

8    Q.    Now, are you aware from the evidence in this trial record

9    that Cable One estimated that their subscriber loss rate from

10   that blackout was less than one percent for the first two

11   months?

12   A.    Well, the blackout was only one month long.

13   Q.    Well, following the blackout there was less than one

14   percent subscriber loss, I'm just asking whether you were aware

15   of that evidence in the record?

16   A.    I thought it was one to two percent, but you're telling me

17   it's less than one?

18   Q.    Well, if I said it was less than two total impact over

19   time, are you aware of that?

20   A.    I am aware of that range, yes.

21   Q.    Okay.  And you're aware that Mr. Sejen testified yesterday

22   by deposition about this.  Did you read that?

23   A.    I did not know that actually, no.

24   Q.    Were you told about that?

25   A.    No.

Q.   Okay.  And were you made aware of his deposition testimony

which was recorded a while ago that the subscriber losses were

fairly insignificant with respect to the Turner blackout?

A.   I do remember testimony along those lines.  And the one to

two percent figure is what stuck in my head.

Q.   And same thing with the Dish Turner blackout, you're aware

of the testimony that the subscriber loss impact was

negligible?

A.   I don't know the use of that word.

Q.   Well, do you remember thirteen thousand seven hundred in

subs?

A.   I don't remember that particular number, no.

Q.   Thirty thousand subs?

A.   I do remember that coming up.

Q.   And that's less than, what, one percent of Dish's

subscribers?

A.   Yes.

Q.   Okay.  You relied, not on any of these short-term

blackouts, but you relied on some surveys in addition to the

two Viacom blackouts, right?

A.   Well, the survey and the Altman Vilandrie study, which

includes survey and set-top box data, yes.

Q.   And also one by Professor Hauser, right?

A.   That's correct.

Q.   Now, on the Professor Hauser one, you know that he

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  actually estimated a one month temporary blackout for Turner,

2  are you aware of that?

3  A.   Yes, I think it was eight percent.

4  Q.   Right.  And so in assessing the reliability of Professor

5  Hauser's estimated permanent blackout rate, it would make sense

6  to see if he got it right or even came close on his one month

7  estimation, correct?

8  A.   It's not unreasonable.

9  Q.   Okay.  And as it turns out, he didn't come close, did he?

10 A.   Well, the eight percent is a lot different than whatever

11 it would be from Cable One, I guess, where you're saying it's

12 one to two percent.

13 Q.   Cable One or Dish, it looks like he's not even in the same

14 universe, he's like eight, nine times off?

15 A.   Well, I don't think you can fairly use Dish because it's a

16 partial blackout, but I think it's more fair to use Cable One.

17 Q.   Okay.  Either way he's way off base on his estimate?

18 A.   That eight percent number seems high, yes, I agree.

19 Q.   And did you take that into account the fact that he didn't

20 get it right on the one month in relying on Professor Hauser's

21 permanent blackout estimates?

22 A.   I'm aware of that.  His twelve percent is corroborative.

23 If I didn't rely on that, if we decided that was unreliable, it

24 wouldn't change my opinions.

25 Q.   Okay.  So the single most important document that you

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  relied on was a slide deck prepared by a company called Altman

2  Vilandrie, correct?

3  A.    That's correct.

4  Q.    Okay.  Now, it is true, sir, that -- and they had a

5  projected subscriber loss rate of nine percent for existing

6  subs who would cancel, and ten percent for prospective.  And

7  they also had some higher numbers, and you used the lower end

8  of the range, correct?

9  A.    That's correct.  That is correct.

10  Q.    And in determining many that the Altman Vilandrie document

11  or slide deck was the single most important document for your

12  subscriber loss calculation, you never spoke to anybody at

13  Altman Vilandrie, correct?

14  A.    I did not.

15  Q.    Okay.  You didn't speak to the person who directed the

16  work, Stefan Bewley, correct?

17  A.    I did not.

18  Q.    And at your deposition you were unfamiliar with the

19  details of the work that he did, correct?

20  A.    Well, I'm familiar with the study's results, and then

21  there was some questions in the deposition about some of the

22  underlying methodology, and I had not dug into that, that's

23  true.

24  Q.    Yes.  I mean, you read the report, but you didn't go

25  behind the report and ask for backup materials from them to see

1  how they actually performed the work, correct?

2  A.    Not beyond what was in the final report, that's correct.

3  Q.    So you just read the document, is what I'm hearing?

4  A.    That is true.

5  Q.    Okay.  And now, are you aware that -- but I heard you say,

6  though, I think, in your direct testimony that that was such a

7  great document because it had lots of analytical work.  Do you

8  recall testifying that it had lots of analytical work, right?

9  A.    Yes, that sounds right.

10  Q.    But at the time you relied on it, you had no idea of what

11  their -- how analytical their work was other than reading what

12  was in the document?

13  A.    Well, it was quite a lot of detail in that document about

14  their methodology and the data they used and their sources so I

15  don't really don't know what you're getting at.

16  Q.    Well, you were not familiar with the details of their

17  methodology, right?

18  A.    Well, there's, of course, details beyond what's described

19  in the final report.

20  Q.    Yes.

21  A.    But I understood the -- the two sources of data they were

22  relying on, and I saw they had hybrid result, and there's a lot

23  of elements in there.  So I just don't really get where you're

24  going.  It sounds like anytime I read a paper that I have to go

25  and talk to the author in order to see whether the paper is any

1    good, that's not how it works.

2    Q.    In all due respect, I don't think it matters if you don't

3    see where I'm going.  I think you just try to answer my

4    questions, okay?

5    A.    I think I have.

6    Q.    Did you know it was an Internet survey?

7    A.    Yes, I understand that the survey part was done on line.

8    Q.    Do you know how many people were surveyed?

9    A.    He mentioned this in his testimony.  I thought there were

10   twelve hundred, something like that, sixteen hundred.

11   Q.    You're now referring to his testimony, which you didn't

12   know at the time that you relied on the report, though?

13   A.    Yes, that's correct.  I thought you were asking me how

14   many people were surveyed.

15   Q.    Did you know, did you know that he, as part of his survey,

16   asked people to rank certain channels as must have, did you

17   know that?

18   A.    Yes, I'm aware of that.

19   Q.    What definition of must have did he provide?

20   A.    He described this in his testimony, I can't give the exact

21   quote.

22   Q.    Well, I'll tell you what it was.  He said he provided no

23   definition of must have?

24   A.    Oh, okay.  I am mistaken then.  I thought he had given

25   one.

1  Q.   Did you understand, let me read you his testimony just to

2  be clear on this.  It's page 1306, the trial testimony.

3           "When they were filling that out, there was

4       nowhere where they could find a definition of what

5       must have meant; is that correct?

6           "Answer:  That's correct."

7     Does that ring a bell?

8  A.   No, I actually not remembered that part of his testimony.

9  Q.   Okay.  And do you know that as part of the survey, for

10 example, they only surveyed on one of the Turner networks and

11 one part asked questions about other networks and another part

12 and kind of all mixed it together?

13 A.   Well, I do recall in his testimony there was part of the,

14 I think it was part of the conjoint analysis, they asked about

15 one network.  Again, these are details I don't have all in my

16 head, though.

17 Q.   Did you read Professor Rossi, who's an expert who will be

18 testifying about that slide presentation, did you read his

19 deposition or his report?

20 A.   I did not.  No, no, sir.

21 Q.   Okay.  Now, you know from reading the trial testimony or

22 your team reading it, that Altman Vilandrie ended up hard

23 coding some number, manually hard coding a number into their

24 work product.  You have heard about that, right?

25 A.   Yes, yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   You didn't know anything about that at the deposition,

2  right?

3  A.   I was not aware of that in that term at the deposition.

4  Q.   And you don't know -- and, of course, you didn't know

5  anything about that at the time that you relied on that

6  document and called it the single best document with respect to

7  the subscriber loss rate, right?

8  A.   I did not know about the details of how they made

9  adjustments over time to their methodology.  I was not aware of

10  that when I first relied on the document.

11  Q.   Now, you indicated in your deposition that you anchored

12  yourself to the lower end of the range, you recall testifying

13  to that?

14  A.   Yes, they had a range, and I chose the lower -- well, I

15  reported to the Court the lower numbers, but I've also put in

16  my expert reports the higher end of the range.

17  Q.   Nine to fourteen percent was the range, right?

18  A.   That I end up with a long-term subscriber loss rate.

19  that's right.

20  Q.   And the lower end was nine percent right?

21  A.   The lower end is nine and the upper is fourteen, yeah,

22  yes.

23  Q.   But when you relied on it as a single most important

24  document, you didn't know, sir, that their original results

25  that they delivered to Charter, their client, reported a low

```
1   end of five percent.  You don't know that, did you?

2   A.   I did not know that they had five percent in the -- to be

3   in the customer grouping.

4   Q.   They had five percent was the low end of their range as

5   opposed to nine percent, did you -- you did not know that at

6   the time that you relied on it, true?

7   A.   That is correct.

8   Q.   Okay.

9   A.   If I used the five percent instead, I would get a

10  long-term subscriber loss rate of 8.5 percent instead of nine

11  in my calculations.

12  Q.   So you obviously have learned about it since because

13  you've just rattled off that calculation, right?

14  A.   Yes, sir.

15  Q.   So you kind of knew this was going to come up, right?

16  A.   I guessed.

17  Q.   Now, nobody gave you a copy -- where did you get the

18  Altman Vilandrie report, you got it from DOJ, right?

19  A.   Yes, well, they must have gotten it from Charter, and I

20  got it from DOJ.

21  Q.   Did you get it from both?

22  A.   No, no, I said I got it from DOJ, that's what I said.

23  Q.   And when DOJ gave it to you, did they give you the

24  original findings and the original results that had the five

25  percent number?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    I don't know.  The one that came to me was the April 27th,

2  I think it is, of 2017.

3  Q.    That's the nine percent?

4  A.    Yes, what was -- the label on that is the final report

5  given to the client.  I don't know what other earlier versions

6  might have been provided either to DOJ than to my support team.

7  Q.    Well, I wasn't referring to earlier versions.  I was

8  referring to a document that was called the final document that

9  was sent to Charter on April 21st that had a low range of five

10  percent.  You never were made aware of that until you learned

11  about it in the course of these trial proceedings, correct?

12  A.    I think that's correct.

13  Q.    Okay.

14  A.    The one I had, was using was a subsequent one.  I believe

15  it's April 27.

16  Q.    Okay.  Now, I'm going to move past Altman Vilandrie, okay?

17  A.    Okay.

18  Q.    You also turned about a long-term Sudden Link Viacom

19  blackout, right?

20  A.    I did.

21  Q.    Okay.  And you came up with a very high, what was it, 9.4

22  percent, did I understand that?

23  A.    I have a 9.4 percent long-term subscriber loss rate based

24  on that blackout episode.

25  Q.    And you are aware that a number of others have actually

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  taken a look at that blackout as well over the years, right?

2  A.   I'm not sure what you're referring to.

3  Q.   Well, are you aware that Sudden Link's own analysis

4  estimated the impact not at 9.4 percent, but 2 to 2.5 percent,

5  were you aware of that?

6  A.   I believe that was only over a short period of time, I'm

7  interested in the long-term subscriber loss rate.

8  Q.   Well, were you aware of what I just asked you?

9  A.   If you're referring to the short-term of around two or

10  three months, I do recall that.

11  Q.   And were you aware that a Comcast analysis put it at 3.8

12  percent, and that was done in November 2016, taking into

13  account a longer period of time.  Were you aware of that?

14  A.   I don't recall exactly what that analysis was, but since I

15  have the data from Sudden Link myself, I don't see how that

16  could be more accurate than the data I have.

17  Q.   Well, I'm not -- I'd just like you to answer whether you

18  had this because I'm going to run out of time, okay?

19      My next question to you is, were you aware that in the

20  Altman Vilandrie slide deck they estimated 4.5 percent, this is

21  the document you said was the most important, and that was done

22  in April 2017, three years after this event, were you aware of

23  that?

24  A.   Yes, and they said they got their -- some information from

25  Charter.

1   Q.   Were you aware that the National Cable Television

2   Cooperative estimated it at 2.5 percent in March of 2015?

3   A.   I believe that's again a short-term rate, and that the

4   previous one was only loss and departures who do not include

5   loss new ads.

6   Q.   Professor, I'm only asking you if you're aware of these

7   numbers, that's all.  You can answer yes or no if you can.

8   Were you aware of that number?

9   A.   Which one?

10  Q.   NCTC, 2.5 percent as of March 2015?

11  A.   I think I've seen that.

12  Q.   Citibank, 2.5 percent as of October 2014?

13  A.   I don't recall that one.

14  Q.   Cox Communications put it at three percent as of April

15  2016, are you aware of that?

16  A.   I don't know about that one, but I don't see how any of

17  this could be as good as the actual Sudden Link data that I

18  have.

19  Q.   Well, I'm going to leave it to Professor Carlton in the

20  interest of time to talk about your projections of the Sudden

21  Link drop.

22      Let's talk about the Cable One Viacom blackout, which

23  occurred in April 2014.  Okay?

24      Are you aware that Cable One -- you put that at sixteen

25  percent; is that right?

1   A.    That is correct.

2   Q.    Okay.  Are you aware that -- would you agree with me that

3   the CEO of Cable One might know more about the business of

4   Cable One than you?

5   A.    I'm sure he or she does.

6   Q.    Are you aware that Cable One's CEO himself said that

7   dropping Viacom cost the company about two percent of video

8   subscribers, are you aware of that?

9   A.    I don't recall that specifically.

10  Q.    Are you aware that Cable One's chief negotiator,

11  Mr. Sejen, who testified by deposition in this trial yesterday,

12  said that the losses attributable to Viacom very, very small in

13  general and not significant.  Are you aware of that trial

14  testimony?

15  A.    Yes, I think I am.

16  Q.    Are you aware of his testimony that the Cable One

17  permanent drop of Viacom was fully absorbed within four to six

18  months?

19  A.    I don't recall that.

20  Q.    And you are aware of Mr. Sejen's testimony putting the

21  drop at about two percent of video subs?

22  A.    I don't specifically recall that.

23  Q.    Did I hear you also talk about a Comcast analysis of

24  Turner in your direct examination?

25  A.    Yes, I think so.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Right.  Now, you said, as I recall, that Comcast got a

2  subscriber loss estimate that was comparable to the low end of

3  your range, do you recall giving that testimony?

4  A.   I do.

5  Q.   In fact, it was not comparable, it was less than your low

6  end, correct?

7  A.   Well, I didn't want to give the exact number, but it was

8  within a single digit percentage of the low end of my range.

9  Q.   Well, we can dispute that, but I won't quibble with that

10 right this moment.  I'll ask you another question instead.

11      Are you aware of the testimony in this record that there

12 was an actual long-term blackout at Comcast, and that Comcast

13 estimated what the subscriber loss rate would be on a long-term

14 basis.  Are you aware of that analysis?  I won't name, I won't

15 give you any more specificity in the interest of

16 confidentiality.

17 A.   I'm sorry, but it's not triggering a recollection, I

18 apologize.

19 Q.   Do you recall reading the testimony that their loss

20 estimates are extremely conservative.  In other words, they're

21 overstating it?

22 A.   I think, was it Mr. Rigdon who -- probably who said they

23 want to, something along those lines, not so much overstated,

24 but more of a bound, I think.

25 Q.   And with respect to the long-term blackout of the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  particular network that did occur, are you aware that they

2  overestimated by over eighty percent?

3  A.    I'm just not remembering that one right now.

4  Q.    I'm going to turn your diversion.  You relied again

5  principally on Altman Vilandrie; is that correct?

6  A.    No, that's not correct.  I relied primarily on the market

7  shares that we could calculate in different geographies.

8  Q.    Well, you relied on Altman Vilandrie for what you called

9  the outside good, correct?

10  A.    For that part, yes, that's correct.

11  Q.    Okay.  Now the outside good, as I understand it, are those

12  people who might depart a -- an MVPD who has lost Turner, for

13  example, but not sign up with another MVPD, but just cut the

14  cord, right?

15  A.    That's correct.

16  Q.    Okay.  And you know a lot of cord cutting has been going

17  on over the past number of years, right?

18  A.    There's somewhat of a trend, yes.

19  Q.    And you use the Altman Vilandrie estimate of ten percent

20  to account for this cord cutting in doing your diversion

21  analysis, right?

22  A.    Well, that is in our modeling the share of the outside

23  good.  The diversion they actually show to the cord cutting is

24  16.8 percent.

25  Q.    I was referring just to the outside good part, you used

1  their ten percent figure, right?

2  A.   Well, I was trying to clarify.  Their figure is 16.8

3  percent, and that converts to a ten percent share of the

4  outside good.

5  Q.   Okay, fair enough.  And you know that he Professor Carlton

6  has a higher number than you for outside good, right?

7  A.   I do, I'm aware of that.

8  Q.   Do you know what it is?

9  A.   I think he has something more around twenty percent.

10  Q.   Correct.  And are you aware of -- what is S&L Kagan?

11  A.   They're an outfit that gathers and reports, and I guess

12  sells data in this industry.

13  Q.   And you are aware that S&L Kagan has estimated that in

14  2018, that would be this year, twenty percent of U.S. TV

15  households will cut the cord.  Are you aware of that statistic?

16  A.   I do recall something like that.  That's not the right

17  number for my purposes.  The Altman Vilandrie number is much

18  better, but I'm aware of it.

19  Q.   And speaking of statistics, when you ran these numbers and

20  came up with these predictions, this is not done to any

21  statistically significant degree of reliability, right?

22  A.   I don't really know what you mean.

23  Q.   Well, in other words, this isn't calculated with any

24  precision, these are just rough ballpark estimates, right?

25  A.   Well, I have a range.  And as I indicated, I can't know

1  for sure what number within that range applies.

2  Q.   But you can't be sure that even the lower end or the upper

3  end of your range will actually be accurate, right?

4  A.   Well, I don't think there's certitude in these things,

5  this is our best estimate, my best estimate.

6  Q.   And you did testify in your deposition that you don't

7  think you have a way of quantifying this with any precision,

8  correct?

9  A.   Okay, I'm not sure what the question was.  But I stand by

10  the answer I just gave, which is we have a range, and that's

11  one way to think about the degree of precision.

12  Q.   Okay.

13        MR. PETROCELLI:  Your Honor, I at this point believe

14  I'm going to -- oh, I have a couple of follow-up questions.

15  BY MR. PETROCELLI:

16  Q.   You talked about a 50/50 bargaining split?

17  A.   Yes, sir.

18  Q.   That's like, you said it was standard, right?

19  A.   It's quite standard, yes.

20  Q.   But you cited an article by someone named Crawford called

21  "The welfare effects of vertical integration in multichannel

22  television markets."  You cited that in your report, correct?

23  A.   Yes, that's right.

24  Q.   And in that report, that article that you cited, and this

25  is in your rebuttal report, by the way, okay?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Okay.

2  Q.    The author there used a different split then fifty/fifty.

3  We're talking about splitting up the gains from trade, right?

4  A.    We are.

5  Q.    And you assumed a fifty/fifty split, and I think you said

6  it was the standard, right?

7  A.    I said it was the standard kind of neutral assumption, and

8  I did the weighted average cost of capital calculation as an

9  empirical check.

10  Q.    But in this article, which is specifically about vertical

11  integration and multichannel television markets, the author had

12  more of a seventy/thirty split, not fifty/fifty, correct?

13  A.    Yes, that was applied to regional sports networks and not

14  to the type of programming content here.

15  Q.    And if you did seventy/thirty, it would produce a very

16  different number, right?

17  A.    That would be significantly different, yes.

18  Q.    Okay.

19        MR. PETROCELLI:  Your Honor, I will reserve the

20  balance of my time if I have any left.

21        THE COURT:  Okay.  You do.

22        MR. PETROCELLI:  Thank you.

23        THE COURT:  All right.

24        MR. PETROCELLI:  How much time do I have left?

25        THE COURT:  Well, I'm about to calculate that.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. PETROCELLI:  I think I have about a half hour,

 2   right?  I don't think I'm going to use it, though.

 3              THE COURT:  That would be good.

 4         Half an hour.

 5              MR. PETROCELLI:  Thank you, Your Honor.

 6              THE COURT:  Plus fifteen on, because each gets

 7   fifteen for redirect and recross, so in theory you could add,

 8   if you want to use it, use it all, forty-five minutes total.

 9              MR. PETROCELLI:  Okay, thank you.

10              THE COURT:  And Mr. Welsh has fifteen left over from

11   his two and a half plus fifteen, so he has a half hour for

12   redirect.

13              MR. WELSH:  Thank you.

14              THE WITNESS:  Or we could just call it a day.

15              THE COURT:  No, no.  No, you and I don't get to do

16   that.  You'll have a nice drink later.

17              THE WITNESS:  You're right, Your Honor.

18              THE COURT:  You'll's be fine.

19         Mr. Welsh, what do you think?

20              MR. WELSH:  One minute, Your Honor.

21              THE COURT:  Okay.

22              MR. WELSH:  May I proceed?

23              THE COURT:  You may.

24              MR. WELSH:  Thank you, Your Honor.

25                         REDIRECT EXAMINATION
```

```
 1  BY MR. WELSH:

 2  Q.   Professor, let's start with the back end of that, and

 3  we'll move forward.

 4      So you were asked some questions about the fifty/fifty

 5  split, do you recall that?

 6  A.   Yes.

 7  Q.   Okay.  And I know you described it, you described it in

 8  your direct, too, that it was a neutral assumption, correct?

 9  A.   Yes.

10  Q.   Now, Professor, are you aware of whether others such as

11  Kevin Murphy have talked about the assumption being a split

12  that -- splitting the incremental surplus equally with each

13  side getting one half, does that ring a bell with you?

14  A.   Yes, I'm familiar with that.

15  Q.   Could you explain to His Honor the context of that and who

16  Kevin Murphy was or is?

17  A.   Right.  So Kevin Murphy is a, I would say highly respected

18  professor of economics at the University of Chicago.  He made a

19  submission on behalf of --

20           MR. PETROCELLI:  Your Honor, I need to object.  May I

21  approach?

22           THE COURT:  You may.

23      (Witness withdrew from the witness stand.)

24      (Sealed bench conference.)

25           MR. PETROCELLI:  Your Honor, we brought this up
```

1   before the trial, and we had a lengthy discussion about it.

2            THE COURT:  We did?  Right here?

3            MR. PETROCELLI:  This is an expert.

4            THE COURT:  Okay.

5            MR. PETROCELLI:  That submitted a report in

6   connection with the Comcast NBCU transaction back in 2011 or

7   '10 on behalf of DirecTV prior to the acquisition by AT&T.

8   It's replete with hearsay.  The expert report is itself

9   hearsay, and we had extended argument on that, and Your Honor

10  made the comment that these expert reports are not coming in,

11  okay?  And what he's trying to do now is get the expert report

12  in through his testimony.  That's the only reason he's asking

13  these questions.

14           MR. WELSH:  Counsel, he's asked questions about the

15  fifty/fifty, points to an article that talks about it being

16  seventy/thirty, and I'm asking whether there's other authority

17  that he's aware of, whether -- and that said it's a

18  fifty/fifty.  Kevin Murphy is of the view that it's a

19  fifty/fifty split.

20           MR. PETROCELLI:  Your Honor, I cited an article in

21  his report that he relied on.  Kevin Murphy was an advocate for

22  a party.  This wasn't a published piece of literature.

23           THE COURT:  I'm not going to allow in testimony by

24  some other expert's --

25           MR. PETROCELLI:  Right.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  -- expert opinion in some other report.

2   It's hearsay on top of hearsay, and I don't think it's

3   appropriate and fair, so.

4          Now, look, if he in some way has indicated in his

5   report, which I have not read obviously, that he relied upon

6   Kevin Murphy in doing an analysis, that might be different, but

7   then he's talking about what his thinking was as to why he

8   adopted the Murphy approach, whatever.  I'm not going to let

9   him testify to what Murphy's opinions were in some other -- at

10  some other time.

11         MR. PETROCELLI:  He gave the basis in his direct

12  exam, Your Honor, he didn't identify anything.  He said it was

13  standard.  He assumed it.  And I referred to his own report.

14  And that's why I asked him about that.

15         THE COURT:  Well, you can go on to something else

16  unless he relied on it in his own report.

17     (Open court.)

18         THE COURT:  All right, sir, come on back.

19     (Witness resumed the witness stand.)

20         THE COURT:  All right, you may proceed consistent

21  with the discussion at the bench.

22         MR. WELSH:  Thank you, Your Honor.

23  BY MR. WELSH:

24  Q.  Professor, you were asked questions regarding short-term

25  Turner blackouts.  I want to come back to that topic.  And I

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  know you talked in your direct examination during your direct

2  examination about the long-term blackouts and the importance

3  there.

4       Can you tell His Honor what your views are of the value

5  that's brought by short-term Turner blackouts as this

6  analysis -- for your analysis?

7  A.   Well, look, I wouldn't want to completely ignore them.

8  There's information there.  But as I think defense counsel has

9  emphasized, there's switching costs, there's inertia.  So if a

10  subscriber expects the blackout to be quite short-term, they

11  can wait.  So that's one reason a short-term blackout is not

12  that informative.

13       The other is that --

14            THE COURT:  How are you defining short-term?

15            THE WITNESS:  Well, the month long one.

16            THE COURT:  A month?

17            THE WITNESS:  Yeah, those are the ones that we're

18  talking about here where we have actual Turner blackouts.  The

19  Cable One and the partial Dish one.  Those are a month, that's

20  what I mean.  I mean a month.

21            THE COURT:  It doesn't matter which month it is?

22            THE WITNESS:  It does actually.  Because the

23  blackouts in October is actually relatively, the Altman

24  Vilandrie study estimates in different seasons the effect of a

25  Turner blackout.  And the fourth quarter with October has the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   lowest rate in their own analysis.

2        So you've heard about March Madness, so that --

3            THE COURT:  Yeah, I've heard a lot about that.

4            THE WITNESS:  So that's the extreme case of when it

5   would be most potent, I would think.  October seems to be less

6   than average, so it matters some.  So I'm talking about a

7   month.  And we've got these switching costs.

8        The other thing that I think is even more important is

9   that in the long run what matters much more is not how many

10  subscribers are lost, but how many subscribers are retained by

11  DirecTV because Charter in my example does not have Turner.  So

12  it's the -- it's the reduced churn.  And that's something

13  you're just not going to see in a month.  So the perimeter we

14  really want to measure, you don't get at all in the short-term

15  ones.  You can't measure it.  And Altman Vilandrie, one of the

16  things I like about the study is they looked at separately at

17  existing customers of Charter and prospects, as they call them.

18  And so it's those prospects that we don't get the data in a

19  month.

20       So the short run is, look, if I had to use it, I suppose

21  I'd find a way.  But we have much better data with the actual

22  longer term blackouts on Sudden Link and Cable one.

23  BY MR. WELSH:

24  Q.   All right.  And Sudden Link Viacom blackout you testified

25  about earlier; is that right?

1  A.   Yes, the Sudden Link Viacom blackout that was much longer

2  term.

3  Q.   And is Professor Carlton also in agreement with you that

4  the Sudden Link Viacom blackout is an important way of looking

5  at this issue?

6  A.   Yes, he's very strong in, especially in his opening report

7  on how this is a very good episode to look at, Sudden Link

8  Viacom.  So we agree on that, and then we have some

9  disagreement about what to make of the data.

10 Q.   Okay.  Now, you were asked some questions by defense

11 counsel, and he's rattling off a whole bunch of numbers, 2.5

12 this, 3.0 this.  Let me ask you, sir, this was, I think, with

13 respect to Sudden Link Viacom.  Is the number that you're aware

14 of for Sudden Link Viacom, which you described earlier in your

15 direct for the long-term blackout is the 9.4 percent?

16 A.   Yes, that's my number.  That's based on my analysis of the

17 Sudden Link data.  And as I said, I just don't see how some of

18 these third parties coming up with some measures could be doing

19 better than what I'm able to do with the actual data.

20 Q.   Okay.  And without going back over your prior testimony,

21 do you feel that the data that you looked at for Sudden Link

22 Viacom and the analysis you did is reliable here today?

23 A.   Yes, I think we have good data directly from Sudden Link,

24 and I'm not aware of any issues about its quality.

25 Q.   Okay.  You were asked questions about Charlie Ergen, do

1   you remember those?

2   A.   I sure do.

3   Q.   Okay.  Now, and I guess the hypothetical that was posited

4   was if you're retained by Mr. Ergen to work in the future,

5   what -- how would your advice shape things there.  Do you

6   recall that generally?

7   A.   I do.

8   Q.   Now, let me ask you this:  If you're in this situation

9   with Mr. Ergen looking at the numbers you came up with, would

10  you advise him that he had a better or a worse bargaining

11  position than he had before based on the numbers that we're

12  looking at in terms of this merger?

13  A.   I think I would -- I'm slightly uncomfortable accepting

14  this hypothetical so fully, but I imagine myself in that

15  situation.  I guess as an analyst in that situation I would

16  advise my client that they do have an additional consideration

17  they have to worry about.  And that would give the other side

18  more leverage because of the ownership of the DirecTV, that

19  Turner and DirecTV are together.

20      Frankly, it would depend a lot on the nature of the client

21  and how they take analytic work and so forth, but that would be

22  the analysis that would be appropriately done, and that's the

23  same sort of analysis I would teach my MBAs to do as well if

24  they were going to be consultants.

25  Q.   Okay.  And looking in the past, Dish did go dark at one

1   point with Turner, correct?

2   A.    Yes, with a subset of the Turner channels.

3   Q.    Yeah.  And afterwards the Dish fees, they went up, didn't

4   they, to Turner?

5   A.    Yes, they did.  I don't remember the specific numbers.

6   Q.    And if Charlie Ergen then threatened to go dark now in

7   this hypothetical world when the mergers happen, would that

8   threat be -- would that threat be of less value now,

9   post-merger as compared to a pre-merger?

10  A.    I don't understand.  I don't get this.

11  Q.    So if Mr. Ergen were to threaten to go dark now with

12  Turner post-merger, would that threat be of less -- less of a

13  threat in that situation given the situation with leverage?

14  A.    Well, I guess without getting into how he would convey the

15  threat, the prospect of going dark would be less daunting to

16  AT&T because they would recognize after the merger that they

17  would pick up some business at DirecTV.  And that's the new

18  factor, and that's the one I focused on.

19  Q.    Okay.  You were asked questions about the profit margins,

20  do you recall those?

21  A.    I do.

22  Q.    For AT&T?  And you were asked about the use of the 2016

23  profit margins and 2017.  Professor, did you have systematic

24  2017 margin data for AT&T packages and bundles at the time you

25  filed your rebuttal report with -- or surrebuttal report on the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   other side?

2   A.   I did not.

3   Q.   Okay.  And I know you were asked questions about the data

4   that came with Professor Carlton's rebuttal report.  I know you

5   were asking Mr. Petrocelli to confirm that that's what he was

6   talking about.  But do you recall that data coming from

7   Mr. Carlton's backup to his rebuttal report, Professor

8   Carlton's?

9   A.   I do.

10  Q.   Okay.  And was that the first time that you saw that data

11  when you got his rebuttal report?

12  A.   Yes, it was.

13  Q.   Okay.  Professor, you were asked some questions about

14  arbitration.  I want to come back to that subject briefly.  And

15  I guess specifically about baseball style arbitration.  Do you

16  recall those questions?

17  A.   I do.

18  Q.   All right.  Now, Professor, are you saying that here that

19  arbitration is a proper resolution to this merger?

20  A.   I don't know what you mean by "proper resolution."

21  Q.   Well, does the arbitration proposal that's been made by

22  the defendants, does that resolve all of your concerns on the

23  competitive effects of the merger?

24  A.   No, it does not.

25  Q.   Do you favor competition over arbitration?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   On the baseball field?  Let me put it this way.  It's kind

2  of an open-ended question.

3           THE COURT:  It seems a loaded question.

4           THE WITNESS:  Maybe that too.

5      So I'd rather -- I'd like to answer it this way.  As an

6  antitrust economist, I am generally wary of regulatory fixes

7  and regulated prices, and I -- a lot of my career, I guess, has

8  been devoted to trying to promote competition instead of

9  regulation.  And arbitration, it's not quite government

10 regulation, but it's a form of regulation where you've got some

11 arbitrators who are setting rates in the market.

12     So I am instinctually, to be blunt about it, kind of

13 negative on that, but I'm not saying it can't ever be useful.

14 It's just I -- and that's why my analysis here is what it's

15 been, is to understand the competitive, how the industry will

16 change and how competition will be altered before we get to

17 this type of patch.

18 BY MR. WELSH:

19 Q.   Okay.  Let's change subjects.  You were asked about Altman

20 Vilandrie, that report.  And you were asked a question about

21 whether you were aware that some information had been hard

22 coded or hard, I think hard coded is the words.  Do you

23 remember that?

24 A.   I do.

25 Q.   Okay.  And I think you were asked about the same question

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  in your deposition, true?

2  A.    I believe so.

3  Q.    Okay.  Now, after your deposition, did you go back and

4  look into this a little bit?

5  A.    Quite a bit.

6  Q.    Did you look at the testimony of Mr. Bewley on the

7  subject?

8  A.    I did read that quite carefully.

9  Q.    And what did you learn from the testimony of Mr. Bewley

10 and how did that impact any concerns or issues that you might

11 have had about Altman Vilandrie study, if any?

12 A.    Well, one thing I thought was interesting is, if I

13 remember this right, Mr. Bewley said that their recommended

14 number for the Turner departure rate is actually the one we're

15 talking about here was higher.  I think it was the fourteen

16 percent figure before they made the adjustment, and then when

17 we made the adjustment, the recommended number went down to

18 nine percent.  If I remember this right.

19     And so that seems to me to really be contrary to the story

20 that defense counsel was developing that somehow this chain was

21 made to cook things to make it look high.  Higher than they

22 really thought it was.  So that seemed, and just in terms --

23 forensically figuring out what to make of these different

24 reports, that struck me as significant.

25     And the other thing, though, is that, as I mentioned, the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   more important figure in my analysis is the -- is actually what

 2   they have as a ten percent, which is the -- the gross, the new

 3   customer rate.  Because that's what matters in the long term.

 4   And that has much more impact on the long-term subscriber loss

 5   rate that I calculate.  And that was not changed here.  What

 6   was changed was the short-term rate, the departure rate.

 7        And so even if -- that's why I included -- mentioned the

 8   8.5 percent figure.  It's not as though my number would go from

 9   low end would go from nine to five percent if you made that

10   change.  It would go from nine to 8.5, using the methods that

11   are described in my report.  And so this is a lot less

12   significant even if you took everything defense counsel was

13   suggesting here, then they would have -- then it might appear

14   because it's just the -- it's just one of the two components

15   that affects the long-term subscriber rate.

16        And the much more important component is the reduced

17   ability to attract new customers at Charter when they don't

18   have Turner content.

19   Q.   And with respect to the change that did occur, did you see

20   from what Mr. Bewley said that that change had also been made

21   as to other programmers -- programming groups, not just Turner?

22   A.   Right, so that was -- thank you.  That was the other thing

23   I thought was notable just in looking at these consultant

24   reports is Mr. Bewley explained it in a way that made sense to

25   me at least, a lot of sense, that they had -- were learning

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  with the methodology, and they were adjusting it, and they

2  subsequently made adjustments for other programming groups, and

3  adjusted the whole model, and this hard coding was a short-term

4  solution before they had adjusted the whole model.  So that

5  made sense to me just as somebody who does this type of

6  analysis in terms of how things happened.

7  Q.    Let's change subjects again.

8      So counsel asked you about the bargaining model.  I think

9  he asked you whether it was an academic model.  Do you remember

10  that question?

11  A.    I do.

12  Q.    All right.  Let me ask you this:  Have bargaining models

13  been used in, first of all, have they been used in academic

14  research?

15  A.    Yes, very much so.  The articles that were cited here,

16  there's a series of articles about this industry.  And what it

17  comes down to is we understand that that's how the rates are

18  set, through bargaining.  So if we're going to model this

19  industry in the academic papers, the best tool is the

20  bargaining model.  And that's -- that's what the literature has

21  gone in that direction in the past, maybe ten years.  So

22  that's, and by the way, it's not just this industry.

23  Bargaining models are also used quite widely in economics now

24  in my field.  They've been used a lot in the healthcare area

25  because we have hospitals bargaining with insurers and so

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  forth.  So this is a very standard tool.

 2      What's less common is to use it to evaluate a merger or a

 3  vertical merger especially.  And, but the bargaining model is

 4  used quite widely in my field of economics.

 5  Q.   Has the bargaining model you mentioned, healthcare and

 6  hospital systems, has the bargaining model been accepted by

 7  courts involving mergers in that area?

 8  A.   Yes, especially in the hospital area, how when two

 9  hospitals merge, they'll have improved greater leverage in

10  negotiating with insurance companies, and that will lead to

11  higher rates, and that's been a concern of hospital mergers.

12  Q.   Have bargaining models also been accepted by the FCC?

13  A.   Well, yes, I think we've talked about the most notably in

14  the Comcast NBCU merger, the FCC analysis, you have a formula

15  very similar to the one that I'm using to estimate the price

16  effects here.

17  Q.   Okay.  Professor, Mr. Petrocelli had a hypothetical that

18  he presented to you.  He talked about there being a five

19  percent sub loss rate, do you remember that?

20  A.   I do.

21  Q.   Okay.  Now, bet me ask you this:  If you went with that

22  hypothetical of five percent sub loss rate, would there be

23  price increases to the customers of other MVPDs in that

24  situation?

25  A.   Yes, there would.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Okay.  And if there was no EDM addressed here, would

2  consumer welfare be harmed even in that situation?

3  A.   Yes.

4  Q.   Okay.

5       MR. WELSH:  Can I have one moment, Your Honor?

6       THE COURT:  You may.

7     (Pause.)

8       MR. WELSH:  No further questions, Your Honor, thank

9  you.

10      THE COURT:  All right, we're going to take a fifteen

11  minute recess.  You remain a witness under oath.  Refrain from

12  discussing your testimony with anyone else.  When we come back

13  we will do what I believe will be the final segment of today's

14  questioning.

15      THE WITNESS:  Yes, sir.

16      THE COURT:  All right, see you in fifteen minutes.

17    (Recess at 5:51 p.m.)

18    (Proceedings resumed at 6:13 p.m.)

19      THE DEPUTY CLERK:  Your Honor, recalling Civil Action

20  17-2511, United States of America v. AT&T, Inc., et al.

21      THE COURT:  It's 74 degrees in here, that's not

22  acceptable.  We'll fix that for tomorrow, counsel.

23      MR. PETROCELLI:  Thank you, Your Honor.

24    Your Honor, I only have about ten minutes.

25      THE COURT:  Fine.

1        MR. PETROCELLI:  So --

2        THE COURT:  You have up to 45 if you want to use it.

3        MR. PETROCELLI:  No, I'm not going to do that.

4        THE COURT:  You're not feeling it?

5        MR. PETROCELLI:  I'm hungry, Your Honor.

6        THE COURT:  Well, there's nothing wrong with that

7   either.

8                    RECROSS-EXAMINATION

9   BY MR. PETROCELLI:

10  Q.   Okay, let's finish up, Professor.

11       When Mr. Welsh asked you, I think at the very end of that

12  examination about whether a five percent departure rate would

13  result in still higher prices to consumers, and you said "yes."

14  Do you remember that?

15  A.   I think he was asking about the customers of the -- yes, I

16  remember that.

17  Q.   And he was asking about only the customers of other

18  distributors, correct?

19  A.   That is what I believe, that is how I interpreted his

20  question, yes.

21  Q.   So if you add in the blue bar there, your elimination of

22  the double marginalization, and you take into account the price

23  decrease to the DirecTV subscribers and you average it all out,

24  then you're at no price increase at or about a five percent

25  departure rate, correct?

1  A.    That's what you represented to me before, and I said I

2  found that believable.

3  Q.    I think you said reasonable, but believable is fine too.

4  A.    Good.

5          THE COURT:  I think he said not unreasonable.

6          THE WITNESS:  You both have a better memory.

7          THE COURT:  That's professor speak.  Courtroom speak

8  is reasonable.

9          THE WITNESS:  I will try to improve.

10          THE COURT:  Good.

11  BY MR. PETROCELLI:

12  Q.    You were asked a couple of questions about your bargaining

13  model having been used in courts, do you remember that?

14  A.    Yes.

15  Q.    Now, it's also true that this bargaining model has been

16  rejected by a number of courts, correct?

17  A.    I think some courts have rejected the use of the Nash

18  bargaining model, I'm aware of that, yes.

19  Q.    And among the grounds on which the a bargaining model has

20  been rejected is the fifty/fifty assumed split of the games

21  portrayed, are you aware of that?

22  A.    No, I'm not sure.  I thought there are some problems in

23  other cases involving the bargaining model that are different

24  from that, but it could be.  I'm not sure.

25  Q.    That the fifty/fifty split is not supported by any

1  particular facts of the case, are you aware of any of those

2  court rulings?

3  A.    That sounds familiar, but I don't have them in my head.

4  Q.    Okay.  Now, with respect to the bargaining model, I think

5  as you've explained, it fundamentally rests on the threat of a

6  permanent blackout of Turner programming, correct?

7  A.    That's true.

8  Q.    And you have -- you have acknowledged that in the real

9  world there has never been a permanent blackout of the Turner

10  networks, correct?

11  A.    Correct.

12  Q.    Okay.  So your model is effectively based on a threat to

13  do something that has never, ever happened, true?

14  A.    I don't think it was so much as a threat.  It's based on

15  the leverage that arise in the negotiations.

16  Q.    But it's based on the leverage that would flow from a

17  threat of a permanent blackout when no such permanent blackout

18  of the Turner networks has ever happened?

19  A.    I agree no permanent blackout of Turner networks has

20  happened on any major MVPD.

21  Q.    Okay.  Now, you will also acknowledge that most of these

22  blackouts are short-term, week, two weeks, a month, correct?

23  A.    I agree.

24  Q.    And I think you yourself even acknowledged Mr. Ergen's

25  comment that real bargaining begins once the blackout begins,

1  right?

2  A.   I thought it was an interesting remark that was sort of

3  revealing.  I just found it interesting.

4  Q.   So wouldn't it be more suitable to the facts of this case

5  to model this so-called leverage based not on a permanent

6  blackout, but on a temporary blackout of one, two, three or

7  four weeks?

8  A.   No, I don't believe that's true.  And I think Professor

9  Carlton agrees with me.

10  Q.   Now, your analysis is again based on whether there's going

11  to be deal or no deal, right?  No deal means a permanent

12  blackout, right?

13  A.   That's true.

14  Q.   But everybody knows that when they get into these

15  impasses, they're only going to last a few weeks or a month at

16  most, you acknowledge that, right?

17  A.   I don't think I would say everybody knows that.  This is

18  the nature of bargaining, you don't know how long a strike is

19  going to last because you don't know whether the other side

20  will give.  No, you can't -- it's not logical to say everybody

21  knows a thing will end at a certain period of time.

22  Q.   But you can't identify any significant permanent

23  blackouts, and you just mentioned the Sudden Link Viacom one,

24  right?

25  A.   I do rely on that, yes.

1  Q.   But, I mean, the reality is virtually every one of these

2  impasses is resolved after requiring either no blackout or a

3  short-term blackout, that's the vast overwhelming majority,

4  correct?

5  A.   Yes, and that's exactly what will be predicted by the

6  bargaining model, and it's confirmed in that sense, because

7  it's a gain from trade.

8  Q.   But the bargaining model has folks thinking about what

9  might happen, what these departure rates would be, what these

10  diversion rates would be if no deal is reached, correct?

11  A.   That is the business reality, yes.  That's what people do.

12  Q.   But the business reality is that a deal will be reached?

13  A.   And the bargaining leverage is based on -- this is why

14  people study this in such great depth, these departure rates

15  and subscriber loss rates, because that is what governs the

16  leverage.

17  Q.   Let me move on to the -- a few follow-up questions on your

18  departure rate.

19      First of all, on the -- in your analysis, you know, you

20  spent a lot of time talking about Altman Vilandrie, and again,

21  on Mr. Welsh's recent questioning.  And I think you suggested

22  that I was spinning some nefarious tail and all of that.  But

23  let me ask you this.

24      Tell us what work, what analytical work was done between

25  the time that Altman Vilandrie submitted its first original

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  report with the low end of five percent until the time when

2  they changed it to a new low end of nine percent.  What more

3  field work, what more analytical work, what more work did they

4  do.  Can you identify anything?

5  A.   As best I can recall from Mr. Bewley's testimony is he

6  discussed the classification of the Turner networks, and they

7  were having -- they were revisiting that, but I can't remember

8  more detail than that.

9  Q.   Well, the testimony is the only thing that happened is

10 that they had a meeting with the client who commissioned the

11 work.  Do you recall that?

12        MR. WELSH:  Objection, Your Honor.

13        THE COURT:  All right.

14    (Sealed bench conference.)

15        THE COURT:  What's your objection?

16        MR. WELSH:  Mr. Petrocelli is absolutely

17 misrepresenting what the witness's testimony was Mr. Bewley in

18 this courtroom.  Mr. Bewley in this courtroom talked about the

19 changes that he made.  Mr. Petrocelli stated the only change

20 that occurred was the meeting with the client, which is

21 absolutely not the case.

22        MR. PETROCELLI:  That's totally true, Your Honor.

23 They had a meeting with the client.  After the meeting, there's

24 an e-mail.  I showed it and they said we're changing the

25 number.  And the only thing that happened was a meeting with

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    the client.

2           MR. WELSH:  Your representation is so off the mark

3    it's not even -- it is beyond the pale.

4           THE COURT:  You've got two choices here.

5           MR. PETROCELLI:  So I'm going to revise the question.

6           THE COURT:  Well, that's one choice.  I'll give you a

7    limited opportunity at re redirect to clean it up.

8           MR. PETROCELLI:  I'll revise the question.

9           THE COURT:  You choose how you want to characterize

10   it.

11          MR. PETROCELLI:  I know the record precisely on this,

12   and I didn't want to take the time to go through the two

13   e-mails, but I'll clean it up, okay?

14          THE COURT:  All right.

15          MR. PETROCELLI:  Thanks.

16      (Open court.)

17          THE COURT:  You may proceed consistent with the

18   discussion at the bench.

19          MR. PETROCELLI:  Thank you.

20   BY MR. PETROCELLI:

21   Q.   All you know about what Altman Vilandrie did between April

22   21st, when they submitted the original results, and April 27,

23   when they submitted what has been marked as Plaintiff's Exhibit

24   79, which the new low end of nine percent is what?

25   A.   I'm not sure.

1   Q.   Okay.  Now, are you aware of the testimony that that

2   report was -- well, not a report, that slide presentation,

3   Exhibit 79, was commissioned in order to inform the Charter

4   content negotiators?

5   A.   Yes, that's my understanding.

6   Q.   And do you know whether it was ever used by any content

7   negotiators?

8   A.   Again now you're pressing on memory on Mr. Bewley's

9   testimony.  But I believe it was presented to his -- the

10  analytics team and not directly to the negotiators, and I can't

11  remember more than that.

12  Q.   Okay.  Do you recall that there was another document that

13  they did assessing potential subscriber loss estimates for the

14  Turner network that Charter did around the same period of time

15  that was used by executives and content negotiators?

16  A.   So there was a document in the February period of time?

17  Q.   Correct.

18  A.   I do recall that, it came up in my deposition.

19  Q.   But that's the only way you know it because it came up in

20  your deposition?

21  A.   I can't recall.  I'd have to check my report whether -- I

22  just don't know.

23  Q.   And do you know what the subscriber loss rate was that the

24  Charter folks specifically identified for Turner?

25  A.   I don't recall the number, but I recall some

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  qualifications around it.

2  Q.   If I told you it was five percent, would you agree with

3  that?

4  A.   I don't recall the number.

5  Q.   My last topic is on the arbitration issue.  You are aware

6  that there was an arbitration mechanism in place with respect

7  to this Court's approval of the Comcast NBCU transaction,

8  correct?

9  A.   Wait, the arbitration, I'm a little confused actually.

10 Q.   Okay.  When Comcast NBCU was approved by this Court, there

11 was both the DOJ consent decree and FCC order that --

12 A.   Right.

13 Q.   -- that contained an arbitration and standstill mechanism

14 similar to what is contained in the Turner letter, correct?

15 A.   What the part I was thrown off by actually was I thought

16 the arbitration mechanism was subject to the FCC oversight.

17 And then I wasn't -- but you then mentioned this Court which

18 has been overseeing the DOJ consent decree.  And I didn't know

19 which piece you were talking about.

20 Q.   Well, let's talk about the DOJ piece, okay?

21 A.   Okay.

22 Q.   Where the Court approved the consent decree, okay?

23 A.   Okay.

24 Q.   Are you aware that -- so you are aware there was an

25 arbitration and standstill mechanism that was part of that,

1  correct?

2  A.    You know, that's -- I've been focusing on the FCC part

3  because that dealt with the MVPDs, and what I recall from the

4  DOJ consent decree was it was directed at the OVD, the online

5  video distributors.

6  Q.    That's correct.

7  A.    So I have not revisited that as much in preparing for my

8  testimony here.

9  Q.    Well, are you aware that this Court required as a

10 condition to approval that the DOJ report back to the Court on

11 whether there would be any -- on any issues or problems with

12 respect to that mechanism?

13          MR. WELSH:  Your Honor, objection.  May I be heard?

14          THE COURT:  Okay.

15     (Witness withdrew from the witness stand.)

16     (Sealed bench conference.)

17          MR. WELSH:  Your Honor, I think all of this is

18 outside of the scope.  I didn't go into any of this during my

19 examination. I'm not sure why --

20          MR. PETROCELLI:  He asked him directly about the

21 arbitration mechanism.  And I'm trying to establish that he was

22 fully aware.  He testified that the arbitration wasn't any

23 good, and he did it on the re-- on Mr. Welsh's redirect.  And

24 I'm trying to establish that he was fully aware that a similar

25 one was in the Comcast decree the Court required to DOJ to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1 | report back.  And he actually worked there at the time, he

 2 | said.  And the DOJ never reported back any issues.

 3 |           THE COURT:  I'll give him some leeway on this.

 4 |           MR. PETROCELLI:  This is my last topic.

 5 |           THE COURT:  All right, it's getting warm.

 6 |      (Open court.)

 7 |           THE COURT:  Come on back.

 8 |      (Witness resumed the witness stand.)

 9 |           THE COURT:  You may proceed consistent with the

10 | discussion.

11 |           MR. PETROCELLI:  Thank you.

12 | BY MR. PETROCELLI:

13 | Q.   So you are aware again that in the DOJ consent decree this

14 | Court imposed a requirement that the DOJ report back to the

15 | Court on any problems or issues with respect to the arbitration

16 | process, are you aware of that?

17 | A.   It sounds familiar, I haven't focused on it recently.

18 | Q.   An d do you know whether the DOJ ever reported back any

19 | problems to the Court with respect to that mechanism, the

20 | arbitration and standstill mechanism?

21 | A.   I'm not aware of such.

22 | Q.   If I told you that they did not do so, you wouldn't

23 | dispute that, correct?

24 | A.   I would not.

25 | Q.   I think I heard you previously testify that the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  arbitration would only make sense to take into account the

2  arbitration and standstill mechanism that Turner offered if

3  distributors exercised their right to arbitration; is that

4  correct?

5  A.   I think so, if I'm understanding you right.

6  Q.   Right.  But let's talk about the situations where

7  distributors don't exercise their right, and they bargain under

8  the shadow of arbitration, and you have -- you're familiar with

9  testimony in this case, including by Charter, that they were

10 able to bargain in the shadow of arbitration with NBCU and

11 reach a deal?

12 A.   Yes, I think so.

13 Q.   And do you not think it's appropriate to take into account

14 the impact of the threat of arbitration that a distributor has

15 against Turner?

16 A.   No, I think that if the distributor finds the arbitration

17 to be a better option than not invoking it, then that would

18 affect the outcome of the negotiations or could anyhow.

19 Q.   But the distributor has new leverage against Turner

20 post-merger because the distributor even prior to electing

21 arbitration has the ability to elect at any time in the course

22 of the negotiations, and Turner knows that, and Turner knows

23 that if arbitration is elected, there's a mandatory standstill

24 where the programming has to be maintained.  You're aware of

25 that, right?

```
 1            MR. WELSH:  Objection, compound, I'm not even sure I
 2   could follow that.
 3            MR. PETROCELLI:  I'll revise it.
 4            THE COURT:  It's getting late, break it down.
 5            MR. PETROCELLI:  Yeah, it's getting late.  I'll break
 6   it down.
 7   BY MR. PETROCELLI:
 8   Q.   So you are aware, though, that a distributor -- that both
 9   Turner and the distributor know that at any time the
10   distributor could elect arbitration, correct?
11   A.   Yes, that sounds right, assuming the distributor
12   qualifies.
13   Q.   Right.  Assuming the distributor qualifies.  And in that
14   circumstance that's leverage that the distributor has over
15   Turner, correct?
16   A.   I think that option for the distributor has some value if
17   it would be invoked.
18            MR. PETROCELLI:  No further questions.
19            THE COURT:  All right.
20         You got your slide pack there?
21            THE WITNESS:  Yes, sir.
22            THE COURT:  Take a look at page 12.  That's the
23   revised page 12.
24            THE WITNESS:  Yes.
25            THE COURT:  Says annual harm summary?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1              THE WITNESS:  Yes.

2              THE COURT:  And millions of dollars?

3              THE WITNESS:  Yes.

4              THE COURT:  I'm a little confused about something

5   here, and maybe you can help me understand.

6         See 2016, that's the first line of your chart there.

7   The net harm to all MVPDs, you've got two hundred and

8   thirty-five million, right?

9              THE WITNESS:  Yes.

10             THE COURT:  Then the next one you got net harm to all

11  MVPD customers two hundred and eighty six million.

12             THE WITNESS:  Yes.

13             THE COURT:  How can you pass on more, how can you

14  pass on more in millions to the customers than the harm to

15  yourself?

16             THE WITNESS:  Right.

17             THE COURT:  How does that work?  I don't get that.

18             THE WITNESS:  Right.  Very understandable question.

19  This is a result of the emerging simulation of the downstream

20  simulation.  So each -- the way it turns out is DirecTV has the

21  cost savings.

22             THE COURT:  Right.

23             THE WITNESS:  And they don't pass through very much

24  of that savings while as the other distributors who have cost

25  increases pass through a larger share of those cost increases.

1  And as a result the consumers are harmed more than the MVPDs

2  are harmed.  You're looking sort of unhappy with that.

3           THE COURT:  No, I think I'm looking confused.

4           THE WITNESS:  Right.

5           THE COURT:  Not unhappy, just confused.

6           THE WITNESS:  Okay, fair.

7           THE COURT:  I don't get it.

8           THE WITNESS:  Right.  So the -- in regions where

9  DirecTV has -- where they have a lower cost.

10          THE COURT:  Uh-hmm.

11          THE WITNESS:  They are competing against rivals who

12  have higher costs.  When your rival has a higher cost, that

13  tends to mean you can charge more too.  So while they have some

14  tendency to lower their prices because their costs are lower,

15  they also have a reason to raise their price because their

16  competitors are raising their price because their costs are

17  higher.  So you've got to work these things out together, and

18  when you do that, DirecTV's prices don't go down all that much.

19  And the other MVPDs, their prices go up quite a bit.

20       Another way to see it --

21          THE COURT:  How do you get those number, where do

22  those numbers come from?

23          THE WITNESS:  Right.  So what we do is, that's what

24  this model of a downstream competition, it's an off-the-shelf,

25  really a standard model that assumes that each of the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   distributors is competing on price to maximize their own

2   profits with the costs they incur.  And we have market shares

3   that we see.

4        And we therefore -- so we have -- we can see the market

5   shares and the prices and the costs before the merger so we can

6   model how they compete.  And then we have a -- we change that

7   system by changing the costs and it percolates through to the

8   prices.  That's the basics of it.

9        I think another way that might be helpful, since I

10  realize this is not intuitive.

11       THE COURT:  I'm take judicial notice of that.  I'm

12  not sure any of this is intuitive.

13       THE WITNESS:  Is that what we find in these models,

14  these are called oligopoly models, where you have a bunch of

15  firms competing, is that --

16       THE COURT:  You must have a lot of Russian customers.

17       THE WITNESS:  Is that if my any costs go up I tend to

18  raise my price, and that makes you raise your price, and so

19  there's an interaction where if -- so we can, you can kind of

20  feed on each other.  And that's partly what's happening here,

21  everybody else's costs go up besides DirecTV.

22       THE COURT:  Yeah.

23       THE WITNESS:  And so their prices are going up, and

24  DirecTV cost is going down.  It pulls that it down a bit, but

25  the net effect is this significant harm.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  All right.  Well, I look forward to
 2    rereading your testimony.
 3              THE WITNESS:  Thank you, Your Honor.
 4              THE COURT:  I'm not sure I got it, but it's too late
 5    and too hot to belabor the point any further.
 6              THE WITNESS:  I'm sure if you looked at all the
 7    equations and appendix, whatever it is, it would be completely
 8    clear.
 9              THE COURT:  I doubt I'll do that.
10          You're excused, Professor.
11              THE WITNESS:  Thank you, Your Honor.
12              THE COURT:  Step down.
13          (Witness excused.)
14              THE COURT:  All right, counsel, come on up.
15          (Sealed bench conference.)
16              THE COURT:  All right.  So tomorrow we'll go out of
17    order.  Do you need two and a half hours for that?
18              MR. PETROCELLI:  Yes, same timing.
19              THE COURT:  Same basic layout?
20              MR. PETROCELLI:  Yes.
21              MR. CONRATH:  And cross.
22              MR. PETROCELLI:  We might be a little bit shorter.
23              MR. CONRATH:  And I might be shorter too, we'll see.
24              THE COURT:  You going to do the cross?
25              MR. PETROCELLI:  Mr. Oppenheimer has Carlton, the
```

```
 1   direct.

 2             THE COURT:  He's going to do the direct.

 3             MR. PETROCELLI:  The direct, yes.

 4        Your Honor, the parties don't have the copy of the

 5   Madison Bond testimony and it was under seal.

 6             THE COURT:  It's what?

 7             MR. PETROCELLI:  Because it was done in a closed

 8   courtroom.  When the transcript came out, we don't have the

 9   Madison Bond part.  He was the guy that you closed the

10   courtroom for on Monday.

11             THE COURT:  Oh, you don't have that?

12             MR. PETROCELLI:  No.  You didn't get it either,

13   right?

14             THE COURT:  I don't see why you can't have it.  I

15   mean, obviously now the bench conferences, I'm not giving those

16   out.

17             MR. PETROCELLI:  No, no, we don't want those.  I just

18   wanted that, you gave us the one awhile ago with Mr. Rigdon.

19   This is Mr. Bond.

20             THE COURT:  Right.  You can have -- I'll tell the

21   reporter you can have the sealed courtroom testimony of Bond,

22   but that doesn't include within it the bench conferences.

23             MR. PETROCELLI:  Exactly, we're on the same page.

24             THE COURT:  Hopefully there won't be any mistakes.

25             MR. PETROCELLI:  We'll let you know.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  But if any of your team sees you get

2    something with the bench conferences that should not happen.

3    It's not permitted and they should send it right back and they

4    should alert the Court there's a problem and the court

5    reporter, but I'm assuming that's not going to happen.

6          MR. CONRATH:  Is there one more?  I'm forgetting

7    whether there was one more who testified in the closed, did

8    Mr. Bewley testify in a closed courtroom for a period?

9          MR. PETROCELLI:  No.

10         MR. CONRATH:  I think just Rigdon and Bond.

11         MR. PETROCELLI:  The Court gave your folks the

12   opportunity to question him, question Mr. Bewley.

13         THE COURT:  It's seventy-six degrees in here. It's

14   not acceptable.

15         MR. PETROCELLI:  I think it's because you have so

16   many people in here.

17         THE COURT:  No, the air condition stopped. It's 5:00,

18   GSA is so cheap.  Put that on the record, they're cheap.

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

1

2          MR. PETROCELLI:  So right on.

3          MR. CONRATH:  Pretty good.

4          THE COURT:  So right on the money.

5          MR. PETROCELLI:  Yes.

6          THE COURT:  You don't have to deal with GSA.

7          MR. CONRATH:  No, I don't think Mr. Petrocelli has

8  had the pleasure.

9          THE COURT:  He doesn't have the pleasure.

10         MR. CONRATH:  I have.

11         THE COURT:  We're dealing with it right now, right

12 here.  So I've given John direction to contact GSA and tell

13 them I want that air conditioning, preferably lower than

14 seventy all day tomorrow.  I want the fans running.  They

15 turned the fans off, that's not good.

16     All right.  So everyone is wondering what the big deal

17 we're making up here.

18         MR. PETROCELLI:  Having a good time.

19         THE COURT:  I don't have any beers back here.  I have

20 to shoo you away.

21         MR. PETROCELLI:  Have a good evening, Judge.

22         THE COURT:  Same to you.  See you tomorrow.

23     (Open court.)

24         THE COURT:  All right.  We'll have Professor Carlton

25 tomorrow, and it'll be the same basic routine.  Hopefully the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  courtroom will be cooler and it won't go as late as whatever it

2  is now.  Good night.

3       (Proceedings adjourned at 6:41 p.m.)

4                            -oOo-

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                        CERTIFICATE

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1          I certify that the foregoing is a true and correct

 2   transcript, to the best of my ability, of the above pages, of

 3   the stenographic notes provided to me by the United States

 4   District Court, of the proceedings taken on the date and time

 5   previously stated in the above matter.

 6          I further certify that I am neither counsel for, related

 7   to, nor employed by any of the parties to the action in which

 8   this hearing was taken, and further that I am not financially

 9   nor otherwise interested in the outcome of the action.

10

11   _____        _____

12   /s/Crystal M. Pilgrim, RPR, FCRR        Date: April 12, 2018

13

14

15

16

17

18

19

20

21

22

23

24

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        :
                                 :
                Plaintiff,       :         CV No. 17-2511
         vs.                     :
                                 :         Washington, D.C.
                                 :         Thursday, April 12, 2018
AT&T, INC., ET AL.,              :             10:45 a.m.
                                 :
                                 :             Day 13
                Defendants.      :
-----------------------------x



                        MORNING SESSION
                  TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE RICHARD J. LEON
              UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:      Craig W. Conrath, Esquire
                         Eric D. Welsh, Esquire
                         Dylan M. Carson, Esquire
                         Cerin M. Lindrensavage, Esquire
                         Ruediger R. Schuett, Esquire
                         Makan Delrahim, Esquire
                         U.S. DEPARTMENT OF JUSTICE
                         Antitrust Division
                         450 Fifth Street, NW
                         Washington, DC  20530
                         202) 532-4560
                         craig.conrath@usdoj.gov
                         eric.welsh@usdoj.gov
                         dylan.carson@usdoj.gov
                         cerin.lindrensavage@usdoj.gov
                         ruediger.schuett@usdoj.gov
                         makan.delrahim@usdoj.gov

```
 1   Appearances Continued:

 2   For Defendant AT&T       Katrina M. Robson, Esquire
     and DirecTV Group        O'Melveny & Myers LLP
 3   Holdings, LLC:           1625 Eye Street, NW
                              Washington, DC  20006
 4                            (202) 220-5052
                              krobson@omm.com
 5
                              Daniel M. Petrocelli, Esquire
 6                            M. Randall Oppenheimer, Esquire
                              O'MELVENY & MYERS LLP
 7                            1999 Avenue of the Stars
                              8th Floor
 8                            Los Angeles, CA  90067
                              (310) 553-6700
 9                            dpetrocelli@omm.com
                              roppenheimer@omm.com
10
                              Michael L. Raiff, Esquire
11                            Robert C. Walters, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
12                            2100 Mckinney Avenue
                              Suite 1100
13                            Dallas, TX 75201
                              (214) 698-3350
14                            mraiff@gibsondunn.com
                              rwalters@gibsondunn.com
15
     For Defendant           Kevin J. Orsini, Esquire
16   Time Warner, Inc.:      Peter T. Barbur, Esquire
                              CRAVATH, SWAINE & MOORE LLP
17                            Worldwide Plaza
                              825 Eighth Avenue
18                            New York, NY  10019
                              (212) 474-1140
19                            korsini@cravath.com
                              pbarbur@cravath.com
20
     Court Reporter:         Crystal M. Pilgrim, RPR, FCRR
21                            Official Court Reporter
                              United States District Court
22                            District of Columbia
                              333 Constitution Avenue, NW
23                            Washington, DC  20001
                              (202) 354-3127
24                            crystal_pilgrim@dcd.uscourts.gov

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1                          Table of Contents

2                              Direct   Cross  Redirect   Recross

3

4    On behalf of the Defendants:

5         Dennis W. Carlton

6          By Mr. Oppenheimer     2430

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1                   P-R-O-C-E-E-D-I-N-G-S

 2          THE DEPUTY CLERK:  Your Honor, calling civil action

 3  number 17-2511, the United States of America v. AT&T, Inc., et

 4  al.

 5          Will counsel for the parties please approach the

 6  lectern, identify yourself for the record and all of the

 7  parties you represent.

 8          MR. CONRATH:  Good morning, Your Honor.  Craig

 9  Conrath for the United States.

10          THE COURT:  Welcome back.

11          MR. CONRATH:  Thank you.

12          MS. LINDGRENSAVAGE:  Good morning, Your Honor.  Cerin

13  Lindgrensavage for the United States.

14          THE COURT:  What's your name?

15          MS. LINDGRENSAVAGE:  Cerin Lindgrensavage, Your

16  Honor.

17          THE COURT:  Lingersavage?

18          MS. LINDGRENSAVAGE:  Lindgrensavage.

19          THE COURT:  All right.

20          MR. WELSH:  Good morning, Your Honor.  Eric Welsh for

21  the United States.

22          THE COURT:  Good morning, Mr. Welsh.

23          MR. DELRAHIM:  Good morning.

24          THE COURT:  My goodness gracious.

25          Are you entering an appearance, Mr. Delrahim?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. DELRAHIM: Makan Delrahim for the United States.

2      Honor to be here, sir.

3          THE COURT:  Honor to have you here.

4          MR. CARSON:  Good morning, Your Honor.  Dylan Carson

5  for the United States.

6          THE COURT:  Welcome.

7          MR. SCHUETT:  Good morning, Your Honor.  Ruediger

8  Schuett for the United States.

9          THE COURT:  What's your name?

10         MR. SCHUETT: Ruediger, R-U-E-D-I-G-E-R, Schuett,

11  S-C-H-U-E-T-T.

12         THE COURT:  Let me see if I can find you on this.

13         MR. SCHUETT:  Hope you do.

14         THE COURT:  Oh, there it is.

15         MR. PETROCELLI:  Good morning, Your Honor.  Daniel

16  Petrocelli for defendants.

17         THE COURT:  Welcome back.

18         MS. ROBSON:  Good morning, Your Honor.  Katrina

19  Robson for defendants.

20         THE COURT:  Welcome.

21         MR. OPPENHEIMER:  Good morning, Your Honor.  Randy

22  Oppenheimer for the defendants.

23         THE COURT:  Welcome.

24         MR. WALTERS:  Good morning, Your Honor.  Rob Walters

25  for AT&T and DirecTV.

```
 1            MR. BARBUR:  Good morning, Your Honor.  Peter Barbur

 2   for Time Warner.

 3            THE COURT:  Welcome.

 4            MR. ORSINI:  Good morning, Your Honor.  Kevin Orsini

 5   for Time Warner.

 6            THE COURT:  Welcome.

 7            MR. WRIGHT:  Good morning, Your Honor.  Mike Wright

 8   for AT&T and DirecTV.

 9            THE COURT:  Welcome.

10            MR. PETROCELLI:  May I approach?

11            THE COURT:  You may.

12        (Sealed bench conference.)

13            THE COURT:  So what's this about Mr. Conrath?  What's

14   the Assistant Attorney General for the United States Antitrust

15   division --

16            MR. PETROCELLI:  Is he going to be examining

17   witnesses?

18            MR. CONRATH:  No, I'm not in control of my boss.

19            THE COURT:  I fully appreciate that.  I fully

20   appreciate that.  But understand --

21            MR. CONRATH:  Not the usual move.

22            MR. PETROCELLI:  That's what I was thinking.

23        Your Honor, I won't share my thoughts.

24        Your Honor, the government has completed the

25   presentation of its case.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              THE COURT:  Not rested.

2              MR. PETROCELLI:  Well, that's what I want to get to.

3         Except for a witness named Mr. Holanda that they want to

4    call out of order in my case and I've agreed to that, okay.

5         But they have no other witnesses and so I believe they

6    ought to be resting their case.  This is not a witness we are

7    calling out of order.  This is our first witness of our case

8    and --

9              THE COURT:  That was not my impression.

10             MR. PETROCELLI:  Well, there are no other witnesses

11   that they have.

12             THE COURT:  There's Holanda.

13             MR. CONRATH:  Mr. Holanda and we've had direct

14   examination in our case, several of theirs, so these are the

15   first witness only in the sense that Mr. Martin was -- but I

16   don't understand.

17             THE COURT:  When do you want to call Holanda?

18             MR. CONRATH:  Friday, the 20th, Your Honor.

19             MR. PETROCELLI:  We're going to be done by next

20   Wednesday or Thursday, Your Honor.

21             THE COURT:  Hold on, I'm trying to digest what he

22   just said.  Where does he live?

23             MR. CONRATH:  I believe New Jersey, Your Honor.

24             MR. PETROCELLI:  That's where I'm born and raised.

25             THE COURT:  You always struck me like a Jersey guy.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. PETROCELLI:  I'm a Jersey guy.  You know what
 2   they say, you can take the --
 3              THE COURT:  The boy out of New Jersey.
 4              MR. PETROCELLI:  Yeah, but you can't take Jersey out
 5   of the boy.
 6              THE COURT:  Lot of Springsteen.
 7         Ghee, let me back up.
 8              MR. CONRATH:  Okay.
 9              THE COURT:  We'll sit next Friday if we have to.
10              MR. CONRATH:  Okay.
11              THE COURT:  I would rather not sit next Friday
12   because like I said before, I've got a 175 other dogs in the
13   kennel.
14              MR. CONRATH:  Right.
15              THE COURT:  So if I can have next Friday for a lot of
16   other things, I'm going to sit because I'm going to lose the
17   following week.  I'm going to lose that Wednesday, but if I
18   could.
19         So I want you to talk to your team about maybe getting
20   Holanda back here earlier in the week.
21              MR. CONRATH:  So we already, when we checked with him
22   when this first came up, we checked and asked when he was
23   available this week.  He was, I'm sorry, next week.  He said
24   only Monday and Friday.  I checked with the defendants and they
25   said we prefer Friday.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. PETROCELLI:  You can call him Monday morning if

2   you want to.

3          How long will it be?

4          MR. CONRATH:  I just don't know if we can adjust that

5   at this time.

6          THE COURT:  Wait a minute.  First of all, who is he?

7          MR. CONRATH:  He is the top executive at RCN which is

8   an older builder, a distributor.

9          THE COURT:  You said third party.

10          MR. PETROCELLI:  Another competitor, a small

11   competitor.

12          THE COURT:  So blame the Judge.  You're welcome to do

13   it.

14          MR. CONRATH:  Sure.

15          THE COURT:  And just tell him look, Judge really is

16   not really wanting to hold court next Friday if he doesn't have

17   to and I think you need to get here preferably Monday.

18          Now here's the significance to all of this.

19          If we have to rush the case, he has to make a motion.

20          MR. CONRATH:  I know, I know.

21          THE COURT:  We can't attenuate this unnecessarily.

22   Unnecessarily or unnaturally or what's another word, whatever,

23   artificial.

24          So I'm willing to give you to Monday or Tuesday to rest

25   your case.  I'm not willing to give you until next Friday.

```
 1              MR. PETROCELLI:  That's great, I'm sorry.

 2              MR. CONRATH:  If I may.  I don't, I mean, I don't

 3    know what we can adjust.  We're not in control of this witness

 4    obviously.  But we're --

 5              THE COURT:  You have a subpoena, you now have a court

 6    directive.

 7              MR. CONRATH:  Okay.

 8              THE COURT:  That you can rest on.

 9              MR. CONRATH:  We'll explore.  I'll see if we can do

10    that and I just want to reserve the option to come back because

11    we're getting, the only reason this is an issue is because

12    defendants are dramatically cutting back on their presentation.

13    We would have been going to Friday anyway.

14              THE COURT:  No, actually, see that's where you're

15    wrong.

16              MR. CONRATH:  Sorry.

17              THE COURT:  Because in the normal course of events,

18    the government completes its case and the defendant starts its

19    case.

20              MR. CONRATH:  Yes, of course.

21              THE COURT:  And here where you haven't completed your

22    case, but Mr. Whatever his name is.

23              MR. CONRATH:  Holanda.

24              THE COURT:  Basically, but for Mr. Petrocelli, but

25    for him saying to me I want to do the experts together because
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  I think it's going to help the Court.  It's going to be a

2  better presentation.

3        At the end of yesterday, this morning I would have said

4  to you call your next witness. If you said I have no other

5  witnesses then the case is over.  I'm not going to do that to

6  you.

7        MR. CONRATH:  We appreciate that.

8        THE COURT:  Because I agreed to this arrangement and

9  this approach, which doesn't mean by the way his case is

10 closed.

11       So I'm letting you call this guy out of order.

12       MR. PETROCELLI:  But Your Honor, our case is going to

13 be done before this witness shows up.

14       THE COURT:  No, that's not going to happen.  Listen

15 to what I'm saying.

16       MR. PETROCELLI:  Well, okay.

17       THE COURT:  This guy is coming in here Monday or

18 Tuesday.  You can tell him that.  He can either come Monday, I

19 really want him to come Monday.

20       MR. CONRATH:  Okay.

21       THE COURT:  I'll give him a slide to Tuesday, that's

22 all I'm giving him.

23       MR. PETROCELLI:  In the meantime, we'll keep calling

24 our witnesses.

25       THE COURT:  You'll keep calling your witnesses.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              MR. PETROCELLI:  Well, we have --

2              THE COURT:  You've got Monday, let me know.

3              MR. PETROCELLI:  We've got two experts.  I can tell

4    you exactly and I gave this to Craig.  We start with Professor

5    Carlton.

6              THE COURT:  This is Monday now.

7              MR. PETROCELLI:  Okay, Monday is Professor --

8              THE COURT:  Carlton is all day today.

9              MR. PETROCELLI:  All day today.  Professor Katz.

10             THE COURT:  Okay.

11             MR. PETROCELLI:  And two is Professor Rossi and these

12   are --

13             THE COURT:  What's the other guy's name?

14             MR. PETROCELLI:  Rossi, R-O-S-S-I.

15             THE COURT:  That's all day, right?

16             MR. PETROCELLI:  Yes, yes, whole day.

17        Then we have a short witness, David Christopher to talk

18   about his profit marketing.  Then Jeff Bewkes, chairman and CEO

19   of Time Warner.

20             THE COURT:  That's all day Tuesday, right?

21             MR. PETROCELLI:  No.  These directs will all be under

22   an hour and a half, Your Honor.

23             THE COURT:  Yes, but they get to cross.

24             MR. PETROCELLI:  Both of them, you're right.

25             THE COURT:  Okay.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      MR. PETROCELLI:  Then next is either Randall

2  Stevenson or John Stankey and that's it.

3      We honestly didn't want to lose Thursday and Friday

4  because we, with the short rebuttal case they may have, we will

5  definitely be done the next week.  We want to try to pick up a

6  week so we can give you more time, that's it.

7      THE COURT:  You've been saying all along,

8  Mr. Conrath, your rebuttal witness will be a couple days.

9      MR. CONRATH:  Couple of days, two, two and half.  It

10  could be shorter but now I see what's coming here, we have to

11  evaluate.  Obviously, we were not -- we understood until just

12  now that defendants were going to fill next week, so I've got

13  to go back and scramble Wednesday or Thursday.

14      THE COURT:  So you tell Mr. Whatever his name is.

15      MR. CONRATH:  Holanda.

16      MR. PETROCELLI:  You were at 154 two days ago.

17      THE COURT:  So tell him.

18      MR. CONRATH:  Okay, we'll do our best and if I can

19  report back to you after I know more, I appreciate whatever.

20      THE COURT:  Look, I don't want to strike him as a

21  witness obviously.  I don't want to, that's not my preference.

22  On the other hand, I can't attenuate this much longer.  We've

23  got to move forward.  I committed to today the accommodation to

24  the defense and frankly, in the spirit of this will help me

25  understand the case better.  Okay, fine.  I'm okay with that,

1    that's fine.  But I, you know, I frankly expected, I've been

2    expecting your next witness to be Monday morning.  And he needs

3    to understand that, Mr. Holanda.

4              MR. PETROCELLI:  That would be ideal.

5              MR. CONRATH:  So to be fair, I offered that and

6    defendants rejected it.

7              MR. PETROCELLI:  But I thought it was because you

8    were going to rest your case and you could call the witness out

9    of order.  So maybe we didn't communicate properly.

10             THE COURT:  Well, that's an exception to the rule.

11   You guys have been working very well together.

12             MR. PETROCELLI:  Monday is fine if you want to call

13   him Monday.

14             MR. CONRATH:  I will go check it out.

15             MR. PETROCELLI:  How long is he, an hour?

16             MR. CONRATH:  An hour.

17             MR. PETROCELLI:  You want to do it by depo?

18             MR. CONRATH:  No.

19             MR. PETROCELLI:  Okay.

20             MR. CONRATH:  I'll look at it.

21             THE COURT:  But that's the worse case scenario.  Read

22   the deposition excerpts.

23             MR. PETROCELLI:  I'll even agree that you can use

24   your own reader.

25             THE COURT:  Read in the excerpts.  He'll give you,

1    what's his name to read, Rossi?

2            MR. CONRATH:  Rosen.

3            THE COURT:  Rosen, he'll let you use Rosen.

4            MR. CONRATH:  He's a good reader.  He did a good job.

5    We had a good reader available.

6            MR. PETROCELLI:  He was under study.  I told you he

7    was good.

8            THE COURT:  It's only fair he gets the next read.

9            MR. CONRATH:  Yeah, right.  So I guess here's my

10   situation.  They have surprised us by making Thursday

11   unavailable.  I've got to scramble to figure out what to do.

12           THE COURT:  This is what happens in trial.

13           MR. CONRATH:  Your Honor, I understand that.

14           THE COURT:  This is week five, this isn't the first

15   week.

16           MR. PETROCELLI:  I did tell Don and you yesterday

17   that I was skinning it down quite significantly.

18           THE COURT:  Six witnesses, seven witnesses, that's

19   skinning it down?

20           MR. PETROCELLI:  It's called the skinny bundle.

21           THE COURT:  Right, okay.  I know what that is.

22           MR. CONRATH:  Yeah, right, absolutely.  I note

23   something else here.  We've received those overnight documents

24   thanks to Your Honor a couple of days ago.  I had asked for, it

25   came to us without any, mostly slide decks.  They came to us

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  without the kind of thing we normally see cover emails and what

2  not.  I've asked for that.  I understand now that

3  Mr. Petrocelli just told me that we will get that.

4          THE COURT:  You going to be deposing this guy this

5  weekend?

6          MR. PETROCELLI:  Yes, I gave it to him on Saturday,

7  gave him three hours.

8          MR. CONRATH:  So we need whatever information, I

9  understand we might get it tonight.

10          THE COURT:  You got today.

11          MR. PETROCELLI:  I told him I would get it to him.

12  Although I don't think, because it goes beyond the scope of

13  what we discussed, but I told him I would get it to him.  I

14  already gave him a stack of documents.  It's only so much we

15  can do.

16      Let's get the show on the road with Professor Carlton.

17          THE COURT:  Two and three quarters or is two and a

18  half going to be enough?

19          MR. PETROCELLI:  Two and a half each of us.

20          MR. CONRATH:  That will be fine.

21          THE COURT:  All right, so we'll do whatever you don't

22  use on direct, direct or cross, rebuttal, direct.

23          MR. PETROCELLI:  Mr. Oppenheimer is doing that, Your

24  Honor.

25          THE COURT:  Let him know that.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. CONRATH:  Thanks.

 2              (Open court.)

 3              THE COURT:  The government has not rested its case,

 4   but as is often commonly done, by agreement of the parties the

 5   defense will be able to call out of order a witness, their

 6   expert witness, which will actually be helpful to the Court to

 7   have the benefit of the two expert witnesses, the principal

 8   expert witnesses for each side back to back.

 9              So government's case is still not closed, but defense

10   may proceed with calling it's witness, it's expert witness for

11   today.

12              MR. PETROCELLI:  Thank you, Your Honor.

13              We call Professor Dennis Carlton and Mr. Oppenheimer

14   will be conducting the examination.

15              THE COURT:  All right, thank you.

16              DEFENDANT WITNESS DENNIS CARLTON SWORN

17              MR. OPPENHEIMER:  Good morning, Your Honor.

18        May I proceed?

19              THE COURT:  You may proceed.

20        Get some water?

21              THE WITNESS:  I have water.

22              THE COURT:  All right, look at that.

23              MR. OPPENHEIMER:  We're set, we're ready to go.

24              THE COURT:  You may proceed.

25                          DIRECT EXAMINATION
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  BY MR. OPPENHEIMER:

 2  Q.   Professor Carlton, good morning?

 3  A.   Good morning.

 4  Q.   Could you introduce yourself to us by starting by briefly

 5  describing your academic background?

 6  A.   Sure.  I graduated Harvard with a degree in applied math

 7  and economics and then I went for, to M.I.T.

 8          THE COURT:  What year did you get out of Harvard?

 9          THE WITNESS:  Pardon me?

10          THE COURT:  What year did you get out of Harvard?

11          THE WITNESS:  1972.

12          THE COURT:  All right.

13          THE WITNESS:  Then I went to M.I.T.

14          THE COURT:  All right.

15          THE WITNESS:  And I got a Master's Degree in

16  operations research which is a branch of the application of

17  mathematics, the business problems and then I got a Ph.D. in

18  economics at M.I.T. in 1976.

19          THE COURT:  Okay, thank you.

20          THE WITNESS:  I spent a year teaching in the faculty

21  at M.I.T.  Then I moved to the University of Chicago in 1976

22  where I have been ever since with the exception of some

23  government service.

24      At the University of Chicago I have been in the

25  economics, I've been a faculty member of the economics
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   department, law school and the business school.

2          THE COURT:  Oh.

3          THE WITNESS:  And I teach courses, I've taught

4   courses in all three places and currently I'm in the business

5   school.

6          The courses I teach are microeconomics, industrial

7   organization which is the study of individual industries and

8   how they behave.  It's a branch in economics that's most

9   closely related to antitrust and in fact, the course I'm

10  teaching this very quarter is the Ph.D. course in industrial

11  organization with an emphasis on antitrust.  And that course is

12  crossed listed in the law school economics department and

13  business school.

14         THE COURT:  Government service you mentioned, what

15  did you do for government service?

16         THE WITNESS:  I've done a number of things.

17         So in 2006 and 2008 I took leave from the University and

18  I served as the Deputy Assistant Attorney General for economic

19  analysis.  Professor Shapiro described basically the chief

20  economist at the Department of Justice.  As he described we

21  have about 50 Ph.D. economists there and you study a variety of

22  vertical issues, horizontal merger issues, just general

23  antitrust issues.

24         THE COURT:  The antitrust division?

25         THE WITNESS:  The antitrust division, yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           THE COURT:  Okay.

2           THE WITNESS:  I also served on a, I was appointed

3    actually to a congressional committee called the Antitrust

4    Modernization Commission and that was 12 people.  I was the

5    only economist.  It was hard to get a word in edgewise.  We

6    produced a report which was designed to address any issues or

7    problems with the antitrust laws.

8           I also served as an adviser to the Bureau of the Census

9    on the collection and interpretation of economic data.

10          I've also consulted for the Federal Trade Commission and

11   the Department of Justice when I was a private citizen on a

12   number of occasions.

13          THE COURT:  Okay.  Thank you.

14   BY MR. OPPENHEIMER:

15   Q.   Professor, have you won any awards?

16   A.   Yes.  I've won several awards from my articles.  I've

17   published widely in the field of microeconomics and industrial

18   organization.

19      I have over a hundred articles and I have two textbooks.  I

20   have two books, one of which is the textbook in industrial

21   organization called Modern Industrial Organization which is one

22   of the top textbooks in the field.

23   Q.   And do you edit any journals?

24   A.   I do.  I'm editor of several, but the most important which

25   I'll mention it's the Journal of Law and Economics which is

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  published by the University of Chicago which the University of

 2  Chicago likes to think is the leading journal in law and

 3  economics.

 4          THE COURT:  They do.

 5          MR. OPPENHEIMER:  Your Honor, based on your excellent

 6  voir dire of the witness, I would offer Professor Carlton as an

 7  expert in industrial organization and antitrust economics.

 8          MR. CONRATH:  No objection.

 9          THE COURT:  I know there's no objection, but I'd like

10  to hear a little more on if he's testified as an expert

11  witness.

12          MR. OPPENHEIMER:  Sure.

13          THE COURT:  If so, where and has he ever been

14  disqualified as one and if he's been qualified, what courts and

15  when, how recently?  Not a lot, but a little bit on that.

16          MR. OPPENHEIMER:  Thank you.  I think I'll try to

17  follow that to the tee.

18          THE COURT:  Give you something to do here.

19          MR. OPPENHEIMER:  It will, it will.

20  BY MR. OPPENHEIMER:

21  Q.   Professor Carlton, by the way Professor, if you could just

22  move the mic a little closer.  Thank you very much.

23      Would you tell us roughly the number of times you've

24  testified and whether you've ever been disqualified as an

25  expert?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      THE WITNESS:  I have testified on numerous occasions,

2  many.  I don't have my CV in front of me.

3      THE COURT:  More than ten?

4      THE WITNESS:  More than ten.

5      THE COURT:  Federal courts?

6      THE WITNESS:  Federal courts.  I've testified on a

7  variety of topics, merger cases, and intellectual property

8  cases, damage cases.

9      THE COURT:  How about on antitrust?

10      THE WITNESS:  Antitrust, many antitrust cases.

11      Since the early, late 1970s, I've been associated with

12  an economic consulting firm called Lexecon.  And Lexecon was

13  started in the late '70s to apply economics to litigation,

14  initially antitrust.  Primarily antitrust then and regulation,

15  and I've been associated with them for many years.

16      I was the president of Lexecon for several years and

17  I've testified and consulted numerous times both in the United

18  States and I've testified in courts around the world on

19  antitrust matters.

20      THE COURT:  In this courthouse?

21      THE WITNESS:  Yes.  In fact, I was just in this

22  courthouse last year on the rail freight case.

23      THE COURT:  Which one of my colleagues?

24      THE WITNESS:  Yes, exactly.

25      THE COURT:  Which one of my colleagues?

1             THE WITNESS:  Friedman.

2             THE COURT:  Judge Friedman.

3             THE WITNESS:  Yes.

4             THE COURT:  Motion granted.

5             MR. OPPENHEIMER:  Thank you, Your Honor.

6        May I proceed?

7             THE COURT:  You may.

8             MR. OPPENHEIMER:  We have a little bit of

9    housekeeping I'd like to, if I may approach, provide the

10   witness with a book of demonstrative that we prepared and his

11   reports for reference?

12            THE COURT:  Sure.

13        Hold on now.

14            MR. OPPENHEIMER:  Sure.

15            THE COURT:  Give me the, give me what you're

16   qualifying as an expert in.

17            MR. OPPENHEIMER:  Your Honor, we offered him as an

18   expert in industrial organization and antitrust economics.

19            THE COURT:  Very good, motion granted.  Motion

20   granted.

21        Proceed with your questions.

22   BY MR. OPPENHEIMER:

23   Q.   Professor Carlton, what were you asked to do in this case?

24   A.   I was asked to examine the competitive effects of the

25   proposed merger as well as to pay special attention to the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  economic analysis that the government is, might present.

2  Q.   Did you reach any conclusions?

3  A.   Yes.  Briefly, the evidence does not support the

4  government's claim, in particular Professor Shapiro's claim

5  that this transaction will harm consumers.

6      In fact, my reading of the evidence is the opposite.  It's

7  going to benefit consumers.

8  Q.   Professor Carlton, overall is it your opinion that it is

9  more likely or not that prices will go up or down as a result

10  of this merger?

11  A.   Based on the evidence as I just said, I believe there will

12  be a benefit to consumers which means on average, prices are

13  going to go down.

14  Q.   Have you prepared a demonstrative outlining your basic

15  opinion in this case?

16  A.   Yes.

17  Q.   Would you take a look at tab one of your notebook?

18  A.   Yes.

19  Q.   We've identified for the Court as identification DX D

20  0108, the document behind tab one.

21      Is that the summary of your basic conclusions?

22  A.   Yes.

23  Q.   Let's start with the first of these, Professor Carlton.

24      Can you give us an explanation and description of your

25  first basic conclusion?

1  A.   Yes.  My first conclusion is that AT&T's consumer prices,

2  their DirecTV prices will fall as a result of this transaction.

3      And Professor Shapiro also agrees with me that the DirecTV

4  prices, consumer prices will fall and the reason for that is

5  pretty simple.  And that's because as a result of this

6  transaction, the vertical transaction standard benefit is

7  what's called the elimination of double marginalization which

8  Professor Shapiro talked about.  That's easy to explain.

9      And AT&T right now is trying to get say a new customer, a

10  new customer, a customer that is not signed up with anybody.

11  If it gets that new customer, it has to pay for a subscriber

12  Turner say $5.

13     Well now they vertically integrate AT&T and Turner, so now

14  when AT&T goes after the customer, it doesn't have to pay the

15  $5 so it's more profitable.  So it's more profitable for AT&T.

16     AT&T is going to have an incentive to get more customers

17  and in particular AT&T's price, the DirecTV price will go down

18  to consumers.  That's clear.  Professor Shapiro and I agree on

19  that.

20     We disagree about the magnitude, but we agree with the

21  prices going down.

22     Of course, as a result of that DirecTV price going down,

23  that puts downward pressure on rivals like Dish, et cetera.

24  Q.   So if one of the results of this merger is that DirecTV's

25  prices to consumers will go down, how does Professor Shapiro

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  claim to still find consumer harm?

2  A.    Professor Shapiro has a model.  It predicts that after the

3  transaction AT&T is going to raise the Turner prices to its

4  rivals.

5      Because the price, the Turner price content goes up to

6  rival MVPDs, those MVPDs are going to have to raise their price

7  to consumers.  And it's that increased price to consumers by

8  the rivals of AT&T that's going to offset the declining price

9  to consumers from DirecTV.

10     When you balance those two, Professor Shapiro comes to the

11 outcome that consumers are on balance will be harmed.

12 Q.    Does this lead you to your second conclusion?

13 A.    Yes.

14 Q.    Before doing that, just so we can keep following, could

15 you just, if you would, just read out loud from your chart,

16 your second conclusion?

17 A.    Yes.  So the second conclusion is focusing on the

18 empirical evidence in this industry.

19     The history of vertical integration, the evidence provides

20 no statistical support for the government's claim that prices

21 will rise in this transaction.

22     Professor Shapiro is saying Turner content prices is going

23 to go up a lot, 20 percent in some of his models.  That's a

24 lot.

25     Well, you can ask the question is that consistent with what

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    we've seen in the past?  Usually when you are studying a merger

2    you don't have the luxury of seeing what's going on in past

3    transactions that are similar.  That's different here.

4        We have at least three that are relevant.  We have News

5    Corp taking over part of DirecTV, that's in 2003.  They

6    disintegrate.  They spin off, News Corp spins off DTV in 2008.

7        We see Time Warner and Time Warner Cable splitting apart in

8    2009 and in 2011 we see Comcast and NBCU vertically integrated.

9        Those are all great opportunities to study whether there's

10    any truth to the government's claim that vertical integration

11    in this industry leads to higher content prices.  And I looked

12    at that.  I'll go through in more detail later.

13        And the answer is no.  There's absolutely no statistical

14    basis to support the government's claim that vertical

15    integration in this industry leads to higher content prices.

16    Q.    Professor Carlton, let's just touch base briefly on each

17    of those three prior events that you mentioned just to clarify.

18        Are each of those that you mentioned, the DirecTV

19    integration with Fox in 2003 and then there's disintegration in

20    2008.

21        The Time Warner Cable which was integration, integrated

22    with Time Warner, Inc. split up in 2009.

23        And Comcast merged as the Court knows with NBCU in 2011.

24        Are all of those vertical integrations and disintegrations

25    in the industry that were involved in this merger case?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   Those are the ones I'm going to look at.  And what's

2   specially striking to me in at least two of those cases, the

3   exact, the very exact same or very similar types of antitrust

4   concerns were raised.  Same type of concerns in NBCU, Comcast

5   and in the News Corp acquisition, part of acquisition of

6   DirecTV.

7       I actually served as an expert for News Corp in that case

8   and the same type of issues were raised and bargaining models

9   much like Professor Shapiro's were used by those raising the

10  concerns.

11  Q.   Are these prior examples you've identified, are they

12  identical with the current case or does that matter?

13  A.   They're not identical.  The economic evidence is not

14  current.  You would like an identical, but they are close

15  enough in my view that they are very probative of what's going

16  on.

17      Like I say, same concerns, same industry, vertical

18  integration and I'll explain even later in more detail why I

19  think that they are quite probative but clearly to me the most

20  relevant evidence.  Ignoring that evidence is a big mistake.

21  Q.   So not seeing price increases in the real world, what

22  approach does Professor Shapiro take?

23  A.   Professor Shapiro doesn't look at that evidence.  Instead

24  he builds, he constructs a model, an economic model.  I will

25  say quite a complicated economic model.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    It has a bargaining element to it as he was describing

2  yesterday.  Didn't talk much about the second element, the

3  merger simulation and it has lots of assumptions like

4  simplifying assumptions, a lot of variables, values he has to

5  plug in and from that model he makes predictions.

6  Q.    So let's go to your third conclusion in that regard.

7  Would you read that into the record and explain what you mean

8  by it?

9  A.    Yes.  Professor Shapiro's model, the one he explained

10 yesterday, is just theoretically unsound.

11    The easiest way to explain it is to repeat briefly what his

12 bargaining model relies on.

13    His bargaining model what he calls the Nash bargaining

14 model depends upon the fact that when two people, two firms are

15 negotiating, the outcome of the negotiation depends upon what

16 is sometimes called the threat point or no agreement point or

17 in our case, the blackout point.

18    So imagine that Turner is negotiating with Comcast right

19 now and in that negotiation Turner figures out that if it

20 doesn't sign a deal, it's going to lose a $150,000,000 per

21 month.

22    Well, the reasoning of Professor Shapiro is the following:

23 After the transaction when Turner is negotiating with Comcast

24 if there were a blackout of Comcast, Turner not only would lose

25 that $150,000,000 as before, but now those blacked out

1    customers of Comcast, some of them are going to come back to

2    AT&T.

3        So Turner is not going to lose a $150,000,000, it's going

4    to lose only a $100,000,000 and because of that in his model

5    prices, Turner content prices, the price Turner charges, will

6    be able to rock, to go.

7    Q.    Does that strike you as odd?

8    A.    Well, the thing that's bothersome about it is that

9    everything in the model I've just described depends upon, or

10   critically depends upon what I call a no agreement point or

11   what happens if there's a blackout.

12       First, there is just to make it clear, there is going to be

13   no blackout.  Professor Shapiro was clear on that.  He's not

14   saying there's going to be blackouts.  Both he and I agree on

15   that.  This is not a case about foreclosure.  This is a case

16   about pricing.

17       So there will be an agreement between Turner and Comcast.

18   He's just saying the price that Turner gets is higher.

19       But here's the key point.  Blackouts are what are driving

20   his model.  He's completely ignored the arbitration commitment

21   of AT&T that says if you're an MVPD, if you're at Comcast and

22   you trigger arbitration, you don't have to worry about a

23   blackout.  A permanent blackout is not in the cards.  The MVPD

24   can prevent that.

25       That just means the central element of his theoretical

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  model does not apply.  In fact, he said that.  He said if I had

2  to build in the arbitration, I'd need a new model.

3      So my basic point is the theories he's using just doesn't

4  apply to this transaction.  My interpretation, he can speak for

5  himself.  That's what he said yesterday.  But I agree.  My

6  point is his model, his theory model does not apply to this

7  transaction.

8  Q.   Are there other ways in which Professor Shapiro has

9  modeled the wrong thing?

10 A.    There are at least two other things he's ignored.

11     One, and this is a simple point.  Contracts.  MVPDs have

12 current contracts with Turner.  That means you can't just raise

13 their price.  Turner can't raise their price post transaction.

14 They're protected by contract.

15     And some of them, I get I can't mention who, but some of

16 them have contracts that last several years.  That means in

17 Professor Shapiro's model prices can't go up to those people.

18 That will tend to keep the prices, the consumer prices that

19 Professor Shapiro is saying are going to go up because there's

20 going to be cost pressure, won't be any cost pressure because

21 those prices can't go up to the MVPDs.

22     Well, if that's the case, that means he's overestimating

23 how quickly these harms are going to start occurring.

24     So the interesting thing is the benefits that even

25 Professor Shapiro agrees will occur, that elimination of double

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   marginalization.  Those are going to stop, those are going to

2   continue.

3       Meanwhile, you have a lot of protection from the harms

4   which he has just not taken that into account at all.  I'll

5   talk about what happens if you correct for that.  It eliminates

6   a lot, or most of the terms.

7       So that's one thing --

8           THE COURT:  Does the fact that there are contracts in

9   place also mean that the benefits of removing the double

10  marginalization can't positively help because the contracts

11  price is already set and can't be decreased?  It can't be

12  increased but it can't be decreased either to offset the double

13  marginalization benefit that you've talked about?  The removal.

14          THE WITNESS:  Well, there's no question things take

15  time to play out.

16          THE COURT:  Right.

17          THE WITNESS:  And you could compare the length of

18  contract that consumers have to which, you know, locks in their

19  price to the length of contracts to these other parties with

20  the MVPDs.  Those tend to be several years.

21      So one is going to happen quicker than the other.  But

22  even on the elimination of double marginalization you, there's

23  nothing prohibiting you from lowering the price to consumer.

24  You might want to lower a price to cut down insurance so you

25  could do that and you have an incentive to do that because you

1  don't want to lose this person because he's now making, would

2  be making more of a profit from him.

3       So I think the elimination of double marginalization

4  benefits really should be thought of as occurring pretty

5  quickly and the fact that there are protections of the MVPDs

6  from Turner prices going up, that's going to constrain harms.

7  A lot in his model.

8       Then the final point is that he has not paid any

9  attention to, and I'm not going to talk much about this.  I

10 understand Professor Katz is going to talk about this.

11      This has to do with the FCC access rules.  My

12 understanding is that if a MVPD complains that someone is

13 trying to raise the price of Turner content to them in a post

14 transaction because AT&T will be vertically integrated into

15 Turner, that MVPD who is complaining can trigger FCC action

16 because the FCC statutes enable the FCC to intervene to prevent

17 the misuse of a, the pricing of content if you vertically

18 integrated into distribution.

19 BY MR. OPPENHEIMER:

20 Q.   Just to be clear, Professor Carlton, is that FCC

21 constraint on Turner pre merger?

22 A.   My understanding is no.

23 Q.   Let's go to your fourth conclusion, if you'd read that

24 into the record?

25 A.   Yes.  As I said, Professor Shapiro has a complicated model

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    to put it mildly.

2              THE COURT:  Is that the rule Goldberg contraption?

3              THE WITNESS:  That would be a possible description.

4         But I mean, in fairness to Professor Shapiro, economist

5    often have such models, there are such models in the

6    literature.  But that could be one description.  But it's

7    really complicated.

8         And there are a lot of simplifying assumptions and there

9    are a lot of variables that he has to choose values for.  I'm

10   just going to focus on a few.

11        On some of the key variables that you need to set a

12   value, I think he's set the wrong value.  I'll explain why.

13   But there are three things I'll mention here.  And they

14   correspond to some of the topics he discussed last time,

15   yesterday.

16        The first has to do with what I'll call a departure

17   rate.  I think you call it the consumer loss rate.  So if you

18   blackout, if Turner blacks out Comcast, how many people will

19   Comcast lose?  I think he's overestimated that.  I'll explain

20   why.

21        If you just correct for that over estimation, that

22   eliminates all of his harms.  What I mean by that is it turns

23   his prediction of a price increase into a price decrease, a

24   benefit to consumers.

25        Second thing, diversion and I say diversion/cord

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    cutting.  That means let's suppose someone Turner raises the

2    price to Comcast.  Comcast loses customers.  We now have to

3    decide where are they going to go.  Are they going to go to

4    DirecTV or are they maybe going to cut the cord.  I think he's

5    way underestimated cord cutting.  I'll explain why.  But just

6    one simple point to keep in mind.

7         Cord cutting is growing.  The population of people who

8    have cut the cord is growing.  In his model it's declining over

9    time because of a peculiar feature of his model.

10        Anyway, if you correct for that, that too eliminates all

11   of his harms.  Or another way of saying it, it turns his

12   prediction that consumer prices are going up into one that

13   they're going down.

14        The third thing has to do with margins.  These are

15   DirecTV's margins.  His model depends on margins and that's

16   understandable as he described yesterday.

17        So he wants to use margins.  What margins does he use?

18   He uses margins from June of 2016.  The second quarter of 2016.

19   Well, I have more recent data.  And I used in exactly the same

20   way as he used them, updated margins, June 2017 margins.

21        And they're much lower than the margins he's using.

22   They are lower by I think roughly 40 percent.  That is a big

23   effect in his model.

24        It also tells you that his predictions of what's going

25   to happen margins, you know, he was predicting 2017 margins and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2449

1   2016, they're way off, right.  He was off by 40 percent.

2       So margins are going down in this industry.  He

3   underestimates the importance of that.  And into the future I

4   won't even take account that they may continue to go down.  I'm

5   just going to use current margins.  And they're a lot lower

6   than what he's using and that has a big effect in his model,

7   you know, in eliminating his predicted harms.

8   Q.   Professor, when you combine all three of those

9   adjustments that you just discussed departures, diversions and

10  margins, when you correct all of those inputs, what happens?

11  A.   Again, if you correct sometimes just one but if you

12  correct them all at the same time it clearly shows that his

13  predicted price increases to consumers is wrong.  And in fact,

14  his model would predict price decreases to consumers of

15  actually slightly more than the magnitude that he was saying

16  prices were going to go up.  But it flips his result, that's

17  the point.

18       MR. OPPENHEIMER:  Your Honor, we'll have a

19  demonstrative a little bit later in a catalog we'll provide

20  you.

21       THE COURT:  All right.

22  BY MR. OPPENHEIMER:

23  Q.   Let's go to your first conclusion which is on DX D 108.

24  It says Professor Shapiro provides no evidence that his results

25  are statistically significant.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Professor Carlton, how much confidence should this Court

2  have in the numbers produced by Professor Shapiro's model?

3  A.    None.

4  Q.    Can you explain why?

5  A.    Yes.  I've already explained his model is theoretically

6  invalid.  I've said that the industry evidence shows that

7  there's no support for the claim that prices in this content

8  prices will be going up.  Certainly nothing like it is the 20

9  percent he suggested.  No support for that at all.

10    And I've also just explained that if you choose more

11  reasonable values for just a few of the perimeters in his

12  model, you flip his results.

13    Even if I ignore all of that.  Even if I ignore all of

14  that, there's another very important point I'm trying to make

15  here.

16    He's predicting as he said yesterday a 27 cent increase in

17  consumer prices.  So I just want everybody to understand what

18  that means.  Twenty-seven cents the consumer is going to be

19  paying extra on a bill, a monthly bill that's about a $140.

20  Wow, that's not very big, that's really tiny percentage wise.

21    And he also testified and I agree with him, economic models

22  of predicting are often imprecise.  Well, his method that he

23  uses does not involve any statistics.

24    He doesn't do any statistical, provide any statistical

25  tests to convince the Court that his number, his tiny percent

1   increase is any different from zero.  It could be zero just

2   because of normal fluctuations in how we estimate models in the

3   perimeters of the model.

4        As he said, our results are imprecise.  Well, where does

5   that leave you?  Here's where it leaves me.  It would be a real

6   mistake to stop a merger just because an expert, even one as

7   highly qualified as Professor Shapiro, says I'm predicting a

8   tiny price increase.

9        Now I can't tell you that that's statistically significant

10  because I've done no statistical tests of that.  I can't tell

11  you that it's any different from zero.  Wow, that would be

12  horrible.  Let me tell you why.

13       It means a lot of time you would be stopping a merger where

14  there's no harm.  But worse than that, we're talking about

15  vertical mergers here.  Vertical mergers generally have

16  benefits.  I'll discuss that a little more.  But even Shapiro

17  agrees that there are benefits.

18       That means if you adopt the standard where someone can come

19  in and say I think there's going to be a slight percentage wise

20  price increase, I can't tell you it's any different than zero,

21  you stand the risk of stopping a merger that could create

22  benefits to consumers.  That's going to wind up harming the

23  public.

24       So from my point of view, it's a dangerous standard to

25  pursue.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Let's move on to your sixth conclusion where you write the

2  proposed merger will lead to additional efficiencies which I

3  think follows under the point you just made, Professor.

4       Can you explain that?

5  A.   Yes.  This is a vertical transaction.  It's well

6  understood that vertical transactions can, not always have to,

7  but can generally lead to efficiencies.  That's because you are

8  combining complimentary assets.

9       So what are the complimentary assets here?  It's

10 distribution with content.  And the, you know, I understand

11 others are going to talk about efficiencies.  Not me.  But the

12 intuitive idea of what's going on here is pretty clear.

13      The information the distributor is going to get to be able

14 to figure out who's watching content is going to be able to

15 produce benefits that will allow content creators to better

16 design content that viewers want to see.  It will allow the

17 combined company to place ads that are more targeted to the

18 population.  And those types of efficiencies are perfectly

19 plausible.  Others will talk about them.  But they're perfectly

20 plausible.

21      But the only other point I would make here is, this is an

22 industry where we see Netflix has come in, you have Google, you

23 have Amazon, these are all big companies that know how to use

24 information and that's what their innovations, that's what

25 they're teaching in this industry.  How to use information to

1  better, to improve the creation of content and the distribution

2  of content as well as their plans obviously to use this for

3  advertising purposes.

4  Q.    From an economist's point of view, are all those entities

5  you just mentioned vertically intergrated in the same way that

6  DirecTV and AT&T would be if this merger went forward?

7  A.    Generally, yes.  That was my point.  That these are

8  vertically intergrated entities who have gotten into the

9  combination of distribution and content.

10 Q.    Does Professor Shapiro account for any of these

11 efficiencies?

12 A.    No.

13 Q.    Could you describe for us how you started your study of

14 this issue and what you began looking at, at the outset?

15 A.    You want me to read my seventh conclusion?

16 Q.    I apologize.  Sometimes I forget about the seventh.

17 A.    Maybe that's an appropriate thing.

18 Q.    We'll get to that in a moment.

19        MR. OPPENHEIMER:  The seventh and my apologies, Your

20 Honor.

21        THE COURT:  No problem.

22 BY MR. OPPENHEIMER:

23 Q.    Professor Shapiro fails to show likelihood of magnitude of

24 harm for claims regarding HBO and coordination.

25    Can you tell us what you mean by that, Professor?

1  A.   Yes.  Especially in light of what Professor Shapiro said

2  yesterday, I'm not quite sure what I'm suppose to rebut on his,

3  from what he said because as he said, and it's quite clear.

4       Unlike what he did for the case of Turner, he does not

5  create a detailed theory for either of the harm that he's

6  postulating for HBO or his coordination theory.  Not worked out

7  in any detail.

8       Moreover, there's absolutely nothing unlike what he did in

9  Turner to quantify anything.  So I'm really not quite sure

10  exactly what he is saying.

11       But at the very least if you look at the coordination

12  concern he raised which is the withholding of content, Turner

13  content post merger, he seems to completely ignore again the

14  arbitration commitment.  Can't do that under the arbitration

15  commitment.

16       So these MVPDs who already have contracts, can't do it.

17  Can't withhold.  Even the new people who may come in.  My

18  understanding is that AT&T is committed to providing them with

19  content.  So he's just completely ignored that contractual

20  commitment.

21       So to me he hasn't put forward a theory of that.  I can't

22  quite tell from what he said how strongly he believes there is

23  a harm from these two theories, but however strong he believes

24  it, at least in the case of coordination seems inconsistent

25  with the arbitration commitment.

1  Q.   Can you tell us how you embarked on your study where you

2  started looking at first?

3  A.   Yes.  I would say the first place to start is just to

4  familiarize yourself with the industry and I prepared some at

5  least descriptive statistics to get a sense of the facts to

6  allow me to put in context the government's claim that post

7  transaction Turner has enough market power that AT&T can use to

8  harm competition.

9  Q.   What did you find in that regard as a preliminary matter?

10  A.   Well, as a preliminary matter if you look at content

11  creation which is what we are concerned about here, there are a

12  lot of new firms that have come in and the firms that have I

13  think transformed the industry.

14      And it's also the case that there are lots of firms

15  involved in content creation and at least Time Warner doesn't

16  dominate in any sense.

17      There are other firms also where they share.  Now I'm not

18  saying, and I want to be clear about this, that Time Warner

19  content isn't value, it's not good.  It's just that what the

20  government is claiming seems much more than that, that they

21  have enough power that AT&T can misuse them.

22  Q.   Would you turn to tab two in your notebook?

23  A.   Yes.

24  Q.   This has been identified for identification here as

25  Defendant's DX D 0109.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Would you tell us what that, is?

2   A.   Yes.  This is a chart that shows the expenditure by firm

3   on programming expense.  And it lists the major firms and what

4   I want to note is the first point I made earlier was that the

5   important descriptive feature in this industry is we have a lot

6   of new firms.

7      So we have Netflix, we have Google coming in, you have

8   Amazon Prime.  These are all big firms, Apple and Facebook we

9   know are coming in.  So these are firms that are coming into

10  the industry and these firms come in and start creating

11  content.

12     So this chart that we're looking at shows who's spending

13  and how much.  And one of the interesting features is that the

14  third one down, Netflix spends more than Time Warner.

15     So a relatively recent entrant is now spending lots of

16  money on content creation.  So the point of this chart is a lot

17  of firms involved in content creation.

18     From the point of view of an economist in antitrust, this

19  isn't an especially concentrated market compared to markets

20  where we really worry about concentration and that doesn't mean

21  there's no problem.  I'm not saying that.  You could continue

22  to investigate, you certainly should.

23     But as a starting point, it's telling you ghee, a lot of

24  places get content.  Lot of possibilities that if one content

25  provider cuts you off, that content provider really may be

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  shooting itself in the foot for the future because an MVPD

2  might go somewhere else.  And resources are moving around in

3  this industry.

4      You know, just last week or two we hear about executives

5  moving to Netflix from the broadcast studio, divisions.  So

6  there's a lot of talent moving around towards these new

7  players.

8  Q.   What about the quality of the new product that's coming

9  into the market?

10 A.   Very high.  Lot of these new players are producing high

11 quality, very popular series.

12     So for example, I looked at the Golden Globe.  I keep

13 saying Golden Glove, Golden Globe awards.  I think 45 percent

14 of the Golden Globe awards that were just awarded went to

15 Amazon, Hulu and Netflix.  So tremendous change in the quality

16 from ten years ago from these people many of whom didn't even

17 exist.

18 Q.   So in trying to find Turner's place in this dynamic market

19 did you look at any other metrics?

20 A.   Yes.  One metric I looked at was viewership.  Now it's not

21 a perfect metric but it is a metric that they use in this

22 industry.

23     I know Mr. Schlichting said, you know, testified to that

24 but again pretty common that people look at viewership in the

25 industry.

Q.   Just to be clear, when you say viewership, what are you
referring to?

A.   For example, the Neilsen ratings would be an example.  You
know, what fraction of consumers are watching your program.

     And what you find is that Time, Time Turner share is
falling over time.  It's a little bit right around 10 percent
in 2011.  It's gone down over time.  The exact numbers are in
my report.  It's down now around 8 percent.  And that's not
counting the OVDs, the over-the-top, the online video
distributors.  If you put the online video distributors in,
that is people like -- give me a minute -- well, there are
many, I'll get to those later.

     But if you just put in all of these other people who are
watching over-the-top, you would cause that share to decline
from 8 percent down to around 6 percent.

     So that's where Time Warner's current share is.  The exact
numbers are in my report.

Q.   Did you provide a demonstrative to illustrate that point,
Tab three?

A.   Oh, I didn't know it was in tab three.  Yes, that's right
out of my report.

     So this makes it clear that the Turner Networks are going
from what I said is right.  Just a little under 10 percent to a
little above 8 percent.  If you go over to period 2010 to 2017.

     And that if you correct for OVDs, it goes from a little

1  above 9 percent to a little above 6 percent.

2  Q.   Did you look at any other viewership metrics?

3  A.   There are some other viewership metrics that I looked at.

4  For example, I know there's been a lot of discussion about non

5  sports and sports.

6      So I asked the question how about the number of programs

7  you have in the top 500.  And I asked what is that number for

8  Time Warner?  And that's in the next demonstrative.

9          MR. OPPENHEIMER:  Let's turn to tab 4, Your Honor.

10  BY MR. OPPENHEIMER:

11  Q.   For identification DX D 110, what is this, Professor

12  Carlton?

13  A.   This is revealing Time Warner's share of the top 500 non

14  sports telecast.  This is for 2017.  It shows they have 1.4

15  percent.

16  Q.   Let's turn now to tab 5 marked for identification as DX D

17  0111.

18      Is that the sports demonstrative?

19  A.   Yes.  So this is similar to the demonstrative we just

20  looked at but this one is for sports.

21      It shows that Turner has a modest share, about 12 percent

22  of the top rated telecasts for sports, but I would note that I

23  looked at Turner's top rated program for sports in the relevant

24  year and it was 161.  It was a 160 first if you were ranking

25  them by popularity.  So no question it's important, but is it

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    at the very top? No.

2    Q.   Based on your analysis, what did you conclude about the

3    content, video content industry at this point?

4    A.   Well, really what I said at the outset; namely, that a lot

5    of new entrants.  Things are changing.  New entrants are

6    changing how information is being made.  It's emphasizing the

7    importance of vertical integration and distribution into

8    content.  A lot of firms providing content.

9        So it's suggestive, not conclusive by any means, but it's

10   suggestive that you should be skeptical of government claims

11   that there is the ability post merger for AT&T to misuse Turner

12   to harm competition.

13   Q.   So we've been talking about the content, upstream content

14   side of this to distributors.

15       Have there been changes in the distribution to consumers

16   directly?

17   A.   Yes.

18   Q.   Would you describe that?

19   A.   So the downstream market; that is, the market involving

20   distribution to consumers has been changing.  Give just one

21   example virtual MVPDs didn't exist ten years ago to any extent.

22   So that here there's certainly a new presence.  As I describe

23   in the reports, it's clear the industry analysts are all saying

24   the market industry is getting more competitive.

25       There are predictions and the evidence will show that

1  margins are going down in this industry.  That is margins of

2  say DirecTV are going down in this industry.  And that's

3  expected to continue.

4  Q.   Does this increase in downstream competition effect

5  Professor Shapiro's general theory that AT&T has an incentive

6  to raise rival's costs?

7  A.   There's no question that profitability AT&T earns from

8  capturing customers depends on its margins.  So if those

9  margins are decreasing it will alter Professor Shapiro's model

10 in the obvious way.

11     What it means is the more competitive distribution becomes,

12 the less incentive you have to raise your rival's cost.  And in

13 fact in his model, in his bargaining model the less

14 profitability you get from a customer switching to AT&T and

15 therefore his bargaining model would say that the forces

16 leading to an increase in Turner price in post merger.  I

17 believe his bargaining model was correct that those will

18 decline.

19 Q.   Let's talk about impact on consumers a little bit.  As an

20 economist in trying to evaluate whether this merger is harmful

21 or beneficial, what kind of affects are you looking at?

22 A.   Well, Professor Shapiro is looking at the affects on

23 consumer prices.  That seems the right thing to do.

24     We want to see what happens when you combine the fact that

25 in his model DirecTV prices are going to go down with his claim

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    that there will be an increase in the cost of Turner content to

2    rivals.

3        Now he played out in the market for video and we want to

4    see what's going to be the result on the end price that

5    consumers pay.

6    Q.    We've heard from a number of distributors, a few

7    expressing some concerns about the merger.  As an economist,

8    can you draw any conclusions from that?

9    A.    Not necessarily.  There are two reasons why a competitor

10   might complain.

11       One reason is he might truly feel that he's being harmed

12   and there is the result of a harm to competition which is what

13   Professor Shapiro has explained.

14       But there's another very good reason.  A rival doesn't want

15   to see a transaction that makes it's competitor more efficient.

16   I mentioned that DTV prices are going down.  That's the last

17   thing in the world a rival MVPD wants to have, a competitor

18   whose price is going to cut price, is going to lower price.

19   Nobody wants that.

20       Well, that's good for consumer.  Maybe bad for the

21   competitors, I understand that.  But that's the whole point of

22   competition.  We want prices to go down for consumers.  We

23   don't want to protect rival's from that affect.

24            THE COURT:  This be a good time to take the morning

25   recess?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. OPPENHEIMER:  Yes, Your Honor.

 2              THE COURT:  All right.  Professor, we're going to

 3   take a 15 minute recess.  As you know, you're a witness under

 4   oath now in the case.  You're not at liberty to discuss your

 5   testimony so far or what it might be when you return with

 6   anyone including your counsel in the case.  Just can't talk to

 7   anyone about it.

 8              THE WITNESS:  Okay.

 9              THE COURT:  So we'll see you back in 15 minutes or

10   so, okay.

11              THE WITNESS:  Okay.

12         (Witness excused.)

13         (Recess at 11:55 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1              (Proceedings resumed at 12:19 p.m.)

 2              THE DEPUTY CLERK:  Your Honor, recalling Civil Action

 3    Number 17-2511.  The United States of America v. AT&T, Inc., et

 4    al.

 5              MR. OPPENHEIMER:  May I proceed, Your Honor?

 6              THE COURT:  Witness remains under oath.  You may

 7    proceed when you're ready.

 8                   DIRECT EXAMINATION (Continued)

 9    BY MR. OPPENHEIMER:

10    Q.   Professor Carlton, let's just spend a few more minutes,

11    then we'll move on to another subject.  But a few more minutes

12    of this elimination of double marginalization.  That's what

13    allows, after the merger, DirecTV to lower its prices, it's one

14    of the efficiencies; is that correct?

15    A.   It creates an incentive for them to lower price and will

16    lead them to a lower price, yes.

17    Q.   Right.  And His Honor was asking you a few questions about

18    the presence of contracts in the system, and that's an

19    important variable that you've talked about and will talk

20    about.  But the existence of those contracts, that doesn't stop

21    DirecTV after the merger from immediately using the benefits of

22    EDM to fight for new customers and compete in the marketplace

23    at the consumer level, correct?

24    A.   Exactly, that's what I said earlier.  There's no

25    inhibition from a contract to cut price, not just to keep

1  customers, but also to get new customers.

2  Q.   Right.  So EDM, the EDM effect basically, the way we

3  should think of that is it kicks in right away?

4  A.   Right away or certainly much, much faster than the

5  contractual provisions that slow -- that prevent the price from

6  rising the Turner content.  I agree with that.

7  Q.   Okay.  And you and Professor Shapiro agree that this EDM

8  effect is real and it takes effect, right?

9  A.   Real and what effect?

10  Q.   Takes effect.  It's present in the real world?

11  A.   Yes.

12  Q.   Okay.  Do you agree on the magnitude of this benefit of

13  this -- the benefits coming from the elimination of double

14  marginalization?

15  A.   No, we disagree for a very simple reason.  One of the

16  benefits that I described is when you're trying to get a new

17  customer, you now are going to make more money, so you want to

18  get after that customer more aggressively.  Go after that

19  customer more aggressively.

20      Well, here's the things.  The number of cord cutters are

21  customers you'd love to get.  And the number of cord cutters is

22  going to influence how hard you try to get those customers

23  because if you lower price, you'll get a lot of them.  So if

24  there are a lot of cord cutters, it creates a greater incentive

25  for you to lower your price.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Professor Shapiro and I disagree on the size of the cord

2  cutting population.  And like I said in my opening remarks, his

3  model has the peculiar feature that the number of cord cutters

4  in his model is decreasing over time.  From my point of view,

5  it's quite clear the number of cord cutters is going up over

6  time.

7      Young people are the ones who are cutting the cord.

8  They're going to be growing older, and they're going to become

9  more and more important, cord cutting is going to become more

10 and more important as an economic influence.  And that's going

11 have a big effect on the incentive of AT&T to use the

12 elimination of double marginalization to become a more

13 aggressive competitor.

14 Q.   I want to talk about one more motivation that they might

15 have to use EDM.  As I understand it, every time you get a new

16 subscriber your advertising becomes more valuable to you, can

17 you address that?

18 A.   Sure.  If I get a -- in the examples I gave, I talked

19 about AT&T now post-merger no longer having to pay Turner,

20 that's true.  It's also the case that if they own Turner they

21 will now get the advertising revenues from Turner that creates

22 even more incentive for them to find it profitable to get a new

23 customer than pre-merger.

24 Q.   Basically the more eyeballs you have, the more valuable

25 your advertising is?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Correct, correct.

2  Q.    Okay.  You know, we're going to want to run through some

3  of this reasonably quickly, but I want to change topics now.

4  Now we're going to talk about the empirical work you did, the

5  examination of what's actually out there in the real world.

6      So let's begin, if you would, Professor, what's the best

7  evidence used to evaluate the likely economic effect of this

8  transaction?

9  A.    As I said earlier, I think the best evident to assess

10 Professor Shapiro's claim that content prices, Turner content

11 prices are going to go way up as an order of magnitude of

12 twenty percent.  Look at what has happened in the past.  We've

13 had several instances where you can examine this theory

14 directly.  Does vertical integration matter in the pricing of

15 content?  Can you detect any harms that come when vertical

16 integration occurs in the pricing of content?

17 Q.    Now, from your review Professor Shapiro's work, did he

18 undertake any of this empirical analysis?

19 A.    As far as I can tell, he did no empirical analysis of this

20 topic at all that he reports.

21     The only thing he reports is he refers to an FCC study that

22 was done at the time of the -- or around the time of the News

23 Corp DirecTV transaction where the same types of concerns were

24 raised, bargaining models were used and the claim was prices

25 were going to up.  And he refers to an FCC study that says we

1   detected that prices did go up.

2       Well, that study is confidential, so I couldn't get ahold

3   of it.  But I have the Kagan data that was used, not that was

4   used, but it's been updated.  So it's new Kagan data from that

5   time period.  And I redid the study in exactly the same way

6   I've been doing my other studies that I'll talk about in a

7   moment.  I couldn't find any evidence that would support the

8   claim that content prices went up in statistically significant

9   amount to harm consumers from that transaction.

10      But I have studied more recent events in more detail as

11  I'll now explain.

12  Q.   And just to clarify a few things about this FCC study.

13  This was a study of DirecTV Fox done at the time of the Comcast

14  NBCUniversal deal, correct?

15  A.   I have to go back and check the exact date, but that

16  squares with my recollection.

17  Q.   All right.  And you said you didn't have access to this

18  study.  And just for clarification, am I correct neither did

19  Professor Shapiro?

20  A.   I don't really know if he had access to the study.  But

21  it's a confidential study, so all I know is I didn't have

22  access to it.

23  Q.   And in its public form it's redacted, correct?

24  A.   Correct.

25  Q.   All right.  Now, you have identified three cases that

1  you've evaluated and done pricing studies on.  I want to turn

2  to those now.  Let's start with the examples that you gave

3  where companies were integrated.  There was Fox TV, which

4  combined in 2003 and split in 2008.  And time Warner and Time

5  Warner Cable that split in 2009.  You studied both of those,

6  correct?

7  A.   Correct.

8  Q.   All right.  And you mentioned vertical disintegration, and

9  it had some significance for your work in this case.  Would you

10 describe for the Court what that's about?

11 A.   Yes, this is a very simple point.  The government's theory

12 is that vertical integration is profitable for the firm because

13 they harm their rival and they make more money.

14     Well, if that's true, if you're vertically integrated, you

15 wouldn't vertically disintegrate because, according to the

16 government, you're now not going to make as much money.  The

17 government's whole theory is that vertical integration is bad,

18 and the company makes, you know, excess -- too much money.

19     Well, then you should never see vertical disintegration.

20 The very fact that you're seeing vertical disintegration in

21 this industry is telling you either the government theory

22 doesn't apply or it doesn't apply then.  But it's clearly a

23 fact that is antithetical to the government's position.  The

24 government says you shouldn't see vertical disintegration.

25 Q.   Professor Carlton, I know a lot of your work in analyzing

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   these three events is fairly complicated and sophisticated.

2   But give us an overview, if you would, how did you go about

3   looking at the pricing from these three events?

4   A.   So I was able to get pricing data from a variety of

5   sources.  Kagan, for example, is an industry source.  But I

6   also was able to get detailed data on these -- on pricing from

7   DirecTV.  What does DirecTV TV pay to cable networks.  And also

8   I was subsequently provided with information that Dish pays and

9   that Charter pays.  So I was able to use this information to

10  test.  Is it true that content prices are higher on a network

11  when it's sold by someone who's vertically integrated.  That's

12  basically the investigation that I'm doing.

13      And to try and sort of briefly summarize it, there's just

14  no evidence that vertical integration has a significant effect

15  on raising prices, there's no evidence, statistical evidence

16  that statistical support for the proposition that vertical

17  integration raises content prices.  You just don't see it.  So

18  when Professor Shapiro is saying content prices of Turner, some

19  of his models go up twenty percent, there's nothing like --

20  there's nothing like that in the data, nothing to support that

21  proposition.

22  Q.   So let's start in this topic by looking at a couple of

23  demonstratives you prepared for us.

24          MR. OPPENHEIMER:  Your Honor, this is marked for

25  identification DXD 0112.

1  BY MR. OPPENHEIMER:

2  Q.   And would you tell His Honor what that is?

3  A.   Yes.  So let's focus on Comcast NBCU.

4      The question is after the transaction, is it the case that

5  the fees for the NBCU networks go up faster or slower than

6  everybody else's prices.  That is, the affiliate fees for other

7  networks, and a simple place to start is with this diagram.

8      So if you look at the diagram, there's a black line and

9  there's a blue line.  And the whole question is, is the black

10  line above the blue line or is it below the brew line?  And the

11  diagram clearly makes it clear the black line is always above

12  the blue line.

13      Well, that's telling you that the blue line, which

14  represents NBCU, an index of NBCU prices, is rising less fast

15  than everybody else.  Just no support for the government's

16  claim that that blue line should be above the black line.  It's

17  just contradicted by the underlying facts.

18  Q.   And that's a result of just looking at the prices; is that

19  correct?

20  A.   That's a result of just looking at the prices using as a

21  data source S&L Kagan, which is a pretty standard data source

22  in the industry.

23  Q.   Is S&L Kagan used by the government as well?

24  A.   Yes.

25  Q.   Okay.  Let's take a look at tab seven, that's another tab

1   that looks very similar to the one we just looked at.  What is

2   this slide telling us?

3              MR. OPPENHEIMER:  This is for identification, Your

4   Honor, this is DXD 0113.

5              THE WITNESS:  This tab basically does the same thing

6   except they used a different data source.  This data source is

7   based not on S&L Kagan, but it's based on DirecTV.  And I asked

8   the question, is the black line above or below the blue line,

9   and as you can see in this chart too, the black line is above

10  the blue line.

11             If the government were correct, then that black line,

12  which is all other, you know, networks should be below the blue

13  line, but it's not, it's above it.  The blue line is below the

14  black line meaning that the prices of the NBCU networks is

15  rising not as fast as the other networks.  So it's just, again,

16  these initial, the charts tell you that it's unlikely if you do

17  a statistical analysis, you're going to find support for the

18  government's claim.

19  BY MR. OPPENHEIMER:

20  Q.   Now, this involves just looking at the prices?

21  A.   Yes.

22  Q.   Did you stop there, did you just look at the prices of the

23  industry and the prices of the vertical entity and stop or did

24  you do more?

25  A.   No, I did a lot more work.  In particular I did what's

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  called an regression analysis or an econometric analysis, which

2  is a statistical attempt to answer the question precisely, is

3  it the case, for example, that the fees in the NBCU networks

4  rose faster than everybody else?  But now I'm trying to control

5  for other things.  Programming and expenditures by network,

6  viewership, other things.  I use different techniques,

7  statistical techniques to analyze the problem in a variety of

8  ways.  I use different datasets.

9      I used the top fifty networks, I used the top hundred

10  networks, I use Dish data.  I use Charter data.  I use Dish

11  data, Charter, I use DTV data, S&L Kagan data.  So I do it in a

12  lot of different ways, I would say.  And the evidence is

13  completely consistent, no matter how you're doing things, that

14  the overwhelming impression you get from the bulk of the

15  evidence is that there's no statistical support for the

16  government's claim that vertical integration into distribution

17  and content leads to higher, higher prices.  So I would say we

18  did a ton of work to show that that simple chart is right.

19          MR. OPPENHEIMER:  Your Honor will be pleased that we

20  have no charts with his formula's recalculations.

21  BY MR. OPPENHEIMER:

22  Q.   The work that you did, was any of that regression work

23  done by Professor Shapiro at all?

24  A.   Professor Shapiro did no econometric analysis of any of

25  the data as far as I can tell.  Or none that he reported.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Now, yesterday --

2  A.   Of this data.

3  Q.   Yes.  Understood.

4      Yesterday Professor Shapiro gave a couple of reasons why he

5  thought NBCU prices might not have gone up after the merger

6  with Comcast.  And I'd just like to touch briefly on that so

7  Your Honor has a full picture of this.

8      The one thing he said maybe this isn't so instructive as

9  you're saying it is because Comcast doesn't compete with other

10 regional cable companies.  What is your view of that?

11 A.   Well, that may or may not be true, but that's irrelevant

12 if I'm using DTV prices.  Comcast competes with DirecTV

13 everywhere.  So if he doesn't like some of my other analysis,

14 he has to at least look at the DTV analysis because Comcast

15 does compete with DirecTV everywhere.  Also competes with DISH

16 everywhere.  So that criticism he's raising just doesn't apply

17 to what I've done.

18 Q.   And to be clear when you did these regression analyses,

19 you've also had Dish data, correct?

20 A.   That's correct.

21 Q.   All right.  And Professor Shapiro also suggested that

22 because there were conditions on the NBCU Comcast merger, that

23 that made it less instructive.  What do you think about that?

24 A.   I think that criticism is not a criticism at all about

25 what I'm doing, in fact, it's an endorsement of what I'm doing.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  My whole point is there were conditions in that Comcast NBCU

2  deal that are very similar to the arbitration commitment that

3  AT&T has made.  So if his position is, oh, the reason Carlton's

4  finding that the NBCU prices don't go up is because of the

5  conditions in NBCU, my response is that's exactly right.

6      That's my point, that if those conditions stop the prices

7  from going up there, then you have to take account of that

8  possibility here and those arbitration, the arbitration

9  commitment that AT&T has given would similarly constrain price,

10 and therefore that's why that Comcast NBCU deal is so probative

11 of the consequences of -- likely consequences of this deal.

12 Q.  You've also spent some time here talking about the

13 increased competition in the market and market structure.  Is

14 that relevant to your analysis here?

15 A.  Yes.  So as I said at the beginning, there's never perfect

16 evidence, you know, probably in any case, but certainly in

17 economics there's never perfect evidence, you do the best you

18 can with the evidence you have.  You can't ignore it, you have

19 to look at it and see if it's going to help you or hurt you.

20 But you can't just ignore it.

21     But there are a few things here why I think the evidence is

22 especially probative.  In 2011, let's go back and talk about

23 Comcast NBCU.  2011.  How are competitive conditions in 2011

24 compared to what they are today?  In 2011, we -- virtual MVPDs

25 weren't really around.  We didn't have, you know, the likes of

1   Facebook, Apple, you know, coming into the industry.  Netflix

2   wasn't an important force or as important as certainly it is

3   today.  All of these new entrants have come in since then.  If

4   anything, that's making the market more competitive, not less

5   competitive.

6       So if you didn't see a harm, a support for the government's

7   theory back then when times were less competitive, you're

8   unlikely to see it, certainly unlikely to see it in the future

9   as times become more competitive.  I think that's compelling.

10      The only other thing I was able to do is, and this is in

11  one of my reports, I don't remember the exact numbers.  If you

12  look at Comcast margins, and we talked about how margins matter

13  to Shapiro's model.  If you look at Comcast margins in 2011,

14  they are, as best I can tell, far high than DirecTV's margins

15  today.  So that would be another reason why the competitive

16  harm would be expected to be less to the extent there's any

17  competitive harm.  So the fact that I'm not finding anything as

18  a -- in the Comcast NBCU deal gives me confidence that that's

19  not something we should be worried about here.

20  Q.   Now, just to be clear, none of the -- you said none of the

21  results showed a statistically significant increase in

22  programming prices, that's a conclusion you reached across all

23  three of these examples; is that right?

24  A.   Yes, true.

25  Q.   But is it also the case that you did find statistically

1  significant, statistically significant decreases in prices

2  associated with some of this vertical integration?

3  A.   That's true.  I described many of the different ways I've

4  tried to analyze the data.  And in some of those it showed that

5  there was a statistically significant negative effect on

6  pricing.

7      I would say the bulk of the results show no statistically

8  significant result at all, but many do show a decrease.  None

9  show -- but as it is, some show a decrease that is

10 statistically significant, but none, let me emphasize this,

11 none show a statistically significant increase in price, which

12 is what the government is claiming should occur.

13 Q.   All right.  Now, I want to move away from the discussion

14 we've been having about the empirical examination of the market

15 you made, the real world market.  And go back to some of your

16 observations about Professor Carlton's [sic] model and its

17 input.  So I want to jump forward.

18 A.   Professor Shapiro's model.

19 Q.   I'm sorry, pardon me.  To Shapiro's inputs.  I want to

20 jump forward to talking about departure rates, diversion and

21 margins.

22 A.   Okay.

23 Q.   So let me bring us back.  Now we're talking about inputs,

24 inputs to Professor Shapiro's model.

25     What did Professor Shapiro assume with respect to how many

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  subscribers an MVPD would lose if it didn't have Turner?

2  A.    The subscriber loss ratio is around nine percent for one

3  of his models.

4  Q.    And do you agree with that?

5  A.    No, I don't.  He didn't quite come out all that clearly I

6  thought in testimony, probably because he didn't have enough

7  time.  But he actually has three departure rates, nine percent

8  for 2016 and then 2017 is around twelve percent, and then for

9  his 2021 model, it's around sixteen percent, but I disagree

10  with all of them.

11  Q.    Are those departure rates you've just described remotely

12  like anything you've seen working with this?

13  A.    No, I disagree with those departure rates.  They're too

14  high.

15  Q.    All right.  Now, how did you estimate a departure rate for

16  Turner?

17  A.    Well, I looked around at the evidence, and my preference

18  is always to see what's happened, was there an event in the

19  industry in which you actually had a blackout.  Because what's

20  important to Professor Shapiro is he, as a blackout, he wants

21  to determine what he called the subscriber loss rate or

22  departure rate.  So are there any examples of permanent

23  blackouts of Turner.  The answer is no.

24      So I said what's the next best thing I can look at, is

25  there a permanent blackout of anybody else?  And hopefully the

1   anybody else will be like Turner.  And I found that there were

2   two permanent blackouts.  They were both involving Viacom.  One

3   was the Sudden Link, a blackout on Sudden Link.  Sudden Link

4   and Viacom were blacked out for roughly a period of three

5   years.  And there was one other one, Cable One, there was a

6   Viacom blackout.

7       In my view, the Cable One blackout was not as probative or

8   informative because Cable One underwent a lot of business

9   transition after, I think it was 2014.  They decided to

10  de-emphasize video.  They jacked up their prices of video.

11  They reassigned their sales force, there was subsequent

12  blackouts of other channels.  So I didn't think that was a good

13  example.  But the Sudden Link and Viacom example did strike me

14  as fruitful to investigate, and that's what I did.

15  Q.   Now, is that Sudden Link Viacom loss been studied within

16  the industry?

17  A.   Yes, it has, partly because these permanent blackouts are

18  so rare people like to look at what happens.

19  Q.   All right.  And did you prepare a demonstrative for us to

20  walk through that?

21  A.   Yes, I did.

22  Q.   If you would turn to Tab A.

23          MR. OPPENHEIMER:  Your Honor, this is marked for

24  identification as DXD 0114.

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  BY MR. OPPENHEIMER:

 2  Q.    And would you turn tell us what that is, Professor

 3  Carlton?

 4  A.    Yes, I asked to identify those instances in which someone

 5  in the industry had done a study to figure out what happened as

 6  a result of the Viacom Sudden Link blackout.  And I wanted a

 7  list only of those instances in which it appeared that a study

 8  was done rather than someone saying, you know, it's X without

 9  telling me why.  And these are the four examples I was able to

10  come up with.

11       Now, I understand I can say some numbers, but not others.

12  Q.    Well, I'll tell you what, why don't I walk you through

13  that and avoid any problems with confidentiality, and we can

14  move through this relatively quickly.

15       So you described how you chose those, the four on the list.

16  Let's start with Sudden Link itself.  Is this from something

17  that Sudden Link said about itself?

18  A.    Yes, my understanding is this was the result of a study

19  that studied Sudden Link either did or commissioned, and they

20  reported it to shareholders.  And they came to the conclusion

21  that there was a loss of between two and a two and a half

22  percent, but it was over within a period of certainly six

23  months, if I remember right.  But for sure, it was over pretty

24  quickly.  And again, two and a half percent, that number I

25  remember.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Okay, good.  And just to be clear, Professor Carlton, when

2  you say it was over, you're not talking about the drop of

3  Viacom being over.  You're saying the drop continued, but the

4  impact from the drop was over in a relatively short period of

5  time and according to your chart was limited to a two to two

6  and a half percent effect on subscribers?

7  A.   Yes, that's correct.

8  Q.   All right.  The next one is Comcast.  We're not going to

9  identify the percentages, but can you identify the sourcing for

10  that information?

11  A.   My understanding is this was a study that Comcast did

12  internally and came to the conclusion of what the loss was, and

13  I can't say the number, but it --

14  Q.   His Honor has it on the chart as the second line.

15  A.   Can I say something like it's under X percent or not?

16  Q.   Well, the exact percentage is before His Honor on line

17  two --

18  A.   Okay, okay.

19  Q.   -- of 114.  So he's got that.

20      The next one we're not constrained is a city, what's that?

21  A.   There was an analysis that the city provides of the

22  industry and in that analysis --

23           THE COURT:  Is that Citibank?

24           THE WITNESS:  You know, I think technically --

25           THE COURT:  You mean Corp?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE WITNESS:  It's called Citi, but that's what's on

 2    the cover, but it's related to Citibank, that group of

 3    companies.

 4              THE COURT:  Okay.

 5              THE WITNESS:  It's a financial analysis, that's my

 6    understanding.

 7              THE COURT:  Okay.

 8              THE WITNESS:  That they put out of the industry.  And

 9    their analysis concluded that the effect was two and a half

10    percent.

11              THE COURT:  Basically the same as Sudden Link's?

12              THE WITNESS:  Very similar, yes, exactly.

13    BY MR. OPPENHEIMER:

14    Q.    And the last one, Charter, what is that from?

15    A.    That was a study that Charter did.  My understanding is

16    that was done in anticipation of upcoming negotiations, and

17    that with content providers and they wanted to assess what was

18    the effect of the Sudden Link Viacom blackout, and they came to

19    a number that I can't say, but.

20              MR. CONRATH:  Wait, wait.

21              THE WITNESS:  You can see what it is.  So that, you

22    know, roughly in a certain ballpark.

23    BY MR. OPPENHEIMER:

24    Q.    All right.  I think what we can say is that you would

25    agree as a characterization of your chart that these are all
```

*** REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER ***

1   low single digits?

2   A.   Yes.

3   Q.   All right.  Let's talk more about Sudden Link itself.

4   What did Professor Shapiro say about the Sudden Link Viacom

5   drop?

6   A.   Professor Shapiro said that the -- using the Sudden Link

7   experience, he's going to come up with a subscriber loss rate

8   of 9.4 percent.  And what you can see is that that number is

9   really an outlier compared to the numbers, the other numbers,

10  much higher.

11  Q.   So I'm going to do a brief reveal here.  You did some

12  corrective work on, which we'll go into, on Professor

13  Shapiro's, Professor Shapiro's number, and what did you bring

14  the Sudden Link departure rate number down to after you did

15  your work in analyzing that data?

16  A.   Well, I looked at what Professor Shapiro did, and it was

17  summarized in the chart I used yesterday.  And my initial

18  response was, holy mackerel, you forgot to include industry

19  trends.

20       In other words, when you're projecting what's going to

21  happen to Sudden Link, had they signed, continued to sign up,

22  in your projections, your downward projections, you failed to

23  account for a significant fact.  That is, the whole industry

24  started to trend down faster, and you didn't add that on to the

25  decline.  It's like you're ignoring the fact that Sudden Link

1   is part of this industry, and the whole industry is being

2   driven down.

3       So in my rebuttal report I put in industry trends to

4   control for what's going on in the industry.  And you make that

5   correction to his model and then run it through his

6   calculations, and all of a sudden you get this number 4.8

7   percent, which you can see is much more in line with what all

8   the industry analysts, the people in the industry were saying.

9       But there's one other point I want to make.  And that is

10  that I used Professor Shapiro's data in doing this.  In the

11  course of me looking at his data I noticed that his data, as I

12  pointed out in one of my footnotes, don't seem to be correct

13  and square up with what's going on in the industry.

14      So just to give an example, it looks like in his data the

15  number of subscribers to a particular -- say, to one of the

16  MVPDs doesn't match what Kagan is saying.  So I'm not sure what

17  reason for the discrepancy is.  I'm just pointing out I don't

18  think that date is so great.

19      But even if you use that data, if you correct it, you get a

20  number much lower than the one he's using and much more in line

21  with what everybody else in the industry who's done a study is

22  saying.

23  Q.   Okay.  Now, let's -- if you would turn, Professor, to tab

24  nine.

25          MR. OPPENHEIMER:  Your Honor, tab nine was marked for

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   identification yesterday as PXD 11-6.

 2   BY MR. OPPENHEIMER:

 3   Q.   Professor Carlton, this was shown to us yesterday by

 4   Professor Shapiro, and you can see that it's his rendition of

 5   his analysis of the Sudden Link subscriber loss.

 6        Is this the conclusion that you were just criticizing?

 7   A.   Yes.

 8   Q.   And would you describe for the Court, and I draw your

 9   attention specifically to the box that has the arrow that

10   points to the space between the red trend line and the little

11   dots that show what Professor Shapiro said were the Sudden Link

12   prices.

13        He said the difference between those two was what he says

14   here on the box is the so-called continuing subscriber loss.

15   And can you walk us through your reaction to this chart?

16   A.   Yes.  I think you said the red line.  It looks orange to

17   me.

18   Q.   Okay.

19   A.   Whatever color it is.

20   Q.   Our work on this case will continue to make me more

21   rigorous, so absolutely.  The orange line, the orange line.

22   A.   I think it's orange.  Is it orange?

23             THE COURT:  It's a close question.

24             THE WITNESS:  Whatever color it is, my wife is a

25   painter and sometimes she'll come up with some color that I

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  never heard of.  I mean, I'd never know these names, magenta.

2        Anyway, let's look at this line, orange.  So here's what

3  Professor Shapiro initially did.  He presents this chart and

4  said that that gap represents the difference between the dot at

5  the bottom, which is what actually occurred, and the orange --

6  you can put a dot on the orange line, it will be helpful.  That

7  dot on the orange line, which represents to him where Sudden

8  Link would have been if the pre-existing trends had continued.

9        So, had nothing -- had there not been a blackout, we

10  would have stayed on that orange line.  You would have

11  continued your trend downward.  Because there was a blackout,

12  you jump down to the dot and the difference in his mind is a

13  measure of the effect of this Sudden Link loss of Viacom.

14        And my point is this:  He's ignoring the fact in this

15  diagram that there, in fact, is an additional thing happening

16  in the industry.  It just so happens, and we'll see this in a

17  minute, that right about the same time the whole industry is

18  coming down faster than it was before.  The whole industry is

19  coming down faster than it was before.  So what that means is

20  that dot that I told you to draw on the orange line at the very

21  end, and so that's -- if you just put a dot over here.

22              THE COURT:  Uh-hmm.

23              THE WITNESS:  Okay.  That gap is what he's saying is

24  the harm.  And what I'm saying is that dot is not taking

25  account of the fact that the whole industry is moving down

1  faster than it was before.  So if you really want to correct

2  for industry trends, that dot of where you would be had there

3  not been a blackout, you would have had to take account of the

4  fact that the industry was coming down faster too, and that

5  would have made Sudden Link come down faster.  And that is what

6  I do in my report and what I say is it's this smaller gap that

7  you should be looking at.  You have to correct for industry

8  trends.

9        And that's kind of a simple point.  And that's what I do

10 in my rebuttal report.  I do it in two different ways, and I

11 virtually get the same answer each way, and that's my criticism

12 of what he did, or what he did not do in relying on the Sudden

13 Link experience.  And it's that correction that then puts you

14 in the same ballpark as what the industry analysts were saying.

15 BY MR. OPPENHEIMER:

16 Q.   All right.  So let's turn then to the next tab, which is

17 identified, Your Honor, as PXD 11-7.  And this was shown to us

18 yesterday along with the argument that it actually answers your

19 criticism that this chart shows that even if you take into

20 account industry trends, there's still this big difference.

21 Would you explain your reaction to the chart we were shown

22 yesterday?

23 A.   Yes, well, the initial reaction is there are a lot of

24 lines on this chart, okay.  But whether Professor Shapiro is

25 actually addressing my criticism or not, it was very unclear if

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  you listened to his testimony.

2      But let me just make two points to show he has not

3  addressed my criticism because you could come away with the

4  impression that this addresses my criticism.

5      First, if you look at this chart, this is the one he put

6  up.  It would be absolutely incorrect, absolutely incorrect to

7  look at the difference between where Sudden Link wound up and

8  the red line.  That's not what even he claims should be done.

9      What he claims should be done is you have to first project

10 where the decline in Sudden Link would take you anyway because

11 they were going down.  You have to take that into account.

12 That doesn't appear anywhere on this chart.  Okay.  He didn't

13 say that.  Okay.  So let me use his own chart to make the point

14 I made earlier.

15     What Professor Shapiro said is he said, look at the red

16 line.  He referred to the red line.  The red line is all

17 industry.  So now it's kind of hard to do, you know, everybody

18 should look at their charts.  But if you just look at the red

19 line.  Make believe you can only see the red line, and then do

20 the following:

21     Ask yourself, isn't it the case that the red line is

22 falling faster after the Viacom blackout than before?  See.

23 Before the Viacom blackout, that red line is not falling very

24 fast.  After the blackout, it starts falling fast.  That's the

25 same thing as I was saying.  Industry trends have changed.  The

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    industry now is falling faster than it was before.

2        Well, that's after you see this chart, you can stop.

3    Professor Shapiro stopped.  He should have said, okay, let's go

4    back here, and that chart that I first showed you, that dot I

5    told you to put on that orange line, you have to move that dot

6    down more because I have to take account of industry trends.

7    He never went back and did, or, you know, left it clear that

8    that's what you had to do.  If you do that, his chart is

9    exactly making my point.

10       Now, he didn't do it statistically, you know,

11   econometrically, you can look in my report.  But it is

12   completely wrong to look at this chart and say that this

13   disproves that industry trends matter.  It's just not right.

14       And just as a logical matter, the whole industry -- let me

15   use an extreme example.  I'm not suggesting this is what

16   happened.  But if a whole industry collapsed after, you know,

17   the Viacom dropout, blackout with Sudden Link, you wouldn't

18   want to say, oh, I'm going to ignore it.  That would make no

19   sense when I'm calculating the effect on Sudden Link of the

20   blackout.  So that's all I'm saying.

21       So I think what I'm saying is very simple.  Industry trends

22   increase, the downward trend.  Sudden Link is part of the

23   industry.  You've got to take account of that.  When you put

24   that dot on your first chart where you're projecting where

25   Sudden Link would have been had there been no blackout.  That's

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   all I'm saying.  I do it, you know, in a much more

2   sophisticated way than I've just done with my pen, in my

3   rebuttal report, and I stand by it.  I stand by it.

4   Q.   And just -- you did mention some more sophistication.

5   Just so we're clear, you didn't just eyeball this, you did an

6   econometric measurement that backs up the observations you just

7   made; is that right?

8   A.   Yes, not only did I do it one way, I did it in two

9   different specifications, and you get virtually the same

10  result.

11  Q.   All right.  So I know you said that Cable One was not a

12  very good example because of the reasons you identified

13  earlier, but just to follow up and close it.  Were you aware

14  whether Cable One itself did any analysis of the Viacom drop?

15  A.   I read in the transcript, what was read into the record a

16  day or two ago, I think, I kind of lost track of the days.

17      But I believe Mr. Sejen explained that the decline was in

18  his view two percent and over pretty quickly.  So the Cable

19  One, what Mr. Sejen said about Cable was two percent, that's

20  not out of line with sort of those numbers we were looking at

21  before when people were evaluating the Viacom experience.

22  Q.   Okay.  So we're going to move a little briskly.  We're on

23  the clock, this is very helpful.

24      Professor Shapiro also relied on an Internet survey

25  performed by Professor Hauser.

1    A.    Yes.

2    Q.    Do you have thoughts about that?

3    A.    Well, I know Professor Rossi is going to talk about that

4    so I'll only say one thing.  Professor Hauser's analysis shows

5    that the departure rate in one month is going to be eight

6    percent.  That just strikes me as way too high on what I --

7    based on what I've seen.

8        If you look at temporary Turner blackouts, and there was,

9    say, one that I'm thinking of in particular, I think it was

10   Cable One and Turner, there was a temporary blackout.  There

11   was nothing like an eight percent effect.  I think they

12   estimated it to be 1.1, 1.2 percent.  Nothing like eight

13   percent.  So it just, I think, cast doubt on what Professor

14   Hauser is doing, but Professor Rossi is going to talk in detail

15   about that.

16   Q.    All right.  And Professor Shapiro also referred to a

17   Comcast drop analysis predicting the effect of losing Turner,

18   did you review that?

19   A.    Yes, on his -- yes.

20   Q.    And do you recall that witnesses in this trial have

21   identified those studies as being conservative and with an

22   error rate?

23   A.    Yes, I read testimony of, I believe Mr. Rigdon is his

24   name.  And he explained that that drop analysis, again, which

25   wasn't based on an actual event.  But based on the best

```
1    estimate of what's going to happen unlike suddenly project

2    what's going to happen, had two effects.

3              MR. CONRATH:  Can we approach?

4              THE COURT:  You need to approach?  Okay.

5         You can step down, Professor.  Sit over there in that

6    chair.

7         (Witness withdrew from the witness stand.)

8         (Sealed bench conference.)

9              MR. CONRATH:  My best recollection as to what we're

10   getting into now was confidential with Rigdon.

11             MR. OPPENHEIMER:  I have -- this might solve it

12   practically.  I only have one or two follow-up questions.  They

13   won't be on any information, just his conclusion and then I'm

14   going to move on to the next subject.

15             THE COURT:  Just steer him away from anything

16   confidential.

17             MR. OPPENHEIMER:  I will certainly do so.

18             THE COURT:  He might be volunteering something

19   confidential not knowing it.

20             MR. OPPENHEIMER:  I'll guard for that, okay.

21             THE COURT:  We're going to take the luncheon recess

22   in about five minutes.

23             MR. OPPENHEIMER:  Five minutes, okay.  I'll move off

24   topic.

25        (Open court.)
```

1          THE COURT:  Come on back up.

2      (Witness resumed the witness stand.)

3          THE COURT:  You may proceed consistent with the

4  discussion at the bench.

5  BY MR. OPPENHEIMER:

6  Q.   You mentioned previously, Professor, that Professor

7  Shapiro uses more than one departure rate; is that correct?

8  A.   Yes.

9  Q.   Okay.  And we don't want to spend too much time on this,

10  but I'd like to have you explain to the Judge the method that

11  Professor Shapiro used to increase his departure rate from nine

12  percent to the other departure rates and how he used those

13  other departure rates?

14  A.   Yes.  So briefly, he uses a departure rate of nine percent

15  for 2016.  That's based in part on the Altman Vilandrie survey.

16  In 2017, he changes the departure rate to twelve percent.  Now

17  why, I don't know, because the Altman Vilandrie data is a study

18  for 2017.  So I don't see any basis to change it, but in any

19  case he changes it.

20      How does he change it?  He uses one of the formulas in his

21  complicated model to say, well, if prices are going up, can't I

22  figure out if the subscriber loss rate is changing, and that's

23  what he's doing.  So he's using one of the formulas in his

24  model to figure out the relationship between the subscriber

25  loss rate and the price increase that he's postulating or that

1   he sees happening.

2       And here's the problem.  It's a complicated formula.  And

3   one of the assumptions in the formula is the following:  If

4   there were to be a permanent blackout, so suppose Turner blacks

5   out Comcast.  So if Comcast is going to save five dollars per

6   subscriber now because they don't have to pay that, of course

7   it doesn't have Turner, but it saves money.  Comcast could

8   lower price.  That makes sense.  He allows for that.

9       But here's what he does in these calculations.  He assumes

10  that the price decline that Comcast would pass along is the

11  same regardless of whether Turner was charging Comcast five

12  dollars or ten dollars.  That doesn't make any sense that you

13  would have the same price drop, but your cost savings are very

14  different because you're not -- in one case you're not paying

15  five, in the other case you're not paying ten.  Why would that

16  have the same effect on how you drop prices?  He assumes you're

17  going to drop prices by that same amount in those two

18  situations.

19      So I just modified his formula and said suppose the price

20  drop that you institute in order to mitigate this harm of

21  losing Turner, suppose it's proportional to the price, which

22  makes more sense rather than just a fixed number.  If you do

23  that, it basically wipes out his increases in departure rates.

24      I have the exact numbers in my report, but to the first

25  approximation it means he stays around nine percent even when

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   you apply his corrections.

 2       Now, I think nine percent is the wrong number, we already

 3   went through that.  But I'm just pointing -- you know, that was

 4   my example of that he improperly calculated Sudden Link

 5   departure rates.

 6       But the point he's making that those departure, that nine

 7   percent departure rate is too low and should be accelerated, I

 8   believe is completely wrong.

 9   Q.   So Professor Shapiro raised his nine percent upwards based

10   on the theory that costs are going up and therefore the

11   departures would be greater.  He got his nine percent from

12   Altman Vilandrie.  In the Altman Vilandrie study, do they raise

13   departure rates?

14   A.   No.  For them, the departure rate is the same in 2017 as

15   it is in 2021.  So it's really very strange why he's in one

16   case relying on Altman Vilandrie for the nine percent, but then

17   he's ignoring the fact that Altman Vilandrie don't change their

18   departure rates in 2017 or 2021, but he does.

19           MR. OPPENHEIMER:  Your Honor, you mentioned that we

20   were close to the noon break.  This night be a good time if

21   it's good for Your Honor.

22           THE COURT:  This is a good time?

23           MR. OPPENHEIMER:  Yes.

24           THE COURT:  All right.  So we're going to take the

25   luncheon recess, Professor.  You remain a witness under oath.

1   Refrain from discussing your testimony so far or what it might

2   be when you return with anyone, including your own counsel.

3   We'll see you back here at 2:45.  You may step down.

4          THE WITNESS:  Okay, thank you.

5      (Witness excused.)

6          THE COURT:  I'll see counsel.

7      (Sealed bench conference.)

8          THE COURT:  I don't have a chess clock here, but I'm

9   guessing maybe about two hours you've used.

10         MR. OPPENHEIMER:  It's getting close, probably a tad

11   more, but I can defer to Your Honor.

12         THE COURT:  Well, you still have a half hour.

13         MR. OPPENHEIMER:  I do.

14         THE COURT:  So obviously you can use the half hour.

15   And if you don't use it all, then you can use whatever is

16   remaining to add to your rebuttal time, which is fifteen

17   minutes.

18         MR. OPPENHEIMER:  Got it.  I'll be very mindful.

19         THE COURT:  That's my rough calculation.

20         MR. OPPENHEIMER:  I honestly deserve it.

21         THE COURT:  Well, is that about what you would say?

22         MR. CONRATH:  Yes, it's pretty close.

23         THE COURT:  It's pretty close.

24      All right, see you this afternoon.

25      (Open court.)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              THE COURT:  We stand in recess.

2         (Luncheon recess at 1:12 p.m.)

3                         -oOo-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

CERTIFICATE

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the stenographic notes provided to me by the United States District Court, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____        _____

/s/Crystal M. Pilgrim, RPR, FCRR        Date: April 13, 2018

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )        CV No. 17-2511
                                    )
                                    )        Washington, D.C.
      vs.                           )        April 12, 2018
                                    )        2:45 p.m.
AT&T, INC., ET AL.,                 )
                                    )        Afternoon Session
            Defendants.             )
_____)        Day 13


TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:           Craig W. Conrath
                              Eric D. Welsh
                              Donald G. Kempf, Jr.
                              Peter J. Schwingler
                              U.S. DEPARTMENT OF JUSTICE
                              Antitrust Division
                              450 Fifth Street, NW
                              Washington, D.C. 20530
                              (202) 532-4560
                              craig.conrath@usdoj.gov
                              eric.welsh@usdoj.gov
                              donald.kempf@usdoj.gov
                              peter.schwingler@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

Katrina M. Robson
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 220-5052
krobson@omm.com

Daniel M. Petrocelli
M. Randall Oppenheimer
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067
(310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Michael L. Raiff
Robert C. Walters,
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
(214) 698-3350
mraiff@gibsondunn.com
rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:

Kevin J. Orsini
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1140
korsini@cravath.com
pbarbur@cravath.com

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

_ _ _

WITNESS INDEX

_ _ _

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEFENDANT'S: | | | | |
| DENNIS CARLTON, Ph.D. | 2503 | 2520 | 2614 | 2619 |

1                   P R O C E E D I N G S

2          DEPUTY CLERK:  All rise.  The United States

3     District Court for the District of Columbia is now in

4     session, the Honorable Richard J. Leon presiding.  God save

5     the United States and this Honorable Court.  Please be

6     seated and come to order.

7          Your Honor re-calling Civil Action No. 17-2511,

8     the United States of America v. AT&T, Inc., et al.

9          THE COURT:  All right.  The witness remains under

10    oath.

11         You may proceed when you're ready.

12         MR. OPPENHEIMER:  Thank you, Your Honor.

13    DENNIS CARLTON, Ph.D., WITNESS FOR THE DEFENDANTS, HAVING

14    BEEN PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED

15    FURTHER AS FOLLOWS:

16    BY MR. OPPENHEIMER:

17    Q    So Professor Carlton, we're going to go through

18    the last of these variables fairly quickly, given the time.

19         Let's just finish up with the departure discussion

20    that we were having.

21         Your departure rate, after looking at all of the

22    material you've looked at that you used in your modeling is

23    what?

24    A    5 percent.

25    Q    And, again, Professor Shapiro's departure rate

1    that you're modeling against is what?

2        A    9 percent or 12 percent or 16 percent, depending

3    upon which one he's using, which model he's using of his.

4        Q    And did you rerun Professor Shapiro's model using

5    your 5 percent departure rate?

6        A    I did.

7        Q    What did you find?

8        A    If you use a 5 percent departure rate, it turns

9    his consumer harms into consumer benefits.  Prices on

10   average go down.

11       Q    Now, let's do a diversion.  We've talked a little

12   bit about diversion and cord cutting.

13            Would you remind us just very briefly why cord

14   cutting matters?

15       A    Cord cutting matters a lot because in his blackout

16   scenario, if you, for example, turn a blackout to Comcast,

17   where are those people go matter lot.

18            Will they go to DTV or will they go to cord

19   cutting?

20            So the more important cord cutting is -- the more

21   those people go to cord cutting, the fewer go to DTV.

22            Moreover, the more important, the bigger the size

23   of the cord cutter is, AT&T is trying to get those as

24   customers; that's where the double marginalization benefit

25   really will start mattering a lot.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2505

1          So if you underestimate the size of cord cutting,

2    you will overestimate diversions to AT&T and underestimate

3    the incentive of AT&T to be aggressive to acquire the cord

4    cutters.

5          Q    And what estimate of cord cutting did

6    Professor Shapiro use?

7          A    Based on Altman Vilandrie, he calculated an

8    estimate around, I think it was 9.8 percent, something like

9    that.

10         Q    Were there actual data available to estimate cord

11   cutting?

12         A    Yes.  There's actually data published by Kagan, so

13   you can calculate what's the size of the households that,

14   relative to the population, of total TV households that are

15   cord cutters -- that is, cord cutters over TV households,

16   you can calculate that.

17         Q    And what do those data show?

18         A    Around 20 percent.

19         Q    And which -- did you use 20 percent in your work?

20         A    I did use 20 percent.

21         Q    Did you see any other evidence regarding the

22   extent of cord cutting, that helped verify that conclusion?

23         A    There are two other things I will mention.  The

24   first is that 20 percent is based on sort of cord cutters,

25   people who won't subscribe to anything.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2506

1           If you look at the penetration of Turner,

2   subscribers in any cable company, it's not 100 percent.

3   That means there are people within each MVPD that also could

4   be attracted to Turner.  And if you counted that, then cord

5   cutting would -- equivalent cord cutting number would be 20,

6   30 percent.

7           But I'm sticking with a 20 percent.

8           The only other piece of information I'll pass on.

9           THE COURT:  You say that's a conservative?

10          THE WITNESS:  What I'm doing.

11          THE COURT:  Yes.

12          THE WITNESS:  Because I want to use 20 percent,

13  not 30 percent.

14          THE COURT:  So you'd say that's a conservative

15  estimate.

16          THE WITNESS:  Yes; favorable to the government,

17  yeah.

18          THE COURT:  All right.

19          THE WITNESS:  And the other piece of information,

20  I'm aware that AT&T has asked the people who have left AT&T,

21  the consumers who have left:  Why did you leave?  Where did

22  you go?

23          And if I recall right, the number is 25 to 30

24  percent of them are saying, I'm going to cord cutting.

25      Q   All right.  Let's talk about margins briefly.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    Yes.

2    Q    You have talked about this a little bit before.

3  Again, what is the significance of margins in

4  Professor Shapiro's model?

5    A    Very simple.

6         The more -- the higher the margin that AT&T earns,

7  the greater their incentive to divert and black people out.

8         So in the blackout scenario that's so important

9  for Professor Shapiro's Nash bargaining, when you have a

10  blackout, the gain that AT&T gets from the blackout because

11  of customers coming to it will depend on the margin it can

12  earn.

13         So it's pretty straightforward.  If that margin

14  goes down, then the incentive of AT&T to engage in a

15  blackout goes down.

16         And that will work through the Nash bargaining

17  model to lower the increase they can demand from Turner.

18  Just mechanically, that's how Professor Shapiro's model

19  works.

20         So if margins go down, Professor Shapiro will

21  predict lower increases in Turner content, even in his own

22  model.

23    Q    And what did Professor Shapiro use to calculate

24  margins?

25    A    Professor Shapiro used the second quarter of 2016

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 2375 of 3826

2508

1    to calculate margins.

2          Q    What did you use?

3          A    I used the latest data, which was June of 2017.

4               And two things:  One, it's much lower.  And that

5    obviously will affect his results.

6               But, two, it shows that margins are going down.

7    He has not taken account of the fact that margins, in fact,

8    have gone down.

9          Q    I want to be clear here.  Where did

10   Professor Shapiro get his 2016 margin data?

11         A    He got them from, I assume, ultimately from AT&T,

12   "ordinary business course" documents.

13              I'm using those same documents, just that were

14   produced at later time period, in exactly the same way as

15   Professor Shapiro.  I'm doing exactly the same thing he's

16   doing.  I'm just using later data, more up-to-date data.

17         Q    And what happens when you use the more up-to-date

18   data?  How does that affect the outcome of

19   Professor Shapiro's model when you run that newer data

20   through his model.

21         A    It eliminates a large fraction of all his harms.

22         Q    Now, Professor Shapiro mentioned yesterday in

23   court that his margin estimates were conservative, because

24   the -- he said the loss of Turner to DirecTV's rivals might

25   help DirecTV keep high-margin customers.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2509

1            Do you recall that?

2            THE COURT:  What is your reaction to that?

3            THE WITNESS:  Well, I've seen no quantification of

4   this effect.  Professor Shapiro provides no quantification.

5   I've not seen it in any of the underlying documents I've

6   reviewed.

7            But the one thing I will note, if you remember, at

8   some point, he characterized the customers who are leading

9   DTV who would otherwise leave but who stay as unhappy

10  customers.

11           Well, the point is the customers who are most

12  likely to leave DTV are those with high churn.

13           The ones with high churn, even if they remained at

14  DTV, are likely to leave in the future.  So, I mean, I

15  don't -- I understand what he's saying.  Different customers

16  may come and go.  That I understand.

17           But to say it's obvious which way it affects

18  margins, LTV margins, just completely from a theoretical

19  point of view, not clear to me; and, again, I've seen

20  absolutely no quantification of this effect.

21      Q    Now we're going to take a little bit of a drive

22  but hopefully not too much of a dive into this model itself

23  on the subject of what was referred to in court yesterday as

24  the bargaining split.  Can you just briefly explain to us

25  how that functions in Professor Shapiro's bargaining model.

1      A      Yes.

2             Well, as Professor Shapiro explained, if two

3      people reach a deal, they're better off than if they don't

4      reach a deal.  So if they're better off by, say, $100, he

5      assumes they split the benefit 50/50.  That's just an

6      assumption he makes.

7      Q      And does that ever change in his model?

8      A      No.  It's 50/50 for everybody for the whole time

9      period.

10     Q      Does that assumption matter?

11     A      It matters a lot, because, obviously, if the split

12     already is in Turner's favor, then Turner is already getting

13     a lot -- a very high price, and there won't be much left for

14     them to be able to raise the price.

15            So it matters a lot in his bargaining model.  It's

16     an important parameter.

17     Q      Is there any empirical evidence in this case to

18     support that 50/50 bargaining split that's in his model?

19     A      I'm not seeing any.  I've not seen him make any

20     attempt to use past transactions to figure out how was --

21     what was, in fact, the bargaining split.  He didn't do any

22     empirical analysis.  He just assumed 50/50.

23     Q      Is there any writing out there on this subject and

24     this industry that would be pertinent to consider?

25     A      You know, there's not much.  But there is a very

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2511

```
1    recent article trying to specifically estimate the

2    bargaining split.  And it has to do with RSNs, regional

3    sports networks, versus distributors.

4              But what it finds is that the bargaining split is,

5    if I remember right, 72 percent in favor of the content

6    provider and 28 percent in favor of the distributor.

7         Q    And just, hypothetically, if you apply that

8    bargaining split to Professor Shapiro's model, what happens?

9         A    Again, it would bee reduce his findings of harm.

10        Q    Does it essentially eliminate all the harm?

11        A    I'd have to look at the chart that contains all

12   the various numbers.

13        Q    You know what?  That is a good cue-up.

14             Your Honor, if you turn to tab 12.

15             And, Professor Carlton, if you would turn to

16   tab 12, we have marked for identification at that tab

17   DXD0116.  This is a chart with a lot on it, Professor.  So

18   would you do me the favor of explaining to the judge what

19   you put together in this demonstrative.

20        A    Yes.  There are a lot of numbers on this chart.

21   There are over 125.  The attorneys wanted me to memorize

22   this for my direct.  And I said, "Let's make a chart.

23        Q    Now, Professor, you're under oath.  You're under

24   oath.

25        A    Okay.  I was only joking.  Barely.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2512

1          So what this chart attempts to do is,

2    Professor Shapiro has several models.  And for each model

3    that he has, I make a variety of changes.  And then I make a

4    variety of combinations of changes.  So just to -- let's

5    just focus on the first column where it says

6    "Professor Shapiro's 2016 Model."  If you see the 27 cents,

7    which is the first entry, that's his model.

8          And then let's suppose you go down three lines

9    where it says, Correcting departure rate from 12 to 5, 15 to

10   5, 20 -- if you look across and you see, in red, minus .01,

11   that means that when you make the correction of making his

12   departure rate 5 percent and apply it to his 2016 model, his

13   harms no longer exist and there's a one-cent benefit.

14         And each one of these rows, it's described on the

15   left, represents some combination of changed assumptions

16   under which I run his model.

17   Q     Could you also explain for the Judge what is the

18   top, very top line that talks about ignoring contracts and

19   accounting for contracts?

20   A     Yes.

21         So within each model, I have one section where I

22   don't account for contracts, and I have another column where

23   I do account for contracts.

24         If you remember, I talked earlier that he pays no

25   attention to the existence of contracts.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        So, for example, to use a different model, suppose

2   I took the 2017 model and I said, what happens if you

3   account for contracts?

4        If you don't account for contracts, you get the

5   45 cents, which he got.

6        If you do account for contracts in his 2017 model,

7   you find there's a benefit of 17 cents; that is, on

8   average -- by "benefit," I mean prices go down by 17 cents,

9   on average.

10       THE COURT:  So all the red numbers are where it's

11  going down, and all the black numbers are where it's the

12  same or going up?

13       THE WITNESS:  Exactly.

14       Now, all the black numbers, if you look at the

15  changes, they're always less than this.  That just means

16  you're reducing the harm.  But all the red numbers are where

17  it's actually a benefit, that prices are going down.

18       Q    And then, lastly, you have a 2016, 2017, and 2021

19  model.  Just briefly tell His Honor what that's about.

20       A    Well, although he talked in detail about it

21  yesterday, he mainly talked about his 2016 model, he has a

22  model for 2017 and 2021, where he makes a variety of changed

23  assumptions.  And I adopt whatever assumptions he's changed,

24  with the exception of what the row indicates.

25       Q    And also, to clarify, Professor, in this sea of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2514

```
 1    red we've got here of all these numbers, these are all --

 2    are they not per-subscriber/per-month amounts?

 3         A    Correct.  It's the amount by which the consumer

 4    prices that they pay per month will fall --

 5         Q    And Professor Carlton, did you --

 6         A    -- on average.

 7         Q    I'm sorry.

 8              Did you also create a demonstrative that takes

 9    examples from each category of correction that you've talked

10    about today to illustrate the application of this chart on

11    each of your changes?

12         A    Yes.

13              MR. OPPENHEIMER:  Your Honor, if you would turn to

14    tab 11, it's marked for identification DXD0115.

15    BY MR. OPPENHEIMER:

16         Q    And, Professor, if you'd look at that, is that the

17    chart that you were describing?

18         A    Yes.

19              This is a subset of the bigger chart we were just

20    looking at.

21              THE COURT:  Okay.

22    BY MR. OPPENHEIMER:

23         Q    So there's a column on the left that's entitled

24    "Input."  And it lists departure rate, diversion rate,

25    customer margin, contract status.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              And then you have below that four corrections

 2    together.

 3              Is this chart providing information on the effect

 4    on the prices of each one of those things considered

 5    individually?

 6         A    Yes.

 7         Q    All right.

 8              So would you then briefly describe each one of

 9    those.

10         A    Yes.  If you -- this is -- what's reported in the

11    right-hand column is the 2016 model.  So if you just change

12    the departure rate from Shapiro's 9 percent to Carlton's

13    5 percent, Shapiro's effect goes from a 27-cent, on average,

14    price increase to a 1-cent price decrease, consumer price

15    decrease.

16              If you just change the diversion rate by

17    blowing -- by taking kind of cord cutting and instead of

18    making it 10 percent of the market, you make it 20 percent,

19    then Professor Shapiro's 27-cent price increase on average

20    becomes 6-cent benefit, decrease.

21              If you change just Professor Shapiro's 2016 margin

22    that he's using, which is 45, 50, into the 25, 38 from the

23    2017 number, the harm goes from 27 to 5 cents, 27 cents to

24    5 cents.

25              Contract status, if you ignore it versus not, it
```

1    lowers it 20 cents in his 2016 model.

2           If you make all four corrections together, 52-cent

3    benefit.

4    Q    And then so altogether, that's the 50-cent

5    benefit, 52 cents?

6    A    Yes.

7    Q    And then the last row?

8    A    The last row is if you just change the bargaining

9    split from 50/50 to 72/28, you, in his 2016 model, cause the

10   prices on average to go down to consumers by a penny.

11   Q    Does this tell you anything about the sensitivity

12   of his model?

13   A    Well, his model depends a lot on the values you

14   have for these key parameters.

15   Q    And, Professor Carlton, sometimes the government's

16   complaint and sometimes Professor Shapiro when he speaks,

17   multiplies these and gets these numbers of hundreds of

18   millions of dollars.

19          But these smaller numbers that we're looking at

20   are the numbers that all of those larger numbers are based

21   on, correct?

22   A    Yes.  This is the elevation and price he's

23   predicting.  He's multiplying it by a large number.

24          But if you flip these small price increases into

25   sort of the modest price decreases and if you multiply that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    by a large number, that's a large gain.  If he's calling it

2    a large loss, then it's a large gain when you flip it.

3            But that's why I think it's easier to think about

4    things as a price, is the price per consumer going up or

5    down.

6        Q    So if we go back to tab 12 and in DXD116, the

7    combinations that you have shown the Court there, any number

8    of these combinations could, in fact, produce results in

9    this merger that represent hundreds and hundreds of millions

10   of dollars of average cost or price decreases --

11       A    To the consumers.

12       Q    -- to the consumers; is that correct?

13       A    Absolutely.

14            So if you multiply any of these numbers by a large

15   number, it becomes big savings.

16       Q    All right.

17       A    Any of the red numbers.

18       Q    Red numbers, right.

19            Just a few quick --

20       A    Savings to consumers, yeah.

21       Q    Just a few quick final questions.

22            Yesterday, there was some exchange between the

23   Court and Professor Shapiro with the Court asking

24   Professor Shapiro how it could be the case in his model that

25   there could be a situation where the increased cost to an

1    MVPD's consumer could exceed the alleged or projected

2    increased cost to the MVPD for Turner content, and I wonder

3    if you could address that for the Court.

4         A     Well, I looked at the transcript again.

5              I think what Professor Shapiro said, his answer

6    was basically right, that that's what comes out of the

7    merger simulation model.

8              Now, you might say, well, does that raise a

9    question about the merger simulation model?

10             I mean, the truth of the matter is, the particular

11   merger simulation model that Professor Shapiro is using,

12   which he said is a standard model -- and I think it is fair

13   to say it's a very basic model.  20 years ago, it might have

14   been the standard model.  But today, people use much more

15   refined -- typically or often use much more refined demand

16   structures than he's using.  And that gives different

17   pass -- can give different pass-through rates.

18             The trouble with a particular standard model he's

19   using, which is what's called a flat logit model, is that

20   everything depends on marketshare.  And maybe that's

21   accurate, may be not in terms of calculating pass-through

22   rates.

23             I think what's more important to say is that

24   merger simulation models sometimes can work well, sometimes

25   not.  It's going to depend.  You might want to check how

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   well they work.

2           But one of the things I happened to look at in his

3   model, the way he does his merger simulation model, he uses

4   it to actually calculate costs of other firms.  It's kind

5   of -- sounds a little bizarre, but that's how his model

6   works.

7           So one of the intermediate files in his model is

8   his protected costs of, for example, Charter, okay, in

9   particular location, or the cost of -- or any other MVPD in

10  a particular location.

11          And what's interesting is if you look at what's

12  predicted from his model, sometimes, you get very strange

13  patterns.

14          What I do I mean by that?  What I mean by that is,

15  let's -- I grew up in Boston.  So I said, listen, if I had

16  to give an example, tell me about Boston.

17          So if I remember right -- I'd have to check the

18  numbers exactly -- but I think it was Charter.  You know,

19  he's doing things by very detailed, local areas.  Same

20  company has very different costs across these areas.

21  I think they vary from 10 to 100, okay, per person.

22          That's a huge variation.  You might look at that

23  and say, that sounds a little wacky.  Maybe the model is not

24  so good.

25          So I wasn't going to mention that.  But since you

1   asked that question about the merger simulation models,

2   yeah, he's using a relatively standard model, but it can

3   have peculiar implications sometimes.

4            MR. OPPENHEIMER:  Your Honor, no further questions

5   at this time.

6            THE COURT:  All right.  Cross-exam?

7            MR. CONRATH:  Thank you, Your Honor.

8            May I proceed.

9            THE COURT:  When you're ready.

10           MR. CONRATH:  Thank you.

11                          -  -  -

12                    CROSS-EXAMINATION

13   BY MR. CONRATH:

14       Q    Good afternoon, Professor Carlton.  Good to see

15   you again.

16       A    Good to see you.

17       Q    So, Professor Carlton, if I'm right, is this

18   approximately the eighth time that you've offered an

19   economic opinion on behalf of AT&T in a federal proceeding?

20       A    I haven't counted, but I have on prior occasions.

21       Q    A number of occasions, right?

22       A    Yes.

23       Q    So when you were doing this work, you worked with

24   a team of people who helped you prepare your report and do

25   your analysis?

1        A     Yes.  They were a group of people I worked with at

2    Compass Lexecon.

3        Q     At Compass Lexecon, right?

4        A     Yes.

5        Q     More or less, how many people worked on that team?

6        A     You know, it varies.  I mean, I typically would

7    meet with two or three people, but there might have been

8    others, you know, research assistants that --

9        Q     Sure.

10            So let's turn to, off process to substance.

11            You agree, do you not, as a general matter, that

12   there are some circumstances in which a vertical merger can

13   be anti-competitive?

14       A     I would agree with that.  My general view is

15   vertical integration is generally pro-competitive, but there

16   can be situations.  Doesn't always have to be.

17       Q     And you agree that a vertical merger can be

18   anti-competitive as a result of raising rivals' costs?

19       A     As a theoretical matter, that could happen.

20       Q     Now, taking out of the context of a merger, you

21   agree that as a general matter, it is in the interest of any

22   competitor for its rivals' costs to go up?

23       A     Yes.  Every competitor would like its rivals to be

24   a worse competitor.

25       Q     We talked about that at your deposition, right?

1          A    I think so, yes.

2          Q    And, therefore, regardless of the merger, it's in

3    the interest of AT&T for its rivals' costs to go up?

4          A    I agree with that, as long as its costs don't.

5          Q    Right.  And the reasons a firm would prefer to see

6    its rivals' costs would go up, because it makes its rivals

7    less competitive, right?

8          A    Yeah, generally, yes, I agree with that.

9          Q    How about a simple hypothetical for you that is

10   something we talked about in your deposition.

11              If, say, there's a merger of steering wheel

12   manufacturers --

13         A    Yes.

14         Q    -- and that leads to an increase in the price of

15   steering wheels of 5 percent and there are no efficiencies,

16   you agree that a merger like that would be harmful and

17   should be blocked?

18         A    If there were a horizontal merger that would raise

19   the price of steering wheels and there were no offsetting

20   benefits, that sounds reasonable to me if the price goes up

21   by 5 percent.

22         Q    And you agree that that merger will be harmful

23   even though the ultimate price of the whole car only goes up

24   by a very small percentage?

25         A    Well, I thought this was a merger of steering

 1    wheels.

 2         Q    Yes.

 3         A    So if it's a horizontal merger of steering wheel

 4    manufacturers and they raise price, that's undesirable,

 5    you know, period --

 6         Q    Right.

 7         A    -- you know, by your hypothetical 5 percent.

 8         Q    Right.

 9              And it doesn't matter that the price, the price of

10    the car in which the steering wheel goes doesn't go up but a

11    very tiny percentage, right?

12         A    I would agree with that, but I just want to make

13    clear, we're talking about a horizontal merger.  This is not

14    a horizontal merger.  It's a vertical merger.

15              So if instead a car manufacturer bought a steering

16    wheel manufacturer, that's a vertical transaction.  If it

17    raised price by 5 cents of steering wheels, you would have

18    to, like in this case that Professor Shapiro is doing, you

19    have to say, okay, that's going to raise the price of -- the

20    cost to some people.

21              On the other hand, I get the elimination of double

22    marginalization.  That's going to be a benefit.  And I've

23    got to figure it out, and I'll have to look at the price of

24    cars at the ultimate level.

25              So I just want to keep things separate.

1          The fact that it's a horizontal merger to raise

2   price, that's bad.

3          But if you have a vertical merger that both raises

4   price but creates efficiencies, as in this case, then you've

5   got to do the balancing.  And that's what

6   Professor Shapiro's doing and I'm doing.

7      Q    Right.  You have referenced the amount, the

8   27 cents per-subscriber/per-month price increase that

9   Professor Shapiro projects, right?

10     A    Yes.  That's what he talked about.

11     Q    Right.  So have you been following some of the

12  testimony in this trial, either by reading the transcripts

13  or getting briefed on it?

14     A    Trying to, yes.

15     Q    And you're aware of the testimony from Mr. Breland

16  that Turner fights over one penny, right?

17     A    I recall reading something about a fight over one

18  penny.

19     Q    Another topic.

20          You agree, don't you, that for blackout evidence

21  to be informative, it needs to be a long-lasting blackout?

22     A    I generally agree that that's the most relevant

23  because it gives everybody time to respond, especially the

24  MVPD.

25          How are you going to replace the content?  Can you

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    replace the content?  That's what's important.

 2            It doesn't mean short-term are irrelevant.  I know

 3    I wouldn't ignore them.  In fact, I talk about them in my

 4    rebuttal report.

 5            But if you're choosing between short-term and

 6    long-term, long-term is the one you want to rely on.  That's

 7    what I relied on in the Suddenlink.

 8       Q    Listen, I know you're an experienced witness and

 9    you know how this works.  Try to answer my questions.  You

10    understand that AT&T's lawyer gets a chance to come back,

11    and you can give whatever explanations seem appropriate at

12    that point.

13            But for now, my question was, you agree that for a

14    blackout evidence to be informative, it needs to be

15    long-lasting blackout, right?  The answer to that is yes?

16       A    Well, generally, yes, much more informative than

17    temporary.  But I wouldn't say temporary or utterly

18    irrelevant.  But I agree basically with what you're saying.

19       Q    You agree that a firm will act to maximize its

20    profits?

21       A    Try to do that, yes.

22       Q    And if a firm has multiple divisions, a firm will

23    maximize its profits across all of them?

24       A    That seems to me a reasonable working hypothesis,

25    yes.

1      Q    So focusing on your work in this case, it's

2  correct, isn't it, that you, you yourself did not create a

3  model to analyze competition in this market?

4      A    Well, I didn't create a model like

5  Professor Shapiro.  But I analyzed an econometric model

6  trying to measure, as I described, the increase in content

7  prices.  That would be what I modeled.

8      Q    So that's your study of past events, right?

9      A    Correct.

10     Q    You didn't try to model what would happen in this

11 merger?

12     A    I didn't, because I thought the evidence from the

13 past events was convincing evidence, and trying to build

14 models that are predictive are more speculative in my mind

15 than analyzing data of what has actually occurred.

16     Q    You presented in your demonstratives some

17 descriptive statistics.

18     A    Yes.

19     Q    So, for instance, DXD111, the number of 500

20 highest-rated sports telecasts like this one, right?

21     A    Yes.

22     Q    And you presented a large number of those in your

23 opening report, right?

24     A    Yes.

25     Q    Did you know that Mr. Petrocelli asked

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2527

1   Mr. Schlichting of Dish if he knew what percentage of

2   national sports viewing Turner represents?

3       A    I don't recall that specifically.

4       Q    You don't recall that testimony?

5            And did you know that Mr. Petrocelli asked

6   Mr. Schlichting of Dish if he knew how many Turner sports

7   events are among the top 500, which would be exactly what

8   you presented in DXD111?

9            You don't remember that testimony?

10      A    I don't remember that exact testimony.

11      Q    Do you recall that Mr. Schlichting said, well,

12  that's not really a metric we use; it's not a metric we find

13  relevant; I've never looked at that metric?

14           You don't recall that testimony?

15           THE WITNESS:  I don't recall that.

16           What I do recall is that he did say that

17  viewership, which is another one of the metics that I put

18  forward is something that he looks at.

19      Q    Right.

20           And you do you recall -- do you recall

21  Ms. Fenwick's testimony that she didn't know the similar

22  statistic that you presented of all the top 500 non-sports

23  events?  You don't recall that either?

24      A    I don't recall that explicitly; but, again, that's

25  just one of the many metrics I provided.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2528

```
 1        Q    One of the things that you talked about is the
 2   existence of contracts in the industry and how that affects
 3   when the bargaining -- any change in bargaining leverage
 4   could be visited on the market.
 5             Do you recall that testimony?
 6        A    Yes.
 7        Q    And your rebuttal report contained a table which
 8   was intended to address this subject; is that right?  Your
 9   table 3 in your rebuttal report, could we look at that?
10        A    If you want to give me a hint what page.
11        Q    I think I will in a minute.
12             Page 31.
13        A    Yes, I have it.
14             THE COURT:  Is that in this document here?
15             MR. CONRATH:  No --
16             THE COURT:  Is it one of these?
17             MR. CONRATH:  -- it's not.  It's in his rebuttal
18   report.  Did you get those, Your Honor?
19             THE COURT:  Let me look.
20             Oh, yeah.  Wait a minute.
21             MR. CONRATH:  I prefer not to give you a second
22   version.
23             THE COURT:  No.  I have the rebuttal report.
24             But what page is it?
25             MR. CONRATH:  31.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***


THE COURT: Okay. Thank you.

MR. CONRATH: I'm sorry.

THE COURT: Has it been marked as -- for identification?

I think the government -- I mean the defense should mark it for identification.

MR. CONRATH: Okay.

If they'll give us a number.

THE COURT: Hold on. It's getting done right now.

MR. OPPENHEIMER: Your Honor, may we approach?

THE COURT: Yeah, sure.

(Sealed bench conference)

THE COURT: That's this one here.

MR. OPPENHEIMER: Your Honor, I have no problem with the marking it for identification. I just obviously don't want to put it into evidence.

THE COURT: No, no. This is not going to be in evidence.

MR. CONRATH: I am not moving it into evidence.

THE COURT: That's DXD-something, right?

MR. OPPENHEIMER: Yeah. Let me get you the number. Give me two seconds.

It's 117, Your Honor.

THE COURT: Okay. Thank you.

(Open court)

```
 1              THE COURT:  Come on back up, Professor.

 2              All right.  So that's DXD117 for identification,

 3    page 31.  All right?

 4    BY MR. CONRATH:

 5         Q    Do you have it front of you there,

 6    Professor Carlton?

 7         A    Yes, I do.

 8         Q    All right.  And I should say that the identities

 9    of the companies on the left has been marked as

10    confidential, so we're not going to mention them, right?

11         A    Okay.

12         Q    But I'll ask questions in a way that enables us to

13    address it.

14              And the distributors that you've listed here in

15    table 3, you chose to list them because they're among the

16    largest distributors; is that right?

17         A    Yes.

18         Q    And the second distributor has blank information

19    about the years.  And that -- do you recall that there's

20    been testimony in court that that second distributor is

21    currently operating under a series of short extensions?

22         A    Yes.

23         Q    So it doesn't have contract for that price

24    protection, right?

25         A    Correct.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2531

1    Q    And so you talk about the contracts extending; but

2  if we look at this, it's correct that there's the first --

3  there's one distributor that has a contract that goes out a

4  number of years, right?

5    A    Yes.

6    Q    And all the others have an expiration date in

7  either 2018 or 2019, right?

8    A    Yes.

9    Q    So any of the distributors, other than the first

10 one on the list there, will be seeking new contracts either

11 in the rest of this year or next year, right?

12   A    No.  If they have a contract that goes through

13 2019, they'll be, I assume, in 2019 seeking a contract for

14 2020.

15   Q    That would be next year?

16   A    2020.  Yeah.  2020.

17   Q    Well, you don't know --

18   A    Oh, I see.  Seeking.  Yes.  Yes.

19   Q    You don't know when in 2019 that contract expires,

20 right?  Could be January, could be December, right?

21   A    Yes.  I'd have to look.

22   Q    Right.

23        So the limits of the extent to which contracts

24 will protect people from any change in bargaining leverage

25 are defined by when their contract is next up for

1    renegotiation, right?

2         A    Absolutely, yes.

3         Q    And other than the one that we were not going to

4    name, the rest of them have something coming up sometime

5    either later this year or next year, right?

6         A    Yes, but the one we're not going to name -- well,

7    I don't know how to say this.

8         Q    Yeah.  You have to think about the significance of

9    them.  I understand your point.  Let's just say it that way.

10   Is that sufficient?

11        A    Yeah.  The significance of the one who's under

12   contract will matter.

13        Q    Yes.

14        A    And I take exactly all of this into account when I

15   present my models of different years.

16        Q    All right.  Another topic.

17             You talked about the -- about Viacom.  And I think

18   at some point you said you thought it was something that you

19   might use to compare to a blackout, a blackout of Viacom to

20   a blackout of Turner, correct?

21        A    Yes.  That was a justification for examining

22   Suddenlink.

23        Q    In your report -- I'm going to ask you to look at

24   your first report.

25             MR. CONRATH:  And I guess, Your Honor, I'm going

```
 1   to have to ask to mark that as well.  And that would be --

 2              THE COURT:  Hold on.

 3              118?

 4              MR. CONRATH:  DXD118, Your Honor.

 5              THE COURT:  All right.  Marked for identification.

 6              MR. CONRATH:  First time for me to mark a defense

 7   exhibit, Your Honor.  It's an unusual situation.

 8              THE COURT:  How do you feel?

 9              MR. CONRATH:  It was okay.

10              THE COURT:  Are you doing all right?

11   BY MR. CONRATH:

12       Q    All right.  Do you have your initial report,

13   Professor Carlton, DXD118?

14       A    Yes.

15       Q    You do.

16            So I'd like to direct you to page 53,

17   paragraph 78.

18       A    Yes.

19       Q    In that paragraph, you say that firms -- picking

20   up on the second line, "Firms use Viacom generally and the

21   Suddenlink-Viacom blackout specifically as a benchmark for a

22   possible Turner blackout."

23       A    Yes.

24       Q    And the basis for that is the Citi estimate that

25   you talked about earlier, right?  That's the footnote?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  What footnote number are we talking

2    about?

3          MR. CONRATH:  Footnote 80.

4          THE WITNESS:  No.  I'll have to -- that's not my

5    recollection.

6          That footnote is a separate footnote.  So one of

7    the reasons why -- I mean a separate point from the question

8    you asked.

9          One of the reasons why I think the

10   Suddenlink-Viacom experience is good is, first, the Citi

11   document -- I think I talked about that Citi document when

12   we were doing -- earlier in my testimony.  That Citi

13   document also makes predictions of long-term blackouts, if

14   I'm remembering correctly.

15         And what this footnote is referring to is that for

16   both Turner and Viacom, when it's asking, what's the effect

17   of a blackout -- and I thought it was a permanent blackout,

18   but what's the effect of a blackout, it gives the identical

19   number of 2.9 percent.

20         The, in the text, I'll have to just go back and

21   check, but my recollection is what I'm talking about is it

22   was an AT&T document that said, we might have a temporary

23   Turner blackout.  What's going to happen?

24         Let's look at what happened based on Viacom.  And

25   we'll do some -- they actually raised it a little bit, not

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 2402 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2535

 1    much, by about 5 percent.  So we use that as the basis.

 2            So --

 3       Q    Well, let's --

 4       A    -- that's what I was trying to say here.

 5       Q    So let's go through and unpack that, because,

 6    first, you understand, first of all, the Citi -- Citi is not

 7    a firm in the industry, right?  This was a publicly

 8    available analyst report, right?

 9       A    Yes.  It's an analyst report of the industry;

10    that's correct.

11       Q    Done by an investment bank, not by a firm that's

12    in the video distribution market?

13       A    That's fair.

14       Q    And you know -- you looked at this report?

15       A    Yes.

16       Q    Yeah.

17            And you know that it uses -- all it uses is the

18    Suddenlink's public statement about the percentage.  So it's

19    not an independent estimate.  It's just repeating what

20    Suddenlink said separately, said about the loss, right?

21    Said about --

22       A    That I'd have to check.

23       Q    Okay.  But you don't have a different

24    recollection, do you?

25       A    But in any case -- pardon me?

1      Q    You don't recall that they did their own

2  independent study?

3      A    I'd have to check.  I thought it was based on more

4  than just repeating.

5           But what I'm saying here is this 2.9 isn't related

6  to their estimate of Suddenlink.

7           What I'm saying is, they're predicting for -- I'd

8  have to look exactly to refresh my recollection.  My

9  recollection is they're predicting what's the effect of a

10  blackout on a general MVPD if it's Viacom, 2.9 percent; if

11  it's Turner, 2.9 percent.  And that's the point, if I

12  remember right, that I'm trying to make in the footnote.

13      Q    All right.  And that's not a recommendation for --

14  or not an estimate by somebody who's in the industry, right?

15      A    I agree with you.

16      Q    All right.

17      A    It's by people who are analyzing the industry.

18      Q    So let's look at the AT&T document that you

19  reference next in the paragraph.

20      A    Okay.

21           MR. CONRATH:  I have some binders, Your Honor.

22  May I approach?

23           THE COURT:  Yes.

24           MR. CONRATH:  May I approach the witness?

25           THE COURT:  Yeah, sure.  Go right ahead.

1  BY MR. CONRATH:

2      Q    Would you look, Professor Shapiro [sic], at DX627.

3      A    I'm Professor Carlton.  Our economists are

4  substitutes but not perfect substitutes.

5           THE COURT:  You look like Carl to me.

6           THE WITNESS:  Thank you.

7           I'm sorry.  What tab?

8  BY MR. CONRATH:

9      Q    627.

10          THE COURT:  What document are we looking at?

11          MR. CONRATH:  627.

12          THE COURT:  627?

13          MR. CONRATH:  Yeah, 627.

14  BY MR. CONRATH:

15     Q    Tell me when you're there.  I want to direct your

16  attention to page 3, please, the executive summary.

17          Do you see that?

18     A    Yes.

19     Q    And what DirecTV says here in the third bullet:

20  "Our negotiating position is not as strong, relative to the

21  Viacom deal."

22          THE COURT:  Whoa, whoa.  I need to see counsel.

23  Hold on.

24          (Sealed bench conference)

25          THE COURT:  Is this in evidence?

1          MR. CONRATH:  No, it's not.

2          THE COURT:  Then how can he read from it?

3          MR. CONRATH:  Well, it's cross-examination.  It's

4    material he cited -- it's the thing he cited for in his

5    report.  I want to point out to him what it actually says

6    that is finally --

7          THE COURT:  Is this in his report?

8          MR. CONRATH:  I don't recall if he quotes it or

9    quotes part of it or probably quotes part of it in there.

10         THE COURT:  Well, let him read it to himself.

11         MR. CONRATH:  Okay.

12         THE COURT:  You can ask him -- he can't be quoting

13   unless it's been admitted into evidence.

14         MR. CONRATH:  Your Honor, we're on

15   cross-examination and so, for instance --

16         THE COURT:  You can ask him why he -- what he

17   relied on about it.  You can ask him questions about his

18   reliance on it.

19         He can't read the document if it hasn't been

20   admitted into evidence.

21         MR. CONRATH:  So we've had cross-examination about

22   things Charlie Ergen said somewhere outside this Court.  And

23   it's been allowed, I presume, because it's cross-examination

24   and confronting the witness with -- he's quoted this

25   document.

1          THE COURT:  Well, if he quoted it, he can read

2    what he quoted.

3          MR. CONRATH:  Yeah, but I want to point to him --

4    let's look at the part you didn't quote and say, isn't that

5    inconsistent?  Isn't that inconsistent with the proposition

6    that Viacom and Turner are the same?  Because it is

7    inconsistent with that proposition.

8          MR. OPPENHEIMER:  Your Honor, this -- the danger

9    here obviously is using an expert just as a channel for

10   information from other sources.  It's used under 703 by the

11   witness.

12         The questions that go directly to the portion he

13   used or the manner in which he used it is one thing; but

14   generally reading it from it, we're just going to get

15   involved in a back-and-forth from a document he had nothing

16   to do with.

17         THE COURT:  Let me see what you've got in mind

18   here.

19         MR. CONRATH:  Sure.

20         THE COURT:  I mean, I don't know who created this

21   document, under what circumstances it was created, who

22   created it.  This is a slide deck, right?

23         MR. CONRATH:  Well, right.

24         But the witness thought it was important enough to

25   cite to, so that seems like it ought to be appropriate to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    question him about it.

2         THE COURT:  No.  Look, you can confront him with

3    what he cited to.  You can ask him about why he cited to it,

4    what he was relying on.  You can do that.  That's perfectly

5    fine.

6         It's just this reading it in wholesale --

7         MR. CONRATH:  Okay.

8         THE COURT:  I mean, if he quoted it, you can read

9    the quote.

10        MR. CONRATH:  Well, he didn't quote it because

11   it's inconsistent with his opinion.  And that's the point of

12   the cross-examination point, to confront him with something

13   that is in -- I mean, I think we ought to be able to

14   confront him with DirecTV documents that are inconsistent

15   with what he said, but especially what he's going to be --

16        THE COURT:  Didn't you just tell me he cited this

17   page?

18        MR. CONRATH:  No --

19        MR. OPPENHEIMER:  A different page.

20        MR. CONRATH:  -- he cited the document or another

21   page.

22        THE COURT:  Okay.  Let me back up.

23        MR. CONRATH:  I'm sorry.

24        THE COURT:  I misunderstood you.

25        I was under the misimpression --

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2541

```
1              MR. CONRATH:  I'm sorry.

2              THE COURT:  -- that the page you've directed him

3    to was a page he cited in his report.

4              MR. OPPENHEIMER:  That's not the case.

5              MR. CONRATH:  He cited to the document.  He did

6    not cite --

7              THE COURT:  This document?

8              MR. CONRATH:  To the document.  He describes the

9    document in his report, and he cites to it --

10             THE COURT:  What's he describe it as?

11             MR. CONRATH:  -- as an AT&T issue.

12             THE COURT:  Is it a slide deck?

13             MR. CONRATH:  Yeah, right, something like that.

14             THE COURT:  DirecTV?

15             MR. CONRATH:  DirecTV, Turner -- DirecTV slide

16   deck.

17             MR. OPPENHEIMER:  We'll just -- page 17.

18             MR. CONRATH:  Here, if I can borrow this for a

19   second.

20             So he says here -- and this is what he said:  "For

21   example, AT&T itself used Viacom."

22             All right?

23             MR. OPPENHEIMER:  That's all he said.

24             MR. CONRATH:  And he cites to it there.

25             So I want to point out to him that what it
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2542

1    actually says is that -- it's worse for us with Turner than

2    Viacom.  It doesn't say it's the same.  It says it's worse.

3    It says the effect would be greater than with Viacom.

4            THE COURT:  It does here?

5            MR. CONRATH:  Yeah.

6            THE COURT:  All right.  Look --

7            MR. CONRATH:  And he said, tell me how to go.

8            THE COURT:  Direct him to that.  Confront him with

9    that and say, isn't it a fact that this report says just the

10   opposite?  If he says, "I don't recall that," say, "Well,

11   here, take a look at -- take a look at page 3 for a minute

12   yourself?  Does it say the opposite?"

13           And if he doesn't, then I think at that point, you

14   can confront him with it.

15           MR. OPPENHEIMER:  Your Honor, here's the

16   complication:  His actual testimony today in court was that

17   this document made adjustments for comparability.  That's

18   his testimony.

19           THE COURT:  Say that again.

20           MR. OPPENHEIMER:  They made adjustments for

21   comparability with Viacom.  So he's testified just in this

22   chair a moment ago.

23           THE COURT:  He'll explain this, then.  If you're

24   right --

25           MR. OPPENHEIMER:  Yeah.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2543

```
1              THE COURT:  -- and when he's confronted with this,
2   he'll explain why he disagrees with it.
3              So do it that way.
4              MR. CONRATH:  Okay.
5              THE COURT:  Let him read it.
6              MR. CONRATH:  Okay.  I guess I'm thinking about
7   going forward for cross-examining a witness, especially
8   here, an expert witness.  I want to confront him with a
9   Turner document that's inconsistent.
10             THE COURT:  Look, anything he cites in his reports
11  is fair game, anything --
12             MR. CONRATH:  Sure.
13             THE COURT:  -- he cites in his reports.
14             Anything he relies upon is fair game, absolutely.
15             Anything that he mistakenly interprets or
16  mistakenly quotes or -- it's all fair game, right?
17             MR. CONRATH:  Right.
18             THE COURT:  But what I'm concerned about is having
19  a situation where, to use Mr. Oppenheimer's expression, he
20  becomes a vehicle or vessel through which documents that
21  have not been admitted into evidence are going to be coming
22  into evidence effectively by being read into evidence.
23             MR. CONRATH:  Well --
24             THE COURT:  We can't have that.
25             So here, the fact that he cites this report, you
```

```
 1    say his characterization of the report is inaccurate and the

 2    consistent with what's in the report.  You can confront him

 3    with that.

 4            My guess is he will have an explanation that may

 5    not be a good one or may be a good one.  I don't know.  But

 6    he'll have an explanation for why he did what he did.  And

 7    then you might want to probe that more.  I mean,

 8    I don't know.  You'll have to make a decision.

 9            MR. CONRATH:  Okay.  Let me ask the broader

10    question so that I know what to do going forward.

11            If there's a document, he makes a statement in his

12    testimony and his reports, I want to --

13            THE COURT:  He cited quotes?

14            MR. CONRATH:  He makes a statement about

15    something.  I want to confront him with an AT&T document

16    that says something inconsistent with that.  It's a document

17    obtained in discovery but is not at this point in evidence.

18    I want to confront him with it and say this.

19            THE COURT:  Is it a statement by him?

20            MR. CONRATH:  No.  It's a statement by the

21    defendant, who --

22            THE COURT:  I'll tell you what.  If you have that

23    situation, come on up.

24            MR. CONRATH:  Okay.

25            MR. OPPENHEIMER:  And the cautionary issue,
```

1   Your Honor, is that we know from a lot of the trial that

2   these slide decks take all different forms.  They're not his

3   document --

4           THE COURT:  That's painfully correct.

5           MR. OPPENHEIMER:  Right.

6           THE COURT:  So the mere fact that it was a slide

7   deck with an AT&T globe on it is not reason enough to allow

8   it to be just -- we need more of a foundation for that.

9   That's why we've been spending the last, parts of the last

10  three, four weeks, before we admitted these slide decks,

11  trying to get some foundation as to who wrote it and when

12  did it happen?  And was it read?  Was it even passed up the

13  food chain to the leadership of the organization?  So that

14  we're in a position to know if it really has any evidentiary

15  value in it, any probative value, you know.  That's

16  important.

17          We don't want to just admit documents that never

18  were seen by -- especially as admissions against the

19  company.  And if there's no reason to believe that the

20  company's leadership ever really saw it, we can't let it in

21  as an admission against the company.

22          So I'll say you've got to be careful.

23          MR. CONRATH:  So I was not proposing to admit it.

24  I was proposing to use it to cross-examine.

25          THE COURT:  Well, if you start reading it into the

 1   record, you're effectively admitting it.  That's the

 2   problem.  That's the problem.

 3           MR. CONRATH:  I understand the Court's ruling.

 4           THE COURT:  So I'm not saying you can't confront

 5   him.

 6           MR. CONRATH:  Okay.

 7           THE COURT:  You can confront him, but we have to

 8   be careful as to -- look, you can refresh a person's

 9   recollection with a ham sandwich, is the old expression.

10   You can always do that, you know.  He may not know, for

11   example -- he's cited this, so he's got to be able to answer

12   the questions.  He's relying.  He's citing it.  So that's

13   fair game.

14           MR. CONRATH:  Okay.

15           (Open court)

16           THE COURT:  Come on back, Professor.

17           All right.  Let's start over again, consistent

18   with our discussion here at the bench.  How's that?

19           MR. CONRATH:  All right.

20           THE COURT:  Take your time.

21   BY MR. CONRATH:

22       Q   Professor Carlton, do you recall that you cited to

23   what is DX627 in your report?

24           THE COURT:  What page in his report, Mr. Conrath?

25   Is it 51?  53?  His footnote is --

 1          MR. CONRATH:  Page 53, yes.

 2   BY MR. CONRATH:

 3      Q    Page 53 of your initial report, correct?

 4          THE COURT:  I'm reading page 53.  Why don't you

 5   ask him about that.  Go ahead.

 6   BY MR. OPPENHEIMER:

 7      Q    And you say there, "AT&T has itself used Viacom as

 8   a proxy for Turner in internal analyses for a blackout."

 9      A    Yes.

10      Q    Would you please look at DX627, and that's the

11   document you cited --

12      A    That's the one.

13      Q    -- in your report, correct?

14      A    Yes.  In other words, is this document -- you're

15   asking me, is the document you gave me the same as the

16   document I cited?

17      Q    Yes, that's correct.

18      A    It looks that way to me.

19          THE COURT:  Okay.

20   BY MR. CONRATH:

21      Q    All right.  And now my question is, would you

22   please look at the third page of DX627 and read to yourself

23   the bullets, the bottom two primary bullets, including the

24   sub bullets.  Just read them to yourself.

25      A    Yes, I read them.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2548

1        Q    And does that refresh your recollection -- let me

2   phrase it another way.

3            That text does not say that Viacom is a proxy for

4   Turner, right?

5        A    That doesn't.

6            But if you look at page 17, which is what I was

7   talking about, it shows that they use the Viacom experience

8   and just make a 5 percent adjustment.  So it's not a big

9   adjustment, so it's pretty close.  That was my prior answer

10  to you.

11       Q    And is it correct that, in fact, what the document

12  says is that -- I'm trying to articulate it.

13           THE COURT:  Is it confidential?

14           MR. CONRATH:  I don't know -- no, I don't think

15  it's confidential.  I'm trying to adhere to Your Honor's

16  instructions.

17  BY MR. CONRATH:

18       Q    In fact, isn't it correct that the document says

19  that things would be worse for them if they were dark with

20  Turner than if Viacom.

21       A    It does say that.

22           But page 17, which is what I was talking about,

23  says "not much worse."  That's why I think they're roughly

24  comparable.

25       Q    And the executive summary says that it would be

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2549

```
 1   worse with Turner, right?

 2        A    It does.

 3             But it's based on page 17 that says it's not going

 4   to be much worse.  That's at only 5 percent adjustment.

 5   That's precisely what was my point.

 6             THE COURT:  I think you made your point.

 7             MR. CONRATH:  Thank you.

 8             THE COURT:  Let's take a break.

 9             MR. CONRATH:  All right.

10             THE COURT:  We're going to take the afternoon

11   recess, one of them.  We're going to have two today,

12   probably.

13             THE WITNESS:  Yeah.

14             THE COURT:  So for 15 minutes.

15             You're a witness under oath.  So refrain from

16   discussing your testimony with anyone, including your

17   counsel.  You know this drill by now.

18             So have a good recess.  We'll see you in

19   15 minutes.

20             DEPUTY CLERK:  All rise.

21             This Honorable Court will now stand in a brief

22   recess.

23             (Recess from 4:00 p.m. to 4:25 p.m.)

24             DEPUTY CLERK:  The United States District Court

25   for the District of Columbia is again in session, the
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    Honorable Richard J. Leon presiding.  God save the United

 2    States and this Honorable Court.  Please be seated and come

 3    to order.

 4              Your Honor, re-calling Civil Action 17-2511, the

 5    United States of America v. AT&T, Incorporated, et al.

 6              THE COURT:  The witness remains under oath.

 7              MR. CONRATH:  May I proceed, Your Honor?

 8              THE COURT:  You may.

 9    BY MR. CONRATH:

10        Q    We were talking about -- Professor Carlton, we

11    were talking about Viacom?

12        A    Yes.

13        Q    Right.

14              And do you recall reviewing the testimony of

15    Mr. Sejen that was about the Cable ONE blackout at Viacom,

16    dropping the Viacom?

17              Do you recall that?

18        A    Yes.  I referred to that.

19        Q    Right.  And you recalled that Mr. Sejen said that

20    Viacom, for them, in the small-world markets where they were

21    operating was not particularly popular content?

22        A    I don't specifically recall that.  What I recall

23    was the 2 percent effect that he mentioned and that it was

24    over quickly.

25        Q    And he said that in that case, they were able to
```

1   put on some replacement channels that their customers

2   wanted, right?

3        A    I'd have to check.  That does square with my

4   recollection.

5        Q    So do you recall that he said that what happened

6   when they had a brief blackout with Turner was that they

7   immediately started notifying their customers that they were

8   trying to work diligently to resolve the situation and get

9   the Turner programming back on the air?

10       A    I'd have to check that.

11       Q    And that's different from the way they treated

12  Viacom, correct?

13       A    I'd have to check.  From what you said, it sounds

14  that way, but I'd have to check.

15       Q    So you said earlier today something like, there's

16  a lot of places to get content.  An MVPD could go somewhere

17  else.

18            Do you recall that?

19       A    I remember referring to my chart that indicated

20  that there were many people, many firms --

21       Q    Right.

22       A    -- that have content, yes.

23       Q    So one of the list of possibilities, you mentioned

24  the fact -- you mentioned Apple, Netflix, Facebook.  None of

25  those is a substitute for live news or live sports for those

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2552

1   customers who like sports and news, right?

2        A    You know, I haven't investigated demand

3   substitutability.  But if you're asking me, does Apple have

4   or do some of these people -- if they don't have sports, do

5   they have a substitute for sports for someone who wants to

6   watch sports?  The answer is no.  The question is, would

7   that person want to watch something else?

8             And also, the point I was making was that the

9   resources that are used to make programming for

10  entertainment, whether it's sports or anything else --

11       Q    Okay.  Could I --

12       A    -- is substitutable.

13            MR. CONRATH:  Your Honor, I think I'm entitled to

14  an answer to my question, and we're now moving on beyond the

15  answer to my question into a speech.

16            THE COURT:  Okay.  All right.  Do you want to

17  restate your question?

18  BY MR. CONRATH:

19       Q    Yes.  My question was, Apple, Netflix, and

20  Facebook are not a substitute for live sports and news for

21  customers who like live sports and news?

22       A    If they don't --

23            THE COURT:  If you know.

24            THE WITNESS:  I haven't studied in detail.  But if

25  they have live sports, if someone wanted to watch sports and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  would only substitute the sports, there would be a

2  substitute.  If they don't substitute -- wouldn't be willing

3  to substitute the sports, it wouldn't be a substitute for

4  that customer.

5        Q    And you remember the testimony of Mr. Schlichting,

6  for example, from Dish?

7        A    I read some of these testimony.

8        Q    And you recall that he was asked if he could just

9  choose to drop Turner.  And he said, it's hard to imagine

10 getting through an election without CNN or getting through

11 the NBA finals without TNT.

12             You remember that, right?

13       A    I'd have to check.  I have no reason to doubt what

14 you're saying.

15       Q    Do you recall Mr. Montemagno of Charter saying

16 that some content is just not replaceable?  If I don't have

17 that content, reducing a rate or giving them a free month of

18 HBO or Showtime isn't going to satisfy that customer?

19       A    Again, I don't remember that specific testimony,

20 reading that; but if you say that's what he said, I have no

21 reason to dispute you.

22       Q    And according to Mr. Montemagno, consumers are

23 just going to go to another distributor if you don't have

24 the content that they want, right?

25       A    If that's what he said, that's what he said.

1      Q    And you agree, don't you, that the price that a

2   person pays for something is a reflection of the value that

3   that person places on it?

4      A    Generally, it seems like a reasonable statement.

5      Q    And Turner is a product that has value, right?

6      A    Yes.

7      Q    And what makes a channel valuable to an MVPD or a

8   virtual MVPD is that they're more profitable carrying it

9   than they would be not at the price they're able to

10  negotiate, right?

11     A    The price someone pays for something is the price

12  they're willing to pay, so they value it at least that

13  amount.

14     Q    At least that much?

15     A    Yeah.

16          I don't know if I answered your question.

17  I'm sorry.

18     Q    I think you did.

19     A    Okay.

20          THE COURT:  I was actually correcting a prior

21  answer I gave.

22          If you pay $5 for something, it means you value it

23  at least $5.

24     Q    Right.

25          Let's talk about your review of prior

1    transactions.

2           So the previous deals that you examined, all of

3    them, is that correct, were governed by an FCC order?

4       A    I'd have to check that.  It might be --

5       Q    At least where there was a combination of -- of

6    vertical integration -- forget the disintegration -- where

7    the vertical integration, there was an FCC order, right?

8       A    That might be.  I'd have to check that.

9       Q    And those placed conditions or limitations on the

10   behavior of the merged firms?

11      A    Consistent with what I already said this morning.

12      Q    Right.

13      A    To the extent the FCC conditions applied, that

14   would constrain the activities of the vertically integrated

15   firms, yes.

16      Q    And that would affect -- those conditions were in

17   part intended to prevent harm to consumers from increased

18   prices resulting from the vertical integration, correct?

19      A    I'm not an expert on FCC regulation.  I know

20   Professor Katz is going to talk about that, but -- so

21   I can't talk about the intent of the law.  But, certainly,

22   if you're asking me would it do that, it seems plausible.

23      Q    In fact, the FCC's conclusion -- and you talked a

24   little bit about the study that's -- this in the study

25   that's redacted.  The FCC's conclusion in the Comcast-NBCU

```
 1    matter in that redacted study was that the only content to

 2    which it did not apply a remedy, it found evidence of harm?

 3         A    I'd have to -- I'd really have to go back and look

 4    at that.  I don't recall that.

 5         Q    You talked, in particular, about the Comcast-NBCU

 6    transaction, correct?

 7         A    Yes.

 8         Q    And that one did have FCC conditions as well as a

 9    Consent Decree, correct?

10         A    Yes.  That's my understanding.

11         Q    And those FCC conditions were in part intended to

12    prevent increases in price resulting from vertical

13    integration?

14         A    It's my general understanding.

15         Q    And you understand that there were conditions

16    intended to protect any distributors who considered or used

17    arbitration?

18         A    There was an arbitration provision, yes, for the

19    their protection.

20         Q    And specifically, there were conditions such as an

21    anti-retaliation provision or an anti-punishment provision

22    intended to protect anyone who exercised an arbitration

23    right, correct?

24         A    I'd have to check that specifically.

25         Q    So did you investigate whether, in your study,
```

 1   whether any of the conditions of the FCC order had an effect

 2   in limiting any price increases that might result from the

 3   vertical integration in the merger?

 4       A    I didn't do a specific study of whether individual

 5   components of the restrictions had separate facts.

 6   I simply, as I said earlier, made the observation that the

 7   arbitration commitment that AT&T is making here or has made,

 8   which will apply post-merger, are similar.

 9       Q    So let's go back to my question.

10            My question is, you came in and said, I've looked

11   at this transaction, and I don't see an effect.

12            I'm asking you if you tried to figure out whether

13   the reason for that was because no effect was possible or

14   because maybe the FCC provisions helped to diminish any

15   effect.

16            You didn't try to answer that question, did you?

17       A    That's fair.  I simply made the observation that

18   there were conditions in that case that look pretty similar

19   to the arbitration commitments in this case.  And I'm

20   observing that in that other case, there was no effect.

21       Q    And so you can't -- all right.  Please, I've got

22   limited time here.  And so you'll get a chance to make

23   whatever explanations you want.  You understand that that's

24   the way it works --

25       A    Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2558

1     Q     Right?

2           Okay.  So you can't tell whether those -- and,

3     well, to be precise, the FCC conditions have now expired,

4     right?

5     A     I would have to check.

6     Q     And so you weren't able to study the period after

7     they expired because they just expired in January, right?

8     A     My -- well, I didn't study the period in January.

9     Q     So looking at the Comcast-NBCU merger was not a

10    way for you to look at an unremedied vertical transaction;

11    is that right?

12    A     If you thought the AT&T arbitration is not

13    sufficiently similar to the conditions in the NBCU-Comcast

14    deal, that would affect the conclusions I could draw for my

15    study.

16    Q     Let's talk about another distinction between that

17    situation and this one.

18          You'd agree that Comcast is a regional distributor

19    that just serves defined footprints in different areas,

20    right?

21    A     It's my general understanding.

22    Q     And, in fact, Comcast operates in regions that

23    encompass somewhere around 30 percent of the country?

24    A     Yes, that's my understanding.

25    Q     And the rest, the 60-plus or 70 percent, are areas

```
1    where Comcast does not operate?

2         A    Here, I'd have to check those exact numbers; but

3    if those are what you're telling me, I have no reason to

4    dispute.

5         Q    All right.  And so where Comcast does not operate,

6    it couldn't get any benefit from raising rivals' costs in

7    those markets where it doesn't compete with any rivals,

8    right?

9         A    It's true, but it competes with Dish and DTV

10   everywhere.

11             It is -- everywhere Comcast is.

12        Q    Yes, but when NBCU is raising its price, it's

13   raising its price in markets that include areas where

14   Comcast does not operate and thus stands no possible benefit

15   from raising rivals' costs; isn't that right?

16        A    In those areas.

17             But if it raised the price to DTV, it would get a

18   tremendous benefit in the areas where it is because it has a

19   large marketshare.  So when the version comes from DTV, it

20   would go to Comcast.  So it's the national share that's

21   going to matter in Shapiro's model.

22        Q    So let's be clear.  In loosely two-thirds of the

23   country, the "raising rivals' costs" effect would not

24   operate in the Comcast-NBCU merger; is that right?

25        A    Yeah, but in the third where it is operating, for
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  precisely the point you're making, it will operate with

2  greater intensity than if it had a lower share and was

3  everywhere, which is like DTV.

4         So I'm just saying in Shapiro's model, what's

5  going to matter basically is their national share.

6     Q    And your study did not attempt to differentiate

7  between any effect on prices in areas where Comcast operates

8  and in areas where Comcast doesn't operate, did it?

9     A    It wasn't necessary when I'm studying DTV.  It

10  wasn't necessary when I'm studying Dish, because it's one

11  price.  So it wouldn't make sense; it's all the same price.

12     Q    Let's look at your study of Dish -- oh, I'm sorry,

13  of DirecTV.

14         Your chart -- I'll get the right number here.

15         THE COURT:  Are you looking at his report?

16         MR. CONRATH:  No.  I'm looking at the

17  demonstratives, Your Honor.

18         THE COURT:  Oh, okay, the demonstratives.

19         MR. CONRATH:  DXD113.

20         THE COURT:  113.

21  BY MR. CONRATH:

22     Q    Do you have that in front of you?

23     A    Can you tell me what tab that is.

24         Oh, I have it.

25     Q    All right.  You have that in front of you.

1          So -- and this DXD113.

2          THE COURT:  Which slide are you looking at?

3          MR. CONRATH:  So it's slide -- DXD113 in the lower

4     right.

5          THE COURT:  That's what it says in the lower right

6     corner.

7          MR. CONRATH:  Right.

8          Tab 7, Your Honor, sorry.

9          THE COURT:  Okay.  Tab 7.

10    BY MR. CONRATH:

11    Q     Do you have that, Professor Carlton?

12    A     Yes.

13    Q     So, I guess -- and this reflects DirecTV's --

14    prices that DirecTV pays to NBCU and also to all the other

15    control networks, right?

16    A     Yes.

17    Q     So, first, let's note that this time period that

18    you show here encompasses the time period when you -- all

19    the entry that you're talking about encompasses the time

20    period when virtual MVPDs were entering and whatever entry

21    from Apple and Facebook happened.  And we still see that the

22    prices are going up substantially; isn't that right?

23    A     Of content in general?

24    Q     Yeah.

25          Well, for the content -- this is the content that

1    DirecTV pays for to NBCU and the other control networks.

2            So whatever --

3    A    Yes, generally prices are going up, if that's your

4    question.

5    Q    And it's going up even in a period when you made a

6    big point of telling us earlier that there was a lot of

7    entry, right?

8    A    Yes.

9    Q    So the entry isn't doing anything to prevent the

10   prices from going up, right?

11   A    Well, be careful.  Costs are going up.

12           THE COURT:  Whoa, whoa.  Let him finish his

13   answer.

14           THE WITNESS:  If costs go up, prices are going to

15   go up.

16   BY MR. CONRATH:

17   Q    Right.  So prices have gone up in this industry,

18   despite the entry that you mentioned from Facebook, Google,

19   Netflix, right?

20   A    Yes.  Costs have gone up because products are

21   higher quality.  And my suspicion is -- my expectation is

22   the demand for video content has gone up.

23   Q    You haven't studied whether quality has gone up,

24   correct?

25           I mean, that's a possible explanation.  But

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2563

1   another possible explanation is that Apple and Facebook

2   aren't very good substitutes for the kind of content that

3   DirecTV is putting on; isn't that right?  That's another

4   possible explanation?

5       A    I haven't -- anything's possible.  If you're

6   asking me what's likely based on what I've studied and the

7   readings I've done for this case, I don't think what you

8   said is a good explanation.

9            I think what I said -- namely, content prices are

10  generally going up.  The talent for content is in greater

11  demand.  I bet the costs are going up.  I bet the quality of

12  the programming has gone up.  And that's what I think is

13  going on.

14           But there's nowhere in my report I'm doing

15  detailed studies of that, but that's what I think.

16      Q    It's not something you've studied?

17      A    Not in my reports.

18           But based on, you know, the background, readings

19  I've done.

20      Q    Well, you understand that you're limited in

21  testifying to the opinions you've disclosed in your report,

22  right?

23      A    I know, but you asked me questions as to why do

24  I think the price is going up.

25      Q    All right.

```
 1            I have an exhibit that I'd like to share.  May I

 2   approach?

 3            THE COURT:  Yes.

 4            MR. CONRATH:  May I approach the witness?

 5            THE COURT:  You may.

 6            THE WITNESS:  Thank you.

 7   BY MR. CONRATH:

 8       Q    So what I've given you, Professor Carlton, is

 9   Government's Exhibit 547 for identification, which, as you

10   can see, is your chart with one additional line, dotted line

11   that we've added to it.

12            Do you see it there?

13       A    Yes.

14       Q    And it's added -- I'm not going to mention the

15   numbers of the years here, just out of confidentiality

16   concern.  But you see that on a particular year, right?

17       A    Yes.

18            MR. CONRATH:  May I approach one more time,

19   Your Honor, with an additional exhibit?

20            THE COURT:  You may.

21            MR. CONRATH:  And may I approach the witness?

22            THE COURT:  You may.

23            MR. CONRATH:  Your Honor, PX548 is backup material

24   for -- Professor Carlton's backup material for figure 12 in

25   his initial report, page 70.  And it was provided to us by
```

1    the expert with his report.

2    BY MR. CONRATH:

3        Q    So, Professor Carlton --

4            THE COURT:  Where does this appear in his report?

5            MR. CONRATH:  It is the backup material to his

6    report.

7            So with the report comes, I want to say a stack.

8    But, I mean, it's electronic, of course, of backup material

9    that explains or backs up material that's actually in the

10   report.

11           THE COURT:  It's not cited in the report?

12           MR. CONRATH:  It backs up figure 12.

13           THE COURT:  All right.

14   BY MR. CONRATH:

15       Q    So if you could look at this second exhibit that I

16   gave you, Government's Exhibit 548 for identification?

17       A    Right, 547.

18       Q    No.  548, the backup material.

19       A    Oh, yes.

20       Q    If you look at the bottom two lines there, that

21   gives the dates for some agreements between NBCU and

22   DirecTV, right?

23       A    Yes.

24       Q    Do you see those dates?

25       A    Yes.

1        Q    And the second date is in the year where we have

2    placed the line on Government's Exhibit 547 for

3    identification.

4              Do you see that?

5        A    Yes.  Yes.

6        Q    All right.

7              The prior contract between DirecTV and NBCU was

8    one that had been negotiated at an earlier date that was, in

9    fact, before the NBC-Comcast merger; isn't that right?  Can

10   you see that?

11       A    Yes.

12       Q    So the price increases that went into effect, that

13   would be the blue line, the NBCU price increases that went

14   into effect after that contract was signed?

15       A    Yes.

16       Q    There are not any tests of vertical integration

17   because they're on a contract that was negotiated before

18   there was vertical integration, right?

19       A    Yeah.  That's before vertical integration.

20       Q    Right.  So --

21       A    If it's before -- if the price is set before

22   vertical integration, it's not a test of vertical

23   integration.

24       Q    All right.

25              So --

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2567

1      A      It can be a basis for a test.

2      Q      So the first -- let me see --

3      A      You can ask a question.

4      Q      -- if I got it right.

5             So there's a contract that's signed before

6      vertical integration.  And we see that that happened in the

7      case of DirecTV and NBCU, right?

8      A      Yes.

9      Q      And the -- until they re-negotiate a contract, you

10     don't see any effect of vertical integration, right, because

11     the contract was signed before they were vertically

12     integrated?

13     A      Correct.

14     Q      So the blue line, which goes up until the date of

15     the new contract, which is indicated by the dashed line on

16     the right here, all those reflect no vertical -- prices

17     reflect no vertical integration, correct?

18     A      To the extent a contract is signed beforehand, all

19     that would be plotted would be escalation in those

20     contracts.

21     Q      Right.

22            And your backup tells us that that contract was

23     signed before the vertical integration, correct?

24     A      That's right.

25     Q      Now, looking at Government's Exhibit 547, the

1    dashed line near the right reflects the date of the second

2    contract that's reported in your backup, right?

3          A    Yes.

4          Q    And you see there's sort of a kink in the blue

5    line, the NBCU price line there?

6          A    Yes.

7          Q    And that's -- the kink happens at the point where

8    the first contract under vertical integration happens; isn't

9    that right?

10         A    That's -- I'd have to check, but that's my general

11   recollection.

12         Q    And after, after the first contract with vertical

13   integration, you'll agree that the NBCU price increases more

14   steeply than the control networks, right?

15         A    That's true, but they wind up at exactly the same

16   point on this chart.

17         Q    They wind up at the same point.  But the one that

18   is increasing faster is the price that was set with vertical

19   integration; isn't that right?

20         A    If you start in 2016 as the base, not if you start

21   in 2010.

22              But that's the whole point.  You want to ask

23   before and after the NBC transaction which price went up.

24              And the point you're making I agree with.  It has

25   to be pre-contract, pre-vertical integration,

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 2436 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2569

1    post-vertical -- pre-transaction, I mean, sorry,

2    pre-Comcast-NBCU transaction, post.

3            This is -- this diagram that I have in here, I

4    said is suggestive evidence.  If you do the exact test, as

5    you say, as you're pointing at, you're exactly right.  You

6    want to compare a contract that was signed without the

7    influence of vertical integration to a contract that's

8    signed with vertical integration.

9            So if you look at paragraph 190 in my report,

10   that's exactly what I do.  I compare a price signed pre to a

11   price signed post.  And that's exactly the test they do for

12   DTV.

13           So you're exactly right.  This is just a rough

14   indication of what's going on, suggestive.  To do it right,

15   you have to be careful.  I agree, it's a much more

16   complicated.  And that's what I do, read paragraph 190.

17           That's why I said in my direct, you know,

18   basically, after you do lot of stuff, like you're

19   suggesting -- and I'm not disagreeing -- you get back the

20   same result, same thing.

21           So I agree with you.

22      Q    So once you look at when the first contract was

23   signed with vertical integration -- just stick with my

24   question -- you see the prices go up faster for NBCU, the

25   vertically integrated company, than they do for the other

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    companies, correct?

2        A    As a matter of graphics, what you're saying is

3    correct.

4            As a matter of economic logics, it's utterly

5    irrelevant.

6            What's relevant is the -- here's where the event

7    starts.  They're equal.

8            Where do they wind up?  Same point.  Start at the

9    same point; they end at the same point.

10           This is only suggestive, only suggestive, because,

11   as you say, you've got to be much more careful.  Read

12   paragraph 190.  That's my econometric study.  I do it

13   exactly like you're suggesting.

14       Q    Can you just answer the simple question:  The

15   prices go up faster with vertical integration, according to

16   your own chart?

17       A    No.

18           The prices -- a correct statement is the

19   following:  If you look at an irrelevant date, as you're

20   looking, do prices go up faster?  Yes.

21           If you look at the relevant date, using these

22   price indices and you look between 2010 and 2017, they're

23   spot-on.

24           Is this the right we to do a complete analysis?

25   No.  That's what I said.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1              The right way, look at my report.  Look at my

2     econometric analysis.  Look at paragraph 190.

3              So I agree with what you're saying.

4        Q    You did think it was good enough to bring to court

5     and put in your demonstratives, didn't you?

6        A    I absolutely did, because I said it was

7     suggestive.  This is the first place you start.  You look at

8     the actual evidence in a simple way.

9              And then you say, now, I have to do

10    more-complicated stuff.  Exactly for the reason you're

11    saying.  You don't want to make a mistake.

12             If you do the more complicated stuff, you can't

13    put it on a simple graph like this.  You have to do an

14    econometric analysis, and you have to go contract by

15    contract.  When did they sign it?  When's the price?

16             Read paragraph 190.  That's exactly what I do.  I

17    agree with you.

18             And the reason I did it here is because I could

19    either put up a chart and say, here's a simple way to -- a

20    suggestive.  I'm telling you I did a very complicated

21    analysis, and this conclusion holds.  Or I could have spent

22    days going through my econometric analysis.  I mean, I'm

23    happy to do that, but I don't have the time.

24       Q    I think we'll all buy into that going through the

25    econometric analysis.

2572

1          THE COURT:  We don't have the time either.

2          THE WITNESS:  Oh, go ahead.

3  BY MR. CONRATH:

4     Q    Nobody is asking for the econometric version.

5     A    I would like to tell me students about it, though.

6     Q    Let's switch topics to -- I would like you to look

7  at your first report, table 7, which is at page 61?

8     A    My first report?

9     Q    No, no.  Table -- that's not right.

10         It's possible that I'm in the wrong report.  Give

11  me one moment, please.

12         Page 57.  I'm sorry.  My apologies.

13         So one of the ways -- one of the things that

14  you've talked to us about the change in the marketplace is

15  the -- you've identified as a relevant change, the growth of

16  virtual MVPDs, right?

17     A    Yes.  Their entry and growth and expected growth.

18     Q    And this chart table in your initial report is

19  attempted -- your attempt to report on particular virtual

20  MVPDs and their activity in the marketplace, correct?

21     A    Yes.

22     Q    So let's look at the eight virtual MVPDs that you

23  identified in your February 2nd report.

24         So, first, let's note, obviously, DirecTV Now is

25  owned by a traditional player, DirecTV, correct?

1        A    Yes.

2        Q    And Sling is owned by Dish, right?

3        A    Yes.

4        Q    And those two are the largest virtual MVPDs?

5        A    That's my recollection.

6        Q    And do you know that they used their existing

7   pay-TV contracts to help to launch their services?

8        A    My general understanding is they've used their --

9   obviously, you have content, yes.

10       Q    Their contracts for content?

11       A    You know, I assume so.  I have no reason to doubt

12   what you're saying.  I haven't studied in that detail.

13       Q    Okay.  Sure.

14            You identified in your initial report a number of

15   virtual MVPDs that had launched without Turner networks.

16   And your report states that the fact that there are some who

17   launched without Turner content undercuts the plaintiff's

18   theory of harm; is that right?

19       A    I did say that.

20       Q    So on that same page, you mention -- that same

21   chart, you mention the ones without Turner contact.  Let's

22   just talk about a couple of those.

23            YouTube TV, do you understand that YouTube TV has

24   now added Turner content?

25       A    Yes.  That's a new development.  I didn't know

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2574

1   that when I wrote my report.

2        Q    So have you -- did you hear the testimony that

3   that contract was being negotiated through the fall and up

4   to being signed in the winter?

5        A    At the time I wrote my report, I did not know that

6   there was going to be a contract.

7        Q    Okay.  And that's something that one of the

8   clients involved knew, but you didn't learn it from them?

9        A    I was not told that there was a likely contract.

10       Q    Right.  So that's one that has launched but now

11  quickly added Turner content, right?

12       A    They've added Turner content, yes.

13       Q    And CenturyLink Stream is another one that you

14  link -- list as being -- launching without Turner, correct?

15       A    Yes.

16       Q    And are you aware that they have since left the

17  business?

18       A    Since I wrote this report, yes, that's my

19  understanding.

20       Q    And the other two that launched without Turner

21  content, do you understand that they're significantly

22  smaller than the others?

23       A    Yes, significantly smaller and recent entrants,

24  very recent.

25       Q    So let's just say, it's correct, isn't it, that of

 1   the four examples you gave of entry without Turner content,

 2   two are no longer good examples of Turner -- of entry

 3   without Turner content; and the other two are still small

 4   enough that it's hard to say whether they're going to be

 5   successful and thrive without Turner content; isn't that

 6   right?

 7        A    I would agree with that.  And that's why my

 8   testimony this morning, I didn't talk about possible entry,

 9   based on the evidence, of virtual MVPDs without Turner

10   content.  But I did talk about the fact that the people who

11   have Turner content are guaranteed to keep having it under

12   the arbitration condition.  And under the arbitration

13   condition, new MVPDs could get --

14             MR. CONRATH:  Your Honor, could I have an

15   instruction not to volunteer things beyond the question

16   that's been asked?

17             THE COURT:  Limit yourself to the answer to the

18   question he asks.

19             THE WITNESS:  Okay.

20             THE COURT:  Mr. Oppenheimer will have a chance to

21   follow up --

22             THE WITNESS:  Okay.

23             THE COURT:  -- on redirect.

24   BY MR. CONRATH:

25        Q    Let's shift to another topic.

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 2443 of 3826

2576

1          You talked a little bit about margins.

2     A    Yes.

3     Q    And you said that in your direct testimony, that

4  you found a big 39 percent drop in margins, and you thought

5  that one was one of your principle criticisms of

6  Professor Shapiro; isn't that right?

7     A    Principle criticism was he didn't use current

8  margins, and that has a big effect.

9     Q    And you actually you made that criticism even

10  though you acknowledged in your deposition that you knew

11  Professor Shapiro didn't have access to the data that AT&T

12  gave you, right?

13     A    I don't know whether he had access to it or not.

14  I don't recall what I said in my deposition.

15     Q    You don't recall saying that?

16     A    Saying what?  That he did or did not or that I

17  don't --

18     Q    He did not have access to it.

19     A    If that's what I said, that's what I said.

20          As I sit here now, I don't know what access he

21  had.  I assume he had access to the same information I have

22  since I turned it over as of today.

23     Q    After you turned it over, yes, right?

24     A    Whatever -- I have no reason to doubt whatever

25  Professor Shapiro said about the data he had available to

1    him.  Whatever he said, I'm happy to agree with.

2         Q    You got new data on lifetime value from AT&T in

3    February, which you used in your February 26th report,

4    right?

5         A    That's correct.

6         Q    And you didn't have it in time for your

7    February 2nd report?

8         A    That's correct.

9         Q    And you used the new lifetime value data to

10   calculate margins?

11        A    Yes; just like Professor Shapiro, using the same

12   methodology as Professor Shapiro.

13        Q    And lifetime values also is called LTV, right?

14        A    Yes.

15        Q    And churn is one of the factors that goes into

16   lifetime value?

17        A    Yes.

18        Q    I think we've talked about this before, but churn

19   is how long a customer stays.  And if you stay for less

20   time, your lifetime value is lower, right?

21        A    All those equal, yes.

22        Q    I think you said at your deposition, a high churn

23   means a short lifetime --

24        A    Sounds right.

25        Q    -- right?

1          Okay.

2     A    I don't remember saying that, but it sounds right.

3          Lifetime with DTV, not period.

4     Q    Right.  Let's be clear.

5          So the 39 percent drop number that you talked

6     about, that was a pretty -- you'd agree that that would have

7     been a pretty significant drop, right?

8     A    You mean the fact that Professor -- the new

9     margins are 39 percent lower than what Professor Shapiro was

10    using in June --

11    Q    Right.

12    A    -- of --

13    Q    You recall in your deposition I asked you if when

14    you got these numbers reflecting such a big drop, did you go

15    to ask anybody at AT&T, what's going on to cause these

16    margins to drop by 39 percent?

17         And you told us at your deposition that you didn't

18    know if you had a specific discussion with anybody about

19    that?

20    A    I didn't -- I don't recall having a specific --

21    I mean whatever I said in my deposition, I said and

22    obviously would stand by it.

23         As I sit here now, my recollection is

24    I don't recall going through any details of calculations of

25    LTV and assume that the data was accurate.  And my

1   understanding was it was produced in the same way in the

2   ordinary business course and that when I saw it, it's

3   consistent with my notion that margins are going down in

4   this industry with my view that it's likely margins are

5   going down in this industry, which is what the analysts have

6   said.

7         Q    So they have been on, the margins have been on a

8   long, slow, steady decline.  But 39 percent is not a long,

9   slow, steady decline, right?  It's a big drop?

10        A    39 percent is a big drop.  I point that out.

11        Q    And you didn't do a separate investigation into

12  those lifetime values numbers versus the numbers that

13  Professor Shapiro had?

14        A    Wait a minute.  I'm using the same number as

15  Professor Shapiro, the same source as Professor Shapiro.

16             Professor Shapiro has a million calculations he's

17  doing, and he's relying on lots of data.

18             And I said, listen, I'm just going to update what

19  you're doing.  And I'll use the same data source you're

20  using, and I'm updating it, period.  I'm just doing exactly

21  what he did.

22        Q    You understand that the data Professor Shapiro

23  used was provided by AT&T during the investigation?

24        A    No.  I assume so.  I mean, I assume he got it

25  through the Department of Justice and AT&T gave it to you

1  guys and you gave it to Professor Shapiro.

2       Q    You based your analysis on the lifetime value

3  numbers from June 2017; is that right?

4       A    That report in my rebuttal is the margins from

5  June of 2017.

6            I also, if I'm not mistaken, include in the backup

7  redoing the calculations if instead of using June 2017, I

8  used January 2017 or April 2017.

9       Q    Well, you received data for January, April, and

10  June.

11       A    Correct.

12       Q    And what you told us at your deposition was that

13  your understanding was you had the only numbers that were

14  produced in the ordinary course; is that right?

15       A    That's my understanding that -- that's actually

16  still my understanding that the latest numbers that are

17  available are those three I mentioned to you, with the

18  latest one being June 2017.  And that's the one I used.

19       Q    And you testified that you thought AT&T produces

20  the data every three months in the ordinary course; that was

21  what you said you thought your understanding was?

22       A    Yeah.

23            Well, if that's what I said, that's what I said, I

24  guess.

25            My understanding now is that they try and produce

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2581

1   it but that I gather the schedule is sometimes not -- it's

2   produced in the ordinary course but that there's a delay in

3   how rapidly they can produce the study because you can't

4   produce it because they have a time lag of data that they

5   need to get.

6        Q    But what you got was not on a three-month

7   schedule, right?  You had January, skipped February and

8   March and got April.

9        A    Correct.

10       Q    Skipped May, but you didn't skip June.  You got

11  June.

12            And you didn't try to investigate what was going

13  on there?

14       A    I didn't do an investigation as to the timeliness

15  of the data, why they produced the data, why they produced

16  it in the past, why they are going to produce it in the

17  future.  I'm just trying to do something real simple.

18            Professor Shapiro uses the -- uses old data from a

19  document.  And I'm going to say I'm just going to get the

20  updated document.  I'm going to use the latest data, and

21  that's it.

22            I -- just like Professor Shapiro hasn't done an

23  investigation of how AT&T -- you know, who produced his data

24  or their underlying analysis.

25            I just took the exact same data source as

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Professor Shapiro and used it in exactly the same way.

2            The only difference between what I'm doing and

3    he's doing is I'm using the latest data.

4        Q    Let's come to that.

5            So there was -- when we were at your deposition,

6    there was an anomaly in the data that you couldn't explain.

7    And later, AT&T's lawyers explained that there was a coding

8    error.  You hadn't checked into the anomaly; is that right?

9        A    I was unaware that there was, when I used it, that

10   there was a coding error.

11           My understanding is that the coding error did not

12   affect the June 27 data that I'm using.

13       Q    And at your deposition, I asked you whether you

14   had checked about whether AT&T calculated lifetime value in

15   the same way as to 2016 and 2017, and you said you weren't

16   aware of any changes.

17           And we later learned in a letter from your lawyers

18   that there was a change in methodology; is that right?

19       A    My understanding is a little different.

20           My understanding is they have been producing these

21   LTV values for a while, many years, and that they are

22   continually refining their techniques to make them more

23   accurate and that whatever they do in the ordinary course is

24   what they have done.  They've been refining their procedures

25   ever since they were instituted, I gather.

1           But that -- and this is the key point.  The LTVs

2    that are being produced today are used in the same way as

3    the LTVs in prior years for financial planning.  And that is

4    what they use to influence their economic decision-making.

5           And from an economic point of view, that's the key

6    point.  That's what Professor Shapiro needs in his model,

7    and that's what I'm sticking in when I update his model.

8       Q    And are you aware that there was a change in

9    methodology for predicting customer churn between

10   Professor Shapiro's 2016 data and your June 2017 data that

11   AT&T gave you that produced --

12      A    No, I'm not.

13      Q    -- that produced about a 10 percent increase in

14   the churn number?

15      A    My understanding now, not at the time of my

16   deposition, was that there have been improvements in the

17   methodology and that the purpose of the LTV is to make it as

18   accurate as possible.

19          Improvements in the methodology are required over

20   time because the underlying economic conditions change over

21   time.  In particular, churn has become more important to get

22   right.  And, therefore, they are continually improving their

23   methods in order to make accurate predictions of their

24   financial incentives that result from capturing a new

25   customer and that the data they're using in this ordinary

1   business course that they produce in their ordinary business

2   for LTV are the numbers they look at for financial planning.

3           That's what they do today with those June 2017

4   numbers.  That's what they did with the numbers

5   Professor Shapiro was using.

6           And from an economic point of view, that means

7   those are the variables you want to be looking at.

8   Q    And an increase in churn would have the effect of

9   reducing lifetime value and reducing margin, right?

10  A    If churn increases, lifetime value will go down.

11  My general understanding is that those are the predictions

12  in the industry, that churn has been increasing and will

13  continue to increase.

14  Q    And you're aware, I assume, that companies like

15  AT&T can affect the amount of churn by, for example,

16  deciding to not take some credit-risky customers.

17          So they can adjust what credit score we're going

18  to sign up people at, and that can reduce churn, right?

19  A    Many things they can do to influence churn,

20  pricing, for example.

21  Q    Right.  And you're aware that AT&T had a project

22  in this time frame specifically designed to reduce churn?

23  A    My general understanding is that they are

24  concerned with churn.  They are considering projects to

25  reduce churn because the change in the industry has been

1    that churn has gone up over time.  Obviously, it's costly to

2    reduce churn.

3         Q    And if they're successful in reducing churn, that

4    will have the effect of increasing lifetime value and

5    margins, right?

6         A    Not necessarily.  It depends how costly it is; in

7    other words, I agree with you if you lower the price to

8    someone, he won't churn.  On the other hand, he's not worth

9    as much because he's not paying as much.

10             So that's the tricky business calculation that

11   they have to go through and figure out.

12             That's why margin LTVs are going down.

13        Q    So in your deposition, you said that you were --

14   actually, just now, you said you were using exactly the same

15   methodology as Professor Shapiro, but, in fact,

16   Professor Shapiro used an average of three months, right,

17   and you used only one month?

18        A    That wouldn't make any difference, significantly,

19   to what I've testified to.  You could use the average.

20             As I said in my work papers, I use the April

21   numbers, which are higher than the June numbers, and didn't

22   change any of the conclusions in my report.

23        Q    But in your report, you used the lowest number,

24   right?  You chose to use --

25        A    I used the most current number in the report.

1    That happened to be lower than the April number.

2           But what I just said is if I use the April number,

3    it wouldn't change any of my conclusions.  It would change

4    the specific numbers, but it wouldn't change my conclusion

5    that Professor Shapiro's margins are way too high and if you

6    use those lower margins, even April's margin, you would wipe

7    out a lot of this harm.

8        Q    Let's look at a document.

9           MR. CONRATH:  May I approach, Your Honor?

10          THE COURT:  Yes.

11          MR. CONRATH:  May I approach the witness?

12          THE COURT:  You may.

13          MR. CONRATH:  Your Honor, I've handed up what's

14   been marked as PX549 for identification.  This is one of the

15   documents that Your Honor ordered to be searched for and

16   produced to us within the last couple of days.

17          So I obviously don't -- and I -- and I got it

18   without a cover email, without metadata and whatnot.  But

19   I -- so I'm not in a position to establish it, but I would

20   like to cross-examine this witness with it.

21          THE COURT:  Uh-huh.

22          MR. CONRATH:  May I proceed?

23          THE COURT:  Well, I don't know what you're going

24   to do with it, but I'll wait and see.

25          MR. CONRATH:  All right.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2587

```
 1            THE COURT:  You're not seeking to admit it,

 2   I trust?

 3            MR. CONRATH:  I am not.

 4            THE COURT:  Good.

 5            Go ahead.

 6            MR. CONRATH:  Although given the circumstances in

 7   which it was -- may we approach?

 8            THE COURT:  Sure.

 9            (Sealed bench conference)

10            THE COURT:  What is this?

11            MR. CONRATH:  This is a more recent -- so if you

12   recall, we had the questions about the data.  Your Honor

13   ordered them to find them and produce them to us.  They did.

14            THE COURT:  Christopher's stuff, right?  This is

15   Christopher?

16            MR. OPPENHEIMER:  Correct.  Yes.

17            THE COURT:  From the weekend.

18            MR. CONRATH:  Well, he supervises 5,000 people,

19   some of whom gathered this.

20            THE COURT:  All right.

21            MR. CONRATH:  So I want to ask this witness about

22   numbers in here that relate to the same number that he used

23   but show subsequent months.

24            And I think I ought to be able to do that, given

25   that we got this from the --
```

```
 1              THE COURT:  Let's start with, what is this?
 2    I have no idea -- it looks like a slide slow.
 3              MR. CONRATH:  It is a slide show.
 4              THE COURT:  I need some foundation of what I'm
 5    looking at.  Who created it?  Who was it for?  When was it
 6    created?
 7              MR. CONRATH:  That's what we've asked them to
 8    provide, and they haven't provided it to us yet.  So I'm
 9    stymied in that I can't --
10              THE COURT:  You're going to be deposing -- what's
11    Mr. --
12              MR. OPPENHEIMER:  Mr. Christopher, Saturday
13    morning.
14              THE COURT:  Yeah.
15              MR. CONRATH:  I want to ask him --
16              THE COURT:  Presumably, he knows that.
17              MR. CONRATH:  Let's hope so.
18              But I think and more to the point, I guess, we're
19    supposed to get tomorrow the cover emails of whatever goes
20    with it.
21              So but I want to question this witness about this
22    document.
23              THE COURT:  Well, first of all, you have no reason
24    to think he's ever seen this before, have you?
25              MR. CONRATH:  Not unless they showed it to him.
```

```
 1            THE COURT:  Do you have reason to believe he's

 2   seen these documents?

 3            MR. OPPENHEIMER:  These are not his documents.

 4            THE COURT:  So right now we're in a situation

 5   where the overwhelming likelihood is he's never seen this

 6   document before?

 7            MR. CONRATH:  I agree.

 8            THE COURT:  He doesn't know anything about its

 9   creation, who created it, what it's about?

10            Now, are you telling me that this is a document

11   that's designed in such a way that you can cherry-pick

12   something out of it and he'll understand what it is or --

13            MR. CONRATH:  Well, I think I can direct him to

14   numbers, the part of this document --

15            THE COURT:  Show me where you want to go --

16            MR. CONRATH:  Sure.

17            THE COURT:  -- because I'm a little --

18            MR. CONRATH:  Yep.

19            THE COURT:  -- confused about what we're doing

20   here.

21            MR. CONRATH:  Page 8, Your Honor.

22            THE COURT:  Page 8?

23            MR. CONRATH:  Eight.

24            Page numbers are down in the lower left.

25            THE COURT:  Lower left.
```

```
 1              Oh, I see.
 2              MR. CONRATH:  So here's the deal.  This is 2017.
 3    What Professor Carlton got from AT&T was these three
 4    numbers.
 5              THE COURT:  Well, hold on.  I want to make sure
 6    I know which ones you're talking about.
 7              MR. CONRATH:  January, April, and June.
 8              THE COURT:  Here's April.  Here's January.  Here's
 9    June.  Okay.
10              MR. CONRATH:  He picked and used to calculate
11    June, which is, as you can see, substantially the lowest at
12    that point.
13              What I want to point out to the witness is, the
14    data, as reported as of whatever the date of this document
15    is, that it went back up.
16              And my question to the witness, in essence --
17              THE COURT:  How come it doesn't -- it's August
18    2017 LTV review.
19              MR. CONRATH:  Right.
20              And I don't know that that means that it was
21    created in August.  I think not; otherwise, we would have
22    gotten it in regular discovery.  So I think it's reviewing
23    people who were signed up during August, and that review
24    comes six or seven months later.
25              THE COURT:  What is it you want to do with 886 and
```

```
 1   931?
 2              MR. CONRATH:  What I want to say to him -- so
 3   I want to point out to him, look, you picked a number that's
 4   the lowest of any on this chart.  Any number, choosing any
 5   one month is risking choosing an unrepresentative month.  He
 6   happened to choose the lowest month.
 7              THE COURT:  Hold on.
 8              Do you have any basis to believe he received all
 9   of this information --
10              MR. CONRATH:  No.
11              THE COURT:  -- from 812 back?
12              MR. CONRATH:  I believe he received only these
13   months, although that's what he's testifying to.
14              THE COURT:  January, April, and June?
15              MR. CONRATH:  Right.
16              I don't know why he didn't ask or wasn't given the
17   earlier months, but that's what he got.
18              THE COURT:  That's what hopefully what's-his-name
19   will tell you Saturday.  I don't know.
20              MR. OPPENHEIMER:  He won't.  They don't exist.
21              What exists is here.  He didn't pick this number.
22   As he testified repeatedly today, this is -- was the most
23   recent number that existed when he did his report.
24              He put all of the numbers that he had into that
25   report.  He used it as an example, the June number.  It was
```

 1   then and it had the most recent completed LTV.

 2          The other problem with this is that the government

 3   also has as a result of our overnight production, which

 4   we're happy to do and we did -- I stayed up really late.

 5          But the government also has in its position that

 6   it isn't shown on this another report that's -- because

 7   these are all the different stages done by different people.

 8   There's another report of the same type that will show you

 9   that this is going down again to about 899.  I think it's

10   899.

11          THE COURT:  In September?

12          MR. OPPENHEIMER:  In September, that's correct.

13          And so it's currently in the form of an Excel

14   spreadsheet because that's the place where they are in

15   process on it.

16          All I'm pointing out is that none of this is

17   inconsistent with the information that has been testified

18   to.  In fact, this is -- what I'm about to show you is based

19   on exactly all the material that they have, and

20   Mr. Christopher can report.

21          As you can see here, Your Honor, that what happens

22   is these things are constantly changing, although you can

23   see a trend.  These are the dates when these documents were

24   finalized, and this is one of them.

25          These are the LTV, the months that they're

1    computing the LTV for, because, as I said earlier,

2    Your Honor, they have to wait a period of time to let all

3    this stuff to see --

4               MR. CONRATH:  To see what happens.

5               MR. OPPENHEIMER:  And then you get actuals.

6               And the government has all of this information.

7    ██████████████████████    ██████████████████████████

8    ████████    ████████████████████████    ████████████████████████

9    ████████████    ████████████████████████████████    ████████████████

10   ██████████████████████████████████████

11   ████████████████████████████████████    ████████████████████

12   ████████████████████████████████████████████    ██████████████████████████

13   ████████████    ██████████████████████████████████████████████████

14   ████████    ████████████████████    ████████████████████

15   ████████████████████████████████    ████████████████████

16   ████████████████████████████    ████████████████    ████████████████████

17   ██████████████████████    ██████████████████████████████████

18   ████████████████    ██████████████████████████

19               The latest one he had is exactly what he testified

20   to, which is June.

21               The problem with all this is that Mr. Christopher

22   can talk about all this stuff.

23               This witness did one thing, did exactly what he

24   said.  He said, give me the same records you gave to

25   Mr. Shapiro.  He was given those records.  The most recent

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2594

1    one of those was June.

2          But he did give all three that he had in that year

3    in his work diagrams.  Those are the facts.

4          THE COURT:  Do you want to ask him how his

5    calculation would be different if the last number he had was

6    886 or 931 versus 812?  Is that what you want to ask him?

7          MR. CONRATH:  I really want to ask him, I would

8    say, essentially, two points.  To pick any one month you're

9    potentially getting at outlier, and you say you filed

10   Professor Shapiro's methodology and he looked at three

11   months; you picked one month and it happened to be the

12   lowest.  That's fair cross-examination.

13         MR. OPPENHEIMER:  First of all, he's asked most of

14   the questions he's just described.  The witness gave the

15   answer that he gave, which didn't make a hill-of-beans

16   difference to him.  He explained why.

17         Clearly, he didn't cherry-pick.  He took the most

18   recent.  And in his work papers, he gave the government and

19   Professor Shapiro all these other numbers.  They're all

20   there in his report.  They're hiding in plain sight.

21         THE COURT:  Look, as far as I'm concerned, you can

22   ask him how his calculations would have been any different

23   if he had had these numbers.

24         He didn't have these numbers.

25         MR. CONRATH:  Right.

1          THE COURT:  He's testified to that, and

2    I don't want to waste time on that.

3          But he's never seen this information.

4          MR. CONRATH:  Correct.

5          THE COURT:  This is information he's never seen.

6    So you can represent to him that these are new numbers that

7    have just been provided to the government and ask him how

8    ████████████████████████████████████████████   █████

9    ███████████████████████████

10        ██████████████████   █████████████████   ██████████

11   ██████████████████████████

12         THE COURT:  You can ask him how it would have been

13   different if he had had those.  Ask him that.

14         MR. OPPENHEIMER:  And, Your Honor --

15         THE COURT:  I'm not introducing this into

16   evidence.  There's no foundation for it.

17         MR. OPPENHEIMER:  Just to be clear, according

18   these notes, these are all --

19         MR. CONRATH:  Those are all drafts.

20         MR. OPPENHEIMER:  Those are all drafts.

21         So this is just a --

22         THE COURT:  So these are drafts?

23         MR. CONRATH:  These are drafts.

24         MR. OPPENHEIMER:  Correct, they're drafts.

25         THE COURT:  Well, I don't --

1          MR. OPPENHEIMER:  It's a very hypothetical

2     exercise.

3          THE COURT:  I'll tell you what.  We're going to

4     take an afternoon break again.  You've used an hour and 45

5     minutes.  You still have 45 minutes to get your two and a

6     half hours.

7          MR. CONRATH:  I don't think I'm going to use all

8     of it.

9          THE COURT:  You can use all of it, but you used --

10          MR. CONRATH:  I'll definitely use the most

11     substantial part of it.

12          THE COURT:  So think about -- if it's a draft, I

13     mean, I don't want you going into draft numbers.  Because we

14     don't have enough information right now on this record as to

15     how accurate these are, how complete they are, how final

16     they are.

17          As far as the numbers he did use, if you want to

18     confront him and ask him how he got the numbers he --

19     ████████████████████████████    ████████████████████

20          MR. OPPENHEIMER:  Maybe I can just short-circuit

21     this.  He's already just testified literally on the stand

22     that he could have used either January or April and it

23     wouldn't have made a difference.

24          Those numbers are substantially higher than any of

25     these other numbers Mr. Conrath has identified.  By an

1   operation of logic, if won't make a difference.  You know

2   what answer you're going to get.

3           MR. CONRATH:  Well, my point is he's testified

4   that they're on a huge drop.  And what we actually see is

5   this is something that goes up and down.

6           The most recent trend was, first, down.  And then

7   based on the draft, based on what they know now, the best

8   available information about these two months is they're

9   going up.  This one is slightly down --

10          THE COURT:  Down.

11          MR. CONRATH:  -- showing my point that what's

12  really going on is this is an area in which there's up and

13  down.  And he's picked the lowest available number and done

14  his calculations on that.

15          MR. OPPENHEIMER:  And he's testified it wouldn't

16  matter if he used these numbers which are much higher.  Then

17  he said, by definition, it wouldn't matter which of these --

18          THE COURT:  We know from testimony why he chose

19  812 over the other two:  It wouldn't have made a difference.

20  You can ask him those questions, absolutely ask him those

21  questions.

22          All right?  You still have 45 minutes left; then

23  we will do redirect and recross.

24          You've got about, I think, combined half hour on

25  redirect, 15 and 15.  And you'll have a half hour -- I mean,

1   you'll have 15 minutes.

2          All right.  Take a recess.  Take the document back

3   from the witness --

4          MR. CONRATH:  Okay.

5          THE COURT:  -- if he has it.  Does he have this

6   already?

7          MR. CONRATH:  Yes.  I'll take it back from him.

8          THE COURT:  Take it back.

9          (Open court)

10          THE COURT:  All right, Counsel.  We're going to

11   take a brief recess.

12          Witness remains a witness under oath.  Refrain

13   from discussing your testimony with anyone.  You know the

14   rules.  We'll see you back here in 15 minutes.  We'll be

15   going till about 7:00.

16          DEPUTY CLERK:  All rise.

17          This Honorable Court will now take a brief recess.

18          (Recess from 5:33 p.m. to 5:55 p.m.)

19          DEPUTY CLERK:  The United States District Court

20   for the District of Columbia is again in session, the

21   Honorable Richard J. Leon presiding.  God save the United

22   States and this Honorable Court.  Please be seated and come

23   to order.

24          THE COURT:  Witness remains under oath.

25          You may proceed.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2599

```
 1            MR. CONRATH:  Thank you, Your Honor.
 2   BY MR. CONRATH:
 3       Q    Professor Carlton, we were talking about the
 4   lifetime value calculations that went into your margin
 5   calculations.
 6            Do you understand that lifetime value calculations
 7   on a monthly basis are something that goes up and down over
 8   the course of a year?
 9       A    My understanding, there can be fluctuations in
10   LTV.
11       Q    All right.  And it would be, there's a potential,
12   if you choose just one month, to pick an unrepresentative
13   month; isn't that right?
14       A    Anything is possible.  I simply chose the latest
15   data, which is what Professor Shapiro did when -- or thought
16   he was doing.
17       Q    And if, hypothetically, the lifetime value went up
18   after you picked that data, then that would mean that a
19   calculation would have to be redone that would reflect an
20   increase in lifetime, value, right?
21       A    If there's a more-updated lifetime value and its
22   different than the one I'm using, that would or could --
23   I mean, would alter the calculations, depending on how much
24   it goes up or down.
25       Q    And am I right that you have not seen any more
```

1   recent lifetime value calculations after your February 26th

2   report?

3       A    I have seen yesterday some new lifetime value

4   calculations that were, I think, turned over to the

5   Department of Justice.  My understanding is those are

6   preliminary.

7       Q    So what did you learn about them when you saw

8   them?

9       A    My general impression was that, as you said, they

10  go up and down, but that, even when they go up -- well,

11  first of all, my general understanding is there are no new

12  finalized LTVs.  That's my first point.

13          The second point, the ones that are in process, as

14  you say, show that LTV can go up and down but that even the

15  more recent LTV values are significantly below those that

16  Professor Shapiro used and, therefore, would not alter the

17  fact that he used LTVs that were too high and that if he

18  used lower LTVs, it would eliminate a lot of his harm.

19      Q    And you recognize that if -- did you see numbers

20  that represent projections for the January 2018 number?

21      A    I believe there were, in what was shown to me,

22  projections, as well as documents that contain projections,

23  yes.

24      Q    Right.  And those projections showed an even

25  higher number than the numbers for July and August of -- and

1    September of 2017?

2        A    That I'd have to check.  Like I say, I used June

3    2017, which as I understand it, is the latest available data

4    of finalized LTVs.

5            The data I saw, as I recollect, had the

6    characteristic that even if these projections materialize,

7    it would still be the case that the LTVs were much lower

8    than what Professor Shapiro used and what period.

9        Q    And is it correct that of all the lifetime values

10   that you saw, the June numbers that you received and

11   incorporated into your report were the lowest of any month;

12   is that right?

13       A    They were the latest data I had; but as I told

14   you, I also did the LTVs for April and for January, which

15   are higher, and the same implication.

16       Q    My question is narrower.

17           I want to talk about all the numbers that you saw,

18   both before and after June, including the ones you saw just

19   in the last day or so.  The lowest, current, completed

20   draft, estimate, projection, the lowest of any of those was

21   the one that you chose to incorporate into your report; is

22   that right?

23       A    No.  Wait.  Wait.

24       Q    The June number.

25       A    My understanding, the lowest completed estimate is

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2602

1    June 2017.  That's the one I used.

2         Q    That's not my question.

3              My question is, now that you've had a chance to

4    look at some of the data in a more updated, the more recent

5    documents that you saw -- you've seen some other months, in

6    addition to June, right?  Some more recent months,

7    projections --

8         A    What you're saying is not --

9         Q    -- and current estimates?

10             THE COURT:  You better approach.

11             (Sealed bench conference)

12             MR. CONRATH:  Now it comes to light that he's

13   actually seen these documents.  So presumably --

14             THE COURT:  That doesn't surprise me.

15             MR. CONRATH:  Yeah, right.  No.  I thought I --

16             MR. OPPENHEIMER:  That doesn't change anything.

17             THE COURT:  The point is these are draft form.

18   July, August, and September are in draft form.  The ones

19   before it are in final form.  And you've made that

20   distinction.

21             MR. CONRATH:  Right.

22             THE COURT:  And he's also said that he ran the

23   numbers with the June --

24             MR. OPPENHEIMER:  To January.

25             THE COURT:  -- January and April numbers, which

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    are the higher numbers.

 2              MR. CONRATH:  So I should say there's nothing.

 3              THE COURT:  So --

 4              MR. CONRATH:  I'm sorry.

 5              THE COURT:  So he's admitted doing the

 6    calculations, not only in June but in April and January,

 7    which are higher.  So, I mean --

 8              MR. CONRATH:  I mean, I should say --

 9              THE COURT:  -- you're beating a dead horse.

10              MR. CONRATH:  I'll stop.

11              Your Honor, I would like to say there's nothing on

12    this to suggest that it's a draft.

13              THE COURT:  Wait a minute.  That's --

14              Wait a minute.  That was what we were just pulling

15    in.

16              MR. OPPENHEIMER:  No, no.  He's --

17              MR. CONRATH:  I believe the cover letter from

18    counsel said that those numbers were a draft, but just the

19    document itself doesn't say.

20              MR. OPPENHEIMER:  I don't know whether this is a

21    draft or not.  What I know is these LTVs are not finalized.

22              THE COURT:  They are not finalized?

23              MR. OPPENHEIMER:  They're not finalized.

24              And Mr. Christopher can explain all of this.

25              THE COURT:  Well, he's going to.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2604

```
 1            So I think you've made your point.  Let's move on

 2    to another topic.

 3            I caution counsel, 6:30, the air conditioning is

 4    going off.  Just be mindful of that, because things will

 5    change very dramatically at 6:30; I promise you.

 6            MR. CONRATH:  I actually have very little to, so I

 7    should wrap up relatively quickly.

 8            THE COURT:  Whatever you want.  Take your time.

 9            (Open court)

10            THE COURT:  All right.  You may proceed,

11    consistent with the discussion at the bench.

12    BY MR. CONRATH:

13        Q   Professor Carlton, one of the things you talked

14    about was the outside good.

15            Do you remember that?

16        A   I think I called the cord cutting, but the outside

17    good is fine.

18        Q   All right.  Well, the outside good would be the

19    economist's phrase for the analytic purposes, right?

20        A   I'm happy to use the word "outside good."

21        Q   Well, I actually was going to ask you about cord

22    cutter.  I just want to see if we're talking about the same

23    thing.

24            So what do you mean when you testified earlier and

25    said that cord cutters are the outside good in this market?
```

1        A    What I meant was that there are people who are

2    taking -- who are subscribed to MVPDs.  There are people who

3    subscribe to virtual MVPDs.  And then there's everybody

4    else.  Those are the three categories.

5             And that third category is an outside good, and

6    those are cord cutters.  And those represent a group of

7    consumers that AT&T could get as customers.

8        Q    All right.  So you do not include people who

9    subscribe to a virtual MVPDs as cord cutters, correct?

10       A    In my calculation of the 20 percent, that's fair.

11            That's because --

12       Q    Yeah.

13       A    -- Professor Shapiro --

14       Q    You don't need to explain.

15       A    Yeah.

16       Q    I just wanted to clarify what you meant by the

17   term "cord cutter."

18       A    Yes.

19       Q    And the source of your projection of 20 percent is

20   SNL Kagan's list of all the people who don't -- reporting of

21   all the households that don't take an MVPD service; is that

22   right?

23       A    TV households that don't take MVPDs of virtual or

24   virtual MVPDs.  And I defined it that way to be consistent

25   with what Professor Shapiro's model was doing.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q     And is the outside good the percentage of people

2  who might leave in response to a blackout and decide that

3  they wouldn't sign up with any other pay-TV provider?

4      A     The outside good is just what I described.  It's

5  the group of TV households that are not customers of virtual

6  MVPDs and MVPDs.

7      Q     Or MVPDs.

8            Right.

9            And to be -- to think about how this applies to

10  analyzing a blackout, right?

11           So is a question that you're asking -- when you

12  say the outside good or cord cutters are relevant, the

13  question you're asking is, are there people who leave the

14  company, the MVPDs that no longer carries Turner,

15  hypothetically, in the case we're talking about, and decide

16  to go to being a cord cutter?

17      A     I was using outside good just to be that third

18  category.

19      Q     Right.

20      A     And in the model, say, this merger simulation

21  model, that represent the category, for example, that's

22  relevant to AT&T.

23      Q     So you would agree -- would you agree with me that

24  if there is someone who leaves an MVPD because they don't

25  have Turner, so the MVPD has a blackout with Turner, right?

1        A    Yes.

2        Q    There are some people who are attached enough to

3   Turner that they don't want to stay with that MVPD that you

4   agree that it's unlikely that if they're so attached to

5   Turner that they want to leave the MVPDs, they're very

6   unlikely to become cord cutters?

7        A    I'd have to investigate that.

8        Q    And that you haven't investigated that?

9        A    I haven't done an investigation of the

10  substitution patterns of people in a blackout.  I chose to,

11  when I was redoing Professor Shapiro's model and altering

12  it, I was simply using his model.

13       He also didn't do an investigation of the

14  substitution patterns amongst the consumers.  He simply

15  assumed what's called a flat logit model, that he just

16  assumed it.  He didn't do any substitution analysis.

17       Q    And would you agree that it's unlikely that of the

18  people who would leave an MVPD because it drops Turner, it's

19  pretty unlikely that 20 percent of those people who are so

20  attached to Turner that they're going to leave their MVPD,

21  it's unlikely that 20 percent of them are going to go be

22  cord cutters and have no video linear service at all; do you

23  agree?

24       A    Well, I've not studied that in detail, nor has

25  Professor Shapiro.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2608

1          But what I'm doing is simply adopting his merger

2   simulation, his standard merger simulation.  And that is the

3   assumption of the demand structure he has adopted.

4          As I said earlier -- I think it was in response to

5   a question you asked, that the demand substitution in these

6   merger simulations -- I think he described them as

7   Rube Goldberg -- I said they're very simple, assumption he's

8   made.  And it's proportional substitution.

9          He hasn't tested that.  That was one of my

10  criticisms, that he simply imposed this demand structure

11  without investigating it.

12         But I didn't investigate it.

13     Q    And so you don't --

14     A    And I adopted his assumptions.  And I'm saying, if

15  you want to assume that and you want to assume proportional

16  diversion, I'm telling you there's this third category; you

17  simply are relying on Altman Vilandrie for the number, when

18  the number is actually right in Kagan.

19     Q    So your assessment, are you implicitly saying that

20  anybody who has a TV is potentially a customer for an MVPD?

21  Is that your implication?

22     A    I'm not saying anything.  I'm using

23  Professor Shapiro's model and saying, this is what your

24  substitution patterns assume.  And if you want to assume

25  that -- you haven't proven anything.  You've done no

1    investigation of that.  If you want to assume it, fine.

2          But then you have to, if you're going to use

3    shares, which is what he's using, you have to use the shares

4    of the people who are in that third category of yours.

5      Q    And your source for that --

6      A    By that "of yours," I mean of Professor Shapiro's.

7      Q    Right.  And your source for that is SNL Kagan?

8      A    Yes.  For shares, just like he's using those

9    shares for his relative market shares of MVPDs.

10     Q    Another topic.

11          If this merger goes through, other firms in the

12   industry might decide to vertically integrate as well;

13   is that right?

14     A    If this merger goes through -- well, whether or

15   not this merger goes through, other firms may decide to

16   vertically integrate.  The incentive for vertical

17   integration in this case is, I think, a reflection of what's

18   going on in the industry; namely, there's an efficiency from

19   vertical integration.

20          And I think barring -- an improper decision to bar

21   this merger, the efficiency of vertical integration will

22   continue to be an incentive that will encourage firms to

23   engage in this industry in vertical integration.

24          I think we are seeing -- we're going to see a

25   restructuring of the industry.

1          Q     And let me ask you to take this in a hypothetical

2     way.

3          Let's suppose that it turns out that you're

4     incorrect and that there actually is a benefit to vertical

5     integration in raising rivals' costs.  I understand that's

6     not your opinion, but I'm asking you a hypothetical

7     question.

8          A     Yes.

9          Q     If the merger allows some firms to benefit by

10    raising rivals' costs, then other firms could vertically

11    integrate in self-defense, right?

12         A     Well, anything could happen in a hypothetical.

13         I mean, I can assume that if you'd like.

14         Q     One of the things that you were asked about was

15    the bargaining parameter.

16         Do you remember that?

17         A     Yes.

18         Q     Right.  And the question you were asked, if I

19    recall, was whether there was any writings out there that

20    addressed the question of bargaining parameter.

21         Do you remember?  And you mentioned --

22         A     Well, I thought the question was whether

23    Professor Shapiro had done anything in this industry --

24         Q     The question you were asked by Mr. Oppenheimer

25    was, are there any writings out there that discuss

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    bargaining parameter in this industry?

2              And you gave an example of one article.

3              Do you remember that question and answer?

4        A    Yes.  Yes, I do.

5        Q    And there are other writings out there that

6    address the bargaining parameter, that use a bargaining

7    parameter in this industry; isn't that right?

8        A    That use a bargaining parameter?

9        Q    Yes.

10       A    There are -- that might well be that they use it.

11   I was referring to a study that actually estimated it.

12             MR. CONRATH:  Can we approach, Your Honor?

13             THE COURT:  Yes.

14             (Sealed bench conference)

15             MR. CONRATH:  This is my last topic, by the way.

16             So I came up because I believe the question he was

17   asked was, are there any writings out there about bargaining

18   parameter?

19             I want to ask him about a subject that's come up

20   before, and it's the Professor Murphy study, his colleague

21   at the University of Chicago, who estimated -- did a

22   negotiating model and used a 50/50 bargaining parameter.

23             And I think my question to him is does he think

24   highly of Professor Murphy.  He knows that Professor Murphy

25   used the 50/50.

2612

```
1              I think it's a perfect follow-up to the question

2    he was asked, which is, are there -- do you know of any

3    writings that are about the bargaining parameter?

4              MR. OPPENHEIMER:  Let me say, we can't go down

5    this road.

6              This is going back into the pre-acquisition, prior

7    merger scenarios.  This is a whole different report.

8              This is what we've already -- let me finish.

9              This is exactly the area that Your Honor properly

10   stopped inquiry in before.

11             Professor Carlton addressed a specific citation in

12   Professor Shapiro's own work report in this case, where he

13   had cited an article, which had a different bargaining

14   split.

15             We can't possibly go retry the other case, which

16   has nothing -- is a pre-merger case, to figure out whether

17   the use of 50/50 there was appropriate or not.  And

18   Professor Shapiro's already said that a lot of people use

19   50/50.  That's not the issue.

20             THE COURT:  Yes.  I don't want to open this

21   Pandora's box, I really don't.  I mean, I already ruled on

22   this.

23             MR. OPPENHEIMER:  Yeah.

24             THE COURT:  I don't want to revisit it now.

25             You know, if he knows something where he cited
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   Murphy, it's different, I guess.  But that's not what

 2   happened here, right?

 3            MR. CONRATH:  Not that I'm aware of.

 4            THE COURT:  It's a hypothetical.

 5            MR. OPPENHEIMER:  No, I think that's just messing

 6   this thing up.

 7            MR. CONRATH:  Okay.

 8            (Open court)

 9            THE COURT:  All right.  What's next?

10   BY MR. CONRATH:

11       Q   Professor Shapiro [sic], it's correct, isn't it,

12   that a bargaining split of 70/30 would reflect the fact --

13   would imply that Turner is powerful enough to bargain for

14   nearly three-quarters of the gains from trade?

15       A   Yeah.  First, again, I'm Professor Carlton.

16            But the -- yes, the bargaining split would mean

17   that if it were, say, 75 percent, that person would be

18   getting three-quarters of the gain from trade.

19       Q   But you've heard the testimony or learned of the

20   testimony of various Turner executives like Mr. Martin and

21   Mr. Breland that MVPDs like Mr. Ergen's Dish today drive

22   hard bargains with Turner.

23            You've heard the testimony, right?

24       A   I don't remember that specific testimony.

25   I remember reading things that both sides seem to be saying:
```

 1    Everybody is driving a hard bargain.

 2              MR. CONRATH:  May I have one moment, Your Honor?

 3              THE COURT:  Sure.

 4              MR. CONRATH:  No further questions, Your Honor.

 5              THE COURT:  All right.

 6              Redirect.

 7                      REDIRECT EXAMINATION

 8    BY MR. OPPENHEIMER:

 9         Q    Your Honor, just a few questions.

10              Professor Carlton, I have documents that I could

11    use to refresh your recollection, but perhaps it won't be

12    necessary.  But if it is, I can do so.

13              You were asked some questions about the effect of

14    a certain long-term contract by one of the entities.  And

15    you were, the point was made that this is a single entity

16    with the longest-term contract.

17              Do you have that entity in mind from what I've

18    just asked you?

19         A    Yes.

20         Q    Do you recall, without my having to refresh you

21    with documents, the percentage reduction in harm resulting

22    from taking that single contract and its actual duration

23    into account?

24         A    I once recollected it since I told you what it

25    was, but you better show me the document so I don't misstate

 1    it.  My recollection, it was a lot.

 2            MR. OPPENHEIMER:  Your Honor, may I approach the

 3    witness with two documents.  We'll provide them to the Court

 4    as well.

 5            THE COURT:  What's the identification?

 6            MR. OPPENHEIMER:  Your Honor, the identification

 7    is -- there are two.

 8            The first is PXD011-2.  It's a demonstrative that

 9    was used yesterday in court by the government.

10            And a second is PXD011-10, also a demonstrative

11    used yesterday in court by the government.

12            THE COURT:  All right.

13    BY MR. OPPENHEIMER:

14        Q    So, Professor Shapiro [sic], what I'd like to do

15    is have --

16        A    Carlton.

17        Q    -- is have you take a look at -- I'm sorry.

18    Pardon me.

19            Is this refreshing --

20        A    I have a respect for Mr. Shapiro, but I don't --

21        Q    I so apologize.

22        A    I don't want to be him.

23        Q    I so apologize.  I cannot tell you how much

24    I apologize.

25            So do you see the PXD001-2?  This was a

1    demonstrative entitled "Predicted Turner Monthly Fee

2    Increases for Rival MVPDs, 2016, Market Configuration."

3         A    Yes.

4         Q    And if you look at the -- for confidentiality

5    reasons, I will not call out names, but do you see the

6    entity that is listed at the top?

7         A    Yes.

8         Q    And do you see the total change in affiliate fee

9    per month which Professor Shapiro is projecting to be the

10   price increase?

11        A    Yes.

12        Q    All right.  And if you then look at -- well, if

13   you multiply that out, is that roughly $200 million a year?

14        A    You're asking me to multiply out the number on the

15   far right --

16        Q    Correct.

17        A    -- in the first row times 12?

18        Q    Yes.

19        A    Yes.

20        Q    Okay.  So roughly 200 million.

21             Now, may I direct your attention to the second

22   document I gave you, PXD011-10.  This also, from

23   Professor Shapiro's report, predicted net change in MVPD

24   annual Turner costs.

25             MR. OPPENHEIMER:  Your Honor, this is the diagram

1   that was given of the net harm -- the net benefit from EDM

2   and the total harm in orange.

3   BY MR. OPPENHEIMER:

4       Q    Do you have that in front of you, Professor?

5       A    Yes.

6       Q    All right.

7            So would I be correct that we would take the

8   change from that contract that I identified that comes from

9   the first entrant on a prior document?  That's the

10  $200 million change.

11      A    Yes.

12      Q    And in order to understand the impact of holding

13  the contract price protection so that that change, in fact,

14  did not occur because of the contract, would we, in fact,

15  reduce the harm to rivals on PXD011-10 from $587 million --

16  would we reduce that number by $200 million?

17      A    Yes.

18      Q    And would we retain the blue bar, which is the EDM

19  effect, the benefit of the merger, at $352 million?

20      A    Yes.

21      Q    And then can you see there how that affects the

22  net harm, which is, in Professor Shapiro's report, projected

23  to be $235 million, how this one contract reduces that?

24      A    Yes, by --

25      Q    And would I be correct that it reduces that amount

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    to approximately, from 235 million total harm to

2    $35 million?

3        A    Yes.

4        Q    And, again, this is just one contract?

5        A    Correct.

6        Q    And does that translate to roughly a 5-cent,

7    leaving roughly a 5-cent projected price increase instead of

8    a 27-cent price increase?

9        A    I think that sounds right.  That should be in one

10    of the calculations I do here.

11        Q    And that's just a single contract and the contract

12    that you were asked about during your examination?

13        A    Yes.

14        Q    Okay.  Just a couple of very quick additional

15    questions.

16        You were asked some questions in a hypothetical

17    about your view of the industry and whether there would be

18    self-defense vertical mergers of some kind.

19        When you answered that question, were you

20    answering that you factually believed that was your

21    assessment that that would occur, or were you simply

22    accepting the premise of the hypothetical?

23        A    The premise was?

24        Q    That there would be vertical defensive mergers.

25        A    I thought I was asked the question, if this merger

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2619

```
 1    occurs and it's anti-competitive, would there be other

 2    mergers in response in order to protect yourself?

 3           And I'm saying that could happen; that could not

 4    happen.  Depends, depends on the circumstances.

 5      Q    And you obviously haven't formed a judgment about

 6    that at this point?

 7      A    I've not investigated that because I don't think

 8    the hypothetical is an accurate statement of conditions in

 9    this industry.

10      Q    All right.  And you were asked some questions

11    regarding some regional -- actually, strike that.

12           MR. OPPENHEIMER:  Your Honor, I have no further

13    questions.

14           THE COURT:  All right.

15           Recross?

16           MR. CONRATH:  Very briefly, Your Honor.

17                           - - -

18                    RECROSS-EXAMINATION

19    BY MR. CONRATH:

20      Q    Professor Carlton, you agree with the proposition

21    that was in defendants' pretrial brief that distributors and

22    programmers have complex, combative, and constant

23    negotiations?

24      A    Could you read that once more.

25      Q    Sure.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2620

1          Defendants' pretrial brief, page 5, says that

2   video distributors and programmers have complex, combative,

3   and constant negotiations.

4          Do you recognize that?

5     A    I read the briefs.  I don't remember that specific

6   language.

7     Q    Do you agree with the proposition that

8   distributors and programmers have constant negotiations?

9     A    I agree they're negotiating and they each want to

10  get a better deal, as in any transaction between two

11  businesses.  But I don't know what to add to that.

12    Q    Let's focus on the constant part.  Let's take an

13  example.

14         You know that DirecTV launched its over-the-top

15  service, DirecTV Now, in November 2016, right?

16    A    I have to check the exact date, but I think what

17  you say squares with my recollection.

18    Q    And during the six, eight, ten months before that,

19  they negotiated the rights that would let them put the

20  programming onto their over-the-top service, right?

21    A    I'm happy to accept that.

22    Q    Okay.  But not all of their contracts expired

23  during that period, right?

24    A    I don't believe so.

25    Q    So they had to go back to someone with whom they

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2621

1    had an already-signed contract with an ask in hand, saying,

2    I want this new right.  They had to do that during the life

3    of the contract, right?

4        A    I think the answer to your question is yes, from

5    the way you phrased it.  But if you're asking me if

6    businesses -- if business one is dealing with business two

7    on some particular product, might it not also then be

8    dealing with it on another product?  That's possible.

9        Q    Right.

10            And so you have talked about -- so there can be

11   renegotiations within the life of an existing contract,

12   right?

13       A    There can be, even for the same product.

14       Q    If one side needs something, the other side has an

15   opportunity to use whatever bargaining leverage they have to

16   get something in return; is that right?

17       A    Anytime there's a negotiation, people can use

18   bargaining leverage, and then you have to consider the

19   long-term reputation of two parties.

20            If you and I sign a contract and the next day,

21   I think you're trying to do something, take advantage of me,

22   the next time I have to buy something, I'm not going to be

23   so eager to go to you.

24       Q    Well, we're talking about parties who by and large

25   need each other, right?

1       A    I don't know.

2            "Need" is a matter of economic -- that depends on

3  the economics.

4            And my point is the reputation of two parties to

5  behave in a certain way matters a lot in terms of each

6  party's willingness to deal with that party, rather than

7  seeking out someone or cutting back how much you rely on

8  that party and switching over to a more-reliable party, if

9  you think someone is going to take advantage of you.

10      Q    So the fact that there's a contract with a certain

11  term doesn't preclude the possible use of bargaining

12  leverage if there are interim negotiations during the life

13  of that contract, correct?

14      A    Bargaining -- bargaining leverage occurs anytime

15  you bargain.

16           MR. CONRATH:  All right.  No more questions.

17           THE WITNESS:  That depends whether you need to

18  bargain or not and re-open a contract; that will depend.

19           If you sign a contract with me and there's some

20  terms in the future that we know we're going to negotiate

21  and I know -- let's say you sign the contract with me and

22  you think Carlton is dishonest; you're not going to be so

23  eager to sign with me.

24           So, yes, bargaining leverage matters.  Your

25  reputation matters.  If I think you're going to take

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2623

1    advantage of me later in the contract, I will take that into

2    account at the outset.

3        Q    And just to stick with the question, the question

4    is, if there's renegotiation, because one side needs

5    something additional from the other side, that's an

6    opportunity for bargaining leverage, right?

7        A    Yes and no.  It depends.

8            If I think that you're going to be dishonest and

9    take advantage of -- not dishonest but going to take

10   advantage of me in the future, right now, I'm going to say,

11   Mr. Conrath, I don't trust you in the future to be a fair

12   partner.  I think you're going to try and take advantage of

13   me.

14           So right now, when we have more equal leverage,

15   we're going to set the conditions into the future as to how

16   contracts get re-negotiated.

17           So that's why, for example, in many industries, if

18   you deal with a supplier, you might specify, this is what

19   I want if I need repair parts.  This is what I want if I

20   want a second-generation model.  You specify all that out.

21   So all that is considered upfront.

22           So the mere fact that there could be renegotiation

23   in the future doesn't mean you can be taken advantage of.

24   You'll anticipate if you're going to be taken advantage of,

25   and that will affect your willingness to deal with the party

 1    initially.

 2        Q    And it's correct, isn't it, that in this industry,

 3    there are constant negotiations?

 4        A    In many industries, there can be constant

 5    negotiations.  It's going to depend on the circumstances.

 6             MR. CONRATH:  All right.  No more questions,

 7    Your Honor.

 8             THE COURT:  You're excused.

 9             THE WITNESS:  I'm excused?  Great.

10             Thank you.

11             THE COURT:  Have a nice day.

12             I'll see the parties.

13             (Sealed bench conference)

14             THE COURT:  All right.  Having fun yet?

15             MR. CONRATH:  Couldn't be better.

16             THE COURT:  Awesome.

17             Okay.  So any news or update on --

18             MR. CONRATH:  Yes.  Mr. Holanda can be here on

19    Tuesday.

20             THE COURT:  He's the morning?

21             MR. CONRATH:  Well, I need to -- I think my goal

22    would be to have a time certain to put him on, if we can,

23    so --

24             MR. PETROCELLI:  Wait a second.  I have Mr. Bewkes

25    scheduled.  So he's going to be a very short witness, right?

```
 1              MR. CONRATH:  I think Holanda is less than an
 2      hour.
 3              MR. PETROCELLI:  On your direct?
 4              MR. CONRATH:  Yes.
 5              MR. PETROCELLI:  He should come after Mr. Bewkes,
 6      then.
 7              He's the chairman and CEO, and I had a prior
 8      arrangement that if he could go on first thing on Tuesday
 9      morning.
10              MR. CONRATH:  I had a prior arrangement for
11      Mr. Holanda on Friday.  So --
12              MR. PETROCELLI:  I didn't negate it.
13              THE COURT:  Hold on.  Hold on.  We'll solve this
14      problem.
15              So what are the odds that Rossi and Katz will be
16      done on Monday?  Pretty high, on direct and cross?
17              MR. PETROCELLI:  I think a good chance we'll
18      finish.
19              MR. CONRATH:  I think so, yes.
20              MR. PETROCELLI:  It might be --
21              THE COURT:  Especially if we go long.
22              MR. PETROCELLI:  Oh, for sure.  For sure.
23              And they're two out-of-town experts too.
24              THE COURT:  Okay.
25              Now, Christopher, as you said, I think,
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2626

```
 1   three-quarters of an hour?

 2          MR. PETROCELLI:  Yes.  Direct will be less than a

 3   half an hour.

 4          MR. CONRATH:  Probably similar.  I mean, we

 5   haven't -- you know.

 6          THE COURT:  You deposed him.

 7          When do you want to do Bewkes -- in the

 8   morning? afternoon?

 9          MR. PETROCELLI:  No.  I want to get him off and on

10   in one day, so I would ask that we call him right after

11   Mr. Christopher.

12          MR. CONRATH:  So now we're putting Mr. Holanda

13   potentially off beyond the end of the day.  So what if

14   Christopher came another day?

15          MR. PETROCELLI:  We can put Holanda right in front

16   of Bewkes instead, and I can do Mr. Christopher after

17   Mr. Bewkes because I have more flexibility with him.

18          THE COURT:  Okay.

19          MR. PETROCELLI:  So why don't we do that?

20          MR. CONRATH:  That works.

21          MR. PETROCELLI:  Okay.  So we'll go next to

22   Holanda first thing Tuesday morning and then Mr. Bewkes.

23          I would say a total of -- what did you say, maybe

24   45 minutes with Holanda?

25          MR. CONRATH:  I'd say an hour, just to be safe.
```

```
 1            MR. PETROCELLI:  A total of a half hour on cross.

 2            THE COURT:  And for you, what do you think you

 3    need with Holanda?

 4            MR. CONRATH:  With Holanda, I think an hour.

 5            And I should say, I think there's potential

 6    confidentiality issues that's going to potentially slow this

 7    down, but I've got to go back and see how much.

 8            THE COURT:  So you're in a confidentiality

 9    situation, hypothetically?

10            MR. CONRATH:  So there is one -- so we've come a

11    long way through this since the last time I spoke with him

12    and his counsel.  We've learned how much we can do.  But my

13    recollection is that there's one event that is not amenable

14    to the "look at this number" sequence.

15            THE COURT:  And how long is Bewkes' direct?

16            MR. PETROCELLI:  One hour.

17            THE COURT:  Say again.  An hour?

18            MR. PETROCELLI:  Yep.

19            THE COURT:  Cross about the same?

20            MR. CONRATH:  Yeah.

21            MR. PETROCELLI:  And the next witness would be

22    David Christopher.

23            THE COURT:  Okay.

24            MR. PETROCELLI:  And then I only have two

25    witnesses left.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2628

```
1              THE COURT:  Mr. Stephenson.

2              MR. PETROCELLI:  Stephenson and Stankey, probably

3    in the reverse order, definitely in the reverse order.

4              MR. CONRATH:  Okay.

5              MR. PETROCELLI:  I think so.

6              THE COURT:  How long for --

7              MR. PETROCELLI:  Well, I think Stankey's direct is

8    an hour.

9              MR. CONRATH:  Probably similar.  It might be an

10   hour and 15 minutes, but it's probably similar.

11             MR. PETROCELLI:  Yeah.  These are in that

12   ballpark, Judge.  They could be 50 minutes.  They could be

13   70 minutes.  But I think an hour is a good average.

14             MR. CONRATH:  Yeah.

15             THE COURT:  Same with him?

16             MR. PETROCELLI:  Same with him, yeah.

17             THE COURT:  So --

18             MR. PETROCELLI:  I don't anticipate --

19             THE COURT:  So you might be done Wednesday?

20             MR. PETROCELLI:  We'll leak into Thursday, would

21   be my guess.

22             THE COURT:  Yes.  No problem.

23             And then Thursday --

24             MR. CONRATH:  Yeah.

25             THE COURT:  -- if you rested --
```

```
 1              MR. PETROCELLI:  Right.

 2              THE COURT:  -- rebuttal case could start.

 3              MR. PETROCELLI:  Yes.  We're very anxious because

 4      we don't want to lose Thursday and Friday, Your Honor.

 5              THE COURT:  Wait a minute.  Friday --

 6              MR. CONRATH:  There might be someone who wants to

 7      lose Friday.

 8              MR. PETROCELLI:  Oh, you're joking.  I see.

 9              THE COURT:  Continuing negotiations.

10              MR. PETROCELLI:  I just want to get the rebuttal

11      case over with.

12              THE COURT:  You can start thinking ahead a little

13      bit, Mr. Petrocelli.  You've got to start thinking ahead

14      because of the clock.

15              MR. PETROCELLI:  Well, Your Honor, that's

16      exactly --

17              THE COURT:  Seven-day clock.

18              Now --

19              MR. PETROCELLI:  I have another clock on my mind,

20      too, Judge.

21              THE COURT:  I know that.  You've got to be

22      thinking ahead.

23              So if we go, if we start the rebuttal case

24      Thursday, how much time did you need, two days?

25              MR. CONRATH:  I think I need two or two and a
```

```
 1   half.  And obviously, I was not planning for Thursday yet,
 2   so I'm going to readjust.
 3              THE COURT:  So if you did two and a half,
 4   hypothetically speaking, all day Thursday, all day Monday,
 5   half a day Tuesday.  I go to New York.  You rest.  The clock
 6   starts running seven days -- one, two, three, four, five,
 7   six, seven.
 8              MR. PETROCELLI:  That's perfect.
 9              THE COURT:  Closing arguments, you wanted to do
10   this day?
11              MR. PETROCELLI:  Correct.  That's perfect.  That
12   is perfect, Your Honor.  It's what we agreed to, end of
13   April.  It works perfectly.
14              MR. CONRATH:  That works.  I mean, seven days from
15   whenever is fine with us.
16              THE COURT:  That seven is a goal.
17              You finish your rebuttal case by 1:00 on the 24th,
18   because my train to New York is like at 2:00.
19              MR. CONRATH:  Okay.
20              So I just -- I've been planning to do the rebuttal
21   case here, here, and here, so I've got to adjust.
22              THE COURT:  You didn't think you'd have Thursday.
23              MR. CONRATH:  Exactly.  And so my ability to round
24   everybody up is limited.  But we'll get on it.  We'll get on
25   it.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              But I just wanted to leave that note of caution.

 2              THE COURT:  It's continuing negotiations.

 3              MR. CONRATH:  Yes.

 4              THE COURT:  Continuous.

 5              MR. CONRATH:  Constant, constant.

 6              MR. PETROCELLI:  Your Honor, you have all the

 7    leverage, though.

 8              MR. CONRATH:  Well, that's true.

 9              THE COURT:  Don't try to be gentlemanly about

10    this.

11              I'd rather not use Friday if I don't have to.  But

12    if I have to, I will.

13              MR. CONRATH:  I'm in 100 percent agreement with

14    not using Friday.

15              MR. PETROCELLI:  If we start off Thursday, it

16    works.

17              THE COURT:  I think the clock is in your

18    advantage, both of you.

19              MR. CONRATH:  Sure.

20              THE COURT:  If we finish at 1:00 on the 24th --

21              MR. CONRATH:  Yeah, sure.

22              THE COURT:  -- that gives you the seven days.

23    Gives you plenty of time to clear your head in terms of the

24    closing arguments; get to do the closing arguments on the

25    30th, which your CEO, I believe, CEOs are available for.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. PETROCELLI:  They are.

 2              THE COURT:  I'm sure Mr. Delrahim will be

 3    available that day.

 4              MR. CONRATH:  That would be my guess.  Makes

 5    perfect sense to me.

 6              THE COURT:  That's the way we'll do it.

 7              Sleep on it, obviously.

 8              MR. CONRATH:  Makes sense.

 9              MR. PETROCELLI:  I'm all in on that, Judge.

10              THE COURT:  Talk to your colleagues and think it

11    through and have a cold beer.

12              MR. PETROCELLI:  I'm thinking we'll have no more

13    than two hours each on closings.

14              THE COURT:  I think that's all you need, frankly.

15    I don't think you need more than that.

16              MR. PETROCELLI:  No, no.

17              MR. CONRATH:  No, no.  That's plenty.

18              MR. PETROCELLI:  That's plenty, Judge.

19              MR. CONRATH:  That's the limit of my vocal cords,

20    which actually are -- already seem to be a little shy.

21              THE COURT:  You don't need more than that.

22              MR. CONRATH:  No, no.  Absolutely not.

23              THE COURT:  You know, you've got to do your

24    25-page brief.

25              MR. CONRATH:  Yep.
```

```
 1            THE COURT:  That'll be due the same day as your
 2    closings --
 3            MR. CONRATH:  As the other stuff.
 4            THE COURT:  -- and findings of fact.
 5            MR. PETROCELLI:  Okay, Judge.
 6            MR. CONRATH:  Thanks very much.
 7            THE COURT:  Have a great weekend.
 8            MR. CONRATH:  We will.
 9            (Open court)
10            THE COURT:  All right.  We will reconvene on
11    Monday morning.  The government does have one more witness,
12    but he is not going to be available until Tuesday.  So we
13    will continue to go forward out of order, technically
14    speaking.
15            The defense has two other experts that'll be on
16    the stand on Monday.  And then first thing Tuesday morning,
17    the government's last witness will be available.  And he
18    well take the stand then.
19            And then the defense will have continuation.  They
20    have a couple more witnesses that day.  So we'll be moving
21    forward with the defense case at that point.
22            The government will be resting sometime Tuesday,
23    probably around lunchtime or something like that.
24            So get your rest, Counsel.  Have a good weekend.
25            DEPUTY CLERK:  All rise.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1            His Honorable Court will stand in recess until the

2    return of court.

3            (Proceedings concluded at 6:41 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-titled matter.


Date: April 13, 2018_____      /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )          CV No. 17-2511
                                   )
                                   )          Washington, D.C.
          vs.                      )          April 16, 2018
                                   )          10:50 a.m.
AT&T, INC., ET AL.,                )
                                   )          Morning Session
          Defendants.              )
_____)               Day 14


TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                             Eric D. Welsh
                             Donald G. Kempf, Jr.
                             Scott A. Scheele
                             Frederick S. Young
                             Samer M. Musallam
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Washington, D.C. 20530
                             (202) 532-4560
                             craig.conrath@usdoj.gov
                             eric.welsh@usdoj.gov
                             donald.kempf@usdoj.gov
                             scott.scheele@usdoj.gov
                             frederick.young@usdoj.gov
                             samer.musallam@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

                                      Katrina M. Robson
                                        O'MELVENY & MYERS LLP
                                        1625 Eye Street, NW
                                        Washington, D.C. 20006
                                        (202) 220-5052
                                        krobson@omm.com

Daniel M. Petrocelli
M. Randall Oppenheimer
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067
(310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Michael L. Raiff
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
(214) 698-3350
mraiff@gibsondunn.com

For Defendant
Time Warner, Inc.:

Kevin J. Orsini
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1140
korsini@cravath.com
pbarbur@cravath.com

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

Court Reporter:                     William P. Zaremba
                                    Registered Merit Reporter
                                    Certified Realtime Reporter
                                    Official Court Reporter
                                    U.S. Courthouse
                                    333 Constitution Avenue, NW
                                    Room 6511
                                    Washington, D.C. 20001
                                    (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

\- \- \-

WITNESS INDEX

\- \- \-

WITNESSES          DIRECT CROSS REDIRECT RECROSS

DEFENDANT'S:

MICHAEL KATZ, Ph.D. 2643  2698
MICHAEL KATZ, Ph.D. 2646

```
1                    P R O C E E D I N G S

2            DEPUTY CLERK:  All rise.  The United States

3   District Court for the District of Columbia is now in

4   session, the Honorable Richard J. Leon presiding.  God save

5   the United States and this Honorable Court.  Please be

6   seated and come to order.

7            Good morning, Your Honor.  We have Civil Action

8   No. 17-2511, the United States of America v. AT&T, Inc.,

9   et al.

10           Counsel for the parties, please approach the

11  lectern and identify yourself for the record.

12           MR. YOUNG:  Good morning, Your Honor.  Fred Young

13  for the United States.

14           THE COURT:  Good morning.

15           MR. MUSALLAM:  Good morning, Your Honor.

16  Samer Musallam for the United States.

17           THE COURT:  Welcome.

18           MR. WELSH:  Good morning, Your Honor.  Eric Welsh

19  for the United States.

20           THE COURT:  Welcome back.

21           MR. CONRATH:  Good morning, Your Honor.

22  Craig Conrath for the United States.

23           THE COURT:  Welcome back.

24           MR. CONRATH:  Thank you.

25           MR. SCHEELE:  Good morning, Your Honor.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    Scott Scheele appearing on behalf of the United States.

 2              THE COURT:  Welcome back.

 3              MR. KEMPF:  Good morning, Your Honor.  Don Kempf

 4    for the United States.

 5              THE COURT:  Welcome back.

 6              MR. PETROCELLI:  Good morning, Your Honor.

 7    Daniel Petrocelli for defendants.

 8              THE COURT:  Welcome back.

 9              MS. ROBSON:  Good morning, Your Honor.

10    Katrina Robson for defendants.

11              THE COURT:  Welcome back.

12              MR. OPPENHEIMER:  Good morning, Your Honor.

13    Randy Oppenheimer for the defendants.

14              THE COURT:  Welcome back.

15              MR. BARBUR:  Good morning, Your Honor.

16    Peter Barbur for Time Warner.

17              THE COURT:  Welcome back.

18              MR. ORSINI:  Good morning, Your Honor.

19    Kevin Orsini for Time Warner.

20              THE COURT:  Welcome back.

21              MR. RAIFF:  Good morning, Your Honor.  Mike Raiff

22    for AT&T and DirecTV.

23              THE COURT:  Welcome back.

24              All right.  Is the defense ready to proceed?

25              MR. PETROCELLI:  We are, Your Honor.
```

```
 1              We call Professor Michael Katz.

 2              Mr. Barbur will be handling the examination.

 3              THE COURT:  All right.

 4              DEPUTY CLERK:  Good morning, sir.  Would you

 5    please raise your right hand.

 6              (Witness is placed under oath.)

 7              DEPUTY CLERK:  Please be seated.

 8              MR. BARBUR:  Your Honor, we have some binders and

 9    materials.  May I hand those out?

10              THE COURT:  You may.

11              Good morning.

12              THE WITNESS:  Good morning, Your Honor.

13              THE COURT:  We've got lots of binders around here.

14              THE WITNESS:  Occupational hazard.

15              THE COURT:  Yes.  Take a look at them.

16              MR. BARBUR:  May I approach the witness,

17    Your Honor?

18              THE COURT:  Sure.  You may.

19              MR. BARBUR:  May I proceed, Your Honor?

20              THE COURT:  When you're ready.

21    MICHAEL KATZ, Ph.D., WITNESS FOR THE DEFENDANTS, HAVING BEEN

22    DULY SWORN, TESTIFIED AS FOLLOWS:

23              DIRECT EXAMINATION ON QUALIFICATIONS

24    BY MR. BARBUR:

25         Q    Good morning, Professor Katz.  Could you please
```

```
 1   state your name for the record.

 2        A    Michael Louis Katz.

 3        Q    And what is your educational background?

 4        A    I have an undergraduate degree from Harvard that I

 5   received in 1978, and then I have the equivalent of a Ph.D.

 6   from Oxford University that I got in 1982.

 7        Q    What is your current position?

 8        A    I'm the Sarin Chair Emeritus in Strategy and

 9   Leadership at the University of California, Berkeley, in the

10   business school.

11             I'm also an Emeritus professor in the Economics

12   Department at Berkeley.

13             And in addition to that, I'm a senior fellow in

14   the Office of Healthcare Transformation in the Ministry of

15   Health in Singapore.

16        Q    What are your academic areas of expertise?

17        A    Broadly in industrial organization, and

18   specifically within that, antitrust and regulation.

19        Q    Have your works been published?

20        A    Yes.  I have approximately 90 articles that

21   appeared in academic journals, as well as some journals that

22   are more practitioner-oriented, covering a wide range of

23   subjects.

24        Q    Have you held any positions in the

25   U.S. Government?
```

1        A        Yes.  I've held two.  I was chief economist at the

2    Federal Communications Commission in '94 and '95 and parts

3    of '96.  And then I was also the Deputy Assistant

4    Attorney General for antitrust analysis at the Department of

5    Justice in 2001, 2002, a little bit of 2003.

6        Q        Your position at the Department of Justice, is

7    that the same position that Professor Shapiro and Carlton

8    have held?

9        A        Yes, it is.  I guess there are almost as many of

10   us as there are binders.

11              THE COURT:  Not possible.

12   BY MR. BARBUR:

13       Q        How many times have you testified at trial?

14       A        I've testified in seven matters at trial.

15       Q        Can you give us some examples.

16       A        Well, one recent one was I testified, I was

17   retained by the U.S. Department of Justice in litigation

18   against American Express.

19       Q        And were all of those antitrust or competition

20   matters?

21       A        They all involved antitrust or competition issues.

22   A couple of them actually had to do with the licensing and

23   the use of benchmarks, but then competition issues arose

24   within that.

25              And other ones involved competition and also

1  regulatory issues.

2       Q    Have you ever been disqualified as an expert?

3       A    No, I have not.

4       Q    And have you ever testified in this courthouse?

5       A    Yes, I have.  I testified in a merger matter in

6  front of Judge Collyer almost 20 years ago.

7            MR. BARBUR:  Your Honor, defendants offer

8  Professor Katz as an expert in the fields of antitrust

9  economics and industrial organization.

10           THE COURT:  Any objection?

11           MR. YOUNG:  No objection, Your Honor.

12           THE COURT:  He'll be so recognized.

13           You may proceed with him as an expert witness.

14                          - - -

15 MICHAEL KATZ, Ph.D., WITNESS FOR THE DEFENDANTS, SWORN

16                   DIRECT EXAMINATION

17                          - - -

18 BY MR. BARBUR:

19      Q    Professor Katz, what were you asked to do in this

20 matter?

21      A    I was asked to assess the effects of Turner's

22 arbitration commitment and the FCC's program access rules on

23 Professor Shapiro's theory that the merger is going to lead

24 to higher prices of Turner programming and, thus, harm

25 consumers.

1     Q    What materials did you review in preparation for

2  your testimony today?

3     A    So I read deposition transcripts.  I reviewed

4  academic literature.  I reviewed expert reports submitted by

5  some of the plaintiff's witnesses.

6         I reviewed some documents that have been produced

7  in this matter.  I've reviewed the trial transcript.

8         In the case of Professor Shapiro, I attended court

9  and listened to his testimony live.

10     Q    What is your review regarding Professor Shapiro's

11  claim that consumer prices will rise as a result of this

12  merger?

13     A    Well, I mean, simply put, I think it's incorrect.

14         I think there's several concerns I have with his

15  analysis.  But, most fundamentally, in terms of what I've

16  looked at, is his failure to account for the effects of

17  arbitration.

18         He's -- I believe, Your Honor, you heard this last

19  Wednesday.  He testified that he held it aside and it's not

20  in his analysis; and I think that's a fatal error, because

21  if you think about how Professor Shapiro's overall approach

22  works, he says he has a theory for why he believes Turner

23  will raise its prices to other distributors.  Well, the

24  arbitration addresses that.

25         Now, there's another part of Professor Shapiro's

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2648

1    theory.  He says there are going to be benefits from the

2    elimination of double marginalization.

3              So what happens is arbitration -- I believe the

4    economic evidence shows and the evidence shows arbitration

5    is going to hold down those price increases.  Arbitration is

6    not going to get in the way of the double marginalization

7    savings.

8              So when you build that into Professor Shapiro's

9    model, what you get is no harm from the merger, but benefits

10   from the merger.  And then his own models say that those

11   benefits get passed through to consumers, and the merger

12   will generate hundreds of millions of dollars of benefits

13   for consumers.

14             So, as I say, just fundamentally, I think his not

15   taking arbitration into account means his model doesn't give

16   us insight into what this merger is going to do.

17   Q    So are you saying that you believe

18   Professor Shapiro's analysis is correct but for his

19   treatment of arbitration?

20   A    No.

21             And I want to be clear, because I think this is

22   probably going to come up repeatedly this morning.

23             I have not done a de novo analysis of this merger.

24   What I have done is focused on Professor Shapiro's claims

25   regarding the Turner prices.

1          Now, I think that's a reasonable place to focus,

2     because that's the only place where he's attempted to

3     quantify the effects of the merger on competition or

4     consumers.

5          And what I've done is largely accept

6     Professor Shapiro's analysis at face value and then just

7     focused on changing just the one part.

8          As Your Honor, I'm sure, remembers, Thursday, you

9     heard a lot from Professor Carlton saying how much he

10    disagrees with the other elements.

11         THE COURT:  Yes.

12         THE WITNESS:  But I'm saying, okay, let's not pile

13    on.  Let me deal with this different issue.  Let me focus on

14    arbitration.  And also we'll come back, I'm sure, a little

15    bit to program access rules.

16         But I'm not accepting that the rest of what

17    he said is right.  Professor Carlton has some concerns, and

18    there are some areas I've looked at where I'm quite certain

19    he's incorrect.  But I'm going to largely take it just to

20    simplify things.

21    Q    So how does your analysis of arbitration differ

22    from Professor Shapiro's analysis?

23    A    I guess to be blunt, I've analyzed and he hasn't.

24    He's explicitly said he's holding it to the side and not

25    building it into his models.

1       Q    So let's discuss how this arbitration commitment

2   by Turner is going to work.

3            First of all, will AT&T also be subject to this

4   arbitration commitment?

5       A    I mean, I'm not a lawyer, but my understanding is

6   they will be.  And certainly the Turner letter that went out

7   to all of its distributors has a sentence that says, AT&E

8   has agreed they're going to be bound to this.

9            So in my work, I've certainly assumed that they

10  will be.

11      Q    So at a high level, what is your understanding of

12  what Turner and AT&T have committed to do?

13      A    Well, so at the highest level, they've committed

14  to final-offer arbitration with fair market value as the

15  standard, which is to say that each party will make an offer

16  to the arbitrator.  They'll put it in front of the

17  arbitrator, and the arbitrator has to pick one offer or the

18  other.

19           So unlike conventional arbitration, in final

20  offer -- it's also known as baseball style -- the arbitrator

21  has to pick one or the other.

22           And then the other critical component -- and I

23  know, Your Honor, you've already heard about this -- is the

24  standstill agreement.  And the pending the arbitration,

25  there won't be a blackout.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q    So has baseball arbitration been used outside of

2    the context of baseball?

3    A    Yes.  That's the most famous use of it.

4         But it's also used, for example, with

5    public-sector employees in many states that often they don't

6    have the right to strike; so instead, they submit to

7    final-offer arbitration or baseball-style arbitration.

8         And then closer to home, the FCC has included

9    final-offer arbitration provisions in several of its orders

10   in response to vertical -- transactions leading to vertical

11   integration of programmers and distributors, one of the most

12   notable ones being Comcast-NBCU.

13        And in the case of Comcast-NBCU, one, just the

14   FCC, as Your Honor knows better than I, the Justice

15   Department also sought arbitration provisions with

16   baseball-style arbitration.

17   Q    What are the benefits of baseball arbitration as

18   compared to other forms of arbitration?

19   A    Well, as I said, you know, if you think about it

20   compared to conventional arbitration, where what people saw

21   happening is -- well, that's where the arbitrator can craft

22   a compromise and can do something that neither side

23   suggested.

24        What people seem to think was happening was the

25   arbitrator would split the difference.  So then the thing

1   is, if you know they're going to split the difference, what

2   should I say to the arbitrator, I want this.  Well, okay.

3   I want this and I want this.

4          And so the concern was that people would put in

5   really unreasonable offers because, oh, it's just to mess

6   with the arbitrator.

7          Well, what's different?

8          Well, with final offer, if you put an offer -- if,

9   you know -- suppose this is we know where the right answer

10  is.  And then if you put it something way over here, it's

11  not that it moves the arbitrator.  It makes the arbitrator

12  say, okay, you're saying this wrong; the other side wins.

13         So it creates this incentive for both sides to

14  come to more to the middle, because you don't want to be

15  seen by the arbitrator as having put in an unreasonable

16  offer.

17         So there are a couple of benefits of doing that.

18  So, one, it makes the arbitrator's job easier, because

19  instead of this and this, okay, you're in closer.  But it

20  also makes it more likely the parties are going to settle,

21  because they say, well, wait a minute; we're not that far

22  apart.

23         And I think one of the things I suspect you will

24  be hearing from me a bunch this morning, the questions, is

25  that when we talk about the effects of arbitration and the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    benefits that it has, it doesn't mean the arbitration

 2    actually has to occur.  It's knowing that the distributor

 3    has the option to arbitrate.  So you're going to hear a

 4    bunch about bargaining in the shadow of arbitration.

 5           So it's knowing it's there is going to be really

 6    important.  And so if the parties know, yes, we could end up

 7    going to an arbitrator and all these things could happen,

 8    you know, if we do get to arbitration, there's pressures to

 9    settle.

10           But there's also then incentives to settle even if

11    you never get there.

12    Q    So let's talk about the specific effects of

13    arbitration in the matter at hand.

14           Is arbitration relevant to the government's theory

15    of harm regarding Turner's prices?

16    A    Yeah, I think it's extremely relevant, because

17    Professor Shapiro's theory really boiled down is that Turner

18    will have more bargaining leverage from blackouts after the

19    merger than it would if the merger didn't occur.  So it's

20    all about more leverage in blackouts.

21           Well, if a distributer invokes the arbitration

22    option that Turner's committed to giving them, if they

23    invoke it, there's no blackout during the negotiation.

24           So it takes away the whole mechanism that

25    Professor Shapiro hypothesizes.  It's central to it.

1        Q    And would that be true even if the distributor

2   does not invoke arbitration?

3        A    Yeah.  This comes back to what I was just saying.

4   As long as both sides know the distributor has that option,

5   they'll take that into account when they're bargaining.

6             And, in fact, that's happened.  There are cases

7   where the distributors -- in the case in the case of

8   Comcast, because you have the arbitration, the distributor

9   will say to Comcast, look, you know, we want a more

10  reasonable offer from you -- i.e., one better for me -- or

11  we're going to invoke arbitration.

12            So yeah.  It doesn't have to actually happen.

13  It's knowing it's there.  It's a tool.

14       Q    So if the government were correct that the merger

15  will create incentives for Turner to raise its prices, would

16  you expect arbitration to be effective at limiting those

17  price increases?

18       A    Yes.

19            And, again, I'm not agreeing that those price

20  increases would incur absent arbitration.  But even if we

21  suppose they would, yeah, I expect arbitration to be

22  effective here.

23            I mean, you've got a situation where you're going

24  to have parties on both sides that are sophisticated; they

25  know the industry.  I mean the fact is they're in the

1    business of negotiating.

2           They'll be able to -- both sides can hire lawyers

3    and consultants.  And I just think there's a lot of

4    information they're going to be able to bring to the

5    arbitrator.  These arbitrators are professionals.  They're

6    professionals with experience.

7           So I think there's every reason to expect the

8    arbitration to work well, if you actually get to it, at a

9    achieving fair market value.  And then knowing that, I think

10   you'll get fair market value even before you get to

11   arbitration.

12       Q    So you mentioned fair market value.  Does the

13   contract laying out the Turner arbitration commitment

14   specifically define fair market value?

15       A    No, it doesn't.  It doesn't offer a formal

16   definition.

17          Now, I believe that both as matter of economics

18   and also, I don't know, maybe real -- I don't want to

19   distinguish between economics and reality.  I do think they

20   go to together.

21          But there are a couple of reasons, though, to say,

22   here's what it means.

23          So in terms of what I would call, say, this

24   economically natural interpretation, is you say, well, why

25   do we have the arbitration here?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1              We have it because what Turner and AT&T have said

2       is, we don't think there's a problem with price increases;

3       but just in case someone's worried they are, we will make

4       this commitment to our distributors to ensure we don't have

5       them.  These are merger-driven price increases.

6              So the natural interpretation is fair market value

7       is, what would happen if the merger hadn't occurred?  Which

8       is, they keep the parties' bargaining power, their leverage,

9       act as if it's the same as it would have been absent the

10      merger.

11             Now, of course, defendants' position is, well,

12      actually, that's -- you don't need to do anything because

13      the bargaining power is going to be the same after the

14      merger.

15             But the fair market value concept would say to the

16      arbitrator, that's what you're trying to do is replicate the

17      balance of power absent the merger.

18             Now, I said I think that makes sense economically

19      because that's looking at the context here.

20             But also, it makes sense because this is what's

21      happened with the FCC.  As I said, the FCC has had

22      arbitration, baseball-style arbitration, in several orders

23      in response to vertical integration.  And they've said, in

24      those arbitrations, arbitrator, look for fair market value.

25             And as far as I know, they have never offered a

1    formal definition of fair market value.  But they have said,

2    in multiple orders, the reason we're doing this, the reason

3    we're imposing arbitration and fair market value is because

4    we want to preserve the pre-transaction or pre-mergers'

5    balance of bargaining power.  So the FCC is saying the same

6    thing that I'm saying economics says.

7        Q    In your opinion, will an arbitrator be able to

8    determine fair market value?

9        A    Yes, I think they will, for the reasons I said

10   before, so I won't labor it.

11        But all the things about why I expect arbitration

12   to work well, when I'm saying it works well, what I mean is

13   it will get to fair market value.

14       Q    What are benchmarks?

15       A    So there are different ways -- you know, you can

16   ask this question, well, how do we get to fair market value?

17   How do you -- what arguments would I make to an arbitrator?

18   Let's put it that way.

19        There's sort of two broad approaches.  One is I

20   could sort of build things from the ground up.  And I expect

21   parties to do some of that.  And I would expect that a

22   distributor could say, look, you know, here's how much the

23   programming is worth to us, because really this is not that

24   much because we don't think many people are going to leave.

25   Or they'll have things that -- here's our business

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    considerations; this is how much we'd be willing to pay.

2           Then another approach is to say, let's look at

3    comparables, okay?  And that's what people mean by

4    benchmarks.  You say, well, let me find something that I can

5    point to that's a similar situation.

6           And I think in this case, these arbitrations,

7    there's a lot of benchmarks.  You can think of several

8    classes of them.

9           So, one, is you would look at what were the Turner

10   contracts -- the terms of the contracts, what were they like

11   before the merger?  And then let's bring those terms up into

12   the present.  We can do that by looking at what's changing

13   in the industry, looking at what's happened with other

14   contracts.

15          Another thing you could do is you could just go

16   look at contracts the distributor has with other

17   programmers.  And you say -- and then they say to the

18   arbitrator, okay, look, we may have to make some

19   adjustments.  But people in the industry do that all the

20   time.  That's a part of how they get ready for negotiations

21   now.

22          So let's look at what's happening with other --

23   this distributor with other programmers.

24          And then, of course, you can also look, and Turner

25   could well say, well, let's look at Turner contracts with

1    different distributors.

2           So there are lot of different benchmarks people

3    can put in.  Well, you might say, well, isn't this going to

4    be overwhelming the arbitrator, and that's where it's going

5    to be up to the parties to say, This is why these benchmarks

6    are the ones that matter, and here's why you should focus on

7    them.

8        Q    So do distributors have benchmarks beyond their

9    prior contracts with programmers?

10       A    Beyond -- well, I mean, they certainly have these

11   benchmarks.  As I said, they're going to have other

12   information, and they're going to have ways to use that and

13   then to update the benchmarks.

14          As I said, they're going to have information about

15   their own cause.  They're going to have set-top box data.

16   I know, Your Honor, you've heard a bunch about that.  The

17   distributors know a lot, who's the ones who are up to date

18   with how the industry operates.

19          They know a lot about their customers' viewing

20   habits.  So they've got a lot of information they can bring

21   to help adjust the benchmarks and make things comparable.

22       Q    Does arbitration need to work perfectly for every

23   distributor in order for the merger to tend to lead to lower

24   consumer prices?

25       A    No.  I mean, it doesn't.

2660

1          First off, I think the evidence in economics shows

2     that arbitration is going to work very well for all the

3     distributors.

4          But it doesn't have to flip Professor Shapiro's

5     findings on their head.

6          First off, if it worked sort of imperfectly for

7     everybody, that could be enough.

8          But I think the most dramatic way to see it is

9     this.

10         Suppose you thought Professor Shapiro was right

11    and that for every distributor, except for the two biggest

12    cable companies, which are Comcast and Charter, suppose you

13    thought that Professor Shapiro's price increases were going

14    to occur according to the way his model says, and you said,

15    you know what?  Let's just throw arbitration out of the

16    picture.  We're going to get Professor Shapiro's price

17    increases.  But I'm not giving away everything here,

18    Your Honor.

19         Let's suppose arbitration does work for Comcast

20    and Charter, which I think is a completely reasonable

21    assumption -- not assumption, conclusion.  I'll talk about

22    why.

23         If arbitration just works just for Comcast and

24    Charter but not for anybody else, Professor Shapiro's models

25    say that the merger will be good for consumers.

2661

1          And the reason for that is -- it seems surprising

2   so few; but, I don't know if you remember, Your Honor, but

3   on Wednesday, one of his demonstratives was a chart showing

4   projections of harm and it broke down by distributors.  What

5   that chart shows is almost a third of all of the harm that

6   Professor Shapiro's predicting comes from Comcast.

7          And so what's happening is -- and then if you

8   look, next, that the huge chunk of it is coming from

9   Charter.

10          And so it's the one -- Your Honor, it's the one

11   where it's like there was -- he had more than one, but

12   there's like a table.  And it will say something like

13   Comcast, and then the final column will show something like

14   16 million a month.  And then he'll have some where.

15          MR. YOUNG:  Objection, Your Honor.  May we

16   approach?

17          THE COURT:  Yes.

18          You can step down.

19          (Sealed bench conference)

20   ██████████   ████████████████████████

21   ███████████████████████████████████████████

22   ██████████████████████████   █████████████

23   ██████████   ██████████████████

24   ██████████   ████████████████████████████

25   ████████   ████████████████████████

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

2662





1

2

3

4

5

6

7

8

9

10

11

12      (Open court)

13      THE COURT:  All right.  Why don't we adjust the

14 question a little bit to deal with the confidentiality issue

15 that the government has raised, the potential issue.

16 BY MR. BARBUR:

17      Q    So we're focusing on your conclusions about

18 Comcast and Charter.  And without revealing specific numbers

19 or percentages from Professor Shapiro's chart, can you

20 explain your opinion.

21      A    Okay.  I would like to clarify one thing on the

22 confidentiality, because there are percentages.

23           The percentage I was referring to, the

24 percentage -- and I won't repeat the number, but the

25 percentage of the harm that's accounted for by Comcast is

1    not the percentage that's shown on that chart, it's not the

2    percentage that are confidential.

3            Professor Shapiro testified, I believe, in open

4    court, on the numbers in the final column.  And I was just

5    dividing numbers on the final column.

6            So to -- and I understand that the percentage

7    price increases are confidential, and I was not referring to

8    those.

9            THE COURT:  Yeah.  I think that was the column

10   that was treated as -- he didn't reveal that, but I think

11   you're -- my recollection is the same as your recollection

12   as to the actual numbers in the ultimate column on the

13   right.  That's the column over here.

14           THE WITNESS:  That's right.

15           And I think the problem is, you can -- just as a

16   matter of arithmetic, you can do one column or the other;

17   but if you do both, then people can work back to guess at

18   some other stuff.

19           So I was just doing -- the percentage I was

20   talking about, Your Honor, since you have it in front of

21   you, I was just talking about, if you look -- and I won't

22   say them, but those numbers of harm --

23           THE COURT:  Just for the record, this is PXD011-2

24   for identification.

25           THE WITNESS:  Okay.  Let me just make the point

 1   since you have it in front of you, hoping I'm remembering

 2   correctly.

 3          As you see, the harm is really where the big

 4   distributors are.  And the point I presume we're going to

 5   make and I'm going to get questions on is really just saying

 6   this:  The harm is with the big distributors.  That's where

 7   the money is to the subscribers.  That's also, though, where

 8   the sophistication is on the other side, the distributors'

 9   side.  Those are the people who can take care of themselves.

10          And, in fact, you know -- so let's start with

11   Comcast, because they're the big one.  You know, again, it's

12   a sophisticated company.  They know the industry.  They know

13   what's going on in this industry, they can hire good lawyers

14   and consultants, they can do these things.

15          And not only that, but Mr. Rigdon -- and I haven't

16   memorized his title, but he's basically their chief

17   programming buyer.  He said, Comcast is not worried about

18   this merger harming them.  So that says, well, you don't

19   even need the arbitration.

20          But he's also said that he thinks that arbitration

21   can -- could potentially give him some benefit by holding

22   it.

23          So I think this notion that this harm with Comcast

24   is going to occur in the face of the arbitration, I just

25   think it's unfounded, okay?

1          Now, Charter, it's a little different.  I hope

2    I don't mispronounce his name too badly.  Mr. Montemagno has

3    testified at trial that he has some concerns about

4    arbitration.

5          THE COURT:  I remember that.

6          THE WITNESS:  Okay.

7          But his concerns, I think, speak to his issue,

8    because, remember, we're talking about Professor Shapiro's

9    theory of Turner pricing.

10         So as I understood his testimony, right, he was

11   concerned it didn't cover HBO.  And he said it didn't cover

12   certain regional sports networks.

13         Okay.  Well, that's irrelevant for asking, will it

14   work for Turner?

15         But another thing he said is he said, well,

16   I don't like this arbitration because it doesn't guarantee

17   I'll get as good a rate as others get.

18         Well, that's true; it doesn't.  As far as I said,

19   there's no guarantee to say, Charter guess what.  You get as

20   good a deal as everybody else.  But that's has nothing to do

21   with whether there's a merger or not.  Negotiation doesn't

22   guarantee that Charter gets as good a rate as everywhere

23   else.

24         So I have to say, I didn't understand his

25   objections as they would apply to Turner.

1            And then the other thing I would note is that in

2    the case of Comcast-NBCU in the arbitration provisions,

3    I believe he testified to this as well -- Charter has used

4    the threat of arbitration to sort of unblock or get their

5    negotiations going.  So they actually have used it, at least

6    in bargaining in the shadow, with Comcast.

7            So, again, my conclusion is, given the size and

8    sophistication of Charter and their knowledge of the

9    industry and all they can bring to the arbitration, that

10   it's a reasonable conclusion as to arbitration is going to

11   work with Charter as well.

12           And as we said, because Professor Shapiro's harm

13   is so concentrated on the big ones, just those two points

14   would be enough to flip his results and say that the

15   merger -- his own analysis would say the merger benefits

16   consumers.

17   Q    Okay.  So you have talked about Comcast and

18   Charter.  Let's talk about some other distributors.  Have

19   you considered whether arbitration would be effective for

20   Dish?

21   A    Yes.  I believe it would be.

22           And, you know, I don't want to sound like a broken

23   record here, other than maybe I should invoke Charlie Ergen.

24           But clearly, Dish is a company that knows how to

25   negotiate.  It's going to get it in and mix it up and do

 1    things.

 2              So I would expect, you know, again, the

 3    arbitration to work for disk Dish.

 4              And, in fact, Dish has been a proponent of

 5    arbitration.

 6        Q    Has Dish supported arbitration in the past?

 7        A    Yes.  They have.  They publicly stated they favor

 8    it.

 9        Q    And have you prepared a demonstrative exhibit

10    relating to some of Dish's statements about arbitration?

11        A    Yes, I have.

12        Q    So let's turn to what has been marked for

13    identification as DXD0120 in your binder.

14              Do you have that in front of you?

15        A    Yes, I do.

16        Q    Could you just walk through these quotes.

17        A    I'm going to ask you to hold on so Your Honor can

18    be on the same page, because I think they also need -- it's

19    a bit out of the order.  There's another demonstrative

20    first.

21        Q    It's the second of the two demonstratives in your

22    binder, Your Honor.

23        A    It says across the top "Dish Statements."

24              THE COURT:  Yes, tab 120.

25              MR. BARBUR:  Yes.

1          THE COURT:  Okay.  Lot of tabs around here too.

2   Tabs, binders.

3          THE WITNESS:  At least the tab is less of a threat

4   to fall on you than a binder.

5          THE COURT:  You're not kidding.

6   BY MR. BARBUR:

7      Q    So, Professor Katz, can you just walk through

8   these quotes that you put on this demonstrative and give us

9   your takeaways from them.

10     A    Okay.  So overall, what they're doing is saying

11  that Dish, in fact, has supported the use of baseball-style

12  arbitration or final-offer arbitration with Comcast, the

13  same type we're talking about here with Turner.

14          So the first one is an earnings column.  That's

15  Charlie Ergen, the CEO and founder of Dish, saying that

16  they've -- pointing out that they have been supporters of

17  it.

18          And he's saying this -- you know, on this one,

19  maybe it doesn't matter that it's an earnings call.  But,

20  generally, you'll see his statements, three of these four

21  are his statements, you're on an earnings call, where, it's

22  my understanding, he's under an obligation to be truthful.

23          And then in the second one, you see he's again

24  talking about baseball arbitration, just like we're talking

25  about here.  He's talking about the Comcast version.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        I believe he's misspoken here in that he said in

2   the consent agreement.

3        MR. YOUNG:  Objection, Your Honor; foundation.

4        THE COURT:  All right.

5        If you have some questions on foundation, that

6   would be good.

7   BY MR. BARBUR:

8   Q    Can you just maybe rephrase your answer,

9   Professor Katz.

10  A    I'm afraid I don't understand the objection, so

11  I don't know what I did wrong.

12       MR. YOUNG:  Your Honor, may we approach?

13       THE COURT:  Yes.

14       (Sealed bench conference)

15       MR. YOUNG:  I don't know Professor Katz's

16  foundation could be for saying that it would be that

17  Mr. Ergen misspoke.

18       MR. BARBUR:  I can ask him his foundation if you

19  want.

20       THE COURT:  Look, these are posts from earnings

21  calls that -- I'm not sure off the top of my head if they

22  have already been admitted into evidence, the earnings

23  calls.  That is not the quote.

24       But if the earning calls was introduced into

25  evidence, then the quote's obviously within the earnings

1    calls.

2         MR. YOUNG:  Mr. Barbur, do you know if these have

3    been admitted?

4         MR. BARBUR:  No.  They were used on

5    cross-examination, I believe, of Mr. Schlichting.  I think

6    they were admitted into evidence.  This is a demonstrative.

7    It's not being admitted into evidence.

8         THE COURT:  Yes, but you're asking him basically

9    to lead the quote into the answer.

10        MR. BARBUR:  No.  I was actually asking him to

11   explain the significance of what he takes away from these

12   quotes.  That was the question.

13        THE COURT:  All right.  Well, then, you won't have

14   him reading the quotes into the record.

15        MR. BARBUR:  And I would not.

16        THE COURT:  So now, your problem relates to what

17   specific comment that he made?

18        MR. YOUNG:  Professor Katz was in the middle of

19   saying that I believe Mr. Ergen misspoke what he said.  And

20   I can't fathom what the foundation would be for him to be

21   able to say that.

22        THE COURT:  He misspoke on an earnings call?

23        MR. YOUNG:  I don't know if --

24        THE COURT:  Is that what he was alluding to?

25        MR. YOUNG:  I don't know what statement here he --

1   Professor Katz thought that Mr. Ergen misspoke about.

2            THE COURT:  Well, why don't you start from the

3   beginning and get him to put on the record, if you can, the

4   basis for him to say that he misspoke and under what

5   circumstances he did misspeak, if that's his position.

6            MR. YOUNG:  Okay.  Will do.

7            THE COURT:  All right.

8            (Open court)

9            THE COURT:  Re-ask the questions, consistent with

10  the discussion at the bench.

11  BY MR. BARBUR:

12       Q    So Professor Katz, we're talking about DXD0120,

13  and you were walking through this.  And I think the concern

14  was when you mentioned that you thought Mr. Ergen had

15  misspoke.

16            So without going back through that, could you just

17  explain your takeaways from these quotes on the chart.

18       A    Let me just clarify.

19            When I said "misspoke," what I mean is I believe

20  that the statement that says that -- about the -- never

21  mind.

22            So the statement there is he's saying that

23  baseball arbitration is something that works well, and he's

24  also pointing out --

25            MR. YOUNG:  Objection, Your Honor.  May we

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  approach?

 2         THE COURT:  No.  I'm going to permit that.

 3         Go ahead.

 4         THE WITNESS:  I thought I was just being --

 5         Right.  He says it's worked very well in the

 6  marketplace.

 7         Anyway, I think it speaks for itself.

 8         The third quotation --

 9         THE COURT:  Don't read the quotation.

10         THE WITNESS:  Okay.  Yeah.  That's it.

11         I'm just saying the third one is from a press

12  release that they put out.

13         MR. YOUNG:  Objection, Your Honor.  May we

14  approach?

15         THE COURT:  No, not yet.

16         Go ahead.

17         THE WITNESS:  Okay.  And it's just having a quote

18  to say that, again, it's showing that they've publicly

19  stated that they think it works well.  And, in fact, this

20  press release that it's attributable to Mr. Schlichting, it

21  gives a series of quotations praising it where they're

22  calling for the use of final-offer arbitration.  And it says

23  you can attribute the quotes to Mr. Schlichting.

24         So, again, what I take away from this is that they

25  have said and that they mean that they want to have

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    final-offer arbitration or baseball style.  They think it
 2    works.
 3            And then the last quotation is a long one; but
 4    it's, they're doing the same thing.  It talks about how
 5    when --
 6            MR. YOUNG:  Objection, Your Honor.  Before we move
 7    to the last quote, may we approach with a hearsay objection,
 8    please?
 9            THE COURT:  Well, we haven't reached a point where
10    there's any basis for a hearsay objection, so you can sit
11    and wait until we get to that point.
12            Go ahead.
13            THE WITNESS:  So, again, the last one --
14            THE COURT:  You're not going to read it in.
15            THE WITNESS:  No.
16            The last one is providing maybe a little more
17    detail of their views.  But, again, they're saying --
18    they're saying that there's arbitration available through
19    the Comcast-NBCU.  It's actually FCC order, the one they're
20    talking about here.
21            And they say, look, this has worked out well for
22    us because it ensures there's not a blackout and, again,
23    that they can get a fair outcome.
24            So what I'm taking away from these is that -- my
25    analysis is Dish should like arbitration, and it provides
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    benefits for them.

2            And then all I'm saying here is that's what

3    they've said in public.  They're announcing that they've

4    actually sought to have arbitration, both -- in some cases,

5    it was already there, like Comcast-NBCU, because the FCC did

6    it.

7            But then they also called on it.

8            Mr. Schlichting called for it.  He said, look, we

9    don't have baseball arbitration here.  It hasn't been

10   opposed by anyone.  But we -- you guys, talking to the

11   tribute, you guys should use it with us because it's good

12   stuff.

13           So I just take it for it corroborates my finding

14   that Dish likes it.

15           THE COURT:  That's your impression?

16           THE WITNESS:  Yes.

17   BY MR. BARBUR:

18       Q    So in addition to talking about arbitration, has

19   Dish ever actually used this kind of baseball arbitration?

20       A    Well, yes.  One of the things Dish -- one of the

21   things they did is under the FCC order, there's a process if

22   you're dealing with Comcast-NBCU if you want to arbitrate.

23   And Dish filed a notice of arbitration to move ahead.

24           But then the parties, as economics would suggest,

25   is typically what happened, the parties ended up settling.

1    But Dish did use it as a tool.  They started down the

2    process.

3         Q    So what are your conclusions as to whether

4    arbitration would be effective for other MVPDs?

5         A    So, again, my conclusion is that, overall,

6    we would expect it to be effective, right, for those MVPDs

7    that bargain.  It turns out there are some tiny, little ones

8    that are just done completely differently.  And

9    I don't think -- Professor Shapiro's model doesn't even

10   speak to those because it's not bargaining.

11        But, you know, other ones, I think the big ones

12   can take care of themselves, and the small ones can join

13   buyer cooperatives.  There are at least four in the

14   industry, including one very large one.  So I think

15   arbitration will work well essentially across the board.

16        Q    So are there any data analyses or studies that

17   support your conclusion that arbitration would be effective?

18        A    Yes.

19        And, again, Your Honor, you heard some of this or

20   maybe a bunch of this from Professor Carlton last Thursday.

21   But he's done a study looking at what happened with

22   Comcast-NBCU after the merger.

23        And what his study found was that the combination

24   of arbitration, program access rules, market forces, all

25   those things together, you can't disentangle them.  But they

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2677

```
 1   all were sufficient to prevent measurable harm or the sorts

 2   of price increases that Professor Shapiro's approach would

 3   have predicted.

 4           And then there's also another study that's been

 5   done by a former FCC economist who is no longer at the FCC,

 6   but he's also done an analysis similar to what

 7   Professor Carlton did, again, reaching the conclusion

 8   that --

 9           MR. YOUNG:  Objection, Your Honor.  May we

10   approach?

11           THE COURT:  Yeah.

12           (Sealed bench conference)

13           MR. YOUNG:  Your Honor, the study by

14   Professor Carlton is in the record.  I don't know what

15   Professor Katz has to offer on that.

16           But in particular, with the other study that he's

17   referring to, it's hearsay; it's outside the record.  He

18   hasn't described anything about it.  And he's offering it

19   for the truth of the matter that there were no changes.

20           THE COURT:  Go ahead, Mr. Barbur.

21           MR. BARBUR:  I disagree.  This is classic 703

22   reliance material.  He's relying on it as an expert.  He's

23   not offering it for the truth of the matter asserted.

24           THE COURT:  I didn't have that impression either.

25   I think he's just stating like what was in his mind as to
```

1    why he reached the conclusions he reached.

2           That study is not -- like you say, it's not in

3    evidence.  So it's not part of the record in the case.

4           MR. BARBUR:  It was disclosed in his expert

5    report, but it's not here.

6           Very well, Your Honor.  Thank you.

7           (Open court)

8           THE COURT:  I'm going to continue, consistent with

9    the discussion at the bench.

10   BY MR. BARBUR:

11      Q    So you were talking about this Dr. Ford, the

12   former FCC economist.  What were his conclusions?

13      A    Just to be clear, yeah, he's a staff economist at

14   the FCC.

15          And then he also had concluded -- sort of the

16   bottom line is that there was an evidence of excessive

17   Comcast price increases.  And I then take away from that

18   that it shows that the combination of the arbitration

19   provisions, the other regulations in place, I mean, was

20   sufficient.

21          But it didn't, as far as I know, you can't

22   disentangle just the arbitration.

23      Q    So have any government authorities concluded that

24   granting an arbitration option to distributors is effective

25   in limiting anti-competitive price increases?

1      A     Well, yeah.  I mean, both the FCC and the

2  Department of Justice have spoken in favor of having

3  arbitration as a means of preventing anti-competitive price

4  increases.

5      Q     And did you also prepare a demonstrative exhibit

6  relating to these statements?

7      A     Yes, I did.

8      Q     And that's going to -- DXD0119 at tab 119 in your

9  binder.

10          And as with the Dish quotations, you don't have to

11  read these into the record, Professor, but please just give

12  us your high-level takeaways from these statements.

13      A     So I'll give Your Honor a chance.

14          So what I would actually say, it's the same

15  takeaway from both, because each quotation has the same

16  structure.

17          First, they say that arbitration has worked well

18  in the past, in dealing with vertical mergers and potential

19  concerns.

20          And then, second, each of them predicts that it

21  will work well for Comcast-NBCU, which as we just mentioned

22  with Professor Carlton, I suggest that, in fact, they were

23  right to be optimistic, that the arbitration they were

24  seeking would, in fact, coupled with everything else going

25  on, would be sufficient.

1      Q    So are the Turner arbitration procedures similar

2   to the Comcast-NBCU procedures that the DOJ and FCC said

3   were effective?

4      A    Yes, I think they are, you know, in many of the

5   fundamental ways.

6           I mean, they're both baseball-style arbitration,

7   and they both had standstill provisions.

8           They're both -- the FCC and Turner ones are fair

9   market value as the standard.

10          As I understand, in both sort of the timing of

11  discovery and things in each case, the parties, they put

12  their final offers in -- you put your final offer in before

13  you know the others.

14          I think there may have been some confusion by some

15  witnesses or may have been in deposition, thinking that

16  somehow going second was an advantage here.  And it's not,

17  because, even if Turner goes second, they don't get to see

18  the other offer.  So to an economist, it's as if they put

19  them in at the same time, okay?

20          And then you have discovery.  And my reading of

21  the rules of the FCC arbitration, it's the same.  So who

22  knows what, when is the same in both.  And as I said, the

23  objective is the same.  The overall structure the same.  So

24  they are similar overall.

25     Q    So switching gears a little bit, is there any

1    reason to think that these procedures will be biased in

2    favor of one side over the other?

3          A    No.

4               I mean, I think what the evidence says is that

5    they'll be unbiased.

6               Now, what I mean by unbiased is it will work well

7    on average.  Okay?  I'm not saying that the arbitration --

8    if we actually get to arbitration -- and I would expect to

9    see very few actual arbitrations, mainly expect bargaining

10   in the shadow.

11              But if you do see them, economics doesn't predict

12   it.  I'm not saying that the arbitrator is going to get it

13   exactly right every time.

14              But I think what it does say and what I'm saying

15   is we expect it to be right on average, and that's what I

16   bean by unbiased.

17              And why that's important, first of all, it's

18   clearly bad to be biased.  But it's also important, because

19   when the parties bargain in the shadow of arbitration, they

20   don't know which way -- if it is going to happen to not be

21   exactly right, they're not going to know which way it's

22   going to go.  They're going to say, okay, on average, it's

23   going to get fair market value.

24              And what that means, then, if we're bargaining in

25   the shadow, is the distributor is going to say, why would I

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2682

```
 1    accept something worse than fair market value?  Because
 2    I can go get arbitration.
 3              And so it's going to then put that floor; it's
 4    going to protect the distributor.
 5         Q    Can the parties also bargain after the distributor
 6    has exercised its arbitration option?
 7         A    Yes.
 8              My understanding is the parties can continue to
 9    bargain right up to the point that the arbitrator issues a
10    ruling.  And, of course, I think technically they could keep
11    bargaining afterwards if they wanted, but --
12         Q    So are you aware that some of the witnesses who
13    have testified at the trial have expressed concerns about
14    how arbitration would work?
15         A    Yes, I am.  I've read the trial transcript.
16         Q    Did you have a reaction to Ms. Fenwick's testimony
17    that her firm, Cox Communications, would not use
18    arbitration?
19         A    Well, I guess I had two reactions.  One was that
20    it struck me that Ms. Fenwick, I think, at least her -- let
21    me just say her understanding of how the arbitration would
22    work and mine are very different.
23              She seemed to be very concerned that arbitration
24    was very limited in terms of what the arbitrator would take
25    into account or how the arbitrator would interpret fair
```

1    market value.  And that's not my understanding of how it

2    works.

3              The arbitrator is supposed to assess the entire

4    contract and its fair market value.

5              Maybe in some ways it's not surprising that she

6    hasn't dug into it because they have -- if Your Honor

7    approves the merger, they'll still have seven years from

8    then to decide whether or not to take the option.  At that

9    point, they can dig in and learn about it.

10             But, A, I think she's somewhat confused about it.

11             And the other thing, though, is that Cox has asked

12   the DOJ to have an arbitration provision if the merger goes

13   through, which suggests that Cox thinks it could be useful

14   and that they might want to use it.

15       Q    All right.  Mr. Montemagno of Charter testified

16   that he wouldn't know the terms of Turner's other contracts

17   when he makes his final offer.

18             Do you agree with him that there's an imbalance of

19   information favoring Turner?

20       A    No.

21             I think that the accurate description is that

22   there will be a balance of information where there will be

23   some things, in each case, one side will know some things

24   the other one doesn't.

25             So the distributor will know about their contracts

```
 1   with other programmers.  Turner will know about its

 2   contracts with other distributors.

 3          There's other information, such as the set-top

 4   box, that the, you know, just the distributor will know.

 5          So each side is going to know some stuff prior to

 6   discovery the other one doesn't.  But I don't see there

 7   being a big imbalance in that.  They each have access to

 8   some benchmarks that others don't.

 9          And then when you get to actually making the

10   arguments to the arbitrator, you'll have had discovery, so

11   they'll be even more balanced.

12     Q    So at the time of making their cases to the

13   arbitrator, will the distributor and the programmer have the

14   same information?

15     A    Yes, because that will be post discovery.

16     Q    Was the extent to which each side had information

17   in arbitration the same in the Comcast-NBCU arbitration as

18   it is under the Turner arbitration commitment?

19     A    Yes.

20          As I was saying before when asked about the

21   similarities, I think the timing of when the final offers

22   are made and when discovery occurs is the same in both of

23   those.

24     Q    And did informational imbalance turn out to be a

25   problem under the Comcast-NBCU arbitration process?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1       A     Again, we refer to back to the studies, but also

2    the fact that it was used by distributors.

3            I'm not aware of any evidence or claim that it

4    didn't work.  As I said, I think the evidence supports that

5    it did.

6       Q     So you mentioned benchmarks.  Aren't benchmarks

7    inherently backward-looking?

8       A     No.  I mean, clearly, if you're going to have

9    anything you're doing based on data, it has to be something

10   that's actually happened, but there are ways to project them

11   forward.

12           People do things like look at time trends and

13   what's happening in the industry and then project things

14   forward.  And you can use recent contracts.  So it's not the

15   case that it's only telling you what happened five years

16   ago.

17      Q     And so how do you think arbitrators will deal with

18   innovative contract provisions?

19      A     I mean, certainly, to the extent they're relying

20   on benchmarks, they would do it the way anything else.  You

21   would look for, are there other contracts that are

22   reflecting this innovation?

23           And, again, this is somewhere where there may be

24   ways that a distributor could have advances.  The

25   distributor could say, all right, well, we've got these new

1   terms that are -- you know, these new great terms that we

2   have in our contracts with all our other programmers, and

3   say to the arbitrator, so we should have it in this one.

4        Or you could also do it sort of more from a

5   ground-up thing, where you say, here's why it makes sense to

6   have this provision.  You'd have to make a case.

7        And, in fact, one thing that's sort of implicit in

8   that question, which I would reject, is that it's not

9   necessarily tension there.  It may be that both sides want

10   the innovation.  It's not like anytime there's an

11   innovation, it means Turner is not going to want it.

12   Q   What is your reaction to Mr. Schlichting's concern

13   that arbitration would not work for Dish because its

14   Sling TV product is unique?

15        MR. YOUNG:  Objection, Your Honor.  May we

16   approach?

17        THE COURT:  Yes.

18        (Sealed bench conference)

19        MR. YOUNG:  Your Honor, my concern is that what

20   we're hearing is Mr. Petrocelli's closing argument coming

21   through Professor Katz.  We haven't had much in the way of

22   economic testimony.  And what we're hearing is Professor --

23        THE COURT:  You don't know what his closing

24   argument is going to be.

25        MR. YOUNG:  Fair enough.

 1          My point is that this is argument as opposed to

 2     economic testimony.

 3          THE COURT:  Well, he's being asked to give his

 4     professional reaction to the concerns that have been raised

 5     by other people.  What's wrong with that?  He's an expert.

 6          MR. YOUNG:  I am not hearing him cite economic

 7     principles for how he's responding.  But that's my

 8     objection.

 9          MR. BARBUR:  He's definitely applying his economic

10     background and understanding to the testimony that's

11     occurred in the trial.  That seems entirely proper for an

12     expert to comment on the evidence.

13          THE COURT:  Yeah, I'm going to permit the

14     testimony.  I don't know.  Misconcerned.

15          MR. YOUNG:  Very well, Your Honor.

16          (Open court)

17          THE COURT:  You may proceed, consistent with the

18     discussion at the bench.

19     BY MR. BARBUR:

20     Q    So let me just restate the question, Mr. Katz.

21          What is your reaction to Mr. Schlichting's concern

22     that arbitration would not work for Dish because its

23     Sling TV product is unique?

24     A    So in some ways it's like the reaction to concerns

25     about innovation, which is to say, then Sling will have

1    contracts with other programmers and would be able to point

2    to those -- point the arbitrator to those contracts.

3           If anything, that's something for Sling's favor

4    because they know what's out there and what reflects their

5    uniqueness.

6       Q    Is there more risk for Turner or the distributor

7    associated with losing an arbitration?

8       A    Well, look, there's risks to both sides.  I mean,

9    from the distributor's point of view, we think just about

10   prices.  There's a risk that they'll get a higher price than

11   they like if Turner's is picked and indeed has a higher

12   price.

13          There's a risk to Turner, of course, the other

14   way.

15          But there's also something that's different

16   between the two parties, which in some ways puts greater

17   risk on Turner, which is their most favored nations clauses,

18   which, Your Honor, I believe you have heard about from other

19   witnesses.

20          What those mean is if Turner loses in arbitration,

21   there's a chance that it's getting a lower price for its

22   programming, not just from the programmer in the

23   arbitration, but from other programmers when the MFN kicks

24   in.  So on the down side, it can suffer more broadly.

25          But if it wins the arbitration, at least as I've

1    understood -- and I've seen a lot of MFNs over the years.

2    If they win, they don't get to go to, say, a bunch of other

3    companies, oh, guess what; we got a higher price in

4    arbitration.  We're jacking up our rates.

5           So it's -- you know, if they lose, it's spread

6    widely.  If they win, okay, you win here but not -- so

7    there's this asymmetry which makes things riskier for

8    Turner.

9       Q    So, Professor Katz, have you reached any

10   conclusion concerning whether arbitration would be too

11   costly to be effective?

12      A    Yes, I have.

13          My bottom-line conclusion is it's not too costly.

14   In one of plaintiff's expert reports, the expert cited a

15   figure that in arbitration, I think from industry sources,

16   say an arbitration costs a million dollars.

17          Well, let's suppose arbitration costs $5 million.

18   Obviously, $5 million is a lot of money in everyday life.

19   But if you're negotiating a contract -- and that's what

20   happened with some of these Turner contracts.  You're

21   negotiating a contract that's in the billions or hundreds of

22   millions.  It's a small number.  It's a tiny percentage.

23   It's not going to move the move needle.

24          Just one other way to see it, those numbers, which

25   I won't get into when they're cut.  Those numbers,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Your Honor, that you can see, right, those are -- I think

2   this much I can say:  Some of them are over $10 million a

3   month.  And what we're talking about is $5 million spread

4   over a three-year contract, so over 36 months.

5           So these are tiny percentages.  And so that's not

6   going to deter you from seeking effective arbitration.

7       Q    So what about costs for video distributors that

8   are small and don't have many subscribers?

9       A    So as I mentioned earlier, one of the options

10  available to them is just to join a buyer cooperative.  And

11  the largest one is NCTC.  And I don't want to say the

12  numbers.  But it has millions of -- millions of subscribers

13  to Turner are getting Turner through contracts negotiated by

14  them.  So, again, you've got this point that they can

15  amortize these costs over a lot of consumers over multiple

16  months.

17      Q    Mr. Schlichting also expressed concern that AT&T

18  would use the threat of withholding HBO in order to deter

19  firms from the invoking arbitration.  Does that make sense

20  to you?

21      A    Not as an economist, because if you think about

22  it, we're talking -- what he's talking about is HBO using

23  the threat of a blackout as leverage.  Well, presuming

24  that's what they're already doing when they negotiate the

25  price of HBO, they're using their leverage from blackout,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   and, of course, the distributor's using the potential threat

2   of blackout the other way.

3           But essentially they've gotten the money they can

4   get from HBO.  And now to come along and say to a

5   distributor, well, okay, arbitration might save you a lot of

6   money; but if you do that, we're going to black you out --

7   you're basically trying to make somebody pay for HBO twice,

8   right?

9           Because you're saying, you're going to pay the

10  price for HBO, and we want you to pay a higher price for

11  Turner, right, which is what he's saying is going to happen

12  if they can't use arbitration.  Well, you can't keep using

13  the same leverage over and over, right?  Otherwise, they

14  find every day, they say, I am going to threaten for another

15  reason and just -- money pump.  And that's a, pardon a

16  little bit of a flippant way of saying, there's not an

17  economic logic that supports what he's saying.

18      Q    So one last concern that's been expressed.

19          Mr. Schlichting also testified that affiliation

20  contracts are so complicated that an arbitrator won't

21  understand them; and, therefore, arbitration won't work.

22  What's your reaction to that?

23      A    Well, my reaction is these contracts are

24  complicated.  But you're talking about a professional

25  arbitrator.  You're talking about sophisticated parties

1    coming in and fully expect, which is my understanding what

2    happens in negotiations as well, is you focus on the terms

3    that matter.

4              I mean, you find these contracts have a lot of

5    terms where you have to pick whether it's the State of

6    Delaware that's -- in the event of disputes and things.

7              But my estimation is what they will to is they'll

8    focus on what matters, and they'll point the arbitrator to

9    that.  And the arbitrators are capable of doing that.  Okay?

10             And also to the extent that people think, well,

11   maybe that makes it risky; we're not sure what happens.

12   Comes back to bargaining in the shadow again.

13             And really, look, the proof is in the pudding,

14   which is to say, we've talked about this morning; you've

15   seen -- talked about how Charter used the threat to sort of

16   get things unstuck.  Dish filed to go into arbitration.

17             Mr. Bond of Comcast testified in this Court that

18   virtually every negotiation Comcast-NBCU has had, because

19   they're under the arbitration provision, that arbitration

20   gets brought up.  And he testified further that it was being

21   brought up for the benefit of the distributors, and he

22   thought it worked.

23             So I think the evidence, the actual experience

24   says, yeah, it works.

25        Q    So we're almost done.  I just wanted to cover one

1   more short topic, and that is the FCC's program access

2   rules.

3           Did you hear Professor Shapiro's testimony about

4   the program access rules?

5       A   Yes, I did.

6       Q   Do you agree with it?

7       A   No, I don't.

8       Q   So before we get into the details of your opinion,

9   can you briefly explain to the Court what those rules are.

10      A   So program access rules are a set of rules the FCC

11  put in place subject to congressional mandate, saying that

12  they should come up with rules to prevent harm to

13  competition from the vertical integration of programmers and

14  distributors.  Right?  They wanted to make sure that somehow

15  control of the programmer wasn't used to harm competition.

16      Q   And are there different categories of restrictions

17  within the program access rules?

18      A   Yes.

19          It's changed over the years; but at present, there

20  are two broad categories.  One category, since it prohibits

21  discrimination against different distributors.  And the

22  other broad category prohibits the distributor from having

23  undue influence on the decisions of the programmer.

24          So, again, the idea of you don't want the

25  distributor telling the programmer to go do things to harm

1    other distributors.

2            But broadly, those are the categories.

3        Q    And will these rules apply to Turner if the AT&T

4    and Time Warner merger closes?

5        A    Yes, they will.  That's my understanding.

6        Q    Did Professor Shapiro take the program access

7    rules into account?

8        A    So as he testified -- I mean, he took them into

9    account, and then he recognizes their existence.

10           But then what he did was, for purposes of

11   modeling, treat them as being completely ineffective.  And

12   his basis for that that he gave in his report was citing

13   some sentences in an FCC order, particularly the FCC

14   Comcast-NBCU order, that he concluded said that a uniform

15   price increase across distributors would get by the rules,

16   that the FCC couldn't catch you.

17           Now, I think there is at least three things wrong

18   with what he's done there.

19           First off, the sentence that sets up the ones he

20   quotes, what it says is -- this is a paraphrase.  They

21   won't, pretty close, a quotation, that a uniform price

22   increase will not necessarily violate the current rules,

23   okay.

24           So the "uniform," "not necessarily," and "current"

25   are all important, okay?

1            So why uniformly?  Well -- and this I can't quote,

2    but those percentages that are the confidential ones, those

3    percentages are different.  And if you translated those into

4    absolute price increases, they're different too.

5            Professor Shapiro did not predict uniform price

6    increases.  His model doesn't do it.

7            So his Mr. Price increases -- if this loophole

8    does exist, his price increases can't drive through it.

9            Now, Professor Shapiro is aware of that.  He has a

10   footnote where he says, well, there's an equivalent uniform

11   price increase, okay.  But that's not what he estimated.

12   And the way his model works, his merger simulation model,

13   you can't just plug in averages and get the same answer.

14           Moreover, I don't believe Professor Shapiro has a

15   sound basis for saying, oh, on average, it all works out,

16   because, as I'm sure Your Honor remembers, he has a

17   bargaining model, and the foundational assumptions of his

18   bargaining model is every bargain between Turner and the

19   distributor is done separately from every other.  Okay?

20           And if he's going to put in a uniform price across

21   it, it means Turner would have to link all of its

22   negotiations.  It would have to make sure that when it

23   negotiated with Comcast, it raised the price, in his world,

24   by as much as it raised it to Charter.

25           Okay.  Well, then you're going to have to ask

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2696

1   yourself, how is that going to happen?  Why are Charter and

2   Dish and all these going to go along with -- they're not

3   going to say, oh, yeah, fine, just tell us what price

4   increase you want so you can get through the loophole.

5           And he hasn't modeled it.  And if he did try to

6   model that, it would just be orders of magnitude, I think,

7   more complicated than the model he has.  But it would be a

8   very different model.  He would have to link all the

9   bargaining he has.

10          So first thing is, he did not do uniform price

11  increase, and it's not so easy to do.  It's a different

12  analysis.

13          Second of all, the FCC statement says it doesn't

14  necessarily violate the rules.  It didn't say you get a free

15  pass.  So he doesn't have take any account of, okay, maybe

16  it does violate them.  And how would the parties think

17  about -- how would Turner think about, do they want to

18  gamble and say, oh, we think we'll be okay?

19          Okay.  But it doesn't say anything about that.

20          And then the third part, as I said, it says, our

21  current rules.  And the FCC has stated clearly, I think they

22  did it in their original program access proceeding, they

23  said, Congress gave us the authority, gave us broad

24  authority to go after anti-competitive actions.  And if we

25  learn that there are actions that need to be addressed, we

1   can change our rules to go after those.

2          So for all of those reasons, I disagree with his

3   approach.

4      Q   So just one last question.  Professor Shapiro, in

5   his testimony, referenced the opinions of Professor Kwoka on

6   arbitration and Professor Wilkie on the program access

7   rules.

8          Have you read their opinions?

9      A   Yes.  I read their opinions, and I took them into

10  account and also the arguments they made and various pieces

11  of evidence they cited.  That all went into the formulation

12  of my opinion that fundamentally, Professor Shapiro's

13  analysis, when you correct for arbitration and then bringing

14  in program access rules to strengthen that finding, when you

15  make that one correction, Professor Shapiro's models say,

16  this merger would be good for consumers.

17         MR. BARBUR:  I have no further questions at this

18  time, Your Honor.

19         THE COURT:  All right.  We're going to take the

20  morning recess.  You're a witness under oath in the case, so

21  you're not at liberty to discuss your testimony so far or

22  what it might be when you return with anybody, including

23  your own counsel, with anyone.

24         THE WITNESS:  I understand, Your Honor.

25         THE COURT:  Okay.

 1           So we'll take a 15-minute recess, and we'll return

 2    afterwards.

 3           DEPUTY CLERK:  All rise.

 4           This Honorable Court will now take a brief recess.

 5           (Recess from 11:55 a.m. to 12:19 p.m.)

 6           DEPUTY CLERK:  All rise.  The United States

 7    District Court for the District of Columbia is again in

 8    session, the Honorable Richard J. Leon presiding.  God save

 9    the United States and this Honorable Court.  Please be

10    seated and come to order.

11           THE COURT:  All right.  The witness remains under

12    oath.

13           Cross-exam when you're ready.

14           MR. YOUNG:  Thank you, Your Honor.

15           THE COURT:  Yes.

16                      CROSS-EXAMINATION

17    BY MR. YOUNG:

18       Q    Good morning, Professor Katz.  Good to see you

19    again.

20       A    Good morning.

21       Q    I'd like to ask you a couple of questions about

22    the two demonstratives that Mr. Barbur asked you about.

23           Do you have those handy?

24       A    Yes, I do.

25       Q    Let's start with DXD120, the one with the Dish

1    statements.

2         A    Yes.

3         Q    First, let me ask you, Mr. Barbur asked you

4    whether you had prepared an exhibit.  Is it your testimony

5    that you selected the quotes to include on DXD120?

6         A    Yes.  I believe these are the quotations taken out

7    of my rebuttal report submitted in this matter.

8         Q    For purposes of the exhibit that you're using here

9    today, did you select these quotes?

10        A    Yes.

11        Q    Now, with respect to the statements made in Dish's

12   second-quarter 2016 earnings call, the first two, are you

13   aware that Mr. Schlichting from Dish explained to the Court

14   that the dispute referred to in this quote was in the

15   retransmission consent context and not a dispute over the

16   licensing of cable networks?

17        A    Yes, I am.

18        Q    Okay.  But you didn't include that?

19        A    Let me step back.

20             I don't recall seeing him explain that to the

21   Court, but I do know that he is drawing distinctions with

22   retransmission consent proceedings, in his view, being

23   different than others.

24        Q    And that was his testimony.  But you don't reflect

25   that on this slide that you prepared?

1       A     I mean, the slide says what it says.

2       Q     And it doesn't include Mr. Schlichting's

3  testimony, does it, sir?

4       A     No, it does not.

5       Q     Thank you.

6             And as Mr. Schlichting also explained to the

7  Court, he believed that baseball-style arbitration made

8  sense in the retransmission consent context for a couple of

9  reasons.  One was that the retrans is only about rate and

10 that there are easy comparables in the market.

11            Do you remember that testimony, sir?

12      A     No, I don't.

13            But if he testified it's only by rate, I'd be

14 surprised if he were correct because I have looked at

15 retransmission consent contracts; and the ones with I saw go

16 on for tens of pages, and there's more than rate in them.

17      Q     And his testimony was that there are easy

18 comparables in the market, correct?

19      A     I don't remember, but that sounds familiar.  It

20 seems like I've seen that possibly in deposition testimony.

21      Q     And so just to be clear, Mr. Schlichting's

22 testimony was that the disputes and retrans are typically

23 about rate where the majority is about rate, correct?

24      A     I don't recall the quotation.  If you want to

25 represent that to me, I don't have a reason to think that

 1    you're misquoting him.

 2         Q    Thank you.

 3              Mr. Barbur asked you about some statements made by

 4    the DOJ and the FCC in the context of the Comcast-NBCU

 5    merger.  And that's DXD119.

 6              Do you have that, sir?

 7         A    I should.

 8              Yes, I do.

 9         Q    Okay.

10              Now, let's start with the Department of Justice

11    quote submitted during the Tunney Act process.  You're aware

12    that the Tunney Act process for that merger took place in

13    2011?

14         A    That sounds right.  I can't remember between 2010

15    to 2012.  But, yes, that time frame.

16         Q    In any event, before the consent decree was

17    entered and the arbitration procedure went into place?

18         A    Yeah, yeah, certainly before the arbitration

19    procedures and the Consent Decree went into place.  I don't

20    remember the timing relative to the FCC order.  But it was

21    either before, or it would be very early on in the process.

22         Q    Now, you're aware that Mr. Sejen of Cable ONE

23    testified about his actual experience over the Comcast-NBCU

24    Comcast arbitration the years that followed?

25         A    You're referring to when -- I just want to make

1    sure.  When you're saying when somebody, I guess,

2    Richard Rosen in his stead read into the record, you're

3    talking about the deposition testimony that was then read in

4    here?  I just want to make sure I know what you're talking

5    about.

6         Q    Yes, sir.

7         A    That's what you're referring to?

8              I'm sorry.  Could you ask again, whether I recall

9    which part?

10        Q    Are you aware that Mr. Sejen from Cable ONE in the

11   deposition testimony that was entered into the record here

12   testified that Cable ONE never seriously considered invoking

13   the arbitration mechanism in Comcast-NBCU because of its

14   risks?

15        A    I'm not sure if I recall that specific part.  I

16   remember in the broader context of his saying that their

17   video business was losing money, and so really put them in a

18   different position than other video providers.

19             So I have to say, as a result of that, I gave much

20   less weight to his testimony than others, because I can

21   understand why if you're running -- if you're losing money

22   on something and you're not running the business for its own

23   sake, that that puts you in a different position than other

24   firms.

25        Q    Professor Katz, my question was a simple one.  Are

1   you aware that he gave that testimony?

2       A    So I don't recall that specific testimony, as I

3   sit here.

4       Q    And are you also aware that Mr. Sejen testified

5   that he did not want to subject the company being saddled

6   with a contract we didn't know the terms of?  Are you aware

7   he made that testimony, sir?

8       A    That sounds familiar, but, again, I don't recall

9   the quotation as I sit here.

10      Q    And are you also aware that Mr. Schlichting

11  testified about his actual experience in a Comcast-NBCU

12  arbitration in the years that followed entry of the decree.

13      A    That's not ringing a bell.

14      Q    Okay.  Well, are you aware that Mr. Schlichting

15  testified that under the Comcast-NBCU decree, arbitration

16  was like Dish putting their head in a noose, because

17  arbitration carries with it a lot of risk?

18           Do you recall that, sir?

19      A    No, I don't recall that.  I was going to say what

20  I testified to is I recall that they started arbitration,

21  but I don't recall anything about a noose.

22      Q    You don't have a reason to -- oh, you don't recall

23  anything about the noose; is that right?

24      A    That's what I just testified to, yes.

25      Q    Oh, okay.

1          Now, with respect to the statements by the FCC,

2    are you aware that under the FCC's Comcast-NBCU order, an

3    arbitrator's decision could be appealed de novo to the FCC's

4    Media Bureau and then to the full commission.

5          A    That's my understanding.

6          Q    And are you aware that by statute, the

7    Commission's decision is appealable to the Federal

8    Court of Appeals?

9          A    I had a recollection that there was some way that

10   things could end up in the Court of Appeals.  I don't -- as

11   I sit here, I couldn't testify that that is what happens

12   after the commission...

13         Q    In any event, you're aware that the Turner

14   arbitration offer does not have those same appeal rights,

15   correct?

16         A    That's correct.

17         Q    And the FCC's statement in your DXD119 isn't

18   expressing any opinion about the Turner offer; isn't that

19   right?

20         A    That's correct.

21         Q    Nor is the DOJ's statement expressing any opinion

22   about the Turner offer, correct?

23         A    That's correct.

24         Q    Professor Katz, there was one other follow-up from

25   your testimony with Mr. Barbur.

1          You mentioned that bargaining cooperatives could

2    invoke arbitration under the Turner offer; is that right?

3        A    That's the assumption of my model, my approach to

4    it.

5        Q    That's your assumption?

6        A    And it's also my understanding that that -- you

7    know, I have a basis for the assumption, but it is an

8    assumption for my analysis in that a letter was sent to NCTC

9    and I believe the other cooperatives, informing them of

10   Turner's arbitration commitment.

11         And it's my understanding that Mr. Stankey will be

12   testifying at trial in this proceeding that AT&T intends to

13   allow certainly NCTC and I believe the other cooperatives as

14   well to avail themselves of the arbitration.

15       Q    Professor Katz, I believe you have in your binder

16   a copy of PX491, which is the arbitration agreement.

17         Can you pull that out, sir.

18       A    Yes, I have it.

19         MR. YOUNG:  May I proceed, Your Honor?

20         THE COURT:  Yes.

21   BY MR. YOUNG:

22       Q    So on the first page of PX491, the first line of

23   the arbitration agreement states that, "At the request of

24   any video distributor, Turner shall provide arbitration."

25         Isn't that right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      A      Actually -- wait.  You're saying the first

2  sentence?

3      Q      Paragraph 1, could you read that to yourself,

4  please.

5      A      Okay.

6             Okay.  The last sentence of it says there would be

7  arbitration, yes.

8      Q      Yes.

9             And so the last sentence says that the arbitration

10 is available to a video distributor, correct?

11     A      Yes.

12     Q      It doesn't say "bargaining cooperative" in the

13 agreement, does it?

14     A      That sentence does not say it; that's correct.

15     Q      And we talked about this at your deposition,

16 right?  In the ordinary understanding that you have of who

17 NCTC is, you don't believe that they are a video distributor

18 in the common, ordinary sense of the term, correct?

19     A      I actually don't believe that's how we talked

20 about it in my deposition.

21            But I do hold the view that in the ordinary,

22 everyday sense of the word, they're not a video distributor.

23     Q      Because what NCTC does is negotiate on behalf of

24 its members who are video distributors, correct?

25     A      That's one thing they do.  I'm not sure if they do

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    others.

2         Q    NCTC doesn't actually operate a video distribution

3    business for itself?

4         A    As far as I know, that's correct.

5         Q    Right.

6              And you're not pressing any legal opinion as to

7    whether NCTC meets the FCC's definition of multi-channel

8    video distribution provider or any other legal definition,

9    correct?

10        A    That's correct.

11        Q    Professor Katz, I'd like to talk about your

12   background a little bit.

13             You were offered as an expert here on antitrust

14   economics and industrial organization, correct?

15        A    That's my recollection, yes.

16        Q    Yes.

17             You were not offered as an expert here on

18   arbitration?

19        A    Well, industrial economics or industrial

20   organization includes or is probably the leading branch of

21   applied game theory.  And that is a subject within an

22   arbitration, is something about which economists write.  And

23   that's my field.  I don't -- so it's encompassed in that.

24        Q    Professor Katz, is it your testimony that

25   arbitration is your field?

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 2574 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2708

1      A    My field?  No.  I'm saying it's encompassed within

2   by broader expertise and that the sorts of modeling I do are

3   exactly the sorts the economic literature on arbitration

4   addresses.

5           And then I am an expert qualified to read those,

6   opine on them.  And I would be qualified, for example, for

7   an academic journal to referee such an article, if asked.

8      Q    And I'd like to ask about the CV that you've

9   submitted in connection with your expert report.

10          Do you know what's in your CV, sir?

11     A    I mean, broadly, yes.  If you've asked if I've

12  memorized it, no.

13     Q    And I'll represent to you that you list more than

14  90 book chapters, articles, and other publications that you

15  have authored in whole or in part and that you list

16  approximately a dozen grants from the National Science

17  Foundation corporations and foundations.

18          Do you have any reason to doubt my representation,

19  sir?

20     A    No.  I actually counted this morning.

21     Q    Are my numbers, right, then, Professor Katz?

22     A    I believe so, or else we're both wrong in the same

23  way.

24     Q    Thank you.

25          And yet, none of your book chapters mention

1    "arbitration" in the title, do they, Professor Katz?

2         A    That's right.  I told you I haven't memorized it,

3    but I think that's correct.

4         Q    None of your articles?

5         A    The titles?  No, I don't think they do.

6         Q    None of your grants?

7         A    That's correct.

8         Q    Now, let's turn to your testimony on consulting

9    work.

10             You also list the cases in which you testified as

11   an expert.

12             You've never testified before in court on the

13   subject of arbitration, at least as far as those materials

14   disclose; isn't that correct?

15        A    Sir, I need to think a minute whether some of the

16   stuff on the benchmark cases -- I don't believe I have.  I

17   may be missing something, but I don't believe I have.

18        Q    Sir, so as you sit here today, Professor Katz, you

19   can't think of anything you have done professionally since

20   leaving the FCC in 1996 having to do with arbitration; is

21   that right?

22        A    You mean aside from having studied the literature

23   on arbitration and what economics says about it, I don't

24   recall doing something beyond that.

25        Q    Okay.  So since it's the subject matter of why

1    we're here, let's look at the Turner arbitration offer.  And

2    that's the offer that you testify is casting the shadow that

3    you rely on in your testimony.

4            And I think you talked about, with Mr. Barbur,

5    that fair market value is not a defined term in the Turner

6    offer, correct?

7        A    I did testify about that, yes.

8        Q    And that your interpretation, which you call an

9    economically natural interpretation, is that this term can

10   be interpreted as having the goal of what would happen if

11   the merger had not occurred; is that correct?

12       A    Yeah.  I may have said it that way.

13           I mean, basically it's to preserve sort of the

14   pre-merger balance of power.  And the reason I make a bit of

15   a distinction is it's not to lock in how the world would be

16   absent the merger, because the world is going to change with

17   the merger.  For example, there are going to be

18   efficiencies.  But it's essentially to rule out the sorts of

19   effects that Professor Shapiro hypothesizes.

20       Q    What antitrust lawyers and economists call the

21   but-for world, right?

22       A    That's different than I think the way we usually

23   use "but-for world," but you could have that as, yeah,

24   I guess a version of the but-for.

25       Q    Now, you're aware, aren't you, sir, that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Mr. Warren testified for Turner that the term "fair market

2   value" was not a term he uses in his business?

3        A    I recall -- I'm not sure if it's -- I recall some

4   witnesses said that.  I also recall seeing documents from at

5   least some cable companies -- I can't remember if it's

6   Dish -- that do say "fair market value."

7             But I don't have in my mind straight which

8   documents or witnesses or which company.

9        Q    You can't tell me what documents you have in mind,

10  sitting here today?

11       A    No, not sitting here.

12       Q    Okay.  And did you cite those documents in your

13  report in support of your interpretation of fair market

14  value?

15       A    No, I did not.

16       Q    And you're aware that Mr. Schlichting from Dish

17  testified that he didn't have an understanding of what fair

18  market value meant either, correct?

19       A    I don't remember if he did or not, but

20  I don't have reason to doubt you on that.

21       Q    And are you aware that no one in this trial has

22  testified that the term "fair market value" in the Turner

23  offer means what you've testified it means?

24       A    Well, I have testified to that, but I'm taking it

25  you mean no one else has testified to that.

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 2578 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2712

1          As I sit here, I don't recall anyone else

2    testifying to that.

3      Q     Thank you, sir.

4          So it's also true that the arbitrator's job in an

5    arbitration wouldn't be limited to price, right?  It would

6    go beyond that to the other terms in the contract?

7      A     That's my understanding, yes.

8      Q     Right.  The arbitrator would have to determine for

9    the entire contract the value of all the terms to figure out

10   what best represents fair market value?

11     A     Yes.  The arbitrator would do a holistic

12   evaluation.

13     Q     Now, it's true, sir, that an arbitrator -- the

14   parties to the arbitration could argue for different

15   interpretations of what "fair market value" means; that is,

16   interpretations that don't match yours?

17     A     They would be free to try, yes.

18     Q     And the merged firm could, in fact, argue for a

19   definition of "fair market value" that would yield a higher

20   number than what your -- or a higher set of terms that were

21   more advantageous to the merged firm than your proposed

22   definition, correct?

23     A     I mean, I don't think there's anything to stop

24   them from doing that other than common sense on their

25   point -- part, given that there's a very public proceeding

1    in which their expert has said that that's how it should be

2    interpreted.

3          But I don't think there's anything to stop them

4    from trying.

5      Q    You're aware that there have been arbitrations

6    conducted pursuant to arbitration conditions adopted by the

7    FCC in prior vertical mergers, correct?

8      A    That's my understanding, yes.

9      Q    And it's correct, isn't it, that you're not aware

10   of any instance in which an arbitrator conducting such an

11   arbitration has adopted the meaning of "fair market value"

12   as you've defined it here?

13     A    I have not obtained access to the ruling, so

14   I don't know what they've said about it.

15     Q    My question is, sir, you're not aware of any

16   instance in which an arbitrator conducting an arbitration,

17   pursuant to the FCC's auspices, has adopted the meaning of

18   fair market value as you've defined it here?

19     A    That's correct.

20     Q    Professor, you're not expressing a legal opinion

21   on whether or not the arbitration offer is illegally

22   enforceable, correct?

23     A    No.  That's correct.

24         For my purposes of my analysis, I'm taking it as

25   an assumption that it is enforceable, and I'm deferring to

```
 1   attorneys or businesspeople to support whether that's right

 2   or not.

 3        Q    And if it turned out that the arbitration offer

 4   were not legally enforceable, that would tend to undercut

 5   its effectiveness, wouldn't it?

 6        A    I mean, if you asked would it weaken it to some

 7   degree, I think the answer is yes.

 8             If you're asking to say sort of loosely, actually

 9   I think the fact that it's been very publicly made and

10   stated in court, it certainly would be costly in terms of

11   its business reputation and maybe in other ways to try to go

12   back on it.

13             But I agree with you that if it's not legally

14   enforceable, that that is one factor.

15             THE COURT:  I'll see counsel.

16             (Sealed bench conference)

17             THE COURT:  I just want to caution counsel to,

18   with regard to the arbitration clauses, effectiveness of any

19   questions you want to ask about that, to be clear on the

20   record that you're linking it to the one that was offered,

21   not in a theory.

22             MR. YOUNG:  Yes.

23             THE COURT:  Because the Court always has an option

24   of imposing an arbitration clause as a remedy.

25             MR. YOUNG:  Yes.
```

 1          THE COURT:  And I don't want the record to be

 2   confused as to anything beyond what this is really limited

 3   to, which is the arbitration clause that AT&T is offering to

 4   its customers -- not AT&T.

 5          MR. YOUNG:  Yes, sir.  I'll try to be mindful of

 6   that, Your Honor.

 7          THE COURT:  Turner.  Turner.

 8          I'm just cautioning you.  You haven't done

 9   anything withdrawn.  I'm just being careful that the record

10   as it appears, that it doesn't solicit any opinion beyond

11   that which was offered.

12          MR. YOUNG:  If Your Honor wishes, I can clean that

13   up with a couple questions now.

14          THE COURT:  No.  I think it's fine.

15          MR. YOUNG:  Okay.

16          THE COURT:  I didn't know where you were going,

17   and I didn't know where he might be going, Mr. Barbur, when

18   he returns.  So I just thought I would be cautious moving

19   on.

20          MR. YOUNG:  Thank you, Your Honor.

21          (Open court)

22          THE COURT:  All right.  You may proceed.

23   BY MR. YOUNG:

24       Q    Professor Katz, you have not analyzed the legal

25   enforceability of options contracts under state law;

1  is that correct?

2      A    That actually may not be correct, but --

3  I think -- it depends on what you mean by "analyzed."

4      Q    Let me ask a different question, then.

5           You have not analyzed the legal enforceability of

6  the Turner arbitration offer under applicable state law,

7  have you?

8      A    No, I have not.

9      Q    And do you recall whether the Time Warner

10  arbitration offer includes a choice-of-law provision?

11      A    Not as I sit here.

12      Q    So along with fair market value, Professor Katz,

13  there's another fundamental element about how the

14  arbitration, the Turner arbitration offer would work that

15  isn't defined.  And you talked about that with Mr. Barbur,

16  and that's the subject of benchmarks.

17           Do you recall talking about that?

18      A    I recall talking about benchmarks, yes.

19      Q    And so benchmarks are what the arbitrator could

20  compare the final offers to in a Turner arbitration in order

21  to try and determine whether -- which of the two final

22  offers comes closest to what the arbitrator believes is fair

23  market value?

24      A    I think what you just said is an implicit

25  definition of benchmarks, yes.

1          Q    Fair enough.

2               Now, there's no instruction in the Turner offer as

3     to what benchmarks to use, correct?

4          A    My recollection is it talks about particular

5     factors that have to be -- get attention and talks about

6     specific contracts.  I don't remember -- or types of

7     contracts, whether it identifies them as bench -- you know,

8     identifies them as benchmarks.  But it does talk about the

9     sort of information that can be submitted.  So I'd have to

10    look to see if it used the term "benchmark."

11         Q    You told me in your deposition, sir, that you

12    didn't believe there was something in the agreement that

13    says, here's the benchmark to use?

14         A    It was consistent with what I just said because

15    what it says is the parties can bring all sorts of evidence

16    to bear.  I think there's some description of certain

17    factors that should get attention, but it does not

18    prescriptively say, these are the benchmarks you have to

19    use.

20         Q    Thank you, sir.

21              And in your testimony with Mr. Barbur, you

22    mentioned three different categories of benchmarks.  You

23    aren't expressing an opinion as to which of those categories

24    is preferrable, are you?

25         A    No.  As I think -- I may have also said in my

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 2584 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2718

 1  deposition, I would expect the parties could use all three

 2  of them and the arbitrator could use all three categories as

 3  well.  I don't think you have to pick and choose

 4  necessarily.

 5      Q    Do you have a belief, sir, as to whether a

 6  distributor's contracts with other programmers is as good a

 7  benchmark as Turner's contracts with other distributors?

 8      A    I don't have -- certainly, my opinion is it could

 9  be.  You'd have to look at the circumstances.  But I think

10  it generally goes one way or the other.

11      Q    The Turner contracts with other distributors are

12  for the Turner networks under discussion in the arbitration;

13  isn't that right?

14      A    If I understand what you mean by Turner contracts,

15  yes.

16      Q    Okay.

17          On a slightly different topic, is there anything

18  in the Turner offer that prevents Turner from getting AT&T's

19  contracts with other distributors?

20      A    As far as I'm aware, there's not.

21      Q    I'm sorry.  The question was, with other

22  programmers.

23      A    Oh, I'm sorry.  That, in fact, was the question

24  I was answering.

25      Q    Yes.  I understand that.

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 2585 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2719

1        A    So I'll listen more carefully.

2        Q    So let me ask it again just so that the record is

3   clear.

4             Is there anything in the Turner offer that

5   prevents Turner, after the merger goes -- were the merger to

6   go through, from obtaining AT&T's contracts with other

7   programmers?

8        A    As far as I know, there's not.

9        Q    If that -- if Turner were to do that, that would

10  mean that Turner has information both about other

11  programmers and about its contracts with other distributors,

12  in a way that the distributors who are participating in a

13  Turner arbitration would not, correct?

14       A    I think that might depend on the distributor and

15  whether or not it had programming.  But if you're asking,

16  "Are there some distributors for whom that could be true?"

17  the answer is yes.

18       Q    Professor Katz, I'd like to ask you to assume with

19  me that the merger has gone through and that AT&T and the --

20  the DirecTV units and the Turner unit have negotiated a

21  contract between the two of them within -- under the

22  umbrella of the AT&T corporation.

23            Do you have that in mind?

24       A    Okay.

25            Can I just ask, is it okay, if you're going to

 1   walk through steps, if I get out a piece of paper and just

 2   write this down?

 3        Q    It will be very brief.  I can ask my question

 4   right now.

 5        A    Okay.

 6        Q    Would that contract, Professor Katz, be something

 7   that could serve as a benchmark or as evidence of fair

 8   market value in the arbitration?

 9        A    I mean, if you're -- I want to make sure.  If

10   you're asking, do I, is it my understanding that if they

11   chose to, Turner could put that contract before the

12   arbitrator, I believe they could.  They can put it...

13        Q    Turning back to benchmarks, you would agree that

14   there's nothing that stops the parties to an arbitration

15   from advocating for that the arbitrator use the benchmarks

16   that would be most advantageous to that party, correct?

17        A    I would expect the parties to advocate for the

18   ones that are most advantageous to them that are credible.

19             I mean, I wouldn't, if you said, hey, look, I've

20   got a benchmark that says, you know, my wife says she'd get

21   hundreds of thousands of dollars, that's not going to be --

22   that may be the most favorable benchmark, but no one is

23   going to use that.

24             You'd want to look at benchmarks that are

25   reasonable or credible so that they're going to influence

1   the arbitrator, at least if you're going into the

2   arbitration as an economically rational participant.

3       Q    And with that limitation, there's no -- there's

4   nothing in the Turner offer that prevents the parties from

5   arguing for the most advantageous, credible benchmarks they

6   can offer, correct?

7       A    That's what I would expect them to do.

8       Q    Right.

9            So this is a decision the arbitrator would have to

10  decide, what benchmarks to use?

11      A    No.  I believe what the arbitrator has to

12  decide -- the parties will pick the benchmarks.  They don't

13  believe the arbitrator can do an independent investigation

14  and seek information on his or her own but would then listen

15  to the parties and then would ultimately weigh the different

16  benchmarks and decide which were credible or not.

17           And so if that's what you mean, yes, that's my

18  understanding of how it would work.

19      Q    So the arbitrator would need to come to a

20  conclusion about which benchmarks seem most appropriate on

21  the way to choosing which of the final offers is closest to

22  fair market value?

23      A    I don't know that that's true.

24           Look, ultimately, the arbitrator is going to have

25  to pick one or the other after weighing the evidence.

1    I don't know that the arbitrator needs to have a checklist

2    of saying, this is the good benchmark; this is the so-so

3    benchmark.

4           But ultimately, the arbitrator will have to make a

5    decision.

6    Q    Now, you also know that Ms. Fenwick discussed an

7    issue that she said is growing in importance, the idea of

8    programmers seeking access to data that MVPD distributors

9    have about what their customers are watching and when,

10   correct?

11   A    I don't remember specifically Ms. Fenwick, but I

12   remember the testimony about the importance of data.

13   Q    And are you familiar with the fact that AT&T is

14   arguing in this case that due to contracting frictions,

15   programmers and distributors have not been able to reach

16   agreement on the terms for selling access to programmers of

17   distributors' data, correct?

18   A    That's my understanding.

19          I'm not sure if I've seen testimony.  But that's

20   certainly my understanding from having talked to people at

21   AT&T generally, that that's one of their concerns and one of

22   their rationales for the merger.

23          But I'm not offering testimony on the

24   efficiencies.  So I just want to be a little careful whether

25   it's sort of stuff I've heard in the hallways, but that's he

1    understanding.

2         Q    Well, you've had access to the trial transcripts,

3    haven't you, Professor Katz?

4         A    Yes.  But I'm just -- I don't recall the AT&T

5    testimony on efficiencies.  I'm certainly aware of the

6    issues with data, but --

7         Q    In fact, Mr. Petrocelli, in his opening, stated

8    that you can't get the rights from content owners to do

9    that.  They won't let you experiment with their constant.

10   They call that bargaining friction.

11        Do you have any reason to disagree with me that

12   that was part of Mr. Petrocelli's opening?

13        A    No.  With all -- and this will be a bit of a

14   flashback for Conrath; but with all due respect for

15   Mr. Petrocelli, I don't spend a lot of time studying the

16   opening statements.  As I understand --

17        THE COURT:  They're not evidence.

18        THE WITNESS:  -- they're not testimony.

19        THE COURT:  That's just argument, so --

20        MR. YOUNG:  Right.

21   BY MR. YOUNG:

22        Q    So here's the question, Professor Katz.

23        If programmers and distributors aren't already

24   buying and selling data like this, an arbitrator can't very

25   well determine a fair market value for that data, can he?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          A      I mean, if you're asking me a different question

2     outside of the Turner arbitration, because I don't believe

3     that one of the tasks before the arbitrator is to determine

4     fair market value of data in isolation.

5               Now, if what you're asking me or meant to ask me

6     was, okay, we're negotiating over contracts, and somebody

7     wants a term in the contract that says, we should -- we want

8     access to data, that is something the arbitrator can decide,

9     because if somebody comes in, a distributor comes in and

10    says, we want this term in here, and then the arbitrator

11    says -- or at least metaphorically says, okay, show me

12    somewhere where anyone's ever done that; and they say, well,

13    no one ever has, I think that's the sound evidence that fair

14    market value, the market outcome, because this -- other

15    programmers having nothing to do with Turner and the merger,

16    if no one's doing it, that suggests that the contract that

17    represents fair market value is not going to have the term

18    in it.

19              Now, that could change going forward.  You could

20    see it start showing up in contracts.  And if it does, first

21    off, it might show up in Turner ones if things somehow

22    change.  But if it did change for whatever reason, if it

23    shows up in another distributor's contract with other

24    programmers, then I would fully expect them to go to the

25    arbitrator and say, look, this contract, we get data; we

1    think Turner should as well.

2            And then they try to make the case, you know, as,

3    perhaps, they are with Professor Shapiro.  They make the

4    case and said, look, that they're just keeping it out for

5    this reason.

6            But there would by ways to address the problem.

7        Q    It sounds like what you're saying, Professor Katz,

8    is that if it hasn't happened before in a programming

9    contract, it's probably not going to happen during an

10   arbitration, correct?

11       A    No, actually, I don't agree with that.

12           I was saying, what I was saying is here's ways, if

13   it has happened before, to bring it in and here's how it

14   can.

15           No.  There's certainly other ways it could come

16   up.  I mean, you could make an argument and say, look,

17   here's something that's changed, and here's why this really

18   should be in Turner's interest but for somehow they're

19   hypothesized to protect DirecTV.

20           Now, I have to say I think that's a pretty

21   implausible situation that you go in and say, well, we're

22   arbitrating with Turner and, yeah, it hasn't ever showed up

23   in any other contract ever, but really this is the time it's

24   necessary.

25           But if that did happen, you could -- you're not

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 2592 of 3826

2726

1  limited to benchmarks.  I know benchmarks get a lot of

2  attention.  But as I understand it, you can bring in other

3  evidence to bear as well.

4     Q    Professor Katz, we are -- you've mentioned on

5  direct that the arbitrator's decision needs to come in the

6  form of choosing one proposed contract versus the other

7  proposed contract, correct?

8     A    Yeah, that's my understanding of the definition of

9  "final-offer arbitration."

10          MR. YOUNG:  Your Honor, I'd like to present to

11  Professor Katz the programming contract between Turner and

12  Dish, which has previously been admitted into evidence under

13  seal, as PX409.

14          May I approach the witness to do that, Your Honor?

15          THE COURT:  All right.  PX409.

16          MR. YOUNG:  Right.

17          Copies have been -- my colleague has given copies

18  to opposing counsel, and I will give copies to the Clerk.

19          THE COURT:  Okay.

20          MR. YOUNG:  Shall I proceed, Your Honor?

21          THE COURT:  When you're ready.

22          MR. YOUNG:  Thank you.

23  BY MR. YOUNG:

24     Q    So, Professor Katz, you have PX409 in front of

25  you, correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    That is correct.

2    Q    Now, out of all of the terms and conditions in a

3    70-plus-page contract like this, you would agree with me

4    that the final offers are required only to agree to a line

5    on two particular terms, correct?

6    A    I can think of two terms.  I'm not sure if you and

7    I are thinking of the same ones.

8    Q    And those two terms are the package of networks

9    being arbitrated and the length of the contract; that is,

10   the number of years the contract would last, correct?

11   A    Yeah.  I think the correct statement is it's my

12   understanding that those two, that they would have to be

13   aligned and to three years as a default.

14        I don't know if there are others or not as I sit

15   here, but...

16   Q    Now, you're aware that the industry witnesses have

17   testified about the wide variety of terms that are included

18   in the programming contracts, correct?

19   A    I don't remember.  I'm certainly aware there are a

20   wide variety of terms.

21   Q    Have you read a programming contact,

22   Professor Katz?

23   A    I'm not sure I've ever read one from end to end,

24   but I have had the misfortune to look at dozens of them on

25   occasion.

1    Q    So you're aware that the contract terms include

2   economic terms like subscriber -- monthly subscriber fees

3   and penetration rates?

4    A    I would just be careful if you're going to then

5   try to tie this to testimony when you say "economic terms."

6         As you and I discussed in my deposition -- this

7   particularly comes up with MFNs.  People in the industry

8   sometimes talk about economic terms and non-economic terms

9   and economic MFNs and non-economic.  And it's fuzzy, at

10  least to me, and I believe actually people in the industry

11  where that line is.

12        I'm not sure that if you're using it that way,

13  that people would call penetration requirements economic

14  terms.

15        So if you just want to use that term loosely,

16  fine.  I mean, to an economist, everything is economics.

17  But if you're trying to -- if you're using it as a term of

18  art, I'm not sure.

19   Q    There are other terms in the contract as well,

20  such as "escalator clauses," which raise the rate from year

21  to year, correct?

22   A    I don't know if this contract does, but I'm

23  certainly aware of contracts that do.

24   Q    And with respect to rates, there are also volume

25  discounts to consider and advertising shares, correct?

1        A    Again, I don't know in this contract but certainly

2    as a general matter, I'm aware of those clauses.

3        Q    All right.  And among the terms that may not

4    appear to be economic terms, there are technical rights with

5    respect to content delivery and also TV Everywhere rights?

6        A    There can be.  Again, I don't know -- depends on

7    which contract you're looking at, for example, with

8    TV Everywhere.  But those terms do appear in some contracts.

9        Q    And other terms that can appear in contracts

10   include OTT distribution rights, as with Sling, and most

11   favored nations provisions?

12       A    Yes, as a general matter.

13       Q    And are you familiar with testimony from

14   Mr. Montemagno at Charter that some terms -- and he called

15   them non-economic terms -- are often tailored to that

16   particular distributor, correct?

17       A    Again, I don't recall -- I have a vague

18   recollection he said that.  That certainly is my

19   understanding of how the industry works.

20       Q    That there's a class of terms that would be

21   tailored to the specific distributor?

22       A    I'm not sure I'd say there's a class of terms, but

23   certainly, it's my understanding -- it's my recollection of

24   contracts that there are differences across distributors.

25   In fact, that was part of my direct testimony is why I've

 1   distinguished these different classes of benchmarks, because

 2   the distributor is going to know about the contracts it has

 3   and whether it has terms that are sort of the standard ones

 4   for that distributor.

 5              THE COURT:  Will he be able -- he or she be able

 6   to share that in any way with anyone?  I mean, it's

 7   confidential, right?

 8              THE WITNESS:  My understanding, they'd be able to

 9   do it in the arbitration, that they -- but I generally --

10              THE COURT:  Treat it as confidential between the

11   arbiter and --

12              THE WITNESS:  Yeah.  I don't -- again, there may

13   be exceptions.  But, generally, the programming contracts

14   I've seen have strong nondisclosure provisions.

15   BY MR. YOUNG:

16       Q    So given all those decisions -- well, is it your

17   testimony, Professor Katz, that you would expect the

18   arbitrator to assess the different proposals on a

19   provision-by-provision basis to assess the differences

20   between the two parties' offers on particular provisions?

21       A    I haven't testified on how I think it works, but

22   if you ask me what -- okay.

23              I just want to be clear.  I did not testify, but I

24   do have a view, I guess, since you've asked.  And I would be

25   pretty surprised if an arbitrator started walking through.

1   What I would expect is the arbitrator is going to say to the

2   parties, okay, which things matter?  Let's focus on what's

3   important.  I mean, this is my understanding of how

4   arbitrators, mediators work generally.

5          And it's not going to behoove either side to start

6   messing around -- you know, like they start saying, no.

7   We're going to get into a big fight over -- you asked

8   before, like which states the laws apply.  That's -- as

9   I understand these things, that's not a smart thing to do in

10  front of an arbitrator.

11         So what I think they're going to do is they're

12  going to focus on what the big issues are, and that's how it

13  will work.

14         Look, you talk about whether these will work.

15  I have looked also at affiliation agreements or

16  retransmission consent agreements, and they have a lot of

17  terms in them as well.

18         And as you've mentioned, Mr. Schlichting thinks it

19  can work there.  I've seen one contract for affiliation

20  agreements that's longer than this one.

21     Q    Professor Katz, you haven't participated in any

22  actual arbitration conducted pursuant to an FCC arbitration

23  provision in one of the previous vertical mergers in this

24  industry, have you?

25     A    No, I haven't.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        Q    Right.

 2             Have you actually been a party to an arbitration,

 3   a final-offer arbitration, Professor Katz?

 4        A    I'm not sure if there's any chance I'm in that

 5   now.

 6             I think I have never been, but I'm actually not

 7   100 percent sure.

 8        Q    Okay.  Have you ever served as an arbitrator in a

 9   final-offer arbitration?

10        A    No, other than resolving disputes with my

11   children, no.

12        Q    Okay.

13             Now, given all these decisions about fair market

14   value, benchmarks and the hundreds of contract terms that

15   would need to be made, let's talk about how an arbitration

16   would work, what an arbitrator would have to do in order to

17   select the final offer that comes closest.

18             At your deposition, you discussed the idea that

19   during arbitration, Turner and the distributor would make

20   their case to the arbitrator, correct?

21        A    I don't recall saying that, but I certainly agree

22   with that statement.

23        Q    Okay.  And that means they'd present evidence to

24   the Court, as you said in your deposition, on quantitative

25   factors, relevant data, and econometrics, correct?
```

1      A     Those are all things I would expect them to bring

2   up.  I mean, it would be their decision, but those are

3   matters --

4      Q     And you'd anticipate that, as in this trial, the

5   parties would bring witnesses to testify to the arbitrator

6   in support of their final offers, correct?

7      A     Yes.  I mean, I think it would end up being

8   somewhat different here, because I believe there wouldn't be

9   third parties; but at a broad level, yes.

10      Q     But there could be economic experts?

11      A     That's my understanding that -- I don't recall

12   anything in Turner ruling that out, and certainly that's

13   happened in FCC arbitrations.

14      Q     Econometrics experts presenting the results of

15   their data runs and their models?

16      A     If they thought that would be useful to the

17   arbitrator, yes.

18      Q     Company employees would come to testify?

19      A     I think so.  The only reason I hesitate, I'm just

20   not sure if there's any issues of confidentiality, but

21   I didn't see anything.  I'm not offering a legal opinion,

22   but I didn't see anything that would rule that out.

23      Q     And you would need some sort of -- you could

24   imagine some sort of industry expert to come in, maybe from

25   company employees or somebody else, to talk about how the

1    industry has changed over time, right?

2        A    Certainly, that's something we discussed in my

3    deposition.  That I do recall.  Yes.

4        Q    And discussing how things might change in the

5    future?

6        A    Yes.

7        Q    And the arbitrator would have to take all that

8    into account in choosing between the two contracts?

9        A    I would hope the arbitrator would take it into

10   account.  I mean, he or she would be in a position to weigh

11   the evidence, and there may be experts that he or she

12   disregards.

13            But that is all evidence that I can imagine being

14   put in front of an arbitrator.

15       Q    You discussed with Mr. Barbur how HBO factors into

16   the Turner offer for arbitration about the Turner networks,

17   correct?

18       A    I think that's not a very accurate

19   characterization, but we did talk about HBO very briefly.

20       Q    Now, the Turner offer does not provide rights to

21   arbitrate for HBO, correct?

22       A    That's my understanding.

23       Q    In fact, you said HBO was irrelevant to the Turner

24   offer, correct?  That's what you testified to on direct?

25       A    Yeah.  I mean, certainly, this part -- yes.

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 2601 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2735

1     Q    Okay.  But you're aware from documents and

2    testimony from Mr. Breland in this case that he was told by

3    Mr. Bewkes, the chairman of Time Warner, that Turner -- that

4    Turner and HBO should work on aligning negotiations between

5    Turner and HBO, correct?

6     A    Yes, I am aware of that.

7     Q    And that they were directed to do that in a

8    systematic way to increase Turner's bargaining leverage,

9    correct?

10    A    Yes, I am aware of that.  That's a different

11    issue.

12    Q    And that they should to that in order to try to

13    maximize the bargaining level in each instance, correct?

14    A    I don't remember the details of it, but, overall,

15    that comports with my recollection, yes.

16    Q    You're also aware that Time Warner directed HBO to

17    stop negotiating with YouTube because of an unacceptable

18    offer for the Turner networks?

19    A    I'm not sure I remember -- it might help you if

20    you could tell me, are you referring to a witness or a

21    document?  That might --

22    Q    This came in with Professor Breland -- with

23    Professor Breland -- with Mr. Breland, from Time Warner,

24    Your Honor.

25    A    I'm sorry.  It sounds vaguely familiar.  But I

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  really -- I just don't remember enough of it to answer.

2  Q    You don't remember that Mr. Breland testified that

3  Time Warner directed HBO to stop negotiating with YouTube

4  because YouTube had given an unacceptable offer for Turner

5  networks; is that your testimony?

6  A    I'm saying I don't recall it.  It sounds like

7  it would be a sensible thing to do if you thought it was an

8  unreasonable offer.  But I just don't -- it didn't stick in

9  my mind.

10  Q    So it would be a sensible thing to do for

11  Time Warner to order HBO to stop negotiating because?

12  A    Oh, wait.  I'm sorry.  I misunderstood your

13  question.  I apologize.

14  Q    Okay.

15  A    Could you repeat your question.

16  Q    Sure.

17  A    I thought you said that they should stop

18  negotiating because they were getting a bad offer.  I may

19  have misunderstood you.  I apologize.

20  Q    I'll give you my question again, Professor Katz.

21      Are you aware that Time Warner directed HBO to

22  stop negotiating for an HBO contract with YouTube because

23  YouTube had submitted an unacceptable offer to Time Warner

24  with respect to the Turner networks?

25  A    Okay.  I'm not sure you said that before, but

1    that's -- that sounds familiar.  But I don't recall the

2    specifics of it.

3        Q    And is it your testimony that that would be a

4    sensible thing to do?

5        A    If you're -- you're saying that if they're

6    simultaneously negotiating them, that they might think about

7    how those negotiations link up?  So yeah, that could be a

8    sensible thing to do.

9        Q    Okay.  And there's nothing in the Turner offer

10   that prevents the merged firm from linking the negotiations

11   for HBO and Turner networks after the merger, correct?

12       A    Depends on what you mean by "link."  I mean, this

13   is where I get back to my point about the economics.

14            And this notion that somehow you're going to get

15   this extra leverage out of HBO you can use over and over,

16   that's the part I rejected.  That a different point than

17   saying, could you try to do the two negotiations at once?

18            My understanding when people in the industry and

19   actually in other industries try to do that, those are two

20   separate points.  But I agree that someone could try to link

21   the negotiations.

22            What I disagree with is that that then somehow

23   undermines the arbitration.

24       Q    You know that Mr. Schlichting from -- testified

25   that because HBO is not covered by the arbitration offer, he

1  believes that the merged firm has, as he put it, leverage

2  outside the arbitration with which it can affect the

3  arbitration.

4          Are you aware of that testimony, sir?

5      A    Yes.  I addressed that testimony in my direct when

6  I said that from a perspective of economics, you know,

7  I understand he's concerned.  He's a businessperson.  He

8  should be concerned in the sense of, I want to look for all

9  the angles, make sure everything is going well.  But I think

10 he's mistaken in terms of how it would actually work.

11     Q    Mr. Schlichting called it a hammer, did he not,

12 Professor?

13     A    That's my recollection.

14     Q    And you think he's just got that wrong?

15     A    Yes.

16     Q    But you do agree with Mr. Schlichting that nothing

17 in the Turner offer would prevent the merged firm from

18 blacking out a distributor on HBO while an arbitration is

19 continuing for the Turner networks, correct?

20     A    If you mean there's nothing in the arbitration

21 procedures, you know, as opposed to there's no economic

22 force, yeah, I agree.  I understand that there's nothing in

23 the four corners of the document that says you can't do

24 that.

25          My argument has to do with the economics or the

1   business of how it would work, not any sort of legal

2   constraint.

3       Q    And if you were incorrect in your view of the

4   business risks associated with that, then Mr. Schlichting

5   would have a basis for thinking that he was facing a hammer

6   if HBO was not included in the Turner arbitration offer,

7   correct?

8       A    No.  I'm not sure that logically follows.  It may

9   be that he and I both could be incorrect.  But, as I say, I

10  obviously believe I am correct.  I'm testifying under oath.

11  I believe he's incorrect.  But it doesn't follow that at

12  least one of us has to be right.

13      Q    In any event, you agree that there's nothing in

14  the Turner offer that prevents the merged firm from refusing

15  to continue negotiations on HBO and even to allow the HBO

16  agreement to expire and black it out for a distributor who

17  is undergoing arbitration for the Turner networks?

18      A    Yeah.  I don't believe there's anything in this

19  document that stops that.

20      Q    Thank you.

21          So let's talk about what the result of the

22  arbitration would be.

23          Based on your deposition testimony, I gather that

24  you don't believe that -- and your testimony with

25  Mr. Barbur, you don't believe that the result of each

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    arbitration would necessarily reach your definition of fair

 2    market value in each case, correct?

 3         A    That's correct.

 4         Q    Because it could easily be the case, right, that

 5    whatever value the arbitrator had in mind for what fair

 6    market value would be, it's not necessarily the case that

 7    either offer would necessarily match that value, correct?

 8         A    Yeah.  They certainly don't have to match it

 9    exactly.

10         Q    Right.

11              So the arbitrator could be presented with two

12    different offers, neither one of which matches what the

13    arbitrator thinks is fair market value?

14         A    Well, first off, it's not clear that the

15    arbitrator would actually even come up with a view of, this

16    is fair market value, and then match everything against it,

17    because these are multidimensional contracts.

18              The arbitrator, again, might take sort of a

19    holistic reasoning, saying this one seems more reasonable

20    than that.

21              But I guess it's conceivable some arbitrator would

22    say, well, it was really -- if we were doing conventional

23    arbitration, I'd pick something different.  That's possible,

24    but --

25         Q    In that answer, Professor Katz, you said that the

1    arbitrator would think about which one was more reasonable,

2    correct?

3        A    I'm saying that's a way that an arbitrator might

4    approach it where reasonable is being used there as a

5    synonym for fair market value.

6        Q    Are you saying that more reasonable is the same as

7    trying to reach -- as the standard for fair market value as

8    you've defined it, which is trying to reach the result that

9    would have obtained if the merger hadn't gone through?

10       A    Wait.  I'm sorry.  I'm not sure I understand the

11   question.

12            Are you asking me if I think that's a general

13   definition of the word "reasonable"?  Is that your question?

14       Q    I'm asking you if you agree or if you're using the

15   term "reasonable" to mean something other than the

16   question -- the target of reaching fair market value, as

17   you've defined, which is the result that would have applied

18   had the merger not gone through.

19       A    The way I was just using it was I meant saying the

20   arbitrator asks himself which one is more reasonable.  And I

21   was using that as a shorthand for the arbitrator saying,

22   okay, which of these two final offers better reflects the

23   fair market value standard before me?

24            And the reason I want to make that distinction --

25            THE COURT:  It doesn't have to equal it.

```
 1              THE WITNESS:  Huh?

 2              THE COURT:  It doesn't have to equal fair market

 3    value.

 4              THE WITNESS:  No.  That's right.  I'm just going

 5    to get which one thinks -- you know, better reflects which

 6    one is closer.  I mean, in some sense, that's the point of

 7    baseball arbitration, is you don't force the arbitrator to

 8    have to really get it out to the 19th decimal point.

 9    BY MR. YOUNG:

10       Q    But you would agree that the arbitrator has to

11    have some conception in mind of what the fair market value

12    is in order to choose been the two offers, correct?

13       A    Yeah.  An arbitrator has to have some view of

14    which one is -- again, reasonable is shorthand, yes.

15       Q    And in any event, the final outcome of the

16    arbitration -- that is, the arbitrator has chosen one of the

17    two final offers presented -- needn't represent that fair

18    market value, correct?

19       A    Let me make sure I understand your question.

20              If the arbitrator has actually gone to the point

21    of saying, all right, I've decided here's what a fair market

22    value contract looks like -- which I wouldn't expect the

23    arbitrator to actually do all of that.

24              But if you have a hypothetical with that, yes, in

25    your hypothetical, it may be that neither contract looks
```

1    like this one this hypothetical arbitrator has done.  If

2    that's what you're asking, the answer is yes.

3        Q    Okay.  So this is the -- how the Turner offer for

4    arbitration would work, this is the arbitration offer that's

5    casting the shadow that you rely on, correct?

6        A    Well, not that last one, because I don't think

7    it's -- but if you're just generally -- it's the arbitration

8    that would occur if they invoked the option to Turner, you

9    know, the one described -- have the process described by the

10    Turner arbitration procedures, yes, that's in the shadow.

11        Q    Isn't it true, Professor, that no industry witness

12    at this trial has testified that the Turner arbitration

13    offer resolves their concerns about the merger?

14        A    Let's be careful just a little bit.  Like, I want

15    to make sure it's not all, you know, "When did you stop

16    kicking your dog?" question, because I don't think that

17    Comcast testified that this resolves their -- I mean,

18    logically you could say Comcast did not testify that this

19    resolves their concerns.  Comcast, though, I believe

20    Mr. Rigdon separately testified, they don't have concerns.

21            And then he also said, as I believe, that he

22    thinks that the arbitration would be beneficial to them.  So

23    anyway, I just want to be clear about that.

24            But I am certainly aware of other witnesses saying

25    that they -- apparently they're opposed to the merger.  And

1   this is part of -- I mean, I'll put this way.  They're

2   opposed to the merger.  And Turner's arbitration commitment,

3   as I understand it -- I'm not offering a legal opinion -- is

4   a contractual commitment that's part of the merger so that

5   apparently they're opposed to the package.

6        Q    Is it also the case -- are you aware also,

7   Professor Katz, that no industry witness at this trial has

8   testified that the Turner arbitration offer would enable

9   them to get a contract that isn't compromised by the

10  increased leverage gained from the merger?

11       A    Again, I mean, I think Mr. Rigdon of Comcast did

12  not say that it would be compromised.  So if you want to get

13  and play the psychological game, yes; he did not testify

14  that arbitration would solve the problem.  But, again, he

15  doesn't see that there's a problem.

16            I'm also assuming that when you say "no industry

17  witness," you're not counting people from AT&T or Turner as

18  industry in that.  I don't recall what they've said about

19  it, but I suspect at least some of them are fans of it.

20       Q    Okay. in your testimony --

21            THE COURT:  You can approach.

22            You can step down.

23            (Sealed bench conference)

24            THE COURT:  Are you going for 5 minutes?  How much

25  more you got?

```
 1            MR. YOUNG:  Two shorter topics, Your Honor.  It

 2   shouldn't take very long.

 3            Let's take the luncheon recess.  How long will it

 4   take when you get back, ten minutes.

 5            MR. BARBUR:  15, maybe, but I can commit to 15.

 6            And 10 if Your Honor asks me to shorten it.

 7            THE COURT:  Let's try to do ten.  We're trying to

 8   do two experts today.

 9            MR. BARBUR:  I have very little redirect.

10            THE COURT:  Redirect, limited redirect.

11            Okay.  Very good.  All right.

12            MR. YOUNG:  Thank you, Your Honor.

13            THE COURT:  All right.

14            (Open court)

15            THE COURT:  We're going to take the luncheon

16   recess.  You remain a witness under oath in the case,

17   Professor.  You know the rules there.  You can't discuss

18   your testimony with anyone, including your own counsel.

19            Be back at 2:45.

20            THE WITNESS:  Thank you.

21            THE COURT:  See you then.

22            DEPUTY CLERK:  All rise.

23            This Honorable Court now stands in recess until

24   the return of court.

25            (Proceedings concluded at 1:15 p.m.)
```

C E R T I F I C A T E

   I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: April 16, 2018_____   /S/__William P. Zaremba_____

            William P. Zaremba, RMR, CRR

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        :
                                 :
                 Plaintiff,      :        CV No. 17-2511
          vs.                    :
                                 :        Washington, D.C.
                                 :        Monday, April 16, 2018
AT&T, INC., ET AL.,              :            2:50 p.m.
                                 :
                                 :            Day 14
                 Defendants.     :
-----------------------------x



                     AFTERNOON SESSION
                 TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE RICHARD J. LEON
             UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:     Craig W. Conrath, Esquire
                        Eric D. Welsh, Esquire
                        Donald G. Kempf, Jr., Esquire
                        Scott A. Scheele, Esquire
                        Samer M. Musallam, Esquire
                        Frederick Young, Esquire
                        U.S. DEPARTMENT OF JUSTICE
                        Antitrust Division
                        450 Fifth Street, NW
                        Washington, DC  20530
                        202) 532-4560
                        craig.conrath@usdoj.gov
                        eric.welsh@usdoj.gov
                        donald.kempf@usdoj.gov
                        scott.scheele@usdoj.gov
                        frederick.young@usdoj.gov
                        samer.musallam@usdoj.gov

```
 1   Appearances Continued:

 2   For Defendant AT&T          Katrina M. Robson, Esquire
     and DirecTV Group          O'Melveny & Myers LLP
 3   Holdings, LLC:             1625 Eye Street, NW
                                Washington, DC  20006
 4                              (202) 220-5052
                                krobson@omm.com
 5
                                Daniel M. Petrocelli, Esquire
 6                              M. Randall Oppenheimer, Esquire
                                O'MELVENY & MYERS LLP
 7                              1999 Avenue of the Stars
                                8th Floor
 8                              Los Angeles, CA  90067
                                (310) 553-6700
 9                              dpetrocelli@omm.com
                                roppenheimer@omm.com
10
                                Michael L. Raiff, Esquire
11                             Robert C. Walters, Esquire
                                GIBSON, DUNN & CRUTCHER LLP
12                             2100 Mckinney Avenue
                                Suite 1100
13                             Dallas, TX 75201
                                (214) 698-3350
14                             mraiff@gibsondunn.com
                                rwalters@gibsondunn.com
15
     For Defendant             Kevin J. Orsini, Esquire
16   Time Warner, Inc.:        Peter T. Barbur, Esquire
                                CRAVATH, SWAINE & MOORE LLP
17                             Worldwide Plaza
                                825 Eighth Avenue
18                             New York, NY  10019
                                (212) 474-1140
19                             korsini@cravath.com
                                pbarbur@cravath.com
20
     Court Reporter:           Crystal M. Pilgrim, RPR, FCRR
21                             Official Court Reporter
                                United States District Court
22                             District of Columbia
                                333 Constitution Avenue, NW
23                             Washington, DC  20001
                                (202) 354-3127
24                             crystal_pilgrim@dcd.uscourts.gov

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

Table of Contents

|                        | Direct | Cross | Redirect | Recross |
|------------------------|--------|-------|----------|---------|
| On behalf of the Defense: |     |       |          |         |
| Michael Katz           |        |       |          |         |
|   By Mr. Young         |        | 2750  |          |         |
|   By Mr. Barbur        |        |       | 2755     |         |
| Peter E. Rossi         |        |       |          |         |
|   By Mr. Barbur        | 2762   |       |          |         |
|   By Mr. Scheele       |        | 2823  |          |         |

```
 1                        P-R-O-C-E-E-D-I-N-G-S

 2            THE DEPUTY CLERK:  Your Honor, recalling civil action

 3   number 17-2511, The United States of America versus AT&T, Inc.,

 4   et al.

 5            THE COURT:  Witness remains under oath.

 6         You may continue when you're ready.

 7            MR. YOUNG:  Thank you, Your Honor.

 8         DEFENSE WITNESS MICHAEL KATZ, PREVIOUSLY SWORN

 9                   CROSS EXAMINATION (Continued)

10   BY MR. YOUNG:

11   Q.   Good afternoon, Professor Katz?

12   A.   Good afternoon.

13   Q.   In your testimony with Mr. Barber you talked about several

14   areas where you disagreed with Dr. Shapiro.  I think there's

15   one area where you do agree with him.

16      As you told me in your deposition isn't it correct that you

17   believe that Nash bargaining is a main stream economic area of

18   bargaining, correct?

19   A.   Yes, I agree with that statement.

20   Q.   Before lunch I asked you about the CV that you had

21   included in your report.  And I'd like to draw your attention

22   to that again where you listed, I think we both calculated that

23   it was more than 90 book chapters, articles and other

24   publications, correct?

25   A.   Yes.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.    And it's true as with arbitration, isn't it that none of

2  your book chapters mentioned the FCC Program Access Regulations

3  in their titles?

4  A.    I think that's correct.  I would have to look to be sure.

5  Q.    And the same is true for your articles?

6  A.    I believe so.

7  Q.    And the same is true for the grants that you've received?

8  A.    I'm sure of that.

9  Q.    Okay.  You also list your testimony on consulting work and

10  isn't it correct that you've never testified before this case

11  on the subject of the FCC Program Access Regulations?

12  A.    Yes.  First, there are two different questions because

13  that's not a list of my complete work.

14      But just to cut through things, the best of my knowledge

15  and recollection, I've never testified on the Program Access

16  rules prior to this proceeding.

17  Q.    Thank you.

18      And as you sit here today, Professor Katz, can you think of

19  anything you have done professionally since leaving the FCC in

20  1996 having anything to do with the Program Access Regulations?

21  A.    So I'm having trouble remembering if it was when I was at

22  the FCC or afterwards.

23      I certainly had professional discussions about the Program

24  Access rules, but it may have been while I was there.

25  Q.    Okay, thank you.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Turning briefly to the actual Program Access Regulations.

2   Would you agree with me that the FCC adopted the undue

3   influence provision at the same time it adopted the non

4   discrimination provision when it first adopted the Program

5   Access rules in 1993?

6   A.   A later date, that would make sense.  Yeah, my

7   recollection is that the unduly influenced provision is in the

8   statute and then that the FCC mirrored in what they did with

9   their rules.  I could be misremembering but that's my

10  recollection.

11      So whenever the FCC first did it, I would expect undue

12  influence to be in there.  The time I think there may have also

13  been the explicit prohibition of the exclusive contracts, but I

14  think that was all.

15  Q.   Isn't it true that one of the reasons the FCC adopted an

16  arbitration remedy in its previous consideration of vertical

17  mergers is that because the FCC concluded that the Program

18  Access rules would not solve the problems of a post merger

19  price increase?

20  A.   I don't think that's a fully accurate description.

21  Accuracy is important here.

22      I believe what FCC said and there may be some language, but

23  certainly the language Professor Shapiro cited saying Comcast

24  NBCU which is one where they put in the arbitration.  They said

25  that the rules did not necessarily prevent certain kind of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  behavior.

2     So if your question is did they say well, there's a

3  possibility that it could slip through, yes, that's my

4  understanding, said there's a possibility.

5     That's different than saying that they were sure that the

6  rules were efficient, at least in my way of thinking.

7  Q.  Isn't it true, Professor, that in the Comcast NBCU the FCC

8  stated our Program Access rules which address discriminatory

9  pricing inadequately address the potential harms presented by

10 the increased ability and incentive of Comcast NBCU to

11 uniformly raise Comcast's rival speeds?

12 A.  Yes.  And I believe when they said inadequately what they

13 meant is that's a possibility that something could slip

14 through.

15    I believe what I just stated was their justification or the

16 logic that led up to that summary conclusion.

17 Q.  That's your interpretation of what the FCC said, am I

18 correct?

19 A.  Yes.

20 Q.  Okay.

21 A.  I mean, the one point, and it's not interpreted literally

22 said that it may get through or that's the paraphrasing, that's

23 not interpretation, that's what the words are.

24 Q.  Professor Katz, you've never negotiated a programming

25 license; is that correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1   A.    I'm certainly not involved in some license, not for video

2   programming, no.

3   Q.    So you would agree with me that you have less experience

4   negotiating program contracts than Warren Schlichting?

5   A.    Yes.

6   Q.    Susan Fenwick?

7   A.    I can't remember if she actually did the negotiations or

8   part of the big thing, a bigger officer but sure, I guess

9   she's, she hasn't done fewer than I have.

10  Q.    And the number that you have is zero?

11  A.    That's correct.

12  Q.    Okay.  You have less experience negotiating programming

13  contracts than Tom Montemagno?

14  A.    Yes.

15  Q.    And you have less experience negotiating programming

16  contracts than Randy Segan?

17  A.    Yes.

18  Q.    You also have less experience than all of those business

19  executives in terms of negotiating programming contracts as you

20  put it in the shadow of arbitration?

21  A.    Yes.

22          MR. YOUNG:  I pass the witness, Your Honor.

23          THE COURT:  All right.

24      Redirect.

25                    REDIRECT EXAMINATION
```

1  BY MR. BARBUR:

2  Q.   Professor Katz, just a very few questions.

3       Could you turn to DX D 0120 which is the quotations that

4  you had -- excuse me -- yes, about Dish, yes?

5  A.   Yes.  120 says Dish statements in support of arbitration?

6  Q.   Right.  Do you recall the questions by Mr. Young as to

7  whether Dish was speaking here about disputes concerning

8  retransmission consents?

9  A.   My recollection is he asserted that's what they were

10 doing.

11 Q.   And is it your understanding that the position that Dish

12 took in these quotes applied to cable networks as well as to

13 retransmission consents?

14 A.   I'm not sure about these specific quotations.  I took the

15 lesson from this that they had spoken in support of

16 arbitration.

17      The one thing where I know was certain what was going on is

18 when Dish filed a notice of intent to arbitrate at the FCC that

19 that notice covered I think retransmission consent, but then

20 also covered everything ordinary cable networks.

21      So I'm quite sure they invoked it for the full spectrum

22 from these quotations and the context, I can't be sure that the

23 quotations were primarily by retransmission or exclusively

24 about retransmission consent.

25 Q.   Mr. Young also asked you some questions about whether the

1  Turner arbitration offer applied to the NCTC.

2      Do you recall that?

3  A.   Yes.

4  Q.   Are you aware of whether Turner has sent a copy of its

5  arbitration commitment to the NCTC?

6  A.   Yes.  I mean, I've seen a letter addressed to them.  I

7  can't be sure that it actually went to them, but I believe they

8  got it.

9           MR. BARBUR:  Let me hand that up for identification

10 purposes.

11      May I approach the witness, Your Honor?

12           THE COURT:  You may.

13 BY MR. BARBUR:

14 Q.   This has been marked for identification.  It is DX 0785.

15      Professor Katz, have you seen that letter before?

16 A.   Yes, I have.

17 Q.   Is this the one you were referring to that was sent to the

18 NCTC?

19 A.   Yes.  As I say, to be precise about this, I can testify

20 that this is a letter addressed to them and you'd have to ask

21 somebody else if they actually sent it, but it's my

22 understanding they did.

23      In fact, I believe Mr. Warren has told me it was sent to

24 them.

25 Q.   Finally, Mr. Young asked you a number of questions about

1  the large number of factors and terms and other aspects of

2  contracts that would be, need to be considered by an

3  arbitrator.

4      Do you recall that?

5  A.   Yes, I do.

6  Q.   Is all of that equally true for the arbitration process

7  under the Comcast NBCU arbitration arrangements?

8  A.   Yes, I can't see any reason it would be different.

9          MR. BARBUR:  Nothing further, Your Honor.

10         THE COURT:  All right.

11         MR. YOUNG:  No redirect, Your Honor.

12         THE COURT:  All right.

13      You may step down.

14         THE WITNESS:  Thank you, Your Honor.

15      (Witness excused.)

16         THE COURT:  Call your next witness.

17         MR. PETROCELLI:  Your Honor, we call Professor Peter

18  Rossi.  Mr. Barbur will handle the witness.

19         THE COURT:  What's the name of the witness again?

20         MR. PETROCELLI:  Peter Rossi, R-O-S-S-I.

21         MR. SCHEELE:  Your Honor, if I may, may we approach

22  the bench for a preliminary matter related to this witness?

23         THE COURT:  Okay.

24      (Sealed bench conference.)

25         MR. SCHEELE:  Your Honor, I just wanted to briefly

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    alert the Court to a sensitive issue relating to this witness.

2          This witness is going to the Altman Vilandrie survey.

3    As the Court may recall in connection with Mr. Bewley, there's

4    an awful lot of sensitivity about the confidential information.

5    That's importantly linked to Altman Vilandrie, but it's

6    important to the United States as well and I'm sure to this

7    Court. The defendants have assured us that they're going to

8    keep the scope of Dr. Rossi's testimony consistent with what

9    Altman Vilandrie has said in public and I'm sure they intend to

10   do so.  I would note, however, that a lot of Dr. Rossi's report

11   in his deposition has been designated as confidential

12   information.

13         It's one thing for Mr. Bewley to be able to self-police

14   one thing on the stand.  It's a little different for Dr. Rossi

15   who's involved with Altman Vilandrie.

16         THE COURT:  He's reviewed the study?

17         MR. SCHEELE:  As I understand he has reviewed the

18   study.

19         THE COURT:  What was the position of the deposition,

20   of his deposition?

21         MR. SCHEELE:  He was deposed.  The deposition was

22   pursuant to the protective order so there were no restrictions

23   of confidentiality in that context.

24         THE COURT:  The witness's testimony in his deposition

25   was it heavily dependent upon discussion with confidential

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  opinion pretty much focuses answers on the non-confidential

2  questions.

3          MR. SCHEELE:  I'll try to do my best to characterize

4  that.

5          Mr. Petrocelli may disagree with my characterization.

6          THE COURT:  Are you questioning him?

7          MR. PETROCELLI:  Mr. Barbur.

8          THE COURT:  Mr. Barbur.

9          MR. SCHEELE:  Dr. Rossi goes into the methodology of

10  the Altman Vilandrie study.  And some of that methodology has

11  been discussed in public as you know in the context of

12  Mr. Bewley's testimony and some of it has not.

13          My only concern, Your Honor, is that Dr. Rossi is the

14  defendant's witness.  Defendants have assured us they are going

15  to try to maintain the confidentiality.  I think it's incumbent

16  upon them to ensure that confidential information remain

17  confidential.  This is an issue where once the genie is out of

18  the bottle, there's no putting the genie back in.

19          So I wanted to make you aware of this sensitive issue.

20  I will do my best to not interrupt the examination, but I may

21  be standing up in a prophylactic sort of way.

22          THE COURT:  You're welcome to object anytime you need

23  to, that's fine.

24          MR. PETROCELLI:  Your Honor, I'd just like the record

25  to be clear of the following:  When Mr. Bewley of Altman

```
1   Vilandrie testified, Your Honor proposed and the government

2   agreed that they could do a public examination of Mr. Bewley

3   and I could do a public cross and then after that examination,

4   if they wanted, they could then request to go into closed

5   session.

6          After they did the public direct and we did the public

7   cross, they passed the witness and did not even ask Your Honor

8   to do any further examination in closed session.

9          Secondly doctor, excuse me, Mr. Bewley's report was as

10  Dr. Shapiro testified, the single most important document that

11  he relied on.  And he openly testified about that report both

12  on direct and on cross.

13         We do intend to examine Professor Rossi about this

14  report.  Actually, it's not a report.  It's a, as you may

15  recall, it's a slide deck presentation.  And we do intend to

16  examine Professor Rossi about it and we will try to stay away

17  from specific figures and things.

18         THE COURT:  Proprietary.

19         MR. PETROCELLI:  We don't agree that when they hard

20  coded the numbers and did all of these things that that's

21  confidential, Your Honor.  All that was elicited in open court.

22  There may be like certain details and I -- do you think there's

23  a detail or two that you can object to?  We can address it

24  here.

25         We don't intend to go into the methodology and
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  demonstrate it's utter unreliability.

 2        MR. SCHEELE:  I don't know that we're in much

 3  disagreement.  The only point that I'm making is that unlike

 4  Mr. Bewley, the defendants are calling this witness.  The

 5  defendants know what they wanted to ask him.  They could have,

 6  and I'm sure they did, look at Mr. Bewley's testimony to

 7  determine the bounds of appropriate confidentiality and it's

 8  incumbent upon them to treat that seriously.

 9        THE COURT:  I have no reason to think they won't.

10        MR. SCHEELE:  I don't either.  I just wanted to alert

11  the Court to this issue.

12        MR. PETROCELLI:  We're good to go.

13        THE COURT:  We're having a grand time up here.

14        MR. SCHEELE:  We may be in vigorous agreement.

15        THE COURT:  Yes, if I had a little ice cream I'd hand

16  it out to you guys.

17        MR. PETROCELLI:  Thank your, Your Honor.

18        MR. SCHEELE:  Thanks.

19        (Open court.)

20        THE COURT:  Mr. Barbur.

21              DEFENSE WITNESS PETER E. ROSSI SWORN

22        MR. BARBUR:  I'm sure Your Honor won't be surprised

23  that we have a binder of documents for Professor Rossi.

24     May I hand those out?

25        THE COURT:  You may.

1        MR. BARBUR:  May I approach the witness, Your Honor?

2        THE COURT:  You may.

3        MR. BARBUR:  May I proceed, Your Honor?

4        THE COURT:  When you're ready.

5                          DIRECT EXAMINATION

6   BY MR. BARBUR:

7   Q.    Processor Rossi, could you please state your full name for

8   the record?

9   A.    Yes, Peter Eric Rossi.

10  Q.    What is your current position?

11  A.    I'm the James Collins Professor of marketing statistics

12  and economics at the Anderson School of Management at UCLA.

13  Q.    How long have you taught there?

14  A.    About nine years.

15  Q.    Where were you before that?

16  A.    The Booth School of Business at the University of Chicago.

17  Q.    How long were you there for?

18  A.    Approximately 21 years.

19  Q.    What courses have you taught?

20  A.    I've taught a wide variety of both doctorial and masters

21  level courses in marketing, marketing research, the new product

22  development, econometrics, and statistics.

23  Q.    At what level have you taught those courses?

24  A.    Those would be at the masters and doctorial level, both.

25  Q.    What is your educational background?

1  A.   My Ph.D is in econometrics which is the application of

2  statistics, economics problems, and in 1948 in University of

3  Chicago.

4     My Bachelors Degree is in mathematics and history from

5  Oberlin College.

6  Q.   You also have an MBA?

7  A.   I do have an MBA, yes, from University of Chicago.

8  Q.   Have you published in the fields that you have referenced?

9  A.   Yes, I have, all three.

10  Q.   Do you have a sense of how many publications you have had?

11  A.   I didn't count them like Professor Katz apparently did,

12  but it's something like 60 plus and I have three books.

13  Q.   And can you give the Court a little more detail on the

14  number and types of publications you authored on survey design?

15  A.   Yes.  I've worked extensively on survey methodology.  How

16  to measure scales, how to interpret scales.  How to implement

17  surveys of particular type.  How to analyze the data.

18     Most recently for example, I published an article in the

19  Journal of Law and Economics on using survey data for a

20  particular type called the conjoint survey to estimate damages

21  in certain patent infringement situations as an example.

22  Q.   Have you had experience in conducting consumer surveys?

23  A.   Yes, I have.

24  Q.   What types of consumer surveys have you conducted?

25  A.   I have as I just mentioned this type of survey called a

1  conjoint survey which undoubtedly we'll talk about a little bit

2  later today.

3      I've also done general purpose surveys a wide variety of

4  types.

5  Q.    Approximately how many surveys have you conducted?

6  A.    It's hard for me to count since I have been doing surveys

7  since the early '80s but at least 30.

8  Q.    What products and industries have you surveyed?

9  A.    I've surveyed a wide variety of consumer package products

10 such as package goods such as razor blades.

11     I've worked on consumer electronics, such things like

12 digital cameras, cell phones, Smart phones, tablets and the

13 like.

14     I've also done some retailer surveys.  I have worked with

15 Walmart and Walgreens and other retailers doing surveys of

16 their customers.

17 Q.    Did you have any other survey related expertise?

18 A.    Well, I had a great deal of influence on the kind of, the

19 way in which survey data is analyzed.

20     So for example, the Altman Vilandrie consulting group who

21 we'll talk about later today used a software called Sawtooth

22 Software, and the founders of Sawtooth Software used some of my

23 ideas.  I'm not blessing the software particularly in and of

24 itself, but they did use some of my ideas.

25     Also the other leading software package that people use and

1  analyze everyday is something called SAS, Statistical Analysis

2  System and they've consulted with me to implement some of my

3  own ideas.

4  Q.    Have you ever testified as an expert in a court

5  proceeding?

6  A.    Yes, I have.

7  Q.    Approximately how many times?

8  A.    Five.

9  Q.    Have you ever been excluded from testifying as an expert

10  by a court?

11  A.    No, I have not.

12          MR. BARBUR:  Your Honor, defendants tender Professor

13  Rossi as an expert in the fields of marketing science,

14  marketing research, survey design, and the statistics of survey

15  sampling.

16          THE COURT:  Hold on a second, let me write this down.

17       Last one was what?

18          MR. BARBUR:  The statistics of survey sampling.

19          THE COURT:  Survey sampling.

20       What was the second one, marketing science was the first

21  one.

22          MR. BARBUR:  Marketing science, marketing research.

23          THE COURT:  Marketing research.

24       All right.  Any objection?

25          MR. SCHEELE:  No Objection, Your Honor, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1            THE COURT:  All right.  He'll be so found to be an

2  expert in those areas.

3            You may proceed accordingly.

4            MR. BARBUR:  Thank you.

5  BY MR. BARBUR:

6  Q.    Professor Rossi, what was your assignment in this matter?

7  A.    My assignment was to review and critique two surveys of,

8  rather two analyses done at attempt to estimate the loss of

9  customers due to a removal or blackout of Turner, all video

10  content from a video provider.

11  Q.    What are those two estimate of subscriber losses?

12  A.    There is one survey that was designed and implemented by

13  Professor John Hauser of M.I.T.

14     And there was another consulting engagement by this firm

15  mentioned earlier, Altman Vilandrie that actually sponsored a

16  number of methodologies but also came to conclusions about

17  current and prospective customer losses.

18  Q.    What kinds of subscriber losses do these two estimates

19  purport to measure?

20  A.    They're purporting to measure the impact of removal of

21  Turner video content from a pay-TV video, multi channel video

22  provider.  And that has two dimensions.

23     The rule of content might cause current customers to switch

24  away from that provider.

25     It also might make the provider less attractive to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  prospective customers.

2  Q.   How does Professor Shapiro use these subscriber loss

3  estimates?

4  A.   It is my understanding that these subscriber loss rates

5  which he calls the Turner loss rate are one of three critical

6  inputs into his economic loss analysis.  And therefore is

7  fundamental actually to that loss analysis.

8  Q.   And he relies both on the Altman Vilandrie study and the

9  Hauser study?

10 A.   He relies primarily on the Altman Vilandrie study which he

11 calls the single most important piece of evidence or document.

12     I wouldn't say that he relies on the Hauser survey.  I

13 think he considered it and finds it consistent with that as we

14 will discuss.

15     One of the problems with the Hauser survey is it does not

16 estimate prospective losses, only current losses.

17 Q.   So let's begin with Professor Hauser's survey.  What

18 material did you review relating to that survey?

19 A.   I reviewed of course Professor Hauser's expert report, his

20 deposition testimony, his testimony here in this trial, as well

21 as supporting documents that were supplied along with his

22 report which include of course the original survey

23 questionnaire which is really represented by a series of screen

24 shots as well as the data that come from the survey.

25 Q.   Can you briefly describe for the Court what Professor

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Hauser did?

2   A.   Yes.  Professor Hauser did a survey, an internet base

3   survey of paid TV subscribers and posed a hypothetical scenario

4   in which there was a permanent blackout of Turner content and

5   asked or measured people's intentions to switch away from their

6   current provider.

7   Q.   Did he have different groups within this survey?

8   A.   He did.  He had what he called a test condition group

9   which are the groups exposed to the blackout condition.  Or the

10  removal condition of Turner channels and he also had what he

11  calls a control group.

12  Q.   Do you have an opinion regarding Professor Hauser's survey

13  and its conclusions?

14  A.   Yes.  I believe Professor Hauser's survey, the instrument

15  is designed in a biased way, the results are unreliable.

16  Q.   Before we go into this in more detail, can you briefly

17  summarize what your conclusions are?

18  A.   Yes.  The basis for that conclusion is four portions or

19  four aspects to it.

20     One is he uses the scale, the intent to switch scale.  This

21  is a confusing scale, an inaccurate scale and I believe cannot

22  be interpreted as a measure of switching probability as

23  Professor Hauser does and as Professor Shapiro requires.

24  That's number one.

25     Number two, I believe the blackout scenario was posed in a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    biased way by the use of video prompts, visual prompts and some

2    leading questions.

3         Three, Professor Hauser did not demonstrate the

4    representativeness of his survey or the ability to extrapolate

5    from his survey results to any other population such as all

6    paid TV subscribers in the United States.

7         And finally, the statistical margin of error in his survey

8    is very large and renders it unreliable.

9    Q.   Professor Hauser has referred to his survey as an

10   experiment.

11        Do you have an opinion about the description of this as an

12   experiment?

13   A.   An experiment as I understand it and as I have practiced

14   is a, this is what you would call a hypothetical experiment.

15   That is to say there aren't any actual blackouts of channels

16   that these respondents are being exposed to.  They're asked

17   imagine what would happen.

18        What I consider to be an experiment, a field experiment, I

19   have been involved in a number of them is where you actually go

20   out in the real world and alter these things experimentally.

21   Q.   Let's talk about the internet survey used by Professor

22   Hauser.  We have heard some testimony about this but can you

23   briefly explain how internet surveys are done?

24   A.   Absolutely.  Internet surveys today are a well used mode

25   of survey research.  Typically what they're done is by, they

1    are companies.  The companies used by Professor Hauser is

2    called SSI, it's Samples Surveys, Incorporated.

3        What they do is they harvest people, they go around and

4    they do emails and display ads in a variety of mechanisms.

5    They basically harvest email addresses and they call that a

6    panel.  In the case of SSI it is a large panel, it's on the

7    order of several million at least.

8        These people have agreed to undertake surveys, and what

9    happens when you want to do a survey is you approach SSI and

10   you say I have a survey, I designed it, I implement it in

11   computer code and they send out tens of thousands of email

12   invitations to this group of people saying if you like to take

13   a survey please click on this link and you can take the survey

14   on your computer.

15       In exchange for this, the respondents receive very little

16   in the way of actual compensation for their time.  They're

17   typically it's in the form, I don't know the specific

18   compensation packets for SSI.  But for others, it's typically

19   eligibility for rebates or possibly a small prize, so it's a

20   fairly minimal compensation.

21   Q.   Do internet panelists tend to take a lot of surveys?

22   A.   Yes, they do.  For example, in the one experience that I

23   had working with internet survey data we asked the people who

24   respond to the survey if they could tell us how many surveys

25   each of the respondents in this survey, several thousand in the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   survey, had taken in the last month.   Seems like a reasonable

2   question.

3       We found for example one person had taken 1500 surveys in

4   the last month.

5                  THE COURT:   Fifteen hundred?

6                  THE WITNESS:   Which is something like 50 a day.

7           Now I'm not saying this necessarily happened in this

8   case, but this is somewhat of a problem with some of these

9   accounts.

10  Q.    Is there a name for the kind of sample you get from an

11  internet survey?

12  A.    Yes.  Statisticians call it a convenient sample.

13  Q.    Why is it a convenient sample?

14  A.    There's no scientific basis for the sample that you get

15  from these surveys.  In other words, they are convenient.

16      For example, I could go out in the hallway in this building

17  and stop various people and call that a sample.

18      It is a sample of the larger population of everyone in

19  Washington, but it's the convenience sample.  There's no

20  scientific basis for the selection of it which makes

21  extrapolating from it extremely difficult.

22  Q.    Did Professor Hauser do anything to ensure that his sample

23  was representative?

24  A.    No.  He did not establish the representativeness of his

25  sample?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   What did he do?

2  A.   Professor Hauser, what Professor Hauser did was to use

3  what's called inbound click balancing.  It sounds complicated,

4  but it's very, very simple.

5      It's what's called a quota.  So he imposed quotas on gender

6  so let's say there's around 51 percent female and 49 percent

7  male in the U.S. adult population.

8      He also imposed some quotas on age groups.  And so you,

9  let's say they send out these tens of thousands of email

10 invitations.  People click on them.  Soon as they get, say

11 let's say he used a total of 1600 respondents approximately.

12     So they get say 800 men, they stop accepting any men.  And

13 then accept only women until they fulfill the quota.  So this

14 is known as the quota sample.

15     The fact that, and this means by, at the end of the day his

16 sample will be in the same proportions of gender and age and

17 also they did some location, geographic location as the U.S.

18 population.  But that does not mean that the sample is

19 representative in the terms of it's used about the important

20 things that he's asking them about which are things like their

21 view about what's the value of Turner content.

22     Your views about how difficult it is to switch your

23 internet providers.  What kind of bundles of different

24 contracts you own as a subscriber.  So all of these things he's

25 provided no evidence about.

1 Q.    Professor Hauser says he asked respondents to indicate

2 whether they were paid TV subscribers and who they subscribed

3 to.

4      Why isn't that good enough?

5 A.    That's what's called a screening question.  So in other

6 words, his approach is to say let me take an, what's called an

7 inbound sample.  Let me assert without any proof that that's

8 representative of the broader U.S. adult population and then I

9 will screen to pay-TV subscribers.

10 Q.    Can you give us an example of what Professor Hauser has

11 potentially missed in doing this?

12 A.    Absolutely.  I've actually mentioned one of them already

13 which is bundles.

14      So we don't know as I think it's been testified to already

15 in the trial, a large number of U.S. households subscribe to

16 not just video content services from their provider like

17 Comcast but they also get their broadband service.

18      They may also get landline.  Sometimes that's called the

19 triple play.  We don't know the distribution of triple play or

20 double plays in this sample.  So that's one example where it

21 might not be representative.

22      Another idea is who is going to take these surveys.  There

23 are people who have the time to take the surveys.  People with

24 low opportunity cost of time.  That might be related to income.

25 It also might be related to your stage in life.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    For example, whether or not you are retired or whether or

2  not you work on a full-time basis or not.  All of those things

3  may be related to your ability to switch.

4  Q.  Have you used internet surveys before?

5  A.  Yes, I have.

6  Q.  Have you taken the position what the results of your

7  internet surveys were representative of the broader population?

8  A.  In virtually all cases, no.  In other words, I used the

9  internet sample as an illustration of a method.

10    For example, in the patent case, excuse me, not case, but

11  the patent article.  In a few cases I have asserted

12  representatives, but always after offering affirmative evidence

13  that my sample was relative.

14  Q.  Has Professor Hauser done that?

15  A.  In my opinion, no.

16  Q.  So setting aside the representatives of the sample, what

17  conclusions do you draw from the size of Professor Hauser's

18  sample?

19  A.  Ultimately anyone who sponsors a survey based estimate is

20  always using a sample.  The reason they're doing this it's too

21  costly to interview every one, that's obvious.

22    So statisticians have devised ways of assessing the

23  reliability or the margin of error.  Everyone here has heard of

24  polling results.  We all know how inaccurate polls can be at

25  times.  And there's typically a margin of error, plus or minus

1   percent.

2      Professor Hauser did not actually provide any margin of

3   error in his results.  He gave a number.  He sponsors the

4   number 12.2 what he calls the departure rate.  But there's no

5   reliability of that number that's provided behind him in his

6   report.

7   Q.   Let's turn to the scale that you mentioned in your opening

8   remarks.  If you could look at Tab A in the binder in front of

9   you.  This is DX 091 5A, DX 0915 are all of the slide that

10  Professor Hauser used in the evidence.  This is a demonstrative

11  exhibit that we put together because the slides are more

12  legible here and these are the exhibits I used in examining

13  Professor Hauser.

14         MR. BARBUR:  It's at the, towards the end of your

15  binder, Your Honor.

16  BY MR. BARBUR:

17  Q.   What questions does Professor Hauser ask people concerning

18  whether they would switch their TV provider as a result of a

19  Turner blackout?

20  A.   Well, Professor Hauser uses what he calls a two part

21  question and also uses the term filter question.  So he asked

22  two questions.

23      It is interesting to know that Professor Hauser's survey

24  has a number of questions in it, but the only two questions

25  that have any bearing on that 12.2 figure that he's sponsoring

1   are two questions.

2   Q.   And that's in this exhibit?

3   A.   In this exhibit.  This question here says would you

4   consider switching?

5        No, I would not consider switching.  Yes, I would or I

6   don't know.

7        He calls that a filter question.  In other words, if you

8   say no, I would not consider, you're assigned a value of zero

9   as your probability of switching.

10       If you say you would consider switching, he then goes to

11  the next page where there is what's called a slider which is

12  an, somewhat of an innovation in the last 20 years.  Didn't

13  many people have computers.  They can position their mouse to

14  drag the slider on the scale.  And then that value is captured

15  by a Professor Hauser.  So this is the scale he uses.

16       This is not a filter question.  Because he uses the results

17  of the first question; namely, would you consider in that 12.2.

18  That 12.2 has all of those zeros in it and believe me, there's

19  a lot of zeros in there.  That's a misuse of the term, at the

20  very least, that's a misuse of the term filter question.

21       A filter question would be something like let's say I try

22  to do a survey on do people agree with steel tariffs.  Many

23  people don't have an opinion.  It's the opinion of many

24  researches that you should not include them in the answer.

25       So only those people that have an opinion are included.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Only the people that say they would consider, that is not what

2    Professor Hauser is doing.  He is using both responses.

3       Look at the, I'm not exactly quite sure what consider

4    means.  Am I always considering?  I'm always considering.  I'm

5    always considering leaving, I mean, in some sense we are all,

6    right.

7       Anyway in the so-called free market.

8       Here we have the scale, right.  And now I'm suppose to as a

9    respondent, just think of yourself as a respondent trying to

10   read this and make sense of it.  It's very difficult frankly.

11   I'm an expert.  I study probability theory on a doctorial

12   level.

13      I have trouble with this scale, right.  Because what is the

14   probability?  There are many examples of experts who don't even

15   understand that concept.  There's also a very large literature

16   on assessing probabilities.  Some of it done by the Nobel Prize

17   winning economist Danny Kahneman, economist/psychologist.  And

18   what did he learn?  He learned that people are really bad at

19   accessing probabilities.  It's actually worse than that.  They

20   systematically overstate the probabilities of infrequent

21   events.  That's exactly the situation here overstatement, okay.

22      Then you look at this and he gives you guidance.  He gives

23   you numbers like zero; one percent, 10 percent so on and then

24   below those numbers are text, descriptions.

25      By the way, this scale was invented in July 1964.  I was 9

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  years old at the time.  The text descriptions that are here are

2  the exact same text descriptions that were in the original July

3  1964 survey.

4      So contrary to what Professor Hauser testified to in this

5  court, this is not the result of continuous improvement over 50

6  plus years.  This is the same scale.

7      Then I would ask you to look at one of these numbers.  For

8  example, it says 10 percent.  And maybe you've studied

9  mathematics and you understand what ten percent or one out of

10 every ten is.

11     But now what is the text description associated with that?

12 Very slight possibility.  Now if I told you that I thought

13 there was a very slight possibility that I would get into a car

14 accident driving from Washington to Baltimore on the Baltimore

15 Washington Parkway this evening, I don't think you would say

16 that was one out of every ten times I attempted that.

17     You might say one out of every thousand or more.  So the

18 text description is out of wack with the numbers.  And that's

19 true throughout the scale.  I'm not just cherry picking this.

20 I won't trespass on the Court's time by reviewing some of these

21 other descriptions.

22     But in any event, this is at the very least a confusing and

23 biased scale.

24 Q.  So Professor Hauser testified that the Juster scale is

25 highly correlated with actual behavior, do you agree?

1  A.   Yes, that is one thing that we have learned a lot in the

2  last 50 years plus after the scale was developed.

3     The performance of this scale in measuring the actual

4  probability that someone buys something or primarily used for

5  buying products, right, has been investigated extensively.

6     And we found that it's actually a very inaccurate scale.

7  And there is, there are a number of articles that are what's

8  called a meta analysis means nothing more than a survey of many

9  other analyses.  There have been analyses of dozens of academic

10 studies of the performance of the scale as well as commercial

11 applications of the scale.

12    And commercially the scale has been used.  It's not as

13 popular today as it was in the past.  It was used for things

14 like would you buy a new car.  Would you buy a new model car,

15 and so on.

16    The results of all that are in an article cited both in

17 Professor Hauser's report and in my report, a 2007 article by

18 Professor Vickie Morowitz and several other co-authors.  And

19 the answer is the correlation between the scale measurement and

20 actual probabilities.  The actual probabilities is between .6

21 and -- excuse me .3 and .6.  What does that mean?

22    If you look at the relation, just to give you some way to

23 calibrate everyone's views to this.  If you look at the

24 correlation between the heights of parents and their children,

25 that correlation has been documented by many statisticians to

1  be something around .7.

2      So you know, people who are tall, my father is actually

3  taller than me, so I'm a little bit of an exception, right.

4  Typically and my guess is Peter Barbur's children might be a

5  little on the tall side.

6      (Laughter in audience.)

7      Definitely James Comey's children might be on the tall

8  side.  And people who are a little shorter tend to have shorter

9  children, whatever.  But we don't think of that as a high, in

10 other words, as a certainty by any means, right.

11     If you're tall, your children are more likely than not to

12 be taller than average.  But that's certainly not something

13 that I would make policy on the basis of.  It's a very weak

14 correlation and it gets worse.

15     For new products, the correlation basically disappears.  So

16 these analogies have had enough studies in them to say let's

17 segregate out all of the new products and the correlation is

18 very, very small.  I think it's generous to say it's small.

19 It's pretty non-existent.

20     And my opinion is this situation is a new situation.  The

21 very reason that Professor Hauser says he wants to do a survey

22 is because there hasn't been a permanent blackout of Turner

23 content.  We can argue about that, but that's what he says,

24 right.  And so it's a, it's a new experience.

25     So I would say the performance of the scale falls more in

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  the new product category.  And then if you look at these

2  surveys he performs very unreliably in that situation.

3  Q.   Does Professor Hauser provide a time frame for respondents

4  when he asks if they would switch providers?

5  A.   No.  That is an innovation of Professor Hauser's.

6      In the original substantiation of the scale, in the

7  original, and in virtually every other study that uses these

8  kind of scales that I have ever seen, there's always a time

9  interval.  That makes sense, right.

10     Suppose I ask you do you plan on buying a car in the next

11 month?  That's a very different question than do you plan on

12 buying a car in the next several years?  It's entirely possible

13 that most Americans buy a car on a relatively infrequent basis.

14     Professor Hauser provides no time frame.  So we don't know

15 if he's asking about whether they are going to switch in the

16 next month, in the next six months or whatever.

17     In fact, this is something that is in handbooks and guides

18 to the marketing research and survey research and in Professor

19 Morowitz's article people are very, very, emphasize this a

20 great deal and I agree with them.  That there needs to be a

21 time frame.  All that means is we don't really know what people

22 are answering when they're answering this question.

23 Q.   So is it your view that a Juster scale should never be

24 used?

25 A.   No.

1    Q.    Why not?

2    A.    Well, I do think that there are some situations in which a

3    Juster scale can be useful.

4        They're useful I think in a directional sense.  Namely

5    let's say I have a, I'm a company and I'm developing several

6    new products.  For example, GM is always developing new

7    versions of their cars and they do surveys.

8        They ask people, you know, are you inclined to buy this

9    vehicle versus another hypothetical kind.  They find the survey

10   is useful to sort of say that this one would be more popular.

11   That's what I could called directional.  That's not the sense

12   of which the results of Professor Hauser's surveys are being

13   used.  They are being used as an exact quantification.

14   Q.    Let's turn to switching costs and bias that you mentioned

15   previously.  First of all, do you consider Professor Hauser's

16   switching rates to be high?

17   A.    I do.

18   Q.    Why is that?

19   A.    If you look at his switching rates in the permanent

20   blackout condition, they are over 28 percent.

21   Q.    What about the switching rate for the control group?

22   A.    The control group is a little over 16 percent I believe.

23   Recall that this situation is purely hypothetical and the

24   people have already been told that they have been given

25   competing offers that are quite similar to their existing

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  offers.  So it's not clear why they have any incentive to

2  switch at all.  But they do switch at a high rate in his data.

3  Q.    When you looked at the survey did you see any incentive

4  for the control group to switch based on the face of the

5  survey?

6  A.    At most minimal.

7  Q.    What do high switching rates indicate?

8  A.    I think they indicate the presence of bias.  At least one

9  type of bias.

10  Q.    So in what specific ways do you believe that Professor

11  Hauser's survey is biased?

12  A.    I think there's two primary ways in which it's biased.

13  One is by minimizing or neglecting many aspects of switching

14  costs.

15     The other is by the way in which he designed the permanent

16  blackout or the blackout conditions which tend to visually

17  overemphasize Turner content as well as there's some leading

18  questions.

19  Q.    Can you provide the Court with a high level of explanation

20  of the four types of switching costs that you have identified?

21  A.    Absolutely.  The first thing if you wanted to switch

22  what's the first thing you would do?  You would have to search

23  for alternatives wouldn't you.  You have to search for other

24  providers.  Those are called search costs, right.  And those

25  might be considerable.  You have to go look for them and so on.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Professor Hauser provides people up front with the

2    competing offers.  So search costs have been set to zero.

3    That's one type of switching cost.

4    The other is what I would call transactional costs which

5    could be quite considerable here.  Namely, you might have to

6    call up your, certainly you will have to call up, if you want

7    to switch, your current provider and terminate your

8    relationship and you might have to pay a fee actually.

9    You might also have to call the new provider and engage

10   them if there was some actual physical hard wiring things that

11   had to be done like a cable strung to your house or whatever.

12   Then you might have to wait for someone to do it, so that's

13   what I would call transactional cost.

14   You might have to change, you know, you go into your bank

15   account and change the pay and all of that stuff.  Those are

16   what I call transactional costs, right.

17   Then the third category of switching costs I would call

18   them bundle derived costs.  That means that Professor Hauser's

19   survey does not consider bundles at all.  In any of his

20   questions there are no mention of bundles.

21   But in reality as I mentioned earlier today people are not

22   just buying video content.  They are buying broadband, possibly

23   landlines as well.  It may be more difficult to re-arrange all

24   of those arrangements at one time.  That's what I would call

25   bundle variety.

1      Finally, there's a whole category of costs which I call

2  psychological costs.

3  Q.    What are psychological costs?

4  A.    They're just inertia thinking cost and so on.  Just to

5  give you an example of that, you know, I have an account with

6  Chase.  And I have a very inferior type of checking account.

7  It's free but doesn't have many amenities.

8      I have been thinking for years and years and years to

9  change this to something more sensible.  I have the time, it's

10  not like I don't have some time, I do have some free time.  But

11  I don't do it.

12      It's because I just don't want to think about it.  It's

13  something that is out of, I just don't want to devote the

14  psychic energy to that.  So that's a form of psychological

15  cost, switching costs.  And these have been widely documented

16  in the literature.

17  Q.    Do you have any estimate of how much switching costs are

18  for switching cable providers?

19  A.    Yes.  There have been actually some academic settings. One

20  that I can identify.  Actually, it was in Professor Hauser's

21  report as well.

22      It was published in the RAND Journal of Economics which

23  is a highly distinguished journal.  I published in the RAND

24  Journal and I think Professor Katz, and certainly Professor

25  Carlton and Professor Shapiro as well.

1       What this gentleman did was attempted to use actual

2  television subscriber data to estimate the extent of switching

3  costs for consumers.  Those numbers that he comes out to say,

4  I'm not endorsing the specific numbers, but to give you an idea

5  of the magnitude of these things, is something between $250 and

6  $400 in current dollars, in 2018 dollars.  Which I consider to

7  be a relatively large cost.

8  Q.    Did Professor Hauser account for any of these costs in his

9  survey?

10  A.    The only thing Professor Hauser set search costs to zero

11  because he provided zero.  He did attempt to evoke transaction

12  costs by having people read a script which is essentially a

13  number of these things that I mentioned.

14     He doesn't account for bundle costs at all and not on

15  psychological costs.  So his attempt is to evoke a hypothetical

16  switching costs of only one type.

17  Q.    So let's turn to bias.  There's a priming section of

18  Professor Hauser's survey, correct?

19  A.    Yes, there is.  That is his own term.

20  Q.    Please describe what that is?

21  A.    So as I said, in the end Professor Hauser relies only to

22  two answers to only two questions to arrive at his 12.2 number.

23     But actually, there's a lot of material prior to that which

24  he himself characterizes priming or getting, engaging people or

25  something along these lines.  And which he asks people about

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   what programs they watch, what genres they watch and so on.

2       These priming questions do have some biases that are sort

3   of in favor, if you will, of Turner content.  When I say in

4   favor, I mean over evaluation.

5   Q.   Turning to tab B in the binder, it's DX 915 B, those are

6   the priming questions.

7       Can you walk us through where you find bias in these

8   priming questions?

9   A.   Yeah.  In the interest of time I would just like to call

10  your attention to one or two of them if that's okay.  So if you

11  look at that, this is in tab B and it's 21.

12          THE WITNESS:  You can see a bunch of logos in the

13  middle of the page, Your Honor.

14          THE COURT:  914?

15          THE WITNESS:  915.

16          MR. BARBUR:  915 200B.

17          THE COURT:  Okay.

18      All right.  0018 B or what page?

19          THE WITNESS:  21.

20          THE COURT:  21.

21          MR. BARBUR:  Page 21 of 915.

22          THE COURT:  Yes.  0021 B.

23          THE WITNESS:  Yes, yes.

24          THE COURT:  Got a lot of logos.

25          THE WITNESS:  Yes, a lot of logos.

1    What Nielsen Ratings Service does rank the events that

2  are televised by popularity.  And this is purported to be or by

3  Professor Hauser as a subset of the top 100.  Some of these

4  events are not the top 100.

5    In particular the March Madness which we were just, we

6  just lived through, which has of course includes some, excuse

7  me, some Turner channels here; namely, TBS and TNT.

8    That's not in the top 100.  But it does give the

9  opportunity to provide three logos.

10    The other is that there's only one, possibly a set of

11  commentary, there is only one political thing that's in the top

12  100.  I think it's the Republican Debates.  One of the

13  Republican Debates I mentioned early on, but it says Republican

14  Party or Democratic Debates and that allows them to add some

15  CNN to the logo.

16    This set of logos here includes more Turner logos than I

17  think is representative of the top 100 events.  Because the

18  other top 100 events don't have any Turner.

19    Then finally, there's other examples here but if you

20  were to look at, at the same Exhibit 0030 which is sports.  And

21  you see another set of logos a little bit more visible.  This

22  is suppose to be sporting events of various kind and you'll see

23  there that almost all of these things like the golf channel,

24  NBA TV, ESPN and NFL Network.  They're specifically sports, 100

25  percent sports channels.

 1        However, the two Turner channel logos there TNT and TBS

 2   are not exclusively sports.  I think that I remember that

 3   Professor Hauser enjoys the Big Bang Theory and I believe

 4   that's on one of those two.  That's it.  That's a rerun of a

 5   show.

 6        So why aren't there NBC and ABC?  NBC and ABC have a

 7   combination of sports events and entertainment television.  It

 8   does provide another opportunity to display Turner logos.

 9   Q.   So let's turn then to the blackouts scenario slides and

10   that's behind tab D in your binder?

11   A.   Yes.

12   Q.   DX 0195 D?

13   A.   Yes, that's easy to find.

14        THE COURT:  Yes, I got that.

15   BY MR. BARBUR:

16   Q.   Could you walk us through where you find bias in these

17   slides?

18   A.   Yes, I think primarily in two places.  Remember, this is

19   what Professor Hauser calls a test condition.  Remember, they

20   are asking people to envision a blackout.  He says well, I got

21   to remind people about what's being blacked out.

22      So he provides you with this array of what look like 10

23   logos which are purported to be, I think there are 9 Turner

24   channels but there are 10 here.

25      He does have once okay, but he does it actually six times.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   The same array he goes through these questions six times.  By

2   the way, you see how large they are.  That's, this is a screen

3   shot, this is not, we have done no enhancement.  Right.

4       So these are very large logos shown six times and then

5   finally he ask these, this question on page 0146 in your own

6   words, your TV planner has no current plan to resume the

7   channel, what would you do to watch your favorite program on

8   these channels that are blacked out?

9       And then people are suppose to write their thoughts.  Well,

10  there's not necessarily, it's not necessarily true that their

11  favorite programs are on Turner content.  In fact, Professor

12  Hauser has said that that is one of the problems is that people

13  don't associate or are kind of confused between what they like

14  to watch and the channels that they are on or at least the

15  network or grouping of the channels which seems fair to me.

16      So this seems to be causing an undue association between

17  favorite programs and the Turner content.

18      The same thing is repeated on 47.  I won't trespass on your

19  time.

20  Q.   So does Professor Hauser's use of a controlled group solve

21  his bias problem?

22  A.   No, it does not.

23  Q.   Why not?

24  A.   Because these are only present in the blackout scenario.

25  They're not present in the controlled scenario.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    He could have easily flashed logos of other groupings of

2    other programming content in the controlled scenario, he

3    didn't.

4    Q.    Going back to the two questions that he used at the

5    beginning.  Could Professor Hauser simply have asked survey

6    respondents would they switch?

7    A.    Absolutely.  Why not?

8    Q.    So then let's move ahead to the Altman Vilandrie study.

9    What materials did you review related to the Altman Vilandrie

10   study?

11   A.    I reviewed, well there really isn't anything like a

12   report.  Obviously, Altman Vilandrie is not being tendered as

13   an expert in the case.

14       There are presentation slide decks that the Altman

15   Vilandrie firm prepared and presented to its client Charter

16   Communication, that's one sort of thing that I did review.

17       I also reviewed the deposition testimony and/or trial

18   testimony of Stefan Bewley who is a principal at Altman

19   Vilandrie and was directly involved in the production of these

20   estimates.

21       Then Altman Vilandrie produced most of but not all of the

22   data and analysis that they had done to derive their estimates.

23   So we were able to investigate very carefully what they did,

24   their methodology and how it works to exactly recreate every

25   single thing.  We didn't have a complete set of production.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   But that's the sort of thing I did review.

2   Q.   So can you give the Court an overview of your opinions

3   about the Altman Vilandrie survey and it's conclusions?

4   A.   Yes.   The Altman Vilandrie sponsored three different, what

5   they called methodologies.   All three are invalid.

6        The reason they are invalid is they're based on what

7   amounts to pure conjecture.   They're unsupported assumptions

8   and unverifiable assumptions.

9   Q.   So let's talk about each of those three methodologies.

10  One of those is a survey method; is that right?

11  A.   That's correct.

12  Q.   Can you describe for the Court what the survey method did?

13  A.   The survey method was a combination of three different

14  survey methods, really.   A conjoint survey, a what's called a

15  Max Diff analysis and their own innovation which they called

16  channel chooser which is a very standard thing in many market

17  research.

18       They took all three and combined them in a somewhat arcane

19  way which I will describe to obtain estimates of Turner loss.

20  Q.   What is a conjoint survey?

21  A.   A conjoint survey is a well respected type of survey that

22  attempts to mock or mirror a real world choice opportunity in

23  which a respondent has the opportunity to choose among

24  different products.

25       In this case, should we turn to the screen for that?

1  Q.    Sure, it's going to be in the binder at DX 878, it's page

2  35.

3  A.    So that's, this is the, an example which we reproduced

4  from their materials of a screen that's a respondent to their

5  conjoint survey.  That's 0035 in 878.

6      You can see it looks a little bit like I imagine everyone

7  here has had the experience of going to Amazon and say I'd like

8  to buy a new TV and then they present you with three TVs and

9  they give you all the attributes of the TVs.  It's very much

10  like that.

11      In this case it's hypothetical bundles.  By the way, they

12  did consider bundles of channels.  You can see there's channels

13  here, there are 12 of them.  It starts with A&E and ends with

14  Nickelodeon.

15      Then it also has some information on possible provision of

16  broadband services as well as the provider as well as the

17  speed.  Then also home phone or landline and then of course a

18  monthly price.

19      So the idea is that respondents are presented with I

20  believe 8 to 10 of these screens.  They choose one of these

21  three possibilities or they may elect to say I don't want any

22  of them.  So there is an option down here saying I really don't

23  want to buy this at all.

24      From that information on the choice of which of these

25  groupings of, these are called product attributes, of channels

1  and broadband service basically and price, you are able to

2  interpret and infer a little bit about each respondent's

3  willingness to trade off these various attributes.

4      In other words, if I removed this channel how much would I

5  have to reduce the price of this product in order to compensate

6  for them.  That sort of thing, that's what a conjoint is.

7  Q.   What Turner channels were included as part of this

8  conjoint?

9  A.   Only one, CNN.

10 Q.   What conclusion do you draw from the fact that only CNN

11 was included in the conjoint?

12 A.   It is impossible as just a matter of mathematical logic to

13 infer about the value or what happened to the group of Turner

14 channels, all nine of them from a survey that only uses one of

15 them.

16 Q.   So this conjoint doesn't say anything about the other nine

17 channels that we saw the logos for?

18 A.   That's correct.

19 Q.   Let's turn to the Max Diff survey.  What is a Max Diff

20 survey?

21 A.   Again, I want to be efficient with the Court's time.  It's

22 just a way of ranking things.

23     So imagine you have a 150 channels as was the case here.

24 That's hard for people to rank.  You would have to sit there

25 and write them all on a piece of paper and shuffle little

1  pieces of paper until you got them in order.

2     Max Diff is such an interesting idea that helps you do the

3  rankings by answering similar questions of choosing the Max,

4  most important and least important in sets of six.  And then

5  they can use that to construct your ranking.

6  Q.   Did Altman Vilandrie define the concept of important as

7  part of this Max Diff?

8  A.   No, not at all.  They actually used the vanilla Max Diff.

9  In other words, innovative at all.  In this case what does

10 important mean?  Does important mean that I won't, I'll switch

11 if I don't, if that channel is omitted.  I don't know and we

12 have no idea what the respondents thought about that.

13 Q.   Do the rankings from least important to most important

14 tell you anything about whether a subscriber to Charter would

15 leave if there was a Turner blackout?

16 A.   Absolutely nothing.

17 Q.   Why not?

18 A.   They're only rankings. We can't tell the trade offs that

19 people make among them.  So it's very difficult to say.

20    There could be wells of people that would say even my, some

21 of my least important channels are vital to me or must have to

22 me or my most important.  It's unclear.  The importance of

23 ranking itself can never be used to assess the value of

24 anything.  It can only rank things in value.  Setting aside the

25 problem of what does importance mean.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   So if one channel is ranked number one and one channel is

2  ranked number five, what can you learn from that?

3  A.   You can't learn very much of anything.  For example, prior

4  to the NBA playoffs are just underway, prior to those playoffs

5  it could be power ranking, Houston Rockets might be number one.

6  In the western conference the Spurs might be four.

7       That does mean that the Rockets are considered to be more

8  likely or better or to win the championship.

9       However, they're not four times as good as the Spurs.

10  Right.  So these numbers, no meaning themselves.  They're just

11  the way of implementing a ranking.

12       So when you get out a Max Diff, there are a bunch of

13  numbers that allow you to sort channels from the most important

14  to the least important but nothing else.

15  Q.   So you said that the conjoint can't be used to estimate a

16  Turner subscriber loss rate and the Max Diff also can't be used

17  to estimate a Turner subscriber loss rate.

18       So how does Altman Vilandrie calculate a loss rate using

19  its survey method?

20  A.   That's a good question.  They have to concoct at something

21  to combine two things that fundamentally cannot be combined.

22       In particular, they implemented the Max Diff in the

23  Sawtooth Software that I mentioned.  For convenience it's an

24  industry standard software.  They implemented the conjoint

25  analysis.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    So in other words, they took, designed the survey as well

2  as analyzed it in the Sawtooth Software.  Then they took those

3  two things out.  Sawtooth Software does not allow you to

4  combine a Max Diff analysis with a conjoint analysis.

5         MR. SCHEELE:  Objection, Your Honor.

6         THE COURT:  Okay.  Approach.

7      (Witness leaves the stand.)

8      (Sealed bench conference.)

9         MR. SCHEELE:  Your Honor, I think we've entered the

10  territory of where again, this is Altman Vilandrie and their

11  methodology.  They're a participant in this industry.  They

12  consult on this methodology of Altman Vilandrie is their core

13  trade secret stuff.

14    I believe Dr. Rossi is now treading into the territory

15  of where Altman Vilandrie would consider and seems to be in

16  its, within its competitive sensitivity.

17         THE COURT:  Do you need to get into that?

18         MR. BARBUR:  That's absolutely incorrect.  This is

19  actually a public document that Altman Vilandrie published, a

20  slide deck.

21         THE COURT:  What is this?

22         MR. BARBUR:  It's a public document.

23         THE COURT:  What is it?

24         MR. BARBUR:  I haven't identified it but I can.

25    Just for illustration purposes, they show a conjoint and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  a Max Diff going into a simulator to produce exactly the

2  results that Professor Rossi is talking about.  There's nothing

3  confidential about this.

4          THE COURT:  Are you going to show this to --

5          MR. BARBUR:  No, no.  I just wanted to educate Your

6  Honor of the fact that this is not confidential.  This is a

7  public document that Altman Vilandrie put out.

8          MR. SCHEELE:  I don't dispute that Max Diff and the

9  conjoint survey are, it's public, that they are both complaints

10 of what they do.

11     He's now getting into methodology.

12         THE COURT:  He may be just passing through it.

13         MR. BARBUR:  We are going very fast.

14         THE COURT:  How much more have you got?

15         MR. BARBUR:  With him, there is two more

16 methodologies, 20 minutes or so.

17         THE COURT:  We're going to take the afternoon break.

18 We are going to go to five today.

19         MR. BARBUR:  I understand.

20         THE COURT:  So take a ten minute recess and then

21 we'll get back.  It will be 4:10 so you finish at 4:30 and you

22 can start your cross.

23     How much is cross?

24         MR. BARBUR:  I'm guessing about an hour.

25         THE COURT:  So we won't finish him today.

1          Okay.

2              MR. SCHEELE:  Thank you, Your Honor.

3          (Open court.)

4              THE COURT:  Come on back up here, sir.

5              THE WITNESS:  Okay.

6          (Witness resumes the stand.)

7              THE COURT:  We're going to take the afternoon recess

8   for ten minutes.

9              You are a witness under oath in the case, you are not at

10  liberty to discuss your testimony with anybody.  What you said

11  so far, what you might say when you return.  So stay

12  independent of all others.  Don't discuss your testimony with

13  anyone, even including your own lawyer.

14             THE WITNESS:  I will.

15             THE COURT:  Okay.

16          All right.  See you in ten minutes.

17          (Witness excused.)

18          (Recess at 4:00 p.m.)

19          (Proceedings resumed at 4:20 p.m.)

20             THE DEPUTY CLERK:  Your Honor, recalling Civil Action

21  Number 17-2511.  United States of America v. AT&T, Inc., et al.

22             MR. BARBUR:  May I proceed, Your Honor?

23             THE COURT:  You may.  Witness remains under oath.

24                  DIRECT EXAMINATION (Cont'd)

25  BY MR. BARBUR:

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   So back before the break you were discussing the

2   combination of the conjoint and the Max-Diff outputs.   Could

3   you explain why you don't think that those two things can

4   properly be combined?

5   A.   Yes, so let's understand exactly what we're doing there.

6   We did a conjoint study, or rather Altman Vilandrie did a

7   conjoint study with these twelve channels, Internet, attribute

8   and price, and they got coefficients from that study or

9   representations of the relative weights of these various

10  channels, vis-a-vis price.   That's one set of information.

11  That's only relevant to the set of channels.

12       Then they also got out of their Max-Diff exercise a ranking

13  of a larger set of channels.   That's all they have.   They have

14  no idea what the coefficients or part worse or utility weights

15  corresponding to the channels that weren't in the conjoint

16  survey.   It's literally an impossibility, and there is

17  absolutely no way to combine those two.

18       So I was reading these slides for a very short time until I

19  concluded that this is an invalid methodology because you can't

20  do that.   I know that everyone knows you can't combine rankings

21  data with data on a different scale.

22  Q.   So what's your bottom line conclusion about Altman

23  Vilandrie survey method results?

24  A.   It's completely invalid. There's no support for what

25  they've done on the survey side.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   And so let's turn to the set-top box analysis that Altman

2   Vilandrie did.

3       First of all, what set-top box data did Altman Vilandrie

4   use for this, part of its analysis?

5   A.   Yes.  So remember the client was Charter Communications.

6   So Charter gave them a sample of their subscriber data.  So

7   every subscriber, of course, has a set-top box, which I'm sure

8   has been discussed in this trial.  And one of the things the

9   set-top box can do is record exactly what channels were on at

10  what time and whether the box was being utilized at all,

11  meaning the signal was going out of the box, not whether anyone

12  was watching, we don't know that.

13      So that data can be -- so it literally would be every

14  instance in time, every little time stamp the set-top box is

15  broadcasting TBS now.  Then it's off for a while, then it's on

16  and so forth.  And they took summaries of that data and sent it

17  to Altman Vilandrie, a subsample of the Charters.

18      I should note that there are two things that are very

19  important about this data.  First of all there's no data among

20  prospective customers for Charter.  It's Charter customers.  So

21  that might raise a red flag in your mind, how could they

22  estimate departure rates or loss rates for prospective

23  customers if the set-top box data doesn't have that.  Number

24  one.

25      Number two, it's just viewing data.  So I could say if I

1  could find my an itemized household in there.  Unfortunately,

2  for me, our household is watching MSNBC almost entire, all the

3  time, right.  So that's all we can learn.  We can't learn

4  anything about my attitude or our attitude as a household about

5  if we took away MSNBC, would we leave or not because that's not

6  in the data.

7      So viewing data alone cannot possibly answer the question

8  about the effect of removing any channel or group of channels.

9  Q.   So how did Altman Vilandrie purport to get subscriber loss

10  figures in the event of a Turner blackout from this set-top box

11  data?

12  A.   That's another good question.  Clearly involves

13  assumptions and, in fact, Mr. Bewley did testify to that

14  effect.  So what they did is make arbitrary assumptions to link

15  viewing data, which is they compress and summarize the data as

16  a percentage.  So they might say, let's say thirty percent is

17  CNN or MSNBC.  Meaning thirty percent of the time that the

18  set-top box is displaying a video signal, it's displaying that

19  particular channel.  And that could be computed not only for an

20  individual channel, but for a grouping of channels, like Turner

21  channels, for example, and others.  That's the only thing you

22  can get from it.

23      So what they have to do is arbitrarily assume that for

24  certain levels of viewing concentration people will have a

25  propensity to leave, which they call churn propensity.  So what

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   they assume is a schedule, which they call the churn propensity

 2   table of those -- which is purely a set of assumptions that

 3   don't come from the data.

 4   Q.    Let's look at page DX 681.0073.

 5            THE DEPUTY CLERK:  681?

 6            MR. BARBUR:  Yeah, 681.0073.

 7            THE WITNESS:  Yes.

 8            MR. BARBUR:  I don't want you to --

 9            THE WITNESS:  Yeah, that looks like this graph with

10   all the lines on the spaghetti graph is actually what they

11   call, spaghetti graph.

12   BY MR. BARBUR:

13   Q.    So without reading the numbers into the record because

14   Altman Vilandrie claims that they're confidential, could you

15   explain what this churn propensity table shows?

16   A.    Absolutely.  So the churn propensity table is on the right

17   border, you can ignore the rest of this.  So what that is,

18   is -- why do I say that?  This is the only thing that they use

19   in developing their estimates, what they call the pure set-top

20   box estimate.

21       So you can see here in the first column is percentages of

22   viewership, I think it's okay for me to say some of those

23   percentages.

24   Q.    Sure.

25   A.    So they go from things like being ranked from four percent

1  all the way up to greater than twenty-two percent.  So that's

2  something -- that's what you could observe from the set-top box

3  data.  I could pick a channel.  I could take TBS, and I could

4  take a household or a subscriber, and I could say over this

5  period of time that I have the data, that household watches TBS

6  fifteen percent of the time, let's just say, right?  And then

7  you go over and look where it's fifteen on the left-hand

8  column, it's somewhere between fourteen and sixteen last I

9  checked.  And then you can just go over and there is a number

10 there which says churn propensity.  All the numbers, and I

11 won't repeat that number, all the numbers in the right-hand

12 column, all of the numbers are purely assumed numbers.  They're

13 not based on any data of any kind.  They're just pure

14 assumptions.

15 Q.  So what's your bottom line conclusion about the set-top

16 box analysis done by Altman Vilandrie?

17 A.  The set-top box analysis has, and if I could just give an

18 example.  They have a threshold in there, which they call a top

19 threshold.  And I won't repeat the threshold, right?  And they

20 say if you're viewing a percentage for a channel or group of

21 channels above that, then you will for sure churn, meaning

22 leave or switch if those channels are removed.

23     So let's take my household, for example.  I would bet that

24 our viewing concentration for MSNBC is about thirty percent,

25 possibly even a little more than that.  And I don't know, it

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  gets revealing a lot to say that that would be considered by

 2  Altman Vilandrie --

 3          MR. SCHEELE:  Objection.

 4          THE COURT:  Approach.

 5      (Witness withdrew from the witness stand.)

 6      (Sealed Bench Conference.)
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



1      ██████ ██████ ██████ ██████ ██████ ██████

2      (Open court.)

3           THE COURT:  Come back up.

4      (Witness resumed the witness stand.)

5           THE COURT:  Why don't you rephrase the question.

6           MR. BARBUR:  Sure.

7      BY MR. BARBUR:

8      Q.   I think you were discussing the combination of the -- I'm

9      sorry, the churn propensity table.  Without revealing any

10     numbers or the indication of even the thirty percent number

11     that you were using, can you just describe your overall

12     conclusions?

13     A.   Yeah, absolutely.  So there is an upper and lower churn

14     threshold.  The assumption is by Altman Vilandrie, without any

15     supporting argument or data, that everyone above, if a channel

16     or group of channels has a viewing concentration higher than

17     the upper threshold, whatever that is, they will with one

18     hundred percent, you can see in the left-hand column.  It's one

19     hundred percent, means they always atrip or leave their

20     provider.  And I was just using an example that perhaps if in

21     our case we had a very important channel that was omitted, we

22     might actually end up streaming it, which it can be streamed.

23          So the other part of it is the lower churn threshold.  And

24     everything, if its viewing concentration is below the lower

25     threshold, which you can see marked in red on this page, the

1  lower one, then you will not atrip, you will not leave.  So

2  that you can see the churn propensity is zero.  So they have

3  two points, one where it's a zero and one is a hundred.  What

4  do you do in between?  You draw a line, which just takes those

5  two assumptions and compounds the error.

6  Q.   Professor, let's move on to the hybrid method.  Can you

7  briefly describe, I understand it's a complicated method, but

8  briefly describe at a high level what the hybrid method is?

9  A.   Yes, the hybrid method is purported to combine aspects of

10 the pure -- so remember, there are three methods.  Pure survey,

11 which we discussed, pure set-top box, which we just finished

12 discussing, and then something that looks like it's in between,

13 hence the term "hybrid" or a combination of.  It's really not a

14 combination of the two methods.  It's really much more in the

15 spirit of the pure set-top box where the lower threshold has

16 been altered based to some extent on some of the survey data

17 through an extraordinarily complicated set of machinations,

18 which make no statistical sense whatsoever.  But it's primarily

19 just a revision or alteration, minor alteration to the set-top

20 box method.

21     So in particular, since the set-top box method can't say

22 anything about prospective customers, which Professor Shapiro

23 needs.  He needs a loss rate for prospective customers.  The

24 hybrid method can't either.

25 Q.   Did the hybrid method result in contract groups of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  programmers being put into groups?

2  A.   Yes, that is part of the methodology, yes.

3  Q.   And can you describe at a high level what the groups

4  meant?

5  A.   Yes, absolutely.  All they did is take the basic idea --

6  that churn propensity table and repeat it threefold and create

7  three different groups.  Each group potentially has a different

8  lower and upper threshold.  In reality, the only group that had

9  a different threshold was what's called group three to which

10  the Turner content was assigned.  And its lower threshold was

11  altered by increasing it.

12  Q.   And how did Altman Vilandrie describe group three?

13  A.   There's -- in the slide decks there's very little

14  discussion about this.  There's some statistics, I believe that

15  Mr. Bewley testified that he called this a group of somewhat

16  substitutable products, and also I think the term "niche

17  networks" has been applied to it.

18  Q.   So what was the effect of having Turner assigned to group

19  three?

20  A.   The effect of assigning Turner to group three was to

21  increase its loss rate.

22  Q.   To increase the churn threshold?

23  A.   Churn threshold, right, yes.

24  Q.   Which would have what effect on the loss?

25  A.   Which would decrease the loss rate.

1   Q.    Okay.  So let's now talk about the bottom line conclusions

2   reached by Altman Vilandrie, and I'm going to refer you to DX

3   0106 and DX 0107, the last two tabs in the binder.  These are

4   just two pages from documents that are entered in evidence and

5   they were used by Mr. Petrocelli when he cross-examined

6   Mr. Bewley.

7   A.    Yes.

8   Q.    So let's look at DX 0106.  And if you look at the second

9   page of that, can you describe what that table shows?

10  A.    So here we are.

11  Q.    DX --

12  A.    106.

13  Q.    106.  And this is the version of the report that's dated

14  April 26th?

15  A.    April 26th is the April 26th back here, and the really

16  relevant things are these two tables.

17  Q.    And just walk us through with what those tables show?

18  A.    Yes, so it shows results from -- for the right-hand table,

19  it says customers, that means existing customers, that's

20  Charter customers.  The second or the right, excuse me, did I

21  say right-hand?  That's the left-hand table, excuse me.  The

22  right-hand table is prospects or prospective customers.  And

23  then it has the results of each of the three methodologies,

24  pure survey, hybrid in the middle, and pure set-top box.

25       The relevant column is the column called percent video

1    loss.  So you can see in that table, for example, and for

2    existing customers that would be the left-hand table.  For the

3    pure survey based simulation, the video loss rate is 14

4    percent.  And you can see it's colored in in blue.  Okay.

5        The hybrid loss rate is five percent, as we've just

6    discussed, that comes from raising the lower threshold, which

7    has the effect of lowering the loss rate because more channels

8    fall in below the lower threshold.  And then the pure set-box

9    number is fourteen percent.

10   Q.   So I think as we discussed before, Professor Shapiro

11   relied on the hybrid method; is that correct?

12   A.   Yes, that's my understanding.

13   Q.   And here the hybrid number for customers is five percent,

14   do you see that?

15   A.   I do.

16   Q.   And the hybrid number for prospects is six percent,

17   correct?

18   A.   That's correct.

19   Q.   The customer numbers in blue and the prospect number is

20   not in blue.  What's the significance of that?

21   A.   There is a great deal of significance of that.  If you

22   notice above it, if you -- it's hard to see, it's a little bit

23   grayed out.  But above the five percent in the left-hand table

24   in the middle, it says "actuals."  Right?  Can you see that?  I

25   don't know, Judge, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  I can see it.

 2              THE WITNESS:  Okay, yes.  And then in other one it

 3    says "implied."

 4              THE COURT:  Yes.

 5              THE WITNESS:  Implied just simply means imputed.

 6    It's not actually calculated from anything other than using the

 7    survey results.  So in some sense these are not -- it's not

 8    really a new analysis.  It's using survey, why is that the

 9    case?  Set-top box data can't tell you about prospective

10    customers.  Because it's Charter customers.  So you have to

11    impute it from the survey.  The survey did survey people that,

12    for example, surveyed Comcast customers, for example, and

13    their's would be prospects to Charter, right.

14         So what they did is they grossed it up by taking the

15    ratio off the survey data and applying it to both the hybrid

16    and the pure set-top box.

17         So this -- there's a lot of things here that are, well,

18    virtually -- essentially everything here is made up by

19    assumption.  If you change the assumptions, everything changes.

20    Q.   So are these the figures actually relied on by Professor

21    Shapiro that we're seeing here?

22    A.   No.

23    Q.   And what happened such that these are not the numbers he

24    relied on?

25    A.   Well, for reasons that have been discussed, I think pretty
```

1  extensively, I released the evidence, the numbers were changed.

2  The methodology was actually altered for Turner alone and it

3  produced a new set of numbers that are present in the exhibit

4  marked 0107.

5  Q.   Is that the hard coding that's been referred to

6  previously?

7  A.   Yes, there was some hard coding in a spreadsheet, hence

8  the term.   Hard coding was the -- a term by the Altman

9  Vilandrie employees, and it would be consistent with my

10  understanding of the term hard coding in software development.

11  Q.   Okay.  So let's look at the second page of DX 0107.  And

12  we'll look at the same numbers that used to be five and six,

13  and what are they now?

14  A.   They're now nine.

15         MR. SCHEELE:  Objection.  May I approach?

16         THE COURT:  You may.

17    (Witness withdrew from the witness stand.)

18    (Sealed Bench Conference.)

19         MR. SCHEELE:  I should not -- I should have objected

20  before the six came in.  Anything in the prospective box, I

21  believe has not been publicly disclosed and is considered

22  confidential.

23         MR. BARBUR:  It was publicly disclosed by Professor

24  Shapiro in his testimony.

25         MR. SCHEELE:  I can't deny that.  I will withdraw my

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  objection.

 2          THE COURT:  One at a time.  So you're saying the nine

 3  and the ten?

 4          MR. SCHEELE:  Anything that's in the prospective box,

 5  I thought that was, had not been disclosed publicly.  And if

 6  Mr. Barbur is representing that Dr. Shapiro represented it

 7  publicly, I don't dispute it.

 8          MR. BARBUR:  He did.  He did it wrong, but he

 9  referred to those numbers in his testimony last Wednesday.

10          THE COURT:  I don't remember personally, but

11  Mr. Barbur is confident about it.

12          MR. SCHEELE:  And I can't dispute it, so I withdraw

13  my objection.

14          THE COURT:  Very good.

15      (Open court.)

16          THE COURT:  Come on back up.

17      (Witness resumed the witness stand.)

18          THE COURT:  You may proceed, Mr. Barbur.

19  BY MR. BARBUR:

20  Q.   So referring again to DX 0107, on the second page.  We

21  were talking about the nine percent and the ten percent

22  numbers.

23  A.   Correct.

24  Q.   The nine percent number is the one that was hard coded,

25  right?
```

1    A.    The nine and the ten percent.

2    Q.    To what extent was the ten percent hard coded, just

3    explain the process?

4    A.    Well, it's just grossing up from the survey, right.  So

5    they just took these numbers and grossed them up so they're

6    based on the survey, the ratio of current, prospective to

7    current for the survey, applied to the nine.  So in other

8    words, the nine, you start with the nine, and then you multiply

9    it by 1.1 and you get ten0, something like that, that's really

10   what they've done.

11   Q.    And did you read Professor Shapiro's testimony about these

12   numbers?

13   A.    Yes, I did.

14   Q.    Why don't we turn to the tab in the binder that's marked

15   C, Shapiro transcript.

16   A.    Could you give me a tab number?

17   Q.    It's not a tab number, it just say C, Shapiro transcript.

18   It's right after tab D.

19   A.    Yes.

20   Q.    And in particular I want to refer you to the bottom of

21   page 2387 to the top of page 2388.

22   A.    Yes.

23   Q.    And this is what Professor Shapiro said.  "And the other

24   thing, though, is that, as I mentioned, the more important

25   figure in my analysis is the -- is actually what they have as a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  ten percent, which is the gross, the new customer rate because

2  that's what matters in the long-term."

3     And then he goes to say, "And that was not changed here.

4  What was changed was the short-term rate, the departure rate."

5  And he then goes to say, "It's not as though my number would go

6  from low end, would go from nine to five if you made that

7  change, it would go from nine to 8.5 using the methods that are

8  described in my report."  Do you see that?

9  A.    I do see that.

10 Q.    And is that correct in your view?

11 A.    No, it's incorrect.

12 Q.    And could you explain why that is?

13 A.    Well, this is based on Professor Shapiro's own

14 calculations of what he calls the long-term loss rate, which is

15 specified by the formulas in his appendix D of his report and

16 implemented in the spreadsheet.

17    And his idea, which is -- certainly I don't know has

18 disputed, is this notion that what's going to happen as you

19 change, if you drop some video content, you're going to lose

20 some of your current customers, but also you may be less

21 attracted to prospective customers.  And those forces are going

22 to take a while to work out.

23    And what he's really more concerned about is the, what he

24 calls the long run loss.  In other words, you start with a

25 customer base and say two million customers, you delete Turner

1   content.  And then after a while it goes down to, say, 1.8

2   million, or 1.9 million, whatever.  I'm not endorsing a number,

3   I'm just giving you an example, right?  And that -- that

4   percentage expresses the percentage, it's called the long-term

5   rate.

6       And that -- three things figure into that calculation.

7   What he calls the departure rate or the loss of current

8   customers, but you can see that that's -- and I agree with what

9   he says here.  That is the less important.  It's the loss of

10  prospective customers.  And why is that?  It's because there's

11  a lot of churn in these industries.  Your prospective customers

12  become your current customers and so on and so forth.

13      And so he implemented that.  And he needs both, and that's

14  the reason why he relies on the Altman Vilandrie study.

15  Because the Altman Vilandrie study is the only other two

16  studies that purports to provide you with loss rates of

17  prospective customers, and he needs that for his formula.

18      So he needs two things for his formula.  The loss rate for

19  current customers and the loss rate for prospective customers.

20  What he did is he went to his spreadsheet or his formula,

21  either one, it doesn't matter, and he changed the nine percent,

22  which is the loss rate of current customers, just as an

23  exercise for his testimony, prior to his testimony, to the low,

24  to the -- prior to April 27th, a Vilandrie number of five

25  percent, but the left the ten percent alone.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1     If you've got five percent, you're bound to six percent

2   because the six percent, as we've just discussed is derived

3   from the five percent.  So you can't -- he's being

4   inconsistent.  So he put in by mistake five percent in his

5   formula, but left the ten percent cell unfilled.  Excuse me,

6   filled with the old number of ten.

7     To be internally consistent, he would change both the

8   current rate called five percent, and what he calls the

9   prospective, he calls it a gross ad rate, to six.  If you do

10  that, then things don't go from nine percent to 8.5, they go

11  from nine percent to 5.4 percent.  That's really almost a

12  halving of an overall long run loss rate.

13    So if you really want to properly represent through

14  Professor Shapiro's own method, his own method, the long run

15  rate based on the lower end of the Altman Vilandrie range as

16  expressed prior to April 27th, you would put five and six in,

17  and you would get an overall 5.4.

18  Q.   Just so we're clear, what Professor Shapiro did was

19  combine the five percent, which was a pre-hard coding number,

20  with the ten percent, which was a post hard coding number?

21  A.   That's correct.

22  Q.   Just two more brief topics.  Are you familiar with the

23  stated purpose of the Altman Vilandrie study?

24  A.   Yes, I am.

25  Q.   And what is that?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   And they say something to the effect of informing their --

2  helping them inform their negotiations with video content

3  providers such as Time Warner.

4  Q.   And were they trying to establish the value to Charter of

5  those --

6  A.   Yes, their view of the one way of doing this would be to

7  compare the fees of that they're currently paying with the

8  savings that occurred if they removed the content, which they

9  would save these fees they're paying to the provider, but they

10  would also suffer some loss of customers, and the whole idea of

11  the Altman Vilandrie methodology is to compare those two losses

12  to compute what they call a net present value, essentially it

13  doesn't make sense.  We'd be better off jettisoning this

14  contract group, saving the fees, but losing a few customers or

15  are we better off keeping them?

16  Q.   So could you turn to PX 0079 at page 7?

17  A.   (Witness complies.)

18  Q.   And again, Altman Vilandrie claims that the numbers on

19  this page are confidential, so I'd ask you not to actually read

20  the numbers into the record.

21  A.   Agreed.

22  Q.   But could you just describe what this page is showing?

23  A.   Yes, absolutely, it's the result of these calculations

24  over various time horizons.

25  Q.   And what is their -- again, not referring to the numbers,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  what is their conclusion for Turner Broadcasting System on

2  here?

3  A.   That Charter, this is done all from the prospective of

4  Charter.  If Charter removed the Turner Broadcasting System,

5  they would save so much in fees and I won't -- that actually

6  they would be better off as a firm.  So in other words, they

7  should not, they should black out the channels to avoid paying

8  subscription fees that are higher than the value of the

9  channels.

10 Q.   So if you go across from Turner Broadcasting Systems on

11 this page there's number with the red circle around it, what

12 does that represent?

13 A.   Yes, that represents the calculation.

14 Q.   And that's their preferred method, is that right,

15 recommended method?

16 A.   I believe so, because you can see in the box.  Everything

17 in red, is -- it says recommended.

18 Q.   And that's the net present value over five years if Turner

19 was dropped; is that correct?

20 A.   That's my understanding, yes.

21 Q.   And those numbers are in millions, you'd have to add six

22 zeros after that to have the right number, right?

23 A.   Yes.

24 Q.   So one last topic.  Professor Shapiro also referred --

25 relied on Altman Vilandrie for his so-called cord cutting rate,

1  are you familiar with that?

2  A.    I am.

3  Q.    And what is your view on his reliance on Altman Vilandrie

4  for the cord cutting rate?

5  A.    Very problematic.

6  Q.    Could you explain why that is?

7  A.    Yes.  So in addition to the machinations which we've

8  talked about and the assumptions, unsupported assumptions,

9  Altman Vilandrie also modified their results.  So they took the

10  results of their conjoint survey, and one of the things that

11  they have in their survey is what they called one of the above,

12  economists call that the outside option.  In other words,

13  that's saying, you know, I'm not going to take any of these

14  providers, which would be like cutting the cord.  And they

15  altered the coefficient on that by reducing it.

16     So they reduced the share, if you will, of the none of the

17  above option.  Just went directly in and multiplied all of

18  those coefficients by .6 without justification.

19  Q.    And what is the effect of that?

20  A.    The effect of that is to lower the outside option, meaning

21  to reduce the amount of cord cutting.

22  Q.    And what would happen if Altman Vilandrie had not made

23  that change to none of the above option or outside option?

24  A.    There would have been more cord cutting, and that means

25  that from the prospective of Professor Shapiro's calculations

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   about the impact on rivals and so on, it would be they would

 2   get less, in other words, by withholding, in Professor

 3   Shapiro's world, one of the motivations for increasing the

 4   prices of this content would be to cost -- ensure costs for a

 5   rival, essentially they removed it from a rival, his view is

 6   that people would come, and some of those people would come to

 7   AT&T as a video multichannel distributor.

 8       So if you increase the size of the outside option, there

 9   are more people, instead of coming to AT&T, they come -- they

10   exit -- some people call this exiting the ecosystem.  Meaning

11   they cut the cord.  So this has the affect of what Altman and

12   Vilandrie did as a direct consequence on one of those three

13   inputs that Professor Shapiro uses, what he called the

14   divergence, I think his divergent rate.  And it has the result

15   of increasing loss.

16       So if he restored that coefficient to its value that was

17   actually based on the data, not based on Altman Vilandrie's

18   manipulations of it for unjustified reasons, we would lower

19   Professor Shapiro's loss rates.

20           MR. BARBUR:  I have no further questions at this

21   time, Your Honor.

22           THE COURT:  All right.

23       Cross-exam.

24           MR. SCHEELE:  Good afternoon, Your Honor.  Scott

25   Scheele appearing for the United States.  May I proceed?

```
1              THE COURT:  You may.

2                       CROSS-EXAMINATION

3  BY MR. SCHEELE:

4  Q.   Good afternoon, Professor Rossi, my name is Scott Scheele,

5  we haven't met before.  I'll be conducting your

6  cross-examination.

7  A.   How do.

8  Q.   Your assignment in this case, Dr. Rossi, was to review the

9  studies done by both Altman Vilandrie and by Professor Hauser,

10 right?

11 A.   Yes, and as well as to understand the way in which those

12 studies were relied upon by Professor Shapiro.

13 Q.   And AT&T didn't contact you to work on this case until

14 early February; isn't that right?

15 A.   That's correct, that was in my deposition.

16 Q.   And you're aware that initial expert reports, including

17 Professor Shapiro's and including Professor Hauser's, they were

18 exchanged in this case on the evening of Friday, February 2nd,

19 were you aware of.

20 A.   I am aware that the date on Professor Hauser's report is

21 February 2nd, yes.

22 Q.   And you testified in your deposition that you weren't

23 contacted by AT&T until somewhere in the first week of

24 February, so the week of Monday, February 5th; is that right?

25 A.   I believe that's correct.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.    And you filed your rebuttal report in this case on

2  February 26th; is that right?

3  A.    That's correct.

4  Q.    So you had three weeks or less to form all of your

5  opinions and draw your conclusions; is that right?

6  A.    That's correct.

7  Q.    About two different studies?

8  A.    That's correct.

9  Q.    And how many staff did you have working with you?

10  A.    I did have some support, as you know, there are a large

11  number of documents produced.  I had support, we divided it up

12  in the following way:  We had Cornerstone working on the Hauser

13  survey and Compass Lexecon working, assisting me at my

14  direction on the Altman Vilandrie work.

15  Q.    So my question was how many?

16  A.    I do not know the exact numbers of the people involved.

17  Q.    How many did you interact with?

18  A.    I interacted with two people at Cornerstone, and I believe

19  two people at Compass Lex, possibly three.

20  Q.    So at the time you were retained, you knew and perhaps

21  your staff knew as well, that you were being hired by AT&T for

22  this litigation; is that right?

23  A.    Yes, well, by Time Warner, I think, but the attorney who

24  contacted me, I believe was an attorney for Time Warner.

25  Q.    Thank you.

1     So Professor, are you were tasked to look at Professor

2   Hauser's survey and the Altman Vilandrie study.  Other than

3   those two piece of evidence, did you look at any other evidence

4   that Professor Shapiro relies on for the Turner subscriber loss

5   rate?

6   A.   No, I did not.

7   Q.   You didn't estimate your own subscriber loss rate for

8   Turner, did you?

9   A.   No, I did not.

10  Q.   And you didn't do any analysis to determine what the loss

11  rate is, did you?

12  A.   No, I did not.

13  Q.   You didn't conduct a survey of your own?

14  A.   No, I did not.

15  Q.   You're familiar with bargaining models generally, though,

16  right?

17  A.   I do have some familiarity with them.  That's not my

18  specialty.

19  Q.   So you're not offering any opinion about Professor

20  Shapiro's economic model, how that operates, are you?

21  A.   Only to the extent that it relies on these inputs and the

22  validity of these inputs.

23  Q.   And you felt that you didn't really need to know about how

24  that model operates to reach your conclusions, didn't you?

25  A.   I needed to understand the importance of these inputs for

1  the outcomes of that model.  No, I was not asked to comment on

2  that model.  I believe other people have commented on it and

3  testified to that effect.

4  Q.  Okay.  So I want to focus now on some of your opinions

5  related to the Altman Vilandrie study, okay?

6  A.  Certainly.

7  Q.  You're aware that Charter Communications hired Altman to

8  develop this simulator tool that would assess the value of

9  different groups of programming content, aren't you?

10 A.  I do understand that Charter engaged Altman Vilandrie,

11 yes.

12 Q.  And are you aware that Charter had inputs into how the

13 study was designed?

14 A.  I know there have been interactions with members of

15 Charter's staff, and Altman Vilandrie staff.  I do not know the

16 exact inputs that Charter did in the design of the study.  I

17 should say that this -- the way in which they designed the

18 study is standard Altman Vilandrie methodology.  So this

19 channel chooser is a product of theirs.  The conjoint is a

20 standard things that they have on their website, and the

21 Max-Diff, of course, is standard methodology.

22 Q.  So you are aware that there was back and forth with

23 Charter and Altman Vilandrie as this was being developed?

24 A.  I would not be -- excuse me, I'm sorry, I didn't mean to

25 speak over you.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        I would imagine that that is the case.  I do not know the

 2   exact extent of it.

 3   Q.   When you wrote your report you didn't know whether Charter

 4   had any input into the design of the study; isn't that right?

 5   A.   Not specifically, no.

 6   Q.   And you don't know how much time Charter executives spent

 7   working with Altman on the study, do you?

 8   A.   No, I do not.

 9   Q.   You're aware that Charter has paid Altman Vilandrie

10   approximately eight hundred thousand dollars for this study?

11   A.   I have become aware -- that during this trial, yes.

12   Q.   You're aware Charter retained Altman Vilandrie in the

13   ordinary course of its business, right?

14   A.   At least one of those engagements, yes.

15   Q.   And you're aware that Charter was not just asking Altman

16   Vilandrie just to conduct a survey, it was a broader project,

17   right?

18   A.   The survey was motivated by a broader concern, yes.

19   Q.   And Charter was asking Altman Vilandrie to work with it to

20   devise the simulation tool that Charter could use going forward

21   to assess the expected subscriber departure rates if a

22   programmer went dark, right?

23   A.   I believe Bewley did testify to that effect, yes.

24   Q.   And you're not expressing an opinion here today that as a

25   business matter that it's inappropriate somehow for Charter to
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  spend eight hundred thousand dollars to conduct -- to have that

2  type of work done, are you?

3  A.   I wouldn't have paid for it, but no.

4  Q.   But you're not expressing an opinion that's somehow

5  inappropriate, are you?

6  A.   You mean inappropriate in some ethical sense?  I'm not

7  sure what you mean by "inappropriate."

8  Q.   Do you think that Charter deciding what it thinks was

9  worth [sic] is valuable to it in term of how it wants to spend

10  its money in having work done was an incorrect decision on

11  Charter's part as a business matter?

12  A.   Large companies engage market researcher all the time and

13  not always pay attention to the results, as was the case here.

14  Q.   And you don't think it's inappropriate in some way that

15  Charter had a role in designing and working on the survey, do

16  you?

17  A.   No.

18  Q.   You don't think it's inappropriate as a business matter

19  that Charter -- for Charter to work with Altman Vilandrie about

20  the level of the viewership and assumed that a subscriber would

21  be assumed to -- would churn, do you?

22  A.   I don't know the basis for those assumptions.

23  Q.   I'm not asking you whether you knew the basis, I was

24  asking whether you thought that would be inappropriate?

25  A.   As long as it's articulated, in other words, if it's

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    really just a bunch of assumptions that you're just applying,

2    it's like writing a spreadsheet for a bunch of projections,

3    it's not based on any data.

4        So as long as you say that, as long as you say that really

5    all our analysis is is based on the assumptions of Charter

6    employees, I have no problem with that.  That's not how its

7    represented.

8    Q.   And Charter is an industry participant so Charter

9    certainly would have some judgment to lend in talking with

10   Altman Vilandrie about the studies it conducts, don't you

11   think?

12   A.   I think ultimately the reason they engage, the only reason

13   they could have engaged Altman Vilandrie was to learn something

14   they didn't know.

15            THE COURT:  I think we'll call a break there.

16            We're going to take the evening recess, reconvene at

17   ten-thirty tomorrow morning.  You remain a witness under oath

18   until tomorrow morning.  You're not at liberty to discuss your

19   testimony with anyone, even your own counsel, between now and

20   then and stay independent of all others, okay.

21            THE WITNESS:  I understand.

22            THE COURT:  You can step down.

23        (Witness excused.)

24            THE COURT:  I'll see counsel.

25        (Sealed Bench Conference.)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           MR. CONRATH:  This is the set you want?

2           THE COURT:  So he's got what, another 40 minutes?

3           MR. CONRATH:  Thirty-five minutes.

4           THE COURT:  All right, 10:30 to 11:30.  Redirect?

5           MR. PETROCELLI:  Briefly, ten minutes.

6           THE COURT:  Okay, so then it's going to be Holanda?

7           MR. CONRATH:  Yes.

8           THE COURT:  Is he available?

9           MR. CONRATH:  Yes.

10          THE COURT:  So you still think a half hour?

11          MR. CONRATH:  Forty-five is a better guess, Your

12  Honor.

13          THE COURT:  All right, so you think after lunch?

14          MR. PETROCELLI:  No, Mr. Christopher.

15          THE COURT:  Christopher.

16          MR. PETROCELLI:  It's going to go Christopher, in all

17  likelihood, Stankey, Bewkes, Stevenson.  Christopher, then John

18  Stankey?

19          THE COURT:  Stankey?

20          MR. PETROCELLI:  Yeah, S-T-A-N-K-E-Y, then probably

21  --

22          THE COURT:  Bewkes?

23          MR. PETROCELLI:  Mr. Bewkes, right, then

24  Mr. Stevenson, that's it.

25          THE COURT:  So these two are Wednesday?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. PETROCELLI:  Wednesday.

 2              THE COURT:  You'll have all this done tomorrow you

 3    think?

 4              MR. PETROCELLI:  Okay, Christopher's direct is

 5    fifteen to twenty minutes, David Christopher.  Fifteen to

 6    twenty minutes on direct.  What's the cross?

 7              MR. CONRATH:  Depends on the direct, but I'm guessing

 8    twenty to thirty.

 9              MR. PETROCELLI:  Okay, Stankey is going to be about

10    an hour and I'd say an hour and a half on direct.

11              MR. CONRATH:  Half an hour at least, maybe a little

12    more.

13              MR. PETROCELLI:  Bewkes is an hour, and Stevenson is

14    an hour.

15              THE COURT:  It's possible we could get these three

16    done tomorrow.

17              MR. CONRATH:  Maybe.

18              THE COURT:  I don't know if it's likely.

19              MR. CONRATH:  Considering we're finishing with Mr.

20    Rossi.

21              THE COURT:  So Stevenson might spill into Thursday.

22              MR. PETROCELLI:  Thursday morning, yes.

23              THE COURT:  And he's your last witness?

24              MR. PETROCELLI:  Yes.

25              THE COURT:  You got witnesses to start Thursday
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    afternoon?

2            MR. CONRATH:  Can I raise another question, Your

3    Honor?

4            When we were talking about closing last week, you

5    politely asked me if Mr. Delrahim would be available on Monday,

6    the 30th, remember we were talking about.  And I checked and

7    the answer is he is not.  So I want to finalize this, but we've

8    got a request it would be for May 2nd, May 2nd, that would be a

9    Wednesday.

10            THE COURT:  I can't juggle this thing just for him.

11    You know, I mean, look, I'm willing to work with you, but I

12    mean he's got two CEOs, maybe three, I don't even know, he

13    might have a third.  I guess he's in the hospital.

14            MR. PETROCELLI:  I asked, Your Honor, he said he's in

15    Los Angeles.

16            MR. CONRATH:  So with Your Honor's permission we'll

17    split a little bit of our closing argument and a small portion

18    at the beginning will be taken by Mr. Delrahim.

19            THE COURT:  Excuse me.

20            MR. PETROCELLI:  Your Honor, he is not, that is --

21            THE COURT:  So it's one lawyer's side.  Let me think

22    about May 2nd.  I'm not making a decision.  But he's known

23    about this now for a number of days, and we talked about that

24    date almost a week ago.

25            MR. PETROCELLI:  A week ago, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  And I mean, I don't know what he's got,

 2   it's not my business, frankly, but it's hard to imagine

 3   whatever it is that it's equally important to this.  It could

 4   be, I don't know.

 5              MR. CONRATH:  I don't know either.

 6              THE COURT:  Well, I can tell you right now it's a

 7   long shot.

 8              MR. PETROCELLI:  We would object, Your Honor.

 9              THE COURT:  Will you be done on Monday or Tuesday?

10              MR. CONRATH:  I believe we'll be done by Tuesday,

11   there's some possibility we'll be done Monday.

12              MR. PETROCELLI:  Of next week.  He asked when is your

13   rebuttal case done.

14              MR. CONRATH:  Right, right, yes, that's what I

15   understood.

16              THE COURT:  We're not using Friday.

17              MR. CONRATH:  We're not using Friday.

18              THE COURT:  That' right.

19              MR. PETROCELLI:  Okay, I know you have a five o'clock

20   class.

21              THE COURT:  Yes, I've got to go.

22              MR. CONRATH:  Okay, thank you.

23        (Open court.)

24              THE COURT:  All right, we'll stand in recess till

25   10:30 tomorrow.
```

1      (Trial adjourned at 5:05 p.m.)

2                           -oOo-

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2              I certify that the foregoing is a true and correct

3    transcript, to the best of my ability, of the above pages, of

4    the stenographic notes provided to me by the United States

5    District Court, of the proceedings taken on the date and time

6    previously stated in the above matter.

7              I further certify that I am neither counsel for, related

8    to, nor employed by any of the parties to the action in which

9    this hearing was taken, and further that I am not financially

10   nor otherwise interested in the outcome of the action.

11

12   _____        _____

13   /s/Crystal M. Pilgrim, RPR,FCRR        Date: April 17, 2018

14

15

16

17

18

19

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        :
                                 :
                 Plaintiff,      :          CV No. 17-2511
         vs.                     :
                                 :          Washington, D.C.
                                 :       Tuesday, April 17, 2018
AT&T, INC., ET AL.,              :          11:00 a.m.
                                 :
                                 :            Day 15
                 Defendants.     :
-----------------------------x



                        MORNING SESSION
                  TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE RICHARD J. LEON
               UNITED STATES DISTRICT SENIOR JUDGE



APPEARANCES:

For the Government:     Craig W. Conrath, Esquire
                        Eric D. Welsh, Esquire
                        Donald G. Kempf, Jr., Esquire
                        Scott A. Scheele, Esquire
                        Justin T. Heipp, Esquire
                        Cerin M. Lindgrensavage, Esquire
                        U.S. DEPARTMENT OF JUSTICE
                        Antitrust Division
                        450 Fifth Street, NW
                        Washington, DC  20530
                        202) 532-4560
                        craig.conrath@usdoj.gov
                        eric.welsh@usdoj.gov
                        donald.kempf@usdoj.gov
                        scott.scheele@usdoj.gov
                        justin.heipp@usdoj.gov
                        cerin.lindgrensavage@usdoj.gov
```

```
 1   Appearances Continued:

 2   For Defendant AT&T      Katrina M. Robson, Esquire
     and DirecTV Group       O'Melveny & Myers LLP
 3   Holdings, LLC:          1625 Eye Street, NW
                             Washington, DC  20006
 4                           (202) 220-5052
                             krobson@omm.com
 5
                             Daniel M. Petrocelli, Esquire
 6                           M. Randall Oppenheimer, Esquire
                             O'MELVENY & MYERS LLP
 7                           1999 Avenue of the Stars
                             8th Floor
 8                           Los Angeles, CA  90067
                             (310) 553-6700
 9                           dpetrocelli@omm.com
                             roppenheimer@omm.com
10
                             Michael L. Raiff, Esquire
11                           Robert C. Walters, Esquire
                             GIBSON, DUNN & CRUTCHER LLP
12                           2100 Mckinney Avenue
                             Suite 1100
13                           Dallas, TX 75201
                             (214) 698-3350
14                           mraiff@gibsondunn.com
                             rwalters@gibsondunn.com
15
     For Defendant          Kevin J. Orsini, Esquire
16   Time Warner, Inc.:     Peter T. Barbur, Esquire
                             CRAVATH, SWAINE & MOORE LLP
17                           Worldwide Plaza
                             825 Eighth Avenue
18                           New York, NY  10019
                             (212) 474-1140
19                           korsini@cravath.com
                             pbarbur@cravath.com
20
     Court Reporter:        Crystal M. Pilgrim, RPR, FCRR
21                           Official Court Reporter
                             United States District Court
22                           District of Columbia
                             333 Constitution Avenue, NW
23                           Washington, DC  20001
                             (202) 354-3127
24                           crystal_pilgrim@dcd.uscourts.gov

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1                        Table of Contents

 2                            Direct   Cross  Redirect   Recross

 3    On behalf of the Defense:

 4        Peter E. Rossi

 5          By Mr. Barbur                          2890

 6          By Mr. Scheele              2851                  2898

 7    On behalf of the Government:

 8        Jim Holanda

 9          By Mr. Conrath          2904

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2           THE COURT:  You can sit where you were.  You can go

 3     back to where you were.

 4           THE WITNESS:  Okay.

 5           THE DEPUTY CLERK:  Good morning, Your Honor.

 6        This is civil action 17-2511, United States versus AT&T,

 7     Inc, et al, DirecTV Group Holding and Time Warner, Inc.

 8        I'm going to ask counsel to please approach the lectern

 9     and identify yourselves for the record.

10           MR. SCHEELE:  Good morning, Your Honor.

11        Scott Scheele appearing on behalf the United States.

12           THE COURT:  Welcome.

13           MR. HEIPP:  Good morning, Your Honor, Justin Heipp

14     for the United States.

15           THE COURT:  Welcome.

16           MR. WELSH:  Good morning, Your Honor.

17        Eric Welsh for the United States.

18           THE COURT:  Welcome.

19           MR. WELSH:  Thank you.

20           MR. CONRATH:  Good morning, Your Honor.

21        Craig Conrath for the United States.

22           THE COURT:  Welcome back.

23           MR. CONRATH:  Thank you.

24           MS. LINDGRENSAVAGE:  Good morning, Your Honor.

25        Cerin Lindgrensavage for the United States.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              THE COURT:  Welcome.

2              MR. KEMPF:  Good morning, Your Honor.

3    Don Kempf for the United States.

4              THE COURT:  Welcome.

5              MR. PETROCELLI:  Good morning, Your Honor.

6    Daniel Petrocelli for defendants.

7              THE COURT:  Welcome back.

8              MS. ROSEN:  Good morning, Your Honor.

9    Katrina Robson for defendants.

10             THE COURT:  Welcome back.

11             MR. OPPENHEIMER:  Good morning, Your Honor.

12   Randy Oppenheimer for defendants.

13             THE COURT:  Welcome back.

14             MR. WALTERS:  Good morning, Your Honor.

15   Rob Walters here for AT&T and DirecTV.

16             THE COURT:  Welcome.

17             MR. BARBUR:  Good morning, Your Honor.

18   Peter Barbur for Time Warner.

19             THE COURT:  Welcome.

20             MR. RAIFF:  Good morning, Your Honor.

21   Mike Raiff for AT&T and DirecTV.

22             THE COURT:  Good morning.

23   See counsel.

24   (Sealed bench conference.)

25             THE COURT:  Not you.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. CONRATH:  Sorry, I wasn't sure which counsel you

2   wanted.

3          THE COURT:  When I say I want counsel, I want the

4   quarterbacks.

5          MR. CONRATH:  Okay.

6          THE COURT:  Sorry for the delay.

7          MR. CONRATH:  No problem.

8          THE COURT:  I had some car trouble this morning.

9   We'll make it up on the back end.  We'll go to six o'clock, all

10  right.

11         MR. PETROCELLI:  Yes.

12         MR. CONRATH:  Sure.

13         MR. PETROCELLI:  Can we talk about the request to

14  move the closing argument?

15         THE COURT:  Say it again?

16         MR. PETROCELLI:  Can we talk about counsel's request

17  to move the closing argument?

18         THE COURT:  I already ruled on it.

19         MR. PETROCELLI:  Perfect, thank you.

20         MR. CONRATH:  I understand, the ruling is we'll do it

21  on Monday?

22         THE COURT:  Monday is -- we'll accommodate everyone

23  except one person who I mean, I don't know his situation and

24  I'm not asking you to tell me, but unless he's in a medical

25  situation, is in a hospital, then he would have to rearrange.

***REDACTED IN ACCORDANCE WITH JULY 31 2018 DISTRICT COURT ORDER***

```
 1   This would apply to by the way to the CEOs.

 2           MR. CONRATH:  Sure.

 3           THE COURT:  Unless they're in a hospital situation,

 4   they have to be here or not be here.  They have a choice.

 5           MR. CONRATH:  I will communicate the message you

 6   should try to rearrange your schedule if you want to be here.

 7   I'll communicate that.

 8           THE COURT:  In his case like the CEOs, they don't

 9   have to be here situation.  It's they want to be here

10   situation.

11       I obviously want to try to help accommodate them to the

12   extent I can, but we're juggling a lot of schedules.  A lot of

13   schedules.

14           MR. PETROCELLI:  Thank you, Your Honor.

15           MR. CONRATH:  Understood.

16           THE COURT:  Come on back up.

17       The witness can resume the stand, remains under oath.

18       And question by Mr. Scheele?

19       (Witness resumed the stand.)

20           MR. SCHEELE:  Your Honor, may I approach about a

21   preliminary matter?

22           THE COURT:  Okay.

23       (Witness leaves the stand.)

24       (Sealed bench conference.)

25       ██████ ████████  ████ █████  █ █████ █████ ███
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2845



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  ████  ████  ████  ████  ████  █  ████  ████

 2    ████  ████  ████  ████  ████  ████  ████  ████  ████

 3  ████████  ████  ████  ████  ████  ████  ████████

 4      ████  ████  ████  ████  ████  ████  ████

 5     ████  ████  ████  ████  ████  ████

 6     ████  ████  ████  ████  ████████

 7     ████  ████  ████  ████  ████

 8       ████  ████  ████  ████

 9      (Open court.)

10        THE COURT:  All right, well, we got that thing done,

11  so start up again.

12        DEFENSE WITNESS PETER E. ROSSI, PREVIOUSLY SWORN

13        MR. SCHEELE:  May I proceed, Your Honor?

14        THE COURT:  YES.

15        MR. SCHEELE:  Thank you.

16              CROSS EXAMINATION (Continued)

17  BY MR. SCHEELE:

18  Q.   Good morning, Dr. Rossi?

19  A.   Good morning.

20  Q.   Reviewing your testimony from yesterday about the Altman

21  Vilandrie study, it sounds like you're suggesting Charter one

22  day in 2016 figured why don't we go out and flush $800,000 and

23  lots of our executives' time into an effort to create a

24  simulation tool that is garbage.

25      Is that what your testimony is?

1  A.    No, that's not my testimony.

2  Q.    Do you think that Charter wanted a study that was riddled

3  with errors?

4  A.    No.

5  Q.    And you come to your conclusions without having any

6  background in this industry; isn't that right?

7  A.    I have no background specifically in the

8  telecommunications industry.  Obviously, my background is in

9  survey design analysis.

10  Q.    Or the pay-TV industry?

11  A.    Excuse me, in the pay-TV industry.

12  Q.    But you would agree that Charter has some experience in

13  the pay-TV industry wouldn't you?

14  A.    Yes.

15  Q.    Mr. Montemagno, Charter's leading negotiator, he has

16  experience in that industry, doesn't he?

17  A.    Yes, he has experience as a negotiator, yes.

18  Q.    Are you aware that Mr. Montemagno came in and testified to

19  this Court that he found the Altman study helpful when he was

20  thinking about his negotiations for programs?

21  A.    Programmers?  I'm aware of some of his testimony.  I'm not

22  sure that's an accurate characterization.

23  Q.    I'll read you the question and answer from the trial

24  transcript?

25  A.    Of his entire transcript?

1  Q.   Page 249.  Question, was this information helpful to you

2  when you were thinking about your negotiations with the

3  programmer at issue here?

4      Answer, yes.  It was helpful.

5      Were you aware of that testimony?

6  A.   I don't believe that characterizes his full testimony.

7  Q.   And were you aware that Charter has incorporated the

8  information from the Altman work into its internal studies?

9  A.   I'm not aware of that.

10  Q.   I'd like to shift gears a little bit, Dr. Rossi.

11      I want to talk with you a little bit about Sawtooth

12  Software.  You testified about Altman combining the results

13  from two different types of study, the conjoint study and a

14  Max-Diff study, right?

15  A.   That's correct.

16  Q.   And Altman did that using Sawtooth Software?

17  A.   That's correct.  Excuse me.  Excuse me.

18      They did that with partially the Sawtooth Software.  The

19  combination was done outside of Sawtooth Software.

20  Q.   Sawtooth Software was involved in combining those, right?

21  A.   Not in combining, no.

22  Q.   You have cited Sawtooth's technical manuals in your

23  report, right?

24  A.   I am aware of Sawtooth's technical manuals.

25  Q.   And you're familiar with Sawtooth generally, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Yes, I am very familiar.

2  Q.    Sawtooth is a commonly used program in survey analysis?

3  A.    In certain types of survey analysis it is commonly used,

4  yes.

5  Q.    You actually I think testified on direct that you

6  contributed, made some suggestions about the Sawtooth Software,

7  isn't that right?

8  A.    I think the correct way to say it is that some of the

9  innovations that I developed as survey methodology have been

10  incorporated into Sawtooth Software.

11  Q.    Thank you.

12     The company that made Sawtooth has been around about 35

13  years?

14  A.    I, I --

15  Q.    You're not sure?

16  A.    At least 20.

17  Q.    Okay.  Are you aware that Sawtooth reports that it's been

18  used to conduct more than 10,000 analyses by it's users each

19  year?

20  A.    Yes, I am.

21  Q.    And Sawtooth allows a user to analyze Max-Diff results,

22  right?

23  A.    Yes, it does.

24  Q.    Are you aware that in 2016 seventy percent of Sawtooth

25  users reported using the Max-Diff functionality the prior year?

1  A.    I'm not aware of that statistic.  It doesn't surprise me.

2  Q.    You're aware that Sawtooth produces technical manuals to

3  instruct users on how to use the software, right?

4  A.    Yes.

5  Q.    But you didn't review any of those manuals in order to

6  inform your opinions about how Altman had used Sawtooth

7  Software in this case, did you?

8  A.    I don't need to review those manuals.  I know what's in

9  Sawtooth Software.

10  Q.    So the answer to my question is no, you did not review

11  them?

12  A.    I did not review specific manuals.  I do not need to.

13  Q.    I understand you don't feel you don't need to.

14     The answer to my question is no, you didn't review them?

15  A.    I did not review the manuals, yes, that's correct.

16  Q.    But in your report you cited a technical paper from

17  Sawtooth that describes how to analyze Max-Diff results, didn't

18  you?

19  A.    I did, yes.

20  Q.    And you criticized Altman for using Sawtooth as part of

21  the conversion of Max-Diff scores into ratio based numbers,

22  right?

23  A.    No.  Altman did not use Sawtooth to do that.  It did it

24  outside of Sawtooth.

25     It took inputs from Sawtooth and in their own program

1    modified them.  This is not from Sawtooth.

2    Q.   Are you aware that the Sawtooth technical manual that you

3    cited in your report describes the exact same procedure that

4    Altman used?

5    A.   The procedure that Altman used is outside of Sawtooth

6    Software and it's completely indefensible.

7    Q.   Are you aware that academic journals in the medical

8    profession have used Max-Diff rescaling procedure that Altman

9    used?

10   A.   You would have to show me the example.

11      What Altman did was try to convert Max-Diff scores into

12   conjoint part-worths. That is impossible, logically impossible

13   and incorrect.

14      What someone did in some medical journal, I don't know

15   without having access to the journal article.

16   Q.   Why don't we shift gears then.

17      You talked about Altman Vilandrie's use of set-top box

18   data, right?

19   A.   Set-top box data, that's one of the methods.

20   Q.   You said that set-top box data can't be used to estimate

21   subscriber losses unless a blackout is actually occurring,

22   right?

23   A.   There's no information at set top box data about the

24   association between viewer concentration and switching which is

25   how Altman Vilandrie uses it.

```
 1  Q.   So was the answer to my question yes?

 2  A.   Could you repeat your question, please?

 3  Q.   Sure.

 4       You said that set-top box data can't be used to estimate

 5  subscriber losses unless a blackout is occurring?

 6  A.   That's not exactly correct.

 7       What I said was you, that the link between viewing

 8  concentration and switching cannot be established using set-top

 9  box data alone.

10  Q.   Are you aware of testimony in this trial from Cox that

11  they used set-top box data to estimate how much leverage they

12  have in program negotiations?

13  A.   I am not aware of that specific testimony, no.

14  Q.   Are you aware of testimony in this trial from Comcast that

15  they use set-top box data to estimate subscriber losses from

16  hypothetical blackouts?

17  A.   I'm not aware of that testimony.

18  Q.   Professor Rossi, you testified about how Altman changed

19  its methodology for the Turner Networks in terms of its

20  overall; is that right?

21  A.   It changed its numbers, yes.

22  Q.   And are you aware that according to Mr. Bewley's trial

23  testimony this changed the methodology, took the Turner

24  Networks out of a grouping of programmers, group 3, and created

25  a more individually tailored estimate of the likely subscriber
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   loss just for the Turner Networks?

2   A.   That's my understanding, yes.

3   Q.   And prior to changing the methodology Altman Vilandrie's

4   recommendation to Charter was that a blackout of Turner would

5   result in a fourteen percent loss rate; isn't that right?

6   A.   That's not quite correct.

7   Q.   Are you aware of Mr. Bewley's testimony that prior to

8   doing that, the recommendation was fourteen percent?

9   A.   That's a different thing that you are saying.  Yes, their

10  recommendation was fourteen percent.

11  Q.   Let me ask the question again so we're clear.

12      Prior to changing the methodology to this individually

13  tailored methodology, Altman Vilanderie's recommendation to

14  Charter was that a blackout of Turner would result in a

15  fourteen percent loss rate, right?

16  A.   Their recommended loss rate was fourteen percent prior to

17  April 27th.  Correct.

18  Q.   Thank you.

19      And are you aware that Mr. Bewley from Altman Vilandrie

20  testified in this trial that Altman made this change based on

21  quantitative analysis?

22  A.   Yeah, I don't know the basis for that analysis.  They

23  changed the numbers.

24  Q.   Are you aware of that testimony?

25  A.   I'm sure that's correct, but I do not, I'm not actually

1   aware of that specific statement.  You used the term

2   quantitative analysis.

3   Q.    Are you aware that Mr. Bewley answered a question about

4   quantitative analysis in that context?

5   A.    I'm not aware of that.  I don't recall at this point.

6   Q.    Are you aware that Mr. Bewley testified that they made

7   this change for the Turner channels to be more individually

8   tailored first before they did it for other programmings close

9   to a deadline?

10  A.    I'm aware of that.

11  Q.    And they did it related to Turner first because Turner was

12  not quite exactly in group 3 or group 2, right; isn't that

13  right?

14  A.    I believe he testified to that affect without evidence.

15  Q.    And are you aware that Altman Vilandrie later made the

16  same change to provide for more individually tailored result?

17  They made that change for all of the other programmers, isn't

18  that right?

19  A.    Without making material difference to any contract group

20  except Turner, yes.

21  Q.    And they delivered the results of that updated methodology

22  to Charter six months later?

23  A.    I believe in October, yes.

24  Q.    And are you aware that Charter paid Altman Vilandrie more

25  money in addition to it's original sum, it's original contract

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   sum beyond that original contract sum in order to refine its

2   methodology and create the individually tailored methodology in

3   October?

4   A.   I don't know what they paid for.  I know they paid an

5   additional fee.  I would not characterize this as refinement of

6   a methodology.

7       I would characterize it as fudging numbers.

8   Q.   Now you testified about Altman Vilandrie hard coding in

9   your direct, right?

10  A.   I did.

11  Q.   You used the phrase hard coding?

12  A.   That is actually not my phrase.  That is a phrase from the

13  email correspondence that is in evidence in this matter.

14  Q.   I wasn't suggesting that you made it up.

15      I was just referring you, giving you contextually that

16  phrase is a phrase that you used in your direct testimony,

17  right?

18  A.   That's correct.

19  Q.   And prior to the hard coding the number representing the

20  departure rate for Turner in an excel spread sheet was

21  determined by a formula; isn't that right?

22      I'm trying to help the Court understand what we mean by

23  hard coding.

24      So prior to what are you calling hard coding, the number

25  representing that departure rate for Turner, that was

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  determined by a formula as opposed to being a number that was

2  typed into the cell, right?

3  A.   That's my understanding, correct.

4  Q.   And that, the formula that underlied that cell prior to

5  the, what we're calling hard coding, that was a formula that

6  applied to group 3; isn't that right?

7  A.   That's correct.

8  Q.   And by hard coding essentially what you are meaning is

9  that instead of that underlying formula for group 3

10 determining what number appeared in that cell would determine

11 what number appeared in that cell, they actually typed in nine

12 percent; is that right?

13 A.   I believe that's correct.

14 Q.   And are you aware of the result of change in this

15 methodology -- let me back up.

16    And that nine percent that they typed in, that was the

17 result of their individually tailored methodology; isn't that

18 right?

19 A.   I wouldn't call it a methodology.  You're right, it was a

20 result of their treatment of Turner separately.

21 Q.   And they didn't just, in other words, they didn't just

22 make this nine percent up out of thin air.  It was the result

23 of a process.  Whether you call it a methodology or not, I

24 don't want to quibble with you, but it was the result of a

25 process?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   Virtually everything Altman Vilandrie did of consequence

2   is a result of made up assumptions in my opinion.

3   Q.   I understand that.  That's not the question I asked you,

4   Dr. Rossi.

5        Dr. Rossi, your counsel is going to have an opportunity to

6   stand up and ask you questions on redirect.

7        If you would just answer my questions if you can simply,

8   that would help us move along?

9   A.   Certainly.

10  Q.   So that nine percent that they manually plugged into the

11  excel spread sheet, that was the result of a process that

12  Altman Vilandrie, that individually tailoring process, right?

13  A.   That's your characterization.  My characterization is they

14  altered the methodology specifically for Turner.

15  Q.   And are you aware that as a result of this change to the

16  methodology for Turner, Altman Vilandrie's recommendation to

17  Charter for the appropriate loss rate for Turner actually went

18  down from fourteen percent to nine percent?

19  A.   Their recommended change from fourteen to nine, that's

20  correct.

21  Q.   Thank you.

22       I want to shift gears and talk with you about another

23  topic.

24       Professor Rossi, you testified that using that nine percent

25  subscriber loss rate Altman calculated a positive.  I think the

1  phrase you used was a positive net present value to Charter if

2  the Turner channels were dropped; isn't that right?

3  A.    That's not my phrase.  That's Altman Vilandrie's phrase

4  from the slide deck.

5  Q.    So just to clarify what that means, by net present value

6  you mean when you testified about it on direct and presumably

7  Altman Vilandrie meant that Altman Vilandrie was essentially

8  telling Charter what Turner was worth.  Is that a fair way to

9  describe it?

10  A.    No.

11  Q.    Well, would you describe for us what net present value

12  meant in that context?

13  A.    It's an attempt to ask what would happen if they

14  discontinued Turner financially in a net present value sense

15  which is a discounted value of effectively savings minus losses

16  over a five year horizon.

17  Q.    When they were calculating that they were using that nine

18  percent subscriber loss rate; is that right?

19  A.    I believe that's correct.

20  Q.    In essence they were essentially suggesting that with that

21  nine percent subscriber loss rate, Charter was overpaying for

22  Turner; isn't that fair?

23  A.    Their fees, savings and the fees would exceed the loss of

24  customers, that's correct.

25  Q.    So if the subscriber loss rate were to decline from nine

1  percent to let's just say five percent, you would agree that

2  Turner's value to Charter would also decline, right?

3  A.   If the subscriber loss rate were to decline?

4  Q.   Yes?

5       If the subscriber loss rate that was put through the

6  methodology instead of being nine percent was five percent, you

7  would assume that the value of Turner to Charter, you concluded

8  that the value based on the Altman Vilandrie methodology, I'm

9  not asking what you would conclude, but having reviewed the

10 Altman Vilandrie methodology that the value of Turner to

11 Charter would also decline, right?

12 A.   The value to Turner?  No, it would increase.

13 Q.   So if the subscriber loss rate decreased --

14 A.   If, excuse me.  It would increase, excuse me.  Yes, yes.

15 Q.   Let me start again so we're clear, okay?

16 A.   Yes.

17 Q.   So if the subscriber loss rate declined from nine percent

18 to let's say five percent, you would agree that Turner's value

19 to Charter would also decline, right?

20 A.   Yes.

21 Q.   But you know Charter chose to keep Turner don't you?

22 A.   Excuse me if I could.

23 Q.   Absolutely?

24 A.   In the way in which Altman Vilandrie was making that

25 calculation.

1   Q.   Yes, that's the question I was asking?

2   A.   And focusing on that specific aspect of their business,

3   yes.

4   Q.   But you are aware that Charter chose to keep Turner

5   though, right?

6   A.   Yes, I am.

7   Q.   So doesn't that suggest that the subscriber loss rate is

8   unlikely to be any lower than the nine percent that Altman

9   Vilandrie recommends?

10  A.   No.

11  Q.   Isn't it a likely explanation for why Turner has not

12  dropped Turner is that because Charter thinks Turner is even

13  more valuable than Altman Vilandrie thought it was?

14  A.   You use the term likely.  I would not say that's likely.

15  It is one possible explanation.

16  Q.   Are you aware that Charter testified in this trial that

17  Turner was quote critically important content end quote?

18  A.   I don't know what critically important content means.

19  Q.   I didn't ask you that.  I asked you if you were aware that

20  Charter testified that Turner was quote critically important

21  content?

22  A.   No, I'm not.

23  Q.   Are you aware that Cox testified that they consider most

24  of the Turner Networks to be must have?

25  A.   No, I'm not.

1  Q.  Are you aware that Dish testified that TNT and TBS are

2  important sports networks?

3  A.   No, I'm not.

4      (Witness leaves the stand.)

5      (Sealed Bench conference.)

6          THE COURT:  Why are you reading for him testimony

7  back onto the record.  It's already in the record. I don't

8  understand why you're doing what you're doing.

9          MR. SCHEELE:  Your Honor --

10          THE COURT:  You're wasting time.

11          MR. SCHEELE:  I will --

12          THE COURT:  Asking him if he knows this or doesn't.

13          MR. SCHEELE:  An expert forms his opinion based on

14  evidence.  He seems to be unaware of a significant amount of

15  evidence.

16          THE COURT:  You're taking snippets of testimony that

17  occurred in the last five weeks asking him if he was aware of

18  it.  I don't get it.

19          MR. BARBUR:  I think it's beyond the scope of the

20  direct.

21          THE COURT:  Well, it's that too.

22      I mean, if you had a specific point I could see, but it's

23  just like asking do you know they said this, they said this.

24      Let's say he said yeah, I do know that.  So then what are

25  you going to ask him?  He doesn't remember it.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. SCHEELE:  That's how he took into account of his

2    analysis.  If he's formed an opinion and his opinion seems to

3    be devoid of the facts that are coming into the trial record.

4          THE COURT:  Well, you could ask him if he, if Charter

5    had a witness that said X or Cox had a witness that said Y or

6    whatever.  You could say X, Mr. X said X, Mr. Y said Y.  Do you

7    agree with him or disagree.  But just reading it back into the

8    record, I don't get it.

9          MR. SCHEELE:  I understand, Your Honor.

10          MR. BARBUR:  He's not purported to summarize all of

11    the evidence in the case.  He's examined a discrete study that

12    was done by a company.

13          THE COURT:  Right.  His focus was on the study.

14          MR. SCHEELE:  The overall point Your Honor is that

15    his focus is on a study that doesn't really look at real world

16    realities.  He has not considered the real world in forming his

17    opinions.

18          THE COURT:  Well, confront him with that then.

19          MR. SCHEELE:  I think that's what I'm trying to do.

20    I will try to be more efficient at it.

21          THE COURT:  All right.

22          MR. SCHEELE:  Thank you, Your Honor.

23      (Open court.)

24          THE COURT:  Come on back up.

25      (Witness resumes the stand.)

```
 1   BY MR. SCHEELE:

 2   Q.   Dr. Rossi, I'd like to shift gears again and talk with you

 3   about your evaluation of Professor Hauser's survey.

 4        Before I do I want to make clear that when you're coming

 5   into this court here criticizing Dr. Hauser you didn't conduct

 6   a survey of your own did you?

 7   A.   I did not.

 8   Q.   You didn't conduct any interviews or do any pre-testing,

 9   did you?

10   A.   No, I did not.  I did not conduct a survey.

11   Q.   You're not going, you are not providing testimony today

12   about any conclusions you've drawn about the survey you've

13   designed in this industry or anything like that?

14   A.   No.

15   Q.   You're just here today to criticize Dr. Hauser's and

16   Altman Vilanderie's survey, right?

17   A.   I'm here to review those surveys and to understand how

18   they fit in with the rest of Professor Shapiro's calculations?

19   Yes.

20   Q.   So let's talk about what you and Professor Hauser agree

21   on.  You and Professor Hauser agree that a well designed survey

22   start with qualitative research using interviews, right?

23   A.   Yes.

24   Q.   And you agree that the purpose of these interviews is to

25   obtain a better understanding of how choices are made and the
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  language with which customers describe the products at issue,

2  right?

3  A.   Yes.

4  Q.   These pre-survey qualitative interviews they don't need to

5  involve representative samples do they?

6  A.   That's correct.

7  Q.   You agree that conducting those interviews was appropriate

8  and useful part of survey design in general, right?

9  A.   In general, yes.

10 Q.   And Professor Hauser he also did a pre-test of his survey

11 didn't he?

12 A.   Of sort, yes.

13 Q.   And you agree that in most instances it's important for a

14 survey to be pre-tested, right?

15 A.   Pre-testing is valuable, absolutely.

16 Q.   And the goal of pre-testing is to make sure that a survey

17 is using language that's understood by respondents and is

18 non-biased and non-leading, right?

19 A.   It can be part of the pre-test, yes.

20 Q.   So the steps we've discussed pre-survey interviews and

21 pre-testing both of which Professor Hauser did, they're

22 intended to ensure that a survey does not lead respondents to

23 answer in a specific manner, right?

24 A.   I would say that pre-testing is mostly about

25 understanding.  It's very difficult to access bias from

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  pre-testing.

2  Q.   So you submitted a report in the Anthem data breach

3  litigation, did you not?

4  A.   Yes, I did.

5  Q.   And do you recall writing in that report that through the

6  use of these pre-testing procedures you would ensure the survey

7  is designed in a way that does not lead the respondents to

8  answer in a specific manner?

9  A.   Obviously I wrote that, yes.

10  Q.   These practices, they're standard practices in survey

11  research to avoid leading respondents to answer in a certain

12  way, right?

13  A.   Pre-testing is a standard practice in survey research for

14  many reasons.

15  Q.   Thank you, Dr. Rossi.

16      I want to shift gears again.

17      Yesterday you testified about the connection between

18  intention scales and behavior, right?

19  A.   Yes, I did.

20  Q.   And you testified just again in our context in that regard

21  you testified about an article where there was a .3 and .6

22  correlation, right?

23  A.   A range of correlations.

24  Q.   A range of correlations and you talked about .3 and .6,

25  right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   On average, yes.

2  Q.   I want to ask you just a few questions about the academic

3  literature that you were referring to.

4      I'd liked to talk about an article Professor Hauser cited

5  and I think you said you may have cited it as well, but I'm not

6  sure about that.  This is the article about Morwitz, Steckel

7  and Gupta?

8  A.   Yes.

9  Q.   Are you aware of the article I'm referring to?

10  A.   Yes, I believe in the International Journal of

11  Forecasting.

12  Q.   In the Morwitz article cited by Dr. Hauser, that's a

13  meta-analysis, which means it is a compilation of other

14  articles, right?

15  A.   It actually contains two meta-analyses, that's correct.

16  Q.   And you testified again about the .3 and .6, was that in

17  connection with this article?

18  A.   Yes.  I was trying to give a range of the averages that

19  have been found in these meta-analysis.

20  Q.   Let's just, I want to explain to the Court, hopefully you

21  can explain to the Court, what a correlation of .3 and .6

22  means?

23      A correlation of 1.0, that would be a perfect correlation,

24  right?

25  A.   It is a perfect linear association, yes.

1  Q.   With the correlation between intent and behavior 1.0, you

2  would expect intention to predict behavior just about every

3  time wouldn't you?

4  A.   Yes.

5  Q.   And so let's take a look at that Morwitz article that's

6  cited by Dr. Hauser.

7          MR. SCHEELE:  May I approach, Your Honor?

8          THE COURT:  You may.

9          MR. SCHEELE:  May I approach the witness, Your Honor?

10         THE COURT:  You may.

11         MR. SCHEELE:  Your Honor, I have handed up what's

12  been marked as Plaintiff's Exhibit 550 for identification.

13     A copy has been provided to defense counsel.

14     May I proceed?

15         THE COURT:  You may.

16         MR. SCHEELE:  Thank you, Your Honor.

17     I'll try to be brief.  I didn't raise these academic

18  articles, so.

19         THE COURT:  I hope so.

20         MR. SCHEELE:  Professor Rossi did.

21  BY MR. SCHEELE:

22  Q.   I'd like you to turn, Dr. Rossi, to page 354 of the

23  article.  I'd like you to look down, let me know when you're

24  there?

25  A.   I'm here.  I'm here.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   I'd liked you to look down the second column there on 354.

2  If you look down that you see some correlations at the top,

3  there's one 9.921, a little bit below .992, .975, .969, .929

4  and so on?

5  A.   .021, .233, .178.

6  Q.   Again, Dr. Rossi, your counsel, this is the second time.

7  Your counsel is going to have an opportunity to examine you.

8  If you would just answer my questions, we move along a little

9  faster.

10 A.   Certainly.

11 Q.   Do you see all of the correlations that I read to you, do

12 you see those?

13 A.   I do see.  Those are some of the many correlations on this

14 page.

15 Q.   Thank you.  You can set that aside.

16     The conclusion of that article is that intentions are more

17 correlated with behavior when certain conditions are present,

18 right?

19 A.   There is that sub analysis, yes.

20 Q.   And the article concluded that they're more correlated

21 with consumer behavior when used with a variety, in a variety

22 of circumstances including when they're used with existing

23 products.  I think you testified about this on direct.  The

24 existing products.

25     When they're used with specific brands, direct brands

```
 1  rather than categories.  Durable goods, short times between

 2  question and decision and multiple product options, right?

 3  A.    I believe that's correct.

 4  Q.    You would agree that pay-TV, that's not a new product is

 5  it?

 6  A.    No, the blackout is a new experience.

 7  Q.    And pay-TV that's a product that's familiar with almost a

 8  hundred million American households, isn't it?

 9  A.    Yes, various aspects of pay-TV, yes.

10  Q.    And the Turner Networks and those logos that are presented

11  in Professor Hauser's survey, they're not new are they?

12  A.    No.

13  Q.    You are aware that Professor Hauser's testimony in this

14  Court where he said he went through all of those five factors,

15  right?  He went through all of those?

16  A.    I did read that testimony, yes.  I don't agree with it.

17  Q.    I understand.

18      Other than the new product, is there anything you disagree

19  with?

20  A.    Yes.

21  Q.    Well, I'm sure your counsel will have an opportunity to

22  talk with you about that then.

23      You also testified on your direct about the Daniel Kahenman

24  article, do you remember that?

25  A.    Daniel Kahenman's Body of Research, yes.
```

1    Q.    Body of Research.

2        I think you testified something to the effect that

3    according to some of that research that people would

4    systematically overestimate the probabilities of infrequent

5    events; is that right?

6    A.    Correct.

7    Q.    Now according to Kahenman's work, he would overstate the

8    probability of events like an earth quake or a flood, right?

9    A.    Those are among the examples.

10   Q.    You would agree that the, wouldn't you, that Kahenman's

11   work is primarily focused on events that are external to the

12   person estimating the probability, not that person's own

13   intentions wouldn't you?

14   A.    There is, that literature is vast.  And this is a very

15   influential figure in the literature.

16       I would say that the, virtually every possible combination

17   of products, events, and personal versus out-sternal

18   probability would have been used in that literature.

19   Q.    So the literature includes earth quakes and floods.  Can

20   you provide an example where it involves the person's own

21   intentions?

22   A.    Yes.  There has been a lot of studies of lotteries and

23   gambling in that literature and people do, not expert gamblers

24   of course, but the lay person tends to overestimate.  Again,

25   the probability of success in a gambling situation where a win

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  is at a low probability which is why people play slots.

2  Q.    That's an example of a person's own intentions, their odds

3  of winning something gambling?

4  A.    Their assessments of probabilities.

5  Q.    You provided an example yesterday of the odds of getting

6  in an accident on the Baltimore Washington Parkway.  That's

7  external to you, right?  That's not your own intentions?

8  A.    It's my subjective assessment of it but it is an external

9  event, correct.

10  Q.    I want to talk to you now a little bit about AT&T's use of

11  intention scales.

12      Are you aware that AT&T uses intention scales similar to

13  the one Professor Hauser used in the ordinary course of their

14  business?

15  A.    I'm not aware of that and it would not surprise me.

16          MR. SCHEELE:  I'd like to hand up a demonstrative,

17  Your Honor.

18      May I approach?

19          THE COURT:  You may.

20          MR. SCHEELE:  May I approach the witness, Your Honor?

21          THE COURT:  Yes.

22          MR. BARBUR:  Your Honor, can we get a copy of the

23  document on which this is based?

24          MR. SCHEELE:  If you like, we can provide that to

25  you.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        MR. BARBUR:  Seems to me this is, it's not on your

2   witness list, on your exhibit list is it?

3        MR. SCHEELE:  This is cross-examination.  It's

4   designed for impeachment.

5        Your Honor, I've provided a copy of what's been marked for

6   identification purposes PX D 12 to defense counsel.

7        May I proceed?

8        And indeed, I believe as requested by defense counsel the

9   underlying document is being provided; is that correct?

10        MR. HEIPP:  It has been provided, that's correct.

11        MR. SCHEELE:  It has been provided.

12   BY MR. SCHEELE:

13   Q.   Dr. Rossi, on the top half of PX D 12 is an intentions

14   scale that AT&T has used in its ordinary course of its

15   business.

16        The question on that intention scale is how likely is it

17   that you might consider becoming a DirecTV subscriber again at

18   some point in the future?

19        And the question and your, Dr. Hauser's survey below uses

20   that same term in the beginning.  How likely are you to switch

21   your TV provider on a scale from 1 to 99.  Those look pretty

22   similar don't they?

23   A.   No, they do not.

24   Q.   You said in your testimony yesterday, Dr. Rossi, that the

25   juster scale typically is used for purchases but not switching;

1   is that right?

2   A.   I have not seen an instance in my experience of it being

3   used for switching.

4   Q.   You cited a paper in your report in which the Juster scale

5   was used to measure people's likelihood of losing jobs didn't

6   you?

7   A.   I'm not aware of that citation that you made.

8   Q.   This is the Chandrashekaran article?

9   A.   Yes.  I don't recall the contents of that particular

10  article right at this point.

11  Q.   Let's move are you are of a 2002 paper that uses the

12  Juster scale to study customers switching in banking?

13  A.   I just said I was not aware of the use of it in a

14  switching context.  That doesn't mean it hadn't been used.

15  Q.   So you are not aware of it and you've never empirically

16  tested the relationship between purchase probabilities scales

17  and switching behavior, have you?

18  A.   No.  Other people have tested the empirical quality of the

19  scale in terms of buying intentions.  Not switching.  You're

20  right, I'm not aware of a particular analysis of that.

21  Q.   I'd like to shift gears then, Dr. Rossi.

22     You testified that the difference between switching and

23  purchasing is, comes down to essentially the switching costs;

24  is that fair?

25  A.   It's one aspect of it, yes.  And an important aspect.

1  Q.   But regardless of what switching costs we are talking

2  about, the description of switching cost in Professor Hauser's

3  survey is the same in the control condition and in the blackout

4  condition, isn't it?

5  A.   It is that description, that script about one aspect of

6  switching costs, yes.

7  Q.   And Professor Hauser's survey measured the switching from

8  one distributor to another by looking at the difference between

9  the control group and the blackout group, right?  It was the

10 difference?

11 A.   He did.

12 Q.   Thank you.

13     Dr. Rossi, you testified yesterday a little bit about the

14 representativeness of Professor Hauser's survey; isn't that

15 right?

16 A.   I did.

17 Q.   And you testified, you testified that in virtually all

18 cases you have taken the position that internet surveys are not

19 representative, right?

20 A.   No, that's not what I said.

21 Q.   Well, let me read.  I just may have gotten, characterized

22 it incorrectly, so let me read the question and answer that I'm

23 referring to.

24 A.   Certainly.

25 Q.   The question was have you taken the position what the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    results of your internet surveys were representative of the

2    broader population?

3         The answer was in virtually all cases, no.  In other words,

4    I use the internet sample as an illustration of a method.

5         For example, in a patent case, excuse me, not a case, but

6    the patent article, in a few cases I have asserted

7    representatives but always after offering affirmative evidence

8    that my sample was relative.

9         Is that a, did I get that right?

10   A.   That's different than what you said in your question.

11   Q.   Okay.  Well then, I stand corrected.

12        But you have proposed using an internet panel in litigated

13   cases in the past haven't you?

14   A.   Yes, I have.  All I have said is that Professor Hauser has

15   not offered evidence of representativeness.

16   Q.   You were retained in the Anthem breach data case, right?

17   A.   I was.

18   Q.   And in your expert report in that matter you said you had

19   a great deal of experience with SSI, the internet panel, right?

20   A.   I have had some experience with them, yes.

21   Q.   And you characterized SSI as a high quality provider in

22   that case, didn't you?

23   A.   I'm not sure I used the term high quality provider, but I

24   do believe it is a quality provider, yes.

25   Q.   You were also an expert in the Tempur-Sealy litigation and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  submitted a report there, right?

 2  A.   I did.

 3  Q.   In the Tempur-Sealy matter in order to accept the

 4  representativeness of an internet sample you compared the

 5  characteristics of that sample to the known characteristics of

 6  the population didn't you?

 7  A.   With respect to variables relevant to the matter of the

 8  survey which is about mattress purchasing.  Not with respect to

 9  age and gender.

10  Q.   Let's take a look at what you did in that matter.

11           MR. SCHEELE:  May I approach, Your Honor?

12           THE COURT:  You may.

13           MR. SCHEELE:  May I approach the witness, Your Honor?

14           THE COURT:  You may.

15           MR. SCHEELE:  Thank you, Your Honor.

16  BY MR. SCHEELE:

17  Q.   Dr. Rossi, I've handed you what's been marked as PX D 13.

18  This is marked for identification purposes.

19     It is a section from one of your reports in Tempur-Sealy

20  and Professor Hauser's trial testimony here.

21           MR. SCHEELE:  May I proceed, Your Honor?

22           THE COURT:  Uh-hmm.

23  BY MR. SCHEELE:

24  Q.   Professor Hauser, reading from your report in Tempur-Sealy

25  it says I would use a high quality internet base panel provider

1  as well as some demographic and appliance ownership questions

2  to establish that my sample is representative and therefore

3  projectable to the population of U.S. consumers; is that right?

4  A.   I did say that, yes.

5  Q.   And you wrote that?

6  A.   Yes, of course I wrote that.

7  Q.   In this trial Dr. Hauser was asked a similar line of

8  questions.  The question was did the sample that you ended up

9  with, the market shares ended up with the market shares of the

10 pay-TV providers match the market shares of the real world with

11 the two share points?

12     Answer, that's right, yes.  And the screen we ask people of

13 course what their provider was.

14     So we have a statement of that and then we have publicly

15 available data again which is itself an estimate but we have

16 publicly available data of what shares are of the various

17 providers and the two of those match up.  They match up within

18 two share points.

19     Were you aware that Professor Hauser testified that way?

20 A.   I am aware that he testified to that.

21 Q.   And that he had attempted to establish representativeness

22 that way?

23 A.   No, he didn't provide any evidence of that.  It's not in

24 his report or any of his backup materials.

25 Q.   You are aware that you talked a little bit about SSI and

1   internet panels in general and some scepticism you had about

2   them.  You talked about the one responding to 1500 surveys in a

3   month or something like that, right?

4   A.   I did say that.

5   Q.   Okay.  But you're aware SSI does, has lots of procedures

6   to prevent issues like that aren't you?

7   A.   As I said, I was not giving that as an example of SSI but

8   more generally about internet panels.

9   Q.   In that event, I'm going to move on to the next topic.

10      You criticized Professor Hauser for not simply asking

11  people to switch instead of first asking them whether they

12  would consider switching; is that right?

13      I think you testified about that?

14  A.   No.  I told, I suggested that rather than using this two

15  part question with this very confusing intent to switch scale

16  that you might just ask people whether they would switch, yes.

17  Q.   And so that two step question you're familiar with that

18  two step approach.  You are familiar with the survey chapter in

19  the reference manual on Scientific Evidence published by the

20  Federal Judicial Center?

21  A.   Yes, I referred to that in my testimony yesterday.

22  Q.   You agree that chapter encapsulates a fairly standard body

23  of knowledge on surveys?

24  A.   It does.

25  Q.   And you cited that manual in the past, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    I have.

2  Q.    That chapter on the manual says that when faced with a

3  direct question without a preliminary question quote,

4  particularly one that provides response alternatives,

5  respondent obligingly may supply an answer that, answer even if

6  the respondent has no opinion.

7       Are you familiar with that?

8  A.    It's, I paraphrased that in my direct testimony, yes.

9  Q.    So you are aware that the manual recommends using a filter

10 question to reduce guessing by quote by first asking the

11 respondent if he or she has an opinion about the issue.  And

12 then asking end quote, then asking the substantive question of

13 those who indicated they do have an opinion, yes?

14 A.    Professor Hauser did not use a question.

15 Q.    That's not what I asked.

16      I asked if you are aware of that phrase from the manual?

17 A.    Yes, I am.

18 Q.    You agree that filter questions are ways to discourage

19 questioning, don't you?

20 A.    They can be.

21 Q.    But you're not sure of whether in any design you designed

22 you ever used a filter question?

23 A.    I'm not sure I have.

24 Q.    You also testified yesterday about Professor Hauser's

25 margin of error, correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A.    Yes.

2    Q.    That opinion wasn't in your report, was it?

3    A.    I said that Professor Hauser failed to provide a measure

4    of reliability in his survey and his margin of error was not in

5    his report.

6    Q.    So that's the extent of your opinion that he failed to

7    provide it?

8    A.    No.  Subsequently Professor Hauser in his deposition

9    testimony did provide a range of, a margin of error and I was

10   simply commenting on that range that he provided in his

11   deposition testimony is very wide, amount to about forty

12   percent of his estimate.

13   Q.    Are you aware that Professor Hauser did include a standard

14   of error terms in his report?

15   A.    It's called standard error, yes.

16   Q.    And as you said, Professor Hauser testified about that,

17   correct?

18   A.    No.  In his deposition testimony he was invited to compute

19   a measure of reliability which was not in his report.  And he

20   did so.

21   Q.    I wanted to ask you a little bit about the Turner logos

22   that you had mentioned in the, in your direct testimony.  That

23   the use of those Turner logos, I think the term is focalism; is

24   that right?

25   A.    Can be one use of that, yes.

1  Q.   So you criticized Professor Hauser's survey for putting

2  too much emphasis on the blacked out Turner channels because it

3  has too many of those logos, right?

4  A.   He presented it six times.

5  Q.   In your report you didn't mention anything about the size

6  of the logos relative to the font or anything like that, did

7  you?

8  A.   I don't recall what I said about it.  It's certainly true.

9  Q.   So your concern is the number of times?

10 A.   Both.

11 Q.   Okay.  You're aware that Professor Hauser did a pre-test

12 in his survey, right?  You testified about that earlier?

13 A.   Yes.

14 Q.   And you are aware that no one in Professor Hauser's

15 pre-test reported that the survey questions were leading; isn't

16 that right?

17 A.   This is, it's not clear this is a conscious realization.

18 But I am aware of the responses to one question at the end of

19 the survey.

20 Q.   And that was an open ended question, right?

21 A.   It was.

22 Q.   And but you didn't examine the responses to that open

23 ended question in the three weeks that you formed your opinion

24 in this matter?

25 A.   I did look at some of them, yes.

1  Q.    In your deposition you don't, do you recall testifying

2  that you did not look at those?

3  A.    No.  In Professor Hauser's deposition he referred to some

4  of those responses and I did follow up by looking at some of

5  them.

6  Q.    I see.

7     So based on your analysis of Professor Hauser's survey you

8  are then aware that only three out of 1,600 survey respondents

9  reported the survey was related at all to Turner; is that

10 right?

11 A.    That's my understanding, yes.

12 Q.    What percentage of that?

13 A.    It's a small percentage, less than one percent.

14 Q.    It's less than .2 percent isn't it?

15 A.    I'm sure you can do arithmetic.

16 Q.    So even with all of those logos, less than .2 percent of

17 survey respondents reported that the survey was related to

18 Turner, right?

19 A.    That's not a test of bias.

20 Q.    I didn't ask your opinion on whether it was a test of

21 bias.  I'm asking you to confirm what you understand about --

22 A.    That's my understanding, yes.

23          MR. SCHEELE:  May I have the Court's indulgence for

24 one moment?  I'm about to wrap up I believe.

25          THE COURT:  Yes.

1        (Pause.)

2   BY MR. SCHEELE:

3   Q.    Professor Rossi, you worked with surveys as part of your

4   academic work, right?

5   A.    I have.

6   Q.    But you've only designed a handful of surveys for

7   businesses, right?

8   A.    I don't know the exact number, but it's probably less than

9   20, yes.

10  Q.    Didn't you testify in your deposition it was three or four

11  times?

12  A.    I don't recall the number of times.

13  Q.    Do you have any reason to doubt that you testified in your

14  deposition that it was three or four times?  We can look at it

15  if you want?

16  A.    No, I have no doubt of that.

17  Q.    And you have never designed a survey for a company in the

18  telecommunications industry, right?

19  A.    That's correct.

20  Q.    Or a media company?

21  A.    That's correct.

22  Q.    And you have never done research in the television

23  industry?

24  A.    Not specifically, no.

25  Q.    And you have never done any research related in

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   negotiations between pay-TV distributors and networks, right?

2   A.   No, I have not.

3   Q.   In cases like this one when you have been retained to

4   access the reliability of survey evidence is it fair to say

5   that in the majority of those you concluded the survey was not

6   reliable?

7   A.   In the majority, yes, not all.

8   Q.   Indeed, in your deposition you estimated that in about

9   nine out of ten surveys you have analyzed you have concluded

10  that the surveys or conclusions were not reliable; isn't that

11  right?

12  A.   That's correct.

13  Q.   That's about ninety percent, isn't it?

14  A.   That's correct.

15  Q.   Nine out of ten?

16  A.   That's correct.

17  Q.   I'm not a numbers guy?

18  A.   That's correct.

19  Q.   In about three weeks time between the time when you were

20  retained and when you completed your report, you were able to

21  add these two surveys to your records, so now you're about

22  eleven for twelve, right?

23  A.   These errors are so obvious, it would take no time at all

24  to assess the errors.

25  Q.   Thank you, Dr. Rossi.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        MR. SCHEELE:  I don't have any further questions.

2        I would request again possibility of, before a break, a

3   ten minute session under seal.

4        MR. BARBUR:  Just a few questions, Professor Rossi.

5                    REDIRECT EXAMINATION

6   BY MR. BARBUR:

7   Q.   Mr. Scheele had confronted you with some testimony about

8   Mr. Montemagno of Charter.

9        Do you recall that?

10  A.   Yes, I do.

11  Q.   I believe you said you thought it was incomplete or

12  inaccurate or words to that effect?

13  A.   Incomplete, certainly.

14  Q.   Have you read Mr. Montemagno's testimony in this trial

15  about the Altman Vilandrie survey?

16  A.   Portions of it, yes.

17  Q.   Are you aware that he said, and I'm now on page 1355 of

18  the trial transcript.  So even though you're the head of

19  content negotiations you had no involvement in commissioning or

20  generating that study; is that right?

21       Correct.

22       In fact, you never even heard of Altman Vilandrie before

23  the last several months; isn't that right?

24       That's right.

25       And then on page 1356 he said you explained there don't you

1  that I don't recall it ever being explained to me how this came

2  about, how it was commissioned, why, what the overall

3  objectives are for.

4      Do you see that?

5      Yes.

6      Then on page 1357 he says but no one at Charter had ever

7  conveyed to you that before that notwithstanding the fact that

8  you were the head of content negotiations, nobody had ever

9  explained that the primary purpose of the study was purportedly

10  for content negotiations?  No one had ever done that had they?

11      No, I don't recall that.

12      In fact, the first time you ever heard that they, this was,

13  this meaning the study, was when you and I met at your

14  deposition, right?

15      Yes.

16      Is that the testimony you reviewed?

17  A.  That's my understanding.

18  Q.  I want to turn to the Morwitz's article that Mr. Scheele

19  showed you.

20      In particular page 354 and the following pages.  You had

21  said that you calculated an average of the correlation of an

22  intention scale with actual behavior; is that right?

23  A.  Yeah.  Excuse me if I could just elaborate, I'm sorry.

24  Q.  Sure?

25  A.  I expressed a range of these correlations to try to give

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   you aware of what the overall correlations are.  That is

2   actually from table four of this article.

3   Q.    Which is the one on page 354?

4   A.    It's actually on page 360 and the overall is R equal .414.

5   Which is between .6 and .3 and .6 the last time I checked.

6   Q.    So even though Mr. Scheele selectively read you some

7   numbers in the .9 range, the average that you calculated was

8   based on this same article?

9   A.    Yes.  And also in the same table that Mr. Scheele was

10  referring to, if you look at all the new products you get many,

11  many very low correlations including a negative 0.093, a

12  positive .142, a positive .178, a positive .233, a positive

13  .301 and a positive .436.

14      Again, in fact if anything, I was being generous.

15  Q.    Using the Morwitz's article, Mr. Scheele also asked you

16  about the degree to which a Juster scale is better at

17  predicting under some circumstances than others.

18      Do you recall that?

19  A.    Correct.

20  Q.    And he asked you whether you agreed with Professor

21  Hauser's discussion of that and you said no.

22      Do you recall that?

23  A.    I do.

24  Q.    And could explain why?

25  A.    Yes.  There's two principal errors that Professor Hauser

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  did in applying these conditions.  One is to characterize this

2  as an existing product.  It is absolutely correct.

3      Pay-TV is an existing product.  This is not, the survey is

4  not about pay-TV.  It's about the reaction of the respondents

5  to a new experience for most of the respondents being black

6  outed.

7      So I consider that to be the analogous question is like in

8  a new product situation and I think that's undoubtedly true.

9      The other thing that Professor Hauser said is he

10 characterized this product which is actually a service, right.

11 You don't buy a physical thing.  You rent a service in access

12 to these channels as a durable good.  It is not a durable good.

13     A durable good is something like a car which throws off a

14 series of service flows over, apparently there was some car

15 issues this morning.  But that's the problem we all have with

16 our cars is that we buy them at one point in time and they

17 throw off transportation services over time.  That's what a

18 durable good is.

19     Pay-TV is a rental service.  It's not a durable good.  So I

20 don't, and I don't know of any marketer or economist who would

21 characterize this product as a durable good.

22 Q.   Then I want to turn to this one demonstrative that you

23 were shown entitled AT&T as used in intention scales, do you

24 have that?

25 A.   I do.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   And you were asked by Mr. Scheele whether you thought that

2  the scale used by DirecTV looked the same as the one used by

3  Professor Hauser.

4      Do you recall that?

5  A.   I do.

6  Q.   And you said no, but you weren't given an opportunity to

7  explain.

8      So could you explain why your answer was no?

9  A.   Yes.  I would ask that people actually look at the

10  demonstrative.  The top one is a scale from one to ten, not

11  from one percent to ninety-nine percent.

12      It's about consideration, not switching.  In fact, we just

13  heard some cross examination about the importance of separating

14  out consideration from switching behavior.

15      It uses likely to consider.  This is a very very different

16  question with a very very different scale.  You'll notice also

17  the textual labels that are on Professor Hauser's scale are

18  absent in the top scale.

19      So I would not characterize this as similar at all.  They

20  are scales.  They do go from roughly one to nine or from one to

21  ninety-nine, but the similarity I think ends there.

22  Q.   Can you also pull out the demonstrative entitled agreement

23  with Professor Hauser representativeness?

24  A.   Yes.

25  Q.   And in the quote from your expert report it says you had

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    established that my sample is representative and therefore

2    projectable to the population of U.S. consumers.

3        Do you see that?

4    A.   I do.

5    Q.   Did Professor Hauser do that here?

6    A.   No, he did not.

7    Q.   You were also asked some questions about a manual and

8    filter questions.

9        Do you recall that?

10   A.   Yes, I do.

11   Q.   Did the filter question that Professor Hauser purported to

12   use conform with the description of filter questions in that

13   manual?

14   A.   No, it did not.

15   Q.   Why not or how not?

16   A.   It's the way in which he used it.  It is true that

17   Professor Hauser had a, we agreed to discuss yesterday, would

18   you consider switching question, yes or no.

19       Then if you said you would consider, he then evokes his

20   scale measurement, right.  But he doesn't use it as a filter

21   question.

22       A filter question, where does filter comes from, it means

23   to remove from.  So in a filter question scenario and anyone

24   who said they would not consider would be removed from the

25   analysis and only the scale values for people who would say

1    they would consider would be used.

2        That's not what Professor Hauser did.  He misused filter

3    questions by assigning a number zero.  So he's not conforming

4    to the suggestions of Shari Diamond in the manual Judicial

5    Evidence at all.

6        Because he's using in his departure rate calculations

7    people who said they wouldn't consider.  It's really a misuse.

8    It's either you call it a misuse or an incorrect

9    characterization on the part of Professor Hauser.

10   Q.   So last point you were also asked questions about a

11   question that Professor Hauser put in his survey toward the end

12   to try to detect bias.

13       Do you recall that?

14   A.   Yes.

15   Q.   And just explain what that question was?

16   A.   So actually there were two references made to detecting

17   bias.  One is the pretest and the other is the responses to the

18   open ended question.

19       At the end of the survey I believe it says something to the

20   extent are you aware of the purpose of the survey.  And as you

21   recall, so this happens at the end of the survey, you're an

22   internet panel.  You've gone through all of these screens.

23       You are receiving compensation for it, modest compensation

24   to be sure, but you are receiving some compensation.  At the

25   very end they say do you have some idea of what the survey is

1   about and then most people don't say anything.

2       So they want to complete this thing.  This is not the way

3   to detect bias, right.

4       The person might not even be aware of the bias.  In fact,

5   it's pretty clear that they aren't because most of them don't

6   report that they think this is being used for a law suit.

7       So this is no way to detect bias and the notion that it has

8   any value in proving that survey is unbiased is to my way of

9   thinking incorrect.

10      And that the better way of thinking about it is these logos

11  were presented in a large graphical format six times before

12  people were asked questions, that seems to be a source of bias.

13          MR. BARBUR:  No further questions.

14          THE COURT:  We'll take the morning recess.

15      Come back in 15 minutes.  If you have any recross limited

16  to redirect, you can ask it then.

17      You are a witness under oath.  Refrain from discussing

18  your testimony with anyone including counsel.

19          THE WITNESS:  I will not.

20          THE COURT:  See you in 15 minutes.

21      (Witness excused.)

22      (Recess taken at 12:19 p.m.)

23      (Proceedings resumed at 12:39 p.m.)

24          THE COURT:  Come on back up.

25      (Dr. Peter Rossi resumed the witness stand.)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  Witness remains under oath.

2      Redirect.

3          MR. SCHEELE:  Yes, Your Honor, thank you.

4      May I proceed?

5          THE COURT:  You may.

6                    RECROSS EXAMINATION

7  BY MR. SCHEELE:

8  Q.   Dr. Rossi, you testified in response to Mr. Barbur's

9  redirect of you about the circumstances where correlations are

10 higher in the Morwitz article, a new product you testified

11 about, and then durable goods, right?

12 A.   No, new products are lower.

13 Q.   I understand.

14     I want to talk with you about the durable good aspect.

15 Because we talked on your cross about the new product.  So, the

16 durable good aspect, that wasn't something you had an opinion

17 about in your report, was it?

18 A.   I didn't have access to Professor Hauser's testimony.  It

19 wasn't in his report either.

20 Q.   So the answer to my question is it wasn't in your report?

21 A.   That's correct.

22 Q.   And, but you did have access to the Morwitz article, which

23 he cites in his report, right?

24 A.   That's correct.

25 Q.   I'd like you to turn -- you have the Morwitz article in

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   front of you, just very quickly about durable goods.  If you

2   turn to page 350 in the Morwitz article.  And let me know when

3   you're there.

4   A.   Yeah, I will.  Just one second, please.

5        Yes.

6   Q.   And the heading there says, "Durables versus nondurables,"

7   do you see that?

8   A.   Yes.

9   Q.   And then there's a sentence there that defines durable

10  goods as tangible goods and nondurable goods are -- are

11  tangible goods that are normally consumed in one or a few uses,

12  right?

13  A.   Yes.

14  Q.   And then -- and you would agree that a set-top box is a

15  tangible good, wouldn't you?

16  A.   Yes, but that's the device by which the service is

17  rendered.

18  Q.   So you would agree it's a tangible good?

19  A.   A set-top box is a tangible good.  But I'm not really

20  buying a set-top box, I'm renting video content.

21  Q.   And then the next witness says, "Two characteristics of

22  consumer durables are likely to affect the predominant decision

23  process.  First, durables are used repeatedly; second, they

24  tend to be higher in price than nondurables."  Isn't it true

25  that those are characteristics of pay-TV?

 1  A.    Higher than -- in price than nondurables?  I'm not clear

 2  that's true.

 3            MR. SCHEELE:  No further questions, Your Honor.

 4            THE COURT:  All right.

 5            MR. SCHEELE:  Your Honor, subject to our request for

 6  a ten-minute session under seal.  Thank you.

 7            THE COURT:  You're excused.  You can step down.

 8       (Witness excused.)

 9            THE COURT:  Call your next witness.

10            MR. CONRATH:  Your Honor, the United States calls Jim

11  Holanda.

12            THE COURT:  Say again.

13            MR. CONRATH:  The United States calls Jim Holanda,

14  H-O-L-A-N-D-A, and we have a -- we'd like to raise a

15  preliminary matter if I can.

16            THE COURT:  Okay.

17       (Sealed Bench Conference.)

18  ████ ███████ ████  ███ ██████  ███

19  ██████ ████████████ ████ ████████ ████ ████ ████ ████

20  ██ ████████ ███  ███  ███████████

21  ██████ ████ █████ ████ █████ █████ ████ ██ ███

22  ████████████ ████ ███  █████████  ████████  ████████████

23  ████ ███████  ████

24       ████  ████  ████

25       ██████ ██████  ██████  ████████  █████ ██ ███ ██

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***





1

2

3

4

5       (Open court.)

6              MR. CONRATH:  United States calls Jim Holanda.

7              THE DEPUTY CLERK:  Sir, please raise your right hand.

8                 JIM HOLANDA, PLAINTIFF WITNESS, SWORN

9              THE DEPUTY CLERK:  You may be seated, sir.

10             MR. CONRATH:  May I proceed, Your Honor?

11             THE COURT:  You may proceed.

12                         DIRECT EXAMINATION

13  BY MR. CONRATH:

14  Q.   Please state your name for the record?

15  A.   Jim Holanda.

16  Q.   And, Mr. Holanda, you are affiliated with RCN; is that

17  right?

18  A.   That's correct.

19  Q.   And RCN is an over-builder; is that right?

20  A.   RCN/Grande and Wave, which are the three cable companies.

21  I am the CEO, are generally considered over-builders or the

22  third wire end of the home versus the incumbent cable company

23  and the incumbent telephone company.

24  Q.   And you mentioned RCN, the three companies that you're

25  affiliated with, RCN is one, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   Yes.

2   Q.   Grande is another?

3   A.   Yes.

4   Q.   And the third is Wave?

5   A.   Yes.

6   Q.   And Wave is an over-builder in San Francisco and a

7   traditional cable company in some other markets; is that right?

8   A.   Yes, that's correct.

9   Q.   Can I just talk about RCN/Grande and Wave together as RCN

10  for simplicity sake as we go forward?

11  A.   That's fine.

12  Q.   And if I have a specific question about just RCN, I'll say

13  "just RCN," is that all right?

14  A.   Okay.

15  Q.   Okay.  Where are your offices?

16  A.   Our offices are in Princeton, New Jersey.

17  Q.   And you're the CEO of RCN?

18  A.   That's correct.

19  Q.   And how long have you been the CEO?

20  A.   Of RCN, it's been seven and a half years, Grande five, and

21  Wave broadband has been three months.

22  Q.   All right.  And what positions did you have prior to

23  becoming RCN's CEO?

24  A.   Prior to that I was the CEO of a cable company in Puerto

25  Rico called Choice Cable.  Prior to that I was the president --

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Patriot Media which owned cable companies in central New

2  Jersey, and prior to that I had various VP of operations roles

3  at Charter, and then finance roles at Comcast in my early

4  career.

5  Q.   So what was your first job in the industry?

6  A.   My first job in the industry was a cable installer for

7  Comcast fresh out of college.

8  Q.   All right.  And you're the guy who brought the -- strung

9  the wires to the house?

10  A.   Climbed telephone poles and did connects and disconnects,

11  yes.

12  Q.   All right.  How long all together have you worked in the

13  industry?

14  A.   That was thirty years ago.

15  Q.   So where does RCN, just RCN offer services?

16  A.   RCN offers services in the greater Boston area, Manhattan

17  and Queens in New York, the suburbs of Philadelphia,

18  Washington, D.C., and some of the suburbs here in this market,

19  eastern Pennsylvania and Chicago.

20  Q.   And where does Grande offer services?

21  A.   Throughout most of the metro-plexus in Texas.

22  Q.   And where does Wave offer services?

23  A.   Wave is primarily in Seattle, Portland, Sacramento and San

24  Francisco.

25  Q.   And how do the three companies together compare to other

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  distributors in terms of size?

2  A.   We have just shy of a million customers, over five hundred

3  thousand of those customers take video services from us.  We

4  think we're the sixth largest cable company in the United

5  States.  And probably the eleventh largest distributor of video

6  in the United States.

7  Q.   What products does RCN offer?

8  A.   We're a traditional triple play provider that offers

9  broadband services via cable modem, television services and

10 phone service.

11 Q.   And historically, how did RCN as an over-builder compete

12 with the larger distributors, the cable or satellite companies?

13 A.   Originally RCN did that by having a very strong technology

14 platform.  They were the first to offer true triple play

15 services in most of the markets that they service.  And that

16 was really how they gave customers choice against the larger

17 cable companies for the first time in all of those markets and

18 that was their underlying business philosophy.

19 Q.   Do you compete against Comcast Cable?

20 A.   Yes, we compete against Comcast Cable in a lot of markets.

21 Q.   In which ones?

22 A.   In Boston, Philadelphia, D.C., Chicago, and San Francisco.

23 Q.   Do you compete against AT&T?

24 A.   We do.

25 Q.   And where?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    We compete against them throughout the State of Texas, and

2  in Chicago and San Francisco.

3  Q.    And do you compete against DirecTV?

4  A.    Yes, we compete against DirecTV across the entire company.

5  Q.    You're familiar with something called the NCTC?

6  A.    I am.

7  Q.    And what does that stand for?

8  A.    The National Cable Television Co-op.

9  Q.    And what is NCTC?

10  A.    NCTC is a buying co-op for very small and medium size

11  cable companies to try and buy programming and other supplies

12  efficiently for our businesses.

13  Q.    Is RCN a member of NCTC?

14  A.    Yes.

15  Q.    And what's your role, if you have a role at NCTC?

16  A.    I sit on the NCTC board of directors.

17  Q.    What's the benefit of negotiating through NCTC?

18  A.    The benefit to the content providers is on any given deal

19  generally we're negotiating on behalf of anywhere from three to

20  seven and a half million customers that the member companies

21  make up, and the advantage is us bringing together that size,

22  we try and do better obviously in terms of negotiating over

23  seven hundred and fifty separate deals because there's over

24  seven hundred and fifty members within NCTC.

25  Q.    So does RCN negotiate some programming contracts itself?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    Yes, we do.

2  Q.    Directly?

3  A.    Yes, we do.

4  Q.    And as RCN's CEO, are you involved in RCN's negotiations

5  for programming?

6  A.    At a high level, I am, and if there's a problem or a

7  decision to be made towards the end of the negotiations, I get

8  involved, but generally speaking we have a team of people that

9  handles that.

10 Q.    And do you have a -- do you stay aware of the NCTC

11 negotiations?

12 A.    Yes.

13 Q.    As a board member?

14 A.    Yes.

15 Q.    Now, let's talk about programming.  Does RCN purchase

16 programming for video customer packages?

17 A.    Yes, we do.

18 Q.    And are you familiar with the Turner networks?

19 A.    I am.

20 Q.    And what importance do you consider that Turner has with

21 the video packages that you put together?

22 A.    We consider the Turner content to be significantly viewed

23 by our customers.

24 Q.    And do you collect information about what your customers

25 are viewing?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.    We do.

2   Q.    And what does that show you about the value of Turner to

3   RCN?

4   A.    We have technology that pulls all of our cable boxes every

5   fifteen minutes so we know what our video customers are tuned

6   to.  We've been tracking that information actually for seven

7   years.  And so of the hundred plus cable channels that we

8   deliver in our expanded basic digital package over the last

9   four or five years, the Turner networks rank very high in terms

10  of our customers viewing those networks.

11  Q.    And when you say a high, can you be more precise?

12  A.    Three of the Turner networks are in our top ten.

13  Q.    And do you use the viewership data that you collect in

14  this way in helping you to make programming decisions?

15  A.    It's one part of what we use to make those programming

16  decisions.

17  Q.    How does the viewership of Turner networks compare with

18  the viewership of Viacom networks at RCN?

19  A.    The Turner networks are ranked higher than Viacom

20  networks.

21  Q.    And do you have an explanation for why that is?

22  A.    Obviously our customers see value in CNN, TNT and TBS.

23  Q.    Do you offer HBO to your customers?

24  A.    We do.

25  Q.    And how important is that to your video offering?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.    We think it's important.  We have a lot of customers that

2   subscribe to HBO as a service and even a large group of

3   customers that obviously watch and take those services.

4   Q.    Is it one of your top subscribed?

5   A.    It's our second most subscribed to, and it's our top

6   viewed premium network.

7   Q.    Okay.  Let's talk about programming costs for a minute.

8   As RCN's CEO, do you pay attention to programming costs?

9   A.    We do.

10  Q.    And why is that?

11  A.    It's the single biggest cost of our business.

12  Q.    All right.  And what's been happening to programming costs

13  over the last five years?

14  A.    They have been going up significantly.

15  Q.    Relative to inflation?

16  A.    Five times, five to eight times the amount of inflation

17  each year over the last five years.

18  Q.    Okay.  How do RCN's programming costs compare to the

19  programming costs of other distributors?

20  A.    Obviously it's generally the same when compared to other

21  members of the NCTC that we buy programming from.  I think

22  compared to the larger distributors, you know, they have volume

23  discounts for being their size.  We think they have anywhere

24  from a twenty-five to forty percent programming cost advantage

25  because of their size.

1    Q.    Okay.  As a result of the programming cost increases over

2    the last five years that you've described, have you changed

3    your pricing to your subscribers?

4    A.    We have.

5    Q.    And in what way?

6    A.    Generally speaking at RCN and Grande, we have historically

7    passed through about eighty percent of those increases on to

8    the consumer.

9    Q.    And you mentioned RCN and Grande, what about Wave, what's

10   been their historic pass-through of cost increase?

11   A.    Three years ago they switched to a model where they're

12   passing through one hundred percent of the cost of the

13   programming on to their video customers.

14   Q.    Okay.  Historically speaking, how are RCN's prices

15   compared to its competitors of the prices to consumers?  Let's

16   back up and make sure we're talking about this right.

17       Historically, how were RCN's prices to its customers

18   compared to the prices of its competitors in the cable

19   satellite business?

20   A.    I think generally speaking we've always tried to be price

21   conscious and price competitive on double and triple play and

22   single play services.  That's obviously gotten harder over the

23   last two and three years as costs for video continue to

24   increase.

25       Generally speaking, we feel our larger competitors have a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  ten to fifteen dollar advantage on price, and we try and make

2  up for that by adding additional services to our bundles to

3  just try and make that up and keep things as competitive as

4  possible.

5  Q.   And tell us what you mean by trying to add additional

6  services and so on to be competitive?

7  A.   We may add additional converter boxes in our base bundle.

8  We try and give customers more speed for the same price for

9  Internet services within our bundles.  And so those are

10 typically the things that we do to try and stay competitive.

11 Q.   Okay.  I'd like to talk, without disclosing any

12 confidential information, RCN's current video strategy.

13      So can you tell the Court what RCN's current video strategy

14 is?

15 A.   Well, we continue to compete for double and triple play

16 customers.  We have not given up on the video business as we

17 have seen a few other midsize companies do so in our industry

18 over the last several years.  We are in development of an IP

19 technology platform within our company to be able to deliver

20 our channels and video packages across the newer technology

21 that's available to consumers via the retail market today, and

22 we still view the video business as important.

23 Q.   All right.  Do you have a relationship with some

24 over-the-top providers?

25 A.   We do, yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   And can you -- and do you have -- do you use the TiVo

2   product as well?

3   A.   In 2010, RCN signed the first deal to team up with TiVo,

4   who is a maker of cable boxes, as well as integrated

5   technology, and we were the first to do so in the United

6   States; that has been a good relationship for us.

7        TiVo allows us to integrate things over-the-top as well as

8   bring customers' apps on their big screen, and so we thought it

9   was a way to differentiate our video product.  And it's been a

10  good partnership for us.

11  Q.   Okay.  And explain to us how you cooperate with OTT

12  providers?

13  A.   So it was four years ago now that we partnered with

14  Netflix and Hulu to integrate those into our set-top box and

15  into our customers' viewing experience just like you would tune

16  to channel 300 to watch HBO, you could turn to channel 400 and

17  your Netflix account would just launch and it would

18  automatically go into -- with your sign-in credentials.

19       We also have an app store with three hundred and fifty

20  apps, but obviously things like Facebook and YouTube and

21  weather apps and business apps are the most used within the app

22  store.  But it's about trying to bring in all things

23  over-the-top in an integrated way to the customer.

24  Q.   And how does offering those over-the-top products and apps

25  benefit RCN in the marketplace?

1  A.   We were the first to do so, and for two years no one

2  followed us.  I guess it was a little over a year ago that

3  Comcast integrated the Netflix app on their X1 platform and now

4  obviously others are moving in that direction as well.

5  Q.   And do you have a functionality that involves searching

6  across all platforms?

7  A.   That's -- TiVo has that technology, yes, that's able to

8  search.  If you type in Sopranos, it goes and looks not only at

9  your linear, but your video on demand, your Netflix accounts

10 and everything that you're authorized for and subscribe to,

11 yes, it searches across those products.

12 Q.   And is that attractive to customers?

13 A.   Yes, customers like it very much.

14 Q.   So since RCN is cooperating with some of these

15 over-the-top companies, does RCN still offer its own video

16 packages itself?

17 A.   Yes, we do.

18 Q.   And how many of your customers take an RCN video package?

19 A.   Just over five hundred thousand of our almost one million

20 customers.

21 Q.   And does RCN plan to continue its, I guess you already

22 told us, you plan to continue offering the video package?

23 A.   Yes.

24 Q.   Let's switch to another topic.  I want to ask you some

25 questions on the subject of Comcast NBCU offering content to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  RCN.

2     Does RCN offer a product called Broadcast Basic?

3  A.   Yes, we do.

4  Q.   And what is Broadcast Basic?

5  A.   It's the base package that all providers are supposed to

6  provide the baseline.  It's the broadcast channels paired with

7  government and public access channels.  It's the most basic and

8  cheapest level of service.

9  Q.   So why would a customer want to buy Broadcast Basic

10 over -- from you or from a cable company or a satellite company

11 instead of getting that programming off the air with an

12 antenna?

13 A.   When the broadcast signals went from analogue to digital

14 back in 2009, the area where you can actually pick up off their

15 channels with an antenna shrunk greatly throughout the United

16 States actually, and in our high rises in places like Chicago,

17 New York and Boston, you simply can't get off air signals, or

18 in rural Pennsylvania or in the suburbs of any of our major

19 markets, you can't simply get those services with an antenna

20 any longer.

21 Q.   And why do you want to offer a broadcast basic package to

22 your customers?

23 A.   We -- in 2012 actually we decided we would pair the

24 broadcast channels with robust broadband services and see if

25 that was something that customers wanted, and a funny thing

1   happened, customers loved that product.  For forty or fifty

2   dollars, customers got high speed Internet and they got their

3   local news, they got live sports, they got the great shows that

4   are on the broadcast channels, and it was a very popular

5   package for our customers.

6   Q.   And does being able to offer Broadcast Basic help you

7   compete with cable and satellite companies?

8   A.   Yes, I think it does, and I think we struck a niche in

9   that, that's when all the streaming services, especially

10  Amazon, Netflix and Hulu were really starting to take off.  So

11  pairing Broadcast Basic with those other over-the-top services

12  was certainly a product set that a lot of our customers liked.

13  Q.   And does Comcast offer Broadcast Basic service in

14  competition with you?

15  A.   Yes.

16  Q.   Are you able to offer Broadcast Basic to all of your

17  customers?

18          MR. WALTERS:  Your Honor, may we approach?

19          THE COURT:  Uh-hmm.

20      Step down, sir.

21      (Witness withdrew from the witness stand.)

22      (Sealed Bench Conference.)

23          MR. WALTERS:  Your Honor, relevance.  This is a

24  frolic and detour into an issue he has with Comcast on how they

25  use penetration rates.  It has nothing to do with this merger.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   It has to do with a condition in the Comcast degree of some

2   kind, but it really has no probative value in this merger.  It

3   is just simply how does Comcast use penetration rates.  That

4   exists in the marketplace today, in fact, they find themselves

5   going to the FCC --

6          THE COURT:  Did you depose him?

7          MR. WALTERS:  Oh, yeah, I deposed him.  That's what

8   this issue is, and they've gone to the FCC, and they've gone --

9   they've tried to prove their lie by complaining in this merger

10  context, and it has nothing to do with this merger.  It's a

11  circumstance that exists in the marketplace today.

12         MR. CONRATH:  It exists in the marketplace today

13  because Comcast and NBCU is a vertically integrated company who

14  has an incentive to limit the way they can use this low price

15  competitor against Comcast.  And this is a -- the restriction

16  that came from Comcast came into play after they became

17  vertically integrated.  He testified to that.

18     So it is an example of a non-price condition -- a

19  vertically integrated company to put on an innovative and

20  aggressive competitor, and they get harder for them to compete,

21  and that's exactly one of the things we're worried about in

22  this merger.  It shows what can happen in a vertically

23  integrated -- in a market with vertically integrated players.

24  ██████  ████  ████  ████  ████  ████  ████  ████

25  ████  ████  ████  ████  ██████  ████  ████  ████

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1 ███████████████████████████████████████████

2 ███████████████████████████████████████████

3 ███████████████████████████████████████████

4 █████████████████████████████████████████

5 ███████████████████████████████████████████

6 ██████████████████████████████████████████

7 ████████████████████████████████████████████

8 ██████████████████████████████████████

9     ████████████████████████████████████████

10 ██████████████████████████████████████████

11 ███████████████████████████████████████████

12 ██████████████████████████████████████████

13 ████████

14          THE COURT:  Well, I'll give you a little more -- a

15 little leeway on this, but I'm concerned about getting too far

16 afield on this now.  I appreciate you're trying to analogize

17 what could happen here to what's happened, what could happen

18 with Comcast competitive to this particular question.  It's

19 speculative at best, and I just -- I don't want to get too down

20 this road on a sideshow.  I'll give you a little leeway and see

21 how it goes.

22          MR. WALTERS:  Thank you, Your Honor.

23          MR. CONRATH:  Thank you.

24      (Open court.)

25          THE COURT:  Come on back up, sir.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        (Witness resumed the witness stand.)

2            THE COURT:  You may proceed consistent with the

3    discussion at the bench for another five minutes, and then

4    we'll take the break.

5    BY MR. CONRATH:

6    Q.   So are you able to offer Comcast basic to all of your --

7    are you able to offer Broadcast Basic to all of your customers?

8    A.   I am not.

9    Q.   And why not?

10   A.   There are several geographic areas where Comcast contracts

11   are prohibiting us from selling any more Broadcast Basic to

12   customers without selling them the entire bundle.

13   Q.   And is that a product of some penetration requirements

14   that are in certain of your agreements with NBCU?

15   A.   Yes, that's correct.

16   Q.   And those penetration requirements have the effect of

17   setting a percentage limit of how much of your product can be

18   sold as Broadcast Basic?

19   A.   Yes, that's correct.

20   Q.   And what do you do when you approach that percentage

21   limit?

22   A.   We no longer offer a low cost television solution for our

23   customers.

24   Q.   And that -- the application of those penetration

25   requirements to make it hard for you to sell Broadcast Basic,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  did that change after Comcast acquired NBCU?

2  A.   Originally, yes, seven and a half years ago, yes.  In

3  regards to the NBC programming, yes.

4  Q.   All right.  So when NBCU was not owned by Comcast you

5  didn't have the same problem you have today; is that right?

6  A.   That's correct.

7  Q.   And the change was to make the penetration requirements

8  more stringent?

9  A.   That's correct.

10 Q.   And the more stringent requirements made it hard for you

11 to sell Broadcast Basic in competition with Comcast?

12 A.   Correct, once we were no longer able to sell that level of

13 service, we saw Comcast come enter the marketplace with their

14 own low cost double play offering to, you know, to compete in

15 that marketplace knowing that we could not sell it anymore.

16 Q.   All right.

17       MR. CONRATH:  I'm about to change topics, Your Honor.

18 You can tell me to go ahead or keep going.

19       THE COURT:  How long?

20       MR. CONRATH:  Well, I have two more topics to handle

21 in open session.

22       THE COURT:  Okay.

23       MR. CONRATH:  I just wanted to alert you before I go,

24 I'm not making a request.

25       THE COURT:  All right, well, do one more and then

 1   we'll stop.

 2            MR. CONRATH:  Okay, very well.

 3   BY MR. CONRATH:

 4   Q.   So you compete with AT&T; is that right?

 5   A.   We do.

 6   Q.   And earlier we discussed the value of Turner programming

 7   to RCN, do you remember that?

 8   A.   Yes.

 9   Q.   Given that value of Turner programming, do you have any

10   concerns over the possible merger of AT&T and Time Warner?

11   A.   Sure, we have the same concerns that we had with Comcast

12   and NBC.

13   Q.   And what are the concerns that you've got?

14   A.   The concerns are using Turner programming to

15   disadvantageous us in competition for broadband customers and

16   double and triple play customers in the areas where we compete

17   against them against their wire line networks.

18   Q.   And --

19            MR. WALTERS:  Your Honor, may we approach?

20            THE COURT:  Uh-hmm.

21       Step down.

22       (Sealed Bench Conference.)

23            MR. WALTERS:  This is not an allegation in his

24   complaint.  There's no allegation of manipulating Turner

25   content in double and triple play.  Likewise, the previous

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  issue of how the penetration rates were is not an allegation in

 2  this case.

 3          MR. CONRATH:  The allegation in this case is that the

 4  Turner for them to be able to use its content to, either to

 5  raise prices or through terms that make it hard for others to

 6  be competitive.  Both prices and terms are relevant.  I can ask

 7  him if he's talking about prices and talking about terms.  He

 8  obviously gave the first opening answer, now I'm going to ask

 9  him --

10          THE COURT:  You believe that will happen, that's

11  speculation.

12          MR. CONRATH:  Well, I think he's -- I think he would

13  say everybody who's testified about what they think is going to

14  happen after the merger is making a prediction about the future

15  his third party witnesses and the party witnesses.

16      And so he's making a prediction based on his experience.

17  He explicitly referenced what he was concerned about in the

18  Comcast.  So he's got some basis for concern there.

19          MR. WALTERS:  We are really mixing apples and

20  oranges.  The basis of concern of Comcast with these

21  penetration rates were never pled in this case, not part of

22  this case.

23      Now apparently the basis of concern is that I'm not going

24  to get Turner content in some fashion.  We have extended

25  arbitration and standstill to NCTC as well as RCN, so that's

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    not a concern.

2        Now, it is against every economic incentive that has been

3    described in this case.  I just don't know where this could

4    possibly be going.  It's just jumping at ghosts.

5            MR. CONRATH:  Well, third parties are expressing what

6    they think the risks are.  Other evidence also addresses what

7    risks are.  I'm about to ask him to elaborate on his short his

8    short answer here.

9            MR. WALTERS:  It's not in the case, Your Honor, it's

10   just not in the case.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  All right.  We'll take the luncheon

 2   recess.  You think about -- talk to your team about to what

 3   extent we need to get into that stuff.  You say you've got

 4   about twenty minutes more?

 5              MR. CONRATH:  A little more than that.

 6              THE COURT:  Then you have half hour on cross?

 7              MR. WALTERS:  Yeah, half hour at most, twenty

 8   minutes.  Thank you.

 9              MR. CONRATH:  Thank you.

10      (Open court.)

11              THE COURT:  All right, sir, come on back up.

12      (Witness resumed the witness stand.)

13              THE COURT:  We're going to take the luncheon recess

14   now.  You're a witness under oath in the case, which means

15   you're not at liberty to discuss your testimony so far or what

16   it might be when you return with anyone, including counsel who

17   you're working with here.  So stay independent of all others

18   and be able to answer the question that you haven't discussed

19   your testimony with anyone when you come back, okay?

20              THE WITNESS:  Okay.

21              THE COURT:  See you in 2:45.

22      (Luncheon recess at 1:19 p.m.)

23                              -oOo-

24

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1                         CERTIFICATE

2          I certify that the foregoing is a true and correct

3   transcript, to the best of my ability, of the above pages, of

4   the stenographic notes provided to me by the United States

5   District Court, of the proceedings taken on the date and time

6   previously stated in the above matter.

7          I further certify that I am neither counsel for, related

8   to, nor employed by any of the parties to the action in which

9   this hearing was taken, and further that I am not financially

10  nor otherwise interested in the outcome of the action.

11

12  _____        _____

13  /s/Crystal M. Pilgrim, RPR, FCRR        Date: April 18, 2018

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )        CV No. 17-2511
                                 )
                                 )        Washington, D.C.
        vs.                      )        April 17, 2018
                                 )        2:50 p.m.
AT&T, INC., ET AL.,              )
                                 )        Afternoon Session
            Defendants.          )
_____)        Day 15


        TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
      BEFORE THE HONORABLE RICHARD J. LEON
        UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                             Eric D. Welsh
                             Donald G. Kempf, Jr.
                             Scott A. Scheele
                             Justin T. Heipp
                             Cerin M. Lindgrensavage
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Washington, D.C. 20530
                             (202) 532-4560
                             craig.conrath@usdoj.gov
                             eric.welsh@usdoj.gov
                             donald.kempf@usdoj.gov
                             scott.scheele@usdoj.gov
                             justin.heipp@usdoj.gov
                             cerin.lindgrensavage@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:                          Katrina M. Robson
                                        O'MELVENY & MYERS LLP
                                        1625 Eye Street, NW
                                        Washington, D.C. 20006
                                        (202) 220-5052
                                        krobson@omm.com

                                        Daniel M. Petrocelli
                                        M. Randall Oppenheimer
                                        O'MELVENY & MYERS LLP
                                        1999 Avenue of the Stars
                                        8th Floor
                                        Los Angeles, CA 90067
                                        (310) 553-6700
                                        dpetrocelli@omm.com
                                        roppenheimer@omm.com

                                        Michael L. Raiff
                                        Robert C. Walters,
                                        GIBSON, DUNN & CRUTCHER LLP
                                        2100 McKinney Avenue
                                        Suite 1100
                                        Dallas, TX 75201
                                        (214) 698-3350
                                        mraiff@gibsondunn.com
                                        rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:                      Kevin J. Orsini
                                        Peter T. Barbur
                                        CRAVATH, SWAINE & MOORE LLP
                                        Worldwide Plaza
                                        825 Eighth Avenue
                                        New York, NY 10019
                                        (212) 474-1140
                                        korsini@cravath.com
                                        pbarbur@cravath.com

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

Court Reporter:                     William P. Zaremba
                                    Registered Merit Reporter
                                    Certified Realtime Reporter
                                    Official Court Reporter
                                    U.S. Courthouse
                                    333 Constitution Avenue, NW
                                    Room 6511
                                    Washington, D.C. 20001
                                    (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

– – –

WITNESS INDEX

– – –

WITNESSES            DIRECT CROSS REDIRECT RECROSS

GOVERNMENT'S:

JAMES HOLANDA        2932  2946      2975
JAMES HOLANDA        2982  2986
                          – – –

INDEX OF EXHIBITS

– – –

DEFENDANT'S                 IDENTIFIED   ADMITTED

DX785 – 11/28/17 Letter                   2962

– – –

INDEX OF EXHIBITS

– – –

GOVERNMENT'S            IDENTIFIED     ADMITTED

PX451                                    2990

PX455                                    2990

PX458                                    2990

PX459                                    2990

                          – – –

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

– – –

WITNESS INDEX

– – –

WITNESSES              DIRECT  CROSS  REDIRECT  RECROSS

DEFENDANT'S:

DAVID CHRISTOPHER    2996   3018     3046

```
1                    P R O C E E D I N G S

2              DEPUTY CLERK:  All rise.  The United States

3    District Court for the District of Columbia is now in

4    session, the Honorable Richard J. Leon presiding.  God save

5    the United States and this Honorable Court.  Please be

6    seated and come to order.

7              THE COURT:  All right.  The witness remains under

8    oath.

9              You may proceed when you're ready.

10             MR. CONRATH:  Thank you, Your Honor.

11                              -  -  -

12   JAMES HOLANDA, WITNESS FOR THE GOVERNMENT, HAVING BEEN

13   PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS

14   FOLLOWS:

15                  DIRECT EXAMINATION (CONTINUED)

16   BY MR. CONRATH:

17       Q    Mr. Holanda, based on your experience in the

18   industry and your knowledge in the industry, do you have

19   concerns about this merger?

20       A    We do.

21       Q    And without revealing any confidential

22   information, is part of the reason for the concerns you have

23   about this merger based on past experience that you had

24   under the Comcast-NBCU vertical merger?

25       A    Yes.
```

```
 1        Q    And does that include what you described for us

 2   before lunch about NBCU conditions that limit your ability

 3   to sell broadcast basic?

 4        A    Yes.

 5        Q    So let me ask you to explain in more detail.

 6   Do you have concerns about the price at which you might be

 7   able to get Turner programming?

 8        A    Yes.

 9        Q    And explain that in a little more detail.

10        A    Right now, we are buying as members of the NCTC.

11             You know, we have had programmers who have not

12   allowed us to participate in NCTC deals in the past.  And so

13   not allowing us to participate and having to negotiate

14   directly with Turner could put us at a disadvantage because

15   we have less customers and puts us at a disadvantage because

16   they could charge us more in the hopes of winning over

17   broadband customers, either through us passing those

18   increases on or us not carrying the programming.

19        Q    So just to be clear, you don't, today, you don't

20   compete with Turner?

21        A    For broadband customers and double- and

22   triple-play customers, we do not.

23        Q    Or for video-service customers, right?

24        A    Right.

25        Q    You do compete with AT&T?
```

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 2800 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2934

1        A     Correct.

2        Q     Do you have issues about the terms or conditions

3    on which you might be able to have access to Turner

4    programming?

5        A     Yes.

6        Q     And explain those for the Court, will you?

7        A     Just in terms of some real-world analogies, we

8    have concerns that if HBO is only available through HBO Now

9    or over -- provided only over the Internet, that a

10   competitor could block IP addresses and prevent our

11   customers from getting those services over the top like we

12   saw Viacom do against Suddenlink and Cable ONE when they

13   dropped the Viacom programming along with some smaller

14   operators.

15           I think we are concerned --

16       Q     And what would that mean for your customers?

17           MR. WALTERS:  Objection, Your Honor.  May we

18   approach?

19           THE COURT:  Yes.

20           (Sealed bench conference)

21           MR. WALTERS:  Your Honor, two objections.

22           Relevance.  This case is about a Turner price

23   increase.  This case is about an HBO and in terms of

24   availability.  And this case is about coordinated effects.

25           There's nothing on checking the complaint, nothing

 1   top, side or bottom about these complaints.  It's just not

 2   relevant in the case, number one.

 3          Number two, it is wildly speculative.

 4          MR. CONRATH:  Your Honor, he's explaining what is

 5   the -- he's worried about the conditions on which he would

 6   have access to the Turner content as well as price or the

 7   Time Warner content.

 8          He's expressed an example before where the

 9   conditions put on him affected his ability to compete.

10          He is just -- he just gave an example of a

11   situation that is a real-world situation that leads him to

12   have these concerns.  So it's not speculative if it's

13   talking about what he's what his -- his basis and the

14   basis --

15          THE COURT:  He's just giving his concerns.

16          MR. CONRATH:  Yeah.

17          THE COURT:  Concerns he has based on prior

18   experience in NBC.

19          MR. WALTERS:  We're in the eleventh hour.  This

20   case has been all about a pricing increase by Turner.  And

21   now he's drifted off into other concerns that aren't

22   price-related.

23          MR. CONRATH:  Well, if your ability to offer a

24   low-cost product is definitely price-related, putting

25   conditions would make it hard to offer a low-cost product.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2936

```
 1            MR. WALTERS:  No.

 2            MR. CONRATH:  It's clearly price-related.

 3            THE COURT:  Let him finish.

 4            MR. WALTERS:  I'm sorry.  Excuse me.

 5            No, it's been about the price of Turner product.

 6   That's what this case has been about.  It's not about these

 7   terms and conditions.  It's just simply not been a part of

 8   the case.

 9            But if we go with this diversion, then I'll have

10   to get into it as well.

11            THE COURT:  What do you have to get into?

12            MR. WALTERS:  I'll have to get into it in the very

13   same subject if we go down this path.  And so it just hadn't

14   been relevant to the case.

15            THE COURT:  I have no problem of you going into it

16   to a limited extent.  He hasn't been going into it in any

17   extent today.

18            MR. WALTERS:  I understand.

19            THE COURT:  At this point he's only really

20   scratched the surface of his concerns, and he's put his

21   concerns on the record, but they're part of the record.

22            Frankly, I don't know how much more detail you'd

23   need to go into anyway.

24            MR. CONRATH:  So there's only -- there's a modest

25   amount of, not a lot more detail for public.  I'm going to
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1    ask him about the future strategy questions and just lay the

2    foundation.  And the Court can then make the decision about

3    whether to hear that in closed session.

4              THE COURT:  Let me ask you a question.

5              MR. CONRATH:  And then I'm going to move to one

6    more topic.

7              THE COURT:  He was deposed, right, obviously?

8              MR. CONRATH:  Yeah, right.
```



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          MR. CONRATH:  Right.

25          THE COURT:  And then we'll do some cross, and then

1   we'll make a decision as to whether we need to go into an

2   Executive Session.

3          I'm not inclined to go into an Executive Session

4   because I don't think it's necessary, but let's see where we

5   go and we'll make a decision.

6          MR. CONRATH:  I think, just to be -- I want to

7   wrap up this line of questioning.  I've got another line of

8   opening -- open-court questioning just about their view of

9   the arbitration offer.

10          THE COURT:  Well, that's probably something we'll

11   talk about.

12          MR. CONRATH:  Yeah.  Okay.

13          MR. WALTERS:  Thank you, Your Honor.

14          (Open court)

15          THE COURT:  You may proceed, consistent with the

16   discussion at the bench.

17   BY MR. CONRATH:

18     Q    So did you finish explaining to us the concerns

19   you've got about whether there would be conditions on the

20   availability of Turner programming after the merger that

21   would affect your ability to compete?

22     A    Yes.

23     Q    Okay.  Good.

24          Do you have concerns that relates about the

25   merger -- without revealing confidential information,

1    do you have a concern that relates to RCN's future video

2    strategy?

3         A    Yes.

4         Q    All right.  And would disclosing RCN's future

5    video strategies in public be harmful to RCN?

6         A    Yes, I believe it would.

7         Q    And can you explain to the Court why that is.

8         A    We're investing in technology and partnerships

9    that I think are out of industry norm.  And revealing the

10   specifics of those ahead of when we launch in a public forum

11   against our five top competitors is something I'd prefer not

12   to do.

13             THE COURT:  I understand.

14             MR. CONRATH:  All right.  I'm not going to go

15   further into that topic at this point, Your Honor, but

16   I have one more topic to cover openly.

17   BY MR. CONRATH:

18        Q    So are you aware that there is an arbitration

19   offer made by Turner in this case?

20        A    Yes.

21        Q    And in fact, at one point in earlier looking at

22   the merger, RCN itself recommended one of the conditions

23   that it proposed related to the merger included arbitration,

24   right?

25        A    That's correct.

1      Q    And have you looked at -- did RCN receive an

2    arbitration offer from Turner?

3      A    We did.

4      Q    And you're familiar with it?

5      A    I am.

6      Q    What is your view of that Turner arbitration offer

7    that you received?

8      A    I think it very much resembled the basics of the

9    Comcast-NBC order, which I thought was a good start; but, at

10    the same time, I felt it was missing some very fundamental

11    things out of the Turner offer that we've learned through

12    our experiences with Comcast-NBC.  And then just in terms of

13    scope, really didn't cover the scope of all the programming

14    that AT&T's proposing to buy.

15      Q    Okay.  So let's take each of those parts at one

16    time.

17           What about the scope?  Tell us what your concerns

18    are about the scope of the arbitration offer, the Turner

19    arbitration offer that was sent to you.

20      A    The Turner offer did not include HBO and did not

21    include their RCN.

22      Q    And those are important products to you?

23      A    Yes.

24      Q    And you said there were concerns about the terms

25    of the Turner arbitration offer or what you thought were

1  problems.  Can you explain those for us.

2      A    It didn't go far enough to protect on technology

3  rights and some of the innovation that's going on.

4          We felt the term was not long enough.

5          And then we thought there was room for improvement

6  on the actual arbitration process itself, again, kind of

7  based on the real-world experience with Comcast and NBC.

8      Q    And what term did you think -- the term of the

9  offer is seven years.  Did you have -- you thought that was

10 not long enough?

11     A    Correct.

12     Q    And did you have another term in mind?

13     A    Just -- not in -- just in terms of technology

14 rights and the scope of the agreement, including all the

15 programming.

16     Q    Did you -- I'm sorry.  Did you have a longer time

17 period than seven years in mind?

18     A    Yes.

19     Q    And what was it?

20     A    Ten years.

21     Q    And you said that there were some things about how

22 the arbitration process itself worked that were a concern

23 for you.  And what were those?

24     A    We had three basic concerns in the arbitration

25 process; one was just access to information.  Usually, when

1  you go into baseball-style arbitration, you have a general

2  sense of what other players are making.  We have no

3  information the way that that was constructed, so we would

4  be going blindly without knowing what other distributors of

5  similar size or scope would be paying upon which to make a

6  decision to arbitrate.

7          We felt that the NCTC, as our negotiating arm

8  through the buying group, should have an express right to

9  use the arbitration, which wasn't included.

10          And then in terms of just the arbitration process,

11  under Comcast, and my understanding under the Turner offer,

12  is that we were supposed to provide our best and final bid

13  first, with no information.

14          And if we had information and AT&T or Turner had

15  to provide their bid first, we just think that that would be

16  a better way to hold everyone more accountable and hopefully

17  avoid arbitration in the first place.

18      Q    RCN has not signed the Turner arbitration offer at

19  this point, is that right?

20      A    Correct.

21      Q    And without disclosing any confidential

22  information, have you had some discussions about the letter

23  with anyone associated with AT&T or Time Warner?

24      A    We have.

25      Q    And with which company?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2944

```
1       A     We've talked to AT&T about the --

2             MR. WALTERS:  Objection, Your Honor.  May we

3   approach?

4             THE COURT:  Yes.

5             (Sealed bench conference)
```



\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

2945



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11        So my view --
12        THE COURT:  Repeat the question.
13        MR. CONRATH:  My wish is only to be clear that
14   we're not, anyone to think I didn't raise it if it came up
15   in front of --
16        MR. WALTERS:  I have no intention on getting into
17   it on cross.
18        MR. CONRATH:  No problem.  I'll withdraw the
19   question.
20        THE COURT:  All right.
21        (Open court)
22        THE COURT:  You may proceed, consistent with the
23   discussion at the bench.
24        MR. CONRATH:  Yes.  So if there was a question
25   pending, I withdraw it.
```

1          And I don't have any more questions for this

2    witness, Your Honor.

3          THE COURT:  Very good.

4          Cross-exam.

5          MR. WALTERS:  Yes, sir, Your Honor.

6                    CROSS-EXAMINATION

7    BY MR. WALTERS:

8    Q    Mr. Holanda, a couple things about RCN.

9          Now, RCN, I think you mentioned, is a

10   sixth-largest cable company in the United States and

11   11th-largest on video; is that right?

12   A    Yes.

13   Q    And you're actually opened by TPG group, the Texas

14   Pacific Group, which is one of the largest private equity

15   firms in the world, with some 75, $100 billion under

16   management; is that right?

17   A    75 billion, yes.

18   Q    And, in fact, you're also partially owned by

19   Google, are you not?

20   A    Google Capital, also known as CapitalG, owns 10

21   percent of the company.

22   Q    So there's been lot of discussion in this case

23   about a pricing model, okay?  And I want to ask you about

24   your specific, real-world experience with some key

25   components to that pricing model.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           So let me just start with this.  You are not here

2    today and RCN does not know what percentage of its

3    subscribers would leave if Turner channels were not

4    available to them, fact?

5        A    Correct.

6        Q    And, in fact, you don't recall any drop analyses

7    that -- and I asked you about this in deposition -- that you

8    have done on Turner content, correct?

9        A    Correct.

10       Q    And so today, you're not offering this Court any

11   empirical data or any real-world evidence of subscriber

12   losses if RCN didn't have Turner, right?

13       A    No, not our company.

14       Q    And, in fact, if you were to understand, try to

15   understand as a distributor what the impact of not having

16   Turner would be, you obviously would have to account for

17   what kind of countermeasures, what kind of mitigants you, as

18   a distributor, would undertake to try to keep your

19   customers, wouldn't you?

20       A    Yes.

21       Q    And RCN's retention efforts, as it turns out,

22   you're pretty good at it.  You've enjoyed pretty good

23   success at hanging on to customers who have told you they're

24   leaving.  That has been a hallmark of your corporate

25   performance, has it not?

1       A    I would say on the broadband side, yes, we've had

2  a lot of success.  Not so much so on the video side.

3       Q    But in all events, the last thing you would do is

4  sit on your hands.  You would do everything you could to

5  hang on to those customers, fair?

6       A    Correct.

7       Q    Now, another issue that has come up as part of

8  this pricing model is that if you lose customers, where do

9  they go?  Are you with me?

10      A    Uh-huh.

11      Q    Now, it's true, isn't it, that people who are

12  leaving the RCN video service, many of them are leaving to

13  go to OTT providers.  They're leaving the traditional

14  ecosystem.  They're going to OVDs or to the new vMVPDs or

15  elsewhere, correct?

16      A    Yes.

17      Q    And there's been a lot of discussion in this case

18  about what that rate is -- 10 percent, 20 percent, whatever

19  it might be.

20           In your experience at RCN, at least half of the

21  customers who leave just RCN's video services are leaving

22  for OTT providers.  That has been your experience, has it

23  not?

24      A    It has.

25      Q    And this number is likely to grow in the future as

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2949

1   Millennials become more and more prominent in the

2   marketplace, isn't it?

3       A    Yes.

4       Q    Let's talk about, then, the third leg of this

5   pricing model stool, which concerns competition and the

6   effect on your profitability.

7           Now, today, Mr. Holanda, consumers have many, many

8   more options to -- for where they can get their video; is

9   that fair?

10      A    Yes.

11      Q    And this intensified competition.  It's led to an

12  increase in the types of products that are available to

13  consumers from distributors, fair?

14      A    Yes.

15      Q    And this intensified competition has led to more

16  lower-cost, skinny bundles available to consumers, OTT,

17  right?

18      A    Yes.

19      Q    And, in fact, you have never seen a better time

20  for consumers in terms of choice and availability in your 30

21  years in the industry, fair?

22      A    Yes.

23      Q    And also in your 30 years of the industry, the

24  consumers have more price points available to them than ever

25  before, fair?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2950

1          A    Yes.

2          Q    And so in the course of this 30 years that you

3     have been in the business, the video distribution market

4     today is more competitive than at any point that you can

5     recall, true?

6          A    True.

7          Q    And this increased competition has been great for

8     consumers, right?

9          A    Yes.

10         Q    But what's good for consumers has also been a

11    challenge, has it not, for RCN and other MVPDs; would you

12    agree with that?

13         A    Yes.

14         Q    And, indeed, for the last five, seven years or so,

15    your video margins have continued to decrease, both for you

16    and for your competitors, because of the intensity of that

17    competition, fair?

18         A    I think that's one of the reasons, but yes.

19         Q    It's put a squeeze on margins over the past

20    several years, right?

21         A    I wouldn't call it a "squeeze," but margins are

22    gradually going down, yes.

23         Q    Well, in fact -- and I don't want to get into the

24    specific numbers, but over the last five, seven years, your

25    margins at RCN on the video product have decreased by over

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2951

1   half, haven't they?

2       A    Yes.

3       Q    And so on this pricing model, we have three basic

4   conclusions.

5            One, you're not telling this Court that -- of any

6   empirical data of what would happen if Turner leaves, right?

7       A    Right.

8       Q    Two, your diversion is over 50 percent for your

9   video customers who leave, right?

10      A    Yep.

11      Q    And, No. 3, your profitability has plummeted as a

12  consequence of a number of things, including this increased

13  competitiveness, fair?

14      A    "Plummeted" is not the word I would use.

15      Q    Okay.

16      A    It's slowly decreased over time.

17      Q    And importantly, with no relief in sight, fair?

18      A    Fair.

19      Q    Now, you spoke to Mr. Conrath about your

20  conversations or your approach to DOJ with regard to this

21  merger.

22           Do you recall that discussion?

23      A    Yes.

24      Q    And you have spoken with DOJ with or without your

25  counsel, what, maybe, on this merger, a half-dozen times

1    now?

2         A    Yes, including preparation for this, yes.

3         Q    And this is not something new for RCN.  I mean,

4    you have, as matter of -- habit might be a little strong.

5    But as a matter of routine, you have weighed in on different

6    mergers in the media industry, have you not, over the last

7    several years?

8         A    Yes.

9         Q    You certainly weighed in on Comcast-NBCU, right?

10        A    Yes.

11        Q    You weighed in on

12   Comcast-Time Warner-Bright House-Verizon.

13             You weighed in on that merger, didn't you?

14        A    Yes.

15        Q    You weighed in on the Comcast-Time Warner merger,

16   right?

17        A    Yes.

18        Q    And you weighed in on the Comcast-Charter

19   transaction as well, didn't you?

20        A    I believe so.

21        Q    Yeah.

22             And, in fact, you, with your staff and your

23   outside counsel, actually prepared a presentation to DOJ on

24   this transaction.

25             You recall that, don't you?

1          A    Yes.

2          Q    And so you, as a competitor, you inject yourself

3     into this regulatory and review process in order to air your

4     concerns but also to attempt to approve your competitive

5     life, do you not?

6          A    Yes; to maintain a level playing field as we move

7     forward.

8          Q    And -- but in the course of weighing in on those

9     issues, you have also urged the DOJ, you have urged them to

10    move on and insist on conditions that really have nothing to

11    do with this merger, haven't you?

12         A    I don't think so.

13         Q    Well, the issue that you were just speaking to

14    Mr. Conrath about, the so-called -- the Comcast issue and

15    the penetration rates, right?  You urged the DOJ that they

16    exclude broadcast basic from any Turner penetration rates,

17    didn't you?

18         A    Yes.

19         Q    Yeah.

20              So let's talk about that for a second.

21              Every major company has penetration rates,

22    vertically integrated or not vertically integrated.  Turner

23    has them.  Disney has them.  Fox has them.  CBS has them.

24    NBCU has them.  Right?

25         A    Yes, but not all of them are tied -- that you add

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2954

1    are tied to broadcast basic.

2        Q    Well, Turner today, without regard to this merger,

3    it is tied to broadcast basic, isn't it?

4        A    Yes.

5        Q    And that's been the case for a long time before

6    there was even any talk of a merger, right?

7        A    Yes.

8        Q    And so that complaint about Turner has nothing to

9    do with the broadcast -- with broadcast basic, or it has

10   nothing to do with this merger.  You were just trying to

11   improve your live video to Turner as a consequence of this

12   merger process, weren't you?

13       A    I think it has everything to do with this merger

14   in that you're allowing a company with the two largest wired

15   and wireless distribution platforms to own significantly

16   viewed programming that they can use contractual terms to

17   disadvantage us in the market for broadband customers, not

18   just video customers.

19       Q    Well, that's --

20       A    And that -- you know, it's important.  Broadband

21   customers are two to four times more profitable today than

22   video customers.

23            And so using programming to gain an advantage in a

24   more profitable line of business that the people that have

25   programming today aren't in is of great concern to us.

1       Q    And that's just by linking penetration rates to

2   this broadcast basic.  That's what you're talking about,

3   right?

4       A    That's what we saw Comcast do, yes.

5       Q    Yeah.  Well, and you've seen Turner do that.  To

6   date, they've always had that in place, right?

7       A    True.  But they don't compete us against us for

8   double- and triple-play and broadband households.

9       Q    That's the point.  They do it without regard to

10  competing with you, don't they?

11      A    Right.

12      Q    All right.

13           Let's just talk for a couple minutes about this

14  arbitration proposition that you did weigh into with

15  Justice.

16           For starters, you know that Turner has offered to

17  all distributors, small and large alike, both a standstill

18  and an arbitration opportunity.

19           Do you understand that?

20      A    Yes.

21      Q    Let's talk about the standstill first.

22           I want to be clear about this.

23           The standstill itself actually affects, changes

24  the negotiating dynamic between a content provider and a

25  distributor, does it not?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        A    Yes.

 2        Q    It does.

 3             And, in fact, the standstill -- and I think you

 4   described this to me in your deposition -- is actually

 5   helpful to the distributor, is it not?

 6        A    Yes.

 7        Q    Yeah, because the standstill changes the dynamic

 8   in the distributor's favor.  You recall that, don't you?

 9        A    Yes.

10        Q    And because before a standstill, the distributor's

11   principal source of -- excuse me, the programmer's principle

12   source of leverage was the ability to go dark.  And with the

13   standstill, it no longer has that, right?

14        A    I wouldn't characterize -- it's one of many

15   weapons a programmer has.  And, yes, it's a very valuable

16   one, and giving it up helps the distributor.

17        Q    Helps the distributor.

18             Okay.  So if it's DOJ's contention here in this

19   lawsuit, in this pricing model we've been talking about, is

20   that a programmer can raise prices from an increased threat

21   of blackout, that possibility just disappears with a

22   standstill, does it not?

23        A    It doesn't disappear.

24        Q    Well, let me try it again.

25        A    Okay.
```

1      Q    In your view, sir, a standstill agreement would

2  eliminate the ability of a content provider like Turner to

3  raise prices by threatening blackout; isn't that true?

4      A    If it's Turner pre-AT&T, I agree with that

5  statement.  If it's Turner post-AT&T and owned by AT&T,

6  their actual incentive is to raise my pricing, make me drop

7  the services, and steal my broadband and video customers.

8      Q    Yeah.  I'm not sure we're connecting on this.

9      A    Okay.

10      Q    My question is simply this -- and we talked about

11  it in your deposition, okay -- is that, in your view, a

12  standstill agreement that Turner has offered to you at RCN,

13  okay, it would eliminate the ability of a content provider

14  like Turner to raise prices by threatening a blackout,

15  because it has no threat of blackout.

16      A    That's correct.

17      Q    That's correct.  Okay.

18          And on this standstill, I think you mentioned the

19  subject of OTT providers and maybe how -- or vMVPDs and how

20  you might do business with them in the future, and without

21  getting into the specifics of that.

22          Now, you understand, don't you, that Turner has

23  made this very same offer of guaranteed content through this

24  standstill and arbitration?  It's made that offer to the

25  virtual MVPDs.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2958

1         Do you understand that?

2    A    Yes.

3    Q    And so to the extent you have any concern about

4    not getting the content from a virtual MVPD, that standstill

5    commitment, that would take care of that concern, would it

6    not?

7    A    I'm not sure it takes care of the concern that I'm

8    worried about.  And maybe we can discuss that more in a

9    closed session.

10   Q    Now, let's go on to the arbitration piece of this

11   that you spoke to Mr. Conrath about.

12        And I think you said this, that AT&T's arbitration

13   offer is actually modeled on the Comcast standstill

14   arbitration agreement.

15        You appreciate that, don't you?

16   A    Yes.

17   Q    And you know that DOJ, in other contexts, has

18   advocated in this Court and elsewhere for that very kind of

19   arbitration mechanism.  You appreciate that, don't you?

20   A    Yes.

21   Q    And, in fact, you came down to DOJ in March of

22   2017.  And RCN recommended, okay, a baseball-style

23   arbitration commitment.  It said, "Following the precedent

24   established in the approval of Comcast-NBCU deal, competing

25   distributors should be able to enforce this right by

 1    requiring that AT&T submit to binding, baseball-style

 2    arbitration.

 3            Do you recall making that recommendation to these

 4    very folks?

 5        A    Yes.

 6        Q    And then later in the year, a few months later,

 7    that's precisely what AT&T and Turner did as -- in the fall

 8    of 2017, right?

 9        A    It was December, late December when we saw the

10    Turner offer for the first time.

11        Q    So later in 2017, correct?

12        A    And it contained none of the fixes that we had

13    proposed in that presentation --

14        Q    I want to get to --

15        A    -- in terms of the baseball-style arbitration.

16        Q    All right.  I want to get to those fixes.

17            But your point in making that recommendation to

18    DOJ is that baseball arbitration would be a reasonable

19    solution because it would allow a third-party arbitrator to

20    decide whether the terms and conditions of the agreement are

21    fair without the distributor losing programming in the

22    process.  That was the inherent logic of it, right?

23        A    Yes.

24        Q    And that's because baseball arbitration, it

25    presents a binary proposition to an arbitrator, which

1   creates significant uncertainty and, thus, encourages a

2   party to negotiate as hard as they can to reach an

3   agreement.

4           You recall telling me that, don't you?

5       A   Yes.

6       Q   And so in your judgment, RCN, you would agree that

7   a baseball-style arbitration provision, combined with a

8   standstill guarantee, would level the playing field.  You

9   recall describing that to me, don't you?

10      A   I recall talking about that that was a good place

11  to start, but our real-world experience suggested that there

12  needed to be some slight modifications --

13      Q   All right.

14      A   -- to the proposal --

15      Q   All right.

16      A   -- which we have been consistent about now for

17  13 months in terms of our advocacy of the merger under the

18  right set of conditions.

19      Q   Good.  And I want to get to those slight

20  modifications in a second, okay?

21          Now, one of the things you mentioned to

22  Mr. Conrath is that you have not tried to arbitrate under

23  the Comcast arbitration provision, right?

24      A   Correct.  We have not formally arbitrated against

25  Comcast.

1      Q    You have not.

2           And the problem is that, for some reason, NCTC

3    believes that it doesn't have the right to arbitrate or to

4    use the standstill arbitration of that -- under that consent

5    decree, correct?

6      A    Yes.

7      Q    And so what RCN has recommended here is that that

8    baseball arbitration provision should allow NCTC to employ

9    that provision on behalf of its members, right?

10     A    Yes.

11     Q    And you know -- you know that Turner has actually

12   extended that standstill in arbitration to NCTC just as you

13   recommended.  You know that, don't you?

14     A    Actually, I don't.

15     Q    Well, let me just show you to see whether this

16   refreshes -- let me just show you what we'll mark for

17   identification.

18          Let's mark this -- may I approach, Your Honor?

19          THE COURT:  Yes.

20          MR. WALTERS:  May I approach the witness?

21          THE COURT:  Go ahead.

22          THE WITNESS:  It's the first time I've seen this.

23   BY MR. WALTERS:

24     Q    All right.  Well, you're on the board of NCTC, are

25   you not?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        A    I am.

 2        Q    And this letter is addressed to Mr. Richard

 3   Fickle, who's the President and CEO of National Cable

 4   Television Cooperative.

 5             Do you see that?

 6        A    Yes.  Yep.

 7        Q    And this letter was sent on November 28, 2017, to

 8   Mr. Fickle, extending the standstill and arbitration

 9   opportunity to NCTC.

10             Do you see that?

11        A    Yep.

12             MR. WALTERS:  Your Honor, we'd move admit

13   Defendants' Exhibit 785.

14             MR. CONRATH:  No objection.

15             THE COURT:  All right.  It will be admitted.

16                              (Defendants' Exhibit DX785
                                  received into evidence.)
17   BY MR. WALTERS:

18        Q    So at least in terms of NCTC and that issue,

19   problem solved, fair?

20        A    Just putting my CEO hat, I think you're

21   acknowledging in writing that you're willing to do it, but

22   the devil is in the details.  And when you're dealing with

23   over 750 member companies, we would just want to make

24   sure -- and I'm putting my NCTC board hat on -- that

25   everybody within NCTC is covered by this.
```

1      Q    All right.

2      A    Provided it is, yes, that would be issue checked

3    off the page.

4      Q    Check off that box?

5      A    Yep.

6      Q    And by the way, in the time you spent with DOJ

7    before you testified, did nobody at DOJ tell you that this

8    had been offered to NCTC and its members?

9      A    I don't recall.

10     Q    Now, if that's check the box on that issue, you

11   raise a second issue, Mr. Conrath, and that was something

12   about the information flow available as part of the

13   arbitration process.

14          Do you recall that?

15     A    Yes.

16     Q    Now, I want to unpack that a little bit and be

17   clear about that.

18          In a commercial arbitration -- excuse me.

19   I misspoke.

20          In a commercial negotiation, RCN wouldn't know the

21   specific terms, distributor terms, with -- other

22   distributors would have with Turner, right?

23     A    Correct.

24     Q    And conversely, Turner would not know of your

25   specific terms with other programmers, correct?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      A    Correct.

2      Q    And for purposes of a commercial negotiation,

3  that's rough justice, isn't it?  They don't know; you don't

4  know, right?

5      A    Yes.

6      Q    And, again, the point of baseball arbitration is

7  to try to achieve a result that most closely resembles

8  commercial negotiation, fair?

9      A    Okay.

10     Q    Okay.

11        So if you then go to the next step, which is RCN

12  actually has discovery rights as part of what Turner has

13  proposed to it in the arbitration -- you're aware of that,

14  aren't you?

15     A    I don't know the extent of the discovery rights.

16     Q    Have you ever read the arbitration agreement

17  itself, multi-page arbitration agreement?

18     A    I read the whole thing back in December.

19     Q    Back in December.

20        And you're not aware that paragraphs 4 and 5

21  provide extensive discovery rights for you as a distributor

22  to learn what the terms of Turner's terms are with other

23  distributors; you're not aware of that?

24     A    No.

25     Q    Nobody at DOJ apprised you of those discovery

1  rights that you would have as part of this process?

2       A    If I thought the discovery rights covered our

3  concern, yeah; I would not have continued to advocate for

4  that.

5       Q    And you haven't studied that language since

6  December, even read it, have you?

7       A    No.

8       Q    Now, in this arbitration process, the truth of the

9  matter is it's really the programmers that is at a

10  disadvantage, don't you think?

11      A    I don't think so.

12      Q    Well, one, it gives up its right -- it's

13  opportunity to threaten a blackout, right?

14      A    Yes.

15      Q    And, two, they've got this little nettlesome

16  problem called MFNs, don't they?

17      A    Some programmers do.  I'm not -- I don't know who

18  does and who doesn't.

19      Q    Well, you know they're pretty pervasive in the

20  industry.  You've been in the business for 30 years.  You

21  know they're out there, don't you?

22      A    I know they're out there and that I don't get

23  them.

24      Q    Well, that's a function of your size.

25           Well, you have -- you have MFNs, don't you?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2966

1      A     Not very many.

2      Q     And by the way, that's just a function of your

3  size, right?  I mean, volume discounts are a reality in this

4  marketplace, are they not?

5      A     They are.

6      Q     And that doesn't have diddly to do with this

7  merger, does it?

8      A     It does.  They're the largest distributor of video

9  programming and have the cheapest costs for programming in

10  the marketplace, DirecTV and AT&T U-verse group.

11      Q     And that's true today, to the best of your

12  knowledge?

13      A     Correct.

14      Q     Okay.  And the other piece of this is, you know

15  that -- and the point of that MFN is that if the programmer

16  bets wrong in this baseball-style arbitration, it could have

17  knock-on effects to its other distributors that you don't

18  have, right?

19      A     I'm not in the content business.  I'm not sure how

20  the mechanics of that would work.

21      Q     All right.

22            So however that might raise the stakes for a

23  programmer, you can't say, fair?

24      A     I can say I think it helps raise the stakes, but

25  I don't know by what degree.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2967

```
1        Q     And then I think the one other issue you raised,

2   maybe one of two more issues you raised, was the

3   arbitration, was this idea -- I think I heard this

4   correctly -- that the programmer should have to make its

5   offer first before you, the distributor, do.

6              Did I hear that correctly?

7        A     Yes.

8        Q     Now, that would be, to the best of your knowledge,

9   unprecedented in baseball arbitration, would it not?  You've

10  never seen anything like that before, have you?

11       A     Yeah.  I've seen the exact opposite, where I have

12  to make the first offer with no information today.

13       Q     But the programmer doesn't know about the terms of

14  that proffer.  They just both go to the arbitrator, right?

15       A     I'd have to go back and look at the mechanics of

16  the Comcast order, but --

17       Q     I want to make sure I heard you correctly.

18             What I heard you saying is you want to take a peek

19  at the programmer's offer before you make your offer.

20             Did I hear that correctly?

21       A     Yes.

22       Q     Well, have you ever played poker?

23       A     It's been long time, but I used to.

24       Q     Well, aren't you, in effect, saying, I don't want

25  to bet until I see your cards?  Isn't that what you're
```

1  saying?

2      A     What I'm saying is, is I think you get the most

3  honest and market-based outcome based on the programmer,

4  knowing that we have the information and knowing that they

5  have to go first, to your very point:  They are not going to

6  want to do something that busts an MFN or leaves them

7  vulnerable in whatever other way possible.

8           So our point of view is it's the most direct way

9  to that outcome.

10     Q     Well, what you have suggested is that you get to

11  look at the bid, the offer from the programmer before you

12  make yours.  That's what you suggested, right?

13     A     Uh-huh.

14     Q     And your chances of winning that baseball

15  arbitration go up, way up if you get to look at their cards

16  before you bet, true?  Isn't that right?

17     A     I don't think it is.

18     Q     How could it not be?

19     A     Because Turner knows what they're charging

20  everybody else.

21     Q     Yeah.  And they have no idea what others are

22  charging you, right?

23     A     True.

24     Q     Let me turn to a couple final subjects.

25           One is, you mentioned technology, and I want to be

1    clear about this.  RCN's ability to negotiate for technology

2    rights has been absolutely frustrated, has it not,

3    Mr. Holanda?  It has absolutely frustrated your ability to

4    innovate and provide customers with more of what they want,

5    your inability to negotiate those technology rights; isn't

6    that true?

7         A    No, I wouldn't characterize that as true.  There

8    is one area of technology rights that has been frustrating

9    to us, versus our competition, as it relates to the delivery

10   of our TV Everywhere service.

11             MR. WALTERS:  Well, I don't want to make a big

12   deal about this, but may I approach, Your Honor?

13             THE COURT:  Yes.

14   BY MR. WALTERS:

15        Q    We discussed this in your deposition, did we not?

16        A    Yes.

17        Q    Okay.  Let me just approach and ask you if you'll

18   look at it so we can get square on this.

19             If you'll look at page 141, line 12.

20             THE COURT:  What date?

21             MR. WALTERS:  I'm sorry, Your Honor?  Page?

22             THE COURT:  What date?

23             MR. WALTERS:  The date of this deposition is

24   February 15, 2018.

25             THE COURT:  141, what line?

```
 1              MR. WALTERS:  Page 141, line 12.

 2    BY MR. WALTERS:

 3       Q     And I asked you the question, "Have these -- these

 4    inabilities to negotiate these rights, these bargaining

 5    frictions, if you will, have they frustrated RCN's ability

 6    to innovate further in the marketplace and provide

 7    customers -- or consumers, excuse me, what you perceive you

 8    would like?"

 9              Do you see that?

10       A     Yes.

11       Q     And go to line 21, and your answer is what?

12       A     "Absolutely."

13       Q     And that was true then, right?

14       A     Right.

15              But go to line 5 on the same page.  And I thought

16    I had clarified prior to that question that in this example

17    that I'm thinking of, which is specifically to the

18    TV Everywhere innovation, the content owners told us it had

19    to do with controlling the viewership experience.  And so

20    they were not giving us the same technology rights as they

21    were giving some of our competitors.

22       Q     Sure.  TV Everywhere was an example of what we're

23    talking about, right?

24       A     Yes.

25       Q     And what happened there is it made TV Everywhere,
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    I think you described it as kludgy and difficult.

 2            Do you remember that?

 3        A    Yes.

 4        Q    And as a consequence of that, you at RCN believed

 5    that you were several years behind Comcast in providing

 6    these services to consumers as a consequence of them having

 7    access to that in their vertical integration.

 8            You recall that, don't you?

 9        A    Yes.

10        Q    And so not having these bargaining frictions has

11    allowed Comcast to innovate more effectively than you have

12    because of your inability to secure those rights.  That's

13    the conversation we were having, right?

14        A    As it related to TV Everywhere, that's correct.

15        Q    One last subject, HBO.

16            Now, you will sometimes use HBO, will you not, as

17    a promotional tool when HBO incentivizes RCN to do so by

18    offering economic incentives; is that right?

19        A    Yes.

20        Q    And I want to be clear about that.  Without these

21    economic incentives, RCN would not use HBO as a promotional

22    tool, correct?

23        A    Correct.

24        Q    And you've also used other premium services,

25    Showtime, Starz, as promotions tools, right?

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18   Page 2838 of 3826

2972

1          A     Yes.

2          Q     And you actually employ a wide array of

3     promotional devices.  It could be higher broadband speeds,

4     additional telephone lines, free equipment, video-on-demand

5     movies.  It's one of the tools in the toolbox, right?

6          A     Yes.

7          Q     And, in fact, the use of premium channels as a

8     promotional tool is not the most or the least important

9     promotional tool.  It's somewhere in the middle of the pack,

10    right?

11         A     Yes.

12         Q     So in that sense, it's just one tool.  And it

13    doesn't exercise tremendous clout and power over you.  It's

14    just in the middle of the pack, fair?

15         A     Fair.

16         Q     And HBO, to this day, has never refused to supply

17    you, RCN, or, to your knowledge, any distributor, with the

18    opportunity to use its product as a promotional tool, right?

19         A     Right.

20         Q     And, in fact, it would be antithetical to HBO's

21    entire business model, where it has a high churn rate and it

22    needs to keep pushing its product to gain subscribers.

23    You understand that's the way HBO works, don't you?

24         A     Well, I understand the churn and the push point.

25               From an overall business perspective, I'm not sure

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    I agree with what you just said.

 2         Q    All right.  But, in fact, today, HBO really has

 3    less influence with you than ever before because a consumer,

 4    if it really wants HBO, it can just pop on the app and go

 5    get HBO Now and head on down the road, right?

 6         A    Yes.

 7              MR. WALTERS:  That's all I have, Your Honor.

 8              Thank you.

 9              THE COURT:  All right.

10              I'll see counsel.

11              (Sealed bench conference)
```



1  █████████    ██████

2  █████████    ████████████████

3  █████████████████████████

4  ██████    ████████████████

5  ██████    ██████

6  ██████    ████████    ████████████

7  ██████

8           MR. WALTERS:  We're good.

9           MR. CONRATH:  So I should do --

10          THE COURT:  On redirect, you will; fragment it,

11  will you?

12          MR. CONRATH:  It might be 10, but it will be fast.

13          THE COURT:  Ten, we'll take a break; and when

14  you're done, do you have any recross?

15          MR. WALTERS:  Right now, no.

16          So let's see if you can keep that to 10 or less,

17  and he'll do recross, if any.

18          MR. CONRATH:  Uh-huh.

19          THE COURT:  And then we'll take the recess, and

20  we'll come back in Executive Session briefly, about,

21  hopefully, only 15 minutes, 20 minutes.  And then we'll get

22  rid of this fellow and we'll get to --

23          MR. WALTERS:  Mr. Christopher.

24          THE COURT:  Mr. Christopher.

25          MR. CONRATH:  All right.  I offer -- that sounds

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   fine to me, but I note that it's easier to get people out of

2   the courtroom than --

3           THE COURT:  That's why I'm going to be taking a

4   break.  We're going to be taking a break.

5           MR. CONRATH:  Okay.

6           THE COURT:  So it all ties into the break.  See,

7   it's brilliant.

8           MR. CONRATH:  I'll just give you what I was going

9   to say --

10          THE COURT:  You can do ten minutes.  You were

11  going to do less than ten; then we're going to take a break.

12          MR. CONRATH:  What I was going to say is, if you

13  did it before the break, you could let everybody go and then

14  people come back in during --

15          THE COURT:  No, no.

16          MR. CONRATH:  Okay.  I'm fine with that.

17  I just --

18          THE COURT:  Yeah.

19          (Open court)

20          THE COURT:  All right.  Redirect.

21                      REDIRECT EXAMINATION

22  BY MR. CONRATH:

23      Q    Mr. Holanda, a couple topics to cover things you

24  discussed about with Mr. Walters.

25          He asked you some questions about whether you had

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2976

```
 1    done empirical studies about the importance of Turner

 2    programming.  I think you told us you evaluate what of the

 3    time your viewers spend watching Turner programming, right?

 4        A    Correct.

 5        Q    Does that inform your opinion about how important

 6    Turner programming is to your viewers?

 7        A    It does.

 8        Q    To your customers?

 9        A    It does.

10        Q    And you have a concern about access to Turner

11    programming.  Is that because you're concerned that you

12    might lose some customers if you didn't have Turner

13    programming?

14        A    Yes.

15        Q    You don't know exactly how many?

16        A    We do not.

17        Q    You had some questions from Mr. Walters about the

18    people who leave RCN; a large proportion -- a substantial

19    proportion of them go to over-the-top or virtual MVPD

20    companies.

21             Do you remember that discussion?

22        A    Yes.

23        Q    Now, as on overbuilder, RCN is often -- one of the

24    main ways it offers service is in apartment or condo

25    buildings, multiunit buildings, right?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2977

```
 1        A     Correct.

 2        Q     As a result, does your customer base skew a little

 3   bit towards Millennials?

 4        A     It does.

 5        Q     You had a question about whether your

 6   profitability had plummeted.  I think you corrected the

 7   "plummeted" word.  But is video service still profitable for

 8   RCN?

 9        A     Yes.

10        Q     And you had some questions about discussions with

11   the DOJ involving various transactions.  I take it there's

12   nothing surprising to you that, if Department of Justice

13   lawyers are trying to learn about a transaction in a

14   marketplace, that they'd reach out and talk to people who

15   are actually in the marketplace?

16        A     And competitors of those doing the deals, yes.

17        Q     Now, you had some questions that went to the

18   broadcast basic issue and some questions about whether other

19   companies don't have penetration requirements.

20              Do you remember that series of questions?

21        A     Yes.

22        Q     Right.

23              So which are the stringent penetration

24   requirements that prevent you today from offering broadcast

25   basic?  From which company do they come?
```

1      A      Right now, they're entirely from Comcast-NBCU.

2      Q      And is that because the other companies in one way

3  or another don't count some things against broadcast basic

4  or otherwise give you opportunities to still be able to

5  offer broadcast basic without getting in the way of it?

6      A      I think that -- I'm trying to think of a way to

7  answer the question without divulging confidential

8  information about the structure of these agreements.

9            But, yes, even where there are penetration

10  requirements, none of the contracts today are prohibiting us

11  from selling more broadcast basic bundled with broadband,

12  other than a few select NBCU agreements.

13      Q      You had a question, some questions about the

14  specific conditions that you recommended to the Department

15  of Justice to be associated with this merger.

16            Do you remember that line of questions?

17      A      Yes.

18      Q      And, Mr. Walters asked you about the arbitration

19  recommendation that you made.  That was just one of five

20  conditions that you recommended, right?

21      A      That's correct.

22      Q      And what you recommended was a package, right?

23      A      That's correct.

24      Q      And the other issues that were covered were

25  included -- included obligations to make -- to provide

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  competing distributors access to key content at a fair

2  market value?

3      A    Yes.

4      Q    And there are other conditions that you weren't

5  recommending just the arbitration as a solution to

6  everything associated with this merger; is that right?

7      A    Correct.

8      Q    Then you had some questions about the exact terms

9  of the arbitration offer.

10         You remember that?

11     A    Yes.

12     Q    Now, the question that an arbitrator would have to

13  resolve would be, what's the value or what's the value of or

14  the fair market value of Turner programming to RCN, for

15  example, if there were an arbitration, right?

16     A    Yes.

17     Q    And which is more relevant to the price of -- or

18  the value of Turner programming to RCN, the value of Turner

19  programming to other distributors or the value of other

20  programming RCN?

21     A    I would think it's the value of Turner to the

22  almost thousand other distributors that are out there in the

23  United States.

24     Q    And that's the information that you don't have

25  access to before you have to put in your offer; is that

1    right?

2         A    Correct.

3         Q    And Mr. Walters asked you some questions about the

4    discovery rights under the arbitration offer.

5              Do you understand that?

6         A    Yes.

7         Q    The one that Turner has made.

8              And do you understand that those discovery rights

9    kick in only after you've made your offer?

10        A    No.  Clearly, when he brought them up, I wasn't --

11   I am not --

12        Q    You don't know one way or the other?

13        A    -- an expert on the detail of the discovery rights

14   contained within the Turner offer.  And I --

15        Q    You don't know.

16             But the discovery rights that come after you've

17   already put in your offer don't help you make an informed

18   offer, do they?

19        A    That may be why we didn't -- I don't remember them

20   as being in the offer.

21        Q    And, finally, you had some questions from

22   Mr. Walters about the TV Everywhere and the access to some

23   technology there.

24             Was a problem that you had there involving

25   Comcast?

1          A     Yes.

2                MR. CONRATH:  No further questions.

3                Renewing my request for closed session,

4    Your Honor.

5                THE COURT:  Recross limited to redirect?

6                MR. WALTERS:  No, sir, Your Honor.

7                THE COURT:  All right.

8                We're going to take the afternoon recess now.

9                You're a witness under oath in the case.  You're

10   not at liberty to discuss your testimony with anyone,

11   including the counsel in the case.

12               You know that?

13               THE WITNESS:  Okay.

14               THE COURT:  When we return, we'll be in Executive

15   Session briefly, for about approximately a half hour or so.

16   And we have a motion that we have to hear argument on anyway

17   outside the presence of the parties -- the public.

18               So I would say, for those of you in the viewing

19   audience, you should probably be -- the doors will be open

20   again at about, after the break and then another half hour

21   or so, so sometime around 5:00.

22               We'll be going until 6:00 today.  So sometime

23   between the quarter of 5:00 and 5:00, the doors will be

24   opening again.  And we'll be going until 6:00 today.

25               Stand in recess.  I'll see you in 15 minutes,

1    counsel.

2            (Recess from 3:51 p.m. to 4:19 p.m.)

3            (Closed session)





***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2984





WilliamPZaremba@gmail.com



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2987



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2988



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2989



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2990



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2991



\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

2992



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2993



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

2994





1

2

3

4

5

6

7

8

9

10

11

12

13          (Recess from 4:37 p.m. to 4:46 p.m.)

14          (Open court)

15          DEPUTY CLERK:  The United States District Court

16   for the District of Columbia is again in session, the

17   Honorable Richard J. Leon presiding.  God save the United

18   States and this Honorable Court.  Please be seated and come

19   to order.

20          THE COURT:  All right.  The government has rested.

21          And the defense is ready to call its next witness,

22   is it not?

23          MR. PETROCELLI:  We are, Your Honor.

24          The defendants call David Christopher.

25          THE COURT:  All right.

```
 1              He can come in and be sworn.

 2              DEPUTY CLERK:  Mr. Christopher, please raise your

 3    right hand.

 4              (Witness is placed under oath.)

 5              You may be seated, sir.

 6              MR. PETROCELLI:  May I proceed?

 7              THE COURT:  When you're ready.

 8              MR. PETROCELLI:  Thank you.

 9    DAVID CHRISTOPHER, WITNESS FOR THE DEFENDANTS, HAVING BEEN

10    DULY SWORN, TESTIFIED AS FOLLOWS:

11                         DIRECT EXAMINATION

12    BY MR. OPPENHEIMER:

13        Q    Mr. Christopher, would you state your name for the

14    record.

15        A    David Ames Christopher.

16        Q    All right.  So, Mr. Christopher, we're going to do

17    a bit of the lightning round this afternoon.  It's the end

18    of the day.  We're going to try to cover topics regarding

19    LTV pretty quickly here.

20              So let's start with:  By whom are you employed?

21        A    AT&T.

22        Q    And what's your title?

23        A    President, AT&T mobility and entertainment.

24        Q    And what are your responsibilities as president?

25        A    General responsibilities for revenue and
```

1   profitability for our consumer mobility, video, and

2   broadband businesses.

3        Q    How long have you had that responsibility?

4        A    Since August of 2017.

5        Q    And what did you do before that?

6        A    I was Chief Marketing Officer for largely the same

7   businesses.

8        Q    And what were your responsibilities in that

9   capacity?

10        A    Marketing responsibilities, advertising,

11   retention, acquisition.

12        Q    All right.  So we've talked a bit in this case

13   about lifetime subscriber values, what we've been calling

14   LTVs.  What would you tell us briefly, what are LTVs?

15        A    Sure.

16             LTVs capture the value of new subscribers.  It is

17   calculated simply by how long a new group of customers will

18   stay with us, times the margin we get from those customers,

19   minus the cost to acquire those customers.

20        Q    So I'll represent that Professor Shapiro, the

21   government's economist in this case, used second-quarter

22   2016 LTVs or lifetime values for his analysis.  Do you have

23   that in mind?

24        A    Yes.

25             MR. CARSON:  Objection, Your Honor.  May we

 1    approach?

 2              THE COURT:  You may.

 3              Sir, you'll have to step down and sit in that

 4    chair against the wall there.

 5              (Sealed bench conference)

 6              MR. CARSON:  Your Honor --

 7              THE COURT:  What's the issue?

 8              MR. CARSON:  -- the defendants have presented a

 9    demonstrative that they indicate they intend to use with

10    Mr. Christopher regarding lifetime value, which represents

11    what Dr. Shapiro and Dr. Carlton have relied on.  I think

12    it's improper to ask this fact witness about whether an

13    expert's reliance on data is valid or appropriate.

14              THE COURT:  I don't think that's what he's going

15    to ask him.

16              MR. OPPENHEIMER:  No.  That's --

17              THE COURT:  Is that what he's going to ask him?

18              MR. OPPENHEIMER:  No, that's not.  I'm going to

19    talk about LTVs.  I'm just setting a benchmark.  That's all

20    we're doing.  We're just setting the benchmark to 2016 LTVs,

21    and then we're going to move on and talk about LTVs.

22              MR. CARSON:  You just represented that the

23    government's expert, Professor Shapiro, relied on these 2016

24    numbers.

25              And then his chart says that Professor Carlton

1   relied on the 2017 numbers that he's going to discuss next.

2          So I'm just trying to indicate for Your Honor

3   that --

4          THE COURT:  I think you just wanted to come up

5   here and chat.  That's what I think.

6          MR. CARSON:  I was previewing the issue that we

7   have a specific issue with.  I think the data that they're

8   going to try to get into evidence through a demonstrative

9   with a fact witness about what an expert is saying or not.

10          THE COURT:  I'm not going to let him testify as to

11   what experts should say or shouldn't say, obviously.

12          MR. OPPENHEIMER:  We're not going there.

13          THE COURT:  Don't ask those kind of questions.

14          MR. CARSON:  Thank you, Your Honor.

15          THE COURT:  Under direction of the Court.

16          (Open court)

17          THE COURT:  Come on back up, sir.

18          You may continue, consistent with the discussion

19   at the bench.

20          MR. OPPENHEIMER:  Yes, Your Honor.

21   BY MR. OPPENHEIMER:

22     Q    So now, having mentioned the second-quarter 2016

23   LTVs, I want to ask you, are the second-quarter 2016 LTVs

24   the most recent LTVs?

25     A    No.

1      Q    Was your team asked to provide updated LTVs to

2   defendants' expert in this case, Professor Carlton?

3      A    Yes.

4      Q    And what did you do in response to that request?

5      A    We provided the latest LTVs, which were June of

6   2017, as well as the LTVs that we had for January and April

7   of the same year.

8      Q    All right.  So June 2017 was the most recent?

9      A    Yes.

10      Q    Now, was the information that you provided in that

11   update different from the 2016 LTV data Professor Shapiro

12   used?

13      A    Same information; just updated.

14      Q    Okay.  Now, I want to get clear on a couple of

15   facts today.

16           Did you or your team cherry-pick the June 2017 LTV

17   data provided to Professor Carlton so he would have a lower

18   LTV number in his analysis?

19      A    Absolutely not.  We provided the latest

20   information.

21      Q    Were you asked to pick among the lowest LTVs from

22   among options?

23      A    No.

24      Q    And to be clear, were the LTVs you provided in

25   both 2016 and 2017 prepared in the same manner as you

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    prepare them in the normal course of your business?

 2         A    Yes.

 3         Q    When did you provide the June 2017 LTV to the

 4    economist?

 5         A    In February of 2018.

 6         Q    All right.  Now, why was the June 2017, 2017 LTV,

 7    the most recent LTV in February of this year?  It seems like

 8    you'd have a more recent LTV.

 9         A    It takes about seven to nine months to generate

10    the LTVs.  We take a new incoming class of customers.  We

11    follow those customers for four bill cycles.  After that

12    team, we run our models.

13              We also, in that process, we match those customers

14    and compare them to millions of customers in our existing

15    base.  And that generates an LTV value that's then

16    quality -- it's then discussed amongst the team and

17    eventually goes to our finance team for approval.

18         Q    So you take a look at a group of folks that come

19    in in June of 2017, and you go through all of that analysis

20    over that period of time so that by February of this year,

21    you have an understanding of the subscriber value of that

22    group of people to you; is that right?

23         A    Yes.

24         Q    All right.  So as of today, are there any newer

25    LTVs?  As of today, sitting in this courtroom now, here in

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3002

1    April?

2        A    No, but we're getting close.

3        Q    Can you explain that to the Judge.

4        A    Sure.

5             We have -- the latest final LTVs are June.  We

6    have July --

7        Q    Excuse me for interrupting.  June 2017?

8        A    2017.

9             We have July of 2017 that we should be final with

10   this month.

11            We have August that we'd be final with next month,

12   in May.

13            And we have early data for September, and we

14   should be done with that in June of this year.

15       Q    All right.  It's a time-consuming process.

16            Were you deposed on Valentine's Day this year in

17   this case?

18       A    Yes.

19       Q    And were you asked questions by the government

20   during your deposition about LTVs?

21       A    Yes.

22       Q    And during the course of your answers to those

23   questions, did you provide the June 2017 video LTV to the

24   government during your deposition?

25       A    Yes.

1      Q    And we're not going to go into the amount of that

2    for confidentiality reasons for a minute, but we'll come

3    back to it.

4           So let's talk about how we're using LTVs in this

5    case.

6           In his work, Professor Shapiro used the average

7    LTV from the second quarter of 2016.

8           Professor Carlton used the updated 2017 LTVs.

9           MR. CARSON:  Objection, Your Honor.

10          MR. OPPENHEIMER:  Just asking for the difference.

11          THE COURT:  All right.  If that's all you're going

12   to ask.

13          MR. OPPENHEIMER:  That's all I'm going to ask.

14   BY MR. OPPENHEIMER:

15     Q    So without mentioning, for confidentiality

16   reasons, the specific values of the June 2016 LTV data and

17   the June 2017 LTV that you updated to, what is the amount of

18   the drop from the 2016 LTV value to the 2017 LTV value that

19   Professor Carlton used?

20     A    It's approximately 40 percent.

21     Q    Does that surprise you?

22     A    No.

23     Q    Why not?

24     A    Our traditional video business is under

25   significant transformation.  We are acquiring fewer

1    customers.  We are paying more to get those customers.  The

2    revenue that those new customers pay us is down.

3         Our content costs are going up.  We're paying more

4    to retain the customers that we do have to keep them.  And

5    even after-that, we are losing a large amount of customers.

6         In 2016, our traditional video business lost

7    133,000 customers.  In 2017, we lost 1.2 million.  So those

8    trends are significant pressure.  They pressure LTVs.  They

9    pressure general margins on the business.

10   Q    When you say "pressure LTVs," what impact do those

11   trends you've described have on the LTVs?

12   A    They pressure them downward.

13   Q    And that LTV is a measure of the value of new

14   customers in the video business to the company, correct?

15   A    Yes.

16   Q    This obviously sounds like a challenge.  Can you

17   describe for His Honor, what is the company doing?  What are

18   you doing to deal with this?

19   A    Sure.

20        Our job is to balance new customers, acquiring new

21   customers, keeping those customers, and profitability.

22        We're working on that every single day to improve

23   that equation.  That's a balancing act.  But that is the job

24   of the entire team.

25   Q    In attempting to deal with dropping LTV values

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    that you see, do you make investments in various efforts to

2    deal with that?  And if so, how do those affect the value of

3    the LTVs?

4         A    Sure.

5              We're constantly making investments, again, to

6    acquire customers or retain customers and improve

7    profitability.

8              If we launch a promotion, for example, to acquire

9    new customers, it pressures LTVs.  If we launch retention

10   efforts to keep customers, keeping them longer helps LTVs,

11   but the cost of doing that has a negative effect.

12             So it's a balancing act, but we're constantly

13   working on it.

14        Q    Have you prepared a chart to help describe the LTV

15   trend that you're discussing with us and to go through it

16   and to enable you to do so without having to disclose the

17   actual LTV values publicly?

18        A    Yes.

19             MR. OPPENHEIMER:  Your Honor, may I approach?

20             MR. CARSON:  May I approach, Your Honor?

21             THE COURT:  Yes.

22             (Sealed bench conference)

23             MR. CARSON:  So we object to this chart under

24   Federal Rule of Evidence 1006.  None of the documents that

25   underlie this chart are in evidence.  Some of them were

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    produced last week.

2              THE COURT:  They're not pieces of evidence.

3    They're a demonstrative.

4              MR. CARSON:  Right.

5              And what he's trying to use, I assume he's going

6    to identify all the numbers that are on the chart or

7    indicate for you which numbers were which.  And none of

8    these documents are in evidence.  They're of the eight

9    documents they identify that underlie this chart.

10             Mr. Christopher is only on two of them.  One of

11   them went to his lawyer on, I think, April 20th --

12   April 10th; he wasn't provided.

13             So the issue goes to the reliability of any of

14   these numbers.  And at least should any of these numbers be

15   referred to, all the documents that the defendants have

16   identified which go into this chart should be able to come

17   into evidence.

18             And I should be able to explore them with

19   Mr. Christopher because he's not on almost all of them.  He

20   didn't -- and there's no -- there's been no foundation laid

21   that, at least from many of these documents, that he

22   received them, that they were final and that they're a

23   collection of mails that he didn't receive.

24             THE COURT:  I thought we went through all these

25   numbers --

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. OPPENHEIMER:  We did, Your Honor.

2          THE COURT:  -- with the prior witness.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22          THE COURT:  I thought I already had a document

23     that laid all this out.

24          MR. OPPENHEIMER:  Well, you were shown a document

25     by the government that did have all of these numbers.  And

1    they were trying to make the point -- and if they're

2    withdrawing this argument, then we don't go there anymore,

3    then we can shorten this even more.

4            THE COURT:  The cherry-pick argument?

5            MR. OPPENHEIMER:  The cherry-pick argument.

6            So if they're not making a cherry-pick argument,

7    we can truncate some of this.  All Carlton is doing is using

8    the updated number, which we already have.

9            MR. CARSON:  Still making a cherry-picking

10   argument.

11           What I'd like to do --

12           MR. OPPENHEIMER:  Then I need to have the

13   cherries.

14           MR. CARSON:  To the extent he wants to show what

15   the cherries look like, the underlying documents should be

16   then fair game, even though he didn't receive any of them.

17   So all of the exhibits that have been identified, he wasn't

18   in receipt of, which we shouldn't be prevented from asking

19   him about all the documents that underlie those numbers,

20   which have been provided, and he's not on them.  So if I

21   show him what somebody on his staff provided to one of their

22   lawyers --

23           THE COURT:  Is there some reason to think these

24   are inaccurate?

25           MR. CARSON:  Some, yes, in the methodology of how

1    they changed.

2            But I can get into that on cross.  I just didn't

3    want to be limited to asking him about documents underlying

4    these numbers that are, that he has not seen or an email

5    he's not received.  There's no indication from the

6    PowerPoint slide that they do every month to underlie these

7    that he received it.  There's nothing on the face of the

8    document that they have identified that supports the

9    demonstrative.

10           I just wanted to be clear if he's going to rely on

11   this stuff, then it's fair game for us to go into the

12   documents that were used for this -- the creation of the

13   demonstrative.

14           MR. OPPENHEIMER:  And, Your Honor, we have no

15   objection to that.  I don't believe -- honestly, I don't

16   believe there is any impeachment on this.  But if the

17   government wants to impeach based on the documents we gave

18   them -- they asked for the underlying documents.  We gave

19   them to them.

20           If they want to try to impeach on the basis of

21   those documents, we have no objection.  I don't think it

22   will be a very successful enterprise, but we have no

23   objection.

24           THE COURT:  We're not putting them into evidence,

25   obviously.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. OPPENHEIMER:  No.  We just want to make sure,

 2    though, that Your Honor does have -- as long as people are

 3    tied down to these, I want to make sure --

 4              THE COURT:  I thought I had all these numbers from

 5    the earlier exhibit, but maybe I don't.

 6              MR. OPPENHEIMER:  Well, based on this

 7    demonstrative, you would have.

 8              MR. CARSON:  It was produced last week to us.  Per

 9    the Court's order, we went through it at his deposition on

10    LTVs this weekend, on Saturday.

11              MR. OPPENHEIMER:  And the -- and he's aware of all

12    these.  He's going to use this to complete his testimony,

13    which hopefully can be even faster than this bench

14    conference in some ways.

15              And then Your Honor will have them, and they can

16    ask whatever questions they want about this.

17              Obviously, we think clearly there's no

18    cherry-picking.  Clearly, we think there's a trend, and we

19    think it shows it.  And he can address that.

20              THE COURT:  You can question him.

21              MR. CARSON:  Thank you.

22              (Open court)

23              THE COURT:  All right.  You may proceed,

24    consistent with the discussion at the bench.

25
```

1    BY MR. OPPENHEIMER:

2        Q    So, Mr. Christopher, I've put before you what's

3    been marked for identification as DX0942, a chart.

4            And I'd asked you earlier if you prepared a chart

5    to help walk through the testimony you were giving today

6    about LTVs and their values and the trends.

7            Is this that chart?

8        A    Yes.

9        Q    All right.  So, again, we're going to use this to

10   avoid calling out these numbers in open court.

11           But to begin with, in looking at DX0942, are the

12   numbers in the column marked LTV actuals that go from

13   January 2017 down through September 2017, are those the

14   numbers of actual, and in the case starting with July

15   through September, draft LTVs as you know them from your

16   work?

17       A    Yes.

18       Q    And if you were to be asked to express the values

19   for each of those LTVs, those are the numbers you would give

20   in open court?

21       A    Yes.

22       Q    Now, let's walk through this chart fairly quickly.

23           Can you explain, generally, what this chart shows

24   and walk His Honor through the labels on the columns and

25   what those labels mean.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3012

```
 1        A      Sure.

 2               We take the first row --

 3               THE COURT:  Hold on a second.  Hold on a second.

 4               Did you take my copy?

 5               MR. OPPENHEIMER:  I may have Your Honor.  Here,

 6   let me give you another one.

 7               THE COURT:  Sharp practices.

 8               Keeping an eye on them.

 9               MR. OPPENHEIMER:  Now, I notice, Your Honor, that

10   the government has not asked whether I gave you back the

11   same chart we started with, but I can represent to you that

12   I did.

13               THE COURT:  It looks the same.

14               MR. CARSON:  May we approach, Your Honor?

15               THE COURT:  No.

16               It looks the same.

17               Back to the witness.

18               THE WITNESS:  Okay.

19               So if you take the first row, what that's saying

20   is the new customers that we, excuse me, acquired in January

21   of 2017, that analysis and that process I talked about,

22   that's roughly seven to nine months, that was done and that

23   was finalized in October of 2017.

24               THE COURT:  Right.

25               THE WITNESS:  The value that we consider finalized
```

1    of those LTVs is what's in the third column.

2            THE COURT:  Okay.

3            THE WITNESS:  The fourth column is a relatively

4    new process.

5    BY MR. OPPENHEIMER:

6        Q    Just for the record, that's identified as LTV

7    projections?

8        A    Correct.

9            The LTV projections in the fourth column is really

10   a new process that the team does, trying to pick the things

11   that we know are likely to happen; but we don't know what's

12   really going to happen until those seven to the nine months

13   after the fact.  So it's just the best guess of the team.

14           THE COURT:  Okay.

15   BY MR. OPPENHEIMER:

16       Q    And on that topic, comparing the LTV projections

17   to the LTV actuals, have you -- has your team had as much

18   experience with the LTVs projections as they have with the

19   LTV actuals?

20       A    No.  The LTV actuals is a very robust analytical

21   process.  Again, it takes seven to nine months to complete.

22   Again, very scientific.

23           The projections are as I described.

24       Q    All right.  And the LTV projections often change

25   over time for the same period?

1      A     Yes.  As we learn more, they change.  And as you

2   can see, the trend is -- the trend is similar, but they

3   change.

4      Q     So to illustrate for His Honor, if we look at LTV

5   projections, the last three in that far right-hand column,

6   for January 2018, do we see, in effect, three different

7   projections for three different months for 2018?

8      A     Yes, that's right.

9      Q     And they're all changing?

10      A     Correct.

11      Q     So walking through the column that pertains to the

12   June 2017 LTVs that Professor Carlton used, does this show

13   that they were finalized in February 2018; they are the

14   value that is listed under LTV actuals; and at or about the

15   same time, there was an associated projection that is listed

16   in the LTV projection column on the far right?

17      A     Yes.

18      Q     All right.  Now, would you explain to His Honor

19   the -- in the last three entries for the LTVs, the upcoming

20   LTVs, the one for July 2017, August 2017, and September

21   2017, it says "draft" in the date finalized.

22            Would you explain that to the Judge and what

23   status each of those is.

24      A     Sure.

25            Those are the ones I mentioned were getting close.

1          So the July one that's listed as July 2017, we

2   should be done with that analysis in April, this month.

3          The August one, we should be done next month, in

4   May.

5          And the September one, where we have early data,

6   we should complete that analysis in June.

7      Q    Now, again, I'm doing this so we don't read

8   numbers into the record.  But His Honor has them, and

9   they're available to him.

10          The LTV actuals, starting with January 2017 and

11   going through April 2017, June 2017, July 2017 -- pardon me.

12          Going from January 2017, April 2017, June 2017,

13   each, in each consecutive month, the LTV is going down;

14   is that correct?

15      A    Yes.

16      Q    And then in July 2017, there's a slight uptick

17   from June; is that correct?

18      A    Yes.

19      Q    And then in August 2017, a slight uptick from

20   July?

21      A    Yes.

22      Q    And in September, a slight downtick now again from

23   August; is that correct?

24      A    Yes.

25      Q    Would you explain to us how that relates to the

1    trend you were describing, the downward pressure on and

2    downward trend of LTVs.

3         A    Sure.

4              The downward trend is the same.

5              The month-to-month variability that we see could

6    be the result of promotions that we're doing, it could be

7    the result of retention spend that we have.

8              In the case of the fall, we do see some

9    seasonality with NFL Sunday ticket, where customers opt in

10   and buy that product.  And that affects the LTVs.  We see

11   that every fall, generally.

12        Q    Now, in terms of the trend you were describing, we

13   see some variability here, some variation.  Would you

14   describe for us how that variability and variation from

15   month to month affects your view of the overall trend of

16   LTVs and subscriber value in your business.

17        A    The overall trend is the same.  I look at -- I

18   consider these month to month or I look at the trend.  It

19   doesn't change my general opinion of what I spoke of

20   earlier.

21        Q    Which was a downward trend?

22        A    Which was a downward trend, correct.

23        Q    Would an apt analogy perhaps be to a downward

24   period in the stock market where you can see the stock

25   market going up and down but the overall trend is down?

1        A    That's a good analogy.

2        Q    If today, Mr. Christopher, you wanted to get the

3    best view of the value of a new subscriber to your company,

4    what would you look at?

5        A    I would look at the latest approved, and, in this

6    case, it would be June of 2017.

7        Q    LTV?

8        A    LTV, yes.

9             MR. OPPENHEIMER:  No further questions.

10            THE COURT:  Let me ask you this.

11            The number in the column LTV actuals for July '17,

12   August '17, and September '17, the first column, you say

13   these are draft numbers, right?

14            THE WITNESS:  Yes, they're draft -- they're

15   just -- the analysis has not completely run its course.

16            THE COURT:  So the numbers in those three columns,

17   in that same column but those three lines, those could all

18   be changing when this is finalized, right?

19            THE WITNESS:  They could.

20            In the case of July, '17 that, again, I expect to

21   be done this month, I really don't expect that to change.

22            THE COURT:  Not much, if at all?

23            THE WITNESS:  Correct.

24            THE COURT:  The other two might change more?

25            THE WITNESS:  They could, and that's why we follow

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3018

1   the process through and ultimately have finance review it.

2            THE COURT:  But those are still draft numbers, all

3   three of those, as of right now?

4            THE WITNESS:  They are draft.  July I would

5   consider -- again, I think we'll finish it this month.  The

6   other will follow the process.

7            THE COURT:  All right.

8            Cross-examination.

9                    CROSS-EXAMINATION

10  BY MR. CARSON:

11       Q    Good afternoon, Mr. Christopher.

12       A    Good afternoon.

13            MR. CARSON:  Oh, sorry.  Dylan Carson for the

14  United States, Your Honor.

15            May I proceed?

16            THE COURT:  You may.

17  BY MR. CARSON:

18       Q    Mr. Christopher, you joined AT&T in 2004, correct?

19       A    Yes.

20       Q    And you worked in the wireless business for about

21  12 years before you joined the entertainment group?

22       A    Yes.

23       Q    And you've worked in the video business for about

24  two years now?

25       A    Yes, although in -- for a period of about two

 1   years, in twenty -- I believe it was 2012 time frame, we had

 2   one consumer organization where we also had, I had a

 3   responsibility for U-verse product marketing.  And then

 4   eventually -- and then so for a period of time, I had that

 5   as well.

 6        Q    So in February of 2016, you became the chief

 7   marketing officer for the entertainment group?

 8        A    Yes.

 9        Q    And we met at your deposition a few days ago,

10   right?

11        A    Yes.

12        Q    Thank you for your time, sir.

13             Let's look at your chart here in front of you and

14   talk about lifetime value.

15             Lifetime value is a prediction into the future,

16   correct?

17        A    Yes.

18        Q    And within AT&T, you have a team of Ph.D. experts

19   who help you calculate lifetime value, true?

20        A    Yes.

21        Q    And those experts don't have a crystal ball, do

22   they?

23        A    No.

24        Q    They use sophisticated statistical models, right?

25        A    Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3020

1       Q     And they take lots and lots of data over many

2  months, and they plug it into their models, right.

3       A     Yes.

4       Q     And they've got over 100 models that they use to

5  try to calculate lifetime value, right?

6       A     There's one core lifetime value model, and there

7  other models that feed into that.

8       Q     And there's a lot of variables that go into the

9  lifetime value calculation, correct?

10       A     There are many variables.  The core principle is

11  as I described.

12       Q     And so I think you testified lifetime value

13  calculation is the expected life of a customer times the

14  profit margin that you want to use, minus the acquisition

15  costs; is that true?

16       A     Yes.

17       Q     And so expected life of a customer, that's called

18  survivorship, right?

19       A     Yes.

20       Q     And when your Ph.D. experts model survivorship,

21  they use data for a new cohort, a cohort of new customers

22  over multiple months, right?

23       A     They track -- I'd say it slightly differently.

24            They track actual bills for bill cycles.  Then

25  they run their models.  Then they -- and in that, they

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  compare it to other customers in our database looking for

2  customers that have similar traits.

3      Q    And so for that new cohort of customers, they take

4  multiple months of data, right?

5      A    Correct.

6      Q    And they compare that new cohort data to data for

7  existing customers, for established customers, over multiple

8  months, right?

9      A    Yes, they do.

10     Q    And your Ph.D. experts within AT&T, they use many,

11  many months to do that comparison and come up with LTV,

12  right?

13     A    Yes.  They take, again, actuals for four months;

14  then they run their models; then they do analysis.

15     Q    And by having many months of data, that allows a

16  more representative sample, true?

17     A    The reason we watch multiple months is -- the

18  reason why we watch multiple months is because within the

19  first several, first four months of a customer's life, they

20  could change their package; they could churn; they could add

21  a premium, drop a premium.  So we learn quite a bit that

22  then goes into the models.

23     Q    But that wasn't my question.

24         My question was, by using multiple months of data,

25  your Ph.D. experts can understand whether they have a more

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   representative sample, true?

2       A    By using multiple months of the same gross adds,

3   gross add group, we have a more-accurate view of what that

4   value is, is the way I would say it.

5       Q    And so according to the Ph.D. experts within AT&T,

6   using three months of data for a cohort analysis is better

7   than using one month, correct?

8       A    In the case of how the calculation works, which is

9   four months, using four months is better.

10      Q    And that's what you testified to this Saturday,

11  right?

12          Using three months is better than one month,

13  right?

14      A    No.  Those were -- that was a different question

15  from -- what I'm answering is, in the seven to nine months,

16  there are four months we track actual bills, actual usage.

17  And that is a very accurate way to start the process of the

18  modeling.

19      Q    You could explain -- and I know you're in a hurry

20  and you need to catch a plane.

21          THE COURT:  He's not acting like he's in a hurry.

22  BY MR. CARSON:

23      Q    So let me try to focus you again.

24          Did you not testify this weekend, according to the

25  experts within AT&T who do this analysis, using three months

```
 1    of data is better than using one month?  Wasn't that your

 2    testimony?

 3         A    No, not for this question.

 4              The way I understand your question, we're talking

 5    about the four months of how the -- tracking actual bills.

 6    That's the question I thought you were asking.

 7         Q    Sorry.  Maybe I wasn't clear.

 8              In trying to understand the survivorship, the

 9    prediction that the Ph.D. experts at AT&T make about how

10    long a customer will stay with the company, using three

11    months of data is better than using one month, correct?

12         A    For the sur -- for the survivorship model, which

13    was a different question, yes, we used three -- we used

14    three months of data.

15         Q    And that's better than one month, true?

16         A    It depends on what question you're asking.

17         Q    Maybe I can refresh your recollection and give you

18    your deposition transcript.

19              MR. CARSON:  May I approach, Your Honor?

20              THE COURT:  You may.

21              MR. CARSON:  May I approach, Your Honor?

22              THE COURT:  You may.

23              MR. OPPENHEIMER:  I'm sorry, Your Honor.  What

24    line?

25              MR. CARSON:  Page 28, lines 17 through 23.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  Which deposition?

 2              MR. CARSON:  This is the April 14th deposition,

 3   2018.

 4              THE WITNESS:  I'm sorry, what page?

 5   BY MR. CARSON:

 6     Q    Page 28, lines 17 through 23.

 7              THE COURT:  What page are you on?

 8              MR. CARSON:  Page 28 of the April 14th, 2018

 9   deposition, lines 17 through 23.

10              THE COURT:  April 14th or February 14th?

11              MR. CARSON:  I'm sorry.  April 14th.  Is it at the

12   end, Your Honor?  I'm sorry.

13              THE COURT:  All right.

14   BY MR. CONRATH:

15     Q    If you can read that to yourself, sir, and let me

16   know when you're there.

17     A    Yes, I see it.

18     Q    So you were asked, "So using three months is more

19   representative, because it can take away vagaries that might

20   apply to any one month in the sample; is that right?

21              And you answered, "I think using three months

22   is -- using three months is better than one month is what

23   the conclusion was."

24              MR. CARSON:  Your Honor, I move for admission of

25   this deposition as impeachment and for the truth of the
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   matter asserted.

2           THE COURT:  You've got to ask him the question

3   whether he remembers saying that and if it's true or not.

4           MR. CARSON:  Okay.

5   BY MR. CARSON:

6       Q    Did I -- were you asked that question, and did you

7   give that answer?

8       A    Yes.  Can I explain?

9       Q    You could explain with your counsel.  I just

10  wanted to clarify that.

11          MR. OPPENHEIMER:  Your Honor, for completeness, we

12  would have the request that he read on.

13          THE COURT:  Request what?

14          MR. OPPENHEIMER:  For completeness, Your Honor.

15          THE COURT:  Requested what?

16          MR. OPPENHEIMER:  Requested additional read of the

17  deposition.

18          THE COURT:  Well, you can do that on your

19  redirect.

20          All right.  So is that the testimony you gave?

21          THE WITNESS:  Yes.

22          THE COURT:  Now, is it true that you gave it?

23          THE WITNESS:  Yes.  We -- I understood you asking

24  a different question.  So for the survivorship model, it is

25  true.  I thought you were asking me about the overall LTV

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    model.

2              THE COURT:  Which is it, survivorship or overall

3    model?

4              MR. CARSON:  It was survivorship, but I thought I

5    made that clear.

6              THE COURT:  Survivorship?

7              THE WITNESS:  Yes.

8              THE COURT:  Okay.  Fine.

9    BY MR. CARSON:

10        Q     Thank you, Mr. Christopher.

11              You also get LTV information on a quarterly basis,

12    correct?

13        A     I get LTV information on a more regular basis, so

14    not just on a quarterly basis.

15        Q     Did you testify this weekend that often I see LTV

16    calculations on a quarterly basis?

17              Do you remember that?

18        A     I do often see it on a quarterly base.  I also get

19    information more regularly than just that.

20        Q     And you look at multiple months of LTVs to

21    determine the trend in LTVs, true?

22        A     To determine a trend?  Yes.

23        Q     And you want to know the trend in LTVs, because

24    LTVs can go up or down from month to month, based on a

25    number of factors, true?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        A    Yes.

 2        Q    All right.  Let's look at your chart.

 3             Now, these are 2017 LTVs, draft and final, right?

 4        A    Yes.

 5        Q    Now, you change your calculation -- or you change

 6   your methodology for calculating LTVs for 2017, true?

 7        A    We updated our ability to better take into account

 8   churn and bundling.  So it is an improvement in how we

 9   calculated it.

10        Q    So you changed your methodology of calculating LTV

11   from 2016 to 2017, correct?

12        A    No.  I wouldn't say it that way.

13             We've -- the overall methodology is the same.  The

14   inputs of how we capture churn and bundling has been

15   modified and improved.

16        Q    So you updated how you use inputs in your

17   methodology for calculating LTV, correct?

18        A    Yes; to better capture churn and to better capture

19   whether a customer is in bundles or not.

20        Q    Now, on your chart here, there's no LTV for

21   February, March, or May of 2017, right?

22        A    Correct.

23        Q    And so you don't have the whole trend in LTVs

24   through June of 2017, do you?

25        A    We are -- no.  I think I had the trend.
```

```
1              But those months you mentioned are not there.
2         Q    You don't have a single quarter of official
3    approved LTVs for 2017 on your chart, do you?
4         A    If you phrase it that way, no.
5         Q    You're not offering to this Court the whole
6    picture of what the LTVs were for 2017, are you?
7         A    No.  I disagree.  There's a trend, if you --
8    again, a trend, by definition, we have multiple points,
9    obviously.  We have January.  We have April.  We have June.
10        Q    And you chose not to provide LTVs for February,
11   March, and May, right?
12        A    No, that's not accurate.
13        Q    You're not offering those LTVs to the court, are
14   you?
15        A    No.  Those LTVs were not done.
16        Q    You don't have them, do you?
17        A    No, we don't have them.
18        Q    And so if you wanted to know the whole trend for
19   LTVs in 2017, you'd need those data points, right?
20        A    I think the trend would be similar, but we don't
21   have those data points.
22        Q    And LTVs can change dramatically from month to
23   month, but you don't have them all for 2017, do you?
24        A    We don't have all of them.  I think the trend is
25   the same.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q    So the LTVs for June of 2017, that's kind of an

2  outlier here, isn't it?

3    A    I don't believe it's an outlier when you look

4  at -- when you look at the entire trend here.

5    Q    And they're LTV actual column, June 2017 is by far

6  the lowest; isn't that true?

7    A    Yes.

8    Q    Now, you don't know if June 2017 is representative

9  of the rest of these 2017 cohorts, do you?

10   A    As I said, July, we are very close, I don't expect

11 that number to change.  I think it's very similar and

12 directional to June.

13   Q    Well, if you took an average of the official

14 approved LTVs for 2017, these top three, that's going to be

15 in the quadruple digits, right, four figures?

16   A    Yes, if you took an average.

17   Q    And so that's going to be higher than June, right?

18   A    Yes, it would be higher than June.

19   Q    And based on these draft numbers that you have for

20 July, August, September, LTVs are trending back up;

21 isn't that true?

22   A    They are trending up for July and August.  They

23 are back down in September.

24   Q    Now, if you have multiple months of LTVs, you

25 wouldn't just focus on one cohort and go tell your boss,

1   Mr. Donovan, that your entire business fell off a cliff

2   because you got one lower cohort, would you?

3       A    No.

4       Q    You wouldn't go to tell investors that AT&T's

5   video business was 40 percent less profitable because of one

6   month's lower cohort, would you?

7       A    No, but that's not what this measures.

8       Q    Well, isn't -- aren't LTVs a measure of

9   profitability?

10      A    They're a measure of new customer profitability.

11  They are not a measure of the entire company profitability.

12      Q    Because the entire company, which has video

13  customers who have been there for a long time, their

14  average, that's ACV, average customer value, is much higher,

15  true?

16      A    The ACV is higher.

17      Q    So -- and, in fact, AT&T's video profit margins

18  have not fallen 40 percent, have they?

19      A    No.  And that was never represented.

20           The LTVs have fallen 40 percent.

21      Q    You've never talked to defendants' expert,

22  Professor Carlton, to explain to him how profitability works

23  at AT&T, have you?

24      A    No.

25           MR. CARSON:  Your Honor, I've marked for

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 2897 of 3826

3031

 1  identification PX551.

 2         May I approach?

 3         THE COURT:  Take a look at it.

 4         Does counsel have it?

 5         Yeah, you better approach.

 6         MR. CARSON:  May I approach?

 7         (Sealed bench conference)

 8         THE COURT:  So what in God's name is that?

 9         MR. CARSON:  This is what are called fast facts.

10  It's a snapshot that we discussed with Mr. Christopher at

11  his deposition this week, which includes margin data,

12  profitability data that he testified to this weekend,

13  Your Honor.

14         THE COURT:  What are you going to do with this?

15         MR. CARSON:  Ask him two questions, I think, on

16  the one page about profit margin video.

17         THE COURT:  You're not admitting all this stuff.

18  This is a document.

19         MR. CARSON:  Why not?

20         THE COURT:  Because it's not even relevant to the

21  case.

22         MR. CARSON:  Sure, it is.

23         THE COURT:  It might be -- that's not even

24  relevant.

25         MR. CARSON:  Fair enough.  I can explain why,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1    Your Honor.

2              THE COURT:  This is not --

3              It might be two little factotums you got in there

4    that's relevant.  But I'm not letting -- this is a multi --

5    this is a double-sided, 40, 50 pages of numbers.

6              MR. CARSON:  Sure.

7              THE COURT:  I'm not letting that in.

8              MR. CARSON:  So can I get him to identify, then,

9    the specific profit margins on the second --

10   third-to-the-last page.  I think the Bates range is 435.

11             MR. OPPENHEIMER:  Wait.  435?

12             MR. CARSON:  Sorry.  No.  I apologize.  There's

13   that.

14             435.

15             And then, sorry, 398.  398 is the profit margins

16   of the video business.

17             MR. OPPENHEIMER:  So this goes way beyond the

18   scope.  I didn't elicit any testimony with respect to profit

19   margins.

20             THE COURT:  Yeah.  This is --

21             MR. OPPENHEIMER:  I talked about LTVs.

22             And I didn't get up earlier and object,

23   Your Honor, because I'm trying to just make this go

24   smoothly.  He was asked --

25             THE COURT:  You have 20 minutes; you're done,
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    right?

 2              MR. OPPENHEIMER:  He was asked questions about

 3    profit margins, suggesting that he had said there was a

 4    40 percent drop in profit margins.  He wasn't asked about

 5    it.  I didn't ask any questions about profit margins.

 6              THE COURT:  What are you doing?

 7              MR. CARSON:  It's cross, Your Honor.

 8              THE COURT:  It has to be within the scope of the

 9    direct examination.

10              MR. CARSON:  Fair enough.

11              THE COURT:  That's a fair --

12              MR. CARSON:  He said, "Our revenues are down.  Our

13    profit margins are down.  We're not acquiring customers."

14    I think he's opened the door to all of those subjects, which

15    I'd like to go in that what he's representing, the decline

16    of the video business, is not as he's representing.

17              THE COURT:  He's a witness on calculations of LTVs

18    and the collection of the data for the purpose of

19    Professor Shapiro to do his model, whatever.

20              MR. CARSON:  Right.

21              THE COURT:  That's what he's on as a witness.  If

22    you want to call him in a rebuttal case, call him.

23              MR. CARSON:  What I heard him testify to on direct

24    was, Margins are down, profits are down, we're having

25    difficulty --
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              THE COURT:  Well, that wasn't what he was trying
2    to say.
3              MR. CARSON:  I think he opens the door to talking
4    about the fallacy of all of that.
5              THE COURT:  I don't.
6              MR. CARSON:  Okay.  Fair enough.
7              THE COURT:  So really question him about the
8    things he came here to talk about.  Stay within the scope of
9    the direct examination.
10             MR. CARSON:  Thank you, Your Honor.
11             (Open court)
12             THE COURT:  What else have you got?
13   BY MR. CARSON:
14        Q    Mr. Christopher, let me ask you -- you can put
15   that aside, sir.
16             The lifetime value that you calculate, that's
17   based on a small cohort of subscribers, correct?
18        A    It's based on new subscribers that come in a given
19   month.
20        Q    And you get about, say, a couple hundred thousand
21   new subscribers every month?
22        A    We get about a million video gross adds in a
23   quarter, new customers in a quarter.
24        Q    So in a monthly cohort, there will be about a
25   third of that?
```

1        A      Roughly.

2        Q      And AT&T has approximately 25 million video

3   subscribers today?

4        A      Slightly lower than that.

5        Q      AT&T's had approximately 25 million video

6   subscribers for each of the last three years, correct?

7        A      No.  Last year, we lost a million two of those

8   subscribers.

9        Q      At the end of 2017, AT&T reported that it had over

10  25 million video subscribers, correct?

11       A      That included over the OTT product; it was not the

12  traditional business which I'm referring to.

13       Q      So all of the video subscribers that AT&T has, you

14  count those, right?

15       A      We do.

16              We do.  We were talking about -- the LTVs we're

17  talking about measures the health of the traditional video

18  business.

19       Q      And all of the subscribers that you have at AT&T

20  for video has stayed roughly flat for each of the last three

21  years, true?

22       A      If you count all lines of business, yes.

23              If you look at traditional, it's down.

24       Q      And if you count all lines of business, you have

25  roughly a little over 25 million subscribers today, true?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3036

1        A    Yes.

2        Q    Now, your counsel has told this Court that Google,

3   Facebook, Amazon, Hulu, and Netflix are running away with

4   the pay-TV industry; but all of those companies have not

5   stopped AT&T from making billions of dollars in the pay-TV

6   business, true?

7        A    True.

8             The amount we're making is less each year.

9             Let me -- the amount we're making is less in 2017.

10  And we expect that to -- the traditional business to go

11  down.

12       Q    Is the amount that you're making, the lifetime

13  value for new subscribers on bundled, multi-product service

14  subscribers increasing?

15       A    I've seen recent data -- no.  I've seen recent

16  data that shows the bundled customers are going down.

17       Q    Aren't bundled customers -- I'm sorry.

18            AT&T is gaining more subscribers today that have

19  what you call multi-product bundles, true?

20       A    Yes.

21       Q    And the LTVs for those multi-product bundles are

22  significantly higher than just video LTVs, true?

23       A    Yes.

24       Q    They can be up to ten times higher for a -- the

25  LTV can be ten times higher for a subscriber who has video

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3037

```
 1    bundled with wireless and broadband, true?

 2         A     Comparing to what?

 3         Q     Versus a video stand-alone customer, true?

 4         A     Yes, directionally.

 5         Q     And the LTV for a customer who has wireless and

 6    DirecTV video service can be several times higher than -- or

 7    several hundred times higher than the LTV for just a

 8    stand-alone video subscriber, correct?

 9         A     It can be higher.

10         Q     And higher by several hundred percent, correct?

11         A     It can be higher.  I'd have to go do the math.

12         Q     Going by your chart here, if LTVs are in the, say,

13    four-digit arrange, the -- an LTV for a wireless plus

14    DirecTV subscriber can be several thousand dollars more than

15    a stand-alone video subscriber, correct?

16              MR. OPPENHEIMER:  Your Honor, objection.

17              THE COURT:  Yeah.  We'll strike the question.

18              Rephrase it.

19    BY MR. CARSON:

20         Q     In general, multi-product households have higher

21    lifetime values, correct?

22         A     Yes.

23         Q     And AT&T has a strategy of building out its 5G

24    mobile broadband network, correct?

25         A     Yes.
```

1      Q      And with that strategy, you expect to have more

2  customers who have mobile broadband with video, correct?

3      A      Yes, that's our hope.

4      Q      And with that build-out of the 5G network and more

5  customers who have multi-product bundles, you expect the

6  LTVs for those multi-product customers to increase, true?

7      A      No, I don't know if I agree with that.

8             I don't know.

9      Q      Didn't you tell investors at a Barclay's

10  conference in December of 2017 that there's a flywheel

11  effect for LTVs.  As you gain more multi-product customers,

12  AT&T will get higher LTVs?

13      A      That's the strategy.  It doesn't always -- we

14  don't know the future LTVs.

15             It's higher than what?

16      Q      Now, churn is one of the important components that

17  goes into calculating these LTVs, true?

18      A      It's one component.

19      Q      Now, every month, a small percentage of AT&T's

20  video subscribers leave, true?

21      A      I don't think it's a small percentage.

22      Q      Well, what percent of AT&T's video subscribers

23  stay every month?  It's around 98 percent, right?

24      A      Yes, but -- yes, but 2 percent leave a month,

25  which means 25 percent leave in a year before you do

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    anything.

2        Q    And subscribership is -- has been flat for the

3    last three years, so you're replacing the customers that

4    leave with new customers, right?

5        A    No.

6             Subscribership has been down in our traditional

7    video business.

8        Q    But in your overall video business, you're

9    replacing subscribers with new ones, and subscribership is

10   flat, true?

11       A    For the traditional video business, no.

12            For --

13       Q    That was that was my question.

14            Overall, all your video subscribers -- you care

15   about all of your video subscribers, right?

16       A    Yes.

17       Q    And all of those video subscribers together, the

18   subscribership has been flat for AT&T, around 25 million,

19   for each of the last three years, right.  Roughly.

20            Now -- and this is despite the annual price

21   increases, a vast majority of customers stay with AT&T,

22   true?

23       A    No, not for the traditional video business.

24            So, again, we lost 1.2 million last year.

25       Q    And so 98 percent of your customers stay every

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3040

1    month, true?

2         A    It's the inverse of the 2 percent.  Yes.

3         Q    And in his opening statement, your counsel told

4    this Court, it's hard to cancel your pay-TV thing, because

5    it's a big pain and many people don't do it.  He was right,

6    right?

7         A    From the seat I sit in, no.

8              Again, roughly 5 -- think about it this way:

9    1.2 million left last year.  Roughly, 5 percent of the

10   traditional video base left last year.

11        Q    In the second half -- in the first half of 2017,

12   AT&T experienced an increase in churn, right?

13        A    Yes.

14        Q    And that's what's reflected on your chart with

15   these -- that was the big contributor to some of the

16   decline, at least for some of these months, in the first

17   half of 2017, right?

18        A    I don't agree with how you phrased that.

19             It's one contributor.

20        Q    Okay.  It was a factor.  You had some hurricanes,

21   some storm impact that increased your churn, right?

22        A    And we had competition that increased churn.

23        Q    And so you saw this churn, and you did something

24   about it.  You took action to lower churn, right?

25        A    We have spent roughly -- in the fourth quarter as

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3041

1    an example, we spent roughly 90 percent more on a

2    year-over-year basis.  We're spending heavily to try to

3    adjust churn.

4         Q    That wasn't my question.

5              In the second half of 2017, you took action to

6    lower churn, true?

7         A    Yes.

8         Q    And you created a churn task force, right?

9         A    Yes.

10        Q    And they have a motto, that drive to 1.5, right?

11        A    Yes.

12        Q    And 1.5 is the historical average of churn, the

13   monthly churn that AT&T has had, right?

14        A    It's the historical average from DirecTV years

15   ago.

16        Q    How about as recent as 2015?

17        A    Yes.

18        Q    And AT&T wants to do everything it can to keep

19   profitable DirecTV customers on satellite with retention

20   credits, right?

21        A    Within reason, we --

22        Q    And so you mentioned that you increased your

23   retention span to reduce that churn, right?

24        A    We did.

25        Q    And your efforts to reduce churn are working,

1  true?

2       A    They are reducing churn.

3            They're coming at a very large price to do so.

4       Q    And your, the entertainment group had, what, about

5  $50 billion in revenue last year?

6       A    Roughly.

7       Q    And the efforts to, the spending, you've -- strike

8  that.

9            You've historically used retention credits to

10 reduce churn, right?

11      A    It's one tool.

12      Q    And so when you see the LTVs coming back up in the

13 second half of 2017, that's a reflection of the reduced

14 churn that that credit spending has caused, true?

15      A    It is part of that.  But, again, churn is one, but

16 one measure in the LTV calculation.

17           THE COURT:  Let me see counsel.

18           (Sealed bench conference)

19           THE COURT:  I'm giving you a lot of leash.

20           MR. CARSON:  I appreciate it, Judge.

21           THE COURT:  And I'm now at the end of my patience.

22           MR. CARSON:  I've got five more minutes.  I was

23 hoping to explain how -- why these numbers are coming back

24 up and why this is the outlier.

25           I apologize.  It's getting there.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3043

```
 1            THE COURT:  I'll give you three minutes.

 2            MR. CARSON:  Okay.

 3            THE COURT:  You're spending way too much time on

 4     stuff that wasn't in the scope of direct exam.  He spent

 5     more time talking about churn now than he did the data, the

 6     LTV data in question.  You know, this is --

 7            MR. CARSON:  Fair enough.  And they're mostly

 8     linked, and I appreciate the Court's patience, Judge, and

 9     I'll try to make it fast.

10            THE COURT:  You get three minutes.

11            MR. CARSON:  Thank you, Your Honor.

12            (Open court)

13     BY MR. CARSON:

14        Q    Mr. Christopher, in November of 2017, your boss,

15     Mr. Donovan, went to the AT&T board to tell them that you

16     had been successful in your efforts to reduce churn, true?

17        A    I don't know that I was at that meeting.

18        Q    Well, did you help prepare slides for Mr. Donovan

19     as presentation to the board?

20        A    I'm sure my team helped prepare information for

21     him.

22        Q    And you had meetings with Mr. Donovan on AT&T's

23     efforts to reduce churn, correct?

24        A    Of course.

25        Q    Now, going back to your chart real quick, you've
```

 1    got one final for June 2017 in -- you got that in -- at

 2    11:00 p.m. the night before your deposition, right?

 3                MR. OPPENHEIMER:  Objection, Your Honor.  May we

 4    approach?

 5                THE COURT:  Yep.

 6                (Sealed bench conference)

 7                THE COURT:  What's the issue?

 8                MR. OPPENHEIMER:  Your Honor, this is truly not an

 9    appropriate line of questioning.  Let me explain why.

10                I think counsel is going to go to a transmittal

11    email that has 11:00 p.m. on it.  And what's important to

12    understand is that there's an agreement with the government

13    that's been outstanding since February of 2017 that

14    productions in this case are controlled so that all the time

15    zones in these emails are normalized Greenwich Mean Time.

16    He did not receive that document at 11:00 p.m.

17                Now, what's going on here is there's an attempt to

18    create the impression that somehow there's something strange

19    or fishy about these documents; they arrived late at night

20    before a deposition.  None of that is true.

21                They were sent from the West Coast offices in the

22    middle of the business day.  There's a five-hour time

23    difference involved here.  It's incredibly misleading to go

24    down this road.

25                MR. CARSON:  And I'm not trying to create that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   impression, Judge.  That was just an aside.  I was trying to

2   reference his recollection to the document we showed him at

3   the deposition.

4          But I'm not trying to get into the time period

5   that he sent it.  That's not the relevance.  I have like

6   three more questions about the LTVs on the chart.

7          THE COURT:  Well, just stick to the LTVs in the

8   chart, but don't stick --

9          MR. CARSON:  I'm just trying to refresh his

10  recollection on the one I was going to refer to.

11         THE COURT:  Just refresh his recollection.

12         (Open court)

13  BY MR. CARSON:

14     Q    Mr. Christopher, you got the June LTV number the

15  day before your deposition, right?

16     A    Yes.

17     Q    And that was on February 13th?

18     A    Yes.

19     Q    And then no final approved LTV since then, right?

20     A    Yes.

21     Q    So a month later, March 13th came; no final for

22  July?

23     A    No.

24     Q    And then April 13th came and still no final for

25  July?

1       A    No.

2       Q    So you've got no new final LTVs in the two months

3  since you received the June LTV, right?

4       A    Correct.

5       Q    And did you rush those June numbers to get them in

6  time for your deposition?

7       A    No.

8            MR. CARSON:  That's all I have, Your Honor.

9            THE COURT:  Okay.  One minute.

10           MR. OPPENHEIMER:  One minute, Your Honor.

11                   REDIRECT EXAMINATION

12  BY MR. OPPENHEIMER:

13      Q    Mr. Christopher, why are there some months missing

14  from this collection?  Quickly explain to the Court why

15  that's the case.

16      A    Sure.

17           We have an LTV team that relocated from Atlanta to

18  L.A.  There were some transition in personnel.

19           We also had some management changes where I was in

20  a new role; I had a new boss.  We had new executives.  We

21  frankly got behind.

22      Q    I want to be really clear about this.

23           As president of the company, was anything done out

24  of the normal course of business with respect to the LTVs

25  that are being calculated up to this present time in any

1   way, shape, or form related to this litigation or impacted

2   by this litigation?

3        A    Absolutely not.

4        Q    All right.

5             There were discussions about driving down churn.

6   You explained that can increase costs.  I just want to be

7   really clear here.

8             When that happens, when you have to make

9   investments to keep folks -- to avoid churn and that sort of

10  thing, does it have an effect on the LTV?  And what is that

11  effect?

12       A    Sure.

13            If you're spending more to reduce churn, it

14  impacts -- so the fact that customers stay longer helps the

15  LTV.  The fact that you're spending more on a consistent

16  basis hurts the LTV.

17            But churn is only one part of -- one part of the

18  LTV.  We're spending heavily on acquisition.

19            Last year, our -- the new customers that came to

20  us, not only did we lose 1.2 million; the new customers that

21  we acquired was down double digits.

22            We're spending heavily to compete.  That is also

23  impacting these LTVs, in addition to the spending on churn.

24       Q    And you were asked a couple of questions about

25  would it be better to have three of this or two of that.

```
 1    Let me just cut to the chase.

 2            If you wanted to understand the value of a new

 3    customer today to the company, would it be better to look at

 4    some average of LTVs or the most recent LTV?

 5        A    If I were looking at what is the value of new

 6    customers, I would use the latest approved LTV.

 7        Q    Is that partly because that single LTV contains a

 8    lot of data that's been used to arrive at that figure?

 9        A    Absolutely.

10            MR. OPPENHEIMER:  No further questions,

11    Your Honor.

12            THE COURT:  All right.

13            You're excused.

14            Let me see counsel.

15            (Sealed bench conference)

16            MR. CARSON:  All right.

17            Oh, sorry, Mr. Conrath.

18            THE COURT:  Oh, my God Almighty, what are we

19    doing?

20            MR. CONRATH:  Sorry.

21            THE COURT:  All right.  Stankey is not first,

22    Bewkes is first.

23            MR. PETROCELLI:  Bewkes next.

24            THE COURT:  That's an hour, you think?

25            MR. PETROCELLI:  I think an hour.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3049

```
 1              THE COURT:  Who's doing Bewkes?

 2              MR. PETROCELLI:  I'm doing all the witnesses.

 3              THE COURT:  Okay.

 4              So one hour.

 5              MR. PETROCELLI:  One and change.

 6              Stankey, an hour and a half, Stephenson about an

 7    hour.  Those are rough numbers.

 8              THE COURT:  All right.  So that's the order,

 9    though?

10              MR. PETROCELLI:  Yep.

11              MR. CONRATH:  Bewkes -- I want to make sure we got

12    it right.  Bewkes, Stankey, Stephenson on Thursday.

13              MR. PETROCELLI:  Bewkes and Stankey in that order

14    tomorrow, and Stephenson first thing Thursday morning.

15              THE COURT:  So realistically, start Stephenson

16    tomorrow?

17              MR. CONRATH:  I don't know.

18              MR. PETROCELLI:  I would hope not, Your Honor.

19    He's the chairman and CEO.  I kind of slotted him in for

20    Thursday morning.

21              THE COURT:  Okay.  That's fine.

22              MR. PETROCELLI:  If we finish --

23              THE COURT:  I doubt we're going to waste time.

24    There's not going to be much free time.  My car isn't

25    working again.  Maybe, you know --
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3050

```
1              MR. WELSH:  It's a durable good, remember,

2      Your Honor.

3              THE COURT:  I learned that today.

4              MR. PETROCELLI:  You learned that today.

5              That's what I learned too.

6              MR. CONRATH:  So how durable it is?

7              THE COURT:  The problem is it's the tires.

8              MR. PETROCELLI:  Tires that are not so durable.

9              MR. CONRATH:  Consumables, I think, is the

10     opposite of durable.

11             MR. PETROCELLI:  Yeah.  And then we have --

12             THE COURT:  All right.  So we've got three.

13             Now, what's your deal with Thursday?  We're not

14     going to take all day on Stephenson?

15             MR. PETROCELLI:  No.  Stephenson is half a day,

16     yeah, less than that, basically.

17             MR. CONRATH:  So we'll put on Mr. Quintero, who's

18     an expert on efficiencies.  Then I think we'll complete the

19     day with Stephenson.

20             And I understand we're not --

21             THE COURT:  Hold on now.

22             MR. CONRATH:  Sure.

23             THE COURT:  Who's after Stephenson?

24             MR. CONRATH:  Quintero, Q-u-i-n-t-e-r-o.

25             THE COURT:  What's he do?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3051

```
1              MR. CONRATH:  He's an efficiencies expert,

2    Your Honor.

3              THE COURT:  Oh, he's an expert witness?

4              MR. CONRATH:  Yes.

5              MR. PETROCELLI:  I do want to say one thing,

6    Your Honor.  We are not calling an efficiency expert.  He

7    was a rebuttal to our efficiency expert who we're not

8    calling.

9              THE COURT:  Okay.

10             MR. CONRATH:  He's the rebuttal to the

11   efficiencies arguments that we're hearing, which I expect we

12   have been hearing and expect to hear more from the witnesses

13   yet to come.

14             THE COURT:  How long will he do on direct?

15             MR. CONRATH:  So I think an hour, an hour to an

16   hour and 15.

17             THE COURT:  What do you think?

18             MR. PETROCELLI:  I would say an hour on cross.

19             THE COURT:  An hour?

20             MR. PETROCELLI:  Yeah.

21             THE COURT:  So that should take care of Thursday.

22             MR. CONRATH:  I think so, yes.

23             MR. PETROCELLI:  Who do you have on Monday?

24             MR. CONRATH:  On Monday would be an expert,

25   Professor Athey, A-t-h-e-y.
```

1              THE COURT:  A-t-h-e-y, Professor Athey?

2              MR. CONRATH:  Right.

3              THE COURT:  What's he testifying about?

4              MR. CONRATH:  She is an advertising and economics.

5              THE COURT:  Advertising.

6              MR. CONRATH:  Advertising.

7              She's related to the CMG's claims.

8              THE COURT:  Okay.  Advertising economics.

9    Professor Athey.

10             MR. CONRATH:  Right.

11             THE COURT:  So she's been deposed, obviously?

12             MR. CONRATH:  Yes.

13             THE COURT:  She's did a report?

14             MR. CONRATH:  Right.

15             THE COURT:  What's your guesstimate on direct?

16             MR. CONRATH:  An hour, testing my knowledge, an

17   hour to an hour and a half.

18             MR. PETROCELLI:  Hour on cross.

19             THE COURT:  What else you got on Monday?

20             MR. CONRATH:  So we've got a couple of other

21   prospective rebuttal experts, rebuttal witnesses that we're

22   thinking about that we may or may not call them.  They're

23   iffy.

24             THE COURT:  But they'll be available.

25             MR. CONRATH:  Either available or we'll have made

1    the decision not to call them.

2         THE COURT:  Okay.

3         MR. CONRATH:  But we'll have somebody to follow

4    Professor Athey.  I'm not sure which.

5         THE COURT:  I just don't want to be in a situation

6    where some of these -- you know, in L.A., we can't get them

7    here, something like that.

8         MR. CONRATH:  We understand that we'll be able to

9    start with Professor Athey on Monday, first thing.  And

10   we'll fill up whatever time is needed.  We know the Court is

11   gone at 1:00 on Tuesday.

12        MR. PETROCELLI:  I will need, then, notification

13   of who you're calling after Athey.  You might not call

14   anyone?

15        MR. CONRATH:  No.  We don't know --

16        THE COURT:  We're going to close court at 1:00 on

17   Tuesday --

18        MR. CONRATH:  Yes.

19        THE COURT:  -- because I have to get to the train

20   station.

21        MR. CONRATH:  That's what I meant to say if I

22   didn't say it.

23        So we understand that.

24        THE COURT:  Good.

25        All right.  We could probably, in that period of

1   time, get a couple witnesses in if we had to.

2          MR. CONRATH:  Right.

3          I think it's extremely likely we'll be closing our

4   rebuttal case and ending a half-day early.

5          THE COURT:  The possibility -- I've got to read

6   whatever they submit.  We could go with the argument end of

7   the day Thursday or first thing Monday.

8          MR. CONRATH:  We can do it either way.

9          MR. PETROCELLI:  I'm in no hurry.

10          MR. CONRATH:  We can do it at the end of the day

11   Thursday.  I might even have recruited someone to argue,

12   following Your Honor's suggestion.

13          THE COURT:  Well, it's just a suggestion.

14   I'm just thinking out loud; that's all.

15          MR. CONRATH:  I know.  We don't have six of the

16   best law firms in the country, but we do have some

17   resources.

18          THE COURT:  You have a very great law firm that

19   you're working with.  It's just not a for-profit

20   organization.

21          MR. CONRATH:  No, it certainly is not.

22          THE COURT:  It has a storied history.

23          MR. PETROCELLI:  Have a good evening, Judge.

24   I hope your car gets fixed, your tires.

25          THE COURT:  The tires.  These cars have these air

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3055

```
 1   pressure censors, and they -- all of a sudden you're driving

 2   and the light comes on.  You don't know if that means -- you

 3   don't know how low it is.

 4          MR. CONRATH:  Is it a half a pound low or is it 30

 5   pounds low?

 6          MR. PETROCELLI:  I can't stand that.

 7          THE COURT:  But then you don't know which tire it

 8   is either.  So you have to go into a gas station, and they

 9   have to check all four tires.  And it turns out there were a

10   couple of them that were a little low, but not -- and then

11   now going downstairs later tonight, I'm going to wonder what

12   I'm going to find.

13          MR. CONRATH:  I hope it's good.  I've that happen.

14          THE COURT:  That's crazy.

15          MR. PETROCELLI:  Too much technology, Your Honor.

16          MR. CONRATH:  The old days you didn't notice it

17   until you could see that it was flat.  That's the way it was

18   when I was young.

19          THE COURT:  All right.

20          MR. PETROCELLI:  Good evening.

21          THE COURT:  Good evening.

22          (Open court)

23          THE COURT:  All right.  10:30 tomorrow morning.

24          Stand in recess.

25          DEPUTY CLERK:  All rise.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3056



1          This Honorable Court stands adjourned.

2          (Proceedings concluded at 6:02 p.m.)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

C E R T I F I C A T E

       I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: April 17, 2018_____    /S/__William P. Zaremba_____

                              William P. Zaremba, RMR, CRR

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,            )      CV No. 17-2511
                                   )
                                   )      Washington, D.C.
         vs.                        )      April 18, 2018
                                   )      10:40 a.m.
AT&T, INC., ET AL.,                 )
                                   )      Morning Session
              Defendants.           )
_____)      Day 16
```

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                             Eric D. Welsh
                             Donald G. Kempf, Jr.
                             Claude F. Scott
                             Richard Cameron Gower
                             Sarah L. Oldfield
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Washington, D.C. 20530
                             (202) 532-4560
                             craig.conrath@usdoj.gov
                             eric.welsh@usdoj.gov
                             donald.kempf@usdoj.gov
                             claude.scott@usdoj.gov
                             richard.gower@usdoj.gov
                             sarah.oldfield@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:                          Katrina M. Robson
                                        O'MELVENY & MYERS LLP
                                        1625 Eye Street, NW
                                        Washington, D.C. 20006
                                        (202) 220-5052
                                        krobson@omm.com

                                        Daniel M. Petrocelli
                                        M. Randall Oppenheimer
                                        O'MELVENY & MYERS LLP
                                        1999 Avenue of the Stars
                                        8th Floor
                                        Los Angeles, CA 90067
                                        (310) 553-6700
                                        dpetrocelli@omm.com
                                        roppenheimer@omm.com

                                        Michael L. Raiff
                                        Robert C. Walters,
                                        GIBSON, DUNN & CRUTCHER LLP
                                        2100 McKinney Avenue
                                        Suite 1100
                                        Dallas, TX 75201
                                        (214) 698-3350
                                        mraiff@gibsondunn.com
                                        rwalters@gibsondunn.com


For Defendant
Time Warner, Inc.:                      Kevin J. Orsini
                                        Peter T. Barbur
                                        CRAVATH, SWAINE & MOORE LLP
                                        Worldwide Plaza
                                        825 Eighth Avenue
                                        New York, NY 10019
                                        (212) 474-1140
                                        korsini@cravath.com
                                        pbarbur@cravath.com

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

– – –

WITNESS INDEX

– – –

WITNESSES            DIRECT CROSS REDIRECT RECROSS

DEFENDANT'S:

JEFF BEWKES          3067


– – –

INDEX OF EXHIBITS

– – –

DEFENDANT'S                  IDENTIFIED   ADMITTED

DX746A – One Page from DX746              3091

```
 1                  P R O C E E D I N G S

 2           DEPUTY CLERK:  All rise.  The United States

 3   District Court for the District of Columbia is now in

 4   session, the Honorable Richard J. Leon presiding.  God save

 5   the United States and this Honorable Court.  Please be

 6   seated and come to order.

 7           Your Honor, this morning we have Civil Action

 8   No. 17-2511, the United States of America v. AT&T, Inc.,

 9   et al.

10           Will counsel for the parties please approach the

11   lectern and identify yourself for the record.

12           MR. SCOTT:  Your Honor, Claude Scott on behalf of

13   the United States.

14           THE COURT:  Welcome back.

15           MR. SCOTT:  Thank you, sir.

16           MR. GOWER:  Cameron Gower on behalf of the United

17   states.

18           THE COURT:  What's your name?

19           MR. GOWER:  Cameron Gower, G-o-w-e-r.

20           THE COURT:  Gower?

21           MR. GOWER:  Yes.

22           THE COURT:  All right.

23           MR. WELSH:  Good morning, Your Honor.  Eric Welsh

24   for the United States.

25           THE COURT:  Welcome back.
```

```
 1              MR. WELSH:  Thank you.

 2              MR. CONRATH:  Good morning, Your Honor.

 3   Craig Conrath for the United States.

 4              THE COURT:  Welcome back.

 5              MR. CONRATH:  Thank you.

 6              MS. OLDFIELD:  Good morning.  Sarah Oldfield for

 7   the United States.

 8              THE COURT:  Welcome.

 9              MR. KEMPF:  Good morning, Your Honor.  Don Kempf

10   for the United States.

11              THE COURT:  Welcome back.

12              MR. PETROCELLI:  Good morning, Your Honor.

13   Daniel Petrocelli for defendants.

14              THE COURT:  Welcome back.

15              MS. ROBSON:  Good morning, Your Honor.

16   Katrina Robson for defendants.

17              THE COURT:  Welcome back.

18              MR. OPPENHEIMER:  Good morning, Your Honor.  Randy

19   Oppenheimer for the defendants.

20              THE COURT:  Welcome back.

21              MR. WALTERS:  Good morning, Your Honor.

22   Rob Walters here for AT&T and DirecTV.

23              THE COURT:  Welcome back.

24              MR. BARBUR:  Good morning, Your Honor.

25   Peter Barbur for Time Warner.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3064

```
 1            THE COURT:  Welcome back.

 2            MR. ORSINI:  Good morning, Your Honor.

 3   Kevin Orsini for Time Warner.

 4            THE COURT:  Welcome back.

 5            MR. ORSINI:  Thank you.

 6            MR. RAIFF:  Good morning, Your Honor.  Mike Raiff

 7   for AT&T and DirecTV.

 8            THE COURT:  Welcome back.

 9            I'll see counsel.

10            (Sealed bench conference)

11            THE COURT:  All right.  It looked like you had

12   something you wanted to announce.  No?

13            MR. PETROCELLI:  No, but --

14            THE COURT:  Or ask about or something?

15            MR. PETROCELLI:  How'd your tires work out

16   yesterday?

17            THE COURT:  No problem today.  It's great.  So I'm

18   proceeding on an expert assumption that it just needed air

19   and there isn't a slow leak.  The lights haven't come back

20   on.

21            MR. PETROCELLI:  No.  We're ready to roll, Judge.

22            THE COURT:  So I'm stating the obvious here.  This

23   is day 18, guys.

24            MR. PETROCELLI:  Starting out with Jeff Bewkes

25   from Time Warner.
```

```
 1              THE COURT:  This is day 18.  Today's the 18th.

 2              MR. PETROCELLI:  It is the 18th, yes.

 3              MR. CONRATH:  It is the 18th, yes.

 4              THE COURT:  So I'm stating the obvious here, but I

 5    figure it's probably smarter to caution you all.

 6    I don't want the direct or the cross of this witness, the

 7    next three witnesses, to in any way focus on or slide into

 8    political machinations and discussions.  I don't want to

 9    hear about, you know, we think this President is against

10    this.  This isn't relevant; it's got nothing to do with this

11    case.  I think --

12              MR. PETROCELLI:  We certainly have no intention of

13    getting into it.

14              THE COURT:  Good.

15              MR. CONRATH:  Nor do we, Your Honor.

16              THE COURT:  That's good.  I certainly expected

17    that that would be your attitude, but obviously I wasn't

18    part of any witness preparations or cross-exam preparations.

19    And so I will -- if the witness, for whatever reason, starts

20    going into that, he's going to get cut off.

21              MR. PETROCELLI:  Yeah.

22              THE COURT:  If you don't cut him off, I'm going to

23    cut him off.

24              And it will be embarrassing, but it's the way it's

25    going to be.
```

1          MR. PETROCELLI:  Yeah.

2          THE COURT:  We're not getting into those kind of

3    discussions.

4          MR. PETROCELLI:  I am certainly going nowhere near

5    those discussions.  One never knows what a witness might

6    say.

7          THE COURT:  That's right.

8          MR. PETROCELLI:  Yeah.

9          THE COURT:  Obviously, some of these witnesses are

10    very strongheaded.

11          MR. CONRATH:  Some have strong fieldings on these

12    topics that they've expressed many times.

13          MR. PETROCELLI:  Is it all right if I, before the

14    witness takes to stand, to tell him not to go there, not

15    that he has any intention of going there, but just to be

16    extra, extra careful?

17          THE COURT:  If you're sufficiently comfortable

18    that he's not some -- first of all, you're not going to be

19    putting him in that thing.  If you're sufficiently

20    comfortable --

21          MR. PETROCELLI:  No.

22          THE COURT:  I think we're probably fine.

23          MR. PETROCELLI:  Okay.

24          THE COURT:  You have to go out and get him.

25          MR. PETROCELLI:  I'll go get him.

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18   Page 2933 of 3826

3067

```
 1                    THE COURT:  You have to get him.

 2                    (Open court)

 3                    MR. PETROCELLI:  Your Honor, may we proceed?

 4                    THE COURT:  You may.

 5                    MR. PETROCELLI:  The defendants call Jeff Bewkes.

 6                    THE COURT:  All right.

 7                    DEPUTY CLERK:  Sir, please raise your right hand.

 8                    (Witness is placed under oath.)

 9                    DEPUTY CLERK:  Please be seated.

10     JEFF BEWKES, WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY

11     SWORN, TESTIFIED AS FOLLOWS:

12                         DIRECT EXAMINATION

13     BY MR. PETROCELLI:

14          Q    Good morning, Mr. Bewkes.

15          A    Good morning, Mr. Petrocelli.

16          Q    Please state your name for the record.

17          A    Jeffrey Lawrence Bewkes.

18          Q    What's your title, Mr. Bewkes?

19          A    Chairman and chief executive of Time Warner.

20          Q    How long have you been chairman and chief

21     executive?

22          A    A little over ten years.

23          Q    And how long have you been with Time Warner?

24          A    39 years.

25          Q    So let's turn the clock back a little.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3068

```
1              When and where did you start?

2       A     I started at HBO, a division of Time Warner, back

3  in 1979.

4       Q     And before we move forward to your current

5  responsibilities, how many years were you with HBO?

6       A     23 years.

7       Q     Until approximately when?

8       A     2002.

9       Q     So let's focus a little bit on those years.  And,

10 perhaps, you can tell His Honor what you did during those

11 years.

12      A     Okay.

13             For the first five years or so, I was in the sales

14 and marketing area.  And these were the early days of cable

15 TV being built.  And we were mostly at HBO engaged in trying

16 to get cable systems to put in satellite dishes so they

17 could receive HBO and offer it to subscribers in the town.

18             And the second part of that is, it was very

19 important to us to get them to not just carry the channel

20 but to get as many people in town to watch it or subscribe

21 to it as we could.

22             So we were mostly doing that.  And there were a

23 number of jobs, roughly, related to that.

24      Q     And what did you do after spending some time in

25 sales and marketing?
```

1      A      About five years later, maybe three or four, I

2   moved into the financial area.  And I spent seven years,

3   mostly in finance, as -- doing VP of budgeting, and then

4   Chief Financial Officer from '86 to '91.

5      Q      And then what?

6      A      And then from '91 to 2002, I moved to Chief

7   Operating Officer for all the business lines of HBO, and

8   that started in '91.  And '95, I became the Chief Executive

9   of HBO, and that lasted until 2002.

10     Q      And then in 2002, you went to Time Warner

11  corporate?

12     A      Yes.

13     Q      Before we get to Time Warner corporate, you know,

14  we've heard a lot in the trial about HBO.  But, perhaps, you

15  can spend a few minutes describing to His Honor what HBO is

16  and how it works.

17     A      Okay, yeah.

18            Well, it started, we were having mostly uncut

19  movies because back in those days, you couldn't watch a

20  movie in your home unless you -- well, you couldn't, unless

21  you waited a few years and it was on CBS.  And then there

22  commercials, and maybe they would cut scenes.

23            So HBO had uncut movies earlier than anywhere

24  else.  And over time, we added original programming,

25  television series, like Sopranos and now Game of Thrones is

1    a pretty noticeable one.  And we have a lot of other kinds

2    of programming on HBO.

3              But the -- how did it work, the key thing about it

4    was there was no advertising.  There's never been.  There

5    isn't now, any advertising on HBO.  So in order to pay for

6    the programming, we had to get people to subscribe to it,

7    the more, the better.  And that's how we paid for what we

8    were doing.

9              The other important thing, very different from

10   what the networks, CBS and the broadcasters were doing in

11   those days, is we had to go through a cable system on a

12   wholesale basis, to get them to carry the network and then

13   get them to offer it vigorously to the homes in their cable

14   system.

15             And there was quite lot of difference between how

16   well one cable operator did that versus another.  That was

17   very important to us.  So that's basically how it worked.

18             And over those years, HBO was getting more and

19   more distribution on cable systems because they were being

20   built across the country.

21   Q    How do you get these distributors to take your

22   product and convince subscribers to buy it?

23   A    Well, you -- well, they had to put in -- they had

24   to make investments to carry the channel.  And then we had

25   to try to motivate them in our affiliate deals that the more

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  subscribers they would get, the better their earnings would

2  be, the better their relationship with us would be.  The

3  more they got, usually it helped their pricing.  So our

4  wholesale prices would go down if they had more subscriber

5  penetration.

6       Q     What are the key drivers for HBO?

7       A     Well, the first one -- there are two really.

8             You have to have -- we need to be on every

9  platform there is.  So it started with our own cable

10 operators that could do this.  Over that decade, the '80s,

11 the satellite companies got into the business.  So we tried

12 to get HBO on the satellite companies.

13      Q     That would be whom?

14      A     That would be Verizon, AT&T, other TelCo, if they

15 could carry video.

16            I'm sorry.  What was I doing, the satellites?

17      Q     Who were the satellite companies?  Yeah.

18      A     I was talking about satellite.

19            Telephone came later.  I'm sorry.  I got it out of

20 order.

21            The satellite companies were DirecTV and Dish

22 company.

23            And I already -- then the next thing that happened

24 was these TelCo.

25      Q     Okay.  And I interrupted you, but you were talking

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   about the key drivers.

2        A    Yes.  The key drivers were, we needed to get our

3   channel, HBO, into the -- carried in the cable ecosystem and

4   then, look, if they sold -- if they didn't sell anybody an

5   HBO subscription in their cable system, we didn't get -- we

6   had no revenue.

7            So we had both goals:  get it in, get it on every

8   distribution platform, and try to get as many people

9   subscribing to it as we could.

10       Q    And why is broad distribution and, for that

11  matter, maximum marketing, important?

12       A    Well, the first reason is to pay for the

13  programming.  And the more people that are signed up, the

14  more we can spread the cost and keep the prices down,

15  because there's always a tension that if you have a higher

16  price, you're going to have fewer subscribers or buyers.

17           There's a fairly important related reason, which

18  is, in those early days, we were buying movies and reselling

19  them; and we knew, as time went on, that we needed to add

20  original programming.  But the question was:  How do we get

21  good-quality original programming when we had a pretty small

22  budget in those days?  And how do we attract talent?

23           So the more we were distributed, the more we could

24  have press articles written about us, the more able we were

25  to attract talent to our programming service.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q    Is that what is known as a virtuous cycle?

2      A    Absolutely, yes.  Yes, it is, because the more

3    subscribers we have, therefore, the more revenue.  And the

4    more people in the country are talking about it, the more

5    the press will write about it.  That attracts the talent

6    that wants to have their show on HBO, and that gives us

7    better shows and, therefore, more subscribers.  So it works

8    like that.

9      Q    And is HBO in every pay-TV household bundle?

10     A    When you say, "every" -- most households that

11   subscribe to a subscription TV bundle, they have to do it on

12   top, in the old days, of a basic cable network model.

13   They -- most of them, the great majority have HBO.

14     Q    Is it considered an add-on?

15     A    It is an add-on.

16     Q    So you don't get it as part of the basic; you have

17   to pay extra?

18     A    Yes.  That's why the marketing is so important.

19     Q    And can you say what percentage of pay-TV

20   households actually subscribe to HBO?

21     A    Yes.

22          I think the national average is in the 30, low

23   30 percent range.

24          There are some affiliates that have 40 percent of

25   their subscribers paying for an add-on premium like HBO.

1           There are some distributors that we have HBO

2    offered through that are down at 15 percent.  That's a very

3    significant difference between a good -- a well-performing

4    distributor and a poorly performing distributor.

5           Q    So HBO is heavily dependent on distributors?

6           A    Heavily dependent, yes.

7           Q    Now, let's move past HBO to your years in

8    corporate.  Can you take us through the chronology there.

9           A    Yes.

10          So I went up to Time Warner in 2002.  And for

11   three to four years, I was a -- with another man, Don Logan,

12   we were both sharing really the Chief Operating Officer job.

13   So we were running the many businesses of Time Warner.  At

14   that time, there were about ten of them.

15          Q    What were the ten businesses of Time Warner at

16   that time?

17          A    Okay.  They were -- let's start with the ones we

18   still have.

19          So they were Warner Brothers studio; HBO; the

20   Turner network room; the Time Warner Cable distributor

21   company, the Time Warner Music companies, which was a group;

22   the Time Warner -- sorry.

23          The Time, Inc., publishing company.  That's time

24   magazine, et cetera.  AOL.  Time Life books.  Three sports

25   teams:  The Atlanta Braves, the Atlanta Hawks, and the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3075

```
1    Atlanta Thrashers.

2            I'm trying to remember.  I apologize if I --

3        Q    New Line?

4        A    New Line Cinema, which was another cinema company.

5        Q    Okay.  And over the years, those got spun off or

6    sold?

7        A    Well, many of them did, but we did -- we spun

8    off -- well, let me do it in chronological order.

9            So we sold the music companies, the sports teams,

10   and the book, Time Life books company between 2002 and '5 or

11   '6, I think.

12           We spun off, separated from the company, the

13   Time Warner Cable, AOL, and the Time, Inc., publishing

14   company, where we got our name, in later -- in two

15   thousand -- after 2008.

16       Q    And that leaves the three that you have now:  HBO,

17   Turner, and Warner Brothers?

18       A    That's right.

19       Q    And can you explain to the Court what the

20   difference is between a sale and a spin-off.

21       A    Yes.

22           A sale, you sell the company to some other

23   company, usually.  They pay you money, cash.  And then you

24   pay tax on it if there's a gain at the corporate level.

25   That's what we did with the books, the sports teams, and the
```

 1  music companies.

 2          When you spin a company -- and remember, your

 3  shareholders own it as part of Time Warner.  They still own

 4  it after you spin it.  You just separate it and say, if you

 5  used to own AOL as part of Time Warner's share of stock,

 6  we're now going to give you a share of the AOL company.  So

 7  now you own the same percentage of that.  It's just a

 8  separate security.

 9          So in case investors want to own more of

10  Time Warner and less of AOL, then they can sell their share,

11  whichever half, which is the main reason for doing spins,

12  because you have different shareholder bases that are

13  natural for these industries because of the fortunes or

14  futures of these industries differ as time goes on.

15      Q    And was Time Warner Cable at one point spun out?

16      A    Yes, it was.  It was spun out in -- well, we

17  decided it in late 2007, announced it -- we decided it

18  inside the company with the Board in early 2008.  And we

19  spun if off -- I believe it went effective in 2009.  So that

20  when that that was over, our shareholders still could own

21  it.  It was just a question of whether they wanted to have

22  more or less of whichever side.

23      Q    Prior to the time that Time Warner Cable was spun

24  out, how many years, approximately, was Time Warner Cable

25  vertically integrated with the Turner networks?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3077

1        A    15 years.

2        Q    And what years were those, approximately?

3        A    1990 -- this is -- can you ask again.

4        Q    Turner.

5        A    Turner and Time Warner Cable?

6        Q    Yes.

7        A    1995 to 2009.  So 15 -- 14, 15 years.

8        Q    And I'm going to go come back later on to the

9   period of time when Turner and Time Warner Cable were

10  vertically integrated, so just hold that thought for a bit,

11  okay?

12            So then when you moved up to corporate now in

13  2002, you oversaw some of the businesses that you indicated,

14  including the Turner networks; is that right?

15       A    Yes.

16       Q    And can you describe to the Court, at a high

17  level, the nature of Turner's business.

18       A    Okay.  The Turner network company had a group of

19  networks that are -- the kind of programming they had was

20  news, children's and family programming, general

21  entertainment, and sports, mostly in the general

22  entertainment networks.

23            So that's what the programming was, but unlike HBO

24  and, but very much like every other basic cable kind of

25  network, because there are two different kinds of cable.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3078

1        The Turner network's revenue comes over time,

2   roughly half of it, although that moves around -- so the

3   Turner -- I'm not.  I'm sorry.  I'll speed it up.

4        The Turner networks revenue comes from

5   subscriptions and from advertising.  And so different than

6   HBO, which only subscriptions.  But the related thing about

7   that that's, again, different from HBO or premium, it's not

8   an add-on in most places.

9        So you don't have to decide, as a consumer

10  household, whether to subscribe to the Turner networks.

11  They come, hopefully, as part of the general offering, when

12  it started, 20 channels, 30 channels.  Now it's 100 channels

13  in the big ones.

14       And so it goes into every home, as do most of its

15  competitor networks, like the ones owned by our other media

16  company, competition.

17  Q    What are the key drivers of the Turner business?

18  A    Well, the Turner business, first, we need to get

19  it on every distribution platform so that we can have

20  subscriber fees and advertising revenues.

21       And, really, the second thing is we have to have

22  good ratings and effective advertising sales, because you

23  can have ratings; but if nobody wants to buy an ad in front

24  of who's watching the show, you have a problem.  So we need

25  both.

1    Q    So like HBO, is broad distribution paramount to

2    Turner's business?

3    A    Yes.

4    Q    Now, finish out your bio a bit.  You're in

5    corporate starting in 2002.  You've got responsibility for

6    Turner and some of the other units.  At some point, did you

7    become COO, Chief Operating Officer?

8    A    Yes.  That, I became COO in 2006.  That went for

9    two years, and then I became chief executive in 2008.

10   Q    And it was during that time that you made these

11   decisions to either sell off or spin out the other

12   businesses, leaving you with the three that you now have?

13   A    Yes.

14   Q    So since the time, let's say, of the spin-off of

15   Time Warner Cable in 2008 and '9 and moving more into the

16   current years, how has the world changed in your business?

17   A    Well, there have been many, many changes.

18        The two big tectonic changes have been that

19   there's been a huge technological change, the Internet,

20   really, that allowed giant new competitors to come into the

21   business with us and go direct to the consumer with

22   television programming.  So the first one is, there's

23   television program being offered directly to consumers.

24        The second is that sometimes those same companies,

25   sometimes some other new entrants, you can now have digital

1    advertising.  And that's different than the old television

2    advertising, and it competes with us.

3         Q    So you described these two changes, I think, as

4    tectonic?

5         A    Yes.

6         Q    And I'd like to talk about each of them for a bit,

7    okay?

8              So could you first explain a little bit more by

9    how streaming of television over the Internet directly to

10   consumers has changed things so much?

11        A    Well, this is a big change, because when you're

12   streaming television over the Internet to someone's house,

13   you can do a lot of things a bit differently or better than

14   if you're putting it through a set-top box.

15             And basically what it allows is those companies

16   that are streaming the TV directly to you, they don't go

17   through a wholesaler.  They have a direct pipe to you.  They

18   have a direct connection with the consumer.

19             So they know who the consumer is.  They know what

20   the consumer is watching.  They know -- they know the

21   contact information.  They know billing -- they have billing

22   relation -- they have all kinds of relationships with the

23   consumers, beyond just providing, in many cases, the

24   television.

25             So they can offer more effective choices.  Or

1   whatever choices they do have on their TV channels, they can

2   tell you about the programming and recommend it to you based

3   on when you may have watched, because they know all that.

4           So they can sell you a better package.  It's not

5   just signing up the subscriber; it's also -- there's a fair

6   amount of churn at the end of the month; people disconnect

7   and you need to replace them.

8           They know how to re-market you if you've

9   interrupted or signed off on your subscription.  So they've

10  got a lot of advantages because of what that technology

11  affords, and they have these big data platforms that let

12  them do it.

13      Q    Now, you have been using the word "they."  Who are

14  "they"?

15      A    Well, in the case of direct-to-consumer video,

16  television delivery, that would be Amazon, Netflix, Google

17  YouTube.

18      Q    Are those companies vertically integrated?

19      A    Yes, they are.

20      Q    They have a direct relationship with the consumer?

21      A    Yes.  They have the content, the programming, and

22  they have the technological capability of delivering it

23  straight to you.  And they can communicate with you about

24  that relationship and what to watch and how to value the

25  program.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q    So is that good for the consumer?

2      A    Yes, it is good for the consumer.

3      Q    Why?

4      A    Well, it gives them more choices of what they may

5    want.  It gives them a much better viewing experience,

6    because they know, oh, I didn't know that was on this

7    channel, because they'll tell you that.

8           And, you know, it also offers, which they do, many

9    different price points.  So depending what you want to pay

10   or what kind of channels you like, you can pick different

11   bundles or you can decide what you can afford.

12          So it's quite a bit more flexible than what our

13   wholesale business -- we try to keep up with that, but it's

14   a bit advanced.

15     Q    So to that point, has this been good for

16   Time Warner?

17     A    Well, yes, because it allows -- we've -- well, it

18   allows us -- if we can get on these packages, it allows us

19   to get our channels to new places where consumers are.

20          It wouldn't be good if we could not.

21     Q    But since you're historically always a wholesaler,

22   have you had the capability or the assets or the information

23   to go direct to the consumer?

24     A    No.

25     Q    Why don't you do it?

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 2949 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3083

1       A    Well, we tried, but -- we tried -- let's take HBO.

2  It's the best example.

3            A few years ago, we -- because HBO had been on

4  cable, satellite, TelCo, et cetera.  And we have these new

5  Internet distributors.  We try to sell HBO directly to

6  consumers over the Internet.

7            When we did that, because we turned it on in 2015,

8  we didn't have the technological capability to actually

9  deliver the HBO signal right through to your house, so we

10  had to contract with a third party to do that.

11           The other thing we needed to do that was we

12  couldn't market to the consumers very effectively.  So we

13  made really wholesale deals with Apple and -- first, with

14  Apple and then later with Amazon.  And we're trying to make

15  them with anybody who will make them with us to get them to

16  market our HBO subscriptions themselves, because they've all

17  got hundreds of millions of consumer relationships.

18       Q    Does Time Warner have billing systems?

19       A    No.  There's the part -- we don't have billing

20  systems.  We don't have retail stores.  We don't have retail

21  outlets.  We don't have customer service people, where you

22  can call them on the phone and complain about your bill or

23  say, I didn't watch that channel.

24           We don't have that.  And that's a very big

25  infrastructure question, and it's a very expensive

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3084

1   proposition.

2       Q     Do you have server farms?

3       A     We don't have server farms.

4       Q     What kind of information and data do you have

5   about consumers?

6       A     Well, basically, in relation to subscriptions --

7   not advertising.  Subscriptions.

8       Q     Subscriptions.

9       A     There's a difference there.

10      Q     Right.

11      A     What information we have about people when we're

12  trying to sell them subscription is we don't know who they

13  are; we don't know what their name is.

14            And in a given cable system, let's say the average

15  is 30 percent of the people in the cable system have

16  subscribed to HBO.  We don't know which 30 percent it is.

17  We can't talk to them.

18            And so we don't know any of that; whereas, our new

19  competitors do know that.

20      Q     Do you have their emails or their contact

21  information?

22      A     We do not have their e-mails, their contact

23  information, their billing information, financial

24  information.  We don't have any of it.

25            We have a little bit of survey data like what

1    Nielsen does with samples that tells us whether x-million

2    people are watching Game of Thrones.  We don't know which

3    people are watching.

4         Q    And do I understand you to be explaining that all

5    these things you don't have to go direct to the consumer,

6    the vertically integrated companies like Netflix and Amazon

7    do have?

8         A    Yes, they do.  They not only have all that

9    information about what they're doing with our programming;

10   they know what they're doing -- what that consumer is

11   watching.  If it isn't ours, they know what they're buying;

12   they know probably how much money they have.  They know all

13   sorts of things.  We don't.

14            And they know, most importantly, who it is.  So if

15   they want to renew their subscription, they can send you a

16   communication and tell you, this is great; you should renew

17   the subscription.

18        Q    Okay.  Now, you mentioned a second tectonic shift,

19   moving past direct-to-consumer and subscriptions.  And can

20   you explain what has happened in recent years to the Court

21   in that regard.

22        A    Okay.  The second one is advertising.

23            So there's been a massive change in advertising.

24            It's related to the first one, because it comes

25   out of the capabilities of Internet, two-way capability.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              And what the change is, it's complicated.  I'll
 2    try to -- so --
 3              THE COURT:  We get a lot of that around here.
 4    Don't let that bother you.
 5              THE WITNESS:  It's hard.  It's hard to keep it --
 6              MR. PETROCELLI:  Yesterday, we learned what a
 7    durable good was, Your Honor.
 8              THE COURT:  There you go.
 9              THE WITNESS:  So television advertising is pretty
10    much the same as it was 25 years ago.  And what I mean by
11    that is that when you're watching some television channel,
12    let's say the Turner channels, and an advertisement comes
13    on, everybody watching the channel is going to see that
14    advertisement.
15        Q    Like a Chevy ad, for example?
16        A    Yeah.  Let's say we sell an ad to Chevy, I hope,
17    to sell a car.  So everybody sees that.
18              Now, there's a little tweak to it because there
19    may -- well, by and large, that's the problem.
20              So we have that.
21              And, therefore --
22        Q    What's the problem with everybody seeing a Chevy
23    ad?
24        A    Well, there's a lot of problems with it, and
25    I think everybody sitting here knows it.
```

1          You're watching a bunch of ads.  There are too

2   many of them.  And you don't -- you're not interested in any

3   of the things that the ad is for.

4          Now, the advertiser doesn't like that either,

5   because why would they pay to send -- put an ad in front of

6   a thousand people, where they themselves know that only

7   2 percent of them are interested in buying a car?  They

8   don't want to pay for all those people.

9          But the TV ad business has been, you get as many

10  people as you can to watch the channel so they watch the ad;

11  and then you sell the ad to the advertisers, hoping they

12  want to pay for all these people that are watching the ad.

13         Now, the problem is increasingly, they do not want

14  to put the ad there, because they know they're showing it to

15  people that aren't interested in it.

16         And if they go over to the digital advertising

17  platforms of Google and Facebook, to name the two leaders,

18  they can sell a Chevy ad just to people that are trying now

19  to buy a car.

20     Q    They know that?

21     A    They know that, from all the data that they have.

22         And they can give them also a different ad than

23  anybody else sees.  They just don't -- they don't just know

24  whether they want to buy a car.  They know lot about these

25  people, how much money they may have.  They know all kinds

 1   of things that help them sell ads against the television

 2   business.

 3            So the problem there is that advertisers are

 4   moving there ad budgets, which are finite, to the digital

 5   platforms at Google and Facebook.  They're moving it away

 6   from television advertising in general.

 7       Q    And how is that affecting your business?

 8       A    Well, if -- we don't have ads on HBO, so that's

 9   about the Turner networks.

10            It was, for many years, that roughly half the

11   revenue came from the advertising and half from

12   subscription.  That's how we paid for the programming.

13            What that does is it takes the ad revenue away

14   from the Turner networks, so it no longer can support half

15   the revenue.  It's now less.

16            And that puts -- it either means our earnings

17   start going down or that it puts pressure on consumer

18   subscription prices, because that's the only two places

19   where we can figure out how to -- if we're short on

20   advertising revenue, we've got to try to get other revenue

21   to cover it.

22            And this is all happening at the same time that

23   these same companies are bleeding away our viewers, because

24   they're offering competitive video that has these

25   advantages, because they know what to put in front of you

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3089

1  individually, and we don't.

2      Q    So it's kind of a double whammy?

3      A    It is a double whammy that is a significant one.

4  And it's not just bad for our company.  It's really bad for

5  all television companies supported by advertising.

6          But what that means is it's actually bad for

7  consumers, because it means that the financial support for

8  all this programming on all these different channels gets

9  pushed over toward subscription prices.  And that's a

10  problem, because we think consumers are up to here with

11  subscription prices.

12     Q    Well, Google and Facebook, those are the two

13  dominant ones on the advertising digital side?

14     A    Yes.

15     Q    And they're vertically integrated?

16     A    Yes.

17     Q    And why don't you do what they're doing?

18  Do you have the same kind of information?  Does Turner have

19  that kind of information?

20     A    That's a problem, because all this money that's

21  moving in advertising and, increasingly in subscriptions,

22  over to these companies, there are just two of them.  So

23  that's -- I think we need competition for that.

24          The advertisers need it.  It's good for consumers

25  if we have it.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          But the reason we can't do it is we don't have the

2   tech platforms; we don't have engineers; we don't have any

3   of the information to know who is this person.  What ad

4   would they like to see?  We can't do any of that.  It's very

5   difficult.  We've been trying to do it, but it's hard to do

6   it at the speed and scale that our new competitors are doing

7   it.

8          MR. PETROCELLI:  Your Honor, may I approach?

9          THE COURT:  You may.

10          MR. PETROCELLI:  Your Honor, I've handed the Clerk

11   and Mr. Bewkes what I've marked as Defense Exhibit 746A.

12          Defense Exhibit 746 is a company document, a

13   Time Warner document dated June 16, 2016, entitled "TV

14   Industry Trends and Strategy."

15          There's no objection to this document, but it's a

16   lengthy document, and I only want to address the witness to

17   one page.  And so that's the page that I've put in front of

18   the witness and would ask Your Honor to receive in evidence.

19          Again, there's no objection to it.

20          THE COURT:  This larger document has already been

21   admitted?

22          MR. PETROCELLI:  No, but I have not, but I can, if

23   you'd like.  I don't think it's necessary.

24          THE COURT:  Oh, okay.

25          MR. PETROCELLI:  Okay.

```
1              THE COURT:  So you just want to do this one page?

2              MR. PETROCELLI:  This one page, right.

3              THE COURT:  All right.  Any objection?

4              MR. SCOTT:  No objection, Your Honor.

5              THE COURT:  All right.  It will be admitted.

6              MR. PETROCELLI:  Thank you.

7              THE COURT:  It's not under seal, though, right?

8              MR. PETROCELLI:  No, Your Honor.

9              THE COURT:  No.  Okay.

10                              (Defendants' Exhibit DX746A
                                 received into evidence.)
11   BY MR. PETROCELLI:

12      Q    So can you -- you have it in front of you,

13   Mr. Bewkes?

14      A    Yes, I do.

15      Q    I think it's best if you just describe this to

16   His Honor.

17      A    Okay.

18      Q    Just describe the document, the chart, what it

19   depicts.

20      A    Okay, Your Honor.

21           If you'll look on the left side of this, say from

22   2000 to 2007 or '8, what you see is how this all started,

23   where we were the, we're the top line, television.  And our

24   advertising going into all the different television

25   networks -- this is the cable networks, the part that comes
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3092

1  from advertising.  It's the broadcast networks -- that shows

2  that 27 percent of the national advertising was there in the

3  television business.  And we were part of that, and it's a

4  pretty steady business.

5           If you look down at the online, at the bottom, you

6  see them at a pretty low share, starting in the single

7  digits, and really staying fairly modest, although you start

8  to see them moving upward in their share in 2006, '7, '8.

9  But still, they were a third, less than half, really a

10 third, of what the TV ads were.

11          And when you then move to -- and that's when I was

12 becoming familiar with this, because I had gone up to taking

13 over a responsibility for the Turner networks in 2002, which

14 is on the left side.

15          Once you get to the 2010, '11, '12 -- and it

16 really doesn't pick up steam -- well, when you get to the

17 2015 -- well, let's see.  Where does it cross -- 2016, what

18 happens is, digital advertising at Google, Facebook mostly,

19 has taken off like a rocket.

20          And television advertising, which had gone up a

21 bit, starts to decline.

22          And so now you get to the place here where you're

23 looking at 2018 and '99, where digital advertising is quite

24 a bit bigger and on an increasing glide path, in the

25 television advertising, which in total is starting to go

Case 1:17-cv-02511-RJL  Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18  Page 2959 of 3826

3093

1    down.  That is bad for television networks, because it

2    presses their ability to get programming.

3            Of course, the digital advertising companies are

4    taking the ad money and starting to bid away the

5    programming, to continue this trend.

6            And as I've said, I think it's bad for consumers,

7    because it means that more pressure on our programming cost

8    would have to be borne by subscribers, or we just simply

9    start not being able to fund our operations.

10           The fact that there are a couple of these -- and

11   the more scale they get, the better information they get to

12   be even more effective at selling subscriptions or selling

13   advertising.  That compounds the problem.

14       Q    Do you have a pen on you?

15       A    Yes -- no, I don't.  I'm sorry.

16            MR. PETROCELLI:  May I approach, Your Honor?

17            THE COURT:  Yes.

18   BY MR. PETROCELLI:

19       Q    If you could draw a line for the Court when

20   Time Warner Cable, you made the decision or the announcement

21   to spin it out.

22       A    Okay.

23       Q    When was that?

24       A    Late 2007.

25       Q    And show the Court that line there.  Hold it up.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3094

1          THE COURT:  Okay.

2     BY MR. PETROCELLI:

3          Q    And so was it after, essentially,

4     Time Warner Cable spun out that these significant changes

5     began to manifest themselves?

6          A    Yes.

7          Q    And, you know --

8          A    Well, back in those days --

9          Q    Excuse me?

10         A    Well, I should say -- I have to wait till you ask

11    me a question.  I'm sorry.

12    BY MR. PETROCELLI:

13         Q    That's usually how it works.

14         A    Yeah, so --

15         Q    Why don't you let the Court know why you decided

16    to spin off Time Warner Cable back in '08, '09.

17         A    Well, basically, financial reasons.

18              As I testified earlier, we had had a very big

19    company with a lot of unrelated things in it, from AOL to

20    books to music and publishing and so on.

21              And the way the world was going -- you can see it

22    here -- is in every industry, it was moving towards more

23    focus on whatever your main talent was.

24              And the problem of having a cable distribution

25    company as a part of basically a media TV production, movie

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    production company, is those are quite different activities.

2          So for financial -- so we spun off the cable

3    company because we thought it had a different natural

4    investor base because the growth rates, the profit margins,

5    all that, future fortunes for cable investing, if you're

6    investing in cable systems, were different than if you're

7    investing in networks or movie production.

8          We thought it could have a different financial

9    structure.  You can put your debt, properly should, on a

10   very predictable stream of revenue, which is what a cable

11   system has.  It's not what a movie studio has.

12         So those were the main reasons on the financial

13   side.

14         There was another kind of half-financial,

15   half-strategic reason.

16         Time Warner Cable was about 12 to 13 percent of

17   the geographical cable subscribers.

18         And all these other cable distributors, like

19   Comcast, DirecTV, and so forth, getting bigger, and we

20   thought that it might need to consolidate with other

21   distribution companies in order to be more efficient,

22   because there's a lot of fixed costs in the plant of a

23   distribution company.  And you need to spread it over more

24   people, and that's exactly what happened.

25        Q    Okay.  Again, I'm going to come back to the time

Case 1:17-cv-02511-RJL Document 158 Filed 08/06/18 Page 2962 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3096

1   when Time Warner Cable was vertically integrated with

2   Turner.  But before I move on, just one quick question about

3   the spin-off.

4           If you -- might you think about it differently if

5   Turner happening today?

6       A   Yes, maybe, but I'm not sure -- we didn't have all

7   of the -- all this business of direct video wasn't there at

8   that time.  In those days, Netflix, for example, was still

9   sending you movies, CD, DVDs in the mail.

10          There was no -- most -- video streaming directly

11  to your house hadn't really happened.

12          We didn't know about -- I don't think anyone did,

13  and no cable company was doing it -- nobody in the cable

14  business or the distribution business at that point was

15  mining data to sell advertising or to sell descriptions.  So

16  those things weren't really on anybody's top of mind at that

17  time.

18      Q   Following up on the advertising, can you, can we

19  go back to that.

20          I want to show you a demonstrative.

21          This has been marked as DX122.

22          MR. PETROCELLI:  May I approach, Your Honor?

23  BY MR. PETROCELLI:

24      Q   Could you please walk the Court through this

25  demonstrative.

1        A     Okay.

2             This shows, all right, what's happened in

3    advertising from 2012 to 2017.

4             And what you see at the top, in the red bar, is

5    Google alphabets, many tens of billions of advertising,

6    growing and, in fact, more than doubling, almost tripling,

7    in five years.

8             You see Facebook starting it out at that five

9    years ago, very small advertising.  It's down at the bottom.

10   It's like $4 billion, and growing at tenfold in the five

11   years, to 40 billion-or-so.

12            And you see them taking now the lion's share of

13   advertising.

14            If you look at the various television companies

15   and you see us down in the light blue, we're basically flat

16   throughout this period.  So the advertisers we had back then

17   are moving most their increased spending over to our new

18   competition.

19            And in certain quarters, our advertising declines,

20   and I believe it's either flat or down as you go forward.

21        Q     So now that you've explained these two very

22   significant changes to your industry, I'd like to have you

23   talk to His Honor briefly about what you tried to do to

24   address these challenges.

25            I think, on the subscription side or the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3098

```
 1   direct-to-consumer side, you indicated you launched HBO Now?

 2       A    Yes.

 3       Q    But even then, had to go through third-party

 4   retailers, right?

 5       A    Yes.  We had to use -- well, we're happy they're

 6   doing it for -- we had to use Apple and Amazon and whoever

 7   else would help us sell subscriptions.

 8       Q    Meaning you couldn't do it directly yourself?

 9       A    Right.

10       Q    Okay.

11       A    And it's good if we get the descriptions through

12   those means at the HBO Internet-delivered service.

13            But we're still not getting from that the data

14   about our own subscribers at HBO that an Amazon or Apple has

15   about those subscribers.  We don't know what else they're

16   watching.  We don't know who they are by name.  They do.  We

17   don't know other things they do, which would help us to

18   market to them for more subscription penetration.

19            So that's on the HBO side -- on

20   direct-to-consumer, which was HBO.

21            We do have a few other things we tried to do.

22            We've launched a couple of niche services at

23   Turner, Boom, and FilmStruck.  FilmStruck is classic films.

24            And we did -- I think we do most of the technology

25   end to end for that, but they're niche.  And we've only got
```

1    a few hundred thousand subscribers.

2           So if we were trying to serve tens of millions of

3    subscribers, our systems couldn't handle it.  In fact,

4    that's what happened when we turned on HBO Now.  It crashed,

5    and we had to beef it up.

6       Q    And what kind of subscriber bases do some of these

7    vertically integrated giants have that you've been talking

8    about?

9       A    Well, Amazon has 50 to 100 million out of their

10   however many hundreds of millions.  And they connect that to

11   their shipping service.

12          Netflix has 125 million global subscribers.

13          Just to illustrate what that does, they've got a

14   programming budget, because of that, that's more than twice

15   the size of HBO's.

16          And HBO's been working on this for 30 years, 40,

17   and they have been doing it for five.

18          So they're a vigorous competitor.  This is on the

19   subscription side.  I'm not doing advertising.

20      Q    Well, let me turn to that on the data side.  What

21   have you tried to do to get some of this first-party data

22   that you say Facebook and Google have to rocket these

23   digital advertising platforms?

24      A    Well, we tried -- what we continued to try to do

25   is we've tried to get it in our affiliate carriage renewal

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  agreements, have not succeeded, generally.

 2          We've tried to get what we could from third

 3  parties.  It's not of the quality and certainly not the

 4  scale of what Google or Facebook have competing in ads.

 5          And we had an idea for buying a few companies that

 6  had a way to figure out what was on the television screen so

 7  we'd know what was being watched, but you still wouldn't

 8  know who was watching.

 9      Q   Well, let me unpack that just little bit.

10          There's been some testimony in this trial about

11  potential negotiations, negotiations with Comcast over data.

12          Do you know anything about that?

13      A   Yes.

14      Q   Can you describe to the Court what you know about

15  that.  Well, they're just one of many examples.

16          But we've tried, as we have in all of our

17  affiliate renewals, to get better data, meaning more

18  information beyond just viewing, but maybe who is it.  They

19  don't want to do that.  What they watch, all those sorts of

20  data that we need both for subscription selling and for ad

21  sales.

22          And we've never succeeded.  In our last carriage

23  renewal negotiation with Comcast, at the very end, they

24  offered us some data.  We were apart on some other things.

25  It was pretty expensive.  We didn't know what it was.  So we

 1   sent a team to talk to them about, well, if we're going to

 2   pay tens of millions for this -- it was somewhere close to

 3   50 million they wanted -- what is the data?  Had could we

 4   use it?

 5           And our teams came back and said, we can't use

 6   this.  It wouldn't be useful for advertising.  It's

 7   certainly not worth anything close to what they're asking.

 8   So we couldn't get that done.

 9           That's basically what's gone on in all of the

10   negotiations, because we need to get our channels on.  You

11   know, we'd like to get the data on top to compete with the

12   new competitors, but we have to get our channels carried.

13           Can't you get the data from some of the virtual

14   MVPDs, like Hulu and YouTube that carry the Turner networks?

15       A   Well, we do get some that were -- we are carried

16   on the Hulu virtual MVPD.

17           And YouTube now also has a virtual bundle.

18   Turner's carried on that.

19           But we don't get -- we just get viewing data on

20   those people watching our channels.  We don't get who they

21   are, all their preferences, whatever -- what these same

22   subscribers are watching on competing channels.

23           All of that, those platforms have; we don't.  And

24   they're the ones selling the ads against us or trying to

25   sell a subscription package to move it away from our other

1   distributors.

2       Q    You mentioned these companies with the chips and

3   the set -- are they known as ACR companies, automated

4   content recognition companies?

5       A    Yes.

6       Q    What are they and what can you -- please explain

7   to the Court what you endeavored to do in that regard.

8       A    Okay.

9            There were three companies that had this automated

10  content recognition that, as I understand it, means they had

11  contracts with television set makers, like LG and Sony and

12  that sort of thing, where, if the TV was a smart TV,

13  connected to the Internet, these ACR companies could

14  collect -- could figure out what was on the screen, through

15  the visual pixels that were on the screen.

16           And so we were thinking, if we could acquire

17  those, put that information together, maybe we'd have some

18  information about whether our channels were being watched.

19           Possibly, we'd know the households; but, again, we

20  wouldn't know who anybody was to be able to offer them a

21  subscription renewal or sell them an ad.

22           So we were thinking about doing that.

23           The other problem with it, there were a lot of

24  issues.  I don't know whether they would have worked out

25  their patent issues.

1          But the key one I remember was, they only had this

2    information by contracts that periodically came do with the

3    television set makers.

4          And if they couldn't renew the contracts, then we

5    couldn't get the information.  So that was a big risk, if we

6    had gone ahead and bought them --

7     Q    Okay.

8     A    -- which we did not?

9          THE COURT:  Would this be a good time to take the

10   morning recess?

11         MR. PETROCELLI:  Perfect time.  I'm just about to

12   go into a different area.

13         THE COURT:  All right.  We're going to take a

14   15-minute recess.

15         You're now a witness under oath in the case, which

16   means you're not at liberty to discuss your testimony so far

17   or what it might be when you return, with anyone, including

18   your counsel.  You have to stay independent of all others.

19   Don't discuss what your testimony has been or what it will

20   be.

21         THE WITNESS:  All right.

22         THE COURT:  All right.  See you in 15 minutes.

23         We'll stand in recess.

24         DEPUTY CLERK:  All rise.

25         This Honorable Court will again take a brief

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   recess.
 2               (Recess from 11:40 a.m. to 12:05 p.m.)
 3               DEPUTY CLERK:  The United States District Court
 4   for the District of Columbia is again in session, the
 5   Honorable Richard J. Leon presiding.  God save the United
 6   States and this Honorable Court.  Please be seated and come
 7   to order.
 8               Your Honor, recalling Civil Action No. 17-2511,
 9   the United States of America v. AT&T, Inc., et al.
10               MR. PETROCELLI:  May I proceed?
11               THE COURT:  You may.  The witness remains under
12   oath.
13               MR. PETROCELLI:  Yes.
14   BY MR. PETROCELLI:
15       Q    I wanted to finish up on essentially chapter one
16   of this two-chapter examination with a couple of follow-up
17   questions.
18               We were talking about data.  And you indicated the
19   effort to get data from Comcast, and you weren't able to do
20   that.
21               Do you recall that?
22       A    Yes.
23       Q    Would you call that bargaining friction, an
24   example of bargaining friction?
25       A    Yes, I would.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q    Can you -- when Time Warner Cable was vertically

2  integrated in the Time Warner family, were there examples of

3  the absence of bargaining friction that enabled certain

4  innovations to occur?

5      A    Yes.

6      Q    Can you give the Court just one or two examples of

7  how you were able to innovate during the time when you were

8  vertically integrated?

9      A    Yes.

10          I think the best examples were HBO -- there are

11  many, but that's the best one.  HBO developing multiplex and

12  then video on demand back to --

13     Q    Explain multiplex to the Court.

14     A    -- back in the 1990s.

15          And innovation is a trial-and-error thing.  So --

16  because there will be many pieces of it if I try to explain

17  it.

18          So back then, if you had subscribed to HBO and you

19  tuned in on Sunday night, you'd see whatever the movie was

20  or whatever was showing on Sunday night.

21          Now, if you had already seen it, you couldn't use

22  the channel unless you wanted to watch it again.

23          Now, in that case, you're paying for the channel.

24  So one of the big issues our customers had was, are you

25  repeating things too much.

1           And so we thought, well, we have a lot of other

2    programming that maybe you'd want to watch it on Sunday

3    night, or whichever night this is.  And so maybe it would be

4    great if we could give it to you on not just one channel but

5    six or seven.

6           So we worked with our cable company,

7    Time Warner Cable, back and forth over a period of several

8    years, trying to understand, well, what would it take to

9    clear six or seven channels on not just your cable system

10   but everybody's in the country, so that they could offer

11   HBO's programming service, not just on one channel but on

12   many channels?

13          And we had to do lot of things.  They had to, on

14   the cable distributor side, they had to make investments to

15   be able to carry six channels, because they could put other

16   things there.  They had to train their marketing and phone

17   operators to deal with people's questions.  They had to deal

18   with receiving those feeds and putting them out, a lot

19   there.

20          On the HBO side, we had to make sure we had the

21   rights to put this on multiple channels.  We had to deliver

22   it technically over the satellites.  So it was a fair amount

23   of moving pieces there.

24          When we started, we didn't know what those moving

25   pieces were.  So by the team we were ready to launch it,

1    which we did with Time Warner Cable, we had a pretty good

2    idea.  We did it.

3         We launched it for no charge.  We didn't charge

4    anything for this improvement to the wholesalers or the

5    customers, because we wanted everyone to adopt it.

6         And they did and it worked very well.

7         So what then happened to other cable distributors

8    that we did know is they looked at that and thought, well,

9    that's a good thing; it will help us sell HBO.  They make a

10   margin on that.

11        So they adopted it, which, again, entailed some

12   expense and effort on their part to do.  So that was

13   multiplex.

14        And it helped us with viewing, because more people

15   liked HBO.  They could use it more.

16        So then we went -- and is this is now in the '90s,

17   the mid-'90s -- for quite a big change, which actually --

18   well, which was video on demand.

19        And that is really a -- it's kind of an

20   improvement over the multiplex innovation, because on the

21   multiplex innovation, you could see five or six different

22   start times on your HBO service, but they were all on a

23   schedule.  You'd have to tune it in at 8:00 and start with

24   the plot and follow it.

25        On video on demand, you could tune in anytime you

1    wanted, 8:15, whenever.

2            You could also pick whichever program was on the

3    HBO feed that month that you wanted to see.

4            And the way I always think is best to explain that

5    is if you think of a show like the Sopranos or now

6    it would be Game of Thrones and you missed last week's

7    episode, well, then the new one's coming on tonight, but

8    you're not caught up.  So how do you -- you can't watch the

9    new one, or maybe you don't want to watch the new one.

10            But if you have video on demand, you can go back

11   and watch the one you missed, and then you can keep in that.

12   That actually led to us being to make TV shows that had

13   series of episodes over time where you could watch three,

14   four, five at a time.  That changed the nature of the

15   programming, gave us an advantage there.

16            So to do that, that was a much bigger technical

17   undertaking, because the cable -- any cable system that

18   would have to do that would have to put servers in their

19   head ends.  They'd have to have a lot more executive

20   expertise in keeping track of which shows were still in the

21   month of April available and which not.  Pretty complicated

22   technical process of putting that out there and getting it

23   to people's homes, not having it break down.  There were

24   things they had to do on the household end with their

25   equipment also, depending on whether they had addressable

1    boxes in the house or not.  Pretty extensive.

2            On the HBO side, not really any less complicated,

3    because we had to go license the programming rights to be

4    able to offer all these different things on an expanded

5    basis from what we had licensed before.

6            Remember, please, we got movies from third

7    parties.  Not all of our programming is original.

8            So that cost money for us to pay for it.  That

9    took a lot of time in affiliate negotiations to get the

10   rights sorted out of exactly what right do we have to show

11   your movie in April 23 times, different times to different

12   people.  All that was new.

13           So there was a lot more behind all that than this,

14   but we probably shouldn't go into it all.

15       Q   But was being vertically integrated a crucial

16   factor in your being able to make those kinds of

17   innovations?

18       A   Well, absolutely, because we needed to know what

19   was possible.  We needed to know what it cost.  And we

20   never -- none of -- neither we nor the network side or the

21   cable side knew the answers to those questions when we

22   started.  So we had to iterate.

23           And if we had had to negotiate to do it,

24   I don't think we could have done it, because then the cable

25   company would have said, well, we're not paying for this.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   How do we know it's worth anything?  We have to make an

 2   outlet.  Why would we put in that expense?  What are we

 3   going to have on this service?  Is it going to be any good?

 4   So all of that.

 5           So we did it.  We didn't worry about which part of

 6   our company was going to pay for it, and then we launched

 7   it.  And it was quite successful.  It made people value HBO

 8   subscriptions more.  It made them watch it more because they

 9   could find something they wanted.

10           We still didn't know who was watching when.

11   That's another story that's still a problem today.  But we

12   at least got that far.

13           And then what happened when we went out -- and it

14   made HBO more watchable, really, is that other cable

15   operators undertook the same efforts, put in the

16   investments, trained their systems to do it.  You know, it

17   took a while.  But it did make HBO more valuable to

18   consumers.

19           And then the competitors to HBO, Showtime, Starz,

20   at the time, they decided it was good for them too.  And

21   they did it.  So that's really how that came about.

22       Q    If you build it, they will come?

23       A    Yes.

24       Q    Let's now turn to chapter 2, and you were

25   describing before our break the significant headwinds in

1    your industry, both on the advertising side, the

2    direct-to-consumer side, and the challenges posed by a

3    number of the large vertical companies and the efforts that

4    your company undertook to address those challenges.

5            So now, let's turn to what any of that had to do

6    with your decision to merge.

7            Can we begin by your telling the Court when you

8    first met with Mr. Stephenson and just briefly how that

9    culminated in a recommendation that you made to the Board.

10       A    Yes.

11           Well, Mr. Stephenson, Randall, who runs AT&T,

12   I had known him because we had been over the years -- he's

13   in the business, and they're one of our distributors at

14   Turner and HBO.  So I had known him somewhat.  And I talked

15   to him occasionally, every year, about -- because we had

16   business together, and he was a big customer.  How are

17   things going?  Sometimes we were on panels together.

18           And in the summer of 2016, he called me in August

19   and said, I'll be in New York.  We ought to -- a lot going

20   on in the industry.  Why don't we get together -- and I

21   said, come for lunch -- and we'll talk ever what you're

22   doing and what we're doing and can we improve our business

23   together.

24           And during that lunch, which was not -- ended up

25   being a pretty long lunch, as we talked through what was

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    happening on all the distributor sides, TelCo, cable, what
 2    was happening in the network side, all these new
 3    developments in digital Internet competition, it became
 4    clear to both of us that while our companies didn't overlap,
 5    that we actually had complementary assets to take advantage
 6    of these opportunities or, the other side of the coin, to
 7    meet the challenge coming from these new competitors.
 8              And so in that lunch, we started talking about
 9    whether it would actually make sense to put our companies
10    together.
11        Q    And is that the decision that you ultimately
12    reached?
13        A    Well, yes, we did.
14              We didn't reach it that day.  We then probably
15    went back, I did, I think he did, and talked to our
16    respective boards that, hey, this is a possibility; should
17    we pursue it?
18              On my side, I know, yes, our Board thought we
19    should, because they knew about these challenges and
20    opportunities.
21              And so over the ensuing months, we reached an
22    agreement to merge the companies and put these complementary
23    capabilities together.
24        Q    And your Board approved it?
25        A    Our Board did approve it unanimously, I believe.
```

1        Q     And what about your shareholders?

2        A     Our shareholders approved it 98, 99 percent.

3        Q     Now, Mr. Bewkes, in addition to the price offered

4    by AT&T for Time Warner, can you tell the Court what your

5    strategic reasons were for doing this deal.

6        A     Well, there were two main reasons, and we have

7    been talking about them.

8              This combination gives us, in the combined

9    company, we hope, a good chance to compete effectively in

10   digital advertising and to get the benefits for our networks

11   of direct-to-consumer distribution.

12       Q     So how does AT&T -- let me start all over again.

13             Dealing with the direct-to-consumer first, okay,

14   how does this transaction allow you to address that issue?

15       A     Well, it allows us -- because AT&T has 150,

16   roughly, consumer relationships through all of its

17   telephone, mobile, household, broadband, DirecTV television,

18   but they've got lot of different --

19       Q     You said 150.  You meant 150 --

20       A     150 million.

21       Q     Okay.

22       A     Yeah.  I'm sorry.

23             They reach a lot of American households with those

24   electronic products.  Some wireless, in addition, which is

25   another new, very important area.

1          So they have all of those 150 million consumer

2     relationships.

3          They have the ability to deliver video signals

4     through all of these different platforms to those people.

5     And so they can give a better consumer experience knowing

6     what to offer people, which package, which bundle, what

7     kinds of programming within those would be interesting to

8     people.

9          They know who those people are.  They have a lot

10     of customer information.  They have stores where they can

11     sell packages of subscriptions.  They have retail telephone

12     call centers in the hundreds of thousands.

13          So they have a very large distribution

14     infrastructure that can allow us to have our networks in

15     front of all these people with more navigation of what we

16     ought to offer them, how we can renew their subscriptions if

17     they're not happy, basically, how to communicate back and

18     forth.

19          There's another area, which is, the more you know

20     about the viewers -- and that would be a pretty big sample

21     of what AT&T had -- the more it informs your programming

22     because you know what to -- you get a better idea of what --

23     you should put more of this on your network, less of that.

24          So it helps you to market.  It helps you to

25     program.  It helps you to understand, really, how to

1   optimize your business.

2        And this is true whether it's Turner network

3   viewing or HBO viewing.

4   Q    And what about on the second issue, the

5   advertising?  How did this transaction -- how does this

6   transaction help you address the advertising challenges you

7   were facing?

8   A    Well, if you go to AT&T, in their customer

9   relationships, they do have a two-way relationship with real

10  people, the viewers.

11       And so they know what the people are watching or

12  want to watch.  They know their preferences for things.

13  They also have other information about them.  I know less

14  about it than they do.

15       But it's heading in the direction of the very rich

16  information that a Google or Facebook have, which are the

17  two biggest competitors in digital advertising.

18       But also, AT&T has the ability, increasingly, to

19  deliver a different ad to a different person on whichever of

20  these platforms.  So -- and they know which ad to deliver to

21  which person; we don't.

22       So it moves us in that direction of being able to

23  compete with the Googles and the Facebooks in this new, very

24  fast-growing ad business and, hopefully, keep more of our

25  advertising revenue to support our programming costs and not

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3116

```
 1   have it all go on the subscription side.

 2        Q    Based on your nearly 40 years of experience and

 3   your judgment, do you believe that this was the best way,

 4   this being a vertical merger with AT&T, to protect and

 5   preserve the business of Time Warner indefinitely into the

 6   future?

 7        A    Yes.

 8             And may I add to that?

 9        Q    You may.

10        A    It's not that we weren't trying to do some of

11   these -- we were trying to do some of these things that

12   we've talked about before the break on direct-to-consumer

13   and on advertising.

14             But it was my judgment and that of our board's --

15   and we had a pretty strong agreement on this judgment, that

16   maybe we could get there, but it's very important -- we need

17   to get there in time, at the right scale, without

18   inefficient cost.

19             And this, for us, is the best way to get where we

20   need to go to compete in this next round and not be too

21   late, too expensive, too risky.  That's really why this is

22   clearly better for our business.

23        Q    Mr. Bewkes, was another strategic rationale for

24   this deal that Turner could get more leverage to raise

25   prices to its distributors?
```

1       A    No.

2       Q    Was that ever discussed or articulated as a reason

3  to do this deal?

4       A    No.

5       Q    Had you ever had an opportunity to do a potential

6  horizontal merger in the past?

7       A    Yes, if we were -- yes, we had.

8       Q    What was that?

9       A    Well, that was two years before, in 2014.  The

10 Fox -- the News Corp. it was called at the time, Fox

11 company, had come to us to propose putting our networks

12 together.  And I think either the main or one of the main

13 reasons they thought that we should do this was to get more

14 leverage when making distribution arrangements with the

15 distributors.

16          I think that's what they thought.  We did not

17 agree with that.  We didn't think that was the right thing

18 to do, because it's not solving the problem we've been

19 talking about.

20          And so we rejected that.

21          And then they actually they'll tried to impose it

22 on us with a hostile offer, which our Board rejected.  And

23 we did not go ahead and do that.

24          One of the reasons, I should say -- I'm now

25 remembering it -- that they were thinking about this and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3118

 1   proposing this sort of thing -- and a lot of people that are

 2   observers in the industry seemed to support this idea.  We

 3   at Time Warner never supported this idea -- was that the

 4   distributors at that time, mostly cable companies, were

 5   consolidating.  And there was this theory that since the

 6   distributors were consolidating, the network groups ought to

 7   consolidate so they could have leverage games against each

 8   other.

 9        We didn't think that was anything -- that's not a

10   good idea.  It's not addressing the fundamental problems

11   consumers have.  And it's not addressing what we need to do,

12   because the future is getting our stuff everywhere over

13   digital platforms, having it be supported by advertising,

14   and competing with these new digital players, who even then

15   were starting to take away subscribers and advertising.

16   Q    So I'd like to now follow up with a few questions

17   about -- related to that about the government's bargaining

18   model that they have presented in this case.

19        The government has asserted that, in a post-merger

20   world, Turner would be able to raise prices to distributors

21   solely on account of the merger, because a blackout of

22   Turner post-merger would not cost as much as a blackout of

23   Turner pre-merger.

24        Now, I know you don't agree with that, but are you

25   just aware of that assertion?

 1          MR. SCOTT:  Objection, Your Honor.  It costs more

 2   to whom?  The question is vague.

 3          THE COURT:  You can rephrase the question.

 4   BY MR. PETROCELLI:

 5     Q    Are you aware of the assertion by the government

 6   that a post-merger blackout is less costly to the merged

 7   company than a pre-merger blackout would have been to

 8   Turner?

 9     A    I'm aware of that assertion.

10     Q    And are you aware of their assertion that because

11   of that, in a post-merger situation, Turner would risk a

12   blackout more than it would pre-merger in order to gain more

13   leverage against the distributor in order to get higher

14   prices?  Are you aware of that assertion?

15     A    Yes, I'm aware of it.

16     Q    Do you agree with that?

17     A    No, I really don't.

18          No.  I think --

19     Q    Can you explain to Your Honor why you don't agree.

20     A    I think it's ridiculous.

21          It's not anything how -- it's not how this works.

22          So if our channels, any of them, are not in some

23   distribution offering, that's catastrophic for us.  We lose

24   a lot of money.

25     Q    How so?

1        A      Due to the size of most of our distributors,

2   hundreds of milligrams of dollars.

3             So we try everything to stay on all of our

4   channels, Turner, HBO, everything, to keep them on there.

5   And that's very important to us.

6             If they're not on there, we're not only losing the

7   subscriber fees; we're losing the advertising revenues.

8   There are other problems that come from it, which is our

9   programming supply starts to dry up, because the sports

10  leagues don't like it if their games aren't carried

11  wherever.  The talent doesn't like it if their show isn't

12  everywhere.  So there's all kinds of problems beyond

13  financial problems if this were to happen.

14            But just on the financial problem alone, we're a

15  public company.  So if we go out of distribution someplace

16  and start losing a lot of money -- and we never know how

17  would that'll go.  Maybe permanent.  Some of them threaten

18  to do that -- then it's a catastrophe.

19            And so we never get the money back.  It can be a

20  chain effect if the distributors after that use it, because

21  we're in a weakened state, to go after us too.  So it really

22  creates a whole series of risks we don't want to have.

23            And I've tried to explain it, since I heard this

24  theory a year ago, to friends of mine.  And the way I -- I

25  think it's best the way to understand it, is if we have a

1    risk that a thousand-pound weight might fall on us -- we

2    hope it doesn't, but if that's always there, then if you

3    said to me, well, don't worry; it might be a 950-pound

4    weight instead of a thousand pounds, are you going to think

5    about it differently, feel differently?  Are you going to

6    take more risk that any of that might happen to you?

7    Absolutely not.

8             And there are lot of other problems that would

9    ensue if that scenario develops.  So, no, we don't -- this

10   makes no sense to us.

11       Q    Well, in your experience, do negotiators, either

12   on the programmer's side or distributor's side, think of

13   these things?  Would they think that they have more leverage

14   post-merger because if they threaten a blackout, they

15   believe the distributor will fear it because the distributor

16   might lose some subs to the sister company?

17       A    No, nobody thinks like that, no network executive

18   and no distributor.

19       Q    Well, you were at Time Warner Cable when it was

20   vertically integrated for about 15 years, correct?

21       A    Yeah.  Yes.

22       Q    At any point in time, did you ever become aware of

23   any negotiator, either on the cable side or at the Turner

24   side, articulating this theory of added incentive or added

25   ability to leverage a price increase?

 1      A     No.  And the reason is there isn't any added

 2   ability or incentive to do that, and all of our executives

 3   know that.

 4      Q     Did you believe that you had some kind of undue

 5   price increase that you were imposing on other distributors

 6   because you were vertically integrated with

 7   Time Warner Cable?

 8      A     No.

 9      Q     And Time Warner Cable, at the time it was

10   vertically integrated, competed with what other

11   distributors?

12      A     All the satellites.  So DirecTV and Dish.

13            All of the TelCos.  So Verizon and AT&T.

14            And in other places, certain other distributors.

15            We competed with numerous distributors in all of

16   these places and time periods.

17      Q     Is this lawsuit or the events leading up to this

18   lawsuit the first time you've ever heard of this theory?

19      A     Yes.

20      Q     When you were deciding to spin off Time Warner

21   cable, was there ever any consideration given to the fact

22   that you might lose this competitive ability to keep prices

23   propped up because of the vertical integration structure?

24      A     No, because it wasn't there to begin with.

25      Q     And once you spun off Time Warner Cable, did you

1    observe a decrease of Turner pricing because of the

2    disintegration?

3         A    No.

4         Q    In all the conversations that you've had with

5    Mr. Stephenson and others in connection with this merger,

6    has anyone ever suggested this theory of the government?

7         A    No.

8         Q    I will represent to you that the government's

9    expert economist, who is sponsoring this theory, has

10   testified that in the event of a Turner blackout, 12 --

11   permanent blackout, 12 percent of the distributors' subs

12   would leave solely on account of the Turner blackout, and

13   actually has given a number as high as 16 percent.

14            Does that sound reasonable to you?

15        A    No, not in -- half of that wouldn't sound

16   reasonable to me.

17        Q    Half of 12 percent wouldn't be reasonable; is that

18   what you're saying?

19        A    I think 5 percent is unreasonable.

20        Q    Based on your vast experience, almost 40 years, in

21   the event Turner wasn't available to a distributor, do you

22   think they would lose any subs?

23        A    Depends what else they did.  They could change

24   their pricing, replace it with other things.

25            I don't think they would lose many -- they'd also

1  be saving money.

2      Q    Well, you have an opinion as to what a potential

3  subscriber loss rate might be?

4      A    Given the -- there are very rare instances of

5  this.  This doesn't happen very often, because it's very bad

6  for any network.  It's not that great for distributors, but

7  I think they have more protection than we do in those cases.

8          I've never -- I don't know of any that are beyond

9  1 percent, less than 1 percent, maybe 2.  That's about it.

10      Q    Now, after this lawsuit was filed, you authorized

11  the submission of a letter on behalf of Turner to all

12  distributors, making a unilateral binding offer of

13  arbitration together with a standstill commitment in the

14  event of an impasse in negotiations, right?

15      A    Yes, I did.

16      Q    Okay.  Why did you do that?

17      A    Well, it was because of this case.

18          Once I understood, which took a while, what this

19  theory was, and we were in the settlement discussions for

20  quite a while, because we didn't think there would be any

21  competitive issues in this merger.  We thought it was

22  pro-consumer and pro-competition.  I still do.  But we

23  understood the government was saying that they had this

24  concern.

25          We do not agree with it.  We think it makes no

1    sense.

2              But since it was their concern and since they had

3    it as a provision in their settlement approach and they had

4    this theory about blackouts, we thought, well, let's get rid

5    of it, because this is a crazy theory; we're not doing it.

6    So let's just take it out.

7              We also knew -- take it off the table -- that it

8    was in the Comcast-NBC Consent Decree.  We think that merger

9    presented more questions on a vertical than ours.

10             So we thought if that was sufficient, which it has

11   been, to handle that, then it's more than sufficient to

12   handle this one, since we don't have some things that would

13   make it even less applicable to us.

14             But we thought, let's just get that out of the way

15   so that we can go ahead with the merger and bring these

16   benefits to our network.

17     Q    And just briefly following up on one comment you

18   made, why did you think Comcast was potentially a more

19   challenging than this one?

20     A    Well, they have big broadcast network, a bunch of

21   owned-and-operated stations.

22             I still think that one is fine, and I think --

23   I haven't seen any problems with what's happened, according

24   to the theories of this bargaining model, that came out of

25   that merger.

1          But we thought, well, if that's worked, which it

2    has for that merger, why wouldn't it eliminate any concerns

3    about this one?

4          Q    And to be clear, does Turner have broadcast

5    networks?

6          A    No.

7          Q    A couple final topics.

8               There's been another assertion by the government

9    in this case that, if this merger goes through, the merged

10   company will coordinate with Comcast-NBCU to harm virtual

11   MVPDs.  Are you aware of that argument that the government

12   is making?

13         A    Recently I've been made aware of that.

14         Q    And do you have any views about that?

15         A    Well, that makes no sense.

16              We want to be on all the virtual MVPDs.

17         Q    Why?

18         A    Because we need our networks carried in front of

19   anyplace where a citizen is watching the screen.  So we want

20   to be in there.  We need it for subscription revenue.  We

21   need it for advertising.  That's why.

22              And we're better placed for that.  Those bundles,

23   they ten to have more concentrated channel offerings.  They

24   go at different, sometimes lower price points.

25              We have our networks at Turner much more

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3127

 1    concentrated than NBC company does.  We have all of our --

 2    most of our business, 85, 90 percent in four Turner

 3    networks.

 4         Q     Which ones?

 5         A     CNN, Cartoon Network, TNT, TBS.

 6               Whereas, Comcast-NBC has, I think, 13 or 15.

 7         Q     How many does Viacom have?

 8         A     Viacom has 25, '6 or '7, somewhere in there.

 9               So they have lot of networks that are marginal.

10    We don't, by our own design, because we wanted to be in

11    every bundle, everywhere, and in every distribution

12    platform.

13               But we have another key difference, which is we

14    have an HBO.  We have an optional add-on, as we've had for

15    30, 40 years on top.

16               We have to sell HBO when we're doing it through a

17    wholesale distributor, on top of whatever package of

18    channels the distributor's putting into your house.

19               So it's better for us to sell HBO on top of a $20

20    package than an $80 package, where you can also buy HBO with

21    no package at all.  Just go buy it directly from a number of

22    sources we've talked about.

23               But we have a different situation -- I think a

24    better one -- than NBC, in all those respects, getting into

25    these new skinny bundles and getting onto virtual

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3128

```
 1   distribution packages.

 2        Q     Are you saying that skinny bundles are good for

 3   Time Warner's business?

 4        A     Yes.  Yes, they are.

 5        Q     Let me ask you one final topic.  And that's the

 6   last assertion that the government's -- the third and final

 7   assertion that the government's making in this case, which

 8   is that if this merger goes through, the merged company will

 9   restrict the availability of HBO as a promotional tool with

10   other distributors.

11             Do you agree with that argument?

12        A     No.

13        Q     Does it make sense?

14        A     No, it does not make sense.

15        Q     Why not?

16        A     Because HBO's entire business, for all the

17   40 years I've been in it, we need to be in every outlet, and

18   we need as many -- we'd like, we want as many people to

19   subscribe to it as we can get.

20             And our efforts, when we're dealing with

21   affiliates, are not, you know, that, yes, we've got to get

22   them to carry the service on their system, but mostly what

23   it's about is getting them providing incentives, getting

24   them to agree to market it so that a lot of people in their

25   system have HBO.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1         And because the penetration varies between this

2    distributor and that distributor, we work hard at getting

3    the laggards to raise their marketing and raise their

4    penetration.

5         If we stop marketing HBO, there's monthly

6    disconnects.  Our subscriber base starts to go down.  Now

7    we're losing money.  So why would we ever do that?  That's

8    self-harm.

9    Q    And, finally, there's been some testimony about

10   coordinating the negotiations between HBO and Turner with

11   other distributors.  Have you ever directed that the

12   negotiations be coordinated in some way?

13   A    Never -- we've never, for example, had an

14   affiliate -- we have separate affiliate contracts.

15   Q    What do you mean, "We have separate"?  Explain

16   that.

17   A    Well, Turner's affiliate contract is quite

18   different, dealing with many different issues than the HBO

19   affiliate contract.  So we've never had -- we have separate

20   affiliate contracts.  We have to.

21        So we don't have the same -- we don't have a

22   common contract, let's say, for add-on HBO carriage versus

23   basic cable -- we don't have that.

24        We don't have the same teams doing it, because

25   they're not good at the same things and they're not aiming

1  for the same solutions.

2         And there are quite different issues that come up

3  if you're making a carriage agreement for a premium add-on

4  like HBO versus if you're doing it for a basic cable network

5  that needs to go into a bundle or a set of bundles that

6  hopefully go to as many homes as you can.

7         Those are very different things, so we don't do

8  that.

9         We have, at times, tried to make -- what we do

10  always is we try to keep our channels on the systems, both

11  of them.  Mostly, they don't come up at the same time.

12  So we don't coordinate the timing.

13         But certain cases, if we can, we would, because

14  for those that threaten to take our channels off, we don't

15  want them to take half of them off because they've got the

16  other ones in their pocket.  So they just divide and conquer

17  and try to punish whichever one they choose to take

18  distribution away from and then, therefore, pressure our

19  revenue.

20     Q    So has this ever happened in the past as a result

21  of which you asked to somehow coordinate the separate HBO

22  and Turner negotiations with the distributor.

23     A    Yes, they're -- yes.

24     Q    Can you give an example.

25     A    Yeah.

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 2997 of 3826

3131

1          The most recent -- the most recent case of that,

2     I think -- well, the two recent cases.  One of them is the

3     Dish satellite distributor; another one is Google, YouTube

4     putting up a new bundle.

5          And the Dish case -- should I just explain the

6     Dish case?

7     Q    Well, His Honor has heard quite a bit about the

8     Dish case, but you can be brief about it.

9     A    All right.

10          So the Turner networks were coming up in the fall

11     of '15, I think it was.

12     Q    2014.

13     A    '14.  Okay.

14          And in that fall, having fought off the Fox offer,

15     we were telling our investors why we should -- they should

16     stay with us.  And we said, because of the opportunities and

17     the challenges coming out of Amazon and Netflix who are

18     going direct to consumer, we're going to launch HBO direct

19     to consumers.  So that's the fall of 2014.

20          We did it with Apple helping us when we finally

21     did it.

22          The Turner networks were facing a renewal with the

23     Dish company that fall.  And Charlie Ergen, who runs the

24     Dish company, didn't like what we were doing with HBO and

25     doing competing distribution.  And so he sent the message

```
 1    that he was going to punish the Turner networks by taking

 2    them out of distribution.

 3            Now, as I recall, he couldn't do all of them,

 4    because only two or three of them were up for renewal,

 5    because he had split them, again, to have more leverage

 6    against the Turner networks.

 7            So he took some of them dark.  That costs us

 8    $150 million, because while he was at it, he manufactured

 9    some billing disputes.

10            We ended up getting it back on, getting Turner

11    back on a month or so, six weeks later.

12            We lost the money.  We never got the money back.

13            But when we got them back on, I said, well,

14    because you're going out publicly and saying that you may go

15    permanently out of business with any or all of our networks,

16    if we're going to let you do this billing dispute, you're

17    going to pocket all this money, and we're going to test

18    this, because HBO's coming up in the spring, let's do the

19    whole thing together, Charlie.  Let's make -- if we're going

20    to be in business together, let's be in business across all

21    our networks.  Let's not have you always threatening to take

22    one and punish the other.  So that's basically what we did.

23        Q    And was there a similar circumstance involving

24    YouTube?

25        A    Well, yes, but much more constructive.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          In the YouTube case, they were launching a virtual

2    bundle, which they had determined before they did it that

3    they wanted to go for Millennials.  They wanted a tight

4    price point.  I think it was $20 or thereabouts.

5          And so they were negotiating with us to get the

6    Turner networks.  HBO wasn't going to be in that bundle.  It

7    was going to be an optional add-on.

8          And during the course of their preparation to

9    launch, they came back to us and said, we're not going to

10   have room for you, because we decided, given our price point

11   and our millennial audience target, we want the big

12   networks, ABC, NBC, CBS, Fox, because we want the sports.

13         And when those companies give us their main

14   networks, they insist, said Google to me and to our

15   negotiators, they want all their cable channels carried.

16   They've got a lot of them.

17         And so we used up all the budget for you.  You're

18   not at that level of need for us, in our judgment, and so

19   your -- Turner networks are going to be left out.

20         We said, on our side, well, that's a problem for

21   us, because you still want to offer HBO on top, but you're

22   carrying all of the networks that compete directly with

23   Turner, everything from NBC and Fox, like FX, USA, they all

24   compete.  Their news channels compete with ours.  We're the

25   only one in all these categories that doesn't have our

1   networks in your new Google bundle, and you're a big

2   company.  You may make this very big.  It will be the future

3   of TV.  We won't be in it.

4           So we're not going to let you do that and use our

5   own premium service to market this thing and get our Turner

6   networks out of circulation.

7       Q    Were you able to ultimately get your Turner

8   networks onto the YouTube virtual offering?

9       A    Well, we weren't --thy launched without us.  And

10  then, over time -- I think it took a year.  They looked at

11  what their results were and decided that they should go for

12  a bigger audience than Millennials, people of more --

13  different age groups and interests; that they should change

14  the price point to a bigger package.  The one they had

15  didn't have sufficient, I guess, attractiveness.

16          And, therefore, they had room for the Turner

17  networks and a number of other networks that they then

18  added.

19          So Turner ended up, very recently, getting onto

20  that distribution platform.

21          HBO is still negotiating with them.  We do expect

22  to reach a distribution deal with HBO, but we haven't yet.

23      Q    And one last question.

24          There's been some recent testimony by competitors

25  regarding if a distributor were to elect arbitration under

1    the Turner offer, that the merged company might retaliate by

2    withdrawing HBO or doing some mischief with HBO.

3              Does that make any sense to you?

4    A     No, it does not make any sense.

5    Q     And why is that?

6    A     There are several reasons.

7              There's nothing wrong with using the arbitration

8    provision -- if the arbitration provision gets us to a deal

9    where our networks are carried, we're -- that our first

10   objective, so good.

11             If the result of the arbitration is a carriage

12   arrangement that we wish it was better, so be it.  It is

13   what it is.  There would be no point then in punishing

14   ourselves by taking our HBO subscribers down and hurting the

15   HBO business.  That just makes no sense.

16   Q     Now, you are aware that HBO is not part of the

17   arbitration offer?

18   A     Yes.

19   Q     And can you explain to the Court why it isn't.

20   A     Well, there's no reason for it.

21             There's -- in real life, and I believe evidence in

22   here undisputed, HBO's aim is to get higher penetration and

23   get its wholesale net effective rate down, not up, because

24   that's how HBO can attract consumers, given it's competing

25   with Netflix, Amazon, and all these others.  So there's

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3002 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3136

1   no -- that makes no sense.

2          Secondly, as I understand it, the government has

3   not said there's any issue with HBO trying to go dark or

4   doing these things.  So I don't think there's a basis for

5   it.

6          And, finally, if the distributor wants to do

7   something with it, they can always get HBO -- if HBO -- if a

8   distributor decided not to carry HBO, which we will work

9   hard that they didn't do that, it wouldn't affect at all

10  what they're selling in basic cable packages, because you

11  don't need to have a basic cable package to get HBO.

12         You can buy HBO from Apple, Amazon, HBO, and an

13  increasing number of sources.  So there's no reason that HBO

14  distribution should affect the distributor in terms of

15  Turner distribution.

16         MR. PETROCELLI:  Thank you.  Nothing further,

17  Your Honor.

18         THE COURT:  All right.  Well, it's the luncheon

19  recess time, so I don't see any sense in starting cross now.

20         Why don't we take the luncheon recess, reconvene

21  at 2:30.

22         You're a witness under oath.  So you're not at

23  liberty to discuss your testimony so far or what it might be

24  when you return, and stay independent of all others.  And

25  we'll see you back here at 2:30.

```
 1              THE WITNESS:  Thank you.

 2              THE COURT:  Okay.

 3              DEPUTY CLERK:  All rise.

 4              This Honorable Court will stand in recess until

 5    the return of court.

 6              (Proceedings concluded at 12:55 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E

       I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: April 18, 2018_____     /S/__William P. Zaremba_____

                                William P. Zaremba, RMR, CRR

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )        CV No. 17-2511
                                     )
                                     )        Washington, D.C.
        vs.                          )        April 18, 2018
                                     )        2:38 p.m.
AT&T, INC., ET AL.,                  )
                                     )        Afternoon Session
            Defendants.              )
_____)              Day 16


        TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
      BEFORE THE HONORABLE RICHARD J. LEON
        UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                             Eric D. Welsh
                             Donald G. Kempf, Jr.
                             Claude F. Scott
                             Richard Cameron Gower
                             Sarah L. Oldfield
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Washington, D.C. 20530
                             (202) 532-4560
                             craig.conrath@usdoj.gov
                             eric.welsh@usdoj.gov
                             donald.kempf@usdoj.gov
                             claude.scott@usdoj.gov.
                             richard.gower@usdoj.gov
                             sarah.oldfield@usdoj.gov

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:                    Katrina M. Robson
                                 O'MELVENY & MYERS LLP
                                 1625 Eye Street, NW
                                 Washington, D.C. 20006
                                 (202) 220-5052
                                 krobson@omm.com

                                 Daniel M. Petrocelli
                                 M. Randall Oppenheimer
                                 O'MELVENY & MYERS LLP
                                 1999 Avenue of the Stars
                                 8th Floor
                                 Los Angeles, CA 90067
                                 (310) 553-6700
                                 dpetrocelli@omm.com
                                 roppenheimer@omm.com

                                 Michael L. Raiff
                                 Robert C. Walters,
                                 GIBSON, DUNN & CRUTCHER LLP
                                 2100 McKinney Avenue
                                 Suite 1100
                                 Dallas, TX 75201
                                 (214) 698-3350
                                 mraiff@gibsondunn.com
                                 rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:               Kevin J. Orsini
                                 Peter T. Barbur
                                 CRAVATH, SWAINE & MOORE LLP
                                 Worldwide Plaza
                                 825 Eighth Avenue
                                 New York, NY 10019
                                 (212) 474-1140
                                 korsini@cravath.com
                                 pbarbur@cravath.com

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEFENDANT'S: | | | | |
| JEFFREY BEWKES | 3199 | 3145 | | |
| JOHN STANKEY | 3204 | 3264 | | |

– – –

INDEX OF EXHIBITS

– – –

| GOVERNMENT'S | IDENTIFIED | ADMITTED |
|---|---|---|
| PX552 | | 3147 |
| PX63 | | 3161 |
| PX554 | | 3271 |

– – –

INDEX OF EXHIBITS

– – –

| DEFENDANT'S | IDENTIFIED | ADMITTED |
|---|---|---|
| DX658 – | | 3233 |

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3143

```
 1                     P R O C E E D I N G S

 2            DEPUTY CLERK:   The United States District Court

 3   for the District of Columbia is again in session, the

 4   Honorable Richard J. Leon presiding.  God save the United

 5   States and this Honorable Court.  Please be seated and come

 6   to order.

 7            Your Honor, re-calling Civil Action No. 17-2511,

 8   the United States of America v. AT&T, Inc., et al.

 9            THE COURT:   The witness remains under oath.  You

10   may proceed when you're ready.

11            MR. SCOTT:   Thank you, Your Honor.

12            I have a couple of documents I would like to hand

13   up and get marked for use with the witness, if I may

14   approach the Clerk and the witness.

15            They will come into evidence.

16            MR. PETROCELLI:   I'd like to see them before

17   they're shown to the witness, Your Honor.

18            THE COURT:   Yes.

19            Give them to defense counsel, please.

20            MR. SCOTT:   The first is PX552 and the second one

21   is PX63.

22            THE COURT:   Okay.  Take a look at them.

23            MR. PETROCELLI:   552.

24            Your Honor one second because it's on not on their

25   exhibit list, so I need to take a quick look at it.
```

1            THE COURT:  Sure.  Go ahead.  No rush.

2            MR. PETROCELLI:  Counsel, is this the attachment

3    to this document?

4            MR. SCOTT:  Yes, yes.  For both of them.

5            (Counsel conferred off the record.)

6            MR. PETROCELLI:  No objection, Your Honor.

7            THE COURT:  All right.

8            MR. SCOTT:  To which?

9            MR. PETROCELLI:  Either.

10           MR. SCOTT:  Okay.  All right.  Your Honor, in that

11   case, we would move Exhibit 552 and 063 into evidence.

12           THE COURT:  Well, I've got to see them.  You've

13   got to tell me what they are.

14           MR. SCOTT:  All right.  Fair enough.  I'm sorry.

15           THE COURT:  I need some foundation for relevance.

16   I need something.  I mean, I don't know what these are.

17           MR. SCOTT:  All right.

18           MR. PETROCELLI:  They need to go under seal if

19   they're going to be admitted, Your Honor.

20           (Pause)

21           MR. SCOTT:  Your Honor, may I approach the

22   witness?

23           THE COURT:  You may.

24           THE WITNESS:  May I ask the Court a question?

25           THE COURT:  Yes.

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3011 of 3826

3145

1              THE WITNESS:  It would help if I had my glasses.

2              THE COURT:  Yes.  You can get them.  Where are

3    they?

4              THE WITNESS:  They're in my bag in that room.

5              They're in that bag.

6              MR. SCOTT:  Your Honor, may I proceed?

7              THE COURT:  You may.

8    JEFFREY BEWKES, WITNESS FOR THE DEFENDANTS, HAVING BEEN

9    PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS

10   FOLLOWS:

11                       CROSS-EXAMINATION

12   BY MR. SCOTT:

13       Q    Mr. Bewkes, I'm Claude Scott with the Justice

14   Department.  Good afternoon.

15       A    How do you do?

16       Q    You have in front of you what's been marked as

17   Exhibit 55 -- Plaintiff's 552.

18            Do you have that front of you?

19       A    Yes.  552?

20       Q    Yes, sir.

21            Please read through that.  It's a couple-page

22   document there.

23            Familiarize yourself with it, and then I've got a

24   couple of questions for you.

25            You went through that?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3146

```
 1        A      I read it.

 2        Q      The document in front of you is a document dated

 3   January 13th, 2017, from you to the Board of Directors of

 4   Time Warner, correct?

 5        A      Yes.

 6        Q      And the subject matter of that is the proposed

 7   2017 long-range plan for Time Warner, correct?

 8        A      Yes.

 9        Q      And long-range plans for Time Warner's business

10   operations are something that are done on a periodic basis,

11   correct?

12        A      Yes.

13        Q      How often do you do them?

14        A      Usually, every year.

15        Q      And you're involved in the process of preparing

16   the long-range plans?

17        A      Yes.

18        Q      And people working with you and under your

19   direction pull together the information for your approval

20   before it's submitted to the board, correct?

21        A      Yes.

22        Q      And this memo is a memo covering the actual

23   long-range plan that was prepared in this time frame and was

24   sent along with the long-range plan to the board, correct?

25        A      Yes.
```

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3013 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3147

1        Q    And it explains the bases upon which the

2    long-range plan was established?

3        A    Yes.

4             MR. SCOTT:  Your Honor, we move exhibit

5    Plaintiff's 552 into evidence.

6             MR. PETROCELLI:  No objection, under seal.

7             THE COURT:  It will be admitted.

8                           (Government's Exhibit PX552
                             received into evidence under seal.)
9    BY MR. SCOTT:

10       Q    Now, Mr. Bewkes, your attorney has agreed to this

11   being submitted under seal, and it is.  So if I ask any

12   questions that get to the area, in an area where I'm likely

13   to draw confidential information from you, please let me

14   know.  I'll try to do this in a way that does not do that,

15   all right?

16       A    Thank you.

17       Q    Now, was this business plan, indicated -- that was

18   sent, the proposed long-range plan, was that done after the

19   merger was announced?

20       A    Part of it -- this plan takes place over a period

21   of many months every year, and so some of it would have been

22   done starting in the summer.

23            We announced the merger in late October, and so

24   the early parts of the plan would be done then.  And then

25   from end of October to the end of the year, we would be

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    finalizing the plan.

2         Q    Well, for the purpose of this plan, although some

3    of it was done after the merger was announced, it was set up

4    as though the merger was not going to happen, correct?

5         A    I believe so, yes.

6         Q    And it was submitted the board in that fashion?

7         A    Yes.

8         Q    And the plan, it says it reflects the fundamental

9    strategy that you've been pursuing for several years,

10   correct?

11        A    Yes.

12        Q    And that strategy had not -- was not changing in

13   the course of this plan from what you had done before the

14   merger was announced?

15        A    Can I ask a clarifying question?

16        Q    Sure.

17             So the plan says it was put together based on the

18   assumption there was no merger, right?

19        A    Yes.

20        Q    And so -- and it incorporates the business

21   planning and strategies that had been in place before you

22   contemplated entering into the transaction?

23        A    Yes.

24        Q    And did that plan, that business plan -- and,

25   again, if we're getting into confidential information,

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3015 of 3826

3149

 1    please let me know.

 2          Did that plan contemplate pursuing digital

 3    products to offer into the market on behest of the

 4    Time Warner companies?

 5       A    Yes, it did.

 6       Q    And that's something that you had been, had in

 7    place for some time before the merger was announced?

 8       A    Yes.

 9       Q    And by "digital properties," could you describe

10    what things had been put in place before the merger was

11    announced by Time Warner?

12       A    Yes.  I think that refers to things like HBO Now,

13    delivered over broadband.  Some of our new subscription VOD

14    services at Turner, like FilmStruck and Boomerang, the

15    children's service.

16          Let me think of any others.

17          Efforts to try to get data for digital

18    advertising, those kind of things.

19       Q    And it also continued your strategic plan.  The

20    point is basically the heart of your business, which is to

21    produce highly desirable content to sell to distributors so

22    they could, in turn, sell it to their customers?

23       A    Yes.

24       Q    And you were looking at ways, before the merger

25    was -- happened and had invested and were pursuing ways to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   deliver that content both over traditional means, as well as

 2   through new platforms that were coming into the market,

 3   right?

 4        A    Yes.

 5        Q    And by "new platforms," are we talking about

 6   Internet delivery of content that you were creating?

 7        A    I think, yeah, we're talking about new bundles and

 8   virtual MVPDs that go over the Internet.  We're talking

 9   about trying to make our own networks be able to go over the

10   Internet, yes.

11        Q    And were you investing in those activities?

12        A    Yes.

13        Q    When the merger was announced?

14        A    Before?

15        Q    Yes.

16        A    Yes.

17        Q    Did you continue to invest in those platforms and

18   those new products after the merger was announced?

19        A    Yes.

20        Q    And till today, you're still pursuing them?

21        A    Yes.

22        Q    Now, prior -- well, strike that.

23             Did at some point in time Warner Brothers and

24   Turner jointly launch its own SVOD, Boomerang?

25        A    Yes.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3151

1      Q     And SVOD means what in that context?

2      A     It means subscription video on demand.

3      Q     So this is a product where customers come directly

4   to you and subscribe to get access to the video that's on

5   there?

6      A     Yes.

7      Q     And what type of video is that product carrying,

8   have available to customers?

9      A     That is family and children's programming.

10     Q     And was offering, in your view, an SVOD product,

11  among other digital products, consistent and logical

12  extension of your current strategy in the market?

13     A     Yes.

14     Q     And the plan also called for strong financial

15  performance going forward into 2017, correct?

16     A     For that product or for the whole company?

17     Q     For the whole company.

18     A     Yes.

19     Q     And now this is an area we've got to be careful

20  because I don't want to reveal confidential information.

21           If you would look on the first page of the

22  document, bullet point 3, where it starts "third" and read

23  through that.

24     A     Yes, sir.

25     Q     Just read through it to yourself, that whole

 1    paragraph, and then I'll have a question for you.

 2        A    Yes.  I see that.

 3        Q    Now, the first sentence there, where it begins,

 4    "third" -- and, again, let's not read it out loud -- and

 5    going forward to the next page, where it ends in 2017 with a

 6    footnote mark, that is what you were projecting your revenue

 7    growth adjusted, operating growth, and adjusted EPS growth

 8    to be, correct?

 9        A    Yes, sir.

10        Q    And you were -- that also reflects the free cash

11    flow that you expected in 2017?

12        A    Yes.

13        Q    Did you hit those numbers?

14        A    I believe we did, yeah.

15             THE COURT:  All right.  It doesn't say "expect."

16    It says "aiming for."

17             MR. SCOTT:  "Aiming for."  I'm sorry, Your Honor.

18             THE COURT:  Let's make sure we keep that straight.

19             MR. SCOTT:  Will do.

20    BY MR. SCOTT:

21        Q    But you hit the numbers you were aiming for, yes?

22        A    I believe we did, yes.

23        Q    Now, the next sentence, again, read it to

24    yourself, which starts with "and" and ends with "cash flow."

25        A    Yes, sir.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3153

```
 1        Q    And it has there, it says there that you're

 2   looking at specific numbers listed for CAGR, C-A-G-R.

 3             What is that?

 4        A    That is compound annual growth rate.

 5        Q    All right.  And there's a number there for that

 6   revenue, correct?

 7        A    Yes.

 8        Q    And then another number for adjusted operating

 9   income that we were looking for, correct?  That was a

10   three-year plan?

11        A    Yes.

12        Q    And 10 percent -- and another number that I won't

13   mention what it is.

14             Do you see that?

15        A    Yes, I do.

16        Q    And then another number in free cash flow,

17   correct?

18        A    Yes, sir.

19        Q    Now, those numbers, are those numbers still good

20   today, from the standpoint of your plan and expectations, if

21   this deal is not approved?

22        A    Are you asking those targets for 2017, which is

23   over, are they still good?  Can I ask what you mean by

24   "good"?

25        Q    Sure.
```

1           Well, it says here over the three-year plan,

2    you're looking for these.

3        A    Oh, for the ones going outward?

4        Q    Right.  Are those numbers still good today, from

5    the standpoint of what performance you're looking for?

6        A    I'm not -- I think so, but I'm not sure.

7        Q    All right, sir.

8           Now, the next paragraph, bullet point there,

9    says -- indicates that you expect to achieve the financial

10   results described above, correct?

11       A    Yes, it does.

12       Q    And it goes on to say that those results would

13   place you at the top of our media peer group in a dynamic

14   and changing operating environment.

15           Do you see that?

16           THE COURT:  Challenging.

17   BY MR. SCOTT:

18       Q    Challenging operating environment.

19           Do you see that?

20       A    I do, yeah.

21       Q    And the terminology there, the top of your media

22   peer group, could you define what you believed your peer

23   group to be?

24       A    I believe in that context, it means the other

25   media companies that have networks and studios, and they

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3155

1    compete doing what things we do.

2         Q    And could you give us some examples of who you

3    consider to be in your peer group.

4         A    Yes.  Disney, Fox, Comcast, Universal, CBS,

5    Viacom.

6         Q    All right, sir.

7              Now, further into the document, you told the board

8    you're not expecting any significant changes in the trends

9    we discussed in the past.

10             Do you see that?

11        A    No, I don't -- oh, I see.  Yes, I do.  Yes, I do.

12   We aren't expecting significant changes in that period.

13   Yes.

14        Q    All right, sir.

15             And what trends are you referring to there?

16        A    Well, the increasing presence of the vertically

17   integrated advertising competitors, the increasing presence

18   of the digital direct-to-consumer subscription companies.

19             That would be, if you -- the first ones would be

20   Facebook and Google on the advertising side.  On the

21   subscription side, it would be all of those, Disney, Fox,

22   Viacom, NBC companies, and then joined by Netflix, Amazon,

23   Hulu.  That's in the United States.

24             Overseas, it would be Sky and companies like that

25   as you go around the world.  Same thing in Latin America.

1    Just a number of those competitors.

2           And the trends were, as we've talked about, more

3    competition and advertising that was flattening or declining

4    our advertising revenue, growth, and more challenges in

5    subscription competition that was reducing what had been the

6    growth in subscription revenue.

7       Q    All right, sir.

8           So, among other things, these are trends that you

9    discussed with Mr. Petrocelli, the growth of digital

10   advertising, which was, in your view, putting pressure on

11   your business, number one?  That would be one.

12      A    That was one, yeah.

13      Q    And the other one being, you said a trend that was

14   putting pressure on subscribership?

15      A    Well, you have --

16      Q    Let me ask the question.

17      A    -- you have a reduction in subscriber growth.

18      Q    Let me finish the question.

19      A    I'm sorry.

20      Q    In the trend that you were talking about that was

21   affecting subscriber growth, is that the growth of MVPDs?

22      A    Excuse me.

23      Q    Sure.

24          The trend that you said was having an effect on

25   subscriber growth, is that trend the growth of MVPDs in the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   market?

 2        A     Well, here it refers to the overall subscriber

 3   growth for the networks across all distribution.

 4        Q     All right.

 5              And was -- were the MVPDs having an effect on that

 6   subscriber growth?

 7        A     Yes.  They were slowing down or losing

 8   subscribers.

 9        Q     The traditional MVPDs?

10        A     Yes.

11        Q     And in part, that was because of the presence of

12   vMVPDs that were taking business away from them?

13        A     That's part of it.

14        Q     All right.

15        A     That's not most it, but that's a little bit of it.

16        Q     Now, you go on in the document to state that you

17   expect to continue to see -- you expect to continue -- well,

18   "We continue to expect a continuing gradual decline in the

19   number of subscriptions to TV, network bundles in the U.S."

20              That's what we were just talking about?

21        A     Yes.

22        Q     And then after that, it says you had greater

23   visibility into some favorable trends with real potential,

24   such as the launch of virtual MVPDs, which has now become an

25   industry-wide development.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      A    Yes.

2      Q    And why did you see that as a potential for your

3  business?  Why did you see that as a potential, that trend,

4  the growth of the vMVPDs -- the vMVPDs, as a potential that

5  may benefit your business?

6      A    Because it would be another place where we could

7  put our networks in front of consumers.

8      Q    And from your perspective, being a content creator

9  and supplier to distributors, it really didn't matter to you

10 if the person was seeing it on one platform, a traditional

11 MVPD, or some new digital format, correct?

12     A    Generally, correct.

13     Q    Because generally, either way, you're going to get

14 paid?

15     A    Yes, generally so.

16     Q    And despite the trends that we've talked and you

17 discussed with Mr. Petrocelli, you were still expecting on a

18 going-forward basis, in this three-year plan, to hit the

19 numbers that are described in here for your financial

20 performance, correct?

21     A    We were hoping.  We set them as a target.  And we

22 expected to achieve them.  We weren't sure, but that was our

23 ambition.

24     Q    And to the best of your recollection, you, in

25 fact, did hit the 2017 projections?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3159

```
 1        A    I do believe we did.

 2        Q    All right, sir, if you would take a look at the

 3   last paragraph or the bullet next to it.

 4             And you indicate that the long-term financial

 5   targets are pretty close to those that you provided to the

 6   board last January, correct?

 7        A    Yes.

 8        Q    And despite the trends that you're seeing in the

 9   market, you say here that you're expecting revenue to be

10   somewhat higher in 2019 than was reflected in the previous

11   plan that was given to them the previous January?

12        A    Yes.

13        Q    And you expect to have more cumulative cash flow

14   over the life period of this plan than you had projected the

15   year earlier, correct?

16        A    Driven largely by lower taxes and interest

17   expense, yes, I think that was the reason for that.

18        Q    All right, sir.

19             And in relation to this, this was -- this plan,

20   with the financial projections that are hoped-for numbers

21   that are laid out in it were based on you following the

22   business plan, the approach to market, that you had been

23   following 2015, '16 and on forward, correct?

24        A    Well, generally, but we were always evolving it.

25   So, in general, you're right, but it does change every year
```

1   to some degree.

2        Q    And one of the things that evolved over that time

3   period was you developing and investing and developing

4   digital products to move your content over different

5   platforms, correct?

6        A    Yes.

7        Q    All right.  You can set that one aside.

8             And let me ask you to take a look at PX63.

9             Do you have that in front of you?

10       A    Yes.

11       Q    I'm not going to go through the whole document,

12   but just a few questions to establish what it is.  And then

13   I'll direct you to a page or 2, okay?

14       A    Yes.

15       Q    Now, this document is headed "Time Warner 2017

16   long-range plan, budget and capital plan."

17            Do you see that?

18       A    Yes, I do.

19       Q    And the document has been marked for

20   identification as PX63, correct?

21       A    Yes.

22       Q    And this is dated January 2017, correct?

23       A    Yes.

24       Q    Is this the business plan that was put together

25   under your supervision and forwarded to the board under the

 1    cover email that we just discussed?

 2         A    Yes.

 3              MR. SCOTT:  Your Honor, the government moves PX63

 4    into evidence under seal.

 5              THE COURT:  Okay.

 6              MR. PETROCELLI:  No objection.

 7              THE COURT:  It will be admitted.

 8                        (Government's Exhibit PX63
                           received into evidence under seal.)
 9    BY MR. SCOTT:

10         Q    Now, again, this has been admitted under seal

11    because of confidentiality concerns.  So if I ask a question

12    that delves into something you think is confidential and

13    raises any concern, let me know and we'll deal with it

14    another way, all right?

15         A    Yes.

16         Q    Now, in the context of this document, would you

17    look at page 63-020.  It has the identification numbers from

18    TWI-LIT-00463312.

19         A    That's down at the bottom?  The number is on the

20    bottom center?

21         Q    Yes, sir.

22         A    Okay.

23         Q    All right, sir.  If you would, there's a heading

24    there in the middle of the page, roughly, that says, "Expand

25    international SVOD and direct-to-consumer offerings."

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3162

1       Do you see that?

2   A    Yes, I do.

3   Q    And does that reflect, in addition to expanding

4   offerings, digital offerings, over-the-top type of

5   offerings, direct-to-consumer offerings in the United

6   States, you're also investing in doing that internationally?

7   A    Direct-to-consumer internationally?

8   Q    Yes, sir.

9   A    Yes, we were.

10  Q    And, again, was part of the impetus of making that

11  investment a desire on your part to be able to contact the

12  consumer directly and gather information that would help you

13  do the things that you talked about with Mr. Petrocelli,

14  market better to them, sell advertising more effectively,

15  those type of things?

16  A    Yes, although -- yes.

17  Q    And that's also true of the investments that you

18  made here in the United States for those type of services?

19  A    Is what true?

20  Q    That you made the investments for products to sell

21  here in the United States and make available to consumers in

22  part so that you could try to gather information regarding

23  those consumers to enhance your marketing generally and your

24  sales of advertising specifically?

25  A    Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3163

1          But you can't put direct -- Internet delivered as

2     though it's direct to consumer.  There are two elements to

3     it.

4          You need to deliver over the Internet, but you

5     have to be able to go directly and deliver through the

6     technology platform all the way to the consumer.

7          And in some of these, as we talked about in the

8     United States, HBO being the biggest, we couldn't get

9     information about the consumer because we had to use third

10    parties to deliver and to market that HBO service.

11         If you go overseas, the same thing is often true.

12    Where we need a tech partner or some helping company -- you

13    see here it talks about Tencent in China and that sort of

14    thing, where they have that capability and information and

15    we don't, even if we're trying to go direct subscription

16    VOD.

17    Q    So you were contracting with tech companies to

18    help you deliver the content over the Internet?

19    A    In overseas now?

20    Q    Yes.

21    A    Yes.

22    Q    And you were also doing that here in the

23    United States?

24    A    Yes.

25              No.  Wait.  Contracting with tech companies like

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Apple and Amazon to help market and deliver the product.

2        Q    All right, sir.

3             Were Apple and Amazon selling your SVOD product?

4        A    At this time?

5        Q    Yes, sir.

6        A    Apple was selling HBO.

7             Amazon, in 2017, I believe, had just begun to sell

8    HBO in the United States.

9             Overseas it's a very different story.  You have to

10   go country by country.

11       Q    Well, is anyone, Amazon, for example, or Apple,

12   for example, selling your SVOD product, the Boomerang

13   product that you recently launched?

14       A    No, I don't think so.

15       Q    That's being done directly by you?

16       A    I believe so.

17       Q    Are you selling any other products digitally,

18   directly to consumers?

19       A    In the United States?

20       Q    Yes, sir.

21       A    I believe FilmStruck.

22       Q    And what is FilmStruck?

23       A    FilmStruck is a classic movie service or art movie

24   service.

25       Q    Meaning what?

```
1        A    Well, it's kind of -- it's like an HBO but focused

2    on films that are classic films or more niche films.  And

3    you pay a subscription fee for that.  And we've started to

4    try to do that, and we have a few hundred thousand

5    subscribers.

6             THE COURT:  Is it different than TCM?

7             THE WITNESS:  Not -- it's similar to TCM, but TCM

8    we don't have direct.

9    BY MR. SCOTT:

10       Q    Now, in addition to the products that are being

11   developed for you to offer directly to consumers for them to

12   consume video, is Warner Brothers developing any digital

13   products to take to market?

14       A    Yes.

15       Q    And are they developing products for you to take

16   to market or for others?

17       A    I think both, but I'm thinking of the one that we,

18   Warner, would take to market or with Turner.

19       Q    And what is that product, sir?

20       A    That's DramaFever.

21       Q    And what is DramaFever?

22       A    I believe it was a Korean subscription VOD

23   service, and I think our reason for buying it had, in

24   addition to whatever it had on, was to try to get the

25   technical capability to deliver the subscription VOD
```

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 3032 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3166

1   services like Boom and FilmStruck.

2       Q    Are you familiar with the product -- and I may get

3   the pronunciation off here, but Machinima?

4       A    Yes.  Machinima it is called.

5       Q    Machinima?

6       A    Yes.

7       Q    And what is that?

8       A    That's another niche digital service that

9   Warner Brothers has.  I don't think -- it's a small one.

10  And I'm not -- I think it has games and that kind of thing

11  on it.  I'm not all that up on what it has.

12      Q    Do you know if that's a direct-to-consumer

13  offering by your company?

14      A    I don't.  I think it either may be that and third

15  parties do it, or we maybe try to do it ourselves.

16      Q    And is Warner Brothers in the process of preparing

17  an over-the-top service using DC Comics content?

18      A    I'm not, you mean separately from the kids and

19  family Boom stuff?

20           I think they are trying to figure out if they

21  could do that, yes.

22           I'm not sure that's still going, but I think so.

23      Q    All right, sir.

24           And are there sufficient projects going on, where

25  your people are trying to develop products to take digitally

1  to market through the Internet on a direct-to-consumer basis

2  that may be some that you're just not aware of?

3      A    Might there be some digital products I don't know

4  about?

5      Q    Yes, sir.

6      A    I would like to say no, and I will say no; but

7  maybe I'll be proven wrong.

8      Q    All right, sir.

9      A    I hope not.

10      Q    Prior to the merger, was this a significant push

11  on behalf of your company to try to develop these digital

12  products?

13      A    Well, not in relation to what else we're doing,

14  no.

15      Q    Well, how much -- you know, from your standpoint,

16  though, you had people who were trying to develop products

17  to let you go directly to consumers?

18      A    Yes.

19      Q    And you're investing money in doing that?

20      A    Yes.

21      Q    And you saw the benefit of that as being able to

22  get subscription money back from them, correct?

23      A    Yes.

24      Q    And also, to be in a position, where you could

25  start developing your own library of customer information?

1      A      Yes.

2      Q      You can set that aside.

3             In the course of your work at Time Warner, have

4    you run across the term "content intelligence"?

5      A      No.

6      Q      Never heard that?

7      A      I don't remember it.

8      Q      The information pertaining to customers that you

9    would like to have access to mine for various things,

10   do you have a term for that?

11     A      Could you ask it again.

12     Q      Sure.

13            You've indicated that there's a body of

14   information out there regarding customers that you think

15   would be useful to you for a variety of reasons, correct?

16     A      Yes.

17     Q      How do you refer to that?  What do you call that

18   body of information?

19     A      I don't -- that's what I call it.  I don't have a

20   name for it.

21     Q      All right, sir.

22            Do you have in front of you the exhibit that was

23   used with you by counsel, D122?

24     A      Yes.

25     Q      Okay.  And do you also have the other exhibit that

1  he used with you, DX0746A?

2        A     Yes.  Yes, I do.

3        Q     All right, sir.

4              Let's start with that one, DX046A.

5              And if you were to turn to the second page that

6  actually has the chart on it, the graph.

7        A     Yes.

8        Q     Now, had you seen this before counsel showed it to

9  you?

10       A     Yes.

11       Q     And in what context had you seen it?

12       A     In our various meetings on advertising and how

13  we're doing in advertising.

14       Q     All right, sir.

15             And the heading here says, "Digital Ad Spend

16  Expected to surpass TV in 2017."

17             And then under that it says, "U.S. Advertising

18  Share."

19             Do you see that?

20       A     I do.

21       Q     And then we have the graph here.

22             Are you familiar with the information that is

23  supposedly reflected by that graph?

24       A     You mean, do I think I know what it's about?

25       Q     Yes, what it means, what those percentages relate

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   to.

2          A    Yes.

3          Q    And what is that, sir?

4          A    The share of U.S. advertising through these

5   respective outlets.

6          Q    The share, as a percentage of the whole?

7          A    Yes, I think so.

8          Q    And how did you define, for this particular

9   document, the whole?

10         A    Well, I didn't make the document, but I understand

11  it to be all the advertising spending, I think, at retail in

12  the United States.

13         Q    All right, sir.

14              And does the document, where the percentages

15  change and whatnot, does it, in any way, account for any

16  changes in the total pie of advertising spend during this

17  period?

18         A    I don't think -- maybe -- probably not.

19         Q    So this would be reflecting percentages of

20  whatever the total number is, though the total number may

21  have fluctuated over time?

22         A    Yes.

23         Q    So, for example, where we're showing that you have

24  gone from -- to 32 percent of the U.S. advertising share,

25  that could be 32 percent of a bigger number than was being

1   spent in advertising years earlier?

2       A    Yes, it could be, and probably is.

3            But I shouldn't speculate.

4       Q    Sir?

5       A    I shouldn't speculate, so I'll answer your

6   questions.

7       Q    Now, with this document, I believe that you

8   indicated in your testimony -- and please correct me if I've

9   not this wrong -- that at least some period of time here,

10  that you thought that the TV revenues were pretty steady?

11      A    TV ad revenues?

12      Q    Ad revenues, yes.

13      A    State -- well, I said steady as share of

14  advertising.

15      Q    All right.

16           And so that would be in the years that we're

17  talking about from, say, 2000, until you peak in 2015 at

18  roughly 31 percent?

19      A    It looks to me as though it peaks in 2012.

20      Q    All right.  As a total -- as a percentage?

21      A    Yeah.

22      Q    Whatever that spend happened to be?

23      A    Yes.

24      Q    And during that time period where your percentage

25  seems to go down and the online goes up, do you know whether

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    or not total spend in advertising for online and TV combined

2    increased?

3         A    Yes, I think it did.

4         Q    And did it --

5         A    TV and online?

6         Q    Yes, sir.

7         A    Yeah, I think it went up.

8         Q    For both?

9         A    Yep, in total.

10        Q    And do you know to what degree?

11        A    A lot more in online than TV.

12        Q    But you don't have -- you don't know what the

13   total numbers are?

14        A    Not right here today.

15        Q    And do you know whether, from a standpoint of

16   total dollars earned by traditional pay TV, whether those

17   dollars went up, down, or stayed flat during the period

18   shown on this chart?

19        A    I think they were in the -- I think they were flat

20   and much flatter than they had been five years before, which

21   is what this other chart, I believe, shows.

22        Q    So is it your understanding, then, from the period

23   2000 to 2019, while Internet advertising was increasing, the

24   advertising spend with traditional TV, pay TV, such as, you

25   know, with your company, stayed level or flat during that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  period?

 2      A    No, that's not a correct statement.

 3      Q    And total amount of dollars spent?

 4      A    You're mixing a bunch of things here.

 5      Q    Okay.  Well, let's back up and see if we can try

 6  it again.

 7      A    If we're doing this chart, which we're not

 8  supposed to show, this is about the total share of

 9  television advertising.  That's not cable TV.  That's all

10  television.  And it's about the share in relation digital.

11  It's not about the total numbers, so that's what it shows.

12      Q    All right, sir.

13           MR. SCOTT:  Your Honor, may I approach with

14  another document?  We'll get it to counsel immediately.

15           THE COURT:  Yes.

16           Give it to counsel first.

17           MR. SCOTT:  We will.

18           Do you have a problem of me showing it to the

19  witness?

20           MR. PETROCELLI:  This is a demonstrative from an

21  expert report, Your Honor.  I don't think -- he can show it

22  to him, but I don't know how far he can go with it.

23           THE COURT:  You can come up.  I'll take a look at

24  it.

25           Sir, you have to step down and sit in that chair

 1   over there.

 2              (Sealed bench conference)

 3              THE COURT:  Kind of looks like this one, doesn't

 4   it?

 5              MR. SCOTT:  Well, the difference is that one shows

 6   a percentage.  This one shows an actual dollar.  So when you

 7   look at actual dollars, the numbers for TV have not declined

 8   in actual dollars.  And this one -- in fact they've gone up

 9   slightly, according to Dr. Carlton's view and his

10   information.

11              THE COURT:  This is from Carlton's?

12              MR. SCOTT:  Yes, sir.

13              THE COURT:  I see.

14              Is there any reason to believe he's seen this?

15              MR. SCOTT:  No, but I want to see if this is

16   consistent with his understanding.  It's getting confusing

17   here with trying to talk surreptitiously around a document

18   that doesn't deal with actual dollars, only deals with

19   percentage in a market that, by his own testimony, has grown

20   exponentially.

21              MR. PETROCELLI:  Your Honor, I think he's missing

22   the entire point of this.

23              THE COURT:  Say it again.

24              MR. PETROCELLI:  He's missing the entire point of

25   this.  It's uncontrovertible that digital advertising is

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    blowing away TV advertising and taking dollars away.

2            He doesn't know what these lines would look like

3    absent the digital invasion.  It's not establishing

4    anything.

5            THE COURT:  He didn't create it.  He's never seen

6    it.  There's no basis to think he's ever seen it.  We don't

7    know completely what Carlton's thinking was.  He wasn't

8    questioned about it.

9            So I'm not inclined to let it go in.  But --

10           MR. SCOTT:  All right.  Thank you, Your Honor.

11           THE COURT:  All right.

12           (Open court)

13           THE COURT:  All right.  You may proceed,

14   consistent with the discussion at the bench.

15   BY MR. SCOTT:

16       Q    If you want, sir, take a look at DXD0122, which is

17   the chart that counsel showed you.

18           THE COURT:  DX746A?

19           MR. SCOTT:  No, sir.  This is the other one that

20   they showed, the bar that.

21           THE COURT:  The bar chart.  Okay.

22           All right.

23   BY MR. SCOTT:

24       Q    You remember discussing that with counsel a while

25   ago?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      A      Yes.

2      Q      Do you know who prepared this?

3      A      No.

4      Q      Now, a couple questions about the document itself

5  to see if you can help illuminate a couple points.

6             I notice one of the companies on here is named

7  Baidu.

8             Do you see that?

9      A      Yes.

10     Q      Do you know who that is?

11     A      It's a Chinese company.

12     Q      And what do they do?

13     A      They do what Amazon does.

14     Q      In China?

15     A      Yeah.

16     Q      Do they have any presence here in the United

17 States?

18     A      I'm not -- I don't know.

19     Q      Do you know if they sell any pay TV?

20     A      No, they don't sell pay TV.  They may sell

21 advertising.

22     Q      But do you know of them selling advertising here

23 in the United States?

24     A      I'm not sure.

25     Q      Now, the document itself is headed "Global

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Advertising Revenue by Selected Companies."

2            Do you see that?

3    A    I do.

4    Q    Who picked the companies --

5    A    I don't know.

6    Q    -- to put on here?

7    A    I don't know.

8            I don't know who made the chart.

9    Q    When did you first see the chart?

10   A    During, in the last month.

11   Q    All right, sir.

12           And have you discussed that chart with anyone

13   other than your lawyers?

14   A    No.

15   Q    Now, this chart, down at the bottom here, has

16   Time Warner and shows it's -- well, strike that.  Let me

17   back up a minute and ask another question here.

18           Do you know why global advertising revenue was

19   selected when we're talking about U.S. markets and a U.S.

20   merger?

21   A    Well, that's -- I'm sorry.  You're not correct

22   about that.

23           Our company competes all over the world, and we

24   are very concerned with international markets.  They're

25   about a third of our revenue.  So we compete all over the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3178

1    world, so does AT&T.

2        Q    All right, sir.

3            Now, the market shows here at the bottom,

4    beginning in 2000 -- well, strike that.

5            The chart contains both what would be TV-type

6    companies, you, CBS, those types of companies, as well as

7    companies that are more computer Internet plays?

8        A    Well, I can't entirely agree with that

9    characterization because some of these, like Google, the

10   biggest one, they're a big television provider too.

11       Q    How many television subscribers do they have?

12       A    Viewers or subscribers.

13       Q    Subscribers?

14       A    They've got millions in their Google - YouTube

15   package.  And they have, I think, over a billion connected

16   to their advertising platform.

17       Q    How many people do they have that subscribe to

18   pay TV from Google?  How many subscriptions?

19       A    I don't know.  It's in the millions.

20       Q    And you know that from what document or what

21   source?

22       A    Oh, I just know it from competing with them.

23       Q    Now, do you know what percentage of Google's

24   advertising is from search engines being used, as opposed to

25   pay TV?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3179

1     A     No.

2     Q     Would it surprise you to learn that it's over

3  85 percent of their advertising is related to search

4  engines, as opposed to anything related to delivering

5  television content?

6     A     Well, I think, while it wouldn't surprise me,

7  I think you're making a false silo there, because I think

8  when they're doing search, they're merging into all kinds of

9  businesses, including media consumption and selling ads for

10 that.

11    Q     Well, let me ask you this.  If I go -- I'm a

12 subscriber of a content package that has your TV channels in

13 it, say -- let's pick TNT.  And I turn on TNT and I see an

14 ad.  That ad is going to be delivered to me linearly in a

15 break in the program, right?

16    A     Yes.

17    Q     And do you have the capability, through your

18 channels and allowing people to access ads, through doing

19 searches on the web?

20    A     Do we?

21    Q     Yeah.

22    A     No.

23    Q     And from the standpoint of your channels and

24 delivering advertising, do you have some limit on how much

25 advertising you can put through a particular program or

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    channel?

2        A    In terms of the number of slots, number of

3    commercials that go on the channel?

4        Q    Yes, sir.

5        A    Yes.  If you put only commercials on, too many,

6    then consumers won't watch the channel.

7        Q    Is there a benchmark that you use on how many

8    commercials you're willing to sell on a particular station

9    or channel?

10       A    Yeah.  We're trying to get -- there's too many

11   now.  We're trying to reduce the number of those; that's why

12   we want to make the commercials more valuable, so we don't

13   have to have as many commercials.  And everything you watch,

14   you'd want to be interested in the commercial.

15       Q    And how much time in a typical program, TV show,

16   is allotted for commercial slots?

17       A    Prime time or daytime?

18       Q    I'll take both.

19       A    A little more in daytime.  Prime time, somewhere

20   between 12 and 15 minutes an hour.

21       Q    That's daytime?

22       A    That was prime time.

23       Q    Or prime time?

24       A    12 in prime time.  12 to 15 in daytime.

25       Q    So the amount of commercials that you can sell is

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3181

```
 1   limited by the amount of space that you're willing to

 2   reserve within the programs in order to have it available

 3   for the commercials?

 4       A    You're saying in terms of how many units of

 5   commercials we sell --

 6       Q    Yes.

 7       A    -- or how much dollars we get for the commercial?

 8       Q    How many units?

 9       A    It's limited by, if we have too many, we hurt our

10   viewing of the commercials, yes.

11       Q    And over the last five years, has the number of

12   slots available for commercials over your networks

13   increased?

14       A    Yes.

15       Q    And to what degree?

16       A    I'm not exactly precise on it.  But it's been

17   trending up, and that's part of the problem.

18       Q    And so the 12 to 15 minutes for daytime and the 12

19   for prime time today is the top end of that, of what you've

20   been offering?

21       A    Well, I'm thinking on our networks, I think that's

22   about the range of it, yeah.

23       Q    And the fee that is paid for the commercial is

24   based on the number of eyeballs that you can deliver through

25   that program?
```

 1      A     Well, it used to be.

 2            And now, less so.

 3      Q     All right.

 4            But still eyeballs do come into play; your ratings

 5      come into play with that?

 6      A     Well, the ratings come into play; that's the

 7      eyeballs.

 8            But the value that the advertisers see is, in

 9      those eyeballs is a big fluctuating thing, because, as we

10      said this morning, advertisers don't want to put

11      advertisements in front of your eyeballs if they know you're

12      not interested in what the commercial is trying to sell you.

13      Q     All right.

14            And in the context of that, though, is that true

15      of all advertisers?  Are there, for example, some

16      advertisers who have a more generic product that want broad

17      coverage and want as many people to see the ads that they

18      place as possible?

19      A     There's a spectrum, but I don't think any

20      advertiser has a product -- maybe I'll think of one that

21      they want everyone -- well, there probably are some they

22      want everybody to see.

23            I think what you're missing is that this

24      competition for advertising isn't just about television.  If

25      the advertisers have a more efficient way to give you a

***REDACTED IN ACCORDANCE WITH JULY 31 2018 DISTRICT COURT ORDER***

1   commercial message while you're searching, that takes away

2   revenue from television.

3           And I think the idea the TV ads only compete with

4   other ads in a TV program from a digital company is wrong.

5       Q    Well, let's take a look at the numbers here in

6   examining what you just said.

7           If you look at, from 2012 to 2017, the global

8   advertising revenue that your attorneys put on here and show

9   from you start at 4.3 billion in 2012, go to 4.5 billion in

10  2013, 2.5 -- 4.5 billion in 2014, 4.6 in 2015, 4.7 in 2016,

11  and 4.7 in 2017.

12          So you've gone from a low of 4.3 billion in 2012

13  to 4.7 billion in 2017, correct?

14      A    Yes.  I would call that flat, roughly flat.

15      Q    All right, sir.

16          And so does that -- from the standpoint of you

17  losing revenue, it's gone slightly up over that time frame,

18  correct?

19      A    Absolute dollars?

20      Q    Yes.

21      A    Not inflation-adjusted.

22      Q    Either way you want to do it.

23      A    About flat.

24      Q    Now, the document that we have here also reflects

25  Comcast's global advertising revenue over this time frame,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3184

1    does it not?

2         A    Yes, it does.

3         Q    And Comcast's revenue over this time period goes

4    from 11.5 to 10.6 to 11.8 to 11.4 to 12.9 to 11.3.

5              Again, would you call that relatively flat?

6         A    Yes.

7         Q    And it's -- both of these are relatively flat,

8    when we have at the top showing -- information showing

9    Google and Facebook growing exponentially, right?

10        A    Yes.

11        Q    Now, in this time frame that we're showing here

12   where Comcast numbers are flat, this is after they did a

13   vertical merger where they melded distribution and content,

14   right?

15        A    I think it must be, yes.

16        Q    And is it your understanding that by doing so,

17   they got access to information about customers that you

18   think you'll get post-merger with AT&T?

19        A    Well, there, I don't know, because I don't know

20   what they're allowed to do or what they're doing.

21        Q    All right, sir.

22             So you don't know what data they've got.  You just

23   know they have some data about customers?

24        A    No.  I know what data they've got at Comcast.

25   I don't know what use they can or do or are allowed to use

1    at NBC.

2         Q    Based on what?

3         A    I don't know.

4         Q    Oh, okay.

5         A    Whether they get that data.  I don't know whether

6    they're allowed to use it.  I don't know whether they're

7    using it.

8              It's really not what I do.  I compete with them.

9    I don't run their company.

10        Q    But you talked to them about trying to buy it from

11   them at one point, the data?

12        A    The data at Comcast?

13        Q    Yes.

14        A    Yes.

15        Q    And your people told you that they didn't think it

16   was useable to do what you wanted to do, right?

17        A    No.  Let me make sure -- please, if I could make

18   sure everybody understands this.

19             We think they do have very valuable data.

20             What they offered to us, we didn't think was what

21   they've got really.  And we didn't think they're willing to

22   let us have what we thought would be useful.  We never got a

23   chance to go in and talk with them about what they had to

24   see if we could make use of it.

25        Q    So you think they have valuable data that could be

1  used to do the type of things that you claim you will do

2  post-merger, from the standpoint of dealing with customers?

3       A    Well, they don't have certain things that AT&T

4  has, but they have other kinds of things like their Comcast

5  cable system has a lot of set-top boxes and a lot of direct

6  customers.  They know what they're doing on television.

7  They know what they're doing through other set-top boxes.

8       Q    And are you seeing any signs that they have

9  improved their sales of digital advertising by the use of

10 the data that you're sure they have regarding customers and

11 their likes and dislikes.

12      A    I couldn't point it out to you.

13           I think that from what I hear from the Turner

14 people, the NBC network group that competes with Turner is

15 doing better at ad sales against Turner than they were three

16 years ago.

17      Q    But we're not saying that there's any real uptick

18 in Comcast sales in the numbers your lawyers put together,

19 are you?

20      A    Well, I don't know whether our lawyers put it

21 together.  But whatever these numbers are for Comcast,

22 I'm not sure what other ad revenues are in there.

23      Q    And sitting here today, you know of no prohibition

24 on NBCU of providing Comcast their data to use or Comcast

25 providing NBCU their data to use in pursuing advertising or

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3187

```
 1   customer relations, do you, sir?

 2        A    I don't know what's in their Consent Decree, so

 3   I don't know what they're allowed to use.

 4             THE COURT:  I'll see counsel.

 5             (Sealed bench conference)

 6             THE COURT:  All right.  You've been going for an

 7   hour.  That was the projection how long your cross was going

 8   to be?

 9             How much more have you got?  We've got to get to

10   another witness today; we'll go to 6:00 or later if we need

11   to.

12             MR. SCOTT:  20 minutes.

13             MR. PETROCELLI:  Beating a dead horse on this

14   issue, Your Honor.

15             THE COURT:  I thought so.

16             MR. SCOTT:  I'm moving on past this issue.

17             THE COURT:  I'll tell you what.  We'll take a

18   break for 15 minutes.

19             MR. SCOTT:  Okay.

20             THE COURT:  We're going to scall Stankey.

21             How long is his direct going to be?

22             MR. PETROCELLI:  An hour and a half.

23             THE COURT:  I'll hold you to it.  All right?

24             All right.  We'll take a recess.

25             MR. SCOTT:  Thank you.
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3054 of 3826

3188

```
 1              (Open court)

 2              THE COURT:  All right.  We're going to take an

 3   afternoon recess.

 4              You remain a witness under oath.  Refrain from

 5   discussing your testimony with anyone so far or what it

 6   might be when you return.

 7              See you back in ten minutes, okay?

 8              DEPUTY CLERK:  All rise.

 9              This Honorable Court will now stand in a brief

10   recess for -- he said 15 and then he said 10.  So be

11   prepared to come back into the courtroom in about 5 minutes.

12              (Recess from 3:40 p.m. to 4:00 p.m.)

13              DEPUTY CLERK:  The United States District Court

14   for the District of Columbia is again in session, the

15   Honorable Richard J. Leon presiding.  God save the United

16   States and this Honorable Court.  Please be seated and come

17   to order.

18              THE COURT:  The witness remains under oath.

19              You may proceed when you're ready.

20              MR. SCOTT:  Thank you, Your Honor.

21   BY MR. SCOTT:

22      Q    Mr. Bewkes, if the merger is permitted, are the

23   channels that you have within TNT and Turner going to be

24   sufficient to generate enough customer data for you, the

25   merged company, to be able to successfully compete for
```

 1   digital advertising with the Googles and Facebooks of the

 2   world?

 3        A    With just those two channels?

 4        Q    Yes, sir.

 5        A    Well, we have more channels than that.

 6        Q    Well, all of your channels, then.

 7        A    Oh, okay.

 8             I think it would be a good start.

 9        Q    Well, that wasn't the question.

10             The question is, are you, and if the merger is

11   permitted, with the channels that you have, going to be able

12   to generate with those channels, sufficient customer

13   information to actually compete for digital advertising with

14   the Googles and Facebooks of the world in a meaningful way?

15        A    Well, I have to correct the question, because I

16   don't understand your question.

17             Your question -- I believe what you're asking is,

18   is there enough data generated at AT&T, with its 150 million

19   households, to give us a data set that we could use to sell

20   advertising on our channels that would be more successful

21   with advertisers than what we have today and make us able to

22   compete with Google and Facebook in selling ads?  I believe

23   the answer to that is yes.

24        Q    And in the digital world, you know AT&T has

25   broadband holdings, correct?

1        A     AT&T has -- excuse me?

2        Q     Has broadband holdings?

3        A     Broadband --

4        Q     Broadband holdings, yes.  They have broadband

5   assets?

6        A     Yes, they do.

7        Q     Are they using the information that you've alluded

8   to as being so valuable in competing with Facebook and

9   Google of digital advertising with that data today, using

10  their current assets?

11       A     Well, that's a bit different because they're

12  connecting people through those.  They don't, I believe,

13  sell -- they do sell a certain amount of advertising.  And I

14  think the answer is, yes, they do use that information in as

15  competitive of a way as they can at DirecTV and at other

16  parts of AT&T to sell advertising to advertisers with

17  digital capabilities to it.  And I think they've improved it

18  a lot since they put DirecTV into AT&T when they acquired it

19  a few years ago.

20       Q     If that's the case, can you explain why, in the

21  10K for AT&T, there's no reference, there's no line item to

22  having revenue from advertising of any kind?

23       A     I don't -- I don't -- I'm not familiar with the

24  AT&T 10K.

25       Q     All right., sir.

1          Let me ask you, if the merger doesn't happen,

2     do you have any concerns about or fear of being able to get

3     your programming, your content on AT&T's cellular networks

4     going forward?

5          A    Well, I have some -- we'd have great hopes to get

6     them on their wireless platform if that wireless platform

7     became a robust video platform.

8               I'd have the same concerns I have about getting

9     our channels onto every distribution platform, whether it be

10    cable, satellite, TelCo, virtuals.  We always have those

11    concerns.

12         Q    And that's just being a supplier to AT&T?

13         A    As a supplier to AT&T.

14         Q    Yeah.

15              Would your concern be higher if you were also a

16    competitor for distribution of content with them about

17    whether you could get your materials on their cellular

18    Website?

19         A    Could you say it again.  I didn't --

20         Q    Sure.

21              If you were, in addition to a supplier of content,

22    also a competitor of theirs for the delivery of content,

23    would that raise your concern higher about whether you would

24    eventually be able to get on the network?

25         A    No.

1       Q    So the concern you have as a supplier would not

2   carry over or be affected if you were also a competitor?

3       A    I'm not sure I understand your question.

4       Q    Well, I thought you said --

5            THE COURT:  I don't get it either.  Why don't you

6   restate it.

7            MR. SCOTT:  Sure.

8   BY MR. SCOTT:

9       Q    I thought you would have concerns as a supplier of

10  content as to whether you could get on their wireless

11  networks.

12      A    What I'm saying to you, if I understand your

13  question, is we have concerns about keeping -- getting our

14  networks on and keeping them on for every distribution

15  platform there is.  So if it has video and video networks,

16  we want to have our networks on it.  That's a concern.

17  That's what we were talking about this morning.

18      Q    But if you were a vMVPD, would you be concerned

19  about the possibility of being able to get on their wireless

20  networks?

21      A    No.

22      Q    All right, sir.

23           MR. SCOTT:  One last document, Your Honor.

24           THE COURT:  Yes.

25           MR. SCOTT:  Provided to counsel has been marked as

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158-31 Filed 08/06/18 Page 3059 of 3826

3193

```
 1   PX0053.

 2           May I approach, Your Honor?

 3           THE COURT:  You may.

 4           MR. SCOTT:  And may I approach the witness?

 5           THE COURT:  Yes.

 6   BY MR. SCOTT:

 7       Q    All right, sir.

 8           Now, I believe you testified at one point, you

 9   rejected a merger overture from Fox, correct?

10       A    Yes.

11       Q    And that was for a variety of reasons, one of

12   which was that Fox didn't offer enough?

13       A    I didn't testify to that yet, but are you asking

14   me that now?

15       Q    Yes, sir.

16       A    We thought it was not a good offer and not worth

17   what they said it was.

18           But the reason we rejected it was primarily that

19   it didn't accomplish the strategic games we've been talking

20   about.

21       Q    And you stated publicly after that that you

22   weren't looking for a merger.  But obviously if someone came

23   in with a financial package that was favorable to your

24   shareholders and a good deal for them, you'd have to

25   seriously consider it?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3194

```
 1        A     Yes.

 2        Q     And AT&T came in with a number that was

 3   significantly higher than what Fox offered, correct?

 4        A     About 50 percent.

 5        Q     And AT&T, for your company, is offering over

 6   $100 million?

 7        A     A hundred --

 8        Q     $100 billion?

 9        A     $100 billion.

10        Q     $100 billion?

11        A     If you include the assumption of debt, yes.

12        Q     And the per-share amount of this is $107.50 per

13   share; is that correct?

14        A     At the target price, yes.

15              But since some of the consideration is in AT&T

16   stock, the actual amount will depend on what the AT&T stock

17   price is when the merger closes, if it closes.

18        Q     So give or take, it's about, what, the stock share

19   per price?

20        A     The AT&T price?

21        Q     Yes, sir.

22        A     36.  That --

23        Q     I'm sorry.  Go ahead.

24        A     No.  I think it's around -- I'm not sure what it

25   is today.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q     In addition to the shares of AT&T stock, you're

2   going -- will be paid another cash amount for each share?

3      A     Well, when we struck the deal, if AT&T stock was

4   in the collar, that the deal hoped that would be the value

5   of AT&T, half of the consideration would be stock in AT&T

6   for our shareholders and half would be cash.

7      Q     And the final -- the amount at the time of the

8   deal was $107.50 per share, but that may vary depending on

9   whether stock is at the time the deal closes?

10     A     Yes.

11     Q     Using -- now -- and that would have been -- using

12  the 107.5 per share, that would have been a 35 percent

13  premium over your trading price at that time?

14     A     I think it was a little higher than that, but in

15  that neighborhood, yeah.

16     Q     And the share price then, trading on October 19th,

17  2016, was $79.24?

18     A     That sounds right.

19     Q     Now, let me ask you to take a look at the document

20  in front of you, which has been marked as PX0553.  It's

21  headed "United States Securities and Exchange Commission

22  Statement of Changes and Beneficial Ownership."

23           Do you see that?

24     A     Yes.

25     Q     And at the bottom, it seems to have been signed by

1    you on February 28th, 2018?

2         A     At the bottom?

3         Q     Bottom right-hand corner there, right under the

4    boxes.

5         A     Signed by me.

6         Q     No.  Signed for you, by Brenda Karickhoff for

7    Jeffrey L. Bewkes.

8         A     Yes.

9         Q     On February 28th, 2018?

10        A     Yes.

11        Q     And this reflects that you, I guess, cashed in

12   some options?

13        A     No, I don't think.  That's not right.

14        Q     Well, what does it -- what did happen on that

15   date?

16        A     These charts go -- I'll tell you what I think

17   happened.

18             So I had some options that were granted to me ten

19   years ago that were going to expire.  And if they expired

20   and I did not exercise them, they would be gone.  They're a

21   part of our incentive for all of our executives to try to

22   make the company more valuable.

23             So before they expired, I wanted to exercise them,

24   and I needed to pay for them.  So you have to pay for the

25   price of them, which is listed here.

1        And then you have to pay for the tax that is

2    imputed on the gain between that historic price and the

3    price when you exercise.

4        So that's what I was doing and swapping shares to

5    pay for both the tax and for the exercise price.

6    Q    All right, sir.

7    A    I didn't sell any shares.

8    Q    All right.

9        And this document reflects, after -- it appears to

10    reflect, and you can tell me if I'm wrong under

11    nonderivative securities acquired, disposed of, or

12    beneficially owned, that at the end of this, you owned

13    1,0294,302 shares of stock in Time Warner?

14    A    I believe I did -- maybe.  I'm not sure.

15    Q    Well, that's what reflected on the document,

16    correct?

17    A    Okay.  Well, then that must be right.

18    Q    Then below that, it also says you have another

19    40,000 shares that are in a savings plan, correct?

20    A    Yes.

21    Q    Do you own any additional stock in Time Warner?

22    A    Yeah, I think I do.

23    Q    Do you know how many shares?

24    A    Maybe another million shares.

25    Q    And then do you have any more outstanding options?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3198

1          A     I do.

2          Q     All right, sir.

3                And when do those come due?  When do they vest?

4          A     Well, they have been granted every year for the

5     last ten years.  So they vest over four years, generally,

6     and then they expire ten years after they were granted.

7          Q     So based on the stock that you currently own, if

8     the deal closes, you will be -- have in hand stock valuing

9     somewhere north of $200 million?

10         A     When you say it would be worth that, after the

11    close?

12         Q     If you get the amount that is in the contract,

13    yes.

14         A     Probably true, yes.  I suspect that's right.

15         Q     And do you know how many more options you have

16    outstanding?

17         A     I don't have it right here for precision, but at

18    least 3 million, maybe 4.

19         Q     All right, sir.

20               And did those vest if you retire?

21         A     They vest if I retire.  They vest if I'm

22    terminated without cause.  And they vest if I'm terminated

23    without cause regardless of whether there's a merger or not.

24    It's always the same whether there's a merger or not.

25         Q     And with those shares, you will walk away, if you

1  cash in when the deal closes, with a premium of roughly 30

2  to 35 percent over the trade value as of the day the deal is

3  announced?

4      A    I believe that's right.

5      Q    And for the 1.3 million shares that are reflected

6  on the document, that would be a benefit to you of somewhere

7  around $40 million over the trade price as of the day the

8  deal was announced?

9      A    I think so, yes.

10     Q    And then as -- more with the other shares that you

11 have, the other million or so?

12     A    I hope so, yes.

13     Q    All right, sir.

14          And when the deal, if the deal closes, are you

15 planning on staying around and help run the company?

16     A    Well, we were talking about that.  But

17 I understand, and I expect, that when the deal closes, I

18 will be terminated without cause.

19          MR. SCOTT:  All right.  No further questions,

20 Your Honor.

21          THE COURT:  Redirect.

22                    REDIRECT EXAMINATION

23 BY MR. PETROCELLI:

24     Q    Why will you be terminated without cause?

25     A    Well, as is common in these kinds of mergers,

```
 1   although it doesn't happen every time, we're moving towards

 2   a fairly long-term project to get Time Warner and AT&T

 3   integrated and do all these things we've been talking about.

 4           And I'm 65.  My contract that I have, as

 5   Time Warner right now as an independent company, runs for

 6   another two and a half years, roughly.  And I had planned to

 7   leave at that point, unless the board were to remove me or

 8   relieve me before that, which they can always do.

 9           So I'm really on the older side to take this out

10   for another five or ten years.  And because of what we're

11   undertaking, because we have a new company and we have all

12   these new capabilities at AT&T we'd like to harness, we've

13   all decided -- Randall, me, John Stankey, who's sitting in

14   the courtroom -- that we need a new management team that can

15   go for this next era.

16           And so our expectation, which we've announced, is

17   that John Stankey will take over what is currently my job

18   running the Time Warner companies.

19   Q    If you're terminated, then, without cause in the

20   event the merger closes, will you then earn less or more

21   money than had you not been terminated and your contract was

22   performed to its natural expiration?

23   A    Well, if I'm terminated without cause, either by

24   Time Warner as an independent company or by Time Warner-AT&T

25   as a merged company, the same result occurs.  I get the same
```

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 3067 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3201

1    severance and amount of stock bonus, whatever it is.

2            All of that, because I'm -- if I'm terminated

3    without cause, is less than what I would earn if I were able

4    to complete my contract.

5            If I complete my contract, which probably would

6    happen if we didn't do the merger, I would earn more money

7    for 2019 and 2020.  Roughly, I would get about -- I'm going

8    to lose about half of what that will be between now and

9    then.

10   Q    So you'll lose about half of what you otherwise

11   would earn if the merger closes and you're then terminated

12   without cause?

13   A    Yes.

14   Q    And in terms of your stock ownership, that's been

15   acquired over how many years?

16   A    Ten years.  There was another ten years before

17   that, but those things have -- I've got -- some of the

18   shares I own, I got 20 years ago.

19   Q    So just over the course of your long career as

20   part of your compensation incentive?

21   A    Yes, because the idea --

22   Q    Right.

23   A    -- is you try to get your executives to have the

24   same interests as the shareholders so they serve the

25   shareholders and try to get the shareholders the best

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    long-term return that you can give.

2        Q    And if the merger does not close, you still have

3    those stock shares, and they'll be worth whatever the market

4    says they're worth, right?

5        A    Yes.

6        Q    And are you getting any special kicker if this

7    merger closes?

8        A    No.

9        Q    One other question.

10            On these new digital properties, Machinima -- what

11    else did we talk about?  FilmStruck, Boomerang, was that it?

12        A    Boom, I think it's called.

13        Q    How many total subscribers do you have for all of

14    those, just ballpark?

15        A    Probably less than half a million.

16        Q    In all?

17        A    Yes.

18        Q    So an insignificant number?

19        A    Yes.

20        Q    And given your testimony about all the things your

21    company has been doing to try to meet the competitive

22    challenges, is it fair to say that, absent the merger, it

23    will take longer, be harder, and cost more money?

24        A    Yes.  That's why we judge this merger to be in the

25    interests of our shareholders and our companies going

```
 1    forward.

 2            MR. PETROCELLI:  Okay.  Thank you.

 3            Nothing further.

 4            THE COURT:  Recross, limited to redirect, do you

 5    have any?

 6            MR. SCOTT:  No, Your Honor.

 7            THE COURT:  Okay.  You're excused.

 8            THE WITNESS:  Thank you, sir.

 9            THE COURT:  You may step down.

10            THE WITNESS:  Thank you.

11            THE COURT:  Call your next witness.

12            MR. PETROCELLI:  We call John Stankey.

13            THE COURT:  All right.

14            DEPUTY CLERK:  Please raise your right hand.

15            (Witness is placed under oath.)

16            DEPUTY CLERK:  Please be seated.

17            MR. PETROCELLI:  Thank you.

18            May I approach, Your Honor?

19            THE COURT:  You may.

20            MR. PETROCELLI:  Hand some to clerk and to

21    counsel.

22            Thank you.

23    JOHN STANKEY, WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY

24    SWORN, TESTIFIED AS FOLLOWS:

25
```

```
 1                    DIRECT EXAMINATION

 2   BY MR. PETROCELLI:

 3        Q    State your full name for the record, please.

 4        A    John Thomas Stankey.

 5        Q    Mr. Stankey, by my count, you testified in

 6   deposition leading up to today five days for a total of

 7   1,900 pages.  I can assure you that we won't be replicating

 8   that today.  I'm going to try to get through this more

 9   quickly so we can try to complete your testimony.  Okay?

10        A    I would appreciate that.

11             THE COURT:  You can count on it.  And he knows.

12             MR. PETROCELLI:  Take the words out of my mouth,

13   Your Honor.

14   BY MR. PETROCELLI:

15        Q    Okay.  So can you just tell His Honor what your

16   current position is.

17        A    I'm currently responsible for the planning and

18   integration of the Time Warner merger.

19        Q    And if the merger closes, what will you be doing?

20        A    As you heard Mr. Bewkes say, I'll be following in

21   his footsteps to run the Time Warner company.

22        Q    Okay.

23             How long have you been working at AT&T?

24        A    About 33 years.

25        Q    And can you briefly describe your roles at the
```

1    company over the years.

2         A    Sure.

3              I started out doing things that people do at the

4    telephone company, including handling requests to repair

5    people's telephone service and requests to install telephone

6    service, worked through a whole bunch of other jobs in

7    various operating roles, to increasing levels of

8    responsibility.

9              Sometime around probably 1993, I took my first

10   turn at trying to get into the pay-TV business.  And it was

11   really one of my first experiences trying to build a product

12   by committee through, we had literally a network being built

13   and, through contract, a separate, independent affiliate

14   trying to build the product and do that.  It didn't turn out

15   so well.  It failed.  And ultimately, I had to move on.

16             I've done a variety of things since then.  I've

17   run the wholesale business, which is the part of AT&T that

18   sells AT&T's network to our competitors to basically

19   complete their networks.

20             I've run all of our business sales organization,

21   where we sell parts of our network to support companies like

22   Bank of America or General Motors or a local barber shop.

23             I ran the regional telephone companies at one

24   time.  These are the companies before the divestiture of the

25   Bell system that were the operating companies like Pacific

1   Telesis, Ameritech, Southwestern Bell.

2          Took my second turn at the pay-TV business

3   sometime in 2003 as the Chief Technical Officer of the

4   company and built the capability to actually deliver TV

5   service over phone lines.

6          I've been the CIO.  I've been the Chief Strategy

7   Officer.  I've run corporate development.  I ran all of

8   operations and administration for the company.

9          And then right in 2015, took over the DirecTV

10   company, which was effectively the consumer market segment

11   of AT&T that had our pay-TV product, our fixed broadband

12   product that goes into homes, and our wireless service for

13   consumers.

14   Q    Prior to acquiring DirecTV in 2015, what was your

15   pay-TV business?

16   A    We had a product called U-verse, which, as I said,

17   I started sometime in 2004 developing.  And we went to

18   market in 2006.  And it delivers TV service over plain old

19   telephone lines.  It was a relatively new technology that

20   enabled us to do that.

21          And by the time we bought DirecTV in 2015, we had

22   about 6 million customers on that service.

23   Q    And where does U-verse provide service?

24   A    It only provides service in parts of our, what

25   used to be our former telephone company operating territory.

1    It's effectively parts of 21 states.

2        Q    Were you involved in a decision to acquire

3    DirecTV?

4        A    I was.

5        Q    And what were the reasons?

6        A    We'd been trying to get into pay TV for quite some

7    time, and the reality is it's a scale business.  And even at

8    6 million customers, going from a dead start of zero to

9    6 million, we still hadn't achieved the kind of scale we

10   wanted to achieve.

11           And we felt that buying DirecTV was a way that we

12   could get that scale.

13           And the scale specifically in this case was to be

14   able to improve our cost structure on buying programming

15   content that we've talked a lot about in this courtroom, and

16   that by getting to that scale, we would substantially change

17   our cost structure.

18           In addition, we intended to pick up a lot of new

19   customers that we could work on migrating into newer ways to

20   serve them with new products.

21           We weren't terribly enamored with the satellite

22   business.  In today's mobile world where people are moving

23   around, putting a satellite Dish on somebody's house and

24   having to be stationary to watch video isn't the optimal

25   going-forward technology.

1          But we did like the customers, so we felt like we

2    can invest to migrate them into newer ways of serving them.

3          Q    So when you talked about achieving scale, did you

4    mean by that by having more subscribers adding DirecTV to

5    U-verse, you could give bigger volume discounts and pay less

6    for the programming?

7          A    Correct.

8          We went from being a 6-million-customer company to

9    roughly 25 million and change.  And that made us one of the

10   largest pay-TV providers in the United States and gave us

11   some flexibility on our content and programming cost

12   structure to be able to do things like offer the DirecTV Now

13   product.

14         Q    And was it one of the objectives in acquiring

15   DirecTV, which, as you said, is a satellite business, to

16   essentially be able to provide television programming in the

17   mobile environment.

18         A    Yeah.

19         It was -- when I came in, one of the clear

20   objectives was to start to transform the way we deliver

21   video to customers, make the video far more portable, start

22   to emphasize the fact that we could use our 100 million

23   wireless subscribers to be able to do things differently,

24   which is dramatically different than Comcast.

25         One of the reasons our data is different is we

 1   have a lot of mobile subscribers who do lot of things that

 2   generate data, and we started investing very heavily to do

 3   that.

 4        Q    And when you acquired DirecTV, did you understand

 5   that it was a mature and, to a certain degree, declining

 6   asset?

 7        A    Absolutely.

 8             In fact, all the estimates we did for the board

 9   talked about the fact that the pay-TV industry, as we knew

10   it today at that time, was peaked and it was going to start

11   coming down.

12             And we knew that we were in a foot race to

13   basically start to change the product to be able to catch

14   the next wave, whatever that next wave was going to be.  And

15   we didn't expect that we were going to continue to see

16   traditional pay-TV subscribers going like this.

17             And so we fully understood this was kind of a

18   renovation project.

19        Q    And did, after you acquired DirecTV, did you take

20   DirecTV out to the mobile environment?

21        A    We did.

22             We really did that in a couple of steps.  One is,

23   we immediately began negotiating rights to get the content

24   that DirecTV bought licensed to be able to deliver it to

25   people over their mobile phones, their tablets, their PCs,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3210

1   in addition to their TVs.

2        Q    To be clear, DirecTV, as well as U-verse, already

3   had contracts with these programmers to offer their

4   programming through your pay TV systems, right?

5        A    That's correct.

6        Q    Did you need to get new contract rights from them

7   in order to essentially offer the same programming through

8   DirecTV Now?

9        A    Well, in the case of DirecTV, to get mobile

10  rights, we needed to do a fair amount of work on the old

11  DirecTV contracts just to be able to deliver the content to

12  the mobile phones.

13            The second phase was to be able to do DirecTV Now,

14  which was a whole new set of contracts entirely, on top of

15  that.

16            So there was quite a bit of contract work going on

17  in tandem right after the close of the transaction in 2015.

18       Q    And how long did it take for your company, after

19  you acquired DirecTV, to launch DirecTV Now?

20       A    It -- when we started the effort -- we closed

21  DirecTV in July of 2015.  Probably by about October of 2015,

22  I had set the direction on what we were going to do with the

23  organization.  And we launched DirecTV Now about a year

24  later, early November of 2016.

25       Q    And how's that business going?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3211

1        A     It's going well.  We're over a million, million

2    subscribers.  So for a year's worth of work, little over a

3    year, that's pretty good scaling.

4              But, look, it's starting.  I mean, there's things

5    we'd like to have seen gone better.  And frankly, the

6    platform we built to deliver DirecTV Now on was intended for

7    a first product.  We'd like to do several other products,

8    and we have not had the opportunity to start offering new

9    iterations beyond what the initial product was.

10       Q     Did you try, after you acquired DirecTV, to go get

11   additional rights from programmers to do innovative things

12   for the benefit of consumers?

13       A     We've been -- yes, we did.

14             I spent -- at the time we closed the DirecTV

15   transaction in July of 2015, one of the immediate things I

16   started to focus my time and attention on, investing a

17   significant amount of money to build this new platform

18   I just talked about, but also meeting directly with many of

19   the large programmers to try to figure out whether we could

20   get rights to do some things differently.

21             The rights for DirecTV Now were one set of

22   discussions.  But we were also trying to build opportunities

23   to do some more unique things, scale content into the mobile

24   environment, change the size of packages, see if we could

25   build products on a win-win basis that allowed us to use our

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 3078 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3212

1   data to help them change their advertising.

2          There was a whole host of things that were

3   discussed, and I immediately started having those

4   conversations with programmers after we closed that

5   transaction.

6   Q    Can you identify some of the programmers that you

7   met with?

8   A    The most frequent -- it was real clear, if we

9   didn't get Fox and Disney going the right way, it was going

10  to be difficult to kind of get the momentum we wanted to get

11  on this.

12         So I spent lot of time with Fox and Disney.  I

13  then ultimately spent time with Discovery, Scripps, Viacom,

14  but I really wanted to see if we could get the two leaders

15  moving.

16  Q    And what was the reaction of the programmers to

17  what you wanted to accomplish in securing of additional

18  rights?

19  A    After several cycles of these conversations, it

20  became apparent to me -- well, in some cases the

21  conversations were courteous and maybe even slightly

22  constructive.

23         I can recall a dinner that I was having with an

24  unnamed Fox executive early in 2016.  And after the dinner,

25  I walked out of the restaurant, realized the path to

1    cooperation of innovation was not going to come through AT&T

2    with these particular companies.

3         Q    What did you do after coming to that view?

4         A    I started asking myself, what should the business

5    do to respond to the changing environment that we've heard

6    about in this courtroom, the dawn of these new services

7    coming from the likes Netflix and Google?  The fact that

8    there were new virtual MVPDs coming into the market,

9    competition was at an all-time high.

10        And I literally started spending some quiet time

11   understanding, was this the trigger?  Was this the time that

12   AT&T was going to have to reconsider its longstanding view

13   of, we'd rather not be in the content development business,

14   and did we need to do that to get to the level of innovation

15   we were going to have to achieve out in the market.

16        Q    And in terms of the industry headwinds and the

17   changes that we have heard, including just now from

18   Mr. Bewkes, did you make similar observations about Google

19   and Facebook on the advertising side, for example?

20        A    There's no -- Mr. Bewkes did a very nice job

21   earlier, and I'm not going to belabor if it lining up the

22   dynamics that were going on in advertising and clearly the

23   dynamics that were going on in how products were changing.

24        One thing I would probably add on is how I was

25   thinking about things at that time and still think about it

1   today, is the market that we're competing in is the market

2   for the customers' time and attention.

3           And the entertainment services that they consume

4   command a lot of their time and attention.  And

5   historically, it's been through traditional TV services.

6   The phrase "couch potato" comes from people sitting on a

7   couch and watching TV.

8           The time-and-attention competition now from the

9   likes of Facebook, from the likes of Google, from the likes

10  of Netflix, they're distracting people from other things

11  they used to do.

12          And somehow, we have to build products that

13  continue to command customers' time and attention.  That's

14  the battle here.

15      Q    Is this what ultimately led to a recommendation by

16  you to your boss that you should consider purchasing a

17  content company?

18      A    That exploration process, a couple weeks of quiet

19  study of my own, some analysis, trying to understand what it

20  would mean to put a media company together with a

21  distribution company, thinking about the talent that was

22  required, a variety of other things, I put a framework

23  together that caused me to start those discussions with

24  Mr. Stephenson.

25      Q    Mr. Randall Stephenson was your boss?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        A     That's correct.

2        Q     And still is, right?

3        A     Yes, he is.

4        Q     What was Mr. Stephenson's reaction?

5        A     We, over the course of a couple weeks, engaged on

6    a lot of different ideas and thoughts, talked about a

7    variety of different options of how we could go about doing

8    that, looked at some broad-scale numbers in the industry.

9    And he felt like the time was now for us to start thinking

10   about what those steps are.

11                THE COURT:  You can approach.

12                (Sealed bench conference)

13                MR. WELSH:  I think Mr. Stephenson will be

14   attending this trial and sitting on the stand to testify.

15   And this witness was just going into hearsay, so I think

16   it's better to wait for Mr. Stephenson.

17                MR. PETROCELLI:  First of all, it's not hearsay at

18   all.  He's talking about his interactions with his boss

19   regarding their state of mind and their thinking that led to

20   the decision to acquire Time Warner.

21                So I'm not going into direct conversations, but

22   they're not hearsay at all, because they're not offered to

23   prove the truth.  They're offered to explain the conduct of

24   the company through its chief executive.  It's classic

25   non-hearsay, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  Yes.  I think I agree with that.

 2              MR. PETROCELLI:  Thank you.

 3              THE COURT:  So I'm going to overrule the

 4     objection.

 5              (Open court)

 6              THE COURT:  All right.  You may proceed.

 7              MR. PETROCELLI:  Yeah.

 8     BY MR. PETROCELLI:

 9         Q    So what was Mr. Stephenson's reaction to your

10     point of view?

11         A    He was receptive to it, and we talked about a

12     couple of options.  And he and I started doing some work to

13     start socializing and preparing the board for some steps we

14     were going to take to explore things further.

15         Q    And was it your thought and idea conveyed to

16     Mr. Stephenson that you should go out and buy a company like

17     Time Warner?

18         A    No, that wasn't the, where we initially started.

19              We had laid out a couple of different options.

20     And our initial discussions were about how could we maybe

21     move and do something that will oftentimes be referred to in

22     the M&A game as a string of pearls.

23         Q    What does that mean?

24         A    One small transaction, another transaction,

25     another transaction over time, possibly.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3217

1    Q    Why didn't you pursue that?

2    A    Well, we did.  We actually did start to kind of

3 explore whether or not that made the most sense.

4    And as we were in the front end of that process

5 and looking at it, things in the industry continued to move

6 incredibly quickly.

7    And, frankly, I think the board was incredibly

8 supportive of the direction, given what they were seeing

9 going on in the market and was encouraging us, as is not

10 uncommon, with the AT&T board to lean in and try to be a

11 little bit more aggressive.

12    And I think Mr. Stephenson took that to heart.

13 And at that point, he started to explore whether or not a

14 more significant step would be the right step for us to

15 take.

16    Q    And that step was ultimately the acquisition of

17 Time Warner?

18    A    That's correct.

19    Q    And that effort was led by Mr. Stephenson?

20    A    Right.

21    He went and started to frame some of that --

22 I think Mr. Bewkes characterized the time frame in his

23 testimony and started to have some discussions to see if he

24 could frame that and what made sense and started to move

25 that forward.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3218

```
1        Q    And did you work closely with Mr. Stephenson in

2   that regard?

3        A    I did.

4        Q    Okay.  I'm going to let Mr. Stephenson take it

5   from here when he testifies tomorrow.  So let me just sort

6   of skip a little bit of this story and ask if you were

7   involved in the meetings with the board in which the

8   acquisition was proposed and discussed.

9        A    I was.

10       Q    And the board reacted with a vote of approval?

11       A    It did, with lot of deliberation and discussion,

12  yes.

13       Q    A number of meetings and calls and discussions?

14       A    Correct.

15       Q    And Mr. Stephenson can help walk us through some

16  of that.

17            But can you just summarize for the Court what the

18  principal reasons were for recommending the transaction to

19  the board?

20       A    Sure.

21            Let me build off of what Mr. Bewkes said.

22            AT&T has customers.  We have technology and

23  distribution platforms to get content out to customers.

24            We have the knowledge of how to manage a customer

25  cycle, how to find them, how to recruit them, bring them in.
```

1          What we don't have is, we didn't have programming.

2     We didn't have the flexibility to change the product, and

3     that's what the guys on the other side had.

4          And they were looking at it saying, well, we don't

5     have customer data.  We don't have customer arrangements and

6     information.  And so it was bringing this together with this

7     that was the fundamental discussion with the board.

8          And the intent of doing that was to yield exactly

9     what Mr. Bewkes alluded to in his frustration that I alluded

10    to when I was talking about the difficulty getting

11    programmers to adjust, was to build a better product, was to

12    get in and innovate faster and quicker, not do it by

13    contract.

14         And that's where we chartered our course.

15    Q    And was advertising part of the objectives and

16    motivations for doing the deal?

17    A    We absolutely believed -- going all the way back

18    to the time I was in corporate strategy in 2012, I started

19    doing work for the company on the importance of having a

20    more-robust advertising revenue stream in the business.

21         We do a great job of selling subscriptions to

22    customers.  We're not as strong at putting advertising in

23    place.  We felt like we had to diversify our revenue streams

24    significantly for a variety of reasons, one being that many

25    of our new competitors, like Google, don't charge anybody

1    anything for what they do.  They do it all on advertising.

2         We have an entire generation coming up -- my

3    children are a good example, my young adult children -- who

4    they don't believe they should pay anybody for what they do.

5    They should get it all for free.

6         So we knew we were going to need to have the

7    capability over time to be able to market and sell products

8    with advertising-supported models.

9    Q    Now, if the court approves this merger, you

10   indicated your role will be to run the company, right?

11   A    That's correct.

12   Q    Can you give the Court just a couple of examples

13   of the kinds of things that you envision doing by owning,

14   controlling the Time Warner content that you can't do now?

15   A    Sure.

16        First of all, I would put the caveat on this that

17   once teams come together, I think the right ideas will come

18   out and the right collaboration will occur.

19        But I give you some very simple examples of how we

20   think about extending assets.

21        So there was a discussion around CNN earlier and

22   how many advertising slots you can get in to CNN.  I think

23   there's a way to expand that.  There's a way to expand that

24   by taking CNN out to the mobile device and re -- there's

25   very high-quality content at CNN that a lot of people don't

1   have a chance to see because they don't sit around in their

2   living room.  They've got to work during the day.  They've

3   got to do things.

4          Now, what can we do to re-stack that and re-edit

5   it and get it out to mobile phones so that during a

6   15-minute break, you can get your set of news clips and

7   information that's tailored to you and what you like to see

8   in your particular geography that you find compelling and

9   interesting.

10          And that actually expands the amount of

11   advertising that can be sold.  It isn't capped and fixed, as

12   was being suggested in Mr. Bewkes' cross-examination.

13          It's a new customer at a new moment doing

14   something that wasn't being done otherwise.  And it's your

15   interaction with CNN at that time, which means that that can

16   be a highly targeted and directed ad that could be very,

17   very profitable but very tuned to your likes and dislikes.

18          So that would be an example of something we could

19   do on a foundation of capabilities that the two businesses

20   have together.

21     Q    You mentioned couch potato, and I plead guilty to

22   the charge.  Is there anything in this for people like me?

23     A    Sure.  Absolutely.

24          So for somebody like you and being

25   sports-oriented, you probably want to see more content

1  that's higher resolution in sports programming.  So in the

2  case of that, we want high-resolution television in our

3  distribution business, selling TV to customers.

4       Customers want what they call 4K.  It's the next

5  step in visual clarity for TV.

6       Higher resolution means it's easier to watch.  You

7  can see more things.  Unfortunately, the industry has been

8  very slow to adopt it.  We've been working very hard with

9  different programmers to try to get what's called 4K content

10  to take out to the customers.

11       By the controlling the source of it now in some

12  cases, like the NBA games, like the NCAA games that we've

13  been talking about in this courtroom, and controlling the

14  distribution, we can move more 4K out to enjoy that couch

15  potato experience with better visual examination.

16       Q    How does owning Time Warner content help you do

17  that?

18       A    Well, we get to control both sides to that.  We

19  get to make the decisions on how the content is either

20  produced or how the games are shot and then move it out over

21  a distribution platform that we control the technology on so

22  that we can do more of that.

23       Q    And these are the kinds of things that you would

24  encounter bargaining friction in attempting to do by

25  contract with unaffiliated companies?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3223

1       A    These are the things that traditionally move very,

2    very slowly in the media and distribution business, yes.

3       Q    And can you give, perhaps, one more example of an

4    innovative use of content, for example, involving

5    interactivity?

6       A    Sure.

7            And probably not up Your Honor's alley, certainly

8    not up my alley, necessarily, but we've got a lot of people

9    who are watching content now and using social networks with

10   them.  They're watching content, and they like to integrate

11   things so that they can share their experiences over

12   Facebook.

13           Maybe they're watching something in particular

14   that they like and they to clip it and send it to their

15   friends.  And it's a funny scene from a comedy sketch the

16   night before, share it with people, put it on there.  Maybe

17   even while they're watching it, they want to have a social

18   conversation, texting back and forth.

19           Or possibly while they're watching an NBA game,

20   they want to have a second screen experience while they're

21   watching on the big screen.  They want to be able to

22   interact with a simulcast that goes on with stats and

23   information on their mobile phone so that they're getting

24   information about the play calling in the game.

25           These are all interactive and social opportunities

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3224

 1   that, as you control the entire distribution stream and you

 2   actually have the content, that you can begin to prove in so

 3   that the industry can start to implement many of those

 4   things.

 5        Q    Okay.

 6             So I'd like to now turn to some more specific

 7   benefits that you believe will accrue to the company.

 8             You were here when Dr. Shapiro testified, right?

 9        A    I was.

10        Q    And you heard his testimony that except for the

11   elimination of double marginalization, he assumed, for

12   purposes of his bargaining model, that there would be no

13   efficiencies or benefits as a result of the merger?

14        A    Yes.  I think he said the number was zero.

15        Q    Zero.

16             And he also said he was relying on other

17   government experts to address those issues, right?

18        A    He did.

19        Q    Okay.

20             Now, do you agree that the number is zero?

21        A    I do not.  I've been involved in eight major

22   merger integrations and transactions during my career with

23   AT&T, directly involved.  And my experience is that putting

24   two companies of this stature and size together does yield

25   efficiencies and benefits.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q    Okay.  So can we talk -- that's what I want to

2    turn to now is the identification and description of what

3    we'll call merger synergies, okay?

4      A    Okay.

5      Q    And have you been involved, since the announcement

6    of the merger back in 2016, in identifying and even

7    quantifying some of these merger efficiencies?

8      A    I have.  I've been involved in a number of

9    different ways since the initial announcement on up to

10   today, but I've been involved consistently throughout that

11   time.

12     Q    And at some point during the last year and a half,

13   have -- you actually were named the head of the integration

14   process?

15     A    In August of 2017, I became primarily responsible

16   for that as my sole responsibility.

17     Q    And can you describe to the Court how this process

18   works, where you identify and quantify synergies.

19          And I want to be clear.  These are predictions of

20   what might happen as a result of the merger, right?

21     A    Yes.  By default, they have to be predictions

22   because the businesses haven't come together yet.  But

23   they're predictions that are built on our past experience

24   and the knowledge of individuals who have oftentimes done

25   things like this.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q     And how many times have you done this before, did

2   you say?

3      A     I personally have been directly involved in the

4   leadership and execution of eight transactions, I hate to

5   say.

6      Q     And they pursued this same type of process that

7   you're now about to describe?

8      A     We've -- every time we've done a major

9   transaction, we worked this process.

10          It's been fine-tuned and honed a little bit over

11   the years, but it's ostensibly the same process.

12      Q     So can you describe for His Honor the process that

13   you have been involved with in directing for estimating or

14   predicting the kind of synergies that will result as a

15   result of the merger.

16      A     Sure.

17          The process -- I'll abridge this.

18          But it starts before the transaction is even

19   announced to the public.

20          Part of the due diligence process of deciding to

21   do the transaction is evaluating whether or not there are

22   benefits to putting the two companies together.  Are the

23   benefits significant enough that there's going to be value

24   returned to the shareholder?

25          And so when the M&A groups that are doing the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  study are actually evaluating the target company, they build

2  models around where there can be benefits and efficiencies.

3       And they take their best shot at doing that in a

4  very short period of time.  An M&A process is usually a

5  small number of people, very contained to a couple of weeks.

6       I think you heard Mr. Bewkes say they started

7  talking in August; they closed the transaction in October.

8  So it's a confined period of time.

9       But they take their best shot at that.  They're

10  generally very conservative at the first run, because you're

11  representing to the board:  Is there some minimum threshold

12  that we can hit that we know we're going to get a return to

13  the shareholder and benefit?

14       And that's called version one, but it's generally

15  sometimes ten iterations or so will be done during that

16  period of time.  But it keeps its iterating.

17       You then announce the transaction.  You close it.

18       And now, you can do more, a little bit more.  You

19  still have limits on gun jumping, but we've set up a process

20  that allows us to work collaboratively with the other

21  company that we're acquiring, under legal supervision, to

22  begin to do some more joint planning so you can get more

23  information and data.

24       Q    Is that called a parlor room process?

25       A    Parlor rooms are part of that process.

1           It allows you to exchange certain information that

2    has been legally reviewed and scrubbed.

3           It allows you to have exploratory meetings between

4    experts on both sides.

5           In this catchball goes on back and forth.

6           In this case, with this transaction, over 15,000

7    manhours of work went into this; 2000 documents, roughly,

8    being produced; probably similar number of meetings were

9    held, about 2,000 meetings.

10          And these iterations are done on what these

11   benefits can be.

12          So it's a naturally evolving process, as more data

13   and more information is collected.

14          And then we'll -- hopefully, at some point, we'll

15   close this transaction.

16          When we close it, we'll iterate again, because now

17   we don't have to have legal separation on lot of this stuff.

18   We can get in and look at operating data and get more people

19   involved.

20          So we'll do yet more revisions and more versions

21   to this plan.

22      Q   And when you have estimated synergies through this

23   process in the past, have you been able to achieve them?

24      A   We have a really strong track record of delivering

25   on what we commit.  Frankly, our shareholders wouldn't

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    tolerate us doing more transactions, if we didn't do that.

2         Our track record, especially on what I would call

3    expense-oriented synergies is very, very strong.

4         The most recent transaction with DirecTV, we

5    generated over $2 billion of value and expense savings.  By

6    the time we got to the end of 2017 -- that's a run rate,

7    recurring every year -- that was higher than what we had

8    predicted.

9         So we do very well on that.

10        On the revenue side, sometimes it's a little bit

11   more challenging.  They're a little bit harder to predict.

12   There's a little more variability and products and services

13   that we don't exactly know.  But we still do reasonably well

14   on those types of things.

15        But we're also fairly conservative in how we

16   provide guidance and information, both on expense and

17   revenue synergies out to our investors as part of the

18   process that Mr. Petrocelli [sic] was asking me about.

19   Q    What is a revenue synergy?

20   A    A revenue synergy would be selling a product, some

21   business opportunity to do something, to sell a product or

22   service that we're not able to sell today with the

23   businesses separate.

24   Q    What is a cost synergy or savings?

25   A    Removing an expense from the business.

1        If we have two accountants and we only need one

2   and a body comes out because of that, then there's an

3   expense savings.

4        Q    And is there anybody responsible for tracking and

5   being accountable for the synergies that you estimate?

6        A    Yes.

7             Part of the process that we use is these estimates

8   are all built into business plans.  So they go from being

9   estimates to, once the transaction closes, they're

10  decomposed and installed into people's operating plans.

11             Executives like myself who have financial

12  objectives associated with them, our performance and our

13  bonuses are based on achieving them.

14             And there's an organization, a group of

15  individuals that, in this case in a post-close environment,

16  would report to me that literally go out monthly and track

17  our performance to those objectives, roll up our performance

18  around them, report out to the senior leadership team, roll

19  them up quarterly, and report out to the board on what our

20  progress has been on achieving those.  And that's been our

21  rigor that we've used in every transaction to ensure we

22  achieve our objectives.

23        Q    So will you be ultimately responsible for the

24  synergies and reporting them to Mr. Stephenson and to the

25  board?

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 3097 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3231

1        A     I will.

2        Q     And what happens if you don't achieve them?

3        A     Not very good things, so...

4        Q     Okay.

5        A     It obviously directly impacts my compensation

6    because it goes into my financial targets that I'm paid on.

7    And if it's really, really ugly, it will impact my longevity

8    with the company.

9        Q     Well, hopefully, that won't happen.

10            Let's take a look at the one exhibit that I'm

11    going to show you, which is Exhibit 658 --

12            MR. PETROCELLI:  -- which is what has been

13    referred to, Your Honor, as version 41 of this process of

14    estimating and describing costs and revenue synergies.

15            But because it's a lengthy document and I want to

16    move the whole document into evidence, I'm only going to

17    address the witness to one page.  That's page 92.  And

18    I have that in the binder as a separate document marked as

19    Exhibit 658A, since it's just easier to look at that one

20    page than this big, thick document.

21            And I'm going to move this document into evidence

22    right now, Your Honor.  We discussed this prior to the

23    commencement of evidence in this case.  We had -- there was

24    an objection.  We had argument.  And Your Honor ruled that

25    this comes in to demonstrate the company's belief in these

 1   predicted synergies.

 2           So with that, I move all of Exhibit 658 into

 3   evidence, but I only want to address the witness to 658A,

 4   which is the single-page handout in the binder.

 5           THE COURT:  Mr. Welsh, do you have any objection?

 6           MR. WELSH:  I want to make sure that it's clear

 7   from the prior hearing on this that the document is being

 8   admitted not for the truth of the matter but just for state

 9   of mind.

10           Is that correct?

11           MR. PETROCELLI:  The way Your Honor put it was for

12   the truth of the company's belief in the matters estimated

13   and predicted.  But not for the truth that they were -- that

14   they will, in fact, occur.

15           THE COURT:  State of mind of the company.

16           MR. PETROCELLI:  Yeah.

17           THE COURT:  Time of the deal.

18           MR. WELSH:  We would continue to believe and

19   maintain our objection that there's hearsay and double

20   hearsay within the document.  It does not qualify as a

21   business record.  So I just wanted to make sure the record

22   was clear on that.

23           THE COURT:  All right.

24           MR. WELSH:  Just for clarification purposes,

25   because I was not following the single page, is the whole

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    document coming in?

2            MR. PETROCELLI:  Yes.  I move the whole document

3    in.

4            MR. WELSH:  But you're only asking about one page?

5            MR. PETROCELLI:  Correct.

6            MR. WELSH:  Thank you, Your Honor.

7            MR. PETROCELLI:  Under seal, Your Honor, the whole

8    document?

9            THE COURT:  Yes.  Under seal and for the limited

10   purpose stated.

11           MR. PETROCELLI:  Yeah.

12                                    (Defendants' Exhibit DX658
                                       received into evidence
13                                     under seal.)

14   BY MR. PETROCELLI:

15       Q    And now, can you pull out Exhibit 658A.  You have

16   that there?

17           There's also one in the -- you have it.

18       A    I'm with you.

19       Q    You're with me.

20           So what I'd like you to do now is I want you to

21   walk through the different categories for the Court on both

22   the cost side and the revenue side.  And can you begin by

23   telling the Court what the total amount of synergies is

24   that's estimated and when they will begin to occur.

25       A    Sure.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          And I'm going to move in and out of some material

2   that's public and nonpublic.  So I'm going to go from

3   numbers to obtuse here.

4        Q    Okay.

5        A    So let's start on the left side of your page where

6   you see it says, "Estimated Cost Synergies."

7          And you'll notice that the, there's an initial and

8   a current estimate.  The current estimate is from the

9   iterations of the work.  So it's the most current view we

10  have, and it shows $1.5 billion of run-rate cost savings by

11  the year 2020.

12       Q    What does that mean exactly?

13       A    So once we hit the year -- it's actually three

14  years after close of the transaction.  Since we assume we'd

15  close this in 2017, it will probably be a little bit later

16  in 2020 or 2021.

17         But it means that by that period of time, there

18  will be one and a half billion dollars of expenses removed

19  from the run rate of the combined businesses as a result of

20  the transaction.

21       Q    Does that mean each year?

22       A    That means each and every year succeeding.

23  So it's in -- it goes on and on.

24         Now, there are several categories.

25       Q    Before you go to the categories, could you give

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3235

1    the total on the revenue side.

2         A    Sure.

3              If you go to the right side of the page, you'll

4    see those other bars over there.  And you'll notice that

5    we're going to talk about the black ones, because those are

6    net of implementation costs.

7              There is a current estimate of $1 billion of

8    revenue synergies that will occur, again, three years after

9    close, and they will recur every year after that.

10        Q    So that comes to a total of what?

11        A    2.5 total billion dollars of improved annual run

12   rate.

13        Q    Starting?

14        A    Three years after close of the transaction.

15        Q    So for now, that would be approximately?

16        A    2021, I'm going to guess, by the time we get

17   through this drill.

18        Q    Okay.

19             Now, could you then describe, generally, for the

20   Court, what the categories of cost savings are, starting

21   with the first one, marketing?

22        A    So we'll work on the left side of the sheet first,

23   and I'm going to go obtuse here because these are not broken

24   out publicly.  So I will point you to the first one, which

25   is marketing.

1          Obviously, you move to the second column to see

2     what the amount is that's in that particular category.  It

3     starts with the dollar sign and the 5.

4          And that particular category on cost savings is

5     primarily driven by the fact that as we put the two

6     businesses together, we have two very large companies that

7     buy a lot of advertising in the marketplace today.  AT&T,

8     you probably as you sit at home, you see advertising for

9     mobile phones and pay-TV services to promote our products

10    and services.

11         And if you're at home, you might see things like

12    Warner Brothers advertising new movies that they're putting

13    out or new series that are premiering on HBO to drive

14    subscriptions.

15         AT&T has had experience of late working down

16    advertising costs by buying at scale.

17         We've worked with advertising agencies to look at

18    what we can do on that combined spend, and we believe

19    there's a substantial amount of money that can be driven out

20    of the total combined spend of the two companies because of

21    the scale that comes from bringing those together.

22         In addition, there are some other categories that

23    include some more effective buying, some more effective

24    production of advertising work, et cetera, that round out

25    that amount.

1     Q     In by "scale," you mean because you're buying in

2  such volume, you can get lower prices?

3     A     That's correct.

4     Q     Okay.  What's the next one?

5     A     The second category there is labeled as content

6  and OTT.  Again, go to the second column for the dollar

7  amount that's associated with that, which there's largely

8  two drivers here.

9          One is that the current AT&T company spends money

10  on building content that's specific for some of its products

11  that it sells.

12          There's an opportunity to unlock the cost of that

13  content, not incur it, by using fallow content that's in the

14  library of the Time Warner companies.  And that fallow

15  content will avoid having to expend the money that AT&T

16  would normally spend to do that work.

17          The second part of that is Mr. Bewkes referred

18  earlier to the fact that the Time Warner company is trying

19  to build platforms to get their services direct to consumer

20  out to their customers, like HBO, and he said it would

21  crash.

22          AT&T has platforms like that, and we've invested

23  in scaled platforms like that.  And we believe, when you

24  look at the combined businesses and bring them together,

25  that there's efficiencies that will accrue to having one or

 1   two platforms to get that done and concentrating that spend

 2   or removing some of the elimination or duplication of it.

 3       Q    The next category?

 4       A    The next category is corporate spend.  Gave an

 5   example of this earlier.

 6           When we put the two companies together, both

 7   companies have corporate overheads.  They both have legal

 8   departments.  They both have accounting departments.  They

 9   both have tax departments.

10           We don't need all of those after we put the two

11   together.

12           And so the corporate entities will actually have

13   fewer people involved in them to run both combined

14   businesses.

15           And the head count that's associated with that

16   largely drives that number in that column.

17           Similar example would be after we completed the

18   DirecTV transaction, about 250 million came out of corporate

19   overheads.  So you can see that it's the same kind of play

20   we'd be running here.

21       Q    The next category, vendor.

22       A    Both companies buy a lot of equipment from third

23   parties, about $16 billion of third-party spend with the

24   Time Warner company.  We looked at what parts of that

25   16 billion overlap was similar spends that the current AT&T

1    company makes.

2           So, for example, maybe we both buy copy machines.

3    Maybe we both use delivery services.

4           And then looked at the relative cost per units of

5    what each company is paying for those particular vendor

6    contracts and evaluated how much could be saved by bringing

7    those spends together.

8           So savings on third-party contracts that are in

9    place, and that's the number that's represented in that

10   column.

11       Q    And the last category, network IT?

12       A    So one of AT&T's businesses is providing network

13   services to people.

14          I mentioned earlier that we provide data networks

15   for Bank of America or General Motors or the Federal

16   Government so phones and computers can talk to each other.

17          The unfortunate part is that Time Warner uses

18   another company other than AT&T for some of their network

19   services and will be able to replace that provider with an

20   AT&T network that will actually reduce the costs associated

21   with their data networks and telecommunications services.

22          In addition, AT&T runs a very, very large and

23   scaled information technology company and organization.  And

24   some of the costs that we have bringing the two together

25   will drive some efficiencies on the vendors, the licenses,

1    and the infrastructure that's used to support that.

2         Q    Now, can you go to the revenue side.

3         A    Sure.

4         Q    What's the first one, ad growth?

5         A    So this is the hardest one on the page, and

6    I'm sure there will be a fair amount of discussion on this

7    over the next hour or two.

8              You heard Mr. Bewkes talk about the importance of

9    advertising.

10             Again, let's look at the far right-hand column.

11   You'll see the number that's expected there.

12             That number in that far right-hand column has two

13   parts.  The first part is what I'll call the easy part, and

14   it will generate a little less than a half of that amount of

15   money on that sheet of paper.

16             Let me pick up where Mr. Bewkes left off.  He

17   talked to you about the fact that there are advertising

18   slots in their current programs that they have out there,

19   and they want to be able to sell them for more money.

20   Here's how that might work.

21             If Your Honor was in a situation where he had a

22   relationship with maybe an online provider for gentlemen's

23   clothing, let's say, and you bought things online or you

24   bought -- you went to a retail store and the store knows

25   about your purchasing habits.  And that gentlemen's

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3107 of 3826

3241

1  retailer, for example, decided they wanted to advertise on a

2  particular to Time Warner channel.

3          We have first-party data at AT&T where we can come

4  in and that retailer may say, I'm going to give you a list

5  of all the people who have done business with me in the

6  United States.  We go and take that list that they provide

7  us and we can go match it back against our customer base.

8  And we can say, how many people do you have on this list

9  that we have as customers?

10          We can then look at that customer list and go say,

11  how many of those customers watch something in common?

12          And lo and behold, we find out that a bunch of

13  people who buy from this gentlemen's clothing distributor

14  watch Law & Order.

15          And so we go and say, there's a very obvious

16  thing.  If you want to sell bow ties, you can go buy

17  advertising on Law & Order.  That may be great.  We know

18  that there's numbers there.  It's probably not all that

19  counterintuitive.

20          But then we also go look and say what we didn't

21  know is we look at these people and we also find out that

22  one of their other favorite shows is American Gangster, and

23  American Gangster actually sells at a lower price in the

24  market than Law & Order.  But we can prove to you you're

25  going to get the right number of customers because we have

1  verifiable evidence that that list matches the people who

2  watch that show.

3          And so we can provide value for them in that data

4  that they can't get today because they have no knowledge of

5  that, as Mr. Bewkes said.

6          That raises the value of the advertising we sell,

7  and that's what drives higher yield and improves the

8  advertising business.

9          These are the kind of straightforward things we

10  can do, and there's other subtle things we can do, like we

11  know whether or not you actually watched it, so we can see

12  if you actually tuned in, and tell the advertiser about

13  that.

14          That's the low-hanging fruit.

15          The harder part, you heard Mr. Bewkes mention the

16  fact that there's advertisements that are actually going to

17  specific households.

18          So if somebody is watching the football game, one

19  person may get the beer commercial because they're a beer

20  drinker; the other person may get the Coke commercial

21  because they drink soft drinks.

22          How do you know that?  Can you do that?

23          Yes, you can.

24          And the question is, can you do that more

25  dynamically now?

1           Our intent is to invest to build a capability to

2     do that.  And you heard Mr. Bewkes allude to the fact that

3     there's the data there.  But nobody has built the capability

4     of the platform in the industry.

5           To do what Google and Facebook are doing on the

6     Internet to TV advertising, there's no reason why, when a

7     unique TV stream is showing up on a mobile phone or

8     somebody's TV that you can't put a unique advertisement in

9     there.  And that's what Mr. Bewkes talked about in terms of

10    trying to get specific ads to specific people.

11          That's the second part of that that's going to

12    require more time and several years to put in place, but our

13    intent is to invest to do that.

14    Q    Is that called the programmatic platform?

15    A    It's called the programmatic marketplace or the

16    programmatic platform, and it has a couple different

17    components to it.

18    Q    And is the Turner inventory from all the Turner

19    channels, all the commercial slots available for all the

20    Turner channels, of sufficient scale to make this happen?

21    A    It's a sufficient scale to get started and

22    demonstrate that, in fact, these improvements can be made in

23    the market and effectively work.

24          It has a broad enough exposure to different

25    demographic profiles, different people.

1          At the end of the day, we need to ultimately get

2     others to come in and want to do the same thing with their

3     advertisement, but prove it on ourselves, demonstrate it

4     works, and then encourage other companies, like Disney, to

5     come in and maybe give some of their inventory in, or Fox to

6     come in and give some of their inventory into the platform.

7          Ultimately, we want to incent others into this

8     programmatic platform.

9     Q    Okay.  Can you turn to the next category called

10    combined assets.

11    A    Sure.

12         Briefly, I think Mr. Bewkes also mentioned that

13    one thing Time Warner didn't have are things like retail

14    stores.  They don't have call centers.  They don't have

15    applications that they actually support that have customer

16    interaction with them.

17         And by butting the two companies together, we can

18    actually sell more products and services.

19         So an example would be AT&T has lot of customers

20    that use our apps when they're in DirecTV Now.  Time Warner

21    has lot of pay-per-view movies.  By working through search

22    algorithms and placement on the different screens that

23    customers scroll through, we can sell more movies on demand,

24    more products and services.

25         We can use our retail stores, over 5,000 retail

1    stores at AT&T, to put Time Warner products and services,

2    merchandise, branded merchandise, actually use it to promote

3    the sale of those.  We can incorporate Time Warner

4    characters and figures into our advertising that help raise

5    customer awareness of new movies that are coming out to sell

6    more movie tickets and raise attendance at movies.

7          So it's, by putting the two businesses together,

8    one of the types of things we can do to sell more product

9    and drive more revenue.

10   Q     And finally the last category, content

11   intelligence?

12   A     This is the one that's probably the hardest to

13   pinpoint when.  You know, Mr. Petrocelli [sic] says

14   "prediction," there's no doubt there's a degree of

15   prediction in this.

16         It's a new area of the industry that's occurring.

17   We read about how Netflix, for example, is using information

18   on what customers are watching to figure out what content to

19   charter and make and build, what stars to put in shows, when

20   to schedule things.

21         This is a new area.  But we have a lot of data now

22   when we put the two businesses together.

23         What we do know is that the businesses separately

24   can't do this today.  We don't do programming and content

25   development at AT&T.  And as you heard am Bewkes say, they

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1    don't have the information on what people are watching.

2             So now, for the first time, this comes together.

3    We can see what folks are doing.

4             Folks who are in the creative process can look at

5    this data and start making decisions around how to avoid

6    making movies that people don't want to watch or putting the

7    wrong stars in or scheduling in a more optimal fashion that

8    ultimately yields better financial results for the business

9    because of that.

10       Q    When you use the data, is it done on an anonymized

11   basis?

12       A    The data at AT&T, everything is done based on a

13   very explicit privacy policy.

14            Data is handled, depending on the customer's

15   wishes, as to whether they choose to opt in or opt out.

16            It's managed based on those preferences.  And

17   there's a very transparent approach to it.

18            We aggregate and anonymize the data for purposes

19   of this work.  And in the cases of our approach, this is for

20   our internal use.  We're not brokering the data out.

21       Q    What do agree of confidence do you have in these

22   predictions?

23       A    We have a high degree of confidence.  As I said,

24   we've done these transactions many times before.  Obviously

25   with this many unique projects, some have highest
```

1  probability; some have slightly lower probability.

2       But in terms of the abilities of our company to

3  execute on this and adjust to the uncertainties that come

4  up, high degree of probability that we'll work through this.

5     Q    When you say "high degree of probability," do you

6  think it's more probable than not that you will be able to

7  achieve these $2.5 billion in annual synergies?

8     A    It is more probable than not.

9     Q    Turning to a different subject but related, can

10  you describe to His Honor how the company is going to be

11  structured if this merger occurs.

12     A    Sure.

13       There will be four unique operating groups.

14       The one that I'll be responsible for, which is the

15  former Time Warner company or the media company.

16       The legacy core AT&T business, which will be

17  called the communications company.  There will be a peer of

18  myself who will have responsibility for all of the

19  telecommunications services, the pay-TV services that we

20  sell to our retail customers like DirecTV.  That will all be

21  in the communications company.

22       In between those two, there will be an advertising

23  company.  You may have heard that we hired an executive from

24  the advertising industry by the name of Brian Lesser, who

25  will be coming in to run that.  He came out of WPP, a large

1    advertising agency, because he's interested in building

2    these new capabilities that we just talked about.

3         And then the fourth entity will be all of our

4    international operations, everything outside of the

5    United States.

6         So those four operating entities will be the core

7    operating entities of AT&T.

8    Q    So Turner and HBO will be in, what you called the

9    MediaCo, the business unit that you will be running;

10   is that right?

11   A    Turner, HBO, and Warner Brothers.

12   Q    And Warner Brothers, yes.

13        And where will DirecTV be?

14   A    DirecTV will be in the communications company.

15   Q    DirecTV will not be under your jurisdiction?

16   A    That's correct.

17   Q    That's another executive?

18   A    That's correct.

19        My job will be to run the media company and the

20   media assets to their fullest potential.

21   Q    Do you anticipate that these companies will

22   operate independently?

23   A    They each will have an independent P&L.  They'll

24   each have independent responsibilities back to the corporate

25   profit plan and the corporate business plan.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3249

1       Q    But if they're operating independently, how will

2  they be able to achieve the synergies as a result of the

3  merger?

4       A    So as I said earlier, we have a fairly rigorous

5  process around how we break these objectives out into the

6  company.  So when things get built into the plans, action

7  gets taken, many of these objectives will be put down into

8  people's operating plans.  And those that require

9  cooperation amongst the groups, the fact that it's in their

10  operating plan will drive that level of cooperation.

11           However, the bulk of these synergies actually rest

12  into the media company to actually make the changes.  So

13  there's a substantial amount of them that are contained

14  within the media company, and there's a substantial amount

15  that are between the media company and the advertising

16  company.  And we've built the process around how we're going

17  to actually work between the two entities to cooperate to

18  build the right products so that we can ultimately achieve

19  these.

20           MR. PETROCELLI:  Okay.  We're heading into our

21  stretch run here, Your Honor.

22           THE COURT:  What's that mean?

23           MR. PETROCELLI:  Well, probably have 15 minutes,

24  1-5.  How am I doing on my time?

25           THE COURT:  You've done an hour.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3250

```
 1              MR. PETROCELLI:  Okay.  Well, I'm going to come in

 2     below my estimate, unlike my last witness.

 3              THE COURT:  Okay.

 4              MR. PETROCELLI:  Okay.

 5     BY MR. PETROCELLI:

 6        Q    We've heard some suggestion in witness testimony

 7     that if the merger occurs, Turner and DirecTV might be able

 8     to share competitive information.

 9              MR. PETROCELLI:  Bless you.

10              THE COURT:  Thank you.

11     BY MR. PETROCELLI:

12        Q    Can you speak to that?

13        A    That won't happen.  It won't happen on a couple of

14     different fronts.

15              First of all, in existing contracts, customers

16     have, in many instances they have non-disclosure agreements

17     in them, and they restrict the movement of information.

18              Secondly, the reason we separately structure

19     entities within AT&T is we firewall that kind of thing.

20              We have sensitive information all over AT&T today.

21     We sell -- I mentioned I ran the wholesale business, as an

22     example.  And I would sell to competitors who compete with

23     our business services group that sells out directly to

24     retail customers like Bank of America and GM.  There were

25     hard firewalls.  My contracts could never be seen by anybody
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3251

1    else in the business.

2              There will be no Turner employees that can gain

3    access to DirecTV carriage agreements and vice versa.

4         Q    Let's talk a little bit about some of the

5    government claims since you're going to be the person

6    running Turner and HBO, as well as Warner Brothers.

7              I don't want to have to describe it to you because

8    you've been here in court every day, but you've heard this

9    testimony about a bargaining model and how it could be used

10   to increase leverage and increase prices.

11             Do you think that's likely to happen?

12        A    No.

13        Q    And you've been on the distribution side, unlike

14   Mr. Bewkes, who has spent his career on the programming

15   side?

16        A    Correct.

17        Q    And have you been in charge and involved in

18   content negotiations during your tenure on the distribution

19   side?

20        A    I have.

21        Q    And do you believe that what you heard in this

22   bargaining model, there's any reality to your experiences?

23        A    There is no reality to it.

24             The -- as you've heard, there's already very

25   intense and aggressive negotiations occur out of that

1    process.  And I expect them to be the same way in the

2    future, and I don't think there's going to be any change.

3         Q     In your experience, do you think that distributors

4    will be thinking that Turner has more leverage because

5    Turner and DirecTV are owned by the same ultimate parent?

6         A     No.

7         Q     And what about with respect to virtual MVPDs?

8    We've heard testimony about virtual MVPDs.  And the claim of

9    the government is that post-merger, the company will

10   coordinate with Comcast to harm virtual MVPDs.

11             Can you speak to that?

12        A     Yeah.

13             Mr. Bewkes hit the nail on the head.  If you're

14   running a media company and you need broad distribution, the

15   last thing you want to do in a business that's got a

16   challenged advertising model is to stop putting customers in

17   front of the advertising product.

18             And so when I talked about buying DirecTV and our

19   need to figure out how to get a very mature product in the

20   right place, part of the way you're going to see content

21   distributed in the future is virtually, over the Internet.

22   You've got to build content that can be distributed that way

23   and seen that way.

24             And if you take that category of individuals and

25   say you're not going to distribute to them, you're not going

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   to have a very relevant media business moving forward,

2   especially a relevant advertising business.

3        Q    Is the virtual business model very important to

4   the future of AT&T?

5        A    We launched DirecTV Now because we think you've

6   got to be in a position to distribute virtually -- I

7   indicated, have a strong desire to offer another set of

8   products beyond the current bundles and packages we offer on

9   DirecTV Now to do other combinations of content.  But some

10  of the bargaining friction is what prevents combining that

11  content with other types of content to sell that way.

12           So we're very interested in starting to push the

13  dynamics on that.

14       Q    Does the fact that you're also a wireless company

15  and one of the biggest in the country, does that factor into

16  whether the growth of virtuals is good for your business?

17       A    What is underneath everything we do here -- why do

18  we want people to engage in content?  We want people to

19  engage in content because, first of all, they like it.  But

20  if they like it, they use networks more.  They connect to

21  our network.  They use their wireless device more.  The more

22  you watch, the more you use.  The more you use, the more

23  indispensable it is.

24           If we can build really good content and attach it

25  to our network and you think about AT&T as saying, that's a

1    place I not only go to get connectivity, to get my cell

2    phone, but I also get great content, that's going to be good

3    for our business over time.

4            If a virtual MVPD drives one of our customers who

5    buys a wireless phone to use it more because they can take

6    their content on the go, that's what a virtual allows them

7    to do, they can watch it wherever they go and they use their

8    AT&T phone more, that's not bad for us either.  We like

9    that.

10           At the core, our biggest business is our wireless

11   business.  It's almost two times what we do in the

12   entertainment side of things.  It's huge to us.  We've got

13   to do things that keeps growing the engagement with our

14   network and our wireless business.

15       Q    So following up on that, if a customer is a Sling

16   customer, for example, okay, not a DirecTV Now customer, but

17   subscribes to Sling, is that potentially good for your

18   wireless business?

19       A    If they put more usage on the wireless network and

20   it causes them to buy up on data plans or get more devices

21   and connect more things to the network to do that, that's

22   good for our business.

23       Q    So does AT&T post-merger have any incentive to

24   slow down the growth of virtual MVPDs?

25       A    No.  The media company, in particular, wants to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3255

```
 1   get everything out there, and we'll continue to do that.
 2        Q    Now, what about Comcast?  You've heard as part of
 3   this theory that your interests would be aligned with
 4   Comcast to impede virtuals.
 5             Can you speak to that, please?
 6        A    I really can't.
 7             I mean, I can't even imagine it, to be honest with
 8   you.
 9        Q    Why is that?
10        A    I don't like Comcast.  I haven't liked Comcast.
11        Q    Why is that?
12        A    I've been competing with Comcast for years.  And
13   to the notion that we're going to align with them -- you
14   know, we do battle with them all the time.
15             And I think I mentioned earlier, we're different.
16   And we have a mobile network; that's what different about
17   us.
18             We don't want to cooperate with Comcast to play
19   their game.  We want to figure out how we use our mobile
20   devices and our mobile network to change the game and do
21   things differently, not do it the same way they want to do
22   it.
23        Q    Didn't you have a dispute with them when they ran
24   a commercial on you that wasn't truthful?
25        A    It happens like every quarter.  I mean, we're
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   constantly trying to play Whac-A-Mole with them.  I'm not

 2   going to cooperate with somebody I don't like.

 3       Q    You heard some testimony from some witnesses,

 4   I think one witness in particular, Mr. Schlichting, that

 5   post-merger, he -- there would be concern that you might

 6   want to blow up their skinny bundle.

 7            What do you think about that?

 8       A    Well, we kind of expected that they might we

 9   concerned about that.

10            And when we put the arbitration offer out there,

11   we picked a date that included bundles that were in the

12   market prior to when the Dish Sling bundles went into the

13   market so that they can make sure that those are still

14   preserved and out there in the market.  I mean, we're -- I

15   put out money where our mouth is.  So --

16       Q    We've heard testimony that programmers like to get

17   all of their networks in these offerings.  What about a

18   distributor.  Is a distributor more open to smaller bundles?

19       A    Distributors love smaller bundles.  I mean, they

20   prefer smaller bundles, yes.

21       Q    And what about post-merger; what does AT&T and

22   your MediaCo see with regard to thinking about smaller

23   bundles?

24       A    As I said earlier, when I did the introduction of

25   DirecTV Now, I expected there needed to be additional

1  products and services coming behind it.  And most of those

2  aren't getting bigger.  They're about how to get smaller

3  chunks together.

4          And I think the future of this industry is going

5  to be a little bit smaller compilations of different types

6  of services.  And that's the reality of where we're headed.

7      Q    And again, that can inure to the benefit of your

8  wireless network?

9      A    It's good for the wireless network.

10         As we structure the offer, if somebody's concerned

11  it happening first at AT&T, we make whatever bundles are

12  available in the AT&T distribution side available as part of

13  the arbitration offer as well.

14     Q    Yesterday we heard a witness, Mr. Holanda from

15  RCN, raise a concern that, post-merger, his basic broadcast

16  package could somehow be harmed.

17         You heard that testimony?

18     A    I did.

19     Q    Can you please speak to that.

20     A    Well, I can speak to it from the perspective of

21  how I understand the industry to work.  I don't know that

22  I can speak to it from the perspective, per se, of

23  Mr. Holanda's contracts.

24     Q    Well, from the former.

25     A    So in every contract that we have, every

1    programmer that we buy content from has what's called a

2    penetration requirement.

3                When you agree to pay for content, there's two

4    parts to the price.  There's the price that you pay per

5    unit, and there are the percentages of customers that have

6    to get the content.  So the price per unit and the

7    percentage of customer.

8                The obvious reason why somebody does that is they

9    don't want to sell you something that you choose not to put

10   out in the market.  So they require you to get a certain

11   percentage of customers to use the service.

12               And every distributor on the market deals with

13   price and penetration.

14               We all have, all distributors have a cheap bundle

15   or cheap offer in the market that has fewer programmers in

16   it.

17               We all fight this battle that because there's a

18   penetration requirement, that a minimum number of customers

19   need to get the content, that you bump up against that

20   penetration requirement, that you start to hit it.

21               And when you bump up against it, you can't sell

22   any more of the small packages.

23               So we have a small package.  It's not a broadcast

24   package like Mr. Holanda was talking about.  But we have a

25   small package that, from time to time, we have to take out

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3259

1    of the market, because we've hit the penetration

2    requirement.  We've used the 15 percent cushion that you

3    have not to include a basic off-air broadcast network.  It's

4    actually even less than that.  I'll just use 15 percent here

5    in the room.

6              So what I don't get is, we have a contract with

7    NBCU.  We have a contract with CBS.  We have a contract with

8    Fox.  We have a contract with Disney-ABC.  They're all of

9    the same.  They have a broadcast network.  And other than

10   CBS, they all have basic cable bundles under -- attached to

11   them.

12             Those penetration requirements are all roughly the

13   same on every single one.

14             NBCU doesn't do anything more egregious to us than

15   Fox or than Disney.  And we bump up against those pen

16   requirements.  Every carrier has that problem.

17        Q    So does -- first of all, Turner doesn't have

18   broadcast networks, right?

19        A    Turner doesn't have a problem.  In that dynamic

20   yesterday, they weren't even part of the bundle.

21        Q    You mean the bundle that Mr. Holanda was talking

22   about does not include the Turner network?

23        A    No.  It's only -- there's no Turner content in

24   that bundle.

25        Q    Okay.

1        And speaking of bundling, we've heard some

2   questions about bundling the DirecTV video product with your

3   wireless service.  Have you, has your company attempted to

4   do that?

5        A    We have.  Right after I closed the DirecTV

6   transaction, part of that set of discussions I had with the

7   programmers was about trying to structure programming rights

8   differently for just receiving them on wireless devices at a

9   better price point.

10        And a variety of things prevented that from

11   happening.  In some cases, it was MFNs allegedly.  In some

12   cases, it was people weren't willing to do it.  In some

13   cases, there were some willing players, but we just couldn't

14   get the right group of channels and product together that

15   would make a difference.

16        Q    But in terms of selling to consumers, have you

17   attempted to bundle the wireless phone service with video?

18        A    We have.  Yeah, we have.

19        Q    Has that's been successful?

20        A    Not as much as we'd like.

21        This is when we sell pay TV, can we get somebody

22   to buy pay TV and wireless together?  You know, that would

23   be really good for us if we get new customers for both.

24        When I left the business in September of 2017,

25   August of 2017, less than 3 percent of our inbound customers

1   were buying both together.  It was a very small percentage.

2          The problem is, when a customer is thinking about

3   buying pay TV, it doesn't necessarily align for when they're

4   thinking about buying a cell phone or changing their cell

5   phone carrier.  They tend to buy pay-TV services -- when

6   they move -- you have your cell phone all the time.

7          Q     So you would refer to that as an unnatural bundle?

8          A     It's an unnatural bundle.  It just doesn't have

9   the same triggers.

10         Q     Final subject is arbitration.

11               You allowed Turner to state in its arbitration a

12  binding offer to distributors that AT&T would stand behind

13  it?

14         A     Yes.

15         Q     Why?

16         A     Well, first of all, when this whole thing went

17  down, we clearly had no intention whatsoever to do any of

18  the things that the government alleged, specifically using

19  this merger to raise prices on the Turner content, as you

20  heard Mr. Bewkes talk about.

21               And this isn't a remedy.  The arbitration isn't a

22  remedy, because we don't believe that's going to happen.

23               Effectively, we said we're going to put our money

24  where our mouth is.  So it's really clear while we're

25  sitting here and everywhere else, that just isn't going to

1    happen.

2         So take away the blackout provision and make sure

3    that everybody understands that we're sincere about that.

4    Q    And you heard some testimony about a concern that

5    if a distributor elects arbitration with Turner, that the

6    company might retaliate with HBO.

7         What's your reaction to that?

8    A    It's -- I think Mr. Bewkes dealt with that very

9    well.

10        It's not an economically sound decision to make.

11   There's a variety of reasons.

12        We want broad distribution on HBO.  After the

13   close of the transaction, trust me, that'll be even a more

14   important focus of this business, to get broader

15   distribution of HBO.

16        You also heard Mr. Sutton talk about that there's

17   certain programming agreements where if you retaliate and

18   you were to do it by going dark, that's not a good outcome

19   for HBO.  It could be really problematic to work the

20   customer base back in.

21        But it just doesn't make any sense that you're

22   going to go and take an 85 percent penetrated product and

23   try to use a 30 percent elective premium that only certain

24   customers get that, also, the contracts don't align and try

25   to use that as a way to retaliate against somebody.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q     Last question.  The government has also alleged,

2   with respect to HBO, that post-merger, the company might

3   want to restrict its use as a promotional tool to harm other

4   distributors.

5            Can you speak to that?

6      A     I just said it earlier.

7            I mean, absolutely want to incent broader

8   distribution.  And that's our goal, is to put more of it out

9   there, and these distributors are incredibly important to

10  us.

11           I have absolutely no concerns whatsoever that

12  we're going to continue to push HBO to anybody who wants to

13  sell it moving forward.

14           MR. PETROCELLI:  Thank you.  No further questions.

15           THE COURT:  All right.  We're going to take a

16  ten-minute recess.

17           You remain a witness under oath in the case.

18  Refrain from discussing your testimony with anyone.  You've

19  heard me say it a million times.

20           THE WITNESS:  I have.

21           THE COURT:  You can step down.

22           All right.  We'll come back in ten minutes.

23           DEPUTY CLERK:  All rise.

24           This Honorable Court will now take a brief recess.

25           (Recess from 5:32 p.m. to 5:47 p.m.)

```
1              DEPUTY CLERK:  The United States District Court

2    for the District of Columbia is again in session, the

3    Honorable Richard J. Leon presiding.  God save the United

4    States and this Honorable Court.  Please be seated and come

5    to order.

6              THE COURT:  The witness remains under oath.

7              Cross-examination.

8              All right.

9              MR. WELSH:  Good afternoon, Your Honor.

10             May I proceed?

11             THE COURT:  You may proceed till 6:30 --

12             MR. WELSH:  Thank you, Your Honor.

13             THE COURT:  -- the witching hour.

14             MR. WELSH:  We'll hope the air conditioning

15   cooperates with us.

16             THE COURT:  It's already stopped.

17             MR. WELSH:  Oh.  We won't tell --

18             THE COURT:  That's why it has to be 6:30.

19             MR. WELSH:  We won't tell anyone.

20             THE COURT:  Oh, believe me, I know.

21                      CROSS-EXAMINATION

22   BY MR. WELSH:

23        Q    Good afternoon, Mr. Stankey.

24        A    Good afternoon.

25        Q    It's good to see you again.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3265

1        A     Likewise.

2        Q     Mr. Stankey, let's start off with some

3    preliminaries here.

4              Now, in this trial, you've been AT&T's corporate

5    representative; is that correct?

6        A     Yes.

7        Q     Okay.  So you've been able to sit in court for

8    every day of this trial and listen to the testimony, right?

9        A     I have.

10       Q     All right.  And you've done that, right?  You've

11   been here every day listening to the testimony of the

12   witnesses, correct?

13       A     I can't promise I heard it all, but I heard most

14   of it.

15       Q     Okay.  I saw you had pretty good attendance, so

16   I wanted to point that out.

17             Now, Mr. Stankey, previously, you were the CEO of

18   AT&T's entertainment group; is that correct?

19       A     Correct.

20       Q     Okay.  And you moved out of that role.  I think

21   you testified about that on direct, right?

22       A     Yes.

23       Q     And if I heard you correctly, that happened in

24   August of 2017, correct?

25       A     Yes.

1      Q    So for the past eight months, approximate, you've

2    been working on preparing for the close of this merger; is

3    that true?

4      A    Yes, to the extent we could, given the

5    circumstances.

6      Q    Right.

7           And I think you talked about them in the

8    deposition that I took of you, and you said that there were

9    things that you couldn't do after a while.  So what you

10   ended up doing is working on this litigation, right?

11     A    I've been spending time supporting the litigation,

12   yes.

13     Q    Yeah.

14          So a big part of your job for the last eight

15   months has been to get this merger proved, right?

16     A    My job hasn't been to get the merger approved,

17   per se.  I've been working the operational integration

18   issues.

19     Q    Well, if it is approved, you're going to be

20   responsible for running the, what's the Time Warner part of

21   the business, if I heard that correctly from

22   Mr. Petrocelli's questions to you; is that right?

23     A    That's correct.

24     Q    And, again, if the merger goes through and that

25   happens, your compensation is going to increase fairly

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    significantly; isn't that right?

2        A    My compensation changes and increases, yes.

3        Q    And as it stands now in the recent proxy

4    statement, which I think was March 12th, 2018, that had your

5    compensation at approximately $10 million; is that right?

6        A    It's somewhere in that range; that's about right.

7        Q    And, again, if this merger goes through, you'll

8    see a bump with that, right?

9        A    A bump?

10       Q    An increase in your compensation.

11       A    Yes.

12       Q    Your total compensation.

13       A    My compensation will increase, yes.

14       Q    Now, I know we talked about this in your

15   deposition, and I know you made a little bit of a passing

16   joke that you didn't want us to tell your wife about what

17   your compensation was.

18            So we're going to try -- I think your counsel

19   heard it because they've designated that information as

20   being confidential.

21            But I want to hand to you a document that we

22   prepared that would have the figure of your increase in

23   compensation on it, okay, so that we can keep it

24   confidential, under seal?

25            MR. WELSH:  Your Honor, this is PX554.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              May I approach, Your Honor?

 2              THE COURT:  You may.

 3              MR. WELSH:  Your Honor, PX554 has been handed to

 4    opposing counsel.

 5              May I approach the witness?

 6              THE COURT:  You may.

 7    BY MR. WELSH:

 8       Q    All right.  Mr. Stankey, you have --

 9              MR. WELSH:  May I proceed, Your Honor?

10              THE COURT:  You may.

11    BY MR. WELSH:

12       Q    Mr. Stankey, you have PX554 in front of you.  And

13    you see there's a figure listed there, correct?

14       A    I do.

15       Q    And is that the amount of your compensation that

16    would be increased by if this merger were to go forward?

17       A    I actually couldn't tell you if that's the amount,

18    given the number of moving parts, including the changes to

19    accrued pensions, et cetera.  I don't know.

20       Q    We spoke in February at your deposition;

21    is that correct?

22       A    Yes, we did.

23       Q    Let's see if I can help you out with your

24    testimony.

25              THE COURT:  This number is the amount of the
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3269

```
 1    increase --

 2              MR. WELSH:  Just the increase.

 3              THE COURT:  -- of the incentive?

 4              MR. WELSH:  Yes, the increase.  That's correct,

 5    Your Honor.

 6              May I approach, Your Honor?

 7              THE COURT:  You may.

 8              MR. WELSH:  May I approach the witness,

 9    Your Honor?

10              THE COURT:  Yes, you may.

11    BY MR. WELSH:

12         Q    Mr. Stankey, you've been handed the transcript of

13    your depositions, these are for the individual depositions.

14              I'm going to ask you to look at the second of

15    those tabs.  This is the transcript of the deposition I took

16    of you on February 16 --

17              MR. WELSH:  -- which has been marked for

18    identification as PX581, Your Honor.

19    BY MR. WELSH:

20         Q    Mr. Stankey, I'm going to direct you to page 44.

21              Tell me when you're there, sir.

22         A    Okay.

23         Q    And I'm going to -- I can't say this out loud

24    because it's been designated as confidential by your

25    employer, but I'm going to direct you to page 44, line 24,
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   through 45, line 5, which is my question.

 2            And then line 45 -- page 45, line 6 and 7, is your

 3   answer.  Would you please read those to yourself.

 4       A    Okay.

 5       Q    Does that refresh your memory that the number that

 6   we have listed here is on -- on PX554 is the number that you

 7   provided to me in your deposition on February 16, 2018 as

 8   the amount of increase in your compensation if this merger

 9   were to go forward?  Did you tell us that that day, on

10   February 16th?

11       A    For the portions of my compensation that include

12   my base and my short-term bonus --

13       Q    Yes.

14       A    -- and my long-term compensation, yes, not for the

15   portions of my compensation that include pension

16   calculations.

17       Q    Right.

18            So for the portion we're talking about here, the

19   increase amount, which I can't say publicly, though, that

20   was the amount that you testified to that day, right?

21       A    Correct.

22       Q    And that's what's listed on PX554, correct?

23       A    Correct.

24            MR. WELSH:  Your Honor, I move for admission of

25   PX554 into the record under seal.

1          MR. PETROCELLI:  It's not a document, Your Honor;

2    but if it comes in under the rule of testimony, I have no

3    objection.

4          THE COURT:  It will be admitted.

5                         (Government's Exhibit PX554
                          received into evidence under seal.)
6          MR. WELSH:  Thank you, Your Honor.

7    BY MR. WELSH:

8    Q    So, Mr. Stankey, you were asked some questions

9    about the corporate structure of AT&T if this merger goes

10   through.  I want to come back to that topic now.

11         If the merger were consummated, I think you said

12   that there was going to be four operating companies and you

13   would be over the media, which was the Time Warner

14   companies, Warner Brothers, Turner, and HBO; is that right?

15   A    Correct.

16   Q    And then there would be a communications company.

17   That would be led by Mr. John Donovan; is that right?

18   A    That's correct.

19   Q    Now, again, if the merger were to be consummated,

20   there's nothing, though -- moving forward, there's nothing

21   that would prevent -- that you're aware of that would

22   prevent AT&T from changing course in terms of how it would

23   structure the business; isn't that fair?

24   A    Within the guidelines of whatever legal or tax

25   structures or things we have in place, there's nothing that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3272

1    prevents us from changing.

2        Q    Right.

3            So there's no prohibition that you're aware of

4    today that, say, six months after the merger were

5    consummated, if it were, that AT&T would say, you know what?

6    Not such a great idea.  Let's just change the structure

7    around?

8        A    If there's one thing I know, organizations change.

9        Q    Now, again, I'm going to ask you these questions,

10   assuming that the merger were to go forward.  You would

11   expect that there will be collaboration -- even under this

12   structure that you've testified about, you would expect that

13   there would be collaboration between the media business and

14   the communications business let led by Mr. Donovan isn't

15   that true?

16       A    In what regard?

17       Q    Well, I asked you in your deposition whether there

18   would be collaboration between -- you would expect there to

19   be collaboration.

20           Do you remember that?

21       A    I would expect that there will be communication;

22   and within the context of how we run the broader AT&T

23   company, there will always be things that we have to team

24   and work on.

25       Q    And if in that context, if Mr. Donovan decided he,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3273

```
 1   for his groups, his communications group he wanted to push a

 2   certain agenda that he thought was both valuable for his

 3   group, that communications group, and valuable for AT&T as a

 4   whole, you would consider that as part of what you're doing

 5   for the media group, isn't that right?

 6        A    If Mr. Donovan wanted to talk to me about

 7   something he thought was a good idea, of course, I'd sit

 8   down and talk with him.

 9        Q    And you would also consider that if Mr. Donovan

10   came to you with a proposal, even if it were disadvantageous

11   to your media group, if it was good for the overall aspect

12   of AT&T; isn't that right?

13        A    Well, the way the business is set up is that our

14   particular organizations are incented to achieve their

15   objective for the good of overall AT&T.

16        Q    That wasn't my question.

17             My question is that if Mr. Donovan came to you as

18   head of communications and said, I'd like you to consider

19   doing this, even if that were disadvantageous for your

20   group, if it was good for the overall of AT&T, beneficial in

21   that respect, it's something that you would consider; isn't

22   that true?

23        A    Always we're going to listen to what he has to

24   say.  And depending on the horizon and time frame and what

25   the initiative is, we'll weigh that.
```

1      Q      What you told us in your deposition was that what

2   matters is the long-term value creation for the shareholder

3   of AT&T.  That's the issue, right?

4      A      There's no question my fiduciary responsibility is

5   the long-term value creation of the shareholder at AT&T.

6      Q      Now, you also -- I think you told us at the time

7   of your deposition that it was your understanding that,

8   again, looking at where things, the planning that's been put

9   in place for post-merger for the structure of this

10  organization, that there would be compensation adjustments

11  made going post-merger for Mr. Donovan and for yourself

12  based on the overall performance of AT&T; isn't that true?

13     A      There are compensation elements that we get paid

14  at that are relevant to the overall performance of AT&T, and

15  those numbers are being changed from how we do it today to

16  what we would do in a post-close environment.  And it's

17  moving financial amounts into short-term compensation for

18  salary and bonus to be higher tied to an individual business

19  unit.

20     Q      Okay.  But the point is that a portion of the

21  compensation that you would obtain, that Mr. Donovan would

22  obtain, a portion of that is not tied just to how your

23  group, your media group, operates and succeeds or doesn't

24  succeed, but it's also tied to the overall performance of

25  AT&T as an organization, as a company, right?

1       A     Yeah.  We're paid in stock for a portion of our

2    compensation, and that obviously tracks to how AT&T

3    corporation does.

4       Q     And in your deposition, we talked about this

5    subject.

6             Do you recall that?

7       A     I recall talking about compensation, yes.

8       Q     And we talked about what the overall compensation

9    for the success of AT&T would be and whether there was a

10   percentage that was attributed to that at that point in time

11   in February of 2018.

12            Do you remember that?

13      A     I don't.

14      Q     If you would take a look at your deposition.  Let

15   me see if I can help refresh you.

16            So same binder in front of you, same deposition,

17   if you look at page 219.

18            And if you would start at line 11 and read through

19   219, line 24.

20            Actually, you can go to 220, line 4.

21            And then tell me when you're done reading that,

22   sir, and I'll ask you some questions.

23            Now, the figures there, I want us to be careful

24   because your employer has designated the figures as

25   confidential, so I'm not going to say that out loud.

1          But having read that, do you recall now that we

2     discussed what the thinking was at the time about the

3     compensation figures for short-term compensation bonus that

4     would occur for you and your colleagues at your level

5     post-merger if the merger were to occur?

6          A     Sorry.  We were talking past each other because

7     you hadn't said it was the short-term bonus you're referring

8     to.

9          There's a portion of the short-term bonus where my

10    boss has discretion around how he allocates money based on

11    what we call corporate citizenship, how we work within the

12    company for the betterment of AT&T, represent the brand, do

13    the things that we need to do in the business to his

14    judgment.

15         It's a relatively small percentage of that total

16    bonus overall, and in comparison to what I get paid in

17    equity is a very small percentage.

18         Q     Your boss being Mr. Stephenson --

19         A     Correct.

20         Q     -- in that situation?

21         MR. WELSH:  Okay.  Your Honor, I have another

22    exhibit which is confidential.  The purpose of it is just to

23    put that figure in that we've just been dancing around in

24    open court, just so that we can get that into the record.

25         And this is PX555 for identification.

```
 1              May I approach, Your Honor?

 2              THE COURT:  You may.

 3              MR. WELSH:  May I approach the witness,

 4  Your Honor?

 5              THE COURT:  Yes.

 6              MR. WELSH:  May I proceed, Your Honor?

 7              THE COURT:  You may.

 8  BY MR. WELSH:

 9       Q    Mr. Stankey, you have PX555, which is the

10  confidential exhibit.  I just want to see if the number

11  that's attached there -- you see a percentage.  Is that the

12  percentage that we've been talking about that's in your

13  deposition and is also related to this short, the short-term

14  bonus?

15       A    It is the percentage of the amount of the

16  short-term bonus.

17       Q    And that's the amount, just so it's clear and

18  we're all talking the same thing, that's the amount that

19  Mr. Stephenson has discretion in terms of how he would

20  compensate you at the end of the year related to the overall

21  performance of AT&T as an organization, correct?

22       A    That percentage that's on that sheet of paper?

23       Q    That's right.  That's what I'm talking about?

24       A    Yes.

25       Q    Is that right?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3278

```
 1              Okay.  Thank you.

 2              Now, Mr. Stankey, you talked to the Court earlier

 3    about what you see as being the benefits of this merger, so

 4    I want to come back and talk about this.

 5              And I think I heard Mr. Petrocelli ask you whether

 6    you were making predictions.

 7              And I think you said, yes, this is a --

 8    predictions is something we have to protect.

 9              Do you remember that testimony?

10        A    I do.

11        Q    Now, and I think you also testified that you've

12    been involved in other mergers, right?

13        A    I have.

14        Q    So you were involved in the AT&T-DirecTV merger;

15    is that right?

16        A    I was.

17        Q    At the time you were AT&T -- at the time of that

18    merger, you were AT&T's group president and chief strategy

19    officer; is that true?

20        A    Yes.

21        Q    And you led the due diligence for AT&T in that

22    transaction, right?

23        A    I did.

24        Q    And I know you submitted an affidavit to the FCC

25    where you talked about how you were familiar with the
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3145 of 3826

3279

 1    significant synergies associated with the DirecTV

 2    acquisition.

 3            Do you remember that?

 4        A    Yes, I do.

 5        Q    And that's factually true; you were familiar with

 6    those synergies, right?

 7        A    Yes.

 8        Q    And so let's talk about your predictions there in

 9    the AT&T-DirecTV merger.

10            AT&T there, in your leading up that charge, you

11    predicted revenue synergies from the DirecTV merger;

12    isn't that true?

13        A    We did.

14        Q    And one synergy that AT&T, you, predicted was that

15    the merger would help it add new pay-TV subscribers by

16    bundling pay TV with other products, like broadband.

17            Do you remember that?

18        A    I do.

19        Q    Now, AT&T fell short of that prediction, didn't

20    it?

21        A    It did.

22            MR. WELSH:  Your Honor, if I can ask

23    Mr. Petrocelli, we can approach?

24            THE COURT:  Sure.

25            (Sealed bench conference)



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3281



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3282



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3283



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3284



\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

3285



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3286



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3287



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3288



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** 

3289

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
```

13          (Open court)

14          THE COURT:  Come on back.

15          All right, you may proceed, consistent with the

16   discussion at the bench.

17          MR. WELSH:  Your Honor, I have what we have

18   identified, marked for identification as PX556.

19          May I approach?

20          THE COURT:  Yes.

21          MR. WELSH:  Copy of 556 is being given to opposing

22   counsel.

23          May I approach the witness?

24          THE COURT:  You may.

25

1    BY MR. WELSH:

2         Q    Mr. Stankey, you have what we've marked as 556 and

3    this is for confidentiality reasons, so I'm just going to

4    ask you these questions.

5              Do you see that, if you turn to the second page,

6    there's an A and B, okay?  The synergy miss that we were

7    just talking about on DirecTV, that merger in 2015, was the

8    amount of subscribers associated with that, is that

9    correctly listed at point A on this exhibit?

10        A    Can you give me a time frame or a specific period

11   of time you want to reference this to.

12        Q    Sure.  If we can look at January of 2016, that

13   time frame, would that be the approximate number?

14        A    That the results at that period of time.

15        Q    That this is the number of subscribers that were

16   in that miss.

17        A    For traditional pay-TV prescribers or all video

18   subscribers or --

19        Q    Do you recall that the -- let's see if we can talk

20   about the number.

21             Do you recall what the size of the miss was in

22   terms of the dollar amount?

23        A    Well, that depends on what products you're talking

24   about, unfortunately.

25        Q    I'm going to hand you a different transcript.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3291

```
 1              MR. WELSH:  Actually, we'll move on, Your Honor,

 2      and we'll come back to this if we need to.

 3              THE COURT:  This was covered in his deposition,

 4      right?

 5              MR. WELSH:  Yes, it was.

 6              THE COURT:  These numbers are in his deposition,

 7      right?

 8              MR. WELSH:  They are.

 9              THE COURT:  Okay.

10      BY MR. WELSH:

11          Q    Let's talk about Defendant's Exhibit 658.  Can you

12      pull that binder over, if you would, sir.

13              I think you were shown that exhibit by defendants,

14      correct?

15              MR. PETROCELLI:  Counsel, what exhibit?

16              MR. WELSH:  It's your exhibit, 658.

17      BY MR. WELSH:

18          Q    Now, this is a document.  It's called version 41,

19      right?

20          A    Yes.

21          Q    And you were asked about by Mr. Petrocelli during

22      his examination on direct, right?

23          A    Yes.

24          Q    And this is essentially a PowerPoint presentation

25      that was put together, right?
```

1        A     Well, there's a lot of Excel in here too.

2        Q     Combination of the two.

3        A     But there's some PowerPoint sheets too, some Word

4   documents.

5        Q     And this document is the basis of AT&T's view,

6   which you testified about that one page as to the summary of

7   its claimed synergies; is that correct?

8        A     Correct.

9        Q     Now, let's flip through this document, Defense

10  Exhibit 658 a little bit.

11            On the cover of the document, it says "Preliminary

12  Draft" in red letters; is that right?

13       A     It does.

14       Q     And if you flip through the document, almost every

15  single page says "Preliminary Draft," doesn't it?

16       A     It does.

17       Q     "Figures subject to change based on diligence,"

18  right?

19       A     Yes.

20       Q     And in the footer of the document, if you look,

21  it's small, but at the footer, it says it's for discussion

22  purposes only, doesn't it?

23       A     That's what it says, yes.

24       Q     And if I can direct you to page 74 of the deck,

25  which is called "Expense Synergies" -- tell me when you're

```
 1   there.

 2        A    Okay.

 3        Q    Now, on that page, it's expense synergies.

 4             Do you see that?

 5        A    I do.

 6        Q    And then we have that red box with a preliminary

 7   draft.

 8             And then underneath that, there's another box,

 9   right, on the right?

10        A    Yes.

11        Q    And it says there "Draft view of expense synergy

12   allocations," right?

13        A    It says, "Draft view of expense synergy

14   allocations, more detail.  Final view to be determined

15   during budget process."

16        Q    So the document that you've been testifying about

17   today, this version 41, Defendants' Exhibit 568, this is a

18   draft that's occurred in this merger work that you've been

19   working on, right?

20        A    As I said, yeah.  It's a draft that we'll continue

21   to iterate as we move through the process and close and get

22   more work and more information.

23        Q    Let's talk about what you know and your

24   involvement with this draft.

25             Now, you did not personally create any of the
```

1    slides that are in that exhibit; isn't that true?

2         A    No, I didn't actually develop the PowerPoint

3    slides.

4         Q    And you didn't personally do any of the Excel

5    spreadsheets that are in there; isn't that true?

6         A    I did not.

7         Q    And you didn't personally work up the numbers that

8    are in that exhibit; isn't that true?

9         A    On page 74?

10        Q    In the document.  You didn't personally work up

11   the numbers in that exhibit?

12        A    I provided input to certain numbers, assumptions,

13   certain information that might go into a model that

14   generated things, but I didn't personally write them down on

15   a sheet of paper here.

16        Q    The synergy model, there was a model used for the

17   document that we're looking at, right?

18        A    There's a variety of models that are used.

19        Q    And the synergy model, though, for the document,

20   is produced by a merger planning team, is that right?

21        A    That's correct.

22        Q    And you saw this document, this version 41, only

23   after it was in its current form; isn't that's true?

24        A    I'm not sure I understand your question.

25        Q    You didn't see the draft, this version 41, before

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3161 of 3826

3295

1    it was finalized and became version 41, right?

2         A    No, I've seen other versions of this document as

3    it's matured.

4         Q    Right.

5              But as to version 41, you hadn't seen the workings

6    of that version before it got finalized, true?

7         A    Can you describe to me what you mean by

8    "workings."

9         Q    Well, we'll move on.

10             Look at page 7 of the exhibit, if you would.

11             Now, this is called "Synergy Revenue and OI

12   Detail."

13             Do you see that?

14        A    Yes.

15        Q    And this is a roll-up for the synergies,

16   is that correct, for the document?

17        A    It is.

18        Q    And the middle column there, it says "Merger

19   Planning July 2017," right?

20        A    It does.

21        Q    Those are the synergies that you're talking about

22   here for ad growth, for combined assets, and for content

23   intelligence, right?

24        A    No.  Those are the July numbers.

25             This was their -- those numbers have been revised

1    into this October final.

2         Q    What you have here, though, you have ad growth,

3    you have combined assets, you have content intelligence,

4    correct?

5         A    Yes.

6         Q    And then the middle column is talking about the

7    merger planning for July 2017, right?

8         A    Yes.

9         Q    And in July of 2017, you were over the

10   entertainment group at AT&T; you were not in your position

11   on the integration; isn't that true?

12        A    I was not in my current position on the

13   integration.  I was going through some of this material in

14   my role within DirecTV or as CEO of entertainment group.

15        Q    That wasn't my question, sir.  And your counsel

16   will have time to ask you questions if he so chooses.

17             My question to you is:  In July of 2017, you were

18   over the entertainment group at AT&T, correct?

19        A    Yes, correct.

20        Q    And you did not assume your responsibilities for

21   the integration until August of 2017 when you then headed it

22   up, correct?

23        A    That's correct.

24        Q    Thank you.

25             Now, at this point in July of 2017, had the

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3163 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3297

1   integration effort been underway for some time?

2        A    Yes.  As I described, the integration effort

3   starts before we announce the acquisition.

4        Q    And it actually had started about eight-or-so

5   months before, is that right, before you got involved as

6   head of the integration effort?

7        A    Well, the first version of something like this or

8   the foundation of this would have been done in October,

9   finished in October of 2016.

10       Q    And this is version 41, and there were other

11  versions of the document.  And I think you testified in your

12  deposition that you had seen that the last version of the

13  document that you saw before version 41 was roughly version

14  22, correct?

15       A    Sounds about right.

16       Q    And you placed that -- in your deposition, you

17  placed that in May of 2017, that you saw it around then,

18  correct?

19       A    I think that's correct, yes.

20       Q    And then you were asked a lot of questions.  You

21  gave lot of depositions, I know, in February of this year.

22  And you were the corporate representative on a lot of these

23  synergies and efficiencies issues, correct?

24       A    Yes.

25       Q    Okay.  And you were asked about version 41, DX658,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3298

```
 1   during the deposition in February of this year, correct?

 2        A    Yes.

 3        Q    And I think at that time, you testified that you

 4   were, even as you were preparing to be deposed, that you

 5   still had questions about how some of the numbers in

 6   version 41 were actually derived; isn't that right?

 7        A    There's always questions about numbers and how

 8   they're derived, yeah, sure.

 9        Q    Well, you, to prepare, you actually looked at

10   version 41, right, to prepare for your deposition?

11        A    Yes, I did.

12        Q    And then in looking through that, you actually

13   noticed that one of the numbers had an assumed 200 percent

14   increase in viewership for cross-promotions.

15             Do you remember that?

16        A    I do.

17        Q    And next to that number, that 200 percent

18   increase, you wrote "large" next to it, didn't you?

19        A    I did.

20        Q    And that was because -- you weren't sure how they

21   got to that, how that number was derived, right?

22        A    It was a note to myself to go and do some

23   follow-up and understand some things.

24        Q    And there's another synergy when you went through

25   this -- again, to try to familiarize yourself to prepare for
```

1    the deposition, there was another synergy that AT&T was

2    claiming involving bundling of wireless and OTT products.

3            Do you remember that?

4        A    Not off the top of my head, I don't.

5        Q    Well, do you remember -- and I can help refresh

6    your memory if it --

7            THE COURT:  We'll have to do that in the morning.

8            MR. WELSH:  Okay.  Thank you, Your Honor.

9            THE COURT:  It's 6:30.

10           All right.  We're going to take the evening

11   recess.  You remain a witness under oath in the case,

12   Mr. Stankey.  You're not at liberty to discuss your

13   testimony with anybody so far or what it might be when you

14   return.

15           See you 10:30 tomorrow morning.

16           THE WITNESS:  I'll be here.

17           THE COURT:  You can step down.

18           I'll see counsel.

19           (Sealed bench conference)

20           THE COURT:  All right.  He's got about a half an

21   hour left on the clock.

22           MR. CONRATH:  Your Honor, I think -- I don't want

23   to interrupt, but I think -- I just talked to him.  He

24   thinks that he has about 45 minutes to an hour more.

25           THE COURT:  He's not going to get that much time.

```
 1              MR. CONRATH:  Okay.

 2              THE COURT:  I might let him go a little over a

 3     half hour.

 4              MR. CONRATH:  I mean, we did have Mr. Bewkes this

 5     morning that went two hours instead of one.

 6              THE COURT:  He just went for 40 minutes.  Your

 7     estimate was an hour.

 8              MR. CONRATH:  Mr. Bewkes' estimate was an hour

 9     this morning; he went for two, and we didn't object.  And

10     I guess we would like a little of the same --

11              THE COURT:  Mr. Stankey went for an hour and a

12     quarter with direct exam.  He's already gone 40 minutes.  If

13     he goes another half hour, he's an hour and a quarter --

14     well, if he goes another 40 minutes, 45 minutes, he's a half

15     hour -- I mean, an hour and a quarter.

16              MR. CONRATH:  Yeah, and that's all I was saying

17     was 45 minutes, perhaps, an hour.  So it's real close to

18     that, if you can.

19              THE COURT:  We'll see where he is at the

20     half-an-hour mark.  The most he's going to get is 45

21     minutes.  That's all.  Because that would equal out with

22     what Mr. Petrocelli had.  What the heck was that?

23              All right.

24              Now, after him is Mr. Stephenson, right?

25              MR. PETROCELLI:  Our final witness, Your Honor.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3301

```
 1    I'm judging I can get it done within one hour and 15

 2    minutes.

 3            THE COURT:  Okay.

 4            The same for you?

 5            MR. CONRATH:  I will try to do less, but that

 6    would be my best estimate.

 7            THE COURT:  Less is always more.

 8            MR. CONRATH:  Yes.

 9            THE COURT:  All right.  So that gets us -- that's

10    the whole morning.  We're in the afternoon now at that

11    point.

12            MR. CONRATH:  We're definitely into the afternoon.

13            THE COURT:  Definitely afternoon.

14            So it's going to be mid-afternoon.

15            Do you have a witness after him on rebuttal?

16            MR. CONRATH:  Yeah, we do, Mr. Patel, who is our

17    efficiencies expert.

18            THE COURT:  You mentioned him.

19            MR. CONRATH:  Right.

20            And I know you said asked about arguing the

21    motion.

22            THE COURT:  Oh, yes.

23            MR. CONRATH:  I was going to do that.

24            THE COURT:  I haven't read what you all submitted

25    yet because you haven't submitted it.
```

1          MR. PETROCELLI:  Can we put that off till Monday?

2          THE COURT:  I don't mind doing it Monday morning.

3          MR. PETROCELLI:  Okay.  That's fine.

4          THE COURT:  Because Quintero's estimate was an

5     hour each, and that takes the rest of the afternoon.

6          MR. CONRATH:  Yeah, sure.

7          THE COURT:  So we can do the argument first thing

8     on Monday morning.

9          MR. PETROCELLI:  Monday morning.

10          THE COURT:  And then we have, what, one more

11    witness after Quintero.

12          MR. CONRATH:  Two more.  Professor Athey and

13    Professor Shapiro.

14          THE COURT:  Okay.  Shapiro, the same Shapiro as

15    before?

16          MR. CONRATH:  Yeah.

17          THE COURT:  You're recalling him?

18          MR. CONRATH:  For rebuttal.

19          MR. PETROCELLI:  I'm going to want to talk to

20    Your Honor about that tomorrow --

21          THE COURT:  All right.  Well, we're --

22          MR. PETROCELLI:  -- because he's not really

23    permitted to just get up there and bolster his initial

24    testimony and repeat what he said.  Rebuttal -- the scope of

25    rebuttal has limits, and I'd like to -- I've asked counsel

1   to let me know what it is he intends to address, and they

2   have declined to tell me.

3           MR. CONRATH:  That's -- go ahead.

4           MR. PETROCELLI:  Okay.  I sent an email yesterday

5   saying, I don't think he qualifies as a rebuttal witness;

6   but if you disagree, please tell me the topics.

7           And I asked you again this morning.  And the

8   response was, we decline to tell you.  He's just going to

9   respond to everything that's been said about him.

10          And my view is that is not the law.  It's

11  obviously within Your Honor's discretion.

12          But you can't bring an expert back up here to

13  basically say that our experts, who are responding to him,

14  were wrong and he was right.

15          You're supposed to address new matter that came

16  up, not to hear all about -- so the way this worked is he

17  put in a bargaining model; it was criticized by various

18  experts; and he wants to come back and say, no, they're

19  wrong; I'm right.

20          MR. CONRATH:  Well, we want him to respond to the

21  arguments.  They brought in a string of experts and fact

22  witnesses to criticize Professor Shapiro's evidence.

23          THE COURT:  Right.

24          MR. CONRATH:  That is perfectly appropriate

25  rebuttal for him to say, let me explain why those criticisms

 1    are incorrect.

 2             That's sometimes the whole point of rebuttal is to

 3    say what came in on the defendants' case is not right, and

 4    let us explain why.  Obviously there are limits to that.

 5             MR. PETROCELLI:  He knew all of those criticisms,

 6    Your Honor, through the report of the rebuttal experts

 7    that --

 8             THE COURT:  True.  Fair point.

 9             MR. PETROCELLI:  And also from the depositions.

10             So by the time he took the stand, as you will

11    recall, he kept, even averting to Dr. Carlton.

12             And so, look, this is a discretionary call.  My

13    view is that if there are legitimate rebuttal topics, they

14    could let us know, and then we can decide if we have a

15    dispute or not.

16             But just to have him come up here and basically

17    try to get the last word and like a reply brief almost,

18    that's not proper scope of rebuttal.

19             MR. CONRATH:  Well, the proper scope of rebuttal

20    is responding to things that were put in in the defendants'

21    case, of which there were many that were aimed at critiquing

22    Professor Shapiro.  Our intent is to say, did you hear --

23             THE COURT:  All right.  I mean, we'll have more

24    time to discuss this later.

25             MR. PETROCELLI:  Okay.

1          MR. CONRATH:  Okay.

2          THE COURT:  But it will be helpful in the interim

3     to have whoever on your team of people -- I can't even off

4     the top of my head remember who did the direct exam of

5     Mr. Shapiro.

6          MR. CONRATH:  Mr. Welsh.

7          THE COURT:  So he's busy right now.  So you're

8     going to have to get somebody else probably.

9          But have whoever it is who helps Welsh or helps

10    Welsh in preparing the Shapiro exam to see if they can

11    identify things that came up in the testimony regarding

12    Shapiro's models or Shapiro's testimony, whatever, that

13    are -- that were new, unexpected, weren't covered in the

14    rebuttal reports, that were basically -- basically

15    something, a new twist, so to speak, for lack of a better

16    way of putting it, so we can at least identify what those

17    are, if there are any.

18          Now, if the answer that comes back is that there

19    aren't any, that makes a much harder decision for me.

20          MR. CONRATH:  Okay.

21          THE COURT:  So if the answer is, well -- I'm

22    making this up to make a point.  There were 18 things that

23    came up and Mr. Shapiro -- Professor Shapiro wants to

24    respond to those 18 things, because, it wasn't in the

25    rebuttal report, he never had a chance to discuss it before,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   or whatever it is -- I don't know.  You guys have the

 2   transcripts, and you've got a staff that can check it out.

 3          I don't know.  I mean, I think Mr. Petrocelli has

 4   basically represented that he doesn't think there was

 5   anything new that came out that wasn't previously in the

 6   rebuttal or the depositions.  I don't know if that's

 7   accurate or not, because I don't know them as well as you

 8   both know them.

 9          MR. PETROCELLI:  And, in fact, the only reason

10   that came up, Your Honor, is that, Mr. Shapiro, for the

11   first time, after having not been prepared on his

12   deposition, gave a response about the Altman Vilandrie

13   report or slide deck that we had never heard before.  That

14   was new.

15          And so Professor Carlton responded to it, as did

16   Professor Rossi.

17          And now he wants to come back and respond to that.

18          I mean, it never ends, Your Honor.

19          THE COURT:  Well, I think it's pretty clear that,

20   to the extent they can isolate new things, new wrinkles,

21   whatever, he's going to get a chance to respond to those.

22          If it's going beyond that --

23          MR. CONRATH:  So can I push back on that,

24   Your Honor?  Because I think --

25          THE COURT:  Yeah, of course, you can.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3307

```
 1              MR. CONRATH:  I think the proposition that an

 2    expert in the government's case-in-chief has to anticipate

 3    all the possible arguments and explain it away in the

 4    case-in-chief --

 5              THE COURT:  No one said that.  I never said that.

 6              MR. CONRATH:  No.

 7              THE COURT:  I'm not -- don't knock over that lamp.

 8              MR. CONRATH:  Don't do that.

 9              I think that's the implication -- that's the

10    implication of the argument.  And I think there's a natural

11    sequence, which is, you know, plaintiff puts in its case;

12    defense responds and says, well, no, that's wrong.  Let me

13    explain why.

14              Rebuttal case is, what's the plaintiff's pushback

15    to the defendants' case?  And the fact there was an expert

16    report doesn't mean it was our obligation to answer every

17    criticism of the defense.

18              THE COURT:  There's a rebuttal report here.

19              MR. CONRATH:  Yeah.

20              THE COURT:  Each of the experts did rebuttal

21    reports.

22              MR. CONRATH:  Yes.

23              THE COURT:  And so they had a chance in their

24    rebuttal report to, so to speak -- there is an expression.

25              MR. PETROCELLI:  No.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  There's an expression.  It's an old

2    expression, but to tell the tale their way, whatever the

3    expression is.

4          But the point is, they got to see what the other

5    expert said, and then they rebutted it.  They rebutted it.

6    Okay.  Fine.

7          Then, of course, they came to court, and they gave

8    their testimony under direct and cross.  And I don't have

9    any problem at all with the idea that if things came up that

10   had never been before in the rebuttal reports and it's some

11   new twists and turns, that's not a problem.  That's easy.

12          MR. CONRATH:  Sure.

13          THE COURT:  But if it's just rehashing the same

14   things over and over again I don't -- and giving him a

15   second bite at the apple, as opposed to the defense has only

16   had one bite at the apple, I have a little trouble with

17   that.

18          I'm not making a ruling yet.  I'm not saying I've

19   ruled.  But I'm just saying it's going to be helpful to

20   know, were there new twists and turns?  Were there new

21   things that were raised that were never in the rebuttal

22   reports or were there not?

23          MR. PETROCELLI:  And that's what my suggestion was

24   and is, if we can just have a conversation or give us an

25   itemization of these.

```
1              THE COURT:  He's going to identify some.

2              MR. CONRATH:  We'll look at that and do what

3    Your Honor has asked.

4              I just want to leave you with the thought that the

5    implication Mr. Petrocelli's arguing is that the government,

6    in its case, has to anticipate and explain away every

7    argument that there is.

8              MR. PETROCELLI:  No, that's not my argument,

9    Craig.

10             MR. CONRATH:  That's the implication.

11             MR. PETROCELLI:  No, it's not.

12             MR. CONRATH:  Right.  I didn't interrupt you --

13             THE COURT:  I didn't take it that way, certainly.

14             MR. CONRATH:  But the rebuttal, rebuttal case is

15   to come back and say, here's the answer to the criticisms

16   that were made.  I think we're entitled to have that chance

17   to explain what the answer is.

18             THE COURT:  I understand.  I understand what

19   you're saying.

20             MR. CONRATH:  Some of it is new; some of, I think,

21   probably is not.

22             THE COURT:  Up to a point -- up to a point, you're

23   right.  But we don't have the luxury of replowing old

24   territory here.

25             MR. CONRATH:  No.  We would be --
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    THE COURT:  It's just not a luxury that you have.

2    MR. CONRATH:  I know.  We're not going to replow

3  the territory, but we are going to take -- advance the

4  arguments.  One side says this.  The other side says this.

5  The other side says, well, what's the pushback to that?  And

6  that's a normal process of a rebuttal case.

7    MR. PETROCELLI:  There's law on the scope of

8  rebuttal.  And I think, Craig, you're over --

9    THE COURT:  We don't have to decide this this

10  minute.  Take a look at what you got.  We'll talk about it

11  further.  He's going to be here Monday.  He's not getting on

12  before Monday, under any scenario.

13    MR. CONRATH:  No.  No way.

14    THE COURT:  And the ultimate decision of the scope

15  of the examination on Monday, I can think about it over the

16  weekend.  I can look and do some research.  I can figure it

17  out.

18    If you have a list of new twists and turns that

19  did, in fact, occur, I can have the benefit of that list.

20    If there aren't any, there aren't any.  Okay?

21  There aren't any.  There aren't any.  But like I said a

22  minute ago, I think that makes a harder decision for me

23  because then it's more like a replowing situation, and

24  I'm not really inclined to do that.

25    So you've got your homework assignment.

3311

```
 1              MR. CONRATH:  We have.

 2              MR. PETROCELLI:  Thank you, Your Honor.

 3              THE COURT:  See you tomorrow.

 4              (Open court)

 5              DEPUTY CLERK:  All rise.  This Honorable Court

 6      will stand in recess until the return of court.

 7              (Proceedings concluded at 6:42 p.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3312

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: April 18, 2018_____    /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,     :
                              :
              Plaintiff,      :        CV No. 17-2511
         vs.                  :
                              :        Washington, D.C.
                              :        Thursday, April 19, 2018
AT&T, INC., ET AL.,           :           10:45 a.m.
                              :
                              :           Day 17
              Defendants.     :
-----------------------------x
```

```
                    MORNING SESSION
                TRANSCRIPT OF BENCH TRIAL
         BEFORE THE HONORABLE RICHARD J. LEON
             UNITED STATES DISTRICT SENIOR JUDGE
```

APPEARANCES:

For the Government:     Craig W. Conrath, Esquire
                        Eric D. Welsh, Esquire
                        Donald G. Kempf, Jr., Esquire
                        Matthew D. Siegel, Esquire
                        Sarah Oldfield, Esquire
                        Anna E. Sallstrom, Esquire
                        U.S. DEPARTMENT OF JUSTICE
                        Antitrust Division
                        450 Fifth Street, NW
                        Washington, DC  20530
                        202) 532-4560
                        craig.conrath@usdoj.gov
                        eric.welsh@usdoj.gov
                        donald.kempf@usdoj.gov
                        matthew.siegel@usdoj.gov
                        sarah.oldfield@usdoj.gov
                        anna.sallstrom@usdoj.gov

```
 1   Appearances Continued:

 2   For Defendant AT&T        Katrina M. Robson, Esquire
     and DirecTV Group        O'Melveny & Myers LLP
 3   Holdings, LLC:           1625 Eye Street, NW
                              Washington, DC  20006
 4                           (202) 220-5052
                              krobson@omm.com
 5
                              Daniel M. Petrocelli, Esquire
 6                            M. Randall Oppenheimer, Esquire
                              O'MELVENY & MYERS LLP
 7                            1999 Avenue of the Stars
                              8th Floor
 8                            Los Angeles, CA  90067
                             (310) 553-6700
 9                            dpetrocelli@omm.com
                              roppenheimer@omm.com
10
                              Michael L. Raiff, Esquire
11                            Robert C. Walters, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
12                            2100 Mckinney Avenue
                              Suite 1100
13                            Dallas, TX 75201
                             (214) 698-3350
14                            mraiff@gibsondunn.com
                              rwalters@gibsondunn.com
15
     For Defendant            Kevin J. Orsini, Esquire
16   Time Warner, Inc.:       Peter T. Barbur, Esquire
                              CRAVATH, SWAINE & MOORE LLP
17                            Worldwide Plaza
                              825 Eighth Avenue
18                            New York, NY  10019
                             (212) 474-1140
19                            korsini@cravath.com
                              pbarbur@cravath.com
20
     Court Reporter:          Crystal M. Pilgrim, RPR, FCRR
21                            Official Court Reporter
                              United States District Court
22                            District of Columbia
                              333 Constitution Avenue, NW
23                            Washington, DC  20001
                             (202) 354-3127
24                            crystal_pilgrim@dcd.uscourts.gov

25
```

Table of Contents

                    Direct   Cross   Redirect   Recross

On behalf of the Defense:

    John T. Stankey (Resumed)

        By Mr. Welsh                   3324                 3374

        By Mr. Petrocelli                       3369

    Randall Stephenson

        By Mr. Petrocelli     3376

E-X-H-I-B-I-T-S

                                          Marked    Received

On behalf of the Government:

Exhibit No. PX 555 Sealed                             3324

Exhibit No. PX 72                                     3333

Exhibit No. PX 323                                    3335

Exhibit No. PX 344                                    3337

Exhibit No. PX 6                                      3357


On behalf of the Defense

Exhibit No. 664                                       3400

Exhibit No. 609                                       3409

Exhibit No. 640                                       3412

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1              P-R-O-C-E-E-D-I-N-G-S

2          THE DEPUTY CLERK:  Matter before the Court, United

3    States of America v. AT&T, Inc., et al.

4          Counsel please come forward and identify yourselves

5    for the record.

6          MR. WELSH:  Good morning, Your Honor, Eric Welsh for

7    the United States.

8          THE COURT:  Welcome back.

9          MR. WELSH:  Thank you.

10         MS. SALLSTROM:  Good morning, Your Honor, Anna

11   Sallstrom for United States.

12         THE COURT:  What's your name?

13         MS. SALLSTROM:  Anna Sallstrom.

14         THE COURT:  Sallstrom?

15         MS. SALLSTROM:  Sallstrom.

16         MR. SIEGEL:  Good morning, Your Honor, Matthew Siegel

17   for the United States.

18         THE COURT:  Welcome.

19         MR. CONRATH:  Good morning, Your Honor, Craig Conrath

20   for the United States.

21         THE COURT:  Good morning, welcome back.

22         MS. OLDFIELD:  Good morning, Your Honor, Sarah

23   Oldfield for the United States.

24         THE COURT:  Welcome back.

25         MR. KEMPF:  Good morning, Your Honor, Don Kempf for

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    the United States.

 2              THE COURT:  Welcome back.

 3              MR. PETROCELLI:  Good morning, Your Honor, Daniel

 4    Petrocelli for defendants.

 5              THE COURT:  Welcome back.

 6              MS. ROBSON:  Good morning, Your Honor, Katrina Robson

 7    for defendants.

 8              THE COURT:  Welcome back.

 9              MR. OPPENHEIMER:  Good morning, Your Honor, Randy

10    Oppenheimer for the defendants.

11              THE COURT:  Welcome back.

12              MR. WALTERS:  Good morning, Your Honor, Rob Walters,

13    AT&T, DirecTV.

14              THE COURT:  Welcome back.

15              MR. BARBUR:  Good morning, Your Honor, Peter Barbur

16    for Time Warner.

17              THE COURT:  Welcome back.

18              MR. ORSINI:  Good morning, Your Honor, Kevin Orsini

19    for Time Warner.

20              THE COURT:  Welcome back.

21              MR. RAIFF:  Good morning, Your Honor, Mike Raiff for

22    AT&T and DirecTV.

23              MR. PETROCELLI:  May we approach?

24              THE COURT:  Sure.

25              (Sealed Bench Conference.)
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1

2

3

4

5

6

7

8          (Open court.)

9          THE COURT:  Witness remains under oath.

10          MR. WELSH:  May I have just one minute to confer?

11          THE COURT:  Yes, take a minute.

12          Do you have some water there?

13          THE WITNESS:  I do, thank you.

14          THE COURT:  All right.

15          (Pause.)

16          MR. WELSH:  Thank you, Your Honor, may I proceed?

17          THE COURT:  When you're ready, you go ahead.

18          MR. WELSH:  Okay, thank you.

19          Your Honor, just as a housekeeping measure and I

20 mentioned this to Mr. Petrocelli before we started.  I

21 neglected yesterday to move into evidence PX 555.  And we would

22 go ahead and do that at this time.  I don't believe there's any

23 objection.

24          MR. PETROCELLI:  No objection.

25          THE COURT:  Hold on, let me check my notes here.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    That's admitted under seal, right?

 2            MR. WELSH:  It is under seal, yes, Your Honor.

 3            THE COURT:  All right, that'll be admitted under

 4    seal.

 5            MR. WELSH:  Thank you, Your Honor.

 6            (Plaintiff's Exhibit No. PX 555 was

 7        received in evidence under seal.)

 8            THE COURT:  All right, when you're ready.

 9            MR. WELSH:  Yes.

10        JOHN T. STANKEY, DEFENSE WITNESS, PREVIOUSLY SWORN

11                    CROSS-EXAMINATION (Cont'd)

12    BY MR. WELSH:

13    Q.   Mr. Stankey, good morning.

14    A.   Good morning.

15    Q.   I want to come back and talk a little bit more, a few more

16    questions that I have on DX 658, which I think is in that

17    binder in front of you.

18        Now, the numbers that are in DX 658, some of those do

19    include what you would characterize to be wild guesses; isn't

20    that true?

21    A.   No.

22    Q.   Okay.  You -- to prepare for your deposition you had your

23    own personal copy of version 41, correct?

24    A.   Yes, I had a working copy of version 41.

25    Q.   Because you were deposed on behalf of AT&T as a company,
```

1  right, as a company witness, right?

2  A.    That's correct.

3  Q.    Okay.

4        MR. WELSH:  Your Honor, I have what's been marked as

5  PX 557.  May I approach?

6        THE COURT:  You may.

7        MR. WELSH:  May I approach the witness, Your Honor?

8        THE COURT:  You may.

9        MR. WELSH:  Your Honor, a copy of PX 557 has been

10 provided to opposing counsel.  May I proceed?

11       THE COURT:  You may.

12 BY MR. WELSH:

13 Q.    Mr. Stankey, you have PX 577, do you recognize that as

14 being your working copy of version 41, which is DX 658?

15 A.    Yes.

16 Q.    And the handwriting in the document is yours; is that

17 correct, sir?

18 A.    Yes, it is.

19 Q.    And if I can direct you to page 109 of the document, which

20 is titled "Wireless and OTT bundling," tell me when you're

21 there?

22 A.    I'm there.

23 Q.    And on that page next to the information that's being

24 presented there on these synergies, you wrote that the 10 BP

25 reduction number there, you said that that was a SWAG, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1   A.   That particular element of that estimation for that

2   initiative.

3   Q.   And tell His Honor what a swag is, that's a guess, right?

4   A.   That would be an educated guess, that's correct.

5   Q.   Well, it's an acronym, and it stands for wild guess, I'm

6   not going to say what the A is, but it's a wild guess, right?

7   A.   It's a guess, its based on whatever the best information

8   somebody has in their experience.

9   Q.   Can you tell us what SWAG means as an acronym?

10  A.   You just said it, do you want me to say it again?

11  Q.   Okay.

12       Let's talk about a different --

13       THE COURT:  Hold on, let's be clear about something.

14  What does it mean to you?  That's what I want to know.

15       THE WITNESS:  It's when somebody doesn't have any

16  empirical data working through something and they have to make

17  a guess based on their personal experience.

18       THE COURT:  That's what it means to you?

19       THE WITNESS:  That's what it means to me.

20       THE COURT:  You wrote it there, that's what you were

21  thinking.

22       THE WITNESS:  That's correct.

23       THE COURT:  Okay, that's all.  Go ahead.

24  BY MR. WELSH:

25  Q.   Now, the numbers in here, these estimates, in some cases
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    they involve conversion rates, right?

2    A.    What do you mean by a conversion rate?

3    Q.    When you were asked in your deposition about conversion

4    rates, do you recall that?

5    A.    I don't recall that.

6    Q.    All right, let's see if I can help you out.

7              MR. WELSH:  Your Honor, I have some binders with the

8    deposition transcripts, may I approach?

9              THE COURT:  You may.

10             MR. WELSH:  May I approach the witness, Your Honor?

11             THE COURT:  You may.

12             Is this a different binder than this other one?

13             MR. WELSH:  It is, Your Honor, the first binder was

14   for his individual depositions that he gave.  The second

15   binder, which has a lot more girth to it, that's the, on behalf

16   of the company's 30(b)(6) witnesses.

17             THE COURT:  All right.

18             MR. WELSH:  Thank you, Your Honor.

19             THE COURT:  All right.  I'd like to have the paper

20   concession in this case.

21   BY MR. WELSH:

22   Q.    Now, Mr. Stankey, I'm going to direct you to tab 5 of that

23   big binder.  And this is the deposition that you gave on

24   February 15 of this year, correct?

25   A.    That's what it looks like, yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   All right.  And I'm going to direct you to page 55 of that

2  deposition.

3  A.   Okay.

4  Q.   And do you see there on line -- starting on line 15, if

5  would you read that through the end and tell me when you're

6  done?

7  A.   (Witness complies.)

8       Okay.

9  Q.   Does that help to refresh your memory that there was a

10  discussion in your deposition back in February, just two months

11  ago, about conversion rates that are in this exhibit?

12  A.   It does.

13  Q.   Okay.  And in response to the questions that were asked of

14  you that day, you told us that the conversion rates that are in

15  the document, that some of those were prepared by Time Warner

16  personnel to your knowledge, right.

17  A.   That's correct.

18  Q.   All right.  And you didn't know how at least one of those

19  conversion rates was derived; isn't that true?

20  A.   Yeah, the work that was done on the Time Warner side,

21  oftentimes because of restrictions on how data flows they would

22  have to provide inputs like a conversion rate to complete an

23  analysis.

24  Q.   Okay.  I think my question was really simple, and we're

25  trying to be very efficient for the Court on time.

1  A.    Okay.

2  Q.    So if you could just answer my questions.  You understood

3  that some of those conversion rates were coming from Time

4  Warner personnel, not from AT&T personnel, correct?

5  A.    That's correct.

6  Q.    All right.  And as a result you didn't stand over the

7  shoulders of the Time Warner people because you weren't allowed

8  to, right?

9  A.    That's correct.

10  Q.    All right.  And that information that you got on these

11  conversion rates, you couldn't answer in your deposition

12  whether or not those were using any empirical data at Time

13  Warner; isn't that true?

14  A.    That's true.

15  Q.    And you hadn't discussed those conversion rates with the

16  Time Warner personnel or looked at the back of what the Time

17  Warner personnel did to arrive at those conversion rates; isn't

18  that true?

19  A.    I did not discuss them.  People in the working team may

20  have discussed them.

21  Q.    Okay.  Again, answer my question if you would.  Counsel

22  can ask you a question.  But you did not, correct?

23  A.    I did not.

24  Q.    All right.  Let's talk about a different one of your --

25  and you can put that to the side for now, sir, thank you.

1        Let's talk about a different one of your -- of AT&T

2   synergy claims here, this is on content intelligence, and I

3   think you testified about this yesterday.

4        Now, I think you described earlier, certainly in your

5   depositions that you gave, that content intelligence is using

6   data to drive create decisions in the development of content,

7   correct?

8   A.   That's one use of it, yes.

9   Q.   Okay.  I think you gave an example yesterday about it

10  tells you which stars you want to put into a particular show,

11  that sort of thing, right?

12  A.   That was one of the examples I gave, yes.

13  Q.   All right.  Now, AT&T hasn't been able to test to see

14  whether content intelligence even works, right?

15  A.   That's correct, as I said, neither company really has both

16  sets of data to do that.

17  Q.   Okay.  Now, as you were getting involved with your role as

18  head of integration, you went over and talked with Time Warner

19  employees, didn't you?

20  A.   I did.

21  Q.   Yeah, you called it you're making your rounds, right?

22  A.   I may have.

23  Q.   Okay.  And you talked to those employees about content

24  intelligence, right?

25  A.   I talked to them about a number of things including

1   content intelligence.

2   Q.   And you were told by Time Warner employees that content

3   intelligence was speculative, unproven and untested, weren't

4   you?

5   A.   There are people in Time Warner who hold that point of

6   view, yes.

7   Q.   All right.  And after those rounds, you came back to AT&T

8   and you thought that the advertising synergies that you've been

9   talking about here, you thought that those were going to be a

10  significant execution risk, correct?

11  A.   No.

12  Q.   You came back and you also found that Turner didn't have

13  buy-in or Time Warner didn't have buy-in on the content

14  intelligence, right?

15  A.   Can I clarify, are you asking about advertising or content

16  intelligence?

17  Q.   So this one I'm asking about contents intelligence.  You

18  came back from your rounds and you had found that Time Warner

19  didn't buy into the idea of content intelligence, correct?

20  A.   There were individuals that I spoke with who were

21  skeptical of some of the approaches.

22        MR. WELSH:  Your Honor, I have two binders here of

23  some exhibits if I may approach?

24        THE COURT:  You may.

25        MR. WELSH:  May I approach the witness, Your Honor?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1              THE COURT:  You may.

2              MR. WELSH:  May I proceed?

3    BY MR. WELSH:

4    Q.   Mr. Stankey, you have some exhibits here, we're not going

5    to go through all of these, I just want to ask you about a

6    couple of them, though.  If I could ask you to look at PX 72.

7    A.   (Witness complies.)

8    Q.   Now, Mr. Stankey, this is an email from Amy McCracken,

9    starting out with the email from Amy McCracken to you on

10   September 1, 2017 with your response on September 4; is that

11   correct?

12   A.   Correct.

13   Q.   Is that correct, sir?

14   A.   Yes, that's correct.

15   Q.   All right.  And you worked with Amy McCracken in this

16   timeframe, correct?

17   A.   I did.

18   Q.   And she was responsible for some of the overall program

19   management associated with the integration effort, correct?

20   A.   That's correct.

21   Q.   All right.  And this particular email or exchange of

22   emails relates to an update that was being prepared at the time

23   for what you've described as being the Friday morning meetings

24   with Mr. Stephenson, correct?

25   A.   That's what it appears to be, yes.

1    Q.   All right.  And in your email to her you're offering her

2    comments and edits on the presentation which relates to the

3    synergies topic, correct?

4    A.   Yes.

5    Q.   In particular it relates to content intelligence, correct?

6    A.   There are comments in here about content intelligence,

7    correct.

8                MR. WELSH:  Your Honor, I move for admission of PX

9    72?

10               MR. PETROCELLI:  No objection.

11               THE COURT:  It will be admitted.

12               (Plaintiff's Exhibit No. PX 72 was received

13          in evidence.)

14   BY MR. WELSH:

15   Q.   Mr. Stankey, I'm going to ask you to look at your email

16   response to Ms. McCracken, in the second paragraph of that

17   where it starts off, "Synergy slides are fine."  Do you see

18   that paragraph?

19   A.   I do.

20   Q.   All right.  And in your comment to her you said, "Contents

21   intelligence has specious buy-in from my rounds and should be

22   characterized as the initiative that will require significant

23   behavioral and incentive work," those are your words to

24   Ms. McCracken that day, correct?

25   A.   Correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  Q.   And you also say that, "Advertising has the most

 2  significant executive risk, I think this is understood," those

 3  are your words to Ms. McCracken, correct?

 4  A.   They are.

 5  Q.   Okay, thank you.

 6       Now, after this exchange of emails with Ms. McCracken, Ms.

 7  McCracken revised the presentation for the Friday morning

 8  meeting, didn't she?

 9  A.   I suspect she did, I don't recall exactly.

10  Q.   All right.  Well, let's see if I can help you out.  Look

11  at PX 323 in your binder.

12  A.   (Witness complies.)

13  Q.   Are you there, sir?

14  A.   I'm in the tab, yes.

15  Q.   Okay.  So PX 323 are emails between yourself and

16  Ms. McCracken on September 5, 2017, correct?

17  A.   Yes, they are.

18  Q.   And again, this relates to the merger planning and

19  presentation that we've been talking about, true?

20  A.   It does.

21  Q.   And the draft of the presentation at that time is

22  attached, correct?

23  A.   Yes, there is one attached.

24            MR. WELSH:  Your Honor, I move for admission of PX

25  323?
```

```
 1              MR. PETROCELLI:  No objection.

 2              THE COURT:  It'll be admitted.

 3              (Plaintiff's Exhibit No. PX 323 was

 4         received in evidence.)

 5   BY MR. WELSH:

 6   Q.   So now going back and looking at the email itself, Mr.

 7   Stankey, I want to look at Ms. McCracken's email to you, which

 8   is in the middle of that page, are you there?

 9   A.   I'm there.

10   Q.   All right.  And she goes through a number of the slides

11   and she writes next to slides 35, do you see that where it says

12   "synergy slides," right?

13   A.   I do.

14   Q.   All right.  And that's the same reference that you had in

15   PX 72 when you talked about synergy slides, right?

16   A.   I'm sorry, can you repeat the question?

17   Q.   Sure.  PX 72, which you just looked at, where you said

18   "synergy slides," you guys are talking about the same topic

19   here, right?

20   A.   I believe so.

21   Q.   Okay.  And then Ms. McCracken writes next to slide 35 on

22   synergy slide, she says, "Synergy slides updated with" --

23              THE COURT:  Slow down, slow down for my reporter.

24              MR. WELSH:  Sorry.

25              THE COURT:  Slow down.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. WELSH:  Thank you, Your Honor.

 2   BY MR. WELSH:

 3   Q.   She says, "Synergy slides updated with current numbers and

 4   added risk comment to CI.  Did not add to advertising, agreed,

 5   it's understood," right?  That's Ms. McCracken's words to you

 6   in response to your email, correct?

 7   A.   That's what she wrote.

 8   Q.   All right.  And CI, you understood to be content

 9   intelligence, correct?

10   A.   I did.

11   Q.   Okay.  And if we look at page 5 of the presentation, which

12   is attached, it's actually at PX 323 dash 007, tell me when

13   you're there.

14   A.   (Witness complies.)

15   Q.   Are you there, sir?

16   A.   Yes, I'm there.

17   Q.   It's page entitled "Synergies," correct?

18   A.   It is.

19   Q.   And then the top part has contents intelligence on the

20   right, correct?

21   A.   It does.

22   Q.   And Ms. McCracken added an asterisk there and dropped a

23   footnote where she says "Appropriate incentives will be

24   necessary to reduce achievability risk," correct?

25   A.   That's correct.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Okay.  Now, after this point you told Mr. Stephenson that

2  contents intelligence had specious buy-in," didn't you?

3  A.   No, I didn't say that to him.

4  Q.   Well, let's look at PX 344 in your binder.

5  A.   (Witness complies.)

6  Q.   Are you there, sir?

7  A.   I am.

8  Q.   All right.  Now, 344 again is an exchange of emails

9  between you and Ms. McCracken on September 6 and September 7 of

10 2017, right?

11 A.   It is.

12 Q.   And this relates again to this presentation that we've

13 been talking about, the one for Mr. Stephenson, correct?

14 A.   That's correct.

15 Q.   All right.

16      MR. WELSH:  Your Honor, I move for admission of PX

17 344?

18      MR. PETROCELLI:  No objection, Your Honor.

19      THE COURT:  Be admitted.

20      (Plaintiff's Exhibit No. PX 344 was

21      received in evidence.)

22 BY MR. WELSH:

23 Q.   Now, you told Ms. McCracken at the top in paragraph one,

24 you said, "A few points, item one," you said, "Drop the

25 asterisk on the content initiative.  I covered Randall off line

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    on this yesterday, he gets the issue, no need to dwell on the

2    room."  Those are your words?

3    A.    Those are my words, and I don't see "specious" in there.

4    Q.    And the Randall is Mr. Stephenson?

5    A.    That's correct.

6    Q.    Let's talk briefly about what you described yesterday as

7    the programmatic platform, okay?  Change topics here a little

8    bit.

9         Now, the model for AT&T's numbers, these estimates in DX

10   658, assumes that you have certain distributors and certain

11   programmers that are committed to contributing inventory for

12   this platform; isn't that right?

13   A.    Over periods of time, yes.

14   Q.    Okay.  And at the time of your deposition in February on

15   behalf of AT&T, AT&T hadn't had discussions with these

16   distributors that we're talking about, these certain particular

17   distributors about contributing their inventory to the

18   platform; isn't that right?

19   A.    Specifically about the programmatic platform is the

20   question?

21   Q.    That's correct.

22   A.    That would be a correct statement.

23   Q.    All right.  Nor had AT&T had conversations with any

24   programmers, these particular programmers that your model

25   assumes about contributing their inventory to a programmatic

1  platform, correct?

2  A.    That's not correct, that's not entirely correct.

3  Q.    As to some of the particular programmers that your model

4  depends upon, at the time of your deposition in February, there

5  had not been discussions with those programmers; isn't that

6  true?

7  A.    There have been discussions with programmers about whether

8  or not there would be a desire to move inventory into a better

9  modernization model, there hasn't been anything put in front of

10  them around a specific set of deliverables in the programmatic

11  platform.

12  Q.    Well, I want to make sure we're on the same page.  So if

13  you look at tab 2 of your binder with the deposition

14  transcripts.  And this is from February 14, 2018, and I'm going

15  to direct you to page 297.

16          THE COURT:  What's the date of that deposition?

17          MR. WELSH:  February 14, 2018, Your Honor.

18          THE COURT:  Thank you.

19          MR. WELSH:  Tab 2.

20          MR. PETROCELLI:  What page?

21          MR. WELSH:  Two nine seven.

22  BY MR. WELSH:

23  Q.    Are you there, sir?

24  A.    I am.

25  Q.    Okay.  I'm going to direct you to line 9, the question was

 1  asked:

 2      "Has AT&T had any discussions yet with Viacom

 3      and Fox about contributing their inventory to the

 4      platform?"

 5      The answer at line 13 was, "No, we don't have a

 6      commitment to close the transaction, and the

 7      platform won't be there unless we close the

 8      transaction, I think that would be a very

 9      premature discussion at this point."

10      Is that correct?

11  A.    That is consistent with what I just characterized for you.

12  Q.    That was your answer to that question that day, right?

13  A.    That's correct.

14  Q.    And as it stands then today, because you haven't had

15  conversations with the distributors, for example, that we

16  talked about, you can't tell us that they will, in fact, want

17  to come and give their inventory to a competitor for this

18  programmatic platform, you cannot tell the Court that today,

19  can you?

20  A.    I cannot tell the Court that today.

21  Q.    Let's go to a new topic.  Now, on direct you testified

22  that the traditional pay-TV ecosystem is changing, correct?

23  A.    Yes, I did.

24  Q.    You were asked some questions by Mr. Petrocelli, and you

25  talked about that yesterday, right?

1  A.   I did.

2  Q.   All right.  Now, the pace of change, though, that's going

3  to occur, that's an open question, isn't it?

4  A.   Can you be more specific, the pace of what change?

5  Q.   The pace of change in terms of what's happening in the

6  traditional pay-TV ecosystem, that pace is an open question as

7  to how quickly that's going to go?

8  A.   I don't know, in my mind it's not, it's going pretty

9  quick.

10  Q.   Okay.  If you would look at tab 2 of your individual

11  deposition.  So this is the smaller of the two binders with

12  transcripts.

13  A.   (Witness complies.)

14  Q.   I'm going to direct you to page 284.  And I'm going to

15  direct you to line 22.  Do you see where the question starts:

16      "Okay.  And do you believe that traditional

17     pay-TV distribution, that will remain an

18     important part of the entertainment delivery in

19     the future."  Do you see that question?

20  A.   I do.

21  Q.   And your answer on line 2 of 285 was:

22     "As we talked about earlier, I think it's, it's

23     definitely peaked, and it's on its way down.  It

24     will decline.  That decline can't be stop[ed at

25     this point.  The question is, what is the pace of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    it, what is it replaced with."

2        That was your answer to that, right?

3   A.    That's the pace of decline.

4   Q.    And then I asked on line 8:

5        "And what the pace of it is and what's it's"

6    "replaced with, are those open questions?"

7        And your answer on line 11 and 12 is, "I think

8    they're open questions."  Correct?

9   A.    Correct, that's the first part of the answer.

10  Q.    Did you give that answer to my questions that day?

11  A.    I did.

12  Q.    Okay.  Now, you're familiar with SNL Kagan?

13  A.    I am.

14  Q.    And we heard some testimony from the defendant's expert

15  witness about SNL Kagan, you were here for that, right?

16  A.    I recall SNL Kagan being brought up, I don't remember the

17  exact context.

18  Q.    And you're aware that SNL Kagan projects that five years

19  from now that there will be seventy-eight million U.S.

20  households still subscribing to traditional pay-TV?

21  A.    That's entirely possible.

22  Q.    You don't dispute that?

23  A.    SNL Kagan, I have reason to probably think it's under

24  estimated, given that was one of the sources we used when we

25  did the DirecTV transaction that missed the inflection point.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Missed the inflection point?

2  A.   The inflection point of the downward trend in pay-TV.

3  Q.   For the revenue, the revenue missed you testified about

4  yesterday?

5  A.   The customer subscription numbers.

6  Q.   Okay.  So is it your testimony, then, that SNL Kagan is

7  not reliable?

8  A.   They've been underestimating to some degree the trend.

9  Q.   So is the answer that it's unreliable, sir?

10 A.   Every estimate has a degree of reliability in it.

11 Q.   Are you also aware that SNL Kagan projects that the rate

12 of multichannel subscriber loss will be slowing down over the

13 next five, six years?

14 A.   I don't know.  I'm not familiar with that particular

15 estimate.

16 Q.   Okay.

17         MR. WELSH:  Your Honor, we have what we've

18 identified, marked for identification as PX 578.  May I

19 approach?

20         THE COURT:  Five seven eight?

21         MR. WELSH:  That's correct, Your Honor.

22         THE COURT:  Okay.

23         MR. WELSH:  May I approach the witness?

24         THE COURT:  You may.

25         MR. WELSH:  Your Honor, a copy of PX 578 has been

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   provided to defense counsel.  May I proceed?

 2              THE COURT:  Yes.  Are you intending to introduce

 3   this?

 4              MR. WELSH:  I'm not.

 5              THE COURT:  Okay, good.  That'd be an issue.

 6              MR. WELSH:  Yeah.  May I proceed, Your Honor? Thank

 7   you.

 8   BY MR. WELSH:

 9   Q.   So, Mr. Stankey, you have PX 578 in front of you?

10   A.   I do.

11   Q.   You recognize that as SNL Kagan data?

12   A.   Can you point me to something on the page?

13   Q.   Sure.  Look at the third page, do you see the copyright

14   for Kagan?

15   A.   I do.

16   Q.   Okay.  And I'm going to ask you to look at what's there on

17   the multichannel subscriber's growth, the projections looking

18   at 2019 out.  And if you would take a look at that.

19   A.   (Witness complies.)

20              MR. PETROCELLI:  Your Honor, I object, there's no

21   foundation for this, and --

22              THE COURT:  You can approach.

23              (Witness withdrew from the witness stand.)

24              (Sealed Bench Conference.)

25              MR. PETROCELLI:  He's trying to read into the record
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  something for which there's absolutely no foundation.  If he

2  wants to refresh recollection, that's one thing, but you can't

3  read hearsay into the record.

4       MR. WELSH:  I don't think I did that.  And I was

5  actually trying to refresh his recollection, but I'm --

6       MR. PETROCELLI:  You didn't ask a question.

7       MR. WELSH:  You had an objection first.

8       MR. PETROCELLI:  You didn't ask a question.

9       THE COURT:  Well, let's -- okay.  Let's make sure we

10 aren't just reading this stuff into the record, point one.

11      MR. WELSH:  Right.

12      THE COURT:  Point two, ask him a question, direct his

13 attention to what you want him to read.  He can read it to

14 himself.

15      MR. WELSH:  That's what I was going do.

16      THE COURT:  Okay, but just avoid him reading it into

17 the record.

18      MR. WELSH:  Right, I understand.

19      MR. PETROCELLI:  Thank you, Your Honor.  It's obvious

20 that nobody would have any recollection with respect to any

21 figures in that document.

22      THE COURT:  There are a lot of figures in this

23 document.

24      MR. PETROCELLI:  I don't know what kind of question

25 that that would obviously have to refresh, so I just want to be

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    careful we're not --

2            THE COURT:  Tell me what you're pointing him to?

3            MR. WELSH:  It's on the third page, Your Honor.  It's

4    the line at the bottom, the subscriber loss.

5            THE COURT:  This right here.

6            MR. WELSH:  Yes, the percentage, the percentage

7    numbers going across.

8            MR. PETROCELLI:  So what's the question as to what

9    you want his recollection refreshed?

10           MR. WELSH:  The question I'm going to ask him is if

11   this refreshes his recollection that SNL Kagan is predicting a

12   decline in the percentage of sub-loss out into the future.  He

13   can say yes or he can say no.

14           THE COURT:  This is 33 percent, is that what this is

15   supposed to be here?

16           MR. WELSH:  That's right.  And what I think my

17   question was, whether from 2019 going out, whether that number

18   was declining.  And that's what I want to see if I can refresh

19   his recollection about.

20           MR. PETROCELLI:  Your Honor, that is a misuse of the

21   doctrine of refresh recollection.  It has to be something that

22   he had once known and now the question is whether looking at it

23   makes him remember something he previously knew.

24           THE COURT:  All right, okay.

25           MR. WELSH:  How do I challenge whether he's, in fact,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   had a recollection of it unless I can show it to him and see if

 2   it --

 3              THE COURT:  Hold on, hold on.  Show him the document.

 4              MR. WELSH:  Okay.

 5              THE COURT:  Point him to this area.

 6              MR. WELSH:  Right.

 7              THE COURT:  Ask him if he's familiar with this

 8   document.  If the answer to the question is no, you can ask him

 9   do you have any recollection of this type of data being brought

10   to your attention by your staff?  If the answer is no, you

11   can't just use this as a way to read into the record.

12              MR. WELSH:  I wasn't going to mention the numbers at

13   all.

14              THE COURT:  So find out if he -- he can look at it.

15              MR. WELSH:  Okay.

16              THE COURT:  And see if it has any impact on

17   refreshing his recollection, but that's about it.

18              MR. WELSH:  Okay, all right.  I think that may be

19   Your Honor's.

20              THE COURT:  Oh.

21              MR. PETROCELLI:  Also we have to deal with an issue.

22              THE COURT:  You got about ten minutes left.

23              MR. PETROCELLI:  And I don't think I'll need more

24   than that, so then we have to deal with the issue of the, that

25   number.
```

```
 1                 THE COURT:  Yeah, well, at the end of the ten minutes
 2    check with your people to see what they found out.
 3                 MR. WELSH:  I will, Your Honor, thank you very much.
 4                 (Open court.)
 5                 THE COURT:  Come on back up, Mr. Stankey.
 6                 (Witness resumed the witness stand.)
 7                 THE COURT:  All right, you may proceed consistent
 8    with the discussion at the bench.
 9                 MR. WELSH:  Yes, Your Honor.
10    BY MR. WELSH:
11    Q.   Mr. Stankey, you have Plaintiff's Exhibit 578, right?
12    A.   I do.
13    Q.   All right.  And I just want to direct you to the third
14    page of this.  And to the bottom where it says, "multichannel
15    subscribers' growth."  And I just want you to look at that, I
16    don't want you to read it out loud.  Just look at that
17    information that's there.  Tell me when you're done.
18    A.   (Witness complies.)
19         Okay.
20    Q.   Does this refresh your recollection at all, sir, that you
21    learned from your staff or from anyone else that -- about the
22    information that's there on the multi-subscriber growth
23    projection that were done by SNL Kagan?
24    A.   I've not seen this dataset before.
25    Q.   Right, and my question, though, is did your staff bring
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   this to your attention in terms -- or anyone bring it to your

 2   attention before you came in to testify about the, what you

 3   call the changing ecosystem?

 4   A.    I've not seen this dataset before.  I don't know of this

 5   dataset.

 6   Q.    Okay.  That really wasn't my question.  My question was

 7   whether staff, your staff or anyone else had advised you of the

 8   numbers or the trends that are associated with this information

 9   that's reported here by SNL Kagan, can you tell us that?

10   A.    Not that I recall.

11              THE COURT:  If you recall.

12   BY MR. WELSH:

13   Q.    Let's change subjects.

14         Now, Mr. Stankey, you've told the Court about your

15   predictions, right?  Correct?

16   A.    Are you on synergy predictions?

17   Q.    I'm just talking generally.  You told the Court about your

18   predictions.  Now, your predictions are dependent upon a number

19   of different factors; isn't that fair.

20              THE COURT:  You need to be more specific.  There's

21   been a lot of talk about predictions here now.

22              MR. WELSH:  The predictions -- fair point, Your

23   Honor, I apologize.

24   BY MR. WELSH:

25   Q.    As to DX 658, version 41?
```

1  A.   Yes.

2  Q.   All right.

3  A.   I've talked about those predictions.

4  Q.   Okay.  And those predictions that you talk about there,

5  those are dependent upon a number of factors, right?

6  A.   Sure.

7  Q.   Okay.  And at the end of the day whether or not the merged

8  entity is able to achieve this also depends upon, one of the

9  factors is, is the personnel that are going to be with the

10 merged company; isn't that true?

11 A.   You don't get things done without people.

12 Q.   Right.  Now, you know from your past experience with

13 mergers that personnel do leave when there's a merger, right?

14 A.   They do.

15 Q.   And there's a risk here in this case that top tier

16 executives of Time Warner could be gone after the merger, true?

17 A.   There's a risk after any transaction that that could

18 occur.

19 Q.   In fact, we heard just the other day from Mr. Bewkes that

20 he'll be stepping on, and you're moving into his place,

21 correct?

22 A.   Yes, he shared that.

23 Q.   All right.  Now, you, in terms of what work you've done on

24 integration, you already have plans to make some changes in

25 terms of personnel if this merger were to go forward; isn't

1    that true?

2         MR. PETROCELLI:  May I approach, Your Honor?

3         THE COURT:  You may.

4         (Sealed Bench Conference.)



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3353

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20          (Open court.)

21          THE COURT:  You may proceed consistent with the

22   discussion at the bench.

23          MR. WELSH:  Thank you, Your Honor.

24   BY MR. WELSH:

25   Q.   All right, Mr. Stankey, this is the last topic I have to

1  talk with you about.

2      You testified yesterday about your quiet time.  I think

3  you mentioned that a couple of times where you were

4  contemplating AT&T's future, I just want to come back to that

5  subject.  Do you recall that?

6  A.   Yes, I do.

7  Q.   Okay.  And, in fact, I think you said, and I'll quote this

8  in the transcript at page 3214, you said that:

9      "Exploration process, a couple of weeks of

10     quiet study of my own, some analysis, trying to

11     understand what it would mean to put a media

12     company together with the distribution company,

13     thinking about the talent that was required, a

14     variety of other things, I put a framework

15     together that caused me to start those discussion

16     was Mr. Stephenson."

17     Okay?  So I just want to come back to that subject with

18  you, okay?

19  A.   Sure.

20  Q.   All right.  Now, as you were contemplating this and coming

21  up with your thoughts for Mr. Stephenson, you thought about

22  Time Warner itself as being the company to be acquired; isn't

23  that true?

24  A.   When I was doing this work I had literally a landscape of

25  the entire industry, including Time Warner.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   Right.  But that was a piece of it, you were looking at it

2   and you then thought about Time Warner in the context of

3   putting this analysis together for Mr. Stephenson, correct?

4   A.   I did.

5   Q.   This framework.  Okay.  And if you look at PX 6 in your

6   binder.

7   A.   (Witness complies.)

8   Q.   And just tell me when you're there, sir?

9   A.   Okay.

10  Q.   Now, PX 6, we talked about this in your deposition, these

11  are your notes, correct?

12  A.   They are.

13  Q.   And you prepared these notes to put together your

14  framework, your thoughts which you would then share with

15  Mr. Stephenson, correct?

16  A.   This was, yes, one of the documents I put together.

17  Q.   Okay.  And you did share and discuss this with

18  Mr. Stephenson, right?

19  A.   We had a number of conversations about elements that are

20  on these sheets of paper, yes.

21  Q.   Okay.

22          MR. WELSH:  Your Honor, I move for admission of PX 6

23  into the record?

24          MR. PETROCELLI:  No objection.

25          THE COURT:  All right, it will be admitted.

1              (Plaintiff's Exhibit No. PX 6 was received

2         in evidence.)

3    BY MR. WELSH:

4    Q.   Now, in your thought process in setting up your framework

5    and your discussions with Mr. Stephenson, you considered Time

6    Warner to be must have content, didn't you?

7    A.   I put a note down there next to Time Warner that indicates

8    must have with a number of other players in the industry given

9    the popularity of the content.

10   Q.   Okay.  And you have Viacom listed there, but you didn't

11   list Viacom as being must have; isn't that right?

12   A.   That's correct.

13   Q.   Okay.  Now, the last point, sir.  You testified yesterday

14   that there were no reality to the government's bargaining

15   model, do you remember the question being asked and that was

16   your testimony in response?

17   A.   Yes, I do.

18   Q.   Okay.  Now, you were, in fact, advised by Moelis and Co.

19   in 2016 that one advantage of AT&T buying the premium content

20   programmer was to give the programmer additional leverage in

21   carriage negotiations, correct?

22   A.   We were not advised by them, no.

23             MR. WELSH:  Your Honor, I have a document marked for

24   identification as PX 580.  May I approach?

25             THE COURT:  Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           MR. WELSH:  May I approach the witness, Your Honor?

2           THE COURT:  You may.

3           MR. WELSH:  Your Honor a copy of Plaintiff's Exhibit

4    580 has been provided to defense counsel.  May I proceed?

5           THE COURT:  You may.

6    BY MR. WELSH:

7    Q.   All right.  Mr. Stankey, you have Plaintiff's Exhibit 580

8    in front of you, correct?

9    A.   I do.

10   Q.   All right.  And we looked at this, I think in your

11   deposition that we look took in February down in Dallas,

12   correct?

13   A.   We did.

14   Q.   Okay.  And this is a presentation that you received from

15   Moelis and Company in 2016, correct?

16   A.   It was an unsolicited presentation that they dropped off

17   at the office and covered with me on, yes.

18   Q.   My question, a very simple question is, this is a

19   presentation that Moelis and Company presented to you in 2016.

20   Is the answer to that "yes"?

21   A.   It's -- not every page, but they did drop this deck off

22   when they came to the office.

23   Q.   Right.  They didn't just drop it off.  You discussed it,

24   certainly, certain pages of this you discussed with them,

25   didn't you?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.    Certain pages I did, yes.

2   Q.    All right.  And if you look at page 10 of the

3   presentation.

4               THE COURT:  What -- where are the numbers you're

5   looking at, counsel?

6               MR. WELSH:  In terms of the AT&T number, Your Honor,

7   it would be AT&T DOJ 2R02664612.

8               THE COURT:  I think I see it now.

9               MR. WELSH:  It's page number 10 of the presentation

10  itself.

11              THE COURT:  Well, my -- this is my page 10 is blank.

12              MR. WELSH:  May I approach, Your Honor?

13              THE COURT:  Yeah.

14              MR. WELSH:  Okay.

15              THE COURT:  Hold on, maybe I got a bad copy or

16  something.

17              MR. WELSH:  Yes, that's what I'm worried about.  It's

18  the AT&T DOJ 2R02664612.  This is the page I'm directing the

19  witness to.

20              THE COURT:  Wait a minute now.

21              MR. PETROCELLI:  This page right here, 612.

22              MR. WELSH:  Yes.

23              THE COURT:  Six one -- hold on, this one here, 612?

24              MR. WELSH:  That's correct, Your Honor.

25              MR. PETROCELLI:  While I'm up here --

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        THE COURT:  Make sure he's got the right page too.

2        MR. WELSH:  I will, Your Honor.

3        THE COURT:  Okay.

4        (Sealed Bench Conference.)



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3363



***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***





***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

6          (Open court.)

7          THE COURT:  Well, there are a lot of issues we had to

8   talk about.  Sorry for the inconvenience.  But I think we've

9   resolved the ones we could resolve.

10         Where does that leave you, Mr. Welsh?  Do you have

11  any more questions for this witness?

12         MR. WELSH:  I think -- give me one second, Your

13  Honor.

14         THE COURT:  Yes.

15         MR. WELSH:  Thank you.

16         Pass the witness, Your Honor.

17         THE COURT:  Okay.  All right.  We're going to take

18  the morning recess.  You remain a witness under oath.  When we

19  come back in fifteen minutes Mr. Petrocelli will have some

20  limited, I'm assured, limited redirect.

21         MR. PETROCELLI:  Yes, Your Honor.

22         THE COURT:  Yes, and then any recross will be limited

23  to the redirect.  So we'll see you back in fifteen minutes, and

24  refrain from discussing your testimony, you know the rules.

25         (Recess at 11:50 a.m.)

```
 1              (Proceedings resumed at 12:10 p.m.)

 2              THE COURT:  Witness remains under oath.

 3              (Witness resumes the stand.)

 4              MR. PETROCELLI:  May I proceed, Your Honor?

 5              THE COURT:  When you're ready.

 6                        REDIRECT EXAMINATION

 7  BY MR. PETROCELLI:

 8  Q.    On the subject of your estimates related to DirecTV,

 9  there was questions about missing revenue estimates.

10        Do you recall that?

11  A.    I do.

12  Q.    What were the reasons?

13  A.    The primary reason was there was an inflection change in

14  the industry as I mentioned earlier where the decline of the

15  traditional pay-TV bundle started faster than we assumed and

16  that is probably a couple years ahead.

17        It resulted in fewer subscribers as a result of that.  And

18  actually, an increase in our estimates in the number of

19  over-the-top subscribers that we would have during that same

20  period of time.

21  Q.    How did your estimates come out with respect to content

22  costs?

23  A.    We exceeded our content costs savings estimates which is

24  the most significant value driver of the transaction and our

25  expense estimates overall were exceeded up through the end of
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  2017 on a cash basis, total cash for both revenue and costs

2  synergies, we were slightly better than planned and now in the

3  added years the revenue synergies will ultimately kind of start

4  to create a degree of a gap on that.

5  Q.  You were asked questions about content intelligent

6  synergies and views of certain individuals of, at Time Warner.

7      Do you recall that?

8  A.  I do.

9  Q.  And what's your understanding of the Time Warner view and

10  how did that impact your thinking?  This is with respect to

11  content intelligence, synergies.

12  A.  I think I mentioned in my direct testimony that neither

13  company today has the wherewith all to actually execute around

14  using data analytics to help inform the creative process.

15      There will be more information coming after the business

16  is combined and the reality is that people are going to have to

17   learn new tricks.

18      Any time, it's not lost on me coming into this job.  There

19  are going to be dynamics of culture and willingness to change

20  that occur after every transaction and that's not unique to the

21  Time Warner entities.  It's the same for the AT&T entities and

22  part of the leadership challenge is to incent and motivate

23  people to make those changes.

24  Q.  How do you incent them?

25  A.  That's what was on the piece of paper is that we will

1  probably have to do some things like figure out how we motivate

2  people with budget incentives or opportunities to do more

3  development or other approaches maybe in their direct

4  compensation to get them to start testing some of these new

5  concepts and see if we can innovate around them.  It's not

6  business as usual.

7  Q.    You were asked questions and indeed shown an email in

8  Plaintiff's Exhibit 72 in which the statement appears that

9  advertising has the most significant execution risk.

10        Do you recall that?

11  A.    I do.

12  Q.    What did you mean by that?

13  A.    Yesterday we talked about the two parts of the advertising

14  synergies and the first part being very straightforward that

15  has very manageable, very reasonable risk around it.

16        The second part being the programmatic platform that we

17  talked about which is the need to merge a fair amount of

18  technology and get others in the industry to ultimately

19  participate.  That has a higher degree of execution as a result

20  of that.

21        It's reasonable business execution, a risk if anything in

22  business was easy and didn't have some degree of execution

23  risk, then there would be a lot more businesses around.

24        So we understand that there's going to be risk associated

25  with that, but the size of the prize is pretty significant

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  accompanied with the resources of AT&T combined with Time

2  Warner, that's one of the reasons we're doing this to actually

3  try to achieve that.

4  Q.   Why do you think other companies, other distributors and

5  other programmers if you do get this platform up and running

6  will participate?

7  A.   Yield ultimately wins, meaning if somebody can bring

8  inventory and get paid more for it, there's an economic

9  incentive to do that.  Now these are also smart and

10 sophisticated businesses. They're not going to do it blindly.

11 Their advertising time is important to them.  It's part of

12 their brand, it's what they need to do.

13     They're going to want to see proof that it's actually

14 working properly.  That's the scale from the Time Warner

15 inventory allows us to demonstrate that we can get it up and

16 working beyond just concept and then ultimately try to use that

17 as the basis under which those commercial constructs can be

18 cemented to move forward.

19     The industry is looking for options right now.  As we go

20 out and talk with folks, they clearly want a higher quality

21 option to some of the products that are being offered by

22 Facebook and Google that protect their brands and have an

23 opportunity to target advertising.

24 Q.   Finally, with respect to the revenue and cost synergies in

25 version 41, do you need the merger to achieve them?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   Yes.  This is the whole purpose of doing it.  You can't,

2   you go through each of those initiatives and if you don't put

3   the two businesses together, you can't actually achieve those

4   objectives.

5   Q.   How will consumers benefit from this merger and in

6   particular with respect to the synergies that you've identified

7   to the Court?

8   A.   Well, clearly when you innovate you have to do things to

9   invest to make things different and change.

10      By pulling out overhead costs or costs that aren't germane

11  to products and becoming more efficient, that's where the

12  resources are created to provide that pivot to innovate a

13  change.

14      While you're managing down a mature business, you need to

15  create space to invest to create the next generation of the

16  business.

17      It's no different when we had landlines, voice lines and

18  we wanted to build wireless networks, you had to create that

19  time to pivot.

20      There are a lot of negative years of wireless service

21  where we consumed cash before it finally started to turn a

22  profit.  The same thing has to happen here.  Generate more cash

23  from other parts of the business, get efficiencies in savings,

24  redirect it into the business to innovate change moving

25  forward.

1  Q.   Thank you.

2        MR. PETROCELLI:  Nothing further.

3        THE COURT:  Recross limited to redirect.

4        MR. WELSH:  Yes, Your Honor, thank you.

5        Just a couple of very quick questions.

6                        RECROSS EXAMINATION

7  BY MR. WELSH:

8  Q.   Mr. Stankey, I just want to come back to some questions

9  that you just answered about content intelligence.

10       Now I'm correct am I not, sir, that the folks at HBO don't

11 believe that the analytics that you're talking about will help

12 them with content creation; isn't that true?

13 A.   I have only talked to a couple of people at HBO.  I can't

14 speak to all of the folks and I know that there's some

15 scepticism in the individuals I've had discussions with.

16 Q.   Well actually, in your deposition you told us that the HBO

17 management team doesn't believe that going into a whole bunch

18 of analytics around that right now would serve them much

19 purpose.

20       Do you remember that testimony, sir?

21 A.   I do.

22 Q.   And you don't expect to use content intelligence to

23 improve HBO's content, do you?

24 A.   At some point in time I would expect we'll be mature

25 enough to be able to apply it.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Do you recall in your deposition in response to a question

2  about whether you would use it for HBO, you said in terms of

3  actually looking at content creation, no expectation around

4  necessarily tweaking that side of things.

5       Do you remember that testimony, sir?

6  A.   That was in that particular plan, that's correct.

7  Q.   Okay.

8            MR. WELSH:  No further questions, Your Honor.

9            Thank you.

10           THE COURT:  All right.

11           You're excused.

12           (Witness excused.)

13           MR. PETROCELLI:  Well, we have one final witness,

14  Your Honor.

15           THE COURT:  All right.

16           MR. PETROCELLI:  Randall Stephenson.

17           THE COURT:  All right.  Swear the witness.

18          DEFENSE WITNESS RANDALL STEPHENSON SWORN

19           THE WITNESS:  Good afternoon, Your Honor.

20           THE COURT:  Welcome.

21           MR. PETROCELLI:  May I approach, Your Honor?

22           THE COURT:  You may.

23           MR. PETROCELLI:  Ready.  Thank you, Your Honor.

24           THE COURT:  You may proceed.

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1                        DIRECT EXAMINATION

 2   BY MR. PETROCELLI:

 3   Q.    Hello, Mr. Stephenson.  Can you please introduce yourself?

 4   A.    I am Randall Stephenson, Chairman and CEO of AT&T.

 5   Q.    How long have you been with AT&T?

 6   A.    Thirty-five years.

 7   Q.    Can you briefly take His Honor through your career path?

 8   A.    Yes.  Your Honor, I began in 1982 with Southwestern Bell

 9   Telephone which was right at the time of the AT&T divestiture.

10         MR. PETROCELLI:  One second, Your Honor.  The air

11   conditioning is right over my head.

12         Can I move his microphone up?

13         THE COURT:  Yes.

14         THE WITNESS:  Is this better?

15   BY MR. PETROCELLI:

16   Q.    Yes, just boom it out there, Mr. Stephenson.

17   A.    Okay.  I began with Southwestern Bell which was just

18   before, right at the time of divestiture when AT&T split up and

19   Southwestern Bell was probably the smallest of the baby bells.

20   I got my job the old fashion way.  My brother got me on, he was

21   an installation tech, still in Norman, Oklahoma today.

22       I began working the late night shift while I was going to

23   college, working in the computer room, writing code and

24   mounting tapes on computer drives.

25       After I graduated with a Masters in accountancy, I was
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    hired in St. Louis to work in various finance functions.

2    Started out in corporate taxation and went through a number of

3    business planning and marketing and a number of roles

4    throughout the company.

5        Ultimately it was moved to Mexico City.  I spent four

6    years managing our operation there.

7        Was brought back and I've had a number of executive level

8    positions from our corporate controller to chief financial

9    officer, I became chief operating officer in 2004.

10       And shortly thereafter, we merged with AT&T and so that's

11   when Southwestern Bell and AT&T came together and I assumed

12   that role of chief operating officer with AT&T at that time and

13   in 2007 I was appointed as chairman and CEO of AT&T.

14            MR. PETROCELLI:  Your Honor, may I approach just in

15   case he needs water?

16            THE COURT:  You may.

17            MR. PETROCELLI:  Oh, you have one, okay.

18   BY MR. PETROCELLI:

19   Q.   Can you please tell us a little bit about AT&T?

20   A.   AT&T is a 140 year old company now.  And it's a company

21   that has reinvented itself many, many times over the years.

22       It's a company that comes from a significant number of

23   inventions.  As you know, Alexander Graham Bell was the founder

24   and it was founded to deliver voice communications over

25   telegraph wires.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        And AT&T also discovered satellite communications.  It was

2   the discovery place of the integrated circuit which today we

3   now know as the silicon chip and the basis for all of this

4   digital media that we see today.

5        It was actually a place where the big bang was discovered,

6   the first oldest light in the universe, it's the source of the

7   big bang.

8        And so it's a prestigious company, a company that has got

9   a history of innovation and I'm obviously very proud to serve

10  as the CEO.

11  Q.   What is AT&T like today?

12  A.   Today AT&T employs 250,000 people and they're located

13  around the world.  We have operations in almost 200 countries

14  around the world.

15       We, our basic function in life we like to say is to

16  connect people to their world everywhere they live, work and

17  play.  That's what we do.

18       We connect people to people whether it's by voice

19  communication, wireless or wire line, texting, social media, we

20  just connect people to people.

21       We connect people to businesses, business to businesses is

22  a big business for AT&T.  And of late a big focus of ours has

23  been connecting people to entertainment.  So we're in the

24  connectivity business.

25  Q.   Can you describe for His Honor how the various businesses

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  of AT&T today break down?

 2  A.    We have it's, our revenues are about a 160 billion dollars

 3  a year.  It's somewhat evenly split between services we provide

 4  to businesses, and services we provide to the consumer.

 5        And the services we provide to businesses are everything

 6  from voice communication to primarily data.  We transmit data

 7  for large corporations all around the world.  We do video

 8  communications for these companies as well.

 9        And we provide these services from everybody between Exxon

10  Mobile and the federal government all the way down to your

11  local plumber.

12        On the consumer side we provide a wide range of services,

13  mobility, wireless technology, TV service, broadband service,

14  and just a wide range of services to the consumer, voice

15  telephone.

16        We do this in the United States.  We have a large

17  operation that's growing nicely in Mexico and we also provide

18  some of these services throughout Latin America.

19        We are, our largest business interestingly enough, a lot

20  of people don't realize this, is our wireless business.  This

21  is a business that we have been investing in aggressively for a

22  couple of decades and today if you were to take our wireless

23  business and pull it out, it would be number 37 in the Fortune

24  500.

25        It's about the same size in revenue as Proctor and Gamble,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    P&G, so it's our largest business.

2         Then we have a small nascent starting advertising business

3    as well.

4    Q.   Does AT&T have a history of investing to innovate?

5    A.   At AT&T we invest a lot.  Over the last six or seven years

6    we have invested more capital in the United States of America

7    than any other public trading company.  So we invest a lot of

8    money.

9         I have a philosophy in this industry that if you're not

10   investing at the top tier, you won't be relevant for long.  In

11   fact, I have a strong belief that if you missed one technology

12   cycle in this industry, it may not kill you, but it will make

13   you sick for a very long period of time.

14        So we invest aggressively.  Our best example of this you

15   have heard me reference wireless is an area where we have been

16   investing very aggressively over the last few years.

17        You remember when we first started, it was just wireless

18   telepathy.  We call that first generation technology.  It

19   became very pervasive throughout the United States.

20        Then we moved to 2G, that's second generation.  You'll

21   hear 2G, 3G, 4G today.  And 2G means it's second generation

22   wireless.  You recall what this is, that's when you had a flip

23   phone.  You could actually for the first time send text

24   messages on a flip phone and take pictures.  That was second

25   generation technology.

1    Then around 2006, 2007 was really the ground breaking

2  technological development in wireless.  That was third

3  generation or 3G technology.  Why 3G was so important is it was

4  the first time when the internet itself became mobile.  You

5  could get to the internet with wireless technology.  It was a

6  good experience.

7    And the same time that we were launching 3G, the first

8  iPhone was introduced in the United States.  AT&T was the

9  exclusive provider of that iPhone for a number of years.

10    So the iPhone is really what made, the iPhone with 3G

11  technology is what made the internet mobile.  That was ground

12  breaking.

13    In fact, if you were to go back to that point in time and

14  compare it to today, the volumes on our network over that

15  period of time are up two hundred fifty thousand percent.  It's

16  a staggering number, the volumes in terms of what's happened

17  once you made the internet mobile.

18    Then comes the newest iteration of the technology and

19  that's fourth generation.  This is where we are today.  We are

20  on the fourth generation.  And fourth generation technology, 4G

21  is very relevant because what this allowed was the streaming of

22  video onto the mobile device.  And this is what has allowed

23  video to take off.

24    This is one of our big focus areas, getting video

25  delivered onto the mobile device.  The customer is no longer

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    bound to their living room looking on a TV on a screen.  They

2    can get all of that content now on a mobile device.

3        To put that into perspective, if you look at our network

4    today over half of all of the traffic on our network today is

5    video, delivering video.  Half of the volume on the network is

6    video.  So that's 4G.

7        Then we're culminating now and presently deploying what's

8    called 5G, fifth generation.  And all of these seem to get

9    progressively more and more interesting in terms of what

10   they're allowing to happen in our market place and in our

11   society.

12       5G is probably going to be the most transforming.  The

13   best way I can describe 5G is try to imagine your cell phone

14   with a fiber optic cable hooked to it.  That's the kind of

15   speeds we're talking about.

16       So wireless technology delivering at speeds comparable to

17   what you see in some of our fiber deployments today.  This is

18   going to begin to allow things that we have talked about for a

19   long time; the Buck Rogers things like driverless automobiles.

20       Without this kind of technology autonomous cars,

21   automobiles without drivers is not going to be feasible, but it

22   is now we believe going to be feasible.

23       Why is that important to us?  The connectivity is

24   important.  But most importantly is when you put people in

25   driverless cars you've given them more time.  No longer are you

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   driving an hour, hour and a half a day.  You are sitting in an

2   automobile.

3        Our belief is that's going to drive video consumption up

4   even more.  So video delivery is going to become more and more

5   important.

6        The other thing that 5G will do and probably I'll stop

7   with this, but as you get that kind of bandwidth, that kind of

8   performance out of wireless technology, now you have something

9   that will broadly compete with the traditional cable model.

10       We can actually deliver broadband into the home

11  wirelessly.  This starts to, for a company like ours, get very

12  exciting because now you can have a nationwide footprint of

13  high speed broadband internet into the home as well, not just

14  to the mobile device.

15  Q.   So let's talk about video, Mr. Stephenson.  When did AT&T

16  first get involved in pay-TV?

17  A.   In about 2006 we had been deploying broadband to the home

18  and we were not being very competitive with our, the cable

19  companies.  We didn't have a TV product.  All we had was a

20  broadband product.

21       So we needed to stand up to TV product.  We actually

22  worked, Mr. Stankey back over there worked, helped me develop a

23  new technology.  And it was basically delivering video over the

24  copper cables going into your home.

25  Q.   You mean for telephone copper cables?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   A.   Over the same line that was delivering your telephone

2   service, we were able to deliver TV over this.

3        And it became a very nice service for us.  We started that

4   in 2006.  And over the years we developed about a six million

5   subscriber base.  But candidly six million subscribers in the

6   pay-TV business is a hard way to compete.  You are buying

7   content at a much higher cost than everybody else in the

8   ecosystem and we figured we, we decided we needed to do

9   something very different.

10  Q.   So what did you do?

11  A.   We, in 2014 we began looking and actually pursued

12  acquiring DirecTV and we pursued that for a couple of reasons.

13       First and foremost, DirecTV when we acquired it made us

14  the largest pay-TV provider in the United States.  When you're

15  trying to acquire content, you are operating on thinner

16  margins.  If you can get your content cost down, it throws off

17  significant benefits.

18       So we wanted to pursue DirecTV.  It would generate

19  significant synergies.  In fact, the synergies were sizable.

20  They were over two billion dollars a year.  Take that money,

21  then reinvest it.

22       This is an approach we take a lot.  Generate the

23  synergies, turn around and reinvest it in new technology in new

24  capabilities.

25       What was important here was we had been trying for some

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   time to get the rights to deliver the video that we were giving

2   our customers in their homes, we wanted to deliver it over

3   their mobile devices.  It was very difficult getting the

4   capability to do that, getting the rights and so forth.

5       We acquired DirecTV.  And within about 12 months we had

6   stood up a completely new platform.  A new TV platform that

7   requires no satellite.  It can be delivered to your Smart

8   phone, to your tablet or to your TV.

9       All the content you're accustomed to seeing on DirecTV

10  without a satellite dish delivered over the internet or over

11  our wireless service.

12      So that was the key driver behind getting DirecTV.  Give

13  us the opportunity to get this content to our wireless

14  subscribers.

15  Q.   Is what you're describing that you were able to do within

16  a year or so of acquiring DirecTV in the launch of DirecTV Now?

17  A.   That's correct.  It was DirecTV Now and very, very

18  different and unique platform.  Our customers can watch the

19  content anywhere and everywhere they want to go.

20      We were, we launched this product expecting it to have

21  wide adoption in the market place.  What was most interesting

22  is we launched it in the fourth quarter of 2016 without much

23  promotion because we wanted to do a soft launch.

24      In our soft lunch in the first quarter we put it in the

25  market place.  We added more subscribers than this U-verse

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  platform added in its first year.  So the adoption has been

2  quite significant.  We are well over a million subscribers and

3  it's growing very, very nicely now.

4  Q.   How did you price it?

5  A.   It's interesting.  If you are a DirecTV subscriber on

6  average you are paying AT&T about $106 a month.  DirecTV Now,

7  this new product we're talking about, we sized down the

8  content.  Got content that we thought was really focused and

9  more relevant to the customer, particularly those that are

10 wireless centric and we priced it at $35 a month.

11      So it explained the adoption.  So we have kept the price

12 point there and the adoption has been quite impressive.

13 Q.   When you acquired DirecTV Now, excuse me, when you

14 acquired DirecTV, the satellite company, what was your thinking

15 about the status of that business long term?

16 A.   Yeah.  When we bought DirecTV in fact, when we took it to

17 our board of directors and took the deal to them for approval,

18 we told the board look, this is a mature business.  In fact,

19 the pay-TV business has peeked.  That's what we told them in

20 2014.

21      So this business will be in decline for the foreseeable

22 future.  The objective here is to mine out the synergies, get

23 the cost reductions of the business to turn around and reinvest

24 in the new technology.

25      So it was fully anticipated the business was going to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  decline.  We do this a lot.  When we merged with AT&T we knew

2  that was a declining business, generate a lot of synergies and

3  we turned around and reinvested in new products within AT&T

4  that are now growing nicely.

5  Q.   So after you acquired DirecTV, and developed the DirecTV

6  Now business, I'm now in the years 2015, 2016, before Time

7  Warner, can you describe to the Court what was happening in the

8  media and entertainment industry and how it was shaping your

9  thinking about next steps?

10 A.   Okay.  We as a company have thought we needed to own

11 original content at some point.  And in this time frame

12 counselor is speaking of 2015, 2016, we are obviously watching

13 very closely and the media and entertainment industry is going

14 through some rather significant disruption.

15     It's coming from predominately folks in the text sector.

16 You hear them referred to often as the FANG; Facebook, Amazon,

17 Apple, Netflix and Google.  The companies, if you talked to any

18 of their CEOs, there's one issue they talk about a lot and that

19 is what is the engagement on their platform.

20     They're all about engagement.  They can give you metrics

21 all day long on what their engagement is like.  Engagement to

22 them is critical.  Because with engagement you can sell more

23 advertising.  With engagement Amazon can sell more shoes or

24 grocery, it's all about engagement to them.

25     The one area that drives engagement like no place else,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  like no other ability is premium content.  Premium video.  TV

2  shows, movies, sports, music.  That drives engagement so the

3  Fang, if you will, are all focused on premium video.  How do we

4  get premium video onto our platforms to drive this kind of

5  engagement?

6      So you are seeing them all do this from beginning soup to

7  nuts beginning to end.  For example, Netflix has a studio where

8  they're doing original content creation.  And they're investing

9  billions of dollars in original content creation.

10     So they create video, they aggregate it meaning they have

11 a place where you can go out and see all of the content

12 available from Netflix.  They have recommendation engines which

13 tell what you might enjoy watching.  And then if you decide off

14 that aggregation place that that slick user interface, you want

15 to watch it.  They deliver it to you.  They deliver it directly

16 to the consumer.  They don't go through a cable company.  They

17 don't go through a satellite company.  Because of the

18 technology, they can take the video from content creation

19 vertically integrated up through aggregation and deliver it

20 directly to the consumer.

21     They're selling this service as a subscription service

22 for, I don't even know what the prices are any more, ten,

23 eleven, twelve, thirteen dollars a month and you get access to

24 all of their content.

25     As you engage, they get data on what you are watching,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  what you're viewing and then they can actually use that to help

2  formulate what content they ought to be creating to bring to

3  you so that you'll use more of it.  That's the Netflix model.

4  Q.   And these companies like Netflix are they vertically

5  integrated?

6  A.   Completely vertically integrated.  One hundred percent of

7  content creation all the way up to the distribution through to

8  the consumer.

9       There are other models.  Amazon has a similar model.

10  Complete vertical integration just like Netflix.  They have a

11  studio, they have an aggregation and ratings then they have a

12  distribution to the consumer.

13       But their model is different.  Because what their model is

14  they want you engaging in this content so that as you engage,

15  they learn more about you and as you engage you will buy more

16  shoes or you will buy more groceries.  It's a very different

17  model.

18       If you are an Amazon customer, Amazon Prime customer, you

19  get access to all of their content free.  You don't have to pay

20  for it.

21  Q.   How many subs does --

22  A.   Amazon Prime just announced yesterday they announced that

23  they now have one hundred million subscribers.  So there's one

24  hundred million people who have free access to the Amazon

25  content.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.   Now in addition to the vertically intergrated content

2   providers like Netflix, what were you also seeing during these

3   industry headwinds from other tech companies like Google and

4   Facebook?

5   A.   Yeah.  So like Google and Facebook those are once again

6   different models but they are pursuing a similar strategy.

7        The content is critical to them.  They want the engagement

8   but they want the engagement for a different reason.  They

9   basically sell advertising.  So the more engagement that

10  happens on the Google platform, the more they learn about you,

11  the more they can target advertising to the customer.  So

12  their's is all about advertising.  So you are seeing different

13  models.

14       Netflix, a subscription model.  Google, Facebook

15  advertising models.  Amazon to drive commerce.

16  Q.   These are all vertically integrated companies?

17  A.   All of them are vertically intergrated.

18  Q.   Why would you have an interest in advertising and you can

19  explain to the Court, you mentioned before you had a nascent

20  advertising business.  Maybe you can talk to the Court a bit

21  about what your advertising business was at the time and what

22  you were, what conclusions you were drawing from Facebook and

23  Google?

24  A.   Sure.

25       I don't know what level there has been discussed about the

1   advertising but I'm going to get real simplistic.  If you watch

2   CNN for example, every hour of CNN there are sixteen minutes of

3   commercials.  In that sixteen minutes, fourteen of them CNN

4   maintains.  They own those and they sell the advertising into

5   those fourteen minutes.  Two of the minutes go to the

6   distributor, so DirecTV.  We get two minutes of advertising in

7   every hour of CNN programming.

8   Q.     That would be for all programmers?

9   A.     Turner, TNT, ESPN, the cable channels.  We get two minutes

10  of advertising of the sixteen in all of these programmers

11  content.

12      At AT&T we then go out and we sell that two minutes to

13  advertisers very directly.  What we have been doing over the

14  last years, the last few years, is getting our customer's

15  permission to use their viewership data.

16      And what are they watching, when are they watching it.

17  Particularly as they begin to move the content onto their

18  mobile devices, you can also begin to discern what locations

19  are they when they are watching certain content.

20      So you begin to put all of this data together.  You know

21  the demographics of the household.  Now you go to advertisers

22  with our little two minimum blog.

23      We say we have this information.  We can get very targeted

24  in terms of what you're looking for and we can show what

25  program, what times of day, what locations, and we can deliver

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    the advertising in a very targeted way.

2        These advertisers, Your Honor, are paying us multiples on

3    a, we measure it per impression.  How many impressions do you

4    deliver and so how much revenue per impression can you

5    generate.

6        We are generating revenues that are three, four, and five

7    times per impression what companies like Turner, CBS and those

8    companies are getting from theirs because we have such targeted

9    data.

10       Turner, CBS, they have massive inventories of advertising

11   but they don't know who the customer is.  They can't see the

12   end user customer.  They don't know who they are, they don't

13   know what they're watching, who is watching.

14            THE COURT:  How do you know?

15            THE WITNESS:  Because we have set-top boxes in the

16   home.

17            THE COURT:  DirecTV?

18            THE WITNESS:  We also have mobile devices.

19            THE COURT:  Is that from DirecTV?

20            THE WITNESS:  DirecTV is one of the set-top boxes

21   are.

22            THE COURT:  Then the other data comes from what, the

23   mobile devices?

24            THE WITNESS:  Mobile devices, yes, Your Honor.

25   BY MR. PETROCELLI:

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Q.    And with the data from DirecTV set-top box and mobile

2   device and can you get data from U-verse set-top boxes also?

3   A.    Correct.

4   Q.    And did that inform your thinking about what you might be

5   able to do to monetize a larger inventory of advertising?

6   A.    Yeah.  It's a small business but it's growing nicely.

7   It's giving us a lot of conviction that this is something that

8   if we had a large inventory of advertising, we could do at

9   scale.  We are gaining a lot of conviction about that.

10          So as we're watching all of this disruption going on

11  in the media and entertainment world, I begin with John Stankey

12  studying the media industry a lot.

13          As complicated as people try to make it, it's

14  actually not that complicated in terms of the equation is real

15  simple.  The more people that watch your content, the more your

16  content is worth.

17          So what could actually drive greater content

18  viewership and make content worth more?  Well, I am a strong

19  believer that if you make this content mobile, you get it off

20  the TV in the living room and you put it on a mobile device and

21  it escapes the household, now the content is being viewed

22  everywhere.  We are seeing this play out.  Half of our volumes

23  on our networks are video now.

24          So the viewership of this content by arithmetic has

25  to go up.  The content has to be worth far more.  But not only

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  that, but this large load of advertising inventory these

2  companies have, I believe are being under utilized.

3        As we begin to discern what people are watching,

4  where they're watching it with their permission, if we actually

5  owned a large block of this inventory, that inventory we

6  believe would be far more valuable under the AT&T umbrella by

7  using this data than it is by under the media companies.

8  Q.   How would consumers benefit from your ability to earn more

9  money for advertising?

10 A.   At the end of the day, these are very competitive

11 industries.  Price is always a big deal in this industry.  To

12 the extent that you can generate higher yields off the

13 advertising in these services, it takes the pressure off of the

14 subscription revenues.  That has always been the equation here.

15      The better you do on advertising, the less you have to

16 charge the consumer for the service.  It really gives you an

17 opportunity to shift the load from the consumer to advertisers.

18 That is really the strategy behind this.

19 Q.   Did these industry trends that you have now described to

20 the Court lead you to a conclusion about what strategy your

21 company should pursue?

22 A.   Unequivocally.

23 Q.   What was that?

24 A.   In 2016 we said we need to own content.  We just think the

25 strategic rational is too compelling.  We believe the execution

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   of it is imminently achievable.  So we decided we need to

 2   pursue ownership of content in 2016.

 3   Q.    What did you do in that regard?

 4   A.    We began to do an evaluation of a lot of opportunities and

 5   we looked at a number of different companies.  And began to

 6   develop a strategy on what we might go pursue and we developed

 7   that strategy.

 8         The strategy was one of pursuing a number of smaller

 9   content companies.  And trying to aggregate a large number of

10   these and then getting to scale by buying a number of smaller

11   companies.

12   Q.    What happened to that strategy?

13   A.    We took it to our board of directors and our board of

14   directors gave us the green light to go execute on it and John

15   Stankey began executing on it.

16         And we're sitting in this environment and this world is

17   changing fast.  Players are being taken off the table.  Other

18   players are combining and going and pursuing different

19   strategies.  And it was moving really fast.

20         Acquiring these small companies was taking a long time.

21   Just getting a non disclosure agreement with the first one we

22   targeted was taking weeks to get done.

23         And we knew we ultimately wanted to have scale.  You

24   needed to have scale to be relevant and get the advertising

25   inventory and to do all of the things we were pursuing.
```

```
 1        And to get scale I began to question if it was the right
 2   strategy.  Should we think about streaming together pearls or
 3   should we just go find a company that has similar needs as we
 4   do and combine the two and achieve our end result in a much
 5   quicker fashion.  That led us to Time Warner.
 6   Q.   Did you end up ever acquiring any of these smaller content
 7   companies?
 8   A.   We tried two of them to no avail.  We didn't have success.
 9   One we didn't see all the way through.  Just taking a long time
10   to get the negotiations going.  And so we decided to make a
11   change in direction and pursue a larger target.
12   Q.   So how did you personally identify Time Warner?
13   A.   We had a number of what I'll call larger scale
14   opportunities in front of us.  We went through all of them.
15        A lot of the companies in the media industry are, have
16   large family ownership and they're very difficult to get a
17   transaction done with.  Some of them just were not for sale.
18        Time Warner was one that every time you looked at it you
19   came back to it.  It met all of the needs we were looking for.
20   It had a great content production capability, the studios,
21   Warner Brother Studios, had a very deep content library.  I
22   think it is the best library in the world.  I really do.
23        HBO, a wonderful premium video capability.  A direct to
24   consumer capability that they were pursuing.  And then Turner
25   Networks.  And the beauty of Turner Networks is that's where
```

1  this large inventory advertising resides.  So a really large

2  load of advertising inventory in Turner that we felt we could

3  put to work.

4       So you put all of that together, it met all of the needs

5  of the strategy that we were trying to pursue.

6  Q.   So did you review any materials about Time Warner before

7  you decided to make an overture?

8  A.   Yeah.  This was a not inconsequential shift in our

9  direction.  So I did a lot of this work myself.  And I as you

10  might guess, I got their annual report and I read it over and

11  dog eared it multiple, multiple times and learned as much as I

12  could about the company.

13       I spoke to a number of people just about the company.  A

14  few people, not a number, but I had a couple of board members

15  who knew the company.  So I did a lot of my own personal

16  research, evaluating the company.  And the more I looked at it,

17  the more enthusiastic I got about it.

18  Q.   Did you prepare your own analysis of the company?

19  A.   I did.  I spent a lot of time in my office at home working

20  on this because I hadn't spoken to anybody internally about it.

21  It was just something I was really wrestling with in my mind,

22  are we pursuing the right approach here.  Should we go after a

23  larger opportunity right off the bat.

24       So I was doing just a lot of work on my own in my office

25  at home evaluating it to kind of gain conviction.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Q.    Can you take a look at Exhibit 664 in your binder?

2          Do you have that?

3    A.    Yeah, I have it here.  Okay, I got it.

4    Q.    Can you tell the Court what 664 is?

5          MR. PETROCELLI:  There's no objection to this, Your

6    Honor.

7          MR. CONRATH:  My grade school teacher might object to

8    it because the handwriting is very poor.

9          But this is, these are my hen scratched notes of the

10   analysis I was doing in my office at home.  And what I had done

11   is just pulled together Time Warner past financial performance,

12   a summary level you see it here.

13         And then what were the projections.  I was looking at

14   analyst reports in terms of what was being projected for 2016.

15         What I was trying to discern here was if you put Time

16   Warner with AT&T, this is a, this is a big shift.  And for our

17   owners it was going to be, we call it a head snapper, you know,

18   where did that come from kind of moment.

19   Q.    By owners, you mean shareholders?

20   A.    Our shareholders, thank you.

21         So from our shareholders standpoint this was going to be a

22   rather significant shift in strategy.  I thought it was really

23   important to make sure that we could gain shareholder support

24   with this.  That we could accomplish some really basic

25   objectives if we did a deal like this.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1       I couldn't dilute their earnings.  So I had to be earnings

 2   accretive. I could not dilute the cash flow in the business.

 3   So I had to be free cash flow accretive.

 4       I could not in any way risk our dividends.  Our

 5   shareholders enjoy a nice dividend and it's a big part of the

 6   value equation of owning AT&T stock, getting that dividend.

 7   Q.   Do you have many retired shareholders?

 8   A.   We have a lot of retirees.  A lot of big institutional

 9   owners who really like the dividend.  They are guaranteed cash

10   return year in and year out.

11       And last,  I couldn't compromise the financial integrity

12   of the business.  Our credit ratings, our access to the debt

13   markets and so forth.

14       So what I was trying to do with this is just get myself

15   comfortable that if you took, put these two companies together,

16   recognizing that you would have to pay a premium to acquire

17   them.  Could you put them together in a way that would, I call

18   that my box; earnings free of cash flow accretive, support the

19   dividend and not compromise the financial integrity of the

20   business.

21       This was my analysis to get myself comfortable if that was

22   achievable.  I wasn't going to go past step one if I couldn't

23   get past this step.  That's what this was doing.

24            MR. PETROCELLI:  Your Honor, I offer this into

25   evidence.  There's no objection.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. CONRATH:  No objection.

 2              THE COURT:  All right, it will be admitted.

 3              (Defense Exhibit Number 664 received sealed into

 4    evidence.)

 5    BY MR. PETROCELLI:

 6    Q.   So after you prepared your notes, what did you then do?

 7    A.   I called up Jeff Bewkes and just asked him if he would

 8    have time to talk about his industry and our industry.

 9         I told him I just thought we ought to spend some time

10    together and he agreed and so we set up a lunch and we got

11    together and talked about our respective industries.

12    Q.   What was the outcome of that discussion?

13    A.   A quick lunch turned into a very long afternoon.

14         Jeff and I spent a lot of time comparing views.  I

15    explained to him how I viewed our business, he was explaining

16    to me his.

17         And the more we talked, the more we realized that these

18    two companies coming together would give us, we believe, a very

19    unique opportunity to provide a compelling opportunity

20    vis-a-vis what you see happening in the tech industry and what

21    you see happening in the media entertainment industry to create

22    our own vertically integrated content creation, content

23    aggregation and content distribution to not only our TV

24    customers in the home but most importantly, into the mobile,

25    the wireless environment.
```

 1        We have one hundred million wireless subscribers and then

 2   how we could use that to leverage the advertising business.  We

 3   both got very excited about it.  And both agreed that it was

 4   probably worth going and visiting with our respective boards

 5   about whether we ought to pursue something.

 6   Q.   And that takes us to exhibit, Defense Exhibit 609.  If you

 7   could turn to that, please.

 8        Could you tell the Court what this is?

 9   A.   Okay.  I got, I assembled my board on September 1st to

10   have a call.  It was a call to tell them about the meeting that

11   I had had with Jeff.  And to let them know that there was a

12   real interest in pursuing, doing something closer together with

13   Time Warner, meaning combining the two companies.

14        So what these are, what you are looking at here, these are

15   just notes.  When I do a board meeting I get on my tablet, my

16   iPad and I just put a bunch of bullets together, points that I

17   want to make sure that I cover with my board.  It's just kind

18   of my check list and things I need to cover.

19        The first few pages are about things that have nothing to

20   do with this deal.  But as you get back, you will see the notes

21   that are describing the conversation I had with Jeff and what

22   my thoughts are about the deal at that time.

23   Q.   So could you turn to page 7 of Exhibit 609?

24   A.   Okay.

25   Q.   And you see there reference to a potential deal structure?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.    I do.

2  Q.    And it says no significant cost synergies to pay for deal

3  premium.  This is a vision deal potentially very powerful, but

4  will have to be proven over time.

5        Could you explain what you meant and had in mind when you

6  wrote those notes?

7  A.    So at this moment in time, this point in time I was

8  operating off those hen scratched notes that you saw earlier.

9  That was the depth of the analysis that I had done at this

10 time.  I didn't yet know what type of synergies were available.

11       But what I wanted my board to understand was that this was

12 a vertical deal.  There are not a lot of overlaps of operation,

13 there is not redundant distribution, redundant sales and so

14 forth.  There aren't those kind of really large cost synergies

15 we're accustomed to see in a deal.

16       So I wanted my board prepared to --

17 Q.    When -- excuse me -- when you were accustomed to seeing a

18 deal, do you mean in a horizontal deal?

19 A.    In a horizontal deal where you have these overlaps of

20 operations and so in those kind of deals you just have large

21 costs that you can take out of the businesses and that helps,

22 you know, pay for a premium if you have to pay a premium to

23 acquire a business.  This was not one of those.

24       As I said, this is a vision deal.  So I didn't want my

25 board to have this expectation of really large cost synergies

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   if we have to pay a premium here to compensate for that.

 2         You have to believe in the vision.  You have to believe in

 3   what I've been talking about here that distribution of this

 4   content to wireless will drive the value of the content up.

 5         That the ability to pair our data with their advertising

 6   inventory will drive value.  But there were not going to be at

 7   this time I couldn't identify any great synergies to say relax.

 8   If we have to pay a premium, there are synergies to cover it.

 9   I couldn't represent that at that time.

10   Q.   Now just skipping ahead for the moment, there has been

11   testimony in the trial about fairly significant synergies

12   including cost savings.

13         How do you reconcile that with your notation here that

14   there are no significant cost synergies?

15   A.   So you're going to hear, you may have already heard I

16   suppose, multiple versions of synergies.  And as you're going

17   through a deal like this, you go through three distinct stages

18   really.

19         This is stage one.  Stage one, I have done, my team has

20   done no due diligence.  And I am, I am wanting my board to

21   understand we don't know what synergies there are.  There may

22   be none, there may be few, but we don't know.  So it's what I'm

23   positioning the board for here, stage one, okay.

24         Stage two, once Jeff and I say we agree we should pursue a

25   deal, now I bring in my due diligence teams.  The mergers and
```

1  acquisition teams who have, they go in and they begin to work

2  with the Time Warner team, they begin to do a bottoms up look

3  at some of the cost savings that would be achievable here.

4      What are some of the opportunities on revenues?  They do a

5  different level of detail.  And they begin to identify as you

6  would guess what happens when you don't need two headquarters

7  organizations.  What kind of savings can you get from vendors

8  and so forth.

9      They do a little more detailed review that I will take to

10  my board if we get to a deal.

11         THE COURT:  Are they trying to help you understand

12  what price realistically you should offer to purchase the

13  company?

14         THE WITNESS:  What price would you feel comfortable

15  offering, Your Honor, that is correct.

16         And second of all, what is the financial profile this

17  business will look like after it's done?  What does the

18  business look like once you put the two together and you have

19  achieved these synergies?  It has a very different look often

20  times.

21         So it is trying to do both.  What can you justify

22  paying?  Then what does the business look like on a run rate

23  going forward basis?  So you have more detail there.

24         Now what I will tell you invariably in this second

25  state a deal you take to your board for approval, these are

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  levels of synergies that you feel highly confident that you can

2  achieve.

3         You have not done extreme detail planning but these

4  are things that you can have a high degree of predictability

5  and comfort in achieving.  So those will always be higher with

6  stage one.

7         Then you get to a stage three.  The deal has been

8  reached.  And the deal has been announced and you are

9  submitting it for regulatory approval with the Department of

10  Justice or whomever.  That generally takes at least a year for

11  a deal of this size.

12         What we do then is we go into detailed merger

13  integration planning.  This is what John Stankey has been doing

14  for the last year.

15         In this stage you bring in experts.  You bring in

16  people that know the parts of the business you know nothing

17  about.  You bring in the people from the new organization

18  that's going to be combining with you and you begin to do data

19  driven detail bottoms up analysis on what kind of synergies are

20  achievable.  What new business models are achievable.

21         We always do something here.  We have learned this

22  over the years.  This is a very important part of doing this.

23  Is you put people on these merger integration teams that are

24  going to own these businesses when the deal is consummated.

25  That serves as a very important function.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              It serves as a governor.  They can't get too zealous.

 2  They know that they're going to own it.  They know ultimately

 3  when the deal closes they will have to execute on those

 4  synergies and they will have to produce them, and their

 5  compensation will be tied to achieving those synergies.

 6              You put all of that together so stage three

 7  invariably you get to synergy numbers that are even higher and

 8  better than stage two.

 9              You are just getting more detail and more data and

10  you're understanding the business better.  That's stage three.

11              And then there is always stage four which is to go

12  execute.  Our history on execution is you generally exceed on

13  execution all three stages.

14  Q.    You are at stage three now?

15  A.    We are at stage three at this time.

16  Q.    Okay.  Can you turn to page 8 of Exhibit 609?  There you

17  are listing out some key issues and concerns.

18        The first one, how can you advantage your own distribution

19  parentheses TV, BB, that's broadband, wireless end parentheses

20  without harming TW, Time Warner position as a wide distributor

21  of content to other SVOD, cable networks and broadcast networks

22  and how to use the distribution business to increase the value

23  of the media business.

24        Can you explain that to the Court?

25  A.    This was another issue that I thought it was really
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    important that my board grasp and understood.

2        That is AT&T, I told you earlier that it's a one hundred

3    sixty billion in revenues and Time Warner is about thirty

4    billion in revenues.

5        So there are two areas you try to assess.  And that is if

6    you acquire Time Warner you combine with them, how can that

7    content add value to this hundred and sixty billion dollar

8    business.

9        And I spent a lot of time thinking about this and

10   especially after I visited with Jeff.  Because I told you the

11   value of a content company is a function of how many people

12   watch the content.  Period.  It's no more complex than that.

13       So content valuations are a function of distribution.

14   Wide broad distribution.  The more distribution, the better you

15   are.

16       So I was trying to tell my board that if there is a

17   thought process that says we're going to use this content to

18   enhance the distribution business, that means you're going to

19   have to limit the distribution, do exclusive things with AT&T.

20   That is counter to how you create value in one of these

21   businesses.

22       So that strategy is not a very good strategy.  If that's

23   how we are going to create value, that's not a good approach to

24   creating value.

25       Now how can a distribution, a second bullet, how can a

1  distribution company drive value to a media or content company?

2  That one you get excited about.

3       Because you can use the distribution of the hundred sixty

4  billion dollar company to drive value into the thirty billion

5  dollar company.  You give them more distribution, access to

6  wireless distribution, the ability to develop and innovate

7  their content for wireless distribution.

8       And don't forget this advertising.  Using the data out of

9  the distribution company to enhance the value and drive higher

10 value into the advertising inventory.

11      So the point I was trying to make with the board, it's not

12 really clear to me that you can use this to drive value into

13 the distribution company, the media company.  But it's really

14 clear to me how the distribution company can enhance the value

15 of a media company.

16      Said really simplistically, a hundred sixty billion dollar

17 company doesn't buy a thirty billion dollar company hoping that

18 the thirty billion dollar company can make its value greater.

19      The hundred sixty billion dollar company buys the thirty

20 billion dollar company with the expectation that they can drive

21 value in the thirty billion dollar company.  It's a matter of

22 math.

23 Q.  Finally, can you turn to page 11 of Exhibit 609 and there

24 you are describing your views about Turner, HBO and Warner

25 Brother Studios as to Turner high quality cable network assets,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  HBO great asset, Warner Brothers, crown jewel.

2      Were these your views about the quality of the content you

3  are acquiring?

4  A.   This was my assessment of spending a few weeks just

5  grinding through annual reports and talking to people who knew

6  this business.  This was my assessment of what they had, yes.

7  Q.   One, let's fast forward now from September 1 to October

8  22, 2016.  And that is the board meeting on when you presented

9  the deal to the board for discussion and approval?

10  A.   That's correct.

11  Q.   And you had done a lot of work between September 1 and

12  October 22?

13  A.   So the due diligence team have been hard at work during

14  that period of time putting the deal together.

15  Q.   Can you turn to --

16          MR. PETROCELLI:  Your Honor, I'd like to move first

17  of all, Exhibit 609 into evidence.  Under seal, please.

18          THE COURT:  Any objection?

19          MR. CONRATH:  No objection.

20          THE COURT:  Be admitted.

21          (Defense Exhibit Number 609 received under seal into

22  evidence.)

23  BY MR. PETROCELLI:

24  Q.   Can you turn to Exhibit 640, page 35, please?

25      And could you describe what that is to the Court?

1   A.   This is the presentation that was put in front of my board

2   on October 22nd.  It was a Saturday morning.

3        It's the detailed presentation giving them the details on

4   the deal, the transaction rational, the financials of the deal,

5   the deal terms, and the regulatory assessment and so forth.

6        So it's the complete presentation to my board.

7             THE COURT:  Did they have this in advance?

8             THE WITNESS:  They did, yes, sir.

9             THE COURT:  So they could study it before the

10  meeting?

11            THE WITNESS:  I'm sorry?

12            THE COURT:  So they could study it before the

13  meeting?

14            THE WITNESS:  Yes, that's correct.

15            THE COURT:  You plan on going through this?

16            MR. PETROCELLI:  Just one page.

17            THE COURT:  All right, then we'll take the luncheon

18  recess.

19            Go ahead.

20  BY MR. PETROCELLI:

21  Q.   Okay.  Page 36.

22  A.   Okay.

23  Q.   It says transaction rationale.

24       Can you just describe perhaps in your own words to His

25  Honor what were the reasons that you recommended this deal to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  your board?

2  A.    Yeah.   The rationale why should AT&T do this deal?   Why

3  should we put our shareholder's money into acquiring an asset

4  spending a hundred billion dollars to acquire a business like

5  this?

6       And this was the rationale.   We had concluded as a board

7  and a management team that we needed to own premium content.

8  And this was in our view the highest quality, you see the word

9  actionable.   Meaning it could, a deal could get done with this

10  company.   So it was actionable.

11      It was a deal that could actually get done and our belief

12  was this was going to accelerate innovation.   Getting premium

13  content into the world of mobility.   Owning content like this

14  with our mobile distribution we thought was going to make this

15  go much faster.

16      This data driven business -- I'm not going to go through

17  all of these.   But this was important.   Getting to a data

18  driven business model was really critical in this.

19      What that means is this large advertising inventory using

20  our data to make that advertising inventory worth more, that's

21  the first piece.

22      But also using our data, we know what our customers like

23  to watch.   We know what stars, Hollywood stars get watched a

24  lot.   So being able to use that content or that data to

25  influence the content creation in Warner Brothers Studios, and

1    even HBO.

2         So this is basically a recitation largely of what I have

3    covered with you here this morning but it is going through that

4    rational and that logic with my board.

5    Q.   And did the board vote to approve?

6    A.   Yeah, it was a long meeting.  We went through a lot of

7    detail.  And after the course of a rather long meeting, there

8    was unanimous approval to do the transaction.

9              MR. PETROCELLI:  Your Honor, I'd move 640 into

10   evidence under seal with no objection.

11             MR. CONRATH:  No objection.

12             THE COURT:  All right.  It will be admitted under

13   seal.

14             (Defense Exhibit Number 640 received under seal into

15   evidence.)

16             MR. PETROCELLI:  I have probably less than ten

17   minutes but we can do it after lunch.

18             THE COURT:  Yeah, we'll take the luncheon recess now.

19             You are a witness under oath now in the case.

20             THE WITNESS:  Yes, sir.

21             THE COURT:  What that means is you are not at liberty

22   to discuss your testimony so far or what it might be when you

23   return with anyone including your own lawyers.  You can't talk

24   to anyone about it, with company, friends, family, nobody.

25   Just stay independent of all others, be able to answer the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  question if asked have you discussed your testimony with anyone

2  during the break?  Be back at 2:40.  Stand in recess.

3          (Witness excused.)

4          (Luncheon recess at 1:12 p.m.)

5                          -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

1

2       I certify that the foregoing is a true and correct

3  transcript, to the best of my ability, of the above pages, of

4  the stenographic notes provided to me by the United States

5  District Court, of the proceedings taken on the date and time

6  previously stated in the above matter.

7       I further certify that I am neither counsel for, related

8  to, nor employed by any of the parties to the action in which

9  this hearing was taken, and further that I am not financially

10 nor otherwise interested in the outcome of the action.

11

12

13  _____        _____

    /s/Crystal M. Pilgrim, RPR, FCRR        Date: April 19, 2018

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CV No. 17-2511 |
| | ) | |
| | ) | Washington, D.C. |
| vs. | ) | April 19, 2018 |
| | ) | 2:51 p.m. |
| AT&T, INC., ET AL., | ) | |
| | ) | Afternoon Session |
| Defendants. | ) | |
| _____ | ) | Day 17 |

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:            Craig W. Conrath
                              Eric D. Welsh
                              Donald G. Kempf, Jr.
                              Peter J. Schwingler
                              Matthew D. Siegel
                              U.S. DEPARTMENT OF JUSTICE
                              Antitrust Division
                              450 Fifth Street, NW
                              Washington, D.C. 20530
                              (202) 532-4560
                              craig.conrath@usdoj.gov
                              eric.welsh@usdoj.gov
                              donald.kempf@usdoj.gov
                              peter.schwingler@usdoj.gov
                              matthew.siegel@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

Katrina M. Robson
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 220-5052
krobson@omm.com

Daniel M. Petrocelli
M. Randall Oppenheimer
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067
(310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Michael L. Raiff
Robert C. Walters,
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
(214) 698-3350
mraiff@gibsondunn.com
rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:

Kevin J. Orsini
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1140
korsini@cravath.com
pbarbur@cravath.com

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

– – –

WITNESS INDEX

– – –

WITNESSES          DIRECT CROSS REDIRECT RECROSS

DEFENDANT'S:

RANDALL STEPHENSON  3419  3438
RANDALL STEPHENSON  3501  3502
RANDALL STEPHENSON  3503
RONALD QUINTERO     3526
                         – – –

INDEX OF EXHIBITS

– – –

DEFENDANT'S              IDENTIFIED   ADMITTED

DX640 –                               3420
DX625 – Letter Dated October 26, 2016    3423
                         – – –

INDEX OF EXHIBITS

– – –

GOVERNMENT'S              IDENTIFIED    ADMITTED

PX558                                   3461

PX47                                    3474

PX558                                   3483

                         – – –

WITNESS INDEX

– – –

WITNESSES          DIRECT CROSS REDIRECT RECROSS

GOVERNMENT'S:

RONALD QUINTERO     3508

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1             P R O C E E D I N G S

2             DEPUTY CLERK:  All rise.  The United States

3    District Court for the District of Columbia is now in

4    session, the Honorable Richard J. Leon presiding.  God save

5    the United States and this Honorable Court.  Please be

6    seated and come to order.

7             THE COURT:  All right.  The witness remains under

8    oath.

9    RANDALL STEPHENSON, WITNESS FOR THE DEFENDANTS, HAVING BEEN

10   PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS

11   FOLLOWS:

12            MR. PETROCELLI:  May I proceed?

13            THE COURT:  When you're ready.

14            MR. PETROCELLI:  Thank you.

15            DIRECT EXAMINATION (CONTINUED)

16   BY MR. PETROCELLI:

17      Q    Mr. Stephenson, we left off with your Board

18   presentation on October 22, 2016.  I want to show one more

19   page from that exhibit, which is page 57.  And, again, we're

20   at Exhibit 640.  It's entitled "Time Warner Synergies."

21            Do you have that in front of you?

22      A    Yes, I do.

23      Q    Before you were explaining to the Court the three

24   stages of synergies, is this stage two?

25      A    This would be stage two after the due diligence

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3420

```
 1   has been performed by the merger and acquisition team.

 2        Q    And this was what was presented to your Board?

 3        A    This is what was presented to the Board, which,

 4   again, these are at the stage where you say these are highly

 5   probable scenarios, very confident in achieving those.

 6        Q    Both on the cost side and on the revenue side?

 7        A    That is correct.

 8             THE COURT:  What's that page again?

 9             MR. PETROCELLI:  Your Honor, it's page 57 --

10             THE COURT:  57.

11             All right.

12             MR. PETROCELLI:  -- of Exhibit 640.

13             And I'd like to move Exhibit 640 into evidence,

14   Your Honor --

15             THE COURT:  All right.  Any objection?

16             MR. PETROCELLI:  -- under seal.

17             THE COURT:  Any objection?

18             MR. CONRATH:  No objection.

19             THE COURT:  It will be admitted under assignment.

20                                    (Defendants' Exhibit DX640
                                       received into evidence
21                                     under seal.)

22   BY MR. PETROCELLI:

23        Q    I have one other document that I would like to

24   show you, Mr. Stephenson, and it's on the witness stand in

25   front of you.
```

 1          MR. PETROCELLI:  And, Your Honor, I've handed it

 2   out.

 3          THE COURT:  Hmm?  Oh, okay.

 4   BY MR. PETROCELLI:

 5     Q    And it's marked as Exhibit 625.  It is a letter

 6   dated October 26, 2016, from Randall Stephenson to all

 7   officers.

 8          Do you recognize this, Mr. Stephenson?

 9     A    Yes, I do.  I personally crafted this letter.

10     Q    You wrote it yourself?

11     A    I did.

12     Q    And could you just generally tell the Court what

13   this is, and then I'd like to direct your attention to a

14   portion of it.

15     A    Okay.

16          When we signed the transaction, we announced it

17   publicly.

18          There are a lot of questions within Time Warner,

19   within AT&T about what exactly does this mean and how we're

20   going to do business.  And this was me wanting to lay out --

21   we, internally, we referred to it as our Magna Carta, that

22   this is how we will do business.

23          And as you can see, as you go down to our AT&T

24   employees, what I was trying to say is we are going to

25   continue to buy a broad array of content to distribute to

 1   our customers.  We're not going to get narrowly focused on

 2   Time Warner content.

 3        Then the second bullet was to you Time Warner

 4   employees.  You're going to continue to broadly distribute

 5   your content.  That is the value of your business.  And

 6   I wanted to lay it out very clearly to all of our people.

 7        And then some comments about CNN and editorial

 8   independence and so forth and to our consumers what they

 9   could expect and, lastly, that this was -- as we like to say

10   it, we are going directly at cable, to compete against our

11   cable competitors.

12        So that's what this was trying to describe.

13   Q    Could you read out loud the paragraph that you

14   wrote to the consumers.

15   A    "To the consumers:  We know you want more than

16   what the industry is giving you today.  That's why we're

17   launching DirecTV Now, our 100-plus channel, 100 percent

18   over-the-top product that is aggressively priced with

19   packages beginning at $35 a month.  Looking ahead, we will

20   use our digital rights and Time Warner's content to create

21   new choices, skinnier bundles, video created just for mobile

22   viewing and social media, and low-cost video products

23   supported by advertisers instead of consumers.  More choice,

24   lower cost."

25   Q    And when you wrote those words then, do you still

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3423

1    stand behind these words today?

2        A    That is our value proposition to the market.

3        Q    And is that true of everything you wrote in here?

4        A    There is not a word of this I would change if I

5    were to rewrite it today.

6            MR. PETROCELLI:  Okay.  Your Honor, I would move

7    into evidence Exhibit 625 if there's no objection.

8            MR. CONRATH:  No objection.

9            THE COURT:  Okay.  Is that one under seal or no?

10           MR. PETROCELLI:  No.

11           THE COURT:  No.

12                              (Defendants' Exhibit DX625
                                received into evidence.)
13   BY MR. PETROCELLI:

14       Q    Now, have you considered, Mr. Stephenson, were the

15   Court to approve this merger and allow you to proceed with

16   this merger, how you would organize the company?

17       A    Yes.

18           We've put a lot of thought and, in fact, put a lot

19   of it into place already.

20           What the plan is and what has already been put in

21   place is we would stand up a communications company, which

22   this is the company that serves our business and consumer

23   customers, broadband, TV, wireless services, and so forth.

24   That is one business unit.  And all the technology and so

25   forth that goes along with that would be in that business

3424

1   unit.  That is being run today by a gentleman named John

2   Donovan.  We have put that business unit in place, and it's

3   executing.

4        Q    Is DirecTV in that business unit?

5        A    DirecTV is in that business.

6        Q    And U-verse?

7        A    U-verse is in that business as well.

8             So all of our consumer-facing products are in that

9   business today.

10            We will also have a media company.  That is what

11  you think of when you hear "Time Warner" today.  So

12  Warner Brothers studios, HBO, and Turner networks will be in

13  that.

14            And we also have some digital properties that we

15  have acquired over the years that we would also place in

16  that business unit.

17            And then we have some --

18            THE COURT:  And CNN?

19            THE WITNESS:  CNN will be in that business unit as

20  well.

21  BY MR. PETROCELLI:

22       Q    You mean cnn.com?

23       A    It's cnn.com.

24            So, yes, anything that's under the Turner

25  umbrella, CNN, cnn.com, they have a number of digital

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3425

```
 1    properties; we have some digital properties.  We will place

 2    those in there.

 3            And then we also have some regional sports

 4    networks.  Those will also be put into there because they're

 5    all media-content-type properties.

 6        Q    So just to be clear in what you're calling

 7    MediaCo, there will be all the Turner channels, right?

 8        A    Correct.

 9        Q    Including CNN, TNT, TBS, and the rest of them?

10        A    All of that will be in there.

11        Q    HBO?

12        A    HBO will be in that MediaCo business unit, and

13    Warner Brothers studios will be in there as well.

14            THE COURT:  Films.  So all the films are in this

15    one?

16            THE WITNESS:  All the films and the IP library.

17            THE COURT:  TCM?

18            THE WITNESS:  Exactly.  Exactly.

19            We will have a third business unit --

20    BY MR. PETROCELLI:

21        Q    Who is going head that one up?  Mr. Stankey,

22    right?

23        A    Oh, I'm sorry.  Mr. Stankey will be running that

24    business unit.

25            We'll have a third business unit.  This one has
```

1    already been stood up as well.  We're calling it right now

2    AdCo, advertising company.

3           We have hired a gentleman, a very seasoned

4    executive, who has previously stood up another advertising

5    company.  We hired him from WPP, a rather large advertising

6    business here in the United States -- actually, I guess

7    they're out of London.  He will head up AdCo.

8           This is where all of our advertising technology

9    will go.  This is where all of the data aggregation

10   capabilities will go.

11          And this -- responsibility of this organization is

12   to use the data out of the communication company, and we

13   have large infrastructure, big data bases and so forth that

14   have all that data, routinely and constantly being updated.

15          And the inventory from Turner networks, the

16   advertising inventory from Turner networks and the

17   advertising inventory from DirecTV and U-verse, this

18   individual's job is to put together the technology to build

19   the databases, to improve the monetization, the yields, if

20   you will, from this advertising inventory, taking it to

21   market and realizing these advertising synergies that we've

22   been talking about.  That is the sole responsibility of that

23   organization.

24      Q   And the person's name is what?

25      A   Brian Lesser.  He's the individual that we hired

1    who is running that business unit.

2           Then we have a fourth business unit, and it's our

3    international properties.  So we have, as I mentioned

4    earlier, a rather large Mexico wireless property and a

5    satellite business in Mexico.  We have satellite businesses

6    throughout Latin America, these are our international

7    properties.  These are all aggregated, and they're under

8    Lori Lee.

9           There will be advertising opportunities in these

10   businesses as well.

11   Q    We've heard a lot about efficiencies that the

12   merger can be expected to achieve.  Are you going to lose

13   any efficiencies if you have these four units operating

14   independently?

15   A    No.

16          We have a lot of experience in how you make

17   synergies, how you realize those.

18          And as I mentioned to you, the way the synergies

19   are built, the efficiencies are built, are people who will

20   ultimately run these business units are creating these

21   business plans.

22          When we close this transaction, most of these

23   plans are locked away.  They're in clean rooms, because we

24   can't be seeing them.  There's some competitive intelligence

25   in there and so forth.

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***   Filed 08/06/18   Page 3294 of 3826

3428

1          The day the merger is closed, these plans are

2     taken out of the clean rooms.  They're handed off to the

3     various teams in these organizations.  And they said, these

4     are your efficiency plans.  They have been put together by

5     the people we've discussed.

6          And those numbers, those impacts are built into

7     the business plans and the budgets of all the people in

8     these various business units.  And compensation is set to

9     achieve those budgets, and that's how you realize those

10    efficiencies we move forward.

11    Q     Turner will be in one company, MediaCo; and

12    DirecTV is in another company, the communications company,

13    right?

14    A     Right.

15    Q     Will they be able to share confidential

16    information?  So, for example, Turner has all of these

17    carriage agreements with various distributors; then DirecTV

18    and U-verse have carriage agreements with other programmers.

19         How will that work?

20    A     We -- first of all, those contracts all have

21    provisions in them about sharing information, and that would

22    constrain that kind of sharing.

23         But, second of all, this is one of the reasons you

24    structure businesses this way.

25         We have a lot of experience within AT&T of dealing

 1   in areas where we're serving customers that are also our

 2   competitors.

 3           So an example would be Verizon.  We sell them

 4   fiber connections to all their cell sites, not all, but many

 5   of our cell sites in our properties.  They're a customer,

 6   and we negotiate those price.

 7           They would not want the people who that compete

 8   against them on the retail side every day to know what their

 9   cost structure looks like and what those price points are.

10   There are rules, but we also just have practices on how you

11   keep that information separate.

12           It's important that we do that.

13           I never want Verizon to question that the

14   information I get by doing business with them is being

15   shared with the retailer.  They'll stop doing business with

16   us.  And it's just -- it's bad business, but it's also just

17   inappropriate.

18           That's what I like about this structure, in terms

19   of our media company, very separate.  Any dealings between

20   media company and DirecTV will be arm's-length dealings.

21   They will be negotiating pricing, just like Turner would

22   negotiate pricing with Comcast.

23           That information shall never bridge the divide.

24   It shall never cross the divide.  It is proprietary.  It's

25   confidential, and it shall be held as such.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1     Q    So, Mr. Stephenson, I'd like to conclude by asking

2 you about why we're here today.  And, in particular,

3 I think, as you know, the government is claiming that this

4 merger will harm competition.

5          What the government is saying is that, simply on

6 account of the merger and for no other reason, that Turner

7 will be able to raise its prices to other distributors,

8 other than DirecTV, in that the merged company will have an

9 incentive and ability to do that.

10          What is your reaction to that, Mr. Stephenson?

11     A    On its face, the premise -- it's absurd.

12     Q    Why is it absurd?

13     A    The idea that after this merger -- when you

14 consider how pricing is set in Turner's business today, it

15 is aggressive negotiation.  It is extensive negotiation.  It

16 is a negotiation process that has been built up over many,

17 many years.

18          And Turner is getting the fair price for their

19 content.  I must believe they do.  I think they're very good

20 at it.  I've negotiated against them, and I do believe

21 they're getting fair value for their content.

22          The idea that all of a sudden Turner is under the

23 AT&T umbrella and somehow Turner's content is worth more

24 defies logic to me.  I don't understand how that mechanism

25 would work, how that would be affected in the marketplace.

1            And it just, it literally defies logic to me how

2    their content would be worth more the next day than it was

3    the day before, before we acquired them.  So I just --

4    I don't even follow the logic.

5        Q    The government also contends that solely as a

6    result of the merger, the company will have the incentive

7    and ability to restrict the use of HBO as a promotional tool

8    with distributors other than DirecTV.

9            What do you say about that?

10       A    That probably defies business logic.

11           HBO is dependent upon all these distributors to

12   sell their product.  That's how they sell their product.

13           And I will say it again.  It's not that

14   complicated.

15           The value of one's content is a function of how

16   many people are watching the content, and any action that

17   would restrict the distribution of that content is

18   value-destroying action.  And so it doesn't make business

19   sense to me that anybody would do that.

20       Q    And, finally, the government contends that solely

21   as a result of this merger, the company will have the

22   incentive and ability to coordinate with Comcast-NBCU for

23   the purpose of harming virtual MVPDs.

24           What is your reaction to that?

25       A    You probably have to live in this industry every

```
1    day like I do to appreciate what a stretch that is.

2             We compete every day with Comcast in the

3    marketplace.  The individual that runs communication

4    company, he wakes up every day trying to think, how do I win

5    in the marketplace against Comcast?

6             He is using predominantly wireless as his

7    advantage against Comcast.  Wireless distribution is a huge

8    advantage for him against Comcast, because they have no

9    wireless business, per se.  They have a very small one, but

10   it's not much.

11            So he wakes up every day thinking about, how do I

12   use wireless to differentiate myself vis-à-vis Comcast?

13            Now, as you think about virtual MVPDs and the idea

14   that we might be inclined to work with Comcast to hurt

15   virtual MVPDs, it's actually the opposite with us.

16            With AT&T, we're in a unique position.  We like

17   over-the-top.  Over-the-top generally means, in this day and

18   age, wireless.  People are using their wireless devices to

19   watch video, whether it's our video or not, we're somewhat

20   ambivalent.  We'd rather it be our video; but either way, it

21   serves our interests for people to watch video over our

22   wireless network.

23            We want to propagate that.  We're enthusiastic

24   about that.  We want people engaged with these devices all

25   day, as much as possible, watching media and video.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3433

```
1              To the extent that that is another virtual MVPD,

2     we'd rather it were ours; but actually, it serves our

3     interests, the virtual MVPD platform, to proliferate.

4        Q     In your Exhibit 625, what you called the

5     Magna Carta, your letter of October 26, 2016, you indicated

6     that the company will use its rights to enhance skinny

7     bundles.

8              Do you see that, skinnier bundles?

9        A     Yes, I do.

10       Q     There's been a suggestion that, in connection with

11    this coordination claim, that the company would have the

12    incentive and ability to impede the emergency and the

13    development and growth of skinny bundles.

14             What is your view about that?

15       A     It's taking off of what I was just speaking about

16    regarding virtual MVPDs.

17             Anything that will drive more utilization of our

18    mobile asset is a good thing.  That serves our interests.

19             And, as you think about the folks in the

20    communication company -- excuse me, communication company

21    side, their world is all about, how do we get content costs

22    down?  How do we meet customer demand for lower content

23    offerings?

24             Our DirecTV Now is a classic case of that.  A $35

25    offer into the marketplace, a skinny bundle.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          That's what the customer is demanding.  And only a

2     company that's directly interfacing with the consumer is

3     going to have that sensitivity.

4          I will confess that media and entertainment

5     companies may not be as motivated for skinny bundles.

6     They're selling to a wholesaler.  So they want to sell as

7     much to the wholesaler as they can.

8          But the distributor, like AT&T, we have customers

9     telling us, we can't pay $100 for a bundle of content.  We

10    need another option.  That's what DirecTV Now is all about,

11    getting skinnier bundles into the hands of our customers.

12         In fact, we have a product that we hope to be

13    launching here in the next couple of weeks.  It's called

14    AT&T Watch, and it is a $15 bundle.

15         It's taking basically the sports programming out

16    of DirecTV Now and getting a really skinny bundle that we

17    can put out there for $15 to our customers.

18         And interestingly enough, if you're an AT&T

19    wireless unlimited customer, we're going to give that bundle

20    to you for free.

21         So these are the kind of things that we're

22    motivated to do as a distributor, get the bundle's tensity

23    down and get a skinnier, skinnier bundle into the

24    marketplace.

25         Q    What if you're not an AT&T wireless customer; will

1  you be able to buy this new offering for $15 that you called

2  AT&T Watch?

3      A    We'll sell it for $15 to anybody that wants to buy

4  it, of course.

5      Q    The government says, based on these three

6  allegations, that this transaction will harm competition.

7          Do you agree with that?

8      A    No, I don't agree with it at all.

9          We've been talking a lot about this here today and

10  how I am absolutely convinced at so many levels that this is

11  going to drive greater competition, is going to drive

12  consumer benefits that I -- there are some of the best

13  consumer benefits I've seen in any transaction I've been a

14  part of.

15         The ability to innovate video, media, premier

16  media for the wireless infrastructure, for the wireless

17  environment -- that's a beautiful thing.  Our customers want

18  that, and we're actually excited thought that.

19         Ability to generate new advertising revenue

20  streams to help us offset the rising cost of content and

21  keep subscriptions prices low -- this is a really good thing

22  for the consumer.

23         The ability to do all this innovation for the

24  consumer -- there are few opportunities I've seen that are

25  this consumer-friendly.  I would suggest that the only --

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    the only lack of competition as a result of this transaction

2    has been the delay of getting it to the marketplace.

3            And we're just anxious to get moving and get this

4    transaction put together so we can begin to bring these

5    consumer benefits to play.

6        Q    Finally, Mr. Stephenson, AT&T has a long, storied

7    history.  Time Warner is an iconic company that goes back to

8    the '20s when the Warner Brothers themselves started this

9    business.

10           How important is this transaction to AT&T and

11   Time Warner?

12       A    You heard me talk about the history of AT&T,

13   140 years.  And this company has had a lot of seminal

14   moments where significant events have happened or

15   significant technological innovation has happened, and it's

16   really changed the complexion of the company.

17           Probably the most seminal that I can think of in

18   recent memory is wireless.  And this company pursued

19   wireless aggressively.  And we moved very aggressively.  We

20   invested hundreds of billions of dollars in that technology.

21           And it changed the company.  It literally changed

22   the complexion of the company.  And it changed -- we believe

23   it changed, to a certain extent, the world:  How our

24   customers interact, how our customers communicate and how

25   they work and how they play.  It changed all of that for our

 1    customers.

 2            I actually believe that we're on the cusp of

 3    another one of these moments.

 4            And Time Warner, the ability to bring this kind of

 5    content to bear and the kind of innovation that stands in

 6    front of us here, I believe we're going to look back and

 7    it's going to be one of those moments where we'll have

 8    fundamentally changed the very nature of the company that we

 9    are and how we address the consumer.

10            And it's going to create a consumer interaction

11    with media entertainment that I think is going to be really

12    game-changing and very important for a long time.  So it's

13    very important for who we are as a company.

14            MR. PETROCELLI:  I have nothing further,

15    Your Honor.

16            THE COURT:  All right.

17            Cross-exam.

18            MR. CONRATH:  I have some binders.  May I hand

19    them up?

20            THE COURT:  All right.

21            MR. CONRATH:  May I approach the witness,

22    Your Honor?

23            THE COURT:  You may.

24            MR. CONRATH:  May I proceed, Your Honor?

25            THE COURT:  When you're ready.

```
 1              MR. CONRATH:  Thank you.

 2                       CROSS-EXAMINATION

 3    BY MR. CONRATH:

 4         Q    Good afternoon, Mr. Stephenson.

 5         A    Good afternoon.

 6         Q    And we met before at your deposition --

 7         A    We did.

 8         Q    -- correct?

 9              Good to see you again.

10         A    Good to see you.

11         Q    You were asked a couple of questions a minute ago

12    about the government's theory of the case?

13         A    About the government's -- I'm sorry?  About the

14    government's what?

15         Q    Theory of the case, the questions Mr. Petrocelli

16    just asked you.

17              Do you recall that?

18              MR. PETROCELLI:  I cannot hear you.

19              THE COURT:  You're going to have to --

20              MR. CONRATH:  Yeah.  I'm afraid my voice is

21    just -- do you mind if I grab a lozenge?

22              THE COURT:  No.  Go right ahead.

23              We've got a devilish situation here.  If we turn

24    these fans off --

25              MR. CONRATH:  Yeah, I know.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3439

```
 1              THE COURT:  -- it's going to get very warm in this
 2   room very fast.  So it's a rock and a hard place.
 3              I think it's better to be cooler than to be
 4   hotter --
 5              THE WITNESS:  Me too.
 6              THE COURT:  -- generally.
 7              MR. CONRATH:  I'm all in favor of that,
 8   Your Honor, so I'll speak up.
 9              THE COURT:  You're just going to have to project a
10   little bit more.
11              MR. CONRATH:  Right.
12              THE COURT:  Take your time.
13              MR. CONRATH:  Don't worry, Your Honor.
14   BY MR. CONRATH:
15      Q    You said to us, Mr. Stephenson, that as to the
16   first part of the government's case, the premise was absurd.
17              Do you remember that?
18      A    I remember that, yes.
19      Q    I'd like you to turn in your notebook to PX442,
20   please.
21              MR. PETROCELLI:  Your Honor, may we approach?
22              THE COURT:  Okay.
23              Mr. Stephenson, you'll have to step down to that
24   chair there, okay?
25              Thank you, sir.
```

 1           (Sealed bench conference)

 2           THE COURT:  Oh, 442.

 3           MR. CONRATH:  442.

 4           THE COURT:  Hold on.  Let me get it.

 5           All right.

 6           MR. PETROCELLI:  Your Honor, here is my objection,

 7    and it will likely apply to a lot of these documents.

 8           We had lengthy argument about this before the

 9    evidence in the case began on March 19 and March 20.

10           These are regulatory submissions in other matters.

11    Big, thick documents and reports.  This is -- this one,

12    Exhibit 442, right?

13           THE COURT:  Uh-huh.

14           MR. PETROCELLI:  This has to do with program

15    access rule issues on whether exclusivity provisions are

16    going to continue or be abolished.  Those are big, thick

17    legal documents.  They have nothing to do with this case,

18    Your Honor.

19           What they want to do is pick out like sentences

20    here and there, advocacy arguments in different

21    transactions, in different circumstances to try to --

22           THE COURT:  You're not moving this into admission,

23    are you?

24           MR. CONRATH:  Yes.  This is a statement of what

25    could be --

```
 1              THE COURT:  What are you doing?

 2              MR. CONRATH:  -- of what could be a clearer

 3    statement of a party opponent?  This is a document that they

 4    made a conscious decision to submit to the federal agency.

 5    It's got statements about how competition works.  That is,

 6    of course, exactly what I want to ask him about.

 7              It says that vertically integrated companies had

 8    the incentive and ability to hinder competition.  That's

 9    exactly the issue in this case, something he just said is

10    absurd.  And the company, speaking as an entity, said that

11    that is true.

12              THE COURT:  But take this first one here.  This

13    has nothing to do with this case, right?

14              MR. CONRATH:  The part that I just discussed does.

15    But, obviously, it's in the context of something else.

16              THE COURT:  In other words, the regulatory issues

17    that this -- these comments, these are comments by AT&T.

18              MR. CONRATH:  Yeah.

19              THE COURT:  The regulatory issue that these

20    comments have been submitted for relates to -- it's a

21    completely different matter, regulatory matter, right?

22              MR. CONRATH:  Yes, sure.  It doesn't relate to

23    this merger; but it relates, however, to vertical

24    integration and competition.

25              MR. PETROCELLI:  It does not, Your Honor.
```

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3308 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3442

1          MR. CONRATH:  It's their statement about -- it's

2     their statement about that that I want to confront the

3     witness with.  I want to move it into evidence because it's

4     the company's statement.

5          THE COURT:  What page do you have in mind?

6          MR. CONRATH:  Page 3, I think.  I didn't bring my

7     copy, but maybe --

8          MR. PETROCELLI:  I have it here.  You can share it

9     with me.

10          MR. CONRATH:  It's the second paragraph,

11     Your Honor, this paragraph.

12          THE COURT:  All right.

13          MR. CONRATH:  This sentence right here is exactly

14     on point, the -- he just said that they don't have the

15     incentive and ability to hinder competition.

16          This says, "The incentive and ability of

17     vertically integrated cable operators and the programming

18     affiliates to hinder competition in the distribution of

19     video programming by withholding critical programming

20     remains as strong today as they were in 2007."

21          MR. PETROCELLI:  Now, let me explain.

22          MR. CONRATH:  It's the principle -- it's exactly

23     the principle behind our case, Your Honor.

24          MR. PETROCELLI:  You can't take these broad

25     propositions and try to put them in the mouth of this

 1   witness.

 2         This has to do with a situation involving the

 3   Padres and Cox who were keeping the programming exclusive to

 4   Cox and nobody else before Cox ended up selling this

 5   baseball sports network, and they were not sharing it and no

 6   other distributors could carry it.

 7         That's the trial-within-the-trial problem of

 8   letting in these kinds of statements untethered and exactly

 9   the argument Mr. Conrath is making, to try to make it sound

10   like this applies to all circumstances.  This is in context

11   to a specific set of situations.  It has nothing to do with

12   our case.

13         Your Honor, we are on such a broader, important

14   set of issues in this case.  And to try to mislead the

15   record with these cherry-picked statements, no indication

16   that this witness ever even saw this document, and all

17   they're trying to do now is put in these documents --

18         THE COURT:  Hold on.

19         Was he questioned about this in his deposition?

20         MR. CONRATH:  No.

21         MR. PETROCELLI:  None of this.

22         THE COURT:  Why not?

23         MR. CONRATH:  No, because there were so many other

24   things to question him about in his deposition.

25         THE COURT:  I'll tell you what.  Why don't you go

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   question him about other stuff.  At the moment I'm not going

2   to allow this in.

3            MR. CONRATH:  Okay.

4            (Open court)

5            THE COURT:  Let's move on to another topic.

6            MR. CONRATH:  All right.

7   BY MR. CONRATH:

8       Q    One of the things that you talked about with

9   Mr. Petrocelli was your statement that the value of content

10  depends entirely on how many people watch the content.

11           Do you remember that discussion?

12      A    Yes, I do.

13      Q    So that's not 100 -- that's not always true, is

14  it?  For example, let's take HBO.  HBO could cut its price

15  in half and get a lot more viewers, but that doesn't make

16  any sense, does it?

17           The people who run it -- go -- the people who run

18  HBO have decided that it makes sense to sell less of HBO at

19  the price they're charging, rather than to cut it low and

20  make it -- get more viewers, right?

21      A    I'm sorry.  Was the question -- what was the

22  question?

23      Q    So the question is:  Sometimes it makes -- it's

24  not only viewership that gives value to content, right?

25  Sometimes the content has value that can be obtained by not

 1   distributing it as widely as possible, like HBO?

 2       A    So I don't know what the price elasticity of HBO's

 3   content is.  I really don't.  I assume they're trying to

 4   optimize that.

 5            But I would tell you, as a matter of course,

 6   broader viewership is always better than less.

 7       Q    Making more money is always better than less,

 8   right?

 9       A    In business, that is correct.

10       Q    Glad to have learned one thing.  Thank you.

11            So one of the things that you've talked about in

12   the course of your testimony is the number of changes in the

13   industry, right?

14       A    The changes in the industry, yes, correct.

15       Q    So the fact that the industry has been changing

16   over these last five, eight years, has not stopped AT&T and

17   DirecTV from the increasing the price to its video

18   customers; is that right?

19       A    Yeah.  We've probably increased price most years.

20            What we have is a situation where content costs,

21   which is the biggest input element for video, content costs

22   escalate year in and year out.  And so in this business,

23   what you try to do is recoup as much of that through price

24   as you can.

25            But what we're finding is, as more competitive

1    alternatives find their way into the marketplace, it's

2    getting harder and harder to pass those costs along, that's

3    why you launch new products at lower price points like

4    DirecTV Now.

5         Q    Right.  So, for example, for your video

6    subscribers in this most recent January, you raised prices

7    something between four and five percent; is that right?

8         A    I don't know exactly what we did.

9         Q    And a year ago, in January 2017, you raised prices

10   about 5.1 percent; is that right?

11        A    I don't know.

12        Q    The year before that, the year before that, also

13   about 5-and-some percentage change?

14        A    Yeah.  I don't know the exact numbers.  I do know

15   content costs increased in all of those years.

16        Q    And in 2014, you had a price increase of

17   3.7 percent?

18        A    I don't know.

19             What year did you say?

20        Q    2014.

21             Now, you told us earlier, I think, that when you

22   acquired DirecTV, you were able to get the content costs

23   down -- your U-verse content costs down substantially; is

24   that right?

25        A    Yeah.  We created a significant cost savings from

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3447

1    the DirecTV acquisition.

2         Q    And you still had a cost increase, a price

3    increase in that year?

4         A    We did, we still had a cost increase and a price

5    increase even with the synergies.

6         Q    Now, you talked some about the FAANG companies,

7    Facebook, Apple, Amazon, Netflix, Google, right?

8         A    Okay.  Right.

9         Q    Let's talk about that topic a little bit.

10        A    Right.

11        Q    So one thing that you told me in your -- in your

12   deposition was that the importance of CNN and sports is that

13   they're live, live content, live programming.

14             Do you remember that?

15        A    Yes.

16        Q    And you still agree with that?

17        A    That those are still important?

18        Q    Yeah.

19        A    Yes, correct.

20        Q    And live programming matters, you told us, because

21   when you're working towards an advertising model, live is

22   critical because live people don't skip live; people don't

23   skip through the ads?

24        A    They don't tend to.

25        Q    Right, right.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1          And so Netflix doesn't have live sports, right?

 2     A    To date, I don't believe they do.

 3     Q    And they don't have news?

 4     A    I don't know if Vice is on there or not.  I'd have

 5  to check.

 6     Q    They don't have live news?

 7     A    What's that?

 8     Q    Netflix doesn't have live news?

 9     A    I believe that's correct.

10     Q    And Amazon doesn't have live news?

11     A    I believe that's correct.

12     Q    So what these companies provide is video on

13  demand; is that right?

14     A    By and large, Amazon has bid on sports rights.

15  I believe they carried the NFL in 2017.  I'm not exactly

16  sure.

17     Q    Okay.

18     A    But they have had NFL rights, so they do have some

19  live sports that they have carried.

20     Q    Right.  They had a small amount of NFL, right?

21     A    It's the NFL.

22     Q    True enough.  True enough.

23          And having -- but their main business is video on

24  demand, right?

25     A    I'm sorry?

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***   Filed 08/06/18   Page 3315 of 3826

3449

1     Q    But their main business is video on demand?

2     A    They're main video business is video on demand.

3     Q    Right.  Yes.

4          And DirecTV also has video on demand, right?

5     A    We do.

6     Q    And having video on demand complements the live

7     sports and live news that DirecTV provides, right?

8     A    Depends.  For who?  I mean, if we're talking video

9     on demand in general, I don't think any -- in this day and

10    age, you cannot characterize all customers the same.

11    Q    No.

12    A    Half, half of all the Millennials in the United

13    States have no subscription service to a satellite or a

14    cable subscription, half.

15         Now, they're obviously finding ways to get live

16    content.  There are several ways they can get it.  But

17    they're largely using subscription video on demand,

18    SVOD-type services.

19    Q    All right.  And so for -- when you say they're

20    finding a way to get it, you're, I think, agreeing with me

21    that video on demand is in substantial part, a complement to

22    the live sports, live news that you get --

23    A    For those 50 percent of Millennials, it is not a

24    complement.  It is a replacement.  There are another 20 to

25    30 million households in the United States who have no

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3450

1   pay-TV subscription.

2          These people are not going without entertainment.

3   They're not going without news.  And they're not going

4   without sports.  We know they're consuming it.  They're

5   finding alternatives to consuming it, and that number is

6   growing.  It's not shrinking.

7          We lost, last year, DirecTV, lost 1.2 million

8   subscribers in 2017.  The whole system, pay TV, cable,

9   satellite, lost 3 million.

10         Netflix just released their results this week.

11  They added 2 million U.S. subscribers this last quarter

12  alone.  So we know they're getting entertainment and media.

13  They're just not getting it from the traditional cable and

14  satellite services.

15      Q    All right.  So let's break down a couple of parts

16  of that.

17         You said the whole system lost something like

18  3 million households, right?

19      A    3 million.

20      Q    And that's on a base of more than 90 million,

21  right?

22      A    Correct.

23      Q    So it's declining, but it's still pretty

24  substantial.  More than 90 million households in the

25  United States is still pretty substantial, right?

```
1       A      It's declining at a rapid pace.

2              This conversation feels a little bit like ones I

3   used to have when wireless was replacing wireline

4   telephones.  We used to kid ourselves into thinking, you

5   know, it's not declining that fast; and before long, it was

6   gone.

7              This is that same kind trajectory that we're on.

8       Q      That was a loss of 3 million out of 90 million,

9   90-plus last year, right?

10      A      That is correct.

11      Q      And when you say there are 20 or 30 million

12  households that don't currently have a pay-TV subscription,

13  it's true that there have never -- it's never been the case

14  that all households in the United States have a pay-TV

15  subscription?

16      A      That's correct.

17      Q      So there's some number of those people who just,

18  for whatever reason, their own preference, their economic

19  situation, whatever, they're just not buying a cable or

20  satellite or other subscription service, right?

21      A      That's correct.

22             But that number is growing, and the subscription

23  number is declining unequivocally.

24      Q      Now, you said that what you're accomplishing, what

25  you want to accomplish in this merger is to put together a
```

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***   Filed 08/06/18   Page 3318 of 3826

3452

1    distribution company and a content company.  That's the

2    vertical integration that you're talking about here, right?

3        A    That is correct.

4        Q    So you also said that Netflix, in your view, is

5    completely vertically integrated.

6             Do you remember that?

7        A    I do.

8        Q    But let's break that apart, because, first, while

9    Netflix does some production, Netflix also does buying of

10   content itself, right?

11       A    Yes, they do.

12       Q    Right.  So they're partially virtually integrated

13   upstream, right?

14       A    I guess you would have to say that, but probably,

15   there's nobody who's 100 percent vertically integrated,

16   including AT&T after this deal is done.

17       Q    Fair enough.  Fair enough.

18            And Netflix doesn't have a distribution company

19   that delivers content into the house.  They have to go over

20   somebody else's broadband network, like maybe AT&T's, right?

21       A    Or wireless.

22            But they deliver their content directly to the

23   consumer without going through anybody else.

24       Q    Well, let's be precise.

25            They deliver their content to the consumer going

1    through a broadband company or a wireless company, right?

2       A    Their content is traversing a wireless or a

3    broadband service.

4       Q    All right.  So they're not vertically integrated

5    in the same way that AT&T would be vertically integrated

6    after this merger, right?

7       A    No.  They have a -- I disagree.

8            You're talking about a refinement.

9            They create, develop, aggregate, and deliver

10   content directly to the consumer.  They have a direct

11   relationship with the consumer.  They're not going through

12   anybody else.  Their relationship is one on one with the

13   consumer.

14           They have a billing relationship.  They have email

15   addresses.  They have the capability to communicate with the

16   consumer.  That is basically what we're talking about here

17   with AT&T.

18           Now, they happen to buy a broadband service or a

19   wireless service also from us.

20           But we have a relationship with the consumer.

21   When you put Time Warner with it, we will have content

22   aggregation and content creation.

23           So there's not a lot of difference in terms of the

24   market behavior of the two.

25       Q    So let's try to focus on my question.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3454

1           You understand, Mr. Petrocelli gets a chance to

2      come back and ask you more questions.

3           A    Okay.

4           Q    My question, let me rephrase it.

5                So Netflix has to go through somebody else's

6      distribution, broadband or wireless, in order to get to

7      customers, correct?

8           A    The traverse is somebody else's broadband service.

9           Q    That's also true of Amazon?

10          A    That is correct.

11          Q    And that's also true of Apple?

12          A    That is correct.

13               May I?

14               It's also true of DirecTV Now it's also true of

15      HBO's direct-to-consumer product.  I mean, they're all the

16      same.

17          Q    The FAANG companies that you talked, let's be

18      precise about what they're doing.

19               So Facebook, for example, does not have a virtual

20      MVPD?

21          A    That is correct.

22          Q    And nor does Amazon?

23          A    Facebook, I believe, recently announced their

24      intention to do one.

25          Q    They're going to do something that's kind of a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3455

1    YouTube-type project, right?

2         A    Yeah.  But I thought -- my recollection is -- and

3    I will subject this to check, but that it was going to have

4    premium content.

5         Q    And Apple does not have virtual MVPD?

6         A    They do not.

7         Q    And Google does, they have YouTube TV, right?

8         A    That is correct.

9         Q    And that has about 300,000 subscribers?

10        A    I think that's the latest count.  They just

11   launched last year.

12        Q    You talked a little bit about Amazon Prime, do you

13   recall that discussion?

14        A    I do.  They just added 100 million subscribers.

15        Q    And you talked about them having, I think your

16   words were, free access to Amazon content.

17        A    I'm sorry.  Three what?

18        Q    Free access to --

19        A    Oh, free.

20        Q    -- Amazon content.

21             But to be clear, everybody who's an Amazon Prime

22   member has paid to be an Amazon Prime member, right?

23        A    That is correct.  There's a fee that goes with

24   that.

25        Q    Right.  And Amazon Prime is mainly about free

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3456

```
 1   shipping from Amazon?

 2        A    Yeah.  So if you're an Amazon Prime customer, you

 3   get a lot of benefits from Amazon, including free shipping

 4   and access to this content.

 5        Q    Right.  And there may be quite a few Amazon Prime

 6   of that large number of Amazon Prime numbers who don't even

 7   know that there's some Amazon Prime access to video content

 8   associated with their free shipping?

 9        A    I suspect that's right.

10        Q    Let's talk a little bit about ad spending because

11   you talked about wanting to compete with Facebook and Google

12   for ad spending, right?

13        A    Correct.

14        Q    So the amount of money that Facebook and Google

15   make on advertising is from digital advertising; is that

16   right?

17        A    That's correct.

18        Q    And the category of digital advertising is

19   actually pretty broad, right?  It includes things like ads

20   that show up when you search, right?  That's --

21        A    Right.

22        Q    -- digital advertising?

23             Paid classifieds, like Craigslist, that's digital

24   advertising?

25        A    Right.
```

1        Q    Right.

2             Job listings, that's digital advertising?

3        A    Correct.

4        Q    Real estate listings, that's digital advertised

5   listings.  That's digital advertising?

6        A    Yes.  I -- yes, correct.

7        Q    It also includes display ads that show up on a

8   Website.  If I'm reading a Website and there's an ad on the

9   right-hand side, that's digital advertising as well, right?

10       A    It would be, yes.

11       Q    So the many of these kinds of digital advertising

12  don't really lend themselves to showing up in a television

13  spot, correct?

14       A    It's not relevant.

15            Advertisers are trying to get to consumers in a

16  very targeted way.  So if they can use a banner ad in a

17  Website, versus placing a TV ad on a television show, it's

18  the same ad dollars; they're just being used different ways.

19       Q    Well, there are some kinds where television ad

20  could be the same.  There's also a substantial part of

21  digital advertising that it's going to be a really hard sell

22  for you, isn't it?

23       A    Our objective is not to pursue digital

24  advertising.  Our objective is to pursue premium video

25  advertising, but using a model very similar to what is used

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    in digital advertising for targeting, focused, measurable

2    kind of results.

3        Q    And I think you told us that what you -- or you

4    and others of your colleagues have told us is you want to go

5    after the Facebook and Google quantity of advertising, the

6    advertising that they're taking in that you'd like to have a

7    part of; is that right?

8        A    If I may rephrase it.

9        Q    Sure.

10       A    Our objective is to drive advertising in premium

11   video.  And if you get the model right, we are convinced

12   that a lot of the advertising dollars that have come out of

13   premium video and moved into digital, our advertisers, our

14   customers that are advertisers tell us they would love to

15   bring it back if you could create the same capability and

16   put it on premium video.

17            I'll tell you this.  We talk to advertisers.

18   You're hard-pressed to find an advertiser who says, I would

19   like to spend more with Facebook and Google.  They would

20   like to do more in premium video.

21            And so what we're trying to do is create a

22   platform that would attract them back to premium video.

23            THE COURT:  When you say "premium video," in that

24   situation there, you're not talking about YouTube?

25            THE WITNESS:  No.  I'm talking about TV,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   television shows, CNN, et cetera, Your Honor.

 2              THE COURT:  So movies?

 3              THE WITNESS:  To the extent there's advertising in

 4   movies, yes.

 5              THE COURT:  Okay.

 6              So movies, TV shows, not newscasts?

 7              THE WITNESS:  Yes, newscasts, CNN, if that's --

 8   yes, correct, CNN.

 9              THE COURT:  All right.  Go ahead.

10              MR. CONRATH:  All right.

11   BY MR. CONRATH:

12        Q    So you've told us, I think, and your colleagues

13   have said, you'd like to compete more to take over -- for

14   advertising with Facebook and Google, right?

15        A    I'm sorry, Mr. Conrath.  I didn't hear you.

16        Q    Sorry, the microphone.

17              You'd like to compete more with Facebook and

18   Google --

19        A    Correct.

20        Q    -- for advertising dollars?

21        A    I'm sorry.

22              Yeah, we would like to compete for their

23   advertising dollars, that is correct.

24        Q    It's also true, though, that you've also been

25   considering more cooperation with Facebook; isn't that
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3460

```
 1   right?

 2        A    Maybe something that's going on in the

 3   organization.  I don't know.

 4        Q    Well, you met with Mark Zuckerberg, who's the CEO

 5   of Facebook, in the summer of 2017; is that right?

 6        A    I believe that's correct.

 7        Q    And after that meeting, you had an email exchange?

 8        A    I don't recall.

 9             MR. CONRATH:  May I approach, Your Honor, with

10   PX558?

11             THE COURT:  558?

12             MR. CONRATH:  Yes.

13             THE COURT:  Thank you.

14             MR. CONRATH:  May I approach the witness,

15   Your Honor?

16             THE COURT:  You may.

17   BY MR. CONRATH:

18        Q    Mr. Stephenson, let me know when you have had a

19   chance to look at it.

20        A    Okay.  I've read it.

21        Q    Okay.

22             MR. CONRATH:  May I proceed, Your Honor?

23             THE COURT:  You may.

24             MR. CONRATH:  Okay.

25
```

Case 1:17-cv-02511-RJL Document 158 Filed 08/06/18 Page 3327 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3461

1    BY MR. CONRATH:

2        Q    So do you recognize PX558, Mr. Stephenson?

3        A    Yes, I do.

4        Q    And it's an email exchange between you and Mark

5    Zuckerberg of Facebook?

6        A    That's correct.

7        Q    And you exchanged this in the course of your

8    responsibilities as CEO of AT&T?

9        A    That is correct.

10           MR. CONRATH:  Your Honor, I move the admission of

11   PX558.

12           THE COURT:  All right.

13           No objection?

14           MR. PETROCELLI:  No.

15           THE COURT:  No.  It will be admitted.

16           MR. CONRATH:  All right.

17                                  (Government's Exhibit PX558
                                     received into evidence.)
18   BY MR. CONRATH:

19       Q    You wrote, Mr. Stephenson --

20           MR. PETROCELLI:  Your Honor, not for the truth.

21   Hearsay document, but come in for non-hearsay purposes.

22   I'm not sure it's being offered for the truth.

23           MR. CONRATH:  Well, it's being offered -- parts of

24   it are Mr. Stephenson's own statements.

25           THE COURT:  Right.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3462

```
 1              MR. CONRATH:  And it's a business record, and then
 2    the parts of it are someone else's statements.
 3              And obviously he's not --
 4              THE COURT:  Why don't you come up.  We'll discuss
 5    it.
 6              (Sealed bench conference)
 7              MR. PETROCELLI:  Your Honor, just to be clear, the
 8    statements by Mr. Stephenson are his party admissions, so
 9    those would come in, but not the statements by
10    Mr. Zuckerberg.  Those would not come in for the truth, and
11    it's not a business record.  It's an email.  It's like a
12    telephone conversation in writing.
13              So this part would be for non-hearsay purpose.
14    This part is not hearsay either because it's -- under the
15    Federal Rules, it's a party statement.
16              MR. CONRATH:  It's a party statement, right.
17              MR. PETROCELLI:  Right.
18              MR. CONRATH:  This a not a party statement.  And
19    it may -- it probably explains what he was saying, and so
20    it's relevant for that purpose as a part of this document.
21              THE COURT:  So as to the Stephenson portion,
22    that's fine.
23              Now, as to the Zuckerberg portion, what purpose
24    for which you want that admitted?
25              MR. CONRATH:  Well, it's necessary --
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              THE COURT:  Is it a narrative or a Business

2    Records Exception to the hearsay rule?

3              MR. CONRATH:  So I think it's a business record

4    for Mr. Stephenson, who kept it in his files.  It's a

5    business communication.  And it is, of course, an important

6    of understanding what Mr. Stephenson says.

7              MR. PETROCELLI:  I think it can come in --

8              MR. CONRATH:  Yeah.

9              MR. PETROCELLI:  -- for the non-hearsay purpose of

10   explaining Mr. --

11             MR. CONRATH:  Yeah.

12             MR. PETROCELLI:  -- Stephenson's comments.

13   I don't have an objection to that.

14             But it literally would not come in for the truth

15   of what Mr. Zuckerberg is saying.

16             THE COURT:  Yeah.

17             Well, I don't think it's a company admission.

18             MR. PETROCELLI:  Well, that's another point.

19             THE COURT:  I really don't think it is.

20             MR. PETROCELLI:  Yeah.

21             I mean, it's a --

22             MR. CONRATH:  He is -- I mean, he is the CEO of

23   the company.  When he speaks, it's effectively the company

24   speaking.

25             THE COURT:  No.  I'm talking about the Zuckerberg
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3464

```
 1   part.

 2           MR. CONRATH:  Oh, yeah.  No, no.

 3           MR. PETROCELLI:  Yeah.

 4           MR. CONRATH:  No, no.  I don't think either of us

 5   thinks that comes in.

 6           THE COURT:  The first part is definitely coming in

 7   for the truth of the matter asserted.

 8           I think the Zuckerberg part of it, I'm going to

 9   let that in as a business record.

10           MR. CONRATH:  Okay.  Thank you.

11           (Open court)

12           THE COURT:  You may proceed, consistent with the

13   discussion at the bench.

14           Go ahead.

15   BY MR. CONRATH:

16       Q    Mr. Stephenson, you wrote -- in the response, you

17   wrote to Mr. Zuckerberg that AT&T could give Facebook a lot

18   more of AT&T's ad inventory if Facebook could show that

19   doing so would yield better results, right?

20       A    I did.

21       Q    And Mr. Zuckerberg had written to you that he

22   might be able to help build your ad capabilities, right?

23       A    Yeah, but here's another one of these

24   customer-competitor relationships.

25           The first part of this email is Mark and me
```

1    talking as me, his customer.  And we hand them advertising

2    that they deliver to their customers.

3             And so the first part of this email is about, can

4    we give him more ads to deliver to his customers to try to

5    sell our products?  We use them; we pay them as a customer.

6        Q    And then he wrote that they might be able to help

7    you build your ad capabilities, right?  That's one of the

8    things that he said to you?

9        A    He did.  He wrote that.

10       Q    Okay.

11       A    Look, this was at -- in Sun Valley at the annual

12   confab.  And people run into each other.  You sit down out

13   by a duck pond, and you have casual conversation,

14   particularly when you're a large paying customer to them.

15   And you have conversations.

16            He followed up with an email.  There was never a

17   single minute of follow-up from this.  This was a passing

18   kind of exchange.

19       Q    And another thing you wrote to him in your

20   response was the Time Warner acquisition should offer both

21   of us areas to consider in the future, right?

22       A    I did.

23       Q    And just simply put, you're the CEO of AT&T.  If

24   there were more money to be made from cooperating with

25   Facebook than from competing with it, you'd have to choose

1    the option that was better for AT&T?

2        A    Well, it depends on what relationship you're

3    talking about.

4              There is Facebook, the competitor.  In

5    advertising, they're a competitor.  There's Facebook, the

6    customer.

7              A company like Time Warner that creates lot of

8    premium content and a company like Facebook that has

9    signaled that they intend to go into premium content, they

10   would be a customer at some point.  And so I just think it's

11   really good to keep relationships with people open for those

12   kind of situations.

13       Q    Okay.  You can put that aside.

14            Part of what you hope to do with Time Warner and

15   AT&T combining is to build something that you call a

16   programmatic ad platform; is that right?

17       A    Yes, sir.  That's correct.

18       Q    And we talked about this a little bit in your

19   deposition, right?

20       A    We did.

21       Q    And you told us at your deposition that this is

22   something that is going to take time, right?

23       A    Yes, it will.

24       Q    And it's going to take technology, including --

25   that includes technology that AT&T doesn't have right now,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3467

1  right?

2       A    That is correct.

3       Q    And so you might have to buy technology or

4  technology companies?

5       A    It's always build or buy decisions.  It's a

6  function of time to market, generally, is what makes those

7  decisions.

8       Q    So you might have to build some technology that

9  doesn't even exist today?

10       A    There is technology like this that exists.  It may

11  not exist within AT&T, but it exists.  It's not like it's

12  new science or new rocket science.  It's technology that

13  it's out there and does exist.

14       Q    And I think you told us that the upshot of this is

15  that you'll be old and retired by the time AT&T will have a

16  programmatic platform that could be selling to other media

17  companies like Fox or Disney, right?

18       A    I'm already old.  I don't know how close I am to

19  retirement.  But it well take time to stand this up.

20            For other players -- I mean, I want to be really

21  clear about this.  The ability to build an exchange, to sell

22  our own advertising inventory and have advertisers coming in

23  and exchanging and then actually building campaigns

24  themselves into our advertising inventory, I -- that is

25  something that we can stand up, I am confident, fairly

1   quickly.  There are companies that can be acquired that can

2   accelerate that significantly, and so those kind of

3   capabilities will be stood up in reasonably short order.

4          Now, over what period of time will others see what

5   you're doing and say, we would like to be apart of that?

6   Because you're building an exchange.  And anybody can come

7   and participate in an exchange, and it will be open to all.

8   So I really can't say how long that will be.  But that's an

9   aspiration, is to ensure that it's available for all.

10     Q    And, in fact, I think, didn't you tell us that to

11  make it really work and be successful, you need to get

12  others to put their ad inventory into the platform?

13     A    It would actually drive more scale, I believe we

14  can be very successful just with our own ad inventory.

15     Q    You have talked about the idea of using -- the

16  idea that maybe if you can get more ad revenue, that might

17  have the effect of making it possible to reduce or limit the

18  price increases to your consumers.

19          Do you recall that discussion?

20     A    Yeah.  That's a very important piece of it.

21     Q    So just looking historically, in 2017, AT&T

22  collected 7 percent more ad revenue than it had in the year

23  before, but you still increased subscriber fees in 2018;

24  isn't that right?

25     A    It's a rather small business today.  It's a

1   $1 billion business.  And so if it were up 7 percent, that's

2   $70 million.

3          So you can't say just because prices went up, that

4   it had no effect on pricing.  It's a small number.  It's

5   hard to measure, but --

6   Q    Well, in fact, if we looked back, AT&T has had

7   increases in its ad revenues over the last four years, and

8   yet has had pretty substantial consumer price increases in

9   every one of those years; isn't that true?

10  A    It's a still small and very nascent business.

11  Q    Now, in trying to achieve the synergies that you

12  hope to accomplish with this merger, one issue involves

13  corporate culture, right?

14  A    I'm sorry?

15  Q    Let me ask it this way.

16         AT&T and Time Warner have very different corporate

17  cultures, correct?

18  A    Yeah.  Most companies do have different cultures.

19  Q    And some people would describe AT&T as a pipes

20  company, somebody that delivers data --

21  A    I don't describe it that way.

22  Q    I understand you don't, but I believe we talked

23  about this in your deposition.

24         That's the -- AT&T delivers data through pipes or

25  wires to people's households, right?

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3336 of 3826

3470

1      A      That's one of the services we provide.

2      Q      Right.

3             And Time Warner is a creative company?

4      A      Yes, they are.  Their whole business proposition

5   is around creativity.

6      Q      And when two companies merge, having different

7   cultures is a potential source of risk; is that right?

8      A      It always is.  We've done a number of business

9   combinations.

10            It's always one of the more difficult issues to

11  manage through.

12     Q      And, in fact, you've said about this cultural

13  divide, between AT&T and Time Warner, that this is the issue

14  that will determine the success or failure of the deal?  Can

15  we maintain the culture necessary to continue attracting the

16  talent and creativity in a media and entertainment company?

17            You said that, didn't you?

18     A      It's the very reason behind the organization's

19  structure that Mr. Petrocelli took me through.

20     Q      And there's no guarantee that culture clashes

21  aren't going to interfere with achieving some of the

22  synergies that you hope to achieve or the efficiencies that

23  you hope to achieve?

24     A      I disagree with that.

25            And there's no guarantee, but the efficiencies

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   we're talking about here, particularly redundant costs and

 2   removing redundant costs, vendor billings, standing up an

 3   advertising business, I don't think the creative culture is

 4   going to get in the way of achieving those.  We can achieve

 5   the lion's share of those just through normal business

 6   operations.

 7            The culture, the preserving the culture, that is

 8   the main reason we're talking about organizing the business

 9   the way we are, is to preserve the culture of both

10   companies, by the way.

11       Q    And when you talked about how the business is

12   going to be organized into separate groups, you, in essence,

13   were trying to tell us that there's going to be a wall of

14   sorts between the media company and the communications

15   company; is that right?

16       A    No.  I didn't mention anything about a wall.

17       Q    Well, they're going to be kept separate in some

18   important ways, right?

19       A    They're going to be operated and run independently

20   and autonomously, they'll have their own profit objectives.

21   And they'll be making their own business decisions and

22   strategic decisions and capital allocation decisions.

23       Q    Then they all report up to you; is that right?

24       A    That is correct.

25       Q    And you're going to be responsible for setting the
```

1  overall direction of both the media company and the

2  communications company, right?

3       A    That is correct.

4       Q    And, in fact, I think you told us in your

5  deposition that there's only one strategic planner at AT&T

6  and it's you?

7       A    I lead the whole process.

8       Q    Right.

9            And as the CEO, you have an obligation to maximize

10  shareholder value, right?

11       A    I do.

12       Q    And if that means making sure that the different

13  parts of the company work together, you'll make sure they

14  work together?

15       A    My job is to create long-term shareholder value.

16       Q    And it is correct, isn't it, that the management

17  at AT&T for most senior executives, their -- a very

18  substantial part of their compensation is tied to the

19  overall company's stock price?

20       A    That is correct.  They're compensated with AT&T

21  stock, so, thereby --

22       Q    You, I think, told us that you -- well, you had a

23  communication with Jeff Bewkes of Time Warner in early

24  August 2016, right?

25       A    That's correct.

1          I don't remember the date.  I thought it was later

2     in August, but you may be right.

3          Q    So I think your meeting was later in August,

4     right?

5          A    Oh, we had a phone call; you're correct.

6          Q    You had a phone call in early August.

7               And you relayed that phone call or reported on it

8     to John Stankey in an email; is that right?

9          A    I remember that, yes.

10         Q    Yeah.

11              Could you turn to PX47 in your binder.

12         A    47?

13         Q    Yes.

14         A    I'm sorry.  I'm not seeing 47.  Maybe it's back.

15    Hang on.

16         Q    It's the second one in.

17         A    Second one in.

18              Oh, I got it.

19         Q    And PX47 is an email from you to John Stankey and

20    a couple of other -- and Lori Lee and John Stephens, right?

21         A    Yeah, that's correct.

22         Q    Subject, Jeff Bewkes.

23              And this is your reporting of a conversation that

24    you had with Mr. Bewkes, right?

25         A    That is correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3474

```
 1          MR. CONRATH:  Your Honor, I move the admission of

 2   PX47.

 3          MR. PETROCELLI:  No objection.

 4          THE COURT:  All right.  It will be admitted.

 5                              (Government's Exhibit PX47
                                 received into evidence.)
 6   BY MR. CONRATH:

 7     Q    So looking at -- do you need to read this over to

 8   remind yourself of the event?

 9     A    I've read it.  I've read it.  Thank you.

10     Q    Okay.  Sure.

11          So in this telephone conversation that you're

12   reporting here, Mr. Bewkes told you that Time Warner was

13   going to announce the next day that it was taking a

14   10 percent ownership stake in Hulu, right?

15     A    Correct.

16     Q    And further, Mr. Bewkes told you that Hulu was

17   going to launch an over-the-top MVPD-type service offering

18   that included Turner content and also other large

19   programmers, right?

20     A    I don't recall if it had all that specificity, but

21   I believe that's correct.

22     Q    It's in the second sentence there of the email.

23     A    Yeah.  I just didn't have the specificity of what

24   Time Warmer content is what I was saying.

25     Q    You're correct.  Right.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3475

1          And Mr. Bewkes said to you he didn't think it

2    would impact our relationship with them, right?

3          A    Correct.

4          Q    And you responded and disagreed with that

5    proposition, right?

6          A    Yeah.  I didn't say how it wouldn't affect our

7    relationship, because all relationships are changing right

8    now.

9          Q    Right.

10          I mean, these -- "Thanks for the call, but it's

11    hard to imagine it won't impact all of our relationships,"

12    is what you said?

13          A    Yes.

14          Q    Were you a little annoyed with him for that?

15          A    No, I wouldn't I was annoyed.  It was the same

16    call I asked if we could get together and talk.

17          Q    Right?

18          A    But what I was articulating is, look, everybody is

19    trying to figure out how to maneuver in this new world.  And

20    so what I was articulating was, you're going to take your

21    content and put in a virtual MVPD.  We're standing our own

22    up.

23          What I hope is we get the same rights for ours.

24    I hope we get the same stacking rights.  That's what we were

25    trying to convey in here, make sure we're all treated the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  same in this world.

2      Q    Okay.  So let's take that step by step.

3           You said to Mr. Bewkes, "We are trying to figure

4  out how to navigate a very new world where you folks are

5  going around us, while trying to preserve the old revenue

6  streams and business models from us."

7           That's what you said to Mr. Bewkes, right?

8      A    Correct.  You're trying to go direct to the

9  consumer --

10     Q    Right.

11     A    -- but at the same time preserve the revenue

12  streams from us exactly as they are.

13     Q    Right.

14          And so "going around us," you meant this virtual

15  MVPD thing they were getting into?

16     A    As one example, yeah.

17     Q    Right.

18          And -- but what you said in your deposition was

19  that you were concerned about whether Time Warner, with this

20  ownership stake in the Hulu product, would preclude it from

21  licensing content to AT&T, that same content for AT&T's

22  virtual MVPD, DirecTV Now, right?

23     A    That's what I was trying to say earlier, is that

24  we just -- what protection do we have if you go take an

25  ownership stake that we'll still have access to the content?

1  We just want to make sure we get the same access.

2      Q    So you were afraid that them being a part-owner of

3  a virtual MVPD might make them -- didn't mean that they

4  would necessarily want to license their content to your

5  virtual MVPD?

6      A    Just trying to make sure we had the same access as

7  others.

8      Q    You can set that aside.

9          When you were talking about how you came to do

10  this deal with Time Warner, you told us that previously, you

11  had a string of pearl -- a different option, the "string of

12  pearls" option.

13         Do you remember that testimony?

14     A    I do.

15     Q    And you had to plan that way to go ahead and

16  acquire content companies, a number of different ones,

17  right?

18     A    Correct.

19     Q    And your Board of Directors had been onboard with

20  that plan?

21     A    They had given us permission to go forward.

22     Q    Right.

23         And you'd already talked to two potential pearls?

24     A    We had.

25     Q    And if you hadn't been able to come to a deal with

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3478

1  Time Warner remember, you would have continued work on the

2  "string of pearls" approach?

3      A    That would have had to have been some kind of

4  fallback position.

5      Q    And that's because you said you have a need, you

6  felt you already had decided you had a need to own content?

7      A    Yeah.  It's hard to say if we didn't do

8  Time Warner exactly what we'd do.

9           It's kind of hard to even put myself in that

10  position right now.

11      Q    All right.  But you'd already decided you had a

12  need to own content?

13      A    We had.  We concluded we wanted to own content.

14      Q    So one of the ways you might have owned content

15  came up in the course of having conversations with the

16  Department of Justice about this lawsuit; is that right?

17      A    I'm sorry.  I did not hear you.

18      Q    Sure.

19           One of the ways that you might have come up with

20  owning content -- let's back up.

21           You had some discussions with the Department of

22  Justice before this lawsuit got started, right?

23      A    Meaning regarding this transaction?

24      Q    Yes.

25      A    Correct, we did.

1          Q    Right.

2               And one of the suggestions that the Department of

3     Justice made to you would have indicated a willingness to

4     permit AT&T to acquire all of Warner Brothers?

5          A    To acquire all of what?

6          Q    Warner Brothers.

7               MR. PETROCELLI:  May we approach?

8               THE COURT:  You may.

9               (Sealed bench conference)

10              MR. PETROCELLI:  So I object that he's trying to

11    get into settlement discussions to suggest that the

12    department is okay with acquiring Warner Brothers or HBO but

13    not Turner, in order to, perhaps, argue in this case that if

14    we get two of the businesses, that that's okay but we can't

15    get Turner.

16              As I've indicated before, I've pled this case all

17    or nothing.  Trying to now negotiate with the Court to

18    hive off one company, we see this in their DirecTV motion

19    opposition as well, Your Honor.

20              THE COURT:  Well, let's ask him where he's going.

21              MR. PETROCELLI:  Okay.  I just wanted to make an

22    objection.

23              MR. CONRATH:  Thank you.

24              MR. PETROCELLI:  It's not relevant.

25              And, also, we're talking about settlement

1   discussions, too.

2         MR. CONRATH:  But we're not offering them for a

3   limited purpose, which is, there is one narrow purpose.

4         THE COURT:  What's your purpose?

5         MR. CONRATH:  The narrow purpose is to show that

6   there are -- that the efficiencies they claim for wanting

7   some of the content are not merger-specific.  So they could

8   have acquired Warner Brothers and HBO and achieved whatever

9   efficiencies they say they want.

10        THE COURT:  How do they know that?

11        MR. CONRATH:  Because --

12        THE COURT:  They said that.

13        MR. CONRATH:  Because my colleagues told them that

14   they could go ahead, if they acquired --

15        THE COURT:  That doesn't mean a deal can be made.

16   If your colleagues say that we're not going to oppose you if

17   you want to go talk about Warner Brothers, maybe

18   Warner Brothers wouldn't have sold themselves to you.

19        MR. PETROCELLI:  Nor would they buy just those two

20   entities.

21        MR. CONRATH:  That's my point.  It's their choice.

22   It's their choice to acquire -- to do an all-or-nothing

23   deal.  They were offered the opportunity to acquire these.

24        THE COURT:  I'll give you a little leeway to ask

25   questions, but we're not going to get into settlement

1    discussions.  We're not going to get into hypothetical

2    discussions that never occurred because I don't think that's

3    fair.

4               I mean, if they have never talked to

5    Warner Brothers about acquiring them -- it's one thing to go

6    out and have acquisition conversations with pearls and maybe

7    try to buy the pearls and they fall through or, for whatever

8    reason, they don't work out.

9               But hypothetical possibilities --

10              MR. CONRATH:  Let me put it -- I guess maybe

11   I didn't explain it exactly right.

12              What the possibility is that they could

13   go ahead -- they already had the contract at that point, so

14   what they could have done --

15              THE COURT:  On track with Time Warner?

16              MR. CONRATH:  With Time Warner, right.

17              THE COURT:  Okay.

18              MR. CONRATH:  So they could have sold Turner --

19   gone ahead with the contract and sold Turner and, therefore,

20   acquired Warner Brothers and HBO.

21              THE COURT:  We don't know if Time Warner would've

22   agreed to that.  We don't know.

23              MR. CONRATH:  Yeah, because they have a contract

24   to --

25              THE COURT:  Time Warner?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3482

```
1           MR. CONRATH:  -- with all of them already.  They
2     already have the contract with Time Warner.
3           They could say, Okay, we're going to go ahead with
4     that contract, and we agree to sell Turner.  That would have
5     resolved it and allowed them to acquire those two to show --
6           MR. PETROCELLI:  This is settlement discussions,
7     Your Honor.  And their proposal was categorically rejected.
8     It would destroy the value of the deal.  That's not the
9     transaction.
10          THE COURT:  Yes.  I'm not inclined to let you go
11    down this road.  Think it through.  Maybe there's another
12    way to get into it.
13          You've already talked about the pearls.  He's
14    already mentioned that they looked at other options.  We're
15    going to take a 15-minute recess.  You're at the 53-minute
16    mark.  So to be equal to Mr. Petrocelli -- he did an hour
17    and 12 minutes -- you've got 19 minutes left.
18          MR. CONRATH:  Okay.  Perfect.
19          MR. PETROCELLI:  Thank you, Your Honor.
20          (Open court)
21          THE COURT:  We're going to take an afternoon
22    recess.
23          You remain a witness under oath.  You know the
24    rules.  Don't discuss your testimony with anybody.  See you
25    back in 15 minutes.
```

```
 1              DEPUTY CLERK:  All rise.

 2              This Honorable Court will now take a brief recess.

 3              (Recess from 4:12 p.m. to 4:33 p.m.)

 4              DEPUTY CLERK:  The United States District Court

 5    for the District of Columbia is again in session, the

 6    Honorable Richard J. Leon presiding.  God save the United

 7    States and this Honorable Court.  Please be seated and come

 8    to order.

 9              THE COURT:  All right.  The witness remains under

10    oath.

11              You may continue.

12              MR. CONRATH:  Thank you, Your Honor.

13              I have one housekeeping mattering, if I can, which

14    is PX558 was admitted, but I'd like to request that it be

15    admitted under seal until we can make one redaction on it.

16              THE COURT:  All right.  Is that all right with the

17    defendant?

18              MR. PETROCELLI:  No objection.

19              THE COURT:  All right.

20              MR. CONRATH:  Thank you, Your Honor.

21                             (Government's Exhibit PX558
                                received into evidence under seal.)
22    BY MR. CONRATH:

23       Q    Mr. Stephenson, you talked a little bit about the

24    desire to do targeted advertising by using information about

25    customers and marrying that with the inventory of
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   Time Warner; is that right?

 2        A    That is correct.

 3        Q    And you want AT&T, for example, to be able to tell

 4   a car dealer that someone who saw an advertisement actually

 5   showed up on a car lot?

 6        A    That would be an opportunity.

 7        Q    And you'd do that by tracing the person's location

 8   through their cell phone, right?

 9        A    With their permission.

10        Q    Right.

11             And you want to be able to distribute Turner's

12   advertisements through Turner's content into the mobile

13   environment, because I think you said AT&T knows so much

14   more about the customer when they're consuming in the mobile

15   environment; is that right?

16        A    I didn't follow all of that.  I'm sorry.

17        Q    Sure.  Let me phrase it again.

18             I think you told us at your deposition that

19   it's -- one of the reasons you want to be able to put Turner

20   content into the mobile environment is that AT&T knows so

21   much more about the customer when they're consuming in the

22   mobile environment?

23        A    Correct.

24        Q    And when they're in the mobile environment,

25   you know -- you can know where customers are?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        A    Is that what the deposition said or is that --

 2        Q    That's a question to you.

 3        A    Oh, okay.

 4             Yeah.  When you have location-based data with

 5   their permission, it gives you good insight for advertisers.

 6        Q    And you know what Websites they visit?

 7        A    Again, with their permission.

 8        Q    Including after they view a particular

 9   advertisement?

10        A    After they what?

11        Q    Including you know what Website they go to after

12   they view a particular advertisement?

13        A    That can be discerned.

14        Q    And when you say this is with permission, it's

15   correct, isn't it, that some of the data that you collect is

16   where the consumer has to opt in to give permission; and

17   there's other data, though, that you collect on consumers,

18   where the consumer has to opt out.  If they just do nothing,

19   the data is collected; isn't that right?

20        A    I don't know if that's accurate.

21        Q    It just shows up as part of the sign-up; isn't

22   that right?

23        A    I'm sorry.

24        Q    The agreement to allow AT&T to use the data shows

25   up as part of the sign-up, unless the consumer affirmatively
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3486

1    opts out, for some of the data that you collect; isn't that

2    correct?

3         A    There is a requirement that they must select to

4    allow us to use their data.

5         Q    And your wish to use the data is to produce -- to

6    send consumers more targeted advertisements;

7    isn't that correct?

8         A    That is correct.

9         Q    And you don't really have a way of knowing if

10   consumers want targeted data based on all their information

11   of where they've been, what Websites they visited, and what

12   other -- and that kind of information, do you?  You don't

13   know if consumers really want that?

14        A    The consumer would be required to opt in to allow

15   us to use their information for that purpose.

16        Q    But you don't know if they'd really want it?

17        A    I don't know how to answer the question.

18        Q    Okay.

19             Could you turn to PX -- oh, I'm sorry, DX609,

20   which is the document that's in your small -- it's in the

21   small binder that Mr. Petrocelli gave you.

22             And I want to direct your attention to page 8 of

23   DX609.

24        A    Okay.

25        Q    Okay.  You have that?

1        A    I do.

2        Q    That's the -- this is the page you talked about

3    with Mr. Petrocelli, right?

4        A    Correct.

5        Q    So under the heading, key issues/concerns, you

6    have three bullets, right?

7        A    Correct.

8        Q    The first one says, "How can you advantage your

9    own distribution -- TV, broadband, wireless -- without

10   harming Time Warner's position as a wide distributor of

11   content to other SVOD cable networks and broadcast

12   networks."

13            Right?  Did I read that right?

14       A    I see it, yes.

15       Q    And the second one says, "How to use distribution

16   business to increase the value of the media business."

17            Do you see that?

18       A    I do.

19       Q    And if I understood your description of this in

20   the discussion with Mr. Petrocelli, you said that you, in

21   using these notes to talk to the Board, you basically

22   rejected the first point, but you wanted to pursue the

23   second point; is that right?  Did I understand that

24   testimony right?

25       A    That's what I was conveying.  But as you see in

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3488

```
 1   the third bullet, it's not yet clear to me how we execute on

 2   all of this.

 3       Q    Right.  And I don't recall you talking about the

 4   third bullet earlier.  But I think what it says is, "Jeff

 5   and I discussed at length it's not clear to me how we

 6   execute on this."

 7            Right?

 8       A    Right.

 9       Q    So it doesn't say -- in the third bullet, it

10   doesn't say anything about rejecting the first bullet, about

11   advantaging your own distribution, does it?

12       A    It doesn't say it specifically, no.

13       Q    And both of the two key issues, the first two key

14   issues and concerns are phrased similarly, right?  How can

15   you do this?  How to use this.  That's a parallel

16   construction, isn't it?

17       A    I'll take your word for the grammatical

18   description.

19       Q    And the third bullet says you discussed it; you

20   don't know how to execute on it, right?

21       A    Correct.  We have two issues here.  And as you

22   evaluate this transaction, here are two issues you have to

23   understand.

24            Can you use the media and entertainment content to

25   advantage your distribution business?  That's the hard one.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3489

1          When -- as you can see here, when, as a wide

2    distributor of content, that's the criterion.  It has to be

3    a wide distributor of content.

4          So can you use something that requires wide

5    distribution to advantage your own distribution?

6          That's a question.  I don't see how you execute on

7    that.  It's not yet clear exactly how you execute on that.

8          How to use distribution to increase the value of

9    the media business, that's a question.  But I feel like

10   I have better framework.  I have better understanding as to

11   how you do that.

12         The first one, it wasn't clear to me how you could

13   ever execute on that one, period.

14   Q    Well, there's nowhere in these notes that you made

15   for the preparation of the Board that says that you can't do

16   the first bullet or you don't want to do the first bullet or

17   anything negative about the first bullet, is there?

18   A    These are mental notes for me.  This is not a memo

19   to my Board, where I'm going to be audited and they're going

20   to ask me, exactly what does this mean?  These are cues from

21   me to talk to my Board about.

22         And the cue for me, I knew where I was going with

23   this.  The cue for me is, ask the Board, how can you use

24   your distribution business to -- or the content to advance

25   your distribution business?

1          You probably can't.  And I was telling the Board,

2    you need to get your head around that.  Don't think that's a

3    value creator.

4          The second one -- as a cue to me and my memory,

5    the second one is easy.  That one is easy to grasp and

6    understand.  These are mental cues from me in discussing

7    with them, not a memo.

8      Q    Well, you understand that the first bullet there,

9    the first part of it, "How can you advantage your own

10   distribution?" is parallel to the government's case here;

11   isn't that correct?

12     A    And it's an important question.  In fact, the

13   reality of it is, you can't.  You can't make a value

14   equation work if you're going to use the content to

15   advantage your own distribution.

16         So set the government case aside.  There's just no

17   business logic to it.  That's basically the premise of this

18   statement.  There is no business logic.

19     Q    What it is is a question of how to do it.

20         And let's just be clear.  You're expecting us to

21   take your explanation today that what you meant when you

22   wrote it then, where it doesn't say anything negative about

23   it, your explanation today is that it was your cue to

24   yourself to tell the Board that this was impossible?

25     A    Well, regardless of how one might want to

 1    attribute my intent in this memo, the reality is -- as you

 2    go through all the documents on this deal, the reality is,

 3    we've said you can't do it.

 4         The value of the content is broad distribution.

 5    The two don't go together.  They don't match.  They're

 6    inconsistent equations.

 7         And so regardless here -- and the intent of this

 8    was to tell the Board, you can't do that.  Don't have that

 9    in your mind.  It doesn't work from a business standpoint.

10         I wasn't even talking about it from an antitrust

11    standpoint.  Just from a business standpoint, it doesn't

12    make sense.

13         MR. CONRATH:  May we approach the bench?  I have a

14    question, Your Honor.

15         THE COURT:  Yep.

16         (Sealed bench conference)

17         MR. CONRATH:  So I am only here because I wanted

18    to make sure I was not in the final --

19         THE COURT:  You can pull that out if you want to.

20    It might help you.

21         MR. CONRATH:  Right.

22         THE COURT:  There you go.

23         MR. CONRATH:  So I'm just here to follow up,

24    because when I wanted to ask him questions about PX442, this

25    filing before you, you told me, don't do it now.  And

```
 1    I don't think you finally told me whether I was permitted to

 2    or not.

 3              THE COURT:  No.  You're right.

 4              MR. CONRATH:  And I just wanted to make sure I was

 5    clear --

 6              THE COURT:  No.  You're right.

 7              MR. CONRATH:  -- before the end of the day.

 8              MR. PETROCELLI:  And the other thing, Your Honor,

 9    because I went back and looked at it, you did -- you know,

10    this, the hearings, it has an expert declaration attached.

11    It has an expert declaration attached in addition to all the

12    other objections.

13              MR. CONRATH:  We'll stipulate that that --

14              THE COURT:  What are we talking about now?  What

15    are you referring to?

16              MR. PETROCELLI:  What document are you referring

17    to?

18              MR. CONRATH:  PX442.

19              MR. PETROCELLI:  Yes.

20              THE COURT:  It's this thing here.

21              MR. PETROCELLI:  Yeah.  So for all the reasons

22    that I said, it involves a completely different issue which

23    does not pertain to this case in any way, shape, or form.

24              THE COURT:  This is the -- what-do-you-call-it

25    rules, right?
```

1          MR. PETROCELLI:  This has to do with the

2  sunsetting of a particular exclusivity provision in the FCC

3  program access rules.

4          THE COURT:  The program access rules.

5          MR. PETROCELLI:  And positions that people were

6  taking not on the rules in general but on whether content,

7  RSNs in particular, can be maintained exclusively or not.

8  And it had to do with a circumstance involving

9  Cox Communications and the San Diego Padres.

10          THE COURT:  I'm not going to let the document in.

11          But this sentence here, you can show it to him.

12          MR. CONRATH:  Okay.

13          THE COURT:  He can read it to himself.  You can

14  ask him, do you remember seeing this before?  This was --

15  you can show him what it's about.  Okay?

16          Program access rules.  These are comments of AT&T,

17  correct?  This sentence is in here.  Ask him if he's

18  familiar with the sentence.

19          He may or may not be.  I have no idea.

20          You said you didn't get into it in deposition,

21  right?

22          MR. CONRATH:  No.

23          THE COURT:  Okay.

24          If his answer is I've never seen this before,

25  well, I don't know where we go from here.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3494

```
 1            MR. PETROCELLI:  We can't bring the document into
 2   evidence, Your Honor --
 3            THE COURT:  He can read that sentence to himself.
 4            MR. PETROCELLI:  To himself, correct.
 5            MR. CONRATH:  Can I ask him the substance of the
 6   sentence and see if he agrees with it?
 7            THE COURT:  Ask him:  Does this make sense to you?
 8   Ask him if that makes sense to him, because it's a statement
 9   of the company --
10            MR. CONRATH:  Yeah.
11            THE COURT:  -- during the time he was the CEO.
12   This was the position of the company.
13            Now, granted, Mr. Petrocelli's point is a good
14   point.  It's on a different matter, but it was still under
15   his command.  And it does relate to vertical-integrated
16   companies and their having enhanced leverage as a result.
17   And this was the company's position in this document here.
18   So it will be fine.
19            So I think you show him what the document is,
20   filed during his tenure.  Show him that sentence.  Have him
21   read it to himself.  Ask him if he's familiar with it, if it
22   makes sense to him, does he understand it, and is this the
23   thinking of the company at the time and see what he says.
24            I don't know what he's going to say.  He's never
25   been confronted with it.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3495

 1              MR. PETROCELLI:  It wasn't about vertically

 2    integrated companies generally.  It was a very specific

 3    situation, Your Honor.

 4              THE COURT:  Well --

 5              MR. CONRATH:  It's stated very generally.  It's a

 6    very general statement.

 7              THE COURT:  My guess is, Counsel, he never saw

 8    this.  It's just a guess.  That's a wild guess.

 9              MR. CONRATH:  That a wild guess.

10              THE COURT:  My guess is he never saw this; it's

11    the first time he's ever seen the sentence; and you'd have

12    to really think it through and talk to his -- whoever.

13    That's my guess.

14              But I'm willing to let you have a shot at it.

15              MR. CONRATH:  Okay.

16              MR. PETROCELLI:  Okay, Your Honor.

17              THE COURT:  How's that?  You got that?

18              MR. CONRATH:  So I believe I understand it.  And

19    if I -- I will follow the instructions you gave.  And if I

20    stray, I'm sure you'll let me know.

21              THE COURT:  He'll start nipping at your heels,

22    this guy.

23              MR. CONRATH:  That could happen.

24              THE COURT:  He's not going to sit still.

25              MR. PETROCELLI:  Your Honor accused me of having

```
 1    some Bruce Springsteen in me, remember?

 2            THE COURT:  You're a Jersey boy, right?

 3            MR. CONRATH:  That would explain a lot.

 4            MR. PETROCELLI:  Spring-like guy.  Northern

 5    New Jersey.

 6            MR. CONRATH:  It would explain a lot.

 7            THE COURT:  Oh, Northern New Jersey.

 8            MR. PETROCELLI:  On the north side of town.

 9            THE COURT:  Oh, Essex County.  All right.

10            MR. PETROCELLI:  Exactly.  Essex County.

11            THE COURT:  You can take the boy out of

12    Essex County, but you can't take Essex County out of the

13    boy.

14            (Open court)

15            THE COURT:  All right.  You may proceed,

16    consistent with our discussion.

17            MR. CONRATH:  All right.  Thank you, Your Honor.

18    BY MR. CONRATH:

19       Q    Mr. Stephenson, would you look at your big binder

20    there.

21       A    My what?

22       Q    The big binder.

23       A    Oh, yeah.

24       Q    And I'd like you to look at PX442.

25            Do you have it there?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3497

```
 1        A    I do.

 2        Q    All right.  Do you see that PX442 is comments of

 3   AT&T, Inc.?

 4        A    Yes, I do.

 5        Q    And that was in the period when you were the CEO?

 6        A    I'm trying to find the date on it.  The date is --

 7        Q    Lower left.

 8             THE COURT:  Look on the front page.

 9             THE WITNESS:  Oh, here we go.  June 2012.

10             Okay.  Thank you.

11   BY MR. CONRATH:

12        Q    You were the CEO in that time?

13        A    2012 I was.

14        Q    Yes.  Okay.

15             I'd like you to look at the page, the third page

16   of the document.  It's got the 003 at the bottom.

17        A    Okay.

18        Q    And I want to direct your attention to the

19   sentence that begins the second paragraph, starts with "V."

20        A    Okay.

21        Q    Just read that silently to yourself.

22             MR. PETROCELLI:  Your Honor, can we have some

23   foundation?  Has he ever seen this document before?

24             THE COURT:  Oh, yeah.  I assume we're go to get

25   there.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3498

```
 1              MR. CONRATH:  We're going to get there, right.

 2              THE COURT:  Yeah.  Let him read it.

 3              THE WITNESS:  Okay.

 4    BY MR. CONRATH:

 5       Q    Okay.  Do you recall whether you saw this document

 6    at the time?

 7       A    I don't.

 8       Q    Is this something that you would ordinarily be

 9    briefed on before something, a filing is made at the Federal

10    Communications Commission?

11       A    Something like program access, not always, no.

12       Q    Let me ask you to just focus on the first sentence

13    of that paragraph and ask you if that, you understood that

14    to be the position of AT&T as expressed to the FCC at the

15    time.

16       A    Well, I'm apprehensive to answer any questions

17    about the first sentence because it doesn't reflect the full

18    paragraph.  And what this is all about as I -- I mean, I'm

19    reading this for the first time.  And it's some fairly

20    detailed language.

21              But I'm apprehensive to comment on the first

22    sentence.

23       Q    Let me rephrase it, then.

24              Having read the whole paragraph, do you take that

25    to be the statement -- the position of AT&T to the FCC at
```

1      the time it was written.

2              MR. PETROCELLI:  Your Honor, I need to object on

3      lack of foundation.  This is utter speculation.

4              THE COURT:  Yes.  I'm going to sustain that

5      objection.

6              MR. CONRATH:  Okay.

7              THE COURT:  You can have a different question if

8      you have one.

9      BY MR. CONRATH:

10     Q    Do you recognize that the point made in this

11     paragraph has validity in the marketplace as you know it?

12     A    I don't know that I would agree with that, to be

13     candid with you.  And I'm looking at a document written in

14     2012.  What may apply in 2012 is irrelevant today.

15             So I don't even know how to respond.  I don't --

16             I don't even know that I agree with the comment,

17     to be honest with you.

18             MR. CONRATH:  All right.  Your Honor, I'm going to

19     respectfully -- since the witness has confirmed that this

20     was a statement of AT&T as of the time when he was the

21     chairman and was reflected in a filing to the FCC, I'll

22     renew my request to admit the document.

23             MR. PETROCELLI:  Objection for all the reasons

24     stated:  402, 403, no foundation.

25             THE COURT:  Yeah.  I'm going to sustain the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    objection.

 2              MR. CONRATH:  Okay.

 3              Give me one moment, Your Honor.

 4              THE COURT:  Yes.

 5    BY MR. CONRATH:

 6       Q    Would you -- I'm sorry, but pull up your other

 7    binder again one more time.

 8       A    Sure.

 9       Q    And if you would look at PX609, the first

10    document.

11       A    Okay.

12       Q    Page 12.

13              Page 12, you're making a comparison of a number of

14    companies, including comparing them to Time Warner,

15    is that right, on the top half of this page?

16       A    Yes, that's what it's doing.

17       Q    Right.

18              And what you said about Viacom is their cable

19    networks is a disaster; is that right?

20       A    That's what it says.

21              MR. CONRATH:  Your Honor, I have no more

22    questions.

23              THE COURT:  Redirect?

24              MR. PETROCELLI:  Just one or two questions.

25              THE COURT:  Okay.
```

REDIRECT EXAMINATION

BY MR. PETROCELLI:

    Q    You were asked about price increases by DirecTV to consumers after the merger, assuming the Court approves the merger.  Will having Turner and DirecTV owned by one company allow DirecTV to be more aggressive in lowering prices to consumers?

    A    To be more aggressive?

    Q    In lowering prices to consumers.

    A    Well, the merger synergies, by definition, will facilitate prices to be contained or lowered.

    Q    To DirecTV's subscribers?

    A    To DirecTV subscribers.

    Q    And also, will it allow for reinvest -- reinvesting in the product as well?

    A    Yes.

         So the advantage of synergies are they generate margins and cash flow, and so those are either reinvested back into the business through pricing or reinvested in product enhancements or infrastructure.

    Q    When you say "invested it back in the business through pricing," it will yield lower prices to the DirecTV subscribers; is that right?

    A    Yes.  That's the objective.

         MR. PETROCELLI:  Okay.  Thank you, Your Honor.

1          MR. CONRATH:  On that point, Your Honor?

2          THE COURT:  On that point.

3                    RECROSS-EXAMINATION

4    BY MR. CONRATH:

5          Q    So Mr. Petrocelli asked you about whether you'll

6    be able to get lower prices by being in one company.  Did

7    you tell us a while ago that you expect pricing decisions

8    between the media company and the communications group to be

9    arm's-length negotiations?

10         A    I absolutely do.

11         Q    And do you expect, therefore, the media company to

12   get equivalent prices from -- apply equivalent prices to the

13   communications group as those that would apply to an outside

14   party that is of similar size?

15         A    There will be arm's-length negotiations.

16         Q    And do you expect the outcome will be similar

17   prices to what it would be if the communications group were

18   an outside company?

19         A    In terms of the prices they pay for content, I do.

20              That is not all of the costs, though, in the

21   communication company for delivering TV service.  And these

22   merger synergies we're talking about -- vendor cost

23   reductions, marketing cost reductions -- there's an

24   incredible amount of marketing costs in this business.  And

25   to the extent putting these two companies together yield

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   those marketing cost reductions, cost of service goes down.

 2   That's money available to compete in marketplace or to

 3   reinvest in the product.

 4              MR. CONRATH:  No further questions, Your Honor.

 5              MR. PETROCELLI:  One follow up, Your Honor, on

 6   that, just on that one piece.

 7                       REDIRECT EXAMINATION

 8   BY MR. PETROCELLI:

 9     Q    When you have stacked margins, how will that get

10   handled at the parent level such that it would result in

11   lower prices to DirecTV consumers for the --

12              MR. CONRATH:  Objection; leading.

13     Q    How will --

14              THE COURT:  Rephrase the question.

15              MR. PETROCELLI:  Yeah, I was trying to get to the

16   point.

17              THE COURT:  You were trying to rush.

18              MR. PETROCELLI:  Rush, exactly, because you had

19   that look, Your Honor, and I'm borrowed --

20              THE COURT:  I'm about to have that look again.

21              MR. PETROCELLI:  I know.  I'm on borrowed time

22   here.

23   BY MR. PETROCELLI:

24     Q    But explain to the Court how, at the parent level,

25   these stacked margins work.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3504

1        A     So I'm going to be at 30,000 feet, but there will

2   be arm's-length negotiations.

3            By the way, this happens in our business today.

4   We do this exact same thing, arm's-length negotiations, for

5   services between business units.  And they're getting

6   market-based pricing in their arm's-length negotiations.

7            However, at the AT&T consolidated level, the

8   reality is those content costs that are being sold to

9   DirecTV, the cost to AT&T is truly what is the cost to

10  create the content, not that pricing in the marketplace.

11           And so when we roll everything up, there is

12  enhanced margins at the consolidated level.

13           What we do at AT&T is I have enhanced margins up

14  here; it relieves the profit requirements I have on

15  communication company.  And so I reduced my profit and cash

16  flow requirements out of that business; therefore, they

17  effectively get the benefits of those cost reductions when

18  they're in the marketplace setting prices.

19           MR. PETROCELLI:  I have nothing further.

20           MR. CONRATH:  No.

21           THE COURT:  I have a question for you.

22           THE WITNESS:  Okay.  Yes, sir.

23           THE COURT:  This arbitration clause --

24           THE WITNESS:  Yes, sir.

25           THE COURT:  -- that you all offered, right, it was

 1    modeled after the NBC-Comcast idea?  Is that the essence of

 2    it?

 3              THE WITNESS:  Yes, Your Honor.  That was -- my

 4    understanding, that was the objective when Turner put that

 5    in the marketplace; it would mimmick the Comcast.

 6              THE COURT:  And the 7 years' time frame was picked

 7    because it was a 7-year in NBC-Comcast?

 8              THE WITNESS:  I honestly --

 9              THE COURT:  You're not sure.

10              THE WITNESS:  I don't know.

11              THE COURT:  Well, you've been speaking a lot

12    tonight, today, I should say --

13              THE WITNESS:  Yes, sir I'm sorry.

14              THE COURT:  -- about your vision.

15              Where do you think this universe, this ecosystem

16    that you've been describing today, will be seven years from

17    now?

18              THE WITNESS:  If you'd ask me seven years ago what

19    this world would look like today, I would have missed it so

20    far.

21              But I do believe this:  And that is, as we

22    continue to put this kind of capability into these mobile

23    networks and more and more fiber into homes, the need for

24    people, for content creators, to go through cable companies

25    and satellite companies to get their content to the

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3372 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3506

 1  consumer, that is a thing of the past.  They will have

 2  direct and immediate access to those consumers.

 3          And the consumers' availability and access to

 4  content, it has just in the last four or five years

 5  exploded.

 6          I think the explosion goes to a whole different

 7  level, and I think the availability of content is going to

 8  be radical.

 9          And as a result, if we allow this to proliferate

10  and this constant to be delivered over these mobile devices

11  and services, inherently, that means the cost of content has

12  to come down.  Just the proliferation of it means it gets

13  cheaper over time.

14          And this is why I think the more we can do to

15  incentivize and motivate this kind of proliferation, embrace

16  what the tech community is doing -- you know, they're a

17  great competitor, but they have also created some great

18  opportunities and benefits for the consumer.  This content

19  is costing less.

20          And there is nothing but downward pricing

21  pressure.

22          I know our satellite TV prices go up.  My view,

23  that's inconsequential.  What we're all working towards is

24  creating 35 and $15 bundles.  And that's where the world is

25  moving and the Millennials are moving.  So content -- or I

1    should say -- yeah, content pricing to the consumer can do

2    nothing but continue to go down in the foreseeable future.

3              THE COURT:  You're excused.

4              THE WITNESS:  Thank you.

5              THE COURT:  Do you have any other witnesses?

6              MR. PETROCELLI:  No, Your Honor.  I just need to

7    introduce into evidence Defense Exhibit 893.  It is the

8    government's answers to our interrogatories 8 and 9.

9              There's no objection to this.

10             MR. CONRATH:  No objection, Your Honor.

11             MR. PETROCELLI:  And with that, the defendants

12   rest.

13             THE COURT:  All right.

14             Does the government wish to put on a rebuttal

15   case?

16             MR. CONRATH:  We do, Your Honor.

17             THE COURT:  Call your first witness.

18             MR. CONRATH:  Our first witness is Mr. Ron

19   Quintero.

20             And my colleague, Matthew Siegel, will be handling

21   this witness.

22             Just give us one moment to clear out.

23             MR. PETROCELLI:  Your Honor, Mr. Walters is

24   handling that witness.

25             THE COURT:  All right.  Thank you.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1            MR. SIEGEL:  Good afternoon, Your Honor.

2   Matthew Siegel for the United States.

3            The United States calls Ronald G. Quintero.

4            Your Honor, I've given the witness copies of his

5   expert reports.

6            I should also mention that the defendants have

7   claimed confidentiality in a fair amount of the information

8   that Mr. Quintero is going to be discussing.

9            But we framed our questions in order to avoid

10  disclosing the information, to keep things moving.

11           THE COURT:  Good.

12           DEPUTY CLERK:  Please raise your right hand.

13           (Witness is placed under oath.)

14           DEPUTY CLERK:  Please be seated.

15           THE COURT:  Welcome.

16           MR. SIEGEL:  May I proceed, Your Honor?

17           You may.

18  RONALD QUINTERO, WITNESS FOR THE GOVERNMENT, HAVING BEEN

19  DULY SWORN, TESTIFIED AS FOLLOWS:

20               DIRECT EXAMINATION ON QUALIFICATIONS

21  BY MR. SIEGEL:

22       Q    Good afternoon.

23       A    Good afternoon.

24       Q    Could you please state your name for the record.

25       A    Ronald Gary Quintero.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q     Mr. Quintero, how are you currently employed?

2      A     Chartered Capital Advisers and by

3   R. G. Quintero & Company.

4      Q     And those are your companies?

5      A     They are.

6      Q     And you're here today to give expert testimony on

7   the synergies of the defendants' claim from the merger?

8      A     I am.

9      Q     You have an MS in accountancy and an advanced

10  professional certificate in investment management, both from

11  the NYU Stern School of Business?

12     A     That is correct.

13     Q     Can you briefly summarize your employment history

14  for the Court.

15     A     Yes, sir.

16           I have 43 years of professional experience,

17  initially at Peat, Marwick, Mitchell & Company, now called

18  KPMG, first of the audit staff.  Then I moved to the firm's

19  merger and acquisition department and ultimately started and

20  ran their corporate finance consulting practice in New York.

21           After that, I joined Zolfo Cooper, which is one of

22  the principal financial restructuring firms; then the

23  investment banking department of Bear Stearns; and

24  ultimately, in 1988, I started both my firms,

25  R. G. Quintero & Company, a specialty CPA firm, and

1   Chartered Capital Advisers, a financially oriented

2   management consulting firm.

3       Q     Thank you.

4             And could you explain to the Court what kinds of

5   projects your firms work on.

6       A     The most frequent type of projects I work on are

7   involved in mergers and acquisitions, valuations, financial

8   restructuring, forensic accounting, financial forecasting,

9   due diligence, and certain other financially oriented

10  projects, some of which involved litigated matters.

11      Q     You also have several professional certificates

12  relevant to the work that you've done in this matter?

13      A     That is correct.  I have ten professional

14  licenses.

15      Q     Could you briefly list for the Court just the ones

16  that are most relevant here.

17      A     Those most relevant to this matter are that I'm a

18  certified public accountant, a chartered financial analyst,

19  a certified management accountant, and I am certified by the

20  American Institute of CPAs in forensic accounting.

21      Q     Do you teach numerous professional and academic

22  programs, including the CFA preparatory program?

23      A     That is true.

24      Q     Have you ever testified as an expert witness in a

25  court before?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3511

```
 1         A     Yes, I have.

 2         Q     Ever in Federal District Court?

 3         A     I have.

 4         Q     When you've testified as an expert witness, how

 5   often has your work involved forensic accounting or

 6   financial forecasting?

 7         A     Most projects employ one or both of those

 8   disciplines.

 9         Q     Has the Court ever failed to recognize you as an

10   expert when you've been put forward as one?

11         A     Never.

12         Q     Have you ever testified as an expert in any

13   antitrust merger matters?

14         A     Yes, I have.

15         Q     Which cases?

16         A     About a year and a half ago in the Anthem-Cigna

17   antitrust case.

18         Q     And that was here in the district of D.C.?

19         A     It was.

20         Q     What subject matter did you address there?

21         A     Claimed synergies.

22               MR. SIEGEL:  Your Honor, the United States offers

23   Ronald G. Quintero as an expert in financial forecasting and

24   forensic accounting to testify regarding the claimed

25   synergies in this matter.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3512

```
 1              MR. WALTERS:  Your Honor, may we approach?

 2              THE COURT:  You may.

 3              You'll have to step down to that chair.

 4              (Sealed bench conference)

 5              MR. WALTERS:  Your Honor, we have two issues.

 6              One is, he's an accountant.  Many of the matters

 7    that are reflected in his report, they don't involve

 8    accounting at all.  They don't involve any specialized

 9    knowledge.

10              He's offering up judgments, for example, on, could

11    this synergy be accomplished without a merger?

12              That's not a matter of any accounting ability or

13    any specialized knowledge.  That's just -- and he's never

14    been in this industry.  That's just a question for

15    businesspeople.

16              So I think it's very important.  And

17    Judge Jackson, when she had him testify, she limited it to

18    only those issues where he could provide professional -- and

19    there are a handful of discrete issues, but not many.

20    Merger specificity is certainly not one of them.  That's

21    number one.

22              Number two --

23              THE COURT:  Did you just say "merger specificity"?

24              MR. WALTERS:  That is the only way that the

25    synergies could be accomplished is with a merger, as opposed
```

1   to the ordinary course.

2           He will offer opinions on that.  That's not a

3   matter of expertise, his expertise.  It's really just a

4   business, and he's never been in the business.

5           So that's the first issue.

6           The second issue is, I felt like it's a better

7   part of valor to bring it to Court's attention in light of

8   his testimony.  He said that he had always been qualified,

9   never been refused as an expert.

10          In deposition, he likewise testified that he had

11  never been discredited in any case.  We have learned, in

12  light of that testimony, indeed, he was discredited in a

13  fairly substantial matter in New York State Court.

14          And so I don't know what we do with that, other

15  than to apprise the Court that we have a real issue there.

16  We don't think that, in light of that development, he should

17  serve as an expert.

18          THE COURT:  When you say "discredited," does that

19  mean that he's rejected as an expert by the Court?

20          MR. SIEGEL:  That's what I was asking, Your Honor.

21  That was my question, and I believe he's testified dozens of

22  times.  And discredited -- we would say that this is a

23  matter of opinion.  And he can certainly be crossed about

24  it, and he's happy to be.

25          I think --

1          THE COURT:  He's been deposed, apparently.

2          MR. WALTERS:  He was deposed, and his testimony

3     was that he had never been discredited.  Indeed, he has been

4     discredited as an expert witness.

5          I can handle it on cross.  I just thought I should

6     apprise the Court of that.

7          THE COURT:  What's your remedy you're seeking, so

8     to speak, from this?

9          MR. WALTERS:  Well, I would think at a minimum

10     that, number one, he should be confined only to those things

11     where he can actually bring true expertise to the question.

12     And I'll just have to do that issue by issue as he proceeds.

13          There are a handful of things where I think he can

14     be.  But many of these issues we know he's going to go into

15     based on his report are not the subject of his expertise.

16          THE COURT:  What kind of synergies is he going to

17     be testifying about?

18          MR. SIEGEL:  He's going to be testifying about

19     roughly 60 percent of the synergies.  Synergy is not -- all

20     the cost synergies that you heard Mr. Stankey testify about,

21     those are the cost side, which is sort of a financial

22     forecasting.  That's why we got him.  He's a financial

23     forecaster.

24          And then the combined-asset revenue synergies,

25     which are kind of pro forma business models to kind of size

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3515

```
 1    up possible cross-selling and cross-promotional

 2    opportunities.

 3             What he's not testifying about -- and you'll get

 4    this in a moment -- are the data-oriented synergies, the

 5    advertising enhancement with data that's being alleged, or

 6    the sort of hiring better movie stars because you have more

 7    data and these sort of things.

 8             He's testifying more about the -- well, just the

 9    ones I mentioned.

10             I should add that --

11             THE COURT:  Do you have any problem with financial

12    forecasting as it relates to his expertise?

13             MR. WALTERS:  Well, I do if it involves any

14    accounting expertise.  But in terms of -- there's not really

15    a financial forecast.

16             What he's going to do is he's going to come and in

17    say, this particular cost and whether you can actually

18    achieve it, in his judgment, is not verifiable.

19             That's really just a business judgment based on

20    somebody who's in the industry.  It's not really an

21    accounting issue.

22             He would also say it could have been accomplished

23    without this merger.

24             Again, it's not -- he's not bringing any expertise

25    to it.
```

1    And the third thing he's going to do is he's going

2    to say, these costs are fixed and they're not variable

3    costs, which are really just an economic matter and not an

4    accounting matter.

5    So there could be small issues within what he's

6    doing, where he could bring some expertise to bear.

7    But what he's really doing is just coming in and

8    second-guessing Mr. Stankey.  And he's never been in the

9    industry, and that's not a matter of expertise.

10    MR. SIEGEL:  Your Honor, I mean, in every case

11    that I know of, in any antitrust merger case, the people who

12    are typically hired to assess synergies are people with

13    precisely the kind of background Mr. Quintero has.  It was

14    true in Anthem-Cigna.  I'm not saying that it was --

15    THE COURT:  What did she qualify him as in

16    Anthem-Cigna?

17    MR. SIEGEL:  I'm not sure of the actual language.

18    I think it was something akin to a financial expert or

19    financial.

20    THE COURT:  How about financial forecasting?  Did

21    she --

22    MR. SIEGEL:  I don't think the language was

23    necessarily "financial forecasting."  It was -- and

24    sometimes it's not clear in these cases, because they --

25    it's a bit informal.  The person is stipulated in.  And the

```
 1   Court, you know, says, oh, he's admitted as an expert to
 2   attest to synergies or something like that.
 3            MR. WALTERS:  I can tell you what happened.
 4   I have the transcript here.
 5            What Judge Jackson did was twofold.
 6            First of all, the defense just stipulated in.  It
 7   was all very amorphous about that.  It wasn't any sort of
 8   formal challenge.
 9            She did two things.
10            One is she confined him to, if there were discrete
11   issues as part of the synergies assessment, where he could
12   bring specialized accounting knowledge to it, she would let
13   him speak to it.  If he went beyond that, that was the
14   problem, number one.
15            The other thing is -- and I don't know whether he
16   intends to do this.
17            There's this notion of whether there are
18   cognizable synergies; that is, legally -- synergies that
19   Your Honor should take into account.
20            What she said is that was her province and not his
21   province.  So he couldn't speak to those ultimate issues.
22            So she did those two things.
23            MR. SIEGEL:  And we are happy with -- look, the
24   legal cognizability, obviously, he's not going to testify
25   to.
```

1          The elements of –– the factual elements of legal

2    cognizability, which we're going to discuss, but those are

3    so-called verifiability merger specificity, meaning you need

4    the merger to do it; you couldn't do it without the merger.

5          And the question of whether the costs are fixed

6    costs or variable costs in nature.  These are the factual

7    questions that we would proffer him for.

8          MR. WALTERS:  They are factual questions.  They're

9    not a matter of expertise.  That's my point.  They're just

10   fundamentally business decisions.

11         A handful of these issues, there might be an

12   accounting role on it, but very few.  But he's really just

13   coming in as sort of a surrogate businessperson.

14         THE COURT:  As we're going through this, though,

15   how are we going to know when, other than after hearing any

16   particular question, as to whether or not it's objectionable

17   from that point of view?

18         MR. WALTERS:  Well, I think he has to lay a

19   foundation of some kind to say that there is this particular

20   issue where your accounting and training would give you the

21   ability to add some value on that question.  I would think

22   that that would be incumbent.

23         It wouldn't be a difficult thing to do, but

24   I think that would be appropriate, because beyond that,

25   again, he's just speaking to like any, you know, employee of

1   AT&T about whether, could we do this by contract or do we

2   need to actually do a merger?  Again, that has nothing to do

3   with his expertise.

4          MR. SIEGEL:  As I recall in the Anthem-Cigna case,

5   these kinds of questions were handled in the usual way they

6   are in bench trials, which is it's a matter of weight.

7          If a person starts crossing over into either

8   economic testimony or legal testimony, either the judge or,

9   failing that, with the assistance of defense counsel's

10  objections, slaps them down and says, you know, we object;

11  you're crossing over into legal areas.

12         And the Judge kind of weighs it appropriately,

13  depending on where it is.

14         But clearly -- I mean, the mainstay of this

15  testimony is what people -- I mean, it's not -- I don't know

16  whether -- the relevance of it.

17         But the expert, which I think Your Honor has heard

18  about, it was retained by the defense for the same,

19  precisely the same thing.  I believe it was a very similar

20  background.  I don't think there was any difference.

21         THE COURT:  Look, to help -- to be of benefit to

22  me, since I have to make the call here in the end, as you're

23  doing your questioning of the witness, I assume you're going

24  to have to, for lack of a better way of putting it, set up

25  each topic with some preliminary questions to see if his

1   review of the materials that he was assigned to review gave

2   him any knowledge with regard to whatever the issue is.

3          So you're going to have to have some preliminary

4   questions that are going to indicate his familiarity with

5   whatever the issue is you want him to opine on.

6          MR. SIEGEL:  Oh, sure, yeah.

7          THE COURT:  So after you set that up as to any

8   given topic that you're looking for an opinion on, at some

9   point, you should ask him, before you ask him for his

10  opinion, to what extent does his knowledge and experience

11  enable him or qualify him to be able to opine on this

12  particular topic, whatever that topic is, and let him

13  explain why his experience at KPMG, or wherever it was, gave

14  him the kind of experience that will enable to give an

15  opinion on whatever the particular topic is.

16         At that point, having done that, I'll be in a

17  better position to have an understanding as to, A, what

18  you're looking for --

19         MR. SIEGEL:  Yeah.

20         THE COURT:  -- and, B, how his experience and

21  supposed expertise relates to what it is you're now seeking

22  an opinion on.

23         Then, once we get over those two hurdles, I'm sure

24  if there's a problem with the second hurdle, Mr. Walters

25  will be saying, come on; we need to discuss this.  And,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    Judge, I don't think his expertise system, as he just

 2    explained it, gives him any special knowledge.

 3            Or conversely, he'll say nothing because he does

 4    agree it does give him special knowledge.  And then he'll be

 5    in a better position to object, if he's going to.  And I'll

 6    be in a better position to rule, if I'm going to and have

 7    to, and then -- before we ever get to the opinion.

 8            So, I mean, I'm making this up to make a point.

 9            MR. SIEGEL:  Yep.

10            THE COURT:  If you've got ten issues that you want

11    him to opine on, on each of those ten issues, you're going

12    to have to do the set-up.

13            You're going to have to lay the foundation of what

14    the issue is.  You're going to have to lay the foundation of

15    his familiarity with the facts based on whatever it was you

16    told him to review.  He's going to have to confirm that he

17    reviewed it.

18            And then, three, once you do the first two

19    hurdles, the third one is, what is in your background --

20    what is it in your background, your experience that gives

21    you an expertise, you believe, to opine on this particular

22    subject?  And let him explain what it is.

23            MR. SIEGEL:  Okay.

24            THE COURT:  And if the answer he gives to that

25    happens to be problematic in some way, sketchy in some way,
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    not clear, then he'll be in a position to object.

 2            MR. SIEGEL:  Sure.

 3            THE COURT:  You'll be in a position to oppose it.

 4            MR. SIEGEL:  Yep, if you do.

 5            THE COURT:  Then I'll be in a position to rule.

 6            MR. SIEGEL:  What I'll do is, just to signal to

 7    Your Honor, this is -- there's going to be sort of three big

 8    areas of cost synergies, one area of revenue synergies.

 9            For each of these areas, what I could do is ask

10    him, you know, what in your background gives you the

11    expertise or ability to assess this particular category?

12    And we'll hear him out on that and see if that does the

13    trick.

14            Is that acceptable?

15            THE COURT:  Well, I think it would be better to

16    break it into, with each point you want an opinion on,

17    because if you're doing it kind of as an omnibus for a whole

18    group -- I think you said you're at three costs.

19            MR. SIEGEL:  Yeah, one by one -- we'll do it one

20    by one as we go.

21            THE COURT:  Yes.  I think doing them seriatim is

22    going because that way we'll have clarity on the --

23            MR. SIEGEL:  Great.

24            MR. WALTERS:  The expertise, as I understand it,

25    is an accounting expertise that you've offered.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3523

1          Am I correct about that?

2          MR. SIEGEL:  I don't think of it as limited to

3    accounting.  I mean, it's -- forensic accounting is a

4    discipline of accounting, a subdiscipline.

5          And financial forecasting is either -- is what it

6    sounds like.  It's either consuming, assessing, and/or

7    creating financial forecasts.

8          These things come up, not just in a legal context,

9    but in valuations; people want to -- minority shareholders

10   want to get bought out, these kinds of things.

11         MR. WALTERS:  I just want to be clear, though.

12   Accounting a discrete area.  Financial forecasting is a

13   discrete area.

14         There's no such thing as expertise in synergies.

15         What they want to do is kind of take this

16   financial forecasting and say, I can now be an expert in

17   synergies.  And synergies is fundamentally a business

18   matter.

19         So if we are careful to combine those two

20   expertises to these issues, that's one thing.  But I think

21   we'll just see how we do.

22         MR. SIEGEL:  I think we'll have to.  I mean, every

23   merger -- every tried merger case I've ever seen has

24   expert --

25         THE COURT:  There aren't a lot of those.

1          MR. SIEGEL:  I know there aren't.  True, but

2    they're getting more experts on both sides on this issue.

3          And typically, I have to say the experts have the

4    very kind of expertise and background as Mr. Quintero and as

5    Mr. Gokhale, his opposite member on the other side that they

6    chose not to testify.

7          MR. WALTERS:  Let me just say this:  We obviously

8    had an expert of different qualifications.  We were much

9    more careful about it as responsive to him.

10          But with if we're talking precedent, Judge Jackson

11    was quite clear:  accounting and you can't speak to the

12    ultimate issue.  Anything outside of that, we're out of

13    bounds.

14          So that was, I think, a very precise thinking

15    about what he could do.

16          THE COURT:  It will be important for me to

17    understand what it was that he actually reviewed, read,

18    analyzed --

19          MR. WALTERS:  Oh, yeah.

20          THE COURT:  -- before we get to --

21          MR. WALTERS:  Absolutely.

22          THE COURT:  -- the third point, which is, well,

23    what is it in your background that you believe will enable

24    you to opine on whether or not that which you reviewed --

25          MR. WALTERS:  Yeah.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1            THE COURT:  -- was an expert opinion?

2            MR. SIEGEL:  We'll go into that.  Yeah,

3    absolutely.

4            And, you know, please let me know if more could be

5    elicited.

6            THE COURT:  I don't have any doubt he's going to

7    raise questions.

8            MR. SIEGEL:  Okay.  I'll count on it.

9            MR. WALTERS:  Well, I will.

10           I mean, I think -- my own personal view is that he

11   hasn't been -- he reviewed preciously little.  I don't think

12   it's enough for him to opine.  But at a minimum, I guess I

13   could cross him on that.  But we'll see what they elicit.

14           THE COURT:  You'll get to cross him; that's for

15   sure.

16           MR. WALTERS:  Yes, sir.

17           THE COURT:  Okay.

18           MR. SIEGEL:  Thank you very much, you guys.

19           THE COURT:  All right.

20           (Open court)

21           THE COURT:  All right.  So the Court will

22   recognize the witness as an expert in forensic accounting

23   and financial forecasting.

24

25
```

1                    DIRECT EXAMINATION

2     BY MR. SIEGEL:

3          Q    Mr. Quintero, what were you retained to do in this

4     matter?

5          A    To evaluate the synergies proffered by the

6     defendants with respect to cost synergies and one of the

7     claimed revenue synergies.

8               MR. SCHWINGLER:  Your Honor, I have a

9     demonstrative that I'd like to use with this witness.

10    Defendants have been provided a copy.

11              May I hand one up to the Court?

12              THE COURT:  Yes.

13              MR. SIEGEL:  And may I approach the witness?

14              THE COURT:  You may.

15              MR. SIEGEL:  Your Honor, this exhibit --

16              THE COURT:  Well, let's hear, first, about what

17    materials he reviewed personally.

18              MR. SIEGEL:  What materials he reviewed?

19              THE COURT:  Yes.  What did you give him to review

20    and analyze?

21              MR. SIEGEL:  Okay.

22    BY MR. SIEGEL:

23         Q    Mr. Quintero, can you briefly describe for the

24    Court the materials that you and others who assisted you on

25    this matter reviewed to reach the opinions that you've

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    reached in this case?

2          A     Yes.

3                I reviewed version -- what has been commonly

4    referred to as version 41, which details and quantifies the

5    defendants' representations with respect to claimed

6    synergies in this matter.

7                I reviewed all of the supporting documentation

8    represented by the defendants as being the basis for

9    version 41, as well as all the documentation that the

10   consultant that the defendants hired with respect to

11   synergies indicated as being a basis for version 41.

12         Q     Pardon me, Mr. Quintero.  When you say the

13   supporting information identified by defendants as

14   supportive of version 41, could you tell the Court what you

15   mean by that.

16         A     The defendants proffered 306 documents in January

17   of 2018 that they represented as being the basis underlying

18   version 41.

19               The defendants' consultant, who was retained with

20   respect to claimed synergies, made reference to 284

21   documents that also pertained to version 41.

22               And through the work that I and my colleagues did,

23   we reviewed approximately, not only the aforementioned

24   documents, put about a thousand documents pertaining to

25   claimed synergies and synergies that we thought, prior to

 1   hearing any representations with respect to claimed

 2   synergies, that we believed would be synergies that the

 3   defendants would assert.

 4          And I also reviewed --

 5          THE COURT:  Are those thousand documents above and

 6   beyond the 590 that you just referred to, 306 and 284?

 7          THE WITNESS:  No, Your Honor.  It is inclusive of.

 8          THE COURT:  Okay.

 9          THE WITNESS:  And then I also reviewed deposition

10   testimony in connection with the claimed synergies.

11   BY MR. SIEGEL:

12   Q    And did you have a chance to indirectly elicit

13   deposition testimony by providing advice as to questions or

14   topics that you wanted explored?

15   A    I did.

16          I provided the Department of Justice both an

17   indication of the type of information that I was looking for

18   and, prior to depositions, the type of information that I

19   was seeking to elicit.

20          And I also attended two of the depositions, and

21   members of my staff attended two other depositions.

22          THE COURT:  How many people in your staff worked

23   on this with you?

24          THE WITNESS:  Including myself, five, over a

25   period of more than 12 months.

1          MR. SIEGEL:  May we proceed, Your Honor?

2          THE COURT:  Yes.

3          MR. SIEGEL:  Okay.  Your Honor, the demonstratives

4    given to Mr. Quintero have been marked as PXD16 for

5    identification.

6          THE COURT:  All right.

7          MR. SIEGEL:  May we proceed?

8          THE COURT:  Yes, you may proceed.

9          MR. SIEGEL:  Okay.

10   BY MR. SIEGEL:

11     Q    Mr. Quintero, please turn to page 1 of PXD16

12   marked for identification.

13          And what does page 1 show?

14     A    Page 1 summarizes the claimed cost synergies and

15   claimed revenue synergies that have been asserted by the

16   defendants based on the annualized rate of an amount of

17   those synergies projected for the year 2020.

18          MR. SIEGEL:  I should mention that the numbers on

19   this page, Your Honor, like most of the dollar figures we're

20   going to be looking at today, have been designated

21   confidential by the defendants.

22          So we're going to take care not to disclose them,

23   with the exception of the two numbers at the very bottom,

24   the larger totals.

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3530

1    BY MR. SIEGEL:

2        Q    Now, you saw Mr. Stankey testify yesterday,

3    Mr. Quintero?

4        A    I did.

5        Q    And these figures on page 1, are they from

6    version 41, the version that Mr. Stankey talked about?

7        A    They are.

8        Q    And that is also a document that's been admitted

9    as DX658?

10       A    That's what I understand.

11       Q    Now, just to clarify the record, Mr. Stankey

12   talked about types of synergies called content and OTT.

13            Do you recall that?

14       A    Yes.

15       Q    And those are included -- the content and OTT

16   categories are included in the corporate spend category

17   there on the left, first line above the bottom;

18   is that right?

19       A    That's correct.

20       Q    And he also talked about a category called network

21   IT synergies?

22       A    Yes.  That is correct.

23       Q    And that category is included in the vendor spend

24   category, which is just between the marketing spend and the

25   corporate spend there on the left?

1          A      That is correct.

2          Q      And the categories that are shown here on page 1

3     are consistent with other discussions, other categorizations

4     of the synergies that were done in version 41, and that's

5     why you used this categorization; is that right?

6          A      Yes, that is correct.

7          Q      Now, does the bottom row, left side of page 1, say

8     the defendants are claiming about $1.5 billion a year in

9     synergies by 2020?

10         A      Yes.

11         Q      Does it say defendants -- on the right-hand side

12    bottom, does it say the defendants are claiming $1 billion,

13    roughly, per year in revenue synergies?

14         A      That is correct.

15         Q      And you mentioned that you reviewed version 41,

16    right?

17         A      I did.

18         Q      You mentioned that you had a staff working with

19    you.  About how many hours did you and your staff spend

20    studying the asserted synergies in this case?

21         A      Over a period of more than 12 months, in excess of

22    2,000 manhours.

23         Q      And what criteria did you apply to assess the

24    claimed synergies?

25         A      I evaluated them from the perspective of whether

1   or not, in the case of cost synergies, they were

2   merger-specific, verifiable, and whether or not they

3   pertained to variable costs.

4       Q    And why did you look at these particular factors?

5       A    These are the criteria that I have routinely been

6   asked to use for purposes of evaluating claimed synergies in

7   connection with antitrust matters.

8       Q    Now, when you testified at Anthem-Cigna, what

9   criteria did you use in that case?

10      A    The same three criteria that I just enumerated.

11      Q    What does it mean for a synergy to be

12  merger-specific?

13      A    For it to be merger-specific, it would be a

14  synergy that can only be accomplished by way of a merger and

15  then could not be accomplished absent a merger.

16      Q    And could you tell the Court what it means for a

17  synergy to be verifiable?

18      A    It is a synergy that can be objectively verified

19  by reasonable means, both with respect to likelihood and

20  amount.

21      Q    And, finally, could you just briefly tell the

22  Court what it means for a synergy to affect a variable cost.

23      A    A variable cost is one that changes in direct

24  response to changes in volume, such as number of

25  subscribers, viewers or MVPDs.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3533

1      Q    Now, I'd like to focus you on the cost synergies

2    first.  I'm going to ask you for a broad summary of your

3    opinion before diving into the individual categories, the

4    ones that we see here on page 1.

5           On the cost side, that is, the left-hand side of

6    page 1, have you reached an opinion about the cost synergies

7    being claimed by the defendants in this matter?

8      A    I have.

9      Q    And what is that?

10      A    Based on the information proffered by the

11    defendants, they have not been demonstrated to be

12    merger-specific, verifiable, nor do they pertain to variable

13    costs.

14      Q    And focusing, similarly, on the revenue synergies

15    on the right-hand side, have you -- which of those synergy

16    categories did you look at?

17      A    Those pertaining to combined assets.

18      Q    And have you -- well, stepping back, what

19    briefly -- could you tell the Court what are the combined

20    asset synergies?

21      A    The combined asset synergies are claimed

22    additional operating income or, in other words, the net of

23    revenues minus expenses that the defendants assert could

24    come about as a result of cross-promotion of their various

25    products or services or bundling their products and

1    services.

2        Q    Have you reached an opinion as to the combined

3    asset revenue synergies being claimed by the defendants?

4        A    I have.

5        Q    And what is it?

6        A    Based on the information proffered by the

7    defendants, they are neither merger-specific nor verifiable.

8             MR. WELSH:  Your Honor, may we approach?

9             THE COURT:  Yes.

10            (Sealed bench conference)

11            MR. WALTERS:  Your Honor, there's just no

12   foundation for any of this.  There's -- none of his

13   expertise can move in -- probative on the question of

14   whether these synergies can be accomplished in means other

15   than a merger.

16            There's just no expertise, no foundation for this,

17   precisely the point I made at the front end.

18            MR. SIEGEL:  Your Honor, we're summarizing the

19   opinions.  We've haven't gotten -- in the individual

20   categories, our plan, my plan is to ask, how does your

21   expertise bear on the questions that you're studying, you

22   know, topic by topic?

23            He's summarizing opinions now.

24            I will point out that defendants' expert opined on

25   the issue of merger specificity with regard to all of these

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    synergies and has essentially the same background as

 2    Mr. Quintero, similar background.  I don't want to point --

 3             MR. WALTERS:  Like everything else, you hope for

 4    the best and plan for the worst, right?  And, of course, we

 5    had an expert.  He does have different expertise.

 6             We've always maintained that none of these matters

 7    are appropriate for expertise.  There are a handful of small

 8    issues around verifiability where you can apply some

 9    accounting expertise.

10             But beyond that, the question of whether you can

11    do this with or without a merger is fundamentally a business

12    judgment.

13             Mr. Stephenson can make that judgment; Mr. Stankey

14    can make those judgments, because they're in the industry.

15             He never been, and it's not a function of

16    accounting or financial forecasting.

17             THE COURT:  Well, I have a feeling this is all

18    going to get pointed out on cross-examination.

19             MR. WALTERS:  It will, if necessary.

20             THE COURT:  Well, I'll give him a little more

21    leeway to get you through the --

22             MR. WALTERS:  Summary.

23             THE COURT:  -- summary.  But start getting into

24    the --

25             MR. SIEGEL:  Yep.
```

1          THE COURT:  -- specific issues and demonstrating

2     that his experience, such as this, does really enable him to

3     opine on whatever the topic is.

4          MR. SIEGEL:  Absolutely.  I'll ask in each case.

5          MR. WALTERS:  Thank you, Your Honor.

6          (Open court)

7          THE COURT:  All right.  You may proceed.

8     BY MR. SIEGEL:

9     Q     Mr. Quintero, we were talking about the combined

10    asset revenue synergies.  Had you finished telling your

11    opinion with regard to those?

12    A     I have.

13    Q     And I noticed that you did not address the issue

14    of variable costs, an issue that you did address on the side

15    of the cost synergies.  Just wanted to give you a chance to

16    explain that.

17    A     Because costs do not pertain to revenue, so they

18    would not be relevant considerations for evaluating revenue

19    synergies.

20    Q     You heard Mr. Stankey talk about the marketing

21    cost savings yesterday as one category of cost synergies

22    being claimed?

23    A     I did.

24    Q     And can you tell the Court a bit about what is it

25    in your background that enables you to assess the marketing

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  synergies in this case?

2      A    As a CPA, doing this type of work for many types

3  of clients, whether it's in connection with a matter like

4  this, on behalf of a lender that wants to evaluate a

5  business plan, I'm routinely reviewing claimed synergies or

6  related types of assertions to determine whether or not

7  they're verifiable based on underlying documents and

8  information.  That is a core discipline that I apply

9  throughout my practice.

10     Q    Is the marketing savings a kind of particular type

11  of procurement savings, basically, in the marketing area?

12     A    It is.

13     Q    And in what kind of other matters would you be

14  called upon to look into procurements, synergies of that

15  kind?

16     A    It could be in connection with due diligence in a

17  merger and acquisition transaction, a valuation engagement,

18  working on behalf of a lender, considering whether or not to

19  extend more or less credit for a company.

20          It could be in connection with a bankruptcy

21  proceeding.  Or it could be a bankruptcy trustee, examiner,

22  representative of various parties in interest, where I have

23  to test assertions and see, are they objectively verifiable

24  beyond just somebody's representation?

25     Q    And one point that -- just to get on the public

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3538

1   record, you mentioned that you're assessing the combined

2   asset synergies in this case, but you did not look at the

3   other two categories of asset -- of revenue synergies, the

4   content intelligence and the advertising growth;

5   is that right?

6       A    That is correct.

7       Q    Why is that?

8       A    Because there is another consultant who,

9   I understand, has evaluated those two classifications of

10  revenue synergies.

11      Q    Now, what did you think of Mr. Stankey's testimony

12  on this point of marketing cost synergies generally?

13      A    I thought it was very articulate.  It was very

14  passionate.  But from my vantage point as a CPA, who's very

15  familiar with the underlying documentation, it is not

16  objectively verifiable.

17      Q    Did you examine the marketing cost savings claimed

18  by the defendants?

19      A    I did.

20      Q    And what have you concluded with regard to the

21  marketing cost savings, based on the criteria you employed?

22      A    That they're not merger-specific, verifiable, nor

23  do they relate to variable costs.

24      Q    I'd ask you to turn it page 4 --

25          MR. WALTERS:  Objection, Your Honor.  We move to

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3405 of 3826

3539

```
 1    strike as to merger specificity, and we move to strike as to
 2    variable versus fixed --
 3              THE COURT:  You can approach.
 4              MR. WALTERS:  -- without -- because of the
 5    foundation -- there's no foundation for that.
 6              THE COURT:  You can approach.
 7              (Sealed bench conference)
 8              THE COURT:  We don't do speaking objections.
 9              MR. WALTERS:  Excuse me, sir.
10              MR. SIEGEL:  Your Honor, variable versus fixed
11    costs, there could be nothing more central to the kind of
12    work Mr. Quintero does.  I can ask him about it.
13              It's going to be like quite a slam dunk, I think,
14    but I'll ask him, gladly.
15              As far as merger specifically, all I can say is
16    that, you know, Mr. Quintero looks routinely at, you know,
17    gives advice to people about mergers, companies that are
18    thinking of merging, companies that are breaking up,
19    companies that are undergoing all kinds of corporate control
20    changes, and trying to figure out what kinds of changes they
21    could make with and without the merger is central to the
22    work that this man does, both in his litigation consulting
23    and in his non-litigation consulting, and the work that he
24    teaches in his CFA classes.
25              MR. WALTERS:  There are three parts to this
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3540

```
 1    test:  verifiability, merger specificity, and fixed and

 2    variable.

 3              As to the first, we don't object.  He can speak to

 4    the verifiability based on the foundation Mr. Siegel's laid.

 5              There's absolutely no foundation for the latter

 6    two conclusions.  He has no expertise.  There is no such

 7    thing as an expertise in whether something can be done by

 8    merger versus by contract.  It's fundamentally a business

 9    matter, so there's no foundation for that.

10              Similarly, variable versus fixed costs is an

11    economic matter.  I can take the witness on voir dire and

12    establish he's not an economist; he doesn't have that

13    expertise.  No foundation for that third element as well.

14              As for the first, Mr. -- we have no objection.

15              MR. SIEGEL:  So I mean, the variable versus --

16              THE COURT:  What's the first one you want to go

17    through, verifiable?

18              MR. SIEGEL:  I was doing to do it -- we're not

19    going to go through every single element for every single

20    synergy or we're going to be here for, you know, two days.

21              But I will go -- what I was going to do was to go

22    through just the four big categories that we laid out and

23    ask him both about merger specificity and verifiability and

24    handle the fixed versus variable costs at the very end as

25    kind of an omnibus thing, because it's a logic that kind of
```

1   cuts across.

2          I can ask him right now about fixed versus

3   variable costs.  I can't believe that -- I mean, it's -- I'm

4   happy to do it, actually.

5          I'll ask him, does any of your -- do any of the

6   work that you do involve distinguishing fixed from variable

7   costs?  And we'll see what he says.

8          I mean, one way to handle this is if it sounds

9   like he's starting to be speculative or starting to talk

10  about matters of kind of, you know, industry that would

11  really be a province of people who work in a business as

12  opposed to people who study businesses or industries, then

13  we can get an objection.

14         But it also just goes to weight.  I mean,

15  Your Honor is not going to accord it much weight if that's

16  the case.

17         MR. WALTERS:  I have a suggestion that might help

18  you.  We don't have an objection to him speaking to this

19  verifiability.  I'll cross him on those issues.

20         We have a standing objection of cross-merger

21  specificity.  There's nothing in the foundation that's

22  established, or could establish, that would allow this

23  witness to speak to merger specificity.

24         And if you want to handle the variable versus

25  fixed costs at the end, you can do that.  We'll evaluate it

1  in context.  That might allow us to proceed.

2       But as to the second element, there simply is no

3  foundation.  There's no basis.

4       MR. SIEGEL:  All I can say is I believe that it is

5  routinely done by people precisely with his background.  And

6  he does routinely advise people on the consequences of

7  mergers, including what kinds of cost savings and revenue

8  benefits could be accomplished with the merger, without the

9  merger, based on financial data and information, which is

10  precisely what he's been fed by the defendants and by

11  their -- by defendants.

12       THE COURT:  Why don't you do the first one, see

13  how it goes.  Let's see how it goes.

14       MR. SIEGEL:  The first item, okay.  The first cost

15  item is the marketing one.  We'll do that, and I'll try to

16  elicit it in a way that Your Honor --

17       THE COURT:  See how it goes.

18       MR. WALTERS:  Thank you, Your Honor.

19       (Open court)

20  BY MR. SIEGEL:

21   Q    So please turn to page 4, Mr. Quintero, of the

22  PXD16, if you would.

23       Now, is page 4 a summary of the how the defendants

24  calculated their marketing spend synergies?

25   A    It is.

3543

1     Q    Now, why did you conclude that these synergies are

2    not verifiable or merger-specific?

3     A    With --

4          MR. WALTERS:  Objection, Your Honor.  Foundation

5    as to the latter.

6          THE COURT:  Well, let's -- I'll overrule that.

7          Come on.  Let's see how it goes.

8          THE WITNESS:  With all but one of these

9    categories, they're calculated by just applying and assumed

10   percentage savings to the Time Warner spend or, in some

11   cases, to the AT&T spend and assuming, without any

12   additional level of documentation, that the assumed

13   percentages is correct.

14         And then there's one category on this page that

15   just has assumed dollar amounts that would be saved.

16   BY MR. SIEGEL:

17    Q    Now, Mr. Quintero, how do you know that these

18   percentages that you see on this page are just assumed

19   percentages and not based on data or analysis of any kind?

20    A    Because I reviewed all of the underlying

21   documentation that's been proffered by the defendants.

22    Q    Did AT&T point to any calculations or evidence

23   underlying these percentage savings?

24    A    Not below this level.

25    Q    Not below the level shown on page 4?

1        A     The level -- that is correct.

2        Q     Looking at the domestic paid media synergy, the

3    top item on page 4, could you just tell the Court what that

4    means, domestic paid media.

5        A     Money saved on advertising.

6        Q     And how is the domestic paid media synergy in

7    particular calculated by AT&T?

8        A     AT&T has assumed that 15 percent of the

9    Time Warner spend in this area would be saved by the year

10    2020.

11        Q     And how is that 15 percent figure derived?

12        A     It is an assumption.

13        Q     Did you have any reason to believe that this

14    synergy, the domestic paid media synergy, is not

15    merger-specific?

16        A     I do.  Because --

17        Q     What was that?  I'm sorry.

18        A     Because the basis underlying the asserted

19    assumption is that by Time Warner consolidating from three

20    media buying services to one, they would be able to reduce

21    their costs by 15 percent.

22             Now, Time Warner is a very sophisticated company

23    in this area.  They spend almost as much money as does AT&T.

24    And, in fact, they're in the business of selling advertising

25    through the Turner network, so they certainly know this

1    business well.

2           And so it is reasonable to believe, without any

3    additional explanation, that the reason that they choose

4    three buying services is because, considering not only the

5    costs, but also the effectiveness of the spend, that is the

6    right thing to do.

7           And with respect to merger specificity, if they

8    wanted to save money without regard, again, to the effect,

9    by consolidating from three to one and they believe it would

10   really save money, they can do this without having to go

11   through a merger.

12      Q    You can put page 4 aside, Mr. Quintero.

13          Did you hear Mr. Stankey talk about the vendor

14   spend category of synergies?

15      A    I did.

16      Q    And what does the vendor spend category mean?

17      A    That is a category of money that's spent with

18   third-party vendors, such as professional service firms,

19   provider of transportation services, and the like.

20      Q    Now, why did you conclude that the vendor spend

21   synergies are not verifiable?

22      A    Because they are based on pretty much the same

23   types of calculations, an assumed percentage savings that's

24   attributed to one or more vendors in a particular category,

25   sometimes more than one assumed percentage, but, again, a

1    non-verifiable assumed percentage savings.

2        Q    Now, Mr. Quintero, the vendor spend synergy that

3    you're describing sounds a lot like the marketing spend

4    synergy that you described a moment ago.

5             Are they different?

6        A    Only in terms of what is being saved in terms of

7    what category of expenditure.

8             But the mathematical calculation is a similar type

9    of calculation.

10       Q    And how about in terms of the areas of expertise,

11   of your particular expertise, that would enable you to

12   assess the vendor spend synergy?  Are they different in any

13   way from the areas and emphases of expertise that enable you

14   to assess the marketing spend synergies?

15       A    No, sir.  These are the disciplines I've applied

16   throughout most of my career.

17       Q    Please look at page 5, if you would, of PXD16.

18   May we proceed, Your Honor?

19             THE COURT:  Yes.

20   BY MR. SIEGEL:

21       Q    Page 5, is this an example of a calculation of a

22   synergy in the vendor spend category?

23       A    It is.

24       Q    And where did this calculation shown on page 5

25   come from?

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3413 of 3826

3547

1        A      This calculation comes from version 41.

2        Q      And did you hear Mr. Stankey talk about the --

3    sorry.  Pardon me.  Strike that.

4               This calculation shown on page 5, is this an

5    example of a vendor spend calculation?

6        A      It is.

7        Q      And it's the logistics and distribution vendor

8    spend calculation?

9        A      Yes.

10       Q      Please tell the Court, what does that mean, the

11   logistics and distribution synergies?

12       A      These are organizations that get involved in

13   packaging and delivering products and other items, as well

14   as a provider of office supplies.

15       Q      And what's wrong with this calculation, in your

16   view?

17       A      Again, it's got the same very general

18   non-verifiable aspect to it in the way that it was conceived

19   and applied.

20       Q      Could you explain to the Court what you mean by

21   the very general non-verifiable aspect.

22       A      Yes, sir.

23              There's three components to these calculations.

24              There's a projection on the Time Warner part,

25   which is where all the claimed savings are purported to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3548

1    exist, of expenses by seven different vendors, 2018, '19,

2    and '20.  So since these synergies are all assumed based on

3    projected amounts in 2020, it takes the projected

4    expenditures in 2020 for each of these seven vendors.

5             It assumes, without further explanation, that

6    either 30 percent saved will be realized on three of the

7    vendors or 5 percent on the other five.

8             Now, what's particularly interesting about these

9    assumptions is, in five of the seven categories, Time Warner

10   actually spends more money than does AT&T.  And, in fact, in

11   two of them, AT&T doesn't spend any money at all.  So it

12   raised the question, why are these vendors going to suddenly

13   choose to give such a break post-business combination to

14   Time Warner.  No explanation in the underlying documentation

15   is provided.

16            So the product of the assumed spend for each of

17   these vendors in 2020, times the assumed savings in

18   connection with each of these vendors in 2020 gives rise to

19   the total number that you see in the lower right-hand corner

20   of this schedule.

21        Q    In your experience, Mr. Quintero, is that the way

22   such a calculation is typically done?

23        A    No, not at all.  There always has to be underlying

24   information, comparison of contracts from the, in this case,

25   it would be between Time Warner contracts and AT&T contracts

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3415 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3549

 1    to see, is there a basis for assuming savings, other

 2    documentation, in order to be able to substantiate the

 3    asserted savings.

 4         Q    And is this calculation seen on page 5

 5    representative, fairly representative, of the ones that you

 6    saw in the vendor spend category?

 7         A    Yes.  It's a consistent theme.

 8         Q    Now, I probably should have asked.  Was the

 9    marketing calculation that you described with regard to the

10    domestic paid media, was that fairly representative of the

11    others that you saw in that category?

12         A    It was, except for the one that I said was based

13    on just an absolute dollar amount of savings.

14         Q    What was the analysis or data source behind that

15    absolute dollar amount for that exceptional case?

16         A    It was an assumed savings pertaining to

17    data-driven marketing, both on the part of AT&T and

18    Time Warner.

19         Q    Okay.  You can set page 5 aside.

20              Did you hear Mr. Stankey talk about the combined

21    asset revenue synergies?

22         A    I did.

23         Q    And those were cross-promotional and bundling

24    synergies?

25         A    That is correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3550

1     Q    Can you tell the Court about a -- well, strike

2  that.

3          Can you tell the Court a bit about how the work

4  that you typically do and, including your educational and

5  professional background, enables you to assess these

6  combined asset revenue synergies?

7     A    Because, just like the cost synergies, I'm

8  routinely reviewing information prepared by clients or other

9  third parties for a variety of reasons in order to evaluate

10  how reliable they are.

11          And I'm reporting on such, either back to the

12  clients or to other third parties.  Sometimes I'm using the

13  information for my own analyses.

14     Q    And similarly, Mr. Quintero, how does your work

15  experience and training qualify you to evaluate whether a

16  claimed efficiency is merger-specific?

17     A    Because my work experience professional,

18  background, professional licenses are heavily geared towards

19  being able to dig deep into information, to solicit

20  information, in order to be able to take raw data and see if

21  it can be converted into something that is reliable, or to

22  determine that it's not reliable.

23     Q    Moving back to the combined asset revenue

24  synergies.  What -- I think you mentioned those are

25  cross-promotional and bundling synergies, right?

1       A       That is correct.

2       Q       Can you tell the Court about a typical example of

3   one of these combined asset revenue synergies?

4       A       For example, the claimed revenue synergies in

5   connection with promoting Warner Brothers films.

6       Q       Please turn to page 3 of PXD16.

7               MR. SIEGEL:  May we proceed, Your Honor?

8               THE COURT:  Okay.

9   BY MR. SIEGEL:

10      Q       Mr. Quintero, does this table shown in page 3 come

11  from version 41?

12      A       It does.

13      Q       And does this table on page 3 show how the

14  defendants calculated the Warner Brothers film synergy?

15      A       It does.

16      Q       And that's one of the combined asset revenue

17  synergies?

18      A       It is.

19      Q       And what does this synergy reflect?

20      A       This synergy reflects the asserted incremental

21  operating income or difference between revenues and costs

22  that the defendants assert would come about as a result of

23  promoting Warner Brothers films at the AT&T stores and via

24  any other methods, although the only ones for which costs

25  have been projected is promoting them at the AT&T stores.

1          Q    And could you please explain for the Court what's

2     wrong with this synergy calculation.

3               And, Mr. Quintero, I just caution you, as you do

4     that, please don't disclose any of the numbers, basically,

5     in this -- in page 3, with the exception of the "lift per

6     film" lines.

7          A    Okay.

8               MR. WALTERS:  Your Honor, may we approach?

9               THE COURT:  You may.

10              (Sealed bench conference)

11              MR. WALTERS:  I apologize, but this is a whole new

12    arena of synergy.  These are revenue synergies.

13              And this is really what -- the question is, how

14    do you take these movies and put them in stores and mobility

15    and generate incremental revenue?

16              There's no foundation he has any ability or

17    expertise in this area.

18              THE COURT:  Has he even had a matter like that?

19              MR. SIEGEL:  Anthem-Cigna, there were revenue

20    synergies that were asserted.  I know he considered them.

21    I can't swear to you that it was in his testimony.  I

22    suspect it was.

23              MR. WALTERS:  That was a horizontal merger.  It

24    was all about cost.

25              But the point is, what -- he was confined to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3553

```
 1    accounting issues again there.

 2            The point is the only kind of expertise to know

 3    whether you can actually do that is people who operate in

 4    the industry.

 5            He's never been in this industry.  He's never done

 6    this.  He's never done any cross-promotion.  It has nothing

 7    to do with accounting --

 8            MR. SIEGEL:  Your Honor --

 9            MR. WALTERS:  Let me finish.

10            MR. SIEGEL:  Okay.

11            MR. WALTERS:  -- or looking at underlying

12    invoices, forensic accounting, to see whether they can be

13    generated.

14            They're fundamentally business judgments based on

15    business experience and ability.  That's not what he does.

16            MR. SIEGEL:  He had access to the documents that

17    were proffered to him by these experienced managers at AT&T,

18    essentially all of the backup and proffered as all the

19    backup to version 41.

20            Moreover, I mean, just looking at this, at this

21    sheet at page 3 answers the question of whether it's an

22    appropriate province for an accountant.

23            It is.  I mean, look at it.  It's an accounting

24    statement, more or less.  It's a future-looking forecast of

25    the possible income that could be generated by certain
```

1    cross-promotions.

2             And it's -- we -- Mr. Quintero is an experienced

3    financial forecaster.  He's assessing financial forecasts.

4    There couldn't be more --

5             THE COURT:  He has no knowledge or expertise in

6    this field, right?

7             MR. SIEGEL:  In this industry, you mean?

8             THE COURT:  Well, yeah.

9             MR. WALTERS:  No, sir.

10            MR. SIEGEL:  In this industry or in the are of --

11   because I can lay a further foundation about revenue

12   synergies in particular, why revenue synergies.  I'm happy

13   to do that.

14            THE COURT:  What experience has he ever had in

15   dealing with the film industry?

16            MR. SIEGEL:  The film industry, I can ask him.  He

17   has had some.  He's had experience, some experience in

18   related industries, but I'm happy to ask him about it.

19            THE COURT:  This is the --

20            MR. SIEGEL:  Shall I lay a foundation?

21            THE COURT:  This is the media entertainment

22   industry.

23            MR. SIEGEL:  Yeah.

24            THE COURT:  This is, in particular, the movie

25   industry?

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3421 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3555

```
1                MR. SIEGEL:  Okay.

2                THE COURT:  Has he ever had a case -- has he had

3    knowledge or involvement in --

4                MR. SIEGEL:  I believe so.

5                And I can ask him more about it.  I mean,

6    I don't want to speak for him.  I'm happy to ask him what

7    experience --

8                THE COURT:  You just don't know?

9                MR. SIEGEL:  No, no.  I do know that he has had

10   experience in related industries.  I mean, I believe he's --

11   yes, he has had experience.  He's worked for a movie studio

12   before.

13               But I don't want to -- I don't have his résumé on

14   me, but I'm happy to ask him.  And he'll do a much better

15   job than I can of drawing the lines and saying whether it's

16   relevant or it's not relevant.

17               I mean, the truth of the matter is, people in his

18   field who are proffered information by industry experts and

19   data from the actual companies, which he was, are able to --

20               THE COURT:  He's not an expert in the area of this

21   industry.  He has no knowledge or background in this

22   industry.

23               MR. SIEGEL:  I can't say that.

24               MR. WALTERS:  Or --

25               THE COURT:  Let me ask him.
```

1          MR. WALTERS:  And even more fundamentally, in

2    cross-promotions in this industry, right?  I mean, that's

3    what we're talking about is, can you or can you not generate

4    anything about revenues?  There's no basis he knows anything

5    about that.

6          THE COURT:  If you want to ask him about

7    experience he's had in dealing with the cross-promotion.

8          MR. SIEGEL:  Cross-promotion.

9          I kind of had it both ways.  Cross-promotions,

10   generally.  And this industry -- you know, that is to say,

11   the subject area and the industry area.

12         THE COURT:  The film industry.

13         MR. WALTERS:  It should be cross-promotions in the

14   film industry.

15         MR. SIEGEL:  Well, I mean, if we can get as

16   narrow -- look, if we get infinitely narrow, the guy is

17   going to have no experience at a certain point.

18         I can ask him both and see if he's convincing on

19   it.  I think it all goes to weight, Your Honor.

20         It's -- look, I'm sure he's worked in the film

21   industry before.

22         THE COURT:  Let's see what he says.

23         MR. SIEGEL:  Okay.

24         MR. WALTERS:  Thank you, Your Honor.

25         (Open court)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   BY MR. SIEGEL:

 2        Q    Mr. Quintero, do you have any experience working

 3   in the film or entertainment industries?

 4        A    I do.

 5        Q    And can you tell the Court a bit about that.

 6        A    Things that really -- that immediately occur to

 7   me -- and, Your Honor, I've worked during the course of my

 8   43-year career on over a thousand projects.  So I'm just to

 9   tell you what occurs to me off the top of my head.

10             I got involved in the advising in connection with

11   the acquisition of 20th Century Fox in evaluating the

12   various business units in connection with developing pricing

13   for the various business units.

14             As recently as a few months ago, I got involved in

15   a matter pertaining to the largest television studio in --

16   east of California, in evaluating certain financial and

17   other information.

18             I've been involved in testifying as an expert

19   witness with respect to values of television stations.  I've

20   testified as an expert witness in Bankruptcy Court on the

21   emergence from Chapter 11 on a couple of major television

22   stations.

23             And I'm sure if I looked deeper, I would find

24   others.  But those are ones that immediately occur to me,

25   but I believe that there are others.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q    Were there any people on your staff who worked on

2   this matter, who, to your knowledge, had experience or have

3   experience in the media or entertainment industries?

4      A    One of the members of my staff who worked on this

5   engagement was formerly in the strategic planning and

6   finance department, an M&A department, of

7   Charter Communications.

8      Q    A cable company?

9      A    And with the others, I've just not asked them

10  about that industry-specific issue because what we're doing

11  is really applying a functional area of expertise that

12  applies to many industries.

13     Q    What about promotional opportunities; have you had

14  occasion to consider promotional opportunities that

15  businesses were considering?

16     A    Routinely because in developing financial

17  projections, with respect to revenues, that's one of the

18  areas that would be considered.

19     Q    So, Mr. Quintero, what is this, I believe you told

20  us this synergy shown on page 3 reflects the incremental

21  operating income that might be obtained from promoting

22  Warner Brothers films at AT&T stores and possibly through

23  other AT&T assets; is that fair?

24     A    That is correct.

25     Q    Now, what's wrong with this synergy calculation?

1  I asked you that before, and I was warning you not to

2  disclose the particular dollar figures here other than the

3  lift per film percentages.

4          MR. WALTERS:  Your Honor, we renew the objection.

5  No foundation.

6          THE COURT:  Overruled.

7          Go ahead.

8          THE WITNESS:  First of all, in terms of putting

9  this in perspective, I've reviewed correspondence from

10  senior Warner Brothers executives.  An EVP for business

11  strategy reviewed these projections -- or I don't know if

12  it's these, but reviewed the general projections proffered

13  by AT&T.  He characterized those specifically pertaining to

14  combined asset synergy --

15          THE COURT:  Don't testify to as to what he said.

16          THE WITNESS:  Okay.

17          THE COURT:  That's hearsay.  You can't testify as

18  to that.

19          THE WITNESS:  All right.

20  BY MR. SIEGEL:

21      Q    If you would, just walk us through the most

22  relevant elements, most relevant or emblematic of your

23  assessment here on page 3, if you would.

24      A    Certainly.

25          The first row entitled "WB, Domestic Box Office,

3560

1    Per Tentpole."

2                A tentpole is a heavily promoted film.

3                The basis for that first row is the average box

4    office receipts per tentpole in 2016.

5                Now, I reviewed the box office receipts, not only

6    for 2016, but the three years preceding that.

7                2016 was the highest year, so they built off the

8    highest year, made that even larger to make it the

9    foundation for 2020.

10               And so the assumption is that on the amount shown

11   on 2020, that there would be four such promoted tentpole

12   films.

13               And the third row, the lift per film, or the

14   increased box office receipts per film, would be 15 percent.

15               Why 15 percent?  I don't know.  Could be zero

16   percent; could be more or less.  There's no basis shown for

17   the 15 percent.

18               The only relevant information that has been

19   proffered by the defendants pertaining to 15 percent is that

20   they would presumably, through such promotion, close half

21   the gap between the Warner Brothers tentpole films and those

22   of another major, highly successful studio.

23               Now, why half a gap as opposed to none of the gap

24   or all the gap?  Again, it is just an assumption.

25               So that's the assumption with regard to that first

1     category.  And it's repeated in the second category, the

2     other films that are shown in this page, to show, in the

3     middle of page, the total incremental box office that is

4     assumed to be realized from these cross-promotional

5     activities.

6         Q    And then to consider the Court's time, without

7     walking through all of the detail, are there other

8     assumptions that concern you in the calculation to get to

9     the bottom line there on the bottom right?

10        A    There are.

11        Q    Of a similar nature to the ones you discussed?

12        A    Yes, that is correct.

13        Q    Now, is this Warner Brothers film calculation a

14    typical example of how the defendants calculated their

15    combined-asset revenue synergies?

16        A    That is correct.

17        Q    Do you generally regard cross-promotional

18    synergies such as this one to be merger-specific?

19        A    No, because they can also be accomplished without

20    going through a merger.

21        Q    Well, what makes you think they can?

22        A    Because, first of all, this year, AT&T and

23    Warner Brothers have done such a cross-promotion without

24    having to go through a merger.

25             Also, I saw deposition testimony indicating that

1   Turner has also done cross-promotions with some major

2   retailers in the United States, again, without having to

3   enter into a business combination.

4       Q    You can put page 3 aside, Mr. Quintero.

5            Now, Mr. Quintero we've covered all of the synergy

6   calculations -- strike that.

7            Mr. Quintero, have we covered all the synergy

8   calculations you did in your work on this matter?

9       A    No, sir.

10           We talked about the three major categories of

11  costs, the one major category of revenues.  In fact, there

12  are approximately 30 subcategories that I looked at in

13  connection with the work that I did.

14      Q    And we're not going to go into all those right

15  now, correct?

16      A    I would if you would like me to, but I don't think

17  you do.

18      Q    I would not.

19           Are the shortcomings in the calculations that we

20  have just discussed typical of those you observed in the

21  rest of the defendants' work in version 41?

22      A    Yes, sir.

23      Q    Did you consider any other claimed synergies aside

24  from the cost and revenue synergies in this matter?

25      A    I did.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3563

1      Q      Which synergies are you referring to?

2      A      The defendants have also claimed innovation

3   synergies.

4      Q      What would an example be?

5      A      An example would be optimize movie content so it

6   can be seen on a mobile phone.

7      Q      Have you reached an opinion on the innovation

8   synergies you considered?

9      A      I have.

10     Q      And what is that?

11     A      Well, recognize my area of expertise is in

12   finance.  And so what I focused on or would have focused on

13   would be any claimed financial synergies or incremental,

14   either incremental or revenues or reduced costs associated

15   with innovation synergies.  They were not quantified by the

16   defendants; therefore, I'm unable to say that any are

17   verifiable.

18     Q      Mr. Quintero, I'm not going to ask you to go

19   through any more detailed examples.  But before we wrap up,

20   I just want to turn briefly to a couple points Mr. Stankey

21   hit on in his testimony yesterday.

22            Did you hear Mr. Stankey mention that AT&T has

23   often met its synergy targets in previous mergers?

24     A      I have.

25     Q      And did that convince you that some of the

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3430 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3564

1  synergies asserted here are, indeed, verifiable?

2      A    No.

3      Q    Why not?  Now, I caution you, when answering that

4  question, AT&T is taking the position that the dollar

5  figures concerning the DirecTV revenue synergies are

6  confidential.

7      A    I understand.

8      Q    So why did the track record, for what want of a

9  better term, in other mergers not convince you that the

10  synergies being proffered here are verifiable?

11      A    I heard Mr. Stankey testify that he had been

12  involved in eight prior mergers where claimed synergies had

13  been accomplished.  First of all, I don't have documentation

14  to any degree of detail on those eight mergers he is

15  referring to.  The one that I got the most information is

16  DirecTV.

17          However, each merger is unique.  So the fact that

18  they may or may not have achieved the synergies in prior

19  mergers is not relevant to this specific merger.  The prior

20  mergers are, as I understand, all horizontal mergers,

21  merging with another company in the same business.

22          It's a lot easier to project potential synergies

23  on horizontal mergers, where you have a good understanding

24  of the revenue and cost structure and you are able to

25  eliminate redundant costs.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  Is this the first one you testified in

 2    where it's a vertical merger as an expert?  Is this the

 3    first time you testified as an expert witness in a

 4    vertical-merger case.

 5              THE WITNESS:  With respect to antitrust matters,

 6    yes, sir.

 7              THE COURT:  Okay.  Thank you.

 8    BY MR. SIEGEL:

 9        Q    And so each one has its unique attributes.

10              Now, with respect to --

11              THE COURT:  What's the question?

12    BY MR. SIEGEL:

13        Q    The question was -- I think the question is

14    just -- I'm not sure if the witness has finished or not.

15              Why it is that Mr. Stankey's testimony about the

16    experience of meeting synergies in certain prior mergers did

17    not convince him that the synergies being proffered in this

18    merger are verifiable.

19        A    And if I combine verifiable and merger-specific,

20    also, to the extent that any of these other mergers achieve

21    synergies, it's not necessarily because of merger

22    specificity.  There can be other factors.

23              Now, with respect to the DirecTV merger,

24    Mr. Stankey testified, as I saw based on the underlying

25    data, there's a huge miss on the revenue synergies.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3566

 1          And with respect to the cost savings, the largest

 2    element of cost savings was on savings with respect to

 3    content, because of the fact that DirecTV had a better deal

 4    than did AT&T's U-verse; however, that type of synergy is

 5    not being reflected in this matter.  So that's why I say

 6    specific to this merger, whatever did or didn't happen in

 7    the prior mergers really have no bearing on this one.

 8          Q    And, Mr. Quintero, did you hear Mr. Stankey

 9    testify that the managers who estimated these synergies

10    shown in version 41 will be held accountable to achieve

11    them?

12          A    I heard that testimony.

13          Q    And did that convince you that some of these

14    synergies being proffered here are, indeed, verifiable?

15          A    No, sir.

16          Q    Why not?

17          A    First of all, I don't know if those managers were

18    one and the same as the people who quantified these

19    synergies.

20          I also heard Mr. Stankey say that the AT&T process

21    is, after the transaction closes, that's when they update

22    the quantification of synergies.

23          So I don't even know if the ones for which they

24    will be held accountable for are, indeed, the same ones that

25    we see in version 41.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3567

1         Also, even when people are well intentioned in

2    quantifying synergies, even when they have incentives to be

3    able to achieve them and potential penalties to come up

4    short, it doesn't mean that they're going to achieve them.

5         And, in fact, I've not heard what the incentives

6    are or what the penalties for failure to achieve the

7    synergies.

8         So that does not equate to verifiability.

9    Q    Mr. Quintero, did you hear my colleague,

10   Mr. Welsh, ask Mr. Stankey about why the synergy roll-up on

11   page 7 of version 41 was dated July 2017?

12   A    I heard that question.

13   Q    And Mr. Stankey asserted that the synergies

14   covered by version 41 are actually from October, the date

15   that it was dated.

16        Do you remember that?

17   A    I heard that.

18   Q    Okay.  Do you have an opinion about that?

19   A    I do.

20   Q    What is it?

21   A    Well, the synergies in the 1010 version 41

22   document are actually almost the very same as the ones that

23   were contained in a predecessor document dated May 25th.

24        And by July 31st, those synergies were the same

25   ones as what was reflected in 1010.  So really, the latest

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3568

1   date that I could say that they applied to was July 31st,

2   and everything subsequent is just rolling them forward in

3   other documents.

4        Q    So the numbers themselves were the same?

5        A    That is correct.

6        Q    And as of July 31st, had Mr. Stankey taken over as

7   head of integration?

8        A    No, sir.  My understanding is that he took over

9   August 3rd.

10       Q    Now, we're down to our final topic, Mr. Quintero,

11  your opinions on the fixed versus variable cost question.

12            Do you -- you said that you found none of the

13  claimed -- step back for a moment.

14            What, in your background and practice, in your

15  work, enables you to assess the difference between a fixed

16  cost and a variable cost?

17       A    Well, throughout my entire career, I've dealt with

18  distinguishing between fixed and variable cost.  That's part

19  of the training in accountancy as a CPA, as a certified

20  management accountant, in my developing and reviewing

21  financial projections.  Understanding the distinction

22  between fixed and variable cost is a very important

23  discipline to be cognizant of and to be able to apply.

24       Q    Did you -- you said that you found none of the

25  claimed cost savings have been shown to be variable costs in

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3569

1    nature?

2        A    That is correct.

3        Q    Do you have an understanding of why you were asked

4    to look at variable costs?

5        A    Yes, I do.

6        Q    What is that?

7        A    First of all, my experience has been, in all of

8    the antitrust matters that I've been asked to review,

9    potential cost synergies, the distinction between fixed and

10   variable costs and knowing which ones are variable is

11   important.

12            Also, all of those -- I've testified I'm an

13   accountant, a financial person.  I'm not an economist.  But

14   I understand economists regard variable cost savings as

15   being the ones that can potentially be available for

16   providing benefits to consumers.

17       Q    Now, why in this case do you conclude that no

18   variable cost savings have been demonstrated?

19       A    First of all, the defendants have not claimed in

20   any of the documentation or in version 41 that any of these

21   claimed costs savings are variable costs.

22            Also, from my having looked at the underlying data

23   and how they quantified the claimed savings, none of them

24   were based on the sort of volumetrics, such as number of

25   subscribers or MVPDs, that are normally associated with

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3436 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3570

1    quantifying variable costs.

2         Q    In version 41, do defendants claim anywhere any

3    kind of cost synergies or variable or fixed?

4         A    I didn't see any.

5         Q    Did Mr. Stankey discuss any synergy categories

6    yesterday that are routinely regarded in your profession as

7    fixed costs?

8         A    Yes.

9         Q    Which ones?

10             Well, let me step back.

11             Can you provide the Court with a few examples?

12        A    In terms of what he discussed yesterday?

13        Q    Yes.

14        A    Well, for example, any cost savings pertaining to

15   corporate overhead, those are routinely referred to as fixed

16   costs.  Advertising, marketing, those are fixed costs.  You

17   have a budget, and you implement according to the budget.

18        Q    Please now turn to page 7 of PXD16, Mr. Quintero.

19             This is -- yeah, page 7.

20             MR. SIEGEL:  May we proceed, Your Honor?

21             THE COURT:  You may.

22             MR. SIEGEL:  I'll wait till you're there.

23             Okay.

24   BY MR. SIEGEL:

25        Q    Mr. Quintero, is it your opinion that there will

1    be no synergies whatsoever from this merger?

2         A    No, sir.

3         Q    What is your opinion, then?

4         A    It's my opinion that, based on the documentation

5    provided by the defendants, that there are no synergies that

6    are verifiable, merger-specific, or that pertain to variable

7    costs.

8         Q    And with regard to -- were you speaking with

9    regard to the cost or the revenue synergies?

10        A    Well, I would say the same for the revenue

11   synergies that I had reviewed, other than the issue with

12   respect to verifiable costs.

13        Q    And is that conclusion essentially what's depicted

14   on page 7 of the demonstrative?

15        A    Yes, sir.

16        Q    Now, Mr. Quintero, what is your professional

17   opinion of the backup and documentation that defendants

18   provided for their claimed synergies?

19        A    As a CPA, I would be in violation of my

20   professional obligations if I were to represent that they

21   are objectively verifiable.  They're simply assertions

22   without an appropriate level of underlying documentation or

23   proof.

24             MR. SIEGEL:  Thank you, Mr. Quintero.

25             I pass the witness.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  All right.  Well, we've reached the

 2    end of the day today.

 3              You're a witness under oath in the case.  It means

 4    you will not be at liberty to discuss your testimony so far

 5    or what it might be when we return on Monday.

 6              THE WITNESS:  I understand, Your Honor.

 7              THE COURT:  So you need to be back here at 10:30,

 8    ready to go.  We actually might have an argument on a legal

 9    matter before we start, but we should be back here ready to

10    go at 10:30, just in case.

11              THE WITNESS:  I will be.

12              THE COURT:  Don't discuss your testimony with

13    anyone, including your own counsel, between now and then.

14              THE WITNESS:  I understand, Your Honor.

15              THE COURT:  All right.  You're excused.

16              THE WITNESS:  Thank you.

17              MR. PETROCELLI:  Your Honor, may I approach?

18              THE COURT:  Yes.

19              (Sealed bench conference)

20              MR. PETROCELLI:  Your Honor, yesterday, you had

21    asked Mr. Conrath to provide to me the areas that

22    Mr. Shapiro purports to address on Monday and so we could

23    have a further discussion about whether it was appropriate

24    rebuttal.

25              I emailed him last night to follow up on it, and
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    I've asked him several times today.  And now it's 6:30, and

 2    I have nothing.

 3            MR. CONRATH:  And I said I would provide it by the

 4    end of the day, and I'm prepared to do it.  And I understand

 5    that the Court wanted to make a ruling.  I'm prepared to

 6    provide it.

 7            THE COURT:  Well, I mean, look.

 8            MR. PETROCELLI:  There is a --

 9            THE COURT:  I have to make a decision about to

10    what extent, if any, he'll be restricted --

11            MR. CONRATH:  Yeah, sure.

12            THE COURT:  -- and to how far he'll be going.

13            I was hoping that we would have some insight as to

14    those situations where his specific testimony had been

15    rebutted, and those circumstances where he was rebutted,

16    those were the ones we were going to focus your question on.

17            MR. PETROCELLI:  Your Honor, we were supposed to

18    have that today so we could have the discussion now, because

19    we can't be forced into preparing in the blind.

20            And I need to know what are the topics, because I

21    intend to argue that I think most, if not all, of them were

22    inappropriate subjects of rebuttal testimony.  Let me give

23    that to Your Honor.  I'll -- I'll give this to you.  It's

24    just basic law on the subject.

25            Now --
```

1           MR. CONRATH:  If I can see --

2           MR. PETROCELLI:  -- it would have been helpful to

3    receive this earlier so I could --

4           THE COURT:  Hold on now.

5           MR. CONRATH:  I'll withdraw.

6           MR. PETROCELLI:  These are not topics, Your Honor.

7    This is just an argument.

8           MR. CONRATH:  So I request permission to offer --

9    we had an oral motion yesterday.  Request permission to

10   offer a couple-page letter laying out the legal part.  The

11   topics are being attached.

12          MR. PETROCELLI:  Every one of these topics,

13   Your Honor, every one of them was covered in his direct

14   exam, every one of them.

15          This is a complete do-over.  Having now heard

16   Professor Carlton, Professor Katz, and Professor Rossi, he

17   had all that information, Your Honor, in the rebuttal

18   reports.  He gave a deposition.  He came in and testified.

19          And now he -- now that we were able to respond to

20   him, he wants to basically come in and repeat what his

21   position is.  And that's not appropriate rebuttal.  It has

22   to be something new that he could not have presented

23   initially, and nothing falls in that category.  This is a

24   complete redo of his opinion, inputs.

25          That was --

1          MR. CONRATH:  This is not --

2          MR. PETROCELLI:  Excuse me.

3          -- inputs, margin, simulation, program access,

4     claimed efficiencies.

5          He even testified that he has no opinion on

6     efficiencies, no opinion on program access rules, because

7     that was going to be handled by other experts.

8          In addition, I emailed Mr. Conrath last night.

9     And I said, if he has done any additional work, we further

10    object on that basis, because we can't be ambushed with this

11    guy coming in to try to, like --

12         THE COURT:  Has he done expert work?

13         MR. PETROCELLI:  He would not answer my question.

14         MR. CONRATH:  I described what his testimony will

15    be there.  I don't think anybody characterizes it as extra

16    work, but I'm sure anything he says could easily be

17    mischaracterized that way.

18         He is responding to specific things that came up

19    in the testimony of Professor Carlton, Professor Katz.

20         But the fact testimony that was not available that

21    came from Mr. Christopher would be in documents that came,

22    and his testimony is entirely appropriate rebuttal.

23         The implication of the argument of defendants is

24    that Professor Shapiro would have been required to rebut,

25    pre-rebut every possible argument that the other side had,

```
1    which is both inefficient and unfair and not warranted.

2            Professor Shapiro put in his evidence, his

3    opinions.

4            Mr. Carlton and others came back and said, well,

5    here's what we say about that.

6            Rebuttal is the time for the witness to say, well,

7    I've heard that argument; let me explain to you, not to

8    repeat what he said, because that would not be rebuttal.  I

9    agree with that.

10           But to say, instead, let me take the argument,

11   arguing in the next step and say, what's wrong with the

12   attacks that have been made on my argument?

13           I should say that this is extremely common, all

14   right?  I'm not sure I remember being in an antitrust case

15   where the last witness wasn't the government's economic

16   expert responding to the attacks that have been made or

17   heard during the trial.

18           MR. PETROCELLI:  Then we call Professor Carlton in

19   to demonstrate why these new criticisms of Professor Shapiro

20   are incorrect.

21           Your Honor, here's the difference.  The rebuttal

22   reports were all ordered by Your Honor.  Dr. Shapiro had

23   everything in advance, okay, of not only his deposition but

24   also his trial testimony.  So he laid out his opinions.

25   Dr. Carlton and the other doctors responded.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3577

```
1              Now, there was nothing new that they came up with

2    that he had not already known about and, indeed, largely

3    testified about.

4              They're trying to suggest that he held back on his

5    testimony on all of the criticisms that he already knew and

6    read about that had been made on his testimony.  He

7    addressed all of that in his testimony.

8              How many times did he say that I have a

9    disagreement with Dr. Carlton on this; he agrees with me on

10   this?  That was all part of his testimony.

11             So what he wants to do is come in and essentially

12   do a closing argument about why -- repeat all of the points

13   he made the first time around.

14             All they're going to say is, Professor Carlton

15   says my departure rate is wrong.  He is wrong.  Here's why

16   he is wrong.  My departure rate is right.

17             And now he's going to go through everything he

18   said.

19             This is his whole testimony, Your Honor, in his

20   whole letter here.

21             MR. CONRATH:  So what he's not going to do is

22   repeat what he said before, because that would not --

23   because we're not going to ask him those questions.  The

24   question is, here's what was said about your testimony.

25             THE COURT:  Who's going to question him?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3578

```
 1              MR. CONRATH:  Mr. Welsh will question him,
 2   Your Honor.
 3              And it is a perfect -- perfectly normal rebuttal
 4   testimony is, here's what the other side said about the
 5   arguments.  What do you -- is that correct or not?  Explain
 6   what's wrong.  If you disagree with it, explain what's wrong
 7   with it.
 8              And that's what we would propose to do.
 9              THE COURT:  How long would it take?  I mean,
10   you've got seven topics right here.
11              MR. CONRATH:  It's probably 45 minutes.
12              MR. PETROCELLI:  Your Honor, you had indicated --
13              THE COURT:  How long?
14              MR. CONRATH:  It's probably 45 minutes.
15              MR. PETROCELLI:  You had indicated if he has a new
16   twist, and that's consistent with the law that I've given
17   you.
18              He said nothing here.  He's repeated essentially
19   every topic of his direct examination.
20              THE COURT:  Let him finish.
21              MR. CONRATH:  I mean --
22              THE COURT:  Wait a minute.  Let him finish; then
23   you go.
24              MR. PETROCELLI:  There's law on this, Your Honor.
25   It's under his view -- there's really no definition, no law
```

 1    on the scope of rebuttal.

 2             Under his view, the expert can come back in and

 3    completely respond to anything, and the defense expert has

 4    no right to come back and respond to what he heard.

 5             That's why we gave you some legal principles,

 6    Your Honor, because anything that the expert already knew

 7    and could have presented the first time around and not

 8    allowed to bolster his original opinion by waiting and then

 9    coming back the final time when nobody can respond to him.

10             It's unfair and it's prejudicial.

11             You want to have Dr. Carlton come back and respond

12    to Dr. Shapiro again?  When does it stop?

13             MR. CONRATH:  Well, I think the normal process in

14    the trial is it stops at the plaintiff's case, defense, and

15    rebuttal.

16             MR. PETROCELLI:  There's surrebuttal.

17             THE COURT:  You've got probably an hour of

18    cross-exam with Quintero -- well, you have oral arguments on

19    the motion to dismiss, probably first thing on Monday.

20             MR. PETROCELLI:  Then they have --

21             THE COURT:  You have the cross-exam of Quintero.

22    Now we're probably an hour and a half, roughly, into the

23    morning.

24             Then you've got Athey.

25             MR. CONRATH:  Yes.

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3446 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3580

1          THE COURT:  And you're projecting two and a half

2    hours on Athey.  That's rest of the day.

3          So Shapiro won't start until Tuesday morning.

4          MR. CONRATH:  Correct.

5          THE COURT:  You're projecting roughly 45 minutes,

6    roughly, maybe an hour at the most?

7          MR. CONRATH:  Yes.

8          THE COURT:  So let's say I cap it at an hour,

9    okay?

10          Then you have an hour, okay?

11          And then you have no one else after that.

12          MR. CONRATH:  That's right.

13          MR. PETROCELLI:  I just think it's inappropriate,

14    Your Honor.

15          THE COURT:  I haven't made a ruling yet.

16          MR. PETROCELLI:  It's going to be closing argument

17    by Professor Shapiro.

18          THE COURT:  Why don't I -- I want to look at this

19    stuff overnight.  Why don't we do a conference call tomorrow

20    at about 4:30.

21          MR. CONRATH:  4:30, that works.

22          THE COURT:  And leave word with my Deputy Clerk

23    here where I can reach you.  You guys --

24          MR. CONRATH:  We can set it up -- we can set up a

25    conference call.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  Set it up so that I call into a

2    number --

3          MR. CONRATH:  We'll do that.

4          THE COURT:  -- because you'll probably be back in

5    California, and you'll probably be here -- although maybe

6    you won't be.

7          MR. PETROCELLI:  Actually, I'm leaving right now

8    for the first time in a long time to go see my family.

9          MR. CONRATH:  Good.

10         MR. PETROCELLI:  But I will make myself available

11   for the call.

12         THE COURT:  You don't have to have a gang of 50.

13   Just the two of you.  I don't really need anything more

14   that.  If you want to have Welsh, of course.  He's going to

15   handle the witness.

16         MR. CONRATH:  He's the one who has to do the

17   questioning.

18         THE COURT:  He's going to handle the witness for

19   you guys.

20         MR. PETROCELLI:  It's either going to be me or

21   Mr. Oppenheimer, one of us.

22         THE COURT:  We'll have the two of you, and that's

23   all we need.  We don't need more than that.

24         MR. CONRATH:  Sure.

25         THE COURT:  We don't need a gang of thousands.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3582

```
 1              And talk about it tomorrow at 4:30.

 2              MR. CONRATH:  May I ask one other, on a different

 3    topic?

 4              For Monday, would it be possible to do the

 5    argument on the motion at the end of the day instead of the

 6    beginning so that we can ensure to get Professor Athey off?

 7    Because I had been hoping we would start with her.  And we

 8    can do the argument.  It shouldn't take too long.

 9              THE COURT:  It will be Quintero to start.

10              MR. CONRATH:  Yeah, Quintero will start,

11    obviously.  But I want to --

12              THE COURT:  Yeah, we can do the argument later in

13    the day.  That will be great.

14              MR. PETROCELLI:  It's all right with me, Your

15    Honor.

16              THE COURT:  It doesn't matter.

17              MR. PETROCELLI:  It doesn't matter to us.

18              Thank you very much, Judge.

19              MR. CONRATH:  That was my hope.

20              Thank you, Your Honor.  We'll talk to you

21    tomorrow.

22              THE COURT:  All right.

23              DEPUTY CLERK:  Mr. Conrath -- are you having the

24    4:30 conference call -- are they calling chambers or is it

25    here in the courtroom on the record?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3583

```
 1              THE COURT:  I'm calling them.

 2              DEPUTY CLERK:  Okay.

 3              THE COURT:  I'm calling them.  There's not going

 4    to be any -- we'll put it on the -- we don't need to put it

 5    on the -- don't put that on the docket.  There's no reason

 6    for that.

 7              All right.

 8              (Open court)

 9              THE COURT:  All right.  See you at 10:30 on

10    Monday.

11              DEPUTY CLERK:  All rise.

12              This Honorable Court will stand in recess until

13    the return of court.

14              (Proceedings concluded at 6:40 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

C E R T I F I C A T E

   I, William P. Zaremba, RMR, CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-titled matter.


Date: April 19, 2018_____   /S/__William P. Zaremba_____

          William P. Zaremba, RMR, CRR

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )        CV No. 17-2511
                                    )
                                    )        Washington, D.C.
        vs.                         )        April 23, 2018
                                    )        10:41 a.m.
AT&T, INC., ET AL.,                 )
                                    )        Morning Session
            Defendants.             )
_____)        Day 18


            TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
          BEFORE THE HONORABLE RICHARD J. LEON
            UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                             Eric D. Welsh
                             Donald G. Kempf, Jr.
                             Matthew D. Siegel
                             Nathan D. Brenner
                             Sanford M. Adler
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Washington, D.C. 20530
                             (202) 532-4560
                             craig.conrath@usdoj.gov
                             eric.welsh@usdoj.gov
                             donald.kempf@usdoj.gov
                             matthew.siegel@usdoj.gov
                             nathan.brenner@usdoj.gov
                             sanford.adler@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

Katrina M. Robson
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 220-5052
krobson@omm.com

Daniel M. Petrocelli
M. Randall Oppenheimer
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067
(310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Michael L. Raiff
Robert C. Walters,
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
(214) 698-3350
mraiff@gibsondunn.com
rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:

Kevin J. Orsini
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1140
korsini@cravath.com
pbarbur@cravath.com

APPEARANCES CONTINUED

Court Reporter:                  William P. Zaremba
                                 Registered Merit Reporter
                                 Certified Realtime Reporter
                                 Official Court Reporter
                                 U.S. Courthouse
                                 333 Constitution Avenue, NW
                                 Room 6511
                                 Washington, D.C. 20001
                                 (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

- - -

WITNESS INDEX

- - -

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GOVERNMENT'S: | | | | |
| RONALD QUINTERO | | 3602 | 3678 | |

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3455 of 3826

3589

P R O C E E D I N G S

1              P R O C E E D I N G S

2          DEPUTY CLERK:  All rise.  The United States

3   District Court for the District of Columbia is now in

4   session, the Honorable Richard J. Leon presiding.  God save

5   the United States and this Honorable Court.  Please be

6   seated and come to order.

7          Good morning, Your Honor.  This morning we have

8   Civil Action No. 17-2511, the United States of America v.

9   AT&T, Inc., et al.

10         Counsel for the parties, please approach the

11  lectern and identify yourself for the record.

12         MR. SIEGEL:  Good morning, Your Honor.

13  Matthew Siegel for the United States.

14         THE COURT:  Welcome.

15         MR. BRENNER:  Good morning, Your Honor.

16  Nathan Brenner for the United States.

17         THE COURT:  What's your name?

18         MR. BRENNER:  Nathan Brenner.

19         THE COURT:  Brenner?

20         MR. BRENNER:  Yes.

21         MR. ADLER:  Good morning, Your Honor,

22  Sanford Adler for the United States.

23         THE COURT:  Adler?

24         MR. ADLER:  Yes.  A-d-l-e-r.

25         MR. CONRATH:  Good morning, Your Honor.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    Craig Conrath for the United States.

 2            THE COURT:  Good morning.

 3            MR. WELSH:  Good morning, Your Honor.  Eric Welsh

 4    for the United States.

 5            THE COURT:  Good morning.

 6            MR. KEMPF:  Good morning, Your Honor.  Don Kempf

 7    for the United States.

 8            THE COURT:  Good morning.

 9            MR. PETROCELLI:  Good morning, Your Honor.

10    Daniel Petrocelli for defendants.

11            THE COURT:  Good morning.

12            MS. ROBSON:  Good morning, Your Honor.

13    Katrina Robson for defendants.

14            THE COURT:  Good morning.

15            MR. OPPENHEIMER:  Good morning, Your Honor.

16    Randy Oppenheimer for the defendants.

17            THE COURT:  Good morning.

18            MR. WALTERS:  Good morning, Your Honor.

19    Rob Walters here for AT&T-DirecTV.

20            THE COURT:  Good morning.

21            MR. BARBUR:  Good morning, Your Honor.

22    Peter Barbur for Time Warner.

23            THE COURT:  Good morning.

24            MR. ORSINI:  Good morning, Your Honor.

25    Kevin Orsini for Time Warner.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1              THE COURT:  Good morning.

2              MR. RAIFF:  Good morning, Your Honor.  Mike Raiff

3    for AT&T and DirecTV.

4              THE COURT:  Good morning.

5              I'll see counsel.

6              (Sealed bench conference)

7              THE COURT:  That was an interesting development.

8              MR. CONRATH:  Yes.

9              I'll just give you two seconds' worth.  There was

10   no communication in the end.  I mean, obviously, poor

11   judgment, but --

12             THE COURT:  But he directly disobeyed the Court's

13   orders?  The Court said to stay independent of all other

14   people.

15             MR. CONRATH:  That part I agree.

16             THE COURT:  He's in contempt of court.

17             If you disobey a court order and you're a witness,

18   you're in contempt.  The only question is:  What punishment

19   is appropriate?  What punishment do you think is

20   appropriate?

21             MR. CONRATH:  So I think, Your Honor, that the --

22   that's the question, a question for the Court separately.

23             I think from the perspective of, for us to go

24   forward, there's no communication, no prejudice, and no

25   discussion of his testimony with anyone.  He should complete
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3592

```
 1    his testimony, and the Court should turn to the question of

 2    that at a later time.

 3              THE COURT:  What's his email to -- you watched the

 4    things he sent to your colleague, Mr. Siegel?

 5              MR. CONRATH:  Pardon me?

 6              THE COURT:  Have you watched these things that he

 7    sent to your colleague?

 8              MR. CONRATH:  No.  I asked an attorney not working

 9    on the case to look at them to tell me if they talked about

10    his testimony, as I thought that was, I needed to know that,

11    and to tell me the dates.  And, of course, I can read the

12    description.

13              But I understand one is from another case and one

14    is obviously having to do about a report or something that

15    relates to the case.

16              THE COURT:  Was he confronted by you --

17              MR. CONRATH:  No.

18              THE COURT:  -- about why he did what he did?

19              MR. CONRATH:  No.

20              THE COURT:  Did anyone on your team confront him?

21              MR. CONRATH:  No.

22              It seemed like that would potentially be getting

23    into questions that he might be asked about, so it seemed to

24    us that our appropriate response was that that, in itself,

25    would have been --
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1       THE COURT:  Did anybody confront him with the

2   question of, have you talked to anybody, other than the

3   people that have been emailed?

4       MR. CONRATH:  We had no discussion about this

5   topic with him or the reason that it's a potential subject

6   of examination; but for the Court questioning him and giving

7   him standards, it seemed like the right thing for us to do

8   was to remain independent and not ask those questions.

9       We could do it, but it seemed like the right time.

10      MR. PETROCELLI:  Your Honor, I would suggest that,

11  given his violation of the Court's order, that we -- there

12  be an instruction that an adverse finding can be made

13  regarding his credibility, which I think is appropriate in

14  these circumstances.

15      So if it were a jury trial, for example, the jury

16  would be instructed that they could make a finding that he

17  lacks credibility based on his violation of some order or

18  rule.  And I think we ought to be able to cite to his

19  violation in arguing his lack of credibility to Your Honor.

20      And I think he ought to be admonished about what

21  he did.

22      THE COURT:  Bring him in.

23      MR. CONRATH:  Okay.

24      THE COURT:  You stay here and bring him up here.

25      (Pause)

1          THE COURT:  Mr. Quintero, you're under oath.

2          THE WITNESS:  I understand that.

3          THE COURT:  I've been informed of the emails you

4   sent.

5          THE WITNESS:  That's correct -- I mean, since

6   Friday.

7          THE COURT:  Yes, this was on Saturday.

8          THE WITNESS:  Okay.

9          THE COURT:  You sent two emails?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Sending things you found on the web to

12   lawyers in this team.

13          THE WITNESS:  They were copied, as well as a

14   member of my firm.

15          THE COURT:  Okay.

16          And you did that in direct violation of the

17   Court's orders?

18          THE WITNESS:  I did not understand that that

19   pertained to the --

20          THE COURT:  I said, "Stay independent of all

21   others.  Do not discuss your testimony with anyone."

22          THE WITNESS:  I did not.

23          THE COURT:  I understand that part.

24          But you didn't stay independent of all others.

25   You directly violated the Court's order.

1          THE WITNESS:  I will accept whatever penalty you

2    wish to impose on me, Your Honor.

3          May I tell you what the e-mail was?

4          THE COURT:  Hold on.  I'm not done yet.

5          Did you discuss your testimony with anyone in your

6    firm?

7          THE WITNESS:  No, sir.

8          THE COURT:  Any personal friends?

9          THE WITNESS:  No, sir.

10         THE COURT:  Any family members?

11         THE WITNESS:  No, sir.  Only the existence of it.

12         THE COURT:  Say that again.  Only the existence of

13   it, because my wife knew since I was here.

14         What did you discuss with your wife?

15         THE WITNESS:  Just that I was at the mid-way

16   point.

17         THE COURT:  Okay.  So you didn't go into the

18   substance of any of your testimony?

19         THE WITNESS:  No, Your Honor.

20         THE COURT:  Did you discuss it with anyone from

21   the Justice Department's team?

22         THE WITNESS:  No, sir.  I had no discussions with

23   the Justice Department's team.

24         THE COURT:  So the only thing you did was you sent

25   these two e-mails, that one?

```
 1              THE WITNESS:  Yes, Your Honor.

 2              And that has nothing to do with this case.

 3              THE COURT:  Okay.

 4              And that one?

 5              THE WITNESS:  Okay.  Yes, sir, I guess I did,

 6    which I forgot about that.

 7              THE COURT:  This one is entitled, the subject,

 8    according to your email, is "AT&T Goes on Offensive in

 9    Time Warner Merger Case."

10              THE WITNESS:  Uh-huh.

11              THE COURT:  Right?

12              Did you view this document --

13              THE WITNESS:  I did.

14              THE COURT:  -- whatever?

15              THE WITNESS:  I did.

16              THE COURT:  Okay.  And was there anything in that

17    document that you thought pertained to what you were

18    testifying to or what you would testify to?

19              THE WITNESS:  No, Your Honor.  It was a general

20    news information.

21              THE COURT:  Okay.

22              THE WITNESS:  Your Honor, had I known that was in

23    violation, I obviously would not have done that.

24              THE COURT:  Okay.

25              Mr. Petrocelli, do you have any question you'd
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3463 of 3826

3597

1    like to ask in regard to this issue?

2          MR. PETROCELLI:  When you indicated that this

3    first email, the one that was at 2:33 p.m. April 21st, 2018,

4    had nothing to do with this case, you sent it to a lawyer at

5    the DOJ who examined you in this case --

6          THE WITNESS:  As well as --

7          MR. PETROCELLI:  -- Matthew Siegel, as well as

8    other lawyers.

9          THE WITNESS:  Uh-huh.

10         MR. PETROCELLI:  So why would you be sending this

11    e-mail to the lawyer who just examined you in this case if

12    it had nothing to do with this case?

13         THE WITNESS:  It was generally on the top-ten

14    monopolies of all time.  The people ignore monopolies.

15         MR. PETROCELLI:  Why did you send it to the lawyer

16    who examined you in this case?

17         THE WITNESS:  Only because I thought he would be

18    interested.  It has nothing to do with this case.

19         MR. PETROCELLI:  Did this relate to Google,

20    Facebook, Amazon, and any other --

21         THE WITNESS:  No.  There are other ones a lot of

22    people don't realized, for example, Unilever, companies like

23    that.

24         MR. PETROCELLI:  But did it include those

25    companies that are involved in this case?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE WITNESS:  I don't recall that they were --

 2    because the substance of the article is monopolies that

 3    people don't even realize they're monopolies.

 4              MR. PETROCELLI:  You were obviously searching the

 5    web on Saturday?

 6              THE WITNESS:  I am searching every day, having

 7    nothing to do with this.  These are just -- as I testified,

 8    I'm a professional educator.  I'm constantly learning thing.

 9              MR. PETROCELLI:  How did you happen to come across

10    an interview about this case?

11              THE WITNESS:  Let's see.  Which one is this?

12              MR. PETROCELLI:  The second email.

13              THE WITNESS:  Actually, I don't recall the

14    substance of that one.

15              MR. PETROCELLI:  Well, how did you come across

16    that?

17              THE WITNESS:  Because I'm constantly looking to

18    see what's going on.

19              MR. PETROCELLI:  Was this an interview that went

20    on that day or was this a prior day?

21              THE WITNESS:  No.  On this one, I don't recall the

22    substance of it.

23              In the last --

24              MR. PETROCELLI:  Where did you get the subject

25    line from?
```

1          THE WITNESS:  Because what I do, as matter of

2   interest, is I periodically do searches on YouTube, as well

3   as on the Internet, about this case and about lots of other

4   things.

5          MR. PETROCELLI:  So you were searching on the

6   Internet about this case on Saturday and out popped this

7   YouTube piece.  And you emailed it to the lawyer who just

8   examined you?

9          THE WITNESS:  I did.

10          Again, I don't know that it has anything to do --

11          MR. PETROCELLI:  Why were you searching the

12   Internet on Saturday about this case?

13          THE WITNESS:  I work seven days a week on this and

14   other cases.

15          MR. PETROCELLI:  But the Court had instructed you

16   to do no independent work while you're on the witness stand,

17   to remain independent.  To remain independent --

18          MR. CONRATH:  To remain independent.  That's a

19   different point.  Let's be reprice.

20          THE WITNESS:  I continued to be independent.

21          THE COURT:  When you were searching the Internet

22   about this case --

23          THE WITNESS:  Uh-huh.

24          THE COURT:  -- which you just said you were doing,

25   did you come across any testimony or accounts of the

1    testimony of witnesses or analysis of the accounts and

2    testimony of the witnesses that you thought might be helpful

3    or germane to what you're testifying to?

4              THE WITNESS:  Not whatsoever.

5              Mine is the most benign subject of this trial,

6    probably.

7              MR. CONRATH:  And I know that expert witnesses are

8    exempted from the rule against being --

9              MR. PETROCELLI:  Not while they're on the stand,

10   though.

11             MR. CONRATH:  I'm just making that one

12   observation.

13             THE COURT:  Do you have any questions you'd like

14   to ask?

15             MR. CONRATH:  No.

16             THE COURT:  Please step back.

17             THE WITNESS:  Thank you.

18             THE COURT:  Mr. Conrath, is there anything you

19   want to add in conclusion?

20             MR. CONRATH:  No.  I think the Court can consider

21   his violation of order to remain independent.  I think

22   there's no indication that there was any communication

23   discussing his testimony.

24             He should go ahead and testify, and the Court

25   obviously will take his violation of that order to remain

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  independent into account in evaluating his testimony.

2          MR. PETROCELLI:  Well, I would just add that he's

3  now acknowledged that he was searching the Internet

4  regarding this case while he's on the witness stand and

5  after the direct instruction from the Court.  And I do think

6  that warrants an adverse inference regarding his correct.

7          THE COURT:  All right.  I'm not going to strike

8  him.  Obviously, he is in contempt, and I will have to make

9  a separate decision at later time as to what kind of

10  punishment is appropriate.  It might be a fine.

11          I'm going to permit -- who's handling this case

12  for you -- I mean this witness for you guys?

13          MR. PETROCELLI:  Mr. Walters.

14          THE COURT:  Mr. Walters will be permitted to

15  confront him on what he did and question him accordingly.

16          How much more -- is his direct done?

17          MR. CONRATH:  Pardon?

18          THE COURT:  Is direct exam done?

19          MR. CONRATH:  His direct exam is done.

20          MR. PETROCELLI:  Yes.  We're starting his cross.

21          THE COURT:  So Mr. Walters would be at liberty to

22  confront him on that.

23          And he's got these documents, obviously, so he's

24  welcome to do that.

25          And I'll make a decision at a later time as to

1    what the appropriate resolution is from my perspective.

2    I'm not going to strike him.

3              MR. PETROCELLI:  All right.  Thank you.

4              MR. CONRATH:  Thank you, Your Honor.

5              (Open court)

6              THE COURT:  Call the witness.

7              The witness is under oath.

8              THE WITNESS:  Yes, Your Honor.

9              Mr. Walters, when you're ready.

10             MR. WALTERS:  Yes, sir.  May I proceed?

11             THE COURT:  You may.

12   RONALD QUINTERO, WITNESS FOR THE GOVERNMENT ON REBUTTAL,

13   HAVING BEEN PREVIOUSLY SWORN, RESUMED THE STAND AND

14   TESTIFIED FURTHER AS FOLLOWS:

15                         CROSS-EXAMINATION

16   BY MR. WALTERS:

17       Q    Mr. Quintero, you're aware of Mr. Conrath's letter

18   to this Court about your correspondence over the weekend

19   with your lawyers, are you not?

20       A    Yes, I am.

21       Q    And Mr. Conrath brought to the Court's attention

22   the communications you had with DOJ, in violation of this

23   Court's instruction on Friday.  You're aware of that, are

24   you not?

25       A    They weren't communications.  It was forwarding a

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3469 of 3826

3603

1    couple of YouTube videos.

2        Q    And those YouTube videos that you did forward, you

3    both, you forwarded them to your lawyers, Mr. Siegel, who

4    had examined you in the case, correct?

5        A    He was one of the recipients.

6        Q    As well as a member of your staff, correct?

7        A    That is correct.

8        Q    And one of the videos that you sent was actually a

9    news report, reporting on the expert testimony, economic

10   expert testimony in this case of Mr. Shapiro on one hand and

11   Dr. -- Dr. Shapiro on one hand and Dr. Carlton on the other;

12   isn't that right?

13       A    I vaguely recall that, yes, sir.

14       Q    And Dr. Shapiro, he's actually the economist, the

15   government's lead economist in this case; isn't that right?

16       A    Yes, sir.

17       Q    And Dr. Shapiro is actually the one who is relying

18   exclusively on your opinions about almost $2 billion of

19   these synergies; isn't that right?

20       A    I have no such knowledge of that.

21       Q    You don't know that he's relying on them for

22   purposes of his economic modeling?

23       A    I do not.

24       Q    And that news report reported gave an assessment

25   of how those two economic experts were faring; isn't that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    right?

2        A    I don't recall these, all the specifics of that,

3    the report.

4        Q    And you would agree with me that that would be

5    germane to this matter, would you not?

6        A    I would believe so.

7        Q    And then the second video that you sent also

8    reported on a matter that was germane to this case, correct?

9        A    I don't believe that's the case.

10       Q    Well, it reported on the so-called top-ten

11   monopolists or monopolists you've never heard of, right?

12       A    That is correct.

13       Q    And one of those monopolists that it reported on

14   was Netflix, right?

15       A    I believe so, yes.

16       Q    Yes.

17            And you know that Netflix in its role, its

18   competitive role in this marketplace, is highly germane to

19   this case, don't you?

20       A    I don't know the extent to which people are using

21   Netflix within this case because it's outside the scope of

22   my work.

23       Q    You know it's implicated in this case, don't you?

24       A    I heard it mentioned in the testimony that I

25   observed.

1          Q     You know it's implicated in this case, don't you?

2          A     As I previously said, I heard it mentioned.

3    I don't know the specifics of how it's being used in this

4    case.

5          Q     And that same video reported on Google, did it

6    not?

7          A     I don't recall what it said about Google.

8          Q     I didn't ask you that.

9                That same report reported on video reported on

10   Google, did it not?

11         A     Again, I don't recall that.

12         Q     You don't recall that it reported on Google and

13   its monopolist role?

14         A     There were ten companies.  I don't recall if

15   Google was one of them.  I was cooking my lunch as I was

16   listening to it.

17         Q     And then there was yet a third one, Facebook, that

18   they reported on, too, and its platform and its monopoly

19   role.

20               You recall that, don't you?

21         A     Again, I don't recall that specifically.

22         Q     And then -- now, did you do any other -- now, you

23   were trolling the Internet on Saturday, were you not, about

24   this case?

25         A     I troll the Internet almost every day about a wide

1   range of topics.

2       Q    And so let me -- to answer my question, you were

3   trolling the Internet on Saturday about this case, weren't

4   you?

5       A    I believe every day, in recent days, I had been

6   looking to see what's in the news.

7       Q    And that included Saturday, didn't it?

8       A    Yes, sir.

9       Q    Okay.  And in doing that, you then forwarded that,

10  those videos on to a member of your staff, right?

11      A    I believe one of the two videos -- and I believe

12  it was the one about the monopolist, I thought he would be

13  interested in it.

14      Q    And now, did you do any additional work, any

15  reading, any anything from Friday to today about the case or

16  about your testimony today, just read to yourself, did you

17  do anything?

18      A    Yes, I did.

19      Q    What did you do?

20      A    I reviewed my report and documents that I might be

21  called upon to testify on this case.

22      Q    What documents?

23      A    Other things within my general collection of

24  documents that I prepared in connection with this case over

25  the last year or so that I've worked on the case.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3607

1        Q    So as you reviewed those documents or checked your

2   report, did you interact with any members of your staff as

3   part of that process?

4        A    I interacted with nobody in connection with that.

5        Q    But you did review those additional documents, did

6   you not?

7        A    I did some review, yes, sir.

8        Q    So now on Thursday, you also told Judge Leon or

9   you told Judge Leon that no court has ever failed to

10  recognize you as an expert; isn't that right?

11       A    That is correct.

12       Q    Okay.  But that's only part of the story, isn't

13  it, Mr. Quintero?  You didn't describe the more fundamental

14  question of whether any court has ever discredited your

15  testimony, did you?

16       A    I was not asked about that.

17       Q    But you do recall discussing that subject in your

18  deposition, don't you?

19       A    There was a case I believe I was deposed on.

20       Q    Yes.

21            And in that case, what you, the only thing you

22  referred to was a 1987 decision in which you said, "The

23  judge determined that some portion of my testimony was not

24  what he was willing to rely on."

25            You recall that, don't you?

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3474 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3608

 1          A     Approximately that, yes, sir.

 2          Q     But that was hardly the full truth, was it,

 3    Mr. Quintero?

 4          A     To the best of my knowledge, it is.

 5          Q     Well, isn't there a much more recent decision from

 6    New York in which the Court utterly disqualified your

 7    testimony?

 8          A     There was -- I just became aware of it recently.

 9    There was a case a little bit a year ago -- more than a year

10    ago where he didn't disqualify it.  The judge made his

11    decision and did not use two of the inputs from my testimony

12    in connection with that decision.

13          Q     Yeah, okay.  That might yet be a third.  But I'm

14    talking about the Fresh Del Monte case.

15                Do you recall that decision?

16          A     I do.

17          Q     And do you recall what the Court concluded about

18    your testimony there?

19          A     No.  I have never seen the decision.

20          Q     You don't recall that what the Court said in that

21    decision is that, "Particularly in light of the

22    cross-examination, I find Mr. Quintero's testimony to be

23    utterly discredited.  When a professional witness testifies,

24    they at least ought to be consistent.  His testimony in the

25    Mathias case was inconsistent with the testimony he gave

\*\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\*

3609

1    here.  You get what you pay for."

2         You're not aware of the judge's conclusion in that

3    decision about your testimony?

4    A    I've never heard that until just now.

5    Q    So you literally have no idea that that occurred

6    to you?

7    A    I've never heard of it until just now.

8    Q    And so that's your explanation for why you failed

9    to disclose that decision when we asked you explicitly in

10   your deposition whether a Court had ever discredited your

11   testimony?  Is that your explanation?

12   A    I could not if I was unaware of it.

13        I will research it after we're done with this.

14   Q    But you certainly testified in that case, didn't

15   you?

16   A    I did.

17   Q    And that was a big case, wasn't it?

18   A    No, it wasn't.

19   Q    Well, I mean, there were big firms involved in

20   that case, weren't there?  Cleary, Gottlieb and others?

21   A    Perhaps on behalf of Fresh Del Monte.  I was

22   working for a sole practitioner.

23   Q    So nobody -- your testimony is nobody has ever

24   brought to your attention when a judge in New York

25   discredited your testimony as harshly and in a fashion he

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    did.  That's your testimony?

2         A    That is correct.  And I've certainly been grilled

3    by many.

4         Q    Now, in this case, okay, in this case, you had

5    been retained by the Justice Department; is that right?

6         A    Yes, sir.

7         Q    And now you have now been retained a total of five

8    times on merger efficiencies in antitrust cases; is that

9    right?

10        A    Yes, sir.

11        Q    And in each case, you're retained by the same

12   antitrust division of DOJ that's here today, right?

13        A    That is correct.

14        Q    Okay.  You've never once testified for a defendant

15   on merger efficiencies, have you?

16        A    Not to the best of my recollection.

17        Q    All right.  And in each of those matters, you've

18   testified, whether it's in deposition or in court, that the

19   claimed efficiencies were either non-existent or badly

20   overstated.  That's been your testimony, correct?

21        A    They have been overstated.  I don't recall the

22   extent to which, but that is correct, with respect to

23   verifiability and the other criteria that I described.

24        Q    We'll get to those criteria.

25             Now, I want to be crystal clear about your

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3611

1    conclusions and what I heard on Thursday.

2            Now, you know AT&T has estimated total annual

3    synergies of about $2 and a half billion, right?

4        A    Yes, sir.

5        Q    And you have assessed categories representing

6    about 2 billion of those synergies, isn't that right, 1.9,

7    somewhere in that range?

8        A    Approximately, that is correct.

9        Q    Okay.  And of those almost 2 billion in synergies,

10   about 1.6 billion represent so-called cost synergies, right?

11       A    About 1.55, that is correct.

12       Q    About 1.55.  All right.

13           And of the almost $2 billion of cost and revenue

14   synergies and under the standards you've applied, you have

15   concluded, and you have opined to this Court, that AT&T

16   should get zero credit for their claimed efficiencies,

17   right, zero, nada, zilch?

18       A    Based on the criteria that I described, that is

19   correct.

20       Q    Not a penny?

21       A    That is correct.

22       Q    Now, you appreciate the significance of that

23   opinion for purposes of this case, don't you?

24       A    I am not familiar with all the applications of my

25   work.  I'm focused solely on the synergies about which I

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   testified.  Other applications are beyond the scope of my

2   assignment.

3        Q    All right.  Now, again, you know that Dr. Shapiro

4   is the lead economist in this case for DOJ, right?

5        A    That is my understanding.

6        Q    And you're not an economist or an antitrust

7   economist, right?

8        A    That is correct.

9        Q    But DOJ didn't have Professor Shapiro offer an

10  opinion on synergies in any sense in this case.  You know

11  that, don't you?

12       A    Yes, sir.  That's the best of my knowledge.

13       Q    And instead, what Dr. Shapiro has done is simply

14  assumed the synergies here should be zero.

15            You know that, don't you?

16       A    No, I don't.

17       Q    So you don't know that?

18       A    I've never seen his report.

19       Q    And you don't know that he has relied -- for at

20  least the 2 billion in synergies that you reviewed, he's

21  relied solely and exclusively on your opinions, right?

22       A    I do not know that.

23       Q    You don't know that the only efficiencies, the

24  only synergies that he dialed into his model were the

25  so-called elimination of double marginalization

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3613

 1  efficiencies?  You don't know that?

 2       A    No, sir.

 3       Q    Do you know what those are?

 4       A    I have a basic understanding of it.

 5       Q    Yeah.  Those are those double margins or the

 6  stacking margins that both sides agree should be limited as

 7  part of the modeling.  You know that, don't you?

 8       A    No, sir.

 9       Q    But you do know, though, beyond that, that

10  Dr. Shapiro has included no other efficiencies in his

11  pricing model?

12       A    I have no knowledge of what he did or did not

13  include in his pricing model.

14       Q    Well, you do know this, don't you, that if AT&T's

15  efficiencies were credited in this case, then it would

16  overwhelm Dr. Shapiro's conclusions regarding price

17  increases by some almost tenfold; you know that, don't you?

18       A    I do not.

19       Q    Well, 2 and a half billion and he's predicated

20  280-or-something million in price increases.  You know that

21  it would overwhelm those price increases, don't you?

22       A    Again, you're asking about something about which

23  I have no knowledge.

24       Q    Now, let's see how you get to zero.  Let's take a

25  couple minutes and just see how you get to zero, not a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3614

 1   penny.

 2            Now, to get to zero, you have to apply a test,

 3   right?

 4        A    I described a threefold test, yes, sir.

 5        Q    And it was the DOJ lawyers themselves who provided

 6   you with that framework or that test to apply here, right?

 7        A    No, sir.  These are the tests that I routinely

 8   apply in these types of matters.

 9        Q    But the DOJ lawyers, you discussed it with them,

10   and they gave you that test to apply, right?

11        A    They agreed that the -- the correct criteria for

12   costs and the two criteria that I used with respect to

13   revenues.

14        Q    The DOJ asked you to evaluate these cost

15   efficiencies and revenue synergies using the framework

16   provided by DOJ, correct?

17        A    I would agree with that.

18        Q    And so, in effect, those were DOJ's marching

19   orders here, apply that test, right?

20        A    They were consensual agreement with respect to the

21   appropriate way to approach this.

22        Q    And on Thursday now, you didn't say a lot about

23   the actual standards that underlie that test, did you?

24        A    In what respect do you mean I didn't say a lot?

25        Q    Well, let's talk about verifiability, okay?

1    That's one of the components of your test, right?

2         A    Yes, sir.

3         Q    Okay.  Now, on Thursday what you did tell this

4    Court is that you would count synergies if they can be

5    objectively verified by reasonable means, both with respect

6    to likelihood and amount.  That's what you said, right?

7         A    Yes, I did.

8         Q    But that's not entirely true, is it?

9         A    I don't know what you mean.

10        Q    Well, you missed a key word there, didn't you?

11        A    Well, what do you mean, I missed a key word?

12        Q    Well, what I mean by that is that in truth, you

13   actually, when you applied this test, you required

14   certainty, did you not?

15        A    No, sir.

16        Q    Well, in your rebuttal report, if you look at

17   page 39 --

18             MR. WALTERS:  And, Your Honor, I have some

19   materials.  May I approach?

20             THE COURT:  You may.

21             MR. WALTERS:  May I approach the witness,

22   Your Honor?

23             THE COURT:  You may.

24   BY MR. WALTERS:

25        Q    Now, in paragraph 39 of your rebuttal report, you

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    see what you wrote there?  It's on page 39.

 2              THE COURT:  Which tab are we looking at?

 3              MR. WALTERS:  I'm sorry, tab 7, Your Honor.

 4              Thank you.

 5              THE COURT:  All right.

 6    BY MR. WALTERS:

 7        Q    And you write there that a review of the above

 8    opportunities indicates they are actions whose outcome is

 9    difficult to project with a high degree of certainty.

10              Do you see that?

11        A    Yes, sir.

12        Q    And then at your deposition, you testified that

13    you required a high degree, or at least a reasonable degree

14    of certainty, when you were reviewing AT&T's synergy

15    projections.  You recall that testimony, didn't you?

16        A    I don't recall those exact words, but I'm looking

17    for some reasonable degree of certainty; yes, that's

18    correct.

19        Q    So you're looking for a reasonable degree of

20    certainty, right?

21        A    Yes, not pure speculation.

22        Q    All right.  Well, and you didn't use the word

23    "certainty" on Thursday, did you?

24        A    I actually don't recall which precise words that I

25    used.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q    And this standard of reasonable degree of

2  certainty, that's what the DOJ lawyers and you discussed and

3  agreed to employ; isn't that right?

4      A    I don't recall having a specific conversation

5  about that with the DOJ lawyers.

6      Q    But you're aware, aren't you, that DOJ's own

7  merger guidelines, they don't require any degree of

8  certainty for projections to be verifiable.  You know that,

9  don't you?

10      A    That may be, being very precise about the words.

11  As a layman, I just mean that it can't be speculative.  It's

12  got to be something that appears to be likely.

13      Q    Well, words matter, don't they?

14      A    If you're a politician, they do.  I don't have the

15  degree of sophistication that a politician does.  I'm

16  speaking as a layman.

17      Q    Well, Mr. Quintero, you know that in the merger

18  guidelines, it doesn't touch topside or bottom any level of

19  certainty; that all it says is they need to be established

20  by reasonable means, correct?

21      A    I've forgotten the exact words.  I do recall

22  something to that effect.

23      Q    All right.  So did DOJ instruct you to apply a

24  standard of verifiability that went beyond what their

25  guidelines said?  Or did you come up with that yourself?

1        A     Those were just words I chose to use.  And, again,

2   I'm not requiring certainty in the way in which I did this

3   work.

4        Q     But, nevertheless, in applying that standard, you

5   came to the conclusion that zero out of 250 -- 2.5 billion

6   should be credited, right?

7        A     Well, zero --

8        Q     Yes or no?

9        A     No, because I did not look at the entire 250 --

10  $2 and a half billion.

11       Q     Of the 2 billion.  Thank you.

12       A     Of the little bit less than 2 billion that I

13  looked at, that is correct based on the criteria that I

14  applied.

15       Q     All right.  Now, were you here for Dr. Shapiro's

16  testimony?

17       A     No, sir.

18       Q     Okay.  You don't know that when he testified, that

19  what he said is that synergies are verifiable just when they

20  are likely to be achieved?  Have you seen that testimony he

21  offered?

22       A     I haven't seen his testimony.

23       Q     You haven't reviewed it, and you weren't here for

24  it?

25       A     Correct.

1     Q     And you have no reason to doubt -- and I'll

2     represent to you that the testimony he offered is just

3     simply if they are likely to be achieved?

4     A     If that's within the record, then I would have no

5     reason to doubt that.

6     Q     But, Mr. Quintero, you know what a self-fulfilling

7     prophecy is, don't you?

8     A     Yes, sir.

9     Q     And that's what you have done here on

10    verifiability, isn't it?

11    A     No, sir.

12    Q     You've used a standard of reasonable certainty

13    that ensures the result is going to be zero on

14    verifiability, aren't you?

15    A     Absolutely incorrect.

16    Q     Well, in your deposition, you testified that

17    there's an inherent degree of uncertainty in all merger

18    projections.  You recall that testimony, don't you?

19    A     I don't recall that exact testimony, but I would

20    agree with that comment.

21    Q     And so by definition, it's almost tautological,

22    isn't it?  If it's inherently uncertain about synergies and

23    projections and you apply a degree of certainty, by

24    definition, it will never meet it, won't it?

25    A     Absolutely incorrect.

1        Q    Now, there's a second reason that you didn't

2    verify these synergies, right?  And that has to do with the

3    information that you actually reviewed, and maybe, more

4    importantly, the information you didn't review, right?

5        A    I was constrained by the information that was

6    provided.

7        Q    Yes, you were constrained, okay.

8             And for at least some of the synergies that you

9    evaluated, it certainly is possible to verify those

10   synergies, but you would have required more information,

11   correct?

12       A    That is correct.

13       Q    But in many of those circumstances -- and we'll

14   get to some of the specifics -- you didn't make any effort

15   to go get the information that you thought would be helpful,

16   did you?

17       A    I went through all the documentation that was

18   referred to by both the defendants and their consultants,

19   and I went beyond that.

20       Q    All right.  But you didn't go to information when

21   you thought it might be possible to verify, that you thought

22   would be helpful, did you?

23       A    I went after, to use your words, all of the

24   information that the defendants and the consultants said

25   underlined version 41.  And I even went beyond that because

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3621

1    I reviewed more documents than that.

2         Q    Well, wasn't it your understanding that everything

3    you needed was supposed to be referred in the documents that

4    were provided to you by DOJ?

5         A    So could you clarify what you mean by that.

6         Q    Well, wasn't it your understanding that everything

7    you needed was supposed to be referred to in the documents

8    that were provided by DOJ to you, right?

9         A    Well, to be very precise, I received all the

10   documents that were referred to in both what the defendants

11   provided in January, as far as documents underlying

12   version 41; I got all the documents that the defendants'

13   consultant referred to as being the basis for quantifying

14   the synergies; and I went beyond that.

15        And those were all documents that I obtained from

16   the Department of Justice.

17        Q    And those are those couple of hundred documents

18   from those two different sources that you talked about on

19   Thursday, right?

20        A    Well, not only the roughly --

21        Q    Well, just start there.

22        Isn't that right?  That was like the 280 from DOJ

23   and the couple hundred documents that were attached to

24   Mr. Gokhale's report.  That's what we're talking about,

25   right?

1       A    The numbers are not correct that you described but

2   included those plus many others.

3       Q    Now, what you did here, though, is very different,

4   is it not, than what you would do if you were evaluating

5   synergies for a business client, right?

6       A    Again, it depends on the scope of the assignment.

7       Q    If you were looking at a client's business and if

8   there was a piece of information that you needed, you would

9   just go ask for it, wouldn't you?

10      A    Well, if it's my client, I have a better access

11  than in the proceedings such as this.

12      Q    So the answer is "yes," right?

13      A    Generally speaking, that is correct.

14      Q    All right.  So that's a whole different exercise

15  than if you're doing it for a business client; that's what

16  you're telling us, right?

17      A    It is a similar exercise in terms of application

18  of skill set, but it may differ in terms of the type of

19  information I have access to.

20      Q    Exactly.

21           But here, you didn't -- here you didn't ask DOJ

22  for any additional information.  You just stopped, right?

23      A    No, sir.  I asked, by virtue of telling them that

24  I want, in preparation for both the documentation request

25  the DOJ made, the questions that were asked in connection

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3623

```
 1   with the various depositions, and presumably, the

 2   defendants' consultants had full access to all relevant

 3   information.  So --

 4        Q    But you remember speaking to this issue in your

 5   deposition, don't you?

 6        A    With respect to?

 7        Q    Well, let's look at page 207.  It's right there in

 8   front of you, your deposition.  Let's look at page 207,

 9   lines 21 through 24, if you wouldn't mind.

10             And do you see at line 21, you were asked a

11   question:  "You did not ask your client in this case, the

12   Department of Justice, to provide you with that information,

13   did you?"

14             And your answer was what?

15        A    I put as that information.

16        Q    Additional information?

17        A    Well, as I previously testified, I asked them, by

18   virtue of the requests that were made, to be more precise.

19        Q    Well, let's put it this way:  You certainly didn't

20   make any effort to look into the millions of documents and

21   the vast trove of financial information that was provided

22   DOJ in this case to determine whether the information you

23   found missing in the synergy analysis was, in fact,

24   available; you didn't do that, did you?

25        A    I should not have had to based on what the
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3624

```
 1   defendants were supposed to be doing.

 2        Q    Yeah.  I didn't ask you that.

 3             What I asked you is, I just want to confirm that

 4   you didn't do that, did you?

 5        A    We had access to the entire nearly 8 million

 6   documents that the DOJ had electronically.

 7        Q    Right.  And you made no effort, right, to look

 8   into those millions of documents, if you wanted further

 9   inquiry, further confirmation, further verifiability, right?

10        A    Other members did look, but we understood that the

11   information the defendants represented as being relevant to

12   version 41 had been produced, and so we focused on those.

13        Q    Well, this is not the first time you've had this

14   conversation.  Could you look at page 143 of your

15   deposition.

16             Line 17, do you see that?

17        A    Yes.

18        Q    And the question is, "Did you make any effort to

19   look into the millions of documents and vast trove of

20   financial information that was provided to DOJ in this case

21   to determine whether the information that you found missing

22   in the synergy analysis would be available?"

23             Do you see that?

24        A    I do.

25        Q    And what's your answer?
```

3625

```
1        A    "I did not personally."

2        Q    That's your answer?

3        A    Yes.  I did not personally make the queries.

4        Q    You didn't qualify by "personally" in your answer

5   here, did you?

6        A    It was a very specific question, and I answered it

7   in the way it was asked.

8        Q    I see.

9             Now, in truth, what you actually did was anything

10  but what you suggested on Thursday in your response to

11  Mr. Siegel's questions, right?

12       A    I don't know which question you're asking --

13  referring to.

14       Q    Well, Mr. Siegel asked you, "And similarly,

15  Mr. Quintero, how does your work experience and training

16  qualify you to evaluate whether a claimed efficiency is

17  merger-specific?"

18            Do you recall that?

19       A    Vaguely.

20       Q    And your answer was, "Because my work experience,

21  professional background, professional licenses are heavily

22  geared towards being able to dig deep into information, to

23  solicit information, in order to be able to take raw data

24  and see if it can converted into something that's reliable,

25  or to determine that it's not reliable."
```

1          You recall giving that testimony, don't you?

2     A    Vaguely, yes, sir.

3     Q    Yeah.

4          And so therein really lies the secret of what's

5     going on here, right?  The government -- I want to be clear

6     about this.  The government didn't ask you to figure out

7     what level of synergies might actually be reflected by this

8     transaction, did they?

9     A    I was revealing the defendants' assertions.

10    Q    Yeah.

11         So the government did not ask you, did they, to

12    determine what level of synergies might actually, in a real

13    world, be reflected by this transaction, did they?

14    A    No.  My role was to evaluate the claims proffered

15    by the defendants and the underlying information supporting

16    those claims.

17    Q    Right.

18         And the government didn't ask you to determine

19    when you could do any additional work to satisfy the

20    standards that they gave you, did they?

21    A    They did not.

22    Q    So what's really going on here is the government

23    and you discussed this unattainable standard of certainty.

24    You didn't review anything other than the documents that

25    were provided to you.  You didn't dig deep.  You didn't

1    solicit information to determine the actual synergies that

2    might occur here in the real world, did you?

3        A    Well, there were several statements that you made,

4    several of which I disagree with.

5        Q    And you know that if you actually, if somebody

6    came to you and gave you that chart and said, hey,

7    Mr. Quintero, figure out what's actually going to happen

8    here, as opposed to this test that the government gave you,

9    right, the answer would be very different than zero, would

10   it not?

11       A    It likely would, because I would have worked with

12   the defendants to tell them the type of information that is

13   required in order to be able to provide something that is

14   verifiable.

15       Q    And so on verifiable, let's talk about something

16   else you testified about on Thursday, and that's AT&T's past

17   record.  You recall that testimony, don't you?

18       A    I do.

19       Q    Now, I was surprised to hear you say on Thursday

20   that whatever did or didn't happen in the prior mergers

21   really have no bearing on this one.  You recall giving that

22   testimony, don't you?

23       A    Approximately, yes, sir.

24       Q    And you also went on to say the fact that they may

25   or may not have achieved the synergies in prior mergers is

1    not relevant to this specific merger.  That's what you

2    represented to Judge Leon, was it not?

3         A    I believe I said something to that effect.

4         Q    Yeah.

5              But you're aware, aren't you, of DOJ's own merger

6    guidelines that say the opposite, aren't you?

7         A    Well, it is a consideration, and I accept that.

8    It is a consideration.

9         Q    And the DOJ guidelines actually say, "Efficiency

10   claims substantiated by analogous past experience are those

11   that are most likely to be credited."

12             You know that, don't you?

13        A    Yes, sir.

14        Q    So DOJ itself is prepared to say that in this

15   context, on these issues, that past is prologue, right?

16        A    Well, if it is analogous, that's the key

17   consideration that you just cited.

18        Q    Right.

19             Analogous, right?  So if you're looking at cost

20   synergies here and you're looking at cost synergies there,

21   we ought to be able to compare, right?

22        A    Yes.

23        Q    Now, even in your rebuttal report, you acknowledge

24   that whether AT&T has met cost synergy targets on a large

25   transaction is relevant, didn't you?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1       A    I don't recall those exact words, but I agree with

2   that assertion.

3       Q    Well, in fact -- well, if you want, you can look

4   at your rebuttal report, page 35.  And you say that the fact

5   that certain AT&T records apparently show that the company

6   has met cost synergy targets on certain large transactions

7   in the past is not an irrelevant fact.

8            That's what you wrote, isn't it?

9       A    I don't see paragraph 35.  But, again, if you're

10  representing --

11      Q    I'm sorry.  Page 35, if I misspoke, tab 7.

12      A    Okay.

13           Tab 7 begins with page 38.

14           I have --

15      Q    Do you have your report right there?

16      A    I have a copy right here.  Yes, I do.

17      Q    Maybe I just missed it.

18           Why don't you look at page 35 of your report, your

19  rebuttal report.

20      A    And, again, I'm not disputing it if you're

21  representing that that's what it says.

22      Q    All right.  Well, then let's move on.

23           Now, and the reason, the reason it's relevant is

24  because a track record of success in making synergy

25  predictions, because it can enhance the credibility of the
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    net set of projections; that's the point, isn't it?

2         A    It's possible, yes, sir.

3         Q    And a business team with successful synergy

4    results and experience, that would tend to enhance the

5    credibility of that set of projections, right?

6         A    It could.

7         Q    And so you heard at length from Mr. Stankey last

8    week, didn't you, the head of that successful business team.

9    You were here for his testimony, weren't you?

10        A    I was.

11        Q    And you heard from Mr. Stankey's testimony about

12   AT&T's successful track record of achieving synergy

13   projections in past mergers, right?

14        A    I heard his testimony, yes, sir.

15        Q    And you heard his testimony about how he himself

16   had played leadership roles in eight separate

17   multibillion-dollar acquisitions in which they had

18   exceeded -- met or exceeded their cost synergy projections,

19   right?

20        A    I heard that testimony.

21        Q    For example, when they acquired SBC,

22   Southwestern Bell, right, you knew that those targets were

23   about over $2 billion a year, and they met those targets,

24   right?

25        A    I don't know that.

1          Q     Well, do you know that in the SBC transaction,

2     they actually increased their estimates from 15 billion to

3     18 billion because they were so successful?

4          A     No, I don't know that.

5          Q     You didn't look into that, did you?

6          A     I don't recall that.

7          Q     You didn't look into that, did you?

8          A     Other members of my staff looked at those matters.

9     Again, it was not relevant to what I was doing.

10          Q     So it wasn't relevant, the fact that they had

11     cleared the bar in SBC; is that what you're telling us?

12          A     Again, I don't have personal knowledge of what

13     they did or didn't do based on whatever documentation may

14     have been furnished.

15          Q     And you know that when they acquired BellSouth,

16     that they surpassed their target there of more than

17     $2 billion a year, right?

18          A     Again, I don't know that.

19          Q     Is that because, I guess, that's irrelevant too?

20          A     Again, I've not -- I'm not aware of conclusive

21     information that make that relevant to this matter here.

22          Q     All right.  So when Mr. Stankey came into this

23     Court, Federal Court, and swore to tell the whole truth, you

24     have no reason to disbelieve him.  You believe Mr. Stankey,

25     don't you?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3632

1      A    I have no reason not to believe what he testified

2  with respect to that transaction.

3      Q    So for those facts, do you require any more for

4  verifiability?  Do you need documentation?  Or can you just

5  believe Mr. Stankey's testimony?

6      A    As a CPA, I would require documentation.

7      Q    So you don't believe him?

8      A    I didn't say I didn't believe them.  If I want to

9  verify it, I require documentation.

10      Q    So that's really what's going on here, right?  You

11  might believe something could happen.  You might believe

12  they will achieve synergies.  You just didn't check that box

13  and get that right verification, right?

14      A    I use the same criteria that AT&T's auditors,

15  Ernst & Young, does.  We require documentation in our

16  profession.

17      Q    All right.  And so on the DTV synergies, now, you

18  actually did look into that, didn't you?

19      A    I did.

20      Q    All right.  And that was a $66 billion transaction

21  some two and a half years ago, right?

22      A    I don't recall the exact number, but it was in

23  that order of magnitude.

24      Q    And you analyzed that information, didn't you?

25      A    I looked at some information that was provided.

1     Q    And based on that analysis, you're aware that AT&T

2  has, in fact, surpassed the cost synergies that were

3  projected in that transaction, right?

4     A    That is my understanding.

5     Q    And you also heard from Mr. Stankey last week that

6  to date, AT&T has met its overall synergies plan for DTV,

7  that they have actually been over on costs, a little behind

8  on revenues, but they met them overall.  You heard that,

9  didn't you?

10     A    What I heard was there was a big miss on revenues.

11  And the cost synergies that he referred to, half of them in

12  terms of content, as I testified on Thursday, are not

13  relevant to this transaction.

14     Q    Oh, the volume purchases on content are not

15  relevant?  That's your testimony?

16     A    Very specifically, by U-verse being able to buy at

17  the rates that DirecTV had, that's not relevant to this

18  transaction.  That was a horizontal deal.  This is a

19  vertical deal.  Not the same animal.

20     Q    Is that what you're telling us, that when you look

21  at cost synergies, the fact that one's a horizontal deal and

22  one's a vertical deal, that somehow that makes the

23  assessment of cost synergies irrelevant?  Is that what

24  you're telling us?

25     A    Well, very specifically, as I said --

1    Q    No, no.  That's not what I'm asking you.  I'm

2  saying, is that your testimony that it is irrelevant because

3  that was a horizontal deal and this is a vertical deal in

4  assessing cost synergies, yes or no?

5    A    No, I did not say it's irrelevant.  I said it's a

6  different -- my words, I believe, were it's a different

7  animal.

8    Q    And so -- but, again, Mr. Stankey sat in that same

9  chair and he said, in terms of overall synergies, net now

10  revenue and costs, we have to date met our objectives.  You

11  heard that testimony, did you not?

12    A    I didn't hear it with respect to revenues.

13  I heard revenues is a big miss.

14    Q    I didn't ask you -- maybe you and I are not

15  connecting.

16    A    Possible.

17    Q    I want to make sure you listen very carefully to

18  my question, okay, very carefully.

19        What Mr. Stankey said is that when you take all of

20  the synergies, costs and revenues, okay, to date, and you

21  net it all out, they have met their projections.  You heard

22  that, didn't you?

23    A    I don't recall him saying it that way, but I was

24  parsing it out into the two different categories of

25  synergies.

1      Q    I'm sure you were.  I'm not.  Okay?

2           What I'm saying is, if you take cost and revenues,

3    they met their objectives as of 2017.  You heard that

4    testimony, didn't you?

5      A    Again, I don't have a specific recollection of

6    that testimony.

7      Q    And if you did testify to that effect, you have no

8    reason to doubt that conclusion, that sworn testimony,

9    do you?

10     A    I have no reason to doubt what he said.

11     Q    Now, AT&T, frankly, I mean, of all the companies

12   in America, right, achieving synergies is a core competency

13   of theirs, isn't it?

14     A    I've not evaluated AT&T in relationship to other

15   companies.  I can't make that conclusion.

16     Q    Well, you know.  You've heard that they made 13

17   multibillion-dollar acquisitions in the last 20 or 25 years,

18   right?

19     A    13 -- I don't know the number 13.

20     Q    All right.  Now, but you would acknowledge, would

21   you not, that a favorable track record of achieving

22   synergies lends credibilities to -- excuse me, lends

23   credibility to AT&T's projections for synergies in this

24   current Time Warner transaction.  You would agree with me,

25   wouldn't you?

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***   Filed 08/06/18   Page 3502 of 3826

3636

1    A    To the extent that the things that represent

2  synergies are relevant to prior transactions certainly would

3  be a consideration, although less relevant than the specific

4  information on this transaction.

5    Q    But we talked about this in your deposition,

6  didn't we?  You discussed this in your deposition.  And you

7  acknowledged that a favorable track record of achieving

8  synergies lends credibility to AT&T's projections for

9  synergies in the current Time Warner transaction, fair?

10    A    In isolation, I would say that's a reasonable

11  statement to make.

12    Q    Very good.

13      And notwithstanding all of that, you have,

14  nevertheless, given AT&T exactly zero credit for achieving

15  efficiencies here in the $2 billion that you looked at,

16  right?

17    A    As I testified, it was a little bit less than

18  2 billion.  But, yes, applying the criteria that are

19  normally applied, I have not given them credit.

20    Q    Now, let's talk about what AT&T did in its process

21  in this transaction, okay?

22      Let's talk about what you think they should do and

23  what they actually did, okay?

24      Now, in your deposition and in your report, you

25  describe some of the things you think companies ought to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   consider in evaluating synergies, don't you?

 2        A    I'm sorry.  In my?

 3        Q    In your deposition and in your opening report, you

 4   describe some of the things that a company should consider

 5   in evaluating synergies, didn't you?

 6        A    If you would point me to the specific things that

 7   you're referring to, I'd be happy to respond to it.

 8        Q    All right.  Let's tick through them.

 9             For example, you said companies should consider

10   historical information on the relevant costs, right?

11        A    You're looking at my report?

12        Q    I'm looking at your deposition.

13        A    Okay.

14        Q    All right.  Is that -- we don't need to look at

15   either.  Why don't we just say you agree with that, don't

16   you?

17        A    I agree with that statement.

18        Q    And you also agree that a company should look at

19   the procurement costs or what AT&T should do is look at the

20   procurement costs of AT&T and Time Warner.  That would be a

21   prudent thing to do, would it not?

22        A    I agree with that.

23        Q    And what AT&T should also do here is look at the

24   prospects for getting concessions from vendors.  That would

25   be a prudent thing to do, right?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3638

 1        A      Yes, sir.

 2        Q      And you said that AT&T, what it should do is use

 3    its business judgments -- judgment as one of the tools in

 4    making these projections.  You agree with that, don't you?

 5        A      Again, I don't recall if I said that, but I do

 6    agree with that.

 7        Q      And that it should look at ordinary cost

 8    projections as part of that process.  You agree with that,

 9    don't you?

10        A      I would normally look at that, yes, sir.

11        Q      But here's the rub, Mr. Quintero.  In truth, in

12    reaching your conclusions here, you really didn't know what

13    AT&T, what the business integration team relied on in making

14    their projections and whether they are well-founded.  You

15    didn't know that, did you?

16        A      I only know what they provided in the

17    documentation that they represented as underlying version 41

18    and the other things that I previously discussed.

19        Q      That's all you knew is sort of like hear no evil,

20    speak no evil.  You just fixated, like, myopically on what

21    was provided in support of a report, and you didn't go

22    beyond that, did you?

23        A      I relied on, in good faith, the defendants

24    providing the sort of information that they were supposed to

25    have provided.

1      Q    And so -- but, again, in reaching your conclusions

2    here, you really didn't know what the AT&T business

3    integration team relied on in making these projections,

4    did you?

5      A    I know only what they furnished as being the basis

6    for their conclusions, as well as what their consultant

7    indicated supported their conclusions.

8      Q    And as a consequence, it would be speculative on

9    your part, right, to know what AT&T, what they did was

10   well-founded, right?

11     A    Again, I'm constrained by what they provided that

12   they represented as being the foundation.

13     Q    And so as a consequence, it would be speculative

14   for you to opine on what they actually did, whether it was

15   or was not well-founded, fair?

16     A    To the contrary, based on the information that I

17   received, I thought that was speculative.

18     Q    Well, we -- you discussed this in your deposition,

19   right?

20     A    I discussed many things in my deposition.

21     Q    All right.  Well, let's go to page 241, line 19.

22          And you got this question:  "Is it possible that

23   the information that was provided in connection with

24   version 41 in the supporting materials was sufficient to

25   allow the AT&T business managers to reach conclusions that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3640

```
 1    these cost savings were reasonable and achievable but that

 2    same level of information would not be sufficient to allow

 3    you to verify these estimates?"

 4         Do you see that?

 5    A    Yes.

 6    Q    And your answer to that was what?  On line 3 of

 7    page 242.

 8    A    I said, "Yes, sir."

 9    Q    And then if you go down to line 19, you go on to

10    say, "So I don't know.  Not having spoken to them and not

11    knowing what they did or didn't have access to, it would be

12    entirely speculative on my part to know whether what they

13    did was well-founded."

14         Do you see that?

15    A    Yes, sir.

16    Q    And that was true, right?

17    A    Yes, sir.  As I previously testified, I'm

18    constrained by what's been produced.

19    Q    That was true, right?

20    A    Yes, sir.

21    Q    It was true then, and it's now true now, right?

22    A    Yes.  I can't know what they didn't tell me or

23    what was in their heads.

24    Q    Well, let's talk about that for a second.

25         Now, you would agree, would you not, that it's
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3641

1   relevant to know how AT&T plans to use the synergies'

2   projections.  You would agree that's relevant, wouldn't you?

3        A     That would be something that would be useful to

4   know.

5        Q     Okay.  And if AT&T intends to integrate the

6   synergy plans into its future business plans, that would

7   tend to enhance the credibility of the process of creating

8   those projections, right?

9        A     It may or may not.

10        Q     Well, let's look at page 66 of your deposition.

11              And on line 5, do you see on page 66?

12        A     I'm not there yet.

13              Okay.

14        Q     You get the question, "All other things being

15   equal, though, if a set of business plans is going to be

16   integrated into future business plans, that would tend to

17   enhance the credibility of the projections."

18              Do you see that?

19        A     Yes, sir.

20        Q     And your answer is, "Certainly, credibility, the

21   process that went into creating the projections."

22              Right?

23        A     Yes, sir.

24        Q     And that was true, right?

25        A     Yes, sir.

1    Q    Now, let's just talk for a second about version 41

2    itself.  You know what that is, right?

3    A    Yes, sir.

4    Q    That's Exhibit 658.

5         Now, at least until this trial, you had no idea

6    why version 41 was created or how AT&T would use it in its

7    projections, did you?

8    A    Well, I saw several variations that preceded

9    version 41.  And when you say I have no idea of how it was

10   created, what do you mean by that?

11   Q    Well, you had no idea why it was created, did you?

12   A    Well, I saw it as the successor to previous

13   versions of a similar document --

14   Q    All right.

15   A    -- in order to try and substantiate what the

16   claimed synergies and efficiencies were.

17   Q    Mr. Quintero, until this trial, you didn't

18   actually know why version 41 was created other than reading

19   what you surmised -- other than what you surmised based on

20   reading the title of the document, right?

21   A    I guess I don't know what you mean by "why it was

22   any created."

23   Q    All right.  What its purpose was.

24   A    Well, it speaks for itself.  It documents the

25   claimed synergies and efficiencies.

1          Q    But as of your deposition, you've testified,

2    didn't you, that other than reading the title, okay, you had

3    no idea why it had been created, right?

4          A    I don't remember what I said about it, but I don't

5    have anybody who specifically said this is the reason it's

6    been created.  But I certainly reviewed it.  And as I said,

7    the document speaks for itself.

8          Q    Well, let's look at page 61 of your deposition

9    quickly, sir, line 13.

10              And the question to you is:  "Mr. Quintero, we've

11    talked about a bit of -- we've talked a bit about

12    version 41.  Do you have an understanding of what this

13    document will be used for by AT&T?

14              "Answer:  Only based on the title that's been

15    given to the document.

16              "Question:  What's your understanding?

17              "Answer:  Well, it just says 'merger planning,

18    finance.'  So I can only surmise, based on the title, that

19    it's something that the finance department would be using

20    for purposes of the merger planning.  But beyond that,

21    I don't know how this document is going to be used."

22              Do you see that?

23          A    Yes, sir.

24          Q    And that was your sworn testimony at the

25    deposition, was it not?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    Yes, sir.

2    Q    All right.

3         And you really never bothered to find out even

4    whether this was for business purposes or for litigation

5    purposes, did you?

6    A    I have no reason to believe it wasn't for business

7    purposes.

8    Q    But you didn't bother to find that out, did you?

9    A    Again, I had no reason to make such an inquiry.

10   Q    Well, you were asked at your deposition, right,

11   "Is it prepared for business purposes, or was it prepared

12   for litigation or advocacy purposes?"

13        And your answer was, "I don't know what they may

14   have considered in preparing this document."

15        That was your testimony, was it not?

16   A    I don't recall.  But I see it here, so I don't

17   dispute that I said it.

18   Q    And until this trial, you didn't know the extent

19   to which version 41 projections would be integrated into

20   business plans, right?

21   A    When I say I don't know the extent, correct;

22   I don't know the extent that that will occur if this

23   transaction goes through.

24   Q    And you also mentioned you didn't speak with any

25   of the AT&T people who are involved in this synergy process,

1    right?

2        A    Other than just I briefly, politely said hello to

3    Mr. Stankey after his deposition, as well as Mr. Fete, after

4    his deposition.

5        Q    All right.  No substantive conversations, right?

6        A    No, sir.

7        Q    And the only people you've spoken to are the DOJ

8    lawyers about the substance of the synergies, right?

9        A    As well as members of my staff who were working

10   with me on this.

11       Q    And you didn't speak to any of those dozens of

12   subject-matter experts that underlie each and every one of

13   these cost synergies, did you?

14       A    Not directly, no, sir.  Only through their

15   documents.

16       Q    Now, what you heard from Mr. Stankey last week,

17   though, is that the process that AT&T employed in this very

18   transaction is a rigorous, fine-tuned process that they've

19   applied over many transactions, similar transactions.  You

20   heard that, didn't you?

21       A    Yes, sir.

22       Q    And that that process involved over 15,000

23   people-hours, did it not?

24       A    I heard him say that.

25       Q    It involved over 2,000 meetings, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        A       That's what I've heard.

2        Q       And that they generated thousands of documents in

3    that process, right?

4        A       I don't remember him saying that, but I did review

5    quite a few documents.

6        Q       And you also recall Mr. Stankey testifying that

7    AT&T and its business units will integrate these projections

8    into their business plans and budgets.  You heard that,

9    right?

10       A       Yeah.  I heard him say that after the transaction

11   closes, they will update it, modify it, and then it will

12   become part of their business plan.

13       Q       Part of it.

14               And then they're going to track those and their

15   business progress against those projections, right?

16       A       Yes, sir.  That's right my understanding.

17       Q       At that the very same AT&T managers that helped

18   calculate these synergies will be held responsible, will be

19   held accountable for these synergies.  You heard that,

20   right?

21       A       I don't recall -- well, I heard him say that, and

22   so I have no basis to dispute that.

23       Q       And that the people's compensation will be

24   influenced by whether they meet the synergies that are

25   reflected in the integration process for this transaction,

1  right?

2      A    I heard him say his would.  I don't have any

3  reason to dispute whether or not theirs may be influenced,

4  but I have no way to know that ether.

5      Q    By the way, you attended Mr. Fete's deposition,

6  didn't you?

7      A    I did.

8      Q    That was the first time and you and I met, right?

9      A    Yes, sir, to the best of my knowledge.

10     Q    And you recall Mr. Fete going on at length in his

11  deposition -- I'm happy to show it to you -- that the very

12  same people who were responsible for this integration

13  process would own it on the acquisition of Time Warner.

14          You mean that, don't you?

15     A    No, I don't recall that.

16     Q    But you have, you don't recall that testimony?

17     A    I don't.

18     Q    Well, let's have you glance at it.  Look at tab 11

19  in your binder.

20          You see on page 103, 104, 105 all those

21  highlighted sections about how the people in the parlor

22  process are going to own these projections?

23     A    Is there a specific line you want me to look at?

24     Q    Sure.

25          If you look at page 105.

1             So, again, generally speaking, they're going to be

2    in the parlor process --

3             MR. SIEGEL:  Objection, Your Honor.

4             THE COURT:  You can approach.

5             (Sealed bench conference)

6             MR. SIEGEL:  This is just a hearsay objection.

7             THE COURT:  Whoa, whoa, whoa.

8             You need to -- you can't go on the record until

9    the other counsel arrives.

10            MR. SIEGEL:  Apologize.

11            THE COURT:  Are you in a rush or something?

12            Now, state your objection.

13            MR. SIEGEL:  Hearsay.

14            THE COURT:  Okay.

15            MR. WALTERS:  This is impeachment purposes,

16   Your Honor.  It's not for the truth.  It's to impeach him.

17   He claims he doesn't know about any of this.  He was there

18   in attendance, and he heard this testimony.

19            THE COURT:  I'll overrule it.

20            (Open court)

21            THE COURT:  You may proceed.

22   BY MR. WALTERS:

23      Q    So, Mr. Quintero, at page 105, what Mr. Fete says

24   is, "Generally speaking, they're going to be put -- going to

25   put the -- in the parlor process, are going to be -- to put

1   the people responsible for managing Time Warner's

2   relationship and our real estate together."

3           Do you see that?

4       A   Yes.

5       Q   Does that refresh your recollection that Mr. Fete

6   spoke to the subject of the same people being on both sides

7   of the equation?

8       A   I'm -- looking at this, I can't tell for sure what

9   he's referring to, because he's talking about the

10  relationship and our real estate together.  I just don't

11  know, just looking at that isolated sentence, what he's

12  talking about.

13      Q   In the interest of time, let's move on.

14          All of these things that we just talked about, all

15  of those things that were reflected in the process that

16  Mr. Stankey is responsible for, those are all hallmarks of a

17  process that's calculated to produce reliable synergies

18  protections, right?  That's what you would expect to see?

19      A   It's the starting point.

20      Q   And, nevertheless, you turned a blind eye to those

21  protocols, that rigor, those processes, and gave them zero

22  credit in your assessment of almost $2 billion in synergies,

23  right?

24      A   Because I was looking for the documentation of

25  that, and that was what was deficient.

1      Q    Now, let's turn to a few of the specifics, if we

2    could, briefly, on what you testified about last Thursday.

3           You recall testifying about the vendor savings.

4    Do you remember that?

5      A    Yes, sir.

6      Q    Okay.  Let's turn to the fifth page of your

7    demonstratives.  You have the demonstratives up there?

8      A    Apparently not.

9      Q    I have another copy.

10          MR. WALTERS:  May I approach, Your Honor?

11          THE COURT:  You may.

12   BY MR. WALTERS:

13     Q    Now, this page 5 of your demonstrative, this

14   relates to logistics vendors, right?

15     A    Yes, sir.

16     Q    And logistics, that's one of eight vendor

17   categories in version 41, right?

18     A    Yes.

19     Q    Now, you testified on Thursday that version 41

20   assumes, without further explanation, that either 30 percent

21   saved will be realized on three of the vendors or 5 percent

22   on the other five.

23          Do you recall that testimony?

24     A    The other four.

25     Q    On the other -- on the other -- well, I think you

1    said five, but let's just say four.  It doesn't matter for

2    these purposes.

3              What you said, though, is that version 41 assumes,

4    without further explanation, either 30 percent or 5 percent,

5    right?

6        A    Yes, sir.

7        Q    And you told Judge Leon that there was no

8    explanation in the underlying documentation that is

9    provided.

10             You recall that too, don't you?

11       A    Yes.

12       Q    That's not true, is it?

13       A    Well, if you regard one or two sentences to be an

14   explanation, that is correct.

15       Q    Well, I'm just reading what you told all of us on

16   Thursday, and you told us that there was no explanation in

17   the underlying documentation that's provided.  That's what

18   you said, right?

19       A    In the way financial professionals regard

20   explanation, yes, that is correct.

21       Q    Well, let's drill down on that for a second.

22             Now, let's look at the page from version 41 that

23   you pulled this data from, okay?

24             And that is, just for your convenience and the

25   Court's convenience, if you look at tab 12, it shows a few

```
1    pages from version 41, including page 130, because I want to

2    compare these two.

3              Do you see that?

4         A    I see it.

5         Q    And if you look at your demonstrative on one hand

6    and page 130, what you did to create this demonstrative is

7    you only reproduced half the page, right?

8         A    That's correct.  Just the numbers.

9         Q    Just the numbers.

10             And on the right side of the page, you see where

11   it says "Synergy Details and Assumptions"?

12             Do you see that?

13        A    Yes, sir.

14        Q    But, again, you told the Court on Thursday there's

15   no explanation in the documentation that's provided, right?

16        A    And that is a correct statement.  That is correct.

17        Q    Well, let's see if there's an explanation here.

18   Look at the first vendor.

19             Do you see there in -- for confidentiality

20   purposes, we won't use the name, but do you see that name?

21        A    Yes.

22        Q    And it says, at the end of the block in that

23   section entitled "Synergy Details and Assumptions," okay?

24             Do you see that?

25        A    Yes.
```

```
 1        Q    And it says there that the potential savings found

 2   in the assembly and distribution of moving operations from

 3   one facility to AT&T's facility.

 4             Do you see that?

 5        A    Yes.

 6        Q    Well, that looks like an explanation for how

 7   they're going to save that money with that particular

 8   vendor, doesn't it?

 9        A    No, that's not a satisfactory explanation.

10        Q    Okay.  Well, that's --

11        A    There's something that you excluded from the

12   sentence that precedes it.

13        Q    Well, it just says, "Low synergy attainment due to

14   specialized-type service being provided, potential savings

15   found in assembly and distribution, moving operations from

16   one facility to AT&T's facility."

17             Do you see that?

18        A    Yes.

19        Q    Okay.  And that's the explanation provided here in

20   the synergy details, right?

21        A    As a financial professional auditor, that's not an

22   explanation.  All that is is a statement.

23             An explanation provides a lot more than that.

24   That would never withstand scrutiny to an auditor.

25        Q    Sir, certainly didn't withstand scrutiny for you
```

1   in these purpose here, did it?

2        A     It did not.  And I would expect anybody else with

3   my professional expertise would have the same view.

4        Q     Well, did you raise your hand and say, hey, AT&T,

5   can I have some more detail on that?

6        A     Again --

7        Q     Did you?

8        A     No, sir, I did not.

9        Q     Okay.  Did you raise your hand and say, can I talk

10  to the subject-matter experts who made this assessment and

11  see why they think this is going to happen?

12             Did you?

13       A     I --

14       Q     Did you?

15       A     Yes.

16             What I specifically said was, I instructed the DOJ

17  the type of information that we wanted to get in the form of

18  documentation, as well as deposition testimony.  And I

19  received the documents I previously referred to.

20       Q     Well, it says -- I mean, right down here, it says

21  the leads on this:  AT&T, Rachel Kutz; Time Warner,

22  Ken Gottesman.

23             Do you see that?

24       A     Yes, sir.

25       Q     Okay.  Did you ask DOJ to depose either of those

```
 1   people?

 2        A    No, sir.

 3             THE COURT:  Would this be a good time to take the

 4   morning recess?

 5             MR. WALTERS:  Yes, sir.

 6             THE COURT:  All right.  We're going to take a

 7   15-minute recess.  You remain a witness under oath.  Refrain

 8   from discussing your testimony with anyone, including the

 9   counsel for the government.  Stay independent of all other

10   people.

11             THE WITNESS:  Yes, Your Honor.

12             THE COURT:  See you in 15 minutes.

13             DEPUTY CLERK:  All rise.

14             This Honorable Court will now take a brief recess.

15             (Recess from 12:07 p.m. to 12:30 p.m.)

16             DEPUTY CLERK:  The United States District Court

17   for the District of Columbia is again in session, the

18   Honorable Richard J. Leon presiding.  God save the United

19   States and this Honorable Court.  Please be seated and come

20   to order.

21             THE COURT:  Let me see counsel.

22             I'll see counsel.

23             (Sealed bench conference)

24             MR. SIEGEL:  Yes, sir.

25             THE COURT:  You've done about an hour.  What
```

1    do you have left?

2            MR. WALTERS:  35, 40 minutes.

3            THE COURT:  No.  You ain't getting it.

4            MR. WALTERS:  Half hour?

5            THE COURT:  15 minutes.

6            MR. WALTERS:  Really?  Just 15?

7            THE COURT:  15 minutes.  He did about an hour and

8    a quarter on his direct.

9            MR. WALTERS:  So 15 minutes?

10           THE COURT:  You can have 15 minutes.  I'll start

11   this next witness this morning.

12           MR. WALTERS:  Start him this morning?

13           Yes, sir, I'll do it.

14           THE COURT:  So if it leads to 20, I'll let you

15   have 20, but that's it.

16           MR. WALTERS:  Okay.  I'll do what I need to do.

17           THE COURT:  So at like 15, I'll be getting touchy

18   with you.

19           (Open court)

20           THE COURT:  You may proceed when you're ready.

21           The witness remains under oath.

22   BY MR. WALTERS:

23       Q   Mr. Quintero, on Thursday, I want to turn to a new

24   subject, which is the corporate cost synergies.

25           Are you with me?

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18   Page 3523 of 3826

3657

1         A     Yes.

2         Q     Okay.  Now, on Thursday you didn't say much about

3    AT&T's analysis of corporate cost synergies, but let's look

4    at page 6 of your demonstrative, if you would.

5               Now, there, you reproduce some information from

6    page 149 of version 41.

7               Do you see that?

8         A     Yes.

9         Q     But, again, you've omitted information from that

10   section of version 41.  So let's look at the actual

11   document, which is on page 149, tab 12, of version 41.

12              Do you see that?

13        A     Yes.  I have it front of me.

14        Q     And you recall from your deposition that you

15   believed that, based on this summary page, that AT&T simply

16   took a specific percentage haircut and applied it across the

17   board to Time Warner's corporate costs, right?  Just top

18   down, that's what you said, right?

19        A     Based on this and the supporting spreadsheet.

20        Q     Now, you know that's wrong, right?

21        A     No, sir.  I believe I testified that there is

22   another document that may have been the basis for the

23   assumption that was used.

24        Q     Well, let's go to that other document.  Why don't

25   we just turn to the network page, 150.

1           Do you see it says, "Corporate costs savings

2    details"?

3           Do you see that?

4       A    Yes, I do.

5       Q    You didn't include that page in your

6    demonstrative, did you?

7       A    No, sir, I did not.

8       Q    But you testified at your deposition that you

9    weren't able to ascertain the linkage between the page 149

10   and page 150, right?

11      A    Specific to the spreadsheet that was used to

12   generate 150, that is -- 149, that is correct.

13      Q    Right.  So 149 says, here is the total; and 150 is

14   the detail.  And you didn't establish the linkage between

15   those two, did you?

16      A    It's not the detail.

17           Page 149 pertains to claimed cost savings in the

18   year 2020.  Page 150 reflects a budget for 2017.

19      Q    And so on the page 150, in fact, what that shows

20   is not that it's a top-down, but every one of those 31

21   categories gets a different percentage, right, of corporate

22   cost reductions?  That's what page 150 shows, right?

23      A    It shows numbers somewhat similar to what you're

24   saying.

25      Q    Yeah.  Okay.

1          And, for example, in the middle of the left side,

2     it says, "Board of Directors, 100 percent reduction,

3     $4 million."

4          Do you see that?

5     A     Yes, sir.

6     Q     Okay.

7          So every one of those little guys gets a different

8     percentage, and it all rolls up into that 75 percent on

9     page -- or that percentage on page 149, right?

10    A     It does not roll up.

11         These are assumed across-the-board, rounded

12    percentages.  And the bottom-line number does not agree

13    exactly with 149.  It may have been a basis or a

14    consideration in creating page 149.

15    Q     And because you didn't establish the linkage

16    between these two pages, you asserted that AT&T had just

17    made this percentage up and applied it as a top-down haircut

18    without doing any analysis.  That's what your assertion was,

19    right?

20    A     And that is correct, yes, sir.

21    Q     Yeah, and you never bothered to ask anybody about

22    whether that was right, did you?

23    A     Again, the numbers speaks for themselves.

24    Q     Well, look at the bottom.  It says, Peter Knag and

25    Doug Horne are the subject-matter experts?

Case 1:17-cv-02511-RJL Document 158 *\*\*REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER\*\*\* Filed 08/06/18 Page 3526 of 3826

3660

1      A    Yes.

2      Q    You never asked the government to depose those

3  people and understand what the build-up to that number was?

4      A    No, sir.  But I saw emails from Mr. Horne

5  criticizing this process.

6      Q    Based on that, that limited look, you concluded

7  that these corporate cost synergies were entitled to zero, a

8  goose egg, credit in this proceeding, right?

9      A    Based on looking at all this information, that is

10  correct.

11      Q    Right.

12      A    I believe I also testified, it's possible that

13  some portion of this may be achievable.  They've just not

14  provided an appropriate basis to give them that credit.

15      Q    I see.  So they didn't provide appropriate basis

16  to get the credit.  But you know Mr. Bewkes, right, will not

17  be here?  You know there's no need for a second Board of

18  Directors.  You know there's no need for another CFO.

19  You know all those are real costs.  But, nevertheless,

20  nevertheless, you gave zero credit here, right?

21      A    You just raised several issues, and I can address

22  each one if you wish.

23      Q    You gave zero credit here, notwithstanding the

24  fact that you know none of that corporate overhead is going

25  to be necessary, is it?

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18   Page 3527 of 3826

3661

 1       A      Some portion of it is likely to be necessary.

 2       Q      Some portion of it?

 3       A      That is correct.

 4       Q      But much of it, most of it is not, right?

 5       A      Again, some portion.  They haven't adequately

 6  documented which portions are appropriate.

 7       Q      And you also went on and told Judge Leon and in

 8  your report, you said that none of these are going to -- are

 9  merger-specific, right, according to the test you applied;

10  isn't that right?

11            Isn't that right?

12       A    I couldn't say none of them, because, again, I

13  indicated in my report that a portion of it probably is

14  merger-specific.

15       Q      Well, let's just --

16       A      They've just not provided a basis for being able

17  to determine which portion.

18       Q      I see.  Well, let's just look at page 7 of your

19  demonstrative, the last page, all right?

20            "Claimed Cost Synergies, Corporate Spend."

21            Do you see that?  Page 7.

22            Do you see that?

23       A      Yes, sir.

24       Q      And under "Corporate Spend Merger-Specific," it

25  says what, "no"?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3662

```
 1        A    That is correct.

 2        Q    So you're giving zero credit for any of these

 3   corporate cost expenditures or savings, right, as being

 4   merger-specific?  That's what you said, right?

 5        A    Yes, sir.

 6             Although that's in contrast to what I actually

 7   wrote in my report.

 8        Q    I'll bet it is.  I'll bet it is.

 9             A couple of other quick ones.

10             Now, on the marketing spend that you discussed

11   last week, you recall that, don't you?

12        A    Yes.

13        Q    And you said that there was no underlying

14   documentation for that, right?

15        A    That is correct.

16        Q    And so let's look at tab 13, okay?

17             Look at page 8 of that.  That's called "Execution

18   Plan, Domestic Paid Media."

19             Do you see that?

20        A    Yes, I do.

21        Q    Okay.  That's underlying documentation on domestic

22   paid media, that very subject, is it not?

23        A    I believe we have a difference of understanding as

24   to what constitutes adequate documentation.

25        Q    I'll bet we do.
```

1          But that's underlying documentation in support of

2     domestic paid media, is it not?

3          A    On a superficial basis, that is correct.

4          Q    All right.  Well, let's dig one lower, deeper --

5     one level deeper.

6               Did you look at the analysis in there about CPMs?

7     Do you see that CPM analysis?  You're aware of that,

8     aren't you?

9          A    Are you calling page 9 that you referred to me an

10     analysis?

11               On page -- you see in there on page 9?

12               THE COURT:  Which exhibit?

13               MR. WALTERS:  This is tab 13, Your Honor.  It's

14     marked Defendants' Exhibit 665.

15     BY MR. WELSH:

16          Q    Do you see that?

17          A    Yes.

18          Q    And do you see how it refers to the CPM yields

19     down in the synergy details?

20               Do you see that?

21          A    Yes.

22          Q    Now, did you go behind those numbers to figure out

23     what was going on there?

24          A    At the time that this was furnished, this was all

25     that was referred to by the defendants and their

1    consultants.

2            I subsequently found something else, but it's not

3    an analysis.  It's just some straight numbers.

4        Q    All right.  So the answer to my question is, no,

5    you didn't, right?

6        A    I couldn't have because they never specified that

7    this was what was being relied upon.

8        Q    Okay.  Is the answer to my question, no, you did

9    not?

10       A    I did not as of the time that I prepared my

11   rebuttal report.

12       Q    All right.  So then let's look at tab 14.

13           Now, tab 14 actually gets behind those CPMs.

14           And by the way, do you know what a CPM is?

15       A    Yes.

16           MR. SIEGEL:  Objection.

17   BY MR. WALTERS:

18       Q    Okay.  If you look at tab 14 --

19           MR. SIEGEL:  Your Honor, objection.

20           THE COURT:  You may approach.

21           (Sealed bench conference)

22           MR. SIEGEL:  Just pointing out this document, 14,

23   it's not in evidence.  It's not, was not -- and then as far

24   as if it's going to be used for impeachment, it was not

25   written by the witness, nor was it relied upon by the

1   witness in his expert work.

2          MR. WALTERS:  It's not for the truth.  It's simply

3   to impeach him to show that he didn't dig further.  That's

4   all it's for.

5          THE COURT:  So what are you going to be asking

6   him?

7          MR. WALTERS:  Just confirm that he simply did not

8   evaluate this in his conclusion that we get zero credit.  He

9   didn't evaluate another analysis underlying.

10          THE COURT:  Has this been provided to him?

11          MR. WALTERS:  Yes, sir.  It's been produced.  It's

12   on our exhibit list.  It's DX671.

13          MR. SIEGEL:  Your Honor, it's not in evidence.  It

14   was not raised in a deposition.  It was not relied upon by

15   our expert or by their expert, nor was it written by the

16   witness.

17          MR. WALTERS:  It will just take a second.  It will

18   be very quick.  That's my point.

19          THE COURT:  Well, you can show it to him and ask

20   him if he's ever seen it before or if he's ever had access

21   to it.

22          MR. WALTERS:  That's all I'll do.  That's all I'll

23   need to do.  Thank you.

24          THE COURT:  Objection overruled.

25          (Open court)

1          THE COURT:  You may proceed, consistent with the

2     discussion at the bench.

3     BY MR. WALTERS:

4          Q    So, Mr. Quintero, this tab 14, this DX671, this

5     CPM study, do you see that?

6          A    Yes.

7          Q    Did you ever look at that document?

8          A    Again, I had no way of knowing it at the time that

9     I prepared my report.  I have viewed this subsequently;

10    doesn't change my opinion.

11         Q    So you have.  And who provided it to you?

12         A    I have received this from the Department of

13    Justice.

14         Q    So the Department of Justice forwarded this to

15    you, didn't they?

16         A    That is correct.

17         Q    But at the time you prepared your report, you had

18    not seen it, correct?

19         A    I had never seen access to -- references to it in

20    the defendants' information, nor that of its defendant --

21    its consultant.

22         Q    So let me just ask you a couple other things, and

23    we'll finish up.

24              Now, you testified, didn't you, to, on Thursday,

25    that none of the cost savings, zero, are properly considered

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   to be variable costs.  Didn't you testify to that fact?

 2        A    Yes, sir.

 3        Q    And now, did the DOJ lawyers tell you that this --

 4   that that testimony was inconsistent with the DOJ's own

 5   horizontal merger guidelines?

 6        A    No, sir.

 7        Q    They did not tell you that?

 8        A    No, sir.

 9        Q    Did they tell you that it was also inconsistent

10   with their commentary to the merger guidelines?  Did they

11   tell you that?

12        A    No, sir.  We had no such conversations.

13        Q    And were you aware that in the commentary, that it

14   says that the agency's considered merger-specific,

15   cognizable reductions in fixed costs because consumers may

16   benefit from them over the longer term?  Were you aware of

17   that?

18        A    I'm aware of that.

19        Q    You are aware of that?

20        A    I have read that before.

21        Q    Now, are you aware of the Antitrust Modernization

22   Commission?

23        A    No, sir.

24        Q    So you don't recall Professor Carlton's testimony

25   and the fact that he served on it?

1      A    I'm unaware of Professor Carlton's testimony.

2      Q    And I assume you're unaware that Mr. Kempf here

3  and Mr. Delrahim here also served on that modernization

4  commission; is that right?

5      A    No, sir.  I'm unaware of that.

6      Q    All right.  So on the variable cost itself, right,

7  the way you defined "variable cost" was, is what happens

8  when there's a backout, what's the immediate, okay, and very

9  quick effect if there's a backout, right?

10     A    That's one way that I believe I testified in my

11 deposition testimony, and I also testified on that, slightly

12 different way, in my court testimony.

13     Q    You did.  I mean, let's talk about how slightly

14 different that was.

15          In your deposition and in your report, it was what

16 are the costs that go away immediately if there's a backout,

17 right?

18     A    I believe I said something to that effect.

19     Q    Yes.

20     A    I believe I said some other things as well, but

21 I believe that was one of the elements of my testimony.  But

22 I believe there was other comments that I made in my

23 deposition testimony.

24     Q    And that was the definition of variable costs that

25 you had discussed with DOJ, right, as part of your

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  assignment here, right?

2      A    I'm sorry.  I don't know what you mean.

3      Q    Well, that what you, indeed, and the DOJ lawyers

4  agreed should be the definition of variable costs, right,

5  what immediately goes away if there's a blackout, right?

6      A    No.  In my report, I believe I defined a variable

7  cost, and it wasn't in the way that you just characterized

8  it.

9      Q    But that's certainly the way you characterize it

10  in your deposition, right?

11     A    I believe that was one of the things that I said

12  in my deposition, and I believe I said some other things as

13  well pertaining to variable costs.

14     Q    And you know for a fact, don't you, that if it's

15  something other than immediate, if you give it a longer time

16  horizon, much more is going to be a variable cost, right?

17     A    No.

18         What there would be is revised fixed costs over

19  longer time horizons.

20     Q    Yeah.

21         But if the time horizon is longer than immediate,

22  much more will be considered to be a variable costs will it

23  not?

24     A    No, sir.  Variable costs are variable costs.  Fix

25  costs are fixed costs.  But fixed costs can change over

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3670

```
 1    time.  For example, rent is a fixed cost.  New lease, you've
 2    got a new rent.
 3        Q    Well, let's just talk about it in the context of
 4    the marketing costs where you bought it up on Thursday.
 5             Now, is it your testimony in this courtroom that
 6    no marketing expenses or advertising expenses should
 7    properly be viewed as variable costs?  Is that your
 8    testimony?
 9        A    Well, you have to identify --
10        Q    Is that your testimony?
11        A    Generally speaking, marketing costs are fixed
12    costs.  They are fixed spends that are established for time
13    periods.
14        Q    So if I'm Turner or I'm Warner Brothers and I say,
15    I'm going to produce five more movies or ten more series and
16    I want to market them and advertise them, your testimony is
17    that those are fixed costs?
18        A    Yes.  There's a fixed budget that has been
19    established for five movies or ten movies, and it doesn't
20    change as a result of number of subscribers.
21        Q    Well, let's say I want to sell more tickets to a
22    particular movie, so I go out and advertise it.  Is it your
23    testimony that those are fixed costs?
24        A    Yes, they are.
25             There's also the testimony of Mr. Tsujihara.
```

1      Q     I see.

2      A     He didn't call them fixed costs, but he said

3   something that is highly relevant to this.

4      Q     All right.  Well, let's just finish up with a

5   couple things before lunch.

6            Now, you also looked at these innovation

7   synergies, didn't you?

8      A     Yes, sir.

9      Q     And -- but you have not reached any conclusions

10  about whether AT&T will be able to achieve the innovations

11  that it anticipates from this transaction, right?

12     A     As I testified, I cannot give any opinions with

13  respect to the technical capability, only the financial

14  impacts.

15     Q     All right.  But you may, AT&T might be able to

16  achieve those innovation synergies; you just haven't looked

17  at enough information to allow you to have an opinion one

18  way or another, right?

19     A     No.  I have no technical ability to ascertain

20  whether they can or cannot achieve those innovation

21  synergies.

22     Q     Right.

23     A     I can only review the financial information and

24  comment on the financial impact.

25     Q     So you're not qualified to speak to that subject,

1   right?

2       A    With respect to the technical capabilities,

3   absolutely not.

4       Q    Well, and you heard, didn't you, Mr. Holanda,

5   Mr. Montemagno, Mr. Stankey, Mr. Martin, Mr. York, and

6   others talk about those frictions in the marketplace, as

7   those impediments to actually being able to innovate.  You

8   heard that, and you know about that testimony, don't you?

9       A    Well, again, the only person of those that you

10  just mentioned whose testimony I was present for was

11  Mr. Stankey's testimony.

12      Q    And if they testified to that effect, you have no

13  reason to doubt their testimony, do you?

14      A    I have no reason to -- I have no opinion on it.

15  I wasn't even present.

16      Q    Fair enough.

17           But you would agree, wouldn't you, that if AT&T is

18  able to achieve its goal of furthering innovations, that

19  would be a good thing for consumers.  We can agree on that,

20  cant we?

21      A    It depends on what it is.

22      Q    Well, didn't you tell me in your deposition that

23  if AT&T is able to achieve that goal, that that would be

24  good for consumers?  You recall that testimony, don't you?

25      A    I don't recall that, but I would say more

```
 1    precisely, it depends on the -- what it is that is done.

 2             As a consumer and as an AT&T customer, if it

 3    enhances my experience, certainly -- and doesn't cost me

 4    anything, certainly, that's good.

 5        Q    All right.  Let's finish with this.

 6             Now, look at page 7 of your demonstratives again.

 7    You'll have that, I think, in front of you.

 8             Do you see that?

 9        A    Yes, sir.

10        Q    Now, you've been very clear in your opinions that

11    there are zero efficiencies that meet your test, right?

12        A    That is correct, of the ones that I --

13        Q    And that's on all three elements of your test?

14    That's verifiability, merger specificity, right, and on all

15    the elements of the test, correct?

16        A    Yeah, and variable costs with respect to costs,

17    and then the two that I have deemed to be relevant to

18    revenues.

19        Q    Okay.  So, Mr. Quintero -- but if this were the

20    real world, okay, if this were the real world and AT&T had

21    hired you to evaluate the synergies here, you wouldn't tell

22    them it would be zero, synergies that would be achievable

23    here, would you?

24        A    This is the real world.  If they had hired me, I

25    would have guided them towards producing better proof.
```

1   Unfortunately, they've not done that.

2        Q    But if they had hired you in the real world, in a

3   business setting, you wouldn't tell them synergies

4   achievable of zero, would you?

5        A    Yes.  If they had furnished me this information, I

6   would.  And I would say, you've got more work to do if you

7   want to be able to have this withstand scrutiny.

8        Q    All right.  Well, let's look at your deposition,

9   page 139, sir.

10            And go to line 23.

11            And the question that's put to you is -- tell me

12   when you're there.

13       A    All right.

14       Q    The question that's put to you is, "You would not

15   have told -- if AT&T had hired you to evaluate the surgeries

16   here, you would not tell them that there is zero synergies

17   to be achieved here; is that correct?"

18            Do you see that?

19       A    Yes.

20       Q    And what's your answer?  Just give me your answer.

21       A    "Correct."

22            But then there's more comment that follow

23   "correct."

24       Q    Yeah, well, your lawyer will have plenty of

25   opportunity.  But your answer to that is correct.  If AT&T

1    had hired you, you wouldn't tell them zero synergies, right?

2        A    That's the first part of a longer sentence; that

3    is correct.

4        Q    And then, in fact, what you would tell AT&T is

5    there's a high likelihood, a high degree of likelihood, that

6    there are efficiencies to be gained as a result of this

7    merger, right?

8        A    I believe that the -- some would likely be

9    possible.

10           The key issue is documenting it properly.

11       Q    Well, let's be real clear about this.

12           Let's go to page 19 of your deposition, sir.

13           Let's go to line 5.

14       A    I'm there.

15       Q    And you get the question:  "Do you believe that

16   there are likely to be some efficiencies to be gained as a

17   result of this merger?"

18           Your answer is, "I would believe so."

19           The question to you next is:  "What is the

20   likelihood that there are in the some efficiencies to be

21   gained as a result of this merger?"

22           And your answer is, I would believe a high degree

23   of likelihood that there would be some efficiencies.

24           Do you see that?

25       A    Yes, sir.

1      Q    Was that, those questions -- those were questions

2  to you, and those were your answers; isn't that right?

3      A    Yes, sir.

4      Q    Okay.  And so if someone were to try to add up, in

5  light of that, if someone were to try to add up all of the

6  actual, okay, the actual pluses and minuses from this

7  transaction that would actually occur in the real world,

8  it would be wrong to put a zero next to the synergies,

9  wouldn't it?

10     A    It would be right if one is applying the objective

11  criteria that I applied.

12     Q    Yeah.

13          If you apply the tests you applied, right, okay,

14  about certainty and verifiability and but-for and merger

15  specificity -- okay, and none of these are variable costs,

16  right? -- if you applied that, the answer is zero, right?

17     A    No, I did not apply the criteria of certainty.

18     Q    But if we're talking about the real world, there

19  is a high likelihood, right?  That's what your testimony

20  was, that AT&T will achieve synergies in this transaction,

21  right?

22     A    Unquantified synergies.  It is certainly likely

23  that some synergies will occur.

24     Q    So if AT&T had hired you to come and do this, what

25  you would do, as you testified on Thursday, is you would dig

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18   Page 3543 of 3826

3677

1    deep, right, and you would solicit information, right?

2    That's what you would do if they came to you and hired you

3    in a business setting, right?

4        A    I would have worked with management team to better

5    quantify the information so that it was provable, so that it

6    would withstand scrutiny by somebody like me.

7        Q    Yes, sir, you would.

8            And then you would do that additional work,

9    wouldn't you?  You would ask questions, and you would try to

10   understand the synergies estimates.  You would do that

11   additional work, wouldn't you?

12       A    If I were working for AT&T, I would certainly work

13   with them to try to get that done to the best of what is

14   possible, given information that can be obtained.

15       Q    And that's the point.  You didn't do that

16   additional work here, did you?

17       A    I did as much work as I could with the information

18   that was proffered and represented.

19           THE COURT:  Mr. Walters --

20           MR. WALTERS:  Yes, sir.  Last question.

21           THE COURT:  -- your time is up.

22           MR. WALTERS:  May I have one question?

23           THE COURT:  One question.

24   BY MR. WALTERS:

25       Q    And that's because the DOJ lawyers, okay, they

1   didn't ask you to do that additional work here, right?

2       A    No, sir.

3       Q    Well, that was -- would you look at page 145 of

4   your deposition.

5            THE COURT:  No.  One question.  You got your

6   question.

7            MR. WALTERS:  Yes, sir.  Thank you.

8            THE COURT:  Redirect.

9            You've gone 15 minutes.  That's it.

10                   REDIRECT EXAMINATION

11  BY MR. SIEGEL:

12      Q    Good morning, Mr. Quintero.

13      A    Good afternoon.

14      Q    Now, Mr. Walters asked you about your -- some of

15  the documents you relied on.

16           Do you recall that?

17      A    Yes.  He asked me several questions on the

18  documents.

19      Q    And you mentioned that you rely on documents that

20  were identified in an interrogatory; is that right?

21      A    Yes.  I previously had testified about that.

22      Q    And in that interrogatory, are you referring to

23  the interrogatory in which AT&T was asked specifically,

24  separately for each potential efficiency or synergy of the

25  transaction, to state the amount and nature of those

1    synergies and costs and time in the attainment of those

2    synergies to identify the spreadsheets or other documents

3    containing the calculations or models used --

4              THE COURT:  Whoa, whoa, whoa.  Slow down.

5              MR. SIEGEL:  Sorry.

6              THE COURT:  My court reporter is good, but he's

7    not a machine, all right?  Slow down.

8              MR. SIEGEL:  Okay.

9    BY MR. SIEGEL:

10        Q    -- and to identify the calculations or other

11   models used to support this synergy?

12        A    Yes, sir.

13        Q    And do you recall receiving an answer to that

14   interrogatory?

15        A    Yes.

16        Q    And do you recall that answer including the

17   assertion that the latest quantification of the synergies

18   was in the document we've been talking about, version 41?

19        A    Yes.

20        Q    And that this document and its underlying

21   spreadsheets and inputs would be produced to the plaintiff?

22        A    Yes.

23             THE COURT:  Direct exam, redirect.  This is not

24   leading questions.

25             MR. SIEGEL:  Okay.

1          THE COURT:  Reformulate your question.  Ask a

2    question.  Don't testify.

3    BY MR. SIEGEL:

4          Q    Mr. Quintero, in substance, what do you recall of

5    the response to that interrogatory as it concerned the

6    documents the DOJ was going to receive from AT&T?

7          A    My understanding was that the defendants were to

8    produce the documents, and I received those documents that

9    they did produce.

10         Q    And did you rely only on those documents?

11         A    No, sir.

12         Q    What other categories of documents did you rely

13   on?

14         A    I relied upon the documents produced by the

15   defendants' consultant on synergies, who produced two

16   reports, all the documents that he referred to, as well as

17   many others that we found independently, deposition

18   testimony, and other information enumerating approximately a

19   thousand documents.

20         Q    Okay.  And Mr. Walters asked you a bit about why

21   you didn't work with defendants' subject-matter experts, as

22   he called them, or ask DOJ to depose those individual.

23              Do you recall that?

24         A    Yes, sir.

25         Q    Did we have any 30(b)(6) depositions in the

1    investigation in the case --

2        A    Yes.

3        Q    -- on this topic?

4        A    On synergies, yes.

5        Q    How many, do you recall?

6        A    I don't recall the exact number.

7        Q    Okay.  And -- but there were several?

8        A    That's my understanding.

9        Q    And do you recall any of these subject-matter

10   experts being proffered in any of these 30(b)(6)

11   depositions?

12       A    My understanding -- and I'm speaking as layman --

13   is that the people who were deposed were those who were

14   representing the defendants with respect to synergies.

15       Q    And did the defendants' expert, whose reports you

16   received, interview any of these subject-matter experts?

17       A    His report referenced ten that he spoke to, is my

18   recollection of the number.

19       Q    And did he provide notes or records of any kind so

20   you could get access to the benefits of those interviews?

21       A    He did not.

22       Q    Regarding other transactions, including DirecTV,

23   but I think Mr. Walters referred to 13 different

24   transactions, do you remember Mr. Walters asking you about

25   that?

1       A    Yes.

2       Q    And did you see any evidence of a track record of

3  achieving synergies in these 13 transactions?

4       A    I saw -- I and members of my staff who looked at

5  that saw some general evidence, but it wasn't conclusive.

6       Q    And what kind of evidence?  How would you

7  characterize the evidence that you received on the 13

8  transactions?

9       A    Relatively sparse documentation.

10      Q    Were there any transactions where you received

11  more fulsome documentation?

12      A    The only one that was more complete, or I should

13  characterize as less incomplete, was that pertaining to the

14  acquisition of DirecTV.

15      Q    And I think Mr. Walters had read a quote from you.

16  I believe it was from your report, one of your reports,

17  about it being somewhat valuable or informative if a company

18  has achieved analogous synergies in the past.

19      A    Yes.

20      Q    Were the surgeries analogous that were achieved in

21  the DirecTV transaction?

22      A    No.

23      Q    Why not?

24      A    Because the revenue synergies were, as stated by

25  Mr. Stankey, a big miss.

1          And on the cost synergies, about half of them were

2     on content, which is not relevant to this transaction.

3          Q    And Mr. Walters talked to you a bit about the

4     standard for verifiability that you applied.

5               Do you recall that?

6          A    Yes.

7          Q    And was that standard for verifiability that you

8     applied described in paragraph 23 of your opening report?

9          A    It was described in my opening report.  I don't

10    remember the paragraph.

11              Yes.

12         Q    And you're looking at paragraph 23 of your opening

13    report?

14         A    I am.

15         Q    And does it do a good job of describing the

16    standard you used for verifiability in this case?

17         A    Yes.

18         Q    Could I ask you just to tell us what it says.

19         A    It says, "Under the Guidelines, efficiency claims

20    must be verifiable to be credited against likely harm to

21    competition."

22              The guidelines say that, "Efficiency claims will

23    not be considered if they are vague, speculative, or

24    otherwise cannot be verified by reasonable means."

25         Q    Now, the -- I think Mr. Walters asked you about

1  whether the same people who were responsible for the synergy

2  calculations own it; in other words, are going to be held

3  responsible for it in this matter.

4          Do you recall that?

5     A    Yes.

6     Q    All right.  Now, without repeating or summarizing

7  any documents that you may have reviewed, have you reached

8  an opinion about whether people at Time Warner working on

9  the synergy estimates thought that the process of

10 calculating those estimates was valid?

11    A    Yes, I have.

12    Q    And what is that opinion?

13    A    That some of the most senior people at Time Warner

14 have expressed, through documents, that they do not accept

15 the validity of the approach for documentation.

16    Q    And have you seen any evidence in this case that

17 gives you any doubt that the Time Warner executives will be

18 the ones who will be held accountable?

19         MR. WALTERS:  May we approach, Your Honor, very

20 briefly?

21         THE COURT:  You may.

22         (Sealed bench conference)

23         MR. WALTERS:  Your Honor, not only beyond the

24 scope, but he's just testifying to hearsay to a bunch of

25 documents that is improper and I'd have to cross-examine

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   about.  And so on that basis, we object.

 2          MR. SIEGEL:  We just way, we've been trying to

 3   keep him away from funneling hearsay in; but we think, as an

 4   expert witness, he has some latitude to use his --

 5          THE COURT:  Objection sustained.  Move on.

 6          (Open court)

 7          THE COURT:  Strike the last question.  Move

 8   forward.

 9   BY MR. SIEGEL:

10     Q    Just a couple brief points for purposes of

11   completeness.

12          Do you recall that Mr. Walters asked you about

13   some deposition testimony at page 66 of your deposition in

14   this litigation?

15     A    I have to look at page 66.  I don't recall what it

16   pertains to.

17     Q    And do you have that deposition at tab 3 of the

18   binder that Mr. Walters gave you?

19     A    Yes.  I have it in front of me.

20     Q    The question was asked:  "Sure.  All other things

21   being equal, if a set of business plans is going to be

22   integrated into future business plans, that would tend to

23   enhance the credibility of projections."

24          And did Mr. Walters read the first part of the

25   answer:  "Certainly, the credibility of the process that

1    went into creating the projections"?

2        A    Yes.

3        Q    And did he fail to include the subsequent part of

4    that sentence?

5        A    Yes.

6        Q    And what does that say?

7        A    "Not the verifiability of the documents or the

8    credibility of the result."

9        Q    And, similarly, if you turn to page 140 of that

10   deposition, turning your attention to lines 1 -- page 139,

11   23, over to 140, 6, to line 6.

12           Do you recall that you and Mr. Walters discussed

13   that little passage?

14       A    Yes.

15       Q    And that was a question:  "You would not have

16   told -- if AT&T had hired you to evaluate the synergies

17   here, you would not tell them that there's zero synergies to

18   be achieved here; is that correct?"

19           And you answered, in Mr. Walters' telling of it,

20   "Correct."

21           Was there additional testimony that clarified that

22   "correct" answer?

23       A    Yes.

24       Q    And what is that?

25       A    "Because had he hired me, I would have fixed some

1    of the problems that I saw in the work that has been done,

2    or I would tell them that these things have to be fixed."

3              MR. SIEGEL:  Can I have a moment, Your Honor?

4              No further questions, Your Honor.

5              THE COURT:  All right.  Recross.

6              MR. WALTERS:  Nothing, Your Honor.

7              THE COURT:  Nothing?

8              You're excused.

9              Call your next witness.

10             (Sealed bench conference)

11             THE COURT:  Athey, right?

12             MR. CONRATH:  Yes, that's correct, Your Honor.

13             MR. PETROCELLI:  Mr. Raiff, R-a-i-f-f, will handle

14   her cross-examination.

15             MR. CONRATH:  Mr. Schwingler.

16             THE COURT:  Okay.

17             All right.  So why don't we do this.  We'll cut

18   the break short.  Schwingler can have an hour and a quarter,

19   2:30 to 3:45; take a 15-minute break; cross-exam, 4:00 to

20   5:00.  It will be your earlier estimates basically.

21             Redirect, 15 minutes.

22             MR. CONRATH:  15 minutes.  Okay.

23             THE COURT:  I have to leave at 5:15.

24             MR. PETROCELLI:  You have to leave at 5:15.

25             THE COURT:  I should have left about 5:00, but

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   I'll let Mr. Pitofsky carry the load.

2           MR. CONRATH:  Maybe we can shorten along the way.

3   Obviously, if we can't --

4           THE COURT:  You don't have to decide.  I'll let

5   you all decide that.

6           MR. PETROCELLI:  Timing is not good, Your Honor,

7   but we do have objections to Professor Shapiro's --

8           THE COURT:  Well, tell me on what.

9           MR. PETROCELLI:  -- testimony.

10          Well, in our view, he's introduced new work, new

11  calculations, new numbers that went beyond and was not

12  consistent with the discussion that we had on the phone

13  Friday.  So I would like an opportunity to address that.  I

14  suppose I could do that tomorrow morning.

15          I don't want to delay Your Honor at all.

16          THE COURT:  Well, how long will that take?

17          MR. PETROCELLI:  Probably ten minutes.

18          THE COURT:  Do it now.  Tell Mr. Schwingler that

19  he won't need to have the witness here until 2:30.

20          MR. CONRATH:  Until 2:30?  Okay.

21          THE COURT:  We'll talk about your situation.

22          MR. PETROCELLI:  Let me go get my materials.

23          MR. CONRATH:  I'm going to replace myself with

24  Mr. Welsh, who will be handing this for us, the part about

25  Professor Shapiro.

1              THE COURT:  Right.

2              MR. WELSH:  Good afternoon, Your Honor.

3              THE COURT:  Good afternoon.

4              All right.  You've got some issues relating to

5       Shapiro; is that correct?

6              MR. PETROCELLI:  Yes, Your Honor.

7              THE COURT:  They gave you the thing, though, that

8       they were supposed to give you, right?

9              MR. PETROCELLI:  Yes, Your Honor.  They gave us a

10      supplemental report, and then they gave us some

11      demonstratives.

12             And, Your Honor, here is the problem.  He has done

13      new work.

14             MR. WELSH:  I'm having trouble hearing you.  I'm

15      sorry.

16             MR. PETROCELLI:  Professor Shapiro has done new

17      work, which involves, among other things, doing some kind of

18      regression that allows him to draw certain lines.

19             On the telephone with the Court, I specifically

20      asked whether any regression analyses had been done; and the

21      answer was "no."  Something was done to create these new

22      charts.  That's number one.

23             Beyond that, Your Honor --

24             THE COURT:  I thought we had -- I thought the

25      understanding was that he was going to be limited to being

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   confronted by statements by the other experts that raised

2   questions or disagreements with the report and that he'd

3   have a chance to respond to those.

4            MR. WELSH:  Yes, Your Honor.

5            THE COURT:  He not allowed to do any new expert

6   report, any new opinions.  He's supposed to be responding to

7   the confrontations that are being provided by the other

8   experts.

9            MR. WELSH:  Right, and that's what he's prepared

10   to do, Your Honor.

11            And I think pursuant to what Your Honor's

12   instructions were, we did provide a supplemental report to

13   them Saturday at noon.  It had the two items that we

14   discussed with Your Honor on the following.

15            That it had the averaging of the lifetime values

16   compared to Dr. Shapiro -- Dr. Carlton's approach of just

17   looking at June of 2017.

18            Professor Shapiro's averaged the three, the

19   January, April, and June figures.  That's in item one.

20            I understand that there's no objection to that

21   from the defendants.  We've heard none.

22            Item two is getting to the difference between the

23   lifetime values of the existing subscribers versus the new

24   subscribers.  We talked about that with Your Honor on the

25   phone on Friday as well.

1          This is springing from footnote 414 of

2   Professor Shapiro's initial report.  The information is

3   coming from that, and all that he is doing with respect to

4   this information is basic math.

5          And we provided backup information for that.  It

6   was simply taking the subscriber acquisition costs, which

7   has already been reported and already given to the other

8   side, and Professor Carlton has had it.

9          He's taking that number, adding that to the

10  lifetime value to make a point about the differences between

11  the existing versus subscriber value.  It's just a simple

12  calculation which he says here, in the supplemental of how

13  he's doing it of just adding the lifetime value plus the

14  subscriber acquisition costs and that's it.  And then he's

15  reporting that out.

16         So that was what Mr. Conrath had explained to

17  Your Honor on Friday were the additional pieces, that we

18  wanted to make sure that there wasn't going to be any

19  question or some controversy here.

20         And what we've also done, Your Honor, pursuant to

21  Your Honor's instructions and we were hoping we were

22  compliant here, is we've stated what the objection is of

23  Mr. -- I'm sorry, Professor Carlton to Professor Shapiro's

24  testimony and opinion on each one of these items.  And

25  that's what we intend to do tomorrow with Professor Shapiro

 1   as well, is to go through and explain --

 2            THE COURT:  You have one hour each.  That's all

 3   you've got.

 4            MR. WELSH:  I understand, Your Honor.

 5            But I would also want to come back to this

 6   point --

 7            THE COURT:  Why is he creating new charts?  Why is

 8   he including new demonstratives?

 9            MR. WALTERS:  That's what I wanted to go through

10   right now, Your Honor.

11            THE COURT:  Why is that necessary?

12            MR. WALTERS:  Well, it's just for explanatory

13   purposes.

14            THE COURT:  He can explain it.

15            MR. WALTERS:  But this chart, Your Honor, right

16   here, this is the one that we showed Your Honor before.

17   It's exactly the same chart that we showed Your Honor during

18   his direct.

19            THE COURT:  Why do we need to see it any more?

20            MR. WALTERS:  Well, what he's trying to do, you

21   may remember Professor Carlton talking about the red line --

22            THE COURT:  You're not creating new charts.

23            MR. WALTERS:  And that's all that he did is he

24   broke out the red line.

25            My understanding is there's no additional work

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   here.  He broke out the red line and just to show to

 2   Your Honor that there's been no change here.

 3            MR. PETROCELLI:  You --

 4            MR. WELSH:  This is not --

 5            MR. PETROCELLI:  Your Honor, this a brand-new

 6   opinion, and this is based on some kind of linear --

 7            MR. WELSH:  Excuse me.  Taking this -- this is my

 8   copy.

 9            MR. PETROCELLI:  Well, he already has it.  If he

10   didn't need to -- if he already had it, he wouldn't need to

11   draw a new line.  And it's not only misleading, Your Honor;

12   it's incorrect.

13            But let me explain to you.  These are all new

14   numbers.  Mr. Welsh said "Your Honor's direction,

15   Your Honor's direction."

16            Nothing Your Honor said on the phone allowed them

17   to run all new calculations, Your Honor, a brand-new theory

18   that he is surfacing with.  He's doubling the harm.

19            Look at this, Your Honor.  All new.

20            This is a complete ambush.

21            And let me tell you why he's doing this,

22   Your Honor.  He refuses to update the profit margin to

23   reflect the more current profit margin that Mr. Christopher

24   testified to and that we provided to him long ago.  He's

25   trying to justify using an older profit margin.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          So, therefore, he's telling the Court:  Let me use

2     the old, outdated profit margin because I think it's

3     understated, in any event.

4          The reason I think it's understated is because if

5     I run some new and different calculations, look, I'd come up

6     with massive, higher numbers, 545, instead of 235.  These

7     are all new numbers, Your Honor, that we're hearing for the

8     first time.

9          THE COURT:  Look, I was very clear.  This was

10    going to be limited to his being confronted with what other

11    experts disagreed with him about and why he disagrees with

12    them and what his reasoning was for his prior opinions.

13         This is not about new opinions.  This is not about

14    coming up with new theories.

15         I was very clear about that.

16         And this is morphing into something that I had

17    never authorized, let alone thought was appropriate under

18    the circumstances.

19         So I'm not going to let him do that.  So you've

20    got to get your act together between now and tomorrow

21    morning and figure out how to present this the way,

22    consistent with our discussion the other day.

23         There's a transcript of our discussion.  The

24    reporter has it.  He made a transcript of it.  Look at it.

25    That's what you're going to be limited to.

1          I don't want to see new demonstratives, and

2     I don't want to see new opinions.

3          MR. WELSH:  Thank you, Your Honor.

4          (Open court)

5          THE COURT:  All right.  We'll take the luncheon

6     recess.  We'll reconvene at 2:30.

7          DEPUTY CLERK:  All rise.

8          This Honorable Court will stand in recess until

9     the return of court.

10          (Proceedings concluded at 1:15 p.m.)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: April 23, 2018_____   /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          :
                                   :
                Plaintiff,         :          CV No. 17-2511
          vs.                      :
                                   :          Washington, D.C.
                                   :      Monday, April 23, 2018
AT&T, INC., ET AL.,                :            2:45 p.m.
                                   :
                                   :            Day 18
                Defendants.        :
-----------------------------x



AFTERNOON SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:     Craig W. Conrath, Esquire
                        Eric D. Welsh, Esquire
                        Donald G. Kempf, Jr., Esquire
                        Sarah Oldfield, Esquire
                        Caroline Anderson, Esquire
                        Peter J. Schwingler, Esquire
                        U.S. DEPARTMENT OF JUSTICE
                        Antitrust Division
                        450 Fifth Street, NW
                        Washington, DC  20530
                        202) 532-4560
                        craig.conrath@usdoj.gov
                        eric.welsh@usdoj.gov
                        donald.kempf@usdoj.gov
                        sarah.oldfield@usdoj.gov
                        caroline.anderson@usdoj.gov
                        peter.schwingler@usdoj.gov

```
1    Appearances Continued:

2    For Defendant AT&T        Katrina M. Robson, Esquire
     and DirecTV Group        O'Melveny & Myers LLP
3    Holdings, LLC:           1625 Eye Street, NW
                              Washington, DC  20006
4                             (202) 220-5052
                              krobson@omm.com
5
                              Daniel M. Petrocelli, Esquire
6                             M. Randall Oppenheimer, Esquire
                              O'MELVENY & MYERS LLP
7                             1999 Avenue of the Stars
                              8th Floor
8                             Los Angeles, CA  90067
                              (310) 553-6700
9                             dpetrocelli@omm.com
                              roppenheimer@omm.com
10
                              Michael L. Raiff, Esquire
11                            Robert C. Walters, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
12                            2100 Mckinney Avenue
                              Suite 1100
13                            Dallas, TX 75201
                              (214) 698-3350
14                            mraiff@gibsondunn.com
                              rwalters@gibsondunn.com
15
     For Defendant            Kevin J. Orsini, Esquire
16   Time Warner, Inc.:       Peter T. Barbur, Esquire
                              CRAVATH, SWAINE & MOORE LLP
17                            Worldwide Plaza
                              825 Eighth Avenue
18                            New York, NY  10019
                              (212) 474-1140
19                            korsini@cravath.com
                              pbarbur@cravath.com
20
     Court Reporter:          Crystal M. Pilgrim, RPR, FCRR
21                            Official Court Reporter
                              United States District Court
22                            District of Columbia
                              333 Constitution Avenue, NW
23                            Washington, DC  20001
                              (202) 354-3127
24                            crystal_pilgrim@dcd.uscourts.gov

25
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1                    Table of Contents

 2                           Direct   Cross   Redirect   Recross

 3   On behalf of the Government:

 4        Susan C. Athey

 5          By Mr. Schwingler      3702

 6          By Mr. Raiff                    3740

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2            THE DEPUTY CLERK:  Your Honor, recalling civil action

 3   number 17-2511, the United States of America versus AT&T, Inc.

 4   et al.

 5            THE COURT:  Call your next witness.

 6            MR. CONRATH:  Your Honor, may we approach for one

 7   quick follow up thing?

 8            THE COURT:  Yes.

 9        (Sealed bench conference.)

10            MR. CONRATH:  Just quickly following up on the

11   conversation before lunch.  I want Your Honor to know that

12   we're, we are obviously doing our best to follow exactly what

13   the Court told us in the conference Friday.

14        But I just want to let you know that we do not have a

15   transcript.  If the Court means for to us to have a transcript,

16   if you could let the court personnel know, obviously, it would

17   assist us in making sure we are doing everything right.  But I

18   just didn't want a misimpression.

19            THE COURT:  I've got notes.

20            MR. CONRATH:  We do.  I wasn't complaining.

21            THE COURT:  I specifically remember taking these off

22   the table.  I specifically remember hoping this was no big

23   deal.

24            MR. CONRATH:  Yes.

25            THE COURT:  The averaging of the three numbers.
```

1          MR. CONRATH:  Yes, it's not.

2          THE COURT:  And the bigger issue is the value of,

3     valuing issue.

4          MR. CONRATH:  Yeah, that's right.

5          THE COURT:  And the solution, I was hopeful was you'd

6     get your stuff on Saturday at noon, and you'd have a chance to

7     review with your expert or whoever and that would give you

8     plenty of time to prepare.  And that was what was suppose to

9     happen.

10          MR. PETROCELLI:  Your Honor, I don't want to go over

11     the argument again, but they're all new calculations and

12     everything and Your Honor indicated those are not fair game.

13          MR. CONRATH:  I'm not meaning to reargue.  I think we

14     were trying to honor what we said.  I just wanted to raise that

15     one possibility.

16          MR. PETROCELLI:  Okay.

17          THE COURT:  If it's a question of responding to a

18     criticism that was raised against him whatever, it is obviously

19     a limit to how far he can go in terms of spinning that off into

20     coming up with a whole new opinion that they don't have time in

21     fairness to them to be prepared to oppose.

22          MR. CONRATH:  Sure.

23          THE COURT:  There is an ability to respond and he

24     should respond.

25          MR. CONRATH:  Okay.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1            THE COURT:  But coming up with whole new charts and

2   whole new calculations and whatever, that's taking it I think a

3   step too far.

4            MR. CONRATH:  Okay, we understand.  He will be

5   prepared to respond to the criticisms without doing the whole

6   new charts.

7            MR. PETROCELLI:  Thank you, Your Honor.

8            MR. CONRATH:  Thank you.

9        (Open court.)

10            MR. CONRATH:  Mr. Schwingler will be handling our

11   next witness, Your Honor.

12            THE COURT:  All right.

13            MR. PETROCELLI:  Mr. Raiff will be handling the

14   defense of the witness, Your Honor, thank you.

15            THE COURT:  All right.

16        Call your witness.

17            MR. SCHWINGLER:  United States calls Professor Susan

18   Athey as a rebuttal expert.

19        And Your Honor, we've provided Professor Athey with

20   copies of her reports in case they may be of assistance.

21            GOVERNMENT WITNESS SUSAN C. ATHEY SWORN

22            MR. SCHWINGLER:  May I proceed, Your Honor?

23            THE COURT:  All right.

24                      DIRECT EXAMINATION

25   BY MR. SCHWINGLER:
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Good afternoon, Professor Athey.

2  A.   Good afternoon.

3  Q.   Please state your name for the record?

4  A.   Susan Athey.

5  Q.   And Professor Athey, are you here today to testify about

6  the ad growth in content intelligence synergies that defendants

7  claim will result from their merger?

8  A.   Yes.

9  Q.   Could you start by describing your educational background

10  for His Honor?

11  A.   Yes.  I have Bachelor Degrees in economics, computer

12  science and mathematics from Duke University, and a Ph.D. in

13  economics from Stanford.

14  Q.   Where are you currently employed?

15  A.   I'm the economics of technology Professor at the Stanford

16  Graduate School of Business.

17  Q.   Could you walk us through the various academic positions

18  you've held throughout the years leading up to your current

19  job?

20  A.   Sure.  I have spent about six years each as an economics

21  Professor at M.I.T., Harvard and Stanford.

22  Q.   In your current position at Stanford Business School, do

23  you teach any classes related to advertising?

24  A.   Yes.  I teach classes to MBAs, called advertising and

25  monetization, the economics of digital platform markets and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  market places.

2  Q.   You mentioned the economics of digital platform markets.

3  Could you briefly explain what a platform market is?

4  A.   Sure.  A platform is a business that brings together two

5  different types of constituents like buyers and sellers.

6      So an example might include eBay that brings together small

7  sellers and small buyers, Airbnb or Uber.

8  Q.   Do any of the classes you teach involve data?

9  A.   Yes.  So I teach classes to executives about operating

10  data driven businesses, using data in business strategy.  As

11  well as using machine learning and artificial intelligence for

12  businesses.

13      I also teach classes to Ph.D. students about machine

14  learning and econometrics which is basically about using

15  statistics to analyze large data sets.

16  Q.   What fields do you conduct your research?

17  A.   A lot of my research falls into the broad field of

18  industrial organization.  Within that field the few sub fields

19  including the economics of platforms, the impact of technology

20  and digitization on markets including media markets and

21  advertising.

22  Q.   Could you just briefly define industrial organization?

23  A.   Yes.  So industrial organization is the study of market

24  structure and the sources of market power.  Horizontal and

25  vertical integration, firm behavior and firm organization.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   So you've listed a few sub topics of specialization.

2      Have you also published on the economics of context?

3  A.   Yes, I have.

4  Q.   Have you served on any editorial boards?

5  A.   Yes.  Over the years I've served as associate editor for

6  most of the top economic journals including for example, the

7  RAND Journal of Economics.

8  Q.   Have you received any awards for your scholarship?

9  A.   Yes.  In 2007 I received the John Bates Clark Medal which

10  is awarded by the American Economic Association to the

11  economist under the age of 40 who's made the greatest

12  contributions to the field.

13      I'm also an elected member of the National Academy of

14  Sciences which is one of the highest honors for an American

15  scientist.

16      I've also received some other awards like recently I

17  received the Jean-Jacques Laffont prize from the Institute of

18  Industrial Economics for a world renowned scholar.

19  Q.   I'd like to set aside academics for a moment.

20      Could you briefly describe for the Court your business

21  experience?

22  A.   Yes.  So I spent about six years as the consulting chief

23  economist for Microsoft.  I also served on boards of directors

24  for technology firms.  I just joined my fourth board a few

25  weeks ago.

1      I advise to venture capital companies and I also do

2  consulting for some small startups as well as large businesses

3  about their data and platform strategy.

4  Q.   Could you describe some of the experience you have in the

5  business world with platform businesses?

6  A.   Yes.  So three of the four companies where I serve on the

7  board are platform businesses.  And then at Microsoft almost

8  all of my work concern platforms particularly their advertising

9  platforms.

10          THE COURT:  What are the other boards you serve on?

11          THE WITNESS:  Expedia, Lending Club, A Place for

12  Rover, and Ripple.

13          THE COURT:  Microsoft too?

14          THE WITNESS:  No, I'm not on the board of Microsoft.

15      I was the consulting chief economist there for six

16  years.

17  BY MR. SCHWINGLER:

18  Q.   Professor Athey, have you advised businesses on strategies

19  relating to starting platforms?

20  A.   Yes, I have.  So the, in my business consulting work for

21  example I considered strategy around programmatic television

22  advertising platforms.

23  Q.   Have you personally been involved in designing a platform

24  business?

25  A.   Yes.  When I started at Microsoft their search engine was

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    very young and one of my main responsibilities was to help

2    operate the search advertising platform, to evaluate it's means

3    of improvement including evaluating sources of data, the

4    benefits of the data and improving the search advertising

5    platform.

6        And also strategic partnerships and large business deals

7    that would for example induce other websites to sell their

8    advertising inventory through Microsoft's advertising platform.

9    Q.   I'd like to change topics for a moment.

10       Could you describe for the Court your business experience

11   with television advertising?

12   A.   Yes.  The companies where I serve on the board are very

13   large advertisers and they advertise across a range of media

14   ranging from digital to television.

15       Of course, I also teach about television in my advertising

16   and monetization course including the impact of recent changes

17   in industry as they relate to television.

18   Q.   Could you describe the role of data in your work?

19   A.   So data is part of almost everything that I do.  I

20   mentioned that data was a critical part of my work at

21   Microsoft.  And it's a key source of competitive advantage for

22   all of the businesses that I work with.

23       My research is also intimately involved with data.  I

24   develop statistical methods that can be used on large data sets

25   and apply them to consumer data sets including web browser

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  behavior, individual consumer purchase behavior, mobile

2  location data and other types of large data sets.

3  Q.   So we discussed platforms, television advertising and

4  data.

5       Do you have any experience analyzing mergers?

6  A.   Yes, I do.  I've served as a consulting expert on a

7  variety of vertical and horizontal matters involving

8  advertising platforms.

9       As part of that I've presented to regulators around the

10  world and produced analyses for them including the Department

11  of Justice, the Federal Trade Commission, the European

12  Commission, and a variety of state and international agencies.

13  Q.   Professor Athey, have you ever testified as an expert?

14  A.   Yes, I have.

15  Q.   In what context?

16  A.   I was retained by the FTC for a matter involving digital

17  advertising.  And I recently testified as an economic expert in

18  a case involving a tax matter.

19  Q.   Have you been qualified to testify as an expert in

20  industrial organization?

21  A.   Yes, I have.

22  Q.   Have you been qualified to testify as an expert in the

23  economics of advertising platforms?

24  A.   Yes.

25  Q.   Has any court ever excluded you from testifying as an

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  expert?

2  A.   No.

3           MR. SCHWINGLER:  Your Honor, the United States offers

4  Professor Athey as an expert in industrial organization and the

5  economics of advertising platforms.

6           THE COURT:  What court were you qualified in

7  industrial organizations as an expert?

8           THE WITNESS:  I'm sorry?

9           THE COURT:  What court?

10          THE WITNESS:  Oh, in the tax court in my recent

11 testimony.

12          THE COURT:  In industrial organizations?

13          THE WITNESS:  Yes.

14          THE COURT:  That was a U.S. Tax Court Judge?

15          THE WITNESS:  Yes.

16          THE COURT:  What is the Judge's name?

17          THE WITNESS:  It's slipping my mind as I sit here.

18          THE COURT:  You testified in the trial?

19          THE WITNESS:  Yes.

20          THE COURT:  And the economics of what was it?

21          MR. SCHWINGLER:  The economics of advertising

22 platforms.

23          THE COURT:  Same court, same judge?

24          THE WITNESS:  No.  That was in FTC court.

25          THE COURT:  That was in a FTC proceeding,

1   administrative proceeding?

2          THE WITNESS:  Yes, exactly.

3          THE COURT:  So never in an Article III Court.  Never

4   been qualified in an Article III Court?

5          THE WITNESS:  No.

6          THE COURT:  What year did you get your Ph.D.?

7          THE WITNESS:  In 1995.

8          THE COURT:  Defense position?

9          MR. RAIFF:  Yes, Your Honor.

10         THE COURT:  Do you have questions?

11         MR. RAIFF:  No, Your Honor.

12       We do have objections to the extent she's being offered

13   as an expert on efficiencies and to the extent she's being

14   offered on an expert on content intelligence.

15         THE COURT:  Step down.

16       (Witness leaves the stand.)

17       (Sealed bench conference.)

18         MR. RAIFF:  Her report includes content intelligence

19   as well.  I just want to make sure they're not offering her for

20   content intelligence.

21         THE COURT:  It wasn't mentioned.

22         MR. RAIFF:  It wasn't mentioned, so it's more of a

23   clarification perhaps.

24         THE COURT:  Are you going into that?

25         MR. SCHWINGLER:  Yes, we are.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              THE COURT:  On what basis?

 2              MR. RAIFF:  I object to this.

 3              THE COURT:  It's not in the report.

 4              MR. SCHWINGLER:  It is in her report.

 5              MR. RAIFF:  No, it is in her report.  So I just

 6   wanted to make sure, she wasn't qualified.

 7              THE COURT:  What umbrella is content intelligence,

 8   tells us about industrial organization or economics in

 9   advertising?

10              MR. SCHWINGLER:  She will be applying her expertise

11   in valuing data.  I could ask a few more questions on that.

12         That relates to specifically how the defendants plan on

13   using data, different uses to allegedly generate additional

14   revenues after the merger.

15         And she has direct experience in and analyzing issues

16   that --

17              THE COURT:  What?

18              MR. SCHWINGLER:  She -- I think it would be better if

19   I asked her to give an example.  But she frequently probably in

20   her consulting work for Microsoft might be the best example

21   where she got into the evaluation of data.  She would be better

22   than me for that question.

23              THE COURT:  I would hope so.

24              MR. RAIFF:  The other objection is to the extent

25   they're offering any opinions on efficiencies.
```

         1          She's never been an expert on efficiencies ever before.

         2  This is the first time.  So to the extent they're asking --

         3          THE COURT:  This is her first time in an Article III

         4  Court.  She didn't even know enough to stand up when she took

         5  the oath.  You should have prepped her about it.  Remember that

         6  lesson.  Do you hear me?  I'm talking to the United States,

         7  remember that lesson.

         8          You plan on going into efficiencies?

         9          MR. SCHWINGLER:  She's being called to testify

        10  exclusively about two categories of efficiencies or synergies.

        11  They were disclosed in her report months ago.  The time for --

        12          THE COURT:  She deposed?

        13          MR. RAIFF:  Yes, we deposed her, Your Honor.

        14          THE COURT:  You went through all this with her?

        15          MR. RAIFF:  Yeah, I confirmed that she's never been

        16  an expert on efficiencies ever before.  This is her first time.

        17  She knows stuff about advertising, so she can talk about for

        18  example trends of people going to the digital side and leaving

        19  TV side.  But to talk about what's merger specific or

        20  verifiable, I think those are way outside her expertise on

        21  efficiencies.

        22          MR. SCHWINGLER:  I have a few responses.

        23          First, she was disclosed.  Her opinions were disclosed

        24  under the schedule that the Court put in place.

        25          THE COURT:  That's not the question.

 1          The question is whether or not she's an expert.  What

 2    umbrella are you saying that comes under?

 3          MR. SCHWINGLER:  So merger specificity she'll be

 4    applying economic principles for both the ad platforms and

 5    general industrial organization principles, to analyze whether

 6    the merger is necessary to achieve these types of synergies.

 7    There will be economic principles we'll discuss and apply that

 8    were disclosed in her reports.

 9          THE COURT:  She is saying her knowledge with regard

10    to efficiencies or synergies comes under economics advertising

11    platforms?

12          MR. SCHWINGLER:  She's going to be analyzing a couple

13    of very specific synergy claims through the lens of her

14    economic expertise and her broader expertise involved in using

15    data advising on advertising.  She's probably the most, the

16    world's foremost expert on these specific issues.

17          The fact that this is the first time that it's been

18    raised in a Court in the context of a synergy claim doesn't

19    disqualify her as a witness.

20          THE COURT:  I didn't say that.  I need to get some

21    clarity as to what the basis of her knowledge and expertise is

22    as it relates to the opinions on efficiencies and synergies.

23          MR. SCHWINGLER:  She'll be analyzing a claim, the

24    defendant's haven't really highlighted it in the trial.  But

25    they've taken the position that the only way to pair AT&T's

1   data with Turner's advertising inventory is to merge.

2       And she is familiar with the way data transactions work,

3   the economics underneath them.  She is involved in data

4   transactions and will apply that expertise and those principles

5   to identify for the Court practical alternatives to a merger

6   that could allow them to achieve the same.

7           THE COURT:  Alternatives to who?

8           MR. SCHWINGLER:  You can look at merger specificity

9   from the perspective of either merging party and she will do

10  that.  It may be helpful if we get started I can ask her

11  questions that will help?

12          THE COURT:  You have an hour.

13          MR. RAIFF:  Yeah, I think our point is she can talk

14  about advertising in some of these issues and where the money

15  is going.  But to come out with an opinion that something is

16  not merger specific, I don't think she has the expertise in

17  deciding what's merger specific and what's not or what's

18  verifiable or what's not.

19          THE COURT:  Did she go through that in her

20  deposition?

21          MR. RAIFF:  Well, no, I didn't ask her about the

22  ultimate question, but she does have that in some of her

23  reports about what's merger specific and what's not.

24          Again, I think frankly I'm going to ask her some

25  questions about how all of the money is going from TV to

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  digital.  I think she's fine on that.  It's just when you start

2  tieing that to the standard of efficiencies and start saying

3  this is not merger specific.  This is merger specific.  This is

4  not verifiable, this is verifiable.  I think that goes way

5  beyond her expertise.

6          MR. SCHWINGLER:  So to be clear that last step of

7  saying something is or isn't merger specific is just stating

8  the standard which she will testify to is that the merger is

9  not the only practical way to achieve these efficiencies.

10         That's what the case law says, that's what D.C. Circuit

11  said in the Anthem case a year ago.  So she's going to apply

12  her expertise both economically and in the business

13  specifically related to these issues.

14         I might note that Mr. Stankey put on these efficiencies

15  for the defense and they didn't go into any qualification of

16  his expertise with platform economics or even building an ad

17  platform.

18         THE COURT:  All right, I'll qualify her as expert in

19  industrial organization and the economics in advertising

20  platforms.  However, I'll wait and see how it proceeds with

21  regard to efficiencies.  Obviously, you're going to get to

22  cross examine her on efficiencies and we'll see how that plays

23  out.

24         MR. RAIFF:  Thank you, Your Honor.

25         THE COURT:  You've got one hour.

1          (Witness resumes the stand.)

2          (Open Court.)

3          THE COURT:  The Court will find her an expert in

4    industrial organizations and the economics of advertising

5    platforms.  You may proceed.

6          MR. SCHWINGLER:  Your Honor, the United States, the

7    witness may reference Diversion 41 document which is DX 658 and

8    then DX 658 A which is that one page excerpt that Mr. Stankey

9    testified about.

10         May I approach and provide her copies?

11         THE COURT:  Sure.

12         THE WITNESS:  Thank you.

13         MR. SCHWINGLER:  Your Honor, I have extra copies if

14   the Court would like some as well.

15         THE COURT:  I got so much up here, I don't need it.

16         MR. SCHWINGLER:  May I proceed, Your Honor?

17         THE COURT:  Go right ahead.

18   BY MR. SCHWINGLER:

19   Q.   Professor Athey, what was your assignment in this matter?

20   A.   So my assignment was to provide an economic analysis of

21   certain synergies related to advertising revenue and content

22   intelligence.

23   Q.   Which synergy specifically did you assess?

24   A.   So with reference to the Exhibit DX O 65 5A, the ad growth

25   synergy and the content intelligence synergies.

1   Q.   As a very high level what are your opinions in this

2   matter?

3   A.   So my opinion is that these synergies are neither merger

4   specific.

5           MR. RAIFF:  Your Honor, can we approach?

6       It isn't consistent with the bench conference.  We

7   object to the extent she's making an ultimate conclusion on

8   what is merger specific and what's verifiable.

9           THE COURT:  All right, overruled.

10          THE WITNESS:  So my opinion is that the revenue

11  synergies that I analyzed are neither merger specific nor

12  verifiable.

13  BY MR. SCHWINGLER:

14  Q.   We'll get into the details in a moment.

15      Could you briefly describe the framework you applied in

16  analyzing these revenue synergies?

17  A.   So I used the standard framework applied by economists to

18  these problems.  So a synergy would be considered merger

19  specific, if it can be attained with the merger but cannot be

20  attained without the merger.

21      And so for example, if there are other practical methods to

22  achieve the synergies, they wouldn't be merger specific.

23      For verifiability, the synergy would be verifiable if it

24  can be objectively verified by reasonable means both in terms

25  of likelihood as well as magnitude.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1      So for example, if a synergy is speculative, it wouldn't be

 2 verifiable.

 3 Q.    Professor, what materials did you consider when you

 4 analyzed these claimed synergies?

 5 A.    So I started with the merger planning document and the

 6 number summarizing the synergies and then I considered all of

 7 the materials that were provided by the defendants to justify

 8 those synergies.

 9      Beyond that I looked at business documents from the

10 regulatory business as well as depositions that pertained to

11 those synergies and I conducted my own industry research.  And

12 all of those materials are described in my report and my

13 materials considered.

14      There were also expert reports that were prepared to

15 justify those synergies.  Those experts, two experts did not

16 end up testifying for the defense.

17      And then subsequent to that I reviewed portions of trial

18 testimony that are relevant to the efficiencies.

19 Q.    You referenced a core merger planning document, is that DX

20 658?

21 A.    Yes, it is.

22 Q.    Let's start with the ad growth synergies.  What are the

23 two main types of revenues that fit under this category?

24 A.    So there are two big buckets of ad growth synergies.  The

25 first pertain to increasing the revenue for certain data driven

1 products that Turner sells that they already have.  They're

2 products that already exist.

3    The second category of revenue synergies pertain to

4 programmatic ad platform that Mr. Stankey described last week.

5 This is a brand new business that doesn't yet exist.

6 Q.   Let's start with the first category of Turner ad revenues.

7 And we will cover the platform later.

8    Just briefly, what is your understanding of the defendant's

9 claims with respect to Turner ad revenues?

10 A.   So the Turner ad revenues come from expanding the sale of

11 certain products that Turner sells.  So today most of Turner's

12 ad sales are sold based on the broad demographic categories of

13 the viewers of certain shows.

14    Turner also sells a product that uses additional data for

15 targeting and that basically allows advertisers to select their

16 programs based on finer grand demographics.  That product is

17 sold at a premium and the synergies involve a selling more of

18 that product than is sold today.

19 Q.   Are defendants claiming synergies for both traditional

20 linear TV and TV distributed over the internet?

21 A.   Yes.

22 Q.   Without saying the specific number which is confidential,

23 about how much money are we talking about for this category of

24 synergy?

25 A.   So revenue scaling up to several hundred million dollars

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  per year by 2020 and continuing on an going basis.

2  Q.   At a high level what's the basis for your opinion that

3  these claimed increases in ad revenues are not merger specific?

4  A.   So the defendants haven't shown that a merger is necessary

5  to improve Turner's ad revenues, even if the value of AT&T data

6  for that purpose had been shown.

7       Furthermore, they haven't evaluated the benefits of AT&T's

8  data above and beyond the data that's available today.

9       And finally, if this is really as valuable as the

10  defendants claim, so if it's really several hundred million

11  dollars available from bringing this AT&T data to Turner

12  inventory, the parties would be highly incentivized to find a

13  way to make a deal rather than walking away and leaving all of

14  that money on the table.

15  Q.   Professor, what economic principles are relevant to

16  assessing whether this category of synergy is merger specific?

17  A.   So just at a very high level economic theory says that if

18  two parties can come together and create a lot of value that

19  they should find a way to make an agreement.  They should find

20  a way to split the surplus rather than again walking away and

21  leaving all of that money on the table.

22  Q.   How does that principle apply to the claimed increase in

23  Turner ad revenues?

24  A.   So in this particular case, we're talking about hundreds

25  of millions of dollars of revenue and so they would be highly

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   motivated to really do what it took to work out how to split

 2   the surplus.

 3   Q.   The Court has heard some testimony about bargaining

 4   frictions or contracting frictions.

 5        Could you explain what a contract friction is?

 6   A.   Just to start with if you are going to make a contract

 7   particularly about data, you will need to do the work to write

 8   down all of the conditions in the contract that specify the

 9   relevant contingencies.  Exactly which data is going to be

10   produced, on what time interval, the quality of the data, what

11   happens if the contract was terminated and so on.  And what

12   happens if something about the data changes.

13        So that can be a lot of work, but that's the work that you

14   would do to set up a contract for something complicated.

15   Q.   Are contract frictions common in data transactions?

16   A.   Yes.  So every data transaction would need to overcome

17   these frictions, but data contracts are ubiquitous.  They are

18   used everywhere in the advertising industry and even in this

19   case there are dozens of examples of data contracts involving

20   the parties even.

21        So even though these frictions exist, they are also

22   overcome on a regular basis and processes and approaches to

23   overcoming those are commonly used.

24   Q.   Is uncertainty about the value of the data a type of

25   friction that is important to consider?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A.   Yes.  So if you're buying and selling data that's an

2    example of a good that you might need to try out before you

3    understand the value of it.

4         And that's going to be again common across all of the

5    different types of data transaction.  Any time someone buys

6    data for the first time, they're going to face uncertainty

7    about what the value is.

8         But again, data contracts are ubiquitous in industry and so

9    people then finding some ways to overcome those frictions.

10   Q.   Short of merging with the company across the table from

11   you, are there any practical ways that the firm could establish

12   the value of its data?

13   A.   Yes.  So there's a number of practical alternatives and

14   these are the alternatives that are regularly used in this

15   industry.

16        So when it's a small number of firms they can engage in

17   things like revenue sharing or profit sharing.  They can also

18   write flexible contracts where the contracts can adjust to new

19   information that comes out.

20        But probably the most common way of salvaging the value of

21   data is just to do trials or pilots.

22   Q.   Could you just briefly explain for His Honor how a typical

23   trial or pilot might work?

24   A.   Sure.  So the most common way that data contracting works

25   is that the buyer really buys a subscription to the data.  They

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  pay a monthly or annual fee to continue to access and use the

2  data and receive new deliveries of data.

3      So in that type of subscription model what a pilot or trial

4  would look like is a discount on the initial subscription value

5  or even a free trial.

6      And for a profit maximizing firm offering a subscription

7  they're going to consider that stream of subscription revenue,

8  that's the lifetime value of the customer.

9      And a profit maximizing firm trying to attract a customer

10  and get that life time value finds it profitable to offer an

11  initial period even for free in order to prove the value of its

12  product.  And of course, this is a very common practice even

13  outside of data.

14      Most products that require a consumer to experience them

15  before knowing the value will be introduced with, you know,

16  free trials, or when you buy software it will have a trial

17  period or initial subscription for free.

18  Q.  Professor Athey, based on your experience and your review

19  of the record in this case, do you have any reason to believe

20  the methods that you just described would not work in

21  establishing the value of AT&T's data?

22  A.  No.  This is what you would expect as a start up cost if

23  you were going to go out and try to sell the data product.  You

24  would expect to follow the normal business practices of

25  offering introductory trials and pilots and really doing what

1  it takes to establish the value of the product.

2      Anticipating that they, when people see the value you'll

3  get that future, that future value.  Again, these types of

4  arrangements are really ubiquitous in this industry and

5  factually for these types of data.

6  Q.   Now other than what you've discussed already, are there

7  any other reasons why your view is that the Turner advertising

8  revenue synergies are not merger specific?

9  A.   Yes.  So far, we've been talking from the perspective of

10  AT&T as a seller of data and the things that they could do to

11  get people to buy their product.

12      For the synergies to be merger specific we also have to

13  consider the perspective of the buyer.  If the buyer could find

14  alternative sources other than merging to get data to improve

15  its advertising revenue, then the synergies would not be merger

16  specific.

17  Q.   Have defendants established that AT&T's data would in fact

18  provide incremental value to Turner over alternative sources

19  available?

20  A.   No, they have not.

21  Q.   What's your basis for that?

22  A.   So there's a variety of opportunities for Turner to buy

23  additional data for the purposes of targeting.  They are

24  already offering an ad product that uses a variety of data

25  sources for incremental targeting and there are other data

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  sources for sale even using similar set-top box data from
 2  millions of consumers that can be used to provide additional
 3  targeting for advertising for programmers.
 4  Q.   And does the merger planning document that AT&T produced
 5  analyze the value of AT&T's data relative to these alternative
 6  sources?
 7  A.   No.  The merger planning document just starts from where
 8  Turner's current position and doesn't evaluate any additional
 9  data source that they might acquire beyond what they had at the
10  time of putting forward the document.
11  Q.   Professor, did you review Mr. Stankey's testimony last
12  week that the merger is necessary to achieve all of the
13  synergies including the categories you analyzed?
14  A.   Yes.
15  Q.   And what's your response to that testimony?
16  A.   So I understand that Mr. Stankey's statement, but he
17  didn't explain why.  He didn't explain why these other
18  practical methods that are widely used wouldn't work in this
19  circumstance.
20       And so he didn't really address the questions about
21  practical alternatives.
22  Q.   Did Mr. Stankey's testimony cause you to change your
23  opinion on merger specificity in any way?
24  A.   No.
25  Q.   Let's turn to verifiability and we'll still on the Turner
```

1   advertising.

2       What's the basis for your opinion that these Turner ad

3   revenues are not verifiable?

4   A.   So I started by studying the documents that the defendants

5   put forward including what they provided to support their

6   numbers as well as the ad records that were also put forward in

7   support of numbers.

8       When I dug in I saw that the numbers here were merely

9   assumptions and there was no meaningful analysis underlying the

10  magnitude that were put forward.

11  Q.   Could you give an example for His Honor of an assumption

12  that was not justified in your view?

13  A.   So the lion share of the synergies come from improved

14  revenue from additional targeting for linear TV.  So again,

15  linear TV is sold using these broad targeting buckets and the

16  special product they're selling now includes additional data

17  and allows advertisers to target more finely.

18      That product is sold at a large premium over the base line

19  product.  So all of the synergies around this product come from

20  the assumption that they're going to sell dramatically more of

21  this product without lowering the price.

22      So going from perhaps low single digits of adoption to more

23  than 40 percent of customers adopting this product without

24  changing the price as a result of the merger as a claim.

25  Q.   How did defendants arrive at those numbers?

1   A.   So they appeared as simply to be assumptions.  There's not

2   an analysis underlying the claims about the additional uptake

3   of this product.

4        In particular, what we haven't seen is that any analysis of

5   which customers would actually see that big of value.  And to

6   see why we would need such an analysis, the value of this

7   additional targeting could vary a lot from customer to

8   customer.

9        So a lot of the biggest TV advertisers are using TV because

10  they want to reach a very broad audience.  So it's an open

11  question whether it would be twenty percent more valuable for

12  them to more finely target and particularly the way that

13  they're targeting is just by picking shows so that they would

14  see a twenty percent greater efficiency by better picking which

15  shows reach their target audience.

16       And there wasn't an analysis of how many firms would,

17  would, could use that or the potential efficiencies from

18  different segments of firms for example.

19  Q.   Let's turn to this programmatic ad platform for a few

20  minutes.

21       Before we start, could you explain for His Honor just what

22  a programmatic ad platform is, how it works?

23  A.   Sure.  So programmatic just basically means automated.

24  That word can be used in a variety of ways.  But here for these

25  purposes it's automated.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        An ad platform is something, a platform for buying and

 2   selling ads where the sellers of ads or like programmers or

 3   distributors would come together with advertisers to buy the

 4   ads.  So the programmatic ad platform is an automated way to do

 5   that.

 6   Q.   Is that how most television ads are bought and sold today?

 7   A.   No.  So today the majority of linear television

 8   advertising is bought and sold at what's called the upfront.

 9        So the upfront, the programmers and the advertisers all

10   come to New York, they're stars, they get to hear about the new

11   show, and then they buy and sell the ads based on the

12   demographic of who is watching the shows.

13        After those are over throughout the year there's additional

14   direct sales called scatter between the programmers and the

15   advertisers throughout the year.

16   Q.   So how does this ad platform that AT&T wants to make fit

17   into this process?

18   A.   So as I mentioned today, the buyers and sellers are

19   connecting directly.  They are directly contracting over the

20   ads and they're directly delivering the video.

21        So the programmatic ad platform would insert itself as a

22   middleman between those relationships.  There would be a

23   middleman between the programmers and distributors and the

24   advertisers for automated buying and selling.

25   Q.   Is there anything like this in the market for television
```

1  advertising today?

2  A.   No.   So the, what this platform is hoping to do,

3  accomplish, is to attract the inventory from distributors as

4  well as programmers and earn a commission on that inventory.

5     We have not seen any programmatic platforms like this gain

6  wide adopting in the industry for programmers and distributors

7  to sell their inventory.

8  Q.   And I'd like to turn to the actual synergy claims and just

9  very briefly so we know what we're talking about.

10    What types of revenues are defendants claiming will result

11  from this platform?

12  A.   So there's two types of revenue included in the synergy

13  claim.   The first are the commissions that are charged when the

14  platform intermediates the sales between advertisers and

15  programmers and distributors.

16    The second is there's a type of advertising called

17  addressable advertising and the claim is that when other

18  distributors bring their addressable inventory to the platform

19  so there's an increase in addressable inventory available on

20  the platform, that will help AT&T sell its own addressable

21  inventory and AT&T will sell more of it.

22  Q.   I'm not sure we have had a definition for addressable yet.

23    So briefly could you explain what it means to have an

24  addressable ad?

25  A.   Sure.   So for addressable ads two people might be watching

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  the same show at the same time.  But one of them comes from a

2  high income household and another from a low income household

3  and those two people might see different ads on the same

4  program at the same time.

5  Q.   For both types of revenues from this platform, what's your

6  opinion about these claimed synergies?

7  A.   So my opinion is that they're neither merger specific nor

8  verifiable.

9  Q.   Let's start about merger specificity.  Why are these not

10  merger specific?

11  A.   So to build a platform like this and make it successful,

12  it does require overcoming a variety of obstacles.

13     But there's no evidence that the, the merger is necessary

14  for the firm to overcome those obstacles or that it

15  substantially increases the likelihood of success of the

16  platform.

17  Q.   Did you review Mr. Stankey's testimony last week where he

18  talked about using Turner's ad inventory to get the platform

19  started and prove that it works?

20  A.   Yes.  So he's referring to a concept of seed inventory and

21  seed inventory would be the initial inventory on the platform

22  that would help attract the first advertisers to the platform.

23  Q.   And based on your experience with the platform businesses,

24  is a merger the only way to acquire seed inventory?

25  A.   No, it's not.  A variety of ad platforms have started

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   without, without a merger instead by forming contracts to

2   attract the first inventory onto a platform.

3        These are commonly used practices across industries but

4   particularly in advertising.  And even the, in some of the

5   ordinary course, I'm sorry, in the merger planning documents

6   that I reviewed, these types of practice, the number of

7   contractual practices were proposed that could be used to

8   attract additional inventory to the Turner, to the AT&T

9   platform.

10  Q.   Could you give His Honor a few examples of common

11  contractual arrangements that can be used to acquire seed

12  inventory?

13  A.   Sure.  If you're going to come and sell something on a

14  platform instead of your existing alternatives, you are going

15  to be worried about whether you will get a good price for it

16  and whether you'll make as much money as you would in your

17  alternatives.  That's the big problem.

18       If you are a platform you are hoping that if you succeed

19  you'll see a big stream of revenue.  And the platform is going

20  to enjoy that.

21       So as a profit maximizing platform you're going to be

22  willing to bear some of that risk for the initial customers to

23  get them to come.

24       So there's some very simple ways to do that.  One of the

25  first is a revenue guarantee.  So you basically tell the seller

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  they'll, you'll guarantee them a minimum amount of revenue when

2  they sell through your platform, but then they can keep the

3  upside or share in the upside.

4      Another way to do it just to simplify things further is the

5  platform can actually buy inventory and that removes all of the

6  risk from the partner.  And then sell it on the platform.

7      So this aligns the incentives of the platform to do a good

8  job monetizing the revenue and it shifts the risk onto the

9  platform who will ultimately bear the benefits if the platform

10 succeeds.

11 Q.  Based on your experience with platforms and your review of

12 the record in this case, do you have any reason to believe that

13 those alternative arrangements wouldn't work here?

14 A.  No.  So just to start with AT&T actually already has a

15 large amount of inventory and so just putting AT&T's inventory

16 on the platform already means that if advertisers came, they

17 would have something to buy.

18     And then these techniques again are commonly used in

19 advertising and they were proposed in the merger planning

20 document as the type of techniques that would attract

21 additional inventory onto the platform after the merger.

22 Q.  Let's turn to verifiability for this ad platform.

23     At a very high level, why are the revenues from the ad

24 platform in your view not verifiable?

25 A.  So for this category all of the synergies come from a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    brand new product.  So introducing any new product is risky.

2        Introducing a platform that has to bring together both

3    buyers and sellers is especially risky.

4        Then finally, in the TV industry putting forward this type

5    of platform is particularly risky.

6    Q.   And what has to happen for defendants to pull this off?

7    A.   So a whole bunch of things have to happen.  First, they

8    just have to build it, so they have to build the technology.

9    They have some piece of it today.

10       They would have to build others and they might also need to

11   do some acquisitions to get other components of the technology

12   to just stand up to the platform.

13       Once the platform is built then comes sort of the greater

14   challenges.  They need to convince both buyers and sellers to

15   participate in the platform.

16       So generally when you speak about the economics of

17   platforms, they're going to create the most value.  When, it's

18   hard for buyers and sellers to interact without the platform

19   when there's lots of buyers and sellers like on eBay.

20       They might have trust problems or coordination problems in

21   figuring out how to interact with one another.  They might need

22   help with payment.

23       So those types of services need the platform to add a lot

24   of value and firms don't, the participants don't need the

25   platform because they are getting a lot of value.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1        In this industry we have kind of the opposite scenario

 2   where we have a lot of concentration on one side of the market.

 3   You know, just a handful of programmers and distributors who

 4   control most of the inventory, so it's extreme concentration on

 5   one side of the platform.

 6        On the other side of the platform there's maybe two hundred

 7   advertisers that account for about two-thirds of the

 8   advertising revenue.  So that's also highly concentrated

 9   relative to most commercial platforms.

10        So just concentration on one side of the market would be

11   sufficient to create risk of people going around the platform.

12   But with extreme concentration on one side and concentration on

13   the other, it can be very difficult to induce people to come to

14   your platform and pay a commission especially if they already

15   have established relationships and they've already sort of

16   solved the set up problems and coordination problems of

17   contracting directly.

18        Then a final thing they need to pull off is they actually

19   need to convince their competitors to do this.  So if AT&T was

20   standing up alone, they would already be trying to induce their

21   competitors on the distribution side to contribute inventory

22   like the addressable inventory.

23        If the firms merged then all of the sources of inventory

24   are competitors to the merged entity.  The programmers are

25   competitors of Time Warner, the distributors are competitors of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    AT&T.

2        So in an environment where they have pretty good

3    alternatives, it may be especially difficult to get them onto

4    the platform.

5    Q.   Professor, has anyone tried to create a similar platform

6    in the past?

7    A.   Yes.  So there have been a few attempts.  For example,

8    Google which has had a lot of success in creating advertising

9    platforms for example in search or banner ads created something

10   called Google TV in 2007 which was intended to be a

11   programmatic platform similar to this one.

12       They shut that down in 2012 and that was partly due to the

13   types of concerns that I've raised before that the participants

14   didn't see the value of going through a platform.

15   Q.   To circle back on one point and then we'll move on to the

16   next topic.

17       You mentioned you need to acquire inventory from the

18   defendant's competitors.  Have you seen any evidence in the

19   record suggesting that AT&T or Time Warner competitors are

20   likely to contribute inventory to this platform?

21   A.   I have not seen analysis or evidence to that affect.

22   Q.   Of the revenue synergies attributed to this ad platform,

23   what portion depend upon the contribution of inventory from

24   AT&T and Time Warner's competitors?

25   A.   So all of the synergies from the platform depend directly

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  on the contributions of the competitors.

2  Q.   Professor Athey, let's move onto content intelligence.

3      And before we get into the synergy claims, could you

4  briefly describe for the Court what content intelligence means

5  as defendants use that term?

6  A.   Sure.  Content intelligence is basically using data to

7  make content better.  And so here we are talking about applying

8  AT&T's data to improve the content of Time Warner.

9  Q.   I direct your attention to page 114 of DX 658.  This is

10 the version 41 document.

11 A.   Okay.

12 Q.   And can you confirm for the Court that the three

13 categories of synergies are revenues on this page are the

14 categories of content intelligence that you analyzed?

15 A.   Yes.  So the three categories are content acquisition and

16 syndication which basically means making more money on the

17 syndication of shows like reruns.

18     Second is scheduling optimization.  So that's using data to

19 figure out which programs should come after which other program

20 to keep people from turning off the TV.

21     The third is creative development.  That's basically using

22 data to pick STARZ or make a movie that people would like more.

23 Q.   Are these three categories are these the ones that the

24 defendants went ahead and actually quantified?

25 A.   Yes, that's correct.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Are all three of these categories based on the application

2  of AT&T data to Time Warner content?

3  A.   That's correct.

4  Q.   Again, without getting into the specific numbers which are

5  confidential, about how much money do defendants claim they'll

6  make through these content intelligence synergies?

7  A.   So revenues rising to a couple of hundred million dollars

8  per year by 2020 and continuing on an ongoing basis.

9  Q.   Why aren't in your view these revenues merger specific?

10 A.   So similar to the advertising revenue synergies, the

11 defendants haven't established that a merger is needed to

12 create this value as opposed to practical alternatives like

13 contracting for the data.

14     And then further, they haven't shown that AT&T's data is at

15 all better than other types of data that would be available and

16 that are sold in the market for these same purposes and could

17 be used by Time Warner if they chose for these purposes.

18 Q.   Why in your opinion are these synergies not verifiable?

19 A.   So again, when I look at the numbers put forward in the

20 documents, they were not justified by meaningful analysis.

21     They were simply assumptions about the magnitudes that they

22 would receive.

23 Q.   Could you give His Honor an example of an assumption

24 underlying these calculations that you found programmatic?

25 A.   Yes.  So for the scheduling optimization which is about

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  which programs should come after which other program.  All of

2  the numbers were based on a single example and they assumed

3  that that example could be replicated once a day.

4  Q.   Could you turn to page 116 of the version 41 document, DX

5  658?

6  A.   Yes.

7  Q.   And on the right side under the synergy details and

8  assumptions it refers to a viewership uplift.

9       Do you see that?

10 A.   Yes.

11 Q.   Is that what you're referring to?

12 A.   Yes.

13 Q.   Where did defendants get that number?

14 A.   So again, the number came from a single example actually

15 on a different network.  So the example was based on AMC which

16 has one of the most popular show on cable called The Walking

17 Dead, that's about zombies.

18     And so this Walking Dead show was appearing in a certain

19 time slot.  Then they took the prequel to The Walking Dead

20 called Fear The Walking Dead and they put that prequel in the

21 time slot directly following The Walking Dead.

22     From that they got a thirty-five percent increase in the

23 viewership for that time slot.  And that thirty-five percent

24 number is the number that's entered here and it's described The

25 Walking Dead example for the justification for the number.

1  Q.    Why is that one example insufficient to verify all of

2  these claimed synergies?

3  A.    So a couple of reasons.  First of all, The Walking Dead is

4  one of most popular shows on television and it's in a

5  relationship with Fear The Walking Dead is about as close as it

6  could get.

7      So that uplift is probably not representative of what you

8  could get from rescheduling other programs.

9      Second, there's no reason to believe that data was needed

10 to make that decision.  Let alone advanced data or data better

11 than what comScore provides about which people watch which

12 programs in common.  For this type of extreme synergy it may

13 also be extremely obvious which programs should go together.

14     And so this example is that's not representative of the

15 kinds of uplifts that you would get from the incremental

16 addition of data beyond what's already available for scheduling

17 decisions.

18 Q.    And just so the record is clear, this example, does this

19 relate to all three categories of content intelligence or just

20 the scheduling category?

21 A.    Just the scheduling category.

22 Q.    Do defendants -- let me try again.

23     Are there similar issues with the other categories of

24 content intelligence calculations?

25 A.    Yes.  Just for example, around creative development

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   actually there was a fear of it as skepticism and controversy

2   about whether data was even useful for making a great movie.

3   Whether the creative developers really wanted data for that

4   purpose.  And there's no analytic justification for these

5   magnitudes.

6   Q.   Apart from the issues with the calculations are there any

7   other reasons why in your view the content intelligence

8   synergies aren't verifiable?

9   A.   Yes.  So as I mentioned, there's in order for what we

10  would need to be verified here would be the incremental value

11  of the data beyond other data sources that are already

12  available.

13       And so there's, there was no attempt to show that

14  additional data was needed to carry out any of these goals.

15  Q.   Did you review Mr. Stankey's testimony last week that AT&T

16  isn't able to confirm that these content intelligence synergies

17  even work?

18  A.   Yes, I did and that's consistent with my review of other

19  documents that expressed similar concerns.

20           MR. SCHWINGLER:  No further questions, Your Honor.

21           THE COURT:  All right.  Cross exam.

22           MR. SCHWINGLER:  May I proceed, Your Honor?

23           THE COURT:  You may.

24                       CROSS EXAMINATION

25  BY MR. RAIFF:

1   Q.   Professor Athey, a few questions on your experience.

2   Prior to this case, you've never testified as an expert

3   relating to merger efficiencies, true?

4   A.   Not in a court, no.

5   Q.   In fact, in your deposition you told me you had never been

6   retained as an expert relating to merger efficiencies; is that

7   right?

8   A.   Not for a proceeding like this, no.

9   Q.   On the advertising front, have you ever worked in an

10  advertising agency?

11  A.   No.

12  Q.   Okay, have you ever sold television advertising?

13  A.   No, I've not directly sold it myself.

14  Q.   Have you ever personally placed an order for television

15  advertising?

16  A.   I've certainly reviewed orders for television advertising

17  in terms of their magnitude, their content, and their

18  effectiveness, but I haven't attended an upfront and placed an

19  order myself.

20  Q.   So back to my question, you have never personally placed

21  an order for television advertising true?

22  A.   No, I have not.

23  Q.   Okay.  Let's talk briefly about vertical mergers and

24  innovations.

25       First of all, you agree that when analyzing a merger an

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  economist like yourself should take into account pro

2  competitive effects of the merger, right?

3  A.    An economist would balance the cost and benefits.

4  Q.    And you recall us discussing at your deposition the

5  potential benefits that might arise from vertical mergers.

6      Do you recall that discussion?

7  A.    Broadly, yes.

8  Q.    Okay.  And you agreed in your deposition that some of the

9  potential benefits of vertical mergers might include cost

10 reduction and improved product design that can lead to lower

11 prices, higher quality products and increased investment and

12 innovations.

13     You still agree with that today?

14 A.    I agree that those are possible outcomes, yes.

15 Q.    Okay.  Well, let's focus on the potential for innovations

16 first.

17     You know AT&T and Time Warner are hoping the merger is

18 going to allow them to build and develop this programmatic ad

19 platform, right?

20 A.    That's their hope.

21 Q.    Right.  And you know from, and I think you talked about

22 this in your expert report, you know that this is a platform

23 that's going to specialize in the sale of premium video ad

24 inventory, right?

25 A.    That's their plan.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Okay.  And they also plan and they envision selling

2  targeted data driven advertisements through this new platform,

3  right?

4  A.   That's correct.

5  Q.   Okay.  And this new platform is going to be able to serve

6  multiple, sell ads to multiple devices, cell phones, tablets,

7  TVs, even computers, right?

8  A.   The broad aspiration would be to serve advertising to

9  different devices.

10 Q.   All kinds of devices, right?

11 A.   That would be their hope.

12 Q.   Okay, and then once completed the hope is the platform

13 would be open to other programmers and other distributors,

14 right?

15 A.   More so than not all of the merger synergies that I

16 evaluated required the participation of other platforms and

17 distributors.

18 Q.   So then back to my question.  Once completed this platform

19 would be open to other programmers and other distributors,

20 right?

21 A.   Yes.

22 Q.   And today I think you explained on the television side

23 there's no such thing, right, there's no programmatic

24 advertising platform for buying linear television ads today,

25 right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  A.   That's correct.  So some, some companies offer

2  programmatic buying on their own inventory and there may be

3  other nation things but nothing that's gotten widespread

4  adoption.

5  Q.   Back to my question.  On the television side, there's no

6  programmatic advertising platform for buying linear television

7  ads, true?

8  A.   Not one that has, is serving a variety of third party

9  inventory sources.

10 Q.   Got you.

11     So if AT&T and Time Warner are successful in building their

12 programmatic ad platform on TV side, it will be a first of its

13 kind, right?

14 A.   It would be the first successful platform of serving these

15 third parties.

16 Q.   And AT&T actually has a very long history of inventing and

17 innovating as you probably read from Mr. Stephenson's

18 testimony, right?

19 A.   So for example, Bell Labs was very successful in basic

20 R&D.

21 Q.   On TV side there's no programmatic ad platform but there

22 are programmatic ad platforms on the digital side or the

23 internet side, right?

24 A.   That's correct.

25 Q.   For example, Google's programmatic ad platform, right?

1  A.   So Google gets more than eight percent of it's revenue

2  from it's search advertising platform where it buys and sells

3  search advertisements and then it also operates a banner ad

4  platform for selling display ads.

5  Q.   So back to my question.  Google has its own programmatic

6  ad platforms, right?

7  A.   Yes.

8  Q.   And you read Mr. Bewkes's trial testimony about how he

9  expressed some concern about how advertising dollars are

10 leaving the TV side and moving over to the digital side.

11     Did you read that part?

12 A.   Yes, so there's --

13 Q.   I just want to know if you read it first.

14     Did you read that testimony from Mr. Bewkes?

15 A.   Yes.  I'm not sure you fully characterized the entire

16 exchange about that.

17 Q.   Got it?

18 A.   But I'm familiar with the testimony.

19 Q.   You agree and you explained in your deposition that over

20 the past few years advertisers have been spending more and more

21 money on the digital advertising side, right?

22 A.   As users spend more and more time on the digital side,

23 advertising dollars have tended to follow the users, not always

24 as fast as the users move, but they have been following the

25 users.

1  Q.   Okay.  So back to my question.

2      Over the past few years advertisers have been spending more

3  and more money on the digital advertising side, true?

4  A.   Yes.  It makes it sound like they're, it's the way you ask

5  the question that it's coming away from TV revenue per hour for

6  example and that's been more stable, but as the advertising,

7  entire advertising pool has grown as people are spending more

8  and more of their time connected.

9  Q.   Let me ask you that next question again.

10      You agree, Professor Athey, that in general more and more

11  ad dollars have been shifting from the television ad side to

12  the digital ad side?

13      You agree with that?

14  A.   In terms of percentages, yes, so that the shares have been

15  shifting.

16  Q.   And Google and Facebook are the biggest players in digital

17  advertising, right?

18  A.   Yes.  They are players in slightly different things.

19  Q.   That's right.  In fact, in your deposition you confirmed

20  that Google and Facebook together account for roughly sixty

21  percent of the digital advertising in the U.S., right?

22  A.   That's correct.

23  Q.   And these two companies are capturing most of the online

24  advertising industry revenue throughout the last few years,

25  right?

```
 1              MR. SCHWINGLER:  Objection, Your Honor.

 2         May we approach?

 3              THE COURT:  Yes.

 4         (Witness leaves the stand.)

 5         (Sealed bench conference.)

 6              MR. SCHWINGLER:  My objection is based on the scope

 7    of direct which is limits to verifiability and merger

 8    specificity.  It has nothing to do with broader industry trends

 9    in other markets for other types of advertising.

10              MR. RAIFF:  It's all about the need and the

11    opportunity for this programmatic platform that she's been

12    criticizing and claiming that it's not verifiable, that we're

13    not going to be able to do it and the need and opportunity is

14    so great, that's why they're investing in this and we're about

15    to go into exactly how it is you solve the problem and create a

16    programmatic platform.

17              THE COURT:  All right, overruled.

18         (Witness resumes the stand.)

19         (Open court.)

20              THE COURT:  You may proceed.

21              MR. RAIFF:  Thank you, Your Honor.

22    BY MR. RAIFF:

23    Q.   Back to my question.  There's these two companies,

24    Facebook and Google.  They have been capturing most of the

25    online advertising throughout the past few years, right?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  A.    That's correct.

 2  Q.    And there are a few out there that are trying to compete

 3  with for example, Google's programmatic advertising platforms,

 4  right?

 5  A.    Yes.

 6  Q.    For example Bing, Microsoft Bing, their search engine and

 7  programmatic platform is trying to compete with Google, right?

 8  A.    That's right on the search side.

 9  Q.    That's right.

10      And as you explained in your deposition, you agree, don't

11  you, that healthy competition to the Google programmatic

12  platforms will help consumers, advertisers and publishers,

13  true?

14  A.    That's correct.

15      I also talked about how to be effective the competition

16  needs to concern advertising and these are experiences that are

17  similar to the platforms that they're competing with.

18  Q.    But you agree, you agree that healthy competition to the

19  Google programmatic platforms will help consumers, advertisers

20  and publishers, true?

21  A.    Effective competition, yes.

22  Q.    Okay.  Let's continue talking a little bit about that and

23  benefits to consumers.

24      And let's talk a little bit about the benefits to consumers

25  of targeted advertising.  First of all, as you explained in
```

1  your deposition, one way consumers benefit from targeted ads is

2  by seeing more relevant ads, right?

3  A.   That's correct, depending on the product and the format.

4  Q.   You agree, right?

5  A.   That if consumers see more relevant ads, yes, they can

6  benefit from that.

7  Q.   And you also read some of the trial testimony about how

8  advertisers are generally willing to pay more for data driven

9  targeted advertising, right?  You read some of that testimony?

10  A.   Yes.  Again, some advertisers more than others depending

11  on the context and type of ad, they may be, see more value to

12  reaching a wide set of consumers at other points in the

13  conversation that a marketer is having with a consumer having

14  them be more targeted is more helpful.

15  Q.   Got you.

16      So they're willing to pay more for that, right?

17  A.   They are willing to pay to the extent that it provides

18  additional value to them.

19  Q.   And you heard and probably read some of Mr. Bewkes's

20  testimony where he was talking about the importance of

21  advertising revenue in order to keep subscription prices down

22  for consumers?

23      You recall reading that?

24  A.   I'm broadly familiar with that testimony.

25  Q.   You recall that in your deposition, we talked about that

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  same point?  You recall about how advertising revenues can be

2  used to help subsidize or offset the cost of consumers, that

3  cost of consumers have to pay for services?

4       You recall us talking about that subject?

5  A.   I recall that we discussed different business models for

6  --

7  Q.   Yeah and for example, on the internet side you agree that

8  advertising profits have subsidized a wide variety of useful,

9  powerful and entertaining services that might otherwise have

10 never come into existence or would have cost consumers

11 significantly more?

12      You still agree with that, right?

13 A.   Yes.  So I would frame it that the business model for

14 certain internet product is to monetize them through

15 advertising.  There's a range of monetization models used out

16 there through subscriptions and combination based.

17 Q.   Like Google, like Google consumers get a lot of benefit

18 from Google's advertising and monetizing advertising because

19 they get a lot of free services like free search, right?

20 A.   Yes.

21 Q.   And that's a benefit to consumers, right?

22 A.   The search engine as a whole provides benefits, yes.

23 Q.   This is consistent with the concept that Mr. Bewkes and

24 Mr. Stephenson were testifying about, right, that it's

25 important to be able to increase ad revenues in order to take

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  pressure off subscription price, right?

2  A.   I haven't studied the interplay between subscriptions and

3  ad revenue in response to this case.  Those aren't part of the

4  synergies that I was, part of my assignment.

5  Q.   You agree or at least don't dispute Mr. Stephenson's and

6  Mr. Bewkes's testimony about increasing ad revenue can help

7  take pressure off subscription prices?

8       You don't dispute that, right?

9  A.   You know, I haven't analyzed exactly how their incentives

10 change.  So I don't, I'm not ready to express an opinion about

11 how I think their profit maximization would work.

12 Q.   Got you.

13      I just want to make sure you're not disputing that concept?

14 A.   I'm familiar with his testimony.

15 Q.   All right, let's switch gears and spend a few minutes

16 talking about how companies can build successful programmatic

17 platforms.

18      And you referred earlier to Mr. Stankey's trial testimony

19 where he discussed how AT&T wants to use Turner's advertising

20 spots to prove to themselves and to prove to others that this

21 new platform can work, right?

22      You recall that testimony?

23 A.   I'm familiar with the testimony.

24 Q.   And first of all, you agree that in order to have a large

25 successful programmatic platform, you would need to have a

```
 1  large amount of ad inventory, you agree with that?

 2  A.   Yes.

 3  Q.   Okay.  And in fact, I think the way you described it is to

 4  be big, you need to be big, right?

 5  A.   I don't think I used those words.

 6  Q.   Okay, but you agree with that to be big, you need to be

 7  big?

 8  A.   I guess it's hard to disagree.

 9  Q.   Okay.  In your report you discussed this chicken and egg

10  problem, you recall that?

11  A.   Yes.

12  Q.   And what you were trying to say is to be successful an ad

13  platform needs to have a critical mass of sellers and a

14  critical mass of buyers, right?

15  A.   That's correct.

16  Q.   And as you noted in your report, it's very difficult to

17  attract one side of the platform without having the other side,

18  right?

19  A.   That's correct.

20  Q.   And so for example, advertisers will not use the platform,

21  their advertisers are not going to come to the platform unless

22  there's plenty of advertising inventory for them to buy, right?

23  A.   Well, I'm not sure how to define plenty, but they need to

24  have sufficient advertising inventory to buy, to justify their

25  time and expense to come and more broadly, they need to see
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   value from transacting through the platform including

2   commissions versus other alternatives.

3   Q.   Right, they need to see.  As you explained, having scale

4   of advertising inventory is required for an advertising

5   platform to succeed?

6        You still agree with that?

7   A.   Having sufficient scale to attract advertisers, of course

8   all platforms go through a growth phase.

9        For example, the Google double click ad platform for banner

10  ads it started as a start up and it made, it had contracts for

11  sellers, then it got more buyers, then it got more sellers and

12  then it got more buyers and it started from zero and grew.

13  Q.   You talked about ways, there are ways to break through

14  this chicken and egg problem you describe, right?

15  A.   Exactly.

16  Q.   One way you mentioned in your report is by offering

17  something unique or something of unique value, right?

18  A.   Yes.

19  Q.   And you recall us discussing exactly how Google and

20  Facebook were able to break through this chicken and egg

21  problem and build their programmatic ad platform?

22       You recall us discussing that?

23  A.   Broadly.

24  Q.   Okay.  For its search advertising programmatic platform

25  Google solved the chicken and egg problem by growing user

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  eyeballs and ad inventory first, correct?

2  A.   That's an oversimplification, so.

3  Q.   Well, let's take a look at your deposition on exact words

4  because I want to be precise in exactly your, the question and

5  answer.

6            MR. RAIFF:  Your Honor, may we approach with the

7  deposition?

8            THE COURT:  Sure.

9            MR. RAIFF:  May I approach the witness as well, Your

10  Honor?

11            THE COURT:  You may.

12  BY MR. RAIFF:

13  Q.   I want to make sure we get these next few questions

14  exactly right.  If you could turn to the transcript on page 53.

15            MR. RAIFF:  And Your Honor, this is a deposition

16  taken on March 8th, 2018 of Professor Athey.

17  BY MR. RAIFF:

18  Q.   And we're turning to page 53, lines 10 through 13.  And do

19  you recall at your deposition, Professor Athey, that I asked

20  you almost the precise question I'm reading from line 10.

21       Question, for the search programmatic platform, did Google

22  solve the chicken and egg problem by growing user eyeballs and

23  ad inventory first?

24       And your answer was yes.

25  A.   Yes.  And there's about a page one and a half long answer

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    prior to that where I outlined the whole history.

2    Q.   Your counsel can ask you plenty of questions about the

3    long history?

4    A.   Yes.

5    Q.   I'm on a, I'm on the clock here, so I'm going to get

6    straight to the point.

7         Now I want to turn to the Facebook question.  Same kind of

8    questions on Facebook.

9         Same thing with Facebook.  For its social media

10   programmatic platform, Facebook attracted users and ad

11   inventory through its own and operated social network, right?

12   A.   That's correct.

13   Q.   And as you mentioned in your deposition, that's exactly

14   how Facebook was able to solve and break through this chicken

15   and egg problem by growing its ad inventory and eyeballs first,

16   true?

17   A.   That's right.  And just to be clear, almost all of

18   Facebook's revenue today comes from Facebook selling its own

19   inventory.  So Facebook is attracting users to the Facebook

20   social network and then selling access to advertisers for users

21   on that network.

22   Q.   Precisely right.  So it actually grew and started its

23   programmatic platform based on its own owned and operated ad

24   inventory, true?

25   A.   That's right.  It's a little bit of a different type of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1  platform because it's main ambition is not to attract third

 2  party inventory but rather to monetize its own users.

 3  Q.   So let's now turn to the platform AT&T and Time Warner are

 4  hoping to build.

 5      So you know, you know AT&T they're planning to use the

 6  Turner ad inventory to start up or as you said, to seed or to

 7  fuel its new programmatic platform, right?

 8  A.   That together with inventory from AT&T as well.

 9  Q.   Good point.

10      So you know Turner has about six hundred and seventy

11  billion ad spots available per year.

12      Does that sound about right to you?

13  A.   Roughly.

14  Q.   And Turner's ads, they go out to virtually the entire

15  country, right?

16  A.   Yes.

17  Q.   Right.  Their shows are not just, their ads are not just

18  distributed to the DirecTV homes.  They're distributed through

19  a bunch of distributors throughout the U.S., right?

20  A.   That's correct.

21  Q.   And without Turner, AT&T has about a hundred and

22  seventy-nine billion ad spots, right?

23  A.   Again, I'm not sure of the exact number.

24  Q.   Roughly, sound about right?

25  A.   Sound about right.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.   Okay.  And those ads though, they just go to the DirecTV

2  homes, right?  DirecTV ads just go to the DirecTV homes, right?

3  A.   DirecTV ads to DirecTV, U-verse also is another

4  distributor.

5  Q.   As opposed to the Turner's fourteen minutes which go out

6  to the entire U.S., right?

7  A.   That's correct.

8  Q.   Okay.  And if this merger is allowed to go through the

9  combined company will have about eight hundred fifty billion

10  combined advertising spots available, right?

11  A.   Are you saying that all of the inventory would be on the

12  platform?  Is that what you're asking?

13  Q.   Let me read the question again.

14     If this merger is allowed to go through, the combined

15  company will have about eight hundred and fifty billion

16  combined advertising spots available?

17  A.   That sound like the overall inventory, but I don't -- I

18  don't believe that's all going to be on the platform.

19  Q.   Well, you know from reading Mr. Stankey's trial testimony

20  that the plan is to use the Turner advertising inventory to

21  prove up the concept and to demonstrate that in fact these

22  improvements can be made in the market and effectively work,

23  right?

24  A.   That's their plan in the presence of a merger.

25  Q.   If they are able to do this, if they are successful in

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  proving up the concept, then they want to invite others to come

2  in, right?

3  A.   That's right.  If they also need to prove it to themselves

4  for that matter.

5  Q.   That's right.  That's yet another reason to have Turner

6  inventory is to prove it to themself that this programmatic ad

7  platform can work, correct?

8  A.   That's right.

9  Q.   Okay.  And then Mr. Stankey explained that it's his belief

10  that yield winds, meaning that programmers and distributors

11  will join up if they see AT&T has built a better mouse trap and

12  attracts higher ad dollars, right?  That's his belief, right?

13  A.   That's a characterization of the testimony.

14      It doesn't address questions about strategy like whether

15  the highers want to configure their inventory to a competing ad

16  platform.

17      So they might factor that in addition to yield or concerns

18  about being reliant on their competitor for their main revenue

19  stream might also --

20  Q.   His belief if yield winds, right?  His business judgment

21  is yield winds, right?

22  A.   I can't speak to his overall belief.  That's a

23  characterization.

24  Q.   You know from looking at the assumptions in the

25  advertising synergies, you know from looking at the assumptions

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  that you were talking about a little while ago, it's actually a

2  pretty modest art and small percentage of contribution that the

3  assumptions are assuming for the programmers and distributors,

4  around ten percent for the programmers and five percent for the

5  MVPDs, true?

6  A.    Those, that's roughly the numbers.

7          THE COURT:  Will this be a good time to take the

8  afternoon recess?

9          MR. RAIFF:  Yes, Your Honor.  Thank you.

10         THE COURT:  We'll take a fifteen minute recess.

11         You're a witness under oath in the case.  Let me explain

12 what that means to you.  You can't discuss your testimony with

13 anybody, including your own lawyers.  Stay independent of all

14 others, don't discuss it, what it's been or what it will be

15 when your return.  Stay independent of anyone else.

16         THE WITNESS:  Thank you.

17         THE COURT:  Step down, see you in fifteen minutes.

18     (Witness excused.)

19     (Recess at 4:00 p.m.)

20     (Proceedings resumed at 4:20 p.m.)

21         THE COURT:  Witness remains under oath.

22         MR. RAIFF:  May I proceed, Your Honor?

23         THE COURT:  You may.

24         MR. RAIFF:  Thank you.

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1                     CROSS-EXAMINATION (Continued)

 2   BY MR. RAIFF:

 3   Q.   Let's put aside the platform and let's talk about what

 4   could happen shortly after the merger if it's allowed to go

 5   through.

 6        You know part of the synergies relate to improving the

 7   advertising by combining Turner's capabilities with AT&T's

 8   capabilities and data, right?

 9   A.   That's correct.

10   Q.   And you know that today AT&T has certain advertising

11   capabilities that Turner does not have, right?

12   A.   Or that Turner doesn't currently have.

13   Q.   Right.  So let's talk about a couple of those.  Let's

14   start with addressable TV.

15        You talked about that a little bit.  That's basically where

16   if you and I are neighbors and we're watching the exact same

17   show, a distributor could send you one ad while sending me a

18   different ad, right, that's addressable TV advertising, right?

19   A.   That's correct.

20   Q.   All right.  It's very different from the spray and pray

21   advertising approach that we've heard a little bit about at

22   trial, right?

23   A.   If you're referring to buying based on broad demographic

24   categories, yes.

25   Q.   Okay.  And it's also even more targeted than the data
```

1  driven linear advertising, right?

2  A.   It potentially can be if the advertisers choose.

3  Q.   And you know that Turner does not sell that type of

4  addressable TV advertising where it can send one ad to one

5  house old and the other ad to the other household, right?

6  A.   Yes, so in general there are some partnerships in the

7  industry where programmers can make a partnership or a

8  contractual arrangement with distributors.  So to my

9  understanding Turner doesn't have such a contract in place

10 today.

11 Q.   Okay.  Well, Professor Athey, I don't want to cut you off,

12 and I know you want to throw in some of the government's views

13 every once in a while, but it's been a long trial.  We're all

14 trying to finish things up.  I'm on a clock, and so if we could

15 just stick to my questions, please.

16 A.   Yes.

17 Q.   Okay.  So back to my question.

18    You know that Turner does not sell that type of addressable

19 TV advertising where it can send one ad to one home while at

20 the same time sending another ad to another home, right?

21 A.   No, it does not offer that product today.

22 Q.   And, in fact, you read Mr. Bewkes's testimony about

23 Turner's inability to do this, an inability to serve ads to

24 different people, right?

25 A.   I'm familiar with the testimony.

1  Q.   Okay.  And you know, though, that today AT&T is able to

2  sell addressable TV advertising, right?

3  A.   Yes, AT&T does offer that product.

4  Q.   In fact, AT&T is one of the leaders in addressable TV

5  advertising, right?

6  A.   You know, they sell a substantial portion of their

7  inventory through that mechanism.

8  Q.   Right.  And, in fact, DirecTV was the first company, the

9  first company to sell addressable TV back in 2012, right?

10  A.   That sounds right.

11  Q.   And you know that AT&T gets more than five times the price

12  for its addressable TV advertising than it gets on its regular

13  advertising, right?

14  A.   That's an accurate description of the revenue they were

15  receiving on the volumes that they're selling today.

16  Q.   Okay.  And so Turner does not have this capability or is

17  not selling addressable advertising today, and AT&T is the

18  leader in selling addressable TV, fair?

19  A.   Yes.

20  Q.   And you read Mr. Bewkes's trial testimony explaining that

21  this was real important to him, that this was an important

22  aspect of the merger to him, do you recall reading that?

23  A.   That's broadly consistent with my reading.

24  Q.   And after the merger Turner will be able to use AT&T's

25  addressable capabilities, right?

1  A.   With or without the merger, Turner can arrange to sell

2  addressable on AT&T's customers, either through a partnership

3  or through the merger, so the plan is to do that after the

4  merger.

5  Q.   And let me ask you a couple of questions.

6       I know that that's the theory of contracting or I think you

7  call it the economics of contracting.  I really want to stick

8  to the real world for a second.  In the real world that hasn't

9  happened, has it?

10 A.   Not for this programmer and this distributor, but for

11 other programmers and other distributors so it just makes it

12 sound like, when you're asking the question, like it's somehow

13 impossible.

14 Q.   And do you know whether or not any of this was reflected

15 in Professor Shapiro's efforts to model the merger effects?

16 A.   I haven't reviewed that.

17 Q.   Okay.  Let's take another example.

18      Customer list matching, and some advertisers I think call

19 it customer provided list matching.  Maybe just can you briefly

20 explain to the Court your understanding of how that works, how

21 customer list matching works for TV advertising?

22 A.   Sure.  So if you're the kind of advertiser that has a

23 direct relationship with the customer, you might have a list of

24 who those customers are.  And so with customer list matching

25 you could try to send it in and then figure out what kind of

1  shows your customers are watching, and you might use that to

2  decide, you know, which shows to buy, which shows to buy ads

3  on.

4  Q.   And so, for example, AT&T, they can actually build a

5  campaign around or using the advertiser's list of customers,

6  right?

7  A.   That's a capability, yes.

8  Q.   And you heard, I think you probably read Mr. Stankey's

9  testimony.  I think he used the example of a men's clothing

10  store, do you recall that?

11  A.   Yes.

12  Q.   And I think you confirmed in your deposition that this

13  customer list matching is very valuable to advertisers, right,

14  or actually pretty valuable to advertisers, right?

15  A.   It depends on the advertiser, if you don't have a customer

16  list, then it's harder to use that.  Like if you're selling,

17  you know, wholesale through a retailer and you don't like a

18  package goods company or something like that that doesn't

19  directly interact, then you can't use it.  But for some

20  advertisers, that could be useful, especially if you had a

21  niche audience or an audience that behaved differently than the

22  general demographics of your audience.

23       So for men, you might know already that you're selling to

24  men, but if you had a particular audience of unusual men whose

25  viewing habits were very different than other men, that could

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  be an incremental value from customer list matching.

2  Q.   Okay.  So you agree it can be pretty valuable to

3  advertisers who have customer lists, true?

4  A.   And it depends on the advertiser, but for some advertisers

5  it could be valuable.

6  Q.   And you know AT&T is able to do customer list matching

7  today based on the fact they have first party data, right?

8  A.   Based on the data that they have about their customers.

9  Q.   And, in fact, that's one of their strongest selling types

10  of advertising products today, right?

11  A.   I'm not sure that I would agree with that

12  characterization.

13  Q.   Okay.  Well, let's flip to the Turner side.

14     You know that Turner does not do customer list matching

15  advertising today, true?

16  A.   That's correct.

17  Q.   And that's because, I think you explained in your

18  deposition, that's because Turner does not know the specific

19  identities of the viewers in order to match them to a customer

20  list, correct?

21  A.   That's correct.

22  Q.   But if the merger is allowed, you know Turner will be able

23  to do customer list matching using the AT&T's data, correct?

24  A.   So again, the question makes it sound like the merger is a

25  crucial part of making that happen, but that type of matching

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   could be arranged through a business relationship where

2   advertisers could have access to that data through a

3   partnership between Turner and AT&T.

4   Q.   Sorry to interrupt.

5       But back to the real world, that certainly hasn't happened

6   with Turner, right, today they're unable to do any customer

7   list matching today, true?

8   A.   Turner has not entered into those types of contracts and

9   offered that product.

10  Q.   And you don't know whether or not Professor Shapiro would

11  have taken this into account in his effort to model a merger

12  effects, right?

13  A.   No, I was focused on the revenue efficiencies that I

14  described.

15  Q.   Okay.  Let's spend a little more time discussing what

16  might change if Turner has access to AT&T's data, okay?

17      You agree that -- that programmers just in general, like

18  Turner, they need data to be able to sell this data driven

19  targeted advertising, right?

20  A.   That's correct.

21  Q.   And as a general rule, better data potentially allows for

22  better targeting, do you agree with that?

23  A.   That's right, the data needs to be better than what you

24  already have.

25  Q.   For example, first party set-top box data is generally

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  thought to be better for targeting than traditional Nielsen

2  ratings, right?

3  A.   So you said first party set-top box data, so I think

4  generally for what you're trying to do with this targeting

5  product is use data to more finely describe who's watching the

6  shows.  So did the companies like ComScore and Nielsen has now

7  acquired data set-top boxes, up to thirty million of them, and

8  matched them with Experian data, which allows you to figure

9  out -- plenty of data to figure out, you know, who's watching

10  which show, which then could be used to target ads.

11     So I think the distinction is that I'm -- that relates to

12  your question is you said that was first party data, set-top

13  box data, and I'm not sure that that's different.

14  Q.   Couple of things on that.

15     First of all, you didn't finish the ComScore/Nielsen

16  example.

17     Isn't it true that the data ComScore and Nielsen receive

18  and sell to programmers cannot, cannot be used for targeting

19  advertising today, true?

20  A.   So I'm not quite sure that's right.  So some of the

21  announcements that have been made about partnerships between

22  programmers like Fox and Turner with the ComScore for these

23  audience products are -- relate to using the data for our

24  targeted advertising.

25  Q.   Okay.  You know today Turner's unable to use any data from

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  ComScore or Nielsen to do targeted advertising, true?

2  A.    I think that was the case at the time of the documents

3  that I reviewed.  I actually, as I sit here, I don't know that

4  that's true today.

5  Q.    Okay.  So back to the original question.  As a general

6  rule let's -- I'll take out the word "first party," but set-top

7  box data is generally thought to be better for targeting than

8  traditional Nielsen rating data, right?

9  A.    So all of these datasets are similar.  They're panel

10  datasets where you're watching consumers and recording in some

11  way or another what the consumers are watching.  So the big

12  difference with the set-top box data is just that it's passive,

13  it's recorded, and it's sort of recorded, therefore, more

14  cheaply at larger scale.  So the data is roughly just the same

15  kind of data, it's not like it's, you know, qualitatively

16  different, it's showing who's watching which show, what they

17  watch next, and so on, just the set-top box data in principle

18  is bigger.

19  Q.    Okay.  And you know today Turner's data driven targeted

20  advertising relies on third party data, you know that today,

21  right?

22  A.    Yes, it relies on a variety of data sources that they've

23  acquired.

24  Q.    And you know Turner is having difficulty today selling its

25  data driven targeted advertising, you know that from reading

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   the deposition and from reading the trial testimony, right?

2   A.   So I think the analogous products are low single digit

3   share for both AT&T and for Turner.

4   Q.   Well, you didn't know that AT&T sells about twenty-two to

5   twenty-five percent of its advertisers through target and

6   advertising?

7   A.   So if you're counseling addressable, that's a separate

8   category.  So the data -- the product that's comparable to

9   Turner's product, the sort of data driven linear product.

10  Q.   Because Turner is not able to do addressable?

11  A.   It doesn't currently offer that product.

12  Q.   Okay.  And you read probably John Martin's testimony where

13  he explained that Turner's advanced targeting advertising

14  represents less then five percent of Turner's advertising

15  revenue, do you recall reading that?

16  A.   That sounds broadly correct.

17  Q.   And you know from reading the deposition, I think you

18  explained this in your deposition, that Turner believes it's

19  having difficulty selling its data driven targeting advertising

20  because it's based on third party data instead of first party

21  data, right?

22  A.   That characterization was in the testimony, also some of

23  the other documents talked about other reasons as well such as

24  difficulty with the market adoption or the advertiser's demand

25  for the product.

```
 1   Q.   Okay.  So now let's switch over to the AT&T side and

 2   discuss the type of data that Turner will be able to access if

 3   the merger is allowed.

 4       We know AT&T has a substantial amount of first party data,

 5   right?

 6   A.   Yes.

 7   Q.   Okay.  They -- and that's because AT&T has around

 8   twenty-five million television subscribers, right?

 9   A.   Yes.

10   Q.   And AT&T has about sixteen million broadband subscribers,

11   correct?

12   A.   Yes.

13   Q.   And AT&T has over a hundred million mobile subscribers,

14   right?

15   A.   Yes, although just to be clear, my report looked at these

16   advertising synergies in the merger planning document, and so

17   the set-top box data was the primary source of data for those

18   advertising synergies.

19   Q.   And you know that AT&T's data driven advertising product

20   sells at prices sixty percent higher than the ads that AT&T

21   sells just based on traditional Nielsen ratings, right?

22   A.   So the way that question is framed it makes it sound like

23   if you took an advertiser who was buying the regular product

24   that they would pay sixty percent --

25            THE COURT:  Don't worry about what it sounds like.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  Answer the question.

 2          THE WITNESS:  Okay.  So --

 3          THE COURT:  You're not teaching a course here.

 4  Answer the question.

 5          THE WITNESS:  So the people who are buying the

 6  targeted product are different than the people buying the

 7  non-targeted product, and the prices are sixty percent higher

 8  for the ones that are in the targeted product than the

 9  non-targeted product.

10  BY MR. RAIFF:

11  Q.   Okay, so let's go back to my question.

12       You know that AT&T's data driven advertising product sells

13  at prices about sixty percent higher than ads that AT&T sells

14  just based on traditional Nielsen ratings, correct?

15  A.   That's an accurate description of the difference in the

16  CPMs of what they're selling.

17  Q.   And part of the reason you explained in your deposition,

18  part of the reason AT&T can charge advertisers a higher price

19  is because AT&T has more granular information about its

20  audiences compared to the traditional Nielsen rating, that's

21  true, right?

22  A.   The higher prices due to the finer demographics that are

23  offered for targeting.

24  Q.   Okay.  And it's because AT&T has more granular information

25  about its audience as compared to traditional Nielsen ratings,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  do you agree with that?

2  A.   The data they're using is providing that more granular

3  targeting.

4  Q.   And you know Turner's data driven advertising product

5  today that it's offering only sells for about sixteen to

6  seventeen percent more than ads they sell based on traditional

7  Nielsen ratings, right?

8  A.   Again their -- there's a baseline on Turner that's based

9  on the types of advertisers they are selling there, and the --

10  there's a subset, a small subset that are buying this

11  additional product, and the prices on the additional product

12  are roughly sixteen percent higher in terms of who's buying

13  that and what they're buying today.

14  Q.   And if the merger goes through, Turner will have access to

15  the same first party data that AT&T is using today for its data

16  driven advertising product, correct?

17  A.   They could use that data or other data sources to create

18  the demographic categories that they'd like to sell.

19  Q.   Well, let's just stick to my questions, please.

20      If the merger goes through Turner will have access to the

21  same first party data that AT&T is using today for AT&T's data

22  driven advertising, true?

23  A.   I believe so.

24  Q.   Let's jump to a another topic, but related.

25      You talk about AT&T's selling its data to programmers,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  right, you talked a little bit about that during your direct

2  examination, right?

3  A.    Yes.

4  Q.    Okay.  You know AT&T previously tried to sell its data to

5  programmers for advertising, right?

6  A.    It's a broad characterization of tried to sell, so they

7  didn't have an actual product that was ready to be negotiated

8  over, they had discussions with programmers about their

9  interest in buying such a product.

10  Q.    AT&T started this initiative to try to sell its data to

11  programmers back in 2015, correct?

12  A.    So when you're referring to 2015, I think you're referring

13  to the stages of product, the process where they were combining

14  the data with their carriage negotiations.

15  Q.    Please stick to my question.

16        MR. RAIFF:  Your Honor, I might need an instruction

17  or a little bit help.  But if you could, please, just try to

18  stick to my questions.

19  BY MR. RAIFF:

20  Q.    AT&T began this initiative to sell data back in 2015, do

21  you agree with that?

22  A.    They began an initiative.

23  Q.    And as of October 2016, AT&T had not successfully and had

24  not entered into any contracts to sell data to programmers,

25  true?

1   A.   That's correct.

2   Q.   And you pointed out in your deposition that the parties

3   seem to be really far apart on price, the bid ask breadth was

4   very large, do you recall discussing that in your deposition?

5   A.   Well, that's not exactly how I characterized it.

6   Q.   Do you recall discussing how when AT&T approached Disney,

7   for example, that AT&T estimated that Disney was spending about

8   seven million dollars annually on its data for advertising, do

9   you recall that?

10  A.   Yes.

11  Q.   And do you recall that AT&T estimated that its data was

12  worth about a hundred and sixteen million dollars to Disney, do

13  you recall that?

14  A.   Yes.

15  Q.   And you recall commenting on that big gap and how it would

16  be an awfully big change for a corporation like Disney to go

17  from spending seven million dollars to a hundred and sixteen

18  million dollars for data, do you recall that?

19  A.   Yes.

20  Q.   And that sounded very impractical to you, right, do you

21  recall that?

22  A.   It sounds like it might be difficult to walk into one

23  meeting and walk out with a signed contract because if you

24  hadn't even specified what you were selling.

25  Q.   And the inability to agree on a value or to agree on a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1   price is a form of bargaining friction, you agree with that,

2   right?

3   A.   The -- I guess the friction comes from different beliefs

4   about the value.

5   Q.   Fair enough.

6      And you read Mr. Welch's deposition where he testified

7   about how their efforts to sell data to programmers was a

8   failure, right?

9   A.   Yes.

10  Q.   And you agree at your deposition that it appeared that the

11  data for programmers' initiative was unsuccessful, true?

12  A.   No, that's not how I would characterize what I described

13  in my deposition.  In my deposition I talked about how this was

14  an ongoing negotiation.  I described how there were initial

15  meetings where they said here's some data.  This is the kind of

16  data we can possibly sell you, we think that it has very high

17  value.  Are you interested?

18     I reviewed an internal document that gave the list of the

19  programmers that they were selling it to, with probabilities of

20  sale ranking from high and medium and so on, an email

21  describing that they were, in October that they were hopeful,

22  especially about Disney and Fox.  They did say that Turner had

23  a robust data solution already, so it was slightly lower on the

24  priority list.

25     And then my understanding is that when the merger was
```

1  announced that they decided to pursue a different strategy.

2  Q.   Let's turn to page 165 of your deposition and see exactly

3  what you said.

4      Remember we were talking about Mr. Welch's testimony, and

5  this was on page 165, starting on line 13.  And we were talking

6  about Mr. Welch testimony that the data for programmers was

7  unsuccessful.  And I asked you on line 13, page 165:

8           "You testified under oath that the data for

9           programmers' initiative was unsuccessful.  Are you

10          disputing that, is he lying," I asked?

11          And your answer:  Well, so no.  What I said was

12          that they did not sell data for programmers to a

13          customer prior to the merger, the merger."

14          And then you go on to say, "Which is consistent

15          with it being unsuccessful."

16     Do you see that?

17 A.   Yes.

18 Q.   And that's what you testified to at the time, right?

19 A.   I said that it's consistent with being unsuccessful, and I

20 also said that these were ongoing efforts, and the efforts had

21 not been stopped prior to the merger announcement, and which is

22 what I just summarized as a characterization of my testimony.

23 Q.   All right.  Let's wrap up this topic and go to one final

24 topic.  Just to be clear, AT&T did not reach any agreement with

25 any programmers to sell its data prior to the merger

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1  announcement in late 2016, true?

 2  A.    That's true.

 3  Q.    And you're aware that after this data for programmers'

 4  initiative or this effort, AT&T decided that a new programmatic

 5  advertising platform with Time Warner merger could help AT&T

 6  fully monetize its data, right?

 7  A.    That was their general plan.

 8  Q.    And you're aware that AT&T plans to keep all of the data

 9  under one roof within its four walls as part of the

10  programmatic advertising platform, right?

11  A.    Yes.

12  Q.    And that's another potential benefit of the programmatic

13  platform being able to monetize AT&T's data with its own

14  platform within its own four walls rather than selling data to

15  programmers, right?

16  A.    Well, it's a form of selling because they would be

17  enabling programmers to -- and third party inventory providers

18  to access the data through the platform.

19  Q.    Well, you know from reading the materials that actually

20  the programmers are not going to be able to actually access the

21  actual data, you know that, right?

22  A.    Not the raw data.

23  Q.    Let's turn to a final topic, the content intelligence you

24  talked about.

25        You recall we discussed at your deposition how Netflix uses

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  data to make content decisions?

2  A.   We discussed that topic, yes.

3  Q.   Do you recall telling me that customer data is a valuable

4  asset for Netflix because it helps Netflix choose programs?

5  A.   I'm familiar with that general claim.

6  Q.   And, for example, consumer data provides Netflix with

7  information about which movie stars are popular to which

8  groups, and that helps Netflix in deciding what shows to buy

9  and what stars to put in shows, that's true?

10 A.   Broadly speaking, we don't have a quantification of the

11 extent or other sources of data that they use.

12 Q.   And you agree that data can be useful when a company is

13 making content decisions, true?

14 A.   It can be.

15 Q.   And set-top box data, for example, can help demonstrate

16 that people who like one type of show also typically like a

17 different type of show, you recall telling me that?

18 A.   Yes, so evidence that -- that some people find not useful

19 or the commercial products available with that kinds of type of

20 information in it.

21 Q.   And, in fact, as you explained yourself in the deposition,

22 this is the sort of information that can help inform scheduling

23 decisions, right?

24 A.   It could.

25 Q.   And after the merger, if it's allowed to go through, Time

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   Warner will have access to AT&T's data, right?

 2   A.   Yes.

 3            MR. RAIFF:  No further questions, Your Honor.

 4            THE COURT:  Okay.  Redirect.

 5            MR. SCHWINGLER:  Just a few questions, Your Honor.

 6                      REDIRECT EXAMINATION

 7   BY MR. SCHWINGLER:

 8   Q.   Professor Athey, you were asked about whether after the

 9   merger Turner could offer addressable advertising, do you

10   recall that?

11   A.   Yes.

12   Q.   And is Turner addressable advertising a quantified synergy

13   in this case?

14   A.   No.

15   Q.   Before the break you were asked about whether competition

16   for Facebook and Google could benefit consumers, advertisers

17   and publishers, do you recall that question?

18   A.   Yes.

19   Q.   And your answer was "effective competition."  Do you

20   recall that?

21   A.   Yes.

22   Q.   Could you explain briefly for His Honor what you meant by

23   "effective competition" for the Google and Facebook advertising

24   platforms?

25   A.   Sure.  So at a high level more than eighty percent of
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Google's revenue comes from search advertising, this is like

2  direct marketing, so you type "auto insurance" into Google and

3  an ad comes up for that.

4      That is very different than TV advertising, which is kind

5  of described as the top of the funnel, it's trying to get

6  people interested.  And so those two types of advertising are

7  not necessarily substitutes or competitors.

8      Just think about if you were going to send out a catalog

9  and you thought about how effective and cost effective will it

10 be to mail those catalogs.  If I've just run a great TV

11 campaign, then actually my ROM (sic) my catalogs would go up

12 wouldn't throw it in the garbage, but instead they might buy

13 from your catalog.

14     So TV is not really an effective competitor for a search

15 because, in fact, they sometimes go together in a positive way.

16     And then, you know, Facebook kind of sits in a different

17 part of the funnel where you're providing, you know, short

18 messages, maybe offers, trying to continue the conversation

19 with the consumer who may be broadly aware of the product are

20 also some direct marketing.

21     And so these are really different types of advertising and

22 advertisers thinks about this whole portfolio and how they go

23 together in making an effective campaign.

24     And so in terms of the TV market, search and Facebook are

25 pretty different.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1  Q.    And is AT&T's desire to compete with Google and Facebook

2  relevant to your opinions on merger specificity?

3  A.    No.  If we just think about the platform, a question would

4  be, you know, does the merger help this platform impede.  And

5  so if you thought, for example, that having a merger might make

6  it harder to get a broad set of competitors onto the platform,

7  that could make it harder to compete, but generally since the

8  merger is not necessary to make the platform successful, it

9  really doesn't -- the fact that Google and Facebook are out

10 there doesn't really change the analysis of merger specificity,

11 which is more about overcoming contracting friction in

12 different ways to make the platform.

13 Q.    And does this desire to compete with Google and Facebook

14 in any way validate or verify the calculations that AT&T put in

15 its version 41 merger planning document?

16 A.    Sure, so just I'll give an example of the platform, the

17 existence of competitors might increase the risk of success and

18 that could make things possibly more speculative.  But it

19 certainly doesn't help verify the magnitude that these

20 synergies will actually be attained.

21        MR. SCHWINGLER:  No further questions, Your Honor.

22        THE COURT:  Recross on the redirect?

23        MR. RAIFF:  No.

24        THE COURT:  You're excused.

25    (Witness excused.)

1          THE COURT:  See counsel.

2      (Sealed bench conference.)

3          THE COURT:  All right.  Over the last break we got

4  access to the transcript of the telephone call the other day.

5          And basically my clerk's notes and my recollection

6  basically were consistent with what we saw here.

7          These particular topics were off the table four, six and

8  seven, three, averaging up to three years didn't really amount

9  to much.  No big deal to the defendants.

10     The big issue is this one here, the MVDs so I think you

11 kind of come back to where we started.  You know, coming up

12 with new opinions or new schematics and diagram is stuff beyond

13 what I think really is fair under the circumstances.  That

14 doesn't mean he can't be confronted, should be confronted with

15 criticisms slash disagreements that have been set forth by

16 other experts.  It's a chance to explain them.  Give his

17 version of things.

18     I think going off into the new formulating opinions and

19 schematics and diagrams.  A new regression now.

20         MR. CONRATH:  I don't think there's any regression.

21         THE COURT:  No, okay.

22         MR. PETROCELLI:  Well, Your Honor, there was all

23 kinds of new calculations, and we have no ability to get

24 underneath them or understand them, and those are all set forth

25 in those new graphics.  And so my understanding is that that is

1  out of bounds.

2       MR. CONRATH:  I think you're right.  If I might

3  respond. My recollection is it was involved this addition, and

4  we gave work papers on Saturday, made perfectly clear

5  everything is involved in those.

6       MR. PETROCELLI:  Completely new and different

7  calculations of harm on the last day of trial, Your Honor, with

8  no ability to respond.  And that went way beyond what we

9  discussed, okay.

10      MR. CONRATH:  Sure, the only point of those was to

11  explain why the attack on him as being wrong is not justified

12  because, in fact, his calculations are conservative.  The

13  specific attack that was made, his response is he said, look,

14  the wrong -- the right, I think the criticism included the

15  proposition that the long-term customer is the one who's saved

16  and his or her value is what's relevant.  He made an addition

17  to say, look, you can see this, and this is the long-term value

18  if you don't include the acquisition cost because of the

19  customers already acquired.  It's nothing more complicated than

20  that.

21      MR. PETROCELLI:  Your Honor, he has already said all

22  of that.  He said that his numbers which are outdated and not

23  current in his view are understated.  He's already given that

24  testimony, and now he's trying to do is go in and come up with

25  new numbers and calculate new harm, and that's way out of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    bounds.  We would have to call another expert to demonstrate

2    why those numbers are foolish.

3           THE COURT:  You're not going to have to do that

4    because I'm not going to let him spin off into that direction.

5    So all right.  So he can testify to the -- his response to the

6    criticisms and testify to the agreements people have.  I don't

7    want him propounding new schematics and diagrams.

8           MR. CONRATH:  Okay, okay, understood.  So I think

9    part of his explanation of why these, in response to that, if

10   he can explain, tell me if I'm wrong.  He can explain why he

11   concludes that his number is conservative without calculating

12   that, but explaining in principle or broad strokes.

13          THE COURT:  The opinions that he's already given.  He

14   gave them.

15          MR. PETROCELLI:  He gave that opinion.

16          THE COURT:  He gave them in his report.  It's an

17   opinion he gave in his deposition.  It's an opinion he gave in

18   his report.  It's an opinion he gave when he was on the stand.

19   That's all fair game.  It's going off into other things, that's

20   where the problem starts.

21          MR. CONRATH:  Okay.

22          THE COURT:  I think at this late hour.

23          MR. PETROCELLI:  And running numbers too.

24          MR. CONRATH:  So I think I understand.  What he's

25   explaining is principally he outlined in his report.  He is

1    explaining why the criticism he got to which this is a response

2    is correct.  And as long as he doesn't calculate a new number

3    explaining the principle of why he's correct is what he ought

4    to be doing on rebuttal.

5            MR. PETROCELLI:  I don't have a problem with that

6    because he's already said that, Your Honor, but he can repeat

7    it if he wants to.

8            MR. CONRATH:  And may I address sort of the two other

9    questions?  If I can -- there's only one principle, and I did

10   discuss this in our phone call on Friday.  This is not a new

11   opinion, but there's an economic principle that he has to

12   explain the difference between fixed and variable.  It's not a

13   new opinion, but it wasn't relevant until we heard the

14   defendant's responsive efficiencies case.

15           THE COURT:  Is it in his report?

16           MR. CONRATH:  Absolutely, it was in his report.  And

17   we cited the place and it's in his report in the supplemental

18   report we gave the defendants.

19           MR. PETROCELLI:  Oh, no, no, no, it's not in his

20   original report, Your Honor.

21           MR. CONRATH:  Absolutely it is.

22           MR. PETROCELLI:  Show me where it is.  Are you

23   talking about --

24           MR. CONRATH:  We cited it in --

25           MR. PETROCELLI:  The difference between fixed and

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    variable.

2         MR. CONRATH:  We cited and referenced exactly the

3    pages where it is in his  report that we delivered.

4         MR. PETROCELLI:  Here's the problem, Your Honor.  He

5    testified in his deposition under oath in this trial that he

6    has nothing to do with efficiencies, nothing except elimination

7    of double marginalization.  And he's relying entirely on

8    Quintero, okay?

9         Now he wants to come back after Quintero was

10   cross-examined and give testimony on fixed versus variable

11   costs.  It's way outside the scope of anything in Dr. Carlton's

12   testimony, and it's not -- it's something he took himself.  And

13   that's why you have an X there.  He took himself out of play on

14   that issue.

15        MR. CONRATH:  He took -- he's not addressing the

16   question of whether a cost is fixed or variable.  It's a narrow

17   question, which is only relevant after we heard their defense.

18   So it would not have been relevant for him to express in his

19   direct testimony.  That is to say that economists explain that

20   variable costs are ones that should be counted fixed costs.

21   That's all there is, but it's an important economic principle

22   that is perfectly appropriate for him to explain as a rebuttal.

23        THE COURT:  What was the criticism aimed at him that

24   he's responding to?

25        MR. PETROCELLI:  None.

1          MR. CONRATH:  So this one is not a criticism relating

2     to him.  They brought in an efficient, efficiencies is not part

3     of our original case.  They brought in an affirmative defense

4     on efficiencies.  We responded to that in two ways:

5          One, the testimony we've heard today there's behind that

6     is one principle, which is that variable costs are relevant to

7     efficiencies and we'll get to consumer's fixed costs are not

8     relevant to efficiencies and we'll get to consumers.  Those two

9     sentences are all that he needs to say, but they are not part

10    of his initial response.  They are a response to defendant's

11    efficiencies affirmative defense.  They're just explaining why

12    what Mr. Quintero --

13          THE COURT:  You want to ask him in one question.

14          MR. CONRATH:  Absolutely, one question.

15          THE COURT:  You pointed out in your report the

16    following.  This is this and this is this.  Is that correct?

17    Yes, end of discussion.

18          MR. CONRATH:  That is all that is necessary, Your

19    Honor.

20          THE COURT:  End of discussion.  Go ahead.

21          MR. CONRATH:  I just have one more question.  I want

22    to make sure we're doing this the way Your Honor wants.

23          We would like to use some demonstratives that will

24    help -- what he's going to do is say you are criticized by

25    Professor Carlton to say this, what's your answer to that?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  He can use the same demonstratives he

2    used when he was on the stand before.  No new demonstratives.

3    Same as before.  You've got one hour, 10:30 to 11:30 fifteen

4    minute break.  You all have one hour, no more than that, 11:45

5    to 12:45.  And then if there's redirect and recross, seven and

6    a half minutes each.  That's all you're getting.

7          MR. CONRATH:  Okay.

8          THE COURT:  I have to catch a train.

9          MR. CONRATH:  Do you want to hear argument about the

10   DirecTV, Your Honor.

11         THE COURT:  No, but I'm not going to grant it.  I

12   don't think -- I think it's a closer call than I thought it

13   might be, but I just don't think really under the totality of

14   the circumstances it makes sense to grant it.

15         MR. PETROCELLI:  I was going to suggest that you

16   defer it until your final ruling.

17         THE COURT:  I could, you know, I mean, but I think in

18   fairness to the parties, I don't think you should be expecting

19   that I'm going to grant it or they should be expecting I'm

20   going to grant it or the other way around.

21         What I do, however, think is that on the trial brief,

22   each side should devote at least five pages.  Well, up to five

23   pages on their thoughts on what, if any, remedial decisions by

24   the Court could be sensible or whatever under the circumstances

25   depending upon how the Court rules.

1          So I don't want to be -- I don't want to wake up weeks

2    from now and say, geez, I wish I had thought about what remedy

3    steps I could take here that might make sense as opposed to

4    blocking it or not blocking it.  I don't know if what other

5    options there might be.  Since the law seems to provide me a

6    very wide range of discretion.

7          MR. PETROCELLI:  Be happy to do that.

8          MR. CONRATH:  Up to five pages, we'd be happy to do

9    that.

10          THE COURT:  I'll keep it under five.  Obviously we've

11   talked about some of these things.  We talked about

12   arbitration, we talked about that.  We talked about some of

13   these other things.  But I think it would be helpful to have

14   your thoughts of the parties of remedial steps.

15          MR. CONRATH:  Sure, sure.  We'd be glad to do that,

16   Your Honor.

17          MR. PETROCELLI:  Okay, thank you.

18          MR. CONRATH:  Is that it?

19          THE COURT:  Anything else?

20          MR. PETROCELLI:  No, that's it, Your Honor.  Take

21   care.

22      (Open court.)

23          **THE COURT:**  All right, we'll stand in recess until

24   10:30 tomorrow morning.  We'll be going until one o'clock

25   tomorrow.

1      (Trial adjourned at 5:09 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1                        CERTIFICATE

2          I certify that the foregoing is a true and correct

3    transcript, to the best of my ability, of the above pages, of

4    the stenographic notes provided to me by the United States

5    District Court, of the proceedings taken on the date and time

6    previously stated in the above matter.

7          I further certify that I am neither counsel for, related

8    to, nor employed by any of the parties to the action in which

9    this hearing was taken, and further that I am not financially

10   nor otherwise interested in the outcome of the action.

11

12   _____        _____

     /s/Crystal M. Pilgrim, RPR,FCRR          Date:  April 24, 2018
13

14

15

16

17

18

19

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )          CV No. 17-2511
                                   )
                                   )          Washington, D.C.
          vs.                      )          April 24, 2018
                                   )          10:44 a.m.
AT&T, INC., ET AL.,                )
                                   )          Day 19
          Defendants.              )
_____    )


TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                             Eric D. Welsh
                             Donald G. Kempf, Jr.
                             Ruediger R. Schuett
                             Dylan M. Carson
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Washington, D.C. 20530
                             (202) 532-4560
                             craig.conrath@usdoj.gov
                             eric.welsh@usdoj.gov
                             donald.kempf@usdoj.gov
                             ruediger.schuett@usdoj.gov
                             dylan.carson@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:

Katrina M. Robson
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 220-5052
krobson@omm.com

Daniel M. Petrocelli
M. Randall Oppenheimer
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067
(310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Michael L. Raiff
Robert C. Walters,
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201
(214) 698-3350
mraiff@gibsondunn.com
rwalters@gibsondunn.com

For Defendant
Time Warner, Inc.:

Kevin J. Orsini
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1140
korsini@cravath.com
pbarbur@cravath.com

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3795

– – –

WITNESS INDEX

– – –

WITNESSES            DIRECT CROSS REDIRECT RECROSS

GOVERNMENT'S:

CARL SHAPIRO, Ph.D. 3799  3843

– – –

INDEX OF EXHIBITS

– – –

DEFENDANT'S              IDENTIFIED   ADMITTED

DX943 –                               3885

```
 1                    P R O C E E D I N G S

 2              DEPUTY CLERK:  All rise.  The United States

 3    District Court for the District of Columbia is now in

 4    session, the Honorable Richard J. Leon presiding.  God save

 5    the United States and this Honorable Court.  Please be

 6    seated and come to order.

 7              Your Honor, we have Civil Action No. 17-2511,

 8    United States of America v. AT&T, Inc., et al.

 9              Counsel for the parties, please approach the

10    lectern and identify yourself for the record.

11              MR. WELSH:  Good morning, Your Honor.  Eric Welsh

12    for the United States.

13              THE COURT:  Welcome back.

14              MR. WELSH:  Thank you.

15              MR. CARSON:  Good morning, Your Honor.

16    Dylan Carson for the United States.

17              THE COURT:  Welcome back.

18              MR. CONRATH:  Good morning, Your Honor.

19    Craig Conrath for the United States.

20              THE COURT:  Welcome back.

21              MR. CONRATH:  Thank you.

22              MR. SCHUETT:  Good morning, Your Honor.

23    Ruediger Schuett for the United States.

24              THE COURT:  Welcome back.

25              MR. KEMPF:  Good morning, Your Honor.  Don Kempf
```

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3663 of 3826

3797

```
 1    for the United States.

 2              THE COURT:  Welcome back.

 3              MR. PETROCELLI:  Good morning, Your Honor.

 4    Daniel Petrocelli for defendants.

 5              THE COURT:  Welcome back.

 6              MS. ROBSON:  Good morning, Your Honor.

 7    Katrina Robson for defendants.

 8              THE COURT:  Welcome back.

 9              MR. OPPENHEIMER:  Good morning, Your Honor.

10    Randy Oppenheimer for the defendants.

11              THE COURT:  Welcome back.

12              MR. WALTERS:  Good morning, Your Honor.

13    Rob Walters here for AT&T and DirecTV.

14              THE COURT:  Welcome back.

15              MR. BARBUR:  Good morning, Your Honor.

16    Peter Barbur for Time Warner.

17              THE COURT:  Welcome back.

18              MR. ORSINI:  Good morning, Your Honor.

19    Kevin Orsini for Time Warner.

20              THE COURT:  Welcome back.

21              MR. RAIFF:  Good morning, Your Honor.  Mike Raiff

22    for AT&T and DirecTV.

23              THE COURT:  Welcome back.

24              All right.  Any preliminary matters?  Or you're

25    all set?
```

1          Call your witness.

2          MR. WELSH:  Thank you, Your Honor.

3          Your Honor, the United States calls

4  Professor Carl Shapiro as an expert in industrial

5  organization and antitrust economics in its rebuttal case.

6          THE COURT:  Okay.

7          DEPUTY CLERK:  Please raise your right hand.

8          (Witness is placed under oath.)

9          DEPUTY CLERK:  Please be seated.

10          THE COURT:  You may proceed.

11          MR. PETROCELLI:  Your Honor, may I approach?

12          THE COURT:  Okay.

13          (Sealed bench conference)

14          THE COURT:  What, are you a mind reader?

15          MR. WELSH:  I didn't even get the question out.

16          MR. PETROCELLI:  I noticed that the witness has a

17  notebook in front of him, and he carried it to the witness

18  stand.

19          MR. WELSH:  It's just his report.  So I can take

20  it back and give it to him later, Your Honor.

21          MR. PETROCELLI:  I didn't know what's in there.

22          MR. WELSH:  It's just his reports.

23          THE COURT:  Okay.  Well, yeah, if that's what it

24  is, then just retrieve it until you're ready to --

25          MR. WELSH:  That's fine.  It's just if we need to,

1    if we wanted to refer to it, that's all.  Okay.  Thank you.

2              I'll get it back.

3              (Open court)

4              THE COURT:  Come on back up, Professor.

5              All right.

6              MR. WELSH:  Try again, Your Honor?

7              THE COURT:  Try again.

8    CARL SHAPIRO, Ph.D., WITNESS FOR THE GOVERNMENT, HAVING BEEN

9    DULY SWORN, TESTIFIED AS FOLLOWS:

10                        DIRECT EXAMINATION

11   BY MR. WELSH:

12       Q    Good morning, Professor Shapiro.  Welcome back.

13       A    Thank you.

14       Q    Now, Professor, have you been following the

15   testimony in this trial?

16       A    Yes, I have.

17       Q    And, broadly speaking, did the testimony that you

18   reviewed, has that caused you to change any of your opinions

19   that you previously gave the Court?

20       A    Well, I definitely learned things from what I

21   read, but my general opinions have not changed.

22       Q    Okay.  So we've got a limited amount of time here

23   this morning.  I want to get right to the topic.  So the

24   first topic I want to discuss with you is about the

25   bargaining model.  Okay?

1          Professor, did you read testimony from

2     Professor Carlton that you used quite a complicated economic

3     model.  Did you hear that comment by Professor Carlton?

4          A    I read that.

5          Q    Professor, what's your response to that comment?

6          A    Well, it reminded me of the famous quote

7     attributed to Albert Einstein, which is, "Everything should

8     be made as simple as possible but no simpler."

9               I believe that the model I'm using is as simple as

10    possible, while still capturing the fundamental economic

11    forces that are in play here to analyze the likely effects

12    of this merger.

13              If one were to discard the bargaining model as

14    overly complicated, I think you'd then be in a situation

15    where you would lack any theoretical model, any economic

16    model to evaluate the effects of vertical mergers in a range

17    of industries, including this one, where fees are based on

18    negotiation.

19         Q    Did you also read that Professor Carlton testified

20    that your model was theoretically unsound?

21         A    I noticed that.

22         Q    And what's your response to that comment?

23         A    I think that's clearly false.

24              The model is a standard "split the difference"

25    bargaining or is a standard model that's in the textbooks;

1   we teach our students; that's been -- more complicated

2   versions building on that are in the academic literature.

3   So it's without question, in my view, theoretically sound.

4          I think that what Professor Carlton was saying

5   after that sound bite was that he thought it was improper to

6   apply it here because of the arbitration proposal.  That's

7   not about whether the model is theoretically sound.  It's a

8   question about how we treat arbitration and remedies.  And

9   obviously, we differ on that.

10          But the model is theoretically sound.

11   Q     And I know you talked about using it in your

12   teaching of students, that sort of thing.  Has it also been

13   accepted by the FCC?

14   A     Well, yes.  The FCC uses models in their analysis

15   of the NBC, excuse me, the Comcast-NBCU transaction.  And,

16   well, the DOJ and the FCC routinely use bargaining models in

17   merger analysis, and sometimes that ends up court as well.

18   Q     Now, you've also read about Professor Katz and his

19   testimony in court, and he's criticized you on a number of

20   issues; is that right?

21   A     He has.

22   Q     Now, has Professor Katz, though, testified that

23   the Nash bargaining models aren't in the mainstream?

24   A     I saw that.

25   Q     Do you agree with his comment there?

1      A     On this point, I am very happy to agree with my

2  Berkeley colleague.

3      Q     All right.  Let's change topics now.  I want to

4  talk about some of the inputs into the model itself.

5            There's been lot of testimony since you were last

6  here about this subject.

7            Did you read some criticism by Professor Carlton

8  that you used a lot of simplifying assumptions and the wrong

9  value for the key variables in your model?  Do you recall

10 reading that?

11     A     I do.

12     Q     Now, what's your response to that critique by

13 Professor Carlton?

14     A     Well, I strenuously disagree with his assertion

15 that I used the wrong value for one or more of the key

16 inputs into my model.

17           I have, I think, a very sound basis for the inputs

18 I used.

19           And that's really what I'm here today, Your Honor,

20 to talk about, why I -- to defend the inputs I used in my

21 model.

22     Q     And we're going to talk about the inputs in a

23 second, so this will be the subscriber loss rate as one and

24 the margins as another; is that right?

25     A     Yes.  Those are the two that got the most

1    attention, I would say, and we'll talk about in a moment.

2        Q    Before we get there, though, do you have any

3    general criticism of the way Professor Carlton went about

4    selecting variables for the modeling that he was doing for

5    his purposes?

6        A    So I think the framing for what you're going to

7    hear today, Your Honor, is that, not surprisingly,

8    Professor Carlton was suggesting lower, lower, lower numbers

9    on all these items than I had.  And we're going to talk

10   about that.

11           But methodologically, I want to flag, before we

12   get into the details, in several of these areas, I provided

13   a range, a low end and a high end.  And I tended to testify

14   and emphasize the low end but noted the high end, okay?

15           And what Professor Carlton has done is taken the

16   low-end numbers and tried to peck away at them, attack them,

17   and we'll talk about that.

18           But he's pretty much ignored the higher end, or

19   the fact there's this range.  And that reflects a certain

20   bias in his approach in favor of his client.

21       Q    Let's move now to talk about specific inputs, and

22   we'll start with the subscriber loss rate.

23           Did you read that Professor Carlton asserted that

24   your estimate of the effects of the Suddenlink-Viacom

25   blackout, which you talked about before with His Honor, that

```
 1    that failed to account for significant effect and that the

 2    whole industry had started to trend down faster?

 3              Do you recall reading that?

 4        A    I do.

 5        Q    And I think when Professor Carlton was in here, he

 6    proclaimed that that was a "holy mackerel" moment.  And he

 7    focused, then, the Court on a red line or a magenta line, as

 8    he was calling it, from the demonstrative on industry

 9    trends.

10              Do you remember that?

11        A    I do.

12        Q    Now, do you have a response to Professor Carlton's

13    thinking on this point and his criticism of you?

14        A    Yes.

15              His assertion that there was a change in industry

16    trends that happened to take place at the same time as the

17    Suddenlink-Viacom blackout is false.  We can look at the

18    data -- and I have -- and there is no such change in trend.

19              MR. WELSH:  Your Honor, I have a demonstrative

20    which we have used before previously with Professor Shapiro.

21    It's been marked as PXD011-06.  It was used the last time

22    Professor Shapiro was here in court.

23              May I approach?

24              THE COURT:  What's it?  0-what?

25              MR. WELSH:  I'm sorry, it's PXD011-06.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  Okay.

2          MR. WELSH:  May I approach the witness,

3  Your Honor?

4          THE COURT:  You may.

5          MR. WELSH:  Your Honor, I provided a copy of

6  PXD011-06 to opposing counsel.

7          May I proceed?

8          THE COURT:  You may.

9          MR. WELSH:  Okay.

10  BY MR. WELSH:

11      Q    Professor Shapiro, you have PXD011-06 in front of

12  you.  Can you explain to His Honor your thinking about this

13  demonstrative and how this plays into Professor -- your

14  response to Professor Carlton's criticism of you about the

15  industry trends.

16      A    Yes.

17          So Professor Carlton's attack on my analysis here

18  was based on his assertion that the industry decline in

19  subscribers became more pronounced just about at the same

20  time as this blackout, which was October of 2014.

21          He said that -- he asked the Court to look at the

22  red line here, which is all MVPDs in the country, measuring

23  their subscribers.  And he asserted that the line became

24  steeper after October 2014, reflecting a change in industry

25  trends, a drop-off.

1          And the line does not become steeper.  That is a

2    false statement.  And so his attack is invalid.

3          Q    Looking at Professor Carlton's testimony, then,

4    did that make you change your subscriber loss rate for the

5    Suddenlink-Viacom blackout?

6          A    No.  My 9.4 percent estimate here stands, because

7    the attack was in error.

8          Q    And I take it, looking at the demonstrative here

9    at that red line, you see no difference in the --

10         A    There is no difference.  I looked at that, studied

11   that previously, and the data analysis indicates no change

12   in trend.

13         Q    Now, do you continue to believe, Professor, that

14   your analysis is based on reliable evidence here?

15         A    Absolutely.

16              Professor Carlton and I agreed that this episode,

17   the long-term blackout of Viacom on Suddenlink, was, I think

18   he would agree, the best single episode of a real-world

19   blackout that we could look to.  And my 9.4 percent figure

20   stands unscathed, in my view, because the attack was based

21   on an error.

22         Q    Let's change topics now.  Let's talk about a

23   different input, the diversion rates.

24              Did you read testimony from Professor Carlton that

25   you underestimated the number of MVPD subscribers that would

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    drop their MVPD service entirely in response to a Turner

 2    blackout?

 3         A    I read that.

 4         Q    What's your response to Professor Carlton's

 5    criticism there?

 6         A    He is -- I believe he's made an error here as well

 7    in his criticism.

 8              He is looking in the wrong place, and so he's

 9    measuring the wrong thing for the purposes at hand.

10         Q    So what did he look at?  And what should he have

11    done?  What should he have looked at?  Explain that to His

12    Honor.

13         A    So let me -- I have to go back just to make sure

14    what I did and then his attack so we're clear here,

15    Your Honor.

16              The question that we're asking is, if there's a

17    blackout of Turner on Charter -- that's my ongoing, standing

18    example -- of the people that leave Charter, how many will

19    just give up on pay-TV service?  If there are more of those,

20    then fewer of those subscribers will end up at AT&T and the

21    effects I'm calculating will be smaller.

22              So Professor Carlton claims lot of people would

23    drop their MVPD service altogether.

24              So to estimate that, I relied on the

25    Altman Vilandrie study, which studied exactly that question,
```

1    a blackout of Turner on an MVPD, on Charter; how many people

2    would pull the plug?  And I used that number.

3           But Professor Carlton does not use that number.

4    He looks at a different place.  He points out that some

5    20 percent of American households don't have pay-TV service.

6    But that's not the right place to look.

7           Think about it.  We're asking if there's a

8    blackout of Turner on Charter and you're -- suppose you're a

9    Charter subscriber and you're like, hey, I love my Turner

10   content, sports, news.  I'm really unhappy here.  I'm going

11   to leave Charter.  Then you're pretty likely to want to go

12   somewhere else where you can get the Turner content.

13          And the fact that there are a lot of other

14   households, maybe they're younger, who don't have pay-TV

15   services is kind of beside the point.  We're talking about

16   the households who leave Charter because they value the

17   Turner content so highly.

18          So he's just looking at the wrong number.

19          I've got a direct estimate of exactly what we want

20   to measure, and he's looking at something else.  I think

21   that's a mistake.

22     Q    Did Professor Carlton then use an estimate of

23   diversion that was too high?

24     A    The result of this dispute between the two of us

25   is his measure of this flow out of pulling the plug is two

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   to three times higher than it should be.  So -- and, again,

 2   because he's measuring -- overestimating the people leaving

 3   the pay-TV system, he's underestimating the flows to

 4   DirecTV.  This was a significant difference.  He's got that

 5   number two to three times too high, in my view.

 6       Q    Let's change topics again.  Let's talk about

 7   another input, and this is the margins.

 8            Did you read testimony from Professor Carlton that

 9   he was doing exactly the same thing as you and using the

10   June 2017 margin data; he was just updating the information?

11       A    I did.

12       Q    Do you agree with Professor Carlton on this point?

13       A    No, I do not.  And there are two reasons why I

14   disagree.  First, he picked one month from the later year,

15   instead of all three, using all three months.  So that's a

16   difference.

17            The bigger difference is he has brushed aside and

18   not engaged on the larger point that I make about the value

19   of existing subscribers to AT&T being substantially higher

20   than the value of new subscribers, which -- that's a second

21   point.

22       Q    Did he also -- I know you testified earlier this

23   morning about Professor Carlton failing to acknowledge that

24   you're looking at the lowest of the number of ranges.  Was

25   he guilty of that here as well?
```

1        A    Yes, that's true.

2        Q    Now, Professor, do you think it is a valid

3    approach to take the lower bound of a range as both the

4    starting point and the ending point for discussion, as

5    Professor Carlton does?

6        A    No.  I think this is -- this is the methodological

7    point I mentioned earlier.

8             I provide a range, and then he attacks the lower

9    end and pulls it down, okay?  And we'll talk about that.

10   I think there's some validity to using the 2017 margin

11   instead of 2016 margins.

12            But then the range moves, and he's not talking

13   about the range.  He's talking just about the low end.  And

14   I think that's stilted.  I think that's not -- not the way

15   it should be done.

16       Q    Let's talk about the first point that you

17   mentioned.  Did you read Professor Carlton's testimony that

18   it wouldn't make any difference significantly to his

19   analysis if you took the average of three months for the

20   lifetime values in 2017, rather than choosing the single

21   lowest month for 2017 as he did?

22            Did you see his testimony on that?

23       A    I did.

24       Q    Do you agree with his position on that point?

25       A    No, I don't think it's correct.

1          I think Your Honor's heard a lot about those

2     different -- these data at this point, using the June 2017

3     figure as he did for the lifetime value.

4          Instead of taking the average of the three months

5     where we now have data, April -- excuse me, January, April,

6     and June, the average is 28 percent higher than the low

7     month of June, and I consider that significant.

8     Q     And if you were to use the 28 percent higher

9     average for these three months on the 2017 LTVs, these

10    lifetime values, rather than the lowest number that

11    Professor Carlton picked, does it affect the results of your

12    bargaining model in a similar manner?

13    A     Actually, in a more pronounced manner.

14         When you feed this through the model and account

15    for the elimination of the double marginalization, the net

16    increase in MVPD costs, if you use the average of the three

17    months, is about three times the number that he calculated

18    using the June figure alone.

19    Q     Now, why would you choose -- just explain to His

20    Honor, why would you choose multiple months versus looking

21    at a single month as an economist looking at these issues?

22    A     I think it's simply a matter of reliability.

23         We know the month-to-month figures move around.

24    Mr. Christopher talked about that.  And we can see in the

25    numbers they move around.

1          So any one number, you know, it could be high; it

2     could be low.  It's more reliable to use the average.

3     I think that's pretty intuitive.

4          The only argument, I think, that's worthy of

5     addressing of using only one month was he did use the last

6     month.  He used June.  So you could say, well, it's more

7     recent.  He did.

8          But I think that's a very weak argument for a

9     number of reasons.

10          For one thing, we know from Mr. Christopher's

11     testimony that the number went up after that.  And

12     Mr. Christopher, we have from his testimony the July figure,

13     which he said was pretty nearly final, didn't think it would

14     change much at all, was about 10 percent higher than the

15     June figure right there, and we had some figures for

16     subsequent months that weren't quite as -- weren't finalized

17     yet.  So there's that fact.

18          And then there's also just the fact that if we're

19     doing merger analysis and we're talking about evaluating a

20     merger that will have substantial effects for years to come,

21     I think it would be a mistake just to take one month that

22     happens to be the low one and do an analysis based on that

23     alone.

24     Q    Let's talk about a different topic with respect to

25     margins, and this would be the point you raised earlier

1   about the value to AT&T to its existing subscribers, versus

2   the new subscribers.

3           Now, Professor Carlton criticized your statement

4   that your profit margins were conservative because retaining

5   current subscribers is more valuable to AT&T than gaining

6   new subscribers.

7           And he went on to say that you provided no

8   quantification of this effect.

9           Do you recall his testimony on this subject?

10      A    I do.

11      Q    What's your response to Professor Carlton on this

12   point?

13      A    Well, I did provide quantification in my initial

14   report.  I pointed this issue out.  And the numbers there

15   show that the value of existing subscribers was between 150

16   and 225 percent as large as new subscribers.  So roughly

17   twice as big, let's say, but there's a range.

18           So I did quantify this, and it's substantial.

19           MR. PETROCELLI:  Your Honor, may I approach?

20           THE COURT:  You may.

21           (Sealed bench conference)

22           MR. PETROCELLI:  I am concerned that in violation

23   of your Court's order yesterday, the witness is trying to

24   quantify numbers that previously have not been disclosed.

25           He said something like, I don't know, two or three

1   hundred.  He gave some big number just now, okay?  And

2   he said it's in his report.

3           THE COURT:  150 percent, I think he said.

4           MR. PETROCELLI:  Yeah, something like that.

5           And my team there is shaking their head.  They're

6   not sure if this number appears anywhere in his report.  So

7   I would simply ask Mr. Welsh just to have the witness point

8   it out where it is in his report; otherwise, I have an

9   objection to it if it's not in the report, Your Honor.

10          THE COURT:  Do you know off the top of your head

11  if it's in the report?

12          MR. WELSH:  It's in a footnote in his report.

13          MR. PETROCELLI:  Is that footnote 414?

14          MR. WELSH:  414.

15          MR. PETROCELLI:  But there's no quantification in

16  there.

17          MR. WELSH:  I'll ask the witness to put the

18  footnote in front of him and have him explain to Your Honor

19  why he sees that as a quantification.  That's his testimony.

20          MR. PETROCELLI:  Do you see what's happened here,

21  Your Honor?

22          THE COURT:  No.

23          MR. PETROCELLI:  Let me tell you what's happened

24  here.  If we look at the footnote, we're not going to see a

25  quantification.  And the witness just gave a quantification,

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    and the representation is that it was in his report.

 2            What I'm now hearing Mr. Welsh say is that this

 3    number that we just heard is not his in his report.  But you

 4    have to do some calculation in order to derive it.

 5            MR. WELSH:  I think he said it's about twice as

 6    much.  And I think that that's in the footnote, if you look

 7    at the -- there's numbers in the footnote.  It's a lengthy

 8    footnote.

 9            MR. PETROCELLI:  Can we take a look at that,

10    Your Honor?  Because I don't think he ought to be permitted

11    to do quantification.

12            MR. WELSH:  I have a copy of it here.

13            THE COURT:  Look at the report.

14            MR. PETROCELLI:  Show him where it says -- what

15    was his number, 150 percent or something like that?

16            THE COURT:  I thought he just said 150.  We can

17    have it read back if we have to.  I thought he said --

18            MR. WELSH:  This is the footnote.  It talks about

19    underestimating the benefit of retaining current

20    subscribers.  He goes on to say, "Keeping such subscribers

21    is likely more valuable to MVPDs than gaining new

22    subscribers, and the evidence shows that AT&T factors this

23    into its decision-making."

24    ████████████████████████████    ███████████████████████████████

25    ███████████████████████████████████████████████████    ██████████

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3816

1  ██████████████████████████████████████████

2  ████████████████████████████████████████

3  ████████████████

4         This is what he considers to be the

5  quantification, and I'm happy to go back and draw this out

6  from the witness.  But that's -- these are the

7  quantification figures that he's talking about.

8         THE COURT:  So what he just said, this is the

9  underlying theoretical basis for what he just said?

10        MR. WELSH:  That's correct.

11        MR. PETROCELLI:  Where is the -- 150 percent of

12  what number?

13        THE COURT:  If I remember it correctly --

14        MR. PETROCELLI:  Or whatever the percentage is.

15        What is -- 150 percent of what?

16        MR. WELSH:  I'm going to confess that I'm

17  math-challenged.  But I know that what he would say is he's

18  looking at these numbers in this footnote.  And this is the

19  basis for it.  And I'm happy to just ask him that on the

20  record.

21        THE COURT:  Yeah.  Why don't you have him link

22  whatever it is he just said to that theoretical underpinning

23  that's in that.  That's 144?

24        MR. PETROCELLI:  414, Your Honor.

25        THE COURT:  Excuse me.  414Hren.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. WELSH:  Yeah, 414.

2          THE COURT:  414.

3          What page is that?

4          MR. WELSH:  That's 143 to 144.

5          MR. PETROCELLI:  We're going to talk about that,

6     Your Honor.

7          THE COURT:  All right.

8          MR. WELSH:  That's my only question on that

9     subject.

10          But I'm happy to go back and just link it up.

11          THE COURT:  Yeah, just have him link it together.

12          MR. WELSH:  Can I approach him with the

13     transcript?

14          THE COURT:  Oh, yeah.

15          MR. WELSH:  Okay.

16          MR. PETROCELLI:  Thank you, Your Honor.

17          THE COURT:  All right.

18          (Open court)

19          THE COURT:  You may proceed.

20          MR. WELSH:  May I approach the witness,

21     Your Honor?

22          THE COURT:  Consistent with our discussion at the

23     bench here.

24          MR. WELSH:  Yes, Your Honor.

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   BY MR. WELSH:

 2       Q    Professor, we were just discussing the

 3   quantification question about the existing subscribers

 4   versus the new adds.  And you testified loosely, I think,

 5   that it was about twice as much.

 6            I want to ask you, sir, if you -- you have in

 7   front of you your initial report.  I think you said that

 8   this was in your initial report.

 9            Can you point out to His Honor where this, where

10   you're finding this, where the basis is for your statement.

11       A    Yes, I can.

12            This is in my initial report on page 144 in the

13   footnote, which is long footnote.  It spills over from

14   page 143.

15            Well, should I read this?  I guess I will.

16            MR. PETROCELLI:  No, Your Honor.

17            THE WITNESS:  What do you want me to do?

18   BY MR. WELSH:

19       Q    Don't read it into the record.  But if you could

20   just explain to His Honor, is the basis for what you just

21   testified to, is that in this footnote?  And maybe you could

22   just generally explain to His Honor how we get there.

23       A    Okay.

24            So there's three measures of value that I

25   mentioned in the footnote:  the lifetime value, which is the
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   new ads we've been talking about; the active customer value,

2   ACV; and the lost customer value.

3            The latter two relate more to the value to AT&T of

4   retaining subscribers, and those are the significantly

5   larger numbers that I was referring to in my previous

6   answer.

7            THE COURT:  And those numbers come from the

8   Altman Vilandrie report?

9            THE WITNESS:  No, sir.

10           These are numbers from AT&T documents.  There's

11  two or three AT&T documents cited here where they were

12  concerned about losing subscribers and were trying to figure

13  out how bad that would be for them.  And so the value of

14  those subscribers to them, which is exactly the concern --

15  what I'm trying to measure.

16           THE COURT:  Okay.

17           MR. WELSH:  Is that satisfactory, Your Honor?

18           Thank you.

19  BY MR. WELSH:

20      Q    You can put that to the side, Professor.

21  Thank you very much.

22           Now, Professor, can you explain to His Honor why

23  this subject about the existing subscriber values, why this

24  matters to your analysis.

25      A    Well, first, over the longer term, if there's a

1    blackout of Turner on Charter -- I'll stick with that -- an

2    important benefit to AT&T-DirecTV is that they will retain

3    subscribers; they'll have reduced churn.

4            And if that value is high, then all the effects

5    I'm talking about, bargaining model, are higher.  And

6    so this higher number we're now talking about is what gives

7    me a higher end of my range.

8            And I had done an analysis with the lower numbers

9    for the gross adds.  Those are lower because we have to take

10   out all the costs of getting the subscribers, the subscriber

11   acquisition costs.

12           So the higher numbers mean there's more value to

13   AT&T of that blackout on Charter, and it gives them more

14   leverage in the bargaining.  And it's a significant factor.

15           So that's the answer.

16   Q     Okay.  Thank you.

17           One last topic on margins.

18           Professor, did you read Professor Carlton's

19   testimony that there was nothing in the underlying documents

20   that he reviewed to support the idea that customers gained

21   by DirecTV because of a Turner blackout would be especially

22   valuable?

23           Do you recall that testimony?

24   A     I do.

25   Q     Sir, do you have a response to that?

1       A    I do.

2           I think there is some very pertinent evidence in

3   the record that I did mention.  There was a temporary

4   blackout of Fox, under the Fox programming on Dish.  And, as

5   a result of that, AT&T gained some subscribers.  And they

6   observe that these subscribers were especially valuable, the

7   super-low risk.

8           And as -- the way I think about it at least was,

9   these are subscribers who generally don't move around, but

10  they left because of the backout.  So they're kind of

11  sticky.

12          So if they unstick from Dish and they move over to

13  DirecTV, they're going to probably stick around for a while.

14  And so they're valuable.

15          And this is directly relevant evidence, in terms

16  of the type of subscribers that DirecTV would pick up if

17  there were a blackout of Turner content on any other MVPD.

18  So I think we do have evidence on that, and I cited it.

19      Q    And how does that affect your analysis?

20      A    Again, the higher the value of these subscribers

21  are to AT&T, the more bargaining leverage they get, and

22  they -- larger the effects that I'm measuring, that I'm

23  quantifying, and the greater consumer harm in the end.

24      Q    Now, Professor Carlton also criticized you by

25  presenting a chart to His Honor when he was here that had

1   lot of red numbers on it.

2        Do you remember that chart?

3   A   I do.

4   Q   And what was your response -- what's your response

5   to what Professor Carlton did there?

6   A   I think it's easy to produce a chart with a lot of

7   red numbers.  I can produce a chart with a lot of black

8   numbers.

9        And the reason they're getting the red numbers is

10  because there's a credit that I've acknowledged for the

11  efficiencies, elimination of double marginalization.

12  So if you peck away sufficiently at the harms, you'll end up

13  with these red numbers.  So that's what's going on.

14       But in the end, it's not how many numbers you can

15  produce or what colors they are.  It's, what are the

16  reliable numbers?  What are the best estimates?

17       And I am -- that's why I'm here today, to tell

18  Your Honor, well, I think my inputs are well supported.  And

19  so the red numbers come from making changes that I don't

20  think are justified based on the underlying evidence.

21  Q   Let's change topics now.  Let's talk about the

22  estimates of consumer harm here.

23       Now, Professor Carlton testified about how you

24  calculated the amount of increased MVPD costs that would be

25  passed through to consumers.  Do you remember his testimony

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3823

```
 1   on that subject generally?

 2        A    I do.

 3        Q    And Professor Carlton called the model that you

 4   used as being a basic model, I think, was his words.

 5             Do you recall that?

 6        A    I do.

 7        Q    What's your response to Professor Carlton's

 8   statement about this point?

 9        A    Well, just to be clear, Your Honor, now we're

10   talking about -- this is not the bargaining model.  This is

11   the model of how the MVPDs compete and set their prices,

12   which we're using to see about how cost changes are passed

13   through to consumer prices.

14             And so I think he and I are agreeing that the

15   model I used is kind of a basic off-the-shelf model of

16   competition, price competition.

17             So we agree on that.

18        Q    Now, he also suggested that the model can

19   sometimes have, I think he called it, peculiar implications.

20             Do you remember his testimony there?

21        A    I do.

22        Q    Do your findings -- Professor, do your findings

23   regarding consumer harm here depend upon peculiar

24   implications of the model you applied to MVPDs?

25        A    Not in my view.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1          Part of what Professor Carlton was referring to

 2     there, I believe, were the pass-through rates, how much of

 3     the costs of MVPDs, cost change due to the Turner content,

 4     how much of those costs will get passed through and show up

 5     in the form of higher prices paid my consumers for their

 6     pay-TV service.

 7          So the pass-through rates are very important.  And

 8     I believe he -- one of the things he's referring to was the

 9     fact that in this modeling exercise, the harm to consumers,

10     millions of dollars per year, was greater than the net

11     increase in MVPD costs.

12          And you -- Your Honor, actually noticed this as

13     well at the end of my testimony.  And so I don't --

14     I wouldn't call that peculiar, but I think it does warrant

15     some explanation.

16     Q    Okay.

17     A    And he did seem to be mentioning that point as

18     well.

19     Q    Now, after reading Professor Carlton's testimony,

20     do you believe that the pass-through rates that you derived

21     using your standard merger simulation model are reliable?

22     A    I do.

23          This is a feature of the standard model in this

24     setting.

25          And here's what is going on, Your Honor.

1      The AT&T –– let's say DirecTV is experiencing

2  lower costs.  That's the efficiency I've accredited it.  And

3  they passed those lower costs on to some degree in the form

4  of lower prices for their customers.  That's part of what

5  I'm expecting, predicting, actually.

6      But all their competitors are experiencing higher

7  costs for the Turner content.

8      So this is an asymmetric situation.  One firm,

9  DirecTV, has lower costs.  Everybody else has higher costs.

10      So AT&T, there's kind of two things that are

11  warring in terms of what happens.  They're tempted to lower

12  their price because their costs went down, but they're also

13  tempted to raise their price because all their competitors

14  did.  All the competitors are raising the price.

15      When you work that through, the model shows that

16  AT&T only lowers their price 22 percent as much as their

17  costs went down.  So a lowish pass-through rate for them.

18      While as everybody else, since all of them are

19  experiencing these cost increases for Turner, their

20  pass-through rate as a group is 62 percent.

21      So the pass-through rate for AT&T is 20s.  The

22  pass-through rate for the others as a group is 60s.  Both of

23  those, on its face, would seem reasonable.  I mean, they're

24  between 0 and 100 percent, so there's a partial pass-through

25  of costs.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          And when you then put that in -- when you do the

2     arithmetic with that, you end up with the result that was

3     more surprising, which is the overall consumer harm is

4     greater than the net MVPD costs.

5          So that's what's going on.  It's different

6     pass-through rates for AT&T versus their rivals and then

7     added up.

8     Q     So I understand that.  Why are the pass-through

9     rates then different for AT&T versus the other MVPDs?  Can

10    you explain that?

11    A     So because from AT&T's point of view they -- I'll

12    say DirecTV.  They, like I said, they wanted -- they have an

13    incentive to lower their price because their costs went

14    down.  And they do lower their price some.

15         But since all of their competitors, in any given

16    region, are experiencing a price increase, that pulls up

17    their -- that's the countervailing incentive.

18         And while as the other competitors, they're going

19    to be raising their prices more, because it's only the one

20    competitor at DirecTV to them who has the lower price.

21         So it's not symmetric, like I said, and that's

22    what gives us this result.

23         The surprising bottom line, if you will, it does

24    follow from arithmetic once you use the 22 percent and the

25    62 percent pass-through rates.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q      Thank you.

2             Now, is there an alternative here, Professor, to

3      using a merger simulation model to assess the downstream

4      consumer price effects?

5      A      Yes.  The alternative is simply to take the net

6      MVPD cost changes -- that was the $235 million a year at the

7      low end that I mentioned -- and just use that and use that

8      and apply a pass-through rate to that number.  I suggested

9      75 percent to 100 percent.

10            It would gave somewhat lower numbers than I'm

11     giving for consumer harm, but you could get there without

12     using this downstream model of competition at all, okay?

13            The point of the model downstream is to have what

14     I think of as a more accurate or better way of calculating

15     this pass-through.  But if you don't use it, you can get

16     somewhat lower numbers.

17     Q      Let's change subjects.  I want to talk to you

18     about efficiencies.

19            I have one question for you on efficiencies.

20            Professor, how does the distinction between fixed

21     and variable costs help guide the merger analysis?

22     A      Well, so I better define the terms first.

23            So variable costs are costs that the company

24     incurs that vary with, depending on how much out output it

25     produces.  It's often used if you think of a manufacturing

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18   Page 3694 of 3826

3828

1   setting.  If you're making automobiles, you make more cars,

2   you're going to need more labor; you're going to need more

3   raw materials.  Those are variable costs.

4       But headquarters costs are not going to vary if

5   you make more cars this month or this quarter.  So those

6   would be fixed.  Okay?

7       So those are the two categories.

8       And it's basic microeconomics.  I guess that when

9   a firm's variable costs go down, they will tend to lower

10  their price.  We've been talking about that actually.

11      But if the fixed costs go down, it doesn't have

12  the same effect, okay?  And that's just -- that's the way

13  the economics work.  I can explain more if you want.

14      And so for that reason, in merger analysis, if

15  we're looking at how efficiencies affect prices, we focus

16  very much on variable costs.

17      And if we think a merger might cause prices to go

18  up and we're asking if there's some offsetting efficiency,

19  we would look to the variable cost efficiencies because

20  those are the ones with that would put the downward pressure

21  on price but not the fixed costs.

22  Q    Let's move to the final topic here.  I want to

23  talk about prior vertical mergers.

24      Professor Carlton testified that the evidence that

25  he's seen from prior vertical deals is the best evidence to

1   assess your claim that prices will go up after the merger.

2          Do you recall his testimony on that subject?

3      A    I do.

4      Q    Now, first off, Professor, can you explain to His

5   Honor how you think about evidence from prior transactions

6   when you're looking at merger analysis?  Can you explain

7   that?

8      A    Yes, I would like to.

9          So, first, Your Honor, I would want to make very

10  clear, I agree with Professor Carlton, that looking at prior

11  transactions is a good thing to do for trying to evaluate a

12  transaction in front of us that hasn't happened yet.  So

13  that's agreement.

14          But I want to flag for you and emphasize three

15  cautions in doing that that apply in general.  I'm not even

16  talking about this case yet.  I'm just talking general.

17          First, are the prior transactions, are they very

18  similar to the current one?  If they're not very similar,

19  they're not going to be as informative, in terms of either

20  the transactions themselves or the market conditions when

21  they took place.  So how close is the analogy, the analog?

22  I think it's common sense.

23          The second point is, how good is our data to

24  evaluate the prior transactions?

25          The fact is that economists in my field, we love

1   the idea of looking at merger retrospectives, is the term we

2   use, because what happened, that's -- that's the evidence.

3   And there's a lot of literature on that.

4           But very often, we just have trouble telling what

5   happened.  You know, we have a hospital merger, and the

6   prices went up.  But is that because of the merger, or is it

7   because of something else that went on?  Overall market

8   conditions?  Other costs went up as a result?

9           Or maybe we don't have very good data on what

10  happened because it's confidential prices.  So you just want

11  to ask, how good is our data?

12          A lot of the time we can't tell what the effect of

13  a merger is because we don't have good enough data.  And

14  when we can, we're happy.  That's good.

15          But just be careful.  How good is the data?

16  That's my second point.

17          And the third is if there's an antitrust remedy,

18  then it's not going to give to clean test of a merger, at

19  least unless the merger currently under study is also

20  remediated in a comparable way.

21  Q   So we have the general observations there.  Let's

22  talk about, more specifically, as to Professor Carlton's

23  criticisms of, as it might apply here.

24          Professor Carlton criticized your modeling by

25  saying that there's nothing like 20 percent price increases

1    for Turner content based on the industry data that he's

2    looked at.

3              Do you remember his criticism on that?

4         A    I do.

5         Q    Can you -- what's your response?

6         A    So we have the first point about, are these other

7    transactions analogous?  But then we have a -- the main

8    point I want to emphasize here is the problems with the

9    data.

10             So a lot of Professor Carlton's analysis uses this

11   SNL Kagan data.  And it's pretty poor for these purposes.

12             And there are two fundamental problems with the

13   data.  One is that SNL Kagan is relying on public sources.

14   They don't have the particular contracts and the rates the

15   way we have them from discovery.

16             And so -- and they report a rate charged for a

17   network or a group of content to all of the distributors on

18   average, okay?

19             So when we're looking at mergers, I mean, such as

20   this one, I'm predicting -- and vertical integration, some

21   rates will go up; some rates will go down.  They're just

22   looking at an average.  So it's much harder to detect the

23   effects because they just have an average.

24             And that includes what is the price within the

25   vertically integrated company for content, which is not a

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    real market price.

2         So that's just a fundamental problem with those

3    data, because they're relying on public sources and doing an

4    average.  So there's kind of a schmearing going on that

5    makes it harder to find stuff we're looking for.  It's like

6    you have the binoculars, but they're out of focus.

7         The other thing is the presence of long-term

8    contracts, is we know there are these multi-year contracts

9    between programmers and distributors.  So when we have a

10   transaction in the industry, a vertical merger or

11   disintegration, the effects of that will only be felt over

12   time.

13        And SNL Kagan doesn't have the data on the length

14   of these different contracts because that tends to be

15   confidential.  So there's a schmearing over time, as well as

16   across average in the industry.

17        So that's a lot of -- that's serious limitations

18   on these data.  It's not Professor Carlton's fault.  That's

19   just the data.

20        And so we're trying to take the binoculars, look

21   closely at what happened, and they're either really poor

22   binoculars or they're out of focus.  So we don't see what

23   we're looking for.  It's just not a very strong test.  So

24   you just -- just be careful about that.

25        Q    So let's put the SNL Kagan data to the side.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3833

```
 1          Professor Carlton also testified about using

 2    DirecTV data to claim that there's just no evidence that

 3    vertical integration has a significant effect on raising

 4    prices.

 5          Do you remember his testimony on that?

 6     A    Yes.  This is DirecTV data you're asking about.

 7     Q    Yes.

 8     A    Okay.  I'm with you.

 9     Q    Okay.  What's your response to this point?

10     A    Well, this is better data, okay, because now we're

11    talking about DirecTV's own data.

12          But the problem here is that we know that in

13    evaluating the Comcast-NBCU merger and from the DirecTV data

14    is that for five years, the first five years after the

15    merger, they were paying rates under a long-term agreement

16    that had been negotiated before that merger.

17          So then we have a renegotiation in 2016.  And we

18    can talk about that, and he has a chart about that.  But you

19    just need to understand that's one event, one renegotiation.

20    And so we can look at what happened, but you have to be

21    careful not over-interpreting the one -- what that one data

22    point is, effectively.

23          MR. WELSH:  Your Honor, I have a demonstrative

24    that Professor Carlton used, which was DXD0113.

25          May I approach?
```

```
 1              THE COURT:  You may.

 2              MR. WELSH:  May I approach the witness,

 3    Your Honor?

 4              THE COURT:  You may.

 5              MR. WELSH:  Your Honor, I've handed a copy of

 6    DXD0113 to opposing counsel.

 7              May I proceed?

 8              THE COURT:  You may.

 9    BY MR. WELSH:

10        Q    Professor Shapiro, you have DXD0113 in front of

11    you.  This is the demonstrative that Professor Carlton used

12    in court.  Can you explain to His Honor what you draw from

13    this in terms of your response to Professor Carlton?

14        A    Yes, certainly.

15              So the blue line, the blue kink line is the NBCU

16    rates that he's indexed; and he's comparing that to the

17    black line, which is the other networks.

18              So through 2016, whatever the blue line tracks,

19    that based on the contract from before the merger.  So that

20    doesn't tell us anything about the effects of the merger.

21              After that, we can learn something.  And we see

22    there's a significant increase in rates right away under

23    that contract, and then there's some further escalation in

24    the contract.

25              I just don't think we can get much from this in
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3835

1    terms of effects of the merger.

2            We do see a significant increase right away in the

3    first year, very substantial, actually.

4            And we also -- just let's remember, this also was

5    done in the shadow of the FCC order that applied to Comcast

6    and NBCU.

7        Q    Thank you.

8            Now, Professor Carlton testified that the very

9    fact that you're seeing vertical disintegration in this

10   industry is antithetical to the government's position.

11           Do you remember his testimony there?

12       A    I noticed that.

13       Q    What's your response to that comment by

14   Professor Carlton?

15       A    I disagree.  I think it's an error.

16           So here's why.  If we look at the Time Warner

17   disintegration with Time Warner Cable, which I believe is

18   what he's referring to, that in no way disproves or rejects

19   the theory I'm putting forward, Your Honor.

20           Mr. Bewkes was asked why they spun off

21   Time Warner Cable.  And he gave an answer that made lot of

22   sense to me.  He said it was primarily for financial

23   purposes.

24           There were different sets of investors who were

25   interested in the cable company, which had a more steady

1    stream of earnings than those interested in the other part,

2    the Time Warner, what's now Time Warner.

3            And so there were some financial gains.  I think

4    he said you could issue debt more easily against the cable

5    side.  This is more reliable.  Perfectly sensible to me.

6            And there was also the possibility that

7    Time Warner Cable might want to merge with another cable

8    company later for scale, which did happen.

9            So those are perfectly good reasons.  And those --

10   so Professor Carlton seems to have brushed those aside or,

11   I don't know, he did not account for those reasons.

12           And once you do, there's no inconsistency, in my

13   view, between Time Warner choosing to do that ten years ago

14   and the bargaining approach and effect of vertical

15   integration that I'm describing here.  I think they're

16   perfectly consistent.

17       Q   So, Professor, let's go ahead and wrap up here.

18           Despite the criticisms that Professor Carlton has

19   made, do you continue to stand behind your opinions and your

20   belief and your models and the reliability of your inputs?

21       A   Yes.  I came to court today -- and thank you,

22   Your Honor, for letting me come again, appearing here -- to

23   explain why I think a number of these attacks are either in

24   error or there's methodological problems.

25           And so I stand by my opinions, the ranges I've

1    offered, and I hope I've explained why.

2              MR. WELSH:  Thank you, Your Honor.

3              I pass the witness.

4              THE COURT:  All right.

5              I'll see counsel.  You can step down.

6              (Sealed bench conference)

7              THE COURT:  Let's be practical.  I'm going to take

8    the morning recess at some point.  So probably just take it

9    now.

10             You're entitled to your hour, and then we've got

11   redirect and possibly recross.  We're not going to finish

12   today.  I don't see that.

13             MR. PETROCELLI:  Really?

14             THE COURT:  Not if you take your hour.

15             MR. PETROCELLI:  Oh, well, I'll do less than an

16   hour.

17             THE WITNESS:  I'm not telling you to do less than

18   an hour.

19             MR. WELSH:  He wants to go back to L.A.

20             MR. PETROCELLI:  I've got to get you out of here

21   by 1:00.

22             THE COURT:  Well, no.  We can come back Thursday.

23   We can come back Thursday afternoon.  There's no magic to

24   that.

25             MR. PETROCELLI:  Unless Your Honor feels the need

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3838

```
 1   to have us come back.

 2             Let me see.

 3             THE COURT:  I mean, if we take a 15-minute break

 4   right now.

 5             MR. PETROCELLI:  How about if we take a ten-minute

 6   break and maybe I go a half hour?  Put the witness on a

 7   short leash and make him answer my questions.

 8             MR. WELSH:  That makes sense to us going a half

 9   hour and a ten-minute break.

10             THE COURT:  I don't -- we'll take a 10-minute

11   break.  It's not a problem.  I worry about my court

12   reporter.  But that's my -- he works/she works very hard,

13   and they need a break.  And they -- they're doing this very

14   hard concentrating --

15             MR. WELSH:  Right.

16             THE COURT:  -- especially when people start

17   speaking quickly.  And some of our experts speak quickly.

18   Sometimes our lawyers speak quickly.  So I have to protect

19   my court reporters too.

20             MR. PETROCELLI:  Okay.

21             THE COURT:  I'm not telling you you've got to be

22   done today.  I'm just -- I want to be clear to both sides.

23   As far as I can see, you went five minutes less than your

24   hour, which is commendable.

25             MR. WELSH:  Thank you.
```

```
 1              THE COURT:  It is commendable, very commendable.

 2              MR. WELSH:  Thank you.

 3              THE COURT:  But I don't want you, Mr. Petrocelli,

 4   to feel that you have to rush or that you have to cut it

 5   short.

 6              MR. PETROCELLI:  Okay.

 7              THE COURT:  I want to be extremely clear about

 8   that.

 9              MR. PETROCELLI:  Well, I would feel that way.  Why

10   don't I just do my best and we'll stop when we have to stop.

11              THE COURT:  That's fine.

12              But you have to break at 1:00, no later than 1:00,

13   if I'm going to make my train.  So I am more than happy to

14   reconvene on Thursday to complete whatever needs to be

15   completed, whether it be your cross, your cross and his

16   direct, your recross and his redirect, whatever.

17              So I don't want anyone to feel like I didn't get

18   my full chance to do what I needed to do.  I want to be

19   crystal clear about that.

20              So you talk.  We'll take the break right now.  You

21   talk to your team, and you talk to your team.  But that's

22   where I stand on this issue.

23              MR. PETROCELLI:  Your Honor, if we have to come

24   back and complete it --

25              THE COURT:  Come back at 2:30 on Thursday.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          MR. PETROCELLI:  The redirect, if he does any,

2   should be limited to appropriate redirect.  I don't want a

3   whole other new examination just because there's more time.

4          THE COURT:  Redirect is redirect.  It's not a

5   whole new examination, obviously.

6          And as it is, we're going to have to do a

7   conference call on Thursday anyway to talk about closing

8   arguments.

9          MR. WELSH:  Okay.

10          THE COURT:  Because I've got some new thoughts on

11   that subject, too.

12          MR. PETROCELLI:  We're still going to do it on the

13   30th, right?

14          THE COURT:  Yes.  I thought about it, the amount

15   of time, how to stagger it, that kind of thing.

16          MR. PETROCELLI:  Okay.

17          THE COURT:  But we can do that with a conference

18   call if we're not back for taking evidence.

19          The other advantage to finishing this Thursday for

20   you all, and just talking, spitballing, as they say, the

21   clock doesn't start running until Thursday.

22          MR. PETROCELLI:  Yeah, on the findings.

23          MR. WELSH:  Proposed findings, that's right.

24          THE COURT:  So you know your teams better than

25   I know your teams, obviously.  And that gives them till next

1    Thursday as opposed to the next Tuesday.  I'm just saying.

2    You think about that.  That's up to you all to make your

3    call.

4              MR. PETROCELLI:  Okay.

5              THE COURT:  The bottom line remains, I don't want

6    anyone feeling that they didn't get their fair opportunity

7    to do their examinations.  There's no magic to today,

8    per se.  I mean, I will be back Thursday.  We can reconvene

9    at 2:30 on Thursday if we have to.

10             So talk to your teams.  Figure that part out.

11             And the only thing you need to know for sure is by

12   1:00 today, I have to be out.

13             MR. PETROCELLI:  And if 1:00 is cutting it short

14   before, if you need to leave before 1:00 and we have come

15   back on Thursday, that's fine.

16             MR. WELSH:  Let's see how counsel does with his

17   examination because I wouldn't mind getting

18   Professor Shapiro -- I don't know what his schedule is on

19   Thursday.  I haven't talked to him about that because

20   I though we would get him on and off today.  So I would

21   certainly prefer to do that.  Maybe we can just see where

22   defense counsel ends up with the examination.  If we break

23   and come back, that will an hour.

24             THE COURT:  As you know, these things take on a

25   life of their own.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3842

```
 1            MR. WELSH:  I understand.

 2            THE COURT:  And we can be in the middle of a

 3     direct or a cross and all of a sudden you see new angles,

 4     you see new tributaries that you need to pursue.  They have

 5     a way of taking on their own life.  So there's some food for

 6     thought right there, okay?

 7            MR. WELSH:  Thank you, Your Honor.

 8            MR. PETROCELLI:  Thank you, Your Honor.

 9            THE COURT:  All right.

10            (Open court)

11            THE COURT:  Professor, we're going to take the

12     morning recess.  You are a witness under oath in the case.

13     You know the rules.  Refrain from discussing your testimony

14     so far or what it might be when you return with anyone.

15     Stay independent of all others, okay?

16            THE WITNESS:  Yes, sir.

17            THE COURT:  See you back in 15 minutes.

18            THE WITNESS:  Okay.

19            THE COURT:  All right.  We'll stand in recess.

20            DEPUTY CLERK:  All rise.

21            This Honorable Court will now take a brief recess.

22            (Recess from 11:44 a.m. to 12:00 a.m.)

23            DEPUTY CLERK:  The United States District Court

24     for the District of Columbia is again in session, the

25     Honorable Richard J. Leon presiding.  God save the United
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   States and this Honorable Court.  Please be seated and come

2   to order.

3         MR. PETROCELLI:  May I proceed, Your Honor?

4         THE COURT:  When you're ready.

5                    CROSS-EXAMINATION

6   BY MR. PETROCELLI:

7       Q    Good morning, Professor.  We meet again.

8       A    Hello.

9       Q    You closed your direct examination by saying you

10  stand by all your opinions.

11          Do you remember that?

12      A    Yes.

13      Q    And one of the opinions you stand by is your use

14  of a profit margin based on the second quarter of 2016,

15  almost two years ago, correct?

16      A    I stand by those calculations; but I also said

17  it would be reasonable to use the 2017 margins if one did it

18  in the context of the rest of my analysis.

19      Q    Now, let's talk about your failure to use any

20  margins more current than the second quarter of 2016.

21          Now, first of all, the number you came up with for

22  LTV, for the long-term value, or lifetime value, was 1324,

23  1,324, is that right, for your second quarter of 2016,

24  right?

25      A    I did not come up with that number.  That was the

 1    number from AT&T's documents.

 2         Q    That's the number you used in your calculations,

 3    right?

 4         A    That is correct.

 5         Q    And we went through this, so I'm not going to go

 6    through it again in detail.  But you knew, as of

 7    February 14, when Mr. Christopher testified, that the number

 8    for June of 2017 had dropped from your number of 1324 or

 9    AT&T's number of 1324 down to $821.

10              That was in the very deposition of Mr. Christopher

11    that you cited in your report but apparently never read.

12              Do you remember all that from your trial

13    testimony?

14         A    I do remember talking about that with you.  I do.

15    Yes, sir.

16         Q    And then you also remember that when you issued

17    your rebuttal report, there was additional backup data that

18    was provided for the $821 LTV, together with some prior

19    months, January 2017 and April 2017.

20              Do you recall that?

21         A    That that was provided in the backup materials to

22    Professor Carlton's rebuttal report.

23         Q    On February 26th, right?

24         A    Give or take.  Okay.

25         Q    Well, that was the day.

Case 1:17-cv-02511-RJL ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Document 158 Filed 08/06/18 Page 3711 of 3826

3845

1          A     Okay.

2          Q     So we don't have to give or take.  We actually can

3    be certain.

4          A     Very good.

5          Q     Okay.  As of February 26th, 2018, you had data for

6    not only June 2017 for the 812 LTV, but you also had data

7    for January and April.  Right?

8          A     That is correct.

9          Q     Now, when you gave your deposition on March 8, you

10   did not update your second-quarter 2016 profit margin to

11   reflect this new data, correct?

12         A     That is correct.

13         Q     And when you testified at trial a couple of weeks

14   ago now I guess, you didn't update your calculations to

15   reflect that more recent profit margin data, correct?

16         A     I think I presented the original calculations, but

17   I discussed this newer data that had come later.

18         Q     Now, so you didn't update it, right?  I just want

19   to be clear.

20               MR. WELSH:  Your Honor, may we approach?

21               THE COURT:  Okay.

22               (Sealed bench conference)

23               THE COURT:  What's your objection?

24               MR. WELSH:  First, I think this is going outside

25   the scope.

1          Secondly, I'm confused as to why counsel is asking

2     about whether he's updating when we had more than one

3     discussion about this, that he was not permitted to update,

4     which was what we've had conferences with Your Honor about

5     the last several days.

6          MR. PETROCELLI:  I think he misunderstood my

7     question.

8          I'm just re-setting the table, Your Honor, that

9     this is not controverted because it's in his original trial

10    testimony, that even though he had the 2017 profit margin

11    data, he did not redo his numbers based on that data.

12         I'm not talking about some new calculation that he

13    wanted to get into yesterday which has nothing to do with

14    this stuff this, Your Honor.

15         So I'm just re-setting that he's sticking to his

16    1324.  And what he was arguing in his direct exam,

17    Your Honor, is that he's justified in using an out-of-date

18    profit margin because he think even that margin is too low,

19    for all these other reasons that I'm going to explore with

20    him.

21         THE COURT:  I'll give you leeway.  It's

22    cross-examination.

23         MR. PETROCELLI:  Okay.

24         (Open court)

25         THE COURT:  You may proceed.

1    BY MR. PETROCELLI:

2        Q    So going back to my question, Professor, I'm just

3    establishing, which I think is clear already from the

4    record, that you did not update the 1324 number by using the

5    January, April, and June 2017 numbers, correct?

6        A    When I testified previously, that is correct.

7        Q    Now, you could have done that, but you chose not

8    to do that, right?

9        A    I don't know what's allowed -- it's very unclear

10   to me in this case what I'm allowed to do and not since

11   every time I try to add two numbers together, apparently I'm

12   not allowed to present it to the Court.

13       Q    Well, you didn't seek to file a supplemental

14   report.  Your lawyers didn't ask to follow file a

15   supplemental report before you testified the first time,

16   simply seeking to insert the new profit margin figures from

17   2017, in lieu of the old profit margin figures.

18            That never happened, right?

19       A    I believe what happened was --

20       Q    Can you answer that question?

21       A    -- that the DOJ sought additional discovery.

22            I'm not going to use those numbers until

23   I understand better where they're coming from.  So I just --

24       Q    So the answer to my question is --

25       A    Let me finish my answer.

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3714 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3848

1        Why there are --

2   Q    The answer to my question is that you didn't do

3   it?

4        THE COURT:  Whoa, whoa, whoa.  One at a time,

5   please.

6        Let him finish his answer; then you ask him --

7        THE WITNESS:  There are three months.  They're not

8   even consecutive months.  Okay?  This data was provided very

9   late.  I didn't have it before.

10       It is -- it is not my practice, sir, to take such

11  data without checking it out and use it.

12       My practice would be to look into it more and

13  figure out how reliable it is.

14  Q    And you had every opportunity to do so; but,

15  instead, you stuck to your guns to use a high number that

16  you knew was not reflective of today's profit margin,

17  correct?

18  A    I already explained what I did.

19  Q    Is that correct?  You're sticking to your number

20  because it's higher and it produces a higher price increase.

21  That's the reason you're sticking to it?

22  A    No.  That's completely false.

23       The reason I'm sticking to it at that time was

24  because I did not know enough about the new numbers.

25       Look, this whole problem is created because, as

1    far as I can see, because AT&T, for months, did not provide

2    the data that I would normally expect to get.

3              Fine.  That's where we are.

4        Q    You had --

5        A    Then when I'm given more data later and now we've

6    had the trial, I understand that more; that's why I said

7    this time around, I could see using the 2017 data.  I did

8    not have confidence to do that before.

9        Q    Well, let's use the 2017 data.

10             You said it produces a number three times higher

11   than Professor Carlton's number.

12             Do you recall that?

13       A    For the net increase in annual MVPD cost.

14       Q    And so -- and you know that the number that

15   Professor Carlton used was the most current final number

16   that AT&T has, which was for June 2017, correct?

17       A    I understand his number is based on June 2017,

18   that single month.

19       Q    And you know that's the most current finalized

20   number that the company has, right?

21       A    I agree with that, but I've certainly explained

22   why I think it's a mistake to use that number, but I do know

23   that's what he did.

24       Q    But even if you averaged January, April, and June

25   of 2017, I think you indicated you would come up with a

1  number higher than Professor Carlton's but still

2  significantly lower than yours, right?

3       A    That is true.

4            That is true.  And that would now be the anchor of

5  the very low end of my ranges for this Court.

6       Q    So that number -- the prior number that

7  Professor Carlton utilized, the, I guess the net number was

8  approximately 30 million.  So when you said it was three

9  times higher, that would put the number at 90 million,

10 right?

11      A    It's 98 million.

12      Q    98 million.  Okay.  That would be the net harm to

13 consumers on a, what, annual basis?

14      A    Yes, that's the -- no, it's not consumers, sir.

15           That's the net increase in MVPD costs on an annual

16 basis.

17           Again, that's a very low end.  And in my

18 supplemental report, I showed much higher numbers.  But that

19 would be the new low end, except in the 2017 figures.

20      Q    So 98 million would be the new low end, in lieu of

21 your prior 235 million, correct?

22      A    That is correct.

23      Q    And now, if you run $235 million through the

24 merger simulation model, I think you came out with a 27-cent

25 per-subscriber/per-month overall price increase, taking into

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3851

```
 1    account the DirecTV elimination of double marginalization,

 2    and consequent, lower prices, right?

 3         A    I have $269-million-a-year figure in my head.  But

 4    we could translate it, and we have done that, into per

 5    subscribe/per month.

 6         Q    About 27 cents was the number you had in your

 7    first report, right?

 8         A    Okay.

 9         Q    Okay.

10         A    I want to check, but I'll accept your

11    representation.

12         Q    Okay.

13              But if you used the new low number of 98, you're

14    down to about 13 cents rather than 27 cents, correct?

15         A    Again, that sounds roughly right.  Again, I just

16    feel it's important for the record to be clear, that is

17    absolutely the new low end.  And you are doing the same

18    thing Professor Carlton does, which is forget about the fact

19    that there's a range and that's the low end.  But you're

20    allowed to do that.

21         Q    And you recommended the low range in your opinion.

22    You gave a range.  You had a departure rate, for example, of

23    9 percent.  You had a departure rate of 14 percent.  And you

24    chose 9 percent as the departure rate.  That was the low

25    end, as you said in your report, correct?
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3852

```
 1      A    Apparently, I'm suffering the consequences of

 2   being conservative.

 3      Q    Well, you had good reason to pick the low end.

 4   You were trying to be conservative, in your opinion,

 5   correct?  That's what you just said.

 6           You didn't do it out of the goodness of your

 7   heart?

 8      A    That is true.

 9      Q    Okay.

10      A    So the way I think about these things is that I

11   have a range.  And since the low end of the range led to

12   significant consumer harm, that is what I reported, while

13   noting there was a higher end.  That is what I did.  And

14   that is my normal practice, and I will stick with it.

15      Q    I want to talk about the margins over the last

16   couple of years from the time that you used your 2016 figure

17   to calculate harm in your model.

18           You are aware of Mr. Christopher's trial

19   testimony, I believe after you testified, that margins are

20   going down, right?

21      A    Yes, I am.

22      Q    And you are aware, sir, of the testimony of pretty

23   much every other competitor witness in this case who has

24   testified that their video margins are going down, right?

25      A    Yes.
```

1          And let's make sure we're precise about that, the

2   video margins, because the multiproduct margins are going

3   up.

4      Q    Well, we can address that, too, although you

5   didn't talk about it on your direct exam.

6      A    Fair enough.

7      Q    Mr. Holanda, for example, of RCN testified that

8   his video product margins have decreased by half over the

9   past number of years.

10         You recall that testimony?

11     A    I did not read his testimony, actually.

12     Q    And Mr. Schlichting said that his profit margins

13  are declining.  I know you read his testimony.

14     A    You are correct.

15     Q    And Mr. Hinson of Cox said his margins are going

16  down.

17         Do you recall that?

18     A    I think it is not disputed that the video margins

19  are going down.

20     Q    And so same would be true, then, of Mr. Montemagno

21  of Charter and Mr. Sejen of Cable ONE?

22     A    I don't specifically recall their testimony; but

23  as I said, I don't think this is a point in dispute.

24     Q    So now, when you testified on direct -- and it

25  seemed to me that what you were trying to do is justify this

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   old, obsolete, inflated 1324 profit margin -- you said, "The

 2   larger point now," and then you started talking about this

 3   theory that we should be looking at customers who DirecTV is

 4   retaining because, in your example, Charter, for example,

 5   doesn't have Turner.

 6           Do you recall that?

 7   A    I do.

 8   Q    And you called it the larger point.

 9           Do you remember saying that?

10   A    Okay.  Yes.

11   Q    Now -- and just so we can all understand what this

12   larger point is, what you're talking about is that in the

13   event of a blackout or potential blackout that these

14   negotiators are hypothesizing as the alternative to the deal

15   that you're model assumes they're going to make, DirecTV is

16   realizing that it has some customers who might otherwise

17   leave to go to Charter or elsewhere, but won't go because

18   Charter doesn't have Turner; so, therefore, they're

19   retained.

20           That's the general idea, right?

21   A    Correct.

22   Q    And you're saying that those customers, existing

23   customers, are higher-value customers because they have been

24   at DirecTV; the subscriber acquisition costs have been baked

25   off by now, and they're worth more.  That's the idea of

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    trying to put a higher margin on these existing DirecTV

 2    customers, right?

 3         A    That's the idea.  It's not -- it's what AT&T does.

 4    It's clearly correct.  That's the idea.

 5         Q    Now, to be clear, this larger point now on the

 6    last day of trial that you've argued to the Judge, was

 7    buried in footnote 414 of 300 pages of expert reports,

 8    including some ten appendices.  And this was an appendix

 9    No. 9; is that right?

10         A    I don't know which number appendix.

11         Q    Well, you know, sir --

12         A    We can look -- I letter them, so I don't know the

13    numbers.

14         Q    You know --

15         A    I can look.  If it matters, I can look it up.

16         Q    Why don't you look.  Why don't you look.

17              You know that footnote 414, I think out of a total

18    of 417 footnotes.  It barely made the cut.  In the

19    next-to-last appendix, no less.

20              This much larger point that all of a sudden has

21    become the cornerstone of your margin opinion.

22              Am I correct?  Is it at 414?

23         A    Yes, that's the right number.

24         Q    Is it appendix 9?

25         A    Appendix I, so we could count up.  But let's say

```
 1    it's 9.

 2         Q    Okay.

 3         A    But, look, you've got some nice flare here.  It's

 4    at the very end of a long report on a footnote.  You got me

 5    on that one.

 6         Q    Well, I didn't get you; you got you.

 7         A    Well, I would not draw the same implications that

 8    you seem --

 9         Q    You put it in there.

10         A    -- to be about where it happens to be situated,

11    sir.

12              THE COURT:  All right.  Look, let's move on to the

13    next thing.

14    BY MR. PETROCELLI:

15         Q    Now, you have -- I think as you said there in that

16    footnote, you have actually no way of quantifying the number

17    of people at DirecTV who might be ready to leave but for the

18    fact suddenly that some other MVPD might not have Turner,

19    right?

20         A    No, that's not correct.

21         Q    Okay.  But you have not quantified the number of

22    such people, right?

23         A    No.  I have.  That's part of the subscriber loss

24    rate.

25         Q    Well, but the subscriber loss rate are people that
```

1    are leaving -- were leaving the affected MVPD, plus the

2    reduced number of gross adds, right?

3         A    No, you don't have that right, sir.

4         Q    Well, subscriber loss rate are people who would

5    leave Charter, right, and disperse to different places.

6    That's part one of the loss rate, correct?

7         A    That's part of it.

8         Q    But the overwhelming part of it, I think you said,

9    the most important part of subscriber loss were the

10   reduction in gross adds to Charter because it doesn't have

11   Turner, right?

12        A    Oh, yes, to Charter, that's good, yes.

13        Q    That's what I said before, to Charter.

14        A    It was a little confusing to me.  Maybe I -- I'm

15   with you.

16        Q    Okay.  But you haven't calculated the number of

17   unhappy DirecTV subs who are about to leave DirecTV but

18   decide to stay because Charter doesn't have Turner?

19        A    No.  I have calculated that.

20        Q    Well, what's the number of such people?

21        A    Well, this would be the -- this would be the --

22   it's about 10 percent after countermeasures, I'd have to

23   check.

24        Q    Are you talking about the outside good there when

25   you say "10 percent"?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3858

1        A     No, sir.  No, we're not talking about that.

2        Q     So where did you get the 10 percent?

3        A     So if you go back to the Altman Vilandrie

4    document, they have calculations for what will happen to

5    Charter's existing customers and how many they'll lose and

6    then what'll happen to their ability to get gross adds.

7              So when you use -- that's the number that

8    corresponds to the reduced churn at DirecTV.

9        Q     You mean the prospective customers?

10       A     That's right.  The prospective customers at

11   Charter, because that would be the Charter gross adds that

12   you're talking about.

13             And if they can't, if they lose a certain share of

14   their gross adds a certain number of those would have come

15   from DirecTV.  So that's the number we're now talking about,

16   which is the reduced churn at DirecTV.  So I have calculated

17   that.

18       Q     But it's not 10 percent because 10 percent is the

19   total of lost prospective customers.  They're not all coming

20   from DirecTV?

21       A     No.  That's fair.

22             But that's -- what we're doing is we take that

23   lost gross adds at Charter since they don't have Turner, and

24   then we apply the diversion rate to them.  And that is how I

25   calculate the number you were asking about, which is the

1    reduced churn at AT&T.  And those are the retained

2    subscribers that have this higher value.

3        Q    Now, on that 10 percent, by the way, from the

4    Altman Vilandrie, do you know how they got to 10 percent?

5        A    Well, I have to go back and look at their

6    document.  I have not -- I have not looked at that for a

7    couple of weeks.

8        Q    Well, are you aware, can you tell the Court, then,

9    what part of their methodology did they use to derive this

10   10 percent figure that you use in your analysis as

11   representing the reduced gross adds?

12       A    Let's have a look at the document, and I think

13   I can answer that.

14       Q    The answer is you don't know without looking at

15   the document, correct?

16       A    That is true.

17       Q    And do you know whether it was part of a survey

18   question?

19       A    Again, I don't have these things memorized.  I'd

20   want to look at the document that I relied on.

21       Q    And do you believe that they asked, in their

22   survey -- I'm talking about Altman Vilandrie now, and I'm

23   talking about the derivation of this 10 percent figure that

24   reflects prospective customers.  We're on the same page,

25   right?

1        A    I understand you.

2        Q    Okay.  Is it your belief that in order to come up

3   with that number, they actually surveyed people about

4   whether or not they would decline to join Charter if Charter

5   did not have Turner?  Is that your belief?

6        A    Again, I was not testifying about that here

7   earlier.  I don't have that memorized.  I would just need to

8   look at the document.  I don't have any particular belief

9   except that I need to look at the document.

10       Q    So what if I told you, sir, that in the

11   Altman Vilandrie -- and to be clear, you have previously

12   testified that you're not familiar with the Altman Vilandrie

13   work product, other than you read the report, correct?

14       A    And then subsequently reading Mr. Bewley's

15   testimony about it.

16       Q    But you didn't talk to anybody at

17   Altman Vilandrie, correct?

18       A    As we -- that's correct, as we discussed

19   previously.

20       Q    And you didn't talk to anybody at Charter about

21   the project?

22       A    No, not -- I did not talk to them directly.

23       Q    And you didn't even get all the documents from

24   DOJ.  We went over that last time, including the original,

25   final report, right?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      A    I don't have anything more to add from last time.

2   I used the report that I've cited in my report.

3      Q    They didn't even give you the cover emails that

4   indicated that they had previously sent a final slide

5   presentation on April 21.  You got the one on April 27,

6   correct?

7            MR. WELSH:  Objection, Your Honor.

8            THE COURT:  You can approach.

9            (Sealed bench conference)

10            MR. WELSH:  We seem to be retreading old ground

11   here in prior testimony as to the witness when he was here

12   the first time, and it seems to me outside the scope.

13            MR. PETROCELLI:  So here's why this is highly

14   relevant, Your Honor.  And he just said that he relied on

15   this 10 percent figure at Altman Vilandrie.  He has no idea

16   where that figure comes from.

17            It turns out, Your Honor, they did no work

18   whatsoever with Altman Vilandrie to survey any prospective

19   customers about whether they would decline or refuse to join

20   an MVPD if it they didn't have Turner, yet that's the

21   overwhelming basis of his reliance on that document.  He

22   doesn't even know what's underneath it.

23            He has not read the survey questions.  He doesn't

24   know that the survey questions don't include questions

25   directed to this.

1          And, in fact, on the face of the document I'm

2    about to show him, it indicates that those numbers were

3    simply implied or derived.

4          And this, he testified, is the single most

5    important document that he relied on for his model.  He has

6    complete lack of knowledge about what they did.

7          And I want to also point out, Your Honor, that

8    when he testified on direct the last time -- actually, it

9    was on my cross, I think -- he said that if he had used the

10   original numbers that he was not made aware of by DOJ --

11   they had a 5 percent subscriber loss rate, not the 9 that

12   was hard-coded later on, he said that would have led to

13   simply a modest reduction of his departure rate from

14   9 percent to 8.5, because they did not change the key

15   number, which was the 10 percent he's now talking on.

16         It turns out, Your Honor, that was flatly false.

17   They changed not only a 5, but they -- the 10 is a new

18   number too.  It came from the very report that I want to

19   show him that right now, because, Your Honor, his reliance

20   on that report, I believe, is wholly unjustified and

21   eviscerates his whole opinion for his model, because he

22   relies on it for the subscriber loss rate; he relies on it

23   for the cutting the cord; he relies on it for something

24   called countermeasures, which is what people would do to

25   save the subscriber.

1          And so I need to spend a little bit more time

2   demonstrating his utter lack of awareness and his false

3   testimony in his prior examination.

4          THE COURT:  False or inaccurate?

5          MR. PETROCELLI:  I don't know, Your Honor.

6          THE COURT:  It's an important difference between

7   those two things.

8          MR. PETROCELLI:  Well, Your Honor he's had these

9   documents for a long, long time.  So let's just say they

10  were inaccurate, okay?

11         How can they -- how could he get this wrong?  He's

12  been working on this for 16 months.  He gave two expert

13  reports.  He gave a deposition.  He give a trial testimony.

14  And so I'm going to now confront him with that.

15         They can't --

16         THE COURT:  I'll give you a little leeway.

17         MR. PETROCELLI:  Thank you.

18         (Open court)

19         THE COURT:  You may proceed.

20  BY MR. PETROCELLI:

21     Q    So we can establish that all you did was read the

22  report, right?

23     A    I relied on the report.  I didn't dig behind it.

24     Q    And you don't really know how Altman Vilandrie

25  derived their 10 percent customer number that you heavily

1  rely on?

2       A    I don't know sitting here.  I'd have to check the

3  report.

4       Q    Now, you also recall -- when you testified last

5  time about this, you indicated, Professor, that you had not

6  been aware that they had originally came out with a hybrid

7  subscriber loss rate of 5 percent, because you hadn't been

8  shown that document, right?  The first one you saw was the

9  one that had 9 percent.

10           Do you recall that?

11      A    That was from my deposition testimony.

12      Q    Yeah.

13           And that's when you learned for the first time,

14  when you were confronted with this at your deposition,

15  right?

16      A    That's correct.

17      Q    Now -- but when we were together last time, you,

18  I think I was asking you the questions.  I think you said to

19  me that it would not have mattered very much, even had you

20  seen the 5 percent figure, because the key number was the

21  10 percent figure for the prospective customers, and you

22  testified that number was not changed, right?

23      A    Yes.  That that number is more important in the

24  end for calculating the long-term subscriber loss rate;

25  that's correct.

1      Q    But you don't know how they derived that

2   10 percent, right?

3      A    Again, without going back and looking at the

4   study, I can't give you details on that right now.

5      Q    And you said that number had not been changed,

6   like the 5 percent had been changed, right?

7      A    I don't know whether it was changed or not.  I was

8   just indicating that one is in the end, more important.

9      Q    Well, wait a second, sir.  You testified -- let me

10  get it for you.  Okay?

11     A    Well, maybe I can help -- oh, go ahead.

12     Q    Page 2387 of your trial testimony on April 11.

13          "And the other thing, though, is that, as I

14  mentioned, the more important figure in my analysis is -- is

15  the -- is actually what they have as 10 percent, which is

16  the gross -- the new customer rate, because that's what

17  matters in the long term.  And that has much more impact on

18  the long-term subscriber loss rate that I calculate.  And

19  that was not changed here.  What was changed was the

20  short-term rate, the departure rate."

21          Do you recall giving that testimony under oath?

22     A    Okay.  That sounds right.

23     Q    Now, in fact, you were mistaken in giving this

24  testimony, because the 10 percent was also changed from a

25  prior number, correct?

1     A    I don't know about that or whether that may have

2   been a different change than I was referring to.  These are

3   just details I certainly cannot tell you sitting here.

4     Q    Well, let me show you what I had previously shown

5   you, which is the relevant page of the document.  I'll give

6   you Plaintiff's Exhibit 79 and Defendants' Exhibit 684, is

7   it?

8          What I'm going to do, instead, is I'm just going

9   to give you the ones that have just the relevant pages to

10   avoid, so I'm going to hand --

11          MR. PETROCELLI:  Your Honor, may I approach?

12          THE COURT:  You may.

13   BY MR. PETROCELLI:

14     Q    So here's Plaintiff's Exhibit 79.

15          And then I'm going to hand you a demonstrative,

16   Defendants' 10, which is taken from defendants', I believe

17   it's 684.

18          MR. WELSH:  May I have a copy?

19          And, Your Honor, I would object.  The witness

20   should have the full document.

21          THE COURT:  Well, let's see if he needs the full

22   document.  If he does, we can get it for him.

23   BY MR. PETROCELLI:

24     Q    If you need the full documents, I'd be happy to

25   give them to you.  But as I did last time, the numbers

1      you're talking about are only on these pages.

2              So take a look, first, at the one that you saw and

3      you base all your work on, which was Plaintiff's 79.  And

4      you'll see there, under the hybrid method, you'll see actual

5      9 percent for existing customers, correct?

6      A    I see that.

7      Q    And then you go to prospects.

8              And you'll see the 10 percent number that you said

9      was very important, right?

10     A    Yes, that's correct.

11     Q    And -- but you notice how on the 9 percent above

12     it, it says "Actuals."

13             Do you see that?

14     A    I see that.

15     Q    But look under the 10 percent, it says "Implied."

16             Do you see that?

17     A    I do.

18     Q    And we've just established, you don't have any

19     idea how they implied this 10 percent?

20     A    Well, if you want to talk about that, I should see

21     the whole document, which I have mentioned on several

22     answers previously.

23     Q    Now, take a look at Exhibit 10, the

24     demonstrative 10, which is the original slide deck

25     presentation.

1          And you indicated when you were here in court last

2    time that you now see that it shows 5 percent for actuals in

3    the hybrid category, right?

4          A    I see that.

5          Q    And that's the number that you said, when combined

6    with the 10 percent, which you said was not changed, would

7    yield only a modest reduction of your subscriber loss rate

8    from 9 to 8.5 percent, correct?

9          A    That is correct.

10         Q    But if you look directly to the right of the box

11   containing the 5 percent, you see under "Prospects," a

12   number, 6 percent, not 10 percent, correct?

13         A    I see that.

14         Q    So you were wrong when you testified under oath in

15   your trial examination a couple of weeks ago when you said

16   the 10 was not changed.  The 10 was changed from 6, correct?

17         A    Well, to look at this document, that seems to be

18   the case.  So it appears that I was not aware of that

19   change, so I made a mistake on that.  It seems to be

20   correct.

21         Q    And you've been working on this for, what, 16

22   months now --

23         A    Yes.

24         Q    -- with a team of people?

25         A    Yes, I have.

1      Q     Including a whole bunch of people at DOJ,

2   including economists?

3      A     Yes.

4      Q     And so your testimony about 8.5 percent, if you

5   use these lower numbers, is wrong.

6            If you use 5 percent and 6 percent, you don't get

7   8.5 percent, do you?

8      A     I don't know exactly what you get, but this is a

9   good example of how I've been -- I'm using the low numbers,

10  and then you're coming after me.

11           Why don't be look at the 16 percent figures that

12  aren't changed that are for the pure simulation base and the

13  pure STB, just like the 14 percent numbers weren't changed

14  before.  I could have taken an average, and I didn't do

15  that.

16     Q     That was your choice, and you made the choice to

17  rely on these numbers.  And you can go back and question

18  yourself, but I'm questioning you about the very opinions

19  that you rendered.

20     A     But that that's --

21     Q     So bear with me now.

22           On the 5 percent and the 6 percent, if you use

23  those numbers instead of 5 and 10, do you know what that

24  does to your departure rate?

25     A     Well, I think it's going to end up in that range

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    of 5 or 6 percent.

2         Q    Exactly.

3         A    Okay.  That's exactly my point, that if I mention

4    the higher numbers -- I explain in my reports that I was

5    using the lower numbers because -- I explained why, and

6    that's conservative.

7              And it says you're doing exactly the same thing

8    again, which is totally invalid as far as I'm concerned,

9    which is you're taking the low end of a range.  And you've

10   got a good point here in terms of how it was changed --

11             THE COURT:  Sir, you're not here to editorialize.

12   Your counsel will ask you questions if you need to explain

13   something more fully.  Listen to the questions and answer

14   them.

15             THE WITNESS:  I apologize.

16             THE COURT:  That's all right.

17             THE WITNESS:  I get -- I have my views.

18   I apologize.

19             THE COURT:  You're entitled to your views.

20             Okay.  Next question.

21   BY MR. PETROCELLI:

22        Q    And you know that if you use the 5 and the

23   6 percent, rather than the 9 and the 10 percent or the 5 and

24   the 10 percent, it's going to yield a departure rate between

25   5 and 6 percent.  And as you previously testified, that's

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    going to wipe out entirely any price increase, correct?

 2         A    If you just make that change alone, I think we

 3    figured that largely eliminates the net MVPD cost increase.

 4         Q    Now, let me go to another topic, then, since

 5    I think we're -- I think I'm done with Altman Vilandrie,

 6    okay?

 7              Let me go to -- I think we covered margins.

 8    I think I'm going to go to -- briefly on outside good.  You

 9    also relied on Altman Vilandrie for outside good, right?

10         A    That is correct.

11         Q    And they came up with a 16.8 percent number, which

12    you converted to 10 percent after taking into account,

13    I think, market shares, right?

14         A    Yes, that's right.  At least to a 10 percent --

15    that's correct.

16         Q    Now, do you realize that they derive their

17    16.8 percent number that you relied on by coming up with a

18    figure and then reducing it by 40 percent?

19         A    I am aware of that.

20         Q    Were you aware of that when you relied on it?  Or

21    are you just recently aware of it, by reading

22    Professor Rossi's trial testimony?

23         A    I can't remember exactly.

24         Q    But you did read Professor Rossi's trial

25    testimony, where he indicated that Altman Vilandrie
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    inexplicably reduced their outside good figure, their

 2    cord-cutting figure by 40 percent?

 3         A    I'm aware of his testimony.

 4         Q    And you don't have an explanation from the

 5    Altman Vilandrie work product as to why they did that?

 6         A    My understanding is Mr. Bewley explained he did

 7    that based on evidence that reflected market conditions in

 8    Altman Vilandrie, as part of their analysis.

 9         Q    But all you know is what Bewley said, right?

10         A    Well, he's the one who led the study, I think, so

11    that is what I know.

12         Q    So moving past that, let's go to Suddenlink, okay?

13              Now, on Suddenlink, your number through your work

14    was a 9.4 percent subscriber loss rate, right?

15         A    Long-term subscriber loss rate, yes.

16         Q    Right.

17              And I took you through this the last time, and so

18    I don't want to repeat it.  But you do know that if you

19    stack yours up against Professor Carlton's and everybody

20    else's, yours is the outlier.  You're aware of that, right?

21         A    Well, I don't think other people are measuring the

22    same thing, so I don't think that's quite accurate.

23              MR. PETROCELLI:  Can I -- may I approach,

24    Your Honor?

25              THE COURT:  You may.
```

1    BY MR. PETROCELLI:

2        Q    This is marked as Defendants' Demonstrative 124.

3             This is --

4             MR. WELSH:  Your Honor --

5             (Sealed bench conference)

6             MR. WELSH:  I'm confused -- I thought Your Honor's

7    instructions were there will be no demonstratives.

8             THE COURT:  Yes, that was my --

9             MR. PETROCELLI:  That was on direct, Your Honor.

10   This is cross.  All I'm pointing out is that this is from

11   his prior testimony, and every one of those yields a price

12   increase.

13            THE COURT:  Sauce for the goose is sauce for the

14   gander.

15            MR. PETROCELLI:  But --

16            THE COURT:  No.

17            MR. PETROCELLI:  These are not new calculations,

18   though.

19            THE COURT:  That's fine.

20            MR. PETROCELLI:  Okay.

21            THE COURT:  We had a little clarity, I thought,

22   yesterday about the demonstrative.

23            MR. PETROCELLI:  Fair enough.

24            (Open court)

25            MR. PETROCELLI:  I'm not going to the show you the

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3874

1   demonstrative.

2           THE WITNESS:  I'll forget that I saw it.

3   BY MR. PETROCELLI:

4       Q     But you are aware that under everybody else's

5   reported subscriber loss rate -- I know that you disagree

6   with them, including Professor Carlton's -- they all would

7   lead to an overall price decrease, correct?

8       A     It's not a matter of whether I agree or disagree

9   with what they've measured.  Almost all of these are

10  measured in very short-term loss rate.  It's not the right

11  thing to look at, and Professor Carlton and I agree about

12  that.

13      Q     Well, I'm not going to take issue with that now

14  because I already did.  And I already crossed you on that,

15  including testimony of people who were talking about the

16  event long after the fact and the impact that it had.  So I

17  will move on to a different Suddenlink topic, which is your

18  chart.

19          Could we take a look at the chart that counsel

20  showed you.  You have his Suddenlink chart?

21      A     I have it.

22      Q     Can I see it.

23      A     This one here, you mean, right?

24      Q     Yeah, that one right there.

25          THE WITNESS:  Do you have that, Your Honor?

1           THE COURT:  011-06?

2           THE WITNESS:  (Nodding head.)

3           THE COURT:  Okay.

4           MR. PETROCELLI:  Let me make sure it's the same

5    one.

6           May I approach?

7           THE COURT:  You may.

8           MR. PETROCELLI:  Yep, that's it.

9           THE COURT:  Okay.

10   BY MR. PETROCELLI:

11       Q    Now, you know that Professor Carlton says that you

12   did not -- in doing your Suddenlink work, you did not

13   control for industry trends.  You know that's his position,

14   right?

15       A    I do.

16       Q    And that he has run regressions, in which he

17   contends that -- around the time of the Viacom-Suddenlink

18   blackout, the industry changed and it declined at an

19   accelerated pace, correct?

20       A    That appears to be his belief.

21       Q    And you have a contrary belief, right?

22       A    He's incorrect.

23       Q    Okay.  Well, take a look at your chart for a

24   minute, please.

25           Now, the way you constructed this is you started

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3876

1    essentially at ground zero, around the time of the event.

2    And then you kind of worked backwards 21 months to see what

3    the actual industry data reflected, right, using your red

4    line for now?

5         A    Okay.

6              Yes, that's correct.

7         Q    Okay.  So if you go back, you start at zero in the

8    middle of your chart, around September 2014.  Do you see

9    that?  Or right around the time of the blackout, right?

10             And if you go back to the first month, January

11   2013, that you have plotted, that's 21 months, correct?

12        A    Okay.

13        Q    Yes.

14             And the red line starts at about 1 percent above

15   zero there, correct.  It's halfway in between 0 and 2.

16             Do you see that?

17        A    I see that.

18        Q    And now, it's dropping down to zero at about the

19   time of the blackout in on or about September of 2014,

20   right?

21        A    Yes.

22        Q    Now, if we go 21 months forward, past that event,

23   that would take us to about June 2016.

24             Do you see that?

25        A    Yes.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1      Q    If you just draw an imaginary line there --

2      A    Okay.

3      Q    -- instead of going out to November of 2016,

4  you'll see that the red line is now at 2 percent, right,

5  below zero.

6           So it's dropped faster after the event than before

7  the event, correct?

8      A    Taken on those average periods that you've picked,

9  that is correct.

10     Q    But if we go past June, it's even dropping more,

11  correct?

12     A    Well, it's continuing to go down.

13     Q    Yes.

14     A    I mean, that's what these trends are.

15     Q    Okay.

16          So then it is true, then, that there was an

17  increase in the decline post blackout for the industry as a

18  whole, correct?

19     A    Well, for the periods you have picked, that's

20  correct.  We did the statistical analysis, and there was no

21  statistically significant difference in the trends.

22     Q    Well, I didn't pick this.  This is your chart.

23     A    No.  You just picked a particular time period,

24  sir.

25     Q    Well, I started at the beginning of your chart,

3878

1   January 2013.

2       A     That's correct.

3       Q     And I went all the way -- and we can even go --

4   I was just trying to be fair by measuring 21 months versus

5   21 months.

6       A     I see, yeah.

7       Q     If we want to go out to November and add some more

8   months, it continued to decline even faster, right?

9       A     I can't eyeball that.  I've looked at the data and

10  done the econometrics on that.

11      Q     Now, when you looked at the data, you had data,

12  sir, through December of 2016, right?

13      A     It looks to me like it's -- I see November here.

14  I don't know the exact extent of our data.  Yeah.

15      Q     Well, you -- we have from your work papers -- we

16  have from your work papers a page from your computer file

17  that shows that you had data for all these distributors

18  going all the way through December 2016, yet your chart cuts

19  it off at November 2016.

20            Does that ring a bell?

21      A     No.

22      Q     Did you prepare this chart, or did your team do

23  this?

24      A     Well, the team actually did the graphing of the

25  chart, yeah.

1     Q    Well, did anybody make aware to you when they were

2  preparing this chart to present in court that if you did one

3  more month, there would have been a precipitous drop in

4  the -- in your red line here in the industry subscriber

5  counts?

6     A    I would have to ask my team about that additional

7  data point, if whether it was reliable.  I don't know

8  sitting here.

9     Q    Well, what if I told you that there were over

10  1 million subs that were lost in that month bigger than any

11  of the prior months in your data set going all the way back

12  to January 2003.  Would you accept that?

13     A    Well, I would -- we can look at the data.

14  I don't know.  I don't have that in my head.

15          MR. PETROCELLI:  Let's mark as the next exhibit

16  for identification Defendants' what?

17          This is a -- I'm marking this, Your Honor, as

18  exhibit, defense exhibit -- this is not a demonstrative.

19  This is actually from his file, so give me the next exhibit

20  in order.

21          MS. ROBSON:  I have 943.

22          MR. PETROCELLI:  943.

23          May I approach, Your Honor?

24          THE COURT:  You may.

25

1   BY MR. PETROCELLI:

2       Q    So I've placed front of you 9 -- what has been

3   identified as Exhibit 943, which I will represent to you is

4   a printout from one of the computer files that accompanied

5   your expert reports that you provided to us.  And you'll see

6   that it goes through December 2016, correct?

7       A    I see that.

8       Q    And you'll see that there's quite a big jump --

9   quite a big decline, I should say, from November to December

10  that's not reflected on your chart, correct?

11      A    I believe that's correct.

12          MR. PETROCELLI:  Okay.  Your Honor, I'd like to

13  move this into evidence.  It's directly from his work

14  papers.

15          MR. WELSH:  Objection.  I'd like to be heard.

16          THE COURT:  You may be heard.

17          (Sealed bench conference)

18          MR. WELSH:  I can't tell anything about this.

19  There's nothing on the document that indicates the source.

20  There are a bunch of numbers that someone could have just

21  typed up.

22          MR. PETROCELLI:  He verified that this is from his

23  work papers.  He doesn't deny it, Your Honor.  And it

24  absolutely is.  I can give you -- how am I supposed to bring

25  in a computer file?

1          THE COURT:  Well, maybe I didn't hear him verify

2    it like you.

3          MR. WELSH:  I didn't hear that either.

4          MR. PETROCELLI:  I thought he --

5          THE COURT:  Let's assume he verifies it.  What's

6    your objection, then, if he verifies this is from his work

7    papers?

8          MR. WELSH:  I don't know the source of what the --

9    I didn't -- depending on what the witness says, I don't know

10   what the source of the information is, where this came from,

11   so it would be hearsay.  So I'm not sure what the purpose is

12   for the admission of the information into the record.

13         MR. PETROCELLI:  It's his -- he explicit -- this

14   is -- these the numbers he used on his chart.  But his team,

15   his team or he left off December, which was in this line.

16         MR. WELSH:  He can -- you know, I think he can

17   talk to the ones found -- if he wants to try to refresh the

18   witness' recollection with the document, that's one thing.

19   I haven't heard anything to set a foundation that would

20   begin to approach to get this into the record.

21         THE COURT:  Apparently, this is data that he

22   accumulated and had access to and relied upon and put into

23   the evidence at trial.

24         Now, if he confirms all of that, then to me that's

25   got to come in.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3882

```
 1              MR. WELSH:  I just, I don't know.  I didn't hear

 2    that from the -- I don't even know if I heard that question

 3    being asked.

 4              THE COURT:  That can be established in a matter of

 5    a few questions.

 6              Now, I want to remind you that --

 7              MR. PETROCELLI:  Yeah.

 8              THE COURT:  Hold on a minute.  Slow down.

 9              You're not done.

10              MR. PETROCELLI:  I'm not done.

11              THE COURT:  And he has not done redirect.

12              MR. PETROCELLI:  And I'm not done either.

13              THE COURT:  Yeah.

14              MR. PETROCELLI:  And you were right.

15              THE COURT:  So I think the practical reality is

16    we're going to go to till 1:00 and come back Thursday.

17    You'll finish whatever you need to finish, and you get to do

18    redirect.  And that's, you know --

19              MR. PETROCELLI:  There's no reason to rush this,

20    Your Honor.

21              MR. WELSH:  I can see where counsel is at the end

22    of his -- his hour will be up at 1:00.  So at that point,

23    I can decide whether or not redirect is necessary and then

24    whether or not we'd have to bring the witness back.

25              THE COURT:  Well, that is true.  It will be 1:00.
```

1    But that's without any redirect.

2            MR. WELSH:  That's right.  But I'll evaluate at

3    that point, Your Honor.

4            MR. PETROCELLI:  How much time?

5            THE COURT:  We have ten minutes.

6            MR. PETROCELLI:  I might be able to.  Because he's

7    throwing out an inducement to me to finish up so we don't

8    have to come back on Thursday.  But I'm happy to --

9            THE COURT:  I think this is too important to both

10   sides to rush.  That's my opinion.  I'll let you try your

11   case the way you want to, gentlemen.

12           MR. PETROCELLI:  I'm not going to rush,

13   Your Honor.  I'm just going to finish all of my examination.

14           THE COURT:  So get your foundation in place.

15           MR. WELSH:  Thank you, Your Honor.

16           MR. PETROCELLI:  This is your copy?

17           THE COURT:  Oh.

18           (Open court)

19           THE COURT:  You may proceed according to our

20   discussion at the bench.

21   BY MR. PETROCELLI:

22       Q    Professor, so you see that these numbers started

23   January 2013, and they track the months in your -- number of

24   the months in your chart, right?

25       A    I do.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3884

1      Q    Okay.  And I represented to you that this came

2    from the computer file, one of them that you submitted with

3    your expert reports.

4           Do you have any reason to doubt that?

5      A    No.

6      Q    And do you have any reason to doubt these numbers?

7      A    No.

8           MR. PETROCELLI:  So I would ask that it be

9    admitted into evidence.

10          THE COURT:  Well, let me just ask you this,

11   Professor.  Where did you get these numbers from, if you can

12   recall?

13          THE WITNESS:  These numbers are from the

14   distributors themselves.  They're measuring their

15   subscribers counts.  And then we added them all up to get

16   the total.

17          THE COURT:  Okay.

18          MR. PETROCELLI:  So I'd move it into evidence,

19   Your Honor.

20          THE COURT:  All right.  It will be admitted.

21          MR. PETROCELLI:  Okay.  Thank you.

22          Does this need to be confidential?

23          THE COURT:  It's DX943, right?

24          MR. PETROCELLI:  Yes, 943.

25          MR. WELSH:  Yes, apparently so.

```
 1              MR. PETROCELLI:  Okay.

 2                              (Defendants' Exhibit DX943
                                received into evidence
 3                              under seal.)

 4   BY MR. PETROCELLI:

 5       Q    Now, can you go back to --

 6              MR. PETROCELLI:  Actually, I'll move forward,

 7   Your Honor --

 8              THE COURT:  All right.

 9              MR. PETROCELLI:  -- now that I have that in

10   evidence.

11   BY MR. PETROCELLI:

12       Q    Let me talk a little bit about the so-called

13   natural experiments of Dr. Carlton that you comment on, the

14   prior transactions, okay?

15              Now, without going back over my examination the

16   last time on this, just to kind of set the stage, you had

17   made a determination that it would not be fruitful, I think

18   was the word you used, to do the kind of analysis into these

19   three transactions or so that Dr. Carlton did, right?

20       A    Above and beyond what I'd already seen, including

21   from AT&T's own economists.

22       Q    But you -- would you agree with the following

23   sentence with regard to the utility and usefulness of

24   precedent transactions?

25              "Ideally, the reliability of different methods of
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3886

```
 1    evaluating proposed mergers should be gauged by an

 2    intelligent combination of theoretical analysis and

 3    empirical evaluation.  The most direct way to do the latter

 4    is to compare the observed changes from completed mergers

 5    against premerger predictions."

 6              Would you agree with that statement?

 7         A    Not fully.

 8         Q    You are aware that is your own statement, right?

 9         A    I didn't recognize it.

10         Q    Well, you wrote an article with -- is it

11    Professor Farrell?

12         A    Yes, Joe Farrell, Joseph Farrell.

13         Q    Joe Farrell and yourself in 2010?

14         A    Okay.

15         Q    And that appears at page 34, footnote 68, and you

16    wouldn't dispute that, would you?

17         A    Again, I generally agree with it.  I was

18    processing -- there's a lot there.  It might be a little bit

19    demanding in terms of what one could do, but I agree with

20    the general thrust.

21         Q    And do you agree with this statement:  "In light

22    of the significant vertical acquisitions that have occurred

23    in this industry, we believe that Professor Rogerson would

24    need to provide considerably more empirical evidence before

25    the Commission should place any significant weight on his
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    bargaining theory."

 2              Do you recall that?

 3         A    That one I do recall, yes.

 4         Q    And that's an opinion that you gave in support of

 5    the News Corp. acquisition of DirecTV -- yeah, DirecTV back

 6    in 2003, correct?

 7         A    It was a partial acquisition, but that's correct,

 8    yes.

 9         Q    Right.

10              Okay.  Now, regarding the chart that you showed,

11    you were shown on -- let's see if I can find my copy.  You

12    were shown by Mr. Welsh, I think you were shown one of

13    Professor --

14              MR. PETROCELLI:  May I approach?

15    BY MR. PETROCELLI:

16         Q    You were shown Defense Exhibit 113.

17              I also would like you to take look at

18    Professor Carlton's Defense Demonstrative Exhibit 112.

19              Now, on -- you talked about 113 and indicated that

20    the --

21              MR. WELSH:  Can I have a copy?

22    BY MR. PETROCELLI:

23         Q    That the Comcast-DirecTV [sic] deal was done in or

24    about 2016, and then the prices started to go up there, kind

25    of catching up to the DirecTV line with the other
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3888

```
 1    programmers, right?

 2         A    In 113?

 3         Q    In 113, yes.

 4         A    Yes.

 5         Q    Okay.  And you know that when a contract is up for

 6    renewal and re-negotiate, there's a re-set of prices, prices

 7    you would expect to go up when a new contract is negotiated

 8    between a distributor and a programmer, given the general

 9    increase in programming costs, right?

10         A    Yes.

11         Q    Now, take a look at Defense Demonstrative 112.

12    You recognize this from Professor Carlton's testimony,

13    right?

14         A    Yes.

15         Q    And this is based on Kagan data for all

16    distributors and all networks, right?

17         A    Well, these control networks, yes.

18         Q    Yes.

19              And you see -- and this is based on Kagan data,

20    right?

21         A    That's correct.

22         Q    And you see here that the NBC line is consistently

23    under the industry line, right?

24         A    I see that.

25         Q    And in terms of the use of Kagan data, you are
```

1    aware that many of the people in the industry who negotiate

2    these deals use Kagan data, right?

3         A    Yes.  I think it's commonly used.

4         Q    And even the FCC used in one of the orders that

5    you cited last time you were here when they did the

6    retrospective on the Fox transaction.  That was based on

7    Kagan data in the FCC order that you relied on, right?

8         A    I believe that's correct.

9         Q    Okay.  Actually, with that, I think I only have a

10   final question or two, and that's on the -- on your

11   bargaining model in general.

12              Do you agree with the following statement?

13              "According to Professor Rogerson's version of the

14   bargaining theory and vertical coordination, every, even

15   partial, vertical ownership acquisition would lead to a

16   significant danger of programming price increases by

17   changing the threat point for the vertically integrated

18   programmer.  This -- his bargaining theory proves too much."

19              Do you recall making those statements in your

20   expert submission in that case?

21         A    Yes, I do.  And the main reason is because

22   Professor Rogerson did not give any credit to the

23   elimination of double marginalization.  So he was just

24   looking at one side of the balancing.

25         Q    Do you also recall making the following statement:

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    Professor Rogerson does not address the real-world

2    complexity of the bargaining environment?

3         A    Yes.  He didn't do any of the analysis that I've

4    done here.

5         Q    And do you recall making this final statement.

6              "This per se approach is also suggested by the

7    fact that he does not provide any evidence that integrated

8    cable programmers actually have previously acted in

9    accordance with his concerns."

10             Do you recall making that statement?

11        A    That's correct.  Since he did not do empirical

12   analysis to support his bargaining model and did not have

13   prior historical evidence, my view was that his analysis was

14   incomplete.

15        Q    And here, you are very familiar with the trial

16   testimony of the witnesses who have actually worked in

17   vertically integrated companies, who have also testified

18   that they have never acted or even thought about the issues

19   you have presented in your bargaining model, correct?

20        A    Well, I understand that the parties of this

21   transaction say that, but it's also quite clear that the

22   distributors who stand to be disadvantaged by this

23   transaction if it goes forward do, indeed, indicate concerns

24   that are consistent with the bargaining model.

25        Q    And you're also familiar with the testimony of

 1    Greg Rigdon and Matt Bond of Comcast-NBCU that they never

 2    thought of that these things that you're positing.  You

 3    recall that testimony?

 4         A    I do.

 5              MR. PETROCELLI:  Nothing further, Your Honor.

 6              THE COURT:  Let me see counsel.

 7              (Sealed bench conference)

 8              THE COURT:  What are you thinking there,

 9    Mr. Welsh?

10              MR. WELSH:  If I could have one minute to confer

11    with Mr. Conrath, and then I'll be able to come up and tell

12    Your Honor whether we feel there's a need.

13              THE COURT:  Go see him.

14              MR. WELSH:  Thank you.

15              (Pause)

16              (Government counsel conferred off the record.)

17              MR. WELSH:  We may have a few questions for

18    Professor Carlton.  We have also --

19              THE COURT:  Shapiro?

20              MR. WELSH:  I misspoke.  Thank you.  Shapiro.

21              We have -- I've been informed that he might not be

22    available, though, to come back on Thursday, because of

23    commitments.  So that is an issue.

24              I'm wondering if we might impose and let us confer

25    further and then notify Your Honor and defense counsel by

1    the end of the day as to whether or not there is a need to

2    bring him back and whether we can bring him back on Thursday

3    afternoon for any further examination.

4            THE COURT:  I'm just going to announce that we're

5    reconvening Thursday at 2:30.  If he can't come, then he's

6    got his own problems.  I mean, he's your witness.

7            MR. WELSH:  No.  I understand that, Your Honor.

8            THE COURT:  He's a witness in this case under

9    oath.  He's not free -- you're not releasing him?

10           MR. WELSH:  I'm not suggesting that.

11           THE COURT:  He's not released?

12           MR. WELSH:  Right.

13           THE COURT:  And if he doesn't show up on Thursday

14   at 2:30, then you forgo whatever questions you may have

15   asked on redirect.  That's your loss.

16           He's not being released.  He's a witness in the

17   case.  I can't imagine what else he has to do.  Unless it's

18   a hospitalization, medical procedure, or some kind

19   longstanding, he's here, or you forgo.

20           MR. WELSH:  And if we decide to forgo, should we

21   just advise Your Honor in advance?

22           THE COURT:  Yeah, you can do that.

23           We're going to have to have some kind of a

24   conference on Thursday anyway --

25           MR. WELSH:  Oh, that's right.  Yeah, right.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
1           THE COURT:  -- with regard to -- either we're

2   going to be here, or we're going to be doing a

3   teleconference call on Thursday to deal with the other issue

4   that I talked to you about.

5           MR. PETROCELLI:  Any preparation we should do in

6   advance of that call, Your Honor.

7           THE COURT:  No.  I don't think so.

8           MR. PETROCELLI:  Thank you very much.

9           THE COURT:  Because if the, if the only -- here's

10  the only differences.  If the evidence closes today, if it

11  turns out the evidence closes today, either because he

12  doesn't show up or they don't want to ask him questions, the

13  clock starts today.

14          MR. PETROCELLI:  Does Your Honor have a preference

15  as to --

16          THE COURT:  Otherwise, it's Thursday the clock

17  starts.

18          MR. PETROCELLI:  Is Your Honor indifferent to

19  that?  Or does Your Honor have a preference?

20          THE COURT:  Indifferent to what?

21          MR. PETROCELLI:  Do you prefer having the clock

22  start on Thursday?

23          THE COURT:  No.  Frankly, I think I'm trying to

24  give you both a little help --

25          MR. PETROCELLI:  Yeah, well, actually --
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1          THE COURT:  -- to be quite frank.

2          I mean, I think I'm throwing you a bone.  If you

3   don't want the bone, that's your choice.

4          MR. PETROCELLI:  Yeah.

5          THE COURT:  But I think I'm throwing you -- more

6   so your teams than you.

7          MR. PETROCELLI:  I just wanted to make sure

8   that --

9          MR. WELSH:  On behalf of our team, I would say

10  thank you.

11         THE COURT:  I mean, you know, seven days is an

12  aggressive schedule.

13         MR. PETROCELLI:  Yeah.

14         THE COURT:  And when I was in your shoes, nine

15  sounded better than seven.

16         MR. PETROCELLI:  Still does, Your Honor.

17         THE COURT:  That applies to the briefs, too.

18         MR. PETROCELLI:  Yeah.  Everything.  Right.

19         THE COURT:  So, yeah.  So, I mean, you've got

20  briefs, and you've got findings of fact.  So from a "get the

21  job done" point of view, I would think nine sounds better

22  than seven.  That's all I'm saying.

23         MR. PETROCELLI:  When can you let us know, by the

24  end of the day today?

25         MR. WELSH:  Yes, by the end of the day.  We can

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1   obviously talk with Professor Shapiro just about the

 2   logistics of this.

 3                THE COURT:  Sure, of course.

 4                MR. PETROCELLI:  But not about any --

 5                MR. WELSH:  No, no.  Of course not.

 6                MR. PETROCELLI:  Not his testimony.

 7                MR. WELSH:  Right.  Of course not.

 8                THE COURT:  All right.

 9                MR. PETROCELLI:  All right.  Thank you,

10   Your Honor.

11                THE COURT:  All right.

12                (Open court)

13                THE COURT:  All right.  We're done for today,

14   Professor.  You may or may not be coming back on Thursday.

15   You're going to be talking to your counsel only about

16   logistics, nothing else.

17                I'm not releasing you as a witness in the case.

18   You are not released.  So if they need to ask you more

19   questions, which is their decision, not yours, you need to

20   be here on Thursday.

21                And if you're not here, then they take the

22   consequences of you not being here and they forgo asking you

23   any other questions.

24                The only thing you can discuss with them, since

25   you're not being released, is logistics issues:  your

1    schedule, getting back here, and all that.

2           On Thursday, we'd be reconvening at 2:30 in the

3    afternoon.  So you talk to them about whatever arrangements

4    you need to make in order to meet that schedule.  They

5    understand the consequences of your not being able to be

6    here, and we'll leave it at that.

7           Thursday, we will discuss further closing

8    arguments, what day, what time, how much time each side has,

9    and how much of the government's can be used for rebuttal

10   purposes.

11          So we'll stand in recess until Thursday at 2:30.

12          MR. PETROCELLI:  Okay.

13          MR. WELSH:  Okay.

14          DEPUTY CLERK:  All rise.

15          This Honorable Court now stands in recess until

16   the return of court.

17          (Proceedings concluded at 1:06 p.m.)

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-titled matter.


Date: April 24, 2018_____    /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )        CV No. 17-2511
                                     )
                                     )        Washington, D.C.
        vs.                          )        April 26, 2018
                                     )        2:40 p.m.
AT&T, INC., ET AL.,                  )
                                     )        Day 20
            Defendants.              )
_____)


         TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
         BEFORE THE HONORABLE RICHARD J. LEON
         UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:            Craig W. Conrath
                              Eric D. Welsh
                              Donald G. Kempf, Jr.
                              Ruediger R. Schuett
                              Justin T. Heipp
                              Dylan M. Carson
                              U.S. DEPARTMENT OF JUSTICE
                              Antitrust Division
                              450 Fifth Street, NW
                              Washington, D.C. 20530
                              (202) 532-4560
                              craig.conrath@usdoj.gov
                              eric.welsh@usdoj.gov
                              donald.kempf@usdoj.gov
                              ruediger.schuett@usdoj.gov
                              justin.heipp@usdoj.gov
                              dylan.carson@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:                          Katrina M. Robson
                                        O'MELVENY & MYERS LLP
                                        1625 Eye Street, NW
                                        Washington, D.C. 20006
                                        (202) 220-5052
                                        krobson@omm.com

                                        Daniel M. Petrocelli
                                        M. Randall Oppenheimer
                                        O'MELVENY & MYERS LLP
                                        1999 Avenue of the Stars
                                        8th Floor
                                        Los Angeles, CA 90067
                                        (310) 553-6700
                                        dpetrocelli@omm.com
                                        roppenheimer@omm.com

                                        Michael L. Raiff
                                        Robert C. Walters,
                                        GIBSON, DUNN & CRUTCHER LLP
                                        2100 McKinney Avenue
                                        Suite 1100
                                        Dallas, TX 75201
                                        (214) 698-3350
                                        mraiff@gibsondunn.com
                                        rwalters@gibsondunn.com


Court Reporter:                         William P. Zaremba
                                        Registered Merit Reporter
                                        Certified Realtime Reporter
                                        Official Court Reporter
                                        U.S. Courthouse
                                        333 Constitution Avenue, NW
                                        Room 6511
                                        Washington, D.C. 20001
                                        (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

– – –

WITNESS INDEX

– – –

WITNESSES          DIRECT CROSS REDIRECT RECROSS

GOVERNMENT'S:

CARL SHAPIRO, Ph.D.                3903    3921

– – –

INDEX OF EXHIBITS

– – –

GOVERNMENT'S          IDENTIFIED     ADMITTED

PX559                                3912

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3901

```
 1              P R O C E E D I N G S

 2          DEPUTY CLERK:  All rise.  This Honorable Court is

 3   now in session, the Honorable Judge Richard J. Leon

 4   presiding.  God save the United States and this Honorable

 5   Court.  Please be seated and come to order.

 6          Good afternoon, Your Honor.  This afternoon we

 7   have Civil Action No. 17-2511, the United States of

 8   America v. AT&T, Inc., et al.

 9          Counsel, please approach the lectern and identify

10   yourselves for the record and the party or parties that you

11   represent.

12          MR. WELSH:  Good afternoon, Your Honor.

13   Eric Welsh for the United States.

14          THE COURT:  Welcome back.

15          MR. WELSH:  Thank you.

16          MR. CARSON:  Good afternoon, Your Honor.

17   Dylan Carson for the United States.

18          THE COURT:  Welcome back.

19          MR. CARSON:  Thank you.

20          MR. HEIPP:  Good afternoon, Your Honor.

21   Justin Heipp for the United States.

22          THE COURT:  Welcome.

23          MR. CONRATH:  Good morning, Your Honor.

24   Craig Conrath for the United States.

25          THE COURT:  Welcome back.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. CONRATH:  Thank you.

 2              MR. SCHUETT:  Good afternoon, Your Honor.

 3   Ruediger Schuett for the United States.

 4              THE COURT:  Welcome.

 5              MR. KEMPF:  Good afternoon, Your Honor.  Don Kempf

 6   for the United States.

 7              THE COURT:  Welcome back.

 8              MR. PETROCELLI:  Good afternoon, Your Honor.

 9   Daniel Petrocelli for defendants.

10              THE COURT:  Welcome back.

11              MR. ROBSON:  Good afternoon, Your Honor.

12   Katrina Robson for defendants.

13              THE COURT:  Welcome back.

14              MR. OPPENHEIMER:  Good afternoon, Your Honor.

15   Randy Oppenheimer for the defendants.

16              THE COURT:  Welcome back.

17              MR. WALTERS:  Good afternoon, Your Honor.

18   Rob Walters here for AT&T and DirecTV.

19              THE COURT:  Welcome back.

20              MR. RAIFF:  Good afternoon, Your Honor.

21   Mike Raiff for AT&T and DirecTV.

22              THE COURT:  Welcome back.

23              We're missing some people.

24              DEPUTY CLERK:  Mr. Barbur.

25              THE COURT:  Mr. Orsini and Mr. Barbur are not
```

1   here.  Are they okay?

2           MR. PETROCELLI:  Yeah, they're fine.

3           THE COURT:  All right.

4           MR. PETROCELLI:  I'm here for Time Warner.

5           THE COURT:  I understand.  We know that.

6           All right.  Is the witness ready to resume the

7   stand?

8           You remain under oath.

9           MR. WELSH:  May I proceed, Your Honor?

10          THE COURT:  You may.

11          MR. WELSH:  Thank you.

12  CARL SHAPIRO, Ph.D, WITNESS FOR THE GOVERNMENT ON REBUTTAL,

13  HAVING BEEN PREVIOUSLY SWORN, RESUMED THE STAND AND

14  TESTIFIED FURTHER AS FOLLOWS:

15                          - - -

16                  REDIRECT EXAMINATION

17  BY MR. WELSH:

18      Q    Good afternoon, Professor Shapiro.

19      A    Good afternoon.

20      Q    I just have a few questions for you this

21  afternoon, and let's get right to it.

22          I want to start off, Professor, by talking about

23  the Suddenlink-Viacom analysis, okay?  And I want to get us

24  all back to that subject.

25          So you recall being asked questions about your

 1    PXD11, this chart with the Viacom -- the blackout with

 2    Suddenlink in October of 2014.

 3            Do you recall that, sir?

 4    A    I do.

 5    Q    And we were talking about it in terms of the

 6    criticism that Professor Carlton had raised with you about

 7    the industry trend.  He claimed you hadn't taken into

 8    account the industry trend.  Your testimony was speaking to

 9    that issue.

10            Do you remember that?

11    A    I do.

12    Q    Okay.  Now, you were also, that day, presented by

13    defense counsel with a new exhibit, which was DX943 that

14    Mr. Petrocelli represented to you was a printout directly

15    from your work papers.  This is a two-column exhibit.

16            Do you remember that?

17    A    I do.

18    Q    Now, Professor, Mr. Petrocelli was a bit off in

19    his representations, so I'm going to tell you and I'll

20    represent to you that Exhibit DX943 actually is not a

21    printout directly from your work papers but, instead, was

22    pulled by the defendants from data accompanying your report

23    and formatted using code that was modified by defendants in

24    a way that aggregated the data of the different distributors

25    together, okay?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1       A    I understand.

 2       Q    Okay.  Now, Professor, I'd like show you what we

 3   have marked as PX559, which I will represent to you is a

 4   table taken from the same data that we're just talking

 5   about, the same data set from your backup that defendants

 6   used to create DX943, but this one breaks out the subscriber

 7   levels for Dish from the other MVPDs.

 8            MR. WELSH:  Your Honor, may I approach?

 9            THE COURT:  You may.

10            MR. WELSH:  May I approach the witness,

11   Your Honor?

12            THE COURT:  Yeah.

13            MR. WELSH:  May I also approach the witness to

14   give him a copy of DX943, Your Honor?

15            THE COURT:  Sure.

16            MR. WELSH:  Does Your Honor need another copy of

17   DX943?

18            THE COURT:  No.  I have that here.

19            MR. WELSH:  Okay.

20            Do you need a copy?

21            MR. PETROCELLI:  Yeah, I'll take one.  Is it a

22   two-page or a one-page?

23            MR. WELSH:  It's one, multiple copies.

24            THE COURT:  It has a backside.

25            MR. PETROCELLI:  Oh, okay.

1          MR. WELSH:  Your Honor, I've handed PX559 as well

2    as DX943 to opposing counsel.

3          May I proceed?

4          THE COURT:  You may.

5    BY MR. WELSH:

6      Q    Now, Professor, if you could look at PX559,

7    do you see that the first two columns on PX559, that those

8    match up with the columns in DX943?

9      A    Yes, I see that.

10     Q    And do you see on PX559 that one of the

11   distributors, Dish, that information was broken out

12   separately in that right column, and then we have the other

13   column with all MVPDs, excluding Dish?

14         Do you see that?

15     A    I do.

16     Q    And if you flip it over to the second page,

17   do you see that that includes the December 2016 information

18   for Dish broken out separately.

19     A    Yes, I see that.

20     Q    Okay.

21         Now, Professor, similar to -- you were asked

22   question about DX943.  So similar to that, do you believe

23   that the data that we have here on PX559, that that was from

24   your backup to your reports?

25     A    I have no reason to doubt that.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. WELSH:  Your Honor, I'd move for admission of
 2    PX559.
 3              THE COURT:  Yeah.  I want to see the parties about
 4    this.
 5              You can step down, sir.
 6              (Sealed bench conference)
 7              THE COURT:  So I'm confused about what's going on
 8    here.  So before I admit anything into evidence, I want to
 9    make sure I understand what's going on here.
10              So the two columns in 943, which have been
11    admitted, are the same as the first two columns in 559.
12              MR. WELSH:  Correct, Your Honor.
13              THE COURT:  Okay.
14              But the next two columns, are they supposed to be
15    read straight across.  Like for 1113 and go -- for some
16    reason you go to 82342 and then you go to 69330?  Are these,
17    like, two whole new columns?
18              MR. WELSH:  So the columns in here, this one is
19    all the MVPDs, all states, excluding Dish.  And that,
20    I think, is subscriber count for all of those -- those
21    months it's going on, so January, February, March, April,
22    May, et cetera.
23              THE COURT:  You read these across?
24              MR. WELSH:  Yes.
25              THE COURT:  And Dish is standing alone?
```

1      MR. WELSH:  Dish is standing alone.  That's

2 absolutely correct, Your Honor.

3      MR. PETROCELLI:  Your Honor, these, as

4 I understand this, because I'm seeing this for the first

5 time, these numbers are identical to 943 in this column.

6      THE COURT:  Right.

7      MR. PETROCELLI:  Okay.

8      And then what they appear to have done is to

9 isolate Dish here, and then just subtract --

10      MR. WELSH:  That's correct.

11      MR. PETROCELLI:  -- subtract it.

12      So I guess the point they want to make is that

13 Dish stands out in some way.

14      MR. WELSH:  That's correct.

15      MR. PETROCELLI:  Yeah.  Okay.

16      THE COURT:  Now, the part that I'm confused

17 I guess, about is, where is this coming from?  Because he

18 doesn't seem to know.

19      MR. PETROCELLI:  No.  You asked --

20      MR. WELSH:  It comes from his backup to his

21 report.  Mr. Petrocelli asked him on Tuesday when he had

22 DX943 admitted, where did that come from?

23      THE COURT:  Yeah.

24      MR. WELSH:  You represented to him it came from

25 his report.  That's one of the issues that we're trying to

1  address here, because what Mr. Petrocelli told

2  Professor Shapiro then was he represented that it was a

3  printout directly from his work papers, which it actually is

4  not.  It's coming from data, a data report that was part of

5  Professor Shapiro's backup, okay?

6        So what defense counsel did on Tuesday to prepare

7  DX943 was to go to that data; they applied the code; it

8  printed out the code, the information from the code --

9        THE COURT:  Right.

10        MR. WELSH:  -- onto DX943.

11        What we have done with PX559 is apply the code to

12  this data set that's part of Shapiro's report, backup for

13  his report; and we've modified it so we could pull out the

14  Dish, just as they modified it to go with all the -- this

15  column.

16        MR. PETROCELLI:  Your Honor, just to be clear --

17  and I do take exception to how he phrased his question about

18  misrepresenting things.  All of this data comes from his

19  files, all of it, okay?

20        THE COURT:  Including these four columns?

21        MR. PETROCELLI:  Yes.  All these columns come from

22  his files.  Okay?  But it's electronic.  It's not in hard

23  copy.  So you need to run programs to go extract it and to

24  create a piece of paper.

25        THE COURT:  Yes.

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3776 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3910

1          MR. WELSH:  This is an example of the raw data,

2   without doing the code, and this goes on for pages and pages

3   and pages, because this is by individual; it's by state.

4          MR. PETROCELLI:  Yeah.

5          MR. WELSH:  And so this is a summary of it, if you

6   will.

7          MR. PETROCELLI:  And, Your Honor -- actually,

8   Your Honor, before you admitted that -- you may not remember

9   this, but I have the transcript -- you asked him directly

10  yourself:  Where did this come from?

11         And he answered your question that this data comes

12  from the distributors and they ran and they categorized it.

13         MR. WELSH:  We think that what was presented

14  before is incomplete and misleading in terms of the -- well,

15  we'll come to that in the testimony.

16         But anyway, what we're trying to do is just show

17  Your Honor the complete story here with the data.

18         MR. PETROCELLI:  Your Honor, what this is --

19         THE COURT:  Hold on a second, though.

20         This backside here, you see how you have -- the

21  first column is the date.

22         MR. WELSH:  Correct.

23         THE COURT:  The first column is the date, right?

24         So these next three columns are the same as it

25  says here, right?

 1              MR. WELSH:  Correct.

 2              THE COURT:  So this is subtracted from what?

 3              MR. WELSH:  So this would just be the count for

 4  December of 2016.

 5              This is the count for November of 2016 for Dish.

 6              THE COURT:  Which is included in this number?

 7              MR. WELSH:  No.

 8              MR. PETROCELLI:  No.

 9              MR. WELSH:  It's excluded from this number,

10  Your Honor.

11              THE COURT:  It's excluded from this number.

12              MR. WELSH:  It's excluded.  This will be all the

13  others, and this is Dish separately.

14              MR. PETROCELLI:  All they did, Your Honor, is they

15  created -- when they ran the numbers, they created

16  additional columns to iso -- this is everybody.  They just

17  wanted to show, Your Honor --

18              THE COURT:  So if you add this column to this

19  column, you get that column.

20              MR. WELSH:  You get that.

21              MR. PETROCELLI:  What this is about, Your Honor,

22  is I crossed him because when he did his chart here to show

23  what was happening, he cut it off in November --

24              THE COURT:  Oh, I see.

25              MR. PETROCELLI:  -- even though his data goes all

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 3778 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3912

1    the way out to December.

2            I pointed out, if you add December, the red line

3    goes down.

4            They're now coming back and saying the reason it

5    goes down was because of Dish.

6            So I guess we'll hear his explanation.

7            THE COURT:  All right.

8            MR. PETROCELLI:  Okay.

9            MR. WELSH:  Is that --

10           THE COURT:  All right.  I'll admit it.

11           MR. PETROCELLI:  I have no objection to it,

12    Your Honor.

13           THE COURT:  Okay.  All right.

14           (Open court)

15           THE COURT:  We'll admit the document.

16           THE WITNESS:  You may question him.

17           MR. WELSH:  Thank you, Your Honor.

18                         (Government's Exhibit PX559
                            received into evidence under seal.)
19    BY MR. WELSH:

20       Q    Now, Professor Shapiro, you have PX559 in front of

21    you.  I want to ask you some questions about, in compiling

22    your subscriber count for your reports, do you recall there

23    being an issue about the reliability of the data that was

24    produced by one distributor in December of 2016?

25           MR. PETROCELLI:  Objection.  That is leading,

Case 1:17-cv-02511-RJL  Document 158 *** REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER *** Filed 08/06/18  Page 3779 of 3826

3913

1  Your Honor.

2          THE COURT:  Well, you can rephrase the question.

3          MR. WELSH:  Okay.  I'll rephrase.

4          THE COURT:  Rephrase the question.

5  BY MR. WELSH:

6      Q    Do you recall, when you were doing your work in

7  compiling the sub counts for your reports, do you recall

8  there being any sort of an issue with respect to any data

9  coming in from a subscriber -- from an MVPD, excuse me?

10     A    I do recall being aware of the, something

11  anomalous about the Dish data in that last month that we're

12  talking about.  I don't recall the specifics, though.

13     Q    So if we look at PX559 and look at November and

14  December, do you -- does that document indicate that there

15  was a drop in Dish subscribers from November to December of

16  2016?

17     A    Yes.  Am I allowed to use the numbers?  I mean,

18  there's a --

19          THE COURT:  Yeah.  It's not under seal, right?

20  Or is it?

21          MR. PETROCELLI:  We did 943 under seal at your

22  request.

23          MR. WELSH:  Okay.

24  BY MR. WELSH:

25     Q    Let's talk percentages.  Maybe that's the easiest

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3914

```
 1    thing, if we can.

 2              THE COURT:  So 943 is under seal?

 3              MR. PETROCELLI:  I think so, at his request.

 4              MR. WELSH:  I think it was, if I recall from the

 5    transcript, it was, Your Honor.

 6              THE COURT:  Because if it doesn't need to be under

 7    seal, that's fine.  I rather it not be.

 8              MR. WELSH:  Can I confer with counsel?

 9              THE COURT:  I didn't note it as under seal when I

10    wrote it down.

11              (Government counsel conferred off the record.)

12              MR. WELSH:  It's not going to need to be under

13    seal, Your Honor.

14              THE COURT:  Okay.  Good.

15              All right.  So neither one does now.

16              MR. WELSH:  That's my understanding, correct,

17    Your Honor.

18    BY MR. WELSH:

19         Q    Now, so the --

20         A    I apologize.

21              MR. WELSH:  May I proceed, Your Honor?

22              THE COURT:  Yes.  You can use the numbers now.

23              MR. WELSH:  Okay.

24    BY MR. WELSH:

25         Q    Go ahead.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1        A    Thank you.

2             So according to this exhibit, 559, the data here

3    shows the Dish subscriber count going down from 10.9 million

4    to 9.7 million from November to December of 2016, which is

5    more than a 10 percent drop.

6        Q    Now, from your work, sir, does it sound reasonable

7    to you that there can be a drop of that magnitude in one

8    month for any one MVPD.  Does that make sense?

9        A    Well, it does look very peculiar, particularly

10   given the previous time series for Dish, which is gradually

11   declining.  And that's then very -- it stands out.

12            So there's a question about it.

13       Q    Did you see anything reported in SEC filings for

14   Dish that would report on such a loss of that sort of

15   magnitude for a single month?

16       A    I did not recall seeing such a thing, no.

17       Q    And looking at PX559 and looking at the other

18   column, so this would be the one with the other MVPDs,

19   do you see that column?

20       A    Yes, I do.

21       Q    Looking at that, do you see any sort of what

22   counsel had called on Tuesday being a precipitous drop in

23   industry subscriber counts?  Do you see that in that column

24   for the MVPDs in December of 2016?

25       A    No.

1              If you took at the column excluding Dish, the --

2     there's essentially no change from November to December.

3     It's a 6,000 drop out of 60 million.  So, you know, tiny.

4          Q    And the trend, then, for the other MVPDs -- the

5     other MVPDs, putting Dish aside, was that trend essentially

6     flat?

7          A    You mean from November to December or more

8     generally are you asking me?

9          Q    More generally, in 2016.

10         A    Yes.

11              So it's very -- yes.  We can just look at the data

12    here so we're clear.  From, let's say, December 2015 to

13    December 2016, so we're using the same month, we have

14    68,900,000.

15              In December 2015, 68,500,000-some in a year later.

16    So that is, just give me a moment, four hundred -- so that's

17    very small, again, less than a percent.

18         Q    Now, does having an anomalous 10 percent drop for

19    one MVPD in one month, does that translate into an

20    industry-wide trend?

21         A    Certainly not.

22         Q    And going back now to your demonstrative, your

23    chart, PXD011, has your opinion changed here, Professor,

24    about whether there was a change in the industry subscriber

25    trends starting in October of 2014?

1       A    No.  I stand by that.

2            There are two issues.  One is this data, this

3   extra month.  And I think we've addressed that now.

4            The other is whether we see a trend in the data

5   that I do report on that chart, and I did test

6   econometrically whether there was a drop-off and there was

7   not one.  So I stand by what I said in court previously.

8       Q    And even with this issue of the reliability of the

9   Dish data for December of 2016, this one MVPD, does that

10  affect your response to Professor Carlton's "holy mackerel"

11  claim or criticism that was directed at the whole industry,

12  starting to trend down faster in October of 2014?

13      A    No.  I think this is a bit of a sideshow.

14           Your Honor, the main -- what I did is I looked at

15  how Suddenlink was doing before the blackout and after the

16  blackout, and I saw it dropped off, which I think is

17  reliable.

18           What Professor Carlton did was say that there was

19  a change in the industry trend, not that I wasn't accounting

20  for trends, but I missed a change in the trend in the

21  industry.  And I don't think that happened.  I stand by that

22  for the reasons given.

23      Q    Would this -- Professor, would this be another

24  example of the defendants relying on a single month of data,

25  even if it's not the best way to do economic analysis?

1          MR. PETROCELLI:  Objection.  Foundation and

2     argumentative.

3          THE COURT:  Yeah.  No.  I'll sustain that

4     objection.

5          THE WITNESS:  Thank you, Your Honor.

6     BY MR. WELSH:

7     Q    Professor, let's change topics.  I just have a

8     couple other questions for you, and then we'll finish up.

9          Professor, let's talk about the range-of-harm

10    numbers.  I think you were asked some questions about this,

11    and I specifically want to come back to the averaging of the

12    lifetime values.  There were questions asked of you by

13    Mr. Petrocelli on that subject, okay?

14         Do you recall testifying, sir, that if you used

15    the average of those 2017 lifetime values to calculate the

16    profit margins and then a 9 percent subscriber rate, loss

17    rate, that the net annual MVPD cost increase from the

18    bargaining model would be $98 million?

19         Do you remember that testimony?

20    A    Yes.

21    Q    Okay.  Now, I know you said in response that

22    that's the lower end and that Mr. Petrocelli just wanted to

23    talk about the lower end; and you wanted to, I think,

24    mention the higher end.  So let's talk about the higher ends

25    here.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              I want to ask you -- first off, let's look at

 2    2016, the 2016 margins.  If you used the 2016 margins and

 3    looked at a 14 percent subscriber loss rate, that would be

 4    the higher end; is that right?

 5       A    Yes.

 6       Q    If we did that, do you recall what the net

 7    amount -- the net annual MVPD cost increase would be in that

 8    situation?

 9       A    I think it was four or five hundred million range

10    rather than 235 million, but I don't have the exact number

11    memorized.

12       Q    If you put your report in front of you, would that

13    help you?

14       A    It would.

15              MR. WELSH:  May I approach the witness,

16    Your Honor?

17              THE COURT:  You may.

18              THE WITNESS:  Thank you.

19              MR. WELSH:  Would Your Honor would like a copy as

20    well or not?

21              THE COURT:  I think I have a copy somewhere here.

22              He's just refreshing his recollection?

23              MR. WELSH:  He is, Your Honor.  I'm just going to

24    point him to a page and that's it.

25              THE COURT:  Don't read the report out loud.  Just
```

Case 1:17-cv-02511-RJL  Document 158  Filed 08/06/18  Page 3786 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3920

1    refresh your recollection.

2            THE WITNESS:  Should I look for it or do you want

3    to help me?

4    BY MR. WELSH:

5        Q    I'll help you.

6            Your initial report, and if you look at page 65 --

7    you can tell me when you're there.  I'm going to look at my

8    copy as well to make sure I'm right.

9        A    Thank you.

10           I see the number here says $561 million annually.

11       Q    Does reading that refresh your memory that that

12   was the amount, sir?

13       A    Yes, that's correct.

14       Q    That's the amount at 14 percent, with the 2016

15   margins under your bargaining model; is that correct?

16       A    Yes.

17       Q    You can put that to the side now.  Thank you, sir.

18           And now if we spring forward and we look at the

19   lifetime value averaging margins and then apply the

20   14 percent subscriber loss rate to that, so that higher end

21   of those calculations, do you recall as to the amount of the

22   net annual MVPD cost increase there?

23       A    We're still using the 2016?

24       Q    I'm looking at 2017, looking at the averaging of

25   those lifetime values.  Do you know what -- if we're looking

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1    at the 14 percent higher bound of that, do you know what

 2    that amount is?

 3         A    I believe that's -- the number $348 million is in

 4    my head.  I think that's the right range.  I can't swear to

 5    the exact number.

 6         Q    Is that your best recollection, though?

 7         A    It is.

 8         Q    Last question for you, Professor.  After hearing

 9    the criticisms of Professor Carlton, is it still your

10    opinion, sir, as an antitrust economist, that this proposed

11    merger would lead to a substantial lessening of competition?

12         A    Yes.

13              MR. WELSH:  Okay.  I have no further questions,

14    Your Honor.  Thank you.

15              THE COURT:  All right.

16              Recross, limited to redirect.

17                           -  -  -

18                    RECROSS-EXAMINATION

19    BY MR. PETROCELLI:

20         Q    When I showed you the -- your chart with the data

21    through November 2016 when you left off December -- through

22    November 2016, when you left off December 2016 -- that was

23    Exhibit 943 that I showed you on Tuesday -- you didn't have

24    any recollection of why December was not there.

25              Do you recall?
```

1      A    I did not remember that at the time; you are

2  correct.

3      Q    Yes.

4           And now you have this recollection that it's all

5  about Dish.  What have you done since Tuesday to today to

6  refresh your recollection?

7      A    I reviewed some of the -- some of my materials

8  that I had used to prepare for testimony originally.

9      Q    So after you left court on Tuesday until today,

10  you reviewed materials related to this data; is that right?

11      A    I didn't look at data sets itself.  I just had

12  materials that I had as part of my preparation.

13      Q    But as part of your preparation, you refreshed

14  your recollection that the month you left off had to do with

15  Dish, correct?

16      A    That's correct.

17      Q    So you knew before you were just asked by

18  Mr. Welsh that he was going to ask you about that, right?

19      A    I thought he probably would, because it seemed to

20  me that was a missing piece from the cross-examination.

21      Q    So did you talk to anybody about coming to court

22  today and being prepared to talk about the Dish subscriber

23  loss in the month of December 2016?

24      A    No, sir.

25      Q    Did you talk to any members of your staff?

```
 1        A     No, sir.

 2        Q     Anybody?

 3        A     No.

 4        Q     Did you talk to anybody about anything related to

 5   this case?

 6        A     No.

 7        Q     Where did you find the materials to review on the

 8   Dish subscriber loss?

 9        A     I had them with me.  They were printed out.

10        Q     Who printed them out?

11        A     They were printed out by -- Bates White printed

12   them out for me, and I asked them to print out some

13   materials when I arrived in D.C. last Saturday to prepare to

14   testify.

15        Q     So you already had these data sets printed out

16   such that you were able to go and figure out that it was

17   about Dish?

18        A     No, I did not have the data set printed out.

19        Q     So how did you refresh your recollection

20   specifically that the month of December, which you left off

21   your chart, had to do with Dish subscriber loss?

22        A     Well, as part of my preparation, I asked my team

23   in this case, the economists at Bates White, to prepare --

24   there were a series of topics I want to be prepared, many

25   that I want to be prepared about.
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1           And this is all prior to -- it was a week ago --

2   well, not quite a week ago.  Last Saturday.  And so there

3   are some memos that they produced for me that -- to help me

4   prepare.  And one of those memos related to this topic or

5   had -- yes, related to this topic.

6       Q    Well, if you had all of that material prepared

7   before you testified on Tuesday, how come you didn't know

8   the answers to my questions on Tuesday?

9       A    Well, I thought I did pretty well, but that one

10  did not stick in my head on that particular data point.  So

11  my memory is not perfect.

12      Q    So you just went and looked at that material

13  between Tuesday and today?

14      A    Yes, sir.

15      Q    And do you recall, then, deliberately leaving

16  December 2016 off that chart when you created it for use in

17  this case?

18      A    I recall that -- actually, that's -- my

19  recollection is vague on exactly that conversation, but --

20  so I'm not absolutely certain.

21      Q    Conversation with whom?

22      A    With the Bates White people about when we

23  originally prepared the chart, about whether we -- about

24  exactly which -- how long to extend the time series.

25      Q    So you made a decision, then, in consultation with

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

 1    others to prepare this chart to show a trend; but you

 2    deliberately left off the last month of the year, knowing

 3    that it would show a steep decline, right?

 4        A    I can't -- again, I can't remember that exact

 5    conversation.  But my recollection is more from the memo

 6    that I read more recently about the data being unreliable

 7    for Dish that year.  I don't have a specific recollection

 8    about the earlier conversation.

 9        Q    And when you say the data is unreliable, you have

10    no knowledge about what actually happened at Dish during

11    that month, right?

12        A    Oh.  I don't know why they reported such a steep

13    drop-off.  But it's pretty clear to me that to the extent

14    there was a drop-off for Dish in 2016, that is not

15    informative about what happened to Suddenlink for the two

16    prior years.

17        Q    But it's --

18        A    So it --

19        Q    I'm sorry.

20        A    So I wouldn't change my analysis because of this

21    one later anomalous data point.

22        Q    But it is part of the industry, and there are ups

23    and downs and that's a down.  And to be complete, it should

24    have been included, right?

25        A    Well, again, I don't think it's reliable.  It

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3926

```
1    stands out.
2            It would not ultimately affect my conclusions much
3    if you were to include that data point because I think it
4    should get this -- it's much later.  And I just don't think
5    it's informative, like I said, about the blackout effects
6    over -- that it started more than two years earlier.
7        Q    Let me ask you about something else that you said
8    on Tuesday, and I think you just repeated it when you were
9    talking about this industry trend.
10           You said, quote -- and this is at page 3877 of the
11   trial transcript from Tuesday.
12           "We did the statistical analysis, and there was no
13   statistically significant difference in the trends."
14           Do you recall saying that?
15       A    I do.
16       Q    Now, Professor --
17           MR. WELSH:  Your Honor, objection.
18           THE COURT:  Come here.
19           MR. PETROCELLI:  Okay.
20           (Sealed bench conference)
21           MR. WELSH:  It's outside the scope of my redirect.
22           MR. PETROCELLI:  It's on the very topic,
23   Your Honor, of the industry trends.
24           And let me tell you what's going on here, okay?
25           He slipped this into an answer on Tuesday, and he
```

 1  did it again today.

 2          No statistical significant analyses appear

 3  anywhere in his reports.

 4          THE COURT:  In his what?

 5          MR. PETROCELLI:  In his reports.

 6          And I believe that he did this afterwards, did not

 7  disclose it to us -- the DOJ did not disclose it to us, and

 8  he put it into the record.

 9          And it's actually quite -- he put it into the

10  record that he did a statistical significant analysis.

11          THE COURT:  Of the trend?

12          MR. PETROCELLI:  Yes.

13          Which is a critical point that we're discussing,

14  okay?

15          And Mr. Welsh has asked him about these trends in

16  trying to establish that there was no big drop-off --

17          MR. WELSH:  My question.

18          MR. PETROCELLI:  Excuse me.

19          -- and now they're trying to cut off me from

20  cross-examining him on the same issue and slip in new work

21  that he did.

22          When we spoke on the phone Friday, Your Honor --

23          THE COURT:  Do these questions link to this?

24          MR. PETROCELLI:  This is the same issue.  This is

25  at that same chart, Your Honor.  This is the same red line

 1    we're talking about.

 2                THE COURT:  I'll let him question him.

 3                MR. WELSH:  If I can just state, Your Honor, that

 4    my questions were related to Dish on this point.  And he's

 5    going back to the transcript from Tuesday on the general

 6    subject of the trend --

 7                THE COURT:  Trends.

 8                MR. WELSH:  Sure.

 9                MR. PETROCELLI:  It's an anomaly.

10                MR. WELSH:  But not the specific issue that we've

11    been talking about.

12                MR. PETROCELLI:  It's the same red line.  Come on.

13                THE COURT:  I'll give you a little leeway on this.

14    But don't abuse it.

15                MR. PETROCELLI:  What I'm trying to do is lay a

16    foundation to move to strike that on the ground that we have

17    had no information about that.  That's all I'm trying to do.

18                THE COURT:  Let's see where it goes.

19                (Open court)

20                THE COURT:  You may proceed, based on the

21    discussion at the bench.

22    BY MR. PETROCELLI:

23         Q    So I read you that testimony about a statistical

24    analysis.  You recall that, right before our little

25    conference with the Judge?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1    A    Just now, yeah.

2    Q    Yeah.

3         And you will agree with me that there is no

4    statistical analysis of this trend identified anywhere in

5    either your first report or your rebuttal report, correct?

6    A    That's correct, because this was in response to

7    something Professor Carlton did in his rebuttal report.

8    Q    So you did this after Professor Carlton's rebuttal

9    report, correct?

10   A    That is correct.

11   Q    Okay.  And you never disclosed it to us, correct?

12   I think it may have come up in my deposition.

13        You never disclosed any work product to us about

14   any statistical analysis that you did; and even in your

15   deposition, you didn't say that you had done such a

16   statistical analysis.

17        You said you were thinking about doing some

18   things, and you hadn't decided on what you were going to do.

19        Do you recall that?

20   A    I don't recall that nuance.  I know it came up in

21   the deposition.  I don't remember the specifics that you're

22   asking about.

23   Q    Well, I can show -- I'll get the deposition, and

24   we'll show that.

25        But who ran this analysis?

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1        A    I did, supervising the people -- the economists at

 2   Bates White.

 3        Q    Why was it not given to us?

 4        A    You'd have to ask the lawyers.  I didn't believe

 5   there was another round of disclosure at this point.

 6             MR. PETROCELLI:  Well, Your Honor, may I approach?

 7             THE COURT:  You may.

 8             (Sealed bench conference)

 9             MR. PETROCELLI:  Your Honor, it's exactly what

10   I thought.  It was never -- he did an analysis after

11   Professor Carlton testified, and you recall on the phone --

12             THE COURT:  Hold on now.  Slow down.

13             I believe he just testified that he did it after

14   Carlton did his rebuttal report --

15             MR. PETROCELLI:  Forgive me.  You're right.

16             THE COURT:  -- not after he testified.

17             MR. PETROCELLI:  Even better, Your Honor.

18             THE COURT:  But before, if I understood him

19   correctly --

20             MR. PETROCELLI:  I stand corrected.

21             THE COURT:  All right.

22             MR. PETROCELLI:  I stand corrected.  So that means

23   that after --

24             THE COURT:  If he did it after the rebuttal

25   report --
```

1                MR. PETROCELLI:  After, which is February 26.

2                THE COURT:  But before some deposition that he had

3       after that?

4                MR. PETROCELLI:  No.  No.

5                THE COURT:  No?

6                MR. PETROCELLI:  He backed off of that because he

7       doesn't disclose that in his deposition.

8                THE COURT:  When was his last deposition?

9                MR. PETROCELLI:  March 8th.

10               THE COURT:  So that was before the rebuttal

11      report?

12               MR. PETROCELLI:  After.

13               THE COURT:  It was after the rebuttal report?

14               MR. PETROCELLI:  Yeah.  The rebuttal report is

15      February 26th, Your Honor.

16               THE COURT:  The rebuttal report is February 26th.

17               Okay.  When was his last deposition?

18               MR. PETROCELLI:  March 8.

19               And in his deposition, he -- and I don't have the

20      words exactly.  But he said something to the effect that,

21      I'm thinking about it; I don't know what I'm going to

22      present to the Judge yet.  Okay?

23               THE COURT:  So as of this date --

24               MR. PETROCELLI:  He had not done --

25               THE COURT:  You had not received any --

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1              MR. PETROCELLI:  Zero.

 2              THE COURT:  -- statistical analyses of this trend?

 3              MR. PETROCELLI:  Correct.

 4              And the first time we heard any word of it,

 5    Your Honor, was Tuesday.  And I just showed you in his

 6    testimony where he said it, and he's just now admitted that

 7    he did do the additional work.

 8              THE COURT:  He did it back here?

 9              MR. PETROCELLI:  Yes.

10              THE COURT:  In this area here?

11              MR. PETROCELLI:  Well -- or no.  I think it was

12    after his deposition that he actually --

13              MR. WELSH:  It was after Professor Carlton's --

14    the testimony of Professor Carlton.

15              MR. PETROCELLI:  But when did he complete it?  Do

16    you know when he -- when did he complete that analysis?

17              THE COURT:  You can ask him that, but I had the

18    impression it was before the last deposition.  That was the

19    impression I had.

20              MR. PETROCELLI:  Okay.  I think -- I'll show you

21    the deposition testimony.

22              But my point is that from March 8th, let's say,

23    until Tuesday --

24              THE COURT:  Which was April 24th?

25              MR. PETROCELLI:  Yeah.
```

```
 1              No disclosure to us whatsoever.

 2              And I need to add one other piece, Your Honor,

 3     because we had a conference call in connection with our

 4     objection to Professor Shapiro's scope of rebuttal

 5     testimony.  I think Your Honor actually said it was

 6     transcribed, although I don't have a copy of that

 7     transcript, but we have notes, though.

 8              And in that call, I specifically asked:  No

 9     regressions, no analysis, no new work?

10              THE COURT:  You asked about regressions.

11              MR. PETROCELLI:  Yes, I did.

12              THE COURT:  I remember that.

13              MR. PETROCELLI:  And Your Honor agreed with that.

14              MR. WELSH:  This is not -- okay.  Go ahead.

15              MR. PETROCELLI:  Okay.

16              And so that's -- and so they didn't know -- when

17     they put him on -- they didn't disclose that to us,

18     Your Honor.  It wasn't in that supplemental report that he

19     gave to us after that phone call, and all of a sudden now it

20     comes out.

21              THE COURT:  When was his last report?

22              MR. PETROCELLI:  He submitted that.

23              MR. WELSH:  He did a --

24              MR. PETROCELLI:  The same date, the 26th.

25              MR. WELSH:  There was a supplemental that went
```

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   last week pursuant to Your Honor's -- actually, it was --

 2   I'm losing track of my days now.

 3             MR. PETROCELLI:  It was on Saturday.

 4             MR. WELSH:  Saturday.

 5             MR. PETROCELLI:  You allowed Professor Shapiro, on

 6   three narrow topics, to submit a rebuttal -- a supplemental

 7   rebuttal report.  This is not disclosed in that.

 8             THE COURT:  It wasn't in it?

 9             MR. PETROCELLI:  No, it wasn't, Your Honor.

10             MR. WELSH:  It wasn't one of the issues that we

11   were disclosing on the supplement, Your Honor.

12             THE COURT:  So the obvious question is:  If he did

13   this analysis, statistical analysis, prior to Tuesday, after

14   this deposition on March 8th, why didn't they get it?

15             MR. WELSH:  There wasn't an opportunity to provide

16   the information.

17             THE COURT:  You can just hand it to me.

18             MR. WELSH:  I'm sorry?

19             THE COURT:  You can just hand it me.

20             MR. WELSH:  Can I confer with my colleague just to

21   see whether I have it?

22             THE COURT:  Go ahead.

23             MR. WELSH:  Thank you.

24             THE COURT:  Hold on.  He's going to go talk to his

25   colleague.
```

1           (Pause)

2           THE COURT:  All right.

3           MR. WELSH:  Your Honor, we'll withdraw his

4    reference to statistical significance.  He did talk about --

5    he did eyeball it.  It's all about this red line.  That's

6    what it's about.  And he said you can eyeball it and see

7    that there's not a change.

8           And he then talked about there being a statistical

9    significance --

10          MR. PETROCELLI:  I have no issue with eyeballing,

11   but the two references today and on Tuesday to "statistical

12   significant" would be withdrawn.

13          THE COURT:  Withdrawn.  Okay.

14          MR. PETROCELLI:  Your Honor, that'll be clear from

15   the record, then, right, yes?

16          THE COURT:  Well, my reporter just took it down.

17          MR. PETROCELLI:  Okay.

18          THE COURT:  So --

19          MR. PETROCELLI:  And the one reference --

20          THE COURT:  The Court is striking the two

21   references to the statistical analysis.

22          MR. PETROCELLI:  One of them was at page 38771, 19

23   through 21, and then today he said it again.

24          MR. WELSH:  Okay.

25          (Open court)

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3936

```
 1            THE COURT:  You may continue.

 2   BY MR. PETROCELLI:

 3       Q    One final question.

 4            Now, you were asked to run through some numbers on

 5   your high end.  But do you recall testifying on Tuesday at

 6   page 3852 of the trial transcript:  "So the way I think

 7   about these things is that I have a range.  And since the

 8   low end of the range led to significant consumer harm, that

 9   is what I reported, while [sic] there was a higher end.

10   That is what I did.  And that is my normal practice, and I

11   will stick with it."

12            You reported on the lower end, sir, and that's

13   when you stick with, correct?

14       A    I highlighted the lower end and described the

15   range, and I stick with that, yes, sir.

16            MR. PETROCELLI:  Nothing further, Your Honor.

17            THE COURT:  Okay.

18            MR. WELSH:  Your Honor, this is a housekeeping

19   measure.  I am advised that we will need to put PX559 under

20   seal because of confidentiality issues.

21            THE COURT:  Oh.

22            MR. WELSH:  The DX943 does not need to be, but

23   PX559 will be -- will need to be.

24            MR. PETROCELLI:  943.

25            MR. WELSH:  What did I just say?
```

```
1              943 does not need to be.

2              MR. PETROCELLI:  Because there's no names.

3              MR. WELSH:  Right.  So PX559 does.

4              Thank you, Your Honor.

5              THE COURT:  All right.  Any objection to that?

6              MR. PETROCELLI:  No objection, Your Honor.

7              THE COURT:  All right.  So PX559 will be admitted

8    under seal.  PX943 will be admitted but not under seal.

9              You're excused.

10             THE WITNESS:  Thank you, Your Honor.

11             THE COURT:  Take care.

12             Mr. Conrath, do you have any more witnesses you

13   want to call?

14             MR. CONRATH:  We could keep going, but I think

15   it's time to quit, Your Honor.

16             So I've got a couple of housekeeping matters.

17             THE COURT:  Housekeeping matters there?

18             MR. CONRATH:  Yes.  One is a housekeeping matter.

19             You'll recall the other day that PX558, we asked

20   to be under seal so we could redact some information.  And I

21   have a redacted copy of PX558, which if I could pass up, I'd

22   appreciate it.

23             THE COURT:  You've shown it to the defense there?

24             MR. CONRATH:  They already have it from yesterday.

25             THE COURT:  All right.
```

1          Yes, I remember this now.

2          MR. CONRATH:  Right.

3          THE COURT:  I understand.

4          MR. CONRATH:  Yeah.  It had --

5          THE COURT:  It's probably timely that you do that.

6          MR. CONRATH:  Pardon?

7          THE COURT:  It's probably timely that you do that.

8          MR. CONRATH:  Yeah, I think so.

9          Second, Your Honor --

10          THE COURT:  I'm just saying, yeah.

11          MR. CONRATH:  -- I'd like to move the Court to

12   take judicial notice of certain PXs that are public filings.

13   And I have -- if I may approach to pass these up and also a

14   short memorandum in support of this motion.

15          THE COURT:  All right.

16          The defense has seen all of this and reviewed all

17   this?

18          MR. CONRATH:  They've seen this, although I did

19   not give them the memorandum until earlier today.  And so I

20   obviously have no objection if in a day or so they respond

21   in writing, if that's their preference.

22          But the request is for the Court to take judicial

23   notice of filings that have been made by AT&T and also

24   DirecTV.  And I offer them, as appropriate in any time, of

25   course, judicial notice.  But here --

1            THE COURT:  What are they filings in?

2            MR. CONRATH:  They are filings in several

3    proceedings at the Federal Communications Commission.

4            THE COURT:  Okay.

5            MR. CONRATH:  They make statements that are

6    inconsistent with what -- some of the statements by their

7    executives in this trial, saying that the government's

8    theory of vertical integration is absurd, doesn't make any

9    sense.

10           They're basically espousing the same theory in

11   those cases.  And we ask the Court to take judicial notice,

12   which we think is entirely appropriate.

13           MR. PETROCELLI:  May I respond, Your Honor?

14           THE COURT:  You will in a second.

15           Go ahead.  Finish your thought, Mr. Conrath.

16           MR. CONRATH:  So I think this is the last -- we're

17   not calling any more witnesses, offering any more

18   exhibits -- the subject to resolution or to the Court's

19   resolving this.  We're prepared to close our rebuttal case.

20           THE COURT:  Okay.  Mr. Petrocelli?

21           MR. PETROCELLI:  Your Honor, we object to each and

22   every one of these exhibits.  We've had extensive argument

23   about these already.

24           THE COURT:  Between the parties or in front of me?

25           MR. PETROCELLI:  With Your Honor at the two days

1   of hearings that occurred prior to the first witness on

2   March 19 and March 20.

3           They've attempted to lay foundation with

4   Mr. Stephenson with one of the documents.  He had no

5   familiarity with it.

6           They have not called a single witness with respect

7   to any of these documents to try to lay foundation and get

8   them in evidence.

9           Every one of these documents is completely

10  irrelevant under 401, 402, 403.  They relate to other

11  proceedings.

12          There's been no witness testimony about any of

13  them.  Those proceedings are unrelated to this case.  They

14  have not been used to impeach any witness.

15          They are rife with hearsay.  And six of them have

16  expert reports of experts, wholly inadmissible expert

17  reports of experts who never testified, are not subject to

18  cross-examination.

19          We went through this at length on the 19th and/or

20  20th, and they didn't even attempt to put these into

21  evidence in their case-in-chief, Your Honor.

22          They never actually offered them into evidence in

23  their case-in-chief, except they tried, one of the

24  documents, Exhibit 442, with Mr. Stephenson.  You gave them

25  an opportunity to lay foundation.  They were unable to do

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3941

1  so, and the document was not admitted.

2          They did not attempt to present any of the other

3  documents to any other witnesses or call any witnesses with

4  regard to these documents.

5          THE COURT:  So as I understand it, these are

6  documents that the government is offering to be able to cite

7  in its closing brief, closing argument as admissions of the

8  company, AT&T, right?

9          MR. PETROCELLI:  That would be their argument with

10  respect to some of these, but they can't even make that

11  argument with respect to others, because, for example,

12  several of these are for DirecTV pre-acquisition.

13          THE COURT:  Pre-acquisition?

14          MR. PETROCELLI:  Pre-acquisition.

15          And those under the cases that I cited to you at

16  the time, Your Honor, are not admissions against the

17  successor company.

18          For example, that was the case of

19  Three Rivers Confections.  Statements made by a predecessor

20  in interest or employees of a predecessor are not

21  admissible.

22          I also cited case law to you that the expert

23  reports are inadmissible.

24          The citation to that is

25  Mahnke versus Washington Metro, 821 F. Supp. 2d 125.  That's

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

```
 1   a D.C. District Court opinion, 2011.

 2              THE COURT:  For the benefit of the record --

 3              MR. PETROCELLI:  Excuse me?

 4              THE COURT:  For the benefit of the record, this

 5   notebook, it's about 4 inches thick of paper.  And I have no

 6   way of knowing, from looking at this notebook, what

 7   sentences or paragraphs in here the government is pointing

 8   to as admissions that they would like to be able to use in

 9   their closing argument or in their trial brief.

10              How could I do that without knowing that for

11   starters?

12              MR. PETROCELLI:  Well, Your Honor, that is

13   certainly true.

14              This is just an inexcusable document dump on the

15   last minute of the trial, when we have no ability to respond

16   to any of this.

17              Every one of these has an explanation of

18   completely different circumstances, and I could probably

19   find you an equal number of documents in which the

20   government has asserted exactly the opposite positions,

21   including in the Comcast-NBCU merger, where they advocated

22   to Your Honor how great the arbitration remedy was, for

23   example.  And now, all of a sudden, they have no interest in

24   it.

25              THE COURT:  Yeah.
```

1          MR. PETROCELLI:  So we can both play this game.

2          These are totally different transactions.  Some of

3    them are not even transaction.  They involve sunsetting of

4    the exclusivity rule under the FCC rules.  Some of them go

5    back to other -- Charter-Time Warner merger, all kinds of

6    things in here.

7          And this is solely for the purpose of being able

8    to cherry-pick and quote, out of context, with no witness

9    testimony and with no ability of the defense to respond or

10   explain the circumstances so that they can put it in a

11   post-trial brief and probably an appellate brief,

12   Your Honor.

13         That's what this is about.  And it would be a

14   manifest injustice to, at this late stage, to let them dump

15   these documents indiscriminately into the record.

16         THE COURT:  Well, we're not going to have that.

17         MR. PETROCELLI:  And I'm happy to address all of

18   this in writing, but I don't think Your Honor needs any

19   writing.  And this is like the fourth or fifth time we've

20   passed on this issue.

21         THE COURT:  I've got a lot of paper here.  I don't

22   need any more writing at the moment.

23         So, Mr. Conrath, at an absolute minimum, you're

24   going to have to isolate and identify as to each document

25   what statement or statements you believe are, A, relevant;

Case 1:17-cv-02511-RJL  Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER*** Filed 08/06/18  Page 3810 of 3826

3944

1  B, statements that would be qualified as admissions of a

2  party, if that's your theory, okay; statements that are not

3  in violation of 403 in any way.

4          I mean, so I don't know how long it will take to

5  do that, because this is a lot of paper.  This is a lot of

6  paper.

7          And as Mr. Petrocelli pointed out correctly, I

8  might add, 442, we went through the exercise with

9  Mr. Stephenson as to 442.  And I would not admit it, under

10  the circumstances, based on the proffers that were made and

11  the things that you were pointing to.

12          So I've already rejected the admission of 442, and

13  I can't even imagine the rationale for why I would

14  essentially be reversing myself as to 442.

15          So now, I don't know how long it's going to take

16  to do what I just said.  But if you want to do closing

17  arguments Monday, you've got a lot of work ahead of you.

18          MR. PETROCELLI:  Your Honor, we would need an

19  opportunity to respond.

20          And I need to emphasize to the Court how

21  prejudicial this would be to the defendants, because we've

22  had no opportunity to address these matters.  And seeing

23  them for the first time in a closing argument or in a

24  closing brief or an appellate brief is inappropriate.

25          They had every chance to call witnesses --

1          THE COURT:  I already told you I'm not going to

2     admit it.

3          MR. PETROCELLI:  And the request for judicial

4     notice doesn't do anything.  It's not a silver bullet that

5     all of a sudden allows them to dump in hearsay and

6     irrelevant evidence.

7          THE COURT:  I've got a feeling that this is stuff

8     that you would like but you don't need.

9          MR. CONRATH:  So if I can address a couple of

10    points Your Honor made.

11         So in the -- the memorandum that I handed up

12    isolates and lists the specific statements, and I'm happy to

13    limit to those that are identified on page 3 and 4.

14         These -- it is correct that this includes 442.

15         I did not offer 442 or did not request judicial

16    notice.  And so I'm offering it under a different approach

17    here, and that's the only reason on why it would come back

18    to 442.

19         And as to the question of DirecTV, in the motion

20    that we -- the motion response that we filed with respect to

21    DirecTV in footnote -- I won't recall the number, addresses

22    the question of the appropriateness of looking at something

23    from DirecTV.

24         These documents that we've submitted do include

25    some statements that are adoptive admissions, when a party

1    submits an expert report to a court or to -- and asks the

2    Court to rely on it or in this case to a federal agency and

3    asks the Court to rely on it, that party is adopting it.

4    And I think that's a pretty standard judgment of whether a

5    party has adopted something.

6            So there are a couple expert reports in there, and

7    they're adoptive admissions for that reason.

8            So with those limitations, I think we have

9    addressed the questions that Your Honor posed, identified

10   the specifics.  And I ask the Court to --

11           THE COURT:  Well, look, here's the practical

12   reality.  The practical reality is that you want me to rule

13   on this prior to Monday.  You want to use these Monday?

14           MR. CONRATH:  I would like the right to.

15           THE COURT:  Well, I don't know how I can be in a

16   position to review all of these documents, which are

17   mammoth, in order to have the context in which the limited

18   portions you're pulling out of it, cherry-picking out of it,

19   as Mr. Petrocelli's suggests, without having some sense of

20   the context.

21           And like I said, we're talking 4 inches here or

22   more.  I mean, it's lot of paper, a lot of paper.

23           Today is Thursday afternoon.  Closing arguments

24   are supposed to be Monday morning.

25           So I just -- and we might need to have argument on

 1    some of these issues.

 2            So I've got a feeling that, at an absolute

 3    minimum, you can't use any of this Monday, any.  And none of

 4    this will be admitted by Monday, so you can't use it Monday.

 5            I'll leave open the question of whether it can be

 6    admitted by Thursday when your findings of fact are

 7    submitted and your trial brief.

 8            But I might have to have a hearing on some of

 9    these things that you're seeking to admit here.

10            MR. CONRATH:  We'd be fully prepared to proceed

11    that way, Your Honor.

12            THE COURT:  Okay.  I'll take a look at it.

13            MR. CONRATH:  Okay.  Thank you.

14            THE COURT:  Mr. Petrocelli.

15            MR. PETROCELLI:  As I also pointed out when we

16    argued about this over a month ago, expert --

17            THE COURT:  I didn't have this pleading, though.

18    I didn't have this memo back then and all that.

19            MR. PETROCELLI:  No, you didn't.

20            THE COURT:  This is a dump on the Court right now

21    at the 11th hour and 55th minute.

22            MR. PETROCELLI:  Well, not only on the Court, but

23    it's extremely prejudicial to us.

24            I just want to correct something that Mr. Conrath

25    said.

1          THE WITNESS:  The law is quite clear that expert

2     reports are not admissions and are not adoptive admissions

3     of parties.  That's Kirk v. Raymark Industries, 61 F.3d 147,

4     Your Honor.

5          THE COURT:  Yeah.

6          So as far as I'm concerned, anyway, this is all

7     off the table for Monday.  So don't be planning on including

8     it anywhere in your arguments.

9          And then we'll figure out what we're going to do

10    about it before you get your stuff in on Thursday.

11         All right.  Now, let's talk about Monday.

12         I think two hours is too much, counsel,

13    I don't think you need two hours each.

14         I'm going to have trial briefs and, obviously,

15    findings of fact.  So I think right now my inclination is to

16    limit each side to an hour and a half and allow the

17    government to take a portion of it, say, 15 minutes, to do a

18    rebuttal since you have the burden of proof.

19         So what I was thinking is starting Monday at 11:00

20    and going until 12:15.  You can go till 12:30 and use your

21    whole hour and a half.  That's your choice.

22         But whatever time you choose between the two, then

23    we'll break for lunch and we'll come back at 2:00.

24         And then the defense will do their hour and a

25    half, and we'll take a 15-minute break for my reporter,

Case 1:17-cv-02511-RJL   Document 158   Filed 08/06/18   Page 3815 of 3826
***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3949

 1    especially.

 2             And then we'll do whatever rebuttal you want to

 3    do.  You only have up to 15 minutes to do it.  And that'll

 4    take care of the closing arguments for Monday.

 5             Can you live with that?

 6             MR. PETROCELLI:  That is acceptable, Your Honor.

 7             MR. CONRATH:  Yes, certainly, that works for us,

 8    Your Honor.

 9             THE COURT:  Okay.

10             Now, in terms of the closing arguments, if you

11    want to use posterboards or whatever, you're welcome to do

12    that.  That's fine.

13             Don't do slide decks.  I don't want any more slide

14    decks.  I've got plenty of slide decks here.  I don't want

15    any more slide decks.

16             And I think that's pretty much the only other

17    issue I had.

18             Do you have any questions, counsel?

19             MR. PETROCELLI:  May I approach?

20             THE COURT:  Yes.

21             (Sealed bench conference)

22             MR. PETROCELLI:  Unusual request, but I wanted to

23    know whether it would be possible if Mr. Conrath and I could

24    maybe discuss the schedule with you in chambers with regard

25    to the timing of your opinion.  I have some more, just

 1    information that I wanted to discuss with you.

 2             THE COURT:  You mean off the record?

 3             MR. PETROCELLI:  Yeah, off the record.

 4             And then, secondly --

 5             THE COURT:  When do you want to do that, today?

 6    We could do today.

 7             MR. PETROCELLI:  Yes, that would be great if we

 8    could do that.

 9             And then the second thing is, I want to make sure

10    that in our closing arguments, findings of fact, trial

11    briefs that neither party refers to any prior or other kinds

12    of settlement discussions.

13             I bring it up, Your Honor, because they're

14    inadmissible.  And I've been reading, unfortunately, news

15    reports, inaccurate.

16             THE COURT:  News reports?

17             MR. PETROCELLI:  Yes.

18             Inaccurate news reports, reporting on settlement

19    overtures.  And I don't want to see any of this show up in

20    briefs of the parties.

21             And we certainly don't intend to do that.

22             THE COURT:  Where is this coming from?

23             MR. PETROCELLI:  You know, Your Honor, I have no

24    idea.

25             MR. CONRATH:  I haven't seen it.

Case 1:17-cv-02511-RJL   Document 158 ***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***   Filed 08/06/18   Page 3817 of 3826

3951

1          MR. PETROCELLI:  Okay.  Well, it's troubling to

2     me.

3          So in any event, I assume that counsel agrees that

4     there will be no discussion of anything that was discussed

5     prior to the filing of this lawsuit.

6          MR. CONRATH:  So, it doesn't seem to me to be --

7     I think there's nothing that is, truthfully, I'm

8     anticipating discussing.

9          MR. PETROCELLI:  Okay.  I just want to make sure

10    because I don't want --

11         THE COURT:  Say that again.

12         MR. PETROCELLI:  I wanted to make sure, and

13    I think counsel is agreeing with me, that neither party is

14    going to be citing to settlement discussions.

15         THE COURT:  Shouldn't be.

16         MR. PETROCELLI:  Okay.  Because they're not

17    admissible under the Rules.

18         MR. CONRATH:  Well, I don't want to exaggerate.

19    They are admissible for various purposes.  We all know that.

20    We understand what the Rule is, but I don't envision using

21    them in this argument.

22         THE COURT:  I did ask -- remember now, I asked

23    each side to have a few pages, write me a five-page about

24    remedy things.

25         MR. CONRATH:  Yes.

1          THE COURT:  Should it come to pass that I'm

2    thinking along those lines -- I don't know if I will or

3    won't -- but I'd rather have it in hand as an option to be

4    thinking about than not having it in hand --

5          MR. CONRATH:  Yeah, sure.

6          THE COURT:  -- and having to ask you to submit

7    something supplemental, which would cause a furor of

8    curiosity --

9          MR. CONRATH:  Yes.

10          THE COURT:  -- which we don't need.

11          MR. CONRATH:  No.

12          MR. PETROCELLI:  It's already been --

13          MR. CONRATH:  We're working on that.

14          MR. PETROCELLI:  Your Honor, on that subject,

15    I have a -- I must say I have a bit of a concern, because

16    this case -- as I've indicated to you at other bench

17    conferences, this case has been presented and defended on

18    the basis that the merger is approved or not approved.  And

19    from our standpoint, there isn't any middle ground.

20          What I don't want to see is, in our briefs, is

21    some new idea or some proposed remedy of the government

22    that's not been the subject of this trial and I have no

23    ability to respond to it, because the way this is working,

24    we're simultaneously exchanging these five pages that you've

25    requested or a couple of pages, on the same day -- by the

1   way, that day is now -- the clock moved it to two days.

2   So I think --

3            MR. CONRATH:  Thursday.  It's Thursday.

4            MR. PETROCELLI:  It's Thursday, right?

5            THE COURT:  It's next Thursday.

6            MR. PETROCELLI:  Next Thursday by 6:00 p.m.

7            MR. CONRATH:  Right.  By 6:00, we agree.

8            MR. PETROCELLI:  And I certainly don't want to

9   inundate Your Honor with more paper.  But I am a little bit

10  concerned about for the first time seeing something that's

11  never come up in trial.

12           THE COURT:  Obviously, if either side felt that

13  something was brought up in the findings or the briefs that

14  were -- that's totally shocking out, we can always have --

15           MR. PETROCELLI:  Okay.

16           THE COURT:  -- we can always have a hearing,

17  either under the husher or not under the husher, to discuss

18  it.

19           And then I can always make a decision whether

20  it would be fair, if the party that felt somehow prejudiced,

21  to give them a chance to respond or whatever.  I mean,

22  there's always that kind of flexibility.

23           MR. PETROCELLI:  Okay.

24           MR. CONRATH:  Sure.

25           THE COURT:  I don't want anyone to feel like they

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   got snookered.

2           MR. PETROCELLI:  That's what I'm concerned about,

3   Your Honor.

4           THE COURT:  I don't think it's likely for that to

5   happen, frankly.

6           MR. PETROCELLI:  Well, I understand that

7   Your Honor wants to make sure that all of your options are

8   brought to your attention.

9           THE COURT:  Well, the hard reality of the fact is

10  that judges in this type of situation are wrestling with

11  lots of discretionary authority to try to protect the public

12  to the fullest extent of their ability, even if it doesn't

13  include granting the injunction that's being requested by

14  the government.

15          So, I mean, if I were to reach the point where I

16  thought, okay, I'm not willing to grant the injunction, but

17  I want to take some steps, like in the Comcast case, where

18  you take some steps to maybe make sure there's a remedy that

19  would be kind of an added protection to the public -- we've

20  even talked about, well, maybe the Court could mandate

21  arbitration or something like that, as opposed to making

22  just a letter offer to you all, offer to give the parties.

23          MR. PETROCELLI:  Right.

24          THE COURT:  So I think it's probably more prudent

25  to have that kind of material in my hands, rather than seek

1    it, two weeks prior to the date that the thing might come

2    up.

3              MR. CONRATH:  It seems entirely appropriate to us

4    to include it in the trial briefs.  The five pages will be

5    plenty.

6              It's clear that the Court has very -- Courts have

7    very broad discretion in these cases, prayer for relief or

8    such other relief as the Court may find just and proper.  So

9    that includes a wide variety of stuff, and we will address

10   the possibilities in those three to five pages.

11             THE COURT:  Yeah.

12             So it's just really -- I'm trying to be cautious,

13   and I'm trying to also avoid a furor of curiosity --

14             MR. CONRATH:  If you're asked.

15             THE COURT:  -- and fluttering of articles in

16   papers about why is the Judge -- it's two weeks till the

17   deadline, and why is the judge asking for this now?  I mean,

18   that's not a good situation for anyone to be in,

19   I don't think.

20             MR. CONRATH:  We'll address it now.

21             THE COURT:  There would be rampant speculation if

22   I were to do that.  There would be all kind of arbitrageurs

23   doing things that -- I just don't think it's --

24             MR. PETROCELLI:  What about closing argument?  Do

25   you want any of this addressed in closing argument on

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3956

```
 1   Monday?

 2          THE COURT:  I don't think so.  I don't think

 3   that's necessary.

 4          MR. CONRATH:  Well, I'm certainly going to talk

 5   about the arbitration in the private proposal.

 6          THE COURT:  Oh, yes.

 7          MR. CONRATH:  I have no problem with that.

 8          THE COURT:  That's part of the case.  That's the

 9   evidence of the case.

10          MR. PETROCELLI:  That's the evidence of the case.

11          And that's the only issue that's been -- come up

12   in the case, and I'll address that as well, Your Honor.

13          THE COURT:  Yes.  That's perfectly appropriate.  I

14   don't see any reason not do so if you want to talk about

15   that.

16          MR. PETROCELLI:  Here's what I wanted to explain

17   to Your Honor.  I guess I can -- I prefer to do it --

18          THE COURT:  We can do it off the record.

19          MR. PETROCELLI:  I prefer it to do it off the

20   record.

21          THE COURT:  We can do that.

22          So what I'll do is I'll adjourn the Court in the

23   next few minutes, and then I'll ask John to come out and get

24   the two of you and let's go to the conference room.  It will

25   take five minutes.
```

1          MR. PETROCELLI:  Thank you.  That's all I need.

2          MR. CONRATH:  That's fine.  That's fine.

3          MR. PETROCELLI:  Thanks.

4          MR. CONRATH:  Can I ask you a question about using

5    placards and not slide decks?

6          THE COURT:  Yeah.

7          MR. CONRATH:  If we hand you something that's in

8    the form of -- that we would otherwise put in a placard, I

9    don't want to --

10         THE COURT:  No.  That's fine.

11         MR. CONRATH:  I don't want it to be a slide deck.

12         THE COURT:  In other words, it's a

13   representative -- it's a smaller version of what's on the

14   demonstrative?

15         MR. CONRATH:  Yeah.

16         THE COURT:  That's fine.

17         MR. CONRATH:  Okay.

18         MR. PETROCELLI:  It's not evidence; it's just for

19   illustration purposes.

20         THE COURT:  It's demonstrative.

21         MR. CONRATH:  It's demonstrative.

22         It could be a copy of an exhibit, something I want

23   to refer to, but perhaps I just didn't want to --

24         THE COURT:  You can show any exhibit.

25         MR. PETROCELLI:  Any exhibit is fair game.

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

1   Anything in evidence, trial testimony.

2           MR. CONRATH:  I just didn't want to tread on the

3   slide deck prohibition, Your Honor.

4           THE COURT:  It's not a prohibition.

5           MR. CONRATH:  It's just --

6           MR. PETROCELLI:  It's good judgment is what it is.

7           THE COURT:  It's good judgment.

8           MR. PETROCELLI:  Thank you, Your Honor.

9           THE COURT:  All right.

10          (Open court)

11          THE COURT:  All right.  So --

12          MR. CONRATH:  I just wanted to say one brief word,

13  Your Honor, which is, we know when a case like this comes to

14  a Court, that it's an imposition, in a sense, on the Court

15  and all of its personnel.  And I just want to express our

16  thanks to the Court and its personnel who have offered as

17  many courtesies in every way.

18          THE COURT:  That's very kind of you.

19          MR. CONRATH:  We appreciate it.

20          THE COURT:  That's very kind of you.  Thank you.

21          MR. PETROCELLI:  Your Honor, we echo that on

22  behalf of Time Warner and AT&T and everybody.  It's been an

23  absolute privilege and honor to have presented this case in

24  your courtroom with your staff, who's been extraordinarily

25  courteous and professional.  And Your Honor has gone to

1   great lengths to accommodate the parties, and we truly,

2   truly appreciate it.

3           Thank you very much.

4           THE COURT:  All right.  Well, thank you also.  And

5   it's not necessary, Counsel.

6           It's not every day one has a case of this

7   importance.  And it's not very often that, if ever, we have

8   a case that's as well prepared and well tried.

9           So it's a great compliment to both sides, and

10  we'll see what Monday brings.

11          But, you know, based on everything up until today,

12  it's pretty exemplary.

13          So thanks for all your hard work, and I think both

14  sides deserve a round of beers, at a minimum.

15          11:00 Monday.

16          DEPUTY CLERK:  All rise.

17          This Honorable Court now stands in recess until

18  the return of court.

19          (Proceedings concluded at 3:48 p.m.)

20

21

22

23

24

25

***REDACTED IN ACCORDANCE WITH JULY 31, 2018 DISTRICT COURT ORDER***

3960

C E R T I F I C A T E

   I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: April 26, 2018_____  /S/__William P. Zaremba_____

             William P. Zaremba, RMR, CRR