IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                )
                                         )
                Plaintiff,               )    CV No. 17-2511
                                         )
                                         )    Washington, D.C.
           vs.                           )    March 19, 2018
                                         )    10:30 a.m.
AT&T, INC., ET AL.,                      )
                                         )
                Defendants.              )
_____)

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Craig W. Conrath
                             Eric D. Welsh
                             Donald G. Kempf, Jr.
                             Curtis W. Strong
                             Alexis K. Brown-Reilly
                             Elizabeth A. Gudis
                             Nathan D. Brenner
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Washington, D.C. 20530
                             (202) 532-4560
                             craig.conrath@usdoj.gov
                             eric.welsh@usdoj.gov
                             donald.kempf@usdoj.gov
                             curtis.strong@usdoj.gov
                             alexis.brown-reilly@usdoj.gov
                             elizabeth.gudis@usdoj.gov
                             nathan.brenner@usdoj.gov

APPEARANCES CONTINUED

For Defendant AT&T
and DirecTV Group
Holdings, LLC:                      Katrina M. Robson
                                   O'MELVENY & MYERS LLP
                                   1625 Eye Street, NW
                                   Washington, D.C. 20006
                                   (202) 220-5052
                                   krobson@omm.com

                                   Daniel M. Petrocelli
                                   M. Randall Oppenheimer
                                   O'MELVENY & MYERS LLP
                                   1999 Avenue of the Stars
                                   8th Floor
                                   Los Angeles, CA 90067
                                   (310) 553-6700
                                   dpetrocelli@omm.com
                                   roppenheimer@omm.com

                                   Robert C. Walters
                                   GIBSON, DUNN & CRUTCHER LLP
                                   2100 McKinney Avenue
                                   Suite 1100
                                   Dallas, TX 75201
                                   (214) 698-3350
                                   rwalters@gibsondunn.com


For Defendant
Time Warner, Inc.:                 Kevin J. Orsini
                                   Peter T. Barbur
                                   CRAVATH, SWAINE & MOORE LLP
                                   Worldwide Plaza
                                   825 Eighth Avenue
                                   New York, NY 10019
                                   (212) 474-1140
                                   korsini@cravath.com
                                   pbarbur@cravath.com

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                    P R O C E E D I N G S
 2            DEPUTY CLERK:  All rise.  The United States
 3   District Court for the District of Columbia is now in
 4   session, the Honorable Richard J. Leon presiding.  God save
 5   the United States and this Honorable Court.  Please be
 6   seated and come to order.
 7            Good morning, Your Honor.  This morning we have
 8   Civil Action No. 17-2511, the United States of America v.
 9   AT&T, Inc., et al.
10            Counsel for the parties, please approach the
11   lectern and identify yourself for the record.
12            MR. CONRATH:  Good morning, Your Honor.
13   Craig Conrath for the United States.
14            THE COURT:  Welcome back.
15            MR. WELSH:  Good morning, Your Honor.  Eric Welsh
16   for the United States.
17            THE COURT:  Welcome back.
18            MR. WELSH:  Thank you.
19            MR. KEMPF:  Good morning, Your Honor.  Don Kempf
20   for the United States.
21            THE COURT:  Welcome back.
22            MR. STRONG:  Good morning, Your Honor.
23   Curtis Strong for the United States.
24            THE COURT:  Welcome back.
25            MS. BROWN-REILLY:  Good morning, Your Honor.
```

1    Alexis Brown-Reilly for the United States.

2              THE COURT:  Welcome.

3              MS. GUDIS:  Good morning, Your Honor.

4    Elizabeth Gudis for the United States.

5              THE COURT:  Welcome.

6              MR. BRENNER:  Good morning, Your Honor.

7    Nathan Brenner for the United States.

8              THE COURT:  Welcome.

9              MR. PETROCELLI:  Good morning, Your Honor.

10   Daniel Petrocelli for defendants.

11             THE COURT:  Welcome.

12             MS. ROBSON:  Good morning, Your Honor.

13   Katrina Robson for defendants.

14             THE COURT:  Welcome.

15             MR. OPPENHEIMER:  Good morning, Your Honor.

16   Randy Oppenheimer for the defendants.

17             THE COURT:  Welcome.

18             MR. WALTERS:  Good morning, Your Honor.

19   Rob Walters here for AT&T and DirecTV.

20             THE COURT:  Welcome.

21             MR. BARBUR:  Good morning, Your Honor.

22   Peter Barbur for Time Warner.

23             THE COURT:  Welcome.

24             MR. ORSINI:  Good morning, Your Honor.

25   Kevin Orsini for Time Warner.

```
 1              THE COURT:  Welcome.

 2              MR. ORSINI:  Thank you.

 3              THE COURT:  Well, there's not a lot of extra space

 4   in the courtroom, Counsel, so use it wisely and use it

 5   efficiently.  It's a little tight, but we're finally here.

 6              So let's spend the next whatever hours we need

 7   productively talking about these evidentiary issues so that

 8   when you do your opening arguments on Wednesday morning,

 9   you'll have some sense of how the evidence is likely to come

10   in and you can make whatever adjustments would be

11   appropriate under those circumstances to think through how

12   it is likely to impact your case and the way which you wish

13   to present your case over the next, hopefully, four to six

14   weeks, but I think it's looking more like six to eight.

15              It looks like you want to say something,

16   Mr. Petrocelli.  You're about to explode out of that chair,

17   I think.  Do you have a revelation or a gift?  You have some

18   kind of thing you're going to hand me, it looks like.

19              MR. PETROCELLI:  Well, I just -- may I rise?

20              THE COURT:  Sure.  Of course.

21              MR. PETROCELLI:  Okay.

22              I just wanted to make sure that Your Honor had the

23   latest joint submission of objections which were sent this

24   morning.  It's in bigger type.

25              And also, there are a number of objections that
```

 1   have been removed by both sides.

 2             THE COURT:  Well, thank you for working that out.

 3             MR. PETROCELLI:  Yeah.

 4             THE COURT:  I've not had a chance to review it

 5   yet.  I have my copy that I reviewed with my staff this

 6   weekend, which I have some notes on.  But I'll take a look

 7   at it.

 8             MR. PETROCELLI:  Okay.  Do you have an extra copy,

 9   Eric?

10             MR. WELSH:  Your Honor, may I approach?

11             THE COURT:  Uh-huh.

12             MR. PETROCELLI:  Let's make sure we're talking

13   about the same thing.

14             Yes, that's it.  Thank you.

15             MR. WELSH:  Your Honor, we do have a copy of the

16   latest joint statement of objections, which I can give to

17   Your Honor.

18             We also have, for the Court, our latest trial

19   exhibit list.  We have withdrawn a number of exhibits.  And

20   it's reflected on the exhibit list.

21             THE COURT:  Good.  Thank you.

22             MR. WELSH:  There's a cover letter to the Court

23   explaining the document withdrawal.

24             THE COURT:  You can give all that stuff to John

25   here.

1              And if you have extra copies of this chart, you

2    can give the Clerks each one, if you have an extra one, for

3    each of the Clerks and for me.

4              MR. WELSH:  I do have an extra copy, Your Honor.

5              Also, just for the record and for Your Honor, we

6    have a disk in here with the new load, which has the

7    hyperlinked exhibits in there.

8              We did have a few exhibits.  Again, we've

9    withdrawn a few.  We had a few that had some pagination

10   problems.  We've corrected it.

11             Defendants are aware of all of this, and I don't

12   believe we have any issues there.  But I just wanted to get

13   the latest to the Court.

14             THE COURT:  Thank you so much.

15             MR. WELSH:  Okay.

16             THE COURT:  I appreciate that.

17             Well, that's one of the reasons why we have this

18   little two-day period.  We can make adjustments, and we can

19   type things up.  And then once we start Wednesday with the

20   evidence and the arguments, it will be a more smoother and

21   more efficient process.

22             MR. WELSH:  Thank you, Your Honor.

23             THE COURT:  Thank you very much.

24             I'm still glad I have my bifocals.

25             We'll take a look at these later.

1          So let's start with kind of two of the kind of
2   overarching issues that I think are going to keep repeating
3   themselves with regard to the objections to the evidence.
4          The first, of course, is the concern the parties
5   have about whether or not something qualifies as a business
6   record and should, therefore, qualify under the Business
7   Record Exception to the hearsay rule.  And, I mean, that's
8   one of those issues that's going to keep coming up.
9          And then, of course, under that same umbrella,
10  there's the other option of whether something is a statement
11  of an opposing party.  They're kind of interrelated in terms
12  of possibility in a given situation.
13         And then, of course, the other issue that's going
14  to keep coming up with relevancy.  There are a lot of
15  objections based on relevancy.  And that's fine.  Relevancy
16  is a very common objection to evidence.
17         But it's going to help me lot, especially before
18  we start with the arguments and the evidence on Wednesday,
19  to have a little clarity from both sides on the relevancy
20  issue, particularly as it relates to some of these documents
21  that are on your chart here.
22         So I want to start first, though, with the
23  Business Records Exception.
24         Obviously, there are many exhibits where this is a
25  hearsay objection.  And the government's response -- at

1    least they seem to be mostly exhibits that the government is

2    introducing.  But I'm sure there's some on the other side as

3    well, I'm sure, where the defense is objecting as hearsay

4    and the government is saying, look, this is a business

5    record, and it should be able to come in as a business

6    record.

7            Now, most of those, I'm not saying all, but most

8    are emails.  And some of them are even email chains.  And

9    I think everyone can agree -- if you don't, obviously, I'll

10   hear from you on this.  But the mere fact that something is

11   an email that's made on a business computer does not

12   necessarily mean it qualifies for the Business Records

13   Exception.

14           I don't think there's much debate on that.

15   I think the Courts have been pretty clear on that.  And

16   that's why it's important, when introducing these emails --

17   and fortunately or unfortunately, the way business is

18   conducted these days in this country and the world is a lot

19   of email evidence that's discovered in the process.  And

20   that's one of the things we have to wrestle with.

21           So I've already indicated that I'm not inclined to

22   allow emails to come in unless we have at least the sender

23   or the receiver that can attest to the foundation of the

24   email.

25           And, of course, that problem becomes more

1    exponential when you have chains of email.  We have all

2    these various parties who are receiving them.  We don't even

3    know if they got them.  We don't know if they saw them.  We

4    don't know if they were accidentally deleted.  They weren't

5    the one who sent it, and they certainly weren't the last one

6    to receive it.  So you just don't know.

7            So I wanted to give each side a chance to discuss

8    these issues, in general terms, before we plunge into any of

9    the specifics.

10           I know the government and the defense both have

11   thought this all through, but the Court is going to have to

12   rule on a lot of these as it relates to specific documents

13   that the government wants to get in or the defense wants to

14   get in.

15           So let's start with that.  Let's start with that

16   problem/issue that is going to be a recurring one.

17           MR. PETROCELLI:  Thank you, Your Honor.

18           So let me see if I can try to crystallize where we

19   are on this.

20           THE COURT:  I assume you agree with the premise?

21           MR. PETROCELLI:  Absolutely, Your Honor.

22           THE COURT:  Now, just because something is done on

23   a computer of the AT&T company or Time Warner company or

24   something, that doesn't make it a business record.

25           MR. PETROCELLI:  No.  That's absolutely correct,

1    Your Honor.

2           And what -- as you know, and I think the Court has

3    indicated its guidance on this, the government wanted to put

4    in those four boxes of documents there, Your Honor.  There's

5    probably, I don't know, thousands of pages there.  There's

6    160-something plaintiff exhibits, and they want to put those

7    all into the record without a witness addressing any of

8    those documents.

9           And I thought we were past this issue, but I

10   learned over the weekend that the government is still

11   maintaining that it wants those four boxes of documents to

12   come into the record without a witness.

13          We vehemently object.  Those documents are replete

14   with emails.  I personally looked at every single one of

15   them.  They have all kinds of PowerPoint decks that are

16   hundreds of pages.

17          And our position was very simple, and it's

18   actually reflected in the new submission that we made to

19   you, is that we will have very few objections to all these

20   documents, Your Honor, provided that they show it to a

21   witness:  Did you see it?  Did you receive it?  Ask a couple

22   of questions about the document to connect it to the case.

23          And if --

24          THE COURT:  So kind of like the old-school way of

25   trying cases.

1          MR. PETROCELLI:  I would say so.

2          And I just want to punctuate this point,

3    Your Honor, by reading from the plaintiff's trial brief,

4    pretrial brief at page 67, under the heading, Trial

5    Presentation.

6          Because defendants, like most large corporations,

7    extensively use email, presentations, and memoranda in

8    conducting their business, it is essential to see their

9    documents to understand key facts.

10          I could not agree more, and yet they want the

11   Court to see these documents behind closed doors, not during

12   the trial, and not without a witness, who can explain what

13   the documents mean to Your Honor.

14          It is not possible to understand the facts of this

15   case by seeing thousands of pages of documents for the first

16   time after the trial is over when nobody has had an

17   opportunity to address the documents to the Court.

18          I have made clear to the government that if they

19   want to add additional witnesses, within reason -- remember,

20   we had a limit of 30 -- they can call those witnesses.

21          THE COURT:  Let me stop you right there.

22          It's not going to be a good argument for either

23   side, either side, to say, well, this is going to extend the

24   trial a bit.

25          Now, it's one thing if it's going to extend the

 1   trial three months.

 2           MR. PETROCELLI:  Exactly.

 3           THE COURT:  But if it's going to just extend the

 4   trial a number of hours or even a couple days, that's not

 5   going to be a good argument.

 6           This is a case that's too important to both sides

 7   and to the future of this industry to -- you know, a few

 8   days, one way or another, come on.  We'll just do it.  I'll

 9   cancel things.  We'll get it done.

10           So I don't want to hear those kind of arguments,

11   and I'm kind of assuming I won't, frankly.  But I might as

12   well give you a preview of that issue.

13           MR. PETROCELLI:  Well, I appreciate it,

14   Your Honor.  But I really don't believe that at the end of

15   the day when the documents are submitted in court during the

16   course of the trial, that it is going to extend it more than

17   a day or so, if that.  And, again, we're willing to make the

18   witnesses available if they want to add a couple of

19   additional witnesses.

20           So assuming the documents come in through

21   witnesses, Your Honor, I do not believe that you're going to

22   see too many objections from us with respect to real

23   business records, like data and information that's put

24   together in a report or something.

25           What you will see from time to time is that within

1     a number of these emails, for example -- and let's assume

2     the witness properly authenticates the email -- yeah, I saw

3     this and, yeah, we talked about this, right -- oftentimes in

4     those emails, Your Honor, there's an embedded level or two

5     of additional hearsay.

6              So someone might say, hey, you know, I spoke to

7     such-and-such at some other company, or they may attach some

8     article.  Those other statements don't come in for the truth

9     of the matter asserted.  The press clippings and articles

10    don't come in for the truth of the matter asserted.

11             And we trust Your Honor's judgment that in going

12    through these documents, that Your Honor would not receive

13    those for the truth.  And we don't want to have to burden

14    the Court to stand up on every document, unless Your Honor

15    wishes us to, to say, we have no objection except with

16    respect to the embedded hearsay, we object for that coming

17    in on the truth.

18             Now, we could do that every time or we could just

19    entrust it to Your Honor to sort that out on your own.

20             But that's the primary issue that I see in these

21    documents.

22             THE COURT:  Well, remember, the Court's at a big

23    advantage vis-à-vis the parties in terms of familiarity with

24    the documents and familiarity with how these documents

25    relate to the strength of your case or your defense.

1            So the Court needs to hear, I'm not saying

2    ad nauseam, but I do need to hear and benefit, have the

3    benefit of your experience and knowledge on some of these

4    issues.

5            It's going to be very important, because this

6    is -- you know, I'm just learning this, so to speak, in

7    terms of my exposure to these records, these documents.

8            You've been wrestling with them for months and

9    months and months, and you're very familiar with them.  And

10   you're team has been wrestling with them too, I might add.

11           So you're very -- you're at a level of knowledge

12   and exposure to these things way beyond what the Court is.

13           The Court's going to run and try to catch up as

14   best it can, but I will definitely profit from having your

15   insight on that.

16           So while I don't -- look, I'm not looking for

17   arguments ad nauseam on the one hand; but on the other hand,

18   some indication from each side as to its thinking on this

19   particular subject.

20           For example, one of the one thing that's become

21   obvious to me in the limited time I've had to look at these

22   is that oftentimes the email seems to be desirable to the

23   government because they want something attached to it.

24           The person who authored the email, for whatever

25   reason, attached a deck of slides.  There seems to be a lot

 1  of deck of slides going on around this case.  I don't know

 2  why there's so many decks of slides -- I mean, this is a new

 3  way of doing business, at least from my perspective.

 4          Thinking back to when I was in private practice, I

 5  don't remember my clients having these issues.

 6          But the deck of slides thing, well, if the person

 7  who authors the email didn't author the deck of slides,

 8  sometimes you can't tell that from looking at the email.

 9          Well, whose deck of slides is this?  And where did

10  it come from?  And what's the basis for it?  Like you said,

11  are they being offered to prove the truth of the matter

12  asserted within the slides or aren't they?

13          Now, having the person sitting in the witness

14  seat, they can be asked those questions pretty quickly,

15  pretty easily.

16          Where did you get these slides from?

17          Did you create them?

18          At whose direction did you address them?

19          Where did the data come from that you relied upon?

20          Et cetera, et cetera, et cetera.

21          That would be very helpful for me, although it may

22  be for you all, with your level of knowledge of the case,

23  maybe a little redundant or maybe not that helpful to you.

24  But to me, it would be very helpful to know some of these

25  things.

1          MR. PETROCELLI:  Yeah.

2          And so the short answer is, Your Honor, we think,

3    with that guidance, that the witnesses can be asked to

4    address these documents.  They can provide the necessary

5    foundation.  And with some simple questions and answers, you

6    can determine whether the witness has any meaningful

7    knowledge about the documents.

8          And I think if we go down through that approach,

9    it will actually go quite smoothly and we'll know what's

10   relevant and we'll know what doesn't have to come into the

11   record.

12         THE COURT:  To what extent, thinking kind of big

13   picture of your objections that I have here on the record in

14   your filing, to what extent are these objections not so much

15   to the person who authored the email but to all of the

16   people that have been put on the chain, who have been

17   participating in the chain and having their email responding

18   in some way to the original email that was done by the

19   person who started the chain?

20         MR. PETROCELLI:  Well, that's certainly part of

21   the problem as well, Your Honor.

22         And oftentimes, what the Courts can do is they'll

23   just have part of the email end up coming into evidence, the

24   part that was relevant to the testimony.  And the rest can

25   be, you know, cut off from the document when it's presented

1   to the Court for admission.  So it can be handled any number

2   of ways.

3           But I think those are the general comments that

4   I wanted to make.

5           As long as we have witnesses talking about

6   documents, I think this will be most informative to the

7   Court and make the record, importantly, most clear.

8           THE COURT:  Okay.

9           MR. PETROCELLI:  Thank you.

10          THE COURT:  Thank you.

11          Mr. Conrath, or someone on your team?

12          MR. CONRATH:  Mr. Welsh is taking care of this

13  from here, Your Honor.

14          THE COURT:  Okay.  Very good.  Thank you,

15  Mr. Conrath.

16          Mr. Welsh.

17          MR. WELSH:  Thank you, Your Honor.

18          In response, Your Honor, I agree with

19  Mr. Petrocelli when he read from our trial brief about the

20  importance of the defendants' documents here.  They clearly

21  are important to the government's case --

22          THE COURT:  Sure.

23          MR. WELSH:  -- whether it be email, PowerPoint,

24  reports, or memoranda.

25          Your Honor, I think that looking at the situation

1   with -- and I wanted to respond to one other thing, which

2   is, with respect to 167 documents, I just want the record to

3   be clear, we're not asking to have all 167 documents,

4   exhibits admitted without a sponsor.

5          There is a grouping of that, and I'll come back

6   and talk about that in a minute.  But I did want to put that

7   out there --

8          THE COURT:  Sure.

9          MR. WELSH:  -- initially.

10         Your Honor, with respect to the two issues that

11  you've raised, the Business Records Exception, and then

12  I would also, with the Court's indulgence, also talk about

13  the statements of a party under 801(d)(2).

14         THE COURT:  We'll get to that at some point.

15         MR. WELSH:  With respect to the business records,

16  as Your Honor noted, the way the businesses work today, at

17  least as we've seen in this industry, there is a tremendous

18  amount of email that gets sent around between the employees

19  of the companies.

20         They also, as Your Honor has correctly noted,

21  there is an awful lot of PowerPoint presentations here.

22  That is the way that these businesses operate.

23         You will see it both from defendants, with AT&T

24  and Time Warner, and you'll see it with some of the

25  third-party documents that are coming in as well,

1    Your Honor.

2            PowerPoint presentations are today's memorandum

3    that we would have drafted a number of years back.

4            THE COURT:  Yeah.  Well, that's -- I'm sensing

5    that, certainly.  And so I'm going to really need to sort of

6    peel back that artichoke and get down a few layers because

7    I'm not letting any PowerPoint in that I don't know who

8    authored it, at whose direction it was authored, when it was

9    directed, when it was authored, what was relied upon.  None

10   of that is coming in until all those questions are answered.

11           And the circumstances under which it happened.

12           You know, look, this, what's happening with this

13   email stuff at these companies is it's taking the place, in

14   part, of what used to happen at the water cooler.

15           You know, people get together and chat, in the old

16   days would chat about, well, what's going on?  Or have you

17   heard the latest?  Or whatever.

18           That kind of email traffic, I don't see how that

19   could ever qualify, frankly, as a Business Records Exception

20   ever.

21           But there's other kind of business records, in the

22   form of emails, that clearly qualify as business records,

23   clearly.

24           And making sure the distinction between what used

25   to be water-cooler conversation and a real business record,

1    it seems to me, has got to be demonstrated; it's got to be

2    clear.

3           MR. WELSH:  Yes, Your Honor.

4           And I think as to the former, what you have

5    described as being the water cooler chatter now in an email,

6    we would see those coming in under 801(d)(2), with the

7    statements against the party in interest here.

8           THE COURT:  Well, that's not that simple either,

9    now, Mr. Welsh, because just because it's a person in a

10   company who sends something doesn't mean that they are at a

11   level of responsibility and at a level of importance in the

12   company that they can make a statement for the company.

13          And knowing who they are and what their role is

14   and what their purpose is and what their authorization is is

15   going to be important in order to determine whether

16   something can qualify under 801(d)(2) as a statement of a

17   party opponent.

18          MR. WELSH:  Would you --

19          THE COURT:  We're going to have to peel that back.

20   We're going to have to figure out that.

21          MR. WELSH:  Would Your Honor like me to go into

22   that issue now or wait?

23          THE COURT:  We'll come to it.  I want to obviously

24   give Mr. Petrocelli a chance to talk about that too.  He

25   didn't get into that.

1          I'm focusing more now at the moment on just emails

2   itself --

3          MR. WELSH:  Yes, Your Honor.

4          THE COURT:  -- and what your thoughts are, what

5   your concerns are, frankly, about admitting these emails and

6   email chains.

7          MR. WELSH:  Yes.

8          Well, with respect to email, I think that some of

9   the email certainly does come in as a business record.

10  I think you look at the email; and on the face of it, these

11  are email exchanges between employees of AT&T, employees of

12  Time Warner.  They're discussing projects that they're

13  working on.

14         It's evident in the email itself that this is the

15  way that they're transacting business.  It is not what

16  Your Honor has referred to as the water-cooler chatter.

17         I think those clearly come into the category of

18  job this is an email that was prepared in connection with

19  what their job responsibilities are and what they're doing

20  in the business.  And that's, I think, a reasonable view for

21  the document coming in.

22         THE COURT:  Right.

23         MR. WELSH:  I think PowerPoint decks, again, same

24  issue.

25         THE COURT:  What percentage would you guesstimate,

1    Mr. Welsh -- and I realize it's an guesstimate.

2              What percentage would you guesstimate are emails

3    between AT&T employees or Time Warner employees and other

4    third parties?

5              MR. WELSH:  Between AT&T?

6              THE COURT:  Not internal, not internal emails, you

7    know, AT&T employee to -- AT&T employee 1 to AT&T

8    employee 2, or even AT&T to Time Warner employees.

9              But third parties?

10             MR. WELSH:  I do not know what that number would

11   be from our exhibits.  I don't believe that it is a --

12             THE COURT:  High percentage?  Small percentage?

13             MR. WELSH:  I believe that to be a lower

14   percentage.  I think the emails that we're talking about are

15   internal to the defendants themselves, for the most part.

16             There are some.  I won't say that there are not.

17             THE COURT:  Oh, of course.

18             MR. WELSH:  But I think proportionally, it's going

19   to be more internal to AT&T and Time Warner.

20             THE COURT:  Okay.

21             MR. WELSH:  And, again, with respect to the

22   PowerPoints which we are focusing on, those documents are

23   being sent around internally at AT&T and Time Warner.

24             In some cases they're going back and forth between

25   AT&T and Time Warner with respect to this transaction.

 1              But the PowerPoint presentations I do think

 2    qualify as business records under the hearsay exception.

 3    They're prepared internally for use by senior executives in

 4    the organization.

 5              THE COURT:  Well, that'll be a question:  Are

 6    they?

 7              In other words, based on my limited review to

 8    date, when I see a PowerPoint that's attached to an email,

 9    on the face of the document, I have no way of knowing, for

10    example, will it ever be used in a presentation?  Has it --

11    you know, who authored it?  Who required it?  What was it

12    based on?

13              I don't know any of those things from just looking

14    at the email and looking at the PowerPoint.

15              It could be a situation, of course -- absent

16    testimony to the contrary, it could be a situation where the

17    person thought this was going to be used by a senior

18    executive and they never ended up using it, because, for

19    whatever reason, they thought the data in it -- this is a

20    hypothetical -- was inaccurate or was inappropriate or was

21    too revealing of a company's thinking on some issue or

22    something like that.

23              So it would seem to me that anytime you want to

24    introduce a PowerPoint slide show, the person who you're

25    going to introduce it through is going to have to know the

1    answers to these questions.

2            They're going to have to know -- they're going to

3    have to, preferably, be the person who made it, created it.

4    They're going to have to know what the basis of it was, what

5    record or documents they used.  Who directed them to make

6    it?  Was it ever used?  In what setting was it used?  Were

7    they present?

8            I'm going to need context before I'm just going to

9    admit this kind of stuff into the record.

10           MR. WELSH:  Yes, Your Honor.

11           THE COURT:  Believe me, in the olden days --

12   certainly Mr. Conrath and Mr. Petrocelli remember those

13   days -- they're my vintage -- Judges in these kind of cases

14   just simply said, well, I'll take it for what it's worth.

15           That was pretty much what they would do in bench

16   trials.  Don't fight over evidence, gentlemen.  I'll take it

17   for what it's worth, and then leave it to people to wonder:

18   What did he think it was worth?

19           Well, this is not that kind of case.  We're past

20   that point now.

21           We can't -- I can't just do it that way.  Believe

22   me, it's tempting.  It would be very tempting to just simply

23   say, well, don't worry about it; I'll take it for what it's

24   worth.

25           You can't do that here.  The stakes are too high.

 1   There's too much interest on both sides that we've got to be
 2   clear on these things.
 3           Now -- and I appreciate, it's going to slow things
 4   down.  And that's okay.  That's the price we have to pay,
 5   though, for getting it right and getting it clear.
 6           I'm willing to do it, and I think your parties are
 7   willing to do it, too, because they know the stakes are that
 8   important.
 9           MR. WELSH:  Yes, Your Honor.
10           If I can comment on one thing which Your Honor
11   just referred to.
12           THE COURT:  Sure.
13           MR. WELSH:  And that is the witness talking about,
14   well, it's a draft and did it go for presentation to the
15   senior executives?  You're using that hypothetical.
16           THE COURT:  Yeah.  Do they know?
17           MR. WELSH:  With respect to that, Your Honor,
18   I know that we do have some draft presentations, draft X.
19   And it's part of the process, again, of these individuals,
20   these employees, at the defendants', in terms of what
21   they're doing in the business.  And they prepare these
22   drafts; they then circulate them; they comment on them.
23           We don't believe that to qualify as a business
24   record under the hearsay exception, that it has to be that
25   final draft that goes to a senior executive.

1            The draft itself can be part of a business record

2    of a corporation if it's part of what a team is working on,

3    for example, in coming up with what the presentation will be

4    to senior executives, to a board, that sort of thing.

5            THE COURT:  Certainly, it's insightful as to what

6    they're thinking.

7            MR. WELSH:  Exactly.

8            THE COURT:  It is insightful as to what their

9    thinking is.

10           But whether their thinking was ever accepted or

11   adopted by someone at a higher level or, perhaps, more

12   importantly, at a level where decisions are actually made,

13   you know, I want to be cautious about assuming.

14           And I don't want to assume at any point that just

15   because someone did a PowerPoint at, say, a lower level,

16   that that can be attributable to people at a higher level,

17   where the decision-makers are making the decisions for the

18   company.

19           MR. WELSH:  Right.

20           Well, I'm not aware, though, of there being a

21   requirement under 803 which would require that the deck

22   elevate to that level, to a senior executive.

23           So I do think that -- and what I'm hearing from

24   the Court is that you'll want to look at these PowerPoint

25   decks individually.  But I think the fact that someone is

1   doing a draft of a PowerPoint deck and if it that

2   employee -- and the people that we're talking about here,

3   Judge, are -- these are executives that are doing these

4   things.  These are vice presidents and presidents of

5   organizations.

6           THE COURT:  See, I didn't know that off the top of

7   my head.  So that helps.

8           MR. WELSH:  Yeah.  We're not talking about someone

9   who was just hired off the street.  I mean, these are folks

10  that have been in the organization for years that are doing

11  these decks.

12          And so their thinking in these drafts, when

13  they're presenting it to their colleagues -- and sometimes

14  these will be teams of four or five working on a particular

15  issue -- that gets then elevated.

16          Now, sometimes it might not go anywhere because

17  that's where it ends.

18          THE COURT:  Right.

19          MR. WELSH:  But the fact that they did that draft

20  and have presented it internally -- it could have been

21  killed by, by the way, for a number of reasons, including --

22  you know, if legal got involved, then it might have ended.

23  That's important here too, Your Honor.

24          But I think with respect to drafts, and they're

25  working on this and the thoughts that are going down on

 1   there, I think that's going to be actually very helpful and

 2   important for the Court to be able to see that to understand

 3   what their thinking is in terms of how this industry is

 4   going to work, what they're thinking about what'll happen

 5   with the merger if it were to go through.

 6          All of those things are really very important

 7   issues here.  And I think just simply because it might be in

 8   a draft, it does not mean that it should not be considered

 9   for potential admission as a business record.

10          THE COURT:  Well, is it clear in most instances,

11   based on your experience, Mr. Welsh, what decks are actual

12   drafts, what decks are actual final decks?

13          MR. WELSH:  I think that comes down, sometimes, to

14   the cover emails that Your Honor mentioned.

15          THE COURT:  Yeah.

16          MR. WELSH:  We have included them so that it

17   provides some context.

18          Sometimes, the parties, the AT&T or Time Warner,

19   will actually put on the cover of the deck, the slide deck,

20   that it's a draft.  And then sometimes it's not.

21          And so we have included some of those cover emails

22   to provide that sort of guidance.

23          THE COURT:  All right.

24          MR. WELSH:  I think that's all I have to say with

25   respect to the business records.

1            And we do believe that there is certainly,

2    authority out there, including in this District Court, for

3    admission of emails as business records.

4            And certainly, the PowerPoints, again, if you go

5    back to the time period where we looked at memos being

6    drafted, there's a great deal of authority out there on

7    that, which I'm sure Your Honor is fully aware of.

8            We'd be happy to give citations to the Court if

9    that would be helpful, or we could do that later if the

10   Court would also like to see the citations.

11           THE COURT:  All right.

12           MR. WELSH:  Okay.

13           THE COURT:  Let me give Mr. Petrocelli a chance to

14   respond to that, and then we'll come back and we'll deal

15   with the 801 issue.

16           MR. WELSH:  And one other thing I did jot down

17   from what Mr. Petrocelli was saying.  You talked about some

18   of the emails having embedded hearsay that might be a point

19   where there's something that's being discussed by someone

20   else who's outside of the organization.

21           I think we have tried to note in our response to

22   their objections that we would not be trying to introduce

23   that portion of the email, for example, that might be

24   talking about what someone else from outside the

25   organization has said for the truth of the matter stated as

1    simply being admitted for other reasons, whether it be as a

2    business record or whether it be as an admission.

3            THE COURT:  What about email chains themselves?

4    Are there going to be some chains where it really doesn't

5    matter to you all who they were sent to; what matters is who

6    authored it and who has got the ball rolling?

7            MR. WELSH:  Yeah.  It's an interesting -- it's a

8    really interesting question.  There are an awful lot of

9    email that are between one or two people.  And then there

10   are emails, as Your Honor notes, where they're longer

11   chains; they're going to three or four different people

12   being added and that sort of thing.

13           I don't think, from the perspective of the

14   Business Records Exception under 803, and we'll talk about

15   in 801 in a bit, but I don't think that that impacts the

16   question for the Court as to whether or not that email is --

17   qualifies as a business record.

18           I think that when -- I'll give you an example,

19   Your Honor.  There might be an e-mail chain that goes back

20   and forth internally at AT&T and DirecTV about a particular

21   strategy that they're trying to invoke with respect to some

22   of these third parties.  And that email chain will go back

23   and forth between three or four different individuals, they

24   might be adding some additional thoughts.  All of these

25   people are part of a group within the defendant, AT&T.  They

```
 1    all report up through lines of authority and that sort of
 2    thing.
 3            The fact that we might have, instead of two people
 4    on that email but three or four that are going to be added
 5    to it that are part of this group, I don't think it changes
 6    the calculus for the Court as to what Your Honor would be
 7    looking at as to whether or not that's a business record.
 8            If it's been prepared and as part of a
 9    communication of a strategy that they're trying to develop
10    or an approach that they want to develop in terms of what
11    they're doing in the business, then I don't think that
12    that -- the fact that there might be more people added to
13    that chain, changes the initial question:  Is that part of
14    the business of the organization, what they're doing and how
15    they're trying to effectuate it, through email rather than
16    doing it in person in a conference room?
17            I think if we put it into that setting and
18    everyone was in a conference room having that same
19    discussion, I don't think we would hear the defendants say
20    they're not conducting business there.  They are.  They're
21    doing AT&T, DirecTV, or Time Warner's business.
22            The fact that they decide not to go into a
23    conference room and have that discussion but instead do it
24    by email because it's more convenient, is different.
25            THE COURT:  Maybe at some point the lightbulb will
```

 1   go off that they were better off doing it that way.

 2               MR. WELSH:  Maybe so, Your Honor.

 3               THE COURT:  In my *In Re: Fannie Mae* litigation

 4   case, I think there were 30,000,000 documents produced, and

 5   the estimate was 17,000,000 were email.

 6               You know, when the case got to the end for summary

 7   judgment motions, I asked the counsel once, how many of

 8   those emails do you think were actually relevant and really

 9   important to the outcome of the case?  And the estimate was

10   about a thousand.

11               But lot of money was spent on lawyers and staff

12   reviewing those 30,000,000 pieces of documents and those

13   17,000,000 emails.

14               Someone's profiting from it all.

15               MR. WELSH:  It is the times.

16               THE COURT:  Yeah, well, maybe this will become a

17   case study on how to do things differently.

18               MR. WELSH:  One more point, if I may, briefly,

19   Your Honor.

20               I should note, too, that we have at this point one

21   third party that has submitted to us a certification that

22   their documents that we would be seeking to introduce are

23   business records of that third party.

24               We don't know if we'll have others from third

25   parties; we may.  But I just wanted to point that out to

1    Your Honor, and we'll be giving that to defendants' counsel

2    and then also to Your Honor.

3              And that certification would reach some what we've

4    been talking about in terms of PowerPoint decks, and these

5    are a third party that is in the industry.

6              THE COURT:  Well, of course, the Court is the only

7    one that'll make the final call on whether something

8    qualifies --

9              MR. WELSH:  Yes, Your Honor.

10             THE COURT:  -- as a business record.

11             MR. WELSH:  Correct.  Yes.

12             THE COURT:  They're entitled to their own opinion,

13   of course.

14             MR. WELSH:  I just wanted to let Your Honor know

15   about that fact.

16             THE COURT:  Very good.

17             MR. WELSH:  Thank you very much.

18             THE COURT:  Mr. Petrocelli.

19             MR. PETROCELLI:  Yeah, just briefly.

20             I think this discussion illustrates the point

21   Your Honor made at the outset, which is there isn't a "one

22   shoe fits all" answer to all of this.

23             You have to put the witness on the stand and find

24   out:  Did you have anything to do with this?  Are you

25   involved in any decision-making?  Was this a draft?  Who

1   did you send this to?  What instructions did you get?

2          You can't make these sweeping generalizations in

3   advance in the blind.  You just have to take it one by one.

4   It's the way trials are conducted.

5          It turns out, Your Honor, you hit on a very

6   important issue that you will see during this case, which is

7   that the government is relying on a number of documents

8   produced by lower-level people.  They have 18 exhibits from

9   one young man who just came out of business school, for

10  example.  And they have them on the witness list.

11         They have more exhibits for this fellow than they

12  do for the chairman and CEO of the company.

13         Now, this fellow, he's a good employee, but he had

14  absolutely nothing to do with the decisions that were made

15  to acquire Time Warner.

16         And so it's for that reason that these witnesses

17  need to take the stand so Your Honor can see for yourself

18  whether and to what extent this is really meaningful to your

19  decision in this case and to the facts of the case.

20         The fact that emails are done in a business

21  instead of talking in a conference room does not make them

22  business records.

23         Business records have a particular set of

24  requirements that are in the Evidence Code about how they're

25  maintained in the regular course of that person's business;

1    they have to have an indicia of reliability.  And that's why

2    we need to understand, you know, for these --

3          THE COURT:  So what would be your -- I'm

4    anticipating the argument that, well, Mr. Petrocelli, this

5    is the way we do business at such-and-such corporation.  We

6    circulate emails -- we have email discussions between the

7    workers, and we attach these slide shows and we send them

8    around.  And we do this in the regular course of business;

9    so, therefore, it is, per se, some kind of a business

10   record.

11         MR. PETROCELLI:  Well, we would disagree with

12   that, Your Honor, because it has to be the duty of that

13   person to conduct that business, someone whose job it is to

14   do a particular activity.  That's what the rule is about.

15         It doesn't sweep everything done in a business

16   under the business records.

17         Now, it may turn out many of these documents are

18   business records, and I'm not sure there will be an

19   avalanche of business record objections so as long as the

20   witness is on the stand and we get a little information

21   about that particular document.

22         I don't know what documents they're really going

23   to use.  I mean, they have 600 or so on the exhibit list,

24   and I doubt if they're going to introduce all 600.

25         Drafts is a real problem here, because, for

1    example, Your Honor, at page 42, footnote 76 of their brief,

2    they cite Exhibit 32.

3            Exhibit 32 is a draft document, and this is one of

4    many drafts.  I just used this by illustration because it

5    was discussed in their trial brief.

6            It's a draft document that was later changed,

7    okay, by this set of employees.  They've prepared the draft.

8    It was later changed.  The final version was then submitted,

9    in this case to the chairman and CEO, who, actually,

10   disagreed with what was in the deck.

11           You would know none of that unless you took the

12   testimony from the witness.

13           So, unfortunately, these are going to have to be

14   done on a kind of case-by-case, document-by-document basis.

15           I also don't believe that just because an employee

16   of the company writes something in an email, that that

17   becomes a binding admission on the company.

18           Under 801(d)(2), it has to be made by a person

19   whom the party authorized to make a statement on that

20   subject.  So, generally, it has to be someone who has the

21   authority to do whatever they're purporting to do with the

22   authority of the company.

23           And they might have authority to do one act but

24   not another act within their sphere of responsibility.  So,

25   again, that will become apparent once the testimony is

1   elicited.

2          THE COURT:  Is it your impression from reviewing

3   these emails so far, Mr. Petrocelli, that in the case of

4   some of the email chains, it's an important piece of

5   evidence, from the government's point of view, that a

6   certain person in that chain actually received whatever the

7   deck was or whatever the thing was that was in the email, so

8   that they could link that person, not the author of the

9   email, but the person in the chain, they can link him or her

10  to the discussion that's taking place, whether it be in a

11  deck or in some memo or something like that?

12         MR. PETROCELLI:  So I don't want to speak for the

13  government, of course.

14         THE COURT:  Your impression.  I'm just looking for

15  your impression.

16         MR. PETROCELLI:  My observation is that that

17  doesn't come up all that much.

18         I think that the chains are in the record because

19  the lawyers wanted to put in a complete document, so they

20  start with the beginning of the chain and it goes on and on.

21  And sometimes, it's just the last piece of it or a middle

22  piece of it that they want to talk about.

23         Sometimes, it's relevant to see who got the email.

24         But, you know, these emails have large numbers of

25  recipients on them, oftentimes.  You know, you just "reply

1  all" and it goes to a whole bunch of people.

2          And most of the time, I don't think there's a lot

3  of significance to the chains.

4          And sometimes, I think you could just take one

5  part of the chain and use that instead of the whole

6  document.

7          THE COURT:  Okay.

8          MR. PETROCELLI:  Okay, Your Honor?  Thank you.

9          THE COURT:  Thank you.

10         Mr. Welsh.

11         We kind of morphed into the 801 session.

12         MR. WELSH:  We did.

13         THE COURT:  If you want to put your perspective

14  forward, that would be helpful.

15         MR. WELSH:  Absolutely, Your Honor.

16         And I do want to note what Mr. Petrocelli said a

17  minute ago.  He is correct that with the chains, a lot of

18  times, it is a question of completeness.

19         Of course, the government has put in the full

20  exhibits as best we could because we were anticipating that,

21  as there frequently are in these sorts of matters,

22  objections from the defendants, that, well, you didn't put

23  in the entire document; and, therefore, there's a

24  completeness objection.  So --

25         THE COURT:  Yeah.  And I would say to the

1    government, frankly, since, you know, you're the one more

2    likely to be producing this as evidence, if you've got a

3    chain situation where, from your point of view, it doesn't

4    really matter who else was in that chain got it, I mean,

5    obviously, if in the chain is the CEO of the company, that

6    might matter --

7              MR. WELSH:  I would expect so.

8              THE COURT:  -- or the CFO or some person at the

9    very top of the pyramid.

10             If it doesn't really matter, then, you know, maybe

11   you might want to think about maybe -- because I don't think

12   you're going to hear a completeness argument from

13   Mr. Petrocelli.  I certainly don't think that's the case.

14             And I have no desire to read all the chain emails,

15   if they aren't really relevant to the case that you're

16   building or to the defense, in case of Mr. Petrocelli's

17   side, if he's trying to introduce a chain.  If it's not

18   really relevant to the defense that you're building, well,

19   then, just give me the email.  Just give me that one email,

20   which has the a relevance basis, obviously, or you wouldn't

21   be proposing it, and we'll deal with that one email.

22             And then, you know, just excise the other emails,

23   because the defense knows that that's not really what's

24   relevant here.  It's just the original email.

25             MR. WELSH:  Yes, Your Honor.  We'll take a look at

1    it and see what we can do to try to reduce that issue down.

2                THE COURT:  Good.

3                MR. WELSH:  Your Honor, Mr. Petrocelli talked

4    about there being 600 exhibits for the government.

5                There are not.  There's 519 that we're talking

6    about here today.

7                THE COURT:  That's progress.

8                MR. WELSH:  So the defendants like to have this

9    creep.

10               THE COURT:  That's progress.

11               MR. WELSH:  So I just wanted to let the Court be

12   aware of that.

13               With respect to 801(d)(2), I also heard

14   Mr. Petrocelli say that, well, it does matter if it's a

15   low-level -- lower-level employee.  And he said that the

16   employee has to be authorized.

17               Mr. Petrocelli, I think, was referring the Court

18   to 801(d)(2)(C).  But, of course, there are other provisions

19   under 801(d)(2) that are applicable here for the Court.  And

20   I think a lot of what we're going to be talking about are

21   under subsections A and under subsection D.

22               Subsection A is if it was made by the party in an

23   individual representative capacity, and D is if it was made

24   by the parties' agent or employee on a manner within the

25   scope of that relationship and while it existed.

1              With respect to --

2              THE COURT:  Yeah, well, let's take a look at those

3    for a second.

4              MR. WELSH:  Yes, Your Honor.

5              THE COURT:  And let me get the benefit of your

6    thinking on that.

7              So you're saying -- obviously, we've talked a

8    little bit about (d)(2).

9              So go ahead now.

10             MR. WELSH:  Yes, Your Honor.

11             There are four parts to that.  So there's A, which

12   was made by the party in an individual representative

13   capacity.

14             THE COURT:  Okay.

15             MR. WELSH:  Then there's B is one the party

16   manifested that it adopted or believed to be true, so that's

17   the adoption exception.

18             C was made by a person whom the party authorized

19   to make a statement on the subject.  I believe that's the

20   one that Mr. Petrocelli was referring Your Honor to.

21             THE COURT:  Yes, I think that's right.

22             MR. WELSH:  And then D is, was made by the

23   parties' agent or employee on a matter within the scope of

24   that relationship and while it existed.

25             So there's a number of different subprovisions

1   here.  They have different requirements and different

2   standards associated with it.

3          Looking at, for example, at the subsection D,

4   we would note that we've had a lot of discussion here,

5   Your Honor, about the sponsorship of exhibits, and we've

6   even heard this today.

7          We do believe that the documents can come in

8   without sponsorship if they're email, if they're PowerPoint

9   deck of AT&T, DirecTV, Time Warner, under, certainly, under

10  801(d)(2)(D).

11         We would note to Your Honor that there is a recent

12  opinion, order from this, from the District Court here, just

13  in January, end of January --

14         THE COURT:  By whom?

15         MR. WELSH:  By Judge Hogan.

16         THE COURT:  Right.

17         MR. WELSH:  Give me one second, Your Honor.

18         THE COURT:  Sure.

19         MR. WELSH:  On January 25, 2018, in the *United*

20  *States Conference of Mayors versus Great-West Life & Annuity*

21  *Insurance Company.*

22         THE COURT:  Okay.

23         MR. WELSH:  Judge Hogan in that case, following

24  the trial, had reviewed objections that had been asserted by

25  the defendants of admission of email that had come in under

1  801(d)(2)(D).

2          And the Court overruled the objections and --

3  overruled it again in this order, did it apparently at trial

4  and then overruled it in this order from Judge Hogan,

5  finding that the requirement -- the only requirement here

6  was whether the individual was an employee of the company

7  under 801(d)(2)(D).

8          And I have a copy of this opinion I can hand to

9  Your Honor if you would like to see that.

10          THE COURT:  That would be great.

11          Now, did he have an occasion to deal with the

12  decks issue?

13          MR. WELSH:  This order and this opinion only

14  addresses email, Your Honor.

15          THE COURT:  Slide decks -- okay.

16          Now, how about the slide decks?  Has the

17  D.C. Circuit had an occasion to deal with slide decks that

18  are being circulated within the company for potential future

19  presentations that are going to take place down the road?

20          MR. WELSH:  I have not seen that specifically,

21  Your Honor.  I think it's just similar larger issues of is

22  it something that was done -- similar these emails, was it

23  done by an employee during the time of their relationship

24  with the defendants?

25          I think if it's done in that setting, what we see

1    consistently in the case law out there, whether -- whether

2    within this circuit or outside the Circuit, is a broad

3    adoption of 801(d)(2)(D) applying to the documents of the

4    defendants coming in as statements of a party.

5              THE COURT:  Well, you see, the thing I think the

6    Court has to be careful about -- and I know you want me to

7    be careful about it, too, I'm sure, is that just because

8    it's created in a computer of the company during business

9    hours, et cetera, et cetera, by an employee of the company,

10   it shouldn't necessarily be able to overcome the hearsay

11   rule, unless there's sufficient circumstantial guarantees of

12   trustworthiness under the circumstances.

13             And the fact that at an employee puts together

14   some slide deck doesn't, per se, mean that this is a

15   reliable assemblage of facts and thinking on the company's

16   part; it could be a first draft; it could be a first effort,

17   if it's not final, particularly.

18             I think it becomes critical for the Court to hear

19   testimony from that person who's circulated this slide deck,

20   you know, under what circumstances it made this, what it

21   relied upon in putting the information together, what

22   direction it had, things like that.

23             MR. WELSH:  But that, Your Honor, that's exactly

24   what was in front of Judge Hogan, based on my read of that

25   opinion.  And the defendants had argued in trial, we

1    shouldn't have an employee -- this is an email.

2          But I think it's the same issue.  We shouldn't

3    have an employee who talks about what's in this email or get

4    these emails into evidence without having this sort of

5    context that I think is what Your Honor is talking about.

6          THE COURT:  Yeah.

7          MR. WELSH:  Judge Hogan didn't say that.

8          He said, if the employee is within the employ of

9    the party, it comes in by virtue of 801(d)(2)(D).

10          I would note that in 801, there is no requirement,

11    as Your Honor is just mentioning, about having this sort of,

12    trustworthiness or the context of what there is.

13          The statement comes in.  If the defendants want to

14    put on witnesses at some point to try to speak to those

15    issues and to explain away those issues, that's up to them.

16          But we're talking here about something that's

17    fundamentally different, which is these are admissions of a

18    party here as to very significant points, and I think those

19    come in, Your Honor.

20          It's up to the defendants if they want to put on

21    witnesses to try to refute those points.

22          Again, 801(d)(2) does not have this requirement.

23          And, in fact, I would note, if I may, that we have

24    seen authority that the rule, 801(d)(2)(D) -- 801(d)(2),

25    actually, is to be construed liberally.  We have a Seventh

 1   Circuit opinion there, citation, if Your Honor would like,

 2   which is the *Aliotta versus National Railroad Passenger*

 3   *Corp. case, 315 F.3d 756, 761.*  That's the Seventh Circuit,

 4   2003.

 5          Your Honor, also, there's no personal knowledge

 6   that's required under 801(d)(2).  We would point out to

 7   Your Honor that the *United States versus AT&T* is an opinion

 8   out of this Court in 1981, which found that there was no

 9   express requirement of firsthand knowledge under

10   801(d)(2)(D).

11          THE COURT:  Is that Judge Green, Harold Greene?

12          MR. WELSH:  I don't have the --

13          THE COURT:  Mr. Conrath thinks so.  You're

14   probably right about that.

15          MR. WELSH:  Again, looking at a different case,

16   *Smith versus Pena*, which is a Westlaw citation of 164774,

17   out of this Court on March 31, 1988, Rule 801(d)(2)(D):

18   Does not require such statements be accompanied by

19   guarantees of trustworthiness or that the declarant have

20   personal knowledge of the truth of the matter asserted.

21          And under (d)(2)(D), Your Honor, the scope of the

22   employees' relationship has also been construed as being

23   very broad.

24          We would point Your Honor to the *Jacklyn versus*

25   *Shering-Plough Healthcare* case, 176 F.3d 921, 928 Sixth

 1  Circuit, 1999, which stands for the proposition that the

 2  test is whether the statement concerns a matter within the

 3  scope of the agency or employment, full stop.

 4          Then we look at *Wilson versus Prudential*

 5  *Financial,* 603 F. Supp. 2d, 163 at 169.  That's out of this

 6  District Court in 2009, similarly finding that the statement

 7  of the employee or the defendant made during the course of

 8  his employment and offered against the defendant, that's

 9  what was of focus there.

10          So 801 is intended to have a very narrow

11  requirement to be able to show that it is an admission, and

12  the question of whether there's context, the question of

13  whether, as Your Honor had noted, trustworthiness, those

14  points have been, I think, rejected by the authority I just

15  mentioned.

16          THE COURT:  Well, that's more a concern for the

17  Business Records Exception.

18          MR. WELSH:  I'm sorry -- yes.

19          THE COURT:  That's more of a concern --

20          MR. WELSH:  I understand, Your Honor.

21          So I do think that much of what we're talking

22  about here -- and I think Judge Hogan's opinion out of this

23  Court just a couple months ago does give weight to the

24  government's argument that we should be able to bring in a

25  lot of these documents that we have cited and put in

1  response to their objections that they're coming in under

2  801(d)(2), that they should come in without sponsorship.

3        And it's up to the defendants, if they want to put

4  on witnesses on the stand to talk about those documents and

5  to explain away to Your Honor why this is not to be an

6  admission.

7        It's no great surprise, Your Honor, that we have a

8  lot of documents here that have admissions of AT&T, DirecTV,

9  and Time Warner.  That's not a surprise.

10        Your Honor will see exhibit after exhibit of some

11  very startling statements by these individuals, especially

12  when they come into this Court and want this merger to go

13  through.

14        Your Honor is entitled to take those documents

15  into evidence as admissions of these defendants.  It is

16  then -- they can either try to put on witnesses after

17  witnesses and try to explain away the many, many, many

18  documents and many, many, many bad statements in those

19  documents that are helpful to the government's case.

20        But that's up to them, Your Honor.  That's not up

21  to the government in terms of what it has to do it make its

22  case.

23        THE COURT:  All right.

24        MR. WELSH:  Thank you.

25        THE COURT:  Thank you, Mr. Welsh.

1            MR. PETROCELLI:  May I respond, Your Honor?

2            THE COURT:  Yes, you may.

3            MR. PETROCELLI:  I think there's a fundamental

4    misunderstanding reflected by counsel's argument.

5            The Evidence Code, Your Honor, does not make

6    anything automatically admitted into evidence.  The

7    Evidence Code contains the law on what may or may not be

8    admitted into evidence.

9            If a document qualifies as a business record, it

10   may be admitted.  If a document qualifies as an admission,

11   it may be admitted.

12           The admission of evidence in the record is always

13   the province of the Trial Judge in any trial.

14           And there is nothing in this short opinion which I

15   just read which would indicate otherwise.

16           The idea that they could put those four boxes on

17   day 1 of the trial and say, I move all of this into

18   evidence, and it's in the record and it's now up to us to

19   sift through all of that and call witnesses, it's their job

20   to put the documents into evidence through a witness.  And

21   if there's an admission of a party, it may come in.

22           Your Honor doesn't know what kind of weight to

23   give to these documents, unless you have seen them and seen

24   witnesses talk about the documents.

25           THE COURT:  Right.

1          MR. PETROCELLI:  So we can't see documents for the

2     first time after the trial is over.

3          And I will give Your Honor -- here's a copy for

4     counsel -- some authorities about what the Courts have

5     frowned upon --

6          May I approach?

7          THE COURT:  Yes.

8          MR. PETROCELLI:  -- as the proverbial document

9     dump.  And it is disfavored by the courts and by the

10    commentators and treatises alike.

11         The record would be a mess; we wouldn't know what

12    the evidence was at the end of the day.

13         And so whether something is an admission because

14    it's an email or statement of a party, that will be apparent

15    once they put the document up and show the witness and show

16    Your Honor.

17         And I don't know how many times there's going to

18    be interruptions to lay foundation or anything like that,

19    because it may just be immediately apparent.  But there may

20    be a number of documents where it's not apparent and there

21    has to be some questions asked.

22         Like I said, you can't have a "one shoe fits all"

23    rule.  That's not how the evidence in a trial works,

24    Your Honor.

25         Thank you.

1          THE COURT:  All right.  What we're going to do

2    is -- okay.

3          MR. WELSH:  May I be heard just briefly,

4    Your Honor?

5          THE COURT:  Just briefly, Mr. Welsh.

6          MR. WELSH:  Your Honor, just to come back and

7    reiterate one point, which is -- and has gone to

8    responding -- but, again, under the case law and under the

9    rule itself, there is no requirement of having that person

10   come in.

11         And when we're talking about 801(d)(2), not the

12   Business Records Exception, but as to the parties'

13   statement, there is no such requirement about having that

14   witness come on the stand.

15         And I think it's important here, Your Honor, not

16   just because of what the rule says and what it law says,

17   but, also, Your Honor, we talk about the -- we talk about

18   the sponsorship issue in general that defendants are talking

19   about here.

20         There's an exhibit, Your Honor, which is PX469,

21   which is a document that Cravath, Swaine & Moore, Counsel

22   here, submitted to the government in response to the second

23   request that was issued by the government on this merger.

24   We want to put this document into the record, and we want to

25   put it into evidence, Your Honor.

1          They object to this.  And so if I understand --

2          THE COURT:  Who do you want to put it in through?

3          MR. WELSH:  That's exactly right, Your Honor.

4   They want us to call a witness to the stand, I guess, to put

5   in this evidence that they're submitting to the government

6   on behalf of their clients in response to a second request

7   that was issued in this merger, for this merger review.

8          So evidently, Mr. Petrocelli would have us call

9   Ms. D'Amico, of Cravath, Swaine & Moore, as a witness to

10  talk about what's in this submission.

11         And I think it's just an example of one of the

12  problems that we have here.

13         We have documents that we're trying to get

14  admitted, Your Honor.  They are SEC-type documents.  There

15  are submissions made by DirecTV, submissions made by AT&T to

16  the FCC.

17         THE COURT:  Look, that --

18         MR. WELSH:  Those are admissions.

19         THE COURT:  Those are not probably going to be a

20  problem at all.  I would be actually very curious to hear

21  the objection as to those.

22         These are official documents submitted on behalf

23  of these corporations to the Securities & Exchange

24  Commissions.

25         MR. WELSH:  And the FCC, Your Honor.

1              THE COURT:  And the FCC.

2              MR. WELSH:  Yes.

3              THE COURT:  To me, I can't even conceive, in that

4    situation, what would be a good objection to that being

5    usable and admittable in a case like this, as long as it's

6    relevant.  It has to be relevant --

7              MR. WELSH:  Yes, Your Honor.

8              THE COURT:  -- obviously.

9              But assuming it gets over the hurdle of relevance,

10   I just can't even imagine there would be any issue of any

11   kind, frankly, there.

12             Now, just having said that, I can easily envision

13   any number of situations -- and, of course, we have to look

14   at, I have to look at the evidence, but I can easily

15   envision any number of situations where somebody in the

16   company, one of these companies on the defense, made a

17   statement in an email that there's a serious question as to

18   whether or not they were authorized to do that, had the

19   authority to do it, were doing it under circumstances that

20   were appropriate for them to be making a statement of that

21   kind, whatever, where they would object to that as being a

22   statement of the company.  And knowing the context, the

23   circumstances, et cetera, might really be critical to

24   figuring out if it qualifies under 801.

25             MR. WELSH:  Yeah.

1              And I think under 801(d)(2)(D), it would qualify.

2              I think what Your Honor is talking about is that

3      that goes to the weight that Your Honor gives to it,

4      all right?

5              I think it comes in as an admission under the

6      rule.  I think the rule is fairly clear on that point.

7              But I think Your Honor then has the prerogative of

8      how much weight you give to that evidence.

9              THE COURT:  Well, you know, there's, at the end of

10     that rule, 801, it says the statement must be considered,

11     but it is not by itself establish the declarant's authority

12     under C, the existence or scope of the relationship under D,

13     or the existence of the conspiracy or participation in it

14     under E.

15             So the way the rule is structured, there are still

16     things that, even though it might on its surface seem to

17     qualify for, C, D, and E subsections, the Court still has to

18     make its own assessment as to whether or not the foundation,

19     so to speak, is in place for it to ultimately be admitted

20     under that particular provision.

21             MR. WELSH:  Yeah.

22             Thank you, Your Honor.

23             THE COURT:  All right.  We're going to take a

24     little morning recess here.  My, as you already know, but

25     certainly if you don't, you will know soon, the hardest

 1    working person in this room is sitting right here in front

 2    of me.  And he's been here quite a while and working really

 3    hard to keep this record complete and clear.

 4              So we're going to take a 15-minute break now.

 5              When we come back, unless something you need to

 6    finish up on on these topics, I'd like to start talking a

 7    little bit about the relevancy objections that are, of which

 8    there are many.  And we'll go till about 1:00.  Then we'll

 9    take the luncheon recess.  Then when we come back, we'll

10    just keep chucking through them -- chugging through them.

11              Come on.  Yeah.  If you have.

12              MR. CONRATH:  I realized that the one thing

13    I should have mentioned to the Court in terms of scheduling

14    out topics to cover, one of the things that I think was

15    potentially up for discussion today or tomorrow was the

16    proposed confidentiality orders.

17              And I just wanted to let you know that there are

18    some lawyers for third-party witnesses of ours who are

19    present today.

20              THE COURT:  Yeah.

21              One other thing, Mr. Conrath, as I mentioned

22    earlier, we're kind of in tight quarters here.

23              MR. CONRATH:  Yeah, I know.

24              THE COURT:  And the first row inside the bar is --

25    on each side is for the counsel for each side.

1              MR. CONRATH:  Uh-huh.

2              THE COURT:  The second row is not.

3              MR. CONRATH:  Yeah.  Right.

4              THE COURT:  So if you have people on your staff in

5    that first row behind the bar, they cannot stay there.  That

6    row is reserved for court personnel.  So you might have too

7    many people here.  Every seat seems to be taken, and I leave

8    it to your judgment as to who should be here and who needs

9    to be here, who doesn't need to be here, whatever.

10             But that row behind them, you cannot use.

11             MR. CONRATH:  I think we might have one malfeasor,

12   Your Honor, but we'll correct that.

13             THE COURT:  I'll leave it to you to sort out who

14   gets what chair and what seat.  I know you'll figure that

15   all out for me.

16             MR. CONRATH:  Right.  Thank you.

17             THE COURT:  See you in 15 minutes.

18             DEPUTY CLERK:  All rise.

19             (Recess from 11:58 a.m. to 12:22 p.m.)

20             DEPUTY CLERK:  The United States District Court

21   for the District of Columbia is again in session, the

22   Honorable Richard J. Leon presiding.  God save the United

23   States and this Honorable Court.

24             Please be seated and come to order.

25             Your Honor, recalling Civil Action No. 17-2511,

1   the United States of America v. AT&T, Inc., et al.

2           THE COURT:  All right.

3           MR. PETROCELLI:  Your Honor, may I --

4           THE COURT:  Sure.

5           MR. PETROCELLI:  -- add just a final point to that

6   last discussion?  Actually, a couple of points.

7           First of all, in the category of public filings,

8   we are not making the argument that a sponsoring witness is

9   required.  We do have relevance objections, which we can

10  discuss.  But we're not making the sponsoring witness

11  argument.

12          Secondly, in the category of "it's a small world,"

13  it turns out that Ms. Pam Radford, who's our technical

14  person, was the technical person in the case in front of

15  Judge Hogan that happened earlier this year that counsel

16  just gave you the opinion on.

17          THE COURT:  Oh, I see.

18          MR. PETROCELLI:  Okay.

19          And, while I can't profess to recite accurate

20  details, there was a significant issue in that case where

21  the key employee, a salesman defendant, was on the lam, did

22  not show up for trial, could not be subpoenaed, could not be

23  found; and that had a role to play, I'm told, in why certain

24  documents of his may have been admitted without his

25  testimony.

1          So it just underscores the point that every

2   circumstance is different, and you can't make any sweeping

3   generalizations.

4          And I highly doubt there are cases that say,

5   Your Honor, that documents can automatically come into

6   evidence just because they may or -- they may be admissible.

7          And Your Honor indicated that you wanted to

8   address relevance.  And I don't know how and -- but I'll

9   turn it back over to you, and you can let us know how you

10  would like us to proceed.

11          THE COURT:  Well, obviously, there were a lot of

12  objections that are raised by the defense to exhibits that

13  the government seeks to introduce, not only on hearsay -- or

14  sometimes not even a hearsay basis, just a relevance basis,

15  and the first one out of the box is this comments of PX0001,

16  comments of DirecTV, Inc., before the FCC in June of 2010.

17          The government believes it's relevant to the

18  merger in question, to the incentives of the companies, and

19  they don't believe it's in any way prejudicial.

20          You take the position, which you're more than

21  welcome to take, that the probative value is substantially

22  outweighed by the unfair prejudice.

23          And you also claim it's not relevant.

24          So let's start with that one right there.  That's

25  probably as good a place to start as any.

1          MR. PETROCELLI:  Thank you, Your Honor.  That is a

2    good place to start.

3          There are actually 13 exhibits of the plaintiffs

4    that fall in this category.  By "this category," I mean the

5    category of prior regulatory proceedings, not this

6    proceeding, not the regulatory proceeding that occurred

7    before this case, but other proceedings in the past,

8    proceedings involving FCC exclusivity issues, retransmission

9    consent regulations, the *Charter-Time Warner Cable* merger,

10   which did not go through, completely different merger from

11   this one.  Those exhibit numbers, for the record, are

12   Plaintiff Exhibits 1, 2, 355, 434, 441, 442, 443, 444, 449,

13   450, 464, 467, and 468.

14         Your Honor, seven of those submissions included

15   expert reports, reports of experts hired in those cases.

16         Expert reports are not admissible.  In fact,

17   they're not even -- the expert reports in this case are not

18   on either side's exhibit list because the expert is going to

19   be testifying live, and yet we have seven expert reports in

20   these other proceedings.

21         In addition, a number of these documents are

22   redacted.  And while these involve submissions made by AT&T

23   and DirecTV, in some cases, the company doesn't even have

24   the unredacted copies.

25         And so on a number of grounds, we would object

1   that once you start receiving submissions made in other

2   cases, now that opens up a whole Pandora's box of:  What

3   were the circumstances?  What were the issues?  What were --

4              THE COURT:  It's like a trial within a trial.

5              MR. PETROCELLI:  Exactly.

6              Now, I want to remind Your Honor that we actually

7   confronted this issue before in this case when we sought

8   various communications at the Department of Justice related

9   to political issues.

10             And one of the arguments which we made,

11  unsuccessfully, was that we compared this to the

12  *Comcast-NBCU* merger.  And the government argued that was

13  very different, and that was one of the bases of

14  Your Honor's ruling.

15             And I mention that because the same idea applies

16  here as well.  Every one of these mergers has a whole

17  different set of circumstances attended to it.

18             And if all of a sudden they're going to dump into

19  the record all of these prior submissions, it's going to put

20  us in a difficult position of now having to figure out how

21  to explain what was going on there.  And it's not, at the

22  end of the day, going to provide any relevant evidence as to

23  whether, in this case, there's any harm to competition as

24  the government alleges.

25             Moreover, Your Honor, we have a fundamental issue

1  with respect to the government's decision to name as a

2  defendant DirecTV.

3          Now, DirecTV is a wholly owned subsidiary of AT&T.

4  It's a separate legal entity.

5          DirecTV, for example, made the submission that's

6  attached as Exhibit 1.

7          First of all, the law is quite clear, Your Honor,

8  that the statements of DirecTV, prior to the time it was

9  later on acquired by AT&T, are not the admissions or

10  statements of the successor company, nor, of course, are

11  they the admissions or statements of Time Warner.  They are

12  only the admissions or statements of DirecTV.

13          But there's another problem that we have that

14  we're going to have to confront either now or at the close

15  of the government's case, and that is that DirecTV has no

16  business being a defendant in this case.

17          Under Section 7 of the Clayton Act, the party

18  that's acquiring the assets, in this case would be AT&T,

19  would be a proper party defendant, not a subsidiary against

20  whom the Court would be able to award no relief at all,

21  because they're not acquiring anything; they're not selling

22  anything; they're simply one of many companies owned by the

23  acquiring company.

24          And, Your Honor, there isn't going to be any

25  evidence that will be presented by the government that's

 1   directed to DirecTV being a purchaser or a party to the

 2   merger agreement, zero, because they're not.

 3          I suggest, Your Honor, that the only reason they

 4   were included was because the law would not countenance

 5   these submissions on behalf of DirecTV as relevant to AT&T

 6   or Time Warner, because they were made long before the

 7   acquisition of the company by AT&T, so the idea was just put

 8   them in the case so they can then declare the statements

 9   admissions.

10          And under Rule 12(h)(2), we can raise at any time

11   at trial and under Rule 12(c), a motion for judgment on the

12   pleadings, which we intend to do, certainly by the close of

13   the government's case, because there won't be any evidence

14   that they are a proper party under Section 7 of the

15   Clayton Act.

16          There are cases, Your Honor, in which -- in merger

17   cases in which a subsidiary was named as a defendant.  But

18   those are cases, to our research, that have occurred after a

19   merger has occurred and a case is brought and relief is

20   granted that included, let's say, divestiture or something.

21          And for that reason, since the merger has already

22   happened and the companies are already merged, it may be

23   necessary to take them apart; and that might involve one of

24   the subsidiaries.

25          And so in that situation, of course, it makes

 1  sense that you would have to name all relevant companies

 2  that are relevant to the disaggregation of the entities.

 3          THE COURT:  Are they co-conspirators in those

 4  cases?

 5          MR. PETROCELLI:  I can't answer that, Your Honor.

 6  But that may be true as well.

 7          But here, of course, we don't have that situation,

 8  because the merger hasn't occurred yet.  And so DirecTV

 9  doesn't need to be a defendant in this case.

10          And I suggest the only reason they're a defendant

11  in this case is because the government wants to get in these

12  prior statements.

13          Now, with respect to the prior statements,

14  Your Honor, several of them were made by DirecTV and others

15  were made by AT&T.  And I just think that we're going down a

16  collateral path, looking at all these prior statements,

17  looking at all these -- if expert reports can't come in in

18  this case, it would stand to reason they can't come in in

19  this case if they were filed in some other case, especially

20  given the fact that they're not even complete; they're

21  redacted.  We don't have the witnesses here to testify about

22  them.

23          And so we would argue, Your Honor, that these

24  submissions are completely irrelevant to the current

25  proceedings, and certainly under 403.

1         Now, the government likes them because in those

2    statements, there were challenges to some of the mergers,

3    not according -- the government suggests that, for example,

4    DirecTV was seeking to block the *Comcast-NBCU* merger.

5    That's not correct.

6         And this is just an example of how we're going

7    down, you know, a collateral path.

8         The position of DirecTV back in 2010 was that it

9    believed that there should be certain conditions imposed on

10   the merger, not that the merger should be blocked.

11        And one of the conditions, it turns out, that they

12   were supporting was the imposition of an arbitration remedy.

13   And that, of course, was ultimately advocated by the

14   government and adopted by the Court.

15        So totally different landscape at the time.  2010

16   to today, you're going to learn, during the course of this

17   case, completely different world in the media technology and

18   entertainment industries.  I mean, so much has happened in

19   warp speed to change the landscape of the industry.

20        The Comcast-NBCU transaction, one of the principle

21   issues of concern were broadcast stations.  NBC in

22   particular.

23        There are no broadcast stations in this case.

24   Turner doesn't have a broadcast station.  Turner is a Cable

25   Network.  And that's just one of many other differences.

1           Now, one thing, Your Honor, that we can take from

2    these prior transactions that we, the defendants, are

3    pointing to, not what advocacy other parties made or even

4    AT&T may have made in prior proceedings because that's what

5    these are, these are advocacy pieces, but what actually

6    happened in those mergers.

7           Like, for example, one of the arguments that we

8    are presenting and some of the evidence that we will present

9    to the Court is what actually happened after the fact with

10   respect to the prices when the *Comcast-NBCU* merger was

11   approved by the Court.

12          What happened over the last seven, eight years?

13   Did the prices go up?  Did they go down?  What happened in

14   prior merger transactions?

15          So it's fair game to look at the actual facts of

16   what happened in the marketplace.  That's one thing.

17          This, though, is completely different.  This is

18   actually going and looking into the advocacy positions

19   asserted by lawyers and their clients and using those as

20   relevant evidence in this case.

21          And I can cite Your Honor to a case called the

22   *United States versus McKeon, 738 F.2d 26*.  It's a

23   Second Circuit decision.  And I'll just read briefly the

24   quote.

25          "If prior argument may be freely used for

1   evidentiary purposes, later triers of fact will be forced to

2   explore the evidence offered at earlier trials in order to

3   determine the quality of the inconsistency between positions

4   taken by a party.  This will result in a substantial loss of

5   time on marginal issues divergent from the real issues and

6   exposure to evidence which may be otherwise inadmissible and

7   prejudicial."

8           And that applies equally so here, Your Honor,

9   because you would have no opportunity, if you received all

10  of these documents in evidence, to even review the expert

11  reports and see to what extent they were admissible, and

12  they are completely inadmissible as hearsay.

13          So, at the very minimum, none of these expert

14  reports should come into evidence at all, Your Honor.  We

15  don't have the witnesses here to testify, and they're not

16  even coming into evidence in this case.

17          So that's the nature of our relevancy objection to

18  these prior regulatory proceedings.  It's a 401 relevancy.

19  It's 403, undue consumption of time and prejudice.

20          Thank you, Your Honor.

21          THE COURT:  Thank you.

22          Mr. Welsh.

23          MR. WELSH:  Thank you, Your Honor.

24          Let me start off with a few basic points, I think.

25          And I'll get to the relevance point in a second,

1    but I just wanted to come back to one thing.

2              It's the government's position that these filings

3    with the FCC -- that the DirecTV, AT&T made to the FCC,

4    those are admissions under 801(d)(2) and they come in and

5    the Court is entitled to take judicial notice of those.

6              And we can submit --

7              THE COURT:  What year did they become a wholly

8    owned subsidiary?

9              MR. WELSH:  DirecTV?  That was in 2015, I believe,

10   Your Honor.

11             THE COURT:  2015.

12             Now, these statements occurred prior to that,

13   right?  This says 2010.

14             MR. WELSH:  I believe they did, Your Honor.

15             THE COURT:  Yeah.  So I guess the question, in

16   part, would be, well, how can a statement made by a company

17   five years before it became a wholly owned subsidiary of

18   another company be a statement of that company five years

19   later?

20             MR. WELSH:  Your Honor, first of all, DirecTV is

21   party in this case at this point, and we heard a lot of

22   argument by Mr. Petrocelli about that.  And we would be

23   happy to address that at the appropriate time if it becomes

24   necessary.

25             I think the statements of DirecTV certainly go to

 1  DirecTV now.  They are also a market participant and a key

 2  player in the market.

 3              And the fact that the government has added them to

 4  the complaint as an operating subsidiary is certainly

 5  something that's happened in the past.  And I think it's

 6  certainly relevant.

 7              THE COURT:  You didn't add them as a defendant in

 8  this case for the sole purpose or limited purpose of getting

 9  in these prior filings that DirecTV did prior to it becoming

10  a wholly owned subsidiary?

11              MR. WELSH:  They were named because they're a

12  market participant in part of this merger.  And given what

13  the defense has been arguing in terms of their proposed fix

14  and other things, it was appropriate to include them as part

15  of the defendants.

16              THE COURT:  I see.

17              MR. WELSH:  Your Honor, with respect to -- I'm

18  prepared to go specifically exhibit by exhibit.  But what

19  Your Honor will see is that these are statements that are

20  made by AT&T, by DirecTV that really go to some central

21  issues in this case.

22              The government has to persuade Your Honor about

23  the market and about the dynamics of this market.  It's not

24  just what happens in the boardroom with AT&T and

25  Time Warner.  So we have to show what's going on there.

 1            The statements that are at issue here are

 2    statements that these parties have made to the FCC that talk

 3    about in a situation where there is a vertical merger, where

 4    they -- their concerns that they express to the FCC about

 5    what that vertical integration will mean.

 6            So, for example, on our Exhibit 1, PX1, they state

 7    that "As the FCC has documented on many occasions, vertical

 8    integration of program and distribution can, if left

 9    unchecked, give the integrated entity the incentive and

10    ability to gain an unfair advantage over its rivals.  This

11    ultimately results in higher prices and lower-quality

12    service for consumers."

13            That's their statement.  That's an admission

14    against interest in this litigation.

15            THE COURT:  Against DirecTV.

16            MR. WELSH:  Against DirecTV.

17            But I think it also can be -- I think it can be

18    attributed to AT&T, given the fact that they acquired them.

19    I don't think that they get a pass on what happens with

20    DirecTV by virtue of the transaction.

21            THE COURT:  They acquired the findings later.

22            I mean, how can they be making a statement in 2010

23    before they've been acquired that's attributable to their

24    acquirer five years later?  Has any court ever acknowledged

25    that being appropriate?

1          MR. WELSH:  I don't know offhand, Your Honor.

2          THE COURT:  Do you know?

3          MR. WELSH:  We can certainly brief this issue for

4     Your Honor if that would be helpful.

5          But I would say that, looking just at DirecTV,

6     that statement that they made goes to issues that Your Honor

7     is going to hear about in this case --

8          THE COURT:  Oh, I don't doubt that.

9          MR. WELSH:  -- about the incentives and the

10    abilities of what happens in vertical integration.

11         THE COURT:  That statement was being made in

12    connection with the *Comcast-NBC* merger, wasn't it?

13         MR. WELSH:  If I could get my exhibits in front of

14    me, Your Honor, it might help me.

15         THE COURT:  Go right ahead.

16         MR. WELSH:  So that was the comments, Your Honor,

17    of DirecTV that were submitted to the FCC in the *Comcast-NBC*

18    merger proceeding in 2010.

19         THE COURT:  Right.

20         MR. WELSH:  That's correct.

21         THE COURT:  Yeah.

22         They were concerned about that.

23         MR. WELSH:  And, again, DirecTV there had urged

24    that the vertical merger of the largest cable company and

25    some of the most popular cable programming that was

 1  available, that it should be blocked because Comcast had not

 2  demonstrated that the harms of vertical integration

 3  outweighed any benefits.

 4          And that's what these statements are going to,

 5  Your Honor.

 6          As stated in PX1 at 003, that the merger would

 7  give Comcast new opportunities to gain unfair leverage over

 8  rivals to the detriment of consumers.

 9          Again, this is something that Your Honor is going

10  to hear about through a number of witnesses in this trial

11  about how the industry operates, how the negotiations occur,

12  how leverage is so vitally important in the negotiation.

13          And what happens in vertical integration like this

14  is that the leverage shifts.  And that's the concern, is

15  that it's going to lead to higher prices to the consumer

16  because of the leverage in the negotiations.

17          THE COURT:  Of course, the Department of Justice

18  back then in 2010 didn't agree with their analysis, right?

19  Because they blessed the *Comcast* merger with NBC?

20          MR. WELSH:  With --

21          THE COURT:  The antitrust Division did.

22          MR. WELSH:  The antitrust division did with

23  certain provisions put in place in decrees, which Your Honor

24  was involved with, as was the FCC with their -- with their

25  order.

1             THE COURT:  Yeah.  I mean, I had a piece of it

2     too, but --

3             MR. WELSH:  Yes, Your Honor.

4             THE COURT:  But obviously, this was DirecTV's

5     thoughts back then before the final decision was made by

6     antitrust and the Court, and these were its concerns back

7     then --

8             MR. WELSH:  Correct.

9             THE COURT:  -- for that merger.

10            MR. WELSH:  Correct.

11            And what we're seeing now, though, is when we have

12    a similar sort of transaction here, as the defendants would

13    argue, with AT&T and Time Warner being acquired and vertical

14    integration occurring here, now we have the parties coming

15    in and singing a completely different tune than what was

16    previously in the *NBCU-Comcast* merger.

17            THE COURT:  Well, it's similar up to a point; I'll

18    concede to you that.  But it's dissimilar in many ways, is

19    it not?  I mean, if nothing else, in terms of magnitude.

20    NBC-Comcast is one thing, but this is a different horse.

21            MR. WELSH:  I would submit, Your Honor, though, we

22    don't have a lot of examples of vertical integration here in

23    this industry.

24            THE COURT:  No.

25            MR. WELSH:  And so we have to look at what is out

 1  there.  And certainly, the *NBC-Comcast* merger would be an

 2  example of that.  And the statements that the parties then

 3  make in connection with that, I think, are appropriate for

 4  the Court -- certainly, they bear some relevance to what's

 5  going on here for the Court to understand the markets and

 6  the concerns of participants in the market.

 7          THE COURT:  So what if the Court were to say, it

 8  will be admitted only as to DirecTV, not as to AT&T and

 9  Time Warner, Exhibit 01 here, 0001?  And, of course, if the

10  Court should decide, at a later time, as Mr. Petrocelli has

11  signaled, that it's going to seek the dismissal of the case

12  against DirecTV, hypothetically, if the Court were to grant

13  that, then this exhibit would be gone from the case.

14          How would that affect your case against AT&T,

15  Time Warner?

16          MR. WELSH:  I think --

17          THE COURT:  Not DirecTV.

18          MR. WELSH:  Your Honor, I would think that the

19  government certainly wants the exhibit in, not just for

20  DirecTV --

21          THE COURT:  Oh, I know you want it.

22          MR. WELSH:  -- for AT&T.

23          THE COURT:  You're going to hear me say this many

24  times, so get used to hearing it.

25          MR. WELSH:  Yes, sir.

1                THE COURT:  A couple of my favorites expressions:

2    Less is more, of course, is one.  And the other is, we must

3    distinguish between what you want and what you need.

4                I'm focusing now on what you need, not what you

5    want.  What you need.

6                Do you need this?  Do you really need it?  Or

7    do you just want it?  Because it may be more trouble than

8    it's worth.

9                MR. WELSH:  I think, Your Honor, it's hard for me

10   to put it into a category for Your Honor.

11               THE COURT:  Sounds like a want.

12               MR. WELSH:  I don't believe so, Your Honor.

13               THE COURT:  Sounds like a want.

14               MR. WELSH:  I would say that because it goes to

15   central issues in this case --

16               THE COURT:  All right.

17               MR. WELSH:  -- because there are so few examples

18   of vertical integration, that I think it becomes appropriate

19   for the Court to take this in as evidence so that it would

20   help Your Honor to understand how parties have viewed these

21   situations in the past, and so you can then evaluate, when

22   you hear the witnesses for AT&T, for DirecTV, for

23   Time Warner coming on the stand and saying something that is

24   different, you can evaluate that and say, all right,

25   I understand now where we are.

1              I think it's important that -- for the
2     government's case that Your Honor take that evidence in and
3     give it weight that you believe is appropriate.  We do think
4     that it, again, is an admission and should come in, not only
5     against DirecTV but AT&T.
6              And if, as to Your Honor's point about DirecTV and
7     if it were to be dismissed, we would want, obviously, to be
8     heard about that subject.  And we would also, if Your Honor
9     wishes, we would be prepared to submit briefing on this
10    point about whether DirecTV's --
11             THE COURT:  Well, how about all these expert
12    reports?
13             MR. WELSH:  So the export reports, Your Honor, I
14    think would come in --
15             THE COURT:  Seven, I think, Mr. Petrocelli said.
16             MR. WELSH:  I don't believe there are seven expert
17    reports.
18             THE COURT:  No?
19             MR. WELSH:  But I think we have a number of
20    exhibits that, seven of them, I think he was referring to,
21    which are statements that have come in from AT&T or DirecTV.
22    Not all of those are expert reports.  There are a few.
23             I think the expert reports, Your Honor, come in
24    under 801(d)(2)(D) -- (d)(2)(C), excuse me, with respect to
25    the adoption.

1           These are -- as Your Honor will see from the

2    document itself, there are cover letters that we'll submit

3    the document to the FCC on behalf of AT&T.  It's very clear

4    that those are being submitted.

5           I think Your Honor, again, can take judicial

6    notice of those documents, and they come in as an admission

7    under C, even though they're by an expert.

8           The reason why it's relevant, Your Honor, again,

9    we come back to some of the same issues that you are going

10   to hear from a lot of the witnesses in this case about --

11   and especially our experts in this case that talk about the

12   bargaining theory that occurs.

13          Dr. Shapiro for the government will testify about

14   this.

15          And defendants will be responding to that.

16          The fact that defendants have, in the past,

17   submitted expert reports to the FCC where they discuss the

18   bargaining theory, that is where their position was.

19          And now to come into court and tell Your Honor,

20   well, the bargaining theory is wrong; we shouldn't look at

21   the bargaining theory, that's why it's relevant, Your Honor.

22          We're seeing an admission being made in the past

23   on something that's relevant to what you're going to hear in

24   this case for AT&T and DirecTV.

25          And I'm, again, happy to go through -- it would be

 1  tedious, but I can go through each one of the seven if

 2  Your Honor would like.

 3            THE COURT:  All right.

 4            Mr. Petrocelli, do you want to respond in any way?

 5            MR. PETROCELLI:  Yes, I do.  Yes.

 6            First of all, Your Honor, the law could not be

 7  more clear that the statements of DirecTV pre-acquisition

 8  are not admissible against AT&T or Time Warner.

 9            "Statements made by a predecessor in interest or

10  employees of a predecessor are not admissible under

11  Rule 801(d)(2)(A)."

12            That's a Third Circuit case, *Three Rivers*

13  *Confection v. Warman*, another Sixth Circuit case.

14            Rule 801(d)(2) does not include statements by

15  predecessors in interest among the types of statements the

16  rule makes admissible.

17            So at the very most, that could come in only

18  against DirecTV but -- and I guess we'll have to brief this

19  to Your Honor at the appropriate time.

20            But the fact that DirecTV is a market participant

21  means nothing in terms of whether they can be sued in this

22  case.  There are many market participants.  The fact that

23  there's a contractual irrevocable offer made by Turner to

24  other distributors doesn't make DirecTV a party to this case

25  any more than it would any distributor to this case.  So

1    those were just non sequiturs, Your Honor.

2           You sue the merging parties to -- and in

3    particular the party acquiring the assets under Section 7.

4    And DirecTV is acquiring nothing and it's selling nothing.

5    It has absolutely no standing to be sued in this case.

6           On the second issue, Your Honor, again, contrary

7    to the government's argument, the expert reports are, A, not

8    admissible under normal rules of hearsay, but, B, and most

9    important to this point, they are not admissions of a party.

10          "Because an expert witness is charged with the

11   duty of giving his or her expert opinion regarding the

12   matter before the Court, we fail to comprehend how an expert

13   witness, who is not an agent of the party who called him,

14   can be authorized to make an admission for that party."

15          And that's 61 F.3d 147, Third Circuit case,

16   *Kirk v. Raymark Industries*.

17          Experts of this sort are independent experts, and

18   they are not -- they don't make admissions for parties.  So

19   to have -- it would be anomalous, Your Honor, to have in

20   this record -- and I think it is actually seven expert

21   reports, so we were double-checking while Mr. Welsh was

22   addressing the Court -- would be anomalous to have expert

23   reports in on prior matters and not have, when they're

24   inadmissible in this case.

25          And, Your Honor, the Comcast-NBCU proceeding was

 1    one of the cases in which they want to get some of these

 2    exhibits in.

 3              But the other cases, Your Honor, have absolutely

 4    nothing to do with this case.  Most of them concerned FCC

 5    proceedings on whether to extend the ban on whether

 6    vertically integrated cable companies could maintain

 7    exclusivity of certain of their programming.

 8              And this is not an issue in this case.  The

 9    government, frankly, is not even -- as you're going to

10    learn, they're not even alleging that the defendants are

11    going to withhold any content from distributors; that the

12    Turner networks are going to be withheld.

13              That allegation was made, but it's not going to be

14    proven in this case for reasons that we'll explain when the

15    trial begins.

16              But this exclusivity FCC issue is totally

17    different.  A number of these reports were filed in that

18    proceeding.  And ultimately, by the way, the FCC decided to

19    eliminate the ban.

20              And so we'd have to get into the explanation about

21    what those proceedings were about, why these reports were

22    filed, what positions we're taking.

23              And in terms of prior statements about the

24    bargaining model, I think counsel has, in some sense, has

25    misunderstood our position.

1              What we are saying is that in this case, this

2      particular expert opinion, who will try to prove a price

3      increase through the use of a very hypothetical academic

4      bargaining model, does not work.

5              And it does not work for a whole host of reasons.

6      It might work in some other case.  It might work elsewhere.

7      But it doesn't work under the facts of this case.

8              And so the fact that there might have been a

9      support for a bargaining model solution in another case has

10     no bearing on whether it works in this case, because it's

11     all about the specific facts and circumstances.

12             A model, after all, is no more than a computer,

13     and it's only as good as what you put in.  Garbage in,

14     garbage out.  If you're not putting in any meaningful,

15     relevant information, you're not going to get anything

16     meaningful or relevant output.

17             And in large part, that's what you're going to

18     hear when we get to that part of the case, Your Honor.

19             But you're not going to learn anything from

20     reading, you know, reams and reams of reports and documents

21     in other proceedings about why somebody may have thought a

22     bargaining model was a good idea or a bad idea, let alone in

23     these FCC proceedings that don't pertain to the issues at

24     hand.

25             So we would assert with respect to each and every

     1     one of those exhibits, Your Honor, that they should be

     2     excluded as irrelevant and certainly -- under 403; and

     3     certainly, all the expert reports embedded therein are

     4     admissible, nor are they admissions of a party.

     5             Thank you.

     6             THE COURT:  All right.

     7             Well, as far as that particular exhibit is

     8     concerned, as of right now, I'm not inclined to allow it to

     9     come in against anyone other than DirecTV.

    10             Of course, if DirecTV is going to be challenged as

    11     to its continued presence in the case, that's a separate

    12     issue.

    13             With regard to the expert reports, I'm not

    14     inclined to allow them, but I will give it a little more

    15     thought, since this is the first time I've heard this issue

    16     raised.  And I will look at some of these cases that have

    17     been cited here.

    18             But I'll give the government fair warning that

    19     I'm not inclined to allow the expert reports in, even as to

    20     DirecTV.

    21             Now, with regard to -- certainly, not as

    22     admissions against AT&T, Time Warner.

    23             I couldn't help but notice 03, Exhibit 03 was a

    24     Google presentation titled "YouTube TV."  And that kind of

    25     caught my eye.  I was wondering if that is still in the

1    pipeline here to be used.

2            MR. PETROCELLI:  We've objected to it, because

3    there's no foundation for it, nor has there been a witness

4    who's laid the foundation.

5            There was one witness from Google who gave a

6    deposition.  But in our judgment, there was no proper

7    foundation for this particular exhibit, which is why --

8            THE COURT:  You claim, it's, of course,

9    irrelevant.

10           MR. PETROCELLI:  Correct.

11           Well, also, we objected on the ground of hearsay,

12   Your Honor.  Yeah.

13           THE COURT:  And hearsay, of course, also.

14           MR. PETROCELLI:  You're talking about Exhibit 3?

15           THE COURT:  PX0003.

16           MR. PETROCELLI:  Right.  I'm looking -- yes,

17   exactly.

18           THE COURT:  Your principal objection is relevance

19   on that one; is that correct?

20           MR. PETROCELLI:  Well, I'm actually looking at

21   my --

22           THE COURT:  Because, see, I don't have your

23   updated chart.  I'm looking at my prior chart --

24           MR. PETROCELLI:  It says hearsay.  I think that's

25   probably the principal objection, given that there's no

1    third party here to talk about the document and lay any

2    foundation for it or explain it.

3            Now, if the third party shows up, then we can

4    reserve and see if the foundation can be laid.

5            But right now, there's no plans, I'm told, to call

6    that party.

7            But if I'm mistaken and the party shows up, then

8    we would have to see what he or she says about the document.

9            THE COURT:  What's the relevance, from the

10   government's point of view, on this particular document,

11   some Google presentation titled "YouTube TV"?

12           MR. WELSH:  Your Honor, this -- I'm going to be

13   careful what I can say about the document.  It's been

14   designated as confidential by the third party.

15           THE COURT:  All right.  Well, that's fine, you

16   should be careful, then.

17           MR. WELSH:  But in responding, Your Honor, the --

18           THE COURT:  Who do you want to get it in through?

19           MR. WELSH:  One of Google's witnesses, Mr. Kyncl.

20           THE COURT:  Okay.

21           MR. WELSH:  And he has been deposed in this case,

22   his deposition.  He's the gentleman that we mentioned, the

23   one that we'd be putting on through deposition.  And his

24   testimony goes to this document, as well as another document

25   that is being submitted by the government, Your Honor.

```
 1                    THE COURT:  And when was it created?

 2                    MR. WELSH:  In October of 2017 is my

 3       understanding, Your Honor.

 4                    THE COURT:  The presentation was?

 5                    MR. WELSH:  Yes, that's correct.

 6                    THE COURT:  Is this one of those slide deck

 7       things?

 8                    MR. WELSH:  I believe so, yes, Your Honor.

 9                    And this is an example of, as I was mentioning

10       earlier, my statement to Your Honor and argument, that this

11       is how the industry operates, with communicating internally

12       on slide decks.

13                    The document is relevant, Your Honor, because it

14       goes to a third party's view of the importance of Turner

15       content to their business.  This is a distributor, who

16       Your Honor --

17                    THE COURT:  This is what Google -- Google is

18       saying it's important to its business?

19                    MR. WELSH:  Google's view of the importance of

20       Turner to its business, yes, Your Honor.

21                    THE COURT:  To its business.

22                    MR. WELSH:  Yes.

23                    And that's why we believe it to be relevant to the

24       issues in this case.

25                    Google has YouTube TV.  Your Honor will hear --
```

1          THE COURT:  Is Google a competitor of AT&T and

2     Time Warner.

3          MR. WELSH:  Yes, Your Honor, that's correct.

4     That's why -- it's confidential, and that's why I'm being

5     careful about what I'm saying in open court.

6          But we do believe it's highly relevant to their

7     view of Turner and what will happen.  It will be the

8     government's argument later about what will happen with this

9     market if the merger went through.

10          THE COURT:  We'll have to hear from that witness

11     you want to introduce it into.

12          MR. WELSH:  I'm sorry, Your Honor?

13          THE COURT:  I'll need to hear from that witness

14     before I make any ruling on that, then, what his thinking is

15     on --

16          MR. WELSH:  And, again, we'll be submitting his

17     deposition testimony, which will go to this and -- either

18     that or we'll have him on live.

19          THE COURT:  Oh, you'll have him on live, believe

20     me.

21          MR. WELSH:  Okay.

22          THE COURT:  I'm not -- I can tell already this is

23     someone I'm going to need to ask questions of at a minimum

24     if you all don't.

25          MR. WELSH:  Okay.

1           THE COURT:  So you better plan on being here.

2           MR. WELSH:  Yes, Your Honor.

3           THE COURT:  All right.  We're going to take the

4    luncheon recess.  We'll reconvene at 2:30.

5           As I indicated previously, we'll take an hour and

6    a half for lunch, not to spend an hour and a half eating

7    lunch, but I have a lot of other cases that need to be

8    attended to in that brief period; plus I'm going to have my

9    own lunch, but that's a separate issue.

10          So anyway, we'll see you back at 2:30.  We'll go

11   no later than 5:00.  We'll take an afternoon break, too, of

12   course.

13          MR. PETROCELLI:  Your Honor --

14          THE COURT:  Do you have a question?

15          MR. PETROCELLI:  -- do we need to clear our desks

16   or can we --

17          THE COURT:  You can leave your stuff here.  Once

18   everyone's left the courtroom, the courtroom will be

19   secured.

20          MR. PETROCELLI:  Okay.

21          THE COURT:  Everyone has to leave the courtroom

22   shortly.  Parties can obviously attend to their papers and

23   things.

24          But ultimately -- you know, and the lines will

25   start all over again for those in the audience.  So that's

1    just the nature of the situation.

2            Unfortunately, we have so much interest that we're

3    going to have to have lines both at the morning for the

4    morning session and for the afternoon session.  That's not a

5    problem of yours.

6            MR. PETROCELLI:  Thank you, Your Honor.

7            THE COURT:  Any other issues?

8            MR. PETROCELLI:  No.  That's it.

9            THE COURT:  Okay.  We'll stand in recess.

10           DEPUTY CLERK:  All rise.

11           (Proceedings concluded at 1:03 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: March 19, 2018_____     /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR