```
                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,       :
                                :
               Plaintiff,        :          CV No. 17-2511
         vs.                    :
                                :          Washington, D.C.
                                :       Thursday, April 19, 2018
AT&T, INC., ET AL.,             :            10:45 a.m.
                                :
                                :            Day 17
               Defendants.      :
---------------------------x



                     MORNING SESSION
              TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE RICHARD J. LEON
              UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:    Craig W. Conrath, Esquire
                       Eric D. Welsh, Esquire
                       Donald G. Kempf, Jr., Esquire
                       Matthew D. Siegel, Esquire
                       Sarah Oldfield, Esquire
                       Anna E. Sallstrom, Esquire
                       U.S. DEPARTMENT OF JUSTICE
                       Antitrust Division
                       450 Fifth Street, NW
                       Washington, DC  20530
                       202) 532-4560
                       craig.conrath@usdoj.gov
                       eric.welsh@usdoj.gov
                       donald.kempf@usdoj.gov
                       matthew.siegel@usdoj.gov
                       sarah.oldfield@usdoj.gov
                       anna.sallstrom@usdoj.gov
```

```
 1   Appearances Continued:

 2   For Defendant AT&T        Katrina M. Robson, Esquire
     and DirecTV Group        O'Melveny & Myers LLP
 3   Holdings, LLC:           1625 Eye Street, NW
                              Washington, DC  20006
 4                            (202) 220-5052
                              krobson@omm.com
 5
                              Daniel M. Petrocelli, Esquire
 6                            M. Randall Oppenheimer, Esquire
                              O'MELVENY & MYERS LLP
 7                            1999 Avenue of the Stars
                              8th Floor
 8                            Los Angeles, CA  90067
                              (310) 553-6700
 9                            dpetrocelli@omm.com
                              roppenheimer@omm.com
10
                              Michael L. Raiff, Esquire
11                            Robert C. Walters, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
12                            2100 Mckinney Avenue
                              Suite 1100
13                            Dallas, TX 75201
                              (214) 698-3350
14                            mraiff@gibsondunn.com
                              rwalters@gibsondunn.com
15
     For Defendant           Kevin J. Orsini, Esquire
16   Time Warner, Inc.:      Peter T. Barbur, Esquire
                              CRAVATH, SWAINE & MOORE LLP
17                            Worldwide Plaza
                              825 Eighth Avenue
18                            New York, NY  10019
                              (212) 474-1140
19                            korsini@cravath.com
                              pbarbur@cravath.com
20
     Court Reporter:         Crystal M. Pilgrim, RPR, FCRR
21                            Official Court Reporter
                              United States District Court
22                            District of Columbia
                              333 Constitution Avenue, NW
23                            Washington, DC  20001
                              (202) 354-3127
24                            crystal_pilgrim@dcd.uscourts.gov

25
```

Table of Contents

```
                              Direct   Cross   Redirect   Recross

On behalf of the Defense:

    John T. Stankey (Resumed)

        By Mr. Welsh                    3324                3374

        By Mr. Petrocelli                       3369

    Randall Stephenson

        By Mr. Petrocelli    3376
```

E-X-H-I-B-I-T-S

```
                                            Marked    Received

On behalf of the Government:

Exhibit No. PX 555 Sealed                             3324

Exhibit No. PX 72                                     3333

Exhibit No. PX 323                                    3335

Exhibit No. PX 344                                    3337

Exhibit No. PX 6                                      3357


On behalf of the Defense

Exhibit No. 664                                       3400

Exhibit No. 609                                       3409

Exhibit No. 640                                       3412
```

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2            THE DEPUTY CLERK:  Matter before the Court, United

 3    States of America v. AT&T, Inc., et al.

 4            Counsel please come forward and identify yourselves

 5    for the record.

 6            MR. WELSH:  Good morning, Your Honor, Eric Welsh for

 7    the United States.

 8            THE COURT:  Welcome back.

 9            MR. WELSH:  Thank you.

10            MS. SALLSTROM:  Good morning, Your Honor, Anna

11    Sallstrom for United States.

12            THE COURT:  What's your name?

13            MS. SALLSTROM:  Anna Sallstrom.

14            THE COURT:  Sallstrom?

15            MS. SALLSTROM:  Sallstrom.

16            MR. SIEGEL:  Good morning, Your Honor, Matthew Siegel

17    for the United States.

18            THE COURT:  Welcome.

19            MR. CONRATH:  Good morning, Your Honor, Craig Conrath

20    for the United States.

21            THE COURT:  Good morning, welcome back.

22            MS. OLDFIELD:  Good morning, Your Honor, Sarah

23    Oldfield for the United States.

24            THE COURT:  Welcome back.

25            MR. KEMPF:  Good morning, Your Honor, Don Kempf for
```

```
 1   the United States.

 2           THE COURT:  Welcome back.

 3           MR. PETROCELLI:  Good morning, Your Honor, Daniel

 4   Petrocelli for defendants.

 5           THE COURT:  Welcome back.

 6           MS. ROBSON:  Good morning, Your Honor, Katrina Robson

 7   for defendants.

 8           THE COURT:  Welcome back.

 9           MR. OPPENHEIMER:  Good morning, Your Honor, Randy

10   Oppenheimer for the defendants.

11           THE COURT:  Welcome back.

12           MR. WALTERS:  Good morning, Your Honor, Rob Walters,

13   AT&T, DirecTV.

14           THE COURT:  Welcome back.

15           MR. BARBUR:  Good morning, Your Honor, Peter Barbur

16   for Time Warner.

17           THE COURT:  Welcome back.

18           MR. ORSINI:  Good morning, Your Honor, Kevin Orsini

19   for Time Warner.

20           THE COURT:  Welcome back.

21           MR. RAIFF:  Good morning, Your Honor, Mike Raiff for

22   AT&T and DirecTV.

23           MR. PETROCELLI:  May we approach?

24           THE COURT:  Sure.

25           (Sealed Bench Conference.)
```



1    MR. PETROCELLI:

2

3

4

5

6    THE COURT:

7    MR. PETROCELLI:

8    THE COURT:

9    MR. PETROCELLI:

10   THE COURT:

11   MR. PETROCELLI:

12

13

14   THE COURT:

15   MR. PETROCELLI:

16   MR. WELSH:

17

18   THE COURT:

19   MR. PETROCELLI:

20   MR. WELSH:

21

22

23   MR. PETROCELLI:

24

25   THE COURT:

1

2          MR. PETROCELLI:

3          THE COURT:

4          MR. PETROCELLI:

5          MR. WELSH:

6          MR. PETROCELLI:

7          THE COURT:

8          MR. PETROCELLI:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          MR. WELSH:

1  ███████████████████████████████████

2       MR. PETROCELLI: ████████████████████

3  █████████████████████████████

4       MR. WELSH: ██████████████████████

5  █████████████████████

6       MR. PETROCELLI: ███████████████████████

7  ████████████████████████████████████████████

8  ███████████████████████████████████████████

9       MR. WELSH: ████████████████████████████

10 ████████████████████████████████████████████

11 ███████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████

15      MR. PETROCELLI: ███████████████████████████

16 ████████████████████

17        ███████████████

18        █████████████████████████████

19 ███████████████████

20      THE COURT: ████████████████████████████

21 ████████████████████████████████████████

22 ████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████

25      MR. PETROCELLI: ██████████████████

1        MR. WELSH: ███████████████████████████

2 ████████████████████████████████████████████

3 ███████████████████████████████████████████

4 ████████████████████████████████████

5 ███████████████████████████████████████████

6 ██████████████████████████████████████████

7 ████████████████████████████████████████

8 ███████████████████

9        MR. PETROCELLI: ██████████████████████

10 ███████████████████████████████████████████

11 ████████████████████████████████████████████

12 ██████████████████████████████████████

13 ██████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ██████████████████████████████████████████

17 █████████████████████████████████████

18        MR. WELSH: ████████████████████

19 ██████████████████████████████████████

20 ███████████████████████████████████████████

21 ████████████████████

22        THE COURT: ██████████████████████████

23 ████████████████████████████████████████

24 ███████████████████

25        MR. WELSH: ████████████████████████

1        THE COURT:

2        MR. PETROCELLI:

3

4

5        THE COURT:

6

7

8

9

10       MR. WELSH:

11       THE COURT:

12

13

14

15

16

17

18

19       MR. WELSH:

20       THE COURT:

21

22

23

24       MR. PETROCELLI:

25       THE COURT:

```
 1      ████████████████████████████

 2           MR. PETROCELLI:    ██████████

 3           THE COURT:    ████████████████████████████████

 4      ████████████████████████████

 5           MR. PETROCELLI:    ████████████████████████

 6           MR. WELSH:    ██████████████

 7           THE COURT:    ████ right.

 8           (Open court.)

 9           THE COURT:  Witness remains under oath.

10           MR. WELSH:  May I have just one minute to confer?

11           THE COURT:  Yes, take a minute.

12           Do you have some water there?

13           THE WITNESS:  I do, thank you.

14           THE COURT:  All right.

15           (Pause.)

16           MR. WELSH:  Thank you, Your Honor, may I proceed?

17           THE COURT:  When you're ready, you go ahead.

18           MR. WELSH:  Okay, thank you.

19           Your Honor, just as a housekeeping measure and I
```

20 mentioned this to Mr. Petrocelli before we started.  I

21 neglected yesterday to move into evidence PX 555.  And we would

22 go ahead and do that at this time.  I don't believe there's any

23 objection.

```
24           MR. PETROCELLI:  No objection.

25           THE COURT:  Hold on, let me check my notes here.
```

1   That's admitted under seal, right?

2          MR. WELSH:  It is under seal, yes, Your Honor.

3          THE COURT:  All right, that'll be admitted under

4   seal.

5          MR. WELSH:  Thank you, Your Honor.

6          (Plaintiff's Exhibit No. PX 555 was

7       received in evidence under seal.)

8          THE COURT:  All right, when you're ready.

9          MR. WELSH:  Yes.

10          JOHN T. STANKEY, DEFENSE WITNESS, PREVIOUSLY SWORN

11                    CROSS-EXAMINATION (Cont'd)

12   BY MR. WELSH:

13   Q.   Mr. Stankey, good morning.

14   A.   Good morning.

15   Q.   I want to come back and talk a little bit more, a few more

16   questions that I have on DX 658, which I think is in that

17   binder in front of you.

18       Now, the numbers that are in DX 658, some of those do

19   include what you would characterize to be wild guesses; isn't

20   that true?

21   A.   No.

22   Q.   Okay.  You -- to prepare for your deposition you had your

23   own personal copy of version 41, correct?

24   A.   Yes, I had a working copy of version 41.

25   Q.   Because you were deposed on behalf of AT&T as a company,

1  right, as a company witness, right?

2  A.   That's correct.

3  Q.   Okay.

4       MR. WELSH:  Your Honor, I have what's been marked as

5  PX 557.  May I approach?

6       THE COURT:  You may.

7       MR. WELSH:  May I approach the witness, Your Honor?

8       THE COURT:  You may.

9       MR. WELSH:  Your Honor, a copy of PX 557 has been

10 provided to opposing counsel.  May I proceed?

11      THE COURT:  You may.

12 BY MR. WELSH:

13 Q.   Mr. Stankey, you have PX 577, do you recognize that as

14 being your working copy of version 41, which is DX 658?

15 A.   Yes.

16 Q.   And the handwriting in the document is yours; is that

17 correct, sir?

18 A.   Yes, it is.

19 Q.   And if I can direct you to page 109 of the document, which

20 is titled "Wireless and OTT bundling," tell me when you're

21 there?

22 A.   I'm there.

23 Q.   And on that page next to the information that's being

24 presented there on these synergies, you wrote that the 10 BP

25 reduction number there, you said that that was a SWAG, right?

1  A.    That particular element of that estimation for that

2  initiative.

3  Q.    And tell His Honor what a swag is, that's a guess, right?

4  A.    That would be an educated guess, that's correct.

5  Q.    Well, it's an acronym, and it stands for wild guess, I'm

6  not going to say what the A is, but it's a wild guess, right?

7  A.    It's a guess, its based on whatever the best information

8  somebody has in their experience.

9  Q.    Can you tell us what SWAG means as an acronym?

10  A.    You just said it, do you want me to say it again?

11  Q.    Okay.

12        Let's talk about a different --

13        THE COURT:  Hold on, let's be clear about something.

14  What does it mean to you?  That's what I want to know.

15        THE WITNESS:  It's when somebody doesn't have any

16  empirical data working through something and they have to make

17  a guess based on their personal experience.

18        THE COURT:  That's what it means to you?

19        THE WITNESS:  That's what it means to me.

20        THE COURT:  You wrote it there, that's what you were

21  thinking.

22        THE WITNESS:  That's correct.

23        THE COURT:  Okay, that's all.  Go ahead.

24  BY MR. WELSH:

25  Q.    Now, the numbers in here, these estimates, in some cases

1   they involve conversion rates, right?

2   A.   What do you mean by a conversion rate?

3   Q.   When you were asked in your deposition about conversion

4   rates, do you recall that?

5   A.   I don't recall that.

6   Q.   All right, let's see if I can help you out.

7        MR. WELSH:  Your Honor, I have some binders with the

8   deposition transcripts, may I approach?

9        THE COURT:  You may.

10       MR. WELSH:  May I approach the witness, Your Honor?

11       THE COURT:  You may.

12       Is this a different binder than this other one?

13       MR. WELSH:  It is, Your Honor, the first binder was

14  for his individual depositions that he gave.  The second

15  binder, which has a lot more girth to it, that's the, on behalf

16  of the company's 30(b)(6) witnesses.

17       THE COURT:  All right.

18       MR. WELSH:  Thank you, Your Honor.

19       THE COURT:  All right.  I'd like to have the paper

20  concession in this case.

21  BY MR. WELSH:

22  Q.   Now, Mr. Stankey, I'm going to direct you to tab 5 of that

23  big binder.  And this is the deposition that you gave on

24  February 15 of this year, correct?

25  A.   That's what it looks like, yes.

1    Q.   All right.  And I'm going to direct you to page 55 of that

2    deposition.

3    A.   Okay.

4    Q.   And do you see there on line -- starting on line 15, if

5    would you read that through the end and tell me when you're

6    done?

7    A.   (Witness complies.)

8         Okay.

9    Q.   Does that help to refresh your memory that there was a

10   discussion in your deposition back in February, just two months

11   ago, about conversion rates that are in this exhibit?

12   A.   It does.

13   Q.   Okay.  And in response to the questions that were asked of

14   you that day, you told us that the conversion rates that are in

15   the document, that some of those were prepared by Time Warner

16   personnel to your knowledge, right.

17   A.   That's correct.

18   Q.   All right.  And you didn't know how at least one of those

19   conversion rates was derived; isn't that true?

20   A.   Yeah, the work that was done on the Time Warner side,

21   oftentimes because of restrictions on how data flows they would

22   have to provide inputs like a conversion rate to complete an

23   analysis.

24   Q.   Okay.  I think my question was really simple, and we're

25   trying to be very efficient for the Court on time.

```
1   A.    Okay.

2   Q.    So if you could just answer my questions.  You understood

3   that some of those conversion rates were coming from Time

4   Warner personnel, not from AT&T personnel, correct?

5   A.    That's correct.

6   Q.    All right.  And as a result you didn't stand over the

7   shoulders of the Time Warner people because you weren't allowed

8   to, right?

9   A.    That's correct.

10  Q.    All right.  And that information that you got on these

11  conversion rates, you couldn't answer in your deposition

12  whether or not those were using any empirical data at Time

13  Warner; isn't that true?

14  A.    That's true.

15  Q.    And you hadn't discussed those conversion rates with the

16  Time Warner personnel or looked at the back of what the Time

17  Warner personnel did to arrive at those conversion rates; isn't

18  that true?

19  A.    I did not discuss them.  People in the working team may

20  have discussed them.

21  Q.    Okay.  Again, answer my question if you would.  Counsel

22  can ask you a question.  But you did not, correct?

23  A.    I did not.

24  Q.    All right.  Let's talk about a different one of your --

25  and you can put that to the side for now, sir, thank you.
```

1       Let's talk about a different one of your -- of AT&T

2  synergy claims here, this is on content intelligence, and I

3  think you testified about this yesterday.

4       Now, I think you described earlier, certainly in your

5  depositions that you gave, that content intelligence is using

6  data to drive create decisions in the development of content,

7  correct?

8  A.   That's one use of it, yes.

9  Q.   Okay.  I think you gave an example yesterday about it

10 tells you which stars you want to put into a particular show,

11 that sort of thing, right?

12 A.   That was one of the examples I gave, yes.

13 Q.   All right.  Now, AT&T hasn't been able to test to see

14 whether content intelligence even works, right?

15 A.   That's correct, as I said, neither company really has both

16 sets of data to do that.

17 Q.   Okay.  Now, as you were getting involved with your role as

18 head of integration, you went over and talked with Time Warner

19 employees, didn't you?

20 A.   I did.

21 Q.   Yeah, you called it you're making your rounds, right?

22 A.   I may have.

23 Q.   Okay.  And you talked to those employees about content

24 intelligence, right?

25 A.   I talked to them about a number of things including

1   content intelligence.

2   Q.   And you were told by Time Warner employees that content

3   intelligence was speculative, unproven and untested, weren't

4   you?

5   A.   There are people in Time Warner who hold that point of

6   view, yes.

7   Q.   All right.  And after those rounds, you came back to AT&T

8   and you thought that the advertising synergies that you've been

9   talking about here, you thought that those were going to be a

10  significant execution risk, correct?

11  A.   No.

12  Q.   You came back and you also found that Turner didn't have

13  buy-in or Time Warner didn't have buy-in on the content

14  intelligence, right?

15  A.   Can I clarify, are you asking about advertising or content

16  intelligence?

17  Q.   So this one I'm asking about contents intelligence.  You

18  came back from your rounds and you had found that Time Warner

19  didn't buy into the idea of content intelligence, correct?

20  A.   There were individuals that I spoke with who were

21  skeptical of some of the approaches.

22          MR. WELSH:  Your Honor, I have two binders here of

23  some exhibits if I may approach?

24          THE COURT:  You may.

25          MR. WELSH:  May I approach the witness, Your Honor?

```
 1                 THE COURT:  You may.

 2                 MR. WELSH:  May I proceed?

 3    BY MR. WELSH:

 4    Q.   Mr. Stankey, you have some exhibits here, we're not going

 5    to go through all of these, I just want to ask you about a

 6    couple of them, though.  If I could ask you to look at PX 72.

 7    A.   (Witness complies.)

 8    Q.   Now, Mr. Stankey, this is an email from Amy McCracken,

 9    starting out with the email from Amy McCracken to you on

10    September 1, 2017 with your response on September 4; is that

11    correct?

12    A.   Correct.

13    Q.   Is that correct, sir?

14    A.   Yes, that's correct.

15    Q.   All right.  And you worked with Amy McCracken in this

16    timeframe, correct?

17    A.   I did.

18    Q.   And she was responsible for some of the overall program

19    management associated with the integration effort, correct?

20    A.   That's correct.

21    Q.   All right.  And this particular email or exchange of

22    emails relates to an update that was being prepared at the time

23    for what you've described as being the Friday morning meetings

24    with Mr. Stephenson, correct?

25    A.   That's what it appears to be, yes.
```

1  Q.   All right.  And in your email to her you're offering her

2  comments and edits on the presentation which relates to the

3  synergies topic, correct?

4  A.   Yes.

5  Q.   In particular it relates to content intelligence, correct?

6  A.   There are comments in here about content intelligence,

7  correct.

8          MR. WELSH:  Your Honor, I move for admission of PX

9  72?

10          MR. PETROCELLI:  No objection.

11          THE COURT:  It will be admitted.

12          (Plaintiff's Exhibit No. PX 72 was received

13      in evidence.)

14  BY MR. WELSH:

15  Q.   Mr. Stankey, I'm going to ask you to look at your email

16  response to Ms. McCracken, in the second paragraph of that

17  where it starts off, "Synergy slides are fine."  Do you see

18  that paragraph?

19  A.   I do.

20  Q.   All right.  And in your comment to her you said, "Contents

21  intelligence has specious buy-in from my rounds and should be

22  characterized as the initiative that will require significant

23  behavioral and incentive work," those are your words to

24  Ms. McCracken that day, correct?

25  A.   Correct.

1  Q.   And you also say that, "Advertising has the most

2  significant executive risk, I think this is understood," those

3  are your words to Ms. McCracken, correct?

4  A.   They are.

5  Q.   Okay, thank you.

6       Now, after this exchange of emails with Ms. McCracken, Ms.

7  McCracken revised the presentation for the Friday morning

8  meeting, didn't she?

9  A.   I suspect she did, I don't recall exactly.

10 Q.   All right.  Well, let's see if I can help you out.  Look

11 at PX 323 in your binder.

12 A.   (Witness complies.)

13 Q.   Are you there, sir?

14 A.   I'm in the tab, yes.

15 Q.   Okay.  So PX 323 are emails between yourself and

16 Ms. McCracken on September 5, 2017, correct?

17 A.   Yes, they are.

18 Q.   And again, this relates to the merger planning and

19 presentation that we've been talking about, true?

20 A.   It does.

21 Q.   And the draft of the presentation at that time is

22 attached, correct?

23 A.   Yes, there is one attached.

24          MR. WELSH:  Your Honor, I move for admission of PX

25 323?

```
 1              MR. PETROCELLI:  No objection.

 2              THE COURT:  It'll be admitted.

 3              (Plaintiff's Exhibit No. PX 323 was

 4         received in evidence.)

 5   BY MR. WELSH:

 6   Q.   So now going back and looking at the email itself, Mr.

 7   Stankey, I want to look at Ms. McCracken's email to you, which

 8   is in the middle of that page, are you there?

 9   A.   I'm there.

10   Q.   All right.  And she goes through a number of the slides

11   and she writes next to slides 35, do you see that where it says

12   "synergy slides," right?

13   A.   I do.

14   Q.   All right.  And that's the same reference that you had in

15   PX 72 when you talked about synergy slides, right?

16   A.   I'm sorry, can you repeat the question?

17   Q.   Sure.  PX 72, which you just looked at, where you said

18   "synergy slides," you guys are talking about the same topic

19   here, right?

20   A.   I believe so.

21   Q.   Okay.  And then Ms. McCracken writes next to slide 35 on

22   synergy slide, she says, "Synergy slides updated with" --

23              THE COURT:  Slow down, slow down for my reporter.

24              MR. WELSH:  Sorry.

25              THE COURT:  Slow down.
```

1          MR. WELSH:  Thank you, Your Honor.

2   BY MR. WELSH:

3   Q.    She says, "Synergy slides updated with current numbers and

4   added risk comment to CI.  Did not add to advertising, agreed,

5   it's understood," right?  That's Ms. McCracken's words to you

6   in response to your email, correct?

7   A.    That's what she wrote.

8   Q.    All right.  And CI, you understood to be content

9   intelligence, correct?

10  A.    I did.

11  Q.    Okay.  And if we look at page 5 of the presentation, which

12  is attached, it's actually at PX 323 dash 007, tell me when

13  you're there.

14  A.    (Witness complies.)

15  Q.    Are you there, sir?

16  A.    Yes, I'm there.

17  Q.    It's page entitled "Synergies," correct?

18  A.    It is.

19  Q.    And then the top part has contents intelligence on the

20  right, correct?

21  A.    It does.

22  Q.    And Ms. McCracken added an asterisk there and dropped a

23  footnote where she says "Appropriate incentives will be

24  necessary to reduce achievability risk," correct?

25  A.    That's correct.

```
 1   Q.   Okay.  Now, after this point you told Mr. Stephenson that

 2   contents intelligence had specious buy-in," didn't you?

 3   A.   No, I didn't say that to him.

 4   Q.   Well, let's look at PX 344 in your binder.

 5   A.   (Witness complies.)

 6   Q.   Are you there, sir?

 7   A.   I am.

 8   Q.   All right.  Now, 344 again is an exchange of emails

 9   between you and Ms. McCracken on September 6 and September 7 of

10   2017, right?

11   A.   It is.

12   Q.   And this relates again to this presentation that we've

13   been talking about, the one for Mr. Stephenson, correct?

14   A.   That's correct.

15   Q.   All right.

16        MR. WELSH:  Your Honor, I move for admission of PX

17   344?

18        MR. PETROCELLI:  No objection, Your Honor.

19        THE COURT:  Be admitted.

20        (Plaintiff's Exhibit No. PX 344 was

21   received in evidence.)

22   BY MR. WELSH:

23   Q.   Now, you told Ms. McCracken at the top in paragraph one,

24   you said, "A few points, item one," you said, "Drop the

25   asterisk on the content initiative.  I covered Randall off line
```

1  on this yesterday, he gets the issue, no need to dwell on the

2  room."  Those are your words?

3  A.    Those are my words, and I don't see "specious" in there.

4  Q.    And the Randall is Mr. Stephenson?

5  A.    That's correct.

6  Q.    Let's talk briefly about what you described yesterday as

7  the programmatic platform, okay?  Change topics here a little

8  bit.

9        Now, the model for AT&T's numbers, these estimates in DX

10  658, assumes that you have certain distributors and certain

11  programmers that are committed to contributing inventory for

12  this platform; isn't that right?

13  A.    Over periods of time, yes.

14  Q.    Okay.  And at the time of your deposition in February on

15  behalf of AT&T, AT&T hadn't had discussions with these

16  distributors that we're talking about, these certain particular

17  distributors about contributing their inventory to the

18  platform; isn't that right?

19  A.    Specifically about the programmatic platform is the

20  question?

21  Q.    That's correct.

22  A.    That would be a correct statement.

23  Q.    All right.  Nor had AT&T had conversations with any

24  programmers, these particular programmers that your model

25  assumes about contributing their inventory to a programmatic

1   platform, correct?

2   A.   That's not correct, that's not entirely correct.

3   Q.   As to some of the particular programmers that your model

4   depends upon, at the time of your deposition in February, there

5   had not been discussions with those programmers; isn't that

6   true?

7   A.   There have been discussions with programmers about whether

8   or not there would be a desire to move inventory into a better

9   modernization model, there hasn't been anything put in front of

10  them around a specific set of deliverables in the programmatic

11  platform.

12  Q.   Well, I want to make sure we're on the same page.  So if

13  you look at tab 2 of your binder with the deposition

14  transcripts.  And this is from February 14, 2018, and I'm going

15  to direct you to page 297.

16          THE COURT:  What's the date of that deposition?

17          MR. WELSH:  February 14, 2018, Your Honor.

18          THE COURT:  Thank you.

19          MR. WELSH:  Tab 2.

20          MR. PETROCELLI:  What page?

21          MR. WELSH:  Two nine seven.

22  BY MR. WELSH:

23  Q.   Are you there, sir?

24  A.   I am.

25  Q.   Okay.  I'm going to direct you to line 9, the question was

 1   asked:

 2       "Has AT&T had any discussions yet with Viacom

 3    and Fox about contributing their inventory to the

 4    platform?"

 5       The answer at line 13 was, "No, we don't have a

 6    commitment to close the transaction, and the

 7    platform won't be there unless we close the

 8    transaction, I think that would be a very

 9    premature discussion at this point."

10       Is that correct?

11   A.   That is consistent with what I just characterized for you.

12   Q.   That was your answer to that question that day, right?

13   A.   That's correct.

14   Q.   And as it stands then today, because you haven't had

15   conversations with the distributors, for example, that we

16   talked about, you can't tell us that they will, in fact, want

17   to come and give their inventory to a competitor for this

18   programmatic platform, you cannot tell the Court that today,

19   can you?

20   A.   I cannot tell the Court that today.

21   Q.   Let's go to a new topic.  Now, on direct you testified

22   that the traditional pay-TV ecosystem is changing, correct?

23   A.   Yes, I did.

24   Q.   You were asked some questions by Mr. Petrocelli, and you

25   talked about that yesterday, right?

1   A.    I did.

2   Q.    All right.  Now, the pace of change, though, that's going

3   to occur, that's an open question, isn't it?

4   A.    Can you be more specific, the pace of what change?

5   Q.    The pace of change in terms of what's happening in the

6   traditional pay-TV ecosystem, that pace is an open question as

7   to how quickly that's going to go?

8   A.    I don't know, in my mind it's not, it's going pretty

9   quick.

10  Q.    Okay.  If you would look at tab 2 of your individual

11  deposition.  So this is the smaller of the two binders with

12  transcripts.

13  A.    (Witness complies.)

14  Q.    I'm going to direct you to page 284.  And I'm going to

15  direct you to line 22.  Do you see where the question starts:

16        "Okay.  And do you believe that traditional

17     pay-TV distribution, that will remain an

18     important part of the entertainment delivery in

19     the future."  Do you see that question?

20  A.    I do.

21  Q.    And your answer on line 2 of 285 was:

22        "As we talked about earlier, I think it's, it's

23     definitely peaked, and it's on its way down.  It

24     will decline.  That decline can't be stop[ed at

25     this point.  The question is, what is the pace of

1    it, what is it replaced with."

2       That was your answer to that, right?

3  A.   That's the pace of decline.

4  Q.   And then I asked on line 8:

5       "And what the pace of it is and what's it's"

6    "replaced with, are those open questions?"

7       And your answer on line 11 and 12 is, "I think

8    they're open questions."  Correct?

9  A.   Correct, that's the first part of the answer.

10 Q.   Did you give that answer to my questions that day?

11 A.   I did.

12 Q.   Okay.  Now, you're familiar with SNL Kagan?

13 A.   I am.

14 Q.   And we heard some testimony from the defendant's expert

15 witness about SNL Kagan, you were here for that, right?

16 A.   I recall SNL Kagan being brought up, I don't remember the

17 exact context.

18 Q.   And you're aware that SNL Kagan projects that five years

19 from now that there will be seventy-eight million U.S.

20 households still subscribing to traditional pay-TV?

21 A.   That's entirely possible.

22 Q.   You don't dispute that?

23 A.   SNL Kagan, I have reason to probably think it's under

24 estimated, given that was one of the sources we used when we

25 did the DirecTV transaction that missed the inflection point.

1   Q.   Missed the inflection point?

2   A.   The inflection point of the downward trend in pay-TV.

3   Q.   For the revenue, the revenue missed you testified about

4   yesterday?

5   A.   The customer subscription numbers.

6   Q.   Okay.  So is it your testimony, then, that SNL Kagan is

7   not reliable?

8   A.   They've been underestimating to some degree the trend.

9   Q.   So is the answer that it's unreliable, sir?

10  A.   Every estimate has a degree of reliability in it.

11  Q.   Are you also aware that SNL Kagan projects that the rate

12  of multichannel subscriber loss will be slowing down over the

13  next five, six years?

14  A.   I don't know.  I'm not familiar with that particular

15  estimate.

16  Q.   Okay.

17          MR. WELSH:  Your Honor, we have what we've

18  identified, marked for identification as PX 578.  May I

19  approach?

20          THE COURT:  Five seven eight?

21          MR. WELSH:  That's correct, Your Honor.

22          THE COURT:  Okay.

23          MR. WELSH:  May I approach the witness?

24          THE COURT:  You may.

25          MR. WELSH:  Your Honor, a copy of PX 578 has been

1   provided to defense counsel.  May I proceed?

2          THE COURT:  Yes.  Are you intending to introduce

3   this?

4          MR. WELSH:  I'm not.

5          THE COURT:  Okay, good.  That'd be an issue.

6          MR. WELSH:  Yeah.  May I proceed, Your Honor? Thank

7   you.

8   BY MR. WELSH:

9   Q.   So, Mr. Stankey, you have PX 578 in front of you?

10  A.   I do.

11  Q.   You recognize that as SNL Kagan data?

12  A.   Can you point me to something on the page?

13  Q.   Sure.  Look at the third page, do you see the copyright

14  for Kagan?

15  A.   I do.

16  Q.   Okay.  And I'm going to ask you to look at what's there on

17  the multichannel subscriber's growth, the projections looking

18  at 2019 out.  And if you would take a look at that.

19  A.   (Witness complies.)

20         MR. PETROCELLI:  Your Honor, I object, there's no

21  foundation for this, and --

22         THE COURT:  You can approach.

23         (Witness withdrew from the witness stand.)

24         (Sealed Bench Conference.)

25         MR. PETROCELLI:  He's trying to read into the record

1   something for which there's absolutely no foundation.  If he

2   wants to refresh recollection, that's one thing, but you can't

3   read hearsay into the record.

4          MR. WELSH:  I don't think I did that.  And I was

5   actually trying to refresh his recollection, but I'm --

6          MR. PETROCELLI:  You didn't ask a question.

7          MR. WELSH:  You had an objection first.

8          MR. PETROCELLI:  You didn't ask a question.

9          THE COURT:  Well, let's -- okay.  Let's make sure we

10  aren't just reading this stuff into the record, point one.

11         MR. WELSH:  Right.

12         THE COURT:  Point two, ask him a question, direct his

13  attention to what you want him to read.  He can read it to

14  himself.

15         MR. WELSH:  That's what I was going do.

16         THE COURT:  Okay, but just avoid him reading it into

17  the record.

18         MR. WELSH:  Right, I understand.

19         MR. PETROCELLI:  Thank you, Your Honor.  It's obvious

20  that nobody would have any recollection with respect to any

21  figures in that document.

22         THE COURT:  There are a lot of figures in this

23  document.

24         MR. PETROCELLI:  I don't know what kind of question

25  that that would obviously have to refresh, so I just want to be

1  careful we're not --

2        THE COURT:  Tell me what you're pointing him to?

3        MR. WELSH:  It's on the third page, Your Honor.  It's

4  the line at the bottom, the subscriber loss.

5        THE COURT:  This right here.

6        MR. WELSH:  Yes, the percentage, the percentage

7  numbers going across.

8        MR. PETROCELLI:  So what's the question as to what

9  you want his recollection refreshed?

10        MR. WELSH:  The question I'm going to ask him is if

11  this refreshes his recollection that SNL Kagan is predicting a

12  decline in the percentage of sub-loss out into the future.  He

13  can say yes or he can say no.

14        THE COURT:  This is 33 percent, is that what this is

15  supposed to be here?

16        MR. WELSH:  That's right.  And what I think my

17  question was, whether from 2019 going out, whether that number

18  was declining.  And that's what I want to see if I can refresh

19  his recollection about.

20        MR. PETROCELLI:  Your Honor, that is a misuse of the

21  doctrine of refresh recollection.  It has to be something that

22  he had once known and now the question is whether looking at it

23  makes him remember something he previously knew.

24        THE COURT:  All right, okay.

25        MR. WELSH:  How do I challenge whether he's, in fact,

1  had a recollection of it unless I can show it to him and see if

2  it --

3          THE COURT:  Hold on, hold on.  Show him the document.

4          MR. WELSH:  Okay.

5          THE COURT:  Point him to this area.

6          MR. WELSH:  Right.

7          THE COURT:  Ask him if he's familiar with this

8  document.  If the answer to the question is no, you can ask him

9  do you have any recollection of this type of data being brought

10  to your attention by your staff?  If the answer is no, you

11  can't just use this as a way to read into the record.

12          MR. WELSH:  I wasn't going to mention the numbers at

13  all.

14          THE COURT:  So find out if he -- he can look at it.

15          MR. WELSH:  Okay.

16          THE COURT:  And see if it has any impact on

17  refreshing his recollection, but that's about it.

18          MR. WELSH:  Okay, all right.  I think that may be

19  Your Honor's.

20          THE COURT:  Oh.

21          MR. PETROCELLI:  Also we have to deal with an issue.

22          THE COURT:  You got about ten minutes left.

23          MR. PETROCELLI:  And I don't think I'll need more

24  than that, so then we have to deal with the issue of the, that

25  number.

1        THE COURT:  Yeah, well, at the end of the ten minutes

2   check with your people to see what they found out.

3        MR. WELSH:  I will, Your Honor, thank you very much.

4        (Open court.)

5        THE COURT:  Come on back up, Mr. Stankey.

6        (Witness resumed the witness stand.)

7        THE COURT:  All right, you may proceed consistent

8   with the discussion at the bench.

9        MR. WELSH:  Yes, Your Honor.

10   BY MR. WELSH:

11   Q.   Mr. Stankey, you have Plaintiff's Exhibit 578, right?

12   A.   I do.

13   Q.   All right.  And I just want to direct you to the third

14   page of this.  And to the bottom where it says, "multichannel

15   subscribers' growth."  And I just want you to look at that, I

16   don't want you to read it out loud.  Just look at that

17   information that's there.  Tell me when you're done.

18   A.   (Witness complies.)

19        Okay.

20   Q.   Does this refresh your recollection at all, sir, that you

21   learned from your staff or from anyone else that -- about the

22   information that's there on the multi-subscriber growth

23   projection that were done by SNL Kagan?

24   A.   I've not seen this dataset before.

25   Q.   Right, and my question, though, is did your staff bring

1    this to your attention in terms -- or anyone bring it to your

2    attention before you came in to testify about the, what you

3    call the changing ecosystem?

4    A.   I've not seen this dataset before.  I don't know of this

5    dataset.

6    Q.   Okay.  That really wasn't my question.  My question was

7    whether staff, your staff or anyone else had advised you of the

8    numbers or the trends that are associated with this information

9    that's reported here by SNL Kagan, can you tell us that?

10   A.   Not that I recall.

11            THE COURT:  If you recall.

12   BY MR. WELSH:

13   Q.   Let's change subjects.

14        Now, Mr. Stankey, you've told the Court about your

15   predictions, right?  Correct?

16   A.   Are you on synergy predictions?

17   Q.   I'm just talking generally.  You told the Court about your

18   predictions.  Now, your predictions are dependent upon a number

19   of different factors; isn't that fair.

20            THE COURT:  You need to be more specific.  There's

21   been a lot of talk about predictions here now.

22            MR. WELSH:  The predictions -- fair point, Your

23   Honor, I apologize.

24   BY MR. WELSH:

25   Q.   As to DX 658, version 41?

1  A.    Yes.

2  Q.    All right.

3  A.    I've talked about those predictions.

4  Q.    Okay.  And those predictions that you talk about there,

5  those are dependent upon a number of factors, right?

6  A.    Sure.

7  Q.    Okay.  And at the end of the day whether or not the merged

8  entity is able to achieve this also depends upon, one of the

9  factors is, is the personnel that are going to be with the

10 merged company; isn't that true?

11 A.    You don't get things done without people.

12 Q.    Right.  Now, you know from your past experience with

13 mergers that personnel do leave when there's a merger, right?

14 A.    They do.

15 Q.    And there's a risk here in this case that top tier

16 executives of Time Warner could be gone after the merger, true?

17 A.    There's a risk after any transaction that that could

18 occur.

19 Q.    In fact, we heard just the other day from Mr. Bewkes that

20 he'll be stepping on, and you're moving into his place,

21 correct?

22 A.    Yes, he shared that.

23 Q.    All right.  Now, you, in terms of what work you've done on

24 integration, you already have plans to make some changes in

25 terms of personnel if this merger were to go forward; isn't

1   that true?

2           MR. PETROCELLI:  May I approach, Your Honor?

3           THE COURT:  You may.

4           (Sealed Bench Conference.)

5           MR. PETROCELLI:  ████████████████████████

6   ████████████████████████

7           THE COURT:  ████████████

8           MR. PETROCELLI:  ████████████████████████

9   ███████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ███████████████████████████████████████████████

12  ████████████████

13          THE COURT:  ████████████████████████████

14  ████████████████████

15          MR. WELSH:  ████████████████████████████

16  ████████████████████████████████████████████████

17  ███████████████████████████████████████████████

18  ████████████████████

19          THE COURT:  ██████████████████████████

20          MR. WELSH:  ████████████████████████████

21  █████████████████████████████████████████

22  ████████████████████████████████████████████

23  ████████████████████████████████████████████

24  █████████████████████████████████████████████

25  ████████████████████████████████████████████

1 ████████████████████████████████████████

2 ████

3        ████████████████████████████████████

4 ██████████████████████████████████████████████

5 ███████████████████████████████████████████████

6 ███████████████████████████

7        THE COURT: ██████████████████████

8 ███████████████████

9        MR. WELSH: ██████████████████████

10 ███████████████████████████████████████████

11 ███████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████

14 ███████████████████████████████████████████

15 ████████████████████████████████

16        ███████████████████████████████████████

17 ███████████████████████████████████████████

18 ███████████████████████████████████████████

19 ██████████████████████████████████████████

20 ████████████████████████████████████████

21 ██████████████

22        MR. PETROCELLI: ████████████████████

23 ███████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ███████████████████████████████████████████



1
2
3
4          THE COURT:
5
6
7          MR. WELSH:
8
9          THE COURT:
10         MR. WELSH:
11
12
13
14
15         THE COURT:
16
17         MR. WELSH:
18         THE COURT:
19         MR. WELSH:
20         THE COURT:
21         MR. WELSH:
22         THE COURT:
23         MR. WELSH:
24         THE COURT:
25



1

2

3

4

5

6

7       MR. WELSH:

8

9

10

11       THE COURT:

12

13

14       MR. PETROCELLI:

15

16

17       THE COURT:

18

19

20       (Open court.)

21       THE COURT:  You may proceed consistent with the

22  discussion at the bench.

23       MR. WELSH:  Thank you, Your Honor.

24  BY MR. WELSH:

25  Q.   All right, Mr. Stankey, this is the last topic I have to

1  talk with you about.

2      You testified yesterday about your quiet time.  I think

3  you mentioned that a couple of times where you were

4  contemplating AT&T's future, I just want to come back to that

5  subject.  Do you recall that?

6  A.   Yes, I do.

7  Q.   Okay.  And, in fact, I think you said, and I'll quote this

8  in the transcript at page 3214, you said that:

9      "Exploration process, a couple of weeks of

10     quiet study of my own, some analysis, trying to

11     understand what it would mean to put a media

12     company together with the distribution company,

13     thinking about the talent that was required, a

14     variety of other things, I put a framework

15     together that caused me to start those discussion

16     was Mr. Stephenson."

17     Okay?  So I just want to come back to that subject with

18  you, okay?

19  A.   Sure.

20  Q.   All right.  Now, as you were contemplating this and coming

21  up with your thoughts for Mr. Stephenson, you thought about

22  Time Warner itself as being the company to be acquired; isn't

23  that true?

24  A.   When I was doing this work I had literally a landscape of

25  the entire industry, including Time Warner.

1   Q.    Right.  But that was a piece of it, you were looking at it

2   and you then thought about Time Warner in the context of

3   putting this analysis together for Mr. Stephenson, correct?

4   A.    I did.

5   Q.    This framework.  Okay.  And if you look at PX 6 in your

6   binder.

7   A.    (Witness complies.)

8   Q.    And just tell me when you're there, sir?

9   A.    Okay.

10  Q.    Now, PX 6, we talked about this in your deposition, these

11  are your notes, correct?

12  A.    They are.

13  Q.    And you prepared these notes to put together your

14  framework, your thoughts which you would then share with

15  Mr. Stephenson, correct?

16  A.    This was, yes, one of the documents I put together.

17  Q.    Okay.  And you did share and discuss this with

18  Mr. Stephenson, right?

19  A.    We had a number of conversations about elements that are

20  on these sheets of paper, yes.

21  Q.    Okay.

22         MR. WELSH:  Your Honor, I move for admission of PX 6

23  into the record?

24         MR. PETROCELLI:  No objection.

25         THE COURT:  All right, it will be admitted.

1          (Plaintiff's Exhibit No. PX 6 was received

2     in evidence.)

3  BY MR. WELSH:

4  Q.    Now, in your thought process in setting up your framework

5  and your discussions with Mr. Stephenson, you considered Time

6  Warner to be must have content, didn't you?

7  A.    I put a note down there next to Time Warner that indicates

8  must have with a number of other players in the industry given

9  the popularity of the content.

10  Q.    Okay.  And you have Viacom listed there, but you didn't

11  list Viacom as being must have; isn't that right?

12  A.    That's correct.

13  Q.    Okay.  Now, the last point, sir.  You testified yesterday

14  that there were no reality to the government's bargaining

15  model, do you remember the question being asked and that was

16  your testimony in response?

17  A.    Yes, I do.

18  Q.    Okay.  Now, you were, in fact, advised by Moelis and Co.

19  in 2016 that one advantage of AT&T buying the premium content

20  programmer was to give the programmer additional leverage in

21  carriage negotiations, correct?

22  A.    We were not advised by them, no.

23          MR. WELSH:  Your Honor, I have a document marked for

24  identification as PX 580.  May I approach?

25          THE COURT:  Yes.

```
1              MR. WELSH:  May I approach the witness, Your Honor?

2              THE COURT:  You may.

3              MR. WELSH:  Your Honor a copy of Plaintiff's Exhibit

4    580 has been provided to defense counsel.  May I proceed?

5              THE COURT:  You may.

6    BY MR. WELSH:

7    Q.   All right.  Mr. Stankey, you have Plaintiff's Exhibit 580

8    in front of you, correct?

9    A.   I do.

10   Q.   All right.  And we looked at this, I think in your

11   deposition that we look took in February down in Dallas,

12   correct?

13   A.   We did.

14   Q.   Okay.  And this is a presentation that you received from

15   Moelis and Company in 2016, correct?

16   A.   It was an unsolicited presentation that they dropped off

17   at the office and covered with me on, yes.

18   Q.   My question, a very simple question is, this is a

19   presentation that Moelis and Company presented to you in 2016.

20   Is the answer to that "yes"?

21   A.   It's -- not every page, but they did drop this deck off

22   when they came to the office.

23   Q.   Right.  They didn't just drop it off.  You discussed it,

24   certainly, certain pages of this you discussed with them,

25   didn't you?
```

1  A.    Certain pages I did, yes.

2  Q.    All right.  And if you look at page 10 of the

3  presentation.

4          THE COURT:  What -- where are the numbers you're

5  looking at, counsel?

6          MR. WELSH:  In terms of the AT&T number, Your Honor,

7  it would be AT&T DOJ 2R02664612.

8          THE COURT:  I think I see it now.

9          MR. WELSH:  It's page number 10 of the presentation

10 itself.

11         THE COURT:  Well, my -- this is my page 10 is blank.

12         MR. WELSH:  May I approach, Your Honor?

13         THE COURT:  Yeah.

14         MR. WELSH:  Okay.

15         THE COURT:  Hold on, maybe I got a bad copy or

16 something.

17         MR. WELSH:  Yes, that's what I'm worried about.  It's

18 the AT&T DOJ 2R02664612.  This is the page I'm directing the

19 witness to.

20         THE COURT:  Wait a minute now.

21         MR. PETROCELLI:  This page right here, 612.

22         MR. WELSH:  Yes.

23         THE COURT:  Six one -- hold on, this one here, 612?

24         MR. WELSH:  That's correct, Your Honor.

25         MR. PETROCELLI:  While I'm up here --



1          THE COURT:  Make sure he's got the right page too.

2          MR. WELSH:  I will, Your Honor.

3          THE COURT:  Okay.

4          (Sealed Bench Conference.)

5          MR. PETROCELLI:

6

7

8

9

10         MR. WELSH:

11

12         THE COURT:

13

14

15

16

17

18         MR. WELSH:

19         THE COURT:

20         MR. PETROCELLI:

21

22

23         THE COURT:

24

25         MR. WELSH:



```
 1  ███████████████████████████████████████████

 2  █████████████████████████████████████████████

 3          MR. PETROCELLI:  ████████████████████

 4          THE COURT:  ██████████████

 5          MR. PETROCELLI:  ██████████████████████████

 6          THE COURT:  ████████████████████████

 7  ██████████████

 8          MR. WELSH:  ████████████████████████

 9  ████████████

10          THE COURT:  ██████████████████████

11          MR. WELSH:  ██████████████████████████████

12  ██████████████████████████████████████████

13  ██████████████████████████████████████████

14  ███████████████████████████████████████████

15  ███████████████████████████████████████████

16          THE COURT:  █████████████████████████

17  █████████████████████████████████████████████

18  █████████████████████████████████████████████

19  ██████████████████████████████

20          MR. WELSH:  ██████████████████████████

21  ██████████████████████████████████████████

22          THE COURT:  ██████████████████████████████

23  ███████

24          MR. WELSH:  ██████████████████████████

25  ██████████████████████████████████████████████
```

 1   ████████████████████████████████████████████

 2   ████████████████████████████████████████████████

 3   ██████████████████████

 4        THE COURT:   ████████████████████████

 5        MR. WELSH:   █████████████████████████████

 6   ██████████████████████████████████████████████████

 7   ██████████████████████████████████████████

 8   ██████████████████████████████████████████

 9   ██████████████████████

10        THE COURT:   █████████████████████████████████

11   ███████████████████████████████████████████

12   ███████████████████████████████████████████

13   ████████

14          ███████████████████████████████████████████

15   ██████████████████████████████████████████████

16   ████████████████████████████████████████

17   ████████████████████████████████████████

18   ███████████████████████████████████████████

19   ██████████████████████████████████████████████

20   ██████████

21        MR. WELSH:   ██████████

22        THE COURT:   ██████████████████████████████████

23   ██████████████████████████████████████████

24   ██████████

25        MR. WELSH:   ████████████████████████

```
1          THE COURT:  ████████████████████████
2     ████████████
3          MR. WELSH:  ███████████████████████████████████
4  ████████████
5          THE COURT:  ██████████████████████████
6          MR. WELSH:  ████
7          THE COURT:  ██████████████████████████
8     ████████████
9          THE COURT:  ███████████████████
10         MR. WELSH:  ██████████████████████████████████
11         THE COURT:  ████████████████████████████████████
12         MR. WELSH:  ████████████████
13    ███████████████████████████████████████████████████████████
14 █████████████████████████████████████████████████████
15 █████████████████████████████████████████████
16 ████████████████████████████████████████████████████████████
17         THE COURT:  ████████████████████████████████
18 ████████████
19         MR. WELSH:  ██████████████████
20         MR. PETROCELLI:  █████████████████████████████████
21         THE COURT:  ████████████████████████████████████████
22 ██████████████
23         MR. PETROCELLI:  █████████████████████████████████
24 █████████████████████████
25         MR. WELSH:  ███████████████████████████████████
```



24    MR. PETROCELLI:

1        MR. WELSH: ██████████████

2      ████████████████████████████████████

3    ████████████████████████

4      ████████████████████████████████████████████

5  ██████████████

6      ████████████████████████

7        THE COURT: ████████

8        MR. WELSH: ██████████████████████████████████

9  ████████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████

12   ████████████████████████████████████████████

13 ██████████████████████████████████████████████

14 ██████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ██████████████████████████████████████████

17 ██████████████████████████████████████████████

18 ████████████████████

19   ██████████████████████████████████████

20 ████████████████████████████████████████████

21 ████████████████████████████████████████████

22 ██████████████████████████████████████████████

23 ████

24   ██████████████████████████████████████████

25 ████████████████████████████████████████████████



1

2          MR. PETROCELLI:

3

4

5

6

7

8

9

10

11

12          MR. WELSH:

13

14          MR. PETROCELLI:

15

16

17          THE COURT:

18

19          MR. PETROCELLI:

20

21

22

23

24          THE COURT:

25          MR. PETROCELLI:

3367



```
 1  ████████████████
 2       MR. WELSH:  ███████████████████████████
 3  ███████████
 4       THE COURT:  ███████████████████████████
 5  ████
 6       MR. PETROCELLI:  ██████████████
 7       THE COURT:  █████████████████████
 8       MR. WELSH:  ███████████
 9       THE COURT:  ████████████████
10  █████████
11       MR. WELSH:  ██
12       THE COURT:  ██████████████████████████
13  ████████████████████████████████████████
14  ██████████████████████████████████████
15  ███
16       MR. PETROCELLI:  ████████
17       MR. WELSH:  ███████████
18       THE COURT:  ██████████
19       MR. WELSH:  ██
20       THE COURT:  ██████████████████████████
21  ██████████
22       MR. WELSH:  ██████████████████████████
23  ██████████
24       THE COURT:  ████
25       MR. WELSH:  ██████████████
```

```
 1          THE COURT:  ███████████████████████████████
 2  ████████████████████████
 3          MR. PETROCELLI:  █████████████████
 4          THE COURT:  ███████████████████████████████████
 5          MR. PETROCELLI:  ██████████
 6          (Open court.)
 7          THE COURT:  Well, there are a lot of issues we had to
 8  talk about.  Sorry for the inconvenience.  But I think we've
 9  resolved the ones we could resolve.
10          Where does that leave you, Mr. Welsh?  Do you have
11  any more questions for this witness?
12          MR. WELSH:  I think -- give me one second, Your
13  Honor.
14          THE COURT:  Yes.
15          MR. WELSH:  Thank you.
16          Pass the witness, Your Honor.
17          THE COURT:  Okay.  All right.  We're going to take
18  the morning recess.  You remain a witness under oath.  When we
19  come back in fifteen minutes Mr. Petrocelli will have some
20  limited, I'm assured, limited redirect.
21          MR. PETROCELLI:  Yes, Your Honor.
22          THE COURT:  Yes, and then any recross will be limited
23  to the redirect.  So we'll see you back in fifteen minutes, and
24  refrain from discussing your testimony, you know the rules.
25          (Recess at 11:50 a.m.)
```

1          (Proceedings resumed at 12:10 p.m.)

2          THE COURT:  Witness remains under oath.

3          (Witness resumes the stand.)

4          MR. PETROCELLI:  May I proceed, Your Honor?

5          THE COURT:  When you're ready.

6                          REDIRECT EXAMINATION

7    BY MR. PETROCELLI:

8    Q.   On the subject of your estimates related to DirecTV,

9    there was questions about missing revenue estimates.

10         Do you recall that?

11   A.   I do.

12   Q.   What were the reasons?

13   A.   The primary reason was there was an inflection change in

14   the industry as I mentioned earlier where the decline of the

15   traditional pay-TV bundle started faster than we assumed and

16   that is probably a couple years ahead.

17         It resulted in fewer subscribers as a result of that.  And

18   actually, an increase in our estimates in the number of

19   over-the-top subscribers that we would have during that same

20   period of time.

21   Q.   How did your estimates come out with respect to content

22   costs?

23   A.   We exceeded our content costs savings estimates which is

24   the most significant value driver of the transaction and our

25   expense estimates overall were exceeded up through the end of

1  2017 on a cash basis, total cash for both revenue and costs

2  synergies, we were slightly better than planned and now in the

3  added years the revenue synergies will ultimately kind of start

4  to create a degree of a gap on that.

5  Q.   You were asked questions about content intelligent

6  synergies and views of certain individuals of, at Time Warner.

7       Do you recall that?

8  A.   I do.

9  Q.   And what's your understanding of the Time Warner view and

10  how did that impact your thinking?  This is with respect to

11  content intelligence, synergies.

12  A.   I think I mentioned in my direct testimony that neither

13  company today has the wherewith all to actually execute around

14  using data analytics to help inform the creative process.

15       There will be more information coming after the business

16  is combined and the reality is that people are going to have to

17   learn new tricks.

18       Any time, it's not lost on me coming into this job.  There

19  are going to be dynamics of culture and willingness to change

20  that occur after every transaction and that's not unique to the

21  Time Warner entities.  It's the same for the AT&T entities and

22  part of the leadership challenge is to incent and motivate

23  people to make those changes.

24  Q.   How do you incent them?

25  A.   That's what was on the piece of paper is that we will

1   probably have to do some things like figure out how we motivate

2   people with budget incentives or opportunities to do more

3   development or other approaches maybe in their direct

4   compensation to get them to start testing some of these new

5   concepts and see if we can innovate around them.  It's not

6   business as usual.

7   Q.   You were asked questions and indeed shown an email in

8   Plaintiff's Exhibit 72 in which the statement appears that

9   advertising has the most significant execution risk.

10       Do you recall that?

11  A.   I do.

12  Q.   What did you mean by that?

13  A.   Yesterday we talked about the two parts of the advertising

14  synergies and the first part being very straightforward that

15  has very manageable, very reasonable risk around it.

16       The second part being the programmatic platform that we

17  talked about which is the need to merge a fair amount of

18  technology and get others in the industry to ultimately

19  participate.  That has a higher degree of execution as a result

20  of that.

21       It's reasonable business execution, a risk if anything in

22  business was easy and didn't have some degree of execution

23  risk, then there would be a lot more businesses around.

24       So we understand that there's going to be risk associated

25  with that, but the size of the prize is pretty significant

1   accompanied with the resources of AT&T combined with Time

2   Warner, that's one of the reasons we're doing this to actually

3   try to achieve that.

4   Q.   Why do you think other companies, other distributors and

5   other programmers if you do get this platform up and running

6   will participate?

7   A.   Yield ultimately wins, meaning if somebody can bring

8   inventory and get paid more for it, there's an economic

9   incentive to do that.  Now these are also smart and

10  sophisticated businesses. They're not going to do it blindly.

11  Their advertising time is important to them.  It's part of

12  their brand, it's what they need to do.

13       They're going to want to see proof that it's actually

14  working properly.  That's the scale from the Time Warner

15  inventory allows us to demonstrate that we can get it up and

16  working beyond just concept and then ultimately try to use that

17  as the basis under which those commercial constructs can be

18  cemented to move forward.

19       The industry is looking for options right now.  As we go

20  out and talk with folks, they clearly want a higher quality

21  option to some of the products that are being offered by

22  Facebook and Google that protect their brands and have an

23  opportunity to target advertising.

24  Q.   Finally, with respect to the revenue and cost synergies in

25  version 41, do you need the merger to achieve them?

1  A.    Yes.  This is the whole purpose of doing it.  You can't,

2  you go through each of those initiatives and if you don't put

3  the two businesses together, you can't actually achieve those

4  objectives.

5  Q.   How will consumers benefit from this merger and in

6  particular with respect to the synergies that you've identified

7  to the Court?

8  A.    Well, clearly when you innovate you have to do things to

9  invest to make things different and change.

10     By pulling out overhead costs or costs that aren't germane

11 to products and becoming more efficient, that's where the

12 resources are created to provide that pivot to innovate a

13 change.

14     While you're managing down a mature business, you need to

15 create space to invest to create the next generation of the

16 business.

17     It's no different when we had landlines, voice lines and

18 we wanted to build wireless networks, you had to create that

19 time to pivot.

20     There are a lot of negative years of wireless service

21 where we consumed cash before it finally started to turn a

22 profit.  The same thing has to happen here.  Generate more cash

23 from other parts of the business, get efficiencies in savings,

24 redirect it into the business to innovate change moving

25 forward.

1    Q.    Thank you.

2          MR. PETROCELLI:  Nothing further.

3          THE COURT:  Recross limited to redirect.

4          MR. WELSH:  Yes, Your Honor, thank you.

5          Just a couple of very quick questions.

6                      RECROSS EXAMINATION

7    BY MR. WELSH:

8    Q.    Mr. Stankey, I just want to come back to some questions

9    that you just answered about content intelligence.

10         Now I'm correct am I not, sir, that the folks at HBO don't

11   believe that the analytics that you're talking about will help

12   them with content creation; isn't that true?

13   A.    I have only talked to a couple of people at HBO.  I can't

14   speak to all of the folks and I know that there's some

15   scepticism in the individuals I've had discussions with.

16   Q.    Well actually, in your deposition you told us that the HBO

17   management team doesn't believe that going into a whole bunch

18   of analytics around that right now would serve them much

19   purpose.

20         Do you remember that testimony, sir?

21   A.    I do.

22   Q.    And you don't expect to use content intelligence to

23   improve HBO's content, do you?

24   A.    At some point in time I would expect we'll be mature

25   enough to be able to apply it.

1  Q.   Do you recall in your deposition in response to a question

2  about whether you would use it for HBO, you said in terms of

3  actually looking at content creation, no expectation around

4  necessarily tweaking that side of things.

5       Do you remember that testimony, sir?

6  A.   That was in that particular plan, that's correct.

7  Q.   Okay.

8            MR. WELSH:  No further questions, Your Honor.

9            Thank you.

10           THE COURT:  All right.

11           You're excused.

12           (Witness excused.)

13           MR. PETROCELLI:  Well, we have one final witness,

14  Your Honor.

15           THE COURT:  All right.

16           MR. PETROCELLI:  Randall Stephenson.

17           THE COURT:  All right.  Swear the witness.

18           DEFENSE WITNESS RANDALL STEPHENSON SWORN

19           THE WITNESS:  Good afternoon, Your Honor.

20           THE COURT:  Welcome.

21           MR. PETROCELLI:  May I approach, Your Honor?

22           THE COURT:  You may.

23           MR. PETROCELLI:  Ready.  Thank you, Your Honor.

24           THE COURT:  You may proceed.

25

```
 1                        DIRECT EXAMINATION

 2   BY MR. PETROCELLI:

 3   Q.    Hello, Mr. Stephenson.  Can you please introduce yourself?

 4   A.    I am Randall Stephenson, Chairman and CEO of AT&T.

 5   Q.    How long have you been with AT&T?

 6   A.    Thirty-five years.

 7   Q.    Can you briefly take His Honor through your career path?

 8   A.    Yes.  Your Honor, I began in 1982 with Southwestern Bell

 9   Telephone which was right at the time of the AT&T divestiture.

10         MR. PETROCELLI:  One second, Your Honor.  The air

11   conditioning is right over my head.

12         Can I move his microphone up?

13         THE COURT:  Yes.

14         THE WITNESS:  Is this better?

15   BY MR. PETROCELLI:

16   Q.    Yes, just boom it out there, Mr. Stephenson.

17   A.    Okay.  I began with Southwestern Bell which was just

18   before, right at the time of divestiture when AT&T split up and

19   Southwestern Bell was probably the smallest of the baby bells.

20   I got my job the old fashion way.  My brother got me on, he was

21   an installation tech, still in Norman, Oklahoma today.

22       I began working the late night shift while I was going to

23   college, working in the computer room, writing code and

24   mounting tapes on computer drives.

25         After I graduated with a Masters in accountancy, I was
```

1    hired in St. Louis to work in various finance functions.

2    Started out in corporate taxation and went through a number of

3    business planning and marketing and a number of roles

4    throughout the company.

5        Ultimately it was moved to Mexico City.  I spent four

6    years managing our operation there.

7        Was brought back and I've had a number of executive level

8    positions from our corporate controller to chief financial

9    officer, I became chief operating officer in 2004.

10       And shortly thereafter, we merged with AT&T and so that's

11   when Southwestern Bell and AT&T came together and I assumed

12   that role of chief operating officer with AT&T at that time and

13   in 2007 I was appointed as chairman and CEO of AT&T.

14           MR. PETROCELLI:  Your Honor, may I approach just in

15   case he needs water?

16           THE COURT:  You may.

17           MR. PETROCELLI:  Oh, you have one, okay.

18   BY MR. PETROCELLI:

19   Q.   Can you please tell us a little bit about AT&T?

20   A.   AT&T is a 140 year old company now.  And it's a company

21   that has reinvented itself many, many times over the years.

22       It's a company that comes from a significant number of

23   inventions.  As you know, Alexander Graham Bell was the founder

24   and it was founded to deliver voice communications over

25   telegraph wires.

1     And AT&T also discovered satellite communications.  It was

2  the discovery place of the integrated circuit which today we

3  now know as the silicon chip and the basis for all of this

4  digital media that we see today.

5     It was actually a place where the big bang was discovered,

6  the first oldest light in the universe, it's the source of the

7  big bang.

8     And so it's a prestigious company, a company that has got

9  a history of innovation and I'm obviously very proud to serve

10 as the CEO.

11 Q.  What is AT&T like today?

12 A.  Today AT&T employs 250,000 people and they're located

13 around the world.  We have operations in almost 200 countries

14 around the world.

15    We, our basic function in life we like to say is to

16 connect people to their world everywhere they live, work and

17 play.  That's what we do.

18    We connect people to people whether it's by voice

19 communication, wireless or wire line, texting, social media, we

20 just connect people to people.

21    We connect people to businesses, business to businesses is

22 a big business for AT&T.  And of late a big focus of ours has

23 been connecting people to entertainment.  So we're in the

24 connectivity business.

25 Q.  Can you describe for His Honor how the various businesses

1  of AT&T today break down?

2  A.    We have it's, our revenues are about a 160 billion dollars

3  a year.   It's somewhat evenly split between services we provide

4  to businesses, and services we provide to the consumer.

5        And the services we provide to businesses are everything

6  from voice communication to primarily data.   We transmit data

7  for large corporations all around the world.   We do video

8  communications for these companies as well.

9        And we provide these services from everybody between Exxon

10  Mobile and the federal government all the way down to your

11  local plumber.

12        On the consumer side we provide a wide range of services,

13  mobility, wireless technology, TV service, broadband service,

14  and just a wide range of services to the consumer, voice

15  telephone.

16        We do this in the United States.   We have a large

17  operation that's growing nicely in Mexico and we also provide

18  some of these services throughout Latin America.

19        We are, our largest business interestingly enough, a lot

20  of people don't realize this, is our wireless business.   This

21  is a business that we have been investing in aggressively for a

22  couple of decades and today if you were to take our wireless

23  business and pull it out, it would be number 37 in the Fortune

24  500.

25        It's about the same size in revenue as Proctor and Gamble,

1   P&G, so it's our largest business.

2       Then we have a small nascent starting advertising business

3   as well.

4   Q.   Does AT&T have a history of investing to innovate?

5   A.   At AT&T we invest a lot.  Over the last six or seven years

6   we have invested more capital in the United States of America

7   than any other public trading company.  So we invest a lot of

8   money.

9       I have a philosophy in this industry that if you're not

10  investing at the top tier, you won't be relevant for long.  In

11  fact, I have a strong belief that if you missed one technology

12  cycle in this industry, it may not kill you, but it will make

13  you sick for a very long period of time.

14      So we invest aggressively.  Our best example of this you

15  have heard me reference wireless is an area where we have been

16  investing very aggressively over the last few years.

17      You remember when we first started, it was just wireless

18  telepathy.  We call that first generation technology.  It

19  became very pervasive throughout the United States.

20      Then we moved to 2G, that's second generation.  You'll

21  hear 2G, 3G, 4G today.  And 2G means it's second generation

22  wireless.  You recall what this is, that's when you had a flip

23  phone.  You could actually for the first time send text

24  messages on a flip phone and take pictures.  That was second

25  generation technology.

1          Then around 2006, 2007 was really the ground breaking

2     technological development in wireless.  That was third

3     generation or 3G technology.  Why 3G was so important is it was

4     the first time when the internet itself became mobile.  You

5     could get to the internet with wireless technology.  It was a

6     good experience.

7          And the same time that we were launching 3G, the first

8     iPhone was introduced in the United States.  AT&T was the

9     exclusive provider of that iPhone for a number of years.

10         So the iPhone is really what made, the iPhone with 3G

11    technology is what made the internet mobile.  That was ground

12    breaking.

13         In fact, if you were to go back to that point in time and

14    compare it to today, the volumes on our network over that

15    period of time are up two hundred fifty thousand percent.  It's

16    a staggering number, the volumes in terms of what's happened

17    once you made the internet mobile.

18         Then comes the newest iteration of the technology and

19    that's fourth generation.  This is where we are today.  We are

20    on the fourth generation.  And fourth generation technology, 4G

21    is very relevant because what this allowed was the streaming of

22    video onto the mobile device.  And this is what has allowed

23    video to take off.

24         This is one of our big focus areas, getting video

25    delivered onto the mobile device.  The customer is no longer

1    bound to their living room looking on a TV on a screen.  They

2    can get all of that content now on a mobile device.

3         To put that into perspective, if you look at our network

4    today over half of all of the traffic on our network today is

5    video, delivering video.  Half of the volume on the network is

6    video.  So that's 4G.

7         Then we're culminating now and presently deploying what's

8    called 5G, fifth generation.  And all of these seem to get

9    progressively more and more interesting in terms of what

10   they're allowing to happen in our market place and in our

11   society.

12        5G is probably going to be the most transforming.  The

13   best way I can describe 5G is try to imagine your cell phone

14   with a fiber optic cable hooked to it.  That's the kind of

15   speeds we're talking about.

16        So wireless technology delivering at speeds comparable to

17   what you see in some of our fiber deployments today.  This is

18   going to begin to allow things that we have talked about for a

19   long time; the Buck Rogers things like driverless automobiles.

20        Without this kind of technology autonomous cars,

21   automobiles without drivers is not going to be feasible, but it

22   is now we believe going to be feasible.

23        Why is that important to us?  The connectivity is

24   important.  But most importantly is when you put people in

25   driverless cars you've given them more time.  No longer are you

1   driving an hour, hour and a half a day.  You are sitting in an

2   automobile.

3       Our belief is that's going to drive video consumption up

4   even more.  So video delivery is going to become more and more

5   important.

6       The other thing that 5G will do and probably I'll stop

7   with this, but as you get that kind of bandwidth, that kind of

8   performance out of wireless technology, now you have something

9   that will broadly compete with the traditional cable model.

10      We can actually deliver broadband into the home

11  wirelessly.  This starts to, for a company like ours, get very

12  exciting because now you can have a nationwide footprint of

13  high speed broadband internet into the home as well, not just

14  to the mobile device.

15  Q.   So let's talk about video, Mr. Stephenson.  When did AT&T

16  first get involved in pay-TV?

17  A.   In about 2006 we had been deploying broadband to the home

18  and we were not being very competitive with our, the cable

19  companies.  We didn't have a TV product.  All we had was a

20  broadband product.

21      So we needed to stand up to TV product.  We actually

22  worked, Mr. Stankey back over there worked, helped me develop a

23  new technology.  And it was basically delivering video over the

24  copper cables going into your home.

25  Q.   You mean for telephone copper cables?

A.    Over the same line that was delivering your telephone

service, we were able to deliver TV over this.

       And it became a very nice service for us.  We started that

in 2006.  And over the years we developed about a six million

subscriber base.  But candidly six million subscribers in the

pay-TV business is a hard way to compete.  You are buying

content at a much higher cost than everybody else in the

ecosystem and we figured we, we decided we needed to do

something very different.

Q.    So what did you do?

A.    We, in 2014 we began looking and actually pursued

acquiring DirecTV and we pursued that for a couple of reasons.

       First and foremost, DirecTV when we acquired it made us

the largest pay-TV provider in the United States.  When you're

trying to acquire content, you are operating on thinner

margins.  If you can get your content cost down, it throws off

significant benefits.

       So we wanted to pursue DirecTV.  It would generate

significant synergies.  In fact, the synergies were sizable.

They were over two billion dollars a year.  Take that money,

then reinvest it.

       This is an approach we take a lot.  Generate the

synergies, turn around and reinvest it in new technology in new

capabilities.

       What was important here was we had been trying for some

1   time to get the rights to deliver the video that we were giving

2   our customers in their homes, we wanted to deliver it over

3   their mobile devices.  It was very difficult getting the

4   capability to do that, getting the rights and so forth.

5        We acquired DirecTV.  And within about 12 months we had

6   stood up a completely new platform.  A new TV platform that

7   requires no satellite.  It can be delivered to your Smart

8   phone, to your tablet or to your TV.

9        All the content you're accustomed to seeing on DirecTV

10  without a satellite dish delivered over the internet or over

11  our wireless service.

12       So that was the key driver behind getting DirecTV.  Give

13  us the opportunity to get this content to our wireless

14  subscribers.

15  Q.   Is what you're describing that you were able to do within

16  a year or so of acquiring DirecTV in the launch of DirecTV Now?

17  A.   That's correct.  It was DirecTV Now and very, very

18  different and unique platform.  Our customers can watch the

19  content anywhere and everywhere they want to go.

20       We were, we launched this product expecting it to have

21  wide adoption in the market place.  What was most interesting

22  is we launched it in the fourth quarter of 2016 without much

23  promotion because we wanted to do a soft launch.

24       In our soft lunch in the first quarter we put it in the

25  market place.  We added more subscribers than this U-verse

1  platform added in its first year.  So the adoption has been

2  quite significant.  We are well over a million subscribers and

3  it's growing very, very nicely now.

4  Q.   How did you price it?

5  A.   It's interesting.  If you are a DirecTV subscriber on

6  average you are paying AT&T about $106 a month.  DirecTV Now,

7  this new product we're talking about, we sized down the

8  content.  Got content that we thought was really focused and

9  more relevant to the customer, particularly those that are

10 wireless centric and we priced it at $35 a month.

11      So it explained the adoption.  So we have kept the price

12 point there and the adoption has been quite impressive.

13 Q.   When you acquired DirecTV Now, excuse me, when you

14 acquired DirecTV, the satellite company, what was your thinking

15 about the status of that business long term?

16 A.   Yeah.  When we bought DirecTV in fact, when we took it to

17 our board of directors and took the deal to them for approval,

18 we told the board look, this is a mature business.  In fact,

19 the pay-TV business has peeked.  That's what we told them in

20 2014.

21      So this business will be in decline for the foreseeable

22 future.  The objective here is to mine out the synergies, get

23 the cost reductions of the business to turn around and reinvest

24 in the new technology.

25      So it was fully anticipated the business was going to

1    decline.  We do this a lot.  When we merged with AT&T we knew

2    that was a declining business, generate a lot of synergies and

3    we turned around and reinvested in new products within AT&T

4    that are now growing nicely.

5    Q.    So after you acquired DirecTV, and developed the DirecTV

6    Now business, I'm now in the years 2015, 2016, before Time

7    Warner, can you describe to the Court what was happening in the

8    media and entertainment industry and how it was shaping your

9    thinking about next steps?

10   A.    Okay.  We as a company have thought we needed to own

11   original content at some point.  And in this time frame

12   counselor is speaking of 2015, 2016, we are obviously watching

13   very closely and the media and entertainment industry is going

14   through some rather significant disruption.

15        It's coming from predominately folks in the text sector.

16   You hear them referred to often as the FANG; Facebook, Amazon,

17   Apple, Netflix and Google.  The companies, if you talked to any

18   of their CEOs, there's one issue they talk about a lot and that

19   is what is the engagement on their platform.

20        They're all about engagement.  They can give you metrics

21   all day long on what their engagement is like.  Engagement to

22   them is critical.  Because with engagement you can sell more

23   advertising.  With engagement Amazon can sell more shoes or

24   grocery, it's all about engagement to them.

25        The one area that drives engagement like no place else,

1  like no other ability is premium content.  Premium video.  TV

2  shows, movies, sports, music.  That drives engagement so the

3  Fang, if you will, are all focused on premium video.  How do we

4  get premium video onto our platforms to drive this kind of

5  engagement?

6       So you are seeing them all do this from beginning soup to

7  nuts beginning to end.  For example, Netflix has a studio where

8  they're doing original content creation.  And they're investing

9  billions of dollars in original content creation.

10       So they create video, they aggregate it meaning they have

11  a place where you can go out and see all of the content

12  available from Netflix.  They have recommendation engines which

13  tell what you might enjoy watching.  And then if you decide off

14  that aggregation place that that slick user interface, you want

15  to watch it.  They deliver it to you.  They deliver it directly

16  to the consumer.  They don't go through a cable company.  They

17  don't go through a satellite company.  Because of the

18  technology, they can take the video from content creation

19  vertically integrated up through aggregation and deliver it

20  directly to the consumer.

21       They're selling this service as a subscription service

22  for, I don't even know what the prices are any more, ten,

23  eleven, twelve, thirteen dollars a month and you get access to

24  all of their content.

25       As you engage, they get data on what you are watching,

1   what you're viewing and then they can actually use that to help

2   formulate what content they ought to be creating to bring to

3   you so that you'll use more of it.  That's the Netflix model.

4   Q.   And these companies like Netflix are they vertically

5   integrated?

6   A.   Completely vertically integrated.  One hundred percent of

7   content creation all the way up to the distribution through to

8   the consumer.

9        There are other models.  Amazon has a similar model.

10  Complete vertical integration just like Netflix.  They have a

11  studio, they have an aggregation and ratings then they have a

12  distribution to the consumer.

13       But their model is different.  Because what their model is

14  they want you engaging in this content so that as you engage,

15  they learn more about you and as you engage you will buy more

16  shoes or you will buy more groceries.  It's a very different

17  model.

18       If you are an Amazon customer, Amazon Prime customer, you

19  get access to all of their content free.  You don't have to pay

20  for it.

21  Q.   How many subs does --

22  A.   Amazon Prime just announced yesterday they announced that

23  they now have one hundred million subscribers.  So there's one

24  hundred million people who have free access to the Amazon

25  content.

```
 1   Q.    Now in addition to the vertically intergrated content

 2   providers like Netflix, what were you also seeing during these

 3   industry headwinds from other tech companies like Google and

 4   Facebook?

 5   A.    Yeah.  So like Google and Facebook those are once again

 6   different models but they are pursuing a similar strategy.

 7         The content is critical to them.  They want the engagement

 8   but they want the engagement for a different reason.  They

 9   basically sell advertising.  So the more engagement that

10   happens on the Google platform, the more they learn about you,

11   the more they can target advertising to the customer.  So

12   their's is all about advertising.  So you are seeing different

13   models.

14         Netflix, a subscription model.  Google, Facebook

15   advertising models.  Amazon to drive commerce.

16   Q.    These are all vertically integrated companies?

17   A.    All of them are vertically intergrated.

18   Q.    Why would you have an interest in advertising and you can

19   explain to the Court, you mentioned before you had a nascent

20   advertising business.  Maybe you can talk to the Court a bit

21   about what your advertising business was at the time and what

22   you were, what conclusions you were drawing from Facebook and

23   Google?

24   A.    Sure.

25         I don't know what level there has been discussed about the
```

1  advertising but I'm going to get real simplistic.  If you watch

2  CNN for example, every hour of CNN there are sixteen minutes of

3  commercials.  In that sixteen minutes, fourteen of them CNN

4  maintains.  They own those and they sell the advertising into

5  those fourteen minutes.  Two of the minutes go to the

6  distributor, so DirecTV.  We get two minutes of advertising in

7  every hour of CNN programming.

8  Q.    That would be for all programmers?

9  A.    Turner, TNT, ESPN, the cable channels.  We get two minutes

10  of advertising of the sixteen in all of these programmers

11  content.

12      At AT&T we then go out and we sell that two minutes to

13  advertisers very directly.  What we have been doing over the

14  last years, the last few years, is getting our customer's

15  permission to use their viewership data.

16      And what are they watching, when are they watching it.

17  Particularly as they begin to move the content onto their

18  mobile devices, you can also begin to discern what locations

19  are they when they are watching certain content.

20      So you begin to put all of this data together.  You know

21  the demographics of the household.  Now you go to advertisers

22  with our little two minimum blog.

23      We say we have this information.  We can get very targeted

24  in terms of what you're looking for and we can show what

25  program, what times of day, what locations, and we can deliver

1   the advertising in a very targeted way.

2        These advertisers, Your Honor, are paying us multiples on

3   a, we measure it per impression.  How many impressions do you

4   deliver and so how much revenue per impression can you

5   generate.

6        We are generating revenues that are three, four, and five

7   times per impression what companies like Turner, CBS and those

8   companies are getting from theirs because we have such targeted

9   data.

10       Turner, CBS, they have massive inventories of advertising

11  but they don't know who the customer is.  They can't see the

12  end user customer.  They don't know who they are, they don't

13  know what they're watching, who is watching.

14            THE COURT:  How do you know?

15            THE WITNESS:  Because we have set-top boxes in the

16  home.

17            THE COURT:  DirecTV?

18            THE WITNESS:  We also have mobile devices.

19            THE COURT:  Is that from DirecTV?

20            THE WITNESS:  DirecTV is one of the set-top boxes

21  are.

22            THE COURT:  Then the other data comes from what, the

23  mobile devices?

24            THE WITNESS:  Mobile devices, yes, Your Honor.

25  BY MR. PETROCELLI:

1  Q.   And with the data from DirecTV set-top box and mobile

2  device and can you get data from U-verse set-top boxes also?

3  A.   Correct.

4  Q.   And did that inform your thinking about what you might be

5  able to do to monetize a larger inventory of advertising?

6  A.   Yeah.  It's a small business but it's growing nicely.

7  It's giving us a lot of conviction that this is something that

8  if we had a large inventory of advertising, we could do at

9  scale.  We are gaining a lot of conviction about that.

10        So as we're watching all of this disruption going on

11  in the media and entertainment world, I begin with John Stankey

12  studying the media industry a lot.

13        As complicated as people try to make it, it's

14  actually not that complicated in terms of the equation is real

15  simple.  The more people that watch your content, the more your

16  content is worth.

17        So what could actually drive greater content

18  viewership and make content worth more?  Well, I am a strong

19  believer that if you make this content mobile, you get it off

20  the TV in the living room and you put it on a mobile device and

21  it escapes the household, now the content is being viewed

22  everywhere.  We are seeing this play out.  Half of our volumes

23  on our networks are video now.

24        So the viewership of this content by arithmetic has

25  to go up.  The content has to be worth far more.  But not only

1  that, but this large load of advertising inventory these

2  companies have, I believe are being under utilized.

3          As we begin to discern what people are watching,

4  where they're watching it with their permission, if we actually

5  owned a large block of this inventory, that inventory we

6  believe would be far more valuable under the AT&T umbrella by

7  using this data than it is by under the media companies.

8  Q.   How would consumers benefit from your ability to earn more

9  money for advertising?

10 A.   At the end of the day, these are very competitive

11 industries.  Price is always a big deal in this industry.  To

12 the extent that you can generate higher yields off the

13 advertising in these services, it takes the pressure off of the

14 subscription revenues.  That has always been the equation here.

15          The better you do on advertising, the less you have to

16 charge the consumer for the service.  It really gives you an

17 opportunity to shift the load from the consumer to advertisers.

18 That is really the strategy behind this.

19 Q.   Did these industry trends that you have now described to

20 the Court lead you to a conclusion about what strategy your

21 company should pursue?

22 A.   Unequivocally.

23 Q.   What was that?

24 A.   In 2016 we said we need to own content.  We just think the

25 strategic rational is too compelling.  We believe the execution

1  of it is imminently achievable.  So we decided we need to

2  pursue ownership of content in 2016.

3  Q.    What did you do in that regard?

4  A.    We began to do an evaluation of a lot of opportunities and

5  we looked at a number of different companies.  And began to

6  develop a strategy on what we might go pursue and we developed

7  that strategy.

8       The strategy was one of pursuing a number of smaller

9  content companies.  And trying to aggregate a large number of

10  these and then getting to scale by buying a number of smaller

11  companies.

12  Q.    What happened to that strategy?

13  A.    We took it to our board of directors and our board of

14  directors gave us the green light to go execute on it and John

15  Stankey began executing on it.

16      And we're sitting in this environment and this world is

17  changing fast.  Players are being taken off the table.  Other

18  players are combining and going and pursuing different

19  strategies.  And it was moving really fast.

20      Acquiring these small companies was taking a long time.

21  Just getting a non disclosure agreement with the first one we

22  targeted was taking weeks to get done.

23      And we knew we ultimately wanted to have scale.  You

24  needed to have scale to be relevant and get the advertising

25  inventory and to do all of the things we were pursuing.

1        And to get scale I began to question if it was the right

2    strategy.  Should we think about streaming together pearls or

3    should we just go find a company that has similar needs as we

4    do and combine the two and achieve our end result in a much

5    quicker fashion.  That led us to Time Warner.

6    Q.    Did you end up ever acquiring any of these smaller content

7    companies?

8    A.    We tried two of them to no avail.  We didn't have success.

9    One we didn't see all the way through.  Just taking a long time

10   to get the negotiations going.  And so we decided to make a

11   change in direction and pursue a larger target.

12   Q.    So how did you personally identify Time Warner?

13   A.    We had a number of what I'll call larger scale

14   opportunities in front of us.  We went through all of them.

15       A lot of the companies in the media industry are, have

16   large family ownership and they're very difficult to get a

17   transaction done with.  Some of them just were not for sale.

18       Time Warner was one that every time you looked at it you

19   came back to it.  It met all of the needs we were looking for.

20   It had a great content production capability, the studios,

21   Warner Brother Studios, had a very deep content library.  I

22   think it is the best library in the world.  I really do.

23       HBO, a wonderful premium video capability.  A direct to

24   consumer capability that they were pursuing.  And then Turner

25   Networks.  And the beauty of Turner Networks is that's where

1  this large inventory advertising resides.  So a really large

2  load of advertising inventory in Turner that we felt we could

3  put to work.

4       So you put all of that together, it met all of the needs

5  of the strategy that we were trying to pursue.

6  Q.   So did you review any materials about Time Warner before

7  you decided to make an overture?

8  A.   Yeah.  This was a not inconsequential shift in our

9  direction.  So I did a lot of this work myself.  And I as you

10  might guess, I got their annual report and I read it over and

11  dog eared it multiple, multiple times and learned as much as I

12  could about the company.

13       I spoke to a number of people just about the company.  A

14  few people, not a number, but I had a couple of board members

15  who knew the company.  So I did a lot of my own personal

16  research, evaluating the company.  And the more I looked at it,

17  the more enthusiastic I got about it.

18  Q.   Did you prepare your own analysis of the company?

19  A.   I did.  I spent a lot of time in my office at home working

20  on this because I hadn't spoken to anybody internally about it.

21  It was just something I was really wrestling with in my mind,

22  are we pursuing the right approach here.  Should we go after a

23  larger opportunity right off the bat.

24       So I was doing just a lot of work on my own in my office

25  at home evaluating it to kind of gain conviction.

1    Q.   Can you take a look at Exhibit 664 in your binder?

2         Do you have that?

3    A.   Yeah, I have it here.  Okay, I got it.

4    Q.   Can you tell the Court what 664 is?

5              MR. PETROCELLI:  There's no objection to this, Your

6    Honor.

7              MR. CONRATH:  My grade school teacher might object to

8    it because the handwriting is very poor.

9              But this is, these are my hen scratched notes of the

10   analysis I was doing in my office at home.  And what I had done

11   is just pulled together Time Warner past financial performance,

12   a summary level you see it here.

13             And then what were the projections.  I was looking at

14   analyst reports in terms of what was being projected for 2016.

15             What I was trying to discern here was if you put Time

16   Warner with AT&T, this is a, this is a big shift.  And for our

17   owners it was going to be, we call it a head snapper, you know,

18   where did that come from kind of moment.

19   Q.   By owners, you mean shareholders?

20   A.   Our shareholders, thank you.

21        So from our shareholders standpoint this was going to be a

22   rather significant shift in strategy.  I thought it was really

23   important to make sure that we could gain shareholder support

24   with this.  That we could accomplish some really basic

25   objectives if we did a deal like this.

1      I couldn't dilute their earnings.  So I had to be earnings

2    accretive. I could not dilute the cash flow in the business.

3  So I had to be free cash flow accretive.

4      I could not in any way risk our dividends.  Our

5  shareholders enjoy a nice dividend and it's a big part of the

6  value equation of owning AT&T stock, getting that dividend.

7  Q.    Do you have many retired shareholders?

8  A.    We have a lot of retirees.  A lot of big institutional

9  owners who really like the dividend.  They are guaranteed cash

10  return year in and year out.

11      And last,  I couldn't compromise the financial integrity

12  of the business.  Our credit ratings, our access to the debt

13  markets and so forth.

14      So what I was trying to do with this is just get myself

15  comfortable that if you took, put these two companies together,

16  recognizing that you would have to pay a premium to acquire

17  them.  Could you put them together in a way that would, I call

18  that my box; earnings free of cash flow accretive, support the

19  dividend and not compromise the financial integrity of the

20  business.

21      This was my analysis to get myself comfortable if that was

22  achievable.  I wasn't going to go past step one if I couldn't

23  get past this step.  That's what this was doing.

24        MR. PETROCELLI:  Your Honor, I offer this into

25  evidence.  There's no objection.

```
 1              MR. CONRATH:  No objection.

 2              THE COURT:  All right, it will be admitted.

 3              (Defense Exhibit Number 664 received sealed into

 4    evidence.)

 5    BY MR. PETROCELLI:

 6    Q.   So after you prepared your notes, what did you then do?

 7    A.   I called up Jeff Bewkes and just asked him if he would

 8    have time to talk about his industry and our industry.

 9         I told him I just thought we ought to spend some time

10    together and he agreed and so we set up a lunch and we got

11    together and talked about our respective industries.

12    Q.   What was the outcome of that discussion?

13    A.   A quick lunch turned into a very long afternoon.

14         Jeff and I spent a lot of time comparing views.  I

15    explained to him how I viewed our business, he was explaining

16    to me his.

17         And the more we talked, the more we realized that these

18    two companies coming together would give us, we believe, a very

19    unique opportunity to provide a compelling opportunity

20    vis-a-vis what you see happening in the tech industry and what

21    you see happening in the media entertainment industry to create

22    our own vertically integrated content creation, content

23    aggregation and content distribution to not only our TV

24    customers in the home but most importantly, into the mobile,

25    the wireless environment.
```

1    We have one hundred million wireless subscribers and then

2    how we could use that to leverage the advertising business.  We

3    both got very excited about it.  And both agreed that it was

4    probably worth going and visiting with our respective boards

5    about whether we ought to pursue something.

6    Q.   And that takes us to exhibit, Defense Exhibit 609.  If you

7    could turn to that, please.

8         Could you tell the Court what this is?

9    A.   Okay.  I got, I assembled my board on September 1st to

10   have a call.  It was a call to tell them about the meeting that

11   I had had with Jeff.  And to let them know that there was a

12   real interest in pursuing, doing something closer together with

13   Time Warner, meaning combining the two companies.

14        So what these are, what you are looking at here, these are

15   just notes.  When I do a board meeting I get on my tablet, my

16   iPad and I just put a bunch of bullets together, points that I

17   want to make sure that I cover with my board.  It's just kind

18   of my check list and things I need to cover.

19        The first few pages are about things that have nothing to

20   do with this deal.  But as you get back, you will see the notes

21   that are describing the conversation I had with Jeff and what

22   my thoughts are about the deal at that time.

23   Q.   So could you turn to page 7 of Exhibit 609?

24   A.   Okay.

25   Q.   And you see there reference to a potential deal structure?

1  A.    I do.

2  Q.    And it says no significant cost synergies to pay for deal

3  premium.  This is a vision deal potentially very powerful, but

4  will have to be proven over time.

5       Could you explain what you meant and had in mind when you

6  wrote those notes?

7  A.    So at this moment in time, this point in time I was

8  operating off those hen scratched notes that you saw earlier.

9  That was the depth of the analysis that I had done at this

10 time.  I didn't yet know what type of synergies were available.

11      But what I wanted my board to understand was that this was

12 a vertical deal.  There are not a lot of overlaps of operation,

13 there is not redundant distribution, redundant sales and so

14 forth.  There aren't those kind of really large cost synergies

15 we're accustomed to see in a deal.

16      So I wanted my board prepared to --

17 Q.    When -- excuse me -- when you were accustomed to seeing a

18 deal, do you mean in a horizontal deal?

19 A.    In a horizontal deal where you have these overlaps of

20 operations and so in those kind of deals you just have large

21 costs that you can take out of the businesses and that helps,

22 you know, pay for a premium if you have to pay a premium to

23 acquire a business.  This was not one of those.

24      As I said, this is a vision deal.  So I didn't want my

25 board to have this expectation of really large cost synergies

1    if we have to pay a premium here to compensate for that.

2          You have to believe in the vision.  You have to believe in

3    what I've been talking about here that distribution of this

4    content to wireless will drive the value of the content up.

5          That the ability to pair our data with their advertising

6    inventory will drive value.  But there were not going to be at

7    this time I couldn't identify any great synergies to say relax.

8    If we have to pay a premium, there are synergies to cover it.

9    I couldn't represent that at that time.

10   Q.   Now just skipping ahead for the moment, there has been

11   testimony in the trial about fairly significant synergies

12   including cost savings.

13         How do you reconcile that with your notation here that

14   there are no significant cost synergies?

15   A.   So you're going to hear, you may have already heard I

16   suppose, multiple versions of synergies.  And as you're going

17   through a deal like this, you go through three distinct stages

18   really.

19         This is stage one.  Stage one, I have done, my team has

20   done no due diligence.  And I am, I am wanting my board to

21   understand we don't know what synergies there are.  There may

22   be none, there may be few, but we don't know.  So it's what I'm

23   positioning the board for here, stage one, okay.

24         Stage two, once Jeff and I say we agree we should pursue a

25   deal, now I bring in my due diligence teams.  The mergers and

1   acquisition teams who have, they go in and they begin to work

2   with the Time Warner team, they begin to do a bottoms up look

3   at some of the cost savings that would be achievable here.

4        What are some of the opportunities on revenues?  They do a

5   different level of detail.  And they begin to identify as you

6   would guess what happens when you don't need two headquarters

7   organizations.  What kind of savings can you get from vendors

8   and so forth.

9        They do a little more detailed review that I will take to

10  my board if we get to a deal.

11            THE COURT:  Are they trying to help you understand

12  what price realistically you should offer to purchase the

13  company?

14            THE WITNESS:  What price would you feel comfortable

15  offering, Your Honor, that is correct.

16            And second of all, what is the financial profile this

17  business will look like after it's done?  What does the

18  business look like once you put the two together and you have

19  achieved these synergies?  It has a very different look often

20  times.

21            So it is trying to do both.  What can you justify

22  paying?  Then what does the business look like on a run rate

23  going forward basis?  So you have more detail there.

24            Now what I will tell you invariably in this second

25  state a deal you take to your board for approval, these are

1 levels of synergies that you feel highly confident that you can

2 achieve.

3         You have not done extreme detail planning but these

4 are things that you can have a high degree of predictability

5 and comfort in achieving.  So those will always be higher with

6 stage one.

7         Then you get to a stage three.  The deal has been

8 reached.  And the deal has been announced and you are

9 submitting it for regulatory approval with the Department of

10 Justice or whomever.  That generally takes at least a year for

11 a deal of this size.

12         What we do then is we go into detailed merger

13 integration planning.  This is what John Stankey has been doing

14 for the last year.

15         In this stage you bring in experts.  You bring in

16 people that know the parts of the business you know nothing

17 about.  You bring in the people from the new organization

18 that's going to be combining with you and you begin to do data

19 driven detail bottoms up analysis on what kind of synergies are

20 achievable.  What new business models are achievable.

21         We always do something here.  We have learned this

22 over the years.  This is a very important part of doing this.

23 Is you put people on these merger integration teams that are

24 going to own these businesses when the deal is consummated.

25 That serves as a very important function.

1          It serves as a governor.  They can't get too zealous.

2  They know that they're going to own it.  They know ultimately

3  when the deal closes they will have to execute on those

4  synergies and they will have to produce them, and their

5  compensation will be tied to achieving those synergies.

6          You put all of that together so stage three

7  invariably you get to synergy numbers that are even higher and

8  better than stage two.

9          You are just getting more detail and more data and

10  you're understanding the business better.  That's stage three.

11          And then there is always stage four which is to go

12  execute.  Our history on execution is you generally exceed on

13  execution all three stages.

14  Q.   You are at stage three now?

15  A.   We are at stage three at this time.

16  Q.   Okay.  Can you turn to page 8 of Exhibit 609?  There you

17  are listing out some key issues and concerns.

18          The first one, how can you advantage your own distribution

19  parentheses TV, BB, that's broadband, wireless end parentheses

20  without harming TW, Time Warner position as a wide distributor

21  of content to other SVOD, cable networks and broadcast networks

22  and how to use the distribution business to increase the value

23  of the media business.

24          Can you explain that to the Court?

25  A.   This was another issue that I thought it was really

1  important that my board grasp and understood.

2      That is AT&T, I told you earlier that it's a one hundred

3  sixty billion in revenues and Time Warner is about thirty

4  billion in revenues.

5      So there are two areas you try to assess.  And that is if

6  you acquire Time Warner you combine with them, how can that

7  content add value to this hundred and sixty billion dollar

8  business.

9      And I spent a lot of time thinking about this and

10 especially after I visited with Jeff.  Because I told you the

11 value of a content company is a function of how many people

12 watch the content.  Period.  It's no more complex than that.

13     So content valuations are a function of distribution.

14 Wide broad distribution.  The more distribution, the better you

15 are.

16     So I was trying to tell my board that if there is a

17 thought process that says we're going to use this content to

18 enhance the distribution business, that means you're going to

19 have to limit the distribution, do exclusive things with AT&T.

20 That is counter to how you create value in one of these

21 businesses.

22     So that strategy is not a very good strategy.  If that's

23 how we are going to create value, that's not a good approach to

24 creating value.

25     Now how can a distribution, a second bullet, how can a

1   distribution company drive value to a media or content company?

2   That one you get excited about.

3       Because you can use the distribution of the hundred sixty

4   billion dollar company to drive value into the thirty billion

5   dollar company.  You give them more distribution, access to

6   wireless distribution, the ability to develop and innovate

7   their content for wireless distribution.

8       And don't forget this advertising.  Using the data out of

9   the distribution company to enhance the value and drive higher

10  value into the advertising inventory.

11      So the point I was trying to make with the board, it's not

12  really clear to me that you can use this to drive value into

13  the distribution company, the media company.  But it's really

14  clear to me how the distribution company can enhance the value

15  of a media company.

16      Said really simplistically, a hundred sixty billion dollar

17  company doesn't buy a thirty billion dollar company hoping that

18  the thirty billion dollar company can make its value greater.

19      The hundred sixty billion dollar company buys the thirty

20  billion dollar company with the expectation that they can drive

21  value in the thirty billion dollar company.  It's a matter of

22  math.

23  Q.  Finally, can you turn to page 11 of Exhibit 609 and there

24  you are describing your views about Turner, HBO and Warner

25  Brother Studios as to Turner high quality cable network assets,

1  HBO great asset, Warner Brothers, crown jewel.

2      Were these your views about the quality of the content you

3  are acquiring?

4  A.   This was my assessment of spending a few weeks just

5  grinding through annual reports and talking to people who knew

6  this business.  This was my assessment of what they had, yes.

7  Q.   One, let's fast forward now from September 1 to October

8  22, 2016.  And that is the board meeting on when you presented

9  the deal to the board for discussion and approval?

10 A.   That's correct.

11 Q.   And you had done a lot of work between September 1 and

12 October 22?

13 A.   So the due diligence team have been hard at work during

14 that period of time putting the deal together.

15 Q.   Can you turn to --

16      MR. PETROCELLI:  Your Honor, I'd like to move first

17 of all, Exhibit 609 into evidence.  Under seal, please.

18      THE COURT:  Any objection?

19      MR. CONRATH:  No objection.

20      THE COURT:  Be admitted.

21      (Defense Exhibit Number 609 received under seal into

22 evidence.)

23 BY MR. PETROCELLI:

24 Q.   Can you turn to Exhibit 640, page 35, please?

25      And could you describe what that is to the Court?

1   A.   This is the presentation that was put in front of my board

2   on October 22nd.  It was a Saturday morning.

3        It's the detailed presentation giving them the details on

4   the deal, the transaction rational, the financials of the deal,

5   the deal terms, and the regulatory assessment and so forth.

6        So it's the complete presentation to my board.

7             THE COURT:  Did they have this in advance?

8             THE WITNESS:  They did, yes, sir.

9             THE COURT:  So they could study it before the

10  meeting?

11            THE WITNESS:  I'm sorry?

12            THE COURT:  So they could study it before the

13  meeting?

14            THE WITNESS:  Yes, that's correct.

15            THE COURT:  You plan on going through this?

16            MR. PETROCELLI:  Just one page.

17            THE COURT:  All right, then we'll take the luncheon

18  recess.

19            Go ahead.

20  BY MR. PETROCELLI:

21  Q.   Okay.  Page 36.

22  A.   Okay.

23  Q.   It says transaction rationale.

24       Can you just describe perhaps in your own words to His

25  Honor what were the reasons that you recommended this deal to

1    your board?

2    A.    Yeah.    The rationale why should AT&T do this deal?    Why

3    should we put our shareholder's money into acquiring an asset

4    spending a hundred billion dollars to acquire a business like

5    this?

6        And this was the rationale.    We had concluded as a board

7    and a management team that we needed to own premium content.

8    And this was in our view the highest quality, you see the word

9    actionable.    Meaning it could, a deal could get done with this

10   company.    So it was actionable.

11       It was a deal that could actually get done and our belief

12   was this was going to accelerate innovation.    Getting premium

13   content into the world of mobility.    Owning content like this

14   with our mobile distribution we thought was going to make this

15   go much faster.

16       This data driven business -- I'm not going to go through

17   all of these.    But this was important.    Getting to a data

18   driven business model was really critical in this.

19       What that means is this large advertising inventory using

20   our data to make that advertising inventory worth more, that's

21   the first piece.

22       But also using our data, we know what our customers like

23   to watch.    We know what stars, Hollywood stars get watched a

24   lot.    So being able to use that content or that data to

25   influence the content creation in Warner Brothers Studios, and

1   even HBO.

2       So this is basically a recitation largely of what I have

3   covered with you here this morning but it is going through that

4   rational and that logic with my board.

5   Q.   And did the board vote to approve?

6   A.   Yeah, it was a long meeting.  We went through a lot of

7   detail.  And after the course of a rather long meeting, there

8   was unanimous approval to do the transaction.

9            MR. PETROCELLI:  Your Honor, I'd move 640 into

10  evidence under seal with no objection.

11           MR. CONRATH:  No objection.

12           THE COURT:  All right.  It will be admitted under

13  seal.

14           (Defense Exhibit Number 640 received under seal into

15  evidence.)

16           MR. PETROCELLI:  I have probably less than ten

17  minutes but we can do it after lunch.

18           THE COURT:  Yeah, we'll take the luncheon recess now.

19           You are a witness under oath now in the case.

20           THE WITNESS:  Yes, sir.

21           THE COURT:  What that means is you are not at liberty

22  to discuss your testimony so far or what it might be when you

23  return with anyone including your own lawyers.  You can't talk

24  to anyone about it, with company, friends, family, nobody.

25  Just stay independent of all others, be able to answer the

1   question if asked have you discussed your testimony with anyone

2   during the break?  Be back at 2:40.  Stand in recess.

3              (Witness excused.)

4              (Luncheon recess at 1:12 p.m.)

5                              -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATE

2        I certify that the foregoing is a true and correct

3   transcript, to the best of my ability, of the above pages, of

4   the stenographic notes provided to me by the United States

5   District Court, of the proceedings taken on the date and time

6   previously stated in the above matter.

7        I further certify that I am neither counsel for, related

8   to, nor employed by any of the parties to the action in which

9   this hearing was taken, and further that I am not financially

10  nor otherwise interested in the outcome of the action.

11

12

13  /s/Crystal M. Pilgrim, RPR, FCRR        Date: April 19, 2018

14

15

16

17

18

19

20

21

22

23

24

25