UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,         :
                                  :
                  Plaintiff,      :        CV No. 17-2511
            vs.                   :
                                  :        Washington, D.C.
                                  :        Monday, April 23, 2018
AT&T, INC., ET AL.,               :          2:45 p.m.
                                  :
                                  :          Day 18
                  Defendants.     :
----------------------------x



AFTERNOON SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Government:      Craig W. Conrath, Esquire
                         Eric D. Welsh, Esquire
                         Donald G. Kempf, Jr., Esquire
                         Sarah Oldfield, Esquire
                         Caroline Anderson, Esquire
                         Peter J. Schwingler, Esquire
                         U.S. DEPARTMENT OF JUSTICE
                         Antitrust Division
                         450 Fifth Street, NW
                         Washington, DC  20530
                         202) 532-4560
                         craig.conrath@usdoj.gov
                         eric.welsh@usdoj.gov
                         donald.kempf@usdoj.gov
                         sarah.oldfield@usdoj.gov
                         caroline.anderson@usdoj.gov
                         peter.schwingler@usdoj.gov

```
 1   Appearances Continued:

 2   For Defendant AT&T        Katrina M. Robson, Esquire
     and DirecTV Group        O'Melveny & Myers LLP
 3   Holdings, LLC:           1625 Eye Street, NW
                              Washington, DC  20006
 4                            (202) 220-5052
                              krobson@omm.com
 5
                              Daniel M. Petrocelli, Esquire
 6                            M. Randall Oppenheimer, Esquire
                              O'MELVENY & MYERS LLP
 7                            1999 Avenue of the Stars
                              8th Floor
 8                            Los Angeles, CA  90067
                              (310) 553-6700
 9                            dpetrocelli@omm.com
                              roppenheimer@omm.com
10
                              Michael L. Raiff, Esquire
11                            Robert C. Walters, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
12                            2100 Mckinney Avenue
                              Suite 1100
13                            Dallas, TX 75201
                              (214) 698-3350
14                            mraiff@gibsondunn.com
                              rwalters@gibsondunn.com
15
     For Defendant           Kevin J. Orsini, Esquire
16   Time Warner, Inc.:      Peter T. Barbur, Esquire
                              CRAVATH, SWAINE & MOORE LLP
17                            Worldwide Plaza
                              825 Eighth Avenue
18                            New York, NY  10019
                              (212) 474-1140
19                            korsini@cravath.com
                              pbarbur@cravath.com
20
     Court Reporter:         Crystal M. Pilgrim, RPR, FCRR
21                            Official Court Reporter
                              United States District Court
22                            District of Columbia
                              333 Constitution Avenue, NW
23                            Washington, DC  20001
                              (202) 354-3127
24                            crystal_pilgrim@dcd.uscourts.gov

25
```

1                        Table of Contents

2                            Direct   Cross   Redirect   Recross

3    On behalf of the Government:

4         Susan C. Athey

5            By Mr. Schwingler      3702

6            By Mr. Raiff                    3740

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          P-R-O-C-E-E-D-I-N-G-S

2              THE DEPUTY CLERK:  Your Honor, recalling civil action

3    number 17-2511, the United States of America versus AT&T, Inc.

4    et al.

5              THE COURT:  Call your next witness.

6              MR. CONRATH:  Your Honor, may we approach for one

7    quick follow up thing?

8              THE COURT:  Yes.

9          (Sealed bench conference.)

10             MR. CONRATH:  Just quickly following up on the

11   conversation before lunch.  I want Your Honor to know that

12   we're, we are obviously doing our best to follow exactly what

13   the Court told us in the conference Friday.

14         But I just want to let you know that we do not have a

15   transcript.  If the Court means for to us to have a transcript,

16   if you could let the court personnel know, obviously, it would

17   assist us in making sure we are doing everything right.  But I

18   just didn't want a misimpression.

19             THE COURT:  I've got notes.

20             MR. CONRATH:  We do.  I wasn't complaining.

21             THE COURT:  I specifically remember taking these off

22   the table.  I specifically remember hoping this was no big

23   deal.

24             MR. CONRATH:  Yes.

25             THE COURT:  The averaging of the three numbers.

1          MR. CONRATH:  Yes, it's not.

2          THE COURT:  And the bigger issue is the value of,

3   valuing issue.

4          MR. CONRATH:  Yeah, that's right.

5          THE COURT:  And the solution, I was hopeful was you'd

6   get your stuff on Saturday at noon, and you'd have a chance to

7   review with your expert or whoever and that would give you

8   plenty of time to prepare.  And that was what was suppose to

9   happen.

10          MR. PETROCELLI:  Your Honor, I don't want to go over

11   the argument again, but they're all new calculations and

12   everything and Your Honor indicated those are not fair game.

13          MR. CONRATH:  I'm not meaning to reargue.  I think we

14   were trying to honor what we said.  I just wanted to raise that

15   one possibility.

16          MR. PETROCELLI:  Okay.

17          THE COURT:  If it's a question of responding to a

18   criticism that was raised against him whatever, it is obviously

19   a limit to how far he can go in terms of spinning that off into

20   coming up with a whole new opinion that they don't have time in

21   fairness to them to be prepared to oppose.

22          MR. CONRATH:  Sure.

23          THE COURT:  There is an ability to respond and he

24   should respond.

25          MR. CONRATH:  Okay.

1          THE COURT:  But coming up with whole new charts and

2    whole new calculations and whatever, that's taking it I think a

3    step too far.

4          MR. CONRATH:  Okay, we understand.  He will be

5    prepared to respond to the criticisms without doing the whole

6    new charts.

7          MR. PETROCELLI:  Thank you, Your Honor.

8          MR. CONRATH:  Thank you.

9        (Open court.)

10          MR. CONRATH:  Mr. Schwingler will be handling our

11    next witness, Your Honor.

12          THE COURT:  All right.

13          MR. PETROCELLI:  Mr. Raiff will be handling the

14    defense of the witness, Your Honor, thank you.

15          THE COURT:  All right.

16        Call your witness.

17          MR. SCHWINGLER:  United States calls Professor Susan

18    Athey as a rebuttal expert.

19        And Your Honor, we've provided Professor Athey with

20    copies of her reports in case they may be of assistance.

21          GOVERNMENT WITNESS SUSAN C. ATHEY SWORN

22          MR. SCHWINGLER:  May I proceed, Your Honor?

23          THE COURT:  All right.

24                DIRECT EXAMINATION

25    BY MR. SCHWINGLER:

1  Q.   Good afternoon, Professor Athey.

2  A.   Good afternoon.

3  Q.   Please state your name for the record?

4  A.   Susan Athey.

5  Q.   And Professor Athey, are you here today to testify about

6  the ad growth in content intelligence synergies that defendants

7  claim will result from their merger?

8  A.   Yes.

9  Q.   Could you start by describing your educational background

10 for His Honor?

11 A.   Yes.  I have Bachelor Degrees in economics, computer

12 science and mathematics from Duke University, and a Ph.D. in

13 economics from Stanford.

14 Q.   Where are you currently employed?

15 A.   I'm the economics of technology Professor at the Stanford

16 Graduate School of Business.

17 Q.   Could you walk us through the various academic positions

18 you've held throughout the years leading up to your current

19 job?

20 A.   Sure.  I have spent about six years each as an economics

21 Professor at M.I.T., Harvard and Stanford.

22 Q.   In your current position at Stanford Business School, do

23 you teach any classes related to advertising?

24 A.   Yes.  I teach classes to MBAs, called advertising and

25 monetization, the economics of digital platform markets and

1  market places.

2  Q.   You mentioned the economics of digital platform markets.

3  Could you briefly explain what a platform market is?

4  A.   Sure.  A platform is a business that brings together two

5  different types of constituents like buyers and sellers.

6     So an example might include eBay that brings together small

7  sellers and small buyers, Airbnb or Uber.

8  Q.   Do any of the classes you teach involve data?

9  A.   Yes.  So I teach classes to executives about operating

10  data driven businesses, using data in business strategy.  As

11  well as using machine learning and artificial intelligence for

12  businesses.

13     I also teach classes to Ph.D. students about machine

14  learning and econometrics which is basically about using

15  statistics to analyze large data sets.

16  Q.   What fields do you conduct your research?

17  A.   A lot of my research falls into the broad field of

18  industrial organization.  Within that field the few sub fields

19  including the economics of platforms, the impact of technology

20  and digitization on markets including media markets and

21  advertising.

22  Q.   Could you just briefly define industrial organization?

23  A.   Yes.  So industrial organization is the study of market

24  structure and the sources of market power.  Horizontal and

25  vertical integration, firm behavior and firm organization.

1   Q.   So you've listed a few sub topics of specialization.

2        Have you also published on the economics of context?

3   A.   Yes, I have.

4   Q.   Have you served on any editorial boards?

5   A.   Yes.  Over the years I've served as associate editor for

6   most of the top economic journals including for example, the

7   RAND Journal of Economics.

8   Q.   Have you received any awards for your scholarship?

9   A.   Yes.  In 2007 I received the John Bates Clark Medal which

10  is awarded by the American Economic Association to the

11  economist under the age of 40 who's made the greatest

12  contributions to the field.

13       I'm also an elected member of the National Academy of

14  Sciences which is one of the highest honors for an American

15  scientist.

16       I've also received some other awards like recently I

17  received the Jean-Jacques Laffont prize from the Institute of

18  Industrial Economics for a world renowned scholar.

19  Q.   I'd like to set aside academics for a moment.

20       Could you briefly describe for the Court your business

21  experience?

22  A.   Yes.  So I spent about six years as the consulting chief

23  economist for Microsoft.  I also served on boards of directors

24  for technology firms.  I just joined my fourth board a few

25  weeks ago.

1      I advise to venture capital companies and I also do

2  consulting for some small startups as well as large businesses

3  about their data and platform strategy.

4  Q.   Could you describe some of the experience you have in the

5  business world with platform businesses?

6  A.   Yes.  So three of the four companies where I serve on the

7  board are platform businesses.  And then at Microsoft almost

8  all of my work concern platforms particularly their advertising

9  platforms.

10            THE COURT:  What are the other boards you serve on?

11            THE WITNESS:  Expedia, Lending Club, A Place for

12  Rover, and Ripple.

13            THE COURT:  Microsoft too?

14            THE WITNESS:  No, I'm not on the board of Microsoft.

15      I was the consulting chief economist there for six

16  years.

17  BY MR. SCHWINGLER:

18  Q.   Professor Athey, have you advised businesses on strategies

19  relating to starting platforms?

20  A.   Yes, I have.  So the, in my business consulting work for

21  example I considered strategy around programmatic television

22  advertising platforms.

23  Q.   Have you personally been involved in designing a platform

24  business?

25  A.   Yes.  When I started at Microsoft their search engine was

1   very young and one of my main responsibilities was to help

2   operate the search advertising platform, to evaluate it's means

3   of improvement including evaluating sources of data, the

4   benefits of the data and improving the search advertising

5   platform.

6       And also strategic partnerships and large business deals

7   that would for example induce other websites to sell their

8   advertising inventory through Microsoft's advertising platform.

9   Q.   I'd like to change topics for a moment.

10      Could you describe for the Court your business experience

11  with television advertising?

12  A.   Yes.  The companies where I serve on the board are very

13  large advertisers and they advertise across a range of media

14  ranging from digital to television.

15      Of course, I also teach about television in my advertising

16  and monetization course including the impact of recent changes

17  in industry as they relate to television.

18  Q.   Could you describe the role of data in your work?

19  A.   So data is part of almost everything that I do.  I

20  mentioned that data was a critical part of my work at

21  Microsoft.  And it's a key source of competitive advantage for

22  all of the businesses that I work with.

23      My research is also intimately involved with data.  I

24  develop statistical methods that can be used on large data sets

25  and apply them to consumer data sets including web browser

1  behavior, individual consumer purchase behavior, mobile

2  location data and other types of large data sets.

3  Q.   So we discussed platforms, television advertising and

4  data.

5     Do you have any experience analyzing mergers?

6  A.   Yes, I do.  I've served as a consulting expert on a

7  variety of vertical and horizontal matters involving

8  advertising platforms.

9     As part of that I've presented to regulators around the

10 world and produced analyses for them including the Department

11 of Justice, the Federal Trade Commission, the European

12 Commission, and a variety of state and international agencies.

13 Q.   Professor Athey, have you ever testified as an expert?

14 A.   Yes, I have.

15 Q.   In what context?

16 A.   I was retained by the FTC for a matter involving digital

17 advertising.  And I recently testified as an economic expert in

18 a case involving a tax matter.

19 Q.   Have you been qualified to testify as an expert in

20 industrial organization?

21 A.   Yes, I have.

22 Q.   Have you been qualified to testify as an expert in the

23 economics of advertising platforms?

24 A.   Yes.

25 Q.   Has any court ever excluded you from testifying as an

1  expert?

2  A.   No.

3        MR. SCHWINGLER:  Your Honor, the United States offers

4  Professor Athey as an expert in industrial organization and the

5  economics of advertising platforms.

6        THE COURT:  What court were you qualified in

7  industrial organizations as an expert?

8        THE WITNESS:  I'm sorry?

9        THE COURT:  What court?

10        THE WITNESS:  Oh, in the tax court in my recent

11  testimony.

12        THE COURT:  In industrial organizations?

13        THE WITNESS:  Yes.

14        THE COURT:  That was a U.S. Tax Court Judge?

15        THE WITNESS:  Yes.

16        THE COURT:  What is the Judge's name?

17        THE WITNESS:  It's slipping my mind as I sit here.

18        THE COURT:  You testified in the trial?

19        THE WITNESS:  Yes.

20        THE COURT:  And the economics of what was it?

21        MR. SCHWINGLER:  The economics of advertising

22  platforms.

23        THE COURT:  Same court, same judge?

24        THE WITNESS:  No.  That was in FTC court.

25        THE COURT:  That was in a FTC proceeding,

```
 1    administrative proceeding?

 2              THE WITNESS:  Yes, exactly.

 3              THE COURT:  So never in an Article III Court.  Never

 4    been qualified in an Article III Court?

 5              THE WITNESS:  No.

 6              THE COURT:  What year did you get your Ph.D.?

 7              THE WITNESS:  In 1995.

 8              THE COURT:  Defense position?

 9              MR. RAIFF:  Yes, Your Honor.

10              THE COURT:  Do you have questions?

11              MR. RAIFF:  No, Your Honor.

12         We do have objections to the extent she's being offered

13    as an expert on efficiencies and to the extent she's being

14    offered on an expert on content intelligence.

15              THE COURT:  Step down.

16         (Witness leaves the stand.)

17         (Sealed bench conference.)

18         MR. RAIFF:  Her report includes content intelligence

19    as well.  I just want to make sure they're not offering her for

20    content intelligence.

21              THE COURT:  It wasn't mentioned.

22         MR. RAIFF:  It wasn't mentioned, so it's more of a

23    clarification perhaps.

24              THE COURT:  Are you going into that?

25         MR. SCHWINGLER:  Yes, we are.
```

```
1              THE COURT:  On what basis?

2              MR. RAIFF:  I object to this.

3              THE COURT:  It's not in the report.

4              MR. SCHWINGLER:  It is in her report.

5              MR. RAIFF:  No, it is in her report.  So I just

6  wanted to make sure, she wasn't qualified.

7              THE COURT:  What umbrella is content intelligence,

8  tells us about industrial organization or economics in

9  advertising?

10             MR. SCHWINGLER:  She will be applying her expertise

11 in valuing data.  I could ask a few more questions on that.

12       That relates to specifically how the defendants plan on

13 using data, different uses to allegedly generate additional

14 revenues after the merger.

15       And she has direct experience in and analyzing issues

16 that --

17             THE COURT:  What?

18             MR. SCHWINGLER:  She -- I think it would be better if

19 I asked her to give an example.  But she frequently probably in

20 her consulting work for Microsoft might be the best example

21 where she got into the evaluation of data.  She would be better

22 than me for that question.

23             THE COURT:  I would hope so.

24             MR. RAIFF:  The other objection is to the extent

25 they're offering any opinions on efficiencies.
```

```
 1          She's never been an expert on efficiencies ever before.

 2   This is the first time.  So to the extent they're asking --

 3          THE COURT:  This is her first time in an Article III

 4   Court.  She didn't even know enough to stand up when she took

 5   the oath.  You should have prepped her about it.  Remember that

 6   lesson.  Do you hear me?  I'm talking to the United States,

 7   remember that lesson.

 8          You plan on going into efficiencies?

 9          MR. SCHWINGLER:  She's being called to testify

10   exclusively about two categories of efficiencies or synergies.

11   They were disclosed in her report months ago.  The time for --

12          THE COURT:  She deposed?

13          MR. RAIFF:  Yes, we deposed her, Your Honor.

14          THE COURT:  You went through all this with her?

15          MR. RAIFF:  Yeah, I confirmed that she's never been

16   an expert on efficiencies ever before.  This is her first time.

17   She knows stuff about advertising, so she can talk about for

18   example trends of people going to the digital side and leaving

19   TV side.  But to talk about what's merger specific or

20   verifiable, I think those are way outside her expertise on

21   efficiencies.

22          MR. SCHWINGLER:  I have a few responses.

23          First, she was disclosed.  Her opinions were disclosed

24   under the schedule that the Court put in place.

25          THE COURT:  That's not the question.
```

1    The question is whether or not she's an expert.  What

2    umbrella are you saying that comes under?

3    MR. SCHWINGLER:  So merger specificity she'll be

4    applying economic principles for both the ad platforms and

5    general industrial organization principles, to analyze whether

6    the merger is necessary to achieve these types of synergies.

7    There will be economic principles we'll discuss and apply that

8    were disclosed in her reports.

9    THE COURT:  She is saying her knowledge with regard

10   to efficiencies or synergies comes under economics advertising

11   platforms?

12   MR. SCHWINGLER:  She's going to be analyzing a couple

13   of very specific synergy claims through the lens of her

14   economic expertise and her broader expertise involved in using

15   data advising on advertising.  She's probably the most, the

16   world's foremost expert on these specific issues.

17   The fact that this is the first time that it's been

18   raised in a Court in the context of a synergy claim doesn't

19   disqualify her as a witness.

20   THE COURT:  I didn't say that.  I need to get some

21   clarity as to what the basis of her knowledge and expertise is

22   as it relates to the opinions on efficiencies and synergies.

23   MR. SCHWINGLER:  She'll be analyzing a claim, the

24   defendant's haven't really highlighted it in the trial.  But

25   they've taken the position that the only way to pair AT&T's

1   data with Turner's advertising inventory is to merge.

2        And she is familiar with the way data transactions work,

3   the economics underneath them.  She is involved in data

4   transactions and will apply that expertise and those principles

5   to identify for the Court practical alternatives to a merger

6   that could allow them to achieve the same.

7        THE COURT:  Alternatives to who?

8        MR. SCHWINGLER:  You can look at merger specificity

9   from the perspective of either merging party and she will do

10  that.  It may be helpful if we get started I can ask her

11  questions that will help?

12       THE COURT:  You have an hour.

13       MR. RAIFF:  Yeah, I think our point is she can talk

14  about advertising in some of these issues and where the money

15  is going.  But to come out with an opinion that something is

16  not merger specific, I don't think she has the expertise in

17  deciding what's merger specific and what's not or what's

18  verifiable or what's not.

19       THE COURT:  Did she go through that in her

20  deposition?

21       MR. RAIFF:  Well, no, I didn't ask her about the

22  ultimate question, but she does have that in some of her

23  reports about what's merger specific and what's not.

24       Again, I think frankly I'm going to ask her some

25  questions about how all of the money is going from TV to

1    digital.  I think she's fine on that.  It's just when you start

2    tieing that to the standard of efficiencies and start saying

3    this is not merger specific.  This is merger specific.  This is

4    not verifiable, this is verifiable.  I think that goes way

5    beyond her expertise.

6            MR. SCHWINGLER:  So to be clear that last step of

7    saying something is or isn't merger specific is just stating

8    the standard which she will testify to is that the merger is

9    not the only practical way to achieve these efficiencies.

10           That's what the case law says, that's what D.C. Circuit

11   said in the Anthem case a year ago.  So she's going to apply

12   her expertise both economically and in the business

13   specifically related to these issues.

14           I might note that Mr. Stankey put on these efficiencies

15   for the defense and they didn't go into any qualification of

16   his expertise with platform economics or even building an ad

17   platform.

18           THE COURT:  All right, I'll qualify her as expert in

19   industrial organization and the economics in advertising

20   platforms.  However, I'll wait and see how it proceeds with

21   regard to efficiencies.  Obviously, you're going to get to

22   cross examine her on efficiencies and we'll see how that plays

23   out.

24           MR. RAIFF:  Thank you, Your Honor.

25           THE COURT:  You've got one hour.

```
 1            (Witness resumes the stand.)

 2            (Open Court.)

 3            THE COURT:  The Court will find her an expert in

 4  industrial organizations and the economics of advertising

 5  platforms.  You may proceed.

 6            MR. SCHWINGLER:  Your Honor, the United States, the

 7  witness may reference Diversion 41 document which is DX 658 and

 8  then DX 658 A which is that one page excerpt that Mr. Stankey

 9  testified about.

10            May I approach and provide her copies?

11            THE COURT:  Sure.

12            THE WITNESS:  Thank you.

13            MR. SCHWINGLER:  Your Honor, I have extra copies if

14  the Court would like some as well.

15            THE COURT:  I got so much up here, I don't need it.

16            MR. SCHWINGLER:  May I proceed, Your Honor?

17            THE COURT:  Go right ahead.

18  BY MR. SCHWINGLER:

19  Q.   Professor Athey, what was your assignment in this matter?

20  A.   So my assignment was to provide an economic analysis of

21  certain synergies related to advertising revenue and content

22  intelligence.

23  Q.   Which synergy specifically did you assess?

24  A.   So with reference to the Exhibit DX O 65 5A, the ad growth

25  synergy and the content intelligence synergies.
```

1  Q.   As a very high level what are your opinions in this

2  matter?

3  A.   So my opinion is that these synergies are neither merger

4  specific.

5           MR. RAIFF:  Your Honor, can we approach?

6       It isn't consistent with the bench conference.  We

7  object to the extent she's making an ultimate conclusion on

8  what is merger specific and what's verifiable.

9           THE COURT:  All right, overruled.

10          THE WITNESS:  So my opinion is that the revenue

11  synergies that I analyzed are neither merger specific nor

12  verifiable.

13  BY MR. SCHWINGLER:

14  Q.   We'll get into the details in a moment.

15      Could you briefly describe the framework you applied in

16  analyzing these revenue synergies?

17  A.   So I used the standard framework applied by economists to

18  these problems.  So a synergy would be considered merger

19  specific, if it can be attained with the merger but cannot be

20  attained without the merger.

21      And so for example, if there are other practical methods to

22  achieve the synergies, they wouldn't be merger specific.

23      For verifiability, the synergy would be verifiable if it

24  can be objectively verified by reasonable means both in terms

25  of likelihood as well as magnitude.

1      So for example, if a synergy is speculative, it wouldn't be

2  verifiable.

3  Q.    Professor, what materials did you consider when you

4  analyzed these claimed synergies?

5  A.    So I started with the merger planning document and the

6  number summarizing the synergies and then I considered all of

7  the materials that were provided by the defendants to justify

8  those synergies.

9      Beyond that I looked at business documents from the

10  regulatory business as well as depositions that pertained to

11  those synergies and I conducted my own industry research.  And

12  all of those materials are described in my report and my

13  materials considered.

14      There were also expert reports that were prepared to

15  justify those synergies.  Those experts, two experts did not

16  end up testifying for the defense.

17      And then subsequent to that I reviewed portions of trial

18  testimony that are relevant to the efficiencies.

19  Q.    You referenced a core merger planning document, is that DX

20  658?

21  A.    Yes, it is.

22  Q.    Let's start with the ad growth synergies.  What are the

23  two main types of revenues that fit under this category?

24  A.    So there are two big buckets of ad growth synergies.  The

25  first pertain to increasing the revenue for certain data driven

1  products that Turner sells that they already have.  They're

2  products that already exist.

3      The second category of revenue synergies pertain to

4  programmatic ad platform that Mr. Stankey described last week.

5  This is a brand new business that doesn't yet exist.

6  Q.  Let's start with the first category of Turner ad revenues.

7  And we will cover the platform later.

8      Just briefly, what is your understanding of the defendant's

9  claims with respect to Turner ad revenues?

10 A.  So the Turner ad revenues come from expanding the sale of

11 certain products that Turner sells.  So today most of Turner's

12 ad sales are sold based on the broad demographic categories of

13 the viewers of certain shows.

14     Turner also sells a product that uses additional data for

15 targeting and that basically allows advertisers to select their

16 programs based on finer grand demographics.  That product is

17 sold at a premium and the synergies involve a selling more of

18 that product than is sold today.

19 Q.  Are defendants claiming synergies for both traditional

20 linear TV and TV distributed over the internet?

21 A.  Yes.

22 Q.  Without saying the specific number which is confidential,

23 about how much money are we talking about for this category of

24 synergy?

25 A.  So revenue scaling up to several hundred million dollars

1  per year by 2020 and continuing on an going basis.

2  Q.   At a high level what's the basis for your opinion that

3  these claimed increases in ad revenues are not merger specific?

4  A.   So the defendants haven't shown that a merger is necessary

5  to improve Turner's ad revenues, even if the value of AT&T data

6  for that purpose had been shown.

7       Furthermore, they haven't evaluated the benefits of AT&T's

8  data above and beyond the data that's available today.

9       And finally, if this is really as valuable as the

10  defendants claim, so if it's really several hundred million

11  dollars available from bringing this AT&T data to Turner

12  inventory, the parties would be highly incentivized to find a

13  way to make a deal rather than walking away and leaving all of

14  that money on the table.

15  Q.   Professor, what economic principles are relevant to

16  assessing whether this category of synergy is merger specific?

17  A.   So just at a very high level economic theory says that if

18  two parties can come together and create a lot of value that

19  they should find a way to make an agreement.  They should find

20  a way to split the surplus rather than again walking away and

21  leaving all of that money on the table.

22  Q.   How does that principle apply to the claimed increase in

23  Turner ad revenues?

24  A.   So in this particular case, we're talking about hundreds

25  of millions of dollars of revenue and so they would be highly

1   motivated to really do what it took to work out how to split

2   the surplus.

3   Q.   The Court has heard some testimony about bargaining

4   frictions or contracting frictions.

5       Could you explain what a contract friction is?

6   A.   Just to start with if you are going to make a contract

7   particularly about data, you will need to do the work to write

8   down all of the conditions in the contract that specify the

9   relevant contingencies.  Exactly which data is going to be

10  produced, on what time interval, the quality of the data, what

11  happens if the contract was terminated and so on.  And what

12  happens if something about the data changes.

13      So that can be a lot of work, but that's the work that you

14  would do to set up a contract for something complicated.

15  Q.   Are contract frictions common in data transactions?

16  A.   Yes.  So every data transaction would need to overcome

17  these frictions, but data contracts are ubiquitous.  They are

18  used everywhere in the advertising industry and even in this

19  case there are dozens of examples of data contracts involving

20  the parties even.

21      So even though these frictions exist, they are also

22  overcome on a regular basis and processes and approaches to

23  overcoming those are commonly used.

24  Q.   Is uncertainty about the value of the data a type of

25  friction that is important to consider?

1  A.    Yes.   So if you're buying and selling data that's an

2  example of a good that you might need to try out before you

3  understand the value of it.

4      And that's going to be again common across all of the

5  different types of data transaction.   Any time someone buys

6  data for the first time, they're going to face uncertainty

7  about what the value is.

8      But again, data contracts are ubiquitous in industry and so

9  people then finding some ways to overcome those frictions.

10 Q.    Short of merging with the company across the table from

11 you, are there any practical ways that the firm could establish

12 the value of its data?

13 A.    Yes.   So there's a number of practical alternatives and

14 these are the alternatives that are regularly used in this

15 industry.

16     So when it's a small number of firms they can engage in

17 things like revenue sharing or profit sharing.   They can also

18 write flexible contracts where the contracts can adjust to new

19 information that comes out.

20     But probably the most common way of salvaging the value of

21 data is just to do trials or pilots.

22 Q.    Could you just briefly explain for His Honor how a typical

23 trial or pilot might work?

24 A.    Sure.   So the most common way that data contracting works

25 is that the buyer really buys a subscription to the data.   They

1  pay a monthly or annual fee to continue to access and use the

2  data and receive new deliveries of data.

3      So in that type of subscription model what a pilot or trial

4  would look like is a discount on the initial subscription value

5  or even a free trial.

6      And for a profit maximizing firm offering a subscription

7  they're going to consider that stream of subscription revenue,

8  that's the lifetime value of the customer.

9      And a profit maximizing firm trying to attract a customer

10 and get that life time value finds it profitable to offer an

11 initial period even for free in order to prove the value of its

12 product.  And of course, this is a very common practice even

13 outside of data.

14     Most products that require a consumer to experience them

15 before knowing the value will be introduced with, you know,

16 free trials, or when you buy software it will have a trial

17 period or initial subscription for free.

18 Q.   Professor Athey, based on your experience and your review

19 of the record in this case, do you have any reason to believe

20 the methods that you just described would not work in

21 establishing the value of AT&T's data?

22 A.   No.  This is what you would expect as a start up cost if

23 you were going to go out and try to sell the data product.  You

24 would expect to follow the normal business practices of

25 offering introductory trials and pilots and really doing what

1   it takes to establish the value of the product.

2      Anticipating that they, when people see the value you'll

3   get that future, that future value.  Again, these types of

4   arrangements are really ubiquitous in this industry and

5   factually for these types of data.

6   Q.   Now other than what you've discussed already, are there

7   any other reasons why your view is that the Turner advertising

8   revenue synergies are not merger specific?

9   A.   Yes.  So far, we've been talking from the perspective of

10  AT&T as a seller of data and the things that they could do to

11  get people to buy their product.

12     For the synergies to be merger specific we also have to

13  consider the perspective of the buyer.  If the buyer could find

14  alternative sources other than merging to get data to improve

15  its advertising revenue, then the synergies would not be merger

16  specific.

17  Q.   Have defendants established that AT&T's data would in fact

18  provide incremental value to Turner over alternative sources

19  available?

20  A.   No, they have not.

21  Q.   What's your basis for that?

22  A.   So there's a variety of opportunities for Turner to buy

23  additional data for the purposes of targeting.  They are

24  already offering an ad product that uses a variety of data

25  sources for incremental targeting and there are other data

1   sources for sale even using similar set-top box data from

2   millions of consumers that can be used to provide additional

3   targeting for advertising for programmers.

4   Q.   And does the merger planning document that AT&T produced

5   analyze the value of AT&T's data relative to these alternative

6   sources?

7   A.   No.  The merger planning document just starts from where

8   Turner's current position and doesn't evaluate any additional

9   data source that they might acquire beyond what they had at the

10  time of putting forward the document.

11  Q.   Professor, did you review Mr. Stankey's testimony last

12  week that the merger is necessary to achieve all of the

13  synergies including the categories you analyzed?

14  A.   Yes.

15  Q.   And what's your response to that testimony?

16  A.   So I understand that Mr. Stankey's statement, but he

17  didn't explain why.  He didn't explain why these other

18  practical methods that are widely used wouldn't work in this

19  circumstance.

20      And so he didn't really address the questions about

21  practical alternatives.

22  Q.   Did Mr. Stankey's testimony cause you to change your

23  opinion on merger specificity in any way?

24  A.   No.

25  Q.   Let's turn to verifiability and we'll still on the Turner

1   advertising.

2       What's the basis for your opinion that these Turner ad

3   revenues are not verifiable?

4   A.   So I started by studying the documents that the defendants

5   put forward including what they provided to support their

6   numbers as well as the ad records that were also put forward in

7   support of numbers.

8       When I dug in I saw that the numbers here were merely

9   assumptions and there was no meaningful analysis underlying the

10  magnitude that were put forward.

11  Q.   Could you give an example for His Honor of an assumption

12  that was not justified in your view?

13  A.   So the lion share of the synergies come from improved

14  revenue from additional targeting for linear TV.  So again,

15  linear TV is sold using these broad targeting buckets and the

16  special product they're selling now includes additional data

17  and allows advertisers to target more finely.

18      That product is sold at a large premium over the base line

19  product.  So all of the synergies around this product come from

20  the assumption that they're going to sell dramatically more of

21  this product without lowering the price.

22      So going from perhaps low single digits of adoption to more

23  than 40 percent of customers adopting this product without

24  changing the price as a result of the merger as a claim.

25  Q.   How did defendants arrive at those numbers?

1   A.   So they appeared as simply to be assumptions.  There's not

2   an analysis underlying the claims about the additional uptake

3   of this product.

4       In particular, what we haven't seen is that any analysis of

5   which customers would actually see that big of value.  And to

6   see why we would need such an analysis, the value of this

7   additional targeting could vary a lot from customer to

8   customer.

9       So a lot of the biggest TV advertisers are using TV because

10  they want to reach a very broad audience.  So it's an open

11  question whether it would be twenty percent more valuable for

12  them to more finely target and particularly the way that

13  they're targeting is just by picking shows so that they would

14  see a twenty percent greater efficiency by better picking which

15  shows reach their target audience.

16      And there wasn't an analysis of how many firms would,

17  would, could use that or the potential efficiencies from

18  different segments of firms for example.

19  Q.   Let's turn to this programmatic ad platform for a few

20  minutes.

21      Before we start, could you explain for His Honor just what

22  a programmatic ad platform is, how it works?

23  A.   Sure.  So programmatic just basically means automated.

24  That word can be used in a variety of ways.  But here for these

25  purposes it's automated.

1    An ad platform is something, a platform for buying and

2   selling ads where the sellers of ads or like programmers or

3   distributors would come together with advertisers to buy the

4   ads.  So the programmatic ad platform is an automated way to do

5   that.

6   Q.   Is that how most television ads are bought and sold today?

7   A.   No.  So today the majority of linear television

8   advertising is bought and sold at what's called the upfront.

9    So the upfront, the programmers and the advertisers all

10  come to New York, they're stars, they get to hear about the new

11  show, and then they buy and sell the ads based on the

12  demographic of who is watching the shows.

13   After those are over throughout the year there's additional

14  direct sales called scatter between the programmers and the

15  advertisers throughout the year.

16  Q.   So how does this ad platform that AT&T wants to make fit

17  into this process?

18  A.   So as I mentioned today, the buyers and sellers are

19  connecting directly.  They are directly contracting over the

20  ads and they're directly delivering the video.

21   So the programmatic ad platform would insert itself as a

22  middleman between those relationships.  There would be a

23  middleman between the programmers and distributors and the

24  advertisers for automated buying and selling.

25  Q.   Is there anything like this in the market for television

1    advertising today?

2    A.   No.   So the, what this platform is hoping to do,

3    accomplish, is to attract the inventory from distributors as

4    well as programmers and earn a commission on that inventory.

5        We have not seen any programmatic platforms like this gain

6    wide adopting in the industry for programmers and distributors

7    to sell their inventory.

8    Q.   And I'd like to turn to the actual synergy claims and just

9    very briefly so we know what we're talking about.

10       What types of revenues are defendants claiming will result

11   from this platform?

12   A.   So there's two types of revenue included in the synergy

13   claim.   The first are the commissions that are charged when the

14   platform intermediates the sales between advertisers and

15   programmers and distributors.

16       The second is there's a type of advertising called

17   addressable advertising and the claim is that when other

18   distributors bring their addressable inventory to the platform

19   so there's an increase in addressable inventory available on

20   the platform, that will help AT&T sell its own addressable

21   inventory and AT&T will sell more of it.

22   Q.   I'm not sure we have had a definition for addressable yet.

23       So briefly could you explain what it means to have an

24   addressable ad?

25   A.   Sure.   So for addressable ads two people might be watching

1    the same show at the same time.  But one of them comes from a

2    high income household and another from a low income household

3    and those two people might see different ads on the same

4    program at the same time.

5    Q.   For both types of revenues from this platform, what's your

6    opinion about these claimed synergies?

7    A.   So my opinion is that they're neither merger specific nor

8    verifiable.

9    Q.   Let's start about merger specificity.  Why are these not

10   merger specific?

11   A.   So to build a platform like this and make it successful,

12   it does require overcoming a variety of obstacles.

13       But there's no evidence that the, the merger is necessary

14   for the firm to overcome those obstacles or that it

15   substantially increases the likelihood of success of the

16   platform.

17   Q.   Did you review Mr. Stankey's testimony last week where he

18   talked about using Turner's ad inventory to get the platform

19   started and prove that it works?

20   A.   Yes.  So he's referring to a concept of seed inventory and

21   seed inventory would be the initial inventory on the platform

22   that would help attract the first advertisers to the platform.

23   Q.   And based on your experience with the platform businesses,

24   is a merger the only way to acquire seed inventory?

25   A.   No, it's not.  A variety of ad platforms have started

1   without, without a merger instead by forming contracts to

2   attract the first inventory onto a platform.

3       These are commonly used practices across industries but

4   particularly in advertising.  And even the, in some of the

5   ordinary course, I'm sorry, in the merger planning documents

6   that I reviewed, these types of practice, the number of

7   contractual practices were proposed that could be used to

8   attract additional inventory to the Turner, to the AT&T

9   platform.

10  Q.   Could you give His Honor a few examples of common

11  contractual arrangements that can be used to acquire seed

12  inventory?

13  A.   Sure.  If you're going to come and sell something on a

14  platform instead of your existing alternatives, you are going

15  to be worried about whether you will get a good price for it

16  and whether you'll make as much money as you would in your

17  alternatives.  That's the big problem.

18      If you are a platform you are hoping that if you succeed

19  you'll see a big stream of revenue.  And the platform is going

20  to enjoy that.

21      So as a profit maximizing platform you're going to be

22  willing to bear some of that risk for the initial customers to

23  get them to come.

24      So there's some very simple ways to do that.  One of the

25  first is a revenue guarantee.  So you basically tell the seller

1  they'll, you'll guarantee them a minimum amount of revenue when

2  they sell through your platform, but then they can keep the

3  upside or share in the upside.

4      Another way to do it just to simplify things further is the

5  platform can actually buy inventory and that removes all of the

6  risk from the partner.  And then sell it on the platform.

7      So this aligns the incentives of the platform to do a good

8  job monetizing the revenue and it shifts the risk onto the

9  platform who will ultimately bear the benefits if the platform

10 succeeds.

11 Q.   Based on your experience with platforms and your review of

12 the record in this case, do you have any reason to believe that

13 those alternative arrangements wouldn't work here?

14 A.   No.  So just to start with AT&T actually already has a

15 large amount of inventory and so just putting AT&T's inventory

16 on the platform already means that if advertisers came, they

17 would have something to buy.

18     And then these techniques again are commonly used in

19 advertising and they were proposed in the merger planning

20 document as the type of techniques that would attract

21 additional inventory onto the platform after the merger.

22 Q.   Let's turn to verifiability for this ad platform.

23     At a very high level, why are the revenues from the ad

24 platform in your view not verifiable?

25 A.   So for this category all of the synergies come from a

1   brand new product.  So introducing any new product is risky.

2       Introducing a platform that has to bring together both

3   buyers and sellers is especially risky.

4       Then finally, in the TV industry putting forward this type

5   of platform is particularly risky.

6   Q.   And what has to happen for defendants to pull this off?

7   A.   So a whole bunch of things have to happen.  First, they

8   just have to build it, so they have to build the technology.

9   They have some piece of it today.

10      They would have to build others and they might also need to

11  do some acquisitions to get other components of the technology

12  to just stand up to the platform.

13      Once the platform is built then comes sort of the greater

14  challenges.  They need to convince both buyers and sellers to

15  participate in the platform.

16      So generally when you speak about the economics of

17  platforms, they're going to create the most value.  When, it's

18  hard for buyers and sellers to interact without the platform

19  when there's lots of buyers and sellers like on eBay.

20      They might have trust problems or coordination problems in

21  figuring out how to interact with one another.  They might need

22  help with payment.

23      So those types of services need the platform to add a lot

24  of value and firms don't, the participants don't need the

25  platform because they are getting a lot of value.

1      In this industry we have kind of the opposite scenario

2  where we have a lot of concentration on one side of the market.

3  You know, just a handful of programmers and distributors who

4  control most of the inventory, so it's extreme concentration on

5  one side of the platform.

6      On the other side of the platform there's maybe two hundred

7  advertisers that account for about two-thirds of the

8  advertising revenue.  So that's also highly concentrated

9  relative to most commercial platforms.

10     So just concentration on one side of the market would be

11  sufficient to create risk of people going around the platform.

12  But with extreme concentration on one side and concentration on

13  the other, it can be very difficult to induce people to come to

14  your platform and pay a commission especially if they already

15  have established relationships and they've already sort of

16  solved the set up problems and coordination problems of

17  contracting directly.

18     Then a final thing they need to pull off is they actually

19  need to convince their competitors to do this.  So if AT&T was

20  standing up alone, they would already be trying to induce their

21  competitors on the distribution side to contribute inventory

22  like the addressable inventory.

23     If the firms merged then all of the sources of inventory

24  are competitors to the merged entity.  The programmers are

25  competitors of Time Warner, the distributors are competitors of

1  AT&T.

2      So in an environment where they have pretty good

3  alternatives, it may be especially difficult to get them onto

4  the platform.

5  Q.   Professor, has anyone tried to create a similar platform

6  in the past?

7  A.   Yes.  So there have been a few attempts.  For example,

8  Google which has had a lot of success in creating advertising

9  platforms for example in search or banner ads created something

10  called Google TV in 2007 which was intended to be a

11  programmatic platform similar to this one.

12     They shut that down in 2012 and that was partly due to the

13  types of concerns that I've raised before that the participants

14  didn't see the value of going through a platform.

15  Q.   To circle back on one point and then we'll move on to the

16  next topic.

17     You mentioned you need to acquire inventory from the

18  defendant's competitors.  Have you seen any evidence in the

19  record suggesting that AT&T or Time Warner competitors are

20  likely to contribute inventory to this platform?

21  A.   I have not seen analysis or evidence to that affect.

22  Q.   Of the revenue synergies attributed to this ad platform,

23  what portion depend upon the contribution of inventory from

24  AT&T and Time Warner's competitors?

25  A.   So all of the synergies from the platform depend directly

1    on the contributions of the competitors.

2    Q.    Professor Athey, let's move onto content intelligence.

3          And before we get into the synergy claims, could you

4    briefly describe for the Court what content intelligence means

5    as defendants use that term?

6    A.    Sure.   Content intelligence is basically using data to

7    make content better.   And so here we are talking about applying

8    AT&T's data to improve the content of Time Warner.

9    Q.    I direct your attention to page 114 of DX 658.   This is

10   the version 41 document.

11   A.    Okay.

12   Q.    And can you confirm for the Court that the three

13   categories of synergies are revenues on this page are the

14   categories of content intelligence that you analyzed?

15   A.    Yes.   So the three categories are content acquisition and

16   syndication which basically means making more money on the

17   syndication of shows like reruns.

18         Second is scheduling optimization.   So that's using data to

19   figure out which programs should come after which other program

20   to keep people from turning off the TV.

21         The third is creative development.   That's basically using

22   data to pick STARZ or make a movie that people would like more.

23   Q.    Are these three categories are these the ones that the

24   defendants went ahead and actually quantified?

25   A.    Yes, that's correct.

1  Q.   Are all three of these categories based on the application

2  of AT&T data to Time Warner content?

3  A.   That's correct.

4  Q.   Again, without getting into the specific numbers which are

5  confidential, about how much money do defendants claim they'll

6  make through these content intelligence synergies?

7  A.   So revenues rising to a couple of hundred million dollars

8  per year by 2020 and continuing on an ongoing basis.

9  Q.   Why aren't in your view these revenues merger specific?

10  A.   So similar to the advertising revenue synergies, the

11  defendants haven't established that a merger is needed to

12  create this value as opposed to practical alternatives like

13  contracting for the data.

14      And then further, they haven't shown that AT&T's data is at

15  all better than other types of data that would be available and

16  that are sold in the market for these same purposes and could

17  be used by Time Warner if they chose for these purposes.

18  Q.   Why in your opinion are these synergies not verifiable?

19  A.   So again, when I look at the numbers put forward in the

20  documents, they were not justified by meaningful analysis.

21      They were simply assumptions about the magnitudes that they

22  would receive.

23  Q.   Could you give His Honor an example of an assumption

24  underlying these calculations that you found programmatic?

25  A.   Yes.  So for the scheduling optimization which is about

1  which programs should come after which other program.  All of

2  the numbers were based on a single example and they assumed

3  that that example could be replicated once a day.

4  Q.    Could you turn to page 116 of the version 41 document, DX

5  658?

6  A.    Yes.

7  Q.    And on the right side under the synergy details and

8  assumptions it refers to a viewership uplift.

9      Do you see that?

10 A.    Yes.

11 Q.    Is that what you're referring to?

12 A.    Yes.

13 Q.    Where did defendants get that number?

14 A.    So again, the number came from a single example actually

15 on a different network.  So the example was based on AMC which

16 has one of the most popular show on cable called The Walking

17 Dead, that's about zombies.

18     And so this Walking Dead show was appearing in a certain

19 time slot.  Then they took the prequel to The Walking Dead

20 called Fear The Walking Dead and they put that prequel in the

21 time slot directly following The Walking Dead.

22     From that they got a thirty-five percent increase in the

23 viewership for that time slot.  And that thirty-five percent

24 number is the number that's entered here and it's described The

25 Walking Dead example for the justification for the number.

1  Q.   Why is that one example insufficient to verify all of

2  these claimed synergies?

3  A.   So a couple of reasons.  First of all, The Walking Dead is

4  one of most popular shows on television and it's in a

5  relationship with Fear The Walking Dead is about as close as it

6  could get.

7      So that uplift is probably not representative of what you

8  could get from rescheduling other programs.

9      Second, there's no reason to believe that data was needed

10 to make that decision.  Let alone advanced data or data better

11 than what comScore provides about which people watch which

12 programs in common.  For this type of extreme synergy it may

13 also be extremely obvious which programs should go together.

14     And so this example is that's not representative of the

15 kinds of uplifts that you would get from the incremental

16 addition of data beyond what's already available for scheduling

17 decisions.

18 Q.   And just so the record is clear, this example, does this

19 relate to all three categories of content intelligence or just

20 the scheduling category?

21 A.   Just the scheduling category.

22 Q.   Do defendants -- let me try again.

23     Are there similar issues with the other categories of

24 content intelligence calculations?

25 A.   Yes.  Just for example, around creative development

1  actually there was a fear of it as skepticism and controversy

2  about whether data was even useful for making a great movie.

3  Whether the creative developers really wanted data for that

4  purpose.  And there's no analytic justification for these

5  magnitudes.

6  Q.  Apart from the issues with the calculations are there any

7  other reasons why in your view the content intelligence

8  synergies aren't verifiable?

9  A.  Yes.  So as I mentioned, there's in order for what we

10  would need to be verified here would be the incremental value

11  of the data beyond other data sources that are already

12  available.

13      And so there's, there was no attempt to show that

14  additional data was needed to carry out any of these goals.

15  Q.  Did you review Mr. Stankey's testimony last week that AT&T

16  isn't able to confirm that these content intelligence synergies

17  even work?

18  A.  Yes, I did and that's consistent with my review of other

19  documents that expressed similar concerns.

20          MR. SCHWINGLER:  No further questions, Your Honor.

21          THE COURT:  All right.  Cross exam.

22          MR. SCHWINGLER:  May I proceed, Your Honor?

23          THE COURT:  You may.

24                      CROSS EXAMINATION

25  BY MR. RAIFF:

1  Q.   Professor Athey, a few questions on your experience.

2  Prior to this case, you've never testified as an expert

3  relating to merger efficiencies, true?

4  A.   Not in a court, no.

5  Q.   In fact, in your deposition you told me you had never been

6  retained as an expert relating to merger efficiencies; is that

7  right?

8  A.   Not for a proceeding like this, no.

9  Q.   On the advertising front, have you ever worked in an

10 advertising agency?

11 A.   No.

12 Q.   Okay, have you ever sold television advertising?

13 A.   No, I've not directly sold it myself.

14 Q.   Have you ever personally placed an order for television

15 advertising?

16 A.   I've certainly reviewed orders for television advertising

17 in terms of their magnitude, their content, and their

18 effectiveness, but I haven't attended an upfront and placed an

19 order myself.

20 Q.   So back to my question, you have never personally placed

21 an order for television advertising true?

22 A.   No, I have not.

23 Q.   Okay.  Let's talk briefly about vertical mergers and

24 innovations.

25      First of all, you agree that when analyzing a merger an

1  economist like yourself should take into account pro

2  competitive effects of the merger, right?

3  A.   An economist would balance the cost and benefits.

4  Q.   And you recall us discussing at your deposition the

5  potential benefits that might arise from vertical mergers.

6     Do you recall that discussion?

7  A.   Broadly, yes.

8  Q.   Okay.  And you agreed in your deposition that some of the

9  potential benefits of vertical mergers might include cost

10  reduction and improved product design that can lead to lower

11  prices, higher quality products and increased investment and

12  innovations.

13     You still agree with that today?

14  A.   I agree that those are possible outcomes, yes.

15  Q.   Okay.  Well, let's focus on the potential for innovations

16  first.

17     You know AT&T and Time Warner are hoping the merger is

18  going to allow them to build and develop this programmatic ad

19  platform, right?

20  A.   That's their hope.

21  Q.   Right.  And you know from, and I think you talked about

22  this in your expert report, you know that this is a platform

23  that's going to specialize in the sale of premium video ad

24  inventory, right?

25  A.   That's their plan.

1  Q.   Okay.  And they also plan and they envision selling

2  targeted data driven advertisements through this new platform,

3  right?

4  A.   That's correct.

5  Q.   Okay.  And this new platform is going to be able to serve

6  multiple, sell ads to multiple devices, cell phones, tablets,

7  TVs, even computers, right?

8  A.   The broad aspiration would be to serve advertising to

9  different devices.

10 Q.   All kinds of devices, right?

11 A.   That would be their hope.

12 Q.   Okay, and then once completed the hope is the platform

13 would be open to other programmers and other distributors,

14 right?

15 A.   More so than not all of the merger synergies that I

16 evaluated required the participation of other platforms and

17 distributors.

18 Q.   So then back to my question.  Once completed this platform

19 would be open to other programmers and other distributors,

20 right?

21 A.   Yes.

22 Q.   And today I think you explained on the television side

23 there's no such thing, right, there's no programmatic

24 advertising platform for buying linear television ads today,

25 right?

1  A.   That's correct.  So some, some companies offer

2  programmatic buying on their own inventory and there may be

3  other nation things but nothing that's gotten widespread

4  adoption.

5  Q.   Back to my question.  On the television side, there's no

6  programmatic advertising platform for buying linear television

7  ads, true?

8  A.   Not one that has, is serving a variety of third party

9  inventory sources.

10  Q.   Got you.

11      So if AT&T and Time Warner are successful in building their

12  programmatic ad platform on TV side, it will be a first of its

13  kind, right?

14  A.   It would be the first successful platform of serving these

15  third parties.

16  Q.   And AT&T actually has a very long history of inventing and

17  innovating as you probably read from Mr. Stephenson's

18  testimony, right?

19  A.   So for example, Bell Labs was very successful in basic

20  R&D.

21  Q.   On TV side there's no programmatic ad platform but there

22  are programmatic ad platforms on the digital side or the

23  internet side, right?

24  A.   That's correct.

25  Q.   For example, Google's programmatic ad platform, right?

1  A.    So Google gets more than eight percent of it's revenue

2  from it's search advertising platform where it buys and sells

3  search advertisements and then it also operates a banner ad

4  platform for selling display ads.

5  Q.    So back to my question.   Google has its own programmatic

6  ad platforms, right?

7  A.    Yes.

8  Q.    And you read Mr. Bewkes's trial testimony about how he

9  expressed some concern about how advertising dollars are

10 leaving the TV side and moving over to the digital side.

11     Did you read that part?

12 A.    Yes, so there's --

13 Q.    I just want to know if you read it first.

14     Did you read that testimony from Mr. Bewkes?

15 A.    Yes.   I'm not sure you fully characterized the entire

16 exchange about that.

17 Q.    Got it?

18 A.    But I'm familiar with the testimony.

19 Q.    You agree and you explained in your deposition that over

20 the past few years advertisers have been spending more and more

21 money on the digital advertising side, right?

22 A.    As users spend more and more time on the digital side,

23 advertising dollars have tended to follow the users, not always

24 as fast as the users move, but they have been following the

25 users.

```
1    Q.    Okay.  So back to my question.

2        Over the past few years advertisers have been spending more

3    and more money on the digital advertising side, true?

4    A.    Yes.  It makes it sound like they're, it's the way you ask

5    the question that it's coming away from TV revenue per hour for

6    example and that's been more stable, but as the advertising,

7    entire advertising pool has grown as people are spending more

8    and more of their time connected.

9    Q.    Let me ask you that next question again.

10       You agree, Professor Athey, that in general more and more

11   ad dollars have been shifting from the television ad side to

12   the digital ad side?

13       You agree with that?

14   A.    In terms of percentages, yes, so that the shares have been

15   shifting.

16   Q.    And Google and Facebook are the biggest players in digital

17   advertising, right?

18   A.    Yes.  They are players in slightly different things.

19   Q.    That's right.  In fact, in your deposition you confirmed

20   that Google and Facebook together account for roughly sixty

21   percent of the digital advertising in the U.S., right?

22   A.    That's correct.

23   Q.    And these two companies are capturing most of the online

24   advertising industry revenue throughout the last few years,

25   right?
```

```
 1          MR. SCHWINGLER:  Objection, Your Honor.

 2      May we approach?

 3          THE COURT:  Yes.

 4      (Witness leaves the stand.)

 5      (Sealed bench conference.)

 6          MR. SCHWINGLER:  My objection is based on the scope

 7  of direct which is limits to verifiability and merger

 8  specificity.  It has nothing to do with broader industry trends

 9  in other markets for other types of advertising.

10          MR. RAIFF:  It's all about the need and the

11  opportunity for this programmatic platform that she's been

12  criticizing and claiming that it's not verifiable, that we're

13  not going to be able to do it and the need and opportunity is

14  so great, that's why they're investing in this and we're about

15  to go into exactly how it is you solve the problem and create a

16  programmatic platform.

17          THE COURT:  All right, overruled.

18      (Witness resumes the stand.)

19      (Open court.)

20          THE COURT:  You may proceed.

21          MR. RAIFF:  Thank you, Your Honor.

22  BY MR. RAIFF:

23  Q.   Back to my question.  There's these two companies,

24  Facebook and Google.  They have been capturing most of the

25  online advertising throughout the past few years, right?
```

1  A.    That's correct.

2  Q.    And there are a few out there that are trying to compete

3  with for example, Google's programmatic advertising platforms,

4  right?

5  A.    Yes.

6  Q.    For example Bing, Microsoft Bing, their search engine and

7  programmatic platform is trying to compete with Google, right?

8  A.    That's right on the search side.

9  Q.    That's right.

10     And as you explained in your deposition, you agree, don't

11  you, that healthy competition to the Google programmatic

12  platforms will help consumers, advertisers and publishers,

13  true?

14  A.    That's correct.

15     I also talked about how to be effective the competition

16  needs to concern advertising and these are experiences that are

17  similar to the platforms that they're competing with.

18  Q.    But you agree, you agree that healthy competition to the

19  Google programmatic platforms will help consumers, advertisers

20  and publishers, true?

21  A.    Effective competition, yes.

22  Q.    Okay.  Let's continue talking a little bit about that and

23  benefits to consumers.

24     And let's talk a little bit about the benefits to consumers

25  of targeted advertising.  First of all, as you explained in

1  your deposition, one way consumers benefit from targeted ads is

2  by seeing more relevant ads, right?

3  A.   That's correct, depending on the product and the format.

4  Q.   You agree, right?

5  A.   That if consumers see more relevant ads, yes, they can

6  benefit from that.

7  Q.   And you also read some of the trial testimony about how

8  advertisers are generally willing to pay more for data driven

9  targeted advertising, right?  You read some of that testimony?

10  A.   Yes.  Again, some advertisers more than others depending

11  on the context and type of ad, they may be, see more value to

12  reaching a wide set of consumers at other points in the

13  conversation that a marketer is having with a consumer having

14  them be more targeted is more helpful.

15  Q.   Got you.

16     So they're willing to pay more for that, right?

17  A.   They are willing to pay to the extent that it provides

18  additional value to them.

19  Q.   And you heard and probably read some of Mr. Bewkes's

20  testimony where he was talking about the importance of

21  advertising revenue in order to keep subscription prices down

22  for consumers?

23     You recall reading that?

24  A.   I'm broadly familiar with that testimony.

25  Q.   You recall that in your deposition, we talked about that

1    same point?  You recall about how advertising revenues can be

2    used to help subsidize or offset the cost of consumers, that

3    cost of consumers have to pay for services?

4        You recall us talking about that subject?

5    A.   I recall that we discussed different business models for

6    --

7    Q.   Yeah and for example, on the internet side you agree that

8    advertising profits have subsidized a wide variety of useful,

9    powerful and entertaining services that might otherwise have

10   never come into existence or would have cost consumers

11   significantly more?

12       You still agree with that, right?

13   A.   Yes.  So I would frame it that the business model for

14   certain internet product is to monetize them through

15   advertising.  There's a range of monetization models used out

16   there through subscriptions and combination based.

17   Q.   Like Google, like Google consumers get a lot of benefit

18   from Google's advertising and monetizing advertising because

19   they get a lot of free services like free search, right?

20   A.   Yes.

21   Q.   And that's a benefit to consumers, right?

22   A.   The search engine as a whole provides benefits, yes.

23   Q.   This is consistent with the concept that Mr. Bewkes and

24   Mr. Stephenson were testifying about, right, that it's

25   important to be able to increase ad revenues in order to take

1   pressure off subscription price, right?

2   A.   I haven't studied the interplay between subscriptions and

3   ad revenue in response to this case.  Those aren't part of the

4   synergies that I was, part of my assignment.

5   Q.   You agree or at least don't dispute Mr. Stephenson's and

6   Mr. Bewkes's testimony about increasing ad revenue can help

7   take pressure off subscription prices?

8        You don't dispute that, right?

9   A.   You know, I haven't analyzed exactly how their incentives

10  change.  So I don't, I'm not ready to express an opinion about

11  how I think their profit maximization would work.

12  Q.   Got you.

13       I just want to make sure you're not disputing that concept?

14  A.   I'm familiar with his testimony.

15  Q.   All right, let's switch gears and spend a few minutes

16  talking about how companies can build successful programmatic

17  platforms.

18       And you referred earlier to Mr. Stankey's trial testimony

19  where he discussed how AT&T wants to use Turner's advertising

20  spots to prove to themselves and to prove to others that this

21  new platform can work, right?

22       You recall that testimony?

23  A.   I'm familiar with the testimony.

24  Q.   And first of all, you agree that in order to have a large

25  successful programmatic platform, you would need to have a

1  large amount of ad inventory, you agree with that?

2  A.   Yes.

3  Q.   Okay.  And in fact, I think the way you described it is to

4  be big, you need to be big, right?

5  A.   I don't think I used those words.

6  Q.   Okay, but you agree with that to be big, you need to be

7  big?

8  A.   I guess it's hard to disagree.

9  Q.   Okay.  In your report you discussed this chicken and egg

10  problem, you recall that?

11  A.   Yes.

12  Q.   And what you were trying to say is to be successful an ad

13  platform needs to have a critical mass of sellers and a

14  critical mass of buyers, right?

15  A.   That's correct.

16  Q.   And as you noted in your report, it's very difficult to

17  attract one side of the platform without having the other side,

18  right?

19  A.   That's correct.

20  Q.   And so for example, advertisers will not use the platform,

21  their advertisers are not going to come to the platform unless

22  there's plenty of advertising inventory for them to buy, right?

23  A.   Well, I'm not sure how to define plenty, but they need to

24  have sufficient advertising inventory to buy, to justify their

25  time and expense to come and more broadly, they need to see

1  value from transacting through the platform including

2  commissions versus other alternatives.

3  Q.   Right, they need to see.  As you explained, having scale

4  of advertising inventory is required for an advertising

5  platform to succeed?

6      You still agree with that?

7  A.   Having sufficient scale to attract advertisers, of course

8  all platforms go through a growth phase.

9      For example, the Google double click ad platform for banner

10 ads it started as a start up and it made, it had contracts for

11 sellers, then it got more buyers, then it got more sellers and

12 then it got more buyers and it started from zero and grew.

13 Q.   You talked about ways, there are ways to break through

14 this chicken and egg problem you describe, right?

15 A.   Exactly.

16 Q.   One way you mentioned in your report is by offering

17 something unique or something of unique value, right?

18 A.   Yes.

19 Q.   And you recall us discussing exactly how Google and

20 Facebook were able to break through this chicken and egg

21 problem and build their programmatic ad platform?

22     You recall us discussing that?

23 A.   Broadly.

24 Q.   Okay.  For its search advertising programmatic platform

25 Google solved the chicken and egg problem by growing user

1  eyeballs and ad inventory first, correct?

2  A.   That's an oversimplification, so.

3  Q.   Well, let's take a look at your deposition on exact words

4  because I want to be precise in exactly your, the question and

5  answer.

6        MR. RAIFF:  Your Honor, may we approach with the

7  deposition?

8        THE COURT:  Sure.

9        MR. RAIFF:  May I approach the witness as well, Your

10 Honor?

11       THE COURT:  You may.

12 BY MR. RAIFF:

13 Q.   I want to make sure we get these next few questions

14 exactly right.  If you could turn to the transcript on page 53.

15       MR. RAIFF:  And Your Honor, this is a deposition

16 taken on March 8th, 2018 of Professor Athey.

17 BY MR. RAIFF:

18 Q.   And we're turning to page 53, lines 10 through 13.  And do

19 you recall at your deposition, Professor Athey, that I asked

20 you almost the precise question I'm reading from line 10.

21      Question, for the search programmatic platform, did Google

22 solve the chicken and egg problem by growing user eyeballs and

23 ad inventory first?

24      And your answer was yes.

25 A.   Yes.  And there's about a page one and a half long answer

1  prior to that where I outlined the whole history.

2  Q.   Your counsel can ask you plenty of questions about the

3  long history?

4  A.   Yes.

5  Q.   I'm on a, I'm on the clock here, so I'm going to get

6  straight to the point.

7       Now I want to turn to the Facebook question.  Same kind of

8  questions on Facebook.

9       Same thing with Facebook.  For its social media

10  programmatic platform, Facebook attracted users and ad

11  inventory through its own and operated social network, right?

12  A.   That's correct.

13  Q.   And as you mentioned in your deposition, that's exactly

14  how Facebook was able to solve and break through this chicken

15  and egg problem by growing its ad inventory and eyeballs first,

16  true?

17  A.   That's right.  And just to be clear, almost all of

18  Facebook's revenue today comes from Facebook selling its own

19  inventory.  So Facebook is attracting users to the Facebook

20  social network and then selling access to advertisers for users

21  on that network.

22  Q.   Precisely right.  So it actually grew and started its

23  programmatic platform based on its own owned and operated ad

24  inventory, true?

25  A.   That's right.  It's a little bit of a different type of

```
 1  platform because it's main ambition is not to attract third

 2  party inventory but rather to monetize its own users.

 3  Q.   So let's now turn to the platform AT&T and Time Warner are

 4  hoping to build.

 5       So you know, you know AT&T they're planning to use the

 6  Turner ad inventory to start up or as you said, to seed or to

 7  fuel its new programmatic platform, right?

 8  A.   That together with inventory from AT&T as well.

 9  Q.   Good point.

10       So you know Turner has about six hundred and seventy

11  billion ad spots available per year.

12       Does that sound about right to you?

13  A.   Roughly.

14  Q.   And Turner's ads, they go out to virtually the entire

15  country, right?

16  A.   Yes.

17  Q.   Right.  Their shows are not just, their ads are not just

18  distributed to the DirecTV homes.  They're distributed through

19  a bunch of distributors throughout the U.S., right?

20  A.   That's correct.

21  Q.   And without Turner, AT&T has about a hundred and

22  seventy-nine billion ad spots, right?

23  A.   Again, I'm not sure of the exact number.

24  Q.   Roughly, sound about right?

25  A.   Sound about right.
```

1  Q.   Okay.  And those ads though, they just go to the DirecTV

2  homes, right?  DirecTV ads just go to the DirecTV homes, right?

3  A.   DirecTV ads to DirecTV, U-verse also is another

4  distributor.

5  Q.   As opposed to the Turner's fourteen minutes which go out

6  to the entire U.S., right?

7  A.   That's correct.

8  Q.   Okay.  And if this merger is allowed to go through the

9  combined company will have about eight hundred fifty billion

10 combined advertising spots available, right?

11 A.   Are you saying that all of the inventory would be on the

12 platform?  Is that what you're asking?

13 Q.   Let me read the question again.

14    If this merger is allowed to go through, the combined

15 company will have about eight hundred and fifty billion

16 combined advertising spots available?

17 A.   That sound like the overall inventory, but I don't -- I

18 don't believe that's all going to be on the platform.

19 Q.   Well, you know from reading Mr. Stankey's trial testimony

20 that the plan is to use the Turner advertising inventory to

21 prove up the concept and to demonstrate that in fact these

22 improvements can be made in the market and effectively work,

23 right?

24 A.   That's their plan in the presence of a merger.

25 Q.   If they are able to do this, if they are successful in

1  proving up the concept, then they want to invite others to come

2  in, right?

3  A.    That's right.  If they also need to prove it to themselves

4  for that matter.

5  Q.    That's right.  That's yet another reason to have Turner

6  inventory is to prove it to themself that this programmatic ad

7  platform can work, correct?

8  A.    That's right.

9  Q.    Okay.  And then Mr. Stankey explained that it's his belief

10  that yield winds, meaning that programmers and distributors

11  will join up if they see AT&T has built a better mouse trap and

12  attracts higher ad dollars, right?  That's his belief, right?

13  A.    That's a characterization of the testimony.

14     It doesn't address questions about strategy like whether

15  the highers want to configure their inventory to a competing ad

16  platform.

17     So they might factor that in addition to yield or concerns

18  about being reliant on their competitor for their main revenue

19  stream might also --

20  Q.    His belief if yield winds, right?  His business judgment

21  is yield winds, right?

22  A.    I can't speak to his overall belief.  That's a

23  characterization.

24  Q.    You know from looking at the assumptions in the

25  advertising synergies, you know from looking at the assumptions

1  that you were talking about a little while ago, it's actually a

2  pretty modest art and small percentage of contribution that the

3  assumptions are assuming for the programmers and distributors,

4  around ten percent for the programmers and five percent for the

5  MVPDs, true?

6  A.    Those, that's roughly the numbers.

7          THE COURT:  Will this be a good time to take the

8  afternoon recess?

9          MR. RAIFF:  Yes, Your Honor.  Thank you.

10         THE COURT:  We'll take a fifteen minute recess.

11       You're a witness under oath in the case.  Let me explain

12  what that means to you.  You can't discuss your testimony with

13  anybody, including your own lawyers.  Stay independent of all

14  others, don't discuss it, what it's been or what it will be

15  when your return.  Stay independent of anyone else.

16         THE WITNESS:  Thank you.

17         THE COURT:  Step down, see you in fifteen minutes.

18     (Witness excused.)

19     (Recess at 4:00 p.m.)

20     (Proceedings resumed at 4:20 p.m.)

21         THE COURT:  Witness remains under oath.

22         MR. RAIFF:  May I proceed, Your Honor?

23         THE COURT:  You may.

24         MR. RAIFF:  Thank you.

25

CROSS-EXAMINATION (Continued)

BY MR. RAIFF:

Q.   Let's put aside the platform and let's talk about what could happen shortly after the merger if it's allowed to go through.

     You know part of the synergies relate to improving the advertising by combining Turner's capabilities with AT&T's capabilities and data, right?

A.   That's correct.

Q.   And you know that today AT&T has certain advertising capabilities that Turner does not have, right?

A.   Or that Turner doesn't currently have.

Q.   Right.  So let's talk about a couple of those.  Let's start with addressable TV.

     You talked about that a little bit.  That's basically where if you and I are neighbors and we're watching the exact same show, a distributor could send you one ad while sending me a different ad, right, that's addressable TV advertising, right?

A.   That's correct.

Q.   All right.  It's very different from the spray and pray advertising approach that we've heard a little bit about at trial, right?

A.   If you're referring to buying based on broad demographic categories, yes.

Q.   Okay.  And it's also even more targeted than the data

1  driven linear advertising, right?

2  A.   It potentially can be if the advertisers choose.

3  Q.   And you know that Turner does not sell that type of

4  addressable TV advertising where it can send one ad to one

5  house old and the other ad to the other household, right?

6  A.   Yes, so in general there are some partnerships in the

7  industry where programmers can make a partnership or a

8  contractual arrangement with distributors.  So to my

9  understanding Turner doesn't have such a contract in place

10  today.

11  Q.   Okay.  Well, Professor Athey, I don't want to cut you off,

12  and I know you want to throw in some of the government's views

13  every once in a while, but it's been a long trial.  We're all

14  trying to finish things up.  I'm on a clock, and so if we could

15  just stick to my questions, please.

16  A.   Yes.

17  Q.   Okay.  So back to my question.

18      You know that Turner does not sell that type of addressable

19  TV advertising where it can send one ad to one home while at

20  the same time sending another ad to another home, right?

21  A.   No, it does not offer that product today.

22  Q.   And, in fact, you read Mr. Bewkes's testimony about

23  Turner's inability to do this, an inability to serve ads to

24  different people, right?

25  A.   I'm familiar with the testimony.

1  Q.   Okay.  And you know, though, that today AT&T is able to

2  sell addressable TV advertising, right?

3  A.   Yes, AT&T does offer that product.

4  Q.   In fact, AT&T is one of the leaders in addressable TV

5  advertising, right?

6  A.   You know, they sell a substantial portion of their

7  inventory through that mechanism.

8  Q.   Right.  And, in fact, DirecTV was the first company, the

9  first company to sell addressable TV back in 2012, right?

10  A.   That sounds right.

11  Q.   And you know that AT&T gets more than five times the price

12  for its addressable TV advertising than it gets on its regular

13  advertising, right?

14  A.   That's an accurate description of the revenue they were

15  receiving on the volumes that they're selling today.

16  Q.   Okay.  And so Turner does not have this capability or is

17  not selling addressable advertising today, and AT&T is the

18  leader in selling addressable TV, fair?

19  A.   Yes.

20  Q.   And you read Mr. Bewkes's trial testimony explaining that

21  this was real important to him, that this was an important

22  aspect of the merger to him, do you recall reading that?

23  A.   That's broadly consistent with my reading.

24  Q.   And after the merger Turner will be able to use AT&T's

25  addressable capabilities, right?

A.   With or without the merger, Turner can arrange to sell

addressable on AT&T's customers, either through a partnership

or through the merger, so the plan is to do that after the

merger.

Q.   And let me ask you a couple of questions.

    I know that that's the theory of contracting or I think you

call it the economics of contracting.  I really want to stick

to the real world for a second.  In the real world that hasn't

happened, has it?

A.   Not for this programmer and this distributor, but for

other programmers and other distributors so it just makes it

sound like, when you're asking the question, like it's somehow

impossible.

Q.   And do you know whether or not any of this was reflected

in Professor Shapiro's efforts to model the merger effects?

A.   I haven't reviewed that.

Q.   Okay.  Let's take another example.

    Customer list matching, and some advertisers I think call

it customer provided list matching.  Maybe just can you briefly

explain to the Court your understanding of how that works, how

customer list matching works for TV advertising?

A.   Sure.  So if you're the kind of advertiser that has a

direct relationship with the customer, you might have a list of

who those customers are.  And so with customer list matching

you could try to send it in and then figure out what kind of

1  shows your customers are watching, and you might use that to

2  decide, you know, which shows to buy, which shows to buy ads

3  on.

4  Q.   And so, for example, AT&T, they can actually build a

5  campaign around or using the advertiser's list of customers,

6  right?

7  A.   That's a capability, yes.

8  Q.   And you heard, I think you probably read Mr. Stankey's

9  testimony.  I think he used the example of a men's clothing

10 store, do you recall that?

11 A.   Yes.

12 Q.   And I think you confirmed in your deposition that this

13 customer list matching is very valuable to advertisers, right,

14 or actually pretty valuable to advertisers, right?

15 A.   It depends on the advertiser, if you don't have a customer

16 list, then it's harder to use that.  Like if you're selling,

17 you know, wholesale through a retailer and you don't like a

18 package goods company or something like that that doesn't

19 directly interact, then you can't use it.  But for some

20 advertisers, that could be useful, especially if you had a

21 niche audience or an audience that behaved differently than the

22 general demographics of your audience.

23     So for men, you might know already that you're selling to

24 men, but if you had a particular audience of unusual men whose

25 viewing habits were very different than other men, that could

1   be an incremental value from customer list matching.

2   Q.   Okay.  So you agree it can be pretty valuable to

3   advertisers who have customer lists, true?

4   A.   And it depends on the advertiser, but for some advertisers

5   it could be valuable.

6   Q.   And you know AT&T is able to do customer list matching

7   today based on the fact they have first party data, right?

8   A.   Based on the data that they have about their customers.

9   Q.   And, in fact, that's one of their strongest selling types

10  of advertising products today, right?

11  A.   I'm not sure that I would agree with that

12  characterization.

13  Q.   Okay.  Well, let's flip to the Turner side.

14     You know that Turner does not do customer list matching

15  advertising today, true?

16  A.   That's correct.

17  Q.   And that's because, I think you explained in your

18  deposition, that's because Turner does not know the specific

19  identities of the viewers in order to match them to a customer

20  list, correct?

21  A.   That's correct.

22  Q.   But if the merger is allowed, you know Turner will be able

23  to do customer list matching using the AT&T's data, correct?

24  A.   So again, the question makes it sound like the merger is a

25  crucial part of making that happen, but that type of matching

1  could be arranged through a business relationship where

2  advertisers could have access to that data through a

3  partnership between Turner and AT&T.

4  Q.   Sorry to interrupt.

5      But back to the real world, that certainly hasn't happened

6  with Turner, right, today they're unable to do any customer

7  list matching today, true?

8  A.   Turner has not entered into those types of contracts and

9  offered that product.

10 Q.   And you don't know whether or not Professor Shapiro would

11 have taken this into account in his effort to model a merger

12 effects, right?

13 A.   No, I was focused on the revenue efficiencies that I

14 described.

15 Q.   Okay.  Let's spend a little more time discussing what

16 might change if Turner has access to AT&T's data, okay?

17     You agree that -- that programmers just in general, like

18 Turner, they need data to be able to sell this data driven

19 targeted advertising, right?

20 A.   That's correct.

21 Q.   And as a general rule, better data potentially allows for

22 better targeting, do you agree with that?

23 A.   That's right, the data needs to be better than what you

24 already have.

25 Q.   For example, first party set-top box data is generally

1  thought to be better for targeting than traditional Nielsen

2  ratings, right?

3  A.   So you said first party set-top box data, so I think

4  generally for what you're trying to do with this targeting

5  product is use data to more finely describe who's watching the

6  shows.  So did the companies like ComScore and Nielsen has now

7  acquired data set-top boxes, up to thirty million of them, and

8  matched them with Experian data, which allows you to figure

9  out -- plenty of data to figure out, you know, who's watching

10 which show, which then could be used to target ads.

11     So I think the distinction is that I'm -- that relates to

12 your question is you said that was first party data, set-top

13 box data, and I'm not sure that that's different.

14 Q.   Couple of things on that.

15     First of all, you didn't finish the ComScore/Nielsen

16 example.

17     Isn't it true that the data ComScore and Nielsen receive

18 and sell to programmers cannot, cannot be used for targeting

19 advertising today, true?

20 A.   So I'm not quite sure that's right.  So some of the

21 announcements that have been made about partnerships between

22 programmers like Fox and Turner with the ComScore for these

23 audience products are -- relate to using the data for our

24 targeted advertising.

25 Q.   Okay.  You know today Turner's unable to use any data from

1   ComScore or Nielsen to do targeted advertising, true?

2   A.   I think that was the case at the time of the documents

3   that I reviewed.  I actually, as I sit here, I don't know that

4   that's true today.

5   Q.   Okay.  So back to the original question.  As a general

6   rule let's -- I'll take out the word "first party," but set-top

7   box data is generally thought to be better for targeting than

8   traditional Nielsen rating data, right?

9   A.   So all of these datasets are similar.  They're panel

10  datasets where you're watching consumers and recording in some

11  way or another what the consumers are watching.  So the big

12  difference with the set-top box data is just that it's passive,

13  it's recorded, and it's sort of recorded, therefore, more

14  cheaply at larger scale.  So the data is roughly just the same

15  kind of data, it's not like it's, you know, qualitatively

16  different, it's showing who's watching which show, what they

17  watch next, and so on, just the set-top box data in principle

18  is bigger.

19  Q.   Okay.  And you know today Turner's data driven targeted

20  advertising relies on third party data, you know that today,

21  right?

22  A.   Yes, it relies on a variety of data sources that they've

23  acquired.

24  Q.   And you know Turner is having difficulty today selling its

25  data driven targeted advertising, you know that from reading

1    the deposition and from reading the trial testimony, right?

2    A.   So I think the analogous products are low single digit

3    share for both AT&T and for Turner.

4    Q.   Well, you didn't know that AT&T sells about twenty-two to

5    twenty-five percent of its advertisers through target and

6    advertising?

7    A.   So if you're counseling addressable, that's a separate

8    category.  So the data -- the product that's comparable to

9    Turner's product, the sort of data driven linear product.

10   Q.   Because Turner is not able to do addressable?

11   A.   It doesn't currently offer that product.

12   Q.   Okay.  And you read probably John Martin's testimony where

13   he explained that Turner's advanced targeting advertising

14   represents less then five percent of Turner's advertising

15   revenue, do you recall reading that?

16   A.   That sounds broadly correct.

17   Q.   And you know from reading the deposition, I think you

18   explained this in your deposition, that Turner believes it's

19   having difficulty selling its data driven targeting advertising

20   because it's based on third party data instead of first party

21   data, right?

22   A.   That characterization was in the testimony, also some of

23   the other documents talked about other reasons as well such as

24   difficulty with the market adoption or the advertiser's demand

25   for the product.

```
 1   Q.   Okay.  So now let's switch over to the AT&T side and

 2   discuss the type of data that Turner will be able to access if

 3   the merger is allowed.

 4       We know AT&T has a substantial amount of first party data,

 5   right?

 6   A.   Yes.

 7   Q.   Okay.  They -- and that's because AT&T has around

 8   twenty-five million television subscribers, right?

 9   A.   Yes.

10   Q.   And AT&T has about sixteen million broadband subscribers,

11   correct?

12   A.   Yes.

13   Q.   And AT&T has over a hundred million mobile subscribers,

14   right?

15   A.   Yes, although just to be clear, my report looked at these

16   advertising synergies in the merger planning document, and so

17   the set-top box data was the primary source of data for those

18   advertising synergies.

19   Q.   And you know that AT&T's data driven advertising product

20   sells at prices sixty percent higher than the ads that AT&T

21   sells just based on traditional Nielsen ratings, right?

22   A.   So the way that question is framed it makes it sound like

23   if you took an advertiser who was buying the regular product

24   that they would pay sixty percent --

25               THE COURT:  Don't worry about what it sounds like.
```

1   Answer the question.

2           THE WITNESS:  Okay.  So --

3           THE COURT:  You're not teaching a course here.

4   Answer the question.

5           THE WITNESS:  So the people who are buying the

6   targeted product are different than the people buying the

7   non-targeted product, and the prices are sixty percent higher

8   for the ones that are in the targeted product than the

9   non-targeted product.

10  BY MR. RAIFF:

11  Q.   Okay, so let's go back to my question.

12       You know that AT&T's data driven advertising product sells

13  at prices about sixty percent higher than ads that AT&T sells

14  just based on traditional Nielsen ratings, correct?

15  A.   That's an accurate description of the difference in the

16  CPMs of what they're selling.

17  Q.   And part of the reason you explained in your deposition,

18  part of the reason AT&T can charge advertisers a higher price

19  is because AT&T has more granular information about its

20  audiences compared to the traditional Nielsen rating, that's

21  true, right?

22  A.   The higher prices due to the finer demographics that are

23  offered for targeting.

24  Q.   Okay.  And it's because AT&T has more granular information

25  about its audience as compared to traditional Nielsen ratings,

1  do you agree with that?

2  A.   The data they're using is providing that more granular

3  targeting.

4  Q.   And you know Turner's data driven advertising product

5  today that it's offering only sells for about sixteen to

6  seventeen percent more than ads they sell based on traditional

7  Nielsen ratings, right?

8  A.   Again their -- there's a baseline on Turner that's based

9  on the types of advertisers they are selling there, and the --

10 there's a subset, a small subset that are buying this

11 additional product, and the prices on the additional product

12 are roughly sixteen percent higher in terms of who's buying

13 that and what they're buying today.

14 Q.   And if the merger goes through, Turner will have access to

15 the same first party data that AT&T is using today for its data

16 driven advertising product, correct?

17 A.   They could use that data or other data sources to create

18 the demographic categories that they'd like to sell.

19 Q.   Well, let's just stick to my questions, please.

20     If the merger goes through Turner will have access to the

21 same first party data that AT&T is using today for AT&T's data

22 driven advertising, true?

23 A.   I believe so.

24 Q.   Let's jump to a another topic, but related.

25     You talk about AT&T's selling its data to programmers,

1  right, you talked a little bit about that during your direct

2  examination, right?

3  A.   Yes.

4  Q.   Okay.  You know AT&T previously tried to sell its data to

5  programmers for advertising, right?

6  A.   It's a broad characterization of tried to sell, so they

7  didn't have an actual product that was ready to be negotiated

8  over, they had discussions with programmers about their

9  interest in buying such a product.

10 Q.   AT&T started this initiative to try to sell its data to

11 programmers back in 2015, correct?

12 A.   So when you're referring to 2015, I think you're referring

13 to the stages of product, the process where they were combining

14 the data with their carriage negotiations.

15 Q.   Please stick to my question.

16      MR. RAIFF:  Your Honor, I might need an instruction

17 or a little bit help.  But if you could, please, just try to

18 stick to my questions.

19 BY MR. RAIFF:

20 Q.   AT&T began this initiative to sell data back in 2015, do

21 you agree with that?

22 A.   They began an initiative.

23 Q.   And as of October 2016, AT&T had not successfully and had

24 not entered into any contracts to sell data to programmers,

25 true?

1  A.    That's correct.

2  Q.    And you pointed out in your deposition that the parties

3  seem to be really far apart on price, the bid ask breadth was

4  very large, do you recall discussing that in your deposition?

5  A.    Well, that's not exactly how I characterized it.

6  Q.    Do you recall discussing how when AT&T approached Disney,

7  for example, that AT&T estimated that Disney was spending about

8  seven million dollars annually on its data for advertising, do

9  you recall that?

10  A.    Yes.

11  Q.    And do you recall that AT&T estimated that its data was

12  worth about a hundred and sixteen million dollars to Disney, do

13  you recall that?

14  A.    Yes.

15  Q.    And you recall commenting on that big gap and how it would

16  be an awfully big change for a corporation like Disney to go

17  from spending seven million dollars to a hundred and sixteen

18  million dollars for data, do you recall that?

19  A.    Yes.

20  Q.    And that sounded very impractical to you, right, do you

21  recall that?

22  A.    It sounds like it might be difficult to walk into one

23  meeting and walk out with a signed contract because if you

24  hadn't even specified what you were selling.

25  Q.    And the inability to agree on a value or to agree on a

```
 1   price is a form of bargaining friction, you agree with that,

 2   right?

 3   A.   The -- I guess the friction comes from different beliefs

 4   about the value.

 5   Q.   Fair enough.

 6       And you read Mr. Welch's deposition where he testified

 7   about how their efforts to sell data to programmers was a

 8   failure, right?

 9   A.   Yes.

10   Q.   And you agree at your deposition that it appeared that the

11   data for programmers' initiative was unsuccessful, true?

12   A.   No, that's not how I would characterize what I described

13   in my deposition.  In my deposition I talked about how this was

14   an ongoing negotiation.  I described how there were initial

15   meetings where they said here's some data.  This is the kind of

16   data we can possibly sell you, we think that it has very high

17   value.  Are you interested?

18       I reviewed an internal document that gave the list of the

19   programmers that they were selling it to, with probabilities of

20   sale ranking from high and medium and so on, an email

21   describing that they were, in October that they were hopeful,

22   especially about Disney and Fox.  They did say that Turner had

23   a robust data solution already, so it was slightly lower on the

24   priority list.

25       And then my understanding is that when the merger was
```

1  announced that they decided to pursue a different strategy.

2  Q.   Let's turn to page 165 of your deposition and see exactly

3  what you said.

4     Remember we were talking about Mr. Welch's testimony, and

5  this was on page 165, starting on line 13.  And we were talking

6  about Mr. Welch testimony that the data for programmers was

7  unsuccessful.  And I asked you on line 13, page 165:

8           "You testified under oath that the data for

9           programmers' initiative was unsuccessful.  Are you

10           disputing that, is he lying," I asked?

11           And your answer:  Well, so no.  What I said was

12           that they did not sell data for programmers to a

13           customer prior to the merger, the merger."

14           And then you go on to say, "Which is consistent

15           with it being unsuccessful."

16     Do you see that?

17  A.   Yes.

18  Q.   And that's what you testified to at the time, right?

19  A.   I said that it's consistent with being unsuccessful, and I

20  also said that these were ongoing efforts, and the efforts had

21  not been stopped prior to the merger announcement, and which is

22  what I just summarized as a characterization of my testimony.

23  Q.   All right.  Let's wrap up this topic and go to one final

24  topic.  Just to be clear, AT&T did not reach any agreement with

25  any programmers to sell its data prior to the merger

1    announcement in late 2016, true?

2    A.   That's true.

3    Q.   And you're aware that after this data for programmers'

4    initiative or this effort, AT&T decided that a new programmatic

5    advertising platform with Time Warner merger could help AT&T

6    fully monetize its data, right?

7    A.   That was their general plan.

8    Q.   And you're aware that AT&T plans to keep all of the data

9    under one roof within its four walls as part of the

10   programmatic advertising platform, right?

11   A.   Yes.

12   Q.   And that's another potential benefit of the programmatic

13   platform being able to monetize AT&T's data with its own

14   platform within its own four walls rather than selling data to

15   programmers, right?

16   A.   Well, it's a form of selling because they would be

17   enabling programmers to -- and third party inventory providers

18   to access the data through the platform.

19   Q.   Well, you know from reading the materials that actually

20   the programmers are not going to be able to actually access the

21   actual data, you know that, right?

22   A.   Not the raw data.

23   Q.   Let's turn to a final topic, the content intelligence you

24   talked about.

25        You recall we discussed at your deposition how Netflix uses

1  data to make content decisions?

2  A.   We discussed that topic, yes.

3  Q.   Do you recall telling me that customer data is a valuable

4  asset for Netflix because it helps Netflix choose programs?

5  A.   I'm familiar with that general claim.

6  Q.   And, for example, consumer data provides Netflix with

7  information about which movie stars are popular to which

8  groups, and that helps Netflix in deciding what shows to buy

9  and what stars to put in shows, that's true?

10  A.   Broadly speaking, we don't have a quantification of the

11  extent or other sources of data that they use.

12  Q.   And you agree that data can be useful when a company is

13  making content decisions, true?

14  A.   It can be.

15  Q.   And set-top box data, for example, can help demonstrate

16  that people who like one type of show also typically like a

17  different type of show, you recall telling me that?

18  A.   Yes, so evidence that -- that some people find not useful

19  or the commercial products available with that kinds of type of

20  information in it.

21  Q.   And, in fact, as you explained yourself in the deposition,

22  this is the sort of information that can help inform scheduling

23  decisions, right?

24  A.   It could.

25  Q.   And after the merger, if it's allowed to go through, Time

```
 1  Warner will have access to AT&T's data, right?
 2  A.   Yes.
 3           MR. RAIFF:  No further questions, Your Honor.
 4           THE COURT:  Okay.  Redirect.
 5           MR. SCHWINGLER:  Just a few questions, Your Honor.
 6                      REDIRECT EXAMINATION
 7  BY MR. SCHWINGLER:
 8  Q.   Professor Athey, you were asked about whether after the
 9  merger Turner could offer addressable advertising, do you
10  recall that?
11  A.   Yes.
12  Q.   And is Turner addressable advertising a quantified synergy
13  in this case?
14  A.   No.
15  Q.   Before the break you were asked about whether competition
16  for Facebook and Google could benefit consumers, advertisers
17  and publishers, do you recall that question?
18  A.   Yes.
19  Q.   And your answer was "effective competition."  Do you
20  recall that?
21  A.   Yes.
22  Q.   Could you explain briefly for His Honor what you meant by
23  "effective competition" for the Google and Facebook advertising
24  platforms?
25  A.   Sure.  So at a high level more than eighty percent of
```

1   Google's revenue comes from search advertising, this is like

2   direct marketing, so you type "auto insurance" into Google and

3   an ad comes up for that.

4      That is very different than TV advertising, which is kind

5   of described as the top of the funnel, it's trying to get

6   people interested.  And so those two types of advertising are

7   not necessarily substitutes or competitors.

8      Just think about if you were going to send out a catalog

9   and you thought about how effective and cost effective will it

10   be to mail those catalogs.  If I've just run a great TV

11   campaign, then actually my ROM (sic) my catalogs would go up

12   wouldn't throw it in the garbage, but instead they might buy

13   from your catalog.

14      So TV is not really an effective competitor for a search

15   because, in fact, they sometimes go together in a positive way.

16      And then, you know, Facebook kind of sits in a different

17   part of the funnel where you're providing, you know, short

18   messages, maybe offers, trying to continue the conversation

19   with the consumer who may be broadly aware of the product are

20   also some direct marketing.

21      And so these are really different types of advertising and

22   advertisers thinks about this whole portfolio and how they go

23   together in making an effective campaign.

24      And so in terms of the TV market, search and Facebook are

25   pretty different.

1   Q.   And is AT&T's desire to compete with Google and Facebook

2   relevant to your opinions on merger specificity?

3   A.   No.   If we just think about the platform, a question would

4   be, you know, does the merger help this platform impede.   And

5   so if you thought, for example, that having a merger might make

6   it harder to get a broad set of competitors onto the platform,

7   that could make it harder to compete, but generally since the

8   merger is not necessary to make the platform successful, it

9   really doesn't -- the fact that Google and Facebook are out

10  there doesn't really change the analysis of merger specificity,

11  which is more about overcoming contracting friction in

12  different ways to make the platform.

13  Q.   And does this desire to compete with Google and Facebook

14  in any way validate or verify the calculations that AT&T put in

15  its version 41 merger planning document?

16  A.   Sure, so just I'll give an example of the platform, the

17  existence of competitors might increase the risk of success and

18  that could make things possibly more speculative.   But it

19  certainly doesn't help verify the magnitude that these

20  synergies will actually be attained.

21          MR. SCHWINGLER:   No further questions, Your Honor.

22          THE COURT:   Recross on the redirect?

23          MR. RAIFF:   No.

24          THE COURT:   You're excused.

25      (Witness excused.)

1          THE COURT:  See counsel.

2      (Sealed bench conference.)

3          THE COURT:  All right.  Over the last break we got

4  access to the transcript of the telephone call the other day.

5          And basically my clerk's notes and my recollection

6  basically were consistent with what we saw here.

7          These particular topics were off the table four, six and

8  seven, three, averaging up to three years didn't really amount

9  to much.  No big deal to the defendants.

10     The big issue is this one here, the MVDs so I think you

11  kind of come back to where we started.  You know, coming up

12  with new opinions or new schematics and diagram is stuff beyond

13  what I think really is fair under the circumstances.  That

14  doesn't mean he can't be confronted, should be confronted with

15  criticisms slash disagreements that have been set forth by

16  other experts.  It's a chance to explain them.  Give his

17  version of things.

18     I think going off into the new formulating opinions and

19  schematics and diagrams.  A new regression now.

20          MR. CONRATH:  I don't think there's any regression.

21          THE COURT:  No, okay.

22          MR. PETROCELLI:  Well, Your Honor, there was all

23  kinds of new calculations, and we have no ability to get

24  underneath them or understand them, and those are all set forth

25  in those new graphics.  And so my understanding is that that is

1   out of bounds.

2         MR. CONRATH:  I think you're right.  If I might

3   respond. My recollection is it was involved this addition, and

4   we gave work papers on Saturday, made perfectly clear

5   everything is involved in those.

6         MR. PETROCELLI:  Completely new and different

7   calculations of harm on the last day of trial, Your Honor, with

8   no ability to respond.  And that went way beyond what we

9   discussed, okay.

10        MR. CONRATH:  Sure, the only point of those was to

11  explain why the attack on him as being wrong is not justified

12  because, in fact, his calculations are conservative.  The

13  specific attack that was made, his response is he said, look,

14  the wrong -- the right, I think the criticism included the

15  proposition that the long-term customer is the one who's saved

16  and his or her value is what's relevant.  He made an addition

17  to say, look, you can see this, and this is the long-term value

18  if you don't include the acquisition cost because of the

19  customers already acquired.  It's nothing more complicated than

20  that.

21        MR. PETROCELLI:  Your Honor, he has already said all

22  of that.  He said that his numbers which are outdated and not

23  current in his view are understated.  He's already given that

24  testimony, and now he's trying to do is go in and come up with

25  new numbers and calculate new harm, and that's way out of

1    bounds.  We would have to call another expert to demonstrate

2    why those numbers are foolish.

3            THE COURT:  You're not going to have to do that

4    because I'm not going to let him spin off into that direction.

5    So all right.  So he can testify to the -- his response to the

6    criticisms and testify to the agreements people have.  I don't

7    want him propounding new schematics and diagrams.

8            MR. CONRATH:  Okay, okay, understood.  So I think

9    part of his explanation of why these, in response to that, if

10   he can explain, tell me if I'm wrong.  He can explain why he

11   concludes that his number is conservative without calculating

12   that, but explaining in principle or broad strokes.

13           THE COURT:  The opinions that he's already given.  He

14   gave them.

15           MR. PETROCELLI:  He gave that opinion.

16           THE COURT:  He gave them in his report.  It's an

17   opinion he gave in his deposition.  It's an opinion he gave in

18   his report.  It's an opinion he gave when he was on the stand.

19   That's all fair game.  It's going off into other things, that's

20   where the problem starts.

21           MR. CONRATH:  Okay.

22           THE COURT:  I think at this late hour.

23           MR. PETROCELLI:  And running numbers too.

24           MR. CONRATH:  So I think I understand.  What he's

25   explaining is principally he outlined in his report.  He is

1  explaining why the criticism he got to which this is a response

2  is correct.  And as long as he doesn't calculate a new number

3  explaining the principle of why he's correct is what he ought

4  to be doing on rebuttal.

5          MR. PETROCELLI:  I don't have a problem with that

6  because he's already said that, Your Honor, but he can repeat

7  it if he wants to.

8          MR. CONRATH:  And may I address sort of the two other

9  questions?  If I can -- there's only one principle, and I did

10  discuss this in our phone call on Friday.  This is not a new

11  opinion, but there's an economic principle that he has to

12  explain the difference between fixed and variable.  It's not a

13  new opinion, but it wasn't relevant until we heard the

14  defendant's responsive efficiencies case.

15          THE COURT:  Is it in his report?

16          MR. CONRATH:  Absolutely, it was in his report.  And

17  we cited the place and it's in his report in the supplemental

18  report we gave the defendants.

19          MR. PETROCELLI:  Oh, no, no, no, it's not in his

20  original report, Your Honor.

21          MR. CONRATH:  Absolutely it is.

22          MR. PETROCELLI:  Show me where it is.  Are you

23  talking about --

24          MR. CONRATH:  We cited it in --

25          MR. PETROCELLI:  The difference between fixed and

1  variable.

2          MR. CONRATH:  We cited and referenced exactly the

3  pages where it is in his  report that we delivered.

4          MR. PETROCELLI:  Here's the problem, Your Honor.  He

5  testified in his deposition under oath in this trial that he

6  has nothing to do with efficiencies, nothing except elimination

7  of double marginalization.  And he's relying entirely on

8  Quintero, okay?

9          Now he wants to come back after Quintero was

10  cross-examined and give testimony on fixed versus variable

11  costs.  It's way outside the scope of anything in Dr. Carlton's

12  testimony, and it's not -- it's something he took himself.  And

13  that's why you have an X there.  He took himself out of play on

14  that issue.

15          MR. CONRATH:  He took -- he's not addressing the

16  question of whether a cost is fixed or variable.  It's a narrow

17  question, which is only relevant after we heard their defense.

18  So it would not have been relevant for him to express in his

19  direct testimony.  That is to say that economists explain that

20  variable costs are ones that should be counted fixed costs.

21  That's all there is, but it's an important economic principle

22  that is perfectly appropriate for him to explain as a rebuttal.

23          THE COURT:  What was the criticism aimed at him that

24  he's responding to?

25          MR. PETROCELLI:  None.

```
1          MR. CONRATH:  So this one is not a criticism relating

2   to him.  They brought in an efficient, efficiencies is not part

3   of our original case.  They brought in an affirmative defense

4   on efficiencies.  We responded to that in two ways:

5          One, the testimony we've heard today there's behind that

6   is one principle, which is that variable costs are relevant to

7   efficiencies and we'll get to consumer's fixed costs are not

8   relevant to efficiencies and we'll get to consumers.  Those two

9   sentences are all that he needs to say, but they are not part

10  of his initial response.  They are a response to defendant's

11  efficiencies affirmative defense.  They're just explaining why

12  what Mr. Quintero --

13          THE COURT:  You want to ask him in one question.

14          MR. CONRATH:  Absolutely, one question.

15          THE COURT:  You pointed out in your report the

16  following.  This is this and this is this.  Is that correct?

17  Yes, end of discussion.

18          MR. CONRATH:  That is all that is necessary, Your

19  Honor.

20          THE COURT: End of discussion.  Go ahead.

21          MR. CONRATH:  I just have one more question.  I want

22  to make sure we're doing this the way Your Honor wants.

23          We would like to use some demonstratives that will

24  help -- what he's going to do is say you are criticized by

25  Professor Carlton to say this, what's your answer to that?
```

1          THE COURT:  He can use the same demonstratives he

2   used when he was on the stand before.  No new demonstratives.

3   Same as before.  You've got one hour, 10:30 to 11:30 fifteen

4   minute break.  You all have one hour, no more than that, 11:45

5   to 12:45.  And then if there's redirect and recross, seven and

6   a half minutes each.  That's all you're getting.

7          MR. CONRATH:  Okay.

8          THE COURT:  I have to catch a train.

9          MR. CONRATH:  Do you want to hear argument about the

10  DirecTV, Your Honor.

11         THE COURT:  No, but I'm not going to grant it.  I

12  don't think -- I think it's a closer call than I thought it

13  might be, but I just don't think really under the totality of

14  the circumstances it makes sense to grant it.

15         MR. PETROCELLI:  I was going to suggest that you

16  defer it until your final ruling.

17         THE COURT:  I could, you know, I mean, but I think in

18  fairness to the parties, I don't think you should be expecting

19  that I'm going to grant it or they should be expecting I'm

20  going to grant it or the other way around.

21          What I do, however, think is that on the trial brief,

22  each side should devote at least five pages.  Well, up to five

23  pages on their thoughts on what, if any, remedial decisions by

24  the Court could be sensible or whatever under the circumstances

25  depending upon how the Court rules.

1         So I don't want to be -- I don't want to wake up weeks

2   from now and say, geez, I wish I had thought about what remedy

3   steps I could take here that might make sense as opposed to

4   blocking it or not blocking it.  I don't know if what other

5   options there might be.  Since the law seems to provide me a

6   very wide range of discretion.

7              MR. PETROCELLI:  Be happy to do that.

8              MR. CONRATH:  Up to five pages, we'd be happy to do

9   that.

10             THE COURT:  I'll keep it under five.  Obviously we've

11  talked about some of these things.  We talked about

12  arbitration, we talked about that.  We talked about some of

13  these other things.  But I think it would be helpful to have

14  your thoughts of the parties of remedial steps.

15             MR. CONRATH:  Sure, sure.  We'd be glad to do that,

16  Your Honor.

17             MR. PETROCELLI:  Okay, thank you.

18             MR. CONRATH:  Is that it?

19             THE COURT:  Anything else?

20             MR. PETROCELLI:  No, that's it, Your Honor.  Take

21  care.

22      (Open court.)

23             **THE COURT:**  All right, we'll stand in recess until

24  10:30 tomorrow morning.  We'll be going until one o'clock

25  tomorrow.

1          (Trial adjourned at 5:09 p.m.)

2                              -oOo-

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2          I certify that the foregoing is a true and correct

3 transcript, to the best of my ability, of the above pages, of

4 the stenographic notes provided to me by the United States

5 District Court, of the proceedings taken on the date and time

6 previously stated in the above matter.

7          I further certify that I am neither counsel for, related

8 to, nor employed by any of the parties to the action in which

9 this hearing was taken, and further that I am not financially

10 nor otherwise interested in the outcome of the action.

11

12 _____          _____

/s/Crystal M. Pilgrim, RPR,FCRR      Date:  April 24, 2018
13

14

15

16

17

18

19

20

21

22

23

24

25